1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE OF WASHINGTON , | CASE NO. 3:17-cv-05806-RJB |
| Plaintiff, | ORDER ON GEO'S MOTION TO DISMISS COMPLAINT |
| v. | |
| THE GEO GROUP, INC., | |
| Defendant. | |

THIS MATTER comes before the Court on Defendant The GEO Group, Inc.'s Motion to Dismiss Complaint. Dkt. 10. The Court has considered Defendant's motion, Plaintiff State of Washington's Response, Defendant's Reply, the Complaint, and the remainder of the file herein. Dkts. 1-1, 17, 18. The Court also considered oral argument held in open court on November 20, 2017.

This case centers on the compensation of detainees at the Northwest Detention Center, a facility Defendant operates in Tacoma, Washington, under a contract with United States Immigration and Customs Enforcement (ICE), a division of the Department of Homeland

Security. Defendant uses detainees to assist in operating the facility under a Voluntary Work Program, and in exchange for their work, Defendant compensates detainees $1 per day.

Plaintiff filed this[1] action "to enforce Washington's minimum wage laws and to remedy the unjust enrichment" from Defendant's "long standing failure to adequately pay immigration detainees[.]" Dkt. 1-1 at ¶1.1. Defendant's Fed. R. Civ. P. 12(b)(6) motion seeks dismissal on four primary grounds: (1) the State's claims are preempted by federal law, (2) the State lacks authority to bring this lawsuit, (3) the State fails to state a claim for unjust enrichment and violations of the Washington Minimum Wage Act, and (4) the State's unclean hands and laches bar relief. Dkt. 10.

## I.   BACKGROUND

A.   The Complaint.

The following facts alleged in the Complaint are taken as true for purposes of Defendant's motion.

Defendant is a private corporation that has owned and operated the Northwest Detention Center, a 1,575 bed facility, since 2005. Dkt. 1-1 at ¶¶3.8, 3.9. ICE contracts with Defendant for the detention of adult detainees awaiting resolution of immigration matters. *Id*. at ¶3.10 Defendant relies upon detainees for a wide range of services, including laundry service, cleaning general living spaces, buffing floors, and painting. *Id*. at ¶4.2. Defendant compensates detainees at $1 per day, but Defendant has in some cases alternatively compensated detainees with more or better food. *Id*. at ¶¶4.4, 4.5. Since 2005 Defendant has received the benefit of this $1 per day labor without the financial burden of paying the State minimum wage, currently set at $11 per hour. *Id*. at ¶¶3.6, 4.9.

---

[1] *See* companion case, *Chen v. The GEO Group, Inc.*, No. 3:17-cv-5769 (W.D.Wash. Sept. 26, 2017).

ORDER ON GEO'S MOTION TO DISMISS COMPLAINT - 2

1    The Complaint alleges that Plaintiff has a "quasi-sovereign interest in protecting the

2  health, safety, and well-being of [Washington] residents [ ] includ[ing] . . . harms to their own

3  and Washington's economic health." Dkt. 1-1 at ¶¶3.3, 3.4. Further, it is alleged, "[t]he

4  enforcement of minimum wage laws is of preeminent concern to the people of Washington," and

5  "[t]he Legislature enacted minimum wage laws to protect Washington workers" as well as to

6  "safeguard 'the immediate and future health, safety and welfare of the people of the state.' *Id*. at

7  ¶3.5, citing RCW 49.46.005(1).

8    The Complaint alleges two causes of action, unjust enrichment and violations of

9  Washington's Minimum Wage Act. Dkt. 1-1 at ¶¶5.1-6.6. Plaintiff seeks an order requiring

10  Defendant to disgorge its unjust enrichment from the failure to adequately pay detainees. *Id*. at

11  ¶¶7.5, 7.6. Plaintiff also seeks declaratory relief that Defendant is an "employer" that must

12  comply with the State's minimum wage laws when managing detainee-workers, who are

13  "employees," and injunctive relief that Defendant be enjoined from paying detainee-workers less

14  than the State minimum wage. *Id*. at ¶¶7.1-7.4.

