UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

|                              |   |                      |
|------------------------------|---|----------------------|
| CHAO CHEN,                   | ) | C17-5769-RJB         |
|                              | ) |                      |
|     Plaintiff, | ) | TACOMA, WASHINGTON |
|                              | ) |                      |
| v.                           | ) | November 20, 2017    |
|                              | ) |                      |
| THE GEO GROUP, INC.,         | ) |                      |
|                              | ) |                      |
|     Defendants. | ) |                   |
|                              | ) |                      |
| and                          | ) |                      |
|                              | ) |                      |
| STATE OF WASHINGTON,         | ) | C17-5806-RJB         |
|                              | ) |                      |
|     Plaintiffs, | ) |                    |
|                              | ) |                      |
| v.                           | ) |                      |
|                              | ) |                      |
| THE GEO GROUP, INC.,         | ) |                      |
|                              | ) |                      |
|     Defendants. | ) |                   |

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. BRYAN
UNITED STATES DISTRICT JUDGE

_____

```
 1

 2

 3     APPEARANCES:

 4

 5       For the Plaintiff        ANDREW FREE
         Chen:                    ADAM BERGER
 6                                JAMAL WHITEHEAD
                                  DEVIN THERIOT-ORR
 7                                LINDSAY HALM
                                  Attorneys at Law
 8

 9
         For the Defendant        JOAN MELL
10       GEO:                     CHARLES DEACON
                                  MARK EMERY
11                                Attorneys at Law

12

13       For the Plaintiff        MARSHA CHIEN
         State of Washington:     LA ROND BAKER
14                                Assistant Attorneys General

15
         For the Defendant        JOAN MELL
16       GEO:                     CHARLES DEACON
                                  MARK EMERY
17                                Attorneys at Law

18

19

20

21

22

23

24

25
```

1    MORNING SESSION

2    NOVEMBER 20, 2017

3    THE COURT:  Looks like the gang's all here this

00:00:02  4    morning.  This is combining a hearing in 17-5806, State

00:00:09  5    versus Geo, and 17-5769, Chen versus Geo.

00:00:17  6    I guess the first thing I should do is, I am not going to

00:00:24  7    try and call roll.  If you would make your appearance and let

00:00:29  8    me know who is going to speak for each party.

00:00:33  9    MS. MELL:  Joan Mell.

00:00:36  10    THE COURT:  Wait a minute.  Just a second.  Sorry.  I

00:00:40  11    don't hear well.  It is important you speak right into the

00:00:44  12    mic and keep your voices up, everybody.  I don't like to bug

00:00:49  13    you, but I'll bug you if I have to because I have to hear

00:00:52  14    what you are saying.

00:00:53  15    MS. MELL:  May I stay seated for purposes of reaching

00:00:57  16    the microphone?

00:00:58  17    THE COURT:  A lot louder.

00:01:00  18    MS. MELL:  Your Honor, my name is Joan Mell.  I

00:01:03  19    represent the Geo Group, Inc.  I will be doing the oral

00:01:07  20    presentation.  We have co-counsel here, Charles Deacon and

00:01:10  21    Mark Emery.

00:01:15  22    THE COURT:  For Geo.

00:01:19  23    MS. MELL:  We mixed you up.  We are Geo.  We are on

00:01:23  24    the defense.  You pointed at me.  We are in the reverse.

00:01:27  25    MS. CHIEN:  Marsha Chien.  I am here with La Rond

| | | |
|---|---|---|
| 00:01:32 | 1 | Baker.  Between the two of us, we represent the State of |
| 00:01:35 | 2 | Washington. |
| 00:01:36 | 3 | THE COURT:  You are speaking for the State? |
| 00:01:38 | 4 | MS. CHIEN:  Yes. |
| 00:01:40 | 5 | MR. FREE:  Andrew Free, together with Adam Berger, |
| 00:01:43 | 6 | Jamal Whitehead, Devin Theriot-Orr and Lindsay Halm, I |
| 00:01:49 | 7 | represent Mr. Chen.  I will be speaking on his behalf. |
| 00:02:29 | 8 | THE COURT:  I mention my hearing.  It puts a burden |
| 00:02:33 | 9 | on you, but it is important that you speak up, as I |
| 00:02:36 | 10 | indicated. |
| 00:02:37 | 11 | I set this hearing because the motions to dismiss in both |
| 00:02:45 | 12 | cases overlap.  I divided time in my order by party.  I am |
| 00:02:51 | 13 | not sure that was really fair because the plaintiffs in the |
| 00:03:01 | 14 | case have much the same issues and the defense has to respond |
| 00:03:07 | 15 | to both issues. |
| 00:03:13 | 16 | I guess I want to assure you we will give you the time you |
| 00:03:18 | 17 | need to argue.  I set time limits, but I don't follow them |
| 00:03:22 | 18 | very closely.  It was my hope we would finish around noon. |
| 00:03:30 | 19 | I am aware of the motion of remand and other things that |
| 00:03:34 | 20 | have gone on in the case.  We will deal with those in due |
| 00:03:43 | 21 | course. |
| 00:03:54 | 22 | There is one motion that was noted today that has to do |
| 00:03:57 | 23 | with the filing of the contract.  Geo filed a motion for an |
| 00:04:06 | 24 | order declaring the contract filing sufficient and, |
| 00:04:09 | 25 | alternatively, to file limited redacted pages in camera and |

| | |
|---|---|
| 00:04:13 | 1 |

1  under seal.  That is a two week motion.  Not a one day

2  motion.  The defendants -- the plaintiffs have a right to

3  respond.  We will note that for two weeks out.

4      That raises the question of the contract.  We got a

5  contract, I believe, from the State that may not be complete,

6  and it may be different than the total contract.  That is the

7  one I have been working from because it is the only one I

8  had.  If there are differences, as we discuss this, you can

9  point them out to me if I am referring to the wrong language.

10     Now, in terms of my preparation, I read all your briefs

11  and mostly twice, and reviewed parts of them three or four

12  times.  I have looked at the contract considerably.  I have

13  looked at a lot of the law that you have cited.  I have

14  worked with my staff on this, my law clerks, two of them have

15  been working on this as well.

16     The bottom line is that my main interest here is the

17  preemption issues.  You can discuss the other issues raised,

18  if you wish to.

19     I think that is all preliminary.

20     Ms. Mell, the burden is on you, I guess.

21         MS. MELL:  Your Honor, for purposes of the

22  allocation --

23         THE COURT:  Let me see if these are going to work

24  now.

25         MS. MELL:  Testing, testing.

00:06:22  1      THE COURT:  I can hear you.  When I talk, I get a lot

00:06:28  2  of feedback.  I don't know what the deal is here.  Just a

00:06:33  3  minute.  Try again.

00:06:45  4      MS. MELL:  Your Honor, my name is Joan Mell.  I am

00:06:47  5  appearing on behalf of the Geo Corps.  It is Geo's position

00:06:51  6  we would request to reserve the full 15 minutes for rebuttal.

00:06:56  7      Having no objection, I will sit down and wait.

00:07:03  8      THE COURT:  Who is next?  Mr. Free.

00:07:11  9      MR. FREE:  Good morning, Your Honor, can you hear me

00:07:14  10  okay?

00:07:14  11      THE COURT:  Yes.

00:07:15  12      MR. FREE:  Let's start with preemption since that is

00:07:19  13  the concern of the Court.  It strikes me there is some

00:07:26  14  underlying scaffolding we need to do, and we can address the

00:07:30  15  three forms of preemption that Geo raises.

00:07:32  16      First, there is a presumption against preemption.  It is a

00:07:36  17  function of our federalist system, it is a function of the

00:07:38  18  fact there is a cooperative relationship between the federal

00:07:42  19  government and the states.  The federal government has never

00:07:45  20  regulated the entire field of wages.  That is a traditional

00:07:49  21  state function.  States regulate.  In this case, the State of

00:07:53  22  Washington has regulated it, in fact, since 1913, even before

00:07:57  23  the FLSA.

00:07:58  24      The second presumption is if a party is raising a

00:08:03  25  preemption argument, the party has the burden of proving it.

00:08:06  1    It is not the plaintiff's burden, Mr. Chen or the State of

00:08:11  2    Washington, to prove the Minimum Wage Act is not preempted.

00:08:15  3    It is Geo's burden to prove it is.

00:08:18  4        I don't know what they are going to say in that regard

00:08:20  5    other than what they have said in their brief.  To the extent

00:08:24  6    that Geo raises new arguments in the reply, I would

00:08:26  7    respectfully request the opportunity to rebut those

00:08:28  8    arguments.

00:08:30  9        Moving on to the subject, the specific forms of preemption

00:08:35 10    that Geo has raised.  They raised express preemption, field

00:08:40 11    preemption and conflict preemption.  The only thing that they

00:08:42 12    say expressly preempts the Minimum Wage Act is IRCA, the

00:08:45 13    Immigration Reform Control Act of 1986, specifically 8 U.S.C.

00:08:50 14    1324a(h)(2), which is IRCA's express preemption clause.

00:08:56 15        When Geo is discussing in their brief prior cases like

00:09:02 16    Alvarado Guevara that indicate this longstanding recognition

00:09:08 17    that state wage claims have no bearing, or that federal wage

00:09:13 18    claims have no bearing on the federal scheme, that's not

00:09:16 19    relevant to express preemption.  The only express preemption

00:09:20 20    argument that I understand that they have raised in either of

00:09:22 21    the briefs is the IRCA preemption.

