# EXHIBIT 1

No. _____

# In The
# United States Court of Appeals for the Ninth Circuit

In re The GEO Group, Inc.

The GEO Group, Inc.
                        Petitioner-Defendant

v.

U.S. District Court for the Western District of Washington,
                        Respondent.

The State of Washington,
                        Respondent-Real Party in Interest.

On Petition for a Writ of Mandamus to the United States District Court for the
Western District of Washington (No. 3:17-cv-05806)

## PETITION FOR A WRIT OF MANDAMUS

Scott A Schipma
Jerry Stouck
GREENBERG TRAURIG LLP
2101 L St NW, Ste. 1000
Washington, DC 20037
(202) 331-3141
schipmas@gtlaw.com
stouckj@gtlaw.com

Mark Emery
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0210
mark.emery@nortonrosefulbright.com

Douglas Edward Smith
LITTLER MENDELSON
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101
(206) 623-3300
desmith@littler.com

January 3, 2019                *Counsel for Petitioner The GEO Group, Inc.*

**ORAL ARGUMENT REQUESTED**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, petitioner The GEO

Group, Inc. (NYSE: GEO) states that it has no parent corporation and that

BlackRock Fund Advisors owns 10% or more of its stock.

January 3, 2019                              /s/ Mark Emery
                                             Mark Emery
                                             Counsel for Petitioner

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ........................................................iv

INTRODUCTION AND RELIEF SOUGHT ...........................................1

ISSUE PRESENTED ...........................................................3

STATEMENT OF JURISDICTION..................................................3

STATEMENT OF THE FACTS ....................................................3

    A.    The Voluntary Work Program at NWDC ..................................3

    B.    The State's Lawsuit.................................................5

    C.    The State's Motion To Compel .......................................6

    D.    The District Court's Discovery Order ................................7

    E.    GEO's Motion To Reconsider The Discovery Order ....................7

    F.    GEO's Motion To Certify The Issue For Appeal ......................8

STANDARD OF REVIEW .......................................................9

WHY THE WRIT SHOULD ISSUE ...............................................10

  I.    GEO Has No Other Adequate Means To Prevent The
Compelled Disclosure Of Its Confidential Financial
Information.............................................................10

  II.    GEO Will Be Damaged And Prejudiced In A Way Not
Correctable By An Appeal From A Final Judgment..........................11

  III.    The District Court's Ruling Is Clearly Erroneous As A Matter
Of Law.................................................................15

    A.    There Is No Colorable Theory Of Unjust Enrichment
That Makes The Compelled Financial Information
Relevant ...........................................................17

    B.    The State's Claim Does Not Support Broad Discovery Of
Financial Information For Other Reasons ............................23

  IV.    The District Court's Order Contains An Oft-Repeated Error...........27

  V.    The District Court's Order Raises New And Important
Problems On An Issue Of First Impression ..............................27

CONCLUSION................................................................30

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................31

CERTIFICATE OF COMPLIANCE WITH PAGE LIMITATION,
    TYPEFACE REQUIREMENTS, AND TYPE STYLE
    REQUIREMENTS ........................................................................................31

CERTIFICATE OF SERVICE .........................................................................32

ADDENDUM

# TABLE OF CITATIONS

**Page(s)**

## CASES:

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) ........................................................16

*Air Serv Corp. v. Flight Services & Systems, Inc.*,
  199 Wash. App. 1011, 2017 WL 2345701 (Wash. Ct. App. May
  30, 2017) ........................................................................19, 20

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982)............................................................25, 27

*Allyis, Inc. v. Schroeder*,
  197 Wash. App. 1082, 2017 WL 751329 (Wash. Ct. App. Feb.
  27, 2017) ........................................................................23

*Barrientos v. CoreCivic, Inc.*,
  No. 4:18-cv-00070 (M.D. Ga.), *on appeal*, *CoreCivic, Inc. v.
  Barrientos*, No. 18-90025 (11th Cir.) ............................................3

*Barton v. U.S. Dist. Court*,
  410 F.3d 1104 (9th Cir. 2005) ....................................................12

*Bauman v. U.S. Dist. Court*,
  557 F.2d 650 (9th Cir. 1977) ............................................10, 11, 27

*Bock v. Am. Growth Fund Sponsors, Inc.*,
  904 P.2d 1381 (Colo. App. 1995)..................................................29

*California v. Frito-Lay, Inc.*,
  474 F.2d 774 (9th Cir. 1973) ......................................................26

*Chandler v. Washington Toll Bridge Auth.*,
  17 Wash. 2d 591, 137 P.2d 97 (1943) ............................................24

*Cole v. U.S. Dist. Court*,
  366 F.3d 813 (9th Cir. 2004) ......................................................10

iv

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ........................................................17

*Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc.*,
  642 F.3d 728 (9th Cir. 2011) ..........................................................25

*Detention Watch Network  v. ICE*,
  No. 1:14-cv-583-LGS (S.D.N.Y.) ....................................................14

*Gonzalez v. CoreCivic, Inc.*,
  No. 17-cv-2573-JLS (S.D. Cal.) ........................................................3

*Gonzalez v. CoreCivic, Inc.*,
  No. 1:18-cv-169-LY (W.D. Tex.)........................................................3

*Hartley Pen Co. v. U.S. Dist. Court*,
  287 F.2d 324 (9th Cir. 1961) ..........................................................12

*Hernandez v. Tanninen*,
  604 F.3d 1095 (9th Cir. 2010) ........................................................13

*Hofer v. Mack Trucks, Inc.*,
  981 F.2d 377 (8th Cir. 1992) ..........................................................16

*In re Cement Antitrust Litig.*,
  688 F.2d 1297 (9th Cir. 1982) ........................................................30

*In re Electronic Arts, Inc.*,
  298 F. App'x 568 (9th Cir. 2008)....................................................12

*In re Lombardi*,
  741 F.3d 888 (8th Cir. 2014) ..........................................................13

*In re Sims*,
  534 F.3d 117 (2d Cir. 2008) ............................................................28

*Kerr v. King County*,
  259 P.2d 398 (1953) ................................................................18, 25

v

*Kerr v. U.S. Dist. Court*,
    511 F.2d 192 (9th Cir. 1975) ........................................................16

*Liew v. Breen*,
    640 F.2d 1046 (9th Cir. 1981) ......................................................16

*Lynch v. Deaconess Medical Center*,
    776 P.2d 681 (Wash. 1989) ...........................................................24

*Medhekar v. U.S. Dist. Court*,
    99 F.3d 325 (9th Cir. 1996) ..........................................................13

*Menocal v. GEO Group, Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015) .......................................3, 29

*Metrophones Telecommc'ns, Inc. v. Global Crossing
    Telecommc'ns, Inc.*, 423 F.3d 1056 (9th Cir. 2005)................19, 20

*Moberg v. Terraqua, Inc.*,
    199 Wash. App. 1059, 2017 WL 3048645
    (Wash. Ct. App. July 18, 2017) ....................................................22

*Mohasco Indus., Inc. v. Lydick*,
    459 F.2d 959 (9th Cir. 1972) ........................................................11

*Novoa v. GEO Group., Inc.*,
    No. 17-cv-2514 (JGB) (SHKX), 2018 WL 4057814 (C.D. Cal.
    Aug. 22, 2018) .........................................................................3, 29

*Nwauzor, et al. v. GEO Group*,
    No. 17-cv-5769-RJB (W.D. Wash.) .................................23, 26, 31

*Osborn v. Boeing Airplane Co.*,
    309 F.2d 99 (9th Cir. 1962) ..........................................................24

*Owino v. CoreCivic, Inc.*,
    No. 17-cv-1112-JLS-NLS (S.D. Cal.) ............................................3

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976)...................................................................................26

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2010) .......................................................10, 11, 28

*Pickern v. Pier 1 Imports (U.S.), Inc.,*
    457 F.3d 963 (9th Cir. 2006) ........................................................................17

*Sanderson v. Winner,*
    507 F.2d 477 (10th Cir. 1974) .....................................................................16

*Star Editorial, Inc. v. U.S. Dist. Court,*
    7 F.3d 856 (9th Cir. 1993) ............................................................................11

*United States v. Fei Ye,*
    436 F.3d 1117 (9th Cir. 2006) ......................................................................12

*Young v. Young,*
    164 Wash. 2d 477, 487-88, 191 P.3d 1258 (2008).....................20, 21, 23, 24

*Wade's Eastside Gun Shop. Inc. v. Department of Labor and*
    *Industries*, 372 P.3d 97 (Wash. 2016) .........................................................15

*Whyte v. Suffolk Cty. Sheriff's Dep't,*
    91 Mass. App. Ct. 1124, 86 N.E.3d 249 (2015) ......................................28, 29

## STATUTES:

8 U.S.C. § 1555(d) .........................................................................................5

28 U.S.C. §1291 ...........................................................................................10

28 U.S.C. §1292(a)(1)....................................................................................10

28 U.S.C. § 1292(b) ................................................................................10, 11

28 U.S.C. § 1651(a) ........................................................................................3

Dep't of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92
Stat. 1021, 1027 (Oct. 10, 1978)........................................................5

Public Records Act, Wash. Rev. Code § 42.56.030 ..................................3, 15, 29

## RULES:

Fed. R. Civ. P. 26(b) ...........................................................................8, 16

## OTHER AUTHORITIES:

16 Wright & Miller, Fed. Prac. & Proc. § 3935.3 (3d ed.)....................................10

25 Wash. Prac., Contract L. & Prac. § 18.303.08 (3d ed.) ..................................24

INS General Counsel, *The Applicability of Employer Sanctions to
Alien Detainees Performing Work in INS Detention Facilities*,
General Counsel Op. No. 92-8 (INS), 1992 WL 1369347 (Feb.
26, 1992) .......................................................................................5

Restatement (First) of Torts (1939) .......................................................12

Restatement (Third) of Restitution and Unjust Enrichment (2011) ....................19

6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI301A.02 (6th
ed.) ...........................................................................................19

6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI303.08 (6th ed.).................19

## INTRODUCTION AND RELIEF SOUGHT

This case rests on an issue of first impression: whether a state government can get restitution from a contractor that runs an immigration detention facility for the federal government, on the grounds that the contractor was unjustly enriched by work performed at the facility by federal immigration detainees.  Equally novel is the specific issue in this petition: whether the state is entitled to discovery of the contractor's commercially-sensitive financial information, when that information is irrelevant to any colorable unjust enrichment claim.  The district court erred in granting the State of Washington's ("State") motion to compel The GEO Group, Inc. ("GEO") to produce irrelevant, but highly sensitive financial information. GEO petitions for a writ of mandamus vacating the order compelling discovery.

GEO operates the Northwest Detention Center ("NWDC") in Tacoma, Washington, on a contract basis for U.S. Immigration and Customs Enforcement ("ICE").  NWDC houses federal immigration detainees in ICE's custody while they await deportation or asylum proceedings.  While there, detainees may participate in a Voluntary Work Program ("VWP"), a program created and contractually-mandated by ICE and administered by GEO, that gives detainees the opportunity to pass time in detention by doing housekeeping or maintenance tasks for which detainees are typically compensated $1 per day.

The State purports to bring this case as a *parens patriae* action, through its

1

Attorney General.  It seeks injunctive and declaratory relief, alleging that GEO has violated Washington's Minimum Wage Act ("MWA") by failing to pay detainees a minimum wage.  The State also seeks monetary restitution for unjust enrichment, alleging that GEO "benefits by retaining the difference between the $1 per day that it pays detainees and the fair wage that it should pay for work performed at NWDC."  Petition Addendum ("A") at A23 ¶ 6.5.

Since the case was filed, the State's unjust enrichment theory and its related discovery requests have grown voraciously.  The State now claims that it is entitled not only to disgorgement of the "fair wage" it initially sought, but also to more than a decade of profits that GEO has allegedly obtained from operating the VWP at NWDC.  Under that expanded theory, the State has served many discovery requests and filed various motions seeking GEO's financial information.

In a recent order (A1-11, the "Discovery Order"), the district court cut back, as burdensome and disproportionate, some of the State's most outlandish requests for financial information.  But it also compelled GEO to respond to many others.  *See* A9-10.  That order is clearly erroneous because the financial information is not relevant, as required by Federal Rule of Civil Procedure 26(b), to any theory of unjust enrichment that the State could possibly have against GEO under Washington law.  The error is not correctable by a post-judgment appeal, because production to the State materially risks public disclosure resulting from requests to

2

the State under Washington's Public Records Act.  Compelling such broad

discovery of financial information as "related" to unjust enrichment claims could

also prejudice contractors in the numerous other cases in which detainees have

sued them for unjust enrichment related to the VWP.[1]  The Court should issue a

writ of mandamus to the district court to vacate the Discovery Order to the extent it

compels GEO to produce the financial information.

## ISSUE PRESENTED

Whether GEO should be compelled to produce confidential and sensitive

financial information that is irrelevant to any colorable unjust enrichment claim

that the State could bring in this action.

## STATEMENT OF JURISDICTION

The Court has jurisdiction under the All Writs Act, 28 U.S.C. § 1651(a).  *See*

*Perry v. Schwarzenegger*, 591 F.3d 1147, 1156-57 (9th Cir. 2010).

## STATEMENT OF THE FACTS

### A.    The Voluntary Work Program at NWDC.

Federal immigration detainees are housed in Service Processing Centers

---

[1] *See Menocal v. The GEO Group, Inc*., No. 1:14-cv-02887-JLK-MEH (D. Colo.); *Novoa v. The GEO Group, Inc*., No. 5:17-cv-02514-JGB-SHK (C.D. Cal.); *Owino v. CoreCivic, Inc*., No. 3:17-cv-1112-JLS-NLS (S.D. Cal.); *Gonzalez v. CoreCivic, Inc*., No. 3:17-cv-2573-JLS (S.D. Cal.); *Gonzalez v. CoreCivic, Inc*., No. 1:18-cv-169-LY (W.D. Tex.); *Barrientos v. CoreCivic, Inc*., No. 4:18-cv-00070 (M.D. Ga.), *on appeal, CoreCivic, Inc. v. Barrientos*, No. 18-90025 (11th Cir.).

("SPCs"), which ICE operates directly, as well as Contract Detention Facilities

("CDFs"), which contractors like GEO operate under ICE's policies, contract

terms, and supervision.  Both SPCs and CDFs (like NWDC) must follow ICE's

Performance Based National Detention Standards ("PBNDS").  *See* A122.

Under the current ICE-GEO Contract, GEO must administer a VWP that

complies with the PBNDS.  A122.  The current PBNDS states that the VWP

"provides detainees opportunities to work and earn money while confined, subject

to the number of work opportunities available and within the constraints of the

safety, security and good order of the facility."  A95.  The program aims to

enhance "[e]ssential operations and services…through detainee productivity" and

to reduce "[t]he negative impact of confinement…through decreased idleness,

improved morale and fewer disciplinary incidents."  *Id.*  Participation is voluntary

and limited to 8 hours per day and 40 hours per week.  A97.  The availability of

work depends on a detainee's risk classification level, and it is "the sole

responsibility of ICE to determine whether a detainee will be allowed to perform

on voluntary work details and at what classification level."  A122.

The current version of the PBNDS states that compensation for VWP

participation "is at least $1.00 (USD) per day."  A97.  Versions of the PBNDS

prior to July 23, 2013 stated that the compensation is "$1.00 per day."  A103, 109.

Under the current ICE-GEO Contract, ICE reimburses GEO "at the actual costs of

$1.00 per day per detainee," and that is the amount VWP participants at NWDC typically are paid.  A121.  This $1 daily allowance is authorized by a federal statute providing that appropriations "now or hereafter" to ICE shall be available for "payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed."  8 U.S.C. § 1555(d). The most recent rate specified by Congress was "not in excess" of $1 per day per detainee.  *See* Dep't of Justice Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (Oct. 10, 1978); INS General Counsel, *The Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention Facilities*, General Counsel Op. No. 92-8 (INS), 1992 WL 1369347 (Feb. 26, 1992).

### B.    The State's Lawsuit

The State has asserted two claims.  *First*, it seeks declaratory and injunctive relief on the grounds that GEO violates the MWA by failing to pay detainees a state minimum wage.  The State seeks to prevent GEO from operating the VWP without paying detainees the wage allegedly required by the MWA.  A23-24.

*Second*, the State seeks restitution for GEO's alleged "unjust enrichment." The complaint alleges that "[s]ince 2005, GEO receives and has received the benefit of having necessary work done at NWDC without bearing the financial burden of paying the minimum wage to those who perform such work," A22 ¶ 4.9,

because GEO allegedly "utilizes detainee labor to operate NWDC" but "does not pay adequate compensation to detainees for their work." A23 ¶¶ 6.3, 6.4. The State alleges that GEO "benefits by retaining the difference between the $1 per day that it pays detainees and the fair wage that it should pay for work performed at NWDC." A23 ¶ 6.5. It further alleges that "[i]t is unjust for [GEO] to retain the benefit gained from its practice of failing to pay adequate compensation to detainees for the work they perform at NWDC." A23 ¶ 6.6. The State asks the district court to "[o]rder [GEO] to disgorge the amount by which it has been unjustly enriched." A24 ¶ 7.6. The State argues that discovery of GEO's financial information is relevant to unjust enrichment, not the MWA claim. A40-41.

### C.    The State's Motion To Compel.

The State moved to compel discovery on what it calls "at least two dimensions" of GEO's alleged unjust enrichment: "(1) the difference between 'fair wages' and what GEO actually paid detainee workers; and (2) the profit derived as a result of its unfair labor practices." A26-27. The State argues that "[w]hile the difference between a 'fair wage' and the $1/day paid is an essential part of the disgorgement of unjust enrichment analysis, Washington *also is entitled to discover and evaluate the full value of the benefit received and retained by GEO, including company-wide profits, resulting from its practice of failing to pay adequate compensation to detainees at the NWDC*." A40. This claim to

6

discovery is based on the erroneous view that ***both*** unpaid wages ***and*** profits constitute the measure of unjust enrichment under Washington law.

### D.    The District Court's Discovery Order.

The Discovery Order partly denied discovery of GEO's financial information, finding that "[g]enerally speaking, the State's discovery requests are overbroad, complex, and ask for documents that may not be in existence and are not proportional to the needs of the case."  A8.[2]  The district court also found that "[t]he burden and expense of responding to the discovery requests probably outweighs their likely benefit."  A8-9.  The court then struck out portions of the State's requests and modified others to shape an order compelling disclosure of various sensitive GEO financial documents.  A9-10 (containing complete list of requests compelled and denied).

Although this Discovery Order implicitly deemed all of the compelled information to be relevant to the unjust enrichment claim, the district court nowhere explained why, or on what authority, it deemed the discovery relevant.

### E.    GEO's Motion To Reconsider The Discovery Order.

GEO sought reconsideration of the portions of the Discovery Order that compelled production of the irrelevant financial information.  A64-71.  GEO

---

[2] The Discovery Order also disposed of GEO's motion for relief from deadlines and motion to compel.  A1-8.  Those rulings are not at issue in this petition.

argued that district court had clearly erred by holding that the compelled financial information was relevant to the unjust enrichment claim.  *See* A68-70.  GEO also noted that, after the filing of the State's motion to compel, the State had served an expert report without the confidentiality markings required by the protective order. *See* A66-67, 75-76.  This mishandling of financial information underscored GEO's concern that the protective order would not protect its information.

The district court denied GEO's motion for reconsideration.  A12-13 ("Reconsideration Order").  The court concluded that the financial information sought by the State is discoverable under Rule 26(b), but declined to explain why, or on what authority.  Instead, the court stated that "[t]o avoid making any findings on the merits of any claim prematurely, further comment on their relevance would appear imprudent."  A13.

### F.    GEO's Motion To Certify The Issue For Appeal.

GEO moved to certify an interlocutory appeal, under 28 U.S.C. § 1292(b), on whether the financial information is within the scope of discovery for an unjust enrichment claim. The district court declined to certify the issue, stating that the Discovery Order and the Reconsideration Order "determined discovery's relevance only under Fed. R. Civ. P. 26(b)(1)."  A15.  In its order denying certification, the district court stated:

> This case arguably centers on a ***novel question of law***, namely, whether detainees at the NWDC may be subject to the State Minimum

8

> Wage Act.  Resolving the discovery dispute about Defendant's financials may also involve addressing ***an unsettled issue of state law, the measure of damages for an unjust enrichment claim***.  This motion, however, involves a third issue—the scope of discovery when an unjust enrichment claim is pled.

A17 (emphases added).  Although the district court attempted to separate the "scope of discovery" issue from the novel and unsettled issues surrounding the unjust enrichment claim, it did not erase the central issue: whether the discovery is "relevant" to any colorable unjust enrichment theory under Washington law.  Instead, it sidestepped the issue by concluding that "the discovery issue is collateral."  *Id*.

Thus, in three consecutive decisions the district court has declined to articulate why GEO's financial information is relevant to the unjust enrichment claim, and further declined to certify the issue for appeal.  Discovery in this case is currently set to close on March 15, 2019 and trial is set to begin on July 7, 2019.

## STANDARD OF REVIEW

This Court uses five factors to decide whether mandamus is proper: (1) whether the petitioner has no other means to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new

and important problems or issues of first impression. *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654-55 (9th Cir. 1977).

The factors are merely "guidelines" for the Court's analysis. *Perry*, 591 F.3d at 1156. "Not every factor need be present at once," but the absence of clear error is dispositive. *Id*. The district court's error is clear and all factors weigh in favor of issuing the writ.

## WHY THE WRIT SHOULD ISSUE

### I.   GEO Has No Other Adequate Means To Prevent The Compelled Disclosure Of Its Confidential Financial Information.

The first *Bauman* factor is met when "the petitioner lacks an alternative avenue for relief." *Id.* at 1157. "Mandamus review has been held to be appropriate for discovery matters which otherwise would be reviewable only on direct appeal after resolution on the merits." *Id.* (citation omitted); 16 Wright & Miller, Fed. Prac. & Proc. § 3935.3 (3d ed.) ("Mandamus has shone prominently in the constellation of appellate devices to review discovery orders.").

GEO lacks any alternative avenue for relief from the Discovery Order. "'A discovery order ... is interlocutory and non-appealable' under 28 U.S.C. §§ 1291, 1292(a)(1) and 1292(b)." *Perry*, 591 F.3d at 1157 (citation omitted). GEO is mindful that this Court expects an issue to be diligently pursued in the district court before petitioning for mandamus. *See Cole v. U.S. Dist. Court*, 366 F.3d 813, 822-23 (9th Cir. 2004). Here, GEO has acted with all diligence. GEO timely

10

challenged the relevancy of the discovery and brought to the district court's attention its concerns about the ineffectiveness of the protective order and the politicized surroundings of this case that pose risks of prejudice.  A42-47.  GEO timely sought reconsideration of the Discovery Order, raising further concerns about the protection of its information.  A64-70.  GEO then sought certification of the issue for an interlocutory appeal to this Court under 28 U.S.C. § 1292(b), but was again denied on the grounds that the issue was "collateral."  *See* A14-18; *cf. Mohasco Indus., Inc. v. Lydick*, 459 F.2d 959, 960 (9th Cir. 1972).  GEO is now left with no remaining avenues to obtain relief from an order compelling discovery of confidential and sensitive information.

## II.   GEO Will Be Damaged And Prejudiced In A Way Not Correctable By An Appeal From A Final Judgment.

The second *Bauman* factor is satisfied when "no [post-judgment] review could prevent the damage that [proponents] allege they will suffer or afford effective relief therefrom."  *Perry*, 591 F.3d at 1157 (citation omitted); *see*, *e.g*., *Star Editorial, Inc. v. U.S. Dist. Court*, 7 F.3d 856, 859 (9th Cir. 1993) ("[I]f the district court erred in compelling disclosure, any damage the [newspaper] suffered would not be correctable on appeal.").

Mandamus is often used to protect the disclosure of private or confidential information that a party would ordinarily not divulge.  *See* 16 Wright & Miller, Fed. Prac. & Proc. § 3935.3 (3d ed.) ("[M]andamus review is most likely to be

available to protect claims that discovery threatens an irreparable invasion of important privacy interests.").  This Court has issued a writ of mandamus to set aside an order that required the plaintiff to disclose a secret formula that it had obtained under a non-disclosure agreement.  *Hartley Pen Co. v. U.S. Dist. Court*, 287 F.2d 324 (9th Cir. 1961).  In *In re Electronic Arts, Inc.*, 298 F. App'x 568 (9th Cir. 2008), the Court issued a writ preventing public disclosure of a licensing agreement that would include "pricing terms, royalty rates, and guaranteed minimum payment terms."  *Id*. at 569-70 (deeming the information "trade secrets"); *see also* Restatement (First) of Torts § 757 cmt. b (1939) ("trade secret" may include "information which is used in one's business," and "gives him an opportunity to obtain an advantage over competitors who do not know or use it").

In discovery cases, mandamus clearly applies: "a remedy after final judgment cannot unsay the confidential information that has been revealed."  *In re Sims*, 534 F.3d 117, 129 (2d Cir. 2008); *Barton v. U.S. Dist. Court*, 410 F.3d 1104, 1109 (9th Cir. 2005) ("[O]nce the questionnaires are disclosed to the defendant, the disclosure cannot be undone, by appeal or otherwise").  This Court has recognized that compliance with a discovery order may moot any subsequent appeal of that order, which also supports mandamus review.  *United States v. Fei Ye*, 436 F.3d 1117, 1123 (9th Cir. 2006).

Appellate courts also exercise mandamus power to halt discovery when the

relevance and application of the underlying claim is legally doubtful, but the prejudice from disclosure is high.  The Eighth Circuit issued a writ when a director of the department of corrections was ordered to identify both the pharmacy that made pentobarbitol for use in executions and the company that tested the drug.  *In re Lombardi*, 741 F.3d 888 (8th Cir. 2014).  That was because the information was "***not relevant*** to any claim that should survive a motion to dismiss" and discovery could subject the firms to intense pressures and business harm.  *Id.* at 895.  In *Medhekar v. U.S. Dist. Court*, 99 F.3d 325 (9th Cir. 1996), the Court issued a writ staying initial disclosures while a motion to dismiss was pending because "the harm sought to be avoided, the burden and cost of providing the initial disclosures, cannot be corrected in a subsequent appeal from a final judgment in the absence of mandamus relief."  *Id.* at 326-27.  *See  also Hernandez v. Tanninen*, 604 F.3d 1095, 1101-02 (9th Cir. 2010) (issuing mandamus where broad finding on privilege waiver might force witness "to testify about his evaluation of [unrelated] matters").

Here, the district court has widened the scope of discovery to include highly sensitive commercial financial information that is irrelevant to any unjust enrichment claim allowed under Washington law.  *See* Section III, *infra*.  GEO is compelled to disclose a broad range of financial information that it would never normally release.  Once the information is provided, GEO will be at continued risk

that the information will become publicly available, and compromise its

competition position.  Among other things, GEO must produce for discovery:

- "all documents . . . containing financial performance analyses, financial models, or other financial evaluations prepared in connection with or for the purpose of GEO Group's offers(s) and bid(s), and negotiations related to amendment(s) and renewal(s), of contracts related to the NWDC from 2005 – present;"
- all "supporting information" for "profit and loss statements" since 2005;
- "all documents that set forth the detailed operating costs of the facility, Voluntary Work Program costs, labor costs, and payroll expenses as well as all details of revenue, contract payments and reimbursements for the NWDC;"
- "all documents that contain financial analysis, financial models, analysis of profits earned, valuation of work performed, or other assessments of the Voluntary Work Program at the NWDC from 2005 to present;"
- "any per diem rate calculations and models related to GEO Group's NWDC Contract(s) from 2005 to present, including . . . desired margins;"
- any documents or information related to assumptions made in determining the contractually negotiated per diem rate(s) and calculations for the NWDC Contracts.

A9-10.

For a federal contractor that regularly bids on ICE's facility contracts, this

information is highly confidential trade secret information that would not be

willingly disclosed.  GEO routinely seeks to protect such information from

disclosure.  *See*, *e.g.*, Order at 7; *Detention Watch Network  v. ICE*, No. 1:14-cv-

583 (S.D.N.Y. Sept. 1, 2016), ECF 141 (granting GEO leave to intervene to protect

confidential information from disclosure under FOIA, recognizing GEO's "interest

in preventing the disclosure of commercial information that [it] regard[s] as

14

confidential").  Information such as per diem rates, financial modeling and analyses are proprietary internal work, and their confidentiality is critical to GEO's business.  Once that information is provided to the Attorney General, GEO is at continued risk of public disclosure, with potentially drastic effects.

That is true despite a protective order.  When the State served an expert report on GEO, it contained explicit references to, and discussions of, documents that GEO had designated confidential, but without any confidential marker on the report itself.  *See* A75-76.  GEO was forced to take steps to fix the State's mistake.

GEO also has significant concerns, in light of the politicized nature of this case and multiple pending suits, *see* A47 n.2; *supra* n.1, that information GEO discloses to the State could become available to the public through Washington's liberally construed Public Records Act ("PRA").  *See Wade's Eastside Gun Shop. Inc. v. Dep't of Labor and Indus.*, 372 P.3d 97, 99 (Wash. 2016) (discussing Wash. Rev. Code § 42.56); *see* A87 (portion of protective order discussing PRA).  The risk of public disclosure in this case is very real, and could prove very damaging.

