**BAKER DECLARATION**

**EXHIBIT B**

```
                    UNITED STATES DISTRICT COURT

                   WESTERN DISTRICT OF WASHINGTON
   _____

   STATE OF WASHINGTON,        )
                               )   No. 17-cv-05806-RJB
              Plaintiff,       )
                               )
         vs.                   )
                               )
   THE GEO GROUP, INC.,        )
                               )
              Defendant.       )
                               )
                               )

   _____

            30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF
                          COLLEEN MELODY
                         August 10, 2018
                       Fircrest, Washington
   _____
```

Taken Before:

Laura A. Gjuka, CCR #2057
Certified Shorthand Reporter

```
 1                    A P P E A R A N C E S

 2        For the Plaintiff:

 3             MARSHA CHIEN
               LA ROND BAKER
 4             Assistant Attorney General
               Office of the Attorney General
 5             800 Fifth Avenue, Suite 2000
               Seattle, WA 98104
 6             206-464-7744
               larondb@atg.wa.gov
 7             marshac@atg.wa.gov

 8
          For the Defendant:
 9
               JOAN K. MELL
10             III Branches Law, PLLC
               1019 Regents Boulevard
11             Suite 204
               Fircrest, WA 98466
12             253-566-2510
               joan@3brancheslaw.com
13
          Also Present:
14
               ANYA PERRET
15

16

17

18

19

20

21

22

23

24

25
```

```
 1        referenced internal attorneys.  Were the processes
 2        involving outside attorneys?
 3   A    I don't understand.
 4   Q    Did you have action on this matter prior to opening your
 5        Timekeeping system that involved attorneys who were not
 6        employed by the AG?
 7   A    Almost certainly.  I mean, yes.  The answer to that is
 8        yes.
 9   Q    Who?
10              MS. CHIEN:  Objection, work product.  You
11        can answer to the extent not privileged.
12              THE WITNESS:  Part of the job duties of
13        attorneys in the civil rights unit is to take outreach
14        meetings that are requested by external people,
15        individuals external to the Attorney General's Office.
16        That has included outreach meetings with attorneys and
17        non-attorneys about conditions affecting workers in
18        Washington, conditions affecting vulnerable populations
19        in Washington, and general civil rights complaints or
20        concerns that people have.
21           That outreach work has been ongoing since the civil
22        rights unit was established in January 2015.  And
23        frequently during these outreach meetings,
24        conditions/issues involving the Northwest Detention
25        Center are raised, among a whole host of other issues
```

```
 1            that commonly come up at these outreach meetings that
 2            are sometimes connected to and sometimes wholly
 3            unconnected to the Northwest Detention Center.
 4       BY MS. MELL:
 5    Q  Is there a standing outreach meeting for the Northwest
 6       Detention Center?
 7    A  No.  That our office is involved in, no.
 8    Q  So what outside attorneys have you had an outreach
 9       meeting with specific to this matter?
10                  MS. CHIEN:  Objection, work product and
11       common interest privilege.  You can answer to the extent
12       not privileged.
13                  THE WITNESS:  I don't know that we have
14       had an outreach meeting specific to the Northwest
15       Detention Center where our attorneys have sought out or
16       created a meeting specific to this matter, at least
17       before the investigation started.  Certainly once we
18       started investigating we were asking more specific
19       questions about the practices at NWDC.  But prior to
20       that we wouldn't have had specific outreach meetings
21       about NWDC.  We do take meetings with groups, as part of
22       their portfolio, represent or advocate for the rights of
23       immigrants and also the rights of workers, and in those
24       outreach meetings NW comes up a fair amount.
25       BY MS. MELL:
```

```
 1   Q   Okay.  So with regard to this case, who did you meet
 2       with prior to opening the matter?
 3               MS. CHIEN:  Objection, work product and
 4       common interest.  You can answer to the extent not
 5       privileged.
 6               THE WITNESS:  So prior to opening this
 7       case, we didn't have a case to meet with them about.  We
 8       would have done outreach meetings that would have
 9       invited them to share with us issues of concern in the
10       areas in which they work.
11         So, for example, when we take outreach meetings at
12       the request of Disability Rights Washington, we invite
13       them to tell us the issues of concern to Disability
14       Rights Washington, and then we talk with them to see if
15       there is any role that the State may have in improving
16       conditions for people with disabilities in Washington
17       state.  So it's not an outreach meeting about the
18       Northwest Detention Center, it's an outreach meeting
19       about the work of the organization with whom we're
20       meeting.
21     BY MS. MELL:
22   Q   All right.  Who did you meet with and have any
23       communications with about minimum wages at the Northwest
24       Detention Center prior to opening a number in
25       Timekeeping in this case?
```

