THE HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STATE OF WASHINGTON,

       Plaintiff,

vs.

THE GEO GROUP, INC.,

       Defendant.

Case No. 3:17-cv-05806-RJB

***AMICUS CURIAE* BRIEF OF THE
INTERNATIONAL HUMAN RIGHTS CLINIC
AT SEATTLE UNIVERSITY SCHOOL OF LAW
AND GLOBAL RIGHTS ADVOCACY**

## I.   <u>INTRODUCTION</u>

The GEO Group, Inc. ("GEO"), one of the largest companies to operate detention centers in the

United States, has been consistently accused of human rights abuses across the nation[1] and criticized

---

[1] *See generally,* DETENTION WATCH NETWORK, A TOXIC RELATIONSHIP: PRIVATE PRISONS AND U.S. IMMIGRATION
DETENTION (2016), http://www.nwdcresistance.org/wp-content/uploads/2015/09/Feb-Hunger-Strike-Press-Release-.pdf;
*US: Death in Immigration Detention,* HUMAN RIGHTS WATCH (Jul. 7, 2016, 12:00 AM),
https://www.hrw.org/news/2016/07/07/us-deaths-immigration-detention; Jerry Iannelli, *Five Reasons South Florida's Pro-
Trump Private-Prison Company is Evil,* MIAMI NEW TIMES (Jan. 7, 2018, 8:00 AM),
http://www.miaminewtimes.com/news/five-reasons-boca-private-prison-company-geo-group-is-evil-9967258.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 1
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

by international human rights bodies.[2]  These allegations include failing to provide adequate medical treatment, using solitary confinement as a retaliatory measure, providing inadequate food and nutrition to detainees, and complicity in the expansion of immigrant detention.[3]  The present case considers yet another troubling issue, also the subject of lawsuits elsewhere in the U.S. and of international concern[4]: the employment rights of this vulnerable population and their exploitation for monetary gain.

As presented below, GEO violates several international legal standards through its detainee Work Program at the Northwest Detention Center ("NWDC").  For a variety of reasons discussed in the following pages, the nature of the detainees' work at NWDC cannot be considered truly voluntary. Moreover, the grossly-inadequate $1 per day wage prevents them from meeting even their basic needs. As a result, the situation at the NWDC appears to rise to the level of forced labor, a universally-condemned practice defined under international law, which carries significant consequences and obligations for the United States Government.

## II.  IDENTITY AND INTEREST OF AMICUS CURIAE

The International Human Rights Clinic of Seattle University School of Law ("the Clinic") seeks to defend and promote human rights both in the U.S. and across the globe.[5]  Through direct representation and other forms of advocacy, the Clinic has worked for individuals and groups who have suffered torture, wrongful conviction, arbitrary detention, discrimination, and illegal intrusion

---

[2] See A/HRC/36/37/Add.2, UN Report of the Working Group on Arbitrary Detention on its visit to the United States of America, available at https://documents-dds ny.un.org/doc/UNDOC/GEN/G17/193/37/PDF/G1719337.pdf?OpenElement, pag. 8; IACHR Press Release August 2017. IACHR Expresses Deep Concern for Deaths and Detention Conditions at Migrant Detention Centers in the United States.

[3] See DETENTION WATCH NETWORK, *supra* note 1, at 3-5; A/HRC/36/37/Add.2, para. 33.

[4] *See* United Nations, Report of the Working Group on Arbitrary Detention on its visit to the United States of America, A/HRC/36/37/Add.2, para. 33 (2017).

[5] Please note that another Clinic of the Ronald Peterson Law Clinic at Seattle University School of Law will also likely present an *amicus curiae* brief in this case. That Clinic, the Workers' Rights Clinic, will present a brief on distinct legal issues.

---

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 2
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

into ancestral lands. The Clinic has a special interest in cases where the rights of vulnerable populations, such as detainees and migrants, are at stake. Drawing on over a decade of experience and expertise, the Clinic seeks to ensure that courts understand the critical international legal dimensions to such cases. The Clinic does not, in this brief or otherwise, represent the official views of Seattle University.

Global Rights Advocacy (GRA) is a non-profit organization founded in Seattle with the mission to provide victims access to international human rights mechanisms through high-quality legal defense and advocacy strategies. GRA is committed to promote and disseminate knowledge on the use of international human rights law and to permeate its content in domestic law, policies and practices. GRA's Director, Alejandra Gonza, is an Affiliate Instructor of Law at University of Washington School of Law. Previously, Gonza was the Director of the UW International Human Rights Clinic, where she started the project Profit over Dignity in partnership with undocumented leaders. Through this project, UW law students conducted more than 40 interviews of immigrant detainees at the Northwest Detention Center, toured the facility, drafted shadow reports, requested urgent appeals, and filed individual complaints before the United Nations Special Procedures and the Inter-American Commission of Human Rights. This brief does not represent the official views of the University of Washington.

### III.  BACKGROUND

A.  THE GEO GROUP AND THE NORTHWEST DETENTION CENTER

The United States immigration detention system has been highly privatized.[6] In 2016, 73 percent of immigrants held by Immigration & Customs Enforcement ("ICE") were in facilities

---

[6] DETENTION WATCH NETWORK, *supra* note 1, at 2.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 3
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

operated by private prison companies like GEO.[7] In the present case, ICE has contracted GEO to operate NWDC in Tacoma, Washington.[8] This facility has 1,575 beds and operates at maximum capacity.[9] In order to maintain these lucrative contracts, GEO has engaged in multi-million-dollar lobbying efforts over the years.[10]

ICE has designed Performance-Based National Detention Standards (hereinafter "PBNDS").[11] The PBNDS allow contractors, like GEO, to implement a "Voluntary Work Program" ("Work Program").[12] The PBNDS establish four important parameters to this program: (1) detainees shall be provided the opportunity to participate in the Work Program; (2) detainees participating in the work program are required to sign a voluntary work program agreement that should be generally translated into Spanish; (3) detainees are not allowed to work more than eight hours per day; and (4) detainees should be compensated at the rate of at least $1 per day.[13] Nevertheless, these parameters and the PBNDS in general are intended as guidelines that are not legally enforceable.[14] Contracting centers ultimately decide whether to adopt these standards.[15]

---

[7] DETENTION WATCH NETWORK, *supra* note 1, at 2.

