

# Performance-Based National Detention Standards 2011



U.S. Immigration
and Customs
Enforcement

# 4.1 Food Service

## I. Purpose and Scope

This detention standard ensures that detainees are provided a nutritionally balanced diet that is prepared and presented in a sanitary and hygienic food service operation.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs and CDFs.* IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. All detainees shall be provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietitian.

2. Detainees, staff and others shall be protected from harm, and facility order shall be maintained, by the application of sound security practices in all aspects of food service and dining room operations.

3. Detainees, staff and others shall be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations.

4. Dining room facilities and operating procedures shall provide sufficient space and time for detainees to eat meals in a relatively relaxed, unregimented atmosphere.

5. Food service facilities and equipment shall meet established governmental health and safety codes, as documented in independent, outside sources.

6. Detainees, staff and others shall be protected from health-related harm by advance medical screening and clearance before any detainee is assigned to work in food service operations.

7. Food service areas shall be continuously inspected by food service staff and other assigned personnel on schedules determined by the food service administrator and by applicable policy requirements.

8. Stored food goods shall be maintained in accordance with required conditions and temperatures.

9. Food service personnel shall provide nutritious and appetizing meals. Nutritional needs are diverse because of differences in age, activity, physical condition, gender, religious preference and medical considerations. Food service personnel shall accommodate the ethnic and religious diversity of the facility's detainee population when developing menu cycles. While each facility must meet all ICE/ERO standards and follow required procedures, individuality in menu planning is encouraged.

10. Therapeutic medical diets and supplemental food shall be provided as prescribed by appropriate clinicians.

Ex. 14 to Armstrong Decl.
Page 2 of 85

11. Special diets and ceremonial meals shall be provided for detainees whose religious beliefs require adherence to religious dietary laws.

12. Detainees shall receive a religious or special diet free of any personal cost.

13. Food shall never be used for reward or punishment.

14. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Food Service" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ADLF-4A-01 through 4A-18. (Five of those Expected Practices are mandatory for accreditation: 4A-07, 4A-11, 4A-13, 4A-15 and 4A-16.)

ICE/ERO *Performance-based National Detention Standards 2011*:

- "2.7 Key and Lock Control"; and

- "2.14 Tool Control."

FDA Public Health Services Food Code.

## V. Expected Practices

## A. Administration

### 1. Food Service Administrator or Equivalent

The food service program shall be under the direct supervision of an experienced food service administrator (FSA) who is responsible for the following:

a. Planning, controlling, directing and evaluating food service;

b. Training and developing cook foremen (CF);

c. Managing budget resources;

d. Establishing standards of sanitation, safety and security;

e. Developing nutritionally adequate menus and evaluating detainee acceptance of them;

f. Developing specifications for procurement of food, equipment and supplies; and

g. Establishing a training program that ensures operational efficiency and a high quality food service program.

The food service department shall also be staffed by one or more cook supervisors (CS) and CF, although the organizational structure may differ among facilities, particularly when food service is provided by a food service contractor. Therefore, references to the CS and CF in this detention standard describe

Ex. 14 to Armstrong Decl.
Page 3 of 85

typical duties for those positions, although the functions may be performed by others, depending on the organizational structure.

## B. Security

### 1. Custody and Security

The facility's custody and security policy and procedures shall address the following:

a. buildings or portions of buildings housing the food service department;

b. all types of detainee traffic in and out of the department;

c. detainee behavior;

d. control of repairs;

e. control of utensils with a custodial hazard potential (e.g., knives, cleavers, saws, tableware);

f. official counts and census;

g. area searches; and

h. any other matters having a direct or indirect bearing on custody and security.

The facility's training officer shall devise training curricula and provide appropriate training to all food service personnel in detainee custodial issues. Among other topics, this training shall cover ICE/ERO's current detention standards.

### 2. Knife Control

The knife cabinet must be equipped with an approved locking device. The on-duty CF, under direct supervision of the CS, shall maintain control of the key that locks the cabinet..

Knives must be physically secured to workstations for use outside a secure cutting room. Any detainee using a knife outside a secure area must receive direct staff supervision. Knives shall be inventoried and stored in accordance with standard "2.14 Tool Control."

*To be authorized for use in the food service*

*department, a knife must have a steel tang through which a metal cable can be mounted. The facility's tool control officer is responsible for mounting the cable to the knife through the steel tang.*

*The FSA/CS shall monitor the condition of knives and other food service utensils, disposing of items not in good working order and ordering replacements. If a knife is misplaced or lost, staff shall immediately notify the FSA and Chief of Security, and shall hold detainees who may have had access to the missing knife in the area until a thorough search is conducted. The responsible CS shall provide the details of the loss in a written report to the Chief of Security.*

The knife cabinet shall meet the tool-control standards of the Occupational Safety and Health Administration, as well as any site-specific standards developed by the facility.

### 3. Key Control

Keys shall be inventoried and stored in accordance with standard "2.7 Key and Lock Control."

*The control room officer shall issue keys only in exchange for a name chit from receiving staff. Under no circumstances shall detainees have access to facility keys.*

*The CS shall return the keys to the control room before going off duty. At no time may anyone carry facility keys outside the facility.*

### 4. Controlled Food Items/Hot Items

All facilities shall have procedures for handling food items that pose a security threat.

a. Yeast and Yeast Products
   All yeast must be stored in an area with no detainee access, preferably in a locked metal yeast cabinet for which the food service department has only one key. The locked yeast cabinet shall be maintained in a secure area.

   Until the yeast is thoroughly incorporated as an ingredient in a food item being prepared, only

one member of the food service staff, closely supervised, may handle and dispense it.

Staff shall keep a record of the yeast inventory (in pounds and ounces), indicating quantity of receipt and issue, balance on hand and the record-keeper's initials.

b. Other Food Items
   Mace, nutmeg, cloves, sugar and alcohol-based flavorings also require special handling and storage.

   1) The purchase order for any of these items shall specify the special-handling requirements for delivery.

   2) Staff shall store and inventory these items in a secure area in the food service department.

   3) Staff shall directly supervise use of these items.

## 5. Work Area Searches

All facilities must establish daily searches of detainee work areas (e.g., trash) as standard operating procedures, paying particular attention to trash receptacles.

Searches of detainees leaving certain work areas (e.g., bakery, vegetable preparation, dining room, warehouse) are required to reduce the possibility that hot food or contraband can leave the restricted area. Unless otherwise directed by facility policy or special instructions, staff shall prevent detainees from leaving the food service department with any food item.

Food service personnel as well as facility detention staff shall conduct food service area searches.

## 6. Counts

The FSA shall establish procedures for informing staff of the local counting procedures, and shall establish measures to ensure that the procedures are followed.

Staff must be able to account for detainees at all times.

The counting officer must have a staff observer/backup during each count. Detainees shall be assembled in one section of the dining room and be required to remain seated until their names are called, and shall then move to another section of the dining room.

## C. Detainee Workers

### 1. Detainee Workforce

Detainees may volunteer for work in accordance with standard "5.8 Voluntary Work Program" and must work in accordance with standard "2.2 Custody Classification System."

The number of detainees assigned to the food service department shall be based on a quota developed by the FSA and approved by the facility administrator. The quota shall provide staffing according to actual needs, and shall eliminate any bias toward over- or understaffing.

### 2. Detainee Job Descriptions

The FSA shall review detainee job descriptions annually to ensure accuracy and specific requirements. Before starting work in the department, the detainee shall sign for receipt of the applicable job description. A copy of the detainee's job description shall remain on file for as long as the detainee remains assigned to the food service department.

### 3. Detainee Orientation and Training

To ensure a quality food service program and instill good work habits, each CS shall instruct newly assigned detainee workers in the rules and procedures of the food service department. During the orientation and training session(s), the CS shall explain and demonstrate safe work practices and methods and shall identify the safety features of individual products and equipment.

Training shall also include workplace-hazard recognition and deterrence, including the safe handling of hazardous materials. Detainees shall learn

Ex. 14 to Armstrong Decl.
Page 5 of 85

to use and understand protective devices and clothing and to report any malfunctions or other safety-related problems to their supervisors.

The CS must document all training in each detainee's detention file.

### 4. Detainee Work Hours and Pay

Detainee volunteers shall work and be paid in accordance with standard "5.8 Voluntary Work Program."

### 5. Meals for Food Service Workers

The FSA shall establish the meal schedules for detainee food service workers.

Detainee workers shall receive the same fare as other detainees. The CS shall not allow detainees to prepare "special" dishes or condiments for their own or other detainees' consumption.

Detainee workers assigned to the staff dining room may be allowed to eat in that area. All others shall eat in the main dining room, or, if the facility has no main dining room, the FSA shall designate an area for workers to eat.

### 6. Detainee Clothing

Detainees assigned to the food service department shall have a neat and clean appearance.

*Unless the facility administrator establishes other policy, the detainee food worker uniform shall consist of the following: white, short-sleeved, summer-type uniform shirts and pants; safety work shoes; and a white paper hat or white cap. White aprons or smocks of either cloth or disposable plastic may be part of the uniform.*

a.  Detainees with hair shoulder-length or longer shall be required to wear a hair net under their hats or caps.

b.  Detainees with facial hair shall be required to wear beard guards when working in the food preparation or food serving areas.

c.  Detainees working in the garbage room, dish machine room, pan-washing area, etc., shall be required to wear rubber or plastic aprons suited to the task and rubber boots, if required, for sanitation or safety.

d.  Detainees working in refrigerated and freezer areas shall be provided appropriately insulated clothing.

### 7. Use of Tobacco

Tobacco in all its forms is prohibited in the food service department.

## D. Food Service Dining Room/Satellite Meals Operations

### 1. General Policy

Ordinarily detainees shall be served three meals every day, at least two of which shall be hot meals; however, the facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. The dining room schedule must allow no more than 14 hours between the evening meal and breakfast.

Clean, potable drinking water must be available.

Meals shall always be prepared, delivered and served under staff (or contractor) supervision.

Meals shall be served in as unregimented a manner as possible. The FSA's table arrangement should facilitate ease of movement and ready supervision. The dining room shall have the capacity to allow each detainee a minimum of 20 minutes dining time for each meal.

### 2. Display and Service

The following procedures apply to the display, service and transportation of food to main and satellite food service areas:

a.  Before and during the meal, the CS in charge shall inspect the food service line to ensure:

1)  all menu items are ready for consumption;

Ex. 14 to Armstrong Decl.
Page 6 of 85

2) food is appropriately presented; and

3) sanitary guidelines are observed, with hot foods maintained at a temperature of at least 140 F degrees (120 F degrees in food trays) and foods that require refrigeration maintained at 41 F degrees or below.

b. Every open food item and beverage shall be protected from contaminants by easily cleaned sneeze-guards, cabinets, display cases or other such equipment.

c. Servers must wear food-grade plastic gloves and hair nets whenever there is direct contact with a food or beverage. Servers must use tongs, forks, spoons, ladles or other such utensils to serve any food or beverage. Serving food without use of utensils is strictly prohibited.

d. Servers shall use scoops, tongs or other approved utensils when handling or dispensing ice for consumption. The FSA shall consider the practicability of purchasing automatic ice-dispensing equipment.

e. Utensils shall be sanitized:

1) as often as necessary to prevent cross-contamination and other food-handling hazards during food preparation and service;

2) after every food preparation/service session; and

3) again, if necessary, immediately before being used.

f. Sugar, condiments, seasonings and dressings available for self-service shall be provided in individual packages, closed dispensers, or automated condiment-dispensing systems. Salad dressings may be served in open containers if the serving ladle extends beyond the top edge of the container.

g. If the facility does not have sufficient equipment to maintain the minimum or maximum temperature required for food safety, the affected items (e.g., salad bar staples such as lettuce, meat, eggs, cheese) must be removed and discarded after two hours at room temperature.

Food shall be delivered from one place to another in covered containers. These may be individual containers, such as pots with lids, or larger conveyances that can move objects in bulk, such as enclosed, satellite-meals carts.

In any facility, if food carts are delivered to housing units by detainees, they must be locked unless they are under constant supervision of staff.

All food-safety procedures (e.g., sanitation, safe-handling, storage, etc.) apply without exception to food in transit.

h. Soiled equipment and utensils must be transported to the appropriate receptacles in closed containers.

i. A member of the food service staff shall oversee the loading of satellite meal carts. Staff shall inspect all food carts before allowing their removal from the food service area.

### 3. Dining Room Workers

The CF in charge shall train dining room workers in the requirements of the job, including how to perform specific tasks. A basic task common to all dining room workers is to keep the tables and floors clean during the meal service. Once the meal service is over and the detainees have left the room, the workers can undertake major cleaning tasks.

### 4. Serving Lines

The serving counter shall be designed and constructed to separate and insulate the hot foods on the one hand and the cold foods on the other. A transparent "sneeze guard" is required.

### 5. Salad Bars and Hot Bars

Food items at salad bars and hot bars shall be arranged for logical and efficient service. A

Ex. 14 to Armstrong Decl.
Page 7 of 85

transparent "sneeze guard" is required.

### 6. Beverage Counter/Bar

Self-service beverage-and-ice stations shall be designed for quick and easy access. These stations shall be designed for sanitary and efficient service, including traffic flow.

### 7. Staff Dining Room

*The FSA shall have jurisdiction over the staff dining room. The staff dining room shall offer the same food items as the detainee dining room.*

### 8. Meal tickets

The facility may establish a meal ticket program for employees and guests.

*Examples of persons who may receive meals gratis include advisors, guest speakers, technicians/others rendering a service without charge, equipment demonstrators, athletic teams, entertainers, foreign visitors, volunteers and others whose service to the facility is in the best interest of the government.*

*Individuals receiving government reimbursement for their services (e.g., contract employees, per-diem-status personnel) are ineligible for guest meals provided free of charge.*

## E. Menu Planning

### 1. General Policy

The FSA shall base menu selections on the best nutritional program the facility can afford meeting U.S. minimum daily allowances. The ICE/ERO standard menu cycle is 35 days.

The food service program significantly influences morale and attitudes of detainees and staff, and creates a climate for good public relations between the facility and the community.

The overall goal of a quality food service program is to provide nutritious and appetizing meals efficiently and within constraints of the existing budget, personnel resources, equipment and physical layout of the facility. Nutritional needs are diverse because of differences in age, activity, physical condition, gender, religious preference and medical considerations.

The FSA shall accommodate the ethnic and religious diversity of the facility's detainee population when developing menu cycles. While each facility must meet all ICE/ERO standards and follow required procedures, individuality in menu planning is encouraged. Institutions geographically near one another shall consider the benefits of coordinating their menus and the cost-reductions to be achieved through joint purchasing.

The FSA is solely responsible for food service program planning and resource allocation and use.

### 2. Nutritional Analysis

A registered dietitian shall conduct a complete nutritional analysis that meets U.S. Recommended Daily Allowances (RDA), at least yearly, of every master-cycle menu planned by the FSA. The dietitian must certify menus before they are incorporated into the food service program. If necessary, the FSA shall modify the menu in response to the nutritional analysis to ensure nutritional adequacy. In such cases, the menu shall be revised and re-certified by the registered dietician.

If the master-cycle menus change significantly during the year, the cycle shall be reevaluated to ensure nutritional values are maintained.

## F. Food Preparation

### 1. General Policy

The CS or equivalent is responsible for ensuring that all items on the master-cycle menu are prepared and presented according to approved recipes. This responsibility includes assessing the availability and condition of ingredients required by particular recipes, and communicating supply needs to the FSA. For this reason, the CS shall review upcoming menu items as much in advance as possible.

Ex. 14 to Armstrong Decl.
Page 8 of 85

The CS or equivalent has the authority to change menu items when necessary. Every such change or substitution must be documented and forwarded to the FSA. The CS shall exercise this menu-changing authority as infrequently as possible.

Knowledge of ingredients, quantities and food preparation techniques and procedures is essential for producing quality products.

## 2. Preparation Guidelines

Food shall be prepared with minimal manual contact. Food service workers shall thoroughly wash fruits and vegetables with fresh water before cooking or serving raw.

A worker shall test-taste with a clean fork or spoon only; using a soiled food preparation utensil is prohibited. Test-tasting utensils, unless disposable, must be washed after every usage. Disposable test-tasting utensils shall be discarded after a single use.

Any food cooked at a lower temperature than provided below constitutes a food safety hazard and shall not be served. Food service staff and detainee workers involved in cooking shall ensure that the following foods are cooked at the required temperatures:

a. Raw eggs, fish, meat and foods containing these items—145 F degrees or higher

b. Game animals, comminuted (ground) fish and meats, injected meats and eggs not intended for immediate consumption—155 F degrees or higher

c. Stuffing containing fish, meat, or poultry—165 F degrees or higher

d. Roast beef and corned beef—145 F degrees or higher

Potentially hazardous foods that have been cooked and then refrigerated shall be quickly and thoroughly reheated at a minimum of 165 F degrees before being served. Steam tables, warmers and similar hot food holding equipment are prohibited

for the rapid reheating of these foods.

After being reheated at 165 F degrees, the food may be maintained at 140 F degrees on a heated steam line or equivalent warming equipment.

The facility shall obtain pasteurized milk and milk products from approved facilities only. Manufactured milk products shall meet federal standards for quality.

The facility may use reconstituted dry milk and dry milk products for cooking and baking purposes, in instant desserts and in whipped items. If reconstituted in-house, the dry milk and milk products shall be used for cooking purposes only. Powdered milk reconstituted in an approved milk-dispensing machine or "mechanical cow" may be used for drinking purposes. To ensure wholesomeness, an approved laboratory shall test milk produced in the mechanical cow twice monthly for presence of bacteria. The mechanical cow shall be disassembled, cleaned and sanitized before and after each use.

Powdered milkshake or ice cream mix, reconstituted in an approved ice cream machine, may be used. An approved laboratory shall test dairy-based products produced in the machine for the presence of bacteria monthly. The ice cream machine shall be disassembled, cleaned and sanitized before and after each use.

Liquid, frozen and dry eggs and egg products are pasteurized at temperatures high enough to destroy pathogenic organisms that might be present; however, because of the possibility of contamination or recontamination after opening, thawing or reconstitution, these products shall be primarily used in cooking and baking.

Nondairy creaming, whitening or whipping agents may be reconstituted in-house only if immediately stored in sanitized, covered containers not larger than one gallon, and cooled to 41 F degrees or lower within four hours of preparation.

Ex. 14 to Armstrong Decl.
Page 9 of 85

The CF shall use thermometers to ensure the attainment and maintenance of proper internal cooking, holding or refrigeration temperatures of all potentially hazardous foods.

To prevent cross-contamination, separate cutting boards must be used for raw and cooked foods. The cutting boards must be washed, rinsed and sanitized between every use.

The FSA may require use of color-coded cutting boards, which reduce the risk of cross-contamination during food preparation.

### 3. Food Cooling

Potentially hazardous food must be cooled from 140 to 70 F degrees within two hours of cooking, and from 70 to 41 F degrees or below within four hours. Foods prepared from ingredients at ambient temperature, such as reconstituted foods and canned tuna, must be cooled to 41 F degrees within two hours of cooking/preparation.

The food service department can meet time-and-temperature requirements for cooling by using any or all of the following techniques, which expedite cooling:

a.  placing the food in shallow pans;

b.  separating food into smaller or thinner portions;

c.  using rapid cooling equipment;

d.  stirring the food in a container placed in an ice water bath;

e.  using containers that facilitate heat transfer;

f.  adding ice as an ingredient; and/or

g.  using a commercial blast-chiller.

During cooling, the food containers shall be arranged in cooling or cold-holding equipment in a way that maximizes heat transfer through the walls of the containers.

Food protected from overhead contamination shall be left uncovered during the cooling period. If the risk of overhead contamination exists, the food must be loosely covered to facilitate heat transfer from the surface of the food.

### 4. Food Thawing

Potentially hazardous food shall be thawed according to one of the following procedures:

a.  under refrigeration that maintains the food at 41 F degrees or below;

b.  submerged in running water:

  1) at a water temperature of 70 F degrees or below;

  2) with sufficient water velocity to agitate and float off loose particles in an overflow; and

  3) for a period that does not allow thawed portions of ready-to-eat or raw animal foods to rise above 41 F degrees; also

  4) the allowed periods for thawing include the time the food is exposed to the running water, the time to prepare food for cooking, and/or the time it takes under refrigeration to cool the food to 41 F degrees; or

c.  as part of a cooking process, provided there is continuous cooking throughout the process.

### 5. Food Protection—General Requirements

Food and ice shall be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage and other sources of contamination. Protection shall be continuous, whether the food is in storage, in preparation, on display or in transit.

All food storage units must be equipped with accurate easy-to-read thermometers. New heating and/or refrigeration equipment purchases shall include a zone-type thermometer with temperature graduations. Refrigeration equipment shall be designed and operated to maintain a temperature of 41 F degrees or below.

Ex. 14 to Armstrong Decl.
Page 10 of 85

## 6. Hermetically Sealed Foods

Canned food that has abnormal color, taste or appearance, or which is contained in cans that show abnormalities such as bulging at ends, swelling or leakage, shall not be served. Unsuitable canned food shall be surveyed, reported and destroyed.

## 7. Potentially Hazardous Foods

Potentially hazardous foods are those foods that provide a good medium for bacteria growth. They include any perishable food that consists in whole or part of milk, milk products, eggs, meat, poultry, fish or shellfish or other high-protein foods.

Potentially hazardous foods shall be prepared with minimal manual contact. Such products shall be prepared from chilled ingredients whenever feasible. The surfaces of equipment, containers, cutting boards and utensils used for preparation and subsequent storage of potentially hazardous food shall be cleaned effectively after each use.

Potentially hazardous food shall be prepared as close to serving time as practicable. Potentially hazardous raw frozen food shall be cooked from the frozen state whenever practical. Tempering shall be accomplished by refrigeration at 40 F degrees or below or, with potable running water, at 70 F degrees or below. The potable water technique may be used only if the product is sealed in its original container. At no time shall potentially hazardous food thaw at room temperature.

