# BAKER DECLARATION

# EXHIBIT F

```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON

 3    _____

 4   STATE OF WASHINGTON,           )

 5              PLAINTIFF,          ) NO. 3:17-CV-05806-RJB

 6      VS.                         )

 7   THE GEO GROUP, INC.,           )

 8              DEFENDANT.          )

 9                                  )

10                                  )

11    _____

12           DEPOSITION UPON ORAL EXAMINATION OF

13                WILLIAM A. MCHATTON

14    _____

15                    10:00 A.M.

16                 FEBRUARY 1, 2019

17              800 FIFTH AVENUE, SUITE 2000

18                SEATTLE, WASHINGTON

19

20

21

22

23

24   REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                      A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4
        MARSHA CHIEN
 5      ANDREA BRENNEKE
        LA ROND BAKER
 6      Assistant Attorney Generals
        Office of the Attorney General
 7      800 Fifth Avenue, Suite 2000
        Seattle, Washington 98104
 8      (206) 464-7744
        andreab3@atg.wa.gov
 9      larondb@atg.wa.gov
        marshac@atg.wa.gov
10

11
     FOR THE DEFENDANT:
12
        MICHAEL PUSATERI
13      Greenberg Traurig
        2101 L Street, N.W.
14      Suite 1000
        Washington, D.C. 20037
15      (202) 533-2354
        pusaterim@gtlaw.com
16

17

18   ALSO PRESENT:  CAITIE HALL

19

20

21

22

23

24

25
```


206 622 6875 │ 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1      Q.  So --
 2      A.  Did I tell anybody that I was going to be going
 3   to a deposition?
 4      Q.  Did you discuss the details of what you might
 5   testify to?
 6      A.  No.
 7      Q.  Did you speak with any ICE employees?
 8      A.  No.
 9      Q.  Did you speak with any ICE attorneys?
10      A.  No.
11      Q.  How long were you employed by The GEO Group?
12      A.  From February 9th, 2004 through I believe my
13   resignation date, retirement date was like August 28th,
14   2018.
15      Q.  What positions did you hold during your
16   employment at The GEO Group?
17      A.  I was the facility's first compliance manager and
18   then was promoted to the associate warden security in, I
19   believe, 2010.
20      Q.  And during your employment for The GEO Group
21   where were you located?
22      A.  Originally -- the facility did not open until
23   April 23rd, 2004.  The original location of the facility
24   for ICE detention was in Seattle on Airport Way, and I
25   had to prepare the manuals, the policies and procedures
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   for the facility that would be approved by Immigration

 2   in Washington, D.C., before we opened.  So I basically

 3   moved out of my home in -- with my 95-year-old mother,

 4   worked 12 to 14 hours a day, six days a week to prepare

 5   those manuals.

 6       Q.  So when you say "those manuals," can you please

 7   describe what you mean by that?

 8       A.  Policies and procedures that the Northwest

 9   Detention Center operated under.

10       Q.  And did you develop all of the policies and

11   procedures that the Northwest Detention Center utilizes

12   or utilized when it opened?

13       A.  Yes.

14       Q.  Does that mean that you also developed the

15   policies and procedures covering the voluntary work

16   program?

17       A.  Let me add this to my statement because there's a

18   story that goes with it.  I'd prefer to tell the story.

19       Q.  Okay.

20       A.  You okay with that?

21       Q.  We're okay with it for now.  We'll see where it

22   goes.

23       A.  The original warden of the facility was from the

24   Bureau of Prisons.  The associate warden was from the

25   Department of Corrections, State of Washington.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    I beat that by -- and we opened.

2        Q.   Great.   You've got an incredible memory, which is

3    very lucky.

4        A.   Depends on the subject.

5        Q.   Hopefully of the voluntary work program.

6             So in terms of crafting the policies governing

7    the voluntary work program, do you remember your process

8    for that?

9        A.   I absolutely do.

10       Q.   Okay.   Can you tell me about that?

11       A.   Because the process of that was no different than

12   any of the other processes.   I had devised a framework

13   for the -- for the policies, meaning what it'd look

14   like.   Okay.   And my background as a policy person was

15   to present information to the person that I want to have

16   follow these rules and regulations in a manner of "I

17   will do this."

