**CHIEN DECLARATION**

**EXHIBIT A**

```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON

 3

 4   STATE OF WASHINGTON           )
                                   )
 5        Plaintiff,               )
                                   )
 6   vs.                           ) No. 3:17-CV-05806-RJB
                                   )
 7   THE GEO GROUP INC.            )
                                   )
 8        Defendant.               )

 9

10           DEPOSITION UPON ORAL EXAMINATION

11                   OF GREG BINGHAM

12

13                    10:13 A.M.

14                   MAY 23, 2019

15                 800 FIFTH AVENUE

16                    SUITE 2000

17             SEATTLE, WASHINGTON  98104

18

19

20

21

22

23

24   REPORTED BY:  CATHERINE A. DECKER, CCR NO. 1975

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         LANE POLOZOLA

 5         ANDREA BRENNEKE

 6         Office of the Attorney General

 7         800 Fifth Avenue, Suite 2000

 8         Seattle, Washington  98104

 9         lane.polozola@atg.wa.gov

10         andreab3@atg.wa.gov

11         206 442-4492

12

13         R. ANDREW FREE

14         Law Office of R. Andrew Free

15         P.O. Box 90568

16         Nashville, Tennessee  37209

17         844 321-3221

18         andrew@resist.law

19

20

21

22

23

24

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   For the Defendant:
 2         J. MATTHEW DONOHUE
 3         Holland & Knight LLP
 4         111 Southwest Fifth Avenue, Suite 2300
 5         Portland, Oregon   97204-3626
 6         503 517-2924
 7         matt.donohue@hklaw.com
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   Also present:   KATIE HALL, Legal Assistant
25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  insurance, his insurance for working, his personal
 2  health insurance and things like that.  His car, what's
 3  the depreciation on his car that he uses to, say, drive
 4  to and from the site.  What have his tools cost, that
 5  sort of thing.  So in those three you have cost
 6  reimbursement was last one, time and material, and
 7  fixed price.  And this is pretty typical of a fixed
 8  price.
 9                  MR. DONOHUE:  Can we take a break?
10                  MR. POLOZOLA:  Sure.
11                          [A brief recess was taken.]
12       Q.  [By Mr. Polozola] Okay.  So I want to continue
13  on with just your summary of opinions here.  And I
14  think on page 3 you say "There appears to have been no
15  ambiguity between ICE and GEO about the Voluntary Work
16  Program, the payment to program participants, and GEO's
17  reimbursement for those payments, which is detailed in
18  CLIN 0003 Detainee Voluntary Wages."  Is that your
19  opinion today?
20       A.  It is.
21       Q.  On the payment to detainees aspect of that
22  sentence, what do you believe is unambiguous?
23       A.  That they were to receive -- that it was to be
24  a passthrough cost and that they were to receive a
25  dollar a day -- a dollar a shift.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.   And on that second issue of a dollar a shift,
 2   is it your position that the contract requires GEO to
 3   pay them a dollar per shift?
 4             MR. DONOHUE:  Object to the form.
 5        A.   Based on, like, the standards and practices in
 6   my work in the federal procurement, I think people
 7   would interpret that or would operationalize that as
 8   that is what they needed to do is pay them a dollar a
 9   day -- a dollar a shift, a dollar a day.
10        Q.   Okay.  What standards are you referring to?
11        A.   Well, let me -- I mean, I could refer to the
12   Nash and Ciminic Good Administration of Government
13   Contracts, I could refer to the Contract Pricing
14   Reference Guides by the Defense Acquisition University,
15   could refer to the Formation of Government Contracts by
16   Nash and Ciminic, and various other treatises that kind
17   of form my opinions, the body of knowledge that I
18   developed.  But based on that, that's how a contractor
19   would and should operationalize the contract.
20        Q.   So I just want to understand clearly.  This is
21   how you interpret the contract?
22             MR. DONOHUE:  Object to the form.
23        A.   I'm at page 1, the third paragraph.  I'll just
24   say, I have not been asked to and do not express an
25   opinion on the proper interpretation of regulations
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  contracting officer.
 2       Q.  Right.  So am I misunderstanding that ICE
 3  could give GEO permission to exceed this amount and
 4  bill ICE for an amount above $114,975?
 5       A.  That's my understanding, yes.
 6       Q.  Are you aware of whether GEO has sought
 7  permission to exceed payments under CLIN 3 from ICE?
