UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                      Plaintiff,<br>     v.<br><br>THE GEO GROUP, INC.,<br><br>                      Defendant. | CASE NO. 17-5806 RJB<br><br>ORDER ON CROSS MOTIONS<br>FOR SUMMARY JUDGMENT |

This matter comes before the Court on The GEO Group Inc.'s ("GEO") Motion for Summary Judgment against the State of Washington (Dkt. 245) and the State of Washington's Motion for Summary Judgment on Minimum Wage Act Claim and Defendant The GEO Group, Inc.'s Preemption Defense (Dkt. 251). The Court has considered the pleadings filed in support of and in opposition to the motions and the file herein.

This case arises out of GEO's alleged failure to compensate immigration detainees at the Northwest Detention Center ("NWDC"), a private detention center, in accord with the Washington Minimum Wage Act ("MWA"). Dkt. 1. The parties now file cross motions for summary judgment. Dkts. 245 and 251. For the reasons provided below, GEO's motion (Dkt.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 1

245) should be denied and the State's motion (Dkt. 251) should be granted as to GEO's preemption defense and denied in all other respects.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

### A. FACTS

GEO is a private corporation that has owned and operated the NWDC, a 1,575-bed detention facility in Tacoma, Washington, since 2005. Dkt. 156, at 8-9. GEO operated and still operates the NWDC based on a series of contracts with the U.S. Immigration and Customs Enforcement ("ICE"). Dkts. 16-2, and 19. The first contract, contract ALC-2-C-0004, was signed by the company GEO acquired in 2002 ("2002 Contract") and applied to GEO's provision of services to ICE in 2005. Dkt. 246-1, at 1-137. Starting on October 24, 2009, GEO operated the NWDC pursuant to ICE contract HSCEDM-10-00001 ("2009 Contract"). Dkt. 246-2. From September 28, 2015 to the present, GEO has operated the NWDC under ICE contract HSCEDM-15-00015 ("2015 Contract"). Dkt. 246-3, at 1-203.

Under these contracts, GEO provides "detention management services including the facility, detention officers, management personnel, supervision, manpower, training certifications, licenses . . . equipment, and supplies" for immigration detainees awaiting resolution of immigration matters. *See e.g.* Dkt. 246-3, at 45.

Language in the 2002 Contract between GEO and ICE is different than that used in the 2009 or 2015 contracts as provided below.

**2002 CONTRACT**

Under the 2002 Contract, a detainee is defined as "[a]n individual confined within the facility under the authority of [the ICE];" and an employee "refers to a person employed by the contractor." Dkt. 246-1, at 18. The 2002 Contract provides that, "[s]ubject to existing laws,

regulations Executive Orders and other provisions of this contract, aliens unauthorized to be employed in the United States shall not be employed by [GEO] . . . to work on, under or with this contract." Dkt. 246-1, at 111.

Under the heading "Detainee Labor," the 2002 Contract provides: "[GEO] shall provide work opportunities for detainee volunteers subject to the approval of ICE." Dkt. 246-1, at 46. It notes that:

1. [GEO] may solicit volunteers. The number and activities of such volunteers shall be controlled and approved by [ICE's Contracting Officer's Technical Representative "COTR")] prior to the assignment of the activities. . .
2. [GEO] remains fully responsible to perform all services required under this contract with neither interruption nor diminishment of service regardless of the availability of detainee volunteers.
3. Creation of work opportunities is viewed primarily as a benefit to [ICE] and the detainees in custody. It should not be considered by [GEO] as an opportunity to diminish services or responsibilities.

Dkt. 246-1, at 46. The 2002 Contract's COTR was "designated to coordinate the technical aspects of [the contract] . . . however, he [was] not [authorized] to change any terms and conditions of the resultant contract, including price." Dkt. 246-1, at 107.

