1

THE HONORABLE ROBERT J. BRYAN

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

9

10 STATE OF WASHINGTON,

11                 Plaintiff,

12 v.

13

14 THE GEO GROUP, INC.,

15                 Defendant.

Case No.: 3:17-cv-05806-RJB

DECLARATION OF JAMES KELLY
DOJ STATEMENTS OF INTEREST -
INTERGOVERNMENTAL IMMUNITY

16

17 I, James Kelly, make the following statement under oath subject to the penalty of perjury

18 pursuant to the laws of the United States and the State of Washington:

19

20 1.     I am over the age of eighteen (18) and competent to testify in this matter. My statements

21 are based upon my education, training, and experience. I have personal knowledge about South

22 Correctional Entity Regional Jail ("SCORE") because I was one of the founding officials involved

23

24 in its establishment and I was the Deputy Director from October 2010 to September 2018. In my

25 position, I oversaw operations and am familiar with the Inmate Worker Program.

26 2.     SCORE is a regional jail located at 20817 17th Ave. S. Des Moines, WA 98198 with a

27

28 capacity of 802 inmates and detainees. The population includes detainees who have not been

29 convicted of any crime. The jail was established by way of an interlocal agreement to detain

30

31 DECLARATION OF JAMES KELLY
3:17-cv-05806-RJB                     1 of 5

arrestees and sentenced offenders in the furtherance of public safety and emergencies within the jurisdiction of its member cities and contracting agencies.   Its interlocal agreement expressly authorized SCORE to enter into contracts with private third parties for goods and services necessary to fully implement its purposes.

3.      At SCORE, detainees and inmates may participate in the Inmate Worker program if he or she exhibits good behavior and is not considered an escape risk.  Inmate workers must be able and willing to perform physical labor and obtain a health clearance.

4.      Detainee and inmate workers provide operational support to the facility.

5.      The work assigned serves the entire secure side of the facility and is not limited to personal care of the individual detainee's or inmate's own living space.

6.      SCORE assigns detainee and inmate workers a variety of work.  The work includes laundry services, and janitorial within the secure side of the facility.    SCORE has a private contractor overseeing detainee work in the kitchen.

7.      With regard to hours worked, detainees and inmates work generally seven days a week, on shifts of approximately six to seven hours.

8.      One of the private corporations that SCORE contracted with was Aramark Correctional Services, LLC.  ("Aramark").  Aramark provided jail facility services that enabled the jail to focus on security while Aramark oversaw the kitchen services.

9.      Aramark provides the supervision of detainee and inmate workers who prepare meals, serve meals in all of the pods, and maintain the kitchen.  Detainee and inmate workers take direction from their Aramark supervisors who give them instructions, assign individual tasks, and oversee

DECLARATION OF JAMES KELLY
3:17-cv-05806-RJB                                     2 of 5

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

1    performance.  Aramark may remove any individual detainee or inmate who does not perform and

2    not give him or her work.

3

4    10.    Detainee and inmate workers are not paid minimum wages by SCORE or by Aramark.

5    11.    Detainee and inmate workers are incentivized to work for food, or other non-monetary

6    benefits like recreational time and less restrictive housing.

7

8    12.    SCORE does not apply the Minimum Wage Act to detainee nor inmate work.

9    13.    The State has never enforced the Minimum Wage Act to detainee nor inmate work at

10   SCORE.

11

12   14.    Any requirement obligating SCORE or Aramark to pay detainees or inmates minimum

13   wages would have a substantial financial impact.  It would not be feasible to continue operations

14   under the current contract, and would necessarily trigger contract renegotiations because it would be

15

16   a significant change in circumstances and assumptions made during the contract procurement

17   process.  The contract would necessarily require renegotiation, and the additional costs would be

18   prohibitive for the facility to cover within existing budgets.

19

20   15.    Elevating detainees or inmates to the status of an employee who earned minimum wages

21   would result in security issues within the facility for a variety of reasons.  Inmate income creates an

22   imbalance of power between wage earners and non wage earners that invites corruption and undue

23

24   influence.  Corrections officers would lose the ability to incentivize cooperation and compliance if

25   detainees and inmates had the financial resources to get and do what they wanted on their own. This

26   would also create issues with financial accounting because SCORE has not historically had the

27

28   capacity to manage that kind of detainee or inmate income.

29   16.    Attached are true and correct copies of the following documents:

30

31

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

1

a.      Amended and Restated SCORE Interlocal Agreement

2

b.      SCORE Inmate Manual

3

Dated this 12th day of September, 2019 at Covington, WA.

4

5

6

_James Kelly_

7

James Kelly

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

1

2

**CERTIFICATE OF SERVICE**

3

4
I, Joseph Fonseca, hereby certify as follows:

5
I am over the age of 18, a resident of Pierce County, and not a party to the above action.  On

6

7
September 12, 2019, I electronically filed the above Declaration of James Kelly, with the Clerk of

8
the Court using the CM/ECF system to the following:

9
Office of the Attorney General

10
Marsha Chien, WSBA No. 47020
Andrea Brenneke, WSBA No. 22027

11
Lane Polozola

12
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

13
MarshaC@atg.wa.gov

14
andreab@atg.wa.gov
lane.Polozola@atg.wa.gov

15

16
I certify under penalty of perjury under the laws of the State of Washington that the above

17
information is true and correct.

18
DATED this 12th day of September, 2019 at Fircrest, Washington.

19
_____/s/_____

20
Joseph Fonseca, Paralegal

21

22

23

24

25

26

27

28

29

30

31

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

EXHIBIT A

**Return Address:**
Penny Bartley
SCORE
1055 South Grady Way
Renton, Washington   98057



20091001001682
INTERLOCA 81.00
GREGORY
PAGE-001 OF 020
10/01/2009 15:03
KING COUNTY, WA

Please print or type information **WASHINGTON STATE RECORDER'S Cover Sheet**   (RCW 65.04)

**Document Title(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)
Amended and Restated SCORE
1. Interlocal Agreement _____   2. _____

3. _____   4. _____

**Reference Number(s) of Documents assigned or released:**

Additional reference #'s on page _____ of document

**Grantor(s)** Exactly as name(s) appear on document

1. Cities of Auburn, Des Moines, Federal Way, Renton, Tukwila, Burien

2. and SeaTac, Washington , _____

Additional names on page _____ of document.

**Grantee(s)** Exactly as name(s) appear on document

1. Public , _____

2. _____ , _____

Additional names on page _____ of document.

**Legal description** (abbreviated: i.e. lot, block, plat or section, township, range)

_____

_____

Additional legal is on page _____ of document.

**Assessor's Property Tax Parcel/Account Number**      ☐ Assessor Tax # not yet
assigned

The Auditor/Recorder will rely on the information provided on this form.  The staff will not read the document
to verify the accuracy or completeness of the indexing information provided herein.

"I am signing below and paying an additional $50 recording fee (as provided in RCW 36.18.010 and
referred to as an emergency nonstandard document), because this document does not meet margin and
formatting requirements. Furthermore, I hereby understand that the recording process may cover up or
otherwise obscure some part of the text of the original document as a result of this request."

                                                                    Signature of Requesting Party

Note to submitter: Do not sign above nor pay additional $50 fee if the document meets margin/formatting requirements

# AMENDED AND RESTATED SCORE INTERLOCAL AGREEMENT

among

## CITY OF AUBURN,

## CITY OF DES MOINES,

## CITY OF FEDERAL WAY,

## CITY OF RENTON,

## CITY OF TUKWILA,

## CITY OF BURIEN,

AND

## CITY OF SEATAC, WASHINGTON

Dated as of October 1, 2009

## TABLE OF CONTENTS

**Page**

Section 1.   Definitions.................................................................................................... 2

Section 2.   SCORE Facility; Authority................................................................................ 4

Section 3.   Duration of Agreement ................................................................................... 6

Section 4.   Withdrawal and Termination ........................................................................... 6

Section 5.   Administrative Board....................................................................................... 7

Section 6.   Operations Board ............................................................................................ 9

Section 7.   Facility Director .............................................................................................. 9

Section 8.   Personnel Policy............................................................................................ 10

Section 9.   Budget, Policies and Operations ................................................................... 10

Section 10.  Contracts and Support Services .................................................................... 11

Section 11.  Policy and System Evaluation ....................................................................... 11

Section 12.  Additional Services Authorized..................................................................... 11

Section 13.  Inventory and Property ................................................................................. 11

Section 14.  Local Control ............................................................................................... 12

Section 15.  SCORE Facility Financing and Construction; SCORE Facility Public
            Development Authority ................................................................................. 12

Section 16.  Preliminary Costs of the SCORE Facility; Bellevue Property ............................ 15

Section 17.  Compliance with Continuing Disclosure Requirements...................................... 15

Section 18.  Filing of Agreement...................................................................................... 15

Section 19.  Severability .................................................................................................. 16

Section 20.  Execution and Amendment............................................................................ 16

Section 21.  Third Party Beneficiaries .............................................................................. 16

Section 22.  Hold Harmless .............................................................................................. 17

Section 23.  Counterparts................................................................................................. 17

P:\20358_DG\20358_0KS      09/23/09

## AMENDED AND RESTATED SCORE INTERLOCAL AGREEMENT

THIS AMENDED AND RESTATED SCORE INTERLOCAL AGREEMENT amends and restates the SCORE Interlocal Agreement, dated as of February 25, 2009 (the "Original Interlocal Agreement" and as amended and restated hereby, the "SCORE Formation Interlocal Agreement"), and is entered into this October 1, 2009 among the Cities of Auburn, Des Moines, Federal Way, Renton, Tukwila, Burien and SeaTac, Washington (the "Member Cities"), all of which are municipal corporations under the laws and statutes of the State of Washington:

