**PERRIN DECLARATION**

**EXHIBIT A**

**BEFORE THE BOARD OF INDUSTRIAL INSURANCE APPEALS**

**STATE OF WASHINGTON**

| | | |
|---|---|---|
| IN RE:   **GENERAL SECURITY SERVICES** | ) | **DOCKET NOS. 96 W376 & 97 W463** |
| **CORPORATION** | ) | |
| | ) | |
| **CITATION & NOTICE NOS.  115319824 &** | ) | **DECISION AND ORDER** |
| **115191728** | ) | |

APPEARANCES:

Employer, General Security Services Corporation, by
Davis, Wright & Tremaine, per
Michael J. Killeen

Employees of General Security Services Corporation, by
Northwest Federal Court Security Officers Union, per
Edwin H. White, President

Department of Labor and Industries, by
The Office of the Attorney General, per
James M. Hawk, Assistant

Docket No. 96 W376 is an appeal filed on September 20, 1996, with the Board of Industrial Insurance Appeals by the employer, General Security Services Corporation, from Corrective Notice of Redetermination  (CNR) No. 115319824, dated September 4, 1996. The CNR affirmed Citation and Notice No. 115319824, dated June 26, 1996, that cited the employer with one serious violation, containing four sub-parts, of regulations issued under the authority of the Washington Industrial Safety and Health Act with a total penalty assessed equal to $850.  **AFFIRMED AS MODIFIED.**

Docket No. 97 W463 is an appeal filed on September 2, 1997, with the Board of Industrial Insurance Appeals by the employer, General Security Services Corporation, from Citation and Notice No. 115191728, dated August 14, 1997. The Citation and Notice cited the employer with three serious violations of regulations issued under the authority of the Washington Industrial Safety and Health Act (WISHA) with a total penalty assessed equal to $3,600.  **VACATED.**

1

## PROCEDURAL AND EVIDENTIARY MATTERS

On December 19, 1997, the Department moved to amend Item No. 1-3 of Citation and Notice No. 115191728 by changing the cited safety standard from WAC 296-24-007501(1)(a) to WAC 296-24-07501(2)(a).  The Department's motion is granted.

The employer submitted, as Exhibit No. 10, a one-page "memorial" dated August 30, 1996, from a Department employee to an assistant attorney general, the Department's legal representative.  The Department objected to the admission of Exhibit No. 10 on grounds of attorney-client privilege and relevance.  The attorney-client privilege normally applies to prevent the discovery and use of such documents at trial.  However, the Department waived this privilege by disclosing this document while complying with a public disclosure request.  The waiver of the privilege occurs even when, as here, the disclosure of the document was accidental or due to a clerical error.  Nonetheless, Exhibit No. 10 remains rejected pursuant to ER 402 inasmuch as its contents are irrelevant.

The September 23, 1997 deposition of compliance officer Don Lofgren was published without objection during the January 5, 1998 hearing.  Pursuant to CR 32(a)(2), there are no restrictions on the usage of this deposition.  It is in evidence for all purposes, not merely for impeachment of the deponent.  Deposition Exhibit No. 2 is renumbered as Exhibit No. 22 and is admitted.  Deposition Exhibit No. 1 is noted to be part of Exhibit No. 3 and has already been admitted under that number.  Deposition Exhibit No. 3 is noted to be the same as Exhibit No. 10 and remains rejected under that number.

On November 16, 1998, we reopened the record of these appeals, pursuant to RCW 51.52.102, in order to obtain evidence necessary to the disposition of one of these appeals, Docket No. 97 W463.  At the hearing held on November 16, 1998, a document previously marked for identification as Exhibit No. 12 that was withdrawn, was admitted as Exhibit No. 12.  Thereafter,

the employer, employees and Department waived the presentation of additional evidence and the record was closed.

As part of its Petition for Review, the Department submitted declarations of Stephen M. Cant and John R. Spear with accompanying documents for inclusion in the hearing record.   This proffered material is rejected as untimely.

## DECISION

Pursuant to RCW 51.52.104 and RCW 51.52.106, this matter is before the Board for review and decision on timely Petitions for Review filed by the employer, General Security, its employees, and the Department of Labor and Industries, to a Proposed Decision and Order issued on May 27, 1998, in which CNR No. 115319824, dated September 4, 1996, and Citation and Notice No. 115191728, dated August 14, 1997, were vacated.   We have granted review to consider a large number of issues, including the Department's jurisdiction and authority to enforce WISHA under the following circumstances.

On August 13, 1937, the United States purchased the 1010 5th Avenue property in Seattle, on which the federal courthouse was erected.   In 1989, the United States acquired the Union Station Building at 1717 Pacific Avenue in Tacoma through a 30-year lease with an option to buy for a nominal amount at the end of the lease term.   The purpose of this acquisition was to renovate and use the buildings thereon as a federal courthouse.   In 1996 and 1997, the buildings at both of these locations were being used as federal courthouses.

