# CHIEN DECLARATION

# EXHIBIT A

```
 1                    UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3      _____

 4                                  )
        STATE OF WASHINGTON,         )  C17-5806-RJB
 5                                   )
                     Plaintiff,      )  TACOMA, WASHINGTON
 6                                   )
        v.                           )  September 12, 2019
 7                                   )
        THE GEO GROUP, INC.,         )  9:30 a.m.
 8                                   )
                     Defendant.      )  Motion Hearing
 9      _____

10

11                 VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE ROBERT J. BRYAN
12                 UNITED STATES DISTRICT JUDGE
        _____

13

14      APPEARANCES:

15       For the Plaintiff:      Andrea Brenneke
                                 Lane Polozola
16                               Marsha Chien
                                 Office of the Attorney General
17                               800 Fifth Avenue
                                 Suite 2000
18                               Seattle, WA  98104

19       For the Defendant:      Colin L. Barnacle
                                 Akerman LLP
20                               1900 Sixteenth Street
                                 Suite 1700
21                               Denver, CO  80202

22                               Joan K. Mell
                                 III Branches Law
23                               1019 Regents Blvd.
                                 Suite 204
24                               Fircrest, WA  98466

25
```

1              THE COURT:  Good morning.  Okay.  This is cause

2     number 17-5806, State of Washington versus the GEO Group.

3     And it comes on this morning for oral argument regarding the

4     pending motion for reconsideration and also on the continuing

5     issue of intergovernmental immunity.

6         Let me get your appearances first, here.  For the

7     plaintiff?

8              MS. CHIEN:  Marsha Chien for the State of Washington.

9              MR. POLOZOLA:  Lane Polozola also for the State of

10    Washington, Your Honor.

11             MS. BRENNEKE:  I'm Andrea Brenneke for the State of

12    Washington.

13             THE COURT:  Okay.  And for the defense?

14             MR. BARNACLE:  Colin Barnacle on behalf of GEO Group.

15             THE COURT:  Mr. Barnacle.

16             MS. MELL:  And Joan Mell on behalf of GEO Group.

17             THE COURT:  First, before we start argument here, I'm

18    mindful that the plaintiffs, particularly, have objected to

19    the United States' statement of interest or I should say

20    statements of interest.  I think the court should consider

21    those statements of interest for a number of reasons.

22        First, the government has the right to show the court its

23    interests, pursuant to 28 United States Code Section 517.

24    And they can do that without appearing as a party.  Second,

25    the United States' statement of interest cited at least two

1   cases in their statements of interest that are relevant and

2   were not cited to the court in their final forms at our first

3   go-around on intergovernmental immunity, that's simply

4   because they were finally decided after the court's rulings

5   last December on that subject.  And those cases, *Dawson v.*

6   *Steager* and *United States v. California*, helped to clarify

7   the law on intergovernmental immunity.  And I think it's

8   important for the court to consider them.

9        Third, I am mindful that the statement of interest is

10  outside the court's planned schedule for the case.  It raises

11  something late that we thought was put to bed early.  But the

12  parties have had due process notice and an opportunity to be

13  heard on that subject.  And if there was an error it should

14  be fixed as soon as possible.

15       So, in other words, neither the court nor the plaintiffs,

16  at least, like the timing, but there's no harm and no foul by

17  raising these issues again later in the case.

18       Fourth, the current reconsideration of the

19  intergovernmental immunity question is not consideration of a

20  motion by a non-party.  The government did not make a motion.

21  And I think you should consider the court's concern about

22  that issue as being raised sua sponte by the court.  And it's

23  raised out of concern for the accuracy of the law and the

24  law's interpretation as applied here.  That's a long way of

25  saying that I don't want to hear more about the propriety of

1    further consideration of intergovernmental immunity.  We'll

2    get to that.

3        Now, this started out with the motion for reconsideration

4    filed by the defendants, or defendant, under Docket 289.  So

5    I think the defense should go first.

6        MR. BARNACLE:  Thank you, Your Honor.  The motion for

7    reconsideration, as well as the reply, focus on three primary

8    things.  Number one, derivative sovereign immunity.  The

9    motion for reconsideration highlights what it believes is a

10   fundamental flaw in the Ninth Circuit's decision in the

11   *Cabalce* case.  We believe it was decided upon two cases,

12   *Hanford*, and then the Supreme Court's decision in *Boyle*, that

13   sort of introduced the idea of discretion in the design

14   process in the government contractor defense discretionary

15   function exemption context.

16       And by catapulting those concepts into the derivative

17   sovereign immunity discussion in this case, via *Cabalce*, it

18   introduced a concept of discretion that has no place under

19   the law.  And so by introducing this concept of discretion in

20   the design process, the state has latched onto that, and

21   basically said because GEO could pay more than one dollar,

22   they are no longer entitled to derivative sovereign immunity.

23   That's the argument they're making.

24       At the end of the day, the contract says at least one

25   dollar.  So under *Yearsley* and *Campbell-Ewald*, as long as you

1   follow the contract, which is at least one dollar, paying one

2   dollar follows that directive in the contract.

3        By introducing this concept of discretion, what they've

4   done is kind of taken the argument away from what they're

5   actually seeking in this lawsuit, which is a declaration --

6   their complaint is very clear, they want a declaration that

7   these detainees are statutory employees under the Minimum

8   Wage Act.  That's very different than a lawsuit saying that

9   they can pay more than one dollar.  If this lawsuit was about

10  paying more than one dollar, and that's what they said, we

11  wouldn't be here today because we would have had that

12  dismissed, because there's no law that says you have to pay

13  more than one dollar.

14       The law that they're trying to impose here is they are

15  employees entitled to minimum wage.  If you focus on that

16  argument, which we must, that runs afoul of the contract.

17  The contract says you pay at least one dollar.  And because

18  of federal law, you cannot treat the detainees as employees.

19  They cannot be employees.

20       So, GEO has followed those two very explicit directions in

21  its contract, and introducing the concept of discretion to

22  pay more than one dollar takes us away from what we're

23  actually arguing about in this case.

24       So why have they done that?  I think they've done it for a

25  couple reasons.  One, they understand that it poses this

1  issue for derivative sovereign immunity, and they're trying

2  to meander their way out of that issue.  It also creates the

3  incredible preemption issue.  And that's kind of the second

4  point of our motion for reconsideration.

5      If you look at the Minimum Wage Act up against the IRCA,

6  which says you cannot employ people who are not

7  work-authorized, you cannot have those two together.  They

8  are asking in this lawsuit that we employ these people

9  pursuant to the Minimum Wage Act.  That runs directly against

10  the IRCA, which says you cannot employ this classification of

11  individuals.

