# POLOZOLA DECLARATION

# EXHIBIT A



---

*State Of Washington v. The GEO Group Inc.*
Case No. 3:17-cv-05806-RJB

---

**Expert Report Of Gregory S. Bingham**

**The Kenrich Group LLC**

**1919 M Street, NW, Suite 620**

**Washington, DC 20036**

**20 September 2018**

Gregory S. Bingham

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF OPINIONS ................................................................................ 3

III.    BACKGROUND .................................................................................................. 4

IV.     FEDERAL CONTRACT PROCUREMENTS ..................................................... 5

   A.   U.S. Government Procurement Processes ........................................................... 5

   B.   2015 GEO Contract Solicitation Documents ...................................................... 8

V.      THE CONTRACT AND CONTRACT ADMINISTRATION ............................ 9

   A.   The NWDC Contract's CLIN Structure .............................................................. 9

   B.   CLIN 0003 Invoicing ......................................................................................... 10

   C.   Oversight Of GEO's Program Administration ................................................... 13

   D.   Ramifications For Contractor Non-compliance .................................................. 15

VI.     CONCLUSION ................................................................................................. 17

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

### I.    Introduction

The Kenrich Group ("Kenrich") was retained by Greenberg Traurig, LLP on behalf of The GEO Group ("GEO") in its dispute with the State of Washington.  Kenrich was retained to perform an independent and objective analysis of the Government contracts that are the subject of the dispute – GEO's Federal Government contracts for a detention facility in support of U.S. Immigration and Customs Enforcement's ("ICE") Seattle Field Office.

This Expert Report summarizes my findings and opinions.  Kenrich's work on this matter was performed by me or other professional colleagues working under my direct supervision.  In reaching my opinions, I relied upon my training, education, and professional experience, as well as the various related contract documents and other information and documents listed in this Expert report and attachments, as well as a discussion with GEO personnel.  I also considered the requirements of the Federal Acquisition Regulation ("FAR") and the Department of Homeland Security ("DHS") Acquisition Regulation ("HSAR").

I have not been asked to, and do not, express an opinion on the proper interpretation of regulations such as the FAR and HSAR.  Based on my over 32 years of working on Government contract matters and teaching of practical applications of the FAR, I am knowledgeable about the procurement, subcontracting, and accounting processes and procedures of companies with Government contracts.  Based on my work with hundreds of clients over many years, including numerous cases involving procurement practices by prime contractors acquiring goods and services, as well as the procurement practices of the Federal Government, I have extensive experience assessing the appropriate practices for purchasing goods and services and the administration of Government contracts.  As such, throughout this report, I address the practices employed by GEO and other companies in the context of how Government contractors conduct their operations to be consistent with the requirements of the FAR.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

I am the President of Kenrich[1] with over 32 years of experience assisting clients on a variety of Government contract matters, including: (1) testimony on industry practices, damages, and penalties relating to disputes arising from Government contracts including contract breach, lost profits, delay and disruption, and termination cost recovery; (2) regulatory consulting on compliance issues arising from the contract pricing and evaluation guidance found in FAR 12 and 15 as well as other Federal Government procurement requirements including the Cost Principles found in FAR 31, the Cost Accounting Standards, Office of Management and Budget circulars, and Agency supplements; (3) contract formation issues relating to cost or pricing data, auditing, fact-finding and the definitization of prices as well as cost realism and other issues on bid protests; (4) review and preparation of claims for changed work, delay, and disruption; (5) review of various Government contractor systems, including accounting, billing, and purchasing systems; (6) review or preparation of hundreds of termination settlement proposals on contracts terminated for convenience as well as assistance on contracts terminated for default; (7) forensic investigation of accounting matters involving allegations of issues such as defective pricing, improper billings, mischarges, and improper labor charging; and (8) management consulting.  I am also an Adjunct Professor in the George Washington University School of Business, where I teach the course "Pricing and Cost Issues in Government Contracts," which is a required course for students in the school's Master of Science in Government Contracts program.  Many of my students are buyers for the Federal Government or for large Government contractors.  I also serve on the board of directors and Executive Committee, and chair the Audit Committee of the Capital Area Food Bank, the largest charity of its kind on in the Washington, D.C. area.  I have spent a significant amount of time participating in various industry groups including the National Defense Industrial Association ("NDIA"), the American Bar Association ("ABA") Public Contract Section where I was the first ever non-attorney chair of the Accounting Cost and Pricing Committee, the George Washington University Government Contracts Advisory Board, and the National Contracts Management Association ("NCMA"), where I am a frequent lecturer.  My curriculum vitae ("CV"), which provides a more detailed description of my background,

---

[1] Kenrich is a national business consulting firm with offices in Washington, D.C., Austin, Chicago, Dallas, Houston, Las Vegas, Los Angeles, Minneapolis, New York, Phoenix, and Raleigh-Durham.  Kenrich professionals include Government contract specialists, accountants, financial analysts, certified fraud examiners, and engineers who provide general business operations, management, regulatory, dispute resolution, and other consulting services to corporations and the legal profession.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

education, and experience, is attached as Appendix 1.  A listing of my testifying experience is
included as Appendix 2.  A listing of Documents Relied Upon is included as Appendix 3.

My opinions are based on an independent professional examination of the documents and
electronic information identified in this Report and the attachments.  The opinions contained in
this Expert Report have been prepared on the basis of information and assumptions set forth in
this Expert Report.  My opinions are based on the information reviewed to date and are subject to
change if new information becomes available.[2]  The compensation to Kenrich for my work on
this engagement is based upon actual hours expended at an hourly rate of $595, and is not
dependent on the outcome of this case.

## II.    Summary Of Opinions

Based on my over 32 years of experience, the solicitation process for contract HSCEDM-
15-D-00015 and the resulting contract are typical of Government procurements.  In my
experience, individual contractors do not have discretion to propose on some solicitation
requirements while declining to propose on others, and can only very rarely cause the procuring
agency to change the contract's requirements and specifications.  There appears to have been no
ambiguity between ICE and GEO about the Voluntary Work Program, the payment to program
participants (detainees) and GEO's reimbursement for those payments, which is detailed in
CLIN 0003, Detainee Volunteer Wages.

GEO's expected rate of reimbursement of $1.00 per day per detainee, as identified in
CLIN 0003, reflects "pass through" costs, as these costs were incurred by GEO, and not marked
up to include indirect costs, profit, or the added costs of administering the Voluntary Work
Program.  GEO's invoice submission, and ICE's evaluation and payment processes, are typical
of other billing, evaluation, audit, and payment practices I have evaluated during the course of
my career.

---

[2] I currently anticipate (a) attending depositions and/or trial to hear relevant witness testimony, or (b) reading
testimony transcripts that I may rely on for my testimony at trial.  I also anticipate receiving additional document
production.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

ICE had available multiple remedies and sanctions it could exercise if GEO failed to properly follow its contract requirements, including decrements to GEO's invoices, negative assessments of contract performance, cure notices, and contract termination for convenience or for default.  Kenrich understands that none of these remedies or sanctions were exercised with respect to the Voluntary Work Program, and it therefore does not appear that GEO's performance on contract HSCEDM-15-D-00015 was deficient.

As evidenced by ICE's routine inspections, other significant government oversight, and the Government's continued acceptance of GEO's contract performance, GEO adequately administered the Voluntary Work Program in accordance with the standards and specifications incorporated within contract HSCEDM-15-D-00015.

### III.    Background

GEO owns and operates the Northwest Detention Center ("NWDC"), a private immigrant detention center in Tacoma, Washington.  ICE awarded GEO contract HSCEDM-15-D-00015 ("the Contract") on 28 September 2015, with a base period of one year, and nine option years.[3]

The Contract includes pricing for three Contract Line Item Numbers ("CLINs").  The Contract for CLIN 0003, the CLIN for the ICE-required Voluntary Work Program, noted, "Reimbursement for this line item will be at the **actual cost of $1.00 per day per detainee**. Contractor shall not exceed the amount shown without prior approval by the Contracting Officer" [emphasis added].[4]  The "amount shown" is $114,975.

