# POLOZOLA DECLARATION

# EXHIBIT B

```
 1                  UNITED STATES DISTRICT COURT

 2                 WESTERN DISTRICT OF WASHINGTON

 3

 4   STATE OF WASHINGTON          )
                                  )
 5        Plaintiff,              )
                                  )
 6   vs.                          )  No. 3:17-CV-05806-RJB
                                  )
 7   THE GEO GROUP INC.           )
                                  )
 8        Defendant.              )

 9

10            DEPOSITION UPON ORAL EXAMINATION

11                   OF GREG BINGHAM

12

13                     10:13 A.M.

14                    MAY 23, 2019

15                  800 FIFTH AVENUE

16                     SUITE 2000

17            SEATTLE, WASHINGTON  98104

18

19

20

21

22

23

24   REPORTED BY:  CATHERINE A. DECKER, CCR NO. 1975

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4         LANE POLOZOLA

 5         ANDREA BRENNEKE

 6         Office of the Attorney General

 7         800 Fifth Avenue, Suite 2000

 8         Seattle, Washington  98104

 9         lane.polozola@atg.wa.gov

10         andreab3@atg.wa.gov

11         206 442-4492

12

13         R. ANDREW FREE

14         Law Office of R. Andrew Free

15         P.O. Box 90568

16         Nashville, Tennessee  37209

17         844 321-3221

18         andrew@resist.law

19

20

21

22

23

24

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   For the Defendant:

 2          J. MATTHEW DONOHUE

 3          Holland & Knight LLP

 4          111 Southwest Fifth Avenue, Suite 2300

 5          Portland, Oregon  97204-3626

 6          503 517-2924

 7          matt.donohue@hklaw.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Also present:  KATIE HALL, Legal Assistant

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       Q.   How many times?

2       A.   I would say between five and ten times.

3       Q.   And how far back time wise was your first

4   retention by Holland and Knight?

5       A.   Approximately ten years ago.

6       Q.   Have you been -- excuse me.  Have you done

7   work for the GEO Group aside from your testimony in

8   this case?

9       A.   I have not.

10      Q.   Has any of your prior experience involved

11  issues related to state law labor standards?

12           MR. DONOHUE:  Object to the form.

13      A.   So state procurement regulations multiple

14  times, I don't remember it involving -- would you

15  restate your question.

16           MR. POLOZOLA:  Would you read the

17  question back, please.

18           [The question was read back by the reporter.]

19      A.   I believe so.

20      Q.   How so?

21      A.   I think state law labor standards have been

22  implicated in some of the work we have done assisting

23  construction contractors in their reporting of

24  information about their union and other workers to, I

25  believe it was, the state -- I'm fairly sure it was the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    state regulatory body.  So that's how I remember right

2    now I've encountered it.  There may be more.

3        Q.  But can you recall any others specifically?

4        A.  And again it's the labor standards.  And I'm

5    struggling a bit because I work on procurement issues

6    at the state level a fair amount.  But the labor

7    standards -- I can't remember other times when I've

8    dealt with the labor standards, or interfaced the labor

9    standards.

10       Q.  So for the example you did mention the

11   construction contractors.  Did that involve an analysis

12   of state minimum wage requirements?

13       A.  It did not.

14       Q.  Have you worked on any other matters involving

15   state minimum wage requirements?

16       A.  I don't remember at the time.

17       Q.  Has any of your prior experience involved

18   issues related to federal detention standards?

19       A.  Somewhat, yes.

20       Q.  How so?

21       A.  Well, one of the matters -- and I can draw

22   your attention to page 6 of my appendix 2.  At the top

23   of the page there is a matter listed, it starts with

24   Medical Development International Inc., and a long list

25   of people and companies.  And this related to the

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  provision of medical services for detainees, for

 2  prisoners, at various prison facilities.

 3      Q.  Do you have any other experience with federal

 4  detention standards aside from that one case?

