The Honorable Robert J. Bryan

1
2
3
4
5
6
7

8

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

9

10  STATE OF WASHINGTON,

11          Plaintiff,

12  v.

13  THE GEO GROUP, INC.,

14          Defendant.

Case No.: 3:17-cv-05806-RJB

**DECLARATION OF COLIN L. BARNACLE**

15

16      I, Colin L. Barnacle, make the following statement under oath subject to the penalty of

17  perjury pursuant to the laws of the United States and the State of Washington:

18      1.      I am the attorney for The GEO Group, Inc. in the above-captioned matter.  I am

19  over the age of eighteen (18), and I am competent to testify in this matter.

20      2.      Attached is a true and correct copy of the following exhibit:

21      **EXHIBIT A:** The Deposition transcript of Gregory Bingham, who was deposed by the

22  State of Washington on May 23, 2019.

23      Dated this 20th day of November, 2019 at Denver, Colorado.

24      Akerman, LLP

25      *s/ Colin L. Barnacle*
        Colin Barnacle, (Admitted *pro hac vice*)
26      Attorney for Defendant The GEO Group, Inc.

27

---

DECLARATION OF COLIN L, BARNACLE
(3:17-CV-05806-RJB) – PAGE 1

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  303-260-7712

**<u>PROOF OF SERVICE</u>**

I hereby certify on the 20th day of November, 2019, pursuant to Federal Rule of Civil Procedure 5(b), I electronically filed and served the foregoing **DECLARATION OF COLIN L. BARNACLE** via the Court's CM/ECF system on the following:

Marsha J. Chien
Andrea Brenneke
Lane Polozola
Patricio A. Marquez
OFFICE OF THE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104

*Attorneys for Plaintiff*

*s/ Nick Mangels*
Nick Mangels

PROOF OF SERVICE
(3:17-CV-05806-RJB) – PAGE 2

**AKERMAN LLP**
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  303-260-7712

50884467;1

# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3

4    STATE OF WASHINGTON          )
                                  )
5          Plaintiff,             )
                                  )
6    vs.                          ) No. 3:17-CV-05806-RJB
                                  )
7    THE GEO GROUP INC.           )
                                  )
8          Defendant.             )

9

10           DEPOSITION UPON ORAL EXAMINATION

11                  OF GREG BINGHAM

12

13                    10:13 A.M.

14                   MAY 23, 2019

15                 800 FIFTH AVENUE

16                    SUITE 2000

17           SEATTLE, WASHINGTON  98104

18

19

20

21

22

23

24   REPORTED BY:  CATHERINE A. DECKER, CCR NO. 1975

25

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        LANE POLOZOLA

 5        ANDREA BRENNEKE

 6        Office of the Attorney General

 7        800 Fifth Avenue, Suite 2000

 8        Seattle, Washington  98104

 9        lane.polozola@atg.wa.gov

10        andreab3@atg.wa.gov

11        206 442-4492

12

13        R. ANDREW FREE

14        Law Office of R. Andrew Free

15        P.O. Box 90568

16        Nashville, Tennessee  37209

17        844 321-3221

18        andrew@resist.law

19

20

21

22

23

24

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   For the Defendant:

 2        J. MATTHEW DONOHUE

 3        Holland & Knight LLP

 4        111 Southwest Fifth Avenue, Suite 2300

 5        Portland, Oregon  97204-3626

 6        503 517-2924

 7        matt.donohue@hklaw.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Also present:  KATIE HALL, Legal Assistant

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                       I N D E X

 2

 3    EXAMINATION BY:                              PAGE

 4         MR. POLOZOLA                              5

 5         MR. FREE                                163

 6

 7

 8    EXHIBITS FOR IDENTIFICATION                  PAGE

 9    Exhibit 197    G. Bingham's report            10

10    Exhibit 198    Solicitation, offer & award    76
                     GS 040430-660
11
      Exhibit 199    Excel files, Final proposal    105
12                   revision, GS 229681

13    Exhibit 200    PBNDS 2011                     122
                     GS 000001-03, GS
14
      Exhibit 201    GEO Group's responses and      130
15                   Objections to State of Wash.
                     Second set of request for
16                   Admissions

17    Exhibit 202    Contract award to GEO, 10/24/09 140
                     GS 00270461-0648
18
      Exhibit 203    Solicitation, offer and award  144
19                   GEO-State 00270649-0784

20    Exhibit 204    E-mail from J. Rice to         160
                     G. Bingham notes of conversation
21                   with L. Carillo and C. Hill

22    Exhibit 205    Declaration of Tae Johnson     200

23

24

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                   SEATTLE, WASHINGTON; MAY 30, 2019

 2                          10:13 A.M.

 3                          --oOo--

 4

 5                        GREG BINGHAM,

 6    sworn as a witness by the certified court reporter,

 7                     testified as follows:

 8

 9                         EXAMINATION

10    BY MR. POLOZOLA:

11        Q.   Good morning, Mr. Bingham.   Lane Polozola here

12    on behalf of the State.   With me today to Andrea

13    Brenneke and Katie Hall, our legal assistant.

14                  MR. FREE:   Mr. Bingham, I'm Andrew Free.

15    I represent a certified class of plaintiffs in a case

16    called Nwauzor vs. GEO.   It's been consolidated with

17    this case.

18        Q.   All right.   So Mr. Bingahm, I know you've been

19    deposed before.   How many times have you been deposed?

20        A.   I believe, like, 22.

21        Q.   Okay.   So I'll give you some instructions.   I

22    know you will be familiar with them, but I want to make

23    sure we're clear.   Please answer verbally yes or no,

24    don't shake your head or say "uh-uh" or "uh-huh" for

25    the sake of the court reporter.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.  Understood.
 2        Q.  Thank you.  Please try and let me finish my
 3   questions.  I will do my best to let you finish your
 4   answers before I ask any followup.  If you don't
 5   understand a question, please ask me to clarify;
 6   otherwise, I'll assume you understand, if that makes
 7   sense.
 8        A.  Understood.
 9        Q.  If you don't know the answer you can say so,
10   but if you do know the answer, you have to answer the
11   question.  Please give your attorney an opportunity to
12   object, but you are required to answer the question
13   unless you are instructed not to on privilege grounds.
14   Do you understand?
15        A.  Understood.
16        Q.  If you need a break at any point, feel free to
17   ask; we're happy to accommodate.  I'll just ask that
18   you answer the pending question before taking a break.
19        A.  Will do.
20        Q.  Okay.  What did you do to prepare for this
21   deposition?
22        A.  I reviewed documents, and I reviewed some
23   deposition transcripts and some other documents -- and
24   I can go into more detail as you wish.  And I met with
25   counsel, with Matt.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.   When did you meet with counsel?

2      A.   Tuesday afternoon, evening.

3      Q.   One meeting only?

4      A.   Yes.

5      Q.   And when you say you reviewed deposition

6  transcripts, what transcripts did you review?

7      A.   The deposition transcripts of Ryan Kimble,

8  Bertha Henderson, Alisha Singleton, and William

9  McHatton.

10      Q.   No other deposition transcripts that you are

11  reviewed to prepare?

12      A.   No others.

13      Q.   And you mentioned other documents.  What other

14  documents did you review to prepare for this

15  deposition?

16      A.   A part of a contract dated July of 2002,

17  awarded July 2002, and it starts with GEO-State

18  00270649, I believe.

19      Q.   Can you repeat that number one more time for

20  me?  I wasn't ready for it.

21      A.   Certainly.  00270649.

22      Q.   And what was -- can you explain to me a bit

23  about that contract.  Who were the parties and what was

24  it about?

25      A.   It was between CSC and INS, if memory serves.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   And it was -- it might have been the first in a series

 2   of contracts regarding the Northwest Detention Center

 3   in that it, included with the contractor, needed to be

 4   ready to perform within 240 days of contract award.

 5   And so with such a long period of time from contract

 6   award to performance, it may have been the first in a

 7   series.

 8        Q.  And what portion of that contract did you

 9   review?

10        A.  A significant portion.  It was -- there were

11   sections referencing documents, and the documents

12   referenced were not included in the PDF file I was

13   looking at.  It's hard for me to definitively say what

14   was missing.  It was a significant part, I believe, of

15   that 2002 contract.

16        Q.  Okay.  Were there any other documents that you

17   reviewed to prepare?

18        A.  Yes.  2009 contract, and it begins with the

19   Bates no. GEO-State 00270461.

20        Q.  And what was that contract?

21        A.  I think it's the one that in the deposition

22   transcripts, and you may have come to be referring to

23   as the 2009 contract between GEO and ICE.

24        Q.  For the Northwest Detention Center?

25        A.  Yes.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.   Okay.  Had you reviewed that contract at the
 2   time you offered your report in this case?
 3        A.   I had not.
 4        Q.   What other documents did you review to prepare
 5   for this deposition?
 6        A.   2008 National Detainment Handbook, Bates
 7   starting with GEO-State 015696.
 8                   MR. FREE:  I'm sorry.  Can you repeat
 9   that?
10                   THE WITNESS:  The Bates number was
11   015696.
12        Q.   And what was that document?
13        A.   It was a multipage, I believe developed by
14   ICE, and it addressed various things about detention
15   centers generally.  And I would have to look at it to
16   be more verbose.
17        Q.   Okay.  Any further documents that you reviewed
18   to prepare?
19        A.   Okay.  So the documents -- and I'm looking at
20   my appendix 3 to my report.  So it lists some documents
21   there.  And I think I probably reviewed -- I reviewed
22   most, maybe not all, but I reviewed most of those
23   documents as well.
24        Q.   For the documents that you reviewed that were
25   not listed in your appendix 3, did reviewing those
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  documents cause you to modify any of your opinions as

2  set forth in your report?

3       A.  No.

4       Q.  And why didn't you review those documents

5  before you offered your report in this case?

6                MS. ARMSTRONG:  Object to the form.

7       A.  Well, they were not available to me is the

8  short answer.  For some reason -- well, for some of

9  them they had not yet occurred, so several of the

10  depositions had not yet been taken, so I could not --

11  they just didn't exist at that time.

12      Q.  And for the documents that did exist, was

13  there a reason that they were not provided to you?

14                MS. ARMSTRONG:  Object to the form.

15      A.  I'm not aware, if there is reason, what the

16  reason was.

17      Q.  So turning to your appendix 3, is this list --

18  I see that you have a copy of your report.  Let's go

19  ahead and have one marked as an exhibit so that we know

20  what we're referring to.  It's going to be Exhibit 197.

21       [Exhibit No. 197 was marked for identification.]

22      Q.  So can you actually take a look at Exhibit 197

23  that I provided to you.  Once you have had a moment to

24  review my question will be whether that's a complete

25  copy of your report as you provided in this case.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       A.   Yes.   This appears to be a full and complete
2  copy of my report.
3       Q.   Great.   So turning to appendix 3 where we
4  were, there are, as far as I can tell, ten documents
5  listed here or ten bullet points, and number 11 refers
6  to an interview with GEO personnel.   For numbers 1
7  through 10, is that a complete list of documents that
8  you had reviewed in order to prepare your report in
9  this case?
10       A.   No.
11       Q.   What other documents had you reviewed to
12  prepare your report that are not listed here?
13       A.   And I'll do my best to answer that, of course,
14  as with everything today.   But the -- on page 1 of my
15  report, the second full paragraph, at the end where it
16  says "I also considered requirements of the Federal
17  Acquisition Regulation (FAR) and the Department of
18  Homeland Security (DHS) Acquisition Regulation (HSAR)."
19  So I reviewed four -- those are other documents that I
20  reviewed.   So item 4 here, the GEO FPR (final proposal
21  revision), I don't know the Bates ranges here if they
22  include the Excel file that was submitted, I believe by
23  GEO, to ICE as part of their FPR, but I have reviewed
24  that spreadsheet, the Excel workbook, which was
25  submitted as part of the FPR.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.  And what was contained in that Excel file?

 2        A.  A number of tabs, different sheets that can be

 3   selected and that build up the pricing by CLIN and also

 4   by different categories of cost.

 5        Q.  Okay.  And who provided you with that Excel

 6   spreadsheet?

 7        A.  Counsel.

 8        Q.  Can you be clear on which counsel?

 9        A.  I believe -- I'm certain that was from

10   Greenberg Traurig.  That's T-r-a-u-r-i-g.

11        Q.  So in addition to the legal authorities you

12   mentioned, the FARs, are there any other documents that

13   are not included in this list that you reviewed to

14   prepare your report?

15                 MS. ARMSTRONG:  Object to the form.

16        A.  I don't remember any others.  There are -- as

17   you know from my report, there are footnotes providing

18   sources.  And if there are any sources there that are

19   not listed here, like the FAR and the HSAR, I didn't

20   include here as a document relied upon, but I have them

21   in the footnote.  I'll say I generally reference

22   various authoritative texts, and I don't remember if I

23   did when forming my opinion because I reference them so

24   frequently, and I can list a few of those are a book by

25   Nash and Cibinic, that's C-i-b-i-n-i-c, and it's
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   called:  Formation of Government Contracts.  And I
 2   often reference the defense contract audit agencies,
 3   the DCAA's Contract Audit Manual.  And going forward I
 4   will refer to that as the DCAM, DCAA Contract Audit
 5   Manual.  I often refer to it for when I'm researching
 6   things.  There's another book also by Nash and Cibinic,
 7   and the name is Administration of Government Contracts.
 8   And I may have referenced it.
 9        Q.  Okay.  So number 11 refers to interview of GEO
10   personnel.  Who from GEO did you interview?
11        A.  Chuck Hill.  He's a director of business
12   development for GEO western region.  On the phone
13   statement at the same time was Lewis Carillo,
14   C-a-r-i-l-l-o, and I believe he's a VP of corp counsel.
15        Q.  So he's an attorney?
16        A.  I believe so.
17        Q.  Did you speak with anyone else from GEO?
18        A.  I don't believe so.
19        Q.  When did that conversation or conversations
20   occur?
21        A.  In mid September of 2018.
22        Q.  So days before your report was issued?
23        A.  Yes.
24        Q.  And to be clear, your report is dated
25   September 20, 2018, so in the week or two before your
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  report was submitted?

 2      A.   It was within certainly within a week.

 3      Q.   Had your report been drafted before you spoke

 4  with those individuals from GEO?

 5              MR. DONOHUE:  Object to the form.

 6      A.   I'm sure we had at least an outline, maybe a

 7  rough draft.

 8      Q.   Why didn't you name the individuals from GEO

 9  in your report?

10              MR. DONOHUE:  Object to the form.

11      A.   No reason.

12      Q.   What did you discuss with regard to -- or

13  excuse me.  What did you discuss with Mr. Hill?

14      A.   Well, and one way to address that answer is

15  for us to go -- there are four or five times in my

16  report where I make a reference to an interview of GEO

17  personnel.  And I either put that as a source or I make

18  reference to that for how I know something.  Or often

19  it's -- I know something from three different ways, if

20  you will, and that's one of the ways.  So we could do

21  that now, we could do that in the course of the

22  deposition.  I'll leave that up to you.

23      Q.   Okay.  Is there anything you discussed with

24  Mr. Hill that did not end up in your report aside from

25  those four to five times you're referring to?
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.   Well, I didn't transcribe every word that was

2  said in the phone call, so I'm sure there was things

3  said that I found to be not relevant that didn't make

4  it into the report.  Everything that I found to be

5  relevant did make it into the report.

6      Q.   Do you have any examples of information you

7  found to be not relevant that you chose not to include

8  in the report?

9      A.   No, I do not.

10      Q.   And so if I heard you correctly, did you

11  transcribe notes from the call?

12      A.   A colleague of mine -- there was no literal

13  transcription of notes.  There was a colleague of mine

14  that summarized, was taking notes during the call.

15      Q.   Okay.  Who was that person?

16      A.   That person was Jonathan Rice.

17      Q.   So there was a record at least in notes form

18  of what was discussed on that call?

19      A.   Yes.

20      Q.   How long did that conversation last?

21      A.   The conversation I was on was less than an

22  hour.  And there may have been another conversation --

23  I'm speculating, but there may have been another

24  conversation between Jonathan and Mr. Hill prior to

25  mine.  I don't remember.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.   Okay.  Do you supervise Jonathan Rice?

2        A.   I do.

3        Q.   So for conversations that may or may not have

4   occurred between Mr. Rice and, GEO, is that potentially

5   a conversation you're relying upon in your report?

6        A.   No.

7                  MR. DONOHUE:  Object to the form.

8        Q.   So I'm trying to understand, there may or may

9   not have been additional conversations with GEO

10  personnel, correct?

11       A.   There may have been, and it wasn't -- it would

12  have been at my direction, but I don't remember now if

13  I directed Jonathan to do that or not in this case.

14  Sometimes I will, if I am not available, he has a less

15  busy schedule than mine, I might say go ahead and reach

16  out to them and then I'll be on a later call.  I don't

17  remember if I did that in this case or in this instance

18  or not.

19       Q.   So for the information you learned from GEO

20  and any instances where you cite interview with GEO

21  personnel in your report, did you independently confirm

22  the facts you discussed with GEO?

23                 MR. DONOHUE:  Object to the form.

24       A.   We would -- it's hard for me to answer that

25  broadly.  I mean, if we to go item by item where it's

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  referenced in my report, I could answer it better that

2  way.

3      Q.  Okay.  Have you spoken with anyone from GEO

4  since submitting your report?

5      A.  I have not.

6      Q.  Okay.  So let's turn back to your experience a

7  bit.  Can you explain to me your educational

8  background, please.

9      A.  Certainly.  I have a bachelor's of science

10  degree in electrical engineering from the University of

11  Kentucky and I worked a bit as an electrical engineer.

12  And after that I went and got an MBA, master's of

13  business administration, degree from the University of

14  Texas in Austin.  And after that I began working in the

15  field that I work in now about 33 years ago.  I have --

16  I don't know if you want me to cover this now, but I

17  also teach a lot in the field that we're talking about

18  today.  I'm an adjunct professor at George Washington

19  University where I teach a course called Pricing and

20  Cost Issues in Government Contracts.  And I teach a lot

21  of government COs, contracting officers, and CORs,

22  contracting officer representatives, as well as company

23  people -- people that work for contractors that do

24  business with the federal government, agencies of the

25  federal government.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.   Okay.  So to be clear.  When you refer to the

2   field that we are talking about today, what field do

3   you understand that to be?

4                    MR. DONOHUE:   Object to the form.

5        A.   I guess I would say procurement, especially

6   U.S. federal government procurement processes and

7   practices.

8        Q.   So in the past 33 years have you been with the

9   same firm the entire time or no?

10       A.   I have not been with the same firm for the

11  entire time.

12       Q.   How long have you been with your current firm?

13       A.   Since 2004 -- since April of 2004.

14       Q.   But were you doing the same type of work

15  before that period?

16       A.   Yes, I was -- well, let me clarify.  There

17  have been changes in federal procurement over the

18  course of that 33 years.  Early in my career the U.S.

19  government bought a lot of hardware -- Jeeps, tanks,

20  airplanes, things like that.  Today they buy a lot of

21  services and a lot of -- just the nature -- even the

22  hardware they buy is often, the consent is more

23  software than it is hardware.  But especially the

24  services, like in this matter, like in the subject

25  contract where there is a service.  So there have been

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  a lot of changes in federal procurement over that time

2  period.  But I have been working in federal procurement

3  policies and practices for that 33 years.

4      Q.  Okay.  How long have you served as a

5  testifying expert for litigation purposes?

6      A.  So I -- my job responsibilities involve a lot

7  of different things in addition to that, and I guess I

8  would say that I think I first testified in, like,

9  1994.  So I'm just checking that because it's easy to

10  see in my listing.  1991 was the first time I

11  testified.  And at that time it was somewhat rare for

12  me to testify.  Now I testify more than once a year,

13  multiple times a year.

14          I also provide a lot of advice to clients,

15  consulting advice, that is not in the context of a

16  dispute.  So it's -- there is a new regulation or the

17  company -- as an example, the company -- a regulation

18  is applicable to the company that was not applicable to

19  the company prior, and they want to know how to modify

20  their operations with respect to this new clause that's

21  been added to one of their contracts.  So I provide a

22  lot of consulting assistance of that nature.

23          Also there's sometimes whistle blowers or

24  False Claims Act type allegations and I will

25  investigate that sort of thing more from an accounting

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  and finance and practices in the industry, because...
 2  So I'll just say that testimony is not -- it's maybe
 3  half or less of my job responsibilities.  I'm also the
 4  president of the Kenrich Group, and that takes some
 5  amount of time performing the role of president.
 6       Q.  How many times have you testified at trial?
 7       A.  Approximately 15 -- well, and I'm including
 8  trials, mediations, arbitrations.  And if the number is
 9  important we should go through my list and we'll figure
10  out how I developed it.  Because some of the mediations
11  I presented multiple times, and I count that as one for
12  the purposes of the number that I think is 15.
13       Q.  Okay.  I'll take your word on 15.  And I
14  believe you said you've been deposed, was it, 22 times?
15       A.  I believe that's correct.
16       Q.  And how many times -- have you been retained
17  by Greenberg prior to this case for any matter?
18       A.  I may have been.  I worked on a matter about
19  ten years ago, 2008 or '09, and the attorney I was
20  working with, he has moved firms a few times.  I think
21  he was at Greenberg Traurig at that time, but I'm not
22  absolutely sure.
23       Q.  And have you been retained by Holland and
24  Knight ever before this case?
25       A.  Yes.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.   How many times?

2        A.   I would say between five and ten times.

3        Q.   And how far back time wise was your first

4    retention by Holland and Knight?

5        A.   Approximately ten years ago.

6        Q.   Have you been -- excuse me.  Have you done

7    work for the GEO Group aside from your testimony in

8    this case?

9        A.   I have not.

10        Q.   Has any of your prior experience involved

11    issues related to state law labor standards?

12                 MR. DONOHUE:   Object to the form.

13        A.   So state procurement regulations multiple

14    times, I don't remember it involving -- would you

15    restate your question.

16                 MR. POLOZOLA:   Would you read the

17    question back, please.

18             [The question was read back by the reporter.]

19        A.   I believe so.

20        Q.   How so?

21        A.   I think state law labor standards have been

22    implicated in some of the work we have done assisting

23    construction contractors in their reporting of

24    information about their union and other workers to, I

25    believe it was, the state -- I'm fairly sure it was the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  state regulatory body.  So that's how I remember right
 2  now I've encountered it.  There may be more.
 3      Q.  But can you recall any others specifically?
 4      A.  And again it's the labor standards.  And I'm
 5  struggling a bit because I work on procurement issues
 6  at the state level a fair amount.  But the labor
 7  standards -- I can't remember other times when I've
 8  dealt with the labor standards, or interfaced the labor
 9  standards.
10      Q.  So for the example you did mention the
11  construction contractors.  Did that involve an analysis
12  of state minimum wage requirements?
13      A.  It did not.
14      Q.  Have you worked on any other matters involving
15  state minimum wage requirements?
16      A.  I don't remember at the time.
17      Q.  Has any of your prior experience involved
18  issues related to federal detention standards?
19      A.  Somewhat, yes.
20      Q.  How so?
21      A.  Well, one of the matters -- and I can draw
22  your attention to page 6 of my appendix 2.  At the top
23  of the page there is a matter listed, it starts with
24  Medical Development International Inc., and a long list
25  of people and companies.  And this related to the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  provision of medical services for detainees, for

2  prisoners, at various prison facilities.

3      Q.  Do you have any other experience with federal

4  detention standards aside from that one case?

5      A.  My memory is fuzzy on this, it's hard over 33

6  years.  But I think I worked on a bid protest where a

7  company that provides -- it may be a competitor of GEO

8  for all I know -- but provides that type of services,

9  did not get awarded a federal contract and protested

10 that nonaward.  And I worked on that matter, I believe.

11 My memory is fuzzy on that.

12     Q.  Do you have any experience with private

13 prisons or detention facilities, generally speaking?

14             MR. DONOHUE:  Object to the form.

15     A.  Could you -- by experience, could you expand

16 on that.

17     Q.  Sure.  Do you have prior experience where you

18 have contracted -- or excuse me.  Do you have prior

19 experience where you have worked as a consultant for

20 other private detention companies or private prison

21 companies?

22     A.  Just the bid protest that my memory is

23 somewhat fuzzy on.  Just that.

24     Q.  Have you worked on -- well, let me give you

25 some preface here.  Putting aside the identity of the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   client, have you ever worked on any issues relating to

2   private detention or private prison aside from this

3   case?

4        A.  Aside from the bid protest, I don't remember a

5   time.

6        Q.  So in the bid protest that you mentioned, what

7   was the name of the company that you were working with?

8        A.  I'm sorry.  I don't remember.

9        Q.  Do you recall the outcome of that?

10       A.  No.  And let me say, I remember discussing

11  this matter and then -- but I don't remember if --

12  sometimes in a bid protest the company is trying to

13  decide whether they need a cost expert or someone that

14  does what I do, and they will ask us to fill out a

15  protective order application to be admitted to the

16  case, and then they won't need us.  So we review some

17  documents and we get ramped up, but then we don't end

18  up doing it.  That may have happened, and that may be

19  why my recollection is fuzzy on what the matter was.

20  And it's also quite some time ago.

21       Q.  Have you ever worked as an expert in a case

22  where you were hired by a state government?

23       A.  I don't believe so.

24       Q.  Have you ever worked as an expert in a case

25  where you were hired by a local government?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.  Yes.

2      Q.  What case was that?

3      A.  Well, do you mean by case, like a dispute?

4      Q.  Let's start with dispute, yes.

5      A.  I don't believe so.

6      Q.  So is there a nondispute matter where you've

7  consulted for a local government?

8      A.  Yes.

9      Q.  And what was that matter?

10      A.  That was a -- it's been 20 years ago.  There

11  may be others, but this one comes to me first.  It was

12  assisting in Iowa, a local government, in developing a

13  solicitation.  It needed certain things procured, and

14  it was developing a solicitation trying to figure out

15  what companies might provide the service and how to

16  structure the solicitation.  And I was working on that.

17      Q.  Similar set of questions.  Have you ever

18  worked in a case where you were hired by a union?

19      A.  I don't believe so.

20      Q.  And I said "case," so I want to be clear here.

21  Have you ever consulted or worked on nondispute-related

22  matters for a union?

23      A.  I don't believe so.

24      Q.  Have you ever worked on a case where you were

25  hired by an employee rather than an employer?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                MR. DONOHUE:  Object to the form.
 2        A.  A few times, yes.
 3        Q.  Can you tell me what those few times are?
 4        A.  Well, they both related to -- they were both
 5   whistle blowers in the context of the False Claims Act.
 6        Q.  And so let's take them one by one, if you
 7   could just give me a little bit of detail on each.
 8        A.  It's been so long.  They were both in the mid
 9   to late '90's and we did not have a good experience and
10   did not work for whistle blowers, or we were very much
11   more circumspect when working for whistle blowers after
12   that.  But we were retained by an outside law firm to
13   get to analyze some damages issues, assuming certain
14   facts by the whistle blower.  And I believe it was the
15   defense industry in both cases.
16        Q.  Okay.  And why were you circumspect after that
17   about working with whistle blowers?
18        A.  Well, maybe I'll amend my answer --
19   circumspect about working with counsel for whistle
20   blowers.
21        Q.  Why is that?
22        A.  Because of the experiences we had there.
23        Q.  What about those experiences were negative, if
24   any, that caused you to be circumspect?
25        A.  If memory serves, I thought we were retained
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  and we had an agreement about what we would do and what

 2  we would be paid, and we did what we -- there was some

 3  issue where we did what we thought we had agreed to do,

 4  and we thought they had agreed as well.  And then they

 5  didn't pay us.

