The Honorable Robert J. Bryan

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

10

STATE OF WASHINGTON,

CIVIL ACTION NO. 3:17-cv-05806-RJB

11

Plaintiff,

12

v.

STATE OF WASHINGTON'S
TRIAL BRIEF

13

THE GEO GROUP, INC.,

14

Defendant.

15
16
17
18
19
20
21
22
23
24
25
26

STATE OF WASHINGTON'S TRIAL BRIEF

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**TABLE OF CONTENTS**

I.   INTRODUCTION...................................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................................... 1

III. APPLICATION OF THE LAW ................................................................................. 5

     A.   Despite Applicable State Law, GEO Fails to Pay Detainee Workers the
          Minimum Wage ............................................................................................... 5

          1.   The MWA Broadly Protects Washington Workers............................... 5

          2.   The MWA's Express Language Makes Clear That GEO is an Employer
               and Detainee Workers Are Its Employees ........................................... 6

          3.   Even if the Economic-Realities Test Applies, GEO Is an Employer and
               Detainee Workers Are Employees ........................................................ 8

          4.   No MWA Exemption Applies ............................................................. 12

               a.   No Volunteer Exemption Applies............................................ 12

               b.   The Residential Exemption Does Not Apply ........................... 13

               c.   The Government-Operated Facility Exemption Does Not Apply and
                    GEO's Attempts to Re-Write It Should Be Rejected ............... 14

     B.   GEO is Unjustly Enriched When Paying Detainee Workers $1 Per Day for
          Work Performed ............................................................................................. 16

     C.   GEO Cannot Avail Itself of Any Immunity.................................................. 21

          1.   Derivative Sovereign Immunity Does Not Apply Because ICE Nowhere
               Requires GEO to Pay Detainee Workers $1 per Day for Work Performed..... 21

          2.   Intergovernmental Immunity Does Not Apply Because GEO Is Not
               Being Treated Differently Than Any Other Private Business.................... 25

IV.  RELIEF SOUGHT .................................................................................................. 29

     A.   Washington Seeks an Injunction Requiring GEO to Comply with the MWA
          for Work Performed........................................................................................ 29

     B.   Washington Seeks Disgorgement of GEO's Unjustly Retained Benefit................. 30

# TABLE OF AUTHORITIES

## Cases

*Anfinson v. FedEx Ground Package Sys., Inc.*,
   281 P.3d 289 (Wash. 2012) ..................................................................... 6, 7, 8

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ............................................................................ 19

*Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*,
   810 P.2d 12 (Wash. Ct. App. 1991) .................................................................. 17

*Becerra v. Expert Janitorial, LLC*,
   332 P.3d 415 (Wash. 2014) ....................................................................... passim

*Berry v. Transdev Servs., Inc.*,
   No. C15-01299-RAJ, 2017 WL 1364658 (W.D. Wash. Apr. 14, 2017) ................ 9

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
   797 F.3d 720 (9th Cir. 2015) .............................................................. 22, 24, 25

*Calhoun v. Washington*,
   193 P.3d 188 (Wash. Ct. App. 2008) ................................................................ 16

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016) ............................................................... 21, 22, 23

*Chandler v. Wash. Toll Bridge Auth.*,
   137 P.2d 97 (Wash. 1943) ................................................................................ 17

*Cox v. O'Brien*,
   206 P.3d 682 (Wash. Ct. App. 2009) ............................................................... 30

*David v. Bankers Life & Cas. Co.*,
   No. C14-766RSL, 2018 WL 3105985 (W.D. Wash. June 25, 2018) ................... 13

*Dawson v. Steager*,
   139 S. Ct. 698 (2019) ....................................................................................... 27

*Drinkwitz v. Alliant Techsystems, Inc.*,
   996 P.2d 582 (Wash. 2000) ................................................................................ 6

*Ellenburg v. Larson Fruit Co.*,
   835 P.2d 225 (Wash. Ct. App. 1992) ................................................................ 18

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988)........................................................................................... 29

*Heaton v. Imus*,
   608 P.2d 631 (Wash. 1980) ......................................................................... 19, 30

*Hendryx v. Turner*,
    187 P. 372 (Wash. 1920) ................................................................ 19

*Hill v. Xerox Bus. Servs., LLC*,
    426 P.3d 703 (Wash. 2018) ............................................................. 6

*Hisle v. Todd Pac. Shipyards Corp.*,
    93 P.3d 108 (Wash. 2004) ........................................................ 13, 19

*In re KBR, Inc., Burn Pit Litig.*,
    744 F.3d 326 (4th Cir. 2014) .................................................... 22, 23

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
    633 F. Supp. 2d 892 (N.D. Cal. 2007) ............................................ 26

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
    No. 17-5217, 2019 WL 2552955 (D.C. Cir. June 21, 2019) ................... 22

*Lynch v. Deaconess Med. Ctr.*,
    776 P.2d 681 (Wash. 1989) ............................................................ 17

*Magana v. Northern Mariana Islands*,
    107 F.3d 1436 (9th Cir. 1997) ....................................................... 13

*Menocal v. GEO Grp., Inc.*,
    113 F. Supp. 3d 1125 (D. Colo. 2015) ............................................ 21

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir. 2018) ....................................................... 21

*Mitchell v. PEMCO Mut. Ins. Co.*,
    142 P.3d 623 (Wash. Ct. App. 2006) .............................................. 13

*North Dakota v. United States*,
    495 U.S. 423 (1990) ................................................................ 25, 26

*Novoa v. GEO Grp., Inc.*,
    No. EDCV 17-2514 JGB (SHKx), 2018 WL 4057814 (C.D. Cal. Aug. 22, 2018) .............. 22

*Osborn v. Boeing Airplane Co.*,
    309 F.2d 99 (9th Cir. 1962) ........................................................... 18

*Paradise Valley Investigation & Patrol Servs., Inc. v. U.S. Dist. Court*,
    521 F.2d 1342 (9th Cir. 1975) ....................................................... 20

*Real v. Driscoll Strawberry Assocs., Inc.*,
    603 F.2d 748 (9th Cir. 1979) ......................................................... 13

*Rocha v. King County*,
    460 P.3d 624, 2020 WL 1809610 (Wash. 2020) ......................... 6, 7, 15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Salim v. Mitchell*,
   268 F. Supp. 3d 1132 (E.D. Wash. 2017)................................................................. 22

*Seattle Prof'l Eng'g Emps Ass'n v. Boeing Co.*,
   991 P.2d 1126 (Wash. 2000), *amended by* 1 P.3d 578 (Wash. 2000) ........................ 19, 20

*SEC. v. Rind*,
   991 F.2d 1486 (9th Cir. 1993) ................................................................................ 20

*Tift v. Prof'l Nursing Servs., Inc.*,
   886 P.2d 1158 (Wash. Ct. App. 1995)...................................................................... 7

*Torres-Lopez v. May*,
   111 F.3d 633 (9th Cir. 1997) ................................................................................ 9, 10

*Town Concrete Pipe of Wash., Inc. v. Redford*,
   717 P.2d 1384 (Wash. Ct. App. 1986)...................................................................... 20

*U.S. Postal Serv. v. City of Berkeley*,
   No. C 16-04815 WHA, 2018 WL 2188853 (N.D. Cal. May 14, 2018) ........................ 26

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ................................................................................ 28, 29

*United States v. County of Fresno*,
   429 U.S. 452 (1977)................................................................................................ 25

*W. Coast Hotel Co. v. Parrish*,
   300 U.S. 379 (1937)................................................................................................ 6

*Washington v. United States*,
   460 U.S. 536 (1983)................................................................................................ 26

*Yearsley v. W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940).................................................................................................. 22

*Young v. Young*,
   191 P.3d 1258 (Wash. 2008) ................................................................ 17, 20, 30, 31

### Statutes

Wash. Rev. Code § 49.46.005 ................................................................................ 6

Wash. Rev. Code § 49.46.010(2)............................................................................ 6, 7

Wash. Rev. Code § 49.46.010(3)............................................................................ 6, 7

Wash. Rev. Code § 49.46.010(3)(d) ...................................................................... 12

Wash. Rev. Code § 49.46.010(3)(e) ...................................................................... 12

1     Wash. Rev. Code § 49.46.010(3)(j) ................................................................ 12

2     Wash. Rev. Code § 49.46.010(3)(k) ................................................ 12, 16, 27

3     Wash. Rev. Code § 49.46.020(1) .................................................................. 6

4     Wash. Rev. Code § 49.46.090(1) ................................................................ 13

5

### <u>Other Authorities</u>

6     6A *Washington Practice: Washington Pattern Jury Instructions: Civil* 330.90
7      (7th ed. 2019) .......................................................................................... 8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.    INTRODUCTION

The State of Washington (Washington) brings this action against The GEO Group, Inc. (GEO) in its *parens patriae* capacity to ensure that, as a publicly-traded, for-profit corporation doing business in Washington, GEO complies with Washington's Minimum Wage Act (MWA), and disgorges the benefits it received from its longstanding practice of paying detainee workers only $1 per day for work performed. GEO operates the Northwest Detention Center (NWDC) in Tacoma, Washington on the backs of detained individuals awaiting their immigration proceedings.[1] Detainee workers prepare and provide up to 4,725 meals per day; wash the clothes and bedding of up to 1,575 detainees who reside in the facility; fold and distribute laundered items; provide barbering services; clean the common areas; buff and wax floors; and otherwise maintain the facility. GEO controls, supervises, and benefits from its large-scale detainee workforce. Based on the law and the overwhelming, undisputed evidence, GEO is in an employment relationship and must pay detainee workers the minimum wage. Even if the jury decides differently, the Court should conclude GEO has been unjustly enriched.

