**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Plaintiff,<br><br>    v.<br><br>THE GEO GROUP, INC.,<br><br>        Defendant. | CIVIL ACTION NO. 17-cv-05806-RJB |
| UGOCHUKWU GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA, individually and on behalf of all those similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE GEO GROUP, INC., a Florida corporation,<br><br>    Defendant. | CIVIL ACTION NO. 17-cv-05769-RJB<br><br>JOINT REPORT REGARDING REMOTE TRIAL PROCEEDINGS |

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    On December 4, 2020, this Court issued a letter to the parties in this case asking the

2    parties what they think about a possible Zoom trial. *Nwauzor*, ECF No. 313; *State*, ECF No. 429.

3    The Parties conferred as to the feasibility of an all-virtual Zoom trial. The State and Private

4    Plaintiffs are agreeable to trial by Zoom. On the other hand, GEO strongly objects to an all-

5    virtual Zoom Trial and accepts the Court's alternative to wait out the pandemic. The Parties'

6    positions are set forth in further detail in the foregoing joint report.

7    **1.      Plaintiffs' Positions Regarding Possibility of a Remote Trial.**

8            The State of Washington is agreeable to trial by Zoom. If the Court is inclined to proceed

9    with a remote trial, Washington is prepared to proceed in February 2021 or thereafter.

10   Scheduling trial in February, March, or April 2021 would provide all parties the opportunity to

11   modify their preparations to account for the nature of trial by Zoom, ensure that all parties and

12   witnesses are prepared for remote proceedings, and to account for now-existing conflicts of all

13   counsel. Washington believes that with that limited amount of time prior to trial, all technical

14   and logistical hurdles can be resolved and the case can proceed in an orderly and efficient fashion

15   via remote means.

16          The Private Plaintiffs also consent to trial by Zoom, and agree to a trial setting any time

17   after April 5, 2021. Other trial commitments in January and February 2021 render Class Counsel

18   unavailable for an earlier setting.

19          Plaintiffs note that GEO provided its written "position" below, which spans more than

20   17 pages, at 12:08 p.m. on December 18, 2020—the date this Joint Report is due. Plaintiffs

21   believe GEO's lengthy argument is improper in a Joint Report of this nature and dispute the facts

22   and statements of law in GEO's statement. Given the timing of GEO's statement in relation to

23   the Court's deadline, Plaintiffs are not in a position to respond to the substance of GEO's

24   arguments. If the Court wishes to proceed with trial by Zoom and would like the assistance of

25   further briefing in response to GEO's arguments below, Plaintiffs are happy to provide it.

26

## 2. Defendant's Position Regarding Possibility of a Remote Trial.

Defendant The GEO Group, Inc. ("GEO") firmly objects to an all-virtual jury trial. This complex case is not well suited for a virtual trial, particularly given that courts are in the early phases of determining the efficacy of such procedures. Both parties in this case are entitled to a fair and just result. Any result in a virtual trial would be marred by concerns about whether all jurors received the same information or if technical and other distractions prevented the jurors from considering all evidence presented. The result would be a verdict shrouded in uncertainty. Moreover, GEO would be deprived of the opportunity to present this complex and important trial in open court with a live audience and three dimensional participants; instead, it would be relegated to presenting its case one dimensionally on a small screen, in some cases possibly the size of a smart phone. This would be contrary to the fundamental nature of a jury trial:

> Jury trials are innately human experiences. More is often communicated in a courtroom non-verbally than verbally. Such a human experience must allow for the look and feel of direct human interaction. . . the remote, sterile, and disjointed reality of virtual proceedings cannot at present replicate the totality of human experience embodied in and required by our Sixth and Seventh Amendment.

*Infernal Tech., LLC v. Sony Interactive Entertainment, LLC,* 19 CV-00248, Dkt. No. 261 at n 4. at n. 4 (E.D. Tex. Nov. 20, 2020) (emphasis added) (Attached as Exhibit A). Given the extensive time the parties have spent in discovery and preparation for trial of this complex and novel case—an all-virtual trial would be innately inappropriate and would deprive GEO of a fair presentation of its case.

Indeed, a remote virtual trial will deny GEO its constitutional guarantees of a "trial by jury" under the Seventh Amendment and of fundamental fairness in the jury trial process. The Seventh Amendment requires "a trial by a jury in the presence . . . of a judge," *Capital Traction Co. v. Hof*, 174 U.S. 1, 13–14 (1899), and procedural due process requires an adequate opportunity to be heard, *Reid v. Engen,* 765 F.2d 1457, 1463 (9th Cir.1985); *Kirk v. U.S. I.N.S.,* 927 F.2d 1106, 1107 (9th Cir. 1991). Due process requires "that the agency gave the appealing

JOIN T REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

party adequate notice and an opportunity to be heard, and that procedural irregularities did not undermine the fundamental fairness of the proceedings." *Sherman v. State,* 128 Wn.2d 164, 184, 905 P.2d 355 (1995). As explained herein, a Zoom trial flatly contradicts the Seventh Amendment's jury-presence requirement, and under the current technological capabilities, it is a near certainty that irregularities in the all-virtual process will undermine the fundamental fairness of any remote trial.

