The Honorable Robert J. Bryan

1
2
3
4

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

STATE OF WASHINGTON,

               Plaintiff,

v.

THE GEO GROUP, INC.,

               Defendant.

Case No. 3:17-cv-05806-RJB

**DECLARATION OF TIERNAN KANE IN SUPPORT OF THE GEO GROUP, INC.'S RESPONSE TO THE STATE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

5     Pursuant to 28 U.S.C. § 1746(2), I, Tiernan Kane, state and declare as follows:

6     1. I am over eighteen years of age. I have personal knowledge of, and am competent to testify

7  about, the matters contained herein.

8     2. I am an Attorney at Cooper & Kirk, PLLC, and one of the attorneys representing The GEO

9  Group, Inc. in this matter.

10    3. Attached hereto as Exhibit A is a true and correct copy of excerpts of the rough draft of the

11  Trial Transcript of June 11, 2021.

12    4. Attached hereto as Exhibit B is a true and correct copy of Trial Exhibit A-014.

13    5. Attached hereto as Exhibit C is a true and correct copy of excerpts of the rough draft of the

14  Trial Transcript of June 10, 2021.

15    6. Attached hereto as Exhibit D is a true and correct copy of excerpts of the rough draft of the

16  Trial Transcript of June 4, 2021.

DECL. OF TIERNAN KANE I.S.O.
GEO'S RESP. TO THE STATE'S
RENEWED MOT. FOR J.
AS A MATTER OF LAW
3:17-CV-05806-RJB            1

COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600

7. Attached hereto as Exhibit E is a true and correct copy of excerpts of the rough draft of the Trial Transcript of June 8, 2021.

8. Attached hereto as Exhibit F is a true and correct copy of excerpts of the rough draft of the Trial Transcript of June 9, 2021.

9. Attached hereto as Exhibit G is a true and correct copy of excerpts of the rough draft of the Trial Transcript of June 14, 2021.

10. Attached hereto as Exhibit H is a true and correct copy of Trial Exhibit A-321.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 2nd day of August, 2021, in South Bend, Indiana.

_____s/ Tiernan Kane_____

Tiernan Kane, Ind. Bar No. 36452-71

Respectfully submitted, this 2nd day of August, 2021.

By: /s/   Tiernan Kane_____
Charles J. Cooper,* D.C. Bar No. 248070
Michael W. Kirk,* D.C. Bar No. 424648
Tiernan Kane,* Ind. Bar No. 36452-71**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
E-mail: ccooper@cooperkirk.com
E-mail: mkirk@cooperkirk.com
E-mail: tkane@cooperkirk.com
* Appearing *pro hac vice*
**Not admitted to the D.C. Bar

By: s/ Joan K. Mell_____
**III BRANCHES LAW, PLLC**
Joan K. Mell, WSBA #21319
1019 Regents Boulevard, Suite 204
Fircrest, Washington 98466
Telephone:     (253) 566-2510

DECL. OF TIERNAN KANE I.S.O.
GEO'S RESP. TO THE STATE'S
RENEWED MOT. FOR J.
AS A MATTER OF LAW
3:17-CV-05806-RJB                    2

COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600

1
2
3
4

Facsimile:      (281) 664-4643
Email: joan@3brancheslaw.com

*Attorneys for Defendant The GEO Group, Inc.*

DECL. OF TIERNAN KANE I.S.O.
GEO'S RESP. TO THE STATE'S
RENEWED MOT. FOR J.
AS A MATTER OF LAW
3:17-CV-05806-RJB                    3

COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600

**PROOF OF SERVICE**

I hereby certify on the 2nd day of August, 2021, pursuant to Federal Rule of Civil Procedure 5(b), I electronically filed and served the foregoing **THE GEO GROUP, INC.'S RESPONSE TO THE STATE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW** via the Court's CM/ECF system on the following:

**SCHROETER GOLDMARK & BENDER**
Adam J. Berger, WSBA #20714
Lindsay L. Halm, WSBA #37141
Jamal N. Whitehead, WSBA #39818
Rebecca J. Roe, WSBA #7560
810 Third Avenue, Suite 500
Seattle, Washington 98104
Telephone: (206) 622-8000
Facsimile: (206) 682-2305
Email: hberger@sgb-law.com
Email: halm@sgb-law.com
Email: whitehead@sgb-law.com
Email: roe@sgb-law.com

**THE LAW OFFICE OF R. ANDREW FREE**
Andrew Free (Admitted *Pro Hac Vice*)
P.O. Box 90568
Nashville, Tennessee 37209
Telephone: (844) 321-3221
Facsimile: (615) 829-8959
Email: andrew@immigrantcivilrights.com

**OPEN SKY LAW PLLC**
Devin T. Theriot-Orr, WSBA #33995
20415 72nd Avenue S, Suite 100
Kent, Washington 98032
Telephone: (206) 962-5052
Facsimile: (206) 681-9663
Email: devin@openskylaw.com

**MENTER IMMIGRATION LAW, PLLC**
Meena Menter, WSBA #31870
8201 164th Avenue NE, Suite 200
Redmond, Washington 98052
Telephone: (206) 419-7332
Email: meena@meenamenter.com

*Attorneys for Plaintiffs*

s/Lynn Brewer
Lynn Brewer

## **TABLE OF EXHIBITS**

**Page**

Exhibit A – Excerpts of Trial Transcript Rough Draft, June 11, 2021 .............................................1

Exhibit B – Trial Exhibit A-014.................................................................................................26

Exhibit C – Excerpts of Trial Transcript Rough Draft, June 10, 2021 .........................................38

Exhibit D – Excerpts of Trial Transcript Rough Draft, June 4, 2021 ...........................................46

Exhibit E – Excerpts of Trial Transcript Rough Draft, June 8, 2021 ...........................................51

Exhibit F – Excerpts of Trial Transcript Rough Draft, June 9, 2021............................................59

Exhibit G – Excerpts of Trial Transcript Rough Draft, June 14, 2021 .........................................62

# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT

 2        WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                              )
     UGOCHUKWO GOODLUCK NWAUZOR, )
 5   et al.,                     )
                                 )
 6             Plaintiffs,       )  3:17-cv-05769-RJB
                                 )  3:17-cv-05806-RJB
 7   v.                          )
                                 )  Tacoma, Washington
 8   THE GEO GROUP, INC.,        )
                                 )  June 11, 2021
 9             Defendant.        )
     _____)  Jury Trial
10                               )
     STATE OF WASHINGTON,        )  9:00 a.m.
11                               )
               Plaintiff,        )
12                               )
     v.                          )
13                               )
     THE GEO GROUP, INC.,        )
14                               )
               Defendant.        )
15   _____

