```
 1                UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                                )
     UGOCHUKWO GOODLUCK NWAUZOR,   )
 5   et al.,                       )
                                   )
 6                Plaintiffs,      )  3:17-cv-05769-RJB
                                   )  3:17-cv-05806-RJB
 7   v.                            )
                                   )  Tacoma, Washington
 8   THE GEO GROUP, INC.,          )
                                   )  June 1, 2021
 9                Defendant.       )
     _____  )  Jury Trial
10                                 )
     STATE OF WASHINGTON,          )  9:00 a.m.
11                                 )
                  Plaintiff,       )  Jury Voir Dire
12                                 )
     v.                            )
13                                 )
     THE GEO GROUP, INC.,          )
14                                 )
                  Defendant.       )
15   _____)
```

```
16   _____

              VERBATIM REPORT OF PROCEEDINGS
17         BEFORE THE HONORABLE ROBERT J. BRYAN
              UNITED STATES DISTRICT JUDGE
18   _____
```

```
19

20

21

22

23

24       Proceedings stenographically reported and transcribed
             With computer-aided technology
25
```

```
 1                         APPEARANCES

 2

 3     For the Plaintiff        JAMAL N. WHITEHEAD
       Nwauzor, et al.:         ADAM J. BERGER
 4                              Schroeter Goldmark & Bender
                                810 Third Avenue
 5                              Suite 500
                                Seattle, Washington
 6

 7
       For the Plaintiff        ANDREA BRENNEKE
 8     State of Washington:     LANE POLOZOLA
                                MARSHA J. CHIEN
 9                              800 Fifth Avenue
                                Suite 2000
10                              Seattle, Washington

11

12     For the Defendant        LAWRENCE D. SILVERMAN
       The GEO Group:           ADRIENNE SCHEFFEY
13                              Akerman LLP
                                1900 Sixteenth Street
14                              Suite 1700
                                Denver, Colorado
15
                                JOAN K. MELL
16                              III Branches Law PLLC
                                1019 Regents Boulevard
17                              Suite 204
                                Fircrest, Washington
18

19

20

21

22

23

24

25
```

```
1                                    MORNING SESSION
2                                    JUNE 1, 2021
3           THE COURT:  Okay.  Do we have all the lawyers now?
4           THE CLERK:  I assigned everyone.  They might be
5    making the transition from the main session to this one.
6           THE COURT:  Can you all hear me now?
7           MR. WHITEHEAD:  Yes, Your Honor.
8           THE COURT:  I want to make a record as to where we
9    are.  This is in combined Cause Nos. 17-5806 and 17-5761.
10          THE CLERK:  Your Honor, can I double check that
11   Angela Nicolavo has been able to join this room and she's
12   prepared to report?
13          COURT REPORTER:  Good morning.  Yes, I am online and
14   ready to go.
15          THE COURT:  For the record, this is combined Cause
16   Nos. 17-5806 and 17-5769, State versus GEO and Nwauzor versus
17   GEO.
18       Are the parties ready to proceed for the State?
19          MS. CHIEN:  Yes, Your Honor.  This is Marsha Chien
20   for the State.
21          THE COURT:  And for Nwauzor.
22          MR. WHITEHEAD:  Yes, Your Honor, Jamal Whitehead, and
23   we are ready to proceed.
24          THE COURT:  And for GEO?
25          MS. MELL:  Yes, Your Honor, Joan Mell,
```

1  Adrienne Scheffey and Larry Silverman.

2           THE COURT:  Okay.  After our first little glitch here

3  this morning, I guess we are ready to introduce the case to

4  the jury.  You can bring the jury in.

5           THE CLERK:  The juror questionnaires were emailed to

6  counsel a few minutes ago.  I am getting bounce backs from

7  the State of Washington email addresses because it says the

8  file is too large.

9           MS. SCHEFFEY:  Could you upload it to Box?

10          THE CLERK:  Yes.  This will take a minute to get the

11  copy printed for you.  I think we should be ready to go in

12  about five minutes.  It will take a minute to get it uploaded

13  to Box as well.

14     The jury questionnaires are printed out.  I will talk to

15  Julie about getting them to you.  The items have been

16  uploaded to the defendants and now the plaintiffs.  I just

17  put them in the exhibit folders on Box.  I will take care of

18  them later and remove them.  If you want them, download them

19  from there.  We are ready in that respect.

20     Judge Bryan, do you want me to take a minute and make sure

21  yours are printed out?  The juror questionnaires?

22          THE COURT:  I guess we need to know.

23          THE CLERK:  Okay.  Just a moment.

24          THE COURT:  I have, on my screen, about 25 jurors.

25  Where are the rest of them?

1       THE CLERK:  They'll be on separate screens, if you

2   move your mouse over the screen, there should be a little

3   blue arrow on the right side or left side so you can flip

4   between the three screens of participants.  When we break

5   into smaller groups, everyone will be able to fit on the

6   screen but not at this moment.

7       THE COURT:  Okay.  Ladies and gentlemen, we will

8   start here this morning after a little delay.  We are

9   conducting civil trials remotely using this Zoom platform

10  because of the pandemic and the problems that have arisen on

11  account of the pandemic.

12      There is a good thing about doing it this way and that is

13  that you won't be required to come into the courthouse every

14  day, but the jurors that end up sitting on this case will

15  participate by computer from your home and your private space

16  or office.

17      The obligations of jurors will be the same as if you were

18  in the courtroom.  You must be able to give these cases your

19  full attention from 9:00 to 4:00 throughout the trial and you

20  must follow all of the orders of the Court and instructions

21  from the Court and court staff.

22      The first order of business today is for me to tell you a

23  little bit about the cases we are going to try and to

24  introduce the participants in the trial.

25      We have joined two cases together for the first phase of

1   this proceeding because the two cases share common issues.

2       After those issues are resolved, the same jury may be

3   called upon to hear a second phase of the case.  The

4   plaintiff in the first case is the State of Washington.

5       I don't know if you can see the lawyers -- Tyler?  Tyler

6   is my courtroom deputy clerk who you may have met before.

7           THE CLERK:  Yes, sir.

8           THE COURT:  The lawyers for the State of Washington

9   are Andrea Brenneke, Marsha Chien and Lane Polozola.  If you

10  don't see them now, you will shortly.

11      The plaintiffs in the second case are Goodluck Nwauzor and

12  Fernando Aguire-Urbina.  Their lawyers are Jamal Whitehead

13  and Adam Berger.  The plaintiffs are here on their own

14  behalf, and Mr. Nwauzor as the representative of a class of

15  other people.

16      Their claims are described as a class action.  A class

17  action is a lawsuit that has been brought by one or more

18  plaintiffs on behalf of a larger group of people who have

19  similar legal claims.  All of these people together are

20  called a class.

21      In a class action, the claims of many individuals can be

22  resolved at the same time instead of requiring each member of

23  the class to sue separately over the same issue.  Because of

24  the large number of possible claims that are in this case,

25  not everyone in the class will testify.  The evidence in the

1  trial applies to all class members.  All members of the class

2  will be bound by the results of this trial.

3      In the second case, in the class claim, the class consists

4  of the following:  all civil immigration detainees who

5  participated in the voluntary work program at the Northwest

6  Detention Center at any time between September 26th, 2014,

7  and the date of final judgment in this matter.

8      You will hear more about the voluntary work program and

9  the Northwest Detention Center in a few minutes.

10     The defendant in both cases is The GEO Group,

11  Incorporated, a corporation that is often just referred to as

12  GEO.

13     GEO's lawyers here are Joan Mell, Adrienne Scheffey and

14  Lawrence Silverman.

15     The parties have agreed on certain facts.  These facts

16  will give you a background of the issues in the case.

17     The following facts are admitted by the parties:  GEO owns

18  and operates the Northwest Immigration and Customs

19  Enforcement Processing Center, which was known from 2005 to

20  2019 as the Northwest Detention Center, or known as "The

21  Center."  It is located at 1623 East J Street in Tacoma,

22  Washington.

23     Since October of 2005, GEO has contracted with U.S.

24  Customs and Immigration Enforcement, also often referred to

25  simply as ICE, I-C-E, that's part of the Department of

1    Homeland Security, and the contract was to provide civil
2    immigration detention management services at The Center for
3    adults held in administrative custody as they await
4    immigration status review by ICE and the federal judiciary.
5        GEO has expanded the capacity of The Center.  The Center
6    initially had the capacity to house between 500 to 800
7    individuals.  In July of 2006, GEO expanded The Center to
8    house up to 1,000 individuals.  In October 2009, GEO expanded
9    The Center a second time so that it now has the capacity to
10   house up to 1,575 individuals.
11       Pursuant to The Center contract between GEO and ICE, GEO
12   provides detention services to ICE, including, but not
13   limited to the building management and administration
14   security, clean and vermin-free facilities, food service with
15   three nutritious meals per day, clean uniforms and bedding,
16   and barbershop and grooming services.
17       Pursuant to The Center contract between GEO and ICE, GEO
18   is required to perform in accordance with specific statutory,
19   regulatory, policy and operational constraints, including the
20   ICE Department of Homeland Security Performance-Based
21   National Detention Standards, as well as all applicable
22   federal, state and local laws.
23       The Performance-Based National Detention Standards, and
24   its predecessor the National Detention Standards, is a set of
25   standards developed by ICE to ensure that all entities it

1    contracts with provide safe and secure facilities.

2        Performance-Based National Detention Standard 5.8 requires

3    that GEO offer detained persons an opportunity to work in a

4    voluntary work program or VWP.

5        Since October of 2005, GEO has offered detainees positions

6    in its voluntary work program.  On a given day, there could

7    be as many as 470 positions for detainees in the voluntary

8    work program at The Center.

9        While detained, detainees do not have the opportunity to

10   leave The Center or work outside of The Center unless

11   explicitly authorized by ICE.

12       GEO does not review whether detainee workers have work

13   authorization when reviewing their requests or applications

14   for positions in the voluntary work program.

15       GEO maintains job descriptions for voluntary work program

16   positions.  Positions that are available to detainees in the

17   voluntary work program are varied, including in the kitchen,

18   in the laundry room, cleaning of common areas and cutting

19   hair in the barbershop.

20       GEO provides detainees in voluntary work program positions

21   with all equipment, materials, supplies, uniforms and

22   personal protective equipment necessary to their voluntary

23   work program position.

24       GEO has never paid detainees in the voluntary work program

25   positions the state minimum wage.  GEO has paid and continues

1    to pay detainees in voluntary work program positions one

2    dollar per day.

3        Performance-Based National Detention Standard 5.8 states,

4    "Detainees shall receive monetary compensation for work

5    completed in accord with the facility standard policy.  The

6    compensation is at least one dollar per day."

7        GEO employs non-detainee employees including two or three

8    janitors at The Center.  Washington's hourly minimum wage

9    from 2005 to the present year has gone from $7.35 on January

10   1, 2005, to $13.50 on January 1, 2020.

11       Mr. Nwauzor, the plaintiff, is a citizen of Nigeria, and

12   was granted asylum in the United States in January of 2017.

13   Mr. Nwauzor was held at The Center as a civil immigration

14   detainee from approximately June of 2016 until January of

15   2017.  Mr. Nwauzor held a voluntary work program position

16   during his detention at The Center.  Mr. Nwauzor obtained

17   lawful permanent residence status, commonly known as a green

18   card, in July of 2018.

19       Mr. Aguire-Urbina was born in Mexico.  He was held at The

20   Center as a similar immigration detainee beginning in

21   September of 2012.  Mr. Aguire-Urbina held a voluntary work

22   program position during his detention at The Center.

23       That concludes the recitation of the agreed facts that the

24   parties have presented to the Court.

25       All parties agree that the first issues to be tried are

1    whether GEO is required to pay the hourly minimum wage to

2    detainees in the voluntary work program at The Center under

3    the State of Washington's Minimum Wage Act, and does

4    government immunity render GEO immune from liability under

5    the Minimum Wage Act.

6        The plaintiff, State of Washington, brings the first case

7    as an enforcement action to require GEO to adhere to

8    Washington State's Minimum Wage Act.

9        In the second case, the class plaintiffs' claim is to

10   recover money they claim is due under the Minimum Wage Act

11   for work performed as part of the voluntary work program.

12       Defendant denies the plaintiffs' claims and affirmatively

13   claims that GEO is immune from plaintiffs' claims under the

14   law.  Plaintiffs deny the defendant's claims.

15       The parties have the burden of proving any claim or

16   affirmative defense by a preponderance of evidence, which

17   means that you must be persuaded by the evidence that the

18   claim or affirmative defense is more probably true than not

19   true.

20       GEO has been the subject of news reports on other subjects

21   lately that are not directly relevant to these cases.  These

22   cases, today's cases, are not about whether the government's

23   contracting with private entities to operate detention

24   facilities is a good or bad policy.  Nor is it about specific

25   events at The Center unrelated to the issue of minimum wage

1    and the voluntary work program.  Also, these cases are not

2    about the United States immigration policies or border

3    issues.

4         An important part of these cases is jury selection.  In

5    order that the cases be tried before an impartial jury, the

6    lawyers and I will ask you questions, not to embarrass you or

7    pry into your private affairs, but to determine if you are

8    unbiased and without preconceived ideas that might affect the

9    cases.  You should not withhold information in order to be

10   seated on this particular jury.  You should be

11   straightforward in your answers, rather than answering in a

12   way you feel the lawyers or I expect you to answer.  Your

13   answers will be under oath.

14        It is presumed that when a jury has been selected and

15   accepted by both sides, each of you will keep an open mind

16   until the cases are finally submitted, that you will accept

17   the instructions of the Court, and will base any decision on

18   the law and the facts, uninfluenced by any other

19   considerations.  The purpose of the questions to you is to

20   determine if you have that state of mind.

21        The lawyers have the right and duty to challenge any

22   jurors for cause.  They may also challenge a certain number

23   of jurors without giving any reason as a guarantee to both

24   parties that they may remove some jurors if they wish.  You

25   should not take offense if you are challenged.  The

1 challenges are not exercised as any personal reflection on

2 you.

3     We have about 50 jurors this morning, and we are going to

4 chose a jury of nine so most of you will not serve in any

5 event.  There are a number of witnesses who may testify in

6 these cases.  I have asked counsel to list the witnesses that

7 are local, that is to Western Washington, and people that it

8 is possible you might know.  I would ask as I read this list

9 of potential witnesses that you make a mental note of anyone

10 you know or may know of that is on the list.  I will ask

11 about this when we question the potential jurors.

12     This is a long list of witnesses.  I should add that I am

13 not sure all these people will testify.  There may be other

14 witnesses, but these are people that you may know or know of

15 because they are from the western part of Washington.  The

16 list is now displayed on the screen for you.  I will read the

17 witnesses.  Lynne Buchanan, Edwin or Erwin De La Cruz,

18 Byron Eagle, Debra Eisen, Tammy Fellin, Robbin Gard, Joshua

19 Grice, John Patrick Griffin, Bertha Henderson, Michael Heye,

20 H-E-Y-E, David Holt, Lee or Leroy Jaramillo, David Johnson,

21 Marc Johnson, Ryan Kimble, Jose Medina-Lara, Orlando Marquez,

22 Sean McCreery, William, Bill, McHatton, Colleen Melody,

23 Iolani Menza, Jeffrey Munson, Sean Murphy, Maria Nara also

24 known as Karla Gomez Soto, Goodluck Nwauzor, the plaintiff,

25 Peter Nickerson, Leslie Perrin, Alma Poletti, Dan Ragsdale,

1  Bruce Scott, Daniel Sheehan, Alisha Singleton, Chris Strawn,

2  Brian Strong, Sarah Sytsma, S-Y-T-S-M-A, David Tracy, David

3  Ventruella, Christina Wells and Taylor Wonhoff.

4      Again, we'll be asking you if you know or know of any of

5  those witnesses in a few minutes.

6      We are going to divide you into group or flights of 16 to

7  determine whether each of you can serve as fair and impartial

8  jurors in the case.  This is going to take some time.

9  Unfortunately, a large part of jury service is waiting.  It

10  will take us some time to inquire of each flight.  We will

11  work as fast as we can.  I hope you will be patient with us

12  because it will take some time.

13      Now, from this point on, you are potential jurors in the

14  case that I have described to you.  That means that from this

15  point on, you should not discuss this case among yourselves

16  or with anyone else.  Don't let anyone discuss it with you or

17  in your presence.  You should understand that it is difficult

18  to keep an open mind during the progress of the case if you

19  discuss the case and express opinions about it before it is

20  time to deliberate together on a verdict.

21      You should not read, view or listen to any report in the

22  newspapers or radio or television or on the computer

23  regarding the subject of this trial.  Don't let anyone

24  permit -- don't permit anyone to read or comment on it to you

25  or in your presence.  It is important that you each keep your

1   mind free of extraneous influences so that you may decide the

2   case on the evidence and under the Court's instructions on

3   the law.  If your family or friends ask you about the case

4   you are here today about, you should tell them you are under

5   the Court's instructions not to discuss it.  When the trial

6   is over, you'll be released from this instruction, and you

7   will be able to discuss your experiences as a juror.

8       The lawyers and parties and witnesses are not permitted to

9   talk to you during the trial.  Even a discussion that has no

10  relation to the case may appear to a third party to be an

11  inappropriate communication.  Bear in mind that the lawyers

12  and participants in the trial will not be friendly to you,

13  particularly outside of the court setting.

14      Also, you should not seek out evidence on your own.  Don't

15  go to the places described in the case and in the evidence.

16  Understand that the case has to be decided only on the

17  evidence admitted in the courtroom, or in this virtual

18  courtroom.

19      Also, you should not seek out any information on your

20  computers or on the internet.  Get all of your information

21  about the case here in this virtual courtroom from the

22  witnesses and the instructions on the law from the Court, and

23  you will hear the arguments of counsel.  I will repeat these

24  instructions from time to time throughout the trial.  I

25  wanted you to know at this point that as potential jurors,

1    you are under the instructions of the Court not to discuss

2    the case or seek out evidence on your own.

3        Now, ladies and gentlemen, as I indicated, we are going to

4    go to groups of 16 for the questioning portion of jury

5    selection.  Tyler, my courtroom deputy, will provide for 16

6    of you to appear on the screen and we will question them, and

7    after that, we will take another flight of 16 and so forth.

8        Tyler, I think we can move to the next phase here if you

9    want to give me 16 jurors.

10        THE CLERK:  The first 16 jurors will stay in here,

11    the other potential jurors will go into a breakout room right

12    now.  I am going to number them in number order so it is

13    easier to follow along.  I will let you know when we are

14    ready to proceed.

15        Juror 15, are you able to turn your camera on?  We skipped

16    15 for the moment.  I am trying to get Juror 15 to turn on

17    their camera.  There we go.

18        Okay.  Your Honor, the first 16 jurors are here in a row.

19        THE COURT:  Ladies and gentlemen, the first thing is

20    you should be sworn to tell the truth regarding these

21    questions regarding jury selection.  If you will raise your

22    right hands.  Tyler will administer the oath.

23        THE CLERK:  You and each of you do solemnly swear or

24    affirm that you will well and truly answer such questions as

25    may be asked of you touching upon your qualifications to

1    serve as jurors in the trial now before the Court?  Please

2    say "I do."

3         (Jurors responded affirmatively.)

4           THE COURT:  Have you all answered "I do"?

5    All right.  Ladies and gentlemen, I am Judge Bryan.  I

6    don't know if you saw the lawyers when I read their names

7    earlier.  Let me go through their names again.  I think you

8    can see them on the screen now.

9         Representing the State of Washington is Andrea Brenneke,

10   Marsha Chien and Lane Polozola.

11        The plaintiffs in the second case, the class action, are

12   Jamal Whitehead and Adam Berger.

13        The lawyers for GEO, the defendant, are Joan Mell,

14   Adrienne Scheffey and Lawrence Silverman.

15        Okay.  Now, ladies and gentlemen, I have a number of

16   questions I am going to ask you, and I would ask you to

17   simply raise your hand if you have a response.

18        First, did you all hear my introduction to the case?

19   Anyone that did not?  Is all the information that you

20   provided the Court in writing regarding jury service true and

21   correct to the best of your ability to make it?  Is there

22   anyone that feels you should make some change to the written

23   material you provided?  All right.

24        Now, using the Zoom platform for trials is a fairly new

25   thing brought on by the pandemic.  We have had to find ways

1    to keep the courts moving, consistent with safety and health

2    requirements.  This Zoom environment requires that all

3    concerned, including jurors, cooperate and promptly report

4    any issues and use their best efforts to provide a fair trial

5    to all concerned.  Are you all willing to participate with

6    those things in mind?  Anyone that is not willing to

7    participate on this platform?

8        The good thing about it is that you don't have to come

9    into court everyday and you get to stay home and also

10   participate as a juror.

11       Now, the lawyers have estimated three weeks trial for the

12   first phase of the case with another week for the second

13   phase, if necessary.  Lawyers and judges only can estimate

14   time.  We are notoriously bad at estimating time, but that's

15   our best estimate at this point.  Once we start, it will take

16   as long as it takes.

17       Trial will typically be from nine to noon and one to four

18   daily with morning and afternoon breaks.  I want to know if

19   there is anything in your life that would make it truly

20   difficult or truly unfair for you to be a juror on this case?

21   Yes.  Is your name Ice?

22            PROSPECTIVE JUROR 15:  No.

23            THE COURT:  Juror No. 15.

24            PROSPECTIVE JUROR 15:  Yes, hello, Your Honor.  Hi.

25   I have at home with me right now a five-year-old special

```
1    needs child.  He is mostly okay on his own, but just when we
2    moved into this group, I did have to tend to him, and he has
3    to get on and off the school bus during those hours.  He gets
4    his therapy through school, so it is not really something
5    that I am just able to opt out of for us for a couple of
6    weeks.  That is my concern.
7              THE COURT:  Okay.  I think Ms. Ice should be excused.
8    Any objection from counsel?
9        Okay, Ms. Ice, thank you.  You may be excused.
10       Any of the rest of you have any issues that you want to
11   raise about general matters of jury service?
12       Ms. Christianson?
13             PROSPECTIVE JUROR 10:  I have a husband that is
14   currently in need of a knee replacement and currently it
15   fills with blood and he is unable to move or get to the
16   hospital, so I oftentimes have to leave work to get him to
17   the emergency room to have that drained.  We can't have
18   surgery until September.
19             THE COURT:  Let me make a note here as we go.
20       Mr. Krytenberg, is that right, did you have your hand up?
21             PROSPECTIVE JUROR 1:  I did, yes.
22             THE COURT:  What is your issue?
23             PROSPECTIVE JUROR 1:  I lead a team of people at
24   work, and we are in the most pivotal stage of our project
25   development.  If I am gone for a month or more, it will set
```

1    the project back that much further, costing the company

2    hundreds of thousands of dollars, which is, frankly,

3    unacceptable.  I can't be gone for four, five, six weeks at

4    this point.

5            THE COURT:  Who else had their hand up?  Mr. Crosley?

6            PROSPECTIVE JUROR 13:  I have a similar concern.  I

7    am director of a large IT department.  I really can't be away

8    from work for four weeks plus.  I will be -- if required to

9    serve, I'll be doing this from the hours of nine to four but

10   still have to do my job non-business hours and the evening

11   and into the night.  I don't know that I can sustain that for

12   the full duration that is possible here.

13           THE COURT:  Okay.  Anyone else?  Okay.

14   Ms. Christianson, you are caring for your husband; is that

15   right?

16           PROSPECTIVE JUROR 10:  That's true, yes.

17           THE COURT:  And generally, what is his situation?

18           PROSPECTIVE JUROR 10:  He is unable to oftentimes use

19   the restroom.  He has really bad osteoarthritis.  When his

20   knee pulls up, he is unable to move.  He cannot drive.  He

21   cannot get his own food because he can't get out of bed.  I

22   am oftentimes there having to help with those needs.

23           THE COURT:  You are his sole caregiver?

24           PROSPECTIVE JUROR 10:  We have no family in this

25   state.  I have a ten year old and I have a seven year old.

1          THE COURT:  Okay.  You may be excused,

2     Ms. Christianson.

3          PROSPECTIVE JUROR 10:  Thank you.

4          THE COURT:  I will ask Juror No. 1 and No. 13 to sit

5     tight.  We will see how flexible we can be here.

6          THE CLERK:  Your Honor, Juror No. 2 raised their hand

7     at the end there.  I believe he might have something to add.

8          THE COURT:  Mr. Troemel, Juror No. 2, did you have a

9     problem with jury service?

10         PROSPECTIVE JUROR 2:  Unfortunately, I am the only

11    one working right now.  My wife is unemployed due to COVID.

