```
 1                UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                                  )
     UGOCHUKWO GOODLUCK NWAUZOR,     )
 5   et al.,                         )
                                     )
 6              Plaintiffs,          ) 3:17-cv-05769-RJB
                                     ) 3:17-cv-05806-RJB
 7   v.                              )
                                     ) Tacoma, Washington
 8   THE GEO GROUP, INC.,            )
                                     ) June 2, 2021
 9              Defendant.           )
     _____    ) Jury Trial
10                                   )
     STATE OF WASHINGTON,            ) 9:00 a.m.
11                                   )
                Plaintiff,           )
12                                   )
     v.                              )
13                                   )
     THE GEO GROUP, INC.,            )
14                                   )
                Defendant.           )
15   _____

16                VERBATIM REPORT OF PROCEEDINGS
17             BEFORE THE HONORABLE ROBERT J. BRYAN
                 UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24      Proceedings stenographically reported and transcribed
25               With computer-aided technology
```

```
 1                        APPEARANCES

 2

 3    For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
 4                             Schroeter Goldmark & Bender
                               810 Third Avenue
 5                             Suite 500
                               Seattle, Washington
 6

 7
      For the Plaintiff        ANDREA BRENNEKE
 8    State of Washington:     LANE POLOZOLA
                               MARSHA J. CHIEN
 9                             800 Fifth Avenue
                               Suite 2000
10                             Seattle, Washington

11

12    For the Defendant        LAWRENCE D. SILVERMAN
      The GEO Group:           ADRIENNE SCHEFFEY
13                             Akerman LLP
                               1900 Sixteenth Street
14                             Suite 1700
                               Denver, Colorado
15
                               JOAN K. MELL
16                             III Branches Law PLLC
                               1019 Regents Boulevard
17                             Suite 204
                               Fircrest, Washington
18

19

20

21

22

23

24

25
```

1                          EXAMINATION INDEX

2

3    EXAMINATION OF:                                        PAGE

4
      ALISHA SINGLETON      DIRECT EXAMINATION
5                           BY MS. CHIEN                      46
                            CROSS-EXAMINATION
6                           BY MS. MELL                       93

7    WILLIAM McHATTON       DIRECT EXAMINATION
                            BY MS. CHIEN                     117
8                           CROSS-EXAMINATION
                            BY MS. MELL                      191
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              EXHIBIT INDEX

2
       EXHIBITS ADMITTED                                    PAGE
3
         Exhibit 2                                          137
4        Exhibit 14                                          90
         Exhibit 17                                         158
5        Exhibit 69                                          82
         Exhibit 78                                          88
6        Exhibit 80                                          62
         Exhibit 82                                          74
7        Exhibit 83                                         143
         Exhibit 84                                         146
8        Exhibit 85                                         149
         Exhibit 88                                         150
9        Exhibit 89                                         151
         Exhibit 91                                         152
10       Exhibit 103                                         79
         Exhibit 115                                         64
11       Exhibit 123                                        124
         Exhibit 127                                        164
12       Exhibit 129                                        177
         Exhibit 131                                        122
13       Exhibit 132                                        162
         Exhibit 137                                        174
14       Exhibit 141                                        169
         Exhibit 146                                        181
15       Exhibit 229                                         61
         Exhibit 233                                        198
16       Exhibit 244                                        126
         Exhibit 297                                        130
17       Exhibit 309                                         54
         Exhibit 321                                         51
18       Exhibit 329                                        129
         Exhibit 364                                        187
19       Exhibit 430                                        132
         Exhibit 521                                        130
20       Exhibit 522                                        129

21

22

23

24

25
```

```
 1                              MORNING SESSION

 2                              JUNE 2, 2021

 3      (The following occurred outside the presence of the jury.)

 4           THE CLERK:  Good morning, counsel.  Sorry for the

 5   delay.  We had some juror issues.  I have attempted to allow

 6   all the attorneys in.  There are still some joining.  Do you

 7   see anybody that is missing that needs to be here for just

 8   the attorneys?

 9           THE COURT:  I don't have Ms. Mell.

10           THE CLERK:  Defense is in the process.  Ms. Scheffey

11   is also in the process of joining.

