1        UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT TACOMA

3  _____

4                              )
   UGOCHUKWO GOODLUCK NWAUZOR,  )
5  et al.,                      )
                               )
6            Plaintiffs,        ) 3:17-cv-05769-RJB
                               ) 3:17-cv-05806-RJB
7  v.                           )
                               ) Tacoma, Washington
8  THE GEO GROUP, INC.,         )
                               ) June 3, 2021
9            Defendant.         )
   _____  ) Jury Trial
10                              )
   STATE OF WASHINGTON,         ) 9:00 a.m.
11                              )
             Plaintiff,         )
12                              )
   v.                           )
13                              )
   THE GEO GROUP, INC.,         )
14                              )
             Defendant.         )
15                              )
   _____
16
            VERBATIM REPORT OF PROCEEDINGS
17       BEFORE THE HONORABLE ROBERT J. BRYAN
             UNITED STATES DISTRICT JUDGE
18 _____

19

20

21

22

23

24
       Proceedings stenographically reported and transcribed
25              With computer-aided technology

<pre>
 1

 2                       APPEARANCES

 3

 4    For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
 5                             Schroeter Goldmark & Bender
                               810 Third Avenue
 6                             Suite 500
                               Seattle, Washington
 7

 8

      For the Plaintiff        ANDREA BRENNEKE
 9    State of Washington:     LANE POLOZOLA
                               MARSHA J. CHIEN
10                             800 Fifth Avenue
                               Suite 2000
11                             Seattle, Washington

12

13   For the Defendant        LAWRENCE D. SILVERMAN
     The GEO Group:           ADRIENNE SCHEFFEY
14                            Akerman LLP
                              1900 Sixteenth Street
15                            Suite 1700
                              Denver, Colorado
16
                              JOAN K. MELL
17                            III Branches Law PLLC
                              1019 Regents Boulevard
18                            Suite 204
                              Fircrest, Washington.
19

20

21

22

23

24

25
</pre>

EXAMINATION INDEX

EXAMINATION OF:                                          PAGE

WILLIAM McHATTON      CROSS-EXAMINATION
                      BY MS. MELL                         6
                      REDIRECT EXAMINATION
                      BY MS. CHIEN                        34
                      RECROSS-EXAMINATION
                      BY MR. WHITEHEAD                    37

JOHN PATRICK
GRIFFIN               DIRECT EXAMINATION
                      BY MS. CHIEN                        38
                      CROSS-EXAMINATION
                      BY MR. BERGER                       73
                      CROSS-EXAMINATION
                      BY MS. MELL                         75

JOSE MEDINA-LARA      DIRECT EXAMINATION
                      BY MR. WHITEHEAD                   102
                      CROSS-EXAMINATION
                      BY MS. SCHEFFEY                    120
                      REDIRECT EXAMINATION
                      BY MR. WHITEHEAD                   147

BERTHA HENDERSON      DIRECT EXAMINATION
                      BY MS. BRENNEKE                    149
                      CROSS-EXAMINATION
                      BY MS. SCHEFFEY                    197

1                        EXHIBIT INDEX

2
     EXHIBITS ADMITTED                              PAGE
3
       Exhibit 5                                    180
4      Exhibit 27                                   198
       Exhibit 37                                   191
5      Exhibit 49                                    54
       Exhibit 51                                   187
6      Exhibit 197                                   16
       Exhibit 352                                   60
7      Exhibit 433                                   51
       Exhibit 434                                   59
8      Exhibit 438                                   61
       Exhibit 439                                   56
9      Exhibit 440                                  167
       Exhibit 442                                   45
10     Exhibit 445                                   46
       Exhibit 447                                   52
11     Exhibit 456                                  176
       Exhibit 527                                   53
12     Exhibit A-282                                 23

13

14

15

16

17

18

19

20

21

22

23

24

25

MORNING SESSION

JUNE 3, 2021

1   (The following occurred outside the presence of the jury.)

2           THE COURT:  Unless there is something preliminary, we

3   will bring the jury in and continue with Mr. McHatton.

4           MR. SILVERMAN:  Judge, just a couple of quick

5   logistical points.  First of which, we wanted to make sure

6   the rule of sequestration is in effect.  There are so many

7   people watching this, some of which I thought were witnesses.

8   In any event, we want clarity one way or the other that the

9   rule of sequestration is in effect.

10          MS. CHIEN:  To the extent you are concerned about

11  Colleen Melody, she's our designee.  The parties agreed we

12  would have our designees attend.

13          MR. SILVERMAN:  We are also keeping folks out, but we

14  want to make sure everybody agrees.

15          MS. CHIEN:  Yes.

16          MR. WHITEHEAD:  Yes.

17          MR. SILVERMAN:  One logistical question:  It doesn't

18  look like Exhibit 14 is in the Box, the admitted Box and we

19  thought it was admitted.

20          MS. CHIEN:  We also emailed Mr. Campbell about that,

21  so I think it might have been added.  Mr. Campbell might know

22  better.

23          THE CLERK:  I will consult the Box.  I do have 14 on

1    my admitted list.  It might not have gotten in the Box.  I'll

2    check that out.

3              MR. SILVERMAN:  One final question:  What is the

4    Court's pleasure in terms of advising the parties each day

5    how much time you have used because we are both on a clock.

6              THE COURT:  When you want to know, you ask Tyler.

7    He's the clock keeper.

8              MR. SILVERMAN:  Okay.  Thank you, Your Honor.  That's

9    all we had.

10             THE COURT:  All right.  Is Mr. McHatton here and

11   ready?

12             MS. MELL:  Yes, Your Honor.

13             THE COURT:  We'll bring the jury in and continue with

14   cross.

15        (The following occurred in the presence of the jury.)

16             THE CLERK:  All right, Your Honor, it appears that

17   all nine jurors are here.

18             THE COURT:  All right.  We will continue with

19   Mr. McHatton's testimony, folks.

20        Ms. Mell, you may inquire.

21             MS. MELL:  Good morning, ladies and gentlemen of the

22   jury.

23                       CROSS-EXAMINATION

24   BY MS. MELL:

25   Q   Mr. McHatton, can you take out Exhibit 14 for me, please,

1    and can we publish that to the jury, talking about a memo?

2    Exhibit 14.

3    A    Okay.

4    Q    Do you recall discussing this memorandum you received from

5    Ms. Singleton during your testimony yesterday?

6    A    I do.

7    Q    The communication concerned the change in the PBNDS

8    standards?

9    A    Yes, whenever there was a new edition of the PBNDS, I took

10   the applicable sections and passed them on to the department

11   heads to review so that they were knowledgeable that, A,

12   there was a new standard out, and B, that they needed to

13   become familiar with it so that they knew what changes

14   applied to their departments, and at the same time, kind of

15   as a double-check, I asked them to get back to me in

16   reference to any changes they may have noted in the standards

17   that I possibly had missed myself.

18   Q    When you learned that PBNDS standards had been changed by

19   ICE to insert the words "at least" before "a dollar a day,"

20   did that prompt you to think, "Oh, I need to figure out what

21   the local minimum wage is and pay minimum wages"?

22   A    Absolutely not.  That is kind of an apples and orange

23   issue.  This is a voluntary work program.  The standard began

24   at a dollar a day.  This said it was a dollar a day.  The

25   term "at least" was added, but at no time was there ever any

1    thought that this was a minimum wage issue.

2    Q   I would like to show you Exhibit 127, Page 231.  Do you

3    remember discussing the PBNDS standards yesterday?

4    A   Exhibit 127?

5    Q   The PBNDS standards.

6    A   Yes.

7    Q   Page 231.

8         THE COURT:  Again, those have different page numbers.

9    You need to specify whether you are referring to the page of

10   the document or the Bates stamp page in the lower right.

11        MS. MELL:  231 page number of the PBNDS standards,

12   Your Honor.

13        THE WITNESS:  I am looking at the Standard 4.1, food

14   service.  It would be chronologically Page 231.  It is

15   stamped at the bottom 185047.

16   BY MS. MELL:

17   Q   All right.  That matches what I am looking at.

18        I guess 4.1 has to do with food service, correct?

19   A   Yes, it does.

20   Q   This is the section you were referencing yesterday with

21   regard to how you integrated kitchen duties into the job

22   descriptions?

23   A   Affirmative.

24   Q   All right.  So what does PBNDS standards, specifically 4.1

25   C.2, say about job descriptions?

A   It reads, "The FSA," which stands for the food service
administrator, "shall review detainee job descriptions
annually to ensure accuracy and specific requirements.
Before starting work in the department, the detainee shall
sign for receipt of the applicable job description.  A copy
of the detainee's job description shall remain on file for as
long as the detainee remains assigned to the food service
department."

Q   Just as a reminder, the PBNDS standards were not written
by you?

A   Absolutely not.  They are a government publication.

Q   "Government" being?

A   Federal government.  I'm sorry.

Q   But ICE is the contract client?

A   Yes.

Q   Okay.  I would like you to take a look at Exhibit 83 and
84, if you can look at those together.  That would be the job
descriptions.  Those were admitted yesterday.

A   Oh, yes.  I believe those are the ones for the food
service in particular, right?

Q   My 84 says "dishwasher, pots and pans, detainee job
description."  83, "cook, prep server"?

A   That is correct.  83 is cook, prep server, and 84 is
dishwasher, pots and pans.

Q   So you prepared these job descriptions, as I understand

1  your testimony.  Did I hear that correctly?

2  A    I created the originals, yes.

3  Q    Did the originals match these versions that had signature

4  lines at the bottom?

5  A    Oh, absolutely.  That was a requirement as I just read,

6  yes.

7  Q    So you complied with PBNDS standards in terms of the form

8  of the job descriptions you created?

9  A    Yes.

10 Q    The duties and responsibilities set forth there are

11 consistent with the PBNDS standards?

12 A    Yes.

13 Q    With regard to the enumerations of job duties and

14 responsibilities, do you see those delineated?

15 A    Yes.

16 Q    Was it your expectation that any detainee that volunteered

17 would be expected to complete all enumerated tasks, 1 through

18 14, on any given day; that was the scope of their work, or

19 were these kinds of activities -- this was demonstrative of

20 what they may be asked to do?

21 A    The latter.

22      MR. WHITEHEAD:  Objection, Your Honor.

23      THE COURT:  Ms. Mell, you are leading the witness.

24 Please avoid leading questions.

25      MS. MELL:  Thank you, Your Honor.

1    BY MS. MELL:

2    Q   What was your expectation with regard to the enumerations

3    on these job descriptions in terms of performance?

4    A   These are a list of possible duties that an individual

5    assigned to one or the other of these two titles would be

6    expected to become familiar with, would probably do, but

7    absolutely would not be doing 1 through 14 in the course of

8    his job in any given day or shift.

9    Q   GEO didn't have any performance evaluations of the

10   detainees in terms of meeting those 14 objectives?

11           MR. WHITEHEAD:  Objection.

12           MS. CHIEN:  Objection.

13           MS. MELL:  Sorry.  Sorry.  Sorry.

14   BY MS. MELL:

15   Q   What kind of performance evaluations did GEO maintain on

16   the detainees relative to these job descriptions?

17   A   I do not recall any job evaluations per se for the work

18   performed by detainees in this, nor any of the other jobs

19   that fall under the voluntary work program.  They showed up

20   or they didn't show up.  They performed the duties assigned

21   and were excused to go back to their housing unit.  There was

22   no form evaluation.

23   Q   Moving on to another policy that you were involved with.

24   I am going to ask to you take a look at A-278.  This was an

25   exhibit that was uploaded to Box recently.

1    A    I am looking at Exhibit A-278.

2    Q    What is that?

3    A    This is --

4         THE COURT:  Just a minute.  Just a minute, please.  I

5    don't know what view the jury has, but they should be able to

6    see the witness.  I don't see him on my screen.

7    BY MS. MELL:

8    Q    What is Exhibit A-278, Mr. McHatton?

9    A    There are four pages to this exhibit.  They are the

10   signature pages for GEO Northwest Detention Center 5.1.2,

11   which I believe is the voluntary work program.

12   Q    All right.  Can you take a look at Exhibit 197?

13   A    197 --

14        MS. CHIEN:  Just to be clear, I don't think 197

15   should be published now.  I don't think it has been admitted.

16        THE COURT:  If it hasn't been admitted, it should be

17   removed from the screen.

18        MS. MELL:  Did you put it on?  Please don't put it on

19   yet.

20   BY MS. MELL:

21   Q    Do you have it, Mr. McHatton?

22   A    Yes, I do.

23   Q    I'm sorry.  Okay.  What is Exhibit 197?

24   A    Exhibit 197 is the GEO Northwest Detention Center Policy

25   5.1.2 entitled "Voluntary Work Program."

1  Q   Is this a voluntary work program policy developed for the

2  voluntary work program in this case?

3  A   Yes, it is.

4  Q   Does Exhibit A-278 have the signature page with the actual

5  signatures on it associated with this?

6  A   You are asking me if Exhibit A-278 has a signature page --

7  is the signature page?

8  Q   Does Exhibit A-278 have the signature page that's

9  associated with Exhibit 197?

10  A   Yes.

11  Q   What page of Exhibit 278 is the signature page for Exhibit

12  197?

13  A   It is Page 8.

14  Q   Why is the signature page -- why are the signature pages

15  separate?

16  A   The signature pages are separate because when a request is

17  made for a policy, it is printed from the computer, and

18  therefore the signature page, as you can see on the last

19  page, is blank.  The signature page, which is done -- every

20  policy is reviewed annually and approved annually by both the

21  highest ranking official in ICE as well as the highest

22  ranking official at the facility by GEO.  Those signature

23  pages are kept with the original document in the compliance

24  manager's office, so that person has the entire history of

25  the -- of all policies and, in particular, this policy,

1    5.1.2, with all the changes over the course of history.

2    "History" referring to inception, 2004, to today, 2021.

3    Q   Were you the custodian of the signatures during your

4    tenure?

5    A   When I was the compliance manager, when I created the

6    original policy in 2004 through 2010, correct.

7    Q   All right.

8         MS. MELL:  GEO would offer, Your Honor, 197 and A-278

9    into evidence.

10        MS. CHIEN:  We would object.  There is significant

11   problems with the signature page of Exhibit 278.  The

12   signature pages are not the same on each of the four pages.

13   One says "facility administrator," and if you --

14        THE COURT:  Wait a minute.  Is that not a matter for

15   further examination of the witness or cross-examination,

16   Ms. Chien?

17        MS. CHIEN:  Further examination would be necessary.

18        THE COURT:  I think more examination on Exhibit A-278

19   is appropriate.

20        MS. MELL:  Thank you, Your Honor.

21   BY MS. MELL:

22   Q   Mr. McHatton, can you explain what the signatures are on

23   A-278, first page?

24   A   First page, to me, can be interpreted either way.  The one

25   I am looking at, the top page or, historically speaking,

1    going back to the back page, what is the first page?

2    Q   In the Exhibit 278, it's Page 8 of 8 with signatures, the

3    signatures, if you are looking at it, 4-24-20 to 4-21.

4    A   Yes, that would be Page 1.  Thank you.  Yes, that's the

5    one I'm looking at.

6    Q   Okay.  What does -- how do you know what this page of

7    signatures relates to?

8    A   It is a requirement of the contract that all policies,

9    procedures, any and all activity that GEO does, to include

10   policy and procedures, be approved by the highest ranking

11   official in ICE and the highest ranking official in GEO.

12       If you look at Page 1, it says, at the top, "facility

13   administrator" and then below that says "ICE officer in

14   charge."  That is dated 4-20-2020, and it appears to be --

15           MR. WHITEHEAD:  Objection, the witness is reading an

16   exhibit into the record that hasn't been admitted.

17           THE COURT:  The objection is sustained.

18           MS. CHIEN:  I would also point out this witness

19   indicated he had retired in 2018.  This signature page is

20   from to 2020, 2021.

21           THE COURT:  Next question.

22   BY MS. MELL:

23   Q   Mr. McHatton, during your tenure, were signature pages

24   kept cumulatively for Policy 5.1.2 in this form?

25   A   Yes.

1  Q   How do you know that the signature page for Exhibit 197,

2  the VWP Policy 5.1.2, effective 4-18-2014 is the last page in

3  the exhibit?

4  A   Because that's the way it was maintained, if I am

5  understanding your question correctly.

6  Q   Is there any question in your mind the applicable

7  signatures --

8          THE COURT:  Just a minute.  Please don't lead the

9  witness.

10 BY MS. MELL:

11 Q   All right.  How do you know, then, that the last page

12 belongs with Exhibit 197, the policy for the voluntary work

13 program effective 4-18-2014?

14 A   Let me try this again.  Is Exhibit 197 a recognized

15 exhibit?

16          MS. CHIEN:  No.

17          THE WITNESS:  It is not yet?

18          MS. MELL:  It is a stipulated exhibit, Your Honor.

19          THE WITNESS:  It is stipulated?  Okay.

20          THE COURT:  Wait a minute.  Has 197 been offered?

21          MS. MELL:  197 is offered, and it is stipulated, Your

22 Honor.

23          MS. CHIEN:  No objection.

24          THE COURT:  All right.  197 may be admitted.

25              (Exhibit 197 was admitted.)

1          THE WITNESS:  Okay.  If you look at that exhibit,

2    there are, according to information at the bottom right-hand

3    corner, it says it is Page 1 of 8, so therefore, there are

4    eight pages that constitute this document.  The last page is

5    the signature page, the page that, in effect, makes this a

6    living, working document for the one we are looking at for

7    the year 2014 until it changes again, if it does change.

8          Can you look at the last page and have that up on the

9    screen, please?

10   BY MS. MELL:

11   Q    Yes.

12   A    Please.  The last page is the signature page.  It is blank

13   in 197 because this is a document that was printed from a

14   computer.  The actual signature page is maintained by the

15   compliance manager.  There you go.  The subject, then, is

16   Exhibit A-278, which, as I understand, has not been approved

17   yet.  It has four pages to it.  It goes all the way back to

18   the -- well, what I am looking at goes back to 2010.  It is

19   the history of the document, 5.1.2, from April 2010 each year

20   through the current year, April 2021.  The document, as I

21   previously stated, is signed by the highest ranking official

22   in ICE at the facility and the highest ranking official for

23   GEO at the facility.

24         The terminology, going back to Page 1, is identified as

25   the warden, which would be the GEO person, and the next line

1    would be the ICE assistant field office director.  In each

2    and every year, each policy has to be reviewed and approved,

3    not only by the warden but by ICE in accordance with the

4    contract.

5        So the first page is consistent, the warden, ICE assistant

6    field office director, throughout the entire page.  Given

7    that we are looking at 1.2, the eighth page, bottom right for

8    the year 2014, you can see once again that the signatures are

9    the warden and the ICE assistant field office director.  In

10   A-278, Page 2, it remains consistent.  So from 2015 through

11   2019, it is staying consistent with those terms, warden and

12   ICE field office director.

13       In 2019, which has been pointed out is after I retired,

14   ICE, because we don't change anything, like I said, without

15   ICE's involvement and approval --

16            MS. CHIEN:  Objection.

17            THE WITNESS:  -- they came up with the idea they

18   wanted the warden to sign as a facility office

19   administrator --

20            MS. CHIEN:  Objection, Your Honor.  The witness is

21   testifying to things that he doesn't have foundation for.  He

22   retired in 2018.  What happened in 2019 is not his to know.

23            THE COURT:  The objection is sustained.  Let's go by

24   question and answer and not narrative.

25            MS. MELL:  I believe the foundation has been laid to

1   admit this as a business record.  These are the signature

2   pages for 5.1.2.

3        MS. CHIEN:  Your Honor, Exhibit 278 are inconsistent

4   signature pages.  One says "warden," one says "facility

5   administrator."  The only thing that the witness has pointed

6   out is there are eight pages.  This is the eighth page of a

7   document that apparently was eight pages.  Exhibit 197 is

8   eight pages.  We don't know which signature this applies to.

9        MS. MELL:  The witness testified the applicable

10  signatures on the last page apply to the 2014 policy, which

11  you testified are ascribed by date, 4-14-14.  Effective date

12  is 4-18-2014.

13       MS. CHIEN:  Your Honor, GEO's counsel is asking him

14  to admit a document for signatures that were past his

15  retirement.

16       THE COURT:  I think the objection is well taken

17  and --

18       MS. MELL:  Your Honor --

19       THE COURT:  Wait a minute.  Among other things, you

20  have me confused about how many pages and the page numbering.

21  My copy of A-278 has four pages and on each page it says

22  "Page 8 of 8."  So the exhibit should not be admitted in its

23  present form.

24       MS. MELL:  All right.  I would mark as Exhibit A-279,

25  Page 4 of Exhibit A-278, and have the witness mark as Exhibit

1   A-279 the last page.

2   BY MS. MELL:

3   Q   Mr. McHatton, what is Exhibit A-279?

4           THE COURT:  Is this an exhibit that was just marked?

5           MS. MELL:  Yes, Your Honor.

6           THE COURT:  I don't have a copy of it.

7           MS. MELL:  It is the last page of Exhibit A-278, just

8   the one page.

9           THE COURT:  I have the last page of A-278.  If you

10  mark another exhibit, why --

11          MS. MELL:  Okay.  Last page is A-279.

12  BY MS. MELL:

13  Q   Mr. McHatton, do you have A-279?

14  A   Yes.

15  Q   What is A-279?

16  A   It is Page 8 of 8 of the GEO Northwest Detention Center

17  Policy 5.1.2, stating that Policy 5.1.2 was approved by the

18  highest ranking officials in GEO and in ICE in April of 2014.

19  Q   How do you know A-279 is, in fact, the correct signature

20  page for Exhibit 197, the policy effective 4-18-2014?

21          MS. CHIEN:  Your Honor, I am confused because I don't

22  have A-279.  The A-279 I have is a photo.  I want to make

23  sure I am tracking.

24          MR. WHITEHEAD:  That's what I have as well, a photo

25  for Exhibit 279.

1    MS. MELL:  What is the last exhibit number?

2    Your Honor, for the record, we have renamed the Exhibit

3    A-281.

4         MS. CHIEN:  I haven't gotten Exhibit 281.

5         MS. MELL:  It's the last page of Exhibit A-278.

6    BY MS. MELL:

7    Q   Mr. McHatton, have you designated the last page of -- the

8    signature page as Exhibit 281?

9    A   I have.

10   Q   How do you know Exhibit A-281 is the proper signature page

11   for the policy effective 4-18-2014 set forth in Exhibit 197?

12        MS. CHIEN:  Can we just get a moment where -- I don't

13   believe the Court, and I don't believe plaintiffs, have

14   Exhibit 281.  I would like to confirm what I am looking at.

15        MR. WHITEHEAD:  I agree, Your Honor.

16        MS. MELL:  I believe, Your Honor, it should be in the

17   Box.

18   May I proceed?

19   BY MS. MELL:

20   Q   Mr. McHatton, how do you know Exhibit A-281 is the proper

21   signature page for Exhibit 197, the voluntary work program

22   GEO policy effective 4-18-2014?

23        MR. WHITEHEAD:  Objection, leading.

24        MS. MELL:  How?

25        THE COURT:  Overruled.

1           THE WITNESS:  I recognize it as part of the original

2    document, 5.1.2, Page 8 --

3    BY MS. MELL:

4    Q    What are the indicators --

5    A    -- in the year 2014.  The document is signed by the then

6    Warden Lowell Clark, and the ICE highest ranking official,

7    Sylvie Lobato, on a date that precedes the effective date of

8    the policy.

9    Q    Is the date that it is signed in the appropriate proximity

10   to the effective date?

11   A    Absolutely.  It is dated -- let me rephrase.  It is signed

12   by both Mr. Clark and Ms. Lobato on April 14th, and the

13   effective date for the policy is April 18th.

14           MS. MELL:  I believe the foundation exists to admit

15   A-281 into evidence.

16           MR. WHITEHEAD:  Objection, Your Honor.  I think the

17   difficulty with Exhibit A-278 illustrates the problems with

18   Exhibit 281.  It is uncertain what this goes to.  We have a

19   mismatch of documents with just signature pages.  I don't

20   know where the rest of this document is, and for that reason,

21   Your Honor, the proper foundation hasn't been laid.  This

22   exhibit should be excluded.

23           MS. MELL:  The document is kept in this manner in the

24   ordinary course of business.

25           THE COURT:  Exhibit A-281 may be admitted.

1    (Exhibit A-281 was admitted.)

2    BY MS. MELL:

3    Q   Mr. McHatton, why does GEO have ICE sign its policies like

4    the 5.1.2?  Excuse me.  I missed a step here.  I forgot where

5    we are.

6         MS. MELL:  Now that it has been admitted, can we

7    publish it, please, and have the jury finally get to see the

8    signature page, what we have all been talking about?

9         THE COURT:  Just a minute.  We have a numbers problem

10   here.  I have, in your regular proposed exhibit file, A-281

11   that is a picture with the word "northwest" on it.

12        MS. MELL:  I think that is 279.

13        THE COURT:  We have two Exhibit A-281s marked.

14        MS. MELL:  Are you sure the photos aren't 279 and

15   280?  You have a 281 in that?

16        THE COURT:  There is a 281 in there.

17        MS. MELL:  All right.  We have a numbering problem.

18   For purposes of the record, may I amend 281 to 282?

19       May we publish A-282 to the jury?

20        THE COURT:  Are there any other objections to this

21   exhibit?

22       A-282 may be admitted.

23             (Exhibit A-282 was admitted.)

24        MS. MELL:  All right.  Can we publish it?

25        MS. CHIEN:  To clarify, this needs to be marked as

1    A-282.

2              THE COURT:  I'm sorry, I didn't get your objection.

3              MS. CHIEN:  My objection is counsel showing A-281

4    when we should be showing A-282 for the record to make it

5    clear what signature page we are looking at.

6              MS. MELL:  We got it.  It has my numbers chicken

7    scratched on it, but it is 282.

8              MS. CHIEN:  I mean -- Your Honor, I want to --

9    BY MS. MELL:

10   Q   Mr. McHatton --

11   A   Yes.

12   Q   Why does GEO have ICE sign its policies like 5.1.2?

13   A   The simple answer is that all business conducted has to be

14   approved by ICE, therefore, as stated in the contract,

15   policies and procedures have to be signed by both the highest

16   ranking official in GEO as well as the highest ranking

17   official at the facility by ICE.

18   Q   So with regard to the contract itself, does the

19   contract -- does the contract ask you to make sure that every

20   policy is signed by an official or is there -- strike that.

21         What language do you rely on in the contract to get

22   your policies and procedures signed by ICE?

23   A   What language within the contract did I rely on?  Is that

24   your question?

25   Q   I was trying to follow up with your answer.  I thought you

1    said -- what did you say in terms of why you have ICE sign

2    the policies and procedures that GEO prepares?

3    A   Simple answer is because I was told that's the way it has

4    to be, and I believe it is required in the contract.

5    Q   So let's take a look at the contract, Exhibit 129.  Turn

6    to Page 43.

7    A   I am there.

8    Q   Sub D.

9    A   Sub D, I am there.

10   Q   What does that tell you in terms of GEO's relationship

11   with ICE relative to policies and procedures?

12       MS. CHIEN:  Objection, he shouldn't be just reading

13   the contract.

14       THE COURT:  Sustained.

15       MS. MELL:  Your Honor, I didn't read the contract.

16   My question was:  What does it tell us?

17       THE WITNESS:  It talks about the relationship that is

18   to exist between the contractor and the government, the

19   State, ICE -- excuse me -- not -- it is very specifically

20   spelled out.  And then in the very last sentence in that

21   says, "The contractor is expected to become familiar with all

22   constraints affecting the work -- onto the next page -- to be

23   performed."  Then there is a listing of A through Y on Page

24   44 of all of the expectations.

25

1  BY MS. MELL:

2  Q   How did you, in your position of developing the policies,

3  ensure that GEO, at the time of an audit, could show that

4  your policies and procedures fulfilled the intent of what ICE

5  wanted you to do?

6  A   Somewhere in this it says that everything has to flow from

7  the Performance-Based National Detention Standards.  If our

8  policies did not mimic that, the content of the specific

9  standard, and include the procedural activity for how we were

10  going to follow it, then it would not be approved by ICE,

11  and we would fail on audit.

12  Q   So can you take a look at Page 45, under "performance,"

13  Sub E?

14  A   Yes.

15  Q   Do you see the first sentence there starts with "the

16  contractor"?

17  A   Oh, I apologize.  I was trying to go deeper into the

18  contract -- the paragraph to find the opening sentence, the

19  first sentence, which is possibly what you asked, "shall

20  perform all services in accordance with ICE 2011

21  Performance-Based National Detention Standards."

22  Q   Is that the language you are talking about?

23  A   Yes.  Needless to say, there is additional statements

24  after that, all of which are applicable to how we are to --

25  how we are to create our policies and conduct our business.

