UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

|  |  |
|---|---|
| UGOCHUKWO GOODLUCK NWAUZOR, et al., | ) ) ) |
| Plaintiffs, | ) 3:17-cv-05769-RJB ) 3:17-cv-05806-RJB |
| v. | ) ) Tacoma, Washington |
| THE GEO GROUP, INC., | ) ) June 4, 2021 |
| Defendant. | ) ) Jury Trial |
| STATE OF WASHINGTON, | ) ) 9:00 a.m. |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE GEO GROUP, INC., | ) ) |
| Defendant. | ) ) |

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. BRYAN
UNITED STATES DISTRICT JUDGE
_____

Proceedings stenographically reported and transcribed
With computer-aided technology

```
 1                          APPEARANCES
 2
 3     For the Plaintiff        JAMAL N. WHITEHEAD
       Nwauzor, et al.:         ADAM J. BERGER
 4                              Schroeter Goldmark & Bender
                                810 Third Avenue
 5                              Suite 500
                                Seattle, Washington
 6
 7
       For the Plaintiff        ANDREA BRENNEKE
 8     State of Washington:     LANE POLOZOLA
                                MARSHA J. CHIEN
 9                              800 Fifth Avenue
                                Suite 2000
10                              Seattle, Washington
11
12     For the Defendant        LAWRENCE D. SILVERMAN
       The GEO Group:           ADRIENNE SCHEFFEY
13                              Akerman LLP
                                1900 Sixteenth Street
14                              Suite 1700
                                Denver, Colorado
15
                                JOAN K. MELL
16                              III Branches Law PLLC
                                1019 Regents Boulevard
17                              Suite 204
                                Fircrest, Washington
18
19
20
21
22
23
24
25
```

```
 1                        EXAMINATION INDEX

 2
       EXAMINATION OF:                                       PAGE
 3
       BERTHA HENDERSON      CROSS-EXAMINATION
 4                           BY MS. SCHEFFEY                    5

 5                           REDIRECT EXAMINATION
                             BY MS. BRENNEKE                   11
 6
                             RECROSS-EXAMINATION
 7                           BY MR. WHITEHEAD                  36

 8     ALISHA SINGLETON      CROSS-EXAMINATION (Resumed)
                             BY MS. MELL                       40
 9
                             REDIRECT EXAMINATION
10                           BY MS. CHIEN                      70

11     ERWIN DE LA CRUZ      DIRECT EXAMINATION
                             BY MR. WHITEHEAD                  74
12
                             CROSS-EXAMINATION
13                           BY MR. SILVERMAN                 104

14     IOLANI MENZA          DIRECT EXAMINATION
                             BY MR. POLOZOLA                  112
15
                             CROSS-EXAMINATION
16                           BY MR. BERGER                    141

17                           CROSS-EXAMINATION
                             BY MS. SCHEFFEY                  147
18
       ORLANDO MARQUEZ       DIRECT EXAMINATION
19                           BY MS. CHIEN                     167

20                           CROSS-EXAMINATION
                             BY MS. SCHEFFEY                  180
21

22

23

24

25
```

1

EXHIBIT INDEX

2

3   EXHIBITS ADMITTED                                    PAGE

4     Exhibit 35                                          29
      Exhibit 57                                          34
5     Exhibit 234                                        138
      Exhibit 300                                         81
6     Exhibit 303                                         85
      Exhibit 408-A                                      194
7     Exhibit 435                                        171
      Exhibit 607                                        173
8     Exhibit A-286                                      183
      Exhibit A-287                                      186
9     Exhibit A-289                                      186

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                    MORNING SESSION

 2                                    JUNE 4, 2021

 3      (The following occurred outside the presence of the jury.)

 4           THE COURT:  Counsel, I want to tell you if you have

 5      an objection, speak up loudly because if I don't hear it, it

 6      doesn't help.  Be sure you are heard if you have an

 7      objection.

 8         Tyler, are we all present?

 9           THE CLERK:  That is correct.  All nine jurors are

10      present, Judge.

11         (The following occurred in the presence of the jury.)

12           THE COURT:  All right.  Good morning, folks.  We will

13      continue with the examination of Ms. Henderson.  Where is

14      Ms. Henderson?

15           THE CLERK:  I am admitting her now.  She's on her

16      way.

17           THE COURT:  There is Ms. Henderson.  We are in the

18      middle of redirect; is that correct?

19           MS. SCHEFFEY:  Yes, Your Honor.

20                            CROSS-EXAMINATION

21      BY MS. SCHEFFEY:

22      Q   Good morning, Ms. Henderson.  Thank you for coming back

23      today.  I appreciate it.

24           At the end of the day yesterday, we were talking about

25      training.  I am not really quite sure where we ended.  I want
```

1  to put Exhibit 5, which has been admitted, up on the screen.

2  Is this the training detainee volunteers get in the kitchen?

3  A   Yes, it is.

4  Q   I want to now call out page 231 of Exhibit 127, which is

5  also admitted.  It is the Performance-Based National

6  Standards, if we could get that on the screen.  I have a

7  great tech team working with us.  Page 231 of Exhibit 127.

8  If we could call out Item 3.  I think it is a few pages down.

9  It is not that part.  We want to get to page 231.  One more

10  page and we'll be there.  There we go.  If you could call out

11  Item 3 under there.  Do you recognize this, Bert?

12  A   Yes.

13  Q   What is it?

14  A   This is the ICE standard on training detainees.

15  Q   Do the PBNDS require that detainees receive training?

16  A   Yes, it is a requirement.

17  Q   And is that the training that was contained in Exhibit 5?

18  A   Yes, it is.

19  Q   Is that intended to meet the standard?

20  A   That is to meet the standards, yes.

21  Q   Is the training that detainee workers get shorter than

22  that of employees?

23  A   Yes, it is.

24  Q   Do detainees go through new employee orientation with

25  sexual harassment training?

Henderson - Cross

1    A    No, they don't.

2    Q    What about training on how to clock in and out for their

3    shift?

4    A    No, they don't.  That's not a requirement for them.

5    Q    I also want to talk to you about permanence of detainees

6    in the facility and turnover.  How long are most detainees at

7    the facility?

8    A    Most of them are there for a few weeks to a couple of

9    months.

10   Q    Are most of the detainees there a month or less?

11   A    It is possible, yes.

12   Q    So when a detainee signs up to volunteer, are they

13   committed to volunteering for any minimum period of time?

14   A    No, they are not.  Some can come and sign up and work for

15   a day or a week.  So it is all volunteer.

16   Q    Okay.  Do you ever have detainees show up for just one day

17   and then choose not to come back?

18   A    Yes.

19   Q    Can you count on any minimum number of detainees in the

20   kitchen each day?

21   A    No, I cannot.

22   Q    What about if a detainee comes to you and asks to skip

23   their day of volunteering to work on their immigration case,

24   what happens?

25   A    They can do that.

1  Q    Are they written up?

2  A    No, they are not.

3  Q    If a GEO employee called in on short notice and said, "I

4  can't come in today," may he or she be written up?

5  A    It is a possibility, yes, or counseling.

6  Q    I also wanted to talk to you about performance, the

7  performance metrics.  If a detainee decides they don't want

8  to participate in the program one day, are they precluded

9  from changing their mind a week later and asking to volunteer

10  in the kitchen?

11  A    No, they are not.  That happens all the time.

12  Q    If a detainee does not want to do a specific task in the

13  kitchen, let's say panning up, but they are willing to stir

14  soup, would they get removed from the kitchen?

15  A    No, they won't.

16  Q    Do you give detainees performance reviews?

17  A    No, I don't.

18  Q    So yesterday, the jury heard from Mr. John Patrick

19  Griffin.  Do you remember working with him?

20  A    Yes.

21  Q    Does he still work with you?

22  A    No, he doesn't.

23  Q    Was his employment terminated for failing to meet the

24  kitchen standards?

25  A    Yes, it was.

1    Q    When the standards weren't being met with the detainees --

2           MS. BRENNEKE:   Objection.   These are all leading

3    questions.

4           THE COURT:   Sustained.

5    BY MS. SCHEFFEY:

6    Q    Were any of the detainees who volunteered alongside

7    Mr. Griffin terminated for poor performance?

8    A    No, they were not, no.

9    Q    I want to talk to you about uniforms and equipment.   Are

10   detainees who do not participate in the voluntary work

11   program provided uniforms?

12   A    Yes, they are.

13   Q    So in providing uniforms, does it matter whether a

14   detainee is participating in the voluntary work program or

15   not?

16   A    It does not.   They wear uniforms.   It is a requirement.

17   Q    You said it is a requirement.   Is that a requirement of

18   ICE?

19   A    Yes, it is.

20   Q    What about tools, are detainees allowed to keep kitchen

21   tools in their bunk unit?

22   A    No, they are not.   My staff, GEO staff is the only ones

23   that can check out tools.

24   Q    Is that related to whether they participate in the

25   voluntary work program or is it just a detention security

1    requirement?

2    A    Security requirement.

3    Q    I think I heard you testify earlier that the GEO facility

4    is a knife-free facility; is that correct?

5    A    That is correct.

6    Q    Okay.  How do you get most of your vegetables?  Are they

7    already cut up?

8    A    There's some that are cut up.  We do have dough cutters

9    that are tethered to the tables.  They are monitored on an

10   hourly basis for security reasons and accountability.

11   Q    And then so let's say you are going to serve chicken, do

12   you get a whole chicken to cut up or does it already come

13   presliced?

14   A    It comes presliced.  You have the thighs.  If it is a

15   turkey roast, then we have a meat slicer, which is also a

16   tool that has to be checked out and monitored throughout the

17   day by my staff.

18   Q    When you get the thighs, are those fresh thighs, frozen,

19   how do they come to you?

20   A    Fresh thighs and leg quarters.

21   Q    Do you have any opinion as to why detainees participate in

22   the voluntary work program?

23   A    Yes.  A lot of them like to do it because they want to get

24   out of the unit, get their minds off of their immigration

25   status.  They enjoy doing it.  We also enjoy them coming in

1   and helping out.  They get to learn new things and keep their

2   mind off their issues.

3           MS. SCHEFFEY:  No further questions.  Thank you.

4                   REDIRECT EXAMINATION

5   BY MS. BRENNEKE:

6   Q   I have a few clarification questions from what you have

7   said.  First off, let's talk again about the training.  You

8   said the new GEO staff are provided 40 hours of training at

9   the start of their employment; is that right?

10  A   New GEO staff will go through an academy, and they will

11  also go through an extra 40 hours of OJT.

12  Q   They have refresher ART training annually; isn't that

13  right?

14  A   That is correct.

15  Q   All of the new GEO staff employee training is around

16  becoming detention officers, isn't it?

17  A   Becoming detention officers and also a refresher of the

18  food service courses that -- also monthly, I did mention that

19  monthly we do have food service meetings and that's also

20  training in food service also.

21  Q   So the training you provide your GEO staff in food

22  services is limited to monthly meetings and training?

23  A   No, it is not limited to monthly meetings.  It is -- in

24  food service, that is always an ongoing training process of

25  learning new things.  There is new codes that come out from

1    the local health department, so that is -- in our profession

2    it is ongoing.

3    Q    You provide that in monthly meetings to your GEO staff and

4    then on-the-job training when they are in the kitchen; is

5    that right?

6    A    That's correct, when they are hired, yes.

7    Q    And then -- none of the training that GEO corporate

8    provides is specifically oriented toward food service

9    production; isn't that true?

10   A    We have a GEO policy that is in food service.  We do have

11   a food service manual that we do so, yes, it is a requirement

12   that we do go through our policies and procedures in food

13   service, yes.

14   Q    And those are GEO's policies and procedures for the

15   Northwest Detention Center; is that right?

16   A    GEO and ICE.

17   Q    Let's pull up, if we could, Caiti, Exhibit 20, I think

18   it's 27.

19         When you are talking about GEO policies and procedures

20   for food service, in the upper left-hand corner it says "GEO

21   Corrections Northwest Detention Center."  Do you see that?

22   A    Yes.

23   Q    These are the GEO policies and procedures you require your

24   food service GEO employees to follow?

25   A    GEO employees, correct.

1   Q   These are the ones you cover with them to make sure that

2   they understand what the standards are; is that right?

3   A   Yes.

4   Q   That training is all done by you inhouse at the Northwest

5   Detention Center, isn't it?

6   A   That is correct.

7   Q   Now, in contrast -- well, strike that.

8        When you hire new GEO staff for the kitchen, you have

9   to do the on-the-job training and hands-on training so they

10  understand the particulars of the Northwest Detention Center

11  kitchen, isn't that true, how you set up the operation and

12  the particulars about that kitchen?

13       You can take that down.

14       MS. SCHEFFEY:  Objection.

15       THE COURT:  What is your objection?

16       MS. SCHEFFEY:  Compound and misstates prior

17  testimony.

18       THE COURT:  Rephrase the question, Ms. Brenneke,

19  please.

20  BY MS. BRENNEKE:

21  Q   Ms. Henderson, when you hire new GEO staff from the

22  community, you still need to provide them the specific

23  hands-on training about how your kitchen works at the

24  Northwest Detention Center, right?

25  A   They will be abrupt (sic) on how to know the policies and

1    procedures of GEO and the food service and also ICE standards

2    also.

3    Q    When new detainee workers come into the kitchen, you also

4    treat them as entry level workers because you don't know for

5    sure if they have worked in a kitchen or not before; is that

6    right?

7    A    They come in as being fresh.  They are going to be trained

8    no matter what.  It is a standard.  It is required.  I

9    can't -- they are not treated as employees.  That's why their

10   training is going to be different than what GEO staff

11   training is going to be.

12   Q    Well, they are not treated as detention workers, so they

13   don't need the detainee worker training, correct?

14   A    They do not need a detention officer training, no.

15   Q    What you do is you have that Exhibit 5 which you developed

16   with all of the specifics about what's required in the

17   kitchen that they need to know; is that right?

18   A    Yes, I will, and it's giving them an idea of what they

19   will be doing working in the kitchen.  There would be some

20   difference in laundry or in the pods.  So there is going to

21   be a training packet for every volunteer work program that we

22   provide for them.

23   Q    You have taken the responsibility to create that packet,

24   that new kitchen worker orientation packet for those new

25   detention worker trainings?

1   A   According to the policy, yes.

2   Q   I think you also testified that GEO staff provides

3   on-the-job training and retraining of detention -- of

4   detainee workers to make sure they follow those proper

5   standards and procedures and get it right; is that correct?

6   A   It is a requirement.  As far as getting it right, it is

7   going to be ongoing because they do come and go because it is

8   a voluntary work program.  They can work a month and not work

9   any more, and then a month later if they decide they want to

10  come back, they will be retrained again.  We will review that

11  training packet for them because it is something that I know

12  they are not going to stick in their head and make sure that

13  they are following those procedures.  So that is going to be

14  ongoing.  Their standards are going to be much lower than the

15  standards that I would treat my GEO staff.

16  Q   Right, and the GEO staff have to provide pretty constant

17  supervision and retraining as necessary to make sure those

18  standards are met, correct?

19  A   It is GEO staffs' responsibility to make sure that the GEO

20  policy and ICE standards are met.  As far as the detainees,

21  because it is volunteer, it is the little tasks that they do

22  go through that we need to -- of course, handwashing, it is a

23  constant thing.  It's something that they are not going to

24  keep in mind and be vigil about it.  So those are some of the

25  things we have to keep reminding them of what they need to

do.

Q   If the detainee workers just blatantly say, "Hey, I'm not going to wear a uniform.  I'm not going to wear gloves like the policies require," then you would remove them for failure to follow the required procedures; isn't that right?

A   Not necessarily.  At first, again, that's where you look at that training book, and I can refer back to that saying these are the standards.  This is why it is required to wash your hands because we don't want anyone to get sick.  We don't want you to get sick.  So that's why there is a training packet for the detainees so they can be aware of that.

Q   If they just decided, "Hey, I like working in the kitchen, but I don't like wearing the gloves, I am not going to do that," you would be required to remove them from their position; isn't that right?

A   I would, again, speak with them and let them know the severity of why it is necessary.  If it is a medical issue that they can't wear gloves, it is something we can discuss and maybe just, if they would like to stay in the kitchen, maybe work in a different area where they are not handling any food.

Q   Ms. Henderson, I want to be really clear, though:  If people refuse to follow your standards, you maintain the authority, and you sometimes use it, to remove them from the

1    kitchen because you need to follow those standards as GEO

2    employees, correct?

3              MS. SCHEFFEY:  Objection, compound.

4              THE COURT:  She may answer.

5              THE WITNESS:  In regards to that, if a detainee

6    decides -- again, it's volunteer.  So if they don't want to

7    work and do what is asked of them, they don't have to do it.

8    If they are not following the detainees rules, then they can

9    be removed.

10   BY MS. BRENNEKE:

11   Q    All right.  Now, in every other food services operation

12   you have worked for before GEO, have you given new employees

13   the opportunity to obtain the Washington State Food Service

14   Handler Permits as required by state law?

15   A    In every department I work at, in any job working in food

16   service, it is required to have a food handler's card.

17   Q    GEO has chosen not to allow or require detainee workers to

18   obtain a Washington State Food Handler's Permit at the

19   Northwest Detention Center?

20   A    It is a voluntary work program.  They get a medical

21   clearance through medical, that's what is required.

22   Q    You are saying GEO hasn't provided them the opportunity to

23   get a food handler's permit or required them to do that; is

24   that right?

25   A    It is not required for the detainees to have a food

1    handler's permit.  It is required for them to have a medical

2    clearance.

3    Q   Did you say that's because there is so much turnover that

4    you don't want to expend GEO's resources on unnecessary

5    training?

6         MS. SCHEFFEY:  Objection.

7    BY MS. BRENNEKE:

8    Q   Is that why you are not requiring --

9         THE COURT:  Just a minute.

10         MS. BRENNEKE:  Sorry, Your Honor.

11         THE COURT:  Just a minute.  Just a minute.  Just a

12    minute.

13         The objection is overruled.  You may want to rephrase

14    your question again.

15    BY MS. BRENNEKE:

16    Q   Ms. Henderson, is the reason you haven't required the

17    detainee workers to have the opportunity and to pass and to

18    obtain the Washington State Food Handler's Permit is because

19    there is a lot of turnover and you don't want to expend the

20    resources on that training?

21    A   No, the reason is that they are not employees.

22    Q   Did GEO ever obtain a waiver of the requirement of the

23    State of Washington Food Handler Permits for detainee workers

24    who work in the kitchen?

25    A   As far as the standard is concerned, the standard says

1   that they need to only have a medical clearance.

2   Q   I am talking about Washington State law.  Did you ever get

3   a waiver from the State of Washington to allow them to work

4   in the kitchen without a food handler permit?

5   A   I have had the Health Department come in for the last 14

6   years that I have been there, and what they require is

7   looking at the medical clearance for medical and their

8   training packet that is required by ICE.  There is no problem

9   with it.  They are not employees, so therefore, they are not

10  required to have that food handler's card.

11  Q   So the State of Washington has looked at your training

12  packet and determined that is equivalent to the food handler

13  permit requirements; is that right?

14          MS. SCHEFFEY:  Objection.  Calls for speculation.

15          THE COURT:  I'm sorry, is there an objection or

16  something?

17          MS. SCHEFFEY:  Yes, objection.  Calls for

18  speculation.

19          THE COURT:  She may answer.

20          THE WITNESS:  I can't speak for the Tacoma Health

21  Department.  But in my experience and everywhere I have been

22  and for the last 14 years, the requirement that they ask for

23  and that they look at when they come and do an inspection is

24  they look at the detainee training packet to make sure they

25  have a medical clearance by PHS and that the training has

1    been performed on them.

2    BY MS. BRENNEKE:

3    Q   Okay.  That's good.  Thank you for clarifying that.

4        Let's go back to detainee uniforms.  You just testified

5    that all detainees have uniforms at the Northwest Detention

6    Center; is that right?

7    A   Yes, they do.

8    Q   Those are the blue uniforms, orange uniforms, what is the

9    other one?

10   A   Yellow.

11   Q   Yellow.  Okay.  In the kitchen, they don't wear those, do

12   they?

13   A   They wear white uniforms.

14   Q   The white uniforms are provided only when they are working

15   in the kitchen; isn't that true?

16   A   Yes.

17   Q   They are only allowed to wear the white uniforms when they

18   are working at the kitchen, right?

19   A   Well, I don't want them to wear their normal uniforms