15    B.  Extra-pleadings.

16    Defendant operates the Northwest Detention Center by "a complex statutory, regulatory,

17  and contractual relationship" with ICE. Dkt. 10 at 9. The contract central to the Defendant-ICE

18  relationship ("the Contract"[2]) sets out terms for a ten-year operation of the facility. Dkt. 19 at 47.

19  The Contract requires of Defendant, *inter alia*, that "[d]etainee labor shall be used in accordance

20  with the detainee work plan developed by the Contractor, and will adhere to the ICE PBNDS

21  [Performance-Based National Detention Standards] on Voluntary Work Program." *Id.* at 86. *See*

22

23  [2] Only a redacted version of the Contract has been considered, because the full contract, which redacts pricing information, is not part of the record. *See* Dkt. 19. Whether the Contract should be sealed, redacted, or produced in full is the subject of a pending motion. Dkt. 20.

24

ORDER ON GEO'S MOTION TO DISMISS COMPLAINT - 3

1   *also*, *id.* at 49. Further, "the detainee work program shall not conflict with any other

2   requirements of the contract and must comply with all applicable laws and regulations." *Id.*

3        The Voluntary Work Program articulates standards, *inter alia*, prohibiting discrimination,

4   accommodating disabilities, limiting work to "8 hours daily, 40 hours weekly," and

5   compensating detainees. 2011 Performance-Based National Detention Standards, Section 5.8,

6   Voluntary Work Program, available online at http://www.ice.gov/detention-standards/2011/ (last

7   accessed Dec. 3, 2017). The detainee compensation provision of the Voluntary Work Program

8   states:

9        Detainees shall receive monetary compensation for work completed in accordance with
         the facility's standard policy. The compensation is at least $1.00 (USD) per day. The
10        facility shall have an established system that ensures detainees receive the pay owed them
         before being transferred or released.

11  *Id.*

12  **II.   STANDARD UNDER FED. R. CIV. P. 12(B)(6)**

13       Fed. R. Civ. P. 12(b) motions to dismiss may be based on either the lack of a cognizable

14  legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri*

15  *v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990). Material allegations are taken

16  as admitted and the complaint is construed in the plaintiff's favor. *Keniston v. Roberts*, 717 F.2d

17  1295 (9th Cir. 1983). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

18  need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement

19  to relief requires more than labels and conclusions, and a formulaic recitation of the elements of

20  a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007)

21  (internal citations omitted). "Factual allegations must be enough to raise a right to relief above

22  the speculative level, on the assumption that all the allegations in the complaint are true (even if

23

24

1   doubtful in fact)." *Id.* at 555. The complaint must allege "enough facts to state a claim to relief

2   that is plausible on its face." *Id.* at 547.

3       Where a state law claim is preempted by federal law, dismissal may be granted under

4   Fed. R. Civ. P. 12(b)(6). *E.g., Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1225 (9th Cir.

5   2005) (affirming dismissal of state law claims preempted by ERISA).

6   **III.   PREEMPTION**

7       A.   Preemption generally.

8       The Supremacy Clause provides that the laws of the United States "shall be the supreme

9   Law of the Land[,] . . . anything in the Constitution or Laws of any State to the Contrary

10  notwithstanding." U.S. Const. art. VI, cl. 2. Federal law can preempt state law in three ways: (1)

11  express preemption, (2) field preemption, or (3) obstacle/conflict preemption. *Nat'l Fed'n of the*

12  *Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016). "Regardless of the type of

13  preemption involved—express, field or conflict—the purpose of Congress is the ultimate

14  touchstone of pre-emption analysis." *Id.*

15      Analysis "starts with the basic assumption that Congress did not intend to displace state

16  law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This presumption applies in "all pre-

17  emption cases, and particularly in those in which Congress has legislated . . . in a field which the

18  States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal

19  quotations and citations omitted). "[L]abor standards fall[] within the traditional police power of

20  the State." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987). *See also*, RCW

21  49.46.005(a). The party seeking to set aside state law bears the burden to show preemption.