00:09:24 22        What does IRCA preempt? IRCA expressly preempts any state

00:09:31 23    or local sanction relating to the hiring or employ of

00:09:34 24    undocumented immigrants.  Two parts of that, we raised in our

00:09:38 25    brief.  You have the quality of being a sanction, which is

00:09:42 1   the Second Circuit and Affordable Housing, the New York

00:09:45 2   Supreme Court in <u>IDR vs Balbuena</u> has defined specifically it

00:09:50 3   is a punishment.  That is not the back wages Mr. Chen seeks.

00:09:56 4        I will let the State speak to it separately about the

00:09:59 5   other forms of relief in this case.

00:10:01 6        Back wages are not a sanction, and courts across the

00:10:05 7   country have recognized that.  Even if they were, which they

00:10:08 8   are not, it is a sanction for hiring undocumented immigrants

00:10:13 9   or allowing those undocumented immigrants to be employed.

00:10:17 10  That is not what the Minimum Wage Act does.  The Minimum Wage

00:10:21 11  Act provides a specific bottom level of $11 an hour for every

00:10:27 12  worker, regardless of immigration status.

00:10:29 13       After <u>Hoffman Plastics</u>, which is a Supreme Court case,

00:10:35 14  which says IRCA might interfere with NLRA -- National Labor

00:10:40 15  Relations Act -- if you were to require reinstatement, courts

00:10:42 16  across the country began addressing claims of whether an

00:10:46 17  undocumented person can recover back wages for hours of work

00:10:49 18  below the minimum wage.  In other words, can an employer get

00:10:52 19  out of having to pay for the labor they have obtained simply

00:10:55 20  because the person that gave the labor is undocumented.

00:10:58 21       Courts across the country, as we set forth in our brief,

00:11:02 22  said no, no because that would encourage employers to skirt

00:11:05 23  the requirements.  It would suppress wages across the labor

00:11:09 24  market.  FLSA and the Minimum Wage Act are labor-market

00:11:13 25  centric.  They recognize that when one employer suppresses

00:11:18  1   wages for one set of workers, the rest of the employers are

00:11:22  2   subjected to unfair competition.  It would frustrate the

00:11:26  3   congressional purpose of making sure everybody is getting

00:11:29  4   paid a minimum wage.  It would frustrate the legislative

00:11:33  5   purpose in Washington.  IRCA does not preempt the Minimum

00:11:37  6   Wage Act.

00:11:45  7           THE COURT:  Let me ask you, there are some inmates on

00:11:52  8   the Tide Flats that are authorized to work in this country;

00:11:56  9   some are not, as I understand it.  Do we have to look at all

00:11:59  10  of this in two different tracks in order to determine what

00:12:04  11  may be preempted and what may not be?

00:12:07  12          MR. FREE:  Not for the purposes of express

00:12:10  13  preemption, Your Honor, is my answer, and I'll explain it and

00:12:13  14  unpack it.

00:12:14  15      First of all, it is really important to recognize these

00:12:17  16  are not inmates.  They are civil detainees that can't be

00:12:20  17  forced to work.  All of their work is being given to Geo

00:12:24  18  because supposedly they volunteer it.  Unlike all the cases

00:12:29  19  that Geo cites where they are analogizing to prisoners who

00:12:33  20  have been convicted of a crime, are criminal detainees,

00:12:35  21  immigration detainees are different.  They are civil

00:12:39  22  detainees.

00:12:39  23          THE COURT:  Detainees and not inmates.

00:12:42  24          MR. FREE:  The second point is you are -- if you were

00:12:45  25  to get to the question of employment status, you would see

| | |
|---|---|
| 00:12:49 | 1 |
| 00:12:52 | 2 |
| 00:12:56 | 3 |
| 00:13:01 | 4 |
| 00:13:04 | 5 |
| | 6 |
| 00:13:11 | 7 |
| 00:13:12 | 8 |
| 00:13:14 | 9 |
| 00:13:16 | 10 |
| 00:13:20 | 11 |
| 00:13:23 | 12 |
| 00:13:29 | 13 |
| 00:13:35 | 14 |
| 00:13:36 | 15 |
| 00:13:39 | 16 |
| 00:13:45 | 17 |
| 00:13:48 | 18 |
| 00:13:51 | 19 |
| 00:13:54 | 20 |
| 00:13:58 | 21 |
| 00:14:04 | 22 |
| 00:14:11 | 23 |
| 00:14:20 | 24 |
| 00:14:28 | 25 |

that, yes, a lot of people in the Tide Flats, in the Tacoma Northwest Detention Facility, do have work authorization.  A significant portion of the 1,575 people there either were permanent residents and are currently undergoing an administrative proceeding or have authorization to work through pending asylum applications, through pending cancellation of removal applications or have a bona fide claim to U.S. citizenship, frankly.  So, yes, there are people there who can be working.

    That is a question for conflict preemption analysis.  That is not a question for express preemption analysis.  Because the express preemption question is, is the Minimum Wage Act properly subject to 8 U.S.C. 1324a(h)(2), which is the sanction provision.

    If you would like for me to address that question in the context of conflict preemption, I can. If 1324a(h)(2) doesn't cover back pay, it doesn't matter whether they are authorized.  That is our argument.  It doesn't cover that. It is not a sanction for the hiring of undocumented immigrants, and therefore congress did not preempt the Minimum Wage Act.

            THE COURT:  The effect of 1324a(a)(1)(A) would be if these people are truly employees, it would make Geo a criminal for hiring them.

            MR. FREE:  First of all, you have the state law

00:14:30  1   question.  These are Minimum Wage Act claims under Washington
00:14:33  2   state law.  Federal law would be a separate question.  Your
00:14:39  3   Washington state law requires that everybody who does work in
00:14:44  4   Washington gets paid the minimum wage unless they are subject
00:14:46  5   to exemption.  Period.  If there are consequences to Geo for
00:14:51  6   that, then that is the impact of Washington state law.
00:15:00  7        With respect to field preemption, unless the Court has
00:15:03  8   questions about express preemption, Geo has, in its reply
00:15:08  9   brief to our response, expressly foreclosed a regulatory
00:15:11 10   preemption argument.  That is at pages four and five in Note
00:15:15 11   13 of Geo's reply brief.  What they say is the agency, we,
00:15:20 12   Geo, are not claiming that the agency has preempted the
00:15:23 13   field.
00:15:29 14        They go through this entire exercise in their motion to
00:15:33 15   dismiss discussing the complex statutory, regulatory and
00:15:36 16   policy framework, discussing how congress, through its
00:15:37 17   express and delegated statutory authority, has occupied the
00:15:41 18   field of immigration detention and labor.
00:15:44 19        Then when we point out that there are certain requirements
00:15:48 20   that an agency must go through if it is going to preempt
00:15:52 21   state law under executive orders, under federal law, none of
00:15:56 22   that is in the record here.  In fact, it is the opposite.
00:15:58 23   Under PBNDS, the Performance Based National Detention
00:16:02 24   Standards, that ICE promulgated, they say at least a dollar a
00:16:06 25   day.  In practice, Geo pays employees, detainees in other

00:16:11   1   facilities more than a dollar a day.  There is not that

00:16:14   2   regulatory record.  They foreclosed that argument.  They

00:16:19   3   expressly disclaim regulatory exemption. So we are stuck with

00:16:22   4   field preemption on the statutes they cite.

00:16:24   5        Those statutes, particularly 8 U.S.C. 1231(g), which deals

00:16:30   6   with the location of detention centers and the secretary's

00:16:33   7   authority to come up with locations for detention, and 8

00:16:36   8   U.S.C. 1103(a)(11)(B), which deals with the secretary's

00:16:41   9   authority to contract with state or local government for the

00:16:45  10   detention and safekeeping of detainees, to enter into

00:16:49  11   agreements to do that.  Most relevantly, I think, is 8 U.S.C.

00:16:54  12   1555(d) which says -- congress said that congress --

00:16:58  13   appropriations shall be available for the payment of

00:17:03  14   allowances to immigrant detainees at a rate that congress

00:17:08  15   shall set from time to time in the Appropriations Act

00:17:12  16   involved.  I can read the direct quote if you like.  That's

00:17:16  17   the message.

00:17:17  18        The last time congress did that was in 1978.  It hasn't

00:17:22  19   done anything since.  The agency has continued to run the

00:17:25  20   dollar a day program.  In fact, it is said you can do more,

00:17:29  21   you can pay them more, but you must pay them at least a

00:17:32  22   dollar a day.

00:17:34  23        No party in this case, including Geo and ICE, a non-party,

00:17:39  24   has behaved as though that is the ceiling.  Not since 1978.

00:17:46  25   Almost 40 years.  Okay?

| | |
|---|---|
| 00:17:49 | 1 |

          None of the statutory citations that Geo provides forms

00:17:53   2   the complex federal statutory scheme that would foreclose any

00:18:00   3   state action.  The reason we know that is through Arizona vs

00:18:04   4   United States.

00:18:04   5       In Arizona vs United States, the Supreme Court looked at a

00:18:08   6   number of actions taken by the legislature in the state of

00:18:11   7   Arizona.  It said, if we put all these things together, it is

00:18:15   8   clear that with respect to certain parts of the statute

00:18:17   9   congress acted, and there can be no room for other state

00:18:22   10  regulation.