## III.   The District Court's Ruling Is Clearly Erroneous As A Matter Of Law.

The Discovery Order and Reconsideration Order contain a clear error of law: they deem the State's requests for discovery of financial information to be relevant to a theory of unjust enrichment that is contrary to Washington law.

In order to be discoverable, information must be relevant to a party's claim.

15

"Parties may obtain discovery regarding any nonprivileged matter *that is relevant to any party's claim* or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b) (emphasis added).  Although the question of relevancy "is to be more loosely construed at the discovery stage than at the trial," *Kerr v. U.S. Dist. Court*, 511 F.2d 192, 196 (9th Cir. 1975), relevancy is still required.  *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992) ("While the standard for relevance in the context of discovery is broader than in the context of admissibility . . . this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery").  Determinations of relevance in discovery matters should be reversed for abuse of discretion.  *Liew v. Breen*, 640 F.2d 1046, 1049 (9th Cir. 1981) (citation omitted).  An error of law is a per se abuse of discretion. *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013).

This Court has cited favorably *Sanderson v. Winner*, 507 F.2d 477 (10th Cir. 1974), in which mandamus power was exercised to halt irrelevant financial discovery.  *See Kerr*, 511 F.2d at 197 n.7.   In *Sanderson*, plaintiffs bringing an antitrust class action sought writs directing a district court to vacate orders requiring them to produce income tax returns and financial documents.  507 F.2d at 479.  The defendants had moved for those orders, arguing that they were entitled to know whether the plaintiffs were able to pay the costs of litigation.  The court issued the writs because it "failed to see relevancy in these inquiries."  *Id*.

16

The district court's holding that the financial information is relevant to the State's unjust enrichment claim is clear error.  Washington law measures unjust enrichment for unpaid services rendered only by the reasonable market value of the services and not with respect to a defendant's profitability.  Accordingly, the district court should not have ordered production of confidential business information, which order GEO will be unable to reverse later.

### A.   There Is No Colorable Theory Of Unjust Enrichment That Makes The Compelled Financial Information Relevant.

Under Washington law, the measurement of the unjust enrichment for services rendered extends no further than the reasonable, ascertainable market value of those services.  The financial information that the district court has held to be discoverable is irrelevant to any such calculation.

The State's unjust enrichment theory and its related discovery requests have morphed and expanded significantly over the course of this case.  The State has pled that unjust enrichment is "the difference between the $1 per day that [GEO] pays detainees and the fair wage that it should pay for work performed at NWDC." A23 ¶ 6.5.[3]  The State argued that GEO has been unjustly enriched "by failing to

---

[3] The State must be held to the unjust enrichment theory it pled.  *Pickern v. Pier 1 Imports (U.S.), Inc*., 457 F.3d 963, 968-69 (9th Cir. 2006); *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir. 2000) (summary judgment on unpled theory improper because defendant had no notice of which actions to defend).

pay detainee-workers a fair wage."  Washington's Opp. to Motion to Dismiss, at 7
(ECF No. 17, Nov. 13, 2017).   It described the alleged "benefit" to GEO as "the
difference between the $1 per day that it pays and the fair wage that GEO should
have paid."  *Id*. at 20; *see also id*. at 20 n.6 ("fair market rate [GEO] would have
had to pay for the work performed"); Washington's Reply In Support Of Mot. To
Remand, at 11 (ECF No. 28, Dec. 1, 2017) ("Washington seeks the fair market
value of the detainee-workers' services.").  The State now seeks not only the fair
market value of the detainees' labor, but ***also*** "the amount of profit GEO derived
and retained from detainee labor at NWDC and the financial boon it received from
its unfair labor practices," which it claims are "also part of the benefit GEO
received."  A52-53.  This is not consistent with Washington law.

When alleged unjust enrichment arises from services rendered, the measure
of the unjust enrichment is ***only*** the reasonable value of the services rendered, if
ascertainable.  Thus, in  *Kerr v. King County*, 259 P.2d 398 (Wash. 1953), in a suit
for unpaid overtime wages, the court explained unjust enrichment as: "[t]he law
imposes upon a person a fictitious promise to pay, from an implied legal duty or
obligation, for the reasonable value of services rendered to him, which he has
accepted and the benefit of which he is enjoying."  *Id*. at 403.  *See also
Metrophones Telecommc'ns, Inc. v. Global Crossing Telecommc'ns, Inc*., 423 F.3d
1056, 1076 (9th Cir. 2005) (interpreting measure of unjust enrichment under

18

Washington law under contract implied-in-law as "the reasonable value of the services provided").

This rule is also consistent with the Restatement (Third) of Restitution, which states that "[m]arket value is likewise the usual measure of enrichment in cases of restitution for services that are presumed to be beneficial to the recipient, where market value becomes a proxy for 'value to the recipient.'".  Restatement (Third) of Restitution and Unjust Enrichment, § 49 cmt. f (2011).  Similarly, under the Washington Pattern Jury Instructions for quasi-contract, a jury is instructed to award "the reasonable value of the [*services performed*] [*work*, *labor*, *or property furnished*]" if those services or labor were received by a defendant that "knew or should have known" that the plaintiff expected payment.  6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 301A.02 (6th ed.).  The pattern instruction on restitution is similar.  *See id.* WPI 303.08.

The instance in which the measurement for unjust enrichment for unpaid services rendered is ***not*** the reasonable value of services is when there is no ascertainable market value.  In *Air Serv Corp. v. Flight Services & Systems, Inc*., 199 Wash. App. 1011, 2017 WL 2345701 (Wash. Ct. App. May 30, 2017), plaintiff Air Serv sought unjust enrichment restitution for provided cleaning services on airplanes.  The court of appeals stated that "***[w]hen services have been provided***, ***the first measure is typically represented by the market value of the***

19

*services rendered*, while the second measure involves disgorgement of the profit the defendant received as a result of the services rendered." *Id*. at *4 (citing *Young v. Young*, 164 Wash. 2d 477, 487-88, 191 P.3d 1258 (2008)). The latter measure is only used when the former is not available. *Id*. at *1 ("disgorgement of profit is a viable remedy for unjust enrichment when there is no market value available"). Choosing profits **and** market value as the measure of unjust enrichment is not an option. Disgorgement of profits was permitted in *Air Serv **because the services were "unique" and the trial court could not ascertain the market value**. *Id*. at *4-5.

Here, the alleged market value of the detainees services is apparent on the face of the State's own pleadings. A23 ¶ 5.6 (alleging that GEO violates state minimum wage laws "when it pays detainees who work at NWDC $1 per day *instead of the hourly minimum wage*"). But when the State moved to compel GEO's financial records, it sought discovery on a theory that sprawls far beyond an hourly wage, to GEO's "profits" or other alleged monetary "benefits."

The State relied below on the Supreme Court of Washington's decision in *Young*, which was plainly inapposite. A40, 52. In *Young*, a property owner sued the occupants of her property, seeking to quiet title and eject the occupants. They counterclaimed for unjust enrichment, based on improvements made to the property. 191 P.3d at 1260-61. The court held that the measure of recovery to a

claimant *for improvement to land* was the value of what it "would have cost the defendant had it obtained the benefit from some other person in the plaintiff's position," *or* "the extent to which the other party's property has been increased in value or his other interests advanced." *Id.* at 1263-64 (citations omitted).

*Young* does not apply here because it addressed unjust enrichment awards "for improvements to real property," and not for services rendered. *Id*. at 1266. When improvements to real property are at issue, a property owner "must disgorge the entire value of the benefit she received as determined by either the fair market value of the services *or* the amount the improvements enhanced the value of the property." *Id*. at 1265 (emphasis added). But here, the detainees who allegedly "enriched" GEO did so by voluntarily participating in the VWP. Thus, the claim for unjust enrichment would involve only services rendered, not property values. The State cited no better cases and, as shown above, other Washington cases, Washington's pattern jury instructions, and the Restatement show that reasonable market value is the only proper measure of any unjust enrichment award here.

Allowing the State to pursue such an unpled, amorphous, open-ended unjust enrichment claim—and to obtain discovery of a wide swath of highly sensitive financial documents as "related" to that claim—not only exceeds Washington law, it also sets a dangerous precedent. It would license the State to sue companies for unjust enrichment whenever the Attorney General deems that a company is paying

21

its employees less than the Attorney General thinks "just." Such a claim would then, under the district court's holding, entitle the Attorney General to dig through that company's finances, assign some value to the benefit received, and force the company to disgorge that amount for the public good. That is not the law.

Indeed, that logic fails even when advanced by the person who actually performed the services. In *Moberg v. Terraqua, Inc.*, 199 Wash. App. 1059, 2017 WL 3048645 (Wash. Ct. App. July 18, 2017), the plaintiff argued that he was entitled to restitution for unjust enrichment because of his "dedication, long hours and hard work," which he claimed benefitted the company's work and increased its revenue. While it was clear that the company's contracts had "increased in value," the court reversed a summary judgment for the plaintiff, in part because it saw "no viable argument why the increased business should be viewed as an injustice to him rather than [the company owner's] reward for sound hiring and management decisions. *Id*. at *10.

In sum, the State's claim is limited to—if anything at all—the reasonable value of the services rendered (e.g., a minimum wage), and not profits or other consequential monetary recovery that it claims for the detainees' work. The district court clearly erred by compelling discovery that is not relevant to a colorable theory of unjust enrichment under Washington law.

**B.** **The State's Claim Does Not Support Broad Discovery Of Financial Information For Other Reasons.**

While discovery of GEO's confidential information is improper within the scope of the State's unjust enrichment claim, the discovery order should also be reversed because the claim itself is fatally flawed.  To prove unjust enrichment in Washington, a plaintiff must show (1) the defendant received a benefit, (2) ***at the plaintiff's expense***, and (3) under circumstances that make it "unjust for the defendant to retain the benefit without payment." *Young*, 191 P.3d at 1262.   For several reasons, the State cannot meet this burden.

1.     As a threshold matter, the State has no standing to sue for unjust enrichment because it did nothing to enrich GEO itself.  In Washington, unjust enrichment requires that a benefit received is ***at the plaintiff's expense***.  *Young*, 191 P.3d at 1262; *Allyis, Inc. v. Schroeder*, 197 Wash. App. 1082, 2017 WL 751329 (Wash. Ct. App. Feb. 27, 2017) (plaintiff could not sue competitor for unjust enrichment when competitor was enriched by plaintiff's former employee and not by plaintiff).  But it is only ***detainees*** who participated in the VWP, not the State.  A class of NWDC detainees has already sued for unpaid wages, leaving the State with no separate "unjust enrichment."  *See Nwauzor, et al. v. GEO Group*, No. 17-cv-5769-RJB (W.D. Wash.).

2.     The State's claim fails under the elements of Washington's own law.  A volunteer cannot recover in unjust enrichment.  *Lynch v. Deaconess Medical*

23

*Center*, 776 P.2d 681, 683 (Wash. 1989) (to state an unjust enrichment claim, "plaintiff cannot be a mere volunteer"); *Young*, 191 P.3d at 1262. But all detainees are, by definition, volunteers, and participants acknowledge that they are working voluntarily. A97 ("The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment."). The State fails to even allege that detainees' participation is involuntary.[4]

3. There is no unjust enrichment because there was no reasonable expectation by detainees that GEO would pay the detainees market wages. "[E]ven when a person has received a benefit from another, he or she is only liable to pay for it when the circumstances are such that between the two, it is 'unjust' to retain it without paying restitution." 25 Wash. Prac., Contract L. & Prac. § 18.303.08 (3d ed.) (citing *Chandler v. Washington Toll Bridge Auth.*, 137 P.2d 97, 102 (Wash. 1943)); *Osborn v. Boeing Airplane Co.*, 309 F.2d 99, 102 & n.6 (9th Cir. 1962) (noting, *inter alia*, that under Washington law "an obligation to pay,

---

[4] In denying GEO's motion to dismiss, the district court "infer[ed] that detainees' participation was involuntary from the alleged circumstances, where detainees are housed at a private immigration detention center, Defendant has compensated detainees at $1 per day since 2005, regardless of hours worked, and Defendant has financially benefited from the work without the financial burden of paying the State minimum wage." Order, at 15 (ECF No. 29, Dec. 6, 2017). This huge inference—which essentially assumed GEO was violating ICE policy and its contract by having involuntary VWP participation, *see* A95, 122—was completely unwarranted, and the unjust enrichment claim should have been dismissed on the face of the complaint because involuntariness was not alleged.

24

ordinarily, will not be implied in fact or by law if it is clear that there was indeed no expectation of payment").  In *Kerr*,  when the plaintiffs sued for unpaid overtime wages for services performed for the defendant King County, the Washington court of appeals held there was no unjust enrichment because "there was no expectation on the part of the respondents that they would be ***paid*** for their overtime.  There was no expectation on the part of the county that it would ***pay*** respondents for their overtime."  259 P.2d at 403 (emphasis in original).

So too here: detainees volunteered to work in the VWP for $1 per day, without any reasonable expectation that they would be paid a minimum wage and with acknowledgement that the program is voluntary.  A97.  GEO never expected to pay a state minimum wage to detainees, as its contract notes that its "actual cost" would be $1 per day per detainee, and there is nothing "unjust" about detainees receiving what the PBNDS permits and the contract reimburses.   A121.

4.      Finally, the State lacks *parens patriae* authority to bring an unjust enrichment claim on behalf of detainees.  *See generally Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-08 (1982).   Such claims must rely on a state's quasi-sovereign interest, which does not include "sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party."  *Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc*., 642 F.3d 728, 737 n.2 (9th Cir. 2011).  Yet that is just what the State pursues here.  *See, e.g.,*

25

Washington's Reply In Support Of Mot. To Remand, at 11 (ECF No. 11, Dec. 1, 2017) ("Washington seeks the fair market value of the detainee-workers' services."). The State lacks any independent interest apart from the private interests of detainees who participated in the VWP, which the detainees themselves are pursuing now in the *Nwauzor* action. *See supra* at 23. Allowing the State to pursue its relief in a representative capacity for a class of detainee "employees" would "be a substantial departure from the scope of *parens patriae* authority…" *California v. Frito-Lay, Inc*., 474 F.2d 774-75 (9th Cir. 1973); *see also id*. at 775-778 (California had no standing to sue to recover for individual citizen injuries because "*[p]arens patriae* has received no judicial recognition in this country as a basis for recovery of money damages for injuries suffered by individuals"); *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (state has standing only when "sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens").

At bottom, allowing the State's *parens patriae* suit here would grant a state license to sue in equity anytime it also sues to enforce any law, including against the federal government's contractors. But *parens patriae* standing has nothing to do with the enforcement of a state's domestic law against a domestic actor; instead, it involves a state bringing suit to protect its citizens from an ***external*** threat or violation. *See, e.g.*, *Snapp*, 458 U.S. at 608-09 (Puerto Rico had standing to sue

26

east coast apple growers under federal law for employment discrimination against Puerto Ricans). Allowing state law enforcement actions to serve as a backdoor for vague—and potentially limitless—equitable awards on behalf of specific people stretches the *parens patriae* doctrine beyond recognition.

In sum, the State has no valid unjust enrichment theory. Consequently, there is no basis to compel discovery of financial information as relevant to such a claim.

## IV. The District Court's Order Contains An Oft-Repeated Error.

The district court held that financial information is relevant to the State's unjust enrichment claim. It repeated the error in denying GEO's motion for reconsideration and denied GEO's motion to certify the issue for interlocutory appeal, without explaining how GEO's confidential financial information could have any effect on this case. The district court's discovery rulings may impact the several pending cases in which similar unjust enrichment claims have been raised, and other courts may similarly compel discovery of financial information that far exceeds the scope of unjust enrichment. *See supra* n.1. The Court should address this issue before the district court's error is repeated elsewhere.

## V. The District Court's Order Raises New And Important Problems On An Issue Of First Impression.

Under the fifth *Bauman* factor, this Court has "exercised mandamus jurisdiction to review discovery orders raising particularly important questions of first impression." *Perry*, 591 F.3d at 1157. This type of factor is satisfied when a

27

case involves "the extension of an established principle to an entirely new
context." *In re Sims*, 534 F.3d at 129.  Unjust enrichment may be a familiar claim,
but it is novel in the context presented here, where a state Attorney General is
seeking to recover restitution by inserting state wage laws into a long-standing
federal program simply because it is administered by a private company.  The State
acknowledges that whether its wage laws apply to immigration detainees is one of
"first impression."  Washington's Opp. To Motion To Dismiss, at 3 (ECF No. 17,
Nov. 13, 2017).  The use of the State's power to sue for unjust enrichment for
***detainees***' work has even greater novelty.  ***No court*** has ever allowed that.

Only a few courts have weighed in on whether immigration detainees can
sue for unjust enrichment for ***their own*** work, reaching different results.  A
Massachusetts appellate court affirmed the dismissal of a case brought by an ICE
detainee against a detention facility for minimum wages and unjust enrichment.
The court held that "[a]bsent some factual allegation that [the detainee] reasonably
expected compensation at a higher rate, and the defendants accepted the benefit of
his labor with actual or chargeable knowledge of his expectation, the complaint
fails to state a claim for quantum meruit or unjust enrichment." *Whyte v. Suffolk
Cty. Sheriff's Dep't*, 91 Mass. App. Ct. 1124, 86 N.E.3d 249, 2017 WL 2274618
(Mass. App. Ct. May 24, 2017), *review denied*, 477 Mass. 1113, 94 N.E.3d 395
(2017).  Here, too, the State has not alleged that detainees expected compensation

at the Washington minimum wage level, or that GEO accepted detainee labor with any similar expectation.  *See supra* at 23-26.

In *Menocal v. GEO Group, Inc*., 113 F. Supp. 3d 1125 (D. Colo. 2015), the district court declined to dismiss an unjust enrichment claim brought by detainees under Colorado law.  *Id*. at 1133.  However, the district court only declined to dismiss an unjust enrichment claim for "the fair value of [the detainees'] services," and did not hold that the unjust enrichment claim permitted recovery of GEO's profits (as the State argues in this case).  *Id*. (citing *Bock v. Am. Growth Fund Sponsors, Inc*., 904 P.2d 1381, 1387 (Colo. App. 1995) for proposition that the "proper measure of unjust enrichment is difference between consideration paid and fair market value of employee's services").  Neither *Whyte* nor *Menocal* addresses the issue of whether a ***state government*** can recover in unjust enrichment, and if so, what the proper measure of any award might be.[5]

Thus, the scope of discovery allowed on a Washington unjust enrichment claim for services rendered is an issue of first impression, and, as discussed, carries serious consequences for GEO, particularly due to the risk of disclosure through Washington's Public Records Act.  Similar unjust enrichment claims have been

---

[5] In *Novoa v. GEO Group, Inc*., No. 5:17-cv-2514-JGB-SHK, 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018), a detainee seeks disgorgement and alleges that he "conferred a benefit to GEO through coercion and/or fraud."  *Id.* at *8.  There is no such allegation in this case.

advanced in other immigration detainee class action litigation in this Circuit and others.  *See supra* n.1.  Without the Court's exercise of the writ, such rulings would likely continue to evade review as interlocutory orders, while harming the contractors that must disclose their sensitive financial information.  *See In re Cement Antitrust Litig*., 688 F.2d 1297, 1304-05 (9th Cir. 1982) (exercising mandamus power over "an important question of first impression" that "may continue to evade review *in other cases as well*").

## CONCLUSION

The Court should issue a writ of mandamus to the district court to vacate the Discovery Order to the extent it compels disclosure of GEO's financial information.

Dated:  January 3, 2019                    Respectfully submitted,

Scott A Schipma                           /s/ Mark Emery
Jerry Stouck                              Mark Emery
GREENBERG TRAURIG LLP                     NORTON ROSE FULBRIGHT US LLP
2101 L St NW, Ste. 1000                   799 9th Street, NW, Suite 1000
Washington, DC 20037                      Washington, DC 20001
(202) 331-3141                            (202) 662-0210
schipmas@gtlaw.com                        mark.emery@nortonrosefulbright.com
stouckj@gtlaw.com
Douglas Edward Smith

LITTLER MENDELSON
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101
(206) 623-3300
desmith@littler.com                       *Counsel for Petitioner*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 21-3 and Circuit Rule 28-2.6, GEO states that there are no related cases pending before this Court.  A prior appeal in *Ugochukwu Nwauzor, et al v. The Geo Group, Inc*., No. 18-35753, a case before Judge Bryan in the U.S. District Court for the Western District of Washington that involves claims by detainees at the NWDC for minimum wage under Washington's Minimum Wage Act, was voluntarily dismissed.  This Court also denied a petition for interlocutory appeal of a class certification order arising from the same matter, *Ugochukwu Nwauzor, et al v. The Geo Group, Inc*., 18-80095.

## CERTIFICATE OF COMPLIANCE
## WITH PAGE LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the page limitations of Ninth Cir. R. 21-2 and 32-3 because this petition is not more than 30 pages, and contains 7,265 words, apart from portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman typeface.

Dated: January 3, 2019

/s/ Mark Emery
Counsel for Petitioner

31

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Petition with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 3, 2019.

I further certify that on January 3, 2019, a notice of the filing of the foregoing (including a complete copy of the foregoing) will be filed in the underlying proceeding in the United States District Court for the Western District of Washington, in compliance with Federal Rule of Appellate Procedure 21(a)(1), and that all parties to the proceeding and the district court (Judge Robert Bryan) will be served with that notice and copy of the petition through the district court's CM/ECF system.  In addition, a courtesy copy of the foregoing has been provided via e-mail to counsel for the State of Washington and in paper form to the district court.

Dated: January 3, 2019

                                         _____
                                              */s/ Mark Emery*
                                         Counsel for Petitioner

No. _____

IN THE

# United States Court of Appeals for the Ninth Circuit

IN RE THE GEO GROUP, INC.

THE GEO GROUP, INC.
Petitioner-Defendant

v.

U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON,
Respondent.

THE STATE OF WASHINGTON,
Respondent-Real Party in Interest.

On Petition for a Writ of Mandamus to the United States District Court for the
Western District of Washington (No. 3:17-cv-05806)

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS

Scott A Schipma
Jerry Stouck
GREENBERG TRAURIG LLP
2101 L St NW, Ste. 1000
Washington, DC 20037
(202) 331-3141
schipmas@gtlaw.com
stouckj@gtlaw.com

Mark Emery
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW
Washington, DC 20001
(202) 662-0210
mark.emery@nortonrosefulbright.com

Douglas Edward Smith
LITTLER MENDELSON
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101
(206) 623-3300
desmith@littler.com

January 3, 2019

*Counsel for Petitioner The GEO Group, Inc.*

## ORAL ARGUMENT REQUESTED

# ADDENDUM TABLE OF CONTENTS

**Item**                                                                       **Page**

District Court's Order On The Defendant The GEO Group, Inc.'s Motion For Relief And Motion To Compel, And Plaintiff The State Of Washington's Motion To Compel ("Discovery Order," ECF No. 133, filed October 2, 2018)................................................................................A1

District Court's Order Denying GEO's Motion for Reconsideration Of Order Compelling Disclosure Of Its Confidential Financial Documents ("Reconsideration Order," ECF No. 144, filed October 17, 2018) ...........................................................................................A12

District Court's Order Denying Defendant The GEO Group, Inc.'s Motion To Certify Interlocutory Appeal (ECF No. 157, filed November 27, 2018) ...................................................................A14

State of Washington's Complaint (ECF No. 1, filed in Superior Court of the State of Washington, September 20, 2017)............................A19

LCR 37 Expedited Joint Discovery Motion To Compel Defendant GEO's Financial Documents (ECF No. 126, filed September 18, 2018) ......................................................................................................A26

The GEO Group's Motion For Reconsideration Of Order Compelling Discovery Of GEO's Financial Documents (ECF No. 142, filed October 16, 2018) ............................................................................A64

October 3, 2018 Letter of Dawn A. Ellison to State of Washington Regarding Confidentiality Designation (ECF No. 142-1, Exhibit A To Motion For Reconsideration, filed October 16, 2018)...............A75

Stipulated Protective Order (ECF No. 70, filed June 26, 2018)..........................A77

Excerpt From 2011 Performance Based National Detention Standards (rev. 2016), Voluntary Work Program, 5.8 (full document available at https://www.ice.gov/detention-standards/2011#wcm-survey-target-id)................................................................................................A95

Excerpt from 2008 Performance Based National Detention Standards, Voluntary Work Program (full document available at https://www.ice.gov/detention-standards/2008)............................................A100

Excerpt from 2000 Performance Based National Detention Standards, Voluntary Work Program (full document available at https://www.ice.gov/detention-standards/2000)............................................A106

Excerpts From Contract HSCEDH-15-D-00015, between The GEO Group, Inc. and U.S. Immigration and Customs Enforcement (contract available at ECF No. 19) ...............................................................A117

CERTIFICATE OF SERVICE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE OF WASHINGTON, | CASE NO. 3:17-cv-05806-RJB |
| Plaintiff, | |
| v. | ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL |
| THE GEO GROUP, INC., | |
| Defendant. | |

BEFORE THE COURT are two motions filed by Defendant The GEO Group, Inc., a Motion for Relief From Deadlines (Dkt. 111), and a Motion to Compel (Dkt. 113). Also before the Court is Plaintiff the State of Washington's Motion to Compel (Dkt. 126). The Court has reviewed the entirety of the record and heard oral argument on October 1, 2018.

**A. GEO's Motion for Relief from Deadlines (Dkt. 111).**

Having visited—and revisited—the discovery deadline for GEO's production to the State on at least two prior occasions, the parties and the Court are familiar with the lengthy procedural

A1

history. The back and forth was at least in part precipitated because of complications involving

ICE review of some discovery prior to its production to the State by GEO. *See* Dkts. 86, 96. As

relevant here, the current Court-imposed deadline is as follows: "All discovery submitted with

GEO's first request for review by ICE, but not part of the resubmission, shall be produced by

Friday, July 27, 2018." Dkt. 86 at 13, ¶4. Further, GEO must produce "all discovery resubmitted

for review by ICE, and thereafter approved by ICE for production," by Friday, August 31, 2018."

*Id*.

GEO seeks to modify the deadline as follows:

(1) GEO to produce all discovery resubmitted for review by ICE, and thereafter approved by

ICE for production by November 5, 2018;

(2) To the extent ICE prohibits GEO from producing discovery, GEO must produce a

discovery log documenting redaction by November 12, 2018.

Dkt. 111-1; Dkt. 116 at 7.

According to GEO: it has produced over 28,000 documents to the State; approximately

3,000 documents have been submitted to ICE for review; GEO received 518 documents as

reviewed by ICE on September 5, 2018, and GEO produced the discovery to the State "during

the week of September 10, 2018." Dkt. 111 at FN 5; Dkt. 116 at 4, 5. GEO also represents that it

has recently submitted approximately additional documents for ICE review, due to several

unintentional errors in GEO's discovery triage. *Id*. at 5.

The State opposes GEO's motion to compel because the State needs the withheld

documents to effectively litigate the case, especially in light of discovery deadlines. Dkt. 115 at 2

(citing Sept. 20, 2018 expert disclosure deadline; Oct. 25, 2018 discovery motions deadline;

November 16, 2018 discovery cutoff). The State urges the Court to "stand by its Order requiring

production of the withheld documents." *Id*. at 3. The State notes that even if GEO is given

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND
MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 2

A2

1    additional time, there is no guarantee it can meet its new deadline, because production is

2    contingent on ICE. *Id*. at 4. The "repeated invitation to ICE—a nonparty—to participate in the

3    discovery process is causing indefinite delay that now prejudices [the State's] ability to litigate

4    this case and meet deadlines[,]" the State contends. Dkt. 121 at 1. GEO has used ICE as a shield,

5    the State contends, by recently "submitting to ICE categories of documents that do not seem to

6    fall within the review criteria articulated in this Court's Orders[.]"

7         GEO's motion IS HEREBY DENIED. Extending the deadline is an exercise in futility,

8    because ICE, which must review withheld documents prior to their production, is not a party to

9    the case. If the Court were to extend the deadline as requested to November 5, 2018, GEO could

10   wait until then to produce the discovery. But as the State emphasizes, ICE is not subject to

11   deadlines imposed on the parties. However, ordering GEO to immediately produce the withheld

12   discovery, as the State urges, could cause collateral problems, as previously briefed at length.

13        Nevertheless, the Court now makes the following order to expedite orderly completion of

14   discovery.

15        It is HEREBY ORDERED: On a rolling basis, GEO SHALL (1) produce all discovery

16   necessarily subject to a review by ICE within three (3) days of receipt from ICE, except

17   discovery ICE prohibits GEO from producing; and (2) for discovery ICE prohibits GEO from

18   producing, GEO must update its discovery log documenting items withheld and produce the

19   discovery log to the State within five (5) days of receipt of notice of such prohibition from ICE.