1   A   We met with lots of organizations about concerns about
2       labor practices at the Northwest Detention Center or
3       those concerns were raised as part of the meeting.  They
4       include legal aid organizations in Washington that
5       represent detainees or former detainees or their
6       families, or they advocate for detention condition
7       improvements.  So those would be the Northwest Justice
8       Project, Columbia Legal Services, Disability Rights
9       Washington, the ACLU of Washington, the Northwest
10      Immigrants Right Project.  And attorneys in the private
11      bar who, either just as a private representational
12      matter or through their membership in the American
13      Immigration Law Association, represent people who are
14      current or former detainees at NWDC.
15          On the nonlegal side, there are a number of groups
16      that raise concerns about the Northwest Detention
17      Center, including One America, the Northwest Detention
18      Center Resistance, and the UW and Seattle U Human Rights
19      Clinics, which do legal and nonlegal work.  We've met
20      with Consejo Latino, the Commission on Hispanic Affairs,
21      the Washington State Human Rights Commission, the
22      Washington Defender Association Immigration Project, and
23      probably a number of others.  It's a large detention
24      facility in Tacoma, and it affects a lot of folks in
25      Washington state.

```
 1    Q  So can you tell me who you met with and discussed wages
 2       at the Northwest Detention Center prior to opening a
 3       matter in Timekeeping?
 4                   MS. CHIEN:  Objection, work product,
 5       common interest privilege.  You can answer to the extent
 6       not privileged.
 7                   THE WITNESS:  It's the same groups that I
 8       just gave you.
 9       BY MS. MELL:
10    Q  How about names of people?
11    A  Oh, individuals?
12    Q  Yeah.
13    A  I can't do that.  I can tell you that just because I
14       don't -- I don't know everybody who was present at each
15       of those meetings.  Outreach is something that we do as
16       a standing part of our job.  So these meetings happen
17       frequently.  And Northwest Detention Center conditions
18       come up so frequently that I could never itemize all of
19       the people that were at each one of the meetings that we
20       took.
21           So, you know, when we meet with the Northwest
22       Justice Project, for example, we do that several times a
23       year, and we invite them to bring whoever they would
24       like to those meetings.  We bring different members of
25       our staff, and we talk to them about issues of concern
```

```
 1       to them.  The participants are different every time.
 2       The meetings are quarterly or more.  And I could not
 3       enumerate for you the names of everybody who attended
 4       those meetings, starting with the civil rights unit, and
 5       filing this particular lawsuit.
 6   Q   Who can you recall at this time?
 7                 MS. CHIEN:  Same objection, work product
 8       and common interest.
 9                 THE WITNESS:  I can't tell you -- I don't
10       know, I can't tell you which of the meetings that we
11       attended with the Northwest Justice Project, for
12       example, when this issue of labor practices at the
13       Northwest Detention Center did or didn't come up.  We
14       hear about these issues so often that we were very
15       familiar with the complaints that legal and nonlegal
16       advocacy groups had.  And it wasn't as if we were
17       documenting during our outreach meetings all of the
18       issues as they were raised, along with a list of
19       participants.  That's just not how we do those meetings.
20       BY MS. MELL:
21   Q   Do you have any recollection of any person you've talked
22       to?
23                 MS. CHIEN:  Same objections.
24                 THE WITNESS:  About the minimum wage
25       issues at the --
```