[8] *Tacoma ICE Processing Center*, The GEO Group, Inc., https://www.geogroup.com/FacilityDetail/FacilityID/71 (last visited Feb 20, 2018).

[9] *Id.*

[10] Michael Cohen, *How For-Profit Prisons Have Become the Biggest Lobby No One is Talking About,* The Washington Post (Apr. 28, 2015), https://www.washingtonpost.com/posteverything/wp/2015/04/28/how-for-profit-prisons-have-become-the-biggest-lobby-no-one-is-talking-about/?utm_term=.36b8461492a7.

[11] Performance-Based National Detention Standards 2011, Immigration and Customs Enforcement, 445 (2011) https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. [hereinafter PBNDS]

[12] *See id.* at 405.

[13] *Id.* at 46-47.

[14] *See* Am. Civil Liberties Union, *Holiday on ICE: The U.S. Department on Homeland Security's New Immigration Detention Standards* 14 (2012), https://www.aclu.org/sites/default/files/field_document/aclu_detention_standards_hearing_statement_final_2.pdf [https://perma.cc/XDG8-FQ38].

[15] *Id.*

---

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 4
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

GEO claims that its Work Program addresses the negative impacts of confinement by reducing idleness and improving morale among detainees.[16] GEO refuses to offer enrichment or education programs to detainees, despite often prolonged time in detention, and GEO appears to be the only party that truly benefits from its work program.[17] The program allows the company to avoid recruiting from the usual labor market, enabling GEO to obtain very inexpensive labor to maintain its facility, reduce operational costs, and increase its profits.[18] In fact, ICE's reliance on for-profit detention centers, like NWDC, ensure that private detention centers remain a multi-billion dollar industry.[19] For example, GEO grew its profits from $41,845,000 in 2007 to $143,840,000 in 2014, an increase of 244 percent.[20] In September of 2015, GEO and ICE signed a new contract for the continued management of the NWDC for nine years and six months, which is expected to generate approximately $57 million in annual revenue for GEO.[21]

It is important to stress that GEO has not been contracted to imprison persons with criminal convictions.[22] As the Honorable Court is aware, individuals detained at NWDC are being held for possible *civil* violations of immigration law.[23] That is a meaningful difference to emphasize because the NWDC detainees should not be receiving any criminal punishment. The Supreme Court has

---

[16] Seth H. Garfinkel, *The Voluntary Work Program: Expanding Labor Laws to Protect Detained Immigrant Workers,* 67 Case W. Rev. 1287, 1289 (2017).

[17] *Id.* at 1290. *See also* Interview by UW International Human Rights Clinic with J.G.P. (Feb. 11, 2018).

[18] *Id.*

[19] *Id.* at 1295.

[20] *See* Bethany Carson & Eleana Diaz, *Payoff: How Congress Ensures Private Prison Profits with an Immigrant Detention Quota* 6 (2015), http://grassrootsleadership.org/reports/payoff-how-congressensuresprivate-prison-profit-immigrant-detention-quota [https://perma.cc/R7RH-7TDC].

[21] Adam Smith, *Congressman Smith Statement on GEO Group Contract* (Oct. 6, 2015), https://adamsmith. house.gov/media-center/press-releases/congressman-smith-statement-on-geo-group-contract. *See also The GEO Group Signs Contract for the Continued Management of Northwest Detention Center,* Business Wire, http://www.businesswire.com/news/home/20151001005937/en/GEO-Group-Signs-Contract-Continued-Management-Northwest (last visited Feb. 18, 2017).

[22] Garfinkel, *supra* note 12, at 1311-12.

[23] *Id.*

---

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 5
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

recognized this difference, and has stated that civil detainees should be entitled to more considerate treatment and conditions of confinement.[24] It is clear that detainees who choose to participate in the NWDC work program should enjoy the rights and privileges of typical employment circumstances, as this does not constitute a punitive situation.

Finally, while it falls outside the narrow scope of this brief, it must nevertheless be emphasized from the outset that the routine detention of migrants by the U.S. government is not only a cruel practice, but it is also one that clearly violates international human rights law and disregards international recommendations to prevent the expansion of arbitrary detention.[25] United Nations human rights authorities and the Inter-American Commission of Human Rights have expressed serious concern over detention conditions at the NWDC, urging corporate detention facilities to follow international standards of due diligence.[26] Several hunger strikes complaining about detention conditions at the NWDC and the recent death of an asylum seeker prompted Washington congressional delegation request for an independent investigation and comprehensive inspection and review of conditions[27].

---

[24] *See Youngberg v. Romeo,* 457 U.S. 307, 321–22 (1982).

[25] UNWGAD. Deliberation No. 5: The right to seek and enjoy asylum and the non-criminalization of immigration; Among the recommendations issued by the Universal Periodic Review to the United States Government in the second cycle, the following should be stressed: "Put an end to unlawful practices which violate human rights, including… arbitrary detention, and close any arbitrary detention centers… Prevent torture and ill-treatment in places of detention… seek alternatives to detention and end use of detention for reason of deterrence… Consider alternatives to the detention of migrants." *Report of the Working Group on the Universal Periodic Review,* United States of America, A/HRC/30/12, 20 July 2015, paras. 176.203, 176.213, 176.252, 176.253; IACHR Expresses Concern over Recent Migration and Asylum Policies and Measures in the United States, June 18, 2018; UN High Commissioner for Human Rights, June 18, 2018; Inter-American Commission on Human Rights, Report on Immigration in the United States: Detention and Due Process, UN Doc. OEA/Ser.L/V/II. 78/10 at 149 (Dec. 10, 2010) at https://www.oas.org/en/iachr/migrants/docs/pdf/migrants2011.pdf;

[26] U.N Communication UA-USA 218. February 2018. Mandates of the Working Group on Arbitrary Detention; the Working Group on the issue of human rights and transnational corporations and other business enterprises; the Special Rapporteur on the situation of human rights defenders and the Special Rapporteur on the human rights of migrants