All precooked, potentially hazardous, refrigerated or frozen food intended for reheating hall be heated rapidly to a temperature above 165 F degrees.

## 8. Leftovers

Prepared food items that have not been placed on the serving line may be retained for no more than 24 hours. Leftovers offered for service a second time shall not be retained for later use, but shall be discarded immediately after offering. All leftovers shall be labeled to identify the product, preparation date and time.

# G. Religious/Special Diets

## 1. General Policy

All facilities shall provide detainees requesting a religious diet a reasonable and equitable opportunity to observe their religious dietary practice, within the constraints of budget limitations and the security and orderly running of the facility, by offering a common fare menu. While each request for religious diet accommodation is to be determined on a case-by-case basis, ICE anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility.  Information about the availability of religious and special diets shall be provided to detainees in a language or manner that they can understand.

"Common Fare" refers to a no-flesh protein option provided whenever an entrée containing flesh is offered as part of a meal. Likewise, a "Common Fare" meal offers vegetables, starches and other foods that are not seasoned with flesh. This diet is designed as the foundation from which modifications can be made to accommodate the religious diets of various faiths.

When considering denying a request by a detainee to participate in the religious diet program, or removal of a detainee from the religious diet program, the facility administrator, or his/her designee, shall consult with the local FOD prior to denying the request or prior to removing a detainee from the program. To participate in the common fare program, a detainee shall initiate an "Authorization for Common Fare Participation" form (Appendix 4.1.A) for consideration by the chaplain (or FSA).  On the form, the detainee shall provide a written statement articulating the religious motivation for participation in the common fare program.  Oral interpretation or written assistance

Ex. 14 to Armstrong Decl.
Page 11 of 85

shall be provided to illiterate or limited-English proficient detainees as necessary in completing this form.  If participation is approved, the chaplain or FSA shall forward a copy of the form for inclusion in the detainee's detention file.

Detainees whose religious beliefs require adherence to particular dietary laws or generally accepted religious guidelines and practices shall be referred to the chaplain. The chaplain shall verify the religious diet requirement by reviewing files and consulting with religious representatives.  In the case of an unorthodox request, the chaplain or religious services coordinator is encouraged to consult established clergy contacts in the community to determine whether a request pertaining to a particular faith is appropriate.  Facilities may employ different mechanisms to determine if a detainee's request should be granted; however, the determination may not impose a substantial burden on a detainee's religious exercise or necessitate lengthy questionnaires or numerous interviews. Response to the request for a religious diet must be provided in a timely manner, and documented. Absent an articulable reason to deny the request, the presumption must be that the detainee's request constitutes a legitimate exercise of religious belief and practice.

The chaplain or religious services coordinator and FSA shall issue specific written instructions for the implementation of the diet as soon as practicable and within 10 business days of verification.

*Once a religious diet has been approved, the FSA shall issue, in duplicate, a special-diet identification card.*

*This diet-identification card shall contain the following information:*

*a.  detainee name and A-number;*

*b.  type of religious diet prescribed;*

*c.  expiration date, within 90 days; and*

*d.  signature of the FSA.*

*The FSA shall contact the appropriate individual or department to obtain a photo of the detainee, and shall attach the photo to the identification card. The FSA shall ensure that the food service department receives one copy of the special-diet identification card. The second identification card shall be issued to the detainee who, at every meal, must present the card to the CS on duty. The second copy of the consultation sheet shall be filed in the detainee's detention file.*

*Any time a detainee on a religious diet refuses a meal and/or accepts the regular mainline meal in place of the religious meal, the cook on duty shall notify the FSA in writing.*

## 2. Standard Common Fare Menu (Religious Diet)

Common fare is intended to accommodate detainees whose religious dietary needs cannot be met on the mainline. The common fare menu is based on a 14-day cycle, with special menus for the ten federal holidays. The menus must be certified as exceeding minimum daily nutritional requirements and meeting RDAs. Beverages shall be selected from the regular menu.

## 3. Changes to the standard Common Fare Menu

Modifications to the standard common fare menu may be made at the local level for various reasons. For example, seasonal variations affect the availability of fresh produce in different locations, making menu modifications inevitable. Modifications may also be made to meet the requirements of various faith groups (e.g., for the inclusion of kosher and/or halal flesh-food options).

With the facility administrator's concurrence, the FSA may make temporary, nutritionally equal substitutions for fresh seasonal produce that violates no religious dietary requirements. The chaplain or local religious representatives shall be consulted if technical questions arise. The Chaplain shall escort other clergy to the common fare preparation area for

Ex. 14 to Armstrong Decl.
Page 12 of 85

frequent, random monitoring of compliance with religious dietary requirements.

## 4. Hot Entree Availability

To the extent practicable, a hot flesh-food entree shall be available to accommodate detainees' religious dietary needs. Hot entrees shall be offered daily and shall be purchased, prepared and served in a manner that does not violate the religious requirements of any faith group.

## 5. Kosher Requirements

With the exception of fresh fruits and vegetables, the facility's kosher-food frozen entrees shall be purchased precooked in a sealed container, heated and served hot. Other kosher-food purchases shall be fully prepared, ready-to-use and bearing the symbol of a recognized kosher-certification agency. Any item containing pork or a pork product is prohibited. Only bread and margarine labeled "pareve" or "parve" shall be purchased for the kosher tray.

## 6. Plates and Utensils

Kosher trays shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for kosher-food service only. Separate cutting boards, knives, food scoops, food inserts and other such tools, appliances and utensils shall be used to prepare kosher-foods, and shall be identified accordingly. Meat and dairy food items and the service utensils used with each group shall be stored in areas separate from each other. A separate dishpan shall be provided for cleaning these items, if a separate or three-compartment sink is not available.

## 7. Religious Requirements

If a facility has a no-pork menu, in order to alleviate any confusion for those who observe no-pork diets for religious reasons, the above information, within "Section G," shall be included in the facility's handbook and the facility orientation. If the facility has a chaplain, he/she shall also be made aware of the policy.

## 8. Nutritional Requirements

Common fare menus shall meet RDAs. A detainee who chooses the common fare menu shall select beverages only from the regular menu.

## 9. Instant Food and Beverages

The food service shall provide a hot-water urn for reconstituting instant beverages and foods for use by detainees.

## 10. Plates and Utensils

Common Fare meals shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for common fare service only. Separate cutting boards, knives, food scoops, food inserts and other such tools, appliances and utensils shall be used to prepare common fare foods, and shall be identified accordingly. Meat and dairy food items and the preparation and service utensils used with each group shall be stored in areas separate from each other. A separate dishpan shall be provided for cleaning these items, if a separate or three-compartment sink is not available.

The chaplain shall escort other clergy to the common fare preparation area for frequent, random monitoring of compliance with religious dietary requirements.

## 11. Application and Removal

The facility administrator, in consultation with the chaplain, shall be the approving official for a detainee's removal from the common fare program. The facility administrator or chaplain is required to consult with the local FOD prior to denying any request for a religious diet.  In addition, once a detainee has been approved for a religious diet program, he or she may not be removed from the program without prior consultation with and concurrence from the FOD.  Denial or removal from a religious diet must be documented with the

Ex. 14 to Armstrong Decl.
Page 13 of 85

date and reason, and must be approved by the facility administrator.  The documentation should also include the date of FOD concurrence.

Food service staff shall refer to the daily roster to identify detainees in the common fare program. Staff shall not use this information to disparage a detainee's religion or religious views or to attempt to dissuade him/her from participating in the program.

a. The FSA shall monitor the food selections of all detainees participating in the common fare program to ensure the legitimacy of their participation.

b. Staff shall train and supervise all detainees with common fare assignments.

c. A detainee's temporary adoption of a medically prescribed diet or placement in a Special Management Unit (SMU) shall not affect his/her access to common fare meals. However, if a prescribed medical diet conflicts with the common fare diet, the medical diet takes precedence.

d. A detainee who has been approved for a common fare menu must notify the chaplain, in writing, if he/she wishes to withdraw from the religious diet.  Oral interpretation or written assistance shall be provided to illiterate or limited-English proficient detainees as necessary in providing written notice of withdrawal from a religious diet.

The Chaplain may recommend withdrawal from a religious diet if the detainee is documented as being in violation of the terms of the religious diet program to which the detainee has agreed in writing. If a detainee refuses five consecutive common fare meals, the chaplain may recommend in writing that the facility administrator remove the detainee from the program. Detainees participating in the common fare program may also consume items for sale through the facility's commissary program without risk of being removed from the

program, as long as such purchases are consistent with the common fare program. However, purchase of foods items inconsistent with the common fare program may be grounds for removal from the program.

To preserve the integrity and orderly operation of the religious diet program and to prevent fraud, detainees who withdraw or are removed may not be immediately re-established back into the program.

The process of re-approving a religious diet for a detainee who voluntarily withdraws or who is removed ordinarily may take up to ten days. However, repeated withdrawals, voluntary or otherwise, may result in a waiting period of up to one month before the re-approval request is decided. The decision to remove and/or reinstate a detainee rests with the facility administrator, in consultation with the chaplain and/or local religious representatives, if necessary.

## 12. Annual Ceremonial Meals

The chaplain, in consultation with local religious leaders as necessary, shall develop the ceremonial meal schedule for the subsequent calendar year and shall provide this schedule to the facility administrator. The schedule shall include the date, religious group, estimated number of participants and special foods required. Ceremonial and commemorative meals shall be served in the food service facility, unless otherwise approved by the facility administrator.

The food service department shall be the only source of procurement for food items. To maintain equity in menu design, all meals shall be limited to food items on the facility's master-cycle menu. To facilitate food preparation, consultations between the FSA and local religious representative(s) concerning appropriate menus shall occur six to eight weeks in advance of the scheduled observance. The religious provider may, through the food service department, procure the ritual observance food items (in minimal quantities). Such items shall not generally constitute

the main entree for the ceremonial meal.

### 13. Religious Fasts and Seasonal Observances

The common fare program shall accommodate detainees abstaining from particular foods or fasting for religious purposes at prescribed times of year, including, but not limited to:

a. Ramadan

During Ramadan, Muslims participating in the fast shall receive the approved meals after sundown for consumption in the food service department or SMU.

During the December fast, vegetarian or hot fish dishes shall replace meat entrees. Fasters shall receive both noon and evening meals after sundown.

Detainees not participating in the common fare program, but electing to observe Ramadan or the December fast shall be served the main meal after sundown. If the main menu does not meet religious requirements, the detainee may participate in the common fare program during the period in question.

Each facility may provide a bag breakfast or allow detainees to go to the food service department for breakfast before dawn. Bag breakfasts shall contain nonperishable items such as ultra-high pasteurized milk, fresh fruit, peanut butter, dry cereal, etc. The menu for the common fare program cannot be used for a bag breakfast.

b. Passover

The facility shall have the standard Kosher-for-Passover foods available for Jewish detainees during the eight-day holiday. The food service department shall be prepared to provide Passover meals to new arrivals.

All Jewish detainees observing Passover shall be served the same Kosher-for-Passover meals, whether or not they are participating in the common fare program.

c. Lent

During the Christian season of Lent, a meatless meal (lunch and dinner) shall be served on the food service line on Fridays and on Ash Wednesday.

### 14. Common Fare Recordkeeping and Costs

The FSA shall estimate quarterly costs for the common fare program and include this figure in the quarterly budget. The FSA shall maintain a record of the actual costs of both edible and non-edible items.

## H. Medical Diets

### 1. Therapeutic Diets

Detainees with certain conditions—chronic or temporary; medical, dental, and/or psychological—shall be prescribed special diets as appropriate.

Special (therapeutic) diets shall be authorized by the clinical director (CD) on Form IHSC-819, or equivalent, detainee special need(s). The form shall specify the type of therapeutic diets to be prescribed and, if necessary, renewed, in 90-day increments. Once prescribed, the diet shall be made available to the detainee by the next business day.

*The cook on duty shall notify the FSA and/or CS in writing any time a detainee on a therapeutic diet refuses the special meal or accepts the regular meal from the main food service line.*

### 2. Snacks or Supplemental Meals

The physician may order snacks or supplemental meals for such reasons as:

a. insulin-dependent diabetes;

b. a need to increase protein or calories for pregnancy, cancer, AIDS, etc.; and/or

c. a need to take prescribed medication with food.

## I. Specialized Food Service Programs

### 1. Satellite Meals

"Satellite meals" refers to food prepared in one

---

Ex. 14 to Armstrong Decl.
Page 15 of 85

location for consumption elsewhere (e.g., general housing units, the SMU, remote housing areas, etc.).

The sanitary standards required in the food service department, from preparation to actual delivery, also apply to satellite meals. Satellite meals and microwave instructions (if applicable) shall be posted where satellite meals are served.

Foods shall be kept sufficiently hot or cold to arrest or destroy the growth of infectious organisms. The FSA shall ensure that staff members understand the special handling required with potentially hazardous foods, such as meat, cream or egg dishes. Staff must understand the critical importance of time and temperature in delivering safe food.

To prevent bacteria growth, food must be prepared and held at the proper temperatures until served. Satellite tray meals must be delivered and served within two hours of food being plated.

Foods in the potentially hazardous category shall remain under refrigeration until cooking time and, after cooking, maintained at or above 140 F degrees. Hot foods must be placed in a heated serving line during tray assembly. Thermal bags and carts, refrigerated carts, thermal compartment trays, etc., shall be used for satellite meals.

Outside foods prepared in bulk for transportation to a remote housing unit or other location shall be transported in thermal containers that maintain cold items at temperatures below 41 F degrees and/or hot items at temperatures above 140 F degrees, excluding items served within the two-hour window for meal service.

## 2. Weekend and Holiday Meal Schedule

When weekend and/or holiday meal schedules differ from the weekday schedule, detainees in the SMU shall receive a continental breakfast or regular breakfast items. Brunch service shall conform to the breakfast meal pattern, and dinner service to the noon or evening meal pattern.

## 3. Selection of Menu Courses

Care must be taken to ensure that culturally diverse meals are provided in such portions as to be nutritionally adequate.

## 4. Segregation Unit Food Rations

Food items in excess of the normal prescribed ration shall not be given to detainees in segregation units as a reward for good behavior, nor shall food rations be reduced or changed or otherwise used as a disciplinary tool.

## 5. Segregation Unit Sack Lunches

Detainees in segregation units shall receive sack meals only with the facility administrator's written authorization. The medical department shall be consulted when necessary.

## 6. Sack Meals

All meals shall be served from established menus in the dining room or housing units. In some circumstances, detainees may be provided sack meals.

Sack meals shall be provided for detainees being transported from the facility, detainees arriving or departing between scheduled meal hours, and detainees in the SMU, as provided above.

a. Quality
Sack meals shall be of the same nutritional quality as other meals prepared by the food service.

b. Preparation
Members of the food service staff shall prepare sack meals for detainees who are being transported to/from other locations by bus or air service. While detainee volunteers assigned to the food service department shall not be involved in preparing meals for transportation, they may prepare sack meals for on-site consumption.

A designated member of the transportation by land or plane crew shall pick up all sack meals prepared for detainee transportation from the food service department. Before departing, this crew member shall inspect the sacks for:

Ex. 14 to Armstrong Decl.
Page 16 of 85

1) quality of contents;

2) proper wrapping; and

3) correct individual counts.

c. Contents

For any detainee who shall be transported by the ICE Air Operations (IAO), the sack lunch must comply with IAO criteria. Otherwise, the following requirements are applicable:

Each sack shall contain at least two sandwiches, of which at least one shall be meat (non-pork). Commercial bread or rolls may be preferable because they include preservatives. To ensure freshness, fresh, facility-made bread may be used only if made on the day of lunch preparation. Sandwiches shall be individually wrapped or bagged in a secure fashion to prevent the food from spoiling. Meats, cheeses, etc., shall be freshly sliced the day of sandwich preparation. Leftover cooked meats shall not be used after 24 hours.

In addition, each sack shall include:

1) one piece of fresh fruit, or properly packaged canned fruit (or paper cup with lid), complete with a plastic spoon;

2) one ration of a dessert item, like cookies, doughnuts and fruit bars; and

3) such extras as:

   a) properly packaged fresh vegetables, like celery sticks and carrot sticks; or

   b) commercially packaged "snack foods," such as peanut butter crackers, cheese crackers and individual bags of potato chips.

These items enhance the overall acceptance of the lunches.

Extremely perishable items such as fruit pie, cream pie and other items made with milk, cream or other dairy ingredients shall be excluded.

d. Packaging

Whenever possible, the food service department shall pack sack meals intended for bus or air service in disposable "snack boxes" that are designed for proper placement of contents and to afford maximum protection during handling, packaging and transporting.

If necessary, paper bags may be used.

These lunches shall be stored in a secured, refrigerated area until pickup.

## J. Safety and Sanitation

### 1. General Policy

All food service employees are responsible for maintaining a high level of sanitation in the food service department. An effective food sanitation program prevents health problems, creates a positive environment and encourages a feeling of pride and cooperation among detainees.

Food service staff shall teach detainee workers personal cleanliness and hygiene; sanitary methods of preparing, storing and serving food; and the sanitary operation, care and maintenance of equipment, including automatic dishwashers and pot and pan washers.

### 2. Personal Hygiene of Staff and Detainees

a. All food service personnel shall wear clean garments, maintain a high level of personal cleanliness and practice good hygiene at all times. They shall wash hands thoroughly with soap or detergent before starting work and as often as necessary during the shift to remove soil or other contaminants.

b. Staff and detainees shall not resume work after visiting the toilet facility without first washing their hands with soap or detergent. The FSA shall post signs to this effect.

c. Neither staff nor detainees shall use tobacco in a food service work area. If they use tobacco in a smoking-permitted area, they shall wash their hands before resuming work.

Ex. 14 to Armstrong Decl.
Page 17 of 85

d. All staff and detainees working in the food preparation and service area(s) shall use effective hair restraints. Personnel with hair that cannot be adequately restrained shall be prohibited from food service operations. Head coverings, gloves and beard guards are encouraged, but not required, when staff members are distributing covered serving trays.

e. Detainee food service workers shall be provided with and required to use clean white uniforms while working in a food preparation area or on the serving line.

f. All food service personnel working in the food service department shall be provided with and required to use approved rubber-soled safety shoes.

g. To prevent cross-contamination, staff and detainees who prepare or serve food shall not be assigned to clean latrines, garbage cans, sewers, drains or grease traps, or other such duties, during the period of food preparation.

h. Only authorized food service personnel shall be tasked with preparing and serving food.

i. Authorization is based on approval from the facility's health services department.

j. Only authorized personnel shall be allowed in the food preparation, storage or utensil-cleaning areas of the food service area.

### 3. Medical Examination

The facility administrator shall document that food service personnel have received a pre-employment medical examination to identify communicable diseases that may contraindicate food service work.

The medical department shall document detainees' clearance for food service work prior to their assuming food service duties. The food service department shall refer to the medical department detainees that have been absent from work for reasons of communicable illness, for a determination of medical clearance prior to resuming food service work.

### 4. Daily Health Checks

The CF or detention staff assigned to food service shall inspect all detainee food service workers on a daily basis at the start of each work period. Detainees who exhibit signs of illness, skin disease, diarrhea (admitted or suspected) or infected cuts or boils shall be removed from the work assignment and immediately referred to health services for determination of fitness for duty. The detainees shall return to work only after the FSA has received written clearance from health services staff.

### 5. Environmental Sanitation and Safety

All facilities shall meet the following environmental standards:

a. Facilities must be clean and well-lit, and must display orderly work and storage areas.

b. Overhead pipes must be removed or covered to eliminate the food-safety hazard posed by leaking or dusty pipes.

c. Walls, floors and ceilings in all areas must be cleaned routinely.

d. Facilities must employ ventilation hoods to prevent grease buildup and wall/ceiling condensation that can drip into food or onto food contact surfaces. Filters or other grease-extracting equipment shall be readily removable for cleaning and replacement.

e. The area underneath sprinkler deflectors must have at least an 18-inch clearance.

f. Facilities must possess hazard-free storage areas:

1) Bags, containers, bundles, etc., shall be stored in tiers and stacked, blocked, interlocked and limited in height for stability and security against sliding or collapsing.

2) No flammable material, loose cords, debris or other obvious hazards may be present.

Ex. 14 to Armstrong Decl.
Page 18 of 85

3) No pests or infestations may be present.

g. Aisles and passageways shall be kept clear and in good repair, with no obstruction that may create a hazard or hamper egress.

h. To prevent cross-contamination, kitchenware and food-contact surfaces shall be washed, rinsed and sanitized after each use and after any interruption of operations during which contamination may occur.

i. Facilities must possess a ready supply of hot water (105-120 F degrees).

j. Garbage and other trash shall be collected and removed as often as possible. Garbage/refuse containers shall have sufficient capacity for the volume and shall be kept covered, insect- and rodent-proof and frequently cleaned. The facility shall comply with all applicable regulations (local, state and federal) on refuse handling and disposal and standard "1.2 Environmental Health and Safety."

k. The premises shall be maintained in a condition that prevents the feeding or nesting of insects and rodents. Outside openings shall be protected by tight-fitting screens, windows, controlled air curtains and self-closing doors.

### 6. Equipment Sanitation

Information about the operation, cleaning and care of equipment shall be obtained from manufacturers or local distributors. A file of such reference material shall be maintained in the food service department and used in developing equipment cleaning procedures for training. Sanitation shall be a primary consideration in the purchase and placement of equipment.

Equipment shall be installed for ease of cleaning, including the removal of soil, food materials and other debris that collects between pieces of equipment or between the equipment and walls or floor. Older facilities that may not have the advantage of the latest designs and equipment can meet sanitation standards through careful planning, training and supervision.

The FSA shall develop a schedule for the routine cleaning of equipment.