18            So it was pretty much -- let me think a minute.

19   I was going to say first person.   That doesn't sound

20   correct in my mind, and so guess it would be second, you

21   will blah, blah, blah, blah.   And so I took that which

22   was the National Detention Standard on the voluntary

23   work program, and I downloaded that into my framework

24   and then I reworked it to let the individual reading it

25   know that that was his or her responsibility to do it in

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    line with that.

2        Q.  Okay.

3        A.  Does that make sense?

4        Q.  It does make sense.

5            So you drafted the policies governing the

6    voluntary work program at the Northwest Detention Center

7    yourself but with the influence of the PBNDS; is that

8    correct?

9        A.  Close.  Influence, absolutely.  But it was the

10   National Detention Standards.

11       Q.  Okay.

12       A.  I don't think it became PBNDS until 2008.

13       Q.  That's correct.  Thank you for that correction.

14           So is it fair to say that ICE gave approval of

15   your policy, but it did not give you directive around

16   how the policy needed to be drafted?

17       A.  Oh, no.

18           MR. PUSATERI:  Object.  You can answer.

19       Q.  (BY MS. BAKER)  Go ahead.

20       A.  They were quite specific.

21       Q.  Can you tell me how specific they were?

22       A.  They wanted it to model the National Detention

23   Standards, mimic.

24       Q.  But you had provided other policies to ICE that

25   had not actually been --


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    A.   Everything --

2         MR. PUSATERI:   Object; misstates testimony.

3    A.   Everything that we operated under was driven by

4    the National Detention Standards.

5    Q.   But you as a GEO employee drafted the policies

6    and created the policies yourself; is that correct?

7    A.   Yep, I drafted them.   They were approved by

8    initially headquarters, and then any revisions that were

9    annual had to be signed by both the ICE ranking official

10   in ICE as well as us.

11   Q.   So I want to go back.

12        You indicated that you had two positions when you

13   worked for The GEO Group at the Northwest Detention

14   Center.  One of them was compliance manager; is that

15   correct?

16   A.   That was my first position.

17   Q.   And the other was as assistant warden; is that

18   correct?

19   A.   Correct.

20   Q.   Can you tell me in your position as compliance

21   manager what duties you had relating to the voluntary

22   work program?

23   A.   The duties were, first, to have a policy and

24   procedure that would be acceptable to ICE and the

25   warden.  At that point in time, both CSC and later GEO

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1     A.   Yeah.   It was the guy who replaced me, Bruce

2  Scott.

3     Q.   And was there a previous chief of security before

4  Bruce Scott?

5     A.   Yes.

6     Q.   If you don't recall, that's okay, but I will --

7     A.   Jaramillo, J-a-r-a-m-i-l-l-o.

8     Q.   Do you know how long Bruce Scott was in that

9  position?

10     A.   I would prefer not to guess.

11     Q.   Okay.   So as associate warden, did you have

12  responsibility for ensuring that GEO officers supervised

13  detainee workers in the voluntary work program?

14     A.   The way I heard your question is did I have

15  supervision responsibility over the officers who --

16  dotted line.   Direct would come from the chief and

17  captain and the lieutenant, chief lieutenant.

18     Q.   Did you develop training for the GEO officers

19  that oversaw the detainee workers in the voluntary work

20  program?

21     A.   I believe that's included within the academy.

22     Q.   Can you tell me what that means?

23     A.   What I just said?

24     Q.   That's correct.

25     A.   Before and into the -- before an individual

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    officer is placed on the job, he or she must complete I

2    believe it to be approximately six-weeks training

3    academy, plus I think it's two weeks on-the-job training

4    before he or she is assigned a shift and a post, et

5    cetera.

6        Q.  And it's your understanding that supervising

7    detainee workers is part of the training that GEO

8    officers receive in the academy?

9        A.  I believe it is.

10       Q.  Do you know if there are particular policies or

11   documents that GEO guards would receive as part of their

12   training regarding supervising detainee workers in the

13   voluntary work program?

14       A.  My recollection of the way it was originally in

15   the compliance is that, for example, Alisha Singleton or

16   Michael Heye, they have been pretty much -- Alisha was

17   the original classification officer, and then I guess

18   Michael Heye was added to that role.  And so Alicia was

19   lead.

20           And so either one of those two would conduct a

21   class as part of the academy, and they would use the NDS

22   or the PBNDS or our own policies.  They handed out one

23   or both.

24       Q.  And so when you say they would use your own

25   policies --

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1     Q.   And then could a detainee worker be disciplined

2   either through the IDP process or the UDC -- is it UDC,

3   the unit disciplinary?  Is it UDC or UDP?