 8       A.  Definitively, no, I don't.
 9       Q.  Does CLIN 3 or anywhere else in the contract
10  state that GEO is limited to paying detainees $1 per
11  day?
12              MR. DONOHUE:  Object to the form.
13       A.  CLIN 3 indicates that GEO is limited to paying
14  the detainees to $1 per day.
15       Q.  So does GEO have the option of paying
16  detainees more than $1 per day in your opinion?
17       A.  Not without -- this program is an ICE program.
18  If ICE told GEO, We want you to pay something other
19  than a dollar per day, ICE has the ability to direct
20  GEO to do that.  And under a circumstance like that, I
21  think it would be typical of GEO to follow the
22  directions given by the contracting officer or the COR.
23       Q.  So back to kind of the question that started
24  this part of our conversation.  In addition to CLIN 3
25  and the paragraph on the voluntary work program that
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   they need to make more trips in the vehicles than they
 2   had anticipated.  And so as the fuel costs -- and so it
 3   appears as if GEO is going to exceed the not-to-exceed
 4   limit on fuel cost.  And GEO goes to the ICE COR and
 5   the COR says, I understand.  Continue to send me your
 6   receipts.  I'm going to mod the contract to increase
 7   that not to exceed.  That's a noncontroversial, kind of
 8   straightforward one.
 9           Another one might be more of what's called a
10   constructive change, and that is often, somehow the
11   parties disagree about whether this was a change to the
12   contract.  So maybe in this circumstance ICE believes
13   that this is something covered by the statement of
14   work, by the performance of work statement that GEO is
15   obligated to perform.  And GEO believes that it is not
16   covered by the performance work statement, that it is
17   something that GEO should be compensated for.  And so
18   then in those circumstances sometimes there is a
19   request for equitable adjustment or a modification.  A
20   request for equitable adjustment is a type of a
21   modification.  And the parties negotiate -- in the
22   extremes they actually litigate over these REAs, but
23   they negotiate and come to terms on them.
24                   MR. DONOHUE:  Can we take a break when
25   you get a chance?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1            MR. POLOZOLA:  Sure.
 2                  [A brief recess was taken.]
 3     Q.  So we were discussing contract modifications
 4  before the break, and I want to follow up.  Are you
 5  aware of whether GEO has proposed modifications to this
 6  contract regarding repayment of detainee wages?
 7     A.  Am I aware if there were any?
 8     Q.  If GEO has requested a modification to the
 9  contract with regard to CLIN 3 payment of detainee
10  wages.
11     A.  I think I remember a reference to that in one
12  of the deposition transcripts.
13     Q.  What was the reference that you're thinking
14  of?
15     A.  I think Ryan Kimble made a reference to it,
16  but it could have been Bill McHatton.  I don't
17  remember.
18     Q.  So I take it based on that you don't recall
19  the outcome of that request?
20     A.  I don't recall the outcome, no.
21     Q.  Could GEO request a modification to CLIN 3 to
22  pay detainees more than $1 per day?
23            MR. DONOHUE:  Object to the form.
24     A.  I know of no limitations on GEO to request a
25  change to the contract.  It might be denied, but I know
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  of no limitation on GEO to make the request.
2       Q.  Okay.  We're going to grab an exhibit that was
3  previously marked as Exhibit 188.
4              MR. POLOZOLA:  For the record it's
5  GEO-State 046233 [handing.]
6       A.  [Witness reviews document.]
7       Q.  [By Mr. Polozola] So you can have as much time
8  as you need, but I'll just ask, have you seen this
9  document before?
10      A.  I don't believe so.
11      Q.  And have you seen a document of this nature
12 before, not this specific one but a document like this?
13             MR. DONOHUE:  Object to the form.
14      A.  Yeah.  I've seen lots of letters like this
15 asking for a contract mod or a request for equitable
16 adjustment.
17      Q.  Okay.  So the subject line in this document is
18 "Request for equitable adjustment," and it lists the
19 contract number Northwest Detention Center.  Is this a
20 standard request for modification of the sort you were
21 discussing earlier, or is this different from what you
22 were envisioning?
23      A.  I've seen ones like this.  This is on the
24 simple side; it's straightforward.  I've seen others
25 that were much more complicated than this.  This makes

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              [The question was read back by the reporter.]
 2         Q.   I can ask it more directly if you would like.
 3         A.   Yes.
 4         Q.   Okay.  Do the parties have to live with the
 5    terms of the contract absent the contract modification?