## 2009 CONTRACT and 2015 CONTRACT

The 2009 Contract and 2015 Contract require that GEO comply with all "applicable federal, state and local labor laws," and the Illegal Immigration Reform and Immigrant Responsibility Act. Dkts. 246-2, at 19 and 58; 246-3, at 46 and 52. They further provide that "[s]hould a conflict exist between any of these standards, the most stringent shall apply." Dkt. 246-2, at 58 and 246-3, at 52. Both contracts require that GEO perform all services in accordance with the applicable ICE Performance-Based National Detention Standards ("PBNDS"), and other standards. Dkt. 246-2, at (applying ICE 2008 PBNDS) 246-3, at 45 (applying ICE 2011 PBNDS).

The 2009 Contract and 2015 Contract define a "contractor employee" as an "employee of a [GEO] hired to perform a variety of detailed services under this contract. Dkts. 246-2, at 51 and 246-3, at 47. They define a detainee is "any person confined under the auspices and the authority of any federal agency. Many of those being detained may have substantial and varied criminal histories." Dkts. 246-2, at 51 and 246-3, at 47. Under the heading "Minimum Personnel Qualification Standards," the 2009 Contract and the 2015 Contract provide that:

> [GEO] shall agree that each person employed by [GEO] shall have a social security card issued and approved by the Social Security Administration and shall be a United States citizen or a personal lawfully admitted into the United States for permanent residence, have resided in the U.S. for the last five years . . . possess a high school diploma or equivalent (GED), and obtain a favorable Suitability for Employment Determination.

Dkts. 246-2, at 69 and 246-3, at 63. They further provide that "[s]ubject to existing law, regulations and/or other provisions of this contract, illegal or undocumented aliens will not be employed by [GEO] or on this contract." Dkt. 246-2, at 77 and 246-3, at 71.

Under the heading "Manage a Detainee Work Program" the 2009 Contract and 2015 Contract require that, "[d]etainee labor shall be used in accordance with the detainee work plan developed by [GEO], and will adhere to the ICE PBNDS on Voluntary Work Program" ("VWP"). Dkt. 246-2, at 89 and 246-3, at 82. While the ICE 2008 PBNDS (applicable to the 2009 Contract) provided that the VWP "compensation is $1 a day," (available online at http://www.ice.gov/detention-standards/2008/ (last accessed Aug. 5, 2019), under the ICE 2011 PBNDS (applicable to the 2015 Contract) on the VWP, "the compensation is at least $1.00 (USD) per day" (Dkt. 253-14, at 4). The 2009 Contract and the 2015 Contract further provide:

> The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial service or other jobs. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations.

> Detainees shall not be used to perform the responsibilities or duties of an employee of [GEO]. Detainees shall not be used to perform work in areas where sensitive documents are maintained . . .
> Appropriate safety/protective clothing and equipment shall be provided to detainee workers. Detainees shall not be assigned work that is considered hazardous or dangerous. . .
> It will be the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level.

Dkt. 246-2, at 89 and 246-3, at 82.

Both the 2009 Contract and the 2015 Contract contain a contract line item number that provides, "Detainee Volunteer Wages for the Detainee Work Program. Reimbursement for this line item will be at the actual cost of $1.00 per day per detainee. Contactor shall not exceed the amount shown without prior approval by the Contracting Officer." Dkts. 246-2, at 6 and 246-3, at 5. The unit price is listed as $114,975.00. *Id.* As was the case with the 2009 Contract, in the 2015 Contract, the contracting officer is the person authorized to change the contract. Dkts. 246-2, at 23 and 246-3, at 54 and 96. The 2009 Contract and the 2015 Contract provide that "[t]he contracting officer is the only person authorized to approve changes in any of the requirements under this contract. Notwithstanding any clause contained elsewhere in this contract, the said authority remains solely with the contracting officer." Dkt. 246-2, at 23 and 246-3, at 54.

## **VOLUNTARY WORK PROGRAM at the NWDC**

As above, GEO is also required by the 2009 Contract and 2015 Contract to manage a VWP. Dkts. 246-1, at 46 (2002 Contract), Dkt. 246-2, at 89 (2009 Contract) and Dkt. 246-3, at (2015 Contract). The 2002 Contract also refers to a VWP. Dkt. 246-1, at 46. GEO developed various polices regarding the VWP and discusses those policies in detainee handbooks. Dkt. 246, at 4 and 250.