### RECITALS:

WHEREAS, the Member Cities are authorized by chapter 70.48 RCW to contract for, establish and maintain correctional facilities in furtherance of public safety and welfare; and

WHEREAS, the Member Cities currently contract with other local governments within the State of Washington for correctional services at a great expense to the City; and

WHEREAS, chapter 39.34 RCW, the Interlocal Cooperation Act, authorizes municipalities in Washington to enter into agreements for the joint undertaking of certain projects as provided therein; and

WHEREAS, the Member Cities entered into a SCORE Interlocal Agreement, effective February 25, 2009 (the "Original Interlocal Agreement"), to form a governmental administrative agency pursuant to RCW 39.34.030(3) known as the South Correctional Entity ("SCORE") to establish and maintain a consolidated correctional facility to be located in the City of Des Moines (the "SCORE Facility") to serve the Member Cities and federal and state agencies and other local governments that may contract with SCORE in the future to provide correctional services essential to the preservation of the public health, safety and welfare; and

WHEREAS, the Member Cities have determined that the SCORE Facility will provide improved correctional facilities within the boundaries of the consolidated service areas at a lower total cost to the participating Member Cities than currently available alternatives or than the participating Member Cities could individually provide; and

WHEREAS, financing for the acquisition, construction, equipping, and improvement of the SCORE Facility will be provided by bonds issued by the South Correctional Entity Facility Public Development Authority (the "SCORE Facility Public Development Authority"), a public development authority chartered by the City of Renton pursuant to RCW 35.21.730 through 35.21.755 and secured by the full faith and credit of the Cities of Renton, Auburn, Federal Way, SeaTac, Tukwila, and Burien (the "Owner Cities"); and

WHEREAS, the Member Cities now desire to amend the Original Interlocal Agreement to allocate the proportion of debt service on bonds issued by the SCORE Facility Public Development Authority to each of the Owner Cities and to designate the City of Des Moines as the host city; and

WHEREAS, the establishment and maintenance of the SCORE Facility will be of substantial benefit to the Member Cities and the public in general;

NOW THEREFORE, it is hereby agreed and covenanted among the undersigned as follows:

**Section 1.**     **Definitions**.     Capitalized terms used in this SCORE Formation Interlocal Agreement shall have the following meanings:

**"Administrative Board"** means the governing board of SCORE created pursuant to Section 5 of this SCORE Formation Interlocal Agreement.

**"Bonds"** mean, collectively, bonds, notes or other evidences of borrowing issued by the SCORE Facility Public Development Authority to provide interim and permanent financing for the SCORE Facility and thereafter, to finance or refinance equipment, completion, expansion and other capital improvements essential to maintain the SCORE Facility's functionality.

**"Budget"** means the budget prepared by the Facility Director in consultation with the Operations Board, and submitted to the Administration Board for its approval in accordance with Section 5 and Section 9 of this SCORE Formation Interlocal Agreement, which budget shall set forth (a) an estimate of the costs of capital improvements required to be made to the SCORE Facility within the applicable year, (b) on a line item basis, all anticipated revenues and expenses for the operation and maintenance of the SCORE Facility for the applicable year, and (c) any information required by policies adopted by the Administrative Board pursuant to Section 9(b) of this SCORE Formation Interlocal Agreement.

**"Capital Contribution"** means, for each Owner City, that Owner City's Owner Percentage multiplied by the principal of and interest on Bonds as the same shall become due and payable.

**"Costs of Maintenance and Operation"** means all reasonable expenses incurred by SCORE in causing the SCORE Facility to be operated and maintained in good repair, working order and condition, and all costs of administering SCORE.

**"Designated Representative"** means the Mayor or the City Manager, as selected by each Member City, or his or her designee.

**"Facility Director"** means the director of the SCORE Facility selected by the Administrative Board pursuant to Section 7 of this SCORE Formation Interlocal Agreement.

**"Host City"** means the City of Des Moines, Washington.

**"Member Cities"** mean the Owner Cities and the Host City.

**"Operations Board"** means the board formed pursuant to Section 6 of this SCORE Formation Interlocal Agreement.

**"Owner Cities"** mean the Cities of Auburn, Renton, Federal Way, Tukwila, Burien and SeaTac, Washington.

**"Owner Percentage"** means the percentage assigned to each Owner City, as follows:

    (a)    Auburn – thirty-one (31%)
    (b)    Federal Way – eighteen (18%)
    (c)    Renton - thirty-six (36%)
    (d)    Tukwila – eight (8%)
    (e)    Burien – four (4%)
    (f)    SeaTac – three (3%)

**"Presiding Officer"** means the member of the Administrative Board selected pursuant to Section 5 of this SCORE Formation Interlocal Agreement.

**"SCORE"** means the governmental administrative agency established pursuant to RCW 39.34.030(3) by the Member Cities.

**"SCORE Facility"** means the consolidated correctional facility acquired, constructed, improved, equipped, maintained and operated by SCORE.

**"SCORE Facility Public Development Authority"** means the South Correctional Entity Facility Public Development Authority chartered by the City of Renton, Washington.

**"SCORE Formation Interlocal Agreement"** means this Amended and Restated SCORE Interlocal Agreement among the Member Cities, as amended from time to time.

**"Subscribing Agencies"** mean the federal and state agencies, municipal corporations, and other local governments, other than the Member Cities, that contract with SCORE for correctional services at the SCORE Facility pursuant to the terms of this SCORE Formation Interlocal Agreement.

3

**Section 2.    SCORE Facility; Authority.**

(a)    _Administrative Agency._    There is hereby established a governmental administrative agency pursuant to RCW 39.34.030(3) to be known as the South Correctional Entity ("SCORE").  SCORE shall initially consist of the Member Cities.

(b)    _Powers of SCORE._  SCORE shall have the power to acquire, construct, own, operate, maintain, equip, and improve a correctional facility known as the "SCORE Facility" and to provide correctional services and functions incidental thereto, for the purpose of detaining arrestees and sentenced offenders in the furtherance of public safety and emergencies within the jurisdiction of the Member Cities.   The SCORE Facility may serve the Member Cities and Subscribing Agencies which are in need of correctional facilities. Any agreement with a Subscribing Agency shall be in writing and approved by SCORE as provided herein.

(c)    _Administrative Board._  The affairs of SCORE shall be governed by the Administrative Board formed pursuant to Section 5 of this SCORE Formation Interlocal Agreement.  The Administrative Board shall have the authority to:

      1.    Recommend action to the legislative bodies of the Member Cities;

      2.    Approve the Budget, adopt financial policies and approve expenditures;

      3.    Establish policies for investing funds and incurring expenditures of Budget items for the SCORE Facility;

      4.    Review and adopt a personnel policy for the SCORE Facility;

      5.    Establish a fund, or special funds, as authorized by chapter 39.34 RCW for the operation of the SCORE Facility;

      6.    Conduct regular meetings as may be designated by the Administrative Board;

      7.    Determine what services shall be offered at the SCORE Facility pursuant to the powers of SCORE and under what terms they shall be offered;

      8.    Enter into agreements with third parties for goods and services necessary to fully implement the purposes of this SCORE Formation Interlocal Agreement;

9.     Establish rates for services provided to members, subscribers or participating agencies;

10.     Direct and supervise the activities of the Operations Board and the Facility Director;

11.     Enter into an agreement with a public corporation or otherwise to incur debt;

12.     Make purchases or contract for services necessary to fully implement the purposes of this SCORE Formation Interlocal Agreement;

13.     Enter into agreements with and receive and distribute funds from any federal, state or local agencies;

14.     Receive and account for all funds allocated to the SCORE Facility from its members;

15.     Purchase, take, receive, lease, take by gift, or otherwise acquire, own, hold, improve, use and otherwise deal in and with real or personal property, or any interest therein, in the name of the SCORE Facility;

16.     Sell, convey, mortgage, pledge, lease, exchange, transfer and otherwise dispose of property and assets;

17.     Sue and be sued, complain and defend, in all courts of competent jurisdiction in its name;

18.     Make and alter bylaws for the administration and regulation of its affairs;

19.     Enter into contracts with Subscribing Agencies to provide correctional services;

20.     Employ employees as necessary to accomplish the terms of this SCORE Formation Interlocal Agreement;

21.     Establish policies and procedures for adding new cities as parties to this SCORE Formation Interlocal Agreement; and

22.     Engage in any and all other acts necessary to further the goals of this SCORE Formation Interlocal Agreement.

### Section 3.   Duration of Agreement.

The initial duration of this SCORE Formation Interlocal Agreement shall be for a period of ten (10) years from its effective date and, thereafter, shall automatically extend for additional five (5) year periods unless terminated as provided in this SCORE Formation Interlocal Agreement. Notwithstanding the foregoing, this SCORE Formation Interlocal Agreement shall not terminate until all Bonds issued by the SCORE Facility Public Development Authority as provide in Section 15 of this SCORE Formation Interlocal Agreement are no longer outstanding.

### Section 4.   Withdrawal and Termination.

(a)     Subject to Section 4(g) below, any Member City may withdraw its membership and terminate its participation in this SCORE Formation Interlocal Agreement by providing written notice and serving that notice on the other Member Cities on or before December 31 in any one-year. After providing appropriate notice as provided in this Section, that Member City's membership withdrawal shall become effective on the last day of the year following delivery and service of appropriate notice to all other Member Cities.

(b)     Subject to Section 3 above, four (4) or more Member Cities may, at any one time, by written notice provided to all Member Cities, call for a termination of SCORE and this SCORE Formation Interlocal Agreement. Upon an affirmative supermajority vote (majority plus one) by the Administrative Board, SCORE shall be directed to terminate business, and a date will be set for final termination, which shall be at least one (1) year from the date of the vote to terminate this SCORE Formation Interlocal Agreement. Upon the final termination date, this SCORE Formation Interlocal Agreement shall be fully terminated.