General Security Services Corporation (GSSC) is a Minnesota corporation that employs Court Security Officers (CSOs) in federal courthouses in Tacoma and Seattle (including the bankruptcy courthouse in Seattle) and in other western states.   GSSC has fewer than 50 employees in the State of Washington.   GSSC contracts with the United States Marshal Service (USMS) to assist it in providing security in those federal facilities.   CSOs monitor courthouse

3

entrances, a function that requires them to operate x-ray machines and metal detectors provided by the USMS.  CSOs also conduct foot patrols throughout the courthouses, monitor trials held at the courthouses and assist the USMS with prisoners in transit within the courthouses and during trials. CSOs generally have considerable experience in law enforcement before they are hired by GSSC. General Security pays them, provides their uniforms and supervises them in a limited fashion.  The CSOs are deputized by the USMS.  Each CSO carries identification while on duty within the courthouses identifying him or her as a "Special Deputy U.S. Marshal Court Security Officer."  The USMS requires them to go to a federal training school for orientation training.  The USMS provides the weapons and equipment carried by CSOs while on duty.  The USMS has a firearm or deadly force policy with which the CSOs must comply.  The USMS requires that each CSO annually qualify on the shooting range with the firearm it assigns to him or her.  The USMS determines the type and style of uniform that CSOs wear while on duty, the locations at which they are stationed and the hours they work.  GSSC has the power to hire and fire CSOs, but they are subject to multiple background checks conducted by the USMS.  The USMS can refuse to allow a CSO to work at the courthouses for disciplinary or other reasons.  This is tantamount to firing the CSO inasmuch as the only GSSC workplaces within this state are federal courthouses.

The first issue we address is whether the Department has jurisdiction to enforce safety regulations promulgated under the authority of the Washington Industrial Safety and Health Act (WISHA) of 1973 upon a private company who contracts with the United States government to provide services solely within United States courthouses.  This issue requires interpretation of the United States Constitution art. I, § 8, cl. 17.

United States Constitution art. I, § 8, cl. 17 of the Constitution of the United States confers upon the United States Congress the power:

> To exercise exclusive legislation in all cases whatsoever, over such
> district (not exceeding ten miles square) as may, by cession of particular

4

states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings;

Exclusive "legislation" is the same thing as exclusive "jurisdiction." *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525 (1884).   This provision essentially is reiterated by Article XXV of the Constitution of the State of Washington.

The Washington State Supreme Court has interpreted this constitutional provision in the context of the Department's power to enforce WISHA upon the operations of a private contractor performing work solely within a federal enclave.  The federal enclave in question was Mt. Rainier National Park, over which the state legislature ceded exclusive jurisdiction to the United States by enacting Rem. Rev. Stat. § 8110 (now codified as RCW 37.08.200).  In *Department of Labor & Indus. v. Dirt & Aggregate, Inc.*, 120 Wn.2d 49 (1992), the Washington State Supreme Court determined that the federal government had obtained exclusive jurisdiction over the land within the boundaries of the national park.  Because of the cession of exclusive jurisdiction, the State could not enforce safety and health regulations promulgated under WISHA within the park since the United States Congress had not granted the State such regulatory authority.

In the appeals before us, the Department has attempted to distinguish *Dirt & Aggregate* by noting that the federal enclave in that case, Mt. Rainier National Park, was ceded to the United States while the federal courthouses in Seattle and Tacoma were purchased and leased, respectively.  However, the holding in *Dirt & Aggregate* was not dependent on the method by which the United States obtained the property, but instead upon the extent of jurisdiction over the property that was granted it by the state Legislature.

Mere ownership by the federal government and use for public purposes of lands within a state, by itself, does not withdraw the lands from the jurisdiction of the state. *James v. Dravo Contracting Co.*, 302 U.S. 134, 82 L. Ed. 155, 58 S. Ct. 208 (1937). The two methods specified in art. I, § 8, cl. 17 of the Constitution of the United States by which the United States obtains jurisdiction over land within this and other states are cession (as in *Dirt & Aggregate*) and purchase by the consent of the legislature. Jurisdiction over property purchased by the federal government can be exclusive or concurrent. *Ryan v. State*, 188 Wash. 115 (1936). A state, by statute, may qualify its consent to federal jurisdiction by reserving for itself concurrent jurisdiction with the federal government over the land acquired. *Dravo Contracting Co.*, 302 U.S. 134.

In our state, legislative consent for acquisition of property by the United States, along with the cession of jurisdiction over it, has been accomplished by statute. Initially, the jurisdiction acquired by the United States over property purchased in this state was exclusive. Rem. Rev. Stat. § 8108, adopted in 1891, stated:

> The consent of the state of Washington be and the same is hereby given to the acquisition by purchase or by condemnation, under the laws of this state relating to the appropriation of private property to public uses, by the United States of America, or under the authority of the same, of any tract, piece, or parcel of land, from any individual or individuals, bodies politic or corporate, within the boundaries or limits of this state, for the sites of locks, dams, piers, breakwaters, keepers' dwellings, and other necessary structures and purposes required in the improvement of the rivers and harbors of this state, or bordering thereon, or for the sites of forts, magazines, arsenals, docks, navy yards, naval stations, or other needful buildings authorized by any act of congress, . . . the consent herein and hereby given being in accordance with the seventeenth clause of the eighth section of the first article of the Constitution of the United States, and with the acts of congress in such cases made and provided; and the jurisdiction of this state is hereby ceded to the United States of America over all such land or lands as may have been or may be hereafter acquired by purchase or by condemnation, or set apart by the general government for any or either of the purposes before mentioned: Provided, that this state shall retain a concurrent jurisdiction with the United States in and over all tracts so acquired or set apart as aforesaid, so far as that all civil and criminal process that may issue under the authority of this state against any

person or persons charged with crimes committed, or for any cause of action or suit accruing without the bounds of any such tract, may be executed therein, in the same manner and with like effect as though this assent and cession had not been granted."