12      So by saying we're not talking about employing the

13  detainees, that's not what this is about, that's a red

14  herring, Your Honor.  I think we have to focus in on what the

15  Minimum Wage Act, in calling these people employees, in how

16  that is preempted by the IRCA.

17      Then finally, through these arguments, the state has

18  effectively made a proposal for how GEO can meander through

19  all of these laws and still comply with everything.  They

20  have come up with a proposal for how they can comply with the

21  Minimum Wage Act, how they can operate a Voluntary Work

22  Program, and how they can comply with the IRCA, all in one

23  fell swoop.  And that is simply employ those who are

24  work-authorized, and/or employ people in the City of Tacoma.

25      By making that proposal they are effectively directly

1    regulating the ICE contract.  The ICE contract and the PBNDS

2    say:  GEO, you will have this Voluntary Work Program, it's

3    for all detainees, it is for the purposes of reducing

4    idleness, for increasing morale, and for lessening

5    disciplinary actions against detainees.  By saying no, we're

6    going to create a Voluntary Work Program that's limited to

7    this set of people, that is directly saying, federal

8    government, your PBNDS, they don't matter.  We're going to

9    say what this Voluntary Work Program is, and it's not going

10   to be what you say it is.  It's going to be this limited

11   purpose.

12        So I think by making that argument they walk themselves

13   into a direct regulation intergovernmental immunity issue as

14   well.

15        Thank you.

16        THE COURT:  Okay.  You may want to comment on this.

17   It seems to me that the state has a burden of proof in this

18   case, under their theories, that, in fact, members of --

19   well, I should say some detainees are being used as

20   employees, contrary to the contract, and that also they

21   would, in proving that, have the burden of proving that GEO

22   violates the law that says they can't employ aliens that are

23   not qualified to be employed.

24        If they can prove those two things to a jury, doesn't your

25   argument go away?  In other words, I don't -- I doubt that

1    GEO can treat people as employees under the Minimum Wage Act

2    standards and then say, well, they can't be employees because

3    federal law says that we can't employ them.  I mean, if GEO

4    is doing it, then, you know -- but the state would have to

5    prove those two things, that you're using them

6    inappropriately, and that that's a violation of IRCA.

7            MR. BARNACLE:  Understood, Your Honor.  And you're

8    actually articulating some arguments that they did not make,

9    which in response to our summary judgment on derivative

10   sovereign immunity and preemption, their response talked

11   about discretion in the design process and how GEO could have

12   paid more than one dollar; and they argued on that point.

13   And in their reply brief they took another approach, which

14   basically said they do comply with derivative sovereign

15   immunity standards because the word "applicable law" is

16   something that injects the Minimum Wage Act into the

17   contract.

18       So they do not argue or raise the issue that GEO is not

19   complying with its contract because it is, in fact, using

20   detainees in the role of employees and performing functions

21   as employees.  They don't have that factual record before us

22   on this motion.  So I believe that's not before the court as

23   we sit here for this motion for summary judgment.  The facts

24   aren't in the record.

25           THE COURT:  Okay.  Do you want to respond on the

1   motion for reconsideration first here, Ms. Chien?

2          MS. CHIEN:  Your Honor, my name is Marsha Chien, and

3   I represent the State of Washington.  I'll be addressing

4   GEO's arguments regarding derivative sovereign immunity,

5   preemption, and the Minimum Wage Act, which counsel did not

6   mention in the oral arguments but brought up in his papers.

7   And my colleague, Lane Polozola, will be arguing and

8   responding to the U.S.'s statement of interests.

9          First, regarding derivative sovereign immunity, GEO argues

10  that in *Cabalce* the Ninth Circuit confused the law.  No

11  Supreme Court decision, no Ninth Circuit decision, no other

12  circuit court has distinguished, considered *Cabalce* or

13  identified *Cabalce* as bad law.  It is inappropriate for this

14  court to, district court, to overturn Ninth Circuit

15  precedent.  That is inappropriate.

16         Even setting aside *Cabalce*, GEO fails to meet the standard

17  for derivative sovereign immunity under *Campbell-Ewald*.

18  *Campbell-Ewald* states that immunity applies when the

19  contractor simply performs as directed.  That's the exact

20  language from *Campbell-Ewald*.  GEO would have you ignore that

21  language, because the fact of the matter is ICE has never

22  directed GEO to pay a dollar a day.  ICE has stated in

23  e-mails to GEO that there is no maximum to the dollar a day,

24  specifically suggesting that it does not direct GEO in terms

25  of its payments to detainees.

1    GEO in this case, in discovery, has agreed it has the

2    option to pay more than a dollar a day.  And it has done so

3    in the past.

4       Regarding GEO's argument that the Minimum Wage Act is not

5    an applicable state labor law, that is completely false.  It

6    is clearly an applicable state labor law.  The Minimum Wage

7    Act is general applicable law that applies to all private

8    contractors, including GEO.  None of the GEO ICE contract

9    provisions that GEO has cited directs GEO to do otherwise.

10      To the extent that GEO argues the contract's "no detainee

11   as employee" provision conflicts with state law, the state

12   notes that a contract provision cannot preempt state law.

13   And regardless if there were any conflict, the GEO ICE

14   contract specifically states that the most stringent

15   standards should apply, i.e., the Minimum Wage Act, not a

16   lower standard, which is just at least a dollar a day.

17      Regarding GEO's argument, which -- and I just want to make

18   this point, because counsel reiterated it, it was in its

19   papers and counsel reiterated it in its oral arguments,

20   blurring the lines between derivative sovereign immunity and

21   intergovernmental immunity.  Those doctrines are separate.

22   They're based on two separate bodies of law.  They stem from

23   separate Supreme Court case law.

24      And in blurring the lines and arguing that GEO has

25   whatever sovereign immunity that the federal government has,

 1   it undercuts basic tenets of both doctrines.  But independent

 2   of derivative sovereign immunity is that GEO only gets

 3   immunity if it simply performed as directed.  It does not

 4   just get any immunity the federal government has.

 5       Similarly, intergovernmental immunity allows for direct

 6   regulation of federal contractors.  So to the extent that GEO

 7   dislikes the federal contractors, the quote-unquote direct

 8   regulation, the state is allowed to directly regulate federal

 9   contractors in a non-discriminatory manner, which is what

10   we've done here, and which my colleague will continue with

11   that conversation.

12       Regarding GEO's argument on preemption.  I think Your

13   Honor hit exactly the point that we were discussing, when you

14   were asking your questions of GEO.  There are work-authorized

15   detainees within the detention facility.  Counsel is

16   incorrect that there's nothing in the record suggesting there

17   are work-authorized detainees.  On our motion for summary

18   judgment we submitted documentation that there are

19   work-authorized detainees within the Northwest Detention

20   Center.  And GEO responded and admitted there are green card

21   holders, i.e., people with work authorization, within the

22   Northwest Detention Center.  So when they operate with all

23   5,075 detainees, or 1,000, or 200 work-authorized detainees,

24   the VWP will still exist.  So there is no conflict.