In its complaint, the state of Washington alleges that the detainees participating in the Voluntary Work Program are employees of GEO, and that they are entitled to the state minimum wage.  The state alleges that the detainees performed "necessary work," and that because GEO received a benefit from the detainees' work, but did not pay these detainees the state minimum wage, GEO was unjustly enriched.[5]

---

[3] Kenrich is aware that GEO was also awarded predecessor contracts at NWDC in approximately 2005 and 2009, and Kenrich understands these contracts to be generally consistent with the 2015 contract.

[4] The Contract at 5 (GEO-State 036829).

[5] State of Washington Complaint, 20 September 2017.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

IV.   **Federal Contract Procurements**

A.   <u>U.S. Government Procurement Processes</u>

The FAR and agency supplements are the primary regulations used by all Federal executive (i.e., U.S. Government) agencies in their acquisition of supplies and services, as well as various Federal statutes.[6]  FAR Part 15, Contracting By Negotiation, provides regulations regarding policies and procedures governing competitive and noncompetitive negotiated acquisitions.  The Government's procurement process involves multiple steps from the solicitation of proposals to the award of the contract, and includes solicitation amendments prior to contract award, as well as contract modifications after contract award.

Initial steps in the procurement process often include gathering information regarding approaches, costs, and lead times from interested parties, as well as requests for information, industry meetings, and other exchanges of information.  Even after the Government has issued a request for proposal ("RFP," or solicitation), the Government may amend the RFP based on new or additional information.  Once all proposals are submitted, the source selection process begins.

The majority of source selections make use of competitive bidding based on proposals. Proposals contain detailed explanations as to why the proposing party is capable of performing the contract and why it is the best choice to perform the work.[7]  A significant amount of information relating to historical costs, basis of estimates, and forecasted costs may be requested and disclosed either as part of a proposal or during the Government's proposal evaluation process.  During this process, the contractor often learns the Government buyer's opinion on

---

[6] Foreword of the FAR. The FAR was established for the codification and publication of uniform policies and procedures for acquisition by all Government agencies, including the Department of Homeland Security (see FAR Part 1.101, Purpose). The HSAR is a supplemental regulation to the FAR and provides additional policies and procedures that specifically address the activities of the DHS (see HSAR 3001.101, Purpose).

[7] FAR 2.101 defines proposal as:

"'Offer' means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called 'bids' or 'sealed bids'; responses to requests for proposals (negotiation) are offers called 'proposals'…"

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

various aspects of the contractor's proposal. The contractor may also have the opportunity to submit proposal revisions in order to address concerns or weaknesses raised by the Government.

There are several steps or phases that are sometimes undertaken by the Government in a procurement. These can include:

1. As the Government buyers identify and define their requirements, there can be an extensive exchange of information with industry participants.[8]

2. Publishing of a Presolicitation Notice, which "provides a general description of the scope or purpose of the acquisition and invites potential offerors to submit information that allows the Government to advise the offerors about their potential to be viable competitors."[9]

3. Publishing of an RFP.[10]

4. Holding meetings with interested bidders to explain the RFP and provide further information for their use in developing a proposal.

5. Receiving and evaluating initial proposals.[11]

6. Asking questions of offerors regarding their respective proposals and approaches (e.g., publish and evaluate responses to evaluation notices ("EN")).[12]  This sometimes results in interested bidders learning more about the Government buyer's impressions of their proposal and submitting proposal modifications.[13]

---

[8] See FAR 15.201, Exchanges With Industry Before Receipt of Proposals.

[9] See FAR 15.202, Advisory Multi-Step Process.

[10] See FAR 15.203, Requests for Proposals.

[11] FAR 15.302, Source Selection Objective, states, "[t]he objective of source selection is to select the proposal that represents the best value."

[12] FAR 15.306(b), Exchanges With Offerors After Receipt of Proposals, states, "[Communications m]ay be conducted to enhance Government understanding of proposals; allow reasonable interpretation of the proposal; or facilitate the Government's evaluation process."

[13] FAR 15.001, Definitions, defines proposal modifications as "a change made to a proposal before the solicitation closing date and time, or made in response to an amendment, or made to correct a mistake at any time before award."

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

7. Providing more feedback to offerors. This may give the offerors an idea of their standing as compared to other bidders.

8. Amending the RFP as necessary based on updated information from the user community as well as information provided by the offerors.[14]

9. Requesting and evaluating revisions to proposals.[15]  This could include a final proposal revision ("FPR"), a second FPR (i.e., FPR 2), and so on.

10. Conducting a final evaluation of proposals, selecting a winner, filing a source selection briefing, and conducting a debriefing with each bidder.[16]

11. Reacting as necessary to bid protest(s) filed by the disappointed bidder(s) (i.e., those bidders who were not awarded the contract).[17]  A bid protest is a written objection by an interested party (most often the losing bidder) to an award or proposed award of the contract.[18]  Bid protests usually arise if the interested party believes that the Government has violated procurement law or regulation.[19]

As a result of the procurement process described above, contract requirements included in the original RFP may remain static or be amended for all offerors.[20]  In my experience however, individual contractors do not have discretion to propose on some solicitation requirements while declining to propose on others, and can only very rarely cause the procuring agency to change the contract's requirements and specifications.  Contract awards, and the incorporated CLIN structure, statement of work or Performance Work Statement ("PWS"), and

---

[14] FAR 15.206, Amending the Solicitation, states, "When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation."

[15] FAR 15.307, Proposal Revisions, states:

"(a) If an offeror's proposal is eliminated or otherwise removed from the competitive range, no further revisions to that offeror's proposal shall be accepted or considered.

(b) The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations."

[16] See FAR 15.503, Notifications To Unsuccessful Offerors, FAR 15.504, Award To Successful Offeror, and FAR 15.506, Post-Award Debriefing Of Offerors.

[17] See FAR 15.507, Protests Against Award.

[18] See FAR 33.101, Definitions.

[19] See http://www.gao.gov/legal/bid-protests/search, U.S. Government Accountability Office – Bid Protests.

[20] See FAR 15.206, Amending the Solicitation.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

specifications, therefore closely follow the framework set forth in the solicitation and communicated to the contracting community throughout the procurement process. This is intended to result in an objective, equal, and transparent procurement process for government agencies and contractors, with the goal of ensuring that the procuring agency secures the best value for the goods and services it buys.

### B. 2015 GEO Contract Solicitation Documents

The Government's solicitation for this contract specified its expectations for the Voluntary Work Program reimbursement to be $1.00 per day. The HSCEDM-15-R-00001 solicitation for CLIN 0003 reads, "Reimbursement for this line item will be at the actual cost of $1.00 per day per detainee. Contractor shall not exceed the amount shown without prior approval by the Contracting Officer. This is a Not-To-Exceed [amount] of $114,975.00."[21] Further, the PWS attached to the solicitation reads,

> "Detainee labor shall be used in accordance with the detainee work plan developed by the Contractor, and will adhere to the ICE PBNDS [Performance-Based National Detention Standard] on Voluntary Work Program. … Detainees shall not be used to perform the responsibilities or duties of an employee of the Contractor."[22]

GEO's final proposal revision was responsive to these solicitation requirements, including proposed detainee compensation of $1.00 per day,[23] reading in part,

> "The NWDC will develop a comprehensive volunteer detainee work program which complies with PBNDS 2011. … Examples of detainee work programs include maintenance, food service, laundry, and sanitation/grounds work. … **Detainees will not be used under the following situations: to perform the responsibilities of an employee**…" [emphasis added][24]

Given the consistency between GEO's final proposal revision and the Government's solicitation, there appears to have been no ambiguity about the Voluntary Work Program and the expected rate of reimbursement.

---

[21] Solicitation HSCEDM-15-R-00001, PDF page 4.

[22] *Id.*, PDF page 78.

[23] GEO Final Proposal Revision, RFP HSCEDM-15-R-00001, 25 August 2015 (GEO-State 229681).