 5      A.  My memory is fuzzy on this, it's hard over 33

 6  years.  But I think I worked on a bid protest where a

 7  company that provides -- it may be a competitor of GEO

 8  for all I know -- but provides that type of services,

 9  did not get awarded a federal contract and protested

10  that nonaward.  And I worked on that matter, I believe.

11  My memory is fuzzy on that.

12      Q.  Do you have any experience with private

13  prisons or detention facilities, generally speaking?

14              MR. DONOHUE:  Object to the form.

15      A.  Could you -- by experience, could you expand

16  on that.

17      Q.  Sure.  Do you have prior experience where you

18  have contracted -- or excuse me.  Do you have prior

19  experience where you have worked as a consultant for

20  other private detention companies or private prison

21  companies?

22      A.  Just the bid protest that my memory is

23  somewhat fuzzy on.  Just that.

24      Q.  Have you worked on -- well, let me give you

25  some preface here.  Putting aside the identity of the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    client, have you ever worked on any issues relating to

2    private detention or private prison aside from this

3    case?

4        A.  Aside from the bid protest, I don't remember a

5    time.

6        Q.  So in the bid protest that you mentioned, what

7    was the name of the company that you were working with?

8        A.  I'm sorry.  I don't remember.

9        Q.  Do you recall the outcome of that?

10       A.  No.  And let me say, I remember discussing

11   this matter and then -- but I don't remember if --

12   sometimes in a bid protest the company is trying to

13   decide whether they need a cost expert or someone that

14   does what I do, and they will ask us to fill out a

15   protective order application to be admitted to the

16   case, and then they won't need us.  So we review some

17   documents and we get ramped up, but then we don't end

18   up doing it.  That may have happened, and that may be

19   why my recollection is fuzzy on what the matter was.

20   And it's also quite some time ago.

21       Q.  Have you ever worked as an expert in a case

22   where you were hired by a state government?

23       A.  I don't believe so.

24       Q.  Have you ever worked as an expert in a case

25   where you were hired by a local government?


206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  contractors versus government agencies?
 2      A.  Well, there are contractors that work for the
 3  government that are effectively an arm of the
 4  government, and I'm thinking about these M&O, that's
 5  management operations contracts, for example, that the
 6  Department of Energy awards where the contractor then
 7  runs like Sandia National Lab or Los Alamos National
 8  Lab, or the Hanford site, or Oakridge Tennessee site
 9  for the federal government.  So I've worked for those
10  entities multiple times.  And in your question of me
11  for the split, where do I put those is kind of what I'm
12  getting at.
13      Q.  Yeah.  So I guess let's go back to your
14  initial answer where I believe you referred to
15  government contractors or commercial entities versus
16  government entities.  So I'm using the split that you
17  used in your answer, and I want to know how that shakes
18  out numbers wise.
19              MR. DONOHUE:  Object to the form.
20      A.  It's much more -- it's more than 90 percent.
21  It's 90-10 or so or higher depending on how you split
22  these M&O contractors that are effectively the
23  government.
24      Q.  Okay.  So I think you mentioned in your report
25  that you had experience regarding improper labor
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   talking about employees and you asked about detainees.

2   I am distinguishing them in my -- I was distinguishing

3   the employee versus detainee in my answer.

4       Q.  Have you -- in number 7 here, this is what I'm

5   referring to -- "forensic investigation of accounting

6   matters involving allegations of issues such as

7   defective pricing, improper billings, mischarges and

8   improper labor charging."  Has any of that work

9   involved improper labor charging at private detention

10  facilities?

11      A.  I don't believe so.

12      Q.  You mentioned earlier that you had worked on

13  certain damage-related issues.  Are you offering any

14  opinions in this case as to economic or damages-

15  related issues?

16      A.  I am not.

17      Q.  So on the same topic that we were just

18  discussing, you may have mentioned that you've

19  consulted on what the standards are for how employers

20  record time.  So can you explain to me generally what

21  is the industry standard for how employers are supposed

22  to record time, if any?

23              MR. DONOHUE:  Object to the form.

24      A.  And this is -- what I'm addressing is how

25  companies are to instruct their employees to record



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.   And I'm just on page 1, first paragraph,

2   second sentence, "Kenrich was retained to perform an

3   independent and objective analysis of the government

4   contracts that are the subject of the dispute -- GEO's

5   Federal Government contracts for a detention facility

6   in support of US Immigration and Customs Enforcement's

7   Seattle field office.

8      Q.   So what about the contracts were you asked to

9   analyze?