 6      Q.  Have you ever been hired by a federal

 7  government agency?

 8      A.  Yes.

 9      Q.  Which agencies?

10      A.  The Department of Defense.

11              THE WITNESS:  Can we continue while I

12  refill my water?

13              MR. POLOZOLA:  Sure.

14      Q.  [By Mr. Polozola} So you mentioned the

15  Department of Defense.  What matter did you work on for

16  the Department of Defense?

17      A.  And your initial question said retained, and I

18  was contacted and I'll tell you more about the matter

19  if you want to hear about it.  But when I was

20  contacted, I thought it made more sense for one of my

21  colleagues, so I introduced my colleague; my firm was

22  retained, I worked a few hours but my colleague did

23  most of the work and provided the testimony.

24      Q.  Okay.  So putting that instance aside, have

25  you been hired by any federal agencies?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.  Well, and I was hired and I did incur hours
 2   and we were paid, so I was hired there.  But then there
 3   was a matter for -- I believe it was for a judicial
 4   branch, it was a judge.  It was not -- you said an
 5   executive branch agency, I believe.
 6        Q.  I think I said a federal government agency,
 7   but I understand the distinction.  So what was the
 8   matter with the judicial branch?
 9        A.  A judge in a mediation wanted someone to
10   evaluate the damages claims by the different parties
11   and advise them.
12        Q.  So you served as a damages expert in that
13   matter?
14        A.  Yeah.  It's not a damages expert in the
15   traditional sense because I was just working for the
16   judge.  I mean, there were, like, damages experts
17   reporting to the judge and the judge wanted assistance
18   in evaluating what he was given.
19        Q.  Sure.  So in your practice today, do you
20   primarily work for government contractors?
21        A.  I work more for government contractors --
22   commercial contractors, companies -- than I work for
23   government entities.
24        Q.  If you can explain the extent of that split
25   for me, what percentage of your work is for government
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  contractors versus government agencies?
 2      A.  Well, there are contractors that work for the
 3  government that are effectively an arm of the
 4  government, and I'm thinking about these M&O, that's
 5  management operations contracts, for example, that the
 6  Department of Energy awards where the contractor then
 7  runs like Sandia National Lab or Los Alamos National
 8  Lab, or the Hanford site, or Oakridge Tennessee site
 9  for the federal government.  So I've worked for those
10  entities multiple times.  And in your question of me
11  for the split, where do I put those is kind of what I'm
12  getting at.
13      Q.  Yeah.  So I guess let's go back to your
14  initial answer where I believe you referred to
15  government contractors or commercial entities versus
16  government entities.  So I'm using the split that you
17  used in your answer, and I want to know how that shakes
18  out numbers wise.
19              MR. DONOHUE:  Object to the form.
20      A.  It's much more -- it's more than 90 percent.
21  It's 90-10 or so or higher depending on how you split
22  these M&O contractors that are effectively the
23  government.
24      Q.  Okay.  So I think you mentioned in your report
25  that you had experience regarding improper labor
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    charging issues.  Does that sound familiar?

2        A.  Maybe you could direct me to that page of the

3    report.

4        Q.  I believe it's on page 2.  It's about halfway

5    down.  It's in what would be item no. 7.

6        A.  Yes, I see it.  And I'm writing on my version,

7    I'm not writing on your exhibit.

8        Q.  Well, actually, you're free to write on this

9    one because that one will stay with the court reporter.

10   If you need to identify something and help show us

11   something, please do it on this copy.

12       A.  Will do.

13       Q.  But back to improperly recharging as referred

14   to here in item no. 7, can you explain to me what that

15   experience was?

16       A.  So I have quite a lot of experience in that

17   area investigating that and educating and training

18   contractors on how to properly charge their labor and

19   how to properly -- assisting in the accounting

20   operations of government contractors in properly

21   accounting for labor costs.  And so sometimes this has

22   been in the context of an investigation where at one

23   extreme a contractor is alleged to have -- people that

24   the contractor alleged to have worked on one contract

25   while they recorded their time to a different contract.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  That's an easy example.  That's an example I use in my
2  class at George Washington University.
3          But there is often much less exciting, if you
4  will, labor charging issues that more relate to just
5  overtime.  If someone works eleven hours in a day and
6  they are a salaried employee, do they just say, well,
7  I'm salaried.  I just record eight hours on my time
8  sheet.  That would be -- in most instances that's
9  improper.  They should record all eleven hours.  And if
10  they -- as an example.  And I could go on, but I may
11  have answered your question.
12      Q.  I think so.  So when you refer to this here,
13  it's referring to accounting matters involving labor
14  charging issues; is that correct?
15              MR. DONOHUE:  Object to the form.
16      A.  It's not only accounting.  I mean, it's -- if
17  a company has 5,000 employees and all 5,000 have to
18  fill out time sheets or record their labor in some way
19  every day, it becomes a contract administration issue,
20  or just a company administration issue in how do you
21  train people to record their time properly and how do
22  you audit and evaluate to ensure that they record their
23  time properly.  How do you test that they perform their
24  labor charging properly.
25      Q.  Has that experience involved advice as to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  whether an entity must comply with state minimum wage

 2  laws?

 3                MR. DONOHUE:  Object to the form.

 4       A.  I don't believe so.

 5       Q.  Has any of the experience you were just

 6  discussing involved issues related to detainee labor

 7  practices?

 8                MR. DONOHUE:  Object to the form.

 9       A.  Well, there's a lot of overlap at least with

10  regard to how time is recorded for detainees or

11  employees.  But most of my work, maybe all of it, has

12  been related to employees.

13       Q.  And when you say they've been related to

14  employees, am I understanding you that it has not been

15  related to detainees?

16       A.  It's primarily, maybe exclusively been, but

17  certainly primarily been related to employees.

18       Q.  So I just want to make sure I understand.  Are

19  you distinguishing between the two as though detainees

20  cannot be employees?

21                MR. DONOHUE:  Object to the form.

22       Q.  I'm just trying to understand what you're

23  referring to here.  I want to be clear.

24       A.  Understood.  I thought you were making that

25  distinction in your question when you were -- I was
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  talking about employees and you asked about detainees.

2  I am distinguishing them in my -- I was distinguishing

3  the employee versus detainee in my answer.

4      Q.  Have you -- in number 7 here, this is what I'm

5  referring to -- "forensic investigation of accounting

6  matters involving allegations of issues such as

7  defective pricing, improper billings, mischarges and

8  improper labor charging."  Has any of that work

9  involved improper labor charging at private detention

10 facilities?

11     A.  I don't believe so.

12     Q.  You mentioned earlier that you had worked on

13 certain damage-related issues.  Are you offering any

14 opinions in this case as to economic or damages-

15 related issues?

16     A.  I am not.

17     Q.  So on the same topic that we were just

18 discussing, you may have mentioned that you've

19 consulted on what the standards are for how employers

20 record time.  So can you explain to me generally what

21 is the industry standard for how employers are supposed

22 to record time, if any?

23              MR. DONOHUE:  Object to the form.

24     A.  And this is -- what I'm addressing is how

25 companies are to instruct their employees to record

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    time and how they do it.  And I'll just say -- and some
2    of this comes from DCAM, the audit manual.  But what
3    I'm explaining is kind of the standards and practices
4    in the industry, and it's that employees, every
5    employee fills out a time sheet.  It can be electronic
6    or paper, but fills out a time sheet every day, and
7    that they record all of their time.  And if they worked
8    eleven hours, for example, and they're salaried, they
9    don't make an assumption that they should just put down
10   eight hours.  And if they work on -- and they should be
11   very accurate in their reporting.  Some require
12   recording time to the tenth of an hour, others do
13   not -- but be accurate in the reporting, and to not
14   favor one time of contract over another.
15           And an example of that would be if a person
16   worked eleven hours in a day, and they worked three
17   hours on a proposal, which is, say, not reimbursable,
18   and they worked eight hours on a contract, in this
19   example their time is reimbursable to the company.  An
20   improper billing, that some people are unaware of is
21   improper, would say, well, I'm salaried, so I'm just
22   going to record eight hours -- I'm salaried and I
23   worked eight hours on this reimbursable contract, so
24   I'm going to record all of my time to the reimbursable
25   contract; that would be improper.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1          The proper way would be to say no, if I worked
 2   8.25 hours on the reimbursable contract, record 8.25
 3   hours to the reimbursable contract.  And if I worked
 4   2.75 hours on the proposal, record 2.75 hours to that
 5   proposal.  And then -- and I may have answered your
 6   question, but I have gotten work on this subject, just
 7   to be complete in the answer.  So then companies should
 8   oversee their employees to make sure that they are
 9   doing that and make sure that they do record their time
10   daily and that they are accurate in how they record it.
11          So companies can oversee that by, there are
12   electronic timekeeping systems, and they can check to
13   see kind of electronically through the computer did
14   everybody report their time every day, and if they
15   didn't, they can go to that person and educate them on
16   the property timekeeping practices.  If someone puts in
17   their time and then in a day, say on Monday, and then
18   they come in Wednesday and they edit their time to
19   adjust it to something different, they need to put a
20   reason down.  So that's something again where the
21   employer, the company, can see that type of information
22   through the electronic data and go and monitor them and
23   explain to them, train them on the proper timekeeping.
24   Those are -- there is more, but I think that addresses
25   your question.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.  So what's the standard as to how company

 2  employees actually record time, if any?

 3                  MR. DONOHUE:  Object to the form.

 4      A.  When you say "actually record time," what do

 5  you mean by that?

 6      Q.  So I'm interested in knowing how employees

 7  record time worked, and I think you referred to it

 8  could be on paper, it could be electronic.  I'm curious

 9  to know what the standard practice is in your

10  experience.

11                  MR. DONOHUE:  Object to the form.

12      A.  It varies based on the industry.  A company I

13  was working with recently, a number of people there

14  don't have access to a computer because of the nature

15  of their job.  So they hand write their time on a paper

16  time sheet, and they give that to someone else, an

17  administrative person who does have access to a

18  computer, and that person enters their time, again,

19  daily.

20              But in other environments where virtually

21  everybody has access to a computer because of the

22  nature of their job, then there is typically an

23  electronic timekeeping system.  And they can go log

24  into the system and it will often have a drop-down menu

25  where they can -- you may envision -- one example I saw

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   had a series of rows sort of like a spreadsheet.  So

2   you could say if you worked 11 hours in a day and you

3   worked on three different projects, you could put in

4   the number of hours on the first project, put in a

5   number of hours, and then select a drop-down menu and

6   you would select the project that that number of hours

7   was for.  Then you go to the next row, put in the

8   number of hours, go to the drop-down menu and select

9   that, whatever those hours were.  And then the third

10  and so on.  And then at the bottom of the page it

11  totals so you can reconcile if you think you worked 11

12  hours, if those sum to 11 hours, that's confirmation.

13          If you entered the numbers wrong and it sums

14  to 21 hours instead of 11 hours, you realize, oh, I

15  must have not put in the right numbers.  Then you can

16  have the opportunity to adjust it.  What I just

17  described is kind of a typical process.

18      Q.  Why is accurate timekeeping important?

19              MR. DONOHUE:  Object to the form.

20      A.  Well, for many reasons.  And one example would

21  be, let's say, you have a cost reimbursement contract

22  and the hours that you record -- the hours that

23  employees record in many cases are the hours that are

24  billed to the government.  And if you record the wrong

25  hours, the bill could be misstated, so not just the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  employer record but the bill to the government could be

2  misstated.  So that's obviously a problem.  Even if you

3  do not have a cost reimbursement contract where it

4  could cause a bill to be wrong, there's a category of

5  cost called fringe benefits, and it includes things

6  like health care and vacation and paid time off and

7  401(k) and that sort of thing -- human resources type

8  costs.  And you need to accurately apportion their cost

9  of fringe benefits to contracts.

10         You need to determine the amount of fringe

11  benefits by hour -- not by person, not by day, but by

12  hour.  So if someone works 11 hours, the fringe benefit

13  rate per hour is slightly smaller than if they worked 8

14  hours.  So if they don't accurately record their time,

15  the fringe benefit hourly rate developed will be

16  inaccurate and that could cause an overbilling to the

17  federal government, that could cause a misapportionment

18  of cost internally.  So that's just not sound

19  accounting or appropriate cost accounting.

20         There are other -- I use fringe benefits as an

21  example.  There are other indirect costs that it also

22  affects if the costs were inaccurately recorded -- if

23  the labor hours were inaccurately recorded.

24     Q.  So I want to return to your report here.  What

25  were you retained to do in this case?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1       A.   And I'm just on page 1, first paragraph,

 2  second sentence, "Kenrich was retained to perform an

 3  independent and objective analysis of the government

 4  contracts that are the subject of the dispute -- GEO's

 5  Federal Government contracts for a detention facility

 6  in support of US Immigration and Customs Enforcement's

 7  Seattle field office.

 8       Q.   So what about the contracts were you asked to

 9  analyze?

10       A.   Well, determine if the solicitation process

11  and the contracts awarded were typical of federal

12  government procurement practices, and to review the

13  practices related to certain passthrough costs, which

14  included payments made to detainees in accordance with

15  the voluntary work program, and if you will, the

16  contract administration -- various contract

17  administration practices related to the voluntary work

18  program and the billing of costs, the billings to ICE

19  and the oversight of the contract.  That's the types of

20  things I was asked to review.

21       Q.   And I think we established earlier that at the

22  time of your report you had not reviewed any contracts

23  prior to the 2015 contract discussed here?

24       A.   I believe that's correct.

25       Q.   And I think -- correct me if I'm wrong.  I
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  think in your report you state that you were told that

2  they were generally consistent?

3       A.  I was.

4       Q.  And who told you that?

5       A.  And I say in footnote 3 on page 4, "Kenrich is

6  aware that GEO was also awarded predecessor contracts

7  at NWDC in approximately 2005 and 2009, and Kendrich

8  understands these contracts to be generally consistent

9  with the 2015 contract."  And I believe I was -- in the

10  interview I had with GEO personnel, I brought that up,

11  and then I -- based on my experience in the industry I

12  was not surprised to hear that they would be generally

13  consistent.

14       Q.  Okay.  Did you review any ICE contracts with

15  contractors other than GEO in preparing your report?

16       A.  In preparing my report, no.

17       Q.  Have you ever?

18       A.  Could you restate the question.

19       Q.  Sure.  So I mean, I'm asking whether as part

20  of your report you reviewed similar contracts for

21  companies other than GEO with ICE -- and it's not a

22  question.  I'm just explaining.  And I think you said

23  for purposes of my report, no, right?  Am I

24  misunderstanding?

25                    MR. DONOHUE:  Object to the form.  Go

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    ahead.

2       A.  Based on the context you added -- I mean, I've

3    reviewed likely thousands of similar contracts.

4       Q.  With ICE?

5       A.  Not with ICE.

6       Q.  So my question is with ICE.

7       A.  I don't remember how many ICE contracts I've

8    reviewed.  I'm sure I reviewed some at least on the MDI

9    matter that we looked at earlier.  But it's hard -- I

10   review so many contracts, it's just part of my practice

11   somebody calls me and says, Hey, I need your advice on

12   something.  Here's my contract.  Go to page 400, or

13   whatever, and let's talk about how do I react to this.

14   How do I comply with this.  And I will say, Well, other

15   people in your industry, this is how I understand

16   people typically respond to that.  This is my advice on

17   the best way to handle that.  So I'm sure I've seen ICE

18   contracts.  I don't remember how many.

19      Q.  Okay.  So I have a similar question, not

20   necessarily limited to ICE, but DHS or INS; are you

21   familiar with INS?

22      A.  I am.

23      Q.  So have you reviewed contracts between DHS and

24   private contractors?

25      A.  Yes.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.  And can you give me examples of those

 2  contracts?

 3      A.  Okay.  Well, I can give you some that -- it's

 4  hard to give -- I mean, I can't be exhaustive.  But

 5  like Coast Guard is currently under DHS, and I've

 6  worked on multiple -- you're asking if I reviewed

 7  contracts by DHS?  Contracts between DHS and

 8  contractors?

 9      Q.  Yeah.

10      A.  And so I have reviewed multiple contracts

11  between Coast Guard and companies.  And Coast Guard is

12  currently under DHS, and I believe when I reviewed them

13  they were under DHS, I don't remember that

14  definitively, but those fall into that.  I've reviewed

15  a contract for the provision of Canine Protective

16  Services awarded by DHS to a contractor.  There's a

17  security one that I can't put my finger on, some

18  security services.  But there likely are others.  Those

19  are some examples.

20      Q.  Did any of those DHS contracts relate to

21  private detention services?

22      A.  I don't believe so.

23      Q.  And same question for INS.  Have you reviewed

24  contracts between INS and private contractors?

25      A.  And this is before I authored the report -- or

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   your earlier question you limited it to before I

2   authored the report.

3       Q.   Let's go with ever, since it will be a more

4   inclusive answer.

5       A.   Ever.   Yes.   So I've reviewed a 2002 contract,

6   a contract awarded July 2002 that was, I believe, by

7   INS to CSC.

8       Q.   What is CSC?

9       A.   Correction -- I don't remember.   I believe the

10  first C was correction.   I don't want to speculate.

11      Q.   Okay.   Can you tell me what that contract

12  related to, what types of services, products?

13      A.   So that was the one that I referred to earlier

14  that may have been the first in the series on this

15  matter -- that's vague.   Let me restate that.   That may

16  have been the first contract at the Northwest Detention

17  Center.

18      Q.   Okay.

19      A.   From July of 2015.

20      Q.   So turning to your summary of opinions, the

21  opinions you're offering in this case.   I just want to

22  walk through and make sure I understand what your

23  opinions are.   So at page 3 you say the solicitation

24  process for contract HSCEDM-15-D-00015 and the

25  resulting contract are typical of Government

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   procurements."  Is that your opinion today?

2       A.  It is my opinion, yes.

3       Q.  And what other government procurement are you

4   comparing this solicitation process to?

5       A.  It's -- so over the course of my career, 33

6   years, I've kind of developed a body of knowledge of

7   the process by which the federal government, and, to a

8   lesser extent, state governments and some foreign

9   governments procure goods and services.  And that's

10  part of what I teach at George Washington University,

11  and what I teach for the National Contract Management

12  Association and the ABA and some others.  That's --

13  when I say the solicitation process here it's typical,

14  I'm referring to that it's typical of U.S. government

15  contracts for goods and services of this nature.

16      Q.  So if I wanted to test that theory and compare

17  against other contracts, what contracts would I compare

18  it against?

19              MR. DONOHUE:  Object to the form.

20      A.  Of fixed-price contracts.  I mean, there are

21  different categories -- there is sealed bid, fixed

22  price, and there's cost plus and commercial item.  And

23  this is very kind of typical of a FAR 15, federal

24  acquisition regulation 15, a contract that is kind of a

25  solicitation process that is executed in accordance

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   with FAR 15.

2       Q.  So am I understanding correctly that what you

3   are saying is that it followed FAR 15; therefore, it

4   was typical?

5               MR. DONOHUE:  Object to the form.

6       A.  It's hard for me to summarize it quite like

7   that.  When I look at the cover sheet, that's a typical

8   cover sheet, government form.  When I look at the CLIN

9   structure and how that's organized, that's typical.

10  When I look at the performance work statement, that is

11  typical.  When I look at the clauses incorporated by

12  reference from the FAR, that's a typical list for this

13  type of procurement.  When I look at the other

14  documents referenced, all those things considered, you

15  just look at it and it's kind of like it's typical.  I

16  knew there would be a listing of clauses incorporated

17  by reference, and I knew what some of those clauses

18  would be.  And it proved to be true.  And I thought I

19  had a good guess at what the billing provisions would

20  be, and when I checked the billing provisions, that's

21  the way they were.  So I'm trying to give you a flavor

22  about why I think it's typical.

23      Q.  Okay.  So I think you referred to, was it a

24  fixed cost?  Was that what you said about what type of

25  contract this is?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1         A.   Yes.

2         Q.   So what type of contract is the GEO-ICE

3    contract?  And let's pause for a moment.  When we're

4    referring to the contract, can we agree that we are

5    referring to the 2015 GEO-ICE contract referred to in

6    your report?

7         A.   Yes.

8         Q.   Just for clarity of the record.  Okay.  So

9    what type of contract is that in your experience?

10        A.   Well, I think I would like to distinguish

11   maybe four different types.  There's kind of a

12   commercial item contract, there is a sealed bid

13   contract, a FAR 15 contract, and then a cost plus

14   contract.

15        Q.   Okay.

16        A.   This is fairly typical of a FAR 15 fixed-price

17   contract.

18        Q.   And why is that?

19             MR. DONOHUE:   Object to the form.

20        Q.   I'll restate.  Why is the GEO-ICE contract

21   typical of a FAR 15 fixed-price contract?

22        A.   Well -- and I think I kind of answered that

23   when I spoke earlier.  It's been -- and I'll just say

24   it's more than the contract, it's the -- the contract

25   resulted from the solicitation process, and the entire

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  solicitation process is typical in my experience of a

2  FAR 15 fixed-price contract.

3      Q.  Okay.  So let's focus on the fixed price part

4  of that.  What does "fixed price" mean?

5      A.  By way of example, if you wanted to remodel

6  your kitchen and you had drawings and you took the

7  drawings to three different contractors and asked them

8  to give you a price, a bid price, to remodel your

9  kitchen in accordance with those drawings, that's a

10  fixed-price contract.  Another way of doing remodeling

11  your kitchen is to do it on a time-and-material basis,

12  T&M.  And that would be you just have to hire a

13  carpenter and say, I will direct your work, and you

14  will bill me, and for every hour you work I will pay

15  you $20 an hour.  And for all of your materials I will

16  reimburse all of -- you give me the receipts and I will

17  reimburse you for the cost of the materials and then

18  I'll pay you for your $20 per hour for every hour you

19  work.

20          And a third type would be a cost

21  reimbursement, and that's where you ask the carpenter

22  what are their costs, even his own labor cost, not a

23  rate of $20 per hour but his cost.  And then you pay

24  him his cost.  And then he has to demonstrate to you

25  what his costs are, and his costs would include his

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   insurance, his insurance for working, his personal
 2   health insurance and things like that.  His car, what's
 3   the depreciation on his car that he uses to, say, drive
 4   to and from the site.  What have his tools cost, that
 5   sort of thing.  So in those three you have cost
 6   reimbursement was last one, time and material, and
 7   fixed price.  And this is pretty typical of a fixed
 8   price.
 9                  MR. DONOHUE:  Can we take a break?
10                  MR. POLOZOLA:  Sure.
11                          [A brief recess was taken.]
12       Q.  [By Mr. Polozola] Okay.  So I want to continue
13   on with just your summary of opinions here.  And I
14   think on page 3 you say "There appears to have been no
15   ambiguity between ICE and GEO about the Voluntary Work
16   Program, the payment to program participants, and GEO's
17   reimbursement for those payments, which is detailed in
18   CLIN 0003 Detainee Voluntary Wages."  Is that your
19   opinion today?
20       A.  It is.
21       Q.  On the payment to detainees aspect of that
22   sentence, what do you believe is unambiguous?
23       A.  That they were to receive -- that it was to be
24   a passthrough cost and that they were to receive a
25   dollar a day -- a dollar a shift.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.  And on that second issue of a dollar a shift,
2  is it your position that the contract requires GEO to
3  pay them a dollar per shift?
4              MR. DONOHUE:  Object to the form.
5      A.  Based on, like, the standards and practices in
6  my work in the federal procurement, I think people
7  would interpret that or would operationalize that as
8  that is what they needed to do is pay them a dollar a
9  day -- a dollar a shift, a dollar a day.
10     Q.  Okay.  What standards are you referring to?
11     A.  Well, let me -- I mean, I could refer to the
12  Nash and Ciminic Good Administration of Government
13  Contracts, I could refer to the Contract Pricing
14  Reference Guides by the Defense Acquisition University,
15  could refer to the Formation of Government Contracts by
16  Nash and Ciminic, and various other treatises that kind
17  of form my opinions, the body of knowledge that I
18  developed.  But based on that, that's how a contractor
19  would and should operationalize the contract.
20     Q.  So I just want to understand clearly.  This is
21  how you interpret the contract?
22              MR. DONOHUE:  Object to the form.
23     A.  I'm at page 1, the third paragraph.  I'll just
24  say, I have not been asked to and do not express an
25  opinion on the proper interpretation of regulations

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   such as the FAR and the HSAR.  "Based on my," at this

2   point, over 33 "years of working on government contract

3   matters and teaching the practical application of FAR,

4   I am knowledgeable about the procurement,

5   subcontracting and accounting processes and procedures

6   of companies with government contracts.  Based on my

7   work with hundreds of clients over many years,

8   including numerous cases involving procurement

9   practices by prime contractors and acquiring goods and

10  services as well as the procurement practices of the

11  federal government, I have extensive experience in

12  assessing the appropriate practices for purchasing

13  goods and services and the administration of government

14  contracts."

15         So I'm addressing practices and I'm addressing

16  the standards based on review of many, many contracts

17  and solicitations and assisting companies in the

18  administration of government contracts.  And I think

19  I've answered your question.

20       Q.   Okay.  So I'm going to refer back to page 3,

21  and this is under the heading "Summary of opinions,"

22  and it's the portion we reviewed a bit earlier, there

23  appears to have been no ambiguity between ICE and GEO

24  about the Voluntary Work Program, the payment to

25  program participants, detainees, and GEO's

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  reimbursement for those payments, which is detailed in

 2  CLIN 003, Detainee Volunteer Wages."  And my question

 3  was, are you offering an interpretation of the

 4  contract?

 5       A.  No.

 6               MR. DONOHUE:  Object to the form, asked

 7  and answered.

 8       Q.  Are you offering any opinions on whether ICE

 9  believed this contract to be ambiguous or unambiguous?

10               MR. DONOHUE:  Could you restate that

11  question, please.

12       Q.  Are you offer any opinions as to whether ICE

13  believed the contract to be ambiguous or unambiguous?

14               MR. DONOHUE:  Object to the form.

15       A.  I'll say based on my 33 years of experience

16  that ICE behaved as if there was no ambiguity.  They

17  behaved as if the actions of GEO were what was

18  intended.

19       Q.  Did you speak with anyone from ICE?

20       A.  I did not.

21       Q.  So then continuing on through your summary of

22  opinions here, you referred to GEO's expected rate of

23  reimbursement for the $1-a-day payments as reflecting

24  passthrough costs, and you note that they were not

25  marked up to include indirect cost, profit, or the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  added cost of administering the VWP.  And you go on and
 2  say, "GEO's invoice submission, and ICE's evaluation
 3  and payment processes, are typical of other billing,
 4  evaluation, audit, and payment practices I have
 5  evaluated during the course of my career."  Is that
 6  your opinion today?
 7       A.  It is.
 8       Q.  And what other practices are you comparing the
 9  ICE-GEO process to?
10       A.  Well, okay.  I'll just take this in turn.  The
11  bills, the invoices, I've reviewed hundreds, certainly
12  thousands of invoices from government contractors to
13  agencies of the federal government.  And this, the
14  invoices here, the way they are structured are typical
15  of matters like this with a CLIN structure such as we
16  have here.  The evaluation process and the audit
17  process -- the audit process is typical in that ICE --
18  I mean, the multiple bodies auditing the contractor's
19  compliance with the contract from ICE to the quality,
20  the surveillance, quality assurance surveillance plan,
21  whatever that is addressed later to OSHA, to internal
22  audits, to the state health agencies, et cetera.  The
23  audit is overseen here, the audit environment here is
24  typical for a contract of this nature.  And the payment
25  practices are typical.  And I'm basing that on the body
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  of knowledge I've developed with regard to payment

2  practices by federal government agencies.