# II.    FACTUAL BACKGROUND[2]

GEO has owned and operated the NWDC in Tacoma since November 2005. GEO renamed the Northwest Detention Center (NWDC) to the Northwest ICE Processing Center (NWDC) in 2019, but it remains a GEO-owned-and-operated facility. At the NWDC, GEO contracts with U.S. Immigration and Customs Enforcement (ICE) to provide detention management services, including daily bed space for up to 1,575 immigrant detainees. Pursuant to its detention contract with ICE (the GEO-ICE Contract), GEO is required to perform in accordance with specific statutory, regulatory, policy, and operational constraints, including the

---

[1] GEO recently renamed the NWDC as the "Northwest ICE Processing Center" in September 2019. Washington refers to the facility as the NWDC to be consistent with prior briefing and documentary evidence.

[2] All facts set forth in this section have been drawn from prior filings in this case, in which citations to supporting evidence were provided. Those citations have been omitted here in the interest of readability.

ICE/DHS Performance Based National Detention Standards (PBNDS) and applicable federal, state, and local laws—including "state and local labor laws[.]" "Should a conflict exist between any of these standards," GEO must comply with "the most stringent" law or standard.

GEO developed a detainee work program at the NWDC called the "Voluntary Work Program" (VWP). Approximately 470 detainees work in the NWDC each day. GEO is responsible for the development and administration of the VWP, which provides detainees opportunities to work and earn money while detained. The money detainee workers earn through the program allows them to buy commissary goods, and pay for phone calls, etc. GEO maintains detainee job description forms that specify the "work duties," "normal work hours," "training requirements," and other details of available positions.

GEO's Classifications Department hires and assigns detainee workers to these positions and particular shifts. Before starting any position, the detainee worker is required to sign a "Voluntary Work Agreement" and job description. Once signed, GEO provides detainee workers with all equipment, materials, and personal protective equipment necessary for the job. Detainees are "required to work as scheduled." GEO officers train detainee workers on all applicable health and safety regulations and supervise the detainee workers' performance. According to GEO's policy, "[u]nexcused absences from work or unsatisfactory work performance may result in removal from the voluntary work program." Detainee workers are typically paid the day after work is performed.

The GEO-ICE contract requires that the VWP comply with all applicable laws and the PBNDS, and not conflict with any other requirements of the contract. The PBNDS provides that "[d]etainees shall receive monetary compensation for work completed" of "at least $1.00 (USD) per day," while also requiring GEO comply with all state labor laws. State labor law requires employers to pay its employees the minimum wage, but GEO chooses to pay detainee workers only $1 per day for work performed. As GEO has acknowledged in meeting minutes, internal memos, and responses to Requests for Admission in this litigation, GEO has the option to pay

detainee workers more under the GEO-ICE contract. In fact, GEO has exercised that option in certain circumstances; for example, when detainee workers agreed to work a double or triple shift in the kitchen, GEO paid them $5 per day; when detainee workers worked a barbershop shift in addition to another job, GEO paid them $2 per day ($1 for each shift).

Though paid far below the minimum wage, detainee workers perform work that is at the heart of GEO's core operations and contractual obligations. For example, the GEO-ICE contract requires that GEO prepare three meals per day for approximately 1,575 detainees housed in the facility. Detainee workers are an essential component of the food services operation staffing plan. GEO's daily kitchen staffing model currently provides for nearly one hundred detainee workers assigned to specific shifts: twenty-five to thirty workers for each meal plus ten to twelve workers on the night cleaning crew. Detainee workers sign kitchen worker rules and regulations, including regarding health and hygiene, and complete kitchen training/orientation regarding kitchen expectations, standards and procedures, hazardous chemical safety, and use of personal protective equipment, including uniforms, hair nets, beard guards, and slip-resistant boots, which GEO provides and requires them to use when working. Detainees work in all areas of the kitchen, including preparing, cooking, and plating meals; washing all dishes; cleaning the kitchen; and helping to track inventory. For each meal shift, GEO assigns three "Food Supervisors" to manage the kitchen and supervise the detainee workers. GEO achieves its heavy food service volume, and complies with its corporate food service policies, contractual obligations, the PBNDS, and food safety requirements, by leveraging a large number of detainee workers in all areas of its kitchen operations.

Detainee workers also contribute to GEO's core contractual obligation to provide clean linens throughout the facility. Pursuant to the GEO-ICE Contract, GEO must provide a facility laundry and ensure that each detainee's uniform, personal clothing, and linens are thoroughly cleaned and disinfected. To achieve those ends, between four and eight detainee workers at the NWDC work in an industrial sized laundry facility under the supervision of one GEO Officer.

Laundry shifts are approximately six-hours and require workers to sort, wash, dry, and fold the clothing, bedding, and towels used in the NWDC, and clean the parts of the NWDC dedicated to laundry work. In addition, once the laundry is washed and dried, dozens more female detainee workers fold and prepare the laundry for distribution. Before beginning work as a laundry worker, detainees must complete laundry training, which a GEO officer provides, that covers physical safety measures including special procedures for cleaning laundry from the medical units.

Next, GEO assigns detainee workers to complete core janitorial work of the secure side of the facility. The "pod porter" position is the most prevalent janitorial work opportunity. Pod porters are assigned to one of three shifts, and are responsible for cleaning common toilets, sinks, and showers; sweeping and mopping the floors; distributing and collecting food trays; distributing laundry and commissary; and performing general upkeep in the common areas of "pods"—the living areas that house more than fifty individuals. Detainee workers also perform janitorial work outside of their living units in the Medical Area, Recreation Area, Law Library/Barbershop, Intake Area, and Visitation Area. In janitorial positions outside the pods, detainee workers sweep floors, empty trash receptacles, wipe down and disinfect surfaces. Detainee worker duties are substantially similar, if not identical, to the work performed by non-detained janitors who work in the non-secure part of the facility.

GEO also assigns detainee workers to heavy janitorial work in the common areas and the Grey Mile hallways; these are "temporary work details" that can span from several hours up to several days. GEO may assign detainee workers to paint walls within the pods and in all communal areas when a wall has a scratch or other maintenance issue. GEO may also assign detainee workers to sweep and mop the floors. Other times GEO may assign detainee workers to use machinery and chemicals to strip, buff, and wax the floors. Since common-area maintenance must happen when there is less foot traffic in the hallways, the detainee workers assigned to these work details often work during counts and/or at night. No job descriptions exist

for these "as-needed jobs." GEO's detention officers train detainee workers on the materials, cleaning chemicals, and personal protective equipment, and supervise the work performed.

GEO also assigns detainee workers to the NWDC barbershop. In fact, the NWDC barbershop is completely staffed by detainee workers. Detainees work as barbers, shaving and cutting detainees' hair, and are also responsible for cleaning the work area. Detainees assigned as barbershop cleaners are responsible for keeping the barbershop hygienic and for cleaning and oiling clippers, storing combs in a sanitized solution, sweeping floors, and cleaning the sinks and chairs after the barbers complete their work. According to GEO's policies, the regular barbershop schedule includes detainee barbers working in the morning and designated detainee cleaners who clean and sanitize all tools and the barbershop. There are six to eight barbers at any given time, who are scheduled as GEO directs.

In sum, GEO has relied on detainee workers to complete its core functions required under the GEO-ICE contract. Although GEO has made a substantial profit from NWDC operations every year that would more than cover the increased cost of paying its workers the minimum wage, GEO has chosen to pay detainee workers only $1 per day for that work. Washington brings claims against GEO to correct this violation of the MWA and ensure it is followed moving forward, as well as to disgorge the amounts by which GEO has been unjustly enriched by this longstanding labor practice.