### A.    This Case is Not Well Suited for a Zoom Trial.

GEO has reviewed the cases that this Court has noted were tried remotely and has concluded that they do not provide a justification that the instant case, a class action with many complexities and witnesses, should be tried remotely. From GEO's research, no jury trial has spanned longer than eight days. Nor has any court, to date, virtually tried a class action trial. GEO should not be made to be the test subject.

No all-virtual trial has come close to the scope and magnitude of the present case. Instead, the cases highlighted have all been single-plaintiff actions challenging a narrow set of facts.[1] This case is a class action encompassing tens of thousands of former and current ICE detainees and many different individual fact patterns. This case involves claims brought not only by private plaintiffs against GEO, but also claims brought by the Washington Attorney General seeking a change in the existing application of Washington law. The plaintiffs seek tens of millions of dollars in damages and the trial is expected to last at least three weeks. Plaintiffs have collectively listed *twenty-seven* witnesses for their case in chief. *Nwauzor* ECF 297. In addition, GEO has identified up to *twenty-four* additional witnesses for a total of *over fifty* witnesses. *Id.* Plaintiffs have identified nearly *six hundred* documents that they will use in their case in chief, many of

---

[1] *See e.g. Dallo v. Holland America Line N.V., LLC*, Case No. 2:19-cv-00865 (W.D. Wash.) (Zilly, J.) (resolving a single-plaintiff personal injury case involving a plaintiff who fell while on a cruise ship); *Goldstine v. FedEx Freight, Inc.*, Case No. 2:18-cv-01164 (W.D. Wash.) (Pechman, J.) (involving a former employee's disability discrimination claim); *Orn v. City of Tacoma*, Case No. 3:13-cv-05974 (W.D. Wash.) (Pechman, J.) (involving a plaintiff's challenge to his treatment during a single interaction with Tacoma police).

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

which are thousands of pages long. While GEO has listed only 230 exhibits, Plaintiffs have disputed the admissibility of *every single exhibit* proposed by GEO. Further, GEO is not only the defendant in this case. It is also the counterclaimant in that it has its own affirmative case that it will present to the jury, in addition to the defenses to Plaintiffs' claims. Thus, unlike the prior cases where admissibility concerns could be addressed in advance of trial, here, it will likely be necessary for the Court to address the exhibits as trial progresses and with the necessary context for each exhibit. Without this context, there is no meaningful way for the Court to determine in advance of the trial how many of the over 800 exhibits could be introduced through 50 different witnesses.

Further, the logistics of trial will be unwieldy. Many of GEO's witnesses live in Florida and are on Eastern Standard Time—three hours ahead of Washington. Thus, by 4:00 p.m. PST, it is 7:00 p.m. EST. As a result, trial hours would be in constant flux, or GEO's witnesses would be forced to testify late in the day, when they are fatigued. Breaks would not be consistent among the time zones. For example, an east coast witness may require a lunch break at noon, which would only be 10:00 a.m. in Washington. At the same time, the jurors would all be in Washington and may thereafter need a lunch break shortly after the witness in the east coast returned from his or her break. Add in additional time zones, including GEO's counsel's presence in Mountain Standard Time, and the logistics of scheduling the trial, its attendant breaks and start and stop times, and the schedule would quickly become unmanageable.

In addition, the other cases that have been tried virtually involved pressing circumstances requiring a race to a verdict—this case does not involve such circumstances. For example, in *Orn v. City of Tacoma*, Case No. 3:13-cv-05974, the lawsuit had been pending over seven years. Exhibit B at 3. Plaintiff was ill and at risk of not being able to testify if the trial was further delayed. Exhibit B at 3. Likewise, in Judge Zilly's recent trial, *Dallo v. Holland America Line N.V., LLC*, the Plaintiff lived in California, was in her late eighties, had suffered a brain injury, and was not interested in travelling. Case no. 2:19-cv-00865, ECF 429-1 at 3 (W.D. Wash.).

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1     Here, there are no such pressing circumstances that counterbalance the risk of an unduly
2 prejudicial remote trial.

3        Moreover, the ability of the general public to view the proceedings in large numbers also
4 poses additional concerns. Indeed, if jurors believe that *anyone* in their community could be
5 tuned in on the video conference (including new media) on questions of their personal beliefs
6 and opinions, they may not be forthcoming—particularly as it relates to highly political topics
7 such as immigration. This is not a situation where the juror is in the Court and can see exactly
8 who is there watching and counsel can address any apparent influence in the courtroom. Instead,
9 there is a pressure that hundreds of individuals, some of whom you may know—maybe your
10 boss who is confirming you are at jury duty or your teenage child learning about civics, could
11 be watching. To that end, the Western District of Washington generally has a policy "of
12 protecting a juror's identity" and "will not confirm with anyone" whether a particular person is
13 serving on the jury.[2] There will be no way to do so here. This is particularly concerning in a case
14 which involves polarizing political opinions and where jurors may be asked to rule contrary to
15 the political positions that have been adopted by the Attorney General of Washington.