16            VERBATIM REPORT OF PROCEEDINGS
17       BEFORE THE HONORABLE ROBERT J. BRYAN
              UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24    Proceedings stenographically reported and transcribed
25              With computer-aided technology
```

1   voluntary work program are employees under the state Minimum

2   Wage Act definition.

3       That's the case in a nutshell from the plaintiffs'

4   standpoint.  There is evidence if the jury chooses to believe

5   it, to support those positions.  None of the defendant's

6   affirmative defenses have been proven as a matter of fact and

7   law at this point and fact issues remain on all of the

8   plaintiffs' allegations in the case and all of the

9   defendant's affirmative defenses.

10      The motion for judgment as a matter of law is denied.

11  Issues relating class representation are reserved until

12  briefing is completed on that issue.

13      All right.  You can bring the jury in and we will go to

14  work continuing with Ms. Sytsma's testimony.

15          MS. SCHEFFEY:  Ms. Sytsma, while we get oriented, can

16  you confirm you have documents in front of you printed?

17          THE WITNESS:  I do.

18          THE CLERK:  Looks like all the jurors are present.

19      (The following occurred in the presence of the jury.)

20          MS. SCHEFFEY:  May I proceed?

21          THE COURT:  Please, do, Ms. Scheffey.

22                  DIRECT EXAMINATION (Resumed)

23  BY MS. SCHEFFEY:

24  Q   You testified detainees in the DOC system work in food

25  services for no more than 1.70 an hour; is that right?

1   A    We have incarcerated workers who work in food service and

2   that is correct, the 1.70 is the level 4.

3   Q    1.70 an hour is not the amount a detained person

4   ultimately receives, correct, there is mandatory deductions?

5   A    We don't use detainee, we use incarcerated.  There are

6   mandatory deductions, correct.

7   Q    I understand you use incarcerated.  I think yesterday we

8   went over the fact that an incarcerated person just means

9   someone who is held under the authority of state law and is

10  not free to leave the place they are held; is that right?

11  A    They are held in the Department of Corrections.

12  Q    So there are mandatory deductions before the amount of pay

13  hits the inmate's account, correct?

14  A    Yes.

15  Q    Those food products that incarcerated persons are making,

16  they are sold to other detention centers and prisons and can

17  serve those meals to their detainees or inmates, right?

18  A    The food products are within our DOC facilities and we do

19  sell to county jails.

20  Q    Can Correctional Industries sell to private contractors?

21  A    If the finished good is used within agencies or non-profit

22  organizations.

23  Q    Do those agencies include the federal government?

24  A    Yeah -- so a public agency, so I would have to assume.

25  Q    Okay.  So a private contractor who is serving a public

Sytsma - Direct

1   agency could purchase food made at subminimum wages and use
2   that for its detained population, correct?
3   A   I could give an example.  The only example I have of us
4   selling to a private would be Shepherd's Grain.  We had a
5   wheat farm sold to Shepherd's Grain.  In return we purchased
6   the wheat back and used it in our food services area and also
7   believe it was also utilized at the UW.
8   Q   The food made by incarcerated individuals was used at
9   University of Washington; is that correct?
10  A   No, the wheat that was sold to Shepherd's Grain.
11  Q   Okay.  The wheat that was picked by incarcerated
12  individuals, is that what they were doing?
13  A   No, CI had a field crops program.  We -- the wheat was
14  harvested.  We had to contract to have the wheat harvested
15  and it was then purchased.  Our crew would help with watering
16  and maintaining the crop.
17  Q   So the incarcerated individuals helped work on a farm
18  essentially maintaining the crops?
19  A   Yes.
20  Q   While working on the farm they were making subminimum
21  wages?
22  A   They were within our gratuity scale, correct.
23  Q   Those goods and services sold by that farm, which is
24  wheat, I assume, those were then sold to University of
25  Washington?

Sytsma - Cross

1   Q   The Correctional Industries doesn't operate in any jails;

2   is that right?

3   A   No.

4   Q   Not in Yakima County jail?

5   A   No.

6   Q   GEO's counsel yesterday asked you a couple questions about

7   those incarcerated who are serving life without parole; is

8   that right?

9   A   Yes.

10  Q   What percentage of inmates participating in Correctional

11  Industries programs will eventually be released into the

12  community?

13  A   Over 90 percent.

14  Q   Now I would like to dig a little deeper into these work

15  programs we have been discussing.  What work programs does

16  Correctional Industries manage?

17  A   We manage the Class I and Class II.

18  Q   I understand Class I.  There is none operating; is that

19  right?

20  A   That's correct.

21  Q   So what are the work programs under Class II?

22  A   We have several programs.  We have textile operations

23  which they do several things that could include mattresses,

24  clothes, embroidery, screen printing.  We also have our

25  optical.  We have food and laundry.  There is more.  I know I

1  last forum we held we did bring in currently incarcerated

2  individuals to talk about what they do in CI and the skills

3  they have gained.

4  Q  I would like you to refer back to A-54 which is the annual

5  report and turn to page 14, which is Bates stamp 10161 --

6  sorry 001 -- yeah, right.  You were talking about the

7  community employment services and workforce development.  I

8  would like to ask you a question after you have had a chance

9  to review this page.  I would like to ask how successful is

10  CI's community employment specialist at helping get inmates

11  released a job?

12        MS. SCHEFFEY:  Objection, beyond the scope.

13        THE COURT:  Overruled.

14        THE WITNESS:  You can see from this chart, I mean,

15  community employment specialist employment rate is 86

16  percent.  So this -- of the individuals who release and go,

17  you know, work with our employment specialist, again, it is a

18  voluntary program, 86 percent of them are employed.  The

19  average amount of time it takes in this report is showing 18

20  days.  Again, we are proud of our success, so the average

21  wage was $16 per hour.  The highest wage was $48 per hour.

22  BY MS. CHIEN:

23  Q  Thank you.  So earlier you testified that CI, in addition

24  to upholstery and optical and other programs such as that,

25  also operates laundry facilities and food service programs,

Case 3:17-cv-05806-RJB Document 510 Filed 08/02/21 Page 13 of 81

22

Sytsma - Cross

1  is that right?

2  A   Correct.

3  Q   Do those working in CI laundry facilities receive the job

4  training supports we just discussed?

5  A   Absolutely.

6  Q   Do those working -- inmates working in Correctional

7  Industries food services receive the job training supports we

8  just discussed?

9  A   Yes.

10  Q   When the incarcerated individuals work in these laundry

11  and food services positions who are they supervised by?

12  A   CI staff which are Correctional Industries supervisor

13  assistants.

14  Q   Are those CI staff correctional officers?

15  A   No.

16  Q   What are they?

17  A   They are employees of CI.  They are Correctional

18  Industries supervisors.  So they are employees of

19  Correctional Industries.  They supervise the incarcerated, as

20  well as coach and mentor.

21  Q   Are they considered job mentors?

22  A   Yes.

23  Q   Do in -- does Correctional Industries or incarcerated

24  individuals who work in CI's food service program receive any

25  certification?

Angela Nicolavo - Court Reporter, 1717 Pacific Ave, Tacoma, WA - 253-882-3832
Page 008

1    BY MS. MELL:

2    Q    Can you give us your name, please?

3    A    Byron Eagle.

4    Q    Mr. Eagle, you are a state employee, correct?

5    A    Correct.

6    Q    The title of your position is chief of secure operations

7    for the Washington Special Commitment Center?

8    A    Yes.

9    Q    The Special Commitment Center houses people involuntarily,

10   correct?

11   A    Yes.

12   Q    They are civilly committed, not criminally, correct?

13   A    That is correct.

14   Q    The state houses them on an island in Puget Sound where

15   the job opportunities are limited to what work they can do

16   while confined there, correct?

17   A    Correct.

18   Q    The state pays money to these people they house on McNeil

19   Island to do work while detained, correct?

20   A    Correct.

21   Q    The amount of money the state pays to those workers is not

22   minimum wage, correct?

23   A    It is not.

24   Q    So one of those people the State maintains is Brandon

25   Ollivier?

1        THE COURT:  I think he may answer.

2        THE WITNESS:  So the vocational program is a

3   voluntary program.

4   BY MS. MELL:

5   Q   All right.  So the vocational program is a voluntary

6   program.  I am more interested in knowing whether or not the

7   150 to 280 residents at the Special Commitment Center tries

8   to have work for them to do?

9        MS. BRENNEKE:  Object to the form.

10        THE COURT:  I think he may answer.

11        THE WITNESS:  I am confused by your question.  Can

12   you restate it?

13   BY MS. MELL:

14   Q   Sure.  Of the 150 to 280 residents the state has detained

15   at the Special Commitment Center, do you try to have work for

16   all of them to do or just some of them?

17   A   It is a -- vocation is a voluntary program.  It is their

18   decision to participate in that or not.  I don't know what

19   else to say.

20   Q   So is the only way that a person the State has detained

21   there able to get the 2.50 an hour is if they volunteer for

22   the work program?

23   A   Yes.

24   Q   So if a detainee wanted to work, the Special Commitment

25   Center could not allow him or her to do any work unless they

1  A   So the employees -- you are referring to state employees,

2  correct?  Maybe I should have you restate the question.

3  Q   So the employees pick what the activities are, correct?

4         MS. BRENNEKE:  Object to the form.

5         THE COURT:  Sustained.  I don't know what you are

6  talking about now.

7  BY MS. MELL:

8  Q   With the work that the detainees can do at the Special

9  Commitment Center, employees pick what kind of work they can

10  volunteer to do, correct?

11  A   Residents volunteer and they chose and apply for the work

12  they want to do.

13  Q   Okay.  So who creates the list of choices?  Did you hear

14  my question?

15  A   No.  I had some feedback.  Sorry.

16  Q   Who creates the choices in work?

17  A   The adult training specialist.

18  Q   And the kinds of work the adult training special pick

19  concern the operational needs of the facility, right?

20  A   Some of them.

21  Q   Some of those operational needs of the facility include

22  doing the laundry, correct?

23  A   Yeah, laundry is a part of the vocation program, yes.

24  Q   And laundry is an operational need of the facility,

25  correct?

1  A    Yes.

2  Q    And the vocation program has detainees doing laundry other

3  than their own clothing, correct?

4  A    Correct.

5  Q    So how broad is the laundry that the detainees launder?

6  A    I don't know that.

7  Q    Do you know if they launder sheets for all the detainees?

8  A    No, I don't.

9  Q    Is the laundry facility an industrial laundry room?

10  A    I don't know.

11  Q    Have you ever been in the laundry room?

12  A    No.

13  Q    Do you know whether or not the laundry machines that are

14  used for the vocational program are the kind of laundry

15  machines that you have at home?

16         MS. BRENNEKE:  Objection, foundation.

17         THE COURT:  He may answer.

18         THE WITNESS:  Yeah, I don't know.  I haven't been in

19  that area.

20  BY MS. MELL:

21  Q    Is it correct you don't have any employees assigned to

22  launder the linens or bedding at the facility?

23  A    I don't know that to be true either.

24  Q    I didn't hear you.

25  A    I don't know.

1    live?  Do they live collectively together in a large housing

2    unit?

3    A   Yes, they do.

4    Q   Are there bathrooms that have multiple showers stalls in

5    them?

6    A   Yes.

7    Q   Are there toilets -- are their bathrooms with multiple

8    toilets in them?

9    A   Yes.

10   Q   Do you know that the detainees clean those bathrooms?

11   A   Yes, they do.

12   Q   Do the staff use those bathrooms?

13   A   They do not.

14   Q   Are there special toilets on the secure side that staff

15   use?

16   A   Yes.

17   Q   Do the detainees clean those bathrooms?

18   A   I don't know.

19   Q   Do you send your janitors on to the secure side to clean

20   toilets?

21   A   Again, I don't send them any where.  That area is not

22   under me so I don't direct their work so I don't know.

23   Q   When you have been on the secure side, have you ever seen

24   janitors who are employees for the State of Washington

25   cleaning the toilets?

1    to do work that would be related to facilities that are used

2    by the staff?

3    A   Correct.

4    Q   It is your testimony, though, that with regard to space

5    detainees use, collectively, not individually, that if a

6    person is working as a porter in the program, they clean

7    those areas, the common areas?

8    A   Yes, they clean common areas.

9    Q   The other kind of janitorial work that they do, does it

10   include polishing the floors?

11   A   I don't know.

12   Q   Sweeping the floors?

13   A   I don't know.

14   Q   Mopping the floors?

15   A   I don't know that either.

16   Q   As the manager of the program, do you spend any time on

17   the secure side watching what the detainees do?

18   A   I don't.

19   Q   Do you know whether or not any of the detainees do food

20   preparation?

21   A   Yes, they do.

22   Q   They are not just making individual meals for themselves,

23   correct?

24   A   Correct.

25   Q   The meals they prepare are in a kitchen that is larger

Eagle - Direct

1    A    Do I value it?  I don't know what you mean.

2    Q    Would you agree the work they perform is meaningful?

3    A    Yes.

4    Q    It is not your goal to make work for them to do like move

5    rocks that have no purpose?

6    A    No.

7    Q    Has there ever been a situation where a detainees has

8    asked to do work that you have not had a job for and you

9    permitted them to do that work?

10   A    I don't recall getting proposals.

11   Q    Do the detainees paint?

12   A    Not to my knowledge.

13   Q    Have you allowed the detainees to create art at the

14   Special Commitment Center?

15   A    Yes.

16   Q    What kind of art have you permitted detainees to make?

17   A    The art I am referring to is part of a therapeutic project

18   where they were working with some staff members on the unit.

19   The staff work with the residents to do some art work as part

20   of a therapeutic project.

21   Q    Was that therapeutic project done in a program outside of

22   the vocational program?

23   A    The one I am referring to it did.

24   Q    You didn't pay them to do the art?

25   A    No, I don't believe they were paid, no.

Eagle - Direct

1   Q    What is the scope of work done in the landscaping area?

2   A    Lawn mowing and weed eating.

3   Q    Are detainees ever asked to move dirt?

4   A    I don't know, not to my knowledge.

5   Q    Do you have employees overseeing the detainees when they

6   are mowing the lawn?

7   A    Yes.

8   Q    Does that work benefit the state?

9   A    Yeah.

10  Q    Does the work of the detainees mowing the lawn benefit the

11  state?

12  A    Yes.

13  Q    If the detainee didn't mow the lawn, the lawn supervisor

14  would have to mow the lawn, correct?

15  A    The lawn supervisor does mow the lawn.

16  Q    If a detainee worker isn't mowing the lawn, then the

17  supervisor will mow the lawn, correct?

18  A    No, the lawn supervisor, they do mow the lawn.

19  Q    Right.  So do they mow the lawn when the detainee is also

20  mowing the lawn?

21  A    Yes.

22  Q    So supervisors do the same work alongside the detainees?

23  A    I have seen that occur, yes.

24  Q    So it is the exact same work done by the supervisor as is

25  done by the detainee, correct?

1   A    When I observed it was, yes.

2   Q    The state employee gets paid state wages and the detainees

3   gets pay subminimum wages, correct?   Somewhere around 2.50 an

4   hour, correct?

5   A    Somewhere around there, yes.

6   Q    Do you track your detainees' time working?

7   A    It is tracked, yes.

8   Q    Do you keep track of that time so that you could pay them?

9   A    Yes.

10  Q    Do you take any deductions from that pay?

11  A    I don't know that.

12  Q    Is the pay pretty typically somewhere between one dollar

13  and three dollars per hour?

14  A    Yes, that's accurate.

15  Q    Did the state at one point pay participants substantially

16  more but it cut the pay down to save money?

17  A    Yes, that's what I understand.

18  Q    Do you know that a number of the detainees there have sued

19  the state over the pay rates?

20       MS. BRENNEKE:   Your Honor, I object.   I think this is

21  an entirely different matter not relevant to this proceeding.

22       THE COURT:   The objection is sustained.

23  BY MS. MELL:

24  Q    In your position, do you set the pay rates?

25  A    No, I do not.

Grice – Direct

```
 1    BY MS. MELL:

 2    Q   Is it correct, Mr. Grice, that state inmates assigned by

 3    prison officials to work on prison premises for a private

 4    corporation at rates established and paid for by the state

 5    are not employees of the private corporation and would not be

 6    subject to the Minimum Wage Act according to practices at the

 7    Department?

 8    A   Yes, that would be the Department's enforcement policy as

 9    codified in ESA1, our administrative policy on that subject.

10    Q   So any state inmate assigned under, for instance, a

11    contract with GEO, to detain state inmates, GEO could have

12    those inmates working at two dollar a day and not be subject

13    to the Minimum Wage Act?

14          MR. POLOZOLA:   Objection, counsel is asking the

15    witness to speculate about a position they would take.

16          THE COURT:   The objection is sustained.

17    BY MS. MELL:

18    Q   Is it consistent with your standard that GEO could pay two

19    dollars a day to inmates assigned by the State of Washington

20    to be in their custody?