12    I'll be losing a bunch of money not working during this

13    trial.

14         THE COURT:  Okay.  All right.  I will consider those

15    issues and rule on them later.

16      Did someone else have something?

17      I trust that all of you have a computer or iPad or

18    something with a camera you can use for the entire trial.  I

19    wouldn't want you to try to do this on a cell phone.  Are all

20    of you comfortable with your equipment that you have

21    available?  Seems to be going all right once we got started

22    this morning.

23      Ms. Tooley.

24         PROSPECTIVE JUROR 7:  I am borrowing this one right

25    at the moment.  My laptop did not work.  I couldn't get a

```
 1   picture on it.  I used my mother's.  I don't know for four
 2   weeks if she would allow me to use this.  I may have to -- if
 3   you could supply one.
 4          THE COURT:  Are you comfortable using court
 5   equipment, if necessary, that we will supply?
 6          PROSPECTIVE JUROR:  I will ask her.  It might be
 7   fine.  I have not had an opportunity to ask her permission
 8   yet.
 9          THE COURT:  Okay.  All of you have reliable internet
10   connectivity?  Can all of you use this Zoom platform
11   throughout the trial as we go along?
12      Do all of have you a quiet place where you can participate
13   online for several hours every day without interruption?
14   Anyone that does not?
15      All right.  Do any of you know or know of the lawyers that
16   I introduced?
17      Have any of you heard of this case before?  From what you
18   have heard about it so far, does it remind you of anything
19   that is happening or has happened in your own life?
20      Do any of you know or know of any of the witnesses whose
21   names I read?
22      Are any of you or anyone close to you involved with the
23   courts or the administration of justice?
24          MR. WHITEHEAD:  I believe Juror No. 9 had her hand
25   up.
```

```
1          THE COURT:  Yes, Ms. Duprey.

2          PROSPECTIVE JUROR 9:  Yes, I am familiar with someone

3   that is named as one of the witnesses.  I know someone with

4   that name.  I also am familiar with people in detention being

5   paid a dollar a day as my daughter was in detention and had a

6   job that paid her a dollar a day.  She's no longer in

7   detention, but I am aware of that firsthand.

8          THE COURT:  Was she in detention at the GEO facility?

9          PROSPECTIVE JUROR 9:  She was in a correction

10  facility in Oregon.

11         THE COURT:  Is there anything about what you have

12  heard about this issue that would cause you to feel one way

13  or another going into the trial?

14         PROSPECTIVE JUROR 9:  I think it would.  I am

15  familiar with the need to -- you know, I am familiar with the

16  limited resources that gives someone in detention to, you

17  know, make a phone call or purchase necessary personal

18  products, things like that.  I have a little insight into it.

19         THE COURT:  Yes.  You mention you knew one of the

20  witnesses?

21         PROSPECTIVE JUROR 9:  I do know someone named

22  David Johnson.

23         THE COURT:  Common name.  Where does that person that

24  you know live?

25         PROSPECTIVE JUROR:  He lives in Seattle.
```

1        THE COURT:  Okay.  I don't know.  I have to ask
2   counsel if that is the same person on your witness list.
3   Common name.
4        PROSPECTIVE JUROR 9:  It is.
5        MS. CHIEN:  It might be helpful if she knew what job
6   or occupation, if she's aware of where Mr. Johnson worked.
7        PROSPECTIVE JUROR 9:  No.
8        THE COURT:  Is this someone you know well or know of?
9        PROSPECTIVE JUROR 9:  I am friends with his father.
10  I have known him since he was a young -- I have known
11  David Johnson since he was a little boy.
12        THE COURT:  Okay.  I think I should excuse
13  Ms. Duprey.  Thank you, ma'am.
14        PROSPECTIVE JUROR 9:  Thank you very much.
15        THE COURT:  You may be excused.
16     Ms. Deruyter, No. 8.
17        PROSPECTIVE JUROR 8:  Did you ask about law
18  enforcement?
19        THE COURT:  Yes.
20        PROSPECTIVE JUROR 8:  My husband is retired 33 years
21  from LA County Sheriff's Department.
22        THE CLERK:  I thought Juror 12 had stepped away.
23  He's there.  We are good.
24        THE COURT:  Yes, Mr. Monta.
25        THE CLERK:  He stepped away.  I was concerned he had

1   left.  That's all.  He has returned.

2          PROSPECTIVE JUROR 12:  I am here.

3          THE COURT:  Okay, Mr. Monta, Juror No. 12, did you

4   have an answer?

5          PROSPECTIVE JUROR:  No, he just asked if I had

6   stepped away.  I had used the restroom.

7          THE COURT:  Ms. Tooley.

8          PROSPECTIVE JUROR 7:  Family members retired.  My

9   father retired.  He was a corrections officer.  My

10  father-in-law is a retired sheriff or police officer of some

11  sort.

12         THE COURT:  Okay.  All right.  Do any of you have a

13  relationship with or particular knowledge about Immigrations

14  and Customs Enforcement, that is ICE, or a particular

15  knowledge about GEO or with GEO?  Do any of you have any

16  particular relationship with or knowledge about the State

17  Department of Labor & Industries or the Attorney General's

18  Office for the State?  Okay.  Do any of you have strong

19  feelings about immigration, immigrants or immigration

20  policies that might cause you to start into the case favoring

21  or disfavoring one side or the other?

22      As I indicated, the case is not about our government's

23  immigration policy.

24      Do any of you have strong feelings about immigration or

25  immigrants or policy that might cause you to start into the

1     case favoring one side or the other?

2              MR. WHITEHEAD:  I believe Juror No. 8 has her hand

3     raised.

4              THE COURT:  Yes, Ms. Deruyter.

5              PROSPECTIVE JUROR 8:  My husband worked for 20 years

6     with, like, the DEA on the border of Southern California with

7     Immigration and drugs coming over.  He was undercover

8     narcotics.  We kind of have a strong (sic) against immigrants

9     even coming over the border.  I don't know if that is what

10    you are asking for or not.

11             THE COURT:  I am asking about that because some of

12    the parties to the case are detainees in an immigration

13    facility.  They have not been -- they are not criminals as

14    such.  They are not there for criminal reasons.  They are

15    being held pending immigration action.  I would like to know

16    if you have strong feelings about them that would affect your

17    judgment as to whether they might be entitled to minimum wage

18    under the State's Minimum Wage Act.

19             PROSPECTIVE JUROR 8:  Okay.  No, that's okay.  That

20    clarifies it.  Thank you.

21             THE COURT:  You think you can start into this trial

22    without feelings that would affect your judgment for one side

23    or the other?

24             PROSPECTIVE JUROR 8:  Not exactly sure because most

25    of the people that came over for his job came over illegally.

1    So I guess, on that part, I would have a strong feeling

2    against them even just coming over.  I don't know why they

3    weren't stopped at the border.  I don't know if that makes

4    sense.  I have a strong feeling against -- my mother had a

5    green card and became an American citizen.  My father-in-law

6    had a green card and became an American citizen.  I don't

7    have anything against people coming over legally.  I just

8    don't understand why they are in a detention facility if they

9    are doing it legally for years.

10           THE COURT:  I expect you'll hear more about that from

11   counsel and further questions.

12           PROSPECTIVE JUROR 8:  Okay.

13           THE COURT:  Yes.  Thank you.

14       Do any of have you any strong feelings about ICE or about

15   GEO?  Any of have you any strong feelings about the State of

16   Washington or any of its departments or anything that might

17   cause you to start into the trial favoring one side or the

18   other?  Mr. Krytenberg?

19           PROSPECTIVE JUROR 1:  Yeah, frankly, I morally object

20   to privatization of these types of situations.  It is slave

21   labor in my opinion.  It is morally reprehensible.  And I

22   would find it hard to be objective.

23           THE COURT:  With that statement, I think the juror

24   should be excused.  You may be excused, Mr. Krytenberg.

25       Do any of you have any strong feelings about minimum wage

1    laws generally that might cause you to start into the case

2    favoring one side or the other?  Any of you have strong

3    feelings about privately run detention centers that might

4    affect your judgment here?

5        Do any of you have strong feelings about class actions, as

6    I described Plaintiff Nwauzor's class participation here?

7    Yes, Ms. McDonald.

8        PROSPECTIVE JUROR 14:  I don't know that I have a

9    strong opinion.  I think I should probably share that, in my

10   role as director of human resources, I have been involved in,

11   you know, class action cases in California that revolved

12   around wage and hours.  I just want to make sure --

13       THE COURT:  Is there anything about your experience

14   in that regard that would start you into this case favoring

15   one side or the other?

16       PROSPECTIVE JUROR 14:  I mean, I don't know the

17   answer to the question.  Really, if it was in regards to

18   their regular employment, probably would be concerned they

19   weren't paid that minimum wage.  This is a little different.

20   I am just trying to keep an open mind.

21       THE COURT:  Do you think you can be fair and

22   impartial going in here and make a fair decision based on the

23   evidence?

24       PROSPECTIVE JUROR 14:  I do.

25       THE COURT:  Can all of you accept the law from the

1    Court and apply it here, even though you might disagree with

2    the law?  It is important that you do that.  Sometimes we

3    are -- even us judges are surprised to find out what the law

4    is in a particular case.  Sometimes we have to do things that

5    we -- that are required by the law that we might not like

6    very much.  Can all of you accept the law and apply it?

7        Okay.  Is there anything about this case, as you

8    understand it now, that might cause any of you to start into

9    the trial with any bias or prejudice or feelings favoring one

10   side or the other?  Anything we have not discussed that makes

11   you want to be excused?

12       All right.  It is just about time for a break before we go

13   to --

14            THE CLERK:  Your Honor, No. 13 has his hand raised.

15            THE COURT:  Mr. Crosley.

16            PROSPECTIVE JUROR 13:  It sounded like we are

17   wrapping up.  I wanted to reiterate my concern over my

18   ability to give this my full attention over the next four

19   weeks with the balance that I will have to strike with work

20   and this.  I know other people have that same issue.  It is

21   going to be significant for me.

22            THE COURT:  I will keep that under consideration.  We

23   will see how we do with the -- we will see how liberal I can

24   be, is what I am telling you.

25       Ms. Rickabaugh, did you have a question or comment?

 1          Sometimes we all move our hands.  Sometimes I see a

 2     movement.  All right.

 3          Now, I gave you an instruction about recesses.  I would

 4     ask you to follow those instructions.  We will take about ten

 5     minutes for a break, and then we will proceed with counsels'

 6     questions of the panel.  All right?

 7                         (Recessed.)

 8               THE COURT:  We are ready to go to counsels'

 9     voir dire.  Who speaks for plaintiffs first?

10               MS. CHIEN:  Mr. Whitehead will be speaking for the

11     plaintiffs.

12               THE CLERK:  The limitation with Zoom, I have to bring

13     everyone back in, including the panels that are not

14     participating in order to put them back out again.  It will

15     take a minute or two to reorganize everybody again.

16               MR. WHITEHEAD:  The jury is out of the room right

17     now?

18               THE CLERK:  The jury was out of the room at that

19     time.  I just brought them back.  Okay, Your Honor, looks

20     like everybody is back and ready to go.

21               THE COURT:  Okay.  Now, ladies and gentlemen, as I

22     indicated earlier, the lawyers have the opportunity to

23     supplement the questions that I have asked you.  They can ask

24     questions of the entire panel or questions of individual

25     jurors.  I understand Mr. Whitehead, for the plaintiffs, will

1    go first.

2        So Mr. Whitehead.

3            MR. WHITEHEAD:   Thank you, Your Honor.

4        Good morning.  My name is Jamal Whitehead.  I am one of

5    the attorneys representing the private plaintiffs in this

6    case.  For most, if not all of you, I am guessing this is

7    your first time going through jury selection.  Perhaps from

8    what you have seen on TV you may be thinking this is the part

9    of the trial where the lawyers ask trick questions to

10   psychoanalyze you.  I don't do it that way.  What I want to

11   know is who wants to be on the jury, not who I am trying to

12   kick off.  Most importantly, I want to know who can listen to

13   the evidence in this case with an objective mindset.  I can't

14   give you any specific details.  In fact, I would get in

15   trouble if I talked about the evidence.

16       What we can talk about are some of the principles that you

17   will need to wrestle with if you serve as a juror.  I will

18   ask questions to get the ball rolling.  I am not trying to

19   pry or embarrass you.  I want you to be brutally honest with

20   me and yourself about whether you can serve on this case with

21   an open mind.  The goal is to be impartial.  We call it bias.

22   If you are already leaning in one direction or the other,

23   doesn't mean there is anything wrong with you.  If you

24   already have strong notions about the issues in this case, it

25   just means there are some issues that are so close to home

 1  that it is difficult to sit and listen to the evidence

 2  fairly.  It is like asking a new parent who is the cutest

 3  baby in the world.

 4      With that in mind, let's just talk.

 5      You heard from the judge's introduction, this case

 6  involves people who are currently or formerly detained in an

 7  immigration detention center.  The case isn't about

 8  immigration, but it involves immigrants.  If you follow the

 9  news or politics, you know immigration is a hot-button topic.

10  Some people think we should build walls to keep immigrants

11  out because they are taking jobs.  Others think we should

12  build bridges to take more in because we are a nation that

13  welcomes immigrants.

14      My question is:  Looking at these two views, which one are

15  you closer to?  Anybody want to get us started?

16      Juror No. 7.  Thank you.  Tell us about it.

17          PROSPECTIVE JUROR 7:  As I answered in my

18  questionnaire, I don't have any strong feelings one way or

19  the other way.  I think a wall is a little ridiculous.  That

20  is more money out of the pockets of the taxpayers.  Bridges,

21  when they come over, I guess they get money and education and

22  things like that to get them started.  We all started out as

23  immigrants really.  Technically, the country is built on it.

24  I don't really have any strong feelings one way or the other.

25          MR. WHITEHEAD:  Thank you for sharing and getting the

1    ball rolling.

2        Who else would like to share?  Juror No. 3?

3            PROSPECTIVE JUROR 3:  I would say I lean more toward

4    bridges.  I work at a university.  I have many students who

5    are either immigrants themselves or children of immigrants.

6    Hearing their story, I am very sympathetic to the struggles

7    they face.

8            MR. WHITEHEAD:  Thank you for sharing.

9        By show of hands, who feels the same as Juror No. 3.  Hold

10    them up until I call your number.  Juror No. 4, Juror No. 6,

11    Juror No. 8, Juror No. 11, Juror No. 14, Juror No. 16.

12        Juror No. 8, go ahead.

13            PROSPECTIVE JUROR 8:  I am actually towards the wall

14    even though I would not be an American citizen if immigrants

15    weren't here.  My mother was Canadian, my father was from

16    Holland, both came over, one as a young adult, my mother as a

17    child.  But they -- no one was ever in a detention facility.

18    I have two close people that never went to a detention

19    facility.  Both have become American citizens.

20        I am actually against the whole facility.  I think if they

21    are coming over, if they have a reason to be stalled at the

22    facility, they shouldn't come over.  Does that make sense?

23            MR. WHITEHEAD:  It does.  Thank you for sharing.  I

24    guess I think back to one of the responses you gave to the

25    judge, you were talking about your husband's experiences on

1   border enforcement.  I don't want to put words in your mouth.

2   I believe you said something along the lines of it mattered

3   to you whether or not people came to the country legally or

4   illegally.  Did I get that right?

5           PROSPECTIVE JUROR 8:  Yes.

6           MR. WHITEHEAD:  Why does that matter to you?

7           PROSPECTIVE JUROR 8:  Well, illegally we don't know

8   what they are bringing over.  So many have brought over

9   either illnesses or contraband.  Most of my -- I have lot --

10  I have two nephews that have come over.  I have a brother.

11  Lots of people have come over.  They have all come over

12  legally.  They have all followed the rules.  We have laws.

13  That's why we have laws.  People coming over, I can

14  understand if someone is seeking asylum and coming over, but

15  I don't believe they are put in a detention facility because,

16  you know, jails are full, so send them back.  I'm sorry.

17  That is my opinion.

18          MR. WHITEHEAD:  Thank you.  The judge is going to

19  instruct you on the law.  Everyone in this case agrees that

20  folks that are in the detention center itself are not being

21  held there as punishment.  The circumstances of the people

22  and how they found themselves in detention, it does vary.  My

23  question to you is this:  If there were people that came to

24  the United States without prior permission, do your

25  experiences and beliefs make it such that you are leaning

1   against those folks, even if it is just a little bit?

2        PROSPECTIVE JUROR 8:  Yes.  Yes, if -- yes, if they

3   just came over and they want -- okay, they are put -- I am

4   kind of, stay in your country, get the visa, do it right, and

5   then come over.  That's what we are built on.  We are built

6   on all those people.  Does that make sense?

7        MR. WHITEHEAD:  The people that came without prior

8   permission, they face an uphill battle for you as you sit and

9   look at this case?

10       PROSPECTIVE JUROR 8:  Yes.

11       MR. WHITEHEAD:  When I get done, opposing counsel

12  will have questions for you, the judge may have questions for

13  you, will you give them the same answer you gave me?

14       PROSPECTIVE JUROR:  Yes.

15       MR. WHITEHEAD:  Thank you.  Juror No. 11, I am going

16  to channel my mother right now.  Juror No. 11, where do you

17  fall?

18       PROSPECTIVE JUROR 11:  A little bit toward bridges.

19  I think it is more of a demographics type thing.  Where our

20  population is getting older and more of us are retiring, we

21  are not reproducing at the rate that we need to be to support

22  retirees so that support needs to come from somewhere.

23      Just based on that, I kind of lean toward bridges.  I also

24  have sympathy for a lot of people I think coming from Central

25  America.  They are leaving really bad conditions, and they

1    are coming up here.  I know it is illegal and there should be

2    a legal framework for people to immigrate to the

3    United States.  I understand their plight.  I do, you know,

4    they -- they should not come illegally, but I understand, I

5    guess.

6             MR. WHITEHEAD:  Thank you for sharing.  I appreciate

7    that.

8         Let's see.  Ms. Potter, Juror No. 5, could you share?

9             PROSPECTIVE JUROR 5:  Can you hear me?  You are back

10   at the building walls, building bridges.  I don't feel like,

11   while I have many feelings for all different people, that the

12   immigration policy is not about feelings.  It is about

13   following our immigration law and our immigration policy.

14   Our policy is a virtual wall.  I am kind of on the line with

15   Juror No. 8, that follow the law, you are welcome to be here.

16   If you don't follow the law, we will help you follow the law

17   and get you what you need in order to be here legally.  For

18   our country to support many, many immigrants for the sake of

19   them not following our immigration law, we have a problem.

20            MR. WHITEHEAD:  Thank you for sharing.  So look,

21   Juror No. 8, is it the case that before you have heard any

22   evidence in this case, folks that came to the United States

23   without prior permission, are they facing an uphill battle in

24   this case?

25            PROSPECTIVE JUROR 8:  Can you say that again?

1          MR. WHITEHEAD:  Yes.  We all have our feelings and

2     our beliefs.  I guess I am following up on what you just

3     expressed.  Before you heard any evidence in this case, we

4     are just sitting here at neutral.  Is it the case that folks

5     that may have come to the United States without prior

6     permission, are they facing an uphill battle for you in this

7     case in trying to decide what happened?

8          PROSPECTIVE JUROR 8:  Absolutely they are facing an

9     uphill battle.  That's tough to come across the border

10    illegally, get across, find a job, get citizenship, that's

11    difficult.  But there is a road, there is a path, there is

12    information.  There is ways to get that information.  There

13    is plenty of people willing to provide that information,

14    that's why we have the laws.  It is difficult as a child that

15    lives here -- anybody who lives here that is not an

16    immigrant, it is difficult for a child to raise and turn 13

17    and turn 16 and save money to buy a car and go to college and

18    get out on their own.  It is difficult for everybody.  They

19    are not the only ones that struggle, but the information is

20    out there and that's -- we need to go get that information.

21         MR. WHITEHEAD:  I maybe asked the question

22    inartfully.  Really, what I am driving at is, you, as the

23    person sitting and listening to the evidence, do you feel

24    like just sitting at neutral maybe you are leaning against

25    folks that came to this country without prior permission?

1         PROSPECTIVE JUROR 8:  Leaning against them doing

2    what?  If my neighbor came to me and said that they are here

3    illegally, I would ask them, would you like to be here

4    legally?  And yes, let's help you be here legally.  I love

5    the diversity we have in our country.  It is absolutely

6    phenomenal.  I know the best people that speak many different

7    languages.  My grandmother came from Mexico.  I know the

8    story.  It is wonderful.  We have to do it legally.

9         MR. WHITEHEAD:  I really appreciate you sharing.

10   Let's get some other folks we haven't heard from.  Juror

11   No. 6, could you share with us, please?

12        PROSPECTIVE JUROR 6:  I was brought to the

13   United States when I was 16 years old by my parents.  I

14   worked my way up to be a naturalized citizen.  That's my

15   status, I am a U.S. citizen.  I do know the struggles that

16   people go through to get to the United States.  It is easy to

17   say, oh, there is a way to get, what you say, legalized easy.

18   It is not that easy for somebody.  Like, I been there.  I

19   been there.  I know.  A lot of people, they don't have a

20   person in the United States that can sponsor them to come to

21   the United States.  The only way they can come here is

22   illegal.  I'm sorry, yeah.  It is illegal, sad, when you hear

23   the stories of people trying to cross.  It is sad.  Make you

24   cry.  Not easy.  It is not easy to get citizenship.

25        MR. WHITEHEAD:  Thank you for sharing.

1      Juror No. 16.

2          PROSPECTIVE JUROR 16:  I would lean more toward

3   bridges.  I really am trying to be more objective and neutral

4   in this situation.  I do feel how Juror 7 said we all come

5   from immigrants.  I know doing my ancestry, there was a lot

6   of immigration.  Whether it was legally or illegally, I can't

7   say for sure.  It was an opportunity for me to be here today.

8   I empathize also with the human suffering.  I am a social

9   worker by nature.  Social justice and things like that are

10  really my passion right now.

11          MR. WHITEHEAD:  Thank you.  Who else haven't we heard

12  from?  Juror No. 2, have we heard from you yet?

13          PROSPECTIVE JUROR 2:  Can you hear me?

14          MR. WHITEHEAD:  I can.

15          PROSPECTIVE JUROR 2:  I do not support illegal

16  immigration.  If they are going to do it, they need to come

17  the right way.  With everything that is going on now, with

18  all the veterans and everything, I do not support illegal

19  immigration at all.

20          MR. WHITEHEAD:  My question is this:  I know you will

21  sit and listen to the evidence.  I won't ask you that

22  question.  Just sitting here, not having heard any evidence

23  in this case, would you say that you are leaning against my

24  clients because they may be held in a detention facility?  Is

25  that a problem for you in this case?

```
 1              PROSPECTIVE JUROR 2:  Yes.

 2              MR. WHITEHEAD:  Thank you for sharing.  If the judge

 3    or opposing counsel were to ask you that question, would you

 4    give the same answer?

 5              PROSPECTIVE JUROR 2:  Yes, sir.

 6              MR. WHITEHEAD:  Is that everyone?  Did we get

 7    everybody?  No. 12.

 8              THE COURT:  Just a second.  I don't know how you have

 9    divided up your time.  You have used better than 15 minutes,

10    Mr. Whitehead.

11              MR. WHITEHEAD:  Then I will stop there.  It was nice

12    speaking with everyone.  I will pass the baton.  Thank you.

13              MS. CHIEN:  Hi.  My name is Marsha Chien, and I

14    represent the State of Washington.  Mr. Whitehead has asked

15    you couple of questions about immigration.  I would like to

16    switch gears a little bit.  I am hoping you can be as

17    brutally honest with me as you were with Mr. Whitehead.

18        In addition to the people that Mr. Whitehead represents,

19    there are two other types of entities that are part of this

20    case, a private company and the government.  I would like to

21    talk to you about the role of private companies and the

22    government.

23        I would like to start by asking what people think is the

24    purpose of a private company?  Maybe we can start with Juror

25    No. 7.  What is the purpose of a private company?
```

1    PROSPECTIVE JUROR 7:  I guess I am not really

2 understanding that question.  Can you say it a different way

3 maybe?

4    MS. CHIEN:  Sure.  Why do private companies exist?

5 How about that?  Why do businesses exist?

6    PROSPECTIVE JUROR 7:  Like entrepreneurship?  Like

7 you own your own company or a large CEO?

8    MS. CHIEN:  Let's start with Amazon.  Why does Amazon

9 exist?

10    PROSPECTIVE JUROR 7:  To sell products to the

11 consumer and make money.