12           THE COURT:  There she is.

13           THE CLERK:  We are good to go.

14           THE COURT:  Good morning, counsel.  We have got all

15   the jurors waiting in the breakout room for us.  I have a

16   couple of things I wanted to deal with this morning.  First,

17   I wondered who is presenting opening statement for -- the

18   State goes first.

19           MS. CHIEN:  I will be, Your Honor.

20           THE COURT:  All right, Ms. Chien.

21      Mr. Whitehead?

22           MR. WHITEHEAD:  Good morning, Your Honor, yes.

23           THE COURT:  All right.  For the defense, Ms. Scheffey

24   or Mr. Silverman?  Who is going to make opening statement for

25   the defense?
```

1          MS. MELL:  Mr. Silverman.

2          THE COURT:  Okay.  I just need to know who to call

3   on.

4       The other thing is we didn't make a very complete record

5   on the so-called Batson challenge yesterday.  I wanted to

6   complete that record.  Mr. Whitehead raised the question of

7   discrimination in the challenge made by the defense against

8   Ms. Membreno.  That was based on her race.  She was

9   obviously -- and also from her testimony -- Mexican

10  background and was darker skinned than other jurors and

11  obviously was a -- her appearance, I guess, supported the

12  testimony that she was not only Mexican, but also an

13  immigrant.  So I felt that he had appropriately raised the

14  question, and I heard the response from Ms. Mell about that

15  and determined, on the basis of the record and the totality

16  of the circumstances, that we had a case of purposeful

17  discrimination.  I was not persuaded by the justification

18  offered by Ms. Mell, based on the testimony given by all the

19  other jurors that led me to the conclusion that the reason

20  given for the strike was not persuasive, and that under, as I

21  say, the totality of the circumstances that the strike was

22  motivated by Ms. Membreno's race rather than a

23  non-discriminatory reason.  So that's the record I wanted to

24  supplement.  That's that.

25      We'll go to opening statements.  Ms. Chien, I guess you

1    are ready to go first; is that right?

2              MS. CHIEN:  Yes, Your Honor.

3              THE COURT:  Ms. Mell?

4              MS. MELL:  I want to take exception to the Court's

5    characterization of my motives for attempting to strike --

6              THE COURT:  Ms. Mell, you don't have to take

7    exception to everything -- any time I rule contrary to you.

8    That's a done deal, right or wrong.  I think it was right.

9    The circuit will certainly tell me if it was wrong.

10             MS. MELL:  There was no intentional discrimination on

11   my part.  That's what I take issue with.  I don't like being

12   called racist on the record.  It wasn't racially motivated.

13   I would like the record to reflect that.

14             THE COURT:  All right.  You can bring the jury in,

15   and we'll go to opening statement.

16         (The following occurred in the presence of the jury.)

17             THE CLERK:  Good morning, jurors.  I want to make

18   sure that all of you have your cameras on.

19         We are ready to go.

20             MS. CHIEN:  Can I double-check that we have the

21   ability to screen share with Mr. Campbell?

22             THE CLERK:  You can screen share.

23             THE COURT:  Ladies and gentlemen, as I indicated

24   yesterday, we will start the trial this morning with opening

25   statements from counsel.

1      First, please give your attention to Ms. Chien for the

2  State of Washington, plaintiff.

3      Ms. Chien.

4          MS. CHIEN:  Thank you.

5      The GEO Group is a private, for-profit company from

6  Boca Raton, Florida, that chooses to do business in

7  Washington.  Like every company, GEO relies on people to run

8  its business.  GEO decides the job duties, sets the workers'

9  shifts, trains workers, supervises them, manages payroll and

10 supplies the uniform and equipment necessary to perform the

11 work.  But unlike every other business, GEO pays most of its

12 workers $1 per day for their labor, and that's why you are

13 here today.

14     GEO will say that they do not need to pay minimum wage,

15 that its product and the people that perform the work somehow

16 make GEO above the law.

17     GEO is not special.  GEO is not a form of government.  GEO

18 is not a government agency.  Regardless of the product it

19 sells, GEO is a money-making business and turns a profit for

20 its operations in Washington.

21     Like every company, GEO must pay its workers the minimum

22 wage.

23     As you will hear, GEO's product is something it calls

24 detention management services.  In Washington, GEO sells

25 these services to a single customer, the United States

 1   Immigration and Customs Enforcement.  I will refer to it as

 2   ICE throughout this trial.

 3       ICE detains people, not because they have been convicted

 4   of a crime but while people await a review of their

 5   immigration status.  After an immigration official reviews

 6   their status, many of the people detained will be released to

 7   return to their families in the United States.

 8       ICE detains some of these people in its own federal

 9   facilities, but sometimes ICE contracts with companies like

10   GEO for its services.

11       In Washington, GEO provides ICE these services at its

12   facility in Tacoma.  Ever since it opened in 2005, GEO has

13   operated its Tacoma facility at a profit.  For years, the

14   facility was known as the Northwest Detention Center.  After

15   the State filed this lawsuit, however, GEO changed the name

16   of the facility to the Northwest ICE Processing Center.

17       Regardless of the reason why GEO changed the name to

18   include "ICE," the Tacoma facility remains GEO-owned and

19   GEO-operated, and detainee labor is integral to GEO's

20   business.

21       GEO relies on a voluntary work program in which the people

22   detained complete the work of GEO's own contract.  While ICE

23   requires GEO to create a detainee work program, ICE leaves it

24   up to GEO as to how to set up the program and run it.  Almost

25   all details and daily management of the program are

1    completely left up to GEO.  In other words, what jobs to

2    assign, how workers will be trained, how the work is

3    supervised, how the work is scheduled, how many detainee

4    workers are needed, what equipment is needed to do the work,

5    what uniforms to wear, and how much detainee workers will be

6    paid are GEO's choices to make.

7        Although, again, after the State filed this lawsuit, GEO

8    changed the name of the work program to the Voluntary

9    Facility Activities Program.  The facility activity is still

10   work.

11       You will hear from GEO's Assistant Warden Bill McHatton

12   who worked for GEO when the Center first opened in Tacoma.

13   He will tell that you back then, he, along with other GEO

14   staff, drafted job descriptions for each job assignment, set

15   the work schedule, and tasked GEO staff with training

16   detainee workers and supervising their work.

17       You will also hear from Alisha Singleton, the GEO officer

18   who managed the work program on a day-to-day basis for nearly

19   15 years.  Ms. Singleton will tell you that she managed the

20   schedules, work rosters and other forms used to track when

21   and where detainees worked.  She will tell you she fielded

22   detainees' requests to work, as well as GEO's officers'

23   requests for more detainee workers.  She confirmed all the

24   paperwork to work.  Until it was transferred to a separate

25   department, she also did the payroll for detainee workers.

1      Although GEO may argue that the detainee workers were

2   simply doing personal chores, I will ask you to consider the

3   evidence carefully.  The jobs are much more than personal

4   chores.  The detainee workers' jobs are to support the core

5   services GEO agrees to provide in its own ICE contract; that

6   it will prepare thousands of meals each day; that it will run

7   a laundry facility big enough to wash linens for more than

8   1500 detainees at any time; and that it will ensure the

9   Center is clean and meets all sanitation requirements.

10      You will hear testimony that detainee workers clean, mop

11   and buff virtually every area of the center from the hallway

12   known as the Grey Mile, to the kitchen, to the laundry

13   facility, to the living areas, to the law library and

14   barbershop, to visitation, to medical, to intake.

15      You will hear from GEO's food service manager,

16   Bertha Henderson, as well as other current and former GEO

17   officers that worked in the kitchen, Edwin de la Cruz and

18   John Patrick Griffin.  All of them will tell you that they

19   trained and supervised detainee workers in the kitchen.  The

20   detainee workers unloaded food shipments, cut vegetables,

21   operated braisers and ovens, set up the serving lines,

22   distributed food on the serving lines, served the food,

23   washed dishes and cleaned the kitchen every night.

24      You will hear from three GEO officers, Iolani Menza,

25   David Tracy and Marc Johnson.  They will tell you that they

1  supervised detainee workers when they cleaned throughout the

2  facility.  The detainee workers are the barbers at the

3  barbershop and provide thousands of haircuts every year.

4      Menza and Tracy will tell you they get paid almost $30 per

5  hour to work right next to detainee workers doing the same

6  thing, loading and unloading washers and dryers, putting

7  together bedrolls, folding and stacking laundry from

8  industrial-sized bins everyday.  They will also tell you that

9  the people detained, "make an important contribution to the

10 center."

11      GEO's creation of a work program alone is not the reason

12 why you are here today.  The fact that GEO relies on detainee

13 workers to run its business is not the problem.  The reason

14 you are here today is because GEO does not pay its workers

15 the minimum wage, let alone a competitive wage.  Far from it.

16 GEO pays its workers a single dollar per day -- not per hour,

17 per day -- for their labor.  GEO's practice of paying

18 detainee workers a dollar a day is the core of what this case

19 is about.

20      So who am I?  My name is Marsha Chien.  Along with my

21 colleagues Andrea Brenneke and Lane Polozola, we represent

22 the State of Washington, and we are here to enforce the law.

23      Washington first enacted its minimum wage in 1959.

24 Without it, businesses undercut each other, take unfair

25 advantage, and make it harder for workers to find jobs that

1  pay a living wage.  GEO's decision to pay detainee workers a

2  dollar a day directly undercuts the purpose of our state law,

3  and it does so on an incredible scale.

4      GEO's own staff will testify that approximately 400

5  detainee workers work at the center every single day.  Some

6  work for 30 minutes mopping showers and bathrooms.  Over 100

7  others work in the kitchen, rotate between four different

8  shifts, lifting heavy pots, plating trays, preparing food and

9  cleaning equipment.

10     GEO may suggest at trial that detainee work is not a value

11 or a benefit to GEO, and that assignments are made-work

12 activities, simply to reduce idleness in detention.

13     GEO's own witnesses, financial documents and staffing

14 plans demonstrate the opposite:  Detainee work is real work

15 and integral to GEO's business.

16     You will hear from GEO's financial executives, Chuck Hill

17 and Brian Evans, who will testify that GEO would likely have

18 to replace detainee labor with employees hired from the

19 Tacoma community.  An expert economist, Peter Nickerson, will

20 confirm that all detainee worker assignments in the center

21 are similar to jobs found in the community.

22     You will also hear testimony that GEO has had to hire

23 temporary workers, reassign existing GEO staff to other areas

24 of the facility, and rely on kitchen staff to work overtime

25 when GEO was short on detainee workers.  In fact, GEO hires

1  janitors from the community to do the exact same jobs the

2  detainee workers do but in the few areas in the Center where

3  detainee workers are not allowed to go.  GEO pays these

4  janitors not a dollar per day, but $15 per hour.  More than

5  the minimum wage.

6      So GEO's practice of paying a dollar a day for all this

7  work impacts much more than detainee workers.  It reduces the

8  number of jobs available in the Tacoma community.  The work

9  assigned to people detained at the center are jobs that could

10  have been filled by people in the community just like GEO

11  officers.

12      You will hear testimony from a Work Source supervisor in

13  Tacoma.  Work Source is an employment agency that provides

14  training and employment services to job seekers across

15  Washington.  That supervisor will tell you that there are

16  people in Tacoma who seek jobs today cleaning, mopping,

17  preparing food and doing laundry.  While they would not do

18  that for a dollar per day, they certainly would do so for

19  minimum wage.

20      So the basic facts about the work program are not really a

21  secret.  There is really not that much disagreement about

22  them.  GEO will attempt to distract you.  First, GEO will say

23  the ICE contract specifically prohibits GEO from employing

24  detainee workers.  But what GEO does and what the contract

25  says are two different things.

1      For example, the ICE contract says that GEO can't use

2   detainee workers to fulfill its contractual obligations, and

3   yet that is clearly what GEO has done.

4      You will hear that ICE reimburses GEO a dollar for every

5   detainee worker's day of work, but no one will testify that

6   the contract prevents GEO from paying the minimum wage.  Not

7   even GEO.

8      In fact, you will see that the contract tells GEO in

9   multiple places to comply with state and local labor laws.

10  The detainee work program section of the contract

11  specifically states the detainee worker -- the detainee work

12  program must comply with all applicable laws and regulations.

13  ICE's Performance-Based National Detention Standards, which

14  you will hear referred to as the "PBNDS" or the "ICE

15  standard," says GEO must pay, quote, "at least a dollar per

16  day," allowing GEO to pay the minimum wage.

17     In fact, GEO has long known that GEO can pay people

18  detained at the center more than a dollar per day.  You will

19  see a memo dated April 2012 where Alisha Singleton, the

20  person that managed the work program for nearly 15 years,

21  which she flagged for GEO's leadership, that GEO had the

22  option to pay more than a dollar per day, quote, "if we

23  like."  Even ICE confirms it.

24     In August of 2014, ICE told GEO's Assistant Warden

25  McHatton, that quote, "There's a minimum compensation of a

1   dollar, however, there is no maximum."

2       Today, as part of this very lawsuit, GEO has admitted

3   that, quote, "GEO has the option to pay more than a dollar

4   per day to detainee workers."  In fact, GEO has exercised

5   this option.  GEO has paid detainee workers sometimes two

6   dollars per day, sometimes five dollars per day, when it was

7   short on detainee workers.  Ms. Singleton will tell you that

8   once GEO had enough detainee workers, GEO would always return

9   to paying workers a dollar per day.

10      So don't let GEO's reference to the ICE contract or ICE

11  standards give you pause.  Neither prevents GEO from paying

12  the minimum wage.

13      GEO's second distraction will be to say that detainee

14  workers do not qualify for minimum wage, either because of

15  their immigration status or because everything they need is

16  provided for, or because the work program is voluntary.

17      As you will hear from Chris Strawn, an immigration expert,

18  many of the detainees are lawful immigrants and eligible to

19  work in the United States just like and you me.  Even if some

20  are not, then minimum wage applies to all workers, regardless

21  of their immigration status or work authorization.  In fact,

22  it must.  If companies were allowed to pay immigrants less,

23  employers would only hire those vulnerable worker, and there

24  would be a race to the bottom.

25      Although GEO will claim that detainees need not be paid

1   the minimum wage because GEO provides everything a detainee

2   could want, you will hear from detainee workers themselves.

3   They will tell you that they needed more money to call their

4   families, that they needed more money to supplement the

5   meager food that they were provided.  One detainee worker

6   will tell you after months of working 30 hours per week in

7   the center's kitchen, he had only $22 in his pocket when he

8   was released, not even enough for his bus ticket home when he

9   was released to the United States.

10      The fact that detainees sign a voluntary work program

11  agreement and agree to a dollar a day does not give GEO a

12  free pass.  Although no one forces detainees to work any more

13  than anyone forces anyone to work at a restaurant, a store,

14  or an office, once they do work, they are entitled to lawful

15  pay.  It makes sense that for-profit companies cannot rely on

16  volunteers.  If a private company permits people to work,

17  whether Amazon or GEO, they must pay the minimum wage.

18      As a final distraction, GEO will point its finger at the

19  State, but context matters at trial.  Soon I will finish and

20  GEO's counsel will give their opening statement.  They will

21  say something like:  The State doesn't pay the minimum wage

22  to the people it incarcerates, so what's good for the goose

23  is good for the gander.

24      Since I won't get a chance to speak with you again, I

25  would like to put that in context.  Our state law exempts

1  governments from paying its inmates or detainees the minimum

2  wage because governments are different from GEO.  As

3  employees in Washington Department of Corrections will

4  testify, the reason DOC imprisons inmates is because they

5  were found guilty of committing a crime.

6      As employees of Washington's Department of Social and

7  Health Services will testify, state-run mental health

8  hospitals and commitment centers protect the mentally ill

9  themselves.  So DOC inmates and DSHS civil detainees

10  participate in work programs because it is either part of

11  their criminal sentence, or part of an individualized

12  rehabilitation plan.  State agencies are not in the business

13  of detention for profit.

14      In contrast, none of the people detained at the center are

15  serving a criminal sentence.  No one is participating in the

16  work program as part of a mental health treatment plan or

17  rehabilitation plan.  According to GEO's own policy, the work

18  program is meant to gainfully employ detainees while

19  contributing to the orderly operation of the facility.

20  That's it.

21      Knowing that a private contractor is different from a

22  government agency, GEO will attempt to confuse you.  GEO will

23  argue that the State's exemption unfairly discriminates

24  against GEO because it is a federal contractor.  In other

25  words, that the State's minimum wage law applies to federal

1    contractors but not state contractors.

2        I suspect GEO will point to its own contract with the

3    State which was signed in case DOC's prisons were over

4    capacity, but it was never used.  So allow me to put that

5    contract in contrast.  GEO's contract with the Department of

6    Corrections is no different from the ICE contract.  Just like

7    the ICE contract, the DOC contract, one, requires GEO to

8    comply with all state laws; two, sets a floor that GEO must

9    pay those incarcerated; and three, allows GEO to pay more

10   than that floor.  So just like the ICE contract, the State

11   contract nowhere prevents GEO from paying the minimum wage.

12       In sum, the State's minimum wage law does not apply

13   because GEO is a federal contractor.  The State's minimum

14   wage law applies because GEO is a private corporation.

15   Period.

16       So this case is not about Washington's prisons or mental

17   health systems.  This case is about GEO, a private,

18   money-making business.

19       GEO did not become the federal government when it

20   contracted with ICE.  GEO has a CEO, a CFO and is accountable

21   not to the public, but to its shareholders.  GEO is a private

22   company that chooses to do business in Washington.  As long

23   as it chooses to do business in Washington, our State law

24   requires that GEO pay its workers the minimum wage.

25       So after you have heard all of the evidence, the core

1  question before you will actually be simple and

2  straightforward:  Does GEO use the people detained at the

3  center to do the work necessary to run its business?  We

4  believe it clearly does.

5       At the close of this case, we will ask you to require GEO

6  to pay the minimum wage for labor performed on its behalf,

7  whether the labor was completed by the people detained or

8  workers from the Tacoma area.

9       Thank you.

10          THE COURT:  Thank you, Ms. Chien.

11       Mr. Whitehead is next for Mr. Nwauzor and

12  Mr. Aguire-Urbina and the class, so please give your

13  attention now to Mr. Whitehead.

14          MR. WHITEHEAD:  Washington has a long and proud

15  history of protecting workers.  In fact, it was among the

16  first states in the nation to pass a minimum wage law.

17  Reasonable minds can differ about what the minimum wage

18  should be, but without minimum wage laws, employers can take

19  advantage of desperate workers and push wages down for entire

20  communities.  Not only that, but employers who pay less than

21  the minimum wage hold an unfair business advantage.  If an

22  employer pays its employees less than the minimum wage, the

23  law requires the employer to make it right.

24       My name is Jamal Whitehead, and along with my colleague,

25  Adam Berger, we represent the plaintiffs in this matter,

 1    Ugochukwu Goodluck Nwauzor and Fernando Aguire-Urbina.

 2        Mr. Nwauzor is what's known as a class representative,

 3    which means he's brought this case not just for himself, but

 4    on behalf of all the other people that took part in the

 5    worker program at the detention center.

 6        Ms. Chien has told you a lot of the story in this case.

 7    Let me take you back to 2005.  GEO buys what was then called

 8    the Northwest Detention Center on the Tacoma Tideflats.  GEO

 9    contracts with U.S. Immigration and Customs Enforcement,

10    better known as ICE, to provide detention management services

11    at the center.

12        The contract goes like this:  GEO agrees to house and feed

13    and clean up after 1500 men and women in a secure facility in

14    return for money.  GEO agrees to follow all the applicable

15    federal, state and local labor laws.  GEO agrees to follow

16    the highest standard if there is ever a conflict between

17    these laws.

18        GEO hires workers in the community to carry out management

19    and security functions, but GEO relies on the people detained

20    inside the center to prepare, cook and serve food,

21    essentially run the laundry service and barbershop, and

22    perform almost all janitorial duties.

23        GEO provides the training, the tools and the supplies the

24    detainee workers need to perform their various jobs.  GEO

25    supervises the detainee workers as they work, and GEO fires

1   the detainee workers when they do a poor job.  GEO pays the

2   detainee workers one dollar a day for their labor.

3       Let me tell you why we are suing GEO.  We are suing GEO

4   because it used the detainee workers like employees, but

5   violated the rule that says employers in Washington must pay

6   their employees at least the minimum wage.

7       We all have experiences as employees, some of us as

8   employers, maybe it is the absence of a job that is most

9   meaningful in your life.  So your common sense tells you what

10  it means to be an employee, but to do your part in this case,

11  you are going to learn about the work done inside a detention

12  center, which is likely an unfamiliar setting to you.  By the

13  time this case is over, though, you'll know more about the

14  work done inside the detention center than anyone in the

15  Puget Sound.

16      What you will learn during the course of this trial is

17  that even though the work setting may be different, there is

18  certain basic things to look for to answer the central

19  question in this case:  Whether GEO employs the detainee

20  workers to do the work necessary to run its business.

21      We will show you real images from inside the facility.

22  You will hear testimony from GEO's current and former

23  administrators, managers and officers about GEO's near

24  absolute control over the worker program.  Really, there is

25  no genuine dispute on these points.  GEO creates the job

1   descriptions for the detainee workers.  GEO evaluates whether

2   a detainee worker is suitable for a given job.  GEO approves

3   shift locations, schedules and length.  GEO trains detainee

4   workers.  GEO provides all the tools and equipment necessary

5   for the job.  GEO manages and directs the work.  GEO judges

6   whether the work has been done right.  GEO signs off on the

7   completion of the work.  GEO removes or terminates bad

8   workers.  GEO handles all aspects of payroll.  Working for

9   GEO is the only option detainee workers have while in

10  detention.

11       What you will learn is GEO relies on the detainee workers

12  to maintain the facility.  No, I am not talking about the

13  actual business of detention, like making sure the doors are

14  locked.  Just everything else.  You will hear from a number

15  of witnesses who will tell you that the detainee workers make

16  an important contribution to the facility, and how using the

17  detainee labor is a key part of GEO's business plan.  You

18  will hear testimony about how every day hundreds of workers

19  cook, clean, do laundry and cut hair at the facility, and how

20  GEO really doesn't have anyone else to carry out these

21  functions.

22       For example, GEO employs two, sometimes three, janitors to

23  clean the parts of the facility that the detainee workers

24  can't access like the administrative offices and the building

25  lobby.  But the living pods, kitchen, laundry room, the

1    recreational areas, the barbershop, hallways, those are all

2    cleaned exclusively by detainee workers.

3        Take the kitchen as another example.  You will hear how

4    GEO produces as many as 45,000 meals each week, but how there

5    are only 13 GEO staffers in the kitchen.  Of those, three are

6    managers who perform administrative functions, the others,

7    the kitchen officers, only two work at a time on each kitchen

8    shift.

9        How is GEO able to prepare so much food with only two

10   kitchen officers on each shift?  Well, you will hear the

11   answer, and how it involves 20-plus detainee workers on each

12   shift who actually prepare and serve those 45,000 meals.

13       It is the same story in the laundry room.  GEO has one

14   laundry officer working a laundry shift in a facility that

15   can hold over 1500 people.  Who washes and folds the sheets,

16   blankets, towels and clothing?  The detainee workers, that's

17   who.

18       Same story in the barbershop.  GEO employs zero barbers.

19   Who cuts hair at the center?  You guessed it, the detainee

20   workers.

21       You will hear how if the detainee labor were removed from

22   the equation, GEO would need to authorize overtime for its

23   existing personnel, bring in outside workers, hire

24   third-party vendors, or all of the above.  GEO has done its

25   own analysis and knows precisely how many -- emphasis on the

1    word "many" -- full-time employees it would need from the

2    community to replace the detainee workers.

3        That's why we are here.  GEO has used the detainee workers

4    like employees, and rather than paying them fairly and

5    consistent with the law, GEO pays them just one dollar a day.

6        Coming to trial was no easy decision.  Before we decided

7    to come before you, the jury, we had to determine a few

8    things for ourselves.  For starters, we had to determine

9    whether the work performed by the detainee workers was just

10   simple housekeeping or chores like you do around your house.

11   Because if it was, it would be silly to bring this kind of

12   lawsuit.

13       We looked at the job descriptions for the detainee

14   workers, and yes, there are job descriptions.  We saw the

15   work performed was for the benefit of the facility and GEO.

16   Not just a matter of making their own beds.

17       You will hear from several of the workers, and they will

18   tell you about how they cleaned the showers for their entire

19   living unit, or how they served food and cleaned up after

20   their entire living pod.  That's how we determined that the

21   work in question was more than just house chores.

22       Next, since no one is forced to work, we had to determine

23   whether the detainee workers were more like volunteers

24   donating their labor.  Because if the workers were volunteers

25   that might explain why GEO didn't pay them like employees.

Opening Statement - Mr. Whitehead

1    So we asked detainee workers why they worked, and many told

2    us that they needed the money to call loved ones from GEO's

3    pay phones, or to help pay for lawyers in their immigration

4    cases, or just to buy comfort items from the commissary.

5        We also learned, and GEO will agree, that only non-profit

6    organizations can have unpaid volunteers under state law.

7    GEO is very much a for-profit business.  The Judge will

8    instruct you on the law of the case.  All agree that GEO must

9    follow the law, and that any agreements between GEO and the

10   detainee workers who worked less than the minimum wage, it is

11   no defense in this case.  In other words, GEO can't contract

12   its way around state laws.  So that is how we determined that

13   the detainee workers weren't merely volunteers.

14       We also had to determine whether detainee workers were

15   even eligible to be employees, given their uncertain

16   immigration status.

17       So we asked our expert, UW Professor Christopher Strawn,

18   whether detained persons may be work authorized.  He will

19   tell that you many detainees are authorized to work as

20   lawful, permanent residents, while others are eligible to

21   apply for employment authorization.

22       We also learned it is no defense to say that the minimum

23   wage does not apply because the workers lacked work

24   authorization.  Otherwise, there would be an incentive,

25   frankly, for shady employers to hire workers without work

1    authorization because they could stiff the workers without

2    consequence when it came time to pay.

3         Along those same lines, we had to determine whether the

4    people being held were there as criminal punishment.  Because

5    if they were, perhaps a different set of rules apply.  We

6    asked all of the GEO witnesses before trial whether any

7    aspect of detention is punishment, and everyone agrees, and

8    the Judge will instruct you, that the detention center is not

9    a prison.  The people held there are not being held as

10   punishment.  They are being held while the government sorts

11   out their immigration status.

12        We also had to determine whether GEO's contract with ICE

13   prevented GEO from paying the detainee workers the minimum

14   wage.  Because if ICE was in control, it might explain some

15   of GEO's actions.  So we looked closely at the wording on

16   GEO's contract with ICE, and we found a few things.

17        To start, GEO's contract with ICE says GEO must follow all

18   applicable federal, state and local laws, including

19   employment laws.  The contract says that if there is any

20   question that comes up about which law to follow, GEO must

21   follow the strictest standard.  And along those lines, you

22   will hear how GEO follows employment discrimination laws and

23   workplace safety laws, like OSHA in the worker program.

24        Next, the contract requires GEO to pay at least one dollar

25   a day to detainee workers.  We found internal emails from GEO

1   and ICE about the meaning of that phrase "at least".  They

2   show that one dollar per day was the minimum amount, but

3   nothing prevented GEO from paying more to comply with state

4   laws.  We also talked to GEO personnel that will testify that

5   GEO does, in fact, pay some detainees more than a dollar a

6   day when it needs to attract more workers.

7       Finally, we asked GEO written questions in the run up to

8   trial, and it admitted that it can, in fact, pay more.  So

9   that's how we determined that GEO's contract with ICE doesn't

10  prevent it from paying the detainee workers more.

11      You'll be able to determine whether bringing a private

12  lawsuit against GEO would duplicate the efforts of the State

13  in its law enforcement action.  Because if the State was

14  already looking into the matter, then it wouldn't be

15  necessary to bring a private lawsuit, too.

16      What we learned is that Ms. Chien and her colleagues at

17  the Attorney General's Office represent the people of

18  Washington.  The relief they seek is looking into the future.

19  There was no one to represent only the interest of the

20  detainee workers, the people who did the work and didn't get

21  paid.  The relief we seek for them is for the work that they

22  performed in the past.  That's how we determined that a

23  private lawsuit would not duplicate the efforts of the State.

24      Since the State of Washington is also suing GEO, we had to

25  determine whether the State is operating any similar programs

1    for inmates or detainees and paying them less than the

2    minimum wage.  It wouldn't be right for the State to be

3    hypocritical on this issue.

4        What we learned is the minimum wage laws exempt government

5    actors from paying inmates who are detainees the minimum

6    wage, but not private companies like GEO.

7        We didn't stop there, though.  We looked even further to

8    see if the State of Washington contracted with any private

9    companies to house inmates or detainees, like ICE does with

10   GEO.  We determined that the State doesn't do business with

11   any private detention companies in Washington.  That is how

12   we determined that the State wasn't being hypocritical.

13       Now, you will receive a verdict form at the end of this

14   case asking whether GEO employed the detainee workers.  But I

15   want to take my final minutes with you and let you know this

16   case is about real people.

17       One of the people you will hear from is the class

18   representative I told you about earlier.  His name is

19   Ugochukwu Goodluck Nwauzor.  He goes by Goodluck, and,

20   frankly, with a name like that, who wouldn't.  Goodluck was

21   born in Nigeria, and Igbo is his first language.  He grew up

22   with his parents and his brothers in a Christian community.

23   He moved away from home to start a business in Chibok County,

24   Nigeria.

25       If you have heard about Chibok County, it's likely because

1   you remember the news story about -- you heard about the

2   terrorist group Boko Haram kidnapping and marrying off 300

3   schoolgirls.

4       Goodluck got into an argument with a Boko Haram member

5   about the atrocities they were committing.  Boko Haram

6   destroyed his store where he also lived and threatened to

7   kill Goodluck and his family.

8       Goodluck couldn't stay in Nigeria, so he left.  He

9   traveled by boat, by car, by foot to the United States

10  seeking protection.  He will tell you that he did not sneak

11  into America.  He presented himself at a security checkpoint

12  seeking asylum.

13      While his application was pending, he spent months at the

14  Northwest Detention Center.  He cleaned the shower stalls in

15  his living unit every afternoon after dozens of men used it.

16  GEO trained him to do the job and supervised his work.

17  Goodluck was a good worker, but he saw GEO personnel fire

18  others who weren't.  He was paid one dollar a day for his

19  labor, which he used to help his asylum case and call his

20  family.

21      He was granted asylum and released from the detention

22  center.  He worked for a hotel in Pioneer Square until

23  recently where he was laid off because of COVID.  Before he

24  was laid off, he was recognized as employee of the month at

25  the hotel.

1    He's had a hard life.  He doesn't look for pity.  He will

2    tell you that employees work for money and have bosses, and

3    that GEO treated him like an employee while he was detained.

4        From beginning to end, everything we show you in trial is

5    for you to see that GEO used the detainee workers like

6    employees to maintain its facility.  GEO paid them just one

7    dollar a day to maintain its profit margin.

8        This is an important case.  Not because you are being

9    asked to make sweeping judgments about our country's

10   immigration policies or weigh in on a culture war.  It is

11   important because you are being asked to pass judgment on

12   corporate conduct that takes advantage of desperate people,

13   to pass judgment on corporate conduct that pushes down wages

14   for entire communities, to pass judgment on corporate conduct

15   that is premised on an unfair business advantage.

16       If an employer pays its employees less than the minimum

17   wage, the law requires the employer to make it right.  We are

18   asking you to hold GEO accountable for its choices.  We are

19   asking you to make this right.

20       Thank you.

21       THE COURT:  Thank you, Mr. Whitehead.

22   Now, please give your attention to Mr. Silverman for the

23   defendant.

24       MR. SILVERMAN:  Good morning, ladies and gentlemen of

25   the jury.  My name is Larry Silverman.  It is my pleasure to

1  represent the GEO Group in this lawsuit.  With me is

2  co-counsel Joan Mell, who you met during jury selection, as

3  well as Adrienne Scheffey, my other co-counsel, who is waving

4  on the screen as we speak.  We are going to represent the GEO

5  Group here during these proceedings.  In addition, our

6  corporate representative, Bruce Scott, who is the facility

7  administrator for the Northwest ICE Processing Center.

8      There is a radio show that used to be on when people

9  listened to the radio shows, it was The Paul Harvey Show.  It

10 was called, "The rest of the story."  Here is the rest of

11 story.

12     Let's start with the fact that you heard during opening

13 statements that, quote, "GEO doesn't have anyone else to do

14 these jobs, to do these tasks."  Remember hearing that?  GEO

15 has, depending on how many detainees it has, either 320

16 available employees or 374 available employees to do whatever

17 needs to be done.  Most of them are -- in sports you call

18 them utility players.  They are not specified for a specific

19 task.  GEO has to keep the railroads running on time, and it

20 has plenty of folks to do it.

21     You will hear in a few minutes GEO can't count on any

22 volunteers because they don't have to have skills, they don't

23 have to have a background, and they don't actually have to

24 show up for their volunteer positions.  We will talk about

25 that in a few minutes.

Opening Statement - Mr. Silverman

1       Let's talk about the rest of the other side of the story.

2  You heard counsel talk about all the investigating they did,

3  and they found this and they found that.  Well, the State of

4  Washington has been doing the exact same thing that GEO does

5  in its own facilities for many years, and the State of

6  Washington knew that GEO was doing what it was doing for many

7  years.

8       You will specifically hear that in the detention

9  facilities in the state of Washington, it has never treated

10  any of its detainees as employees, never paid them minimum

11  wage.  They do the exact same things that they are

12  complaining about in this case.

13      What they are complaining about in this case is a

14  volunteer program set up in a detention facility that is

15  required by the federal government.  The federal government

16  requires the facility, but it also requires the voluntary

17  work program to keep people busy, increase morale, decrease

18  boredom, help with security.  You've heard the phrase about

19  what idle hands can do.  Use your own version of that.  The

20  point is, it is a mandatory volunteer program because it is a

21  secured facility and people need something to do.

22      So GEO creates volunteer tasks and makes them available

23  for the detainees to volunteer.  Most of those tasks take 20

24  minutes or less to complete.  They are the kind of tasks that

25  in any other context you would refer to as chores.  Things

1    like wiping down the tables, things like pulling up the

2    garbage bags and putting them in a bin and taking them to

3    another place.  As we sit here, that's my job at home, and I

4    am in trouble for not doing that.  Folding laundry, the

5    laundry that they wear, things like that.

6        The volunteer program is set up in a way to maximize the

7    number of volunteer opportunities because the whole purpose

8    of the detention volunteer program is to give people a chance

9    if they want to volunteer.  There is a waiting list for most

10   of these volunteer opportunities.  So what one person could

11   do, GEO creates four volunteer opportunities.  It's a little

12   bit like a kindergarten little league game where you know

13   everybody has to play.  You are not maximizing your chances

14   of winning.  You are maximizing your chances of

15   participation.

16       So what this case is about is the plaintiffs' attempt to

17   convert what is a volunteer program into employment.  They

18   want to call it employment.  But two things, first of which,

19   it is like no employment you have ever heard of.  It is

20   employment where you don't have to have any skills, you don't

21   have to have any qualifications.  It's first come, first

22   served, and if you decide not to show up for what you

23   volunteer for, you nonetheless can stay in the program.

24       That's what a volunteer does.  But no one involved in any

25   way has an expectation that the detainees, when they

1    volunteer, change into employees.  The federal government

2    doesn't have that understanding.  GEO doesn't have that

3    understanding.  It fully explains this program to the

4    detainees so they shouldn't have that understanding or

5    expectation.  Most importantly, as you just heard, the State

6    of Washington doesn't have that expectation because it does

7    the exact same thing.

8        People who are detained in the facility are not detained

9    by GEO.  They are detained by the federal government.  The

10   federal government has decided what our immigration policy is

11   in the United States and which detainees are going to be held

12   in detention versus which ones go out on bail or other

13   aspects of the program.  In addition, it is the federal

14   government who solely decides when and how long a detainee

15   will be in detention.  It can range from 30 to 60 days, 90

16   days, depending on the year.  It is the federal government

17   who decides the security status of any specific detainee

18   because one of the major components of getting into detention

19   is if someone is in the United States and commits a crime or

20   commits violence, those folks are segregated out in the

21   facility and classified separately.

22       GEO doesn't control any of that.  What GEO does do is GEO

23   contracts with the federal government to run this facility on

24   behalf of the federal government.

25       So there is a 200-plus page contract that sets forth every

1    rule and expectation that the federal government has in this

2    program.  Let me point to two specific provisions.  You will

3    be hearing a lot of this.  The first of which is how the

4    voluntary work program gets paid for.  "Detainee volunteer

5    wages for the detainee work program:  Reimbursement for this

6    line item will be at the actual cost of one dollar per day

7    per detainee.  Contractor shall not exceed the amount shown

8    without prior approval by the contracting office."

9        Ultimately, it is ICE's dollar.  GEO provides the

10   one-dollar stipend to a volunteer for volunteering, then GEO

11   gets reimbursed for that.

12       There is a second provision as well.  Pull up Page 82.

13   The second provision specifically specifies how the detainee

14   work program is supposed to work.  It states:  "The detainee

15   work plan must be voluntary," and you will hear that it is.

16   "Detainees shall not be used to perform the responsibilities

17   or duties of an employee of the contract."  So the

18   requirement and the expectation is that the detainees are

19   doing something different than what employees do.  That's the

20   contract.

21       As you heard briefly referred to during opening, there is

22   a 400-plus page manual that ICE provides in order to

23   determine how a detention facility is run.  It is known as

24   the Performance-Based National Detention Standards.  This is

25   the 2011 edition.  It was significantly revised during the

1    Obama administration, and those revisions have carried forth

2    ever since.  You are going to see that the detention

3    standards as set forth in there are, quote, "An important

4    step in detention reform and serve to ensure that the care of

5    detainees is the most humane possible."

6        One of the ways that ICE has proposed -- and not just

7    proposed, requires, is that a voluntary work program be

8    instituted to keep people busy if they want to volunteer.

9    ICE is pretty clear as to what the purpose of the program is.

10   This is a detention facility.  "The negative impact of

11   confinement shall be reduced through decreased idleness,

12   improved morale, and fewer disciplinary incidents."  That's

13   what ICE wants to accomplish by having a volunteer program

14   available, and that is what the volunteer program in this

15   facility, in all these facilities, is intended to provide.

16       So we are going to talk a little about the program.  How

17   is this conveyed to the detainees when they come to the

18   center?  In fact, ICE prints standard brochures that are

19   provided to each detainee -- showing you English and Spanish,

20   but it's available in numerous languages -- that specifically

21   advise the detainee there is a volunteer opportunity

22   available and pays, in that case, at least one dollar a day.

23   But GEO also provides its own manual that each detainee

24   receives and signs for that sets forth the programs at the

25   specific facility here in the Northwest, as opposed to the

1    other manuals which talk about what are the programs at any

2    detention facility around the country.  This manual, which is

3    received by each detainee and which is signed for by each

4    detainee, specifically advises the detainee that the payment,

5    the stipend, is one dollar per day, and it is voluntary.

6    They can choose to volunteer.

7        Why does somebody volunteer?  Again, you heard some

8    reference that is probably true that you probably don't have

9    any kind of real understanding of what the day-to-day life is

10   in a facility like this.

11       In fact, the detainees have no responsibilities to do any

12   specific task.  They can, and some of them do, sleep all day,

13   watch TV all day.  You can play video games.  You can play

14   Xbox 16-hours-a-day, which I wouldn't think anybody can do,

15   but my son has proved me wrong.  There are lots of other

16   opportunities for things a detainee can do.  To show you some

17   examples, they can go to the law library, they can play at

18   the athletic fields, they can workout in their housing unit,

19   they can watch movies.  There is actually a movie program.

20   So participation in the program is optional.  But as noted in

21   the standards, the voluntary work program exists because

22   there is the presumption that people want an opportunity to

23   be active.  People want an opportunity to feel some

24   accomplishment, to feel productive, to feel like they are

25   contributing to their area, to their household, and to

1    provide a distraction for folks who are in detention and may

2    be bitter about it.  The goal in confinement is:  Why don't

3    we give folks something to do.

4        So not everyone volunteers, but people do because they

5    want this opportunity.  And so all of the detainees, when

6    they volunteer, they know the extent of the program, and they

7    know that they are volunteering, and that the stipend is one

8    dollar per day at this facility.

9        So the volunteer tasks that they do, as I noted, are more

10   like chores.  You are going to hear lots about that.  Let's

11   talk for a minute about what it takes to become a formal

12   employee of GEO, a formal employee to work at this facility.

13   It requires a massive background check because it is a secure

14   facility.  It requires all sorts of skills or qualifications.

15   It requires work authorization in the United States, which a

16   fairly low percentage of these folks have, but, you know, we

17   are going to show none of them could pass the background

18   check.

19       Nonetheless, that's what it would take to be a formal

20   employee.  The employees, none of whom are detainees, none of

21   whom are in the facility, in fact, you know, work for wages

22   to support their families.  GEO is very proud of its

23   employees.

24       The detainees don't have to work.  Everything that is

25   provided to them is provided to them at no charge.  There is

1    no back charge where if they are ultimately released where

2    they have to pay for any portion of that.  All their food,

3    all their clothing, the laundry, every aspect of what they do

4    is, in fact, paid for without cost.

5        So if they receive either a dollar a day stipend for

6    volunteering, or if they receive money from the outside,

7    whether it is a gift from the family or someone else, that

8    money goes to them and is used at the commissary, so they can

9    pick what they want to spend at the commissary.  Items like

10   ramen noodles -- if you learn one thing in this case,

11   apparently ramen noodles are a really big deal in a detention

12   facility.  They may purchase different kinds of soaps and

13   shampoos than the ones that are provided by the GEO Group, or

14   telephone calls.  Those are the kinds of things they spend

15   the money on.

16       Let's, again, talk about what the program is and what the

17   expectations are.  The program is that GEO will make

18   available opportunities.  They are filled primarily on a

19   first come, first serve basis.  A detainee doesn't have to

20   have any experience or skill to volunteer.  If they would

21   like to work in the kitchen or do tasks in the kitchen, they

22   will put their name down and it is first come, first serve.

23   When their name comes up, they will get that opportunity.

24   They don't have to interview for it.  GEO doesn't select

25   based on qualifications.  It is first come, first serve.

Opening Statement - Mr. Silverman

1       Once they volunteer, they can not show up.  If they don't

2   show up because they choose to meet with their lawyer, go to

3   religious services, workout or play at the athletic field,

4   GEO would prefer they let the people that they are

5   volunteering with know.  If they don't show up, they are

6   nonetheless eligible to stay in the program.  That means a

7   detainee can decide, I don't want to do laundry anymore.  Let

8   me try the kitchen.  Let me try helping out at the athletic

9   facility.  That's available to them.

10      As we are going to show you and talk about at the end of

11  the case, this is completely unlike any employment

12  relationship you have ever heard of.

13      So GEO doesn't act like an employer.  For the most part,

14  it can't remove folk who are volunteering.  Obviously, a

15  violation of the kinds of conduct standards that you would

16  expect in a detention facility, you can't fight, you can't

17  steal, you can't be insubordinate to an officer, would be

18  grounds to, A, remove them from a volunteer position and, B,

19  potentially confine them to their own area.  But short of

20  that, you may hear anecdotal or incidental, but it is not

21  supervision, and it is not a job review and performance

22  review like you would be familiar with in any employment

23  context.

24      The program exists because of the ICE determination that

25  it is very important for morale, to decrease boredom, and

 1    discipline to have a volunteer option.  You didn't hear the

 2    word "volunteer" much during opening statement.  It is a

 3    volunteer position, and the tasks are designed as such.  If

 4    people choose not to volunteer, they don't.

 5        Now, that is one of two legal issues you are going to be

 6    deciding, which is the question of:  Is this volunteer

 7    relationship, can it be changed into an employment context

 8    where the volunteer or detainee becomes an employee?

 9        There is another legal question, which is that GEO has

10    raised the issue that the State of Washington is attempting

11    to impose a double standard by imposing on GEO, who is a

12    contractor for the federal government, completely different

13    standards than the State of Washington adheres to in its own

14    facilities.

15        You heard a comparison to, say, a prison where someone has

16    been convicted, but that's not all of the detention

17    facilities that are run by the State of Washington.  The

18    State of Washington has a number of detention facilities, and

19    it has detainees doing all sorts of tasks that are very, very

20    similar to what the volunteers at the GEO facility do.  None

21    of them have ever been classified as employees.  None of them

22    get the Washington minimum wage.  None.  So we are going to

23    show that.  You are going to hear that evidence, and you are

24    going to have to decide.

25        You heard some argument kind of impugning the for-profit

1    aspect of GEO, as if the fact that GEO is a for-profit

2    somehow makes it okay to impose a double standard between a

3    detention facility run by the State and a federal detention

4    facility that the federal government has decided to

5    subcontract to GEO.

6        That's what this case is about.  I want -- you know, let's

7    start with that second issue first, which is the double

8    standard.  You didn't think when you came to a federal trial

9    you would hear a quote from the movie Animal House, but here

10   it is, which is that in the very end of the movie when the

11   heads of the fraternity are watching some of their pledges

12   getting verbally abused and bullied by the head of the ROTC,

13   one goes to the other, he goes, "He can't do that to our

14   pledges.  Only we can do that to our pledges."  That's what

15   the State of Washington is attempting to impose here.

16       There are lots of things that this case is not about.

17   Some of it you get reminded of as if it is relevant, but it

18   is not.  First of which, this is not about the merit of the

19   detention program of the United States government.  Whether

20   any detainee, whether a named plaintiff or not has a story

21   about why they came to the United States and sought asylum or

22   violated -- or other detainees may have violated criminal

23   laws, the point is that the questions about American detainee

24   policy, about American immigration policy, about whether we

25   are too loose or too strict, none of this has any application

1    to this case.

2        The second thing you are going to hear about, but the case

3    is not about, is about whether it is okay for a for-profit

4    entity to make a profit.  You heard, and apparently you are

5    going to hear testimony impugning the fact that GEO attempts

6    to make a profit on the massive building and the massive

7    project that it runs.  Again, this case is not about that,

8    and you are not going to hear anything which would cause you

9    to decide that you would discriminate or think less of GEO

10   because it is a company that happens to be privately run and

11   for profit.

12       Finally, and most important, this case is not about

13   whether one dollar a day is the right number.  Should it be

14   two dollars a day?  Should it be five dollars a day?  None of

15   that matters.  The claim here is that the State and the

16   plaintiffs' claim that by virtue of their volunteer work,

17   their volunteer tasks, depending on who you ask, the

18   detainees have changed the relationship and are entitled to

19   $13.69 an hour, or whatever the minimum wage is at any

20   specific time.  The question of whether or not Congress,

21   which set the one-dollar-a-day rate back in 1979, whether

22   that should be readjusted, whether by ICE or Congress, is not

23   the issue here.  The fact that those rates are set and are

24   otherwise part of the federal government's program does not

25   change the question of whether there is somehow an employment

 1   status that entitles detainees to $13.70 an hour for their

 2   volunteer labors, their volunteer tasks.

 3       You are only here to address a very narrow issue, which is

 4   the volunteer work program, which is mandated by ICE, which

 5   has the specific function in this institution to reduce

 6   boredom, reduce idleness and otherwise improve morale,

 7   constitutes employment.

 8       We really appreciate your attention.  We really appreciate

 9   you focusing on the kinds of issues that are going to be

10   actually at issue.

11       Thank you for your time.

12           THE COURT:  Thank you, Mr. Silverman.

13       I know that Ms. Mell's name is on your picture,

14   Mr. Silverman.  I'm sorry for that.  She's there, too.  I

15   think the jury understands there are two different lawyers

16   there.  Ms. Mell is the female lawyer, and Mr. Silverman is

17   the male in that picture.

18           MR. SILVERMAN:  She's the one with hair.

19           MS. MELL:  Not much.

20           THE COURT:  Ladies and gentlemen, we are going to now

21   turn ourselves to the presentation of evidence.  We're

22   perhaps a little early for our regular break.  I think we'll

23   take a ten-minute break so the lawyers can get ready to start

24   the presentation of evidence.  We will just be at recess for

25   about ten minutes.

```
 1                          (Recessed.)

 2      (The following occurred outside the presence of the jury.)

 3              THE COURT:  Are we all set here?  Who is going to

 4    call the first witness for the State?

 5              MS. CHIEN:  I will, Your Honor.

 6              THE COURT:  Okay.  Bring the jury in.  We'll go to

 7    work.

 8        (The following occurred in the presence of the jury.)

 9              THE COURT:  Are we ready to proceed?

10              THE CLERK:  Yes, Your Honor.

11              THE COURT:  Ms. Chien, you may call your first

12    witness.

13              MS. CHIEN:  The State would like to call

14    Alisha Singleton.

15              THE COURT:  Ms. Singleton, if you will raise your

16    right hand and be sworn.

17                          ALISHA SINGLETON,

18        having been sworn under oath, testified as follows:

19              THE COURT:  Thank you.  You may inquire, Ms. Chien.

20                          DIRECT EXAMINATION

21    BY MS. CHIEN:

22    Q   Good morning, Ms. Singleton.  Can you please state your

23    name?