1   Q    Those standards included correctional standards, correct?

2   Excuse me, sorry.

3   A    Yes.

4   Q    All right.  Let's go to another thick document.  Let's go

5   to the PBNDS standards, Exhibit 127.

6   A    I don't have 127 in front of me.

7   Q    Why don't you take a look at the screen.  We have it

8   published.

9   A    Thank you.

10  Q    Let me ask you this:  What do you recall from your prior

11  testimony with, I believe it was Ms. Chien was asking you

12  about the meaning of "facility administrator," and whether

13  that was GEO or ICE when you were looking at or interpreting

14  the PBNDS standards?

15  A    My response at that point in time was based upon my

16  reality of working there.  I believe Ms. Chien pointed out

17  differences to me.

18  Q    What does PBNDS standards say about chain of command for

19  ICE at the facility?  Can you take a look at Page 465, in the

20  definition section 7.5?

21  A    Page 475 is 7.5, the definition section.

22  Q    What term does ICE -- oh, 465.  Excuse me.  There we go.

23  A    There, okay.  Chain of command is on Page 465 of that

24  standard.  In that section, it is talking about the ICE chain

25  of command.  It says, "Similarly --

1   Q   Stop for just a second here.  What term under PBNDS does

2   ICE use in its standard for the top ICE official in the chain

3   of command?

4   A   The officer in charge.

5   Q   So officer in charge?

6   A   It says, "ICE chain of command at a detention facility

7   ascends from the officer in charge," and then two other

8   positions.

9   Q   Let's flip over to the definitions referenced earlier in

10  your testimony, 467.  We are still in 7.5, the definitions.

11  How does PBNDS or ICE define "facility administrator"?

12  A   I am being shown --

13  Q   Sorry.  Page 467, definition of "facility administrator."

14  A   I'm sorry.

15  Q   You see this there?  I've got dueling screens.  Sorry.

16  This is painful for us, too.  You need to get down to here.

17  A   You have to rotate that the other direction.  Go left 90

18  degrees.

19  Q   Can you read that?  That looks sideways on my screen.

20  Isn't that sideways?

21  A   It is sideways.  Go the other direction.  We still have to

22  go right 90 degrees, I'm sorry.  There you go.

23  Q   Painful, painful, painful.  I need a facility

24  administrator right here.  This is going to be tricky.  Be

25  patient.  I have to change the page over.  The question

1  before you is:  How does PBNDS or ICE define "facility

2  administrator"?

3  A   It is the generic term for the chief, and it says,

4  "Executive officer of a detention facility."  On the next

5  page it has, my recollection is --

6  Q   Just a second.  Let me get it.  I'll flip.  Hold on.

7  There we go.

8  A   Okay.  It has examples of titles that could be applicable.

9  Warden.  There it is.  Officer in charge.  GEO could -- go

10  down, please.  You are up too high.

11  Q   I am not moving it.  I don't know why it is doing this.

12  A   There you go.  Stop.

13  Q   I am trying.  Okay.  Examples are warden, officer in

14  charge, sheriff, jail administrator, et cetera. Who is the

15  warden at the ICE Northwest Processing Center?

16  A   Currently or back then?  The position is warden.

17  Q   Who did the warden work for?

18  A   GEO.

19  Q   Who did the officer in charge work for?

20  A   GEO, in this context.

21  Q   Officer in charge was GEO?

22  A   In this context, since these are examples, it is saying

23  the warden could be called the officer in charge or -- it

24  says "et cetera," so you could call him the chief honcho.

25  What is confusing is that in this section it is saying it is

1    the same thing as the ICE person in charge, officer in

2    charge.

3    Q   The definition uses a term that you understand pertains to

4    the ICE official, OIC?

5    A   OIC.

6           MS. CHIEN:  Objection, that's not what he testified.

7    BY MS. MELL:

8    Q   Let's look at --

9           THE COURT:  Wait a minute.  I heard an objection.

10          MS. CHIEN:  Objection, that is not what he testified

11   to.

12          THE COURT:  The objection is well taken and is

13   sustained.

14      What is the next question?

15   BY MS. MELL:

16   Q   What do you think about -- how does the definition of

17   "facility administrator" and the definition of "chain of

18   command" work for you in terms of how you apply the PBNDS

19   standards to the Northwest Detention Center?

20   A   Can I hear that question again, please?

21   Q   How did the definition of "chain of command" and the

22   reference to "officer in charge" as an ICE official apply to

23   you when you were interpreting the PBNDS standards as it

24   relates to the other definition of "facility administrator"

25   that uses the term "warden" and "officer in charge"?

1   A    I understand.  The officer in charge in this content of

2   the applicable Performance-Based National Standards, ICE is

3   the head entity for the officer in charge.  The warden is the

4   highest ranking official in GEO at the Northwest Detention

5   Center.

6   Q    So what did you understand when applying PBNDS standards

7   when the standards refer to "facility administrator"?  Who

8   did they mean?

9   A    Time and experience said the facility administrator was

10  going to be the warden, the GEO highest ranking authority.

11  Q    Who else was at the facility relative to the highest

12  ranking authority for ICE?

13  A    I'm sorry?

14  Q    Was there an officer in charge at the Northwest Detention

15  Center?

16  A    Yes, there was.

17  Q    That was an ICE official?

18  A    Yes, that is the case.

19  Q    And did you have any history and experience of applying

20  the PBNDS standards to include both the officer in charge and

21  the warden as the facility administrator role under the

22  standards?

23  A    Absolutely.

24  Q    Why was that your experience?

25  A    As the compliance manager, policies had to be signed by

1   both of those authorities before the policy itself would be

2   recognized and become official.

3   Q   So with regard to implementation of any policies and

4   procedures at the Northwest ICE Processing Center, was there

5   ever a scenario where you developed a policy or implemented a

6   policy without checking with the officer in charge, the ICE

7   official?

8   A   Absolutely not.

9   Q   Mr. McHatton, how did you -- let me say that a different

10  way.

11       What was your feeling about your job relative to

12  implementing the voluntary work program?  What were your

13  goals?  What did you feel your duties were?

14  A   To meet all expectations of the standard, to put out a

15  program that ICE would be glad to represent, that we would be

16  glad to represent; to provide as many opportunities to the

17  detainee population to make it work.

18  Q   How do you feel about the idea that during your tenure you

19  might have been exploiting those volunteers who were part of

20  the VWP?

21          MS. CHIEN:  Objection.

22          THE COURT:  The objection is sustained.

23  BY MS. MELL:

24  Q   Did you ever talk to the detainees about the voluntary

25  work program and their participation in it?

1    A    Yes, I did.

2    Q    What did they share with you about that?

3              MS. CHIEN:   Objection, hearsay.

4              THE COURT:   Sustained.

5    BY MS. MELL:

6    Q    What did you observe about their participation that gave

7    you a sense of how they felt about it?

8    A    I talked to the detainees personally in their housing --

9              MS. CHIEN:   Objection to the extent he's going to

10   talk about what they told him.  It is hearsay.

11             MS. MELL:   They are party opponents.

12             MR. WHITEHEAD:   No, Your Honor, not in this context.

13   Mr. Nwauzor perhaps.

14             THE COURT:   The objection is sustained.

15   BY MS. MELL:

16   Q    Did you have any observations, during your tenure, of the

17   participants in the voluntary work program that left you with

18   an impression of what their feelings or thoughts were about

19   the program?

20   A    My opinion was, and is now, that they enjoyed

21   participation in the program.  It got them out of the housing

22   unit for periods of time, or even in the housing unit it

23   provided them with an opportunity to feel good about

24   themselves and put a little money in their canteen for

25   telephone and personal items.  They appreciated the fact that

1   it existed.

2   Q   Did you appreciate them?

3   A   Absolutely.

4   Q   All right.

5           MS. MELL:  Nothing further.  Thank you, Mr. McHatton.

6           MS. CHIEN:  I'll hopefully be relatively brief.

7                    REDIRECT EXAMINATION

8   BY MS. CHIEN:

9   Q   Ms. Mell discussed -- talked with you about "facility

10  administrator," "officer in charge" and all the definitions

11  that relate to that; is that right?

12  A   Yes.

13  Q   I think your testimony is that the top person at GEO and

14  the top person at ICE have to sign policies that apply to the

15  Northwest Detention Center; is that right?

16  A   That is correct.

17  Q   You testified there was -- the top person was an officer

18  in charge, or was the warden of GEO, GEO was the warden --

19  was the top officer at the Northwest Detention Center; is

20  that right?

21  A   Yes.

22  Q   I would like to show you Exhibit A-282, the infamous

23  signature page.

24          MS. MELL:  I object to characterizing the exhibit as

25  "infamous."

1    MS. CHIEN:  I am referring to the amount of time we

2  talked about it.  Apologies.  I'll withdraw.  I'll withdraw.

3    THE COURT:  All right.

4  BY MS. CHIEN:

5  Q   Looking at A-282, looks like the warden signed; is that

6  right, at the top of A-282?

7  A   Yes.

8  Q   The ICE official is listed as the ICE assistant field

9  officer director; is that right?

10 A   That was the terminology at the time.

11 Q   It wasn't officer in charge, was it?

12 A   That was the terminology at the time.

13 Q   Moving on.  I think yesterday we were discussing, I

14 believe, the GEO staff lockers and public areas and the admin

15 buildings.  Are those referred to as the non-secured areas of

16 the facility?

17 A   Yes, they are.

18 Q   Who cleaned those non-secured areas of the facility?

19 A   Janitors.

20 Q   Were those janitors detainee workers?

21 A   No.

22 Q   Where were those janitors hired from?

23 A   I don't remember if we started with a contract and then

24 they became GEO employees, so I don't know what the situation

25 is today.

1   Q   Were the janitors that cleaned the non-secured areas of

2   the facility Tacoma-area workers?

3   A   Are you asking if they lived in Tacoma?

4   Q   Yeah.

5   A   I don't know.

6   Q   In the Tacoma area?

7   A   I don't know where they lived.

8   Q   Presumably, they came into work each day to clean the

9   non-secured side of the facility; is that right?

10  A   That's correct.

11  Q   They are within a day's drive of the Tacoma facility; is

12  that right?

13  A   Yes.

14  Q   So the janitors that cleaned the non-secured areas of the

15  facility likely came from within a day's drive of the Tacoma

16  area; is that right?

17  A   Yes.

18  Q   Were those Tacoma janitors paid a dollar per day?

19  A   No, they were contracted employees and later became GEO

20  employees.  They were employees, not voluntary work program

21  participants.

22          MS. CHIEN:  Thank you.  No further questions.

23          THE COURT:  Mr. Whitehead, anything?

24          MR. WHITEHEAD:  Just on one thing.

25

1                    RECROSS-EXAMINATION

2    BY MR. WHITEHEAD:

3    Q    You said you thought the workers enjoyed participating in

4    the program.  Do I have that right?

5    A    Based upon my knowledge and experience, yes.

6    Q    This is something people enjoyed doing, a welcome

7    distraction?

8    A    Those who participated shared those thoughts.

9    Q    A feel-good exercise?

10   A    I'm sorry?

11   Q    A feel-good exercise; is that right?

12   A    I don't know that I would use that phrase.  I don't know.

13   No one ever said those words to me, that I can recall.

14   Q    Cleaning toilets after dozens of people used them, is that

15   a feel-good exercise?

16        MS. MELL:  Objection, Your Honor.  That

17   mischaracterizes his testimony, as if that's what he

18   affirmed.  He did not.

19        THE COURT:  The objection is sustained.

20   BY MR. WHITEHEAD:

21   Q    Is that a welcome distraction, cleaning toilets after

22   dozens of people use them?

23        MS. MELL:  I am not sure how that was different.

24        MR. WHITEHEAD:  It was the witness's testimony, "a

25   welcome distraction."

1          THE COURT:  The objection is overruled to this

2    question.  You may answer.

3          THE WITNESS:  Can I understand the question again,

4    please?

5    BY MR. WHITEHEAD:

6    Q   My question to you, sir, if I understood you, you said

7    participating in the program was a welcome distraction.  My

8    question was and is:  Is cleaning toilets after dozens of men

9    use them a welcome distraction?

10   A   I have never heard anybody answer -- I have never asked

11   anybody that question, and I have never heard anybody, you

12   know, give me those words.

13   Q   Same goes for showers, cleaning showers after dozens of

14   people use them, that's not a welcome distraction, is it?

15   A   The people I spoke with said they enjoyed the opportunity

16   to participate in the voluntary work program.  They did not

17   specify, other than the guys that -- and women that worked

18   laundry were very proud of those activities, food service,

19   barbershop, the mundane, if you will, working in the housing

20   units --

21   Q   It is true, sir, people did those jobs --

22   A   I don't recall any --

23   Q   It is true that people did those jobs for money, correct?

24   A   They received a dollar a day for what they did.

25         MR. WHITEHEAD:  No further questions.  Thank you.

1          THE COURT:  Thank you, Mr. McHatton.  You may be

2   excused.

3          THE WITNESS:  Thank you.

4          MS. CHIEN:  May we take a break so we can get our

5   next witness lined up?

6          THE COURT:  Okay.  We will take our morning break.

7   We are a little early for that, really, but we will take our

8   morning break now and reconvene in about ten minutes.

9                       (Recessed.)

10         THE CLERK:  All the jurors are present and the

11  witness is on his way.

12         THE COURT:  Who is your next witness?

13         MS. CHIEN:  The State of Washington would like to

14  call John Patrick Griffin.

15         THE COURT:  Last name?

16         MS. CHIEN:  Griffin is his last name.

17         THE CLERK:  Mr. Griffin, are you able to get your

18  video turned on?

19         THE WITNESS:  Yep.

20         THE COURT:  Yeah, there he is.  Mr. Griffin, if you

21  will raise your right hand and be sworn.

22                    JOHN PATRICK GRIFFIN,

23     having been sworn under oath, testified as follows:

24         THE COURT:  Thank you.  You may inquire, Ms. Chien.

25

DIRECT EXAMINATION

BY MS. CHIEN:

Q   Good morning.  Thank you for being here today.  Can you please introduce yourself and spell your name for the record?

A   John Patrick Griffin, J-O-H-N, P-A-T-R-I-C-K, Griffin, G-R-I-F-F-I-N.

Q   Where do you live, Mr. Griffin?

A   I live in Tacoma, Washington.

Q   Are you currently employed?

A   Yes, I am.

Q   Where do you work?

A   Bridgeport Place Assisted Living Community.

Q   How long have you worked there?

A   Approximately three and a half years.

Q   What is your job at the Bridgeport Assistant Living?  Is that what you said?

A   Yes, I'm a culinary director of food service.

Q   Where were you employed before that?

A   I was employed at Cedar Ridge Retirement Community in Bonney Lake, Washington.

Q   What was your job at Cedar Ridge Retirement Community?

A   Same position.  Running the kitchen.

Q   How long have you been running kitchens or working in kitchens?

A   Approximately -- I have been in food service all my life.

1    So I would say, in management, probably 30 years or so.

2    Q    Have you ever been employed by the GEO Group?

3    A    Yes.

4    Q    When were you employed by GEO?

5    A    Oh, my goodness gracious.  I am trying to think.  Was it

6    around 2008 or '9.  Something around there.

7    Q    How long were you employed by GEO?

8    A    Approximately three years.

9    Q    Where did you work when you worked for GEO?

10    A    I worked in the kitchen department.

11    Q    Sorry.  Let me go bigger.  Where is the building?

12    A    The building is in downtown Tacoma, the Tideflats, the

13    industrial area.

14    Q    What was the building called when you worked there?

15    A    GEO -- or Northwest Detention Center GEO.

16    Q    What job did you hold at the Northwest Detention Center?

17    A    I was the supervisor in the kitchen.

18    Q    Why did you work for GEO?

19    A    One good reason is they pay well.

20    Q    How much were you paid?

21    A    Approximately, I believe, 32 bucks an hour.

22    Q    What did your job -- what did your duties as food service

23    supervisor entail?

24    A    My job was to supervise six cooks and also supervise the

25    detainees.

1    Q    The six GEO cooks, is that what you mean?

2    A    Yes.

3    Q    The detainee workers?

4    A    Yes.

5    Q    What were the GEO cooks and the detainee workers doing?

6    A    The GEO cooks were the ones that cooked the meals.  The

7    detainees were the ones that did prep and serving and

8    cleanup.

9    Q    Who was your supervisor?

10   A    Bert Henderson.

11   Q    What was Bert Henderson's job title?

12   A    Director of Food Service.

13   Q    What was your typical work schedule when you worked as the

14   food service supervisor at the Northwest Detention Center?

15   A    I played two roles.  I cooked four days a week, plus

16   supervising the cooks and detainees, and one day of

17   paperwork.

18   Q    What was the paperwork?

19   A    Getting files ready, the detainees' diet orders, getting

20   it in the system, making sure that all the cooks completed

21   their production sheets with temperatures.

22   Q    Did you also do inventory?

23   A    Did inventory every week, yes.

24   Q    Just generally, what did inventory involve?

25   A    Well, you have between dry ingredients and the frozen and

1  refrigerated ingredients.  I shared the responsibility with

2  another cook, either I do all the dry and he does the frozen

3  and refrigerator or vice versa.

4  Q   I think you testified -- what did detainee workers do in

5  the kitchen again?

6  A   The detainees were supposed to just do cleanup in the

7  kitchen and serve on what we call the production line,

8  putting the trays together for the pods.  They also did deep

9  cleaning.

10 Q   Did they also prep the food?

11 A   They prepped food, they chopped, they cut, they mixed

12 stuff together in the kettles.

13 Q   Who decided where the detainee workers would work in these

14 different areas?  I hear serving line, I hear prep, and I

15 hear cleaning.

16 A   It would be either myself or another cook.  Two cooks were

17 working at the same time, so one was in the back area doing

18 the prep and the other one was on the line.  Mostly, I spent

19 the time supervising the line and getting the detainees set

20 up to -- you know, what scoop to use, where to put it on the

21 tray.

22 Q   Both you and the other cooks are all GEO staff?

23 A   Yes.

24 Q   Let's actually start in the prep area.  I am trying to go

25 in order.  Can you tell me what detainees did in the prep

1    area?

2    A   In the prep area, for an example, if they made potato

3    salad, they would boil, you know, I don't know, two, 300

4    pounds of potatoes in those big kettles, hundred-gallon

5    kettles, and then they would take them out and chop them up

6    with a dough cutter that was tethered to the table.  They

7    would mix salad together with dressing.  They would make the

8    sack lunches for all the other detainees.

9    Q   Who supervised the detainees while they did this prep

10   work?

11   A   The cooks.

12   Q   What equipment would detainees use to work within the prep

13   area?

14   A   Like I said, the dough cutter, which is tethered to the

15   table.  That was their knife to chop everything up.  Pretty

16   much that is it.  If there was anything in the kettles, they

17   had big oars they would stir things with.

18   Q   Let me actually make this easier.  I am going to show you

19   Exhibit 442 and ask if you recognize it.  I forgot, we

20   provided you the hard copies.  There is something in your

21   packet of information on the table.  There should be an

22   exhibit for you, a binder of documents.  Do you see that on

23   your table?

24   A   Yes.

25   Q   Can you turn to Exhibit 442?  Tell me if you recognize it,

1    and then I'll move to admit it.  Do you see it?

2    A   Yes, I see it.

3    Q   Do you recognize it?

4    A   Yes, that's the prep area of the kitchen.

5           MS. CHIEN:  I would like to move to admit Exhibit

6    442.

7           MS. MELL:  GEO has no objection.

8           THE COURT:  442 may be admitted.

9                  (Exhibit 442 was admitted.)

10   BY MS. CHIEN:

11   Q   So you testified this is the prep area; is that right?

12   A   Yes.

13   Q   Can you describe some of the equipment in this prep area?

14   A   So, as you can see, one of the detainees has a tilt

15   skillet for sauces and some gravies and other dishes are made

16   out of, yes.  That's one that is used.  There is three

17   kettles that is most of the cooking.  There is a lot of beans

18   on the menu.  So they'll open up tin cans of beans and put

19   them in the kettles.

20   Q   Sorry, go ahead.

21   A   In the back area where you see the sink, that's where they

22   do all the prep, cutting and chopping.

23   Q   Who are those people in white?  Can you tell?

24   A   Those are detainees.

25   Q   How can you tell that those are detainees?

1    A    Based on the uniforms they are wearing.

2    Q    So you mentioned -- are these called steam kettles, is

3    that what you said, the three big tanks?

4    A    Steam kettles, hot kettles, yes.

5    Q    What is made in those?

6    A    The potatoes are boiled in them, beans are cooked in them.

7    If you are making bread pudding, since you are feeding nearly

8    1500 detainees, you are using them up every day.

9    Q    Is this equipment typical of industrial kitchens you have

10   used at other jobs?

11   A    It is very typical.  I just never worked in a capacity

12   this large.

13   Q    Who trained the detainee workers on how to use all this

14   equipment?

15   A    It would be the cooks, myself and the other cooks.

16   Q    Is that GEO staff?

17   A    Yes, GEO staff.

18   Q    I am going to ask you to turn in your binder to Exhibit

19   445, and ask if you recognize it?

20   A    I do.

21        MS. CHIEN:  I would like to move to admit Exhibit

22   445.

23        MS. MELL:  GEO has no objection.

24        THE COURT:  445 may be admitted.

25             (Exhibit 445 was admitted.)

BY MS. CHIEN:

Q   Can you tell me what this picture is taken of?

A   This is the opposite end of the other picture.  You can see the tilt skillets, the steam kettles, and straight back you can see the walk-in oven.

Q   What is the walk-in oven used for?

A   That is to cook cakes, cornbread, bread pudding.  It is called a speed rack that you load sheet pans on and you put hotel pans of whatever you are cooking on it.  It goes inside that walk-in and it attaches to the ceiling and spins.

Q   Did detainee workers work with this walk-in oven?

A   Yes.

Q   How many GEO cooks would supervise this area, this prep area during any given shift?

A   One.

Q   If there were not detainee workers in the prep area, could that one GEO cook do all the prep alone?

A   Not at all, no.

Q   I would like to move from the prep area.  You also testified detainee workers worked in the serving area; is that right?

A   Yes.

Q   Who supervised the detainee workers in the serving area?

A   That would be another GEO cook or myself.

Q   I am going to hand you Exhibit 430 and ask if you

1    recognize it.  I think it has actually been admitted.  I

2    think I can move to admit as long as GEO has no objections.

3              THE COURT:  What number now?

4              MS. CHIEN:  Exhibit 430.  I think it has already been

5    admitted.

6              THE COURT:  Okay.

7    BY MS. CHIEN:

8    Q   Can you tell me what this area is of?

9    A   This is what I call the production area.  This is the line

10   setup to dish up the trays.

11   Q   What do you mean by "line"?  Can you -- for people who are

12   not culinary directors, can you tell me what "the line"

13   means?

14   A   If you see those steam tables, there are two of them with

15   three wells in them.  Those were the -- hot food would go

16   into.  The other ones on the opposite side are refrigerated

17   ones that the cold stuff would go into -- salads, rolls,

18   bread.  There would be somebody at the beginning of the line

19   where the tray rack is and would be -- I call the production

20   caller would call out -- you do all the diets first for each

21   tray, call out which diets do what.

22       So we would have to show every day -- pick detainees to go

23   over there and work a section.  If we use a four-ounce scoop

24   for potato salad, you know, show them how to do it.  The

25   language was always an issue, if you show them physically,

1    they learned pretty quick.

2    Q    Detainee workers would work on this line --

3    A    Yes.

4    Q    -- distributing the food; is that right?

5    A    Yes.

6    Q    Would they stand next to the steamer and this refrigerator

7    that you mentioned?

8    A    Correct, yes.

9    Q    How many detainees would you need to work the line in

10   order to distribute the number of meals for each meal?

11   A    Minimum of nine, I believe.

12   Q    I am going to hand you -- actually, I am going to ask you

13   to look at Exhibit 433.

14           MS. MELL:  Your Honor, Your Honor?

15           THE COURT:  Yes.

16           MS. MELL:  We have an issue with regard to the

17   exhibit as it has been depicted to the jury.  There were

18   arrows shown, and I do need to have a capture screen shot and

19   marking of the exhibit as it has been marked.  I am not sure

20   the witness is doing that.  I think the attorney is.  I need

21   clarification and the record to be clear as to the form that

22   it has been marked up and make it available for any cross-X.

23           MS. CHIEN:  Your Honor, it's no different from a

24   callout.  We don't plan to submit this exhibit with arrows.

25   We are trying to direct the attention to what the witness is

1    talking about.

2            MS. MELL:  I think that equates to the attorney

3    testifying.  This witness wasn't marking it.

4            THE COURT:  Well, you marked a bunch of stuff with

5    the yellow highlighter yesterday.

6            MS. MELL:  Unfortunately, we didn't get time to get

7    that in, but I think that is an important part of this

8    process.

9            THE COURT:  Well, wait a minute.

10           MR. WHITEHEAD:  Your Honor, if we were in open court,

11   and I was standing at the lectern, we could illustrate a

12   document and we could clear that document.  I don't see what

13   the difference is with what is happening now.

14           MS. MELL:  If we were in court and you illustrated a

15   document, I would ask the document be marked.

16           THE COURT:  What needs to be clarified is who is

17   making what mark and pointing something out is different than

18   making a mark.  And we're wasting time on this minor issue

19   here.  If you want to have something marked, mark it, I

20   guess, although exhibits are already supposed to be all

21   marked, and we will go from there.

22       What is the next question of the witness?

23   BY MS. CHIEN:

24   Q   I would like to show you Exhibit 433 and ask if you

25   recognize it.

1    A    Yes.

2            MS. CHIEN:  I would like to move into evidence

3    Exhibit 433.

4            MS. MELL:  GEO has no objection, Your Honor.

5            THE COURT:  433 may be admitted.  Was 430 offered?

6                (Exhibit 433 was admitted.)

7            MS. CHIEN:  That was previously admitted, Your Honor.

8    It was already an admitted exhibit.

9            THE COURT:  Oh, all right.  Go ahead.

10   BY MS. CHIEN:

11   Q    Can you tell me what this photo is taken of?

12   A    Again, we are on the production line and you see one of

13   the -- two of the detainees, but one of them is stacking

14   trays for the diet orders.  They put stickers on the front of

15   the trays.

16   Q    Yep.

17   A    Yeah, you see?  Yeah.  They are putting the stickers on

18   for each pod, and then the other one is organizing them.

19   Q    What do you mean by "stickers"?

20   A    These are the diet stickers.  That was one of my jobs when

21   a detainee came in.  Sometimes they would either have a

22   lactose diet or sort of like -- not a cardiac diet, a

23   vegetarian diet or diabetic tray, things of that nature.

24   From what the menu has, you would have to make sure you

25   fulfilled their diets.

1    Q    So each one of these things that are stacked in this

2    photo, is that a meal, one meal would go on each of those

3    stacked trays?

4    A    Yes.

5    Q    Those are detainee workers doing the stickers; is that

6    right?

7    A    Yes.

8    Q    I am handing you Exhibit 447.  I am asking you to look at

9    Exhibit 447 and ask if you recognize it.

10            MS. CHIEN:  I would like to move to admit Exhibit

11    447.

12            MS. MELL:  GEO has no objection, Your Honor.

13            THE COURT:  It may be admitted.

14                (Exhibit 447 was admitted.)

15    BY MS. CHIEN:

16    Q    Can you tell me what is happening in this photo?

17    A    On the left side where you see the detainee with the

18    bucket of water filling the steam wells for the hot food.

19    Q    What are the carts behind the trays.  So on the right side

20    of the photo.

21    A    Those are the carts that go in each pod.  You see all the

22    locks on it, so they lock them all together before they leave

23    the kitchen.

24    Q    Do all the trays go on those carts?

25    A    For each pod, yes.  So it could be -- one pod could have

1    127 trays; the other one could have 80 trays.

2    Q   They are all stacked on those carts to be delivered to the

3    living units; is that right?

4    A   Yes.

5    Q   I am going to show you what has been marked as 527 and ask

6    if you recognize it.

7    A   Yes.

8    Q   Can you tell me --

9            MS. CHIEN:  Can I move to admit Exhibit 527?

10           MS. MELL:  I don't think the foundation was there,

11   but I have no objection.

12           THE COURT:  527 may be admitted.

13                   (Exhibit 527 was admitted.)

14   BY MS. CHIEN:

15   Q   Can you tell me what this photo is of?

16   A   Oh, it looks like a tray that came back from the pod.

17   Q   This is how the food is served; is that right?

18   A   Correct, yes.

19   Q   You mentioned that there was -- that you worked on the

20   production line; is that right?