20   while they are working in the kitchen, so yes, we give them a

21   white uniform to wear.  It is in our standards that they wear

22   a white uniform, and we provide them with the slip-guard

23   boots and PPEs that's required for food service.

24   Q   All those uniforms are only and exclusively for those who

25   are in the detainee work program in the kitchen, correct?

1    A    Just in the kitchen, correct.

2    Q    You had also testified yesterday -- feels like ancient

3    history, doesn't it?  You testified yesterday to the fact

4    that you are only having a few detainee workers showing up on

5    their shifts right now; is that correct?

6    A    That is correct.

7    Q    It's also true, Ms. Henderson, that the overall population

8    of detainees at the Northwest Detention Center is unusually

9    low right now because of COVID; isn't that true?

10   A    It is unusually low, yes, it is.

11   Q    So you have, what, about, you know, 300 or so detainees

12   right now; is that correct?

13   A    Roughly, yes.

14   Q    And in the past, you would have in excess of 1300, up to

15   the capacity of over 1500; is that right?

16   A    Yes.

17   Q    So during this time of COVID, the capacity has been lower

18   and your food service requirements as a result are lower; is

19   that correct?

20   A    The requirements are still going to be there.  The

21   standard as far as food service is still going to be there.

22   Q    But you are providing three meals a day for 300 detainees

23   or 900 meals as opposed to three meals for 1500 detainees?

24   A    Yes.

25   Q    There is a lower level of production required right now?

1    A    Yes, there is.

2    Q    I also want to just be really clear that in spite of

3    COVID, there have been no -- there have been no GEO staff

4    laid off or terminated because of the change of population,

5    correct?

6    A    There hasn't been a change.

7    Q    You are fully staffed to provide services for this lower

8    level of population?

9    A    Yes, we are prepared to do that whether it's at 300 or

10   1500.

11   Q    Now, when you looked at the GEO staffing requirements for

12   detainee workers, you testified that you had looked at the

13   actual staffing needs and determined that 25 or 30 workers

14   were needed per food preparation shift.  Do you recall that

15   testimony?

16   A    I do.

17   Q    And in fact, prior to September of 2018, you were getting

18   pretty much actual staffing, full staffing in accordance with

19   your staffing plan; isn't that true?

20   A    It would vary.  The detainee volunteer workers would vary

21   on a daily basis.  If there was scheduled 25, that didn't

22   mean that I was counting on all 25 to show up.

23   Q    Isn't it true that prior to September of 2018, in fact,

24   you were getting in excess of 25 detainees on a regular

25   basis?

A    There has been days where I had 25.  There has been days
where I had five.  It would all vary.  I cannot count on that
amount every day.

Q    I know you can't count on it, Ms. Henderson, but what I am
asking you about is what your experience was.  When I took
your deposition, you said prior to September of 2018 you had
actual staffing of 25 to 30 workers who worked and fully
staffed each of the meal shifts in the kitchen, didn't you?

        MS. SCHEFFEY:  Objection.

BY MS. BRENNEKE:

Q    On average?

        MS. SCHEFFEY:  Objection.

        THE COURT:  State your grounds, Ms. Scheffey.

        MS. SCHEFFEY:  This isn't proper impeachment.  We
don't have the deposition in front of the witness or in front
of me so I can follow along.

        THE COURT:  That's a fair objection.

        MS. BRENNEKE:  Let me ask the question, and I will go
to the deposition if we need to.

BY MS. BRENNEKE:

Q    Ms. Henderson, I am talking about averages, not particular
days.  So on average, prior to September of 2018, you had
actual staffing of 25 to 30 detainee workers who worked and
fully staffed each of the meal shifts in the kitchen; isn't
that correct?

1  A    That's what was on the kitchen roster.  Again, I can't say

2  that every day there was 25.  25 was what was asked of.  Was

3  25 there on a daily basis?  There may have been days that

4  there were 25.  But there is also days that there was less

5  than the 25.

6  Q    Okay.  You had the experience of them being more fully

7  staffed than not during that time period; is that correct?

8  A    We have had days where there is 25.  Again, we have also

9  had days when there was less than the 25.

10  Q    Why don't we take a look at an exhibit that Ms. Scheffey

11  showed you earlier, Exhibit 309.  Pull that up, please.

12  Caiti, we've shown her before page 026947, which I believe is

13  on page 33.  Let's go back one.  Let's go to 47.  We want to

14  see Bates stamp 026947.

15      You recall Ms. Scheffey showed you this page of this

16  very long exhibit, which this was the breakfast shift for

17  October 22, 2015; is that correct?

18  A    That was the day that document was created.

19  Q    Right.  Okay.  The second page is -- if you go to the

20  second page, this was the number of detainee workers who were

21  set up to work that day, and there was 33 listed as

22  authorized; is that right?

23  A    Can I explain a little bit about what this document is?

24  This document was created on the 22nd.  If you look at the

25  top towards the right, it has Wednesday, Thursday, Friday,

1    Saturday, Sunday, Monday, Tuesday.  Those are the days -- so

2    October 22nd is the beginning of when that document was

3    created where the volunteers had volunteered.  Those were the

4    days.  Also on day offs, there are days where the detainees

5    have already requested to be off.  Any given day -- this

6    document is blank, but any given day what we would do, we

7    would put an "S" on it that they were there.  Looking at this

8    document, it looks like, yes, there is 33 that volunteered,

9    but on a daily basis, starting with Wednesday, that would be

10   the day that we would annotate that those detainees showed

11   up.  So again, there is that average of 33.  There could have

12   been 20 or 15 that showed up on that Wednesday.  That is how

13   we keep track.

14   Q   All right.  Ms. Henderson, do you recall that when -- I am

15   going to have you take a look at your deposition transcript.

16   On page 40, do you recall when I asked you at page 23 -- line

17   23, I said, "So prior to September or October of 2018, did

18   you have 25 to 30 people per shift of the detainee workers

19   working in the kitchen?"  You said, "In that range, yes."  Is

20   that correct?

21   A   That is correct.

22   Q   So on average, you were getting 25 to 30 detainees working

23   on average?

24   A   So if we go back to our -- that last exhibit, on average,

25   we were getting 33 that volunteered on average per day.  If

1    that is not filled out, then, yes, we do get the average of

2    25.  You have to base it on that form being filled out

3    throughout that week to see if there is volunteers that

4    actually came those days.

5    Q   I just want the jury to understand, you authorize more

6    workers because sometimes people need a day off or they are

7    sick or something like that, or they transition out?

8    A   I am not going to use the term "authorized."  They

9    volunteer.  So if I have 25 people that volunteer that want

10   to work, we allow them to do that.  So we got 33 people that

11   decided that they wanted to volunteer to work that breakfast

12   shift.  Again, you have to look at the whole scope of that

13   document.  It came out on the 22nd.  But it started on that

14   Wednesday, so every day of the week there is going to be -- I

15   can't count on how many is going to show up.

16   Q   Right.  I understand that.  What was important to me is

17   that in your testimony before, and I think what you just said

18   to the jury is that, in fact, you had 25 or 30 people per

19   shift actually showing up for each food service shift; isn't

20   that correct?

21   A   No.

22   Q   On average?

23   A   On average, there is 25.  That's what we -- that signed up

24   to volunteer to work.  But on a daily basis, if you have the

25   document that was filled out for that whole week, you would

1    see the average that came.  That was the average that
2    volunteered.
3    Q    I understand.  But in your deposition that we just read,
4    you said you had 25 to 30 people per shift working in the
5    kitchen.  You said in that range, yes; correct?
6    A    It can be in that range.  I am saying -- I feel like I'm
7    saying-- giving you the same answer.
8    Q    Well, Ms. Henderson, I think it is important because
9    obviously it is going to shift.  The jury needs to understand
10   what the norm has been in the past of how things have worked.
11   Also, prior to September or October of 2018, you also had ten
12   to 12 night cleaning detail workers showing up to work for
13   those shifts, didn't you?
14   A    If the document that we were showing, the exhibit that we
15   were showing that was completed for that week, then we can
16   actually look and have a vigil (sic) of how many actually
17   showed up.  On average, yes, we were asking for 20 to 25
18   volunteers to work.  That was per shift, that is correct.
19   What actually came is a different number.  I wish you had
20   that document to show.
21   Q    We can definitely show you some of your reports because
22   you are actually tracking this information on a daily basis.
23   You also track it on an annual basis, don't you?
24   A    Detainee volunteer workers?
25   Q    Yes.

 1    A    As far as that, I track meals.  As far as the volunteer

 2    worker that show up on that work roster, that's my only

 3    tracking that we keep on the detainees that sign up and

 4    volunteer to work.

 5    Q    That information gets cumulatively tracked so you can look

 6    at that on an annual basis, too; isn't that true?

 7    A    No.

 8    Q    Why don't we take a look at Exhibit 35?

 9            MS. SCHEFFEY:  Is 35 admitted, Andrea?

10    BY MS. BRENNEKE:

11    Q    Tell me when you've found that, Ms. Henderson.

12    A    I have it.

13    Q    Is that the 2013 year-end report for the Northwest

14    Detention Center?

15    A    Yes.

16    Q    That is something your food service department had some

17    components in that; is that correct?

18    A    Yes.

19            MS. BRENNEKE:  I move to admit that.

20            MS. SCHEFFEY:  I don't think we have the foundation

21    about whether she creates this or maintains it.

22            MS. BRENNEKE:  It is a stipulated exhibit,

23    Your Honor.

24            MS. SCHEFFEY:  I just want to make sure it is clear

25    before we admit it under her that she has some knowledge of

1    what is in here.

2            THE COURT:  Exhibit 35 may be admitted.

3                    (Exhibit 35 was admitted.)

4    Q   Ms. Henderson, why don't we go ahead and put -- okay.

5    That's the 2013 year-end report of the Northwest Detention

6    Center; is that right?

7    A   Yes.

8    Q   Your section, I think, begins on page 15.  Can you please

9    show us that page?  Is this the food service summary that

10   shows the tracking of the number of meals, including sack

11   lunches and special diets you served in 2013?

12   A   Yes.

13   Q   This shows a range from like the low end in July of

14   116,667 meals to the high in December of 167,472 meals; is

15   that right?

16   A   Yes.

17   Q   If you look at page 5 --

18           THE COURT:  Counsel -- well --

19           MS. BRENNEKE:  Would you like me to say the Bates

20   stamp numbers?

21           THE COURT:  Well, you have got to either go by one or

22   the other and tell the jury which one you are going by so

23   that it makes some sense.

24           MS. BRENNEKE:  Thank you, Your Honor.  I apologize.

25

1    BY MS. BRENNEKE:

2    Q   Can we go back to the food service summary.  If they are

3    making notes, that was page 35.

4          MS. BRENNEKE:  Your Honor, I am a little clunky

5    because we are trying to get it on the Zoom.  You are

6    absolutely right.  For the record --

7          MS. SCHEFFEY:  Mine only goes to page 26.

8    BY MS. BRENNEKE:

9    Q   What is on the screen is GEO-State 029822, that's page 15

10   where the food service summary is, right?  Is that correct,

11   Ms. Henderson?  That's page 15 of the report.  Okay.

12         Then I wanted to just also, if you would look at page 5

13   of the report, Caiti.  If you can help us get there.  All

14   right.  Page 5 of the report is GEO-State 029812.  This shows

15   an average daily population of detainees at the Northwest

16   Detention Center of 1,354; is that correct?

17   A   Yes, it is.

18   Q   And so not quite to capacity, but getting pretty close; is

19   that right?

20   A   Uh-huh, yes.

21   Q   To your point about the detainee work and how much work is

22   done in the kitchen, I want you to take a look, please, at

23   Appendix D, which is page 25 of that report.  This shows the

24   detainee work details by type at the Northwest Detention

25   Center; is that right?

A    Yes.

Q    It talks about detainee work details by types, and details are the same thing as shifts; is that true?

A    No, that is just the detail that they volunteered for, whether it be detailed laundry, kitchen, pod, that's the detail.

Q    Is it your understanding that when they are doing this tracking, they are tracking how many details or shifts were worked by detainees at the Northwest Detention Center that year?

A    Me personally did not comply (sic) this information.  I didn't give them information as far as tracking how many detainees worked per day.  That probably was on a classification basis.  I can't say that I was the one that gave them that information.

Q    Well, Ms. Henderson, you did testify that when people come to work, they sign that they have worked so they can get paid for that day; is that correct?

A    That is correct.  But there is more than one voluntary work program.

Q    You mean there is a voluntary work program in the kitchen, one in the laundry, one in the pod; is that what you mean?

A    Yes.

Q    So for the kitchen, you have those out count sheets that we have looked at, I believe, and when people work they sign

1  on there that they worked that detail or that shift, correct?

2  A   Yes.

3  Q   Then you pass those out count sheets on to the payroll

4  people so they get paid; is that correct?

5  A   That is correct.

6  Q   And so the work detail, or the work shifts are, in fact,

7  tracked every day by who worked that day so they could get

8  paid; is that right?

9  A   That is correct.

10 Q   You said you don't provide training on how to clock in or

11 clock out for the kitchen; is that right?

12 A   Not for detainees, no.

13 Q   Right, that's because you are not tracking the hours they

14 are working, are you?

15 A   Yes, we are.

16 Q   How are you -- how are you tracking the hours they work?

17 A   Because I know the times that they actually come in and

18 there is no clock in/clock out.  They are not employees.  The

19 standard does say, the voluntary work program says they can

20 work up to eight hours a day.

21 Q   Okay.  So, in general, you know how many hours they are

22 working because you know how long the shifts last; is that

23 right?

24 A   That is correct.  That's why it is broken down to three

25 different shifts.

1   Q    But when you are tracking who works, you are not having

2   them clock in and monitor how many hours or minutes they

3   worked that day, are you?

4   A    No, there is no clocking in or clocking out.

5   Q    Let's look back at our Exhibit 35 -- no, I want the

6   exhibit back up.  So when they work a shift, that information

7   is sent on to payroll.  What I want you to look at here in

8   terms of the types of work detail, this corresponds with the

9   areas of work of the voluntary work program in the facility,

10  correct, pods, laundry, medical, kitchen?

11  A    Yes.

12  Q    It says, for example, that in the pod there is 71,998

13  shifts and 57 percent of the workforce; is that right?

14  A    Yes.

15  Q    And then in the laundry says there were 11,938 shifts and

16  that was nine percent of the work in the voluntary work

17  program that happened in the facility that year; is that

18  right?

19  A    I believe so, yes.

20  Q    And then kitchen, this is your area, you had 29,521 shifts

21  worked by detainee workers.  That was 23 percent of the work

22  of the voluntary work program at the Northwest Detention

23  Center in 2013; is that right?

24  A    Yes.

25  Q    So effectively, the kitchen provides work opportunities

1   for about a quarter of the people at the Northwest Detention

2   Center who wanted to work; is that right?

3   A    That is correct.

4   Q    In the end, the total I guess at the end of that year,

5   there were 126,474 work details or shifts by detainee

6   workers; is that correct?

7   A    That is correct.

8   Q    Excuse me for one moment, please.  I want to make sure

9   that -- all right.  Just so the jury is really clear, because

10  there is a lot of evidence in the record that may come out

11  through other witnesses.  I want you to take a look at one of

12  your kitchen sign-off sheets.  Could you please pull up

13  Exhibit 57?  Do you have that, Ms. Henderson?

14  A    Yes, I do.

15  Q    Is that the detainee worker kitchen cleanup pay sheet the

16  kitchen officer would have filled out and the detainee worker

17  signed to show they worked on May 9th of 2013?

18  A    Yes.

19            MS. BRENNEKE:  I move to admit.

20            MS. SCHEFFEY:  No objection.

21            THE COURT:  Exhibit 57 may be admitted.

22                 (Exhibit 57 was admitted.)

23  BY MR. BRENNEKE:

24  Q    This is an example of what you were talking about, that

25  you have the rosters of who is authorized, but then when

1   people actually show up you get to track them by day, by

2   shift, and the detainee workers sign off that they worked; is

3   that right?

4   A   This is the pay sheet that gets turned in, yes.

5   Q   Uh-huh.  Okay.  And so on this date, this shows that ten

6   detainee workers actually showed up and signed off that they

7   worked on the night cleaning shift of May 9th, 2013; is that

8   right?

9   A   Yes.

10  Q   And then this gets passed on for payroll and tracking that

11  we saw; is that right?

12  A   Uh-huh, yes.

13  Q   You do this for every single shift that is worked in the

14  kitchen; is that right?

15  A   Yes, we do.

16  Q   That is your payroll tracking process?

17  A   Yes.

18          MS. BRENNEKE:  I have no further questions,

19  Your Honor.

20          THE COURT:  May this witness now be excused?

21          MR. WHITEHEAD:  Your Honor, I do have a couple

22  questions.

23          THE COURT:  Go ahead, Mr. Whitehead.

24                  RECROSS-EXAMINATION

25

1    BY MR. WHITEHEAD:

2    Q   Ms. Henderson, let me see if I can find you on my screen.

3    There you are.

4         I don't want to lose sight of the big picture of your

5    testimony or the food service operation.  Someone needs to

6    prep the food at the Northwest Detention Center, correct?

7    A   That is correct.

8    Q   Someone needs to serve the food, correct?

9    A   That is correct.

10   Q   Someone needs to clean up afterward?

11   A   That is correct.

12   Q   This happens on a big scale; is that right?

13   A   Big scale every day, that is correct.

14   Q   You have a facility that can hold up to 1500 people,

15   right?

16   A   Yes, huh.

17   Q   If I understood your testimony yesterday, we even have GEO

18   personnel that take meals from the kitchen; is that right?

19   A   Yes.

20   Q   ICE personnel?

21   A   That is correct.

22   Q   Someone needs to do this work?

23   A   Yes.

24   Q   Is that right?

25        Historically, detainee workers have been a part of the

 1  solution at the Northwest Detention Center, correct?

 2  A   They have been a help, yes.

 3  Q   All right.  Remind me, how many kitchen staffers do you

 4  have?

 5  A   I have 13 in my department.

 6  Q   But it is only two that work at any given time actually

 7  prepping and serving food, correct?

 8  A   Incorrect.  There is six people on shift per day, three in

 9  the morning, three in the afternoon.  Myself and my

10  production manager is there seven days a week.

11  Q   Six people divided by three shifts is two working at any

12  given time, correct?

13  A   When you ask "shifts," there is two shifts, morning shift,

14  afternoon shift, three cooks in the morning, three cooks in

15  the afternoon.

16  Q   All right.  I understand your testimony in terms of the

17  number of people cooking at any given time.  The GEO

18  personnel is outnumbered by the detainee workers, correct?

19  A   Yes, they are.

20  Q   The detainee workers, they are doing the bulk of the food

21  prep, serving and clean up?

22  A   That is incorrect.  Because if the detainees don't show

23  up, my staff will be able to get those meals out.

24  Q   I understand that part of your testimony.  I just want to

25  be clear on this point:  Is it your testimony that someone

1    other than the detainee workers does the bulk of the food

2    prep, serving and clean up?

3    A    GEO staff was hired to do that.

4    Q    All right.  Again, I want to be clear on your testimony.

5    I don't want to put words in your mouth.  Your testimony is

6    GEO staff does the bulk of the food prep, serving and clean

7    up at the Northwest Detention Center?

8    A    That is correct.  That's not all of what we do.

9    Q    Okay.  And to that part of your testimony, would it be

10   fair for the jury to judge what you have just told us against

11   perhaps what others testify or document in this case?

12   A    We were hired by GEO to run the food service department

13   and to ensure that we are serving the appropriate meals seven

14   days a week for those that are detained at that facility.

15   Q    You called the detainee workers "volunteers" a number of

16   times, but they work for money; is that right?

17   A    It is a voluntary work program.  There are detainees that

18   are there that don't volunteer to do any jobs.

19   Q    They are paid for their time; is that correct?

20   A    That is an ICE standard they put out that will give them

21   that incentive, but, again, they are detainees.  That's why

22   there is programs there that is mandated that we have

23   different programs for them.  One just happened to be

24   volunteering working in the kitchen.  Again, they may

25   volunteer and they may not.

1  Q   I understand what you are saying.  But it is a yes-or-no

2  question.  The detainee workers are paid a dollar a day for

3  their work, correct?

4  A   Yes, they are.

5  Q   Are you a volunteer?

6  A   I have volunteered before.  But I'm hired as an employee

7  for GEO.

8  Q   That's right.  You are paid, correct?

9  A   That is correct.

10  Q   You do your job for the money?

11  A   I am paid to do the job that is required of me to do.

12        MR. WHITEHEAD:  Thank you.  No further questions.

13        THE COURT:  May Ms. Henderson be excused?

14        MS. BRENNEKE:  Yes, Your Honor.  Thank you very much,

15  Ms. Henderson.

16        THE COURT:  Ms. Henderson, I have one question for

17  you.

18        THE WITNESS:  Sure.

19        THE COURT:  How do you figure out what size of boots

20  to get for the detainees?

21        THE WITNESS:  On average, I go from a size six to a

22  size 14.  I have had to actually purchase boots for a

23  gentleman that had an 18.  So I have all different sizes

24  there.

25        THE COURT:  Okay.  As one with size 15 feet, I was