22  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 634 (2011).

23      B.   Express preemption.

24

ORDER ON GEO'S MOTION TO DISMISS COMPLAINT - 5

1    Express preemption applies where Congress explicitly states its intent to preempt state

2    law in the language of a statute. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

3    Where Congress has expressed an intent to preempt state law, the scope of the preemption is

4    determined by examining congressional intent, beginning with the legislative text, "which

5    necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v.*

6    *Easterwood,* 507 U.S. 658, 664 (1993). Courts also consider the "statutory framework," as well

7    as the "structure and purpose of the statute as a whole." *Lohr*, 518 U.S. at 486 (1996). "[W]hen

8    the text of a pre-emption clause is susceptible of more than one plausible reading, courts

9    ordinarily accept the reading that disfavors pre-emption. *Altria Group, Inc. v. Good*, 555 U.S. 70,

10   77 (2008) (internal quotations and citations omitted).

11   Defendant points to §1324a(h)(2) of the Immigration Reform and Control Act (IRCA) as

12   expressly preempting the State minimum wage provision. Dkt. 10 at 20; Dkt. 18 at 7-9. Through

13   IRCA, Congress created "a comprehensive scheme prohibiting the employment of illegal aliens

14   in the United States." *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 147 (2002);

15   §1324a(a). The sole preemption provision under IRCA, §1342a(h)(2), prevents state and local

16   governments from "imposing civil or criminal sanctions (other than through licensing and similar

17   laws) upon those who employ . . . unauthorized aliens." §1324a(h)(2).

18   At issue is how broadly to define the term "sanction" under §1324a(h)(2). According to

19   Defendant, the term should be broadly construed to include disgorgement, particularly because a

20   finding that Defendant is an "employer" would expose Defendant to liability for double damages

21   and attorneys fees. Dkt. 18 at 14. Plaintiff argues that because employing unauthorized aliens is

22   the act that IRCA sanctions, only state laws imposing sanctions for that conduct fall within

23   IRCA's express preemption clause. Dkt. 17 at 23, citing to *Chamber of Commerce of the U.S. v.*

24

*Whiting*, 563 U.S. 582, 600 (2011) (holding that "IRCA expressly preempts some state powers dealing with the employment of unauthorized aliens and it expressly preserves others.")

Both parties agree that §1324a(h)(2) is an express preemption statute. There are no other express preemption provisions under IRCA, so the key question is what Congress intended for §1324a(h)(2) to preempt. Section 1324a(h)(2) prohibits states from imposing civil or criminal sanctions "upon those who employ . . . unauthorized aliens[.]"  Put differently, states cannot penalize employers for employing unauthorized aliens. Even if, as Defendant argues, the provisions of the Washington Minimum Wage Act are construed as "sanctions," they would not be imposed on account of employers hiring unauthorized aliens, but rather because of the failure to pay the prevailing minimum wage. *See* RCW 49.46.020. Indeed, the Washington Minimum Wage Act nowhere mentions immigration status, aliens, or any related term. *See* RCW 49.46 *et seq*. Section 1324a(h)(2) does not preempt the State minimum wage provision.

In defense of its view that the term sanction should interpreted broadly to include lost wages, attorneys fees, and costs, Defendant relies on *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010). Dkt. 18 at FN 41. In *Edmondson*, the court analyzed an Oklahoma statutory scheme (now-repealed) that "subject[ed] employers to cease and desist orders, reinstatement, <u>back pay</u>, costs, and attorneys' fees" for hiring unauthorized aliens, concluding that "[s]uch impositions . . . fall within the meaning of §1324a(h)(2) sanctions." *Id*. (emphasis added). *Edmondson* is inapposite. Even if *Edmondson* was binding precedent, analysis of the term "sanction" was done in the context of a preliminary injunction, with focus on the likelihood—and not the actual merits—of whether the Oklahoma law would be preempted. More importantly, the mention of back pay was dicta and had no bearing on the holding of the case. The court focused on the attempt by the Oklahoma legislature to create a work authorization

program that excluded unauthorized aliens from employment, which falls squarely within what §1324a(h)(2) precludes states from doing.