00:18:23   11      With respect to others, other parts of this statute,

00:18:27   12  particularly the identification provisions of Arizona's law,

00:18:31   13  that's a traditional police power that is governed by

00:18:34   14  preemption principles.  They said that can go forward, and it

00:18:38   15  did.  Similarly, you look at a regulation or alien

00:18:42   16  registration provision like you have in Heinz and in other

00:18:45   17  cases, that is a complete federal scheme where the federal

00:18:49   18  government, by statute, has conveyed what needs to happen,

00:18:53   19  has reserved to itself what needs to happen in clear terms

00:19:00   20  that foreclose any possibility of cooperative federalism.

00:19:03   21      That is not the case here.  How do we know?  We look at

00:19:07   22  the contract.  The contract says that when there is an

00:19:10   23  ambiguity between the contract, federal law and state law,

00:19:15   24  you are going to observe the most stringent requirement.  The

00:19:20   25  contract sets forth the constraints that Geo has to follow as

00:19:24  1  part of its performance down at the Tide Flats.  Those

00:19:28  2  constraints include applicable state and local labor codes,

00:19:33  3  applicable state and local health and safety codes.

00:19:37  4      To say, well, we have this cooperative federalism with

00:19:41  5  regard to health and safety, with regard to some state and

00:19:44  6  local labor codes, but not others, embarrasses the argument

00:19:50  7  that congress has field preempted all immigration detention.

00:19:55  8  It is just not the case.

00:19:56  9      We explained in our brief what you have to have if you are

00:20:01 10  going to field preempt something, and we don't have it.  I

00:20:04 11  think where the closest question is for the Court is, is this

00:20:06 12  conflict preempted.  Geo claims that if it was forced to pay

00:20:13 13  Mr. Chen, and the punitive class he seeks to represent,

00:20:17 14  Washington's minimum wage would present a conflict to the

00:20:25 15  accomplishment of the purposes set forth in federal law.

00:20:28 16  Under Geo's claim, if that's true, then the Minimum Wage Act

00:20:30 17  is preempted.

00:20:32 18      Let's unpack that idea for a second.  If Geo is right,

00:20:37 19  every federal contractor that is subject to a federal law and

00:20:43 20  a state law is going to be able to say that if compliance

00:20:48 21  with the state law gets too expensive, so expensive in fact

00:20:53 22  that they might not want to do it any more, then that state

00:20:56 23  law is preempted.  That would be the government contractor

00:21:01 24  defense that has been raised in United States vs Boyle.

00:21:04 25      Geo didn't raise the government contractor defense here.

00:21:07  1    They have not raised the government contractor defense, and
00:21:10  2    it is because that government contractor defense has failed
00:21:13  3    elsewhere.  Doesn't apply.
00:21:16  4        The idea that the company's expense and compliance with
00:21:21  5    the law can provide a basis for preempting a state law has
00:21:27  6    never been supported by any court.  That is the sort of
00:21:31  7    elemental question.
00:21:33  8        Then we can unpack it a little more.  As a practical
00:21:36  9    matter, it is not just a hypothetical conflict that they have
00:21:39  10   to prove.  They have to prove there will be an actual
00:21:41  11   conflict.  It can't just be a tension between federal law and
00:21:45  12   state law.  It has to be irreconcilable, and we have to know
00:21:49  13   it is going to happen.
00:21:50  14       The very important point from this record at this stage of
00:21:54  15   the case is there has been no discovery.  We have
00:21:57  16   out-of-court statements and footnotes from a corporation that
00:22:01  17   has a monetary interest in not complying with the law, not
00:22:04  18   having the law applied to it.  We have had no opportunity to
00:22:07  19   cross-examine anybody.  We have had no opportunity to test
00:22:10  20   what the agency's position on this is.  We haven't heard from
00:22:13  21   the federal government.  Why aren't they here?  Geo hasn't
00:22:17  22   moved to dismiss for failure to join an indispensable party.
00:22:21  23   The government has intervened.
00:22:23  24       We are sitting here on a paper record that consists of
00:22:25  25   statements of counsel.  I'll raise my hand and say, I am

00:22:28  1    included because Geo, in the reply brief, quotes me as

00:22:32  2    saying -- they don't quote me, they quote the article --

00:22:34  3    saying if Geo had to pay, and all these contractors had to

00:22:37  4    pay, the immigration detention system would collapse.

00:22:39  5         First of all, I am not quoted as saying that.  Second of

00:22:42  6    all, it doesn't exactly matter.  Geo, and we cite this in our

00:22:47  7    brief in a footnote, Geo's western regional supervisor told

00:22:51  8    the people of Washington that you could close the Tide Flats,

00:22:55  9    that it wouldn't affect federal policy, it wouldn't affect

00:22:56  10   the federal immigration policy.  That's what he said.

00:22:59  11        What we are dealing with at this point is competing

00:23:02  12   factual statements that are not in the record.  It would be

00:23:05  13   inappropriate for the Court to resolve those factual disputes

00:23:08  14   at this point.

00:23:09  15        I don't have a good idea where I am on time.

00:23:12  16             THE COURT:  You are past due.

00:23:13  17             MR. FREE:  I apologize.  Unless the Court has

00:23:16  18   questions about the plaintiff's position.

00:23:17  19             THE COURT:  I may have.

00:23:21  20        Thank you, Mr. Free.  Ms. Chien.

00:23:30  21             MS. CHIEN:  As the Court noted earlier, we filed a

00:23:38  22   motion to remand on November 8.  We wanted to raise the point

00:23:42  23   that the existence of a private class action in federal court

00:23:45  24   doesn't create federal jurisdiction over the state claim.

00:23:49  25   That is <u>Syngenta vs Henson</u>.

00:23:52  1      It is not necessary to reach the motion to dismiss against

00:23:56  2  the State.  However, if the Court is inclined to reach the

00:23:59  3  motion to dismiss, we would like to address the certain

00:24:01  4  issues, specifically what this case does and does not do.

00:24:05  5      The State seeks to enforce the state minimum wage law

00:24:09  6  against a private employer that does business in Washington,

00:24:12  7  just like it enforces the minimum wage law against any

00:24:16  8  private employer in Washington.  The State does not seek to

00:24:19  9  challenge federal immigration authority to detain aliens, it

00:24:24 10  does not seek to challenge federal authority to contract with

00:24:27 11  Geo or detention services.  The State does not seek to

00:24:31 12  challenge federal immigration policies, nor does the State

00:24:35 13  seek to challenge the congressional appropriations.

00:24:39 14      Geo, in the reply brief, repeatedly states that ICE cares

00:24:43 15  about the voluntary work program and the fact that detainees

00:24:46 16  work in order to defray costs, in order to eliminate or

00:24:51 17  minimize the tax burden on taxpayers.  Unfortunately, that is

00:24:55 18  nowhere found in ICE's detention standards nor in the

00:24:58 19  contract between ICE and Geo.  The contract between ICE and

00:25:01 20  Geo requires Geo to apply all applicable state -- comply with

00:25:07 21  all applicable state labor laws.  If there is any ambiguity,

00:25:12 22  to apply the most stringent law between federal, state and

00:25:15 23  local laws.  It also requires that Geo not use its detainee

00:25:22 24  workers to fulfill the responsibilities of the contractor.

00:25:27 25      The detention standards that defendants cite repeatedly,

```
00:25:34   1    the purpose of the detention standards is not to defray

00:25:37   2    costs.  It is to provide opportunities for detainee workers

00:25:43   3    to earn money.  The concerns about defraying cost and tax

00:25:46   4    burdens are nowhere found within ICE's detention standards or

00:25:51   5    the contract.  Those are Geo's concerns alone.  Geo's

00:25:55   6    concerns regarding costs, whether it is private or otherwise,

00:25:59   7    are Geo's alone, meaning all federal concerns or federal

00:26:02   8    issues that ostensibly create federal jurisdiction or

00:26:08   9    ostensibly create federal preemption, are non-existent.

00:26:12  10        I think Mr. Free addressed most of the preemption

00:26:15  11    arguments.  I would like to spend some time addressing some

00:26:17  12    of the claims specifically made against the State.

00:26:21  13        If Your Honor has any other questions, I am happy to

00:26:24  14    answer those as well.

00:26:25  15        The first argument that defendants bring is whether or not

00:26:29  16    the State has authority or standing to bring this claim.  It

00:26:34  17    would be incredible if the state attorney general's office

00:26:37  18    did not have authority to enforce its own laws.  The AG --

00:26:42  19    the legislature enacted RCW 43.10 -- sorry -- enacted all of

00:26:49  20    the -- enacted the legislature statute, and enacted listing

00:26:53  21    all of the AG's powers, including the ability to bring cases

00:26:57  22    of public concern, matters of public concern in any court.

00:27:00  23    That was affirmed in City of Seattle vs McKenna, which is an

00:27:04  24    interesting case because City of Seatte vs McKenna basically

00:27:09  25    stands for the proposition that the AG's office can bring
```

00:27:12  1    these cases, as long as there is a matter of concern, and

00:27:15  2    that is regardless of whether or not some portion of the

00:27:18  3    population disagrees with the lawsuit at hand.

00:27:22  4            THE COURT:  Ms. Chien, how does the enforcement of

00:27:32  5    the Minimum Wage Act usually proceed against an employer who

00:27:36  6    is not abiding by it?