20        If GEO has used its submissions to ICE to delay production of discovery that does not fit

21   within categories previously identified by the Court and does not require ICE review, GEO

22   SHALL IMMEDIATELY produce this discovery.

23        This Order makes no findings or further orders about deadlines.

24

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND
MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 3

A3

**B. GEO's Motion to Compel (Dkt. 113).**

GEO's Motion to Compel raises three primary issues: (1) whether the Attorney General's Office (AGO) should be compelled to produce discovery of State of Washington agencies; (2) whether the AGO should be compelled to produce discovery from certain and/or all divisions within the AGO; and (3) whether the AGO should be compelled to produce metadata in its possession. Dkt. 113 at 2, 3.

**1.  Discovery from State of Washington agencies.**

The parties disagree about whether the AGO should be responsible to produce discovery held by State of Washington agencies. Dkt. 113 at 7-11. GEO seeks discovery from State agencies, such as the Department of Labor and Industries (L&I), the Department of Corrections (DOC), the Department of Social and Health Services (DHS), and the Governor's Office because of its relevance to GEO's defenses of unclean hands and laches. *Id*. GEO posits that the State, which has leveled allegations that GEO violates the State Minimum Wage Act (MWA), also operates its institutions at sub-minimum pay rates. *Id*. The State has wrongfully delayed bringing this enforcement action, GEO maintains, because, as discovery on State agencies will show, the State has long-known of GEO's Volunteer Work Program (VWP). *Id*.

GEO contends that the AGO has actual control over information held by state agencies because of the AGO's requisite relationship with them and statutory power to represent them. Dkt. 113 at 8, 9. By enforcing the MWA, GEO argues, the State has an obligation to produce discovery on behalf of L&I, the State agency charged with enforcing the MWA. *Id*. at 10.

The State maintains that the AGO does not control the documents of State agencies. Dkt. 118 at 4-7. The State agencies are not parties to this lawsuit, the State argues, because the AGO initiated this lawsuit as *parens patriae*, so "the AGO has no more way of compelling production

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 4

from L&I and DOC than GEO." Dkt. 118 at 5. GEO should seek the discovery directly from the third-party State agencies themselves, the State argues, because the State agencies are better positioned to respond to the discovery requests, and forcing the AGO to produce discovery for State agencies would impose an unfair burden on the AGO that sets bad precedent, because the AGO would be forced to produce discovery for 26 cabinets and 230 boards and commissions. *Id*. at 8-10.

The parties' disagreement boils down to their respective views about whether State agencies should be viewed as a part of, not separate from, the plaintiff, the State of Washington. The parties cite authority of varying persuasiveness, none of it binding. *See* Dkt. 113 at 7-9, citing *Wilson v. State of Washington*, No. C16-5366 BHS, 2017 WL 518615, at *3 (W.D.Wash. Feb. 8, 2017), *State v. Reed*, 429 P.2d 870, 872 (1967); and Dkt. 118 at 4, citing to *United States v. Am. Express Co.*, No. 1:10-cv-04496, 2011 WL 13073683, at *3 (E.D.N.Y. July 29, 2011); *Colorado v. Warner Chilcott Holdings Co. III, Ltd.*, No. 05-2182, slip op. at 8 (D.D.C.May 8, 2007). In this Court's view, where the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies. Because the AGO is the law firm to the State of Washington, the AGO should respond to and produce discovery on behalf of the State of Washington, including its agencies. This view should not be construed as a finding for any other purposes.

At oral argument, the State repeatedly referenced the "*Amtrak* case," *New York ex. rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 265 (N.D.N.Y. 2006), which the State relies on for the proposition that "[j]ust as a law firm does not subject all its clients to party discovery when it sues on behalf of only one client, the AGO cannot subject all state agencies to party discovery when it sues on behalf of one client—here, Washington residents." Dkt. 118 at 5. *Amtrak* addressed the issue of whether discovery could be compelled from the Office of the State

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 5

A5

1    Comptroller for the State of New York. *Id*. at 261.  In *Amtrak*, like in this case, the State was the

2    named plaintiff, but in holding that discovery served on the Office of the Comptroller need not

3    be compelled, the court reasoned that the State was a nominal party in what was, effectively, an

4    enforcement action on behalf of another agency, the Department of Transportation. Unlike

5    *Amtrak*, this case is not an enforcement action by an individual agency pleaded with the State of

6    Washington as a nominal party, but rather, the AGO has explicitly brought this case as *parens*

7    *patriae* on behalf of the State of Washington. Further, *Amtrak* relied heavily analyzing the

8    Constitution for the State of New York, a different state.

9        On this issue, GEO's motion is HEREBY GRANTED. The AGO, on behalf of the

10   plaintiff, SHALL produce all relevant, responsive, non-privileged information held by the State of

11   Washington, including its agencies. This Order makes no findings as to the merits of specific

12   discovery requests.

13       **2.  Discovery within divisions of the AGO.**

14        GEO asserts that discovery outside of the CRU, but within the AGO, is "likely" to

15   contain discovery relevant to GEO's affirmative defense. Dkt. 113 at 11. According to GEO, the

16   State previously represented that it searched the entire AGO for responsive discovery, but more

17   recently the State has argued that combing AGO files would be of "no value" because all AGO

18   discovery would be privileged, which, GEO argues, suggests that the State has not searched all

19   AGO divisions. *Id*. at 11, 12.

20        The State counters that GEO's request is inappropriate, because any discovery that the

21   AGO possesses, if it exists, originates from State agencies themselves, not the AGO. Dkt. 118 at

22   9. If it exists, the State posits, it would "likely" be protected by attorney-client privilege or work

23

24

A6

1   product doctrine. *Id*. Searching the files of over five-hundred lawyers in twenty-seven (27)

2   divisions would be an undue burden, the State opines. *Id*. at 10.

3         The State's argument on this issue is not well-taken. The State exaggerates its burden,

4   because, as GEO notes, discovery to be found within the AGO is most likely to be found within

5   just a few divisions of the AGO, such as L&I and DOC. The fact that much of the discovery

6   could fall within a privilege is no answer to the production of discovery that falls outside any

7   privilege. The State should produce a log for privileged material.

8         On this issue, GEO's motion is GRANTED. The AGO SHALL produce discovery all

9   relevant, responsive, non-privileged information held by all divisions of the AGO and agencies of

10   the State. This Order makes no findings as to the merits of specific discovery requests.

11       **3.**   **Metadata.**

12         According to GEO, the State has not produced discovery containing metadata of

13   custodian information, which GEO represents is valuable to determining who has access to

14   documents, who uses documents, and has knowledge of documents, regardless of who authored

15   them. Dkt. 113 at 13. GEO contends that this metadata is kept in the ordinary course of business

16   and should be produced, especially because the State has insisted that GEO produce the same

17   information. *Id*. at 12, 13.

18         The State argues that GEO does not need custodian information and cannot provide

19   authority requiring the State to produce it. Dkt. 118 at 11. Moreover, the State remarks, for much

20   of the discovery produced, individual custodial information can be determined, and "[o]f the

21   remaining documents, . . . more specific custodian information is unavailable." *Id*. at 12.

22         It is unclear from the State's brief whether it has turned over the metadata in its

23   possession. As to all discovery from AGO divisions, the State should produce metadata in native

24

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND
MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 7

A7

format, without summarizing or otherwise manipulating the information. If the State has already

produced the metadata consistent with this Order and the spirit of this Order, the State need not

reproduce the information.

On this issue, GEO's motion is GRANTED. To the extent that the State possesses

metadata for discovery that identifies individual custodians, all discovery produced, both past

and prospective, shall contain this metadata and shall be produced without modification.

**C. The State's Motion to Compel (Dkt. 126).**

The State requests simply that GEO be compelled to produce "financial documents"

within ten (10) days. Dkt. 126-1. A closer examination of the pleadings reveals a far more

complicated request, because "financial documents" implicates multiple interrogatories (ROGS)

and requests for production (RFPs) from the State's second round of discovery requests. *See* Dkt.

126 at 5-13. The State's request also has two parts, Part A, discovery pertaining to the State's

claim for unjust enrichment (ROG #7 and RFPs ##18, 38-44, 51-55), and Part B, discovery

pertaining to GEO's "offset" affirmative defense (ROG #8 and RFP #8). *Id.* 2. Broadly speaking,

the State seeks discovery of financial documents both particular to the Northwest Detention

Center (NWDC) and general to GEO, a publicly-traded multinational corporation that operates

the government program at issue, the Volunteer Work Program, at multiple facilities. *See id.* at

5-13.

1. **Part A: Discovery for the State's unjust enrichment claim (ROG #7 and RFPs ##18, 38-44, 51-55).**

At issue are ROG #7 and RFPs ##18, 38-44, and 51-55, which the parties have quoted in

full in their brief. Dkt. 126 at 5-13. Generally speaking, the State's discovery requests are

overbroad, complex, and ask for documents that may not be in existence and are not proportional

to the needs of the case. The burden and expense of responding to the discovery requests

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 8

A8

probably outweighs their likely benefit. Rather than simply denying the State's motion, however, to expedite discovery, the Court chooses to modify the State's discovery requests by eliminating portions of the requests that should not be compelled, as indicated by strikethrough and underlining below. To that extent, the State's Motion to Compel is HEREBY GRANTED IN PART and DENIED IN PART.

The State's discovery requests are HEREBY MODIFIED as follows:

**INTERROGATORY NO. 7**: For each year from 2005 to the present, please identify GEO's profits or losses for the NWDC ~~and the basis for your answer~~ and the source of that information.

~~**REQUEST FOR PRODUCTION NO. 18**: Please produce all documents that are referenced in, support, or that form the basis of Your response to Interrogatory No. 7.~~

**REQUEST FOR PRODUCTION NO. 38**: For each of the years 2005 to the present, please produce all GEO's financial statements, Profit and Loss statements, and budget ~~and budget to actual analysis on a quarterly or annual basis~~, if any, for the NWDC for each of the years during the relevant time period.

~~**REQUEST FOR PRODUCTION NO. 39**: To the extent not previously produced, please produce GEO's U.S. Corrections & Detention Division financial statements, Profit and Loss statements, budget, and budget to actual analysis on a quarterly or annual basis for each of the years during the relevant time period.~~

**REQUEST FOR PRODUCTION NO. 40**: To the extent not previously produced, and to the extent they exist, please produce the NWDC's financial statements, Profit and Loss statements, and budget ~~and budget to actual analysis on a quarterly or annual basis from 2005 to present,~~ including all documents that set forth the detailed operating costs of the facility, Voluntary Work Program costs, labor costs, and payroll expenses as well as all details of revenue, contract payments and reimbursements for the NWDC.

~~**REQUEST FOR PRODUCTION NO. 41**: To the extent not previously produced, please produce all documents that contain financial performance analysis, financial models, financial evaluations, analysis of profits earned, or other assessments of the performance of the NWDC contract(s) with ICE.~~

**REQUEST FOR PRODUCTION NO. 42**: To the extent not previously produced, and to the extent they exist, please produce all documents related to the profit or loss of the NWDC's Voluntary Work Program, including budget ~~and budget to actual analysis on a quarterly or annual basis~~ from 2005 to the present, and all documents that set forth the detailed operating costs of the Voluntary Work Program, as well as revenues, payments and reimbursements received.

**REQUEST FOR PRODUCTION NO. 43**: To the extent not previously produced, and to the extent they exist, please produce all documents that contain financial analysis, financial models, analysis of

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 9

A9

profits earned, valuation of the work performed, or other assessments of the Voluntary Work Program at the NWDC from 200<u>5</u> to present.

~~**REQUEST FOR PRODUCTION NO. 44**: To the extent not previously produced, please produce all documents that contain financial analysis, financial models, analysis of profits earned, valuation of the work performed, or other assessments of the Voluntary Work Program within the GEO Group from 2005 to the present.~~

**REQUEST FOR PRODUCTION NO. 51**: Please produce all documents<u>, to the extent they exist,</u> containing financial performance analyses, financial models, or other financial evaluations prepared ~~in connection with~~ or for the purpose of GEO Group's offer(s) and bid(s), and negotiations related to amendment(s) and renewal(s), of contracts related to the NWDC from 2005 - present.

**REQUEST FOR PRODUCTION NO. 52**: To the extent not previously produced, <u>and to the extent they exist,</u> please produce any per diem rate calculations and models related to GEO Group's NWDC Contract(s) from 2005 to present, including, but not limited to, the following factors: "Voluntary Work Program" costs and expenses; labor costs and payroll expenses (excluding Voluntary Work Program); expected and guaranteed occupancy; all other costs of providing services (including food, medical, building operations, etc.); desired margins.

~~**REQUEST FOR PRODUCTION NO. 53**: To the extent not previously produced, please produce any calculations concerning overhead and other costs allocated to the NWDC Contracts in evaluating profitability and the per diem rates as well as the methodology used to allocate such costs, including any changes in methodology.~~

~~**REQUEST FOR PRODUCTION NO. 54**: To the extent not previously produced, please produce all documents that contain any analyses of the NWDC Contract costs, and categorization of those costs as variable or fixed, during the relevant period and any changes to allocation of costs in between categories.~~

~~**REQUEST FOR PRODUCTION NO. 55**: To the extent not previously produced, please produce any documents or information related to assumptions made in determining the contractually negotiated per diem rate(s) and calculations for the NWDC Contracts.~~

## 2. **Bifurcation.**

As an alternative to producing financials discovery now, GEO has requested bifurcation under Rule 42(b), which allows for bifurcation to promote "convenience, to avoid prejudice, or to expedite and economize." According to GEO, the financials discovery is only necessary if and when a trier of fact finds GEO liable, but liability is doubtful, GEO continues, with a high risk that the State could misuse the information and a high cost to GEO. Dkt. 126 at 25. However, at least for the State's unjust enrichment claim, separating liability from any remedy could prove

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 10

A10

impractical. Both sides have alleged equitable theories of recovery, with overlap between liability and remedy. Further, even if theoretically possible to bifurcate, GEO has presented no compelling basis for bifurcation specific to this case, and offers no explanation for why the existing protective order fails to alleviate its concerns. The request to bifurcate is DENIED WITHOUT PREJUDICE.

### 3. Part B: GEO's "offset" affirmative defense (ROG #8 and RFP #8).

GEO has withdrawn its "offset" affirmative defense. Therefore, as to Part B (ROG #8 and RFP #8), the State's motion to compel is DENIED AS MOOT.

IT IS SO ORDERED.

The Clerk is also directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 2nd day of October, 2018.

ROBERT J. BRYAN
United States District Judge

ORDER ON DEFENDANT THE GEO GROUP, INC.'S MOTION FOR RELIEF FROM DEADLINES AND MOTION TO COMPEL, AND PLAINTIFF THE STATE OF WASHINGTON'S MOTION TO COMPEL - 11

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

10

11

12

13

14

15

16

| | |
|---|---|
| STATE OF WASHINGTON, | CASE NO. 3:17-cv-05806-RJB |
| Plaintiff, | |
| v. | ORDER DENYING GEO'S MOTION FOR RECONSIDERATION OF ORDER COMPELLING DISCOVERY OF ITS CONFIDENTIAL FINANCIAL DOCUMENTS |
| THE GEO GROUP, INC., | |
| Defendant. | |

17

18

19

20

THIS MATTER comes before the Court on Defendant the GEO Group, Inc.'s Motion for Reconsideration of Order Compelling Discovery of its Confidential Financial Information. Dkt. 142. The Court deems a Response by the Plaintiff the State of Washington unnecessary. W.D.Wash. Local Court Rule 7(h).

21

22

23

24

GEO seeks partial reconsideration of the Court's discovery order, which compelled GEO to produce certain financial documents. Dkt. 133 at 9, 10. GEO argues that the Court erred, because the financial documents are not relevant to the State's Unjust Enrichment claim, but

A12

even if they are, the Court should explain how or why it reached the opposite conclusion and should reconsider bifurcating merits and damages. Dkt. 142 at 2, 5-7. GEO also argues that "new information" indicates that the compelled financial information is not sufficiently protected, because, GEO alleges, the State recently failed to observe confidentiality terms of the existing Protective Order. *Id.* at 2-5.

The motion should be denied. First, the Court reiterates that the financial documents it has compelled (Dkt. 133 at 9, 10) are discoverable. They fall within Rule 26(b), which limits discovery to matters that are "nonprivileged . . . relevant . . . and proportional to the needs of the case." Fed. R. Civ. P. 26(b). To avoid making any findings on the merits of any claim prematurely, further comment on their relevance would appear imprudent.

Second, if the State has violated terms of the Protective Order, enforcing it by means of a motion for reconsideration would be improper, particularly where there is no indication that the parties have conferred about the issue. Further, if the existing Protective Order is insufficient, the parties should negotiate amendments thereto, and if they cannot agree, to file a motion.

GEO's Motion for Reconsideration of Order Compelling Discovery of its Confidential Financial Information (Dkt. 142) is DENIED.

IT IS SO ORDERED.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 17th day of October, 2018.

ROBERT J. BRYAN
United States District Judge

ORDER DENYING GEO'S MOTION FOR RECONSIDERATION OF ORDER COMPELLING DISCOVERY
OF ITS CONFIDENTIAL FINANCIAL DOCUMENTS - 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE OF WASHINGTON, | CASE NO. 3:17-cv-05806-RJB |
| Plaintiff, | ORDER DENYING DEFENDANT |
| v. | THE GEO GROUP, INC.'S |
| THE GEO GROUP, INC., | MOTION FOR CERTIFICATION |
| Defendant. | OF INTERLOCUTORY APPEAL |

THIS MATTER comes before the Court on Defendant The GEO Group, Inc.'s Motion for Interlocutory Appeal. Dkt. 145. The Court has considered the motion, Plaintiff State of Washington's Response, Defendant's Reply, the underlying orders challenged by Defendant (Dkts. 133, 144), and the remainder of the file herein. The motion for certification of interlocutory appeal should be denied for the reasons stated herein.

**A. Background.**

A14

Defendant seeks certification of interlocutory appeal under 28 U.S.C. § 1292(b) of "[t]he Court's unexplained holding that GEO's financial records are relevant to unjust enrichment[.]" Dkt. 145 at 6. The issue of whether Defendant should be compelled to produce financial documents has been considered twice by this Court: first, in an Order on Plaintiff's Motion to Compel (Dkt. 133 at 8-11), and second, in an Order on Defendant's Motion for Reconsideration (Dkt. 144 at 1, 2). The second order readily acknowledged the Court's relevance finding, where the Court stated:

> The Court reiterates that the financial documents it has compelled (Dkt 133 at 9, 10) are discoverable. They fall within Rule 26(b) . . . To avoid making any findings on the merits of any claim prematurely, further comment on their relevance would appear imprudent.

Dkt. 144 at 2. Defendant is a multinational corporation that operates multiple detention centers, but the Court limited production of financial documents to the Northwest Detention Center (NWDC) only, setting out parameters including date and type of document. Dkt. 13 at 9, 10.

The Court's orders (Dkts. 133, 144) determined discovery's relevance only under Fed. R. Civ. P. 26(b)(1). Whether the discoverable financial information will be admitted in evidence at trial is a very different issue that is not ripe for decision. Indeed, after receiving the subject discovery, Plaintiff may determine that it is not helpful to its damages theories, and that it should not be offered at trial; or it may be offered at trial and rejected by the Court; or it may be received in evidence. These possibilities do not undermine the relevance of the material for discovery purposes.

**B. Standard for interlocutory appeal under § 1292(b).**

Under § 1292(b), certification for interlocutory appeal is warranted:

> When a district judge . . . shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]

ORDER DENYING DEFENDANT THE GEO GROUP, INC.'S MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL - 2

A15

The statute can be distilled into three separate requirements, all of which must be satisfied for courts to certify an interlocutory appeal.

## C. Discussion.

### 1. First and second requirements: controlling question of law and substantial ground for difference of opinion.

For an issue to be a "controlling question of law," it must be shown that "resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litigation*, 673 F.3d at 1026. The issue cannot be "collateral to the basic issues of the case[.]" *Id.* at 1027.

Whether there is "substantial ground for difference of opinion" under § 1292(b) depends on the degree to which controlling law is unclear. *Couch v. Telescope Inc.*, 611 F.3d 629 (9th Cir. 2010). This criterion is satisfied "where the circuits are in dispute on the question and the court of appeals of [this] circuit has not spoken . . . or if novel and difficult questions of first impression are presented." *Id*.

First, according to Defendant:

> The Court's Orders raise a controlling question of law because they hold that GEO's financial information is relevant to the State's unjust enrichment claim, which is the sole and controlling claim for monetary relief in this case.[1]

Dkt. 145 at 10. Defendant opines that "[w]hether any financial documents are relevant . . . depends on a proper interpretation of Washington's law regarding unjust enrichment," an issue that "the parties hotly dispute." *Id.* at 11. Second, according to Defendant, the contours of the unjust enrichment claim are unsettled law. *Id.* at 12-15.

---

[1] This statement is erroneous, and mixes the question of relevance for discovery purposes, and for admissibility at trial. *See* p. 2, ln. 13-19, *supra*.

ORDER DENYING DEFENDANT THE GEO GROUP, INC.'S MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL - 3

1    This case arguably centers on a novel question of law, namely, whether detainees at the

2    NWDC may be subject to the State Minimum Wage Act. Resolving the discovery dispute about

3    Defendant's financials may also involve addressing an unsettled issue of state law, the measure

4    of damages for an unjust enrichment claim. This motion, however, involves a third issue—the

5    scope of discovery when an unjust enrichment claim is pled.

6    Even if there is substantial ground for difference of opinion about whether Defendant's

7    financials are discoverable, the discovery issue is collateral, so the first requirement, that a

8    controlling issue of law must be raised, is not satisfied. Resolving whether Defendant must

9    produce financial information for the NWDC does not necessarily affect the outcome of the

10   litigation. Defendant tacitly concedes as much, when arguing that its financials are irrelevant. *See*

11   Dkt. 126 at 17-22.

12   While there may be substantial difference of opinion regarding the scope of discovery,

13   the difference regards a collateral discovery matter. Defendant's showing is insufficient for the

14   first requirement, that a controlling question of law is raised.

15       *2.   Third requirement: materially advances the ultimate termination of the litigation.*

16   The third § 1292(b) requirement focuses on the degree to which a certified appeal, which

17   is reserved for "exceptional circumstances," would "avoid protracted and expensive litigation."

18   *In re Cement Antitrust Litigation*, 673 F.2d at 1026.

19   Defendant argues that a "successful appeal would sharply curtail the open-ended

20   damages inquiry Plaintiff has proposed, simplify the parties' further disputes [on] liability and

21   damages, and limit the scope and extent of further discovery." Dkt. 150 at 9. Dkt. 145 at 15, 126.

22   An appeal of the "narrow issue" could be done without any substantial effect on the trial

23   calendar, Defendant maintains. *Id.*

24

ORDER DENYING DEFENDANT THE GEO GROUP, INC.'S MOTION FOR CERTIFICATION OF
INTERLOCUTORY APPEAL - 4

A17

1    This criterion is not satisfied. Discovery will draw to a close on March 15, 2019, Dkt.

2    137, and prior orders significantly limited the scope of the financial information discovery. *See*

3    Dkts. 133, 144. Defendant is not on the hook for 'open-ended damages' discovery. Defendant

4    makes no showing about the burden of producing its financial information, versus the cost of

5    litigating an interlocutory appeal, and it would appear that an interlocutory appeal would detract

6    from efforts to justly, speedily, and inexpensively litigate this case. Finally, Defendant's

7    optimism notwithstanding, Defendant has presented no support to substantiate its hope that an

8    interlocutory appeal would be resolved prior to the trial currently scheduled on July 7, 2019.

9    Disclosure of confidential materials can be protected by under the terms of the existing

10   protective order, or an addition, in spite of GEO's concern.

11   Defendant's showing is not sufficient to support the third requirement, material

12   advancement of the ultimate termination of the litigation.

13   **D. Conclusion.**

14   Because the 28 U.S.C. § 1292(b) requirements are not satisfied, GEO's motion for

15   certification of interlocutory appeal should be denied.

16                                            * * *

17   THEREFORE, it is HEREBY ORDERED that Defendant The GEO Group, Inc.'s Motion

18   for Certification of Interlocutory Appeal (Dkt. 145) is DENIED.

19   The Clerk is directed to send uncertified copies of this Order to all counsel of record and

20   to any party appearing *pro se* at said party's last known address.

21   Dated this 27th day of November, 2018.

22

23   ROBERT J. BRYAN
     United States District Judge

24

ORDER DENYING DEFENDANT THE GEO GROUP, INC.'S MOTION FOR CERTIFICATION OF
INTERLOCUTORY APPEAL - 5

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

September 20 2017 9:34 AM

KEVIN STOCK
COUNTY CLERK
NO: 17-2-11422-2

1

2

3

4

5

6

7

8

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR PIERCE COUNTY**

9

| STATE OF WASHINGTON, | NO. |
|---|---|
| Plaintiff, | COMPLAINT |
| v. | |
| THE GEO GROUP, INC., | |
| Defendant. | |

### I.     INTRODUCTION

**1.1**     The State of Washington files this action against Defendant The GEO Group, Inc. ("Defendant" or "GEO") to enforce Washington's minimum wage laws and to remedy the unjust enrichment that results from Defendant's long standing failure to adequately pay immigration detainees for their work at the privately owned and operated Northwest Detention Center ("NWDC").

**1.2**     The enforcement of minimum wage laws is of vital and imminent concern to the people of Washington as the minimum wage laws protect Washington workers and create employment opportunities.

**1.3**     Each year Washington sets an hourly minimum wage, and employees protected by Washington's minimum wage laws must be paid at least the set hourly minimum wage.

COMPLAINT

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Unit
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 442-4492

1.4    Defendant pays detainees $1 per day for work they perform at NWDC. This is a violation of Washington's minimum wage laws, and the practice of paying detainee workers $1 per day has unjustly enriched Defendant.

PLAINTIFF, the State of Washington, for its causes of action against Defendant GEO, alleges as follows:

## II.    JURISDICTION AND VENUE

2.1    The Attorney General is authorized to commence this action pursuant to RCW 43.10.030(1).

2.2    Subject matter jurisdiction is proper in this Court pursuant to RCW 2.08.010, RCW 7.24.010, and RCW 7.24.020 because this is an action alleging state law violations and seeking declaratory and injunctive relief.

2.3    Jurisdiction and venue are proper in this Court pursuant to RCW 4.12.020 and RCW 4.12.025 because work performed by detainees occurs at NWDC, which is located in Pierce County, and because this matter arises from Defendant's business practices and transactions at NWDC.

## III.    PARTIES

### PLAINTIFF STATE OF WASHINGTON

3.1    The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include bringing enforcement actions to ensure compliance with Washington laws.

3.2    The Washington State Department of Labor and Industries is a state agency dedicated to the safety, health, and security of Washington's 2.5 million workers. The Department of Labor and Industries enacts rules and operates enforcement programs that help ensure compliance with the State's wage laws.

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Unit
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 442-4492

A20

3.3     Washington has a quasi-sovereign interest in protecting the health, safety, and well-being of its residents which includes protecting its residents from harms to their own and Washington's economic health.

3.4     Washington's interest in preventing and remedying injuries to the public's health, safety, and well-being extends to all of Washington's residents, including individuals who suffer indirect injuries and members of the general public.

3.5     The enforcement of minimum wage laws is of preeminent concern to the people of Washington. The Legislature enacted minimum wage laws to protect Washington workers and safeguard "the immediate and future health, safety and welfare of the people of the state." RCW 49.46.005(1).

3.6     Washington set the below minimum wages for 2005-2017:

| January 1, 2017 | $11.00 | January 1, 2010 | $8.55 |
| January 1, 2016 | $9.47 | January 1, 2009 | $8.55 |
| January 1, 2015 | $9.47 | January 1, 2008 | $8.07 |
| January 1, 2014 | $9.32 | January 1, 2007 | $7.93 |
| January 1, 2013 | $9.19 | January 1, 2006 | $7.63 |
| January 1, 2012 | $9.04 | January 1, 2005 | $7.35 |
| January 1, 2011 | $8.67 | | |

*See* http://www.lni.wa.gov/WorkplaceRights/Wages/Minimum/History/default.asp (last visited September 18, 2017).

**DEFENDANT**

3.7     Defendant GEO is a for-profit business operating in Washington.

3.8     Since 2005, Defendant GEO has owned and operated NWDC, which is located at 1623 E. J Street, Tacoma, Washington.

3.9     NWDC is a private immigration detention center that has the capacity to house approximately 1,575 individuals.

1      **3.10**   Defendant GEO contracts with U.S. Immigration and Customs Enforcement
2  ("ICE") for the detention of adult civil detainees, who are awaiting resolution of their immigration
3  matters. GEO has contracted with ICE to provide this service at NWDC since 2005.

4      **3.11**   GEO's contract with ICE requires GEO to comply with state and local laws and
5  codes when it operates NWDC.

6                **IV.**    **ALLEGATIONS**

7      **4.1**   Defendant relies upon detainee labor to operate NWDC.