1   because they think they might be matters for
2   enforcement, matters of legislation.
3       We receive contacts from law enforcement partners in
4   police departments and sheriff's offices.  Individuals
5   contact us all the time.
6   BY MS. MELL:
7   Q   What is the process for deciding what matter to take --
8       who was involved in the decision to take enforcement
9       action?
10  A   Enforcement action by the civil rights unit?
11  Q   Yes.
12  A   Well --
13              MS. CHIEN:  Objection, work product.  You
14  can answer to the extent not privileged.
15              THE WITNESS:  And part of it involves
16  communication with our client, the attorney general.  So
17  without specifying, you know, sort of too much of that,
18  when we develop a matter through investigation, the
19  civil rights unit makes a formal recommendation.  Any
20  time we seek to file litigation, there is a formal
21  recommendation and review process that we engage in.
22      Attorneys in the office summarize the results of
23  their investigation for me.  I review investigation --
24  I'm sorry, litigation recommendations, as well as the
25  deputy attorney general who is my supervisor.  And then

```
 1        members up the chain from that also have review
 2        authority before litigation is commenced.
 3        BY MS. MELL:
 4    Q   Does the civil rights unit file litigation without
 5        Bob Ferguson's approval?
 6                  MS. CHIEN:  Objection, attorney-client
 7        privilege.  Work product.  You can answer to the extent
 8        not privileged.
 9                  THE WITNESS:  Yes.  There have been times
10        that we have done that where the authority rests with
11        the civil rights unit.  But it's a matter-by-matter
12        determination.
13        BY MS. MELL:
14    Q   So no matter what, you have to ask whether or not you
15        can do that?
16    A   No.  There are certain classes of matters that we have
17        been given authority to pursue without additional
18        review.
19    Q   Okay.  What are those?
20    A   We represent the Washington State Human Rights
21        Commission in enforcement matters for that agency, for
22        example.  There are other matters that are
23        non-litigation matters that we pursue and that are
24        significant in scope, but that don't result in formal
25        litigation and don't require a sort of written product
```

1    Project or Disability Rights Washington that have a more
2    directed focus.
3        But a lot of the groups who brought these issues to
4    our attention, the human rights clinics at the
5    University of Washington, it is a topic area like human
6    rights they are interested in, and within that they have
7    identified conditions at the Northwest Detention Center
8    as part of their interest.
9  Q So the state of Washington is comprised of more than
10    those interest groups, correct?
11 A Sure.
12 Q What did AG Ferguson do to tap into a broader spectrum
13    of interest groups so that he could ascertain whether or
14    not to initiate litigation on behalf of the state of
15    Washington?
16              MS. CHIEN: Objection, misstates the
17    testimony. She did not say that AG Ferguson directed
18    this investigation.
19              MS. MELL: She did say he approved this
20    investigation and the filing of the lawsuits.
21              THE WITNESS: That's not true. So the
22    investigation was Attorney General Ferguson did not
23    approve the opening of the investigation. I do that.
24    So the attorneys recommend an investigation, and they
25    request permission to open the matter through me, with

Case 3:17-cv-05806-RJB   Document 184-2   Filed 04/11/19   Page 13 of 14
99

1      me, and I approved the opening of this investigation.
2      Attorney General Ferguson approved the filing of the
3      lawsuit.
4      BY MS. MELL:
5  Q   Okay. So what, other than your recommendation from the
6      investigation, did the Attorney General consider?
7  A   I think that's probably privileged because it would have
8      been materials that we as attorneys would have prepared
9      and forwarded him for his review, along with others in
10     the supervising chain, right, including our summaries of
11     the facts, our summaries of the law, and our application
12     of our facts to the law for purposes of recommending
13     litigation.
14 Q   Did Attorney General Ferguson consider input from a
15     broader spectrum of individuals who would reflect the
16     citizens of the state of Washington?
17                 MS. CHIEN: Objection, work product
18     attorney-client privilege and misstates testimony.
19                 THE WITNESS: So I want to answer your
20     question. But built into your question is an assumption
21     that the groups that I've named are somehow a narrow
22     group of interests. And I don't agree with that
23     assumption. I think it's a remarkably broad group of
24     interests. But if there are specific groups that you
25     want to ask whether we met with, that might be a way

<u>C E R T I F I C A T E</u>

I, Laura Gjuka, a Certified Court Reporter in and for the State of Washington, residing at University Place, Washington, authorized to administer oaths and affirmations pursuant to RCW 5.28.010, do hereby certify;

That the foregoing Verbatim Report of Proceedings was taken stenographically before me and transcribed under my direction; that the transcript is a full, true and complete transcript of the proceedings, including all questions, objections, motions and exceptions;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

That upon completion of signature, if required, the original transcript will be securely sealed and the same served upon the appropriate party.

IN WITNESS HEREOF, I have hereunto set my hand this 20th day of August, 2018.

_____
Laura Gjuka, CCR No. 2057