[27] Letter from WA Congress people Adam Smith, Pramila Jayapal, Maria Cantwell, Patty Murray. November 28, 2018, available at https://adamsmith.house.gov/_cache/files/a/f/afa3e2e5-a4f8-4c08-b247-64de5adfcfcc/5CB81EBAA04EB388859293E49DBD02A4.letter-to-dhs-ig-to-investigate-conditions-at-the-nwdc.pdf

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 6
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

B.     APPLICABLE INTERNATIONAL LAW

The U.S. Supreme Court affirmed in *Paquete Habana* the enduring principle that

"[i]nternational law is part of our law and must be ascertained and administered by the courts of justice

of appropriate jurisdiction."[28] The United States is bound by provisions of foundational human rights

instruments such as the American Declaration on the Rights and Duties of Man, the Universal

Declaration of Human Rights ("UDHR"), and the International Covenant on Civil and Political Rights

("ICCPR").[29]  The international community agrees that most, if not all, provisions of the American and

Universal Declarations represent binding customary international law;[30] further, the United States

signed and ratified the ICCPR.[31]

The UDHR and the ICCPR stand as the primary United Nations human rights instruments. The

UDHR was one of the very first international documents to set out a list of fundamental human rights

that should be universally protected.[32] The US played a major role in its drafting and adoption.[33] The

UDHR, as mentioned, is extremely influential and considered a part of customary international law.[34]

For its part, GEO's "Human Rights Policy" claims that the company's procedures and policy take the

UDHR into account.[35]

---

[28] *The Paquete Habana*, 175 U.S. 677, 700 (1900).

[29] See G.A. Res. 217 (III) A, Universal Declaration of Human Rights (Dec. 10, 1948) [hereinafter UDHR]; American Declaration of the Rights and Duties of Man, OEA/Ser.L./V.II.23, doc. 21, rev. 6 (1948) [hereinafter American Declaration]; International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S 171 [hereinafter ICCPR].

[30] The Restatement (Third) of Foreign Relations clarifies that, "[a] state's responsibility to individuals of foreign nationality under customary law includes the obligation to respect the civil and political rights articulated in the principal international human rights instruments—the Universal Declaration and the International Covenant on Civil and Political Rights—as rights of human beings generally..." Restatement (Third) of Foreign Relations Law § 711, comment (c) (1987).

[31] ICCPR, *supra* note 22.

[32] See UDHR, supra note 22.

[33] Gillian MacNaughton & Mariah McGill, *Economic and Social Rights in the United States: Implementation Without Ratification*, 4 Ne. U.L.J. 365, 366 (2012).

[34] Restatement (Third) of Foreign Relations Law § 711, comment (c) (1987).

[35] *GEO's Global Human Rights Policy*, THE GEO GROUP, INC. (Apr. 17, 2018, 6:07 PM) https://www.geogroup.com/geos_global_human_rights_policy, *click on link entitled "GEO's Global Human Rights Policy."* Policy also accessible at

---

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 7
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

The ICCPR constitutes a binding, multilateral treaty that requires states parties to uphold a range of civil and political rights, such as the right to life, freedom of speech, and the right to due process.[36] The United States has been bound by the ICCPR since 1992.[37] This treaty requires states to "respect and ensure" numerous rights within their jurisdiction.[38] The Human Rights Committee, the international body that monitors state compliance with the ICCPR, has clarified that in order for a state to "respect and ensure" such rights, it must prevent, punish, investigate and redress rights violations caused even by private actors, such as GEO.[39] Importantly, both the UDHR and the ICCPR feature specific articles protecting worker rights.[40]

For its part, the International Labor Organization (ILO) is the UN agency that sets out international labor standards and ensures state compliance with these standards.[41] With 187 state members, the ILO is the authoritative source for international labor standards and working conditions.[42] The United States is a member and has a permanent seat on the ILO's executive governing body.[43] At the 1998 International Labour Conference, the member states adopted the ILO Declaration on Fundamental Principles and Rights at Work. The Declaration stated in part:

> all state members, even if they have not ratified the Conventions in question, have an obligation, arising from the very fact of membership in the Organization, to respect, to promote and to realize, in good faith and

https://www.geogroup.com/Portals/0/SR/Human%20Rights/Human%20Rights%20Policy.pdf [hereinafter Human Rights Policy].

[36] ICCPR, *supra* note 22.

[37] *Id.*

[38] *See id.* at art. 2.

[39] *See* UN Human Rights Committee (HRC), General comment no. 31 [80], The Nature of the General Legal Obligation Imposed on States Parties to the Covenant, 26 May 2004, CCPR/C/21/Rev.1/Add.13, [hereinafter General Comment no 31].

[40] *See* UDHR, *supra* note 22, at preamble; and ICCPR, *supra* note 22, at art. 2.

[41] International Labour Organization, Constitution (1919) http://www.ilo.org/dyn/normlex/en/f?p=1000:62:0::NO:62:P62_LIST_ENTRIE_ID:2453907:NO.

[42] *See* Mission and Impact of the ILO: Promoting Jobs: Protecting People, International Labour Organization, (Apr. 18, 2018) http://www.ilo.org/global/about-the-ilo/mission-and-objectives/lang--en/index.htm.

[43] About the Governing Body, International Labour Organization, (Apr. 18, 2018), http://www.ilo.org/gb/about-governing-body/lang--en/index.htm.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 8
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

in accordance with the Constitution, the principles concerning the fundamental rights which are subject of those Conventions, namely: (a) freedom of association and the effective recognition of the right to collective bargaining; (b) the elimination of all forms of forced or compulsory labour; (c) the effective abolition of child labor; and (d) the elimination of discrimination in respect of employment and occupation.[44]

Therefore, although the US has ratified only two of the eight ILO Fundamental Conventions,[45] as an ILO member, the U.S. has solemn obligations to promote a full range of just working conditions as provided in the Declaration on Fundamental Principles and Rights at Work.[46] Further, GEO has explicitly stated in its "Human Rights Policy" that it took into account the ILO Declaration when devising its policy.[47] As a result, the Honorable Court should particularly focus on the compatibility of GEO's Work Program with these authoritative ILO standards.