### 7. Equipment and Utensils

a. Information
All food service equipment and utensils shall meet the National Sanitation Foundation International (NSF) standards or equivalent standards of other agencies.

b. Materials

1) Materials used in the construction or repair of multi-use equipment and utensils shall:

a) be non-toxic, non-corrosive, non-absorbent, durable under normal use, smooth and easily cleaned;

b) impart no odors, colors or tastes; and

c) retain their original properties under repeated use, creating no risk of food-adulteration as they deteriorate.

2) Paint is prohibited on any surface that may come into contact with food.

3) Milk-dispensing tubes shall be cut diagonally about two inches from the cutoff valve. Bulk milk dispensers shall be equipped with thermometers.

c. Design and Fabrication

1) All food service equipment and utensils (including plastic ware) shall be designed and fabricated for durability under normal use.

a) Such equipment shall be readily accessible, easily cleaned and resistant to denting, buckling, pitting, chipping and cracking.

2) Equipment surfaces not intended for contact with food, but located in places exposed to splatters, spills, etc., require frequent cleaning. Therefore, they shall be reasonably smooth,

Ex. 14 to Armstrong Decl.
Page 19 of 85

washable, free of unnecessary ridges, ledges, projections and crevices. Upkeep of equipment surfaces shall contribute to cleanliness and sanitation.

d.  Installation

1)  Equipment shall be installed in accordance with the manufacturer's instructions and good engineering practices.

2)  Installers shall allow enough space between pieces of equipment and between equipment and walls to facilitate routine cleaning. Adjacent pieces may be butted together if the gap between them is sealed.

e.  General Cleaning Procedures

1)  Moist cloths for wiping food spills on kitchenware and food-contact surfaces on equipment shall be clean, rinsed frequently in sanitizing solution and used solely for wiping food spills. These cloths shall soak in the sanitizing solution between uses.

2)  Moist cloths used for non-food-contact surfaces like counters, dining table tops and shelves shall be cleaned, rinsed and stored in the same way as the moist cloths used on food-contact surfaces. They shall be used on non-food-contact surfaces only.

3)  Detergents and sanitizers must have Food and Drug Administration approval for food service uses.

f.  Manual Cleaning and Sanitizing

1)  A sink with at least three labeled compartments is required for manually washing, rinsing and sanitizing utensils and equipment. Each compartment shall have the capacity to accommodate the items to be cleaned. Each shall be supplied with hot and cold water.

2)  Drain-boards and/or easily movable dish-tables shall be provided for utensils and equipment

both before and after cleaning.

3)  Equipment and utensils shall be pre-flushed, pre-scraped and, when necessary, pre-soaked to remove gross food particles. A fourth sink compartment with a garbage-disposal is useful for these purposes and shall be included in plans for facilities being built or renovated.

4)  Except for fixed equipment and utensils too large to be cleaned in sink compartments, the following procedures apply to cleaning equipment and utensils:

a)  Wash in the first sink compartment, using a hot detergent solution changed frequently to keep it free from soil and grease.

b)  Rinse in or under hot water in the second compartment, changing the rinse water frequently. This compartment shall be kept empty, and a sprayer shall be used for rinsing to prevent rinse water from becoming soapy or contaminated.

c)  Sanitize in the third compartment using one of the following methods:

i.  Immerse for at least 30 seconds in clean water at a constant temperature of 171 F degrees that is maintained with a heating device and frequently checked with a thermometer. Use dish baskets to immerse items completely.

ii.  Immerse for at least 60 seconds in a sanitizing solution containing at least 50 parts per million (ppm) chlorine at a temperature of at least 75 F degrees.

iii. Immerse for at least 60 seconds in a sanitizing solution containing at least 12.5 ppm iodine, with a pH not higher than 5.0 and a temperature of at least 75 F degrees.

iv.  Immerse in a sanitizing solution containing an equivalent sanitizing

chemical at strengths recommended by the U.S. Public Health Service.

v. Periodically check and adjust as necessary the chemical concentrations in a sanitizing solution, using a test kit.

vi. Air dry utensils and equipment after sanitizing.

vii.    Steam clean oversized equipment, provided the steam can be confined to the piece of equipment. Alternatively, rinse, spray or swab with a chemical sanitizing solution mixed to at least twice the strength required for immersion sanitizing.

g. Mechanical Cleaning and Sanitizing
Spray or immersion dishwashers or devices, including automatic dispensers for detergents, wetting agents and liquid sanitizer, shall be maintained in good repair. Utensils and equipment placed in the machine must be exposed to all cycles.

1) The pressure of the final rinse water must be between 15 and 25 pounds per square inch (psi) in the water line immediately adjacent to the final-rinse control valve.

2) Machine- or water line-mounted thermometers must be installed to check water temperature in each dishwasher tank, including the final rinse water.

Baffles, curtains, etc., must be used to prevent wash water from entering the rinse water tank(s) and time conveyors to ensure adequate exposure during each cycle.

Equipment and utensils must be placed on conveyors or in racks, trays and baskets to expose all food-contact surfaces to detergent, washing and rinsing without obstruction and to facilitate free draining.

3) The  following temperatures must be

maintained for hot-water sanitizing:

a) Single-tank, stationary rack, dual-temperature machine: wash temperature of 150 F degrees; final rinse, 180 F degrees.

b) Single-tank, stationary rack, single-temperature machine: wash and rinse temperature of 165 F degrees.

c) Multi tank, conveyor machine: wash temperature of 150 F degrees; pumped rinse, 160 F degrees; final rinse, 180 F degrees.

d) Single-tank, pot/pan/utensil washer (stationary or moving rack): wash temperature of 140 F degrees; final rinse, 180 F degrees.

i.   When using a chemical spray in a single-tank, stationary rack, glass-washer, maintain a wash temperature of at least 120 F degrees, unless otherwise specified by the manufacturer.

ii.  Air-dry all equipment and utensils after sanitizing, by means of drain boards, mobile dish tables and/ or carts.

h. Equipment and Utensil Storage.  Eating utensils shall be picked up by their bases or handles only. Utensils shall be stored in perforated pans only.

Glasses, tumblers and cups shall be inverted before storing. Other tableware and utensils may be either covered or inverted.

## 8. Storage of Clothing and Personal Belongings

Clothes and other personal belongings (e.g., jackets, shoes) shall be stored in designated areas, apart from:

a. areas for the preparation, storage and serving of food; and

b. areas for the washing and storing of utensils.

The FSA shall identify space for storing detainee belongings.

### 9. Lavatories

Adequate and conveniently located toilet facilities shall be provided for all food service staff and detainee workers.

a. Toilet fixtures shall be of sanitary design and readily cleaned.

b. Toilet rooms and fixtures shall be kept clean and in good repair.

c. Signs shall be prominently displayed.

d. Lavatories shall have readily available hot and cold water.

e. Soap or detergent and paper towels or a hand-drying device providing heated air, shall be available at all times in each lavatory.

f. Waste receptacles shall be conveniently placed near the hand-washing facilities.

### 10. Pest Control

Good sanitation practices are essential to an effective pest control program. The FSA is responsible for pest control in the food service department, including contracting the services of an outside exterminator as necessary.

To protect against insects and other pests, air curtains or comparable devices shall be used on outside doors where food is prepared, stored or served.

### 11. Hazardous Materials

Only those toxic and caustic materials required for sanitary maintenance of the facility, equipment and utensils shall be used in the food service department.

a. All food service staff shall know where and how much toxic, flammable or caustic material is on hand, and shall be aware that their use must be controlled and accounted for daily.

b. Detainee-type combination locks shall not be used to secure such material.

c. All containers of toxic, flammable or caustic

materials shall be prominently and distinctively labeled for easy content identification.

d. All toxic, flammable and caustic materials shall be segregated from food products and stored in a locked and labeled cabinet or room.

e. Cleaning and sanitizing compounds shall be stored apart from food products.

f. Toxic, flammable and caustic materials shall not be used in a manner that may contaminate food, equipment or utensils or may pose a hazard to personnel or detainees working with or consuming food service products.

g. A system for intermediate storage of received hazardous substances shall secure the materials from time of receipt to time of issue.

The FSA shall obtain and file for reference Material Safety Data Sheets (MSDSs) on all flammable, toxic and caustic substances used in the facility as required by standard "1.2 Environmental Health and Safety."

### 12. General Safety Guidelines

a. Extension cords shall be UL-listed and UL-labeled and may not be used in tandem.

b. All steam lines within seven feet of the floor or working surface, and with which a worker may come in contact, shall be insulated or covered with a heat-resistant material or otherwise be guarded from contact. Inaccessible steam lines, guarded by location, need not be protected from contact.

c. Machines shall be guarded in compliance with OSHA standards:

1) Fans within seven feet of the floor or work surface shall have blade guard openings no larger than two inches.

2) Protective eye and face equipment shall be used, as appropriate, to avert risk of injury. Dangerous areas presenting such risks shall be conspicuously marked with eye-hazard

warning signs.

3) Safety shoes shall be worn in FSA-designated foot hazard areas.

4) Meat saws, slicers and grinders shall be equipped with anti-restart devices.

5) The maintenance manager shall provide ground fault protection wherever needed in the food service department, and shall document this protection for the FSA.

d. Light fixtures, vent covers, wall-mounted fans, decorative materials and similar equipment and materials attached to walls or ceilings shall be maintained in good repair.

e. Lights in food production areas, utensil and equipment washing areas, and other areas displaying or storing food, equipment, or utensils shall be equipped with protective shielding.

f. An approved, fixed fire-suppression system shall be installed in ventilation hoods over all grills, deep fryers and open flame devices. A qualified contractor shall inspect the system every six months. The fire-suppression system shall be equipped with a locally audible alarm and connected to the control room's annunciator panel.

g. Hood systems shall be cleaned after each use to prevent grease build-up, which constitutes a fire risk. All deep fryers and grills shall be equipped with automatic fuel or energy shut-off controls.

### 13. Mandatory Inspection

The facility administrator shall implement written procedures requiring the food service administrator or designee to conduct the weekly inspections of all food service areas, including dining, storage, equipment and food-preparation areas.

All of the food service department equipment (e.g., ranges, ovens, refrigerators, mixers, dishwashers, garbage disposal) require frequent inspection to ensure their sanitary and operable condition. Staff shall check refrigerator and water temperatures daily and record the results. The FSA or designee shall verify and document requirements of food and equipment temperatures.

The FSA or CS shall inspect food service areas at least weekly.

An independent, external inspector shall conduct annual inspections to ensure that the food service facilities and equipment meet governmental health and safety codes.

Personnel inspecting the food service department shall note any recommended corrective actions in a written report to the facility administrator. The facility administrator shall establish the date by which identified problems shall be corrected.

Checks of equipment temperatures shall follow this schedule:

a. dishwashers: every meal;

b. pot and pan washers: daily, if water in the third compartment of a three-compartment sink is used for sanitation and the required minimum temperature is 180 F degrees; and

c. refrigeration/freezer equipment (walk-in units): site-specific schedule, established by the FSA.

All temperature-check documentation shall be filed and accessible.

The FSA shall develop a cleaning schedule for each food service area and post it for easy reference. All areas (e.g., walls, windows, vent hoods) and equipment (e.g., chairs, tables, fryers, ovens) shall be grouped by frequency of cleaning (e.g., after every use, daily, weekly, monthly, semiannually or annually).

## K. Food Storage, Receiving and Inventory

### 1. General Policy

Since control and location of subsistence supplies are site-specific, each FSA shall establish procedures for storing, receiving and inventorying food.

Ex. 14 to Armstrong Decl.
Page 23 of 85

On the purchase request for potentially dangerous items (e.g., knives, mace, yeast, nutmeg, cloves and other items considered contraband if found in a detainee's possession), the FSA shall mark them "hot," signaling the need for special handling.

## 2. Receiving

The first step in receiving food is matching incoming items with the invoice, purchase order and control specifications. Weekly deliveries of fresh produce, meats and other perishable items shall be inspected for freshness, quality and general appearance. Staff shall supplement their inspections of perishables with random checks of weight, count, size, etc.

Receiving staff shall examine deliveries promptly to determine acceptability both for quantity and quality, consistent with the contract. If immediate examination is not practical upon delivery because inspection shall involve time-consuming tests, the vendor shall receive a receipt confirming delivery of a particular number/gross weight of containers in good condition (or, if not, noting exceptions).

## 3. Food Receipt and Storage

The following procedures apply when receiving or storing food:

a. Inspect the incoming shipment for damage, contamination and pest infestation. Rats, mice or insects may be hiding in the middle of a pallet.

b. Promptly remove damaged pallets and broken containers of food. Separate damaged food containers from other food and store separately for disposal. Take special care in handling flour, cereal, nuts, sugar, chocolate and other such products highly susceptible to contamination.

c. Upon finding that an incoming food shipment has been contaminated, contact the FSA/CS for instructions on the next course of action.

d. Store all food item products at least six inches from the floor and sufficiently far from walls to facilitate pest-control measures. A painted line may guide pallet placement. Wooden pallets may be used to store canned goods and other non-absorbent containers, but not to store dairy products or fresh produce.

e. Store perishables at 35-40 F degrees to prevent spoilage and other bacterial action, and maintain frozen foods at or below zero degrees.

f. Prevent cross-contamination by storing foods requiring washing or cooking separately from those that do not.

g. For rapid cooling, use shallow pans (depth not to exceed four inches). Cover or otherwise shield refrigerated food from contamination.

h. Do not store food in locker rooms, toilet rooms, dressing rooms, garbage rooms or mechanical rooms, or under sewer lines, potentially leaking water lines, open stairwells or other sources of contamination.

## 4. Inventory

Determining inventory levels and properly receiving, storing and issuing goods are critical to controlling costs and maintaining quality. While the FSA shall base inventory levels on facility needs, each facility shall always stock a 15-day food supply at a minimum.

Procedures for checking the quality and quantity of food and other supplies and their distribution to the point of use shall comply with industry-established policies and financial management practices.

Food service inventory represents significant financial resources converted into goods in the form of food, supplies and equipment. All food service personnel must be aware of the value of the inventory and of his/her responsibility for the security of these goods upon receipt.

The master-cycle menus offer guidance to managers planning inventory levels.

Inventory levels shall be established, monitored and periodically adjusted to correct excesses or shortages.

### 5. Stock Rotation

Each facility shall establish a written stock rotation schedule.

### 6. Perpetual Inventory

"Perpetual Inventory" is the process of recording all food service purchases and food distribution. Although details may vary, the information recorded always includes the quantity on hand, quantity received, quantity issued and unit cost for each food and supply item.

Perpetual inventory records are important because they provide the FSA with up-to-date information on product usage, and act as a guide for further purchases.

For accurate accounting of all food and supplies, a perpetual inventory record is insufficient. An official inventory of stores on hand must be conducted annually.

All food service departments shall complete a physical inventory of the warehouse quarterly.

### 7. The Dry Storeroom

Proper care and control of the dry storeroom involves the following:

a. keeping the storeroom dry and cool (45-80 F degrees) to prevent swelling of canned goods and general spoilage;

b. sealing or otherwise making impenetrable all wall, ceiling and floor openings to prevent entry of dirt, water, pests, etc.;

c. vigilant housekeeping to keep the room clean and free from rodents and vermin (a drain for flushing is desirable); and

d. securing the storeroom under lock and key to prevent pilferage—the FSA is responsible for key distribution.

### 8. Refrigerators

Butter, milk, eggs and cream shall be separated from foods having strong odors. Eggs shall not be subjected to freezing temperatures.

Refrigeration units shall be kept under lock and key when not in use. Walk-in boxes shall be equipped with safety locks that require no more than 15 pounds of pressure to open easily from the inside. If latches and locks are incorporated in the door's design and operation, the interior release mechanism must open the door with the same amount of pressure even when locks or bars are in place.

Whether new or used, the inside lever of a hasp-type lock must be able to disengage locking devices and provide egress. The FSA, along with the Safety Manager, shall review the walk-in freezer(s) and refrigerator(s) to ensure that they operate properly.

Ex. 14 to Armstrong Decl.
Page 25 of 85

# Appendix 4.1.A: Authorization for Common Fare Participation

Name of detainee:

_____ A-number: _____

I hereby request authorization to participate in the Common Fare Program. I agree to comply with the program requirements. I understand that if I am observed consuming mainline foods or violating other program requirements, I may be removed from program participation and will not be eligible for immediate reinstatement. Repeated program violations may result in removal from the program for up to one year. I further understand that the same conditions for reinstatement may apply if I voluntarily withdraw from the program for any reason.

I understand that I must have a recorded religious preference in order to be eligible for the program and that I must provide a written reason for requesting to participate in the religious diet program.

Religious preference: _____

Specific reason for wanting to participate in the Common Fare Religious Diet Program:

Signature of detainee:

_____ A-number: _____

Date: _____

Signature of Chaplain:

_____

Date: _____

Record Copy—Detainee Detention File; Copy - Chaplaincy File; Copy—Detainee

Ex. 14 to Armstrong Decl.
Page 26 of 85

# 4.2 Hunger Strikes

## I. Purpose and Scope

This detention standard protects detainees' health and well-being by monitoring, counseling and providing appropriate treatment to any detainee who is on a hunger strike.

Nothing in this detention standard is intended to limit or override the exercise of sound medical judgment by the clinical medical authority (CMA) responsible for a detainee's medical care. Each case must be evaluated on its own merits and specific circumstances, and treatment shall be given in accordance with accepted medical practice.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Any detainee who does not eat for 72 hours shall be referred to the medical department for evaluation and possible treatment by medical and mental health personnel. Prior to 72 hours, staff may refer a detainee for medical evaluation, and when clinically indicated, medical staff may refer the detainee to a hospital;

2. The ICE/ERO Field Office Director shall be immediately notified when a detainee is on a hunger strike, declared or otherwise;

3. The detainee's health shall be carefully monitored and documented, as shall the detainee's intake of foods and liquids. The clinical director, designated physician or treating medical staff shall conduct a full clinical and mental health assessment and evaluation, and recommend a course of treatment, intervention or follow-up;

4. When medically advisable, a detainee on a hunger strike shall be isolated for close supervision, observation and monitoring;

5. Medical, mental health or hospital staff shall offer counseling regarding medical risks and detainees shall be encouraged to end the hunger strike or accept medical treatment;

6. Refusal of medical treatment shall be documented in the detainee's medical file;

7. Involuntary medical treatment shall be administered only with medical, psychiatric and legal safeguards;

8. A record of interactions with the striking detainee, the provision of food, attempted and successfully administered medical treatment, and communications between the CMA, facility administrator and ICE/ERO regarding the striking detainee shall be established; and

9. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone

Ex. 14 to Armstrong Decl.
Page 27 of 85

handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language into which written material has not been translated, or who is illiterate.

## III. Standards Affected

This detention standard replaces "Hunger Strikes" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-52, 4D-15.

National Commission on Correctional Health Care, *Standards for Health Services in Jails (2014)*.

ICE/ERO *Performance-based National Detention Standards 2011:* "4.3 Medical Care."

## V. Expected Practices

### A. Staff Training

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike.

### B. Initial Referral

Procedures for identifying and referring a detainee suspected or announced to be on a hunger strike to medical staff shall include obtaining from qualified medical personnel an assessment of whether the detainee's action is reasoned and deliberate, or the manifestation of a mental illness.

Facilities shall immediately notify the local Field Office Director or his/her designee when an ICE/ERO detainee begins a hunger strike.

1. Staff shall consider any detainee observed to have not eaten for 72 hours to be on a hunger strike, and shall refer him/her to the CMA for evaluation and management.

2. Medical personnel shall document the reasons for placing a detainee in a single occupancy observation room. This decision shall be reviewed every 72 hours. Medical personnel shall monitor the detainee in a single-occupancy observation room, when medically advisable and taking into consideration the detainee's mental health needs. If measuring food and liquid intake/output becomes necessary, medical personnel shall make a decision about appropriate housing placement.

### C. Initial Medical Evaluation and Management

Medical staff shall monitor the health of a detainee on a hunger strike. If a detainee engaging in a hunger strike has been previously diagnosed with a mental condition, or is incapable of giving informed consent due to age or illness, appropriate medical/administrative action shall be taken in the best interest of the detainee.

1. During the initial evaluation of a detainee on a hunger strike, medical staff shall:

   a. measure and record height and weight;

   b. measure and record vital signs;

   c. perform urinalysis;

   d. conduct psychological/psychiatric evaluation;

Ex. 14 to Armstrong Decl.
Page 28 of 85

e.  examine general physical condition; and

f.  if clinically indicated, proceed with other necessary studies.

2.  Medical staff shall measure and record weight and vital signs at least once every 24 hours during the hunger strike and repeat other procedures as medically indicated.

3.  Qualified medical personnel may modify or augment standard treatment protocols when medically indicated.

4.  Medical staff shall record all examination results in the detainee's medical file.

5.  If the detainee refuses the initial medical evaluation or any treatment or other medical procedures, medical staff must attempt to secure the detainee's signature on a "Refusal of Treatment" form. If the detainee will not cooperate by signing, staff shall note this on the "Refusal of Treatment" form.

6.  Any detainee refusing medical treatment shall be monitored by medical staff to evaluate whether the hunger strike poses a risk to the detainee's life or permanent health. See "Section V," "E, Refusal to Accept Treatment" below in this standard.

7.  If medically necessary, the detainee may be transferred to a community hospital or a detention facility appropriately equipped for treatment.

8.  After the hunger strike, medical staff shall continue to provide appropriate medical and mental health follow-up. Only a physician may order a detainee's release from hunger strike treatment and shall document that order in the detainee's medical record. A notation shall be made in the detention file when the detainee has ended the hunger strike.

9.  Records shall be kept of all interactions with the striking detainee, the provision of food, attempted and successfully administered medical treatment, and communications between the CMA, facility administrator, and ICE/ERO regarding the striking detainee.

## D. Food and Liquid Intake and Output

After consultation with the CMA, the facility administrator may require staff to measure and record food and water intake and output as follows:

1.  Record intake and output in the medical record using an IHSC "Hunger Strike Form" or equivalent;

2.  Deliver three meals per day to the detainee's room unless otherwise directed by the CMA— staff shall physically deliver each meal regardless of the detainee's response to an offered meal;

3.  Provide an adequate supply of drinking water or other beverages; and

4.  Remove from the detainee's room all food items not authorized by the CMA. During the hunger strike, the detainee may not purchase commissary/vending machine food.