4     A.   UDC.

5     Q.   So either IDP or UDC, could a detainee worker be

6   disciplined through either of those tracks for engaging

7   in work stoppage?

8          MR. PUSATERI:  Object to form.

9     A.   Hypothetically, yes.  But I don't ever recall

10  that we actually ever did charge an individual with

11  that.

12    Q.   Why do you say hypothetically, yes?

13    A.   It's -- again, it's within the standard that

14  refusing to work.

15    Q.   So refusing to work is something that a detainee

16  worker could be penalized for through the IDP process?

17         MR. PUSATERI:  Object to form.

18    Q.   (BY MS. BAKER)  Is that right?

19    A.   Given the voluntary work program, you could quit

20  at a moment's notice.  I just don't recall.

21    Q.   Okay.  That's fine.

22         And then as an associate warden, what were your

23  duties regarding training detainee workers for

24  participating in the voluntary work program?

25    A.   Typically, that training was conducted by either

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    the housing unit officer, because he or she had the

2    detainee workers there in the housing unit, food

3    service, laundry supervisor, whomever was on point

4    overseeing.

5        Q.  And what were your duties in relation to that

6    training, the training for detainee workers?

7        A.  My duties as it pertained to -- I don't think I

8    had any involvement.  I never -- I don't recall ever

9    having trained a detainee.

10       Q.  Did you have responsibility to ensure that the

11   proper paperwork was being completed for detainee

12   workers?

13       A.  Going back to those audits.

14       Q.  And what were your duties regarding generally

15   monitoring the voluntary work program?

16           MR. PUSATERI:  Object to form.

17       Q.  (BY MS. BAKER)  And I can ask that question a

18   different way if you would prefer.

19       A.  Yeah.

20       Q.  I told you some of my questions will be inartful,

21   so please don't hesitate to say reframe it.

22           So in terms of ensuring that the voluntary work

23   program was operating in compliance with GEO's policies,

24   what were your duties as the associate warden?

25       A.  I think probably the best way to answer that is

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    need in the housing units.  Then laundry had a set
2    number, but that changed again with the population
3    increasing and we -- my recollection was we went to two
4    shifts.
5         So I think the answer is I do not recall having
6    been involved in the numbers of workers assigned to food
7    service.  I think that was between Bert and who was then
8    her supervisor, Kimble.
9      Q.  Ryan Kimble?
10     A.  Yeah.
11     Q.  So is it your understanding --
12     A.  To the best of my knowledge, I don't recall ever
13   having participated in that.
14     Q.  And not just the kitchen, but is it your
15   understanding that administrators at the Northwest
16   Detention Center are the ones responsible for
17   determining how many detainee workers will work per
18   shift in a particular position?
19     A.  May I hear that question again, please.
20     Q.  It's a tough one.
21         So is it your recollection that GEO employees at
22   the Northwest Detention Center are the ones who are
23   responsible for determining how many detainee workers
24   will be assigned to a particular shift for a particular
25   position?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        A.   GEO people, sure.

2        Q.   And you indicated who you think would be

3   responsible for making that decision for the kitchen.

4             Who do you think would be responsible for

5   determining the number of detainee workers that are

6   necessary per shift for the laundry?

7        A.   Who was responsible for saying how many employee

8   detainee workers that he wanted in laundry?  The laundry

9   supervisor.

10       Q.   And who is the laundry supervisor?

11       A.   It's a bid post.  I believe it's a bid post.

12       Q.   I don't know what that means.

13       A.   We went union, and, therefore, all the posts

14  within the facility are open to bid.

15       Q.   And who would be responsible for making the

16  determination regarding how many pod porter positions

17  are available per shift per unit?

18       A.   I believe that I did that in conjunction with the

19  -- it could have been done before I became -- yeah,

20  probably was.  I don't recall ever participating in a

21  meeting after I became the associate to change the

22  number of detainee workers in the housing unit.

23       Q.   But it would have been your responsibility as the

24  associate warden to make that determination if it were

25  necessary?

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.  Probably not because it never crossed my desk.  I

2   mean, if they wanted to increase the number or -- there

3   were -- the jobs that existed in the housing units were

4   identified on a document and available to the housing

5   unit staff so that if they wanted to -- an individual

6   detainee was released and therefore now there's a

7   vacancy, the classification department would have a

8   waiting list and they would pass that back to the

9   officer in that housing unit to say Joe Bocaroni is the

10  next guy up.