 6              MR. DONOHUE:  Object to the form.
 7         A.   Both parties can change the contract.  And I'm
 8    not talking about just a formal change, like a mod to
 9    the contract, the paper document.  The government, ICE,
10    can impose changes on the contractor, and sometimes
11    they don't realize they're doing it.  They just
12    misinterpret or they interpret the contract differently
13    as to thinking that the contractor has to do something,
14    that this is included in their scope of work, and the
15    contractor disagrees.  And so the government in that
16    instance just barrels ahead saying you must do XYZ.
17    And the contractor typically has to continue performing
18    and then ask for this equitable adjustment.
19              So you're talking about -- and there's also
20    force majeure, just changes outside the control of the
21    parties.  So I don't have a succinct answer yes or no
22    to that.  I mean, if both parties -- often both parties
23    don't live precisely to the contract.  They require
24    things, ask for things, influence to get things that
25    are not precisely in the contract, but they are not
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   ICE and say, I would like you to mod CLIN 3 to say
 2   something different than CLIN 3 currently says.
 3       Q.   Would that be consistent with this provision
 4   of the PBNDS?
 5               MR. DONOHUE:   Object to the form.
 6       A.   Well, I just said that they could go to ICE
 7   and say, we would like to modify CLIN 3 in any -- and
 8   I'm just directing in any way -- to increase the price,
 9   to reduce its actual cost.  To increase the actual
10   cost, reduce the actual cost, they could ask for any --
11   I don't know why they would, but you're asking is it
12   theoretically possible?  It is theoretically possible.
13       Q.   So could GEO pay detainees more than $1 per
14   day under the PBNDS 2011?
15               MR. DONOHUE:   Object to the form.
16       A.   I don't think they could under the contract.
17       Q.   That wasn't my question.  I'm referring to
18   this section on compensation that we just reviewed.
19   Does this limit GEO to paying detainees $1 per day?
20       A.   I think the contract limits them to paying
21   them the actual cost of $1 per day.  This says at least
22   $1.
23       Q.   Okay.  And can we agree that "at least $1"
24   means that you could pay more than $1 under this
25   section of the PBNDS?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1            MR. DONOHUE:  Object to the form.
 2       A.   This says at least a dollar, but the contract
 3  says actual cost of a dollar, exactly a dollar.  I
 4  added the word "exactly," but it says "actual cost of
 5  $1."
 6       Q.   So you're not offering any opinion in this
 7  case that the PBNDS requires payment of only $1 to
 8  detainees in the VWP, correct?
 9       A.   I don't think it governs on the payment of --
10  CLIN 3 governs my opinion on the passthrough cost, the
11  actual cost that shall be paid to the detainees and
12  reimbursed by ICE.
13       Q.   And why doesn't this govern in your view?
14            MR. DONOHUE:  Object to the form.
15       A.   Well, I mean, CLIN 3 is very clear that it's
16  exactly a dollar.  This can be a dollar or more.  So
17  how do you interpret the contract, and you're asking
18  for contract interpretation of questions -- I'm giving
19  that, even though I said in my report, for my purposes
20  in my report I did not provide contract interpretation.
21  But I'm doing it now.  The way to interpret those
22  consistently would be exactly $1.  That comports with
23  CLIN 33 and it comports with PBNDS.
24       Q.   So back to the contract modification topic we
25  discussed a bit earlier.  Could GEO as you understand
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.  And so directing your attention to RFA 67 and
 2   I'll find you the page.
 3              MR. DONOHUE:  Page 21.
 4              MR. POLOZOLA:  Thank you.
 5        Q.  [By Mr. Polozola] So the request for admission
 6   no. 67 says, "Please admit that GEO has the option to
 7   pay more than $1 a day to detainee workers for work
 8   performed in the VWP at the NWDC."  And the response is
 9   "Admit."  Is your testimony consistent with GEO's
10   position in this case --
11              MR. DONOHUE:  Object to the form.
12        Q.  -- as stated in RFP 67?
13        A.  What I said is not consistent with RFA 67.
14        Q.  Does this modify or cause you to want --
15   excuse me.  Having viewed this, does this modify any of
16   the opinions you hold in this case?
17        A.  No.
18        Q.  Okay.  So looking at page 10 of your report
19   here, second full paragraph, where you're discussing
20   passthrough costs.  And there are two sentences here
21   about costs associated with administering the voluntary
22   work program.  So the last sentence here says "All
23   costs GEO expected to incur in administering the
24   Voluntary Work Program had to be factored into the
25   fixed prices included in the CLINs."