Detainees who participate in the VWP collect and distribute laundry, prepare and serve food, clean, paint interior walls, and use electric shears to cut hair. Dkts. 184-1, at 8-19; 254-11 and

253-11, at 10. The detainees request to participate in the program (Dkts. 253-11, at 12-14 and 253-56, at 4-5), are assigned to jobs by GEO (Dkt. 253-11, at 8), are scheduled by GEO (Dkts. 253-21, at 13-14; 253-6, at 13-14), are trained by GEO (Dkt. 253-21, at 21; 253-20, at 6-10), are supervised by GEO (Dkt. 253-21, at 20-21) and GEO provides all equipment, materials and personal protective equipment (Dkts. 254-23 and 253-6, at 30-31). GEO pays detainees through a system called the "key banking system," electronically depositing their pay the day after they work. Dkt. 253-41, at 5-6. GEO also makes removal decisions. Dkt. 253-9, at 5.

GEO generally pays detainees who participate in the VWP at $1 per day (Dkt. 156, at 10) but acknowledges that it has occasionally paid workers more than $1 per day (Dkt. 253-15, at 20-21; 254-10, at 15 and 253-11, at 9). Each participant signs a "Voluntary Work Program Agreement," which is provided to the detainees in English or Spanish. Dkt. 247, at 2. These agreements indicate that compensation shall be $1 per day. *Id.*

**B. PROCEDURAL HISTORY**

On September 20, 2017, the State filed this case in Pierce County, Washington Superior Court. Dkt. 1-1. The Complaint maintains that the GEO-ICE Contracts at least allow for, if not require, GEO to compensate detainees working in the VWP commensurate with the State MWA. *Id.* The State alleges that GEO has been unjustly enriched by compensating detainees below that required by state law. *Id.* In its "quasi-sovereign interest," the State makes a claim against GEO for unjust enrichment, and seeks: (1) an order requiring GEO to disgorge its unjust enrichment for compensating detainees below the minimum wage, (2) declaratory relief that GEO is an "employer" subject to the MWA when managing detainee employees, and (3) injunctive relief for GEO to be enjoined from paying detainees less than the minimum wage. *Id.*

In its Answer, GEO makes a counterclaim for unjust enrichment, seeks declaratory and injunctive relief, and asserts thirteen affirmative defenses. Dkt 34.

On December 6, 2017, GEO's motion to dismiss, based in part on the defenses of express preemption and conflict/obstacle preemption, was denied. Dkt. 29.

On February 28, 2018, GEO's counterclaim for unjust enrichment was dismissed. Dkt. 44. Further, State's motion to strike the affirmative defenses of laches, unclean hands, failure to join L & I and ICE, and ripeness, justiciability, and a portion of the offset defense, were denied without prejudice; no finding was made as to the affirmative defense of preemption. *Id.* The remaining affirmative defenses were stricken. *Id.*

On April 26, 2018, GEO's motion to dismiss for failure to join ICE was denied. Dkt. 58. On May 13, 2019, the State's motion for summary judgment on GEO's affirmative defenses of laches, unclean hands and failure to join L & I and ICE was granted and those claims were dismissed. Dkt. 202.

### C. PENDING MOTIONS

GEO moves for summary judgment, arguing that derivative sovereign immunity bars the State from bringing these claims, the State's claims are preempted, and even if the State could bring these claims, its claim for violation of the WMWA should be dismissed because the detainees are not "employees," and that the State's unjust enrichment claims fails. Dkt. 245. The State moves for summary judgment on its WMWA claim, arguing that GEO has an employee-employer relationship with the detainees and the affirmative defense of preemption should be dismissed. Dkt. 251. Both parties have responded (Dkts. 266 and 270) and replied (Dkts. 273 and 275) to the motions, and they are ripe for review.

## II. DISCUSSION

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 7

## A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B. GEO'S DEFENSE OF DERIVATIVE SOVEREIGN IMMUNITY

GEO moves for dismissal of the State's claims, arguing that it is entitled to derivative sovereign immunity. Dkt. 245.