(c)     Subject to Section 4(g) below, in the event any Owner City or the Host City fails to budget for or provide its applicable annual funding requirements for SCORE as provided in Section 15 hereof, the remaining Member Cities may, by majority vote, immediately declare the underfunding City to be terminated from this SCORE Formation Interlocal Agreement and to have forfeited all its rights under this SCORE Formation Interlocal Agreement as provided in Section 4(e). The remaining Member Cities may, at their option, withdraw SCORE's correctional services from that City, or alternatively, enter into a Subscribing Agency agreement with that City under terms and conditions as the remaining Member Cities deem appropriate.

(d)     Time is of the essence in giving any termination notice.

(e)     If an individual Owner City withdraws its membership in SCORE, the withdrawing City will forfeit any and all rights it may have to SCORE's real or personal

P:\20358_DG\20358_0KS          09/23/09

property, or any other ownership in SCORE, unless otherwise provided by the Administrative Board.

(f)     Upon termination of this SCORE Formation Interlocal Agreement, all property acquired during the life of this SCORE Formation Interlocal Agreement shall be disposed of in the following manner:

1.     All real and personal property acquired pursuant to this SCORE Formation Interlocal Agreement shall be distributed to the Owner Cities based on the Owner Percentages; and

2.     All unexpected funds or reserve funds shall be distributed based on the percentage of average daily population at the SCORE Facility for the last three (3) years prior to the termination date of those Member Cities still existing on the day prior to the termination date.

(g)     Notwithstanding any of the other rights, duties or obligations of any Member City under this Section 4, the withdrawal of any Owner City from this SCORE Formation Interlocal Agreement shall not discharge or relieve the Owner City that has withdrawn pursuant to Section 4(a) or been terminated pursuant to Section 4(c) of its obligation to pay debt service on Bonds issued by the SCORE Facility Public Development Authority.  An Owner City may be relieved of its obligation under this SCORE Formation Interlocal Agreement to make payments with respect to its Capital Contribution if the Administrative Board, by supermajority vote (majority plus one), authorizes such relief based on a finding that such payments are not required to pay debt service on Bonds issued by the SCORE Facility Public Development Authority.

**Section 5.     Administrative Board**.

(a)     _Formation_.   An Administrative Board composed of the Designated Representative from each Member City shall govern the affairs of SCORE.

(b)     _Allocation of Votes_.   Each Board member shall have an equal vote and voice in all Board decisions.

(c)     _Voting Requirements_.   Votes regarding (1) debt; (2) approval of the Budget; (3) employment of the Facilities Director; (4) cost allocations made prior to the issuance of Bonds pursuant to Section 16 of this SCORE Formation Interlocal Agreement; and (5) approval of labor contracts, shall require an affirmative vote of a supermajority (majority plus one) of the Member Cities, two (2) of which shall have the highest and the second highest average daily population in the SCORE Facility for the 12-month period ending June 30 of the preceding year.  Votes regarding (1) the conveyance of real property; (2) the addition of additional services pursuant to Section 11 of this SCORE Formation Interlocal Agreement not directly incidental to correctional services (such as providing

court services); and (3) matters addressed in Sections 4(b) and (g) of this SCORE Formation Interlocal Agreement, shall require an affirmative vote of a supermajority (majority plus one) of the Member Cities.

      (d)    <u>Parliamentary Authority</u>.   Unless otherwise provided, Robert's Revised Rules of Order (newly revised) shall govern all procedural matters relating to the business of the Administrative Board.

      (e)    <u>Officers of the Administrative Board</u>.   Members of the Administrative Board shall select a Presiding Officer from its members, together with such other officers as a majority of the Administrative Board may determine.   Subject to the control of the Administrative Board, the Presiding Officer shall have general supervision, direction and control of the business and affairs of SCORE.   On matters decided by the Administrative Board, the signature of the Presiding Officer alone is sufficient to bind SCORE.

      (f)    <u>Meetings of the Administrative Board</u>.   There shall be a minimum of two (2) meetings each year, and not less than fifteen (15) days notice shall be given to all members prior to any such meeting.   Unless otherwise designated by the Presiding Officer, the first meeting shall be held on the second Tuesday of February of each year to review the prior year's service.   The second meeting shall be on the second Tuesday of September of each year to consider and adopt a Budget for the following fiscal year.   Other meetings may be held upon request of the Presiding Officer or any two members.   All meetings shall be open to the public to the extent required by chapter 42.30 RCW.

Five (5) members of the Administrative Board must be present at any meeting of the Administrative Board to comprise a quorum, and for the Administrative Board to transact any business.   Proxy voting shall not be allowed.   Members of the Administrative Board may participate in a meeting through the use of any means of communication by which all members and members of the public participating in such meeting can hear each other during the meeting.   Any members of the Administrative Board participating in a meeting by such means is deemed to be present in person at the meeting for all purposes including, but not limited to, establishing a quorum.

      (g)    <u>Bylaws</u>.   The Administrative Board shall be authorized to establish bylaws that govern procedures of that Board and the SCORE Facility's general operations.

      (h)    <u>Administrative Board Review</u>.   A general or particular authorization or review and concurrence of the Administrative Board by majority vote shall be necessary for all capital expenditures or contracts in excess of $50,000.

**Section 6.**     **Operations Board**.

(a)     Formation.   There is further established an Operations Board which shall consist of up to nine (9) members selected as provided in this paragraph.  One (1) member shall be designated by each of the Member Cities, and up to two (2) at-large members shall be selected, by majority vote, by the Subscribing Agencies to represent the police departments of the Subscribing Agencies.  At the time set for election of the at-large members, only the representatives of the Subscribing Agencies, then in attendance, will participate in the election.  The Member Cities' Operations Board representatives shall not participate in the at-large member elections.  The at-large members shall serve one-year terms, unless otherwise determined by majority vote of the Operations Board.  The purpose and duties of the Operations Board shall be established by the Administrative Board.

(b)     Voting and Meetings of the Operations Board.   Each member of the Operations Board shall have an equal vote in all Operations Board decisions.  The Operations Board shall be authorized to establish bylaws that govern its procedures.  Unless otherwise provided, Robert's Revised Rules of Order shall govern all procedural matters relating to the business of the Operations Board.  The Operations Board shall elect a presiding officer from its members and shall likewise determine the time and place of its meetings; at least one (1) regular meeting shall be held each month at a time and place designated by the presiding officer or a majority of its members.  Special meetings may be called by the presiding officer or any two (2) members upon giving all other members not less than 24 hours prior written notice (electronic or facsimile notice acceptable).  In an emergency, the Operations Board may dispense with written notice requirements for special meetings, but must, in good faith, implement best efforts to provide fair and reasonable notice to all of the members of the Operations Board.  All meetings shall be open to the public to the extent required by chapter 42.30 RCW.

A majority of the members of the Operations Board must be present at any meeting of the Operations Board to comprise a quorum, and for the Operations Board to transact any business.  Proxy voting shall not be allowed.  Members of the Operations Board may participate in a meeting through the use of any means of communication by which all members and members of the public participating in such meeting can hear each other during the meeting.  Any members of the Operations Board participating in a meeting by such means is deemed to be present in person at the meeting for all purposes including, but not limited to, establishing a quorum.

**Section 7.**     **Facility Director**.

Not later than one hundred eighty (180) days prior to the completion of the SCORE Facility, the Operations Board shall recommend to the Administrative Board a person to act as the Facility Director.  The Administrative Board may accept or reject the Operations Board recommendation.  Such Facility Director shall be responsible to the Administrative Board, shall develop the Budget in consultation with the Operations Board and other

P:\20358_DG\20358_0KS          09/23/09

appropriate means in order to fully implement the purposes of this SCORE Formation Interlocal Agreement. The Facility Director shall administer the program in its day-to-day operations consistent with the policies adopted by the Administrative Board.   Such Facility Director shall have experience in technical, financial and administrative fields, and such appointment shall be on the basis of merit only.

### Section 8.   Personnel Policy.

(a)   The Operations Board shall submit to the Administrative Board within one hundred eighty (180) days prior to the completion of the SCORE Facility, a proposed personnel policy for the SCORE Facility for its approval, rejection or modification. All of such modifications or revisions shall be subject to the final approval of the Administrative Board.

(b)   Such personnel policy shall provide for the initial appointment to the SCORE Facility's staff from the personnel presently, permanently appointed or assigned as corrections officers in the Member Cities. Additional employees shall be appointed by the Facility Director upon meeting the qualifications established by the Operations Board and adopted by the Administrative Board. None of such employees shall be commissioned members of any emergency service, but may be eligible for membership under the Public Employees Retirement Systems (PERS), or Public Safety Employees Retirement System (PSERS), as provided by law.

### Section 9.   Budget, Policies and Operations.

(a)   The Facility Director shall distribute a proposed Budget to the Operations Board on or before August 1 of each year, which Budget shall then be provided to the Administrative Board no later than September 1 of such year. Thereafter, the Member Cities shall be advised of the programs and objectives as contained in said proposed Budget, and of the required financial participation for the ensuing year.

(b)   The Administrative Board shall develop financial policies for SCORE as part of the budgetary process. Such policies may include, but are not limited to, (1) items to be provided for in the Budget, (2) a minimum contribution amount for each Member City to pay for Costs of Maintenance and Operation, (3) the process for allocating unexpended amounts paid by the Member Cities for Costs of Maintenance and Operation and assessing the Member Cities in the event of cost overruns, (4) establishing and maintaining reserve accounts, if any, and (5) the process for adding a new party to this SCORE Formation Interlocal Agreement.

(c)   The allocation of prorated financial participation among the Member Cities shall be calculated as provided in Section 15 hereof. Each Member City shall be unconditionally obligated to provide its allocable share of costs as provided in this SCORE Formation Interlocal Agreement.