The use of the term "concurrent" in Rem. Rev. Stat. § 8108 did not change the nature and extent of the federal government's jurisdiction from exclusive to concurrent.  *See*, John N. Rupp, 14 Wash. L. Rev. 1, 23 (1939).  A limited reservation by the state of jurisdiction to serve process does not remove or defeat the grant of exclusive jurisdiction.  *State v. Lane*, 112 Wn.2d 464, 470 (1989).

The Legislature's consent to exclusive jurisdiction of the United States is dependent on the purchased property being used by the United States for a purpose enumerated in art. I, § 8, cl. 17 of the Constitution of the United States.  *Ryan*, 188 Wash., at 126-127.  One of these purposes is "for the erection of . . . 'needful buildings.'"  A federal courthouse is a "needful building" within the meaning of art. I, § 8, cl. 17 of the Constitution of the United States.  *Ryan*, 188 Wash. at 127-128; *Dravo Contracting Co.*, 302 U.S. 134.  Inasmuch as Rem. Rev. Stat. § 8108 was in effect on August 13, 1937, the United States obtained exclusive jurisdiction over that property as provided by that statute.

In 1939, Rem. Rev. Stat. § 8108 was repealed and replaced with Rem. Rev. Stat. §§ 8108-1 through 8101-4 (Laws of 1939, ch. 126, §§ 1-4, effective June 7, 1939), that is now codified in Chapter 37.04 RCW.  RCW 37.04.010 contains the State Legislature's consent to acquisition of land "by purchase, lease, condemnation, or otherwise" for the uses described by art. I, § 8, cl. 17 of the United States Constitution, including "needful buildings."  RCW 37.04.020 defines the jurisdiction ceded to the United States as "concurrent jurisdiction with this state in and over any land so acquired by the United States . . .." Thus, the Washington State Legislature no longer granted exclusive jurisdiction to the federal government over property it purchased in this state.

This change in legislative consent did not change the grant of exclusive jurisdiction the United States had already obtained over the Seattle federal courthouse property.  RCW 37.04.040

7

provides that "jurisdiction heretofore ceded to the United States over any land within this state by any previous act of the legislature shall continue according to the terms of the respective cessions," so long as the United States has affirmatively accepted the ceded jurisdiction and has not failed or ceased to use the land for the purpose for which it was required.  There is no evidence in the record regarding an acceptance of jurisdiction over the Seattle federal courthouse property by the United States.   Nonetheless, such acceptance of jurisdiction by the United States is presumed. *Ft. Leavenworth R. Co.*, *Silas Mason, Inc. v State Tax Comm'n.*, 302 U.S. 134, 82 L. Ed. 155, 114 A.L.R 318 (1937).  This presumption is lent additional weight by the construction and continuous use for almost 60 years of a federal courthouse on the purchased premises.  Absent evidence to the contrary, the presumption of acceptance has not been rebutted.  Acceptance of exclusive jurisdiction over the property by the United States government is deemed established.

The establishment of exclusive jurisdiction by the federal government over the Seattle courthouse property does not mean that all state law is no longer valid there.  State law that had applied to the property at the time of the transfer of ownership and jurisdiction to the United States is still applicable to the property, although the state no longer has the power to amend those laws or pass new ones applicable therein.  *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 84 L. Ed. 596, 60 S. Ct. 431, 127 A.L.R. 821 (1940); *Pacific Coast Dairy, Inc. v. Department of Agriculture*, 318 U.S. 285, 295, 87 L. Ed. 761, 63 S. Ct. 628 (1943).  Since WISHA was not enacted until long after the United States purchased and obtained exclusive jurisdiction over the Seattle federal courthouse property, its enactment in and of itself does not permit it to be applied within the boundaries of that federal enclave.

Since the federal government has obtained exclusive jurisdiction over the Seattle courthouse property it acquired in 1937, many of the principles discussed by our state's Supreme Court in *Dirt & Aggregate* also apply to prevent the Department from enforcing WISHA within the

Seattle federal courthouse.   Because the United States has exclusive jurisdiction over the courthouse property, the state may not resume regulation within it without the express permission of Congress.   The Occupational Safety and Health Act (OSHA) of 1970, 29 U.S.C. § 651 et seq., does not contain express congressional permission for the resumption of state regulation over safety and health on federal enclaves nor does it expand state regulatory power beyond its normal legislative limits.   *Dirt & Aggregate*, 120 Wn.2d at 53-56.   The inescapable conclusion is that the Department of Labor and Industries lacks jurisdiction to enforce WISHA within the Seattle Federal courthouse.   Therefore, Citation and Notice No. 115191728, issued on August 14, 1997, (Docket No. 97 W463) must be vacated due to this lack of jurisdiction.

The remainder of this Decision and Order addresses only CNR No. 115319824, issued on September 4, 1996, (Docket No. 96 W376) involving the application of WISHA to the Tacoma federal courthouse.

The jurisdictional situation regarding the federal courthouse in Tacoma is materially different from that of the Seattle courthouse because of the date the United States acquired the Tacoma courthouse property.   RCW 37.04.020, that was applicable in 1989, only ceded concurrent jurisdiction to the federal government over property it acquired in this state.   That the federal government's acquisition of the property was by lease rather than purchase is not important. RCW 37.04.010 shows that the legislature consented to the acquisition of property by the federal government through lease as well as by purchase.   Since the property in question is subject to the concurrent jurisdiction of both the federal and state government, instead of the exclusive jurisdiction of the federal government, it is subject to the jurisdiction of the state.   *Ryan,* 188 Wash. 115; *State v. Williams*, 23 Wn. App. 694 (1979).

The extent of the state's jurisdiction is described by RCW 37.04.030.  It states:

> The state of Washington hereby expressly reserves such jurisdiction and authority over land acquired or to be acquired by the United States as aforesaid as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition.