25       I also wanted to, again, reiterate the point on this

1   preemption, because GEO's repeated reference back to the

2   contract is inappropriate, also in the preemption context.

3   Again, GEO stated in its oral argument, I believe, that the

4   state's minimum wage law runs afoul of the contract.  That is

5   not enough for preemption.  It is law, not contract, that can

6   preempt state law.  ICE -- neither GEO nor ICE can preempt

7   state law by the contract.

8      I also want to address one argument made in GEO's papers,

9   and highlight.  GEO states that the state's case declares --

10   is problematic or conflicts with the contract and precludes

11   it from operating a VWP.  I just want to emphasize the state

12   does not seek to eliminate the Voluntary Work Program, it

13   seeks only to require GEO to pay the minimum wage, if it

14   chooses to use detainees to complete work within the

15   facility.

16      If Your Honor has no further questions.

17         THE COURT:  No, that's fine.  We haven't got into the

18   intergovernmental immunity.  Let's confine our arguments at

19   this point to the motion for reconsideration.

20         MS. MELL:  Thank you, Your Honor.  Joan Mell on

21   behalf of the GEO Group.  We're going to divide the issues.

22   He's going to address the two cases on intergovernmental

23   immunity addressed in the Department of Justice briefing, and

24   I want to hit on your two policy questions.

25      You have said that the state carries the burden of proof

1    of proving that some detainees are being used as employees,

2    contrary to the contract.  Another way of framing your issue

3    is whether the state may control how the federal government,

4    through its contractors, uses detainees within their

5    facilities, and/or cares for their health, safety and

6    welfare.  The Voluntary Work Program is an established policy

7    decision by the federal government as how to care for its

8    detainees to ensure that the chores are taken care of and

9    accomplished in a way that is applicable to a detention

10   facility.

11       So you necessarily invade the public-policy decisions of

12   the federal government when you allow the state to come in

13   and apply, discriminately, its Minimum Wage Act to a federal

14   detention facility where the detainees are within its custody

15   and control.  Because there's no way to drill down to this

16   dollar-a-day issue, and decide what's a fair rate, without

17   first deciding that they are employees, which removes the

18   federal government's capacity to operate a federal facility,

19   according to detention standards.  And detention standards

20   are established in the same way that the state has.

21       Very telling are the depositions recently taken of the

22   Office of the Governor and of the Department of Labor and

23   Industries.  The department has conceded that were a federal

24   government employee to call and complain about minimum wages,

25   they would close the claim and say, sorry, we don't look into

1    the way the federal government treats its employees.  And in

2    2014 they said that extended to detainees, because they are

3    their instrumentalities.

4       It is the duty and responsibility of the federal

5    government to protect these people and care for them under a

6    policy umbrella that has the greatest federal preemption

7    protections in the universe, i.e., immigration.  So there is

8    no way to not violate sovereign immunity by allowing the

9    state to put before a fact finder whether or not GEO has been

10   taking the detainees within the facility and allowing them to

11   participate in a Voluntary Work Program, in a way that that

12   means they're actually employees.

13      The very fact that they're detainees in a Voluntary Work

14   Program means the federal government gets to decide how to

15   use them.  And the state has done the same whole analysis.

16   So the state came up with a constitutional amendment and

17   applied it and let private contractors use detainees at

18   subminimum wages.  They had a whole entire graph we got that

19   shows there's very little money paid to those entities.

20      And the Governor's office acknowledged that every step of

21   the way in this decisionmaking are policy choices, how to

22   secure the facility.  If you suddenly elevate an argument to

23   a fact finder that you're going to invade this Voluntary Work

24   Program and oversee it and make sure that they're not

25   actually employees, you are then putting at risk, if decided

1   that they are, that now the facility must employ them if

2   they're going to have them engage in these particular

3   activities.

4       And if they are then employed, there's only so much

5   activity that can go on there.  So then GEO and the federal

6   government has to address the corruption issues that

7   necessarily come with a limited few being able to participate

8   in a limited number of activities.

9       Or alternatively, that now you have to run a hotel-model

10  program down there where nobody but a limited few have to do

11  any particular activity, or have the opportunity to do any

12  activity.  And those activities that are done then benefit

13  all of the rest of the individuals who are down there who no

14  longer have to do any chores.  Or they can just pay off the

15  people, and there's a whole internal barter system.

16      Detention is a whole unique animal.  The fact that it's

17  detention, and that it's federal detention, and these are

18  people within the federal government's jurisdiction and

19  control, on immigration issues, necessarily means you cannot

20  allow the state to come in and try to establish that their

21  program is something it's not.  That's why sovereign immunity

22  applies on that question.

23      The second question.  They have the burden of proving GEO

24  violates the federal law -- I think is what you were

25  saying -- and is violating by actually employing these

1    people.  That presupposes, from its inception, that there is

2    an issue that may be decided as to the legal status of

3    detainees, which invades, again, the same analytical reasons

4    I just scrolled through, that these people within the federal

5    jurisdiction and control actually are being employed in

6    violation of the federal law.

7        On its face you're invading the policy choices and

8    decisionmaking of the federal government, how to enforce its

9    own laws.  It necessarily, up front, gets us into this

10   question of sovereign immunity.  And I'm going to sidestep

11   and let him argue those cases.

12       Thank you, Your Honor.

13           THE COURT:  Just a minute.  Are we through with the

14   motions regarding reconsideration of the earlier order?

15           MR. BARNACLE:  Yes, Your Honor.

16           MS. CHIEN:  I'm happy to respond to the arguments

17   that were just presented.

18           THE COURT:  Well, let me deal with the motion for

19   reconsideration.

20       First, I think *Cabalce* is good law.  I don't think it

21   matters much if we follow that case or *Yearsley* or the *Ewald*

22   case.  You have to keep in mind that this was a motion for

23   summary judgment.  And it seems to me that the defendant's

24   arguments basically ignore the plaintiff's proof going into

25   the summary judgment phase.  I think there are issues of fact

1   all over the place in regard to these defenses of, not

2   intergovernmental immunity, but the other kinds of immunity

3   that are urged here.  There are just issues of fact on those

4   things when you consider the plaintiff's positions and

5   showing.

6       I'm not going to change the earlier ruling on the motion

7   for reconsideration.  And the motion for reconsideration

8   filed under Docket 289 is denied.

9       Now, let's turn our attention to the question of

10  intergovernmental immunity that we thought we had put to rest

11  back in December.