[24] GEO Final Proposal Revision, RFP HSCEDM-15-R-00001, 25 August 2015, Section I.1.5 Management and Technical Capabilities Plan, Section IX – Manage a Detainee Work Program, page 57 of 74.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

### V.    The Contract And Contract Administration

#### A.    The NWDC Contract's CLIN Structure

The contract's PWS details the scope of work to be performed by GEO,[25] and states, "The objective of this contract is to obtain a facility for the detention, transportation and food services for ICE detainees located in Seattle, WA area in support of the ICE ERO-Seattle Field Office."[26]  The contract's structure includes three CLINs: CLIN 0001 for detention services, CLIN 0002 for transportation services, and CLIN 0003 for Detainee Volunteer Wages for the Detainee Work Program.  Lower level subCLINs then further break down the cost and pricing vehicles for the corresponding CLINs.  For example, CLIN 0001 is comprised of subCLINs 0001A and 0001B, with subCLIN 0001A establishing a fully burdened firm-fixed-price to provide detention services for a guaranteed minimum capacity (i.e., number of detainee bed days).[27]  SubCLIN 0001B establishes a separate fully burdened firm-fixed-unit-price to provide detention services above the guaranteed minimum capacity (i.e., additional detainee bed days). The Contract's option years follow this same CLIN structure.[28]

CLIN 0003 for the Voluntary Work Program has no subCLINs.  The cost and pricing vehicle directed in the contract states, "Reimbursement for this line item will be at the actual cost

---

[25] Per FAR 2.101, the definition of a PWS is "a statement of work for performance-based acquisitions that describes the required results in **clear, specific and objective terms** with measurable outcomes."  [emphasis added]

[26] The Contract at 43 (GEO-State 036867).

[27] Prices or rates that include the allocation of indirect costs to direct costs, and a profit margin, are sometimes referred to as "fully burdened" prices or rates.  FAR 2.101 defines indirect costs as follows:

> "'Indirect cost' means any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective.

> 'Indirect cost rate' means the percentage or dollar factor that expresses the ratio of indirect expense incurred in a given period to direct labor cost, manufacturing cost, or another appropriate base for the same period (see also 'final indirect cost rate')."

FAR 16.202-1 defines firm-fixed-price contract:

> "A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss."

[28] Base year CLINs are 0001, 0002, and 0003, option year 1 CLINs are 1001, 1002, and 1003, option year 2 CLINs are 2001, 2002, and 2003, and so forth through option year 9.

of $1.00 per day per detainee.  Contractor shall not exceed the amount shown without prior approval by the Contracting Officer."[29]  The amount shown is $114,975.  CLIN 0003 of the Contract clearly indicates that GEO is to bill ICE its **actual cost** of $1.00 per day per detainee.


### B.  CLIN 0003 Invoicing

According to FAR 2.101, a contract line item is defined as "the basic structural element in a procurement instrument that describes and organizes the required product or service for pricing, delivery, inspection, acceptance, invoicing, and payment."  Therefore, the CLINs within GEO's contract dictate how GEO should submit its invoices, and how ICE should pay GEO for its services.  CLIN 0003 specifies, "Reimbursement for this line item will be at the **actual cost** of $1.00 per day per detainee" [emphasis added].[30]  The definition of actual costs according to FAR 31.001 is "amounts determined on the basis of costs incurred, as distinguished from forecasted costs."  Under CLIN 0003, it appears that both parties expected GEO to pay detainees $1.00 per day and invoice ICE at the same rate.[31]

GEO's incurred costs resulting from its detainee payments are "pass through" costs; that is, they are actual costs incurred by GEO without any markups (or burdens) for overhead, general and administrative costs ("G&A"), or profit, and also without the added direct costs of administering the program.  All costs GEO expected to incur administering the Voluntary Work Program had to be factored into the fixed prices included in the CLINs.

CLIN 0003 does not reflect the circumstances for labor costs for contractor employees.  Rather, the Contract's CLIN structure reflects that the actual detainee wage costs incurred by

---

[29] The Contract at 5 (GEO-State 036829).

[30] *Id.*

[31] See ICE's Form G-504 and accompanying support, dated 28 September 2017, for an example of GEO's NWDC invoices.  Kenrich understands that for this invoice, which is submitted for $12,500 in CLIN 1003 costs, GEO submitted 159 pages of daily Voluntary Work Program participants in support of the invoiced CLIN 1003 Worker Pay costs, and that the submitted pages included 12,500 participant work detail entries.  See also, for example, the 2015 annual Inspection Worksheets, which note that "[t]he facility has a system that ensures that detainees receive the pay owed them prior to the detainee being released or transferred" (page 153 of 185).  Per discussion with GEO personnel, daily Voluntary Work Program details are entered into an inmate banking software system, which is then used to track payments and produce reports in support of GEO's invoices.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

GEO in connection with the Voluntary Work Program are not costs associated with company labor, and instead are "pass through" costs often classified by government contractors as "other direct costs." Virtually every Government contract has some type of pass through cost; for example, travel costs are passed through in accordance with the Federal Travel Regulations, and sometimes subcontractor costs and material costs are passed through to the Government without additional markups or burdens applied.[32] Vehicle fuel costs at NWDC are another example of pass through costs, where fuel receipts are provided as support for the fuel costs incurred by GEO, invoiced by GEO to ICE, and reimbursed by ICE with no markups or burdens.[33]

Section IX of the contract's PWS specifies that "[d]etainees shall not be used to perform the responsibilities or duties of an employee of the Contractor" and that the "Contractor shall supply sufficient officers to monitor and control detainee work details."[34] Additionally, Section IV of the PWS requires that:

> "The contractor will agree that each employee working on this contract will successfully pass the DHS Employment Eligibility Verification (E-Verify) program operated by USCIS to establish work authorization. … The Contractor must agree that each employee working on this contract will have a Social Security Card issued and approved by the Social Security Administration. … illegal or undocumented aliens will not be employed by the Contractor, or with this contract."[35]

This is consistent with the requirements set forth in the Government's solicitation as well as the CLIN structure established in GEO's contract, with CLINs 0001 and 0002 corresponding to the cost of performing the contract, while CLIN 0003 is a pass through charge from GEO to ICE at

---

[32] FAR 16.601(a), Time-and-Materials Contracts, reads in part:

> "Other direct costs (e.g., incidental services for which there is not a labor category specified in the contract, travel, computer usage charges, etc.)"

[33] Interview of GEO personnel.

[34] The Contract at 82 (GEO-State 036906). See also 26 U.S. Code § 3306(c)(21), which excludes from the definition of employment, "service performed by a person committed to a penal institution."

[35] The Contract at 70-71 (GEO-State 036894-895). See also Section III at 63 (GEO-State 036887), which reads in part,

> "The Contractor shall agree that each person employed by the firm or any subcontractor(s) shall have a social security card issued and approved by the Social Security Administration and shall be a United States citizen or a person lawfully admitted into the United States for permanent residence..."

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

the rate (i.e., $1.00 per day per detainee) and total lot size (i.e., $114,975) prescribed in the contract.[36]

The Contracting Officer Representative ("COR") and CO are responsible for reviewing invoices submitted by GEO, and Kenrich understands from an interview of GEO personnel that neither have questioned any charges relating to the Voluntary Work Program as unreasonable, unallocable, or unallowable.[37] Because GEO's invoices for Voluntary Work Program pass through costs were accepted and paid, and because no such contract costs were or have since been identified as unallowable, ICE accepted the contract services as administered and confirmed that the services performed and amounts invoiced were in accordance with the requirements of the Contract's pricing provisions.[38] Furthermore, GEO's invoice submission, and ICE's evaluation and payment processes, are typical of other billing, evaluation, audit, and payment practices I have evaluated over my 32-year career.

---

[36] The Contract Section G, "Contract Administration Data," details how GEO is supposed to prepare its invoices and what supporting information is to be provided with each submission. In this section, the contract states,

> "Fixed Unit Price Items (items for allowable incurred costs, such as detention and/or transportation services with no defined minimum quantities, stationary guard or escort services, transportation mileage or other Minor Charges such as sack lunches and **detainee wages**): shall be fully supported with documentation substantiating the **costs and/or reflecting the established price** in the contract and submitted in .pdf format." [emphasis added]

"Other Direct Charges" are also listed in this section and require that "[t]he invoice shall include appropriate supporting documentation for any direct charge billed for reimbursement." See the Contract at 99-100 (GEO-State 036923-924).