10     A.   Well, determine if the solicitation process

11  and the contracts awarded were typical of federal

12  government procurement practices, and to review the

13  practices related to certain passthrough costs, which

14  included payments made to detainees in accordance with

15  the voluntary work program, and if you will, the

16  contract administration -- various contract

17  administration practices related to the voluntary work

18  program and the billing of costs, the billings to ICE

19  and the oversight of the contract.  That's the types of

20  things I was asked to review.

21     Q.   And I think we established earlier that at the

22  time of your report you had not reviewed any contracts

23  prior to the 2015 contract discussed here?

24     A.   I believe that's correct.

25     Q.   And I think -- correct me if I'm wrong.  I

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   your earlier question you limited it to before I

 2   authored the report.

 3       Q.  Let's go with ever, since it will be a more

 4   inclusive answer.

 5       A.  Ever.  Yes.  So I've reviewed a 2002 contract,

 6   a contract awarded July 2002 that was, I believe, by

 7   INS to CSC.

 8       Q.  What is CSC?

 9       A.  Correction -- I don't remember.  I believe the

10   first C was correction.  I don't want to speculate.

11       Q.  Okay.  Can you tell me what that contract

12   related to, what types of services, products?

13       A.  So that was the one that I referred to earlier

14   that may have been the first in the series on this

15   matter -- that's vague.  Let me restate that.  That may

16   have been the first contract at the Northwest Detention

17   Center.

18       Q.  Okay.

19       A.  From July of 2015.

20       Q.  So turning to your summary of opinions, the

21   opinions you're offering in this case.  I just want to

22   walk through and make sure I understand what your

23   opinions are.  So at page 3 you say the solicitation

24   process for contract HSCEDM-15-D-00015 and the

25   resulting contract are typical of Government
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    procurements."  Is that your opinion today?

2         A.  It is my opinion, yes.

3         Q.  And what other government procurement are you

4    comparing this solicitation process to?

5         A.  It's -- so over the course of my career, 33

6    years, I've kind of developed a body of knowledge of

7    the process by which the federal government, and, to a

8    lesser extent, state governments and some foreign

9    governments procure goods and services.  And that's

10   part of what I teach at George Washington University,

11   and what I teach for the National Contract Management

12   Association and the ABA and some others.  That's --

13   when I say the solicitation process here it's typical,

14   I'm referring to that it's typical of U.S. government

15   contracts for goods and services of this nature.

16        Q.  So if I wanted to test that theory and compare

17   against other contracts, what contracts would I compare

18   it against?

19                 MR. DONOHUE:  Object to the form.

20        A.  Of fixed-price contracts.  I mean, there are

21   different categories -- there is sealed bid, fixed

22   price, and there's cost plus and commercial item.  And

23   this is very kind of typical of a FAR 15, federal

24   acquisition regulation 15, a contract that is kind of a

25   solicitation process that is executed in accordance

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   insurance, his insurance for working, his personal

2   health insurance and things like that.  His car, what's

3   the depreciation on his car that he uses to, say, drive

4   to and from the site.  What have his tools cost, that

5   sort of thing.  So in those three you have cost

6   reimbursement was last one, time and material, and

7   fixed price.  And this is pretty typical of a fixed

8   price.

9                   MR. DONOHUE:  Can we take a break?

10                   MR. POLOZOLA:  Sure.

11                           [A brief recess was taken.]

12       Q.  [By Mr. Polozola] Okay.  So I want to continue

13   on with just your summary of opinions here.  And I

14   think on page 3 you say "There appears to have been no

15   ambiguity between ICE and GEO about the Voluntary Work

16   Program, the payment to program participants, and GEO's

17   reimbursement for those payments, which is detailed in

18   CLIN 0003 Detainee Voluntary Wages."  Is that your

19   opinion today?