3       Q.  Okay.  And we'll move on.  I think we're on

4  page 4 now.  You state at the end of the first

5  paragraph, "it therefore does not appear that GEO's

6  performance on the contract was deficient."  And as I

7  understand it, it's your opinion that it was not

8  deficient because ICE did not pursue remedies or

9  sanctions or termination of the contract in any way

10 based on GEO's performance.

11               MR. DONOHUE:  Object to the form.

12      Q.  Am I understanding that correctly?

13      A.  It's not limited to what you said, but that's

14 part of it.

15      Q.  Okay.  Can you explain the summary here so I

16 can understand what your opinion is on this?

17      A.  Certainly.

18               MR. DONOHUE:  Object to the form.

19      A.  Well, from the beginning to the end -- and

20 I'll expand on that.  From the beginning to the end

21 they appear to be in lockstep and in congruence on what

22 was to happen.  And I'll say that from the beginning,

23 ICE circulated a solicitation that had certain

24 requirements.  And GEO submitted a proposal to ICE

25 which mirrored those requirements, saying they would


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  provide the types of services with regard to the

2  voluntary work program that ICE had communicated in its

3  solicitation.  GEO then developed procedures and a

4  program to implement the voluntary work program, and

5  the COR, contracting officer representative, approved

6  of that.

7          And as time went on, there were minor

8  adjustments.  As for any working relationship, there

9  are things that came up that had not been foreseen.

10 And the parties were able to, between GEO and ICE and

11 the ICE COR, they were able to work through those in

12 that matter that appears to have been, and the record

13 indicates, were satisfactory to the ICE COR.  That in

14 addition to the various remedies from adjustment of an

15 invoice, reduction of an invoice from GEO to ICE, ICE

16 could have reduced an invoice as some kind of penalty.

17 And that was never done.  And there were no cure

18 notices, there was no negative CPARs.  All that leads

19 me to believe that GEO's performance on the contract

20 was not deficient.

21     Q.  So aside from the opinions we just discussed

22 in summary form, are there other opinions you intend to

23 offer in this case?

24              MR. DONOHUE:  Object to the form.

25     A.  And I have a hard time answering that type of

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   question.  I don't know if I will testify at trial, I
 2   don't know what I will be asked if I do testify at
 3   trial.  So if I testify at trial and you ask me some
 4   question that's not in the four corners of this report,
 5   I will answer it.
 6        Q.  Sure.  I'm not asking whether you will answer
 7   my questions at trial.  I'm thinking in terms of
 8   buckets here.  We just discussed four major issues that
 9   you offered opinions on.  Are there any other issues
10   that you intend to offer testimony on that we have not
11   discussed?
12             MR. DONOHUE:  Object to the form.
13        A.  Well, I'll say that -- I mean, my summary of
14   opinions, which starts on page 3 and 4, that's still a
15   summary of my opinions.
16        Q.  Is that complete?  Is that summary of opinions
17   complete?
18        A.  I believe it is.
19        Q.  Okay.
20        A.  I mean, I'll just say, if we go into some area
21   that is not here and you ask my opinion, if I have an
22   opinion, I will give it.
23        Q.  Okay.  So are you offering any opinions on
24   whether GEO violated Washington's Minimum Wage Act?
25        A.  I am not.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.  Are you offering any opinions about whether

 2  GEO was unjustly enriched as alleged by Washington in

 3  this case?

 4      A.  I have formed no opinions related to that.

 5      Q.  Are you offering any opinions about whether

 6  GEO is obligated to comply with Washington's Minimum

 7  Wage Act?

 8              MR. DONOHUE:  Object to the form.

 9      A.  I have formed no opinions related to that.

10      Q.  Are you offering any opinions about whether

11  the ICE-GEO contract prevents GEO from complying with

12  Washington's Minimum Wage Act?

13              MR. DONOHUE:  Object to the form.

14      A.  I have formed no opinions related to that.

15      Q.  Okay.  Now we get to the fun part.

16      [Exhibit No. 198 was marked for identification.]

17              MR. DONOHUE:  That hasn't been marked

18  previously?

19              MR. POLOZOLA:  I think it has, but the

20  reason I'm providing it is because as identified in the

21  report, there's a Bates range.  So I want to give a

22  fresh, clean copy.

23              MR. DONOHUE:  The Bates range is

24  GEO-State 036825 through 037027.

25              MS. BRENNEKE:  What was the Bates range?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1                   MR. DONOHUE:   036825 to 037027.

 2                   MS. BRENNEKE:   Can we unmark it and use

 3      Exhibit 129 instead?   Because they're exactly the same.

 4      Is that okay?   He can still look at that one.

 5                   MR. POLOZOLA:   Sure.

 6          Q.   [By Mr. Polozola] This is Exhibit 129

 7      [handing].   Do you recognize this document?

 8          A.   Yes, I do.

 9          Q.   And what is this document?

10          A.   It's a contract between ICE and the GEO Group,

11      and the effective date is September 28, 2015.

12          Q.   Is this the document you reviewed for purposes

13      of your report?

14          A.   Yes.

15          Q.   And who signed this contract for GEO?

16          A.   Amber Martin.

17          Q.   Have you ever spoken with Amber Martin?

18          A.   I have not.

19          Q.   Who signed the contract for the government?

20          A.   Roberta Halls.

21          Q.   Have you ever spoken with Ms. Halls?

22          A.   I have not.

23          Q.   What's the time period for this contract?

24          A.   Well, if all options are exercised, it would

25      go from September 28, 2015, to September 27, 2025.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.   So it's a ten-year contract if all options are

 2   exercised?

 3        A.   If all options are exercised, yes.

 4        Q.   What's the total value of the contract?

 5                  MR. DONOHUE:   Object to the form.

 6        A.   I would have to go by option year to add that

 7   up, if you are assuming the ten-year period.

 8        Q.   Can we turn to -- do you see the Bates range

 9   on the bottom?

10        A.   I do.

11        Q.   So if you go to 035886.

12        A.   Mine starts at 036.

13        Q.   036886, I'm sorry.  My fault -- 866.  Do you

14   see the last line under the "supplies and services"

15   column?

16        A.   I do.

17        Q.   So is that -- I'll just read it.  "The total

18   amount of award, $700,292,089.08," is that -- in your

19   understanding is that the full value of this 2015

20   GEO-ICE contract?

21                  MR. DONOHUE:   Object to the form.

22        A.   I wouldn't interpret it as that.  I think you

23   read the words correctly.  It also refers to box 15G of

24   the cover, which it lists 0, and there are so many

25   assumptions -- well, I wouldn't interpret that as
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  the -- what did you refer to it as?

 2       Q.   The value of the award.

 3       A.   Yeah.  I might say it's something like the

 4  estimated value of the award or something like that.

 5  When newspaper articles write about this sort of thing,

 6  that's what they might say.

 7       Q.   Okay.  So when you say the "estimated value"

 8  of the award --

 9       A.   Estimated maximum value.

10       Q.   Okay.  So estimated maximum -- are you

11  suggesting that there is the possibility that GEO would

12  be paid less than this amount on this contract, even if

13  all of the option years are exercised?

14                 MR. DONOHUE:   Object to the form.

15       A.   Yes, I am suggesting that.

16       Q.   And why is that the case?

17       A.   Because there are -- well, many possible

18  reasons.  Some include contract modifications.  There

19  are changed orders, there are deductive change orders

20  and additive change orders.  And so deductive change

21  orders is a way that it could be less.  There's partial

22  terminations for convenience that terminate part of it.

23  Over such a long period of time, it's not uncommon for

24  the parties to monitor the contract multiple times.

25       Q.   Is it typical that contract values go down in

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  value over time?

2      A.  It's certainly the case that not all options

3  are awarded in many instances.

4      Q.  So you mentioned contract modifications.  Are

5  you aware of whether there have been modifications to

6  this contract?

7      A.  I don't remember seeing that in the documents

8  I've reviewed.  I find it hard -- there have to have

9  been with a contract of this size and complexity over

10 this time period.

11     Q.  So the modifications are part of the contract,

12 though, once they are made; is that correct?

13              MR. DONOHUE:  Object to the form.

14     A.  That's the typical way of thinking of it, yes.

15     Q.  And so going back to the first page here, I

16 would like to understand what documents make up a

17 contract or an award.  So if you could just walk me

18 through.  There are these boxes, 17 and 18, towards the

19 bottom.  In your experience, what component documents

20 make up an award or contract?

21              MR. DONOHUE:  Are you asking about this

22 contract?

23              MR. POLOZOLA:  Well, I'm asking in his

24 experience generally.  But I am curious about this one.

25     Q.  [By Mr. Polozola] So let's start with your

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  experience, and then I want to understand this one in

2  particular.

3      A.  So is your question what documents are

4  typically a part of a contract?

5      Q.  Uh-huh.

6              MR. DONOHUE:  Object to the form.

7      A.  Well, there's typically something similar to

8  this first 42 pages, which is, I think of it as the

9  CLIN structure.  That is typically the first thing.

10 There is typically a description of the specification

11 or what is to be required.  There is typically a

12 performance work statement or a scope of work.  There

13 are typically a list of clauses incorporated by

14 reference as well as some special clauses, sometimes

15 called "H clauses" because they start with the letter

16 H, that are written uniquely for the particular

17 contract.  So they're not just a copy of a clause from

18 the FAR or the HSAR, but they are a special clause.

19 There are often, then, references to different

20 regulations outside of the FAR and HSAR that the

21 contractor is required to adhere to or make reference

22 to.

23     Q.  Okay.  So let's turn to the first page of the

24 contract, which you are looking at now.  So in box 18

25 just above the signature by Roberta J. Halls, there is


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  a portion of that box that says "award."  And then the

2  last sentence says "Award consummates the contract

3  which consists of the following documents, (a) the

4  Government's solicitation and your offer, and (b), this

5  award contract."  So I guess my question is the

6  solicitation, is that considered part of the contract

7  in your experience?

8      A.  It often is, not always, but it often is.

9      Q.  So in this case do you understand this to mean

10  that the government solicitation is part of the

11  contract?

12      A.  And I'll just reread that sentence.  "This

13  award consummates the contract which consists of the

14  following document:  (a) the Government's solicitation

15  and your offer, and (b) this award/contract."  And so

16  you're asking if I think a typical -- in the industry,

17  people would typically anticipate that the solicitation

18  was part of the contract?

19      Q.  And that's correct.

20              MR. DONOHUE:  Object to the form.

21      A.  In my opinion that's what the standards and

22  practices would say, yes.

23      Q.  So this is not out of the ordinary?

24      A.  This is not out of the ordinary.  I don't want

25  to say that the solicitation is always part of the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1   contract, but it is common.

 2       Q.  And in this case it appears, likewise, that

 3   GEO's offer is part of this contract?

 4       A.  Yes.

 5              MR. DONOHUE:  Object to the form.

 6       Q.  Okay.  So we were discussing earlier the firm

 7   fixed-price contract, and I just want to turn back to

 8   that for a moment.  Why does the government use firm

 9   fixed-price contract structures?

10              MR. DONOHUE:  Object to the form.

11       A.  Well, it's a -- you often think of it in terms

12   of the ends of a spectrum, with cost reimbursement

13   contracting at one end of the spectrum and a fixed

14   price being at the other end of the spectrum.  And FAR

15   16 -- well, and kind of the standards in the industry

16   are that if the scope of work can be adequately

17   defined, then it should be a fixed-price contract.  And

18   if the scope of work is too vague to well define, then

19   it should not be a fixed-price contract; it should be a

20   T&M or cost reimbursement contract.  So this -- because

21   the scope of work could be adequately well defined, the

22   contracting officer, which would be typical in a

23   circumstance like this, the contracting officer decided

24   the solicitation should be on a fixed-price basis.

25       Q.  So under a fixed-price contract, does the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  contractor bear the risk if costs increase or does the

2  government bear that risk?

3              MR. DONOHUE:  Object to the form.

4      A.  In general, the risk of a cost increase is

5  more on the contractor than the government, but it's

6  not exclusively on the contractor.  Often the

7  parties -- there are things that are outside of the

8  scope of work or so different than the scope work.  So

9  if the government -- an example that's often bantered

10  around, if the government is buying Jeeps and then it

11  says, I want a Jeep with a fifth wheel, that's outside

12  of the scope of the contract, and they mod the contract

13  to address that cost because the contractors can say,

14  Well, no, what you've asked for is outside of my

15  general scope.

16      Q.  So under this contract between GEO and ICE, is

17  it structured in a way such that GEO is guaranteed a

18  certain amount of profit?

19      A.  I don't believe so.

20      Q.  So is the next step from that if certain costs

21  increase, generally speaking that cuts into GEO's

22  profit, or is it the case that they are reimbursed for

23  increases in costs?

24              MR. DONOHUE:  Object to the form.

25      A.  And that's because of the explanation I just


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    gave about mods to the contract.  It's hard to say in

2    generality.  If there's an area where the contractor

3    estimated what it was going to cost and put that in

4    their price, and then they just missed the estimate, it

5    was not a good estimate.  And there was no change in

6    scope, everything was as planned, then they generally

7    would not get increased cost; they'd get a mod to

8    increase what they're paid.  But if it's outside of

9    their control, more often they would get a mod.

10        Q.  So can we turn to the second page, which I

11   think you called the CLIN structure; is that accurate?

12   Is that how you refer to this?

13        A.  That is how I refer to this.  I mean, it's

14   just a continuation sheet, technically, of this form,

15   but it's where the CLIN structure starts.

16        Q.  Okay.  So what does the CLIN 0001, what does

17   that encompass generally?

18        A.  Well, it's for the base period September 28,

19   2015, through September 27, 2016.  CLIN 00001 just says

20   "detention services IAW," which stands for in

21   accordance with, "the performance work statement."  And

22   its estimate says "estimated 1,575 bed days."

23        Q.  So below that where it says CLIN 0001A, is

24   that part of CLIN 1?

25        A.  Yes.  That's referred to as, like, a subCLIN

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  or a subpart of CLIN 1.

2       Q.  Okay.  So I certainly don't need you to read

3  each one, we both have it in front of us.  But I just

4  want to understand generally what is encompassed in

5  each subclin for CLIN1.

6                  MR. DONOHUE:  Object to the form.

7       A.  Well, okay.  So 0001A is for -- the contractor

8  GEO will be paid a certain minimum amount, and that is

9  based on, they estimate, 1,181 beds each day.  And so

10 if you multiply 1,181 beds times 366 days, that's for

11 that year, then you get 423,246.  And so you would

12 multiply that number of bed days by the unit price that

13 was developed in GEO's proposal, the unit price for a

14 bed day of $115.63, and you get a number.  Now, they

15 made a mistake.  They transposed a digit when they went

16 from column B to column C.  You'll see that in CLIN 1A,

17 1,181 times 366 yields 423,246, and what they've got

18 under "quantity" is not that number, but it's 432,246.

19 So they transposed a few digits.  But they multiplied

20 the incorrect number by the unit price to get the

21 amount of $49,980,604.98 for the amount for CLIN 1A for

22 the base year.

23      Q.  So the unit price, $115.63, is that what would

24 be referred to as the "bed day rate?"

25      A.  Yes.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          Q.  What is the bed day rate?  Not what is the

2    number, but how would you define?

3          A.  Right.  Well, it is GEO's proposed price for

4    bed days.  And GEO submitted its pricing sheets and its

5    final proposal revision showing how it built up its

6    cost and profit for the CLIN 1A and came to 115.63 in

7    its final proposal revision.  And if memory serves,

8    GEO's final proposal revision includes for CLIN 1A

9    $115.63 for a bed day, and ICE accepted that offer, and

10   that's how it gets to this form.

11         Q.  Okay.  So moving on generally to CLIN 2,

12   because I'm sure we will be back to this topic, but --

13              MR. DONOHUE:  Can we do lunch before

14   CLIN 2?

15              MR. POLOZOLA:  CLIN 2 will be very fast.

16              MR. DONOHUE:  It's okay with me.

17         Q.  So for CLIN 2, can you just describe generally

18   what falls into that category of line items?

19         A.  Well, it's transportation services in

20   accordance with the performance work statement.  And

21   there are subCLINS under CLIN 2.  So there is a 2A, 2B,

22   2C, 2D, 2E, 2F, so several subCLINs.  And it's for

23   transportation services.

24         Q.  Okay.

25              MR.POLOZOLA:  We can take a break.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

GREG BINGHAM; May 23, 2019                                      68

1              [Deposition recessed at 12:31 p.m. to be

2    reconvened at 1:30 p.m.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                      AFTERNOON SESSION

 2                         1:28 P.M.

 3                         --oOo--

 4

 5                   EXAMINATION RESUMED

 6    BY MR. POLOZOLA:

 7        Q.  So picking up from where we were, I think we

 8    were discussing the CLIN structure.  We went through

 9    CLIN 1 which we discussed payment using a bed day rate,

10    which is a fully burdened rate; is that correct?

11                    MR. DONOHUE:  Object to the form.

12        A.  I wouldn't use the term "fully burdened" with

13    respect to that.  It is the price per day, and I'm

14    looking at CLIN 1A where it's like a bed day costs

15    115.63.  So that is the price.  And the reason I'm

16    making that is there is cost and price and this is a

17    price.  This is what GEO is charging ICE for a bed day,

18    and the price that ICE has accepted for a bed day,

19    subject to all the rest of the terms and conditions.

20        Q.  Do you have an understanding of what the

21    phrase "fully burdened" refers to?

22        A.  I do.

23        Q.  What is your understanding of that term?

24        A.  That's kind of an informal term, but when

25    developing a price, a typical process is to look at all
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  kinds of different direct costs and then add indirect

2  costs and then add to that profit or subtract from that

3  loss.  So direct costs are if you're building a Jeep,

4  it's the peoples' hands on the assembly line putting

5  the Jeep together.  Indirect costs are like the HR

6  department or the fringe benefits we talked about

7  earlier, or the home office building, the rent on the

8  home office building, those are all indirect costs that

9  are allocated out to all the direct costs in some form.

10        And so fully burdened, although it is an

11  informal term that's not -- people use it differently

12  sometimes.  But typically it means it's the direct cost

13  plus all the different categories of indirect cost have

14  been added.

15     Q.  And under the CLIN 1 line item, does that unit

16  price reflect a fully burdened cost as you understand

17  that term?

18             MR. DONOHUE:  Object to the form.  Asked

19  and answered.

20     A.  It reflects a price.

21     Q.  Right.  So included -- let me just pause for a

22  second.  That price was developed in the proposal,

23  correct, in GEO's proposal to ICE?

24     A.  Yes.

25     Q.  In coming up with that number, did GEO account

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   for its indirect costs, its direct costs?

2        A.  And I don't remember the number 115.63,

3   although it may well be in GEO's final proposal

4   revision.  But there is a spreadsheet in GEO's final

5   proposal revision where they do the type of cost plus

6   profit buildup that I described earlier.  And if we

7   were to go look at that and under CLIN 1A, it may well

8   have developed down to the 115.36; but I don't remember

9   if that's the number there.

10       Q.  And so we also discussed the CLIN 2

11  transportation services.  That was just before our

12  break.  And so turning to CLIN 3.

13       A.  If we could pause a moment on transportation

14  services.

15       Q.  Sure.

16       A.  [Witness reviews page.]  Well, because we were

17  just talking about cost and price, I will just add,

18  since we're in transportation services, so CLIN 2A

19  refers to a fixed flat rate for 18 vehicles.  And so

20  that fixed flat rate is $328,712 a month.  And that's

21  different than CLIN 2B, which is the estimated fuel

22  cost for vehicles.  So that's the fuel cost, and that

23  is -- it's got an estimated monthly cost of $25,000.

24  And the point being that's a situation where they just

25  submit their receipts for fuel and they get their cost

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   reimbursed; not burdens, but just what they paid at the
2   service station for the fuel, that's what they get
3   reimbursed.  Whereas 2A, in the earlier CLINs, were
4   more reflective of a price which is -- which GEO likely
5   used a cost buildup plus profit to get to that price.
6        Q.  Okay.  Thank you.  So looking at 2B when
7   you're drawing the distinction between price and cost.
8   If the cost goes above this not-to-exceed amount, can
9   GEO be reimbursed for those costs?
10                  MR. DONOHUE:  Object to the form.
11       A.  If GEO and ICE come to an agreement on being
12  reimbursed for those costs, then yes, they can.
13       Q.  And if GEO and ICE do not come to an agreement
14  on being reimbursed for those costs, what happens?
15       A.  Well, and there's a sentence here, the third
16  sentence under 2B says "this is a not to exceed of
17  $300,000."  And that is typically -- the contract
18  administration personnel typically view that as a
19  ceiling unless they get approval for higher.
20       Q.  So back to the question, which is, if GEO,
21  let's say the cost of fuel spikes and if they spend
22  more than $300,000 in a given year, do they eat that
23  cost or do they get reimbursed for that cost?
24                  MR. DONOHUE:  Object to the form.
25       A.  That's not -- I can't give a yes/no -- I can't

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  give one or the other.  It depends.  They would work

2  with the COR and with ICE, and they may get an increase

3  and they may not.

4      Q.  Well, so let's take it to that next step then.

5  Let's say they ask and ICE says no.  What happens then?

6              MR. DONOHUE:  Object to the form.

7      A.  And lots of things could happen, and I can

8  give you my speculation of what could happen.  But what

9  happened here I don't know.

10     Q.  Sure.  We're speaking in hypotheticals based

11  on your knowledge of how the industry operates,

12  correct?

13     A.  Yes.

14     Q.  So what is typical in this situation if a

15  contractor exceeds a not-to-exceed cost in the

16  contract?

17             MR. DONOHUE:  Object to the form.

18     A.  For something like fuel cost, it's typical for

19  the government to increase, to say I understand it was

20  only an estimate in the first place and I will increase

21  your funding.

22     Q.  Okay.  So going to CLIN 3, can you explain to

23  me what services are encompassed under that line item?

24     A.  Well, this is ICE requiring GEO to have a

25  voluntary work program.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.  This line item requires GEO to have a

2   voluntary work program; is that your statement?

3               MR. DONOHUE:  Object to the form.

4      A.  This is how -- this is addressing payment, and

5   so this is -- other places the requirement -- well,

6   here and other places is the requirement for the

7   voluntary work program.  And this is how GEO is to bill

8   ICE and how GEO is to pay detainees.

9      Q.  Okay.  So on that point is it accurate to say

10  that CLIN 3 addresses the rate at which ICE must

11  reimburse GEO for payments made to detainees who

12  participate in the voluntary work program?

13     A.  It is both the rate at which ICE will

14  reimburse GEO and GEO will pay the detainees.  It's

15  both.

16     Q.  So I just want to understand.  So yes to the

17  question, but there is something additional, which is,

18  if I am understanding what you're saying, it's your

19  position that this sets forth a requirement that GEO

20  pay detainees $1 a day; is that accurate?

21               MR. DONOHUE:  Object to the form.

22     A.  That is accurate.

23     Q.  Where in line item 3 does it state that GEO is

24  required to pay detainees $1 a day?

25     A.  The second sentence "Reimbursement for this

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  line item will be at the actual cost of $1 per day per

2  detainee.

3      Q.  And you understand that to mean that GEO is

4  required to pay $1 per day?

5      A.  This is about payment terms primarily, and we

6  can go to other places in the contract for more context

7  on this, but they are saying that GEO's actual cost

8  will be $1 per day per detainee.

9      Q.  Okay.  So I just want a clear, it's a yes or

10 no question.  Is it your position that this line item

11 requires GEO to pay only $1 per day to detainees

12 participating in the voluntary work program?

13             MR. DONOHUE:  Object to the form.

14     A.  In my opinion that requirement is throughout

15 this document and others, but here is part of the

16 story.  And part of the story is saying that it's the

17 actual cost.  They're saying your actual cost will be a

18 dollar per day.

19     Q.  Okay.  So where else in the contract -- you've

20 referred to other places.  Where else in the contract

21 does it state that GEO is required to pay detainees in

22 the voluntary work program $1 per day?

23     A.  Well, if we go to the paragraph related to the

24 voluntary work program, that's one place.

25     Q.  Which paragraph are you referring to?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   It's in the solicitation, PDF page 78.
 2        Q.   Is there a Bates number on the bottom of that
 3   page?
 4        A.   There likely is but I don't know the Bates
 5   number.
 6        Q.   Okay.
 7            [Exhibit No. 198 was marked for identification.]
 8        Q.   And to help you out here, the document I just
 9   provided you starts with Bates number GEO-State 040430
10   and continues on through 040660.  And I'll note that
11   this is the document identified in your appendix 3 as
12   document 3 solicitation.  That's the full Bates range
13   that you cited in your report.  Is that the
14   solicitation you were referring to a moment ago?
15        A.   It appears to be.  Can you restate the
16   question.
17        Q.   That question I asked you was what portion of
18   the contract says that GEO is required to pay detainees
19   only $1 per day, and you referred to a paragraph on the
20   voluntary work program from the solicitation, I
21   believe.  And I think you mentioned page 78, which
22   corresponds to the Bates number 040507.  Is that the
23   paragraph you were referring to?
24        A.   That and Bates 040433, which is CLIN 3 of the
25   solicitation.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.   Okay.  So let's take those in turn.   Starting

 2  with the paragraph at 040507, where does it state in

 3  this paragraph that GEO is required to pay detainees

 4  only $1 per day?

 5      A.   This is the directive to have and manage a

 6  detainee work program, and it does not address the

 7  amount that the detainees are to be paid.

 8      Q.   Okay.  So can we agree that this paragraph

 9  does not require GEO to pay detainees only $1 per day?

10                  MR. DONOHUE:   Object to the form.

11      A.   It does not address the payment.

12      Q.   So I just want to be clear.  If it doesn't

13  address the payment, can it require GEO to pay only a

14  dollar per day?

15                  MR. DONOHUE:   Object to the form.

16      A.   It does not address a requirement to pay any

17  amount to detainees.

18      Q.   Okay.  So turning back to 040433, which I

19  think you referred to, this appears to be CLIN 3 in

20  this solicitation.  Are there differences between this

21  CLIN 3 and the CLIN 3 in the contract that we were

22  discussing?

23      A.   I believe they're very similar if not

24  identical, but it's another evidence of a dollar per

25  day, actual cost of $1 per day per detainee.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

GREG BINGHAM; May 23, 2019                                          78

1      Q.  And where in -- if your answers will be the

2  same as the contract, feel free to let me know, but

3  I'll ask anyway.  Where in this CLIN 3 line item does

4  it say that GEO is required to pay only $1 per day to

5  detainees participating in the voluntary work program?

6      A.  Well, when it says actual cost.  In the

7  vernacular of federal procurement, we talked about cost

8  versus price, but this is saying that you will be

9  reimbursed your actual cost, meaning your cost is $1

10 per day per detainee.

11     Q.  So I want to understand that a little bit.  Is

12 there a definition of actual cost in the FAR?

13     A.  Yes.

14     Q.  Okay.  What's that definition?

15     A.  I thought I had it in a foot note to the

16 report, but I don't.  And I don't remember -- I can't

17 quote it from memory, the cost.

18     Q.  So I'm going to read from page 10 of your

19 report that says "The definition of actual costs

20 according to FAR 31.001 is 'amounts determined on the

21 basis of costs incurred, as distinguished from

22 forecasted costs.'"  Does that appear accurate, the

23 definition?