### III.   APPLICATION OF THE LAW

**A.   Despite Applicable State Law, GEO Fails to Pay Detainee Workers the Minimum Wage**

**1.   The MWA Broadly Protects Washington Workers**

Minimum wage laws serve a remedial purpose of "insur[ing] that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage[.]" *Anfinson v. FedEx Ground Package Sys., Inc.*,

281 P.3d 289, 299 (Wash. 2012) (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)). Washington's MWA is no exception.

Washington has a "long and proud history of being a pioneer in the protection of employee rights." *See Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 586 (Wash. 2000). The State first adopted a minimum wage law in 1913, a full twenty-five years before Congress enacted the federal Fair Labor Standards Act (FLSA). *See id.* at 586; *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 386 (1937). To achieve its purpose of providing robust workplace coverage, Washington law demands that courts "liberally construe the provisions of the MWA . . . in favor of workers' protections and their right to be paid a minimum wage for each hour worked." *Hill v. Xerox Bus. Servs., LLC*, 426 P.3d 703, 709 (Wash. 2018) (citing *Becerra v. Expert Janitorial, LLC*, 332 P.3d 415, 420 (Wash. 2014)). *See also* Wash. Rev. Code § 49.46.005. While the MWA contains some exemptions, those exemptions are "narrowly confined." *See Hill*, 426 P.3d at 709 (quoting *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 42 P.3d 1265, 1267 (Wash. 2002) (alteration in original)). As the Washington Supreme Court held, the exemptions apply only to situations that are "plainly and unmistakably consistent with the terms and spirit of the legislation." *Drinkwitz*, 996 P.2d at 587. Here, the MWA covers detainee workers, and GEO violates the MWA hundreds of times a day.

**2.    The MWA's Express Language Makes Clear That GEO is an Employer and Detainee Workers Are Its Employees**

Under the clear language of the MWA, GEO is an employer that must pay its detainee workers the minimum wage. The MWA requires "employers" to pay their "employees" the state minimum wage. Wash. Rev. Code § 49.46.020(1). The MWA defines "employee" broadly as "any individual employed by an employer" and defines "employ" as "to permit to work." Wash. Rev. Code § 49.46.010(3), (2). Instead of identifying specific categories of employment, the MWA broadly includes all workers "permit[ted] to work." *Rocha v. King County*, 460 P.3d 624, 2020 WL 1809610, at *3 (Wash. 2020). The MWA question, therefore, is whether

GEO "permits" detainees "to work," and thereby "employs" them. Wash. Rev. Code § 49.46.010(2); *Becerra*, 332 P.3d at 420.

Washington courts have reached beyond the statute and used two different multi-factor tests to evaluate the "economic realities" of an employment relationship only in limited and unrelated circumstances: to determine whether an employer is a "joint employer" and to determine whether a worker is an "independent contractor[]." *See, e.g., Becerra*, 332 P.3d at 420 (considering whether an employer is a "joint employer"); *Anfinson*, 281 P.3d at 298-99 (determining whether an individual is an independent contractor). The circumstances here are different: GEO has never argued that another entity employs the detainees for purposes of the "joint employer" doctrine, and has never argued that detainee workers are "independent contractors." Nor is there any Washington case law that directs the Court to disregard the MWA's clear language and instead utilize an open-ended, multi-factor approach when, as in this case, the only question is whether workers meet the statutory definition of being "employ[ed]"—engaged or permitted to work.

In determining whether detainee workers are employees, the Court need not go beyond the definitions contained in the statute itself. *Rocha*, 460 P.3d 624, 2020 WL 1809610, at *3 ("[C]ases involving statutory interpretation analysis begins with the statutory language.") Indeed, employment status is a question of law, rather than fact. *See Tift v. Prof'l Nursing Servs., Inc.*, 886 P.2d 1158, 1161 (Wash. Ct. App. 1995) ("The ultimate finding as to employee status is not simply a factual inference drawn from historical facts, but more accurately, is a legal conclusion based on factual inferences drawn from historical facts.").

An inquiry based on the statutory text will require the jury to use common sense by considering and applying the terms "permit," "work," "employer," and "employee" to the circumstances at hand. *See* Wash. Rev. Code § 49.46.010(2)-(3). Although the MWA carves out from the definition of "employee" limited exemptions, such exemptions are construed narrowly and, as discussed below, none apply here. By design, all workers "permitted to work," but not

covered by an explicit exemption, are included in the MWA's protections. Here, the evidence will show GEO prepares job descriptions for each position, manages detainee workers' applications and assignments, determines the work schedule and shift assignments, provides detainee workers with uniforms and personal protective equipment, trains them, supervises them, pays them for their work, and, if necessary, fires them. Since no exemption applies, and GEO certainly engages or permits detainee workers to work, GEO must pay detainee workers the minimum wage.

### 3. Even if the Economic-Realities Test Applies, GEO Is an Employer and Detainee Workers Are Employees

Nonetheless, if the Court is inclined to consider an inapplicable multi-factor test, which it should not, the factors identified in *Becerra* for analyzing joint employer status and *Anfinson* for evaluating whether one is an independent contractor still demonstrate that an employment relationship exists here.

Under the economic-realities tests, the relevant inquiry is whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself. *Anfinson*, 281 P.3d at 299. In considering whether an employee is an independent contractor, for example, Washington courts consider a myriad of factors, including: (1) the right to control, and degree of control exercised by defendant over a worker; (2) the extent of relative investments of defendant and the worker; (3) the degree to which the worker's opportunity for profit or loss is determined by defendant; (4) the skill and initiative required in performing the job; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the defendant's business. *See* 6A *Washington Practice: Washington Pattern Jury Instructions: Civil* 330.90 (7th ed. 2019)(citing *Anfinson*). "These factors are not exclusive and are not to be applied mechanically or in a particular order." *Becerra*, 332 P.3d at 421. Instead, "[t]he determination of the relationship does not depend on such isolated factors." *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

1    Put another way, the test "offers a way to think about the subject and not an algorithm." *Becerra*,

2    332 P.3d at 421.

3         Here, after considering the factors *in toto*, it is clear that GEO is an employer who must

4    pay detainee workers the minimum wage. First, the evidence shows GEO exerts complete control

5    over when, where, and how detainee workers perform their duties in the NWDC. *See*

6    *Torres-Lopez v. May*, 111 F.3d 633, 642 (9th Cir. 1997) (finding sufficient control where

7    employer "exercised significant control" including setting the work schedule, determining the

8    number of workers needed, and inspecting all work performed); *Berry v. Transdev Servs., Inc.*,

9    No. C15-01299-RAJ, 2017 WL 1364658, at *4-5 (W.D. Wash. Apr. 14, 2017) (finding sufficient

10   control where an employer dictated how duties were performed). GEO staff develop job

11   descriptions, determine staffing levels, and assign detainee workers to specific shifts for all work

12   performed in the detention center.

13        For example, detainee workers work three shifts in the kitchen—*i.e.* breakfast, lunch, and

14   dinner—and GEO sets the times of these shifts, each shift typically lasting approximately five

15   hours. Even the work performed by pod porters in the living units is rigidly scheduled. GEO

16   requires detainee workers to undergo extensive training prior to performing certain jobs,

17   including working in the kitchen and the barbershop. GEO provides detainee workers detailed

18   directions regarding the type of chemicals and cleaning tools to use when cleaning the NWDC.

19   Further, for certain positions, GEO requires detainee workers to wear uniforms, hair restraints,

20   and sets targets for detainee workers' personal hygiene—*e.g.* daily showers, weekly hair

21   washing, use of deodorant, and nails clean and well-trimmed. In short, GEO exerts control over

22   how detainee work will be performed.

23        The second, third, fourth, and fifth factors likewise show detainee workers are

24   employees—not independent contractors. GEO's relative investment far outweighs that of the

25   detainee workers. All work occurs in GEO's facility and GEO provides all necessary equipment,

26   uniforms, and personal protective needs. Detainee workers have no opportunity to impact their

rate of profit or loss. With pay capped at $1 per day, detainee workers are paid per detail performed. VWP jobs are pre-determined and the pay remains constant regardless of which detainee performs that task. Likewise, little skill or initiative is required to perform the job. The jobs are not specialized and more akin to a position on an assembly line. Neither the detainee's skill or initiative matters as long as the job is complete. The relationship is also permanent for as long as the detainee worker is detained at the NWDC. Indeed, detainee workers can only work for GEO; they are unable to have any other relationship with any other employer. And absent conduct that would result in GEO firing them, they may continue to work for GEO for as long as they choose.