16        This problem will become more acute still once the jury enters deliberations.
17 Confidentiality is the very hallmark of jury deliberations, and it has always been jealously
18 guarded. *See e.g.*, *Mattox v. United States,* 146 U.S. 140 (1892); *Tanner v. United States*, 483
19 U.S. 107, 120 (1987). That protection could not be maintained against the threats of various
20 recording devices available to jurors at home and elsewhere. Such recordings and subsequent
21 leaks are likely to damage public trust in the integrity of the judicial system, and even the threat
22 of exposure to public whim and malice will chill and bias jury deliberations. *See McDonald v.*
23 *Pless*, 238 U.S. 264, 267–68 (1915).

24

25 _____

26 [2] Jury Summons FAQs, https://www.wawd.uscourts.gov/jurors/jury-summons#Q12 (last visited
December 10, 2020).

JOINT REPORT REGARDING REMOTE      5      ATTORNEY GENERAL OF WASHINGTON
TRIAL PROCEEDINGS                      Civil Rights Division
                                        800 Fifth Avenue, Suite 2000
                                        Seattle, WA 98104
                                        (206) 464-7744

In addition, there is no way for GEO to ensure the confidentiality of its documents. GEO has previously discussed with Plaintiffs that, while the jury may see certain documents, those documents must stay within the courtroom. The parties have discussed GEO's need to ensure all jurors and members of the public do not take pictures of the exhibits or otherwise take them outside of the courtroom. To that end, the parties have discussed limiting any photography or dissemination beyond the courtroom of sensitive documents. In a virtual trial, there is no feasible method for ensuring these documents remain confidential and are not screenshotted, photographed, or otherwise captured and preserved by the public or the jury.

Finally, to the extent GEO seeks sequestration of certain fact witnesses, it will not be possible. There will be no way to ensure that fact witnesses do not listen to all testimony that will be broadcast publicly for anyone to hear. Indeed, any and all fact witnesses could simply call into the public line for the trial and listen to the entirety of the testimony.

A full virtual trial is not only unprecedented in American history; it is also unconstitutional. The Seventh Amendment to the United States Constitution ordains that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." As the Supreme Court noted recently in the related Sixth Amendment context, "the promise of a jury trial surely meant *something*–otherwise there would have been no reason to write it down." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020). "In order to ascertain the scope and meaning of the Seventh Amendment," the Supreme Court long ago established, "resort must be had to the appropriate rules of the common law established at the time of the adoption of that constitutional provision in 1791." *Dimick v. Schiedt*, 293 U.S. 474, 476 (1935).

### B.     A Full Zoom Trial is Unconstitutional.

A full virtual trial is not only unprecedented in American history; it is also unconstitutional. The Seventh Amendment to the United States Constitution ordains that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

trial by jury shall be preserved." As the Supreme Court noted recently in the related Sixth Amendment context, "the promise of a jury trial surely meant *something*–otherwise there would have been no reason to write it down." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020). "In order to ascertain the scope and meaning of the Seventh Amendment," the Supreme Court long ago established, "resort must be had to the appropriate rules of the common law established at the time of the adoption of that constitutional provision in 1791." *Dimick v. Schiedt*, 293 U.S. 474, 476 (1935).

Those rules are clear: " 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions . . . is a trial by a jury . . . in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence." *Capital Traction Co. v. Hof*, 174 U.S. 1, 13–14 (1899). As today, so too at the Founding, to be "present" was to be "[n]ot absent; face to face; being at hand," 2 Samuel Johnson, A Dictionary of the English Language (4th ed. 1773), https://bit.ly/31BN3TZ (emphasis added); *see also* 2 Noah Webster, An American Dictionary of the English Language (1828), https://bit.ly/2De6EAu. Thus, the Seventh Amendment's requirement that a "trial by jury" occur in the presence of a judge was none other than a constitutional command that the jury be at hand to the judge who is to superintend them.

Plainly, a Zoom trial violates this constitutional command. Jurors dispersed to anywhere with internet access are not at hand to the judge. They are not "in the presence . . . of a judge," and a trial so conducted is not a " trial by jury" under the Seventh Amendment. For the reasons set out below, a Zoom trial is bad policy, but even if the court disagrees, it is unconstitutional policy under the Seventh Amendment. The Founders deemed it necessary for a jury to be in living flesh before the judge to resolve questions before the court.

### C. A Zoom Trial Presents Barriers to Justice.

JOINT REPORT REGARDING REMOTE TRIAL PROCEEDINGS

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    Under Federal Rule of Civil Procedure 43(a), "[a]t trial, the witnesses' testimony must

2    be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or

3    other rules adopted by the Supreme Court provide otherwise." However, the rule also provides

4    that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court

5    may permit testimony in open court by contemporaneous transmission from a different location."

6    Fed. R. Civ. P. 43(a). Accordingly, the decision to require testimony by videoconference falls

7    within the Court's discretion. *See Thomas v. Anderson*, 912 F.3d 971, 977 (7th Cir. 2018)

8    ("[U]nder Rule 43(a), the judge has discretion to allow live testimony by video for 'good cause

9    in compelling circumstances and with appropriate safeguards.'"), *cert. denied*, —— S. Ct. ——,

10   140 S.Ct. 533, 205 L.Ed.2d 334 (2019).

11   Conducting a trial by videoconference is certainly not the same as conducting a trial

12   where witnesses testify in the same room as the factfinder. *Thornton v. Snyder*, 428 F.3d 690,

13   697 (7th Cir. 2005), *cert. denied*, 547 U.S. 1192, 126 S.Ct. 2862, 165 L.Ed.2d 896 (2006).