21          MR. POLOZOLA:   Same objection, Your Honor.

22          MR. BERGER:   Incomplete hypothetical.

23          THE COURT:   The objection is sustained.  You are

24    talking about this as though it were the current policy.  I

25    don't know that it is.  The objection is sustained.
```

Grice - Direct

1          MR. BERGER:  Objection.

2          THE COURT:  The question is overbroad.  Sustained.

3   BY MS. MELL:

4   Q   Has -- in 2014, did the Department of Labor & Industries

5   give its opinion as to the applicability of the Minimum Wage

6   Act to participants at the Northwest ICE Processing Center's

7   ICE voluntary work program?

8          MR. POLOZOLA:  Objection, Your Honor.

9          MR. BERGER:  Objection, counsel is trying to

10   circumvent the Court's motion in limine rulings.

11          THE COURT:  The objection is sustained.

12          MS. MELL:  With regard to the objection being

13   sustained, is that based on the motion in limine, even though

14   the applicability --

15          THE COURT:  I am not going to explain it to you.  It

16   is obvious to me, and the objection is sustained.

17   BY MS. MELL:

18   Q   With regard to the Northwest ICE Processing Center, Labor

19   & Industries to date has never received a complaint from a

20   detainee at the Northwest ICE Processing Center about

21   subminimum wages, has it?

22   A   I am not aware of any complaint like the one you

23   described, no.

24   Q   Not one detainee held at the Northwest ICE Processing

25   Center has ever logged onto L&I's website and filed a Minimum

Grice - Direct

1    THE COURT:  The last question is incomplete.

2   Sustained.

3   BY MS. MELL:

4   Q   Are there factors that you know you would apply if -- to

5   ascertain whether or not you refer a federal detainee to the

6   federal government or open an investigation yourself?

7   A   The Department would likely seek legal guidance in

8   determining how state law may apply to that circumstance.

9   Q   Where does the Department of Labor & Industries get its

10  legal advice?

11  A   L&I consults with the Labor & Industries Division of the

12  Attorney General's Office for legal advice.

13  Q   In 2017, did the Department of Labor & Industries receive

14  notice from the Attorney General's Office about a press

15  conference concerning this case?

16  A   I was not employed at the Department for the entirety of

17  2017, and I am not specifically aware of that notice.

18  Q   As a speaking agent of the Department for purposes of this

19  case, did you know there was a press conference to announce

20  this case by the Attorney General?

21  A   I don't have any recollection of that at the moment.

22  Q   Do you have any recollection of there being communications

23  intra-agency about whether or not the Attorney General was

24  going to pursue this lawsuit?

25  A   I don't recall any communications.  I don't believe I was

1  involved in any of those communications, if they did occur.

2  Q   Would they have occurred at your level or were you too low

3  or you just weren't there at that time; is that right?

4  A   I started with the Department as a regulations analyst in

5  July of 2017.  So it is unlikely I would have been involved

6  in that conversation at any point in 2017.

7  Q   As the speaking agent for the Department of Labor &

8  Industries in this case, did you identify any notification

9  that Labor & Industries gave to GEO in advance of the

10  Attorney General filing this lawsuit?

11  A   I am not aware of any notification that the Department

12  gave to GEO, no.

13  Q   You are familiar with the Department of Labor & Industries

14  procedures for enforcement of the Minimum Wage Act, correct?

15  A   Yes.

16  Q   You know this lawsuit was not filed in the name of the

17  Department of Labor & Industries, correct?

18  A   I don't know the full background as to how this lawsuit

19  was offered, within the scope of my duties.

20  Q   Do you know when the Department of Labor & Industries

21  wishes to enforce the Minimum Wage Act it does that in the

22  agency's name?

23  A   Yes, the Department does use its own authorities in the

24  enforcement of the Minimum Wage Act.

25  Q   Before the Department takes a formal enforcement action

Grice – Direct

1    when enforcing the Minimum Wage Act, the Department is in

2    communication with the employer during the investigative

3    stage; isn't that correct?

4    A    Yes, any investigation conducted by L&I regarding labor

5    standards would involve communication with the employer.

6    Q    L&I never did an investigation of the practices at the

7    Northwest ICE Processing Center specific to VWP participants

8    in the voluntary work program?

9    A    No, no, I am not aware of any investigation that touched

10   on detainees in the voluntary work program.

11   Q    You know Department of Labor & Industries has been inside

12   the Northwest ICE Processing Center, don't you?

13   A    I understand that certain other areas of L&I, in my

14   recollection the safety and health officials have conducted

15   inspections at that facility.

16   Q    Do you know that when they are on site that they are given

17   full access to the facility?

18   A    I don't know the nature of their access or the procedures

19   they follow for their investigations.

20   Q    Do you know that they ascertain during their inspection

21   the number of employees and they write that number down in

22   their reports?

23           MR. BERGER:  Objection.

24           MR. POLOZOLA:  Objection, assumes facts.

25           THE COURT:  Sorry.  I heard something.

 1               MR. POLOZOLA:  Objection, assumes facts.

 2               THE COURT:  I think he may answer if he knows.

 3               THE WITNESS:  Can you repeat the question?

 4     BY MS. MELL:

 5     Q   Do you know that the Department of Labor & Industries,

 6     when it conducts a site inspection and walk through, it

 7     counts the number of employees and records the number in

 8     their inspection report?

 9     A   I don't know the details of the procedures that safety and

10     health inspectors follow for their inspections.

11     Q   You do know that the Department of Labor & Industries has

12     never communicated with GEO about the applicability of the

13     Minimum Wage Act to the voluntary work program at the

14     Northwest ICE Processing Center, don't you?

15     A   I am not aware of any communication from the employment

16     standards program regarding applicability of the Minimum Wage

17     Act with GEO, no.

18     Q   The whole department, not just your division, right?

19     A   I can't say with certainty what would have been

20     communicated by other administrative units at L&I.

21     Q   You are speaking today as a speaking agent for the entire

22     agency, aren't you?

23               MR. POLOZOLA:  Objection, Your Honor.

24               THE COURT:  That's a fair question.

25               THE WITNESS: I don't believe I am speaking for the

1   Q   So I think you can see in front of you on the screen, if

2   not, hopefully you can see on your page, expected outcomes in

3   section 5.8.  What is your understanding of what the phrase

4   "expected outcomes" means in the Performance-Based National

5   Standards?

6   A   The concept of a performance-based standard, there are

7   these sort of principled goals that the agency sets out that

8   are expected of the contractor, in this case, that we are

9   supposed to perform.  These are statements that we are to

10  meet in implementing the voluntary work program.  It doesn't

11  prescribe a precise method in every case.  Sets out a floor

12  that we are required to do.

13  Q   When we are talking about the floor, if we could call out

14  item 3 under under expected outcomes, which starts with

15  "essential operations."

16  A   Yes, I see it.

17  Q   What is your understanding of what GEO must do to comply

18  with that expected outcome?

19  A   As I understand it, the purpose of the voluntary work

20  program is to essentially enhance the overall operation of

21  the facility.  In other words, it is not supposed to be a

22  function that is busy work.  It is not something where let's

23  just say you had a detainee that was working in a cleaning

24  type role, you wouldn't take dirt on the floor and keep

25  throwing dirt on the floor just to have the work program go.

1   It has to be something meaningful and useful that just sort

2   of would make logical sense.  That's what I understand that

3   to mean.

4   Q   We can take that part down for now.  What is your

5   understanding of what detainees at the Northwest ICE

6   Processing Center are paid in the voluntary work program?

7   A   As I understand it, they are paid a dollar a day.

8   Q   Why?

9   A   The dollar a day is -- first of all, it is set by the

10  agency.  In other words, there is a portion of the

11  Immigration and Nationality Act that authorized ICE to pay

12  detainees in the detainee work program.  There is no

13  appropriation.  Just means you have the authority to do it.

14  Congress, through the ICE budget process or every agency's

15  budget process, prescribes how much money the agency can

16  spend on a particular item.  In this case, the voluntary work

17  program is in ICE's budget.  It is in our contract.  It is in

18  the standard, and the rate that the agency has set is a

19  dollar a day.

20  Q   When you say "the agency," what you are you referring to?

21  A   ICE, about ICE.

22  Q   So have you visited other facilities as part of your time

23  at ICE?

24  A   Yes, in Arizona there were facilities that I worked at on

25  a regular --

# EXHIBIT B

**Washington State**
**Department of Social & Health Services**

**SCC** Special Commitment Center

Policy 214
# Residential Vocational Program

**Authorizing Sources**
- **RCW 71.09**

**Approved**

Sjah Talbot
Chief Executive Officer
Date: September 13, 2018

**Effective Date**
- **October 1, 2018**

**Sunset Review Date**
- **September 13, 2022**

---

## I.   PURPOSE AND SCOPE

This policy is intended to provide direction and reference to the staff members and the residents of the Special Commitment Center (SCC) on the objectives, purposes, and processes associated with the Resident Vocational Program.

This policy applies to all residents and staff members of the SCC Total Confinement Facility (TCF).

All staff, contractors, volunteers, and interns working with or at any SCC location are responsible for reviewing and complying with SCC policies.

## II.   POLICY

### 1.   Objective of the Resident Vocational Program

The primary objective of the Resident Vocational Program is to provide residents of the Total Confinement Facility with basic work skills, work experience and evaluation which can be of benefit in obtaining gainful employment following their transition from SCC to a less restrictive alternative.

In achieving the objectives of this program, SCC has established various vocational activities that are used to support the residents as a component of their treatment program.  In establishing these activities, SCC relies on its vocational program participants to fulfill the tasks associated with each of these activities. In order for the program to remain a success it is important that participants maintain good attendance and perform the tasks provided in a reliable manner.

On a case-by-case basis, new activities will be added to the program or existing activities removed from the program based on achieved successes and/or challenges. No vocational opportunity will be maintained if doing so will jeopardize the safety of others or the security of the facility.

### 2. The Resident Vocational Program is Non-Compulsory

No SCC resident will be compelled to participate in vocational training or a vocational opportunity. Resident participation in the vocational program is voluntary, however:

*Staff are responsible for reading and understanding the information contained in the full policy. Review of the summary is not sufficient for full understanding.*

Ex. # A-014
2 of 11

Washington State
**Department of Social
& Health Services**

| SCC | Special Commitment Center

Policy 214
**Residential Vocational Program**

**Authorizing Sources**
- **RCW 71.09**

**Approved**

**Effective Date**
- **October 1, 2018**

Sjan Talbot
Chief Executive Officer
Date: September 13, 2018

**Sunset Review Date**
- **September 13, 2022**

## I.   PURPOSE AND SCOPE

This policy is intended to provide direction and reference to the staff members and the residents of the Special Commitment Center (SCC) on the objectives, purposes, and processes associated with the Resident Vocational Program.

This policy applies to all residents and staff members of the SCC Total Confinement Facility (TCF).

All staff, contractors, volunteers, and interns working with or at any SCC location are responsible for reviewing and complying with SCC policies.

## II.   POLICY

### 1.  Objective of the Resident Vocational Program

The primary objective of the Resident Vocational Program is to provide residents of the Total Confinement Facility with basic work skills, work experience and evaluation which can be of benefit in obtaining gainful employment following their transition from SCC to a less restrictive alternative.

In achieving the objectives of this program, SCC has established various vocational activities that are used to support the residents as a component of their treatment program. In establishing these activities, SCC relies on its vocational program participants to fulfill the tasks associated with each of these activities. In order for the program to remain a success it is important that participants maintain good attendance and perform the tasks provided in a reliable manner.

On a case-by-case basis, new activities will be added to the program or existing activities removed from the program based on achieved successes and/or challenges. No vocational opportunity will be maintained if doing so will jeopardize the safety of others or the security of the facility.

### 2. The Resident Vocational Program is Non-Compulsory

No SCC resident will be compelled to participate in vocational training or a vocational opportunity. Resident participation in the vocational program is voluntary, however:

*Staff are responsible for reading and understanding the information contained in the full policy. Review of the summary is not sufficient for full understanding.*

- A resident's unwillingness to participate in the vocational program may be reviewed as one component of their overall treatment and community readiness when considering recommendations pertaining to least restrictive alternative.
- If a resident's ability to participate in vocational programming is limited, barriers will be reviewed and accommodations will be considered.

- Residents who participate in the vocational program, but are unwilling to complete requisite training, perform requisite tasks, meet the performance expectations of the provided opportunity, and/ or are unwilling to cooperate with the work opportunity supervisor, may be dropped from the program.

- A resident who has been dropped from the vocational program may reapply and be considered once current conditions are met.

1. **The Resident Vocational Program is one component of treatment**

The Resident Vocational Program described in this policy is one component of the SCC treatment program and is designed to increase readiness for eventual community transition and enhance or develop necessary skills for employment...

- All residents regardless of treatment status may apply for participation in the vocational program providing they qualify for vocational activities based upon their behavior and its associated level of privilege. *(See SCC Policy 236 Resident Levels of Privilege for more details).*

- Residents actively involved in sex offender specific treatment will be considered for participation in the vocational program as a part of their individualized treatment plan.

2. **How the Resident Vocational Program is Managed**

The Vocational Program is managed at 4 levels.

- Resident vocational activities are prioritized by a resident's participation in treatment.

Vocational staff report to the Chief Executive Officer and/ or designee and act in the capacity of a de-facto human resource & payroll office over the resident vocational program. In doing so, the vocational staff members collaborate with various program managers and/or supervisors to identify and develop vocational activities appropriate for residents within the facility.

- The ***designated supervisor*** is responsible to

  o Complete vocational performance evaluations
  o Ensure the vocational duties description adequately describes the nature of the activities to be performed.
  o Ensure the participant performs the full scope and scale of the vocational opportunity as it is described on the duties description.

**Policy 214 –** *Residential Vocational Program*                                    *9/2018*

o   Ensure participant time is accurately tracked for payroll purposes.
o   Assign work-site supervisors as appropriate to accurately track the start and stop times of each participant.

- The **work-site supervisor** is responsible to

    o   Ensure the start and end time of each resident participant is accurately tracked for payroll purposes,
    o   Assign specific assignments when directed to do so by the designated supervisor,
    o   Report performance deficiencies to the participant's designated supervisor and treatment provider.

3. **Residents must Pre-Qualify to Participate in the Vocational Program**