12    MS. CHIEN:  Does anyone else have other ideas of what

13 you think the purpose of a private company is?  Juror No. 13?

14    PROSPECTIVE JUROR 13:  The purpose of a private

15 company is to create wealth and opportunity for the company

16 and also the people that work there.  One of the benefits,

17 because there is the profit motivation, generally quality is

18 better for any goods or services that a private company would

19 engage in over some type of government entity where there is

20 no incentive -- profit incentive to do a good job.

21    MS. CHIEN:  Thank you, Juror No. 13.

22    Does anyone have other ideas about what a private -- the

23 purpose of a private company, other than what Juror 7 and

24 Juror 13 just mentioned?  Juror No. 5?

25    PROSPECTIVE JUROR 5:  A private company provides a

service that the government doesn't provide.  We are talking

about profit versus non-profit.  The government provides that

general service for the -- the government provides the

general service in the community that we can't cover, for

instance, protection, protection by our police force, ICE.

Any of those companies' protection is one of the main things

our government provides, schools.  Private does what the

government doesn't do.

MS. CHIEN:  This is a good time to switch to

government and ask people what they think the purpose of a

government is.  I will start with Juror No. 14.

PROSPECTIVE JUROR 14:  The purpose of the government

is to ensure the safety and well-being of the populus, to

ensure laws and infrastructure, that sort of thing, are

enforced and maintained.

MS. CHIEN:  Juror No. 12, I see your head nodding.

Can I ask you the purpose of what a government is?

PROSPECTIVE JUROR 12:  People that provide services

when needed, maintain roads, bridges, that type of thing.

MS. CHIEN:  Can I stick with you for my next

question?

PROSPECTIVE JUROR 12:  Sure.

MS. CHIEN:  How can you tell if a government is

successful?

PROSPECTIVE JUROR:  If your bridges are falling down,

```
1    your roads are crumbling, people aren't being cared for, that
2    would be a failure on the government's part.  I pay taxes and
3    that.  Those taxes go for, you know, roads, bridges, for
4    taking care -- people that can't take care of themselves, our
5    veterans that are coming back that are in need.  I think we
6    need to take care of those people that have served us.  Like
7    I say, other people that can't help themselves that we should
8    try to provide for the well-being of our citizens.
9            MS. CHIEN:  Thank you.  Do other people agree with
10   Mr. Monta or have other ideas of how you can determine
11   whether a government is successful?  How about, I am going to
12   turn a little bit to talk about a specific government agency,
13   the Attorney General's Office.  Can you please raise your
14   hand if you have heard of the Attorney General's Office suing
15   a private company or --
16           THE COURT:  You got frozen there, Ms. Chien.  I don't
17   know what happened.
18           MS. CHIEN:  All right.  Apologies.
19           THE COURT:  Go ahead, Ms. Chien.
20           MS. CHIEN:  I would like to ask if everyone can raise
21   your hand if you have heard of the Attorney General's Office
22   suing a person or business to protect the citizens.  11, 12,
23   13.  Okay.
24       Can I ask Juror No. 11, what was the lawsuit about?  What
25   did you think about it?
```

1          PROSPECTIVE JUROR 11:  I believe -- I am not certain

2     on this.  I believe Boeing was sued a few years ago.  I can't

3     remember the particulars of the case.  I think they were

4     sued.  It was something -- I can't remember what it was.  I

5     do remember a lawsuit a few years ago against Boeing.

6          MS. CHIEN:  Do other people remember other lawsuits

7     the Attorney General's Office has brought?  Okay.  Some

8     people think the Attorney General sues too many people.  Can

9     you raise your hand if you think the Attorney General sues

10    too many people and shouldn't be meddling in the affairs of

11    private business?  Let's start with Juror No. 14.

12         PROSPECTIVE JUROR 14:  Sorry, I zoned out.  The

13    question was:  Do I think they sue too many people?

14         MS. CHIEN:  Yeah.

15         PROSPECTIVE JUROR 14:  I don't think so.  I think

16    they are being prudent and bringing forward lawsuits that

17    have merit, and there is a process to ensure that is

18    happening.  I don't have any concerns about that in

19    particular.

20         MS. CHIEN:  Thank you.  Juror No. 8, do you agree the

21    Attorney General's -- do you have any feelings about the

22    Attorney General's Office bringing lawsuits against private

23    businesses or individuals?

24         PROSPECTIVE JUROR 8:  No, I would think -- they are

25    there to protect us.  If they see something that is hurting

the public, I think that is their job to stand up for us and
protect us.

MS. CHIEN:  Okay.  Juror No. 4, can I ask you to
weigh in on whether or not the Attorney General is suing too
many private individuals or businesses?

PROSPECTIVE JUROR 4:  I don't think I have a strong
opinion on the matter.  I did raise my hand as to uphold the
law of the land.  If they are successful, not there is peace
in the land, but to do that -- like, I don't know what the
number was last year.  I think she said that the job -- that
is their job is to kind of maintain order, like a check and
balance type system.  I don't have an opinion on whether the
Attorney General sues too many people one way or the other.
I maybe don't have enough information to know whether they do
or not.  I have never actually looked into that.  That seems
like that is their job.  I think in the preceding cases that
would be handled that way, responsibly like in a court
setting and let the people decide.  I suppose that would be
my answer.  If they are suing people, they must have a reason
to do it because that is their job.  I hope that answers the
question.

MS. CHIEN:  Thank you.  I think I haven't heard from
Juror 2.  If you could weigh in on whether or not the
Attorney General's Office -- if you think the Attorney
General's Office should sue private businesses.

 1          PROSPECTIVE JUROR 2:  To be honest, I don't

 2    understand any of that.

 3          MS. CHIEN:  Okay.  That's fair.

 4          PROSPECTIVE JUROR 2:  I just go to work and come

 5    home.

 6          MS. CHIEN:  Juror 13, I saw you nodding a couple

 7    times.  Have you heard of lawsuits the Attorney General has

 8    brought, and what did you think about them?

 9          PROSPECTIVE JUROR 13:  I have heard of lawsuits.  As

10    you asked for specifics, it occurred to me I couldn't come up

11    with a specific.  I think reputationally I think the Attorney

12    General's Office is kind of known -- I don't know, felt like

13    a big uptick in the number of cases or the publicity around

14    them.  I can't objectively say that it is too much or

15    anything like that.  I think success rate probably predicts

16    if it is too much or too little.  That is it.

17          MS. CHIEN:  You mentioned you had heard the Attorney

18    General's Office -- there was an uptick on lawsuits the

19    Attorney General's Office brings. Do you understand why there

20    might have been an uptick or what the lawsuits were about?

21          PROSPECTIVE JUROR 13:  Seemed to coincide when Trump

22    was in office, there was more activity.  I may be responding

23    to publicity I see on the local news.  Seemed I noticed it a

24    lot more over the last four to five years, a lot more

25    activity.  Again, sorry, no specifics.

```
 1          MS. CHIEN:  Did you have any opinion about the
 2   increase in activity?
 3          PROSPECTIVE JUROR 13:  Nothing is wrong.  Generally
 4   skeptical when I see a lot of publicity around things and
 5   question some motives.  Nothing strong at all.
 6          MS. CHIEN:  Tell me more what you mean about question
 7   motives?
 8          PROSPECTIVE JUROR 13:  Sometimes people's activity is
 9   driven by publicity, especially in the political realm.  I
10   think it is important for leaders, like an Attorney General
11   to make sure that people understand that he and his
12   department are fighting for Washingtonians.  Sometimes when
13   you watch that kind of coverage, I scratch my head and
14   wonder:  Is it because it is important or is it because it is
15   enhancing a reputation?
16          MS. CHIEN:  If the Attorney General is bringing a
17   case here, would you be skeptical why the Attorney General's
18   Office is bringing the case here?
19          PROSPECTIVE JUROR:  No.
20          MS. CHIEN:  Okay.  The Court mentioned this case
21   involves minimum wage.  I have one last question.  I was
22   wondering, who do you think should be enforcing our state
23   minimum wage laws?  I would like to start with Juror No. 5.
24          THE COURT:  I think that is pretty close to the line
25   of questions that you can't expect the jurors to know the
```

1    answer.

2         MS. CHIEN:  That's fair.  Does anyone have any

3    concerns about the State Attorney General's Office bringing

4    lawsuits against private business?  Nope.  Okay.

5       Thank you for your time.  I appreciate it.  Looking

6    forward to spending a couple weeks with you.

7         THE COURT:  Thank you, Ms. Chien.

8       Who speaks for the defendant now?  Ms. Mell.

9         MS. MELL:  Good morning, folks.  My name is

10   Joan Mell.  I represent the GEO Group.  I, too, like

11   Mr. Whitehead, have no capacity or ability or credentials to

12   dig into your psychoanalytic history or nitpick your

13   background in that way.

14      I am a people person.  I love this process of getting a

15   chance to talk to you.  I am appreciative of your time today

16   and am hoping to get to know you better for the purposes of

17   making sure the GEO Group gets a fair trial, and that,

18   honestly, plaintiff gets a fair trial.  It is most important

19   that both sides have a fair shot at you helping them decide

20   this case.  So the more you can tell me about yourself and

21   any thoughts you have strongly about some of the issues you

22   might be grappling with hearing this case will only make the

23   process fairer.

24      I am going to be a little bit snoopy.  One of the things I

25   am going to delve into is politics.  When I say the name "Bob

1  Ferguson," what comes to mind?  Anybody have a reaction to

2  the name Bob Ferguson?  Does anybody know who Bob Ferguson

3  is?

4       Juror No. 12, who is Bob Ferguson?

5            PROSPECTIVE JUROR 12:  The State Attorney General.

6            MS. MELL:  Who knows who if the State Attorney

7  General is an elected position?  Juror No. 11, elected or not

8  elected?

9            PROSPECTIVE JUROR 11:  The Attorney General is

10 elected.

11           MS. MELL:  Some people debate which public officials

12 should be elected and which should be appointed.  Who has

13 weighed in on the debate on perhaps a judge appointment?  Who

14 has feelings whether or not an official like the Attorney

15 General should be appointed or elected?  Anybody have strong

16 feelings on that?

17           PROSPECTIVE JUROR:  My question is:  When you say

18 elected or appointed, elected by the people.  The appointment

19 would be by whom?

20           MS. MELL:  Depends on who the State decides gets to

21 make the decision.  The debate around judges, for instance,

22 has been whether they should be appointed by other lawyers

23 and judges.  With the AG, it might be the governor.  Would

24 the governor be an appropriate executive or elected Attorney

25 General, why or why not?

1    PROSPECTIVE JUROR:  In that case, I am for being an

2  elected official and not appointed.  I think there is an

3  incredible bias one way or the other, depending on who the

4  governor is, who voted for the governor in that way.  I would

5  like the ability to vote, if I could.

6    MS. MELL:  That brings up another issue on voting.

7  Some people say you always vote partisan.  If you are

8  democrat, you have to vote democrat.  If you are republican,

9  you vote republican.  Other people say, I don't want to pick

10  sides.  I want to vote for who I like, what they believe in,

11  what they stand for.

12    Who has strong feelings about whether or not it should be

13  partisan -- R, D -- or you should have your decision to vote

14  for whoever you want?

15    Juror No. 14?

16    PROSPECTIVE JUROR 14:  I really strongly feel you

17  shouldn't vote necessarily just for your party.  You really

18  should just pick the best person.  It is probably not going

19  to be very often you pick somebody that is outside of your

20  party, but the fact that you go in with that open mind, I

21  think, is better for our system of government.

22    MS. MELL:  Anybody else have strong feelings about

23  that?

24    Juror No. 11?

25    PROSPECTIVE JUROR 11:  I pretty strongly believe you

1   shouldn't have to register for a party and then vote along
2   those lines.  I agree with Juror 14, you should make a
3   decision based on the individual that is up for election and
4   not just because of the party they belong to.  If there is
5   people in the state of Washington, particularly the area of
6   the secretary of state, that she's a republican, on most
7   issues, I am not in agreement with republicans, but she does
8   a really good job of administering her duties as the
9   secretary of state for Washington.  I will vote for her
10  because she does a good job.  I think people should be a
11  little bit more -- less tribal, I think, in their voting.
12      MS. MELL:  Who has an issue here, all of you being
13  from the south sound, with the weight of the Seattle vote,
14  King County?  Has anybody heard that King County elects its
15  officials across the state?  If you don't have the King
16  County vote, you're not being elected.  Any south sounders
17  here have an issue with that?
18      PROSPECTIVE JUROR:  I do.  I do.  I'll be very
19  honest.  Our whole state, the decision of our whole state is
20  weighed within one central area, just based on population.
21  So, sure, sure, I have an issue.
22      The Attorney General, when we vote Attorney General,
23  doesn't matter what our party is, we can vote for either way
24  when it comes to Attorney General.  You were talking about
25  voting party line on that.  You can vote opposite parties on

1    that.

2         MS. MELL:  There is a system here when it comes down

3    to the final day, you can choose who you want to vote for.

4    That's true.

5      Tell me about issues like strong feelings that you would

6    have about a private corporation that is in the detention

7    business.  Some people say, for instance, they would never

8    invest in a corporation that they didn't believe in.  Other

9    people would say, if the corporation pays dividends and is

10    running a successful, healthy company, that's what we are

11    looking for, that's why we have corporations to invest in and

12    that makes the market economy successful.  Others would say,

13    you know, I don't even know what my stocks or my investments

14    are.

15      Who tracks their investment such they wouldn't invest in a

16    company they don't believe in?  Anybody else?

17      No. 12.  Juror No. 12, tell me about your beliefs on

18    corporations and how you should invest in them.

19         PROSPECTIVE JUROR 12:  Can you hear me?

20         MS. MELL:  I can.

21         PROSPECTIVE JUROR 12:  You can.  Okay.  I was going

22    to say, yeah, I mean, I don't know if I am a big investor,

23    whatever.  I would hope that my investments were with

24    corporations that were honest, that were making a profit, not

25    off of exploiting people or whatever, but, you know, making

1    the profits honestly than that and morally would be -- I

2    would hope that my -- most of my investments are in where I

3    used to work and that, so, you know, I don't know that -- I

4    am not a big investor.  I would want -- I would hope that

5    these companies are getting -- making a profit morally,

6    ethically right, that they are not exploiting people in

7    situations like that.  That is probably hard for some, I

8    guess.

9            MS. MELL:  Tell me this:  Is it immoral to be a

10   privately run detention center and develop income from

11   detention services providing a facility for the safe and

12   secure needs of people in government custody?

13           PROSPECTIVE JUROR 12:  I am not a big expert on it --

14           THE COURT:  Excuse me.  Hold on a second.  I am not

15   hearing anything here.  There is something going on with my

16   hearing aids.

17           PROSPECTIVE JUROR 12:  Am I still on?

18           THE COURT:  Wait a minute.  Let's see what is going

19   on with the sound.  Where is Tyler?

20           THE CLERK:  Yes, sir.

21           THE COURT:  All of a sudden there, Tyler, I lost the

22   sound.  I couldn't hear.

23           THE CLERK:  It still shows you as hooked up to audio.

24   Do we need to switch to the headset?

25           THE COURT:  I can't hear him.

 1          THE CLERK:  Rachel, do we need to switch to the

 2    headset?

 3       Your Honor, it looks like you are muted.

 4          THE COURT:  Okay.  Ms. Mell, can you hear me?

 5          MS. MELL:  Yes, Your Honor, I can.

 6          THE COURT:  Okay.  I can hear you so I guess whatever

 7    happened, happened.  I don't know what it was.  I am on the

 8    other system now.  Let's go back to where you were, your

 9    question.

10          MS. MELL:  I am going to ask a new question.  I asked

11    about investing in corporations.  If you are not an investor

12    and not putting money into the stock market, how about

13    working for a company you don't believe in the premise, or

14    you believe they are doing something that you don't like?

15    Anybody here believe you should only work for a company and

16    only take a job you believe in?  Juror No. 7?

17          PROSPECTIVE JUROR 7:  I personally would only work

18    for a company that I believe in.  That doesn't mean everybody

19    has to do that.  A lot of people, they take their jobs where

20    they can get them.

21          MS. MELL:  If I asked you to work for a company that

22    invests in properties and develops properties for detention

23    purposes, is that a place you would consider working?

24          PROSPECTIVE JUROR 7:  That would be fine because, to

25    be perfectly honest, I didn't even know what these detention

 1   facilities were until it was a word on the questionnaire.  I

 2   didn't know they existed.  It is something way down in

 3   Florida, there were kids being kept in some kind of detention

 4   center, and that's about all I knew about that.

 5            MS. MELL:  We are not in Florida, and we are not on

 6   the border doing those kind of things.  Who here believes

 7   they heard something in the media that they believe is going

 8   on in the detention center?  Does anybody have a belief the

 9   detention center holds minors?

10       Do you believe the detention center -- somehow GEO's

11   exploiting anybody there or has any control over the people

12   that are there?

13       Juror No. 4?

14            PROSPECTIVE JUROR 4:  Is it okay to say I never heard

15   of GEO before this day?

16            MS. MELL:  It is.  It is.  It absolutely is.

17       Let's see, Juror No. 6, I wanted to ask you whether or not

18   you had the experience, since you talked about your history

19   of coming to the country when you were 16, have you, since

20   living here, been involved in the immigration issues down at

21   the detention center?

22            PROSPECTIVE JUROR 6:  I was never detained by

23   anybody.  I never been involved in any kind of detention or

24   have any experience in that kind of environment.

25            MS. MELL:  In terms of feelings about that part of

1    the immigration process, do you have strong feelings and

2    negative feelings about the way detention works or doesn't

3    work or the fact it exists?

4         PROSPECTIVE JUROR 6:  This is the first time I hear

5    it is a private company.  I thought it was always the

6    government, like the government offices dealing with people

7    who they caught.  This is the first time I hear it is

8    actually a different company dealing with immigration.

9         MS. MELL:  Does everyone know the detention center

10    down on the Tideflats actually has courtrooms in it, and ICE

11    operates out of there?  People know that ICE is functioning

12    down there, and the processing occurs by the courts who are

13    federal workers, who are part of Homeland Security?  No?

14    Yes?  This is going to be fun.  You are going to learn

15    everything about what goes on in Tacoma.

16      All right.  Juror No. 11, I see you work for ecology, I

17    think, yes.  Do I have the right agency?

18         PROSPECTIVE JUROR 11:  Yes, I do.

19         MS. MELL:  Have you been involved in your work there

20    with the debates that go on in the legislative arena over

21    privatization versus government jobs?

22         PROSPECTIVE JUROR 11:  I don't work in the regulatory

23    or the legislative part of the Department of Ecology.  I work

24    on the science arm.  We do research, environmental research

25    and that kind of thing.

1          MS. MELL:  Do you have a feeling that government only

2     should operate detention?

3          PROSPECTIVE JUROR 11:  I kind of distinguish between

4     detention facilities and prisons.  I don't know that much

5     about detention facilities, so I can't provide an answer on

6     that.  I don't believe that private companies should run

7     prisons, however.

8          MS. MELL:  What is the difference between a private

9     company running a prison and detention in your mind?  What is

10    the difference?

11         PROSPECTIVE JUROR 11:  Like I said, I don't know that

12    much about detention facilities.  My sense is the people that

13    are in the detention facilities, the immigrants, are being

14    detained because they are waiting to be -- see if they have a

15    legal case to become citizens or get on the path to

16    citizenship, so they are being detained for that.

17       People in prison have been convicted of a crime.  It is a

18    different thing.  I don't know if I am right in that or not,

19    but that's kind of my sense of it.

20         MS. MELL:  Has anybody been here since 2007 when

21    Washington grappled with the issue of private use of inmate

22    labor relative to its constitution?  Anybody remember that

23    discussion?  So there was a conversation that went on at the

24    state level about inmate labor and use and private

25    corporations being able to use inmate labor.  Proponents put

1    out a statement in support that basically said offenders

2    shouldn't just sit idle while they serve their time in state

3    prison.  They should work to reduce the burden on taxpayers

4    by paying room and board or other money that they owe.  The

5    one sure way to accomplish this is to allow private

6    for-profit businesses to employ offenders in our prisons

7    without putting the public safety at risk.  Offenders working

8    promotes both inside safe -- safety both inside and outside

9    our prisons.

10        Now, the opposite side was out there saying --

11        THE COURT:  Wait a minute.  Wait a minute.  Get to a

12   question, please.

13        MS. MELL:  There was obviously an opposing side of

14   that.  The opposing side was, that would compete with private

15   industry.  Who has strong feelings on either the proposed or

16   the opposition of that issue?  How about the issue of minimum

17   wage versus independent contract work?  Who on this panel

18   works as an independent contractor?  Who -- let's talk about

19   the Minimum Wage Act.  Minimum Wage Act.  Some people think

20   the government should be involved in setting a minimum wage.

21   Other people would say the market sets the rate, and it

22   facilitates jobs when you don't have rates set by the

23   government.  Who is strongly on the side of government

24   setting the minimum wage?

25        Juror No. 14, tell us about your beliefs in the government

1    setting the minimum wage.

2          PROSPECTIVE JUROR 14:  I think it is just a risk that

3    we shouldn't take.  I would hate to see anybody being

4    exploited, which can happen, unfortunately.  Not everyone has

5    the same concern for their fellow man and so, you know, some

6    businesses, some individuals who run a business could exploit

7    workers.  So, really, to have a fair chance to compete in

8    our -- or to succeed in our economy, workers should have

9    minimum wage, probably a living wage, really.  I would say

10   that is necessary.  I don't know about these people.  They

11   don't sound like regular employees.  Again, I don't have an

12   opinion for sure on this group.  For a regular employee, they

13   should have a minimum wage, and let's hope it is a living

14   wage as well.

15         MS. MELL:  How about on the question of if the

16   government should set it?  Who on the panel thinks local

17   government should set the rate or it should be set at the

18   federal level?

19      Juror No -- let's see, 12, tell me what you think about

20   that.

21         PROSPECTIVE JUROR 12:  Yeah.  I hope -- yeah, I don't

22   think it should just be a blanket minimum wage or whatever.

23   It can vary from county to county or whatever.  That would be

24   my thought on it, belief.  There is -- the cost of living in

25   Seattle is higher than obviously some of the eastern counties

1    in that.  You would have -- it would be -- I can see where

2    there would be a difference in the minimum wage, what it

3    costs to live in Ritzville compared to Seattle.

4        MS. MELL:  Juror 16, how about you?  Have you known

5    anyone or experience in the debate about minimum wages where

6    the concern was if the rate is set at a rate that is too

7    high, that the program or the job would go away?

8        PROSPECTIVE JUROR 16:  I don't have any opinions

9    either way.  I am kind of neutral on this at this point.  I

10   don't have any strong feelings either way.

11       MS. MELL:  Does anybody have the experience of losing

12   a job over minimum wages?

13       PROSPECTIVE JUROR:  I have friends that lost jobs at

14   minimum wage.  They were hired at a certain rate.  When the

15   minimum wage amount went up, was increased, the business

16   reduced their number of employees and managed the business

17   with -- small business, managed the business with two instead

18   of four.

19       MS. MELL:  In that situation, did you or the folks,

20   friends you knew, fault the employer or did they fault the

21   government?  Or they just -- (inaudible) natural transition?

22       PROSPECTIVE JUROR:  They did not fault the employer.

23   They understood when a policy is made, the employer does not

24   have a choice on that.  They did not fault the employer.

25   They had to go find another job.

1          MS. MELL:  So on the more sensitive issue of

2    immigration; who has feelings that detention should not be a

3    tool of immigration, all the needs of our country could be

4    handled through non-secure methods, home monitoring perhaps,

5    some tool or implement like that?

6          PROSPECTIVE JUROR:  Who pays for that?

7          MS. MELL:  That is an issue that I was going to ask

8    you when we were talking about the Attorney General's

9    lawsuits.  Who thinks that it is -- do I want to say that?

10   Who thinks the Attorney General has the decision-making

11   authority over what happens to any recovery in the lawsuits

12   that he brings?  Do people know what happens?  Who follows

13   the legislative cycle?  Anybody here gone down and testified

14   on the budget bill, weighed in on appropriation to agencies?

15   No?

16       How about back to the issue of what is the purpose?  I

17   want to kind of build on Mr. Whitehead's bridges-versus-walls

18   issue.  Does anybody have strong feelings -- I guess some

19   people would say that those people who don't follow the

20   paperwork and don't get here following the rules are not a

21   threat to our communities because they are fleeing asylum or

22   other unpleasant, untenable situations.  Others would say

23   that anybody who is in the United States who hasn't followed

24   the paperwork necessarily are a threat to our safety and

25   security.  Who has an opinion strongly on one side or the

1  other of that framing of the issue?