24    A   Alisha Singleton.

25    Q   Did you used to work for GEO?
```

Singleton - Direct

1    A    Yes, ma'am.

2    Q    How long did you work for GEO?

3    A    Almost 20 years.

4    Q    When did you start working at GEO?

5    A    September of 2001.

6    Q    What was your first job at GEO?

7    A    Detention officer.

8    Q    Where did you work when you worked for GEO?

9    A    In the units.  I started in Seattle, working the different

10   units.

11   Q    You started in Seattle.  Did you move locations?

12   A    Yes, we moved down to Tacoma in 2004.

13   Q    So you started working in Tacoma in 2004; is that right?

14   A    Correct.

15   Q    Did you work -- what was the facility called in Tacoma?

16   A    Northwest Detention Center.

17   Q    You testified that you were a detention officer when you

18   first started.  Did you later change positions?

19   A    Yes, in 2004, I applied and was promoted to classification

20   officer position.

21   Q    How many classification officers were there when you were

22   promoted?

23   A    One temporary one at the time.

24   Q    Was that you or?

25   A    No, there was one before me, a temporary one because it

Singleton - Direct

1    was in a position that had been established once we moved

2    down there.

3    Q   So when you first held the classification officer job,

4    were you the only classification officer?

5    A   Yes.

6    Q   When you left GEO, how many classification officers were

7    there?

8    A   Two.

9    Q   Why do you no longer work for GEO?

10   A   I was terminated.

11   Q   Prior to your termination, were you working?

12   A   No, I had been off since July of 2019 on a work injury

13   under L&I worker's compensation.

14   Q   What happened?  What work injury?

15   A   I was injured during defensive tactics training, and I got

16   a torn rotator cuff.

17   Q   When did GEO terminate you?

18   A   April of 2021, April 9th.

19   Q   Were you supposed to be coming back to work from worker's

20   comp?

21   A   Yes, I was supposed to come back April 5th of 2021, but I

22   had already had a preplanned scheduled week of vacation off.

23   I was on vacation pay that week, then I was told that Friday

24   that I was being terminated.

25   Q   Were you terminated for unsatisfactory work performance?

A    No, I had been there for 20 years with zero disciplinary
infractions or attendance issues.

Q    Let's turn to your job as a classification officer,
because it sounds like you worked as a classification officer
for 15 years; is that right?

A    Correct, since 2004.

Q    What were your job responsibilities as classification
officer?

A    I was responsible for the classification program as well
as the voluntary work program.  For classification, I had to
either classify all of the incoming detainees and/or review
the ones that had been done after hours, as well as the
periodic reviews that were required according to the ICE
standards.

Q    So you mean classify detainees based on what?

A    It can be their criminal history, disciplinary history, it
can be reasons why they would have came into custody.

Q    You mentioned also in addition to classifying detainees
you managed the work program; is that right?

A    Correct.

Q    What were your responsibilities over the detainee work
program?

A    So, initially, it was receiving paid slips that were
turned in.  Then I would enter the pay manually into the pay
system for them.

1    Q    Did you also receive requests from detainees to work?

2    A    At the very beginning periodically.  Typically, they just

3    worked and the slips came from the officers.

4    Q    Did you receive requests from GEO officers for detainee

5    workers?

6    A    At some point, yes.

7    Q    During your time as classification officer, did you make

8    work assignments?

9    A    Yes.

10   Q    I hear you said you worked on pay sheets.  Is that what

11   you are saying?

12   A    Correct, yeah.  Those would be turned in for the previous

13   day's work and they would be entered the following business

14   day.

15   Q    And you would enter it; is that right?

16   A    Correct.

17   Q    Let's talk about those responsibilities sort of in turn.

18   So you testified that you received requests from detainee

19   workers.  How did you receive requests from detainee workers?

20   A    Initially, they would be on paper, so a paper request

21   submitted by the detainee and then eventually it evolved into

22   a computer request system where they would come

23   electronically.

24   Q    Do detainee workers request specific jobs within the

25   detainee work program?

1    A    Yes, some will request specific jobs, some will request

2    specific times of the day, some just request for any type of

3    work.

4    Q    How many requests on average do you receive a day or did

5    you receive a day?

6    A    It could vary.  I could receive anywhere from ten a day up

7    to 50 a day.

8    Q    I am going to ask you to open the envelope that we have

9    mailed you and see -- pull out Exhibit 321.  I am going to

10   ask if you recognize it?  That packet should include little

11   tabs.  I would like you to turn to Exhibit 321.

12   A    In the binder or in the envelope?

13   Q    It is in the envelope.  Sorry if we made it difficult for

14   you.

15   A    This one?

16   Q    Yes.  Do you recognize this?

17   A    Detainee request form.

18           MS. CHIEN:  Move to admit Exhibit 321.

19           MS. MELL:  No objection.

20           THE COURT:  321 may be admitted.

21               (Exhibit 321 was admitted.)

22   Q    Looking at Exhibit 321, can you tell me what this is?

23   A    This is a request submitted from a detainee.  It looks

24   like they are requesting to work.

25   Q    What was your response?

 1    A    Placed on the waiting list.

 2    Q    Is that your signature at the bottom?

 3    A    Yes.

 4    Q    So a detainee worker doesn't get a job right away whenever

 5    he requests one?  He has to wait until a job comes open?

 6    A    Yes.  Typically, if it is not available wherever he is

 7    requesting the job, yes.

 8    Q    Who managed the wait list for these jobs?

 9    A    Classification department does.

10    Q    Did ICE receive a review of these detainee workers'

11    requests?

12    A    No.

13    Q    Did ICE manage the waiting lists for jobs in the detainee

14    work program?

15    A    No.

16    Q    Did ICE decide which detainees would be assigned to which

17    job?

18    A    No.

19    Q    You also testified earlier you received requests from GEO

20    staff for more detainee workers; is that right?

21    A    Yes.

22    Q    Who would request additional workers?

23    A    It could be pod officers, any officers responsible for any

24    area where work is needed.  It could be a department head

25    over a specific area of work, so they can come from various

1  entities.

2  Q   Those are all GEO staff; is that right?

3  A   Correct.

4  Q   How would they request -- how would you receive requests

5  from GEO staff for more detainee workers?

6  A   They could submit -- they could call, leave a voicemail,

7  if they are supervisors and have access to email or some

8  officers do, I get them via email.  A lot of times the most

9  common way would be through memorandums.  So it would be them

10  typically.  There was one outside entity that would use

11  detainees sometimes, commissary officer or commissary person.

12  Q   After you received these requests from detainee workers or

13  requests from GEO staff for more detainee workers, what would

14  you do next?

15  A   Look at where they are requesting work at, make sure their

16  classification level as well as disciplinary status allows

17  them to work where they are requesting, if there is an

18  opening, make sure they have the proper paperwork, and then

19  place them into a job or on the waiting list for either one.

20  Q   How do you assign the work?

21  A   We have work rosters we send out that list who is assigned

22  to which jobs.  They get -- we take them to the living unit

23  or the areas of responsibility.

24  Q   I am going to ask you to look in the folder again for

25  Exhibit 309 and ask if you recognize it?

1   A   Yes, it's a pod porter roster.  So this is a living unit

2   job assignment roster.

3   Q   I want you to actually flip through it because I think

4   there is multiple pages.

5   A   Yes, this looks like a complete list of all the job

6   assignments within the facility.

7            MS. CHIEN:  I would like to move to admit Exhibit

8   309.

9            MS. MELL:  Objection, Your Honor, relevance.  It

10  contains information in excess of what the testimony has

11  been.

12           MS. CHIEN:  It is the work rosters that the witness

13  has identified for the entire facility.  We believe this is a

14  business record.

15           THE COURT:  Is this just for one day, Ms. Singleton?

16  I see a date at the top.

17           THE WITNESS:  Yes, looks like this is for October

18  25th.  So for this particular day, that would have been the

19  date completed.

20           THE COURT:  All right.  Exhibit 309 may be admitted.

21                (Exhibit 309 was admitted.)

22  Q   So looking at this exhibit, how often did these work

23  rosters come out?

24  A   It could vary depending on the need.  Typically, pod ones

25  were done three days a week.  Kitchen was done two days a

1    week and the other areas, based on needs.  There were other

2    areas that different workers would submit requests for

3    changes.

4    Q   That is helpful to me.  Maybe I should orient ourselves to

5    the document.  Looking at Page 1 of Exhibit 309, can you tell

6    me what this page is?

7    A   This is a pod porter roster.  So this is one of the

8    specific living units in the facility.  It lists all the jobs

9    that are available.  It lists who is assigned to the job as

10   well as the waiting list.

11   Q   Is it the job assignments for the A-1 pod?

12   A   Correct.

13   Q   If you see in the fourth column, it says, "Main job

14   responsibilities should be completed as scheduled."  Do you

15   see that?

16   A   Yes.

17   Q   Was the expectation that the duties would be completed as

18   scheduled?

19   A   Yes.

20   Q   I understand that Page 2, if you turn to Page 2 of the

21   document.  Can you tell me what this -- can you tell me what

22   this roster is for?

23   A   This is the A-2 living unit work roster sheet for who is

24   assigned to those jobs in that area.

25   Q   I understand the next couple pages go to each different

1    pod within the facility.  I would like you to turn to Page

2    11.  It is Bates stamped at the bottom 26931 if that helps.

3    Can you tell me what this roster is for?

4    A   This is a female laundry detail that was completed within

5    the Delta 1, so D-1 living units where the females were

6    housed.

7    Q   So females assigned to D-1 were assigned to female

8    laundry?

9    A   Correct, the laundry that was completed outside the unit

10   in the laundry area was brought into the female unit once it

11   was completed and they would do the folding and sorting of

12   it.

13   Q   So D-1 pods would fold the laundry?

14   A   Correct.

15   Q   What is the time of their work shift, according to this

16   roster?

17   A   Nine p.m. to one a.m.

18   Q   I would like to turn to the next page of this work roster.

19   Can you tell me what this assignment, what this work roster

20   is for?

21   A   It is a female detail for cleaning up the medical

22   department.

23   Q   Can you go down to the next page.  We are back to the

24   pods?

25   A   That's Delta 2, which is another female unit.

1    Q    I would like to turn to Page 22 of Exhibit 309.  Can you

2    tell me what this work roster is for?

3    A    That is the laundry detail.  That is where work is

4    completed in the laundry department where they do the washing

5    of the clothes for the facility.

6    Q    These are the workers that are assigned to the laundry

7    facility?

8    A    Yes.

9    Q    I would like to turn to the next page.  Do you recognize

10   this work roster?  What jobs was this work roster for?

11   A    This is an intake clean-up detail.  These detainees work

12   in the intake and processing area and doing the cleaning of

13   those cells and the common area in there.

14   Q    I would like to turn to the next page and ask you what the

15   workers assigned on this page were responsible for?

16   A    This is the floor detail.  These detainees did mopping,

17   sweeping, waxing and/or buffing of any of the facility common

18   area, so typically the halls.

19   Q    Is this sometimes referred to as the Grey Mile workers?

20   A    Correct.

21   Q    I would like to turn to the next page.  Can you tell me

22   what these detainees were assigned to do?

23   A    They were assigned to clean the outside recreation yard on

24   the exterior of the facility.

25   Q    I would like to turn to the next page.  Can you tell me

1    what the detainees on this work roster were assigned to do?

2    A    Barber detail.  They worked inside the barbershop,

3    haircuts for the detainees in the facility.  The second

4    portion is they would do the clean up in that area after the

5    barbers were completed.

6    Q    I would like you to turn to the next page.  Can you tell

7    me what the detainees assigned to this detail were doing?

8    A    Kitchen shift.  They worked in the kitchen in the

9    facility.  This was the breakfast shift roster for the

10   morning.

11   Q    Do you see what hours the breakfast shift were scheduled

12   to work at?

13   A    Yes, 3:30 a.m. to 7:30 a.m.

14   Q    Were detainees expected to -- were detainees scheduled on

15   this work roster expected to work their shift?

16   A    Correct.  If they had days off and they requested them,

17   they were on this list as well.

18   Q    If can you go to the next page.  Do you see this is where

19   workers were -- what were workers assigned to do in this work

20   roster?

21   A    This is a continuation of the breakfast shift, the morning

22   shift kitchen roster.

23   Q    Looks like detainees are numbered, looks like there is 33

24   workers assigned to the breakfast shift; is that right?

25   A    That's the number at that time that we were allowed to

1  have in there.  Looks like one is missing so they had 32.

2  Q    Okay.  Looking at this exhibit list, or I'm sorry, looking

3  at this work roster, I want to go back to my earlier

4  question, how long would it take to put together these work

5  rosters?

6  A    It can vary depending on how many updates need to be

7  completed.  Kitchen roster takes the longest.  Kitchen takes

8  pretty much a full eight-hour workday to complete.

9  Q    How frequently did the kitchen roster come out?

10  A    Twice a week, minimum.  Sometimes three times as week if

11  they did not have enough workers and needed more updates.

12  Q    So once the workers are on the rosters and assigned, how

13  are detainee workers informed as to what their job duties

14  are?

15  A    Every area has a training sign-off sheet where they are

16  supposed to orientate them and go over what their job

17  responsibilities are, and the detainee signs off on them.

18  Q    You called it a training worksheet, is that what you said?

19  A    Yeah, like a job description which goes over what their

20  duties are.

21  Q    There is a job description that detainee workers sign when

22  they work a certain shift; is that right?

23  A    Correct.

24  Q    Which jobs have job descriptions?

25  A    Pod workers do.  Kitchen workers do.  Laundry does.  Floor

Singleton - Direct

1   detail does.  All of the ones I am aware of have a job

2   description that they sign, and the officers who went over

3   the responsibilities signs it as well.

4   Q   Remind me of what the purpose of the job description is,

5   what is the purpose of the job description?

6   A   So they are aware of what their responsibilities are for

7   it.

8   Q   Who trains the detainee worker and walks through the job

9   description?

10  A   Typically, the person responsible for that area.  So if it

11  is in the living unit, it will be the pod officer.  If it is

12  in the kitchen it will be one of the kitchen staff, whoever

13  oversees that area.

14  Q   Is that GEO staff?

15  A   Yes, all GEO staff.

16  Q   Do detainee workers have to sign anything else in addition

17  to the job description?

18  A   Voluntary work agreement.  They sign their pay sheets

19  also.

20  Q   I am going to hand you Exhibit 229 and ask you to look at

21  that.  I am going to ask you to open it and look, review 229

22  and the documents I have given you.  Do you recognize this?

23  A   Yes, it is a voluntary work agreement.

24          MS. CHIEN:  I would like to move to admit Exhibit

25  229.

1          MS. MELL:  No objection, Your Honor.

2          THE COURT:  It may be admitted.

3                    (Exhibit 229 was admitted.)

4    Q    What is this again?

5    A    Voluntary work program agreement.

6    Q    Detainees are required to sign this when they start a job

7    in the voluntary work program; is that right?

8    A    Yes, it is required to be signed before they are allowed

9    to work.

10   Q    I see in No. 3 at the top of the sheet says, "Detainees

11   are required to work when scheduled and participate in all

12   work-related training."

13        Did I read that correctly?

14   A    Yes.

15   Q    Was that an expectation of the work program?

16   A    Yes.

17   Q    I am going to look at No. 4 as well.  Says, "Unexcused

18   absence, unsatisfactory work performance or participation in

19   a serious infraction, fighting, is cause for removal from a

20   work assignment.  Workers are expected to be ready for work

21   at the required time."

22        Did I read that correctly?

23   A    Yeah.

24   Q    I would like to turn to the bottom, towards the bottom of

25   the work agreement.  It says, your safety is our highest

1  priority.  Please ask for the safety equipment if it is not

2  immediately provided for your detail.  And then it says, "We

3  thank you for your important contribution to maintaining this

4  facility."  Did I read that correctly?

5  A   Yeah.

6  Q   Detainee workers make an important contribution to

7  maintaining the facility?

8  A   Yes.

9  Q   All right.  You also mentioned pay sheets, I believe.

10  Detainee workers had to sign pay sheets; is that right?

11  A   Correct.

12  Q   What is a pay sheet?

13  A   Pretty much, in essence, like a timecard, for once they do

14  their job or complete it, then they sign and that's how they

15  get paid.

16  Q   I am going to hand you Exhibit 80 and ask if you recognize

17  it.  I am going to ask you to open Exhibit 80.

18  A   Yes.  This is the daily detainee worker pay sheet.

19        MS. CHIEN:  I would like to move to admit Exhibit 80.

20        MS. MELL:  No objection.

21        THE COURT:  All right.  80 may be admitted.

22            (Exhibit 80 was admitted.)

23  Q   Do you know who created this pay sheet form?

24  A   It would have been Michael Heye would have been the one

25  that created it.

1  Q   Is Michael Heye a GEO staffer?

2  A   Yes, second person that was in classification.

3  Q   Michael Heye started after you as classification officer;

4  is that right?

5  A   Yes.

6  Q   When are detainees required to sign this form?

7  A   They are supposed to sign it after they complete their job

8  assignment.

9  Q   The work roster we saw before indicates what the

10  detainee's job is.  This worker pay sheet actually indicates

11  if they worked that day; is that right?

12  A   Correct.

13  Q   Read fourth bullet point.  It says, "List all details on

14  the pay sheet except the kitchen, barbershop, outside,

15  laundry and recreation yard for detail."  Can you tell me

16  what that is referring to?

17  A   Those are the external jobs outside of the living units

18  themselves or the area.  They turn in their own pay sheets

19  because they are the ones that verify their work.

20  Q   So there is a separate pay sheet for those areas of the

21  work program; is that right?

22  A   That is correct.

23  Q   I am going to turn to the last bullet of the detainee

24  worker pay sheet, and it says, by obtaining a detainee

25  signature, staff is affirming the following have been

1   evaluated, met acceptable standards, the job was completed,

2   detainee maintained a good attitude and the detainee began

3   work on time.

4        Did I read that correctly?

5   A   Yes.

6   Q   In your experience, was GEO staff supervising detainee

7   workers required to evaluate and affirm that detainee workers

8   met those standards before detainee workers could sign the

9   pay sheet?

10  A   Yeah, usually in the area they are in.  The work is

11  completed so they come up usually like in the pod, sitting on

12  their desk, and she will come sign it once it is done and let

13  the officer know they completed their job.

14  Q   Once you have the pay sheets, the pay sheet I just showed

15  you, the ones from the other facilities, what did you do?

16  A   We put them together in order and then go through and

17  manually input their pay into the pay system.

18  Q   I am going to hand you -- or direct you to look at Exhibit

19  115.  Do you recognize this?

20  A   Yes, this is a printout from a completed day of pay sheet.

21        MS. CHIEN:  I would like to move to admit Exhibit

22  115.

23        MS. MELL:  No objection.

24        THE COURT:  115 may be admitted.

25                 (Exhibit 115 was admitted.)

1   Q    This exhibit, I believe, is 24 pages long.  Can you tell

2   me, what does this indicate, what is listed in this batch

3   listing?

4   A    In the batch, it has the detainee's name, the date the

5   transaction was completed, the time it was considered

6   complete, the whole batch and the date that they completed

7   the work.

8   Q    Do you see in the column for user there are initials,

9   A. S.?

10  A    Correct, that would have been me.  I would have done the

11  batch on this particular day.

12  Q    In the second column, is this a list of detainee workers

13  that worked in the detainee work program?

14  A    Yes.

15  Q    Under transaction amount, what does that mean?

16  A    That is how much they were paid that particular day for

17  that job.

18  Q    I would like you to turn to Page 12 of this exhibit.  I

19  think it is Bates stamped 104158, if that helps you.  157,

20  apologies.  I'm sorry, 158.  Do you recognize this?

21  A    Yes.

22  Q    What is it?

23  A    So it is a work roster.  This is the one that was -- we

24  originally used when we first created them for how we did

25  their pay, these would get turned in and we would pay them

1   off of this.

2   Q   These work rosters or pay sheets were what supported the

3   transaction amount we looked at above?

4   A   Correct.

5   Q   Did GEO maintain the same or similar records for every day

6   the detainee workers performed work?

7   A   Yes.

8   Q   Now that we have talked about work program procedures, I

9   would like to move to assignments and schedules.  When we

10  talked about the work rosters, it looked like there were jobs

11  in the units of the facility -- in the pods, laundry, intake,

12  floor workers, the rec yards, the barbershop and then the

13  different kitchen shifts; is that right?

14  A   Correct.

15  Q   Did ICE direct you that these were the jobs or tasks to

16  include in the detainee work program?

17  A   No.

18  Q   Who decided those were the areas the detainee workers

19  would work in the facility?

20  A   GEO.

21  Q   Let's take the schedules for each in turn.  How many

22  detainee workers were assigned to work in GEO's kitchen

23  operations when you left -- when you last worked at GEO?

24  A   I believe there were around between 30 and 35, I believe.

25  Q   Per shift?

1    A    Per shift, and then that was for the three shift --

2    serving shifts.  And then they had, I believe, ten on a night

3    cleaning shift.

4    Q    You mean when you say "serving shifts," you mean

5    breakfast, lunch and dinner?

6    A    Correct.

7    Q    30 to 35 detainees on each shift?

8    A    Correct.

9    Q    What were the hours for the breakfast shift?

10   A    The breakfast shift was approximately 3:30 a.m. to about

11   7:30 a.m.

12   Q    What were the hours for the lunch shift?

13   A    So lunch was 2:30 -- no, lunch was around 11:00 because

14   they had to go down before count.  Lunch would have been

15   about 11:00 and then they were done, typically, around 3:00.

16   Q    Are you referring to Exhibit 309 to refresh your

17   recollection on this?

18   A    Yes.

19   Q    What were the hours for the dinner shift?

20   A    11 to 2:30 for lunch.  Dinner was 3:30 to about 7.

21   Q    What time did the night crew work from?

22   A    They worked, I believe, 11 p.m. they worked -- about ten,

23   11 to about two a.m.

24   Q    Moving on to the laundry, how many detainee workers were

25   assigned to work in GEO's laundry operation?

1    A    Laundry, I believe they had four, yeah, four on each

2    shift.  They had a day shift and then they had a swing shift

3    so it would have been four assigned to each.

4    Q    Eight workers in total?

5    A    Yes.

6    Q    Approximately, how many hours did they work in laundry?

7    A    Laundry, they typically -- day shift would go down when

8    the day shift officers get there, so about 7:30, 8:00.  They

9    would work, depending on the day, anywhere from until 12

10   usually.  They go back for lunch and count, and then they

11   come back and they would be done, typically, by two.

12   Q    How many detainee workers were assigned to the barbershop?

13   A    The barbershop could have up to, I believe, ten were

14   assigned, but they only typically had about three or four in

15   there.  That's how many chairs they had, so it was determined

16   based on whatever level they were cutting that day who

17   actually was going to be the barber.

18   Q    Approximately three to four barbers would work on any

19   shift in the barbershop?

20   A    Yes.

21   Q    But ten workers would be assigned to the barbershop?

22   A    Correct.

23   Q    How many detainee workers could be assigned to working in

24   the living unit, in the pod?

25   A    That depended on the size of the living unit.  So the

1    bigger units, those had 18 or 19 for our bigger units.  Then

2    the smaller units, say, about 15.

3    Q    Can you remind me what the job responsibilities were of

4    the people working in the living units?

5    A    Yeah, they would clean the floors and tables after the

6    meals, sweep and mopping them, cleaning the showers.  If it

7    was a unit that had open bathrooms, then they would be

8    responsible for cleaning the bathrooms, toilets, floors in

9    there as well.  They all cleaned the showers in all the

10   units.

11   Q    To clarify, was there jobs in the living unit for laundry

12   as well?

13   A    Yes, they had laundry jobs in the units.  The laundry

14   person, because when they would bring the laundry to the

15   unit, they would give it back to the detainees who it was

16   assigned to.

17   Q    The folks working in the pod who were in laundry were

18   separate from the detainee workers who were assigned to the

19   laundry facility; is that right?

20   A    Correct.

21   Q    All of these jobs in the living unit, they are assigned to

22   clean the showers, bathrooms, the tables where detainee

23   workers eat, is this separate from where detainee workers,

24   their individualized bunk areas?

25   A    Correct.

1  Q    They are assigned to work in the common areas of the

2  living unit; is that right?

3  A    Correct.

4  Q    Have the pod porter job responsibilities been the same

5  throughout your tenure as classification officer?

6  A    They varied slightly over the years.

7  Q    Why did they change over the years?

8  A    They changed.  We had expansion and added additional

9  units, which were a different size, so they became larger,

10  then we needed more people to do cleaning.

11  Q    When you first started at GEO, how many pod workers were

12  there in the unit, approximately?

13  A    I am going to guess five, if even that.

14  Q    You mentioned that the Northwest Detention Center

15  expanded.  Is that why you are talking about there was more

16  people in the Northwest Detention Center when you left

17  employment?

18  A    Yes.

19  Q    What is a pod porter schedule?

20  A    The pod porter is going to be based on shift.  You have

21  day shift, swing shift, graveyard shift, and they will have

22  specific times that they are supposed to do the jobs,

23  depending on what shift they are assigned to and what job.

24  Q    Was it seven days a week?

25  A    Typically, yes.

1   Q    Let's move to floor workers, the workers that work on the

2   Grey Mile.  What do the floor workers on the Grey Mile do?

3   A    The floor, Grey Mile workers, they can sweep.  Typically,

4   nightly, they would sweep and at least mop up the floors.

5   Sometimes they would do it throughout the day because they

6   did create a day shift one during count to maintain the

7   floors, and they would do waxing and buffing as well.

8   Q    Did waxing and buffing the floors require equipment?

9   A    Yes.

10  Q    Who provided that equipment?

11  A    GEO.

12  Q    How many detainee workers were assigned to the Grey Mile

13  or assigned to do this floor work?

14  A    So, they could have up to 16.  It just varies on what the

15  need is on any given night, how many they will actually use.

16  Q    I would like to move to intake.  What do detainee workers

17  do who are assigned to intake?

18  A    They clean the cells in there where the intake, the

19  bookings come in.  They clean the common area floor, sweeping

20  and mopping those as well, taking the trash out from all the

21  areas inside of the intake area.

22  Q    How many detainee workers are assigned to intake?

23  A    So they had four on day shift and three on swing.

24  Q    Let's move to the medical area.  What did the detainee

25  workers assigned to medical do?

1    A    They cleaned the floors, sweeping and mopping them.  They

2    took out the trash and wiped down common areas and cleaned

3    the cells in there as well.

4    Q    When would medical workers work?

5    A    They would usually work during count time, because there

6    wasn't any movement and the females did it, so they had to do

7    it during count when the males weren't out.

8    Q    Let's move to visitation.  What did detainee workers do

9    assigned to visitation?

10   A    Cleaned the visiting area, mopping, sweep, wiping down the

11   counters, the seats, the windows.

12   Q    How many detainee workers are assigned to visitation?

13   A    Visitation, I believe they had -- let's see, I think there

14   was two per shift maybe.  They had those on day shift and

15   swing shift.  I do not see a roster for that one.

16   Q    Let me see.  We will do it off your memory if it is not

17   included in Exhibit 309.

18        Let's go to recreation.  What did detainee workers do

19   who were assigned to recreation?

20   A    They sweep, pick up trash out there.

21   Q    Is there a bathroom out there?

22   A    Yes, there is a bathroom.  They would clean that.

23   Q    How many detainee workers are assigned to recreation?

24   A    Outside recreation, they have four.  They had four of

25   them.  They were typically on days.  I believe we added a

1   swing shift so that they would have something to do cleaning

2   on swing shift as well, I believe it was four and four or

3   four and three when I left.

4   Q   Can you clarify that for me.  What do you mean by "four

5   and four and three"?

6   A   So four on day shift, and then four or three would be on

7   swing shift also.  We added an occasional shift so the units

8   can be maintained throughout the day.

9   Q   So now that we have identified the number of workers in

10  each schedule, I would like to zoom out.  I am going to hand

11  you Exhibit 82 and ask if you recognize it?

12  A   Yes.

13  Q   What is it?

14  A   It was an email sent to the administrative secretary that

15  was sent monthly for the pay statistics for the month that we

16  send every month to her.

17  Q   You sent it to the administrative assistant on a regular

18  basis?

19  A   Yes, every month.

20          MS. CHIEN:  I would like to move to admit Exhibit 82.

21          MS. MELL:  Objection, duplicative to her testimony.

22  It is hearsay testimony anyway.

23          MS. CHIEN:  This is an email that Ms. Singleton wrote

24  and calculated.  It is not duplicative.  It includes the

25  total detainee workers that worked.