21   A   Yes.

22   Q   I would like to hand you Exhibit 49, which I actually

23   believe is a series of photos, and ask if you recognize these

24   photos.

25   A   Yes.

1          MS. CHIEN:  I would like to move to admit Exhibit 49.

2          THE COURT:  Pardon me?  I didn't hear your response,

3   Ms. Mell.

4          MS. MELL:  I apologize, Your Honor.  GEO has no

5   objection.

6          THE COURT:  All right.  49 may be admitted.

7                  (Exhibit 49 was admitted.)

8   BY MS. CHIEN:

9   Q   Looking at this first photo, can you see what the picture

10  is of?

11  A   The production line.  You see the GEO cook, we're

12  supervising the detainees.  They are at their station dishing

13  up each part of the food.  You can see that -- you know, I

14  call it the production caller.  There is one detainee at the

15  very top starting the order and kind of tells what needs to

16  go in each tray.

17  Q   From -- let's move to Page 3 of Exhibit 49.

18         THE COURT:  These are not numbered, so I assume you

19  are going by the Bates number?

20         MS. CHIEN:  I can read the Bates number into the

21  record, Your Honor.  GEO-State 48487.

22  BY MS. CHIEN:

23  Q   Looking at GEO-State 48487, go ahead and tell me what is

24  going on.

25  A   This is the opposite side of the other picture.  You can

1  see the GEO cook over there and detainees doing the very same

2  thing, dishing up the trays.

3  Q    How many detainees worked the serving line?

4  A    You need a minimum of at least nine to be successful and

5  get fed in time.

6  Q    Let's turn to the next page, which is Bates stamp

7  GEO-State 48488.  Can you tell me what the person to the left

8  is doing?

9  A    I would call that person the shock collar.  So the GEO

10 cook would say, get another hotel pan of beans out of the

11 warmer, which is behind that cart right there, on the right

12 side.

13 Q    You can -- how can you tell that's what he's doing?

14 A    He has the hot pads on.  He's standing next to the cook

15 waiting for the next direction.

16 Q    Do you see the GEO cook supervising the line?

17 A    Yes.

18 Q    If there were no detainee workers, could that GEO cook

19 distribute the meals themselves?

20 A    Absolutely not.  I have been in situations like that

21 before.  It is a little hard.

22 Q    You mentioned detainee workers also worked in cleaning; is

23 that right?

24 A    Correct.

25 Q    Where did detainees work washing dishes?

1    A    I call that the dish pit area.  It is that huge dish

2    machine.  That is what you call it.  It is a big dish machine

3    you put the dishes in and it rolls right through.

4    Q    I'll help you out.  Can you look at Exhibit 439?  I am

5    going to ask if you recognize this.

6    A    Yes.

7    Q    What is it?

8    A    Dish pit room.

9              MS. CHIEN:  I would like to move to admit Exhibit

10   439.

11             MS. MELL:  No objection.

12             THE COURT:  It may be admitted.

13                  (Exhibit 439 was admitted.)

14   BY MS. CHIEN:

15   Q    Can you tell me what happens, what is going on in this

16   photo?

17   A    Looks like something might have gotten jammed in there.

18   That's where you see -- I don't know.  I don't believe that

19   is a GEO cook that is sticking his head in the machine.  You

20   can see three compartment areas where they are deep cleaning,

21   deep scrubbing all the pans and getting ready to run through

22   the machine.

23   Q    Is that to the right with the detainee workers working in

24   the sink area?

25   A    Yeah.  Yeah.

1  Q    Is that the dishwasher that they are working on?

2  A    Yes.

3  Q    How many detainee workers are usually assigned to the dish

4  pit area?

5  A    Let's see.  That varies.  That could be -- based on how

6  many detainees you had working that day, approximately five,

7  six, seven.

8  Q    So now we have discussed the three main work areas of the

9  kitchen, can you tell me if there were any other jobs

10  detainee workers would do in the kitchen?

11  A    There were detainees that did deep cleaning.  On average,

12  probably twice a week all the ovens had to be deep cleaned,

13  scrubbed out, all the racks had to come out.  The ones that

14  did deep cleaning did not work on the line, on the production

15  line or work in the dish pit.  They just did that their

16  entire shift.

17  Q    That is like a kitchen night shift; is that right?

18  A    It is any of the shifts.  If the ovens get really bad --

19  you had a set schedule to get everything cleaned up.

20  Q    When you say "deep cleaning," are you talking about all

21  the equipment we saw in those photos?

22  A    Yes, all the equipment.

23  Q    You mentioned the ovens and things like that, were you

24  talking about the walk-in ovens?

25  A    Yes.  That's probably one of the worst.  That would get

1    pretty filthy.

2    Q   How long would it take to clean the walk-in oven?

3    A   I would give it a couple of hours.  You have to spray oven

4    cleaner, let it set, scrub it out, spray it again and let it

5    sit.

6    Q   How many people would be assigned to deep clean the

7    kitchen?

8    A   It varies on still how many detainees you have.  It could

9    be up to four, five.

10   Q   What are some other jobs that detainee workers did?

11   A   Well, you had deliveries.  Groceries come in, I think,

12   twice a week at least.  So you would have pallets of food,

13   you know, frozen and dry.  The pallets were huge.  In one

14   day, you can have six to seven pallets of food come in.  So

15   the detainees would support the cook on putting them away.

16   So we would give them a marker, they would mark the dates,

17   the cost of the product and which vendor it came from on the

18   boxes for inventory count.

19   Q   And physically move the boxes; is that right?

20   A   Yes.

21   Q   I would like to show you Exhibit 434 and ask if you

22   recognize that photo in your binder.

23   A   Yes.

24           MS. CHIEN:  I would like to move to admit Exhibit

25   434.

1       MS. MELL:  No objection.

2       THE COURT:  434 may be admitted.

3                  (Exhibit 434 was admitted.)

4    BY MS. CHIEN:

5    Q   You talked about loading and unloading deliveries of food.

6    Are these the pallets you are talking about?

7    A   Yes, that's the sally port from the kitchen to the loading

8    dock area.  If you see on the right, the right side, that's

9    where the door is.  You can't see it in the photo.  It's

10   where dry storage is.

11   Q   So the detainees would be unloading these pallets; is that

12   right?

13   A   Yes.

14   Q   We have mentioned unloading pallets, deep cleaning

15   equipment.  Was there also just general cleaning that

16   detainee workers did?

17   A   General cleaning for the kitchen, yes, because they swept

18   and mopped everything.  The kitchen was pretty well organized

19   in that way.  It was very clean.  Cleaning the sally port

20   that leads out to the Grey Mile, that area, the janitorial

21   closets over there, the GEO cooks, including myself, would

22   get the mop water ready for them and bring it into the

23   kitchen.

24   Q   I am going to show you Exhibit 352 and ask if you

25   recognize it?

1    A    Yes.

2             MS. CHIEN:  I would like to move to admit Exhibit

3    352.

4             THE COURT:  352 may be admitted.

5                      (Exhibit 352 was admitted.)

6    BY MS. CHIEN:

7    Q    Can you tell me what this is of?

8    A    That's the janitorial closet.  They have the sanitizer

9    dispenser and the floor cleaner dispenser.

10   Q    This is who -- this is equipment that detainee workers

11   would use to clean the kitchen?

12   A    Yes.

13   Q    Handing you Exhibit 353 and ask if you recognize it?

14   A    Yes.

15            MS. CHIEN:  I would like to move to admit Exhibit

16   353.

17            MS. MELL:  No objection.

18            THE COURT:  353 may be admitted.

19   BY MS. CHIEN:

20   Q    Can you tell me what this is a photo of?

21   A    Sally port between the Grey Mile and a detainee worker

22   mopping it.

23   Q    How often does a detainee worker mop this sally port?

24   A    All three shifts, breakfast shift, lunch shift and dinner

25   shift.

1    Q    Shifting from the job detainee workers did, I would like

2    to turn to what they wear.  What were detainee workers

3    required to wear in the kitchen?

4    A    As you can see, they had the white uniforms which was

5    laundered in the room next door, and all those rubber boots,

6    so that was always available.  I would say the only issue is

7    sometimes the uniforms didn't fit everybody.  They would use

8    Saran Wrap to hold up the pants and use garbage bags or clear

9    little bags to put in the boots to prevent their feet from

10   getting wet.

11   Q    Who provided the uniforms and all of these boots and

12   things like that?

13   A    GEO did.

14   Q    I am going to hand you 438 and ask if you recognize it?

15            MS. CHIEN:  Move to admit 438.

16            MS. MELL:  No objection.

17            THE COURT:  438 may be admitted.

18                 (Exhibit 438 was admitted.)

19   BY MS. CHIEN:

20   Q    Can you tell me what this photo is taken of?

21   A    The dish pit area.  You see the detainees sitting by the

22   lockers.  I don't know if they are getting ready to put stuff

23   on or taking stuff off.

24   Q    You mean the uniform?

25   A    To me it looks like there is -- the kitchen is not done

1    yet.  And as you can see, some of them are prematurely

2    changing.

3    Q   The area to the right is where detainees would put on

4    their uniforms?

5    A   Yes, they would put the uniforms that GEO gives them, the

6    regular uniforms in the lockers.

7    Q   To the left is the dish pit area we saw earlier?

8    A   Yes.

9    Q   I am showing you Exhibit 459 and ask if you recognize it?

10            MS. CHIEN:  I would like to move to admit Exhibit

11   459.

12            MS. MELL:  No objection, Your Honor.

13            THE COURT:  459 may be admitted.

14                (Exhibit 459 was admitted.)

15   BY MS. CHIEN:

16   Q   Can you tell me what this picture is taken of?

17   A   You see there the white uniforms and the rubber boots with

18   the garbage bags inside keeping their feet dry.

19   Q   Would detainee workers -- did detainee workers in the

20   kitchen, when they worked in the kitchen, would they

21   sometimes take food?

22   A   It was pretty common, yes.

23   Q   What is your understanding of why they would take food?

24   A   My understanding is that they seemed to be pretty hungry.

25   I would say one of the reasons they work in the kitchen is

1   you get to eat as much as you want from the leftovers, then

2   they would use those bags in their boots to put the food in

3   there and try to get it out.

4   Q   Are you aware of how much GEO budgeted for the meals for

5   detainee workers?

6           MS. MELL:  Objection, Your Honor, foundation.

7           THE COURT:  You may answer.

8           THE WITNESS:  I am not one hundred percent.  Do you

9   mean for all the budget for all the detainees or just the

10  kitchen worker detainees?

11  BY MS. CHIEN:

12  Q   Let me rephrase my question.  You did inventory for the

13  kitchen; is that right?

14  A   Correct, yes.

15  Q   Are you aware of how much was budgeted for detainees each

16  meal?

17  A   Yes.

18  Q   How much was budgeted for each meal?

19  A   Approximately 97 cents per detainee.

20  Q   Do you think GEO was able to prepare and serve adequate

21  meals for 97 cents?

22  A   It is difficult.  I would say, in my experience, no.

23          MS. MELL:  Your Honor, I objected to that question,

24  foundation.  The nutritional value is not known to this

25  particular witness, and he has not been qualified as a

1  nutritionist.

2         MS. CHIEN:  I didn't ask if it was nutritious.  I

3  asked if it was adequate.

4         THE COURT:  The objection is overruled.  Just one

5  second.

6         MS. MELL:  I am concerned you are not hearing my

7  objections.  That was the second one I had asked twice.

8         THE COURT:  We are talking to the court reporter,

9  folks.  You don't know what all goes on here.  We have

10 realtime, which means that the court reporter prints out the

11 questions and answers and objections and everything that goes

12 on in the courtroom.  I have a little monitor here so I can

13 read things that are said after they are said.  Pretty fancy

14 deal.  We lost the realtime part of the court reporter's

15 work.  That is what we are talking about here.  She didn't

16 miss the testimony.  She makes a record whether or not there

17 is realtime or not.  Let us proceed.  They will try and hook

18 up realtime, but we will do it.  That is something we

19 probably for the first -- for the first 45 years I was a

20 judge, we didn't have such a thing as realtime.  We can go

21 ahead and go without it for the time being.  Anyway, I'm

22 sorry to interrupt and for that aside.

23     I overruled the last objection.  I am ready for another

24 question.

25         We got it.  Thank you.

1   BY MS. CHIEN:

2   Q   So we talked about the meals and the food.  Let's turn to

3   the work schedules if we can.  How long was a typical shift

4   for detainee workers?

5   A   Approximately four hours.

6   Q   Were there ever shifts that lasted less than four hours?

7   A   No.

8   Q   How many shifts were there?

9   A   Three shifts.

10  Q   Could detainees choose when they showed up for their

11  shifts?

12  A   Yes, they could.

13  Q   Breakfast, lunch, or dinner; is that right?

14  A   Yes.

15  Q   How many detainee workers were necessary to work a

16  breakfast, lunch, or dinner shift?

17  A   I would say approximately 20 or so to be adequate and

18  successful.

19  Q   That is 20 to do both the prep, serving, dishwashing and

20  cleaning?

21  A   Yes.

22  Q   That's the bare minimum; is that right?

23  A   In my opinion, yes.

24  Q   Was there ever a time when you didn't have enough detainee

25  workers in the kitchen?

1    A    Yes.

2    Q    What did you do?

3    A    We would ask officers to help.  That's when the meals

4    would go out late as well because we would have to do it

5    ourselves.

6    Q    GEO staff would have to do it themselves?

7    A    GEO staff, yes.

8    Q    Would you have to work longer hours to do it yourself?

9    A    Yes.

10   Q    Would you ever ask for more detainee workers?

11   A    Yes, we would, but we wouldn't get them that day because

12   there is a process of getting them into the kitchen.

13   Q    Who would you request more detainee workers from?

14   A    From the kitchen officer.  He had a desk in there, he or

15   she.

16   Q    So GEO staff?

17   A    Yes.

18   Q    You said -- GEO staff would work longer.  Would detainee

19   workers who were there work longer as well?

20   A    Absolutely.

21   Q    So both you and the detainee workers might work longer

22   than the four hours -- well, your shift was longer than four

23   hours, but the detainee workers might work longer than the

24   four hours?

25   A    Yes.

1    Q    So how much were you paid when you had to work overtime?

2    A    Time and a half.

3    Q    Did detainee workers get overtime?

4    A    No.

5    Q    How often did detainee workers in the kitchen have shifts

6    that lasted more than four hours?

7    A    I would say at least a couple of times a week for sure

8    just because of the deliveries that would come in.  You never

9    knew when the delivery was going to happen.  If it happened

10   later and you have a bunch of frozen products on pallets, you

11   can't leave them in the sally port.  Detainees would stay and

12   help.

13   Q    You mentioned you also worked overtime?

14   A    Yes.

15   Q    How many overtime hours did you typically work in a week?

16   A    Typically, my work schedule was six days a week.  It could

17   be 10, 12, 15 hours of overtime, approximately.

18   Q    So you testified that you would ask for more detainee

19   workers from the GEO staffer in the kitchen; is that right?

20   A    Yes.

21   Q    Did you ever have to ask ICE to get more detainee workers?

22   A    No, not ICE, but classification.  It was between

23   Bert Henderson and classification on getting detainees into

24   the kitchen.

25   Q    Classification, do you mean Alisha Singleton?

1  A   Yes, Alisha Singleton.

2  Q   Alisha Singleton is a GEO staffer?

3  A   Yes.

4  Q   How much were detainee workers paid for working in the

5  prep area, serving area, the dishwashing area, deep cleaning?

6  A   When I first started there, the detainees had an option,

7  they could work two shifts for five dollars or a dollar a

8  shift.  Then I think less than a year, the rules have changed

9  and no detainees could work two shifts.  Some of them worked

10 three shifts.  It was too much work for them.  They weren't

11 very productive working all three shifts, so it turned into

12 just working one shift for a dollar.

13 Q   The practice, when you left, was that they would be paid a

14 dollar a day?

15 A   Correct.

16 Q   At times, they were paid five dollars per day?

17 A   Yes.

18 Q   Did detainee workers get paid anything in addition to the

19 dollar?

20 A   No.  They would get, you know, a sack lunch to take back

21 to their pod with them.

22 Q   They might get paid in extra food; is that right?

23 A   Food was a reward for staying, putting groceries away.

24 Q   I want to turn back to an issue we discussed today, which

25 is supervision.  Who supervised the detainee workers while

1  they worked in the kitchen?

2  A    The GEO cook.

3  Q    So you would make sure they knew what they were doing in

4  the prep, serving, or dish pit area?

5  A    Correct, yes.

6  Q    Did anyone else supervise the detainee workers?

7  A    You had the kitchen officer that kept an eye on the dish

8  pit area.  You had the cook, GEO cook, myself on one part of

9  the -- on the production line supervising, and then you had

10  the GEO cook in the back area supervising on prep.

11  Q    So it would all be GEO employees; is that right?

12  A    Yes.

13  Q    Would GEO employees or GEO staff have to supervise

14  detainee workers to ensure proper portion control in the

15  meals?

16  A    Yes.

17  Q    They would have to supervise detainee workers cleaning the

18  cooking equipment in the kitchen areas?

19  A    Yes.

20  Q    Did ICE supervise the detainee workers in their day-to-day

21  performance of their work in the kitchen?

22  A    No.

23  Q    What sort of discipline did detainee workers receive while

24  working in the kitchen?

25  A    Well, if they stole food.  At the end of the shift and

1  when we did the pat-down search before they go back to their

2  pod, if they had food on them, they were banned from the

3  kitchen for a week.  They can't work.  If it was some fear,

4  as an example on my watch, one took tortilla shells and put

5  it on the stove to warm up, turned the gas stove on, you

6  know, it was a little bit on fire there, that detainee was

7  expelled from the kitchen permanently.

8  Q    So he was fired from the kitchen; is that right?

9  A    Yes.

10  Q    Let's turn to you.  Why did your employment with GEO end?

11  A    I was terminated.

12  Q    Why were you terminated?

13  A    Several things that happened on my watch with the Health

14  Department.  I didn't discipline the staff when they had

15  violations, temperature violations.  I had a lot of conflict

16  of supervising in the kitchen and doing a cook shift at the

17  very same time.  That was too challenging for me, and I had

18  many complaints on that.

19  Q    It was difficult to serve as a GEO cook and a GEO

20  supervisor?

21  A    Yes.  Originally, I was hired to supervise, not to cook.

22  When I started, it changed to a cook/supervisor shift.

23  Q    Had you been written up before you were terminated?

24  A    Yes.

25  Q    What were some of the reasons why you were written up?

1    A    Let's see.  I have to remember this.  I know one was the

2    Health Department violation.  I think another for a cook that

3    didn't put the proper amount of tater tots on a tray or

4    chicken nuggets on a tray, something like that, because I was

5    supervising the cook on that.  It was a Tuesday when this

6    happened.  I will never forget that part.  So I was written

7    up for that.  And then I was on an improvement plan, so

8    weekly conversation with HR.

9    Q    And then you were terminated; is that right?

10   A    I was terminated.

11   Q    Did you try and sue GEO for your termination?

12   A    No.

13   Q    Did you try and appeal the decision?

14   A    I did try to appeal the decision because prior to that,

15   working with Henderson was very challenging.  I didn't like

16   the way she ran the kitchen.  Her and I bumped heads a few

17   times, so I put a request in to go into another department.

18   Q    You tried to work in another department of GEO; is that

19   right.

20   A    Yes.

21   Q    The request was denied; is that right?

22   A    No, it was accepted.  Prior to that, I got terminated

23   before I could move.

24   Q    So you were terminated before you were transferred to

25   another department?

1    A    Yes.

2    Q    Did you ever try and sue GEO --

3    A    No.

4         MS. MELL:  Objection, Your Honor.

5    BY MS. CHIEN:

6    Q    -- for your termination?  Sorry.

7    A    No.

8    Q    Do you have any complaints about GEO as a company?

9    A    Not at all.

10   Q    Did you like working for -- you know, did you like GEO as

11   a company?

12   A    I did.  I got paid very well.  A lot of overtime.  Yeah,

13   it was good money.

14   Q    How did the jobs that detainee workers did in the kitchen

15   compare to your job as the culinary director in a retirement

16   home now and an assisted living facility?

17   A    Not much difference besides the volume.  The type of work

18   is pretty much the same.  I would hire cooks, not

19   dishwashers, just to do prep.  I hire cooks to do prep and

20   perform the daily routines of serving our residents.

21        MS. CHIEN:  Thank you.  No further questions.

22        THE COURT:  Mr. Whitehead, any questions?

23        MR. BERGER:  Your Honor, I have a few follow-up

24   questions for the witness.

25

CROSS-EXAMINATION

BY MR. BERGER:

Q   Good morning, Mr. Griffin.  Can you hear me okay?

A   Yes, I can.

        THE COURT:  I'm sorry, Mr. Berger.

BY MR. BERGER:

Q   My name is Adam Berger.  I represent the detainee

plaintiffs in this case.  I think you testified as to how

many detainee workers were needed on the line and in the dish

pit to keep operations moving.  How many would you need to

have working in a prep area on a typical shift in order to

get the meals prepared and out to the living units in time?

A   I would say approximately five or six, at least, to be

adequate.

Q   Who would decide which of these areas, which positions in

the different areas a detainee worker would work?

A   Well, the GEO cook, including myself, we would find out

what they know how to do.  It is typically if they worked in

food service somewhere before and they understand what needs

to be done or how to do stuff.  So, physically, you have to

show them each job, what to do, because of the language

barrier you would have.

Q   But then the ultimate decision on who to assign where was

up to who?

A   Myself and the GEO cooks.

1  Q    Did any of the detainee workers ever cook food?

2  A    Yes.

3  Q    Can you describe that for me?

4  A    Now, my shift there was 11 to 8:30, so I considered myself

5  very efficient.  I would have everything prepared by the time

6  they would come in, so there was no cooking involved.  There

7  was just prepping.  On occasion, I would work breakfast

8  shift, come in at three in the morning, get set up, start

9  turning on all the equipment.  Then I think around five is

10 when you got detainees coming in.  They automatically started

11 cooking.  They were doing the scrambled eggs, making the

12 oatmeal, doing all the stuff.  I had questions why they were

13 doing that because they are not supposed to.  The cheek was

14 turned.  The cooks couldn't do it themselves, and I

15 understand.

16 Q    That leads to my next question, which is, for each of

17 these shifts -- breakfast, lunch, and dinner -- there were

18 scheduled start times for those shifts, correct?

19 A    Yes.

20 Q    Detainees could ask classification which shift they wanted

21 to work, correct?

22 A    Yes.

23 Q    But once they were assigned to a particular shift, were

24 they supposed to comply with the start time for that shift?

25 A    Yes.

1   MR. BERGER:  Thank you.  That's all the questions I

2   have.

3          THE COURT:  Okay.  Ms. Mell.

4                  CROSS-EXAMINATION

5   BY MS. MELL:

6   Q   All right.  So Mr. Griffin, your tenure with GEO was

7   approximately three years, 2009 to 2012; is that correct?

8   A   Yes.

9   Q   So since 2012, I learned this morning that you worked at

10  Cedar Ridge and Bridgeport Place; is that correct?

11  A   Yes.

12  Q   How many other jobs have you had since leaving GEO?

13  A   I think there is only two jobs that I have had.

14  Q   So have you had a job longer than two or three years?

15  A   Yes, I have.

16  Q   Was that prior to working at GEO?

17  A   Yes.

18  Q   Okay.  Were any of those jobs -- was that work in any kind

19  of detention center or correctional facility at all?

20  A   No.

21  Q   So with regard to Bridgeport Place, that's a pretty big

22  facility here in Tacoma, correct?

23  A   No, it isn't.

24  Q   It's tiny?

25  A   It's small, yes.

1    Q    So they don't have the kind of kitchen equipment that you

2    were looking at and showing to the jury in all of those

3    photographs?  They didn't have --

4    A    It is smaller equipment.  Same type, but smaller, yes.

5    Q    So same types, same quality?

6    A    Yes, all professional.

7    Q    Okay.  The quality of kitchen equipment provided by GEO

8    was a good quality or comparable to other private businesses

9    in the community?

10   A    Yes.

11   Q    Okay.  With regard to Bridgeport Place, since it is small,

12   do they use volunteers there?

13   A    No.

14   Q    They don't have any --

15   A    Well, they do in the activity department.  They use the

16   high school kids that are required to do some type of

17   volunteer to graduate.

18   Q    So that's volunteer time, that's not paid work, right?

19   A    Yes.

20   Q    At Bridgeport, is that nursing care or assisted living?

21   A    Assisted living.

22   Q    So don't you have interns there helping who are trying to

23   get their credentials being a nursing assistant?

24        MS. CHIEN:  Objection.

25        MR. BERGER:  Objection.

1        MS. CHIEN:  Assuming facts not in evidence.

2        MR. BERGER:  Relevance.

3        THE COURT:  The objection is overruled.

4   BY MS. MELL:

5   Q    That means you get to answer, Mr. Griffin.  Do you need me

6   to ask again?

7   A    No.  The answer is no.

8   Q    No internships for nursing assistants or others who are

9   learning how to do that work?

10  A    No.

11  Q    Cedar Ridge, I am not as familiar with that.  Is that in

12  Pierce County?

13  A    Bonney Lake, Pierce County, yes.

14  Q    Assisted living, nursing home?

15  A    That one was assisted living and independent living.

16  Q    Were there State-paid individuals living there?

17  A    No, private care.

18  Q    Pure private care?

19  A    Uh-huh.

20  Q    With regard to the kinds of meals you worked -- strike

21  that.

22       Did you actually prepare meals or did you have some

23  relationship with the meals that were served there?

24  A    Yes, I pulled shifts; yes, I prepared meals.

25  Q    Hot meals?

1    A    Yes.

2    Q    Using the same and similar technologies available at GEO?

3    A    Yes.

4    Q    Those are pretty high quality?

5    A    Yes.

6    Q    With regard to the meal preparations there, you were

7    trying to serve anybody who needed assisted living support;

8    is that right?

9    A    No.  Restaurant-style service.  Like a restaurant.  We

10   have two dining rooms.  They come to the dining room.  We

11   have a menu.  They order off the menu, and we prepare, cook

12   the order, mostly.

13   Q    With regard to volunteers at that location, did you rely

14   on volunteers there?

15   A    No.

16   Q    There was no -- in terms of the size of the kitchen, how

17   many people did you work with?

18   A    That facility had 147 residents living there, so slightly

19   bigger than where I am at right now.  I had a staff of, I

20   think, 17, 18.  I had a dining room manager as well that

21   managed the servers.

22   Q    How did meal prep go through as compared to GEO in terms

23   of chaotic, not chaotic?

24   A    I call it organized chaotic.  It is the nature of the

25   kitchen.

1    Q    Where -- sorry, I didn't mean to interrupt you.

2    A    Go ahead.

3    Q    I just wanted to get a sense of organized chaos, both of

4    them, or were they distinct?

5    A    Are you referring to the GEO and where I was working or --

6    ask the question again.

7    Q    Sure.  I just wanted to know with regard to both

8    Bridgeport Place and Cedar Ridge, the meal preparation, how

9    did that compare in terms of meal preparation at GEO?

10   A    Same.  Just the volume is a little different.  GEO is much

11   higher in volume because you have nearly 1500 people compared

12   to what I am going through now.

13   Q    And in Bridgeport Place and Cedar Ridge, you didn't have

14   to oversee the volunteers, right?

15   A    No volunteers.

16   Q    Did that make it almost easier to get the job done?

17   A    No, it's a job that you hire people for to make a living.

18   A lot of high school kids, minimum wage to be a server.

19   Cooks -- you know, experienced cooks would come in, so no

20   volunteers.

21   Q    No volunteers at all?

22   A    No.

23   Q    None of them were working under any kind of regulations

24   that were required to have a volunteer work program for

25   anyone?

1    A    Not in the kitchen.  Like I said, the only volunteer they

2    had was in activities because they can do that for hours and

3    play cards with the residents or paint with them.  Nothing in

4    the kitchen.

5    Q    Okay.  Have you -- do you understand that there are meal

6    preparation options out there for purchase, that meals don't

7    have to be made in the kitchen in house in an assisted living

8    facility or in a facility like GEO?

9    A    Yes, I am aware of that.

10   Q    Have you ever shopped the value of purchasing from

11   Department of Corrections Enterprise Services?

12   A    No, I haven't.  I wasn't the person.  I just ordered food

13   from the GEO contract.  That was it.

14   Q    Do you understand there is an option out there to buy from

15   Department of Enterprise Services meals?

16   A    Not when I worked at GEO.

17   Q    You know that now?

18   A    I think you need to elaborate a little bit more what you

19   mean by that.

20   Q    Did you know the State of Washington has detainees, or

21   they are inmates, actually, preparing meals --

22            MS. CHIEN:  Objection, foundation.

23   BY MS. MELL:

24   Q    -- for profit --

25            MR. BERGER:  Objection to foundation, assumes facts

1   not in evidence.