```
 1   curious about that.
 2           THE WITNESS:  Yes, I can --
 3           THE COURT:  Thank you.
 4           THE WITNESS:  You're welcome.
 5           THE COURT:  You may be excused.
 6           THE WITNESS:  Thank you.
 7           MS. CHIEN:  Your Honor, Ms. Singleton is available
 8   for continuation of cross-examination.
 9           THE COURT:  Good, let's get her in.
10           THE CLERK:  Yes, Your Honor, she's on her way into
11   the main session right now.
12           THE COURT:  Ms. Singleton, you were previously sworn.
13   You are still under oath.  We will continue with your
14   testimony.  Where were we when we stopped with her?
15   Ms. Mell, you were cross-examining.
16           MS. MELL:  I am good to go.  That is correct.
17                   CROSS-EXAMINATION (Resumed)
18   BY MS. MELL:
19   Q   Ms. Singleton.
20   A   Yes.
21   Q   You were a GEO employee, correct?
22   A   Yes.
23   Q   And as a GEO employee, one of the benefits GEO paid for
24   you was a health and welfare benefit, they gave you a
25   stipend --
```

1        THE CLERK:  Your Honor, sorry to interrupt.  Can we

2   take a short break for Juror No. 3?

3        THE COURT:  We will take a break, folks.  We will

4   just be at recess for a few minutes.

5                    (Recessed.)

6        THE COURT:  Let's go back on the record and keep

7   going.  We will take a break in about half an hour.

8        THE CLERK:  I am bringing the jury back in.  Thank

9   you for accommodating that.  Juror No. 1 is not connected to

10  audio at the moment.

11     It appears Juror No. 1 was able to reconnect.  As soon as

12  she turns the video on, we should be ready to go.  We are

13  ready to continue.

14       THE COURT:  All right.  The witness is present.  All

15  right, Ms. Mell, you may continue.

16       MS. MELL:  Thank you, Your Honor.

17       THE COURT:  Perhaps -- excuse me.  I'm sorry to

18  interrupt.  We had to get some equipment to one of the jurors

19  and the equipment was being delivered, that's why we had to

20  take a break so she could take care of that.  Then we had the

21  other glitch that is now worked out.  I'm sorry to interrupt.

22  We will go back to where we were and, Ms. Mell, you can start

23  again.

24       MS. MELL:  I am going to ask the question again just

25  so we start fresh.

BY MS. MELL:

Q    So Ms. Singleton, as -- you were employed by the GEO

Corps, correct?

A    Correct.

Q    As an employee of the GEO Corporation, you received a

monthly benefit in the form of a health and welfare benefit,

correct?

A    Correct.

Q    You could spend that at your election to apply to health

care services, correct?

A    Correct, or medical benefits.

Q    Medical benefits.  And at the Northwest Detention Center,

Northwest ICE Processing Center there are a number of medical

providers on site, correct?

A    Yes.

Q    There is a whole range of health care delivered there,

mental health services, dental services?

        MS. CHIEN:  Objection, relevance.

BY MS. MELL:

Q    Those kinds of services, correct?

        THE COURT:  The objection is overruled.

        THE WITNESS:  Yes.

BY MS. MELL:

Q    All right.  And with regard to the availability of those

doctors to you, as a GEO employee, you were not afforded the

1  free medical if you needed to see a doctor that day, correct?

2  A   No, that was only for the detainees.

3  Q   So the detainee voluntary work program participants had

4  access to those medical providers 24/7, correct?

5  A   All detainees have access to that.

6  Q   All right.  So in terms of the ability to access medical

7  care, dental care, mental health care on site, they were able

8  to do that for free there, correct?

9  A   Correct.

10 Q   And when they accessed those services, there was no

11 paperwork that was then brought back to you to apply to their

12 voluntary work program benefit, correct?

13 A   Incorrect.  There are workers in certain areas that

14 require paperwork for medical.

15 Q   Okay.  So the paperwork that you received from medical

16 pertained to the kitchen in particular, correct?

17 A   Correct.

18 Q   So you had to get health care clearance from the doctors

19 there in order for a voluntary work program participant to

20 volunteer in the kitchen?

21 A   Correct.

22 Q   Did you ever get any paperwork back from medical to deduct

23 from their volunteer worker pay the cost of that medical

24 clearance?

25 A   I wouldn't receive that information, if it has to do with

1  any of that.

2  Q   Did you ever receive any documentation, just billing

3  invoices, to apply to VWP participant pay as a deduction?

4  A   We don't receive anything with billing.  So if we did, it

5  wouldn't come to me either way.

6  Q   To the best of your knowledge, were there any deductions

7  that you processed from the voluntary worker pay?

8  A   We do zero deductions for any reason.

9  Q   As an employee of GEO, you were a union employee, correct?

10  A   Correct.

11  Q   And as a union employee, benefits for union membership

12  were taken from your paycheck, correct?

13  A   No.

14  Q   Did you elect not to contribute to the union?

15  A   No, we don't have that choice to be employed.  So I paid

16  it on my own.

17  Q   You paid it separately?

18  A   Correct.

19  Q   So you paid for union benefits as a GEO employee at the

20  Northwest ICE Processing Center, correct?

21  A   I pay union dues.

22  Q   Do you have a union grievance or any unfair labor practice

23  claim pending?

24  A   With our union?

25  Q   Correct.

1    A    No, I have never utilized the union.

2    Q    In terms of your employment status, you have never asked

3    them to advocate on your behalf, correct?

4    A    Yes, when I was terminated, then I did.

5    Q    The union declined to represent you; is that correct?

6    A    Correct.

7    Q    Did they give you a reason why they declined to represent

8    you?

9    A    Only that they don't know anything.

10   Q    I'm sorry, they didn't know anything?  What does that

11   mean?

12          MS. CHIEN:  Objection, relevance.

13          THE WITNESS:  Regarding termination.

14   BY MS. MELL:

15   Q    Did you give them any information about your termination?

16          MS. CHIEN:  Objection, relevance.

17          THE COURT:  Overruled.  You may answer,

18   Ms. Singleton.

19          THE WITNESS:  Yes, I did.

20   BY MS. MELL:

21   Q    What information did you provide to your union about your

22   termination?

23   A    That it was unlawful termination due to discrimination for

24   race and retaliation.

25   Q    Did you also give them any paperwork you received from the

1   Department of Labor & Industries?

2   A   No.

3   Q   At the time you requested union representation, had you

4   received your notification from the Department of Labor &

5   Industries as to a determination of innocent

6   misrepresentation?

7   A   Yes.

8   Q   So at the time you asked for union representation, they

9   knew that you had a finding of misrepresentation against you

10  by the Department of Labor & Industries?

11  A   I don't know.

12  Q   Was that finding of misrepresentation a reason the union

13  gave for not representing you?

14        MS. CHIEN:  Objection, assumes facts not in evidence.

15  She didn't say she knew.

16        THE COURT:  Objection is sustained.

17  BY MS. MELL:

18  Q   Did the union --

19        THE WITNESS:  No.

20  BY MS. MELL:

21  Q   Okay.  You had no conversations with the union over the

22  significance of your misrepresentation findings, correct?

23        MS. CHIEN:  Objection.  Again, assumes facts not in

24  evidence.

25        THE COURT:  The objection is sustained.

1      THE WITNESS:  Innocent misrepresentation.

2      MS. CHIEN:  Ms. Singleton, when it is sustained, it

3   means you don't have to answer.

4   BY MS. MELL:

5   Q   With regard to the collective -- strike that.

6      There was a collective bargaining agreement that

7   applied to your position; is that correct?

8   A   I don't know.

9   Q   Do you know whether or not the detainee volunteers were

10  covered by any kind of collective bargaining agreement, union

11  representation?

12  A   I don't know.

13  Q   Did you ever process any documentation or paperwork to

14  make sure that the detainee workers would be reflected as

15  part of a union or not, whether or not they were represented?

16  A   That wouldn't -- that is not part of my job duties.

17  Q   In terms of documenting the status of detainees who were

18  participating in the voluntary work program, was there any

19  paperwork that you processed that related to union

20  representation for detainees?

21  A   Wouldn't be part of my job responsibility.

22  Q   Why do you say it wouldn't be part of your job

23  responsibilities?

24  A   Because the policy for the voluntary work program for GEO

25  doesn't state that is something I am required to do or

1    maintain.

2    Q    Does the policy for the voluntary work program mention

3    detainees as employees?

4    A    Not that I can recall.

5    Q    Does the policy for voluntary work program participants

6    entertain the idea that voluntary work program participants

7    are represented by unions?

8    A    Not that I am aware of.

9    Q    Did you ever process any paperwork for any voluntary work

10   program participant related to a union grievance?

11   A    I already indicated it wouldn't come to me if it does

12   exist.

13   Q    Have you ever seen in your tenure, your 20 years in

14   working with the voluntary work program, a union grievance or

15   union grievance paperwork that would pertain to a voluntary

16   work program participant making a grievance, a union

17   grievance?

18   A    Those wouldn't come to me.  There is a grievance

19   department.

20   Q    Is there a grievance department for employees?

21   A    I wouldn't know.

22   Q    As an employee, did you ever grieve any conditions of your

23   employment?

24   A    Not that I can recall specifically, no.

25   Q    Do you know whether or not voluntary work program

1    participants had a grievance process?

2    A    All detainees have a grievance process.

3    Q    Does that grievance process allow you to grieve the

4    conditions of your work?

5    A    I wouldn't know if theirs goes to the same place or not.

6    Q    So you are unfamiliar with who makes the final decision as

7    to any complaint or grievance filed by a voluntary work

8    program participant?

9    A    We have a grievance policy, GEO does.  We have a GEO

10   coordinator that receives those and processes those within

11   GEO.

12   Q    You don't know anything about how that process ends,

13   correct, that's not your department?

14   A    No, that's not my department to know the ultimate outcome

15   of it.

16   Q    If ICE was the ultimate decision maker, you wouldn't know

17   that, correct?

18   A    The only information I know about the grievance policy is

19   a process by GEO.

20   Q    You have never participated in it, right?

21   A    I have seen grievances for other reasons that haven't been

22   forwarded to me.  It only has the facility administrator's

23   name on it for signature.

24   Q    The reason you got the grievance is to deal with the VWP

25   participant status?

Singleton - Cross

1    A    No, classification stuff is the only one I can recall

2    right now.

3    Q    So with regard to unfair labor practices, are you familiar

4    with what that is?

5    A    Yes.

6    Q    Did you file an unfair labor practice when the union

7    denied you representation?

8    A    No, I don't -- didn't deal anything with the union.  I am

9    dealing with it through my legal options with an attorney.

10   Q    Okay.  You are presently suing GEO?

11   A    Exploring the legal options with an attorney.

12   Q    You have an attorney retained for that purpose?

13   A    Exploring legal options with an attorney.

14   Q    Okay.  With regard to unfair labor practice, unfair labor

15   practices, in your position in overseeing the processing of

16   paperwork for the voluntary work program, did you ever see

17   any unfair labor practice complaints or paperwork filed on

18   behalf of or by a voluntary work program participant?

19   A    I processed requests asking for work.

20   Q    Okay.  Those are the kites?

21   A    Correct.

22   Q    So the processing of the kites was to acknowledge and

23   recognize which detainees wanted to participate in the

24   voluntary work program, correct?

25   A    The ones that came to me.

1    Q    Okay.  Different area of employee benefits, unemployment.

2    As a GEO employee, you are entitled to unemployment

3    compensation benefits, correct?

4    A    I would imagine.  I haven't applied for any.

5    Q    You have never asked for that kind of benefit from the

6    Department of Employment Security, correct?

7    A    Not while working for GEO, no.  I am not sure what GEO

8    offers.

9    Q    Okay.  How about with regard to detainee workers in --

10   well, anywhere, anywhere any volunteer could participate in

11   the voluntary work program, were there ever any applications

12   that you processed for unemployment benefits for those

13   volunteers?

14   A    They wouldn't come to me.  I process requests for work.

15   Q    Do you keep a file separately on each detainee or keep

16   collective information to who is volunteering?

17   A    I just receive the requests and process them.  I don't

18   maintain detainee files.

19   Q    Okay.  All right.  How about with regard to worker

20   compensation benefits, did you ever process any applications

21   for workers' compensation benefits for detainees?

22   A    Again, those would not come to me.  I only do the ones for

23   requests for work.

24   Q    So as an employee, you are entitled to worker's

25   compensation benefits, correct?

1   A   Yes.

2   Q   As a matter of fact, that's one of the benefits that you

3   accessed as a GEO employee, correct?

4   A   Correct, I'm still receiving workers' compensation.

5   Q   Okay.  In fact, that's what relates to the innocent

6   misrepresentation finding against you, correct?

7   A   Correct.

8           MS. CHIEN:  Objection.

9           THE WITNESS:  An oversight by L&I.

10  BY MS. MELL:

11  Q   Do you still at present owe close to $40,000 to the State

12  of Washington?

13          MS. CHIEN:  Objection, assumes facts not in evidence.

14          THE WITNESS:  No, ma'am.

15  BY MS. MELL:

16  Q   Did the State of Washington assist you in resolving your

17  outstanding obligation to Labor & Industries for unemployment

18  benefits?

19          MS. CHIEN:  Objection, assumes facts not in evidence.

20          THE COURT:  I think that is a fair objection,

21  counsel.

22          MS. MELL:  I think it is a fair objection.  I don't

23  think I got as many of the background pieces in there.  I

24  will start back a few steps.

25

Singleton - Cross

BY MS. MELL:

Q   I see you have an airplane wing.  I think it might be Mount Rainier depicted in your background; is that correct?

A   Possibly.

Q   Is that an airplane wing of an Alaska Airlines jet?

        MS. CHIEN:  Objection, relevance.

BY MS. MELL:

Q   No particular airplane, but you do have a connection to Alaska Airlines, correct?

A   Correct.

Q   Your connection to Alaska Airlines is that you have a job with them, you are one of their employees, correct?

A   Correct.

Q   You have worked for an Alaska Airline -- for Alaska Airlines as an employee in the position of reservation sales agent since December 3rd, 2018, correct?

A   Approximately, correct.

Q   Okay.  And as of December 3rd, 2018, you were still a GEO employee, correct?

A   Correct.

Q   All right.  So you were receiving income from GEO and you were receiving income from Alaska Airlines, correct?

A   Correct.

Q   You are a hard worker.  Didn't stop there.  You also were receiving income because you had a loved one of some kind, I

1    believe, that you were caring for?

2            MS. CHIEN:  Objection, assumes facts not in evidence.

3    BY MS. MELL:

4    Q   Is that correct?

5            THE COURT:  She may answer.

6            THE WITNESS:  It wasn't income.  It was considered

7    compensation for a disabled child of mine.

8    BY MS. MELL:

9    Q   You were receiving Department of Social and Health

10   Services benefits as a caregiver for your child who is

11   disabled?

12   A   Yes, compensation for providing care.

13   Q   Okay.  So in -- I think the title is independent care

14   provider; is that correct?

15   A   Possibly.  I am not sure what the exact title is.

16   Q   That ran -- you are still getting those benefits, correct?

17   A   Correct, she's still my child.

18   Q   So she's -- it doesn't matter whether or not your child is

19   a minor or an adult for those benefits, correct?

20   A   Correct.

21   Q   Okay.  So the period of benefits began in 2018 or prior to

22   that?

23   A   I have always received some type of benefit under one

24   program or another.

25   Q   Okay.  Did she turn 18 -- I'm sorry.  I don't even know

1    your child's name.  I don't mean to refer to her

2    disrespectfully.  Do you have a daughter or son?

3    A    Daughter.

4    Q    Your daughter, did she turn 18 in 2018?

5    A    No, she had already been 18 before that year.

6    Q    Okay.  Did your benefit status change in 2018 so you were

7    receiving a different kind of state benefit as of that date?

8    A    At some point, yes.

9    Q    So those benefits were paid throughout 2018 and 2019?

10   A    Correct.

11   Q    Okay.  Those benefits have stayed the same, then, since

12   they changed in 2018?

13   A    They changed again as well.  Still some type of

14   compensation.

15   Q    Okay.  And then on January 11th of 2018, you made a claim

16   for workers' compensation benefits because you injured

17   yourself in defensive tactics training; is that correct?

18   A    That is correct.

19   Q    Was the injury a shoulder injury?

20   A    Correct.

21   Q    And it was of significance that you actually were off

22   work, correct?

23   A    Not in January of 2018.

24   Q    Did you -- when then did you go off work?  Did you go off

25   work for that injury?

1    A    Yes, but I had zero time lost for the injury until July

2    2019.

3    Q    So you accrued some time loss and then you took time off?

4    A    No, I worked every day like I was scheduled.

5    Q    I am just trying to understand the timing.  The injury

6    occurred in January, but you didn't take any time off until

7    later, much later, like mid-year, July, is that what you

8    said?

9    A    Correct.  The process that workers' compensation has you

10   go through.

11   Q    Okay.  So I am just trying to understand the injury.  Was

12   the injury an injury that required you to be off work, or was

13   there some other reason you went off work that far after the

14   injury?

15   A    In July 2019 is when I had surgery for the injury.

16   Q    Okay.  So it was the surgery that precipitated the need to

17   be off and recover?

18   A    Correct.

19   Q    The recovery period for that was how long?

20   A    Still currently in recovery.

21   Q    You haven't been eligible to return to work at GEO at all?

22   A    They terminated me, so I was cleared to go back to work.

23   Q    Okay.  So then I don't understand.  Are you still

24   recovering?  Were you just returned to work in a light duty

25   capacity?

1   A   Correct.

2   Q   Okay.  All right.  At the point in time that you made

3   your -- well, so you get the injury and then you submit a

4   claim for unemployment compensation, correct?  Not

5   unemployment, workers' compensation.  I have to get my

6   departments straight.  Workers' compensation benefits, you

7   made a claim for those?

8           MS. CHIEN:  I object just because this is going quite

9   long.  I am going to object on relevance.

10          MS. MELL:  Your Honor, I need discretion on

11  foundation to get to the conclusion.

12          THE COURT:  The objection is overruled.

13  BY MS. MELL:

14  Q   Ms. Singleton, did you understand the question?

15  A   I didn't hear the question.

16  Q   I'm sorry.  You made a claim for unemployment compensation

17  benefits for this workplace -- did I say the wrong thing

18  again?  Did I do it wrong again?

19      You made a claim for workers' compensation benefits for

20  your workplace injury, correct?

21  A   I filed my required paperwork for the injury itself.  I

22  wasn't compensated by workers' compensation at all at that

23  point for anything monetary.

24  Q   At some point, they recognized your claim, correct, and

25  started paying you benefits?

1    A    They recognized the claim, but I didn't receive any paid

2    benefits until after I had surgery July of 2019.

3    Q    So at that point in time, they started paying you benefits

4    that included wage loss, correct?

5    A    In July of 2019, correct.

6    Q    Okay.  All right.  Did you ultimately -- well, when you

7    made that claim, did you disclose the income you were

8    receiving from Alaska Airlines?

9    A    Yes.

10   Q    Did you disclose the income you were receiving from DSHS?

11   A    Yes.

12   Q    Okay.  And did you ultimately in February receive a

13   notification from the Department of Labor & Industries that

14   you had an overpayment for a time loss compensation

15   obligation in the amount of $43,527.82?

16   A    February of 2021, correct, somewhere roughly around there.

17   Q    Obviously that was not well-received news, correct?

18   A    Correct.

19   Q    Do you still owe the Department of Labor & Industries or

20   the State of Washington in overpaid benefits?

21   A    Not 43,000.

22   Q    Is that because you have paid some of that off?

23   A    No, it is because they have reduced it several times.

24   Q    So you have been in negotiations with the State of

25   Washington to reduce that amount, correct?

1   A    It is under appeal for the entire amount.

2   Q    Okay.  So the only entity that can reduce that amount is

3   the State of Washington, correct?

4   A    Not sure.

5   Q    You don't understand how the process works?

6   A    I am not sure if another entity can change that amount.

7   Q    It is a state benefit, correct?

8   A    Correct.

9   Q    It's not under the federal system, correct?

10  A    Correct.

11  Q    Do you have a lawyer representing you in that process?

12  A    No.

13  Q    So you are filing the appeal and handling it on your own,

14  correct?

15  A    Correct.

16  Q    The basis for the Department assessing you that amount of

17  money you owe the State was the misrepresentation, correct?

18  A    Innocent misrepresentation, meaning it was an oversight,

19  but nothing intentional on their part.

20  Q    Sure.  The innocent misrepresentation was on your part;

21  you didn't know that you needed to disclose all those

22  benefits?

23  A    Incorrect.  They have always known, and documented that

24  they have always known.

25  Q    So they just didn't catch it.  They didn't apply it

1    correctly to the amount they paid you, correct?

2    A    Whoever did the investigation, never had a conversation.

3    I'm not an L&I worker, so I have no clue how they came to

4    that determination.

5    Q    One of the things you are appealing is that since it's not

6    your fault, you would like them to take accountability for

7    their error and not make you pay back those benefits,

8    correct?

9    A    It was never an innocent misrepresentation because it

10   never occurred.  I disclosed all income at the time.  It was

11   always documented, so it was never not disclosed for it to

12   have an innocent misrepresentation of an income that always

13   existed and they were aware of.

14   Q    So it's the innocent misrepresentation that really

15   troubles you, a finding like that hurts your reputation,

16   correct?

17   A    Innocent means you did nothing wrong.  So there is no

18   legal recourse for that.  They can't do anything to me for

19   that one.

20   Q    Okay.  I just wanted to understand.  Are you asking for

21   that finding to be reversed or not?

22   A    For the entire thing to be reversed.

23   Q    The idea of innocent misrepresentation and that finding

24   and the amount owed was information that GEO learned,

25   correct?

Singleton - Cross

1    A    Well, everybody that is notified of the overpayment.

2    Q    That included GEO, correct?

3    A    I believe so.

4    Q    You actually had a conversation with the facility

5    administrator, Bruce Scott, over that, correct?

6    A    Correct.

7    Q    In your conversations with Mr. Scott, you explained to him

8    it occurred, right -- let me step back a moment.  Did

9    Mr. Scott ask you about it, or had you already disclosed it

10   to GEO when you found out about the finding?

11   A    GEO already knew about it because they would have received

12   information at the same time I did.

13   Q    Okay.  And then you had a conversation with Mr. Scott

14   about that, correct?

15   A    No.

16   Q    I am missing something here in the chain of events.  So

17   you receive a notification and GEO receives a notification

18   that there is a finding of an innocent misrepresentation by

19   you and that you owe money to the State.  Did you learn that

20   GEO had an obligation to do something with that information?

21   A    The day that I was notified of termination.

22   Q    Who notified you that GEO had a duty to do something with

23   that finding by the Department?

24   A    Bruce Scott, the facility administrator.

25   Q    So you did have a conversation with the facility

1   administrator, Bruce Scott, over the finding, correct?

2   A   It wasn't a conversation.  He just said he notified me

3   that they were required to notify immigration.

4   Q   ICE?

5   A   Correct.

6   Q   Okay.  And did he explain --

7        THE COURT:  Excuse me.  Excuse me, counsel.  It is

8   time we took a break.  We'll take ten minutes, folks.

9                    (Recessed.)

10       THE COURT:  Okay.  You can bring everybody back.

11       THE CLERK:  Can I make sure our court reporter,

12  Angela, is here?

13       COURT REPORTER:  I am here.  Thank you, Tyler.

14     (The following occurred in the presence of the jury.)

15       THE CLERK:  We are ready to continue.

16       THE COURT:  All right.  You may continue, Ms. Mell.

17       MS. MELL:  Thank you, Your Honor.

18  BY MS. MELL:

19  Q   Ms. Singleton, is it correct that the issues that you were

20  having with the Department of Labor & Industries over the

21  innocent misrepresentation issue ultimately led to ICE or the

22  government withdrawing your governmental clearance?

23  A   That, I don't know.  Is that why I was terminated?

24  Q   Are you --

25  A   Never told me anything.  I have not received anything in

1   writing formal.  I received my payout for vacation.  I

2   received zero from them.  All they tell me is they can't tell

3   me anything.

4   Q   Is it your testimony today that no one from GEO

5   communicated to you that ICE had revoked your governmental

6   clearance after Mr. Scott informed them of the findings by

7   the Department of Labor & Industries?

8   A   Bruce Scott told me ICE pulled my clearance.  He didn't

9   say why.  I asked him why, and he specifically said he

10  doesn't know.

11  Q   Is it correct that Bruce Scott may not know the precise

12  reasons, but it was because they don't necessarily tell that

13  to him?

14         MS. CHIEN:  Objection, foundation.  She is not going

15  to know what Bruce Scott --

16         THE COURT:  Sustained.

17  BY MS. MELL:

18  Q   Was that conversation with Mr. Scott where he said that

19  they revoked your clearance in close proximity and at the

20  time after which he had told you he needed to inform ICE of

21  your findings of misrepresentation?

22  A   No.

23  Q   It was not?

24  A   No.  The conversation -- I was cleared to come back to

25  work.  I was supposed to come back to work on April 5th.

1   Q    So you were supposed to come back to work on April 5th.

2   When did Mr. Scott tell you he was communicating to ICE the

3   findings of the State against you?

4   A    He never told me he was communicating anything to ICE

5   regarding the findings of anything.

6   Q    It is my understanding that your prior testimony was that

7   he did tell you that he had to report to ICE?

8   A    That was during the conversation of after when I was

9   terminated when I was asking him why they would pull the

10  clearance when I have done nothing criminal.  I have done

11  nothing that is considered unlawful or anything that would

12  violate the terms of the contract.

13  Q    In that conversation, he told you he had to talk to ICE

14  and disclose the findings.  And after that conversation, he

15  got back to you and said ICE had pulled your clearance,

16  correct?

17  A    No, this was all at the same time.  I never talked to

18  Bruce Scott after that day.

19  Q    Okay.

20  A    He just said passingly, well, I did have to report -- or,

21  we did have to report that information, the information of --

22  from L&I to immigration.  I asked him, based on what?  He

23  didn't provide me any information.

24  Q    Okay.  Did someone at some point communicate to you ICE

25  had pulled your clearance?

1    A    No, I actually sent them an email and asked ICE why I was

2    terminated or if my clearance was pulled.  They responded

3    with, "You need to speak to GEO's human resources."

4    Q    Did you speak to GEO resources and learn that information?

5    A    She never said anything, human resources.

6    Q    You called her?

7    A    Yep.

8    Q    You asked her, "Did ICE revoke my clearance?"

9    A    She said, "I need to speak to Bruce Scott."

10   Q    And then nobody got back to you?

11   A    Correct.

12   Q    You have never heard?

13   A    I have never received anything in writing.

14   Q    Have you heard by phone or other form of communication

15   that ICE revoked your clearance?

16   A    That's what Bruce said when I talked to him on April 9th.

17   Q    Without your government clearance, you can't work at the

18   Northwest ICE Processing Center, correct?

19   A    According to Bruce.

20   Q    Do you understand that to be the case?

21   A    As far as I'm aware, yes.

22   Q    With regard to the voluntary work program and your job

23   duties, is it correct that over the voluntary work program,

24   when you were a classification officer for GEO, it was your

25   duty to comply with the requirements of the ICE PBNDS

1  standards?

2  A   I'm not sure what that would have been.  When I got hired,

3  I wasn't hired by ICE.  It was a different process at that

4  time.

5  Q   Over the years, is it correct that your job

6  responsibilities over the voluntary work program when you

7  were the classification officer for GEO was to comply with

8  the requirements of the ICE PBNDS standards?

9  A   Yes.

10 Q   Have you said before that everything that I do for that

11 job is in compliance with the ICE PBNDS standards?

12 A   GEO policies and procedures.

13 Q   So you have never before said, under oath, that everything

14 that I do for that job is in compliance with ICE PBNDS

15 standards?

16 A   Probably because that's what they mirror, GEO mirrors

17 ICE's PBNDS standards.

18 Q   So you would agree that you have represented that the job

19 is in compliance with ICE PBNDS?

20 A   Correct.

21 Q   So previously you testified that the voluntary work

22 program under ICE PBNDS standards were not mandatory; is that

23 correct?

24 A   Not that I was aware of, that they were mandatory, or the

25 specifics of what, you know, we had being done in it.  That's

1    what I am aware of.

2    Q    Okay.  You suggested, I think, in your response to one of

3    the questions that GEO was actually electing to operate the

4    voluntary work program because it wanted detainees to do the

5    cleaning; isn't that correct?

6    A    Well, that's more specific to how the program is run or

7    how many jobs or where and the necessity for the amount of

8    workers.

9    Q    You didn't mean to suggest GEO's motivation for the

10   voluntary work program was having detainees do the work?

11   A    I didn't mean to suggest that it was?  The voluntary work

12   program says we have to have one.  GEO determines what that

13   entails.

14   Q    Is it your testimony today that the PBNDS standards

15   require detainees have the opportunity to participate in a

16   voluntary work program?

17   A    Yes, we were required to have an opportunity.

18   Q    Okay.  With regard to your position for GEO, one of the

19   things you did related to the voluntary work program was

20   prepare a list of eligible detainees who requested to

21   participate in the voluntary work program, correct?

22   A    Yes.

23   Q    Another thing that took your time was assigning detainees

24   to specific jobs within the VWP, correct?

25   A    Correct.

1   Q   You supplied those lists to the detention officers

2   responsible for overseeing those jobs, correct?

3   A   Wherever the area of responsibility was.

4   Q   You made sure that you had all the documentation in order

5   on the VWPs to ensure audit compliance, correct?

6   A   That is correct.

7   Q   During your tenure, you had no audit findings against the

8   voluntary work program and the activities that you oversaw

9   relative to the voluntary work program, correct?

10  A   Not that I can recall.

11  Q   Okay.  So can you agree that a large percentage of your

12  time, or at least 50 percent of your time was dedicated to

13  processing and handling the VWP paperwork and program so that

14  you met audit compliance?

15  A   Not necessarily 50 percent, but a good portion.

16  Q   It was a good portion?

17  A   Correct.

18  Q   If the voluntary work program did not exist, there would

19  be a good portion of your time available to take on tasks

20  that were otherwise dedicated to the voluntary work program,

21  correct?

22  A   Not necessarily because my main collateral -- my main duty

23  was the classification program, which could easily take up

24  all that time as well.

25  Q   As a classification officer, you would be required to do

1    detention officer work like overtime as needed, correct?

2    A    No, classification, that was an interview position, an

3    administrative position, that's why I got to attend

4    department head meetings.

5    Q    In the classification unit in that position, you still had

6    overtime requirements, if you were needed, correct?

7    A    Overtime if it was for classification.

8    Q    So it was your understanding that you could limit your

9    work to just classification officer duties and not do

10   detention officer duties?

11   A    Such as like I haven't worked in a unit or anything.  I am

12   not sure what you are asking.

13   Q    Well, I understood that where you were injured was

14   actually in defensive tactics training, correct?

15   A    Correct.

16   Q    You were required to take defensive tactics training

17   because you worked at the Northwest ICE Processing Center as

18   a classification officer whose duties included making the

19   facility safe and secure?

20   A    I believe I was actually required to.  That is one of the

21   questions I was posing to administration prior to coming

22   back.  I have not always done that since I had my job.

23   Q    Did you comment to administration, in order to get out of

24   defensive tactics training, you needed to get injured like

25   everybody else?

 1    A    Not that I can recall.  If it is a requirement, I have to

 2    do it.

 3            MS. MELL:  I have nothing further.  Thank you,

 4    Ms. Singleton.

 5            MS. CHIEN:  Your Honor, am I allowed to start?

 6            THE COURT:  Yes.

 7                        REDIRECT EXAMINATION

 8    BY MS. CHIEN:

 9    Q    Ms. Singleton, we spent a lot of time talking about from

10    Ms. Mell asking about your Alaska Airlines job.  Is your

11    Alaska Airlines job a physical job?

12    A    No.

13    Q    You could do it from home?

14    A    Yep, I work from home on a computer, which is why it was

15    never a job not allowed to be done under L&I because it is a

16    GEO requirement that prevented me from returning there.

17    Q    GEO's requirement that you had to be physically -- be able

18    to do defensive tactics training is the reason why you

19    couldn't work at GEO with an injury; is that right?

20    A    Correct.

21    Q    Okay.  Now, I don't really want to spend that much time on

22    this.  Ms. Mell has asked you about your Alaska Airlines job.

23    I think your surgery, you are still recovering from, and your

24    disabled daughter; is that right?

25    A    Correct.

1  Q    Does that have anything to do with the voluntary work
2  program?
3  A    No.
4  Q    Nothing to do with the voluntary work program that you
5  managed for 15 years; is that right?
6  A    Correct.
7  Q    Has anyone offered you from the State of Washington money
8  in exchange for your testimony today?
9  A    No.
10 Q    Has anyone offered to fix your L&I case in exchange for
11 your testimony today?
12 A    I never had a conversation with anybody other than L&I
13 about my L&I case.
14 Q    So why was there a change in your -- the amount you owed
15 L&I?
16 A    Because I followed their appeal options, doing a request
17 and reconsideration to the Department of Labor & Industries.
18 The person who issued the overpayment notice reviewed it and
19 reduced it on several occasions.
20 Q    Thank you.  I would like to return to what this case is
21 about, which is about the work program at the Northwest
22 Detention Center.  I just have some questions.  You managed
23 the work rosters, right, for the kitchen?
24 A    Right.
25 Q    You earlier testified you would schedule about 33 detainee

1  workers on the work rosters; is that right?

2  A    Correct.

3  Q    Were there times when there was not enough detainee

4  workers in the kitchen?

5  A    Yes.

6  Q    Would that happen often, sometimes there was not enough

7  detainee workers in the kitchen?

8  A    At certain periods, yes, it would be a pretty regular

9  issue.

10 Q    What would happen?  How would you -- how would

11 Ms. Henderson, who I understand to be the head of the food

12 service department, respond to the lack of detainee workers?

13 A    So it would vary.

14      MS. MELL:  Wait.  Wait, wait.  Your Honor, I'm sorry.

15 My mic was off.  I am objecting as outside the scope of

16 cross.

17      THE COURT:  Overruled.

18      THE WITNESS:  There were times when they would --

19 they would incentivize it by giving them either additional

20 food, candy, sometimes a sheet, and who was the captain at

21 the time Portillio, they would go into the living units

22 individually to talk to the detainees to solicit workers to

23 submit requests so we can get them medically cleared to go to

24 work so we can get enough workers.

25

1    BY MS. CHIEN:

2    Q    Ms. Henderson, and I think you said Portillio, is that the

3    name?

4    A    Correct.

5    Q    Is Portillio a captain?

6    A    He was a captain.  I think he was then.  I don't know what

7    his position is now.  I think he got promoted to major, but

8    yeah, captain at the time.

9    Q    Is he a GEO staffer?

10   A    Yes, everybody is a GEO staffer that dealt with it.

11   Q    Ms. Henderson and Mr. Portillio, GEO staffers, would go to

12   the living units when there weren't enough detainee workers

13   in the kitchen to solicit for more detainee workers; is that

14   right?

15   A    That is correct.

16   Q    They would go to the living units to recruit for more

17   workers; is that right?

18   A    Physically, yes.

19          MS. CHIEN:  I have no further questions.

20          THE COURT:  Thank you, Ms. Singleton.  You may be

21   excused.  You may call your next witness.

22          MS. CHIEN:  Your Honor, could I have a moment to --

23   just one minute to confer with the class plaintiffs?

24          THE COURT:  Sure.  We will be at ease for a minute.

25          MS. CHIEN:  Thank you, Your Honor.