Defendant has not shown that the State minimum wage provision is expressly preempted.

C. Field preemption.

"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. U.S.*, 567 U.S. 387, 399 (2012). Congressional intent to displace state law can be inferred from either "a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws," or where "a framework of regulation [is] so pervasive . . . that Congress left no room for the States to supplement it[.]" *Id.*, citing to *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)(internal quotations omitted). "The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." *Hillsborough Cty, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985). "Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive," but rather, courts consider "evidence [of] a desire to occupy a field completely." *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 149 (1986).

Defendant argues that "uniformity of detention programs" is a dominant federal interest precluding enforcement of the State minimum wage laws. Dkt. 10 at 22. Defendant cites to *Arizona*, 567 U.S. at 402, but *Arizona* nowhere identified uniformity of detention programs as a dominant federal interest. *See id.* at 402-03 ("with respect to the subject of alien registration, Congress intended to preclude States from complementing the federal law, or enforcing additional or auxiliary regulations[.]") Defendant's argument further misses the mark by defining

the pertinent area of regulation as detention programs. Recent Ninth Circuit precedent has emphasized "the importance of delineating the pertinent area of regulation with specificity before proceeding with the field preemption inquiry." *Nat'l Fed'n of the Blind*, 813 F.3d at 734. Here, the pertinent area of regulation for examination is detainee wages.

Defendant argues that through IRCA Congress created a pervasive framework of regulation intended to displace State law. Dkt. 10 at 20, 21. The most to be gleaned about congressional intent for a framework regulating detainee wages at the expense of State law can be found in 8 U.S.C. §1555(d). Section 1555(d) authorizes congressional appropriations for "payment of allowances [to detainees] . . . for work performed," but payment is limited to "such rate <u>as may be specified</u> from time to time <u>in the appropriation Act</u> involved." §1555(d) (emphasis added).  Under this section, Congress arguably speaks to detainee wages when Congress appropriates payment of allowances to detainees for work performed, but although §1555(d) is still in effect, Congress has not specified any rate for detainee work since fiscal year 1979. At that time, Congress appropriated funds for "payment of allowances (at a rate <u>not in excess of</u> $1 per day) . . . for work performed." PL 95–431 (HR 12934), PL 95–431, Oct. 10, 1978, 92 Stat 1021 (emphasis added). At least since fiscal year 1979, Congress has abandoned direct appropriations for payment of allowances, despite its awareness of how to do so. *See, e.g.,* Consolidated Appropriations Act, 2016, PL 114-113, December 18, 2015, 129 Stat 2242, 2497. From the text of §1555(d), Defendant has not shown that Congress intended to preempt state law regarding detainee wages.

Defendant has offered no satisfactory explanation for the congressional silence since 1979 other than to make general representations about congressional delegation of authority to ICE to create a comprehensive regulatory scheme, e.g., through the Voluntary Work Program.

1    Dkt. 18 at 15. The Voluntary Work Program is an ICE policy with no preemptive force at law.

2    As argued in the companion case, if ICE intended the Voluntary Work Program to preempt state

3    law on the issue of detainee wages, ICE would need to follow at least two sets of requirements.

4    ICE, like all federal agencies, is subject to Executive Order 13132, which requires agencies to

5    follow specific rules when intending to preempt state law through agency policy. Federalism, 64

6    FR 43255, E.O. 13132 (1999). For agency policy to have the force of law, agency rule-making

7    processes must also approach at least the spirit of Administrative Procedure Act (APA)

8    formalities. *See United States v. Mead*, 533 U.S. 218 (2001) and its progeny. Defendant has

9    made no showing that ICE made efforts to observe either set of requirements when creating the

10   Voluntary Work Program, so the ICE policy should not be viewed as a comprehensive regulatory

11   scheme with the legal force to preempt state law.