00:27:38  7            MS. CHIEN:  The Department of Labor & Industries is

00:27:42  8    the primary agency that enforces the Minimum Wage Act. That

00:27:45  9    doesn't preclude the attorney general from also enforcing the

00:27:49  10   Minimum Wage Act.  Nothing within -- nothing that is cited by

00:27:52  11   defendants that would preclude our enforcement.

00:27:56  12      I also mention in their reply defendants raise the

00:28:01  13   argument that City of Seatte vs McKenna requires statutory or

00:28:06  14   common law -- a cognizable common law claim.

00:28:10  15      We have both.  The Minimum Wage Act clearly prohibits the

00:28:13  16   conduct that Geo is engaged in, and unjust enrichment is

00:28:18  17   cognizable in a common law claim.

00:28:21  18      The only other case the defendants rely on in the reply is

00:28:27  19   Confederated Tribes, which held that a tribe cannot -- did

00:28:29  20   not have authority to bring a lawsuit because the law they

00:28:33  21   were challenging affected only a single tribal member.

00:28:37  22      That is completely different from the case we have here.

00:28:40  23   The Minimum Wage Act was enacted purposely because the impact

00:28:44  24   of not following minimum wage is a broad impact.  It

00:28:49  25   discourages people from hiring people within the Tacoma

00:28:53  1   community.  It hurts the health and well-being of the workers

00:28:58  2   that are paid a substandard minimum wage.  This has broader

00:29:02  3   impact than just against one individual member of our -- of

00:29:05  4   the Washington community.  This has -- this impacts

00:29:09  5   thousands.

00:29:10  6       Defendant doesn't reply to those arguments.  Those are --

00:29:13  7   we wanted to make sure that was on the record.

00:29:17  8       Regarding the failure to state a claim -- I don't know if

00:29:21  9   you have any other questions around standing or authority

00:29:24  10  that I can address.  I think those are well covered.  I can

00:29:27  11  move on to failure to state a claim.

00:29:29  12          THE COURT:  Yes.

00:29:30  13          MS. CHIEN:  As is clear, as Geo even acknowledges,

00:29:34  14  our Minimum Wage Act clearly covers the detainee workers.

00:29:39  15  There is no exemption for detainees held by private companies

00:29:43  16  at the Tide Flats.  The exemption -- our Minimum Wage Act is

00:29:47  17  to be liberally construed.  In this way, our Minimum Wage Act

00:29:52  18  differs significantly from FLSA, which is the Federal Labor

00:29:56  19  Standards Act.  Differs in two significant ways.  Number one,

00:29:59  20  the purpose of the Minimum Wage Act is much broader than the

00:30:02  21  Fair Labor Standards Act.  We care about the employment

00:30:05  22  opportunities within our community, not just the health and

00:30:08  23  well-being of the detainee workers.

00:30:11  24      Second, FLSA makes no mention regarding detainee --

00:30:16  25  whether or not the state prisoners or anybody is exempted.

```
00:30:21  1    Here, under the Minimum Wage Act, we have an explicitly
00:30:25  2    stated exemption for those detainees held in state
00:30:30  3    facilities, meaning the legislature contemplated detention
00:30:35  4    facilities, decided to exempt state facilities and chose not
00:30:39  5    to exempt the Tide Flats facility right here.
00:30:43  6        The only argument Geo makes to oppose that argument is
00:30:50  7    that it would only be unreasonable if it didn't also apply to
00:30:55  8    their facility in the Tide Flats.  That amounts to nothing
00:30:59  9    but a disagreement with the way our state law is crafted.
00:31:02 10        We cannot assume the legislature would have exempted the
00:31:06 11    Northwest Detention Center.  I can't imagine the legislature
00:31:10 12    would do so now.
00:31:12 13        Regarding FLSA, our Minimum Wage Act is to be liberally
00:31:23 14    construed whereas FLSA is persuasive authority, it is not
00:31:28 15    binding.  Where it is different, it should be treated as
00:31:32 16    different, and the Minimum Wage Act in our case is different.
00:31:35 17        I would like to move -- if the Judge doesn't have any
00:31:39 18    other questions regarding the Minimum Wage Act, I'll move on
00:31:41 19    to the unjust enrichment provision.
00:31:45 20        Unjust enrichment is different from our Minimum Wage Act
00:31:49 21    claim.  We are seeking to discourage the ill-gotten gains,
00:31:55 22    profits made by Geo for profits received for failure to pay
00:31:59 23    the fair wage that they would have had to pay Tacoma workers
00:32:03 24    in the community or otherwise to operate its facility.  The
00:32:08 25    only argument that detainees make is that somehow the state
```

00:32:14  1   could be bound by -- is prevented from bringing the claim due

00:32:18  2   to unclean hand and laches.  Both are equitable defenses.

00:32:24  3   The burden lies with defendant to prove them.  In this case,

00:32:27  4   defendant has done neither.

00:32:31  5          Regarding unclean hands, the fact the government has

00:32:37  6   exempted itself under its own state laws and not exempted

00:32:43  7   Geo's facility doesn't render our hands unclean.  You can

00:32:48  8   look to U.S. vs Phillip Morris, which was the government

00:32:51  9   challenging Phillip Morris' failure to disclose all the risk

00:32:55  10  associated with tobacco usage, and Phillip Morris came back

00:32:59  11  and said, yeah, government, you knew there was also problems

00:33:02  12  with tobacco usage and you didn't say anything either.  The

00:33:08  13  court in the District of Colombia held that is not an unclean

00:33:11  14  hands defense as held against the government, whereas the

00:33:15  15  claims against the government did not suggest the government

00:33:18  16  had engaged in any fraud or misrepresentation.  Nor is the

00:33:22  17  case here.  Us exempting the state detainees from the Minimum

00:33:28  18  Wage Act is not fraud or misrepresentation or any sort of

00:33:31  19  unlawful conduct.

00:33:33  20      Regarding laches.  Again, it is the defendant's burden to

00:33:39  21  prove laches applies.  Here, it is unclear from the briefing

00:33:44  22  whether or not Geo -- when Geo believes that laches would

00:33:50  23  apply.  It is unclear when was the delay.  They failed to do

00:33:58  24  so.  Any delay in bringing the unjust enrichment claim

00:34:04  25  doesn't prevent them -- does not constitute prejudice,

00:34:09  1    another requirement of laches.  I would refer the Court to In
00:34:13  2    Re Marriage of Hunter where it says, any delay for legal
00:34:15  3    obligation that you were supposed to have done years ago
00:34:18  4    cannot count as prejudice.
00:34:21  5        In sum, we believe the State has clear authority under
00:34:27  6    City of Seatte vs McKenna to bring this case.  This is
00:34:32  7    bear -- there are several courts that have deemed that
00:34:36  8    federal contractors, just by the fact they are federal
00:34:39  9    contractors, does not get out of their obligation under state
00:34:44  10   law.  I would only add, regarding on the preemption issue you
00:34:48  11   mentioned, that IRCA -- IRCA does not preempt our state laws.
00:34:55  12   Geo is completely capable of complying with both our state
00:35:00  13   law as well as IRCA.  Does so every day with regard to the
00:35:05  14   security employees, and they check if their employees are
00:35:10  15   work authorized and they pay them minimum wage.  They could
00:35:13  16   do the same here.  There is no preemption between IRCA and
00:35:21  17   state law.
00:35:22  18       The only other -- the only other thing -- the only other
00:35:31  19   item I would add is in defendant's reply on the conflict
00:35:36  20   preemption issue that Mr. Free addressed in Salas vs Sierra
00:35:40  21   Chemical, that case stands for the proposition that IRCA does
00:35:43  22   not preempt wage worker protection laws.  It may affect the
00:35:49  23   remedy.  For example, in that case that said the remedy was
00:35:54  24   limited in Salas, the worker wouldn't be able to get pay
00:35:58  25   after their unlawful determination, after it was discovered

00:36:02   1   they were unauthorized.  That is different from what we have

00:36:07   2   here.  We are talking about people detaining workers who have

00:36:10   3   worked the hours, you know, worked their hours and benefitted

00:36:16   4   Geo, who are not getting paid.  It is not for work not

00:36:21   5   performed, not for wages for an unlawful determination.  That

00:36:25   6   is something that is completely separate.

00:36:27   7        In short, we say the authority over this Minimum Wage Act

00:36:31   8   claim preemption does not apply.  This case is not about

00:36:35   9   federal laws. It is not about federal issues.  Just because

00:36:37  10   of the fact that Geo is a federal contractor doesn't deem it

00:36:43  11   so.

00:36:48  12             THE COURT:  Thank you, Ms. Chien.

00:36:51  13        Ms. Mell.

00:36:55  14             MS. MELL:  Thank you, Your Honor.  Joan Mell

00:37:00  15   appearing on behalf of the Geo Corps.  Geo Corps is here to

00:37:03  16   ask the Court to dismiss these cases by the state and

00:37:06  17   Mr. Chen as a matter of law for failure to state a claim.

00:37:10  18   There are other preemption issues that I will get into in

00:37:14  19   further detail as we go along.

00:37:15  20        You asked a very specific question.  I have Geo's answer

00:37:18  21   to your question.  Does this Court need to be bifurcating

00:37:22  22   those people who can work and try to ascertain a fact pattern

00:37:25  23   of who has eligibility for competitive work and those who

00:37:29  24   don't?  The answer is clearly no.