8      **4.2**   Detainees perform a wide range of work at NWDC including preparing, cooking,
9  and serving food to the detainee population; operating NWDC's laundry service; cleaning living
10  areas and bathrooms; and regularly painting walls and buffing floors.

11      **4.3**   ICE's 2011 Performance Based National Detention Standards require Defendant
12  to pay detainees at least $1 per day for their labor.

13      **4.4**   For most work detainees perform at NWDC, Defendant pays detainees $1 per day
14  for their labor regardless of the number of hours worked.

15      **4.5**   For some work detainees perform at NWDC, Defendants do not pay detainees $1
16  per day, and instead "pay" detainees in snack food such as chicken, potato chips, soda, and/or
17  candy.

18      **4.6**   Detainees are "employees" protected by Washington's minimum wage laws.

19      **4.7**   Defendant is an "employer" for purposes of Washington's minimum wage laws.

20      **4.8**   Defendant does not pay detainee workers the state minimum wage for work they
21  perform at NWDC.

22      **4.9**   Since 2005, GEO receives and has received the benefit of having necessary
23  work done at NWDC without bearing the financial burden of paying the minimum wage to
24  those who perform such work.

25

26

                4               ATTORNEY GENERAL OF WASHINGTON
Civil Rights Unit
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 442-4492

A22

## V.     FIRST CAUSE OF ACTION

### (Violation of Washington's Minimum Wage Law)

**5.1**     Plaintiff realleges and incorporates by reference herein all the allegations of paragraphs 1.1 through 4.9.

**5.2**     RCW 49.46.020 requires every employer to pay the hourly minimum wage "to each of his or her employees" who is covered by Washington's minimum wage laws.

**5.3**     Detainees work for Defendant and perform many of the functions necessary to keep NWDC operational including preparing and serving food to detainees, cleaning common areas, and operating the laundry.

**5.4**     Defendant pays detainees $1 per day for work performed at NWDC.

**5.5**     The current hourly minimum wage in Washington is $11.00 per hour.

**5.6**     Defendant violates RCW 49.46.020 when it pays detainees who work at NWDC $1 per day instead of the hourly minimum wage.

## VI.     SECOND CAUSE OF ACTION

### (Unjust Enrichment)

**6.1**     Plaintiff realleges and incorporates by reference herein all the allegations of paragraphs 1.1 through 5.6.

**6.2**     Defendant operates NWDC as a for-profit business.

**6.3**     Defendant utilizes detainee labor to operate NWDC.

**6.4**     Defendant does not pay adequate compensation to detainees for their work.

**6.5**     Defendant benefits by retaining the difference between the $1 per day that it pays detainees and the fair wage that it should pay for work performed at NWDC.

**6.6**     It is unjust for the Defendant to retain the benefit gained from its practice of failing to pay adequate compensation to detainees for the work they perform at NWDC.

A23

# VII.   PRAYER FOR RELIEF

Wherefore, the State of Washington prays that the Court:

**7.1**   Declare that detainees who work at NWDC are "employees" as defined by RCW 49.46.010(3);

**7.2**   Declare that Defendant is an "employer" of detainee workers at NWDC as defined by RCW 49.46.010(4);

**7.3**   Declare that Defendant and must comply with RCW 49.46.020 for work performed by detainees at NWDC;

**7.4**   Enjoin Defendant from paying detainees less than the minimum wage for work performed at NWDC;

**7.5**   Find and declare that Defendant has been unjustly enriched by its practice of failing to adequately pay detainee workers for their labor at NWDC;

**7.6**   Order Defendant to disgorge the amount by which it has been unjustly enriched;

**7.7**   An award of reasonable attorneys' fees and costs that the State incurs in connection with this action; and

**7.8**   Award such additional relief as the interests of justice may require.

DATED this 20th day of September 2017

ROBERT W. FERGUSON
Attorney General

LA ROND BAKER, WSBA No. 43610
MARSHA CHIEN, WSBA No. 47020
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744
LaRondB@atg.wa.gov
MarshaC@atg.wa.gov

COMPLAINT

6

A24

SEP 2 0 2017

The Honorable Robert J. Bryan

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON,

               Plaintiff,

     v.

THE GEO GROUP, INC.,

               Defendant.

CIVIL ACTION NO. 3:17-cv-05806-RJB

LCR 37 EXPEDITED JOINT
DISCOVERY MOTION TO COMPEL
DEFENDANT GEO'S FINANCIAL
DOCUMENTS

ORAL ARGUMENT REQUESTED

**Noted for Consideration: Sept. 18, 2018**

### I.    WASHINGTON'S INTRODUCTORY STATEMENT

The State of Washington ("Washington") challenges The GEO Group, Inc.'s ("GEO")
longstanding practice of paying detainee workers that keep the Northwest Detention Center
("NWDC") operational $1 per day or food for labor in the Voluntary Work Program ("VWP").
Washington seeks a declaration requiring GEO comply with Washington's minimum wage laws
in the future. In addition, Washington claims that, since 2005, GEO has benefitted from its unfair
labor practices regarding detainee workers at the NWDC and asks the Court to order GEO, a for-
profit corporation, to disgorge the amount by which it has been unjustly enriched. Complaint,
ECF 1-1 ¶ 7.6. Washington pursues discovery regarding at least two dimensions of GEO's

benefit and unjust enrichment: 1) the difference between "fair wages" and what GEO actually paid detainee workers; and 2) the profit GEO derived as a result of its unfair labor practices.

GEO asserts an Affirmative Defense[1] of "offset" against Washington's unjust enrichment award: "Affirmative Defense 8.12. [A]ny award against GEO for unjust enrichment must be offset by costs incurred for caring for plaintiffs during their time in detention." GEO's Answer and Counterclaims, ECF 34, *as modified by* Order on State's Motion to Dismiss or Strike Defendant's Counterclaims and Affirmative Defenses, ECF 44 at 5-6 (removing first clause). In its initial disclosures and interrogatory answers, GEO quantifies the offset as "$17.12 per hour of participation in the Voluntary Work Program."

In Section A of this motion, Washington seeks financial information, statements, and documents regarding NWDC and the VWP to ascertain the profits and benefits GEO retained from detainee labor from 2005 to the present that are relevant to Washington's "unjust enrichment" claim and remedy. In Section B of this motion, Washington seeks financial documents related to the care of detainees that are relevant to GEO's offset affirmative defense and that were used to generate the offset amount and calculation.

GEO has refused to produce any responsive profit or financial information, statements, or documents regarding the NWDC or the VWP, claiming that the discovery is irrelevant, premature until liability is established, and, if there is a future production of financial information, should be limited to the VWP alone. In addition, GEO has withheld all but three summary documents underlying its offset calculation. As Washington cannot effectively litigate its claims or defend against GEO's affirmative defense without the profit and financial evidence it seeks, Washington now moves this Court to order GEO to produce the requested discovery.

This Court should order GEO to produce responsive documents now because (1) GEO's profit information and financial records are relevant and necessary to prove Washington's unjust

---

[1] The affirmative defense of "offset" portion of this joint discovery motion is now moot, *see infra* Section III.B, but remains here to ensure the integrity of the LCR 37 briefing process.

enrichment claim as well as to calculate the disgorgement of profit remedy; (2) GEO's financial records are relevant to its own offset affirmative defense; (3) GEO has refused to produce any profit information or financial records; and (4) Washington's attempts to resolve these issues without judicial intervention have been unsuccessful.

Federal Rule of Civil Procedure 33 requires parties to answer interrogatories and Federal Rule of Civil Procedure 34 requires parties to produce documents that are responsive to discovery requests. A party may move to compel discovery if the movant has, in good faith, conferred with the party opposing discovery to obtain the requested discovery without the court's intervention and that good faith attempt has failed. *Hancock v. Aetna Life Ins. Co.*, 321 F.R.D. 383, 390 (W. D. Wash. July 20, 2017) (citing Fed. R. Civ. P. 26(c)). "A party seeking discovery may move for an order compelling . . . production . . . if a party fails to produce documents." Fed. R. Civ. P. 37(a)(3)(B)(iv).

"The party that resists discovery has the burden to show why the discovery request should be denied[.]" *Alexander v. U.S. Bank. N.A.*, No. C16-1045RSM, 2016 WL 9525593, at *1 (W.D. Wash. Dec. 1, 2016). Indeed, under "the liberal discovery principles of the Federal Rules [the resisting party] carr[ies] a heavy burden of showing why discovery was denied." *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).

Washington certifies pursuant to LCR 37(a) that it has met and conferred with GEO over the telephone and in good faith in an effort to resolve this dispute without Court action. *See* Brenneke Decl. ¶ 15.

## II.  GEO'S INTRODUCTORY STATEMENT

The GEO Group, Inc. ("GEO") moves under Federal Rule 26(c) for a protective order limiting discovery with respect to GEO's profitability because that information is irrelevant to any issue in this case.  Alternatively, the Court should bifurcate trial of liability and damages on the State of Washington's ("State") claims and stay production of profitability information unless and until it becomes relevant to any issue in this case.

A28

The State currently seeks to force GEO to produce extensive discovery relating not only to NWDC's yearly profitability but also into almost all aspects of GEO's business in Washington and elsewhere. *See infra*, III(A). But this information is completely irrelevant to any liability issue in this case. Whether NWDC—or GEO as a whole—operates in the red or in the black has no bearing on who is an "employee," or whether GEO is their "employer." Nor does it relate to the measure of any fair wage that detainees or anyone else would fairly expect for working at NWDC. As the State admits in its briefing, the VWP program is a pass-through. GEO does not pay the detainees $1 a day, then charge ICE some markup above that. There are no profits from the program itself. The only conceivable "profit" that could be disgorged would be the differential between the VWP's $1 a day payment, and what GEO would otherwise have to pay outside workers (to the extent the work is even necessary to run the facility). The information is therefore completely irrelevant, and the State's attempt to force GEO to produce it is an improper fishing expedition. Further, even if the information were to have some marginal relevance, its only conceivable use would be prejudicial to GEO, and any inadvertent disclosure could encourage further competitive harm at NWDC. Because information relating to NWDC's profitability is irrelevant to the State's claims and could potentially cause substantial harm to GEO or others if disclosed, it should be protected from discovery.

Even if the Court believes the information might have some relevance, the Court should still stay production unless and until that relevance is manifest. This Court has discretion to bifurcate proceedings to address liability before assessing any possible award to the State. By doing so, it could obviate any need to force GEO to disclose its confidential business information, which is irrelevant to liability under any theory the State has espoused to date. That approach would protect GEO's interests against any possible misuse of the information by the State, whether inadvertent or otherwise. Consequently, the Court need not order GEO to disclose information relating to GEO's profitability—or any of the other myriad documents the State

A29

seeks relating to GEO's business, internal analyses, bid preparation, or anything similar—even if it finds that that information may become relevant at some future time.

### III.    DISCOVERY REQUESTS AT ISSUE

**A.    GEO's Financial Statements and Documents for NWDC and the VWP Program**

Washington's Second Interrogatories to Defendant GEO ("Second Rogs") ask GEO to identify GEO's profits or losses for NWDC [f]or each year from 2005 to the present. *See* Brenneke Decl. ¶3, Ex. A (Second Rogs at Int. No. 7) and Brenneke Decl. ¶4, Ex. B (Resp. to Second Rogs at Int. No. 7).  Specifically:

> **INTERROGATORY NO. 7**:  For each year from 2005 to the present, please identify GEO's profits or losses for NWDC and the basis for your answer.

> **RESPONSE TO NO. 7**:  GEO objects to this Interrogatory as outside of the scope of discovery, to the extent that its seeks information regarding GEO's profits or losses beyond those related to the voluntary work program ("VWP"), which are not relevant to the claims or defenses in this case. GEO further objects on the grounds that the Interrogatory is unduly burdensome, as it would require GEO to continuously supplement and amend its response without a defined end date. Subject to and without waiving GEO's above stated objections, GEO answers as follows: GEO's profits or losses are not relevant to this proceeding, if at all, until there is determination that GEO is subject to suit and liable for payment of wages to VWP participants under the Washington Minimum Wage Act and/or a theory of unjust enrichment. Should GEO at that time be required to provide a response, GEO will produce documents pursuant to Fed. R. Civ. P. 33(d) that state and describe GEO's profits or losses for the NWDC during the relevant period.

Washington's Second Requests for Production to Defendant GEO ("Second RFPs"), seek production of financial documents regarding GEO's profits or losses for NWDC and GEO's Response to Interrogatory No. 7. *See* Brenneke Decl. ¶5, Ex. C (Second RFPs at RFP 18) and Brenneke Decl. ¶6, Ex. D (Resp. to Second RFPs). Specifically:

> **REQUEST FOR PRODUCTION NO. 18**: Please produce all documents that are referenced in, support, or that form the basis of Your response to Interrogatory No. 7.

> **RESPONSE TO NO. 18**: GEO objects to this Request on the grounds that it is unduly burdensome as it seeks "all documents . . . that form the basis" for GEO's response to Interrogatory No. 7, where documents sufficient to show the profits and losses for NWDC would be reasonable and complete. Likewise, GEO objects to the Request as not proportionate to the needs of the case, as discovery of "all documents" used to detail the profits and losses at NWDC does

A30

nothing to resolve any issue in the case and any burden on GEO would outweigh the negligible benefit Plaintiff would receive from the information. GEO further objects to this Request as outside of the scope of discovery, to the extent that its seeks information regarding GEO's profits or losses, beyond those related to the voluntary work program ("VWP"), as all other profits and losses are not relevant to the claims or defenses in this case. GEO also objects to this Request as overly broad and unduly burdensome as Interrogatory No. 7 has no defined end date and requires GEO to continuously supplement its responses. GEO objects to this Request to the extent that it seeks that information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. Subject to and without waiving GEO's above stated objections, GEO will not be producing documents responsive to this Request at this time. Documents concerning GEO's profits or losses are not relevant to this proceeding at this time. Should the court determine that GEO is subject to suit and liable for payment of wages to VWP participants under the Washington Minimum Wage Act and/or a theory of unjust enrichment, GEO will then conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, to the extent they exist and subject to the protective order entered in this case, produce relevant, responsive, non-privileged documents sufficient to show the profits and losses related to the VWP at NWDC created from 2005 to January 5, 2018. GEO is withholding documents on the basis of the above stated objections.

Washington also requested financial documents regarding the benefits and profits derived from detainee labor and the VWP at the NWDC, as well as the relevant corporate entities, from greater to more particular specificity.

**REQUEST FOR PRODUCTION NO. 38**: For each of the years 2005 to the present, please produce all GEO's financial statements, Profit and Loss statements, budget, and budget to actual analysis on a quarterly or annual basis for each of the years during the relevant time period.

**RESPONSE TO NO. 38**: GEO objects to this Request as outside of the scope of discovery, as it seeks documents that are not relevant to the claims or defenses in this case. GEO's Profit and Loss statements contain information related to a multitude of other facilities that are not subject to the above captioned litigation and over which the State of Washington has no authority, oversight, or contractual relationship. GEO also objects to this Request as cumulative of other requests, including, but not limited to, Request No. 18. GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date. Finally, GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO will not be producing documents in response to this Request and is withholding responsive documents subject to the above stated objections.

A31

**REQUEST FOR PRODUCTION NO. 39**: To the extent not previously produced, please produce GEO's U.S. Corrections & Detention Division financial statements, Profit and Loss statements, budget, and budget to actual analysis on a quarterly or annual basis for each of the years during the relevant time period.

**RESPONSE TO NO. 39**: GEO objects to this Request as outside of the scope of discovery, as it seeks documents that are not relevant to the claims or defenses in this case. Furthermore, GEO objects to this Request as it is not proportionate to the needs of the case, as discovery of GEO's U.S. Corrections & Detention Division's financial statements, Profit and Loss statements, budget, and budget to actual analysis on a quarterly or annual basis do nothing to resolve any issue in the case and any burden on GEO would outweigh the negligible benefit Plaintiff would receive from the information. GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date. GEO also objects to this Request as cumulative of other requests, including, but not limited to, Request Nos. 18 and 38. Finally, GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO will not be producing documents in response to this Request and is withholding responsive documents subject to the above stated objections.

**REQUEST FOR PRODUCTION NO. 40**: To the extent not previously produced, please produce the NWDC's financial statements, Profit and Loss statements, budget, and budget to actual analysis on a quarterly or annual basis from 2005 to present, including all documents that set forth the detailed operating costs of the facility, Voluntary Work Program costs, labor costs, and payroll expenses as well as all details of revenue, contract payments and reimbursements.

**RESPONSE TO NO. 40**: GEO objects to this Request to the extent that it seeks financial statements or other documents reflecting budgeted expenditures that are not relevant to the claims or defenses in this case. In addition, this request is objectionable because it is overly broad and unduly burdensome as it seeks budgets, budget to actual analyses which have no bearing on any claim or defense in the case. GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date. Finally, GEO also objects to this Request as cumulative of other requests, including, but not limited to, Request Nos. 18, 38, and 39. Subject to and without waiving GEO's above stated objections, GEO will conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, and produce relevant, responsive, non-privileged documents, to the extent they exist and subject to the protective order entered in this case, sufficient to show actual expenditures related to the VWP at NWDC from 2005 to January 5, 2018. GEO will withhold documents subject to the above stated objections.

A32

**REQUEST FOR PRODUCTION NO. 41**: To the extent not previously produced, please produce all documents that contain financial performance analysis, financial models, financial evaluations, analysis of profits earned, or other assessments of the performance of the NWDC contract(s) with ICE.

**RESPONSE TO NO. 41**: GEO objects to this Request on the grounds that it far exceeds the scope of discovery under Fed. R. Civ. P. 26(b)(1) as it seeks documents that have no bearing on the claims or defenses in this case. To the extent the State seeks information related to its unjust enrichment claim, analyses, models, evaluations and other assessments are not relevant. Only the actual profits or losses related to the NWDC's VWP program would be relevant. GEO has agreed to produce those documents, subject to its objections, in response to Request 18. GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date. Finally, GEO objects to this Request as cumulative of other Requests seeking similar financial information. GEO will not be producing documents in response to this Request and is withholding responsive documents subject to the above stated objections.

**REQUEST FOR PRODUCTION NO. 42**: To the extent not previously produced, please produce all documents related to the profit or loss of the NWDC's Voluntary Work Program, including budget, and budget to actual analysis on a quarterly or annual basis from 2005 to the present, and all documents that set forth the detailed operating costs of the Voluntary Work Program, as well as revenues, payments and reimbursements received.

**RESPONSE TO NO. 42**: GEO objects to this Request because it is overly broad and unduly burdensome as it seeks budgets, budget to actual analyses which have no bearing on any claim or defense in the case. GEO further objects to this request because it seeks all documents related to the profit or loss of the NWDC's Voluntary Work Program. To the extent the State seeks information related to its unjust enrichment claim only the actual profits or losses related to the NWDC's VWP program would be relevant. GEO has agreed to produce those documents, subject to its objections, in response to Request 18. GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date. Finally, GEO objects to this Request as cumulative of other Requests seeking similar financial information, such as Request No. 40. Subject to and without waiving GEO's above stated objections, GEO will conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, and produce relevant, responsive, non-privileged documents, to the extent they exist and subject to the protective order entered in this case, sufficient to show the operating costs of the VWP at NWDC from 2005 to January 5, 2018. GEO will withhold documents subject to the above stated objections.

A33

**REQUEST FOR PRODUCTION NO. 43**: To the extent not previously produced, please produce all documents that contain financial analysis, financial models, analysis of profits earned, valuation of the work performed, or other assessments of the Voluntary Work Program at the NWDC from 2004 to present.

**RESPONSE TO NO. 43**: GEO objects to this Request to the extent that it seeks financial projections or other documents reflecting budgeted expenditures that are not relevant to the claims or defenses in this case. GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO produce documents dating back to 2004—before the relevant time period of this case and to continuously supplement and produce additional information without a defined end date. Finally, GEO objects to this Request as cumulative of other Requests seeking similar financial information, such as, but not limited to, Requests Nos. 40 and 42. Subject to and without waiving GEO's above stated objections, GEO will conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, and produce relevant, responsive, non-privileged documents, to the extent they exist and subject to the protective order entered in this case, sufficient to show GEO's financial analysis of the VWP at NWDC from 2005 to January 5, 2018. GEO will withhold documents subject to the above stated objections.

**REQUEST FOR PRODUCTION NO. 44**: To the extent not previously produced, please produce all documents that contain financial analysis, financial models, analysis of profits earned, valuation of the work performed, or other assessments of the Voluntary Work Program within the GEO Group from 2005 to the present.

**RESPONSE TO NO. 44**: GEO objects to this Request to the extent that it seeks financial projections or other documents reflecting budgeted expenditures that are not relevant to the claims or defenses in this case. GEO also objects on the grounds that this Request seeks information related to facilities other than the NWDC, which is outside of the scope of discovery and not relevant to the claims or defenses of this case. Furthermore, GEO objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date. Finally, GEO objects to this Request as cumulative of other Requests seeking similar financial information, such as, but not limited to, Requests Nos. 40, 42, and 43. GEO will not be producing documents in response to this Request and is withholding responsive documents subject to the above stated objections.

Finally, Washington sought additional categories of financial documents and information regarding the benefits and profits derived from detainee labor and the VWP at the NWDC, including: financial performance analysis, models and evaluations (RFP 51); per diem rate calculations (RFP 52); calculations concerning overhead and other costs allocated to the

NWDC Contracts in evaluating profitability and the per diem rates (RFP 53); analyses of the

NWDC Contract costs, and categorization of those costs as variable or fixed (RFP 54); and

assumptions made in determining the contractually negotiated per diem rate(s) and calculations

for the NWDC Contracts (RFP 55).  Specifically:

**REQUEST FOR PRODUCTION NO. 51**:   Please produce all documents containing financial performance analyses, financial models, or other financial evaluations prepared in connection with or for the purpose of GEO Group's offer(s) and bid(s), and negotiations related to amendment(s) and renewal(s), of contracts related to the NWDC from 2005 - present.

**RESPONSE TO NO. 51**: GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities.  GEO objects to this request as it is wildly overbroad because as written it would seek the analyses, models, or other valuations for any contract, the vast majority of which have no bearing whatsoever on the claims or defenses in this case.  For example, the request as written seeks financial analyses, models, or evaluations related to contracts with food distributors, maintenance contracts for the heating and air conditioning, and contracts for IT equipment.  None of these are relevant to the claims or defenses in this case.  GEO also objects to this Request overly broad and unduly burdensome as the financial performance analyses, financial models, or other financial evaluations prepared in connection with or for the purpose of GEO Group's offer(s) and bid(s), and negotiations related to amendment(s) and renewal(s), of ICE contracts related to the NWDC also have no bearing on the claims or defenses in this case.   None of that information would make it more or less likely that detainees at the NWDC who participated in the VWP are employees under the Washington State Minimum Wage Act.  Nor would these analyses, evaluations or assessments impact the actual profit or losses related to the NWDC's VWP program.  GEO also objects on the basis that the terms "financial performance analysis," "financial models," and "financial evaluations" as vague and ambiguous.  GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date.  Finally, GEO objects to this Request as cumulative of other Requests seeking similar financial information.  GEO will not be producing documents in response to this Request and is withholding responsive documents subject to the above stated objections.

**REQUEST FOR PRODUCTION NO. 52**: To the extent not previously produced, please produce any per diem rate calculations and models related to GEO Group's NWDC Contract(s) from 2005 to present, including, but not limited to, the following factors: "Voluntary Work Program" costs and expenses; labor costs and payroll expenses (excluding Voluntary Work Program); expected and guaranteed occupancy; all other costs of providing services (including food, medical, building operations, etc.); desired margins.

**RESPONSE TO NO. 52**: GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO objects to this request as outside the scope of discovery as defined in Fed. R. Civ. P. 26(b)(1) as it requests per diem rate calculations and models related to the NWDC's expected and guaranteed occupancy and desired margins. Neither of these categories of documents have any bearing on the claims or defenses in this case nor would they impact any disgorgement calculation. GEO also objects to this Request on the grounds that it is unduly burdensome, as it would require GEO to continuously supplement and produce additional information without a defined end date. GEO objects to this Request as vague and ambiguous as it relates to the undefined "NWDC Contracts," which (as described in GEO's response to Request 51) may encompass myriad contracts having nothing to do with this case. Finally, GEO objects to this Request as it is cumulative of other Requests seeking similar financial information. Subject to and without waiving GEO's above stated objections, GEO will conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, and produce relevant, responsive, non-privileged documents, to the extent they exist and subject to the protective order entered in this case, sufficient to show GEO's per diem rate calculations and models related to the VWP, labor costs and payroll expenses (excluding Voluntary Work Program); all other costs of providing services (including food, medical, building operations, etc.) at NWDC from 2005 to January 5, 2018. GEO will withhold documents subject to the above stated objections.

**REQUEST FOR PRODUCTION NO. 53**: To the extent not previously produced, please produce any calculations concerning overhead and other costs allocated to the NWDC Contracts in evaluating profitability and the per diem rates as well as the methodology used to allocate such costs, including any changes in methodology.

**RESPONSE TO NO. 53**: GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. Furthermore, GEO objects to the Request as not proportionate to the needs of the case, as discovery of any calculations concerning overhead and "other costs allocated to the NWDC contracts" is unreasonably broad and burdensome when documents sufficient to show such calculations and costs would be reasonable and complete. GEO objects to this Request as vague and ambiguous as it relates to the undefined "NWDC Contracts," which (as described in GEO's response to Request 51) may encompass myriad contracts having nothing to do with this case. Finally, GEO objects to this Request as it is cumulative of other Requests seeking similar financial information, including but not limited to Request No. 52. Subject to and without waiving GEO's above stated objections, GEO will conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, and produce relevant, responsive, non-

privileged documents, to the extent they exist and subject to the protective order entered in this case, sufficient to show GEO's calculations and models concerning overhead and other costs related to the VWP at NWDC from 2005 to January 5, 2018. GEO will withhold documents subject to the above stated objections.

**REQUEST FOR PRODUCTION NO. 54**: To the extent not previously produced, please produce all documents that contain any analyses of the NWDC Contract costs, and categorization of those costs as variable or fixed, during the relevant period and any changes to allocation of costs inbetween categories.

**RESPONSE TO NO. 54**: GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO also objects to this Request to the extent that it seeks analyses of NWDC ICE contract costs that are not relevant to the claims or defenses in this case. Furthermore, GEO objects to the Request as not proportionate to the needs of the case, as discovery of "all documents that contain any analyses of the NWDC Contract costs" places a substantial burden on GEO that would outweigh the negligible benefit Plaintiff would receive, especially from information unrelated to the VWP at the NWDC. GEO objects to this Request as vague and ambiguous as it relates to the undefined "NWDC Contracts," which (as described in GEO's response to Request No. 51) may encompass myriad contracts having nothing to do with this case. This request is also unduly because it seeks, among other information, documents containing "any changes to the allocation of costs inbetween categories," which would require an unreasonable and disproportionate amount of analysis to determine which, if any, documents contained such changes. Finally, GEO objects to the extent this Request is cumulative of other Requests seeking similar financial information. Subject to and without waiving GEO's above stated objections, GEO will conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, and produce relevant, responsive, non-privileged documents, to the extent they exist and subject to the protective order entered in this case, sufficient to show GEO's analysis of costs related to the VWP in GEO-ICE contracts governing GEO's operation of the NWDC from 2005 to January 5, 2018. GEO will withhold documents subject to the above stated objections.

**REQUEST FOR PRODUCTION NO. 55**: To the extent not previously produced, please produce any documents or information related to assumptions made in determining the contractually negotiated per diem rate(s) and calculations for the NWDC Contracts.

**RESPONSE TO NO. 55**: GEO objects to this Request to the extent that it requests information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO objects to this request as it seeks documents outside the scope of discovery as defined by Fed. R. Civ. P. 26(b)(1) because assumptions made in determining the contractually negotiated per diem rates and calculations in the GEO ICE NWDC contract have no bearing on whether

detainees participating in the VWP program are employees under the Washington State Minimum Wage Act nor does that information impact any possible disgorgement calculation. GEO objects to this Request as vague and ambiguous as it seeks "information related to assumptions made" concerning the undefined "NWDC Contracts." Finally, GEO objects to the extent this Request is cumulative of other Requests seeking similar financial information, including but not limited to, Requests No. 52 to 54. GEO will not be producing documents in response to this Request and is withholding responsive documents subject to the above stated objections.

1.   **Washington's Argument**

   a.   **GEO Refuses to Produce Any of The Profit and Financial Information, Statements, and Documents Washington Seeks**

Washington's discovery seeks information regarding the "benefit" and profits GEO received at the NWDC from detainee labor there. *See* Brenneke Decl. ¶3, Ex. A (Int. No. 7) and Brenneke Decl. ¶5, Ex. C (RFPs 18, 38-44, 51-55). Washington propounded Interrogatory No. 7 and RFP No. 18 to obtain comprehensive information about GEO's profits and finances at the NWDC where the detainees work, including the VWP. Washington also issued a series of requests for production of particular financial documents related to evaluating GEO's profits and losses from a lesser to greater specificity of focus on the VWP at the NWDC. These include: GEO's overall corporate profits and losses, *id*. at RFP 38; GEO's profits and losses within the "U.S. Corrections & Detention" division, of which NWDC is part, *id*. at RFP 39; GEO's profits at the NWDC itself, *id*. at RFPs 18, 40-41; GEO's profits and losses of the VWP at the NWDC, *id*. at RFPs 42-43; and GEO's profits and losses from the VWP in its overall corporate structure. *Id*. at RFP 44.