The ILO Committee of Experts on the Application of Conventions and Recommendations ("ILO Committee") is responsible for evaluating state compliance with treaties by reviewing state reports and offering recommendations.[48] The ILO treaties most relevant to this particular case include the Migrant Workers Convention, the Migration for Employment Convention, the Minimum Wage Fixing Convention, Protection of Wages Convention, the Declaration on Fundamental Principles and Rights at Work, the Abolition of Forced Labor Convention,[49] and the Forced Labor Convention. While the U.S. has not formally adhered to most of these treaties,[50] it ratified the Abolition of Forced

---

[44]International Labour Organization, Declaration on Fundamental Principles and Rights at Work art. 2(a), June 18, 1998, 37 I.L.M. 1233 [hereinafter ILO Declaration].
[45] Ratifications for United States, International Labor Organization, (Apr. 18, 2018), http://www.ilo.org/dyn/normlex/en/f?p=1000:11200:0::NO:11200:P11200_COUNTRY_ID:102871.
[46] ILO Declaration, *supra* note 37.
[47] Human rights policy, *supra* note 28.
[48]Committee of Experts on the Application of Conventions and Recommendations, International Labor Organization, (Apr. 18, 2018), http://www.ilo.org/global/standards/applying-and-promoting-international-labour-standards/committee-of-experts-on-the-application-of-conventions-and-recommendations/lang--en/index.htm.
[49] For reference, the Abolition of Labor Convention is the only Convention ratified by the United States.
[50]Ratifications for United States, *supra* note 39.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 9
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

Labor Convention in 1991, and all of these instruments together establish a body of law that is well accepted by the community of nations.

Furthermore, in recent years international corporate responsibility principles for living wages have been developed and gained prominence. Since 2011, the UN Guiding Principles for Business and Human Rights (UNGPs) and the OECD Guidelines for Multinational Enterprises (OECD Guidelines) consider living wages as a major part of corporate responsibility.[51] The United States has also endorsed the UNGPs and committed to the OECD Guidelines. Businesses have duties to enact policies and procedures that address their adverse human rights impacts. These policies must demonstrate a commitment to human rights; the policies must establish a due diligence process to identify, prevent, mitigate, and remedy their impacts on human rights.[52]

## IV.    ARGUMENT

### A. THE DEFENDANT'S WORK PROGRAM VIOLATES INTERNATIONAL LABOR STANDARDS AS IT FAILS TO PROVIDE FAIR WAGES AND PROTECTIONS TO ITS WORKERS.

Everyone has the right to just and favorable working conditions, including fair wages and safe working conditions.[53] The international community recognizes that undocumented workers are vulnerable to exploitation, low wages, and unhealthy working conditions.[54] States, and their agents,

---

[51] United Nations, "Guiding Principles for Business and Human Rights" *Implementing the United Nations "Protect, Respect and Remedy" Framework* at 1 (2011), http://www.ohchr.org/Documents/Publications/GuidingPrinciplesBusinessHR_EN.pdf.

[52] United Nations, "Guiding Principles for Business and Human Rights" *Implementing the United Nations "Protect, Respect and Remedy" Framework* at 1 (2011), http://www.ohchr.org/Documents/Publications/GuidingPrinciplesBusinessHR_EN.pdf.

[53] *See* UDHR, supra note 22, at art. 23; Article 23 of Universal Declaration; International Covenant on Econ., Soc. and Cultural Rights, Afg.-Zim., art. VI, *opened for signature* Dec. 19, 1966, 993 U.N.T.S. 3; International Labour Organization, Convention (No. 143) Convention concerning Migrations in Abusive Conditions and the Promotion of Equality of Opportunity and Treatment of Migrant Workers, Alba.-Yug., art. I, *opened for signature* Jun. 24, 1978, 1120 U.N.T.S. 323.

[54] *See* Comm. on Econ., Soc. and Cultural Rights, General Comment No. 23 (2016) on the right to just and favourable conditions of work at 12-13, U.N. Doc. E/C.12/GC/23 (Apr. 27, 2016); Juridical Condition & Rights of the Undocumented Migrants, Advisory Opinion OC-18/03, Inter-Am. Ct. H.R. (ser. A) No. 18 (Sept. 17, 2003).

---

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 10
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

must ensure that migrant workers enjoy treatment that is no less favorable than that of national workers.[55] Specifically, States, and corporations working on their behalf, must ensure that migrant workers are (1) paid the same as nationals for the same work, and (2) provided the same working conditions and protections.[56] In this way, wages should be paid in a regular, timely fashion and in full.[57] As will be discussed below, GEO's Work Program fails to comply with these critical elements.

1. *The Defendant fails to compensate the participants of its work program at a rate that matches that of national workers performing the same task.*

States are afforded discretion when setting a minimum wage. To illustrate, Article 1 of ILO's Protection of Wages Convention defines the term "wages" broadly to encompass remuneration of earnings that is designed and capable of being expressed in monetary terms by national regulations, and is payable in virtue of a contract for services rendered. What constitutes a *fair* wage depends a non-exhaustive list of objective criteria, such as the output of the work; the responsibility held by the worker; the level of skills and education required to perform a task; and the impact of the work on the health and safety of the worker.[58] When determining the level of minimum wage that should be appropriate, a State, and its agents, should account for the needs of the worker, taking into account the general cost of living, and other economic factors.[59]

In the present case, NWDC workers are paid $1 per day— a value that is far less than the minimum wage set for national workers performing the same type of work. Under Article 2(1) of the ILO Convention No. 94, those who engage in public contracts should ensure that workers' wages,

---

[55] *Id.*
[56] *See* General Comment No. 23 at 6.
[57] *Id.* at 4.
[58] *See id.* at 3-4.
[59] International Labour Organization, Convention (No. 131) Convention concerning Minimum Wage Fixing, with Special Reference to Developing Countries, Alb.-Zam., art. III, *opened for signature* Jun. 22, 1970, 825 U.N.T.S. 77.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 11
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

hours of work, and other conditions are no less favorable than those established for work of the same character in the trade or industry concerned. Most NWDC detainees perform maintenance work and food preparation, jobs that are compensated at a much higher rate outside the facility. For example, in the State of Washington, custodial work was recently valued at median wage of $14.55 per hour.[60] A typical custodial worker outside the facility, then, may earn $116.40 for eight hours of work, not including benefits. On the federal level, custodial workers earn on average $7.63 per hour or $61.04 per full workday.[61] However, NWDC workers are paid $1 per day for the same type of work.[62] This rate grossly undervalues and undercompensates the work performed.