## E. Refusal to Accept Treatment

An individual has a right to refuse medical treatment. Before involuntary medical treatment is administered, staff shall make reasonable efforts to educate and encourage the detainee to accept treatment voluntarily. Involuntary medical treatment shall be administered in accordance with established guidelines and applicable laws and only after the CMA determines the detainee's life or health is at risk.

1.  Medical staff shall explain to the detainee the medical risks associated with refusal of treatment, and shall document treatment efforts in the detainee's medical record.

2.  The physician may recommend involuntary treatment when clinical assessment and laboratory results indicate the detainee's weakening condition threatens the life or long-term health of

the detainee.

a. The facility administrator shall notify ICE/ERO if a detainee is refusing treatment, and the health services administrator shall notify the respective ICE/ERO Field Office Director in writing of any proposed plan to involuntarily feed the detainee if the hunger strike continues.  Under no circumstances may a facility administer involuntary medical treatment without authorization from ICE/ERO.

b. The Field Office Director, in consultation with the CMA, shall then contact the respective ICE Office of Chief Counsel and the U.S. Attorney's Office with jurisdiction. After discussing the case, the attorneys shall recommend whether or not to pursue a court order. ICE policy is to seek a court order to obtain authorization for involuntary medical treatment. If a court determines that it does not have jurisdiction to issue such an order, or a hospital refuses to administer involuntary sustenance pursuant to a court order, ICE/ERO may consider other action if the hunger strike continues.

1) If a court order is to be pursued, ICE/ERO shall work with the local ICE Office of Chief Counsel to work with the U.S. Attorney's Office to make the arrangements for a court hearing.

3. Medical staff shall:

a. document all treatment efforts and each treatment refusal in the detainee's medical record;

b. continue clinical and laboratory monitoring as necessary until the detainee's life or health is out of danger; and

c. continue medical and mental health follow-up as necessary.

## F. Release from Treatment

Only the physician may order the termination of hunger strike treatment; the order shall be documented in the detainee's medical record.

Ex. 14 to Armstrong Decl.
Page 30 of 85

# 4.3 Medical Care

## I. Purpose and Scope

This detention standard ensures that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment.

   ***Medical facilities within the detention facility shall achieve and maintain current accreditation*** *with the National Commission on Correctional Health Care (NCCHC), and shall maintain compliance with those standards.*

2. The facility shall have a mental health staffing component on call to respond to the needs of the detainee population 24 hours a day, seven days a week.

3. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

   All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

   Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

   Newly-admitted detainees shall be informed orally or in a manner in which the detainee understands about how to access, appeal or communicate concerns about health services.

4. Detainees shall be able to request health services on a daily basis and shall receive timely follow-up.

5. Detainees shall receive continuity of care from

Ex. 14 to Armstrong Decl.
Page 31 of 85

time of admission to time of transfer, release or removal. Detainees, who have received medical care, released from custody or removed shall receive a discharge plan, a summary of medical records, any medically necessary medication and referrals to community-based providers as medically-appropriate.

6. A detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility. A written list of referral sources, including emergency and routine care, shall be maintained and updated annually.

7. A transportation system shall provide timely access to health care services that are not available at the facility. Procedures for use of this transportation system shall include: a) prioritization of medical needs; b) urgency (such as the use of an ambulance instead of standard transportation); c) transfer of medical information and medications; and d) safety and security concerns of all persons.

8. A detainee who requires close, chronic or convalescent medical supervision shall be treated in accordance with a written treatment plan conforming to accepted medical practices for the condition in question, approved by a licensed physician, dentist or mental health practitioner.

9. Twenty-four hour emergency medical and mental health services shall be available to all detainees.

10. Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed.

11. Occupational Safety and Health Administration (OSHA) and applicable state guidelines for managing bio-hazardous waste and decontaminating medical and dental equipment shall be followed.

12. Detainees with chronic conditions shall receive care and treatment, as needed, that includes monitoring of medications, diagnostic testing and chronic care clinics.

13. The facility administrator shall notify ICE/ERO, in writing, of any detainee whose medical or mental health needs require special consideration in such matters as housing, transfer or transportation.

14. Each detainee shall receive a comprehensive medical, dental and mental health intake screening as soon as possible, but no later than 12 hours after arrival at each detention facility. Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake screening process.

15. Each detainee shall receive a comprehensive health assessment, including a physical examination and mental health screening, by a qualified, licensed health care professional no later than 14 days after entering into ICE custody or arrival at facility. For the purposes of the comprehensive medical examination, a qualified licensed health provider includes the following: physicians, physician assistants, nurses, nurse practitioners, or others who by virtue of their education, credentials and experience are permitted by law to evaluate and care for patients.

16. Qualified, licensed health care professionals shall classify each detainee on the basis of medical and mental health needs. Detainees shall be referred for evaluation, diagnosis, treatment and stabilization as medically indicated.

17. At no time shall a pregnant detainee be restrained, absent truly extraordinary circumstances that render restraints absolutely necessary.

18. Detainees experiencing severe, life-threatening intoxication or withdrawal symptoms shall be transferred immediately for either on-site or off-site emergency department evaluation.

19. Pharmaceuticals and non-prescription medicines shall be secured, stored and inventoried.

20. Prescriptions and medications shall be ordered, dispensed and administered in a timely manner and as prescribed by a licensed health care professional. This shall be conducted in a manner that seeks to preserve the privacy and personal health information of detainees.

21. Health care services shall be provided by a sufficient number of appropriately trained and qualified personnel, whose duties are governed by thorough and detailed job descriptions and who are licensed, certified, credentialed and/or registered in compliance with applicable state and federal requirements.

22. Detention and health care personnel shall be trained initially and annually in the proper use of emergency medical equipment and shall respond to health-related emergency situations.

23. Information about each detainee's health status shall be treated as confidential, and health records shall be maintained in accordance with accepted standards separately from other detainee detention files and be accessible only in accordance with written procedures and applicable laws. Health record files on each detainee shall be well organized, available to all practitioners and properly maintained and safeguarded.

24. Informed consent standards shall be observed and adequately documented. Staff shall make reasonable efforts to ensure that detainees understand their medical condition and care.

25. Medical and mental health interviews, screenings, appraisals, examinations, procedures and administration of medication shall be conducted in settings that respect detainees' privacy in accordance with safe and/orderly operations of the facility.

26. A detainee's request to see a health care provider

of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided. When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

27. Detainees in Special Management Units (SMUs) shall have access to the same or equivalent health care services as detainees in the general population, as specified in standard "2.12 Special Management Units."

28. **Adequate space and staffing for the use of services of the ICE Tele-Health Systems, inclusive of tele-radiology (ITSP) and tele-medicine, shall be provided.*

29. All detainees shall receive medical and mental health screenings, interventions and treatments for gender-based abuse and/or violence, including sexual assault and domestic violence.

30. This standard and the implementation of this standard will be subject to internal review and a quality assurance system in order to ensure the standard of care in all facilities is high.

## III. Standards Affected

This detention standard replaces "Medical Care" dated 12/2/2008.

## IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-2A-15, 4C-01 through 4C-31, 4C-34 through 4C-41, 4D-01 through 4D-21, 4D-23 through 4D-28, 2A-45, 7D-25.

American College of Obstetricians and Gynecologists, *Guidelines for Women's Health Care* (3rd edition. 2007); "Special Issues in Women's Health" (2005).

American Public Health Association *Standards for*

*Health Services in Correctional Institutions*, *Health Services for Women*.

Centers for Disease Control and Prevention website, www.cdc.gov (for the most current guidelines and recommendations on tuberculosis case management and control, HIV management, health care acquired infections, infection control, influenza management, respiratory protection, infectious diseases of public health significance, emerging infectious diseases, and correctional health)

United States Department of Health and Human Services, HIV Clinical Guidelines Portal, http://aidsinfo.nih.gov/Guidelines/default.aspx (for the most current national guidelines on HIV Management)

Infectious Diseases Society of America, http://www.idsociety.org/Content.aspx?id=9088 (for the most current infectious diseases practice guidelines prepared or endorsed by the Infectious Diseases Society of America)

National Commission on Correctional Health Care, *Standards for Health Services in Jails* (2014).

Exec. Order 13166.

ICE/ERO *Performance-based National Detention Standards 2011:*

- "1.2 Environmental Health and Safety," particularly in regard to storing, inventorying and handling needles and other sharp instruments; standard precautions to prevent contact with blood and other body fluids; sanitation and cleaning to prevent and control infectious diseases; and disposing of hazardous and infectious waste;

- "2.11 Sexual Abuse and Assault Prevention and Intervention";

- "4.2 Hunger Strikes";

- "4.6 Significant Self-harm and Suicide Prevention and Intervention"; and

- "4.7 Terminal Illness, Advance Directives and Death."

ICE Health Service Corps (IHSC) *Policies and Procedures Manual.*

The Joint Commission.

www.flu.gov

www.aids.gov

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

# V. Expected Practices

## A. General

Every facility shall directly or contractually provide its detainee population with the following:

1. Initial medical, mental health and dental screening;

2. Medically necessary and appropriate medical, dental and mental health care and pharmaceutical services;

3. Comprehensive, routine and preventive health care, as medically indicated;

4. Emergency care;

5. Specialty health care;

6. Timely responses to medical complaints; and

7. Hospitalization as needed within the local community.

8. Staff or professional language services necessary for detainees with limited English proficiency (LEP) during any medical or mental health appointment, sick call, treatment, or consultation.

**\*\*Medical facilities within the detention facility shall achieve and maintain current accreditation with the National Commission on Correctional Health Care (NCCHC), and shall maintain compliance with those standards.**

4.3 | Medical Care                    260                    PBNDS 2011
*(Revised December 2016)*

Ex. 14 to Armstrong Decl.
Page 34 of 85

## B. Designation of Authority

A designated health services administrator (HSA) or the equivalent in non-IHSC staffed detention facilities shall have overall responsibility for health care services pursuant to a written agreement, contract or job description. The HSA is a physician or health care professional and shall be identified to detainees.

The designated clinical medical authority (CMA) at the facility shall have overall responsibility for medical clinical care pursuant to a written agreement, contract or job description. The CMA shall be a medical doctor (MD) or doctor of osteopathy (DO). The CMA may designate a clinically trained professional to have medical decision making authority in the event that the CMA is unavailable.

When the HSA is other than a physician, final clinical judgment shall rest with the facility's designated CMA. In no event shall clinical decisions be made by non-clinicians.

The HSA shall be authorized and responsible for making decisions about the deployment of health resources and the day-to-day operations of the health services program. The CMA together with the HSA establishes the processes and procedures necessary to meet the medical standards outlined herein.

All facilities shall provide medical staff and sufficient support personnel to meet these standards. A staffing plan will be reviewed at least annually  which identifies the positions needed to perform the required services.

Health care personnel perform duties within their scope of practice for which they are credentialed by training, licensure, certification, job descriptions, and/or written standing or direct orders by personnel authorized by law to give such orders.

The facility administrator, in collaboration with the CMA and HSA, negotiates and maintains arrangements with nearby medical facilities or health care providers to provide required health care not available within the facility, as well as identifying custodial officers to transport and remain with detainees for the duration of any off-site treatment or hospital admission.

## C. Communicable Disease and Infection Control

### 1. General

Each facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and reporting to local, state and federal agencies.

Plans shall include:

a. coordination with local public health authorities;

b. ongoing education for staff and detainees;

c. control, treatment and prevention strategies;

d. protection of detainee confidentiality;

e. media relations, in coordination with the local Public Affairs Officer (PAO);

f. procedures for the identification, surveillance, immunization, follow-up and isolation of patients;

g. hand hygiene

h. management of infectious diseases and reporting them to local and/or state health departments in accordance with established guidelines and applicable laws; and

i. management of bio-hazardous waste and decontamination of medical and dental equipment that complies with applicable laws and standard "1.2 Environmental Health and Safety."

Facilities shall comply with current and future plans implemented by federal, state or local authorities addressing specific public health issues including

Ex. 14 to Armstrong Decl.
Page 35 of 85

communicable disease reporting requirements. Infectious and communicable disease control activities shall be reviewed and discussed in the quarterly administrative meetings as described in Section V.DD of this detention standard. Designated medical staff shall report to the IHSC Public Health, Safety, and Preparedness Unit all detainees diagnosed with a communicable disease of public health significance.

## 2. Tuberculosis (TB) Management

As indicated in this standard below in section "J. Medical and Mental Health Screening of New Arrivals," screening for TB is initiated at intake and in accordance with Center for Disease Control and Prevention (CDC) guidelines.

All new arrivals shall receive TB screening within 12 hours of intake and in accordance with CDC guidelines (www.cdc.gov/tb).  For detainees that have been in continuous law enforcement custody, symptom screening plus documented TB screening within one year of arrival may be accepted for intake screening purposes.

Annual or periodic TB testing shall be implemented in accordance with CDC guidelines; annual TB screening method should be appropriately selected with consideration given to the initial screening method conducted or documented during intake.

Detainees with symptoms suggestive of TB, or with suspected or confirmed active TB disease based on clinical and/or laboratory findings, shall be placed in a functional airborne infection isolation room with negative pressure ventilation and be promptly evaluated for TB disease.  Patients with suspected active TB shall remain in airborne infection isolation until determined by a qualified provider to be noncontagious in accordance with CDC guidelines.

For all patients with confirmed and suspected active tuberculosis, designated medical staff shall:

a. Report all cases to local and/or state health departments within one working day of meeting reporting criteria and in accordance with established guidelines and applicable laws, identified by the custodial agency and the detainee's identifying number of that agency (ICE detainees are reported as being in ICE custody and are identified by their alien numbers).

b. Report all detainees with suspected or confirmed TB to the ICE Health Service Corps (IHSC), Public Health, Safety, and Preparedness Unit within one working day of initial identification with suspected or confirmed TB disease.

   Reporting shall include names, aliases, date of birth, alien number, case status/classification, available diagnostic and lab results, treatment status (including drugs and dosages), treatment start date, a summary case report, and a point of contact and telephone number for follow-up.

c. Promptly report any movement of TB patients, including hospitalizations, facility transfers, releases, or removals/deportations to the local and/or state health department and the IHSC Public Health, Safety, and Preparedness Unit.

When treatment is indicated, multi-drug, anti-TB therapy shall be administered using directly observed therapy (DOT) in accordance with American Thoracic Society (ATS) and CDC guidelines. For patients with drug-resistant or multi-drug-resistant TB, the state or local health department shall be consulted to establish a customized treatment regimen and treatment plan. Patients receiving anti-TB therapy shall be provided with a 15 day supply of medications and appropriate education when transferred, released or deported, in an effort to prevent interruptions in treatment until care is continued in another location.

Treatment for latent TB infection (LTBI) shall not be initiated unless active TB disease is ruled out.

Designated medical staff shall coordinate with the IHSC Epidemiology Unit and the local and/or state health department to facilitate an international referral and continuity of therapy. Designated

Ex. 14 to Armstrong Decl.
Page 36 of 85

medical staff shall collaborate with the local and/or state health department on tuberculosis and other communicable diseases of public health significance.

## 3. Significant Communicable Disease

Designated medical staff shall notify the IHSC Public Health, Safety, and Preparedness Unit of any ICE detainee with a significant communicable disease and of any contact or outbreak investigations involving ICE detainees exposed to a significant communicable disease without known immunity. Significant communicable diseases include, but are not limited to, varicella (chicken pox), measles, mumps, pertussis (whooping cough), and typhoid.

## 4. Bloodborne Pathogens

Infection control awareness shall be communicated on a regular basis to correctional and medical staff, as well as detainees. Detainees exposed to potentially infectious body fluids (e.g., through needle sticks or bites) shall be afforded immediate medical assistance, and the incident shall be reported as soon as possible to the clinical director or designee and documented in the medical file.  All detainees shall be assumed to be infectious for bloodborne pathogens, and standard precautions are to be used at all times when caring for all detainees.

Each facility shall establish a written plan to address exposure to bloodborne pathogens; the management of hepatitis A, B, and C; and the management of HIV infection, including reporting.

a.  Hepatitis

   A detainee may request hepatitis testing at any time during detention

b.  HIV
   A detainee may request HIV testing at any time during detention. Persons who must feed, escort, directly supervise, interview or conduct routine office work with HIV patients are not considered at risk of infection. However, persons regularly exposed to blood are at risk. Facilities shall develop a written plan to ensure the highest

degree of confidentiality regarding HIV status and medical condition. Staff training must emphasize the need for confidentiality, and procedures must be in place to limit access to health records to only authorized individuals and only when necessary.

The accurate diagnosis and medical management of HIV infection among detainees shall be promoted. An HIV diagnosis may be made only by a licensed health care provider, based on a medical history, current clinical evaluation of signs and symptoms and laboratory studies.

c.  Clinical Evaluation and Management
   Medical personnel shall provide all detainees diagnosed with HIV/AIDS medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services, the CDC, and the Infectious Diseases Society of America.  Medical and pharmacy personnel shall ensure that all Food and Drug Administration (FDA) medications currently approved for the treatment of HIV/AIDS are accessible. Medical and pharmacy personnel shall develop and implement distribution procedures to ensure timely and confidential access to medications.

Many of these guidelines are available through the following links:
http://aidsinfo.nih.gov/Guidelines/default.aspx
http://www.cdc.gov/hiv/resources/guidelines/index.htm#treatment
http://www.idsociety.org/Content.aspx?id=9088

Medical and pharmacy personnel shall ensure the facility maintains access to adequate supplies of FDA-approved medications for the treatment of HIV/AIDS to ensure newly admitted detainees shall be able to continue with their treatments without interruption. Upon release, detainees currently receiving highly active antiretroviral therapy and other drugs shall receive up to a 30-

Ex. 14 to Armstrong Decl.
Page 37 of 85

day supply of their medications as medically appropriate.

When current symptoms are suggestive of HIV infection, the following procedures shall be implemented.

1) Clinical evaluation shall determine the medical need for isolation.

    Detainees with HIV shall not be separated from the general population, either pending a test result or after a test report, unless clinical evaluation reveals a medical need for isolation. Segregation of HIV-positive detainees is not necessary for public health purposes.

2) Following a clinical evaluation, if a detainee manifests symptoms requiring treatment beyond the facility's capability, the provider shall recommend the detainee's transfer to a local hospital or other appropriate facility for further medical testing, final diagnosis and acute treatment as needed, consistent with local operating procedures.

3) Any detainee with active tuberculosis shall also be evaluated for possible HIV infection.

4) New HIV-positive diagnoses must be reported to government bodies according to state and local laws and requirements; the HSA is responsible for ensuring that all applicable state requirements are met.

    The "Standard Precautions" section of standard "1.2 Environmental Health and Safety" provides more detailed information.

## D. Notifying Detainees about Health Care Services

In accordance with standard "6.1 Detainee Handbook," the facility shall provide each detainee, upon admittance, a copy of the detainee handbook and local supplement, in which procedures for access to health care services are explained.

Health care practitioners should explain any rules about mandatory reporting and other limits to confidentiality in their interactions with detainees. Informed consent shall be obtained prior to providing treatment (absent medical emergencies). Consent forms and refusals shall be documented and placed in the detainee's medical file.

In accordance with the section on Orientation in standard "2.1 Admission and Release," access to health care services, the sick call and medical grievance processes shall be included in the orientation curriculum for newly admitted detainees.

## E. Translation and Language Access for Detainees with Limited English Proficiency

Facilities shall provide appropriate interpretation and language services for LEP detainees related to medical and mental health care. Where appropriate staff interpretation is not available, facilities will make use of professional interpretation services. Detainees shall not be used for interpretation services during any medical or mental health service. Interpretation and translation services by other detainees shall only be provided in an emergency medical situation.

Facilities shall post signs in medical intake areas in English, Spanish, and languages spoken by other significant segments of the facility's detainee population listing what language assistance is available during any medical or mental health treatment, diagnostic test, or evaluation.

## F. Facilities

### 1. Examination and Treatment Area

Adequate space and equipment shall be furnished in all facilities so that all detainees may be provided basic health examinations and treatment in private while ensuring safety.

A holding/waiting area shall be located in the medical facility under the direct supervision of custodial officers. A detainee toilet and drinking

Ex. 14 to Armstrong Decl.
Page 38 of 85

fountain shall be accessible from the holding/waiting area.

### 2. Medical Records

Medical records shall be kept separate from detainee detention records and stored in a securely locked area within the medical unit.

### 3. Medical Housing

If there is a specific area, separate from other housing areas, where detainees are admitted for health observation and care under the supervision and direction of health care personnel, consideration shall be given to the detainee's age, gender, medical requirements and custody classification and the following minimum standards shall be met:

a. Care

   1) Physician at the facility or on call 24 hours per day;

   2) Qualified health care personnel on duty 24 hours per day when patients are present;

   3) Staff members within sight or sound of all patients;

   4) Maintenance of a separate medical housing record distinct from the complete medical record; and

   5) Compliance with all established guidelines and applicable laws.

   Detainees in medical housing shall have access to other services such as telephone, legal access and materials, consistent with their medical conditions.

   Prior to placing a detainee with a mental illness in medical housing, a determination shall be made by a medical or mental health professional that placement in medical housing is medically necessary.

b. Wash Basins, Bathing Facilities and Toilets

   1) Detainees shall have access to operable washbasins with hot and cold running water at a minimum ratio of 1 for every 12 detainees, unless state or local building codes specify a different ratio.

   2) Sufficient bathing facilities shall be provided to allow detainees to bathe daily, and sufficient bathing facilities shall be physically accessible for detainees with disabilities, as required by the applicable accessibility standard. Water shall be thermostatically controlled to temperatures ranging from 100 F to 120 F degrees.