11     Q.  Do you know who would be responsible for

12  determining how many barbers would be assigned to a

13  particular shift in the barbershop?

14     A.  Again, we increased the number of barbers when we

15  increased the population.  We increased the number of

16  barber chairs.  The recreation department as, it was

17  titled back then, oversaw the barbershop.

18     Q.  And was that a decision that you made?

19     A.  Was what a decision I made?

20     Q.  To increase the number of barbers when the

21  population of the NWDC increased?

22     A.  Probably.

23     Q.  And I know this will get a little bit tedious,

24  but I just want to make sure I have all of the

25  information for each of the positions.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1          So do you know who would be responsible for

2    increasing the number of detainee workers assigned to

3    the gray mile per shift?

4       A.   I think that rested with the captain.  Could have

5    been also -- could have been -- I believe the captain.

6    I'm not certain.

7       Q.   And did you have to receive ICE approval for any

8    of these increases in the detainee worker assignments?

9       A.   We met with the ICE administration weekly, and

10   this would be a subject of presentation.  It would not

11   necessarily involve their blessing.  If they objected,

12   they would say so.

13      Q.   So a couple of times you said that the detainee

14   worker assignments in the voluntary work program

15   increased when the population of the Northwest Detention

16   Center increased.

17          Can you tell me more about that, how those two

18   are correlated?

19      A.   The number of jobs in the housing units did not

20   change.  The number of jobs available in the barbershop

21   changed, laundry changed and food changed.  I do not

22   recall other changes.

23      Q.   And why did they change?

24      A.   Volume, number of people.

25      Q.   So it's fair to say that you needed more detainee

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    workers to offset the larger population that was in the
 2    facility; is that right?
 3        A.   Yep.
 4        Q.   Did ICE ever object to GEO's request or GEO's
 5    informing them that they were increasing the detainee
 6    worker assignments?
 7        A.   Not to my recollection.
 8             MR. PUSATERI:  If you don't mind, I would like to
 9    get some water and we'll take a break.
10             (Recess taken.)
11        Q.   (BY MS. BAKER)  So earlier you discussed drafting
12    the voluntary work program policy and getting ICE
13    approval, and I think you indicated that you were able
14    to draft the policy and get it to ICE before the
15    deadline.
16             Can you tell me how long, if you remember, it
17    took ICE to approve that policy?
18        A.   Once we had a course of action, the National
19    Detention Standards, they received the administrative
20    and the disciplinary segregation and after that they got
21    one or two more, maybe three at the absolute most to
22    review per se individual.  And then the word came back
23    was you now know where we want you to go, and so the
24    next -- I don't recall.  This one's done, here you go.
25    This one's done.  I recall saying, okay, this is our

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   "The detainee work program shall not conflict with any
 2   other requirements of the contract and must comply with
 3   all applicable laws and regulations."
 4        As the compliance manager, you drafted the
 5   policies governing the voluntary work program; is that
 6   right?
 7     A.  In accordance with the National Detention
 8   Standards.
 9     Q.  Did you do anything to ensure that the voluntary
10   work program complied with all applicable laws and
11   regulations?
12     A.  As it pertained to that as it was directed by the
13   standards, yes.
14     Q.  When you say as it pertains to that, can you tell
15   me what you mean?
16     A.  Requirements of the contract.  There's other
17   elements in the contract that pertain to visits,
18   attorney visits, religious freedoms, recreational
19   activity, and not one activity was more important than
20   the other.  So a detainee was free --
21     Q.  Did you do anything to ensure that the policies
22   did not conflict with any of the applicable laws and
23   regulations?
24     A.  Based upon the ones that we -- it was directed
25   toward, yeah.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1       Q.  And when you say "it was directed toward," can

 2   you tell me --

 3       A.  Well, it's --

 4           MR. PUSATERI:  Object; asked and answered.

 5       A.  Just because a person has one arm, a disability,

 6   doesn't preclude that individual from working if he or

 7   she chooses to.  That's what I mean.

 8       Q.  And you can go ahead and move that to the side.

 9   We're going to come back to that document, so keep it

10   close by.

11           (Off the record.)

12       Q.  (BY MS. BAKER)  So you've been handed Exhibits --

13   and sorry to dump these all on you at once -- 83, 84,

14   85, 88, 89, and 91.  And we are going to go through each

15   of those individually.  So let's look first at 83.