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.   Are you referring to the deposition of Ryan
 2   Kimble as GEO's 30(b)(6) representative?
 3        A.   Yes.
 4        Q.   Have you reviewed -- is that the only
 5   deposition transcript from Ryan Kimble that you've
 6   reviewed?
 7        A.   Yes.
 8        Q.   Okay.  Just wanted to clarify.
 9             A few followup questions on modifications
10   related to wage determinations.  I believe we discussed
11   those earlier.  And if I recall, you were
12   distinguishing between what might be viewed as
13   controversial versus noncontroversial requests for
14   modification; is that correct?
15        A.   That is correct.
16        Q.   So for a request for modification relating to
17   updated wage payment standards -- well, let me pause.
18   Do you have an understanding of what I'm referring to
19   when I say a request for modification related to
20   updated wage payment standards?
21        A.   Yes.
22        Q.   And what is that understanding so that we're
23   clear that we're on the same page?
24        A.   That there is a standard wage and that it's --
25   the contract is to be modified -- in the contract, in
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  the proposal, there were forecasted wages, wage rates
2  to be paid each year in the future.  And the forecasted
3  wage rates -- if the actual wage rates differed from
4  what was forecasted, then GEO could request a
5  modification related to that.
6      Q.  So is that the Department of Labor wage
7  determinations?
8      A.  Yes, I believe so.
9      Q.  I just want to be clear that we are referring
10 to the same thing.
11     A.  My understanding is that relates to employees.
12     Q.  So you have a copy of the contract, I believe,
13 somewhere in the bottom of your stack.
14     A.  So what page?
15     Q.  I'm looking at GEO-State 036980.  There are a
16 number of similar schedules.
17     A.  I'm on the page you referenced.
18     Q.  Okay.  And the only question is, is this an
19 example of the wage determination schedules that we
20 were just discussing?
21     A.  Yeah.  I mean, this one is dated, the date of
22 revision on the upper right of 7-25-14, and then there
23 would be presumably later ones that would come out that
24 would be -- that would affect, like, option year 1,
25 option year 2, option year 3.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  different than a dollar a day.  Separately, if you -- I
 2  thought your question was -- I think your initial
 3  question was treat them as employees.  And to treat
 4  someone who doesn't meet all the requirements as an
 5  employee would be in breach of the contract, I believe.
 6      Q.  Is that based on your interpretation of the
 7  contract?
 8              MR. DONOHUE:  Object to the form.
 9      A.  Yeah.  Things like breach are -- I mean, I
10  teach COs and CORs and company people about breach and
11  about the changes and that sort of thing.  So I have a
12  layman's, at least, understanding of that.  But as I
13  said, I'm not here to interpret the contract and I
14  offer no opinions in my report on interpretation of the
15  contract.
16      Q.  Okay.  In this solicitation process -- we'll
17  change tack for a moment.  So in this solicitation
18  process, are you aware of whether GEO's audited
19  financial statements were provided to ICE as part of
20  its proposal?
21      A.  I don't know if they were provided to ICE as
22  part of their proposal.
23      Q.  Is it typical for contractors to be required
24  to provide financial statements when submitting a
25  proposal?
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                REPORTER'S CERTIFICATE

 2

 3       I, CATHERINE A. DECKER, the undersigned Certified

 4   Court Reporter, pursuant to RCW 5.28.010 authorized to

 5   administer oaths and affirmations in and for the state

 6   of Washington, do hereby certify that the sworn

 7   testimony and/or proceedings, a transcript of which is

 8   attached, was given before me at the time and place

 9   stated therein; that any and/or all witness(es) were by

10   me duly sworn to tell the truth; that the sworn

11   testimony and/or proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the

14   foregoing transcript contains a full, true, and

15   accurate record of all the sworn testimony and/or

16   proceedings given and occurring at the time and place

17   stated in the transcript; that a review of which was

18   requested; that I am in no way related to any party to

19   the matter, nor to any counsel, nor do I have any

20   financial interest in the event of the cause.

21       WITNESS MY HAND this 10th day of June 2019.

22       [signature: Catherine A. Decker]

23

24   CATHERINE A. DECKER,
     Washington State Certified Court Reporter, #1975
25   cdecker@yomreporting.com
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com