"[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016), as revised (Feb. 9, 2016). This immunity is not absolute. *Id.* A contractor is entitled to immunity when it performs work "authorized and directed by the Government of the United States." *Id.*, at 673. "[D]erivative sovereign immunity . . . is limited to cases in which a contractor had no discretion in the design process and completely followed government specifications." *Cabalce v. Thomas E. Blanchard & Associates, Inc.*, 797 F.3d 720, 732 (9th Cir. 2015).

GEO's motion for summary judgment, based on derivative sovereign immunity should be denied. GEO has not shown that it was directed to pay participants in the VWP only a $1 for the relevant period. GEO has not shown that it had "no discretion in the design process and completely followed government specifications." *Cabalce, at 732*. The State points out that GEO has, in the past, paid workers more than a $1 a day and has the ability to, and has requested, changes to the contracts, including modifications to be reimbursed more than was originally agreed upon. GEO's motion to for summary judgment based on derivative sovereign immunity should be denied.

### C. CROSS MOTIONS ON GEO'S DEFENSE OF PREEMPTION

GEO moves for summary judgment, arguing that the State's claims are expressly preempted by federal law and that the State's interpretation of Washington law presents an obstacle/conflict to existing federal law. Dkt. 245. The State moves for summary judgment on GEO's obstacle/conflict preemption defense (Dkt. 251, at 26-27) and notes that the Court has already determined that its claims are not barred by express or field preemption (Dkt. 251, at 26, n.1).

The applicable law is in the Court's December 6, 2017 Order on GEO's Motion to Dismiss Complaint (Dkt. 29) and is repeated here, for ease of reference:

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land[,] . . . anything in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, or (3) obstacle/conflict preemption. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016). "Regardless of the type of preemption involved—express, field or conflict—the purpose of Congress is the ultimate touchstone of pre-emption analysis." *Id*.

Analysis "starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This presumption applies in "all preemption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (*internal quotation marks and citations omitted*). "[L]abor standards fall[] within the traditional police power of the State." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987). *See also*, RCW 49.46.005(a). The party seeking to set aside state law bears the burden to show preemption. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 634 (2011).

1. Express Preemption

In the December 6, 2017 Order, this Court held that GEO "has not shown that the State minimum wage provision is expressly preempted" by the Immigration Reform and Control Act ("IRCA"). Dkt. 29, at 8. GEO fails to make the showing again. The December 6, 2017 Order's findings on express preemption is adopted here, again. GEO's motion for summary judgment, based on express preemption should be denied.

2. Obstacle/Conflict Preemption

Conflict preemption exists "where it is impossible for a private party to comply with both state and federal requirements," and obstacle preemption exists "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990).

GEO's motion for summary judgment of the State's case, based on conflict or obstacle preemption (Dkt. 245) should be denied and the State's motion to dismiss those affirmative defenses (Dkt. 251) should be granted. GEO has failed to show that it would be impossible for it to comply with federal law and still pay the detainees minimum wage. If GEO pays detainees more than a $1 a day, that alone does not violate the federal law. It has failed to show that paying the detainees minimum wage "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." This affirmative defense should be dismissed.

**D. CROSS MOTIONS ON THE STATE'S WMWA CLAIM**

GEO moves for summary judgment on the State's WMWA claim, arguing that even if it is not entitled to immunity and the claims are not preempted, the claim should be dismissed because detainees do not satisfy the economic-dependence test under the WMWA. Dkt. 245. The State asserts it is entitled to summary judgment on the WMWA claim because under

Washington's economic-dependence test, which incorporates 13 non-exclusive factors, GEO has an employee-employer relationship with detainee workers. Dkt. 251.