**Section 10.**     **Contracts and Support Services**.

(a)     The Administrative Board (or the Operations Board or the Facility Director, if so designated by the Administrative Board) shall, as necessary, contract with local governments for the use of space for its operations, auxiliary services including but not limited to records, payroll, accounting, purchasing, and data processing, and for staff prior to the selection of a Facility Director for the SCORE Facility.

(b)     The Member Cities hereby agree to furnish legal assistance, from time to time, as approved by the Administrative Board.  The Administrative Board may contract with the City Attorney of a Member City, other local government, or independent legal counsel as necessary.

**Section 11.**     **Policy and System Evaluation**.

The Facility Director shall actively and continually consider and evaluate all means and opportunities toward the enhancement of operations effectiveness for correctional services so as to provide maximum and ultimate benefits to the members of the general public.  The Facility Director shall present his or her recommendations to the Operations Board from time to time.  Any substantive change or deviation from established policy shall be subject to the prior approval of the Administrative Board.

**Section 12.**     **Additional Services Authorized**.

The Administrative Board shall evaluate and determine the propriety of including additional correctional services for local governments, whenever so required, and shall determine the means of providing such services, together with its costs and effects.  These additional services may include, but shall not be limited to the following: alternatives to incarceration, inmate transportation systems, and consolidated court services.

**Section 13.**     **Inventory and Property**.

(a)     Equipment and furnishings for the operation of the SCORE Facility shall be acquired by SCORE as provided by law.  If any Member City furnishes equipment or furnishings for SCORE's use, title to the same shall remain with the respective local entity unless that equipment is acquired by SCORE.

(b)     The Facility Director shall, at the time of preparing the proposed Budget for the ensuing year, submit to the Operations Board a complete inventory together with current valuations of all equipment and furnishings owned by, leased or temporarily assigned to SCORE. In case of dissolution of SCORE, such assigned or loaned items shall be returned to the lending governmental entity and all other items, including real property,

or funds derived from the sale thereof, shall be distributed in accordance with Section 4(f) above.

(c)     Title to real property purchased or otherwise acquired shall be held in the name of SCORE; provided however, that for valuable consideration received, SCORE may convey ownership of any real property as may be approved by supermajority vote (majority plus one) of the Administrative Board.

**Section 14.     Local Control.**

Each Member City and Subscribing Agency shall retain the responsibility and authority for the operation of its police departments, and for such equipment and services as are required at its place of operation to utilize the SCORE Facility.

**Section 15.     SCORE Facility Financing and Construction; SCORE Facility Public Development Authority.**

(a)     SCORE Facility.  In order to provide necessary services for the Member Cities and the Subscribing Agencies, SCORE shall acquire, construct, improve, equip, maintain and operate the SCORE Facility.  The SCORE Facility is expected to be located in the City of Des Moines, Washington.

(b)     Contracts for the SCORE Facility.  The Administrative Board shall authorize, and the Presiding Officer of the Administrative Board, or his or her approved designee, will execute contracts for the development of the SCORE Facility.  These contracts shall include, without limitation, contracts for architectural design and engineering, project management services; real estate acquisition, and construction.

(c)     SCORE Facility Public Development Authority.  In order to finance costs of acquiring, constructing, improving and equipping the SCORE Facility, the City of Renton has chartered the SCORE Facility Public Development Authority.  The purpose of the SCORE Facility Public Development Authority is to issue Bonds to finance and refinance the acquisition, construction, improvement and equipping of the SCORE Facility.  The Administrative Board shall serve *ex officio* as the Board of Directors of the SCORE Facility Public Development Authority as further provided in the Authority's organizational charter.    Upon issuance of Bonds by the SCORE Facility Public Development Authority, Bond proceeds shall be deposited on behalf of SCORE and used for the purposes set forth herein.  SCORE shall be obligated to make payments to the SCORE Facility Public Development Authority at the time and in the amounts required to pay principal of and interest on the Bonds and any administrative costs of the SCORE Facility Public Development Authority.

(d)     SCORE Facility Financing.

(1)     *Capital Contributions.*  Each Owner City shall be obligated to pay an amount equal to its Capital Contribution without regard to the payment or lack thereof by any other Owner City.  No Owner City shall be obligated to pay the Capital Contribution of any other Owner City, and each Owner City shall be obligated to budget for and pay its Capital Contribution.  The obligation of each Owner City to pay its Capital Contribution shall be an irrevocable full faith and credit obligation of such Owner City, payable from property taxes levied within the constitutional and statutory authority provided without a vote of the electors of the Owner City on all of the taxable property within the Owner City and other sources of revenues available therefor.  Each Owner City has or will set aside and include in its calculation of outstanding nonvoted general obligation indebtedness an amount equal to the principal component of its Capital Contribution for so long as Bonds remain outstanding, unless relieved of such payment in accordance with Section 4(g).  Each Owner City's obligation to pay the Capital Contribution shall not be contingent on the receipt of any revenues from other sources, including but not limited to Subscribing Agencies or the Host City.

An Owner City may prepay its Capital Contribution in a manner that is consistent with the authorizing documents for the Bonds; provided, however, that any such prepayment of one or more Owner Cities shall not affect the Capital Contribution of the remaining Owner Cities.  Any Owner City that elects to prepay its Capital Contribution shall be responsible for paying all costs associated with such prepayment.

(2)     *Costs of Maintenance and Operation.*  Subject to the terms of the financial policies established by the Administrative Board pursuant to Section 9(b) of this SCORE Formation Interlocal Agreement, each Member City shall be obligated to pay its allocable portion of Costs of Maintenance and Operation of the SCORE Facility, including any debt issued to finance such costs, as determined in this subsection.

(i)     Until the end of the first calendar year of operations of the SCORE Facility (estimated to be December 31, 2012), the allocable portion that each Member City shall be obligated to pay of Costs of Maintenance and Operation in such year shall be equal to the Member City's 2007 average daily population in all correctional facilities (as provided in the SCORE financial policies) multiplied by the Costs of Maintenance and Operation.

(ii)    Commencing with the calendar year following the first calendar year of operations, the allocable portion that each Member City shall be obligated to pay of Costs of Maintenance and Operation shall be

based on the Member City's average daily population in the SCORE Facility, as supplemented as necessary with the average daily population allocable to the Member Cities in all correctional facilities, for the 12-month period ending June 30 of the preceding year.

(iii)    Commencing with the third calendar year of operations, the allocable portion that each Member City shall be obligated to pay of Costs of Maintenance and Operation shall be based on the Member City's average daily population in the SCORE Facility for the 12-month period ending June 30 of the preceding year.

(e)    <u>Billing and Allocation of Revenues</u>.  Each Member City shall be billed for its Capital Contribution and its portion of Costs of Maintenance and Operation, as applicable, on a semiannual basis, or more frequently as determined by the Administrative Board, calculated as provided for in Section 15(d) above.  Revenues received in a calendar year from Subscribing Agencies or from sources other than the contributions described in Section 15(d) above shall be allocated among the Member Cities as follows:  (i) each Member City shall receive a credit against its obligation to pay Costs of Maintenance and Operation based on that Member City's proportional average daily population as calculated in Section 15(d)(2) above, and (ii) each Owner City shall receive a credit against its Capital Contribution based on that Owner City's proportional Owner Percentage.

(f)    <u>Host City</u>.  Pursuant to RCW 35.21.740, the City of Des Moines, as the Host City, hereby authorizes the City of Renton to operate the SCORE Facility Public Development Authority within the corporate limits of the City of Des Moines in a manner consistent with the terms of this SCORE Formation Interlocal Agreement.  The Host City shall enter into a written agreement with SCORE and any of the Owner Cities, as applicable, to establish a host city fee to be paid in exchange for the availability of the SCORE Facility.

(g)    <u>Tax-Exemption</u>.  The Member Cities shall not (1) make any use of the proceeds from the sale of Bonds or any other money or obligations of the SCORE Facility Public Development Authority or the Member Cities that may be deemed to be proceeds of the Bonds pursuant to Section 148(a) of the Code that will cause the Bonds to be "arbitrage bonds" within the meaning of said Section and said regulations, or (2) act or fail to act in a manner that will cause the Bonds to be considered obligations not described in Section 103(a) of the Code.

(h)    <u>Additional Financing</u>.  Notwithstanding anything to the contrary in this SCORE Formation Interlocal Agreement, bonds, notes or other evidences of borrowing may be issued from time to time by the SCORE Facility Public Development Authority or another issuer pursuant a separate agreement between one or more Member Cities and other entities to provide additional financing for the SCORE Facility on terms as agreed upon by the parties thereto.

14

(i)    Special Facility Designation.    The SCORE Facility, including all equipment, furnishings, and fixtures is critical to the ability of the Member Cities and the Subscribing Agencies to provide necessary and secure correctional services and assure public safety.  Consequently, the SCORE Facility is essential to the preservation of the public health, safety, and welfare.   As a result, the SCORE Facility's equipment, furnishings, and fixtures are special facilities subject to unique standards.  Accordingly, based on the facts presented in this subsection, it is herby resolved that the established policy of the Member Cities is that the SCORE Facility constitutes a "special facility" under RCW 39.04.280(1)(b), and all purchases of any kind or nature for the SCORE Facility shall be exempt from competitive bidding requirements as prescribed by Washington State statute but shall be governed by the procurement policy established by the Administrative Board as amended from time to time.

**Section 16.    Preliminary Costs of the SCORE Facility; Bellevue Property**

The Administrative Board shall allocate costs associated with the design, acquisition, construction, improvement and equipping of the SCORE Facility prior to the issuance of the Bonds by the SCORE Facility Public Development Authority among the Member Cities by an affirmative vote of a supermajority (majority plus one) of the of the Member Cities, two (2) of which shall have the highest and the second highest average daily population in the SCORE Facility for the 12-month period ending June 30 of the preceding year.  Any costs of the SCORE Facility paid by a Member City pursuant to this section may be reimbursed out of proceeds of Bonds to the extent permitted by law.