Inasmuch as our state legislature has consented to (granted) only concurrent jurisdiction to the federal government, art. I, § 8, cl. 17 of the United States Constitution does not prevent all state regulation at the Tacoma federal courthouse.  Our review must now expand to consider whether the Department's attempt to enforce WISHA upon a private contractor at a worksite within the Tacoma federal courthouse is preempted by federal law pursuant to art. VI, cl. 2, of the Constitution of the United States, also known as the Supremacy Clause.

United States Const. art VI, cl. 2, states:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.

Supremacy Clause questions often are referred to as questions of  "preemption" by federal law of state regulation or action.

In *Inlandboatmen's Union of the Pacific v. Department of Transp.*, 119 Wn.2d 697 (1992), the Washington State Supreme Court considered whether the Department of Labor and Industries' power to enforce safety regulations promulgated under the authority of WISHA upon the Washington State Ferry System was preempted by federal law in the form of United States Coast Guard regulations.  In discussing the case, the court provided an overview of the preemption law:

> State law can be preempted in two ways: field preemption or conflict preemption. If Congress indicates an intent to occupy a given field (explicitly or impliedly), any state law falling within that field is preempted; even if Congress has not indicated an intent to occupy a field, state law is still preempted to the extent it would actually conflict with federal law.

10

Federal preemption is governed by the intent of Congress and may be expressed in the federal statute. Absent explicit preemptive language, Congress' intent to supersede state law in a given area may be implied if (1) a scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it, (2) if the federal act touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or (3) if the goals sought to be obtained or the obligations imposed reveal a purpose to preclude state authority. Federal regulations, within the scope of an agency's authority, have the same preemptive effect as federal statutes.

Even if Congress has not occupied an entire field, preemption may occur to the extent that state and federal law actually conflict. Such a conflict occurs (1) when compliance with both laws is physically impossible or (2) when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

There is a strong presumption against finding preemption in an ambiguous case, and the burden of proof is on the party claiming preemption.

*Inlandboatmen*, 119 Wn.2d, at 701-702.  Footnotes and citations omitted. *See also*, *Department of Labor & Indus. v. Common Carriers, Inc.*, 111 Wn.2d 586, 588 (1988); and *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 326-327 (1993).

There is no federal statute that expressly preempts the state's regulation of workplace safety and health.  While OSHA appears to regulate the entire field of industrial safety and health, a provision of that act (29 U.S.C. § 667) actually removed federal preemption by allowing the states to adopt their own plans and standards to regulate this field in lieu of the federal government. *Inlandboatmen*, 119 Wn.2d, at 704.  Our state took advantage of this federal "offer" to allow it to regulate this field itself by adopting WISHA through an exercise of the police power.

We do not conclude that the United States Congress implicitly intended to supercede state industrial safety and health regulation of private employers whose worksites are within federal courthouses.  Courts are reticent to imply federal preemption of an entire field, such as industrial safety and health, without an unambiguous congressional mandate to that effect.  *Inlandboatmen*, 119 Wn.2d, at 705.  The historic police powers of a state to provide for the health and safety of its

citizens are not to be preempted absent a clear and manifest purpose of Congress. *Medtronic Inc. v. Lohr*, 518 U.S. 470, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996); Reece *v. Good Samaritan Hosp.*, 90 Wn. App. 574, 578 (1998). Great deference is given to state legislation such as WISHA where public health and safety are involved. *Inlandboatmen*; *Fisons*. Washington State's interest in protecting Washington workers' safety and health is strong and local in character, and WISHA was enacted pursuant to the state's police power. *Inlandboatmen*, 119 Wn.2d, at 706. Because of the subject matter of the legislation involved in this case and the use by the state of its police power to protect a strong, local interest, it is unlikely that any implicit intent to supercede WISHA exists.

The employer has not shown any pervasive scheme of federal regulation, dominant federal interest or any federal goal or obligation that reveals a purpose to preclude state authority. GSSC maintains that it is tightly controlled by the federal government in the form of the United States Marshal Service (USMS). The record clearly reflects that the USMS is integrally involved in the supervision and control of CSOs employed by GSSC. However, there is a paucity of evidence showing that such regulation extended to include the safety and health of the CSOs within their workplaces at the federal courthouses. Even if USMS policy such as the firearms policy could be construed as regulating the subject matter of workplace safety and health, the existence of such a policy is not sufficient to show that a pervasive federal regulatory scheme exists or that Congress intended to preempt state safety and health law. The fact that CSOs are expected to attend orientation training at a federal training center also does not establish congressional intent to preempt all training requirements contained in state regulations of workplace safety and health.

There is no evidence that state regulation of workplace safety and health actually conflicts with federal law since compliance with both is possible. There is very little applicable federal law in the field of workplace safety and health with which WISHA could conflict. Statutes related to the USMS, 28 U.S.C. § 561, *et seq.*, do not address safety or health-related issues. The regulations

found in 29 C.F.R. § 1960.1, *et seq.* do not apply to CSOs since they are not federal employees. The regulations in 21 C.F.R., pt. 1925, regarding safety and health standards for federal service contracts, do not preclude states from setting additional safety and health standards, nor does compliance with those federal standards relieve a private contractor from compliance with stricter state or local safety and health standards.  21 C.F.R. § 1925.1 (d) & (e).  These federal regulations refer to another regulation regarding personal protective equipment, located at 41 C.F.R. 50-204.7. However, that regulation does not conflict with the WISHA requirement for employer assessment of the need for personal protective equipment for its workers, since it does not contain or prohibit such a requirement.