12          MR. BARNACLE:  Thank you, Your Honor.  In addition to

13  my colleague's comments, I just want to give a brief

14  discussion of the two cases that you referenced, *Dawson v.*

15  *Steager* and *U.S. v. California*.  *Dawson*, which was decided

16  just this year, specifically states that for the purposes of

17  intergovernmental immunity, the question isn't whether the

18  federal entities are similarly situated to state entities who

19  don't receive the benefit, the relevant question is whether

20  they are similarly situated to those who do.

21      So if we think about that question, that question is who

22  receives the benefit?  Who is exempted from minimum wage?  We

23  know that state-run facilities are exempted from minimum wage

24  by the statute itself.  We know that despite the fact that

25  the statute does not exempt federally run facilities.  The

1  state has admitted in its briefing that they do not apply

2  this to federally run facilities, because of

3  intergovernmental immunity concerns.

4      And we now also know that state-contracted facilities, in

5  many instances, receive the benefit as well.  In fact, GEO

6  itself -- so GEO has a contract with the federal government

7  for the Northwest Detention Facility.  GEO also has a

8  contract with the State of Washington DOC for the detention

9  of state detainees.  And in that contract they're required to

10  pay $2 a day.  So we know that the state itself does not

11  apply the minimum wage to GEO.

12          THE COURT:  Is there some institution that GEO runs

13  for the state?

14          MR. BARNACLE:  We included, in our reply brief, a

15  contract between the Washington DOC and GEO, and it's for the

16  detention of state inmates that GEO takes and detains them in

17  other states.  So they physically reside in other states, but

18  these are state detainees.  And the state law that allows

19  this is -- these are for prisoners.

20          THE COURT:  Wait a minute.  Wait a minute.  My

21  question is, does GEO run a facility with State of Washington

22  prisoners in it?

23          MR. BARNACLE:  It has, yes.

24          THE COURT:  Where is that?

25          MR. BARNACLE:  The contract is between Washington DOC

1    and GEO from 2015 to 2018, and the GEO facility was in the

2    state of Michigan, detaining Washington State inmates, and

3    not paying them minimum wage for the work they performed.

4            THE COURT:  Are those inmates subject to a Voluntary

5    Work Program?

6            MR. BARNACLE:  Yes, Your Honor, they have a similar

7    program arranged.

8            THE COURT:  Those are people that are in prison or

9    jail?

10           MR. BARNACLE:  Yes, Your Honor.

11           THE COURT:  Not just detained?

12           MR. BARNACLE:  Yes, these are prisoners, state

13   prisoners.

14       So we know that this law favors three classifications of

15   detention facilities.  State run, federally run, and state

16   contractors.  So the only difference between GEO itself in

17   the two circumstances is one is with the federal government

18   and one is not.

19       In discussing the *U.S. v. California* case, I think this

20   case is really poignant, in this context, because *U.S. v.*

21   *California* talks specifically about federal immigration

22   policies, and the fact that private contractors contracting

23   with ICE perform a federal function.  And *U.S. v. California*

24   very importantly says, in the intergovernmental immunity

25   context, the federal government and federal contractors are

1    treated the same.

2        So the comments in the briefing earlier that the state

3    itself will not apply its Minimum Wage Act to federally run

4    facilities because they understand and they know that they

5    don't have jurisdiction to do so, because of

6    intergovernmental immunity, that is an admission under *U.S.*

7    *v. California* that a federal contractor in the immigration

8    context is performing a federal function.  And the court said

9    they are treated the same.

10        So there's no reason, under that precedent, to treat them

11    differently here.

12        Thank you.

13            THE COURT:  Okay.  Ms. Chien or Mr. Polozola.

14            MR. POLOZOLA:  Good morning, Your Honor.  Thank you

15    for taking the time this morning.  We appreciate it.  And the

16    United States' view of intergovernmental immunity to which

17    GEO has belatedly latched onto, is an extraordinary and

18    frankly unprecedented expansion of this doctrine, that if

19    accepted would result in federal contractors being exempted

20    entirely from neutral and generally applicable state laws.

21    That is not proper and that is not the purpose of

22    intergovernmental immunity.

23        And GEO is not the federal government and it is not

24    running a federally owned facility.  And it is not exempt

25    from all regulations, which as I understand counsel's

1   argument a moment ago, GEO cannot be regulated, because the

2   federal government cannot be regulated.  That is

3   unquestionably not the case, and that is longstanding Supreme

4   Court precedent.

5       Now, there are a few key points to take head on.  One, the

6   court correctly decided previously, or correctly compared

7   GEO -- excuse me -- to other similarly situated private

8   entities, all of which are subject to the Minimum Wage Act.

9   This is necessarily required under governing precedent,

10  because the question is whether Washington law discriminates

11  against GEO based on its status as a federal contractor, or

12  has singled GEO out for worse treatment, and thereby meddled

13  in the federal government affairs.  That's a Supreme Court

14  case, Your Honor.

15      An example of this, which Your Honor is aware of and cited

16  correctly in the prior order, is the *National Security Agency*

17  *Telecommunications* case from California.  There, all

18  unauthorized disclosures that were at issue were treated the

19  same, regardless of who the contractors were.  And the fact

20  that they were dealing with the federal government, there

21  were no heightened standards in that case.  And the court

22  correctly recognized that the non-discrimination rule

23  prevents states from meddling with federal government

24  activities by singling out, for regulation, those who deal

25  with the government.  It does not oblige special treatment,

1   which is what GEO seeks here.

2        And point two, you know, counsel has referenced today and

3   the United States references in its brief, that the

4   Subsection 3(k) exemption does not exempt federal

5   contractors, and therefore there is discrimination because it

6   treats state and federal institutions differently.  A few

7   points, Your Honor.

8        As counsel noted, all parties agreed that the federal

9   government cannot and is not directly regulated in this case.

10  And it's the wrong question.  Because this is not a situation

11  which the law is regulating the federal government directly,

12  it's about a contractor, and in that case the question is

13  whether the contractor is treated differently based on its

14  status as a federal contractor.

15       Just like in *Dawson*, which counsel has referenced -- and

16  Your Honor's certainly, I understand, to be curious about --

17  the question was whether the taxpayer was treated differently

18  based on the source of his benefits.  The court looks to how

19  that taxpayer would be treated if that same taxpayer was

20  dealing with the state versus the federal government.  It was

21  not to find any exemption anywhere and give that benefit to

22  the federal government or its contractors.

23       And certainly I think the key point here, Your Honor, is

24  that states can regulate federal contractors or suppliers,

25  and if done in a non-discriminatory manner.  And that's a

1  point that counsel I think ignores, but it's crucial here,

2  because the Supreme Court in *North Dakota* was clear on this

3  point.  There's no direct regulation where the regulation

4  applies to the contractor or supplier.  And no duties are

5  imposed directly on the federal government through that

6  contractor.