[37] FAR 31.201-2(a), Determining Allowability, reads,

> "A cost is allowable only when the cost complies with all of the following requirements:
>
> (1) Reasonableness.
> (2) Allocability.
> (3) Standards promulgated by the CAS Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the circumstances.
> (4) Terms of the contract.
> (5) Any limitations set forth in this subpart."

[38] FAR 52.232-1, Payments, which is incorporated into the Contract at 107 (GEO-State 036931), reads in part, "The Government shall pay the Contractor, upon the submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and **accepted** or services rendered and **accepted**…" [emphasis added] Therefore, all payments made to GEO were accepted by ICE and paid in accordance with the contract.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

### C. Oversight Of GEO's Program Administration

Throughout administration of the contract, and consistent with Government practices on other Federal procurements,[39] ICE "ensures its custodial supervision obligations are met through a set of standards and inspections to ensure all types of its facilities implement and adhere to ICE's contractual requirements and detention standards."[40]  Specific to the NWDC, ICE employs a full-time detention services manager to "ensure the facility is in compliance with the PBNDS requirements" and also employs a COR to "monitor GEO's performance to ensure that all of the technical requirements under the contract are met… at the price or within the estimated cost stipulated in the contract."[41]  Part of the COR's responsibilities include contemporaneously reviewing invoices and ensuring that GEO does "not otherwise expend the funds allocated for the reimbursement for the $1 per day allowance for detainee participation in the VWP [Voluntary Work Program]."[42]

The full-time on-site supervisory personnel employed by ICE are not the only aspect of Federal Government oversight provided on this contract.  According to the PWS, GEO is responsible for maintaining a detainee work program that complies with the ICE/DHS PBNDS,[43] and ICE conducts annual audit inspections to confirm that GEO complies with the contract's requirements and standards, including GEO's administration of the Voluntary Work Program.[44] The annual inspection assesses the contractor's performance with regards to both mandatory and non-mandatory requirements and evaluates whether the contractor meets the standards as set forth in the PBNDS, which regulates the Voluntary Work Program.[45]

---

[39] See, for example, FAR 42, Contract Administration and Audit Services, FAR 31, Contract Cost Principles and Procedures, and FAR 32, Contract Financing.

[40] Declaration of Tae D. Johnson, 1 August 2018, pp. 3-4.

[41] *Id*., p. 7.

[42] *Id*.

[43] The Contract at 45 (GEO-State 036869).

[44] See, for example, Performance-Based National Detention Standards Inspection Worksheet for Over 72 Hours Facilities, dated 15 April 2014 – 17 April 2014, at 132-134.  Also interview of GEO personnel.

[45] *Id.*

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

ICE's 2011 PBNDS is organized into sections for "Safety," "Security," "Order," "Care," "Activities," "Justice," and "Administration and Management."[46]  The "Activities" section is broken down further into subsections for activities such as "Correspondence and Other Mail," "Marriage Requests," "Recreation," and the "Voluntary Work Program."[47]  The Voluntary Work Program specifications include a purpose and scope for providing the program to detainees, as well as the expected outcome that the "negative impact of confinement shall be reduced through decreased idleness, improved morale and fewer disciplinary incidents."[48]

Further, ICE developed a National Detainee Handbook, which is provided to each detainee upon admission to the facility and includes a local, NWDC specific supplement.[49]  The Voluntary Work Program section of the National Detainee Handbook reiterates the conditions of the program as stated in the contractual requirements, including:

> "If your facility has a volunteer work program, you may be able to volunteer to work.  However, many facilities do not allow ICE detainees to participate in their work programs. … If you participate in the voluntary work program at your facility, you will get **at least $1 for each day you work**..." [emphasis added][50]

As required by the contract's specifications, each detainee that wishes to volunteer for the voluntary work program must first complete a voluntary work program statement.[51]  The NWDC Volunteer Work Program Agreement states that "[c]ompensation shall be $1.00 per day."[52]  ICE's annual inspections include a component to evaluate if GEO developed and maintains "site-specific rules for selecting work detail volunteers in a facility procedure that will include a voluntary work program agreement."[53]  ICE's annual inspections consistently rated GEO's

---

[46] See the 2011 PBNDS (https://www.ice.gov/detention-standards/2011).

[47] *Id.*

[48] See 2011 PBNDS, Section 5.8, II.4.

[49] *Id.*, Section 6.1, "Detainee Handbook."

[50] ICE's National Detainee Handbook, April 2016, at 12 (GEO-State 000473).

[51] *Id.*

[52] NWDC Volunteer Work Program Agreement (GEO-State 003479).

[53] See, for example, Performance-Based National Detention Standards Inspection Worksheet for Over 72 Hours Facilities, dated 15 April 2014 – 17 April 2014, at 132-134.

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

Voluntary Work Program at NWDC as "Meets Standard," and many included a note in the remarks section confirming that detainees were paid $1.00 per day.[54]

In addition to the full-time onsite ICE personnel and the annual audit inspections, the COR also provided additional surveillance and monitoring of GEO's performance as required by the Quality Assurance Surveillance Plan ("QASP").  The QASP allows for "additional routine, follow-up, or unscheduled ad hoc inspections as necessary" and can result in "withholdings or deductions against the monthly invoices for unsatisfactory performance..."[55]  The QASP's Performance Requirements Summary includes a section titled "Activities," which contains the Voluntary Work Program, and reads in part,

> "A Contract Discrepancy Report that cites violations of PBNDS and PWS (contract) sections that reduce the negative effects of confinement permits the Contract Officer to withhold or deduct up to 10% of a monthly invoice until the Contract Officer determines there is full compliance with the standard or section."[56]

Kenrich understands from an interview of GEO personnel that ICE has never filed a Contract Discrepancy Report regarding GEO's administration of the Voluntary Work Program.  Consistent with the full-time onsite government personnel and the annual audit inspections, ICE's routine QASP submissions further confirm that GEO adequately administered the Voluntary Work Program in accordance with the Contract and the standards and specifications incorporated within.

Based on this information, it appears that ICE reviewed, accepted, and paid GEO $1.00 per day per detainee that participated in the Voluntary Work Program.


D. <u>Ramifications For Contractor Non-compliance</u>

As noted above, ICE closely monitored and inspected GEO's performance and administration of the Contract.  If GEO had failed to properly follow its contract requirements, ICE has a number of remedies and sanctions it could have exercised.  These options include invoice deductions, terminating GEO's contract for convenience, sending cure notices and/or

---

[54] *Id.*  Also interview of GEO personnel.

[55] The Contract, Attachment 1, Quality Assurance Surveillance Plan at 3 (GEO-State 036945).

[56] *Id.*, at A-1 (GEO-State 036949).

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

terminating GEO's contract for default, and negatively scoring GEO's Contractor Performance Assessment Reports ("CPARs").

GEO's PWS Section II, "Requirements," includes ICE's remedies for "Contractor's Failure to Perform Required Services":

> "The rights of the Government and remedies described in this PWS are in addition to all other rights and remedies set forth in the contract. Specifically, the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions in the Contractor's invoice shall reflect the contract's reduced value resulting from the Contractor's failure to perform required services. The Contractor shall not be relieved of full performance of the services hereunder and may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance."[57,58]

Invoice deductions and terminating the contract are both potential remedies the Government could have exercised on GEO's performance of the Contract. ICE could also issue negative CPAR scores. CPARs are an assessment of contractor performance for a specific time period (usually a contract year) that provide a record, either positive or negative, of the performance during that time period.[59] CPAR scores are stored in a Government-maintained database and are accessible to all procuring agencies. A poor CPAR can negatively affect a contractor's potential to be awarded future contacts or task orders, its incentive or award fee on cost-reimbursement task orders, and its ability to be awarded work outside of the existing contract.

Kenrich understands that with respect to the Voluntary Work Program, the Government did not deduct any amounts from GEO's invoices, nor did it send cure notices, terminate GEO's

---

[57] The Contract at 54 (GEO-State 036878).