20       A.  It is.

21       Q.  On the payment to detainees aspect of that

22   sentence, what do you believe is unambiguous?

23       A.  That they were to receive -- that it was to be

24   a passthrough cost and that they were to receive a

25   dollar a day -- a dollar a shift.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.  And on that second issue of a dollar a shift,
 2  is it your position that the contract requires GEO to
 3  pay them a dollar per shift?
 4                  MR. DONOHUE:  Object to the form.
 5      A.  Based on, like, the standards and practices in
 6  my work in the federal procurement, I think people
 7  would interpret that or would operationalize that as
 8  that is what they needed to do is pay them a dollar a
 9  day -- a dollar a shift, a dollar a day.
10      Q.  Okay.  What standards are you referring to?
11      A.  Well, let me -- I mean, I could refer to the
12  Nash and Ciminic Good Administration of Government
13  Contracts, I could refer to the Contract Pricing
14  Reference Guides by the Defense Acquisition University,
15  could refer to the Formation of Government Contracts by
16  Nash and Ciminic, and various other treatises that kind
17  of form my opinions, the body of knowledge that I
18  developed.  But based on that, that's how a contractor
19  would and should operationalize the contract.
20      Q.  So I just want to understand clearly.  This is
21  how you interpret the contract?
22                  MR. DONOHUE:  Object to the form.
23      A.  I'm at page 1, the third paragraph.  I'll just
24  say, I have not been asked to and do not express an
25  opinion on the proper interpretation of regulations

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  reimbursement for those payments, which is detailed in

2  CLIN 003, Detainee Volunteer Wages."  And my question

3  was, are you offering an interpretation of the

4  contract?

5      A.  No.

6              MR. DONOHUE:  Object to the form, asked

7  and answered.

8      Q.  Are you offering any opinions on whether ICE

9  believed this contract to be ambiguous or unambiguous?

10             MR. DONOHUE:  Could you restate that

11  question, please.

12     Q.  Are you offer any opinions as to whether ICE

13  believed the contract to be ambiguous or unambiguous?

14             MR. DONOHUE:  Object to the form.

15     A.  I'll say based on my 33 years of experience

16  that ICE behaved as if there was no ambiguity.  They

17  behaved as if the actions of GEO were what was

18  intended.

19     Q.  Did you speak with anyone from ICE?

20     A.  I did not.

21     Q.  So then continuing on through your summary of

22  opinions here, you referred to GEO's expected rate of

23  reimbursement for the $1-a-day payments as reflecting

24  passthrough costs, and you note that they were not

25  marked up to include indirect cost, profit, or the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  added cost of administering the VWP.  And you go on and

2  say, "GEO's invoice submission, and ICE's evaluation

3  and payment processes, are typical of other billing,

4  evaluation, audit, and payment practices I have

5  evaluated during the course of my career."  Is that

6  your opinion today?

7      A.  It is.

8      Q.  And what other practices are you comparing the

9  ICE-GEO process to?

10     A.  Well, okay.  I'll just take this in turn.  The

11 bills, the invoices, I've reviewed hundreds, certainly

12 thousands of invoices from government contractors to

13 agencies of the federal government.  And this, the

14 invoices here, the way they are structured are typical

15 of matters like this with a CLIN structure such as we

16 have here.  The evaluation process and the audit

17 process -- the audit process is typical in that ICE --

18 I mean, the multiple bodies auditing the contractor's

19 compliance with the contract from ICE to the quality,

20 the surveillance, quality assurance surveillance plan,

21 whatever that is addressed later to OSHA, to internal

22 audits, to the state health agencies, et cetera.  The

23 audit is overseen here, the audit environment here is

24 typical for a contract of this nature.  And the payment

25 practices are typical.  And I'm basing that on the body

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    of knowledge I've developed with regard to payment

 2    practices by federal government agencies.

 3         Q.  Okay.  And we'll move on.  I think we're on

 4    page 4 now.  You state at the end of the first

 5    paragraph, "it therefore does not appear that GEO's

 6    performance on the contract was deficient."  And as I

 7    understand it, it's your opinion that it was not

 8    deficient because ICE did not pursue remedies or

 9    sanctions or termination of the contract in any way

10    based on GEO's performance.