24     A.  Yeah.  With the focus in that, the more

25 relevant phrase for your question is it reads amounts

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  determined on the basis of costs incurred as

2  distinguished from forecasted cost.  And costs incurred

3  is what we're -- when you say actual cost and costs

4  incurred, they mean pretty much the same thing in the

5  context we're discussing right now.

6      Q.  Okay.  So under this definition and as used in

7  CLIN 3 of actual cost, would it be appropriate for GEO

8  to bill ICE for what it expected to spend on detainee

9  wages versus what it actually spent?

10              MR. DONOHUE:  Object to the form.

11      Q.  Do you understand the question?

12      A.  Well, you ask about billed and then you also

13  were talking about CLIN 3.  And CLIN 3 includes a

14  forecast.

15      Q.  Yeah, so let's talk about that because that's

16  really what I'm asking about.  So this number $114,975,

17  that's the amount listed for CLIN 3, correct?

18      A.  It is the amount, yes.

19      Q.  Okay.  So imagine a world in which GEO did not

20  pay that full amount to detainee workers.  Let's say it

21  spent a hundred thousand dollars.  Could GEO still bill

22  ICE $114,975?

23      A.  Typically no, not based on what the CLIN 3

24  says and not based on typical practice.  Now, I haven't

25  gone through to see if there is something that

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  supercedes that in this document, but typically no.

2      Q.  So actual cost here, it prohibits GEO from

3  billing ICE for forecasted costs, correct?

4              MR. DONOHUE:  Object to the form.

5      A.  Well, I'll say it affirmatively, actual cost

6  here means that they pass through whatever their costs

7  are, that they bill ICE what their actual costs,

8  whatever they incur, and they are to incur a dollar a

9  day per detainee and that that is what they are to bill

10 ICE.

11     Q.  Do you know how that amount, $114,975, was

12 determined?

13     A.  I've seen a bill where they -- no, I don't

14 think I have.  I think I've read reference to it.  But

15 to answer your question simply, no, I do not.

16     Q.  Under CLIN 3 that amount can be exceeded,

17 correct?

18     A.  It cannot be exceeded.

19     Q.  Could it be exceeded with approval by the

20 contracting officer?

21     A.  Within the second sentence, "Contractor shall

22 not exceed the amount shown without prior approval by

23 the contracting officer.  This is a not to exceed of

24 $114,975."  So it says that the contractor shall not

25 exceed that amount without prior approval of the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  contracting officer.

2      Q.  Right.  So am I misunderstanding that ICE

3  could give GEO permission to exceed this amount and

4  bill ICE for an amount above $114,975?

5      A.  That's my understanding, yes.

6      Q.  Are you aware of whether GEO has sought

7  permission to exceed payments under CLIN 3 from ICE?

8      A.  Definitively, no, I don't.

9      Q.  Does CLIN 3 or anywhere else in the contract

10 state that GEO is limited to paying detainees $1 per

11 day?

12             MR. DONOHUE:  Object to the form.

13     A.  CLIN 3 indicates that GEO is limited to paying

14 the detainees to $1 per day.

15     Q.  So does GEO have the option of paying

16 detainees more than $1 per day in your opinion?

17     A.  Not without -- this program is an ICE program.

18 If ICE told GEO, We want you to pay something other

19 than a dollar per day, ICE has the ability to direct

20 GEO to do that.  And under a circumstance like that, I

21 think it would be typical of GEO to follow the

22 directions given by the contracting officer or the COR.

23     Q.  So back to kind of the question that started

24 this part of our conversation.  In addition to CLIN 3

25 and the paragraph on the voluntary work program that


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   you cited from the solicitation, are there any other

2   portions of the contract that require GEO to pay only

3   $1 per day to detainees in the voluntarily work

4   program?

5             MR. DONOHUE:  Object to the form.

6        A.  I mean, the contract requires GEO to develop

7   and administer the voluntary work program.  And part of

8   that includes kind of practices, policies and

9   procedures that are approved by ICE and that include an

10  agreement with each detainee that volunteers.  And that

11  agreement indicates $1 per day.

12       Q.  So I didn't understand that last point.  Are

13  you saying that ICE requires GEO to pay only $1 per day

14  because the detainees agree to accept $1 per day?  Feel

15  free to clarify.  That's how I understand what you're

16  saying, so I want to be clear here.

17            MR. DONOHUE:  Object to the form.

18       A.  I'm saying that GEO, under ICE's direction,

19  developed various documents including a detainee

20  handbook that they would give to detainees when they

21  come.  And other policies and procedures and practices

22  include this agreement, a template of an agreement,

23  that GEO will reach with each detainee that volunteers.

24  So I'm saying because ICE agreed, approved those

25  documents, directed how those documents be developed

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  and then approved them after they were developed, that
 2  ICE has directed effectively that it be a dollar a day
 3  paid to the detainees.
 4       Q.  Okay.  So are you aware of whether GEO has
 5  ever paid detainees more than $1 a day for
 6  participation in the voluntary work program?
 7       A.  I have read about that, yes.
 8       Q.  So in that situation what happens from a
 9  billing perspective?
10               MR. DONOHUE:  Object to the form.
11       A.  When you said "in that circumstance," is that
12  what you said?
13       Q.  Sure.
14       A.  Okay.  So which circumstance?
15       Q.  When GEO has paid detainees more than $1 per
16  day for participating in the voluntary work program,
17  what's the next step from a billing perspective there?
18  I'm just trying to understand how this happens.
19               MR. DONOHUE:  Object to the form.
20       A.  Well, okay.  So I don't know -- the record was
21  not crystal clear on the circumstances.  One at least
22  involved the barber shop and there being, like,
23  different roles that could be played at the barber shop
24  so that a detainee could work a shift in one role and
25  then a shift in another role in the barber shop in the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  same day, and that that was approved by ICE, the COR,

 2  and billed as such.  So it was effectively -- I don't

 3  know if ICE suggested it to GEO or GEO proposed it to

 4  ICE, but the contracting parties agreed and it was

 5  billed that way is my understanding.

 6       Q.  And is that through an equitable adjustment or

 7  some other mechanism?

 8                 MR. DONOHUE:  Object to the form.

 9       A.  Typically you would not enter into a

10  modification to the contract or an equitable adjustment

11  for something as small as that.  Typically that would

12  be something that the parties would work out with short

13  of actual modification to the contract.  But let me be

14  clear, I don't know if they mod'd the contract over

15  that instance.

16       Q.  So kind of on the same point, back to CLIN 3

17  where it says "contractor shall not exceed the amount

18  shown without prior approval by the contracting

19  officer."  Can you walk me through typically how that

20  request goes to the contractor or to the contracting

21  officer?

22                 MR. DONOHUE:  Object to the form.

23       A.  You're asking, like, hypothetically typically?

24       Q.  Well, I'll clarify.  I'm assuming you don't

25  know in this specific case whether GEO did or did not,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  based on your prior answer.  I think you said you
 2  weren't aware whether they had, how they had done it.
 3  So yes, I'm asking typically for a request to exceed
 4  the amount shown here under the contract, kind of just
 5  mechanically what form does that take?  That's what I'm
 6  trying to figure out.
 7              MR. DONOHUE:  Object to the form.
 8       A.  Typically there are routine meetings between
 9  the COR and the contractor.  Say, for example, weekly
10  meetings.  And in those weekly meetings they might come
11  up and say, As you know, we have had more detainees
12  volunteer than we had estimated when we put together
13  the estimate of 114,975.  And in this hypothetical
14  dialogue, ICE says, Yeah, I am aware that there's been
15  more.  Well, we have a not to exceed of 114,975, and if
16  we continue to allow this many detainees to volunteer,
17  we will exceed that, says GEO.  And ICE responds, Well
18  this is an ICE program, and in my hypothetical here,
19  ICE says, Fine.  I'll mod the contract to increase that
20  ceiling.  So the ceiling is increased from 114,975 to
21  some higher number.
22       Q.  And under your scenario, if ICE says no, is
23  GEO required to continue the program and eat the cost?
24  What is their remedy there?
25              MR. DONOHUE:  Object to the form.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.  I would have to relook at the requirement, the

2  details of the requirement, if it says shall or may

3  with regard to allowing detainees to volunteer.

4      Q.  And which requirement are you thinking of?

5      A.  I think it's in the contract here, and maybe

6  it's the page that we looked at earlier.

7      Q.  Are you in the solicitation or the contract?

8  Just to clarify.

9      A.  I'm in solicitation.  Do you remember the page

10 from the contract we discussed earlier?

11     Q.  Which page are you asking about?

12     A.  It was the detainee work program, voluntary

13 work program.

14     Q.  It was page 78 of the solicitation -- or 82.

15 So it's 036906 -- I think this is what you are asking

16 about.  You can confirm.

17     A.  Well, to answer your question, I was thinking

18 in terms of whether ICE has the ability -- I'm sorry,

19 whether GEO has the ability to say no to a volunteer or

20 if they have to accept all volunteers.  I think I've

21 seen that in a document, but it's not here and -- so

22 I'm not sure I can answer your question.

23     Q.  So if you can turn in the contract GEO-State

24 to 036867.

25     A.  036867?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.   Yes.   Section C description specification

2   performance work statement.   So at the bottom of this

3   page, the last sentence, or the last paragraph rather,

4   says "The following constraints comprise the statutory

5   regulatory policy and operational considerations that

6   will impact the contractor."

7        A.   I see that.

8        Q.   So if you flip over to page 44, the last

9   sentence of that paragraph says "Constraints include

10  but are not limited to," if you go down to J), it says

11  "The ICE/DHS performance-based detention standards, a

12  copies obtainable on the ICE Internet website."   Is it

13  your understand that ICE/DHS performance-based

14  detention standards, do you understand that to be

15  what's referred to as the PBNDS?

16       A.   Yes.

17       Q.   So does the contract incorporate the PBNDS

18  that ICE establishes?

19                 MR. DONOHUE:   Object to the form.

20       A.   You asked does it incorporate it?

21       Q.   Yeah.

22       A.   I don't know if it incorporates it.

23       Q.   Is GEO required to follow the PBNDS under the

24  terms of the contract?

25                 MR. DONOHUE:   Object to the form.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    A.   In certain aspects at least.  I believe so in

2    certain aspects.

3    Q.   Okay.  So down to q), it says "Applicable

4    federal, state, and local labor laws and codes."  Do

5    you understand this provision to mean that GEO must

6    comply with applicable federal, state, and local labor

7    laws and codes?

8              MR. DONOHUE:  Object to the form.

9    A.   I'll just read it.  It says "Constraints

10   include but are not limited to."  And one of the things

11   that it includes there is item Q.

12   Q.   So is that a yes or a no?

13             MR. DONOHUE:  Object to the form.

14   A.   Applicable federal, state and local labor laws

15   and codes is included as one of the constraints of page

16   43 and 44 of the contract that impact the contractor.

17   Q.   So is this a typical list of constraints in

18   the contracts you've seen in your experience?

19   A.   Yeah.  This is a typical -- I mean, and this

20   says this makes reference to the impact of the

21   contractor.  "The contractor has become familiar with

22   all constraints affecting the work to be performed.

23   They may change over time.  Contractor is expected to

24   be knowledgeable of any changes to the constraints and

25   perform in accordance with the most current version."

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   So this is not an atypical list.

2       Q.  And for q. specifically, applicable federal,

3   state and local labor laws and codes, is that a typical

4   constraint that is included in federal contracts?

5       A.  Sometimes it will have stronger language than

6   this, but some reference to them is typical, yes.

7       Q.  So turning back to the PBNDS, under j, did you

8   review the PBNDS in preparing your report?

9       A.  I did.

10      Q.  Okay.  And which version did you review?

11      A.  I believe it was the 2011 version updated in

12  2016.

13      Q.  And had you reviewed, or have you reviewed,

14  any other versions of the PBNDS?

15      A.  I don't believe so.

16      Q.  Were you familiar with the PBNDS before you

17  provided your report in this case?

18      A.  I don't remember seeing it before.  I may have

19  in that MDI matter I mentioned, but I don't recall it.

20      Q.  Okay.  Are you aware of whether the PBNDS have

21  changed in any way during the period of the GEO-ICE

22  contract?

23      A.  And you're referring to the 2015 contract.

24  Okay.  So in the version that I saw there were some

25  red, I believe edits in red, that were intended to show

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   the updates for the 2016 update.  So if I am

2   interpreting that correctly, then those red edits would

3   have been during the performance of this contract.

4       Q.  Okay.  So I would like to understand in your

5   experience where a contract incorporates another set of

6   standards but the standards changed during the course

7   of the contract, does that mean the contractor's

8   obligations under the contract changed?

9               MR. DONOHUE:  Object to the form.

10      A.  I can't answer that as a blanket statement.  I

11  know that in significant instances they do not.  You

12  have to go to the FAR clauses incorporated by

13  reference.  You don't go to the current FAR.  You go to

14  the date of the FAR clause because it's incorporated by

15  reference and go to that earlier date in the FAR

16  clause.  For other things, it may require that it be

17  updated.  So I don't think I can answer that as a

18  blanket statement.

19      Q.  If you could also turn to in the contract

20  036876.

21      A.  I'm on that page.

22      Q.  Okay.  There is a provision under

23  "Ambiguities," the first sentence reads "All services

24  must comply with the performance work statement and all

25  applicable federal, state and local laws and

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    standards."  Is it your understanding that under the

2    terms of this contract GEO is required to comply with

3    Washington law?

4                MR. DONOHUE:  Object to the form.

5        A.  I have no opinion about Washington law in this

6    matter.  I think you did read the sentence correctly.

7        Q.  So GEO is required to comply with all

8    applicable federal, state and local laws and standards?

9                MR. DONOHUE:  Object to the form.

10       A.  It says in this sentence "All services must

11   comply with the performance work statement and all

12   applicable federal, state and local laws and

13   standards."

14       Q.  And to be clear, we are looking at part of the

15   contract, correct?

16       A.  Right.  And it further says, two sentences

17   later, "If the contractor is unable to determine which

18   standard is more stringent, the contracting officer

19   shall determine the appropriate standard."

20       Q.  So the sentence just before that says "Should

21   a conflict exist between any of these standards, the

22   most stringent shall apply."  Do you understand this

23   provision to mean that if Washington law is more

24   stringent than what is set forth in the contract, GEO

25   is required to comply with Washington law?

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1              MR. DONOHUE:  Object to the form.

 2       A.  Yeah.  I have not done that type of -- I don't

 3  really have a considered opinion on that point.  I

 4  haven't really thought through that.

 5       Q.  To your knowledge has GEO asked ICE which

 6  standard did the Washington minimum wage or the $1 per

 7  day amount apply under the terms of this contract?

 8              MR. DONOHUE:  Object to the form.

 9       A.  I don't know if GEO has asked ICE.  That was

10  your question, right?  I don't know if GEO has asked

11  ICE that.  I know that ICE has continued to pay to

12  reimburse GEO for the cost of the detainee work

13  program, the passthrough cost, and has not found any

14  compliance issues or any noncompliance with respect to

15  GEO's administration of the voluntary work program.

16       Q.  If you can turn to 036906, page 82 under the

17  PDF page numbers.

18       A.  Okay.

19       Q.  So under this section, it says "Manage a

20  Detainee Work Program," I believe.  This is what we

21  were looking at earlier.  Does this provision require

22  GEO to develop a voluntary work program at Northwest

23  Detention Center?

24       A.  Yes.

25       Q.  Does it place constraints on how GEO does

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    that?

2              MR. DONOHUE:  Object to the form.

3       A.  Throughout these five paragraphs it does have

4    some constraints, yes.

5       Q.  So the first sentence where it says "and will

6    adhere to the ICE PBNDS on voluntary work program," is

7    it your understanding that ICE requires anything

8    further in terms of its voluntary work program?  I'll

9    clarify.

10             Is your understanding that in addition or

11   aside from the PBNDS there are further constraints on

12   what GEO is required to do in its voluntary work

13   program?

14      A.  Well, in the body of this there are.  Back at

15   CLIN 3 I think there is.  Do you want me to go through

16   these?

17      Q.  Well, no.  Let me clarify and make it easier

18   for you.  I'm interested in knowing about other

19   standards.  So I can read the four paragraphs myself.

20   But are there other standards that GEO is required to

21   comply with?

22             MR. DONOHUE:  Object to the form.

23      A.  Well, I mean, for the kitchen work there are

24   detainees working in the kitchen who must comply with

25   the medical and the health standards applicable to the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  kitchen.

 2      Q.  And why is that?

 3      A.  I've seen that in -- I can't remember where

 4  I've seen that in the documents.  But if we go -- maybe

 5  it's in the pens, but I know there are standards with

 6  regard to medical and health and safety in the kitchen.

 7  And I know there are security requirements with regard

 8  to where they can work, and that those are in, I

 9  believe, in references.

10      Q.  So the last sentence of this first paragraph

11  where it says "The detainee work program shall not

12  conflict with any other requirements of the contract

13  and must comply with all applicable laws and

14  regulations."  Does this help with our discussion

15  earlier about what happens if GEO had more participants

16  and went over the amount and ICE refused to reimburse?

17  I'm just trying to give you context here because I

18  think the outcome of that discussion was we don't know

19  if they are required to operate the voluntary work

20  program or not.  Does this help clarify your thinking

21  on that issue?

22              MR. DONOHUE:  Object to the form.

23      A.  No, it doesn't.

24      Q.  So if GEO were to expend more than the

25  $114,000 amount and ICE denied a request for a higher



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  reimbursement, I think you said that you were not

2  certain if GEO would have to keep operating the work

3  program.  Would that be a conflict in terms of two

4  contractual provisions?

5              MR. DONOHUE:  Object to the form.

6      A.  I mean, it could be that the detainee work

7  program shall not conflict with the $114,000 not to

8  exceed, in which case the 114,000 not-to-exceed rules

9  in the detainee work program is managed so that it

10  doesn't conflict with that ceiling.

11      Q.  So we've mentioned a few times modifications

12  to the contract.  Can you walk me through briefly what

13  the process for obtaining a contract modification is?

14              MR. DONOHUE:  In the industry or for

15  this one?

16              MR. POLOZOLA:  To the extent they're

17  different, both.

18      A.  Well, let me take two examples, and one is

19  straightforward and the other is less so.  The first

20  example would be -- and this is general to the

21  industry, and I don't know why it would be different

22  here, but I'm talking generally.  And that is there is

23  kind of a noncontroversial mod, and it might be

24  something like the fuel cost that we talked about

25  earlier where the contractor -- fuel prices go up or

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  they need to make more trips in the vehicles than they

2  had anticipated.  And so as the fuel costs -- and so it

3  appears as if GEO is going to exceed the not-to-exceed

4  limit on fuel cost.  And GEO goes to the ICE COR and

5  the COR says, I understand.  Continue to send me your

6  receipts.  I'm going to mod the contract to increase

7  that not to exceed.  That's a noncontroversial, kind of

8  straightforward one.

9          Another one might be more of what's called a

10 constructive change, and that is often, somehow the

11 parties disagree about whether this was a change to the

12 contract.  So maybe in this circumstance ICE believes

13 that this is something covered by the statement of

14 work, by the performance of work statement that GEO is

15 obligated to perform.  And GEO believes that it is not

16 covered by the performance work statement, that it is

17 something that GEO should be compensated for.  And so

18 then in those circumstances sometimes there is a

19 request for equitable adjustment or a modification.  A

20 request for equitable adjustment is a type of a

21 modification.  And the parties negotiate -- in the

22 extremes they actually litigate over these REAs, but

23 they negotiate and come to terms on them.

24          MR. DONOHUE:  Can we take a break when

25 you get a chance?

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                  MR. POLOZOLA:  Sure.

 2                        [A brief recess was taken.]

 3      Q.  So we were discussing contract modifications

 4  before the break, and I want to follow up.  Are you

 5  aware of whether GEO has proposed modifications to this

 6  contract regarding repayment of detainee wages?

 7      A.  Am I aware if there were any?

 8      Q.  If GEO has requested a modification to the

 9  contract with regard to CLIN 3 payment of detainee

10  wages.

11      A.  I think I remember a reference to that in one

12  of the deposition transcripts.

13      Q.  What was the reference that you're thinking

14  of?

15      A.  I think Ryan Kimble made a reference to it,

16  but it could have been Bill McHatton.  I don't

17  remember.

18      Q.  So I take it based on that you don't recall

19  the outcome of that request?

20      A.  I don't recall the outcome, no.

21      Q.  Could GEO request a modification to CLIN 3 to

22  pay detainees more than $1 per day?

23                  MR. DONOHUE:  Object to the form.

24      A.  I know of no limitations on GEO to request a

25  change to the contract.  It might be denied, but I know
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   of no limitation on GEO to make the request.

2       Q.   Okay.   We're going to grab an exhibit that was

3   previously marked as Exhibit 188.

4               MR. POLOZOLA:   For the record it's

5   GEO-State 046233 [handing.]

6       A.   [Witness reviews document.]

7       Q.   [By Mr. Polozola] So you can have as much time

8   as you need, but I'll just ask, have you seen this

9   document before?

10      A.   I don't believe so.

11      Q.   And have you seen a document of this nature

12  before, not this specific one but a document like this?

13              MR. DONOHUE:   Object to the form.

14      A.   Yeah.   I've seen lots of letters like this

15  asking for a contract mod or a request for equitable

16  adjustment.

17      Q.   Okay.   So the subject line in this document is

18  "Request for equitable adjustment," and it lists the

19  contract number Northwest Detention Center.   Is this a

20  standard request for modification of the sort you were

21  discussing earlier, or is this different from what you

22  were envisioning?

23      A.   I've seen ones like this.   This is on the

24  simple side; it's straightforward.   I've seen others

25  that were much more complicated than this.   This makes

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   reference to a spreadsheet, and I don't see a

2   spreadsheet.  It makes reference, "attached is the

3   spreadsheet detailing the estimated increase associated

4   with . . ."  And then it looks like a couple of maybe

5   invoices, but -- so this may not -- there may be more

6   that was attached to the letter than is actually

7   attached here.

8        Q.  Okay.

9        A.  But that may not relate to your question.

10       Q.  That's fine.  I think you said earlier there

11  are noncontroversial and controversial requests for

12  modification.  Is this a noncontroversial modification

13  based on your experience?

14       A.  It is simple and easy to check the math and

15  check the contract to see if you agree that they should

16  get an increase or should not get an increase.  So this

17  would be -- my initial reaction is this would be

18  noncontroversial.  I'm not saying it would be awarded

19  but it would be noncontroversial.

20       Q.  So are you aware of whether this modification

21  was awarded?  I suspect I know the answer but I'll ask

22  anyway.

23       A.  I don't know if it was awarded.

24       Q.  So if you can briefly turn back to the

25  solicitation, Exhibit 198.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   Any particular page?

 2        Q.   Just the front page.  So do you see where it

 3   says in box 4, type of solicitation, sealed bid,

 4   negotiated (RFP)?

 5        A.   I do.

 6        Q.   What's the difference between a sealed bid and

 7   a negotiated RFP?

 8        A.   Well, there are a lot of differences.  Let me

 9   keep it at a somewhat high level.  In the example I

10   gave earlier about you getting your kitchen remodeled

11   and you take the drawings to three different

12   construction contractors, if you take them and say, I

13   just want you to give me a price in a sealed envelope,

14   just give me an envelope with a number on it, that's

15   your bid.  That would be a sealed bid type, and that's

16   in FAR 14.

17             The negotiated RFP is more what would happen

18   here where, in the example of having your kitchen

19   redone, you say to them, No, come back to me with your

20   full estimate.  I want to see a spreadsheet of how much

21   you plan to incur for lumber and how much you plan to

22   spend for the sink and how much you plan to spend for

23   each and every item.  And I'm going to add all that up

24   and then -- so they respond with that type of

25   information, and you negotiate on that type of
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    information.  You might say back to them, Oh, you're

2    spending a thousand dollars for the sink, and I think

3    you can get it for a better price, for $800.  And you

4    might say, You've got down 100 labor hours and I think

5    you're going to need 120 labor hours, so it's okay to

6    increase that.  And you make that kind of knit, if you

7    will.  That kind of very detailed negotiation happens,

8    and it includes profit.  And you might say, You've got

9    down here 15 percent profit, and I think you should do

10   it for some lower profit rate, or something like that.

11           But the sealed bid was very simple.  A sealed

12   bid, you think about a sealed envelope here with a

13   number on it.  That's all you get.  Does that make

14   sense?

15       Q.  I think so.  Sounds like negotiated means it's

16   negotiated.

17       A.  I'll just add with a lot of detailed cost

18   information.  So you can negotiate direct labor,

19   indirect labor, you can negotiate profit, you can

20   negotiate labor hours, you can negotiate material

21   costs, fuel costs.  You can negotiate lots of different

22   details.

23       Q.  Okay.  Are there limitations on what you can

24   negotiate?

25                   MR. DONOHUE:  Object to the form.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1      A.   That's kind of broad, but I'll take a stab at
 2 it.   I mean, the parties have to come to terms.   So if
 3 they negotiate and they don't come to terms, that's a
 4 limitation.   So if you want a contract with this party
 5 and they find some term that you're proposing
 6 unacceptable, well, that's a limitation.   Hope that
 7 answers your question.
 8      Q.   Okay.   So in a negotiated RFP, what is the
 9 contractor or the proposed contractor required to
10 submit in its proposal?   Just to help me understand at
11 a high level.
12      A.   Well, I mean, and typically there is, like,
13 three volumes or three things that must be addressed,
14 and that's technical, cost, and past performance.   And
15 the technical is a narrative explaining the
16 qualifications of the company to do the work, why
17 they're a good company and their approach to solving a
18 problem, and that's where the contractor demonstrates
19 that they know how to do this work and that they are
20 reliable and that sort of thing.   And then the cost is
21 what I referred to earlier, it's the final proposal
22 revision, it's a spreadsheet with a lot of tabs and
23 it's got all this cost built up.   So by CLIN 1 you can
24 see how many hours the estimated number of trips that
25 the fuel cost is based on and then estimated number of
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  hours.  Typically the estimated number of detainee --

2  some kind of estimate for the detainee shifts that will

3  be worked.

4        So I covered technical, cost, and then past

5  performance, where you -- things like the CPAR's

6  rating, that's contractor performance assessment

7  report, I think.  And it's when a government, like on

8  this contract, the subject contract, if ICE was not

9  satisfied with GEO's performance, ICE could enter a

10  negative CPAR rating on GEO, and then GEO would have a

11  harder time getting the next contract or any contract

12  with the government.  Because a government buyer, when

13  they are interested in the past performance of GEO,

14  they would look up their CPAR rating and say, Oh, it's

15  negative.  ICE had a negative experience with them.

16  And so they have a harder time getting other contracts.

17  So that's kind of the three categories that go into

18  that.  The parties then negotiate based on that.

19      Q.  So in the volume 3, I think you said past

20  performance.  But is a contractor to submit a cost and

21  price proposal?

22      A.  I mean, they're required to respond to the

23  solicitation, and the solicitation typically requires

24  cost, price, and past performance.

25      Q.  And did GEO submit those three things in this

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   case?

2       A.  They definitely submitted technical, you know,

3   the narrative, and cost.  I don't remember seeing the

4   past performance.  And maybe it just wasn't in the

5   documents or maybe I missed it in my review because it

6   wasn't so relevant to me.