Finally, the services detainee workers render are an integral part of GEO's business. The detainee workers who toil in the kitchen, cook, serve, and plate food in accordance with food health and safety requirements to ensure that GEO can feed the 1,575 people who are housed in its facility. *See Torres-Lopez*, 111 F.3d at 644. Detainee workers who cut hair in the barbershop ensure that GEO can meet the health and safety standards required of private detention operators. The janitorial and laundry services detainee workers provide likewise allow GEO to meet its contractual obligations and meet industry standards. There is no question the services detainee workers render are integral to GEO's business.

If the Court goes further than the *Anfinson* factors and considers any of the additional economic reality factors that courts have invoked in other circumstances, Washington will still prevail. *See Becerra*, 332 P.3d at 421. In considering whether a defendant is a joint employer, the *Becerra* court also considered defendant's power to determine the pay rates or methods of payments of the workers; defendant's right to hire, fire, or modify the conditions of employment; defendant's preparation of payroll and the payment of wages; whether the work is similar to that of a specialty job in a production line; whether responsibility under the contracts between a labor contractor and defendant pass from one labor contractor or another without material changes; whether the premises and equipment of defendant is used for the work; whether the worker could

shift as a unit from one worksite to another; and whether the work was "piecework." *Id.* While several are inapplicable to the context here, including the factors related to managerial skills and labor contractors, it remains clear that GEO is the detainee workers' employer.

Here, GEO supervises detainee workers' performance of all jobs in the NWDC. GEO enforces its training, productivity, job safety protocols, and other VWP policies through officers whose primary role is to provide supervision to detainees and detainee workers. Although GEO may argue that supervising detainees is the entire purpose of GEO's relationship with detainees as detainees are in custody, this ignores the distinction in the GEO Officer job descriptions between supervising detainee workers while they work, and providing security.

Additionally, GEO has the authority to set the rates it will pay detainee workers for work they perform in the NWDC and manages the payroll. Currently, GEO tracks both the days detainees work in the VWP and the job assigned, pays detainee workers $1 per day for that work, and deposits the payment into their detainee accounts. While the PBNDS requires GEO to pay *at least* $1 per day, GEO admits that it has the option to pay more. GEO's admissions, the applicable detention standards, emails from ICE, and GEO's past practices make it clear that GEO sets the pay rates for detainee workers. Likewise, detainee workers do not have a business organization that could or does shift as a unit from one employer or another. Instead, detainee workers operate as individual workers in the VWP workforce alone. And, GEO is responsible for managing, hiring, and firing detainee workers in the VWP. Detainees seeking to participate in the VWP notify GEO of their interest through an electronic "kite." If there is an opening, GEO will assign the detainee a job or place the detainee on a waitlist. Pursuant to GEO's policy, detainee workers are required to work as scheduled by GEO and GEO may remove detainee workers from a work detail for "unsatisfactory performance" or for missing a scheduled shift. GEO admits that it has terminated detainee workers from VWP positions.

In sum, GEO sets the work schedule for the detainees, provides the detainees with orientation, training, uniforms, equipment, and supervises and directs them in their duties. GEO

cannot argue detainee workers are not "economically dependent on the wages earned to ensure their standard of living." GEO's argument is not related to any of the thirteen factors in the economic realities test set forth in Washington law, which measures whether an employee depends on the employer for all his income, or is instead in business for himself. Even considering the *Becerra* factors that are clearly inapplicable to this context, GEO must be considered an employer and detainee workers employees entitled to the minimum wage.

### 4.     No MWA Exemption Applies

GEO has attempted to argue several exemptions from the MWA definition of "employee" apply here: (1) that detainee workers are "volunteers" (Volunteer Exemption); (2) that detainee workers' "duties require that he or she reside or sleep at the place of his or her employment or [ ] otherwise spend[ ] a substantial portion of his or her work time subject to call, and not engaged in the performance of active duties" (Residential Exemption); and (3) that detainee workers are residents, inmates, or patients "of a state, county, or municipal correctional, detention, treatment or rehabilitative institutions" (Government-Operated Facility Exemption). *See* Wash. Rev. Code § 49.46.010(3)(d), (e), (j), (k). None should be persuasive.

### a.     No Volunteer Exemption Applies

GEO vaguely argues that detainee workers need not be paid the minimum wage because they are mere "volunteers." The MWA sets forth only two ways "volunteers" are exempted from its coverage. Wash. Rev. Code § 49.46.010(3)(d), (e). Neither applies.

Under the MWA, only "educational, charitable, religious, state or local governmental body or agency, or nonprofit organization[s]" or "state or local governmental bod[ies] or agenc[ies]" are eligible to accept volunteer labor. Wash. Rev. Code § 49.46.010(3)(d), (e). GEO is a for-profit company and does not qualify for, and does not assert, either exemption. GEO's decision to call its work program a "Voluntary Work Program" does not render detainee workers "volunteers." Whether parties are in an employment relationship is not determined by labels used

by the parties to describe their relationship. *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) (citing *Rutherford Food Corp.*, 331 U.S. at 729).

Nor does the fact that workers sign a "Volunteer Work Agreement" to gain jobs exempt GEO from liability. While employers can negotiate or bargain to pay rates in excess of the state minimum wage, "employees and employers may not bargain away these minimum requirements." *Hisle v. Todd Pac. Shipyards Corp.*, 93 P.3d 108, 112 (Wash. 2004). Indeed, the MWA bars any contract-law defense based on the Volunteer Work Agreement. *See* Wash. Rev. Code § 49.46.090(1) ("Any agreement between [an] employee and [an] employer allowing the employee to receive less than what is due . . . shall be no defense" to a minimum wage claim).

Any claim that the VWP operates primarily for detainees' own benefit is similarly misplaced. GEO uses hundreds of detainee-workers each day to enable GEO to meet its contractually required obligations and audit standards. Unlike rehabilitation or therapeutic programs, GEO does not promote any medical treatment objectives or individualized goals for reentry or preparation for independent living, and there is no evidence that the VWP contains any component other than detainee workers completing work that GEO assigns and accedes to the benefit of GEO's business operations.

In sum, as a matter of law, detainee workers cannot "volunteer" for a for-profit company. Regardless of whether detainee workers "agree" to the pay or "volunteer," GEO must still pay its detainee workers the minimum hourly wage and comply with the MWA.

**b.      The Residential Exemption Does Not Apply**

GEO's assertion of the Residential Exemption against Washington is untimely and waived because GEO failed to plead and assert it in a timely manner. *Mitchell v. PEMCO Mut. Ins. Co.*, 142 P.3d 623, 625 (Wash. Ct. App. 2006) (describes MWA exemption as an affirmative defense); *David v. Bankers Life & Cas. Co.*, No. C14-766RSL, 2018 WL 3105985, at *4 (W.D. Wash. June 25, 2018) (examining MWA exemptions as affirmative defenses); *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997) (exemption under FLSA is an

1   "affirmative defense that must be pleaded and proved by the defendant"). Even if allowed to

2   assert the Residential Exemption, GEO will be unable to carry its burden of proving that it

3   applies.

4       The Residential Exemption may be satisfied in one of two ways, and GEO bears the

5   burden to prove which clause applies to the NWDC. As this Court recently recognized, the first

6   clause of the Residential Exemption applies to individuals whose "duties require that he or she

7   reside or sleep at the place of his or her employment." *Nwauzor*, ECF No. 280 at 12 (quoting the

8   exemption). Here, there is no evidence that the detainee workers' job duties require them to sleep

9   or reside at the NWDC. *Id.* All parties agree that the detainees are held at the NWDC pending

10  resolution of their immigration status and are not permitted to leave the facility until an

11  immigration judge orders the detainees released or deported. *Id.* It is the detainees' detention,

12  rather than their job duties, that leads those detained to "reside or sleep" at the NWDC. *Id.*

13      Nor does the second clause of the Residential Exemption apply, i.e., the clause applicable

14  to workers "who otherwise spend[] a substantial portion of his or her work time subject to call,

15  and not engaged in the performance of active duties." Detainee workers at the NWDC are

16  assigned to specific shifts. There is no evidence that detainee workers spend work time "on call"

17  and not engaged in the assigned kitchen, laundry, or janitorial duties. *Id.* In short, detainees did

18  not choose work that required that they reside and live at the NWDC. *Id.* They were forced to

19  reside and sleep at the NWDC due to their immigration cases. They then requested and applied

20  to work. GEO cannot claim they are now exempt.