14   Indeed, "[v]ideoconference proceedings have their shortcomings." *Id.* " '[V]irtual reality is

15   rarely a substitute for actual presence and ... even in an age of advancing technology, watching

16   an event on the screen remains less than the complete equivalent of actually attending

17   it.'" *Id.* (quoting *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001)). Certain features

18   of testimony useful to evaluating credibility and persuasiveness, such as " '[t]he immediacy of a

19   living person'" can be lost with video technology, and the " 'ability to observe demeanor, central

20   to the fact-finding process, may be lessened[.]'" *Id.* (citations omitted). Accordingly, "remote

21   transmission [of testimony] is to be the exception and not the rule." *Lopez v. NTI, LLC*, 748 F.

22   Supp. 2d 471, 479 (D. Md. 2010).

23   While some proceedings *may* take place remotely, the judicial system traditionally

24   prefers to conduct proceedings in person where the hearing serves the purpose of fact-finding,

25

26

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

rendering credibility a central contention.[3] There is good cause for this preference. "The parties and the court each have vital and complementary interests in seeing actions resolved expeditiously and fairly after a proper opportunity for all sides to be heard." *Ciccone v. One West 64th Street, Inc.*, No. 651748/2016, 2020 WL 6325719, at *3 (N.Y. Sup. Ct. Sep. 08, 2020). Indeed, multiple studies have shown that the results of proceedings may change based upon whether the proceedings are held remotely. For example, one study of immigration courts found that detained individuals were more likely to be deported when their hearings occurred over video conference rather than in person.[4] Taking these findings a step further, "in three out of six surveyed immigration courts, judges identified instances where they had changed credibility assessments made during a video hearing after holding an in-person hearing."[5] Following these findings (and others), a report from the American Bar Association, which issued recommendations for reforming the immigration system, argued that based on its 2010 findings, the use of video conferencing technology can undermine the fairness of proceedings by making it more difficult to establish credibility and thus argue one's case and suggests limiting the use of video to nonsubstantive hearings.[6] In a case related to previously detained immigrants, these concerns are particularly salient.[7]

---

[3] *See e.g. Supra Infernal Tech,* Exhibit A at n.4 (E.D. Tex. Nov. 20, 2020) ("While some motion practice may be adequately addressed via virtual proceedings, the Court believes that the fair adjudication of the rights of the parties, as envisioned by the Framers and embodied in the Sixth and Seventh Amendments, requires jury trials to be conducted in-person.").

[4] Alicia Bannon, The Impact of Video Proceedings on Fairness and Access to Justice in Court, *available at* https://www.brennancenter.org/our-work/research-reports/impact-video-proceedings-fairness-and-access-justice-court (December 15, 2020).

[5] *Id.*

[6] Eagly, "Remote Adjudication," 978, 984, 989. See American Bar Association Commission on Immigration, 2019 Update Report: Reforming the Immigration System, 2019, https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/2019_reforming_the_immigration_system_volume_1.pdf.

[7] *See Rapheal v. Mukasey*, 533 F.3d 521, 532–34 (7th Cir. 2008) (finding that the statutory right to a fair hearing is violated if remote testimony has "the potential for affecting the [judge's] view of [the respondent's] credibility and in turn the outcome of [the] case").

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Indeed, there is evidence that in part, some of these differences can be attributed to a "vividness effect," whereby testimony that is more "emotionally interesting and proximate in a sensory, temporal, or spatial way is generally perceived by observers as more credible and is better remembered . . it can be argued that live testimonies, due to face-to-face immediacy, are perceived [by jurors] as more vivid than, for example, video-based testimonies, and in-turn are perceived more favourably, considered more credible and are more memorable."[8] Another contributing factor can be that "[t]he audio feature on some videoconferencing technology uses a middle bandwidth filter that cuts off low and high voice frequencies, which are typically used to transmit emotion [and, in turn] removes critical emotional cues that can be used by judicial officers to determine a defendant's remorse and character."[9]

Additionally, it is likely that remote jury service will leave out a clear cross-section of the jury pool. While this court has focused on what can be done to ensure those who lack access to technology or lack technical savvy can participate, there has been no investigation into whether remote juror service is likely to negatively impact participation by women—particularly mothers. Indeed, there is ample research that with the closures of schools and childcare centers, women have been disproportionately impacted.[10]  Without the availability of childcare and schools, many parents will be unable to serve. Indeed, this Court's juror information instructs jurors not to "bring children to the courthouse. Since you will be participating in an official court

---

[8] Alicia Bannon, The Impact of Video Proceedings on Fairness and Access to Justice in Court, *available at* https://www.brennancenter.org/our-work/research-reports/impact-video-proceedings-fairness-and-access-justice-court (last visited December 15, 2020).

[9] Lauren Kirchner, How Fair Is Zoom Justice? *available at* https://themarkup.org/coronavirus/2020/06/09/how-fair-is-zoom-justice (last visited December 15, 2020).

[10] Patricia Cohen, *Pandemic Could Scar a Generation of Working Mothers,* https://www.nytimes.com/2020/06/03/business/economy/coronavirus-working-women.html ("Among married couples who work full time, women provide close to 70 percent of child care during standard working hours, according to recent economic research. That burden has been supersized as schools and other activities shut down and help from cleaning services and babysitters has been curtailed.").