   Pre-participation Training and Screening:

   - A resident will be considered for a vocational opportunity only if the resident has satisfactorily completed the required Industrial Safety Course offered through the Vocational Program and has a current certificate that is updated every three (3) years. Residents applying for food services vocational activities must satisfactorily complete the Food Service Safety and Sanitation course and possess a valid Pierce County Food Worker Card.
   - All courses and identified tests are available free of charge and are available to residents by request.

   - All resident vocational activities require residents to pass a medical record screening.

4. **How a Resident Applies**

   A.  General requirements - Posting, Application and Selection.

   - Except for special projects, vocational activities available to residents will be posted. Postings will name the vocational opportunity and vocational opportunity location, general duties and hours, and eligibility requirements.  Special projects are assigned by vocational staff according to program and treatment needs.

   - Vocational opportunity postings, vocational opportunity description, maintenance and review, application availability, receiving and forwarding applications, and related processes are the responsibility of the Vocational staff, similar to a "human resource" function in the business community.

   - Applicant interview and selection is the responsibility of the work area managers or their designees.  When a resident is selected for a position, Vocational staff must be notified. Vocational staff will communicate that information by memo to the resident and a copy to the resident's Clinical chart.

**Policy 214 –** *Residential Vocational Program*                                    *9/2018*

B.  General Requirements - Application Process.

- Residents may hold on-unit vocational activities only on their assigned living unit. On-unit vocational activities are limited and are posted on the unit where the vocational opportunity is located.  Residents may hold either an on-unit or an off-unit vocational opportunity but not both, except to meet temporary program needs.

- Qualified residents from any living unit may apply for an off-unit vocational opportunity. Vocational staff will consult and review with a member of the Dept. of Resident Treatment if an off-unit vocational activity request is made to ensure it is clinically indicated for the requestee's individualized treatment needs.

- Certain vocational activities may require the applicant to have specific demonstrated skills to qualify.

- Interested residents must apply for posted positions according to directions given.

- Depending on the directions given, residents must complete either a Letter of Interest or application packet that contains a Letter of Interest, Application and Readiness Assessment request.  Accommodations or other assistance will be provided for any resident unable to complete the application materials.

- Documentation of resident participation in the vocational program must be included in the resident's clinical chart and communicated to the resident's assigned therapist or designee.

C.  Vocational opportunity Pre-Training (PT) and/or On-the-Job Vocational Opportunity

Training (OJT) positions are available to residents, depending upon their qualifications, and the program availability. .

- This program is guided by treatment goals.

- PT/OJT is developed and assigned in a similar fashion as are regular resident vocational activities.

- Participation in PT/OJT is based upon application and satisfactory performance.

- Successful completion of PT/OJT may be required for certain vocational activities, but does not guarantee a resident a vocational opportunity assignment upon completion.

5.  **Residents are Supervised, Periodically Evaluated and Paid in the following manner:**

A.  **Supervision and Performance Evaluation.**

- Residents will be supervised and their performance evaluated by their assigned work

**Policy 214 –** *Residential Vocational Program*                                        *9/2018*

opportunity supervisor or designee.

- Vocational staff will initiate an initial Vocational Performance Report (JPR) - 30 days after the resident begins work.  Additional JPRs may be completed as necessary to document a resident's vocational performance and, if necessary, expectations for improvement or vocational termination.  Original JPRs must be forwarded to Vocational staff for processing. Vocational staff will distribute copies to the resident, resident's chart, assigned therapist - and work area manager or designee.

- JPRs must be completed at least yearly. The dates of the reporting cycle will be established by the Adult Training Specialist who coordinates the vocational program. The assigned reporting staff and the work area supervisor/manager will sign off on each report. The supervisor will then ensure the originals are returned to Vocational staff by the mandatory cutoff date given for completion and distribution.

B.  **Pay and Time-keeping.**

- Pay is based upon behavior levels and treatment phases with oversight provided by the Chief Executive Officer and/ or designee.  Pay for special projects, including incentivized chores, will be at the standardized rate for residents who would otherwise not qualify for participation in the vocational program due to being at a level 1 status.

- All resident vocational activities must have a designated time period for starting and stopping work.

- Residents are authorized to be paid only for the designated time period.  Any change to the authorized time a resident works must be <u>pre-approved</u> on the resident's time sheet and initialed by the work area manager or designee.

- It is the resident's responsibility to begin and end work at the authorized times and not to work over the time approved for the vocational opportunity.

C.  **Staff Role in Timekeeping**

- On-unit vocational activities – Residential unit supervisors and or lead staff will review on-unit timesheets **each shift** and will verify the accuracy of each resident timesheet for that shift.

- Off-unit vocational activities – Off-unit work supervisors will review off-unit timesheets **each shift** and will verify the accuracy of each resident timesheet for that shift.

- Residential Program Directors (RPDs) will review timesheet books at least once per month to ensure accuracy.

- The Resident Payroll Desk will not issue resident paychecks if a resident timesheet is

**Policy 214 –** *Residential Vocational Program*                                          *9/2018*

incomplete. Paychecks for late resident timesheets will be issued at the next pay period.

- Resident timesheets for over 40 hours in a pay period must be accompanied by a written explanation by the responsible supervisor.

D. **Resident Role in Timekeeping**

- Residents must assure that their time logged in and out of a vocational opportunity is accurately recorded.

- Residents who claim hours in excess of those actually worked may be terminated.

- Residents are required to sign their time sheet at the end of each pay period.

E. **Vocational Opportunity Retention.**

- SCC expects each resident involved in vocational training to conduct him/herself appropriately in a pro-social manner to maintain good standing and continued eligibility.

F. **Rotational assignments.**

- Residents are normally assigned vocational activities with no fixed end date, but no resident "owns" his or her vocational opportunity.

- Certain existing or new resident vocational activities may be designated for rotation to allow other residents an opportunity for vocational opportunity training and skill development.

G. **Suspension, Loss, and Reinstatement.**

- A resident may lose a vocational opportunity by reason of poor vocational performance, poor attendance, or failing to maintain eligibility requirements.

- Residents who participate in the Vocational Program are expected to conduct themselves appropriately both on and off the work site. For this reason, any resident that receives a Category 1 Behavior Management Report, on or off "the clock", shall be suspended from employment effective immediately until the treatment team, therapist , and RPD have determined whether continued participation in the vocational program impacts safety and security and is therapeutically appropriate for the individual resident.   Should it not directly impact safety or security and continues to be therapeutically appropriate the resident may be permitted to return to work after information has been communicated to the

**Policy 214 –** *Residential Vocational Program*                                                    *9/2018*

Vocational staff. **When appropriate the On Site Administrator (OSA) will provide the Vocational staff with a copy of any CAT I BMR issued during their shift.**

- Any resident that receives a Category II BMR <u>on or off "the clock"</u>, who is not covered by the above eligibility criteria, shall fall under the Privilege Level system. If the hearing coordinator substantiates the Category II BMR as a consequence for inappropriate behavior, he/ or she has the authority to impose on the resident a 1-14 day suspension from work. Vocational Program staff will track the suspension period. Vocational staff will, in turn, notify the work area supervisor/manager. **When appropriate the Supervisor or Work Site Supervisor must provide the Vocational staff with a copy of any CAT II BMR issued during their shift.**

- The resident may be suspended from work, but, except for loss of eligibility, the work area supervisor must consult with the work area manager <u>and</u> Vocational staff before terminating a resident from his vocational opportunity.

- The work area supervisor/manager is responsible to communicate the fact of a resident's termination from a vocational assignment to the resident's treatment team and to Vocational staff by submitting a Vocational Performance Report documenting the reason for termination.

- If a resident is terminated from a vocational assignment for cause (poor work, chronically late for work, continued poor attendance, theft, BMR's etc.), Vocational staff will inform the resident's treatment team. Vocational staff may recommend changes and conditions – including a "waiting period" – before the resident may re-apply for a new vocational assignment in competition with other applicants.

H.  **Medical Restrictions.**

- A resident who is determined by medical staff to have medical restrictions which prevent him or her from performing the required vocational opportunity duties is ineligible for that vocational opportunity.

- Medical ineligibility may not be appealed.

- Residents who have a temporary illness may be required to remain away from their vocational activities until they are cleared by medical staff to resume work.

- Reassignment to another vocational opportunity shall be at the Adult Training Specialist's discretion, subject to availability and medical clearance.

- Another resident may be assigned <u>temporarily</u> to perform another resident's vocational opportunity if the resident is ill, incapacitated, suspended for medical reasons, and/ or temporarily off site for legal or other reasons.

**Policy 214** – *Residential Vocational Program*                                    *9/2018*

I.   **Vocational opportunity loss following Administrative Review.**

- The Administrative Review Hearings Coordinator will inform Vocational staff or designee within 24 hours of any decision affecting a resident's vocational opportunity eligibility.

- If a resident is restricted to or from certain areas or from certain persons and, because of the restriction, is unable to report to work or to perform some or all required vocational opportunity functions, the resident may lose the vocational opportunity at the discretion of the work area manager, following consultation with Vocational staff.

J.  **Breaks while Participating in a Vocational Opportunity.**

Residents are not authorized paid breaks while on a paid vocational opportunity.

Work site supervisors may schedule unpaid breaks for residents.

The unpaid breaks will be at the discretion of the work-site supervisor and will be for no longer than 10 minutes

K.  **Access Porter Program**

- o  Eligible residents who apply or are referred for the position of Access Porter, prior to being hired, must:

    - Successfully complete the Access Porter Training

    - Have a completed Access Porter Training Certificate on file with the Vocational Department

- o  The Access Porter must agree to, and sign, the <u>Access Porter Expectations checklist</u> prior to performing the duties of the position.

    - A new checklist must be completed and signed each time a worker is hired as an Access Porter.

    - A new checklist must be completed and signed any time the duties provided are changed.

- o  Eligibility Requirements

    - In addition to the requirements set forth in this policy regarding vocational opportunity, the Access Porter must also:

        a.  In the past 2 months, not have any acts of physical aggression and/or incidents that are sexual in nature against or with anyone

**Policy 214** – *Residential Vocational Program*                                        *9/2018*

deemed vulnerable due to age, intellect, physical disability or mental disability.  Any past actions may be taken into consideration and could affect a resident's eligibility.

   b. Not have recent acts of cultivating or facilitating a predatory relationship.

   c. Not currently be under investigation for incidents that are sexual in nature and/or introduction of contraband.

- The Vocational Department or SCC Administration may impose other criteria and requirements for resident participation based on security and facility needs

## 2. DEFINITIONS

**Access Porter** – A resident worker that provides assistance to persons who have disabilities. This allows these eligible residents access to programs, services and activities.

**Access Porter Training** – The training a resident receives before performing the tasks or duties associated with the Access Porter position.

**Special Projects** are paid alternative vocational training opportunities for residents who may not otherwise qualify for traditional vocational opportunities.

**On-Unit Vocational activities** are paid work in common areas of a resident's assigned living unit, generally supervised by a residential rehabilitation counselor.

**Off-Unit Vocational activities** are paid work located away from the living unit, generally supervised by a staff person from another program area.

**Physical Aggression** – Intentional, unwelcome, or harmful contact upon the body of another person. This may range from uninvited touching to use of a weapon, bodily or other substance, or parts of one's own body in an intentional, persistent, or forceful manner.

**Vocational opportunity** means for the purposes of this policy, the paid work a resident performs as part of their work experience participation in the vocational program.

**Vocational opportunity supervisor** means an SCC employee who verifies that a resident vocational opportunity was performed, the time the work started, the time the work ended, and directs the resident on tasks to be completed.

- This can be a *designated supervisor* who is responsible for specific actions such as screening, evaluating, assigning the scope and scale of duties and submission of payroll.

**Policy 214** – *Residential Vocational Program*                                           *9/2018*

- It can also be a ***work-site supervisor*** who monitors the resident's performance for a specific day or shift, may assign specific duties and is responsible for correctly recording the resident's start and end time for payroll purposes.

**Vocational staff** means an SCC Adult Training Specialist employed at SCC to provide training and coordination for the overall Vocational Program.

**Vocational training** means for the purposes of this policy the training a resident receives before performing a particular task or work opportunity associated with their work experience participation in the vocational program.

## 3. FORMS & DOCUMENTS

Resident Vocational Training Application          Readiness Assessment request

Access Porter Expectations checklist

## 4. RELATED SCC POLICIES

*SCC Policy 236 Resident Levels of Privilege*          *SCC Policy 238 Behavior Reviews, Consequences, & Appeals*

**Policy 214 –** *Residential Vocational Program*                              *9/2018*

# EXHIBIT C

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON AT TACOMA

3    _____

4    )
UGOCHUKWO GOODLUCK NWAUZOR,    )
5    et al.,                        )
                                   )
6            Plaintiffs,    )  3:17-cv-05769-RJB
                            )  3:17-cv-05806-RJB
7    v.                     )
                            )  Tacoma, Washington
8    THE GEO GROUP, INC.,   )
                            )  June 10, 2021
9            Defendant.     )
_____  )  Jury Trial
10                             )
STATE OF WASHINGTON,           )  9:00 a.m.
11                             )
            Plaintiff,         )
12                             )
13   v.                        )
                               )
THE GEO GROUP, INC.,           )
14                             )
            Defendant.         )
15                             )
_____

16        VERBATIM REPORT OF PROCEEDINGS
17     BEFORE THE HONORABLE ROBERT J. BRYAN
          UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24
     Proceedings stenographically reported and transcribed
25            With computer-aided technology

Eisen - Direct