2    How about No. 16?

3        PROSPECTIVE JUROR 16:  No, I don't have strong

4  feelings either way at this time.

5        THE COURT:  Ms. Rickabaugh had her hand up a minute

6  ago.

7        MS. MELL:  No. 4.

8        PROSPECTIVE JUROR 4:  I did.  Can you rephrase the

9  question for a moment?  I lost my train of thought.

10        MS. MELL:  Oh, sure.  Are you on the side of

11  believing that anyone who hasn't followed the paperwork

12  presents a security threat to the United States or are you on

13  the side of if they didn't follow the paperwork, they are

14  fleeing asylum or some other threat and don't pose a threat

15  being in the United States?

16        PROSPECTIVE JUROR 4:  That is going to come down to

17  an individual.  I -- I guess -- I can't really say I am pro

18  one or the other because some people have to come if they are

19  fleeing a threat.  You know, not only for immigration, but in

20  any circumstance because fleeing a threat, sometimes you do

21  things you wouldn't normally do for safety because that's our

22  nature.  I suppose once they are detained, for lack of a

23  better way to put it, discovering the individual situation

24  and then determining from there what the best thing to do

25  would be would probably be where I would want to land.  I

1  don't know what the law specifically says on that.  I don't

2  think we can blink at everybody that way.  Like I said,

3  people are trying to come, there is no imminent threat from

4  where they are coming from.  They want to become a citizen of

5  the United States and go through the proper route or whatever

6  legal route, you know.  I know people who have had trouble

7  just -- it is a long process, but have done it legally and

8  well.  I don't know anybody that has come illegally and then

9  pursued a legal route.  I think, yeah, it would have to be on

10  an individual basis.  We can't just catch and return people

11  just because they came illegally.  I think it should be -- we

12  should take them on a personal, individual, as a human

13  case-by-case basis.  Did I answer your question?

14            MS. MELL:  Yes.

15            THE COURT:  Thank you, Ms. Rickabaugh.

16      Your time has elapsed, Ms. Mell.

17            MS. MELL:  Thank you, everyone.

18            THE COURT:  Mr. Crosley, tell me a little bit more

19  about your work problem that you described earlier.

20            PROSPECTIVE JUROR 11:  Director of applications at an

21  insurance company.  There is a lot of teams and a lot of

22  people that report to me.  Knowing now this could be four

23  plus weeks, I think it is going to be very difficult for me

24  to be not available during business hours for that duration.

25  I want to do my duty and everything.  If it was going to be a

1   shorter stint, I could juggle both and get work done in the

2   evening and into the night.  That amount of weeks, I think is

3   going to have a really negative impact on my ability to do my

4   job and see projects through.

5           THE COURT:  Who is it you work for?

6           PROSPECTIVE JUROR 11:  Mutual of Enumclaw.

7           THE COURT:  Say that again.

8           PROSPECTIVE JUROR 11:  I work for Mutual of Enumclaw

9   in Enumclaw, Washington.

10           THE COURT:  Mr. Troemel, you also had a work issue.

11           PROSPECTIVE JUROR 2:  Yeah.

12           THE COURT:  Mostly -- go ahead.  I'm sorry.

13           PROSPECTIVE JUROR 2:  I am the sole provider for my

14   family right now.  I cannot -- I am losing about $300 a day.

15   My kids will be home here -- school is out in, like, two

16   days.  I am not going to be able to do this.  I cannot miss

17   work.

18           THE COURT:  Okay.  Thank you.

19           PROSPECTIVE JUROR 2:  Not for $50 a day.  It is too

20   much of a burden.  I make about $300 day.  Being the only

21   sole provider for my family, I cannot miss out on the work.

22           THE COURT:  Ms. Tooley, did you get your computer

23   deal squared away with, who was it?  Your mother?

24           PROSPECTIVE JUROR 7:  I am sure it will probably be

25   fine.  I will let you know if it is not.

 1    THE COURT:  Okay.  We will turn to challenges for

 2  cause.  For this period, we are going to put you back in the

 3  waiting room and we will be back with you hopefully very

 4  shortly.

 5    THE CLERK:  This will take a minute, Your Honor.  I

 6  will let you know when we are ready to proceed.

 7    It appears that all the jurors are no longer in this

 8  session.

 9    THE COURT:  All right.  I am inclined to excuse Juror

10  No. 2.  He not only has his work issues, but also some of the

11  things he said about this, I think, qualify him for release.

12  Is there any objection to excusing Mr. Troemel?

13    MS. MELL:  No, Your Honor.

14    MS. CHIEN:  No objection.

15    MR. WHITEHEAD:  No objection.

16    THE COURT:  I didn't hear.

17    MR. WHITEHEAD:  This is private plaintiffs, no

18  objection here.

19    MS. CHIEN:  No objection from the State.

20    THE COURT:  Ms. Mell, you said no objection?

21    MS. MELL:  No objection.

22    THE COURT:  Juror No. 2 will be excused.

23    Challenges for cause, first for the plaintiff.

24    MR. WHITEHEAD:  We would challenge Juror No. 8.  She

25  expressed a clear bias against illegal immigrants and stated

1  unequivocally on the record she would have a problem deciding

2  a case involving folks that came to the United States

3  illegally.

4      THE COURT:  Ms. Chien, as to Juror No. 8?

5      MS. CHIEN:  We concur with Mr. Whitehead.

6      THE COURT:  Ms. Mell?

7      MS. MELL:  GEO would object to dismissal for cause.

8  I believe that juror would be willing to be fair.  She

9  explained and expressed an ability to hear both sides of the

10  issue and did respond to the questions in a varied way that

11  is not definitive of an inherent bias on the wage and hour

12  issue.

13      THE COURT:  I am not sure I understand the objection

14  for cause as to Juror No. 8.

15      MR. WHITEHEAD:  Juror No. 8 is -- yes, she's the

16  woman that her husband worked on the border patrol.  She

17  expressed a viewpoint that folks that came to the

18  United States illegally, that was problematic for her.

19  Knowing the circumstances behind how people end up at the

20  detention facility are varied, including some people that

21  came without prior permission, I believe that is the way I

22  put the question to her, she said that would be a problem for

23  her.  Those people would face an uphill battle, in her mind,

24  as she sat in view of the evidence.

25      I think one of the other questions I asked her is whether

1   or not she was leaning against people that came to the

2   United States without prior permission.

3       Your Honor, both of those responses indicate that she

4   would not be able to sit with an objective mindset and listen

5   to the evidence in this case.

6           MS. SCHEFFEY:  I would add, my notes say Juror 8 --

7           THE COURT:  Wait a minute.  Wait a minute.  Wait a

8   minute.  Ms. Mell's game here, I am afraid.  I am not afraid.

9   But it is her.  One a side, one a party.

10          MS. MELL:  Yes, Your Honor, we would maintain that

11  this particular witness (sic) said she could keep an open

12  mind and was not biased on the ultimate issue, which was wage

13  and hour.

14          THE COURT:  I am satisfied that I should deny the

15  challenge for cause.  You know, during this voir dire, we

16  were all over the place on everything except the issues in

17  this case regarding minimum wage paid to detainees.  I am

18  satisfied anyway that Juror No. 8 should not be excused for

19  cause.

20      Any other challenges, Mr. Whitehead?

21          MR. WHITEHEAD:  No, I don't believe I have any other

22  for cause.

23          THE COURT:  Ms. Chien?

24          MS. CHIEN:  Nothing for cause.

25          THE COURT:  Ms. Mell?

```
 1                MS. MELL:  No, Your Honor, nothing for cause.
 2                THE COURT:  How many remain from this flight, Tyler?
 3                THE CLERK:  I believe that would leave 11 out of the
 4  original 16.  Five were excused.
 5                THE COURT:  Okay.  Better than I anticipated.  All
 6  right.  I guess we will go to the next flight.  Wait a
 7  minute.  I better --
 8                THE CLERK:  Did you want to bring in Juror No. 2 to
 9  tell him he's excused?
10                THE COURT:  I should talk to the whole panel.
11                THE CLERK:  Just those initial 16 or 11 now?  Okay.
12  I am going to have to bring everybody in and then kick them
13  out again.  There is no better way to do this.  So just a
14  moment.
15      I am going to put most of you back in the breakout rooms.
16  The original 16 will remain here.  Just a moment.
17                THE COURT:  Okay.
18                THE CLERK:  There is one that is not from this flight
19  remaining.  Just a moment.  I am not sure if Juror 25 can
20  move on her own.  I am attempting to put her in the other
21  breakout room, but it is not working for some reason.
22                THE COURT:  I think I have most of our panel here.
23      Mr. Troemel, you may be excused.  Thank you very much for
24  coming in and participating this morning.
25                PROSPECTIVE JUROR 2:  Thank you.
```

```
 1            THE COURT:  The rest of you, just be patient and wait

 2   while we interrogate another panel.  We will be taking a

 3   break at noon for an hour before we get back to the first

 4   panel.  You can plan on being ready to come back to court

 5   after 1:00.

 6        All right.

 7            THE CLERK:  If you would remain signed into Zoom, it

 8   would be helpful instead of signing out and signing back in.

 9        Do you want me to bring in the second group?

10            THE COURT:  Yes, excuse the first panel and bring in

11   the second panel.

12            THE CLERK:  It will take a minute to get everybody

13   shuffled around.  Let me take a minute to put everybody in

14   order.

15        All right.  They are all here in order.

16            THE COURT:  All right.  Ladies and gentlemen, as the

17   screen indicates, I am Judge Bryan.  I'm sorry this takes as

18   long as it takes.  You have been patient to wait.  I

19   appreciate it.  We will go into the afternoon, I am sure,

20   with this process.  We will keep moving along, and it is hard

21   to see from your standpoint, but we are making good progress.

22   So hopefully we will have this completed today.

23        Now, first, we are going to ask you a series of questions.

24   As I indicated earlier, this requires that all jurors be

25   sworn before we ask you questions touching on your
```

1  qualifications.  I would ask that you raise your right hands,

2  and the clerk will administer the oath.

3        THE CLERK:  Do you and each of you solemnly swear or

4  affirm that you will well and truly answer such questions as

5  may be asked of you touching upon your qualifications to

6  serve as jurors in the trial now before the Court?  You can

7  say "I do."

8     (Jurors responded affirmatively.)

9        THE COURT:  Please respond "I do," if you have not.

10     All right.  Maybe I should ask anyone that doesn't.  All

11  right.  Now, did all of you hear my introduction to the case

12  that I read earlier?

13        PROSPECTIVE JUROR 32:  Yes.

14        PROSPECTIVE JUROR 27:  Yes.

15        PROSPECTIVE JUROR 24:  Yes.

16        THE COURT:  Is there anyone that would make a change

17  to the written information that you provided to the court

18  about jury service?  Is all that true and correct to the best

19  of your ability still?

20     Using the Zoom platform for trials is a fairly new thing

21  caused by the COVID-19 pandemic.  We are trying to find ways

22  to keep the courts open and operate consistent with safety

23  and health requirements.  This requires that all concerned,

24  including the jurors, cooperate and promptly report any

25  issues.  I had an issue earlier where my sound went out for

1  some reason.  We need to know right away if you suffer any

2  loss of audio or visual connection.  We need you to cooperate

3  with all aspects of what goes on in order to provide a fair

4  trial to all concerned.

5      Is there anyone that believes you cannot fairly

6  participate in these proceedings using the Zoom platform?

7          PROSPECTIVE JUROR:  No, sir.

8          THE COURT:  Ms. Adkison?

9          PROSPECTIVE JUROR 25:  No.  I am okay with

10 everything.

11         THE COURT:  You say you are okay with everything?

12         PROSPECTIVE JUROR 25:  Yes, I am okay with

13 everything.

14         THE COURT:  I guess the rest of you are, too.

15     We are talking about a time estimate of three weeks for

16 the first phase of the case and possibly another week after

17 that.  That is a time estimate.  Lawyers and judges are

18 terrible time estimators.  Once we start, it takes as long as

19 it takes.

20     Typically, we will be in court or on the Zoom platform

21 from nine to noon and one to four every day until the case is

22 over, with morning and afternoon breaks.

23     Now, is there anything in your life that would make it

24 truly difficult or truly unfair for you to be a juror on this

25 case?

1          PROSPECTIVE JUROR 29:  No, sir.

2          PROSPECTIVE JUROR 25:  Nope.

3          PROSPECTIVE JUROR 20:  I have a vacation planned

4     starting on the 24th of this month.  This is Smith, No. 20.

5     I have a vacation.  It goes from the 24 for about a week and

6     a half.  I would be fine for three weeks.  The extra week, I

7     won't be available.

8          THE COURT:  Let me get a new piece of notepaper here.

9     You have a reservation, you say, Mr. Smith?

10         PROSPECTIVE JUROR 20:  Yeah, it is actually a bowling

11    tournament.  We registered a year ago down in Las Vegas.  It

12    has been planned for quite a while.

13         THE COURT:  Okay.  You are a participant in the

14    tournament?

15         PROSPECTIVE JUROR 20:  Yeah.

16         THE COURT:  I don't want to ask how good a bowler you

17    are.

18         PROSPECTIVE JUROR 20:  It depends.

19         THE COURT:  I want to ask, this is important to you?

20         PROSPECTIVE JUROR 20:  Yeah.  It is the national

21    bowling tournament.  It is actually a trip my family is going

22    to be going with me this time as well.  We are -- we have

23    reservations at different places going there and coming back.

24         PROSPECTIVE JUROR 19:  I am running what is called a

25    sweeper for a bowling league on Friday.

1          THE COURT:  I am -- you are breaking up.  I am not

2    hearing you very well.

3          PROSPECTIVE JUROR 19:  I am running a sweeper for a

4    bowling league on Friday.  As far as I know, I am the only

5    one that can do it.

6          THE COURT:  You run a sweeper?

7          PROSPECTIVE JUROR 19:  Yes, sir.  Yeah.  I don't know

8    how to explain it.  Basically, I am in charge of tracking

9    scores, collecting money.  It is an add-on to a final season

10   for bowling.  And I have a vacation flying out of town July

11   11th.

12         THE COURT:  When is that planned?

13         PROSPECTIVE JUROR 19:  July 11th for five days.

14         THE COURT:  Anyone else?

15         PROSPECTIVE JUROR 18:  No.

16         THE COURT:  Mr. Knight.

17         PROSPECTIVE JUROR 18:  Youngest daughter's high

18   school graduation and family in town the 15th through the

19   17th of June.

20         THE COURT:  I'm sorry, I need you to say that again

21   to hear.

22         PROSPECTIVE JUROR 18:  Our youngest daughter's high

23   school graduation and family, relatives in from out of town

24   the 15th through the 17th of June.

25         THE COURT:  Ms. Burton, you have your hand raised.

1    PROSPECTIVE JUROR 17:  Yes.  I have a couple of

2    things.  Six days a week for four a hours day in our

3    demonstration garden where we are growing food for the food

4    bank and we provide vegetable starts.  It was deemed

5    essential last year when we had the shutdown for COVID; that

6    was the only thing we could do.  We are continuing to do that

7    and provide these to our local food banks.  I am the only one

8    that runs the garden.  Without me, plants won't get watered,

9    food won't go out.  I don't know if that means a lot to you.

10   I am being facetious about that.  I didn't know what level of

11   concern that would raise for you.  For me, it is the job I do

12   right now as a retired person.  It is very important to me

13   and certainly the food banks as well.

14        THE COURT:  Okay.  Mr. Pereira, you had your hand up,

15   too.

16        PROSPECTIVE JUROR 24:  I am a single father and I

17   have a trip planned with my daughter on June 17th, Father's

18   Day weekend through that Monday, I believe, the 21st.

19        THE COURT:  I'm sorry.  I am having trouble with

20   hearing here.  Would you say that again for me?

21        PROSPECTIVE JUROR 24:  As a single father, I have a

22   Father's Day trip planned with my daughter from the 17th

23   through the 21st.

24        THE COURT:  Where are you going?

25        PROSPECTIVE JUROR:  Randle, Washington.  We have a

1 cabin rented.

2       THE COURT:  Mr. Laws, you have your hand up.

3       PROSPECTIVE JUROR 29:  I have a tough work schedule.

4 I am working 12-hour shifts.  I am usually getting home at

5 about two a.m. I think the hardship, you know, me being

6 focused on the case, like, I don't see me really being

7 focused on the case because, you know, I might -- you know, I

8 am going to be probably sleepy most of the time.  During

9 these breaks, I am getting my sleep in.

10       THE COURT:  Mr. MacRobert.

11       PROSPECTIVE JUROR 30:  I am the Washington

12 association representative to the Public Benefits Employees

13 Board.  We have two meetings scheduled this month, June 9 and

14 June 30th.  I was appointed by Governor Inslee in 2018.  I

15 have never missed a meeting.  We have some very important

16 decisions we are going to be making this month with regard to

17 public employee benefits.

18       THE COURT:  Anybody else with problems relative to

19 jury service on this?  I will -- you have something further,

20 Mr. Laws?

21       PROSPECTIVE JUROR 30:  No.

22       THE COURT:  I will deal with those issues that you

23 have raised after lunch.

24     Do all of you have the materials -- camera and laptop or

25 computer and an internet that works -- so that you can

1    continue on this Zoom platform?  Anyone that cannot?

2        Do all of have you a quiet place where you can participate

3    online several hours a day as I described, without being

4    interrupted?

5            PROSPECTIVE JUROR:  Yes, sir.

6            THE COURT:  Mr. Pereira, you are giving me the

7    thumbs-up.  I thought you had something to say.

8        Anyone that could not give the case your full attention?

9            PROSPECTIVE JUROR 26:  No, sir.

10           THE COURT:  Do any of you know any of the lawyers

11   that I introduced earlier?

12           PROSPECTIVE JUROR 26:  No, sir.

13           THE COURT:  I am not sure you saw them.  Did you see

14   the lawyers earlier?  Well, let me introduce them again.

15       For the plaintiff, we have Mr. Whitehead and Mr. Berger;

16   and for the State, Ms. Brenneke, Ms. Chien and Mr. Polozola;

17   and for the defense, Ms. Mell, Ms. Scheffey and

18   Mr. Silverman.  Right?  Okay.  All right.  Do you know of any

19   of those lawyers that are involved in the case?

20       I read a lengthy list of witnesses.  Do any of you know or

21   know of the any of the people on that list?

22       (Jurors respond negatively.)

23           PROSPECTIVE JUROR 19:  There might be a David

24   Johnson.  I have a brother David Johnson.

25           THE COURT:  Where is your brother?

1           PROSPECTIVE JUROR 19:  Portland, Oregon or Long

2    Beach, Washington.

3           THE COURT:  What does he do for a living?

4           PROSPECTIVE JUROR:  Retired and working for Cabela's.

5           THE COURT:  I don't think that is the seem one as the

6    witness.

7       Are any of you or anyone close to you involved with the

8    courts or the administration of justice?

9           PROSPECTIVE JUROR 19:  No, sir.

10          THE COURT:  Any of you involved with law enforcement?

11          PROSPECTIVE JUROR 19:  I am retired from law

12   enforcement.

13          THE COURT:  What did you do before you retired?

14          PROSPECTIVE JUROR:  The first 17 years I was motor

15   carrier enforcement officer.  The last 17 I was safety

16   investigator.

17          MS. MELL:  Your Honor?  Your Honor, I have to ask a

18   question.  I can't tell if Juror No. 30 is watching and

19   presenting via his cell phone or if he is doing something

20   else on his phone.

21          THE COURT:  Thank you.  We want you to be paying

22   attention here even if you feel it is not very interesting.

23      Okay.  It is about noontime.  I want to remind you not to

24   discuss the case with each other or anyone else.  Don't let

25   anyone talk to you about it.  Don't do anything like looking

1   up things on the internet about the case.  Get the case out

2   of your mind for the noon hour, and we will come back to work

3   at 1:00.  I appreciate your patience.  It has been a long

4   morning already.  We are making progress.  We will get

5   through this this afternoon, I think.

6       Okay.  We will call you back to order at 1:00.

7           THE CLERK:  Please remain signed into Zoom.  You can

8   go ahead and shut off your camera and microphone.  If you

9   would stay signed in, that would be helpful.

10          PROSPECTIVE JUROR:  I have one question.  I am using

11  my iPad and it is down to 45 percent.  It was at 100 when we

12  started.  I will try and plug it in.  If I suddenly

13  disappear, I do have my cell phone right next to it.  I can

14  switch over to my cell phone if I need to.

15          THE COURT:  You can go ahead and charge it over

16  lunch.  Just because we have to rename people because of the

17  numbers system, if you can stay signed in, we would greatly

18  appreciate it.  If it is not possible, I understand and we

19  will deal with it.

20          PROSPECTIVE JUROR:  Thank you.

21                  (Recessed.)

22

23

24

25

```
 1                               AFTERNOON SESSION

 2                               JUNE 1, 2021

 3               (The following occurred outside the presence

 4               of the prospective jury panel.)

 5          THE COURT:  Okay.  Can you all hear me?  The

 6   voir dire in the last session, there is way too much talking

 7   and way too little questions.  You don't require a long

 8   dissertation about what the answers might be before you ask

 9   questions.  I almost cut a couple of you off a couple of

10   times when it was just too much talk.  I would call that to

11   your attention.

12      Are we ready to proceed?  A lot of these people gave

13   different excuses.  I am not sure that any of them in and of

14   themselves were sufficient to justify letting them go.  I may

15   have some more questions of them about that.

16      Let's bring the jury in and get going.

17          THE CLERK:  We are just bringing in the second

18   flight, correct?  Okay.

19          THE COURT:  Yes.

20          THE CLERK:  Again, everybody will be coming in, and I

21   have to put the other ones out.  Give me a minute.

22          THE COURT:  Tyler, are we about set here?

23          THE CLERK:  I need to put the last couple of ones in

24   order and then we should be set.

25      Now we are all ready.  We are good to go.
```

1                    (The following occurred in the presence of
2                    the prospective jurors.)
3          THE COURT:  All right.  Folks, I understand a number
4    of you had issues with serving on this case.  I am not going
5    to rule on those at this time.  We will consider them.
6          Are you or anyone close to you involved with law
7    enforcement or the administration of justice?  No lawyers in
8    the crowd?  No police officers?
9          Do any of you have any particular relationship with or
10   particular knowledge about the Immigration and Customs
11   Enforcement agency known as ICE?
12          PROSPECTIVE JUROR 19:  I worked with them a couple
13   times.  This is No. 19.
14          PROSPECTIVE JUROR 26:  No.
15          THE COURT:  Mr. Johnson?
16          PROSPECTIVE JUROR 19:  Yes, sir.
17          THE COURT:  Did you add something?
18          PROSPECTIVE JUROR 19:  I did.  I actually worked with
19   the agency a few times in my career.
20          THE COURT:  What agency?
21          PROSPECTIVE JUROR 19:  ICE and Customs, yes.
22          THE COURT:  What was your job with ICE?
23          PROSPECTIVE JUROR 19:  I just obtained documentation
24   and information for them to proceed with a case against --
25   basically, the driver or the company owner that I was dealing

```
 1    with.
 2         THE COURT:  Going into this case, do you think you
 3    would have some -- that you would be likely to side with
 4    whatever side of the case ICE might seem to be on?
 5         PROSPECTIVE JUROR 19:  Not in this particular case,
 6    Your Honor.
 7         THE COURT:  Do you think you can be fair and
 8    impartial on the issue regarding minimum wage?
 9         PROSPECTIVE JUROR 19:  Yes, Your Honor.
10         THE COURT:  Do any of you have strong feelings about
11    immigration or immigrants or the immigration policy that
12    might cause you to start into the case favoring or
13    disfavoring one side?
14         PROSPECTIVE JUROR 30:  I do.
15         PROSPECTIVE JUROR 25:  I do, too.
16         PROSPECTIVE JUROR 21:  I do, too.
17         THE COURT:  Let me ask you in order.  Let me start, I
18    guess you are numbered in order.  Let me start up here in the
19    upper left, who raised their hand?
20       Ms. Burton, did you have feelings about immigration you
21    wanted to share?
22         PROSPECTIVE JUROR 17:  (Indicated in the negative.)
23         THE COURT:  Mr. Knight, what comes to mind?
24         PROSPECTIVE JUROR 18:  I just feel we need to be
25    taking care of our people here right now, and we just seem to
```

be letting a lot of people in that we can't take care of.  So
it is just difficult.  If I got it right, I mean, the people
in the detention center are there because they tried to get
into the country without following the proper channels.

THE COURT:  Well, not all of them.