```
 1          MS. MELL:  The document is not needed.  She's here to
 2    testify.
 3          THE COURT:  Is this a document you prepared,
 4    Ms. Singleton?
 5          THE WITNESS:  Yes, sir.  I sent an email and created
 6    the spreadsheet and sent that with it as an attachment.
 7          THE COURT:  82 may be admitted.
 8                    (Exhibit 82 was admitted.)
 9  Q   Let's start with this email.  This is an email you sent;
10    is that right?
11  A   Yes.
12  Q   It says -- it is to Shihpei Stevenson, who I think is the
13    administrative assistant; is that right?
14  A   At that time she was, yes.
15  Q   And it says, "This is my ICE outcome measures"; is that
16    right?
17  A   Correct.
18  Q   What is ICE outcome measures?
19  A   ICE outcome measures, that is the classification system,
20    the standards we were required to comply with where we have a
21    number of different things that were required to be sent
22    monthly or quarterly at this particular time for, like,
23    levels in custody and so forth, how many wages were paid for
24    the voluntary work program.
25  Q   What did the attachment to this email, what did it count?
```

1  A   It counted all the workers that participated, the average

2  in the work program for a particular month.

3  Q   I would like to turn to Page 2 of Exhibit 82.  What does

4  it list at the top of each column?

5  A   That is the daily work crew count sheet.  That is how many

6  workers worked each day of that particular month.

7  Q   Turning to Page 3, the sheet doesn't print quite easily so

8  I am going to have to direct you a little bit.  Turning to

9  Page 3 of Exhibit 82, it says, "total."

10  A   Correct.  That's the total for each column for how many

11  detainees worked or were paid for completing those jobs.

12  Q   So for example...?

13  A   Per pod for that particular month for workers throughout

14  the whole unit facility, they paid $4,132 to detainees to

15  work cleaning the living units.

16  Q   For kitchen, which is the fifth column?

17  A   $1,551.

18  Q   Detainee workers worked in the kitchen for the month of

19  February; is that right?

20  A   Correct.

21  Q   What does "O-S-R" stand for?

22  A   Outside recreation.

23  Q   What does "facility" stand for?

24  A   Details within the facility that are not normally assigned

25  jobs.  It could be paint -- could be random things.  It could

1   be random things, like it could be some type of paint detail,

2   something that was specific that needed to be done out of the

3   normal.  So, for example, it could be -- one of the things

4   that fell under facility was commissary detail.  That was one

5   of those.

6   Q   Is it a special detail, something that a GEO staffer

7   requested a detainee worker for?

8   A   Yes.

9   Q   That would fall under facility?

10  A   Correct.

11  Q   What does "previous" refer to?

12  A   Previous is they hadn't been paid for a job they had done

13  on a day before that day, but the pay signature, whatever was

14  needed for verification, came in on that day, so that's the

15  day we completed the pay.

16  Q   I would like to turn to Page 4.  There is another total

17  column.

18  A   Yes, so that looks like that is the end of the sheet, so

19  that represents every day how many people were paid, total.

20  So the first column should be 229 people would have been paid

21  on the 1st of that month.

22  Q   Great.  Now that we have a general idea of the number of

23  detainee workers in the program, I would like to ask:  How do

24  you know how many detainee workers to assign to these jobs?

25  A   It is going to be based on the areas and whatever

1    administration says they are allowed to have for those areas.

2    So if officers request them, or request more, then the

3    request would be submitted to -- for me, typically, the

4    associate warden because that's my -- was my direct

5    supervisor.  Then he would say yes or no at some point.

6    Q    Was your associate warden a GEO staffer?

7    A    Yes.

8    Q    Did you ever ask your GEO supervisor whether ICE had

9    authorized the number of detainee workers in each job

10   assignment?

11   A    No.

12   Q    Did you have the authority to change detainee workers'

13   schedules in order to address requests from GEO staff for

14   more workers?

15   A    Yes.

16   Q    If an area was not meeting certain safety and sanitation

17   requirements, could you assign more detainee workers to that

18   area?

19   A    If it was authorized, yes.

20   Q    Do you mean authorized by your GEO supervisor?

21   A    Correct.

22   Q    Did you have to ask ICE to assign workers to any given

23   area?

24   A    No.

25   Q    We have talked about the work program operationally.  I

1  would like to move on to how the work is supervised.  Who

2  evaluates the detainee workers as to whether or not their

3  work is satisfactory?

4  A   The person responsible for that area.

5  Q   For example, who supervises the work on the Grey Mile, the

6  hallway?

7  A   Typically the Grey Mile will either be an officer or

8  sometimes one of the lieutenants or sergeants.

9  Q   Who supervises the work done in the barbershop?

10  A   They have recreation officers that supervises the law

11  library, and the barbershop is right across from it.

12  Q   Is that a GEO staffer?

13  A   Yes.

14  Q   Have GEO detention officers told you that detainee workers

15  are not doing their job correctly?

16  A   Yes.

17          MS. MELL:  Objection, hearsay.

18  BY MS. CHIEN:

19  Q   What did you tell --

20          THE COURT:  Wait a minute, wait a minute.  The

21  objection is overruled.

22  BY MS. CHIEN:

23  Q   What did you tell GEO detention officers to do when

24  detainee workers are not doing their job properly?

25  A   I would tell them that if they are not doing their job

1    properly or if they don't want to work, I advise them it is a

2    voluntary program.  If the detainee doesn't want to work, he

3    would need to sign a refusal-to-work form.

4    Q    Have detainees been removed from work details?

5    A    Yes.

6    Q    For unsatisfactory performance?

7    A    Yes.

8    Q    Are you aware -- what would GEO staffers do when detainee

9    workers had unsatisfactory work performance?

10   A    Usually, they would have -- give them the refusal-to-work

11   form and tell them to sign it because they are not doing

12   their job correctly.  You know, correct them and have them go

13   complete the work.

14   Q    The GEO staffer would ask the detainee workers to sign a

15   refusal-to-work form; is that right?

16   A    Correct.

17   Q    I am going to ask you to look at Exhibit 103 and ask if

18   you recognize it.

19   A    Yes, this is the detainee refusal-to-work form.

20            MS. CHIEN:  I would like to move to admit Exhibit

21   103.

22            MS. MELL:  No objection, Your Honor.

23            THE COURT:  103 may be admitted.

24                  (Exhibit 103 was admitted.)

25   Q    Did some detainee workers refuse to sign the

1    refusal-to-work form?

2    A    Yes.

3    Q    What would the GEO staffer do then?

4    A    Usually, they would still turn it in.

5    Q    So GEO staff effectively would fire the detainee workers?

6              MS. MELL:  Objection, Your Honor.

7              THE COURT:  Sustained.  It is leading.

8    Q    So what would the GEO staffer do when they turned it in?

9    What did that indicate to you?

10   A    When they turned the form in, because the officer's name

11   is on the top, that indicates to me they did not want to have

12   their job or complete their job, and they are removed from

13   whatever job they are assigned to, if it is anything outside

14   of the kitchen.  The kitchen, because they are sick, it has

15   to go to medical because they require medical clearance.

16   Q    Separate from the kitchen, did this happen frequently that

17   GEO -- that GEO staffers would submit this refusal-to-work

18   form?

19   A    I would get them on a regular basis because I get them in

20   paperwork and memorandums from the pod officers for which

21   somebody needed to be replaced.

22   Q    What is the proper process for removing a detainee worker?

23   A    They either have to be removed because they refused to

24   work, which means they are opting not to have the job, or

25   disciplinary sanction.

1    Q    Okay.  How were you informed a detainee worker had been

2    removed from work due to a disciplinary sanction?

3    A    I would receive a copy of their disciplinary sanction form

4    that is signed off on by the facility administrator.

5    Q    The facility administrator, is that sometimes known as a

6    warden.

7    A    Correct.

8    Q    Is that a GEO staffer?

9    A    Correct.

10   Q    Would ICE be involved when a detainee is terminated for

11   disciplinary reasons?

12   A    No.

13   Q    Do you keep track of detainees who have been removed from

14   work via disciplinary sanction?

15   A    Yes.

16   Q    Does that impact how you do your work rosters?

17   A    Yes, when they are requesting, I have to review that to

18   make sure they have not been removed from specific detail or

19   jobs in general before I can assign them.

20   Q    We talked about detainee workers operations.  I would like

21   to move on to their pay, how detainee workers are paid.  How

22   much did detainee workers get paid?

23   A    A dollar a day.

24   Q    Has GEO ever considered paying more than a dollar per day?

25   A    They have paid more than a dollar a day on occasion.

1    Q    I would like to ask you to look at Exhibit 69 and ask if

2    you recognize it?

3    A    Yes, department head meeting minutes.

4    Q    Did you likely attend this meeting?

5    A    Yes.

6    Q    Meeting minutes were kept in the regular course of

7    business?

8    A    Yes.

9    Q    I would like to move to admit Exhibit 69.

10         MS. MELL:  Your Honor, GEO objects to admission of

11   the meeting minutes as containing information that is beyond

12   the scope of this witness's knowledge and testimony and

13   duplicative.

14   Q    Ms. Singleton, you attended this meeting; is that right?

15   A    Correct, I was at the meeting.

16         MS. MELL:  If she was at the meeting, she can testify

17   to what happened.

18         THE COURT:  Is this a business record of GEO's?  I

19   guess I am asking you, Ms. Singleton.

20         THE WITNESS:  Yes.

21         THE COURT:  I think it may be admitted.

22              (Exhibit 69 was admitted.)

23   Q    I am going to ask you to look down at these meeting

24   minutes.  Let me step back.

25         How often did department heads meet at the Northwest

1    Detention Center?

2    A    Monthly.  Once a month, typically.

3    Q    Do you see your name listed as one of the staff present at

4    this meeting minute?

5    A    Yes.

6    Q    What was the purpose of these department head meetings?

7    A    Go over any issues going on, to bring up things that

8    needed to be addressed, employees of the month, audits if we

9    have them, findings, various facility operation issues.

10   Q    In looking at the staff listed at this meeting minutes,

11   are those all GEO employees?

12   A    Yes, every last one.

13   Q    I would like you to turn to No. 7.  I am going to read it

14   for you.  It says, "We are looking for incentives that are

15   allowed by the policy standards and/or contract to compensate

16   kitchen and laundry workers beyond a dollar a day."  Did I

17   read that correctly?

18   A    Yes.

19   Q    Had detainee workers been paid more than a dollar per day?

20   A    Yes.

21   Q    How much had they been paid?

22   A    There have been various times where it could vary,

23   sometimes it would be a dollar, sometimes people were paid

24   two dollars, some were paid five dollars a day.

25   Q    Let's turn back to Exhibit 115 which we testified earlier

1    was the batch listing.  I would like you to turn to Page 3 of

2    that batch listing.  Do you see at the top the worker named

3    Arturo Murillo-Camacho?

4    A    Yes.

5    Q    How much was he paid?

6    A    Five dollars.

7    Q    Do you know why he was paid five dollars?

8    A    He would have worked in the kitchen.  At that time, the

9    facility administrators authorized people working in the

10   kitchen if they worked three shifts they could be paid $5.

11   Q    Arturo worked three shifts?

12   A    Correct, he would have worked breakfast, lunch and dinner.

13   Q    I am going to ask you to turn to Page 21 of the document

14   of Exhibit 115.

15   A    What is it? What is the number on the bottom?

16   Q    104167.  What is this?

17   A    This is how the kitchen workers are paid.  It's a copy of

18   an account sheet.  This is how they attest they were in there

19   working at the time because it is done during serving shifts.

20   Q    Do you see Arturo Murillo's name in No. 12?

21   A    Yes.

22   Q    Does this indicate he worked the breakfast shift?

23   A    Yes, that's breakfast.

24   Q    Because the formal count time?

25   A    4:46 a.m.

1   Q    Turning to the next page, is this the count sheet for

2   lunch?

3   A    Yes.

4   Q    You can tell because the formal count time was at 11:40?

5   A    Correct.

6   Q    Do you see Murillo's name listed at No. 19?

7   A    Yes.

8   Q    I am going to ask you to turn to the last page.  This is

9   the formal count time for dinner?

10  A    Yes.

11  Q    Did you see Murillo's name listed at No. 19?

12  A    Yes.

13  Q    Were there more than just Mr. Murillo who worked all three

14  shifts in the kitchen, based on your review of the count

15  sheets?

16  A    Yes.

17  Q    Are all the people whose names are crossed out in that

18  exhibit paid five dollars?

19  A    (No verbal response).

20  Q    Thank you.

21       So let's talk about ICE's role in the detainee work

22  program.  What role did ICE or ICE's standards play in the

23  detainee work program?

24  A    ICE standards allowed there to be a work program and set

25  some basic guidelines for if you do have one, requirements

1    that are required to be met.

2    Q    Did ICE require GEO to assign workers to the kitchen,

3    laundry or Grey Mile?

4    A    No.

5    Q    Did ICE train the detainee workers?

6    A    No.

7    Q    Did ICE supervise the detainee workers?

8    A    No.

9    Q    You testified that you worked for GEO for almost 20 years.

10   Let's talk a little bit about the detainee work program over

11   time.  When you first started, how many detainees were there?

12   A    First started in 2001.  On a high day, close to around

13   100.  A little over.

14   Q    What happened to the detainee population when you moved to

15   Tacoma?

16   A    It increased.

17   Q    To how many detainees?

18   A    When I left, it was upward, you can have up to 1500.

19   Q    How did those expansions impact your job responsibilities

20   as the classification officer?

21   A    It became more time involved to complete the work due to

22   the high number of how many detainees you have there who have

23   to be classified, as well as be assigned jobs and requests

24   being answered.

25   Q    So you had more work rosters to create; is that right?

1    A    Yes.

2    Q    And more payroll?

3    A    More workers to assign to jobs that already existed.

4    Q    Were there new areas that you had to assign jobs for?

5    A    Yes, they expanded.  They built an entire new living unit

6    so we had to, you know, hire detainees to clean those.  They,

7    as a result of adding it, created additional floors that

8    needed to be waxed, mopped and buffed, so they had to hire

9    more workers for that.  The outside recreation yard was an

10   addition.  That didn't exist originally.  They had to hire

11   workers to clean that as well.

12   Q    By workers, you mean detainee workers, correct?

13   A    Correct.

14   Q    Talk about the detainee workers pay rate and how it is

15   set.  Does ICE standards regarding the detainee work program

16   indicate what detainee workers should be paid?

17   A    Yes.

18   Q    What does it say?

19   A    Currently?

20   Q    Currently.

21   A    Last one I saw, it says that they are to be paid at least

22   one dollar per day.

23   Q    Was that a change from prior ICE standards?

24   A    Yes, originally, the ICE standards said they were to be

25   paid one dollar per day.

1   Q   Do you recall when there was the change in the ICE

2   standard?

3   A   I am going to say somewhere around 2010, 2011-ish.

4   Q   Did you notify your direct supervisor of that change?

5   A   Yes.

6   Q   Who was your direct supervisor?

7   A   At that time, it would have been Bill McHatton.

8   Q   He was the associate warden of the facility?

9   A   Yes.

10  Q   I am going to show you Exhibit 78.  Do you recognize this

11  document?

12  A   Department head meeting minutes?

13  Q   Yes.

14  A   Yes.

15  Q   Is this likely a meeting you attended?

16  A   Yes, I did attend it.

17          MS. CHIEN:  I would like to move to admit Exhibit 78.

18          MS. MELL:  No objection, Your Honor.

19          THE COURT:  It may be admitted.

20              (Exhibit 78 was admitted.)

21  Q   This meeting appears to have occurred on May 1, 2012; is

22  that right?

23  A   Correct.

24  Q   Did you see the staff present?

25  A   Yes.

1  Q   You see your name listed as the classification officer

2  present?

3  A   Yes.

4  Q   The participants included the warden, Lowell Clark, and

5  the associate warden, Bill McHatton; is that right?

6  A   Correct.

7  Q   Do you see where it says, "Ms. Singleton addressed several

8  key areas of the new PBNDS?

9  A   Yes.

10 Q   And then it says on F, "payment for kitchen workers are

11 flexible under the new PBNDS"?

12 A   Yes.

13 Q   So did you likely tell department heads that payment for

14 kitchen workers was flexible under the new PBNDS, the new ICE

15 standard?

16 A   I told them specifically the standard now allows them to

17 be compensated more than a dollar.

18 Q   I would like to show you Exhibit 14.  Do you recognize it?

19 A   Yes.

20 Q   What is it?

21 A   It is a memorandum that I would have given to my

22 supervisor, Associate Warden McHatton, regarding the

23 voluntary work program changes with the standards that were

24 different from the previous standards.

25        MS. CHIEN:  I would like to move to admit Exhibit 14.

1      MS. MELL:  No objection, Your Honor.

2      THE COURT:  14 may be admitted.

3              (Exhibit 14 was admitted.)

4  Q   Was this a memo you wrote to Associate Warden McHatton?

5  A   Correct.

6  Q   It is dated April 12th, 2012?

7  A   Correct.

8  Q   Do you see the subject line says "Voluntary Work Program

9  2011, PBNDS standards"?

10 A   Correct.

11 Q   That refers to ICE standards?

12 A   Correct.

13 Q   States that compensation is now at least one dollar.

14 However, doesn't say we don't have the option to pay more if

15 we like.

16     MS. MELL:  Objection, Your Honor, she's reading the

17 document.

18     THE COURT:  Sustained.

19 BY MS. CHIEN:

20 Q   Can you tell me what No. 2 says?  Did I read that

21 correctly?

22 A   Yes.

23 Q   Was it a big change when the ICE standard stated the pay

24 could be at least a dollar per day?

25 A   Yes, that's why this memo was completed.  It requested to

1   have a memo sent for any significant changes that applied to

2   my work areas which were classification and the voluntary

3   work program, that was one that stood out as significant.

4   Q   Why were you interested in telling the facility leadership

5   that you could pay more than a dollar a day?

6   A   Because more pay would be more of an incentive to entice

7   detainees to work, and it would make the job easier to

8   maintain.

9   Q   When you say "the job easier to maintain," do you mean

10  your job as classification officer?

11  A   Well, my job and the areas where the detainees worked

12  because there was really high turnover.  In a lot of the

13  outside-of-the-unit details because of the amount of time and

14  effort that is required for the jobs.

15  Q   You thought -- you would have liked detainee workers to be

16  paid more so there would be less turnover, is that what I am

17  understanding?

18  A   To be paid more if it is something that is warranted,

19  absolutely.

20  Q   Did GEO change the pay rate based on the ICE change to at

21  least one dollar a day?

22  A   No.

23  Q   When you left, what were detainee workers paid?

24  A   The majority were paid a dollar per day.  There were some

25  exceptions where they had more than one job and they were

1    paid two dollars a day.

2    Q    Even though the ICE detention standards allowed GEO to pay

3    more than a dollar per day, the general rule was to pay a

4    dollar per day?

5    A    Correct.

6    Q    You testified earlier that kitchen workers were sometimes

7    paid five dollars per day?

8    A    Correct.

9    Q    When you left, they were paid five dollars per day if they

10   worked multiple shifts?

11   A    No.

12   Q    Why did GEO pay detainee workers a dollar per day after

13   paying them five dollars per day?

14   A    Because they had more detainees in the facility.  They had

15   more options of workers.

16   Q    What was the reason why GEO paid five dollars per day for

17   kitchen workers?

18   A    There were various different reasons.  It could be there

19   were times when units were locked down for different reasons

20   like chicken pox, so half the facility could not come out of

21   the living units to work.  So we didn't have enough workers

22   to work.  They wanted to incentivize it so we could still

23   maintain that area.

24   Q    When moments like the chicken pox or other sort of moments

25   of crisis finished, how much did GEO pay detainee workers?

1    A    Back to a dollar per day.

2    Q    Why didn't they keep paying them five dollars per day?

3    A    Because they didn't need them anymore.  The work was able

4    to be maintained with more workers.  There was no longer the

5    crisis.

6              MS. CHIEN:  No further questions.

7              THE COURT:  I assume I should call on Mr. Whitehead

8    next.

9              MR. WHITEHEAD:  I don't have --

10             THE COURT:  All right.  Who speaks here for the

11   defense?  Ms. Mell.  Go ahead with any examination you have.

12             MS. MELL:  Thank you, Your Honor.

13                         CROSS-EXAMINATION

14   BY MS. MELL:

15   Q    Ms. Singleton, I have to find where you are on my screen

16   so I can talk to you.  I guess I will talk to you up there.

17   My name is Joan Mell.  I think you have had an opportunity to

18   meet me before.  I represent GEO.  I would like to do some

19   follow-up questions on some of the specific documents that

20   you referred.

21             When you started at GEO, you were really there from the

22   inception of the program here in Washington, in the Tacoma

23   Tideflats, correct?

24   A    Yes.

25   Q    When you started that position that you took on with GEO,

1   you were involved with Mr. McHatton in trying to figure out

2   what documents were needed to run the facility in a safe and

3   secure manner, correct?

4        MS. CHIEN:  Objection, outside the scope.

5        THE COURT:  Overruled.

6        THE WITNESS:  Mr. McHatton didn't work there when it

7   first opened.  I had a different supervisor.

8   BY MS. MELL:

9   Q   You were there before Bill McHatton?

10  A   Correct.

11  Q   You were, then, an integral person to bring to the table

12  to help develop the policies for the Northwest ICE Processing

13  Center, then known as the Northwest Detention Center,

14  correct?

15  A   No, they were all mirrored directly off ICE standards.  I

16  didn't create any of them.

17  Q   When you say the documents were all mirrored off ICE

18  standards, is it correct that ICE controlled what kind of

19  content needed to be integrated into the forms and documents

20  used at the facility?

21  A   No, the policies mirrored ICE standards.  The building of

22  the program itself and the work areas and so forth, that was

23  all determined by administration of GEO.  They decided what

24  was needed.  If areas were asking for workers once they were

25  setting them up, it went to them.  They said yes or no.

1  Whatever they said was allowed is what I did.

2  Q   What your supervisor directed you to do was what you did,

3  but you did know that direction was coming from ICE, correct?

4  A   No.  ICE standards don't dictate what areas, you know, get

5  cleaned or how many workers we have anywhere.

6  Q   Well, did ICE standards require a voluntary work program?

7  They did, didn't they?

8  A   No, the ICE standards say it is an option.  If you do

9  choose to have one, you just have to comply with certain

10 guidelines.

11 Q   Okay.  So it is your position that ICE had no mandate to

12 operate a voluntary work program; is that your testimony?

13 A   Correct.

14 Q   You thought that you were just operating a voluntary work

15 program at the Northwest ICE Processing Center because GEO

16 wanted it that way?

17 A   Well, yeah, because they needed areas cleaned.  The

18 population ultimately did it.

19 Q   Well, you understand that, at the facility, there are up

20 to 1500 people sitting there with potentially nothing to do

21 to occupy their time all day long, correct?

22 A   Correct.

23 Q   So you appreciated the need to have those individuals have

24 opportunities to do something there, correct?

25 A   That's -- I didn't have an opinion either way.  There is

1   lots of things they can do that didn't involve work.

2   Q   All right.  But you never wrote a memo to GEO saying, boy,

3   I don't think it is right, they shouldn't be doing, I don't

4   know, painting murals.  Didn't they do that?

5   A   Yes, some did do painting of murals.

6   Q   Painting the mural was something that detainees actually

7   volunteered to do and came up with the idea to do, correct?

8   A   I am not sure how that mural painting actually started or

9   who decided they wanted it done.

10  Q   It wasn't your idea, right?

11  A   No.

12  Q   You appreciated the murals because they are pretty

13  beautiful, aren't they?

14          MS. CHIEN:  Objection, outside the scope.

15          THE COURT:  She may answer.

16          THE WITNESS:  Didn't affect me either way.  It wasn't

17  my taste.  Just something on the wall.

18  BY MS. MELL:

19  Q   There was a lot of diversity in the taste of the murals in

20  the facility, correct?  You had to go down the gray hall or

21  the Gray Mile where all the murals were to enter your

22  classification location, correct?

23  A   Correct.

24  Q   Did you ever interface with any of the detainees who

25  indicated to you they appreciated the opportunity to be

1   creative and artistic during the course of their stay there?

2   A   No, nobody has ever told me that.

3   Q   You didn't, in fact, have any conversations with any

4   detainees as to whether or not they would prefer doing the

5   murals versus helping in the kitchen versus being out in the

6   rec yard, correct?

7   A   Yeah, they would communicate that to me sometimes if they

8   saw me in the halls.

9   Q   Their communications to you oftentimes included the need

10  to do work, right?

11  A   No, not necessarily.  They said they wanted something to

12  do.

13  Q   They did want something to do, right?

14  A   Yeah, they asked about schooling.  They asked about a lot

15  of various different things.

16  Q   But schooling isn't something that was designated by ICE

17  in the PBNDS standards as an activity for the voluntary work

18  program, correct?

19  A   There is a standard from ICE regarding it.  It is not in

20  my area so I don't know what it entailed.

21  Q   Your area was the voluntary work program, correct?

22  A   Correct.

23  Q   It was called a voluntary work program, correct?

24  A   Correct.

25  Q   You needed to find them work to do to keep them busy,

1    correct?

2    A    Not necessarily because if they don't want to work, then

3    we just have to figure it out.   There have been times where

4    they don't work.

5    Q    Right, and GEO figures it out.   They can't not provide

6    food, they can't not maintain an unclean, unsatisfactory

7    sanitary facility, correct?

8    A    Correct.

9    Q    Part of the point of the jobs that were selected was to

10   make sure that they had something to do and there is only so

11   many activities to do on the detention secure side of the

12   facility, correct?

13   A    That is not necessarily.

14   Q    Okay.   So "not necessarily" means that they can come and

15   go?   They can pick and chose to do whatever they want to do?

16   A    They can request the job, they can refuse the job.   They

17   can send a request five minutes later for the same job and

18   get reassigned to the same job.   There was no accountability

19   for them if they worked or didn't work.   They worked if they

20   wanted to.   I had more requests for more recreation time, you

21   know, than wanting to work, per se.   They just wanted to be

22   outside playing soccer.

23   Q    Okay.   Being outside playing soccer at the Northwest ICE

24   Processing Center, or Northwest Detention Center, whatever

25   your name of choice is, meant that they were behind barb

Singleton - Cross