2         THE COURT:  The objection should be sustained.

3   BY MS. MELL:

4   Q   In terms of your role with Bridgeport, Cedar Ridge, or any

5   other place you have worked in a kitchen, have you explored

6   the value of purchasing from programs run by the State where

7   the meals are prepared by inmates?

8         MR. BERGER:  Objection.

9         THE COURT:  He may answer.

10        THE WITNESS:  GEO was the only company that I worked

11  for that is in corrections.  All my other jobs were contract

12  by other food service companies.  So, no, I didn't order

13  anything else or convenience stuff.  Everything that we did

14  in our kitchen, we did a lot of scratch cooking.

15  BY MS. MELL:

16  Q   At GEO?

17  A   Not at GEO.  Where I am at right now.  GEO, I wouldn't

18  call it scratch cooking.  I call it -- besides breakfast, GEO

19  was heating up a lot of stuff.  The detainees would heat up

20  the food in the kettles.  You open up 30 No. 10 cans of green

21  beans, things like that.

22  Q   But they weren't shipping in meals frozen that you just

23  put in a microwave and dished out?

24  A   No.

25  Q   Okay.

1    A    Go ahead.

2    Q    I didn't want to interrupt you.

3    A    Oh, no, no, I am fine.

4    Q    Did you have any experience to know what a dollar can

5    purchase in terms of an appropriate meal compared to, for

6    instance, what the State prepares and serves to people who

7    buy from Department of Enterprise Services?

8              MS. CHIEN:  Objection, foundation.

9              THE COURT:  Sustained.

10   BY MS. MELL:

11   Q    Do you have experience with companies like Food Services

12   of America?

13   A    Yes.

14   Q    What is your experience working with them?

15   A    Ordering food and supplies with them.

16   Q    Did they do work in terms of feeding people in

17   correctional facilities or institutional settings?

18   A    I would assume so.  They do deliver food to other

19   correctional facilities.

20   Q    Did you ever price out whether or not the food could have

21   been provided to the detention center through Food Services

22   of America at a price that was cheaper than the dollar you

23   were trying to utilize per meal?

24   A    Not in GEO.  In my current jobs that I have worked in food

25   service, yes.  In GEO, there was a lot of other companies.

1  For example, one, I don't know the name of it, came from

2  Texas.  These were low-grade products.  So, of course, they

3  were really cheap products.  A lot of soy-based beef

4  granules, soy-based Salisbury steak, soy-based burger

5  patties.  Those things are inexpensive and Food Services of

6  America and U.S. Foods, those are higher grade products.  So

7  GEO did not order everything through them.  I think it was

8  Food Services of America.  I don't know if it was Sysco or

9  Food Services of America.  They would order from other

10 companies that had lower grade products.

11      For example, if you got green beans, sometimes they have a

12 grasshopper in it, which is weird.  Things like that.

13 Q   I am assuming you didn't feed grasshoppers to the

14 detainees.  It was your job to make sure they didn't get one

15 of those?

16 A   Right.  Right.

17 Q   How about with regard to -- I think you are highlighting

18 the issue of soy products.  GEO didn't serve just soy

19 products?

20 A   Absolutely.

21 Q   Absolutely?

22 A   Soy products with maybe ten percent meat in it, yes.

23 Q   The soy products served at GEO was the exclusive food item

24 on the menu?

25 A   It wouldn't say soy.  Say, the menu said taco salad.  So

1  the type of product they would use is these beef crumbles

2  that were soy-based with beef in it.

3  Q   The kind that vegetarians eat?

4  A   I wouldn't say it is something a vegetarian would eat

5  because there is a little bit of beef in it.

6  Q   How about -- I think you were often involved in making

7  sure that detainees had the opportunity to eat real meat like

8  chicken, right?

9  A   Yes.

10  Q   So chicken was very popular down there?

11  A   Chicken, very, very popular.

12  Q   They didn't eat just soy; they ate real meat?

13  A   I would say at the holidays they got turkey, real turkey.

14  When there was a contest in the pod, who can keep the

15  cleanest, whatever the winning pod is, as a reward, they got

16  a chicken thigh meal.  That was golden to all the detainees.

17  Q   Are you telling me that your testimony is that the only

18  time anybody got any real meat down at GEOs is when they got

19  a chicken thigh at Christmas or a turkey thigh at

20  Thanksgiving?

21  A   No, I am saying, in my opinion, 80 percent of the products

22  that were served either was beans and soy-based meats.  There

23  was this stuff, it is chicken, but it is chicken parts and

24  pieces.  It is a 40-pound case of ground up chicken that you

25  don't know what was in it, it was just pieces.  That was on

1 the label itself.

2 Q   You were honestly ordering that and serving it to

3 detainees as if you had some question about its content?

4 A   I didn't question the content because that was above my

5 pay grade, and I am not the director of food service.

6 Q   Did you ever make a complaint about the nutritional value

7 of the food that GEO was providing to the State or anybody

8 else who could have done something about it?

9 A   No, they had a set menu.  They controlled the menu.

10 Q   If you were concerned about the content or adequacy of the

11 nutritional level, why would you be purchasing those things

12 and just feeding it to people?

13 A   I wasn't concerned about the nutritional value of what

14 they were getting.  I was just -- you know, they are getting

15 a lot of soy-based products.  Soy is not bad for you.  GEO

16 was -- tried to be most inexpensive in ordering spongy meats.

17 Q   Why didn't you not order spongy meats?  Did you say, "I

18 don't want to serve them spongy meats"?

19          MS. CHIEN:  Objection, this is getting argumentative.

20          THE COURT:  Sustained.

21 BY MS. MELL:

22 Q   Showing you what has been marked as Exhibit 285.  Can you

23 see that in your email?

24          MS. CHIEN:  You'll have to be more specific.  We

25 didn't get -- what number are you at?

1            MS. MELL:  A-285.

2            MS. CHIEN:  You'll have to -- I haven't seen -- okay.

3    I have pulled it up.  Did you want me to email this to

4    Mr. Griffin?

5            MS. MELL:  It is my understanding you provided the

6    email to my office so we could do that.  Is that incorrect?

7            MS. CHIEN:  That was for a different witness,

8    Ms. Mell.  How are you proposing this witness access your

9    exhibit?

10           MS. MELL:  I was proposing that you responded to my

11   email inquiry asking to provide that email to us so that we

12   could get it to him.  I understood that it happened.

13           MS. CHIEN:  Sorry, I have been in court.  Is this

14   uploaded in Box?

15           MS. MELL:  Yes.

16           MS. CHIEN:  The witness is by himself.  We can help

17   him access the Box if you don't mind our support staff

18   entering the room.

19           MS. MELL:  I would authorize the Court to share

20   Exhibit A-285 with the witness through Box.

21           MS. CHIEN:  Do you mind if we allow our support staff

22   to help access the exhibit you have added?

23           MS. MELL:  For that limited purpose, no.

24           THE COURT:  We are waiting to get this one potential

25   exhibit in the hands of the witness.  Is that what we are

1   doing here now?

2          MS. CHIEN:  Yes, Your Honor.  I think GEO counsel --

3   I think we have now gotten it in front of Mr. Griffin.

4          THE WITNESS:  Which exhibit are we looking at?

5          MS. CHIEN:  A-285.

6          THE COURT:  Ms. Mell.

7   BY MS. MELL:

8   Q   Mr. Griffin, can you review the menu items depicted on

9   Exhibit A-285?  I think it is a multipage exhibit.  Just kind

10  of scroll through that and take a look at those meals.

11  A   Hang on a second.  It is not loading up.  The computer is

12  thinking.

13         MS. CHIEN:  I am going to try and email it.

14         THE COURT:  Question, Ms. Mell.

15  BY MS. MELL:

16  Q   Mr. Griffin, having reviewed Exhibit A-285, do -- strike

17  that.

18         Do you know what Exhibit A-285 is?

19  A   It looks like a week's menu.

20  Q   Is it just a week or is it weekly?

21  A   It is a weekly menu, yes.

22  Q   So how did the meals described on Exhibit A-285 compare

23  with the food you were preparing and serving to the detainees

24  at Northwest Detention Center?

25  A   It looks different than what I had.

1    Q    How is it different?

2    A    Because we had beans on it twice a day.

3    Q    Okay.

4    A    Any kind of bean -- black bean, red bean, navy bean -- on

5    the menu for lunch and dinner as part of their nutrition.

6    Q    Do you think turkey baloney -- how does turkey baloney

7    relate to beans?  Better or worse?

8              MS. CHIEN:  Objection.

9              MR. BERGER:  Objection.

10             MS. CHIEN:  This document -- I object.

11             THE COURT:  The objection is sustained.

12             THE WITNESS:  I am not questioning the nutritional

13   value of this menu --

14             MR. BERGER:  Excuse me.

15             THE COURT:  Wait for a question, Mr. Griffin.

16   BY MS. MELL:

17   Q    How does the -- strike that.

18        Your prior testimony was that you didn't believe that

19   meals were adequate --

20             THE COURT:  Excuse me.  Don't paraphrase the

21   witness's testimony.  What is the question to the witness?

22   BY MS. MELL:

23   Q    Are the meals listed on here more -- any more or less

24   nutritional than the meals that you were serving at the

25   detention center?

1   A   I wouldn't --

2           MR. BERGER:  Objection, foundation.

3           MS. CHIEN:  Objection.

4           THE COURT:  Sustained.

5           MS. MELL:  The testimony from this witness was that

6   somehow he knew he had an adequacy opinion.

7           THE COURT:  The objection is sustained to the last

8   question.  What is the next question?

9   BY MS. MELL:

10  Q   Can you form an opinion about the nutritional value of the

11  meals depicted on this exhibit based on what is described

12  here?

13  A   I can --

14          MS. CHIEN:  Objection, foundation.

15          THE COURT:  I'm sorry.  You answered the question,

16  Mr. Griffin, I believe?  What did you say?

17          THE WITNESS:  I cannot make an assumption because I

18  don't know the ingredients, what they are using in the menu.

19  BY MS. MELL:

20  Q   Can you tell from --

21          THE COURT:  Go ahead.

22  BY MS. MELL:

23  Q   Can you tell from Exhibit A-285 that none of these meals

24  are hot meals?

25          MR. BERGER:  Objection, foundation.

1    MS. CHIEN:  Objection.  She's testifying --

2    THE COURT:  Sustained.

3    THE WITNESS:  Repeat the question.

4    BY MS. MELL:

5    Q   With regard --

6    THE COURT:  There is no question.  Go ahead.

7    BY MS. MELL:

8    Q   When you were at the Northwest Detention Center, the

9    Northwest Detention Center was preparing hot meals, not cold

10   meals, correct?

11   A   Yes.

12   Q   When you look at Exhibit A-285, do any of those meals

13   compare with the hot meals that you were serving at the

14   Northwest Detention Center?

15   MR. BERGER:  Objection, compound, foundation.

16   THE COURT:  The objection is sustained.  This is a

17   multipage exhibit with many menus on it.

18   MS. MELL:  I know what to do.  I know what to do.

19   BY MS. MELL:

20   Q   Did you serve turkey baloney sandwiches at the Northwest

21   Detention Center?

22   MR. BERGER:  Objection.

23   THE COURT:  I'm sorry?

24   MS. MELL:  Do you need the question --

25   THE COURT:  I thought I heard an objection.  I didn't

1  hear what you said.

2        MR. BERGER:  I will withdraw the objection.

3        THE COURT:  All right.  What's the next question?

4  BY MS. MELL:

5  Q   Did you serve detainees at the Northwest Detention Center

6  turkey salami sandwiches?

7  A   Turkey baloney sandwiches in sack lunches only.

8  Q   No turkey salami sandwiches?

9  A   No.

10  Q   Did you serve grilled ham and cheese with soup?

11  A   No.

12  Q   Beans and franks?

13  A   No.

14  Q   Creamy chicken casseroles?

15  A   Probably so.

16  Q   Did you give them jelly packets?

17  A   Yes.

18  Q   Pumpkin breakfast bars?

19  A   No.

20  Q   Non-fat dry milk?

21  A   Nope.

22  Q   What did you give them to drink?  Real milk?

23  A   Yes.

24  Q   Whole and skim?

25  A   Skim.

1   Q    With each meal?

2   A    Breakfast.

3   Q    Breakfast.  Did you feed them peanut butter packets --

4           MS. CHIEN:  Objection, relevance.

5           THE COURT:  We are far afield here, counsel, I'm

6   afraid.  Objection is sustained.

7           THE WITNESS:  No.

8   BY MS. MELL:

9   Q    Do you know whether or not in your experience with Food

10  Services of America whether or not they purchased soy

11  products for the meals they purchased for sale?

12  A    They do have some soy products.  I believe GEO did not

13  order through Food Services of America soy products.  They

14  ordered through other companies soy products.

15  Q    There is a photograph at 438.  Can we take a look at that

16  for a minute, please?  Mr. Griffin, do you see Exhibit 438,

17  that photograph?

18  A    Yes.

19  Q    In that room, when they are in that location, what do you

20  call that room?

21  A    I call it the dish pit.  When they are done serving on the

22  line, they set up tables to eat.

23  Q    Okay.  There are benches and lockers in there for them to

24  hang out at during the workday?

25  A    No benches.  They don't hang out there.  There is lockers,

1  yes.

2  Q   Don't they hang out there before you need them on the

3  line?

4  A   As soon as they come in and they change into their white

5  uniforms, they go right to where we direct them.

6  Q   Who picks the music that you play in that area?

7  A   What do you mean by "music"?

8  Q   Do you let them pick the radio station or music they can

9  listen to in that location?

10 A   We had no radio when I worked there.  No music.

11 Q   Did you allow them to -- I don't know what the right word

12 is.  Hang out isn't the right word.  Did they talk and relax

13 there during the times when they weren't needed on the line?

14 A   No, I call it organized chaotic.  Everybody got a job to

15 do.  They would come in singing sometimes.  You know, it is

16 very loud in there.  The kitchen is extremely loud.  They are

17 all talking, you know, getting ready.

18 Q   Did you get the sense they were enjoying the collegiality

19 with their colleagues there in that room?

20 A   I believe so.  They were happy to get out of their pod and

21 do something.

22 Q   It is not your testimony that for the whole four hours

23 they were on task, right?  They got to eat, and they got to

24 take breaks during down times, right?

25 A   No, no breaks.  They got to eat after they were done

1  serving on the production line.

2  Q   Okay.  They could eat for as long as it took them to eat

3  before the roll call, is that what you did?

4  A   You had a timetable to get everything done before the next

5  shift.

6  Q   You gave them at least 30 minutes?

7  A   Yes.

8  Q   Okay.  In a four-hour period?

9  A   Yes.

10 Q   Then they could also take with them when they left select

11 items in the lunch bags?

12 A   No.

13 Q   I thought you said they were rewarded and one of the

14 incentives was to give them bag lunches?

15 A   That was either the lieutenants that directed that.  We

16 did not -- the kitchen -- GEO cooks did not direct that.  It

17 was either the kitchen officer where you see the desk there

18 where that person sits, or it was lieutenants that gave the

19 sack lunches as a reward for working later.

20 Q   Okay.  So it was an additional incentive to the activities

21 there in the kitchen?

22 A   Yes.

23 Q   Okay.  Why do you say it was a reward if you weren't

24 giving it to them?  How do you even know why they were

25 getting the sack lunch?

1    A    That's what the lieutenants called.

2    Q    They called it what?

3    A    They want to give us ten sack lunches as a reward for the

4    detainees buffing the Grey Mile.

5    Q    So you are talking about sack lunches to lieutenants that

6    have nothing to do with the kitchen?

7    A    Yes.  The sack lunches were given out for any extra duties

8    that happened throughout that building.

9    Q    Do you actually know whether or not they were given for

10   extra duty or whether or not they were used by corrections

11   officers to facilitate a positive working relationship with

12   the detainees?

13        MS. CHIEN:  Objection.  Referring to "corrections

14   officers," they are not corrections officer.

15        MS. MELL:  I will fix that.  You are right.  That is

16   wrong.  You are right.

17   BY MS. MELL:

18   Q    Do you know whether or not the bags with food in them, bag

19   lunches, sack lunches I guess you call them, do you know

20   whether or not the lieutenants were actually using that as a

21   tool to facilitate cooperation within the housing units and

22   elsewhere in the facility?

23   A    Yeah, they did.  In my opinion, it was all extra work that

24   they performed they got these sack lunches.

25   Q    You didn't know what the activity was or what the quid pro

1  quo was between the delivery of the sack lunch and what

2  anybody did, right?

3  A    Some, I did know, not all of it because I am in the

4  kitchen mostly, so some of it I did.  If it was near the

5  kitchen, like the Grey Mile and they are painting, or they

6  are doing the floors, the lieutenants would come right in

7  and, "Give me five sack lunches for the detainees that did

8  the extra work."

9  Q    Isn't it correct there are a lot more detainees than

10  employees?

11  A    Yes.

12  Q    Isn't one thing you do in detention is facilitate

13  cooperation and a positive relationship, incentivize people

14  to do the right thing, as opposed to chaos and doing the

15  wrong thing and not following the law, the law of the land?

16  A    Yes.

17  Q    Food is valuable in that kind of an exchange, correct?

18  A    Yes.

19  Q    With regard to your position at GEO, you were an employee?

20  A    Yes.

21  Q    Your training as an employee was far more extensive than

22  the training you are talking about when you were working with

23  the detainees, correct?

24  A    Yes.

25  Q    So there are differences in training that spanned both the

1  scope of knowledge you are required to have, as well as the

2  scope of skills you are supposed to have when employed by

3  GEO?

4  A   When I was employed by GEO, we went through academy

5  training as well to understand where we were working and what

6  we have to do.  On the food service part, I didn't need the

7  training because that's what I had done all my life.  That

8  part -- and cooking.  We are not training cooks.  GEO doesn't

9  train cooks how to cook.  We are training them how to

10 supervise the work in that environment.

11 Q   Because there was a voluntary work program there, right?

12 A   Yes.

13 Q   When you said "sometimes you need to have detainees stick

14 around a little bit longer," you had food pallets that come

15 in late, and you had to unload the food pallets?

16 A   Yes.

17 Q   Did you ever really have a problem getting detainees to

18 want to stick around and not go back to their housing units?

19 A   Not all the time, no.  Some were tired.  The majority of

20 the time we didn't have an issue with them staying.

21 Q   And you certainly didn't make them stay; if they were

22 tired, they left?

23 A   We asked, because on occasion we would have to do it

24 ourselves.

25 Q   And you did.  Whatever needed to get done, you did it,

1  right?

2  A   Yes.

3  Q   There was no exclusivity among the activities; what needed

4  to get done got done?

5  A   The only issue was, you know, on supervising detainees at

6  the same time trying to put groceries away or near the end,

7  like I said, frozen stuff got to be put away.  You can't let

8  it sit out.  If you didn't have enough detainees, we don't

9  have enough cooks to watch the detainees.  There is times I

10 am just the only person in the kitchen and I have the kitchen

11 officer and I don't have a cook because he called out sick,

12 so no prep is being done.  That's the challenging part.  If

13 you don't have the detainees' help to put these groceries

14 away, yeah, you're in a tough situation.

15 Q   Wasn't it a little bit more complicated than it is like in

16 an assisted living facility in that the task you had to

17 perform, like putting frozen food away in a timely manner, if

18 you had detainees doing that, you had to make sure the

19 detainees weren't putting the frozen food in their boots and

20 going back to their dorms, right?

21 A   Yes.

22 Q   How did you balance -- did you have to balance the number

23 of detainees that you could actually supervise and make sure

24 they weren't stealing things and the number of detainees that

25 would actually make your work -- the work get done timely?

1  A   You did.  The only issue about the stealing is where it

2  was in the dish pit area where they would take either

3  leftover food and put it in their little bags and put it

4  lockers and put it in their shoes.  It wasn't the groceries

5  we had to worry about them trying to take.  It is too big.

6  Everything is closed up.

7  Q   So when you said that you asked for detainee workers at

8  times, didn't you always have in the back of your mind, "I

9  want enough to get the job done effectively, but I don't want

10 too many that I can't supervise because part of this is a

11 voluntary work program.  That's what I've got to balance"?

12           MS. CHIEN:  Objection.

13           THE COURT:  What is your objection?

14           MS. CHIEN:  Relevance.

15           THE COURT:  He may answer.

16           THE WITNESS:  The more detainees we had, the better

17 we can get done and be more efficient.

18 BY MS. MELL:

19 Q   I didn't mean to stop you.  Sorry.

20 A   The amount of detainees coming in, if we had 25 detainees,

21 that's even better.  More stuff can get done, compared to

22 having 12 or 9 or 15.

23 Q   The kitchen was a perfect place to use as many people as

24 possible in the detention facility?

25 A   Right.

1  Q   You talked about a detainee that put something on the

2  grill.  What did he put on it?

3  A   A tortilla shell.

4  Q   Do you know if he was able to go volunteer in the rec

5  program or paint murals or work in the pod?

6  A   No, I don't.

7  Q   You mentioned your connection to getting detainees in the

8  program was Alisha Singleton from classification, didn't you

9  work with Michael Heye, too?

10  A   No, I did not.  That was Bert Henderson.  She would work

11  with Singleton on getting detainees in.

12  Q   I have a few more things.  I think we can get you done and

13  out of here before lunch.  Let me just do a quick review

14  here.

15      I think you said that -- with regard to fresh food, the

16  detainees got fresh apples and carrots and things like that,

17  didn't they?

18  A   Yes.

19  Q   There was fresh fruits and vegetables available to eat?

20  A   Yes.

21  Q   With regard to the dollar a day, you never advocated for

22  the detainees to be treated like employees, did you?

23  A   No.

24  Q   You never advocated for them to make minimum wage?

25  A   No.

1    MS. MELL:  I have nothing further.

2    THE COURT:  Ms. Chien.

3    MS. CHIEN:  No further questions from the State.

4    THE COURT:  Mr. Whitehead?

5    MR. BERGER:  Mr. Berger, Your Honor.  No further

6    questions.

7    THE COURT:  I'm sorry, Mr. Berger.

8    MR. BERGER:  I know you haven't heard from me much so

9    far, but in this instance, it is me.

10   THE COURT:  Thank you.

11   THE WITNESS:  Thank you.

12   THE COURT:  We'll take our noon break, folks, and

13   reconvene at 1:00.

14                                    (Recessed.)

15

16

17

18

19

20

21

22

23

24

25

1                                          AFTERNOON SESSION

2                                            JUNE 3, 2021

3      (The following occurred outside the presence of the jury.)

4             THE COURT:  Are we ready to proceed?

5             MS. SCHEFFEY:  Yes, Your Honor.

6             THE COURT:  Bring the jury in, I guess.

7             THE CLERK:  We have all nine jurors, and I will go

8      ahead and admit the witness as well.

9             THE COURT:  Yes, please.

10        (The following occurred in the presence of the jury.)

11            THE COURT:  Mr. Medina-Lara, will you raise your

12     right hand and be sworn.

13            THE WITNESS:  Yes, sir.

14                          JOSE MEDINA-LARA,

15        having been sworn under oath, testified as follows:

16            THE COURT:  You may inquire, counsel.

17            MR. WHITEHEAD:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19     BY MR. WHITEHEAD:

20     Q   Good afternoon, sir.  Can you introduce yourself to the

21     jury?

22     A   My name is Jose Medina-Lara.

23     Q   Were you detained at the Northwest Detention Center?

24     A   Yes, indeed.

25     Q   Can you tell us from when to when?

1   A    I don't recall the date, 2011 to August 26, 2014.

2   Q    While you were the there, did you take part in the

3   voluntary work program?

4   A    Yes, sir.

5   Q    Well, that gives you firsthand insight into how the

6   program works.  Will you answer my questions today about the

7   voluntary work program?

8   A    Sure.

9   Q    Well, I want folks to get a sense of who you are.  How old

10  are you?

11  A    40 years old.

12  Q    Where were you born?

13  A    I was born in Michoacan, Mexico.

14  Q    At some point, did you come to the United States?

15  A    Yes, sir.  I was seven years old.

16  Q    Tell me more about the circumstances, how you came to the

17  United States when you were seven.

18  A    My father was already working in the United States.  He

19  would go back and forth.  My father was here since he was 18.

20  My father is in his late 70s now.  Came with my mother at the

21  age of seven to search for a better life.

22  Q    It is a story of family reunification then?

23  A    Yes, sir.

24  Q    Where did you grow up?

25  A    I grew up in Salinas, California.

1    Q    We are in Washington.  Tell us about Salinas.

2    A    Rural farming community.  It is also plagued with a lot of

3    gang violence, a lot of violence.  Overall, it is a pretty

4    nice community, but plagued by a lot of gang violence.

5    Q    Tell me, how far did you go in school?

6    A    I graduated from high school and attended Hartnell College

7    here in Salinas, California.  I was close to getting my

8    associate's degree, but I stopped because I had to work.

9    Q    You worked, what were you doing when you stopped college?

10   A    I was working as a production manager at a copy shop,

11   similar to Kinkos or FedEx.  I was running the night

12   production shift.  I would go in at five p.m. and I had no

13   time to get out.  I worked five to five, five to six.  It was

14   really difficult to keep up with school and work at the same

15   time, working those hours.

16   Q    Have you heard the phrase "lawful permanent resident"?

17   A    Yes, sir, LPR.

18   Q    What does that mean to you?

19   A    Means permanent -- excuse me -- lawful permanent

20   residence, means you are lawfully here, permanently here.

21   Q    Did you have LPR status?

22   A    Yes, sir.

23   Q    When did you obtain LPR status, permanent resident status?

24   A    2020 got my work permit.  2021 I got my LPR.

25   Q    When you were at the copy shop, were you authorized to

1    work in the United States?

2    A   Yes, sir.

3    Q   I understand at some point you were arrested; is that

4    right?

5    A   Yes, sir.

6    Q   We don't need to delve too deeply into it, but give us

7    some understanding of what happened.

8    A   I grew up in the wrong neighborhood.  I am not going to

9    blame that.  I was charged with possession of controlled

10   substance with intent to sell and a firearm.

11   Q   Were you sentenced to prison?

12   A   I was sentenced to five years in state prison.  I

13   completed my sentence, and for good behavior I was let out

14   after two and a half months.

15   Q   In serving your prison sentence, do you think you paid

16   your debt to society?

17   A   I did.  I still continue to pay it because it is kind of

18   difficult to get certain jobs with a criminal record.

19   Q   Well, you told us earlier that you were at the Northwest

20   Detention Center.  How is it you ended up at the Northwest

21   Detention Center?

22   A   Prior to -- it was about two weeks before I was released

23   from state prison.  I was happy I was going home.  I didn't

24   know anything.  Two weeks before I am supposed to be released

25   from state prison, you know, ICE agents came to see me.  They

said I was going to have a detainer, and I was going to go to

Immigration and two weeks before my release from prison.

Q   I want to make sure I have the sequencing correct.  Is it

that you completed your criminal sentence and then you were

sent to the Northwest Detention Center?

A   I completed my criminal sentence from the State of

California.  From there, I went to El Centro Processing

Center in Imperial County, Southern California.  From there,

I went to numerous places.  I ended up in Yuma City, and then

years later I ended up in the Northwest Detention Center.

Q   These other places, you rattled off some names for us.

Are these other immigration detention facilities?

A   El Centro Processing Center in Imperial County, yes, that

one is strictly immigration.  I also went to county jails,

which you are housed with criminals -- murderers, rapists --

right alongside normal people that are just being detained.

Yeah.

Q   Any of these other facilities that you went to, did they

have a worker program on par with what you experienced at the

Northwest Detention Center?

A   No, not that I am aware of.  No, not like Northwest

Detention Center.

Q   Let's talk about that.  Let's get to the Northwest

Detention Center.  When did you get to the Northwest

Detention Center?

A    2011.  I don't recall the date.

Q    In this case, it is about the voluntary work program. Tell me this:  When did you first learn about the voluntary work program?

A    As soon as I got there.  I actually met up with a couple of detainees I had been with in other facilities over the years.  They told me there is this program, you sign up, they pay you a dollar a day, you get money on your books.  Every 30 days you get $30.  I'm like, why not.  So I signed up.

Q    Why did you sign up to work?

A    Well, because $30 is better than zero dollars.  I don't want to be a burden on my family.  By then, I had already been incarcerated in the state and detained for about four years.  I don't want to rely on my family to send me money. That money went towards different things -- hygiene, extra food, phone calls, and so on and so forth.

Q    You mentioned phone calls.  Were there pay phones then at the Northwest Detention Center?