```
 1              THE COURT:  Ready to call your next witness?
 2              MS. CHIEN:  Class counsel will call the next witness,
 3     actually.
 4              MR. WHITEHEAD:  We would like to call Erwin De La
 5     Cruz.
 6              THE COURT:  Tyler, do you have the witness?
 7              THE CLERK:  No, I don't.
 8              MR. WHITEHEAD:  I believe we have the witness now.
 9              THE COURT:  I see the witness.  Juror No. 1 is trying
10     to get her mute button.
11              THE CLERK:  I know what the issue is.  I need a
12     second to figure it out.
13         We are good.
14              THE COURT:  Mr. De La Cruz, will you raise your right
15     hand and be sworn, please.
16                         ERWIN DE LA CRUZ,
17         having been sworn under oath, testified as follows:
18              THE COURT:  Thank you.  You may inquire,
19     Mr. Whitehead.
20                         DIRECT EXAMINATION
21     BY MR. WHITEHEAD:
22     Q   Good morning, Mr. De La Cruz.
23     A   Good morning.
24     Q   Who is your current employer?
25     A   GEO Group.
```

1   Q   Your current job title?

2           MS. MELL:  Your Honor, just a minute.  I'm sorry to

3   interrupt.  We have a technical concern with the thumbnail.

4   Your Honor was concerned that Mr. Silverman was referred to

5   as Joan Mell.  I believe he still is.  We need a moment to

6   change it to "Mr. Silverman" in the thumbnail.  Unless you

7   want to proceed with it saying "Joan Mell."

8           THE COURT:  Doesn't matter to me.

9           MS. MELL:  Okay.  All right.  We'll keep going.

10  Sorry to interrupt.

11          THE COURT:  All right.

12  BY MR. WHITEHEAD:

13  Q   Mr. De La Cruz, you were telling us GEO is your current

14  employer.  My next question is:  Could you tell us your job

15  title?

16  A   I am the assistant food production manager at the

17  Northwest Processing Center.

18  Q   I understand the kitchen position at the Northwest

19  Detention Center prepares thousands of meals each week; is

20  that right?

21  A   Correct.

22  Q   Will you answer my questions today about how the GEO

23  kitchen is able to prepare so many meals?

24  A   We have a planned menu plan that is approximately five

25  weeks long.  Preparation is extremely important to make sure

1   that the whole day of the next meals are prepped, and then

2   any other parts of the meal that has to be cooked for that

3   day is already either pulled or planned for that day.

4   Q    Before we jump into the weeds of the kitchen operations,

5   let's back up a step.  Can you tell us when you started

6   working for GEO?

7   A    In July of 2015.

8   Q    Okay.  The role that you were hired into, is it the same

9   role that you hold today?

10  A    Correct.

11  Q    We just heard testimony from Ms. Henderson yesterday and

12  this morning.  Tell us, what is your role in relation to

13  hers?

14  A    My role is mainly sanitation, bringing in rations that are

15  coming in, putting them away, the overlook of making sure

16  that the time to start and the time to end is all -- as far

17  as serving the trays, making sure that the count cleared, and

18  a lot of times it is also the accountability of rations that

19  are going on, or that we are using and preparing for the day.

20  Q    You have a military background; is that right?

21  A    Yes, sir.

22  Q    I hear you using the term "rations."  Can you tell us what

23  you mean by "rations"?

24  A    Rations would be the food that has been required at our

25  vendors and that's the food that has been brought in.

1    Q    Ms. Henderson, she's your boss; is that right?

2    A    Yes, sir.

3    Q    Essentially, your role is to assist with the overall

4    kitchen operations?

5    A    Correct, day-to-day operations that happen throughout the

6    day.

7    Q    All right.  So you started into this, but if you could

8    tell us, what does that mean?  Give us an overview of what

9    your duties are in the kitchen.

10    A    I usually arrive, my time is on Mondays, Tuesdays and

11    Wednesdays.  They're mostly closeouts, so they are like

12    1:00 -- between one and nine on Monday, Tuesday and

13    Wednesdays.  I work Saturday and Sundays.  I usually cover a

14    nine to five or eight to four shift.  I work all the holidays

15    on Mondays, of course, because I work a Saturday, Sunday,

16    Monday, Tuesday, into Wednesday.  My normal days off are

17    Thursdays and Fridays.  There is accountability with the food

18    that they draw for the day, so I make sure all the pick lists

19    are in because I do have to -- in Attico, I have to put in

20    all this information to keep up with our account on a weekly

21    basis.  I catch up on Saturdays and Sundays.  I do four hours

22    of kind of like sanitation around the area, putting away

23    rations.  And then I try to split it with the administration

24    portion because we dont have -- there is no clerk, so I do

25    some of the clerk work and I do administrative work, that

1   closeout for Sundays, first closeout, which would be the

2   first week of accountability of everything that we use

3   throughout the week.

4       Then on Monday we have a GEO weekly report that is due.

5   And then I will close that out because it is usually after

6   the dinner meal of Monday night.  Then I put that in and

7   close that week out, and then on Tuesday and Wednesdays, if

8   rations role in, sometimes 30 pallets of food will show up,

9   sometimes ten, just depending on what vendors we had for the

10  week and what food is being brought in for the week.

11  Q   Before we get to the nitty-gritty, I want to take a step

12  back as it relates to the detainee workers.  Can you give us

13  broad categories of what your work entails when it comes to

14  the detainee workers?

15  A   The detainee workers, they have a -- it depends what

16  shift, if they are there or not, because sometimes like the

17  lunchtime, the shift is from ten to about three.  I will come

18  in at one so I have a very minimum time to pull rations

19  through the corridors, and then as soon as I get them in

20  there, then we can start downloading the rations, and I will

21  maybe be assigned two detainees to help me offload.  It is

22  mostly the labor portion of disseminating the rations between

23  refrigeration, dry storage and frozen.  We try to knock out

24  the frozen and the refrigerated items first because the

25  trucks can come in at seven, could come in at nine, sometimes

1    as late as 2:00.  It is a timely matter to pull them in as

2    fast as possible.

3    Q    The detainee workers help you in that respect?

4    A    I'll be assigned maybe about two, and then at 3:00 they

5    would leave because the next shift will come in.  But I have

6    to wait an hour.  But in that waiting time, I will pull more

7    rations through the corridor so we can be ready for the next

8    iteration.  I am usually doing it by myself or unless if

9    there is a pallet jack is still operating on the dock, they

10   will help bring it in to the dock and then I have to pallet

11   jack it through the next corridor to bring it into the

12   facility.

13   Q    Well, how about this:  I am just speaking in broad terms

14   here, would you agree with me that part of your job as the

15   assistant food production manager is to direct the work

16   performed by the detainee workers?

17   A    I will direct and show them what to do --

18   Q    Okay.

19   A    -- in the areas because they are broken down into groups

20   to better efficiently help in this situation.

21   Q    All right.  That touches on one of your other main

22   responsibilities when it comes to the detainee workers.  You

23   also provide training for the work performed by the detainee

24   workers, correct?

25   A    Yes, I'll teach them what needs to be done, if -- to off

1    load or to put up rations, with dates, date and label rations

2    that are coming in.

3    Q    Again, just speaking broadly about your duties and

4    responsibilities when it comes to the detainee workers, it

5    also includes inspecting the work performed by the detainee

6    workers, correct?

7    A    I would have to go back.  We are always supervising, so we

8    try to make the corrections as we go.  If a detainee

9    understands it, then it is great.  Because there is sometimes

10   language barriers between, you know, English and Spanish or

11   even Chinese because we never know who you might -- who the

12   detainee might be.

13   Q    Okay.  Well, let's take a look and bring up a document for

14   you to look at here.  I take it you have a job description;

15   is that right?

16   A    Yes, sir.

17   Q    Let's pull up Exhibit 300.  Previously, our office sent to

18   you a packet of documents?

19   A    Correct.

20   Q    You should have a Tab 300.

21        MR. WHITEHEAD:  Your Honor, Exhibit 300 has been

22   stipulated as admissible and authentic.  I would move or

23   offer Exhibit 300 into evidence now.

24        MR. SILVERMAN:  No objection, Your Honor.

25        THE COURT:  300 may be admitted.

1    (Exhibit 300 was admitted.)

2    BY MR. WHITEHEAD:

3    Q   We are pulling up Exhibit 300 now.  You would agree with

4    me that Exhibit 300 is an accurate statement of your job

5    duties and responsibilities?

6    A   Yes, there should have been a second page.  But that's the

7    cover letter.

8    Q   There actually is a second page.  So let's look at that.

9    It is tiny, maybe we can blow it up.

10   A   You are fine.  I can read it.

11   Q   Maybe for those sitting in the cheap seats maybe we will

12   blow it up a little bit so we can all see.  I want to look

13   at, what is it, the fourth bullet from the bottom there in

14   that first section.  It reads -- starts with, "Directs work,

15   provides training and performs inspections of work performed

16   by detainee food service staff"?

17   A   Correct.

18   Q   Tell me the way you direct the detainee work in the

19   kitchen.

20   A   It does cover a vast amount of training, sanitation of the

21   kitchen, making sure the floors, the tables, the trays get

22   promptly washed, that is even in the pot and pan area.

23   Dishwasher use, trays received from the pods after the

24   service is over.  All the trays are cleaned off, and then

25   they are sent through the dishwasher.  Then they have to be

1    set up to be air dried in racks that are provided.  Of

2    course, anything that is coming off the serving line will

3    come into the pot and pan area, get washed, you know, in a

4    pot and pan area, and then run through the dishwasher to be

5    cleaned and sanitized.  The other --

6    Q    Not to cut you off.  The work you just described, this is

7    work performed by detainee workers?

8    A    Yes, we are also helping them, showing them how to do it

9    properly.  Then it is the same way as in the serving area,

10   too, after we get the serving area set up.  Putting hot

11   water, closing valves, turning on equipment to maintain the

12   140 degree for hot and maintaining the 40 degrees and below

13   for the chill, like salads and stuff like that.

14       Then, of course, the start of the line, making sure that

15   the tables are stayed wiped down and sanitized, the floor is

16   swept constantly, mopped, empty the trash.  All these areas

17   have to be constantly kept up with, and it does -- you

18   supervise them and, hey, make sure every ten, 15 minutes

19   check the trash can, make sure it is emptied or it is

20   covered.  A lot of times they will leave the covers over and

21   make sure everything is covered.  The same as the warmers,

22   are they full, do they keep up with temperature.  And then of

23   course, the back, the prepping area.

24       So even though the kitchen might be small, but it is very,

25   very productive.  Even in the prepping area, are they

1    watching the steam kettles, washing them out, cleaning them,

2    sanitizing them for the next product that needs to be put in.

3    Again, the tables, keeping raw meat items away from salad

4    items.

5        Also, in the ration room is sweeping out the ration room,

6    refrigerators being swept and mopped constantly throughout

7    the day.

8    Q   Again, this is work done by the detainee workers, correct?

9    A   Provided by the detainees and is supervised by the

10   officers.

11   Q   Got it.  All right.  I think we can pull Exhibit 300 down.

12   Thank you.

13       All right.  So as I understand it, GEO serves three

14   meals a day, do I have that right?

15   A   Yes, they do, sir.

16   Q   I probably should have asked this at the outset, the

17   detainees, the folks that are there, are they held as

18   punishment?

19   A   No.

20   Q   Not like a criminal thing being held at the Northwest

21   Detention Center, as far as you understand it?

22   A   That's -- no, not at all.

23   Q   All right.  So give us a sense of the number of meals that

24   the kitchen pumps out each week?  What would you say on

25   average?

1  A   We are doing -- if we are doing over 1,000, so it is

2  3,000, so you are talking probably almost seven -- 6,000

3  meals up into maybe close to 10,000 meals a week.  If we were

4  at 1500, of course, we would be higher.  It is just the

5  amount of trays and amount of food that goes through,

6  depending on how many detainees are at the facility, and as

7  the numbers drop, of course, the amount of food goes down

8  and, of course, the amount of labor goes down as well.

9  Q   Right now as I understand it, it is at a bit of a low

10 point.  The numbers are down in terms of the detainee

11 population; is that right?

12 A   That's correct, that's because of the COVID.

13 Q   I have seen numbers much higher in terms of the number of

14 meals made each week, right?  I mean, there have been times

15 where it exceeds 10,000 meals a week by a factor of three?

16 A   Yes.  Because it was just fully ramped up at the time.

17 Q   Well, let's take a look at another exhibit.  Actually, we

18 are not going to pull this one up on the screen yet but this

19 one is in your packet.  Take a look at Exhibit 303, please.

20 A   The food cost summary.

21 Q   That's what it is.  Is that your name printed sort of on

22 the left-hand side of the document?

23 A   It is.

24 Q   The signature there, is it your signature?

25 A   That's Ms. Henderson's signature.

1    Q   Ms. Henderson, she's the one that would have knowledge

2    about the information that is contained on this report; is

3    that fair to say?

4    A   Yes, sir.

5    Q   The information that we see here on Exhibit 303, this is

6    something that GEO tracked on a regular basis, do I have that

7    right?

8    A   Yes, this is the monthly.  When I said "weekly report,"

9    this is part of that once-a-week report.

10   Q   In fact, with these reports, if Ms. Henderson wasn't

11   around, I mean, you know, this is a report that you would

12   sign, do I have that right?

13   A   Correct.

14          MR. WHITEHEAD:  Your Honor, at this time we offer

15   Exhibit 303 into evidence.

16          MR. SILVERMAN:  No objection, Your Honor.

17          THE COURT:  It may be admitted.

18                (Exhibit 303 was admitted.)

19          MR. WHITEHEAD:  I was going to ask if we can publish.

20          THE COURT:  Yes.

21          MR. WHITEHEAD:  Bring up Exhibit 303, please.

22   BY MR. WHITEHEAD:

23   Q   We have a report here, it has a number of columns and a

24   number of rows.  I want to take a look at -- let's see, I

25   want to look at the fourth column there.  Maybe we can do the

1   whole block, 2015, get the fourth row week all the way over

2   to the total meals.  There we go.  This section in

3   particular, looking at the last column there, shows total

4   meals.  What does "total meals" mean?

5   A    For that week, 34,000 detainees, 424 staff, which would

6   have been 34,440 total.

7   Q    So that fourth column there, the "total meals" column,

8   that's the total number of meals the kitchen pumped out that

9   week?

10  A    From the 1st to the 7th.

11          THE COURT:  Counsel, on my screen, that fourth column

12  is blocked.

13          MR. WHITEHEAD:  It sure is.  Let see, maybe we can

14  make it smaller.

15  BY MR. WHITEHEAD:

16  Q    While we are doing that, Mr. De La Cruz, you have the hard

17  copy there in front of you.  I have a question for you.

18  Looking at that fourth week in the month there, how many

19  meals then were produced that week of December 22nd through

20  December 31 in 2015?

21  A    This particular week, you can only go -- let me go a

22  little further back because the weekly could be for seven

23  days, and can be for ten days.  So this particular fourth

24  week, 12 to 22nd to the 31st is the ten-day week schedule.

25  So it's going to add in an extra three more days of service

1    to make the ten days.  So when you add the ten to the other

2    three, it comes out to 31.  Might be a five-day issue in

3    there, because to make the whole 31 days.  Because of that,

4    that's why that number is at 44,000.

5    Q    So accounting for this one being a ten-day week, then your

6    expectation that perhaps it would be a little bit more in

7    line with the previous weeks then, so maybe not 45,000, but,

8    you know, 30,000 plus?

9    A    It probably would have been about 33, 32 for that week,

10   right.

11   Q    Still a lot of meals, right?

12   A    Yes.

13   Q    All right.  Let's clear off the blow up.  I want to keep

14   looking at this Exhibit 303.  Another column.  It is towards

15   the middle.  It is titled "raw tray," if we can get a call

16   out on the raw tray column.

17   A    Yes.

18   Q    What does this mean?

19   A    The raw tray is basically how much we spent for, let's say

20   for the average for that week per tray.  I think it was

21   $1.10, I think was our --  I can't remember what the

22   weekly -- or the -- what it was for that -- like a dollar a

23   tray.  But this was like 90 cents a tray, a $1.01 a tray that

24   we had spent for the week, and how much it would equate to

25   for the amount of money we had spent for that week based on

1    the head count.

2    Q    So then each tray, then, this would be the raw cost to

3    produce a single tray of a detainee meal; is that right?

4    A    Yes, it is, sir.

5    Q    This is just a snapshot in time, of course.  We see

6    figures ranging from 90 cents to a buck 01 to 92 cents and so

7    on; is that right?

8    A    Yes.

9    Q    Was there a goal or target amount for how much a tray

10   should cost?

11   A    No, not at all.  Because Christmas meals, it just happened

12   that December 22nd through the 31st, Christmas was involved

13   and, of course, that just adds to the cost.  It is not -- it

14   is not really a guiding factor.  It is just how the meals are

15   planned because at the time we were using a six-week menu

16   cycle.  It had no bearing on what -- because it would just

17   happen if you followed it to the tee, you would be okay, you

18   can hit these targets.

19   Q    Certainly there was a budget, correct, on how much could

20   be spent on detainee meals?

21   A    Sure.  If you look further down, you see the monthly, it

22   will say the raw tray is a dollar.

23   Q    There is a number then you would try not to blow past in

24   plating meals?

25   A    Again, it really doesn't play any factor.  If we cooked an

1  extra case of vegetables, I mean, it is not -- if we needed

2  it, we needed it.  We are going to serve the tray at a

3  full -- the full tray amount no matter what, if it costs more

4  or not.  We still -- the goal would be to make sure all the

5  trays were full.

6  Q   At a dollar a tray, this is not steak and lobster meals we

7  are talking about; is that right?

8  A   No.

9  Q   Well, let see.  I think we can clear off this Exhibit 303.

10 I want to talk to you about the kitchen staff composition.

11 There are 13 employees in the kitchen.  Do I have that right?

12 A   Yes, sir.

13 Q   Two of those, of the 13, they are managers; is that right?

14 A   Yes.

15 Q   One is you and the other is Ms. Henderson?

16 A   Yes.

17 Q   Then there are ten cook supervisors.  Do I have that

18 right?

19 A   Yes.

20 Q   Plus one clerk?

21 A   Yes.

22 Q   So that's the 13.  Looking at the cook supervisors, there

23 are three cook supervisors on each shift; is that right?

24 A   Correct.

25 Q   And of the three, there are only two that are doing the

1    actual food prep and service; is that right?

2    A    Yes.

3    Q    That's because the third person is what is called a desk

4    officer; is that right?

5    A    Yes.

6    Q    So with only two GEO staffers on each shift, actually,

7    prepping and serving the meals, how is it that GEO is able to

8    keep up with the demand for 30, 40,000 meals a week?

9    A    We manage it like we normally do every day.  With the

10   detainees, if not detainees, we could also use service staff

11   or clerks from other branches.  If -- if we need them, we can

12   ask for them and then -- it is really the management who

13   would execute and say, hey, do you need more people?  Yes, we

14   do.  Because there is always things happening in a facility

15   like this.  Could be an IMS within the facility.  Detainees

16   weren't able to come in.  No detainees were booking out.  It

17   is always -- it is a constant -- it is an evolving chair

18   (sic).  You may, you may not, get any.  You just keep driving

19   on.

20   Q    I certainly understand that aspect of your testimony.  But

21   it would seem to me that in trying to keep up with 30, 40,000

22   meals a week, the detainee workers are a big part of the

23   answer, would you agree?

24   A    They are a part of the answer, but not the sole surviving

25   of the facility.

1    Q    You need people to help you in the kitchen, correct?

2    A    Sure.  Everybody needs help.

3    Q    The detainee workers are there, correct?

4    A    Yes.

5    Q    You are more than happy to take them in and use them in

6    the kitchen?

7    A    Of course.

8    Q    They help you accomplish the mission in the kitchen

9    operation; is that right?

10   A    Yes.

11   Q    They help you serve the food in a timely manner?

12   A    Yes, they do.

13   Q    They help you to clean up after the fact?

14   A    Yes.

15   Q    So in terms of the chain of command then, as I understand

16   the kitchen, there is Ms. Henderson at the top?

17   A    Yes.

18   Q    There is you as the assistant?

19   A    Yes.

20   Q    The cook supervisors?

21   A    Yes.

22   Q    Then the detainee workers are on the bottom rung, then?

23   A    Yes.

24   Q    We have touched on this earlier.  I think I would like

25   maybe a little bit more detail.  The fact that GEO provides

1    training to the detainee workers on how to do their jobs in

2    the kitchen, do I have that right?

3    A    It is an on-the-job training format.  If a detainee

4    understands how to do the job, fine, because we break them

5    down into three groups.  If he can prep, follow instructions,

6    then he can stay in that group a little bit longer.  If he

7    doesn't, we always can move them to either the pot and pan

8    area or on the serving line to use him, to utilize him still

9    instead of dismissing him because it is just a job

10   opportunity to be working in the area anyway.

11   Q    There is a whole orientation that GEO provides to new

12   kitchen detainee workers; is that right?

13   A    Yes, we do, sir.

14   Q    Tell us about the orientation that GEO provides to the new

15   kitchen workers.

16   A    We have a packet either in English or in Spanish, if he

17   decides to go with the Spanish written orientation book.  We

18   will go over it with them.  The officer, the desk officer,

19   will sign off on all the pages pertaining to that

20   orientation.  Again, it is on-the-job training, so once he is

21   finished with the packet, this is just to familiarize where,

22   what he might be doing, but not exactly what he will be

23   doing, because he could be -- some of them quit on the first

24   day anyway, or the second day.  It is always a revolving

25   amount of people that come in.

De La Cruz - Direct

1    Once he gets on board, everything is fine, he goes and

2   works the day, and any problems, no problems, he understood

3   what we was explaining to him.  Of course, he will be in that

4   section longer to help out.  It works out.

5   Q   Well, talk to us a little bit about the orientation.  What

6   sorts of things are covered in the orientation that GEO

7   provides?

8   A   In the orientation, it's mainly a flip-through of turning

9   on and turning off equipment.  We don't use any knives so --

10  or anything in that nature, but there is hand cutters, like

11  dough cutters, equipment that we -- how to turn off and on

12  the mixer, the ovens.  It just only gives you a brief

13  description, and then when we actually show them how to do

14  it, then, you know, you have to do that crawl, walk and run

15  phase.  And then when he understands it, then we are fine.

16  Q   So the orientation, is this GEO covering all of the things

17  that are important for the detainees to know at the outset of

18  the job?

19  A   No, it is more of the sanitation portion that really is

20  the key to, you know, clean after -- keeping the area clean

21  is a must.  This is really the emphasis in the kitchen,

22  tables to cleaning out equipment, making sure the dry storage

23  is swept, swept and mopped.  Even in the kitchen itself being

24  swept and mopped, especially after the serving of the meals

25  and that kind of -- really helps out in that situation.

De La Cruz - Direct

1   Q   This is a silly question maybe.  I'll ask it anyway.  Tell

2   me why sanitation is important in the kitchen, the hygiene

3   standards you are talking about?

4   A   This is an institutional facility, so one thing that can

5   go wrong is if there was a food-borne illness that broke out,

6   of course, it has to come in or come out somewhere.  These

7   are just eliminating factors.  If you keep the kitchen clean,

8   it will eliminate these factors, because it is very -- in an

9   institutional facility, you can't just get one sick.  You

10  might get more people sick that shouldn't have gotten sick.

11  These are the things, it is just an environmental issue.  It

12  has to be done and maintain the cleanliness of the kitchen.

13  Q   You say institutional.  Funny, I was thinking another "I"

14  word comes to mind.  This strikes me as an industrial-grade

15  kitchen.  Is that fair to say?

16  A   It is.  It is.  But I was in the military and it was an

17  institutional cooking facility.  Because it is all -- you are

18  cooking for a massive amount of people in a short period of

19  time.  You only have an hour and a half to do it all.  It is

20  not like a restaurant where you have line cooks and you are

21  cooking by portion, by table.  It is not that kind of

22  cooking.  You are cooking everything all at one time.  You

23  must serve everything all at one time.

24  Q   Let's talk more about the hygiene and the detainee safety,

25  for lack of a better way to put it, in their food handling

1  and preparing the food.  What does GEO do to make sure that

2  people are hygienic and approaching the food prep and

3  handling in a safe way?

4  A   Well, first of all, we have them, before they even enter

5  the kitchen to don hair nets, beard nets.  It is a known fact

6  that even before you enter the facility in the cooking area.

7  After we check them in, we provide them with boots, uniforms,

8  cook white uniforms.  Instead of using his pod uniform

9  colors, we provide them with the white uniforms.  And then it

10 also helps because we clean all their uniforms.  We provide

11 them with fresh uniforms.  So after the meal is over, they

12 will put the uniforms and discard them into another -- into a

13 laundry bucket so we can take it over to laundry to get

14 washed.

15     By the time when he's done, he would have his boots on,

16 cook whites, pants and top.  He would have a hair net and a

17 beard net and then wash his hands, dry them and then put on

18 gloves before he can come into the kitchen area.  It does get

19 a little bit busy right in between the checking in and

20 getting this process done.  Then before he goes to the

21 serving line or if he is branched out somewhere to get prep

22 done or clean up, or in the sanitation tanks, or in the

23 sanitation area.  If he moves from that spot or works from

24 another spot, then, of course, he is going to wash his hands

25 again, removes gloves, wash his hand, put on fresh gloves and

1    if we go right to serving, that's what the whole uniform
2    would look like.  Should have a fresh pair of gloves, uniform
3    is clean, hair net and beard net to eliminate any foreign
4    objects and, of course, raw handling of foods, because we are
5    handling so much food and serving so many trays.
6    Q   Is it the case that before each detainee worker shift
7    there is a safety meeting?
8    A   Yes, they'll be told that in the back, we are going to, we
9    are waiting for a count clear.  If we are serving
10   something -- it could be anything.  It could be we are
11   serving chicken today, we are serving -- we have vegetables,
12   salad.  We let them know we are having a cold meal today for
13   lunch or for dinner.  You know, make sure you, again, wash
14   your hands, glove up, and make sure all your uniform is
15   together before you walk into the kitchen.
16   Q   Part of this safety meeting, I mean, it's sort of like a
17   fitness-for-duty inspection that GEO is performing each time;
18   is that right?
19   A   During the in processing of their ID cards and taking down
20   their names, we have a sheet that we cover to make sure they
21   didn't have any cuts, cuts or colds or fever in that case.
22   So either he has a choice, he can go to medical and go get
23   checked out or we will put him somewhere where -- if he had a
24   cut on his finger and he has a Band-Aid, we can put him in
25   the sanitation area.  We can still utilize him but not into

1    the serving or prepping area.  So these are the look at, kind

2    of like a look-at in a small quick check out on his physical

3    abilities.

4    Q   Well, let's take a look.  I have another document I would

5    like for you to look at.  It is in your book there.  Let's

6    take a look at Exhibit 306.  I want to ask you a few

7    questions about it before, hopefully, we can show it to

8    everyone else.  Are you there, sir?

9    A   Sorry.  I got it.

10   Q   Okay.  Great.  So what are you looking at there at Exhibit

11   306?  Is that the detainee staff health and hygiene sheet?

12   A   Yes, it is.  This would be the date or -- I know it is

13   blocked off, the name of the detainee or staff and a number

14   and then again, cut, sores, cough, nose, runny nose, hand --

15   Q   Hold on.  Before we start reading from the document, let

16   me ask you a few more questions.  This form, this is the form

17   that is completed during the safety meetings when you are

18   inspecting the workers for hygiene issues?

19   A   Yes.

20   Q   This is a regular part of what GEO does during each safety

21   meeting?

22   A   Yes, it is, sir.

23        MR. WHITEHEAD:  Your Honor, we would offer Exhibit

24   306 into evidence.

25        MR. SILVERMAN:  No objection, Your Honor.

 1              THE COURT:  306 may be admitted.

 2                   (Exhibit 306 was admitted.)

 3    BY MR. WHITEHEAD:

 4    Q   If we could pull up Exhibit 306, please.  We have Exhibit

 5    306 up on the screen here.  Walk us through.  What are we

 6    looking at?

 7    A   This would be the detainee staff health and hygiene.  Of

 8    course, the date, the name, number, then does he have any

 9    cuts.  The reason "sat" would be because he said that he is

10    fine, he doesn't have any cuts, he doesn't have any open

11    sores, he's not coughing, doesn't have a runny nose.  His

12    hands are clean and fingernails are trimmed.  You know, kind

13    of like a check of, if he had any marks.  Sometimes it is the

14    language barrier, they wouldn't understand why we are doing

15    it.  But this is a way to double check and make sure

16    everything is done prior to him going to work.

17    Q   So what happened if one of these boxes are checked?  Is it

18    that the detainee worker isn't allowed to work that day?

19    A   Not necessarily.  If it doesn't -- if it is covered, maybe

20    it is a small cut.  He might not be able to work in the prep

21    area or in the serving area, but he could be in the

22    sanitation area.  And if he chose to not work that day, then

23    he wants to go see medical, then we will let him go see

24    medical.

25    Q   It is the desk officer, then, that is making this

1  assessment; is that right?

2  A   Yes.

3  Q   Well, I think we can take this off the screen.

4       We were talking about what happens if a detainee worker

5  doesn't pass that inspection for the health and hygiene.

6  What happens if a detainee worker doesn't do his job well?

7  Can GEO fire that worker?

8  A   No, we would try to put him in -- well, depends on the

9  situation.  If he doesn't want to work there again, we just

10 let him go.  We would -- he would just deny work and then he

11 signs the form saying that he did not work and then he goes

12 back.  But, no, we don't fire them.  But if he's -- doesn't

13 want to work there, I mean, I can't force him.

14 Q   I think that is true of any job, you know, you really

15 can't force anybody to do anything.  My question was a little

16 different.  Can GEO fire kitchen workers for doing a bad job?

17 A   No, not really.

18            MR. SILVERMAN:  Objection, Your Honor.

19            THE COURT:  What is your objection?

20            MR. SILVERMAN:  For the speech before the question.

21            THE COURT:  That's a fair objection.  Sustained.

22 Rephrase the question.

23 BY MR. WHITEHEAD:

24 Q   Can GEO fire kitchen workers?

25 A   No.

1  Q   Can GEO fire detainee workers for failing to follow the

2  kitchen officer's directions?

3  A   No.

4  Q   Can GEO fire kitchen workers for unexcused absenteeism?

5  A   No.

6  Q   Can GEO fire detainee workers for misconduct?

7  A   No.

8  Q   What about theft?

9  A   No.

10 Q   Unsatifactory work performance?

11 A   No.

12 Q   I want to be clear.  Are you claiming that GEO is unable

13 to terminate or remove kitchen workers?

14 A   If he is -- let's say he has stole something.  If he was

15 caught stealing, he would not be authorized to come back in

16 the kitchen.

17 Q   Okay.  I just want to be clear.  Other than theft, as an

18 exception you just listed for us, is it your testimony that

19 GEO can't fire detainee workers?

20 A   No, they cannot.

21 Q   Sir, we have met before, correct?

22 A   Yes, sir.

23 Q   It was in person, back when people did that sort of thing;

24 is that right?

25 A   Correct.

De La Cruz - Direct

1   Q    You sat with me for a deposition, correct?

2   A    Yes, sir.

3   Q    You answered my questions under oath?

4   A    Yes, sir.

5   Q    An oath to tell the truth.  Just like you took today, an

6   oath to tell the truth?

7   A    Yes.

8   Q    And you did tell me the truth; is that right?

9   A    Yes.

10  Q    You were represented by one of GEO's attorneys at the

11  time, right?

12  A    Yes, I was.

13  Q    I think the deposition was at GEO's attorney's office; is

14  that right?

15  A    Yes.

16  Q    There was a court reporter there, right?

17  A    Yes.

18  Q    There was a written transcript of everything that we

19  discussed?

20  A    Yes.

21  Q    In fact, there was actually a videographer there, do you

22  remember that?

23  A    Yes.

24  Q    You wore a microphone, right?

25  A    Yes.

De La Cruz - Direct

1    Q    There was a big backdrop behind you?

2    A    Yes.

3    Q    Well, I think what I would like to do is play a clip from

4    your deposition.

5            MR. WHITEHEAD:  Counsel, I am going to be at page 29,

6    lines 12 through 24.  While we bring up the clip, this is

7    Clip No. 1.

8            MR. SILVERMAN:  Objection, Your Honor.  He has to let

9    him read the line and ask him about it.  Playing the clip as

10   a form of impeachment?  He just set it up as an impeachment.

11   Let him ask and do the normal impeachment.

12           MR. WHITEHEAD:  The witness committed in his answer

13   that GEO is unable to fire workers.  I would like to play an

14   impeachment clip.

15           THE COURT:  Wait a minute.  I think you can do that.

16   Go ahead.

17   BY MR. WHITEHEAD:

18   Q    We are going to bring up Clip No. 1.

19           MR. WHITEHEAD:  This is page 29, lines 12 through 24.

20   BY MR. WHITEHEAD:

21   Q    Sir, my question to you is going to be a simple one:

22   Wasn't this your response to me at your deposition?

23           (Playing video Clip No. 1)

24           MR. WHITEHEAD:  I apologize.  That is actually the

25   wrong clip.  What I meant to direct you to was page 95, line

De La Cruz - Direct

1   13 through page 96, line 6, and this will be Clip 5.  It is

2   not Ms. Mendoza operating the machinery.  It is me.

3        (Video Clip 5 as follows:)

4        "Question:  You would agree, though, that just generally

5   speaking, failure to follow the safety procedures could lead

6   to termination?

7        "Answer:  It could, yes.

8        "Question:  The same is true with failure to follow a

9   supervisor's instructions, it could lead to termination?

10       "Answer:  It could, yes.

11       "Question:  The same is true of unexcused absenteeism, it

12  could lead to detainee worker termination?

13       "Answer:  Yes.

14       "Question:  Same thing for misconduct, horseplay, et

15  cetera, could lead to termination?

16       "Answer:  Correct.

17       "Question:  Certainly theft, that could lead to

18  termination?

19       "Answer:  Uh-huh, yes.

20       "Question:  Finally, unsatisfactory work performance?

21       "Answer:  Correct."

22                 (Video Clip No. 5 completed.)

23  BY MR. WHITEHEAD:

24  Q    Sir, that was you in the video, correct?

25  A    Right.

1      MR. WHITEHEAD:  Well, I don't think I have any

2 further questions.

3      THE COURT:  Mr. Silverman.

4      MR. SILVERMAN:  I was checking to see if the State

5 had questions before I went.

6      THE COURT:  They didn't jump up, so go ahead.

7      MR. SILVERMAN:  Great, thank you, Your Honor.

8                    CROSS-EXAMINATION

9 BY MR. SILVERMAN:

10 Q   Good morning.

11 A   Good morning.

12 Q   We sort of jumped into the questions without actually

13 introducing you.  Give us a background of who you are and how

14 you got to this job?

15 A   I am Erwin De La Cruz.  I was -- I retired out of the

16 military in 2004 after 24 years of service.  Then I was

17 contractor on base for ten years, and then the contract

18 ended, like so many other federal contracts eventually end,

19 and I was unemployed for about, oh, six months.  Then this

20 position came open.  I applied for it and obtained (sic) at

21 GEO, and went to the interview and went into the interview

22 process and then I went to the academy within three days.

23 The academy started and then I was hired in July of 2015.

24 And presently, still assistant contract manager -- I mean,

25 the assistant food production manager for GEO.

1   Q   Great.  Now, we have previously heard in this case from

2   someone who had the same job as you a couple years before you

3   had it.  Do you like your job?

4   A   I do.  I enjoy working there every day.  We always stay

5   busy.  That is a good thing.

6   Q   Are you proud of your job?

7   A   I do.  I am.  I am proud of my job.  I have been in food

8   service for close to 30 -- over 35 years now.

9   Q   Are you proud of the food that you put out of the kitchen?

10  A   Yes, very much so.  We -- for the better part, yes, it is

11  so satisfying to send food, cook it and serve it.

12  Q   Okay.  So you have been doing this for almost 40 years.

13  You have, as counsel had indicated, a management position.

14  Does that mean you don't have to wash dishes anymore?

15  A   No, I have been in the dish -- I have been in the dish pit

16  for six months.  You know, just things you have to do in the

17  kitchen.  There is always clean up and there is always

18  something to do.  I never had a dull moment.

19  Q   Okay.  Has there been a point in which there were no

20  volunteers in the kitchen while you worked there?

21  A   Yes.

22  Q   How long did that period last?

23  A   Probably six, seven, eight months.

24  Q   Okay.  At that point, you had zero volunteers?

25  A   Correct.

1   Q    What did you do?

2   A    As soon as I walked in, I already know where I got to go,

3   either washing pots and pans or waiting for the food to come

4   in.  While I am waiting for the food to come in, go ahead and

5   wash pots and pans, or help in the cooking process, or even

6   the serving process.  I will jump to see where the hot spots

7   are and cover them accordingly.

8   Q    During that six-month period, did you miss serving a meal?

9   A    No.

10  Q    When we saw some of the breakdowns, when we talk about the

11  preparation of the kitchen, that includes both detainee meals

12  and meals for staff, correct?

13  A    Yes.

14  Q    Does the staff eat the meals?

15  A    Yes.

16  Q    Same meals, same menu items?

17  A    Same meals, same menu items.

18  Q    So when I come back to that six-month period, you provided

19  the same food for both detainees and staff during that

20  period, correct?

21  A    Yes.

22  Q    Do you need detainees in the kitchen?

23  A    You know, if we don't have them, then this is what we are

24  going to do, we are going to do it this way, we are going to

25  provide what we can to make sure that everything is done and

1  it's the bottom line.  We are going to make it work.

2  Q    You had some questions about what you spend per tray.  I

3  don't know why we are asking this.  Let me just follow up on

4  that, which is:  You buy in bulk, right?

5  A    Yes.

6  Q    Just give us a sense, for the folks, you know, on TV, what

7  kind of bulk do you buy?

8  A    Let's start with beans.  They come in 50-pound bags, and

9  then rice, 50-pound bags.  We will get a pallet of maybe 30

10 on each pallet.  Each pallet could be over 2,000 pounds, from

11 1,500 to 2,000 pounds a pallet.  I receive 10, 15, even up to

12 30 pallets within three days, depending on what vendor.  We

13 choose local vendors.  At the time, we had Food Service of

14 America, Sysco and another local brand.  Of course, Single

15 Source.  Of course, the milk is brought in on Mondays, on

16 Tuesdays and Fridays.  Fresh vegetables that are brought in

17 like salads and fruit are brought in the same way.  They

18 could range again from two pallets, three pallets to ten

19 pallets to as many as 15 in one shot.  The most I ever

20 received in one day was 26 pallets.

21 Q    The size you buy in is different than what they offer at

22 say Costco, correct?

23 A    It is, sir, it is.

24 Q    Counsel played a videotape in which you talked about

25 different ways in which you could potentially terminate a

1  volunteer.  Have you ever terminated a volunteer?

2  A   No, I haven't.

3  Q   Let's talk about the different areas which you talked

4  about whether you could or not.  Have you ever, in fact, ever

5  terminated a volunteer for bad performance?

6  A   No.  If there is a memo that was written up on him, then

7  it goes to the work program and then they will decide because

8  he will go to a, I want to say a proceeding to discuss it.

9  If he is not permitted to come back in the kitchen, that will

10 be decided outside of that, not that I could fire him, no.

11 Q   And have you ever personally, say, broken up a fight?

12 A   Yes.

13 Q   After breaking up a fight, are the people who are

14 fighting, can they come back to the kitchen after that?

15 A   No, not at that moment.  They'll be quickly sent away.  I

16 only got 45 seconds.  If there is a fight during serving

17 period, I only got 45 seconds to get this line back on track

18 because of two detainees.

19 Q   So they may not come back to the kitchen.  Do you know

20 whether they are terminated from the program or not?

21 A   No, they'll be sent out and again, the work program,

22 depending on what the incident is, 300 incident or a 100

23 incident, that would determine if he is able to come back.

24 If they fought, the two, the two who hit who, who started the

25 argument, that is all outside of my realm, because that's

1    literally the workforce.  They will have their meeting and

2    then that will decide if he could come back or not.

3    Q    Okay.  There were some questions about the food safety

4    requirements in the kitchen, washing your hands, wearing hair

5    nets and things like that.  If you had a class from the local

6    community college culinary program come in and intern for a

7    day in your kitchen, do they have to follow the same rules

8    and safety requirements that you just described in detail?

9    A    Yes.  He would definitely be washing the hands, wearing a

10   hair net, beard net, washing his hands, gloves up.  We might

11   not make him wear the cook white uniform.  Depends if it is

12   just a briefing or showing him around.

13   Q    Those are, again, as a food safety person, those are

14   non-negotiable?

15   A    Non-negotiable.

16   Q    Coming back to the question of whether you could or could

17   not terminate someone, what was your understanding of the

18   question being asked of you when Mr. Whitehead took your

19   deposition?

20   A    Like I could physically fire him.  It is not, it was just

21   to -- he would have to go to, again, we do the write-ups for

22   him.  Oh, he stole, put down on the memo that he stole, blah,

23   blah.  Then it gets sent over to the lieutenant's office, the

24   lieutenant would take over, then they would take him or the

25   two detainees and then they would go to a, like a court

1    proceeding with ICE.  Then like I say, that's out of my
2    realm.  Then if they decide that he can come back because he
3    didn't steal or he did steal, then he wouldn't be able to
4    come back.  That's according to the court.  It is not like I
5    fired him physically, no.
6    Q    Last question:  What is your favorite part of your job?
7    A    Watching all the trays go by.  We know we did our job and
8    everything is according to what we had served for that day
9    and it looks presentable.
10             MR. SILVERMAN:  No more questions.
11             THE COURT:  Any redirect, counsel?
12             MR. WHITEHEAD:  No, Your Honor.
13             THE COURT:  All right.  I assume Mr. De La Cruz may
14   be excused?
15        Thank you.  You may be excused, Mr. De La Cruz.  Ladies
16   and gentlemen, it is noon, we will reconvene at 1:00.  Please
17   follow my instructions about recesses.  We will see you back
18   here at 1:00 with a new witness.
19                       (Recessed.)
20
21
22
23
24
25

1                                              AFTERNOON SESSION

2                                              JUNE 4, 2021

3      (The following occurred outside the presence of the jury.)

4            MR. POLOZOLA:  We are ready without Ms. Chien.  She

5      had to step out for a moment, but we are here and ready.

6            THE COURT:  You can bring the jury in.

7        (The following occurred in the presence of the jury.)

8            THE COURT:  I think all the jurors are present.

9            THE CLERK:  That is correct, Your Honor.

10           THE COURT:  You may call your next witness.

11           MR. POLOZOLA:  Washington calls Mr. Iolani Menza,

12     Your Honor.

13           THE CLERK:  The witness is just being admitted now.

14     Should be here any second.

15           THE COURT:  All right.  Mr. Menza, can you hear me

16     all right?  You want to unmute your phone.

17           THE WITNESS:  How is that, sir?

18           THE COURT:  Raise your right hand and be sworn.

19                        IOLANI MENZA,

20        having been sworn under oath, testified as follows:

21           THE COURT:  Thank you.  You may inquire,

22     Mr. Polozola.

23           MR. POLOZOLA:  Thank you, Your Honor.

24

25

1      DIRECT EXAMINATION

2   BY MR. POLOZOLA:

3   Q   Good afternoon, Mr. Menza.  My name is Lane Polozola.  I

4   represent the State of Washington in this case.  I am going

5   to be asking you some questions this afternoon.  Okay?

6   A   Okay.

7   Q   Can you please just start by introducing yourself and

8   spelling your name for the record, please?

9   A   My name is Iolani Menza.  Spelled I-O-L-A-N-I, M-E-N-Z-A.

10  Q   Where do you work, Mr. Menza?

11  A   At the Northwest ICE Processing Center.

12  Q   Is that the facility that was previously known as the

13  Northwest Detention Center?

14  A   Yes, sir.

15  Q   You work for the GEO Group; is that right?

16  A   Yes.

17  Q   What is your job title?

18  A   I am a detention officer.

19  Q   How long have you been a detention officer for GEO?

20  A   I want to say 12 and some change, 12 years and some

21  change.

22  Q   Since about 2009, does that sound right?

23  A   October 19th, if you want to get exact.

24  Q   Now just to start, can you tell me what your salary is,

25  Mr. Menza?

Menza - Direct

1    A    Oh, that's -- I should probably know this, but I really

2    don't.  I am going to say around 73 is what I made last

3    yearish.

4    Q    Are you paid hourly?

5    A    Yeah.

6    Q    What is your hourly compensation rate?

7            MS. SCHEFFEY:  Objection.  I object to the relevance

8    of this testimony.

9            THE COURT:  He may answer.

10            THE WITNESS:  Does that mean I answer or I don't

11   answer?

12            MS. SCHEFFEY:  Yes, you may answer.

13            THE WITNESS:  I want to say $29ish, somewhere in that

14   range.

15   BY MR. POLOZOLA:

16   Q    Now, as a detention officer, what posts have you held

17   while working at the Northwest Detention Center?

18   A    I have been the laundry officer.  I have been an intake

19   officer.  I have been an R and M, which is movement and

20   response officer.  Currently, I am a pod officer, which means

21   the dorms.  I have been a law library, and -- yeah, I believe

22   that is it.

23   Q    Okay.  Well, I'll have some questions about a few of

24   those.  So let's start --

25   A    One more.  Property officer as well.

1    Q    Property officer, is that --

2    A    Yes.

3    Q    Okay.  Great.  I want to start.  I think you mentioned

4    being a library officer.  What do you do as a library

5    officer?

6    A    Schedule detainees to come and see, work on their case,

7    utilize the facilities and all the computers, law materials,

8    make copies, notary, whatever we can give them and assist

9    them with in their cases usually, because it is not like the

10   library that you go to, to check out a book.  It is where you

11   work on legal material, stuff of that nature.

12   Q    What are the hours of the law library?

13   A    Basically, it can fluctuate.  It is just to accommodate as

14   many people as possible.  It can start at six in the morning,

15   it can start at five, it can start at seven and go until

16   fourish, usually.

17   Q    So who cleans the law library?

18   A    If we have volunteers, they'll come down and clean up the

19   law library.  If we don't, then the officer will straighten

20   it all up, clean it up.

21   Q    When you say "volunteers," do you mean the detainees?

22   A    Yeah.

23   Q    The detainees who work in the voluntary work program?

24   A    Yes, sir.

25   Q    So cleaning the law library is an assignment a detainee

1  can have in the work program?

2  A   I believe -- I am not in charge of the work program.  I am

3  going to say yeah.

4  Q   When the workers come in and clean the law library, what

5  types of tasks do they do?

6  A   Um, in the law library, they would sweep or straighten up

7  some chairs, they might mop once a week, maybe every three

8  days, just depends on what needs to be done.

9  Q   Do they do kind of the janitorial duties for the law

10  library area?

11  A   Yeah, I would say yeah, pretty much.  Unless I have

12  something specific that I need help with either like we get

13  to start making 100 copies so we can send everybody something

14  specific, maybe they'll help me with that.  Other than that,

15  yeah, pretty much just sweep, straighten out some chairs.

16  Usually I don't see detainees for more than five, ten minutes

17  when I was down there.

18  Q   Do they take out the trash, too?

19  A   Yeah, they can take out the trash.  It is probably about

20  60 feet away to where the end of the hallway is, and there is

21  trash bins.  On their way out, they might take out the trash.

22  If they don't, even I'll throw it over there.

23  Q   For someone that doesn't go to the facility every day,

24  where is the law library located?

25  A   There is a main hallway.  It is, I want to say

1    approximately about 70 of my paces.  I am going to go with

2    120 yards.  I don't know.  It is not a huge, huge area, but

3    it is not a small area either.  The law library would be

4    about 40 percent on the left side.

5    Q   Let me ask a different way.

6    A   Go into the center of the hallway, it is just to the left.

7    Q   Let me ask a different way.  Is it near the barbershop?

8    A   Yeah, it is what is considered the barbershop, right

9    across the hallway from the law library.

10   Q   As the law library officer, are you responsible for what

11   is going on in the barbershop area?

12   A   When I was in, I had an additional officer with me.  That

13   individual would keep an eye on the barbershop.

14   Q   The barbershop, what are the hours of the barbershop?

15   A   Once again, it is all about -- all about -- it can

16   fluctuate and it is all about getting in as many people that

17   need a haircut or need to trim their beards.  Whatever they

18   need.  Just to get as many as we can get in as time allots.

19   Like I said, if there is 15, 20 people that want to do that,

20   then probably, two, three, four hours tops.  If not, it could

21   be as little as two people.  Like I know the females usually

22   don't really cut their hair, and they are in there for 20, 30

23   minutes and that is it.

24   Q   Is the barbershop open every day?

25   A   I believe so, except holidays.

1    Q    In the mornings, they open about seven a.m.?

2    A    Yeah.  They can.  Like I said, fluctuates, up to the

3    officer who is running it that day.  They might open it at

4    six.  They might open it as seven.  They might wait 45

5    minutes to open it.

6    Q    Yeah.  Okay.  Who works in the barbershop?

7    A    Volunteers.  Whoever wants to cut hair, whoever wants to

8    spend time outside the pod.

9    Q    When you say "volunteers," do you mean detainees?

10   A    Yes.

11   Q    And detainees who are working in the work program?

12   A    Yeah.

13   Q    They are paid for working in the barbershop; is that

14   right?

15   A    I believe they can earn money in the voluntary work

16   program.

17   Q    What I am trying to understand, just to clarify, the

18   barbers are there as part of the work program, right?

19   A    Not all the time.  Sometimes people would prefer their

20   friend to cut their hair, they come down with other

21   individuals that they live in the same dorm with and they

22   will just cut their hair.  Sometimes they like to do it

23   themselves.  Just depends.

24   Q    Are there non-detainee GEO staff that cut hair at the

25   barbershop?

1    A    No.

2    Q    For the barbers that are in the barbershop, I am guessing

3    they use tools like scissors and clippers, that kind of

4    stuff; is that right?

5    A    Yes.

6    Q    Who provides the scissors and clippers and those types of

7    tools for the barbers to use?

8    A    When I was there, there was no scissors for the detainees

9    because it is a safety issue.  They were all allowed to use

10    clippers, plug-in clippers.  I was responsible for ordering

11    those.  I would order based on suggestions or what I thought

12    was good.  I would just order clippers and GEO would buy

13    them.

14    Q    GEO provides those tools for the barbers to use?

15    A    Like I said, I would write a receipt and somebody would

16    pay it.  I am not exactly sure what pays or whatever.  Yes,

17    as far as I know, I turned it in to GEO and I get a magic box

18    later on.

19    Q    As the officer in the area, did you have a list of barbers

20    who could work in the barbershop each day?

21    A    Yes.  That would also be based on the voluntary work

22    program.

23    Q    Is that a list that comes from classification?

24    A    Yes.

25    Q    When I say "classification," is there a person who works

1   in classification who would provide that list for you?

2   A   I believe at the time it was -- there was two officers,

3   Heye and Singleton.

4   Q   Alisha Singleton?

5   A   Yes.

6   Q   If no barbers showed up in the barbershop on a day, could

7   you get more barbers by calling the next folks on that list

8   to come down and work?

9   A   Um, well, I don't think I had that scenario ever happen

10  to me, personally.  I would just call around to see if

11  anybody wanted to cut hair.

12  Q   When you say "call around"?

13  A   Call around to the different units.  If I knew, say, Bob

14  liked to cut hair, he lived in Golf 1, I would call Golf 1

15  and ask Bob if he would like to come down and cut hair today

16  or not.  Up to him.

17  Q   Up to him, but you kind of look for folks to come down and

18  do the haircuts that day?

19  A   No, it is up to them if they want to do it.  If I can't

20  get any volunteers, I will see if anybody in the pod that we

21  are cutting has anybody that wants to cut their hair.

22  Q   In the barbershop, who cleans the barbershop area, to your

23  knowledge?

24  A   Usually the cleaners would come more towards the end of

25  the day.  Barbershop would be complete.  I mean, it is like a

1    10 by 12 foot room.  Majority of the time, all the barbers

2    would clean their own machines before we put them away

3    because that has to be done.  Sweeping, mopping, it was

4    50/50.  If the barbers went back to their pods and there was

5    still stuff that needed to be done, then the volunteers for

6    the law library would sweep up or something.

7    Q    How many folks -- well, let me pause for a moment.  When

8    you say "the cleaners," do you mean the detainee workers?

9    A    Yeah, the individuals who come down.

10   Q    How many folks generally cleaned each day?

11   A    While I was there, it would fluctuate from three to five,

12   three to four, three to five, depending on who decided to

13   show up that day.

14   Q    Maybe this is similar to the law library question, but

15   were their tasks similar, janitorial in nature, cleaning the

16   floors, taking out the trash, that kind of stuff?

17   A    Um, yeah, whatever they saw that needed to be done, they

18   would take it upon themselves and do it.  I didn't exactly

19   say, hey, this needs to be done or anything like that.  It

20   was just kind of picking up more than --

21   Q    You were the officer in the area, so were you supervising

22   those workers?

23   A    Like I said, I really didn't need to supervise them.  My

24   job was more the safety and security.  They kind of knew what

25   to do.  They would do it on their own.  I would make sure all

1    my tools are there or I might be dealing with copies or I

2    might be dealing with something else.  It wasn't really like

3    I stood and pointed and said do this or that or anything like

4    that.

5    Q    One question on kind of the layout.  We talked about the

6    law library, we talked about the barbershop, is there another

7    multipurpose room in that area that the detainee workers

8    would clean as well?

9    A    Yes, sir.  If you want to think about the layout, it is

10   like three rooms, a big room at the top, two smaller rooms

11   that kind of fill up underneath that big room, and then a

12   narrow hallway that goes down.  I mean, they are not

13   extremely large.  The multipurpose room was actually, I

14   believe, meant to house offices for ICE and be a secondary

15   room for larger functions like church, stuff like that.  It

16   was no -- it was a waiting room, if anything, probably ten

17   detainees at a time.

18   Q    Just so we are clear, there is no non-detainee GEO

19   staffers that come in and clean that area either; is that

20   right?

21   A    No, I don't believe so.  I mean, if it is messy and it

22   needs to be done, yes, GEO officers will go in there and

23   stack chairs, borrow chairs, clean up the offices if they

24   have something to do.  Yeah.

25   Q    You also mentioned you were a laundry officer, was that

1  back in 2018?

2  A    Yes, I believe so.  Let me see.  I would have to recount

3  my jobs.  Last year I was the intake, half year, so roughly

4  '17 and '18.

5  Q    What are your job duties as the laundry officer?

6  A    Excuse me one second.  Allergy season.  I'm sorry.  My

7  duties as laundry officer, I am going to go and say make sure

8  we have the appropriate amount of laundry within the

9  facility.  Make sure everybody is dressed appropriately

10 within the guidelines, wash and dry individuals' clothes and

11 redistribute them back to the housing units.

12     I had other duties to where mattresses were involved and

13 other things like that.  As it pertains to laundry, it was

14 pretty much the meat and potatoes of it.

15 Q    Is it fair to say that your job was to make sure the

16 laundry for the facility got done?

17 A    Yep, pretty much.

18 Q    Okay.

19 A    Yeah.

20 Q    The laundry facility at GEO exists because GEO has to do

21 the laundry for all the detainees in the facility; is that

22 right?

23 A    I don't know why it exists.  I just know that while we

24 were there, we would do the laundry for everybody.

25 Q    When we say "the laundry," let's just be clear what we are

Menza - Direct

1    talking about.   Are we talking about clean clothing for the

2    detainees?

3    A    Yes, all the uniforms, sweats, so on and so forth, the

4    stuff they use on a day-to-day basis.

5    Q    Clean clothing, their bedding; is that right?

6    A    Yes.

7    Q    Towels that everyone has to use after they take showers?

8    A    Yes, sir.

9    Q    So let me just pause for a moment.   How were you trained

10   as a laundry officer on how to run the laundry?

11   A    Um, how to run the laundry?   Prior to me bidding for the

12   position of laundry officer, before we transitioned from

13   whatever our job was previously into that position, we would

14   job shadow pretty much.   We walk around with another officer

15   that was already previously the laundry officer.   I would job

16   shadow that officer.   He would show me paperwork.   A lot of