12        In summary, Congress has not chosen to occupy the field of detainee wages. There is no

13   showing that Congress intended for its general appropriations after 1979 to delegate to ICE the

14   authority to preempt state law as to detainee wages. ICE policy on detainee wages, specifically,

15   the Voluntary Work Program, does not show a clear agency intent to preempt state law, where

16   there is no showing that ICE attempted to observe formalities that underlie its authority to do so.

17        Defendant has not shown that the State minimum wage provision is field preempted.

18        D.  Conflict/obstacle preemption.

19        Conflict preemption exists "where it is impossible for a private party to comply with both

20   state and federal requirements," and obstacle preemption exists "where state law stands as an

21   obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

22   *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990). Defendant argues that the State's

23

24

minimum wage provision is preempted by both conflict and obstacle preemption. Dkt. 10 at 23, 24.

On conflict preemption, Defendant argues in its Reply that IRCA, which prohibits the hiring of unauthorized aliens, and the State's minimum wage provision, which would require Defendant to treat detainee-workers as "employees" deserving the State minimum wage, are in conflict, making it impossible for Defendant to comply with both. Dkt. 18 at 16. "[H]iring virtually any detainee" would violate IRCA, Defendant opines. *Id*. Defendant's conflict preemption argument is premature, because it relies on factual determinations about the status of detainees. Defendant has challenged the pleadings under Fed. R. Civ. P. 12(b)(6), which means that the Court must resolve the motion based on allegations in the Complaint. *See* Dkt. 1-1.

Regarding obstacle preemption, Defendant points to the obstruction of several federal objectives and purposes: increased costs to ICE, and, ultimately taxpayers; a "balkanized patchwork" of state laws; and the undermining of ICE's authority to care for detainees and enforce the Contract. Dkt. 10 at 23, 24; Dkt. 18 at 16. Defendant's obstacle preemption argument is also premature, because addressing whether the federal objectives and purposes will be obstructed would require resolution of factual determinations far beyond the pleadings.

In sum, the conflict/obstacle preemption issues may become ripe at summary judgment or at trial, but at present factual issues abound that preclude a decision based on the pleadings, and before discovery. Defendant has not shown that the State minimum wage provision is conflict or obstacle preempted.

Admittedly, at first blush the issue of preemption would seem to favor Defendant, given the long history of federal legislation and agency action in the area of immigration detention generally. After peeling back the rhetoric and examining the actual statutes and regulations, on

1   the issue of detainee wages, an area of traditional state prerogative, the Court cannot find

2   evidence of congressional intent—either express or implied—sufficient to overcome the

3   presumption against preemption. Defendant's motion to dismiss based on preemption should be

4   denied.

5   **IV.     AUTHORITY OF THE STATE OF WASHINGTON TO BRING LAWSUIT**

6         The doctrine of *parens patriae* allows states to bring suit on behalf of their citizens.

7   *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600-01 (1982). "States are not normal

8   litigants for the purposes of invoking federal jurisdiction," and have interests and capabilities

9   beyond those of an individual by virtue of their sovereignty. *Massachusetts v. EPA,* 549 U.S.

10  497, 127 S.Ct. 1438, 1454 (2007). States can bring actions *in parens patriae* where there they

11  have (1) a quasi-sovereign interest, (2) an interest apart from the interests of private parties, and

12  (3) injury to a sufficiently substantial segment of their population. *Id*. at 607.

13         A.  Quasi-sovereign interest.

14         Quasi-sovereign interests "consist of a set of interests that the State has in the well-being

15  of its populace." *Snapp*, 458 U.S. at 602. Put differently, "[a] quasi-sovereign interest must be

16  sufficiently concrete to create an actual controversy between the State and the defendant." *Id*.

17  There is no "exhaustive formal definition nor a definitive list of qualifying interests," but quasi-

18  sovereign characteristics "fall into two general categories[,]" one relevant here, "a quasi-

19  sovereign interest in the health and well-being—both physical and economic—of its residents in

20  general." *Id*. at 607.