00:37:32  25        That answer needs to come from ICE.  ICE needs to engage

00:37:37  1   in that discussion.  That is a public policy discussion

00:37:39  2   because this is detention.  This is not a competitive work

00:37:44  3   environment.  The way we address people who can work

00:37:47  4   competitively in a detention or restraint type scenario, we

00:37:55  5   develop work release programs.  We develop least restrictive

00:37:59  6   alternatives.  This state has a long history and a long

00:38:02  7   public record of public policy debate about who is eligible,

00:38:08  8   under what terms, what conditions, where they are allowed to

00:38:11  9   be released into the community, how they are supervised, how

00:38:14  10  those wages earned are handled and deducted and contributed

00:38:18  11  back to the state to cover the cost of their care and

00:38:21  12  supervision.

00:38:22  13       That is not a determination that this Court should engage

00:38:25  14  in.  That is not a discussion that this Court should get into

00:38:29  15  because that is a policy discussion for ICE.

00:38:33  16       Once you have the detention overlay, we are not in the

00:38:37  17  Minimum Wage Act realm or universe.  There is no policy basis

00:38:41  18  to merge the two.  There is a preemption issue because the

00:38:46  19  whole argument, you have never heard either side mention the

00:38:49  20  two key discerning factors, detention and immigration.  This

00:38:55  21  Court has limited discretionary authority over immigration

00:38:59  22  cases.  That is what the court, who's most closely decided

00:39:03  23  one of those issues, decided in <u>Alvarado</u>.

00:39:05  24       Furthermore, the issue of whether or not the Minimum Wage

00:39:11  25  Act even applies, the Minimum Wage Act, you first have to get

00:39:15   1    to an employment contract.  We don't have that here.  Geo --

00:39:20   2            THE COURT:  Wait a minute.  Isn't that a fact issue

00:39:23   3    that we can't decide in this motion as to whether these

00:39:28   4    people are employees?

00:39:31   5            MS. MELL:  That is not a fact issue.  There is no

00:39:32   6    disputed fact about who contracts for the voluntary work

00:39:36   7    program.  There is no disputed fact over what is paid.  There

00:39:41   8    is no disputed fact over ICE policy with regard to the need

00:39:45   9    for a voluntary work program.

00:39:48   10           THE COURT:  There are a lot of disputed facts about

00:39:51   11   who supervised them, how they are chosen, how much they are

00:39:54   12   paid, what they do, what they can't do. Seems to me, they

00:40:04   13   have many of the hallmarks of employment.

00:40:09   14           MS. MELL:  In detention.

00:40:11   15           THE COURT:  In detention.

00:40:12   16           MS. MELL:  That is not competitive work and that is

00:40:15   17   not minimum wage work.  Those policies cannot converge.  If

00:40:19   18   they do converge, then the policy discussion is not as to

00:40:24   19   application of the Minimum Wage Act.  It is an application as

00:40:26   20   to what is the scope of the way we handle individuals who are

00:40:31   21   detained when they have an immigration status.

00:40:34   22       Now, the IRCA issue that is directly on point, if you look

00:40:38   23   at the house provisions as to what IRCA intended, congress

00:40:45   24   found that work was the magnet for illegal immigration.  What

00:40:51   25   the State and what Mr. Chen are actually proposing is that

00:40:57  1    this Court, by judicial edict, make Geo the magnet.  That is

00:41:02  2    a universe that cannot be contemplated in the judicial arena

00:41:08  3    because this Court can't possibly address all the

00:41:10  4    ramifications of creating an employment relationship inside a

00:41:16  5    detention center when the detention is necessary.

00:41:19  6          THE COURT:  I would agree, the Court can't create an

00:41:24  7    employment relationship.  The question is going to be, if the

00:41:28  8    case goes on, to whether these people were employees.

00:41:35  9          MS. MELL:  We clearly know they aren't employees for

00:41:39 10    purposes of state law.  The Minimum Wage Act has an express

00:41:42 11    preemption which is far more sophisticated than any local

00:41:46 12    jurisdictional discussion about state law in any of the cases

00:41:51 13    that have been decided.  Not only that, the beauty of this,

00:41:55 14    the astounding thing is we have a state alleging they have

00:41:58 15    to, allegedly under the McKenna case, come up with some

00:42:03 16    authority to enforce the Minimum Wage Act, when it is not

00:42:06 17    enforceable by the attorney general.  There is a very

00:42:09 18    stringent statutory scheme and regulatory scheme as to how

00:42:12 19    L&I enforces the Minimum Wage Act.

00:42:15 20          If you are going to extend that, the State can come in

00:42:19 21    with the AG and say, oh, well, there have been no complaints,

00:42:22 22    L&I hasn't taken a position on this.  Actually, L&I has taken

00:42:28 23    a position on this.  L&I has a policy statement that says

00:42:31 24    private contractors doing work, having people work in a

00:42:34 25    detention center, is not minimum wage work. There is an

1   express exclusion, so we don't even get there.

2           THE COURT:  I thought the exclusion applied to state

3   detainees, not federal.

4           MS. MELL:  The exclusion doesn't have the word

5   "federal" in it because who down in the legislative arena --

6   being a staff person, I would never put the word "federal" in

7   a one-line exclusion in the Minimum Wage Act.  They are not

8   in the business of telling the feds what to do.  They are

9   staying in their own lane.  They are addressing their policy

10  concerns because they know at the federal level, ICE,

11  congress, they are going to have the same policy discussions.

12  They are going to decide whether or not they want work

13  economic benefit programs.  They are going to decide whether

14  they have least restrictive alternatives.  They are going to

15  decide whether or not these immigrants are going to be

16  attracted to come to the United States because there is

17  minimum wage jobs in detention.

18      You can't take all the criteria for what it means to be an

19  employee out of the Geo contract.  By the way, Your Honor, I

20  did file a much more extensive contract.

21          THE COURT:  I know.  I saw it.

22          MS. MELL:  We concede the one that was filed by the

23  State has the relevant, pertinent parts so we can refer to

24  that.

25      The contract is much broader in terms of what it means,

| | |
|---|---|
| 00:43:52 | 1 |
| 00:43:55 | 2 |
| 00:44:01 | 3 |
| 00:44:05 | 4 |
| 00:44:08 | 5 |
| 00:44:11 | 6 |
| 00:44:16 | 7 |
| 00:44:18 | 8 |
| 00:44:20 | 9 |
| 00:44:25 | 10 |
| 00:44:27 | 11 |
| 00:44:30 | 12 |
| 00:44:34 | 13 |
| 00:44:37 | 14 |
| 00:44:41 | 15 |
| 00:44:45 | 16 |
| 00:44:50 | 17 |
| 00:44:55 | 18 |
| 00:44:58 | 19 |
| 00:45:01 | 20 |
| 00:45:03 | 21 |
| 00:45:07 | 22 |
| 00:45:12 | 23 |
| 00:45:15 | 24 |
| 00:45:17 | 25 |

1   what qualifies, who qualifies to be an employee.  You can't
2   pick and choose and say that because there is a dollar a day
3   floor rather than a ceiling, that gives broad discretion to
4   redefine the whole relationship.  There is no at will
5   negotiations.  There is no contract negotiations.  That is
6   not in dispute.  That is not a factual issue.  It is not
7   minimum wage work.  It is not under state law, and it is not
8   here.

9        THE COURT:  What if all of the detainees refused to
10  do any work?

11       MS. MELL:  Good. They can sit there.  It is a
12  voluntary work program.  We cannot, per contract, compel them
13  to work.  There is no compliance requirement.

14      That brings up a good point.  What if they do?  Isn't that
15  a policy discussion for ICE?  Isn't that a detention issue in
16  terms of who gets to sit idle and who doesn't get to sit
17  idle?  That is addressed in the PMDS -- or whatever.  I am
18  terrible at the acronym.  I can't seem to get it in my head.
19  You know what I mean.  I can put it up here on the board.

20      There is not just factors of pay.  There is factors of
21  what is the appropriate balance and relationship between
22  detainees and people who are employees, what do those
23  requirements need to be, and how does that relationship work.
24  That is not for a judicial determination under the Minimum
25  Wage Act.  That has never been applied in any universe to a

00:45:22  1    detention setting.

00:45:26  2        Let me show you what we are talking about locally.  Here

00:45:29  3    is what we are talking about.  The argument here is simply

00:45:36  4    stated.  This is minimum wage work, when we know this isn't.

00:45:40  5    That is the Pierce County Jail right up the street.  The TNT

00:45:44  6    did a wonderful program talking to these trustees to find out

00:45:47  7    how they valued their opportunities to engage in collective

00:45:53  8    work, community work to make the inside of sitting in the

00:45:57  9    Pierce County Jail less boring, less stressful, better food,

00:46:01  10   better environment, keep your living spaces clean.

00:46:06  11       This is not work where we are asking the detainees to come

00:46:10  12   on the unsecure side and pick up the lunch items for the ICE

00:46:15  13   security people who have thrown out their garbage.

00:46:19  14            THE COURT:  Well, you know, you are getting into what

00:46:22  15   these people are actually doing.  I don't think that is the

00:46:25  16   issue here.  Seems to me that if I am going to rule on issues

00:46:33  17   of preemption, that presupposes, for argument's sake, that

00:46:38  18   these people can be proven to be employees.  Then, assuming

00:46:44  19   that, is their wage rate preempted?