In addition, Washington propounded a series of additional requests to illuminate other aspects of the financial model and profits of the NWDC and its VWP: financial performance analysis, models and evaluations, *id*. at RFP 51; per diem rate calculations, *id*. at RFP 52; calculations concerning overhead and other costs allocated to the NWDC Contract in evaluating profitability and the per diem rates, *id*. at RFP 53; analyses of the NWDC Contract costs, and categorization of those costs as variable or fixed, *id*. at RFP 54; and assumptions made in

A38

determining the contractually negotiated per diem rate(s) and calculations for the NWDC Contract, *id*. at RFP 55.

In response, Defendant GEO refused to produce any of its profit or financial information about the NWDC, claiming "GEO's profits or losses are not relevant to this proceeding, if at all, until there is determination that GEO is subject to suit and liable for payment of wages to VWP participants under the Washington Minimum Wage Act and/or a theory of unjust enrichment." *See supra*, GEO's Resp. to Int. 7. Only then, after a liability determination, would GEO agree to search for and produce documents. *Id*. GEO's refusal to release financial documents until after it is determined GEO is liable disregards the fact that the Court already has entered an Order denying Defendant GEO's motion to dismiss Washington's unjust enrichment claim and allowed the claim to proceed to discovery. ECF 29 at 15-16. Further, as set forth below, the evidence of GEO's profits and finances is relevant and necessary for Washington to prove liability on the unjust enrichment claim itself and it would prejudice Washington to delay discovery until after a liability determination.

Inasmuch as GEO has indicated willingness to produce any financial information, statements, and documents responsive to Washington's requests in the future, GEO also unilaterally limits the scope of the requested discovery to responsive information "related *to the VWP* at the NWDC" alone, ignoring that the VWP is but one part of the NWDC's and GEO's total budget and profit picture. *See* GEO's Resp. to RFP 18 (emphasis added). *See also*, GEO's Resp. to RFP 40 (will search for and produce only documents related to the VWP at the NWDC); GEO's Resp. to RFP 41 (refusal to produce any documents showing financial performance analysis or profit modeling of the NWDC); GEO's Resp. to RFP 51 (refusal to produce NWDC financial performance analysis, models, or evaluations underlying contract offers or bids); GEO's Resp. to RFP 53 (will search for and produce documents related to calculations of overhead and costs only for the VWP at the NWDC); GEO's Resp. to RFP 54 (will search for and produce only documents related cost categories for the VWP at the NWDC); GEO's Resp.

A39

to RFP 38 (refusal to produce financial documents related to The GEO Group, Inc.); GEO's Resp. to RFP 39 (same for GEO's US. Corrections & Detention Division)

### b.   GEO's Profit and Financial Records Are Essential Elements of Proof of Washington's Unjust Enrichment Claim and Remedy

Under Washington law, unjust enrichment occurs "when one retains money or benefits which in justice and equity belong to another." *Bailie Commc'ns*, *Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, 18 (Wash. Ct. App. 1991). To sustain its unjust enrichment claim, Washington must prove three elements: (1) GEO receives a benefit, (2) the received benefit is at another's expense, and (3) the circumstances make it unjust for GEO to retain the benefit without payment. *See Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). The Washington State Supreme Court clarified that the remedy for "unjust enrichment" requires disgorgement of the *full value* of the received benefit, with a focus on the *receiver of the benefit*, not the provider of the benefit. *Id.* at 1265 (holding disgorgement is not limited to the fair market value of labor, but also includes the amount the contested services enhanced the value of the property at issue).

GEO's profits and financial records are essential elements of proof in the first and third prongs of the unjust enrichment liability analysis. To the extent GEO derived profit from the VWP, there is "benefit" to GEO received from the detainees' work; the amount and extent of the profit derived from the unfair detainee labor practices are factual circumstances relevant to the analysis of whether it is "unjust for GEO to retain the benefit without payment." *Id.*   In addition, determining the *amount of profit* GEO derived from the unfair detainee labor practices at the NWDC is necessary for the computation of "disgorgement," the remedy for unjust enrichment. ECF 1-1 at ¶ 7.6. While the difference between a "fair wage" and the $1/day paid is an essential part of the disgorgement of unjust enrichment analysis, Washington also is entitled to discover and evaluate the full value of the benefit received and retained by GEO, including company-wide profits, resulting from its practice of failing to pay adequate compensation to detainees at the NWDC. As such, Washington must have access to GEO's financial information,

A40

statements, and documents to understand the scope of GEO's benefit and enrichment and effectively litigate its unjust enrichment case.

Circumstances particular to GEO's operations require – at a minimum – discovery of financial information regarding the NWDC operation as a whole, not just the VWP in particular, to complete the unjust enrichment liability and disgorgement analysis.

*First*, GEO contracts with ICE to run the NWDC, and is paid on the basis of a negotiated per diem rate with a minimum bed guarantee. *See, e.g.*, GEO-ICE Contract, ECF 19 at 6 ("Detention Bed Days, Guaranteed Minimum), and 103 (invoicing for "Firm Fixed Price Items" including "pre-established monthly guaranteed minimums for detention" and "Fixed Unit Price Items" including "Detention Services (other than firm fixed price)" paid on basis of "Bed day rate"); Brenneke Decl. ¶ 14, Ex. J, Transcript of GEO 30(b)(6) Deposition in the Person of Ryan Kimble (hereinafter "GEO 30(b)(6) Dep.") at 146:5–147:12. Therefore, any savings on operational costs, such as avoiding fair market labor costs by paying detainees $1/day or food through the VWP, would increase GEO's profit margin. Foundationally, GEO admits that NWDC *is profitable* and has not run at a loss, at least since 2012. GEO 30(b)(6) Dep. at 136:17–137:4.

*Second*, as a result of GEO's budgeting practices, GEO's refusal to produce financial statements and records regarding the NWDC, the U.S. Corrections & Detention Division, and The GEO Group, Inc., and instead limit future production of financial documents to those related to the VWP at the NWDC alone, will result in the production of no meaningful financial records at all. This is because GEO chooses not to track specific information about the benefit or profit it derives from detainee participation in the VWP in its normal course of operations; the NWDC has an operating budget with line items for certain programmatic aspects of its operations such as kitchen, food, and security, but there is no budget line item for the VWP. *Id.* at 134:3–135:7. For budgeting purposes, the VWP is treated simply as a pass through: GEO invoices ICE for reimbursement simply in the amount GEO has paid detainee workers. *Id*. at 135:8–136:1. The

A41

very fact that GEO does not keep financial information about the profits generated by the VWP itself requires GEO to produce profit and financial information about the operation of the NWDC, the U.S. Corrections & Detention Division, and The GEO Group, Inc., as a whole, to enable evaluation of GEO's benefit and profit from the challenged labor practices.

*Third*, in its written discovery responses, GEO has said it would provide Washington documents responsive to requests seeking financial information and analysis about the VWP at the NWDC. *See* Resp. to RFP 42 and RFP 43. GEO also said it would produce NWDC documents that "show GEO's per diem rate calculations and models related to the VWP; labor costs and payroll expenses (excluding Voluntary Work Program); all other costs of providing services (including food, medical, building operations, etc.) at NWDC from 2005 to January 5, 2018." *See* Resp. to RFP 52. Yet, Washington has not yet received the responsive documents and GEO refuses to produce them now. Indeed, during the meet and confer telephone conferences, and in their CR 37 letters, GEO's counsel backtracked, rejected Washington's articulation of why profit and financial information is relevant and necessary for proof of unjust enrichment, the disgorgement of profit remedy, and analysis of GEO's claimed offset, and refused to produce any financial documents without order of the court. *See* Brenneke Decl.¶12, Ex. H (GEO's Aug. 14, 2018 letter); *id. at* ¶9, Ex. F (Washington's Aug. 10, 2018 letter).

Because the financial documents requested about the VWP, the NWDC, the U.S. Corrections & Detention Division, and The GEO Group, Inc. all are relevant to proving and assessing the elements of unjust enrichment, the Court should order that they be produced within 10 days, and in full.

### 2.     GEO's Response

#### a.     The State Seeks Discovery That Is Irrelevant And Burdensome

The State's litany of requests for information regarding GEO's finances should be denied.  This Court may issue an order to "protect a party or person from … undue burden or expense," and it may specifically protect confidential commercial information.  Fed. R. Civ. P.

26(c).  While the Federal Rules allow for broad discovery, such discovery must be "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.."  Fed. R. Civ. P. 26(b)(1).  It is improper to order a party to produce irrelevant information. *Jiminez v. City of Chicago*, 733 F. Supp. 2d 1268, 1273 (W.D. Wash. 2010); *see also Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992) ("While the standard for relevance in the context of discovery is broader than in the context of admissibility…, this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery.") (citations omitted); *Reming v. Holland Am. Line, Inc.*, No. C11-1609RSL, 2012 WL 3704937, at *1-2 & n.1 (W.D. Wash. Aug. 27, 2012).

As noted above, the State currently seeks to discover the "profits or losses for NWDC" for "each year from 2005 to the present."  *See supra*, III(A).  The State also seeks to discover all manner of other confidential business documents including internal financial analyses, performance analyses, budgets of various kinds, operating costs, payroll expenses, financial models used in bids and contract negotiations, and many other documents.  *See id.*  The State's requests are not limited to NWDC but extend to the rest of GEO's business as well.  *See id.*  In short, the State apparently seeks to audit GEO's entire business dating back to 2005 on the pretense that that material is somehow essential to the State's claims.

But the State's claims do not turn on GEO's general financial status and profitability.  That information plainly does not relate to the applicability of the MWA.  And in its own words, the State measures GEO's alleged unjust enrichment according to "the ***difference between the $1 per day that [GEO] pays detainees and the fair wage that it should pay*** for work performed at NWDC," because it is "unjust for [GEO] to retain the benefit gained from its practice of ***failing***

A43

*to pay adequate compensation* to detainees for the work they perform at NWDC." Complaint, ECF 1-1, ¶¶ 6.5-6.6 (emphasis added).

The State's other filings show the same pattern. For example, the State claimed that GEO has been unjustly enriched "by failing to pay detainee-workers a fair wage." State's Response to GEO's Mot. to Dismiss Compl., ECF 17, at 7. When detailing the elements of this claim later in that same filing, the State described the alleged benefit to GEO as "the difference between the $1 per day that it pays and the fair wage that GEO should have paid." *Id.* at 20. While the State claimed that this measure is "untethered" to the MWA, the State's measurement was still the "fair market rate [GEO] would have had to pay for the work performed." *Id.* at 20 n.6.

But to the extent this theory of unjust enrichment is appropriate at all—which GEO does not admit—it has no relationship GEO's profitability in Washington or elsewhere: the State's theory calls for a differential calculation between what GEO *has* paid and whatever the State thinks GEO *should* pay. Indeed, when the State talks about "profit" it really means a "benefit," an element required under an unjust enrichment claim. But surely the State would make the same claim if GEO was operating the VWP or the facility at a loss, rather than as a profit. The State's loose use of the term "profit" should not entitle it to discovery of irrelevant information about "profits" that will only be used to harass GEO in a trial or in the public opinion. Thus, discovery relating to profitability is irrelevant and undiscoverable. *Jiminez*, 733 F. Supp. 2d at 1273. It is just the sort of "fishing expedition" that courts should not allow. *Hofer*, 981 F.2d at 380; *Reming*, 2012 WL 3704937, at *1-2.

The State's own testimony confirms this result. The State claimed that when GEO "employs" detainees to do odd tasks at NWDC, "it needs to pay workers no less than $11 an hour." *Id.* at 126:23-127:7. Again, the State claimed that "if GEO was only going to pay minimum wage for cooking, let's say, GEO makes $10 each hour that it otherwise had to pay someone else to do that same work." *Id.* at 135:13-18. The State admitted that the "minimum wage has to be paid to employees who work for employers in Washington state, regardless of

A44

whether a corporation makes any money, lots of money, [or] loses money." *Id.* at 161:24-162:4. And while the State then claimed that GEO's profitability could be relevant to unjust enrichment because that "analysis does depend on what the benefit is," *id.* at 162:5-9, the State nonetheless claimed that the benefit to GEO was the "receipt of the [detainees'] labor," which it further described as "avoid[ing] having to pay the minimum wage or any fair wage to workers and yet *get[ting] the full value of their work*," *id.* at 163:1-4 (emphasis added). When asked how the State would calculate that "full value," the State explained that the "*legislature sets it or the people through their initiative lawmaking power set the value of hourly work*, at least at a minimal level." *Id.* at 163:10-13 (emphasis added).

This testimony shows that GEO's profitability is irrelevant to the State's claims: If GEO would owe a janitor minimum wage to clean, then it could conceivably have been unjustly enriched—which GEO does not admit—by getting the same work from a detainee for only $1; and if GEO would owe a janitor a "fair wage" of, say, $15 per hour to clean, then again it could conceivably have been unjustly enriched by getting the same work for $1. But in neither case would GEO's *profitability* affect the calculation of its unjust enrichment, let alone any of the financial information the State now seeks. *See supra*, III(A). Thus, GEO's profitability is just as irrelevant to the State's unjust enrichment claim as it is to the State's claim for declaratory and injunctive relief under the MWA. And if profitability is irrelevant, then discovery is improper. *Hofer*, 981 F.2d at 380; *Jiminez*, 733 F.Supp.2d at 1273.

The State's current arguments are not to the contrary. The State argues (1) that GEO's profit margins are relevant to its unjust enrichment claim because they are affected by alleged savings achieved through the VWP; (2) that the State needs to dig into all of GEO's financial records because GEO does not keep records at NWDC that are specifically tailored to proving the State's case; and (3) that the State should get the records it wants because GEO agreed at one point to provide some of them and should not be allowed to refuse now. *See supra*, III(A)(1)(a). None of these arguments shows that GEO's profitability is relevant to its liability under either

of the State's claims. And the first argument—the only one that even tries to connect profits to an unjust enrichment award—is backward: even if GEO's profits are **affected by** the VWP— which GEO does not admit—those profits are not therefore **the cause of** any unjust enrichment to GEO.

Nor does the State's reliance on *Young v. Young* change the outcome. *Young* involved an unjust enrichment claim regarding the improvement of a piece of real estate. *See* 164 Wash. 2d at 480-83. In assessing the proper measure of unjust enrichment, the court "h[e]ld [that] when calculating an unjust enrichment award in a quasi-contract action for improvements to real property the award may not be reduced by the claimant's actual cost absent fault by the claimant or inconsequential relationship to the benefit conferred to the defendant." *Id.* at 491. That holding simply has nothing to do with the State's claim, which expressly turns on whether GEO needed to pay either a minimum wage or some other "fair wage" at NWDC. *Young* offers no support for the wide-ranging discovery the State seeks here.

Even were the information sought marginally relevant—which GEO does not admit— the Court should still consider whether particularized harm will result from disclosure of information to the public. If so, it should balance the public and private interests to decide whether to compel production. *See Solis v. Washington, Dep't of Corr.*, No. 08-5362RJB, 2009 WL 10676491, at *1 (W.D. Wash. Oct. 15, 2009) (Bryan, D.J.) (citing *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004)). With respect to confidential information, courts should consider the risk of "inadvertent disclosure" of a trade secret or other confidential information. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992).

Here, that risk is palpable. First, any use of GEO's confidential information would likely be prejudicial. The State has admitted that it intends to produce a "calculation and analysis" of GEO's apparent unjust enrichment that would "be disclosed in connection with [the State's] disclosure of an expert report in this case." Dep. of Melody Colleen, 166:5-18. The State would not explain how any profitability or other financial information would affect that calculation and

A46

analysis, however.  And any use of GEO's financial information at trial would be more prejudicial than probative.  *See, e.g.*, *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 949-50 (N.D. Cal. 2016) (noting that "proof of greed, without more, is likely to amount to a great deal of unfair prejudice with little probative value).  The State has already trumpeted GEO's alleged greed to the media to support this claim.  *E.g.*, Attorney General of Washington, AG Ferguson Sues Operator Of The Northwest Detention Center For Wage Violations (Sept. 20, 2017) (http://www.atg.wa.gov/news/news-releases/ag-ferguson-sues-operatornorthwest-detention-center-wage-violations) (describing GEO as a "multi-billion dollar corporation" that has netted "millions in ill-gotten profits").[2]  If the only plausible use for GEO's financial information is to disclose it to an expert and then to prejudice GEO in court, the Court should not allow discovery of that information now.

At bottom, the State has no legitimate purpose for GEO's financial information.  Its only plausible use is to prejudice GEO, and any inadvertent public disclosure of that information could create further disturbances outside NWDC beyond those that the State's case has already provoked.  For these reasons, GEO respectfully requests a protective order prohibiting the State from inquiring into GEO's finances, both at NWDC and nationwide.

>    **b.    The Court Need Not Order Burdensome Discovery Of GEO's Finances Unless And Until That Information Becomes Relevant**

Even were the Court to deem evidence of profits to be relevant to the unjust enrichment claim, GEO should not have to incur the prejudice of providing such information until the Court

---

[2] Over the past few months, protesters have been regularly present outside NWDC and have caused significant disruptions.  Those protests have resulted in the need for new fencing to keep people away from nearby train tracks.  Jamie Tompkins, *Protesters Voice Complaints To Tacoma City Council Over Northwest Detention Center* (https://q13fox.com/2018/07/10/protesters-voice-complaints-to-tacoma-city-council-over-northwest-detention-center/) (last visited Sept. 5, 2018).  And one recent protest even resulted in several arrests when a group of people surrounded a local police officer's car outside NWDC.  Kenny Ocker, *10 Arrested Outside Northwest Detention Center, Tacoma Police Say* (https://www.kiro7.com/news/south-sound-news/10-arrested-outside-northwest-detention-center-tacoma-police-say/777884865) (last visited Sept. 5, 2018).  Many of these protests focus on GEO's for-profit status, such that the risk of an inadvertent disclosure of information relating to GEO's profitability may well encourage further and more violent protests.

A47

or a factfinder has found that GEO is liable to pay restitution to the State.  As the Court is aware, this issue is novel, and GEO has raised numerous defenses against the State's ability to recover restitution for unjust enrichment.

A court may bifurcate proceedings under Federal Rule of Civil Procedure 42(b).  That Rule allows a court to order a "separate trial of one or more separate issues [or] claims" in order to promote "convenience, to avoid prejudice, or to expedite and economize."  A decision to bifurcate under Rule 42(b) is within the court's discretion.  *Cty. v. Travelers Indem. Co.*, No. C14-1957, 2015 WL 4878011, at *2 (W.D. Wash. Aug. 14, 2015).  Bifurcating a case into liability and damage phases is one common approach.  *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 603 (9th Cir. 2016) (finding district court abused its discretion by refusing to bifurcate liability and damages when testimony relevant only to damages was prejudicial on liability); *Allstate Ins. Co. v. Breeden*, 410 F. App'x 6, 9 (9th Cir. 2010) (upholding bifurcation of damages and liability proceedings when "liability … was a dispositive issue" and verdict "obviated the need for a jury trial … for damages"); *De Anda v. City of Long Beach*, 7 F.3d 1418, 1421 (9th Cir. 1993); *see also Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 961 (9th Cir. 2001) ("One favored purpose of bifurcation is to … avoid[] a difficult question by first dealing with an easier, dispositive issue").

Bifurcating proceedings may also warrant staying discovery on issues that are only relevant to a subsequent stage.  Thus, for example, this Court has stayed discovery into a plaintiff's bad faith claim when the defendant's contract-based defense was discrete and potentially dispositive.  *Karpenski v. Am. Gen. Life Cos.*, LLC, 916 F. Supp. 2d 1188, 1190 (W.D. Wash. 2012).  Another court stayed discovery into a defendant's net worth when that information would be relevant only after liability was specifically established.  *Ziemkiewicz v. R+L Carriers, Inc.*, Civ. No. RDB-13-0048, 2013 WL 2299722, at *2 (D. Md. May 24, 2013).

To the extent NWDC's profitability is relevant to any issue in this case—and it is not— it will be relevant only to the amount of any award against GEO and not to GEO's underlying

liability. That liability will turn entirely on other evidence relating to the proper scope of GEO's legal obligations, the proper construction of its contract, and its performance of that contract in compliance with ICE's direction. Because establishing liability will not involve any information relating to NWDC's profitability, the Court can easily bifurcate proceedings and stay disclosure of that information unless and until GEO is found to be liable.

Other courts have used similar procedures. *Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc.*, for example, involved a Telephone Consumer Protection Act ("TCPA") claim relating to a fax that provided drug information. No. 12-2132(FLW), 2014 WL 413534, at *1 (D.N.J. Feb. 4, 2014). The parties disputed whether the fax was informational or an advertisement, which affected whether sending the fax violated the TCPA. *Id.* Because that determination raised a "narrow, potentially dispositive issue" that could be settled with limited discovery, and because discovery on that issue would not "significant[ly] overlap" with the remaining merits issues, bifurcation was an efficient means to resolve the case. *Id.* at *4-5. The Ninth Circuit has approved a similar approach. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001).

The same procedure would work here. Both of the State's claims pose a narrow question regarding liability: is GEO required to comply with a state wage law or pay some other "fair wage" when it administers the VWP in accordance with ICE's contract terms and governing policies? While the parties disagree on the answer, settling that disagreement does not turn on any of the voluminous records the State now seeks from GEO; it turns on the proper interpretations of federal and state statutes, federal regulations and policies, and the terms of a contract. These issues can be settled with limited evidence, offering the Court an easily separable issue that can be resolved quickly and efficiently before any exhaustive review of GEO's financial records even becomes relevant. *See Danjaq LLC*, 263 F.3d at 961.

On the other hand, forcing GEO to disclose corporate financial information now creates the constant risk of its misuse through prejudicial disclosures to the public or a jury about GEO's

A49

"profits" as a result of wrongdoing. The State has offered no logical link between GEO's finances and any legal liability for unjust enrichment. The State claims it seeks "damages" that are "untethered" to the MWA, State's Opp to GEO's Mot. To Dismiss, ECF 17, at 20 n.6, but if so, its claim is unmoored from any standard at all. The State has essentially admitted this problem by trying to distinguish between a wage action and the State's unjust enrichment action. Dep. of Colleen Melody, 163:9-15 (claiming that the State's unjust enrichment claim turns on GEO's alleged authority to pay more than the "floor set by law"). The State has further explained that it intends to give GEO's information to an expert for a "precise calculation" about "the amount of the unjust enrichment," but has never explained the connection between profitability and liability for unjust enrichment. *Id.* at 171: 1-10. As noted, GEO's pleadings make it clear that the State's unjust enrichment claim seeks only the difference between a "fair wage" and $1 per day per detainee.

Allowing the State to use profitability to establish liability for unjust enrichment would give it free rein to shake down employers as it pleases. On the State's logic, any Washington commercial entity could be accused of unjust enrichment whenever the State alleges that it is too profitable. Given that the State has already claimed—and that this Court has agreed—that it is not subject to any statutes of limitations, the State's theory would amount to a breathtaking amount of prosecutorial power: the State could sue any company it wishes, investigate its finances, and seek to force it to pay the State an award if it decides that that company "can pay [its employees] more." *See* Dep. of Melody Colleen, 127:7. That is not the law, and the Court should not sanction discovery that advances such a theory.

### 3. Washington's Reply

GEO argues its financial information is irrelevant to Washington's claims and that producing it now would be prejudicial and inefficient. GEO's arguments are unpersuasive and its effort to postpone all discovery regarding its financial benefit from detainee labor impedes

A50

Washington's ability to litigate its unjust enrichment case in chief. The Court should compel GEO to produce its financial information and documents within 10 days.

              **a.**        **GEO's Financial Information and Documents Are Relevant To Washington's Unjust Enrichment Claim and to the Calculation of Profits GEO Must Disgorge**

GEO's benefit from detainee labor at NWDC – and the financial information and documents that prove and quantify it – are relevant to liability and calculating disgorgement.

First, the requested financial information is necessary to prove unjust enrichment liability itself. Unjust enrichment is an equitable claim arising from a contract "implied in law;" courts evaluate the "benefit" and value of the labor provided, from the perspective of "the receiver of the benefit," to determine if it is unjust for the beneficiary to retain it and, if so, what disgorgement is required to set things right. *Young*, 191 P.3d at 1262, 1265. Here, GEO denies that it receives *any* benefit from the work of the detainees at NWDC or that the work is even "necessary to run the facility." *See, e.g.,* GEO's Response, *supra* at 4. As such, the "benefit" to GEO of detainee labor at NWDC is directly at issue. Washington is entitled to GEO's financial documents and information to prove benefit and quantify the *amount* of the benefit detainee workers have provided GEO. Such documents are necessary not only to prove GEO obtained a benefit from detainee workers' labor, but also are necessary in considering whether it is "unjust" for GEO to retain the financial benefit – a liability question.

Washington seeks NWDC financial documents to track the financial benefit to GEO of its practice of employing detainees and paying them food or $1/day for work, instead of paying them a fair wage or hiring outside workers. The discovery sought here is necessary to prove and quantify the reduction of wage costs ($1/day or food instead of fair wages) and how those savings increased GEO's value, profitability, and expanded its business.

As such, Washington is entitled to discover the "benefit" to GEO in the form of its increased profits derived from the unfair labor practice. "A person has been unjustly enriched when he has profited or enriched himself at another's expense, contrary to equity." *Cox v.*

A51

*O'Brien*, 206 P.3d 682, 688 (2009) (citing *Dragt v. Dragt/DeTray, LLC*, 161 P.3d 473, 482 (2007)). Because GEO is paid on the basis of a per diem contract, any savings on operational costs, such as avoiding fair market labor costs necessary to run the facility, allows GEO to keep more of each per diem rate payment for itself. GEO has reinvested this in the NWDC (increasing bed capacity) and other parts of its business, all of which increase overall profits. While GEO denies any "profits from the [VWP] program itself," GEO's Response, *supra* at 4, as a result of GEO's own accounting and bookkeeping choices, Washington must conduct a more holistic analysis to understand how its labor practices benefit the NWDC's bottom line.

In unjust enrichment cases, courts have compelled financial "documents relevant to the benefit [defendant] allegedly received." *See Am. KUSA Corp. v. Advantus Corp.*, No. CV 08-3100-VBF(RCX), 2009 WL 10674756, at *3 (C.D. Cal. Sept. 29, 2009) (citing *United States ex rel. Purcell*, 238 F.R.D. 321, 324 (D.C. D.C. 2006) ("defendants' profit … is not only [relevant,] ... but it is patently central to the [plaintiff's] claims."); *State Farm Mut. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 156 (E.D. N.Y. 2005) (financial records relevant to profit)).

Second, quantification of the amount of unjust enrichment is necessary for the remedy of disgorgement. The fair market value of the detainee labor is a central part of the analysis, but disgorgement of "unjust enrichment" must be for the full value by which the labor enriched the beneficiary. *See Young*, 191 P.3d at 1258, 1265 (owner "must disgorge the entire value of the benefit she received as determined by either the fair market value of the services rendered or the amount the improvements enhanced the value of the property"). The remedy may include disgorging "wrongfully obtained profits." *Staff Builders Home Healthcare, Inc. v. Whitlock*, 33 P.3d 424, 426 (2001). Here, the benefit to GEO from detainee labor includes, at a minimum, the fair market value differential between a fair wage and what was paid ($1/day or food). However, the difference between a fair wage and what GEO paid is not the only factor to be considered when determining the scope of benefit the GEO received from its unfair labor practices. Indeed, the amount of the profit GEO derived and retained from detainee labor at the NWDC and the

financial boon it received from its unfair labor practices are also part of the benefit that GEO received. It is undisputed that NWDC and GEO did make and retain profits, and Washington is entitled to discovery of the full "amount by which it has been unjustly enriched" by detainee labor to pursue its prayer for relief that GEO be ordered to disgorge it. ECF 1-1 ¶7.6. "Plaintiffs are entitled to discovery regarding their theory of recovery." *Gabriel Techs. Corp. v. Qualcomm, Inc.*, No. 08CV1992 AJB MDD, 2012 WL 3150604, at *3 (S.D. Cal. Aug. 2, 2012) (allowing discovery of financial records to determine amount to be disgorged in unjust enrichment suit).

Third, GEO wrongly asserts that Washington's liability case revolves around GEO's contract with ICE. *See* GEO's Response, *supra* at 24 (liability evidence relates "to the proper scope of GEO's legal obligations, the proper construction of its contract, and its performance of that contract in compliance with ICE's direction;" "proper interpretations of federal and state statutes, federal regulations and policies"). This argument misses the mark. In fact, the unjust enrichment liability case revolves around GEO's implied in law contract with the detainees, not GEO's contract with ICE. Financial documents are relevant to the actual liability theory in this case.