Article 3 of the ILO's Minimum Wage Fixing Convention states that any minimum wage should account for the needs of workers. As for the NWDC, the wage set by GEO fails to meet the basic personal needs of workers for two reasons. First, the food service is unacceptable. Many NWDC detainees report that GEO serves small portions of poor quality food. This is a well-documented problem that exists despite PBNDS No. 4.1(D)(1), which provides for three nutritious meals every day.[63]

Many detained at NWDC report that they feel compelled to work because they need to supplement their diets by purchasing more substantial food, such as instant noodles, at the commissary

---

[60] *May 2016 State Occupational Employment and Wage Estimates - Washington*, BUREAU OF LABOR STAT., https://www.bls.gov/oes/2016/may/oes_wa.htm (last updated Mar. 31, 2017)

[61] *Custodial Worker – Federal Salaries of 2016,* FEDERALPAY.ORG, https://www.federalpay.com/employees/occupations/custodial-working/2016 (last visited Apr. 19, 2018).

[62] *See* PBNDS, *supra* note 7, at 407-08. *See also* Interview by UW International Human Rights Clinic with B.L. (Jun. 19, 2017).

[63] Resistencia Northwest, *Hunger Strikes: A Call to End Immigration Detention,*YouTube (Sep. 20, 2017), https://www.youtube.com/watch?v=VGG8b7bB1to; Press Release, Maru Mora Villalpando, *Over 100 People Detained in ICE Custody Begin Hunger Strike and Work Stoppage Inside the Northwest Detention Center* (Feb. 7, 2018); Ana Sofia Knauf, *Detainees Launch Another Hunger Strike at Tacoma Immigrant Detention Center to Protest Facility Conditions*, THE STRANGER (Aug. 11, 2017, 5:20 PM), https://www.thestranger.com/slog/2017/08/11/25344718/detainees-launch-another-hunger-strike-at-tacoma-immigrant-detention-center-to-protest-facility-conditions.

---

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 12
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

store.[64] Similarly, E.J.R., who was recently detained at NWDC, stated that many choose to work in the kitchen because they believe they will receive higher-quality food or at least leftovers to supplement their inadequate meals.[65] As explained by S.A.A, "when people are not getting enough food, and [this program] is the only way to find money to pay for more food items—it is hard to call the program voluntary. You have to do it."[66] These accounts demonstrate that GEO fails to meet the detainees' basic needs by providing inadequate food services, and also show that detainees have little choice but to work and accept a $1/day wage.[67]

Second, the NWDC commissary store often sells food and merchandise at very inflated prices, further preventing detainees from meeting their basic needs. Article 7(2) of the ILO Protection of Wages Convention requires that, where other stores or services are not available, GEO, acting on behalf of the US Government, must take appropriate measures to ensure that goods and services are sold at a fair and reasonable price.[68] This standard was devised to protect workers from the very same abusive practices found at NWDC.[69] The commissary store prices are hardly fair and reasonable if detainees must work entire days to afford a single item.

---

[64] *See* Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E. J. R (Apr. 03, 2018).

[65] Interview by SU International Human Rights Clinic with E.J.R. (Apr. 03, 2018); *see also* Interview by UW International Human Rights Clinic with J.C. (Feb. 11, 2018); Interview by UW International Human Rights Clinic with V.P. (Feb. 22, 2019).

[66] Interview by UW International Human Rights Clinic with S.A.A. (Apr. 13, 2018).

[67] Additionally, nearly all of the individuals detained at NWDC we spoke to reported that they feel compelled to work in order to able to afford expensive telephone calls to their families. *See* Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.J.R. (Apr. 03, 2018).

[68] *See also* Comm. on Econ., Soc. and Cultural Rights, *supra* note 45, at 16-17.

[69] *See* International Labor Conference, 91st Session, *General Survey of reports concerning the Protection of Wages Convention (No. 95), and the Protection of Wages Recommendation (No. 85)* Report III (Part 1B) at 105 (2003).

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 13
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

For example, although a 75-cent food item may not ordinarily be considered unreasonable, in this context the price becomes unfair. At the NWDC commissary store, a detainee must work nearly a full day to afford a single serving of instant ramen noodles.[70] Further, if a detainee needs to purchase a bottle of shampoo, which costs $8, he or she must work a week and a half to afford it.[71] As stated by M.A., a former detainee,

> When they say the work is "voluntary," it's not true, because if you don't work, you don't get any privilege. Why don't we just stop working? And not get humiliated for one dollar a day? Because a lot of people need that payment[72].

In sum, GEO makes it impossible for NWDC detainees to meet their basic needs when they earn only $1 a day.

      2. *The GEO Work Program fails to obtain meaningful consent from detainees.*

States must ensure that powerful private corporations, like GEO, do not interfere with a person's right to enjoy just and favorable working conditions. Instead, States must adopt measures necessary to ensure just and favorable conditions of work.[73] Adoption of labor policies that increase the vulnerability of migrant workers to exploitation are incompatible with the ILO Protection of Wages Convention.[74] In the present case, GEO's work program fails to meet international labor standards because its procedures do not adequately protect migrant workers' wages and render them more vulnerable to exploitation.

The GEO work program's procedures fail to obtain meaningful consent from the participants. First, individuals do not give meaningful consent to the terms of employment. As established in Article

---

[70] *See* Interview by SU International Human Rights Clinic with E.R. (Apr. 03, 2018).

[71] *See Hunger Strike Handbook*, NWDC Resistance at 8, (Apr. 2018), http://www.nwdcresistance.org/wp-content/uploads/2015/09/HungerStrikersHandbook-ENG.pdf.

[72] Interview by UW International Human Rights Clinic with M.A. (Feb. 27, 2016).