   3) Detainees shall have access to operable toilets and hand-washing facilities 24 hours per day and shall be permitted to use toilet facilities without staff assistance. Unless state or local building or health codes specify otherwise:

      a) toilets shall be provided at a minimum ratio of 1 to every 12 detainees in male facilities and 1 for every 8 in female facilities, and

      b) all housing units with three or more detainees shall have a minimum of two toilets.

## G. Pharmaceutical Management

Each detention facility shall have and comply with written policy and procedures for the management of pharmaceuticals, to include:

1. a formulary of all prescription and nonprescription medicines stocked or routinely procured from outside sources;

2. identification of a method for promptly approving and obtaining medicines not on the formulary;

3. prescription practices, including requirements that medications are prescribed only when clinically indicated, and that prescriptions are reviewed before being renewed;

4. procurement, receipt, distribution, storage, dispensing, administration and disposal of

Ex. 14 to Armstrong Decl.
Page 39 of 85

medications;

5. secure storage and disposal and perpetual inventory of all controlled substances (DEA Schedule II-V), syringes, and needles;

6. medicine administration error reports to be kept for all administration errors;

7. all staff responsible for administering or having access to pharmaceuticals to be trained on medication management before beginning duty;

8. all pharmaceuticals to be stored in a secure area with the following features:

    a. a secure perimeter;

    b. access limited to authorized medical staff (never detainees);

    c. solid walls from floor to ceiling and a solid ceiling;

    d. a solid core entrance door with a high security lock (with no other access); and

    e. a secure medication storage area;

9. administration and management in accordance with state and federal law;

10. supervision by properly licensed personnel;

11. administration of medications by properly licensed, credentialed, trained personnel under the supervision of the health services administrator (HSA), clinical medical authority (CMA), both; and

12. documentation of accountability for administering or distributing medications in a timely manner, and according to licensed provider orders.

## H. Nonprescription Medications

The facility administrator and HSA shall jointly approve any nonprescription medications that are available to detainees outside of health services (e.g., sold in commissary, distributed by housing officers, etc.), and shall jointly review the list, on an annual basis at a minimum.

## I. Medical Personnel

All health care staff must be verifiably licensed, certified, credentialed, and/or registered in compliance with applicable state and federal requirements. Copies of the documents must be maintained on site and readily available for review. A restricted license does not meet this requirement.

## J. Medical and Mental Health Screening of New Arrivals

As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions. Any detainee responding in the affirmative shall be sent for evaluation to a qualified, licensed health care provider as quickly as possible, but in no later than two working days.  Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake screening process. For intrasystem transfers, a qualified health care professional will review each incoming detainee's health record or health summary within 12 hours of arrival, to ensure continuity of care.

For LEP individuals, interpretation for the screening will be conducted by facility staff with appropriate language capabilities or through professional interpretation services, as described in Section E of this standard ("Translation and Language Access for Detainees with Limited English Proficiency").

If screening is performed by a detention officer, the facility shall maintain documentation of the officer's special training, and the officer shall have available for reference the training syllabus, to include education on patient confidentiality of disclosed information.

The screening shall inquire into the following:

1. any past history of serious infectious or communicable illness, and any treatment or symptoms;

2. history of physical and mental illness;

3. pain assessment;

4. current and past medication;

5. allergies;

6. past surgical procedures;

7. symptoms of active TB or previous TB treatment;

8. dental care history;

9. use of alcohol, tobacco and other drugs, including an assessment for risk of potential withdrawal;

10. possibility of pregnancy;

11. other relevant health problems identified by the CMA responsible for screening inquiry;

12. observation of behavior, including state of consciousness, mental status, appearance, conduct, tremor, sweating;

13. history of suicide attempts or current suicidal/homicidal ideation or intent;

14. observation of body deformities and other physical abnormalities;

15. inquire into a transgender detainee's gender self-identification and history of transition-related care, when a detainee self-identifies as transgender;

16. past hospitalizations;

17. chronic illness (including, but not limited to, hypertension and diabetes);

18. dietary needs; and

19. any history of physical or sexual victimization or perpetrated sexual abuse, and when the incident occurred.

Where there is a clinically significant finding as a result of the initial screening, an immediate referral shall be initiated and the detainee shall receive a health assessment no later than two working days from the initial screening.

For further information and guidance, see standard "2.1 Admission and Release."

Initial screenings shall be conducted in settings that respect detainees' privacy and include observation and interview questions related to the detainee's potential suicide risk and mental health. For further information, see standard "4.6 Significant Self-harm and Suicide Prevention and Intervention."

If, at any time during the screening process, there is an indication of need of, or a request for, mental health services, the HSA must be notified within 24 hours. The CMA, HSA or other qualified licensed health care provider shall ensure a full mental health evaluation, if indicated. Mental health evaluations must be conducted within the timeframes prescribed in "O. Mental Health Program" of this standard.

All facilities shall have policies and procedures in place to ensure documentation of the initial health screening and assessment.

The health intake screening shall be conducted using the IHSC Intake Screening Form (IHSC 795A) or equivalent and shall be completed prior to the detainee's placement in a housing unit.  The Intake Screening Form attached as Appendix 4.3.A mirrors form IHSC 795A and may be used by facilities to ensure compliance with screening requirements in these standards.

Upon completion of the In-Processing Health Screening form, the detention officer shall immediately notify medical staff when one or more positive responses are documented. Medical staff will then assess priority for treatment (e.g. urgent, today or routine).

Limited-English proficient detainees and detainees who are hearing impaired shall be provided

Ex. 14 to Armstrong Decl.
Page 41 of 85

interpretation or translation services or other assistance as needed for medical care activities.

Language assistance may be provided by another medical staff member competent in the language or by a professional service, such as a telephone interpretation service.

## K. Substance Dependence and Detoxification

All detainees shall be evaluated through an initial screening for use of and/or dependence on mood- and mind-altering substances, alcohol, opiates, hypnotics, sedatives, etc. Detainees who report the use of such substances shall be evaluated for their degree of reliance on and potential for withdrawal from the substance.

The CMA shall establish guidelines for evaluation and treatment of new arrivals who require detoxification.

Detainees experiencing severe or life-threatening intoxication or withdrawal shall be transferred immediately to an emergency department for evaluation.

Once evaluated, the detainee will be referred to an appropriate facility qualified to provide treatment and monitoring for withdrawal, or treated on-site if the facility is staffed with qualified personnel and equipment to provide appropriate care.

## L. Privacy and Chaperones

1. Medical Privacy

Medical and mental health interviews, screenings, appraisals, examinations, procedures, and administration of medication shall be conducted in settings that respect detainees' privacy.

2. Same-Gender Providers and Chaperones

A detainee's request to see a health care provider of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided.

When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

A same-gender chaperone shall be provided, even in the absence of a request by the detainee, when a medical encounter involves a physical examination of sensitive body parts, to include breast, genital, or rectal examinations, by a provider of the opposite gender.

Only medical personnel may serve as chaperones during medical encounters and examinations.

## M. Comprehensive Health Assessment

Each facility's health care provider shall conduct a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within 14 days of the detainee's arrival unless more immediate attention is required due to an acute or identifiable chronic condition. Physical examinations shall be performed by a physician, physician assistant, nurse practitioner, RN (with documented training provided by a physician) or other health care practitioner as permitted by law.

Facility medical personnel are encouraged to use the form "Physical Examination/Health Appraisal" attached as Appendix 4.3.B when conducting the comprehensive health assessment.

If documentation exists of such a health assessment within the previous 90 days, the facility health care provider upon review may determine that a new appraisal is not required.

The CMA shall be responsible for review of all comprehensive health assessments to assess the priority for treatment.

Detainees diagnosed with a communicable disease shall be isolated according to national standards of medical practice and procedures.

## N. Medical/Psychiatric Alerts and Holds

Where a detainee has a serious medical or mental

Ex. 14 to Armstrong Decl.
Page 42 of 85

health condition or otherwise requires special or close medical care, medical staff shall complete a Medical/Psychiatric Alert form (IHSC-834) or equivalent, and file the form in the detainee's medical record.  Where medical staff furthermore determine the condition to be serious enough to require medical clearance of the detainee prior to transfer or removal, medical staff shall also place a medical hold on the detainee using the Medical/Psychiatric Alert form (IHSC-834) or equivalent, which serves to prevent ICE from transferring or removing the detainee without the prior clearance of medical staff at the facility.  The facility administrator shall receive notice of all medical/psychiatric alerts or holds, and shall be responsible for notifying ICE/ERO of any medical alerts or holds placed on a detainee that is to be transferred.

Potential health conditions meriting the completion of a Medical/Psychiatric Alert form may include, but are not limited to:

1. medical conditions requiring ongoing therapy, such as:

    a. active TB

    b. infectious diseases

    c. chronic conditions

2. mental health conditions requiring ongoing therapy, such as:

    a. suicidal behavior or tendencies

3. ongoing physical therapy

4. pregnancy

## O. Mental Health Program

### 1. Mental Health Services Required

Each facility shall have an in-house or contractual mental health program, approved by the appropriate medical authority that provides:

a. intake screening Form IHSC 795A (or equivalent)

for mental health concerns;

b. referral as needed for evaluation, diagnosis, treatment and monitoring of mental illness by a competent mental health professional.

c. crisis intervention and management of acute mental health episodes;

d. transfer to licensed mental health facilities of detainees whose mental health needs exceed the capabilities of the facility; and

e. a suicide prevention program.

### 2. Mental Health Provider

The term "mental health provider" includes psychiatrists, physicians, psychologists, clinical social workers and other appropriately licensed independent mental health practitioners

### 3. Mental Health Evaluation

Based on intake screening, the comprehensive health assessment, medical documentation, or subsequent observations by detention staff or medical personnel, any detainee referred for mental health treatment shall receive an evaluation by a qualified health care provider no later than 72 hours after the referral, or sooner if necessary.  If the practitioner is not a mental health provider and further referral is necessary, the detainee will be evaluated by a mental health provider within the next business day.

Such evaluation and screenings shall include:

a. reason for referral;

b. history of any mental health treatment or evaluation;

c. history of illicit drug/alcohol use or abuse or treatment for such;

d. history of suicide attempts;

e. current suicidal/homicidal ideation or intent;

f. current use of any medication;

g. estimate of current intellectual function;

h. mental health screening, to include prior history physical, sexual or emotional abuse;

i. impact of any pertinent physical condition, such as head trauma;

j. recommend actions for any appropriate treatment, including but not limited to the following:

   1) remain in general population with psychotropic medication and counseling,

   2) "short-stay" unit or infirmary,

   3) Special Management Unit, or

   4) community hospitalization; and

k. recommending and/or implementing a treatment plan, including recommendations concerning transfer, housing, voluntary work and other program participation.

## 4. Referrals and Treatment

Any detainee referred for mental health treatment shall receive an evaluation by a qualified health care provider no later than 72 hours after the referral, or sooner if necessary. If the practitioner is not a mental health provider and further referral is necessary, the detainee will be evaluated by a mental health provider within the next business day.

The provider shall develop an overall treatment/management plan.

If the detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility, a referral for an outside mental health facility may be initiated.

Any detainee prescribed psychiatric medications must be regularly evaluated by a duly-licensed and appropriate medical professional, at least once a month, to ensure proper treatment and dosage;

## 5. Medical Isolation

The CMA may authorize medical isolation for a detainee who is at high risk for violent behavior because of a mental health condition. The CMA shall be responsible for the daily reassessment of the need for continued medical isolation to ensure the health and safety of the detainee.

Medical isolation shall not be used as a punitive measure.

## 6. Involuntary Administration of Psychotropic Medication

Involuntary administration of psychotropic medication to detainees shall comply with established guidelines and applicable laws, and shall be performed only pursuant to the specific, written and detailed authorization of a physician. Absent declared medical emergency, before psychotropic medication is involuntarily administered, it is required that the HSA contact ERO management, who shall then contact respective ICE Office of Chief Counsel to facilitate a request for a court order to involuntarily medicate the detainee.

Prior to involuntarily administering psychotropic medication, absent a declared medical emergency, the authorizing physician shall:

a. review the medical record of the detainee and conduct a medical examination;

b. specify the reasons for and duration of therapy, and whether the detainee has been asked if he/she would consent to such medication;

c. specify the medication to be administered, the dosage and the possible side effects of the medication;

d. document that less restrictive intervention options have been exercised without success;

e. detail how medication is to be administered;

f. monitor the detainee for adverse reactions and side effects; and

g. prepare treatment plans for less restrictive alternatives as soon as possible.

Also see section "Z: Informed Consent and

Involuntary Treatment" later in this detention standard.

## P. Referrals for Sexual Abuse Victims or Abusers

If any security or medical intake screening or classification assessment indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical or mental health practitioner for medical and/or mental health follow-up as appropriate.

When a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment. When a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

For the purposes of this section, a "qualified medical practitioner" or "qualified mental health practitioner" means a health or mental health professional, respectively, who in addition to being qualified to evaluate and care for patients within the scope of his/her professional practice, has successfully completed specialized training for treating sexual abuse victims.

## Q. Annual Health Examinations

Any detainee in ICE custody for more than one year continuously shall receive health examinations on an annual basis. Such examinations may occur more frequently for certain individuals, depending on their medical history and/or health conditions. Detainees shall have access to age- and gender-appropriate exams annually, including re-screening for TB.

## R. Dental Treatment

An initial dental screening shall be performed within 14 days of the detainee's arrival. The initial dental screening may be performed by a dentist or a properly trained qualified health provider.

1. Emergency dental treatment shall be provided for immediate relief of pain, trauma and acute oral infection.

2. Routine dental treatment may be provided to detainees in ICE custody for whom dental treatment is inaccessible for prolonged periods because of detention for over six months, including amalgam and composite restorations, prophylaxis, root canals, extractions, x-rays, the repair and adjustment of prosthetic appliances and other procedures required to maintain the detainee's health. Dental exams and treatment shall be performed only by licensed dental personnel.

## S. Sick Call

Each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services (including mental health and dental services) provided by a physician or other qualified medical staff in a clinical setting. This procedure shall include:

1. clearly written policies and procedures;

2. sick call process shall be communicated in writing and verbally to detainees during their orientation;

3. regularly scheduled "sick call" times shall be established and communicated to detainees;

4. an established procedure shall be in place at all facilities to ensure that all sick call requests are received and triaged by appropriate medical personnel within 24 hours after a detainee submits the request. All written sick call requests shall be date and time stamped and filed in the detainee's medical record. Medical personnel shall review the request slips and determine when the detainee shall be seen based on acuity of the problem. In an urgent situation, the housing unit officer shall notify medical personnel immediately.

If the procedure requires a written request slip, such

Ex. 14 to Armstrong Decl.
Page 45 of 85

slips shall be provided in English and the most common languages spoken by the detainee population of that facility. Limited-English proficient detainees and detainees who are hearing impaired shall be provided interpretation/translation services or other assistance as needed to complete a request slip.

All detainees, including those in SMUs, regardless of classification, shall have access to sick call. See standard "2.12 Special Management Units" for details.

All facilities shall maintain a permanent record of all sick call requests.

## T. Emergency Medical Services and First Aid

1. Each facility shall have a written emergency services plan for delivery of 24-hour emergency health care. This plan shall be prepared in consultation with the facility's CMA or the HSA, and must include the following:

   a. an on-call physician, dentist and mental health professional, or designee, that are available 24 hours per day;

   b. a list of telephone numbers for local ambulances and hospital services available to all staff;

   c. an automatic external defibrillator (AED) shall be maintained for use at each facility and accessible to staff;

   d. all detention and medical staff shall receive cardio pulmonary resuscitation (CPR, AED), and emergency first aid training annually;

   e. detention and health care personnel shall be trained annually to respond to health-related situations within four minutes; and

   f. security procedures that ensure the immediate transfer of detainees for emergency medical care.

2. The health services administrator ensures that medical staff have training and competency in implementing the facility's emergency health care plan appropriate for each staff's scope of practice or position.  The facility administrator ensures that non-medical staff  have appropriate training and competency in implementing the facility's emergency plan appropriate for each staff's position.  Training and competency assessment shall include the following areas::

   a. recognizing of signs of potential health emergencies and the required responses;

   b. administering first aid, AED and cardiopulmonary resuscitation (CPR);

   c. obtaining emergency medical assistance through the facility plan and its required procedures;

   d. recognizing signs and symptoms of mental illness and suicide risk; and

   e. the facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services, including by ambulance when indicated. The plan must provide for expedited entrance to and exit from the facility.

3. When a non-medical employee is unsure whether emergency care is required, he/she shall immediately notify medical personnel to make the determination.

4. Medical and safety equipment shall be available and maintained, and staff shall be trained in proper use of the equipment.

5. The facility administrator, in consultation with the designee for environmental health and safety, determines the number, contents, and placement of first aid kits, and establishes protocols for monthly inspections of first aid kits.

6. Victims of sexual abuse shall have timely access to emergency medical treatment and crisis intervention services in accordance with standard "2.11 Sexual Abuse and Assault, Prevention and Intervention."

## U. Delivery of Medication

Distribution of medication (including over the counter) shall be performed in accordance with specific instructions and procedures established by the HSA in consultation with the CMA. Written records of all prescribed medication given to or refused by detainees shall be maintained.

1. If prescribed medication must be delivered at a time when medical staff is not on duty, the medication may be distributed by detention officers, where it is permitted by state law to do so, who have received proper training by the HSA or designee.

2. The facility shall maintain documentation of the training given any officer required to distribute medication, and the officer shall have available for reference the training syllabus or other guide or protocol provided by the health authority.

3. Detainees may not deliver or administer medications to other detainees.

4. All prescribed medications and medically necessary treatments shall be provided to detainees on schedule and without interruption, absent exigent circumstances.

5. Detainees who arrive at a detention facility with prescribed medications or who report being on such medications, shall be evaluated by a qualified health care professional as soon as possible, but not later than 24 hours after arrival, and provisions shall be made to secure medically necessary medications.

6. Detainees shall not be charged for any medical services to include pharmaceuticals dispensed by medical personnel

## V. Health Education and Wellness Information

Qualified health care personnel shall provide detainees health education and wellness information on topics including, but not limited to, the following:

1. dangers of self-medication;

2. personal and hand hygiene and dental care;

3. prevention of communicable diseases;

4. smoking cessation;

5. self-care for chronic conditions; and

6. benefits of physical fitness.

## W. Special Needs and Close Medical Supervision

Consistent with Standard 4.8 "Disability Identification, Assessment, and Accommodation" and the IHSC Detainee Covered Services Package, detainees will be provided medical prosthetic devices or other impairment aids, such as eyeglasses, hearing aids, or wheelchairs.

When a detainee requires close medical supervision, including chronic and convalescent care, a written treatment plan, including access to health care and other care and supervision personnel, shall be developed and approved by the appropriate qualified licensed health care provider, in consultation with the patient, with periodic review. Likewise, staff responsible for such matters as housing and program assignments and disciplinary measures shall consult with the responsible qualified licensed health care provider or health services administrator.

Exercise areas shall be available to meet exercise and physical therapy requirements of individual detainee treatment plans.

Transgender detainees who were already receiving hormone therapy when taken into ICE custody shall have continued access. All transgender detainees shall

Ex. 14 to Armstrong Decl.
Page 47 of 85

have access to mental health care, and other transgender-related health care and medication based on medical need. Treatment shall follow accepted guidelines regarding medically necessary transition-related care.

For special needs related to female detainees, see standard "4.4 Medical Care (Women).

## X. Notifications of Detainees with Serious Illnesses and Other Specified Conditions

The facility administrator and clinical medical authority shall ensure that the Field Office Director is notified as soon as practicable of any detainee housed at the facility who is determined to have a serious physical or mental illness or to be pregnant, or have medical complications related to advanced age, but no later than 72 hours after such determination.  The written notification shall become part of the detainee's health record file.

### 1. Serious Physical Illness

For purposes of this subsection only, the following non-exhaustive categories of medical conditions may be considered to constitute serious physical illness –

- any terminal illness;
- active cancer, including but not limited to aliens undergoing chemotherapy;
- Acquired Immuno- Deficiency Syndrome (AIDS) or diagnosed HIV-positive conditions requiring medication;
- multi-drug-resistant (MDR) or extensively drug-resistant (XDR) tuberculosis disease;
- any condition that requires dialysis;
- any condition that requires tube-feedings, mechanical ventilation, an implanted cardiac device, or an oxygen tank;

- any chronic deteriorating condition requiring multiple medications, to include progressive immune-suppressive conditions;
- any active condition that has caused repeated loss of consciousness;
- any condition that requires an imminent medical procedure or other medical intervention to prevent deterioration;
- any condition or infirmity that requires continuous or near-continuous medical care, such as those who are bedbound or incapable of caring for themselves; or any ongoing or recurrent conditions that have required a recent or prolonged hospitalization, typically for greater than 14 days, or a recent and prolonged stay in the medical clinic of a detention or correctional facility, typically for greater than 30 days;
- conditions requiring frequent care that is beyond the medical capabilities of detention facilities where the alien may be housed;
- any condition that would preclude the alien from being housed, typically for greater than 30 days, in a non-restrictive setting (such as a general population housing unit, as opposed to a special management unit or a medical clinic); or
- any other physical illness determined to be serious by facility medical personnel or by IHSC.

### 2. Serious Mental Illness

For the purposes of this section, the following non-exhaustive categories of conditions should be considered to constitute a serious mental illness:

Ex. 14 to Armstrong Decl.
Page 48 of 85

(a) conditions that a qualified medical provider has determined to meet the criteria for a "serious mental disorder or condition" **pursuant to applicable ICE policies**, including:

- a mental disorder that is causing serious limitations in communication, memory, or general mental and/or intellectual functioning (e.g. communicating, conducting activities of daily life, social skills); or a severe medical condition(s) (e.g. traumatic brain injury or dementia) that is significantly impairing mental function; or

- one or more of the following active psychiatric symptoms and/or behavior: severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety of impulsivity.