16           Are you familiar with this document?

17       A.  Yes.

18       Q.  What is it?

19       A.  It is a detainee Job Description for Food Service

20   Kitchen, Cook, Prep or Server.

21       Q.  Did you create this job description?

22       A.  Again, I may have had a hand in its original

23   development, but I believe I would credit Bert with --

24   Bert Henderson, the food service manager, with its

25   content.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   that people did?

2       A.   It was a job, it was a part of the voluntary work

3   program.

4       Q.   So there should be a job description for the gray

5   mile?

6       A.   I believe that there is.

7       Q.   And I want to ask you about a couple other

8   details that we don't seem to have job descriptions for.

9            So my understanding is that detainee workers did

10  painting in the facility as part of the voluntary work

11  program.  Is that your understanding?

12      A.   Detainee workers who wanted to paint the housing

13  unit were provided the paint, and then they were paid

14  for that.  There probably was not a job description -- I

15  don't know if there's a job description for it.

16      Q.   And how were detainee workers paid for painting

17  the housing units?

18      A.   Any work that was performed was performed under

19  the supervision of an officer, and there was a form that

20  was filled out by that officer that the detainee put his

21  or her name onto.  And I think that went in to

22  classification before it went to the business office for

23  payment.

24      Q.   Since we don't have a job description for the

25  painting detail, can you tell me what that detail --

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   descriptions that we looked at earlier, they have a

 2   place for the detainee to sign to acknowledge that they

 3   understand the scope of the work.

 4        Do you know whether or not there was a job

 5   description for the gray mile that included buffing and

 6   utilizing an electrical buffer?

 7        A.  I would think so, but I don't know.

 8        Q.  And what time does the gray mile shift happen?

 9        A.  Typically, during counts when things slow down

10   and then at night.

11        Q.  And when you say at night, what time is that?

12        A.  I don't recall.

13        Q.  Do you know approximately how many hours

14   individuals or detainee workers would work in the gray

15   mile detail?

16        A.  If all they were doing was sweeping, moping and

17   buffing, they probably were out there doing that for

18   maybe an hour and a half at the most.  If they were

19   doing the stripping of the floor for preparing for wax,

20   then they would do that in the evening.  And I do not

21   know how long they were assigned to on that detail.

22        Q.  Can you give me an approximation?

23        A.  No.  I prefer not to.

24        Q.  And can you tell me what you mean by if they were

25   stripping the floors?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   dollar and then received some sort of additional

2   benefit, some food benefit?

3       A.  I am not.

4       Q.  So I want to go back to these job descriptions.

5           So if you could look at Exhibit 83 and 84, and

6   look at the work duties for both of those positions and

7   these two positions are for kitchen jobs, cook, prep,

8   server and the dishwasher, pots and pans.

9       A.  (Witness reviewing document.)  Okay.

10      Q.  Can you tell me who determined what

11  responsibilities detainee workers who have these

12  positions, what they would do?

13          Like who is responsible for determining the scope

14  of work for those positions?

15      A.  Ultimately, Bert Henderson, the food service

16  administrator.

17      Q.  And then if we can move to Exhibit 85, which is

18  the laundry worker, can you tell me who's responsibility

19  it is for defining the scope of work for a laundry

20  worker?

21      A.  The corrections officer assigned to supervise the

22  laundry on the dayshift or swing shift.

23      Q.  So that's, I think, who may be responsible for

24  ensuring that that work is being done on a particular

25  day.  But who defined this scope of work that's in the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    Q.  Can you tell me when that occurred?

2    A.  No.

3    Q.  Can you tell me why it might have occurred?

4    A.  Why was your question?

5    Q.  Uh-huh.

6    A.  I'd have to speculate.

7    Q.  Did you have to -- did you as associate warden

8  have any responsibilities in approving instances where

9  detainee workers were paid more than a dollar?

10   A.  I think I did.

11   Q.  Do you recall providing that approval?

12   A.  I think if I approved it, I would have to take it

13 to them and get their approval to do it.  I think we --

14 I recall loosely instances in the barbershop where

15 barbers were working other details and got more than a

16 dollar a day.  You cited a situation, a hypothetical,

17 although it could have been, about working in the food

18 service department and then doing a detail in the

19 housing unit.  That would have been very rare I would

20 think because the -- it would just be rare.