Under the WMWA, "an employee includes any individual permitted to work by an employer." *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 871 (2012). Washington uses the "economic-dependence test developed by the federal courts in interpreting the [Fair Labor Standards Act]. The relevant inquiry is whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Id.* "[T]he evaluation of whether an employment relationship exist[s] rest[s] upon the circumstances of the whole activity." *Becerra v. Expert Janitorial, LLC*, 176 Wn. App. 694, 708 (2013), aff'd, 181 Wn.2d 186, 332 P.3d 415 (2014). The "test is flexible and depends on the totality of the circumstances of each case." *Id.* Washington courts consider several factors, including:

(1) "The nature and degree of control of the workers;"

(2) "The degree of supervision, direct or indirect, of the work;"

(3) "The power to determine the pay rates of the methods of payment of the workers;"

(4) "The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;"

(5) "Preparation of payroll and the payment of wages;"

(6) "Whether the work was a specialty job on the production line;"

(7) "Whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;"

(8) "Whether the premises and equipment of the employer are used for the work;"

(9) "Whether the employees had a business organization that could or did shift as a unit from one worksite to another;"

(10) "Whether the work was piecework and not work that required initiative, judgment or foresight;"

(11) "Whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;"

(12) "Whether there was permanence in the working relationship;" and

(13) "Whether the service rendered is an integral part of the alleged employer's business."

*Becerra,* at 717-718 (*citing Moreau v. Air France*, 356 F.3d 942, 947–48 (9th Cir. 2004)). Analysis and application of those factors are not appropriate for summary judgment here. There are genuine issues of material fact as to whether GEO and the detainee workers have an employee-employer relationship under the WMWA. GEO's motion for summary judgment (Dkt. 245) and the State's cross motion for summary judgment (Dkt. 245) should be denied.

### E. GEO'S MOTION ON THE STATE'S CLAIM OF UNJUST ENRICHMENT

"Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wn. App. 151, 159 (1991).

GEO's motion for summary judgment on the entire unjust enrichment claim (Dkt. 245) should be denied. First, GEO argues that the claim should be dismissed because the State is barred from seeking this equitable remedy because the detainees have an adequate remedy under the law – either they are employees under WMWA and they can be compensated under that statue or they are not employees and are bound by the contracts (the Voluntary Work Program

Agreements) they signed to participate. These are not sufficient grounds to dismiss the unjust enrichment claim. There are so many issues of fact in this case, it is not yet clear whether the detainees will be considered employees under WMWA. Further, the State points out that the validity of the Voluntary Work Program Agreements is at issue.

Second, GEO argues that the State's unjust enrichment claim fails because the program is voluntary by its express terms and the detainees could not reasonably expect more. Dkt. 245. Again, the State points to issues of fact as to the validity of the Voluntary Work Program Agreements. The agreements are not yet grounds to dismiss the unjust enrichment claims.

Third, GEO argues that, if the State prevails on its unjust enrichment claim, the proper remedy is the reasonable value of services rendered, not disgorgement of profits, and so moves for summary judgment on the State's claim for the disgorgement of profits. Dkt. 245. GEO maintains that the remedy should be limited to the value of services rendered.

In an action for unjust enrichment in Washington, a court, "reviewing the complex factual matters involved in the case, has tremendous discretion to fashion a remedy to do substantial justice to the parties and put an end to the litigation." *Young v. Young,* 164 Wash.2d 477, 487-88 (2008).

GEO's motion for summary judgment on the unjust enrichment remedy of disgorgement of profits (Dkt. 245) should be denied without prejudice. In addition to having several issues of fact, at this stage in the litigation, it is unclear which remedy, disgorgement of profits or reasonable value of services rendered, would "do substantial justice to the parties." *Young,* at 488.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- The GEO Group Inc.'s Motion for Summary Judgment against the State of Washington (Dkt. 245) **IS DENIED WITHOUT PREJUDICE, as to the State's claim for disgorgement of profits for its unjust enrichment claim, and DENIED, IN ALL OTHER RESPECTS**; and
- The State of Washington's Motion for Summary Judgment on Minimum Wage Act Claim and Defendant The GEO Group, Inc.'s Preemption Defense (Dkt. 251) **IS GRANTED, as to GEO's preemption defenses,** and **DENIED, IN ALL OTHER RESPECTS.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 6th day of August, 2019.

_____
ROBERT J. BRYAN
United States District Judge