The Member Cities hereby agree that any net proceeds received from the sale of the property located at 1440 116th Avenue NE, Bellevue, Washington and 1412 116th Avenue NE, Bellevue, Washington (estimated to be approximately $3,180,000) shall be deposited with SCORE and used to finance costs associated with the design, acquisition, construction, improvement and equipping of the SCORE Facility.

**Section 17.    Compliance with Continuing Disclosure Requirements**

To the extent necessary to meet the conditions of paragraph (d)(2) of United States Securities and Exchange Commission Rule 15c2-12 (the "Rule"), as applicable to a participating underwriter or remarketing agent for Bonds, each Owner City will enter into an undertaking in a form acceptable at the time to the participating underwriter or remarketing agent, as the case may be.

**Section 18.    Filing of Agreement**

Upon execution, this SCORE Formation Interlocal Agreement shall be filed as required in RCW 39.34.040.

P:\20358_DG\20358_0KS        09/23/09

**Section 19.**   **Severability**

If any part, paragraph, section or provision of this SCORE Formation Interlocal Agreement is adjudged to be invalid by any court of competent jurisdiction such adjudication shall not affect the validity of any remaining section, part or provision of this SCORE Formation Interlocal Agreement.

**Section 20.**   **Execution and Amendment**

This SCORE Formation Interlocal Agreement shall be executed on behalf of each Member City by its Designated Representative, or other authorized officer of the Member City, and pursuant to an appropriate motion, resolution or ordinance of each Member City. This SCORE Formation Interlocal Agreement shall be deemed adopted upon the date of execution by the last so Designated Representative or other authorized officer.

This SCORE Formation Interlocal Agreement may not be effectively amended, changed, modified or altered, except by an instrument in writing duly executed by the Designated Representative, or other authorized officer, of each Member City and pursuant to an appropriate motion, resolution or ordinance of each Member City, so long as such amendment does not materially adversely affect the owners of the Bonds or affect the tax-exempt status of the interest paid on the Bonds.  If the Bonds issued by the SCORE Facility Public Development Authority are rated by a rating agency, then no amendment that adds or removes an Owner City from this SCORE Formation Interlocal Agreement or revises Section 15 of this SCORE Formation Interlocal Agreement shall be permitted unless the SCORE Facility Public Development Authority has received written confirmation from the rating agency that such amendment will not result in a reduction or withdrawal of the rating on the Bonds.  If the Bonds are not rated by a rating agency, then no such amendment as described in the preceding sentence will be permitted unless in the opinion of the SCORE Facility Public Development Authority such amendment will not materially adversely affect the owners of the Bonds.

**Section 21.**   **Third Party Beneficiaries**

The SCORE Facility Public Development Authority and the holders from time to time of the Bonds shall be third party beneficiaries hereof and the commitments made herein shall be for their further benefit.

P:\20358_DG\20358_0KS          09/23/09

**Section 22.**   **Hold Harmless**

The parties to this SCORE Formation Interlocal Agreement shall defend, indemnify and save one another harmless from any and all claims arising out of the performance of this SCORE Formation Interlocal Agreement, except to the extent that the harm complained of arises from the sole negligence of one of the participating members.  Any loss or liability resulting from the negligent acts errors or omissions of the Administrative Board, Operations Board, Facility Director and or staff, while acting within the scope of their authority under this SCORE Formation Interlocal Agreement shall be borne by SCORE exclusively.

**Section 23.**   **Counterparts**

This SCORE Formation Interlocal Agreement may be executed in any number of counterparts, each of whom shall be an original, but those counterparts will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this SCORE Formation Interlocal Agreement as of the day and year first written above.

CITY OF AUBURN

By: _____ Mayor _____

CITY OF DES MOINES

By: _____ City Manager _____

CITY OF FEDERAL WAY

By: _____ MAYOR _____

CITY OF SEATAC

By: _____ City Manager _____

CITY OF RENTON

By: _____ MAYOR _____

CITY OF TUKWILA

By: _____ MAYOR _____

CITY OF BURIEN

By: _____ City Manager _____

17

P:\20358_DG\20358_0KS          09/23/09

EXHIBIT B



# Inmate Manual

## Table of Contents

Section 1 - OVERVIEW ...................................................................................................3

Section 2 - RIGHTS AND RESPONSIBILITIES ............................................................4
  2.1    Cells .............................................................................................................4
  2.2    Clothing .......................................................................................................5
  2.3    Health Care .................................................................................................5
  2.4    Sanitation ....................................................................................................6
  2.5    Laundry ........................................................................................................6
  2.6    Hygiene ........................................................................................................6
  2.7    Pregnant Inmates .......................................................................................6

Section 3 - PROPERTY ....................................................................................................7

Section 4 - INMATE PROGRAMS ..................................................................................8
  4.1    Commissary .................................................................................................8
  4.2    Counseling ...................................................................................................8
  4.3    Religion and Religious Counseling ...........................................................8
  4.4    Chemical Dependency ................................................................................8
  4.5    Legal Counsel/Access to Courts ................................................................8
  4.6    Mail ..............................................................................................................9
    4.6.1    Mail Restrictions ...............................................................................9
    4.6.2    Incoming Mail ...................................................................................11
    4.6.3    Outgoing Mail ...................................................................................12
  4.7    Food Service ...............................................................................................12
  4.8    Telephone ....................................................................................................12
  4.9    Visitors .........................................................................................................13
    4.9.1    Visitor Qualifications and Limits ....................................................13
    4.9.2    Professional Visitors ........................................................................13
  4.10   Inmate Worker ............................................................................................13

Section 5 - BOOKING AND RELEASE ...........................................................................14
  5.1    Booking .......................................................................................................14
  5.2    Classification ..............................................................................................14
  5.3    Release ........................................................................................................14

Section 6 - DISCIPLINE ..................................................................................................15
  6.1    Overview ......................................................................................................15
    6.1.1    On-site Adjustment ...........................................................................15
    6.1.2    Minor Infractions ..............................................................................15
    6.1.3    Major Infractions ..............................................................................16
    6.1.4    Fighting .............................................................................................18
  6.2    Financial Responsibility for Damaging SCORE Property ......................18
  6.3    Major Infraction Hearing Process ............................................................19
  6.4    Grievances ...................................................................................................19
    6.4.1    Abuse of Grievance Process .............................................................20
  6.5    Appeals .......................................................................................................20
  6.6    Infractions ...................................................................................................20
  6.7    Inmate Safety and Sexual Assault and/or Harassment ..........................21

**Section 1 - OVERVIEW**

This manual explains your rights and responsibilities as an inmate.

**Assumptions**

In this manual, "we" means the South Correctional Entity (SCORE) or its staff, and "you" means the reader.

***Please note information contained in this handbook is subject to change without notice.***

**Section 2 - RIGHTS AND RESPONSIBILITIES**

As an inmate, you have rights, privileges, and responsibilities.  You can often earn privileges by demonstrating responsibility.

Your freedom of expression of religion, or other Constitutional guarantees are not restricted, unless they threaten the security of the facility or the safety of staff or other inmates.  Being an inmate, for example, is a severe restriction on the freedom of assembly.  We can restrict that freedom even more than normal through isolation or lockdown procedures.

We will try to reduce limiting of such freedoms to the minimum needed to allow the normal and safe operation of the facility.

You have the right to be treated fairly and impartially, although "fairly" does not necessarily mean "equally."  If you have received two infractions for a certain behavior, you will probably have a harsher penalty for the third instance than another inmate might receive for their first infraction on the same offense.

You have the right to be judged on your own behavior, rather than by assumptions about you based on ethnicity, gender, political beliefs or other conditions.  Access to work assignments, inmate programs and the like will be based on your behavior as well as other factors.

You have the right to a safe and sanitary environment.  You are expected to fulfill that right by a daily cleaning of your area; we will help fulfill that right through daily inspections and by promptly reporting any problems you bring to our attention.

You have the right to be free from physical or emotional harm from the staff or from other inmates.  If you are in fear for your safety, you may request to be placed on Protective Custody (PC).  PC is not a disciplinary sanction.

You may ask for a review of decisions, which affect you, such as denials of visitation, etc.  You may ask these reviews be in writing.

You have the right not to be harassed for requiring us to maintain these standards, however repeated frivolous and excessive complaints will become a disciplinary matter.

## 2.1   Cells

You are required to keep all of your issued items neat and orderly.  You may possess only the original number of issued items.

You may not attach items to the walls, windows, mirrors, doors, floor, ceilings, light, vents, furniture or fixtures.  You may not cover the ventilation system components in your cell.

Unless food items are approved from the commissary or when you are fed in your cell by a Corrections Officer, you may not have food items in your cell.

You must return food trays and utensils at the end of each meal.

You may not alter SCORE property, or use it in an inappropriate manner.  It is a minor infraction, for example, to use mattresses, sheets, towels or tubs of water as weights for weight training.  You will be held financially responsible for any damage to SCORE property.

The toilets in your cell are for the disposal of human waste only.  You may not flush anything else down the toilet.  There are mechanical safeguards in place to detect when "foreign objects" are flushed down the toilets.  If it is discovered that "foreign objects" have been flushed down the toilet in your assigned cell or POD, it may result in a temporary loss of privileges for all inmates in the cell or POD.

## 2.2   Clothing

You must wear a complete jail uniform, including shoes, whenever you are out of your cell or away from your bunk in open PODS; you may not roll up the pant legs (a minor infraction).  You may not wear your pants below your waist, i.e., "sagging" (a minor infraction).

Your clothing must be neat as well as clean.  We will discipline you for failing to report or exchange damaged clothing.

You may not mark your clothing in any way.

## 2.3   Health Care

You have access to necessary health care.