The heart of GSSC's argument is that imposition of WISHA on their operation is a regulation of the activities of the United States government because it is performing a uniquely federal function.  This is merely another way of stating that WISHA should be preempted as an obstacle to the accomplishment of the full purpose and objectives of Congress.  The employer has contended that its case is not based upon a preemption argument.  But such a contention is disingenuous inasmuch as many of the cases it cites are preemption cases and the "interference with a federal function" analysis has been used by the United States Supreme Court in deciding preemption cases.  *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 48 L. Ed. 2d 555, 96 S. Ct. 2006 (1976); and *Goodyear Atomic Corp. V. Miller*, 486 U.S. 174, 100 L. Ed.2d 158, 108 S. Ct. 1704 (1988).

In *Goodyear Atomic Corp.*, the Supreme Court noted that state regulation may be invalidated under the Supremacy Clause when the state is claiming authority to dictate the manner in which the federal function (in that case, control over the production of nuclear material) is carried out.  In *Leslie v. Miller*, 352 U.S. 187, 1 L. Ed. 2d 231, 77 S. Ct. 257 (1956), the Supreme Court invalidated a state licensing requirement for contractors that, in essence, gave the state the power of reviewing and approving contractors hired by the United States.  In this case, the federal function

13

is the protection of people and property within a federal courthouse.  The Department, when enforcing WISHA, is not attempting to dictate, amend, review or obstruct the ability of either the USMS or GSSC to fulfill that purpose.  All that the Department has attempted to do is ensure that GSSC employees are adequately trained and protected in order to prevent and reduce injuries when job-related safety or health hazards are encountered.  It is GSSC, not the USMS, that would be responsible to provide that training.

GSSC complains that meeting WISHA requirements will be inconvenient and/or costly.  This is not a valid reason to conclude that WISHA should be preempted.  In *Sadrakula*, the Supreme Court declared that the fact the federal government chose to accomplish its purpose by contracting with a private contractor did not enable that contractor to share the government's immunity from state regulation.  The Court stated that the mere increase in the cost of a contract caused by compliance with state law was not enough of an interference with a federal purpose to require preemption of the state law.

Similarly, the additional burden of dual regulation does not mandate preemption of the state law so long as no actual conflict with federal law exists. *Inlandboatmen*, 119 Wn.2d, at 708-709. Certainly there are instances where an attempt to enforce certain WISHA regulations at a federal courthouse could conflict with federal law or the accomplishment of a federal purpose.  However, the employer has not shown that such a conflict actually occurred in this case, and we will not presume that one exists.  The Department did not attempt to "lock out" or "red tag" x-ray machines, metal detectors or other government-owned equipment.  It did not attempt to issue an order of immediate restraint.  There is no indication that this inspection by the Department prevented CSOs from performing their duties, inhibited any activities within the courthouse or compromised the safety of CSOs or others within the courthouse.  As stated in *Inlandboatmen,* "The possibility of interference or the potential for future conflicts do not justify a finding of preemption."

To summarize thus far, we have determined that neither the operation of art. I, § 8, cl. 17, nor art. VI, cl. 2 of the Constitution of the United States operates to invalidate CNR No. 115319824, dated September 4, 1996, alleging violations of safety standards promulgated under the authority of WISHA at the GSSC workplace in the federal courthouse in Tacoma.  Since CNR No. 115319824 has survived the constitutional attacks on it, we now look at the particulars of the violations it cited and the penalty it assessed.

The Department cited GSSC for violations of four safety regulations at its Tacoma courthouse work-site.  The item cited as No. 1-1a is for a violation of WAC 296-24-040(2), that requires an employer to have an accident prevention program outlined in a written format.  The item cited as No. 1-1b is for a violation of WAC 296-24-045(1) that requires an employer with 11 or more employees to have a safety committee (or at least periodic crew safety meetings).  The item cited as No. 1-1c is for a violation of WAC 296-24-060(2) that requires that a person holding a valid first aid card (certificate of first aid training) be present or available at the work-site at all times.  The item cited as No. 1-1d is for a violation of WAC 296-24-07501(2)(a) that requires an employer to assess a workplace to determine if hazards are present, or are likely to be present, that necessitate the use of personal protective equipment.

The Department has proved that the employer violated three of the four safety standards listed above.  Donald Arnett, the employer's district supervisor since February 1994, admitted that in May 1996 the employer had no written accident prevention program, had no safety committee, and had not performed an assessment of the need to provide CSOs with body armor.  These admissions are consistent with the information gathered by Don Lofgren, the compliance officer who conducted the inspection of the Tacoma work-site of the employer, and with the testimony of Edwin White, the only CSO who testified who was stationed in Tacoma in May 1996.  Mr. Lofgren testified that Mr. Arnett told him that GSSC has 11 CSOs working at the Tacoma courthouse.

Although Mr. Arnett also admitted that in May 1996 the employer did not require any employee to hold a valid first aid card, we find that the employer was not in violation of WAC 296-24-060(2), and, therefore, vacate Item No. 1-1c.

WAC 296-24-060 states in relevant part:

> (1) In addition to RCW 51.36.030, every employer shall comply with the department's requirements for first aid training and certification.

> (2) There shall present or available at all times a person or persons holding a valid certificate of first-aid training.  (A valid first-aid certificate is one which is less than three years old.)