7      Here, for the reasons that we've discussed earlier today,

8  the Minimum Wage Act applies to GEO.  It is not applying to

9  the federal government.  GEO has admitted that it can pay

10 more, and that it would have no effect on the federal

11 government, Your Honor.

12     On *California*, I will point out that counsel has relied on

13 this.  That court rejected all but one intergovernmental

14 immunity challenge.  And in doing so, recognizes that those

15 contractors running those facilities can, in fact, be

16 regulated.  If counsel was correct that because the federal

17 government cannot be regulated, any contractor running a

18 facility for the federal government cannot be regulated,

19 there would be no reason to have the non-discrimination rule

20 in the first place.  You would stop at direct regulation in

21 every case.  And that can't be the case, in light of the case

22 law as it exists.

23     And ultimately what the United States has argued for, Your

24 Honor, is a vast expansion.  And they're essentially

25 asserting that the Intergovernmental Immunity Doctrine bars

1    enforcement of any state law against a federal contractor, if

2    the state government -- not similarly situated constituents

3    -- but the state government is not subject to that same law.

4        Consider what that would mean in practice, Your Honor.

5    Large federal contractors in Washington, like Boeing, GEO, or

6    even Microsoft, could not be subject to neutral state taxes

7    that the state doesn't pay.  An example of those are the B&O

8    tax, property tax, and sales tax.  That's where you get, with

9    the United States and GEO's reading of intergovernmental

10   immunity.

11       And I'll briefly address, Your Honor, the exemption at

12   3(k).  It does not apply to private contractors like GEO.

13   The court has recognized that in its prior order, regardless

14   of whether that exemption included the words "federal" or

15   not, the treatment of GEO would remain the same.  And that

16   proves here that there is no discrimination.  GEO would

17   remain subject to that law.

18       And I do want to take on one issue counsel has raised, the

19   GEO Washington contract from 2015 to 2018, which counsel

20   agrees applies only to individuals outside of Washington.

21   Certainly Washington does not take the position that it has

22   the authority to enforce its Minimum Wage Act for work done

23   in Michigan.  But I do want to point out one additional

24   issue, which is counsel represented that prisoners are

25   actually held there, or were.  There is nothing in the record

1    to suggest that's the case.  And it's my understanding that

2    the contract was, in fact, never utilized.  So it was

3    essentially a contingency plan for overflow, that was not

4    used.  To clarify that issue.

5         And, Your Honor, one additional point on the direct

6    regulation argument.  I certainly understand the court's

7    position which you started with this morning, that you don't

8    want to hear about procedural issues.  I understand that.

9    The one point I will make, if Your Honor will allow it, is to

10   note that the direct regulation argument they raise was

11   raised in reply.  This is an argument they conceded they were

12   not making in summary judgment.  So it has not been fully

13   briefed, with all due respect, Your Honor.

14        To the extent the court does wish to consider it and

15   reject it now, which the state believes is appropriate, I

16   would direct the court's attention to the *North Dakota* case.

17   There's no direct regulation, again, as I noted earlier,

18   where the regulations operate against the suppliers and not

19   the government.  Merely being an entity with whom the

20   government deals does not automatically equate to direct

21   regulation.

22        And in language that is applicable here, the Supreme Court

23   cannot have been clearer in that case, when it explained then

24   that over 50 years ago the court decisively rejected the

25   argument that any state regulation which indirectly regulates

1    the federal government's activity is unconstitutional.  In

2    that case it was reporting and labeling requirements for

3    liquor suppliers.  Certainly if the federal government had

4    undertaken that activity itself, it would have been exempt,

5    it would be a direct regulation if the laws ran to the

6    federal government itself.  For the suppliers, they were not

7    covered.  That was not a direct regulation.

8        You know, Your Honor, if you would like additional

9    briefing on this issue, we're happy to provide it.  But I

10   think the case law is quite clear that contractors are not

11   automatically exempt, merely because they do business with

12   the federal government.  And that's what GEO seeks in this

13   case.  Thank you, Your Honor.

14       THE COURT:  I've got some questions for you, but let

15   me ask the defense for any comments in rebuttal.

16       MR. BARNACLE:  Thank you, Your Honor.

17       Just one quick additional comment on *U.S. v. California*.

18   Again, that case was directly relevant to our circumstances

19   here.  The court -- we were talking about the immigration

20   context, they're talking about the application of federal

21   immigration laws to a private contractor.  In that case the

22   court specifically said any direct or indirect regulation of

23   the private contractor, a federal contractor in that case,

24   could run afoul of the Intergovernmental Immunity Doctrine.

25       They specifically said, in the intergovernmental immunity

1    context, a federal contractor and the federal government are

2    treated the same.  So I'll let my colleague add one other

3    thing.

4           MS. MELL:  Your Honor, the record contains specific

5    information about Washington State detainees, not convicted

6    felons, doing work at subminimum wages without the state

7    enforcing minimum wages.  The best example is that in the

8    early pleadings in this matter, all the photography and all

9    of the articles and all of the factual information pertaining

10   to the jail right up the street, there are individuals in

11   that jail who are working for private contractors to prepare

12   meals and to operate the facility and keep it clean, and they

13   are not paid minimum wage.  In fact, they are required to

14   participate in the programs up there, and they are not paid

15   anything.

16       The second piece of evidence that was introduced in my

17   declaration that provides testimony from the Governor's

18   office, the specific question was asked by the speaking agent

19   of his staff to brief him on, does DOC contract with private

20   entities for detention treatment or rehabilitation services?

21   And it delineates three separate instances where that is the

22   case.  People who have served their confinement and are on

23   release are working in programs at subminimum wages.

24       And importantly, the other record that exists in this

25   court, is the sex offenders' litigation.  The sex offenders

1    are on McNeil Island doing subminimum-wage work.  And they

2    are not confined based on any conviction history.  They have

3    sued and adopted the same reasoning here to say, well, if

4    it's true for GEO detainees, it was certainly true for us.

5    We should not have to be laboring in this manner.  They also

6    have transition programs out into the community where they're

7    similarly not competing at minimum wages and the state has

8    chosen to ignore them.

9         This is a particularized discriminatory action on behalf

10   of the State of Washington that impairs the federal

11   government's ability to apply its programs evenly under the

12   policy objectives it has under its immigration laws, as well

13   as its budgeting and management of the health, safety and

14   welfare of the citizens it's responsible for, as well as

15   those individual detainees who they are caring for as they

16   pass them out of the country.

17        Thank you, Your Honor.

18        THE COURT:  Well, I am curious about a number of

19   things.  One is the case law refers to a functional approach

20   to the claim of immunity:  Going back to the *North Dakota*

21   case.  What do you believe that the functional approach is as

22   applied here, if you believe anything at all?