[58] FAR 52.249-8, Default (Fixed-Price Supply and Service), reads, "(a)(1) The Government may … by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to…(iii) Perform any of the other provisions of this contract."

[59] See https://www.acq.osd.mil/dpap/pdi/eb/cpars.html (as of 18 September 2018), which reads:

> "CPARS is a web-enabled application that collects and manages the library of automated Contractor Performance Assessment Reports (CPARs). A CPAR assesses a contractor's performance and provides a record, both positive and negative, on a given contractor during a specific period of time. Each assessment is based on objective facts and supported by program and contract management data, such as cost performance reports, customer comments, quality reviews, technical interchange meetings, financial solvency assessments, construction/production management reviews, contractor operations reviews, functional performance evaluations, and earned contract incentives."

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**

contract, or assign GEO a negative CPAR score. Therefore, it does not appear that GEO's performance on the Contract was deficient.

### VI.    Conclusion

Based on my over 32 years of experience, in which I have reviewed over a thousand Government contracts, the costs associated with CLIN 0003 for the Voluntary Work Program are typical of pass through costs on Government contracts. The daily rate pricing was established during ICE's solicitation and procurement process, incorporated into GEO's contract via CLIN 0003 and the Contract's PBNDS requirements and related standards, administered and invoiced in accordance with those requirements and standards, and contemporaneously evaluated and accepted as correct by ICE personnel and audit inspections.

# Appendix 1



# Greg S. Bingham
## President

Greg Bingham is the President of The Kenrich Group LLC. He has over 32 years of experience in the field of business consulting, primarily for Government and Construction Contractors.

**Selected Industry Experience**

Clients have included corporations, partnerships and individuals; in-house and outside counsel. Greg has consulted with contractors to the U.S. government, including contractors to many different departments – Defense, Energy, State, Housing & Urban Development – as well as the National Aeronautics and Space Administration, Army Corp of Engineers, Department of Veterans Affairs, Agency for International Development, the General Services Administration, National Institute of Health and others. Mr. Bingham's assistance to clients has included presenting his findings in settlement negotiations, alternate dispute resolution proceedings, depositions and trials. One judge commented as follows with respect to Greg's testimony:

- Mr. Bingham "credibly testified... based on his 28 years in advising clients on government contract issues..."
- "[T]he Court finds Bingham's testimony ... to be credible, well-founded, and reliable,"

**General Government Contracting**

Mr. Bingham has assisted clients on numerous issues including: (1) testimony on industry practices, damages and penalties relating to disputes arising from government contracts and subcontracts including contract breach, lost profits, termination cost recovery and recovery of the costs of delay and disruption; (2) consulting on compliance issues arising from the contract pricing and evaluation guidance found in FAR Parts 12 and 15 as well as compliance with the Cost Principles found in FAR 31 and the Cost Accounting Standards; (3) contract formation issues relating to cost or pricing data, auditing and the definitization of prices as well as cost realism and other issues on bid protests; (4) review or preparation of hundreds of claims for changed work, delay and disruption; (5) forensic investigation of issues involving accounting, estimating and billing including allegations of defective pricing, false claims, mischarges, improper labor charging and improper billings; (6) the initial preparation and updates of CAS disclosure statements as well as the assessment and quantification of cost impacts caused by changes to disclosed or established cost accounting practices; (7) review or preparation of over 1,000 termination settlement proposals on contracts terminated for convenience as well as assistance on contracts terminated for default (e.g., A-12); and (8) Federal Supply Schedule issues relating to the triggering of the Price Reductions and Defective Pricing clauses and related quantum issues.

**The Kenrich Group LLC**
1919 M Street NW
Suite 620
Washington, DC  20036
Tel: (202) 420-7682
Fax: (202) 429-5673
E: gbingham@kenrichgroup.com

**Professional History**
- Navigant Consulting, Inc.
  *Managing Director*
- Tucker Alan Inc.
  *Vice President*
- Peterson Consulting
  *Vice President*
- Texaco
  *Senior Engineer*

**Education**
- University of Texas at Austin
  *M.B.A.*
- University of Kentucky
  *B.S. in Electrical Engineering*

**Professional Associations**
- George Washington University
  o Adjunct Professor in Graduate School of Business
  o Teaches <u>Pricing and Cost Issues in Government Contracts</u>
  o Member of <u>Government Contracts Advisory Board</u>
- National Defense Industrial Association – Vice Chair of Contract Finance Committee
- Capital Area Food Bank
  o Board Member
  o Chair of Audit Committee
- American Bar Association
  o Public Contract Section - Associate Member
  o Current Vice-Chair of Accounting, Cost & Pricing Committee of the Public Contract Section
- Board of Contract Appeals Bar Association
- National Contracts Management Association
- Association of Certified Fraud Examiners



**Government Contract Transitions**

Greg has assisted many companies with transitions.  Some examples have included:  (1) transitions from no government business to contracting with the federal government; (2) transitions from sale of only "commercial items" (or "commercial services") to sales requiring more complex contractual vehicles; (3) transitions from solely fixed-price work where adequate price competition is achieved to some cost-reimbursement contracting; (4) transition from modified CAS coverage to full CAS coverage, including preparing CAS disclosure statements; (5) complying with the Earned Value Management System requirement which are more often required of contractors involved in cost-reimbursement contracting; (6) assessing and demonstrating compliance of Material Management and Accounting Systems, including quantification of cost impacts and negotiations with government oversight personnel; and (7) various other compliance issues often relating to the internal controls and operations.

**Experience Analyzing Changed Work, Delay and Disruption**

Greg has analyzed changed work, delay and disruption on numerous matters ranging from a few hundred thousand dollars to over a billion dollars.  He has assisted contractors in the preparation of requests for equitable adjustment ("REA") and claims as well as analyzing claims and REAs prepared by others.  Greg is very familiar with the DCAA's Contract Audit Manual and the DCAA's audit programs used for the evaluation of various types of claims.  He is very experienced in the analysis of disruption and loss of efficiency claims and has quantified the cumulative cost impact of many changes.  Greg has presented his findings in hearings, settlement negotiations and alternative dispute resolution proceedings.

**Forensic Accounting Investigations of Overbilling, Defective Pricing and False Claims**

Greg has assisted counsel on liability, damages and penalty issues on numerous matters involving allegations of over-billing, defective pricing and false claims, many of which have involved the FAR mandatory disclosure requirements including questions relating to 'credible evidence.' Some of these matters were filed under the Federal False Claims Act.  He has presented the findings of his analysis to government attorneys and auditors including personnel from the Department of Justice, the Office of Inspector General of the DOD, GSA and other agencies, as well as the Defense Contract Audit Agency, the Defense Criminal Investigative Service, the Federal Bureau of Investigation, the Department of Veterans Affairs and the Defense Logistics Agency, among others.

**Government Contract Terminations**

Greg has worked on over 1,000 contract terminations.  His services have included assisting clients with the preparation of termination settlement proposals on contracts terminated for convenience, reviewing and auditing settlement proposals prepared by lower-tier contractors and submitted for review to a prime contractor, and assisting counsel in efforts to convert a termination for default to a termination for convenience.  The magnitude of matters Greg has assisted companies with has ranged from contract values measured in the hundreds of thousands of dollars to contract values in excess of four billion dollars.  Greg's expert testimony on cost recovery issues on contract terminations has been accepted by multiple courts and boards.



**Economic, Damage And Accounting Analyses**

Greg has consulted and testified on projects involving calculation of lost profits, unjust enrichment, business valuations, determination and allocation of costs, and the tracing of funds in the context of data rights challenges as well as in other contexts. He has evaluated issues such as lost revenues, loss of business value, losses of specific contracts, diminution of future revenue prospects, increased costs, avoided costs, fixed and variable costs, costs of capital and mitigation. Greg has utilized a variety of statistical analysis techniques in a number of circumstances.

**Federal Supply Schedule Contracts**

Greg has assisted contractors with various issues relating to Multiple Award Schedule contracting including the impact of the triggering of the Price Reductions and Defective Pricing clauses. He is familiar with the audit practices of the GSA OIG as well as many other government audit groups. Greg has has also conducted internal control reviews of client sales practices and assisted clients in modifying their systems to better control their sales discounting. Greg's work has included the quantification of cost impacts and negotiation with government auditors and oversight personnel.