11              MR. DONOHUE:  Object to the form.

12         Q.  Am I understanding that correctly?

13         A.  It's not limited to what you said, but that's

14    part of it.

15         Q.  Okay.  Can you explain the summary here so I

16    can understand what your opinion is on this?

17         A.  Certainly.

18              MR. DONOHUE:  Object to the form.

19         A.  Well, from the beginning to the end -- and

20    I'll expand on that.  From the beginning to the end

21    they appear to be in lockstep and in congruence on what

22    was to happen.  And I'll say that from the beginning,

23    ICE circulated a solicitation that had certain

24    requirements.  And GEO submitted a proposal to ICE

25    which mirrored those requirements, saying they would


206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.   This line item requires GEO to have a

2   voluntary work program; is that your statement?

3                MR. DONOHUE:   Object to the form.

4        A.   This is how -- this is addressing payment, and

5   so this is -- other places the requirement -- well,

6   here and other places is the requirement for the

7   voluntary work program.   And this is how GEO is to bill

8   ICE and how GEO is to pay detainees.

9        Q.   Okay.   So on that point is it accurate to say

10  that CLIN 3 addresses the rate at which ICE must

11  reimburse GEO for payments made to detainees who

12  participate in the voluntary work program?

13       A.   It is both the rate at which ICE will

14  reimburse GEO and GEO will pay the detainees.   It's

15  both.

16       Q.   So I just want to understand.   So yes to the

17  question, but there is something additional, which is,

18  if I am understanding what you're saying, it's your

19  position that this sets forth a requirement that GEO

20  pay detainees $1 a day; is that accurate?

21                MR. DONOHUE:   Object to the form.

22       A.   That is accurate.

23       Q.   Where in line item 3 does it state that GEO is

24  required to pay detainees $1 a day?

25       A.   The second sentence "Reimbursement for this

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com



6    Q.  Are you aware of whether GEO has sought

7  permission to exceed payments under CLIN 3 from ICE?

8    A.  Definitively, no, I don't.

9    Q.  Does CLIN 3 or anywhere else in the contract

10  state that GEO is limited to paying detainees $1 per

11  day?

12          MR. DONOHUE:  Object to the form.

13    A.  CLIN 3 indicates that GEO is limited to paying

14  the detainees to $1 per day.

15    Q.  So does GEO have the option of paying

16  detainees more than $1 per day in your opinion?

17    A.  Not without -- this program is an ICE program.

18  If ICE told GEO, We want you to pay something other

19  than a dollar per day, ICE has the ability to direct

20  GEO to do that.  And under a circumstance like that, I

21  think it would be typical of GEO to follow the

22  directions given by the contracting officer or the COR.

23    Q.  So back to kind of the question that started

24  this part of our conversation.  In addition to CLIN 3

25  and the paragraph on the voluntary work program that

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    So this is not an atypical list.

2        Q.   And for q. specifically, applicable federal,

3    state and local labor laws and codes, is that a typical

4    constraint that is included in federal contracts?

5        A.   Sometimes it will have stronger language than

6    this, but some reference to them is typical, yes.

7        Q.   So turning back to the PBNDS, under j, did you

8    review the PBNDS in preparing your report?

9        A.   I did.

10       Q.   Okay.  And which version did you review?

11       A.   I believe it was the 2011 version updated in

12   2016.

13       Q.   And had you reviewed, or have you reviewed,

14   any other versions of the PBNDS?

15       A.   I don't believe so.

16       Q.   Were you familiar with the PBNDS before you

17   provided your report in this case?

18       A.   I don't remember seeing it before.  I may have

19   in that MDI matter I mentioned, but I don't recall it.

20       Q.   Okay.  Are you aware of whether the PBNDS have

21   changed in any way during the period of the GEO-ICE

22   contract?

23       A.   And you're referring to the 2015 contract.

24   Okay.  So in the version that I saw there were some

25   red, I believe edits in red, that were intended to show

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   ICE and say, I would like you to mod CLIN 3 to say

2   something different than CLIN 3 currently says.