7       Q.  So I'm looking at your report on page 5, the

8   last paragraph here.  And you state when discussing the

9   competitive bidding process, "A significant amount of

10  information relating to historical costs, basis of

11  estimates, and forecasted costs may be requested and

12  disclosed either as part of a proposal or during the

13  Government's proposal evaluation process."  I want to

14  understand in this case, are you aware of whether

15  historical costs were requested, were provided?

16      A.  It would be atypical in a case like this,

17  well, somewhat atypical, for ICE to ask for

18  historical -- strike that.  I don't know if historical

19  costs were provided.

20      Q.  So I believe you said earlier you reviewed a

21  spreadsheet with pricing information in it.  So that is

22  document 229681, and this was cited in your appendix 3

23  under item number 4 as part of the GEO final proposal

24  revision.

25      A.  If you say so.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1          Q.  You're free to confirm.   It's appendix 3.

 2                    MR. DONOHUE:  Are you marking this?

 3                    MR. POLOZOLA:  Yes.  Good call.

 4          [Exhibit No. 199 was marked for identification.]

 5                    MR. DONOHUE:  So for the record this is

 6     Exhibit 199, a binder labeled State of Washington

 7     versus The GEO Group Inc., and it has on the cover page

 8     GEO-state 229681 and marked confidential.  And the

 9     binder has several tabs of information.

10                    MR. FREE:  Is there a Bates range?

11                    MR. POLOZOLA:  It was printed natively

12     so the Bates number is the cover page.

13          A.  This had to be a huge challenge to print.

14     This is the type of thing that is much easier to review

15     on a computer screen where you can expand it or extract

16     it or move the cell around.

17          Q.  [By Mr. Polozola] We at least gave you large

18     pieces of paper.

19          A.  Yes.  And I'm not complaining.  I'm just

20     saying that people often don't print them because they

21     are so hard to print.  There is also information in the

22     cells that we can't see here.  I mean, there are

23     formulas in a lot of these cells, most of these cells,

24     and we can't see them in this, but in Excel you can see

25     those.  Your questions may not go to those formulas.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.  So just as a starting point, is this the

2  document that you were referring to where you said you

3  reviewed an Excel file?

4      A.  It appears to be.

5      Q.  Okay.  Is this information that was provided

6  as part of GEO's proposal to ICE?

7      A.  You said it was in my appendix.  Do you

8  remember is this the fourth item in my appendix?

9      Q.  I believe so.  This is the Bates number,

10  229681.

11      A.  Got it.  So it's my understanding that GEO

12  submitted a proposal in response to the solicitation.

13  And time passed, and there was likely negotiations that

14  went back and forth between the parties, the ENs, which

15  is an information exchange between ICE and the

16  offerers, the bidders.  And then after that happened,

17  GEO submitted a final proposal revision, and that this

18  was part of that final proposal revision is my

19  understanding.

20      Q.  Okay.  Did you review all of those documents?

21      A.  No, I did not.

22      Q.  Is there a reason that you did not review

23  those documents?

24      A.  The initial proposal or each iteration?

25      Q.  Each iteration involved.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.  I didn't see the necessity.

2      Q.  Okay.  And why do you believe they were not

3  necessary?

4      A.  Well, we could go back to what I expressed

5  opinions on early in my report, if you'd like.  But I

6  didn't see it as necessary for the analysis, what I was

7  investigating.

8      Q.  So how do you know they were not necessary if

9  you didn't review them?

10     A.  Well, the highest level expression of what I

11  was retained for is on page 1, first paragraph, second

12  sentence.  "Kenrich was retained to perform an

13  independent and objective analysis of the Government

14  contracts that are the subject of the dispute -- GEO's

15  Federal Government contracts for a detention facility

16  in support of US Immigration and Customs Enforcement

17  (ICE) Seattle Field Office."  That makes reference to

18  the contracts.  And the issues related to the contracts

19  primarily relate to the amount to be paid primarily --

20  partially relate to the amount to be paid under the

21  voluntary work program.  And that is covered in the

22  contract and the solicitation.  And for that reason, I

23  didn't feel like the proposals were where it was

24  necessary for me to see every iteration of the

25  proposals.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.  But if I'm correct, you do cite the final

2   proposal; is that correct?

3        A.  I do, yes.

4        Q.  So turning back to this set of spreadsheets,

5   if you can flip to what would be the first foldout

6   spreadsheet here, the next half for you.

7        A.  So I think it's the tab titled "2-10-year

8   budget."

9        Q.  Okay.  So I just want to understand, because

10  as cited in your appendix, it cites this whole range of

11  information.  So are you familiar with this

12  spreadsheet?

13       A.  I'm somewhat familiar with this spreadsheet.

14  I mean, I did review it; I didn't review it in super

15  detail, but I did review it.

16       Q.  Okay.  So can you summarize at a high level

17  what's reflected in the spreadsheet?

18       A.  Well, the title of this is:  The GEO Group

19  Inc., Tacoma, Washington, 1,575 beds for ICE Northwest

20  Detention Center.  And then it has a series of columns

21  repeating, and the columns are in groups of three.  So

22  the first three columns relate to CLIN 1A and 1B -- I'm

23  sorry, the first two sets of three relate to CLINs 1A

24  and 1B -- no, I take that back.  The first three sets

25  are CLIN 1A and 1B.  Then the second set are 1001A and

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  1001B.  Then the third set are CLINs 2001A and 2001B.

2  So it goes by year.  So the first three sets are year

3  one, which is CLIN 0001A and 0001B.  Then the second

4  set of three relates to year two, which is CLINS 1001A

5  and 1001B, and so on and so forth.  And it goes on to

6  the second page to get all the way out to CLIN 9001A

7  and 9001B, which is year ten.  So those are how the

8  columns are set up.

9          Down the left side of the page are different

10  cost categories.  And the first half of the page

11  roughly is labor cost, so it shows non-wage

12  determination salaries and it's got various categories

13  under that and a total.  And then it's got wage

14  determination salaries, various categories under that

15  and the total.  And then you sum the two together to

16  get the total labor cost.  And for example, for year

17  one under CLIN 0001A, the total labor cost is

18  $20,768,377.

19          Then the next major category is operational

20  expenses, and there's 15 or so categories there, rows,

21  and the total operational expenses sum to 23,183,841

22  for CLIN 0001A, which is year one.  Then it sums the

23  labor plus the total operational expenses to get a new

24  total operational expenses of 43,952,218.  And then it

25  adds depreciation, then it has another subtotal, total

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  expenses with depreciation.  Then it adds G&A/OH

2  allocation, and that stands for general and

3  administrative expense and overhead allocation.  And

4  then it has another subtotal of all the previous cost

5  categories including the G&A and overhead allocation.

6         Then it adds profit of ten percent and then it

7  has a total with profit.  And then it has another row

8  for cost of capital, but it's always zero, so it's just

9  part of their form that they add cost of capital.  But

10 here they don't have a place for cost of capital -- I

11 mean, they don't have a dollar amount for it; it's just

12 always zero.  Then it appears that they divide the

13 total cost plus profit they've come to, which is

14 49,913,401 for CLIN 0001A.  They divide that, I

15 believe, by 1,575 beds, or maybe it's 1,575 beds times

16 366.  They do that division to get, I believe, 115.63.

17 And I have not checked the math on that.  I'm kind of

18 assuming.  So I believe that's the way this works, but

19 the formulas -- if I just had the spreadsheet I could

20 show you.

21    Q.  I understand.  So are you aware of whether

22 these numbers are derived from historical figures?

23    A.  They typically are estimated using a

24 combination of historical and current information as

25 well as forecasts of future -- what is expected to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   happen in the future.

2       Q.   And is there a formula underlying this somehow

3   in terms of historical and forecasts and current, is

4   one more valuable than the other in putting together a

5   proposal of this nature?

6               MR. DONOHUE:   Object to the form.

7       A.   It's hard to say that one is -- there are

8   formulas in these cells, but I think you're asking a

9   more general question of how much do you use historical

10  versus how much do you use current versus how much do

11  you use a forecast, and that's a judgment call.  The

12  estimating people that put this together typically are

13  quite skilled in making those judgments, and I don't

14  know -- with the information I have here, I don't know

15  how much they favored or how important they thought

16  historical information was versus current -- like this

17  wage determination and the wage rates, that's all based

18  on current and forecasted future information.  The

19  labor hours may be based in some part on historical

20  information.  But how much, I don't know.

21      Q.   So did the solicitation in this case require

22  the provision of historical information for Northwest

23  Detention -- financial information for Northwest

24  Detention Center?

25      A.   I don't know.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1     Q.   Just trying to understand where these numbers

2  come from.   And it sounds to me like it's up to GEO who

3  puts this proposal together to propose whatever numbers

4  they want to come up with.

5     A.   Well, I mean, I haven't studied the

6  solicitation with respect to the question you're

7  asking.   I can say something typical but I would have

8  to go to the solicitation or the proposal to verify it.

9     Q.   So what would be typical that you're thinking

10  of?

11     A.   Yeah, that they would submit what's called

12  cost or pricing data.   And so then they would submit

13  historical cost information -- historical cost and

14  labor and lots of historical information.

15     Q.   And why is this amount of information provided

16  in a proposal?

17     A.   So that the parties can negotiate.   Let's say

18  ICE has a cost analyst that works for ICE, and they

19  look at CLIN 1A, like ten rows or so from the top, it's

20  got health insurance amount for CLIN 1A of 170,100.

21  And so there might be a cost analyst with ICE who can

22  say, Oh, no, that's way too high, or that's way too

23  low.   They have information on what the health

24  insurance should cost.   And they can negotiate.   Then

25  the cost analyst from ICE could go to GEO and say, Hey,

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   you're proposing way too much for health insurance.

2   Here is my data on health insurance.  It should be a

3   much smaller number.  It's that why do they provide --

4   I'm answering your question, why do they provide so

5   much detail.  It's so they can have that kind of

6   detailed negotiation.

7        Q.  So it's important to the negotiation process?

8        A.  Yes.

9        Q.  So down to row 72, the profit line that you

10  mentioned.  Is it common in a government services

11  contract to have a negotiated profit margin?

12       A.  Yes.

13       Q.  And how is that number determined?

14       A.  Well, there is a section of the FAR, it's

15  15.404-4, on profit.  And it's pages long and it's

16  direction to the contracting officer on how to

17  determine the profit rate.  And then the HSAR also has,

18  I believe, more information specific to ICE on how to

19  develop profit information.  And then there's many

20  different philosophies in the negotiating strategies on

21  what is the right profit range.

22       Q.  So is the negotiated profit rate in the

23  ICE-GEO contract ten percent?

24       A.  It's not ten percent across the board.

25  There's no profit added to the CLIN 3, for example.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   There's no profit added to fuel, to the vehicle fuel.

2   There is no -- there may be other categories where

3   there is no profit added.  I mean, you could go through

4   these spreadsheets and figure out which ones add profit

5   and which ones do not.

6        Q.   Sure.  So on the ten percent number, is that

7   an industry standard number for these CLINs, CLINs 1A

8   and 1B, identified here?

9              MR. DONOHUE:   Object to the form.

10       A.   It is not an industry standard number.

11       Q.   So for each -- well, there is non-wage

12   determination salaries, wage determination salaries,

13   and operational expenses, correct?

14       A.   Yes.

15       Q.   So these are expenses that GEO expects to

16   incur in providing services under the contract?

17       A.   That is correct.

18       Q.   So once the contract is agreed upon or

19   awarded, if those costs go up, does GEO, for lack of a

20   better term, eat that cost under the contract?

21             MR. DONOHUE:   Object to the form.

22       A.   I can't give a yes or no.  It depends.

23       Q.   How does it depend?

24       A.   It depends a lot on the reason for the cost to

25   increase, and it maybe gets back to the modification

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    and changes.

2        Q.  So in effect, if the expense were to go up,

3    they could request a modification and potentially be

4    reimbursed for the higher expenses, or ICE could say

5    no, correct?

6              MR. DONOHUE:  Object to the form.

7        A.  Yeah.  It relates more to the reason for the

8    cost increase.  And if the reason for the cost increase

9    was ICE telling GEO, We want you to provide some

10   service that was not covered in the contract, then ICE

11   is going to more often than not say yes, I agree to

12   your cost increase.  If it is a bid error where, let's

13   say, there was a formula problem in here and some cost

14   category was not included in the 49,981,409 at the

15   bottom, so because of a math error it just wasn't

16   included there, and then GEO's cost came in, you know,

17   in accordance with these numbers but higher than the

18   49,981,409, they likely would not get a price increase

19   from ICE.  So I'm just giving you a couple of examples

20   as to why it's hard to say in a vacuum, so to speak,

21   whether they would recover on the cost increase.

22       Q.  So now on the flip side of this question.  If

23   GEO's expenses are lower than those identified in this

24   proposal, does GEO get to keep the benefit of having a

25   lower expense?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    A.  It depends.  If the lower expense was related

2  to a deductive change order, a partial termination,

3  something like that, then they typically would not get

4  to keep that savings.  But if it's like the parties

5  agreed -- let's say the parties negotiated to the

6  numbers on this page, so the parties agreed that this

7  is a reasonable estimate, then they kind of log in the

8  sand and move forward.  And then barring some major

9  change, they live by those prices.  And if the

10  contractor has lower costs, they get the benefit; if

11  the contractor has higher cost, they have less profit.

12  But you can't say it's always that case.  It's just if

13  there are significant changes, what I just said is not

14  true.  You can go through the change order process.

15    Q.  Okay.  So with regard to this proposal, if GEO

16  makes more than ten percent profit with no change

17  orders or significant circumstances, is it under any

18  obligation to notify the government that it's making a

19  higher profit margin than was proposed in the contract?

20    A.  I haven't studied that part of the contract to

21  know.

22    Q.  Well, in terms of what is typical in the

23  field, is a contractor under any obligation to inform

24  the government that it has a higher profit margin than

25  was proposed in the contract?

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              MR. DONOHUE:  Object to the form.

 2       A.   Typically in a fixed-price contract the

 3  parties don't report their cost history after award --

 4  their cost or profit history.  Now, that's different

 5  here for the passthrough costs, such as the voluntary

 6  work program and the vehicle fuel; those you're

 7  reporting your cost and you're getting reimbursed your

 8  cost, but no markups.  So that's the exception to that.

 9  But for other things, barring significant changes, they

10  don't exchange cost information after the award.  Often

11  change orders are a significant event and then you

12  exchange cost information at that point.

13       Q.   So just to clarify, when you were discussing

14  absent significant circumstances, a contract

15  modification would be required, correct, to change the

16  party's obligations in terms of what is owed to GEO?

17              MR. DONOHUE:  Object to the form.

18       Q.   I understand it's kind of a longwinded

19  question.  But I'm trying to understand when you are

20  referring to absent significant circumstances, in a

21  situation where there are significant circumstances is

22  a contract modification required to change the party's

23  obligation?

24              MR. DONOHUE:  Object to the form.

25       A.   I need to hear it again.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1            [The question was read back by the reporter.]
 2       Q.   I can ask it more directly if you would like.
 3       A.   Yes.
 4       Q.   Okay.  Do the parties have to live with the
 5  terms of the contract absent the contract modification?
 6                 MR. DONOHUE:   Object to the form.
 7       A.   Both parties can change the contract.  And I'm
 8  not talking about just a formal change, like a mod to
 9  the contract, the paper document.  The government, ICE,
10  can impose changes on the contractor, and sometimes
11  they don't realize they're doing it.  They just
12  misinterpret or they interpret the contract differently
13  as to thinking that the contractor has to do something,
14  that this is included in their scope of work, and the
15  contractor disagrees.  And so the government in that
16  instance just barrels ahead saying you must do XYZ.
17  And the contractor typically has to continue performing
18  and then ask for this equitable adjustment.
19            So you're talking about -- and there's also
20  force majeure, just changes outside the control of the
21  parties.  So I don't have a succinct answer yes or no
22  to that.  I mean, if both parties -- often both parties
23  don't live precisely to the contract.  They require
24  things, ask for things, influence to get things that
25  are not precisely in the contract, but they are not
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  important enough for the parties to go through the mod

2  process.

3        Q.   So going back to the beginning of this

4  solicitation process here.  In your report you have a

5  sentence that refers to individual contractors not

6  having the discretion to propose on some solicitation

7  requirements while declining to propose on others?

8        A.   Which page are you on?

9        Q.   I believe it's page 7.

10       A.   Yes, page 7 in the paragraph after 11.

11       Q.   So is it the case that contractors -- that

12 solicitations are kind of a take-it-or-leave-it

13 process?  Is that what you're suggesting here?

14       A.   Just that it's more or less -- more or less,

15 yes.  It's rare, especially when you have a series of

16 contracts like this.  It's rare to -- if the contractor

17 ignores or doesn't -- if the contractor ignores some

18 part of the solicitation, they are deemed nonresponsive

19 is often the case.

20       Q.   Okay.  So GEO can propose different prices for

21 the requested services, though, correct?

22       A.   I mean, there are -- in the solicitation where

23 ICE is asking for what's your price, yes, they can put

24 in that price.  In the solicitation where ICE says this

25 is the price, if they came back with a different price,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  I think that would be a -- they would be nonresponsive.

 2  If they proposed something different than they were

 3  directed to propose, that would be nonresponsive -- I

 4  mean typically.

 5      Q.  Okay.  So for CLIN 3 is the implication of

 6  your answer that GEO was unable to propose a different

 7  amount than what was identified in the solicitation?

 8                  MR. DONOHUE:  Object to the form.

 9      A.  The typical process would be if GEO-- to say

10  something different than the solicitation said with

11  regard to CLIN 3 would be nonresponsive.  And so

12  typically they would be omitted from the bidding at

13  that point, or there would be some maybe had such a

14  blatant error, ICE would say, Hey, you made a mistake.

15  You want to resubmit.

16                  MR. POLOZOLA:  I need a quick break.

17                          [A brief recess was taken.]

18      Q.  [By Mr. Polozola] So we've discussed a few

19  times today the PBNDS.  And I think we discussed this

20  earlier, but I want to make sure.  Is it your

21  understanding that GEO is required to comply with the

22  PBNDS under the terms of the contract?

23                  MR. DONOHUE:  Object to the form.

24      A.  I would need to look back at that.

25      Q.  You're looking at the contract?


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.   Yes, I am.   I mean, the more precise statement

2 is in the contract, page 82, which is GEO-State 036906

3 under: Manage a Detainee Work Program. "Detainee labor

4 shall be used in accordance with the detainee work plan

5 developed by the Contractor and will adhere to the ICE

6 PBNDS on Voluntary Work Program."  So that's more

7 narrow than what you said, but I think that's the

8 relevant statement.

9      Q.   Okay.   Just reading your report here, just so

10 we are clear.   On page 8 of your report, you quote the

11 final proposal revision as saying "The NWDC will

12 develop a comprehensive volunteer detainee work program

13 which complies with PBNDS 2011."  Did I read that

14 incorrectly?

15      A.   You did not read it incorrectly.

16      Q.   Okay.   So what are the PBNDS?

17      A.   Well, it's the ICE document.   Stands for the

18 performance-based national detention standard.   And it

19 has a section on voluntary work programs as well as

20 many other sections.   It was -- the relevant version

21 was authored in 2011, I believe, and then updated in

22 2016 and has the updates shown in the document.

23      Q.   I'm going to hand you a document cited in your

24 appendix 3 as document 8, which is a copy of the PBNDS

25 that you relied upon to my understanding.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              [Exhibit No. 200 was marked for identification.]
 2                   MR. FREE:  Do you have the Bates range?
 3                   MR. POLOZOLA:  Yes.  It's GEO-State
 4      000001 through 3, then it skips to GEO-State 000385
 5      through 389.
 6                   MR. DONOHUE:  Do you have another copy
 7      of that?
 8                   MR. POLOZOLA:  Yes [handing].
 9                   MS. BRENNEKE:  I was going to say, PBNDS
10      2011 has been introduced as an exhibit before, but not
11      in the exact same format, so that's why we're
12      redesignating it.
13          Q.  [By Mr. Polozola] Yeah.  To be clear, these
14      are the Bates pages that were identified in appendix 3
15      of your report, Mr. Bingham, which is why we're
16      providing them in this format.  Are you familiar this
17      document?
18          A.  I am, yes.
19          Q.  You reviewed this document in preparing your
20      report?
21          A.  I did.
22          Q.  So if I can direct your attention to Bates no.
23      000385, is this the section of the PBNDS on the
24      voluntary work program?
25          A.  It is, yes.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.   And under section 2, does number 5 state
2   "Detainee work conditions shall comply with all
3   applicable federal, state and local work safety laws
4   and regulations?"
5        A.   It does.
6        Q.   So does this require GEO to comply with all
7   applicable federal, state and local work safety laws
8   and regulations under the terms of the contract?
9             MR. DONOHUE:   Object to the form.
10       A.   Do you want me to interpret this?
11       Q.   Well, I'm asking if under the contract, which
12  I believe you said in your report GEO must comply with
13  the PBNDS 2011?
14       A.   With respect to the voluntary work program.
15       Q.   Okay.  So now we are in that section of the
16  PBNDS 2011, correct?
17       A.   Yes, we are.
18       Q.   So is GEO required to make sure that detainee
19  working conditions comply with all applicable federal,
20  state and local safety laws and regulations?
21       A.   It appears yes.  That's a fair reading of
22  this.
23       Q.   Okay.  So we move on to Bates no. 000387.
24       A.   I'm on that page.
25       Q.   Do you see the section K on compensation?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.  I do.

2      Q.  What compensation is required under that

3  section for detainees in the voluntary work program?

4              MR. DONOHUE:  Object to the form.

5      A.  The second paragraph reads "The compensation

6  is at least $1 USD per day.  The facility shall have an

7  established system that ensures detainees receive the

8  pay owed them before being transferred or released.

9      Q.  So under this provision of the PBNDS could GEO

10  pay detainees more than $1 per day for participation in

11  the voluntary work program?

12              MR. DONOHUE:  Object to the form.

13      A.  Well, I mean, this is an ICE program.  So if

14  GEO asked for -- if ICE directed GEO to pay something

15  different than a dollar per day then GEO could do that

16  in accordance with the contract if the contract -- if

17  they got that direction from ICE.

18      Q.  Would GEO need direction from ICE to ask for

19  that?

20              MR. DONOHUE:  Object to the form.

21      A.  Yes.

22      Q.  So GEO could not go to ICE and ask to pay

23  detainees more than $1 per day?  Am I understanding

24  that correctly?

25      A.  Oh, I think GEO, if it wanted to, could go to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   ICE and say, I would like you to mod CLIN 3 to say

2   something different than CLIN 3 currently says.

3       Q.  Would that be consistent with this provision

4   of the PBNDS?

5                   MR. DONOHUE:  Object to the form.

6       A.  Well, I just said that they could go to ICE

7   and say, we would like to modify CLIN 3 in any -- and

8   I'm just directing in any way -- to increase the price,

9   to reduce its actual cost.  To increase the actual

10  cost, reduce the actual cost, they could ask for any --

11  I don't know why they would, but you're asking is it

12  theoretically possible?  It is theoretically possible.

13      Q.  So could GEO pay detainees more than $1 per

14  day under the PBNDS 2011?

15                  MR. DONOHUE:  Object to the form.

16      A.  I don't think they could under the contract.

17      Q.  That wasn't my question.  I'm referring to

18  this section on compensation that we just reviewed.

19  Does this limit GEO to paying detainees $1 per day?

20      A.  I think the contract limits them to paying

21  them the actual cost of $1 per day.  This says at least

22  $1.

23      Q.  Okay.  And can we agree that "at least $1"

24  means that you could pay more than $1 under this

25  section of the PBNDS?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1                MR. DONOHUE:  Object to the form.

2      A.  This says at least a dollar, but the contract

3  says actual cost of a dollar, exactly a dollar.  I

4  added the word "exactly," but it says "actual cost of

5  $1."

6      Q.  So you're not offering any opinion in this

7  case that the PBNDS requires payment of only $1 to

8  detainees in the VWP, correct?

9      A.  I don't think it governs on the payment of --

10  CLIN 3 governs my opinion on the passthrough cost, the

11  actual cost that shall be paid to the detainees and

12  reimbursed by ICE.

13     Q.  And why doesn't this govern in your view?

14                MR. DONOHUE:  Object to the form.

15     A.  Well, I mean, CLIN 3 is very clear that it's

16  exactly a dollar.  This can be a dollar or more.  So

17  how do you interpret the contract, and you're asking

18  for contract interpretation of questions -- I'm giving

19  that, even though I said in my report, for my purposes

20  in my report I did not provide contract interpretation.

21  But I'm doing it now.  The way to interpret those

22  consistently would be exactly $1.  That comports with

23  CLIN 33 and it comports with PBNDS.

24     Q.  So back to the contract modification topic we

25  discussed a bit earlier.  Could GEO as you understand

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    it obtain a contract modification to pay detainees more

2    than $1 per day for participation in the VWP and be

3    consistent with the PBNDS?

4                    MR. DONOHUE:  Could you read that back.

5    I'm sorry.

6              [The question was read back by the reporter.]

7                    MR. DONOHUE:  Object to the form.

8        Q.  Do you understand the question?

9        A.  I think that I do.  I mean, I think we talked

10   about this.  I think it's kind of asked and answered,

11   although I'll answer it.  The contractor can ask to mod

12   the contract where there's a request to mod any aspect

13   of the contract.  I can't think of an aspect of the

14   contract that the contractor cannot request a mod.

15   Now, would the contractor get the mod?  Would it be in

16   the best interest of the contractor or the government

17   or anybody else to mod?  That's a different question.

18   But can they request to mod the contract?  Yes, they

19   can.

20       Q.  We discussed earlier whether GEO was required

21   to pay only a dollar a day, and I think we have covered

22   that ground.  And correct me if I'm wrong that it's

23   your position that GEO is required under the contract

24   to pay only $1 per day to detainees in the VWP,

25   correct?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       A.  I'll just add to pay their actual cost of $1

2   per day, yes.

3       Q.  So does GEO have the option of paying more

4   than $1 per day?

5               MR. DONOHUE:  Object to the form.

6       A.  Well, not in accordance with the contract.  I

7   mean, can a company break the law, can a company breach

8   the contract?  Yeah, they could breach the contract and

9   do something different than the contract, and until

10  they were caught they could pay more.  So I'm saying

11  out in Never Never Land, so to speak, it is impossible,

12  but not in accordance with the contract.

13      Q.  So are you saying that it would be a breach of

14  the contract to pay more than $1 a day to detainees in

15  the VWP?

16      A.  Yes.

17      Q.  For GEO to pay the detainees.  I'm not talking

18  about GEO submitting reimbursement to ICE for more than

19  $1 a day.

20              MR. DONOHUE:  Object to the form.

21      A.  It would not be in accordance with the

22  contract.  I think -- I mean, if breach means not in

23  accordance, I think breach is the right term.

24      Q.  So I just want to understand this point about

25  GEO's ability to pay more to detainees -- a bit more if

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   you'll indulge me.  So I understand that GEO can only

2   be reimbursed for actual cost is your opinion,

3   correct -- with regard to the detainee work program

4   wages?

5        A.  I'll go further and say they can only be

6   reimbursed actual cost of $1 per day per detainee.

7        Q.  So if the federal court in this case orders

8   GEO to pay detainees $12 or more per hour instead of $1

9   a day and GEO complies with that order, would GEO be in

10  violation of the ICE-GEO contract?

11                 MR. DONOHUE:  Object to the form.

12       A.  I have no -- you're asking a question about

13  federal law versus a contract, and that would not be in

14  accordance with the contract.  But would it be -- would

15  it somehow override?  I think you're asking -- I don't

16  have a considered opinion on that.