21          **c.    The Government-Operated Facility Exemption Does Not Apply and**
22          **GEO's Attempts to Re-Write It Should Be Rejected**

23      Recognizing that GEO permits detainee workers to work and no exemption applies, GEO

24  will nevertheless argue the MWA should not apply based on two arguments that seek to disregard

25  the MWA's terms and add non-statutory exemptions: First, because of the "'fundamental nature'

26  of the activity and relationship," *Nwauzor*, ECF No. 274 at 16, and second, using a non-statutory

1   exclusion for "civil detainees" that GEO has created using non-Washington authorities. The

2   Court should reject those arguments because they simply re-package GEO's assertions of the

3   Government-Operated Facility Exemption, which the Court has dismissed, and conflict with the

4   plain terms of the MWA.

5       First, GEO has cited *Rocha v. King County*, 435 P.3d 325, 332 (Wash. Ct. App. 2019), a

6   case declining to extend MWA coverage to jurors, to argue the Court should ignore the MWA's

7   express language as well as the relevant economic realities factors and, instead, only consider

8   the "true nature of the relationship." *Nwauzor*, ECF No. 274 a t 16. The Court should not accept

9   the invitation. As the Washington Supreme Court recently clarified when reviewing *Rocha v.*

10   *King County*, jurors are not covered under the MWA because one of the limited MWA

11   exemptions applies—not because of some "fundamental nature" of the activity. 460 P.3d 624,

12   2020 WL1809610, at *4 (Wash. 2020). The Supreme Court's holding was grounded in a specific

13   MWA exception: jurors are "engaged in the activities of a[ ] state or local government body or

14   agency." *Id.* (quoting Wash. Rev. Code § 49.46.010(3)(d)). The Supreme Court made clear that

15   employees are those who are "permitted to work," and the MWA's exemptions from that broad

16   definition are construed narrowly and apply "only to situations that are plainly and unmistakably

17   consistent with the terms and spirit of the legislation." *Id.* (citing *Drinkwitz*, 996 P.2d 582).

18       Second, GEO seeks a jury instruction using a "modified economic dependence test" that

19   excludes "civilly detained individual[s]" from the definition of employees. *See* ECF No. 378-1,

20   Def's Proposed Instruction No. 20 ("'Employee'—Detained Individuals") (proposing to instruct

21   jury that they may find detainee workers not to be an employee if a three-part test is satisfied).

22   GEO's "civilly detained individual" test, like its "fundamental nature" argument, ignores the

23   plain and clear language of the MWA that "an employee includes any individual permitted to

24   work by an employer" save for narrow and specific exemptions. *Becerra*, 332 P.3d at 420; *see*

25   *Rocha*, 460 P.3d 624, 2020 WL 1809610, at *4. It also ignores that the MWA already contains

26   an exemption addressing detention circumstances in the Government-Operated Facility

Exemption, Wash. Rev. Code § 49.46.010(3)(k). GEO cites no Washington authority for its proposed non-statutory exemption and no Washington case law interpreting the MWA in that manner exists.[3]

Here, there is no reason to disregard the MWA's express language or fashion a new "civil detention" test based on non-Washington authority. As the Court knows, the MWA specifically considers whether workers in custodial relationships, such as in the NWDC, are employees. The MWA contains a narrow Government-Operated Facility Exemption that excludes from the definition of employee any inmate, detainee or resident of "any state, county, or municipal . . . facility." Wash. Rev. Code § 49.46.010(3)(k). As this Court has repeatedly held, however, that exemption does not apply to GEO. *See* ECF No. 29 at 17; ECF No. 162 at 6-9; *Nwauzor*, ECF No. 280 at 13. Indeed, the Court has specifically rejected GEO's past attempts to invoke non-Washington authority to broaden the scope of the Government-Operated Facility Exemption based on the same FLSA case law it now presents. *See* ECF No. 29 at 16-18 (holding that interpreting Government-Operated Facility Exemption to apply to NWDC detainees would "move[] beyond interpretation to legislation"). The MWA does not exempt private detention facilities from the requirement of paying the minimum wage. GEO is not entitled to that exemption and must pay detainee workers the minimum wage.

## B.   GEO is Unjustly Enriched When Paying Detainee Workers $1 Per Day for Work Performed

Regardless of whether GEO must pay detainee workers the minimum wage, it is clear GEO has profited off the detainee workers' cheap labor and been unjustly enriched for over fifteen years.

---

[3] GEO's previous reliance on *Calhoun v. Washington*, 193 P.3d 188 (Wash. Ct. App. 2008), is misplaced, as the court there addressed a detainee plaintiff's discrimination claim, not an MWA claim. *Calhoun* does not hold that a "modified economic dependence test" should apply in the detention context or otherwise expand the reach of the MWA's Government-Operated Facility Exemption.

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    Unjust enrichment occurs "when one retains money or benefits which in justice and

2  equity belong to another." *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, 18

3  (Wash. Ct. App. 1991). Three elements must be established in order to sustain a claim based on

4  unjust enrichment: (1) the defendant receives a benefit; (2) the defendant obtained and

5  appreciated that benefit at the plaintiff's expense; and (3) the circumstances make it unjust for

6  the defendant to retain the benefit. *See Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). *See*

7  *also Lynch v. Deaconess Med. Ctr.*, 776 P.2d 681, 683 (Wash. 1989); *Chandler v. Wash. Toll*

8  *Bridge Auth.*, 137 P.2d 97, 102 (Wash. 1943) (quoting *Restatement (First) of Restitution* § 1(c)

9  (1937)).

10    Here, there can be no question that GEO has been unjustly enriched. The evidence will

11  show GEO used detainee workers to operate the NWDC, paid them $1 per day for the work

12  performed, and benefitted substantially from the difference between the $1 per day that it paid

13  and the fair wage that GEO should have paid for the same work. GEO assigned detainee workers

14  to tasks GEO itself was required to do under its GEO-ICE contract, i.e., to keep the facility

15  vermin free, to provide clean linens, and to prepare three meals to detainees every day. Hundreds

16  of detainee workers staffed the NWDC's kitchen, laundry, barbershop, and janitorial positions,

17  every single day. The assigned shifts lasted from half-an-hour to six hours per day. By relying

18  on detainee labor, GEO avoided the cost of hiring non-detainee workers and unjustly pocketed

19  the savings and resulting profits. Relying on GEO's own estimate of the hours worked by

20  detainees, Washington's expert witness, Peter Nickerson, a labor economist, will testify

21  regarding how the operational assignments performed by detainee workers are categorized in the

22  outside labor market, the prevailing wages for that work, and the fair wages that GEO should

23  have paid for such work—whether performed by detainee workers or Tacoma-area workers. He

24  will also testify to his calculations of the profits gained by GEO as a result of its labor practice

25  and explain that GEO could have paid a fair market wage to the detainee workers and still

26  profited handsomely from its operations.

1    None of GEO's arguments in defense should prevail at trial. First, GEO will attempt to

2    present evidence that detainees are merely "volunteers" and work merely for the opportunity to

3    feel useful and leave their pod. However, GEO must show that detainee workers are volunteers

4    with no expectation of payment to escape liability. In the unjust enrichment context, "volunteer"

5    status is determined in light of "all surrounding circumstances." *Ellenburg v. Larson Fruit Co.*,

6    835 P.2d 225, 251-52 (Wash. Ct. App. 1992) (internal citations omitted). Namely, courts

7    consider "(1) whether the benefits were conferred at the request of the party benefitted, (2)

8    whether the party benefitted knew of the payment, but stood back and let the party make the

9    payment, and (3) whether the benefits were necessary to protect the interest of the party who

10   conferred the benefit or the party who benefitted thereby." *Id.* An established expectation of

11   payment will defeat a defense of voluntariness. *Osborn v. Boeing Airplane Co.*, 309 F.2d 99,

12   102 (9th Cir. 1962) (quasi-contract action available under Washington law unless "it is clear that

13   there was indeed no expectation of payment").