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

proceeding, you will not be able to provide proper supervision."[11] In the event that a parent does not have childcare, the court suggests that the juror "request a postponement."[12] Given the limited access to childcare and schooling during the pandemic, it is likely that a large cross-section of the jury pool will be unable to serve.

### D. Prior Jury Trials Provide Ample Evidence of Juror Non-Attentiveness During Service.

While virtual jury trials are still in their experimental phase, and a number have concluded, each trial to proceed thus far has failed to identify an effective way to ensure jurors pay attention during trial. For example, in *O'Campo v. Honeywell*, during voir dire, the attorneys and court struggled to get all jurors to turn on their cameras for remote juror service. Exhibit C, Case No. RG19041182, Doc. 22744410 (Notice of Irregularities July 24, 2020). Thereafter, the jurors were often distracted by other tasks while sitting at their computers. For example, Juror No. 23 in the *Honeywell* trial was purportedly playing a video game during the afternoon session. Exhibit C. Juror No. 36 began the day laying down during testimony and later turned off his camera. Juror. Nos. 69 and 70 were working on other devices during the presentation of the case. *Id.* Many others were sleeping or not paying attention. *Id.* Indeed, in the recent trial in front of Judge Pechman, *Orn*, in only the first week of a three-week trial, a juror left the remote proceedings to pick up her daughter while testimony was ongoing. Exhibit D, *Orn* Dkt. 226 at 4. At the same time, other jurors were looking at places other than the presentation of the case or otherwise distracted. Exhibit D, *Orn* Dkt. 227. These irregularities in the process should come as no surprise because "video calls make it easier than ever to lose focus."[13]

---

[11] https://www.wawd.uscourts.gov/jurors/jury-summons#Q12

[12] *Id.*

[13] Benjamin Rasmussen, 'Zoom fatigue' is taxing the brain. Here's why that happens, *available at* https://www.nationalgeographic.com/science/2020/04/coronavirus-zoom-fatigue-is-taxing-the-brain-here-is-why-that-happens/ (last visited December 15, 2020) ("We've all done it: decided that, why yes, we absolutely can listen intently, check our email, text a friend, and post

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

On top of these distractions, there were numerous technological difficulties with which the parties and jurors had to contend. In a recent CLE for the Federal Bar Association, Judge Pechman explained that a juror lost power and had to drive to the library to try to find a place to continue her service.[14] The same distractions and technical issues have been seen in other courts. In Texas, proceedings were delayed while a juror's Zoom video froze and five other jurors were dismissed due to technical issues.[15] While technology in courtrooms has advanced significantly, it is currently not adequate. Indeed, as noted by Judge Zilly, trial was interrupted four or five times in the span of a single week because jurors lost connection. *Nwauzor* ECF 313-1. These technical difficulties, coupled with the distraction to jurors of the stimulus in their own homes, make the presentation of the case a mere afterthought.

Indeed, in concluding that remote jury trials could not permissibly substitute for in-person trials, Judge Gilstrap of the United States District Court for the Eastern District of Texas explained:

> The virtual proceedings detracted from the typical administration of justice, depriving the Court of the ability to observe such critical factors as intonation, body-language, attitude, demeanor, and similar vocal and other physical nuance and those quasi-intangibles that normally breathe life and meaning into the written briefing filed on the docket. This approach also unavoidably hampered the Court's ability to interject questions and have an easy dialogue with counsel. In some instances, virtual proceedings before this Court were infected by the necessarily casual features of home life, such as intrusions of advocates' spouses, children, and family pets. While such happenings may be an increasing norm of remote work in many contexts, they stand in stark contrast to the formality and solemnity in which Court proceedings traditionally are and must be conducted.

---

a smiley face on Slack within the same thirty seconds. Except, of course, we don't end up doing much listening at all when we're distracted.").

[14] *See* Virtual Celebration December 9, 2020, *available at* http://fba-wdwash.org/event/577/. Counsel for GEO attended this virtual CLE.

[15] Justin Jouvenal, Justice by Zoom: Frozen video, a cat — and finally a verdict, *available at* https://www.washingtonpost.com/local/legal-issues/justice-by-zoom-frozen-video-a-cat--and-finally-a-verdict/2020/08/12/3e073c56-dbd3-11ea-8051-d5f887d73381_story.html (last visited December 14, 2020).

Such problems are only magnified in complex proceedings with many moving parts.

*See supra Infernal Technology v. Sony*, Exhibit A at n.1.

Thus, GEO opposes a virtual trial because it would be deprived of its day in court. At a minimum, GEO has the right to present its case where it has the undivided attention of jurors, free from the distractions in their home, including their kids, pets, spouses, televisions, and other devices. This is not possible in a remote trial.