```
 1   the Department had right not to send.
 2   Q   In the past, the State of Washington has utilized other
 3   private contractors under contract to house incarcerants,
 4   correct?
 5   A   I only know of one, but yes, that would be correct.
 6   Q   The one other contract is Corrections Corporation of
 7   America?
 8   A   That's my understanding, yes.
 9   Q   True that the State of Washington sent about 1,000
10   incarcerants to Correctional Corporations of America under
11   that contract?
12   A   That's my understanding.
13   Q   That contract also had a stipulated two dollar per day
14   payment to incarcerants for a minimum of six hours of work?
15           MS. CHIEN:   Object, misstates the testimony.
16           THE COURT:   Objection is overruled.
17           THE WITNESS:   Would you please repeat that.
18   BY MR. SILVERMAN:
19   Q   Under the Corrections Corporation of America contract,
20   isn't it true that the incarcerants that were sent to that
21   company by the State of Washington received a two dollars per
22   day payment for their work?
23   A   Would you please point me to the provision in the contract
24   where the language is?
25   Q   I don't have the contract, but do you remember that?
```

Sytsma - Direct

```
1            THE COURT:  Okay.
2            MS. CHIEN:  Let me check -- a courier came?
3            MS. SCHEFFEY:  They delivered hard copies.  If not,
4   they are in the Box.
5            MS. CHIEN:  Yes, it is confirmed.  She has whatever
6   you are courried over.
7            THE COURT:  Ms. Sytsma, if you would raise your right
8   hand and be sworn.
9                         SARAH SYTSMA,
10      having been sworn under oath, testified as follows:
11                       DIRECT EXAMINATION
12  BY MS. SCHEFFEY:
13  Q   Good afternoon.  Can you see and hear me okay?
14  A   I can.
15  Q   Could you state your name for the record.  I want to make
16  sure I am saying it right.
17  A   Sarah Sytsma.
18  Q   You work for Washington Department of Corrections, right?
19  A   Correct.
20  Q   In 2019, you were named the Director of Correctional
21  Industries, correct?
22  A   Yes.
23  Q   You have over 25 years of experience in corrections?
24  A   20 years.
25  Q   The Department of Corrections is required to provide safe
```

1   and secure housing for those that are detained, correct?

2   A   Correct.

3   Q   It houses both individuals held on detainer after they

4   served their sentence and also those convicted of crimes,

5   correct?

6   A   I know those convicted of crimes.

7   Q   We will get to the next one afterward.  Correctional

8   Industries describes itself as a unique blend of business and

9   government?

10  A   Yes.

11  Q   In Correctional Industries, those who are are detained

12  across the State of Washington work in various facilities,

13  right?

14  A   Yes.

15  Q   You would agree those programs and other work programs

16  that allow detained individuals to stay busy are beneficial

17  to those people who are confined, correct?

18  A   Correct.

19  Q   In your over 20 years of experience, are you aware of any

20  detention facility in the State of Washington that does not

21  provide the opportunity for detained individuals to stay

22  busy?

23  A   Not within our DOC facilities.

24  Q   In the State of Washington, detained individuals can

25  participate in a class of worked called Class II work,

1  correct?

2  A    Yes, our incarcerated individuals, CI oversees Class II

3  programs.

4  Q    That work involves producing goods and services that are

5  sold to generate funds for Correctional Industries, right?

6  A    Many of the programs, yes.

7  Q    Those who perform that work while detained are not paid

8  minimum wages, correct?

9  A    Currently, that is correct.

10 Q    There are also Class III positions, right?

11 A    Yes.

12 Q    People who participate in Class III positions complete

13 tasks inside the facility where they are detained, right?

14 A    Yes.

15 Q    They help with food service?

16 A    There are some Class III positions, correct.

17 Q    They help with the laundry?

18 A    Class II.

19 Q    Class II.  What about maintenance, they help with

20 maintenance?

21 A    Maintenance is Class II -- excuse me, Class III.

22 Q    Class III.  They clean their cells and common areas; is

23 that right?

24 A    Yeah, Class III -- in our Class II programs we do have --

25 part of their day may be cleaning up before the end of the

1   day.

2   Q   They clean bathrooms that are used by many people who they

3   live with, right?

4   A   That's mainly a Class III, although there are some Class

5   II programs that may clean restrooms.  In Class II, it

6   wouldn't be restrooms of the incarcerated.

7   Q   In Class III it would be restrooms of the detained people,

8   correct?

9   A   Yes.

10          MS. CHIEN:   For clarity, it is not "detained."   It is

11   not "detainees."

12          MS. SCHEFFEY:   Marsha, I don't think you are

13   testifying right now.   I don't think you should instruct the

14   witness.

15          MS. CHIEN:   I am trying to clarify your language.

16          MS. SCHEFFEY:   I don't think it is proper.

17      May I proceed, Your Honor?

18          THE COURT:   I am waiting for you.

19   BY MS. SCHEFFEY:

20   Q   Those people in Class III, they clean the showers that are

21   used by other people who they live with?

22   A   Correct.  I want to clarify I do not oversee Class III

23   programs.  I would only be speculating.

24   Q   Okay.  What about Class II, do they clean showers?

25   A   No.

1  Q    When was the new policy enacted?

2  A    In 2019.

3  Q    What is the amount now?

4  A    It went up ten cents, 65 cents to 1.70.

5  Q    This document was updated in 2014, correct?

6  A    This was updated -- the one I am looking at was 2014.  We

7  have a more current of 2019.

8  Q    From 2014 to 2019, were the numbers you see on the screen

9  accurate?

10 A    I know when I came into my position we were paying the

11 probation rate at 65 cents per hour in 2019.

12 Q    The current rate is still less than minimum wage, correct?

13 A    Correct.  The current rate for Class II starts out at 65

14 cents an hour up to 1.70.

15 Q    I believe you testified earlier that some Class II

16 employment is in laundry rooms; is that correct?

17 A    That's correct.  All of laundry is Class II.

18 Q    Sorry.  What was the end of that answer?

19 A    All laundry is managed by CI and Class II.

20 Q    Class II work that is paid at 65 cents an hour; is that

21 correct?

22 A    65 up to 1.70.

23 Q    You also testified earlier that Class II work involves

24 food services; is that accurate?

25 A    It does involve food service.

# EXHIBIT D

```
 1

 2                  UNITED STATES DISTRICT COURT

 3           WESTERN DISTRICT OF WASHINGTON AT TACOMA

 4   _____

 5                              )
     UGOCHUKWO GOODLUCK NWAUZOR, )
 6   et al.,                     )
                                 )
 7              Plaintiffs,      ) 3:17-cv-05769-RJB
                                 ) 3:17-cv-05806-RJB
 8   v.                          )
                                 ) Tacoma, Washington
 9   THE GEO GROUP, INC.,        )
                                 ) June 4, 2021
10              Defendant.       )
     _____) Jury Trial
11                               )
     STATE OF WASHINGTON,        ) 9:00 a.m.
12                               )
                Plaintiff,       )
13                               )
     v.                          )
14                               )
     THE GEO GROUP, INC.,        )
15                               )
                Defendant.       )
16                               )
     _____
17
                VERBATIM REPORT OF PROCEEDINGS
18       BEFORE THE HONORABLE ROBERT J. BRYAN
               UNITED STATES DISTRICT JUDGE
19   _____

20

21

22

23

24

25      P r o c e e d i n g s   s t e n o g r a p h i c a l l y   r e p o r t e d   a n d   t r a n s c r i b e d
            W i t h   c o m p u t e r - a i d e d   t e c h n o l o g y
```

ROUGH DRAFT

A   Security requirement.

Q   I think I heard you testify early that the GEO facility is a knife-free facility, is that correct?

A   That is correct.

Q   Okay.  How do you get most of your vegetables?  Are they already cut up?

A   There's some that are cut up, we do have dough cutters that are tethered to the tables.  They are monitored on an hourly basis for security reasons and accountability.

Q   And then so let's say you are going to serve chicken, do you get a whole chicken to cut up or does it already come presliced?

A   It comes presliced.  You have the thighs, if it is a turkey roast then we have a meat slicer, which is also a tool that has to be checked out and monitored throughout the day by my staff.

Q   When you get the thighs, are those fresh thighs, frozen, how do they come to you?

A   Fresh thighs and leg quarters.

Q   Do you have any opinion as to why detainees participate in the voluntary work program?

A   Yes.  A lot of them like to do it because they want to get out of the unit, get their minds off of their immigration status.  They enjoy doing it.  We also enjoy them coming in and helping out.  They get to learn new things and keep their