PROSPECTIVE JUROR 18:  Sure.  I am sure there are
some exceptions.  In general, the role of that facility is to
house people while they are waiting for their cases to be
heard and they were there because they didn't follow the
proper channels to gain citizenship.

THE COURT:  Okay.  Mr. Johnson, did you have your
hand up?

PROSPECTIVE JUROR 19:  No, Your Honor.

THE COURT:  Mr. Smith?  I don't know who raised their
hand about this question.  Mr. Groves did.

PROSPECTIVE JUROR 21:  I am first generation.  My
father and his family came in legally.  I have no problem as
long as people follow the rules coming into the country.

THE COURT:  Anyone else have strong feelings about
immigration?  Raise your hand.

PROSPECTIVE JUROR 25:  Can you not see me here?

THE COURT:  Ms. Adkison.

PROSPECTIVE JUROR 25:  If they are already in a
detention center, they have either come here illegally or
they have been accused of a crime.  I think they should be

```
 1    deported if that's the case.
 2            THE COURT:  You are making assumptions without
 3    hearing the evidence in this case, I am afraid, Ms. Adkison.
 4    Let me ask you this:  Insofar as that may be relevant, and I
 5    am not sure about that yet, would you be willing and able to
 6    hear the evidence on that subject as to who is housed in the
 7    detention center?
 8            PROSPECTIVE JUROR 25:  Yes, I would.
 9            THE COURT:  And make a judgment based on the
10    evidence?
11            PROSPECTIVE JUROR 25:  Yes, I would.
12            THE COURT:  Mr. Pereira.
13            PROSPECTIVE JUROR 24:  I was married to a European
14    National that went through the legal process to become a
15    naturalized citizen.  I am in support of legal citizenship
16    and proper channels.
17            THE COURT:  Okay.  Who else had their hand up here?
18            PROSPECTIVE JUROR 30:  No. 30.
19            THE COURT:  Mr. Dazey, No. 28.
20            PROSPECTIVE JUROR 28:  I am in the same camp as
21    basically everybody else that has spoken so far.  I would
22    still, like you say, be willing to listen and see the
23    demographics of these folks that are in this facility.
24            THE COURT:  Okay.  Who else had their hand up?
25    Mr. MacRobert.
```

 1          PROSPECTIVE JUROR 30:  I think on the sheet I filled

 2   out, I indicated I have some very strong feelings about what

 3   I consider the school-to-prison pipeline.  I am curious, is

 4   GEO -- GEO is one of the defendants; is that correct?

 5          THE COURT:  Yes.

 6          PROSPECTIVE JUROR 30:  Is GEO a private corporation

 7   that contracts with the federal government?

 8          THE COURT:  Yes.

 9          PROSPECTIVE JUROR 30:  Are they a for-profit

10   organization?

11          THE COURT:  Yes.

12          PROSPECTIVE JUROR 30:  So that's precisely what I

13   object to is profiting off of someone else's misery.

14          THE COURT:  All right.  Okay.  Any other comments on

15   that subject?  Mr. Gordon?

16          PROSPECTIVE JUROR 23:  Thank you, Your Honor.  I just

17   unmuted.  I share Juror No. 30's concerns.  I do feel I can

18   set those aside and consider the facts of this case.

19          THE COURT:  Okay.  Do any of you have any

20   relationship with or particular knowledge about GEO, other

21   than what you have heard in court today?

22          PROSPECTIVE JUROR 30:  I have read quite a bit about

23   not GEO, but ICE and the school-to-prison pipeline as it is

24   so usually known as.

25          THE COURT:  Do any of you have knowledge about or

1  relationship with the State Department of Labor & Industries

2  or the Attorney General's Office?

3           PROSPECTIVE JUROR 29:  No, sir.

4           PROSPECTIVE JUROR 25:  No.

5           THE COURT:  Do any of you have strong feelings about

6  ICE or GEO that would cause you to start into the case

7  favoring or disfavoring one side?

8           PROSPECTIVE JUROR 21:  No, sir.

9           PROSPECTIVE JUROR 25:  No.

10          THE COURT:  We touched on that subject a little bit

11  already.  Do any of you have strong feelings about minimum

12  wage laws in general that might cause you to start into the

13  case favoring or disfavoring one side or the other?

14          PROSPECTIVE JUROR 18:  Yes.

15          THE COURT:  Who answered "yes"?  Mr. Knight?

16          PROSPECTIVE JUROR 18:  Yes, I do.  My concern is that

17  if we got incarcerated individuals and they want to get paid

18  the same wage or more than individuals who have not done

19  anything to get placed in this institution, we are already

20  paying for them to be there, and as a taxpayer, now they want

21  to get paid even more.  It is just ridiculous.  They are

22  getting free room and board and health care and all that

23  other stuff already.  And now they -- you are -- it sends me

24  sideways.

25          THE COURT:  As with some of the other comments, I am

1   afraid you are assuming facts that are not yet in evidence

2   that may or may not be accurate.

3        Further comment, Mr. Dazey, on this matter?  You are

4   muted.  You are muted, Mr. Dazey.  I don't know, we can't

5   hear you unless you unmute.

6            PROSPECTIVE JUROR 28:  I apologize, Your Honor.  I am

7   in the same camp as his comments.  That's about all I can

8   say.

9            THE COURT:  Any other comments on the last question?

10           PROSPECTIVE JUROR 26:  No, sir.

11           PROSPECTIVE JUROR 30:  Would you mind repeating that

12  last question?

13           THE COURT:  I am not sure I can.  I think it was

14  about any strong feelings about ICE or the GEO Group or, for

15  that matter, the State of Washington, that might cause any of

16  you to have strong feelings starting into the case that might

17  cause you to favor one side or the other.

18           PROSPECTIVE JUROR 30:  I would have to answer yes.

19           THE COURT:  And what are your feelings,

20  Mr. MacRobert, that you refer to?

21           PROSPECTIVE JUROR 30:  Well, I think I indicated that

22  I have over the last four or five years done some research on

23  ICE.  Not specifically about them, but just about the whole

24  immigration issue.  I am very political.  In my research, I

25  have read a lot of things that I find very disturbing.  I am

```
 1    also --
 2          THE COURT:  Let me ask you -- excuse me,
 3    Mr. MacRobert.  I don't want to ask you what you might have
 4    learned in your research.  Do you think starting into this
 5    case you may have strong feelings one way or the other?
 6          PROSPECTIVE JUROR 30:  Probably, yes.
 7          THE COURT:  I think I should excuse you.  You may be
 8    excused.  Thank you, Mr. MacRobert.  I appreciate you
 9    participating in this process.
10       Do any of you have any feelings about anything we have
11    discussed that would make it difficult for you to be fair or
12    impartial in this trial?
13       I asked about minimum wage generally.  Mr. Knight
14    responded.  Do any of the others have strong feelings that
15    might cause you to favor one side or the other in this case
16    on minimum wage?
17          MR. WHITEHEAD:  This is Mr. Whitehead from the
18    private plaintiffs.  Juror 28 had raised his hand to your
19    last question.
20          THE COURT:  Mr. Dazey?
21          PROSPECTIVE JUROR 28:  Yes, I feel pretty -- I can't
22    think of the words right now, but not unlike the last
23    gentleman.  I do a lot of reading.  I don't know.  I am not
24    very happy the way they are working it.
25          THE COURT:  Do you think from your reading and what
```

1    you may know about that you might find it difficult to be

2    fair and impartial in this case?

3              PROSPECTIVE JUROR 28:  I am pretty strong headed on

4    things like that, so, yes.

5              THE COURT:  Yeah.  Okay.  Well, I will excuse you as

6    well, Mr. Dazey.  Thank you very much.  You can check out.

7    Thank you.

8         Anyone else have a comment about minimum wage laws

9    generally?

10             PROSPECTIVE JUROR:  No, sir.

11             THE COURT:  Mr. Groves.

12             PROSPECTIVE JUROR 21:  I feel the minimum wage is out

13   of control right now.  If we are doing minimum wage for

14   everybody, no one is going to be able to afford to live in

15   the near future.

16             THE COURT:  Do you think your feeling in that regard

17   would affect the -- your jury service in this case?  That you

18   might start into the trial favoring or disfavoring one side

19   or the other?

20             PROSPECTIVE JUROR 21:  I am not 100 percent sure.

21   No, sir.

22             THE COURT:  I'm sorry, I didn't hear everything you

23   said.

24             PROSPECTIVE JUROR 21:  I said I am not 100 percent

25   sure that I would be unbiased.

```
 1          THE COURT:  Well, I think we'll come back to that.
 2       Do any of you have strong feelings about privately run
 3   detention centers generally that might cause you to start
 4   into the case with some bias or prejudice, one side or the
 5   other?
 6          PROSPECTIVE JUROR 32:  No.
 7          THE COURT:  Do any of you have strong feelings about
 8   class actions generally that might cause you to start into
 9   the case with bias or prejudice one way or the other?
10          PROSPECTIVE JUROR 26:  No, sir.
11          THE COURT:  Is there anything about this case that
12   might cause any of you to start into the trial with feelings
13   or concerns that would favor one side or the other?
14          PROSPECTIVE JUROR 26:  No, sir.
15          THE COURT:  Any reason you might not be able to try
16   this case impartially?
17          PROSPECTIVE JUROR 26:  No, sir.
18          THE COURT:  Anything we have not discussed that you
19   think you should bring up at this point?
20          PROSPECTIVE JUROR:  No, sir.
21          THE COURT:  We will go to questions from counsel.
22   Please give your attention first to Mr. Whitehead.  Is that
23   correct, Mr. Whitehead?
24          MR. WHITEHEAD:  Yes, Your Honor.  That's right.
25       Thank you.  I started to say good morning, but that's
```

1    wrong.  It is good afternoon.  I am Jamal Whitehead.  I am

2    one of the attorneys for the private plaintiffs.

3        My guess is if you are anything like me and you watch TV

4    and the law shows, you may be thinking that this is the part

5    of the trial where the lawyers ask trick questions trying to

6    psychoanalyze you to figure out who is good for their case.

7    I don't like to do it that way.  Really, what I want is to

8    have a conversation with you.  I want to know who wants to be

9    here, who wants to serve on the jury.  I want to know who can

10   do that with an objective mindset.  I can't give you specific

11   details about the case.  I would love to.  I can't talk about

12   the evidence.  I will get in trouble.  What we can talk about

13   are some of the principles that are at play here.

14       I will ask questions to get the ball rolling.  I am not

15   trying to pry or to embarrass you, but, you know, my goal is

16   to just have a conversation.  I want you to be brutally

17   honest both with me and yourself about whether or not you can

18   sit and listen to the evidence here with an objective

19   mindset.  Doesn't mean there is anything wrong with you if

20   you can't.  We all come to this life with experiences and

21   strong notions on some issues.  You know, in talking --

22            THE COURT:  Let's get to a question, Mr. Whitehead.

23            MR. WHITEHEAD:  All right.  Let's do that.  I said

24   brutal honesty, I am going to start.  If I am being brutally

25   honest with you, I am concerned that I represent people that

1  are or were in an immigration detention facility.  Everyone

2  in this case will tell you they are not held there as

3  punishment.  I am concerned some people will hold their

4  immigration status against them nevertheless.  My question to

5  you is this:  What trouble would you have, if even a little

6  bit, deciding a case about wages for people held inside an

7  immigration detention facility?  Anybody want to get the ball

8  rolling?  Some brave soul?

9          PROSPECTIVE JUROR 17:  I don't have any problem

10  looking at that question.  I am not sure I understand fully

11  what you mean.  I don't have any problem looking at what the

12  State of Washington requires, what (inaudible), and the

13  contract they have with the private organization.  It seems

14  like there is a lot of pieces moving in this case.

15          MR. WHITEHEAD:  There are.  I can't wait to tell you

16  all about them.  I do want to hear from everyone.  So thank

17  you very much for sharing.  I appreciate it.  I am just going

18  to work across my screen.

19      Mr. Knight, Juror No. 18, tell me about it.

20          PROSPECTIVE JUROR 18:  As I mentioned earlier, I have

21  a real concern.  We are providing health care, room and

22  board.  And if these people are being held there for a

23  reason, they supposedly have a debt to society and now they

24  want more money, and who is going to end up paying that?  It

25  is going to end up ultimately being the taxpayers, because

the taxpayers just contracted with a private organization to

provide these services.  It is just going to increase our

costs.  I guess if a person wants to work for a fair wage,

they shouldn't do things that would get them in a position to

be placed in a facility like this.

MR. WHITEHEAD:  Thank you for sharing.  I truly

appreciate it.  We are trying to have a conversation.  So let

me ask you:  In terms of what you have just expressed to me,

right, what I am trying to figure out is whether or not the

plaintiffs in this case will get a fair shake.  I know you

will listen to the evidence.  I am not going to ask you that

question.  But my question is, as you sit here at neutral,

not having heard the evidence or looked at the documents or

looked at any of the testimony, are you leaning ever so

slightly against immigrants proving their claims in a case

like this?

PROSPECTIVE JUROR 18:  Again, these are people that

my understanding is they have been caught trying to enter the

country illegally.  They weren't like a former employee of

mine who went through the work visa program, legally came

here to the United States, went through all the paperwork and

all this and that and went through the process like I think

some of the other folks in this group have described.  My

former employee didn't end up in a detention center.  He did

things right.  You people running the border, it is just --

1  we seem to be letting more and more of them in nowadays with

2  the change in administration.  It is just -- yeah, it just

3  kind of makes me really upset to even talk about this

4  subject.  More could be done to prevent people from coming

5  into our country that is not being done the last several

6  months.

7          MR. WHITEHEAD:  Thank you.  You are 100 percent

8  entitled to your beliefs.  No one can tell you to set aside

9  your beliefs, not even the judge, frankly.  My question is

10  whether or not the folks that have claims in this case, if

11  you come into this because of your own experience disfavoring

12  their claims.

13          PROSPECTIVE JUROR 18:  You know, I guess it is the

14  type of thing where it's something I don't want to be

15  involved in.  There is people -- if there is people who want

16  to do jury service, then they need to go for it.  Myself, you

17  know, especially a matter like this, it is just going to be

18  totally frustrating the whole time to sit here for weeks on

19  end and listen to stuff that, you know, ultimately in the

20  end, it is likely going to cost us taxpayers a ton more money

21  either through the legal process or if there is an award for

22  wages in that process, because it ultimately falls on the

23  taxpayers, and our national debt is just spiralling out of

24  control.  This will only add to it.

25          MR. WHITEHEAD:  Thank you.  I appreciate you sharing.

1          THE COURT:  Thank you, Mr. Knight.

2          MR. WHITEHEAD:  I'm sorry, was there a question,

3   Your Honor?

4          THE COURT:  Yes.  Go ahead.

5          MR. WHITEHEAD:  Just by show of hands, who else has a

6   similar view to Mr. Knight?  If you could keep them up, I am

7   going to call out the numbers, Juror 24, Mr. Pereira; Juror

8   No. 25, Ms. Adkison.

9      Thank you.

10     Let's see, Mr. Pereira, tell us about it.  What are your

11  thoughts?

12         PROSPECTIVE JUROR 24:  I echo much of what Juror

13  No. 18 spoke about.  I haven't heard all the evidence.  I

14  don't want to speak without hearing the evidence.  As I have

15  stated before, I was married to a lady who came from Europe.

16  Did the naturalization and the resident process legally.  To

17  me, I believe we do afford those opportunities to everybody

18  who comes through legally.

19         MR. WHITEHEAD:  So with your prior personal

20  experience and your wife coming through through proper

21  channels, do you think you would hold it against folks, maybe

22  even just a little bit, that came to the United States

23  without prior approval?  Or didn't go through those official

24  channels?

25         PROSPECTIVE JUROR 24:  There must be a reason why

1   they are in the detention center.  Again, I am speaking out

2   of turn if I didn't hear all the evidence.

3           MR. WHITEHEAD:  Last question:  As you sit here,

4   would you be able to approach the evidence with an objective

5   mindset or do you feel like maybe you would be leaning, even

6   if it is just a little bit, against people that didn't come

7   through the proper channels?

8           PROSPECTIVE JUROR 24:  I am pretty objective.

9           MR. WHITEHEAD:  I am running short on time here.

10  Ms. Adkison?

11          PROSPECTIVE JUROR 25:  I'm pretty much the same way

12  as Mr. Knight.  I can be objective, too.  I can listen to the

13  evidence, and I do have a strong opinion about illegal aliens

14  coming into this country not through the proper channels.

15          MR. WHITEHEAD:  Thank you for sharing.  Juror No. 19,

16  we haven't heard from you.

17          PROSPECTIVE JUROR 19:  I have to unmute.  Sorry.  I

18  have had experiences on both sides.  From the enforcement

19  side working with ICE, I stopped a driver that was here

20  getting paid cash to work in the United States illegally.  I

21  provided the documentation to take action against him, along

22  with his boss and -- his boss.  Also, I was living in north

23  Portland and our church community there was part of the Dole

24  plant that was attacked many years ago and many people

25  deported, and they were making less than minimum wage.  I am

1    on both sides of it.  I don't know.

2         MR. WHITEHEAD:  Thank you for sharing.  Let's see.  I

3    am going to go across the top row on my screen.

4       Juror No. 21, Mr. Groves is it?

5         PROSPECTIVE JUROR 21:  Yes, Mr. Groves.  I just have

6    concerns about someone being in detention and getting minimum

7    wage.  You are being provided for as it is, if I understand

8    correctly.  They are getting a pittance for what they are

9    doing.  Maybe "pittance" is not the correct word.  Getting

10   something for what they are doing.  I am not sure minimum

11   wage is the correct way to go.

12        MR. WHITEHEAD:  As you think about your experiences

13   and your beliefs, do you think you would have trouble

14   deciding a case about wages for immigrants held inside an

15   immigration detention facility.

16        PROSPECTIVE JUROR 21:  I don't have anything against

17   the immigrants.  Anybody that is in a detention center per se

18   being paid minimum wage.

19        MR. WHITEHEAD:  It's not so much the immigrants, just

20   the idea of minimum wage?

21        PROSPECTIVE JUROR 21:  Correct.

22        MR. WHITEHEAD:  Tell me more about that.

23        PROSPECTIVE JUROR 21:  If I recall, minimum wage was

24   started to help youngsters get started in the world.  It

25   wasn't created to be a sustaining wage for -- to maintain a

1    lifestyle.

2        MR. WHITEHEAD:  Okay.  Let's see.  Juror 22, I don't

3    think we have heard from you.

4        PROSPECTIVE JUROR 22:  I really don't have an opinion

5    on wages and immigration for being minimum wage.  I don't

6    know what the laws are.  I know prisoners in actual prison

7    cells don't make minimum wage.  I don't know if that would

8    apply to the detention center or not.  I would have to hear

9    the testimony and what it would be about.

10       MR. WHITEHEAD:  Thank you for sharing.  Juror No. 23,

11   Mr. Gordon.

12       PROSPECTIVE JUROR 23:  I echo Juror No. 22's feelings

13   about this.  My main question is:  What is the law?  We are

14   not going to try and change the law.  We need to know the

15   law.  I am not sure it will be part of the evidentiary

16   process we go through.  In terms of a bias either against a

17   corporation or against individual immigrants, again, I can

18   set those feelings aside.

19       MR. WHITEHEAD:  Thank you, sir.

20     We have heard from Juror Nos. 24 and 25.  Juror No. 26,

21   Mr. Minor, tell us, what are your thoughts?

22       PROSPECTIVE JUROR 26:  Well, I feel that America was

23   born on immigrants and the great melting pot.  I'm saying, so

24   why -- okay, say you come from a country, say you might be

25   less than, know what I mean, but I'm saying so why don't you

1    give this person a chance?  They might enhance the country

2    coming into the country.  I am saying not because all you are

3    immigrants you are going to come here and do something bad.

4    I don't see it that way.  I'm saying how are you going to

5    form opinion and you haven't even given this person a chance

6    yet?

7              MR. WHITEHEAD:  All right.  Thank you for sharing.  I

8    appreciate that.

9         Juror 27, Ms. Van Well.  Hi.

10             PROSPECTIVE JUROR 27:  I guess I do have the -- what

11   the judge told us about earlier about unconscious biases.  I

12   can see both sides of it.  I think immigration is very

13   necessary.  Like the last gentleman said, our country was

14   built on it.  But I also think that paying detainees minimum

15   wage is not the way to go.  I think -- I don't know the

16   reason that they were there in the first place.  I think I

17   would have to hear the evidence before making up my mind.  My

18   heart says one thing, but it is not the truth or the

19   evidence.  It is not hard, you know what I mean?  I want to

20   listen to what others have to say.  I think that we do need

21   to make some reform in immigration.  I don't know the answer

22   to that.  I mean, nobody in this government seems to know the

23   answer on how to fix it.  It needs to be fixed.  But we do

24   need -- we need our immigrants.  We need our workers, and

25   they do jobs that others do not want to do.  That is part of

1   evolution.  Every country has its immigrant workforce.  I

2   think we should treat people fairly.  I don't think the

3   minimum wage is the answer.

4        MR. WHITEHEAD:  Thank you.  Let's see.  I don't know

5   how much time I have left.

6        THE COURT:  You have zero time.  You went over a

7   minute.

8        MR. WHITEHEAD:  I said, "I don't know how much time."

9   I think I should have said, "I suspect I don't have any time

10  left."  I will end there.  Thank you for your time.  I

11  appreciate it.

12       THE COURT:  Who is next?  Ms. Chien?

13       MS. CHIEN:  Hi.  My name is Marsha Chien.  I

14  represent the State of Washington.  Separate from

15  Mr. Whitehead who represents the detainee workers, I

16  represent the State of Washington, and I work for the

17  Attorney General's Office.

18     You may have heard of the Attorney General, Bob Ferguson.

19  I would like to ask how many people have heard of a lawsuit

20  that Bob Ferguson has brought against individuals and

21  businesses to protect Washington residents.  If you could

22  raise your hand, that would be helpful to me.  18, 17, 26,

23  23.

24     I would like to start with Juror No. 17.  Can you tell me

25  about the lawsuits and what you heard about them?

1          PROSPECTIVE JUROR 17:  I was proud to be from

2    Washington with his work towards the issues from the Trump

3    Administration.  As I recall, he led the battle for that

4    across many different states, the Attorney General who led

5    that.  I was very proud of him.  I am delighted to be a

6    resident of Washington state for the way he defended people

7    that didn't have a voice.

8          MS. CHIEN:  Juror No. 18, you also raised your hand.

9    Have you -- what did you think about the lawsuits that you

10   have heard of that Bob Ferguson has brought?

11         PROSPECTIVE JUROR 18:  There is a reason he's known

12   as Bobby Sue.  Seems like he spent a lot of time trying to

13   chase President Trump around for his own exposure towards a

14   gubernatorial run after Inslee's term is done.  I guess I

15   don't have any respect for the Attorney General.  I think

16   he's just a political animal that happens to have obtained

17   election as a democrat in a state that is really blue to a

18   position where he can just go file lawsuits and not really

19   focus on the people of the state of Washington, but a matter

20   of trying to get his name recognition, and anything that the

21   president tried to do, he was there filing lawsuits.  It was

22   just an incredible waste of our resources and our tax dollars

23   funding his activities for his own personal gain.

24         MS. CHIEN:  If I told you this lawsuit did not have

25   anything to do with the Trump Administration, would that

1  change your views?

2       PROSPECTIVE JUROR 18:  No.  I don't have any respect

3  for Bob Ferguson for what he's done, the track record he's

4  created.  President Trump did tremendous things to bring our

5  country forward.  He was just -- for political reasons was

6  just trying to stand in the way.

7       MS. CHIEN:  Would you have a difficult time being

8  fair and impartial if I told you that one of the parties was

9  represented by the Attorney General?

10       PROSPECTIVE JUROR 18:  Nothing against you.  I am

11  sure there is a lot of very competent attorneys in the

12  office.  But just the man at the top is, you know -- I mean,

13  there is just interviews he won't do with the media because

14  he doesn't want to respond to the tough questions in the

15  media, even though he has been asked many times.  I just

16  don't have any respect.  I was hoping he was going to get

17  defeated.  There is too many democrats who vote by the letter

18  behind the person's name on the ballot.

19       MS. CHIEN:  Would the Attorney General's Office have

20  an uphill battle with you in terms of proving its case given

21  your beliefs on Mr. Ferguson?