```
 1   wire, behind a secure fence line and they weren't free to
 2   come and go of their choosing.  At least leaving the
 3   facility.  They could come and go from their activity but
 4   couldn't leave the grounds, correct?
 5   A   That's ICE's determination, not ours.
 6   Q   They have to stay in the confines of the secure site.  So
 7   that meant they weren't out mowing the lawn, right?
 8   A   They weren't, but they could have.
 9   Q   Did you ever suggest that they should be outside mowing
10   the lawn?
11   A   I don't suggest jobs that somebody would request it.  I
12   would have went through the proper channels.
13   Q   Okay.  So your impression was that there was no limit to
14   what the detainees could seek out to do there.  If they
15   wanted to do a particular activity, that was what the
16   voluntary work program was designed to do, give them
17   something to do?
18   A   Not necessarily because it is based on where a need is.
19   Q   Well, isn't there a need to balance, you know, doing
20   meaningless tasks versus doing something that makes a
21   contribution?  GEO wasn't there and you weren't there sitting
22   there trying to come up with things that were make-work, just
23   have them do something to keep them busy but that was
24   meaningless, right?
25   A   If that's their form of entertainment or what keeps them
```

1    occupied, that's their ultimate choice.

2    Q    Okay.  So is it your testimony that you made an effort to

3    allow the detainees to pick activities to do whether or not

4    they were useful?

5    A    I didn't determine whether they were useful or not useful.

6    I didn't create the program.  I just followed the direction

7    of what they said they wanted workers assigned to do.

8    Q    When you say "they wanted workers assigned to do," are you

9    talking about a conversation that occurred with ICE and the

10   administration?

11   A    No, I never had a conversation with ICE whatsoever in my

12   entire career there about the worker program.

13   Q    You have not?

14   A    No.

15   Q    Can we take a look at Exhibit 69?  That should be the

16   meeting minutes that were just admitted and that you were

17   talking about.  Looking at Exhibit 69, item No. 4 directly

18   calls you out.  "Ms. Singleton is working closely with ICE to

19   revise our classification system."  The classification system

20   was needing revision so that you could address changes to the

21   PBNDS where there was a need to allow -- they changed the

22   standard so that the highly secured, or the folks inside that

23   were wearing the right uniforms, could --

24           MS. CHIEN:  Objection.  Attorney is testifying.

25           THE COURT:  The question got too long, Ms. Mell.  Do

1    you want to rephrase it?

2          MS. MELL:  It was too long.  I will start over.

3    BY MS. MELL:

4    Q   All right.  The classification changes that you were

5    working directly with ICE on, were related in part to what

6    activities the detainees could engage in?

7    A   No, the classification refers to custody levels and the

8    information that were affected by some of the changes we had

9    to receive from them.

10   Q   The custody levels directly affects what kind of

11   activities they can engage in inside the facility, correct?

12   A   Yes, Level 3, per their standard, cannot work outside the

13   living unit.

14   Q   When you were directed to and were working with ICE on

15   classifications systems, that included how those individuals

16   were rated affecting where they worked?

17   A   No, the work program had zero to do with those

18   conversations.  It was literally about information we would

19   need from them in order to accomplish the requirements of

20   their new standards.  It had nothing to do with work.  The

21   work part was internal.  If they said Level 3s couldn't work

22   outside the unit, if somebody ended up ultimately being

23   classified as high-custody Level 3, they just didn't work

24   outside the unit.

25   Q   Do you remember talking to ICE at this stage?

1    A    About Level 3s working outside the unit?

2    Q    Right.

3    A    No, the standards set it.

4    Q    Okay.

5    A    That was part of the voluntary work program standard, not

6    classification standard.  It is a totally different standard.

7    Q    You don't get to the high level but for the classification

8    system, correct?

9    A    The scoring, yeah, based on information provided by ICE,

10    it states their custody level.  I never had any questions

11    about that part so it wasn't necessary to have a

12    conversation.

13    Q    Okay.  So do you remember where these meeting minutes

14    referenced revisions to the classification system?  It was

15    because of the ICE standards, right?

16    A    The ICE standards changed the required scoring for certain

17    activities.  So the conversation of how do we get that

18    information so we can assure they are scored correctly.

19    Q    When you say that you never talked to anyone in ICE

20    directly, you did talk to ICE on site when you talked to ICE,

21    correct?

22    A    Yeah, talked to them on site whenever they were there.

23    Q    Your location at the Northwest Detention Center was

24    inside, in the secure side, in the middle of the building,

25    correct?

1    A    My office was in intake, so that is at the end of the

2    building.

3    Q    Intake was a location that ICE would walk through and

4    observe and frequent throughout your tenure there?

5    A    Correct.

6    Q    Okay.  So in enter -- if you needed to talk to ICE or

7    interact with ICE, they were there on site available to talk

8    to you, correct?

9    A    ICE agents, people that work for ICE.  The people that do

10   the policies don't work there though.

11   Q    When you say "the policies," you are making a distinction

12   I want to understand.  You are saying ICE dictates the

13   policies, but GEO implements that, and that's the difference?

14   A    The ICE standards, what they say we are required to comply

15   with, those are, you know, given to us by ICE.  We have GEO

16   policy, and GEO policies virtually -- they mirror what ICE

17   requirements are.

18   Q    Because everything you do there at the detention center in

19   your role for classification was that you followed ICE

20   standards exactly, correct?

21   A    For classification.  Then it would be depending on what

22   the specific guideline was and the standard.  Some of them

23   said if you had certain programs, then these things apply.

24   If you had certain people coming from certain places, then

25   these things have to apply.  Every part of the standard does

1  not always apply to our facility or even every facility.

2  Q   That was the purpose of creating local standards was to

3  ensure that the implementation was consistent with federal

4  requirements, but were specific to your facility, correct?

5  A   No.

6  Q   What am I missing?

7  A   So the local policies are just GEO policies.  The company

8  has to have policies for whatever reasons, and they just, in

9  essence, say the exact same thing per the foundation, the

10 basic standard.  It doesn't give specifics as to what you are

11 required to do in every single standard.  The voluntary work

12 program says if you have one, you know, these things must

13 occur, or they can't work without a voluntary work agreement,

14 for example.  The voluntary work program standard does not

15 say that we have to have a voluntary work program standard.

16 They say if we do, this is supposed to be the intent of it.

17 Q   The ICE standard contemplates having an agreement in

18 writing about the voluntary work program, doesn't it?

19 A   It says they have to have one, a voluntary work agreement.

20 Q   So that is what GEO then did, they implemented a voluntary

21 work program agreement, correct?

22 A   They opted to have a voluntary work program, so they had a

23 voluntary work program agreement.

24 Q   A voluntary work program agreement is not an employment

25 agreement.  You didn't sign one when you were hired on, did

1    you?

2            MS. CHIEN:  Objection, she's not going to know.

3            THE COURT:  That's two questions.

4    BY MS. MELL:

5    Q   All right.  A voluntary work program agreement is not a

6    GEO offer of employment for an employee, is it?

7            MS. CHIEN:  Objection.  Her opinion -- she's not

8    going to know the answer to that.  That is a personal

9    opinion.

10           THE COURT:  I think she may answer it.

11           THE WITNESS:  Can you repeat the question?

12   BY MS. MELL:

13   Q   A voluntary work program agreement is not an agreement you

14   sign as an employee, is it?

15   A   Myself?

16   Q   Sure.  If that's your knowledge.

17   A   I mean, I am pretty sure I signed a form of one.

18   Q   Did you sign a voluntary work program agreement when you

19   worked for GEO every?

20   A   Not the one in the ICE standards.

21   Q   So the ICE standard voluntary work program agreement is

22   specific to the ICE standards applicable to detainees,

23   correct?

24   A   Yes.

25   Q   Okay.  So when you say that GEO, then, prepared

1    mirror-image policies to what ICE required, you said that GEO

2    did that work and ICE was not involved.  Is that your

3    testimony?

4    A    ICE was not involved in the creation of what?

5    Q    GEO's mirror-image standards that adopt the ICE standards.

6    A    I don't know.  I am not part of that process.  I just have

7    the standards in my area.

8    Q    Okay.  That's what I wanted to clarify.  So when the --

9    when you looked at the -- strike that.

10        Let me ask it this way.  I think we have those in

11   evidence already.  Let me see if I can get up the ICE

12   detention standards.  It will be a minute, but let me ask the

13   question here.  Did you keep the ICE -- strike that.

14        Did you keep GEO's voluntary work program standard or

15   the detainee handbook created by GEO in your work area for

16   your reference?

17   A    Not for my reference per se.  We have it in our area

18   because we have all the policies.

19   Q    Are the policies in your area that you relied on signed by

20   ICE?

21   A    Depends on what you are talking about specifically.

22   Q    Okay.  Let's take the GEO detainee handbook.  Does ICE

23   sign the GEO detainee handbook?

24   A    I don't know, I don't deal with the detainee handbook.

25   Q    You never looked at or relied upon the GEO detainee

1    handbook?

2    A    No.

3    Q    With regard to the voluntary work program, did you have

4    the GEO voluntary work program standard?

5    A    Yeah, it was in our area.

6    Q    And on the very last page, who signed that?

7    A    I don't know; I don't recall.

8    Q    Give me a moment here.  Let me see if I can pull up the

9    appropriate document.  Did we get this admitted in this

10   round?  Let me just look here.  That's the detainee handbook.

11   I need the voluntary work program agreement or policy, GEO

12   voluntary work program policy.

13        MS. CHIEN:  I think it is Exhibit 2, if that helps.

14   BY MS. MELL:

15   Q    So, when you -- let me look here.  Just a second.  All

16   right.  So showing you what has been marked as Exhibit 2.

17        MS. CHIEN:  Your Honor?  I am not sure if you

18   provided these exhibits to Ms. Singleton.  Ms. Mell, I am

19   just flagging that for you.

20   BY MS. MELL:

21   Q    Ms. Singleton, do you have an ability to look at Exhibit

22   2?

23        MS. CHIEN:  We did not include that in her packet.

24        MS. MELL:  Your Honor, I think we need to take a

25   break to address this exhibit.

1   THE COURT:  It is about time for lunch.  Anyway, we

2   will straighten this out.  Where is my list of jurors?

3   MS. CHIEN:  Can I just flag -- I think Ms. Singleton

4   has scheduling --

5   THE COURT:  No.  Here it is.  Just a second here.

6   Mr. Monta, we would like to ask you to raise your camera up

7   or down or something so we can see your face.

8   Ms. Burton, I have been a trial judge for a long, long

9   time.  I have never had a cat in court before.  I just hope

10  the cat is not distracting.  I'm sorry.  You are muted.

11  There.

12  A JUROR:  It is normal around here so it is not

13  distracting.

14  THE COURT:  Somebody raised something else?

15  MS. CHIEN:  Before we go for break, I want to flag

16  that Ms. Singleton has a hard stop at 1:45.  I wanted to make

17  sure that we engage with opposing counsel how much time she

18  has left and sort of dictate when we all come back from

19  lunch.

20  THE COURT:  Ms. Mell, can you give us a guess as to

21  additional time?

22  MS. MELL:  I suspect it will be at least an hour.  I

23  can try to go quickly, but it depends on the witness.

24  THE COURT:  All right.  Well, we will reconvene at

25  1:00.  We are at recess.

1          MS. SCHEFFEY:  Before we leave, we need to find out

2   how to get exhibits to Ms. Singleton.  She didn't contact us

3   before trial.  We want to facilitate that.

4          THE COURT:  I'm sorry, Ms. Scheffey, I didn't hear

5   what you said.

6          MS. MELL:  Your Honor, we need a moment of the

7   Court's time to address the exhibit issue, once the jurors

8   are excused.

9          THE COURT:  Well, I called recess, so the jury is

10  excused.  It is up to Tyler to deal with that, I think,

11  first.

12         THE CLERK:  The jury has been moved to their breakout

13  room.  Let me make sure.  Yep, now they are all gone.

14         MS. MELL:  What about the witness?

15         THE COURT:  What about the witness?

16         MS. SCHEFFEY:  We need her.

17         MS. MELL:  No, I don't.  I don't need the witness to

18  hear this dialogue.  It will affect the impeachment.  I need

19  to have the witness not in the room right now.

20         MS. CHIEN:  Can we discuss how she is going to get

21  her new exhibits, and we can ask Ms. Singleton to leave at

22  that point?

23         MS. MELL:  That is fine.

24         MS. SCHEFFEY:  I think that makes sense.

25         THE COURT:  You are asking me something I don't know

1  anything about.

2          MS. MELL:  Ms. Singleton, where are you and do you

3  have email?

4          THE WITNESS:  Yes, I have email.

5          MS. MELL:  What is your email address?

6          THE WITNESS:  It is lili2g@msn.com.

7          MS. MELL:  Are you anywhere in the Tacoma area right

8  now?

9          THE WITNESS:  Yes.

10          MS. MELL:  Would you be able to come to my --

11          THE WITNESS:  Not Tacoma.

12          MS. MELL:  Can you come to my office over the break

13  where I can provide you all of the exhibits?

14          THE WITNESS:  No.  I am way up in Bonney Lake by

15  Buckley.  It would take me longer than that to go and be

16  back.

17          MR. WHITEHEAD:  This is Mr. Whitehead.  I believe the

18  pretrial orders, both the initial, supplemental, the Zoom

19  trial order allows this proceeding to go forward.  They all

20  contemplate impeachment exhibits being shown via the document

21  share feature on Zoom.  Would that be appropriate here?  I

22  believe so.

23          MS. SCHEFFEY:  Mr. Whitehead, our concern is just do

24  we show it right away to the jury without having shown it to

25  the witness.  We did try to reach her before and we didn't

1    get those to her because she didn't call us back about where

2    we could send anything.

3            MR. WHITEHEAD:  She doesn't have an obligation to

4    call you back.  I would say if you want to try and lay the

5    foundation for the document such that, if you are going to

6    publish to the jury, maybe we can do that out of view of the

7    jury in a separate breakout room.

8            THE COURT:  Well, if we have to excuse the jury as we

9    have done here now, we can excuse the jury to do stuff that

10   needs to be done just like we do in a courtroom.  I am afraid

11   I don't understand what it is you are trying to do or you

12   want me to do.

13           MS. MELL:  Your Honor, just for the record, the

14   problem is here in court, if we were in court, we wouldn't

15   have to send the jury out because I would hand the witness

16   the exhibit and the witness would be looking at the exhibit

17   and the jury would not.  What Zoom limits us in doing is

18   sharing a document with the witness only when we are all in

19   the same room.  That delays things and slows things down when

20   we have to show a witness an exhibit that the witness does

21   not have.

22           THE COURT:  I don't know why we can't excuse the

23   jury, put them in a breakout room and do what has to be done

24   outside the jury's presence.

25           MS. MELL:  I am fine with that.  I am not going to

 1  object to doing it that way.  I just don't like the

 2  technology delay, but that's fine.

 3     Let me look and see.  I think it is a stipulated exhibit

 4  anyway.  I don't know why we are arguing about it.  I think

 5  it can come in.  I have separate issues with the form it is

 6  in right now that I need to address to the Court.

 7          THE COURT:  You have what now?  What else?

 8          MS. MELL:  I need to address the form of the exhibit

 9  issue outside the presence of the witness.

10          MS. CHIEN:  Just so I understand, you are okay with

11  emailing the documents to Ms. Singleton.  Does that make it

12  possible for Ms. Singleton to leave at this moment?

13  Ms. Mell?

14          MS. MELL:  Yes.  We will attempt to do that.  I need

15  to confirm something.  Ms. Singleton, you will have to

16  respond to the email and confirm that you are receiving them.

17          THE WITNESS:  Ms. Chien doesn't have these exhibits?

18          MS. MELL:  She does have those exhibits.

19          THE WITNESS:  Is there a reason she can't provide it

20  to me?

21          MS. MELL:  No, if she's willing to provide you the

22  exhibits, that would be great.

23          MS. CHIEN:  Sure.  I can do that.  Tell me which

24  exhibits.

25          MS. MELL:  I think she should have all of the

Singleton - Cross

1    exhibits made available to her.  I am going to go from

2    whatever I need, I'll be using PBNDS standard; I'll be using

3    the detainee handbook, the GEO one and federal one; I'll be

4    using the policy.

5              THE COURT:  Wait, wait a minute.  This is all

6    pretrial stuff.  I am going to leave it to you to try and

7    solve over the noon hour.  We are cutting into what already

8    is a short noon hour of only an hour.  This is not the only

9    thing that I am dealing with work-wise.  I have -- I need to

10   have time to do stuff, as you do.  So we will reconvene at

11   1:00.

12                         (Recessed.)

13

14

15

16

17

18

19

20

21

22

23

24

25                                   AFTERNOON SESSION

JUNE 2, 2021

 1

 2      (The following occurred outside the presence of the jury.)

 3              THE COURT:  Somebody had a question you wanted to

 4      raise?

 5              MS. MELL:  Your Honor, I don't think I need to raise

 6      the question.  The thing we should verify amongst counsel is

 7      that Exhibit A-275, Page 1 of 9, is not contested, but it is

 8      stipulated to.

 9              MS. CHIEN:  No.  Sorry.  What are you asking again?

10              MS. MELL:  Having had the opportunity to see that I

11      just added the signature page to Plaintiff's Exhibit --

12      stipulated Exhibit 2, do you have any objections to

13      stipulating to the admissibility of what now has been marked

14      as Defense Exhibit A-275?

15              MS. CHIEN:  Yes, we do have objections to this

16      document.  It looks like the signature page was just added,

17      and it is a bit confusing.  The Bates stamped numbers

18      obviously don't continue.  I don't know if we have seen this

19      document because it is not Bates stamped, so I can't verify

20      the authenticity of this.

21              MS. MELL:  Okay.

22              THE COURT:  Are we ready to go?  Is the witness here?

23              THE CLERK:  She is in the waiting room.  Do you want

24      me to admit her?

25              THE COURT:  Yes, get the witness back and jury,

1     please.

2           MS. CHIEN:  One last thing.  The witness has to take

3     her son to the doctor at 1:45.  I want to flag that for the

4     Court in case we need to call her back on a different day to

5     finish her testimony.

6           THE COURT:  I am waiting for a response.

7           MS. MELL:  I need to be able to continue with this

8     examination and not lose my momentum or train of thought.  We

9     have to just finish her.  It is not like -- it is not that I

10    would anticipate bringing her back and wanting to redo and

11    get her to the same place so I could complete it in a short

12    period of time.  That would be disruptive and confusing for

13    me and the jury.

14          THE COURT:  All right.  Ms. Singleton, I understand

15    you have an issue regarding a doctor appointment or

16    something.  Will you tell me about that?  I have to decide

17    what to do.

18          THE WITNESS:  Yes, my son got hurt in football

19    practice yesterday and has a hyperextended knee.  He had to

20    go to the ER.  He has a follow-up today to see if he has to

21    get an MRI.

22          THE COURT:  You were going to take him to the doctor

23    at 1:45, is that what I understand?

24          THE WITNESS:  His appointment is at 2:00.  That's the

25    latest I can leave to get him there on time.

1        THE COURT:  Ms. Mell, any response or question?

2        MS. MELL:  Your Honor, it would be my recommendation,

3   if she's on that tight and that short of a schedule --

4   obviously, I appreciate the need to take care of a kid's

5   medical needs -- that she be dismissed now and recalled later

6   so I can have some consistency with my examination.

7        THE COURT:  Makes sense to me.  Ms. Singleton, we

8   will let you go but ask you to be available to come back when

9   counsel tells you to to finish your testimony.  Okay?

10       THE WITNESS:  Yes, sir.

11       THE COURT:  All right.  Do you have another witness

12  ready to go?

13       MS. CHIEN:  Yes, the State would like to call

14  Bill McHatton.

15       THE COURT:  All right.  You can bring the jury in.

16       THE CLERK:  The jury is returning.

17    (The following occurred in the presence of the jury.)

18       THE COURT:  All the jury is present.  We are going to

19  interrupt Ms. Singleton's testimony, folks.  She has a family

20  situation that she has to take care of this afternoon

21  involving an injury to her son.  She'll come back later in

22  the trial to finish her testimony.

23    This is something that we do as required by witnesses or

24  whatever.  It is not uncommon to interrupt a witness's

25  testimony, and you should draw no inferences from doing that.

1     We will have her back later to finish her testimony.

2     Ms. Chien, you may call your next witness.

3          MS. CHIEN:  State of Washington would like to call

4     Mr. McHatton.

5          MS. MELL:  Your Honor, we are taking a moment to

6     locate and get Mr. McHatton into the online Zoom trial.  He

7     was not the anticipated witness.  As you know, that was a

8     last-minute change.  We are working on it.  He should be here

9     momentarily.

10          THE COURT:  Mr. McHatton, if you would raise your

11    right hand and be sworn.

12                         WILLIAM McHATTON,

13     having been sworn under oath, testified as follows:

14          THE COURT:  Thank you.  You may inquire, counsel.

15                       DIRECT EXAMINATION

16    BY MS. CHIEN:

17    Q    Can you please state your name?

18    A    William A. McHatton.

19    Q    Do you work?

20    A    I am now retired.

21    Q    Where did you work prior to retirement?

22    A    I retired from the GEO Group at the Northwest Immigration

23    Processing Center.

24    Q    Is GEO a for-profit, private company?

25    A    Yes, it is.

1    Q    How long did you work for GEO?

2    A    I worked for GEO from February 2004 through August 2018.

3    Q    When you first started at GEO, what was your job?

4    A    I was the facility's first compliance manager.

5    Q    When you retired, what was your job at GEO?

6    A    I was the -- title was associate warden of security.

7    Q    When you worked for GEO, where were you located?

8    A    At the facility, which is located in Tacoma, Washington.

9    Q    Is the facility called the Northwest Detention Center?

10   A    Back in those days that I was employed there, that's what

11   it was known as, yes.

12   Q    You worked at the Northwest Detention Center until your

13   retirement?

14   A    I did.

15   Q    Who is detained at the Northwest Detention Center?

16   A    People who were detained by Immigration Customs

17   Enforcement.

18   Q    The reason for the detention is not criminal; is that your

19   understanding?

20   A    Correct, it is not criminal.

21   Q    Thank you.  Are both men and women detained at the

22   Northwest Detention Center?

23   A    When I was employed there, the answer is yes.

24   Q    Did the number of detainees change during your time with

25   GEO?

1    A    Yes.

2    Q    How did it change?

3    A    The original immigration detention facility was in

4    Seattle.  This facility, Tacoma, opened, like I said,

5    actually, in April was the initiation date, of 2004.  On the

6    date that it was declared to be opened by Immigration, I

7    believe we brought down somewhere between 250 and 300

8    detainees from that facility that was on Airport Way in

9    Seattle.

10    Q    In 2004, 2005, there was about 250 detainees; is that

11    right?

12    A    That sounds correct.

13    Q    At the time of your retirement, how many people could be

14    detained at the Northwest Detention Center at any time?

15    A    1,575.

16    Q    Let's talk about the physical facility at the Northwest

17    Detention Center.  Given your 15 years at the Northwest

18    Detention Center and as the assistant warden, are you

19    familiar with the physical facility?

20    A    I would say that I am.

21    Q    I am going to show you Exhibit 131.  I am going to ask you

22    to look at Exhibit 131.  It should be in your packet I mailed

23    to you.

24    A    I see two --

25    Q    It should be in the envelope.

1    A    Okay.  Thank you.  Excuse me.  You are asking me now to

2    look at what, please?

3    Q    Exhibit 131.

4    A    Okay.

5    Q    Do you have it?

6    A    That which says "Welcome Book ACA Audit 2017."

7    Q    Yes.  Do you recognize that?

8    A    Barely.  I guess I do, though.  It has been awhile.

9    Q    You worked on these -- do you know what the ACA audit is?

10   A    The American Corrections Association audited the facility,

11   I believe, every three years.

12   Q    What was this welcome book for?

13   A    It was to give a basic introduction of the facility to the

14   auditors from ACA.

15   Q    Did you work on this welcome book along with your

16   assistant?

17   A    I probably participated in its development and approval

18   for presentation.

19   Q    Okay.  I am going to ask you to turn to Page 7 of Exhibit

20   131.

21   A    Okay.

22            THE COURT:  Are you talking about page numbers on the

23   document or Bates numbers?

24            MS. CHIEN:  Page 7 on the PDF, but Bates stamped

25   242554.

1    THE WITNESS:  The facility layout is what you are

2    referring to, I believe.

3    BY MS. CHIEN:

4    Q   Yes.  Is this a fair and accurate depiction of the floor

5    plan of the Northwest Detention Center, to your knowledge?

6    A   Yes.

7    MS. CHIEN:  I would like to move Exhibit 131-A, which

8    is just Page 7, to admit Exhibit 131-A.

9    MS. MELL:  Your Honor, GEO has no objection.  It does

10   contain confidential, secure information.

11   THE COURT:  We don't have a 131-A marked for

12   identification.  We have 131.

13   MS. CHIEN:  Our proposal would be to take out -- just

14   have Page 7 serve as Exhibit 131-A.

15   THE COURT:  Is there any objection to that?

16   MS. MELL:  Yes, in terms of losing the context of

17   what it was prepared for.  It does need to reference the ACA

18   standards.  We would propose it remain the exhibit and not --

19   that one particular page just needs to be limited to the

20   jurors' eyes only.  That is ER 106, Your Honor.

21   THE COURT:  I'm sorry?

22   MS. MELL:  The evidence rule is 106 pertaining to

23   complete documents.

24   MS. CHIEN:  We have no objection to including the

25   entire exhibit, if that's the preference.  We are trying to

1    streamline the number of pages.

2         THE COURT:  Well, if you are offering the full

3    exhibit, I am inclined to admit it.

4         MS. CHIEN:  Okay.

5         THE COURT:  All right.  131 may be admitted.

6              (Exhibit 131 was admitted.)

7    Q    Taking a look at 131, I would like to ask you, when

8    detainees first arrive at the Northwest Detention Center,

9    where within the facility did they go first?

10   A    The reception area.  How do I point that out?

11   Q    I can show you, is it labeled as "intake"?

12   A    Yes, it would be.  Yes.

13   Q    Is it the area I just highlighted?

14   A    That would be intake.  Outside to your right of that is a

15   sally port.  The detainee bus would come in there and they

16   would be escorted off the bus into the intake section.

17   Q    What happens in the intake area?

18   A    They are allowed to shower and change out of their

19   clothing that they came into the facility in and placed into

20   a uniform of the facility based upon their classification

21   level, and then given an orientation to the facility, fed a

22   meal, and then escorted to the appropriate dormitory.

23   Q    Thank you.  I am going to break those down.  I appreciate

24   the complete answer.  You mentioned they were classified.

25   What does it mean to be classified?

1   A    An individual at the Northwest -- I am going to call it

2   the detention center rather than ICE processing center, if

3   that's okay, because it is short.

4   Q    Yes, that's fine.

5   A    They are classified in accordance with their criminal

6   history.  A person with a simplistic, if you will, or basic

7   criminal history would be at a low level.  An individual who

8   was a felon coming from the -- one of the state department of

9   corrections, meaning Oregon, Washington, Alaska, Utah, coming

10  out of prison, they would be at the highest level of custody

11  which would be they would then be given a red uniform.  The

12  basic would be given a blue.  Depending upon, again, minimal

13  criminal history but confinement would be medium, and I

14  believe that uniform level was -- I don't remember.

15  Q    Let me start, you mentioned people are coming from other

16  prisons.  So some of the detainees are coming because they

17  have completed their criminal sentence under state

18  jurisdictions elsewhere; is that right?

19  A    That's correct.

20  Q    Some people you mentioned have quote/unquote "basic

21  criminal history"?

22  A    They have had contact with law enforcement, otherwise they

23  would not be detained.

24  Q    Some people might -- the -- when you say "contact with law

25  enforcement," are there people that have no criminal

1    convictions that are detained at the detention center?

2    A    The low level of custody may not have had a conviction.

3    Q    They might not have a criminal history?

4    A    I am retired from the State of Washington Department of

5    Corrections.  Criminal history has a specific definition to

6    me.  Assuming that is what you are referring to, they may not

7    have a criminal history per se.

8    Q    What information -- you mentioned that detainees are given

9    an orientation in the intake area.  Are they given a detainee

10   handbook?

11   A    Yes, they are given two detainee handbooks, at least, of

12   the material that is in written form and given to them, a

13   federal ICE handbook as well as one that was created by GEO.

14   Q    I am going to show you Exhibit 123, or ask you to look at

15   Exhibit 123.  I think this is stipulated.

16   A    That particular handbook is the GEO handbook.

17            MS. CHIEN:  I would like to move to admit Exhibit

18   123.

19            MS. MELL:  No objection.

20            THE COURT:  State your objection.

21            MS. MELL:  GEO has no objection, Your Honor.

22            THE COURT:  All right.  Exhibit 123 may be admitted.

23                 (Exhibit 123 was admitted.)

24   Q    This is the GEO detainee handbook that is given to

25   detainees?

1    A    All detainees entering the facility are provided with this

2    handbook.

3    Q    Let's turn to Page 15.  Does this provide an introduction

4    to the detainee work program?

5    A    Yes, it does.

6    Q    All right.  Sticking with what happens at intake, you

7    mentioned that detainees are given a uniform.  Who washes

8    those uniforms?  Where are the uniforms coming from or the

9    bed linens?  Which department within GEO is providing those

10   uniforms?

11   A    Who is providing the uniforms would be the business

12   department.

13   Q    Who washes and cleans those uniforms?

14   A    They would be done in the laundry.

15   Q    I would like to turn back to Exhibit 131, Page 7.  I am

16   going to highlight where I think the laundry is.  I would

17   like you to confirm whether that is where the laundry is

18   located?

19   A    That is correct.

20   Q    Did detainee workers work in the laundry facility?

21   A    Detainees work in the detainee laundry, yes.

22   Q    I am going to show you Exhibit 244 and ask whether or not

23   you recognize what this photo is taken of.  You might have to

24   look at it in the documents that you have.

25   A    I'm sorry, you are saying I have it here?

1   Q    Is there anyone in the room with you?  I see you are

2   talking to somebody.  I want to make sure --

3   A    There is no --

4          MS. MELL:  There is nobody in the room.  Her

5   observation is incorrect.

6          MS. CHIEN:  Okay.  Just asking.

7          THE COURT:  It is an appropriate question.

8          THE WITNESS:  I don't know how I put this up here for

9   you all.

10  BY MS. CHIEN:

11  Q    You don't need to show it. I just want you to see it.

12  A    Oh, okay.

13  Q    Do you recognize it?

14  A    Yes, I do.

15         MS. CHIEN:  I would like to move to admit Exhibit

16  244.

17         MS. MELL:  No objection.

18         THE COURT:  244 may be admitted.

19              (Exhibit 244 was admitted.)

20  Q    Can you tell me what this photo is taken of?

21  A    This is a picture of the laundry at the Northwest

22  Detention Center, dryers on the left, washing machines in the

23  rear.

24  Q    Is the person in this photo a detainee worker?

25  A    Yes, a medium level of custody that I couldn't recall is

McHatton - Direct

1    orange.

2    Q    Once -- you mentioned that once they are processed through

3    intake, they are assigned to their housing pod; is that

4    right?

5    A    Yes.

6    Q    Let's turn back to Exhibit 131, Page 7.  I am going to

7    highlight the areas where I think the housing pods are.  I am

8    going to ask if those were the living areas where detainees

9    were assigned.  You can look at your screen, too, if it is

10   easier.

11   A    Okay.  There was housing unit A, B, C, D, and F, and G.  F

12   was the lower level of that building where you see F and G.

13   G was the upper level, second story.

14   Q    You anticipated my next question.  I was going to ask you

15   what the C numbers were, and that identifies the housing

16   pods; is that right?

17   A    Yes, C-1 is a combined cell and dormitory environment,

18   where C-2 and C-3 are dormitory style.

19   Q    Thank you.  How many housing pods are there at the

20   Northwest Detention Center?

21   A    If you are referring to A as a pod and B as a pod, so

22   there would be A, B, C, D, F and G.  What is that, six?

23   Q    I think you are right, six.  Approximately how many people

24   can be assigned to live in each pod?

25   A    Again, that depends on the nature of the pod.  A-1, B-1,

1    C-1, D-1 are combination cell and dormitory.  2 and 3, A-2/3,

2    B-2/3 and C-3 -- C-2 and 3 and D-2 are dormitory style.  D-3

3    was a segregation unit when I left.  So that would not be a

4    normal, regular housing unit.

5    Q   A range.  I understand there might be different sizes of

6    the pod.  The smallest pod held how many detainees and the

7    largest pod held how many detainees, approximately?

8    A   Okay.  Good.  A-1, B-1, C-1, D-1 housed 115.  The A-2, A-3

9    likewise 80.  And the G-1 was a 64, G-2, 64.  G-3 and G-4,

10   75.  Ditto for the F units would be the same.

11   Q   Somewhere between 60 and 115; is that right?

12   A   64 to 115, correct, except for the women.  I guess I

13   should clarify, in D-1 that was -- more restroom facilities

14   were required so the max housing in D-1 was 103.

15   Q   You are good at anticipating my next question, which is,

16   does each pod have their own set of toilets and showers?

17   A   Yes.

18   Q   I am going to show you Exhibit 329.  I want you to look at

19   it.  Sorry.  I want you to look at it in your folder and tell

20   me if you recognize it, and I will move to admit it if you

21   recognize it.

22   A   329, I do recognize it.  It would be -- it would appear to

23   be a dormitory style in either the F or G units.

24            MS. CHIEN:  I would like to move to admit Exhibit

25   329.