A    Yeah, pay phone.  You had to pay to use the phone.  You know, sometimes you couldn't have your family put money on your phone.  I would maybe trade a bag of coffee for a phone call with one of the detainees.  That's how I contacted my family.  If I had the $30, I wouldn't be able to do that.

Q    Do you remember how much a phone call cost while you were there?

1   A   I don't recall, but I want to say around four to five

2   dollars.  I don't recall the exact figure.

3   Q   You mentioned food.  What was the food like at the

4   Northwest Detention Center?

5   A   Sometimes it was okay.  Sometimes, for lack of a better

6   word, it is something I wouldn't feed my dog.  That's where

7   the commissary items came in and, you know, like the food,

8   you could some get ramen.

9   Q   You mentioned ramen, how much did ramen cost at the

10   commissary?

11   A   It was like around 50 cents, if I'm not mistaken.

12   Q   At a buck a day you can get two packs of ramen?

13   A   Two meals, why not.

14   Q   You signed up to work at the worker program.  Did you

15   start right away or did you have to wait?

16   A   I had to wait.  It is a waiting list.  Basically, it is

17   first come, first serve, and there is right of first refusal.

18   If one person leaves, gets bailed out, gets deported, the

19   next person on the list, they ask you, "There is a job open,

20   'yes' or 'no?'"  If they say no, they go down the list to the

21   next person in line on the waiting list.

22   Q   I hope this doesn't sound like a silly question, but could

23   you just start working, or did you have to wait for your name

24   to get called off the list?

25   A   You have to wait.  You can work, but you have to work for

1  free.  No, it is a wait -- a waiting list.

2  Q   Give us a list of the jobs that you worked while you were

3  there at the Northwest Detention Center.

4  A   You would have what they call top tier, first floor,

5  second floor.  Porters, you would sweep and mop either the

6  top tier or bottom tier.  There was day room cleaners, yard

7  cleaners, shower cleaners, food porters.  Then the guys that

8  were sweeping and mop at night after everybody was already in

9  their bunk areas.

10  Q   Is it the case you found yourself in one job more than

11  others?

12  A   Yes.

13  Q   What was the main job you did while at the Northwest

14  Detention Center?

15  A   For about two years, I was a food porter.  I would assist

16  with passing out the food items for breakfast, lunch and

17  dinner.  Breakfast would be, like, the milk, juice, apple,

18  give them the spoon and fork.  After they were done eating,

19  we would pick up the trays and have to sweep and mop all the

20  tables and all areas around the unit.  Take us about an hour

21  and a half each time.

22  Q   We were talking about jobs that you did.  Were there any

23  jobs you didn't want to do?

24  A   Oh, definitely, yeah.  I would never want to be the shower

25  cleaner.  No.  No.  No.

1   Q   Why is that?

2   A   I don't want to go into too much detail, but you would

3   find underwear soiled with feces, all sorts of mess.  No,

4   that's something I would not want to do.  Not for a dollar,

5   no.

6   Q   Hard work for a buck a day?

7   A   Yeah, definitely is.  Brave men.

8   Q   So your name comes up on the wait list.  Who tells you you

9   have the job?

10  A   The unit officer.  Whoever the unit officer of the day is,

11  they would have shifts, the three shifts for officers, they

12  would just -- let's say a guy got released or bailed out,

13  then the next -- Mr. Medina, you are next on the list, would

14  you like to take this job, and you would take the job.  The

15  unit officer would call your name.

16  Q   You get your name called, was there any kind of new-hire

17  paperwork or anything you needed to sign?

18  A   There was paperwork.  Honestly, I was excited to get my

19  job.  I just -- I honestly didn't read -- I read the first

20  three lines and signed it, signed it and dated it.  I

21  honestly didn't read it, to be completely honest.

22  Q   Going into the job, you knew it was a dollar a day; is

23  that right?

24  A   I knew that.  I definitely knew that.

25  Q   Knowing it is a dollar a day, why did you sign up for so

1  little money?

2  A   Like I say, better to have $30 on your books than to have

3  no dollars on your books.

4  Q   Your job, the main job you did, you gave us a little bit

5  of a thumbnail sketch of it.  You told us you were a food

6  porter; is that right?

7  A   Yes.  Along with another worker, you go to the kitchen

8  area and pick up the food cart, and it would have all the

9  trays.  Me, I grab the milk carton, juice, apple, orange,

10 whatever you give them.  I set them on the table, everybody

11 would line in line, put their ID on the officer's desk that

12 they ate.  They come by me and I give them, in the morning,

13 you know, their milk, spoon, fork, whatever it was.  I would

14 pass out the juice, whatever.

15     This was three times a day.  After they were done eating,

16 most people were pretty good about it, they put the trays

17 back in the cart, some people just leave them and not care.

18 We picked up everybody's tray.  We get the trash can, take

19 out the leftovers from all the tables.  While he was taking

20 the food cart back, I would sweep and mop.  I would sweep,

21 then mop was as needed.  Depending on the meals, it would get

22 messy.  We would do that every day for three shifts.

23 Q   You are working.  What is the GEO officer doing during

24 this time?

25 A   Sometimes -- depends.  Every officer is different.  Every

1   officer has their own little routine they would do.  They

2   would collect the IDs and make sure everybody ate.  Some

3   would sit there.  Some would do their round to see if anybody

4   refused to eat, going around the cells to make sure the

5   people ate or not.  Some would sit there at the desk.

6   Q   Was there ever -- did the GEO officers help you clean up?

7   How about that?

8   A   No.  No.  I'm sorry, but no, never.

9   Q   Did you ever see a GEO janitor cleaning up inside your

10  pod?

11  A   I never seen a janitor at GEO.  We were the janitors.

12  Q   On that front, you are cleaning up, sweeping and mopping,

13  again, you know, some of this stuff sounds like common sense.

14  I want the jury to understand.  Break it down for me in terms

15  of cleaning supplies, the equipment you would use to clean

16  up?

17  A   Okay.  So there was an officer's desk, right across from

18  them was a supply room.  The officer would unlock it.  We

19  would go in there and there was solution already there

20  premixed.  We would get the mop bucket, brooms to sweep, so

21  on and so forth.  Put the bucket in, and the solution was

22  right there labeled, you know, shower clean solution, floor

23  mop, et cetera.  We would fill the bucket up.  Go sweep, mop,

24  do whatever you have to do.  After come back, we rinse the

25  mop because we have to use it again.  Go back, we rinse the

1    mop, rinse the bucket, clean it up, put everything back in

2    order, tell officers we are finished, and he would close the

3    supply closet.

4    Q   You did this three times a day?

5    A   Three times a day, seven days a week.

6            MS. SCHEFFEY:  Objection.

7    BY MR. WHITEHEAD:

8    Q   The supplies you used, seems obvious, who provided the

9    supplies?

10   A   GEO.  I am assuming GEO did.

11   Q   Did you have to sign any paperwork when you completed your

12   job?

13   A   Yes, there was a sheet on the officer's desk.  You signed

14   you did your job, finished your assignment, whatever it was.

15   Everybody that worked that shift, everybody had to sign and

16   put their date, sign and date, and the officer would initial

17   it.  That's how you got paid.

18   Q   I want to bring up an exhibit for you.  This is Exhibit

19   80.  It has already been admitted.  Let's see if we can pull

20   that up on the screen.  I just pulled up Exhibit 80.  Can you

21   see it?

22   A   Yes.

23   Q   Is this the form you are talking about?

24   A   It is pretty close, yes.  It is pretty close, yeah.

25   Q   It was your understanding you had to sign this form to get

1    paid; is that right?

2    A   Yes, that is correct.

3    Q   Would the officers let you sign the form if you didn't

4    complete the work?

5    A   No, negative.

6    Q   Can you tell us about a time when a detention officer

7    refused to let you or somebody else sign this form?

8    A   It didn't happen to me because I was always there.  I seen

9    times where there was a guy, he was having an argument with a

10   family member, I don't know, I assume it was his girlfriend

11   because the way they were talking.  Trying to clean after --

12          MS. SCHEFFEY:  Objection, Your Honor, hearsay.  He is

13   describing a conversation of another unknown witness.

14          MR. WHITEHEAD:  My next question is going to be what

15   did the GEO officer say to this employee.  That would be a

16   party statement, 801(d)(2)(D).

17          THE WITNESS:  He said --

18          MR. WHITEHEAD:  Hold on, Mr. Medina-Lara.

19          MS. SCHEFFEY:  He's describing another detainee

20   arguing with a girlfriend or something.  That's what the

21   discussion is right now.

22          THE COURT:  You may answer that question.

23          MS. SCHEFFEY:  That wasn't very clear.

24          MR. WHITEHEAD:  I'm sorry, Your Honor.  Your voice

25   did not come through.

 1                            (Audio interruption.)

 2          THE CLERK:  Your Honor, is your phone underneath your

 3   binders?

 4          THE COURT:  No.

 5          THE CLERK:  We are definitely having trouble

 6   understanding.  We might need to switch to the computer audio

 7   with the headset.  Just a moment.

 8                            (Pause in proceedings.)

 9          THE COURT:  Raise your hands if you can hear me.

10   Okay.  I am not sure you got my last ruling.

11      I overruled the objection.

12      What is the next question?

13          MR. WHITEHEAD:  Your Honor, my question to

14   Mr. Medina-Lara was what the GEO officer said and refusing to

15   let the worker sign the form.

16          MS. SCHEFFEY:  Your Honor, I would object.  That's

17   hearsay.  The GEO officer is not -- it has not been

18   established they are a party opponent or that he can speak

19   and bind the company.

20          THE COURT:  Ms. Scheffey, you are echoing all over

21   the place.  I did not make out your objection.

22          MS. SCHEFFEY:  I would object that the officer is

23   unnamed, and it has not been established and the foundation

24   has not been laid that he can speak for the company.  He is

25   not classified as a party opponent at this point for the

1  hearsay exception.

2         MR. WHITEHEAD:  Your Honor, it is black letter law,

3  801(d)(2)(D), as an employee acting within the course and

4  scope of his employment.

5         THE COURT:  Mr. Whitehead, I am not hearing you very

6  well either.

7         MR. WHITEHEAD:  It is not hearsay, Your Honor.

8         THE COURT:  I think he may answer this question.

9         MR. WHITEHEAD:  Thank you.

10 BY MR. WHITEHEAD:

11 Q   Mr. Medina-Lara, my question to you is:  What the GEO

12 officer said in refusing to let the other worker sign the

13 worker pay sheet we saw at Exhibit 80?

14 A   He said, "You didn't work today, so you don't get paid.

15 You can't sign the form."

16 Q   A refusal to work form, have you ever heard of something

17 like that?

18 A   Oh, yeah.  Let's say that there was a few people that I

19 have seen, they would be going through some emotional

20 stuff -- maybe they got denied bond, lost their case, going

21 to get deported -- and they didn't want to work.  If you

22 didn't want to work, are you -- the officer would ask if you

23 are refusing to work.  You say, yeah, then they would have

24 you sign the form saying you refused the job or your work

25 assigned, and you are basically terminated and fired and the

1   next person on the list comes up.

2   Q   You mentioned that you were a food porter in your pod,

3   which pod were you in?

4   A   I was in the -- I want to say it was B-1.

5   Q   Do you remember how many people were in your pod?

6   A   There was a space for 114 people.

7   Q   At some point, you were released from the Northwest

8   Detention Center.  When was that?

9   A   It was August 26th, 2014.

10  Q   Do you remember the day?

11  A   Oh, yeah.  It was the day after my birthday, best day of

12  my life.  Freedom.

13  Q   What happened with your immigration case that you were

14  able to get released?

15  A   It was dismissed.  Went to the Ninth Circuit.  After

16  almost five years, I was released.

17  Q   Once you were released, where did you go?

18  A   My attorney, Devin -- thank you, Devin.  I love you,

19  man -- he picked me up from the detention center and took me

20  to the SeaTac Airport in Seattle.  He had already spoken to

21  my sister.  Got me a plane ticket.  I went to San Jose.  My

22  family picked me up, and I am in Salinas.

23  Q   Are you working now?

24  A   Yes, sir.  Shop supervisor for an agriculture company.

25  Q   Well, this case is about work in the voluntary work

1  program.  We heard opposing counsel during the opening saying

2  that the work that people performed was like house chores.

3  My question to you is:  What would you say to someone that

4  said the work you did in the worker program was like chores

5  you do around your house?

6  A   Well, I mean, yes, technically, but no because there is --

7  100 -- I don't know what family has 114 people in one house.

8  That's not a chore.  No, I'm sorry.  You clean up for your

9  husband, wife, kid, maybe five people, but not 114.  That is

10  just insane.  That is not chores.

11  Q   Did you donate your time to GEO?

12  A   No.  No.  No.  I would donate it to my own bunk area.

13  Q   Would you work for free?

14  A   Negative.

15  Q   Would you have worked for free cleaning up the toilets

16  after 115 men in your pod?

17  A   No.  No.  No.

18  Q   Would you have worked for free cleaning up the showers

19  after 115 men?

20  A   Oh, no.  No.

21  Q   The job you did, the sweeping and mopping, would you have

22  done that for free?

23  A   No.

24  Q   Would you have done any of these jobs for free no matter

25  how bored you were?

1    A    No, I'll read a book.

2    Q    While you were there at the detention center, was working

3    in the worker program the only job you could get while you

4    were detained?

5    A    I couldn't hear you.

6    Q    While you were at the Northwest Detention Center working

7    in the worker program, that was the only job you could get,

8    right?

9    A    Yes.

10   Q    You couldn't go down the street and work at Starbucks or

11   something like that?

12   A    Negative, no.

13        MR. WHITEHEAD:  Thank you.  Opposing counsel may have

14   some questions for you.

15        MS. SCHEFFEY:  Before I begin, I want to make sure

16   the jury can hear me.  If everyone can wave.

17        THE COURT:  Are you having trouble hearing?

18        MS. SCHEFFEY:  I was making sure the jury can hear

19   me.  Can you hear me as well, Your Honor?

20        THE COURT:  Okay.

21        MS. SCHEFFEY:  I would like to state for the record

22   and request an instruction from Your Honor, the witness just

23   testified that he was released on August 26th, April 2014

24   (sic), which means he is not a class member of the class.  We

25   just request an instruction addressing the limitation of the

1    evidence as a non-plaintiff.

2              MR. WHITEHEAD:  I am not quite sure I follow that.

3              THE COURT:  The request for an instruction is denied.

4                        CROSS-EXAMINATION

5    BY MS. SCHEFFEY:

6    Q   How are you doing, Mr. Medina-Lara?  Can you hear me?

7    A   Yes.  Yes, ma'am, I can hear you.  I am doing good.

8    Q   I want to take a step back.  You started talking about

9    earlier how you got to the facility.  You went through it

10   quickly, so I want to make sure I have it right.

11   A   Okay.

12   Q   You were transferred to the Northwest ICE Processing

13   Center from another facility; is that right?

14   A   From another facility, yes.

15   Q   What was the name of that facility?

16   A   The last facility I was in was California City.  Actually,

17   a federal detention center.  Has immigration and federal

18   inmates.

19   Q   Okay.  So when you were in California City, were you in

20   the custody of ICE or were you serving a prison sentence

21   related to your --

22   A   No, no, I was done with my prison sentence.  That was

23   custody of ICE.

24   Q   So ICE housed you in what was otherwise a jail?

25   A   Correct, federal prison.

1    Q    While you were there, was there a work program?

2    A    Not that I know of.  They didn't allow the ICE people to

3    work, only federal inmates, to my knowledge at least.

4    Q    What kind of housing unit did you have, a cell, a common

5    area?

6    A    Yeah, cell.

7    Q    Were you allowed into a common area while you were there?

8    A    Yes, ma'am.

9    Q    Were you expected to help clean up the common area?

10   A    No.

11   Q    Who cleaned up the common area?

12   A    The workers.

13   Q    Who were the workers?  Were they outside prison workers or

14   were they detained workers?

15   A    I am assuming federal inmates, ma'am.

16   Q    So inmates cleaned up the common areas?

17   A    Yes.

18   Q    What about your cell, were you expected to clean your

19   cell?

20   A    Yeah, I would do it anyways, but yes, you are supposed to

21   maintain it orderly.

22   Q    Were you paid to clean up your cell?

23   A    Negative, ma'am.

24   Q    What about in Tacoma?  If I refer to it as Tacoma, will

25   you know I am talking about the Northwest ICE Processing --

1   A   Yes.

2   Q   What about in Tacoma, were you required to clean up after

3   yourself?

4   A   Your bunk area because there was cells and bunks.  If you

5   are in a bunk area, you are supposed to maintain your bunk

6   area neat.  If you are in a cell, it is kind of up to you if

7   you want to do it or not.  I did.  That's just the type of

8   person I am.

9   Q   If you were to use the shower and you made a huge mess,

10  there was no expectation you clean up after yourself?

11  A   No.

12  Q   No.  Okay.  Did people leave the showers pretty messy?

13  A   Yeah.  Some.  Not all.

14  Q   Did you leave the showers messy and say, "Not my job"?

15  A   No, because I came from the state prison.  We already knew

16  how to clean up after yourself.

17  Q   If you saw someone making a mess, would you ask them to

18  clean up after themselves?

19  A   No, ma'am.  None of my business.

20  Q   Do you think that people tried to keep the areas clean at

21  all for the voluntary workers saying, hey, that person is

22  someone I live with, I'll try and keep it nice?

23  A   No.

24  Q   So before you were at central California, I think you said

25  you were at Yuba County?

1    A    Yeah, amongst others, yeah.

2    Q    Is that when you were in the custody of ICE?

3    A    Yes, that is correct.

4    Q    Was that also a jail-type cell?

5    A    Yuba was a -- it was a cell, but it had bunks inside.  It

6    was like maybe 30 people.  It was one big cell.  There was

7    bunks inside.

8    Q    Were you expected to clean up after yourself there?

9    A    No.

10   Q    Were there jobs in the Yuba County facility?

11   A    Yes, but to my knowledge their preference was to the

12   county inmates because there was county inmates fighting

13   cases, county inmates doing time, and along with immigration.

14   Q    Okay.  So there was a work program available at Yuba

15   County?

16   A    I don't know if it was a work program, what kind of

17   program it was.  It was a county jail, similar to the county

18   jails, whatever they had.

19   Q    You were detained under ICE's authority?

20   A    Yes.

21   Q    Did you get a handbook at Yuba County from ICE saying your

22   rights and responsibilities as a detainee?

23   A    Just the handbook from the jail.

24   Q    You didn't get an ICE handbook?

25   A    No.

1  Q   Did the handbook from the jail say anything about the

2  ability to volunteer for work?

3  A   No.

4  Q   No.  Okay.  Do we have a way of getting you exhibits to

5  look at?

6  A   I believe so. Jamal has done it before.

7  Q   Do you have access to Box?

8  A   I don't.  I don't, ma'am.  I came straight from work.

9       MR. WHITEHEAD:  Ms. Scheffey, I believe your office

10  has Mr. Medina-Lara's email.

11      MS. SCHEFFEY:  Perfect.  I will have someone email

12  you a document, and we'll keep going so we don't hold up the

13  jury.

14  BY MS. SCHEFFEY:

15  Q   It sounds like the reason you ended up in a legal battle

16  with ICE is because of the criminal conviction you faced; is

17  that correct?

18  A   Yes, ma'am; that is correct.

19  Q   Prior to your conviction, were you a lawful permanent

20  resident?

21  A   Yes.

22  Q   And after your conviction, ICE determined you might be

23  removable; is that correct?

24  A   Yes, right before I got released from prison.

25  Q   While you fought your case, but after you were released

1   from prison, ICE mandated you be detained; is that correct?

2   A    Yes.

3   Q    It wasn't GEO who decided whether to hold or release you;

4   is that right?

5   A    No, ma'am.

6   Q    It wasn't GEO who decided whether you got bond or not; is

7   that correct?

8   A    That's correct.

9   Q    Other than the two facilities we just went over, were you

10  at any other facility under ICE custody before coming to the

11  Northwest ICE Processing Center?

12  A    Yeah, went to also Arizona.

13  Q    What facility was that?

14  A    Eloy.  I was only there for like three days.  Eloy,

15  Arizona.

16  Q    Did that facility have a work program?

17  A    I was only there for the weekend.  I don't know.

18  Q    I think you mentioned at least two of the facilities you

19  were held at which held ICE detainees had work programs; is

20  that correct?

21  A    One, the GEO in Tacoma.

22  Q    You mentioned at Yuba County there was a work program?

23  A    There was a work program, but I thought it was like -- I

24  seen mostly county -- because we wear different clothing or

25  bracelets, if you will.  I seen only county people working

1    there, to my knowledge at least.

2    Q   Do you know if they got paid minimum wage at that

3    facility?

4    A   I don't know, ma'am.  I don't know.

5    Q   What about at the other facility, did they get paid

6    minimum wage?

7    A   I don't know.

8    Q   If ICE had kept you at one of those facilities, you

9    wouldn't have any opportunity to volunteer in the work

10   program?

11   A   I don't know if I would have or not.  I didn't really

12   inquire into that at the moment, ma'am.

13   Q   How long were you at Yuba County?

14   A   I was there maybe almost a year, and then if you lose your

15   case through the regular court and you go to the Board of

16   Immigration Appeals you are considered a long-term detainee.

17   I got transferred to the facility, and then I got sent back

18   to Yuba County again, but I don't recall the dates, to be

19   honest.

20   Q   You said -- I think you said just now you were there about

21   a year?

22   A   Yeah, about a year.

23   Q   For the whole year, you didn't participate in the

24   voluntary work program?

25   A   No.

1    Q    Was there a commissary at Yuba County?

2    A    Yeah.

3    Q    How did you buy things from the commissary?

4    A    I mean if your family, you know, friends send money to

5    your account, that's how you would buy commissary.

6    Q    Did your family and friends send money to your account?

7    A    Yeah, occasionally, yes.

8    Q    What about when you were in Tacoma, did your family and

9    friends send money to your account?

10   A    On occasion, yes.

11   Q    Who is Monica Medina?

12   A    My sister.

13   Q    Did she send you like $100 every month while you were

14   detained?

15   A    Yeah.

16   Q    So what did you do to pass the time in Yuba County?

17   A    Oh, I tried to occupy my time -- exercise, go to the law

18   library every day.  I actually taught myself a little bit of

19   law filing my own appeals, briefs.  I learned about habeas

20   corpus, the work program, reading, watching TV.  I just tried

21   to keep myself occupied.

22   Q    You said the work program.  Did you do the work program at

23   Yuba County?

24   A    Yuba County was a cell.  You are stuck in a cell the whole

25   time.  I would read and go to the law library as much as I

1  could.  I was actually representing myself on the case on my

2  immigration case at that time.  I would go to the law library

3  all the time, look at case law, go through LexisNexis and

4  look at cases, and I got consumed with studying law.

5  Q    You did a pretty good job, right, helped get yourself out?

6  A    Thank you, ma'am.

7  Q    Would you have liked more time out of your cell while you

8  were at Yuba County?

9  A    Oh, yeah, no doubt.  Anybody would.

10        MS. SCHEFFEY:  Did someone say something?  I'm sorry.

11        THE WITNESS:  I thought I heard something.

12  BY MS. SCHEFFEY:

13  Q    If you could have gotten out of your cell and what you had

14  to do was wipe down the tables after a meal but you could

15  hang out more and watch more TV, would you have done that at

16  Yuba County?

17  A    The tables were actually inside the unit.  How to describe

18  it?  It was a square unit.  You had bunks on both sides.  In

19  the middle was a table, one long table, and it had the TV at

20  the end.

21  Q    How is that different than the dorm or pod you were in at

22  the Northwest ICE Processing Center?

23  A    For one, the amount of people.  This was like 25, 30

24  people versus 100 and something people.  Where I was at, they

25  had cell living, and they had bunks outside.

1   Q   While you were in Tacoma, you had the option to watch TV

2   all day if you wanted to; is that right?

3   A   If you wanted to, yeah.

4   Q   You could have just not participated at all in the

5   voluntary work program, right?

6   A   Could have sat there and done whatever you wanted.

7   Q   You did watch TV at Tacoma, right?

8   A   Yeah, I would watch TV occasionally in the afternoons.

9   Q   What about board games, could you play board games at

10  Tacoma?

11  A   Chess.

12  Q   Did you have board games in Yuba County?

13  A   No, they had just cards.

14  Q   You had more games and more things to do at Tacoma than

15  you did at Yuba County?

16  A   Yeah, you did.

17  Q   Both were under ICE authority; is that correct?

18  A   Yeah, but Yuba County was weird because it was actually a

19  county jail so it was ran by actual sheriff deputies versus

20  Tacoma where the guards were officers, if you will.  It is

21  completely different.

22  Q   When you say "completely different," is one better than

23  the other?

24  A   Well, no.  You are still in jail.  Jail is jail.  You have

25  a bigger unit, you know.  The conditions are different

1    because it is a smaller unit.  Yuba County, it was a small

2    unit, very cramped.  Tacoma was a bigger unit, a lot of

3    people but it was a bigger unit.

4    Q    A bigger unit, does that mean more TVs?

5    A    Yeah, three TVs -- Spanish TV, sports TV and movie TV.

6    You had a small rec area where you can go outside and get

7    some sun.

8    Q    Did you have an area to go outside and get sun at Yuba

9    County?

10   A    No, we would go outside, I want to say, three times a

11   week, if I recall correctly, for an hour.

12   Q    In Tacoma, you could go out and exercise when you wanted?

13   A    It was about a 20-by-20 unit outside with a metal rack at

14   the top and you could go outside when you wanted.

15   Q    Did you have soccer fields when you wanted or were they

16   not there yet?

17   A    No, little cement, 20-by-20 yard.

18   Q    Did you and the other detainees organize games or sports

19   out there?

20   A    Oh, yeah, occasionally, basketball -- basketball or we

21   would just workout outside.

22   Q    In Tacoma -- I know in Yuba you used the law library.

23   Were you able to use the law library in Tacoma?

24   A    I would go to the law library.

25   Q    In addition to all those things, you chose to volunteer to

1   clean the housing unit?

2   A   For my room, yes.  Yes, I did that.  I keep my area clean.

3   Q   Because of your criminal history, were you classified as a

4   high or medium level detainee at Tacoma?

5   A   It was medium high.  There was blue, which is like low

6   level, and there was orange, and then there was red, which is

7   more dangerous, higher criminal.  I was orange.

8   Q   Did that limit your ability to participate in certain

9   positions in the voluntary work program?

10  A   No, all those jobs were within the unit.

11  Q   One of the jobs in the unit was to help collect the dirty

12  laundry and give it to the laundry officer; is that right?

13  A   No, they were outside guys.  There was three units, B-1,

14  B-2 and B-3.  If I recall correctly, those workers were from

15  the other units.  They come to the cell -- sorry, to the

16  unit, to the door, and they would switch out clothes and put

17  clothes in there.  There was no detainees from my unit that

18  were in the laundry.  The lower, minimum risk inmates that

19  was wearing blue or the classification.

20  Q   How did you decide which position to pick?

21  A   You don't.  It is whatever is open.  You go down the list.

22  Somebody leaves, someone gets bailed out, deported, then you

23  go down the list.  They say, hey, there is a position open.

24  Let's say there is a pod cleaner, shower cleaner, which is

25  the least desirable one, you could move up from the shower

1   cleaner, and the shower one would open up.

2   Q   I want to make sure I am understanding.  When you talk

3   about the list, are you talking about a waiting list?

4   A   No, no, no, the work list.  You have your pod workers,

5   a.m., p.m., your shower cleaners a.m., p.m., top shower,

6   bottom shower, those cleaners a.m., p.m.  There would be a

7   list of positions of the work available and whatever opened,

8   you had a chance.  If you were already working, if you are

9   already hired, you could move up.  If not, you could stay

10  there and that position would open up.  The least desirable

11  one would open up, the next one in line will get the job if

12  you want it.

13  Q   I think you testified earlier, correct me if I am wrong,

14  there was a waiting list; is that right?

15  A   That's correct, ma'am.

16  Q   When you first got there, you were put on the waiting

17  list?

18  A   Yeah, yeah.

19  Q   And so you didn't have to go do the least desirable; once

20  you started working, you started in the position you wanted,

21  right?

22  A   No, not the one I wanted.  Not the one I wanted, but it

23  was sweeping and mopping the tiers at night.

24  Q   You didn't have to go clean the showers first to get into

25  sweeping and mopping the showers?

1    A    No.  Actually, the guys that were there, they didn't know,

2    they were asleep, they didn't care.  I went in there.  I got

3    lucky.

4    Q    While you were on the waiting list, did that mean there

5    were more detainees interested in participating than there

6    were positions available?

7    A    No, just means that there was -- the first -- when I first

8    got to Tacoma, it was a different unit.  There was about 80

9    inmates.  There was about, I don't know, maybe 10, 12 jobs.