17   hands-on, pretty much do as I do and learn.

18   Q    Right.   On the job training; is that fair?

19   A    Yeah.

20   Q    So as part of that, you learned how to operate all the

21   different machines, the driers and washers, right?

22   A    Yep.   Yes, sir.

23   Q    And on those washers and dryers, are the washers and the

24   dryers in the laundry, are they different from the ones you

25   might see like in your house, for example?

1  A   Yes, sir.  They are bigger.  More industrialized.  Best

2  way to explain it is when you go to a laundromat, those are

3  pretty much the washers and dryers that we have, just maybe

4  on a little bit bigger scale.

5  Q   So in terms of a bigger scale, the laundry in the

6  detention center is doing laundry for up to 1,500-plus

7  people; is that right?

8  A   I believe yes, up to 1,500.  I worked there for 12 years,

9  I haven't seen that head count yet.

10  Q   You mentioned the word "laundromat."  I want to clarify

11  something.  Detainees at the facility can't just go into the

12  laundry any time they want and do their own laundry?

13  A   No, sir.

14  Q   You as the laundry officer and the detainee workers in the

15  laundry are doing the laundry for everyone in the facility,

16  right?

17  A   We go through a weekly schedule breaking it up throughout

18  the week so as to not, like, try and overwhelm my machines

19  all at once.

20  Q   Is the laundry operating seven days a week?

21  A   No, sir.

22  Q   How many days a week?

23  A   So depending on what is going on, like I would say

24  Saturdays, no.  You might have to do whatever is leftover for

25  clothing when people book out.  There is usually busy days

1  and not so busy days.

2  Q   Let me ask it a different way.  Are there days when there

3  is nothing happening in the laundry because it is closed?

4  A   Yes.

5  Q   What days are those?

6  A   So if I am doing inventory that day, we are not really

7  washing anything.  One machine might get turned on just

8  because there is dirty stuff that we have collected, mops or

9  whatever that needs to be washed.  I might do a blanket

10  exchange.  I might do a mattress exchange.  I might do some

11  of those other details that I told you I was also charged

12  with.  Yeah.

13  Q   Sounds like those are days where you are still there

14  working, it is not closed?

15  A   There is an officer there at all times.

16  Q   Let me move on.  We have mentioned the detainee workers.

17  Is part of your job as laundry officer to supervise and train

18  a detainee worker crew working in the laundry?

19  A   I had volunteers that come down and want to be part of

20  that and show them hands-on, do as I do and show you how to

21  work these machines.

22  Q   Just to be clear, when you say "volunteers," do you mean

23  detainee workers who are participating in the work program?

24  A   Yes, sir.

25  Q   They are getting paid to come help you work in the

1    laundry?

2    A    They have to get cleared through medical and all that.

3    Then they sign a work sheet.

4    Q    We will come back to that.  I want to be clear, when you

5    say "volunteers," they are actually workers that are getting

6    paid to come do the work in the laundry; is that right?

7             MS. SCHEFFEY:  Objection, asked and answered.

8             THE COURT:  He may answer.

9             THE WITNESS:  Yeah, they come down and help me with

10   the laundry.

11   BY MR. POLOZOLA:

12   Q    They are getting paid to do that, right?

13   A    Through the work program, yeah.

14   Q    I want to break out the laundry duties in a bit more

15   detail.  Part of your duties as laundry officer is to make

16   sure everything gets done.  Does that include things like

17   washing and drying all of the laundry?

18   A    Whatever needs to be done that day, yeah.

19   Q    Making up bedrolls, for example?

20   A    Yes.  I would say on any given day I was in there, we made

21   maybe 15 bedrolls, just so intake had enough bedrolls to

22   issue out to any of the detainees that were coming in.

23   Q    Cleaning the lint traps out of all the machines as well?

24   A    It is a fire hazard if we don't.

25   Q    I think you mentioned picking up and distributing laundry

1   from around the facility, right?

2   A    Yes, sir.

3   Q    You also have to clean the laundry area to make sure it

4   stays clean in a sanitary way; is that right?

5   A    Yes.

6   Q    How many laundry officers at a time work in the laundry?

7   A    One.  One officer in there.

8   Q    Are there multiple shifts per day?

9   A    Yes, there is at least two shifts.

10  Q    So one GEO laundry officer at a time?

11  A    Yes, sir.

12  Q    Okay.  Now, with respect to the detainee workers, how many

13  workers work in the laundry each day?

14  A    Fluctuates.  Once again, when I was in there, I had up to

15  five on my roster I could call and see if they wanted to work

16  that day or not.

17  Q    Per shift?

18  A    I was a dayshift officer.  For my shift, that is -- I

19  would call these specific individuals.  If they didn't have

20  anything going on or they weren't planning on doing the law

21  library or recreation or they were expecting a call from

22  their lawyer or anything like that, they would come down and

23  we would start the daily activities.

24  Q    When folks were working in the laundry, how long would

25  they work per shift?

1    A    Um, typically with me they would show up around 7:30ish,

2    give or take half an hour.  Like I said, if they wanted to go

3    to the rec yard because it is their scheduled time or

4    tournaments or law library, any of that, it would vary on the

5    detainees because I would have some trickle in half hour, 45

6    minutes later or not come until after 11:00, just depended.

7    Typically, I would have already pulled the laundry bins out,

8    stacked them against the wall to see what we had to do for

9    the day.  If it was a normal pod laundry day and we had, say,

10    three to four units to do, we would go around to those units.

11    Q    Sorry to interrupt.  My question was just, how long do

12    they normally work in a shift?

13    A    Like I said, it varies, depending on what day and how much

14    we had to do.  If you want to know a shift, I would say no

15    more than an hour and a half in the morning and then after

16    lunch probably another 45 to an hour and a half.

17    Q    Depended on how much work needed to be done, I think

18    that's what you said; is that right?

19    A    Yep.

20    Q    So when you worked as a laundry officer, I think it was

21    for a year or so, you said, did you generally work with the

22    same detainees?

23    A    Yes.  Yes, I worked with usually the same individuals.

24    Sometimes other -- sometimes detainees would want to come

25    over from a different shift, i.e. swing shift and would come

1   to me and ask me, can I move to this shift, yeah.  I had no

2   issues with that.

3   Q   For the workers in the laundry, just so I get a better

4   sense of what they were actually doing, were they unloading

5   and loading the washers and dryers as part of their job?

6   A   Yes, loading and unloading each pod or any leftover

7   whites, sweats or uniforms.

8   Q   Would they -- I think we mentioned the lint traps, would

9   they help you go around and clean the lint traps?

10  A   Yeah.  We would go around, I would drop all the lint trap

11  doors, check them, make sure that the screens were clear; if

12  they weren't clear, simple as wiping your hand and grabbing a

13  big ball of lint.

14  Q   Did they help clean up the laundry area in terms of taking

15  out the trash, sweeping, mopping, that kind of stuff?

16  A   When I was there, I would do it just because you never

17  know what you could find during a normal laundry day.  You

18  get stuff from intake that hasn't been checked through yet,

19  so when we separate stuff, I would usually take the trash out

20  right before I left for my shift.

21  Q   You mentioned that you would have workers sign some

22  paperwork when they started, right?

23  A   I believe it was a requirement to get cleared.  That's

24  documentation that has to be turned into classification prior

25  to them starting at any position, any voluntary work

1    position.

2    Q    Would that -- is that like a job description?

3    A    It has been awhile.  I think there are job descriptions,

4    but I want to say more just, yeah, I believe, actually, it

5    is.  There is job descriptions that outline duties that they

6    could be responsible for.  Once again, it is up to the

7    officer to show them how to do all that stuff.

8    Q    Yeah, to kind of direct what needs to be done that day,

9    have the detainee workers perform tasks that needed to be

10   done?

11   A    In the laundry room, it is easier to do it with them to

12   keep everybody on task.  So directing them to do it could

13   cause an issue with fires, with -- it is just easier to do it

14   with them.

15   Q    When you say "do it with them," do you mean that you are

16   all doing it together?

17   A    Yeah, loading, unloading.

18   Q    You are kind of doing the same work in a way.  You are

19   loading the washers and dryers just like the detainee workers

20   are loading and unloading the washers and dryers?

21   A    I was a lot heavier back then.  I used it for kind of a

22   little bit of a workout plan.  I would try and get them to

23   let me do as much of it as possible.

24   Q    You mentioned bedrolls a moment ago.  I want to clarify,

25   what is a bedroll?

1  A    A bedroll is the initial bedding that an individual will

2  receive upon arrival at the detention center.  Usually

3  consists of two blankets, two heavier blankets, two sheets,

4  like your normal standard white sheet that would fit over

5  your mattress, some towels, a set of toiletries to include a

6  bar of soap, toothbrush, toothpaste and deodorant and some

7  headphones.

8  Q    Laundry would prepare those and then send them the intake

9  for folks to receive when they come into the facility?

10  A    Yeah, just so they have their immediate needs met right

11  off the bat so they are not trying to order stuff, they can

12  brush their teeth or whatever.

13  Q    The detainee workers would help you make the bedrolls in

14  the laundry; is that right?

15  A    Yeah, they would.  I mean, usually I liked to make the

16  packs myself with all the little stuff because they are

17  usually stacked in my office.  It was easier for me to just

18  do it instead of always pulling them out.  Then we would go

19  and roll, literally roll it like you see in those Easy Rider

20  magazines, they got the roll in front of their bikes, you

21  just roll everything up into a little pillow like, stuff it

22  in a bag and send it on its way.

23  Q    Okay.  I think we mentioned earlier, kind of the

24  on-the-job training aspect of it.  You would show the workers

25  how to do the work they needed to do in the laundry; is that

1    right?

2    A    Yes, sir.

3    Q    So once they started doing the work, if they were doing

4    something wrong, would you help direct it, make sure they

5    were doing things the right way?

6    A    Majority of the time, the other detainees -- because, I

7    mean, in the laundry, it is like procedural.  Sometimes like

8    one of my detainees had a better idea, if we do it this way,

9    organize it this way, this would be the best, most efficient

10   way to do things.  They were pretty on the spot like, hey,

11   man, you only put this in for 30 minutes, not 40 minutes,

12   whatever.  It was rare.  I mean, I have been corrected on

13   numerous times by individuals.  We can't do that, man.  You

14   got to stop the cycle for 15 minutes.  It is not me

15   correcting, it is kind of a both correcting.  I don't correct

16   anybody.  It is what is the best way to accomplish that.

17   Q    Sounds like they are really kind of your partners in

18   getting the laundry done, right?

19   A    Yes, sir.

20   Q    Yeah.  They know what they are doing.  Do folks wear

21   protective equipment when they are working in the laundry?

22   A    So it is required.  I ask them to.  It is mostly gloves

23   and a mask.  Sometimes they will throw on the goggles if they

24   are doing something that is going to flash up, like dust up.

25   We usually don't need to unless we are just cleaning.  There

1    is nothing that we wear all the time.  I would say they use

2    the gloves all the time.  We are not -- we are not cleaning

3    the vents all the time so no goggles necessary.  When we do,

4    yes, they need to put goggles on.  You are not messing with

5    the washing machine, the part where all the stuff is dumped,

6    you don't need your goggles there.  Just the gloves, they

7    would wear a lot.

8    Q    Is that because they are doing other people's dirty,

9    soiled laundry?

10   A    I would say that any time they do stuff, they always, when

11   they work out, they wear gloves.  It doesn't surprise me they

12   would sit there in gloves and read a magazine.  I rarely use

13   gloves.

14   Q    We got into this a little bit.  I do want to break it down

15   step by step because you have mentioned a few different

16   pieces of the puzzle, and I want to make sure we all

17   understand.  How do you get the dirty laundry from around the

18   facility that needs to be done in the laundry facility?

19   A    Go on a walk.  Me and -- so, like I said, I would pull all

20   the carts out and stack them against the wall.  Some of those

21   carts are empty carts.  We would then leave the laundry room,

22   secure it, then we would go on a walk and pick up laundry

23   bags that the units would have waiting outside their unit.

24   They are all labeled.  Then we would just go pick them up,

25   bring them back, line them up and then we start the washing

1    process.

2    Q    You say "we," do you mean you and the detainee workers?

3    A    Yes.

4    Q    Is laundry done on a schedule in the facility?

5    A    When it comes to what is being washed that day, yes, it

6    is.

7    Q    What is the schedule, roughly speaking?

8    A    This isn't exactly the schedule; don't hold me to it.  I

9    can give you an idea of how it is broken up.  On, say,

10   Tuesdays, you would have Alpha, Bravo and Charlie units, they

11   would set their laundry out, and that's what we would be

12   accomplishing.  Since it is a Tuesday, we are only going to

13   do their whites, so we would pick up the bags of white

14   clothing to include their sweats, socks, underwear, towels,

15   T-shirts.  Then if we were doing, say, uniforms as well that

16   day, they would have to separate those so we didn't turn the

17   whites different colors.

18   Q    Okay.  So help me understand how often the laundry is

19   done.  For example, if I am in A pod, how often is my laundry

20   getting done?

21   A    At least two times a week.  So we are on Tuesday,

22   Wednesday comes around and it is shower curtain day on

23   Wednesday.  I would go around the pod -- to all the pods and

24   I would pull all the shower curtains down and we would

25   deliver new shower curtains for them, and we have two loads

Menza - Direct

1   of shower curtains to wash because it is roughly like 29

2   times six of shower curtains.  Then Thursdays would roll

3   around and we would have additional units to do.  And then

4   say Friday rolls around, and it is kind of a wind down day.

5   There isn't very much going on, there is just dirty laundry

6   that accumulated throughout the week, maybe three, four bins

7   of laundry, throw a cycle in.  Once it is washed, throw it

8   into the dryer, dry it, pretty much wind down.  Saturdays and

9   Sundays are good days to go and do blanket exchanges and

10  mattress exchanges.

11      We would just tote fresh washed blankets to the unit, call

12  it out, let them come down and change it out.  Then we wash

13  whatever was dirty.  Half the time, a quarter of the pod

14  would get up; half the time, half the pod would get up.  I

15  really never seen the whole pod get up to do an exchange.

16  Q   Okay.  Thank you.  I think I have a sense of that.  Did

17  you also do the laundry for the medical unit?

18  A   Yes.

19  Q   Okay.

20  A   That portion was like a daily grab.  Whenever we are going

21  to do whatever we are going to go do, i.e., shower curtains

22  or uniforms, they would always have a bag.  Usually it was

23  mops and rags and stuff that they needed.  Sometimes it was

24  clothing.  I mean, medical unit only housed up to like 15

25  detainees or something like that.  Not too much laundry

1   coming out of there.

2   Q   We talked about the pods, the medical.  You are also doing

3   unissued laundry, laundry that is not being returned to

4   individuals, but that is being prepared for new folks coming

5   into the facility?

6   A   Yes, it is a low priority.  It is more of a downtime kind

7   of deal with that.

8   Q   You should have a packet of exhibits in front of you.  Do

9   you have that?

10  A   This?

11  Q   An envelope that has some exhibits.

12  A   There is no -- there is two envelopes over here.  They are

13  both opened.

14          MR. POLOZOLA:  Counsel, do you know if Mr. Menza has

15  the packet of exhibits that was delivered or not?

16          MS. SCHEFFEY:  I am going to ping one of our staff.

17          MR. POLOZOLA:  If you don't, it is okay.  We will go

18  forward.  We can do it by Box.

19          MS. SCHEFFEY:  Hopefully, a staff member is coming.

20          THE WITNESS:  This one?

21          MR. POLOZOLA:  We will pause for one second.

22          MS. SCHEFFEY:  Sorry, Lane.  Can you confirm it has

23  your name on it, Mr. Menza?

24          THE WITNESS:  Yeah.

25

1   BY MR. POLOZOLA:

2   Q    Simple request.  You should see in there an exhibit marked

3   234.  It is a photo.  Let me know when you have it.

4   A    Is it in this book or is it in this --

5   Q    Should be in the folder.

6   A    This one?

7   Q    Yeah.

8   A    Can I rip this open?

9   Q    Sure.

10        THE COURT:  While they are getting exhibits ready,

11   let me remind you all, I know sometimes you get sleepy in the

12   middle of the afternoon.  Do your best to give your full

13   attention to the testimony as it is given and the exhibits.

14   Don't be distracted by answering emails or checking your

15   emails on your phone or anything like that.  Try and give the

16   case your full attention.  Do your best to be awake.  It is

17   okay if you have to stand up for a second or stretch,

18   whatever, as long as you don't leave our virtual courtroom,

19   as long as you can hear and see what is going on, on your

20   screens.  Okay.

21        Mr. Polozola, go ahead.

22   BY MR. POLOZOLA:

23   Q    Mr. Menza, it is 234.

24   A    Yes, sir.

25   Q    Do you recognize that photograph?

Menza - Direct

 1    A    That would be coats and blankets.

 2         MR. POLOZOLA:  Your Honor, we offer Exhibit 234 into

 3    evidence.

 4         THE COURT:  Any objection?

 5         MS. SCHEFFEY:  No objection.

 6         THE COURT:  234 may be admitted.

 7              (Exhibit 234 was admitted.)

 8    BY MR. POLOZOLA:

 9    Q    We will pull this up on the screen for you, Mr. Menza, so

10    everyone can see.  I am just wondering if you can confirm for

11    me, so are these the big bins that you use to go collect

12    laundry from around the facility?

13    A    No, those are the big bins.

14    Q    These are the big bins?

15    A    Yeah, those are the big bins that I like to -- well, when

16    I was in laundry, I liked to put more stuff in those bigger

17    bins and the more agile and smaller bins is what we go and

18    collect laundry around the facility in.  Like I said, those

19    are part of the bins that I would pull out in the morning and

20    stack against the walls so we could, you know, basically

21    assess what we are going to do for the day.

22    Q    Is this dirty laundry waiting to be done in the laundry?

23    A    Not necessarily.  The tags get left on quite often.  It

24    could be dirty laundry.  It looks like it is dirty laundry.

25    It also could be waiting to be separated, coats and blankets.

1   Q    This is laundry that would be done in the facility in the

2   laundry unit?

3   A    Yes.

4   Q    It looks like blankets and jackets; is that right?

5   A    Yeah.  I mean those are really bulky things, that's why

6   they use the big bins.  I mean, it is probably 30 blankets

7   and 15, 20 coats per bin.

8   Q    Now, we talked a little bit about some of the unissued

9   laundry that is not just returned to the living units, right?

10  A    Uh-huh.

11  Q    So for unissued laundry, is that laundry folded in-house?

12  A    Do you mean do I fold it?

13  Q    I am asking, does the laundry get folded?

14  A    Yes, the laundry gets folded.  These don't per se because

15  they are big bulky things.  Usually we lay them over each

16  other and separate the coats and throw it in a pile.  Like

17  the whites will and the uniforms will.

18  Q    For uniforms and whites, laundry that needs to be folded

19  after it has been washed and dried, who folds that laundry?

20  A    I believe the female pods would.  At the time when I was

21  in laundry, females would -- we would stack a couple of carts

22  outside the female units and they would take turns folding

23  and matching things up.

24  Q    Was that -- those folding -- are the units that were

25  folding, were those individuals working in the work program?

Menza - Direct

1  A   So I can't tell you exactly how that went down.  I wasn't

2  in there.  I have seen just all the girls rush, and I want to

3  do it today.  No, I want to do it today.  No, I want to do it

4  today.  It just depends on -- I don't know if they had a

5  system in place for that or what.  Majority of the time, I

6  saw it go in and they were enthusiastic about doing it.

7  Q   They got paid for folding that laundry; isn't that right?

8  A   Once again, I couldn't tell who you got paid, who didn't

9  receive pay for that.

10  Q   In the interest of time, let's sum up.  I understand you

11  had detainee workers working with you in the laundry; is that

12  right?

13  A   Yeah.

14  Q   They were washing and drying clothes, just like you would

15  wash and dry clothes as a laundry officer?

16  A   Yes, sir.

17  Q   Those individuals doing that work with you in the laundry

18  would make one dollar a day; is that correct?

19  A   Through the work program, I believe so.

20  Q   I believe you said you made about $29 an hour?

21  A   I think that is what I am currently at.

22  Q   Would you do that same work for a dollar a day?

23  A   I am not in that situation.  I'm sorry.

24         MR. POLOZOLA:  No further questions, Your Honor.

25         MR. BERGER:  Your Honor, I have a few follow-up

1    questions.  May I proceed?

2            THE COURT:  Yes, please.

3                    CROSS-EXAMINATION

4    BY MR. BERGER:

5    Q    Mr. Menza, can you hear me?  I will raise my hand so you

6    can see where I am.  You can hear me okay?

7    A    Yes, sir.

8    Q    My name is Adam Berger.  I represent the detainee workers

9    in this lawsuit.  I wanted to ask a few quick follow-up

10   questions to which you just testified to just to make sure I

11   understand.

12   A    Sure.

13   Q    Going back to when you were working in the law library.

14   A    Yes, sir.

15   Q    I think you said typically you had about three to five

16   detainee workers that would come and clean the law library,

17   the barbershop area, the multipurpose room?

18   A    Yes, sir.

19   Q    On a daily basis, right?

20   A    Yes, sir.

21   Q    They are typically the ones who did that cleaning, right?

22   A    The cleaning for the law library or?

23   Q    The library, the barbershop.

24   A    Whatever area needed it at the time, you know, sometimes I

25   didn't use the multipurpose area --

1    Q    Okay.

2    A    -- that day, sometimes I did.  Just depended on what

3    needed to be done that day.

4    Q    Yeah, sometimes you would get those detainee workers to

5    help you with copying or some other task, correct?

6    A    Not copying, maybe stapling because I would be in the

7    separate room using the copying machine.  Yeah.

8    Q    Then when you moved on to be the laundry officer, you

9    received on-the-job training primarily for that job, correct?

10   A    Yep.

11   Q    And similarly, when you got detainee workers, you gave

12   them on-the-job training, right?

13   A    The detainee workers and myself would coach individuals

14   through, yes.

15   Q    Okay.  So you had some experienced detainee workers

16   coaching new workers on how to use the machines and perform

17   the other tasks in the laundry, correct?

18   A    Yes.

19   Q    And you as the laundry officer would tell the detainee

20   workers what to do, correct?

21   A    What our task was for the day, i.e., if it was a Tuesday,

22   we needed to start collecting these things, yeah, so I would

23   keep the schedule.

24   Q    You directed the work and kept things on schedule, right?

25   A    Yes, sir.

1  Q   And you continued to monitor the work of the detainee

2  workers to ensure that it was being done, that they were

3  doing their job right and you would correct them or show them

4  again how to do things if it was performed incorrectly?

5  A   Well, like I said, I was also doing it with them because

6  it was my workout program.

7  Q   Okay.

8  A   Yeah.  I was there, so I mean, I wouldn't go and say, hey,

9  you go do this.  I would just grab it or they would try and

10  grab it before me.  Yeah.

11  Q   Making sure that everything was done properly was your

12  responsibility, right?

13  A   Properly or most efficient.

14  Q   Yeah.

15  A   Yeah.

16  Q   So you would provide oversight on the detainee workers to

17  make sure that was accomplished, correct?

18  A   Sure.

19  Q   Then there was a little bit of talking about personal

20  protective equipment in the laundry.  Isn't it true that you

21  encouraged the detainees to use gloves because they were

22  handling other people's dirty laundry?

23  A   Like I said, I have told them we can always wash our

24  hands.  I rarely use gloves.  But if they were going to use

25  gloves, they could use gloves.  They didn't have to.  It was

1    up to them.  Their choice.

2    Q    Sorry.

3    A    My answer is:  I would tell them that, yes, there can be

4    certain things in the drawers or some personal, I don't know,

5    garments, I don't know how you would say it, underwear,

6    underwear would often be not the cleanest, so to be careful.

7    Q    My question is a simple one:  Did you encourage them to

8    wear gloves because they were doing other people's dirty

9    laundry?

10   A    I would say yes.

11   Q    Similarly, when they were cleaning the lint traps, you

12   would give them medical masks and protective eye wear?

13   A    Yes.

14   Q    Do you know how many women in the pods folded laundry on a

15   daily basis?

16   A    I do not, sorry.  I have been there when I pushed laundry

17   over there.  I have seen them run from upstairs and come

18   down, I want to do this, I want to do that.  I have left it

19   there.  I don't know who actually folded, what detainee did

20   what, or how many in total.  I have seen half a pod do it.

21   Being 15, 20 people.  Like I said, I am not sure about the

22   roster or any of that stuff.

23   Q    And I don't mean to put you on the spot, how are you at

24   math?

25   A    Um, well, seeing how I haven't used it in years and years

1    and years and years, I think I can do basic math.

2    Q    I am going to call up Exhibit 35, which has already been

3    admitted.

4    A    35?

5    Q    You may not have that in your packet.  If you look at the

6    screen, it will be up momentarily.  Just to get you oriented,

7    this will be the 2013 annual report for the Northwest

8    Detention Center.

9    A    2013, sir?

10   Q    Yes, 2013 year-end report.  We are going to go to the page

11   that is page -- paginated as page 25 of the document.  The

12   Bates stamp is GEO-State 029832.  Can you see that?

13   A    I can see it.

14   Q    Okay.  We are going to blow out the little part that I am

15   going to ask you about.  Don't worry too much.

16   A    Okay.

17   Q    So what we are going to blow out is just a list.  Let's

18   close that for just a moment.  Can you see this is entitled,

19   you know, types of work detail?

20   A    Yes, sir.

21   Q    So we are just going to go to the column for laundry.

22   Okay?  You see that says 11,938 --

23   A    Sure.

24   Q    -- laundry details for the year?

25   A    Okay.  I don't know what -- I don't really understand what

1  this pertains to.  Is it just how many shirts I have and

2  socks or items or?

3  Q   This is the number of work details in the year in laundry.

4        MS. SCHEFFEY:  Objection.

5        THE WITNESS:  You mean -- there is 11 --

6        MS. SCHEFFEY:  Mr. Menza, objection.

7        THE COURT:  Ms. Scheffey, when you make an objection,

8  I need to know your grounds.

9        MS. SCHEFFEY:  Yes, Your Honor.  My objection is he

10 didn't lay the foundation.  Counsel is testifying about what

11 this number is.

12       THE COURT:  That's a fair objection.  Sustained.

13 BY MR. BERGER:

14 Q   Can we close the blowout again.  Let me just put it this

15 way to you:  I asked you how good you were at math.

16 A   Yes, sir.

17 Q   I think you testified earlier that the laundry wasn't open

18 everyday.  It wasn't open 365 days a year, right?

19 A   I testified we closed the laundry and would go do other

20 things, i.e. mattress exchange, blanket exchange.  You asked

21 me if the machines were running all the time.  I said that

22 maybe one or two machines might be on, but we would go and do

23 other things.

24 Q   Let me clarify.  The laundry was actually in operation

25 every day, just not all the time every day.

1    A    Yes.

2    Q    Well, can you do this math for me, can you divide 11,938

3    by 365?

4    A    So it is like 12,000 divided by 400?

5    Q    Yeah.

6    A    100.

7    Q    Or maybe 30, 30 per day?

8    A    30 what?  I really don't understand what this is.  I don't

9    want to agree to anything that I don't know what I am talking

10   about.

11   Q    Okay.  Fair enough.  I will let you go now.  Thank you for

12   your time.

13                        CROSS-EXAMINATION

14   BY MS. SCHEFFEY:

15   Q    Mr. Menza, I know you have been talking about laundry a

16   lot today.  I'm hoping you'll indulge me a little bit more.

17   A    Sure.

18   Q    So when you were the laundry officer, tell me how you

19   received the laundry a detainee wanted to wash each day?

20   A    They would -- the night before, usually they would pack up

21   what they wanted to on the clip and then put it in a bag and

22   the laundry would be marked as, say, Fox 1 and set outside

23   their unit for me to pick up in the morning.  We would roll

24   the carts through all the units and pick up the laundry that

25   was supposed to be done that day and take it back to the

1    laundry room where we would start to wash and dry those

2    items.

3    Q    I am going to break that down.  You said they put it on a

4    clip.  Can you explain that to me?

5    A    Sure.  The clip is more like say a backpack with a little

6    plastic clip except they can be cinched all the way down to

7    hold smaller items.  They are basically a fabric loop that