21         Applied here, Plaintiff's quasi-government interest falls under the health and well-being

22  category recognized by *Snapp*. Within that category, Plaintiff seeks to enforce the State

23  minimum wage laws to "protect Washington workers," which includes both detainee-workers

24

ORDER ON GEO'S MOTION TO DISMISS COMPLAINT - 12

1   and Washington resident-workers. *See* Dkt. 1-1 at ¶¶3.3, 3.4, 3.5. This purpose is consistent with

2   the legislative purpose found in the preamble to the State Minimum Wage Act, to "encourage

3   employment opportunities within the state," RCW 49.46.005, whereas Defendant's alleged

4   failure to observe the State minimum wage has allegedly enriched Defendant at the expense of

5   detainee-workers and Washington resident-workers *See Id*. ¶¶3.5, 4.1, 4.2, 4.4, 4.9.

6          B.   Interest apart from the interests of private parties.

7          "[T]o maintain [a *parens patriae*] action, the State must articulate an interest apart from

8   the interest of particular parties, *i.e.*, the State must be more than a nominal party." *Snapp*, 458

9   U.S. at 607. Here, the State is more than a nominal party, because its alleged interests extend

10  beyond the individual interest of the parties. This becomes evident by comparing outcomes

11  between this case and the companion case if the respective plaintiffs were to prevail. In this case,

12  beyond seeking disgorgement for unjust enrichment, Plaintiff also seeks declaratory relief, that

13  Defendant is an "employer" that must pay the State minimum wage to detainee-workers who are

14  "employees," and injunctive relief enjoining Defendant from paying detainee-workers less than

15  the State minimum. Dkt. 1-1 at ¶¶7.1, 7.2, ¶7.4. By comparison, the plaintiff in the companion

16  case, Mr. Chao Chen, has not—and could not—seek injunctive relief, because he is no longer

17  detained. Plaintiff has a distinct interest as a sovereign and is not a nominal party.

18         C.   Injury to sufficiently substantial segment of Washington population.

19         There are no "definitive limits on the proportion of the population . . . that must be

20  adversely affected by the challenged behavior." *Snapp*, 458 U.S. at 607. The Complaint alleges

21  an injury to a sufficiently substantial segment of the State. It is alleged that since 2005 Defendant

22  has simultaneously housed up to 1,575 individuals at the Northwest Detention Center and that

23  compensating detainee-workers below the State minimum wage effects both detainee-workers

24

and workers in the general population. *See* Dkt. 1-1 at ¶¶3.5, 3.9. A more exact, quantifiable number of adversely affected proportion of the population should not be required at this stage.

Defendant argues that Washington's citizens have rejected the idea that federal detainees should be "supported at taxpayer expense" and points to a 2007 ballot initiative. Dkt. 10 at 5. The initiative, which Defendant represents received more than 60% approval from voters, apparently addressed the applicability of the State minimum wage to state inmates. Support for the initiative, Defendant argues, shows that the current vast majority of Washington residents reject the applicability of the State minimum wage to civil detainees at a federal facility. Defendant extends its argument beyond the pleadings, and the initiative did not address federal detainees. This argument lacks merit.

D.   *Parens patriae* challenge brought under Fed. R. Civ. P. 12(b)(6).

Defendant brings its challenge to Plaintiff's *parens patriae* authority under Fed. R. Civ. P. 12(b)(6). Dkt. 18 at 9. *Parens patriae* is a doctrine that originated from concerns about standing. *See Snapp*, 458 U.S. at 600-07. *See also*, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017). Framing *parens patriae* as a Fed. R. Civ. P. 12(b)(6) issue lacks support at law. Defendant cites two cases as authority to bring its *parens patriae* challenge under Fed. R. Civ. P. 12(b)(6), *In re TFT-LCD (Flat Panel) Antitrust Litig*., 2011 WL 3475408, at *6 (N.D. Cal. 2011), and *Confederated Tribes of Colville Reservation v. Anderson*, 903 F. Supp. 2d 1187 (E.D. Wash. 2011). Dkt. 10 at 4; Dkt. 18 at 9. In both cases, a cursory glance at the opinions' structure and organization could lend credence to Defendant's approach. Upon closer examination, language used in the courts' analysis does not suggest that either court intended to analyze *parens patriae* under Fed. R. Civ. P. 12(b)(6), but rather shows consideration of the pleadings' sufficiency as to standing. *See id. See also*, *Harris*, 847 F.3d at 656. However, even if

framing *parens patriae* as a Fed. R. Civ. P. 12(b)(6) issue did not lack support at law, analyzing the State's *parens patriae* authority through the lens of the pleadings' plausibility would not, in this case, result in dismissal. *See discussion above*.