00:46:51  20            MS. MELL:  I am not sure I am following your logic.

00:46:54  21   Are you saying in order to reach a federal preemption

00:46:56  22   discussion, you have to decide as a matter of law that they

00:46:59  23   can be employed?  Or you don't have to decide that, you just

00:47:02  24   assume.

00:47:03  25            THE COURT:  I don't have to decide that.  I think I

|  |  |
|--|--|
| 00:47:05 | 1 |

have to assume that they are employees.  If they are not

employees, then there is nothing to preempt.

        MS. MELL:  Okay.  All right.  Focus on preemption, is

what you are telling me to do.  All right.

    Talking about preemption.  How on earth can you have a

congressional house report this long discussing in detail how

it will, de -- how the employment standards are affecting

immigration, illegal immigrants, people coming to the

United States and say that it is not a preemption issue?  You

can't narrow it down to the dollar a day because that is not

the nature of the relationship.  It is not just a wage issue.

It is a, who are these people and are they entitled to be

working in the United States.  They were saying no.  Why

would you create it as a matter of public policy within a

detention facility?

    The whole idea that the Minimum Wage Act is not punitive

defies the Minimum Wage Act.  I went back in the legislative

history to actually look at the Minimum Wage Act. They are

saying, well, back wages aren't punitive.  Well, back wages,

in combination with the calculation of attorney's fees and

costs and those other consequences, are, indeed, punitive.

We are operating in the United States, in Washington State,

under an American rule.  When you have an attorney's fee

shifting provision that is identified in the statute, you are

necessarily saying you have done something wrong.  In those

00:48:52  1    cases where they are saying there is no preemption under

00:48:55  2    IRCA, they are worker compensation cases which is a no-fault

00:49:01  3    system without American rule, statutory fee shifting

00:49:03  4    provisions, they are personal injury cases where they are

00:49:08  5    deciding that they need to -- you know, that's not a fee

00:49:12  6    shifting either.  You don't have an attorney fee award in a

00:49:14  7    personal injury case.  You are also dealing with not

00:49:18  8    detention.  There is no in-detention IRCA application ever

00:49:24  9    that has been considered because it is simply not a

00:49:27 10    competitive work environment.

00:49:29 11        There is no need -- the policy objective you see the

00:49:31 12    courts repeating in those cases, what you see them saying is,

00:49:36 13    we are not going to let an employer take advantage of illegal

00:49:39 14    immigrants regardless of -- well, actually, there is big

00:49:44 15    discussion in some of those cases about, well, let's see who

00:49:47 16    is the real bad actor here and compare who is the bad actor.

00:49:51 17    Did they get employed because they presented illegal

00:49:53 18    documentation so that is their fault, they don't get any?

00:49:56 19    That becomes a very unusual fact specific way to analyze

00:50:02 20    preemption, which I would recommend against.

00:50:05 21        In this instance, I would urge the Court to focus on the

00:50:09 22    fact that you have the IRCA position of not wanting to employ

00:50:16 23    immigrants illegally, then you have the added overlay that

00:50:20 24    all detention follows federal standards for correction, ACA

00:50:27 25    standard, PBNDS standards, all those things are there because

00:50:32  1   there is a very careful balance that has to be maintained

00:50:35  2   within the detention context.  Yes, it is preempted for those

00:50:40  3   reasons.

00:50:47  4       Other preemption.  I don't know. What other preemption

00:50:51  5   issue is the Court struggling with?  I don't see how you can

00:50:53  6   possibly get there.  Even for a population that arguably can

00:50:57  7   work, not in detention, not in detention in the free

00:51:03  8   negotiating Minimum Wage Act universe in what the Minimum

00:51:07  9   Wage Act is intended to address.  You see like in the <u>Hale</u>

00:51:11  10  case, they kind of line up the FLSA standards and policy

00:51:15  11  objectives with the objectives of work, and they do this

00:51:23  12  comparative analysis.  If you look at the Minimum Wage Act,

00:51:27  13  the two standards in the Minimum Wage Act that I -- the

00:51:31  14  Supreme Court certainly doesn't need to help you here because

00:51:34  15  the Minimum Wage Act has said what its purpose is.  That is

00:51:39  16  to maintain minimum standards of employment -- I am looking

00:51:45  17  at RCW 49.46.005(1) -- and to encourage employment

00:51:51  18  opportunities within the state.

00:51:53  19      Well, that necessarily means that you have employment

00:51:59  20  opportunities.  Employment opportunities in detention, in the

00:52:03  21  context of immigrants who may have documented or undocumented

00:52:09  22  status, whether or not they are able to work, those decisions

00:52:13  23  get made by ICE on the forefront, but more so on a case by

00:52:17  24  case, individualized basis.  There are judges down there

00:52:20  25  administratively making these determinations.  If they are

00:52:24  1    authorized to work, Geo can't be in the position of becoming

00:52:29  2    their employer in that sense where they then are the one who

00:52:34  3    has to affirm that they are performing at an acceptable level

00:52:38  4    that justifies the basis for them prevailing in their removal

00:52:43  5    action.  It creates a whole plethora of issues that conflict

00:52:47  6    with maintaining order in the context of corrections that

00:52:52  7    don't exist where a contractor, for instance, in the

00:52:56  8    California case, where a contractor is not paying prevailing

00:53:02  9    wages to a worker whom he hires on the outside at a cut-rate.

00:53:06  10   That is not what we are dealing with.

00:53:08  11       I have my binders here; I could go through and flop in

00:53:12  12   front of the Court every regulatory piece of information that

00:53:17  13   controls this relationship.  It is abundant.  It is abundant

00:53:21  14   because it is immigration.  It is abundant because it is

00:53:23  15   detention.  You can't take those two things out of the

00:53:26  16   universe and judicially set the whole world on fire creating

00:53:30  17   Geo as the magnet for employment.  It is a bad policy

00:53:33  18   decision.  It is bad policy.  It is policy.  It needs to be a

00:53:37  19   policy at the federal level, not here.

00:53:41  20       The whole reason the State doesn't include the word

00:53:44  21   "federal" is because they don't engage in federal policy

00:53:46  22   discussions.  They are very careful not to step on one

00:53:50  23   another's toes.  They stay in their lane.  The feds stay in

00:53:54  24   their lane.  It is as simple as that.

00:53:59  25       THE COURT:  Question:  What does the contract mean

```
00:54:05   1    when it includes constraints the contractor is expected to

00:54:12   2    perform, follow, and that includes applicable federal, state

00:54:20   3    and local labor laws and codes?

00:54:23   4        MS. MELL:  With -- are you saying the labor laws and

00:54:28   5    codes are part of state law?  Or are you asking me about

00:54:36   6    applicable?

00:54:36   7        THE COURT:  I am talking about your contract.

00:54:39   8        MS. MELL:  The contract ensures that Geo is a good

00:54:43   9    government citizen, and to the extent laws locally and

00:54:49   10   state-wide apply to Geo, Geo will be responsive to the needs

00:54:53   11   of the local community.  For instance, on the zoning issues,

00:54:57   12   I am representing Geo on a discussion about whether or not

00:55:01   13   they should be subject to Department of Corrections -- well,

00:55:06   14   correction zoning standards, whether or not they are an

00:55:10   15   essential public facility.  That whole private/public debate

00:55:13   16   went by the wayside.  The issue of privatization is a

00:55:16   17   non-issue.  There is no distinction there.  It becomes sort

00:55:19   18   of one of these how much is too much, does it really apply.

00:55:24   19   Geo, Geo, honestly in the years I have been working for them,

00:55:28   20   they try to be good citizens and work and negotiate with

00:55:31   21   local government on those things that seem amenable and seem

00:55:34   22   to not --

00:55:36   23       THE COURT:  Do they follow state law for their

00:55:39   24   employees?

00:55:40   25       MS. MELL:  That is an interesting question.  We have
```

00:55:42    1    not had to.  For instance, is the question:  Does Geo have to

00:55:46    2    pay state employees subject to the Minimum Wage Act?  I would

00:55:50    3    still say no, not necessarily.  The laws that Geo follows are

00:55:56    4    the contract.  If you look in the contract, even the

00:55:59    5    employees are highly regulated in their pay rate.  For the

00:56:03    6    most part, those pay rates exceed the minimum wage, so I

00:56:08    7    think that is why it has never been an issue.

00:56:09    8            THE COURT:  Not all of them.

00:56:11    9            MS. MELL:  They are subject to collective bargaining.

00:56:16   10    In the context -- you know the provision in the congressional

00:56:19   11    reports where they discuss there is not supposed -- IRCA

00:56:22   12    provisions were not intended to supercede labor regulations.

00:56:27   13    If you look at that whole paragraph, it actually concerns and

00:56:31   14    discusses the NLRB.  My read of labor laws in that context is

00:56:37   15    actually the collective bargaining rights, and those things

00:56:40   16    that fit within civil service and collective bargaining as

00:56:44   17    opposed to pure minimum wage laws.  I don't think -- I think

00:56:48   18    it is a case by case basis.  Certainly here, where there is

00:56:51   19    an express exclusion under the state law for private

00:56:56   20    contractors running work programs for people in detention,

00:57:02   21    and the people have spoken, they want an offset.  They have

00:57:07   22    found it to be in the State's interest to have offsets and to

00:57:11   23    have work in detention not at minimum wage.