Finally, GEO attempts to dodge accountability altogether by questioning the legitimacy of Washington's use of its prosecutorial law enforcement authority and claiming Washington is suing GEO, and can "shake down" any business, simply because it is "too profitable." *See* GEO's Response, *supra* at 25. GEO fails to identify any evidence of prosecutorial misconduct. This is a law enforcement case arising from GEO's own longstanding, unjust, and unfair labor practices. *See* Complaint, ECF 1-1 at ¶¶ 4.4-4.5, 4.9, 6.3-6.6. (GEO "utilizes detainee labor to operate NWDC," and pays detainees in food or $1/day, instead of the "adequate compensation," "minimum wage," or a "fair wage" that it should have paid). Washington seeks only what is fair and the remedy that is available under the common law: "disgorgement of unjust enrichment." *Id.* at ¶ 7.6.

A53

b.      **Disclosure of GEO's Financial Documents Would Not Prejudice GEO**

GEO claims that allowing discovery into its financial information will inflame community-based protests against it and the for-profit prison industry. GEO's Response, *supra* at 22, fn. 2. But GEO's corporate profits are no secret. GEO is publicly traded on the New York Stock Exchange and reports its overall annual financials on its website. *See* The GEO Group, Inc. 2001-17 Annual Reports, http://investors.geogroup.com/FinancialDocs (last checked Sept. 18, 2018).

Washington simply seeks to obtain financial information specific to the legal claims at the heart of this case: GEO's unjust benefit from detainee labor at the NWDC. GEO can produce responsive documents – to the extent necessary – pursuant to the terms of the Protective Order. GEO's profitability is requisite information to understand the extent of its enrichment and calculate the disgorgement that justice demands must occur. GEO cannot credibly claim to be prejudiced if Washington obtains, and uses, GEO's own financial documents to prove the elements of its unjust enrichment claim. As GEO's financial information can – inasmuch as is necessary – be shielded by the Protective Order, and is needed to prove liability and calculate the remedy for Washington's unjust enrichment claim, there is no harm or prejudice to GEO in producing it.

c.      **Bifurcation Would Cause Prejudice and Is Inefficient**

In a last ditch attempt to shield its financial information, GEO, alternatively, argues for two additional procedural delays: bifurcation of trial and a stay of discovery on remedies. However, the facts related to GEO's benefit from detainee labor at the NWDC are squarely at issue in both the liability and remedy aspects of Washington's case. Here, where there is a complete overlap of factual issues, bifurcation of the trial and delay of discovery of financial information essential to the liability phase until after the liability phase would rob Washington of information critical to its ability to prove its case. Bifurcation in this instance is also an affront

A54

to judicial economy and would prejudice Washington, as it would require two periods of overlapping discovery and two duplicative trials that would draw this matter out for years. As bifurcation would not promote convenience, expedite or economize the proceedings, and itself would cause prejudice, it meets none of the standards of Federal Rule of Civil Procedure 42(b) and GEO's motion for bifurcation should be denied.

**B.      GEO's "Offset" Affirmative Defense**

In discovery, Washington also seeks financial information and documents about GEO's "Offset" affirmative defense.  Specifically:

> **INTERROGATORY NO. 8**:  For each year from 2005 to the present, please state the amount and basis for the amount of GEO's claimed offset, including GEO's calculation in its Initial Disclosures: "Offset: $17.12 per hour of participation in the Voluntary Work Program."

> **RESPONSE TO NO. 8:**  GEO objects to this Interrogatory to the extent that it seeks that information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO further objects on the grounds that the Interrogatory is unduly burdensome, as it would require GEO to continuously supplement and amend its response without a defined end date. Subject to and without waiving the above stated objections, GEO answers as follows: The formula is described in its Initial Disclosures and the data used in calculating the offset come from the budget and actual expenditures of the NWDC. The rate of $17.12 has been established based on (1) GEO's calculation of $28.12 as cost per detainee; (2) less the $1 dollar per day detainee participants are compensated for their participation in the VWP; and (3) less the $10 dollars per hour for the balance of the allegedly applicable minimum wage. GEO seeks an offset to reimburse ICE for ICE expenditures providing for detainees essential living expenses while earning minimum wages in ICE's VWP as GEO will pass on any increased VWP payments to ICE by way of an equitable adjustment. Pursuant to Fed. R. Civ. P. 33(d), GEO will produce documents that state and describe the total expenditures for the relevant period that serve as the basis for the amount of GEO's claimed offset. Documents that are referenced in, support, or form the basis for GEO's response to this Interrogatory are forthcoming and will be produced in response to Plaintiff's Request for Production No. 19. Following production, GEO will provide Bates number references for the documents produced in response to this Interrogatory.

> **REQUEST FOR PRODUCTION NO. 19**: Please produce all documents that are referenced in, support, or that form the basis of Your response to Interrogatory No. 8.

**RESPONSE TO NO. 19**: GEO objects to this Request on the grounds that it is unduly burdensome as it seeks "all documents . . . that form the basis" for GEO's response to Interrogatory No. 8, where documents sufficient to show the amount and basis of GEO's claimed offset would be reasonable and complete. Likewise, GEO objects to the Request as not proportionate to the needs of the case, as discovery of "all documents" that form the basis of the claimed offset does nothing to resolve any issue in the case and any burden on GEO would outweigh the negligible benefit Plaintiff would receive from the information. GEO objects to this Request to the extent that it seeks that information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and/or any other applicable privileges or immunities. GEO also objects to this Request as overly broad and unduly burdensome as Interrogatory No. 8 has no defined end date and requires GEO to continuously supplement its responses. Subject to and without waiving GEO's above stated objections, GEO will conduct a reasonable search of documents on active electronic systems and reasonably accessible paper storage areas that GEO reasonably believes contain potentially relevant information within its possession, custody, and control, to the extent they exist, have not already been produced, and subject to the protective order entered in this case, produce relevant, responsive, non-privileged documents sufficient to show the amount and basis of GEO's claimed offset created from 2005 to January 5, 2018. In addition, GEO has already produced three responsive documents: GEO- State 19281, GEO-State 19283, and GEO-State 19286. GEO is withholding documents on the basis of the above stated objections.

1. **Washington's Argument**

GEO alleges an offset affirmative defense to Washington's unjust enrichment award for "costs incurred for caring for plaintiffs during their time in detention." ECF 34, page 7 at ¶8.12, *as modified by* Order on State's Motion to Dismiss or Strike Defendant's Counterclaims and Affirmative Defenses, ECF 44, at 5-6 (removing first clause). In discovery, GEO quantifies its offset at "$17.12 per hour of participation in the Voluntary Work Program." Brenneke Decl. ¶ 6, Ex. D (Resp. to Int. 8).

Washington seeks full discovery of the underlying documents that provide the basis for GEO's offset affirmative defense. Brenneke Decl. ¶ 5, Ex. C (RFP 19). In response, GEO produced three summary documents to support its quantification of the offset and indicated it would produce all documents sufficient to show the amount and basis for the offset calculations. *See* Brenneke Decl. ¶ 6, Ex. D (Resp. to RFP 19). Later, after Washington requested the underlying documents again in a CR 37 letter, counsel for GEO changed course and refused to

produce them. *Id.* at ¶11, Ex. G (Washington's August 23, 2018 letter); *Id.* at ¶13, Ex. I (GEO's August 23, 2018 letter). These documents are unquestionably discoverable and the Court should order GEO to produce them.

In addition, GEO's finances and profits at issue in Section A, *supra*, also are relevant to GEO's offset affirmative defense to Washington's unjust enrichment claim, as they are circumstances that either make it unjust for GEO to retain the benefit without payment, *see Young v. Young*, 191 P.3d at 1262, or require an offset. GEO focuses on the *costs* incurred for caring for detainees during their time in detention, but that is only one side of the equation. To defend against the offset, and retain the equitable nature of the unjust enrichment remedy of which it is a part, Washington is entitled to full discovery related to the care of the detainees under the terms of its "per diem" GEO-ICE NWDC contract: the costs, the revenues and reimbursements GEO receives from ICE, and the profits earned. To ensure that any offset analysis is equitable, the Court should compel GEO to produce all of its financial and profit records regarding the benefit it retained from the NWDC and its VWP since 2005, including the costs, revenues and profits it derived from the care for detainees.

## 2. GEO's Response

The State's arguments in support of its motion to compel the production of GEO's financial and profit records based on GEO's Offset affirmative defense are moot and should be disregarded. On September 14, 2018, GEO filed a Notice of Volunteer Dismissal of Offset Affirmative Defense. Prior to filing the Notice of Volunteer Dismissal of Offset Defense, GEO met and conferred with the State regarding this issue, and the State indicated that they had no objection to GEO's voluntary dismissal of its Offset affirmative defense. As a result, the State's arguments in support of its motion to compel that are based on GEO's Offset affirmative defense are moot and should be disregarded.

### 3. Washington's Reply

In light of GEO's dismissal of its offset affirmative defense, Washington respectfully requests this Court grant the Motion to Compel GEO's financial information and documents on the basis of Washington's unjust enrichment claim alone.

Dated this 18th day of September, 2018

Respectfully submitted,

BOB FERGUSON
Attorney General of Washington

s/ *Andrea Brenneke*
LA ROND BAKER, WSBA No. 43610
MARSHA CHIEN, WSBA No. 47020
ANDREA BRENNEKE, WSBA No. 22027
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
larondb@atg.wa.gov
marshac@atg.wa.gov
andreab3@atg.wa.gov


s/*Joan K. Mell*
Joan K. Mell, WSBA No. 21319
III Branches Law, PLLC
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
Telephone: (253)566-2510
Facsimilie: (281)664-4643
joan@3brancheslaw.com

**NORTON ROSE FULBRIGHT US LLP**

A58

**NORTON ROSE FULBRIGHT US LLP**
Andrea L. D'Ambra
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 318-3000
Facsimile: (212) 318-3400
andrea.dambra@nortonrosefulbright.com

Charles A. Deacon
300 Convent St.
San Antonio, Texas 78205
Telephone: (210) 270-7133
Facsimile: (210) 270-7205
charlie.deacon@nortonrosefulbright.com

Mark Emery
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Telephone: (202) 662-0210
Facsimile: (202) 662-4643
mark.emery@nortonrosefulbright.com

**GREENBERG TRAURIG, LLP**
Scott Schipma
2101 L Street, N.W.
Washington, DC  20037
Telephone: (202) 331-3141
schipma@gtlaw.com

**CERTIFICATION**

I certify that the full response by the responding party has been included in this submission, and that prior to making this submission the parties conferred to attempt to resolve this discovery dispute in accordance with LCR 37(a).

Dated: September 18, 2018

s/ Andrea Brenneke
ANDREA BRENNEKE

A60

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the United States District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 18, 2018

*s/Andrea Brenneke*
ANDREA BRENNEKE

A61

THE HONORABLE ROBERT J. BRYAN

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON**

9

STATE OF WASHINGTON,

10

Plaintiff,

11

v.

12

THE GEO GROUP, INC.,

13

Defendant.

14

NO. 3:17-cv-05806-RJB

[PROPOSED] ORDER GRANTING
MOTION TO COMPEL DEFENDANT
GEO'S FINANCIAL DOCUMENTS

15
16
17
18
19
20
21
22
23
24
25
26

This matter came before the Court on the LCR 37 Expedited Joint Discovery Motion
To Compel Defendant GEO's Financial Documents;

The Court has considered all legal authority, briefing, and argument submitted to the
Court on this matter.  Having considered the foregoing and been fully informed.

IT IS HEREBY ORDERED that the Motion to Compel Defendant GEO's Financial
Documents is GRANTED; and

IT IS FURTHER ORDERED that defendant GEO shall search for and produce
documents responsive to Washington's discovery requests to the State of Washington within
ten days of the date of this order.

1

A62

1      Dated this _____ day of _____, 2018.

2

3                                           _____
                                         Honorable Robert J. Bryan
                                         United States District Court Judge

4

5  Presented by:

6

7  /s *Andrea Brenneke*_____

8  OFFICE OF THE ATTORNEY GENERAL
    ROBERT W. FERGUSON

9  LA ROND BAKER, WSBA No. 43610

10  MARSHA CHIEN, WSBA No. 47020
    ANDREA BRENNEKE, WSBA No. 22027

11  Assistant Attorneys General
    Office of the Attorney General

12  800 Fifth Avenue, Suite 2000
    Seattle, WA 98104

13  (206) 464-7744

14  larondb@atg.wa.gov
    marshac@atg.wa.gov

15  andreab3@atg.wa.gov

16

17

18

19

20

21

22

23

24

25

26

[PROPOSED] ORDER GRANTING
MOTION TO COMPEL GEO'S
FINANCIALS

       2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Unit
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 442-4492

A63

The Honorable Robert J. Bryan

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Plaintiff,<br><br>v.<br><br>THE GEO GROUP, INC.,<br><br>               Defendant. | No. 3:17-cv-05806-RJB<br><br>**THE GEO GROUP INC'S MOTION FOR RECONSIDERATION OF ORDER COMPELLING DISCOVERY OF ITS CONFIDENTIAL FINANCIAL INFORMATION**<br><br>NOTE ON MOTION CALENDAR:<br>October 16, 2018 |

A64

The GEO Group, Inc. ("GEO") moves the Court to reconsider Section C (pages 8-11) of the Court's Order (ECF 133, "Order"), which compels discovery of GEO's confidential financial information in connection with the State of Washington's unjust enrichment claim. In the Order, the Court properly held that the "the State's discovery requests are overbroad, complex, and ask for documents that may not be in existence and are not proportional to the needs of the case." Order 8-9. The Court also properly held that "[t]he burden and expense of responding to the discovery requests probably outweighs their likely benefit." *Id*. GEO recognizes that the Court has significantly trimmed the scope of the State's requests.

However, compelling any confidential financial information is of great concern to GEO because its disclosure can compromise GEO's trade secrets and competitive business position. *See* Expedited Jt. Mot., ECF 126, at 5-13 ("Jt. Mot.") (document requests). As explained below, events since the filing of the State's motion to compel have confirmed GEO's concerns that the Protective Order entered in this case (ECF 70, "Prot. Order") may be insufficient to prevent the misuse and/or mishandling of GEO's financial information in this case and others that GEO is defending.

Further, GEO respectfully believes the Court erred by compelling discovery of confidential financial information. *See* Order, 8-10. GEO's financial information is irrelevant to both GEO's alleged liability and any possible restitution or disgorgement award for unjust enrichment for the value of detainee labor in the Voluntary Work Program ("VWP") at the Northwest Detention Center ("NWDC"). In its Order, the Court did not explain how or why it reached the opposite conclusion. The financial information is irrelevant to the unjust enrichment claim that the State has pled, and GEO's confidential information at issue is more likely to lead to harassment and prejudice against GEO than to materially advance any aspect of this case. Alternatively, those actions give the Court reason to bifurcate discovery. Consequently, reconsideration is warranted.

A65

# ARGUMENT

The Court may grant a motion for reconsideration upon either a showing of new facts that could not, with reasonable diligence, have been brought to its attention earlier or "a showing of manifest error" in a prior ruling. L.C.R. 7(h). A manifest error is one that is "plain and indisputable" and that "disregard[s] the controlling law or the credible evidence in the record." *Gaskill v. Travelers Ins. Co.*, C11-5847, 2012 WL 13026638, at *1 (W.D. Wash. Mar. 28, 2012).

## I.     New Information Indicates That Compelled Confidential Financial Information Is Not Sufficiently Protected.

In the Joint Motion, GEO argued that disclosure of its highly-sensitive confidential business information is likely to be prejudicial either in court or in the public eye. Jt. Mot., 21-22. In response, the State argued that "GEO's financial information can … be *shielded by the Protective Order*" such that "there is *no harm* or prejudice to GEO in producing it." *Id.* at 29 (emphasis added). However, the State's mishandling of confidential information since the Joint Motion was filed shows that GEO's concerns are well-founded.

The Protective Order defines "confidential information" to include "Business financial information." *See* Prot. Order, § 2(3). The Protective Order requires any third party with access to confidential information produced in this case to sign an Acknowledgement and Agreement to Be Bound. *See id.* § 4.2, Exhibit A. The Protective Order covers even confidential information that was inadvertently disclosed. *Id.* § 11.2. The State's expert, Dr. Peter Nickerson, and seven of his associates have signed that Acknowledgement. *See* WA00007688-95.

But when the State served Dr. Nickerson's expert report on September 20—two days *after* it filed the Joint Motion—that report contained explicit references to, and discussions of, proprietary business information in documents produced by GEO designated confidential, without

A66

any confidential marker on the appropriate portions of the report itself.[1]  *See* October 3, 2018 Letter from D. Ellison (attached as Exhibit A to this motion).  An expert report containing designated confidential information is fully covered by the Protective Order's protections and subject to its requirements.  *See* Prot. Order, § 3 ("The protections conferred by this agreement cover . . . (1) any information copied or extracted from confidential material; (2) all copies, excerpts, summaries, or compilations of confidential material;…").  The State and its expert failed to comply with the terms to which they agreed.  Instead, the State forced GEO to note the violation and to request a new version of the expert report with the proper markings.  *See id.*  That this mishandling of GEO's confidential information took place ***while the State was asking the Court to order GEO to disclose a wealth of detailed confidential information***, citing ***the Protective Order itself*** as a way to avoid prejudice to GEO shows the very real risk of improper disclosure despite the Protective Order.

The risk of improper disclosure is broader yet.  The Protective Order expressly contemplates the use of confidential information in the *Nwauzor* case before this Court.  *See* Prot. Order § 4.1.  While the State's service of Dr. Nickerson's report on GEO enabled it to address the State's failure, neither GEO nor the Court has any way to know whether the improperly-marked version of that report had already been disclosed to class counsel in *Nwauzor*.  If so, did the State address its failure through the steps required by the Protective Order? *See id.* § 11.2.  Have the underlying confidential documents or other confidential information been provided to the *Nwauzor* plaintiffs or other plaintiffs in detainee cases against GEO?  Only the State can answer these questions.  This demonstrated risk underscores the need for the Court to reconsider its decision to compel GEO to disclose a wide range of sensitive and proprietary financial information that is, as explained more

---

[1] This use of confidential information and failure by the State to comply with the requirements of the Protective Order was only clear days later after a detailed review of dozens of documents cited in the State's expert report.

fully below, irrelevant to the State's unjust enrichment claim.

## II.    The Court Erred By Compelling Financial Information That Is Irrelevant To The State's Unjust Enrichment Claim.

In light of these risks, the Court should not compel discovery of GEO's confidential and proprietary financial information without a proper showing of relevance to the State's claims.  *See* Fed. R. Civ. P. 26(b).  "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008).  The elements are "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit."  *Id.* at 484-85.

The State's claim, as pled, puts GEO on notice of no theory that would make GEO's profits, losses, budget, or pricing information relevant.  The State alleges: (1) GEO benefits from "having necessary work done at NWDC without bearing the financial burden of ***paying the minimum wage*** to those who perform such work;" (2) GEO "benefits by retaining ***the difference between the $1 per day*** that it pays detainees ***and the fair wage that it should pay***;" and (3) "[i]t is unjust for [GEO] to retain the benefit gained from its practice of ***failing to pay adequate compensation***."  Complaint, ECF 1-1, ¶¶ 4.9, 6.5, 6.6.  These claims are clearly limited to allegedly unpaid compensation in the form of ***hourly*** wages.  The measure of the alleged unjust enrichment, if any, is the wage-value of the detainees' work, not by any theory that makes  GEO's profits or losses at NWDC, budgets, or pricing considerations relevant.  Surely the State would contend that the detainees' labor had a value measurable in wage compensation ***regardless*** of whether NWDC operates at a profit or loss or how GEO sets its budgets or competitive pricing.

The State must be held to the theory it has pled, and the Court should not compel discovery on a theory never noticed by the pleadings.  "Federal Rule of Civil Procedure 8(a)(2) requires that

the allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006). Accordingly, "[a] complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (plaintiff could not proceed at summary judgment on unpled theory because defendant had no notice of which actions to defend).

Without conceding that the State's unjust enrichment claim merits submission to a factfinder, GEO submits that the narrowness of the State's unjust enrichment claim is clear in light of the relevant Washington Pattern Jury Instruction. That instruction calls a jury to award "the reasonable value of the [*services performed*] [*work*, *labor*, *or property furnished*]" if those services or labor were received by a defendant that "knew or should have known" that the plaintiff "expect[ed] payment of reasonable value." 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 301A.02 (6th ed.). The Washington Pattern Jury Instruction on restitution uses similar language. *See id.* 303.08. These instructions illustrate that liability for unjust enrichment is limited to the "reasonable value" of the services performed or work furnished. The claim turns on whether a plaintiff expected payment for labor, and whether the defendant knew or should have known that the person expected payment of reasonable value for services rendered or work furnished. As applied here, the State's claim alleges that GEO did not pay detainees the minimum or a "fair" hourly wage that they allegedly expected, but instead $1 per day. Even were this claim plausible or meritorious—and it is not—it would not relate to GEO's profits, losses, budgets, or pricing.

Citing *Young*, the State argued that GEO's financial records are needed to "evaluate the 'benefit' and value of the labor provided" from GEO's perspective. *See* Jt. Mot. 26. But as discussed, the benefit is simply the alleged hourly wage value of the labor, nothing more. The

value *Young* assigned to the benefit conferred—the increase in the value of ***real property*** resulting from the plaintiff's improvements—has no bearing in the State's case, where the allegedly unjustly received "benefit" from a service would be a simple math question: the delta between the hourly rate the State alleges detainees should have received, and the $1 per day that they did get.

Under no colorable theory is the State entitled to the amount VWP participants enhanced GEO's corporate value, just as an employee is not entitled to the profits of his employer simply because he performed his duties as an employee. *Moberg v. Terraqua, Inc.*, 199 Wash. App. 1059, 2017 WL 3048645, at *10 (July 18, 2017) (employee whose work increased employer's revenue provided no viable argument why retention of revenue was unjust). Were that the proper approach, every employee would seek unjust enrichment restitution in the amount his services enhanced his employer's business to the extent the employees' services increased its profitability. The State cited no cases reaching that result, and it conflicts directly with cases like *Moberg*.

Finally, GEO submits that the State's mishandling of GEO's confidential information favors bifurcation. *See* Jt. Mot. 22-25. In denying GEO's request for bifurcation, the Court noted that GEO "offer[ed] no explanation for why the existing protective order fails to alleviate its concerns." Order 11. The State's mishandling of GEO's confidential information in connection with the State's expert report demonstrates the serious risks ***even under the existing protective order***. Accordingly, to the extent the Court compels the financial discovery, GEO respectfully requests that the Court should reconsider bifurcating discovery and staying this highly sensitive disclosure obligation at least until dispositive motions have clarified its relevance.

**Modification Sought.** GEO requests the Court modify part C of the Order to deny the State's motion to compel with respect to Requests For Production Nos. 38, 40, 42, 43, 51, and 52, or to bifurcate discovery until the information sought has become relevant.

Dated: October 16, 2018

**NORTON ROSE FULBRIGHT US LLP**
/s/ *Andrea L. D'Ambra*_____
Andrea L. D'Ambra
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 318-3000
Facsimile: (212) 318-3400
andrea.dambra@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
Charles A. Deacon
300 Convent St.
San Antonio, Texas 78205
Telephone: (210) 270-7133
Facsimile: (210) 270-7205
charlie.deacon@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
Mark Emery
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Telephone: (202) 662-0210
Facsimile: (202) 662-4643
mark.emery@nortonrosefulbright.com

**LITTLER MENDELSON P.C.**
Douglas E. Smith
One Union Square
600 University Street
Suite 3200
Seattle, WA 98101
Telephone: (206) 623-3300
Facsimile:  (206) 447-6965
desmith@littler.com

**GREENBERG TRAURIG, LLC**
Scott A. Schipma
2101 L Street NW, STE 100
Washington, DC 20037
(202)-313-3141
schipmas@gtlaw.com

**ATTORNEYS FOR DEFENDANT
THE GEO GROUP, INC.**

## CERTIFICATE OF SERVICE

I, Susana Medeiros, hereby certify as follows:

I am over the age of 18, a resident of New York County, and not a party to the above

action. On October 16, 2018, I electronically served the above Motion for Reconsideration of

Order Compelling Discovery of GEO's Confidential Financial Information via ECF to the

following:

Office of the Attorney General
La Rond Baker, WSBA No. 43610
Marsha Chien, WSBA No. 47020
Andrea Brenneke, WSBA No. 22027
Eric Mentzer, WSBA No. 21243
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
LaRondB@atg.wa.gov
MarshaC@atg.wa.gov
Andreab3@atg.wa.gov
EricM@atg.wa.gov

Norton Rose Fulbright US LLP
Charles A. Deacon (Pro Hac Vice)
300 Convent St.
San Antonio, TX 78205
(210)-270-7133
charlie.deacon@nortonrosefulbright.com

Norton Rose Fulbright US LLP
Mark Emery (Pro Hac Vice)
799 9th St. NW, Suite 1000
Washington, DC 20001-4501
(202)-662-0210
mark.emery@nortonrosefulbright.com

Littler Mendelson P.C.
Douglas E. Smith, WSBA No. 17319
William J. Kim, WSBA No. 46792
One Union Square
600 University Street
Suite 3200
Seattle, WA 98101
(206) 623-3300
desmith@littler.com
wkim@littler.com

Greenberg Traurig LLP
Scott A. Schipma (Pro Hac Vice)
Dawn A. Ellison (Pro Hac Vice)
Jerry Stouck (Pro Hac Vice)
2101 L Street NW, STE 100
Washington, DC 20037
(202)-313-3141
schipmas@gtlaw.com
ellisond@gtlaw.com
stouckj@gtlaw.com

A72

I certify under penalty of perjury under the laws of the State of Washington that the above information is true and correct.

DATED this 16th day of October, 2018 at New York, New York.

_____

# EXHIBIT A

**GT** GreenbergTraurig

Dawn Ellison
Tel 202.331.3159
Fax 202.261.4792
ellisond@gtlaw.com

October 3, 2018

La Rond Baker
Assistant Attorney General
Wing Luke Civil Rights Unit
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 200
Seattle, WA 98104

*Via email*

Re:    **Confidentiality Designation in *Washington v. GEO*, Case No. 17-cv-05806-RJB**

La Rond:

Pursuant to the parties' Protective Order, issued by Judge Bryan on June 26, 2018 (Dkt. Entry # 70), GEO provides notice that the State of Washington's (the "State's") expert report should be designated confidential, at least in part.

Pursuant to Section 5.2 of the Protective Order, "a designating party may designate information or items produced in this litigation by another party or non-party that contains or is derived from the designating party's own confidential information by designating for protection those parts or portions of the document that qualify for protection."

As a preliminary matter, GEO notes that it is hamstrung at this stage of the case in discerning the exact pages of Mr. Nickerson's report and appendices that contain information that was "derived from [GEO's] own confidential information." As a result, GEO requests that the State, with its superior understanding of its expert's opinions and supporting materials, appropriately designate as confidential all pages that contain information or opinions derived from GEO's confidential information.  At the very least, pages 6, and 8-10, which cite to or discuss confidential business records, should be designated confidential.  *See* Expert Report of Peter H. Nickerson, dated September 20, 2018, at 9-10 (citing GEO-State-022246 and GEO-State-022248 (both marked confidential in the file name of the native excel spreadsheet, as well as the corresponding TIFF image)).  However, to the extent any other pages of Mr. Nickerson's report contain opinions derived from GEO's confidential records, those pages also must be so designated.

Please produce an amended version of Mr. Nickerson's report with the appropriate confidentiality designations by no later than October 10, 2018.

**Greenberg Traurig, LLP | Attorneys at Law**

2101 L Street NW, Suite 1000  |  Washington, DC 20037  |  T +1 202.331.3100  |  F +1 202.331.3101

Albany. Amsterdam. Atlanta. Austin. Berlin˙ Boca Raton. Boston. Chicago. Dallas. Delaware. Denver. Fort Lauderdale. Houston. Las Vegas. London˙ Los Angeles. Mexico City˙ Miami. New Jersey. New York. Northern Virginia. Orange County. Orlando. Philadelphia. Phoenix. Sacramento. San Francisco. Seoul˙ Shanghai. Silicon Valley. Tallahassee. Tampa. Tel Aviv˙ Tokyo˙ Warsaw˙ Washington, D.C. West Palm Beach. Westchester County.

Operates as: ˙˙Greenberg Traurig Germany, LLP; ˙Aseparate UK registered legal entity; ˙˙Greenberg Traurig, S.C.; ˙˙Greenberg Traurig LLP Foreign Legal Consultant Office; ˙Abranch of Greenberg Traurig, P.A, Florida, USA; ˙GT Tokyo Horitsu Jimusho; ˙˙Greenberg Traurig Grzesiaks p.k.