[73] *See* Comm. on Econ., Soc. and Cultural Rights, *supra* note 45, at 16-17.

[74] *See id.* at 20.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 14 (Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

6(1) of the International Covenant on Economic, Social, and Cultural Rights, one has the right "to the opportunity to gain his living by work which he freely chooses or accepts," and States must safeguard this right. At the NWDC, detainees participating in the Work Program reported that they sign a contract before commencing work. PBNDS No. 5.8 states that all written material provided to detainees will be generally translated into Spanish, or assistance shall be provided to a detainee who does not speak English.[75] However, detainees state that they are not informed of the document's contents, and the NWDC does not translate the document for those who do not read English.[76] In fact, many individuals reported that they simply signed the document out of necessity; without the meager wages, they had no way at all to supplement their diets and afford phone calls to family members.[77] Others stated that they did not see a contract at all.[78]

Second, individuals do not provide meaningful consent to the form of payment at NWDC. Article 5 of the ILO Protection of Wages Convention requires workers to give informed consent to electronic payments. In the present case, PBNDS No. 5.8(K) states only that GEO should establish a system that "ensures detainees receive the pay owed to them."[79] Detainees report that they are given an internal bank account, and GEO deposits payments to that account, which may be used for commissary store purchases and phone calls.[80] In this way, individuals who participate in the Worker's Program have not given consent to the terms of employment, nor to the form of payment.

---

[75] PBNDS, *supra* note 7, at 405-06.
[76] *See* Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E. J. R. (Apr. 03, 2018).
[77] *See* Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018).
[78] Interview by UW International Human Rights Clinic with J.A.A.P. (Apr.27, 2018).
[79] PBNDS, *supra* note 7, at 407.
[80] *See* Interview by SU International Human Rights Clinic with E.J.R. (Apr. 03, 2018).

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 15
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

Additionally, the work program's procedures inadequately protect its workers from exploitation, because its time-tracking system fails to ensure that they are paid consistently. Article 12 of the ILO Protection of Wages Convention states that wages shall be paid regularly. In the present case, participants of the GEO work program reported that they must sign in and out of their shift. [81] If they forget to do so, workers will receive no compensation, despite performing the work in the presence of their supervisors. [82] To receive the pay owed to them, [83] individuals must file a formal grievance that often requires them to endure many delays in order to finally receive their wages. [84]

B. WORKING CONDITIONS AT THE NWDC AMOUNT TO FORCED LABOR UNDER INTERNATIONAL LAW.

The 13th Amendment of the US Constitution states that, "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." [85] The United States has further demonstrated its commitment to the abolition of slavery and forced labor by ratifying the ICCPR, joining the ILO, and ratifying the ILO Abolition of Forced Labour Convention (No. 105). In this way, the NWDC detainees cannot be forced to work because they are not detained as a result of a criminal conviction. Moreover, because the workers inside the NWDC are paid wages so inconsistent with those of free U.S. workers, their work must be considered involuntary and, therefore, forced labor under international law.

---

[81] *See* Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by UW International Human Rights Clinic with M.Q. (Jun. 16, 2017).

[82] *See* Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by UW International Human Rights Clinic with M.Q. (Jun. 16, 2017).

[83] PBNDS, *supra* note 7, at 407.

[84] Interview by UW International Human Rights Clinic with F.A.U. (Jun. 16, 2018); *see also* Interview by UW International Human Rights Clinic with M.Q. (Jun. 16, 2017).

[85] U.S. Const. amend. XIII.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 16
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

1.  *An exploitative wage of $1 per day violates the ICCPR.*

The Work Program constitutes forced labor in violation of the ICCPR.  As noted above, the United States has ratified the ICCPR and is therefore obligated to take all reasonable measures to ensure that private actors, especially powerful corporations in control of thousands of vulnerable individuals, are not in violation.[86]  Article 8 of the ICCPR prohibits forced or compulsory labor.[87]  The United Nations Human Rights Committee provides authoritative interpretations of the ICCPR, and has analyzed Article 8. Because the ICCPR does not explicitly define the terms "forced or compulsory labor," the Human Rights Committee has used the ILO Conventions on Forced Labor as well as the ILO Committee's jurisprudence to develop its interpretation of the terms.[88] To illustrate, the Human Rights Committee examined Australia's requirement that recipients of unemployment benefits perform civil service, and considered whether the law violated Article 8. In doing so, the Human Rights Committee held that forced labor includes situations and conditions that are "coercive, exploitative, degrading or dehumanizing."[89] Labor performed by civil detainees at the NWDC, therefore, should not be coercive, exploitative, degrading, or dehumanizing.

Wages of $1 per day are certainly degrading and exploitative. GEO does not have to hire janitors, cooks, or maintenance workers, because detainees perform these services for a fraction of their ordinary cost. Exploitation is defined as "the act of taking advantage of something; especially the act of taking unjust advantage of another for one's own benefit or selfish ends."[90] Here, GEO takes advantage of detainees as they only compensate the detainees at the rate of $1 per day and profit

---

[86] *See* General Comment no. 31, *supra* note 32.
[87] ICCPR, *supra* note 22, at art. 8.
[88] Human Rights Committee, Adoption of Views, *Faure,* CCPR/C/85/D/1036/2001, Nov. 25, 2005.
[89] *Id.*
[90] EXPLOITATION, Black's Law Dictionary (10th ed. 2014).

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 17
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

greatly as a result. Because GEO exploits the labor of the detainees, its conduct constitutes forced or compulsory labor under article 8 of the ICCPR.