- significant symptoms of one of the following:

  - Psychosis or Psychotic Disorder;

  - Bipolar Disorder;

  - Schizophrenia or Schizoaffective Disorder;

  - Major Depressive Disorder with Psychotic Features;

  - Dementia and/or a Neurocognitive Disorder; or

  - Intellectual Development Disorder (moderate, severe, or profound).

b) any ongoing or recurrent conditions that have required a recent or prolonged hospitalization, typically for greater than 14 days, or a recent and prolonged stay in the medical clinic of a detention or correctional facility, typically for greater than 30 days;

c) any condition that would preclude the alien from being housed, typically for greater than 30 days, in a non-restrictive setting (such as a general population housing unit, as opposed to a special management unit or a medical clinic);

d) any other mental illness determined to be serious by IHSC.

### 3. Pregnancy

The notification requirement in this section applies to all women who have been medically certified as pregnant, regardless of the stage of the pregnancy.

## Y. Restraints

Restraints for medical or mental health purposes may be authorized only by the facility's CMA or designee, after determining that less restrictive measures are not appropriate. In the absence of the CMA, qualified medical personnel may apply restraints upon declaring a medical emergency. Within one-hour of initiation of emergency restraints or seclusion, qualified medical staff shall notify and obtain an order from the CMA or designee.

a. The facility shall have written procedures that specify:

1) the conditions under which restraints may be applied;

2) the types of restraints to be used;

3) the proper use, application and medical monitoring of restraints;

4) requirements for documentation, including efforts to use less restrictive alternatives; and

5) after-incident review.

The use of restraints requires documented approval and guidance from the CMA. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's A-file, detention

Ex. 14 to Armstrong Decl.
Page 49 of 85

and medical file.

## Z. Continuity of Care

The facility HSA must ensure that a plan is developed that provides for continuity of medical care in the event of a change in detention placement or status.

The detainee's medical needs shall be taken into account prior to any transfer of the detainee to another facility. Alternatives to transfer shall be considered, taking into account the disruption that a transfer will cause to a detainee receiving medical care. Upon transfer to another facility, the medical provider shall prepare and provide a Medical Transfer Summary as required by "C. Responsibilities of the Health Care Provider at the Sending Facility," found in Standard 7.4 "Detainee Transfers." In addition, the medical provider shall ensure that at least 7 day (or, in the case of TB medications, 15 day and in the case of HIV/AIDS medications, 30 day) supply of medication shall accompany the detainee as ordered by the prescribing authority.

Upon removal or release from ICE custody, the detainee shall receive up to a 30 day supply of medication as ordered by the prescribing authority and a detailed medical care summary as described in "BB. Medical Records" of this standard. If a detainee is on prescribed narcotics, the clinical health authority shall make a determination regarding continuation, based on assessment of the detainee. The HSA must ensure that a continuity of treatment care plan is developed and a written copy provided to the detainee prior to removal.

## AA. Informed Consent and Involuntary Treatment

Involuntary treatment is a decision made only by medical staff under strict legal restrictions. When a detainee refuses medical treatment, and the licensed healthcare provider determines that a medical emergency exists, the physician may authorize involuntary medical treatment. Prior to any contemplated action involving non-emergent

involuntary medical treatment, respective ICE Office of Chief Counsel shall be consulted.

1. Upon admission at the facility, documented informed consent shall be obtained for the provision of health care services.

2. All examinations, treatments, and procedures are governed by informed consent practices applicable in the jurisdiction.

3. A separate documented informed consent is required for invasive procedures, including surgeries, invasive diagnostic tests, and dental extractions.

4. Prior to the administration of psychotropic medications, a separate documented informed consent, that includes a description of the medication's side effects, shall be obtained.

5. If a consent form is not available in a language the detainee understands, professional interpretation services will be provided as described in Section E ("Translation and Language Access for Detainees with Limited English Proficiency") and documented on the form.

6. If a detainee refuses treatment and the CMA or designee determines that treatment is necessary, ICE/ERO shall be consulted in determining whether involuntary treatment shall be pursued.

7. If the detainee refuses to consent to treatment, medical staff shall make reasonable efforts to explain to the detainee the necessity for and propriety of the recommended treatment.

8. Medical staff shall ensure that the detainee's questions regarding the treatment are answered by appropriate medical personnel.

9. Medical staff shall explain the medical risks if treatment is declined and shall document their treatment efforts and refusal of treatment in the detainee's medical record. Detainees will be asked to sign a translated form that indicates that they have refused treatment.

Ex. 14 to Armstrong Decl.
Page 50 of 85

10. The clinical medical authority and facility administrator shall look into refusals of treatment to ensure that such refusals are not the result of miscommunication or misunderstanding.

11. Facilities should make efforts to involve trusted individuals such as clergy or family members should a detainee refuse treatment.

12. A detainee who refuses examination or treatment may be segregated from the general population when such segregation is determined medically necessary by the CMA. Segregation shall only be for medical reasons that are documented in the medical record, and may not be used for punitive purposes. Such segregation shall only occur after a determination by a component mental health professional has taken place that shows the segregation shall not adversely affect the detainee's mental health.

13. In the event of a hunger strike, see standard "4.2 Hunger Strikes."

Standard "4.7 Terminal Illness, Advance Directives and Death" provides details regarding living wills and advance directives, organ donations and do not resuscitate (DNR) orders.

## BB. Medical Records

### 1. Health Record File

The HSA shall maintain a complete health record on each detainee that is:

a. Organized uniformly in accordance with appropriate accrediting body standards;

b. Available to all practitioners and used by them for health care documentation; and

c. Properly maintained and safeguarded in a securely locked area within the medical unit.

### 2. Confidentiality and Release of Medical Records

All medical providers, as well as detention officers and staff shall protect the privacy of detainees' medical information in accordance with established guidelines and applicable laws. These protections apply, not only to records maintained on paper, but also to electronic records where they are used. Staff training must emphasize the need for confidentiality and procedures must be in place to limit access to health records to only authorized individuals and only when necessary.

Information about a detainee's health status and a detainee's health record is confidential, and the active medical record shall be maintained separately from other detention records and be accessible in accordance with applicable laws and regulations.

The HSA shall provide the facility administrator and designated staff information that is necessary as follows:

a. to preserve the health and safety of the detainee, other detainees, staff or any other person;

b. for administrative and detention decisions such as housing, voluntary work assignments, security and transport; or

c. for management purposes such as audits and inspections.

When information is covered by the Privacy Act, specific legal restrictions govern the release of medical information or records.

Detainees who indicate they wish to obtain copies of their medical records shall be provided with the appropriate request form. ICE/ERO, or the facility administrator, shall provide limited-English proficient detainees and detainees who are hearing impaired with interpretation or translation services or other assistance as needed to make the written request, and shall assist in transmitting the request to the facility HSA.

Upon his/her request, while in detention, a detainee or his/her designated representative shall receive information from their medical records. Copies of health records shall be released by the HSA directly to a detainee or their designee, at no cost to the detainee, within a reasonable timeframe after receipt

Ex. 14 to Armstrong Decl.
Page 51 of 85

by the HSA of a written authorization from the detainee.

A written request may serve as authorization for the release of health information, as long as it includes the following information, and meets any other requirements of the HSA:

a. address of the facility to release the information;

b. name of the individual or institution to receive the information;

c. detainee's full name, A-number (or other facility identification number), date of birth and nationality;

d. specific information to be released with inclusive dates of treatment; and

e. detainee's signature and date.

Following the release of health information, the written authorization shall be retained in the health record.

Detainees are to be informed that if they are released or removed from custody prior to laboratory results being evaluated, the results shall be made available by contacting the detention facility and providing a release of information consent.

### 3. Inactive Health Record Files

Inactive health record files shall be retained as permanent records in compliance with locally established procedures and the legal requirements of the jurisdiction.

### 4. Transfer and Release of Detainees

ICE/ERO and the HSA shall be notified when detainees are to be transferred or released. Detainees shall be transferred, released or removed, with proper medication to ensure continuity of care throughout the transfer and subsequent intake process, release or removal (see "W. Continuity of Care," above). Those detainees who are currently placed in a medical hold status must be evaluated and cleared by a licensed independent practitioner

(LIP) prior to transfer or removal. In addition, the CMA or designee must inform the facility administrator in writing if the detainee's medical or psychiatric condition requires a medical escort during removal or transfer.

a. Notification of Medical/Psychiatric Alerts or Holds
Upon receiving notification that a detainee is to be transferred, appropriate medical staff at the sending facility shall notify the facility administrator of any medical/psychiatric alerts or holds that have been assigned to the detainee, as reflected in the detainee's medical records. The facility administrator shall be responsible for providing notice to ICE/ERO of any medical alerts or holds placed on a detainee that is to be transferred.

b. Notification of Transfers, Releases and Removals
The HSA shall be given advance notice by ICE/ERO prior to the release, transfer or removal of a detainee, so that medical staff may determine and provide for any medical needs associated with the transfer, release or removal.

c. Transfer of Medical Information

1) When a detainee is transferred to another detention facility, the sending facility shall ensure that a Medical Transfer Summary accompanies the detainee, as required in "C. Responsibilities of the Health Care Provider at the Sending Facility" found in Standard 7.4 "Detainee Transfers.". Upon request of the receiving facility, the sending facility shall transmit a copy of the full medical record within 5 business days, and sooner than that if determined by the receiving facility to be a medically urgent matter.

2) Upon removal or release from ICE custody, the detainee shall be provided medication, referrals to community-based providers as medically appropriate, and a detailed medical care summary. This summary should include

Ex. 14 to Armstrong Decl.
Page 52 of 85

instructions that the detainee can understand and health history that would be meaningful to future medical providers.  The summary shall include, at a minimum, the following items:

a) patient identification;

b) tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

c) current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;

d) current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

e) any past hospitalizations or major surgical procedures;

f) recent test results, as appropriate;

g) known allergies;

h) any pending medical or mental health evaluations, tests, procedures, or treatments for a serious medical condition scheduled for the detainee at the sending facility.  In the case of patients with communicable disease and/or other serious medical needs, detainees being released from ICE custody are given a list of community resources, at a minimum;

i) copies of any relevant documents as appropriate;

j) printed instructions on how to obtain the complete medical record; and

k) the name and contact information of the transferring medical official.

The IHSC Form 849 or equivalent, or the Medical Transfer Summary attached as Appendix 4.3.C, which mirrors IHSC Form 849, may be used by facilities to ensure compliance with these standards.

## CC. Terminal Illness or Death of a Detainee

Procedures to be followed in the event of a detainee's terminal illness or death are in standard "4.7 Terminal Illness, Advance Directives and Death." The standard also addresses detainee organ donations.

## DD. Medical Experimentation

Detainees shall not participate in medical, pharmaceutical or cosmetic research while under the care of ICE.

This stipulation does not preclude the use of approved clinical trials that may be warranted for a specific inmate's diagnosis or treatment when recommended and approved by the clinical medical director. Such measures require documented informed consent.

## EE. Administration of the Medical Department

### 1. Quarterly Administrative Meetings

The HSA shall convene a meeting quarterly at minimum, and include other facility and medical staff as appropriate. The meeting agenda shall include, at minimum, the following:

a. an account of the effectiveness of the facility's health care program;

b. discussions of health environment factors that may need improvement;

c. review and discussion of communicable disease and infectious control activities;

d. changes effected since the previous meetings; and

e. recommended corrective actions, as necessary.

Ex. 14 to Armstrong Decl.
Page 53 of 85

Minutes of each meeting shall be recorded and kept on file.

### 2. Health Care Internal Review and Quality Assurance

The HSA shall implement a system of internal review and quality assurance. The system shall include:

a.  participation in a multidisciplinary quality improvement committee;

b.  collection, trending and analysis of data along with planning, interventions and reassessments;

c.  evaluation of defined data;

d.  analysis of the need for ongoing education and training;

e.  on-site monitoring of health service outcomes on a regular basis through the following measures:

    1)  chart reviews by the responsible physician or his/her designee, including investigation of complaints and quality of health records;

    2)  review of practices for prescribing and administering medication;

    3)  systematic investigation of complaints and grievances;

    4)  monitoring of corrective action plans;

    5)  reviewing all deaths, suicide attempts and illness outbreaks;

    6)  developing and implementing corrective-action plans to address and resolve identified problems and concerns;

    7)  reevaluating problems or concerns, to determine whether the corrective measures have achieved and sustained the desired results;

    8)  incorporating findings of internal review activities into the organization's educational and training activities;

    9)  maintaining appropriate records of internal review activities; and

    10) ensuring records of internal review activities comply with legal requirements on confidentiality of records.

### 3. Peer Review

The HSA shall implement an intra-organizational, external peer review program for all independently licensed medical professionals. Reviews shall be conducted at least annually.

## FF. Examinations by Independent Medical Service Providers and Experts

On occasion, medical and/or mental health examinations by a practitioner or expert not associated with ICE or the facility may provide a detainee with information useful in administrative proceedings.

If a detainee seeks an independent medical or mental health examination, the detainee or his/her legal representative shall submit to the Field Office Director a written request that details the reasons for such an examination. Ordinarily, the Field Office Director shall approve the request for independent examination, as long as such examination shall not present an unreasonable security risk. Requests for independent examinations shall be responded to as quickly as practicable. If a request is denied, the Field Office Director shall advise the requester in writing of the rationale.

Neither ICE/ERO nor the facility shall assume any costs of the examination, which will be at the detainee's expense. The facility shall provide a location for the examination but no medical equipment or supplies and the examination must be arranged and conducted in a manner consistent with maintaining the security and good order of the facility.

## GG. Tele-Health Systems

*\*\*The facility, when equipped with appropriate technology and adequate space, shall provide for the*

Ex. 14 to Armstrong Decl.
Page 54 of 85

*use of services of the ICE Tele-Health Systems,*
*inclusive of tele-radiology (ITSP), tele-psychiatry*
*and tele-medicine.*

1. The cost of the equipment, equipment maintenance, staff training and credentialing (as outlined in the contract), arrangements for x-ray interpretation and administration by a credentialed radiologist; and data transmission to and from the detention facility, shall be provided by the facility and charged directly to ICE.

2. The facility administrator shall coordinate with the ITSP to ensure adequate space is provided for the equipment, connectivity is available, and electrical services are installed.

3. Immediate 24-hour access, seven days a week, to equipment for service and maintenance by ITSP technicians shall be granted.

4. A qualified tele-health coordinator shall be appointed and available for training by the ITSP. Qualified, licensed and credentialed medical staff shall be available to provide tele-health services as guided by state and federal requirements and restrictions.

Ex. 14 to Armstrong Decl.
Page 55 of 85

Medical Forms:

- Appendix 4.3.A: Intake Screening
- Appendix 4.3.B: Physical Examination/Health Appraisal
- Appendix 4.3.C: Medical Transfer Summary

4.3 | Medical Care                              282                              PBNDS 2011
*(Revised December 2016)*

Ex. 14 to Armstrong Decl.
Page 56 of 85

## INTAKE SCREENING

**Identification**

| Patient was identified by (check 2 sources):  ☐ Wrist Band   ☐ Picture   ☐ Verbally   ☐ ID Badge   ☐ Other: |
|---|
| Chaperone Present?   ☐ Yes   ☐ No   If yes, give chaperone name: |
| Date of arrival at facility:                    Time of arrival:                    Time of initial screening: |
| If transferred from another facility, did medical transfer summary accompany the patient?  ☐ Yes   ☐ No   ☐ Not Applicable |
| Was the Pre-Screening Note reviewed?   ☐ Yes   ☐ No |

## Subjective

**Communication Assessment:**

| What language do you speak?   ☐ English   ☐ Spanish   ☐Other: |
|---|
| Interpreter provided?   ☐ Yes   ☐ No   If yes, name or INT number: |
| If No, patient speaks:  ☐ English fluently   ☐ Provider fluent in patient's native language   ☐ No interpreter available at this time |
| Do you have any difficulty with:   ☐ Hearing   ☐ Speech   ☐ Vision   Check if yes. If yes, what accommodation do you need to help you read, communicate, or navigate the facility? |

**Disability Screening:**

| Do you have any difficulty with walking, standing, or climbing stairs?   ☐ Yes   ☐ No   If yes, explain: |
|---|
| Do you have any difficulty reading or writing?   ☐ Yes   ☐ No   If yes, explain: |
| What was the highest grade completed in school? |
| Do you have any difficulty understanding directions?   ☐ Yes   ☐ No   If yes, explain: |

**Medical Screening:**

| How do you feel today? (Explain in his/her own words) | | | |
|---|---|---|---|
| Are you currently having any pain?   ☐ Yes   ☐ No   If yes, complete pain assessment below | | | |
| a. Character of pain: | b. Location: | c. Duration: | d. Intensity: (0-10 pain scale) |
| e. What relieves pain or makes it worse? | | | |
| Do you have any current or past medical problems?  ☐ Yes  ☐ No   If yes, explain: | | | |

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Medical Screening (continued)**

| |
|---|
| Are you currently or in the past year have you taken any medication on a regular basis, including over the counter and herbal? ☐Yes ☐No<br>If yes, list medications: |
| Do you have your medications with you? ☐Yes ☐No  If yes, list medications and disposition: |
| Do you have any allergies to medication or food? ☐Yes ☐No  If yes, list all: |
| Are you now or have you ever been treated by a doctor for a medical condition to include hospitalizations, surgeries, infectious or communicable diseases? ☐Yes ☐No  If yes, explain: |
| Do you now or have you ever had Tuberculosis (TB)? ☐Yes ☐No |
| In the past 2 months, have you experienced any of the following signs or symptoms continuously for more than 2 weeks:<br><br>Cough? ☐Yes ☐No  Coughing up blood? ☐Yes ☐No  Chest pain? ☐Yes ☐No  Loss of appetite? ☐Yes ☐No<br>Fever, chills, or night sweats for no known reason? ☐Yes ☐No  Unexplained weight loss? ☐Yes ☐No |
| Symptom screening with positive responses(s) is concerning for active TB: ☐Yes ☐No  If yes, explain: |
| Referred to provider for further evaluation. ☐Yes ☐No |
| Have you had any recent sudden changes with your vision or hearing? ☐Yes ☐No  If yes, explain: |
| Do you have any specific dietary needs? ☐Yes ☐No  If yes, explain: |
| Have you traveled outside of the US within the past 30 days? ☐Yes ☐No  If so, where? |
| Have you ever had or have you ever been vaccinated against Chicken Pox? ☐Yes ☐No ☐Admits prior infection |

**LGBT Screening**

| |
|---|
| Are you gay, lesbian, bisexual, transgender, intersex or gender non-conforming? ☐ Yes ☐ No |
| If transgender, what is your gender self-identification? |

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Female Patient Only**

| | |
|---|---|
| Are you pregnant?   ☐ Yes   ☐ No   ☐ Not Applicable    If yes, date of last menstrual period: | |
| Are you currently breastfeeding?   ☐ Yes   ☐ No    If yes, when is the last day you breastfed? | |
| Have you had unprotected sexual intercourse in the past 5 days?   ☐ Yes   ☐ No<br><br>If yes, would you like to speak to a medical provider about emergency contraception to prevent a possible pregnancy?   ☐ Yes   ☐ No<br><br>**If yes, contact a medical provider immediately for guidance.** | |

**Oral Screening**

| |
|---|
| Are you having any significant dental problems?   ☐ Yes   ☐ No  If yes, explain: |
| Do you have dentures, partials, braces, etc?   ☐ Yes   ☐ No  If yes, do you have these items with you? |

**Mental Health Screening**

| |
|---|
| Have you ever been diagnosed with mental illnesses or mental health conditions?   ☐ Yes   ☐ No  If yes, what illness? |
| Have you ever received counseling, medication or hospitalization for mental health problems (to include outpatient treatment)?<br><br>☐ Yes   ☐ No    If yes, explain.<br><br><br>**Refer for follow-up and appropriate treatment as necessary.** |
| Do you have a history of self-injurious behavior?   ☐ Yes   ☐ No   If yes: ☐ Cutting   ☐ Self-mutilation   ☐ Other<br><br>Most recent                                **If yes, refer for follow-up and appropriate treatment as necessary.** |
| Have you ever tried to kill or harm yourself?   ☐ Yes   ☐ No  If yes, when did the attempt occur?<br>Method:   ☐ Gun   ☐ Hanging   ☐ Cutting skin   ☐ Pills   ☐ Other<br>**If attempt was within the last 90 days, make referral to mental health immediately.** |
| Are you currently thinking about killing or harming yourself?   ☐ Yes   ☐ No   **If yes, make referral to mental health immediately.** |
| Do you have a history of assaulting or attacking others?   ☐ Yes   ☐ No |
| Do you know of someone in this facility whom you wish to attack or harm?   ☐ Yes   ☐ No<br><br>If yes, who is this person?                        **If yes, make referral to mental health immediately.** |
| Do you now or have you ever heard voices that other people don't hear, seen things or people that others don't see, or felt others were trying to harm you for no logical or apparent reason?   ☐ Yes   ☐ No   If yes, explain: |

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Sexual Abuse and Assault Screening**

\\\\\

| |
|---|
| Have you been a victim of physical or sexual abuse or assault?   ☐ Yes  ☐ No   If yes, explain: <br><br> **If yes, refer for medical or mental health evaluation as appropriate.** |
| Do you feel that you are in danger of being physically or sexually assaulted while you are in custody?   ☐ Yes  ☐ No   If yes, explain: <br><br> **If yes, refer for follow-up and appropriate treatment as necessary.** |
| Have you ever sexually assaulted or abused another person?   ☐ Yes  ☐ No   If yes, explain: <br><br> **If yes, refer for medical or mental health evaluation as appropriate.** |