21       But I know -- I don't know when, where, how,

22 what, but I do know that I approved more than -- if you

23 did more than one detail somebody was getting an extra

24 dollar.

25   Q.  Can you turn to Exhibit 14 in that binder?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.  Can you tell me about that?

2      A.  Not well, no.  Did I make a sandwich?  No.  Did

3   possibly Alicia or Michael Heye?  Maybe.  I don't -- I

4   don't know who.

5      Q.  So you left the facility last summer; is that

6   right?  You retired in the summer?

7      A.  Yeah.

8      Q.  Bert Henderson told us that they have been having

9   a hard time fully staffing the kitchen with detainee

10  workers.  Are you aware of that occurring?

11         MR. PUSATERI:  Object.

12     Q.  (BY MS. BAKER)  Are you aware of any incidents

13  where the ideal number of detainee workers to staff the

14  kitchen has not been reached?

15         MR. PUSATERI:  Object.

16     A.  She's your source.  If she's -- I wouldn't --

17     Q.  I'm asking you if you are aware of instances.

18     A.  I know periodically -- if ICE had two what we

19  called ICErs in a week, that could dramatically affect

20  the number of detainees available who departed and,

21  therefore, would dramatically affect her work crews on

22  potentially all three of her shifts, four of her shifts.

23  So I know that Bert would go to the housing unit herself

24  to attempt to motivate people to come to work for her as

25  well as other staff.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    chemicals when they are assigned to the laundry?

2         MR. PUSATERI:  Object.

3     A.  Not really.  Because the way they work, meaning

4    the washing machines, that is only attended to, to my

5    recollection, by staff and it's automatic.  And so it

6    requires very -- you might do it -- I don't know how

7    often you do it.  But you don't do it every day.  You

8    don't need to replace the canisters or whatever you want

9    to -- containers because the detergent that we use was a

10   combo unit of washer -- I mean detergent and the word

11   that's in my mouth is not -- Clorox bleach, bleach.  So

12   they didn't touch it.  I respected the detainees who

13   worked in laundry.

14     Q.  Why?

15     A.  Because it was of the length of time that they

16   worked.  They probably worked the longest.

17     Q.  Like how many hours do you think they worked?

18     A.  Six.

19     Q.  And when you say the length of time that they

20   worked, were there detainees who worked in the laundry

21   for long periods of time, like months or --

22     A.  If the guys who worked laundry liked laundry, and

23   the reasons for that are as individual as there are

24   people working laundry, I've asked some, but so to me my

25   recollection and reality is that the laundry had a very

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    document?

2        A.  Yes, I am.

3        Q.  What is it?

4        A.  It is the standard addressing personal hygiene,

5    revision dated December 2016 4.9.

6        Q.  If you turn to page 328 of this --

7        A.  320?

8        Q.  Eight.

9            On the bottom under Expected Practices, the first

10   paragraph reads, "Each detention facility shall have a

11   written policy and procedures for the regular issuance

12   and exchange of clothing, bedding, linen, towels and

13   personal hygiene items.  The supply of these items shall

14   exceed the minimum requirement for the number of

15   detainees to prevent delay in replacing the items."

16           We discussed the laundry earlier.  Detainee

17   workers are responsible for laundering the clothing, the

18   bedding, linens and towels that are referred to in this

19   standard; is that correct?

20       A.  We are, and the detainees assist in that, yeah.

21       Q.  So the detainee workers who work in the laundry

22   assist GEO in being able to meet this standard; is that

23   right?

24       A.  That is correct.

25       Q.  And so the detainee workers' labor is necessary

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1    visitation."  So that contact is the attorney-client
2    room.
3        Q.  And who cleans that area?
4        A.  The detainees would go in there because that's in
5    the controlled side of the facility.  The noncontact
6    visitation, they would clean that.
7        Q.  Detainee workers would clean and maintain the
8    noncontact visitation area?
9        A.  Yeah.  So would staff, so would officers.
10        Individual holding rooms, yes; including
11   designated space and appropriate screening, okay, from
12   that phrase including to the end of the sentence that
13   would be no because that would be outside of the
14   controlled environment.
15       Q.  So just so I'm clear, group and individual
16   holding rooms are cleaned and maintained by detainee
17   workers except to the extent that they are outside of
18   the secure facility, the secure part of the facility; is
19   that correct?
20       A.  Anything that is not within the controlled
21   environment of the facility is not cleaned by the
22   detainees.
23       Q.  So that part of the facility is maintained by the
24   contract janitors; is that right?
25       A.  Right.  So then the next sentence is about the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    rooms themselves.