You are financially responsible for medical treatment.  SCORE will pursue financial reimbursement from you for medical and dental services, and all medications.  You will not be denied medical service due to lack of funds.  Regardless of available funds in your commissary account, you are financially responsible for all medical treatment and in the event that your account carries a negative balance, you will be responsible for the negative balance at any future bookings until the debt is paid in full.

The current fees charged for medical and dental services are posted in the following areas:  booking, housing, programs and medical.  Any questions regarding fees will be answered by medical staff.

If you have an emergency health care problem, notify a Corrections Officer immediately.  If you have a problem that can wait for "sick call" submit an "Inmate Request Form," (generally referred to as a "Kite"), to the medical staff.

The medical staff will review and screen all requests making the necessary referrals to the doctor or the dentist on a priority basis.

Only medical staff can schedule you for appointments outside the facility.  Corrections Staff will transport you to and from any outside appointments; unless you receive a Court ordered medical furlough.

You must take oral medication at the time the medication is issued.  You are subject to a search to confirm you have actually taken the medication.

**2.4     Sanitation**

You must clean (sweep, dust and mop) your cell daily.  SCORE Corrections Officers will provide the necessary equipment.  You must also clean your sink and toilet and assist the POD inmate workers with cleaning common areas, such as floors, windows, tables and showers.

There are designated POD inmate workers for selected housing units.  The POD inmate workers are responsible for the general sanitation and hygiene issues in the common areas.

**2.5     Laundry**

At Intake, you receive clean jail uniform clothing.

You are not allowed to keep any of your personal clothing; all clothing items, including underwear, will be issued by SCORE.

**2.6     Hygiene**

You will be issued a washcloth, soap, a toothbrush, toothpaste and a comb.  We also stock supplies for personal hygiene needs for female inmates.  All inmates must shower at least once every three days. You may not shower during lockdown.  If you are an inmate worker, you must shower at least daily.

**2.7     Pregnant Inmates**

Except in extraordinary circumstances, during the third trimester of the pregnancy or during postpartum recovery, no restraints of any kind may be used on any pregnant inmate incarcerated at SCORE during transportation to and from visits to medical providers and court proceedings. Extraordinary circumstances exist where a Corrections Officer makes an individualized determination that restraints are necessary to prevent the pregnant inmate from escaping or injuring herself, medical or safety personnel or others.

**Section 3 - PROPERTY**

At intake, you are allowed to retain the minimum items necessary for your health and general welfare, (i.e. prescription eye glasses).

The clothing you were wearing and any other non-contraband personal items you had in your possession when you arrived at intake was inventoried and is currently in storage.

You may release your property to non-inmates (normally friends or relatives).  If your assigned property storage bin is full, you will be contacted by a Corrections Officer to discuss the management of your property.  You may not selectively release property - all non-clothing items (minus your identification) may be released upon your approval.  You may not release property more than once.

You may not possess contraband.  Washington Administrative Code (WAC) 289-02-020 defines contraband as any substance or item not specifically permitted by the SCORE Jail administration. Contraband includes anything that is not provided by the SCORE Jail or any item that has been provided that has been altered from or used outside of its original intended purpose or use. Possessing excess amounts of items provided by the SCORE Jail may be considered contraband.

SCORE will provide you with a minimum amount of post cards for correspondence.  You may purchase additional writing material from commissary.

**Section 4 - INMATE PROGRAMS**

SCORE encourages participation in inmate programs and services.

You may decline to participate in any program unless Court mandated.

**4.1      Commissary**

SCORE contracts with an outside vendor for commissary.  Commissary delivery dates occur twice per week during non-holiday weeks, generally on Tuesday and Friday.  You must have money on your inmate account in order to purchase approved items from the commissary.  Commissary items you purchase are to be used or consumed by you.  Purchasing commissary items for another inmate or sharing your commissary items constitutes a minor infraction.  Should you be released prior to arrival of your commissary items, your funds used to purchase the commissary will be placed back into your account.

**4.2      Counseling**

Submit a "Mental Health Kite" to any Corrections staff member if you wish to receive counseling.

Emergency counseling is available at any time by contacting a Corrections Officer.

**4.3      Religion and Religious Counseling**

We will make all reasonable efforts to allow you to freely practice your legitimate religion, limited only by security and operational interests.

**4.4      Chemical Dependency**

Drug and Alcohol counseling is available.  There are specific eligibility criteria.  Submit a "Mental Health Kite" to any Corrections staff member.  Other services including assessments and referrals are available upon request.

**4.5      Legal Counsel/Access to Courts**

You are allowed direct and unlimited access to the Courts.  You may write to the Court at any time. SCORE provides legal resources on-line.  You should submit a Kite for specific items that may assist you for the case in which you are currently in custody if you are representing yourself (pro-se).  Other requests should be directed to your public defender or private legal counsel.

Except during lockdown, you may have attorney visits at any time.

**4.6     Mail**

There are restrictions on what you may receive - how you receive it and send it out.  We will only accept mail from the United States Postal Service and recognized delivery services, such as Federal Express or United Parcel Service.  Mail between inmates in this facility or to those in other correctional facilities is prohibited.  Unauthorized packages will be returned to the sender.

Sending or attempting to send mail in a manner meant to circumvent this policy is subject to discipline.

You will be notified in writing if mail that is received violates SCORE's mail policy.

In the event your mail is rejected, you may appeal the rejection through the Grievance process.  The written Grievance must be submitted to a Corrections Officer within 24 hours after you receive the Inmate Mail Rejection Notification.

### 4.6.1     Mail Restrictions

Incoming mail may be disapproved for receipt for any of the following reasons:
1. The mail contains threats of physical harm against any person or threats of criminal activity.
2. The mail threatens blackmail or extortion.
3. The mail contains contraband or concerns sending contraband in or out of the facility.
   Contraband includes, but is not limited to:  Polaroid pictures, pornographic magazines, photographs or other media containing pornographic pictures, stickers, pictures, art projects of any media, glued items, perfume soaked letters, lipstick marks or any substance which is not identifiable or may pose a safety, security or sanitation risk to the facility (i.e. drugs, etc.).
4. The mail depicts or describes procedures for construction or use of weapons, ammunition, bombs, or incendiary devices.
5. The mail contains plans to escape, or depicts or describes blueprints or operational detail of any existing institutional security devices, (i.e. locks, electronics, facility grounds/buildings).
6. The mail contains plans for activities in violation of facility rules or for criminal activity.
7. The mail is in code or contains gang related markings.
8. The mail is in a foreign language.  Its contents are not understood by the reader and attempts to have the mail interpreted have been unsuccessful.
9. The mail contains information which, if communicated, would create a risk of violence and/or physical harm to any person.
10. The mail contains obscene or sexually explicit material.
    A. The term sexually explicit refers to any pictorial representation that is intended for sexual gratification and shows male or female genitalia, full frontal nudity (including female breast) or depicts sexual behaviors including, but not limited to, intercourse/penetration, sodomy, fellatio, cunnilingus, anilingus, masturbation or depicts any of the following sexual behaviors:
       1. One or more of the participants appears to be:

    a. Non-consenting.

    b. Acting in a forceful, threatening or violent manner.

    c. Dominating one or more of the participants.

    d. In a submissive role.

    e. Degraded, humiliated or appears to willingly engage in behavior that is degrading or humiliating.

    f. A minor or a minor alone is depicted in a sexually suggestive way.

2. Bodily excretory behavior that appears to be sexual in nature.

3. Bestiality, sadomasochistic behavior and/or bondage.

B. The term sexually explicit also refers to written materials that are intended for sexual gratification and describe any of the following sexual behaviors as the predominant theme of the publication or letter:

1. Sexual behaviors including, but not limited to, intercourse/penetration, sodomy, fellatio, cunnilingus, anilingus or masturbation.

2. One or more of the participants appears to be:

    a. Non-consenting.

    b. Acting in a forceful, threatening or violent manner.

    c. Dominating one or more of the participants.

    d. In a submissive role.

    e. Degraded, humiliated or appears to willingly engage in behavior that is degrading or humiliating.

    f. A minor or a minor alone is depicted in a sexually suggestive way.

3. Bodily excretory behavior that appears to be sexual in nature.

4. Bestiality, sadomasochistic behavior and/or bondage.

11. The mail or publication is a threat to legitimate penological objectives.

12. The mail advocates that any ethnic, racial or religious group is inferior for any reason and makes such a group an object of ridicule and scorn and may reasonably be thought to precipitate a violent confrontation between the recipient and a member or members of the target group.

13. The mail has been purported to be legal mail, but upon visual scanning for contraband, the mail is determined to be general correspondence.

14. The mail contains cash or personal check(s).

15. The markings on the envelope/mail are discriminatory in a racial, ethnic/religious or sexual manner.

16. The mail contains backed photographs, Polaroid or other types.

17. The mail contains:

    A. U.S. postage stamp(s);

    B. Stickers on the envelope or non-paper material;

    C. Greeting card(s) larger than 8"x10", padded, musical or laminated;

    D. Magazine or book clippings.

18. The mail contains a publication unauthorized by policy (catalog, pamphlet or magazine).

19. The mail contains a publication not sent directly from the publisher or licensed retailer.

20. The mail contains item(s) not ordered or processed through the facility's designated channels.

21. The mail violates a court order.

22. The mail is correspondence with a former inmate who has not been released from the facility for 30 calendar days or correspondence with an inmate in another detention facility.

23. Other reason(s)

Outgoing mail may be disapproved for mailing for any of the following reasons:

1. The mail violates any of the reasons as set forth above.
2. The mail is addressed to a recipient who has objected to receiving correspondence from the inmate.
3. The mail is sent third person from another inmate.
4. The mail contains item(s) other than standard paper.
5. The mail contains more than three sheets of standard paper.