This regulation is in direct conflict with RCW 51.36.030 that states:

> Every employer, who employs workers, shall keep as required by the Department's rules a first aid kit or kits equipped as required by such rules with materials for first aid to his or her injured workers.  **Every employer who employs fifty or more workers**, shall keep one first aid station equipped as required by the department's rules with materials for first aid to his or her injured workers, and **shall cooperate with the department in training one or more employees in first aid to the injured**.  The maintenance of such first aid kits and stations shall be deemed to be a part of any safety and health standards established under Title 49 RCW.

(Emphasis added.)

It is clear that the Legislature intended, with RCW 51.36.030, to exempt employers with fewer than 50 workers from the requirement for first aid training.  Although it is also clear that the Department has broad rule-making authority under Title 49 RCW, the general provisions of Title 49, and the regulations promulgated under Title 49 cannot be read to repeal the specific exemption provided in RCW 51.36.030.  Although the Department certainly has the authority to adopt rules and regulations regarding safety and health standards under Title 49, the Legislature did not give the Department the authority to repeal legislative enactments.  Because the evidence demonstrates that GSSC had fewer than 50 employees at the time of the inspection, and because WAC 296-24-060 is therefore in conflict with the exemption provided by RCW 51.36.030, the statute must be

accorded more weight than the regulation with which it is in conflict and Item No. 1-1c must be vacated.

The employer notes that Exhibit No. 4, the WISHA interpretative memo regarding body armor as personal protective equipment had not been written as May 31, 1996, when the inspection occurred.  Nonetheless, WAC 296-24-07501(2)(a) was in existence as of that date.  Furthermore, personal protective equipment was described in WAC 296-24-07501(a) as including protective clothing and protective shields and barriers that would include body armor or bulletproof vests.

The Department grouped these four violations into one serious violation (with four subparts) for which a penalty of $850 was assessed.  Mr. Lofgren acknowledged that the grouping of violations was discretionary.  He testified that each of the first three violations, by itself, did not rise to the level of a serious violation.  He stated that Item No. 1-1d, the failure to assess the need for personal protective equipment, helped considerably in raising the grouped violation to a rating of "serious," but he never testified that this violation alone was serious.  Mr. Lofgren concluded that the four violations, when grouped, constituted a serious violation because together they increased the likelihood that serious injury or death could occur.  Although we have vacated Item No. 1-1c, we conclude that the remaining three violations may reasonably be grouped in order to find one serious violation.

GSSC contends that the Department should not be allowed to group these violations when the only reason for grouping them is to allow the assessment of a penalty for a serious violation.  This is a question of first impression in this state.  We have suggested that grouping violations should occur when a logical relationship exists among the violations or when an articulated legal standard requires them to be grouped, *In re Berg Equipment & Scaffolding, Inc.*, Dckt. No. 93 W163 (September 6, 1994), but that statement does not foreclose grouping them for the purpose of producing a serious violation.

In order to reach a proper decision on this matter, we have examined OSHA case law for guidance.  It is well established in federal administrative decisions that grouping of non-serious violations is permissible even if the only purpose for grouping them is to obtain one serious violation for penalty assessment purposes.  Two or more non-serious violations may be grouped together to form a single serious violation if the combined violations create a substantial probability of death or serious physical injury or cause a condition that could result in death or serious injury.  *Secretary of Labor v. CTM, Inc.,* 4 OSHC 1468 (1976), *vacated on other grounds by*, 572 F.2d 262 (10th Cir., 1978); *Secretary of Labor v. Harold A. Simpson & Assoc. Dev. Co.*, 4 OSHC 1894 (1976); *Secretary of Labor v. A.R.A. Mfg. Co.*, 9 OSHC 1271 (1981); and *Secretary of Labor v. A. R. Butler Constr. Co.*, 14 OSHC 2140 (1991).

In this case, the grouping of general (or non-serious) violations to create a single serious violation is appropriate.  It is true that the job-related hazards to which the CSOs are exposed--physical assaults, often with deadly weapons--has nothing to do with the violations in question.  However, it is easy to see how the lack of training and protection resulting from these violations when considered together, would make serious physical injury or death more likely to occur whenever a CSO is assaulted.  Accident prevention programs include instructions on actions to take in case of emergencies, identification of hazards, escape routes and locations of first aid facilities.  Safety committee responsibilities include the identification of unsafe conditions or acts and review of programs for safety improvement purposes.  An assessment of the need for personal protective equipment may reveal situations where such gear or clothing, if provided, would lessen or even prevent injury or death.  In the most likely hazard to confront a CSO, an armed assault at a courthouse entrance by an irate or mentally unstable person, there is no question that death or serious physical harm to a CSO could occur in a number of ways.  Compliance by the employer with the three standards in question would reduce the chance and severity of injury.

For a violation to be rated as serious, the Department must show that the employer had knowledge of the hazardous conduct or condition and that there was a substantial probability that death or physical harm could result from the violation.  RCW 49.17.180(6); *In re Erection Co. (II)*, BIIA Dec. 88 W142 (1990).  The Department has met the burden of proof of both these elements in this case.  All of the witnesses, including Mr. Arnett, testified that the CSOs are exposed to hazards while performing their duties.  These hazards included bodily assaults with fists, knives or guns.  Mr. Arnett stated that CSOs potentially are exposed to fatal injury each day they are on the job.  He acknowledged that a few CSOs had been killed on the job during the past 14 years.  Mr. Arnett also acknowledged the need for CSOs to have safety training.  However, he felt it was the responsibility of the USMS to provide safety training and personal protective equipment to the CSOs.