23        MR. POLOZOLA:  Your Honor, I think the functional

24   approach here is the recognition that the state has the

25   authority to use generally applicable and neutral

1    regulations, and that this analysis must account for that

2    authority.  Private contractors cannot be given special

3    treatment merely because they do business with the federal

4    government.  And I think that's what the functional approach

5    -- that language, I think that's the point that the court was

6    trying to account for, was to recognize that it's not that

7    they can be regulated in no way.  The question is whether

8    they are regulated in a discriminatory way.

9         Thank you, Your Honor.

10        MR. BARNACLE:  Your Honor, I believe analysis of the

11   functional approach is something that you would analyze if

12   there was a question of the application of the neutral law.

13   The argument here is this is a neutral law, that's applied as

14   such.  And I believe that is flatly wrong here.  It's not a

15   neutral law.  It's not applied in a neutral manner.  GEO

16   itself has a contract with ICE.  The state is trying to apply

17   the state minimum wage to GEO under that contract.

18        GEO also has had a contract with the State of Washington

19   DOC for the running of a -- having state prisoners,

20   Washington State prisoners in one of its facilities.  And

21   that particular contract did not -- they did not apply the

22   minimum wage.  In fact, they had a Voluntary Work Program

23   that dictated two dollars a day.  So we're not talking about

24   a neutral application of a state law.  We're talking about a

25   discriminatory treatment where GEO itself is treated one way

1    dealing with ICE, and another way when it's dealing with the

2    state.

3        So I think fundamentally we're not talking about a

4    functional approach to this issue, when at its core we have a

5    discriminatory application of the law.

6            THE COURT:  Well, I guess in regard to the functional

7    approach, I guess what it means to me is we need to look at

8    what's actually happening and not just be limited to the

9    papers.  I think that's a lesson that teaches us that we have

10   to look at exactly what's happening on the ground, not just

11   what the papers might indicate.

12       Let me inquire of the state further about state-run

13   facilities, detention facilities for non-criminals.  Counsel

14   referred to the Special Commitment Center.  This record is so

15   thick it's a little hard to pinpoint things in it.  But is

16   that part of the facts in this case, that the state runs a

17   Voluntary Work Program at the Special Commitment Center that

18   houses people that are civilly committed there?

19           MR. POLOZOLA:  Your Honor, it is my understanding

20   that there are work programs in state institutions.  And I

21   would need to confirm specifically for SCC, for fear of

22   overrepresenting.  But the point to note on this, Your Honor,

23   is that these are state institutions.  So even assuming there

24   is, in the state's view it does not affect this analysis.

25           THE COURT:  Counties and cities run jails.  Do any

 1   counties and cities have Voluntary Work Programs?

 2           MR. POLOZOLA:  I'm not aware specifically, Your

 3   Honor, of what programs they do or do not have.

 4           THE COURT:  Do you know, counsel?

 5           MS. MELL:  Yes, Your Honor.  And the Pierce County

 6   Jail, right up the street, they have --

 7           THE COURT:  You're talking about the Pierce County

 8   Jail?

 9           MS. MELL:  The Pierce County Jail, yes, Your Honor.

10   And that information is in the record.  I put photographs of

11   the jail, and I lined them up side-by-side.

12           THE COURT:  Where in the record is that?

13           MS. MELL:  Your Honor, I will give you a specific

14   citation.  And I can't give it to you off the top of my head.

15   But it would be in the very early motion practice that was

16   done.  With my first declaration I attached it, and I had the

17   photographs up here and was showing them.  I actually

18   displayed them on the viewer.

19       Your Honor, I did want to touch down on this functional

20   application.  The court is drilling down to the contention

21   that it needs a factual recitation in order to know how to

22   apply the intergovernmental immunity.  But the court doesn't

23   need any additional factual information where it understands

24   that the health, safety and welfare of immigration detainees,

25   during processing, to include mitigating their idle time with

1   programs like a Voluntary Work Program, is necessarily the

2   functional issue at stake here.

3       The jurisdictional control over the health, safety and

4   welfare of those detainees belongs to the federal government,

5   just like the federal government has to ensure that their

6   employees are fairly paid.  The state can't come in and take

7   over its supervisory authority or protective authority for

8   detainees who are outside their jurisdiction.

9       And the other thing that is in the record, that's in the

10  deposition testimony of the Governor's speaking agent, is

11  that in -- there was a concession that in the prisons there

12  were private contractors helping, that are contracted for the

13  meal preparation, and the detainees work for them, if I

14  didn't get that clear before.

15          THE COURT:  Question to the state.

16      Doesn't the law require, in this analysis, that GEO be

17  treated the same as the government itself?

18          MR. POLOZOLA:  Your Honor, I don't think that's the

19  proper analysis.  I think the question is whether GEO is

20  discriminated against based on its status as a federal

21  contractor.  In this case there is no such discrimination.

22  If GEO in every circumstance was automatically equated with

23  the federal government, there would never be a question of

24  discrimination, because the federal government cannot be

25  directly regulated.

1      So to the extent -- I think the case law you may be

2   thinking of, Your Honor, is the statement that you cannot

3   discriminate against the federal government or those with

4   whom it deals.  And certainly that is true.  So GEO -- the

5   state is not disputing that intergovernmental immunity could

6   apply if there were, in fact, discrimination.  But that's not

7   the case here.  So I don't think you should automatically

8   equate the two, Your Honor.

9      And if I may, I'll just reiterate -- to reiterate one

10  point, Your Honor.  The examples just given are all state and

11  county facilities.  The dispute here isn't whether those

12  facilities exist or use inmate labor.  That's never been a

13  disputed factual issue in this case, Your Honor.  The

14  question is what private contractor facilities in Washington

15  are doing what GEO does?  And counsel has not identified any

16  others.

17     So for that, I would kind of encourage the court to

18  imagine this in a situation where you have government actors

19  on one side, private contractors on the other.  In this case

20  private contractors under the Minimum Wage Act, as properly

21  construed, are treated the same.  Both the state and the

22  federal government would likewise --

23          THE COURT:  Well, that's a question.  Are they being

24  treated the same by the state?

25          MR. POLOZOLA:  "They" being, Your Honor...

1        THE COURT:  They being anyone -- well, this goes to

2   the question of what do we compare?  But does the state treat

3   itself differently than it wants to treat the federal

4   government here in regard to the Minimum Wage Act application

5   to detainees?

6        MR. POLOZOLA:  Your Honor, the state and the federal

7   government are treated the same.  There's no dispute the

8   federal government is not subject to the Minimum Wage Act.