**Construction**

Greg has been involved in the review and analysis of numerous construction projects ranging into the billions of dollars. He has performed analyses to identify and quantify the economic impact of specific events which have caused cost growth and schedule delays. This work has included the analysis of acceleration, delay, disruption, changed scope of work, identification of parties responsible for specific construction events, and assessment of unabsorbed and extended overhead damages.

**Health Care Billing Compliance-Related Engagements**

Mr. Bingham has consulted with health care providers on issues related to cost principles and federal regulations including the FAR, Federal Employees Health Benefit Acquisition Regulations and other Office of Personnel Management guidance. Issues have included the applicability of the Cost Accounting Standards, assessment of changes in cost accounting practices and the preparation and submittal of disclosure statements.

Greg assisted suppliers of durable medical equipment in their review of alleged payments to nursing homes for referrals. His work was in preparation for a disclosure to the Department of Health and Human Services, Office of Inspector General.



**Greg S. Bingham**

**Professional Associations**

Greg is an Adjunct Professor in the George Washington University where he teaches Pricing and Cost Issues in Government Contracts (GCON 6506), a graduate level course in the Masters of Science in Government Contracts program.  Course topics include the development or evaluation of proposals relating to contract awards, requests for equitable adjustment or claims, and termination settlement proposals.  Audit and evaluation of cost or pricing data as well as other information is also addressed.  The students who take this class have routinely included government contracting officers, contracting officer representatives and contract specialists.

Greg is a member of the George Washington University Government Contracts Advisory Board.

Greg is the Vice Chair of the Contract Finance Committee of the National Defense Industrial Association. This Committee focuses on the accounting, cost, and pricing aspects of government acquisition. Acquisition activities relating to financial management, financial accounting, auditing, allowable costs, cost reporting, contract pricing, financing, profits, payments, and disbursements are its primary areas of work.

Greg is on the board of directors of the Capital Area Food Bank, the largest charity of its kind in the Washington, DC area, where he serves as Chair of the Audit Committee.

**Lecturing and Teaching (Post 2000)**

"The FAR Mandatory Disclosure Rule: Silence Is Not Golden," Thompson Hine LLP Webinar. June 2018.

Moderated a panel discussion on "Recent Cost, Compliance and Damages Decisions Involving the DCAA and DCMA, and Related Trends" at a meeting of the ABA Public Contract Law Section Accounting, Cost, and Pricing Committee.  Washington, DC. June 2018.

 "Managing Supply Chain Challenges" – Cambridge Forum's Forum on Government Procurement Law.  Leesburg, VA. May 2018.

"Costs, Pricing & Accounting" – Third Annual PubKGroup Year-In-Review Webinar. December 2017.

"Government Contracts Terminated For Convenience: Cost and Contract Administration Issues" – Federal Publications Terminations of Government Contracts Seminar. Arlington, VA, November 2017. Alexandria, VA, June 2015. Also several previous years.

"The Cost Accounting Standards and Consequences of Noncompliance," National Contract Management Asssociation Webinar. October 2017 and November 2016.

"Contract Changes: Rules And Requirements" and "Successfully Working With Your Lawyer," both at the Annual World Congress of the National Contract Management Association.  Chicago, IL. July 2017.



Moderated a panel discussion on "Proving a Quantum Claim Before Courts and Boards" at a joint meeting of the ABA Contract Claims and Disputes Resolution Committee and the Accounting, Cost, and Pricing Committee.  Washington, DC. December 2016.

Moderated a panel discussion on "Hot Topic Cost Issues in Federal Contracting" during an American Bar Association Webinar. September 2016.

"Terminations of Government Contracts:  A View from the Front Lines," American Bar Association Annual Meeting of the Public Contract Section.  Chicago, IL July 2015.

"The False Claims Act – Practical Impacts on You" and "The Cost Accounting Standards and Consequences of Noncompliance," both at the Annual World Congress of the National Contract Management Association.  Dallas, TX.  July 2015.

Participated in a panel discussion on "Strategies for Managing and Mitigating Risk" at meeting of the ABA Contract Claims and Disputes Resolution Committee.  Washington, DC. December 2014.

"Claims and Audits in Times of Austerity" and "Government Contracts Terminated for Convenience: Cost and Contract Administration Issues," both at the Annual World Congress of the National Contract Management Association.  Washington, DC.  July 2014.

"What You Should Know About DCAA And It's Role In Dispute Resolution," Annual Program of the Board of Contract Appeals Bar Association, Washington, DC.  December 2013.

"DCAA: From the Perspective of the Construction Contractor and the Government Trial Attorney," American Bar Association Annual Meeting of the Public Contract Section.  San Francisco, California. August 2013.

Moderated a panel discussion on "Expert Testimony" at meeting of the ABA Contract Claims and Disputes Resolution Committee.  Washington, DC. May 2013.

"Negotiating With DCAA Following a Notice of Termination for Convenience:  The Finer Points of Resolving Hot Button Disagreements over Reasonableness and Allowability."  American Conference Institute's National Conference on DCAA Audits, 13 November 2012.

"Executive Compensation:  The Latest on New Caps, Rules and DCAA Requirements for "Reasonableness" as part of the American Conference Institute's Government Contract Cost & Pricing Conference, 17-18 April 2012.

"Preparing for DCAA Audits under the New Business Systems Rule," American Bar Association Meeting of the Public Contract Section.  Annapolis, Maryland.  March 2012.

"Selected Issues in Proving Quantum," at the 50th Annual Spring Seminar of the Boston Chapter of the National Contract Management Association.  Boston, MA.  March 2011.

"DCAA Audits -- Strategies to Prepare and Manage Increasingly Complex and Frequent Audits." American Conference Institute's National Conference, 17 November 2010.



"Adventures In Accounting: Proving Claims," addressed the Board of Contract Appeals Bar Association Annual Meeting.  Washington, D.C. October 2010.

"Selected Issues in Proving Quantum," at meeting of the ABA Contract Claims and Disputes Resolution Committee.  Washington, DC.  September 2010.

"Interacting With A More Active DCAA," American Bar Association Annual Meeting of the Public Contract Section.  San Francisco, California.  August 2010.

"Unique Pricing and Estimating Challenges faced in Change Orders, Requests for Equitable Adjustments and Claims," at Annual Government Contract Management Conference of the National Contract Management Association.  Fort Lauderdale, Florida.  July 2010.

"DCAA Developments:  What Contractors Should Expect in 2010," at seminar hosted by DLA Piper titled Public Contracting In A Global Market.  Washington, DC.  December 2009.

"Oversight of Contractors after a Disaster with Respect to Fraud and False Claims Issues," Panel Discussion at ABA Meeting in New Orleans, May 2009 and again as a Teleconference in September 2009.

"Implications for Contractors of the Decision in Daewoo Eng'g & Constr. Co. v. United States," Panel Discussion hosted by the Federal Circuit Bar Association.  Washington, DC.  April 2009.

"Going for Compliance?  More Contractor Costs and Risks," American Bar Association Meeting of the Public Contract Section.  Annapolis, Maryland.  March 2009.

"Managing Risks of Potential Government Contract False Claims," at the 27th Annual Government Contract Management Conference of the National Contract Management Association.  Rockville, Maryland.  November 2008.

"Commercial Item Disputes," at joint meeting of the ABA Contract Claims and Disputes Resolution Committee and the Commercial Products and Services Committee.  Washington, DC. October 2008.

"Quantitative Methods in Proposals and How These Methods Fare at GAO," at meeting of the ABA Bid Protest committee.  Washington, DC.  May 2008.

"Sarbanes-Oxley:  Impact on Government Contractors," University of Minnesota 42nd Annual National Seminar on Government Contracts, October 2003.

"Recent Cost & Pricing Developments At The Court Of Appeals For The Federal Circuit," American Bar Association Annual Meeting of the Public Contract Section, August 2003.