3       Q.  Would that be consistent with this provision

4   of the PBNDS?

5               MR. DONOHUE:  Object to the form.

6       A.  Well, I just said that they could go to ICE

7   and say, we would like to modify CLIN 3 in any -- and

8   I'm just directing in any way -- to increase the price,

9   to reduce its actual cost.  To increase the actual

10  cost, reduce the actual cost, they could ask for any --

11  I don't know why they would, but you're asking is it

12  theoretically possible?  It is theoretically possible.

13      Q.  So could GEO pay detainees more than $1 per

14  day under the PBNDS 2011?

15              MR. DONOHUE:  Object to the form.

16      A.  I don't think they could under the contract.

17      Q.  That wasn't my question.  I'm referring to

18  this section on compensation that we just reviewed.

19  Does this limit GEO to paying detainees $1 per day?

20      A.  I think the contract limits them to paying

21  them the actual cost of $1 per day.  This says at least

22  $1.

23      Q.  Okay.  And can we agree that "at least $1"

24  means that you could pay more than $1 under this

25  section of the PBNDS?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1           MR. DONOHUE:  Object to the form.

2      A.  This says at least a dollar, but the contract

3  says actual cost of a dollar, exactly a dollar.  I

4  added the word "exactly," but it says "actual cost of

5  $1."

6      Q.  So you're not offering any opinion in this

7  case that the PBNDS requires payment of only $1 to

8  detainees in the VWP, correct?

9      A.  I don't think it governs on the payment of --

10 CLIN 3 governs my opinion on the passthrough cost, the

11 actual cost that shall be paid to the detainees and

12 reimbursed by ICE.

13     Q.  And why doesn't this govern in your view?

14          MR. DONOHUE:  Object to the form.

15     A.  Well, I mean, CLIN 3 is very clear that it's

16 exactly a dollar.  This can be a dollar or more.  So

17 how do you interpret the contract, and you're asking

18 for contract interpretation of questions -- I'm giving

19 that, even though I said in my report, for my purposes

20 in my report I did not provide contract interpretation.

21 But I'm doing it now.  The way to interpret those

22 consistently would be exactly $1.  That comports with

23 CLIN 33 and it comports with PBNDS.

24     Q.  So back to the contract modification topic we

25 discussed a bit earlier.  Could GEO as you understand

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    it obtain a contract modification to pay detainees more

2    than $1 per day for participation in the VWP and be

3    consistent with the PBNDS?

4              MR. DONOHUE:  Could you read that back.

5    I'm sorry.

6         [The question was read back by the reporter.]

7              MR. DONOHUE:  Object to the form.

8    Q.  Do you understand the question?

9    A.  I think that I do.  I mean, I think we talked

10   about this.  I think it's kind of asked and answered,

11   although I'll answer it.  The contractor can ask to mod

12   the contract where there's a request to mod any aspect

13   of the contract.  I can't think of an aspect of the

14   contract that the contractor cannot request a mod.

15   Now, would the contractor get the mod?  Would it be in

16   the best interest of the contractor or the government

17   or anybody else to mod?  That's a different question.

18   But can they request to mod the contract?  Yes, they

19   can.

20   Q.  We discussed earlier whether GEO was required

21   to pay only a dollar a day, and I think we have covered

22   that ground.  And correct me if I'm wrong that it's

23   your position that GEO is required under the contract

24   to pay only $1 per day to detainees in the VWP,

25   correct?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        A.  I'll just add to pay their actual cost of $1
2   per day, yes.
3        Q.  So does GEO have the option of paying more
4   than $1 per day?
5                    MR. DONOHUE:  Object to the form.
6        A.  Well, not in accordance with the contract.  I
7   mean, can a company break the law, can a company breach
8   the contract?  Yeah, they could breach the contract and
9   do something different than the contract, and until
10  they were caught they could pay more.  So I'm saying
11  out in Never Never Land, so to speak, it is impossible,
12  but not in accordance with the contract.
13       Q.  So are you saying that it would be a breach of
14  the contract to pay more than $1 a day to detainees in
15  the VWP?
16       A.  Yes.
17       Q.  For GEO to pay the detainees.  I'm not talking
18  about GEO submitting reimbursement to ICE for more than
19  $1 a day.