17       Q.  Okay.  I'm not asking you to reach a legal

18  conclusion, to be clear.  But it's to this whole series

19  of questions of can GEO pay detainees more.  And the

20  followup here is if they are told by a court to pay

21  more, am I understanding you that it would not be in

22  accordance with the terms of the contract; is that your

23  testimony?

24                 MR. DONOHUE:  Object to the form.

25       A.  That is what I said, but I also said I have

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  not thought about that, and that sounds complicated.
 2  And I don't have a considered opinion on that.  What
 3  I'm struggling with is who wins there, the federal
 4  judge or the contract, you know, ICE or -- I mean,
 5  you've got the executive branch versus the judicial
 6  branch, I'm sure that's -- well . . .
 7        Q.  Fair to dsy that's not your domain?
 8        A.  That's not my domain.
 9           [Exhibit No. 201 was marked for identification.]
10        Q.  So I've handed you what's been marked as
11  Exhibit 201.
12              MR. POLOZOLA:  And I'll state for the
13  record that this is a copy of the GEO Group's responses
14  to Washington's second set of requests for admissions.
15        Q.  [By Mr. Polozola] And because you are not a
16  lawyer, I can give you a brief explanation of what this
17  document is.  The state has asked GEO to admit to
18  certain facts, and GEO provided written responses.
19  Have you reviewed this document before?
20        A.  I have not.
21        Q.  Have you discussed this document with anyone
22  before?
23        A.  I don't know the content of this document.  I
24  may have discussed some of the content, I don't know.
25  But I haven't discussed this document.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.  And so directing your attention to RFA 67 and
 2    I'll find you the page.
 3                MR. DONOHUE:  Page 21.
 4                MR. POLOZOLA:  Thank you.
 5        Q.  [By Mr. Polozola] So the request for admission
 6    no. 67 says, "Please admit that GEO has the option to
 7    pay more than $1 a day to detainee workers for work
 8    performed in the VWP at the NWDC."  And the response is
 9    "Admit."  Is your testimony consistent with GEO's
10    position in this case --
11                MR. DONOHUE:  Object to the form.
12        Q.  -- as stated in RFP 67?
13        A.  What I said is not consistent with RFA 67.
14        Q.  Does this modify or cause you to want --
15    excuse me.  Having viewed this, does this modify any of
16    the opinions you hold in this case?
17        A.  No.
18        Q.  Okay.  So looking at page 10 of your report
19    here, second full paragraph, where you're discussing
20    passthrough costs.  And there are two sentences here
21    about costs associated with administering the voluntary
22    work program.  So the last sentence here says "All
23    costs GEO expected to incur in administering the
24    Voluntary Work Program had to be factored into the
25    fixed prices included in the CLINs."
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      A.   Where are you again?   In the second full
 2  paragraph?
 3      Q.   Last sentence of the second full paragraph.
 4      A.   Okay.  I see that.
 5      Q.   So what costs, as you understand it, is GEO
 6  expected to incur in administering the VWP aside from
 7  detainee wages?
 8      A.   So the cost of administration of the
 9  voluntarily work program would include things like the
10  people who have to classify, have to accept
11  applications from the detainees, determine -- well,
12  enter into the agreement with the detainees with regard
13  to the work, the scope, which includes that they will
14  be paid a dollar a day, and then maintaining a list of
15  who has volunteered in what areas.  And then as
16  openings become available, keeping track of that so
17  they can add them to that area or get them to work in
18  that area.  Dealing with someone, a detainee who is
19  scheduled to work and who leaves during the shift or
20  leaves just before the shift says I don't want to work,
21  then reacting to that and getting the next person on
22  the list into that slot to work that day, those are all
23  administration costs, as well as tracking the shifts
24  worked by the detainees in the different areas and then
25  invoicing those and then adding to the detainee

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  accounts, electronic accounts, the amounts that they
 2  get, the dollar a day that they get, adding those.
 3  Those are all necessary work, as well as whoever does
 4  all those things have fringe benefits.  They have their
 5  salaries, they have their fringe benefits, they have
 6  some amount of overhead, they have office space -- a
 7  computer, they have to use office space -- all those
 8  types of things have costs as well.  So those are the
 9  types of costs I had in mind when I was talking about
10  this administrating of the voluntary work program.
11      Q.  Okay.  And which line item?  Since we've been
12  discussing line items today, where are those costs
13  reflected in the line item portion of the contract?
14      A.  And you're thinking about the binder we looked
15  at in the final proposal revision?
16      Q.  No.  Let's pause, but thank you for the
17  clarification.  I'm actually thinking about the
18  contract itself where you have CLIN 1, CLIN 2, CLIN 3.
19  Where are those costs encapsulated in the contract?
20      A.  Well, so to me, in my accounting world, that's
21  a misnomer.  That's a contract and it's how you're
22  going to be reimbursed.  But how the contractor
23  accounts for cost can be very different than that, and
24  that's why I'm having trouble answering that.  You've
25  asked -- I think, when GEO incurs those costs, where do
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   they record them is the way I'm interpreting your

2   question.

3        Q.   So what's the answer to that?

4        A.   Well, they don't record them to CLIN 1, 2, or

5   3.  They don't record them that way.  The way they

6   record them won't correspond to CLIN 1, 2, 3 like that,

7   I doubt.  I mean, I don't know where they record it,

8   but they typically would not categorize it by CLINs

9   like that.

10       Q.   Okay.  So fair to say that there is no line

11  item that specifically reflects the costs of

12  administering the VWP?

13       A.   No.  There are likely multiple line items in

14  their cost ledger, their accounting cost ledger.

15  There's probably multiple accounts that reflect the

16  cost of administering the voluntary work program.

17       Q.   But in terms of the contract, there is no --

18  that's what I'm getting at.  Is there a line item in

19  the contract that reflects those costs of administering

20  the VWP?

21       A.   And that's where -- I can't answer that.

22  That's to me -- I can't answer that.

23       Q.   Okay.  So let's think about it a different

24  way, how I think about it.  If the costs of

25  administering the VWP go up, is that a passthrough cost

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   that GEO will be reimbursed for?

2       A.  I believe the answer to that is no.  To my

3   knowledge, the only passthrough costs are the dollar a

4   day to detainees in the voluntary work program and the

5   vehicle fuel costs.  Those are the only passthrough

6   costs, and those by definition, passthrough, you can't

7   add anything to them.  It's just you got a receipt for

8   fuel from the gas station, that's how much you get

9   reimbursed.  You've got a record that you paid a

10  detainee a dollar, that's what you get reimbursed.

11  There's no addition to that.

12      Q.  No markup?

13      A.  Yeah, no markup.  Correct.

14      Q.  Okay.  Moving on to another kind of bucket of

15  your report where you discuss ICE's oversight of GEO's

16  program administration.  And I mean, you discuss the

17  fact in your review that ICE has not rejected any

18  charges is unallowable or unacceptable.  And I want to

19  understand the basis for that position.  Did you speak

20  with Mr. Brian Hill, Mr. Hill?

21      A.  Chuck Hill.

22      Q.  Chuck Hill.  Did you discuss that topic with

23  Mr. Hill?

24      A.  I believe I did, but I can tell you in just a

25  moment.  [Witness reviews document.]

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1            I'm not finding it, but I believe it says in
 2   here that I did learn that there had been no compliance
 3   issues with regard to the voluntary work program and
 4   no, like, reductions in invoices related to that, and
 5   no -- there's a form that they have to submit, a kind
 6   of a complaint form that ICE would create.  So I'm
 7   focused on page 14, the bottom of page 14, top of page
 8   15.  The last sentence going off the bottom of page 14
 9   says "ICE's annual inspections consistently rated GEO's
10   Voluntary Work Program at NWDC as 'meets standards,'
11   and many included a note in the remarks section
12   confirming that detainees were paid $1 per day."
13   That's one of the things that I confirmed in my
14   interview.
15       Q.  And how many of those documents did you
16   review?
17       A.  How many of the --
18       Q.  The inspection work sheets that were referred
19   to in that sentence.
20       A.  A handful, not many -- like two or four.
21       Q.  Were they all included in appendix 3 of your
22   report?
23       A.  I think I only included one, the one that I
24   cited here.
25       Q.  So is that the extent of your confirmation in
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    support of that statement you just read back?

2         A.  Yes.  The ones that I reviewed and the

3    interview with Mr. Hill.

4         Q.  Okay.  So when the -- is it the contracting

5    officer or the contracting officer representative who

6    reviews invoices that GEO submits to ICE?

7         A.  Typically the COR.

8         Q.  Okay.  And when that person is reviewing the

9    invoices, are they simply reviewing to determine

10   whether the amounts invoiced are in accord with what

11   the contract requires?

12              MR. DONOHUE:  Object to the form.

13        A.  I don't remember seeing on the record how the

14   COR does that in this case.  I can talk about how they

15   typically do it, but I can't say that I've seen

16   evidence here about what kind of review the COR here

17   does.

18        Q.  And how do they typically do it?

19        A.  Typically they do a risk assessment, and if

20   they consider the contractor more risky, they do a much

21   more detailed review of the invoices.  And if they

22   don't consider them risky, they might just check the

23   math.  They might just check the rate, like per

24   detainee per day rate multiplied by the number of days

25   and beds in the month.  There's a formula there, the

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   detainee bed rate times the number of detainees times

2   the number of days in the month, a monthly invoice, to

3   get you the amount for that CLIN 1A and 1B which have

4   similar formulas.  They might sit there with a

5   calculator and check that the math is right and that

6   the per detainee per bed dollar amount is the amount

7   listed in the contract.  They might just do something

8   as simple as that.

9           But if they consider them risker, they might

10  go further and try to test and audit the amount, the

11  number of bed days that are in that formula, and they

12  assess the risk based on the amount of activity.  And

13  so they've got the annual audits by ICE, they have the

14  internal audits that they do -- well, internal audits

15  are done by GEO, but they likely share the results with

16  ICE, with their customer.  But there are those various

17  types of audits.  And if they tend to do well with

18  those audits, then the typical COR won't feel like they

19  need to check much on the invoice because they kind of

20  trust all the systems in place at the contractor.

21  Anyway, it's a long answer.

22      Q.  I think I got it all.

23              MR. POLOZOLA:  Can we break for a bit?

24                      [A brief recess was taken.]

25      Q.  [By Mr. Polozola] Okay.  Thanks for taking a


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  break.  I appreciate it.  So in the course of the

2  solicitation process leading up to the 2015 contract,

3  how many other bidders were there?

4       A.  I don't know.

5       Q.  Did you discuss that question with anyone or

6  attempt to find out the answer?

7       A.  I discussed that question and I may have known

8  in September of '18 when we were first looking at this.

9  I think I did know but I don't remember now.  It may

10 have been three, but don't hold me to that.  I don't

11 remember the number.  I didn't feel it was relevant,

12 that's why I didn't put it in the report.

13      Q.  Are you aware of other contractors who could

14 provide similar services to those provided under this

15 contract aside from GEO?

16      A.  I think there's two others.  I don't remember

17 their names right now.

18      Q.  Okay.  So early in the day you mentioned that

19 you --

20      A.  Well, let me amend my answer.  I think there

21 are two others that currently offer these types of

22 services.  There's many companies that could provide

23 it, but I think the companies that list that this is a

24 scope of work that they do a lot of, I think there's a

25 total of three, if memory serves.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1     Q.  Okay.  Earlier in the day we discussed

 2   documents that you reviewed to prepare for your

 3   deposition.  So I will show you what we can mark as

 4   Exhibit 202.

 5        [Exhibit No. 202 was marked for identification.]

 6              MR. POLOZOLA:  00270461, that's the

 7   Bates range for Exhibit 202.  The full range is through

 8   00270648.

 9     Q.  [By Mr. Polozola] Are you familiar with this

10   document?

11     A.  Yes.

12     Q.  What is this document?

13     A.  It's the award dated -- its effective date is

14   10-24-09.  It's the award of a contract to GEO Group

15   Inc.

16     Q.  For what?

17     A.  I believe it's for the Northwest Detention

18   Center, but I'm just verifying that.  Yes, it is.

19     Q.  And what are you looking at to verify that --

20   just so we're clear on the record?

21     A.  Just page 12, which is GEO-State 00270474.

22   And these awards can look similar.  I just wanted to

23   make sure that this was not something different than

24   what I reviewed, and it appears to be what I reviewed.

25     Q.  And is this contract structured in the same

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   way as the 2015 contract with regard to the CLINs that
 2   are identified?
 3        A.  Well, CLIN 1A and 1B is the same CLIN.  CLIN 2
 4   I would have to look at but it looks to be the same.
 5   CLIN 3 is the same.  And then it repeats for the other
 6   years -- other options, other years.
 7        Q.  So this contract has a CLIN 3 just as the 2015
 8   contract?
 9        A.  Yes, it does.
10        Q.  And is your opinion with regard to what's
11   required by CLIN 3 the same for this contract as for
12   the 2015 contract?
13             MR. DONOHUE:  Object to the form.
14        A.  Yes, it is.
15        Q.  So just so I'm understanding correctly, under
16   this contract, under CLIN 3, ICE is required to
17   reimburse GEO for costs incurred paying detainee wages
18   in the voluntary work program?
19        A.  Yeah.  And I'll just read, CLIN 3 "Detainee
20   volunteer wages for the detainee work program.
21   Reimbursement for this line item will be at the actual
22   cost of $1 per day per detainee.  Contractor shall not
23   exceed the amount shown without prior approval by the
24   contracting officer."
25        Q.  So our conversation earlier with regard to the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1   2015 contract would be the same with regard to this
 2   contract?  Or no?
 3                 MR. DONOHUE:   Object to the form.
 4       A.  I mean, narrowly.  I mean, we talked about a
 5   lot with regard to the 2015 contract, and I think
 6   you're focused on the $1 per day per detainee, the
 7   actual cost of that with respect to the actual cost of
 8   $1 per day detainee.  Yes, my opinions are the same.
 9       Q.  You thought correctly.  So if you can go to
10   what is page 17 of the PDF.  It's Bates no. 00270479.
11   Okay?
12       A.  I'm at that page.
13       Q.  Okay.  So there is a list of some items here,
14   and you may need to refer to the page before.  This is
15   section C9, Constraints.  And according to this
16   section, "The following constraints comprised a
17   statutory regulatory policy and operational
18   considerations that will impact the contractor."  Going
19   to the last sentence here, it says "Constraints include
20   but are not limited to," bullet j, "The ICE/DHS PBNDS";
21   is that correct?
22       A.  It does say in C9 that "The following
23   constraints comprise the statutory regulatory policy
24   and operational considerations that will impact the
25   contractor."  And then those include j, which is the
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1   ICE/DHS performance-based detention standards.  So yes,

 2   it does.

 3       Q.  And for bullet r, "Applicable federal, state

 4   and local labor laws and codes"; is that correct?

 5       A.  It does say that they have an impact.

 6       Q.  And in your experience -- or let me pause.

 7   Have you seen contracts that use this type of language,

 8   "constraints that will impact the contractor," in the

 9   past?

10       A.  I don't remember this wording.  My memory is

11   of stronger wording than this --

12       Q.  Okay.

13       A.  -- in other contracts.

14       Q.  So is that language that we're looking at on

15   page 17, is that similar to the language in the 2015

16   contract?

17       A.  It is similar, yes.

18       Q.  Is it identical?

19       A.  I haven't checked.

20       Q.  Okay.  So going on to Bates page 00270548.

21       A.  I'm on that page.

22       Q.  And I'm under the section Manage a Detainee

23   Work Program, general.

24       A.  I see that.

25       Q.  Okay.  The last line of the first paragraph,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  this may sound familiar, "The detainee work program

 2  shall not conflict with any other requirements of the

 3  contract and must comply with all applicable laws and

 4  regulations."  Did I read that correctly?

 5      A.  You did read it correctly.

 6      Q.  Is that the same language that appeared in the

 7  2015 contract?

 8      A.  I believe it is, yes.

 9      Q.  So am I -- is it a fair reading of this

10  statement that the Northwest Detention Center voluntary

11  worker program must comply with all applicable laws and

12  regulations?

13           MR. DONOHUE:  Object to the form.

14      A.  Well, I mean, it says that "the detainee work

15  program shall not conflict with any other requirements

16  of the contract."  So that could mean that the detainee

17  work program needs to be modified to make sure that it

18  doesn't conflict with other requirements in the

19  contract, and it does say "and must comply with all

20  applicable laws and regulations."  And it doesn't

21  define what applicable means, but it does have those

22  words.

23      Q.  Okay.

24        [Exhibit No. 203 was marked for identification.]

25           MR. POLOZOLA:  So the Bates range for

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   what was marked as Exhibit 203 is GEO-State 00270649

2   through 00270784.  And I believe those are consecutive.

3        Q.  [By Mr. Polozola] Do you recognize this

4   document?

5        A.  I do.

6        Q.  What is this document?

7        A.  This is the award of a contract awarded July

8   26, 2002, to Correctional Services Corporation.

9        Q.  Is this the contract or the award you referred

10   to earlier in the day as having reviewed to prepare for

11   your deposition?

12        A.  Yes.

13        Q.  So what services were to be provided under

14   this contract?

15        A.  Very similar to the other two contracts that

16   we've discussed, only this included a ramp-up period,

17   if memory serves, a 240-day ramp-up period before

18   beginning to provide services.

19        Q.  Under this contract is the CLIN structure the

20   same as the 2015 contract we reviewed?

21        A.  It is not.

22        Q.  How is it different?

23        A.  It's very different.  It only has two CLINs.

24   It does not have a third CLIN.  And the first two CLINs

25   are much simpler and they take a -- whereas in the 2015

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   contract, I think it's CLIN 1, has the amount of bed --

2   a minimum number of detainees, and then reimbursement

3   for that at a certain rate.  And then if there are a

4   number of detainees above that amount, a different

5   rate.  And this is simple, just much simpler, just an

6   estimated quantity at a price.  And the transportation

7   is simpler in that in the later contract it includes a

8   price for certain vehicles in addition to fuel being a

9   passthrough cost, and that it includes -- the later one

10  includes a CLIN 3.  And there is no CLIN 3 here; in

11  other words, there's no payment for the voluntary work

12  program under this contract.

13       Q.  Is it your understanding that there were

14  detainees who were working at NWDC during the period of

15  this contract?

16       A.  Well, there is a requirement in this contract

17  to have a voluntary work program.

18       Q.  So for costs that were expended to pay the

19  detainee workers for that program, how were those

20  billed to ICE under this contract?

21       A.  I don't see anywhere where there is

22  anticipation that the detainees would be paid.

23       Q.  Do you know whether they were paid or not?

24       A.  I do not know.

25       Q.  So there is no line item for reimbursement of

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  detainee wages in this contract?

2     A.  I saw no reference to the payment, either the

3  payment of detainees or for the reimbursement of

4  payment, so there is no -- just based on this document,

5  it doesn't appear that detainees were to be paid under

6  the voluntary work program.

7     Q.  Is there any limitation in this contract

8  that -- well, let me rephrase.  Is there any limitation

9  in this contract with regard to the amounts the

10 detainees can be paid under the voluntary work program?

11              MR. DONOHUE:  Object to the form.

12    A.  We would have to go to the paragraph on the

13 voluntary work program to see if it says anything about

14 that.  I don't remember if there is any limitation.

15    Q.  And just as you'll recall we discussed today

16 whether GEO was required to pay only $1 to detainee

17 workers under the VWP under the later contracts, is

18 there any similar requirement in this contract to your

19 knowledge?

20              MR. DONOHUE:  Object to the form.

21    A.  To my knowledge there is no requirement to pay

22 the detainees anything.  And there's no provision for

23 passthrough.

24    Q.  Does this contract require or did this

25 contract require GEO to comply with state labor laws?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.  I don't remember.

 2        Q.  So turning to Bates number 00270672.

 3        A.  I'm at that page.

 4        Q.  Okay.  And I'm looking at section H under

 5   "Conflicts."  So the first sentence says "All services

 6   and programs must comply with the SOW, and all

 7   applicable state and local laws, regulations and

 8   detainee court orders"; is that correct?

 9        A.  That is what it says.

10        Q.  Is this section part of this contract?

11        A.  Yes.

12        Q.  So under the section was GEO required to

13   comply with applicable state and local laws,

14   regulations and detainee court orders?

15                    MR. DONOHUE:  Object to the form.

16        A.  This reads that "All services and programs

17   must comply with the statement of work and all

18   applicable state and local laws, regulations and

19   detainee court orders."

20        Q.  Certainly.  So just to clarify, I can read it

21   and we've read it together a few times.  I'm asking

22   whether in your understanding and your experience of

23   what these contracts require under this provision is

24   GEO required to comply with state and local laws?

25                    MR. DONOHUE:  Object to the form.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   Let me say that in my report I said I was not
 2   interpreting contracts or the regulations, and I'm not.
 3   But I think you're asking me to interpret that, and as
 4   such, just as a layman I suppose, it does appear to say
 5   that.
 6        Q.   And so the following sentence, "When a
 7   conflict exists" -- excuse me -- "Should a conflict
 8   exist between any of the aforementioned standards, the
 9   most stringent shall apply," is that similar to the
10   requirement we discussed for the later contracts with
11   regard to conflicting provisions and how stringent
12   standards apply?
13             MR. DONOHUE:   Object to the form.
14        A.   It is similar.  It is certainly similar.
15        Q.   Are they identical?
16             MR. DONOHUE:   Same objection.
17        A.   I would want to line them up side by side.
18   The last sentence appears to be identical.  The second
19   one may be identical, but I don't want to say that they
20   are without checking.
21        Q.   So if you can turn to Bates page 00270694.
22        A.   I'm at that page.
23        Q.   Is this the section you were referring to
24   earlier when you mentioned the voluntary work program
25   section of this contract?  Or did you have something
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  else in mind?

 2      A.  This is the section I was thinking about when

 3  I referred earlier, yes.

 4      Q.  So there is nothing in this provision with

 5  regard to the amounts to be paid to detainees, correct?

 6              MR. DONOHUE:  Object to the form.

 7      A.  What is shown here, no.  But the last under C1

 8  at the very end, it says "REF Section J, attachment

 9  J-3.13."  And I think that would be on the prior page,

10  which is missing.  So the pages jump from C-31 to C-33.

11  There is a C-32 that's missing.

12              MR. POLOZOLA:  So I'll just note for the

13  record that the Bates pages are consistent, so it

14  appears that as produced that page is missing.

15      Q.  [By Mr. Polozola] So unfortunately I can't

16  help you on what's on that prior page.

17      A.  Yeah.  I don't know either.  This is an old

18  document, but there may be reference to payment on that

19  missing page or there may not.  I don't know.

20      Q.  Okay.  Put that one aside for now.  So one

21  followup question.  You mentioned earlier that you

22  reviewed certain deposition transcripts, and I believe

23  you mentioned one being the transcript for Ryan

24  Kimble's deposition.

25      A.  Yes.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.  Are you referring to the deposition of Ryan
 2   Kimble as GEO's 30(b)(6) representative?
 3        A.  Yes.
 4        Q.  Have you reviewed -- is that the only
 5   deposition transcript from Ryan Kimble that you've
 6   reviewed?
 7        A.  Yes.
 8        Q.  Okay.  Just wanted to clarify.
 9            A few followup questions on modifications
10   related to wage determinations.  I believe we discussed
11   those earlier.  And if I recall, you were
12   distinguishing between what might be viewed as
13   controversial versus noncontroversial requests for
14   modification; is that correct?
15        A.  That is correct.
16        Q.  So for a request for modification relating to
17   updated wage payment standards -- well, let me pause.
18   Do you have an understanding of what I'm referring to
19   when I say a request for modification related to
20   updated wage payment standards?
21        A.  Yes.
22        Q.  And what is that understanding so that we're
23   clear that we're on the same page?
24        A.  That there is a standard wage and that it's --
25   the contract is to be modified -- in the contract, in
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  the proposal, there were forecasted wages, wage rates

 2  to be paid each year in the future.  And the forecasted

 3  wage rates -- if the actual wage rates differed from

 4  what was forecasted, then GEO could request a

 5  modification related to that.

 6       Q.  So is that the Department of Labor wage

 7  determinations?

 8       A.  Yes, I believe so.

 9       Q.  I just want to be clear that we are referring

10  to the same thing.

11       A.  My understanding is that relates to employees.

12       Q.  So you have a copy of the contract, I believe,

13  somewhere in the bottom of your stack.

14       A.  So what page?

15       Q.  I'm looking at GEO-State 036980.  There are a

16  number of similar schedules.

17       A.  I'm on the page you referenced.

18       Q.  Okay.  And the only question is, is this an

19  example of the wage determination schedules that we

20  were just discussing?

21       A.  Yeah.  I mean, this one is dated, the date of

22  revision on the upper right of 7-25-14, and then there

23  would be presumably later ones that would come out that

24  would be -- that would affect, like, option year 1,

25  option year 2, option year 3.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.  So when the revised determinations come out,

2    would it be typical that a contractor would request a

3    contract modification to update prices reflected in the

4    contract to account for the higher wages?

5        A.  For some types of contracts, for contracts

6    like this, yeah, that's not uncommon.

7        Q.  Okay.  So taking this back to controversial

8    versus noncontroversial, would that type of request for

9    modification be deemed noncontroversial in your view?

10                   MR. DONOHUE:  Object to the form.

11       A.  Yeah.  What can sometimes be controversial is

12   if someone is, like accounting clerk 1 on the top of

13   this table, is at a rate of $13.89, and let's say that

14   in the next option year or the option year after that a

15   particular employee has now been promoted to accounting

16   clerk 3.  And so you're tracing these people from one

17   category to another category over the course of years,

18   or people just move into entirely different areas, from

19   rental clerk to travel clerk for example, that can be

20   complicated in terms of getting these changes through;

21   but otherwise, for employees, this should be

22   straightforward.

23       Q.  Okay.  So setting aside that complicated

24   situation of individuals moving positions, when these

25   schedules are revised and updated, if the wage rates

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   increase here, does a contractor then go back to the

2   government and request a modification for an increase?

3                   MR. DONOHUE:  Object to the form.

4       A.  If it's part of their contract that they can

5   do that.  And some contracts it's not a part of their

6   contract.  You bid your labor costs and that's what you

7   bid, and there is no -- you might be able to change

8   your labor hours through a mod, but your labor rates

9   you don't get to change.  And I have not studied this

10  contract to see about the entitlement, if you will, or

11  the ability to make these types of changes.  But by the

12  fact that this is showing up in the contract, it looks

13  like it's likely the case that the contractor could, as

14  those wage determinations came out, ask for a mod to

15  increase, or potentially decrease, because wage rates

16  almost always go up.

17      Q.  Okay.  So taking this to the next step, if GEO

18  were required to pay detainees the minimum wage rather

19  than $1 a day, and a request for modification was

20  submitted to ICE requesting an increased rate of

21  reimbursement under CLIN 3, would that in your view be

22  a noncontroversial request for modification?

23                  MR. DONOHUE:  Object to the form.

24      A.  That would be if not a breach of contract,

25  that would at least be a very controversial change,

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  very difficult change.

 2      Q.  And why would that be a very controversial

 3  change?

 4      A.  Because there are some -- well, probably many

 5  reasons.  But there are requirements for employees,

 6  and -- to be an employee.  There are many requirements,

 7  and detainees don't meet those requirements.  And so to

 8  reclassify them somehow from detainees to employees

 9  would be huge.