14   Here, detainee workers can hardly be categorized as "volunteers" in light of all the

15   surrounding circumstances. Not only does GEO invite, or request, detainee workers participate

16   in its program and perform a wide range of work, the detainee workers have little choice but to

17   provide such labor as they are unable to seek other employment. Even more, there is no question

18   that detainee workers expect payment from GEO. Although pay may be limited to $1 per day,

19   the question of voluntariness does not turn on whether the workers acquiesced in the precise

20   *amount* of payment, but rather on whether the workers expected payment *at all*. *Osborn*,

21   309 F.2d at 103 (unjust enrichment theory will only be foreclosed where facts demonstrate there

22   is "indeed no expectation of payment, that a gratuity was intended to be conferred, that the

23   benefit was conferred officiously, or that the question of payment was left to the unfettered

24   discretion of the recipient"). As detainee workers will testify to at trial, detainees work at the

25   NWDC primarily because of the payment, i.e., the opportunity to earn money needed to stay in

26

1    touch with loved ones, and to supplement the limited food and personal hygiene rations they
2    receive—and not, as GEO might suggest, to reduce idleness.

3         Nor does the fact that detainee workers sign a "Voluntary Work Agreement," that
4    acknowledges the pay rate of $1 per day, render them "volunteers." As discussed above, the
5    Voluntary Work Agreement is legally invalid. The MWA creates rights that cannot be bargained
6    away. *Seattle Prof'l Eng'g Emps Ass'n v. Boeing Co.*, 991 P.2d 1126, 1129-30 (Wash. 2000),
7    *amended by* 1 P.3d 578 (Wash. 2000) (Washington law creates "nonnegotiable, substantive
8    rights regarding minimum standards for . . . payment of wages") (citing *United Food &*
9    *Commercial Workers Union Local 1001 v. Mut. Benefit Life Ins. Co.*, 925 P.2d 212, 214-15
10   (Wash. Ct. App. 1996)). While employers can negotiate pay rates above the minimum wage,
11   "employees and employers may not bargain away these minimum requirements." *Hisle*, 93 P.3d
12   at 112. Because the agreements cannot, as a matter of law, constitute valid contracts, an action
13   in equity is the exact mechanism to challenge GEO's unjust benefit. *See, e.g., Heaton v. Imus*,
14   608 P.2d 631, 632-33 (Wash. 1980) (recovery to be granted on the basis of quasi contract to
15   prevent unjust enrichment following finding that there was no enforceable contract between the
16   parties); *Hendryx v. Turner*, 187 P. 372, 374 (Wash. 1920) (remanding for trial on implied
17   contract where no legal or binding contract between the parties existed related to care for child).
18   Since there is no dispute that detainee workers expected—and received—payment from GEO,
19   as a matter of law, detainee workers are not "volunteers."

20        Second, if the MWA claim fails before the jury, GEO will argue Washington's unjust
21   enrichment claim must fail too. Not so. Washington's unjust enrichment claim is a well-
22   established, stand-alone claim that is separate and distinct from the MWA claim. Although the
23   claim may arise out of a common nucleus of facts, courts do not dismiss claims for unjust
24   enrichment as duplicative or superfluous of other claims. *Astiana v. Hain Celestial Grp., Inc.*,
25   783 F.3d 753, 762-63 (9th Cir. 2015) (citing Fed. R. Civ. P. 8(d)(2)). Indeed, none of the
26   elements of an unjust enrichment claim requires proof of a MWA violation as it is independent

of any state statute or contract and "is founded on notions of justice and equity." *Young*, 191 P.3d at 1263. "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Id.* at 1262. While a party cannot bring an equitable unjust enrichment claim if that same party has a valid and adequate claim at law, the rule has no applicability where alternative legal claims are either incomplete or inadequate. *See Boeing Co.*, 991 P.2d at 1134 ("Incompleteness and inadequacy of the legal remedy are what determine the right to the equitable remedy of injunction[.]") (quoting *Phelan v. Smith*, 61 P. 31, 32 (Wash. 1900)); *Town Concrete Pipe of Wash., Inc. v. Redford*, 717 P.2d 1384, 1387 (Wash. Ct. App. 1986) ("Equitable relief is available if there is no adequate remedy at law.").

Here, the legal remedy of the MWA is not adequate to fully redress the State's harms. Washington's unjust enrichment claim is retrospective and challenges GEO's conduct since it began operating the NWDC in 2005 and seeks to redress harms to the labor market and to non-detainee workers, including workers in Pierce County who missed out on job opportunities because GEO's decision to employ and exploit detainees withheld jobs from the market. While Washington seeks declaratory and injunctive relief under the MWA, Washington also requires disgorgement to deter GEO's unlawful conduct. *See, e.g*, *id.*; *SEC. v. Rind*, 991 F.2d 1486, 1490 (9th Cir. 1993) (noting SEC "seeks disgorgement in order to deprive the wrongdoer of his or her unlawful profits and thereby eliminate the incentive for violating the . . . laws. The theory behind the remedy is deterrence and not compensation."); *see also Paradise Valley Investigation & Patrol Servs., Inc. v. U.S. Dist. Court*, 521 F.2d 1342, 1342-43 (9th Cir. 1975) (government's enforcement action under federal labor law seeking injunctive relief and disgorgement of illegally withheld overtime wages is "a suit in equity" to "vindicate a public, rather than a private, right"). In fact, courts routinely recognize that claims for unjust enrichment exist separate and apart from minimum wage act or other statutory claims. For example, the district court that addressed similar claims brought by Colorado immigration detainees against GEO, and

1    dismissed the GEO detainees' Colorado minimum wage act claim because of the narrow purpose

2    of the Colorado statute, refused to dismiss the plaintiffs' unjust enrichment claim. *Menocal v.*

3    *GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1133 (D. Colo. 2015). In so doing, the court noted that,

4    though the minimum wage act claim "is dismissed and not available," "Plaintiffs are permitted

5    to plead in the alternative," as "the remedies sought by the [minimum wage] claim and the unjust

6    enrichment claim are different, and the unjust enrichment claim is not duplicative." *Id.*; *see also*

7    *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 925-26 (10th Cir. 2018) (upholding unjust enrichment

8    class action brought by detainee workers against GEO); *Astiana*, 783 F.3d at 762 (reversible

9    error to construe "quasicontract" cause of action as "duplicative or superfluous to [plaintiff's]

10   other claims").

11          Finally, GEO will argue that the question is not whether detainee workers unjustly

12   enriched GEO, but whether Washington unjustly enriched GEO. Such argument ignores this

13   Court's prior ruling. As this Court recognized, Washington is not suing for damages on behalf

14   of itself, but to protect the health, safety, and well-being of its residents. ECF No. 29 at 12-13.

15   As *parens patriae*, Washington need not show that Washington itself conferred a benefit on

16   GEO, but only that *its state residents*, which include detainee workers, conferred a benefit on

17   GEO. Since detainee workers undoubtedly enriched GEO, and the circumstances make it unjust,

18   the Court should find in Washington's favor on its unjust enrichment claim.

19   **C.     GEO Cannot Avail Itself of Any Immunity**

20          **1.     Derivative Sovereign Immunity Does Not Apply Because ICE Nowhere
21                   Requires GEO to Pay Detainee Workers $1 per Day for Work Performed**

22          Derivative sovereign immunity is no bar to Washington's claims. The Supreme Court in

23   *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016), held that "[g]overnment contractors

24   obtain certain immunity in connection with work which they do pursuant to their contractual

25   undertakings with the United States." That immunity, however, is not absolute and will not attach

26   where a contractor's discretionary actions created the contested issue. *Id.* at 673-74 (rejecting

claim of derivative sovereign immunity where contractor sent text messages to unconsenting recipients even though it was instructed to send messages only to individuals who had "opted in").

A contractor may avail itself of derivative sovereign immunity where: (1) the government authorizes the contractor's actions; and (2) the government validly conferred that authorization, meaning it acted within its constitutional power. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940); *Campbell-Ewald Co.*, 136 S. Ct. at 673. However, derivative sovereign immunity is limited to cases in which a contractor "had no discretion in the design process and completely followed government specifications." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)); *see also In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 346 (4th Cir. 2014) (holding derivative sovereign immunity would not apply "if [the private contractor] enjoyed some discretion in how to perform its contractually authorized responsibilities"). Indeed, when a contractor fails to follow "the Government's explicit instructions, derivative sovereign immunity does not shield the contractor from liability." *Novoa v. GEO Grp., Inc.*, No. EDCV 17 2514 JGB (SHKx), 2018 WL 4057814, at *3 (C.D. Cal. Aug. 22, 2018) (explaining that any immunity for failure to pay minimum wage to detainee-workers depends on "[h]ow much discretion GEO had, if any, in implementing the Work Program"). *See also In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, No. 17-5217, 2019 WL 2552955, at *18 (D.C. Cir. June 21, 2019) (affirming that derivative sovereign immunity is unavailable where federal entity did not explicitly direct contractor to engage in the contested activity); *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1150 (E.D. Wash. 2017) (rejecting derivative sovereign immunity claim at summary judgment where "[t]he factual record would support a finding Defendants had a role in the design of the Program . . . and exercised some discretion in the application of the Program"). Here, GEO cannot avail itself of immunity for two key reasons.