**E.  The Inability to Prevent Jurors from Introducing Improper Outside Information Deprives GEO of an Opportunity for a Fair Trial.**

A virtual trial provides no way to ensure jurors do not use the technology in front of them to conduct extrajudicial research into the parties or witnesses in the trial. Despite the fact that the technology to monitor and limit an individual's use of technology exists,[16] and that it is widely used by employers to limit the use of company devices or ensure freedom from distraction,[17] it is not currently available for jurors. In practice, this means a juror can be simultaneously using an internet search engine to research the parties or witnesses while they are providing testimony, messaging their friends about the trial, or otherwise looking at other information during the presentation of a case. The Court would have no way of monitoring whether the information on the juror's screen is the testimony (and Zoom screen) or, instead, an extraneous document or conversation. With a virtual trial, there is no way to monitor jurors'

---

[16] *See e.g.* Tom Spiggle, Can Employers Monitor Employees Who Work From Home Due to the Coronavirus, *available at* https://www.forbes.com/sites/tomspiggle/2020/05/21/can-employers-monitor-employees-who-work-from-home-due-to-the-coronavirus/?sh=200ee6472fb7 (discussing monitoring software). Indeed, with this particular concern in mind, Zoom previously had a function that allowed the host of a zoom call to see if meeting attendees navigated away from the app for longer than 30 seconds during a meeting, in an effort to monitor attentiveness. *See also* Sara Morrison, Just because you're working from home doesn't mean your boss isn't watching you, *available at* https://www.vox.com/recode/2020/4/2/21195584/coronavirus-remote-work-from-home-employee-monitoring. Without such a function, there is no way to discern whether an individual even has the zoom window in front of them, or if instead, the person is watching a different computer application placed in front of the zoom.

[17] *Id.*

JOINT REPORT REGARDING REMOTE TRIAL PROCEEDINGS

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

activities on their personal devices or other distracting and improper influences.[18] Indeed, Judge Zilly noted as much, indicating one juror had been on his cellphone the entire trial (despite an admonishment not to do so) and the Court had no idea until the end of the case. *Nwauzor* ECF 313-1. There is simply no way to know what technology jurors have and what they could be doing. Thus, an all-virtual trial would deprive GEO of the due process protections afforded in an in-person trial. To be sure, "the introduction of outside influences into the deliberative process of the jury is inimical to our system of justice" *United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir. 1981).

As the Handbook For Trial Jurors Serving In The United States District Courts states: "The words of Supreme Court Justice Oliver Wendell Holmes from over a century ago apply with equal force to jurors serving in this advanced technological age: 'The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'"[19] Consistent with this directive, the Ninth Circuit has made clear that even something as seemingly innocuous as consulting a dictionary amounts to impermissible conduct by the jury.[20] "In one sense the violation may be more serious than where these rights are denied at some other stage of the proceedings because the defendant may have no idea what new evidence has been considered. It is impossible to offer evidence to rebut it, to offer a curative instruction, to discuss

---

[18]By way of example, Attorney Mell recently conducted an interview of a witness on Zoom, when the witness city clerk who appeared distracted ultimately conceded that a City Council Member was instructing her how to answer the questions off screen

[19] Handbook For Trial Jurors Serving In The United States District Courts, *available at* https://www.uscourts.gov/sites/default/files/trial-handbook.pdf (last visited December 15, 2020) (emphasis added).

[20] *Marino v. Vasquez,* 812 F.2d 499, 502-03, 505 (9th Cir.1987) (holding that consulting a dictionary definition for the meaning of "malice" constituted the consideration of extrinsic information); see also see also *Fields v. Brown*, 503 F.3d 755, 793 (9th Cir. 2007) (juror's introduction of biblica passages was a violation of a juror's oath); *Thompson v. Borg*, 74 F.3d 1571, 1574 (9th Cir.1996) ("Juror misconduct typically occurs when a member of the jury has introduced into its deliberations matter which was not in evidence or in the instructions." (emphasis added)).

JOINT REPORT REGARDING REMOTE TRIAL PROCEEDINGS

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  its significance in argument to the jury, or to take other tactical steps that might ameliorate its

2  impact."[21] To that end, the Handbook for Trial Jurors Serving In the United States District Courts

3  makes clear that "during the trial [jurors should not] discuss the case <u>at home</u> or elsewhere.

4  Information that a juror gets from a private source may be only half true, or biased or inaccurate.

5  It may be irrelevant to the case at hand. At any rate, it is only fair that the parties have a chance

6  to know and comment on all the facts that matter in the case."[22] Yet, as noted by Judge Zilly

7  during each break jurors "bolted for the coffee pot in the kitchen or whatever," rather than

8  observing the other jurors and ensuring they did not communicate with others in their household.

9  *Nwauzor* ECF 313-1. The breakout rooms are not monitored, and jurors are free to leave their

10  computers (talk to others on the phone or Google the case). Where jurors are sitting at home with

11  their families, eating lunch with them during the breaks, and potentially listening to the trial in a

12  common living area, such as a living room, it is not clear how these key directives to jurors can

13  be met and due process preserved.

14        This is of particular concern in this case where jurors could be colored by the numerous

15  news articles and opinion pieces written about this case and the Northwest ICE Processing

16  Center ("NWIPC") generally. If jurors can search the internet for information about the NWIPC

17  and the allegations, they could read accounts that are inaccurate, are subject to motions in limine,

18  and information that GEO would be unable to address or rebut—as it would not be before the

19  Court. Further, with the trial's remote broadcast, it is highly likely that reporters could be

20  publishing their own accounts of the trial at the end of each day, which could also improperly

21  color the jurors' impression of the evidence and the trial. Accordingly, absent a clear mechanism

22  for limiting jurors' use of their technology during the trial (as well as their interactions with those

23  in their own households), the risk of impropriety far outweighs any perceived benefit of a virtual

24  ―――――――――――――
[21] *Gibson v. Clanon*, 633 F.2d 851, 854–55 (9th Cir. 1980).