```
1   mind off their issues.
2           MS. SCHEFFEY: No further questions.  Thank you.
3                      REDIRECT EXAMINATION
4   BY MS. BRENNEKE:
5   Q   I have a few clarification questions from what you have
6   said.  First off, let's talk again about the training.  You
7   said the new GEO staff are provided 40 hours of training at
8   the start of their employment; is that right?
9   A   New GEO staff will go through an academy and they will
10  also go through an extra 40 hours of OJT.
11  Q   They have refresher ART training annually; isn't that
12  right?
13  A   That is correct.
14  Q   All of the new GEO staff employee training is around
15  becoming detention officers, isn't it?
16  A   Becoming detention officers and also a refresher of the
17  food service courses that -- also monthly, I did mention that
18  monthly we do have food service meetings and that's also
19  training in food service also.
20  Q   So the training you provide your GEO staff in food
21  services is limited to monthly meetings and training?
22  A   No, it is not limited to monthly meetings.  It is -- in
23  food service, that is always an ongoing training process of
24  learning new things.  There is new codes that come out from
25  the local health department, so that is -- in our profession
```

1   Q   Is it your understanding that when they are doing this

2   tracking, they are tracking how many details or shifts were

3   worked by detainees at the Northwest Detention Center that

4   year?

5   A   Me personally did not comply (sic) this information.  I

6   didn't give them information as far as tracking how many

7   detainees worked per day.  That probably was on a

8   classification basis.  I can't say that I was the one that

9   gave them that information.

10  Q   Well, Ms. Henderson, you did testify that when people come

11  to work, they sign that they have worked so they can get paid

12  for that day; is that correct?

13  A   That is correct.  But there is more than one voluntary

14  work program.

15  Q   You mean there is a voluntary work program in the kitchen,

16  one in the laundry, one in the pod; is that what you mean?

17  A   Yes.

18  Q   So for the kitchen, you have those out count sheets that

19  we have looked at, I believe, and when people work they sign

20  on there that they worked that detail or that shift, correct?

21  A   Yes.

22  Q   Then you pass those out count sheets on to the payroll

23  people so they get paid; is that correct?

24  A   That is correct.

25  Q   And so the work detail, or the work shifts are, in fact,

# EXHIBIT E

```
 1
 2                    UNITED STATES DISTRICT COURT

 3              WESTERN DISTRICT OF WASHINGTON AT TACOMA

 4     _____

 5                                   )
       UGOCHUKWO GOODLUCK NWAUZOR,    )
 6     et al.,                        )
                                      )
 7                    Plaintiffs,     )  3:17-cv-05769-RJB
                                      )  3:17-cv-05806-RJB
 8     v.                             )
                                      )  Tacoma, Washington
 9     THE GEO GROUP, INC.,           )
                                      )  June 8, 2021
10                    Defendant.      )
       _____)  Jury Trial
11                                    )
       STATE OF WASHINGTON,           )  9:00 a.m.
12                                    )
                      Plaintiff,      )
13                                    )
       v.                             )
14                                    )
       THE GEO GROUP, INC.,           )
15                                    )
                      Defendant.      )
16                                    )
17     _____

18                 VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE ROBERT J. BRYAN
19                 UNITED STATES DISTRICT JUDGE
       _____

20

21

22

23

24

25        P r o c e e d i n g s   s t e n o g r a p h i c a l l y   r e p o r t e d   a n d   t r a n s c r i b e d
                  W i t h   c o m p u t e r - a i d e d   t e c h n o l o g y
```

Scott - Cross

1   shall not be assigned work that is considered hazardous or

2   dangerous.  It also states that it is the sole responsibility

3   of ICE to determine whether a detainee will be allowed to

4   perform on the voluntary work program and at what

5   classification level.

6   BY MS. SCHEFFEY:

7   Q   So, what does that mean to you, what you just said that

8   ICE has the sole responsibility to determine whether a

9   detainee is allowed to perform in the voluntary work program?

10  A   ICE reviews and has oversight of everything I do under the

11  contract.  They take it so seriously that they put a contract

12  monitor on site, actually, there is two government employees

13  on site that monitor this contract.  The contracting officer

14  representative, and we also have a detention services manager

15  which reports directly to headquarters Department of Homeland

16  Security in Washington.  That is how seriously they take this

17  contract.  You know, I just -- I got to tell you, after 20

18  years --

19          THE COURT:  Wait a minute.  I think you have answered

20  the question.

21  BY MS. SCHEFFEY:

22  Q   Do you meet with the ICE personnel on site regularly?

23  A   Yes.

24  Q   How regularly?

25  A   I talk to them near daily.  We have at least two or three

1   weekly meetings every single week on subjects related to the

2   detention facility.

3   Q   Do they give you feedback if they think you are doing

4   something wrong?

5   A   Absolutely give us feedback.  There is a whole section of

6   contract that covers that.

7   Q   Can you think of an example of a time when they gave you

8   feedback and told you to change something?

9          MR. WHITEHEAD:   Objection, Your Honor, hearsay.

10          THE COURT:   Sustained.

11   BY MS. SCHEFFEY:

12   Q   Have you ever changed something at ICE's direction?

13   A   Yes, all the time.

14   Q   What have you changed at ICE'S direction most recently?

15   A   Most recently staffing and for the past over a year

16   we have dealt with COVID.  There have been a number of

17   requirements daily that looked at that and how we handle

18   COVID-19, the contractor -- we're the contractor, but the COR

19   is directed stuff with janitors and medical.  They run the

20   contract overall.  They are responsible for the facility.  I

21   manage the facility.

22   Q   Is there anything in this section of the contract that

23   gives you direction about whether detainees should receive

24   uniforms and equipment as part of their volunteer project?

25   A   Yes, it does.  The ICE standard, the PBNDS also requires

Scott - Cross

```
 1    Q    How does that compare to the VWP training?

 2    A    The VWP training that we provide that is required by the

 3    standard on maybe how to sweep and mop a floor, how to spray

 4    and clean a table.  You get a little bit more into the

 5    required skills that they have in the kitchen and the

 6    laundry.  Take a little bit more training in those areas, but

 7    they don't get all the training that a detention officer

 8    receives.

 9    Q    I want to talk about the process you go through in hiring

10    a new GEO employee under the contract.  Do you interview new

11    employees?

12    A    Yes, we do.

13    Q    Do you set minimum skill requirements?

14    A    It is a requirement of the standard that we set minimum

15    skill requirements and -- under the contract, I mean.

16    Q    When you say requirement of the standard, what are you

17    referring to?

18    A    When I talk about the standard, I'm talking about the

19    Performance-Based National Detention Standards.  But direct

20    supervision of detainees, and in some of those multiple

21    things that standard requires, we have to make sure they

22    would be able to perform those functions.  Primarily the

23    functions are labeled out in the contract as those minimum

24    requirements.

25    Q    Do you place them in positions based upon their prior
```

1   do.

2   Q   Okay.  Are there any messy detainees who just aren't

3   naturally clean people?

4   A   There are some.

5   Q   How do you encourage them to clean up after themselves?

6   A   That's where staff detainee communication comes very

7   importantly.  We have also in the past included medical

8   because some detainees come from areas of the country that

9   may have never -- not the one, but the world, that may have

10  have never seen a toilet.  So we engage medical staff also to

11  help educate detainees on proper hygiene.  That is a very

12  important aspect of living in a facility.

13  Q   What about the Xboxes, do you use those in any way to help

14  detainees stay clean?

15  A   The Xboxes you talk about are specifically related to a

16  two-fold part.  We are required to do a sanitation safety

17  inspection every week.  We couple this inspection with an

18  incentive program for detainees to clean their housing unit

19  and follow the facility rules and the units that best meet

20  the facility rules and the sanitation for that given week

21  have a chance to earn not only an Xbox, but a chicken buffet

22  dinner.

23  Q   So if a volunteer chooses to help clean in the pods, are

24  they usually starting with a really messy pod?

25  A   No, they are not because the detainees really like --

1   marked the findings.  This is the narrative section of the

2   report.  The actual findings are marked in a separate area.

3   There are a whole lot of outcome measures as well.

4   Q   Is it your testimony that there is a document somewhere

5   that says GEO has complied or does not need to comply with

6   state minimum wage laws for the voluntary work program, is

7   that your testimony?

8   A   I don't know anything about that, sir.

9   Q   Because if there was that sort of document, I mean that's

10  a document we would have seen by now at trial, would you

11  agree?

12          MS. SCHEFFEY:  Objection, argumentative.

13          THE COURT:  Sustained.

14  BY MR. WHITEHEAD:

15  Q   I would like to direct your attention to Exhibit 17.  This

16  is the excerpt of the PBNDS.  You offered testimony yesterday

17  about the purpose of the voluntary work program.  Do you

18  remember giving testimony along those lines?

19  A   I do.

20  Q   We have a copy of the document up.  If we could blow up

21  item 4 there towards the top right.  I believe this is the

22  section that you read from yesterday.  You talked about one

23  of the purposes being to combat the negative impact of

24  confinement and to reduce idleness.  Do you remember

25  testimony along those lines?

1    A    I do.  I am trying to find the page and exhibit.  What is

2    the Bates stamp number for that one?

3    Q    There is no Bates stamp.  This is page 405.  I believe it

4    is the first page.

5    A    Okay.  I want to make sure I am there.

6    Q    We have it called up on your screen as well.  My question

7    to you is this:  Is this the section you testified from

8    yesterday about the purpose of the voluntary work program?

9    A    I do believe this is one of the expected outcomes that

10   comes to mind when we were talking about that.

11   Q    Let's clear out this call out.  I would like to look at

12   the first of the expected outcomes listed in the PBNDS.  Go

13   ahead and blow that up.  We are on the same page, bottom

14   left.  You skipped over this section.  This section reads

15   "detainees may have opportunities to work and earn money

16   while confined, subject to the number of work opportunities

17   available and within constraints of the safety, security and

18   good order of the facility."  Did I read that correctly?

19   A    You did read that correctly.

20   Q    That's the first of the expected outcomes.  Let's clear

21   off this call out and look at the third of the expected

22   outcomes.  Maybe we can blow that up also.  This one reads

23   "to help with the essential operations and services shall be

24   enhanced through detainee productivity".  Do you see that?

25   A    That is correct.

# EXHIBIT F

1       UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT TACOMA

3  _____

4                               )
   UGOCHUKWO GOODLUCK NWAUZOR,   )
5  et al.,                       )
                                 )
6              Plaintiffs,       ) 3:17-cv-05769-RJB
                                 ) 3:17-cv-05806-RJB
7  v.                            )
                                 ) Tacoma, Washington
8  THE GEO GROUP, INC.,          )
                                 ) June 9, 2021
9              Defendant.        )
   _____   ) Jury Trial
10                               )
   STATE OF WASHINGTON,          ) 9:00 a.m.
11                               )
               Plaintiff,        )
12                               )
   v.                            )
13                               )
   THE GEO GROUP, INC.,          )
14                               )
               Defendant.        )
15                               )
   _____
16
            VERBATIM REPORT OF PROCEEDINGS
17      BEFORE THE HONORABLE ROBERT J. BRYAN
            UNITED STATES DISTRICT JUDGE
18 _____

19

20

21

22

23

24
        Proceedings stenographically reported and transcribed
25                With computer-aided technology

1  A    No, I don't think we would ever pay detainees minimum

2  wage.  We would hire outside workers.  I think it would be

3  destabilizing to the safety and security of the facility to

4  pay detainees minimum wage and would defeat the purpose of

5  the voluntary work program.

6  Q    So paying a detainee worker more would change anything in

7  the structure of the facility's operations?

8  A    I think it would, yeah.  You would introduce a level of

9  people who have a bunch of money who are working and those

10  who don't and you are going to create opportunities for abuse

11  within that system, protection rackets, people are going to

12  control who necessarily gets to volunteer for those jobs and

13  how much they get from that.  It would be disastrous.  I am

14  not aware of any place in the world where voluntary work

15  programs pay minimum wage or high wages.  I think it is for

16  that reason.  The program exists to try to reduce idleness,

17  boredom, ensure people have an opportunity to be active if

18  they want to.  So to promote the safety and security of the

19  facility, I think if you start paying the detainees or the

20  inmates a significant amount of money, they are not all going

21  to make that and that is going to create a significant

22  disparity within the facility and that is going to create

23  issues.  We operate facilities in the United Kingdom,

24  Australia, South Africa, we use these programs there, across

25  the country, just like our government counterparts do and are

# EXHIBIT G