22       PROSPECTIVE JUROR 18:  Yeah, the credibility coming

23  from his side, I just think we need somebody who is not a

24  politically-based person with a politically-based

25  organization is what he has created.  I am just ashamed.  I

 1    understand Juror 17 is proud to be a Washington resident.  I

 2    know a lot of people moving out of the state of Washington

 3    because they feel the same way I do.  They are ashamed.  When

 4    I travel I said, yeah, I'm from Seattle.  People know where

 5    they were --

 6            THE COURT:  I think you have made your point,

 7    Mr. Knight.

 8            MS. CHIEN:  Thank you.  Does anyone else agree with

 9    what Mr. Knight is saying?  If you could raise your hand, I

10    would appreciate it.

11        So --

12            THE COURT:  Mr. Laws, did you have your hand up?  I

13    can't see.

14            PROSPECTIVE JUROR 29:  No, my arm is stretching.

15            THE COURT:  Okay.

16            MS. CHIEN:  Has anyone else heard about the Attorney

17    General's Office bringing a lawsuit also against the Trump

18    Administration?  Mr. Gordon, Mr. Dye.

19        I would like to ask -- we haven't heard from Juror No. 31,

20    Mr. Dye yet.  I would like to hear what your opinions are of

21    the lawsuits against the Trump Administration.

22            PROSPECTIVE JUROR 31:  It is hard for me to define

23    what bearing that would have on this case.  I really don't

24    have enough information to judge how the big-picture issues

25    that we are talking about would bear on this because I have a

 1   feeling it is going to boil down to a bunch of more mundane

 2   law like contract law, minimum wage law and other things that

 3   underlie business relationships among these entities.  If you

 4   want me to, I can tell you how I feel about the Attorney

 5   General's suits filed over the Trump Administration actions,

 6   but I am not sure it applies here.

 7        MS. CHIEN:  Thank you.  Appreciate that.

 8     Mr. Gordon, did you have an opinion about the lawsuits

 9   brought by the Attorney General's Office against the Trump

10   Administration?

11        PROSPECTIVE JUROR 23:  Earlier I was going to say I

12   was embarrassed, although I have a generally positive tone

13   about the Attorney General's lawsuits he brought outside the

14   Trump Administration, but I can't remember specifically what

15   those were.  I just have a general positive tone around that.

16     Regarding the Trump Administration, I have a positive view

17   of the tribunal for actions from that.  I don't anticipate

18   that having any bearing on my ability to consider evidence in

19   this case.

20        MS. CHIEN:  Thank you.

21        THE CLERK:  I believe it looks like we lost Juror

22   No. 29.  Juror 29, Mr. Laws?

23        MS. SCHEFFEY:  Yeah.  While we're taking a break, I

24   just wanted to say that Juror 17, sometimes I have trouble

25   hearing you, if you could talk into the camera, that would be

1    helpful.

2         THE CLERK:  It looks like Juror 29 is able to sign

3    back into Zoom.  Hopefully he'll be able to get his camera

4    back on.  There we go.

5         THE COURT:  Here he is.  We lost you for a minute,

6    Mr. Laws.

7         PROSPECTIVE JUROR 29:  My computer died.

8         MS. CHIEN:  Should I continue?

9         THE COURT:  Yes, please, go ahead.

10        MS. CHIEN:  I want to sort of circle back to

11   something that Mr. Whitehead started.  If I told you all that

12   one of the parties of this lawsuit were undocumented workers,

13   meaning they did not have permission to work, would that

14   change anybody's views as to whether or not they could be an

15   impartial juror on this panel?

16        PROSPECTIVE JUROR 26:  No, ma'am.

17        MS. CHIEN:  Okay.  Going back to the Attorney

18   General's Office, who has heard of lawsuits the Attorney

19   General's Office has brought separate from the Trump

20   Administration?  Sounds like some of you think there might be

21   ones.  Has anyone heard of actual lawsuits that the Attorney

22   General's Office has brought?

23       Who thinks the role of the Attorney General's Office is to

24   sue private businesses or individuals when it's to protect

25   Washington residents?  Can you raise your hand?

1       Call on Juror No. 24.  Can I ask you to tell me about your

2   opinions of the Attorney General's Office suing private

3   businesses and individuals?

4           PROSPECTIVE JUROR 24:  I think it is their role to

5   protect Washington citizens.  Whether we agree with it or

6   not, he's our elected official.

7           MS. CHIEN:  Does anyone disagree with what

8   Mr. Pereira says?  I hope I pronounced that correctly.  It is

9   the Attorney General's role to enforce our laws?

10          PROSPECTIVE JUROR 26:  Yes.

11          MS. CHIEN:  Does anyone think the Attorney General's

12  Office sues too often or too many times, shouldn't sue as

13  much as they have been suing?

14          PROSPECTIVE JUROR 26:  No.

15          MS. CHIEN:  Does anyone else have any other concerns?

16  Okay.

17      I hope I have a minute or two, and ask of the jurors what

18  the purpose of a private company is.  We have spoken about

19  the government, but the other entity in this case is a

20  private company.  I am curious to ask you all what the

21  purpose of a private company is.  Maybe I can start with

22  Juror No. 19.

23          PROSPECTIVE JUROR 19:  Just simply a company to

24  manage what might have been done by a government agency at

25  one point in time.  They contract it out to a private company

 1    to do the same job.

 2          MS. CHIEN:  Just sticking with that, actually.  Does

 3    the contract change the entity -- when a private company

 4    contracts with the government, does that change the status of

 5    that company in your opinion?

 6          PROSPECTIVE JUROR 19:  It could.  Just depends on the

 7    circumstances.

 8          MS. CHIEN:  Juror No. 20, I haven't heard from you in

 9    a little while.  Do you have anything to weigh in on the

10    Attorney General's Office or the lawsuits the Attorney

11    General's Office may have brought?

12          PROSPECTIVE JUROR 20:  No, that's part of their job.

13    They are looking out for us and making sure everybody is

14    following the laws.  Nothing bad to say.

15          MS. CHIEN:  I am going to turn to Juror 21, also

16    going across my screen, and ask, you have expressed some

17    opinions about the minimum wage laws.  I am wondering if you

18    have any concern about the State of Washington enforcing our

19    minimum wage laws?

20          PROSPECTIVE JUROR 21:  Not about enforcing the

21    minimum wage.  I think the minimum wage is too high.

22          MS. CHIEN:  If you think the minimum wage -- if

23    somebody told you that the minimum wage is too high, but that

24    is the law, would you be willing to accept it?

25          PROSPECTIVE JUROR 21:  I would accept it, even though

1    I disagree with it.

2            MS. CHIEN:  Okay.

3        Your Honor, I am not sure of my time.  Maybe I shouldn't

4    ask the question.

5            THE COURT:  Thank you.

6        Ms. Mell.

7            MS. MELL:  Mic on.  Can you hear me now?

8        Mr. Minor, I wanted to ask you, do you have kids?

9            PROSPECTIVE JUROR 26:  No, ma'am, I don't.

10           MS. MELL:  Did you grow up having to do chores in

11   your own house?

12           PROSPECTIVE JUROR 26:  Yes, ma'am, I sure did.

13           MS. MELL:  How were the rules in your household about

14   compensating you for doing the chores around the house?  Was

15   there any parent or whoever you were answering to about

16   chores, did they pay you to do them?

17           PROSPECTIVE JUROR 26:  No, ma'am, they didn't pay

18   anything.  I had my mom and my dad, and we just did the

19   chores.  It was no paying.  Like I said, I grew up in

20   Alabama.  I'm saying we did the chores, we worked on the farm

21   and stuff like that.

22           MS. MELL:  What kind of farm?  What kind of animals?

23           PROSPECTIVE JUROR 26:  We did pigs, chickens, cows,

24   horses, grew watermelon, corn, stuff like that.

25           MS. MELL:  On the farm, did that mean chores happened

1    at five in the morning?

2            PROSPECTIVE JUROR 26:  Yes, ma'am, then we go to

3    school.

4            MS. MELL:  And then you did the chores again, right?

5            PROSPECTIVE JUROR 26:  Yes, ma'am.

6            MS. MELL:  Who thinks that doing chores around the

7    house, that your kids or you should have earned minimum wage

8    doing the chores around the house?

9            PROSPECTIVE JUROR 26:  No one.

10           MS. MELL:  Mr. Gordon, how about you?  At what point

11    is work paid work, minimum wage work?  Chores?  Something

12    else?

13           PROSPECTIVE JUROR 23:  Well, it is whatever the law

14    says is the floor for that.  What seems to be, you are

15    putting in -- if you make the contract with an employer to be

16    paid a certain amount, then you should be paid that amount.

17    If the contract is out of compliance with the law, it should

18    be changed, should be amended to reflect the law.

19        I worked in the strawberry fields from the age of nine or

20    ten where I lived in Southwest Washington.  The minimum wage

21    was very low.  We were paid a fee rate.  We agreed to that,

22    or our parents agreed to it.  That is another example, I

23    guess.

24           MS. MELL:  Did you know that in your status as a farm

25    worker you were exempt from the Minimum Wage Act?

1        PROSPECTIVE JUROR 23:  At the time that I was -- I am

2    not even sure the Minimum Wage Act covered farm workers back

3    in the 1960s.  I don't know.

4        MS. MELL:  So with regard to issues where you can

5    converge, issues on immigration and work, do you think that

6    your work status, or the government's granting you work

7    status should affect whether or not you get paid minimum

8    wage?  23, I am still on you.  I am still picking on you,

9    Mr. Gordon.  I'm sorry.

10        PROSPECTIVE JUROR 23:  I -- again, there is the law,

11    which we follow, and then there may be what is morally right

12    or what is compassionate to that group of people.  They may

13    be the same or they may be different.  I prefer to be

14    compassionate and help people meet their needs to help their

15    family.  The bottom line is, what does the law say?

16        THE COURT:  Excuse me, Ms. Mell.  I think the last

17    question really asks the jurors to say what the law is or

18    what he thought the law was.  That is on the list of

19    do-not-ask questions.

20        MS. MELL:  I apologize, Your Honor.  I will change

21    course accordingly.

22        PROSPECTIVE JUROR 23:  Don't ask and I won't tell.

23        MS. MELL:  I don't know how that law worked out for

24    folks.  Actually, that is a good question.  What do people

25    think about laws that are unfair?  Do people think that

1    notice is important to fair laws, notice to the person who

2    the law affects?  No. 22, Mr. Swessel?

3         PROSPECTIVE JUROR 22:  Swessel, yeah.  What was the

4    question again?  You want to inform the person of the laws

5    before they --

6         MS. MELL:  Yeah.  Do you think in order for

7    government to fairly enforce its laws, it has to give notice

8    to the people who the law is intended to affect?

9         PROSPECTIVE JUROR 22:  Well, there is an awful lot of

10   laws that we have, and I am not aware of all of them myself.

11   I think it would be very difficult to inform everyone of all

12   the laws.  I don't know how to really answer that.  I don't

13   know what vehicle we would have to say, okay, here is all the

14   laws, now I want you to read through them and make sure you

15   understand them all.

16        MS. MELL:  Have you any experience with government

17   contracting and what government contractors are required to

18   attest to or say or promise when they enter into a government

19   contract?  Do you know?

20        PROSPECTIVE JUROR 22:  For, like, in my position in

21   the past, I had to work for the government.  I had to abide

22   by whatever they told me I had to do.  That was part of the

23   company's contract with them, if that's what you mean.

24        MS. MELL:  Did you rely on, I don't know who, the

25   contract enforcement officer to tell you what you were

1    supposed to be doing so you didn't run afoul of following the

2    law?

3          PROSPECTIVE JUROR 22:  I was provided documentation

4    that I had to read through and sign saying I understood all

5    the rules.  I read through it and signed it.  I knew what I

6    was doing with that, with the government, what I could and

7    could not do.

8          MS. MELL:  With regard to immigration issues, do you

9    spend much time reading about immigration?

10          PROSPECTIVE JUROR 22:  I don't read about it.  I hear

11    a lot of it in the news when I watch the local news or CNN,

12    or whatever, if I am flipping through it.  I don't actively

13    seek it out.

14          MS. MELL:  You are not doing any work around

15    immigration by way of advocacy or volunteer time?

16          PROSPECTIVE JUROR 22:  No.  No.

17          MS. MELL:  Mr. Groves, No. 21, you have expressed you

18    had opinions.  Kudos to you.  I happen to be a very

19    opinionated woman.  One of the things I did notice about you,

20    however, is you worked in the U.S. Coast Guard.  Do I have

21    that right?

22          PROSPECTIVE JUROR 21:  That is correct.

23          MS. MELL:  In your capacity working for the U.S.

24    Coast Guard, did you have to follow rules you didn't think

25    made any sense?

```
1              PROSPECTIVE JUROR 21:  Absolutely.
2              MS. MELL:  Did you do them and do them with a smile
3    on your face because that was your job?
4              PROSPECTIVE JUROR 21:  Probably 90 percent of the
5    time.
6              MS. MELL:  The Court is going to instruct you on the
7    law, would you agree you would follow the law, like it or
8    not?
9              PROSPECTIVE JUROR 21:  Yes.
10             MS. MELL:  Mr. Smith, I know you like bowling.  Are
11   you a Tacoma bowler?  What is your bowling alley of choice?
12             PROSPECTIVE JUROR 20:  Narrow's Plaza Bowl in UP.
13             MS. MELL:  Narrow's Plaza Bowl in UP.  Is Rob Nay
14   (phonetic) someone you know?
15             PROSPECTIVE JUROR 20:  Doesn't ring a bell.
16             MS. MELL:  How about Ed Troyer?
17             PROSPECTIVE JUROR 20:  No.  Sorry.  Nope.
18             MS. MELL:  He is over at the Chalet Bowl.
19             PROSPECTIVE JUROR 20:  Chalet, yep.  Old one in
20   Tacoma.
21             MS. MELL:  Do you get -- if you are not bowling,
22   where do you spend your time and energy finding out what is
23   going on in the world, South Sound world?
24             PROSPECTIVE JUROR 20:  A lot of the news, office chat
25   around the office.  I get a lot of news from my co-workers,
```

 1  different perspectives.  My wife and friends.  We have our

 2  circle.  I get information from all the different sources

 3  that I can.

 4          MS. MELL:  Do you work downtown engineering?

 5          PROSPECTIVE JUROR 20:  Actually, our company is in

 6  Fife, not far from Tacoma.  Just across the Tideflats.

 7          MS. MELL:  You are in the Tideflat area.  Do you know

 8  about GEO?  Do you see the GEO trucks coming and going?

 9          PROSPECTIVE JUROR 20:  No.

10          MS. MELL:  Never heard about it?

11          PROSPECTIVE JUROR 20:  No.

12          MS. MELL:  Don't have strong feelings --

13          PROSPECTIVE JUROR 20:  Now I am probably going to be

14  looking.  I don't know.

15          MS. MELL:  Let me think.  I am trying to get to know

16  all you guys.  This is a whole new process for us.  I have to

17  get used to finding people and who I am connecting with.  So

18  it's a little bit -- my eyes are darting around, not because

19  I am not trying to talk to you directly.  I don't know where

20  to look.

21     Ms. Burton, can you talk to me a little bit about any

22  advocacy you have done on immigration issues?

23          PROSPECTIVE JUROR 17:  I have done none.

24          MS. MELL:  Do you follow any of the activities down

25  in Olympia?  Legislative stuff?

1      PROSPECTIVE JUROR 17:  Some.  Little bit.  Mostly on

2  state park stuff.  Not so much on anything else.

3      MS. MELL:  How about the issue that was discussed and

4  talked about this legislative session, shutting down the

5  detention center in the Tideflats?  Anybody get involved in

6  or hear about the legislature trying to ban private detention

7  centers?

8      PROSPECTIVE JUROR 17:  Is that still a question for

9  me or for anybody?

10      MS. MELL:  You are up.  Did you hear about it?

11      PROSPECTIVE JUROR 17:  No.

12      MS. MELL:  I better ask somebody else.

13      PROSPECTIVE JUROR 17:  There you go.

14      MS. MELL:  Anybody else get involved in that issue

15  this legislative cycle or hear it on the news?

16     18, I am not going to call on you because I think I have

17  an idea where you might be.  Maybe not on that issue, I don't

18  know.  Although I would ask, Mr. Knight, if you were given

19  instructions on the law, do you feel strongly that you could

20  follow the law as instructed?

21      PROSPECTIVE JUROR 18:  Yes, we all need to do that,

22  like it or not.

23      MS. MELL:  Even though you voiced some very strong

24  opinions here, you would follow the law as instructed by the

25  Court?

1    PROSPECTIVE JUROR 18:  Instructed, but I am not sure

2    I am the best to understand it all.

3    MS. MELL:  Okay.  All right.  Mr. Gordon, I think you

4    have expressed an opposite opinion of Mr. Knight, is that

5    fair to say, in terms of issues of privatization and Bob

6    Ferguson and his lawsuits, these kind of things?

7    PROSPECTIVE JUROR 18:  Right now, Mr. Knight is just

8    above me in the gallery, so I will wave.  That is probably

9    fair to say.  I am not currently involved in immigration

10   advocacy.  Some years ago our church sponsored a sanctuary

11   family and worked with other churches in meeting the family's

12   needs.  In the past, I have been an advocate for specific

13   immigrants and for changing immigration policy.

14   MS. MELL:  Do you, like Mr. Knight, feel you would

15   not be the best juror because of your sense of feeling the

16   need to support immigrants and change policy if you had that

17   opportunity?

18   PROSPECTIVE JUROR 18:  No.  I feel as Mr. Knight does

19   also, that when -- we need to follow the law.  The law can be

20   changed and it should be changed, but it should be changed

21   through the proper channel, not through an improper one.

22   MS. MELL:  Has anyone on this panel actually

23   testified before the legislature before?  Mr. Dye, what was

24   your issue?

25   THE COURT:  You are muted.

1          PROSPECTIVE JUROR 31:  Sorry, Judge.  Thank you for

2    the reminder.

3       It was a conservation funding issue.  I spoke on behalf of

4    a legislative initiative to fund a conservation action.  I

5    was working for a non-profit conservation organization at the

6    time.

7          MS. MELL:  So was that -- conservation is sometimes

8    an issue that deals with government regulation versus private

9    interests and special interests.  Where were you on those

10   issues?

11         PROSPECTIVE JUROR 31:  I worked for a non-profit

12   organization that was very much oriented towards

13   collaboration with business entities and property owners.  So

14   working for that particular organization and personally, my

15   own personal belief is that there is a lot of good to be

16   gained through collaboration on those issues, and that if

17   outright government regulation can be avoided, it often

18   generates positive results.

19         MS. MELL:  Have you found that there are better means

20   to an end than a lawsuit or strict legislative controls?

21         PROSPECTIVE JUROR 31:  Yes, there can be.

22         MS. MELL:  How do you facilitate that?

23         PROSPECTIVE JUROR 31:  In my mind, there is a window

24   of opportunity in time, often when non-regulatory approaches

25   might be considered.  Once an issue is identified as a

1    regulatory issue and there is a competent government

2    authority and there are a number of players that are acting

3    outside the bounds of the social contract on conservation

4    issues, when government moves toward regulation, certain

5    other opportunities might disappear that could have been

6    pursued in the private sector.  That's all.  We don't do this

7    by design very well in this country.  It is a chaotic and

8    free market, plus governmental arena, very complicated space.

9    I don't think it applies here much, although immigration is a

10   similarly complicated space.  I don't pretend to understand

11   it.

12        MS. MELL:  Do you think immigration is a pretty

13   strongly political issue right now?

14        PROSPECTIVE JUROR 31:  I think that is obvious.  I am

15   not sure whether any of those high level political issues

16   apply to this case.

17        MS. MELL:  Have you been involved in any observing or

18   participated in or been aware of state litigation by the

19   Attorney General's Office in tracking where those dollars go

20   and why, and whether or not they really do go to benefit the

21   public?

22        PROSPECTIVE JUROR 31:  I have not.  That is a

23   specific issue in the state that I have not tracked.

24        MS. MELL:  Mr. Laws, I want to ask you this one

25   question:  You had mentioned at the beginning of this case

1    that you cannot, given the fact you have probably not gotten

2    any sleep, feel like you can give this case your full

3    attention.  Have I caught you sleeping today perhaps?  Are

4    you kind of in and out or are you good?

5             PROSPECTIVE JUROR 29:  I am going to be honest.  You

6    have.

7             MS. MELL:  All right.  All right.  I just wanted to

8    check.  I didn't want to make that assumption.  Thank you for

9    being honest with me about that.

10            PROSPECTIVE JUROR 29:  I am -- I am keeping my eyes

11   open.

12            MS. MELL:  I know you have.  I know you are trying

13   hard.  I see you coming back around, but I just wanted to

14   make sure.

15      Mr. Pereira, what can you tell me about your thoughts on

16   unpaid work?  Any ideas on what work should be paid and what

17   can be unpaid?  Do you do any charitable work?

18            PROSPECTIVE JUROR 24:  I do lots of charitable work.

19   I run my own non-profit in Clark County.  I will go back to

20   what somebody said.  Once you have agreed to work for pay,

21   then there is a contract that needs to be upheld.  I often

22   think about, you know, if we are paying somebody minimum

23   wage, who are we not paying at that point for that same work

24   that should be provided to somebody else.

25            MS. MELL:  What is your charitable work around?  What

1    is your subject area?

2         PROSPECTIVE JUROR 24:  It's called Youth Efforts

3    Against Hunger.  YEAH is our acronym.  We collect donations

4    from wealthy donors and then we pay for our youth to raise

5    animals and agriculture.  It is an agriculture education

6    program.  We take those animals and process them, pay for the

7    processing and donate it all to the Clark County Food Bank.

8         MS. MELL:  So it's got more of a meeting the needs of

9    the people in the community by way of providing a food source

10   for them, which is kind of different than 4H, but sounds like

11   4H.

12        PROSPECTIVE JUROR 24:  We partner with educational

13   programs like 4H and FFA.  So we support agriculture

14   education as well as helping the needy within the area.

15        MS. MELL:  Do you have any control over how they

16   prepare your products for service and consumption?

17        PROSPECTIVE JUROR 24:  About our youth, they are well

18   educated.  There is quality control on the processing of the

19   animals.  We have to have them processed by a state-certified

20   facility so that it is available for human consumption

21   through the food bank.

22        MS. MELL:  Do those kids get paid?

23        PROSPECTIVE JUROR 24:  They do not.  That's why we

24   use our philanthropic opportunities to help them.  They can't

25   do it on their own.  They don't get paid.  We pay nothing

1    more than the expenses they incur.

2          MS. MELL:  Do you have a lot of volunteers in that

3    organization?  Is that what it depends on?

4          PROSPECTIVE JUROR 24:  All volunteer work.

5          MS. MELL:  Is that something that you do in addition

6    to paid work?

7          PROSPECTIVE JUROR 24:  Yes.  I work for Portland,

8    Oregon, the public transit system.  I run their MAX Transit.

9          MS. MELL:  What kind of shifts do you end up working?

10         PROSPECTIVE JUROR 24:  In my regular work -- through

11   the pandemic, seems like 24/7.  Right now, I am working from

12   home a lot of times.  But prior to the pandemic, they were

13   12-hour shifts, three days on, four days off, four days on,

14   three days off.

15         MS. MELL:  You fit in your volunteer work on the off

16   days, sounds like?

17         PROSPECTIVE JUROR 24:  Yes.

18         THE COURT:  Anybody else?  What are your volunteer

19   activities, Ms. Burton?  Do you do volunteer work?

20         PROSPECTIVE JUROR 17:  Yes, I am a master gardener.

21   That is the garden I referred to earlier that the judge was

22   asking if we had a reason why we didn't think we could commit

23   to four weeks of trial is that I am the sole person who takes

24   care of a common garden in Grays Harbor County that provides

25   food for two food banks, McCleary and Elma, in addition to a

1    couple of local churches that provide midday meals for folks

2    that don't have a lot of food.  We also -- besides giving

3    them produce, we also grow plant starts in our greenhouse.

4    There is a lot of pieces to this work.  Those food -- those

5    plant starts go to food bank clients that want to try their

6    hand at gardening and hopefully are able to provide a little

7    bit more food for their own tables that way.

8        Master gardeners are not trying to force anybody to

9    garden.  We are there to provide the produce and a little bit

10   of knowledge if somebody wants to pick up a plant and take it

11   home and try to grow it.

12       So that's what I do.  I generally put in over a thousand

13   hours a year working in the garden.  In addition to that, I

14   am also the education director on the Master Gardener

15   Foundation.  We are just kind of gearing up training for the

16   next set of master gardeners, so that is a hell of a lot of

17   work in addition to that.

18           MS. MELL:  Is it my understanding then that you will

19   have a difficult time being away from that work, and that

20   work has been deemed essential during COVID?