```
 1              MS. MELL:  GEO has no objection.
 2              THE COURT:  329 may be admitted.
 3                      (Exhibit 329 was admitted.)
 4   Q   This is one of the F or G pods.  Is this one of the male
 5   housing pods?
 6   A   Yes, it is.
 7   Q   I am going to show you Exhibit 522 and ask if you
 8   recognize this photo.
 9   A   Okay.
10   Q   Do you recognize this photo?
11   A   It is one of the shower units -- or it specifically is a
12   shower area.
13              MS. CHIEN:  I would like to move to admit Exhibit
14   522.
15              MS. MELL:  GEO has no objection, Your Honor.
16              THE COURT:  522 may be admitted.
17                      (Exhibit 522 was admitted.)
18   Q   You mentioned the showers.  Is this where the 60 to 115
19   detainees might shower?  I will ask my question again.  Are
20   these the showers where the detainees, the 60 to 115
21   detainees, would shower?
22   A   Yes.
23   Q   These are shared; is that right?
24   A   Yes.
25   Q   I am going to show you Exhibit 297 and ask if you
```

1    recognize that photo.

2    A   Yes, I recognize this.

3            MS. CHIEN:  Can I move to admit Exhibit 297?

4            MS. MELL:  GEO has no objection, Your Honor.

5            THE COURT:  297 may be admitted.

6                    (Exhibit 297 was admitted.)

7    Q   Can you tell me what this is of?

8    A   This is a shower area in the -- I believe this is in A, B,

9    C -- A, B or C.  Where the other one probably was in F or G.

10   Shower area with, it appears to be, detainees cleaning the

11   shower area.

12   Q   I am going to show you Exhibit 521 and ask if you

13   recognize that photo.

14   A   I recognize this.

15           MS. CHIEN:  Move to admit Exhibit 521.

16           MS. MELL:  GEO has no objection.

17           THE COURT:  521 may it be admitted.

18                    (Exhibit 521 was admitted.)

19   Q   Can you tell me what this photo is of?

20   A   This is close to the shower area.  I would say, in all

21   likelihood, this is the F and G unit, handwashing and commode

22   area.

23   Q   The detainees assigned to the F or G unit all shared the

24   toilets and sinks?

25   A   Yes.

1    Q    Once they are assigned to a housing pod -- I would like to

2    move on and ask how the meals are provided to detainees?

3    A    Would you please repeat that.

4    Q    Once detainees are assigned to a housing pod, how are

5    meals provided to detainees?

6    A    Detainees are fed their meals in the housing units.

7    Q    Is that called satellite feeding?

8    A    Yes, it is.

9    Q    The meals are prepared -- they are eaten in the living

10   unit.  Where is the food that detainees eat prepared, cooked

11   and plated?

12   A    In the kitchen.

13   Q    Does GEO operate a kitchen on site?

14   A    Yes, it does.

15   Q    I would like to turn back to Exhibit 131, which we ask to

16   put up on the screen which will be easier for you perhaps.

17   A    Okay.

18   Q    I am going to highlight where the kitchen is.  If you

19   could confirm.

20   A    That is correct.

21   Q    How many meals were provided per day in that kitchen?

22   A    How many meals per day?

23   Q    Yes.

24   A    Just picking a number of 1500 detainees, if three meals a

25   day plus -- if usual going to -- plus staff have the

1    opportunity to eat that meal also, as well as ICE and the

2    courts and the medical.  I would be hard-pressed to tell you

3    how many meals in a given day.

4    Q   It could be thousands; is that right?

5    A   Well, it certainly is that.

6    Q   I am going to show you Exhibit 430 and ask if you

7    recognize that photo.  I am going to ask you to go through

8    the envelope and see if you recognize the photo.

9    A   It is in this binder that you gave me?

10   Q   Yes.

11   A   The number is 430.  Okay.

12   Q   Do you recognize this photo?

13   A   I do.

14          MS. CHIEN:  I would like to move to admit Exhibit

15   430.

16          MS. MELL:  GEO has no objection, Your Honor.

17          THE COURT:  430 may be admitted.

18              (Exhibit 430 was admitted.)

19   Q   Can you tell me what this photo was taken of?

20   A   In the food service department.  It is detainees involved

21   in -- I am not sure if -- what exactly they are doing, but

22   they are in the food service department working.

23   Q   When you say "food service department," you mean the

24   kitchen; is that right?

25   A   Yes.  I will use that term "food service" and "kitchen"

1   simultaneously.

2   Q   Yep.  That's fine.  I just wanted to be clear for the

3   record.  I want to look back at Exhibit 131, Page 7.  I am

4   going to put it up on the screen so hopefully you don't have

5   to do too much work.  We have talked about the kitchen,

6   laundry and intake.  I would like to talk about other areas

7   of the facility.  I would like to start at the barbershop.

8   Is this where the barbershop is located?

9   A   Yes.

10  Q   What happens at the barbershop?

11  A   It is where detainees make -- get their hair cut.

12  Q   Who cuts detainees' hair?

13  A   Other detainees.

14  Q   I am going to move to the visitation area.  What happens

15  in the visitation area?

16  A   That is where members of the community, family, friends,

17  may visit detainees.

18  Q   I am going to touch base on the law library.  What happens

19  at the law library?

20  A   Detainees who want to work on their immigration case

21  request access to the law library, and time is allotted to

22  them to do exactly that.

23  Q   I am going to ask you to look at the medical area and ask

24  you what happens in the medical area.

25  A   All detainee medical needs and services are conducted in

1   the medical area, medical, dental, x-rays that they have the

2   capacity to perform.

3   Q   We talked about the living areas.  These are the living

4   areas; is that right?

5   A   Correct.

6   Q   Is that --

7   A   Why don't we take out A-3 for my comfort.  That is not a

8   living area per se.  It is a segregation detention unit.

9   Q   Okay.  The segregation unit, is that where detainees might

10  be segregated to?

11  A   D-3 and H, which is next to G-3 and F-3.  It is that

12  building that you see there.

13  Q   Can I ask, who cleans the segregation units?

14  A   Staff and detainees.

15  Q   Detainee workers work to clean the segregation units?

16  A   They may.

17  Q   What I have highlighted here, is that the secured side of

18  the center, known as the secured side versus the non-secured

19  side of the center?

20  A   Everything that you have highlighted would be the secured

21  facility, yes.

22  Q   The remaining things that are unhighlighted are the public

23  and administrative sides of the facility?

24  A   That would be correct.

25  Q   Detainee workers work in all the highlighted areas of the

1  facility; is that right?

2  A    I don't believe they work medical.

3  Q    I would like -- let's take off -- everything except

4  medical, is that right, in your recollection?

5  A    That would be correct.

6  Q    Now that we have a general understanding of the facility,

7  I would like to talk about your role at the Northwest

8  Detention Center.  Earlier you testified that you were a

9  compliance manager.  What were your job responsibilities as

10  the compliance manager?

11  A    Primary, initially, was to create the policies and

12  procedures that we operated under, and then as the years and

13  time went by, to maintain those, and then to make sure that

14  all the staff were aware of the policies and procedures, the

15  ICE detention standards, later known as Performance-Based

16  National Detention Standards, which basically we operated

17  under, and to assure that those standards and policies and

18  procedures were followed by conducting audits.

19  Q    When you refer to policies and procedures, can you give me

20  some examples of some policies and procedures that you

21  prepared when you were the compliance manager?

22  A    There is a long story to that or a short story.  We could

23  not open the facility until we had an operational policy and

24  procedure manual.  I will condense it from there.  That's why

25  I was hired.  I did policy and procedure for the State of

1    Washington.

2    Q    Let me try and narrow my question so I can help you out.

3    Did you work on the policies and procedures for the detainee

4    worker program?

5    A    I created the policies and procedures based upon the

6    Immigration Customs Enforcement Detention Standards, yes.

7    Q    When you say "ICE standards," are you referring to the

8    Performance-Based National Detention Standards?

9    A    Yes.

10   Q    You created GEO's policy in accordance with the ICE

11   standards; is that what I am hearing?

12   A    Yes.  It is important to understand that GEO could not --

13   I could not create a policy without it being in line with

14   those detention standards and be approved by ICE.

15   Q    So I understand, ICE had to approve the policies, you

16   drafted them; is that right?

17   A    That is correct.

18   Q    I am going to show you Exhibit 2, which I think is

19   stipulated.

20   A    You are going to show me or do I open --

21   Q    Sorry.  Can you open it?  Do you recognize this?

22   A    Yes, I do.

23          MS. CHIEN:  I would like to move to admit Exhibit 2.

24          MS. MELL:  Your Honor, GEO objects to Exhibit 2 in

25   its present form.  It is missing the signature page.  We have

1   re-marked the completed, signed copy as GEO's Exhibit 264 and

2   have that available for the jury.  There would be no

3   objection to that admission.

4          MS. CHIEN:  Your Honor, GEO stipulated to this.  In

5   the exhibit list, you will see GEO has actually stipulated to

6   this exhibit.

7          MS. MELL:  This exhibit is the digital version that

8   doesn't include the signature page.  The signature page --

9          THE COURT:  If they stipulated to it, it should be

10  admitted as it is.  Exhibit 2 may be admitted.  If an

11  additional page needs to be added to it, somebody can provide

12  the testimony and add it.

13         MS. MELL:  Thank you, Your Honor, we'll do that.

14                (Exhibit 2 was admitted.)

15  BY MS. CHIEN:

16  Q   We are looking at Exhibit 2.  Can you tell me what this

17  is?

18  A   This is the 2015 version.  It is dated effective date

19  April 13th, 2015.  A version of the voluntary work program

20  policy for the facility.

21  Q   This is GEO's policy, right?  It is on GEO's letterhead?

22  A   It would be GEO's policy, correct.

23  Q   Again, I am going to ask to turn to Page 1.  You look at

24  the first section.  What is the purpose of this policy?

25  A   It reads, "The purposes of this policy is to set forth the

1    procedures governing the voluntary work program at the

2    Northwest Detention Center."

3    Q    Down at Part B where it says "work assignment."

4    A    Yes.

5    Q    I see listed as the work assignments:  kitchen workers,

6    recreation and barber positions, living area workers,

7    janitorial, server and laundry positions, evening janitorial

8    positions and laundry positions; is that right?

9    A    That is correct.

10   Q    Is the portions that we were highlighting now -- sorry,

11   one second -- is that what we are talking about for the work

12   assignments?

13   A    You are solely talking about the work assignment?  Yes.

14   Q    Looking at Part C of this policy, says "voluntary work

15   program objective."  How many work objectives are there?

16   A    There are three identified there.

17   Q    First objective is stated as, "Physically and mentally

18   able detainees are gainfully employed while contributing to

19   the orderly operation of the facility."

20        Did I read that correctly?

21   A    That's what it reads.

22   Q    Second objective says, "Essential operations and services

23   improve through productivity of detainees."

24        Did I read that correctly?

25   A    You did.

1  Q    The third one is, "The inactivity-induced idleness and

2  disciplinary code violations are reduced."

3        Did I read that correctly?

4  A    That is correct.

5  Q    Referring to the detainee selection section of the policy,

6  does this GEO policy also establish the procedures for

7  detainees to be offered work assignments, at the top of Page

8  3?

9  A    It appears to outline the process.  (Inaudible)

10 Q    If you look at No. 2 on the top of page 3.  It says, "The

11 detainees work request will be forwarded to the

12 classification work program supervisor."  Do you see that?

13 A    Yes.

14 Q    Is the classification work supervisor a GEO staff member?

15 A    Yes.

16 Q    When you were working at GEO, who was the classification

17 officer and supervisor?

18 A    I had two individuals in that capacity, Alisha Singleton

19 and Michael Heye.

20 Q    Turning to Page 3 of the policy and referring to the

21 discrimination in hiring detainee workers, does the GEO

22 policy require detainees -- does the GEO policy prohibit

23 discrimination in the hiring of detainee workers?

24 A    Yes.

25 Q    Turning to Page 4 of the policy, Part I, does the GEO

1    policy require detainees to work as scheduled, if you look at

2    the first line?

3    A    Yes.

4    Q    Turning to Part M of the policy, is it GEO's policy that

5    detainees may be removed from a work detail for cause?

6    A    Yes.

7    Q    I understand this GEO policy to do at least six things.

8    It identified the work assignments, identified GEO's

9    classification officer's responsibilities, prohibited

10   discrimination in the hiring of detainee workers, required

11   detainee workers to work a schedule, allowed detainee workers

12   to be removed for cause, and required GEO to develop training

13   programs -- sorry -- is that right?

14   A    Yes.

15   Q    Earlier you testified you were promoted to assistant

16   warden?

17   A    Yes.

18   Q    When were you promoted to assistant warden?

19   A    2010.

20   Q    What were your job responsibilities as the assistant

21   warden?

22   A    Oversee the operation of the facility and its staff from a

23   security perspective.

24   Q    Did it include oversight of classification staff?

25   A    Yes, at that time.

1   Q    So it included oversight over the detainee worker program?

2   A    I would say yes to that.

3   Q    Let's talk about the detainee worker program

4   operationally.  From your recollection, what jobs were

5   detainee workers assigned to do as part of the work program?

6   A    What jobs did they try to do?

7   Q    What jobs were detainee workers assigned to do as part of

8   the work program?

9   A    I believe we went over that.  Janitorial, if you will,

10  just to put a brand name on something, which would be working

11  in the housing units, wiping down the tables prior to a meal

12  and after the meal.  As we saw pictures of, cleaning the

13  restroom areas, sweeping the floor in the housing unit

14  after -- yeah, numerous times a day.

15  Q    Sorry.

16  A    Working in -- that pretty much takes care of the housing

17  units.  The laundry, assisting in the washing and drying of

18  clothes.  The clothes were then taken to another housing unit

19  to be folded.  Then they were distributed by staff with the

20  assistance of detainees.

21       In the food service department, they would dish up the

22  food.  They may participate in the preparation of the meal.

23  They would, under the supervision of staff, use the carts to

24  deliver the meals to their respective housing units.  After a

25  meal, they would participate in the kitchen -- dishwashing

1    section of the food service department and clean that up.  So

2    it is kitchen, laundry, housing units, and then there was a

3    detail for the hallways.

4    Q    Were those referred to as the Gray Mile workers?

5    A    Yes.

6    Q    Detainee workers also worked in the barbershop,

7    visitation, intake?

8    A    Yes.

9    Q    As compliance manager, did you develop documents related

10   to the detainee work program?

11   A    Yes.

12   Q    What documents did you create as part of the detainee work

13   program?

14   A    Did you say "as compliance"?

15   Q    Yeah.

16   A    As compliance, yes, I did.  I drafted the initial job

17   descriptions, if you will.  I had handed them out to the

18   respective areas for their input and correction as the case

19   may be.

20   Q    What was the purpose of these job descriptions?

21   A    To predominantly use as an information tool to the

22   detainees in the housing units to let them know should they

23   chose to participate in the voluntary work program what they

24   might be doing in a given area.

25   Q    Would you consider it sort of like a training document?

McHatton - Direct

1    A    Very basic training, yeah.

2    Q    I am going to show you Exhibit 83.

3    A    Is that in the book again?

4    Q    Yes, in the book again.  Sorry.  I am going to ask if you

5    recognize Exhibit 83.

6    A    Yes, I do recognize that.

7            MS. CHIEN:  I would like to move to admit Exhibit 83,

8    which I think is stipulated.

9            MS. MELL:  GEO has no objection.

10            THE COURT:  83 may be admitted.

11                (Exhibit 83 was admitted.)

12    Q    Can you tell me what this is?

13    A    This is entitled "Detainee Job Descriptions," specifically

14    job title "cook, prep or server in the food service

15    department/kitchen."

16    Q    It identifies the job title, which I think you flagged.

17    It also identifies their work schedule, is that right, under

18    normal work hours?

19    A    Excuse me, basic breakfast, lunch or dinner, yes.

20    Q    It also indicated what the requirements were for working

21    as a cook prep supervisor in the "special requirements"

22    section?

23    A    Specific work duties, special requirements, training

24    requirements.

25    Q    It lists the training requirements as well.  You can also

1    look at the screen.  We will highlight it for you.

2    A    Okay.  Thank you.

3    Q    Were detainees -- I see a line for signature.  Were

4    detainees required to sign this job description?

5    A    If they wanted to work in the kitchen under any one of

6    those activities, they would be required to acknowledge that

7    they had been served with this document and they would be

8    required to sign it to participate, yes, for their safety and

9    understanding.

10   Q    So their signature would indicate they understood what the

11   specific work duties were?

12   A    Yes.

13   Q    Let's take a look at the specific work duties.  I read

14   that some of the specific work duties are that they follow

15   all recipe cards completely with no deviation without prior

16   approval, that there is preparation of all food products,

17   slicing meats and canning goods --

18          MS. MELL:  Your Honor, this is improper examination.

19   She's reading the document that has been admitted.

20          MS. CHIEN:  I plan to ask if I read it correctly.

21          MS. MELL:  The document speaks for itself.

22          THE COURT:  The document does speak for itself.  If

23   you have questions about it, you can ask them.

24   BY MS. CHIEN:

25   Q    Was one of the specific work duties to clean all ovens,

1   stoves, grills and kettles?

2   A    Yes.

3   Q    Was one of the job duties to do anything the food service

4   supervisor may ask you to do?

5   A    Yes.

6   Q    Is the food service supervisor a GEO staffer?

7   A    Yes.

8   Q    Finally, the job description listed five reasons the

9   detainee worker could be terminated; is that right?

10  A    Yes, there are reasons for termination there.

11  Q    You mentioned -- I think you testified that you drafted

12  this job description and then handed it over to the

13  department heads for their review; is that right?

14  A    Yes.

15  Q    So who helped you draft this job description?

16  A    I believe that I requested and received documents from the

17  Department of Corrections and Bureau of Prisons.

18  Q    Sorry.  I think you -- let me go back.  I think you

19  testified that you drafted job descriptions, and then you

20  would hand them out to the various departments to

21  double-check the contents of the job description; is that

22  right?

23  A    Yes.

24  Q    Who was the head of the kitchen department?

25  A    When I left?  Bert.

1    Q    Bert Henderson?

2    A    Bert Henderson.  Forgive me.  Thank you.

3    Q    Did Bert Henderson look at this job description and help

4    you draft this job description?

5    A    Yes, I think that is a safe thing to affirm.  I don't know

6    that Bert was the food service manager originally when this

7    document was created, but certainly it is not in concrete and

8    it can be amended.  That was last updated, it shows in the

9    one we are looking at, was in January of 2017.  This is the

10   document that existed on that date.

11   Q    If it was updated, do you recall who was the food service

12   manager in 2017?

13   A    She was then.

14   Q    She would have been included in any updates?

15   A    Absolutely.

16   Q    Bert Henderson is a GEO staffer?

17   A    Yes.

18   Q    Showing you Exhibit 84.

19   A    Okay.

20   Q    Do you recognize this?

21   A    I do.

22            MS. CHIEN:  I would like to move to admit Exhibit 84.

23            MS. MELL:  GEO has no objection, Your Honor.

24            THE COURT:  84 may be admitted.

25                    (Exhibit 84 was admitted.)

1    Q    Can you tell me what this is?

2    A    This is the job description for -- detainee job

3    description for a detainee working in the dishwashing area of

4    the kitchen.

5    Q    I am looking at the job title, "Dishwasher, pots and

6    pans"?

7    A    Right.

8    Q    Looking at this job description, are you reminded as to

9    what the training requirements were for this?

10   A    I would have to read them.

11   Q    Looking at the training requirements and reading it, do

12   you recall what the training requirements were?

13   A    Yes.

14   Q    It included hazardous communications training, safety

15   briefing, and learning about equipment and tools?

16   A    Right.  Bert, when I was there, personally took it on

17   herself with personal pride to train all detainee workers

18   coming into the food service department.  So she would

19   conduct that training.

20   Q    This job description also, again, includes their work

21   schedule; is that right?

22   A    Insofar as it is broad, breakfast, lunch, and dinner,

23   right.

24   Q    Do you recall the specific work duties of the dishwasher

25   job description, or the detainees assigned to dishwasher?

1    A    Not without, of course, looking at it as you have brought

2    it up.

3    Q    So it was -- do you recall whether or not emptying trash

4    cans in the dish area, stacking trays in the storage rack and

5    keeping work area thoroughly clean was part of the job

6    duties?

7    A    That's how it reads, correct.

8    Q    Was breaking down the dish machine, cleaning all pipes

9    after each meal also part of the job duties?

10   A    Yes.

11   Q    Was doing anything the food service supervisor may ask you

12   to do part of the job duties?

13   A    Yes.

14   Q    Did this job description, again, list the reasons why a

15   detainee worker could be terminated?

16   A    I think they are probably identical to the other document,

17   but the answer is affirmative.

18   Q    It includes failure to follow safety procedures, failure

19   to follow supervisors' instructions?

20   A    Yes.

21   Q    Again, who developed this job description?

22   A    Originally, I would have developed that, I suppose.

23   Q    Thank you.  I am going to move to Exhibit 85 and ask if

24   you recognize Exhibit 85.

25   A    Yes.

1    MS. CHIEN:  I would like to move to admit Exhibit 85.

2    MS. MELL:  GEO has no objection, Your Honor.

3    THE COURT:  85 may be admitted.

4              (Exhibit 85 was admitted.)

5    Q   Can you tell me what this job description is for?

6    A   Reads that it is the detainee job description for anybody

7    assigned to the laundry as a laundry worker.

8    Q   It also includes their work shift; is that right?

9    A   This specific one is for a day shift, it states.

10   Q   Also identifies the job responsibilities of working in the

11   laundry facility, including loading and unloading washers and

12   dryers?

13   A   Yes.

14   Q   Again, listed six reasons they could be fired?

15   A   Yes.

16   Q   One of the special requirements is "detainee must be able

17   to lift 40 pounds"; is that right?

18   A   That's how it reads.  Correct.

19   Q   Who was responsible for defining the scope of this

20   position for detainee workers?

21   A   Would you please repeat that?

22   Q   Who was responsible for defining the scope of work for

23   these laundry workers, these detainee workers?

24   A   The officer assigned to the laundry.

25   Q   Is that a GEO staffer?

1   A    Yes.

2   Q    I am going to show you Exhibit 88 and ask if you recognize

3   that job description?

4   A    Yes.

5           MS. CHIEN:  I would like to move to admit Exhibit 88.

6           MS. MELL:  GEO has no objection, Your Honor.

7           THE COURT:  88 may be admitted.

8                   (Exhibit 88 was admitted.)

9   Q    Can you tell me what this job description is for?

10  A    This is a detainee job description for a detainee working

11  as a barber.

12  Q    It includes their work shift?

13  A    Yes.

14  Q    Did it include the job responsibilities for detainees,

15  including requiring to clean clippers after every haircut and

16  where to put combs and things like that?

17  A    Yes.

18  Q    Who created this job description and work duties that are

19  listed in this document?

20  A    I would have drafted this initially and shared it with the

21  officer assigned to the oversight of barbershop.

22  Q    The officer assigned to the oversight of the barbershop is

23  a GEO staffer?

24  A    Yes.

25  Q    I am going to show you Exhibit 89.  I would like to ask if

1    you recognize it?

2    A    Yes.

3            MS. CHIEN:  Move to admit Exhibit 89.

4            MS. MELL:  GEO has no objection.

5            THE COURT:  It may be admitted.

6                    (Exhibit 89 was admitted.)

7    Q    Can you tell me what this is?

8    A    States that it is the detainee job description for

9    detainee cleaning the barbershop, barbershop cleaner.

10   Q    It also includes their work shift?

11   A    Again, day shift.

12   Q    Also includes their job descriptions as a barbershop

13   cleaner?

14   A    Right.

15   Q    It includes that floors will be swept with a wet towel,

16   sinks cleaned, chairs wiped down, no hair remains on the

17   floor?

18   A    Right.

19   Q    Who created the job description and work duties?

20   A    Given the date, I did.

21   Q    I am going to show you Exhibit 91 and ask if you recognize

22   Exhibit 91.  Do you recognize it?

23   A    I do.

24            MS. CHIEN:  Can I move to admit Exhibit 91?

25            MS. MELL:  GEO has no objection.

1    THE COURT:  91 may be admitted.

2    (Exhibit 91 was admitted.)

3    Q    Can you tell me what this is?

4    A    This is the overall job description for any detainee who

5    wants to volunteer to work in the housing unit.  It addresses

6    numerous jobs.

7    Q    For detainees that work in the housing unit, is it called

8    a pod porter job?

9    A    Yes.

10   Q    Sets out job responsibilities for several jobs within the

11   living unit; is that right?

12   A    That is correct.

13   Q    For example, we can take the top one, it includes the job

14   responsibility for shower cleaner?

15   A    That is correct.

16   Q    Does it include to scrub walls, floors and sides of shower

17   stalls?

18   A    Yes.

19   Q    Then looking down at the grave cleaner, they are

20   responsible for cleaning the staff bathroom and sweeping and

21   mopping horseshoes and octagon and hallway floors; is that

22   right?

23   A    Correct.

24   Q    "Staff bathroom" refers to GEO staff; is that right?

25   A    Yes, it would be.

1    Q    Not detainee worker bathrooms?

2    A    Under this specific job, that is correct.

3    Q    According to this job description, what time is the grave

4    cleaner scheduled to work?

5    A    11:30 p.m. to 1:30 a.m. or 2330 until 0130.

6    Q    Who developed these job descriptions, this pod porter job

7    description?

8    A    I believe I created this in conjunction with the

9    classification unit staff who were also detention officers,

10    corrections officers.

11    Q    Are you talking about Ms. Singleton and Mr. Heye?

12    A    Yes.

13    Q    Those are GEO staffers; is that right?

14    A    That is correct.

15    Q    Through all these job descriptions, these are all part of

16    the detainee work program; is that right?

17    A    That would be correct.

18    Q    Are there jobs we haven't seen job descriptions for?  For

19    example, the Grey Mile cleaner that you mentioned that I

20    haven't shown you a job description for?

21    A    You have not shown me one for that per se.  I was

22    wondering if it was incorporated into this one.

23    Q    I don't have it for you.

24    A    Okay.

25    Q    I was going to ask you, what did detainee workers assigned

1    to the Grey Mile do?

2    A    Sweep the Grey Mile and mop it, if need be.

3    Q    Did they also buff and wax the Grey Mile?

4    A    That would be a separate crew.

5    Q    Separate crew of detainee workers?

6    A    Right, typically.

7    Q    A separate crew of detainee workers would buff and wax the

8    Grey Mile.  What equipment was necessary to buff and wax the

9    Grey Mile?

10   A    A bucket, mop, and a buffer.

11   Q    Buffer, is that one of those equipments that you like --

12   it is machinery; is that right?

13   A    It is an electric buffer.  Anything that people typically

14   would see -- I guess first place I ever saw one was in a

15   hospital.

16   Q    Typically what janitors would use; is that right?

17   A    Correct.

18   Q    Are there other jobs that Grey Mile workers -- other than

19   Gray Mile workers that I haven't shown you a job description

20   for?

21   A    I don't believe so.

22   Q    What about paint detail?

23   A    Detainees don't paint.

24   Q    Okay.  Were detainee workers assigned to janitorial duties

25   outside of the pod in the Northwest Detention Center?

1  A    Were detainees assigned to janitorial duties outside the

2  housing unit?

3  Q    Yeah.

4  A    Other than what we have talked about, no.

5  Q    Other than what we have talked about, you mean -- detainee

6  workers have work -- done janitorial duties in the medical,

7  visitation, recreation, intake; is that right?

8  A    Yeah.  Not medical.  They were there originally, but that

9  stopped.  They would -- the cleaning details, floor details

10  would be the same group of people doing the visiting area,

11  any place where there is a floor that is within the

12  controlled environment, except medical.

13  Q    Detainees would clean; is that right?

14  A    Yeah, sweep up and attend to keeping the floor in the

15  intake unit, for example, looking good.

16  Q    So now that we have identified the general jobs in the

17  work program, I would like to turn to how the job assignments

18  are identified and work schedules set.  How were job

19  assignments determined to be necessary at the Northwest

20  Detention Center?

21  A    Whether or not the job was necessary?  That would fall

22  under the -- go back to the document.  The voluntary work

23  program and the whole concept, again, is an ICE creation, and

24  we, under contract with ICE, were obligated to create a

25  policy and procedure tied to it that included much of their

1    wording, and so anything that existed, they drove.

2    Q    Do you recall that you were deposed in this quite a long

3    time ago?

4    A    In this case, yes, 2019, I believe.

5    Q    When you were deposed, you were under oath to tell the

6    truth?

7    A    Oh, sure.

8    Q    I am going to ask you to turn to the other document that

9    is in your packet.  It is the transcript from that

10   deposition.

11   A    Okay.

12   Q    I am asking you to turn to Page 57 of that deposition

13   transcript.

14   A    Okay.  I am looking for the numbers, page numbers, 57.

15   Q    Yep.  I am going to start reading at Line 21.

16            MS. MELL:  Your Honor, I object to this methodology.

17            THE COURT:  Well --

18            MS. CHIEN:  Your Honor, I think you might have cut

19   out.  We can't hear you.

20            THE COURT:  I'm sorry.  You can't just read it into

21   the record.  You have to phrase the question in a different

22   way.

23   BY MS. CHIEN:

24   Q    You were asked how is it that job assignments were

25   determined to be necessary for detainee workers at the

1   Northwest Detention Center; is that right?

2   A    Yes.

3   Q    Do you see what your answer was?

4   A    I said, "Based upon an identified need by the housing unit

5   officer, shift supervisor."

6   Q    Thank you.  The housing unit officer and shift supervisor,

7   that's GEO staff; is that right?

8   A    Yes.

9   Q    GEO staff located at the Northwest Detention Center

10  determined how many detainee workers will be assigned to a

11  particular shift; is that right?

12  A    I'm sorry, can I correct that statement?

13  Q    No.  Go ahead.

14  A    My answer at that point in time was based upon an

15  identified need by the housing unit officer or shift

16  supervisor, and that certainly is one of the areas of input,

17  if you will.  The generic areas that were addressed by -- for

18  detainees to work was driven by the ICE PBNDS and the

19  victim -- excuse me, the voluntary work program with input

20  from staff.  That would be a more correct version of the

21  answer.

22  Q    Okay.  So your testimony today is that the ICE standards,

23  the PBNDS would tell you that detainees would need to be

24  assigned to the kitchen or the laundry; is that right?

25  A    Yeah, yes.

1    Q    I would like to show you Exhibit 17.  I would like you to

2    take a look at Exhibit 17.

3    A    I am here.

4    Q    Do you recognize this document?

5    A    Yes.

6    Q    Can you tell me what it is?

7    A    It appears to be the Performance-Based National Detention

8    Standard governing the voluntary work program.

9    Q    So this --

10            MS. CHIEN:  I would like to move to admit Exhibit 17.

11            MS. MELL:  GEO has no objection.

12            THE COURT:  It may be admitted.

13                    (Exhibit 17 was admitted.)

14    Q    I understand Exhibit 17 -- I actually don't know how many

15    pages Exhibit 17 is.  This is the ICE standard for the

16    voluntary work program; is that right?

17    A    Yes.

18    Q    This is the ICE standard that you are saying that guided

19    the voluntary work program at the Northwest Detention Center;

20    is that right?

21    A    Yes.

22    Q    Where in this ICE standard does it direct GEO to create a

23    work assignment for cook, prep or server?

24    A    Nothing in the PBNDS is a sole document.  It is all

25    interconnected, if you will.  So on Page 406 under

1   references, it includes 4.1, food service, so therefore you

2   have to go to the 4.1 food service standard to incorporate

3   specifically what you are asking.

4   Q    Let me actually take a different one.  It nowhere says in

5   this voluntary work program that GEO has to create a laundry

6   worker job, does it?

7   A    It would be under 1.2.  Environmental health and safety

8   would incorporate the laundry, I am fairly certain.

9   Q    Your testimony is the ICE standard 1.2; is that right?

10  A    1.2, 4.1 and then for the housekeeping, Section C on

11  page -- on this page.

12  Q    Okay.  Thank you.

13  A    Go ahead.  I'm sorry.

14  Q    The kitchen staff, for example, who determined what the

15  responsibilities of detainee workers would do in the kitchen?

16  A    I would prefer you repeat the question.

17  Q    I am going back.  In the kitchen, who determined the job

18  responsibilities that detainee workers would do in the

19  kitchen?

20  A    Specifically, I believe -- I don't recall exactly.  I

21  would -- I don't recall exactly.

22  Q    Would it be Bert Henderson?

23  A    She would certainly have input to it.

24  Q    How many shifts were there for detainee workers in the

25  kitchen?

1    A    I believe we read three.

2    Q    Plus a night cleaning shift; is that right?

3    A    That would include the night shift, yes, cleaning shift.

4    Q    Who determined how many detainee workers were needed in

5    the laundry?

6    A    How many were needed in the laundry would probably be my

7    officer assigned to that area.

8    Q    Is that GEO staff?

9    A    Yes.

10   Q    When you retired, how many shifts were there for detainee

11   workers in the laundry?

12   A    I believe we had two.

13   Q    How long were the laundry shifts?

14   A    Now, I don't recall.  I wouldn't want to say I knew.

15   Q    Who determined how many detainee workers were needed for

16   the Grey Mile?

17   A    Typically, the lieutenant to begin with, because we didn't

18   have sergeants, then when we had sergeants, the sergeant was

19   assigned to overlook -- oversee those details.

20   Q    Is that GEO staff?

21   A    Yes.

22   Q    Who determined the schedules for detainee workers who

23   worked as pod porters?

24   A    That was probably myself in conjunction with the

25   classification staff.

1    Q    That's GEO staff?

2    A    Yes.

3    Q    Did you have to get ICE's blessing for any increased

4    detainee worker work assignments?

5    A    Yes.

6    Q    I am going to go back to your deposition transcript, where

7    you were sworn under oath, and ask you to turn to Page 35.

8    A    I am going back to Page 35?

9    Q    Yes.

10    A    I am there.  Do I put that up here again?

11    Q    So I am going to ask you a question.

12    A    Okay.

13    Q    I think in your deposition I asked you, "Did you have to

14    receive ICE approval for any of the increases in the detainee

15    work assignments?"  Do you see your answer?

16    A    What number are you reading from?

17    Q    Line 7.  I asked, "Did you have to receive ICE approval

18    for any of these increases in the detainee work assignments?"

19    A    I see my answer, yes.

20    Q    What did you say?

21    A    I said, "We met with ICE administration weekly, and this

22    would be a subject of discussion" -- I said presentation --

23    "it would not necessarily involve their blessing, but if they

24    objected they would say so."

25    Q    I would like to show you Exhibit 132.  I am going to ask