10   There was probably like five people on the waiting list.

11   Q    At one point, you were one of those five people on the

12   waiting list, right?

13   A    Yeah.

14   Q    Did you apply for unemployment while you were waiting to

15   get a job?

16   A    No, ma'am; that wasn't available.

17   Q    Why isn't it available?

18   A    Because we were being detained.

19   Q    It wasn't employment, right?

20   A    Well -- well, to me, it was a job because you are actually

21   working.

22   Q    Okay.  So if it was a job and you couldn't get a job, why

23   didn't you apply for unemployment?

24          MR. WHITEHEAD:  Objection, Your Honor, argumentative.

25          THE COURT:  Sustained.

1  BY MS. SCHEFFEY:

2  Q   I think you testified there were people that stayed in the

3  shower cleaner position; is that correct?

4  A   They stayed there for about two weeks, I think.

5  Q   Why was it two weeks?  Did they leave the facility or --

6  A   We actually got moved to a different unit, which is B-1,

7  that was a bigger unit.

8  Q   Did your whole pod get moved?

9  A   Yes.  They moved the whole unit, either convert it to a

10  higher security unit so they moved us to the bottom floor.

11  Some people went to B-3 and B-2, some went to B-1.

12  Q   Did those detainees choose not to clean the showers in the

13  bigger unit?

14  A   Two guys that were shower cleaners, they went to another

15  unit.  I don't know if it was B-2 or B-3.

16  Q   Did new people sign up to take their place?

17  A   When we came back to the unit, they let you keep whatever

18  job you had.  Then the other jobs that were open, they asked

19  who wanted to work.  You get in line and sign up for the job.

20  Q   Even though you didn't want to do it, someone else did?

21  A   There was always people willing to do it because, you

22  know, some needed the money.

23  Q   Do you think some people just wanted to pass the time;

24  they were bored?

25          MR. WHITEHEAD:  Objection, calls for speculation.

1  Also, Your Honor, I think we are outside the scope of direct.

2  Wondering about relevance.

3      THE COURT:  Sustained.  Rephrase the question.

4  BY MS. SCHEFFEY:

5  Q  Do you have an opinion about whether people were bored

6  waiting for their cases to resolve?

7      MR. WHITEHEAD:  Same objection, Your Honor.

8      MS. SCHEFFEY:  He can give opinion testimony.

9      THE WITNESS:  Everybody is bored, sad, depressed.  I

10  don't know one person that is not going to be sad being

11  without their family, you know.  Sad.

12      THE COURT:  He answered the question.  The answer may

13  stand.

14  BY MS. SCHEFFEY:

15  Q  Did you enjoy having something to do to keep yourself

16  busy?

17  A  I would keep myself busy.  Law library, read, working out.

18  I tried to occupy my time.

19  Q  Could you request magazines while you were in the

20  facility?

21  A  No, the only thing we got in the unit was a newspaper.

22  Oh, you know what, newspaper, but you could request them.

23  They would come in, and they would have like Sports

24  Illustrated or People.  They would have the newspaper.

25  Q  What about TV channels, could you request TV channels if

1  you wanted them?

2  A   To change it or new channels?

3  Q   Either.

4  A   To change it, yes, you could request to change it.  If

5  there was already a group of people watching TV, then you

6  couldn't.  If somebody was watching, you couldn't change it.

7  Q   When you requested to volunteer cleaning the pod, did

8  anyone interview you to see if you would be a good fit for

9  that position?

10  A   No, they just ask if you want to work.  I said yes.

11  Q   Did anyone ask you if you had any prior skill in that

12  position?

13  A   No.

14  Q   I think you testified earlier that it can be hard to get a

15  job with a criminal history; is that correct?

16  A   That is correct.

17  Q   Did anyone say your -- run a criminal background check or

18  say your criminal history precluded you from getting the

19  position helping clean up?

20  A   No.

21  Q   Did they ever ask you if you were work authorized?

22  A   No, ma'am.

23  Q   Do you know if you were work authorized at that time?

24  A   I was.

25  Q   You were?

1  A   Yeah.

2  Q   Did you ever provide that paperwork to anyone?

3  A   No.

4  Q   So the place you were cleaning, is that where you lived at

5  that time?

6  A   Yes.

7  Q   That was the space you were using; is that correct?

8  A   No, the space everybody used, all 114 inmates.

9  Q   In your own home, do you clean up?

10  A   Of course.

11  Q   Do you live with anyone else?

12  A   Yeah, me and my wife and my daughter.

13  Q   Do you have space that you would say is not your space,

14  just your wife and your daughter's space?

15  A   No.  We have my little man cave.  That's solely my space.

16  Q   Do you clean up after your wife and daughter?

17  A   Yeah, I help out any way I can.

18  Q   Do you try and clean up after yourself?

19  A   Yes, all the time.

20  Q   So in the pods, when you saw someone not cleaning up after

21  themselves, did you ever ask them, "Hey, why are you leaving

22  the trash on the table?"

23  A   I was trying to avoid problems.  You don't know how people

24  are feeling that day, if they are having a bad day or

25  whatever.  It just gets you in problems.

1   Q   Were there any other incentives to clean up after yourself

2   in the facility?

3   A   No.

4   Q   Any Xboxes?

5   A   No.

6   Q   Were there chicken dinners to clean up after yourself in

7   the facility?

8   A   They would have something if your area -- I don't recall

9   exactly.  If the area was nice, the unit, they would give --

10  I forgot what it was.  I think it was chicken dinner, if I am

11  not mistaken.

12  Q   What about movie nights, were there movie nights?

13  A   Yeah, Tuesday and Thursday they would have movies,

14  standard for all units.

15  Q   Regardless of whether it was clean, you always had movie

16  night?

17  A   Tuesday and Thursday they would have movies.

18  Q   Chicken dinner, was that tied to whether it was clean?

19  A   I believe so.  It was mainly your bunk area, mainly.

20  Q   So did the chicken dinners encourage people to clean up

21  their areas and make it easier for the voluntary workers?

22  A   Some didn't care.  I mean it was just chicken.

23  Q   Some people were then cleaner; is that right?

24  A   Some, yeah.  Some, yeah.

25  Q   I know you talked about, you know, you had space for 114

1    people.  Was your dorm always full?

2    A    No, it wasn't always full.  It stayed at about 90,

3    fluctuated between 90 and 100 to 110 all the time.

4    Q    Was it typical for people to come and go quickly, maybe

5    one week, two weeks?

6    A    Yeah, because a lot of people were just -- lets say you

7    just got released from federal prison, signed your

8    deportation, not fighting your case.  The ones that took

9    longer were the Central American people.  Mexico, they went

10   fast if you signed your deportation.

11   Q    Was the length of time you were detained pretty unusual?

12   A    Yeah.

13   Q    If you had to guess, how long would you say most people

14   are there?

15   A    Few months.  I say six months max.

16   Q    When you signed up and volunteered to clean the area where

17   you lived, did you know that you would only get a dollar a

18   day stipend?

19   A    I did.

20   Q    Was that clearly written on the document you got?

21   A    No.  Other detainees let me know you would get a dollar a

22   day for working in the unit.

23   Q    It wasn't clearly written on the document you got?

24   A    You know what, maybe it was, maybe it wasn't.  I was just

25   happy I was going to start working.  I honestly didn't read

1   it.  I just signed it.

2   Q   If you hadn't been transferred from Yuba County to Tacoma,

3   you wouldn't have had the opportunity to make the

4   dollar-a-day stipend but still would have been in ICE

5   custody?

6   A   One more time.

7   Q   If you hadn't been transferred from Yuba County to Tacoma,

8   you wouldn't have had the opportunity to make the dollar a

9   day?

10  A   Not at Yuba County, no.

11  Q   But you were still in ICE custody in Yuba County?

12  A   Right.

13  Q   If ICE decided to keep you at Yuba County, you wouldn't

14  have had an opportunity to work in the voluntary work

15  program; is that right?

16  A   Like I said, it was a county jail so probably not.

17  Q   Did you prefer having the opportunity?

18  A   Everybody likes the opportunity to make money.

19  Q   Did you ever have taxes taken out of your stipend?

20  A   No.  No.

21  Q   When you were in jail, did you have a job?

22  A   In prison, yes.  State prison, yes, I did.

23  Q   What was your job in prison?

24  A   I did small engine repair.  It was a vocational program.

25  It was also called work.  We did work on stuff.  We worked on

1  the prison lawnmowers, weed eaters, all that, so on and so

2  forth.

3  Q   How many hours a day would you spend on that?

4  A   It would go from eight to three.  I also made a dollar.

5  Q   You also made a dollar?

6  A   Yes, I would get a dollar a day for pay.

7  Q   Did you spend from eight to three cleaning the dorms at

8  Tacoma?

9  A   Three to four and a half hours, depended on the meal, how

10  messy it was.  I worked three shifts.  It was breakfast,

11  lunch and dinner.  Some people only had one shift, a.m. and

12  p.m. Since I was a food porter, every time there was

13  breakfast, lunch and dinner, I cleaned every time.

14  Q   The people that had one shift, how long did that take?

15  A   Half hour, hour.

16       MR. WHITEHEAD:  Objection, Your Honor.

17       THE WITNESS:  Half hour to an hour, depends on how

18  messy the unit was.

19  BY MS. SCHEFFEY:

20  Q   You could have chosen to have one of those positions that

21  only had one shift, right?

22  A   Yeah.

23  Q   Did they take anything out of your dollar at the prison

24  you were in when you fixed all those machines?

25  A   State prison?

1    Q    Yeah.

2    A    Yeah, if you owed restitution, they would take restitution

3    out of that.

4    Q    They don't take restitution out of your funds in Tacoma;

5    is that right?

6    A    No.

7    Q    How does the food compare at Tacoma to Yuba County?

8         MR. WHITEHEAD:  Objection, relevance.

9         MS. SCHEFFEY:  He testified he didn't like the food

10   in Tacoma.  I want to get a relative --

11        THE WITNESS:  Yuba County was better.

12        MR. WHITEHEAD:  Hold on one second, Mr. Medina-Lara.

13   The Judge needs to rule.

14        THE COURT:  Mr. Medina-Lara, when there is an

15   objection, you have to wait for me to rule rather than

16   answering the question.

17        THE COURT:  The objection is sustained.

18   BY MS. SCHEFFEY:

19   Q    When you were at Tacoma, you got the dollar a day through

20   the work program.  Let's talk about other things.  Did you

21   get three meals every day?

22   A    Yes.

23   Q    Did you get clothing provided to you?

24   A    Yes.

25   Q    Did you get medical care?

1    A    Yes.

2    Q    Did you pay for any of that?

3    A    No.

4    Q    Did you get a bill when you were released?

5    A    No.

6    Q    Did you make any friends while you were there?

7    A    Yeah, a lot.

8    Q    Did you make any friends while participating in the work

9    program?

10   A    Same thing because we are in the unit, we are in the same

11   unit.

12   Q    Did you feel like -- were there other people who helped

13   with your position in the voluntary work program?

14   A    No, it was just me and the other food porter.  We kind of

15   helped each other out because that was our jobs.  We had to

16   clean up after everybody ate.

17   Q    There were two of you, right?

18   A    Two of us.

19   Q    You guys got to work together?

20   A    We had to work together.  He would pass out the food, and

21   I would pass out the other stuff and clean up after.

22   Q    Did that help you get to know him?

23   A    I knew him since before.

24   Q    How did you know him since before?

25   A    He was working there at the food porter job before me.  He

1    was in my unit.  We would hang out, play card games, work

2    out, stuff like that.

3    Q    Did you ever feel like because you were handing out food,

4    people in your unit were more appreciative than if it had

5    just been an officer?

6    A    No, not really.  Unless we had extra food, we pass it out

7    to whoever, less needy, you know.

8    Q    Would you have -- you said you kept your bunk pretty

9    clean; is that right?

10   A    Oh, yeah.

11   Q    Would you have wanted an officer coming in and going

12   through your stuff and cleaning it up every day?

13   A    That would be nice.

14   Q    Yeah?

15   A    That would have been nice.

16   Q    Would you have been worried about them going through your

17   stuff, or you would be okay with them touching --

18   A    Not at all.

19   Q    Would everyone else share your opinion?

20   A    I can't speak for everybody else, just myself.

21   Q    Were there any people that you remember who was particular

22   about only them touching their things?

23   A    Nobody really likes anybody touching their stuff that I

24   know of from being incarcerated.

25   Q    Did you try to keep the shower clean so the shower porter

1   didn't have to do as much?

2           MR. WHITEHEAD:  Objection, asked and answered.

3           THE COURT:  He may answer.

4       Do you know the question?

5   BY MS. SCHEFFEY:

6   Q   Do you want the question again?  Mr. Medina-Lara, do you

7   remember the question, or do you want me to say it again?

8   A   If I kept the shower clean?

9   Q   Yeah.

10  A   I tried to be respectful and clean up after myself.

11  Q   What about at the tables, did you try to clean up after

12  yourself --

13  A   I always try to clean up after myself anywhere I am at.

14  Q   Were there other people in your dorm who also cleaned up

15  after themselves?

16  A   There were some.  Some cared, some didn't.

17  Q   Would it have been better, in your opinion, if there had

18  just been a rule that everyone had to clean up after

19  themselves rather than paying people a dollar a day to help

20  clean up after the messy people?

21  A   It would be good if everybody did that.  Everybody is

22  different, different backgrounds.  Everybody is different.

23  Q   You testified earlier you got about $100 every month from

24  your sister.

25  A   Yeah.

1  Q    That's about three times more than you would have made in

2  the voluntary work program, right?

3  A    Yeah.

4  Q    Fair to say most of your money you spent on commissary and

5  all of that other stuff you listed came from your sister,

6  right?

7  A    Went for everything -- phone calls, to buy money on the

8  phone, stuff like that.

9  Q    Did you ever get a performance review while participating

10  in the voluntary work program?

11  A    I don't think so.  I don't recall, but I don't think so.

12  Q    Did the officer follow you around to make sure you didn't

13  miss a spot while you were participating in the voluntary

14  work program?

15  A    Some would.  Some would.  They didn't follow you around.

16  They would point stuff out like you missed a spot and this

17  and that.  Yeah, some would.

18  Q    Others, you testified earlier, would be doing something

19  else.  Observing --

20  A    Yes, yes.

21  Q    They wouldn't be busy hovering over there?

22  A    Varied by officer.  Every officer had their own agenda the

23  way they did things.  There was some that yes, and some that

24  didn't.

25  Q    Any day you could just tell them, "I don't want to do this

1    anymore;" is that right?

2    A   Yeah.  You refuse, you have to sign the form and get

3    fired.

4    Q   So you talked about the refusal to work form.  If a

5    detainee signs the refusal to work form on day one, can they

6    go sign up and get on the wait list again the next day?

7    A   Yeah.

8    Q   Nothing stops them?

9    A   No.

10   Q   Did you ever sign a refusal to work form?

11   A   No.

12   Q   Why not?

13   A   I liked getting a dollar a day.

14          MS. SCHEFFEY:  No further questions.

15                    REDIRECT EXAMINATION

16   BY MR. WHITEHEAD:

17   Q   Mr. Medina-Lara, you were asked questions about whether or

18   not you made friends and had clothing provided to you.  Do

19   you remember questions along those lines?

20   A   Yeah.

21   Q   Was detention like an all-inclusive paid resort?

22   A   Oh, no.  No.  No.

23   Q   How did you feel being in detention?

24   A   Oh, man, like, I don't know.  If an animal could speak in

25   the zoo like that, you are in a cage.  You have no control

1   over anything.  All your actions are controlled by the rule

2   book, by the officers.  You can't do anything.  You can't do

3   anything.  Nothing.  That's the only reason I kept my area

4   clean because that's the only control I had.  I developed

5   psychological issues from being in there so long.  I had

6   PTSD.  My sink was so clean you could see yourself in it.  I

7   couldn't have a drop of water in it.  I didn't have those

8   issues before.  It was just issues.  That was the only way to

9   control my environment was to control my own cell, my own

10  area.  As far as everything else, oh, man, nightmares, people

11  yelling and screaming.  Oh, man, it is madness in there, man.

12  I don't wish that on nobody.

13  Q   The free room and board you get while you were there,

14  would you have given that up to be on the outside of the

15  Northwest Detention Center?

16  A   I would give that up in a heartbeat.

17  Q   Even if it meant paying your own food?

18  A   Even if I had to pay premium rates, I would give it up in

19  a heartbeat.

20  Q   You were asked another question about taxes.  You work

21  now, sir; is that right?

22  A   Yes, sir.

23  Q   Do they take payroll taxes out of your check?

24  A   Yes.

25  Q   If you were at the Northwest Detention Center making

1   minimum wage in the worker program, would you have been

2   willing to pay taxes?

3   A   Sure.

4           MR. WHITEHEAD:  Thank you, sir.  I don't have any

5   further questions for you.

6           THE COURT:  The witness may be excused.

7       Thank you, Mr. Medina-Lara.

8           THE WITNESS:  You're welcome, Your Honor.

9           MS. BRENNEKE:  Your Honor, the plaintiffs would now

10  call Bertha Henderson.

11          THE CLERK:  It appears Bertha Henderson has joined.

12  We need her to turn on her camera.

13          THE COURT:  Ms. Henderson, this is Judge Bryan

14  speaking.  There you go.  Can you hear me all right,

15  Ms. Henderson?

16          THE WITNESS:  Yes, I can.

17                       BERTHA HENDERSON,

18      having been sworn under oath, testified as follows:

19                      DIRECT EXAMINATION

20  BY MS. BRENNEKE:

21  Q   Good afternoon, Ms. Henderson.  I am Andrea Brenneke in

22  the corner up here, yes.  Would you please state your name

23  and spell it for the record?

24  A   Bertha Henderson, B-E-R-T-H-A, H-E-N-D-E-R-S-O-N.

25  Q   Do you also go by a nickname?

1    A    Bert, B-E-R-T.

2    Q    Where do you work and what is your position?

3    A    I work at Northwest ICE Processing Center.  What was the

4    other question, I'm sorry?

5    Q    Let's go with that for now.  Is the Northwest ICE

6    Processing Center the new name for the Northwest Detention

7    Center?

8    A    Yes.

9    Q    Are you okay if we go by both of those names

10   interchangeably for this?

11   A    Yes.

12   Q    So who is your employer?

13   A    GEO Group.

14   Q    So the Northwest Detention Center is owned and operated by

15   GEO?

16   A    Yes, it is.

17   Q    GEO is a private, for-profit company; is that correct?

18   A    Yes.

19   Q    What is your position?

20   A    My position is I am the food service administrator.

21   Q    You joined GEO some time ago.  When was that?

22   A    March of 2007.

23   Q    How long total have you been in the food industry?

24   A    Over 40 years.

25   Q    Is your college degree also in food service?

1   A    Yes.

2   Q    It has been your lifelong passion?

3   A    It has.

4   Q    Prior to coming to work for GEO, you worked in various

5   institutions, didn't you?

6   A    Yes.

7   Q    Including nursing homes, military, behavioral health

8   facilities?

9   A    That is correct.

10  Q    When you started with GEO, what was the position you were

11  first hired into?

12  A    I was assistant food service manager.

13  Q    Was it just four months later GEO promoted you to food

14  service manager?

15  A    Approximately, yes.

16  Q    You have been consistently the food service manager or

17  food service administrator since about June of 2007 at the

18  Northwest Detention Center; is that right?

19  A    Yes.

20  Q    And I have used both of those titles.  I want to be clear.

21  Is the food service administrator and food service manager

22  basically all alternative ways to refer to what you do,

23  right?

24  A    That is correct.

25  Q    Now, you are also the department head of food services,

1  correct?

2  A   Yes, I am.

3  Q   So are you involved in that regard in the overall

4  management of Northwest Detention Center?

5  A   Yes, in the food service department.

6  Q   You attend monthly department head meetings, don't you?

7  A   Yes.

8  Q   Now when you started with GEO, they hired you to undertake

9  some really substantial changes to the way that food service

10 was being done in that facility; isn't that correct?

11 A   That is correct.

12 Q   What was it that you were hired to do?

13 A   To provide three meals a day for the detainees.

14 Q   You were hired specifically to bring that meal preparation

15 in-house so that all of that work was done inside the

16 Northwest Detention Center facility, correct?

17 A   Correct.

18 Q   Prior to you being hired, GEO had outsourced the food

19 preparation to a group called Canteen; is that right?

20 A   That is correct.

21 Q   GEO would save money by doing the food preparation in

22 house; is that right?

23 A   I can't answer that question.  I assume that's probably --

24 it was probably best to have their own food service staff

25 that was there instead of having a contract.

1    Q    All right.  Before you started work, GEO provided you with

2    a six-week academy training at the Northwest Detention

3    Center; is that right?

4    A    Yes.

5    Q    What was that academy training for?

6    A    To actually become an officer.  I have already had the

7    training in food service.  It was becoming an officer to work

8    in a correctional facility.  That was my training.

9    Q    There were how many of you in that training?

10   A    There were six.

11   Q    That included you and five people you would actually hire;

12   is that right?

13   A    No, I wasn't in that hiring process.  There was six of us

14   that was hired as GEO staff at that time.

15   Q    Were the other five people hired as GEO staff cooks?

16   A    Yes.

17   Q    So through that academy training, you became GEO -- what

18   they call detention officers; is that right?

19   A    Cook officers.

20   Q    Cook officers?

21   A    Uh-huh.

22   Q    You mentioned correctional facility.  The Northwest

23   Detention Center is not a correctional facility, is it?

24   A    No, it is not.

25   Q    No one is there because they committed a crime?

1    A    Correct.  It is just that environment that I was referring

2    to.

3    Q    It is a secure environment?

4    A    Secure environment, correct.

5    Q    You already had your training in food services, but you

6    have some, like, quarterly contact with the GEO corporate

7    food service department, don't you, where you can get updates

8    on food policies and procedures, what they expect you to

9    implement at the facility level?

10   A    Yes.

11   Q    Let's go through, a little bit, your responsibilities as

12   food service manager.  You are -- basically, the buck stops

13   with you, right?  You are responsible for the overall

14   operations of food services at the Northwest Detention

15   Center?

16   A    That is correct.

17   Q    So you oversee the day-to-day operations of the whole

18   department?

19   A    Yes.

20   Q    You make sure that nutritious food is being served in a

21   safe and timely manner to all the detainees?

22   A    Yes.

23   Q    That means you have to get good vendors and food to come

24   in?

25   A    (No response.)

1    Q    Vendors, like food vendors, and bring the food in,

2    handling inventory, supplies?

3    A    That is correct, yes.

4    Q    You are also responsible for maintaining food

5    temperatures, sanitation and other safety rules related to

6    the preparation and serving of food?

7    A    Yes.

8    Q    You also are in charge of the training and supervision of

9    the GEO kitchen staff that is hired from the community; is

10   that right?

11   A    That is correct.

12        MS. SCHEFFEY:  Objection.

13   BY MS. BRENNEKE:

14   Q    You are also responsible for training and supervising the

15   detainee workers that work in the kitchen; is that right?

16   A    I do supervise the detainees that do volunteer in the

17   kitchen, yes.

18   Q    In general, you are the highest level manager there?

19   A    Yes.

20   Q    It is GEO's -- GEO provides all detainees at the Northwest

21   Detention Center with three meals a day; is that right?

22   A    Yes, we do.

23   Q    Those are hot meals -- breakfast, lunch and dinner?

24   A    That is correct.

25   Q    For each meal, I think you said the prepping and cooking

1    of that food is done in-house in the facility kitchen?

2    A    Yes.

3    Q    Once the food is prepared, it is dished onto trays and

4    sent out into the pods or the living areas where people eat

5    it, right?

6    A    Yes.

7    Q    So in order to accomplish that work -- let's get an

8    overview of the kitchen staffing.  First, let's talk about

9    the GEO staff.  So you hire people from the community to work

10   in the kitchen; is that right?

11   A    Yes, I do.

12   Q    You have a total of how many GEO staff in food services?

13   A    Overall, my department has a total of 13.

14   Q    That includes ten cook supervisors; is that right?

15   A    Ten cook supervisors, a manager and a clerk.

16   Q    Okay.  And then one assistant manager; is that right?

17   A    I just named him, yes.

18   Q    So ten cooks supervisors, you as food services manager,

19   the assistant manager, and a cook?

20   A    Clerk.

21   Q    Clerk.  Okay.  What does the clerk do?

22   A    Clerk is general paperwork, help out, assist with general

23   paperwork.

24   Q    So that's like an administrative role for the kitchen?

25   A    Assisting with the administrative role, yes, that is.

1    Q   So you would have 12 GEO staff who are involved in the

2    actual food handling, food production part, and the 13th

3    person in your staff is more of the administrative person?

4    A   Yes.

5    Q   When you started in 2007, it was you and only five cook

6    supervisors; is that right?

7           MS. SCHEFFEY:  Objection, assumes facts not in

8    evidence.  Your Honor, can you hear my objection?

9           THE COURT:  Overruled.

10   BY MS. BRENNEKE:

11   Q   Ms. Henderson, you can answer.  I want to clarify.  When

12   you were first hired in 2007, you only had five cook

13   supervisors?

14   A   That is correct.  There was a total of seven in the

15   department.  Six were hired, I was the assistant with five

16   cooks.

17   Q   Then it was with the increase of the detainee population

18   and the demands on food production that you needed to

19   increase your GEO staffing; is that right?

20   A   That staffing was not increased at that time.

21   Q   When was it increased?

22   A   Not until after 2014, somewhere around in there.

23   Q   So because of the increased population and demands on the

24   food service department, you added the five cooks and a clerk

25   around 2014, 2015; is that right?

1   A    That was due to the renovation and the increase of

2   population that was going to be added.

3   Q    Okay.  The renovation was that the Northwest Detention

4   Center expanded, the footprint expanded so they could house

5   more detainees?

6   A    That is correct.

7   Q    That's when it became a facility that could handle about

8   1500 people; is that right?

9   A    That's correct.

10  Q    In terms of the schedules, you have three cook supervisors

11  who work each shift, is that right, the GEO staff cook

12  supervisors?

13  A    Total of six per day.

14  Q    Okay.  So you got, what, three in the morning, three in

15  the afternoon shift?

16  A    That is correct.

17  Q    And then there is also an evening shift, and do you have

18  any of your devoted kitchen staff working the evening shift

19  for the night cleaning people?

20  A    Yes, we have one.

21  Q    Is that a kitchen officer?

22  A    Yes, it is.

23  Q    So that's the GEO staff.  In addition to that, you also

24  have detainee workers who work in the kitchen operation,

25  correct?

1  A   We have detainee volunteers that work in the kitchen, yes.

2  Q   They assist with preparing and serving the food as well as

3  dishwashing and cleaning; is that right?

4  A   They help with that.

5  Q   And the schedule for the detainee workers is different

6  than the GEO staff; isn't that true?

7  A   Yes.

8  Q   The detainee worker shifts, they correspond with the meal

9  services -- breakfast, lunch and dinner; is that right?

10 A   Yes, that's when they come.

11 Q   And was it Ms. Singleton in the classification department

12 and you who determined what those worker shifts would be?

13 A   Time-wise, yes.

14 Q   In other words, what the times were that they would start

15 and end?

16 A   Yes.

17 Q   Okay.  And then there is the fourth shift, which is a

18 night cleaning shift for detainee workers who do a little

19 deeper clean of the kitchen; is that right?

20 A   Yes.

21 Q   I think we have had adequate testimony already from other

22 people about when the shifts were for the meal shifts, but

23 how many hours on average at night do the detainee workers

24 work on the night cleaning shift?

25 A   Three.

1   Q   As food service administrator, it was your responsibility

2   to determine what the right number of detainee workers to

3   work in the kitchen would be under the supervision of GEO

4   staff; is that right?

5   A   It was up to me to determine how many we needed.  I mean,

6   my staff, we are there to actually get the job done.

7   Q   Right.  So we'll talk a little bit about the mechanics of

8   that in a minute.  I have some photos to show you and all

9   that.

10       I want to go back to, like, just sort of the staffing.

11  So you were responsible, as the head of the department, to

12  determine the number of detainees that would be assigned to

13  the food service department based upon the actual needs of

14  the department; isn't that true?

15  A   Yes.

16  Q   And you did that collectively in that you involved your

17  staff and your supervisor in considering the overall process

18  of the food service department, is that right, from top the

19  bottom?

20  A   Yes.

21  Q   And you determined when you were doing that staffing

22  analysis that you needed 25 to 30 detainee workers for each

23  food production shift -- breakfast, lunch and dinner; isn't

24  that true?

25  A   That was on average based off of if they showed up.

1  Again, it is all volunteer.  I could have 25 on that shift

2  and none could show up, so that's why we went with that

3  number.