8    the detainees would run through the pant leg or run through

9    the shirt or put the sock in a little eye that they could

10   cinch down -- sorry, allergy season -- where it would stay on

11   the clip and together so they wouldn't lose it while it was

12   being washed.

13   Q    Okay.  When they received their laundry back, do they get

14   it back on that clip?

15   A    Yes, they do.

16   Q    Is that laundry ever folded by detainee volunteers?

17   A    No, most detainees are pretty particular on how they

18   handle their own clothes, whether or not they want to roll it

19   or they want to fold it with a super crease.  They tend to do

20   that themselves.  Once we send all their laundry back to

21   them, it is unfolded.  It is the way we got it.

22   Q    Is their a pod position to help collect laundry in the pod

23   before it gets put in the bag outside the pod?

24   A    There is someone that is identified.  But the pod

25   officer -- majority of the time, when I roll around, they

1  hear the cart and they look to their side, and there is the

2  bag that gets put out by the detainee.  He will just grab it

3  and throw it outside of his door, and I will come by and pick

4  it up.

5  Q    Did you testify earlier you are a pod officer?

6  A    Yes, I am a pod officer.

7  Q    When you are a pod officer, do you have a detainee who has

8  volunteered to help just do that, take the bags and put it

9  outside with the laundry in it?

10 A    Yes, I do.  They don't go around collecting all the

11 laundry from each individual.  They basically just put a bag

12 there and all the detainees know that if they want to do

13 their laundry that day, they bring it down themselves and

14 throw it in the bag.

15 Q    So the detainee who volunteered to help collect the

16 laundry or help put the laundry outside in the hallway, is

17 that their entire task for the day?

18 A    Yes, that is their task for the day because when we are

19 done as laundry officers and we have washed that pod, we go

20 into the unit and we utilize one of the -- majority of the

21 time, it is the ping pong table, it is a bigger table, so we

22 utilize that table and we spread out their laundry, and as

23 the detainees wake up, later on they will come by, look for

24 their clip, and they will take it with them back up to their

25 room.

1  Q   I believe you testified earlier that when you get

2  detainees, you have them for a portion of time in the morning

3  and then a portion of time in the afternoon; is that correct?

4  A   Yes, ma'am.

5  Q   What happens in the middle?

6  A   Usually in the middle, the machines are running and there

7  is nothing for them to do, so I mean they have only read the

8  magazines so many times.  I need them to go take a break, do

9  something, write a letter, just go back to their pods and

10  hang out until I call them back after count time, around

11  11ish.

12  Q   Is that 11:00 in the morning?

13  A   Yeah, that is 11:00 in the morning.  Count time was ten --

14  well, is ten now.  Back then, I think it would have been an

15  hour later.  I would call them probably around 12ish.

16  Q   What is count?

17  A   Count is where we verify all the individuals in the

18  facility, are in the facility safe, breathing, in the area

19  they are supposed to be in.

20  Q   So if the detainees come back for count -- from count

21  around 11:00, are they back in their pods for lunch?

22  A   No, they tend to want to eat in that area, in the laundry

23  area because laundry is so close to the kitchen I can send

24  them over with the kitchen workers after all the food has

25  been served and they eat with the kitchen guys.

1    Q   Does that give them a break from all the people they are

2    already living with in their dorm?

3    A   It does.

4            MR. BERGER:  Objection, Your Honor, leading.

5            THE COURT:  The answer may stand.

6            THE WITNESS:  Yeah, it does give them a break.  When

7    I was there, there was no COVID restrictions so you would

8    have multiple, multiple detainees from all over the facility.

9    I think at any given time, I would have different units in

10   the law library -- not law library, but in laundry with me.

11   You could have up to ten units, maybe more in the kitchen.

12   So yeah, go over there, set up tables, serve themselves food

13   and go ahead and laugh it up a little bit.

14   BY MS. SCHEFFEY:

15   Q   About how long do they spend at lunch over with the

16   kitchen?

17   A   I am going to go -- the average lunch would be 45 minutes.

18   That was probably the average.  30 to 45 minutes, they would

19   be over there, and I would be doing paperwork or whatever it

20   is I need to do.  If any of the machines would go off, I

21   either empty them and reload them.  Yeah, pretty much.  Plus

22   they also got to use the ice machine while they were in the

23   kitchen, throw some ice in their cold drinks.

24   Q   I think you mentioned there is a shower curtain day; is

25   that correct?

1  A   Yes.  Shower curtains are to be washed weekly throughout

2  the facility.  The numbers off the top of my head, I can't

3  really give you specifics.  I can give you a general amount

4  of pods, somewhere in the 24, 25, maybe a little bit more

5  pods.  That's why I said, that number times six, roughly six

6  showers, each one having a curtain.  We go and collect all

7  those curtains and they would -- really didn't take very many

8  wash loads to do all the curtains in the facility.  It was a

9  very, very short day usually.

10 Q   When you say "very, very short," how long are you talking

11 about?

12 A   I am talking about I would call them -- let's say an hour,

13 hour and a half in the morning.  Then I would call them back

14 for lunch and we wouldn't load the machines or do any work.

15 I let them come down and eat and then go back to their pods.

16 Q   Are you in a union?

17 A   I am in the union.

18 Q   As part of the union, do you bid for certain positions in

19 the facility?

20 A   Yes, you bid based on seniority throughout the facility

21 for shift and for post.

22 Q   Is the laundry position -- I will rephrase that.  Is the

23 laundry position highly desirable?

24 A   I am going to say days off wise, no.  Switching up being a

25 pod officer, yes.  I can't really put it into like would I

1   bid for it at this stage.  If the days were different, yes, I

2   would bid for it in a heartbeat.

3   Q   Is the actual work you do in the laundry pretty easy?

4   A   Yes.

5   Q   Are there any officers who prefer not to have detainees in

6   the laundry?

7   A   I used to prefer not to have detainees in there myself.

8   There are other officers, I would say, two on the top of my

9   head right now, yes, they would prefer to do everything

10  themselves.

11  Q   So did you have the authority to say no to having

12  volunteers with you?

13  A   I wouldn't want to take the opportunity away from

14  detainees to come down and fill their day.  A lot of these

15  individuals, they don't have too many things going on so this

16  helps them fill that day.  They will come down and keep busy.

17  Basically just busy, busy, busy, you know, you got to tell

18  them to take a break, relax a little bit, go back to your

19  pod, go to recess or yard.  Things like that.  I wouldn't

20  take the opportunity and tell them they could not come down,

21  even though I might have planned on doing the majority of

22  everything myself that day.

23  Q   Have you ever done all the laundry yourself?

24  A   Yes.

25  Q   Was it hard?

1  A   It is not.  It just allowed me to -- I did say I was

2  fatter.  It was one of my get-my-steps-in kind of thing.  The

3  laundry room isn't that big.  35 foot by 25 foot, those

4  dimensions.  It is moving 15 feet at the longest from the

5  furthest washing machine to the furthest dryer.  Not too much

6  area to cover.  It is just pick up, put it in, push the

7  button.

8  Q   Is there a radio in the laundry room?

9  A   Yep.  The detainees would often choose what they wanted to

10 listen to without having to put earphones in.  I wouldn't let

11 them get too crazy and blare it to where people are looking

12 in.  I mean, it had to be loud enough for them to hear over

13 the machines.

14 Q   Before, you talked about folding laundry.  I want to

15 clarify what is folded.  The ring the detainees give you, is

16 that laundry folded?

17 A   No, ma'am.  Like I said, it is a piece of fabric that goes

18 through one of the openings in the clothing i.e. the neck

19 loop, the -- what is this called?  Your arm hole.

20 Q   Sounds good.

21 A   Even the bottom of it.  I think the only thing that is the

22 hardest to secure on it is the socks.  Like I said, there is

23 a little loop that you can strap down and comes to pretty

24 small so they don't fall out.  Nothing is folded.  It is all

25 lose.  We moved from the bags because there was a complaint

1  that, you know, the very inside of the bag never got dry so

2  we moved to the loops to allow it to kind of like freely dry.

3  Q   What laundry is folded, then?

4  A   Only things that need to be reshelved or reissued.  We

5  really don't have -- say we had a J pack and 30 people left,

6  they would leave all the clothing that they were issued

7  behind and we would bag that up and throw it in the washer,

8  rewash it, throw it in the dryer, put it in a bin and we

9  would take it down to the female unit where it would sit

10  there and wait to be folded by the detainees in the female

11  unit, whether it is Delta or Delta 2.  That was based on when

12  they felt like doing it.

13  Q   You just used an acronym, was it J pack?

14  A   I'm sorry.  That is also probably too old of a term.  It

15  is where we have a flight going out, detainees are scheduled

16  to be on that flight, and they will no longer be housed with

17  the NWIPC.  Those 30 individuals get on a bus and they go

18  down and ICE deals with that.  They are no longer with us.

19  We rewash all their clothes reissue it out.

20  Q   You said you brought the laundry down to the female unit.

21  Why didn't you have them come to you?

22  A   Um, well, I would -- I am, I would have volunteers come

23  that were male and we can't mix the two.  We can't have

24  females and males in the same area.  This way, the females

25  could be a part of something and do something other than --

1  other than pod work, I guess you could say.

2  Q   The females need opportunities in the voluntary work

3  program?

4  A   I would say, yeah, it was to let as many people do

5  something besides wiping down a table.

6  Q   I think you also testified that you work in the pod; is

7  that correct?

8  A   Yes, I am currently a pod officer.

9  Q   Currently a pod officer.  Just so I can understand, first

10  of all, what is a pod?

11  A   A pod is a -- it is a unit with available bed space in --

12  basically it is a housing unit.  It is where individuals can

13  be housed for the duration of their stay or I think the --

14  yeah, that is the best way to explain it.  It is just a place

15  where all the detainees have individual space for themselves

16  and kind of a community of detainees that can be housed

17  together based on their classifications and policies.

18  Q   In the pod, do detainees have their beds in there?

19          MR. BERGER:  Objection, Your Honor, beyond the scope.

20          THE WITNESS:  Yes.

21          MS. SCHEFFEY:  I am trying to lay the foundation

22  here, Your Honor, for what position --

23          THE COURT:  I think he may answer.

24          THE WITNESS:  Yes, that is where their mattress and

25  bunk areas and their beds are at.

1    BY MS. SCHEFFEY:

2    Q    Are there tables in the pod for them to eat at or play

3    games?

4    A    Yes, but that's not in the immediate area where they

5    sleep.  That's in what is called a day room which doesn't

6    necessarily mean it is a separate room.  It just means more

7    of the middle of the entire room.

8    Q    Are detainee showers also in that same pod?

9    A    Yes, everything that they need is going to be in that

10   unit.  It is going to have the sink area, the microwave,

11   showers, toilets, the day room area.  If they have exercise

12   equipment, if there is some in that pod, it is going to be in

13   that general area as well.

14   Q    Can detainees leave the pod area without an officer

15   escort?

16   A    No, they may not.  Only time is when they are called out

17   to various appointments.  I am notified -- as a pod officer,

18   I am notified.  I go in, notify the individual that he'll be

19   leaving the pod for a little bit, going to see -- whether it

20   is their lawyer, medical, ICE would like to talk to them.

21   They signed up the day before for a law library or they

22   signed up that they want to go outside to the rec yard.

23   Other than that, they can't just leave.

24   Q    So what are the voluntary work program positions within

25   that (inaudible)?

1    A    You have a food server.  You have a general area cleaner.

2    You have a shower cleaner.  You have a bathroom cleaner.  You

3    have someone who sweeps and mops the floors.  You have a

4    general detainee that can do any job, and I am not really --

5    I don't have the paper in front of me with a list of the jobs

6    that are available.  I couldn't tell you all of them.  I

7    think I hit most of them.

8    Q    How does -- when you are a pod officer, how does a

9    detainee tell you they want to volunteer?

10   A    Usually the way it works, a newer guy will come up and ask

11   me how do I work in the pod.  I tell them, you can just send

12   a request through a kite to classification.  They will notify

13   me with whatever is available, if there is anything available

14   or -- then I will notify the individual saying, would you

15   like to do these things.  That will give me a yes or no.

16   Q    Okay.  About how long does it take to clean the shower?

17   A    I have seen it range from five, ten minutes to up to an

18   hour.  The only reason I seen an hour is the individual

19   preferred to stay out of his cell for count and he would sit

20   there, watch TV and squirt down or scrub or do whatever he

21   felt he needed to do to stay out and not be inside during

22   count time.

23   Q    Have you ever cleaned the showers?

24   A    Yes, sir (sic).

25   Q    How long does that take you?

1  A    Me personally, takes me about ten to 15 minutes.

2  Q    Cleaning the bathrooms, have you cleaned the bathroom?

3  A    I have.  I have probably cleaned everything in a pod

4  before.

5  Q    About how long does it take you to clean the bathrooms?

6  A    Bathrooms, I am going to go with probably another 15

7  minutes.  Just depends.  If I ate a good breakfast that day,

8  I am moving fast.  If not, I might take my time.

9        THE COURT:  It is time we took a break, Ms. Scheffey.

10  Excuse me.  We will take our afternoon break, folks.  Be ten

11  minutes.

12   (The following occurred outside the presence of the jury.)

13        MS. CHIEN:  Can I flag one thing?  At 2:30 for our

14  next witness, this is the witness that has a hearing issue.

15  I want to make sure that -- or ask Ms. Scheffey how much

16  further she has because we need that person to be able to

17  testify today and complete given the accommodations we need

18  for him.

19        MS. SCHEFFEY:  Let me try and figure that out during

20  the break.  I am looking at my notes right here.  I am doing

21  paper today.  I am not as organized with my time.

22        MS. CHIEN:  Thanks.

23        THE COURT:  All right.

24                    (Recessed.)

25        THE COURT:  Our next witness, he has a double

 1    interpreter or something.  I don't know what is going on with

 2    this witness.

 3            MS. CHIEN:  He needs an interpreter and he is

 4    partially deaf.  I would propose that -- I would love to stop

 5    now.  Hard stop at 3 with Mr. Menza and switch to our next

 6    witness, if possible, Your Honor.  I think GEO has agreed.

 7            MS. SCHEFFEY:  I have agreed to try and finish and

 8    recall him if necessary.

 9            THE COURT:  You say you wanted to take a further

10    break before that witness?

11            MS. CHIEN:  No, I don't want to take a further break.

12    We might have to let Mr. Menza go early if Ms. Scheffey isn't

13    done by 3:00.

14            MS. SCHEFFEY:  And then call him back Monday.

15            THE COURT:  What is this?  A filibuster?

16            THE CLERK:  If Mr. Menza is still testifying at 3:00,

17    the parties would like to stop and switch to the other

18    witness.

19            THE COURT:  Yeah.

20            MS. CHIEN:  Is it possible to do Mr. Marquez now?

21            MS. SCHEFFEY:  I can try to finish Mr. Menza before 3

22    if we get going.  I would like to give a chance for him to be

23    free.

24            THE COURT:  All right.  Let's go to work.  Bring the

25    jury in.  We will continue with Mr. Menza.

1    THE CLERK:  All right, Your Honor, they are on their

2    way in.  Okay, Your Honor, they are back.

3        (The following occurred in the presence of the jury.)

4        THE COURT:  Okay.  Everybody here?

5        MS. SCHEFFEY:  Yes.

6        THE COURT:  If you are not here, raise your hand.

7    Okay, Ms. Scheffey, you may continue with Mr. Menza.

8    BY MS. SCHEFFEY:

9    Q   Mr. Menza, before we left we were talking about pod

10   positions, do you remember that?

11   A   Yes, ma'am.

12   Q   Do you have any control over whether a detainee chooses to

13   participate in the voluntary work program?

14   A   I do not.  On numerous occasions, I will ask them if they

15   want to.  If they don't, it is up to them.  They have eight

16   hours while I am there.  As long as they do it while I am

17   there when they feel like it, maybe they are having a bad

18   time, maybe they want to sleep an extra hour.  It is up to

19   them.

20   Q   Do you have any control over whether a detainee volunteers

21   on a given day?

22   A   No, I do not.  Like I said, people have things going on.

23   Sometimes they just don't feel like doing much of anything.

24   I am not going to penalize them because they had a bad day.

25   Q   If a detainee's pod position says that they should

1    complete their task during swing shift, what time do they

2    have to show up to finish their pod position?

3    A    I am going to say 1501 to 2300.   Basically 3:00 when swing

4    shift starts to 11 p.m.

5    Q    They can do their position at any time?

6    A    Majority of the time, yeah, any time.   There is nothing

7    really specific except for the server, the food servers.

8    Just yesterday, I served the trays because, you know, they

9    were there and I didn't want the time for the food to go

10   cold.   They came out later on and helped me clean up

11   afterward.   I served all the trays.   That's the only one that

12   has kind of a set time.   With that said, we don't ever really

13   know exactly when the trays will show up.

14   Q    I want to talk to you about cleaning in the pod.   If a

15   detainee who is not a volunteer in the voluntary work program

16   asked to clean something, do you provide them with cleaning

17   supplies?

18   A    Yes, I do.   If they want to clean, I am not going to stop

19   them.   Up to them.   It is where they live.   A lot of the

20   times, individuals will go clean on their own just because

21   they prefer a cleaner environment.   I have an individual in

22   my pod right now, he likes to scrub his room just because --

23   I don't know if he has like a tick about it, but he's very, I

24   want it this way.   He does it every Thursday.   Every

25   Thursday, he scrubs his own room.   That is not required by

1    any of my workers to go and clean other people's rooms or

2    anything like that.  It is just, he prefers it one way,

3    that's what he does.  It passes the time for them.

4    Q   They can't bring supplies from home to clean with?

5    A   No.  No.  Any supplies that we have for them, it has got a

6    data sheet that explains the safety requirements and all

7    that.  Basically, it is an approved cleaning supply.

8    Q   Okay.  You also testified earlier that you were the

9    library officer; is that correct?

10   A   Yes.  Go ahead.

11   Q   Is one of the jobs of the library officer to help pick the

12   movies?

13   A   Mine, specifically at the time there was no recreation

14   specialist at the time, so I took on both positions.  As the

15   law library officer, I also was in charge of recreation.  I

16   would order movies and games and anything that required to be

17   distributed to the housing units or our video program for

18   detainees to watch movies at night.

19   Q   Okay.  Did the detainee volunteers get to help you pick

20   the movies?

21   A   I left it open to everybody.  I would take suggestions.

22   Lots of people would sign up for the law library just to come

23   down and help me pick movies, yeah.  I hear Blade 75 is

24   coming out, so is there any way we can get that?  Sure, as

25   long as it is available through Amazon.  If can find a way to

1    get it through one of these sites, yeah, I will get it for

2    them, no problem.

3    Q    When are those movies played?

4    A    Been awhile.  I believe 7:00ish.  Every night, 7:00 one of

5    the movies would be played and that movie would be repeated

6    the next morning.  In my pod, they liked to sleep past the

7    time it starts.  It is replayed so everybody who didn't watch

8    it the night before could catch it in the morning.

9    Q    You were asked earlier if you would work for one dollar

10   per day; is that right?

11   A    I was.

12   Q    Are you an employee of GEO?

13   A    I am an employee of GEO.

14   Q    Does GEO pay for your rent or mortgage or does that come

15   out of your salary?

16   A    Comes out of my salary.

17   Q    Does GEO pay for your meals?

18   A    They do not.

19   Q    What about your cable TV?

20   A    They do not.

21   Q    To your knowledge, does GEO charge detainees for their

22   room and board?

23   A    To my knowledge, they do not.

24   Q    Do you have any control over the amount of the stipend

25   detainee volunteer workers receive?

1  A    No, that is not within my wheelhouse.

2        MS. SCHEFFEY:  Thank you.  No further questions.

3        MR. POLOZOLA:  Nothing further from the State,

4  Your Honor.

5        MR. BERGER:  No further questions, Your Honor.

6        THE COURT:  All right.  You may be excused,

7  Mr. Menza.  Thank you.

8        THE WITNESS:  Thank you, sir.

9        THE COURT:  Let me ask you about your next witness.

10        MS. CHIEN:  Yes.

11        THE COURT:  We have an English-Spanish interpreter;

12  is that correct?

13        MS. CHIEN:  Correct.

14        THE COURT:  You mentioned he was hard of hearing?

15        MS. CHIEN:  Yes.

16        THE COURT:  Does this require some special

17  accommodation or what?

18        MS. CHIEN:  We have arranged so that we have CART,

19  which I understand to be similar to your real time, that is

20  on a computer right next to him that is typing out the

21  subtitles.

22        THE COURT:  Ladies and gentlemen, it is my

23  understanding this next witness will be testifying in the

24  Spanish language.  Witnesses who do not speak English or are

25  not proficient in English can testify through official court

1    interpreters.  Some of you may know Spanish, but it is

2    important that all of you consider the same evidence,

3    therefore you must accept the interpreter's translation of

4    the witness's testimony and must disregard any different

5    meaning.  And you should make no assumptions about a witness

6    based solely on the use of an interpreter to assist the

7    witness and the Court and any party.

8        You may call your witness, Ms. Chien.

9            MS. CHIEN:  State would like to call Mr. Orlando

10   Marquez.

11           THE CLERK:  He is in the process of joining at the

12   moment.

13           THE COURT:  The court interpreters are already sworn

14   and are official interpreters.  The name of the witness?

15           MS. CHIEN:  Orlando Marquez.

16           THE COURT:  Here he is.

17       Mr. Marquez, I am Judge Bryan, can you hear me all right

18   with the help of the interpreter?

19           THE WITNESS:  Yes, I am able to hear.

20           THE COURT:  Will you raise your right hand and be

21   sworn.  Do you swear or affirm that your testimony in this

22   cause will be the truth, the whole truth and nothing but the

23   truth?

24           THE WITNESS:  Yes.

25                   ORLANDO MARQUEZ,

 1          having been sworn under oath, testified as follows:

 2               THE COURT:  All right.  Thank you.  And you may

 3     proceed, counsel.

 4                         DIRECT EXAMINATION

 5     BY MS. CHIEN:

 6     Q   Mr. Marquez, where do you live?

 7     A   In Burbank, Washington.

 8     Q   Do you have a disability?

 9     A   Yes, I have a hearing loss.  On the right ear, I hear only

10     50 percent.  On the left, nothing.

11     Q   Are you using technical assistance to help you with your

12     disability while you are testifying today?

13     A   Yes, subtitles on audio.

14     Q   Are you familiar with the Northwest Detention Center?

15     A   Yes.  Yes, I was -- yes.

16     Q   You were about to finish your answer before the

17     interpreter spoke.

18               THE INTERPRETER:  The interpreter did not cut him

19     off.  The witness stopped.

20     BY MS. CHIEN:

21     Q   How are you familiar with the Northwest Detention Center?

22     A   (No response.)

23     Q   When were you --

24     A   I was detained.

25     Q   When were you detained at the Northwest Detention Center?

1    A    April 24 to December 1st, 2017.

2    Q    Where were you living before you were at the Northwest

3    Detention Center?

4    A    In Everett, Washington.

5    Q    So you weren't coming from a prison; is that right?

6    A    I was not.

7    Q    While you were at the Northwest Detention Center, did you

8    work there?

9    A    Yes.

10   Q    What jobs did you do while you were at the Northwest

11   Detention Center?

12   A    The kitchen, painting, and the bathroom, the showers.

13   Q    Why did you work at the Northwest Detention Center?

14   A    Because I needed money for my hearing surgery, for my

15   phone calls, for my family and to eat.

16   Q    Let's talk about your job in the kitchen.  How did you get

17   your job in the kitchen?

18   A    I put a message in the computer for ICE requesting a job.

19   They said, okay.  They placed me on a waiting list, and when

20   they needed me, I was called.

21   Q    You put a request in to GEO; is that right?

22            MS. SCHEFFEY:  Objection, misstates testimony.

23       Your Honor, I objected, leading and misstates testimony.

24            THE COURT:  I don't know that there is a question.

25            MS. CHIEN:  Let me try that again.  I can back up.  I

1   will withdraw.

2           THE COURT:  Okay.  Go ahead.

3   BY MS. CHIEN:

4   Q   How did you get your job in the kitchen?

5   A   I placed a message on the computer requesting work.  I was

6   approved and placed on a waiting list, and when I was needed

7   for work, the GEO officer called me to go to work.

8   Q   When you started in the kitchen, did you have to sign

9   anything when you worked in the kitchen?

10  A   Yes.

11  Q   What did you have to sign?

12  A   The job agreement, the description, and the volunteer

13  work.

14  Q   Did you have to sign any training materials?

15  A   Training.

16  Q   Is that yes?

17  A   Yes.

18  Q   How many days a week did you work in the kitchen?

19  A   For the first job, I worked six and for the second job in

20  the kitchen, I worked seven days.

21  Q   Just to clarify, you worked two different times in the

22  kitchen; is that right?

23  A   That's right, the first one because they approved one off

24  day, and the second one I worked the seven days.

25  Q   What was your work schedule when you worked in the

1    kitchen?

2    A    From four to 9:30.  But it would vary.  If they did not

3    have enough people, we would end later.

4    Q    Can you please describe your job duties in the kitchen?

5    A    What I did?

6    Q    Yes, what did you do in the kitchen?

7    A    I would prepare all the utensils that were needed, the

8    forks, everything else, the trays, we would put ice

9    underneath the trays to keep things cool.  Then we would

10    prepare the bread, the butter and all that.  Then at the end,

11    we would clean up, sweeping, mopping and washing.

12    Q    Did you have to carry pots and pans and things like that?

13    A    Yes, the pans, for example, I would bring, and also it

14    depended.  I mean, if you got there to work earlier, then you

15    didn't have the really hard jobs.  But myself, I mean, I

16    would always end up like doing the hard jobs.

17    Q    What did you wear while you were working in the kitchen?

18    A    The uniform that they would give us.  For example, the

19    boots with bags inside of the boots so we would not get our

20    feet wet.  Also, like the mouth covers and the hats and the

21    gloves.

22    Q    Who provided that equipment to you?

23    A    The GEO servers.

24    Q    I am going to ask you to turn to Exhibit 433 in the

25    documents we have given you on the table.

1        MS. SCHEFFEY:  Marsha, were we provided with 433?

2        MS. CHIEN:  It has been admitted.

3   BY MS. CHIEN:

4   Q   It has already been admitted.  I would like to show

5   Exhibit 433.  Do you recognize what is going on in this

6   photo?

7   A   Yes.

8   Q   Can you tell me what is happening on the left side of the

9   photo?

10  A   On the left side, you mean where the officer is or where

11  the trays are?

12  Q   Where the officer is.

13  A   The officer is there with some guys who are getting ice to

14  put ice cubes in some buckets.  The ones on the right are

15  setting up the utensils to sort out for the detainees in each

16  room depending on the number of detainees per room so they

17  match the utensils with the number of people.

18  Q   Asking you to turn to Exhibit 435.  Do you recognize this

19  photo?

20  A   Yes.

21        MS. CHIEN:  I would like to move to admit Exhibit

22  435.

23        MS. SCHEFFEY:  No objection.

24        THE COURT:  435 may be admitted.

25              (Exhibit 435 was admitted.)

1  Q   Can you tell me what is going on in this photo?

2  A   What is happening is we need to take all the bread you can

3  see there in the bags and put them in the large white bins;

4  otherwise, if we get the bread out of those bags, the bread

5  would end up breaking.

6  Q   You were getting the bread out of the bags to make the

7  serving line go faster; is that right?

8  A   Yes.

9  Q   You worked the dinner shift from four to 9:30 and you

10 worked six days a week; is that right?

11 A   Yes.

12 Q   About 30 hours a week; is that right?

13 A   Yes.

14 Q   Who supervised you?

15 A   The GEO servers.

16 Q   How did the GEO servers treat you while you were working

17 in the kitchen?

18 A   Badly, really.  They would rush me.  They would yell at

19 me, and they would scold me.  I reported that.  I reported it

20 on the computer.

21 Q   Tell me, why were they yelling at you?

22 A   They would rush you, you know, when you were busy doing

23 one thing they would start yelling at you for you to do

24 something else, but you were -- you had your hands busy doing

25 one thing and they want you to do something else.