In sum, Plaintiff has authority to bring this case as *parens patriae*. Defendant's motion to dismiss challenging Plaintiff's authority to bring this lawsuit should be denied.

## V.   FAILURE TO STATE A CLAIM

   A.   Unjust enrichment.

Defendant makes three primary arguments attacking the plausibility of the unjust enrichment claim.

Defendant first attacks the unjust enrichment claim because of the failure to allege that detainees' work is involuntary. Dkt. 10 at 29. Defendant represents that the two elements for an unjust enrichment claim are that (1) the enrichment of the defendant is unjust, and (2) the plaintiff is not a mere volunteer, Dkt. 10 at 29, citing to *Lynch v. Deaconess Med. Ctr.*, 113 Wn.2d 162, 165 (1989). It is not clear that "involuntariness" is an element to an unjust enrichment claim. *Compare Lynch*, 113 Wn.2d at 165; *Young v. Young*, 164 Wn.2d 477, 485 (2008). Assuming that "involuntary" must be alleged in the pleadings, the Court can infer that detainees' participation was involuntary from the alleged circumstances, where detainees are housed at a private immigration detention center, Defendant has compensated detainees at $1 per day since 2005, regardless of hours worked, and Defendant has financially benefited from the work without the financial burden of paying the State minimum wage. Defendant argues that the Voluntary Work Program cannot be involuntary because it is voluntary by design, a conclusion that Defendant says is reinforced by a waiver signed by detainees affirming their voluntary participation. *Id*. This reasoning relies upon factual findings beyond the scope of the pleadings.

Defendant's second argument avers that the Complaint fails to allege that detainees had a reasonable expectation of receiving compensation at the State minimum wage. Dkt. 10 at 29, 30. Defendant provides no authority for "reasonable expectation" to be an essential allegation to the pleadings, *see id*., nor is the undersigned of aware of any. *See Young*, 164 Wn.2d at 484-85. Absent this authority, the reasonableness of the parties' expectations is a fairness issue that cannot be decided on a Fed. R. Civ. 12(b)(6) motion.

Finally, Defendant argues that the unjust enrichment claim fails to state a claim because it is not alleged that the State has conferred a benefit on Defendant. Dkt. 10 at 29, 30; Dkt. 18 at 17. Defendant cites to *State v. Am. Tobacco Co., Inc.*, No. 96-2-15056-8-SEA, 1996 WL 931316, at *8 (Wash. Super. Nov. 19, 1996), which is not analogous. In *Am. Tobacco Co.*, the State sought common law damages for itself for "increased public health costs" due to a tobacco company's alleged failure to assume duties owed to protect public health. *Id*. In this case, Plaintiff does not seek damages on behalf of itself, but rather brings this action *in parens patriae* for Washington residents and workers, including detainees, who conferred a benefit on Defendant by working at compensation below the State minimum wage. *See* Dkt. 1-1 at ¶¶3.5, 39.

Defendant's motion to dismiss the cause of action for unjust enrichment for failure to state a claim should be denied.

B. Violations of the Washington Minimum Wage Act.

Defendant contends that the Complaint fails to state a claim for violations of the Washington Minimum Wage Act because detainees are not "employees" under Washington law. Dkt. 10 at 24-28. The Washington Minimum Wage Act defines "employee" generally as "any individual employed by an employer," subject to an enumerated list of exceptions. RCW

49.46.010(3). Defendant argues that detainees fall under an exception, subsection (3)(k), which excepts from the general definition, "Any resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution[.]" RCW 49.46.010(3)(k). Defendant also argues that, when interpreting the statute, the Court should look to Fair Labor Standards Act (FLSA) precedent.