00:57:16   24        What we do know, it doesn't matter if it is a dollar a day

00:57:19   25    or five dollars a day or the minimum wage that ICE has

00:57:22   1   expressed.  ICE has expressed a dollar.  They didn't say that

00:57:27   2   it has to be minimum wage, and they would have this

00:57:31   3   discussion, and advocates have been doing a very good job

00:57:34   4   with regard to minimum wage programs.  This state has known

00:57:37   5   for years.  They have been down there.  I talk to them in

00:57:40   6   various contexts as to whether or not we are compliant.  They

00:57:46   7   know.

00:58:01   8            THE COURT:  Let me look here at some of my notes.

00:58:04   9   You can be seated.  I may have some questions here for all of

00:58:09   10  you.

00:58:10   11           MS. MELL:  Thank you, Your Honor.

00:58:57   12           THE COURT:  The question in my mind here is this -- I

00:59:05   13  have trouble with the acronym, too.

00:59:14   14           MR. FREE:  PBNDS?

00:59:16   15           THE COURT:  Yes.  Apparently, the secretary of ICE

00:59:30   16  adopted those standards.  Most of them, I gather, found their

00:59:38   17  way into the contract.  Those are standards.  I gather they

00:59:50   18  are not requirements.

00:59:54   19           MR. FREE:  They are not.  They are regulatory agency

00:59:59   20  guidelines that did not withstand or go through the process

01:00:03   21  of notice and comment or rule-making.  They set forth

01:00:06   22  requirements that have been incorporated into Geo's contract.

01:00:11   23  Geo has agreed to abide by them.  There are no penalties for

01:00:16   24  not abiding, at least not real ones.

01:00:18   25           THE COURT:  Ms. Mell, do you agree with that?

01:00:21  1        MS. MELL:  Agree with the fact that the standards are

01:00:25  2  not binding?  No, I think ICE and Geo take those standards

01:00:30  3  very seriously, and the actual nature of the --

01:00:34  4        THE COURT:  Well, I agree with that.  They are mostly

01:00:39  5  in the contract, so they take them seriously.  My question is

01:00:44  6  whether there is some authority in those detention standards

01:00:51  7  that has to be followed.  Is there any requirement, any

01:00:55  8  regulation or rule or law or anything, or are they just the

01:01:01  9  wish list of the director?

01:01:04  10        MS. MELL:  I think they are the policy position,

01:01:07  11  express policy position just like the ESA bulletin from the

01:01:12  12  Department of Labor & Industries that the private contractors

01:01:16  13  providing work, having operating work programs don't have do

01:01:25  14  pay minimum wages, I think it would be equal to the ESA

01:01:28  15  bulletin.

01:01:28  16        THE COURT:  What are you referring to?

01:01:30  17        MS. MELL:  Let me give you -- I am looking at a

01:01:48  18  document.  I am drawing a parallel between state agency

01:01:55  19  conduct and federal agency conduct so the PBNDS policy

01:02:00  20  provisions are the expression of the agency as to how they

01:02:05  21  want things to operate.  They will expect that they operate

01:02:07  22  in compliance with those policy expressions.  Similar --

01:02:12  23        THE COURT:  They are not binding?

01:02:15  24        MS. MELL:  I am not sure what you mean by "not

01:02:17  25  binding."

01:02:17  1          THE COURT:  I mean a rule or regulation.  Can

01:02:20  2     somebody look at this, somebody wants to compete with Geo,

01:02:27  3     they want to not follow a lot of those standards.  They make

01:02:35  4     a different proposal to the government.  The government can

01:02:38  5     take them up on it.  They don't have to follow these

01:02:41  6     standards.

01:02:42  7          MS. MELL:  They could have the policy discussion,

01:02:44  8     absolutely.  They could change policy.  They could choose --

01:02:47  9          THE COURT:  Is this the official United States of

01:02:52 10     America government policy or is this the wish list of the

01:02:59 11     director of ICE?

01:03:03 12          MS. MELL:  I think you give too much discretion to

01:03:07 13     the director of ICE to have a wish list and treat it as

01:03:13 14     entirely a wish list as opposed to something that he would

01:03:16 15     enforce.  Administratively, I think the ICE director would

01:03:23 16     say that if you are out of compliance with each, you are

01:03:27 17     violating the rules of the way we want things to operate,

01:03:30 18     just like if Geo violates an ESA, it would be a violation of

01:03:37 19     L&I's policies.  They would choose to enforce it.  We could

01:03:41 20     always come to court and debate that certainly.

01:03:44 21          MR. FREE:  Actually, Your Honor --

01:03:45 22          THE COURT:  In the *New York Times*, April of 2017,

01:03:50 23     there was an article that indicated, I quote, "According to

01:03:59 24     two Homeland Security officials who had knowledge of the

01:04:03 25     plans, but declined to be identified because they were not

01:04:06  1   authorized to speak publicly, the new jail contract will

01:04:11  2   contain a far less detailed set of regulations."

01:04:16  3       In other words, the administration apparently is thinking

01:04:20  4   about changing these.

01:04:22  5           MS. MELL:  The administration was thinking about

01:04:24  6   changing things.  That's why you see terms where ICE decided

01:04:30  7   to express the dollar a day.  They didn't want to be an

01:04:34  8   agency saying they were controlling exactly the amount.  They

01:04:38  9   wanted the discussions to continue as a policy matter as to

01:04:41  10  what kind of programs are we going to have, is everything

01:04:44  11  going to be dollar a day work?  Are we going to have

01:04:47  12  competitive economic programs?  Are we going to have least

01:04:51  13  restrictive work alternatives.

01:04:52  14          THE COURT:  Who has the authority to set the

01:04:55  15  standards for the inmates?

01:04:58  16          MR. FREE:  Do you want to hear from Ms. Mell?

01:05:02  17          THE COURT:  I don't care.  I want to hear from any of

01:05:04  18  you that want to answer.

01:05:05  19          MR. FREE:  I can just tell you, the government says

01:05:10  20  that these standards are unenforceable at law.  You can't

01:05:14  21  take them to court and enforce these standards.  As a matter

01:05:18  22  of administrative law, they are going to get zero deference.

01:05:22  23  These are federal administrative standards.  I am not sure

01:05:25  24  what Ms. Mell put on the screen.  These are not uniform

01:05:28  25  government enforceable standards.  In fact, at contracting

01:05:32  1  facilities across the country, they follow different
01:05:35  2  versions, some intergovernmental services agreement
01:05:38  3  facilities don't follow the 2011 or the 2016 performance base
01:05:45  4  national detention center standards.  Some services
01:05:48  5  processing centers don't.  It is a patchwork across the
01:05:51  6  country.
01:05:52  7        THE COURT:  Well, if that's the only place the dollar
01:05:55  8  a day minimum appears, where does the authority for a dollar
01:06:02  9  a day come from, other than the agreement?
01:06:07 10        MS. MELL:  Congressional appropriation that said it
01:06:10 11  would be a dollar a day.
01:06:11 12        THE COURT:  Well, the appropriation didn't.  The
01:06:15 13  contract said they would be reimbursed a dollar a day.
01:06:21 14  But --
01:06:22 15        MS. MELL:  It did say in the '70s that would be the
01:06:24 16  amount.  Period.  What has changed is there hasn't been a
01:06:28 17  subsequent appropriation with the same limitation since then
01:06:32 18  so then it is up in the air.  If it is up in the air,
01:06:35 19  Your Honor, that doesn't give this Court the invitation to go
01:06:40 20  in and administer a state law Minimum Wage Act to decide that
01:06:44 21  that is the standard applicable to a detention facility
01:06:49 22  housing illegal --
01:06:50 23        THE COURT:  I understand your position, I think.
01:06:52 24        MR. FREE:  They foreclosed this argument.  They've
01:06:57 25  abandoned the argument that this is regulatorily preempted.

01:07:00  1    Now we are justifying the statute.  Yes, the '70s was the

01:07:03  2    last time congress set a number.  Under that context, there

01:07:09  3    is not the clear congressional purpose to displace the

01:07:13  4    Minimum Wage Act that you need in order to find preemption.

01:07:17  5    So then what you are left with is these factual

01:07:21  6    representations that have been made to the Court about what

01:07:23  7    it would actually mean in practice and what the policy

01:07:27  8    implications would be.

01:07:28  9        My friend has asserted there is going to be a magnet for

01:07:33 10    people en masse to cross the border and turn themselves in so

01:07:37 11    they can work for minimum wage in Washington State.  This is

01:07:41 12    her assertion.  She's asserted there is no contract.  In

01:07:45 13    discovery, Your Honor, we will adduce the contract that

01:07:47 14    workers work under.  This is a 12(b)(6) motion.  There are

01:07:51 15    fact issues here that do not prevent us from plausibly

01:07:56 16    pleading violation of the Minimum Wage Act.

01:07:59 17        With respect to the photo I have asked my friend to put up

01:08:02 18    on the screen and her point is it is detainee labor.

01:08:06 19    Your Honor, this is the key insight of Hale.  The key insight

01:08:11 20    of Hale and cases that follow-up on Hale in the Ninth

01:08:15 21    Circuit, not Alvarado from the Fifth, the key insight is who

01:08:19 22    does the detainee labor belong to, whose is it?