October 3, 2018
Page 2

Furthermore, we remind you that the parties are required to confer with each other prior to filing, discussing or referencing documents marked confidential in this litigation. *See* Protective Order § 4.3 ("Before filing confidential material or discussing or referencing such material in court filings, the filing party shall confer with the designating party to determine whether the designating party will remove the confidential designation, whether the document can be redacted, or whether a motion to seal or stipulation and proposed order is warranted."). This provision will apply to any reference by the State to the confidential portions of Mr. Nickerson's report and/or opinions.

If you have any questions regarding this request, please do not hesitate to reach out to me.

Sincerely,

Dawn A. Ellison

The Honorable Robert J. Bryan

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON,

        Plaintiff,

    v.

THE GEO GROUP, INC.,

        Defendant.

No. 17-cv-05806-RJB

**STIPULATED PROTECTIVE ORDER**

## STIPULATED PROTECTIVE ORDER

The parties, by and through their respective counsel, have jointly stipulated to the terms of this Proposed Stipulated Protective Order, and with the Court being fully advised as to the same,

**IT IS HEREBY ORDERED**:

1.    <u>PURPOSES AND LIMITATIONS</u>

Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order (this "Protective Order" or "agreement"). The parties acknowledge that this agreement is consistent with LCR 26(c). It does not confer blanket protection on all disclosures or responses to discovery, the protection it affords from public disclosure and use extends only to the limited information or items that are

entitled to confidential treatment under the applicable legal principles, and it does not presumptively entitle parties to file confidential information under seal.

2.      "CONFIDENTIAL" MATERIAL

"Confidential" material shall include the following documents and tangible things produced or otherwise exchanged:

1.   Personal medical records, including physical and mental health information;

2.   Personal financial information, including non-public tax information, contracts, expenditure reports, and internal records of payment or cost summaries;

3.   Business financial information, including non-public tax information, contracts, expenditure reports, and internal records of payment or cost summaries that incorporate a) staffing information and compensation, b) security information, or c) proprietary and competitive client and vendor information;

4.   Personal immigration information or status, including resident identification numbers, A files, and all immigration administrative records and non-public immigration records;

5.   Non-public criminal history and records, such as juvenile and victim records;

6.   Personal location and identifying information, including home address, home phone number, cell phone number, email address, passport number, drivers' license number, social security number, and birthdate;

7.   GEO safety and security-related policies and procedures and communications, including evacuation, fire safety, security system, staffing, physical plant, and emergency protocol information;

8.   Internal GEO communications or reports regarding the administration of the Northwest Detention Center or any other facility or center operated by the GEO Group, including

A78

internal audits, and internal GEO communications containing proprietary and competitive staffing information or client and vendor information;

9. Communications with Immigration and Customs Enforcement ("ICE") officials containing sensitive or proprietary information regarding the administration of the Northwest Detention Center or any other facility or center operated by the GEO Group, including staffing information or competitive client and vendor information;

10. Communications with officials at the American Correctional Association ("ACA") and other accreditation bodies containing sensitive or proprietary information regarding the administration of the Northwest Detention Center or any other facility or center operated by the GEO Group, including staffing information or competitive client and vendor information;

11. Employee rosters and staffing plans; and

12. Non-public depictions of GEO facilities, including but not limited to, facility diagrams or layouts, photos, audio, and CCTV video.

3.    SCOPE

The protections conferred by this agreement cover not only confidential material (as defined above), but also (1) any information copied or extracted from confidential material; (2) all copies, excerpts, summaries, or compilations of confidential material; and (3) any testimony, conversations, or presentations by parties or their counsel that might reveal confidential material.

However, the protections conferred by this agreement do not cover information that is in the public domain or becomes part of the public domain through trial or otherwise, and does not cover public information and records.

4.    ACCESS TO AND USE OF CONFIDENTIAL MATERIAL

4.1    Basic Principles. A receiving party may use confidential material that is disclosed or produced by another party or by a non-party in connection with this case only for prosecuting,

- 3 -

A79

defending, or attempting to settle this litigation. Confidential material disclosed pursuant to this agreement may not be used for any business or competitive purposes or in any other legal proceeding, except for the case presently styled *Chen v. Geo*, Case 17-cv-05769 (Western District of Washington), as permitted by order of court, or as agreed by the parties. Confidential material may be disclosed only to the categories of persons and under the conditions described in this agreement. Confidential material must be stored and maintained by a receiving party at a location and in a secure manner that ensures that access is limited to the persons authorized under this agreement.

4.2  <u>Disclosure of "Confidential" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the designating party, a receiving party may disclose any confidential material only to:

(a)  the receiving party's counsel of record in this action, as well as employees of counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b)  the officers, directors, and employees (including in house counsel) of the receiving party to whom disclosure is reasonably necessary for this litigation, unless the parties agree that a particular document or material produced is for Attorney's Eyes Only and is so designated;

(c)  persons or firms retained by a party for the purpose of litigation support (*e.g.*, e-discovery vendors/contract review attorneys, trial/jury consultants) or producing graphic or visual aids, as long as these persons or firms sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d)  experts and consultants and their staff to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(e)  the court, any appellate courts(s), jurors, alternate jurors, court personnel, and court reporters and their staff;

- 4 -

(f)     any mediators engaged by the parties, and their support staff;

(g)     copy or imaging services retained by counsel to assist in the duplication of confidential material, provided that counsel for the party retaining the copy or imaging service instructs the service not to disclose any confidential material to third parties and to immediately return all originals and copies of any confidential material;

(h)     during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the designating party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal confidential material must be designated confidential on the record at deposition or at any time during the 15 day correction period thereafter, separately bound by the court reporter, and may not be disclosed to anyone except as permitted under this agreement;

(i)     the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information;

(j)     any other person (i) agreed to by the parties, as long as such persons comply with the procedures established under this agreement, or (ii) permitted by the Court.

4.3     <u>Filing Confidential Material</u>. Before filing confidential material or discussing or referencing such material in court filings, the filing party shall confer with the designating party to determine whether the designating party will remove the confidential designation, whether the document can be redacted, or whether a motion to seal or stipulation and proposed order is warranted. Local Civil Rule 5(g) sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

5.     <u>DESIGNATING PROTECTED MATERIAL</u>

5.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each party or non-party that designates information or items for protection under this agreement must use

- 5 -

A81

1    reasonable care to limit any such designation to specific material that qualifies under the appropriate
2    standards.  In the interest of cost containment, parties may, as an initial matter, designate an entire
3    document as confidential if any part of the document contains confidential material.  If, a party later
4    wishes to use a document in a filing or deposition and believes that only part of the document
5    contains confidential information, the parties will meet and confer in good faith and the designating
6    party will provide a revised version of the document with a line by line designation of the
7    confidential information contained within the document.  Should a designating party wish to use
8    its own confidential document, it may revise the confidential document's designation without
9    meeting and conferring with the receiving party, so long as it timely provide the receiving party
10   with a revised version of the re-designated document and gives the receiving party 15 days to
11   review and make its own determination if the document, or some portions of the document, require
12   confidentiality protection.

13
14        Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown
15   to be clearly unjustified or that have been made for an improper purpose (*e.g.*, to unnecessarily
     encumber or delay the case development process or to impose unnecessary expenses and burdens
16   on other parties) expose the designating party to sanctions.
17

18        If it comes to a designating party's attention that information or items that it designated for
19   protection do not qualify for protection, the designating party must promptly notify all other parties
     that it is withdrawing the mistaken designation.
20

21        5.2    Manner and Timing of Designations. Except as otherwise provided in this
22   agreement (see, *e.g.*, second paragraph of section 5.2(a) below), or as otherwise stipulated or
23   ordered, disclosure or discovery material that qualifies for protection under this agreement must be
24   clearly so designated before or when the material is disclosed or produced.  In addition to
25   designating information that it has produced, a designating party may designate information or
26   items produced in this litigation by another party or non-party that contains or is derived from the
27   designating party's own confidential information by designating for protection those parts or
28   portions of the document that qualify for protection.

A82

(a)    Information in documentary form: (*e.g.*, paper or electronic documents and deposition exhibits, but excluding transcripts of depositions or other pretrial or trial proceedings), the designating party must mark the word "CONFIDENTIAL" to each page that contains confidential material. With respect to documents containing confidential material produced in Native Format, the designating party shall include the appropriate confidentiality designation in the filename.

(b)    Testimony given in deposition or in other pretrial proceedings: the parties and any participating non-parties must identify on the record, during the deposition or other pretrial proceeding, all protected testimony, without prejudice to their right to so designate other testimony after reviewing the transcript. Any party or non-party may, within fifteen days after receiving the transcript of the deposition or other pretrial proceeding, designate portions of the transcript, or exhibits thereto, as confidential. If a party or non-party desires to protect confidential information at trial, the issue should be addressed during the pre-trial conference.

(c)    Other tangible items: the producing party must affix in a prominent place on the exterior of the container or containers in which the information or item is stored the word "CONFIDENTIAL." If only a portion or portions of the information or item warrant protection, the producing party, to the extent practicable, shall identify the protected portion(s).

(d)    Metadata: with respect to all documents produced that contain confidential material, the designating party will also include in the Load File the appropriate confidentiality designation.

5.3    Inadvertent Failures to Designate. An inadvertent failure to designate qualified information or items does not, standing alone, waive the designating party's right to secure protection under this agreement for such material. If a party provides confidential material without designating it as "CONFIDENTIAL," the party may provide timely written notice to the receiving party to designate the information as "CONFIDENTIAL" in accordance with the provisions of this agreement. Upon timely correction of a designation, the receiving party must make reasonable

A83

efforts to ensure that the material is treated in accordance with the provisions of this agreement. Within ten days of providing written notice that confidential information was not appropriately designated under this provision, the designating party must provide the receiving party with replacement copies of such documents containing the proper designation. Upon receipt of such replacement copies, the receiving party shall immediately destroy any copies of the unmarked or incorrectly marked documents, things, information, responses, or testimony within their custody or control and that comply with our legal obligations. If a document that has been redesignated as confidential has been filed with the court, the designating party bears the burden of moving the court to remove the confidential document and file it under seal. If the document was properly designated as confidential and was mistakenly filed with the court, the filing party has the burden of moving the court to remove the confidential document and file it under seal.

6.     <u>THIRD PARTIES</u>

     6.1     <u>Use of Third-Party Information</u>. If a party seeks discovery from a non-party to this suit, the non-party will be provided with a copy of this agreement and may invoke its terms with respect to any confidential information provided to the parties. If any confidential information is produced by a person other than a party pursuant to this agreement, such person shall be considered a designating party and all parties to this order should be treated as receiving parties.

     6.2     <u>Third-Party Disclosure Prohibited By Law</u>. Nothing contained herein shall be construed to restrict the ability of a third party from objecting to disclosure of information within its possession, custody, and control pursuant to any applicable federal or state law. These include, but are not limited to, information withheld pursuant to the Department of Homeland Security's ("DHS") *Touhy* regulations, 6 U.S.C. § 5.44, which explicitly prohibit DHS employees, including Immigration and Customs Enforcement personnel, from producing "any documents or any material acquired as part of the performance of that employee's duties or by virtue of that employee's official status" without authorization from DHS' Office of General Counsel.

6.3     Protective Orders with Third Parties. Nothing in this agreement prohibits a party from negotiating a separate protective order with any third party, provided that all parties to this litigation are included in the negotiation of such agreement and ultimately agree to the terms of such agreement, and the Party to this litigation seeking the separate protective order moves the Court for such an order.

6.4     Publicly Available Third Party Information. Nothing contained herein shall be construed to restrict disclosure and use by the receiving party of any confidential information of another party should such documents, information, or things become publicly available through no fault or wrongdoing of any receiving party.

7.      CHALLENGING CONFIDENTIALITY DESIGNATIONS

7.1     Timing of Challenges. Any party or non-party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a designating party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

7.2     Meet and Confer. The parties must make every attempt to resolve any dispute regarding confidential designations without court involvement, and should discuss whether partial designation of portions of the challenged document will resolve the dispute. Any motion regarding confidential designations or for a protective order must include a certification, in the motion or in a declaration or affidavit, that the movant has engaged in a good faith meet and confer conference with other affected parties in an effort to resolve the dispute without court action. The certification must list the date, manner, and participants to the conference. A good faith effort to confer requires a face-to-face meeting or a telephone conference.

7.3     Judicial Intervention. If the parties cannot resolve a challenge without court intervention, the designating party may file and serve a motion to retain confidentiality under Local

- 9 -

A85

Civil Rule 7 (and in compliance with Local Civil Rule 5(g), if applicable). The burden of persuasion in any such motion shall be on the designating party. Frivolous challenges, and those made for an improper purpose (*e.g.*, to harass or impose unnecessary expenses and burdens on other parties) may expose the challenging party to sanctions. All parties shall continue to maintain the material in question as confidential until the court rules on the challenge.

8.      PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a party is served with a subpoena, service of process, or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," that party must:

(a)      promptly notify the designating party in writing and include a copy of the subpoena or court order;

(b)      promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this agreement. Such notification shall include a copy of this agreement; and

(c)      cooperate with respect to all reasonable procedures sought to be pursued by the designating party whose confidential material may be affected.

Once notified, the designating party seeking to maintain the confidentiality of any information shall have the sole responsibility for obtaining any order it believes necessary to prevent disclosure of the information that have been subpoenaed, requested, or ordered. The subpoenaed party will not produce any of the confidential information while a motion for a protective order brought by the designating party pursuant to this paragraph is pending, or while an appeal from or request for appellate review of such motion is pending, unless a court orders production of materials that are subject to this agreement, then production of such materials pursuant to that Court Order shall not be deemed a violation of this agreement.

9.      WASHINGTON PUBLIC RECORDS ACT

Nothing in this Protective Order shall be construed to require the Civil Rights Unit of the Washington Attorney General's Office (hereinafter "CRU") to violate the terms of Washington's Public Records' Act, RCW 42.56, RCW 40.14, which governs preservation and destruction of government records, or any other statute, administrative rule, or court rule.  If at any time the CRU receives a request pursuant to the Washington Public Records Act, RCW 42.56, that would compel disclosure of any documents or information designated in this action as "Confidential," the CRU shall give written notice and a copy of the request to the designating party, through its attorney of record, within five (5) business days of receiving the request or determining that the request calls for documents or information designated in this action as "Confidential." If the requesting party seeks to compel CRU to disclose the documents or information designated as "Confidential" through a proceeding before a court or regulatory body, the CRU shall provide the designating party, through its attorney of record, with notice of the proceeding within five (5) business days of service of such proceeding. The CRU will not produce confidential information or documents subject to such a request unless either authorized by the designating party to do so, or if the designating party seeks judicial intervention within the time allotted for the CRU to respond to the request, ordered to do so by the court.

10.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

Nothing in this section is intended to modify what the parties have stipulated to and submitted to the court as a more detailed Fed. R. Evid. 502(d) order.

11.     SECURITY AND DATA BREACH

Any person in possession of another Party's confidential information shall exercise the same care with regard to the storage, custody, or use of such confidential information as they would apply to their own material of the same or comparable sensitivity.

- 11 -

A87

11.1 <u>Reasonable Precautions</u>. Receiving parties must take reasonable precautions to protect confidential information from loss, misuse and unauthorized access, disclosure, alteration and destruction. Such measures shall include:

(a) Reasonably preventing unauthorized persons from gaining access to confidential information (physical access control);

(b) Reasonably preventing confidential information from being used without authorization (logical access control) including, but not limited to, the use of passwords;

(c) Reasonably ensuring that persons entitled to use confidential information gain access only to such confidential information as they are entitled to access in accordance with their access rights, and that, in the course of processing or use and after storage, confidential information cannot be read, copied, modified or deleted without authorization (data access control);

(d) Reasonably ensuring that confidential information cannot be read, copied, modified or deleted without authorization during electronic transmission, transport or storage on storage media, and that the target entities for any transfer of confidential information by means of data transmission facilities can be established and verified (data transfer control);

(e) Reasonably ensuring the establishment of an audit trail to document whether and by whom Protected Information have been entered into, modified in, or removed from confidential information processing systems, (entry control); and

(f) Reasonably ensuring that confidential information is processed solely in accordance with instructions from the receiving party's Counsel or the receiving party (control of instructions).

11.2 <u>Breach Response</u>. If the receiving party discovers a breach of security relating to the confidential information of another party, the receiving party shall:

(a) provide written notice to the designating party of such breach no later than twenty-four (24) hours of receiving party's discovery of the breach;

- 12 -

A88

(b)     investigate and remediate the effects of the breach, and provide the designating party with reasonable assurances that such breach shall not recur; and

(c)     provide sufficient information about the breach that the designating party can reasonably ascertain the size and scope of the breach.

If required by any judicial or governmental request, requirement or order to disclose such information, the receiving party shall take all reasonable steps to give the designating party sufficient prior notice in order to contest such request, requirement or order through legal means. The receiving party agrees to provide reasonable cooperation to the designating party or law enforcement in investigating any such security incident.  In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate the unauthorized access as it deems appropriate in its good faith and reasonable judgment.

If a receiving party learns that, by inadvertence or otherwise, it has disclosed the confidential information to any person or in any circumstance not authorized under this Order, the Receiving Party must, as soon as is practicable: (a) notify in writing the designating party of the unauthorized disclosure; (b) use its best efforts to retrieve all copies of the protected materials; and (c) inform the person or persons to whom unauthorized disclosures were made, to the extent the person or persons are identifiable, of all the terms of this protective order and have the person or persons execute a Declaration in the form annexed hereto as Exhibit A.

12.     NON -TERMINATION AND RETURN OF DOCUMENTS

Unless prohibited by law, within 60 days after the termination of this action, including all appeals, each receiving party must return all confidential material to the producing party, including all copies, extracts and summaries thereof, or may certify to the producing party that they have deleted and destroyed these materials

Notwithstanding this provision, counsel are entitled to retain one archival copy of all documents filed with the court, trial, deposition, and hearing transcripts, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work

- 13 -

A89

product, even if such materials contain confidential material. Counsel also shall not be required to delete information that may reside on their respective parties' firms' or vendors' electronic disaster recovery systems that are overwritten in the normal course of business, or information that may reside in electronic files which are not reasonably accessible. Should counsel know or have reason to know that confidential material is to be restored from parties' firms' or vendors' electronic disaster recovery systems or other locations not reasonably accessible, counsel will make reasonable efforts to destroy these materials in good faith.

To the extent confidential material subject to this protective order is retained pursuant to the Public Records' Act, Wash. Rev. Code 42.56 and Wash. Rev. Code 40.14, counsel must make reasonable efforts to destroy these materials in good faith upon expiration of the applicable records retention schedule. Nothing in this provision should be construed to eliminate the producing party's obligation to comply with the notice requirements in Section 9 of this agreement.

The confidentiality obligations imposed by this agreement shall remain in effect until modified, superseded or terminated by order of this Court.

13.    NON-WAIVER OF RIGHTS

Neither the agreement of the parties with respect to confidential material, nor the designation of any information, document, or the like, as confidential material, nor the failure to make such designation shall be construed as:

(a)    evidence with respect to any issue on the merits in this action;

(b)    waiving or restraining a party or third party from using or disclosing its own confidential material as it deems appropriate;

(c)    waiving a party's right to object to any disclosure of confidential material or production of any documents it deems to contains confidential on any ground other than confidentiality that it may deem appropriate;

- 14 -

(d) waiving a party's right to redact from any documents, whether designated "Confidential" or not, any information containing privileged material or any other data protected from disclosure by state or federal law;

(e) allowing a party to argue that review of documents is unnecessary or that a producing party need not cull non-responsive, irrelevant, or other documents before producing to the requesting party.

Respectfully submitted this 20th day of June, 2018.

**BOB FERGUSON**

Attorney General of Washington


/s/ *Andrea Brenneke*

LA ROND BAKER, WSBA No. 43610

MARSHA CHIEN, WSBA No. 47020

ANDREA BRENNEKE, WSBA No. 22027

Assistant Attorneys General

Office of the Attorney General

800 Fifth Avenue, Suite 2000

Seattle, WA 98104

(206) 464-7744

larondb@atg.wa.gov

marshac@atg.wa.gov

andreab3@atg.wa.gov


**ATTORNEYS FOR PLAINTIFF STATE OF WASHINGTON**

**NORTON ROSE FULBRIGHT US LLP**


/s/ *Andrea D'Ambra*

Andrea D'Ambra
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 318-3000
Facsimile: (212) 318-3400
andrea.dambra@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
Charles A. Deacon
300 Convent St.
San Antonio, Texas 78205
Telephone: (210) 270-7133
Facsimile: (210) 270-7205
charlie.deacon@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
Mark Emery
799 9th Street NW, Suite 1000
Washington, DC 20001-4501
Telephone: (202) 662-0210
Facsimile: (202) 662-4643
mark.emery@nortonrosefulbright.com

A91

**NORTON ROSE FULBRIGHT US LLP**
Andrea D'Ambra
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 318-3000
Facsimile: (212) 318-3400
andrea.dambra@nortonrosefulbright.com


**III BRANCHES LAW PLLC**

Joan K. Mell, WSBA #21319

1019 Regents Blvd. Ste. 204

Fircrest, WA 98466

253-566-2510 (P)

281-664-4643 (F)

joan@3brancheslaw.com


**ATTORNEYS FOR DEFENDANT
THE GEO GROUP, INC.**

A92

Dated this 26th day of June, 2018.

ROBERT J. BRYAN
United States District Judge

- 17 -

A93

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty of

perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued

by the United States District Court for the Western District of Washington on [date] in the case of

*State of Washington v. The GEO Group, Inc.*, No. 3:17-cv-05806-RJB. I agree to comply with and

to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge

that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I

solemnly promise that I will not disclose in any manner any information or item that is subject to

this Stipulated Protective Order to any person or entity except in strict compliance with the

provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Western District of Washington for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

- 18 -

A94

# 5.8 Voluntary Work Program

## I. Purpose and Scope

This detention standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

While not legally required to do so, ICE/ ERO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3. Essential operations and services shall be enhanced through detainee productivity.

4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

6. There shall be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation or disability.

7. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or

who is illiterate.

## III. Standards Affected

This detention standard replaces "Voluntary Work Program" dated 12/2/2008.

This detention standard incorporates the requirements regarding detainees' assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) (11/2/2004).

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

## V. Expected Practices

### A. Voluntary Work Program

Detainees shall be provided the opportunity to participate in a voluntary work program. The detainee's classification level shall determine the type of work assignment for which he/she is eligible. Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas. Non-dedicated IGSAs will have discretion on whether or not they will allow detainees to participate in the voluntary work program.

### B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure perimeter of non-dedicated IGSA facilities.

*In SPCs, CDFs, and dedicated IGSAs, low custody detainees may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of no less than one staff member to four detainees. The detainees shall be within sight and sound of that staff member at all times.*

### C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

1. *making their bunk beds daily;*

2. *stacking loose papers;*

3. *keeping the floor free of debris and dividers free of clutter; and*

4. *refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

### D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

*The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.*

1. *Staff shall present the detainee's name to the shift supervisor or the requesting department head.*

2. *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file.*

3. *The shift supervisor or department head shall*

*assess the detainee's language skills because these skills affect the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities shall be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

4.  *Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment. Completed agreements shall be filed in the detainee's detention file.*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Detainees with Disabilities

The facility shall allow, where possible, detainees with disabilities  to participate in the voluntary work program in appropriate work assignments. Consistent with the procedures outlined in Standard 4.8 "Disability Identification, Assessment, and Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure that detainees with disabilities have an equal opportunity to access, participate in, and benefit from the voluntary work programs.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs, CDFs, and dedicated IGSAs a detainee may participate in only one work detail per day.*

## J. Establishing Detainee Classification Level

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

1.  unsatisfactory performance;

2.  disruptive behavior, threats to security, etc.;

3.  physical inability to perform the essential

elements of the job due to a medical condition or lack of strength;

4.  prevention of injuries to the detainee; and/or

5.  a removal sanction imposed by the Institution Disciplinary Panel for an infraction of a facility rule, regulation or policy.

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard "6.2 Grievance System."

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.

1.  The detainee shall perform all assigned tasks diligently and conscientiously.

2.  The detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so.

3.  The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

4.  In the event of a work-related injury, the detainee shall notify the work supervisor, who shall immediately implement injury-response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads, in collaboration with the facility's safety/training officer, develop and institute appropriate training for all detainee workers.

1.  The voluntary work program shall operate in compliance with the following codes and regulations:

    a.  Occupational Safety and Health Administration (OSHA) regulations;

    b.  National Fire Protection Association 101 Life Safety Code; and

    c.  International Council Codes (ICC).

    Each facility administrator's designee is responsible for providing access to complete and current versions of the documents listed above.

    The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

2.  Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials, including:

    a.  safety features and practices demonstrated by the supervisor; and

    b.  recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors (staff and detainees who do not read nor understand English shall not be authorized to work with hazardous materials).

    A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

The voluntary work program agreement, which each detainee is required to sign prior to commencing each new assignment, shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the U.S. Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

If a detainee is injured while performing his/her work assignment:

1. The work supervisor shall immediately notify facility medical staff. In the event the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.

2. First aid shall be administered as necessary.

3. Medical staff shall determine what treatment is necessary and where that treatment shall take place.

4. The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.

## ICE/DRO DETENTION STANDARD

## VOLUNTARY WORK PROGRAM

**I. PURPOSE AND SCOPE.   This Detention Standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security and good order.**

While not legally required to do so, ICE/DRO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This Detention Standard applies to the following types of facilities housing DRO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by DRO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

***Procedures in italics are specifically required for SPCs and CDFs***.  IGSAs must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Some terms used in this document may be defined in the separate **Definitions** Standard.

**II. EXPECTED OUTCOMES.**  The expected outcomes of this Detention Standard are:

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security, and good order.

2. Detainees will be able to volunteer for work assignments but otherwise not be required to work, except to do personal housekeeping.

3. Essential operations and services will be enhanced through productivity from detainees.

4. The negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations.

6. There will be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation, or disability.

7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner which the detainee can understand.

A100

**III. DIRECTIVES AFFECTED.**   This Detention Standard replaces **Voluntary Work Program** dated 9/20/2000.

This Detention Standard incorporates the requirements regarding detainees' being assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (2/2/2004).

## IV. REFERENCES

American Correctional Association 4th Edition, Standards for Adult Detention Facilities: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

Environmental Health and Safety National Detention Standard

Food Service National Detention Standard

## V. EXPECTED PRACTICES

### A. Voluntary Work Program

Detainees who are physically and mentally able to work shall be provided the opportunity to participate in any voluntary work program.

The detainee's classification level shall determine the type of work assignment for which he/she is eligible.

Level 3 detainees shall not be given work opportunities outside their housing units/living areas.

### B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure perimeter of local jails and facilities used under Intergovernmental Service Agreements.

*In SPCs and CDFs, only detainees classified as Level 1 (or the facility's equivalent "Low" custody designation) may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of not less than one staff member to four detainees.  The detainees shall be within sight and sound of that staff member at all times.*

### C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*In SPCs and CDFs, detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

- *Making their bunk beds daily,*
- *Stacking loose papers,*
- *Keeping the floor free of debris and dividers free of clutter, and*

A101

- ▪ *Not hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.*

## D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules will be recorded in a facility procedure that will include a voluntary work program agreement. The voluntary work program agreement will document the facility's program and will be in compliance with this Detention Standard.

*In SPCs and CDFs, the primary factors in hiring a detainee as a worker shall be his or her classification level and the specific requirements of the job:*

- ▪ *Staff shall present the detainee's name and A-number to the shift supervisor or the requesting department head.*

- ▪ *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file and/or A-file.*

- ▪ *The shift supervisor or department head shall assess the detainee's language skills as it affects the detainee's ability to perform the specific requirements of the job under supervision.  To the extent possible, work opportunities should be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

- ▪ *Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee is required to sign a* **voluntary work program agreement** *before every new assignment.  Completed agreements shall be filed in the detainee's detention file*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise.  The work, which generally lasts from several hours to several days, may involve such tasks as digging trenches, removing topsoil and other labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Physically and Mentally Challenged Detainees

While medical or mental health restrictions may prevent some physically or mentally challenged detainees from working, those with less severe disabilities shall have the opportunity to participate in the voluntary work program in appropriate work assignments.

- ▪ The selecting official must consider the precise limitations of a disabled individual before rejecting that individual for selected work assignments.

A102

- Expediency or convenience is insufficient justification to reject or "pigeonhole" a detainee who, with reasonable accommodation, can perform essential functions of the work assignment.

- In disputed cases, the selecting official shall consult medical personnel to ascertain the detainee's suitability for a given project.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a fixed schedule.

*In SPCs and CDFs, the normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.*

*Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.*

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs and CDFs, a detainee may participate in only one work detail per day.*

## J. Facilities That Detain Criminal Aliens

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

*In SPCs and CDFs, the compensation is $1.00 per day. Ordinarily, it is to be paid daily, unless the facility has a system in place that ensures detainees receive the pay owed them before being transferred or released.*

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

- Unsatisfactory performance;

- Disruptive behavior, threats to security, etc.;

- Physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition;

- Prevention of injuries to the detainee;

- A removal sanction imposed by the Institutional Disciplinary Panel for an infraction of a facility rule, regulation, or policy.