      2. *A wage of $1 per day constitutes forced labor under the ILO's labor standards because it is effectively involuntary.*

GEO's Work Program amounts to forced labor under ILO standards because the $1 per day wage strongly indicates an involuntary working arrangement. The Forced Labour Convention (No. 29) and the Abolition of Forced Labour Convention (No. 105) comprise two of the ILO's fundamental treaties.[91] The US has demonstrated its commitment to the elimination of forced labor by ratifying the Abolition of Forced Labor Convention,[92] although it has yet ratify the broader Forced Labour Convention.[93] In any event, according to the ILO Declaration on Fundamental Principles and Rights at Work cited above, all ILO member states, such as the US, have international legal obligations deriving from both of these Conventions.[94]

The Forced Labor Convention establishes a definition of forced labor that is widely accepted in international law: "all work which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."[95] This rule provides for some exceptions. Most significantly, there is an exception for "any work or service exacted from any person as a consequence of a conviction in a court of law."[96] The prison labor exception is important in countries

---

[91] International Labour Organization, Convention (No. 29) Concerning Forced or Compulsory Labor, June 28, 1930. 39 UNTS 55, [hereinafter Forced Labour Convention]; Convention (No. 105) Concerning the Abolition of Forced Labour, Jun. 25, 1957, 320 UNTS 291 [hereinafter Abolition of Forced Labour].
[92] Forced Labour Convention, *supra* note 79; Abolition of Forced Labour, *supra* note 79.
[93] Forced Labour Convention, *supra* note 79.
[94] International Labour Conference 96th Session, *General Survey Concerning the Forced Labour Convention, 1930 (NO. 29), and the Abolition of Forced Labour Convention, 1957 (No. 105). Report of the Committee of Experts on the Application of Conventions and Recommendations*, ¶ 2 (2007) [hereinafter Report on Forced Labour Conventions]
[95] Forced Labour Convention, *supra* note 79, at art. 2(1).
[96] Forced Labour Convention, *supra* note 79, at art. 2(c).

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 18
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

like the US, which require prisoners to work while carrying out their sentence.[97] It is important to note, however, that this exception only applies when prisoners work under the supervision of a *public* authority.[98] If detainees work for a *private* entity or corporation, the work must be voluntary.[99] The Convention provides no exception for the labor of civil detainees.[100] Work can be made available to civil detainees, such as the immigrants in the privately-operated NWDC, *only* on a voluntary basis.[101]

The ILO Committee has stated that, in addition to evidence of formal consent, when "assessing whether convict labour for private parties is voluntary, conditions approximating a free labour relationship are the most reliable indicators of the voluntariness of labour."[102] Factors to consider when determining whether a free labor relationship exists include wage levels, social security benefits, and safety and health conditions.[103] Citing the Protection of Wages Convention No. 95 (1949), the ILO Committee has stated that wages may be reduced to take account of board and lodging expenses.[104] The Protection of Wages Convention establishes that, when reducing wages to account for in-kind compensation, like board and lodging, the value attributed to these expenses must "be fair and reasonable."[105]

Still, when examining a state's compliance with these rules and assessing the voluntariness of prison work, the ILO Committee is strict. For example, it considered the case of France, where "[p]risoners are now estimated to have the highest productivity in Europe, at levels comparable to the

---

[97] See United States v. Reynolds, 235 U.S. 133, 149-50 (1914).
[98] Forced Labour Convention, *supra* note 79, at art. 2(c)).
[99] Report on Forced Labour Conventions, *supra* note 82, at ¶¶ 59-60.
[100] *Id.* at ¶¶ 51-52.
[101] *Id.*
[102] *Id.* at ¶ 60.
[103] *Id.* at ¶ 116.
[104] *Id.* at ¶ 117.
[105] See International Labor Organization, Convention (No. 95) Concerning the Protection of Wages, July 1, 1949, 138 U.N.T.S. 225.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 19
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

free market."[106] In its report to the ILO Committee, France stated that all of its prison work is voluntary; that prisons routinely contract with private companies for prison work; that prisoners may be released early for good behavior and that "work assiduousness" is a factor in determining good behavior; that prisoners do not sign employment contracts with the prison administration or the private entities that may employ them; and that prisoners were paid at a rate of fifty to sixty percent of the normal minimum hourly wage.[107] Additionally, wages were further reduced to account for certain insurance withholdings, including old-age, sickness, maternity, and accident insurance.[108]

In response to this report, the ILO Committee expressed concern and requested that France (1) indicate what measures it is taking "to ensure that a prisoner's consent cannot be vitiated by the fact that a favourable assessment implies 'assiduousness' at work;" (2) take necessary measures to ensure "that labour relations and conditions of employment of prisoners are governed by labor laws;" and (3) re-examine the level of remuneration and indicate measures taken so that the national minimum wage applies to prisoners working for private firms.[109] As of 2014, France was still struggling to raise these wages.[110] As a result, the Committee continues to insist that the French government increase these wages to the level of the national minimum wage.[111]

Because those detained by GEO at NWDC are detainees in a privately-operated facility, any work they perform must be voluntary.[112] While it is true that the detainees are required to sign a

---

[106]International Labor Conference, 93rd Session, *Report of the Director-General, A Global Alliance Against Forced Labour: Global Report under the Follow-up to the ILO Declaration on Fundamental Principles and Rights at Work* 2005 Report I(B) ¶124 (2005).
[107] International Labour Organization, Committee of Experts on the Application of Conventions and Recommendations, Observation on the Forced Labour Convention, 1930 (No. 29), France, 82nd ILC sess. (1995).
[108] *Id*. at 1-2.
[109] *Id*.
[110] International Labour Organization, Committee of Experts on the Application of Conventions and Recommendations, Observation on the Forced Labour Convention, 1930 (No. 29), France, 104th ILC sess. (2014).
[111] *Id*.
[112]Report on Forced Labour Conventions, *supra* note 82, at ¶¶ 51-52.

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 20
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

"voluntary work agreement," and that there is a waiting list for the work program, these facts are not inconsistent with an involuntary working situation.[113] The ILO Committee requires private facilities to obtain the formal written consent of prisoners before they begin to work.[114] This requirement is necessary to ensure that prisoners are offering themselves voluntarily for the work.[115] At the NWDC, detainees are required to sign a work agreement.[116] However, according to both current and former detainees, these agreements are offered only in English and there is no opportunity for them to be translated or explained.[117] Because many of the detainees at the NWDC do not speak English, when they sign these English-only contracts, they do so without being able to understand the content therein. This means that they are not able to truly give their informed, written consent.