**Trauma History Screening**

| |
|---|
| Have you had a physical or emotional trauma due to abuse or victimization?   ☐ Yes  ☐ No |
| Have you ever experienced, witnessed or been confronted with an event that involved actual or threatened death or serious injury (can include domestic violence, sexual assault, robbery, natural disaster, war, serious illness, terrorism).  ☐ Yes  ☐ No <br> If yes, answer the following: <br> • Was your response to this event intense fear, helplessness or horror?   ☐ No  ☐ Some  ☐ Moderate  ☐ Extreme <br> • Has this experience caused significant distress or impairment in your life?   ☐ No  ☐ Some  ☐ Moderate  ☐ Extreme <br> • Has it affected your interpersonal relationships, work or other areas?   ☐ No  ☐ Some  ☐ Moderate  ☐ Extreme <br> • Is this experience currently causing significant distress or impairment in your life?   ☐ No  ☐ Some  ☐ Moderate  ☐ Extreme <br> **If the patient experienced any of the above, refer for follow-up and appropriate treatment as necessary.** |

**Cultural/Religious Assessment**

| |
|---|
| Is there anything important to know about your religious or cultural beliefs that are of concern to you while in detention?   ☐ Yes  ☐ No <br> If yes, explain: |

**Substance Use/Abuse Screening**

| | |
|---|---|
| Have you ever been treated for drug and/or alcohol problems? | ☐ Yes  ☐ No |
| Have you ever suffered withdrawal symptoms from drug and/or alcohol use? | ☐ Yes  ☐ No |
| Are you able to stop using drugs or alcohol if you want? | ☐ Yes  ☐ No |
| Have you ever blacked out or experienced memory loss from drinking or drug use? | ☐ Yes  ☐ No |
| Have drug or alcohol use negatively impacted your life (family, work, relationships, criminal charges)? | ☐ Yes  ☐ No |
| If yes to any of the above questions, explain: <br><br><br> **Refer for follow-up and appropriate treatment as necessary.** | |

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Substance Use/Abuse Screening (continued)**

| In the past three months, have you used tobacco, alcohol, illegal drugs, or misused prescription drugs? ☐Yes ☐No |
|---|

If yes, complete the following (refer for follow-up and appropriate treatment as necessary).

| Substance Used/Route of Use | Date of Last Use | Amount/Quantity Last Used |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

# Objective

| Patient does not appear to have abnormal physical, mental, and/or emotional characteristics.   ☐Yes ☐No |
|---|

| Patient does not appear to have barriers to communication.   ☐Yes ☐No |
|---|

| Patient is oriented to:   Person ☐Yes ☐No   Place ☐Yes ☐No   Time ☐Yes ☐No |
|---|

If you observe any of the following, check the appropriate box and document findings below:

Appearance: ☐Sweating ☐Shaking/tremors ☐Anxious ☐Disheveled ☐Ill appearance
Findings:

Behavior: ☐Disorderly ☐Appropriate ☐Insensible ☐Agitation ☐Inability to
focus/concentrate Findings:

State of Consciousness: ☐Alert ☐Responsive ☐Lethargic
Findings:

Ease of Movement: ☐Body deformities ☐Gait
Findings:

Breathing: ☐Persistent cough ☐Hyperventilation
Findings:

Skin: ☐Lesions ☐Jaundice ☐Rashes ☐Infestations ☐Nits (lice) ☐Bruises ☐Scars ☐
☐Tattoos Needle Marks or Indications of Drug Use   Findings:

Developmental or Physical Disabilities: ☐Developmental Delay ☐Para/quadriplegia ☐Stroke ☐Amputation ☐Cardiac condition
Findings:

Assistive Devices: ☐Glasses/Contacts ☐Hearing aid(s) ☐Denture(s)/Partial(s) ☐Orthopedic brace ☐Prosthetic ☐Cane
Findings:

☐None Observed

Comments/Other Findings:


## Vital Signs

| T _____ P _____ Resp _____ BP _____ HT _____ WT _____ HCG Results: ☐Pos ☐Neg ☐N/A |
|---|


| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Assessment

**Initial Medical Screening:**

| |
|---|
| ☐ No findings requiring referral |
| ☐ Findings requiring referral identified. See disposition below. |
| ☐ List all findings: |

## Plan

**Disposition:**

| |
|---|
| ☐ General population |
| ☐ General population with referral for:    ☐ Medical    ☐ Mental health care |
| ☐ Isolation until medically evaluated |
| ☐ Referral for immediate:    ☐ Medical    ☐ Mental health    ☐ Dental care |
| Details of referral: |

**Care/Intervention/Follow-up:**

| |
|---|
| ☐ Physical examination/Health Assessment will be performed within 14 days. |
| ☐ Physical exam will be scheduled for patient. |
| ☐ Tuberculin Skin Test (TST) administered    ☐ Left forearm    ☐ Right forearm |
| ☐ Chest X-Ray (CXR) completed with appropriate shielding |
| ☐ TST or CXR not needed. Transfer Summary accompanying patient documents negative screening within timeframe allowed by policy. |
| ☐ The following care/treatment was provided during this Intake Screening. |

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

**Patient Education:**

| |
|---|
| ☐ Tuberculosis screening and need for tuberculin skin test (TST) or chest x-ray (CXR) explained to patient prior to performance. |
| ☐ Access to medical, dental, and mental health care explained to patient as well as grievance process. |
| ☐ Given the Dealing with Stress brochure in _____ language. |
| ☐ Given the Medical Orientation brochure in _____ language. |
| ☐ Given the Health Information brochures in _____ language. |
| ☐ Patient verbalized understanding of teaching or instruction provided. |
| ☐ Patient was asked if he or she had any additional questions and all questions were addressed. |
| ☐ Female ONLY: Educated and provided brochure describing female medical and mental health services related to pregnancy, terminated/miscarried pregnancies, contraception, family planning and age-appropriate gynecological health care. |
| ☐ Other education provided: |

| Provider's Signature | Stamp / Printed Name | Date | Time |
|---|---|---|---|

| Reviewer's Signature | Stamp / Printed Name | Date | Time |
|---|---|---|---|

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal

Patient was identified by (check 2 sources):  □ Wrist Band, □ Picture, □ Verbally, □ ID Badge, □ Other _____

Chaperone Present? □ Yes □ No If yes, give chaperone name: _____

**Communication Assessment:**

What language do you speak? □ English, □ Spanish, □ Other: _____

Interpreter provided? □ Yes □ No If yes, Name or INT#:_____

Detainee speaks □ English Fluently; □ Provider fluent in patient's native language; □ No interpreter available at this time

Do you have any difficulty with □ hearing, □ speech or □ vision?  Check if Yes.

     If yes, what accommodations, do you need to help you read, communicate, or navigate the facility? _____

**Subjective:**

| Current Significant Medical Problems | Date Problem began | Current Status |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Current Medications including OTC and Herbal**:

| Name | Dose | Route | Frequency |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Allergies:**

Medications/Food/Environmental:  List All: _____\

**Pain Assessment**

Are you currently in pain? □ Yes □ No If yes, pain began when?_____ Intensity: (0/10 scale)_____

Character of Pain:_____  Location:_____

Duration:_____

Has anything you have done or tried in the past relieved the pain or made it worse?  □ Yes □ No

If yes, explain_____

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal (con't)

**Disability**

Do you have any difficulty with walking, standing, or climbing stairs?  □ Yes □ No
          If yes, do you use a wheelchair, walker, cane or crutches? _____

Have you ever had an injury to your head or brain which resulted in the loss of consciousness and/or recurring headaches, dizziness, confusion or memory loss? □ Yes □ No If yes, when was the injury? mm/yyyy _____
Can you read? □ Yes □ No If yes, in which language? _____Do you have difficulty reading? □ Yes □ No
Can you write? □ Yes □ No If yes, in which language? _____Do you have difficulty writing? □ Yes □ No
What was the highest grade you completed in school? _____
Do you have difficulty understanding directions? □ Yes □ No
          If yes, does someone normally assist you with any regular tasks of daily living? _____

**Medical History**          Has a medical professional ever diagnosed you with any of the following?

| | | | |
|---|---|---|---|
| □Yes □No  Asthma | □Yes □No  Cardiovascular disease | □Yes □No  Tuberculosis | Comment: **Type |
| □Yes □No  Cancer | □Yes □No  Kidney Disease | □Yes □No  Stroke | |
| □Yes □No  HIV | □Yes □No  Hyperlipidemia | □Yes □No  Hepatitis** | |
| □Yes □No  Seizures | □Yes □No  Diabetes | □Yes □No  Sexually Transmitted Infections** | |
| □Yes □No  Hypertension | □Yes □No  Sickle Cell Anemia | | |
| Varicella  □ Yes □ No □ Admits to prior infection  □ Admits being vaccinated  □ History denied at physical exam | | | |
| Other | | | |

**Surgical/Hospitalization History**:

| Surgery or reason for hospitalization | When (mm/yyyy) |
|---|---|
| | |
| | |
| | |
| | |

**Dental**

Do you have any significant dental problems? □No, □Cavity, □ Broken tooth, □Infection, □Broken jaw, □ Other_____
Do you have any dental prosthesis?  □None, □Full upper denture, □full lower denture, □partial denture upper, □partial denture lower, □braces, □retainer

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal (con't)

**Family History**

| | | |
|---|---|---|
| Asthma □ Yes □ No | Hypertension □ Yes □ No  Diabetes □ Yes □ No | Cardiovascular Disease     □ Yes □ No |
| Cancer  □ Yes □ No | Tuberculosis □ Yes □ No  Stroke   □ Yes □ No | Other: _____ |
| Breast or gynecological problems □ Yes □ No | | |

**Female Only**

**OB History:**
Have you ever been pregnant? □No □Yes    #Pregnancies_____        #C-Sections_____
#Live Births _____#Full Term_____#Pre-Term_____        #Abortions____  #Miscarriages_____ #Living_____
Are you pregnant? □No □Yes
Are you currently receiving prenatal care? □No □Yes Where? _____
Have you ever been told that you had a 'high risk' pregnancy?  If yes, what was the reason?
_____
Are you currently breast feeding? □No □Yes
If yes, how old is the nursing child? _____ When was the last time you breast fed? (mm/dd/yyyy)_____

**GYN History:**
When was the first day of your LMP? _____ If more than 30 days, why?
_____
Do you have a history of breast or gynecological problems? □No □Yes  Explain_____
Do you use birth control?  □No □Yes What type? _____ When was the last time you used it? _____
When was your last PAP smear? _____ If known, results_____

**Sexual Abuse and Assault/Vulnerabilities**

Have you ever been a victim of physical abuse?  □No □Yes
Have you ever been a victim of sexual abuse or assault?  □No □Yes
If yes, refer patient for medical evaluation in two working days or for mental health evaluation in 72 hours.

Are you gay/ lesbian, bisexual, transgender, intersex or gender non- conforming?  □Yes   □No
         If transgender, what gender do you identify with_____

Do you believe you are vulnerable to sexual abuse or assault in ICE custody? □Yes   □No   If yes, why?_____
If yes, implement treatment plan.

Have you ever been involved in an incident where you sexually abused others? □Yes   □No
If yes, refer patient for medical evaluation in two working days or for mental health evaluation in 72 hours.

**Mental Health**

Do you have a history of:
Manic episodes   □Yes  □No          Depression □Yes   □No          Psychotropic medications □Yes   □No
Severe anxiety     □Yes  □No          Psychosis   □Yes  □No          Violence towards others □Yes  □No
Suicide attempts/gestures □Yes   □No

Are you currently having any mental health issues?  □Yes   □No    If yes, explain problem and date problem began _____
_____

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal (con't)

**Social History**

---

**Drug Use History:**

Have you used drugs other than those for medical reasons in the past 12 months? □No □Yes   If yes, what?
PCP □No □Yes          Ketamine □No □Yes          Marijuana □No □Yes          Prescription Opiates □No □Yes
LSD □No □Yes          Ecstasy □No □Yes          Methamphetamine □No □Yes
Heroin   □No □Yes          Route:    Injected □No □Yes          Intranasal □No □Yes          Smoked □No □Yes
Cocaine □No □Yes          Route:    Injected □No □Yes          Intranasal □No □Yes          Smoked □No □Yes

When did you last use? _____          Are you having any withdrawal symptoms? □No □Yes If yes, which apply?
□Nausea □Vomiting □Diarrhea □Chills □Sweating □Insomnia □Aches & pains □ Anxiety
Have you ever gone through withdrawal from drugs? □No □Yes If yes, when? _____
Are you currently in a drug treatment program? □No □Yes If yes, Name of program? _____
Type of Program:  □Detox  □Methadone □Residential Treatment □Outpatient □12 Step□ Other

---

**Alcohol Use History:**

Do you drink alcohol?          □ No □Yes   If yes, type? □Beer          □Malt liquor          □Wine    □Liquor
How often do you drink?     □ Daily   □Weekly □Monthly □Rarely
How much do you drink when you drink? _____
Do you notice over time that you need to drink more for the same effect? □No □Yes
When was your last drink? _____
Are you having any withdrawal symptoms? □No □Yes If yes, which apply?  □Headache    □Fever   □Nausea
□Vomiting □Insomnia □Tremor  □Hallucinations □Convulsions
Have you ever gone through alcohol withdrawal in the past? □No □Yes     How long ago? _____
Have you ever been in treatment for alcohol use? □No □Yes   If yes, when? _____
What type of program? □Outpatient  □Inpatient
Have you ever been convicted for driving under the influence of alcohol?  □No □Yes If yes, when? _____

---

**Tobacco History:**

Have you ever used tobacco products?  □No □Yes  If yes, please answer the following questions:
Do you currently use tobacco products? □No □Yes  If yes, what type of products? □ Cigarettes □Cigar □Pipe □Chewing tobacco
How long have you used tobacco products? _____     How frequently did/do you use tobacco? _____
When did you last use tobacco products? _____
Are you having any withdrawal symptoms from not using tobacco? □No □Yes  If yes, what symptoms are you experiencing?
□Cravings □Irritation □Anger □Increased Appetite □Weight Gain □Concentration Problems  □Restlessness □Insomnia
□Anxiety

---

**Preventative Medicine/Screening History**

Have you had screening for cancer?  □Yes   □No     When? (mm/yyyy) _____
          What type screening & results if known? _____
Have you had a mammogram? □Yes   □No   When? (mm/yyyy)_____ Results, if known_____
Have you had a pap smear? □Yes   □No   When? (mm/yyyy)_____ Results, if known_____

---

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

# Physical Examination/Health Appraisal (con't)

**OBJECTIVE:**
**Vital Signs**

| T_____ P_____ R_____ BP_____ HT_____ WT_____ |
|---|
| Visual Acuity (Snellen):  Left_____ Right_____ Both_____ |
| Hearing:  □ Grossly intact □ Other_____ |

**General Physical Examination**

| | R = Refused | NE = Not Evaluated | |
|---|---|---|---|
| General | R | NE | Findings: |
| ENT | R | NE | Findings: |
| Dental | R | NE | Findings: |
| Neurological | R | NE | Findings: |
| Cardiac | R | NE | Findings: |
| Pulmonary | R | NE | Findings: |
| Gastrointestinal | R | NE | Findings: |
| Genitourinary | R | NE | Findings: |
| Extremities | R | NE | Findings: |
| Skin | R | NE | Findings: |
| Comments/Other Findings: | | | |

**Mental Status Examination**

| | |
|---|---|
| Orientation | Alert □No □Yes   Oriented to person □No □Yes   Place □No □Yes   Time □No □Yes |
| Perceptions/ Thought Content | Perceptual disturbances?  □No □Yes<br>If yes, □ Auditory hallucinations        □ Visual hallucinations        □ Delusions |
| Appearance | □ Appropriately dressed □ well groomed; □ Disheveled; □ Other |
| Posture | □ Erect; □ Stooped; □ Slouched; □ Other |
| Gait/Walk | □ Steady; □ Shuffle; □ Limp; □ Other |
| Movement | □ Appropriate; □ Tics; □ Repetitive; □ Rigid; □ Agitated; □ Slow; □ Other |
| Mood | □ Appropriate; □ Labile; □ Relaxed; □ Happy; □ Calm; □ Distressed; □ Angry; □ Agitated; □ Sad/Depressed; □ Fearful/Anxious; □Irritable, □ Other |
| Attitude | □ Cooperative; □ Uncooperative; □ Threatening; □ Evasive |
| Speech | □ Coherent; □ Incoherent; □ Pressured; □ Average speed; □ Rapid; □ Slow; □ Slurred; □ Mumbled; □ Talkative; □ Loud; □ Soft; □ Other |
| Intelligence | □ Appears normal; □ Appears developmentally delayed |
| Insight | □ Good; □ Impaired |
| Comments: | |

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

## Physical Examination/Health Appraisal (con't)

**Assessment:**

___Physical exam/health appraisal shows no significant medical, mental health or dental issues currently.

___Physical exam/health appraisal shows the following significant issues:

**Plan:**

Treatment including medications: _____

_____
_____
_____

Immunizations, Injections, Imaging, Labs:

Referrals:

Other

Preventative Medicine/Patient Education:
__Given the Staying Healthy brochure in the _____ language.
__Verbally given instruction on dental hygiene.
__Provided with instruction appropriate to patient's health needs.
__Patient verbalized understanding of teaching or instructions provided.
__Patient was asked if he/she had any additional questions, and any questions were addressed.
__Patient was instructed to return to medical clinic as needed.
__Patient was instructed to return to clinic for appointment.
__Health Assessment was rescheduled until [_____] to provide sign language interpreter for health assessment.
__Health Assessment was rescheduled until [_____] to provide foreign language interpreter for health assessment.
__Other:_____

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival: | DOB: |
| Facility: | Sex: |

# MEDICAL TRANSFER SUMMARY

| | |
|---|---|
| Last Name: | First Name: |
| A#: | Country of Origin: |
| Date of Arrival at Sending Facility: | DOB: |
| Sending Facility: | Sex: |

**1.  General Information:**

Cleared for Travel by Ground Transportation: □ Yes □ No  Date of Departure: _____

Cleared for Travel by Air Transportation:       □ Yes □ No       Final Destination, if known: _____

Reason for Transfer: □ Custody □ Medical       Medical Escort required: □ Yes □ No       If yes, type: □ Medical □ Psychiatric

**2. Current Medical, Dental, and/or Mental Health Diagnoses/Problems:**                                    **URGENT**

_____

_____

_____

_____

**3. Allergies:** _____

**4. Current Prescribed Medications: List All (Name, Dosage, Directions in layman's terms)**

*Check off Medication Required for Care en Route*

| | Medication | Dose | # Sent | Route | Instructions for use (include proper time for administration) | Stop Date |
|---|---|---|---|---|---|---|
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |
| □ | | | | | | |

**5. TB Clearance Status for Transfer or Transportation**

Screening Modality *(Check all that apply and document below):* □ CXR □ TST □ IGRA □ Symptom Screen

**CXR:** Date: _____

TB Screening: □ Negative, not consistent w/TB    □ Positive, consistent w/TB

**TST:** Administered Date: _____    **TST** Read Date: _____    Results: _____ mm induration

**IGRA:** Collection Date: _____    Results: □ Positive □ Negative □ Indeterminate

**Symptom Screening** Date: _____    Results: □ Positive □ Negative

Is the patient being treated for TB?    □ No    □ Yes, select options:    □ Cleared for general detention population

□ Not cleared for general detention population

□ Being treated for TB, see attached TB Case Management documentation

Ex. 14 to Armstrong Decl.
Page 70 of 85

## Medical Transfer Summary (con't)

**6. Healthcare Follow-Up:**

Recent (within 6 months) Test Results: _____

Recent (within 6 months) Hospitalizations/Surgeries: _____

Recommended Future Lab Work: _____

Pending Specialty Appointment (s):_____

Recommended Specialty Appointment (s):_____

**Requires Immediate Follow Up**: _____

**7. Special Needs Affecting Transportation:  -- Use Standard Infection Control Precautions for all patients --**

Are there any medical, dental, or mental health condition that restricts the length of time the patient can be on travel status? □Yes □No

Reason(s) and maximum length of travel time: _____

Does the patient have any special needs that escorting staff should be aware of? □Yes □No

If so, what? _____

Equipment provided by:  □ Medical Authority □ Other_____   Equipment owned by:  □ Medical Authority □ Other_____ _____

Patient will keep equipment upon arrival at destination?  □Yes □No

Is there any medical equipment required to accompany the patient during travel?  □ Yes   □ No

If so, what? _____

Are any special precautions required during transport?  □Yes □No

Precautions needed for the patient: _____

Precautions needed for the escorting staff: _____

**8.  Additional Comments** (Mark through if no comments are made):  Attach additional pages or medical records as needed

_____

**9. Release from custody: Attach  □ Instructions for Requesting Complete Medical Records**

**□ Community Resource Information, if applicable**

Sending Facility Point of Contact: _____

Sending Facility Contact Number: _____

_____   _____   _____   _____
Completed by Provider Printed Name          Date                    Time                   Provider Signature

| Last Name: | First Name: |
|---|---|
| A#: | Country of Origin: |
| Date of Arrival at Sending Facility: | DOB: |
| Sending Facility: | Sex: |

# 4.4 Medical Care (Women)

## I. Purpose and Scope

This detention standard ensures that female detainees in U.S. Immigration Customs and Enforcement (ICE) custody have access to appropriate and necessary medical and mental health care.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (**) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Female detainees shall receive routine, age appropriate gynecological and obstetrical health care, consistent with recognized community guidelines for women's health services.

   *\*\*The facility's provision of gynecological and obstetrical health care shall be in compliance with standards set by the National Commission on Correctional Health Care (NCCHC).*

2. As part of every detainee's intake health assessment, female detainees shall also receive age-appropriate assessments and preventive women's health services, as medically appropriate.

3. A pregnant detainee in custody shall have access to pregnancy services including routine or specialized prenatal care, pregnancy testing, comprehensive counseling and assistance, postpartum follow up, lactation services and abortion services.

4. At no time shall a pregnant detainee be restrained, absent truly extraordinary circumstances that render restraints absolutely necessary.

5. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

   All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

   Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

6. Medical and mental health interviews, screenings, appraisals, examinations, procedures, and administration of medication shall be

Ex. 14 to Armstrong Decl.
Page 72 of 85

conducted in settings that respect detainees' privacy in accordance with safe and/orderly operations of the facility.