2        Q.  And so there are 25 noncontact rooms and those

3    are maintained and cleaned by detainee workers?

4        A.  Uh-huh.

5        Q.  There are ten private nonmonitored

6    attorney-client rooms, and those are cleaned and

7    maintained by detainee workers?

8        A.  Right.

9        Q.  There are attorney-client offices?

10       A.  Those are not in the controlled environment.

11       Q.  Okay.  So those are cleaned by contract janitors?

12       A.  Yes.  If it's within -- they kept asking for

13   more, so some were -- one -- let me think.

14           Only one was within the controlled environment.

15   And needless to say it was space provided for the

16   storage of visitors personal items.  That was not

17   maintained.

18           (Deposition Exhibit No. 146 was marked for

19   identification.)

20       Q.  (BY MS. BAKER)  You've been handed a document

21   marked Exhibit 146.  Are you familiar with this

22   document?

23       A.  I have to be, I guess, because it's addressed

24   through me to Mike Ruckstuhl who was the acting AFOD at

25   the facility.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1            MR. PUSATERI:  Object.

 2     Q.  (BY MS. BAKER)  Sorry.  The physical plant.

 3            MR. PUSATERI:  Object.

 4     Q.  (BY MS. BAKER)  Actually, let's go back.

 5        You said the main person who is responsible for

 6   this is the fire and safety?

 7     A.  Procedure, the Northwest Detention Center fire

 8   and safety manager is the qualified individual to

 9   oversee environmental health program."  First sentence

10   in procedure.

11     Q.  Yeah.  So if you can -- what were your

12   obligations as associate warden in relationship to

13   ensuring that GEO met its obligations or that the

14   Northwest Detention Center complied with this policy?

15     A.  Supervise the fire and safety manager, ensure

16   that he attends to the duties and responsibilities as

17   outlined within this document and the standards and that

18   he had the -- employing him, making sure he was

19   knowledgeable and attentive of OSHA, WISHA and et

20   cetera.

21     Q.  Can you turn to Exhibit 12?

22     A.  (Witness complies.)

23     Q.  Are you familiar with this document?

24     A.  Little bit.

25     Q.  What is it?
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1          A.  It appears to have been produced in August of

2     2011, which would imply to me that Heather West was

3     possibly the creator of it in conjunction with maybe the

4     person who was the fire and safety manager, at that time

5     was Bruce Scott.

6          Q.  Bruce Scott is now the associate warden; is that

7     correct?

8          A.  Yes, he is.

9          Q.  Do you know why this document would have been

10    created?

11         A.  No, not exactly.

12         Q.  Do you know how this document is used in the

13    facility?

14         A.  I think it's an informational document that's

15    required -- Heather was good at taking something and

16    expounding upon it.  I can't -- I don't remember ever

17    having -- creating a housekeeping plan document as a

18    compliance person.  So I'm not sure.

19         Q.  Can you turn to page 3 in this document?

20         A.  (Witness complies.)

21         Q.  Do you know who would have made decisions about

22    the types of cleaners or disinfectants to be used to

23    clean the various parts of the facility that are listed

24    here?

25         A.  The cleaning products were approved ultimately by



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   the warden but through the fire and safety manager.

2       Q.   And do you know who would have made the decision

3   regarding how frequently certain parts of the facility

4   needed to be cleaned?

5       A.   That probably was driven by standard as well as

6   OSHA, WISHA guidelines.

7       Q.   And the fire -- would the fire and safety manager

8   be the one to make the recommendations?

9       A.   He in conjunction with the compliance person.

10  Food service if it's identified here could have been

11  involved, but it doesn't appear necessarily to be

12  specific by area.  It's a -- well, here we go, kitchen.

13  But looking at that, tables and sinks in the kitchen,

14  really there aren't -- stainless steel.  There aren't

15  any tables in the kitchen, so this is -- I already

16  talked about the food being served in the housing units.

17  Those tables, they had tables and they were stainless

18  steel.

19          So kettles, of course, are in the kitchen, there

20  is a bathroom in the kitchen.  Seems like it's a

21  conjunctive effort.