Any correspondence that violates SCORE's policy by the sender to introduce contraband into the facility, whether incoming or outgoing, will result in a permanent loss of your mail privileges. Your incoming mail will be photocopied and the photocopy of the mail will be provided to you. The original piece of mail will be placed in your property unless there is evidence of an attempt to introduce contraband. In that case, the piece of mail will be retained as evidence and used to assist in the prosecution of criminal charges.

If you have a question regarding what may or may not be considered contraband, please ask a Corrections Officer.

### 4.6.2    Incoming Mail

We will open all incoming mail (unless from an attorney or a public official), and check it for contraband or other violations. SCORE will allow letters, cards and six non-Polaroid pictures into the facility. Inmates shall generally be permitted to subscribe to and otherwise receive from the publisher, paperback books, newspapers or periodicals that may lawfully be delivered through the United States mail. You will not receive envelopes from your incoming mail. Envelopes will be placed into your property bin and will be released to you upon your release from the facility.

Correspondence with former SCORE inmates is not permitted until the former inmate has been out of the SCORE facility for no less than 30 calendar days.

Legal mail is defined as correspondence clearly identified as coming from attorneys, courts, judges, court clerks, other officials of the courts and government agencies. Legal mail will only be opened in your presence by authorized staff.

During election periods, if you have previously registered to vote and receive an "absentee ballot," you will be afforded the opportunity to vote, provided that you meet the following criteria:

1. Are a citizen of the United States;
2. Are a legal resident of Washington State;
3. Are at least 18 years old by Election Day; and
4. If you have been convicted of a felony in Washington, another state or in federal court, you lose your right to vote in Washington State until your civil rights are restored.

Upon receipt of your ballot, SCORE staff will verify that you meet the criteria and you will be provided the opportunity to vote via "absentee ballot."

To vote, you will be called out of your cell between the hours of 0800-0930.  A time that other inmates in the housing unit are locked down for medication pass.  This is to allow you privacy to complete your ballot and you **must remain seated at a table** while voting.  Once you have completed filling out the ballot and sealing it in the "Security" envelope, you will place it in the mailing envelope and notify the Corrections Officer to collect the ballot.  SCORE staff will place the ballot in the outgoing mail to be mailed out on the next mail run.

### 4.6.3      Outgoing Mail

You may write to your legal counsel or public officials without restriction.

You will be limited to three post cards per week, except for legitimate legal or confidential matters, in which case an envelope and paper will be allowed, but the document will be perused for confirmation prior to sealing of the envelope.  You may purchase stamped envelopes and paper through commissary.  You may only write on one side of the post card or envelope.

You must address all outgoing mail with your true name (that under which you are booked) and no return address is authorized.  On the address side of the post card, you may not write in the top three inches of the post card.  That space is reserved for postage meter stamping.

All mail must comply with United States Postal regulations.

## 4.7      Food Service

You will receive three meals a day.  Meals served at SCORE meet the mandated requirements of a nutritionally balanced 2600 calories per day.

If you need a special diet for health reasons, submit a "Medical Kite"; or religious reasons, submit a "Kite" to Programs

## 4.8      Telephone

You have access to telephones in the day rooms.  All telephone calls are collect.  If you cannot limit your calls to allow reasonable access by others, the Corrections Officer will limit your phone calls.  All non-attorney calls are subject to monitoring and recording.

During lockdown hours, inmates will be allowed to return phone calls if requested by their attorney.

SCORE staff will not accept calls for you, or take messages for you, except in verified emergencies.

We will turn off all telephones whenever we believe it necessary to ensure the safety and security of the facility, or to obtain necessary compliance with directives.

**4.9      Visitors**

Non-business visits are conducted by video.  Professional visits may be conducted by video at the request of the professional visitor.

You may refuse to meet visitors.

Video visits (except with attorneys) are subject to recording and monitoring.

We may refuse to allow you to meet with visitors who fail to meet established standards.

We will deny visitors we consider a possible threat to the safety and security or orderly operation of the jail.  That includes visitors under or suspected to be under the influence of intoxicants or drugs or who cannot produce valid picture identification.

You are subject to loss of visitation privileges for any rule violation or inappropriate behavior during visitation.

### 4.9.1      Visitor Qualifications and Limits

Visits are limited to 10 or 25 minutes and must be scheduled by the visitor 24 hours in advance of the visit with the SCORE receptionist or on-line.  Same day visitation is not allowed.  Visitation is currently conducted for in-person video visits Tuesday through Friday, 2:00 pm to 4:00 pm, from 7:30 pm to 9:00 pm.

Visitation conducted via the internet is Tuesday through Sunday, 2:00 PM – 4:00 PM and 7:30 PM – 9:00 PM.

Visitors must arrive and / or check-in on-line before the scheduled visitation time.   Visitors must be appropriately dressed, sober and well-behaved.  Whether a person is appropriately dressed or behaving properly will be at the sole discretion of jail staff.  Visitors must have picture identification.  If a visitor leaves the visitation area or web-site before the established time expires, the visit is automatically terminated.

### 4.9.2      Professional Visitors

You have access to attorneys, prosecutors, detectives and clergy at reasonable hours, depending on the availability of the requested visitor.

**4.10         Inmate Worker**

You can be an inmate worker if you exhibit good behavior and if you are not considered an escape risk. You also have to be able and willing to perform physical labor; you will need a health clearance prior to placement as an inmate worker.

| Section 5 - BOOKING AND RELEASE |
|---|

## 5.1    Booking

You will be issued jail clothing and necessary supplies.

Your personal property will be inventoried, documented and secured for you until your release.

Once you have completed the booking process, if you have bail established at the time of booking, you will be afforded the opportunity to make phone calls to arrange bail and to make contact with an attorney.

## 5.2    Classification

At booking, you will be classified and assigned housing based upon that classification.  Subsequent to booking, the classification officer will review your criminal history, past institutional record with SCORE or any other jail for the purpose of verifying your initial housing classification.

You may appeal your classification by submitting an inmate grievance form.  The Classification Committee meets weekly and will make a final determination of your classification.  You will receive a written response to your appeal.

## 5.3    Release

At release, your cell must pass inspection and you must bring all issued items and all other personal items you have in your cell.

You will be held accountable for any damaged property, and all non-disposable items must be returned to SCORE.

Your property will be returned to you at release, minus any funds that you have spent on commissary or money owed to SCORE for medical services, dental services, medications or damaged property. Funds may be returned to you either in the form of a check, cash or cash card.  Form of return is at the discretion of SCORE.

**Section 6 - DISCIPLINE**

## 6.1     Overview

If you violate the law while incarcerated in the SCORE facility, you are subject to criminal charges and prosecution.

There are three levels of sanctions for violations of facility rules.

### 6.1.1      On-site Adjustment

You may receive an on-site adjustment for a minor rule violation.  You may not appeal an on-site adjustment.  You may decide whether to accept an on-site adjustment, instead of a minor infraction, if the Corrections Officer provides you that option.

Standard sanctions for on-site adjustments include less than 12 hours lockdown, or other minor sanctions which are less than those for minor infractions.

### 6.1.2      Minor Infractions

You can receive a minor infraction for a minor rule violation.

**Violations listed below may result in a Minor Infraction.**

1. Threatening, intimidating or harassing another inmate.
2. Being in an unauthorized area.
3. Not being fully dressed (pants, shirt and shoes) when away from your bunk.
4. Failing to maintain jail health or cleanliness standards.
5. Horseplay, roughhousing or any other unauthorized contact (includes correspondence) with another inmate or visitor.
6. Interfering with facility support staff.
7. Failure to walk quietly, quickly and directly to or from any area.
8. Vulgar, abusive, profane or rude language or gestures.
9. Unauthorized use or retention of jail issued supplies.
10. Manipulating staff.
11. Obstructing clear view into living areas.
12. Improperly obtaining and/or retaining jail food or failing to return food trays or cups.
13. Changing bunk assignments without permission.
14. Obstructing or tampering with lights or vents.
15. Sharing your razor with another or using another person's razor, or other conduct which involves a hygiene risk to yourself or others.
16. Sitting, standing or lying on garbage cans, tables, steps or railings.
17. Improperly wearing jail clothing.

18. Passing items between housing units or cells.

19. Failure to submit all clothing, blankets and towels during linen or clothing exchange.

20. Making excessive or frivolous requests.

21. Using any intercom for non-emergency purposes.

22. Violation of commissary rules and/or manipulating the commissary system.

23. Purchasing commissary items for another inmate, and/or sharing your commissary items with another inmate.

24. Failure to report or exchange damaged jail issued clothing or linen.

25. Altering items and/or using items for something for other than its intended purpose.

Minor Infractions are authorized by the Shift Supervisor, who also authorizes appropriate sanctions.  Minor Infractions are not subject to grievance/appeal.

Standard sanctions for minor infractions include up to 24 hours lockdown, or loss of programs or loss of privileges (for example:  television, telephone, commissary, visitation) not to exceed 72 hours.  While in "lockdown" status for discipline, you do not have access to programs and privileges afforded to inmates in general population.

You may request that a supervisor review the imposed sanction.  However, this request must be made within one hour of receiving notice of the sanction.  The supervisor should respond to the request within a reasonable time (generally within two hours) and shall have final authority as to the imposition of informal discipline.

**6.1.3     Major Infractions**

**Violations listed below may result in a Major Infraction.**

1. Threatening staff.
2. Interfering with staff duties and responsibilities.
3. Questioning staff about their personal lives or matters (first name, habits, family, friends, etc.)
4. Provoking a fight or confrontation with another inmate.
5. Fighting.
6. Assaulting any other person.
7. Holding any person hostage.
8. Attempting escape or escape.
9. Having or making a real or potential weapon (including replicas).
10. Tampering with any security device.
11. Burning of any kind.
12. Direct indirect involvement in a riot or other organized disturbance.
13. Intentionally mutilating, altering or defacing SCORE jail or another person's property.
14. Possession of or attempting to introduce or distribute contraband.