Having determined that the Department correctly cited GSSC for one serious violation, consisting of a grouping of three non-serious violations, we turn to the appropriateness of the penalty that was assessed.  An examination of Exhibit No. 5, the Department's penalty worksheet, reveals potential issues only regarding the Department's rating of the severity of the violation and the size and good faith of the employer.  The Department rated the severity of the hazard as a "6" on a scale of 1 to 6, indicating an injury sustained likely could have the most severe consequences.  Since the type of injuries that could be sustained (bullet wounds or knife wounds for example) could easily result in severe disability or death, the highest possible rating for severity is justified.  The rating of the size of the employer is based on the statement of Mr. Arnett to Mr. Lofgren as well as Mr. Arnett's testimony that GSSC has between 40 and 50 employees in this state.  Therefore, the Department's categorization of the employer's size is also correct.

We disagree with the Department's characterization of the employer's good faith as only "fair."  Mr. Lofgren cited the lack of safety programs by the employer as well as his own "neutral" feelings about its cooperation with the inspection as his reasons for rating its good faith that low.

We believe that the evidence in the record supports a higher rating of "good" good faith on the part of the employer.  Despite Mr. Lofgren's "neutral" feeling about the employer's cooperation, he testified that GSSC permitted and cooperated with the inspection.  There is no indication in the record that GSSC's history of injuries or claims costs was higher than average.  Furthermore, action evidently was taken to address the violations found during the May 31, 1996 inspection.  Another inspection at the GSSC Tacoma courthouse worksite took place in early 1997 at which time no safety violations were found.  (*See* Exhibit No. 21).

The effect of reclassifying the employer's good faith from "fair" to "good" is to reduce the base penalty for Item No. 1-1 by 20 percent.  This results in a reduction of $340 from the $850 penalty assessed by the Department.  Therefore, the total penalty for Item No. 1-1 should be $510.

Our disposition of the issues related to the contents of CNR No. 115319824, issued on September 4, 1996, regarding the Tacoma federal courthouse worksite of GSSC is as follows:  The Department correctly cited the employer with non-serious (general) violations of three safety standards found within Chapter 296-24, WAC.  The action by the Department of grouping these three violations into one serious violation for penalty purposes was permissible.  The amount of the penalty assessed should be reduced from $850 to $510 based on a revision in the rating of the employer's good faith from "fair" to "good".  CNR No. 115319824, as modified, is affirmed.

### FINDINGS OF FACT

1.  On May 31, 1996, the Department of Labor and Industries conducted an inspection of General Security Services Corporation at their place of business at 1717 Pacific Avenue in Tacoma, Washington.  On June 26, 1996, the Department issued Citation and Notice No. 115319824 that alleged one serious violation, with four subparts, of safety regulations promulgated under the authority of the Washington Industrial Safety and Health Act (WISHA), with a total penalty assessed equal to $850.  Following a timely appeal by the employer, the Department issued Corrective Notice of Redetermination (CNR) No. 115319824 on September 4, 1996 that affirmed the violations and penalty but changed the abatement dates.  On September 20, 1996, the employer filed a

Notice of Appeal with Board of Industrial Insurance Appeals that assigned the claim Docket No. 96 W376.

2.    On July 8, 1997, the Department of Labor and Industries conducted an inspection of General Security Services Corp. at their place of business at 1010 5th Ave. in Seattle, Washington.  On August 14, 1997, the Department issued Citation and Notice No. 15191728 that alleged three serious violations of safety regulations promulgated under the authority of the Washington Industrial Safety and Health Act (WISHA), with a total penalty assessed equal to $3,600.   On September 2, 1997, the employer filed a Notice of Appeal with Board of Industrial Insurance Appeals that assigned the claim Docket No. 97 W463.

3.    On August 13, 1937 the United States purchased land at 1010 5th Ave. in Seattle, Washington upon which it built the federal courthouse that it currently occupies.   By statute, the Washington State Legislature consented to the purchase of property and ceded jurisdiction over it to the United States.   The United States accepted the cession of jurisdiction by the state.

4.    In 1989 the United States acquired the Union Station Building located at 1717 Pacific Ave. in Tacoma, Washington by the means of a 30-year lease with an option to buy for a nominal sum at the end of the lease term. By statute, the Washington State Legislature consented to the purchase of property and ceded concurrent jurisdiction over it to the United States.  The United States accepted the cession of jurisdiction by the state.

5.    General Security Services Corp. (GSSC) is a Minnesota corporation that employs between 40 and 50 Court Security Officers (CSOs) in federal courthouses in Tacoma and Seattle (including the bankruptcy courthouse).  GSSC contracts with the United States Marshal Service (USMS) to assist it in providing security in those federal facilities.  CSOs monitor courthouse entrances, a function that requires them to operate x-ray machines and metal detectors provided by the USMS.  CSOs also conduct foot patrols throughout the courthouses and monitor trials held at the courthouses as well as assist the USMS with prisoners in transit within the courthouses and during trials.   CSOs generally have considerable experience in law enforcement before they are hired by GSSC.  They are employees of GSSC, who pays them, provides their uniforms to them and supervises them in a limited fashion.  The CSOs are deputized by the USMS.  Each CSO carries identification while on duty at the courthouses identifying him or her as a "Special Deputy U.S. Marshal Court Security Officer."  CSOs employed by GSSC in Western Washington do not work outside the boundaries of the federal courthouses in Seattle and Tacoma.  The USMS requires all CSOs to go to a federal training school for orientation training.  The USMS provides the weapons and equipment carried by CSOs while on duty.  The USMS

21

has a firearm or deadly force policy with which the CSOs must comply. The USMS requires that each CSO annually qualify on the shooting range with the firearm it assigns to him or her. The USMS determines the type and style of uniform that CSOs wear while on duty, the locations at which they are stationed and the hours they work.  GSSC has the power to hire and fire CSOs, but they are subject to multiple background checks conducted by the USMS.  The USMS can refuse to allow a CSO to work at the courthouses for disciplinary or other reasons.