9   The question then becomes, are contractors treated

10  differently?  And this is to my point a moment ago, Your

11  Honor, it's a legal question of how contractors are to be

12  treated under the Minimum Wage Act.  And Your Honor has

13  rightfully recognized in the past that there is nothing in

14  that exemption that exempts private contractors, regardless

15  of whom they are dealing with.  Under those circumstances,

16  contractors are to be treated the same.  They are not treated

17  differently.

18        THE COURT:  Well, are they treated differently than

19  the state treats itself?  For example, if the state says that

20  the Minimum Wage Act applies to detainees on the tide flats,

21  don't they have to, to be even, to apply the law evenly,

22  don't they have to apply it to detainees at the Special

23  Commitment Center over on the island?

24        MR. POLOZOLA:  Your Honor, no.  I think the exemption

25  on its face is allowed.  And this gets to the point I raised

1   right out of the gate, Your Honor.  If the suggestion is that

2   the state must confer every exemption or benefit that the

3   government enjoys to any contractor that deals with the

4   federal government, that's what I understand the argument to

5   be.  I think that is far too broad.

6       And the tax example I think here is telling.  The question

7   is if the federal government doesn't have to pay taxes, like

8   the state government doesn't have to pay taxes, are federal

9   contractors likewise to be exempted from state taxes?  I

10  think the answer is unquestionably, no.  They can still be

11  subjected to neutral and generally applicable laws, which is

12  the case we have here.

13          THE COURT:  Well, let me ask the defense here.  What

14  are we comparing?  The case law is pretty clear that there

15  has to be some comparison made.  And exactly what is the

16  appropriate comparison here?  And another way to put that, I

17  guess, is how does the Minimum Wage Act treat the state

18  better than it treats the defendant in some way?  In other

19  words, where is the prejudice to the defense here?

20          MS. MELL:  The prejudice to the defense is that the

21  federal government would be precluded from allocating its

22  resources in a way -- in the same way that the state does,

23  because the state in 2007 passed a constitutional amendment

24  that specifically authorized the use of private corporations,

25  specifically authorized private corporations to use detainee

1   labor, period.

2       The Department of Labor and Industries then applied that

3   and developed its ESA1, which is in the record.  And the ESA1

4   explains Subsection K.  And Subsection K describes the

5   exemption for people under state custody.  And it also adds

6   an express sentence that the Department of Labor and

7   Industries testified, if its an enforceable provision, that

8   private contractors are treated the same as the state, with

9   regard to detainees employed by a private contractor, when

10  that employment is with the Department of Corrections,

11  meaning while they're in detention.

12      So you can compare the state-to-state, or

13  federal-to-state, and you can compare federal and state

14  private corporation contractors, and you come up with the

15  same discriminatory application, by analysis, with the

16  premise in this lawsuit.

17      And, again, you have to return back to the issue of, you

18  are discriminating against the federal government's ability

19  to protect the health, safety and welfare of people in

20  detention.  Detention is the functional analysis, because

21  that is the point in time when you have removed these

22  individuals from the free market.

23          THE COURT:  I think you're afield from my question.

24          MS. MELL:  Okay.

25          THE COURT:  Let's assume the state is right and that

1    the evidence might show that GEO is misusing the Voluntary

2    Work Program and is basically running its program on labor

3    that shouldn't be, you know, a-dollar-an-hour labor for work

4    that should be done by other employed people that are not

5    detainees.

6         MS. MELL:  There's no place in the State of

7    Washington where state detainees are subject to the Minimum

8    Wage Act.  So there would be no comparator to contend that

9    the state may invade federal detainees' activities and decide

10   that they would be subject to the federal Minimum Wage Act,

11   whether participating in a program that's overseen by a

12   private contractor, or whether participating in a program

13   that's directly operated by a government entity.

14        The interesting issue is that prior to the Northwest

15   Detention Center and that contract, the individuals held in

16   the Northwest Detention Center were held in local jails.

17   They were participating in those activities.  The trustee

18   programs.  It's a matter of maintaining the facility.  It's

19   chores.  It's what needs to be done to run the program.

20        So the whole concept of Voluntary Work Programs is outside

21   the scope of the Minimum Wage Act, at its inception.  So

22   there is discrimination.  And the representation that I have

23   not stood before you and represented and cited to the record

24   where private corporations are the contract entity with the

25   state, using the detainee labor, is incorrect.  Not only does

1   it happen in the state, it happens in the jails, it happens

2   at the SCC.  It happens everywhere.

3           THE COURT:  You know -- go ahead, counsel, but this

4   double-teaming is ordinarily not allowed.

5           MR. BARNACLE:  Understood, and I apologize.  Just

6   tying back to your question and applying the two cases that I

7   believe are at issue, *U.S. v. California* and *Dawson v.*

8   *Steager*.  Who are we comparing?  I think that was your

9   original question.

10      And I think under either the state's formulation or a

11  broader formulation, which I think the statement of interest

12  is arguing for, the same result is necessary.  So, if we look

13  at those cases, and I think those cases stand for the

14  proposition that in the immigration context -- we're talking

15  about *U.S. v. California* -- in the immigration context,

16  intergovernmental immunity, if you have a contractor

17  performing those functions, they stand in the same shoes as

18  the federal government.

19      We're not talking about a broad application, like the

20  state is arguing, that now the state can't regulate any

21  federal activity at all.  That's not what we're talking

22  about.  We're talking about *U.S. v. California,* which limits

23  itself to the immigration context, and saying in this context

24  the United States and the federal contractor stand in the

25  same shoes.

1        So if that's the case, then comparing -- we have to

2    compare how is the federal government, how is GEO being

3    treated in this situation, in comparison to the state?  And

4    there's no question that in that context they are treated

5    less favorably.  They're applying minimum wage to GEO, which

6    in the immigration context is the United States, according to

7    *U.S. v. California*, and the state is exempted.

8        Or if you look at a more narrow approach, which I think

9    the state is arguing, they're arguing state contractors are

10   treated the same as federal contractors.  That's what their

11   argument is.  And I don't think that's supported by *Dawson v.*

12   *Steager*.  I don't think that's supported by *U.S. v.*

13   *California* in the immigration context.

14       But even if you look at that, again it says the relevant

15   question is whether they are similarly situated to those who

16   do, those who get the favorable treatment, those who are

17   exempted from minimum wage.  We know the state-run facilities

18   are exempted.  We know because they said it.  Federal-run

19   facilities are exempted.  And we also know that

20   state-contracted facilities, GEO itself in its DOC contract

21   with Washington, was exempted.

22       So we've got all three of those circumstances where

23   they're treated better.  The only time that they're not

24   treated favorably is when GEO is contracting with ICE.  So I

25   think under either comparison model we come to the same

1    result.