**Publications**

"Pursuing A Changed Work Claim On Public Works Projects" (Thomson Reuters Government Contract Costs, Pricing & Accounting Report, Volume 12 Issue 2, March 2017), by William D. Guernier and Greg S. Bingham



"Public Works – Construction Contractors And The FAR" (Thomson Reuters Government Contract Costs, Pricing & Accounting Report, Volume 12 Issue 1, January 2017), by William D. Guernier and Greg S. Bingham

Contributor to "Guide to Fixed-Price Supply Subcontract Terms and Conditions, Fifth Edition" (ABA Book Publishing, 2016), by the ABA Section of Public Contract Law's Strategic Alliances, Teaming, and Subcontracting Committee

"Termination for Convenience of the Government: Key Issues for Contractor Recovery" (Thomson Reuters Briefing Papers, No. 14-10, September 2014), by Patricia A. Meagher, Greg S. Bingham, Oliya S. Zamaray, and Jeffrey DuVal

"BACK TO BASICS: As The Pendulum Shifts To More Fixed Price Contracts, Be Prepared For More Contract Changes and Know How To Price Them," By Greg Bingham, Cheryl LeeVan And David Hall, American Bar Association Annual Meeting Of The Public Contract Section, August 2010.

Advisory Board Member of "Government Contracts Costs, Pricing and Accounting Report", Published by Thompson West.

"Costs of Mandatory Ethics and Compliance Programs" by John T. Jones of General Dynamics C4 Systems, Inc. and Greg Bingham, 21 January 2009.

*Of Counsel Interview* of Mr. Bingham relating to Efficiently Conducting Investigations – "Litigation Consultant Offers This to Law Firms: Communicate and Provide Access to Clients" Aspen Publishers Vol. 27, No. 10 October 2008.

"Managing Risks Of Potential Government Contract And Construction False Claims," by Avram S. Tucker and Greg S. Bingham. Presented at American Bar Association Public Contract Section March 2007 meeting in Annapolis, MD.

"Administering Subcontracts After A Termination for Convenience" (Thomson Reuters Briefing Papers, No. 04-4, March 2004), by Patricia Meagher and Greg Bingham.

"Recent Cost & Pricing Developments At The Court Of Appeals For The Federal Circuit," American Bar Association Annual Meeting of the Public Contract Section, August 2003.

"Pricing Changes," Chapter 9 in *Program and Contract Changes*, National Contract Management Association, January 1996.

"Issues Relating to Contract Terminations on Federal Contracts," February 1994.

# Appendix 2

## Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
|---|---|---|
| Protest of **Airborne Tactical Advantage Company, LLC** (File B-414929.2), Naval Air Systems Command, Naval Air Warfare Center Aircraft Division | Government Accountability Office Bid Protest | Declaration July 2018 |
| Raytheon Company v. **Northrop Grumman Systems Corporation** Subcontracts under National Polar-Orbiting Operational Environmental Satellite System program relating to Defense Weather Satellite System | AAA Arbitration | Reports May and June 2018 |
| **Eden Consulting Group** v. AMDEX Corporation | Circuit Court for Montgomery County, Maryland | Disclosure and Deposition April 2018 |
| Gallup, Inc. v. **Greenwich Insurance Company** | Delaware Superior Court Case No. N14C-02-136 FWW | Report March 2018 Deposition April 2018 |
| **Alice Jin-Yue Guan** v. Bing Ran Civil Action No. CL07003662 | Virginia: Circuit Court for the City of Alexandria | Reports January 2015 and July 2015 Trial Testimony September 2015 |
| **Advanced Technology International** submission to Defense Contract Management Agency and Defense Contract Audit Agency | Report on Advanced Technology International's Compliance With Cost Accounting Standard 410 | Report December 2017 |
| L-3 Communications Corporation, and L-3 Applied Technologies, Inc. **v. Serco, Inc.** | United States District Court For The Eastern District Of Virginia Alexandria Division Case No. 1:15-cv-701-GBL/JFA. | Reports October 2015 September 2017 Deposition November 2017 |
| Protest of **CAE USA Inc.** (File B-414259.6), Department of the Army | Government Accountability Office Bid Protest | Declaration November 2017 |

**Page 1 of 8**

## Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
|---|---|---|
| **FlightSafety International Inc.** Submission To Defense Contract Management Agency | Report On The Calculation Of The Government's Share Of FlightSafety International Inc.'s Pension Plan Under CAS 413 | Report June 2017 |
| Appeal Of **FlightSafety International Inc.** Under Contract No. W9124G-04-C-0037 | Armed Services Board Of Contract Appeals, ASBCA Nos. 60415 and 60421 | Report March 2017 |
| **United Launch Services, LLC, et al.** v. The United States of America | United States Court of Federal Claims Case No. 12-380C | Report March 2016 Deposition September 2017 |
| **Syntrix Biosystems Inc.'s** Appeal of HHS Appeals Board No. A-17-28 Settlement Demand | U.S. Department of Health and Human Services ("HHS") Appeals Board No. A-17-28 | Report May 2017 |
| Columbia Energy & Environmental Services, Inc. v. **Washington River Protection Solutions, LLC**, et al. | Superior Court Of Washington In And For Benton County Case No. 15-2-02261-7 | Expert Disclosure December 2016 Deposition April 2017 |
| Appeal of **Supreme Foodservice GmbH** Under Contract No. SPM300-05-D-3130 | Armed Services Board of Contract Appeals, ASBCA Nos. 57884 and 58666 | Reports December 2013 April 2017 |
| Appeal of **FlightSafety International Inc.** Under Contract No. W9124G-04-C-0037 | Armed Services Board of Contract Appeals, ASBCA Nos. 60415 and 60421 | Report March 2017 |
| Appeal of **Phoenix Data Solutions LLC (F/K/A Aetna Government Health Plans)** Under Contract No. H94002-09-C-0008 | Armed Services Board of Contract Appeals, ASBCA No. 560207 | Trial Testimony March 2017 |

## Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
|---|---|---|
| **Technology And Supply Management, LLC** v. Johnson Controls Building Automation Systems, LLC et al | United States District Court For The Eastern District Of Virginia Alexandria Civil Action No. 1:16-cv-303-AJT-MSN | Reports September 2016 October 2016 Deposition October 2016 Trial Testimony January 2017 |
| Lyle Beauchamp and Warren Shepherd v. **Academi Training Center, Inc. (F/K/A U.S. Training Center, LLC)** | United States District Court For The Eastern District Of Virginia Alexandria Civil Action No. 1:11-cv-371-TSE/MSN | Report October 2016 Deposition November 2016 |
| **Occupational Health Centers of the Southwest, P.S. d/b/a Concentra Medical Centers** Protest of Award, State of Maryland Department of Budget & Management | Maryland State Board of Contract Appeals Solicitation No. 050b6400002 | Declaration October 2016 |
| **CGI Federal Inc.** v. FCi Federal, Inc. | Virginia: Circuit Court for Fairfax County Case No. 2015-4021 | Disclosure Statement December 2015 Deposition March 2016 Jury Trial Testimony April 2016 |
| **Wyle Inc. and Wyle Services Corporation** v. ITT Corp., Exelis Inc., and Xylem Inc. | Supreme Court Of The State Of New York County Of New York Case No. 653465/2011 | Report December 2015 Deposition March 2016 |
| Innovative Test Asset Solutions v. United States and **National Aerospace Solutions, LLC** | United States Court of Federal Claims Case No. 15-1590C | Two Declarations January 2016 |
| Appeal Of **VeriFone, Inc.** Under Contract No. DCPO-2012-0342 | Washington, DC Contract Appeals Board No. D-1475 | Report November 2014 Trial Testimony June 2015 |