20                   MR. DONOHUE:  Object to the form.
21       A.  It would not be in accordance with the
22  contract.  I think -- I mean, if breach means not in
23  accordance, I think breach is the right term.
24       Q.  So I just want to understand this point about
25  GEO's ability to pay more to detainees -- a bit more if

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    you'll indulge me.  So I understand that GEO can only

2    be reimbursed for actual cost is your opinion,

3    correct -- with regard to the detainee work program

4    wages?

5        A.  I'll go further and say they can only be

6    reimbursed actual cost of $1 per day per detainee.

7        Q.  So if the federal court in this case orders

8    GEO to pay detainees $12 or more per hour instead of $1

9    a day and GEO complies with that order, would GEO be in

10   violation of the ICE-GEO contract?

11               MR. DONOHUE:  Object to the form.

12       A.  I have no -- you're asking a question about

13   federal law versus a contract, and that would not be in

14   accordance with the contract.  But would it be -- would

15   it somehow override?  I think you're asking -- I don't

16   have a considered opinion on that.

17       Q.  Okay.  I'm not asking you to reach a legal

18   conclusion, to be clear.  But it's to this whole series

19   of questions of can GEO pay detainees more.  And the

20   followup here is if they are told by a court to pay

21   more, am I understanding you that it would not be in

22   accordance with the terms of the contract; is that your

23   testimony?

24               MR. DONOHUE:  Object to the form.

25       A.  That is what I said, but I also said I have

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    not thought about that, and that sounds complicated.

2    And I don't have a considered opinion on that.  What

3    I'm struggling with is who wins there, the federal

4    judge or the contract, you know, ICE or -- I mean,

5    you've got the executive branch versus the judicial

6    branch, I'm sure that's -- well . . .

7        Q.  Fair to dsy that's not your domain?

8        A.  That's not my domain.

9        [Exhibit No. 201 was marked for identification.]

10       Q.  So I've handed you what's been marked as

11   Exhibit 201.

12             MR. POLOZOLA:  And I'll state for the

13   record that this is a copy of the GEO Group's responses

14   to Washington's second set of requests for admissions.

15       Q.  [By Mr. Polozola] And because you are not a

16   lawyer, I can give you a brief explanation of what this

17   document is.  The state has asked GEO to admit to

18   certain facts, and GEO provided written responses.

19   Have you reviewed this document before?

20       A.  I have not.

21       Q.  Have you discussed this document with anyone

22   before?

23       A.  I don't know the content of this document.  I

24   may have discussed some of the content, I don't know.

25   But I haven't discussed this document.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.  And so directing your attention to RFA 67 and
 2   I'll find you the page.
 3                  MR. DONOHUE:   Page 21.
 4                  MR. POLOZOLA:   Thank you.
 5        Q.  [By Mr. Polozola] So the request for admission
 6   no. 67 says, "Please admit that GEO has the option to
 7   pay more than $1 a day to detainee workers for work
 8   performed in the VWP at the NWDC."  And the response is
 9   "Admit."  Is your testimony consistent with GEO's
10   position in this case --
11                  MR. DONOHUE:   Object to the form.
12        Q.  -- as stated in RFP 67?
13        A.  What I said is not consistent with RFA 67.
14        Q.  Does this modify or cause you to want --
15   excuse me.  Having viewed this, does this modify any of
16   the opinions you hold in this case?
17        A.  No.
18        Q.  Okay.  So looking at page 10 of your report
19   here, second full paragraph, where you're discussing
20   passthrough costs.  And there are two sentences here
21   about costs associated with administering the voluntary
22   work program.  So the last sentence here says "All
23   costs GEO expected to incur in administering the
24   Voluntary Work Program had to be factored into the
25   fixed prices included in the CLINs."
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.   Let me say that in my report I said I was not

2   interpreting contracts or the regulations, and I'm not.

3   But I think you're asking me to interpret that, and as

4   such, just as a layman I suppose, it does appear to say

5   that.