10      Q.  Are you -- is it your opinion in this case

11  that detainees cannot constitute employees?

12      A.  Well, I don't know if they never can.  I'm

13  just looking at my report, page 11, and it's citing to

14  the contract.  And it reads "The contractor will agree

15  that each employee working on this contract will

16  successfully pass the DHS employment eligibility

17  verification (E-Verify) program operated by USCIS to

18  establish work authorization.  The contractor must

19  agree that each employee working on this contract will

20  have a Social Security card issued and approved by the

21  Social Security Administration.  Illegal or

22  undocumented aliens will not be employed by the

23  contractor or with this contract."

24          And it further goes on to talk about

25  subcontractors.  "The Contractor shall agree that each

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  person employed by the firm or any subcontractors shall

2  have a Social Security card issued and approved by the

3  Social Security Administration and shall be a United

4  States citizen or a person lawfully admitted to the

5  United States for permanent residence."  And there may

6  well be lots more, but to treat a detainee as an

7  employee -- to treat someone as an employee who had not

8  met all the requirements I just read would be -- if

9  it's not breach -- well, it's not in compliance with

10 the contract.

11     Q.  Okay.  So I'm asking with regard to pay

12 consistent with Washington's minimum wage under state

13 law.  Are you offering an opinion on whether detainees

14 are employees under state law for purposes of

15 Washington's Minimum Wage Act?

16     A.  I'm focused on the contractor who has a

17 contract and trying to comply with their contract.  So

18 if they were to pay them that, I think they would have

19 to reclassify them as an employee.  And to reclassify

20 them as an employee without meeting the requirements

21 that I just read would be a breach -- I mean, not in

22 compliance, maybe breach of the contract.  But it's --

23 so I don't see how they do that without breaching their

24 contract.

25     Q.  So why would they have to reclassify if they

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  were to pay more than $1 per day?

2              MR. DONOHUE:  Object to the form.

3      Q.  Why would detainees need to be reclassified as

4  employees if they were paid more than $1 per day under

5  the voluntary work program?

6              MR. DONOHUE:  Object to the form.

7      A.  Well, that's a little different than your

8  previous question.  Your previous question -- and maybe

9  I'm answering a different question that you asked.  But

10 to treat them as employees, they need to determine what

11 fringe benefits they get, and they need to meet all of

12 the requirements that I earlier read.  Now, I think

13 you're trying to pose, I think, some kind of hierarchy

14 where they're not treated as an employee but they're

15 paid more or something?

16     Q.  I understood you to refer a moment ago to

17 needing to reclassify the detainees as employees if

18 they were paid more than $1, and I'm asking what

19 requires them to be reclassified as employees merely

20 because they were paid more than $1 for participating

21 in the voluntary program.

22             MR. DONOHUE:  Object to the form.

23     A.  Well, okay.  So the contract indicates that

24 they are to be paid a dollar a day.  And so it would be

25 a breach of the contract to pay them something

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    different than a dollar a day.  Separately, if you -- I

2    thought your question was -- I think your initial

3    question was treat them as employees.  And to treat

4    someone who doesn't meet all the requirements as an

5    employee would be in breach of the contract, I believe.

6         Q.  Is that based on your interpretation of the

7    contract?

8              MR. DONOHUE:  Object to the form.

9         A.  Yeah.  Things like breach are -- I mean, I

10   teach COs and CORs and company people about breach and

11   about the changes and that sort of thing.  So I have a

12   layman's, at least, understanding of that.  But as I

13   said, I'm not here to interpret the contract and I

14   offer no opinions in my report on interpretation of the

15   contract.

16        Q.  Okay.  In this solicitation process -- we'll

17   change tack for a moment.  So in this solicitation

18   process, are you aware of whether GEO's audited

19   financial statements were provided to ICE as part of

20   its proposal?

21        A.  I don't know if they were provided to ICE as

22   part of their proposal.

23        Q.  Is it typical for contractors to be required

24   to provide financial statements when submitting a

25   proposal?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.  Well, often -- like I say, it's a public

 2   company, then their financial statements are publicly

 3   available, so that's that circumstance.  When they are

 4   not publicly available, they sometimes are and

 5   sometimes are not.

 6        Q.  We discussed earlier with regard to your call

 7   with Mr. Hill, and I believe I understood you to say

 8   that your colleague took notes of that call; is that

 9   correct?

10        A.  Yes.

11        Q.  Do you still have those notes?

12        A.  Somewhere, yes.

13        Q.  Could they be provided?

14        A.  Yes.  I mean . . .

15        Q.  Could you provide them to counsel in this

16   case?

17                  MR. DONOHUE:  We can take that up, yes.

18                  MR. POLOZOLA:  Okay.  I'll just state

19   for the record that I believe that would be part of the

20   expert's file that would be responsive to and RFP, so

21   the witness has said that they're available.  So we'll

22   expect that they will be provided and we will certainly

23   hold this open so that we have the opportunity to

24   question Mr. Bingham about those notes if necessary.

25                  MR. DONOHUE:  I'm not agreeing to hold
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  the deposition open.  I'll agree to talk with counsel

 2  about whether or not we can provide a copy of the

 3  notes.

 4       Q.  [By Mr. Polozola} Is there a way to obtain

 5  those notes today so that we don't need to hold the

 6  deposition open?

 7            MR. DONOHUE:  If you want to go into

 8  that, then we'll go off the record and I will consult

 9  with the witness and we'll see if we can get a copy of

10  the notes.

11            MR. POLOZOLA:  Let's break momentarily

12  so you guys can -- thank you.

13                      [A brief recess was taken.]

14       [Exhibit No. 204 was marked for identification.]

15       Q.  [By Mr. Polozola] So in the course of the

16  break a document was provided to us and we made copies

17  of the document marked as Exhibit 204.  Can you tell me

18  what this is?

19       A.  It's an e-mail from my colleague Jonathan Rice

20  to me.

21       Q.  What's the subject matter of the e-mail?

22       A.  It doesn't have the subject, per se.  The

23  subject is blank but -- or I can't read it, so I don't

24  believe there is one.  But it's got some notes from a

25  conversation that he and I had with personnel from GEO,

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   Chuck Hill, Director of Business Development for GEO

2   western division, and Lewis Carillo, VP and Corporate

3   Counsel, in mid September.

4        Q.   Okay.  And I see a reference to 9-19, is that

5   September 19?

6        A.   It likely is.

7        Q.   So under the 9/19 call with client, bullet

8   point four, is says "Very rarely detainee gets assigned

9   to two details, not typical because detail for barber

10  shop and barber shop CU are separate details.  Makes

11  sense for security reasons to allow some detainees.

12  This gets approved by ICE prior to any assignment.

13  Sometimes it happens as an error but this is corrected

14  and not allowed to continue."  Do you recall that

15  portion of the conversation with Mr. Carillo and Hill?

16       A.   I recall the conversation.  That particular

17  part of the conversation, no; that's been many months

18  ago.

19       Q.   So do you recall anything further about the

20  conversation with regard to how often detainees are

21  assigned to multiple work details

22       A.   No.

23       Q.   And do you have any understanding of whether

24  ICE reimburses GEO for the cost of paying detainees for

25  multiple details?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1              MR. DONOHUE:  Object to the form.

2       A.  Not from this conversation.  But from the

3   deposition transcripts I read, I believe I understand

4   that the multiple shifts -- at least some of the time

5   when detainees were paid more than a dollar a day, it

6   was with the concurrence of ICE, and they were paid.

7   They were paid more than a dollar a day and the

8   passthrough cost was passed through to ICE and

9   reimbursed to GEO.

10      Q.  Okay.  So in the next section, second

11  paragraph says "Client confirms that VWP is a pure

12  passthrough cost; detainees processing, monitoring,

13  oversight, and payment processing is covered in GEO's

14  operational CLIN."  Do you see that sentence?

15      A.  I do.

16      Q.  Okay.  So what is the operational CLIN that's

17  being referred to there?

18      A.  I believe it's CLIN 1.

19      Q.  Okay.

20              MR. POLOZOLA:  I think I am done -- for

21  myself.

22          [A brief discussion was held off the record.]

23

24

25

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1              E X A M I N A T I O N
 2    BY MR. FREE:
 3       Q.   So we're back on the record at 6:25.
 4   Mr. Bingham, as I said earlier, my name is Andrew Free.
 5   I represent a certified class of people who were
 6   working in the voluntary work program at the Northwest
 7   Detention Center where they were locked up.  I
 8   understand that you haven't rendered an opinion in
 9   their case.  It's called Nwauzor.  You've rendered an
10   opinion in the State's case.  But for legal reasons
11   that really don't concern you, the cases are now
12   together.  And when the case gets tried, your opinion
13   may be offered in both.  So I'm just going to ask you a
14   few questions.  I will try to be brief.  I really
15   appreciate you spending the time today.  If you don't
16   understand anything that I'm asking, I know you'll tell
17   me.  And if anything is unclear I'm happy to rephrase
18   it.
19       A.   Okay.
20            MR. DONOHUE:  And let me just put on the
21   record that class counsel for the Nwauzor case didn't
22   notice this deposition.  We have had a discussion off
23   the record, and the spirit of cooperation and in
24   accordance with the judge's comments from the bench
25   with respect to the consolidation of these cases, I
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  have agreed to let Mr. Free depose Mr. Bingham.  But I

2  would like to say that GEO expects that there is going

3  to be a lot of working together in the future, and we

4  hope that we would receive the same consideration in

5  like or similar circumstances with respect to the many

6  depositions that still need to take place, both in the

7  class case but the remaining State depositions.

8              MR. FREE:  And while we're going to be

9  as accommodating as we can, we are not adopting or

10 agreeing to the statement of our off-the-record

11 discussion.  But as always, we're going to work

12 together to make sure this case is litigated

13 efficiently.

14      Q.  Okay.  Are you ready?

15      A.  Yes.

16      Q.  Okay.  You said before that you weren't sure

17 whether GEO had submitted historical cost information

18 with its response to the solicitation on the 2015

19 contract.  Did I understand that correctly?

20      A.  I think I said they likely did.  They

21 typically do but I have not reviewed the cost

22 information that they submitted.

23      Q.  Okay.  And apart from the MDS, the private

24 prison case that you worked on in 2002, it's my

25 understanding you have never consulted with a private

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  prison contractor in your work in 33 years, other than

2  GEO; is that right?

3      A.  I don't think I said that.  I think I said

4  that I worked on a bid protest, and I believe I have

5  consulted not in a dispute but with other prison

6  contractors just in the last eight years or so.  And I

7  believe it was an indirect cost issue, allocation of

8  indirect cost.  I don't remember much about it because

9  it was such a brief amount of work.

10     Q.  Do you know how many times you consulted with

11 other private prison contractors?

12     A.  I think it was twice.

13     Q.  And I believe you said, and correct me if I'm

14 wrong, but I believe you said you had done some work

15 for Holland and Knight five to ten times over the last

16 ten years?

17     A.  I think that's correct, yeah.

18     Q.  Okay.  What portion of your revenues have come

19 from your business with Holland and Knight?

20     A.  Minuscule.  Less than one-tenth of one

21 percent.  I mean, I have not done a calculation of

22 that, but it would be minuscule; it would be way less

23 than one percent.

24     Q.  And for the Kenrich Group, what portion of

25 Kenrich Group's revenues come from consulting like this

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   as opposed to helping a contractor figure out a bid

2   issue or talk to the government about an audit?

3       A.  So I think your question is what portion of

4   the work is dispute related -- expert witness testimony

5   and dispute oriented.  So the Kenrich Group is about 85

6   consultants, about a hundred employees, and about 30

7   million in annual revenues.  A lot of that is in the

8   world of construction and nuclear utilities and things

9   of that nature that don't -- and so if you concur I

10  will focus my answer on the 25 to 30 percent of our

11  revenue that relates to government contract matters.

12      Q.  I concur.

13      A.  Okay.  And so of that, what portion of that is

14  expert witness testimony, formalized disputes, that

15  sort of thing?  I would guess -- I'm estimating about

16  half.

17      Q.  Okay.  And for you personally, what portion of

18  your book of business does that constitute,

19  approximately?

20      A.  About half.

21      Q.  When was the last time you taught at GW?

22      A.  Not last week but the week before.

23      Q.  Is that a normal course or kind of a

24  specialized -- is that a part of the graduate program?

25      A.  Okay.  So a week-and-a-half ago -- they're



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  developing a new course for attorneys on cost and

 2  pricing issues for the law school, and it's an online

 3  course where they interview -- you go into a studio and

 4  they interview you in front of cameras and that sort of

 5  thing.  And that's what I did a week and a half ago.

 6         So then for the course that I teach, my normal

 7  course, I've taught it ten times, and my last was,

 8  like, about three to four weeks ago was the last time

 9  that I taught that.

10     Q.  How long does that course run?

11     A.  So it's a semester, so it's every spring and

12  every fall.

13     Q.  All right.  Who within a federal government

14  agency is responsible for policing waste, fraud and

15  abuse by government contractors?

16     A.  Well, a number of contracting officers would

17  say they are, that the contracting officers and the

18  CORs and all have a role in preventing waste, fraud and

19  abuse.  The group that is -- another answer to that

20  might be the inspectors general within each agency.

21     Q.  Any reason to believe that's different for the

22  Department of Homeland Security?

23     A.  No.

24     Q.  So while the contracting officers and the

25  technical representatives had a responsibility to

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  administer the contract according to law, when people

2  reporting or when there is independent investigation of

3  waste, fraud and abuse in the first instance within the

4  department, it's at the OIG; is that right?

5      A.   It's hard to answer that in generalities.  If

6  someone feels, say, an employee of a contractor or of

7  the government, feel like they have detected waste,

8  fraud and abuse, who will they call?  Sometimes they

9  will call the contracting officer, sometimes they will

10 call the IG, sometimes they'll call some kind of

11 hotline that is kind of neither.  So it's hard to

12 answer that at the level of generality.

13     Q.   Let's make it more specific.  Do contracting

14 officers or technical representatives have the ability

15 to refer contractors for criminal prosecution based on

16 violations of government contracting laws like the OIG

17 does?

18            MR. DONOHUE:  Object to the form.

19     A.   I think typically the contracting officer

20 would refer a matter for investigation to the IG.

21     Q.   Okay.  And similarly, are you aware of any

22 public facing reports by contracting officers that

23 describe waste, fraud and abuse by government

24 contractors?  Or is that the province of OIG?

25     A.   That is more often the province of the OIG.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.   Okay.   Is it fair to say that the Department
 2   of Homeland Security's Office of Inspector General
 3   would be responsible for monitoring waste, fraud and
 4   abuse in ICE contracts?
 5        A.   They don't really monitor contracts.   I think
 6   they get a -- if they get a referral or someone
 7   highlights something to them, then they swing into
 8   action or not.   They make a determination whether it
 9   rises to the level of something they would investigate.
10   But the monitoring part, that's the CO and the COR.
11        Q.   But my question was monitoring waste, fraud
12   and abuse in government contracts.   And my
13   understanding is the OIG does that and not the
14   contracting officers; can we agree on that?
15                  MR. DONOHUE:   Object to the form.
16        A.   I would not use the term "monitor" with
17   regards to the OIG.
18        Q.   What term would you use?
19        A.   Investigate.
20        Q.   Do they publicly report sometimes their
21   findings of those investigations -- OIG?
22        A.   The OIGs typically do, yes.
23        Q.   Do you have any reason to mistrust the Office
24   of Inspector General?
25                  MR. DONOHUE:   Object to the form.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   You're talking about the Department of

 2   Homeland Security?

 3        Q.   I am.

 4        A.   I'll just answer that generally with respect

 5   to OIGs and auditing bodies that conduct audits like

 6   the Defense Contract Audit Agency and some others, in

 7   their reports to the public and the reports to Congress

 8   they I think sometimes want to justify their

 9   accomplishments and that they are not as neutral as

10   some other bodies might be.

11        Q.   What other body would be more neutral than OIG

12   that you can think of?

13        A.   Well, contracting officers don't publish

14   things, but they are more neutral.  But if you're

15   asking me of bodies that publish something to the

16   public, well, there are studies -- I mean, there are

17   studies conducted by the congressional budget office

18   and the general accountability office from time to

19   time.  And like the Rand study where the DOD or

20   others -- the Office of Federal Procurement Policy

21   commissions studies.  And those, including the office,

22   studies commissioned by the Office of Federal

23   Procurement Policy and proclamations by the Office of

24   Procurement Policy, I think all of those are more

25   neutral than the OIGs tend to be.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1        Q.   Okay.  Do you have any personal experience

2   reviewing DHS OIG reports regarding ICE detention?

3        A.   I don't believe so.

4        Q.   I'm going to ask you some questions about your

5   report and its conclusions.  So if you want to put that

6   in front of you.  At Page 15, in section D,

7   Ramifications for Contractor Noncompliance.  You state,

8   "ICE closely monitored and inspected GEO's performance

9   and administration of the contract.  If GEO had failed

10  to properly follow its contract requirements, ICE has a

11  number of" -- do you see that sentence?

12       A.   I do see it, yes.

13       Q.   And then I understand your conclusion to be

14  that because you have not seen these artifacts of

15  failure, that because, as we reviewed in the notes with

16  Chuck Hill that were in Exhibit 204, there have not

17  been contract discrepancy reports or financial

18  penalties or anything else like that, your assumption

19  is GEO is compliant with the contract.  Am I fairly

20  summarizing your conclusion as to the voluntary work

21  program?

22                 MR. DONOHUE:  Object to the form.

23       A.   If ICE -- I would typically see if the agency

24  was uncomfortable or unsatisfied with the contractor's

25  performance, that you would see artifacts of that.  And

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   what I've seen in the records that are highlighted in

2   the sections that just before you read and just after,

3   those artifacts do not indicate that ICE is

4   dissatisfied with GEO's performance.

5        Q.   And it is on that basis that you conclude, if

6   I understand your report correctly -- this is on page

7   4 -- "ICE had available multiple remedies and sanctions

8   it could exercise if GEO failed to properly follow its

9   contract requirements, including decrements to GEO's

10  invoices, negative assessments of contract performance,

11  cure notices, and contract termination for convenience

12  or for default.  Kenrich understands that none of these

13  remedies or sanctions were exercised with respect to

14  the VWP, and it therefore does not appear that GEO's

15  performance on this contract was deficient."  I left

16  out the contract number.

17       A.   You read that correctly.

18       Q.   Okay.  I think I understand this, but you did

19  list some things that were not listed in the appendices

20  today.  Did you review any of the Department of

21  Homeland Security's Office of Inspector General reports

22  regarding ICE contracting in rendering your opinion?

23       A.   I don't believe I did.  I remember seeing

24  those, but I think it was before this matter.

25       Q.   What do you remember about seeing those?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1        A.   I've forgotten now what the purpose was for me

 2   reviewing those IG reports or NIG reports or even doing

 3   a search at the Department of Homeland Security's OIG.

 4   But it's been some time ago, and it was before

 5   September of last year.

 6        Q.   Do you know approximately how long?

 7        A.   No.

 8        Q.   Do you know what OIG reports, like basically

 9   the substance of the reports that you reviewed or

10   searched for?

11        A.   No.  I reviewed -- I think there's a listing,

12   and I remember scanning through the listing and then

13   opening a few, but it's been quite some time and I

14   don't remember the purpose now.

15        Q.   Do you know approximately how long?

16        A.   I do not.

17        Q.   Do you know if it was before July of 2018?

18        A.   It was likely before July of 2018.

19        Q.   Have you heard anything about the Department

20   of Homeland Security's Office of Inspector General

21   investigating contractor performance at ICE detention

22   facilities?

23        A.   I've seen something in the paper.  I don't

24   remember -- just a headline, that sort of thing.

25        Q.   What do you recall seeing?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   Just a headline, that sort of thing.

 2        Q.   Do you remember what it was?

 3        A.   What paper it was?

 4        Q.   No.  What headline it was.

 5        A.   No.

 6        Q.   How do you know it was just a headline?

 7   What's coming to your head that helps you remember

 8   that?

 9        A.   Just ICE and detention.

10        Q.   Anything else you can recall as you sit here

11   today?

12        A.   No.

13        Q.   Okay.  Do you remember having a reaction to

14   that article?

15        A.   No.

16        Q.   Did it interest you because it was sort of in

17   your wheelhouse or did you just see it?

18        A.   Just government contracts.  When something

19   like a federal government contract issue makes it to

20   the popular press, so to speak, it kind of gets my

21   attention.

22        Q.   Do you remember what the contract issue or

23   anything about the contract issue that was in the OIG

24   report?

25        A.   I do not.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.  Are you aware of the inspector general's
 2 January 29, 2019, report, OIG 19-18?
 3      A.  No.
 4      Q.  This one could have been the headline you saw.
 5 It says "ICE does not fully use contracting tools to
 6 hold detention facility contractors accountable for
 7 failing to meet performance standards."  As I've read
 8 that back to you, does that refresh any recollection
 9 about the headline you saw?
10      A.  No.
11      Q.  And you have no awareness of what the report
12 says?
13      A.  Correct.
14      Q.  What's the likelihood that a contractor who
15 violates the contract is going to be hit with a
16 contract discrepancy report or a cure notice or
17 something like that?  How often do you have to violate
18 in order to get busted?
19           MR. DONOHUE:  Object to the form.
20      A.  That's too vague, too general.  It's hard for
21 me to react to that.
22      Q.  Okay.  Well, you said because there are no
23 reports like this about the VWP, they're compliant.
24      A.  There is no evidence of noncompliance, and
25 there would be in all the different types of remedies

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1    and all the different types of audits and reports that

2    are done.  I can't say definitively, but it is likely

3    that there would be evidence of that in all that

4    oversight if there were problems.

5         Q.  What do you base that on?

6         A.  I have thirty-three years of experience.  I

7    mean, there's a lot of oversight here.  There are --

8    I'll contrast it to you're building Jeeps for the

9    government.  And all that you have to do is --

10        Q.  You know what?  I understand.  If you want to

11   give me this example, that's fine.  But I am trying to

12   be cognizant of the time.  Do you want to contrast it

13   to something or do you want to move on?  It's okay if

14   you want --

15        A.  Yeah, I do.  So you're building Jeeps and the

16   only thing that the government has to do is test that

17   the Jeep you deliver is compliant.  Whereas, here they

18   have to monitor everything the contractor does and they

19   have a corp on site and they have regular meetings.  So

20   it's a lot more oversight than is often the case.

21        Q.  From October 2015 to June 2018, do you have

22   any idea how many contract discrepancy reports ICE

23   issued?

24        A.  Could you say the date range again.

25        Q.  October 2015 to June 2018.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1        A.  No, I don't know.

2        Q.  Do you have any idea how much was deducted

3   from government contractors during that period in terms

4   of contract payments as penalty?

5        A.  Deducted for government contractors for --

6        Q.  For ICE detention.

7        A.  ICE detention?  No, I don't.

8        Q.  Do you have any idea how many violations or

9   deficiencies were found during that period?

10       A.  For ICE detention throughout?  No, I don't

11  know.

12       Q.  Do you know how many ICE facilities there are?

13       A.  Three, I believe.  I'm not sure.

14       Q.  Do you know what the types of facilities there

15  are for ICE?  Like there are three types of contracts.

16  Do you have any understanding of what they are?

17       A.  I may have seen something about that.  I don't

18  recall.

19       Q.  Okay.  If detention service managers during a

20  nearly three-year period found 14,000 deficiencies at

21  ICE facilities, how many deficiency reports or cure

22  notices would you expect?

23       A.  I can't say.  I can't react to that.

24       Q.  Do you know if GEO ever had money deducted as

25  a result of patter or practice of violations at its

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  facilities?

 2      A.  Of any violation not related to the voluntary

 3  work but just violation?

 4      Q.  Uh-huh.

 5      A.  I don't know.

 6      Q.  Assuming that the OIG is correct and 14,003

 7  deficiencies were found at ICE detention centers in a

 8  three-year period almost, and assuming further that the

 9  OIG is correct that ICE imposed financial penalties

10  only twice, do you have any reason to revisit your

11  conclusion that GEO is compliant with its contract

12  because ICE has never penalized it?

13              MR. DONOHUE:  Object to the form.

14      A.  I would need to know more about these

15  discrepancy reports.  There are circumstances certainly

16  in other agencies where discrepancy reports -- where

17  there are lots of discrepancy reports and no

18  financial -- because they're minor things.  They don't

19  rise to the level of any financial penalty.

20      Q.  Would it change your conclusion if the OIG is

21  correct when it says "Even where ICE does issue

22  discrepancy reports, ICE does not track their use or

23  effectiveness?"

24              MR. DONOHUE:  Object to the form.

25      A.  Could you repeat the question.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      Q.  The Department of Homeland Security's Office

 2  Inspector General says, "Even where ICE does issue

 3  discrepancy reports, ICE does not track their use or

 4  effectiveness."  Would that give you cause to revisit

 5  your conclusions about GEO's compliance with the

 6  contract?

 7                  MR. DONOHUE:  Object to the form.

 8      A.  They're saying that -- the OIG says that ICE

 9  does not track the use or effectiveness of the

10  discrepancy reports that it issues?

11      Q.  Correct.

12      A.  No, that would not cause me to revisit my

13  opinion.

14      Q.  Would it change your opinion if the OIG said

15  "No office within ICE could provide any data on how

16  many discrepancy reports are issued to facilities and

17  for what reasons?"

18                  MR. DONOHUE:  Object to the form.

19      A.  You're asking would that change my opinion?

20      Q.  Uh-huh.

21      A.  No, it would not.

22      Q.  Okay.  Would it change your opinion if you

23  learned that out of $3 billion in total payments and

24  14,000 violations, there were only .13 percent of

25  financial deductions for violations?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1                    MR. DONOHUE:  Object to the form.
 2       A.  No, that would not affect my opinion.
 3       Q.  Is there any rate at which you would pin the
 4  typical level of violation that happens before you get
 5  dinged by a contractor within your field?  Just
 6  generally, what's the violation rate?
 7                    MR. DONOHUE:  Object to the form.
 8       Q.  I'm sorry.  What is the violation rate on
 9  which you are basing your opinion?
10                    MR. DONOHUE:  Object to the form.
11       A.  Without more context about these discrepancy
12  reports, I can't offer a definitive answer.  There are
13  areas within federal contracting where reports of that
14  nature are common and numerous, and they don't mean
15  much.  And there are other areas where they mean more
16  and they sometimes are followed by withholding of
17  money.  But it may be a situation where one in a
18  thousand is something significant, and 999 out of a
19  thousand are not.  So I would need more context to
20  really answer that.
21       Q.  I'm just asking about the basis of your
22  conclusion that because there aren't these indicia of
23  noncompliance, GEO is compliant.  I'm wondering, what
24  are you basing that on?  And it seems to me that you're
25  basing it on the assumption, correct me if I'm wrong,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    that if a contractor violates there is going to be a

2    record of that violation; is that true that that's your

3    assumption?

4                    MR. DONOHUE:  Object to the form.

5        A.   It is my experience that contractors that have

6    the level of oversight that GEO has on this contract,

7    that if there is some dissatisfaction with them, that

8    you see it in the records.  You see it in complaints

9    and withholdings and poor CPAR performance reports and

10   things of that nature, if it's significant.  If it's

11   insignificant, no, you don't see that sort of thing.

12       Q.   So it's your assumption then, and you're

13   saying it's based on your experience, that ICE's

14   inspections and the monitoring of the detention

15   facilities, including Northwest Detention Center, would

16   lead to sustained compliance or systemic improvements;

17   is that your assumption?