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

First, GEO violates the government's explicit instructions by paying detainee workers only $1 per day for work performed. While GEO is required to operate a work program and ICE agrees to reimburse GEO $1 per day for detainee work performed, the GEO-ICE contract also explicitly requires GEO to perform in accordance with all applicable federal, state and local labor laws. The contract also instructs GEO to comply with the "most stringent" of any conflicting federal, state, or local standards—an unambiguous directive that speaks to the precise circumstance here. *See Campbell-Ewald*, 136 S. Ct. at 673 n.7 ("Critical [to the contractor's avoidance of liability] in *Yearsley* was . . . the contractor's performance in compliance with *all* federal directions.") (emphasis added); *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d at 345 ("[S]taying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'the act[s] of the government'") (citation omitted). By refusing to pay detainees the minimum wage, GEO both exceeds the authority conferred to it and violates the federal government's explicit instructions.

Second, GEO—and GEO alone—makes the decision to pay detainee workers only $1 per day. As is clear from the actual language of the GEO-ICE contracts, the ICE/DHS PBNDS, and GEO's own admissions, ICE nowhere tells GEO that it must pay detainee-workers only $1 per day for their labor. Indeed, ICE nowhere dictates the types of jobs detainee workers must be assigned. ICE does not dictate that GEO use detainee workers to perform labor critical to the NWDC's operations. And ICE does not direct GEO to skirt Washington's labor laws. To the contrary, ICE's explicit instruction is for GEO to comply with "state and local labor laws." Washington's labor laws include Washington's MWA. Although a "CLIN 3" line item from the GEO-ICE contract sets forth the amount that ICE will reimburse GEO for the work program, the CLIN 3 line item nowhere states that GEO must pay detainee workers any particular wage, much less *limit* GEO to paying only $1 per day to detainee workers.

Were there any doubt, GEO acknowledges it can pay detainees more than $1 per day under the GEO-ICE Contracts and the PBNDS, the current version of which provides that

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

"[d]etainees shall receive monetary compensation for work completed" of "at least $1.00 per day." GEO admitted in discovery that it "has the option to pay more than $1/day to detainee-workers for work performed,", and that it actually *has* paid detainee workers more than $1 per day for work performed by detainee workers. GEO's own employees have also acknowledged that it can pay more than $1 per day. In a memo, GEO's Classifications Department informed the Associate Warden that the PBNDS "doesn't say that we don't have the option to pay more [than $1.00 per day] if we like." And, of course, ICE has explicitly told GEO that "there is no maximum" rate of compensation for detainee workers.

Although GEO-ICE contract provisions prohibit GEO from using detainees to fulfill contractual obligations, ECF No. 246-3 at 82, and requires GEO employ only U.S. citizens or legal permanent residents as employees, *id.* at 63, neither provision authorizes or directs GEO to ignore state law generally or the MWA in particular. Indeed, the undisputed facts at trial will show that some detainee workers are lawfully admitted residents with work authorization and that GEO routinely uses detainee workers to complete its own contractual duties, which includes ensuring the facility is "clean and vermin/pest free;" laundering, changing, and distributing linens; and preparing meals. Notably, GEO could comply with both GEO-ICE contract provisions, and state law, by hiring non-detained Washingtonians from the Pierce County labor pool who need jobs and pay them the minimum wage. Given the many options that allow GEO to comply with both state and federal law, these provisions in the GEO-ICE Contract cannot plausibly be construed as a "government specification" that GEO violate Washington's labor laws. *Cf. Cabalce*, 797 F.3d at 732.

In sum, GEO did not simply perform as directed by the federal government. To the contrary, GEO's conduct failed to conform to the explicit terms of the GEO-ICE contract. As the Court succinctly stated in its order: "GEO has not shown that it was directed to pay participants in the VWP only a $1 for the relevant period." ECF No. 288 at 9. Since the

1    discretionary choices at the heart of this lawsuit were made by GEO and not the federal

2    government, *see Cabalce*, 797 F.3d at 732, derivative sovereign immunity does not apply.

3          **2.    Intergovernmental Immunity Does Not Apply Because GEO Is Not Being**
4                  **Treated Differently Than Any Other Private Business**

5          Similarly, intergovernmental immunity is no bar to Washington's claims.

6    Intergovernmental immunity applies to a state regulation "*only* if it regulates the United States

7    directly or discriminates against the Federal Government or those with whom it deals." *North*

8    *Dakota v. United States*, 495 U.S. 423, 435 (1990) (citing *South Carolina v. Baker*, 485 U.S.

9    505, 523 (1988)) (emphasis added); *United States v. County of Fresno*, 429 U.S. 452, 464 (1977).

10   Under the proper tests, GEO's intergovernmental immunity arguments fail as a matter of law

11   and should not be put to a jury.

12         First, on the "direct regulation" prong, the question is whether the MWA directly

13   regulates the federal government. GEO is a for-profit corporation, not the federal government,

14   and neither the MWA nor its application to GEO at NWDC regulates the federal government's

15   "operations or property." *See North Dakota v. United States*, 495 U.S. at 434-38 (no direct

16   regulation where law operated against federal supplier rather than the federal government); *see*

17   *Nwauzor*, ECF No. 280 at 16-17 (holding that GEO failed to show that the MWA regulates the

18   United States directly); *see also* ECF No. 162 at 7 (explaining that "the MWA does not regulate

19   the Federal Government directly, and, in fact, imposes no duty on the Federal Government

20   itself"). Insofar as GEO seeks to equate itself with the federal government, the Court has already

21   rejected that contention. *Nwazour,* ECF No. 280 at 16.

22         Second, applying the MWA to detainee workers at the NWDC does not mean that the

23   MWA discriminates against the federal government or those with whom it deals, *i.e.*, GEO. It

24   means that GEO is subject to the same law as other private employers. As the Court knows, a

25   state law does not implicate intergovernmental immunity where the state regulation "is imposed

26   on some basis unrelated to the object's status as a federal Government contractor" and is

"imposed equally on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438. Intergovernmental immunity "prevents states from … singling out for regulation those who deal with the government," but does not prohibit the enforcement of *neutral* state laws against federal contractors. *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 633 F. Supp. 2d 892, 904 (N.D. Cal. 2007) (rejecting intergovernmental immunity claim where laws at issue "regulate equally all public utilities, making no distinction based on the government's involvement"); *see also North Dakota*, 495 U.S. at 436-39 (rejecting intergovernmental immunity challenge to state liquor control regulations that applied to out-of-state suppliers providing liquor to the federal government as well as those providing liquor to other entities).

In adopting this "functional approach" to intergovernmental immunity, the Supreme Court explicitly rejected a more absolute rule: that any regulation that implicates the federal government is unconstitutional. *Id.* at 435, 438. Instead, the Supreme Court "accommodate[d] the full range of each sovereign's legislative authority," observing that whatever burdens are imposed on the federal government by a neutral state law "are but normal incidents of the organization within the same territory of two governments." *Id.* at 435 (citing *Helvering v. Gerhardt*, 304 U.S. 405, 422 (1938)). In other words, a state law does not run afoul of intergovernmental immunity merely because a generally applicable state regulation "make[s] it more costly for the Government to do its business." *Id.* at 434 (describing that theory as "thoroughly repudiated") (citing cases). State laws may impose burdens on the federal government without raising constitutional concerns as long as they regulate federal contractors in a non-discriminatory manner. *See, e.g., Washington v. United States*, 460 U.S. 536, 545 (1983) (upholding state tax law where "[t]he tax on federal contractors is part of the same structure, and imposed at the same rate, as the tax on the transactions of private landowners and contractors"); *U.S. Postal Serv. v. City of Berkeley*, No. C 16-04815 WHA, 2018 WL 2188853, at *3 (N.D. Cal. May 14, 2018) (finding no discriminatory treatment of potential buyers of a federal post office

1   building where city's historic district designation that limited options for selling or renovating

2   an old post office was "imposed equally on other similarly situated constituents of the State").

3        Here, intergovernmental immunity does not apply because both the MWA and the unjust

4   enrichment claims are neutral state laws that apply equally to all similarly situated constituents

5   in Washington. ECF No. 162 at 6 ("At its core, and by design, the MWA protects employees and

6   prospective employees generally, placing private firms that contract with the federal government

7   on equal footing with all other private entities."). Though both claims may or may not indirectly

8   economically burden the federal government, neither of Washington's claims single out or

9   discriminate against GEO based on its status as a federal contractor. Washington's claims simply

10  require GEO, like any other private employer, pay the minimum wage and disgorge the amount

11  it was unjustly enriched.