25  [22] Handbook For Trial Jurors Serving In The United States District Courts, *available at*
https://www.uscourts.gov/sites/default/files/trial-handbook.pdf (last visited December 15,

26  2020).

JOINT REPORT REGARDING REMOTE        15        ATTORNEY GENERAL OF WASHINGTON
TRIAL PROCEEDINGS                                Civil Rights Division
                                                  800 Fifth Avenue, Suite 2000
                                                  Seattle, WA  98104
                                                   (206) 464-7744

1  trial. Thus, to ensure the trial is not colored by extrajudicial evidence, this Court should wait

2  until trials can safely be conducted in person to resolve the above identified concerns.

3  **F.      Zoom Fatigue Will Impair the Jury.**

4  In addition to the general technological concerns with Zoom, this case is not well suited

5  for a three-week trial because evidence cannot be presented in an equivalent manner as if it were

6  in person. There is ample evidence that a week-long trial would be very difficult for jurors; it

7  would be even more difficult in a three-week trial. Even in an in-person trial, a jury's task is

8  arduous and involves weighing many pieces of evidence to reach the just result. Research

9  evidence demonstrates that, over Zoom, it would be more difficult and more tiring. "Zoom

10 fatigue," which stems from how individuals process information over video, will impede any

11 jury's ability to take in information remotely.  As one expert explained, "[o]n a video call the

12 only way to show we're paying attention is to look at the camera. But, in real life, how often do

13 you stand within three feet of a colleague and stare at their face? Probably never. This is because

14 having to engage in a 'constant gaze' makes us uncomfortable — and tired."[23] Indeed, "[b]eing

15 on a video call requires more focus than a face-to-face chat."[24] On a video chat, individuals must

16 "work harder to process non-verbal cues like facial expressions, the tone and pitch of the voice,

17 and body language; paying more attention to these consumes a lot of energy."[25] Yet, it is these

18 very things that are the most critical to a jury's duty to assess the credibility of witnesses and

19 weigh the balance of the evidence. Some studies that show that even a brief pause or break in

20 testimony that would be appropriate or unremarkable in everyday conversation is likely to be

21

22

23 [23] Benjamin Rasmussen, 'Zoom fatigue' is taxing the brain. Here's why that happens, *available*
   *at*  https://www.nationalgeographic.com/science/2020/04/coronavirus-zoom-fatigue-is-taxing-
24 the-brain-here-is-why-that-happens/ (last visited December 15, 2020).
   [24]      The      reason      Zoom      calls      drain      your      energy,      *available      at*
25 https://www.bbc.com/worklife/article/20200421-why-zoom-video-chats-are-so-exhausting
   (last visited December 15, 2020).
26 [25] *Id.*

perceived differently on Zoom.[26]  Because individuals are concerned about losing their connection, even a 1.2 second delay in responding to a question resulted in a perception that the speaker was less friendly or focused.[27]

There can be no question that presentation of GEO's case through the Zoom platform is likely to impact how the jury perceives the witnesses' testimony. A large portion of what a witness communicates is through "nonverbal signals such as facial expressions, the tone and pitch of the voice, gestures, posture and the distance between the communicators."[28] During an in-person trial, a jury will "process these cues largely automatically and can still listen to the speaker at the same time. But on a video chat, [the jury] need[s] to work harder to process nonverbal cues. Paying more attention to these consumes a lot of energy."[29] Thus, at worst, the jury is deprived of many of these sensations which are critical[30] to its assessment of an individual's credibility, and at best the jury is easily fatigued and unable to take in the same amount of information that they would be able to in person.[31] These impacts are also not unique to the jury, as counsel is similarly deprived of the benefit of observing the sensory perceptions of the jury.[32]

---

[26] Libby Sander, Zoom fatigue is real — here's why video calls are so draining, *available at* https://ideas.ted.com/zoom-fatigue-is-real-heres-why-video-calls-are-so-draining/ (last visited December 15, 2020).

[27] *Id.*

[28] Liz Fosslein, How to Combat Zoom Fatigue, *available at* https://hbr.org/2020/04/how-to-combat-zoom-fatigue (last visited December 15, 2020).

[29] *Id.*

[30] Benjamin Rasmussen, 'Zoom fatigue' is taxing the brain. Here's why that happens, *available at* https://www.nationalgeographic.com/science/2020/04/coronavirus-zoom-fatigue-is-taxing-the-brain-here-is-why-that-happens/ (last visited December 15, 2020) ("Humans communicate even when they're quiet. During an in-person conversation, the brain focuses partly on the words being spoken, but it also derives additional meaning from dozens of non-verbal cues, such as whether someone is facing you or slightly turned away, if they're fidgeting while you talk, or if they inhale quickly in preparation to interrupt.").