```
  1            UNITED STATES DISTRICT COURT

  2        WESTERN DISTRICT OF WASHINGTON AT TACOMA

  3    _____

  4                                )
       UGOCHUKWO GOODLUCK NWAUZOR,  )
  5    et al.,                      )
                                    )
  6                 Plaintiffs,     )  3:17-cv-05769-RJB
                                    )  3:17-cv-05806-RJB
  7    v.                           )
                                    )  Tacoma, Washington
  8    THE GEO GROUP, INC.,         )
                                    )  June 14, 2021
  9                 Defendant.      )
       _____)  Jury Trial
 10                                 )
       STATE OF WASHINGTON,         )  9:00 a.m.
 11                                 )
                    Plaintiff,      )
 12                                 )
       v.                           )
 13                                 )
       THE GEO GROUP, INC.,         )
 14                                 )
                    Defendant.      )
 15    _____

 16              VERBATIM REPORT OF PROCEEDINGS
 17          BEFORE THE HONORABLE ROBERT J. BRYAN
                UNITED STATES DISTRICT JUDGE
 18    _____

 19

 20

 21

 22

 23

 24      Proceedings stenographically reported and transcribed
 25              With computer-aided technology
```

1   agency in DHS.  There is not a situation where we would look

2   on behalf of ICE to determine that somebody was paying

3   minimum wage as an employee.  It doesn't apply in this case.

4          MR. POLOZOLA:  Your Honor, I am going to object that

5   the witness's answer is non-responsive.  He is testifying to

6   what the law should be in this case.

7          THE COURT:  The answer may stand.

8   BY MS. SCHEFFEY:

9   Q   How do you comply with this section and also the dollar

10  per day payment?

11  A   We pull files that the facility maintains for the folks

12  that participate in the voluntary work program.  There is

13  around 15 or 20 questions.  We look at each element.  I think

14  as I mentioned on Friday, folks that have limited English

15  proficiency need to have an opportunity.  Folks -- it has to

16  be done and administered in a fair way.  Folks need to have a

17  certain amount of training to make sure if there is some

18  amount of technical use of equipment.

19      We would go through each of those elements to make sure

20  the program is being administered according to the standards

21  ICE requires and the outcomes.

22  Q   I would like to go to page GEO-State 036906, page 82 of

23  the document.  If we could call out the manage a detainee

24  work program section.  Can you see that on the screen?

25  A   Yes.

Scott - Direct