21           PROSPECTIVE JUROR 17:  It was deemed essential last

22   year when the garden was closed down to volunteers except for

23   myself because we were still growing produce.  This year, I

24   assumed it was still essential.  Certainly the need for food

25   and food banks has increased.  Our communities haven't gotten

1   any richer in the last year.  People have gotten more

2   desperate.  We have kind of stepped up our efforts, and in

3   doing so, I have got a lot of stuff going on in the

4   greenhouse and in the raised beds themselves.  I am the sole

5   person that shows up six days a week to make sure that

6   everything is happening and delivers food to the food bank.

7           MS. MELL:  If my yard is an example, I don't show up

8   any day of the week.

9           PROSPECTIVE JUROR 17:  Things happen.

10          MS. MELL:  I can see how that would be essential for

11  your project, and it sounds like a very laudable project.

12      That is volunteer work?

13          PROSPECTIVE JUROR 17:  That's volunteer work, yep.

14          MS. MELL:  All right.  Let me see.  Who can I pick on

15  now?  This is kind of fun.  I have you all in the zone.  Who

16  do I pick?  Who do I pick?

17      Let's see, Ms. Van Well, tell me about your time.  What do

18  you do with your time?  I am going to have to have you

19  unmute.

20          PROSPECTIVE JUROR 27:  Okay.  I am retired.  I ran a

21  company, my husband and I.  I just -- I'm 70 years old.  I do

22  have an autoimmune disease.  The last two years with the

23  pandemic, I have had a lot of health issues, and my husband

24  is legally deaf, so I do all the driving and that sort of

25  thing.  I am actually looking for some different types of

1    volunteer work to get into.  Right now, I watch a lot of

2    Netflix and do a lot of shopping online.

3        MS. MELL:  Are you getting bored?

4        PROSPECTIVE JUROR 27:  A little bit, yeah.

5        MS. MELL:  You are actually trying to find things to

6    do that you would do for free, right, just so you are not

7    sitting there watching Netflix another night?

8        PROSPECTIVE JUROR 27:  Sort of, yeah, trying to keep

9    my health good, my energy up.  My only concern is that I do

10   get tired easily.  The fact that this is virtual, it is

11   easier for me to be able to do this.  I think I am -- I have

12   my own opinions, but I feel like I need to really understand

13   both sides and what -- and the issues of everything.

14       MS. MELL:  Did I hear you right, you talked about

15   owning your own business?

16       PROSPECTIVE JUROR 27:  Yeah.  We sold our business to

17   actually one of our largest clients in 2017.  I retired in

18   2018.  I stayed on.  I did the sales for the company.  You

19   know, my husband and I, we used to travel a lot.  You know,

20   with the issue now, so...

21       MS. MELL:  Yeah, bummer.  When you were running your

22   business, did you have to grapple with the question of

23   whether or not you employed people and put them on the

24   payroll versus just hire out the work that needs to get done

25   and hire an independent contractor?

1          PROSPECTIVE JUROR 27:  Yes.  We hired people as

2    independent contractors mostly.  We did have three people in

3    the office.  It was a small business, like a $5 million

4    business.  We ran it for 30 years.

5          MS. CHIEN:  Your Honor, I think we might have lost

6    one of the jurors, Juror 26.

7          THE COURT:  Tyler?

8          THE CLERK:  Let me look into it.  I am trying to find

9    them in the Zoom meeting.  I know this juror was having

10   problems earlier with connectivity with different devices.

11   Might have popped up again.

12      Looks like he's left the meeting.  Maybe if we just wait a

13   minute to see if he comes back on.

14          I don't see him attempting to reconnect yet.  I am

15   not sure how much time you want to wait.

16          THE COURT:  It's about time for a break.  Let's take

17   ten minutes and call him or whatever is your alternative

18   route and get him back on.

19      Ms. Mell, you had about three or four minutes left in your

20   time.  We will continue with that after we take our break.

21          MS. MELL:  Thank you, Your Honor.

22                    (Recessed.)

23          THE COURT:  All set?

24          THE CLERK:  Yes, sir, I believe so.  Do we have 32?

25          THE COURT:  Mr. Minor, I don't know what happened, we

1  lost you for a little bit.  I don't think anything happened

2  before we realized it.

3      Ms. Mell, you can finish your questions.

4      MS. MELL:  Thank you.  I am going to go to Mr. Smith,

5  change things up a little bit.  Mr. Smith, we heard

6  Ms. Van Well talk about the profitability of her small

7  business at five million.  What are your thoughts about

8  profitability of corporations?  Do you work for a company

9  that you would characterize as a small business or a big

10 business?

11     PROSPECTIVE JUROR 20:  We are still small.  We are a

12 small business, private consulting business.  It is all about

13 profitability.  Some projects we make money, some projects we

14 don't.  Depends on the contract and making sure our

15 interpretation of the contract is correct.

16     MS. MELL:  Have you found the business comes if you

17 worry less about the bottom line and more about quality

18 service delivery?

19     PROSPECTIVE JUROR 20:  Definitely you'll get more

20 business.  At the same time, we need to be aware of what

21 types of business are profitable and which aren't.  Even if

22 we get a lot of work, if we are losing money on every job,

23 that is not necessarily a direction we want to keep going in.

24     MS. MELL:  Do you try to look at that from the outset

25 and gauge what you need to do to maintain an appropriate

1    profit margin and still do a good job?

2        PROSPECTIVE JUROR 20:  Oh, yeah.  Our underlying

3    principle is that we are always trying to make sure that our

4    clients are happy.  We will bend over backwards and do what

5    we need to do to keep them happy because that is going to

6    bring more work in.  You know, we are always looking at the

7    bottom line, I guess.

8        MS. MELL:  How do you address issues on -- labor

9    issues?  Are you a union shop?

10        PROSPECTIVE JUROR 20:  No, we are not a union shop.

11    We just look at what the industry pays for rates.  We want to

12    keep our employees happy, so it is all about making sure we

13    are competitive so we can keep our employees where they are.

14        MS. MELL:  Do you, in your work environment, use

15    contracts for employment, like written agreements for terms

16    of employment?

17        PROSPECTIVE JUROR 20:  No, it's pretty much at will.

18    They can leave.  We can let people go.  I mean, there is

19    generally no contracts involved in what we do.  There is

20    contracts with our client, obviously, but not with employees.

21        MS. MELL:  Sure.  Does anybody here have an issue

22    with at-will employment?  Has anybody ever grappled with that

23    concept in their job?  Anybody belong to a union?

24        PROSPECTIVE JUROR 26:  Yes.

25        MS. MELL:  What kind of union, Mr. Minor?

1           PROSPECTIVE JUROR 26:  I am with the post office.  We

2    have a postal union.

3           MS. MELL:  How many years have you been with the

4    postal union?

5           PROSPECTIVE JUROR 26:  31 years.

6           MS. MELL:  Do you play an active role?  Do you like

7    being a shop steward and taking on those responsibilities?

8           PROSPECTIVE JUROR 26:  No, but I am saying, you know,

9    I am not involved as an active union member.  Most of the

10   young kids that come in, they come to me and they ask advice

11   and stuff like that, know what I mean?

12          MS. MELL:  You are a mentor, union or not, right?

13          PROSPECTIVE JUROR 26:  Yes.

14          MS. MELL:  What have you found with the younger

15   workers coming in that they ask you the most often?  What

16   kind of advice do they get from you?

17          PROSPECTIVE JUROR 26:  Well, saying, lately, you

18   know, these young kids ask for -- I am saying my frustration

19   now with these young kids coming in, they ask about the pay.

20   I told them, I said you got to love what you do.  If you love

21   what you do, the pay is going to come.  Don't worry about the

22   pay.  You got to love your job and treat people as human

23   beings, and everything else will fall in place.  That's my

24   biggest frustration with these young kids coming in today.

25          MS. MELL:  Has anybody else seen that issue with

1  expectations, unrealistic expectations about work in their

2  work environment?  Not a big issue for anyone else?

3          THE COURT:  Okay.  I think your time has passed,

4  Ms. Mell.

5          MS. MELL:  Thank you, Your Honor.

6          THE COURT:  Thank you very much.  I have some

7  questions that I want to ask before we finish this session.

8      Ms. Porter, you didn't get called on here.

9          PROSPECTIVE JUROR 32:  No, sir.

10          THE COURT:  Is there anything you have heard here

11  that makes you think you should tell us about it?

12          PROSPECTIVE JUROR 32:  No, I don't have strong

13  opinions either way.  I trust that I can be objective based

14  on the facts that are presented.

15          THE COURT:  Okay.  Let me ask a number of questions

16  along this line.  Juror No. 20, Mr. Smith, you have this

17  bowling deal on the 24th of June.  Let me ask you, what

18  happens if you get stuck here and you can't go?  How bad a

19  deal is that?

20          PROSPECTIVE JUROR 20:  I am not sure.  My wife made

21  all the plans.  I would have to check and find out if there

22  is money we wouldn't get back.  It is kind of -- it is kind

23  of short-term notice for the team for them to find somebody

24  to fill my spot as well.  My team members might be left in a

25  lurch as well.

1    THE COURT:  Juror No. 19, Mr. Johnson, I am not sure

2  I understand your role in the bowling business that you

3  mentioned.

4    PROSPECTIVE JUROR 19:  What happens is sweepers is a

5  function of the end-of-year bowling.  Because I had the

6  knowledge and abilities, I was volunteered to conduct a

7  sweeper.  Basically what it is, people put money in to bowl

8  in hopes to bowl good enough to get the pot of money.  I was

9  the only one in the league that had an understanding or

10  experience with it.

11    THE COURT:  Okay.  Well, Mr. Johnson, what happens if

12  you are stuck here on the jury and you can't deal with that?

13    PROSPECTIVE JUROR 19:  I am not sure.  I have to

14  refund a bunch of money.

15    THE COURT:  It is not your money, is it?

16    PROSPECTIVE JUROR:  No, it's not my money.  I know

17  Mr. Smith knows what I am talking about.

18    THE COURT:  Okay.  Who said they had a Father's Day

19  trip to Randle?

20    PROSPECTIVE JUROR 24:  I did, Your Honor, No. 24.

21    THE COURT:  Mr. Pereira, I wrote down the wrong

22  number.  I couldn't remember.  What happens if you miss that

23  family event?  In other words, how serious is it?

24    PROSPECTIVE JUROR 24:  Pretty serious.  I treasure my

25  father/daughter time, since I only get her part-time anyway.

1  This is one of the weekends I get her.  By court order, I get

2  her on that weekend.  I typically plan a nice father/daughter

3  event, especially being Father's Day.

4         THE COURT:  Right.  I see.  Okay.  Mr. Laws, what do

5  you do in your night job?

6         PROSPECTIVE JUROR 29:  I am a warehouse picker.  I go

7  around and pick alcohol and non-alcoholic drinks for retail

8  stores and grocery stores.

9         THE COURT:  You had anticipated if you are asked to

10 be on this jury that you would still have to work nights?

11        PROSPECTIVE JUROR 29:  Can you repeat that?

12        THE COURT:  If you are stuck on this jury, would you

13 think you still have to go to work nights?

14        PROSPECTIVE JUROR 29:  Yeah, because I am the only

15 person working in my house.  I would miss out on, like, a

16 group of hours.

17        THE COURT:  Who is number 30?  Did we lose somebody?

18        THE CLERK:  I believe 30 was already excused.

19        THE COURT:  Yes, I didn't make a good note.

20    Ms. Burton, what happens if you can't take care of that

21 garden because we have you stuck on jury duty?

22        PROSPECTIVE JUROR 17:  Well, I think we would see a

23 loss of season's production.  Right now, we are ramping up

24 because we are entering into the warm season crops, which are

25 a little more highly productive.  So we would be losing

1   probably the bulk of whatever we donate to the food bank.

2          THE COURT:  There is nobody else you can get to pitch

3   in?

4          PROSPECTIVE JUROR 17:  I am there six days a week for

5   the mornings.  So who is going to fill that time?  It is a

6   labor of love.  Nobody else is going to tend to that.

7          THE COURT:  Okay.  All right.  You folks can go to

8   your other room.  Tyler will put you there.  We will be back

9   with you in a few minutes after we discuss this whole thing.

10                 (The following occurred outside the presence

11                   of the prospective jury panel.)

12          THE CLERK:  I believe all the jurors are out of the

13   main session now.

14          THE COURT:  All right.  I like to be liberal, but it

15   can hurt us in this deal in terms of time.  I want your

16   input, not on challenges for cause, but on whether you think

17   I should excuse some of these people.  No. 17, that is the

18   gardener.

19          MR. WHITEHEAD:  I am certainly sympathetic to the

20   imposition of jury service.  I wonder whether alternative

21   arrangements can be made to tend to the garden.

22          THE COURT:  Wait.  Wait a minute.

23          MR. WHITEHEAD:  Am I jumping the gun?  I apologize.

24          THE COURT:  Excuse or don't excuse.  You are giving

25   the judge advice now?

1    MR. WHITEHEAD:  Your Honor, do not excuse.

2    MS. CHIEN:  State of Washington, do not excuse.

3    MS. MELL:  GEO, excuse.

4    THE COURT:  All right.  As to Juror No. 20,

5    Mr. Smith, his bowling deal.  Mr. Whitehead?

6    MR. WHITEHEAD:  Your Honor, we are fine with

7    excusing.  He said he would leave the team in a lurch if he

8    wasn't there.

9    MS. CHIEN:  State of Washington is also okay with

10    excusing Juror No. 20.

11    MS. MELL:  GEO says excuse.

12    THE COURT:  Okay.  Juror No. 19, who also is

13    concerned about a vacation on the 11th of July and the

14    bowling sweeper deal.

15    MR. WHITEHEAD:  Your Honor, I don't really have a

16    feel on this one.  I am not clear on the sweeper function.

17    Perhaps Ms. Mell can let us know with the bowling knowledge

18    she has what his role is.  I don't fully understand what the

19    hardship is for Juror 19.

20    THE COURT:  I take it as a no.

21    Ms. Chien, what is your input on him?

22    MS. CHIEN:  We would not excuse Juror No. 19.

23    THE COURT:  Ms. Mell?

24    MS. MELL:  GEO says do not excuse.

25    THE COURT:  No. 24, Father's Day trip with

1  court-ordered visitation, he shares custody.

2          MS. CHIEN:  State of Washington would excuse Juror

3  24.

4          MR. WHITEHEAD:  As would private plaintiffs,

5  Your Honor.

6          MS. MELL:  Do not excuse.

7          THE COURT:  29, I am going to excuse.  He can't stay

8  awake.

9      No. 21, I am going to excuse out of hand.  No. 18, I am

10  going to excuse out of hand.  There are a number of others,

11  you can argue about them if you want to challenge them.

12      I am going to excuse Juror No. 20, Juror No. 24, Juror

13  No. 29 and Juror No. 21 and Juror No. 18.

14      I am not going to excuse Juror No. 19.  I will not excuse

15  Juror No. 17.  You can take your challenges for cause.

16          MR. WHITEHEAD:  Yes, Your Honor.  We would challenge

17  Juror No. 25 for cause.  I think the bias she expressed is

18  equal, certainly on par to what was expressed by Jurors

19  No. 18 and 21.  They all expressed an inability to be able to

20  sit and judge the evidence fairly in this case.  That is the

21  position she has taken.  I think it is more than appropriate

22  to strike her for cause.

23          MS. CHIEN:  State of Washington would concur with

24  that.  I believe when we asked whether or not she -- when

25  Juror No. 18 expressed that he would be upset about sitting

1   on this jury, she adamantly raised her hand saying she would

2   agree, further suggesting her bias.

3           MS. MELL:  GEO's position is there is no cause basis

4   to excuse Juror No. 25.  She was no less adamant about her

5   position than Mr. Gordon.  She attested that she would be

6   fair and impartial and apply the law as given to her.

7           THE COURT:  Okay.  Next challenge, Mr. Whitehead.  I

8   will come back to rule on these.

9           MR. WHITEHEAD:  I do not believe I have any others.

10          THE COURT:  All right.  Ms. Chien?

11          MS. CHIEN:  No others from the State.

12          THE COURT:  Ms. Mell?

13          MS. MELL:  23, Your Honor.  He expressed particular

14  sympathies towards individuals who are in financial straits

15  due to their immigration status and having taken on that role

16  of assisting an immigrant family through his church.  His

17  expressions of an interest in caring for others was equal to

18  Juror No. 21's expressed opinions about some of the integral

19  issues in the case.  I think for the same reasons 21 was

20  struck, 23 has similar, if not more specific, biases he

21  expressed.

22          THE COURT:  Mr. Whitehead, regarding Juror No. 23.

23          MR. WHITEHEAD:  That is correct.  I disagree.  He

24  more than satisfied the inquiry as to whether or not he could

25  maintain an objective mindset.  I believe to counsel's

1  question about whether or not he would follow the judge's

2  law, Your Honor, he answered that he would, of course, follow

3  any instructions issued by the Court.  So we have no

4  concerns.

5        MS. CHIEN:  State of Washington also has no concerns.

6  The fact Mr. Gordon helped an immigrant shouldn't disqualify

7  him.  I think that might disqualify all of us sitting here as

8  well.

9     The challenge for Juror 25 is granted.

10    The challenge of Juror 23 is denied.

11    Let me be sure of who we have left.  Let me count these up

12  and be sure.  So this group starts with 17.  She is still in.

13  19 is still in.  24 is still in.

14        MR. WHITEHEAD:  Your Honor, I believe 24 is out.

15        MS. SCHEFFEY:  My notes say you excused 24.

16        THE COURT:  How did 24 get out?

17        MS. SCHEFFEY:  Father's Day challenge.

18        THE COURT:  I ruled.  I'm sorry.  24 is out.  This is

19  not the way we usually do this.  I find it confusing,

20  probably because I confuse myself.  27 is in.  23 is in.  Is

21  there anyone else from this flight that is in?  There is only

22  four.

23        MR. WHITEHEAD:  22, Your Honor.  I believe he is

24  still in.  As is Mr. Minor, 26.

25        THE COURT:  26 is in.  What was the last lady's name?

1    She is still in.

2          MS. SCHEFFEY:  17 is Burton.  Is that who you are

3    thinking of?

4          THE COURT:  Somebody said something I didn't get.

5          MS. SCHEFFEY:  Is 32 Porter?  Is that who you are

6    thinking of?

7          THE COURT:  I can't understand what you are saying.

8          THE CLERK:  No. 32, Porter is the last name, and

9    she's still in.

10         THE COURT:  She's still in.  Are we agreed on this?

11   The jurors from this flight that are still in are 17, 19, 22,

12   23, 26, 27, and 32.

13         MR. WHITEHEAD:  Is Juror 31 still in?

14         MS. MELL:  31 is in.

15         THE CLERK:  31 is Mr. Dye.

16         THE COURT:  Okay.  He's still in.  Everybody agree?

17   You want to go through it again?

18         MR. WHITEHEAD:  Yes, Your Honor.

19         THE COURT:  17 is in, 19, 22, 23, 26, 27, 31 and 32.

20         MR. WHITEHEAD:  That matches our notes, Your Honor.

21         MS. SCHEFFEY:  Same here, Your Honor.

22         THE COURT:  All right.  I think we are ready then to

23   hear challenges for cause.

24         MS. CHIEN:  We did that, Your Honor.

25         THE COURT:  I mean peremptory challenges.  Talk about

1   confusing.

2          MR. WHITEHEAD:  Your Honor, if it would be all right,

3   I don't mean to delay the process any longer, given that

4   plaintiffs are sharing their peremptories, may we have a

5   brief ten-minute recess to confer?

6          THE COURT:  That makes sense.  Perhaps I should call

7   this last group in and excuse those that are excused, and

8   then we will take a break before we go to peremptories.  All

9   right?

10         THE CLERK:  You want this last flight, the 17 through

11  32 to come back?

12         THE COURT:  I was going to have the whole group so I

13  can excuse the ones that are excused.  Can you do that,

14  Tyler?

15         THE CLERK:  Can I bring all the potential jurors in

16  including 33 and beyond?  Do you want everybody back?

17         MS. CHIEN:  I want to double check before we have the

18  jurors back in.  Juror No. 13 expressed a hardship.  I was

19  wondering if you were going to be excusing him as well before

20  we get into the peremptories.  I think he is the one that

21  worked for the insurance company.

22         MS. SCHEFFEY:  He did IT.

23         THE COURT:  He worked for Mutual of Enumclaw.  I did

24  not anticipate excusing him.

25         MS. CHIEN:  Thank you.

```
1        THE COURT:  Tyler, it is the last flight of jurors.
2        THE CLERK:  17 through 32?
3        THE COURT:  Yes.  If you can get them in, I will
4   excuse some and tell the others to stick around.
5        THE CLERK:  I will have to bring everybody in and
6   then I will have to kick everybody out again, but I will
7   leave the last flight in here.
8      It is not letting Juror 33 exit the main session.
9        THE COURT:  Mr. Nelson, you are 33.
10        THE CLERK:  I put him in a different breakout room.
11        THE COURT:  All right.
12        THE CLERK:  Did you want me to put them back in
13   order?
14        THE COURT:  If you would put them in order, I won't
15   mess this up.
16        THE CLERK:  Just a moment.  What happened to 17?
17        THE COURT:  She's right there in the middle.
18        THE CLERK:  It is trickier than it looks.
19        THE COURT:  All right.  Do you think we have them?
20        THE CLERK:  Still working on it, Your Honor.  Just a
21   moment.  Okay.  I believe everybody is in order.
22                        (The following occurred in the presence
23                          of the prospective jury panel.)
24        THE COURT:  Okay.  Mr. Knight, you may be excused.
25   Mr. Smith, you may be excused.  Mr. Groves, you may be
```

1    excused.  Mr. Pereira, you may be excused.  Ms. Adkison, you

2    may be excused.  Mr. Laws, you may be excused.

3        The rest of you hang around and we will complete the jury

4    selection process.  We are going to take a short break before

5    we start that, about ten minutes or so, then we will complete

6    the jury selection process.

7        And Tyler, if it is possible, you can put the remaining

8    jurors all in one group.  Okay.

9            THE CLERK:  Do you want that to include Jurors 33 and

10   beyond, or do you want them separately?

11           THE COURT:  No, you can excuse all of them, 33 and

12   beyond.

13           THE CLERK:  I will excuse them.  Thank you.

14           THE COURT:  Give them a lot of thanks.  We got more

15   than we needed, which is surprising.  Okay.  We will take a

16   break, and try and make it about a quarter after.

17                        (Recessed.)

18           THE COURT:  We have 19 jurors.  The way we do it is

19   everybody moves up.  So the last five jurors or so will not

20   be on the jury.  We are only going to chose nine.  Don't

21   waste challenges on ones that won't serve anyway, is what I

22   was trying to say.

23       Do you want to have the eligible jurors back on the screen

24   before you take your challenges?  Or are you ready to do it

25   by their numbers and names?

```
 1              MS. CHIEN:  We can do it by their numbers and names.
 2              MR. WHITEHEAD:  I agree, Your Honor.
 3              MS. MELL:  No objection, Your Honor.  Numbers and
 4    names.
 5              THE COURT:  All right.  Plaintiffs first.
 6              MS. CHIEN:  Plaintiffs would like to strike Juror
 7    No. 5.
 8              THE COURT:  All right.  Defense.
 9              MS. MELL:  Juror No. 11.
10              THE COURT:  Okay.  Plaintiffs.
11              MS. CHIEN:  Juror No. 8, Your Honor.
12              THE COURT:  All right.  Defense.
13              MS. MELL:  6.
14              THE COURT:  I'm sorry, 6?
15              MS. MELL:  Yes, Your Honor.
16              MR. WHITEHEAD:  Your Honor, as relates to Juror
17    No. 6, I wonder if counsel could articulate a reason for
18    striking No. 6.  No. 6 identified herself as someone who
19    hailed from Mexico.  I am struggling to understand why she
20    would be struck under these circumstances.  I worry that her
21    national origin is part of the basis.
22              THE COURT:  That is a fair question.
23              MS. MELL:  Did you say that was a fair question for
24    me to respond to?
25              THE COURT:  Yes.
```

1    MS. MELL:  The basis for choosing to strike Juror

2   No. 6 is the response that she gave to the question about

3   whether or not the reasons for why people don't get here

4   legally was something she had personal experience with, was

5   not as easy as others on the panel indicated.  They expected

6   the standards should be followed.  I think it shows an

7   inherent bias based on personal experience that she's going

8   to bring to the table on whether or not somebody should be

9   obligated to follow the laws on immigration.

10    THE COURT:  Mr. Whitehead.

11    MR. WHITEHEAD:  Your Honor, I would just note on both

12   the jury questionnaires and during voir dire, there were a

13   number of witnesses that identified themselves as coming from

14   families of immigrants.  So in that respect, Your Honor,

15   No. 6 and her experience was not unique.  I am back to the

16   question of wondering why the peremptory is being exercised

17   with respect to her.