```
 1    if you recognize this document?

 2    A   This is a department head -- has this one already been

 3    acknowledged?

 4            MS. CHIEN:  I would like to move to admit Exhibit

 5    132.

 6            MS. MELL:  GEO has no objection.

 7    A   It is the department head meeting minutes of the warden's

 8    meeting on September 1st, 2015.

 9            THE COURT:  Excuse me.  Exhibit 132 may be admitted.

10            (Exhibit 132 was admitted.)

11            THE WITNESS:  I'm sorry, Your Honor.

12            THE COURT:  That's all right.

13    BY MS. CHIEN:

14    Q   Do you see that you attended this meeting?

15    A   I do.

16    Q   Do you see any ICE official in attendance at this meeting?

17    A   Typically for this meeting, no.

18    Q   I would like to draw your attention to No. 8. Do you

19    recall whether or not you talked about adding a detainee

20    worker to the Grey Mile during this meeting?

21    A   That was brought up as a subject at the meeting with ICE,

22    and then the warden took it over into this meeting and so we

23    were going to have detainee workers.

24    Q   You were allowed to add detainee workers, as many as

25    needed?
```

1   A    Right.

2         MS. CHIEN:  Your Honor, I don't know when you might

3   be wanting to do a break.  This might be a good stopping

4   point.

5         THE COURT:  It is about that time.  We will take ten,

6   folks.  You may be excused.

7                    (Recessed.)

8         THE COURT:  Bring the jury in.  Let's go.  I think

9   everybody is here.  The witness is here.  Okay, Ms. Chien,

10  you may continue.

11  BY MS. CHIEN:

12  Q    Mr. McHatton, earlier I asked you what, within the PBNDS,

13  the ICE Standard 5.8, required GEO assign detainees to work

14  as cooks or preps or servers; is that right?

15  A    That is correct.  That is what you asked.

16  Q    Then you referred to other ICE standards, ICE Standard 4.2

17  and 1.2; is that right?

18  A    I believe those were the standards I identified.  I would

19  have to look to verify.

20  Q    Let me help with you that.  I would like you to turn to

21  Exhibit 127, which is a stipulated exhibit.  It is not in

22  your document.  I am hoping you can access them.  I am hoping

23  I can move to admit it and you can look at it online on the

24  computer once I have moved to admit it.  You can sit still.

25         MS. CHIEN:  I would like to move to admit Exhibit

1    127.

2           MS. MELL:  GEO has no objection to the admission of

3    Exhibit 127.

4           THE COURT:  All right.  It may be admitted.

5                  (Exhibit 127 was admitted.)

6    Q   Are these the ICE standards that you were referring to

7    earlier?

8    A   Those are the Performance-Based National Detention

9    Standards dated 2011.

10   Q   I am going to turn to Page 228 of 4.1.

11          THE COURT:  Again, what numbers are you referring to?

12   The page numbers?

13          MS. CHIEN:  Bates number is GEO-Nwauzor 185044.

14   BY MS. CHIEN:

15   Q   Do you see that?

16   A   Not clearly -- okay.  I see it better now.

17   Q   Is this the ICE standard for food service?

18   A   Yes.

19   Q   Is that what you were referring to earlier when you said

20   that all of the ICE standards intermingle?  4.1 may

21   require detainee workers to work --

22   A   4.1, yes.

23   Q   This is Page 228.

24   A   Right.

25   Q   I would like to scroll down and see if we can't go to Page

 1    231 of this exhibit, which is Bates stamped 185047. Do you

 2    see where it says "detainee workers"?

 3    A    Yes.

 4    Q    Can we cull that out, that section, so you can see it a

 5    little better, just the detainee workers?

 6    A    Right.

 7    Q    Do you see where it says, "Detainees may volunteer for

 8    work in accordance with 5.8"?

 9    A    Absolutely, I do see that.

10    Q    Doesn't say "shall," does it?

11    A    Oh, no.

12    Q    Later on in the next paragraph -- sorry, same area.  In

13    the next paragraph, it says, "The number of detainees

14    assigned to the food service department shall be based on a

15    quota developed by the FSA and approved by the facility

16    administrator."  Do you see that?

17    A    Yes.

18    Q    Who was the facility administrator at the Northwest

19    Detention Center?

20    A    Well, that is another one of those wonderful things, if

21    you will.  In the ICE Performance-Based National Detention

22    Standards, the term "facility administrator," in all honesty,

23    applies to and refers to two people -- the GEO facility

24    administrator, or during my time of employment, the warden,

25    and the ICE facility administrator also known as the AFOA.

1    The FSA is a food service administrator.

2    Q    Food service administrator is a GEO staffer?

3    A    Is the FSA.

4    Q    That's a GEO staffer?

5    A    I'm sorry, yes, it is.

6    Q    You said an AFOA, is that right?  Is an ICE person an

7    AFOA?

8    A    AFOA.

9    Q    What does that stand for?

10   A    Assistant facility office administrator.

11   Q    Do you see AFOA in this paragraph?

12   A    That's what I am saying.  When you see the term "facility

13   administrator," it refers to the ICE facility administrator

14   as well as the GEO facility administrator.

15       I could tell you a long, boring story about how I took

16   deference to that whole thing back in 2004, but I will not do

17   that.

18   Q    I appreciate that.

19   A    But that is what it is.

20   Q    One second.  I would like to ask you to turn in this same

21   Exhibit, 127, to page -- GEO's Bates stamped 184835.  It is

22   Page 19 and PBNDS Standard 1.2.  Do you recognize this?

23   A    Yes, I do.

24   Q    Can you tell me what this is?

25   A    It is the ICE Performance-Based National Detention

1  Standard governing environmental health and safety.  It is

2  probably one of the longest standards, other than food

3  service, amongst the standard.

4  Q   You testified earlier that the detainee work program's

5  laundry job duties were somehow required by this ICE

6  standard; is that right?

7  A   I believe the concept of laundry is in this standard.  I

8  believe that is the case.  Would I swear to it 100 percent?

9  I don't know that I could do that.  I thought it would -- it

10 did.

11 Q   Let me give you a chance to look through the document and

12 you can tell me where it says if this requires a detainee to

13 work in the laundry.

14 A   Does it require detainees to work in the laundry?  I don't

15 believe those words are in there.

16 Q   All right.  Earlier you testified, we talked about ICE's

17 blessing and what was necessary to increase detainee workers;

18 is that right?

19 A   Yes, we talked about that.

20 Q   You recall in your deposition that you said it would not

21 necessarily involve their blessing.  If they objected, they

22 would do so?

23 A   I believe -- I think we read that from my 2019.

24 Q   Uh-huh.  Do you recall if ICE ever objected to an increase

25 in detainee work assignments?

1    A    I do not recall.  I do not recall that they did or did

2    not.  I do not recall.

3    Q    Okay.  I would like to move on -- sorry, one second -- and

4    talk about the work program's training and supervision.  How

5    are detainee workers participating in the work program

6    trained?

7    A    Typically, by the GEO staff person in the area in which

8    they were working.

9    Q    Once trained, who supervised detainee workers while they

10   worked in the work program?

11   A    That same individual.  GEO staff.

12   Q    Is it part of the job responsibility of the GEO staff to

13   supervise detainee workers?

14   A    Yes.

15   Q    What training does GEO staff receive when they start their

16   job about supervision of detainee workers?

17   A    There is an academy that all staff go through and the

18   voluntary work program is part of that curriculum.

19   Q    So GEO staff were provided training on how to supervise

20   detainees in the work program?

21   A    I would answer affirmative to that.

22   Q    Supervising detainee workers is a part of GEO staff's

23   responsibility?

24   A    Yes, as long as they have detainee workers in the area in

25   which they are supervising.

1  Q    While we are talking about GEO staff, I would like to ask

2  you about post orders.  Are you familiar with what a post

3  order is?

4  A    I am.

5  Q    I am going to show you Exhibit 141 or ask you to turn to

6  Exhibit 141 in your documents.

7  A    Is that an acceptable document?  Is this an accepted

8  document?

9  Q    Are these documents kept in the regular course of business

10  at GEO?

11  A    Yes, they are.

12        MS. CHIEN:  I would like to move to admit Exhibit

13  141.

14        MS. MELL:  GEO has no objection, Your Honor.

15        THE COURT:  141 may be admitted.

16              (Exhibit 141 was admitted.)

17  Q    Can you tell me what this is?

18  A    It is a post order.  It is the post order for the laundry

19  officer.

20  Q    What is a post order, as somebody who is not familiar with

21  some of the lingo?

22  A    Every job that a corrections officer might -- would, not

23  might -- would be assigned to has a post order describing the

24  essential elements of that post.  Post duties, as you can see

25  in this one, the laundry exchange schedule, because it is the

1    laundry officer's post order, inventory, key control

2    procedures, closing of shift.  Each post order has that many

3    sections to it at least.  That could be just Section 1.  I

4    think there is six sections in total.

5    Q   Let's turn to Page 2 of Exhibit 141.  Is this what helped

6    you realize this is a laundry officer post order?

7    A   Yeah.  I turned the page because I was not sure of the

8    post order that I was looking at.

9    Q   This sets out the job duties of the GEO staffer who is

10   assigned the laundry officer position; is that right?

11   A   Right.

12   Q   If you turn to the next page, Page 3 of the document.

13   A   All right.

14   Q   I'm sorry, it might be Page 4.  Do you see it lists the

15   laundry officer's post duties?

16   A   Yes.

17   Q   Do you see the third post duty is to supervise and train a

18   detainee work crew on the operation of all machinery and

19   safety equipment assigned to the laundry area?

20   A   Yes, I do.

21   Q   Is one of the primary duties of a laundry officer to

22   supervise detainee workers in the work program that are

23   assigned to laundry?

24   A   Yes.

25   Q   Does the laundry officer also train the detainee workers

1  assigned to laundry as part of the work program?

2  A    Yes.

3  Q    Does the GEO officer also determine whether or not the

4  detainee worker is performing in accordance with their duties

5  when they are assigned to the laundry?

6  A    Yes.

7  Q    Let's turn to pod porters.

8  A    I'm sorry?

9  Q    Let's turn to the pod porter jobs.

10  A    Okay.

11  Q    How did GEO staff train detainee workers as pod porters?

12  A    Would you like to go back to that document?

13  Q    No, I am asking from your testimony, or from your memory,

14  recollection.

15  A    Well, I would -- if I were to do it, I would use that

16  document.

17  Q    Okay.

18  A    That is the porter duties within the housing unit, and I

19  would go down each one of those and communicate the proper

20  expectations of that item.

21  Q    Assuming that we go through that document -- maybe I will

22  rephrase my question so it is more precise.  Who

23  determines -- who is overseeing or supervising the work that

24  detainee workers are doing as pod porters?

25  A    The housing unit officer.

1    Q    That's GEO staff?

2    A    Yes.

3    Q    Let me go back.  I apologize.  I am going to go back and

4    ask you to clarify something.  We were talking about facility

5    administrators; is that right?

6    A    Yes.

7    Q    We identified in the food service ICE standard that the

8    facility administrator determines how many detainee workers

9    work in the kitchen; is that right?

10   A    Not solely, but the facility administrator was identified

11   as one of the persons involved in that.

12   Q    The other person was the food service administrator; is

13   that right?

14   A    Food service administrator.

15   Q    Then we had a discussion as to what "facility

16   administrator" meant; is that right?

17   A    That is correct.

18   Q    I am going to actually have you turn back to Exhibit 127.

19   I am going to show you on the screen, I am going to ask for

20   us to turn to what is Bates stamped 185256.  It is Page 464.

21   No, I want to start at 464.  I am going to show you what this

22   PBNDS section is.  Give me one minute.  It is the PBNDS ICE

23   Standard 7.5.  I am going to show you this ICE standard.  Do

24   you see the section that says "definitions"?

25   A    Yes, I do.

1   Q    This is the definition section of the ICE standards; is

2   that right?

3   A    Appears to be.

4   Q    We had some confusion as to what "facility administrator"

5   meant; is that right?

6   A    There is no confusion in my mind.

7   Q    Let's go to the definition section and go to Bates stamp

8   185259, it is page 467 of this document.  Do you see the

9   facility administrator?  It says, "Generic term for the chief

10  executive officer of a detention center."  On the next page,

11  "A formal title may vary -- warden, officer in charge,

12  sheriff, jail administrator."  Do you see that?

13  A    I do.

14  Q    This definition doesn't say "ICE" in it, does it?

15  A    No, it does not.

16  Q    I would like to turn a little bit -- we talked about

17  supervision.  I would like to talk about discipline.  What

18  happens if a detainee worker doesn't follow the training

19  protocols or guidelines set out for certain positions in the

20  work program?

21  A    I believe that is addressed in the standard itself and

22  that is reiterated in the job descriptions that we talked

23  about previously.  I think there were five or six reasons

24  that a detainee could be removed from a job.

25  Q    How are detainee workers removed from the job?

1    A    Predominantly because they decided they don't want to do

2    it anymore.  That was the primary reason.  Very few are

3    removed for violating a safety rule or anything like that.

4    Q    Okay.  Detainee workers were disciplined for issues that

5    arose in the work program; is that right?

6    A    You used the word "disciplined."

7    Q    Yes.

8    A    I would not use that word.

9    Q    You would not use that word.  Okay.  Let me show you

10   Exhibit 137 and ask if you recognize it.  It should be in

11   your packet.

12   A    Okay.

13   Q    Do you recognize this document?

14   A    Yes, this is a GEO Northwest Detention Center Policy

15   No. 3.3.1, entitled "infractions and disciplinary sanctions."

16            MS. CHIEN:  I would like to move to admit Exhibit

17   137.

18            MS. MELL:  GEO has no objection.

19            THE COURT:  137 may be admitted.

20                 (Exhibit 137 was admitted.)

21   Q    You see this is a policy regarding detainee rules and

22   discipline?

23   A    Yes.

24   Q    It is about infractions and disciplinary sanctions; is

25   that right?

1    A    Yes.

2    Q    This is GEO's policy regarding discipline in the facility;

3    is that right?

4    A    Yes, this is GEO's policy that mimics the ICE detention

5    standard on that same subject.

6    Q    I would like to turn to Page 8.  Do you see where it says

7    "Category 4 offenses"?

8    A    I do.

9    Q    What are Category 4 offenses?

10    A    The lowest level of infraction.

11    Q    Misconduct that a detainee might do?

12    A    Yes.

13    Q    I am going to ask to pull up Page 9, "sanction options for

14    Category 4 offenses."

15    A    Yes.

16    Q    Are these the sanction options if the detainee worker

17    commits a category 4 offense?

18    A    These are taken 400 through 409.  The sanctions are taken

19    directly out of the ICE PBNDS, yes.

20    Q    The sanctions shown on Page 8 -- the Category 4 offenses,

21    examples are on Page 8, is that right, and the sanction

22    options for those offenses are on Page 9; is that right?

23    A    That is correct.

24    Q    Category offenses include things like using equipment or

25    machinery contrary to posted safety standards?

1   A   That would be 412 infraction, according to the list.

2   Q   The sanction options for Category 4 offenses, do you see

3   where it says "loss of job"?

4   A   Yes.

5   Q   Is that referring to a loss of job in the detainee work

6   program?

7   A   That would be loss of job in the detainee work program.

8   Q   Could a detainee worker lose their job for stealing?

9   A   Yes.

10  Q   We have talked a lot about the voluntary work program.  I

11  would like to take a step back.  GEO is a business; is that

12  right?

13  A   Yes.

14  Q   In Washington, who is GEO's customer?

15  A   GEO's customer in the State of Washington is the Northwest

16  Detention Center.

17  Q   That's the facility.  The facility is the Northwest

18  Detention Center; is that right?

19  A   Yes.

20  Q   Who does GEO sell its services to?

21  A   Immigration Custom Enforcement, the federal government.

22  Q   Is there a contract between GEO and ICE for the provision

23  of these services?

24  A   Yes, there is a contract.

25  Q   I am going to show you Exhibit 129.  Do you recognize this

1    document?

2    A    Yes.

3             MS. CHIEN:  I would like to move to admit Exhibit

4    129.

5             MS. MELL:  GEO has no objection.

6             THE COURT:  129 may be admitted.

7                    (Exhibit 129 was admitted.)

8    Q    Can you tell me what this is?

9    A    This is a contract by ICE with the GEO Group.

10   Q    Can you refer to Page 58, which is on the bottom or it is

11   Bates stamped GEO-State 36882.

12   A    I am going to Page 58 at the bottom of the page.

13   Q    Yes, and it is also Bates stamped at the bottom GEO-State

14   36882.  I will ask if I could get the page before it.

15   A    You are telling me to look at Page 57 and 58?

16   Q    Yes.

17   A    Okay.  I am there.

18   Q    Under "Detention Site Standards," do you see where it

19   says, "The contractor shall ensure facilities are clean and

20   vermin/pest free"?

21   A    Yes.

22            THE COURT:  Where are you looking at now, counsel?

23            MS. CHIEN:  Bottom of Page 57, "Detention Site

24   Standards."

25   BY MS. CHIEN:

1    Q   It says, "The contractor shall ensure facility's

2    conformance to the following:  That it be clean and vermin

3    and pest free.  Do you see that?  Looking at Page 58, it

4    continues, "The contractor shall provide and distribute

5    linens."  Do you see that?

6              MS. MELL:  Counsel -- Your Honor, excuse me,

7    objection.  Counsel is testifying and reading the document

8    into the record.

9              THE COURT:  It should go by question here, counsel.

10   BY MS. CHIEN:

11   Q   I have a question about what we just read.  What role did

12   detainees in the work program play in allowing GEO to meet

13   the contractual obligation that the contractor provide

14   suitable linens?

15   A   You are referring to Page 58, Item C, "The contractor

16   shall provide and distribute suitable linens, sheets,

17   pillowcases, towels, et cetera," period.  "Contractor shall

18   launder and change linens per ICE PBNDS."  Your question is?

19   Q   What role do detainees in the work program play in

20   allowing GEO to meet this contractual obligation?

21   A   By way of the voluntary work program, they may participate

22   in the laundering of these sheets, pillowcases, towels, et

23   cetera.

24   Q   When we were referring to Page 57 and that the facility be

25   clean and vermin and pest free, what role did detainees in

1  the work program play in allowing GEO to meet this

2  contractual obligation?

3  A    That is a broader subject.  Clean and vermin pest free

4  refers back to the ICE PBNDS, what was it, 1.2, environmental

5  health and safety.  Other areas of the contract required that

6  we have a vermin and pest control contract with an outside

7  agency in so -- so that, kind of like, would be separate.

8  The "clean" is the detainees may participate in the cleaning

9  of the controlled general area of the facility as part of the

10 voluntary work program.

11 Q    You mentioned PBNDS ICE Standard 1.2 again.  Just to be

12 clear, PBNDS ICE Standard 1.2 is GEO's responsibility and the

13 standards that it must hold to clean the facility, right?

14 A    Driven by ICE, yes.

15 Q    It dictates what GEO's obligations are to provide a clean

16 facility; is that right?

17 A    Right.

18 Q    You testified earlier you couldn't recall anything in 1.2

19 that indicates the detainee workers were responsible for

20 cleaning the facility; is that right?

21        MS. MELL:  Objection, Your Honor, misstates the

22 testimony.

23        THE COURT:  Rephrase the question, counsel.

24 BY MS. CHIEN:

25 Q    Earlier you testified regarding the ICE Standard 1.2 and

1    you couldn't recall where in 1.2 the detainee workers were

2    assigned to meet those obligations that are contained in 1.2;

3    is that right?

4    A    I didn't go completely through 1.2 to find it.  Using

5    those specific words, I don't recall.  I think that is what I

6    said.

7    Q    Let's go back to the laundry.  Did GEO need more detainee

8    workers in the laundry to meet its contractual obligations?

9    A    The answer would be yes.  When the population increased,

10   we had more opportunity for the detainees to work in the

11   laundry.

12   Q    You refer to it as opportunities.  I would like to show

13   you Exhibit 146 and ask if you recognize it.

14   A    Are you asking me to turn to 146?

15   Q    Yes, please.

16   A    Okay.

17   Q    Do you recognize this?

18   A    Yes.

19   Q    What is it?

20   A    It is a laundry plan of action, that is what POA stands

21   for, from the compliance person, Heather West, dated August

22   24th, 2011, through May 2, the individual who is the acting

23   AFOA for ICE, Michael Ruckshuhl.

24   Q    You received this plan of action; is that right?

25   A    Yes.

1       MS. CHIEN:  I would like to move to admit Exhibit

2  146.

3       MS. MELL:  I am not sure -- GEO objects to the

4  admission of this document.  He is here to testify as to what

5  occurred during that time frame.

6       THE COURT:  I'm sorry.  I am having a hard time

7  hearing you.

8       MS. MELL:  GEO objects.  GEO objects to this

9  memorandum as irrelevant and duplicative of his testimony.

10  Mr. McHatton can testify to what occurred during that time

11  frame.

12       MS. CHIEN:  Your Honor, Mr. McHatton has testified

13  that more detainee workers were assigned to laundry and

14  considered it quote/unquote an opportunity.  This exhibit is

15  meant to further elucidate -- impeach him on whether or not

16  it was an opportunity.

17       THE COURT:  I think it may be admitted.

18            (Exhibit 146 was admitted.)

19  Q   This is the laundry plan of action; is that right?  It

20  said your name as the acting warden; is that right?

21  A   Yes.

22  Q   It has the AFOA name that you were referring to earlier;

23  is that right?

24  A   Yes.

25  Q   Then this first paragraph, do you see where it says,

1    "There are other issues with other" -- sorry.  "There are a

2    number of detainees that have badly worn and/or

3    improperly-sized shoes, in particular.  There are other

4    issues that other clothing items were not being properly

5    sized as well."

6    A    I read that.

7    Q    Then below this line -- sorry.  It says -- do you see

8    where it says, "A review of the laundry activities

9    documentation indicates that not all exchanges for clean

10   laundry is being completed according to the posted schedule"?

11   A    I do read that.

12   Q    Do you see where it says, "It appears the staffing level

13   of one person is insufficient."  You can also look at your

14   screen.  It might be helpful.

15            MS. MELL:  I am going to make a standing objection to

16   reading the document in the record now that the jury has the

17   benefit of reading the document themselves.  This is not a Q

18   and A.

19            THE COURT:  Let's have questions.

20   BY MS. CHIEN:

21   Q    What was the plan of action based on this issue, in

22   reviewing the document?  Do you recall what the plan of

23   action was?

24   A    No, not without going back through it.

25   Q    Let's go back to the bottom of the document.  Does this

1   include the plan of action?

2   A   It is only one page, so it should be complete.

3   Q   Do you recall what the plan of action was, given that the

4   laundry wasn't being distributed on schedule?

5   A   I am reading this and it says that additional staff were

6   assigned and additional detainee workers have been assigned.

7   Q   What is that --

8   A   Two overlapping shifts.

9   Q   Additional detainee workers were assigned to help support

10  laundry operations; is that right?

11  A   Uh-huh.

12  Q   Is it your understanding that the laundry still operates

13  with two shifts when you left, when you retired?

14  A   Your question is, was the laundry operating with two

15  shifts when I retired?  Is that a correct -- is that what you

16  asked?  I don't recall.

17  Q   Okay.  If you look back at the plan of action and at the

18  call-out currently, it says, "Detainee work schedules have

19  been modified and expanded to create two overlapping shifts."

20  Does that refresh your recollection as to whether or not

21  there were two shifts?

22  A   This is dated 2011.  You asked if I knew what was going on

23  when I retired, and I don't recall.

24  Q   You do recall there was two laundry shifts?

25  A   I believe I testified that at some point in time there

1    were two shifts, yes.

2    Q    So if there were no detainee workers in the laundry, how

3    would you meet the requirement of providing bed linens as

4    required by the contract?

5    A    They assign officers.

6    Q    With those -- you are talking about officers, GEO staff;

7    is that right?

8    A    That is correct.

9    Q    Would those GEO staff be paid a dollar per day for their

10   labor?

11   A    No, they would not because they would be GEO staff.

12   Q    So let's talk about the dollar per day, the VW pay.  How

13   much did GEO pay the detainee workers in the work program?

14   A    A dollar per day.

15   Q    How did GEO ensure -- I will take that back.

16         Does ICE have a standard regarding detainee worker

17   wages?

18   A    It is part of the voluntary work program standard.

19   Q    So it is in that exhibit ICE Standards 5.8, Exhibit 17?

20   A    I believe so.

21   Q    Do you remember what it says regarding compensation?

22   A    Exactly what it says?  No, I don't.  I would have to go

23   back to it to read it to be exact.

24   Q    Let's go back to it.  Let's look at Exhibit 17.  This is

25   Exhibit 17.  It is the ICE standard regarding the voluntary

1   work program.

2   A   Yes.

3   Q   Do you see where it refers to detainee compensation?

4   A   That would be on Page 407, letter K, compensation.

5   Q   So what do you recall -- do you recall now what it exactly

6   says about detainee compensation?

7   A   It states, "The compensation is at least one dollar (USD)

8   per day.  The facility shall have an established system that

9   ensures the detainee receives the pay owed them before being

10  transferred or released."

11  Q   It said the compensation is at least a dollar per day.

12  During your tenure, did you ever consider paying detainee

13  workers more than a dollar per day?

14  A   During my tenure, I recall seeking permission to pay them

15  a dollar for each assignment, if you will.  If a detainee was

16  working as a barber and then later in the day wanted to be a

17  housing porter also, he would get another dollar for that

18  job.

19  Q   You were aware of opportunity -- you are aware that

20  detainee workers could be paid more than a dollar per day if

21  they worked two different jobs, for example; is that right?

22  A   They were limited to a dollar per day.  We tried to get

23  them more than -- interpreting it as seeking approval for a

24  dollar per assignment, per job.

25  Q   So you were seeking approval to pay more than a dollar per

1  day if they worked two jobs; is that right?

2  A    Yes.

3  Q    Were you ever told by the classification officer that you

4  could pay more than a dollar per day, GEO could pay more than

5  a dollar per day?

6  A    I recall a memo from the classification staff saying

7  that -- every time that a standard came out, I would pass it

8  on to the respective department heads for their review so

9  they were knowledgeable and up-to-date of any changes.  I do

10 recall a memo that says, "Hey, maybe we can pay them more

11 than a dollar a day."

12 Q    Showing you Exhibit 14, which has already been admitted.

13 Is this the memo you are referring to?

14 A    Yes.

15 Q    Ms. Singleton, or the classification department, sent you

16 this memo?

17 A    Singleton and Heye co-signed, yes.

18 Q    This is about updates to the ICE standards; is that right?

19 A    Yes.

20 Q    They told you the compensation is now at least a dollar,

21 however, it doesn't say we have the option to pay more if we

22 like?

23 A    That's what it reads.

24 Q    Did ICE ever tell you that GEO could compensate detainee

25 workers more than a dollar a day?

 1    A    No, they never authorized that.

 2    Q    I am going to show you Exhibit 364.  I am going to -- you

 3    recognize this?

 4    A    Is that part of this book, too?

 5    Q    It is.  Do you recognize this as an email you forwarded?

 6    A    324?

 7    Q    Sorry.  364.  Do you recognize this?

 8    A    Boy, do I recognize it?

 9    Q    Do you see your email listed?

10    A    Yeah, I do.  I don't necessarily recall it without --

11    well, I put a statement on it.  Looks like -- my name is on

12    it, but I don't remember it.  How is that?

13            MS. CHIEN:  I would like to move to admit Exhibit

14    364.

15            MS. MELL:  GEO has no objection, Your Honor.

16            THE COURT:  It may be admitted.

17                    (Exhibit 364 was admitted.)

18    BY MS. CHIEN:

19    Q    At the top, do you see your email?

20    A    Yes.

21    Q    Looks like you are forwarding a message; is that right?

22    A    That's what it appears to me to be, yes.

23    Q    It looks like a representative from ICE is emailing you

24    and Mr. -- is that right?

25    A    Charles Howard is an ICE employee.  He memoed several

1    people to include me.  Is there a subject?  Yes, the

2    voluntary work program on August 27, 2014.

3    Q    It says, "According to the standard, there is a minimum

4    compensation of a dollar, however there is no maximum."  Do

5    you see that?

6    A    I do.

7    Q    You had mentioned one time when GEO chose to pay detainee

8    workers more than a dollar per day, for example, if they did

9    two assignments; is that right?

10    A    Yes.  I believe, if I heard you correctly, the answer to

11    that is affirmative.

12    Q    In addition to the dollar per day, did detainee workers

13    also get food for their work?

14    A    Sometimes they got a candy bar or a sack lunch, if memory

15    serves me correctly.

16    Q    I am hearing testimony that GEO in the past has paid

17    detainee workers at times two dollars if they worked two

18    shifts or -- and food.  Did GEO ever pay detainee workers

19    more than a dollar per day as the rule, as the general rule

20    as opposed to the exception?

21    A    Would you repeat that question, please?

22    Q    Did GEO ever change the pay that detainee workers were

23    paid from a dollar per day?  Did they ever pay more than a

24    dollar per day as the general rule?

25    A    No, the general rule was a dollar per day.

1  Q   After you received the memo from the classification

2  department, GEO still did not pay more than a dollar per day;

3  is that right?

4  A   That is correct.

5  Q   Even after ICE told you via email that there is no maximum

6  pay rate, GEO still did not pay detainee workers more than a

7  dollar per day; is that right?

8  A   If you go back to that memo of yours that Charles Howard

9  created, the memo is to James Gronewold.  He was the

10  contracting officer's representative at the facility.  In

11  other words, he was the guru of the contract.  If you wanted

12  to do anything -- if you wanted to question any element of

13  the contract or the PBNDS, James was the first contact within

14  the facility, and then he would take it to -- I can't

15  remember exactly the person's name in California.  They never

16  allowed it.

17  Q   Let's look at Exhibit 364 one more time.

18  A   Yeah.

19  Q   So we looked at it and it says, "According to" -- the ICE

20  person says, "According to the standard, there is a minimum

21  compensation of a dollar, however there is no maximum." Do

22  you see that?

23  A   Yes.

24  Q   Simple question for you.  It says, "To James Gronewold"?

25  A   That is correct.

1    Q    James Gronewold was on this email?

2    A    Yes.

3    Q    We can take that down.

4         After you received this email, did GEO still pay

5    detainee workers a dollar per day?

6    A    Yes.

7    Q    Now when you retired, do you recall what the minimum wage

8    was in Washington?

9    A    Gosh, no.

10   Q    Was it more than a dollar per day?

11   A    I am sure it was.  My minimum wage when I started working

12   in '68 was a buck and a quarter an hour.

13   Q    Did GEO ever pay detainee workers who worked in the

14   kitchen prepping thousands of meals a day the minimum wage?

15   A    They were not employees, so the answer is no.

16   Q    Did GEO ever pay detainee workers who washed the dishes

17   the minimum wage?

18   A    That is correct, they did not earn minimum wage.

19   Q    Did GEO ever pay detainee workers who worked in the

20   laundry the minimum wage?

21   A    GEO never paid minimum wage to detainee workers,

22   regardless of where they volunteered.

23            MS. CHIEN:  Thank you.  No further questions.

24            THE COURT:  Mr. Whitehead, do you have anything?

25            MR. WHITEHEAD:  No, Your Honor.