4  Q   Yeah.  So you were looking at -- when you went with that

5  number, you were looking at, well, what are the needs of the

6  kitchen from top to bottom?  How many detainee workers in an

7  ideal situation would I have?  You decided it was 25 to 30;

8  is that right?

9  A   Yes.

10 Q   And then you went through a similar analysis, staffing

11 analysis for the night cleaning shift, and you determined

12 that you needed 10 to 12 workers for that night shift, right?

13 A   That is correct.

14 Q   And your staffing plan for the 25 to 30 workers on meal

15 shifts and the 10 to 12 on the night cleaning shifts has been

16 consistent since about June of 2011 when you undertook this

17 analysis, correct?

18 A   I wouldn't say it is consistent.  It is going to vary

19 because you never knew how many were going to come on a daily

20 basis.

21 Q   All right.  So the actual number of people who show up

22 varied on a shift by shift basis?

23 A   Correct.

24 Q   All right.  But the staffing plan in your analysis of what

25 your actual needs were for the department to be running

1    operationally remained consistent from June of 2011; is that

2    right?

3    A   My staffing plan stayed the same based on me asking for

4    volunteers.  That was something that was put out there with

5    the 25.  Again, if they came, they came.  If they didn't,

6    they didn't, but that's what I did ask for.

7    Q   When they came -- let's talk a little bit more about the

8    technical pieces, then we will go on to how it worked.  I

9    just want to get the idea of the shifts.  So detainee workers

10   who are assigned to a kitchen meal shift, they are scheduled

11   to work how many days a week?

12   A   The voluntary work program, they could sign up for any --

13   to work seven days if they wanted to, or they could have

14   signed up to work one day if they wanted to.  It was all on a

15   volunteer worker program.

16   Q   Isn't it true that those who were assigned to a kitchen

17   meal shift were scheduled to work seven days a week with the

18   option to have two days off?

19   A   That is correct.  That was the idea of it, yes.

20   Q   And in order to get those two days off, either you or the

21   classification officer, Ms. Singleton, had to approve a

22   variance to the normal seven-day-a-week schedule; isn't that

23   right?

24   A   That is correct.

25   Q   And the night cleaning workers, their -- their shift was

1 scheduled to work five days a week; is that true?

2 A   That is correct.

3 Q   If there is a new detainee worker for the kitchen, you and

4 the classification officer would have the discretion to

5 decide which shift the workers should be assigned to with

6 the -- you know, considering the input of the worker; is that

7 true?

8 A   No, the detainee decided which shift they wanted to work.

9 Q   If they said they wanted to work breakfast shift and your

10 breakfast shift was full, you would still let them work a

11 breakfast shift?

12 A   If that's what they want.  Being full, that is -- you

13 know, again, being full doesn't mean that if five show up,

14 that's five, and if there is 25 that was signed up for the

15 breakfast shift, then 16 could work.

16 Q   So remember, Ms. Henderson, when I took your deposition in

17 this case on January 30th of 2019?

18 A   Uh-huh.

19 Q   I asked you questions kind of like this?

20 A   Yes.

21 Q   I think there is a deposition transcript that we sent to

22 you.  Could you open that transcript, please, and look at

23 Page 136?

24 A   Got it.

25 Q   At the beginning of that, you recall that I asked you who

1  is it that determines which hours or shifts the detainee

2  workers were working in the kitchen.  You answered at that

3  time, "That is determined by myself, Ms. Singleton and the

4  detainee."  Do you recall that?

5  A   Yes.

6  Q   Right.  And then I asked you, "If somebody preferred a

7  morning shift, they could make that request, but it would be

8  your discretion?"

9  A   That's correct.

10  Q   You said, "That's correct"?

11  A   Uh-huh.

12  Q   Right.  So ultimately you, as the GEO employee, decided

13  when people would work, what shift they would be assigned to,

14  but you would try to do it in a way that would work for them

15  as well, right?

16  A   If there was a need for more or less workers on a

17  particular shift, then I would suggest that they work that

18  day.  But if -- again, it is ultimately up to the detainee

19  because it is a volunteer work program.  They would decide

20  that they can only work breakfast; they could start out

21  working another shift and then go to breakfast.  It was -- it

22  was collaboratory with myself, Singleton, and the choice of

23  the detainee.

24  Q   Right, so you really wanted people to come to work for

25  you?

1  A    Yes.

2  Q    And so if there was an opening, you would give them what

3  they wanted?

4         THE COURT:  Excuse me, counsel.  It is time for an

5  afternoon break.  We will take about ten minutes, folks.  You

6  can be excused.

7                          (Recessed.)

8         THE CLERK:  I believe there is only eight jurors.

9  Just a moment.  All right.  There we go.  Nine jurors.

10        THE COURT:  All right.  Go ahead, Ms. Brenneke.

11 BY MS. BRENNEKE:

12 Q    Ms. Henderson, let's talk about when detainee workers come

13 to their kitchen shift.  GEO provides them with particular

14 uniforms that they are required to wear in the kitchen; is

15 that right?

16 A    That is correct.

17 Q    We have gone through those a little bit, but can you

18 describe what they are?

19 A    They are white uniforms.

20 Q    They are also rubber boots?

21 A    Yes.

22 Q    Does GEO also provide any protective equipment they need,

23 including goggles and gloves for the kind of cleaning work

24 they do?

25 A    Yes, we do.

1   Q   Before detainees work, did GEO staff ensure the detainee

2   workers are actually wearing the required uniforms and

3   equipment?

4   A   Can you repeat that question?

5   Q   Before they work, do the GEO staff actually verify that

6   the detainee workers are wearing the required uniforms and

7   equipment?

8   A   Yes, we do.

9   Q   You have got a changing room where people come in and get

10  their uniforms and change out of their normal uniforms,

11  right?

12  A   There is an area where they do change out, yes.

13  Q   It is my understanding that GEO doesn't assign a

14  particular uniform or pair of boots for each worker, but it

15  is done by sizes?

16  A   I order the uniforms by size, boots also by size.

17  Q   People share, then, the uniforms and they are cleaned

18  after they are used, right?

19  A   There is enough uniforms to go for a whole shift before

20  they have -- they get laundered so, yes, there is enough.

21  When you said "share," they are not wearing the same uniform.

22  There are separate uniforms for them to wear.

23  Q   There is not like one uniform assigned to a particular

24  detainee worker who gets to use the same pair of boots every

25  time he comes to work?

1    A    No, I have several sizes.

2    Q    Can you please take a look at Exhibit 440.  You should

3    have that in your packet.  Let me know when you find it.

4    A    Which exhibit number?

5    Q    440, please.

6    A    Yes.

7    Q    All right.  Is the photo in 440 a true and accurate

8    representation of GEO's kitchen area, that place where they

9    change their clothes?

10   A    That's part of the area.  That is where I do keep the

11   different sizes of uniforms.  They do -- some of it is kind

12   of blocked out of the way.

13          MS. BRENNEKE:  Move to admit that exhibit, 440,

14   please.

15          MS. SCHEFFEY:  No objection from GEO.

16   BY MS. BRENNEKE:

17   Q    We can --

18          THE COURT:  Excuse me, just a second.  It may be

19   admitted.  Go ahead.

20                  (Exhibit 440 was admitted.)

21   BY MS. BRENNEKE:

22   Q    Ms. Henderson, now we can show it to the jury and describe

23   it.  Are the -- can you describe what the uniforms are on the

24   far wall?

25   A    After they get washed, they get put back into the lockers,

1    folded by size and get put back the lockers for the next

2    shift to use.

3    Q    Those are all the clean, laundered uniforms?

4    A    Yes.

5    Q    So what we see here, the people in the white are the

6    detainee workers who are already in uniforms, looks like

7    perhaps they have already worked; is that right?

8    A    It is possible, yes.

9    Q    Then there is a person in an orange uniform.  Is that also

10   a detainee, but one who has not yet changed into his kitchen

11   uniform?

12   A    It is possible, or he was probably leaving, either coming

13   or going, so, yes.

14   Q    Okay.  There is a GEO officer on the right there with the

15   "GEO" emblem on the shoulder?

16   A    Yes.

17   Q    So I wanted to ask you about the plastic bag that is in

18   the hands of the detainee worker in the orange uniform.

19   What -- is that part of the uniform that GEO provides to the

20   detainee workers?

21   A    That is not part of the uniform.  The detainee asked if

22   they changed their uniforms, they want to put their clothes

23   in the bag instead of just throwing it all over the place.

24   They have asked for a bag for their uniforms or their shoes.

25   They have also asked for one to put their boots on.

1    Q    So will you take a look at the detainee worker who is next

2    to the one in the orange?  You can see his boot and there is

3    a plastic bag underneath the boot there.

4    A    Yes.

5    Q    Is that a plastic bag that GEO provides detainee workers

6    to wear as part of their uniform?

7    A    It is not part of their uniform.  If they ask for a bag, I

8    do give them a bag.

9    Q    Are you requiring people to wear the plastic bags?

10   A    No, I am not.

11   Q    I see.  What is the purpose of the plastic bags?

12   A    For them, it is -- one, they may say they want to keep

13   their socks from getting wet.  Various reasons, I guess.

14   That particular one is where they don't want their socks to

15   get wet.

16   Q    Was there also a practice of giving the detainee workers

17   plastic bags to wear to prevent fungus and other diseases

18   that could come from wearing the boots that are shared by

19   others, and in addition to sanitizing the boots, that was a

20   protective measure?

21   A    It was not a practice.  One, we do sanitize the boots.  It

22   was a choice of a detainee to put the plastic bag on.  That

23   never was our practice to make sure they have one.  They have

24   just always asked for it.

25   Q    You have accommodated them?

1    A    Yes.

2    Q    Does GEO provide all of the other parts of the equipment

3    and the uniforms that they are required to wear?

4    A    The PPEs?  Yes.

5    Q    And the uniforms?

6    A    And the uniforms, yes.

7    Q    Let's take a look at the food preparation and service

8    process.  I would like you to pull up -- actually, this

9    Exhibit 49 has already been admitted.  We can just pull it up

10   onto the screen, please, Caiti.  I would like us to go to

11   Page 5 of that, which we haven't seen yet.  All right.  Will

12   you describe this Page 5 of Exhibit 49?  What does that show?

13   A    It shows two detainees and one cook, and the cook is at

14   the other end, and the detainee that is in the middle is

15   dishing up whatever was in that kettle.

16   Q    All right.  Those big kettles are used for cooking food;

17   is that right?

18   A    That is correct.

19   Q    When you say "he's dishing up," is he dishing it up into

20   the service platters that are in the middle there?

21   A    If you see, there is a cart there, correct.  Right there,

22   there is the insert pans that go on the line.  He is just

23   dishing that up out of that pile and putting it in the

24   serving pans and putting it in the warmer.

25   Q    What we are seeing here is the end of the cooking process

1  and getting ready to plate or distribute the food; is that

2  right?

3  A    In preparation for service, yes.

4  Q    All right.  All right.  Let's go to the next -- let's go

5  to the first page of Exhibit 49, please.  All right.  What do

6  you see here in this picture?

7  A    This is serving time.

8  Q    Serving time?  This is the plating line where the

9  detainees are dishing up food onto the trays as they come by

10  on the conveyer belt in the middle?

11  A    Yes.

12  Q    The GEO officer -- the cook supervisor is standing and

13  supervising the work, the one in the dark uniform?

14  A    Yes.

15  Q    So that cook supervisor is really working side by side

16  with the detainee workers ensuring they get it right?

17  A    The cooks are ensuring.  That is our responsibility to

18  make sure what goes out is correct.

19  Q    If they notice that something is not correct in terms of

20  the food portions or the way it is being done, if it is not

21  sanitary, they would make corrections and retrain so that it

22  does get done properly, correct?

23  A    That is correct.  That is our job to do.

24  Q    Let's look at Page 2, please.  This is a little bit better

25  picture.  Does this show the detainees plating and serving

1  meals on the trays?

2  A   That's what they are in the process of doing, yes.

3  Q   Is that what you call the hot line?

4  A   Serving line.  What is in the middle is the serving line.

5  The two that is -- the hot boxes are the two that is on the

6  side.

7  Q   Side?  On the right side?

8  A   On the right side.  On the left side, you have the cold

9  serving line.

10  Q   All right.  So what kind of food is being served in the

11  hot food serving line?

12  A   A variety.

13  Q   Can you give some examples?  I don't know if you can tell

14  what is on those plates.

15  A   Yes, I can't tell what is in the containers right now.  We

16  do have a variety of food items on the menu; spaghetti, fried

17  chicken -- excuse me, oven baked chicken, lasagna -- not

18  lasagna, tacos, macaroni and cheese.  There is just a variety

19  of different items that are on there.

20  Q   Is it the case that one detainee worker would dish out

21  servings of one of those things, like the spaghetti, and put

22  it on the tray, and another detainee worker would dish out

23  something else and put it on the tray so they are each doing

24  the same thing like an assembly line?

25  A   Serving different items, yes.

1   Q    On the far side, is that the cold line?

2   A    On the left side of it, yes.

3   Q    Let's go to the next page, please, Page 3.  I think we get

4   a better shot of the cold line.  Maybe not.  Is this the back

5   side of the cold line?

6   A    Yes, it is.

7   Q    And what kind of foods are put on the trays by the

8   detainee workers who are working on that part of the service

9   line?

10  A    Anything ranging from bread, cornbread, dinner rolls,

11  cake, puddings.

12  Q    That is like cake or dessert on the bottom there?

13  A    That could be cake or cornbread.

14  Q    I am done with that exhibit.  Thank you.

15       After all the food is served, the detainee workers have

16  additional duties related to cleaning, don't they?

17  A    They do.  Once they finish serving, they do have breaks in

18  between where they are able to sit down and have their meals,

19  too.

20  Q    So they sit.  Where do they eat in the kitchen?

21  A    We actually pull out banquet tables and they will set it

22  all up in one part of the kitchen area where they will eat

23  their meals.

24  Q    They have a set period of time where they can eat their

25  meal?

1   A   Yes, they have breaks in between, yes.

2   Q   When they are fed, they are also fed on a tray; is that

3   correct?  They get a tray of food just like anyone else in

4   the detention center would get?

5   A   Yes.

6   Q   If they work in the kitchen, they can also get two or

7   three trays if they are hungry; is that right?

8   A   Most of the time they will put extra on their one tray

9   that they do have.  They will just pile it on.  Yes, they

10  have the option of using one or two trays.

11  Q   That can be an incentive for working in the kitchen; is

12  that true?

13  A   Yes, it can be.

14  Q   After they eat and all the food is away, the cleaning

15  happens; is that right?

16  A   Cleaning is an ongoing thing, but yes, this is generally

17  where we actually end the day and do our cleaning.

18  Q   All right.  You have developed cleaning schedules that you

19  require the staff and detainees for following -- to follow

20  for cleaning in the kitchen; is that right?

21  A   The cleaning schedule that I have posted is my staff that

22  are responsible for their areas to be cleaned.  The detainees

23  do not have a cleaning schedule.

24  Q   But the staff then assign detainee workers particular jobs

25  to make sure all of the cleaning is done; is that right?

 1    A    No, my staff are assigned to the kitchen cleaning areas.

 2    They sign off ensuring they get complete.  The detainees

 3    assist.

 4    Q    Okay.  So let me just be really clear:  The detainee

 5    workers assist in cleaning as directed by your GEO staff?

 6    A    They assist, yes.

 7    Q    Would you please take a look at Exhibit 456?

 8    A    456?

 9    Q    Uh-huh.

10    A    I have a 446.  Not a 56.

11         MS. SCHEFFEY:  Andrea, I could get staff to get it

12    over to her if you give me a second.

13         MS. BRENNEKE:  That would be nice.  Thank you.

14         THE COURT:  A question for the witness?

15         THE WITNESS:  I have it.

16    BY MS. BRENNEKE:

17    Q    Thank you for your patience.  What is in Exhibit 456?

18    What does that depict?

19    A    Cleaning schedule for my cooks, the cook officers.

20    Q    Is that a cleaning schedule that is used in the Northwest

21    Detention Center food operations?

22    A    This was -- this once was one, yes.  I have revised them

23    since then, but yes.

24    Q    Is it somewhat consistent with the kind of schedules you

25    would have in the kitchen operations over time in your

1    tenure?

2    A   Yes, uh-huh.

3           MS. BRENNEKE:  Move to admit 456.

4           MS. SCHEFFEY:  No objection from GEO.

5           THE COURT:  456 may be admitted.

6                  (Exhibit 456 was admitted.)

7    BY MS. BRENNEKE:

8    Q   We can bring that up on the screen.  This is the cleaning

9    schedule that you are expecting your GEO staff to ensure gets

10   done; is that correct?

11   A   That is correct.  There are four teams.

12   Q   Four teams.  I was going to have you take a look on the

13   right side of this.  It says, "after each use."  Is there a

14   set of cleaning items and requirements that need to be done

15   after each use of those items or equipment?

16   A   Yes.  For example, if you are using the mixer, you would

17   want to clean that off and sanitize it before you slice

18   anything else.

19   Q   Right.  That makes sense.  Separately, is there a list of

20   things that need to be cleaned once a day?

21   A   Daily cleaning is daily cleaning, yes, that is correct.

22   Q   Then you have a few other things that need to be done

23   weekly or monthly; is that right?

24   A   That is correct.

25   Q   The job descriptions of the detainee workers include

1  cleaning in both regards, both the cook, prep, servers, as

2  well as the dishwasher, and pots and pan cleaners, right?

3  A    Those items are on there, yes.

4  Q    Why don't we take a look, please, at Exhibit 83.  That has

5  been admitted so we can bring it right up on the screen.

6  That will be easier.  And we have seen this before earlier in

7  the trial.  I just want to ask you, have these -- are these

8  job descriptions that you were involved in developing in the

9  kitchen?

10       MS. SCHEFFEY:  Objection.

11 BY MS. BRENNEKE:

12 Q    It is on -- Ms. Henderson, it is on the screen if you want

13 to take a look at it there.  It might be easier.

14 A    Yes, I see it.

15 Q    You were involved in helping to define what the detainee

16 jobs would be for work in the kitchen; is that right?

17 A    This is an example of what they may be doing in the

18 kitchen.  It has been revised to accommodate a lot of

19 different items that they may do.

20 Q    Right.  And so maybe we can also pull up Exhibit 84,

21 please.  That is also admitted.

22       So we have a cook, prep, server job description,

23 Exhibit 83, and a dishwasher, pots and pans job description,

24 84; is that right?

25 A    That's correct.

1    Q   These are the two that are used in the kitchen presently;

2    is that right?

3    A   That is correct.

4    Q   Before any detainee starts working, they have to sign on

5    to these so they understand what their requirements are and

6    understand what their potential job responsibilities will be,

7    right?

8    A   This isn't the only thing they sign in their training

9    packet, but yes, these are the things they are volunteering

10   to do.  It is not saying everything on here is what they are

11   doing.

12   Q   Right, and so as I understand it, you have designed these

13   descriptions to be general enough that during any single

14   shift, a GEO staff person has the flexibility to direct

15   detainee workers to perform tasks from one or both of these

16   descriptions; is that right?

17   A   That's correct.  There is nothing saying -- today they may

18   come and serve on the line.  Tomorrow, they may wash dishes.

19   Q   Right.  So at the begin -- okay.  So at the beginning, a

20   group of detainee workers may be assigned to prepare for the

21   meal service, right?

22   A   There is different aspects in there, so yes, they may come

23   in and ask to pan up the bread for the day.  So there is just

24   different tasks.  That is why the description is a

25   generalized thing of what they may be doing on a daily basis.

1  Q   The whole food service preparation process is somewhat

2  fluid.  So the GEO cook supervisor might say to a group of

3  detainee workers, you over here are going to go help prepare

4  the food; is that right?

5  A   That's possible, yes.

6  Q   When they are done with that, they may -- the GEO staff

7  may say, now you need to go over and help to assist in the

8  serving or the plating as we were seeing in the Exhibit 49?

9  A   They may do that.  The detainee may also say, can I come

10  and do this, if it is something that seems interesting to

11  them and if they want to learn, then yes.

12  Q   And then if somebody does express an interest, like if

13  they baked in the past, they want to do baking, they can ask

14  the GEO cook officers for that assignment?

15  A   Yes.

16  Q   Ultimately, it is up to the discretion of the GEO staff

17  who is in charge what that person will be allowed to do,

18  correct?

19  A   Yes, because it is our responsibility to make sure that it

20  gets done.

21  Q   All right.  So you were mentioning the training of the

22  detainee workers, things they have to do and sign.  This is

23  just one of those things, right?

24  A   That is correct.

25  Q   So I would like you to take a look, please, in your packet

1   at Exhibit 5.

2   A    Got it.

3   Q    Is that the kitchen orientation checklist and initial

4   packet GEO provides to detainee workers?

5   A    I do provide this to them.

6         MS. BRENNEKE:  I move to have this admitted, Exhibit

7   5.

8         MS. SCHEFFEY:  No objection from GEO.

9         THE COURT:  5 may be admitted.

10                    (Exhibit 5 was admitted.)

11  Q    Ms. Henderson, this is a fairly long exhibit.  I want to

12  establish at the beginning, this includes, in general, the

13  kitchen job duties and responsibilities as well as standards

14  and procedures that GEO expects detainee workers to follow in

15  the kitchen; is that right?

16  A    Yes.

17  Q    Has your new kitchen detainee worker training been pretty

18  consistent throughout the time you have run the kitchen at

19  NWDC?

20  A    It has been very consistent with the exception of

21  sometimes I might have to go in and do some adjusting to it,

22  yes.

23  Q    You conduct these new detainee worker trainings on a

24  weekly basis; is that right?

25  A    Weekly, daily, yes.

1    Q    At least weekly?

2    A    Yes.

3    Q    All right.  And so the training -- the training happens

4    before a detainee worker is allowed to work in the kitchen;

5    is that true?

6    A    It actually starts on the day they volunteer to work and

7    is ongoing.

8    Q    When they come in for that first day of work, you are

9    covering some of the items in this packet before they start

10   doing anything; is that right?

11   A    We kind of cover the whole packet to give them a general

12   idea of what they may be doing.  Again, it is going to be

13   ongoing because they don't have the training that we have in

14   all these areas so we have to -- it is ongoing.

15   Q    It is the GEO staff, the cook supervisors, assistant

16   manager and you who are responsible for making sure that

17   training happens at the very beginning and then ongoing as

18   they need it; is that right?

19   A    That is correct.

20   Q    Let's -- and what I notice here on the very front page is

21   that there is a detainee signature and a cook supervisor

22   signature, you see that?

23   A    Yes.

24   Q    Are they required to sign off on that at the beginning

25   that they have had that training before they start work?

A    Yes.

Q    All right.  Then you keep a file for each of the detainee

workers who work in the kitchen where you can update that

training if they get more later; is that right?

A    I do.  I do keep it on file that they have been shown or

how to do some of the items that are there.  May not get to

all of them, but at least they acknowledge they have been

shown, especially some of things that they don't have any

knowledge of.

Q    All right.  We are not going to spend a ton of time on

this because it would get really boring.  I want to go to

Page 2 of the training packet.  We'll scroll down maybe.  All

right.  Is this the initial hazardous safety training?

A    Yes, it is.

Q    And this particular safety training is done at the very

beginning because it points out hazards of the job assignment

and ways to perform duties and how to operate equipment; is

that right?

A    Yes, it is.  This one is on reporting any kind of injuries

or accidents on the job.  That is why -- we are not going to

let them handle any chemicals.  What if something happens?

Yes, this is a hazardous communication safety form we go over

with them.

Q    You are showing them how to do their job in a way that

would be safe, right, and protect them?

1    A    That is correct.

2    Q    And then there is the hazardous communication training

3    section.  That's important because it lets detainee workers

4    know there are hazardous chemicals used in the kitchen, and

5    there is personal protective equipment, PPEs, that they are

6    required to work with in those areas, right?

7    A    We do go over that with them in the training.  Every

8    chemical, even with the hand soap, is gone over with them.

9    It is all chemicals that we do have in the kitchen.

10   Q    All right.  On Page 3 -- let's go to the next page.  You

11   have got here -- let's look.  You have GEO's kitchen worker

12   rules and regulations.  The detainee workers are required to

13   follow these in the kitchen, correct?

14   A    They are asked to follow these things, yes.

15   Q    And it is the GEO staff that would enforce these rules if

16   there were a violation; is that right?

17   A    We all can, yes.

18   Q    All right.  Let's go through -- unless you want to see any

19   of these, Ms. Henderson, exhibit -- we can skip maybe to Page

20   10.  You can feel free to go back to any of these if you want

21   to reference them.

22        This one is equipment training.  Does this show the

23   different tools and equipment that GEO provides in the

24   kitchen and that the detainee workers might be asked to use

25   to perform their job duties?

1    A    Not all -- yes, it is going to be -- some things like the

2    slicer, we are not going to allow them to operate that unless

3    they had some form of training.  We have had training on

4    those items.  Serving line, things like that.  They may have

5    used some of these things in the past, but a lot of them may

6    not have used them.  So we give them the opportunity to show

7    them that these are some of the equipment that you may have

8    in the kitchen that they may be around.  It is a good

9    training tool.

10   Q    So you actually train the detainee workers on the

11   particular pieces of equipment before they are asked to use

12   them; is that right?

13   A    That is correct.

14   Q    For the meat slicer there, there is a trainee initial next

15   to "equipment."  You would have to say, okay, let's go over

16   this, we'll sign off on it, and then they can do it?

17   A    We -- not necessarily saying they would do it, but yes, we

18   would show them, look, this meat slicer has a safety device

19   on it.  You can't operate it without this on it.  It is

20   giving them a general idea.  We are not going to want a

21   detainee to go and just start slicing away at meat and not

22   know how to operate it.

23   Q    Let's look now at Pages 12 and 13.  We have seen these

24   before.  These are --

25            THE COURT:  Ms. Brenneke, I don't know what page

1  numbers you are looking at.  Refer to the exhibit.

2        MS. BRENNEKE:  Your Honor, you're right.

3        THE COURT:  Refer to the exhibit page numbers.

4        MS. BRENNEKE:  The one we were just looking at is

5  003547.  That was the equipment training.  And now we are

6  moving toward 003549 and 003550.  We've seen these before.

7  BY MS. BRENNEKE:

8  Q   Ms. Henderson, they are part of the initial training

9  packet that detainee workers are given, like their little

10 kitchen handbook at the beginning, right?

11 A   Yes, that's in their packet.

12 Q   They are required to sign these before working, right?

13 A   Yes, that's part of our policy that they are trained

14 before they are doing anything.

15 Q   On the list there, they have got all the specific work

16 duties that we have discussed.  There is also some training

17 requirements, and then there is something called

18 "termination."  Do you see that?

19 A   Yes.

20 Q   That provides them notice that if -- they could lose their

21 position if they failed to follow safety procedures, failed

22 to follow supervisor's instructions, there is unexcused

23 absenteeism, misconduct, horseplay, theft or unsatisfactory

24 work performance; is that right?

25 A   Yes, that's there.

1          THE COURT:  Excuse me a minute.  We are going to have

2    to take a break for a minute to solve an issue that Tyler has

3    raised.  You are going to get an extra little short break

4    here, about five minutes, please.

5          MS. BRENNEKE:  Thank you, Your Honor.

6     (The following occurred outside the presence of the jury.)

7          THE CLERK:  Tyler is in the jury room.  We are having

8    some WiFi issues with a juror.  We need to discuss that.

9          THE CLERK:  I apologize for the delay.  We are trying

10   to get it figured out so Juror 3 can get a court-issued iPad

11   to continue or access to WiFi so she can continue serving on

12   the jury.  We have it all figured out, we can go ahead and

13   continue.

14         THE COURT:  Okay.  Let's get everybody back in here

15   and go to work.

16      (The following occurred in the presence of the jury.)

17         THE COURT:  We are ready to continue.  We had an

18   issue regarding getting some court equipment to one of the

19   jurors.  Had to arrange for that before the end of the day

20   admitted it is arranged and we can continue.

21         MS. BRENNEKE:  Thank you, Your Honor.

22   BY MS. BRENNEKE:

23   Q   For the sake of time, let's move past Exhibit 5 now.  We

24   were just discussing the reasons for termination on the job

25   descriptions.  As food service manager, you have the

1   authority to remove a detainee from their work assignment if

2   their performance is not up to those standards.  That would

3   include poor attendance; is that correct?

4   A   I can.  But attendance, that's something I can't control.

5   Again, it is a voluntary work program.  If a detainee is sick

6   and can't come to work, there is no repercussions that he's

7   going to suffer if he doesn't come to work because he's sick.

8   Q   Your cook officers actually take attendance of detainee

9   workers every meal shift; isn't that true?

10  A   The attendance is what they are -- to let us know that's

11  what they are getting paid.