```
 1   Q   You testified that GEO officers yelled at you.  Did you
 2   complain to anybody?  Sorry, I think you testified you did
 3   complain; is that right?
 4   A   Yes, I did report him, like I said.  I also reported it to
 5   ICE and I told them to look at the cameras.
 6   Q   Look at the cameras in the kitchen; is that right?
 7   A   Yes.
 8   Q   When did you complain?
 9   A   I don't remember.
10   Q   I am going to show -- I am going to ask you to look on
11   your documents at Exhibit 607.  In reviewing this document,
12   do you recognize your complaint?
13   A   Yes.
14           MS. CHIEN:  I would like to move to admit Exhibit
15   607.
16           MS. SCHEFFEY:  I would object on relevance.
17           MS. CHIEN:  It is a complaint he had about his work
18   in the kitchen.
19           MS. SCHEFFEY:  I don't think I heard him testify
20   about that.
21           THE COURT:  607 may be admitted.
22                   (Exhibit 607 was admitted.)
23   Q   Now you can look at your screen.  You see at the top, it
24   says from Orlando Marquez Zavalza?
25   A   Yes.
```

1  Q    It says, "original request."  Below it says -- I believe

2  it has your complaint; is that right?

3  A    Yes.

4  Q    I am going to ask the interpreter to read your original

5  request and tell me if that is correct.

6        THE INTERPRETER:  You want me to read it into

7  English, right?

8        MS. CHIEN:  Yes, please.

9        THE INTERPRETER:  Good evening.  I want to report

10  Server Carter.  I talked to her to ask if she would let me go

11  back to my cell because I was feeling bad, dizzy and with a

12  headache at 7:45 p.m. She just ignored me, you know, and she

13  left.  I have depression and facial paralysis.  I like to

14  work, but at times they force me.  When I am already busy

15  doing some job, they send me to another one.  I told them I

16  only have two hands.  Thank you for your understanding and

17  for your time.

18  BY MS. CHIEN:

19  Q    Is that your recollection of what your complaint was?

20  A    Yes.

21  Q    Do you see at the top of the form it says it is assigned

22  to ICE?

23  A    Yes.

24  Q    What did ICE tell you?

25  A    That I need to report that to GEO.

Marquez - Direct

1    Q    When you had a complaint about the work in the kitchen,

2    the response from ICE is this was a GEO issue, you have to

3    report it to GEO?

4    A    That is right.

5    Q    Why did you quit working at the kitchen?

6    A    Because of the abuse, the yelling and the poor treatment.

7    Q    Did you later request to return to the kitchen?

8    A    Yes, because I needed money.

9    Q    Why did you need money?

10   A    Because I needed to make calls to my family.  I also

11   needed to save some money for my ear surgery.  Basically, to

12   make calls to my family, who was in Mexico.

13   Q    Was it also because you were hungry?

14   A    Yes.

15   Q    Did you get extra food from the kitchen?

16          MS. SCHEFFEY:  Objection, leading.

17          THE COURT:  The objection is overruled.

18   BY MS. CHIEN:

19   Q    Let me ask it again.  Did you get extra food in the

20   kitchen?

21   A    Yes, whatever we could get ahold of, you know, I tried to

22   get a lot.

23   Q    You requested to return to the kitchen.  Did you get to

24   return to the kitchen right away?

25   A    No.

1    Q    Did you have to wait?

2    A    I was placed on a waiting list.  I waited for about one

3    month.  When they did not respond so I sent another one,

4    another request and then they did.

5    Q    You couldn't just work in the kitchen whenever you wanted;

6    is that right?

7    A    It depended on whether they would accept me or not.

8    Q    You also mentioned that you cleaned the bathrooms; is that

9    right?

10    A    Yes, the showers.

11    Q    How much -- did you have to sign anything to prove that

12    you worked in the showers or cleaned the bathrooms?  Sorry.

13    A    Yes.

14    Q    I would like to show you Exhibit 408-A.

15           THE INTERPRETER:  Counsel, you said 408, right?

16           MS. CHIEN:  Yes.

17           THE WITNESS:  Yes, I have it.

18    BY MS. CHIEN:

19    Q    Are you at Exhibit 408?

20    A    Yes.

21    Q    Can you turn to page 29?

22           MS. SCHEFFEY:  408-A, Marsha?

23           MS. CHIEN:  Sorry.  Sorry.  Yeah, yeah, yeah.

24    BY MS. CHIEN:

25    Q    I am going to ask you to look at Exhibit 408 and then turn

1   to the bottom where there is numbers on the bottom.  The

2   bottom says 189008.

3   A   Let me see, I am not able to see the number.

4           MS. SCHEFFEY:  Marsha, if I don't object --

5           MS. CHIEN:  Can I publish it?  Thank you.

6           MS. SCHEFFEY:  Your Honor, GEO does not object to

7   408-A.

8           THE COURT:  Sorry?

9           MS. SCHEFFEY:  I believe Ms. Chien would like to

10  admit Exhibit 408-A.  I do not object.

11          THE COURT:  I don't know what 408-A is.  Is this

12  marked by the defendants?

13          MS. CHIEN:  It is marked by the plaintiffs.

14          THE WITNESS:  The numbers, I don't know whether they

15  are right, 189008.

16  BY MS. CHIEN:

17  Q   I will back up.  Did you have to sign a sheet, a form in

18  order to show that you worked each day?

19  A   Yes.

20  Q   I believe you said you painted; is that right?

21  A   Yes.

22  Q   What did you paint as part of your work program?

23  A   I got to paint all the metal railing on the stairs, the

24  color green.

25  Q   You weren't painting murals; is that right?

1    A    No.

2    Q    All right.  You worked in the kitchen, you worked in the

3    bathrooms and you painted.  How much did you earn for each

4    day of work?

5    A    $6 a week.

6    Q    A dollar a day?

7    A    Yes, a dollar a day.

8    Q    Could you survive at the Northwest Detention Center on one

9    dollar a day?

10   A    Impossible.  No.

11   Q    Why is that?  What did you have to spend money on?

12   A    Because each call to Mexico for three minutes would cost

13   $6 and I would make six to seven calls to Mexico a day asking

14   for help.  I also watched videos, music, and I bought food.

15   Q    The movies cost money; is that right?

16   A    Yes, I would spend over $10 or $8 for videos.

17   Q    So you could watch a movie personally and not with the

18   entire pod; is that right?

19   A    Yes.

20   Q    You couldn't survive on a dollar per day.  Did you have to

21   ask friends or family for money?

22   A    Yes.

23   Q    Did you feel embarrassed to ask for that money?

24   A    Yes, because I have worked really hard to be able to send

25   money for my family and, you know, everybody knows me, and I

1    felt really ashamed to have to have my family send me money

2    and my friends.

3    Q    When you were released from the Northwest Detention Center

4    on December 1, how much money did you have in your account?

5    A    Approximately $22, but, you know, out of all the time I

6    worked, I couldn't believe it.

7    Q    Why were you released from the Northwest Detention Center?

8    A    They accept -- I earn -- I won a case.

9    Q    Your immigration case?

10   A    Yes.

11   Q    What was the basis for you winning your immigration case?

12   A    Because I was afraid of going back, afraid for my life and

13   my brother was killed.

14   Q    Who killed your brother?

15   A    The mafia.

16   Q    You were released, does that mean immigration officials

17   determined you were allowed to stay in the United States?

18   A    Yes.

19   Q    Do you have work authorization?

20   A    Yes.

21   Q    Where do you live?

22   A    Burbank, Washington.

23   Q    What kind of work do you do now?

24        THE INTERPRETER:  The interpreter needs to ask for

25   clarification.

1      THE WITNESS:  I am painting, so I paint boats, water

2  fountains, water tanks.

3  BY MS. CHIEN:

4  Q   How much do you earn an hour?

5  A   The most I've earned is $45.

6      MS. CHIEN:  No further questions.

7                      CROSS-EXAMINATION

8  BY MS. SCHEFFEY:

9  Q   Mr. Marquez, it is my understanding you have a hearing

10  accommodation.  Before we begin, are you able to hear me

11  okay?

12  A   Yes.

13  Q   How did you end up at the Northwest ICE Processing Center?

14  A   ICE detained me at a traffic light in Everett.

15  Q   Before you were detained at the Northwest ICE Processing

16  Center, had you previously been deported by an immigration

17  judge in Houston, Texas?

18  A   Yes.

19  Q   So after you were deported, you reentered the

20  United States, correct?

21  A   Yes.

22  Q   That's why you were detained by ICE, correct?

23  A   Yes.

24  Q   GEO was not the one who detained you, correct?

25  A   No.

1    Q    So before you were deported the first time, were you

2    detained at any other facility?

3    A    Yes.

4    Q    What was the name of that facility?

5    A    I was in Houston for a month, in New Orleans another

6    month.

7    Q    Did you participate in the voluntary work program at

8    either of those facilities?

9    A    (No audible response.)

10   Q    I'm sorry, I didn't hear the answer.

11   A    No.

12   Q    Were you able to make any money while detained in those

13   facilities?

14   A    I remember I did.

15   Q    How did you make that money?

16   A    Paid by the day.

17   Q    Were those a dollar a day programs as well?

18   A    Yes, but I don't understand why we were earning a dollar

19   and what is the difference from now.

20   Q    Have you brought a lawsuit against either of those

21   facilities claiming to be an employee?

22   A    No.

23   Q    Why not?

24   A    I did not have a complaint.

25   Q    Okay.  So when you got to the Northwest ICE Processing

1    Center, you received an orientation, correct?

2    A    Northwest is Tacoma?

3    Q    Yes, we can refer to it as Tacoma, if that is easier.

4    A    Yes.

5    Q    In that orientation, did you learn about the voluntary

6    work program?

7    A    Yes.

8    Q    Did you learn that the stipend was one dollar per day?

9    A    Yes.

10   Q    You were informed you could use the law library?

11   A    What do you mean "the law library"?

12   Q    While you were detained, there was a room where you could

13   use computers and work on your case, correct?

14   A    Yes, and to make the calls.

15   Q    You could watch TV while detained?

16   A    Yes.

17   Q    You could play games?

18   A    Yes.

19   Q    You could participate in recreation?

20   A    Yes.

21   Q    You were able to knit or crochet?

22   A    Yes.

23   Q    You were able to go to church?

24   A    Yes.

25   Q    Another option was to participate in the voluntary work

1  program, right?

2  A   Yes.

3  Q   If you have it in front of you, I would like you to look

4  at Exhibit A-286.

5          THE INTERPRETER:  Could you repeat the exhibit

6  number?

7          MS. SCHEFFEY:  A-286.

8          MS. CHIEN:  You are asking, he needs to look in the

9  Box.  We might need to help him access Box.  You said A-286,

10  Adrienne?

11      I think he has it, maybe.

12  BY MS. SCHEFFEY:

13  Q   Do you have the document in front of you, sir?

14  A   Yes.

15  Q   At the bottom, it says *firma* or signature?

16  A   Yes.

17  Q   Is that your signature?

18  A   Yes.

19  Q   What is this document?

20  A   It is the agreement for the work volunteer program.

21          MS. SCHEFFEY:  Move to admit A-286.

22          MS. CHIEN:  No objection.

23          MS. SCHEFFEY:  If we could publish it to the jury.

24          THE COURT:  It may be admitted.

25              (Exhibit A-286 was admitted.)

1   Q    This document was in Spanish, correct?

2   A    Yes.

3   Q    Is Spanish your primary language?

4   A    Yes.

5   Q    This document told you that the stipend would be only one

6   dollar per day; is that correct?

7   A    Yes.

8   Q    It also told you that your participation was voluntary?

9   A    Yes.

10  Q    It has your A number on it?

11  A    Yes.

12  Q    We can take the document down.  When you asked to

13  participate, you were placed on the waiting list, correct?

14  A    Yes.

15  Q    That was because there were a lot of detainees who wanted

16  to participate, correct?

17  A    Yes.

18  Q    When you were placed on the waiting list for the kitchen,

19  you were notified that it could take a few weeks to get a

20  clearance; is that correct?

21  A    No.

22  Q    Okay.  I would like you to take a look at Exhibit A-289.

23       THE INTERPRETER:  A-289?  Is that -- I'm sorry,

24  counsel, A-289?

25       MS. SCHEFFEY:  A-289.

1    BY MS. SCHEFFEY:

2    Q   Do you have it open?

3    A   Nothing appeared here.  It is not here.

4          MS. CHIEN:  Do you mind if somebody sits in the room

5    with him?

6          THE WITNESS:  Yes.

7    BY MS. SCHEFFEY:

8    Q   Okay.  Do you see your name at the top of this document?

9    A   Yes.

10   Q   Do you also see your A number?

11   A   Yes.

12   Q   Is this a request you made on the tablet in your dorm?

13   A   On the tablet?

14   Q   Is this a request you made on a difference device,

15   something called a kite?

16   A   No.

17   Q   So this document with your A number and name at the top is

18   not yours?

19   A   Yes, yes, it is mine.

20         MS. SCHEFFEY:  Move to admit A-289.

21         MS. CHIEN:  Objection.

22         THE WITNESS:  An officer gave it to me for me to sign

23   it for my -- when I resigned.

24         THE COURT:  A-289 may be admitted.

25         MS. SCHEFFEY:  Can someone publish A-289 for me?

1       (Exhibit A-289 was admitted.)

2   Q   This document states that you were signing to not work in

3   the kitchen anymore; is that correct?

4   A   Yes.  To quit my job, yes.

5   Q   So you were able to resign from the voluntary work

6   program, if you wanted?

7   A   Yes.

8   Q   Can you look at A-287?

9   A   I cannot find it right now on the screen.

10          MS. SCHEFFEY:  Can someone help him get A-287?

11          MS. CHIEN:  You can stay in there.

12          THE WITNESS:  I got it.

13  BY MS. SCHEFFEY:

14  Q   Does this document have your name and A number at the top?

15  A   Yes.

16  Q   Is this your request to work in the voluntary work

17  program?

18  A   Yes, in the room, yes.

19          MS. SCHEFFEY:  I move to admit A-287.

20          MS. CHIEN:  No objection.

21          THE COURT:  It may be admitted.

22              (Exhibit A-287 was admitted.)

23          MS. SCHEFFEY:  Thank you, Your Honor.

24  BY MS. SCHEFFEY:

25  Q   If we can blow up the bottom part, which is the response

1    by Ms. Singleton.  Do you see at the bottom where it says the

2    process may take a few weeks to complete?

3    A    Okay.

4    Q    Does that refresh your recollection that you were told

5    that it would take a few weeks to get a position in the

6    voluntary work program?

7    A    Oh, yes.

8    Q    You testified earlier that you arrived in April 2017; is

9    that correct?

10   A    Yes.

11   Q    So if you look at the top of this document, the date is

12   June 2nd, 2017.  Do you see that?

13   A    Yes.

14   Q    As of that date, you still did not have a position in the

15   voluntary work program; is that correct?

16   A    No.

17   Q    So it took at least two months to get a position in the

18   voluntary work program; is that correct?

19   A    I don't remember.

20   Q    Okay.  Can you look at the request on this document where

21   it says, "Can I get any job here, please?"

22   A    Yes.

23   Q    Were you asking for a job with that request?

24   A    Yes.

25   Q    So at that point, you did not have a position in the

1  voluntary work program?

2  A    No.

3  Q    We just went over that request that was made on June 2nd;

4  is that correct?

5  A    I wrote it on May 31st.

6  Q    On May 31st?  Is that at the top of the document?

7  A    Yes.

8  Q    Then it was received on June 2nd; is that correct?

9  A    Yes.

10 Q    If we could pull up document 289 again on the screen for

11 the witness.

12 A    I have it.

13 Q    You testified a little bit ago this document indicated

14 that you were resigning from your position in the voluntary

15 work program; is that correct?

16 A    Okay, yes.

17 Q    The date at the top of this document, can you see that at

18 the top?  Can we blow that up?

19 A    Yes. (Interpreter still translating the response.)

20        MS. SCHEFFEY:  Object as nonresponsive because the

21 question was:  Can you see the date at the top of the

22 document?

23        THE WITNESS:  Yes, I can see it.

24 BY MS. SCHEFFEY:

25 Q    Okay.  The date is June 16th; is that correct?

1    A    I don't remember whether it was that date, but, yes.

2    Q    Can you see the date at the top of the document?

3    A    Yes, I can see it.

4    Q    That date is June 16th, correct?

5    A    Yes.

6    Q    So some time in between June 2nd and June 16th, you were

7    given a position in the voluntary work program and also chose

8    not to participate anymore; is that correct?

9    A    Yes.

10    Q    So at most you participated for 15 days; is that correct?

11    A    I participated in what?

12    Q    In the voluntary work program in the kitchen?

13    A    I don't remember.

14    Q    When you left the kitchen, did it have any impact on your

15    ability to volunteer for another program?

16    A    Whether it affected me in some fashion to participate in

17    something else?

18    Q    Were you able to request to volunteer in the program again

19    after you left the program?

20    A    Yes.

21    Q    Did you have to interview for a position in the voluntary

22    work program?

23    A    I don't remember.

24    Q    Were you able to take time off to go to church on Sunday?

25    A    Yes.

1   Q    Were you able to ask to be assigned to your preferred time

2   slot at four p.m.?

3   A    Yes.

4   Q    You had the opportunity to be a food server handing out

5   food and milk, correct?

6   A    Yes.

7   Q    You didn't select that position, correct?

8   A    I did select it.

9   Q    We just looked at a document that showed you worked in the

10  kitchen, correct?

11  A    Yes.

12  Q    So that is the position you selected in the voluntary work

13  program, correct?

14  A    Yes.

15  Q    If you hadn't selected that position, you wouldn't have

16  had an opportunity to leave your pod to work; is that

17  correct?

18  A    If I did not have the opportunity to leave what?

19  Q    Your pod or your dorm.

20  A    Yes, I was able to leave.

21  Q    You could leave your dorm whenever you wanted and go

22  outside?

23  A    When the officer said so, there is a list with times and

24  days where you can go out to play, where you can go to

25  church, where you can go do other things.

1    Q    That helps me understand.  Thank you.

2         You liked staying busy while you were detained,

3    correct?

4    A    Yes.

5    Q    You didn't want to sit in your bunk all day, did you?

6    A    No.

7    Q    Did you keep your own area clean?

8    A    Yes.

9    Q    Did you like to make the other volunteers who cleaned up

10   the pods job easier?

11   A    Yes.

12   Q    Prior to being detained, were you working?

13   A    Yes.

14   Q    Did you have a work authorization from the government?

15   A    No.

16   Q    Did you have a work authorization from the government

17   while you were detained?

18   A    No.

19   Q    Who is Myra Marquez?

20   A    Not Myra, Moriya.

21   Q    Moriya, I apologize.  Who is she?

22   A    My first cousin.

23   Q    Did she send you money while you were detained?

24   A    Yes, because I sold my car and I asked for money and it

25   was sent to her and she would send it to me.

1   Q   Did she send you about $200 when you were detained?

2   A   I don't remember whether it was one, two or three.

3   Q   It would have taken you a full year in the voluntary work

4   program to get $300; is that right?

5   A   Yes.

6   Q   Is it fair to say that much more of your money came from

7   Ms. Marquez than from the voluntary work program?

8   A   From my family, yes.

9   Q   Who is Cassandra Pateo (phonetic)?

10  A   A friend.

11  Q   Did she send you money while you were detained?

12  A   Yes.

13  Q   What about Jessica Williams, did she send you money while

14  you were detained?

15  A   Yes, she is the mother of my son.

16  Q   Did you have a friend send you shoes while you were

17  detained?

18  A   I don't remember.

19          THE COURT:  Excuse me, Ms. Scheffey, it is quitting

20  time.  You folks can be excused --

21          MS. CHIEN:  Your Honor, can I just flag, because --

22  Ms. Scheffey, if Ms. Scheffey doesn't have that much longer,

23  I would like to let Mr. Marquez go, given the multiple

24  accommodations that he requires.  I would like to ask

25  Ms. Scheffey --

1        THE COURT:  Ms. Chien, it is 4:00 on Friday night.

2   Court hours were set in the pretrial order.  We are not going

3   to go overtime in the absence of an emergency.  I don't see

4   this as an emergency.  If it is -- if you care, my day is

5   long from over yet.  I have a lot of work to do before I can

6   stop work for the day.

7        Now, I would like counsel to remain on the call for a

8   minute and the jury may be excused.

9        Please follow my instructions about recesses.  Don't

10  discuss the case with anyone else.  Don't read, view or

11  listen to any news accounts, and there have been some, I

12  understand.  Don't look or read them if you see them.  Don't

13  do any independent research or study on any of the matters

14  you heard discussed in court or anything about the case.

15       We will reconvene at 9:00 on Monday.  Have a nice weekend.

16  Don't worry about the case or think about it over the

17  weekend.  It will all come back to you on Monday when you

18  start again.

19       The jury may be excused.

20   (The following occurred outside the presence of the jury.)

21       THE COURT:  Mr. Marquez, you may be excused, but you

22  must come back Monday.

23       THE WITNESS:  Monday?

24       MS. CHIEN:  He said Monday.

25       THE CLERK:  The jury is gone, Your Honor.

1    THE COURT:  All right, Mr. Marquez and the

2    interpreters may be excused.

3    THE INTERPRETER:  Thank you, Your Honor.

4    THE COURT:  Okay.  I asked Tyler if he could give you

5    a time check at the end of the week.  Can you do that, Tyler?

6    THE CLERK:  I can.  Can I take care of one piece of

7    business before I do that so I don't forget?

8    Exhibit -- I believe it was 408-A was offered.  I don't

9    believe there was an objection to it, but then we kind of

10   moved on.  I am just checking to see if it was admitted or

11   not admitted.

12   THE COURT:  I'm sorry, what exhibit number was it?

13   THE CLERK:  Ms. Chien, 408-A.

14   MS. CHIEN:  I don't believe it was admitted.

15   MS. SCHEFFEY:  We have no objection if you want it

16   admitted.

17   MS. CHIEN:  All right.  That's fine.

18   THE COURT:  408-A may be admitted.

19   MS. CHIEN:  Thank you.

20   THE CLERK:  The times that have been used so far, the

21   State of Washington has used seven hours, 45 minutes and 42

22   seconds.  The class plaintiffs have used one hour, 33 minutes

23   and 35 seconds.  The defense has used five hours, 41 minutes

24   and 42 seconds.

25   THE COURT:  Okay.  There you have it.  This seems to

1  me painfully slow.  We got a lot of detail that seems to be,

2  to me at least, seems to be only marginally relevant.  As

3  long as there is sufficient relevance, I am not going to cut

4  anybody off, but I guess what I want to say is I would urge

5  you to examine what it is this case is about and what you are

6  really trying to prove and be sure that the evidence you plan

7  to offer really goes to the issues in the case.  It just

8  seems to me that a number of times, we have been far afield.

9      Okay.  Have a nice weekend.  Don't work too hard over the

10  weekend.  See you on Monday morning at 9:00.  Thanks.

11          MR. POLOZOLA:  Thank you, Your Honor.

12          MS. SCHEFFEY:  Thank you.

13                  (The proceedings adjourned.)