Beginning with the statute itself, it is plain that the definition excepts residents of "state . . . detention" facilities, not federal facilities. *See* RCW 49.46.010(3)(k). The Northwest Detention Center is a federal detention facility and thus does not fall under the exception. This conclusion is reinforced by Washington law narrowly construing exceptions in favor of the employee. *See Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 870 (2012).

Anticipating this result, Defendant urges an expansive interpretation of the exception to extend to federal detainees. (This is an ironic request, because elsewhere Defendant argues that the State deliberately omitted federal detainees from the statutory exception because it would be "outlandish" for the State to include them. Dkt. 10 at 28.) Defendant urges this Court to follow *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1129 (D. Colo. 2015) and *Whyte v. Suffolk Cty. Sheriff's Dep't*, 91 Mass.App.Ct. 1124, 2017 WL 2274618 (Mass. App. Ct. May 24, 2017). *Menocal* and *Whyte* considered the application of state minimum wage laws of Colorado and Massachusetts, respectively, to federal detainees. Both cases rely on *Alvarado Guevara v. Immigration & Naturalization Serv.*, 902 F.2d 394 (5th Cir. 1990), which considered whether FLSA applies to federal detainees. *But see Hale v State of Ariz.*, 967 F.2d 1356, 1362-63 (9th Cir. 1992), *on* reh'g, 993 F.2d 1387 (9th Cir. 1993) (leaving open the possibility that FLSA could apply to incarcerated inmates).

1     Neither *Menocal*, *Whyte*, nor *Alvarado* is binding precedent, and in this Court's view,

2    extending the logic of *Alvarado* to interpret this State's statutory exception to include federal

3    detainees moves beyond interpretation to legislation. In the absence of binding authority, the

4    undersigned should respectfully decline the invitation to add to the statute. At least based on the

5    pleadings, it is plausible that the Plaintiff, arguably, comes within the State definition of

6    "employee," and is not subject to any existing statutory exception.

7     Defendant's motion to dismiss the cause of action for violations of the Minimum Wage

8    Act for failure to state a claim should be denied.

9    **VI.    UNCLEAN HANDS AND LACHES**

10     Defendant summarily urges dismissal of the unjust enrichment cause of action on the

11    equitable grounds of unclean hands and laches. Defendant makes two primary arguments: first,

12    Plaintiff acts in bad faith to enforce the State minimum wage, because State law expressly

13    excepts residents of state, county, or municipal detention facilities from the same protections,

14    and the State operates and benefits from programs similar to the Voluntary Work Program; and

15    second, the State's L&I division, the government entity statutorily-authorized to enforce the

16    State Minimum Wage Act, has never initiated any wage enforcement actions against Defendant,

17    despite its knowledge of the Voluntary Work Program and no excuse for its delay. Dkt. 10 at 31,

18    32.

19     Both arguments reach far beyond the scope of a Fed. R. Civ. P. 12(b)(6) motion. The

20    pleadings on their own do not make a showing of unclean hands or laches sufficient for

21    dismissal. Defendant's motion to dismiss the unjust enrichment cause of action based on unclean

22    hands and laches should be denied.

23

24

1    **VII.    CONCLUSION**

2         Defendant has not overcome the presumption against preemption by showing

3    congressional intent to displace state law as to detainee wages. Defendant has not shown that

4    Plaintiff lacks authority to proceed as *parens patriae* on behalf of Washington residents. The

5    Complaint states a claim upon which relief can be granted for both causes of action. Dismissal

6    under equitable doctrines of laches and unclean hands is not warranted.

7         THEREFORE, Defendant The GEO Group, Inc.'s Motion to Dismiss Complaint (Dkt.

8    10) is HEREBY DENIED.

9         IT IS SO ORDERED.

10        The Clerk is directed to send uncertified copies of this Order to all counsel of record and

11   to any party appearing pro se at said party's last known address.

12        Dated this 6th day of December, 2017.

13

14

15        ROBERT J. BRYAN
          United States District Judge

16

17

18

19

20

21

22

23

24