01:08:23 23        Hale says if it belongs to the detention facility, you

01:08:26 24    don't use the Bonnette test that we use in the Ninth Circuit.

01:08:30 25    Follow along cases, Cooper and Baker and Castle, analyze the

01:08:35  1   detainees' labor under that framework.

01:08:39  2        Since 1896, the Supreme Court has made clear that

01:08:42  3   detainees detained for immigration cannot be forced to work.

01:08:47  4   Today, Geo has said, you can't force them to work.

01:08:50  5   Incidentally, this will be adduced in discovery, you can be

01:08:54  6   put in solitary for inciting a labor stoppage, but since Wong

01:09:01  7   Wing it has been clear, the black letter U.S. Supreme Court

01:09:04  8   law, that detainees cannot be forced to work.  What that

01:09:07  9   means is their labor belongs to them.  Under Ninth Circuit

01:09:12  10  case law with cases like the Gonzalez case, Gonzalez vs

01:09:17  11  Mayberg in the Central District of California, it is

01:09:20  12  recognized in Baker vs McNeil and Castle, if the labor

01:09:25  13  belongs to the detainee, you analyze it under the traditional

01:09:31  14  FLSA test.  Geo does not address this issue.

01:09:34  15        THE COURT:  All right.  I am trying to ask some

01:09:37  16  questions here.

01:10:21  17        I assume these detainees are paid cash money without

01:10:28  18  withholding; is that correct?

01:10:31  19        MS. MELL:  They are not paid cash.  There is money

01:10:34  20  placed on their account without withholding for the cost of

01:10:37  21  their care.

01:10:39  22        THE COURT:  Without withholding for income tax?

01:10:41  23        MS. MELL:  Correct.

01:10:43  24        THE COURT:  Without withholding for Social Security?

01:10:45  25        MS. MELL:  Correct.

01:11:12   1        THE COURT:  All right.  I had a lot of questions,

01:11:16   2   most of which have been answered.  Do you have further brief

01:11:19   3   rebuttal?

01:11:20   4        MR. FREE:  I did.

01:11:21   5        THE COURT:  Brief.

01:11:24   6        MR. FREE:  Very briefly.  I want to leave the Court

01:11:33   7   with two quick thoughts.  First, this is a 12(b)(6) motion.

01:11:40   8   Your Honor has questions about the facts of employment at the

01:11:44   9   Northwest Detention Facility.  There are contract issues that

01:11:49  10   could be elucidated through discovery.  At this point, the

01:11:53  11   question is:  Have the plaintiffs plausibly stated a claim

01:11:57  12   upon which the motion can be granted?  If any of the factual

01:12:00  13   questions you have been interested in or that Geo has raised

01:12:03  14   would determine the way the Court comes out, the appropriate

01:12:06  15   answer is deny the motion, let's do some discovery, even if

01:12:11  16   it is limited as to the preemption question.

01:12:13  17        Second, this is not criminal detention.  This is civil

01:12:19  18   detention.  This is not publicly-run detention. This is

01:12:23  19   private detention, unlike a public facility where every

01:12:29  20   detainee's work is going to enrich the taxpayer by saving the

01:12:35  21   taxpayer a dollar on paying or however much on what that is.

01:12:39  22   Every detainee in this case is in some respect enriching Geo.

01:12:47  23   That is different from Alvarado Guevara, which is a

01:12:49  24   publicly-run facility.  The motion that is currently pending

01:12:53  25   before this Court to seal the contract explains to the Court

01:12:58   1   why.  Geo has said you can't post on Pacer our bed date

01:13:03   2   rates, you can't post our detainee staffing plan because that

01:13:07   3   would help our competitors.  The reason is they profit from

01:13:13   4   this detention and from this work.  That is a --

01:13:18   5           THE COURT:  Is that relevant at this stage?

01:13:21   6           MR. FREE:  It is, Your Honor.  The reason is because

01:13:24   7   Geo relies on Alvarado Guevara and the cases that talk about

01:13:29   8   detainee labor in the immigration detention context.  To the

01:13:33   9   extent Your Honor is persuaded by that, we cite a case from

01:13:36  10   the Fifth Circuit that got decided months afterward that

01:13:39  11   says, no, when you are doing labor for a private party, the

01:13:44  12   FLSA can apply.  That was a case out of Louisiana where the

01:13:49  13   sheriff had his inmates going to a third party farm and doing

01:13:52  14   work.  Key distinction because that is the premise that Geo

01:13:56  15   relies on in the preemption and in the MWA argument it makes.

01:14:01  16   This is civil detention and private.

01:14:03  17       Thank you, Your Honor.

01:14:05  18           THE COURT:  Ms. Chien.

01:14:10  19           MS. CHIEN:  I want to make three points, Your Honor.

01:14:15  20   First, Geo repeatedly states the Minimum Wage Act doesn't

01:14:20  21   refer to the federal -- to the Northwest Detention Center

01:14:25  22   because the State is trying to, quote, stay in their own

01:14:29  23   lane.  The Minimum Wage Act repeatedly has been applied to

01:14:33  24   federal contractors doing federal work.  Doesn't matter.  The

01:14:38  25   staying in your own lane, our minimum wage claim stays in our

01:14:42  1    own lane in the sense it applies within our own state.

01:14:45  2    Northwest Detention Center sits in our own state.

01:14:48  3         Second, Geo repeatedly refers to detention and immigration

01:14:54  4    as if it was a get-out-of-jail free card.  Those are not

01:14:57  5    get-out-of-jail free cards.  The Minimum Wage Act, the

01:15:00  6    legislature specifically considered detention and detention

01:15:05  7    facilities, and explicitly included in the exemption that

01:15:09  8    does not include Northwest Detention Center.

01:15:11  9         Finally, Geo states that the plaintiffs and the State are

01:15:16  10   trying to, quote, set the world on fire, requiring that Geo

01:15:20  11   comply with employee regulation.  It seems to be so

01:15:26  12   burdensome for Geo that they are defending this litigation on

01:15:29  13   that basis.  Employers on a daily basis, routine basis in

01:15:35  14   this state, comply with our minimum wage laws without the

01:15:38  15   burden, without setting the world on fire.  They do it every

01:15:41  16   single day.  It is not a burden.

01:15:44  17        Regarding the L&I guidelines that were placed on the ELMO

01:15:50  18   earlier, those are again similar to the PBNDS.  Not binding.

01:15:56  19   Those are interpretations by L&I, much like the ICE

01:16:01  20   guidelines were interpretations but not binding.  What are

01:16:05  21   binding are regulations.  Here, we have none from ICE or the

01:16:09  22   federal government indicating that Geo is not to pay detainee

01:16:13  23   workers minimum wage.

01:16:14  24        Thank you.

01:16:16  25             THE COURT:  Thank you, Ms. Chien.

01:16:21  1        Do you wish to volunteer a closing thought here?

01:16:24  2        MS. MELL:  Closing thought is:  Why wouldn't you

01:16:27  3    follow Menocal and White?  There was no hesitation by those

01:16:31  4    courts to understand that the application of the law to a

01:16:36  5    detention facility, whether the word "federal" was in the

01:16:39  6    code or not, was not disconcerting.  It didn't matter because

01:16:44  7    the policy objectives are the same.  There still has to be a

01:16:48  8    discussion at the federal level, like you are indicating, at

01:16:51  9    the agency, with congress to decide the scope of work.  It is

01:16:56 10    important that the Court understands, this is not like a

01:16:59 11    sheriff having the detainees go out and work the farm or

01:17:03 12    whatever the supposition is.  That is the purpose of the

01:17:06 13    photographs.  Side by side we see, it is:  This is the jail.

01:17:14 14    People in jail have not been convicted.  They are working for

01:17:19 15    the betterment of the jail and to keep it safe, to keep it

01:17:23 16    clean, to feed themselves.  We are talking about the secure

01:17:27 17    side.  We are talking about their own food.  We are talking

01:17:31 18    about their bunks, their bedding.

01:17:35 19        THE COURT:  Maintaining their own space is a little

01:17:38 20    different than what we are talking about here.  I think it is

01:17:41 21    pretty clear that they have an obligation to keep their own

01:17:45 22    space clean.

01:17:46 23        MS. MELL:  It is on the continuum, though,

01:17:50 24    Your Honor.  We haven't reached that continuum where congress

01:17:54 25    or where ICE has decided that there should be offsets because

01:17:59  1    we are still in the lower level realm of taking care of

01:18:03  2    oneself.  Collectively, yes.  But we are still in the

01:18:07  3    universe, and the whole continuum is what ICE and congress

01:18:12  4    gets to decide, not the courts.

01:18:14  5              THE COURT:  Thank you.

01:18:16  6              MS. MELL:  Thank you, Your Honor.

01:18:19  7              THE COURT:  We are current on things.  We will get

01:18:25  8    you an answer to these motions shortly.  With the holiday

01:18:32  9    coming, it will probably be after that.  I would expect in

01:18:36  10   the week following, we will have an opinion on these motions

01:18:40  11   to dismiss.

01:18:41  12        Thank you.  You have been very helpful.

01:18:44  13                   (The proceedings recessed.)

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1

2                        C E R T I F I C A T E

3

4

5        I certify that the foregoing is a correct transcript from

6     the record of proceedings in the above-entitled matter.

7

8

9

10     /s/ Angela Nicolavo

11     ANGELA NICOLAVO
       COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25