A103

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

## M.  Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

*In SPCs and CDFs, the detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.*

- The detainee shall perform all assigned tasks diligently and conscientiously.

- The detainee may not evade attendance and performance standards in assigned activities or encourage others to do so.

- The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

- In the event of a work-related injury, the detainee shall notify the work supervisor who shall immediately implement injury response procedures.

## N.  Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads develop and institute, in collaboration with the facility's safety/training officer, appropriate training for all detainee workers.

*1.  In SPCs and CDFs the voluntary work program shall operate in compliance with:*

- *Occupational Safety and Health Administration (OSHA) regulations.*

- *National Fire Protection Association 101 Life Safety Code*

- *American Correctional Association Standards for Adult Local Detention Facilities, current edition*

- *International Council Codes (ICC)*

*Each facility administrator's designee is responsible for providing every SPC and CDF in his or her jurisdiction access to complete and current versions of the documents listed above.*

*The facility administrator shall ensure that the facility operates in compliance with all applicable standards.*

2.  Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials including:

- Safety features and practices demonstrated by the supervisor

- Recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors. Staff and detainees that do not read English will not be authorized to work

A104

with hazardous materials.

- A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

The voluntary work program agreement shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. *The facility administrator shall ensure that the facility operates in compliance with all applicable standards.*

## O.  Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/DRO.

*In SPCs and CDFs, if a detainee is injured while performing his or her work assignment:*

1. *The work supervisor shall immediately notify the facility medical staff.  In the event that the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.*

2. *First aid shall be administered when necessary.*

3. *Medical staff shall determine what treatment is necessary and where that treatment shall take place.*

4. *The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.*

**Standard Approved:**

**James T. Hayes, Jr. /s/**                           **12/5/2008**

_____          _____

**James T. Hayes, Jr.**                           **Date**
**Director**
**Office of Detention and Removal Operations**

## INS DETENTION STANDARD

### VOLUNTARY WORK PROGRAM

---

**I.     POLICY**

Every facility with a work program will provide detainees the opportunity to work and earn money.  While not legally required to do so, INS affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

**II.    APPLICABILITY**

The standards provided in this Detention Standard shall apply to the following facilities housing INS detainees:

1.  Service Processing Centers (SPCs);

2.  Contract Detention Facilities (CDFs); and

3.  State or local government facilities used by INS through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours; referred to as "IGSA facilities."

Within the document additional implementing procedures are identified for SPCs and CDFs. Those procedures appear in italics.  IGSA facilities may find such procedures useful as guidelines.  IGSAs may adopt, adapt or establish alternatives to, the procedures specified for SPCs/CDFs, provided they meet or exceed the objective represented by each standard.

See the separate "Definitions" Standard for the meaning of certain terms used in this document.

**III.   STANDARDS AND PROCEDURES**

**A.     Voluntary Work Program**

Detainees who are physically and mentally able to work will be provided the opportunity to participate in any voluntary work program.

The detainee's classification level will determine the type of work assignment for which he/she is eligible.

*General work assignments at SPCs/CDFs do not require specific skills.  A sample of work assignments and corresponding classification levels follows:*

---

| Work Assignment | Level |
|---|---|
| 1.  Kitchen worker (either shift) | 1-2 (and 3, if screened for violence) |
| 2.  Recreation/Library/Barber | 1-2 (and 3, if screened for violence) |
| 3.  Living area clean-up/janitorial | 1-3 |
| 4.  Area cleaning (inside facility) | 1-3 |
| 5.  Area cleaning (outside facility) | 1 |
| 6.  Evening workers (unit janitorial) | 1-2 |
| 7.  Evening workers (building janitorial) | 1-2 |
| 8.  Processing | 1-2 |
| 9.  Bus detail | 1-3 |
| 10. Maintenance | 1-2 |
| 11. Lawn care | 1-3 |
| 12. Laundry | 1-2 |

**B.**  **Voluntary Work Program Objectives**

Through the voluntary work program:

1.  Physically and mentally able detainees are gainfully employed while contributing to the orderly operation of the facility;

2.  Essential operations and services improve through the productivity of detainees; and

3.  Inactivity-induced idleness and disciplinary-code violations will decline.

**C.**  **Required Work Assignments**

Work assignments are voluntary.  However, all detainees are responsible for personal housekeeping.

*In SPCs/CDFs, detainees are required to maintain their immediate living areas in a neat and orderly manner.  This involves making their bunk beds daily, stacking loose papers, keeping the floor free of debris and dividers free of clutter, and hanging/draping no articles of clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures, or other furniture.*

**D.**  **Voluntary Special Details**

Detainees may volunteer for the temporary work details that occasionally arise. The work, which generally last from several hours to several days, can involve digging trenches, removing topsoil, and other labor-intensive work.  Level-3 detainees will not, under any circumstances, work outside the secure outer perimeter.  With immediate supervision, lower categories of level-3 detainees may participate in special details.

**E.**      **Detainee Selection**

The OIC shall develop site-specific rules for selecting work detail volunteers.

*In SPCs/CDFs, these general procedures apply:*

a.      *Staff will present the detainee's name and A-number to the shift supervisor or the requesting department head.*

b.      *The shift supervisor/department head will review the detainee's detention file and/or A-file for classification purpose, scanning documents that might provide relevant information.*

c.      *Inquiries to staff members about the detainee's attitude and behavior may affect the supervisor's selection.*

d.      *Staff will explain the rules and regulations as well as privileges relating to the detainee worker's status.*

*The primary factors in hiring a detainee as a worker will be his/her classification level and the specific requirements of the job.*

**F.**      **Discrimination in Hiring Detainee Workers**

Volunteering detainees will not be denied work opportunities based on non-merit factors, such as social group, race, religion, sex, physical or mental handicaps, or national origin.

**G.**      **Physically and Mentally Challenged Detainees**

INS maintains custody of physically and mentally challenged detainees whose disabilities range from minor to debilitating.  While some of these individuals' medical restrictions will prevent them from working, those with less severe disabilities will have the opportunity to participate in the voluntary work program, in appropriate work projects.

The selecting official must consider the precise limitations of a disabled individual before rejecting certain work assignments. Expediency or convenience will not justify the rejection or pigeonholing of a detainee who, with reasonable accommodation, can perform the essential function of the work involved.  In disputed cases, the official will consult medical personnel to ascertain the detainee's assignability with regard to a given project.

**H.**      **Hours of Work**

Detainees participating in the volunteer work program are required to work according to a fixed schedule.

*In SPCs/CDFs, the normal scheduled workday for a detainee employed full-time is a maximum of 8 hours. Detainees who wish to participate in the work program will not be permitted to work in excess of 8 hours daily, 40 hours weekly.*

*Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program*

## I.    Work Restrictions

The OIC may restrict the number of work details permitted a detainee during one day.

*In SPCs/CDFs, a detainee may participate in only one work detail per day. Also, the detainee is required to sign a voluntary work program agreement before every new assignment. Completed agreements will be filed in the detainee's detention file. (Sample agreement attached).*

## J.    Facilities That Detain Criminal Aliens

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K.    Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

*In SPCs/CDFs, the stipend is $1.00 per day, to be paid daily.*

## L.    Removal of Detainee from Work Detail

A detainee may be removed from a work detail for cause. Upon removing a detainee from a work detail, the OIC shall place a written justification in the detainee's detention file.

A non-exhaustive list of reasons for removal follows:

1.    Unsatisfactory performance.

2.    Disruptive behavior, threats to security, etc.

3.    Infraction of a facility rule, regulation or policy, leading to removal from a work details as a sanction imposed by the Institutional Disciplinary Panel.

4.    Physical inability to perform all functions required by the job, whether because of a lack of strength or a medical condition. Such detainees may be removed from a work detail to prevent future injuries.

A109

**M.**   **Detainee Responsibility**

The OIC will establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

*In SPCs/CDFs, the detainee is expected to be ready to report for work at the required time. The detainee may not leave an assignment without permission.*

The detainee will perform all assigned tasks diligently and conscientiously.  Removal from the work detail and/or disciplinary action may result when a detainee evades attendance and performance standards in assigned activities, or encourages others to do so.

The detainee will exercise care in performing assigned work, using safety equipment and other precautions in accordance with the work supervisor's instructions.  In the event of a work-related injury, the detainee shall notify the work supervisor, who will immediately implement injury-response procedures (see section III. O., below).

**N.**   **Detainee Training and Safety**

All detention facilities shall comply with all applicable health and safety regulations and standards.

The OIC shall ensure that all department heads develop and institutes, in conjunction with the facility's training officer, appropriate training for all detainee workers.

1.    *In all SPCs/CDFs the Voluntary Work Program shall operate in compliance with the following:*

a.    *Occupational Safety and Health Administration (OSHA) regulations set forth in 29 CFR Parts 1910, 1926, and 1960 (current indexes attached);*
b.    *National Fire Protection Association 101 Life Safety Code (current index attached);*
c.    *American Correctional Association Standards for Adult Local Detention Facilities (see section IV., below);*
d.    *INS Environmental Occupational Safety and Health Program Handbook.*

2.    Upon the detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials.  The supervisor shall demonstrate safety features and practices.  Workers will learn to recognize hazards in the workplace, to understand the protective devices and clothing provided, and to report deficiencies to their supervisors.  INS will not tolerate  "lack of knowledge or skill" as an accident's cause.  Therefore, the detainee shall undertake no assignment before signing a voluntary work program agreement.  Among other things, by signing the agreement the detainee confirms he/she has received and understood training about the assigned job from the supervisor. This agreement will be placed in the detainee's detention file.

3.    Medical staff, working with the Public Health Service, will ensure detainees are medically screened and certified before undertaking a food service assignment.

4.    The facility will provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5.    *Each Regional Safety and Health Officer (RSHO) shall be responsible for providing every SPC/CDF in his/her region with complete and current copies of the documents listed in III.N.1., above, including 29 CFR Parts 1910, 1926 and 1960. The OIC shall ensure that the facility operates in compliance with all currently applicable standards.*

## 0.    **Detainee Injury and Reporting Procedures**

The OIC shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of INS.

*In SPCs/CDFs, if a detainee is injured while performing his/her work assignment, the following procedures apply:*

1.    *The work supervisor will immediately notify the facility medical staff. In the event that the accident occurs in a facility that does not provide 24-hour medical coverage, the supervisor will contact the on-call medical officer for instructions.*

2.    *First aid will be administered when necessary.*

3.    *Medical staff will determine what treatment is necessary and where that treatment will take place.*

4.    *The work supervisor will complete a detainee accident report and submit it to the OIC for review and processing. A copy of this report will be placed in the detainee's A-file.*

IV.   **AMERICAN CORRECTIONAL ASSOCIATION STANDARDS REFERENCED:**

American Correctional Association 3rd Edition, Standards for Adult Detention Facilities: 3-ALDF-3E-04, 5A-01, 5A-03, 5A-04, 5A-05, 5A-06, 5A-08, 5A-13.

**Approval of Standard**

Michael D.  Cronin
Acting Executive Associate Commissioner
Office of Programs

SEP 2 0 2000

_____
Date

Michael A.  Pearson
Executive Associate Commissioner
Office of Field Operations

SEP 2 0 2000

_____
Date

A112

Detainee Voluntary Work Program Agreement
Service Processing Center/Contract Detention Facility
*[Insert Facility Name]*


**<u>Detainee Voluntary Work Program Agreement</u>**:


Detainees that participate in the volunteer work program will <u>not</u> be permitted to work in excess of 8 hours daily or 40 hours weekly.

Detainees that participate in the volunteer work program are required to work according to an assigned work schedule and to participate in all work-related training.  Unexcused absence from work or unsatisfactory work performance could result in removal from the voluntary work program.  Detainees must adhere to all safety regulations and to all medical and grooming standards associated with the work assignment.  Compensation shall be $1.00 per day.


I,_____, A#_____, have read, understand, and agree
      (Detainee name)
to comply with the above.  I have received and understand relevant safety training regarding my work assignment:


_____
     Work Assignment


_____          _____
     Detainee Signature                                Date

A113

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

> **Policy:**  In every facility offering a voluntary work program, INS detainees will have the opportunity to work and earn money by participating.  While not legally required, INS affords detainee workers basic Occupational Safety and Health Administration (OSHA) protections.

| VOLUNTARY WORK PROGRAM | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 1.  Does the facility have a voluntary work program?<br>   If yes, do detainees participate? | | | |
| 2.  Does staff maintain a written chart with work assignments and the corresponding classification levels? | | | |
| 3.  Does the Voluntary Work Program:<br>   a. Contribute to detainee morale and the orderly operation of the facility?<br>   b. Improve operations and services?<br>   c. Reduce restlessness and disciplinary code violations? | | | |
| 4.  Does detainee housekeeping meet neatness and cleanliness standards? | | | |
| 5.  Do low level-three detainees have the opportunity to participate in special details?<br>   a. If yes, do they ever work outside the outer perimeter? | | | |
| 6.  Do written procedures govern selection of detainees for the Voluntary Work Program?<br>   a.  Do the same procedures apply for replacement workers as for "new" workers?<br>   b.  Does staff always follow written procedures?<br>   c.  Is merit the sole selection criterion? | | | |
| 7.  Do physically and mentally challenged detainees participate in the program?<br>   a. If yes, how many physically challenged are currently employed?<br>   b. How many mentally challenged? | | | |

A114

| VOLUNTARY WORK PROGRAM | | | |
|---|---|---|---|
| **Components** | **Yes** | **No** | **Remarks** |
| 8. Does the facility comply with work-hour requirements for detainees, not exceeding:<br>  a. Eight hours a day?<br>  b. Forty hours a week? | | | |
| 9. Do exceptions occur regularly?<br>  a. If yes, certain times of the month?<br>  b. Certain times of year? | | | |
| 10. Do detainee volunteers work according to<br>  a. Fixed schedule? | | | |
| 11. Do volunteers receive the $1/day stipend? | | | |
| 12. Has every participating detainee signed the Voluntary Work Program agreement? | | | |
| 13. If the OIC removes a detainee from a work detail, does staff place the written justification for the action in the detainee's detention file?<br>  a. Is this a matter of written procedure? | | | |
| 14. Does staff ensure that detainee volunteers understand their responsibilities as workers before they join the work program?<br>  a. In accordance with written procedure? | | | |
| 15. Does the voluntary work program meet:<br>  a. OSHA standards?<br>  b. NFPA standards?<br>  c. ACA standards?<br>  d. EOSH standards? | | | |
| 16. Does medical staff screen and formally certify detainee food service volunteers?<br>  a. If yes, before the assignment begins?<br>  b. Is this a matter of written procedure? | | | |
| 17. Do detainees receive safety equipment/ training sufficient for the assignment? | | | |
| 18. Does the OIC have the latest OSHA standards? NFPA? ACA? EOSH? | | | |
| 19. Is the proper procedure followed when an alien is injured on the job? | | | |

A115

# U.S. Immigration and Naturalization Service
## NATIONAL DETENTION STANDARDS
## MONITORING INSTRUMENT

| VOLUNTARY WORK PROGRAM |
|:---:|

**Verification Sources:**

**The following may serve as sources of information for auditors verifying the facility's compliance with this detention standard:**

| SOURCE | TIME | DATE | LOCATION |
|---|---|---|---|
| A.  Facility's written work program policies and procedures | | | |
| B.  Observing on-the-job volunteers | | | |
| C.  A-files/detention files | | | |
| D.  OSHA standards | | | |
| E.  NFPA standards | | | |
| F.  ACA standards | | | |
| G.  EOSH standards | | | |
| H.  Detainee and staff interviews | | | |

Facilities must complete the attached Plan of Action for bringing operations into compliance.   For each element found out of compliance, the plan of action will specify remedial action and the estimated timetable for compliance.

**Remarks**: *(Record significant facts, observations, other sources used, etc.)*


_____
Auditor's Signature


_____
Date

A116

| AWARD/CONTRACT | | | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | | RATING | | PAGE OF PAGES |
|---|---|---|---|---|---|---|---|
| | | | | | | | 1   115 |

| 2. CONTRACT (Proc. Inst. Ident.) NO. | | | | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. |
|---|---|---|---|---|---|
| HSCEDM-15-D-00015 | | | | 09/28/2015 | 192115FSETACX0012 |

| 5. ISSUED BY | CODE | ICE/DM/DC-LAGUNA | 6. ADMINISTERED BY (If other than Item 5) | CODE | ICE/DM/DC-LAGUNA |
|---|---|---|---|---|---|
| ICE/Detent Mngt/Detent Contract-LAG<br>Immigration and Customs Enforcement<br>Office of Acquisition Management<br>24000 Avila Road, Room 3104<br>Attn: Jun Surla (949) 360-3073<br>Laguna Niguel CA 92677 | | | ICE/Detent Mngt/Detent Contract-LAG<br>Immigration and Customs Enforcement<br>Office of Acquisition Management<br>24000 Avila Road, Room 3104<br>Attn: Jun Surla.  949-360-3073<br>Laguna Niguel CA 92677 | | |

| 7. NAME AND ADDRESS OF CONTRACTOR (No., Street, City, Country, State and ZIP Code) | 8. DELIVERY |
|---|---|
| GEO GROUP INC THE<br>621 NW 53RD ST STE 700<br>BOCA RATON FL 334878242 | FOB ORIGIN    X  OTHER (See below) |

8. DELIVERY — FOB ORIGIN    X  OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

Net 30

10. SUBMIT INVOICES
(4 copies unless otherwise specified)
TO THE ADDRESS SHOWN IN

ITEM

| CODE | 6127064650000 | FACILITY CODE | |
|---|---|---|---|

| 11. SHIP TO/MARK FOR | CODE | 12. PAYMENT WILL BE MADE BY | CODE | ICE-ERO-FOD-SEATTLE |
|---|---|---|---|---|
| Department of Homeland Security<br>Immigration and Customs Enforcement<br>1623 East J Street<br>Tacoma, WA 98421<br>Attn: James Gronewold | | DHS, ICE<br>Burlington Finance Center<br>P.O. Box 1620<br>Attn: ICE-ERO-FOD-Seattle<br>Williston VT 05495-1620 | | |

| 13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION | | 14. ACCOUNTING AND APPROPRIATION DATA |
|---|---|---|
| ☐ 10 U.S.C. 2304 (c) (    )    41 U.S.C. 253 (c) (    ) | | See Schedule |

| 15A. ITEM NO | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | Continued | | | | |
| | | | 15G. TOTAL AMOUNT OF CONTRACT | | $0.00 |

**16. TABLE OF CONTENTS**

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 103 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 43 | X | J | LIST OF ATTACHMENTS | 115 |
| X | D | PACKAGING AND MARKING | 92 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 93 | | K | REPRESENTATIONS, CERTIFICATIONS AND | |
| X | F | DELIVERIES OR PERFORMANCE | 95 | | | OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION DATA | 97 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 101 | | M | EVALUATION FACTORS FOR AWARD | |

**CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE**

| 17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return __1__ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number **HSCEDM-15-R-00001** including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary. |
|---|---|
| 19A. NAME AND TITLE OF SIGNER (Type or print)<br>Amber Martin, EVP, Contract Administration | 20A. NAME OF CONTRACTING OFFICER<br>Roberta J. Halls |
| 19B. NAME OF CONTRACTOR<br><br>BY _(signature)_<br>(Signature of person authorized to sign) | 19C. DATE SIGNED<br>9/24/15 | 20B. UNITED STATES OF AMERICA<br><br>BY _(signature)_<br>(Signature of the Contracting Officer) | 20C. DATE SIGNED<br>9-24-15 |

NSN 7540-01-152-8069
PREVIOUS EDITION IS UNUSABLE

STANDARD FORM 26 (Rev. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSCEDM-15-D-00015 | | | PAGE 2 | OF 115 |

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | DUNS Number: 612706465 | | | | |
| | COR POC: ███████████ e-mail address, | | | | |
| | Alternate POC: ███████ email address, ███████ | | | | |
| | Finance POC: ███████ e-mail address, ███████ | | | | |
| | . Exempt Action: Y FOB: Destination Period of Performance: 09/28/2015 to 09/27/2025 | | | | |
| | . BASE PERIOD: September 28, 2015 through September 27, 2016. | | | | |
| 0001 | DETENTION SERVICES IAW THE PERFORMANCE WORK STATEMENT (Estimated ████ Bed Days) | | DA | 0.00 | 0.00 |
| | Orders from this Contract will be issued through the issuance of a task order. . Product/Service Code: S206 Product/Service Description: HOUSEKEEPING- GUARD | | | | |
| | . BASE PERIOD: September 28, 2015 through September 27, 2016. | | | | |
| 0001A | Detention Bed Days, Guaranteed Minimum, Beds ████ Day ███████████ Unit of Issue DA is equivalent to Bed-Day. . Product/Service Code: S206 Product/Service Description: HOUSEKEEPING- GUARD | | | | 49,980,604.98 |
| | . BASE PERIOD: September 28, 2015 through September 27, 2016. | | | | |
| 0001B | Detention Bed Days, Above Guaranteed Minimum, Beds of ███████████. Unit of Issue DA is equivalent to Bed-Day. . Product/Service Code: S206 Continued ... | | | | 6,820,849.20 |

NSN 7540-01-152-8007

OPTIONAL FORM 336 (4-86) Sponsored by GSA FAR (48 CFR) 53 110

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-15-D-00015 | | | PAGE<br>3 | OF<br>115 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

GEO GROUP INC THE

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD: September 28, 2015 through<br>September 27, 2016. | | | | |
| 0002 | TRANSPORTATION SERVICES IAW THE PERFORMANCE WORK<br>STATEMENT<br><br>Orders from this Contract will be issued through<br>the issuance of a task order.<br>.<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD: September 28, 2015 through<br>September 27, 2016. | | | | 0.00 |
| 0002A | Transportation Fixed Flat Rate for ▇▇▇▇<br>Vehicles.  These vehicles are:<br><br>1. ▇▇▇▇ Bus<br>2. ▇▇▇ Transporters<br>3. ▇▇▇ Utility Vehicle.<br>4. ▇▇▇ ADA Van<br>5. ▇▇▇ Van.<br>.<br>Unit of Issue MO is equivalent to Month.<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD: September 28, 2015 through<br>September 27, 2016. | ▇▇▇▇▇ | | | 3,944,544.00 |
| 0002B | Estimated Fuel Cost for Vehicles.  Contractor<br>shall not exceed the amount shown without prior<br>approval by the Contracting Officer.  This is a<br>Not-To-Exceed of ▇▇▇▇▇▇ Unit of Issue MO<br>is equivalent to Month.<br>.<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD: September 28, 2015 through<br>September 27, 2016.<br><br>Continued ... | ▇▇▇▇▇ | | | 300,000.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53 110

A119

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>HSCEDM-15-D-00015 | | | | PAGE<br>4 | OF<br>115 |
|---|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

GEO GROUP INC THE

| ITEM NO<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| 0002C | Estimated Travel Cost Inclusive of Lodging and Meals & Incidental Expenses (MI&E) for Detention Officers exceeding the standard working hours. Cost is based on actual charges per occurrence, not to exceed the allowable Federal Travel Regulation rates / costs in effect on the dates of travel.  Contractor shall not exceed the amount shown without prior approval by the Contracting Officer.  This is NOT-TO EXCEED of ▮▮▮▮▮▮▮▮▮▮ Unit of issue LO is equivalent to Lot.<br>.<br>Product/Service Code:  S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD:  September 28, 2015 through September 27, 2016. | | | | 36,000.00 |
| 0002D | OVERTIME. Overtime must be pre-approved by the Government and tracked by the contractor (including name of approver, hours approved, and date of approval).  Overtime hours not used in any base or option period will not roll over to the next performance period.  The contractor shall not exceed the amount shown without prior approval by the Contracting Officer.  Unit of Issue of HR is equivalent to Hour.<br>.<br>Product/Service Code:  S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD:  September 28, 2015 through September 27, 2016. | | | | 122,694.00 |
| 0002E | Remote Post and Other Destinations.  Remote Post and Other Destinations must be pre-approved by the Government and tracked by the Contractor (including name of approver, hours approved and date of approval).  Hours not used in any base or option period will not roll over to the next performance period.  Unit of Issue HR is equivalent to Hours.<br>.<br>Product/Service Code:  S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD:  September 28, 2015 through September 27, 2016.<br>Continued ... | | | | 542,640.00 |

NSN 7540-01-152-8067

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSCEDM-15-D-00015 | | | PAGE 5 | OF 115 |
|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GEO GROUP INC THE

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| 0002F | Transportation Fixed and Flat Rate including vehicles for Yakima Washington and Medford Oregon.<br><br>For Yakima, Washington ████████ Transporter<br><br>For Medford, Oregon ████ ransporters<br><br>Unit of Issue MO is equivalent to Month.<br>.<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br>.<br>BASE PERIOD: September 28, 2015 through September 27, 2016. | ██████ | | | 1,076,088.00 |
| 0003 | Detainee Volunteer Wages for the Detainee Work Program. Reimbursement for this line item will be at the actual cost of $1.00 per day per detainee. Contractor shall not exceed the amount shown without prior approval by the Contracting Officer. Unit of Issue LO is equivalent to Lot.<br>.<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br><br>.<br>OPTION YEAR 1: September 28, 2016 through September 27, 2017. | ██████ | | | 114,975.00 |
| 1001 | DETENTION SERVICES IAW THE PERFORMANCE WORK STATEMENT (Estimated ████ Bed Days)<br><br>Orders from this Contract will be issued through the issuance of a task order.<br>.<br>Amount: $0.00(Option Line Item)<br>09/28/2016<br>Product/Service Code: S206<br>Product/Service Description: HOUSEKEEPING- GUARD<br><br><br>.<br>OPTION YEAR 1: September 28, 2016 through September 27, 2017. | | DA | 0.00 | 0.00 |
| 1001A | Detention Bed Days, Guaranteed Minimum, Beds Continued ... | ██████ | | | 0.00 |

NSN 7540-01-152-8067

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53 110

A121

HSCEDM-15-D-00015

The Contractor shall submit a monthly injury report summary containing, but not limited to, name, time/date, location, circumstances, care rendered, current status, Worker's Compensation status, and reference to identification of initial report.

### V. Protection of Employees
The Contractor shall develop plans that comply with ICE comprehensive plans and procedures to safeguard employees against exposure of blood borne pathogens. The ICE plan is based upon OSHA standards found in the Employee Occupational Safety and Health (EOSH) Manual.

### W. Medical Requests
The Contractor shall adhere to ICE policies and procedures regarding detainee medical requests. If a detainee requires immediate medical attention, the officer shall immediately notify IHSC staff via telephone. The Contractor's Supervisor will, in turn, notify the medical provider as well as the COR or ICE-designated employee.

### X. Emergency Medical Evacuation
The Contractor shall develop and implement written policies and procedures that define emergency health care evacuation of detainees from within the facility.

### Y. Sanitation and Hygienic Living Conditions
The Contractor shall comply with the requirements of the Occupational Safety and Health Act of 1970 and all codes and regulations associated with 29 CFR 1910 and 1926. The Contractor shall comply with all applicable ICE, federal, state and local laws, statutes, regulations, and codes. In the event there is more than one reference to a safety, health, or environment requirement in an applicable, law, standard, code, regulation, or ICE policy, the most stringent requirement shall apply.

## VIII. DETAINEE RIGHTS, RULES, DISCIPLINE, AND PRIVILEGES
The Contractor shall supervise, observe, and protect detainees from personal abuse, discrimination, corporal punishment, personal injury, property damage, harassment, or violation of detainee's civil rights. Contract personnel shall adhere to ICE policies and procedures, and the PBNDS.

In accordance with ICE PBNDS, the Contractor shall permit detainees to: access the law library, legal materials, facilities, and equipment; have document copy privileges; and have the opportunity to prepare legal documents.

## IX. MANAGE A DETAINEE WORK PROGRAM
Detainee labor shall be used in accordance with the detainee work plan developed by the Contractor, and will adhere to the ICE PBNDS on Voluntary Work Program. The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations.

Detainees shall not be used to perform the responsibilities or duties of an employee of the Contractor. Detainees shall not be used to perform work in areas where sensitive documents are maintained (designated ICE workspace). Custodial/janitorial services to be performed in designated ICE work space will be the responsibility of the Contractor.

Appropriate safety/protective clothing and equipment shall be provided to detainee workers. Detainees shall not be assigned work that is considered hazardous or dangerous. This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances, and unusual physical demands.

The Contractor shall supply sufficient officers to monitor and control detainee work details. Unless approved by the COR, these work details must be within the security perimeter.

It will be the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level. All detainees shall be searched when they are returned from work details.

A122

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this Addendum with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 3, 2019.

I further certify that on January 3, 2019, a notice of the filing of the foregoing (including a complete copy of the foregoing) will be filed in the underlying proceeding in the United States District Court for the Western District of Washington, in compliance with Federal Rule of Appellate Procedure 21(a)(1), and that all parties to the proceeding and the district court (Judge Robert Bryan) will be served with that notice and copy of the petition through the district court's CM/ECF system.

Dated: January 3, 2019

*/s/ Mark Emery*
Counsel for Petitioner