Furthermore, according to the ILO Committee, unfair wages or working conditions can be just as indicative of a forced labor situation as a lack of consent.[118] As stated, civil detainees at the NWDC are being paid just $1 per day.[119] That means that they are being paid, at most, $7 per week. In contrast, Washington state has a minimum wage of $11 per hour.[120] Assuming an eight-hour work day and a five-day work week, Washington workers can expect to earn $88 per day or $440 per week of

---

[113] See Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.J.R. (Apr. 03, 2018); Interview by University of Washington Human Rights Clinic with MCR, (Apr. 6, 2018); Interview by University of Washington Human Rights Clinic with JGP, (Mar. 3, 2018).

[114] Report on Forced Labour Convention, *supra* note 82, at ¶115.

[115] *Id*. at ¶ 114.

[116] *See* Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with EJR. (Apr. 03, 2018); Interview by University of Washington Human Rights Clinic with MCR, (Apr. 6, 2018); Interview by University of Washington Human Rights Clinic with JGP, (Mar. 3, 2018).

[117] *Id*.

[118] Report on Forced Labour Conventions, *supra* note 82, at ¶ 60.

[119] *See* Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.J.R. (Apr. 03, 2018); Interview by University of Washington Human Rights Clinic with MCR, (Apr. 6, 2018); Interview by University of Washington Human Rights Clinic with JGP, (Mar. 3, 2018).

[120] RCW 49.46.020 (2017).

---

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 21
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

pre-tax income. When comparing the two wages, the detainees are compensated at a rate that is about 1.1% of the Washington State minimum wage. This appallingly low rate is completely inconsistent with that of free Washington State workers.

The price of items that detainees need to purchase from the commissary store, as mentioned above, further demonstrates the disparity between the working arrangement inside the NWDC and the free world.[121] Maintaining a healthy diet is vital for a detainee's overall health, especially because a person could be detained for prolonged periods of time.[122] Because the cost of many items necessary to a detainee's health, like additional food, are disporportionate, it may take multiple days for detainees to be able to afford them. Because it would take mere minutes for a Washington worker to afford the same items,[123] it is clear that detained workers are not treated similarly to Washington workers.

According to the ILO Committee of Experts, GEO must establish conditions that approximate the conditions enjoyed by free workers.[124] Even allowing for some deduction for food and lodging (expenses that are covered, at least in significant part, by government subsidy[125] and the work of the detainees themselves), $1 per day without social security and other benefits clearly violates international law. There have even been reports of inadequate medical treatment at the NWDC after injuries suffered while participating in the Work Program.[126] To the legal expert and casual observer

---

[121] *See* Interview by SU International Human Rights Clinic with S.S.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with E.S.L. and J.C.L. (Mar. 23, 2018); Interview by SU International Human Rights Clinic with EJR. (Apr. 03, 2018); Interview by University of Washington Human Rights Clinic with MCR, (Apr. 6, 2018); Interview by University of Washington Human Rights Clinic with JGP, (Mar. 3, 2018).
[122] *Id.*
[123] A Washington worker paid $11/hour could afford a $1 cup of noodles after only about six minutes of work.
[124] Colin Fenwick, *Private Use of Prisoners' Labor*, 27 HUMAN RIGHTS QUARTERLY 249, 279 (2005).
[125] *See* Carson & Diaz, *supra* note 16.
[126] Interview by UW International Human Rights Clinic with F.A.U. (Apr. 06, 2018); Interview by UW International Human Rights Clinic with Anonymous (May. 04, 2018).

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 22
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

alike, these conditions are so much worse than the free market that they could be characterized as exploitative and offensive to human dignity.[127]

In sum, the voluntary nature of the Work Program at NWDC is deeply suspect. Detainees cannot understand their work contracts, and they must work to simply have sufficient food and be able to communicate with family on the phone. Yet all of this evidence is actually unnecessary to prove that the work is involuntary. Because the wages and benefits of the NWDC detainees are so drastically lower than minimum wage in Washington State, the working conditions at NWDC in no way resemble conditions of a free labor relationship. Such conditions—among them wage levels, social security benefits, and occupational safety and health standards—are key indicators of voluntariness under international law. Thus, the working conditions at NWDC are so incompatible with a free labor relationship that they should be considered forced labor according to the well-established ILO standard. As one NWDC detainee concluded, "To me this is modern-day slavery. We are handled as property for profit. We are swept under the rug in system recognized to be broken."[128]

## V. CONCLUSION

GEO's failure to provide fair wages and acceptable working conditions to the detainees at NWDC violates international human rights and labor law. As a state party to the ICCPR and the ILO, the United States and its agents, including private companies acting on the State's behalf, are under the obligation to protect the rights of migrant detainees and to prevent and remedy forced labor in all instances. Therefore, the United States, through its state and federal institutions, should ensure that GEO obtain the full, prior, free, and informed consent of all detainees participating in its Work

---

[127] *See* Fenwick, *supra* note 112.
[128] Interview by UW International Human Rights Clinic with F.A.U. (detained in NWDC for over 5 years).

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 23
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

Program, and provide all working detainees with wages, social security benefits, and occupational safety and health standards compatible with a free labor relationship in Washington State.

Dated this 1st day of July, 2019.

/s/ Melissa R. Lee
Melissa R. Lee, WSBA #38808
Ronald A. Peterson Law Clinic
1112 E. Columbia St.
Seattle, WA 98122
Phone: 206.398.4394
Email: leeme@seattleu.edu
Local Counsel for AMICI CURIAE

/s/ Thomas Antkowiak
Prof. Thomas Antkowiak, MA #656280
Ronald A. Peterson Law Clinic
1112 E. Columbia St.
Seattle, WA 98122
Phone: 206.398.4111
Email: antkowit@seattleu.edu
*Pro Hac Vice* Counsel for AMICI CURIAE

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 24
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2019, the foregoing document was electronically filed with the United States District Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

_/s/ Melissa R. Lee_
Melissa R. Lee

AMICUS CURIAE BRIEF OF THE INTERNATIONAL
HUMAN RIGHTS CLINIC AT SEATTLE UNIVERSITY
SCHOOL OF LAW AND GLOBAL RIGHTS ADVOCACY - 25
(Case No. 3:17-cv-05806-RJB)

RONALD A. PETERSON LAW CLINIC
1112 E. Columbia St.
Seattle, WA 98122
206.398.4394