7. A detainee's request to see a health care provider of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided. When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

## III. Standards Affected

Not applicable.

## IV. References

American College of Obstetrics and Gynecology, *Guidelines for Women's Health Care* (3rd edition, 2007).

National Commission on Correctional Health Care, *Standards for Health Services in Jails* (2014)

National Commission on Correctional Health Care: *Position Statement on Women's Health Care in Correctional Settings* (2005)

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities*," 79 Fed. Reg. 13100 (Mar. 7, 2014).

## V. Expected Practices

### A. Overview

In addition to the medical, mental health and dental services provided to every detainee as required by standard "4.3 Medical Care," every facility shall directly or contractually provide its female detainees with access to:

1. pregnancy services, including pregnancy testing, routine or specialized prenatal care, postpartum follow up, lactation services and abortion services as outlined herein;

2. counseling and assistance for pregnant women in keeping with their express desires in planning for their pregnancy, whether they desire abortion, adoptive services or to keep the child; and

3. routine, age-appropriate, gynecological health care services, including offering women's specific preventive care.

### B. Initial Health Intake Screening and Health Assessment

#### 1. Initial Screening

Within 12 hours of arrival, during their initial medical screening, all female detainees shall receive information on services related to women's health care as provided for in this standard and standard "4.3 Medical Care."

#### 2. Initial Health Assessment

If the initial medical intake screening indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical or mental health practitioner for medical and/or mental health follow-up as appropriate.  Consistent with Standard "4.3 Medical Care," when a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment, and when a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

If the initial medical intake screening indicates the possibility of pregnancy, referral shall be initiated and the detainee shall receive a health assessment as soon as appropriate or within two working days.

If the initial medical intake screening indicates any history of domestic abuse or violence, the detainee shall be referred for and receive a mental health evaluation by a qualified mental health provider within 72 hours, or sooner if appropriate, consistent

Ex. 14 to Armstrong Decl.
Page 73 of 85

with Standard "4.3 Medical Care."

All initial health assessments of female detainees shall be conducted by a trained and qualified health provider. In addition to the criteria listed on the health assessment form, the evaluation shall inquire about the following:

a. pregnancy testing for detainees aged 18-56 and documented results;

b. if the detainee is currently nursing (breastfeeding);

c. use of contraception;

d. reproductive history (number of pregnancies, number of live births, number of spontaneous/elective abortions, pregnancy complications, etc.);

e. menstrual cycle;

f. history of breast and gynecological problems;

g. family history of breast and gynecological problems; and

h. any history of physical or sexual victimization and when the incident occurred.

A pelvic and breast examination, pap test, baseline mammography and sexually transmitted disease (STD) testing shall be offered and provided as deemed appropriate or necessary by the medical provider.

## C.  Same-Gender Providers or Chaperones

Consistent with the provisions in Standard 4.3 "Medical Care," a detainee's request to see a health care provider of the same gender should be considered; when not feasible, a same-gender chaperone shall be provided.

When care is provided by a health care provider of the opposite gender, a detainee shall be provided a same-gender chaperone upon the detainee's request.

A same-gender chaperone shall be provided, even in the absence of a request by the detainee, when a medical encounter involves a physical examination of sensitive body parts, to include breast, genital, or rectal examinations, by a provider of the opposite gender.   Only medical personnel may serve as chaperones during medical encounters and examinations.

## D. Preventive Services

Preventative services specific to women shall be offered for routine age appropriate screenings, to include breast examinations, pap smear, STD testing and mammograms. These services shall not interfere with detainee's deportation or release from custody date.

### 1. Contraception

Upon request, appropriately trained medical personnel within their scope of practice shall provide detainees with non-directive (impartial) advice and consultation about family planning and contraception, and where medically appropriate, prescribe and dispense medical contraception.

## E. Pregnancy

Upon confirmation by medical personnel that a female detainee is pregnant, she shall be given close medical supervision. Pregnant detainees shall have access to prenatal and specialized care, and comprehensive counseling inclusive of, but not limited to: nutrition, exercise, complications of pregnancy, prenatal vitamins, labor and delivery, postpartum care, lactation, family planning, abortion services and parental skills education.

The facility administrator shall ensure that the FOD is notified as soon as practicable of any female detainee determined to be pregnant, but no later than 72 hours after such determination, consistent with the notification requirements in Standard "4.3 Medical Care."

The medical provider will identify any special needs (e.g. diet, housing, or other accommodations such as the provision of additional pillows) and inform all

Ex. 14 to Armstrong Decl.
Page 74 of 85

necessary custody staff and facility authorities.  If a pregnant detainee has been identified as high risk, the detainee shall be referred, as appropriate, to a physician specializing in high risk pregnancies.

All chemically dependent pregnant detainees (psychological dependence includes alcohol, sedatives/hypnotics, anxiolytics and opioids) are considered high risk and referred to an obstetrician or another provider capable of addressing their needs immediately.

Pregnancy management and outcomes shall be monitored, quarterly, through a continuous quality improvement process.

## 1. Non-Use of Restraints

Restraints on Pregnant Women: A pregnant woman or women in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary as documented by a supervisor or directed by the on-site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility. Restraints are never permitted on women who are in active labor or delivery.

Restraints shall not be considered as an option, unless one or more of the following applies:

a.  a medical officer has directed the use of restraints for medical reasons;

b.  credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff or others; or

c.  reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event that one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the least restrictive restraints necessary shall be used.

Even in the extraordinary circumstance when restraints are deemed necessary, no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts shall be made to ensure that the detainee is placed on her left side if she is immobilized.

The use of restraints requires documented approval and guidance from the on-site medical authority. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's A-file, detention and medical files.

## 2. Abortion Access

In the event continued detention is necessary and appropriate, and consistent with the practice of our federal partners, if the life of the mother would be endangered by carrying a fetus to term, or in the case of rape or incest, ICE will assume the costs associated with a female detainee's decision to terminate a pregnancy.

a.  In this instance, or in a situation where a female detainee opts to fund the termination of her pregnancy, ICE shall arrange for transportation at no cost to the detainee for the medical appointment and, if requested by the detainee, for access to religious counseling, and non-directive (impartial) medical resources and social counseling, to include outside social services or women's community resources groups.

b.  If a detainee requests to terminate her pregnancy, ICE will document the request in the detainee's medical records. The detainee's statement should be signed personally by the detainee and include clear language of the detainee's intent.

## F. Mental Health Services

Ex. 14 to Armstrong Decl.
Page 75 of 85

In addition to mental health services offered to all detainees, mental health assessments shall be offered to any detainee who has  given birth, miscarried or terminated a pregnancy in the past 45 days.

Ex. 14 to Armstrong Decl.
Page 76 of 85

# 4.5 Personal Hygiene

## I. Purpose and Scope

This detention standard ensures that each detainee is able to maintain acceptable personal hygiene practices through the provision of adequate bathing facilities and the issuance and exchange of clean clothing, bedding, linens, towels and personal hygiene items.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

For all types of facilities, procedures that appear in italics with a marked (\*\*) on the page indicate optimum levels of compliance for this standard.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Each facility shall maintain an inventory of clothing, bedding, linens, towels and personal hygiene items that is sufficient to meet the needs of detainees;

2. Each detainee shall have suitable, clean bedding, linens, blankets and towels;

3. Each detainee shall have sufficient clean clothing that is properly fitted; climatically suitable, durable and presentable;

4. Detainees shall be held accountable for clothing, bedding, linens and towels assigned to them; and

5. Detainees, including those with disabilities and special needs, shall be able to maintain acceptable personal hygiene practices.

6. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate

## III. Standards Affected

This detention standard replaces the standard on "Personal Hygiene" dated 12/2/2008.

Ex. 14 to Armstrong Decl.
Page 77 of 85

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-4B-01 through 4B-09, 6A-08, 6B-05 through 6B-08.

"*Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities,*" 79 Fed. Reg. 13100 (Mar. 7, 2014).

# V. Expected Practices

## A. Supply of Clothing, Bedding, Linen, Towel and Personal Hygiene Items

Each detention facility shall have written policy and procedures for the regular issuance and exchange of clothing, bedding, linens, towels and personal hygiene items. The supply of these items shall exceed the minimum required for the number of detainees to prevent delay in replacing the items.

To be prepared for unforeseen circumstances, it is a good practice for a detention facility to maintain an excess clothing inventory that is at least 200 percent of the maximum funded detainee capacity.

Each SPC and CDF shall have available, at all times, more clothing, bedding, linen and towels than needed to supply the maximum funded detainee capacity.  This excess will allow for the immediate replacement of items that are lost, destroyed, or worn out.

Clothing or shoes that are lost, unserviceable, indelibly stained, or bear offensive or otherwise unauthorized markings shall be discarded and replaced as soon as practicable.

## B. Issuance of Clothing

At no cost to the detainee, all new detainees shall be issued clean, laundered, indoor/outdoor temperature-appropriate, size appropriate, presentable clothing during intake.

The standard issue of clothing is at least two uniform shirts and two pairs of uniform pants or two jumpsuits; two pairs of socks; two pairs of underwear; two brassieres, as appropriate; and one pair of facility-issued footwear.  Additional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate. Footwear that is worn out or damaged shall be replaced at no cost to the detainee.

*For both males and females, personal items of clothing, including undergarments, are not permitted.*

Clothing issued at release shall be in accordance with standard "2.1 Admission and Release."

## C. Special Uniforms and Protective Equipment

Each detainee assigned to a special work area shall be clothed in accordance with the requirements of the job and, when appropriate, provided protective clothing and equipment in accordance with safety and security considerations.

## D. Personal Hygiene Items

Staff shall directly supervise the issuance of personal hygiene items to male and female detainees appropriate for their gender and shall replenish supplies as needed. Distribution of hygiene items shall not be used as reward or punishment.

Each detainee shall receive, at a minimum, the following items:

1. one bar of bath soap, or equivalent;

2. one comb;

3. one tube of toothpaste;

4. one toothbrush;

5. one bottle of shampoo, or equivalent; and

6. one container of skin lotion.

The facility administrator may modify this list as needed (e.g., to accommodate the use of bulk liquid soap and shampoo dispensers).

The distribution of razors must be strictly controlled. Disposable razors shall be provided to detainees on a daily basis. Razors shall be issued and collected daily by staff. Detainees shall not be permitted to share razors.

Female detainees shall be issued and may retain sufficient feminine hygiene items, including sanitary pads or tampons, for use during the menstrual cycle, and may be permitted unbreakable brushes with soft, synthetic bristles to replace combs. Cosmetics are prohibited, as are electric rollers, curling irons, hair dryers and similar appliances.

The responsible housing unit officer shall replenish personal hygiene items on an as-needed basis, in accordance with written facility procedures. The facility administrator may establish an empty container exchange system.

*If the facility has no detainee commissary, personal hygiene items from sources other than the issuing officer(s) may be permitted into the housing units only with the approval of the health services staff and the Chief of Security.*

## E. Bathing and Toilet Facilities

Detainees shall be provided:

1. an adequate number of toilets, 24 hours per day, which can be used without staff assistance when detainees are confined to their cells or sleeping areas.

   ACA Expected Practice 4-ALDF-4B-08 requires that toilets be provided at a minimum ratio of one for every 12 male detainees or one for every 8 female detainees. For males, urinals may be substituted for up to one-half of the toilets. All housing units with three or more detainees must have at least two toilets.

2. an adequate number of washbasins with temperature controlled hot and cold running water 24 hours per day.

   ACA Expected Practice 4-ALDF-4B-08 requires one washbasin for every 12 detainees.

3. operable showers that are thermostatically controlled to temperatures between 100 and 120 F degrees, to ensure safety and promote hygienic practices.

   ACA Expected Practice 4-ALDF-4B-09 requires a minimum ratio of one shower for every 12 detainees.

Inspections of housing units shall periodically measure and document water temperature in the daily log.

Detainees shall be provided with a reasonably private environment in accordance with safety and security needs.  Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or monitored bowel movement.   Staff of the opposite gender shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing.

When operationally feasible, transgender and intersex detainees shall be given the opportunity to shower separately from other detainees.

Detainees with disabilities shall be provided the facilities and support needed for self-care and personal hygiene in a reasonably private environment in which the individual can maintain dignity. When necessary, assistance to  detainees with disabilities who cannot perform basic life functions shall be provided by individuals who are trained and qualified to assist persons with physical and/or mental impairments. Such training may be provided by the health services authority and may involve the expertise of relevant community organizations and government agencies. Discrimination on the basis of disability is prohibited.

Ex. 14 to Armstrong Decl.
Page 79 of 85

## F. Hair Care

Detainees are allowed freedom in personal grooming unless a valid safety, security, or medical concern requires an exception that is fully justified and documented.

Detainees shall be provided hair care services in a manner and environment that promotes sanitation and safety, in accordance with the requirements for "Barber Operations" in standard "1.2 Environmental Health and Safety" and requirements in standard "5.5 Religious Practices."

## G. Issuance of Bedding, Linen and Towels

All detainees shall be issued clean bedding, linens and a towel and be held accountable for those items.

The standard issues shall be, at a minimum:

1. bedding: one mattress, one blanket and one pillow (additional blankets shall be issued, based on local indoor-outdoor temperatures);

2. linens: two sheets and one pillowcase; and

3. towel: one towel.

## H. Exchange Requirements

Detainees shall be provided with clean clothing, linen and towels on the following basis:

1. a daily change of socks and undergarments; an additional exchange of undergarments shall be made available to detainees if necessary for health or sanitation reasons;

2. at least twice weekly exchange of outer garments (with a maximum of 72 hours between changes) at a minimum;

3. weekly exchange of sheets, towels and pillowcases at a minimum; and

4. an additional exchange of bedding, linens, towels or outer garments shall be made available to detainees if necessary for health or sanitation reasons, and more frequent exchanges of outer garments may be appropriate, especially in hot and humid climates.

Volunteer detainee workers may require exchanges of outer garments more frequently than every 72 hours; and

Volunteer food service workers shall exchange outer garments daily.

*Clothing exchanges shall generally be on a one-for-one basis to prevent hoarding and to ensure an adequate supply.*

*Detainees are not permitted to wash clothing, bedding, linens, tennis shoes, or other items in the living units, unless proper washing and drying equipment is available and the facility has written policy and procedures for their use. Any washing and drying policies and procedures shall be posted in the washing area and shall be included in the detainee handbook.*

Ex. 14 to Armstrong Decl.
Page 80 of 85

# 5.8 Voluntary Work Program

## I. Purpose and Scope

This detention standard provides detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

While not legally required to do so, ICE/ ERO affords working detainees basic Occupational Safety and Health Administration (OSHA) protections.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);

- Contract Detention Facilities (CDFs); and

- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.* Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility.

2. Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.

3. Essential operations and services shall be enhanced through detainee productivity.

4. The negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions shall comply with all applicable federal, state and local work safety laws and regulations.

6. There shall be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation or disability.

7. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or

Ex. 14 to Armstrong Decl.
Page 81 of 85

who is illiterate.

# III. Standards Affected

This detention standard replaces "Voluntary Work Program" dated 12/2/2008.

This detention standard incorporates the requirements regarding detainees' assigned to work outside of a facility's secure perimeter originally communicated via a memorandum to all Field Office Directors from the Acting Director of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) (11/2/2004).

# IV. References

American Correctional Association, *Performance-based Standards for Adult Local Detention Facilities*, 4th Edition: 4-ALDF-5C-06, 5C-08, 5C-11(M), 6B-02.

ICE/ERO *Performance-based National Detention Standards 2011*:

- "1.2 Environmental Health and Safety"; and
- "4.1 Food Service."

# V. Expected Practices

## A. Voluntary Work Program

Detainees shall be provided the opportunity to participate in a voluntary work program. The detainee's classification level shall determine the type of work assignment for which he/she is eligible. Generally, high custody detainees shall not be given work opportunities outside their housing units/living areas. Non-dedicated IGSAs will have discretion on whether or not they will allow detainees to participate in the voluntary work program.

## B. Work Outside the Secure Perimeter

ICE detainees may not work outside the secure

perimeter of non-dedicated IGSA facilities.

*In SPCs, CDFs, and dedicated IGSAs, low custody detainees may work outside the secure perimeter on facility grounds. They must be directly supervised at a ratio of no less than one staff member to four detainees. The detainees shall be within sight and sound of that staff member at all times.*

## C. Personal Housekeeping Required

Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.

*Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*

1. *making their bunk beds daily;*

2. *stacking loose papers;*

3. *keeping the floor free of debris and dividers free of clutter; and*

4. *refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

## D. Detainee Selection

The facility administrator shall develop site-specific rules for selecting work detail volunteers. These site-specific rules shall be recorded in a facility procedure that shall include a voluntary work program agreement. The voluntary work program agreement shall document the facility's program and shall be in compliance with this detention standard.

*The primary factors in hiring a detainee as a worker shall be his/her classification level and the specific requirements of the job.*

1. *Staff shall present the detainee's name to the shift supervisor or the requesting department head.*

2. *The shift supervisor or department head shall review the detainee's classification and other relevant documents in the detainee's detention file.*

3. *The shift supervisor or department head shall*

Ex. 14 to Armstrong Decl.
Page 82 of 85

*assess the detainee's language skills because these skills affect the detainee's ability to perform the specific requirements of the job under supervision. To the extent possible, work opportunities shall be provided to detainees who are able to communicate with supervising staff effectively and in a manner that does not compromise safety and security.*

4. *Inquiries to staff about the detainee's attitude and behavior may be used as a factor in the supervisor's selection.*

*Staff shall explain the rules and regulations as well as privileges relating to the detainee worker's status. The detainee shall be required to sign a voluntary work program agreement before commencing each new assignment. Completed agreements shall be filed in the detainee's detention file.*

## E. Special Details

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, may involve labor-intensive work.

## F. Discrimination in Hiring Prohibited

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, gender, sexual orientation or disability.

## G. Detainees with Disabilities

The facility shall allow, where possible, detainees with disabilities  to participate in the voluntary work program in appropriate work assignments. Consistent with the procedures outlined in Standard 4.8 "Disability Identification, Assessment, and Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure that detainees with disabilities have an equal opportunity to access, participate in, and benefit from the voluntary work programs.

## H. Hours of Work

Detainees who participate in the volunteer work program are required to work according to a schedule.

The normal scheduled workday for a detainee employed full time is a maximum of 8 hours. Detainees shall not be permitted to work in excess of 8 hours daily, 40 hours weekly.

Unexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program.

## I. Number of Details in One Day

The facility administrator may restrict the number of work details permitted a detainee during one day.

*In SPCs, CDFs, and dedicated IGSAs a detainee may participate in only one work detail per day.*

## J. Establishing Detainee Classification Level

If the facility cannot establish the classification level in which the detainee belongs, the detainee shall be ineligible for the voluntary work program.

## K. Compensation

Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy.

The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.

## L. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for such causes as:

1. unsatisfactory performance;

2. disruptive behavior, threats to security, etc.;

3. physical inability to perform the essential

Ex. 14 to Armstrong Decl.
Page 83 of 85

elements of the job due to a medical condition or lack of strength;

4. prevention of injuries to the detainee; and/or

5. a removal sanction imposed by the Institution Disciplinary Panel for an infraction of a facility rule, regulation or policy.

When a detainee is removed from a work detail, the facility administrator shall place written documentation of the circumstances and reasons in the detainee detention file.

Detainees may file a grievance to the local Field Office Director or facility administrator if they believe they were unfairly removed from work, in accordance with standard "6.2 Grievance System."

## M. Detainee Responsibility

The facility administrator shall establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

The detainee is expected to be ready to report for work at the required time and may not leave an assignment without permission.

1. The detainee shall perform all assigned tasks diligently and conscientiously.

2. The detainee may not evade attendance and performance standards in assigned activities nor encourage others to do so.

3. The detainee shall exercise care in performing assigned work, using safety equipment and taking other precautions in accordance with the work supervisor's instructions.

4. In the event of a work-related injury, the detainee shall notify the work supervisor, who shall immediately implement injury-response procedures.

## N. Detainee Training and Safety

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility administrator shall ensure that all department heads, in collaboration with the facility's safety/training officer, develop and institute appropriate training for all detainee workers.

1. The voluntary work program shall operate in compliance with the following codes and regulations:

   a. Occupational Safety and Health Administration (OSHA) regulations;

   b. National Fire Protection Association 101 Life Safety Code; and

   c. International Council Codes (ICC).

   Each facility administrator's designee is responsible for providing access to complete and current versions of the documents listed above.

   The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

2. Upon a detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials, including:

   a. safety features and practices demonstrated by the supervisor; and

   b. recognition of hazards in the workplace, including the purpose for protective devices and clothing provided, reporting deficiencies to their supervisors (staff and detainees who do not read nor understand English shall not be authorized to work with hazardous materials).

   A detainee shall not undertake any assignment before signing a voluntary work program agreement that, among other things, confirms that the detainee has received and understood training from the supervisor about the work assignment.

Ex. 14 to Armstrong Decl.
Page 84 of 85

The voluntary work program agreement, which each detainee is required to sign prior to commencing each new assignment, shall be placed in the detainee's detention file.

3. For a food service assignment, medical staff, in conjunction with the U.S. Public Health Service, shall ensure that detainees are medically screened and certified before undertaking the assignment.

4. The facility shall provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

5. The facility administrator shall ensure that the facility operates in compliance with all applicable standards.

## O. Detainee Injury and Reporting Procedures

The facility administrator shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

If a detainee is injured while performing his/her work assignment:

1. The work supervisor shall immediately notify facility medical staff. In the event the accident occurs in a facility that does not provide 24-hour medical care, the supervisor shall contact the on-call medical officer for instructions.

2. First aid shall be administered as necessary.

3. Medical staff shall determine what treatment is necessary and where that treatment shall take place.

4. The work supervisor shall complete a detainee accident report and submit it to the facility administrator for review and processing and file it in the detainee's detention file and A-file.

Ex. 14 to Armstrong Decl.
Page 85 of 85