22      Q.   Let's go back to page 3.

23          The first chart is titled Facility Cleanup and

24  Daily Cleaning Schedule.  Who would have been

25  responsible for performing the cleaning tasks that are

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    identified in that chart?

2         MR. PUSATERI:  Object; mischaracterizes the

3    nature of the document.

4       A.  There's a lot of areas addressed there, floors

5    throughout the facility, windows and sills.

6       Q.  We can go through each one.

7         So floors, hallways, intake, medical area and

8    visitation is the first line of the chart.  And there

9    are directions to sweep and damp mop, strip, sill, wax

10   and spray buff as needed.

11        Who would be responsible for performing those

12   tasks?

13      A.  If it was in the controlled side of the facility,

14   the detainees would do it.  If it was not, it would be

15   GEO.

16      Q.  And then the next line is windows and window

17   sills?

18      A.  Again, both.

19      Q.  And both detainee workers if it's in the

20   controlled part of the facility and GEO employees if

21   it's outside of the controlled part of the facility?

22      A.  Right.

23      Q.  Sinks, commodes and showers.  Who is responsible

24   for cleaning those?

25      A.  Same.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.  In the controlled part, it's detainee workers;

2   outside of the controlled part, it's GEO employees; is

3   that correct?

4      A.  Uncontrolled, GEO.

5      Q.  Trash receptacles.  Is it true if it's inside of

6   the controlled part of the facility that detainee

7   workers would be responsible?

8      A.  Staff would also do that, if need be.

9      Q.  Furniture, vending machines and other equipment?

10     A.  There's no vending machines in the controlled

11   environment.

12     Q.  Going to the next chart, Housing Unit Cleaning

13   Schedule, Assigned Pod Porters.  Are the tasks in that

14   chart ones that would be provided by detainee workers?

15     A.  Yes.

16     Q.  Going to the next section, kitchen cleaning

17   schedule, are the tasks that are identified in this

18   chart ones that would be performed by detainee workers?

19     A.  As well as --

20     Q.  We can go through it line by line if it's easier

21   for you?

22     A.  Well, again, I've already said there's no tables

23   in the kitchen per se other than, you know, prep tables.

24     Q.  Pots and pans, are those cleaned by detainee

25   workers?

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.  Yes.

2      Q.  And the ovens and grills, are detainee workers

3   responsible for cleaning?

4      A.  And GEO staff.

5      Q.  When would GEO staff clean the ovens and grills

6   as opposed to --

7      A.  Typically after use.

8      Q.  -- as opposed to detainee workers cleaning them?

9      A.  Typically after use.  And then detainee workers

10  would come in and do the p.m. cleaning.  That would be a

11  separate chore of grill covers and all that.  There's

12  much more to it than -- I don't understand this.

13     Q.  You don't understand this document?

14     A.  Not a lot.  To me it's informational.  But it's

15  not a directive nature document.

16     Q.  It's is a summary document of cleaning tasks that

17  occur in the facility, though?

18     A.  Yeah.

19     Q.  And you believe that Heather West and/or Bruce

20  Scott were the ones who were responsible for creating

21  that document?

22     A.  Well, looking at the vintage and other material,

23  yes.

24     Q.  Turn to Exhibit 10.

25     A.  (Witness complies.)

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    REPORTER'S CERTIFICATE
 2      I, BETSY E. DECATER, the undersigned Certified Court
 3   Reporter, pursuant to RCW 5.28.010 authorized to
 4   administer oaths and affirmations in and for the State
 5   of Washington, do hereby certify that the sworn
 6   testimony and/or proceedings, a transcript of which is
 7   attached, was given before me at the time and place
 8   stated therein; that any and/or all witness(es) were
 9   duly sworn to testify to the truth; that the sworn
10   testimony and/or proceedings were by me stenographically
11   recorded and transcribed under my supervision, to the
12   best of my ability; that the foregoing transcript
13   contains a full, true, and accurate record of all the
14   sworn testimony and/or proceedings given and occurring
15   at the time and place stated in the transcript; that a
16   review of which was reserved; that I am in no way
17   related to any party to the matter, nor to any counsel,
18   nor do I have any financial interest in the event of the
19   cause.
20      WITNESS MY HAND and DIGITAL SIGNATURE this 13th day
21   of February, 2019.
22   _____
23   BETSY E. DECATER, RPR
     Washington Certified Court Reporter, CCR 3109
24   bdecater@yomreporting.com
25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com