15. Extortion or blackmail (demanding money or items of value from others by any coercion, intimidation or harassment).

16. Engaging in sexual activity with another person or committing an act of indecent exposure to other inmates or staff, or committing sexual harassment as defined by law.

17. Stealing or knowingly possessing stolen property.

18. Fraudulent or improper use of the mail or telephone system, including loaning or allowing another person to use your telephone PIN:

    - Using a PIN other than the one assigned to you;
    - Use of custom calling features (i.e. 3-way calling);
    - Use of the phone or mail to threaten, abuse or harass anyone;
    - Using the mail or phone system to plan or participate in any criminal activity; and
    - Continuing to contact parties who have indicated they do not want contact with you, or anyone you are not legally allowed to have contact with by way of an existing Court order.

19. Lying to staff.

20. Failure to follow any lawful written rule or verbal order of staff.

21. Tattooing or possession of any tattoo paraphernalia or other forms of self-mutilation.

22. Removal or tampering with inmate identification wristband.

23. Being under the influence of any non-prescribed drug or substance or attempting to introduce or manufacture any such substance.

24. Unauthorized retention of any medication you have not been prescribed, or medications you have been prescribed in excess of a single or daily dose.  (If prescribed to the inmate, inmates may possess a one day supply of "keep-on-person" {KOP} medication.)

25. Faking or feigning a medical emergency or serious medical problem.

26. Making a false cry of help (includes false alarms).

27. Officially presenting yourself to be another.

28. Committing three infractions within 180 days.

29. Altering or tampering with any video, audio or telephone equipment or systems.

30. Disturbing the peace, order and routine of the jail.

31. Involvement in activity that could pose a hazard to others or create a security risk.

32. Filing excessive or frivolous grievances.

33. Violation of any local, state or federal law.

34. Writing on or otherwise defacing jail surfaces (walls, floor, property, clothing, etc.).

35. Communication, expression or conduct related to gang affiliation or activity.

36.  Refusing to remain in or move to assigned housing.

37. Attempting to commit, or assisting, encouraging, aiding or abetting another to commit any rule violation listed above:

    - Misuse of video visit or telephone system may result in administrative suspension of these privileges prior to or in addition to the infraction process.
    - You may appeal a Major Infraction and have the right to a due process hearing, if you do so in a timely manner.

**6.1.4     Fighting**

Inmate fights are prohibited.  Inmate fights are a direct violation of Major Infraction number 3.  In the event of a physical fight in a housing POD, **ALL** inmates in the POD will be ordered to lockdown immediately.  Inmates who do not "lockdown" immediately will be considered to be involved in the fight and will be subject to disciplinary sanctions.  The combatant inmates (the inmates directly involved in the fight) will be removed from the POD and placed into Restricted Housing pending a Major Infraction hearing (see Section 6.3).  In addition to any sanctions imposed as a result of the disciplinary hearing process, additional criminal charges <u>may be</u> filed against the inmates involved in the fight or any inmates who may have had any involvement in the incident.  All POD inmates will be locked down for 24 consecutive hours.  Following the 24 hour lockdown, inmates will only be allowed out on a split tier system for a period of up to 144 hours (6 days).  After 48 hours of the split tier system, the shift Captain may review the status of the POD, and at his/her discretion, may return the POD to normal operations.

In the event of a physical fight in a dormitory style POD, N-6 and N-7, **ALL** inmates in the POD will be ordered to the floor lying face down with their hands extended away from their body.  All inmates that do not immediately go to the floor when ordered to do so or when a fight occurs will be considered to be actively involved in the fight and will face a Response to Resistance and disciplinary sanctions.  The combatant inmates (the inmates involved in the fight) will be removed from the POD and placed into Restricted Housing pending a Major Infraction hearing (see Section 6.3).  In addition to any sanctions imposed as a result of the disciplinary hearing process, additional criminal charges may be filed against the inmates involved in the fight or any inmates who may have had any involvement in the incident.  All POD inmates in the POD will be locked down (restricted to their bunk) for 24 consecutive hours.  After 24 hours of lockdown, the shift Captain may review the status of the POD, and at his/her discretion, may return the POD to normal operations.

In the event of an inmate assault against any SCORE staff member, a Major Infraction (number 5), **ALL** inmates within the facility will be locked down for seven days (168 hours).  After 24 hours of lockdown, the shift Captain may review the seriousness of the assault and the status of the PODs, and at his/her discretion, may return the PODs to normal operations.  The assaultive inmate(s) will be removed from the POD and placed into Restricted Housing pending a Major Infraction Hearing (see Section 6.3).  In addition to any sanctions imposed as a result of the disciplinary hearing process, criminal charges **will be** filed against any inmates involved in the assault on a staff member.

While in "lockdown" status, inmates do not have access to programs and privileges afforded to inmates in general population.

**6.2     Financial Responsibility for Damaging SCORE Property**

You are responsible for any costs associated with property that is damaged while you are in custody.  Damaged property is considered a Major Infraction and all allegations of property damage will go through the Disciplinary Hearing Process.  If you are found to be responsible for the damage during the Disciplinary Process, funds will be debited from your commissary account to pay for damages.  The Administrative Disciplinary Hearing Process is in addition to any criminal charges that may be filed against you.

## 6.3    Major Infraction Hearing Process

Hearings are conducted by a Hearings Officer.  Inmates charged with rule violations where the imposed sanction is 30 days or less are not entitled to be present at a hearing.  Inmates charged with rule violations where the imposed sanction may be more than 30 days are entitled to be present at a hearing unless waived in writing or excluded because their behavior poses a threat to facility safety, security and order.

Your hearing will be held in a timely manner.

You may appeal the decision of the Hearings Officer by submitting a grievance form within 24 hours.  You must state the specific reason for your appeal and what specific resolution you are seeking.

To be found that you "committed" a major infraction, the Hearings Officer will consider the facts and determine if a preponderance of evidence exists to support the allegation.  Preponderance of evidence is determined as "it is more likely than not, based on the supporting evidence, the violation occurred."

Upon a finding of "committed," the standard sanction for major infractions include, but are not limited to, loss of access to certain programs and activities for up to two weeks, lockdown for up to ten days, and an automatic loss of ten percent of Earned Early Release Credit (EERC) for each violation, excluding any EERC earned through a work detail.

While in "lockdown" status for discipline, inmates do not have access to programs and privileges afforded to inmates in general population.

## 6.4    Grievances

You have the right to a prompt and professional response to each legitimate grievance.  All grievances must be submitted using a Grievance Form, available to you upon request.  Grievances must be submitted within 24 hours and need to specifically detail the reasons for your grievance, and the specific resolution you are seeking; however, your suggested resolution may not seek financial compensation.

Medical grievances will be submitted through the medical staff and will be adjudicated by medical staff.

If you have been placed into a Restricted Housing unit you may request a hearing to dispute your housing assignment.  You request a hearing by filling out an inmate grievance form within 24 hours after receiving notice of your placement into Restricted Housing.  The Classification Committee meets weekly and will review your request.  The Classification Committee will issue their decision within 24 hours after their meeting.  You may file a written appeal, using the inmate grievance form, with the Classification Administrator within 72 hours after receiving the Classification Committee's housing determination notice.  The Classification Administrator will issue a final housing determination.

Both the grievance and response to the grievance must be in writing.

### 6.4.1   Abuse of Grievance Process

1. Punishment or disciplinary actions shall not result from the filing of a complaint, or grievance unless you demonstrate a pattern of abuse of this process by filing clearly frivolous, repetitious or knowingly false documents.
2. If you file five or more grievances in a week or twenty or more grievances in any 180 day consecutive period, you may be determined to be abusing the grievance process.
3. You may be limited to not more than ten active grievances at any one time.
4. Abuse of the grievance process shall be determined by a shift Captain.  Upon a determination of abuse, limitations on your ability to file grievances may be imposed as follows:
   - The Captain may impose a suspension of your ability to file grievances for a length of time commensurate with the degree of abuse.
   - The length of suspension may be up to six months and may be increased for second and subsequent offenses in increments not to exceed six months.
   - If you are under suspension, you shall normally be allowed to file medical grievances.
   - Abuse of the medical grievance procedures may lead to suspension of the ability to file medical grievances as well.

## 6.5   Appeals

Appeals will be handled by administrative corrections staff within a reasonable time.

An Appeal Form is also available upon request if you are not satisfied with the response.  In such a case, you must resubmit the original grievance and response along with a completed Appeal Form, within 72 hours of receipt of the original grievance response.

Within reason, you have the right to appeal any decision made by corrections staff that affects you. We will discipline you for repeated or frivolous complaints.  You may state your appeal, informally to staff or submit an Appeal Resolution Form which will be routed to the administrative staff.

You have the right to represent yourself at any hearings, and to be notified of your rights at those hearings.

You must exhaust all of your Administrative appeal rights before pursuing other avenues of resolution.

Appeals of medical grievances will be submitted to medical staff and decided by the Health Services Administrator who may elect to consult with the Medical Director and when appropriate, corrections staff.

## 6.6   Infractions

If the infraction is also a violation of the law, the matter may be referred to the Prosecutor for consideration of criminal charges.

Violations involving loss or damage to property, we may seek Court ordered restitution.

Continued disruptive behavior may result in placement into Restricted Housing.

**6.7      Inmate Safety and Sexual Assault and/or Harassment**

<u>Inmate safety is our priority at all times</u>.  At anytime, should you feel that your safety is in jeopardy, you should contact a Corrections Officer immediately.  SCORE has adopted a zero tolerance policy for sexual assault and/or sexual harassment.  SCORE will investigate all allegations of sexaul assault and/or sexual harassment against inmates or staff.