6.     The safety inspection conducted by the Department at the Tacoma federal courthouse on May 31, 1996, did not interfere or obstruct the performance of the CSOs duties or the functioning of the courthouse itself.

7.     CSOs employed at the Tacoma federal courthouse are exposed to hazards, including the possibility of physical assaults, and assaults by individuals armed with deadly weapons.

8.     As of May 31, 1996, at the Tacoma federal courthouse, GSSC did not have an accident prevention plan outlined in a written format as required by WAC 296-24-040(2).  This violation was cited by the Department as Item No. 1-1a.

9.     As of May 31, 1996, eleven CSOs worked at the Tacoma federal courthouse.

10.    As of May 31, 1996, at the Tacoma federal courthouse, GSSC did not have a safety committee or periodic crew safety meetings as required by WAC 296-24-045(1).   This violation was cited by the Department as Item No. 1-1b.

11.    As of May 31, 1996, at the Tacoma federal courthouse, GSSC did not have present or available at all times, at least one person holding a valid certificate of first aid training as required by WAC 296-24-060(2) This violation was cited by the Department as Item No. 1-1c.

12.    As of May 31, 1996, GSSC had not assessed, as required by WAC 296-24-07501(2)(a), whether hazards present, or likely to be present at the Tacoma federal courthouse workplace, would necessitate use of personal protective equipment, including protective shields and barriers such as body armor and bulletproof vests.  This violation was cited by the Department as Item No. 1-1d.

13.    In CNR 115319824, the Department grouped or combined the safety violations cited by it as Item Nos. 1-1a, 1-1b, 1-1c, 1-1d into one violation, Item No. 1-1, that it labeled as serious.  The lack of training and protection of CSOs, related to these safety violations grouped by the Department into Item No. 1-1, expose them to a substantial

probability of serious physical harm or death in view of the occupational hazards that they may encounter as part of their duties at the Tacoma federal courthouse.  GSSC knew or should have known of this additional exposure of CSOs to serious physical harm or death caused by the lack of training and protection.

14.  The severity of the potential effects to the CSOs of the safety violations grouped as Item No. 1-1 in CNR No. 115319824, is most accurately rated as a "6" on a scale of "1" to "6" where a "6" corresponds to very severe adverse effects of worker safety or health and a "1" corresponds to a very low severity of adverse effects.

15.  In regard to Item No. 1-1, of CNR No. 115319824, the employer's good faith is best described as "good."

16.  The employer has fewer than 50 employees.

## CONCLUSIONS OF LAW

1.  The Board of Industrial Insurance Appeals has jurisdiction over the subject matter and parties to these appeals.

2.  Federal courthouses are "needful buildings" within the meaning of art. I, § 8, cl. 17 of the United States Constitution.

3.  The United States has exclusive jurisdiction over the property located at 1010 5th Ave. in Seattle, Washington, including the federal courthouse building.

4.  The United States and the State of Washington have concurrent jurisdiction over the property located at 1717 Pacific Ave. in Tacoma Washington, including the Union Station Building where the federal courthouse is located.

5.  Property leased, with an option to buy, is the equivalent of property purchased within the meaning of art. I, § 8, cl. 17 of the United States Constitution and RCW 37.04.010.

6.  The Department of Labor and Industries does not have jurisdiction to enforce safety and health regulations, promulgated under the authority of Chapter 49.17 RCW (WISHA) within the federal courthouse located at 1010 5th Ave. in Seattle, Washington.

7.  The Department of Labor and Industries has jurisdiction to enforce safety and health regulations, promulgated under the authority of Chapter 49.17 RCW (WISHA) within the federal courthouse located at 1717 Pacific Ave. in Tacoma, Washington.

8.  The enforcement of industrial safety and health regulations by the Department at the federal courthouse in Tacoma upon a private employer, whose employees only work in federal courthouses, is not preempted, per se, by art. VI, cl. 2 of the United States Constitution or by any Act of Congress or federal regulation.

9.  The state safety regulations that GSSC was cited for violating do not conflict with any federal statute or regulation, either expressly or impliedly, nor do they actually conflict with any federal law either by making it impossible for GSSC to comply with both or by standing as an obstacle to the accomplishment of federal purposes, objectives or functioning.

10. Item Nos. 1-1a, 1-1b, and 1-1d, cited in CNR No. 115319824, may be grouped by the Department for the purpose of establishing a single serious violation

11. The employer is not required, within the meaning of RCW 51.36.030, to cooperate with the Department's first aid training program.  Item No. 1-1c, in CNR No. 115319824, citing a general violation of WAC 296-24-060(2), is vacated.

12. The penalty assessed by the Department for Item No. 1-1 in CNR No. 115319824 shall be reduced from $850 to $510.

13. CNR No. 115319824, dated September 4, 1996, is affirmed as modified herein, with a total penalty of $510.

14. Citation and Notice No. 115191728, dated August 14, 1997, is vacated.

It is so **ORDERED**.

Dated this 15th day of December, 1998.

BOARD OF INDUSTRIAL INSURANCE APPEALS

/s/_____
THOMAS E. EGAN                    Chairperson

/s/_____
JUDITH E. SCHURKE                    Member

24