2         THE COURT:  At least one of the cases spoke of an

3    additional economic burden on the federal government.  Is

4    there some economic discrimination against the government

5    here?

6         MR. BARNACLE:  Absolutely.  I think if we play out

7    what the state is seeking in this circumstance, how this

8    really works is if the pricing -- the pricing of the contract

9    that GEO has with the federal government is based on

10   assumptions.  One of those assumptions is that the Voluntary

11   Work Program is going to be a dollar a day, because that's

12   what the contract says it's going to be.  So if all of a

13   sudden we have to pay minimum wage, GEO is ordered to pay

14   minimum wage for this work, these chores, these details, the

15   pricing of that contract would be entirely different.  GEO

16   would have built that assumption into its contract pricing

17   proposal with ICE.  And the cost to ICE, in that

18   circumstance, is going to be considerably greater.

19        In addition to that, when GEO prices labor, they have a

20   more significant markup when they actually profit off of

21   labor.  People they hire at minimum wage or higher, they

22   profit off of that.  They do not profit off of the Voluntary

23   Work Program.  It's a pass-through.  It's a one-to-one

24   reimbursement.

25        So if GEO all of a sudden has a minimum wage requirement

1    on the Voluntary Work Program, they're going to pass that

2    cost, and it's going to be significant, to the federal

3    government.  And they're going to pay a more significant

4    profit kicker on top of that.  So the economic burden is

5    inestimable.  It would change the entire nature of the

6    contract and the pricing.

7         MR. POLOZOLA:  A few points, Your Honor, on the last

8    question -- we can take them in reverse order -- on the

9    economic burden.  I respectfully disagree with counsel's

10   representations.  I think the United States filings in this

11   case are telling in that regard.  The United States was very

12   clear that it will reimburse a dollar, and only a dollar,

13   regardless of what else happens, and make no further

14   statements in that way.  It doesn't dispute that GEO could

15   pay more, but it would still reimburse the dollar.

16      And so on that issue --

17        THE COURT:  Well, I don't think we know if the

18   government would reimburse them at a higher rate.

19        MR. POLOZOLA:  Well, the statements from the

20   government in this case were that the contract requires

21   reimbursement of one dollar, but GEO could pay more.  There

22   is no corresponding --

23        THE COURT:  GEO could pay more.  But they wouldn't

24   necessarily get it back from the government.  That would have

25   to be negotiated in a new contract provision.

1          MR. POLOZOLA:  Exactly, Your Honor.  And that's a

2    speculative argument.  Even accepting counsel's

3    representations that it might result in some incidental

4    economic burden, this is the exact argument that the Supreme

5    Court in *North Dakota* is very clear on.  Incidental effects

6    such as this, when you're dealing with a general neutral

7    regulation, do not constitute an improper direct regulation.

8    To put it in the facts of the *North Dakota* case for Your

9    Honor, the fact that it was going to be more expensive for

10   the federal government to purchase liquor from suppliers who

11   had to comply with that regulatory scheme, did not support

12   the intergovernmental immunity challenge.

13        So I think to that point, Your Honor, the answer,

14   regardless of what it is, doesn't save GEO's or the United

15   States' argument.

16        And if I may, Your Honor, I want to turn back to *United*

17   *States v. California* and this assertion that a federal

18   function is being regulated.  Again, *United States v.*

19   *California* rejected intergovernmental immunity challenges,

20   except for one.  What that means is that there were numerous

21   regulations that applied to these facilities at issue.  They

22   were allowed.  It's not the case that if you happen to

23   operate an immigration facility, that's a federal function,

24   therefore you are exempt from all regulations.

25        So to the point here.  What is regulated is an employment

 1   relationship and a neutral state law.  This says nothing

 2   about immigration, who may come, who may go, how the federal

 3   government must decide those questions.  That is not what's

 4   at issue here.  So we do fundamentally disagree with counsel

 5   on that point.

 6       The reference that GEO continues to make to *U.S. v.*

 7   *California* comes from footnote 7.  It's not a crucial part of

 8   the holding.  I recognize that it does say that contractors

 9   can be treated like the government.  But, again, it's a

10   recognition of this discrimination principle, that if they're

11   discriminated against, they may benefit from this doctrine.

12   But it is not a blanket immunity.

13       On the factual questions that Your Honor has discussed

14   with counsel a moment ago about other facilities, what this

15   distills to, as I understand it, Your Honor, is GEO saying

16   they're the only ones violating the law, therefore the law

17   may not be enforced against them, because that would be

18   discriminatory.  They have not identified other privately run

19   facilities that are doing what they do, and that is not a

20   protection for GEO.  That can't trigger the Intergovernmental

21   Immunity Doctrine.

22       Finally, on the ESA1, the L & I policy that counsel has

23   referenced, this is in our briefing, Your Honor, this is the

24   exact argument that Your Honor rejected the first time on

25   GEO's first motion for reconsideration.  What that policy is

1 discussing is what is clear in the exemption.  Individuals in

2 state institutions receive the benefit of that exemption.

3 They are not deemed employees in the exemption.  If a private

4 contractor is working in a state institution, the exemption

5 on its face still applies.

6     It is not analogous to the circumstances here where you

7 have a privately owned, privately operated facility that

8 chooses to do business with a governmental entity.

9     That's all I have, Your Honor.  I'm happy to answer any

10 questions.

11         THE COURT:  Let me look at my notes here.

12     The South Correctional Entity Regional Jail came to my

13 attention, they call it SCORE, it's a cooperative effort by a

14 number of cities that run this jail.  I don't know if you're

15 familiar with it, but I'm curious whether they have a

16 Voluntary Work Program.

17         MR. POLOZOLA:  Your Honor, I'm not familiar with that

18 specific facility, so I'd be hard pressed to give guaranteed

19 answers on that.

20         MS. MELL:  As a matter of fact, one of the former

21 chiefs from that department was going to be one of my expert

22 witnesses in this case.  Yes, SCORE has a similar type of

23 program.  And it's inherent in any kind of detention

24 facility, you need to have something to keep people busy.

25 And they do.  And these are private contractors who work with

1    the detainees.

2         THE COURT:  Okay.  That's probably not part of the

3    record of the case.  But I was curious about it.  Okay.

4    Well, you've given me a lot to think about, which I will

5    think about and write an order on.  I know lawyers are always

6    anxious.  It's on the top of my pile.  So hopefully early

7    next week I'll have an answer on this remaining issue.

8         Okay.  Thank you.

9                        (Adjourned.)

10

11

12              C E R T I F I C A T E

13

14

15       I certify that the foregoing is a correct transcript from

16    the record of proceedings in the above-entitled matter.

17

18

19

20    */s/ Debbie Zurn*

21    DEBBIE ZURN
      COURT REPORTER

22

23

24

25