**Page 3 of 8**

## Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
|---|---|---|
| L-3 Communications Corporation, and L-3 Applied Technologies, Inc. v. **Serco, Inc.** | Virginia: Circuit Court of Fairfax County Case No. 2014-5946 | Hearing Testimony May 2015 |
| Protest of **Northrop Grumman Systems Corp.** (Files B-410719.1, B-410719.4), U.S. Air Force | General Accounting Office Bid Protest | Declaration December 2014 |
| Space Exploration Technologies Corp. v. United States and **United Launch Services, LLC** | United States Court of Federal Claims Case No. 1:14-cv-00354-SGB | Declarations November 2014 and January 2015 |
| SDS International, Inc. v. **Nova Technologies** | Case No. 1:13-CV-01460-LMB-TCB (E.D. Virginia) | Report June 2014 |
| **AM General LLC** v. Demmer Corporation | Case No. 3:12-CV-00333-WCL-CAN (N.D. Indiana) | Reports August and November, 2013. Declaration November 2013. Deposition Testimony September 2013 and April 2014. Trial Testimony June 2014 |
| **Veolia Transportation** Protest of Award, Massachusetts Bay Transportation Authority - MBTA RFP No. 159-12 | Massachusetts Department Of Transportation | Declaration February 2014 |
| **Northrop Grumman Information Systems** submission to Air Force | Report on the Verification of Costs Recorded to Select Research and Development Accounts relating to Intellectual Property Rights | Report March 2014 |
| Agility Public Warehousing Company K.S.C. and Professional Contract Administrators, Inc., v. **Supreme Foodservice GmbH** | ICDR Case No. 50 181 T 00321 08 The International Centre for Dispute Resolution | Report October 2013 |

**Page 4 of 8**

## Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
|---|---|---|
| Investigation Relating to Labor Charging Irregularities At The Ingalls Shipbuilding Division Of **Huntington Ingalls Incorporated** | Matter before Contracting Officer, Naval Criminal Investigative Service ("NCIS") and the Suspension and Debarring Official Pascagoula, Mississippi | Reports May and June 2013 |
| **Sunrise VA Medical, LLC** v. Department of Veteran Affairs | Civilian Board of Contract Appeals, CBCA No. 2798 | Report November 2012, Mediation Testimony December 2012 |
| **DACA, LLC** v. L.C. Gaskins Construction Company, Inc. | AAA Case No. 30110Y49511 | Report July 2012 Deposition Testimony August 2012 |
| **Fluor Intercontinental, Inc. d/b/a J.A. Jones International**, v. U.S. Department of State | Civilian Board of Contract Appeals, CBCA No. 1559 | Reports October 2009 and February 2012, Deposition Testimony March 2012, Trial Testimony May 2012 |
| Protest of **Northrop Grumman Systems Corporation** (File B-406411), U.S. Air Force | General Accounting Office Bid Protest | Declaration April 2012 |
| Analysis of DCAA Allegations Relating to Estimating and the Cost Accounting Standards of **BAE Systems, Inc.** | Matter before Contracting Officer, York, PA | Four Reports and Related Presentations Fall 2011 |
| **Computer Sciences Corporation** v. U.S. Army under Contract No. DAAB07-00-D-E252 | Armed Services Board of Contract Appeals, ASBCA Nos. 56168, 56169 | Two Reports (2011), ADR Testimony June 2011 |
| **Zafer Taahhut Insaat ve Ticaret A.S.,** v. United States Army Corps of Engineers regarding Anaconda Hospital Project and Specific Contract Termination Accounting and Performance Issues | Matter before Contracting Officer, Iraq | Report April 2011 |

## Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
| --- | --- | --- |
| **Medical Development International, Inc.,** v. John W. Longfield-Smith, Rightsoft, LLC, d/b/a/ RS HealthNet Solutions, LLC, Medical Cost Containment Services, Inc., Medcom Correctional Services, Inc., Correctional Health Alliance, LLC, and Correctional Health Management, LLC | Circuit Court, Seventh Judicial Circuit, In And For St. Johns County, Florida | Deposition Testimony February 2011, Trial Testimony March 2011 |
| Analysis Of Draft Audit Report For **Ibis Tek, LLC** Subcontractor's Proposal To Prime Contractor BAE Systems, U.S. Combat Systems | Pittsburgh, PA | Report April 2010 |
| Initial Audit Report of **ARAR** Termination Settlement Proposal on Afghanistan Infrastructure and Rehabilitation Program | Kabul, Afghanistan | Report January 2010 |
| **Envirocon, Inc.** v. Brookhaven Science Associates, LLC, Case No. CV 06 3137 (TCP/MLO) | United States District Court for the Eastern District of New York | Reports February and June 2008, Mini-Trial Testimony September 2009 |
| Investigation of Selected Allegations for **ENSCO, Inc.** | Falls Church, VA | Report June 2009 |
| **Equipment Sales and Services Company** v. Kellogg Brown & Root, Inc. | London Court of International Arbitration 7975 | Reports February and March 2009, Arbitration Testimony March 2009 |
| **East Coast Resources, LLP** v. Town of Hempstead, New York (Case No. CV 07-02954 | United States District Court for the Eastern District of New York | Report July 2008, Deposition Testimony August 2008 |
| United States *ex rel*. Rory Mayberry, et. al., v. **Custer Battles LLC,** *et al..* (Case No. 1:06cv364 (LO)) | United States District Court for the Eastern District of Virginia | Report May 2008, Deposition Testimony June 2008 |

# Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
|---|---|---|
| **National Academy of Sciences**. Investigation of Employee Embezzlement and Accounting Issues. | Washington, D.C. | Report July 2007 |
| Rigging and Welding Specialist, Inc. v. **DynCorp Technical Services, LLC,** Cause No. 2004-19666 | Harris County Texas, 234th Judicial District | Report and Deposition Testimony October 2005 |
| **Washington International, Inc.** v. United States Army Corp of Engineers | Report on Reasonableness of Award of Subcontract for Security Services in Iraq in the Context of how Government Regulations are Commonly Interpreted in Industry | Report December 2004 |
| Protest of **EDS Information Systems, L.L.C.** (File B-292836.1 – 6), U.S. Department of Housing & Urban Development | General Accounting Office Bid Protest | Declaration April 2004 |
| Night Vision Corp. v. Insight Technology, Inc., Case No. 03-691 | Eastern District of Virginia | Report November 2003, Deposition Testimony December 2003 |
| Hardware Technologies Inc. vs. **Compaq** | Maryland State Court | Reports 2000 and 2002, Deposition Testimony 2002 |
| Bombardier, Inc. vs. **Lockheed Martin Canada, Inc.** | Private Arbitration | Report 2002 |
| Compaq vs. InaCom | Delaware State Court | Report 2002 |
| **InTown Management Group** vs. U.S. Department of Housing and Urban Development | Mediation, Federal Bankruptcy Court Atlanta | Report 2001, Mediation Testimony 2001 |
| **Raytheon E-Systems** vs. Datatape, Inc. | Private Arbitration | Report and Deposition Testimony 2000 |

## Testimony and Related Experience of Greg Bingham

| Case Name | Venue | Testimony |
|---|---|---|
| **SCA Molnlycke** Voluntary Disclosure to U.S. Department of Veterans Affairs | Negotiations | Report and Presentation 1997 |
| [No Longer Have Records] | United States District Court of El Paso County, Texas | Jury Trial Testimony 1992 |
| **Superior Iron Works** | United States District Court, Southern District of Texas | Report and Deposition Testimony 1991 |

# Appendix 3

**State Of Washington v. The GEO Group Inc.**
**Expert Report Of Gregory S. Bingham**
**Appendix 3, Documents Relied Upon**

1. Contract HSCEDM-15-D-00015, GEO-State 036825-037027

2. State of Washington Complaint, 20 September 2017, Dkt. #1-1

3. Solicitation HSCEDM-15-R-00001, GEO-State 040430-040660

4. GEO Final Proposal Revision, GEO-State 040886-040959, GEO-State 229681

5. GEO Invoice 214170801, 28 September 2017, GEO-State 045040-045051

6. Performance-Based National Detention Standards Inspection Worksheets for Over 72 Hours Facilities, 4/15/2014 to 4/17/2014 and GEO-State 015848-015850, -999-6000

7. Declaration of Tae D. Johnson, 1 August 2018, Dkt. #91

8. 2011 Performance-Based National Detention Standards, GEO-State 000001-003, -385-389

9. ICE National Detainee Handbook, April 2016, GEO-State 000462-489

10. Volunteer Work Program Agreement, GEO-State 003479

11. Interview of GEO personnel and any other documents as cited in my Report.