6      Q.   And so the following sentence, "When a

7   conflict exists" -- excuse me -- "Should a conflict

8   exist between any of the aforementioned standards, the

9   most stringent shall apply," is that similar to the

10  requirement we discussed for the later contracts with

11  regard to conflicting provisions and how stringent

12  standards apply?

13                 MR. DONOHUE:  Object to the form.

14     A.   It is similar.  It is certainly similar.

15     Q.   Are they identical?

16                 MR. DONOHUE:  Same objection.

17     A.   I would want to line them up side by side.

18  The last sentence appears to be identical.  The second

19  one may be identical, but I don't want to say that they

20  are without checking.

21     Q.   So if you can turn to Bates page 00270694.

22     A.   I'm at that page.

23     Q.   Is this the section you were referring to

24  earlier when you mentioned the voluntary work program

25  section of this contract?  Or did you have something

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  were to pay more than $1 per day?

 2                 MR. DONOHUE:  Object to the form.

 3      Q.  Why would detainees need to be reclassified as

 4  employees if they were paid more than $1 per day under

 5  the voluntary work program?

 6                 MR. DONOHUE:  Object to the form.

 7      A.  Well, that's a little different than your

 8  previous question.  Your previous question -- and maybe

 9  I'm answering a different question that you asked.  But

10  to treat them as employees, they need to determine what

11  fringe benefits they get, and they need to meet all of

12  the requirements that I earlier read.  Now, I think

13  you're trying to pose, I think, some kind of hierarchy

14  where they're not treated as an employee but they're

15  paid more or something?

16      Q.  I understood you to refer a moment ago to

17  needing to reclassify the detainees as employees if

18  they were paid more than $1, and I'm asking what

19  requires them to be reclassified as employees merely

20  because they were paid more than $1 for participating

21  in the voluntary program.

22                 MR. DONOHUE:  Object to the form.

23      A.  Well, okay.  So the contract indicates that

24  they are to be paid a dollar a day.  And so it would be

25  a breach of the contract to pay them something
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1    different than a dollar a day.  Separately, if you -- I

 2    thought your question was -- I think your initial

 3    question was treat them as employees.  And to treat

 4    someone who doesn't meet all the requirements as an

 5    employee would be in breach of the contract, I believe.

 6        Q.  Is that based on your interpretation of the

 7    contract?

 8                 MR. DONOHUE:  Object to the form.

 9        A.  Yeah.  Things like breach are -- I mean, I

10    teach COs and CORs and company people about breach and

11    about the changes and that sort of thing.  So I have a

12    layman's, at least, understanding of that.  But as I

13    said, I'm not here to interpret the contract and I

14    offer no opinions in my report on interpretation of the

15    contract.

16        Q.  Okay.  In this solicitation process -- we'll

17    change tack for a moment.  So in this solicitation

18    process, are you aware of whether GEO's audited

19    financial statements were provided to ICE as part of

20    its proposal?

21        A.  I don't know if they were provided to ICE as

22    part of their proposal.

23        Q.  Is it typical for contractors to be required

24    to provide financial statements when submitting a

25    proposal?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              REPORTER'S CERTIFICATE

 2

 3      I, CATHERINE A. DECKER, the undersigned Certified

 4  Court Reporter, pursuant to RCW 5.28.010 authorized to

 5  administer oaths and affirmations in and for the state

 6  of Washington, do hereby certify that the sworn

 7  testimony and/or proceedings, a transcript of which is

 8  attached, was given before me at the time and place

 9  stated therein; that any and/or all witness(es) were by

10  me duly sworn to tell the truth; that the sworn

11  testimony and/or proceedings were by me

12  stenographically recorded and transcribed under my

13  supervision, to the best of my ability; that the

14  foregoing transcript contains a full, true, and

15  accurate record of all the sworn testimony and/or

16  proceedings given and occurring at the time and place

17  stated in the transcript; that a review of which was

18  requested; that I am in no way related to any party to

19  the matter, nor to any counsel, nor do I have any

20  financial interest in the event of the cause.

21      WITNESS MY HAND this 10th day of June 2019.

22

23

24  CATHERINE A. DECKER,
    Washington State Certified Court Reporter, #1975
25  cdecker@yomreporting.com
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com