18                   MR. DONOHUE:  Object to the form.

19       A.   Sustained compliance or --

20       Q.   Systemic improvements.  You know, something is

21   broken, you fix it.

22                   MR. DONOHUE:  Same objection.

23       A.   The systemic improvements, I haven't thought

24   about whether that's true or not for this.  The

25   sustained compliance I would say materially

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  sustained -- I mean, I would not be surprised if there

2  were knits.  If there were something that the CO said,

3  I wish you would do this differently, I wish you would

4  do that differently, and write them up on some things.

5  But materially compliant, yeah, I would -- based on the

6  information we've gone through, I would be surprised if

7  there is anything if they are not substantially

8  compliant.

9      Q.  So your understanding is the inspection and

10  monitoring regime that you've described in your report

11  would lead to sustained compliance in Northwest, and in

12  fact did.  Is that your understanding?

13              MR. DONOHUE:  Object to the form.

14      A.  I see no evidence that ICE was not satisfied

15  with GEO's oversight of the detainee work program.

16      Q.  And your presumption is that you would?

17              MR. DONOHUE:  Object to the form.

18      A.  If there was any significant dissatisfaction,

19  based on my 33 years of experience, and I'm saying

20  something significant, and it would show up in one of

21  the eight things that I've referenced, so yeah, I think

22  that it would.

23      Q.  Okay.  Maybe the OIG report that you heard of

24  was the one in June of 2018 that was entitled "ICE's

25  inspection and monitoring of detention facilities do

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  not lead to sustained compliance or systemic

2  improvements."  Is that the headline that you saw?

3      A.  I don't remember the headline.

4      Q.  Okay.  ICE concurred with all five

5  recommendations that the OIG made.  But very briefly,

6  the results of OIG's -- and this is OIG report no.

7  18-67 -- no. 1, "Nakamoto inspections are significantly

8  limited.  And the Office of Detention Oversight

9  inspections were not frequent enough."  Were you aware

10 of this finding by the OIG?

11             MR. DONOHUE:  Object to the form.

12     Q.  Would this finding, if true, undermine your

13 conclusion about passing inspection means you're

14 compliant?

15             MR. DONOHUE:  Object to the form.

16     A.  Would you reread the part prior to your

17 question.

18     Q.  Sure.  And we're doing so live.  I would

19 normally like to put it in front of you, but we're

20 working with what we've got.

21         Result 1, "Nakamoto inspections are

22 significantly limited, and Office of Detention

23 Oversight inspections are not frequent enough."  If

24 that's true and the OIG is not tooting its own horn, as

25 you kind of alluded to earlier, would that call into

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  question your conclusion about the fact that there is

 2  no problem with the audit equals GEO's compliant?

 3              MR. DONOHUE:  Object to the form.

 4      A.  And that's just detention facilities

 5  throughout ICE?

 6      Q.  This is all ICE detention facilities.

 7      A.  Yeah.  It doesn't -- I see so many reports

 8  where they say, Yeah, we can do better and thank you

 9  for the advice.  We will do better.  But still if they

10  were not materially compliant, I think the CO and the

11  COR would have been complaining and we would see that.

12      Q.  Okay.  The second conclusion is "Inadequate

13  inspection followup leads to continuing deficiencies."

14  Knowing that the OIG concluded this prior to preparing

15  your report, does that call into question the fourth

16  conclusion about GEO being compliant at Northwest?

17              MR. DONOHUE:  Object to the form.

18      A.  Not at that level of generality.

19      Q.  Okay.  What about "Onsite detention service

20  managers face challenges in improving compliance."

21  Would that undermine the assumptions that go into that

22  fourth conclusion?

23              MR. DONOHUE:  Object to the form.

24      A.  Without knowing something more specific than

25  that it would not.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        Q.  If the office of inspector general concluded
 2   "ICE does not consistently enforce compliance with
 3   detention standards," would that undermine your
 4   conclusion?
 5                MR. DONOHUE:  Object to the form.
 6        A.  Well, at that level of generality, no.
 7        Q.  Why not?
 8        A.  Because it's not related to this contract.
 9   Nothing you've read to me that I am aware of relates
10   only to this contract.  It's just ICE detention
11   throughout, and it's not fraud, waste and abuse.  IG is
12   always an auditor.  It's always going to find an
13   opinion of that sort of thing, that you need to
14   track -- when you do a discrepancy report, you need to
15   track them better.  You need to systemically improve
16   yourself better.  I think -- well, they're not always,
17   but they're often going to find that sort of thing.
18        Q.  "Even well-documented deficiencies that
19   facilities commit to fixing routinely remain
20   uncorrected for years."  Does that alter any of your
21   conclusions?
22                MR. DONOHUE:  Object to the form.
23        A.  Without knowing more about the alleged
24   deficiencies, no.  I don't know if those are important
25   or unimportant.
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1     Q.   "Other examples of repeat deficiencies include

2  the facilities failing to notify ICE about alleged or

3  proven sexual assaults."  Is that an important

4  deficiency?

5             MR. DONOHUE:  Object to the form.

6     A.   You ask if that's an important deficiency?

7  And I don't know if that's an important deficiency.  I

8  don't know what impact it has on the voluntary work

9  program.

10     Q.   Okay.  Do you know what a waiver is?

11     A.   Generally, yes.

12     Q.   Do you know how many waivers ICE gave of its

13  detention standards this year?

14     A.   No, I do not.

15     Q.   Do you know how many waivers have been

16  requested?

17     A.   No.

18     Q.   Do you know if GEO could ask ICE to waive the

19  PBNDS section 5.8?

20     A.   I assume that they could.

21     Q.   If I told you that the Officer of Inspector

22  General found that ICE granted 96 percent of waivers,

23  would that alter your conclusion about the fact that

24  GEO would necessarily need to modify or seek an

25  equitable adjustment to pay more than a dollar?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1              MR. DONOHUE:  Object to the form.

2     A.  I think that GEO would need to at least modify

3  the contract in order to pay more than a dollar.

4     Q.  Why couldn't they seek a waiver?

5              MR. DONOHUE:  Object to the form.

6     A.  People can seek lots of things.  That would be

7  a poor contracting practice.

8     Q.  Why?

9     A.  Because you're trying to mod the contract.  So

10  instead of modifying the contract, you do something

11  kind of back door or -- I would teach that to be

12  inappropriate, not a best practice.

13     Q.  So the 96 times that ICE has done that this

14  year with respect to -- I mean, excuse me -- 180 times

15  that ICE has done that this year, is it just globally a

16  poor contracting practice, or is there something

17  special about this case?

18              MR. DONOHUE:  Object to the form.

19     A.  And maybe I'm combining two of your sentences

20  to draw improper conclusion, but I thought you were

21  saying that waivers related to billing.  And I think

22  you're just talking about waivers of any kind.

23     Q.  Yeah, I understand.

24     A.  Waivers of any kind -- I mean, there's lots of

25  things that I think can be waived without a contract

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   modification.  Something that affects billing I think

2   would typically -- I mean, it would be a poor practice

3   to allow a billing change on the basis of a waiver.

4       Q.  I understand.  Thank you for that

5   clarification.  How many people have died at the

6   Northwest Detention Center since the 2015 contract was

7   entered into?

8       A.  I don't know.

9       Q.  Have you seen any detainee death reviews

10  regarding those deaths?

11      A.  I have not.

12      Q.  Do you know how many people have died at GEO

13  facilities since 2015?

14      A.  I do not.

15      Q.  Is your assumption about the compliance of GEO

16  with its contract at Northwest based on the assumption

17  that ICE and its monitoring personnel are appropriately

18  staffed to do the jobs that they're budgeted for?

19              MR. DONOHUE:  I was going to ask you to

20  read it back.  I just missed the question.

21          [The question was read back by the reporter.]

22              MR. DONOHUE:  Object to the form.

23      A.  I would say that it's based on the assumption

24  that they are adequately staffed -- someone might say

25  appropriately should be higher.  But I think if they

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  weren't at least adequately staffed, there would be

2  more evidence of it.

3      Q.  Would the evidence include the Secretary of

4  Homeland Security saying under oath that ICE is

5  currently staffed for 34,000 beds and is currently

6  detaining 52,000 people so it's 152 percent

7  overdetention understaffing?

8                  MR. DONOHUE:  Object to the form.

9      A.  Without something more specific than that, I

10  can't interpret that related to this contract or even

11  related to what does it mean staffing in that context.

12  I mean, that could be anything.  That could be people

13  in DC at the headquarters are understaffed.  Not

14  necessarily mean that they are understaffed -- that the

15  COR on site is understaffed.  So anyway it's hard to --

16  I can't read a lot into that statistic.

17      Q.  Did you review any staffing plans for

18  Northwest Detention Center in preparing your report?

19      A.  I've seen discussions of them in the

20  deposition transcripts and the staffing plans.  I don't

21  remember --  I don't remember seeing a staffing plan.

22  I may have.

23      Q.  Just want to understand your testimony from

24  earlier regarding the 2015 bid, or solicitation.  Is it

25  your understanding that there were other bidders?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      A.   I think there were, but that was not so

2   material to my opinion or to my report, so I didn't put

3   it in.   But I thought that there were.

4      Q.   What did you base that on?

5      A.   A vague recollection.   I could be wrong.

6      Q.   From what?

7      A.   I don't know.

8      Q.   If GEO were the sole bidder, would its

9   negotiating position be improved or decreased based on

10  your experience?

11     A.   Its negotiating position would be improved.

12     Q.   If not awarding GEO that contract would cause

13  ICE and the federal government to incur millions of

14  dollars in additional infrastructure costs, let's say

15  to move the court out of the Northwest Detention Center

16  that GEO owns, or to move ICE's enforcement and removal

17  operations office that they have out of Tacoma, would

18  that be a consideration that ICE would take in

19  negotiations on the solicitation?

20              MR. DONOHUE:   Object to the form.

21     A.   It would become -- that is something that ICE

22  would have thought about, likely.

23     Q.   How do you know that?

24     A.   You asked would.   I don't know what they

25  thought about when they were negotiating.

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1       Q.   And you don't know whether GEO ever attempted

2   to negotiate the detainee wage rate prior to the award;

3   is that right?

4               MR. DONOHUE:   Object to the form.

5       A.   I saw no evidence in any of the solicitations

6   or contracts that they attempted to negotiate a

7   different detainee wage rate.

8       Q.   Okay.  Do you know if GEO has ever done that

9   with ICE?

10      A.   I don't know.

11      Q.   Are you aware that GEO has admitted to paying

12  more than a dollar to detainees regularly, not as a

13  barber shop, but that's what they get paid at some of

14  its other contracting facilities?

15      A.   I was not aware of that.

16      Q.   Would that change your conclusion that

17  contractors do not have the discretion to pick and

18  choose what's in the solicitation?  I'll give you the

19  specific language, but that's what I'm asking about.

20  You concluded at page 3 of your report "In my

21  experience, individual contractors do not have

22  discretion to propose on some solicitation requirements

23  while declining to propose on others."

24               MR. DONOHUE:   So what's the question?

25      Q.   Does the fact that GEO did it at other

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

 1  facilities change this conclusion?

 2                MR. DONOHUE:  Object to the form.

 3       A.  Well, the sentence reads "In my experience,

 4  individual contractors do not have discretion to

 5  propose on some solicitation requirements while

 6  declining to propose on others, and can only very

 7  rarely cause the procuring agency to change the

 8  contract's requirements and specifications."  So I say

 9  there only very rarely cause the procuring agency to

10  change their specifications.  I didn't say never; I

11  just said very rarely.

12       Q.  What's rare to you?

13       A.  Well, it's less than one percent, especially

14  once -- let's say in the late '90's when the Northwest

15  Detention Center was just people within ICE, INS at the

16  time, were trying to decide how they're going to solve

17  their problems, et cetera.  At that stage they're

18  having discussions with industry, et cetera, they might

19  be able to make a change like this.  After you get

20  rolling, after you have in place and you've got

21  multiple solicitations, to make a change at that stage

22  is very very rare.

23       Q.  Why?

24       A.  I can speculate as to why.  I'm just telling

25  you based on my 33 years of experience with hundreds,

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  probably thousands of these, at that stage it's very

2  rare to see a contractor go back to the agency and say

3  I want to change your solicitation.

4      Q.  Are you aware that in 2009 GEO recorded zero

5  dollars for the voluntary work program as being paid

6  from ICE -- for fiscal '09?  And then the next year GEO

7  recorded something like 90,000.  I'll get you the

8  actual number.  Were you aware of that?

9      A.  Okay.  I need to understand what you're saying

10  a little bit better.

11      Q.  Sure.  In fiscal year 2009, this is document

12  455 in the Wasser [phonetic] case, GEO received zero

13  dollars from ICE for the voluntary work program,

14  according to ICE.  In 2010 they got 90,074.

15      A.  And your question is?

16      Q.  Is that the sort of situation that you're

17  talking about?

18                  MR. DONOHUE:  Object to the form.

19      A.  I don't know that that's accurate.  If it is

20  accurate, I don't know why.  I can't say if it's true

21  why it is true.

22      Q.  And this is about the Northwest Detention

23  facility.  Do you know how many other ICE detention

24  facilities GEO contracts with -- excuse me -- other

25  immigration detention facilities GEO contracts with ICE

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  to operate?

2      A.  No.

3      Q.  Do you know at how many other facilities GEO

4  pays more than a dollar a day?

5      A.  No.

6      Q.  If I told you it was at least 5 out of 15, so

7  33 percent, that would be more rare than 1 percent,

8  right?

9      A.  More rare than one percent?  Can you restate,

10 please.

11     Q.  It would not be as rare as 1 percent.  I

12 misstated the question.

13     A.  33 percent is higher than 1 percent.

14     Q.  Yes.  So it happens if that's true?

15             MR. DONOHUE:  Object to the form.

16     A.  I don't see the relevance of this without

17 understanding their contract.

18     Q.  I understand.

19     A.  Or the contracts at those facilities.

20     Q.  Okay.  Do you know anything about the Homeland

21 Security Advisory Counsel?

22     A.  I've heard of it.  I don't know anything

23 materially about it.

24     Q.  Are you aware of the report that the Homeland

25 Security Recovery Committee did on private prison


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  contracting?
 2      A.  I've seen the headline but I have not read the
 3  report.
 4      Q.  Do you remember anything else about what that
 5  headline was?
 6      A.  No.
 7      Q.  Okay.  I'm going to take two minutes and make
 8  sure I don't have anymore questions for you.
 9                          [A brief recess was taken.]
10      Q.  [By Mr. Free] Thank you, so much.  I have a
11  couple more questions and then we will be done.  So
12  we're back on the record at 7:27.  Okay.  In your
13  experience, in a typical government contracting setting
14  if you had some labor cost built into the contract and
15  then let's say State law changes and it requires an
16  additional expenditure by the contractor, that's not a
17  force majeure, right?
18                  MR. DONOHUE:  Object to the form.
19      A.  I have not considered that.
20      Q.  Okay.  Typically, if there is a change in the
21  state law that requires a contractor to incur more
22  cost, is that something that the contractor would seek
23  a modification on?
24                  MR. DONOHUE:  Object to the form.
25      A.  Yeah.  It's hard to answer at that level of
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1   generality.  If it's immaterial, they probably would

2   not; they probably would just eat it.  If it's

3   significant, and I guess your question is would they

4   and do they have rights to do that, is that the

5   question?

6        Q.  Yeah.

7        A.  Do they have the rights do to that, that gets

8   at is it force majeure, and that varies a lot contract

9   by contract.  I mean, I've seen escalation where a

10  construction contractor bids so much for steel and the

11  price of steel goes way up, it's a fixed-price

12  contract, they still seek reimbursement.  So I can't

13  definitively answer your question.

14       Q.  This contract says that GEO has to comply with

15  all applicable federal, state and local labor laws,

16  right?

17       A.  It lists constraints that impact the contract.

18  And under these constraints that impact the contract is

19  comply with applicable federal, state and local laws.

20       Q.  It also says if there's a conflict in any of

21  these terms, the most stringent standard applies.

22       A.  If you are unclear about that you need to

23  check with the CO.

24       Q.  Do you know if GEO has ever checked with the

25  CO on the question at issue in this case about the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  minimum wage rate?

 2      A.  You're asking me do I know if they ever

 3  checked with the CO?  I do not know.

 4      Q.  Do you know if they ever checked with folks

 5  at ICE in Washington, DC, about this question, the

 6  minimum wage rate under this contract?

 7      A.  I don't know if they have checked with DC.

 8      Q.  How many government contractors would you say

 9  you've worked for, just looking for an estimate, over

10  your 33-year career?

11      A.  Over a thousand, maybe thousands, but over a

12  thousand.

13      Q.  Of those thousand, how many could file an

14  equitable adjustment and get a meeting with the head of

15  the agency within a week face to face between the head

16  of the agency and the contractor's CEO?

17              MR. DONOHUE:  Object to the form.

18      A.  Let me preface this with most of my -- or a

19  significant part of mine are DOD.

20      Q.  So how many of them could get in front of the

21  commander, whatever it is -- how many of them could get

22  in front of the head of the agency that they are

23  contracting with within a week?

24              MR. DONOHUE:  Same objection.

25      A.  My point is when you have a huge 300 billion a
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   year agency, it's a lot different than what you have a

2   billion-a-year agency.

3        Q.  Do you know what the budget is for DHS?

4        A.  I don't.  I was talking ICE when I was saying

5   a billion a year.  I don't know what ICE's annual

6   budget is.  But DHS obviously has a lot more going on

7   than just ICE.

8        Q.  So same question.  Is the answer zero?  What's

9   the answer?

10                 MR. DONOHUE:  Same objection.

11       A.  The question just restated is how many have

12  filed an REA and gotten a meeting with the head of the

13  agency within a week; is that the question?

14       Q.  Yeah.

15       A.  I've never asked that question.  I've never

16  heard of that.  So I --

17       Q.  It's pretty rare, right?

18                 MR. DONOHUE:  Object to the form.

19       A.  At that level of specificity -- well, one, I

20  don't ask, and I don't know how many people -- meetings

21  with the head of the agency are kind of like you're

22  going to get that from the biggies.  And for -- I don't

23  know how GEO compared to the other contractors for DHS,

24  maybe they classify it.  But like Boeing, Lockheed

25  Martin, Ratheon, Leidos, et cetera, et cetera, they get

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  meetings with the head of the agency regularly.

2      Q.  These are people you've consulted with?

3      A.  Boeing, Lockheed Martin, Ratheon -- yeah, I

4  think, yes.

5      Q.  What does that tell you about their market

6  position, that they're able to get that meeting so

7  quickly?

8              MR. DONOHUE:  Object to the form.

9      A.  Market position?  What's that mean?

10     Q.  I'm just restating "biggies" in a fancier way,

11 trying to understand what you mean.

12     A.  You can work on critical programs and not

13 necessarily be big.  And there are the companies that

14 are working on critical programs that the head of the

15 agency is very concerned with.  Like right now cyber

16 security is very big, very important.  And the

17 contracts are not necessarily very large, but the

18 importance is there.  So they likely can get meetings

19 like that.  I don't know if I answered your question.

20     Q.  It's my understanding that you spoke to no one

21 from ICE before issuing your report?

22     A.  That is correct.

23     Q.  Why not?

24     A.  Well, I had a declaration which was, I felt --

25 the declaration of Tae Johnson, number 7 on my appendix



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  3.  And I think that was arguably better, or it was a

2  replacement, if you will, for a conversation with

3  someone from ICE.

4        [Exhibit No. 205 was marked for identification.]

5     Q.  So after reading this declaration, you had no

6  questions for Tae Johnson or anyone else at ICE that

7  you wanted to follow up on before writing your report?

8     A.  Your question is did I have any followup

9  questions or did I -- could you repeat your question.

10         [The question was read back by the reporter.]

11    A.  I don't remember thinking to myself, Oh, I

12  need to talk to Mr. Johnson or I need to talk to

13  someone at ICE.  I think that answers your question.

14    Q.  As you sit here today, has anything that you

15  have learned during our colloquy caused you to question

16  whatever is in Mr. Johnson's declaration?

17    A.  Our colloquy?

18    Q.  Our discussion.

19    A.  It has not.  I haven't reread this just now.

20    Q.  That's fine.  All right.  Do you know how many

21  times the GEO contract has been modified since it

22  was -- excuse me.  Do you know how many times since GEO

23  took over performance from CSC at the Northwest

24  Detention Center over the course of the contract

25  history, including three contracts, do you know how

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1  many times they've sought modifications?

 2              MR. DONOHUE:  Object to the form.

 3      A.  Modifications of any kind?

 4      Q.  Yes.

 5      A.  No, I don't.

 6      Q.  So I'm assuming you don't know how many times

 7  they have ever been denied modifications?

 8              MR. DONOHUE:  Same objection.

 9      A.  Same answer.

10      Q.  What is the highest profit margin that you

11  have ever seen in a government contract that you worked

12  on?

13      A.  Approximately 70 percent.

14      Q.  What kind of contract was that?

15      A.  That was transportation services in

16  Afghanistan.

17      Q.  What about domestically, non DOD?

18      A.  It's hard to sort through.  There are so many.

19  Well, okay.  I can't parse my memory non DOD versus

20  DOD, but I will say, like, 45 I've seen domestically.

21      Q.  Do you remember what type of contract it was?

22      A.  That particular one -- and I've seen a few in

23  the high 30s and 40s.  The one I was thinking about

24  first was for hardware.  It was non services.

25      Q.  What's the highest that you can remember
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1  seeing in a services contract?

2          MR. DONOHUE:  Object to the form.

3      A.  Well, okay.  I've seen quite high, in the 70

4  percent range, again, for services.  It's just that

5  you -- and you didn't -- in contingency operations

6  where you are operating in a difficult part of the

7  world, it's hard to estimate.  And you do something on

8  a fixed-price basis, it's hard to estimate how bad it

9  could get.  So contractors bid a high fixed price

10 because otherwise it could go very badly.  And if they

11 get -- and if then things, you know, roll of the dice,

12 luck, whatever, things don't go that badly, they make a

13 lot of profit and they're also incentivized for even

14 taking on work like that.

15     Q.  Does GEO's contract fall within that type of

16 contract you're thinking about when you describe that?

17          MR. DONOHUE:  Object to the form.

18     A.  It's not like the form, but it's very hard to

19 manage -- my impression is it's very hard to manage a

20 contract like GEO's contract for the Northwest

21 Detention Center.  So there is a fair amount of risk,

22 and profit should follow risk; in other words, high

23 risk -- if you're going to sign up to a risky contract,

24 you should get a high profit rate.

25     Q.  What's a high profit rate?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    MR. DONOHUE:  Object to the form.
 2        A.  It varies depending on the circumstance.  I
 3   have a hard time just saying what is high without some
 4   parameters around it.
 5        Q.  For a fixed-price contract in a services
 6   environment, non-foreign services, what's a good day at
 7   the office for one of your clients in terms of profit
 8   rate?
 9                    MR. DONOHUE:  Object to the form.
10        A.  Well, I will say that you tend to do better on
11   mods than on the base contract -- sometimes there are
12   situations, so a higher profit rate on mods on a base
13   contract, and then where you have a lot of risk -- you
14   know, in the twenties.
15        Q.  In the twenties.  Okay.  All right.  So what's
16   the profit that GEO has actually realized at Northwest
17   during the course of the contract?
18        A.  I don't know.
19        Q.  Do you know if it's ten percent or more or
20   less?
21                    MR. DONOHUE:  Object to the form.
22        A.  I've already answered that.  I don't know.
23        Q.  Okay.  Thank you.  Is there anything now as
24   you sit here about any of the answers you have given so
25   far that you want to change or modify or correct or
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
  1  amend?

  2      A.  Nothing comes to mind.

  3      Q.  Okay.  You'll have an opportunity to do that,

  4  I think, once we get the transcript.  Is there anything

  5  as you sit here right now that you think you should

  6  have looked at before creating your report that you

  7  didn't?

  8              MR. DONOHUE:  Object to the form.

  9      A.  It's hard for me to parse through -- well,

 10  like, Ryan Kimble's 30(b)(6).  I wish I had read that

 11  before -- would have been nice to have read that before

 12  my report.  I wasn't aware of it.

 13              MR. DONOHUE:  It didn't exist -- or

 14  maybe it did.  I apologize.  I'm not sure the

 15  transcript existed.

 16              MR. FREE:  Who's testifying here?

 17              MR. DONOHUE:  Well, we've gone so long,

 18  we might as well switch out witnesses.

 19      Q.  [By Mr. Free] All right.

 20      A.  So your opinion question is, is there anything

 21  do I think I should have looked at?  Is that what your

 22  question was?

 23              MR. FREE:  Could you read back my

 24  question.

 25              [The question was read back by the reporter.]
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1       A.  Well, I'm curious certainly about those IG

2   reports, but I didn't hear anything in what you read

3   that was specific enough or that causes me much concern

4   about.  But should I have read that before my report,

5   not sure.  As far as anything else, no, nothing comes

6   to mind.

7       Q.  If you had known that GEO pays more than a

8   dollar a day and gets reimbursed by ICE for a dollar at

9   no fewer than five of its other facilities, prior to

10  writing your report would you have wanted to look at

11  those contracts?

12              MR. DONOHUE:  Object to the form.

13      A.  I'm certainly curious about the circumstances

14  and what their contract looks like and how they

15  square -- if their contract reads like these contracts,

16  how they square that.  So I'm curious about that.

17      Q.  Okay.  Thank you.  Those are all the questions

18  that I have for you.

19              MR. FREE:  Thank you, very much, for

20  being so accommodating.  I'm sorry you missed your

21  call.  I'm sorry you missed your flight.  Sorry you

22  missed your dinner.  Thank you, very much.

23                      [Deposition concluded at 7:48 p.m.]

24                              [Signature reserved.]

25

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1                    CORRECTION & SIGNATURE SHEET

2    RE:  STATE OF WASH. VS. GEO GROUP, INC.
          US DIST CT, WEST DIST WASH, 3:17-CV-05806-RJB
3         GREG BINGHAM, 5/22/19
           Reported by:  CATHERINE A. DECKER, CCR No. 1975
4

5         I, GREG BINGHAM, have read the within

6    transcript taken MAY 30, 2019, and the same is true and

7    accurate except for any changes and/or corrections, if

8    any, as follows:

9    PAGE/LINE              CORRECTION            REASON

10   _____

11   _____

12   _____

13    _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22            Signed at _____, Washington,

23    on this date: _____

24

25            _____
                         GREG BINGHAM
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3      I, CATHERINE A. DECKER, the undersigned Certified

 4  Court Reporter, pursuant to RCW 5.28.010 authorized to

 5  administer oaths and affirmations in and for the state

 6  of Washington, do hereby certify that the sworn

 7  testimony and/or proceedings, a transcript of which is

 8  attached, was given before me at the time and place

 9  stated therein; that any and/or all witness(es) were by

10  me duly sworn to tell the truth; that the sworn

11  testimony and/or proceedings were by me

12  stenographically recorded and transcribed under my

13  supervision, to the best of my ability; that the

14  foregoing transcript contains a full, true, and

15  accurate record of all the sworn testimony and/or

16  proceedings given and occurring at the time and place

17  stated in the transcript; that a review of which was

18  requested; that I am in no way related to any party to

19  the matter, nor to any counsel, nor do I have any

20  financial interest in the event of the cause.

21      WITNESS MY HAND this 10th day of June 2019.

22

23

24  CATHERINE A. DECKER,
    Washington State Certified Court Reporter, #1975
25  cdecker@yomreporting.com
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com