12       Although GEO often argues the MWA discriminates against GEO because it exempts

13  the Special Commitment Center, the Pierce County Jail, and other publicly run prisons and

14  detention centers from its requirements, *see* Wash. Rev. Code § 49.46.010(3)(k), state and other

15  publicly run institutions are not similarly-situated employers. *See Nwazour*, ECF No. 280 at 18

16  (Court order observing that both are government-run facilities where "[c]ontractor involvement,

17  if any appears, on the record, limited"). For intergovernmental immunity purposes, the proper

18  comparator for GEO, a private contractor that deals with the federal government, is a similarly

19  situated private contractor that deals with the state government—and not the state government

20  itself. *See Dawson v. Steager*, 139 S. Ct. 698, 703-04 (2019) (considering the similarly situated

21  entity to a former U.S. Marshal challenging a state tax exemption for state employees was

22  another retiree who had performed similar work for the state—not the state government itself).

23  Another way to consider this point is set forth in the following chart showing to whom the

24  Washington MWA applies:

25

26

**Does the Washington State Minimum Wage Apply?**

|  | Government Institution | Private Contract Facility |
| --- | --- | --- |
| **Federal Detainees** | No | Yes |
| **State Detainees** | No | Yes |

As the chart illustrates, the treatment under the MWA is the same for the federal and state governments (MWA does not apply); and for private contractors regardless of with whom they deal (MWA does apply). There is no difference based on one's status as a federal contractor.

GEO likely ignores the proper comparators because all evidence suggests private facilities, with whom the state contracts to send state inmates for work release or individuals for required treatment, do pay the minimum wage—and sometimes more. ECF Nos. 310, ¶¶ 11, 13 (Declaration of DSHS Assistant Secretary); 311, ¶ 6 (Declaration of DOC Work Release Administrator). Indeed, even if a private facility did not pay the minimum wage, that only means another private facility exists that faces MWA liability. While GEO has also offered its own expired contract with the Department of Corrections as a comparator, the GEO-DOC contract was never utilized by DOC and only authorized the detention of state inmates *outside* the State of Washington, where Washington's MWA could never have applied. ECF No. 312, ¶¶ 5-8 (Declaration of DOC Contracts Administrator). *Nwazour*, ECF No. 280 at 18 (questioning whether an out-of-state contract is "sufficiently similar" for intergovernmental immunity purposes).

The Ninth Circuit's decision in *United States v. California,* supports the conclusion that GEO is not entitled to intergovernmental immunity. In *California*, the Ninth Circuit analyzed intergovernmental immunity challenges to three California statutes and applied it only to a single provision of one of the challenged statutes—a provision that called for unique, heightened and specialized requirements on facilities that house federal civil immigration detainees. 921 F.3d 865, 884-85 (9th Cir. 2019). In doing so, the Ninth Circuit upheld the majority of the

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

statute since most of the inspection requirements were the same as requirements placed on other state detention facilities under state law. *Id.* In other words, to the extent California's inspection requirements were neutral and generally applicable—not specialized and heightened burdens placed only on the institutions housing federal immigration detainees—they posed no intergovernmental immunity problem, even if those facilities were run by federal contractors. *Id.* at 882-83.

To the extent the Ninth Circuit suggests that "federal contractors are treated the same as the federal government itself" for purposes of intergovernmental immunity, *Id.* at 882 n.7, that proposition is expressly limited by the holding of *California*, which *allowed* neutral state laws to apply to immigration detention facilities. It is also limited by the supporting citation, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988). In *Goodyear*, a "direct state regulation" case, regulation of the federal contractor was deemed to be regulation of the federal government directly because the contractor was performing a federal function *within* a federally owned facility. 486 U.S. at 180-81 (contractor performed at a "federally owned nuclear production facility"). That is certainly not the case here, where GEO alone owns the NWDC, ECF No. 253-1 at 5 (RFA 1), and the MWA is not regulating any federal function.

In sum, GEO is not entitled to intergovernmental immunity. Like other private employers in Washington, it must follow the MWA and disgorge any unjust enrichment.

## IV.     RELIEF SOUGHT

### A.     Washington Seeks an Injunction Requiring GEO to Comply with the MWA for Work Performed

If Washington prevails at the Phase I jury trial, Washington will seek injunctive relief on its MWA claim. Detainee workers are GEO's employees and GEO should be prohibited from paying them less than the minimum wage for work performed. Although GEO previously argued that the Immigration Reform and Control Act (IRCA) prohibits GEO from paying detainees the minimum wage because they lack work authorization, this Court has already twice-rejected

GEO's argument. *See* ECF No. 288 at 11; ECF No. 29 at 8. In reality, Washington's request for relief need not implicate IRCA or the GEO-ICE contract at all. Washington filed this case not only to protect the rights of detainees laboring for only $1 per day, but also the people in the Tacoma area who are being deprived of jobs through GEO's use of underpaid detainee labor. At trial, evidence will show that there are individuals in Tacoma other than detainees, such as existing GEO staff and other individuals in the community, who are work-authorized and who, under the terms of the GEO-ICE Contract, could do the same jobs that detainee workers now perform. The Court will accordingly have a strong basis to order GEO to pay either detainee workers or Tacoma-area workers the minimum wage for work performed going forward.

**B.    Washington Seeks Disgorgement of GEO's Unjustly Retained Benefit**

At the Phase II bench trial, Washington will seek disgorgement. "A person has been unjustly enriched when he has profited or enriched himself at another's expense, contrary to equity." *Cox v. O'Brien*, 206 P.3d 682, 688 (Wash. Ct. App. 2009) (citing *Dragt v. Dragt/DeTray, LLC*, 161 P.3d 473, 482 (Wash. Ct. App. 2007)). In determining the proper amount of disgorgement, courts evaluate the "profit" or "benefit" from the perspective of "the receiver of the benefit." *Young*, 191 P.3d at 1262, 1265. This is a fact-based and equitable determination that requires the court "review[] the complex factual matters involved in the case" before exercising its "tremendous discretion to fashion a remedy to do substantial justice to the parties and put an end to the litigation." *Id*. at 1264 (citation omitted). *See also Heaton*, 608 P.2d at 633-35 (remanding for calculation of unjust enrichment including profit).

The remedy for unjust enrichment may be measured in one of "two ways:" the fair market value of services rendered *or* the enhanced value to the defendant. *Young*, 191 P.3d at 1263-65. *Young* itself involved unpaid services, and both approaches to remedies were available to those plaintiffs. *Id*. at 1264 ("services" provided by plaintiffs included "dispos[ing] of the debris generated by [property] improvements" and "provid[ing] tools and equipment"). Indeed, while GEO will seek to limit disgorgement to the value of services rendered, the Washington Supreme

Court explicitly instructed that it is "improper" to apply a "blanket exclusion" of any factor, including "profits," that bears on the overall value of the benefit conferred. *Id.* at 1264 (quoting *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 106 (Me. 1994) (emphasis omitted)).

Here, Dr. Peter Nickerson will testify to the amounts by which GEO benefited from the operation of the NWDC with its $1 per day detainee worker labor practice and his calculations that, even if GEO were required to pay fair market wages for the detainee labor and disgorge its unjust enrichment from the past, GEO would still enjoy substantial gross and net profit margins from that operation. As such, justice requires that the Court order GEO to disgorge the full benefits it received in choosing to pay detainee workers $1 per day for work performed, instead of a fair wage. Such an order will remedy the injustice of GEO's unfair labor practices and prevent other employers who might be tempted to undercut Washington's economy and labor market from taking advantage of a vulnerable work force and paying less than fair wages.

Dated this 29th day of April 2020.

Respectfully submitted,

ROBERT W. FERGUSON
Attorney General of Washington

*s/ Marsha Chien*
MARSHA CHIEN, WSBA No. 47020
ANDREA BRENNEKE, WSBA No. 22027
LANE POLOZOLA, WSBA No. 50138
PATRICIO A. MARQUEZ, WSBA No. 47693
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
marsha.chien@atg.wa.gov
andrea.brenneke@atg.wa.gov
lane.polozola@atg.wa.gov
patricio.marquez@atg.wa.gov

| 1 | **CERTIFICATE OF SERVICE** |
|---|---|

I hereby certify that the foregoing document was electronically filed with the United States District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 29th day of April 2020 in Seattle, Washington.

Caitilin Hall
Legal Assistant

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744