[31] *Id.*

[32] J. Richard Caldwell Jr., Christian Tiblier and Kathleen Shea, What Are the Constitutional Considerations in Resuming Civil Jury Trials During a Pandemic?, *available at* https://www.law.com/dailybusinessreview/2020/10/13/what-are-the-constitutional-

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    Furthermore, when individuals are on Zoom, they are aware they are being watched, and

2  often watch their own face to control their own behavior.[33] During in-person conversations, the

3  speaker us typically not aware of their facial expressions which are often a good indicator of our

4  credibility or belief in what we are actually saying. With Zoom, many of these cues are lost

5  because people can carefully watch their own faces and moderate their expressions and, by

6  extension, modify the jury's perception of their credibility. At the same time, these witnesses

7  will be more easily exhausted because of the added pressure of seeing themselves perform.[34] The

8  jury will also suffer fatigue in its effort to discern credibility without the non-verbal cues that we

9  have become accustomed to. "If a person is framed only from the shoulders up, the possibility

10 of viewing hand gestures or other body language is eliminated. If the video quality is poor, any

11 hope of gleaning something from minute facial expressions is dashed."[35] Thus, the effect of

12 "zoom fatigue" will impair the jury's ability to assess credibility and weigh the evidence.

13        **G.        Conclusion**

14       In sum, with the successful clinical trials of several COVID-19 vaccines, and the

15 dissemination of the vaccine beginning across the country, the trial of this matter could

---

considerations-in-resuming-civil-jury-trials-during-a-pandemic/ ("Many times, a jury's individual and collective reaction to a development at trial can and does influence counsel's appreciation and evaluation of the trial progress. Plaintiffs as well as defendants are ill-served by a lawyer's inability to observe jurors' body language and other reactions during trial. In any remote proceeding, a lawyer's perception of the jury's (and judge's) understanding of and receptiveness to evidence or argument must necessarily be dramatically handicapped.").

[33] Libby Sander, Zoom fatigue is real — here's why video calls are so draining, *available at* https://ideas.ted.com/zoom-fatigue-is-real-heres-why-video-calls-are-so-draining/ (last visited December 15, 2020); *see also* Benjamin Rasmussen, 'Zoom fatigue' is taxing the brain. Here's why that happens, *available at* *https://www.nationalgeographic.com/science/2020/04/coronavirus-zoom-fatigue-is-taxing-the-brain-here-is-why-that-happens/* (last visited December 15, 2020) ("[M]ost of us are also staring at a small window of ourselves, making us hyper-aware of every wrinkle, expression, and how it might be interpreted.").

[34] *Id.*

[35] Benjamin Rasmussen, 'Zoom fatigue' is taxing the brain. Here's why that happens, *available at* https://www.nationalgeographic.com/science/2020/04/coronavirus-zoom-fatigue-is-taxing-the-brain-here-is-why-that-happens/ (last visited December 15, 2020).

conceivably continue in-person in 2021. There is no reason to rush the case to trial at the risk of

jeopardizing both sides' right to a fair trial.

Jointly submitted this 18th day of December 2020,

*s/ Jamal N. Whitehead*
SCHROETER GOLDMARK & BENDER
Adam J. Berger, WSBA #20714
Lindsay L. Halm, WSBA #37141
Jamal N. Whitehead, WSBA #39818
Rebecca J. Roe, WSBA #7560
810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000
berger@sgb-law.com
halm@sgb-law.com
whitehead@sgb-law.com

THE LAW OFFICE OF
R. ANDREW FREE
R. Andrew Free (*Pro Hac Vice*)
P.O. Box 90568
Nashville, TN 37209
Tel: (844) 321-3221
andrew@immigrantcivilrights.com

OPEN SKY LAW, PLLC
Devin T. Theriot-Orr, WSBA # 33995
20415 – 72nd Avenue S, Suite 110
Kent, WA 98032
Tel: (206) 962-5052
devin@opensky.law

MENTER IMMIGRATION LAW,
PLLC
Meena Menter, WSBA # 31870
8201 – 164th Avenue NE, Suite 200
Redmond, WA 98052
Tel: (206) 419-7332
meena@meenamenter.com

*Attorneys for Private Plaintiffs*

ROBERT FERGUSON
Attorney General of Washington

*s/ Lane Polozola*
MARSHA CHIEN, WSBA No. 47020
ANDREA BRENNEKE, WSBA No. 22027
LANE POLOZOLA, WSBA No. 50138
PATRICIO A. MARQUEZ, WSBA No. 47693
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
marsha.chien@atg.wa.gov
andrea.brenneke@atg.wa.gov
lane.polozola@atg.wa.gov
patricio.marquez@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

*s/ Adrienne Scheffey*
ADRIENNE SCHEFFEY
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
Telephone: (303) 260-7712
Fax: (303) 260-7714
adrienne.scheffey@akerman.com

III BRANCHES LAW, PLLC

*s/ Joan K. Mell*
JOAN K. MELL, WSBA #21319
1019 Regents Boulevard, Suite 204
Fircrest, Washington 98466
Telephone: (253) 566-2510
Facsimile: (281) 664-4643
joan@3brancheslaw.com

*Attorneys for Defendant The GEO Group, Inc.*

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the United States District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 18th day of December 2020.

_____
CAITILIN HALL
Legal Assistant

JOINT REPORT REGARDING REMOTE
TRIAL PROCEEDINGS
20
ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744