```
 1              THE COURT:  Sustained.
 2    BY MS. SCHEFFEY:
 3    Q   Have you been to other jails, prisons, other facilities
 4    across the state?
 5    A   I did visit Monroe.
 6    Q   And what is Monroe?
 7    A   Monroe is a state correctional facility.
 8    Q   How is -- is your facility the same or different than
 9    Monroe?
10              MR. WHITEHEAD:  Objection, foundation.  I think it is
11    also vague.
12              THE COURT:  That is a very broad question,
13    Ms. Scheffey.  I don't know exactly what you are driving at.
14    The objection is sustained.
15    BY MS. SCHEFFEY:
16    Q   Is your facility layout similar to the facility layout at
17    Monroe?
18    A   Our facility layout is very inclusive of any secure type
19    setting -- confinement setting with detention centers and
20    correctional facilities throughout the state.
21    Q   Are detainee workers integral to your operations at the
22    facility?
23    A   I say they are not integral.  They are very important.  We
24    care about giving detainees opportunities to perform
25    activities that decreases their idleness.  GEO -- we can do
```

# EXHIBIT H

# EXHIBIT H



**ADMINISTRATIVE POLICY**

**STATE OF WASHINGTON
DEPARTMENT OF LABOR AND INDUSTRIES
EMPLOYMENT STANDARDS**

| | | | |
|---|---|---|---|
| **TITLE:** | **MINIMUM WAGE ACT APPLICABILITY** | **NUMBER:** | **ES.A.1** |
| **CHAPTER:** | RCW 49.46<br>WAC 296-128 | | |

**ISSUED: 1/2/2002
REVISED: 6/24/2005
REVISED: 3/24/2006
REVISED: 7/15/2014
REVISED: 12/29/2020**

**SEE ALSO: ES.A.8.1,
ES.A.9.1-9, ES.A.13,
ES.B.1, ES.C.2, ES.D.1**

ADMINISTRATIVE POLICY DISCLAIMER

This policy is designed to provide general information in regard to the current opinions of the Department of Labor & Industries on the subject matter covered. This policy is intended as a guide in the interpretation and application of the relevant statutes, regulations, and policies, and may not be applicable to all situations. This policy does not replace applicable RCW or WAC standards.  If additional clarification is required, the Program Manager for Employment Standards should be consulted.

This document is effective as of the date of print and supersedes all previous interpretations and guidelines. Changes may occur after the date of print due to subsequent legislation, administrative rule, or judicial proceedings. The user is encouraged to notify the Program Manager to provide or receive updated information. This document will remain in effect until rescinded, modified, or withdrawn by the Director or his or her designee.

This policy provides guidance on the applicability of Washington's Minimum Wage Act (MWA), RCW 49.46. The guidance includes descriptions of which employers are subject to the statute, which employees are subject to the protections of the law, and which employees are specifically exempt from the MWA's protections and requirements.

**General RCW 49.46 applicability**

**1. What is RCW 49.46, the Washington Minimum Wage Act, and when does it apply?**

The Washington Minimum Wage Act (MWA), RCW 49.46, establishes a minimum wage for employees in Washington State. *See* RCW 49.46.005 and RCW 49.46.020. The MWA also requires employers to pay overtime wages of at least 1.5 times an employee's regular rate of pay for all hours worked in excess of 40 in a workweek (*see* RCW 49.46.130), requires employers to provide employees with paid sick leave (*see* RCW 49.46.200 and RCW 49.46.210), and requires employers to pay to their employees all tips, gratuities, and service charges that are due to the employees (*see* RCW 49.46.020(3) and RCW 49.46.160). The

MWA also prohibits employers from retaliating against their employees for exercising any of their rights under the MWA (*see* RCW 49.46.810).

The MWA is in addition and supplementary to all other standards (local, state, or federal laws, ordinances, rules or regulations) relating to wages, hours and working conditions, including the Industrial Welfare Act. *See* RCW 49.46.120. When the standards are different, the law or rule that is more protective or favorable to an employee is the standard that applies. Individuals with questions about more protective standards found in federal law should contact the U.S. Department of Labor, Wage and Hour Division.

Rules promulgated under RCW 49.46 can generally be found under WAC 296-128. All of these rules have the same force of law as the provisions of RCW 49.46 itself.

## 2. What employers are subject to RCW 49.46?

Generally, an "employer" under RCW 49.46.010(4) is "any individual, partnership, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." Any employer who meets this definition must comply with the statute requirements.  Certain employers who meet this definition may also be subject to the Fair Labor Standards Act (FLSA), in addition to the MWA. FLSA is administered by the U.S. Department of Labor, and clarification about those standards must be obtained from that agency. Employers must follow the laws that are more protective to the worker when there is a difference between the provisions of state, local, and federal laws.

Additionally, the Washington State Supreme Court held in *Becerra v. Expert Janitorial, LLC*, 181 Wn.2d 186, 332 P.3d 415 (2014), that the "joint employer doctrine" applies to the MWA, and adopted FLSA's economic reality test to determine whether one or more entities are joint employers for purposes of MWA liability. This means that there may be more than one employer responsible for ensuring compliance with the MWA requirements under certain circumstances.

## 3. Which employees are subject to the protections of RCW 49.46?

The protections of the MWA apply to all Washington-based "employees." An "employee" is defined as "any individual employed by an employer" *except* those employees specifically excluded by the legislature in RCW 49.46.010(3)(a) through (p). Whether or not an "employee" is Washington-based is fact-specific, and analyzed on a case-by-case basis. *See* Administrative Policy ES.A.13 for more information on the "Washington-based" standard.

If a worker is exempt from the MWA then state law does not require the employer to provide paid sick leave, minimum wage, overtime, or other protections to that worker. Local or federal law may impose different requirements.

For workers to whom the MWA applies, there are some additional, specific exceptions to the overtime requirements. As a result, some employees may be entitled to minimum wage, paid sick leave, and tips and service charges, even if overtime pay is not required. *See* RCW 49.46.130 and Administrative Policy ES.A.8.1, "Overtime" for more information on overtime requirements.

## 4. Definition of Employ.

"Employ" means to engage, suffer or permit to work. *See* RCW 49.46.010(3) and WAC 296-126-002(3).

*See* Administrative Policy ES.C.2 for a detailed discussion of hours worked during the course of employment.

**Types of workers not covered by RCW 49.46**

**5. Which employees does the statute specifically exclude from the protections of the MWA?**

The following exemptions are found in RCW 49.46.010(3). The MWA does not apply to employees covered by these exemptions. Application of these exemptions depends on the facts, which must be carefully evaluated on a case-by-case basis. Employers have the burden of proving an exemption applies.

    (a) **Certain agricultural employees.** An individual who is employed as a hand harvest pieceworker in the region of employment, *and* who commutes daily from his or her permanent residence to the farm upon which he or she is employed *and* who has been employed in agriculture less than thirteen weeks during the preceding calendar year. Each of the elements listed above must be met in order for the exemption to apply.

    **Note:** All other agricultural workers *are* covered under MWA.

    (b) **Casual laborers.** Any individual "employed in casual labor in or about a private home" *unless* the labor is performed in the course of the employer's trade, business, or profession.

    Casual refers to employment that is irregular, uncertain or incidental in nature and duration. This must be determined on a case-by-case basis by looking at the scope, duration and continuity of employment. Employment that is intended to be permanent in nature is not casual, and is not exempt, regardless of the type of work performed. Employment of housekeepers, caregivers, or gardeners on a regular basis is not considered "employed in casual labor" and such workers are subject to the protections of the MWA.

    (c) **Bona Fide Executive, Administrative, Professional, Computer Professional or Outside Sales employees.** Any individual who meets the exemption requirements in WAC 296-128-500 – 545. *See* Administrative Policies ES.A.9.1-9 for further discussion of these "white collar" exemptions.

    (d) **Volunteer work for an educational, charitable, religious, state or local governmental body or agency or non-profit organization.** Any volunteer engaged in the public service activities of the above type of organizations as long as there is no employer-employee relationship between the organization and the individual *or* the individual gives his or her services gratuitously to the organization.

    **The department uses the following interpretation in determining whether workers are volunteers exempt from the MWA.** Individuals are considered volunteers only when their services are offered freely and without pressure or coercion, direct or implied, from an employer. Individuals who volunteer or donate their services, usually on a part-

time or irregular basis, for public service or for humanitarian objectives, and are not acting as employees or expecting pay, are not generally considered employees of the entities for whom they perform their services.

Unpaid employment is unlawful. An employee-employer relationship exists where there is a contemplation or expectation of payment for goods or services provided.

However, individuals do not lose their volunteer status solely because they receive a nominal fee or stipend. An individual who volunteers to provide periodic services on a year-round basis may likewise receive a nominal monthly or annual fee without losing volunteer status. If the "volunteers" are paid for their services beyond reimbursement for expenses, reasonable benefits or a nominal fee, they are considered employees. A nominal fee may not be a substitute for wage compensation and must not be tied to productivity.

An individual is not a volunteer if he or she is otherwise employed by the same agency or organization to perform services similar to or identical to those for which the individual proposes to volunteer. If an individual provides services as a volunteer and then receives wages for services, that individual is no longer exempt and must be paid at least minimum wage and overtime pay for hours worked in excess of 40 hours per workweek.

These same requirements apply to determine whether a worker is a volunteer exempt from the protections of RCW 49.12, the Industrial Welfare Act. *See* Administrative Policy ES.C.1.

**Volunteers are not allowed in a "for-profit" business.** Any individual, partnership, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of a "for-profit" employer is subject to the provisions of the MWA and must pay wages to any individual who they permit to perform any work.

(e) **Individuals who are employed full time by a state or local governmental agency or nonprofit educational, charitable, or religious organization and who also do volunteer work for the agency.** Such individuals are exempt from the MWA only with respect to the voluntary services.

(f) **Newspaper vendors or carriers.** The department construes "newspaper vendors or carriers" very narrowly and does not include magazine carriers or vendors, those who distribute advertising circulars, or persons who sell or distribute literature at events, such as concerts and sporting events.

(g) **Employees of carriers subject to Part I of the Interstate Commerce Act (Railroads and Pipelines).** Part I of the Interstate Commerce Act is limited to railroads and pipelines only. Interstate motor carriers are covered under Part II of the Interstate Commerce Act and are not exempted from the MWA by this definition.

Non-railroad employees may also be subject to this exemption from the MWA if their activity is integral to the interstate commerce of the railroads. Whether non-railroad employees are exempt should be considered on a case-by-case basis.

(h) **Forest protection and fire prevention.** Any persons engaged in forest protection and fire prevention activities.

(i) **Employees of charitable institutions charged with child care responsibilities.**
Employees of charitable institutions charged with child care responsibilities as long as the charitable institution is "engaged primarily in the development of character or citizenship or promoting health or physical fitness or providing or sponsoring recreational opportunities or facilities for young people or members of the armed forces of the United States."

"Charitable institutions" include churches and other organizations commonly set up under the not-for-profit corporations act if they are recognized by the United States Internal Revenue Service under the tax exemption provision, section 501(c)(3). Typical examples include the YMCA, YWCA, Girl Scouts' organizations, Boy Scouts of America organizations, etc.

"Charged with child care responsibilities" typically means these activities are referenced in the organization's charter, by-laws, or other governing documents. It may also be helpful to evaluate the percentage of the budget and resources of the organization that go towards child care responsibilities.

Charitable institutions charged with child care responsibilities that are "engaged primarily in the development of character or citizenship or promoting health or physical fitness or providing or sponsoring recreational opportunities or facilities for young people or members of the armed forces of the United States" may be engaged in activities related, but not limited to:

- Character development
- Social responsibility
- Mental or physical health
- Recreation
- Youth services
- Services for members of the armed forces of the United States

(j) **Individuals whose duties require they reside or sleep at their place of employment or who otherwise spend a substantial portion of their work time subject to call.**
This exemption encompasses two categories of workers: (1) Those individuals whose duties require that they reside or sleep at their place of employment, and (2) Those individuals who otherwise spend a substantial portion of work time subject to call and not engaged in the performance of active duties.

"Reside or sleep" pertains to employees whose job duties require them to reside at the place of employment and are exempt from all MWA requirements including minimum wage, overtime, and paid sick leave requirements. Merely residing or sleeping at the place of employment does not exempt individuals from the MWA. In order for individuals to be exempt, their duties must require that they sleep or reside at the place of their employment. An agreement between the employee and employer for the employee to reside or sleep at the place of employment for convenience, or merely because housing is available at the place of their employment, would not meet the exemption.

Some positions where the employee's duties may require them to reside or sleep at the place of their employment include apartment managers, maintenance personnel, hotel/motel managers, managers of self-storage facilities, and some agricultural workers such as sheepherders.

(k) **Inmates and others in custody.** Residents, inmates or patients of state, county or municipal correctional, detention, treatment or rehabilitative institution are exempt from all MWA protections and are not required to be paid minimum wage if they perform work directly for, and at, the institution's premises where they are incarcerated, and remain under the direct supervision and control of the institution. Residents, inmates or patients of state, county or municipal correctional, detention, treatment or rehabilitative institution assigned by facility officials to work on facility premises for a private corporation at rates established and paid for by public funds are not employees of the private corporation and would not be subject to the MWA.

(l) **Elected or appointed public officials and employees of the state legislature.** The MWA does not apply to any individual who holds a public elective or appointive office of the state, any county, city, town, municipal corporation, political subdivision, or any instrumentality thereof, or to any employee of the state legislature.

(m) **Washington State ferry crews.** The MWA does not apply to vessel operating crews of the Washington State ferries, as long as the Department of Transportation operates the ferries.

(n) **Crews of non-American vessels.** The MWA applies to persons employed as seamen on an American vessel but does not apply to seamen employed on non-American vessels.

(o) **Farm interns.** The MWA does not apply to any farm intern providing services to a small farm that has a special certificate issued by the department under RCW 49.12.470.

(p) **Junior ice hockey players.** The MWA does not apply to an individual between 16 and 21 years old, in their capacity as a player for a junior ice hockey team that is a member of a regional, national, or international league, and that contracts with an arena owned, operated, or managed by a public facilities district created under RCW 36.100.

**6. Independent Contractors are not Employees.**

A bona fide independent contractor is exempt from the MWA because that person is not "employed" by an employer. However, an employer cannot avoid complying with the MWA by merely designating someone as an "independent contractor." Whether a worker is an independent contractor must be carefully evaluated on a case-by-case basis.

To determine whether an individual is an employee or a legitimate independent contractor for purposes of the MWA, the department looks to the following factors on a case-by-case basis:

- The degree of control that the business has over the worker (the more control a business exerts over the worker, the more likely the worker is an employee);
- The worker's opportunity for profit or loss is dependent on the worker's managerial skill (when the worker's opportunity for profit is not limited by a business, and the worker

controls his or her own business expenses, the worker is more likely an independent contractor);

- The worker's investment in equipment or material (where the worker's investment in equipment or materials is substantial, the worker is more likely an independent contractor);
- The degree of skill required for the job (when a worker brings a special skill to a job and employs those skills in an independent manner, the worker is more likely an independent contractor);
- The degree of permanence of the working relationship (when a limited term working relationship exists, the worker is more likely an independent contractor);
- The degree to which the services rendered by the worker are an integral part of the business (when the services performed by a worker are integral to the business, the worker is more likely an employee).

All of these factors should be considered and weighed in combination with each other in each case.

### 7. Who else may be excluded from the protections of the MWA?

Some individuals may be exempt from the protections of the Minimum Wage Act for reasons other than the exemptions listed explicitly in the statute. For example, federal employees are also not subject to the protections of the MWA. Due to constitutional preemption, federal employees are instead subject to comparable federal laws such as the Fair Labor Standards Act.

Jurors in Washington State are not considered employees of the state or the court for which they are serving as a juror, even if they receive a stipend, and are therefore not covered under the MWA. *See Rocha v. King County,* 195 Wn.2d 412, 460 P.3d 624 (2020).

### Department of Labor and Industries authority under RCW 49.46

### 8. What is the scope of the department's authority under the Minimum Wage Act?

The department has the authority to investigate complaints to determine whether there has been a violation of the MWA. Through the course of an investigation, the department has the authority to gather data and may enter workplaces, examine and copy records, question employees, and investigate such facts, conditions, practices, or matters deemed necessary or appropriate to make a determination. *See* RCW 49.46.040.

*See* Administrative Policy ES.D.1 for a complete discussion of MWA recordkeeping requirements, including the types of records that employers subject to the MWA must maintain and produce to the department.

### 9. What is the department's administrative enforcement authority regarding violations of the Minimum Wage Act?

The chart below illustrates the department's administrative authority to investigate and seek remedies relating to a violation, as outlined in statute or regulation:

| | Statute | Related Policies | Employee Remedies | Department Remedy | Enforcement Authority |
|---|---|---|---|---|---|
| Minimum wage | RCW 49.46.020 | ES.A.2 – ES.A.7 | Wages & interest | Civil penalty | Wage Payment Act, RCW 49.48.082 - 49.48.087 |
| Overtime | RCW 49.46.130 | ES.A.8.1 – ES.A.8.2 | Wages & interest | Civil penalty | Wage Payment Act, RCW 49.48.082 - 49.48.087 |
| Retaliation for exercise of a MWA right | RCW 49.46.210(4) | | Earnings & interest, restoration of position, employer compliance | Civil penalty | WAC 296-128-780 - WAC 296-128-800 |
| Paid sick leave | RCW 49.46.020(4) and RCW 49.46.210 | ES.B.1 – ES.B.2 | Payment for paid sick leave & interest, restoration of sick leave balances. *See* No. 10, below. | Civil penalty | Wage Payment Act, RCW 49.48.082 - 49.48.087, and WAC 296-128-810 |
| Tips, gratuities, and service charges | RCW 49.46.020(3) and RCW 49.46.160 | ES.A.12 | Tips, gratuities, service charges, & interest | Civil penalty | Wage Payment Act, RCW 49.48.082 - 49.48.087, and WAC 296-128-820 |
| Violations of other rights under RCW 49.46 | RCW 49.46.810 | | Employer compliance | Civil penalty | WAC 296-128-830 - WAC 296-128-850 |

An employer that fails or refuses to comply with the recordkeeping requirements found in the MWA, and in the department's corresponding rules, refuses to cooperate with the department's reasonable investigation, or fires or discriminates against an employee because the employee has complained to the department, could also be subject to criminal prosecution under RCW 49.46.100. The department refers criminal violations under RCW 49.46.100 to a city or county prosecutor or the Office of the Attorney General.

In addition to the department's authority to investigate and bring legal action against an employer for violations of RCW 49.46 on behalf of workers, aggrieved workers retain the right to file a civil action against the employer.

**10. What remedies are available to employees when the department investigates paid sick leave violations?**

If an employee files a complaint with the department alleging that their employer failed to provide them with paid sick leave as provided in RCW 49.46.200 and 49.46.210, the department

will investigate the complaint as an alleged violation of a wage payment requirement under the Wage Payment Act. *See* RCW 49.48.082(12). The department has the authority to order additional remedies when its investigation results in a finding that the employer failed to provide the employee with paid sick leave accrual, use, or carryover. *See* WAC 296-128-810. The remedies that may be ordered after such findings are dependent on whether an employee is still employed by the same employer.

When the department's investigation results in a finding that the employer failed to provide the employee with paid sick leave accrual, use, or carryover, and the employee is *still employed* by the same employer, the employee may elect to:

(a) Receive full access to the balance of accrued paid sick leave hours unlawfully withheld by the employer during the period of noncompliance; or

(b) Receive payment from the employer at their normal hourly compensation for each hour of paid sick leave that the employee would have used or been *reasonably expected to use*, whichever is greater, during the period of noncompliance. *See* Administrative Policy ES.B.2 for more information on computing an employee's normal hourly compensation. The employee will receive full access to the balance of accrued paid sick leave hours unlawfully withheld by the employer, less the number of paid sick leave hours paid out to the employee.

> **Note:** The department interprets "reasonably expected to use" by relying on recent data regarding "the frequency of work-loss days" for adults aged 18 and over as published by the U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (CDC). This data found that the average worker misses 3.7 workdays (based on eight-hour workdays) due to illness per year.

When the department's investigation results in a finding that the employer failed to provide the employee with paid sick leave accrual, use, or carryover, and the employee is *no longer employed* by the same employer, the employee may elect to:

(a) Receive payment at their normal hourly compensation from their employer for all hours of paid sick leave that would have accrued during the period of noncompliance;

(b) Receive reinstatement of the balance of paid sick leave hours that would have accrued during the period of noncompliance, in anticipation of the employee's rehiring within 12 months of separation; or

(c) Receive a combination of payment and reinstatement from the employer for all hours of paid sick leave that would have accrued during the period of noncompliance.