18    MS. CHIEN:  The State of Washington would also add

19   she spoke and said she had never been in the detention

20   center.  That wasn't her experience.

21    THE COURT:  Mr. Whitehead, you are leaving this open.

22   I would like to hear your position.

23    MR. WHITEHEAD:  I think the peremptory should not be

24   used.  I feel it is being exercised on a discriminatory basis

25   on the basis of No. 6's national origin.

1    THE COURT:  I am inclined to agree with the plaintiff

2    on this.  The justification for striking, it seems to me, is

3    not a justification for excusing a juror who is an immigrant

4    and from another country.  I think the Batson rules apply.  I

5    will not allow the challenge to No. 6.

6        MS. MELL:  Does that mean I can take another number?

7        THE COURT:  I think you get three.

8        MS. MELL:  I am on two.  That would be Juror No. 3,

9    Your Honor.

10       THE COURT:  Plaintiffs' last.

11       MS. CHIEN:  Plaintiffs would like to strike Juror

12    No. 19.

13       THE COURT:  Defendant's last.

14       MS. MELL:  23, Your Honor.

15       THE COURT:  All right.  The jury will be made up of

16    Juror Nos. 4, 6, 7, 12, 13, 14, 16, 17, and 22.  All right?

17    How are we going to excuse the rest?  Tyler, where are you?

18       THE CLERK:  I am right here.  Do you want me to bring

19    all of those back into the main room, and then you'll say

20    which ones are going to be serving on the jury?

21       THE COURT:  That would be fine.

22       THE CLERK:  Okay.  I am going to go ahead and bring

23    all those back in up through 32 that are still here.

24       THE COURT:  Just a minute.  1, 6, 7, 12, 13, 14, 16,

25    17 and 22.

 1          MR. WHITEHEAD:  I believe 1 was already excused.

 2          MS. CHIEN:  You mean 4?

 3          THE COURT:  I meant 4.  That's my No. 1.  4 will

 4     become Juror No. 1.

 5          THE CLERK:  Can I go ahead and bring all 19 of them

 6     in?

 7          THE COURT:  Yes.

 8          THE CLERK:  Give me a minute to arrange everyone in

 9     number order.

10          THE COURT:  I will ask you to swear the jury in as

11     well when we finish this.

12          THE CLERK:  Just a minute, Your Honor.  We are having

13     problems with one of the jurors.  No. 26, Mr. Minor, has been

14     able to join again.  Mr. Minor, are you able to turn your

15     camera on?  You are on my second page.  I apologize.

16          THE COURT:  They are all here?

17          THE CLERK:  I believe so, Your Honor.

18                         (The following occurred in the presence

19                          of the prospective jury panel.)

20          THE COURT:  Ms. Gorzelsky, you may be excused.  Let's

21     see here.  I can't read my own notes, for gosh sakes.  Let me

22     do this a different way.

23       Ms. Rickabaugh, you are a member of the jury.

24     Ms. Membreno, you are a member of the jury.  Ms. Tooley, you

25     are a member of the jury.  Mr. Monta, you are a member of the

1    jury.  Mr. Crosley, you are a member of the jury.

2    Ms. McDonald, you are a member of the jury.  Ms. Farney, you

3    are a member of the jury.  Somebody is out of order.

4    Ms. Burton, you are a member of the jury.  And you keep

5    moving, Mr. Swessel; you are a member of the jury.  That's a

6    jury of nine.

7        Some of you had too high a number and so you don't get

8    chosen for that reason.  Others were challenged.

9        I would ask now that the jurors that are excused, I want

10   to thank you for your service.  As I told you this morning,

11   being challenged is no personal reflection on you.  The

12   lawyers have determined who remains after starting with,

13   like, 50 people this morning.  If you have been excused, you

14   can sign off.

15       Those that are still on the jury should remain.

16   Ms. Rickabaugh, Ms. Membreno, Ms. Tooley, Mr. Monta,

17   Mr. Crosley, Ms. McDonald-Poper, Ms. Farney, Ms. Burton and

18   Mr. Swessel.  That's the jury you selected, is it not,

19   counsel?

20           MS. CHIEN:  Yes, Your Honor.

21           MR. WHITEHEAD:  Yes, Your Honor.

22           MS. MELL:  Yes, Your Honor.

23           THE COURT:  All right.  Now, you are the jury in this

24   case.  I would ask you all to raise your right hands and be

25   sworn and the clerk will give you the oath to try the case.

1          THE CLERK:  You and each of you do solemnly swear or

2    affirm that you will well and truly try the cause in the

3    matter now pending before the Court and a true verdict

4    therein render according to the evidence and the law?  Please

5    say "I do."

6          (Jurors respond affirmatively.)

7          THE COURT:  Okay.  I guess I expect you to all say it

8    at once.  Ms. Tooley, you are the last one with your hand up,

9    did you say "I do"?

10         JUROR 7:  I said, "I do."

11         THE COURT:  Folks, you are now the jury in this case.

12   I want to give you some instructions that will cover our

13   procedure and some of the legal concepts that you should be

14   aware of.  I am mindful of the time.  After this bit of

15   instruction, it will be about quitting time and we will start

16   with the trial itself in the morning.

17       The case will proceed in the same fashion that American

18   courts of all levels follow.  First, lawyers for each party

19   will have the opportunity to make opening statements to you

20   outlining their position and what they believe the evidence

21   will be.  Then each plaintiff may introduce evidence, and

22   counsel for the defense will have the opportunity to

23   cross-examine the plaintiffs' witnesses.

24       After each plaintiff has rested or concluded their

25   presentation of evidence, the defendant may introduce

1    evidence and counsel for plaintiffs may cross-examine

2    defendant's witnesses.  Rebuttal evidence may also be

3    introduced.

4        After all of the evidence is presented, I will instruct

5    you further on the law.  Those written instructions will be

6    available to you during your deliberations.

7        After instructions, the parties will present their final

8    arguments to you.  After that, you will deliberate together

9    to reach a verdict.  This case, as in all federal cases,

10   requires a unanimous verdict.

11       Now, I want to tell you about some of the law and

12   procedures that apply here.  The law treats all parties

13   equally, whether they are corporations, government entities,

14   a class, or individuals.  That means that corporations,

15   government entities, classes, and individuals are to be

16   treated in the same fair and unprejudiced manner.

17       Corporations and government entities can only act through

18   their employees, agents or officers.  Therefore, corporations

19   and government entities are responsible for the acts of their

20   employees, agents and officers performed within the scope of

21   their authority.

22       When a party has the burden of proving any claim or

23   affirmative defense by a preponderance of evidence, it means

24   you must be persuaded by the evidence that the claim or

25   affirmative defense is more probably true than not true.  You

1    should base your decision on all of the evidence regardless

2    of which party presented it.  The evidence you are to

3    consider in deciding what the facts are consists of the sworn

4    testimony of the witnesses, the exhibits that are admitted

5    into evidence, and any facts to which the lawyers have agreed

6    and any facts that I have instructed you to accept as proved.

7        In reaching your verdict, you may consider only the

8    testimony and exhibits received into evidence.  Certain

9    things are not evidence, and you may not consider them in

10   deciding what the facts are.  I will list them for you.

11   Arguments and statements by lawyers are not evidence.  The

12   lawyers are not witnesses.  What they may say in their

13   opening statements, closing arguments and at other times is

14   intended to help you interpret the evidence, but it is not

15   evidence.  If the facts as you remember them differ from the

16   way the lawyers have stated them, your memory of them

17   controls.

18       Questions and objections by lawyers are not evidence.

19   Attorneys have a duty to their clients to object when they

20   believe a question is improper under the rules of evidence.

21   You should not be influenced by the objection or by the

22   Court's ruling on it.

23       Testimony that is excluded or stricken or that you have

24   been instructed to disregard is not evidence and must not be

25   considered.  In addition, some evidence may be received only

1    for a limited purpose.  When I instruct you to consider

2    certain evidence only for a limited purpose, you must do so

3    and you may not consider that evidence for any other purpose.

4        Anything you may see or hear when the court was not in

5    session is not evidence.  You are to decide the case solely

6    on the evidence received at trial.

7        Evidence may be direct or circumstantial.  Direct evidence

8    is direct proof of a fact such as testimony by a witness

9    about what that witness personally saw or heard or did.

10   Circumstantial evidence is proof of one or more facts from

11   which you could find another fact.  You should consider both

12   kinds of evidence.  The law makes no distinction between the

13   weight to be given to either direct or circumstantial

14   evidence.  It is for you to decide how much weight to give to

15   any evidence.

16       By way of example, if you wake up in the morning and see

17   that the sidewalk is wet, you may find from that fact that it

18   rained during the night.  However, other evidence such as a

19   turned-on garden hose may provide a different explanation for

20   the presence of water on the sidewalk.  Therefore, before you

21   decide that a fact has been proved by circumstantial

22   evidence, you must consider all the evidence in light of

23   reason, experience and common sense.

24       There are rules of evidence that controls what can be

25   received in evidence.  When a lawyer asks a question or

1  offers an exhibit into evidence, and a lawyer on the other

2  side thinks it is not permitted by the rules of evidence, the

3  lawyer may object.  If I overrule the objection, the question

4  may be answered or the exhibit received.  If I sustain the

5  objection, the question cannot be answered and the exhibit

6  cannot be received.  When I sustain an objection to a

7  question, you must ignore the question and not guess what the

8  answer might have been.

9       Sometimes -- this is partly a repeat from an instruction I

10  have already given you.  Sometimes I may order that evidence

11  be stricken from the record and that you disregard or ignore

12  that evidence.  That means you are -- when you are deciding

13  the case, you must not consider the stricken evidence for any

14  purpose.

15      In deciding the facts in this case, you may have to decide

16  which testimony to believe and which testimony not to

17  believe.  You may believe everything a witness says or part

18  of it or none of it.  In considering the testimony of any

19  witness, you may take into account a number of things that I

20  will list for you.  You may consider the opportunity and

21  ability of the witness to see or hear or know the things

22  testified to, the witness's memory, the witness's manner

23  while testifying, the witness's interest in the outcome of

24  the case, if any, the witness's bias or prejudice, if any,

25  whether other evidence contradicted the witness's testimony

or supported it, the reasonableness of the witness's testimony in light of all the evidence and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences.  If you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were and how much weight you think their testimony deserves.  You should avoid bias in assessing witness credibility on account of the person's race, color, religious beliefs, national ancestry, sexual orientation, gender, gender identity, immigration status, political affiliation or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject but may be

1    expressed without conscious awareness, control or intention.

2    Like conscious bias, unconscious bias can affect how we

3    evaluate information and make decisions.

4        Now, I want to say a little bit about your conduct as

5    jurors.  This instruction will be with you throughout the

6    trial, and I'll refer to parts of it from time to time as we

7    go along to remind you.  First, keep an open mind throughout

8    the trial.  Do not decide what the verdict should be until

9    you and your fellow jurors have completed your deliberations

10   at the end of the case.

11       Second, because you must decide this case based only on

12   the evidence received in the case and on my instructions as

13   to the law that applies, you must not be exposed to any other

14   information about the case or the issues it involves during

15   the course of your jury service.  Thus, until the end of the

16   case or unless I tell you otherwise, do not communicate with

17   anyone in any way and do not let anyone else communicate with

18   you in any way about the merits of the case or about anything

19   to do with it.

20       This includes discussing the case in person, in writing,

21   by phone or electronic means, by email, text messaging or any

22   internet chat room, blog, website or application including,

23   but not limited to Facebook, YouTube, Twitter, Instagram,

24   TikTok, LinkedIn, Snapchat or any other forms of social

25   media.

1      This applies to communicating with your fellow jurors

2   until I give you the case for deliberation.  It applies to

3   communicating with everyone else, including your family

4   members, your employer, the media or press and the people

5   involved in the trial.  You may notify your family and your

6   employer that you have been seated as a juror in the case and

7   how long you expect the trial to last.  If you are asked or

8   approached in any way about your jury service or anything

9   about this case, you must respond that you have been ordered

10  not to discuss the matter and report the contact to the

11  Court.

12      Because you will receive all the evidence and legal

13  instructions you properly may consider to return a verdict,

14  do not read, watch or listen to any news or media accounts or

15  commentary about the case or anything to do with it.  Do not

16  do any research such as consulting dictionaries, searching

17  the internet, or using other reference materials, and do not

18  make any investigation or in any other way try to learn about

19  the case on your own.  Do not visit or view any place

20  discussed in the case, and do not use internet programs or

21  other devices to search for or view any place discussed

22  during the trial.  Also, do not do any research about the

23  case, the law, or the people involved, including the parties,

24  the witnesses and the lawyers until you have been excused as

25  jurors.  If you happen to read or hear anything touching on

this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have the case decided only on the evidence that has been presented here in court.  Witnesses here in court take an oath to tell the truth and they are -- and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you have taken an oath to follow the rules, and it is very important you follow these rules.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire process to start over.

If any juror is exposed to any outside information, please notify the Court immediately.  If there is any news account, news media account or commentary about the case or anything to do with it, you must ignore it.  You must not read, watch or listen to any news media account or commentary about the

1   case or anything to do with it.  The case must be decided by

2   you solely and exclusively on the evidence that will be

3   received in the case and on my instructions as to the law

4   that applies.  If any juror is exposed to outside

5   information, please notify the Court immediately.

6       I urge to you pay close attention to the trial testimony

7   as it is given.  During deliberations, you will not have a

8   transcript of the testimony to consult.

9       If you wish, you may take notes to help you remember and

10  understand the evidence.  If you do take notes, keep them to

11  yourself until you begin your deliberations.  Do not let

12  note-taking distract you.  Whether or not you take notes, you

13  should rely on your memory of the evidence.  Notes are only

14  to assist your memory.  You should not be overly influenced

15  by your notes or those of other jurors.

16      From time to time throughout the trial it becomes

17  necessary for me to talk with the lawyers outside your

18  hearing.  I would call a recess for that purpose.  Please

19  understand that while you are waiting, we are working.  The

20  purpose of these conferences is not to keep relevant evidence

21  from you, but to decide how certain evidence is to be treated

22  under the rules of evidence to avoid confusion and error and

23  to decide procedural matters.

24      I am running out of voice.  That should make you happy.

25  We are almost done here.

1      The purpose of these conferences is not to keep relevant

2  evidence from you, but to decide how certain evidence is to

3  be treated under the rules of evidence and to avoid confusion

4  and error.  We will do what we can to keep the number and

5  length of these conferences to a minimum.  I may not always

6  grant a lawyer's request for a conference.  Do not consider

7  my granting or denying a request for a conference as any

8  indication of my opinion of the case or what your verdict

9  should be.

10     As jurors, you are officers of the court.  You must act

11 judiciously, with an earnest desire to determine and declare

12 a proper verdict.  Throughout the trial, you should be

13 impartial and permit neither sympathy nor prejudice to

14 influence you.

15     Now, ladies and gentlemen, I want you to know, I have told

16 you about don't communicate regarding the case.  When you are

17 excused to a chat room as a group, it is perfectly okay for

18 you to talk to each other about things not involving the

19 trial.  So I would hope you have an opportunity to become

20 friendly with each other and with the understanding that you

21 are going to be working together, including your

22 deliberations at the end of the case.  So you are not

23 prohibited from talking with each other about other matters.

24     We will reconvene tomorrow morning at 9:00.  I would ask

25 all of you to be standing by, ready to come to court through

1   your computers at that time.

2       Ms. Tooley, I believe you had -- I am not sure I have your

3   name right.  Juror No. 3, you were going to report on the

4   progress of your computer situation.

5           JUROR NO. 3:  I talked to my father.  He said it

6   shouldn't be a problem.  They use it for church on Sundays

7   and that's about it.

8           THE COURT:  Okay.  Fine.  Thank you very much.  We

9   will see you tomorrow morning at 9:00, and we will begin the

10  case itself with opening statements of counsel.

11      Just one second, please.  I have some questions.

12      Juror No. 8.

13          JUROR NO. 8:  Real quick.  Will we get another email

14  with another link to the Zoom meeting, or are we using the

15  same Zoom meeting?

16          THE COURT:  I should say that Tyler is your boss here

17  while you are on jury duty.  He is the one that can answer

18  that question for you.

19          THE CLERK:  Yes, I am about to hit "send" on an email

20  to everyone with the links for the next several weeks, some

21  instructions, and my contact information, of course, if you

22  need to get ahold of me.

23          THE COURT:  Any other questions?  Okay.  This has

24  been a long day.  A lot of waiting for you, I know.  Things

25  will get interesting from here on out, I promise you.  I look

```
 1   forward to seeking justice along with you for the next few
 2   weeks.
 3       Thank you.  You may all be excused.
 4     (The following occurred outside the presence of the jury.)
 5           THE COURT:  Counsel, do we have anything we have to
 6   talk about?
 7           THE CLERK:  Just a minute, Your Honor.  Juror No. 4
 8   is still here.  We are good to go.
 9           THE COURT:  Can you hear me?  I am not muted.
10           THE CLERK:  We can hear you, Your Honor.
11           THE COURT:  I read the agreed facts at the
12   introduction to the case.  I am curious what form you wish to
13   introduce those facts to the jury.  We can do it by jury
14   instruction or by making an exhibit out of that or whatever
15   you choose.  I don't want to go into that now.  I wanted to
16   raise the question so you'll be thinking about it to present
17   those things at the proper time and in an appropriate way.
18       All right.  Any questions?  Okay.  See you tomorrow at
19   9:00.
20           MS. CHIEN:  Did the parties want to discuss some
21   opening statement objections?
22           MS. SCHEFFEY:  I am ready to move on if you can hear
23   me.  Can you hear me, Your Honor?
24           THE COURT:  Opening statement objections?
25           MS. CHIEN:  The parties --
```

1     THE COURT:  Okay.  Let's talk about it, as long as I

2 don't have to talk too much.  What objection?

3     MS. CHIEN:  The parties have several -- have

4 exchanged demonstratives and exhibits and have a couple

5 issues.  I think from the State's perspective, as opposed to

6 GEO, for GEO's opening they flagged they plan to do some

7 callouts of laws, public laws and federal laws in their

8 opening statement.  We believe any argument regarding the law

9 should be excluded during opening statements.

10     MS. SCHEFFEY:  Your Honor, in response --

11     THE COURT:  Wait a minute.  It is not argument.

12 Opening statement is not argument.

13   Ms. Scheffey, is that your area?

14     MS. SCHEFFEY:  Yes, Your Honor, I'll be addressing

15 that area.  We are not going to make argument.  We will seek

16 the text of the law.

17     THE COURT:  You got a terrible echo.

18     MS. SCHEFFEY:  Hold on one second.  Is this any

19 better, Your Honor?

20     THE COURT:  Well, I think so.  Go ahead.

21     MS. SCHEFFEY:  As to the statement about the law, we

22 do not plan to make an argument about the law.  As you know,

23 one of GEO's defenses is the law discriminates against GEO,

24 so GEO does intend to show the text of the law to say this is

25 what we will argue as discriminatory.

1          MS. CHIEN:  The blowups that GEO flagged are not just

2     limited to the State's minimum wage law.  Also, I believe

3     public law, federal law, which would have nothing to do with

4     whether or not our state law discriminates against GEO.

5          MS. SCHEFFEY:  My understanding is those would also

6     be images that show -- you will hear testimony that Congress

7     set X, Y and Z rate for detention facilities.

8          THE COURT:  I will tell the jury what the law is when

9     the time comes.  It should not be used in opening statement.

10    That is a statement of what the law is.  I would agree with

11    that objection.

12       What else?

13         MS. SCHEFFEY:  Your Honor, the State and private

14    plaintiffs both intend to use demonstratives that they have

15    created that we do not believe are based on evidence that is

16    likely to come in.  One --

17         THE COURT:  Wait a minute.  I'm sorry, you are still

18    echoing real bad.  I don't know what kind of -- are you in a

19    jail cell?  Things might echo in the jail cell.

20         MS. SCHEFFEY:  I am.  I am in jail.

21         MS. MELL:  She can walk down and use my spot.

22         MS. SCHEFFEY:  That's okay.

23         MS. MELL:  If you have not had trouble hearing me, we

24    will put her in my space for the argument.

25         THE COURT:  That's fine.  I don't know what it is

1    that is causing that.

2            MS. MELL:  It will just take a second.

3            THE COURT:  There you go.

4            MS. SCHEFFEY:  Can you hear me now, Your Honor?  I

5    sound like that bad commercial for cell phone service.

6        We have been sent some slides from the State and private

7    plaintiffs that they intend to use as demonstratives in their

8    opening.

9        The first slide I will speak to is the State's.  The slide

10   is based upon Exhibit 602, which we discussed at length in

11   our April 28 hearing.  Your Honor's ruling was you would need

12   to hear foundation before you knew whether it could come in

13   or not.  We believe that is not admissible in opening and

14   should not be shown to the jury, the demonstrative based on

15   evidence that is likely to come in.

16           THE COURT:  What is 602?

17           MS. SCHEFFEY:  602 is the assessment underlying the

18   letter, the letter that was sent to ICE talking about the

19   legal costs and cost of defending against these cases, some

20   of the numbers that no one has gotten any testimony about

21   during deposition, and GEO has argued are privileged under

22   408.

23           MS. CHIEN:  For the State, we would take issue with

24   the idea that no one has been deposed about it.  Mr. Evans,

25   the CFO of GEO, testified he created the document from 602 in

1  support of GEO's request for equitable adjustment and

2  includes the number of employees that GEO calculated would be

3  needed to replace detainee labor if detainee workers weren't

4  hired.  Says GEO did the analysis and determined that 85

5  full-time employees would be necessary to replace detainee

6  labor in the facility.  We think that is directly relevant as

7  to whether or not detainee labor is integral to GEO's

8  business.

9       MS. SCHEFFEY:  That testimony is not in Mr. Evans'

10  deposition because the exhibit was not presented to him.  It

11  had not yet been ordered to be disclosed.  He did not provide

12  testimony about if he knew what it was, whether he created it

13  or used it.  I mean, this is very much not appropriate for

14  opening.  If they want to use it in closing and it comes in,

15  that's fine.  Right now, you specifically said the foundation

16  remains important and that was how you would determine

17  whether or not it would be admissible at trial.  We still

18  haven't gotten that foundation.  It should not be used in

19  opening, let alone as a demonstrative that takes out one

20  small section of that.

21       THE COURT:  The bottom line is I agree with this

22  objection.  It is not a time -- opening statement is when you

23  can tell the jury what you believe the evidence would show.

24  A contested exhibit should not be shown to the jury.  That is

25  my ruling on that objection.

 1          MS. CHIEN:  Thank you, Your Honor.

 2          MS. SCHEFFEY:  Similarly, Mr. Whitehead and the

 3   private plaintiffs intend to use certain slides they have

 4   created that they say are based upon what they expect the

 5   testimony will be, and some of the exhibits -- they have not

 6   identified specific exhibits.

 7          MR. WHITEHEAD:  Not to cut you off.  It is late in

 8   the day.

 9          THE COURT:  Wait a minute.  Every once in awhile, for

10   no good reason, my left hearing aid cuts out.  It has

11   something to do with advancing age.

12      Mr. Whitehead.

13          MR. WHITEHEAD:  I apologize for interrupting.  I

14   wanted to jump to the chase.  Emails were flying late last

15   night.  I am not quite sure where we left off in the

16   exchange.  We won't use the slides.  I have adjusted the

17   PowerPoint accordingly.  I think it is a moot issue on the

18   slides Ms. Scheffey is addressing right now.

19          MS. SCHEFFEY:  Thank you, Jamal.

20          THE COURT:  What else?

21          MS. SCHEFFEY:  Photos, are we still going to address

22   those?

23          MS. CHIEN:  I think we are okay with using photos.

24          MR. WHITEHEAD:  We are okay.

25          MS. SCHEFFEY:  Are you withdrawing your objection to

1   our use of photos as well?

2          MR. WHITEHEAD:  Yes.

3          MS. CHIEN:  Yes.

4          MS. SCHEFFEY:  That is it, Your Honor.

5          THE COURT:  Okay.  Long day, at least for me.  This

6   is not the easiest way to choose a jury.  Maybe it is easier,

7   but it is not as much fun as having them in court where you

8   can communicate better.

9       Thank you, all.  See you in the morning.

10          MR. WHITEHEAD:  Thank you, Your Honor.

11                  (The proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7

8

9    /s/ Angela Nicolavo

10   ANGELA NICOLAVO
     COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25