```
 1          THE COURT:  All right.  Ms. Mell.

 2          MS. MELL:  Thank you, Your Honor.

 3                     CROSS-EXAMINATION

 4   BY MS. MELL:

 5   Q   All right, Mr. McHatton, I am going to try to organize the

 6   pile of documents we have been through here and get started.

 7   If I can have a moment to go back through it.  Let's start

 8   with Exhibit 129.  Do you have the GEO-ICE contract?

 9   A   Yes.

10   Q   Did you write any part of this ICE contract?

11   A   I'm sorry, I did not hear.

12   Q   Did you write any part of the ICE contract?

13   A   No, I did not.

14   Q   Did this ICE contract control any of the materials you

15   prepared when working at GEO?

16   A   I am sure it did.  Without looking at it, I am sure it

17   did.

18   Q   Can you look at Page 82 of that document?

19   A   I am on Page 82.

20   Q   All right.  Page 82 has section number, what is that, 9?

21   A   9 is managing a detainee work program.

22   Q   Do you think you ever derived authority from the documents

23   you prepared by looking at this section of the contract?

24   A   Yes.

25   Q   Did this section of the contract give you guidance on the
```

1    kinds of activities that you chose to select to create job

2    descriptions for in the voluntary work program?

3    A    Yes.

4    Q    When you look at this document -- can we publish this

5    again, Page 82.  Is the jury able to see this document?

6          So the first paragraph sets out some pretty specific

7    requirements, the first of which it must be voluntary.

8    That's a standard contained in the contract itself, correct?

9    A    That is correct.

10    Q    So nothing about the work that was created could be an

11    obligation of any detainee.  They had to volunteer?

12    A    It was totally voluntary.

13    Q    It gives a description of the kinds of work or program

14    assignments.  That's your suggestion of what to do, correct?

15    A    Correct.

16    Q    That included industrial, correct?

17    A    Yes.

18    Q    And industrial meant what to you?  Were any of those job

19    descriptions that we went through related to industrial type

20    work?

21    A    One could imply that laundry might be industrial.

22    Q    In fact, that picture made it look really industrial,

23    right?

24              MS. CHIEN:  Objection.

25              THE COURT:  Sustained.

BY MS. MELL:

Q    So what is your takeaway from the photograph describing the laundry?  Was that industrial equipment?

A    Yes, it was.

Q    One of the reasons that the detention center put industrial equipment into the facility was to achieve industrial work --

        MS. CHIEN:  Objection.

BY MS. MELL:

Q    -- for the laundry, right?

        THE COURT:  What is your objection?

        MS. CHIEN:  She's testifying.  Assumes facts not in evidence.

        THE COURT:  Well, let's go by question and answer here.  What is the next question?

BY MS. MELL:

Q    Did GEO have industrial equipment in what was designated a laundry room at the Northwest Detention Center?

A    Yes.

Q    Is that because GEO did not contract out industrial work like laundry, correct?

A    That is correct.

Q    GEO could have contacted one of the industrial laundry cleaners in town to pick up and drop off laundry every day, correct?

1    A    It certainly could.

2    Q    But it didn't do that, right?

3    A    That is correct.  It chose not to.

4    Q    One of the reasons it chose not to was because the

5    detainees had to have work to do, correct?

6            MS. CHIEN:  Objection.  Assumes facts not in

7    evidence.

8            THE COURT:  Well --

9            MS. CHIEN:  He hasn't testified to that.

10           THE COURT:  The question here really is, whose

11   witness is Mr. McHatton?

12           MS. MELL:  Your Honor, I am on cross.  This is cross.

13           MS. CHIEN:  Mr. McHatton is represented by Ms. Mell.

14           MS. MELL:  This isn't direct.

15           THE COURT:  Is that correct, Ms. Mell?

16           MS. MELL:  Mr. McHatton has asked that I represent

17   him with regard to his testimony in these proceedings.

18           THE COURT:  All right.  Stop leading the witness.

19           MS. MELL:  All right.

20   BY MS. MELL:

21   Q    So I can ask that as a non-leading question.  What purpose

22   did having industrial laundry service equipment serve at the

23   Northwest Detention Center?

24   A    It enabled us to keep the laundry activity in-house.

25   Q    Keeping the laundry activity in-house meant what for the

1  voluntary work program?

2  A   It meant that we had at least one area where we could have

3  detainees work to launder bed linens, clothing, et cetera.

4  Q   Preparing the laundry required time.  Did preparing and

5  doing laundry take time?

6  A   Yes, it did.

7  Q   It was time that detainees could then be outside their

8  housing unit.  They didn't have to be in their housing unit?

9         MS. CHIEN:  Objection.

10        THE COURT:  Sustained.  Leading.

11  BY MS. MELL:

12  Q   What benefit was there to having time in the laundry

13  facility versus the housing unit?

14  A   The purposes of the voluntary work program were identified

15  previously.  One of the primary reasons for the security and

16  control and safety of the facility is to have activity for

17  detainees to participate in that would allow them to do

18  something other than just sit on it -- sit in the housing

19  unit.  It gave them activity to get out of the business, the

20  politics, the hassle of dorm living.

21  Q   How much time could a detainee be outside their housing

22  unit in any given day if they signed up to do the laundry?

23  A   For the laundry, I think that the detainee could be out of

24  his housing unit for probably up to six hours.

25  Q   So if they could be out of their housing unit for six

 1  hours, what controls were there between the laundry facility

 2  and the housing unit?  Maybe I am not asking that correctly.

 3  Let me try that one again.

 4       If a detainee were outside the housing unit on laundry

 5  detail, where in the facility could you find that detainee at

 6  any given time?

 7  A   If the detainee assigned to the voluntary work program in

 8  the laundry was not in the housing unit, he would be in the

 9  laundry.

10  Q   So would -- were there -- when a person -- strike that.

11  Sorry.  Just a minute.  Let me collect my thoughts here.

12       A detainee assigned to laundry duty moved from the

13  location depicted in the photograph with industrial-nature

14  equipment to other locations or not?

15  A   Predominantly, they were in the laundry.  They could also

16  assist the laundry officer in distributing articles of

17  clothing, after they had been washed, to housing units.

18  Q   So what --

19  A   It would not take the entire -- another officer would come

20  in and supervise the detainees who remained in the laundry

21  area performing the washing, drying activity while one of

22  the -- an additional officer would take the clean laundry out

23  to a housing unit to distribute it.  So they would either be

24  in the laundry or be in the hallway or in a housing unit with

25  the supervising officer.

1  Q   How did the laundry move from housing unit to housing

2  unit?

3  A   By way of a cart.

4  Q   That was not -- strike that.

5      Who moved the cart around to the different housing

6  units?

7  A   The laundry officer and detainees.

8  Q   So there would be detainees who worked with the laundry

9  officer to go housing unit to housing unit?

10 A   That is correct.

11 Q   Back to the contract terms.  When it says "maintenance,"

12 what does that mean, at Page 82, in terms of the kinds of

13 things you can come up with for the VWP?

14 A   They did not work, "they" meaning detainees, did not work

15 in any capacity in the physical plant maintenance for the

16 physical maintenance department.  Maintenance in that context

17 is janitorial, in my opinion.

18 Q   Can you think of anything that you created as a job that

19 fit within maintenance requirements?

20 A   Other than what I said about janitorial, the answer is no.

21 Q   I am going to step back a moment and pull up Exhibit 233.

22 Can we pull up Exhibit 233?

23 A   233.

24 Q   Do you have that?

25 A   I do not.  I go from 226 to 244.

1          MS. MELL:  I would offer 233.  To cut to the chase

2    here, we can publish it for the jury if there is no

3    objection.

4          MS. CHIEN:  No objection.

5          THE COURT:  233 may be admitted.

6                (Exhibit 233 was admitted.)

7    BY MS. MELL:

8    Q   I want to make sure we talked about the bins and give the

9    jurors some idea what we are talking about.  Does Exhibit 233

10   provide us any information about how the laundry got to the

11   housing units?

12   A   I would say that it does show the carts that I was

13   referring to as the laundry carts that would go to and from

14   the housing unit or food service, wherever in the facility,

15   to the laundry and then back out again once laundered.

16   Q   What are all those bags in there?

17   A   I don't believe those are bags.  I believe those are

18   blankets.

19   Q   Oh, that's the laundry, the clean laundry?

20   A   Yes.

21   Q   Those are set up to go back to the housing units?

22   A   Yes.

23   Q   Okay.

24          MS. MELL:  We can take that down.

25

1    BY MS. MELL:

2    Q   Back where I was on the maintenance.  When you are looking

3    at the contract, you see the word "maintenance" and then

4    "custodial."  Can we show that again?

5    A   Industrial, maintenance, custodial service, or other jobs.

6    Q   What was -- what activities did you create to meet the

7    custodial needs that would have been different than

8    maintenance?

9    A   That would be the pod porter assignments, the hallway

10   details.

11   Q   When we looked at the hallway detail, there was reference

12   to cleaning staff bathrooms.  What did that mean?

13   A   Do you want to go back to the item that shows the

14   facility?

15   Q   That would be helpful, Exhibit 131.  Can we do that?  Can

16   you publish 131, Page 7 for the jury?

17   A   I have mine up.  There you go.  So now if I run my hand, I

18   don't know how -- I am going to do my best to communicate

19   this for everyone's benefit.  Let's pick on the A Unit, all

20   right?  And there is a hallway outside of the A Unit, then

21   there is a hallway that goes into the A Unit.  Does everybody

22   see that?  There is an area we call the horseshoe that

23   permits entrance into A-1, A-2 and A-3.

24   Q   Are you talking about right there?

25   A   Right there.  Go down.  Go down the horseshoe, now

1    straight.  There you go.  You see that area that looks like

2    an upside down U?

3    Q    Right there?

4    A    Right here.  Too much area.  Just this little horseshoe

5    around a box.  There you got it.  That's the entranceway to

6    A-1, A-2 and A-3 off that is what we call the horseshoe.

7         Now, backing up to where you started, see there is a

8    little line there just right there?  Okay.  Now what that is

9    communicating is that there are staff bathrooms off that main

10   hallway.  Staff assigned to that housing unit, when you gotta

11   go, you gotta go, you can't get relieved and an officer would

12   come down and take the -- relieve the officer in A-1 and

13   permit that officer to go back out that hallway to that area

14   where your pen is at -- highlighter is at -- and use the

15   restroom.

16   Q    What were the restrooms like in terms of size there by

17   comparison to what was in the unit?

18   A    Those are just a sink and commode --

19   Q    Okay.

20   A    -- for emergency use.

21   Q    That prevents the detention officer from having to drop

22   his drawers, for lack of a better term, and go within the

23   unit himself and take his eyes off security?

24   A    The officers were not permitted to use the detainee

25   facilities.

1    Q    Why is that?

2    A    Safety of the officer, predominantly.

3    Q    So was there a different location where detention officers

4    would shower, prepare for work, use the facilities that were

5    not single, on-duty toilet facilities?

6    A    That would be outside the controlled environment of the

7    facility, not part of this picture, that I can tell.

8    Q    Is it down here next to the lobby?  This is the employee

9    entrance, is it not?

10    A    It would be on the -- using this model here, yeah, it

11    would be on this side of the laundry.  See the laundry here?

12    It would be that area here.

13    Q    Okay.  Are we talking right here?

14    A    Yeah, and up.

15    Q    Right there?

16    A    And over.

17    Q    Here?

18    A    Nope.

19    Q    This way?

20    A    Left, yeah.

21    Q    That way?

22    A    That would be the male and female staff --

23    Q    Locker room?

24    A    -- locker room.  Thank you.

25    Q    Locker room.  So right below that location, right along

1    here?

2    A    Say it again, please.

3    Q    Can you look at what I have just highlighted, right here?

4    A    That's too much area, that would be E, I, O, R, or the

5    court staff.

6    Q    So that part right there, none of that part is secure?

7    A    That whole area there is not part of the controlled

8    environment; that is correct.

9    Q    When you say the --

10        THE COURT:  Okay.  Excuse me, Ms. Mell.  It is

11   quitting time.  We will reconvene tomorrow at 9:00 in the

12   morning.  Please let me remind you to check in early.  I

13   think Tyler has requested you do that.  We can't start

14   without you, and you can't start without me.  So we will all

15   try to be on time in the morning.  We will see you tomorrow

16   morning at 9:00 and we will continue.

17

18                    (The proceedings adjourned.)

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5

6        I certify that the foregoing is a correct transcript from

7    the record of proceedings in the above-entitled matter.

8

9

10

11    /s/ Angela Nicolavo

12    ANGELA NICOLAVO
      COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25