12  Q   Uh-huh.  And they note whether or not they come to work on

13  the work roster?

14  A   That is correct.

15  Q   Can you take a look at Exhibit 51?

16  A   Yes.  Got it.

17  Q   Is that a Northwest Detention Center out-count sheet on

18  which GEO staff takes attendance of detainee workers during a

19  shift?

20  A   Yes.

21          MS. BRENNEKE:  Move to admit.

22          MS. SCHEFFEY:  No objection.

23          THE COURT:  51 may be admitted.

24              (Exhibit 51 was admitted.)

25

BY MS. BRENNEKE:

Q   Admitted looking at this, this appears to be the lunch shift of May 31st, 2010; is that correct?

A   Yes, it is.

Q   All right.  And the list of workers looks like there are -- is a series down the middle; is that correct?  There is the name, and there are A numbers?

A   Yes.

Q   Ms. Henderson, we have it projected on the screen.  It may be easier to look at it there.  Then on the right there are some notations regarding some people, Nos. 21 to 26 that says, "refused," "booked out," "sick," "fired," and those are notes that the GEO cook supervisor who is taking attendance that day would have made; is that correct?

A   Someone made that, yes.  I don't see a signature there, but yes, someone made those notations over there on the right.

Q   One of your cook -- one of your cook officers is a desk officer who takes the attendance and handles those things for payroll; isn't that true?

A   Cook officer or kitchen officer.

Q   One of your GEO staff assigned to the kitchen?

A   This is in 2010 so it is possible that one of them did this, yes.

Q   Okay.  I think the distinction you are making is in the

1  past you had detention officers who were assigned to the

2  kitchen; is that true?

3  A   Yes.

4  Q   At some point, all of the cook supervisors became

5  detention officers, and you have only hands-on people that do

6  food service in the kitchen now?

7  A   Exactly.

8  Q   This may have been from an older period of time; is that

9  right?

10  A   Uh-huh.

11  Q   All right.  Now, I think we are done with that exhibit.

12  You have been -- you have been in food service for 40 years;

13  is that right?

14  A   Yes.

15  Q   The food service is a very highly regulated industry,

16  isn't it?

17  A   That is correct.

18  Q   Admitted all of the training that you do for the detainee

19  workers is important to ensure that there is safety in the

20  food production and preparation and service system; is that

21  right?

22  A   That would be for anybody that wanted to come in and

23  volunteer to help out in food service.  That's why I keep

24  saying it is not their responsibility, it is my cook staff

25  that is being held accountable to make sure the food is being

1    served safe.

2    Q    Then they, in turn, supervise and retrain to make sure the

3    detainees are getting it right, correct?

4    A    Not correct.  My staff is the one that is responsible.  I

5    cannot put all that responsibility on a detainee that hasn't

6    had any professional schooling or just on-the-job training to

7    be responsible for that.  That is my GEO staff that is

8    responsible for that.

9    Q    To the extent you are using the detainee workers and

10   certain items like raw meat require gloves or other kinds of

11   protective equipment, it is your GEO staff that ensure those

12   gloves are being worn and there are safety precautions being

13   met, correct?

14   A    If we are having a detainee do a task, that is why there

15   is this generalized training job description that you are

16   seeing.  There is a section in there where it says about

17   glove handling, handwashing those are important things, so if

18   you wanted to come in, I mean those are the things I would

19   have to be showing you how to do to ensure because,

20   ultimately, it would be my responsibility to make sure that

21   food is being served safe, not cross-contamination.  We don't

22   want anyone to get sick.  Admitted yes, it will be our

23   responsibility for that.

24   Q    All right.  Are there also state and local laws and health

25   standards for food services that the Northwest Detention

1   Center is required to comply with?

2   A   Yes, there is.

3   Q   And the state and local governments don't direct you on

4   how to comply with those, it is just that they need to come

5   in and inspect and make sure you do comply; is that right?

6   A   We do have inspections.  We do have audits, yes.

7   Q   I am going to have you take a look --

8        MS. BRENNEKE:  Actually, Your Honor, there is an

9   Exhibit 37 that I did not prepare for the witness's

10  materials.  I apologize for that.  It is a stipulated

11  exhibit.  I ask it be admitted so we can show it on the

12  screen.

13       MS. SCHEFFEY:  What was the number?

14       MS. BRENNEKE:  37.

15       MS. SCHEFFEY:  I have no objection.

16       THE COURT:  All right.  37 may be admitted.

17            (Exhibit 37 was admitted.)

18  BY MS. BRENNEKE:

19  Q   Ms. Henderson, is this a standards compliance checklist,

20  one of the things the GEO Group does at the Northwest

21  Detention Center to make sure you are complying with all of

22  the standards that you have to comply with?

23  A   That is one of the standards.

24  Q   If we could flip to the page -- can you flip to the page

25  with the City of Tacoma certificate.  Bates stamp 241864,

1   Your Honor.  Can you please identify what that is, for the

2   record?

3   A   That is an inspection report from the Tacoma Health

4   Department.

5   Q   The Tacoma Pierce County Health Department comes in and

6   inspects the kitchen operations at the Northwest Detention

7   Center, what, quarterly or...?

8   A   They can come any time.  At least -- they are required to

9   do it at least once a year, sometimes they come twice.

10  Q   They are looking at a whole lot of items to make sure you

11  are complying with the state and local regulations regarding

12  food preparation and safety?

13  A   That is correct.

14  Q   There is one section -- this is so hard to read.  I am

15  going to ask you to blow up one as an example.  "Potentially

16  hazardous food time temperature."  Do you see that?

17  A   Yes.

18  Q   Are those requirements that are for how long and at what

19  temperatures you can hold hot foods or cold foods?

20  A   Yes, it is.

21  Q   Is it pretty standard in your industry that there are,

22  sort of, accepted, sort of, best practice and regulations

23  that are standards that you need to adhere to in order to

24  make sure food preparation is safe?

25  A   This particular portion of this is letting us know that we

1    don't want to keep none of our foods in the danger zone, so

2    they must be at those particular temperatures, whether it is

3    serving hot, holding and cooking phases of it.

4    Q    To avoid food borne --

5    A    That is correct, cross contamination, food-borne

6    illnesses, yes.

7    Q    Hot food stays hot, cold food stays cold, and you don't

8    mix it up?

9    A    Exactly.

10   Q    This particular exhibit has three or so separate

11   inspections from the Tacoma-Pierce County Health Department.

12   You passed all of those inspections; is that right?

13   A    Yes.

14   Q    The rules of -- that are applying here, those would be

15   rules from state or local laws; is that correct?

16   A    Yes.

17   Q    And those are state laws that you are required to follow

18   in your operations at the Northwest Detention Center?

19   A    Yes.  I can give you an example with the Tacoma-Pierce

20   County Health Department.  If you notice the hot temperature

21   was at 135, that is the Tacoma-Pierce County Health

22   Department standard.  GEO and ICE standard is 140 still.

23   Q    So even though these standards and regulations don't come

24   from ICE, you are still required to follow them as a

25   condition of work and of your contract with ICE; isn't that

1    right?

2    A    Tacoma-Pierce County Health Department inspection doesn't

3    have -- it is not contingent on my employment with GEO.  This

4    is just something that they do go out to local restaurants

5    and any establishments that serve food just to make sure that

6    we are following the protocols and keeping the general

7    population safe.

8    Q    So you are required to follow these because you are doing

9    food service work in Tacoma, Pierce County.  These are state

10   and local laws that are applying to you for the kind of work

11   you are doing; is that right?

12   A    Yes.  Any establishment, yes.

13   Q    And if you didn't follow these, they would shut you down;

14   is that right?

15   A    I am not going to -- if you had bad reports, you can, you

16   know -- everything is -- you can actually go on and review.

17   If there is serious violations, yes, they can.

18   Q    I am mindful of time.  Ms. Henderson, I am going to go

19   back to something you talked about earlier.  You were talking

20   about the expansion of the Northwest Detention Center so you

21   could house more people.  Do you recall that testimony?

22   A    Yes.

23   Q    There was a period where there was a remodel of the

24   kitchen; is that correct?

25   A    Yes, that is correct.

1    Q    That was in, what, 2009 or 2010?

2    A    2009.

3    Q    2009.  During that period of time when there was a remodel

4    of the kitchen, you continued to prepare food for all the

5    detainees, but you had to move the food operation into a

6    portable that was outside in the loading dock area; is that

7    correct?

8    A    We had portable kitchens come in, yes.

9    Q    So during that period, you couldn't use detainee workers

10   at all in the kitchen because they weren't allowed outside

11   the secure perimeters; is that correct?

12   A    Yes.

13   Q    And when you couldn't use the detainee workers for the

14   kitchen operation, you hired temporary workers from Labor

15   Ready instead, a temporary worker agency?

16   A    We did do that, yes.

17   Q    In total, there were six temporary workers hired from

18   Labor Ready, each of whom worked eight-hour shifts throughout

19   the day to make up for the work the detainee workers would

20   normally have done; is that right?

21   A    I am going to recall -- like, I am not going to get a

22   specific number but, yes, we did hire Labor Ready to come in

23   and assist, yes.

24   Q    In your deposition, you testified there were six temporary

25   workers, each of whom worked eight-hour days.  Do you have

1    any reason to dispute that now?

2    A    No, I don't.

3    Q    So GEO paid Labor Ready and Labor Ready paid the temporary

4    workers for their work by the hour; is that right?

5    A    Yes.

6    Q    And as I understand it, that was also a difficult time for

7    GEO staff because you had to work longer and harder hours in

8    order to accomplish the needs of the food service department

9    without the detainee workers; is that true?

10   A    It didn't have anything to do with the detainees whether

11   they were out there or not.  The work still had to be done.

12   We were hired to do a job, to feed the population that was in

13   the facility.  Yes, it may be -- yes, it had difficult times.

14   I have never experienced having to work out of a portable

15   kitchen before.  It was -- it was an experience, but we did

16   it.  It can be done with or without having those detainees

17   out there.

18   Q    Right.  In that case, it was done without detainees

19   because you hired temporary workers to go along with the GEO

20   staff, correct?

21   A    We asked for them, yes.

22   Q    Yeah.  And you got them, correct?

23   A    Yes.

24   Q    So, in general, when you have detainee staff that is not

25   showing up at like the 25 or 30 quota that you have planned,

1    when your actual staffing is down, it makes it more difficult

2    for you to get the work out, too, doesn't it?

3    A   With not having the detainee volunteers to come in and

4    work?

5    Q   Yes.

6    A   It can be a task.

7    Q   At times, when the detainee worker numbers were down,

8    sometimes the overtime expenses for the GEO staff has to go

9    up because you are going to get the work done is; is that

10   right?

11   A   It may go up, yes.  Overtime is there.

12        MS. BRENNEKE:  All right.  In the interest of time,

13   Ms. Henderson, I think I will end my questioning with you

14   now.  I appreciate your time and your answers today.

15        THE WITNESS:  Thank you.

16                     CROSS-EXAMINATION

17   BY MS. SCHEFFEY:

18   Q   Ms. Henderson, you have been up there for a little bit.

19   Take a deep breath.  Are you ready to go for some more?

20   A   Yes.

21        MS. SCHEFFEY:  I am going to start, I want to show

22   the witness Exhibit 27, which she has in front of her.  It is

23   stipulated.  Does the State have any objection to admitting

24   it into the record so we can publish it?

25        MS. BRENNEKE:  No objection.

1    THE COURT:  Is this a new exhibit?

2    MS. SCHEFFEY:  GEO moves to admit Exhibit 27.

3    THE COURT:  There is no objection?  All right.  It

4  may be admitted.

5    (Exhibit 27 was admitted.)

6  BY MS. SCHEFFEY:

7  Q   If we could put Exhibit 27 up on the screen.

8       Do you know what this is?

9  A   Policy and procedure manual for the food service

10  department.

11  Q   Does this document describe some of the responsibilities

12  of the food service manager?

13  A   Yes, it does.

14  Q   Who is the food service manager?

15  A   That would be me.

16  Q   So are you responsible for ensuring a full food service

17  program is offered to all detainees?

18  A   It is a good program.  With that volunteer program, I do

19  have to see if they want to volunteer.  Again, if they do

20  want to volunteer, that's why we have a general idea of what

21  they are volunteering for.

22  Q   The second paragraph of the document in front of you,

23  maybe we can cull that out, which starts with "food services

24  manager."  I think it lists some of your responsibilities.

25  Let's wait.  The second paragraph that starts with "the food

1    service manager."  Sorry.  I should say the bottom, the one

2    from the bottom.

3    A   Yes, I got it.

4    Q   You can see it?  Okay.  They'll get it culled out for the

5    jury.

6        If you see, it is actually that bottom one that starts

7    with "food services manager."  There you go.  So are you

8    responsible for planning the meals for detainees?

9    A   I have a corporate food service menu that we are -- you

10   know, we get that, we are making sure we are planning for it,

11   meaning, having those items that are on that menu there,

12   controlling how the food comes in, directing and evaluating

13   any food service issues, yes, I am.

14   Q   Are detainees responsible for planning, controlling and

15   directing food service?

16   A   They are not.

17   Q   Are detainees responsible for evaluating food service?

18   A   They are not responsible for anything with the food

19   service department.

20   Q   When you talk about planning food service, I want to

21   unpack that a little bit.  Are you serving everyone the same

22   menu?

23   A   We have a variety of menus.  We have our general, regular

24   menu, we have a kosher menu, we have a vegetarian menu,

25   halal, any medical diets we may have.  We have a variety.

1    Q    How many types of special meals or menus might you be

2    making in one day?

3    A    At least four or five.

4    Q    Are all of those menus reviewed by a nutritionist for

5    calorie content?

6    A    They are.  They are reviewed yearly and they are reviewed

7    quarterly by myself.

8    Q    About how many calories are there?

9    A    We serve anywhere between 28 to 3,000 calories per day.

10   Q    What types of food do you serve?

11   A    Spaghetti, tacos, baked chicken, sweet and sour chicken,

12   country fried steaks, hamburgers, hot dogs, Polish sausage.

13   Quite a variety of raw vegetables, fruits.  Cakes, cookies,

14   chips.  There is a variety of things on the menu.

15   Q    Are detainees able to give feedback on what types of food

16   they want?

17   A    We do a quarterly food evaluation that we give to the

18   detainees and hope if there is anything we can improve or if

19   it is something that is just really not working, then we can

20   change on that menu.  That's where the responsibility comes

21   in on the food service department -- my cooks, myself.

22   That's why that responsibility is on us so we can evaluate

23   that and see what we can do.

24   Q    Do you incorporate that feedback?

25   A    Yes, I do.

1   Q   Have detainees ever asked for a different cut of meat?

2   A   Yes, they have.  We are a pork-free facility.  With the

3   contents of turkey hot dogs, turkey baloney, that's more

4   because of the different religions it is a pork-free

5   facility.

6   Q   Do you eat the meals you serve at the facility?

7   A   Yes.

8   Q   Are they good?

9   A   Yes.

10  Q   Do the detainees that work in the kitchen eat a meal?

11  A   Everyone in the facility has an opportunity to get a

12  meal -- breakfast, lunch or dinner.

13  Q   When you say "everyone in the facility," do you mean

14  detention officers?

15  A   Detention officers, our medical staff, ICE, the courts, so

16  they all can come and get a meal.

17  Q   Have you ever had ICE come down and eat a meal?

18  A   Yes.

19  Q   Is that the same meal that detainees eat?

20  A   Same meal.  We don't cook anything different for anyone

21  unless they are on medical diet that has to have something

22  totally different.

23  Q   Did you get any complaints from ICE about that meal?

24  A   I do.  Then there is -- everyone is going to have their

25  opinion, so it is going to be complaints about food.  The

1    taste, no.  Everybody is going to have their opinion and

2    stuff.

3    Q   When you say "everybody is going to have their opinion,"

4    are you talking about seasoning, salty, type of meat, what is

5    that?

6    A   That is correct.  We have -- of course, we have the menus.

7    We do have recipes that we follow.  That is, my staff has to

8    follow that recipe to make sure that we are serving the

9    proper portions and the control of what goes in those meals.

10   If there is someone that has a medical diet, there has to be

11   a medical order for PHS, giving us -- to let us restrict

12   those items that they cannot have.  If -- wheat, as an

13   example or gluten free, if someone is on that specific diet,

14   we would have a specific menu and would have to follow that

15   for that person.

16   Q   Going back to Exhibit 27.  It looks like -- it says,

17   "Training and developing the cook foreman," are you

18   responsible for fulfilling that requirement?

19   A   I have monthly meetings with my staff.  With that, we also

20   do the training on the different pieces of equipment.  It is

21   just a refresher.  I am a certified food service manager that

22   I can -- we also are cert safe to where I can implement the

23   training or give tests to my staff, and that's what I do.

24   Q   Are detainee volunteers responsible for developing and

25   training the cook foreman?

1    A    No.

2    Q    Are detainee volunteers responsible for establishing

3    standards for sanitation, safety and security?

4    A    No, they have no responsibility.  That's my staff that has

5    that responsibility.

6    Q    Are detainees responsible for procuring the ingredients

7    for the meal?

8    A    That's not the detainees' responsibility.  That is my

9    responsibility and my staff.

10   Q    Where do you order your food from?

11   A    I have several vendors that we use locally and some that

12   are far.  Locally, I have used Food Service of America,

13   which has changed to Harbor Foods, Sysco.  We have a local

14   dairy company that we use that is in Kent, Springbrook Farms.

15   We also use, for our produce, Charlie's Produce out of

16   Seattle.

17   Q    Do you know if local restaurants use the same

18   distributors?

19         MR. WHITEHEAD:  Objection, Your Honor, relevance and

20   outside the scope of direct.

21         MS. SCHEFFEY:  If you would like to hear from me.

22   This is directly at issue.  It is her job.  It is part of her

23   job description.  There has been a lot of comparisons to the

24   food in the facility versus outside the facility.  I think it

25   is relevant to all the testimony we have heard today about

1  that.

2      THE COURT:  I think the objection should be overruled

3  because this arguably has been opened by other evidence in

4  the case.  It is, appears to me, of scant relevance, but you

5  may inquire.

6  BY MS. SCHEFFEY:

7  Q   Do you remember the question?

8  A   Could you repeat it, please?

9  Q   Do you knew if local restaurants use the same distributors

10  to obtain food?

11  A   From my experience in the different places that I have

12  worked at, yes, I have used those same vendors.

13  Q   It looks like this document also talks about maintaining

14  records for all meals served.  Are detainees responsible for

15  that requirement?

16  A   No, they are not.

17  Q   Are detainees responsible for any of the key operations of

18  the kitchen?

19  A   No, they are not.

20  Q   I would like to turn to Page 3 of Exhibit 27.  Item No. 4,

21  you will see, it talks about handling procedure -- procedures

22  for handling food, items that may be a security threat.  Do

23  you see that?

24  A   Yes.

25  Q   Are detainees responsible for the safety of items that may

1    be a security threat?

2    A    They are not responsible.  That is my staff and myself

3    responsible for the safety and security of our department.

4    Q    Why are you required to control access to yeast?

5    A    Yeast is a form of product that they can use to produce

6    pruno.

7    Q    What is pruno?

8    A    A fermented alcohol beverage that can be made with yeast,

9    bread, fruit and let it ferment for a certain amount of time

10   and then drink it.

11   Q    Is that permitted by the detention center?

12   A    Absolutely not.

13   Q    Do you know if the requirement to control yeast is in the

14   PBNDS?

15   A    That is in the PBNDS.

16   Q    What about sugar, why do you have to control access to

17   sugar?

18   A    Sugar is the same thing; it could be used to produce

19   pruno.

20   Q    When little things like yeast and sugar are a security

21   threat, you have to be pretty strict about the rules of the

22   kitchen?

23         MS. BRENNEKE:  Objection.

24         THE WITNESS:  Right.  I have to make sure the safety

25   and security --

1    MS. BRENNEKE:  Ms. Henderson, I have objected to the

2    form of her question.

3         THE COURT:  Just a minute.  That is basically a

4    leading question.  The objection is sustained.

5    BY MS. SCHEFFEY:

6    Q   Do you have to be strict about stealing in the kitchen?

7    A   Yes.

8    Q   Do you have the same security concerns that we just

9    discussed when it comes to GEO employees who may work around

10   yeast or sugar?

11   A   Yes.

12   Q   You do?

13   A   I do.  Just making sure that they are being controlled and

14   not just being out and not being picked up by someone that is

15   not supposed to have those things.

16   Q   Are you worried about GEO employees making pruno?

17   A   Not my GEO employees, no.

18   Q   Do the security concerns with detainees potentially taking

19   items back to their dorms make it harder to include detainee

20   volunteers in the kitchen?

21   A   What it does -- again, you know, we have our procedures

22   that we have to do.  We just don't want to make sure that

23   those items that are -- that is high in potential that can

24   cause harm or danger to a detainee get back into those units.

25   Q    Is it easier to have a GEO employee doing the task in the

1   kitchen than to have a detainee volunteer?

2   A   Most definitely GEO staff.

3   Q   Are you familiar with the state certification called a

4   food handler certification?

5   A   Yes, I am.

6   Q   Are your food services staff required to have food handler

7   certifications through the State?

8   A   Yes, we do.

9   Q   Are detainees required to have food handler

10  certifications?

11  A   They are not.

12  Q   Is your facility inspected by the State?

13  A   They are inspected by the State, yes.

14  Q   Has the State instructed you to get food handler

15  certifications for detainee volunteers?

16  A   No.

17  Q   I would like to turn to Plaintiff's Exhibit 309, which has

18  been admitted, the Bates number page GEO-Nwauzor 026947.

19  Looks like we have the first page on the screen.  If we could

20  turn to 026947.  We still don't have 026947.  There we go.

21      Do you know what this is, Ms. Henderson?

22  A   Yes, I do.  It is our kitchen roster for the volunteer

23  workers.

24  Q   Is this roster for the week of October 22nd, 2015?

25  A   That was the date the roster was produced, yes.

1    Q   When you receive a roster like this, can you count on it

2    to know the number of volunteers that will show up between

3    Monday and Friday?

4    A   I cannot.

5    Q   Do you have 20-plus detainee volunteers in the kitchen

6    every day?

7    A   No.

8    Q   How many detainees did you have in the kitchen on

9    breakfast this week?

10   A   This week, one.

11   Q   Lunch shift?

12   A   Lunch shift, I believe we have two.

13   Q   What about dinner?

14   A   Dinner, I believe it moved up to three or four.

15   Q   If detainees didn't volunteer to participate in the

16   kitchen, who would make sure the meals were cooked and

17   served.

18   A   My staff would make sure that is done, GEO staff.

19   Q   Has that ever happened to you?

20   A   Yes, it has.

21   Q   Were GEO officers able to get the meals out?

22   A   We were able to cook, serve and get the meals out, yes.

23   Q   When you make your schedules for the week, do you

24   anticipate a minimum number of detainees?

25   A   I can't count on them to come.  Again, it is volunteer.

1   If you look at that document, you can already see that you

2   will not have that amount that is listed because they do have

3   off days.  They may be sick.  It is a volunteer.  They may

4   show up; they may not.  We still have to do our job.

5   Q    Have you ever told one of the GEO employee they could take

6   the day off because detainees would cover the job for them?

7   A    Oh, no.

8   Q    Why not?

9   A    Unless they put in for PTO in advance.  When I do my

10  schedule, it is different.  They are required to be there.

11  My GEO staff are required to be there.  The detainees, it is

12  a volunteer work program.  It is not a volunteer employment.

13  My staff, yes, they are required to be there.

14  Q    Have you ever been able to just say, hey, I am taking the

15  day off, I am going to rely on detainee workers to operate

16  the kitchen?

17  A    I wish I could, but no, I have not been able to do that.

18  Q    Let's talk about the voluntary work program.  I want to

19  talk to you about what happens in the process for a detainee

20  asking to volunteer in the kitchen.  When a detainee wants to

21  volunteer, do you get the chance to interview him or her?

22  A    There is no interview.

23  Q    Do you get to inquire if the detainee has specific skills?

24  A    No.

25  Q    If there is a detainee who already has kitchen experience

1  who doesn't want to volunteer, can you make them come work in

2  the kitchen?

3  A   No, I wouldn't even have access or knowledge if they had

4  that.  It is a voluntary work program.  Whether it is

5  volunteering to work in the kitchen or laundry or in the

6  unit, it is all a volunteer work program.  No interview

7  process to see if they have cooking experience or none of

8  that.  It is a volunteer work program.  GEO staff does have

9  that.

10 Q   Can you turn a detainee away because they don't have any

11 skills?

12 A   No.

13 Q   Do you have to fill out paperwork and send it to Human

14 Resources when you get a new volunteer?

15 A   No, it is a volunteer.  That's part of employment, so

16 detainees are not employed.

17 Q   Do you check to see if a detainee has work authorization?

18 A   That's not what I do.

19 Q   What about when you have a new employee in the kitchen, do

20 you interview him or her?

21 A   GEO staff?

22 Q   Yes.

23 A   Yes, I do interview GEO staff.  That process, an ad would

24 go out giving a description of what the job, where it is

25 located.  They would be called for interviews.  Their

1   applications would be reviewed.  They would come in for an

2   interview.  Based off their skills and qualifications, they

3   could be hired for that position.

4   Q   Do you have minimum requirements or qualifications for GEO

5   staff who work in the kitchen?

6   A   In their job description, yes, they do have to have some.

7   At least a minimum of institutional cooking, two to three

8   years minimum institutional cooking.  There are several other

9   requirements that are in there -- the lifting, the cooking,

10  being able to read recipes, to convert recipes.  So there is

11  a lot more requirements that a cook or food service officer

12  would have to have.

13  Q   If you hire a new food service officer, can they come and

14  go as they please, or do they have to work on a schedule?

15  A   They would have a schedule.

16  Q   If a food services officer comes to you and says, hey, I

17  don't want to work today, I want to go to the gym, what would

18  you say?

19  A   That's not an option.  They can do it on their off days.

20  Q   Would they get written up?

21  A   There would be a possibility of disciplinary actions.

22  Q   What about a detainee that says, hey, I missed rec time, I

23  don't want to do my shift today, I want to go to the rec

24  yard, would they get written up?

25  A   They wouldn't because it is a volunteer work program.  We

1    do allow them to go to rec.  That is part of the initiative

2    of getting out there and doing different things so we would

3    not deny them the opportunity to go to rec or come and

4    volunteer in the kitchen.

5    Q   I want to talk to you about the timing of the tasks in the

6    kitchen the volunteers perform.  Are detainees who volunteer

7    in the kitchen given breaks while they were participating?

8    A   Yes.

9    Q   Breakfast detainees have a break between when they help

10   pan up meals and when food service goes out?

11   A   Yes.

12   Q   Is breakfast mostly prepared before detainees arrive in

13   the kitchen for that shift?

14   A   My staff starts at three a.m.  The detainees that work

15   that volunteer shift generally come in roughly 4:00, 4:30 in

16   the morning, and we start serving at five.

17   Q   What do detainees do on the breakfast shift?

18   A   Again, the majority of the food is probably already

19   cooked.  They may come in and dish up the oatmeal, one may

20   bring the jelly packets out and have them set out.  The

21   sporks needs to be counted for each unit so they can get sent

22   out.  There are different things they might do prior to

23   serving.

24   Q   I also wanted to talk to you about training.  How many

25   hours of training do GEO food service officers get before

1    they start their job?

2    A   We actually go through -- before we actually start, we go

3    through a four- to six-week training.  On a yearly basis, we

4    have ART, annual refresher training, that is also 40 hours.

5    Q   How many hours of training to detainee volunteers get?

6    A   There is no training for them.  Because it is a volunteer

7    work program, they will come in -- say a detainee started on

8    a Monday, they may come in, we will give them the layout of

9    what they may or may not be doing.  Tomorrow they may not be

10   there.  It is an ongoing thing.  There is not going to be

11   that sit-down, 40-hour training before they actually start

12   performing any task in the kitchen.

13   Q   I would like to put Page 228 of Exhibit 127 up on the

14   screen.

15        THE COURT:  You can do that in the morning.  It is

16   quitting time for the day.  We will reconvene at 9:00 a.m.

17   tomorrow and start the fourth day of the trial with the

18   further presentation of evidence.  We will finish

19   Ms. Henderson tomorrow.

20      Okay.  Please don't discuss the case with anyone.  Folks,

21   follow my instructions about recesses.  Don't let anyone talk

22   to you about the case.  Don't read, view or listen to any

23   news account.  Don't look up anything on your own about the

24   case.  Get all your information here in this virtual

25   courtroom.

1        See you in the morning.

2                    (The proceedings adjourned.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Angela Nicolavo*

ANGELA NICOLAVO
COURT REPORTER