1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT TACOMA

3   _____

4
    UGOCHUKWO GOODLUCK NWAUZOR,      )
5   et al.,                          )
                                     )
6              Plaintiffs,           ) 3:17-cv-05769-RJB
                                     ) 3:17-cv-05806-RJB
7   v.                               )
                                     ) Tacoma, Washington
8   THE GEO GROUP, INC.,             )
                                     ) June 7, 2021
9              Defendant.            )
    _____     ) Jury Trial
10                                   )
    STATE OF WASHINGTON,             ) 9:00 a.m.
11                                   )
               Plaintiff,            )
12                                   )
    v.                               )
13                                   )
    THE GEO GROUP, INC.,             )
14                                   )
               Defendant.            )
15                                   )
    _____

16              VERBATIM REPORT OF PROCEEDINGS
17          BEFORE THE HONORABLE ROBERT J. BRYAN
                UNITED STATES DISTRICT JUDGE
18  _____

19

20

21

22

23

24      Proceedings stenographically reported and transcribed
25              With computer-aided technology

```
 1                          APPEARANCES

 2

 3    For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
 4                             Schroeter Goldmark & Bender
                               810 Third Avenue
 5                             Suite 500
                               Seattle, Washington
 6

 7
      For the Plaintiff        ANDREA BRENNEKE
 8    State of Washington:     LANE POLOZOLA
                               MARSHA J. CHIEN
 9                             800 Fifth Avenue
                               Suite 2000
10                             Seattle, Washington

11

12    For the Defendant        LAWRENCE D. SILVERMAN
      The GEO Group:           ADRIENNE SCHEFFEY
13                             Akerman LLP
                               1900 Sixteenth Street
14                             Suite 1700
                               Denver, Colorado
15
                               JOAN K. MELL
16                             III Branches Law PLLC
                               1019 Regents Boulevard
17                             Suite 204
                               Fircrest, Washington
18

19

20

21

22

23

24

25
```

```
 1                          EXAMINATION INDEX

 2
      EXAMINATION OF:                                      PAGE
 3
       DAVID TRACY          DIRECT EXAMINATION
 4                          BY MR. WHITEHEAD                  6
                            CROSS-EXAMINATION
 5                          BY MS. SCHEFFEY                  25
                            REDIRECT EXAMINATION
 6                          BY MR. WHITEHEAD                 33

 7     MARIA NAYRA GOMEZ
       SOTELO               DIRECT EXAMINATION
 8                          BY MS. CHIEN                     41
                            CROSS-EXAMINATION
 9                          BY MR. SILVERMAN                 58
                            REDIRECT EXAMINATION
10                          BY MS. CHIEN                     75

11     MARC JOHNSON         DIRECT EXAMINATION
                            BY MR. WHITEHEAD                 77
12                          CROSS-EXAMINATION
                            BY MS. SCHEFFEY                  98
13                          REDIRECT EXAMINATION
                            BY MR. WHITEHEAD                108
14
       MICHAEL HEYE         DIRECT EXAMINATION
15                          BY MR. WHITEHEAD                112
                            CROSS-EXAMINATION
16                          BY MS. SCHEFFEY                 121

17     BRUCE SCOTT          DIRECT EXAMINATION
                            BY MR. WHITEHEAD                142
18                          CROSS-EXAMINATION
                            BY MS. SCHEFFEY                 173
19

20

21

22

23

24

25
```

1                          EXHIBIT INDEX

2

   EXHIBITS ADMITTED                                    PAGE
3
     Exhibit 20                                         117
4    Exhibit 216                                         53
     Exhibit 341                                         74
5    Exhibit 342                                         74
     Exhibit 474                                         86
6    Exhibit 491                                         84
     Exhibit 490                                         89
7    Exhibit A-296                                       62
     Exhibit A-297                                       63
8    Exhibit A-298                                       64
     Exhibit A-299                                       64
9    Exhibit A-300                                       65

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                                          MORNING SESSION

2                                          JUNE 7, 2021

3       (The following occurred outside the presence of the jury.)

4              THE COURT:  Okay.  Are you all through with

5     Mr. Marquez?

6              MS. CHIEN:  Yes, Your Honor.

7              MS. SCHEFFEY:  Yes, Your Honor, we agreed to let him

8     go.

9              THE COURT:  I will so advise the jury.  Who is the

10    next witness?

11             MR. WHITEHEAD:  David Tracy, Your Honor.  Mr. Tracy.

12             THE COURT:  Say that again.

13             MR. WHITEHEAD:  David Tracy.

14             THE COURT:  Bring the jury in, and bring the witness

15    in.

16        (The following occurred in the presence of the jury.)

17             THE COURT:  Ladies and gentlemen, counsel has advised

18    that they have completed their examination of Mr. Marquez, so

19    he has been excused.  We will go to the next witness this

20    morning, Mr. Tracy.

21        Mr. Tracy, if you will raise your right hand and be sworn.

22                           DAVID TRACY,

23        having been sworn under oath, testified as follows:

24             THE COURT:  You may inquire, counsel.

25
```

1        DIRECT EXAMINATION

2   BY MR. WHITEHEAD:

3   Q   Good morning, Mr. Tracy.  There you are on my screen.  GEO

4   is your current employer; is that right?

5   A   Correct.

6   Q   Your job title, sir?

7   A   Detention facility officer.

8   Q   As a detention facility officer, you are someone that is

9   directly involved in the direction and supervision of

10  detainee workers.  Do I have that right?

11  A   Yeah, well, safety and security of the facility,

12  monitoring detainees.

13  Q   Will you answer my questions today about the detainee

14  worker program?

15  A   Yes.

16  Q   Before we get into the worker program, I would like to

17  take one step back.  What did you do before you began working

18  for GEO?

19  A   I was an off-track betting manager for Emerald Downs out

20  of Lacey, Washington.

21  Q   Why leave Emerald Downs for GEO?

22  A   Better opportunity, better benefits, better pay.

23  Q   When did you start working at GEO?

24  A   October of 2009.

25  Q   You told us you are a detention facility officer.  Could

1  you give us a list of the various job titles you have held in

2  your time with GEO?

3  A   I was a detention facility officer from October -- from my

4  start date until, I believe February 2017, I promoted to a

5  sergeant.  I was a sergeant until I think July of 2018, and

6  then I voluntarily stepped down back to an officer, and

7  that's what my position is now.

8  Q   You told us the steps from detention facility officer to

9  sergeant was a promotion, correct?

10  A   Correct.

11  Q   You went from being a sergeant back to a detention

12  facility officer, why?

13  A   I had more flexibility in my schedule for my family life.

14  That was the main reason.

15  Q   I want to start with your time -- let's start with your

16  time as a sergeant.  Could you tell us about your job duties

17  as a sergeant when it came to directing the detainee workers?

18  A   Overall, my job is safety and security of the facility,

19  made sure detainees, officers, everybody in the facility is

20  safe and secure.

21  Q   As relates to the detainee worker program, though, could

22  you tell us what you did as a sergeant?

23  A   As a sergeant, kind of the same thing as an officer.  We

24  make sure that the workers in the program had the tools they

25  needed, whatever supplies they needed, and if they needed

1  help or had questions about anything, they were free to ask.

2  Q   You would tell them at the outset, you would make sure

3  they understood what their job was, correct?

4  A   Whatever their duty was for that day, they would start.

5  Q   My question is a little bit different.  Would you tell

6  them what their job was, explain it to them before they began

7  working?  Do I have that right?

8  A   Can you say that one more time?

9  Q   I want to make sure I understand the steps.  One of my

10  questions is when you get a detainee worker, say, for the

11  first time, you would walk them through what their job

12  entailed, correct?

13  A   When they volunteered, there is a job description that

14  explains what they would be doing.  A lot of the stuff

15  doesn't need like an in-depth detail.  Sometimes it is just

16  wiping down a table at the end of the night.  A lot of the

17  stuff doesn't need an in-depth walk through of how to do it.

18  Q   You would get a list of the people who wanted to work,

19  correct?

20  A   That would go through the classification officer.

21  Q   And then you would get the list, correct?

22  A   I would get a list of people that were assigned in the

23  voluntary work program.

24  Q   You would get them the equipment they needed to do the

25  job, correct?

1   A    Correct.

2   Q    You would make sure they understood the job they got,

3   correct?

4   A    Correct.

5   Q    You talked to them about safety and doing the job in a

6   safe way, correct?

7   A    Yes.

8   Q    You would also assign an officer to actually oversee the

9   work that was being done?

10  A    Depending on what was being done.  If -- there is always

11  officers or supervisors, someone walking in the area, so

12  there wouldn't necessarily be someone standing over them

13  watching the exact job they are doing, but there would also

14  be someone around in case an emergency were to happen.

15  Q    The first part of their function was to oversee the actual

16  work being done, correct?

17  A    Just monitoring detainees, whether they are in the program

18  or not, that's the main job as an officer or sergeant, just

19  monitoring the safety and security of the building, the

20  detainees, the officers.

21  Q    So we talked about your time as a sergeant.  I want to

22  focus now on your time as a detention facility officer.  Your

23  direction, supervision, as a detention facility officer is

24  much more hands-on; is that correct?

25  A    I think it is kind of the same.  You are still monitoring

1    whether they are working or not working, cleaning, not

2    cleaning, you are still monitoring.  Just because someone is

3    cleaning, you can't pay more attention to them than anybody

4    else in the building.

5    Q    The detention facility officers, they are responsible for

6    the direct control of the detainee workers, do I have that

7    right?

8    A    They are responsible for the direct control of the

9    population.

10   Q    Focusing on the detainee workers in particular, my

11   question is:  In the detention facility, they are responsible

12   for the direct control of the detainee workers.  Do I have

13   that part right?

14   A    Yes.  Just the detainees.  I don't necessarily think the

15   workers have anything to do with it.  If they are working,

16   then, yes, they also have direct control over --

17   Q    The people in the worker program, they are not being held

18   there as criminal punishment, correct?

19   A    No, administrative detention.

20   Q    The detention center, it is not any sort of criminal jail

21   or anything along those lines, correct?

22   A    No.

23   Q    So I want to talk about your direct supervision of

24   detainee workers.  You supervise workers across a number of

25   jobs in the facility.  Do I have that right?

A    Yes.

Q    The living area is one place in which you supervise and direct detainee workers?

A    Yes, monitoring detainees while they are cleaning, while they are sleeping, while they are eating.

Q    You understand my question, though.  Again, I want to focus on your job as relates to the detainee worker program. Do you understand that?

A    I understand that.

Q    Will you limit your responses to just my questions about the detainee worker program?

A    Do the best I can.

Q    I want to talk about what you did to supervise the detainee workers in the living area.  Can you tell us about your direction and supervision in the work program in the living areas?

A    Really, you know, there is various jobs throughout the voluntary work program inside of the units.  You just monitor that they have the equipment when they need something.  You take them to the janitor closet and let -- allow them to get what they need to get, secure the closet, and they would go on, whether cleaning the showers or cleaning the tables, you are still monitoring, you know, you are monitoring the whole unit and you still have your unit duties to do while they are doing their job as well.

Tracy - Direct Examination

1    Q    Those detainee workers, you tell them where to clean,

2    correct?

3    A    When -- I recommend them, you know, something at the table

4    needs to be done.  Or if they missed a table, I would say,

5    hey, can you please go hit that table again.  Something like

6    that.  For the most part, they know what they are doing.

7    Q    So you gave us one example of telling detainee workers

8    where to clean.  Can you give me another example of a time

9    you told detainee workers where to clean?

10   A    Might be something as simple as, you know, just making

11   sure they know to clean the showers or if maybe there is a

12   lot of soap residue around the shower button, ask them to see

13   if they can clean around that button a little bit more than

14   normal.  Something like that.

15   Q    Can you give me another example of a time where you told a

16   detainee worker where to clean?

17   A    Maybe the stairs were especially dusty, ask them if they

18   can, you know, maybe wipe down the handles on the stair rail.

19   Something like that.

20   Q    Any other examples come to mind?

21   A    On the rare occasion, maybe a vent was dusty, sometime

22   during the day, could they look at the vent.

23   Q    The cleaning jobs, GEO provides all the materials the

24   detainee workers need to do the job.  Do I have that right?

25   A    Correct, because they can't bring in their own tools and

1  own equipment.

2  Q    Again, I am limiting things to the living area.  Is it the

3  case that GEO trains the detainee workers on proper cleaning

4  techniques?

5  A    Yes, they would explain what needs to be done.

6  Q    You would make sure the detainee workers put out, say,

7  proper signage if someone was mopping to make sure there were

8  no slip and falls, correct?

9  A    Yes.

10 Q    Now, the detainee workers, there is no discretion on their

11 part about waking up, just spontaneously deciding to clean.

12 They don't have the ability to do that?

13 A    Yeah, they can't travel to different units, especially now

14 during COVID.  Even prior to that, you know, if you are

15 working -- if they were cleaning in alpha 1, they wouldn't be

16 able to go to another unit and clean that area just because

17 they are not -- they are not allowed to travel in between

18 units into the facility.

19 Q    The time estimates for detainee workers cleaning in the

20 living area, it can range; is that right?

21 A    Correct.

22 Q    So 15 to 20 minutes on the lower end, would you agree?

23 A    Yes.

24 Q    As much as two hours on the higher end, correct?

25 A    I would just say, depends on the person.  Some people

1    would -- the job could be completed in -- you know, whatever

2    task they were doing could be completed in 20, 25 minutes.

3    There is certain individuals that, you know, they just happen

4    to go slow or maybe as they are cleaning they are talking to

5    people or watching TV at the same time, so that task takes

6    longer.

7    Q    There are different roles within the different living

8    areas, correct?

9    A    What do you mean by that?

10   Q    In terms of the detainee worker program, there are

11   different jobs that can be done within the living pods,

12   correct?

13   A    Yes.

14   Q    Someone may be charged with wiping down the tables,

15   correct?

16   A    Correct.

17   Q    Perhaps that is an example of a job that may take 15 to 20

18   minutes, would you agree?

19   A    Yes.

20   Q    Some jobs, say cleaning the shower stall, for example, may

21   take longer?

22   A    Given an estimate of how long it takes to clean the

23   showers, I will guess right now 25, maybe 30 minutes.

24   Q    I want to make sure I understand you.  On the high end,

25   your estimate is that jobs within the living units could take

1  as much as two hours, correct?

2  A    For a regular -- you know, a regular person, I think the

3  longest time period it would take somebody would be 30

4  minutes to do one of the tasks.  If it was, you know -- for

5  example, if I am at home mowing the yard and I stop to talk

6  on my phone, you know, maybe the mowing my yard only takes 45

7  minutes, but if I stop to go check on my son or get on the

8  computer, that task then takes much longer to finish.

9  Q    So you also supervise workers in the laundry room, do I

10  have that right?

11  A    Yes.

12  Q    Now, GEO provides the detainee laundry workers training on

13  how to use the washers and dryers, correct?

14  A    If somebody was new in the program and their first day was

15  inside laundry, it would be the laundry officer's duty to

16  explain in simple terms for their safety, you know, while the

17  washing machine is going, if for some reason the door opens,

18  we don't stick our hands in the washer while it is moving

19  because it is a safety issue.  Everything is based around the

20  safety of the detainees, myself, to make sure everything gets

21  done in a safe manner.  That is the ultimate goal at the end

22  of the day whether you are a detainee or officer or anybody

23  in that building.  Everybody wants to be done with the day

24  safely, go -- leave the same way they came in.

25  Q    These washers and dryers, these aren't like the washers

1    and dryers we have at our home, right?  These are big,

2    industrial machines?

3    A    Yeah, they are bigger than what I would have at home.

4    Q    You worked in the laundry for how long?

5    A    Just guessing, a year, and then even now I am in there

6    every once in awhile on an overtime shift.

7    Q    How much overtime do you put in, in a week?

8    A    It varies based on availability.  I volunteer to do

9    overtime every day.  I may get -- right now it seems like I

10   may get two or three shifts a week.

11   Q    When you put in for overtime, what sorts of things are you

12   doing?  Is it just a continuation of your duties as detention

13   officer or something else?

14   A    Correct, might be placed in a unit, intake, it is where

15   there is a hole for that day.  For example, I got my food

16   handler working card so I could work in the kitchen on

17   overtime.

18   Q    I take it when you are working overtime, there is a need

19   within the facility for the work you have done?

20   A    Correct, someone called out, somebody is on vacation,

21   something like that.

22   Q    I want to go back to laundry.  Talking about laundry, GEO

23   is providing all the tools and equipment the detainee workers

24   need to do the job, correct?

25   A    Yeah, they have to because they can't -- they are not

1  allowed to bring in their tools, they don't have a work truck

2  outside to bring in the items that would be required.

3  Q    Laundry workers, they could be terminated by GEO, correct?

4  A    Well, I wouldn't say terminated.  If you broke a rule

5  inside the building, you know, violation code says stealing,

6  they would get written up for stealing just as if somebody

7  not inside the program stole something out of the unit, they

8  would also get written up as disciplinary.  That would be my

9  job to write them up.

10 Q    Theft, that's one example.  Detainee workers in the

11 laundry can be fired for excessive absenteeism?

12 A    If they don't show up, they are basically just removing

13 themselves from the program.

14 Q    GEO can fire detainee workers for excessive absenteeism,

15 correct?

16 A    They can't fire them.

17 Q    What about misconduct, GEO can terminate volunteer workers

18 for misconduct, correct?

19 A    You said "terminate"?

20 Q    Yes.

21 A    I mean, they are not terminated from the work program.

22 They can remove themselves from the work program any time

23 they want.  They don't have to work if they don't want to.

24 It is voluntary.  If they are not showing up for work, they

25 are not showing up for their laundry shift, you know, they

1  would sign a piece of paper saying they didn't -- they don't

2  want to go that day, and two days later they can put another

3  request in to do a different job if they want to.

4  Q   Again, I want you to focus on my question in terms of

5  GEO's ability and what it can do.  My question to you is

6  this:  GEO can terminate detainee workers for unsatisfactory

7  work performance, correct?

8  A   They are not firing them.  If they were supposed to do

9  something and they didn't want to do it, they would -- you

10  know, they would take themselves out of the program.  If they

11  didn't do something as directed, they would get a

12  disciplinary infraction which would happen to somebody

13  outside the program as well.  Then whatever goes on, my part

14  would just be writing it up.  Where it goes from there, I

15  have no control over.  It is a matter of GEO and ICE would

16  make that decision.

17  Q   I want to make sure I understand your testimony.  Are you

18  claiming GEO is unable to fire detainee workers for

19  unsatisfactory work performance?

20  A   I am able to put in a disciplinary write up, and where it

21  goes from there is out of my control.

22  Q   Well, sir, we met before, correct?

23  A   Correct.

24  Q   It was for your deposition.  Do you remember that?

25  A   Two years ago maybe.

1    Q    And we talked for maybe half a day; does that sound about

2    right?

3    A    Yes.

4    Q    You took an oath to tell the truth?

5    A    Correct.

6    Q    And you did tell the truth?

7    A    Correct.

8    Q    And you took an oath today to tell the truth?

9    A    Correct.

10   Q    You knew when I was asking you questions previously of

11   your deposition, there was a written transcript being

12   created.  Do you recall that?

13   A    Correct.

14   Q    You may also remember the session was being videotaped.

15   Do you remember that?

16   A    Correct.

17   Q    Well, today you say that GEO is unable to terminate

18   detainee workers for unsatisfactory work performance.  But

19   back then you testified that GEO could terminate detainee

20   workers; isn't that true?

21        MS. SCHEFFEY:  Objection, improper impeachment.  We

22   don't have the page and line number to follow along.

23        MR. WHITEHEAD:  I did not hear you.

24        THE COURT:  Sustained.

25        MR. WHITEHEAD:  I am confronting the witness right

1   now with the statement.

2   BY MR. WHITEHEAD:

3   Q   Mr. Tracy, I would like to play a portion of your

4   deposition back to you.  My question will be:  Is this you in

5   the video?

6          MR. WHITEHEAD:  Counsel, I am looking at page 76,

7   this is lines 7 through 17.  Ms. Mendoza, can we get Clip 11,

8   please.

9       (Video Clip 11 as follows:)

10  BY MR. WHITEHEAD:

11  Q   Do you agree failure to follow safety procedures could

12  lead to termination of laundry workers?

13  A   Yes.

14  Q   Excessive absenteeism?

15  A   Yes.

16  Q   Misconduct and horseplay?

17  A   Yes.

18  Q   Theft?

19  A   Yes.

20  Q   And unsatisfactory work performance?

21  A   Yes.

22      (Clip ended.)

23  BY MR. WHITEHEAD:

24  Q   That was you in the video, correct?

25  A   Yes.

Tracy - Direct Examination

1  Q  On the subject of termination, it is generally the case

2  that GEO can fire detainee workers.  Do I have that right?

3  A  Can you repeat that one more time?

4  Q  Sure.  I was saying generally the case is that GEO can

5  fire detainee workers?

6  A  Well, it is just a part of disciplinary process.

7  Q  On the flip side of this coin, GEO has the power to hire

8  detainee workers that wish to work; is that right?

9  A  Yeah, so the detainees would put in a request to join the

10  voluntary work program and basically the request goes to

11  classification, and when there is availability open, they

12  would fill that slot, if that makes sense.

13  Q  It does.  You agree with me that GEO has some discretion

14  in who to hire within the voluntary work program, correct?

15  A  Yes, based on classification, issues like that.

16  Q  It is the classification unit that creates the work

17  rosters?

18  A  Correct, I believe so.

19  Q  These work rosters, they are essentially schedules; is

20  that right?

21  A  Just a list of -- basically a list of detainees and what

22  they have volunteered to do.  It is not a schedule as per se

23  to say at nine a.m. the showers have to be cleaned.

24  Q  In putting together these work rosters, you have never

25  seen classifications permit too many workers to work on any

1    given shift, correct?

2    A    What do you mean by that?

3    Q    Well, it is the case in your experience and in your

4    opinion, you have never seen classifications put too many

5    people to work assigned to a given shift, correct?

6    A    There is a set amount of available spots, if that answers

7    your question.

8    Q    It is also the case that you have never felt overstaffed

9    with detainee workers, correct?

10   A    No, just because -- there is always -- if the roster is

11   full, there is also a wait list for people.  If somebody

12   leaves or, you know, books out to the street or gets

13   deported, you know, there is a spot, and the people on the

14   wait list would then fill that empty spot.

15   Q    My question is a little bit different.  My question has to

16   do with whether or not you felt like you were overstaffed,

17   too many detainee workers on any assignment that you have

18   ever worked as detention officer.  As I understand it, you

19   have never felt overstaffed, correct?

20   A    I don't think so.

21   Q    When you say you don't think so, you are agreeing with me?

22   A    I don't understand the question, I guess.  It is confusing

23   to me.

24   Q    Have you ever felt like there were too many detainee

25   workers on a shift that you have worked?

1  A   No, because there is only a set amount available.  There

2  is only a set amount of spots so there is -- like I said, if

3  the spot isn't -- if the spot is full, there can't be

4  multiple people doing that one spot.  There is a wait list.

5  Q   In terms of the detainee workers, is it the case in your

6  experience that not too many, not too few, it has been just

7  right in terms of the staffing levels.  Do I have that right?

8  A   Yes.

9  Q   Now, ICE plays no role in assigning detainee workers,

10  correct?

11  A   It is based off the ICE standards.

12  Q   Again, my question is a little bit different.  ICE plays

13  no role in assigning detainee workers; is that right?

14  A   There is not an ICE officer sitting next to classification

15  deeming who does what, if that's what you are asking.

16  Q   ICE plays no role in terminating employees?

17  A   They would play a role in the disciplinary system which

18  may result in the loss of job through the disciplinary

19  system.

20  Q   In the direction and supervision of detainee workers that

21  you were telling us about earlier, there is no direct

22  supervision from ICE, correct?

23  A   Not specifically.  I mean, if ICE -- you know, if ICE is

24  in the area, they would see them, but there is no ICE officer

25  on post watching or monitoring detainee safety, anything like

1    that.

2    Q   Mr. Tracy, if I understand your testimony, GEO provides

3    detainee workers the training they need to do their jobs,

4    correct?

5    A   Correct.

6    Q   And GEO provides them with the equipment they need to do

7    their jobs, correct?

8    A   They have to because, like I said earlier, they can't --

9    they don't have their own tools or own equipment available to

10   them.

11   Q   GEO doesn't allow the detainee workers to deviate from

12   their job duties, correct?

13   A   I mean, if you are -- if you are assigned a certain task,

14   you couldn't -- in a unit, for example, if you were assigned

15   to clean the showers, that would be your task.  A lot of

16   times the people tasked with cleaning showers, it's kind of a

17   group effort.  They would help each other.

18   Q   GEO supervises the detainee workers to make sure that they

19   are complying with GEO's rules and regulations, correct?

20   A   Correct.

21   Q   At the end of the day, you agree with the statement that

22   the detainee workers make an important contribution to

23   maintaining the Northwest Detention Center, correct?

24   A   Yes.

25            MR. WHITEHEAD:  Thank you, sir.  Your attorney may

1    have some questions for you.

2             THE WITNESS:  Okay.  Thank you.

3                      CROSS-EXAMINATION

4    BY MS. SCHEFFEY:

5    Q   Good afternoon, Mr. Tracy.  Can you hear me?

6    A   I can hear you.

7    Q   I want to back up a little bit.  We were talking about

8    discipline.  I am hoping you can explain to me and the jury

9    about how discipline works in the voluntary work program and

10   at the facility generally.  If you have to write a detainee

11   up for some sort of disciplinary infraction, what do you do?

12   A   I will pick an easy one, stealing.  You would just

13   basically write the disciplinary write-up, incident report

14   with the details of the incident.  You caught them stealing,

15   or say they are in the kitchen and you find a bag of onions,

16   there is no way to get a bag of onions into the dorm without

17   stealing them.  You would write that in a report, and then I

18   turn the report into the supervisor and the supervisor takes

19   it from there.

20   Q   How do you know if something is a disciplinary incident?

21   Is there a document you can look at, a --

22   A   It is in the handbook.  It is all derived from the

23   Performance-Based National Standards and ICE standards.

24   Q   Once you do the write-up, what happens with it?

25   A   Based on the severity of the write-up, they would have a

1    hearing with who ever is at work.  Normally, I believe it is

2    Rich, Lieutenant Rich.

3    Q    As the detention officer in the pod, do you participate in

4    that hearing?

5    A    No.  If I wrote it up, that's where it stops for me.

6    Q    Ultimately, who makes the decision about whether that will

7    be a disciplinary incident or be dismissed?

8    A    It goes to the supervisor.  The supervisor goes -- you

9    know, collecting their evidence and he normally would go talk

10   to the detainee and ask them, you know, what happened in the

11   situation, and then they would forward that packet --

12   incident packet to the segregation lieutenant, which is

13   Lieutenant Rich, and then they would have a hearing on it.

14   Based on the severity, if it is a lesser charge, it would

15   just be with the GEO.  If it was a higher up charge, it

16   involves ICE and GEO.

17   Q    Okay.  So can that all be completed in 15 or 20 minutes?

18   A    No.  Maybe my part in doing the actual write up.  You

19   know, it goes from me and then the lieutenant.  When they

20   have time, they have a set time, maybe I believe it is 24

21   hours from the time the report is turned in to do their

22   investigation and forward it to the segregation lieutenant,

23   Lieutenant Rich.

24   Q    I think you said that discipline then is different than

25   what you think of firing at a job.  Can you --

1      MR. WHITEHEAD:  Objection, leading.

2      THE COURT:  Sustained.  Rephrase.

3  BY MS. SCHEFFEY:

4  Q   Do you think the word "termination" is different than the

5  word "fired"?

6  A   Yes.  Terminate -- like "fired" to me means like I could

7  be fired for not doing my job.  I could be terminated, but it

8  is different.  It is hard to explain.

9      MR. FERRARO:  Oh, come on, it's not that hard to

10  explain.

11  BY MS. SCHEFFEY:

12  Q   Why is discipline at the facility different to you than

13  termination in a job?

14  A   Discipline to me is -- well, anybody in the -- anybody in

15  the detention center can be disciplined, whether they are in

16  the voluntary work program or not.

17  Q   So I think you testified earlier that you were a pod

18  officer; is that right?

19  A   Correct.

20  Q   Can you give me a list of the positions available to

21  volunteers in the pod?

22  A   You know, there is shower cleaner, food porter, juice

23  porter, day room cleaner, laundry, unit laundry.

24  Q   All right.  Let's break those down.  What does the juice

25  porter do?

1  A    Juice porter assists the food porter and officer at

2  mealtime.  Example, the juice porter would hand out, you

3  know, juice packets, or like at breakfast time a butter

4  packet and coffee packet.

5  Q    Do they do anything else other than hand out juice and

6  butter packets?

7  A    They may help clean up after the meal.  For the most part,

8  that's what they do.

9  Q    How long does that position take?

10 A    Roughly ten minutes, just -- it is just while serving

11 trays.  Roughly takes five to ten minutes.

12 Q    What does the unit laundry position do?

13 A    Unit laundry basically just gathers the laundry that gets

14 sent to the actual laundry in the facility.  So throughout

15 the day -- I think they do laundry twice a week.  I am not

16 positive on that, but they -- basically, all the detainees in

17 the unit, they place their laundry into basically a

18 plastic -- a big garbage bag, and the night before their

19 laundry goes out, the laundry officer, all they really do is

20 take the laundry bag from the bin and set it right outside

21 the unit door.

22 Q    What about a unit cleaner, what do they do?

23 A    They have a range of things they could do.  For the most

24 part, on a daily basis, they sweep.  If the floor needs to be

25 mopped, they wipe off the tables, and at the end of the night

1  they just collect the trash and set it right outside the unit

2  door.

3  Q    How long does that task usually take?

4  A    At the end of the night, usually takes about 15, 20, 25

5  minutes.

6  Q    Shower cleaner, what do you do if you clean the showers?

7  A    Once the showers are closed at the end of the night --

8  sorry.  Sorry.  He was facing the mic.  I apologize.

9        At the end of the night, basically they just take the --

10  get the tools from the closet, which is usually just a scrub

11  brush and a made up bucket of chemicals mixed with water and

12  scrub the showers down and rinse them off with water.

13  Q    How long does that usually take?

14  A    I would say at the most 30 minutes.  At the most.  Usually

15  I would say on average, 20 minutes.

16  Q    Are there multiple people who can sign up to be shower

17  cleaners each day?

18  A    I believe there is two or three different spots, like a

19  morning and an afternoon.  Something like that.

20  Q    How many times a day are the showers cleaned?

21  A    I think they are cleaned three times a day.  Two to three

22  times a day, I would say.

23  Q    What about the unit cleaner, are there multiple people who

24  volunteer to be unit cleaners?

25  A    Yeah.  Like I said, I believe there is different times

1   throughout the day, like a morning cleaner, afternoon

2   cleaner, nighttime cleaner.

3   Q    Do you ever work graveyard?

4   A    Yeah, that's the shift I am assigned to right now.

5   Q    What are the hours of the graveyard shift?

6   A    2300, which is 11 p.m. to 07, seven a.m.

7   Q    Are detainees typically asleep during that time?

8   A    Lights out at 11:30.  Like normal people, when lights go

9   out they don't go right to sleep.  Takes a little bit.  I

10  would say by 12:30.  At count time everybody is, for the most

11  part, if they are not asleep they are in their bed area

12  getting ready to go to sleep.

13  Q    What do you do to pass the time?

14  A    Well, right now, especially like during COVID we have a

15  list of cleaning stuff we do ourselves which passes the time.

16  Me, personally, like, for example, right now I am in medical

17  isolation is my post, so I am in a medical unit.  To pass the

18  time, I think two or three months ago, me and my partner we

19  stripped and waxed the floors.  That took, you know,

20  stripping took half a shift for us to do because we have

21  other duties at the same time, and then the next day we put a

22  couple coats of wax down.  You know, basically we just clean.

23  Clean the mile, take the trash out, stuff that just helps our

24  night go by quicker.

25  Q    What is the classification level of the detainees in your

1    pod?

2    A    There is four different classification levels, low, medium

3    low, medium high and high.

4    Q    So for the medium high and high pods, are they allowed to

5    participate in volunteer positions outside of the pod?

6    A    So, medium high are allowed to work outside to volunteer

7    to do tasks outside of the unit.  High classification levels

8    aren't allowed to do tasks outside of the unit.

9    Q    So if there is a high classification pod, is the entirety

10    of their possible volunteer positions in the pod?

11    A    I'm sorry.  They turned down the volume, and it is hard to

12    hear.

13    Q    In a high classification pod, they can volunteer only in

14    the unit; is that right?

15    A    Yes, if everybody was in a unit that only housed level 3s,

16    high classification, that is all they would be able to do is

17    volunteer to do tasks inside the unit.

18    Q    Are there any tasks inside the unit we haven't already

19    gone over earlier?

20    A    The food porter.

21    Q    What does the food porter do?

22    A    Prior to COVID, they would -- they walk from the unit to

23    the kitchen, pick up the trays and walk back to the unit,

24    which is really at the most maybe a minute, minute and a half

25    walk.  It is not a huge facility.  They just assist the

1    officers.  If I am running a unit, you know, I work with the

2    people inside -- that live inside the unit, so it would be me

3    collecting IDs, and the juice porter would be handing out

4    butter packets, juice packets, coffee packets, whatever they

5    need to hand out.  The food porter would actually hand them

6    their trays.

7    Q    Could you hand out trays if there was no volunteer?

8    A    Yeah.  I mean if, say, the food porter is in the law

9    library at that time, you know, we would just collect IDs or

10   instead of actually handing them to us, I have the detainee

11   put the ID on the meal cart, and I would hand out trays.

12   Q    What would happen if there was no voluntary work program?

13   A    No voluntary work program, the work would still get done.

14   It would just get done by officers.

15   Q    How do you feel about working with detainees?

16           MR. WHITEHEAD:  Objection, relevance, also outside

17   the scope.

18           THE COURT:  I think he may answer.

19           MS. SCHEFFEY:  Do you want the question again,

20   Mr. Tracy?

21           THE WITNESS:  Sorry, I couldn't hear.

22   BY MS. SCHEFFEY:

23   Q    How do you feel about working with detainees?

24   A    I personally like it.  You know, they are people just like

25   you and me.  They are just in, you know, a tougher situation

1    at that time in their life.  The relationship, it is all

2    built out of respect.  You show them respect, they show you

3    respect, and then you find a way to work together.  I think

4    personally, when I am working, they tend to help whether they

5    are in the voluntary work program or not.  When they see

6    somebody working, they want to help.  If I am mopping the

7    floor because nobody did it or just because it needs to get

8    done, you know, people are -- I would say they feel bad

9    watching me mop the floor, so they are going to help.  It is

10   all based out of mutual respect.

11            MS. SCHEFFEY:  Thank you.  No further questions.

12            THE COURT:  Are there questions of Mr. Tracy?  Go

13   ahead, Mr. Whitehead.

14                     REDIRECT EXAMINATION

15   BY MR. WHITEHEAD:

16   Q   Mr. Tracy, you testified about passing time on the

17   graveyard shift.  Do you remember testimony along those

18   lines?

19   A   What I just said two minutes ago?

20   Q   Yes.

21   A   Yeah.

22   Q   I need to ask a leading question to orient you.  Sir, you

23   weren't just passing time, you were working, correct?

24   A   Well, yeah, it is a part of my duties.  My duties may not

25   necessarily -- you know, I don't have to strip and wax the

1  floor.

2  Q   That stripping and waxing the floor, you said it took you

3  half a shift.  Do I have that right?

4  A   Throughout doing my other duties.  That's not all I have

5  to do.

6  Q   Sure.  So how much time are we talking about then?  Half a

7  shift, how much time is that?

8  A   If I have to put it down, I would say throughout my other

9  duties, maybe it took an hour to do.  That is starting and

10 stopping, going to do other stuff, going to count, coming

11 back, working on it a little bit more.  Throughout the day,

12 you are working.

13 Q   That stripping and waxing, that work is also performed by

14 detainee workers, correct?

15 A   Correct.

16 Q   You are paid how much an hour, sir?

17 A   Right now I get -- I think I get paid 29.94, I think that

18 is what it is.

19 Q   The detainee workers are paid how much for doing the same

20 job?

21 A   The detainees in the voluntary work program get one dollar

22 a day.

23 Q   Do you remember testimony about the disciplinary process

24 involving ICE and questions about whether GEO could terminate

25 detainee workers?

1    A    Are you asking me from today or two years --

2    Q    Today.  Again, I am trying to orient you here.  Sorry.  I

3    am perhaps doing a bad job.  I asked you a question about

4    whether GEO could terminate detainee workers.  Opposing

5    counsel came on and asked you questions about ICE's

6    involvement.  You were talking about disciplinary hearings.

7    Do you recall that?

8    A    Correct.

9    Q    I want to ask about the way that process begins.  The

10   process begins with a recommendation or determination by GEO

11   about what should happen to a given detainee worker, correct?

12   A    Right, it would be the officer writing up the incident

13   report.

14   Q    So GEO initiates that process, correct?

15   A    Correct.

16   Q    There is an opportunity then at some point for ICE to

17   weigh in as almost an appeal that the detainee worker could

18   have; is that correct?

19   A    I don't know what you mean by they -- ICE would appeal it?

20   Q    Well, ICE is there reviewing GEO's termination?

21   A    Right, they will -- like I sat in on -- long time ago when

22   I was a segregation officer, I would sit in on the hearings

23   with the detainee.  After they give their side, they talk to

24   them about the incident.  We would go back outside and the

25   ICE officer and the segregation lieutenant would talk amongst

1    each other and we would go back in and they would tell them,

2    you know, whatever they are getting charged with, whether it

3    is disciplinary, segregation time or --

4    Q    Can you think of a time ever in which ICE disagreed with

5    GEO's determination?

6    A    Not that I can remember.

7            MR. WHITEHEAD:  Thank you, sir.  No additional

8    questions.

9            THE COURT:  Okay.  May this witness be excused?

10           MR. WHITEHEAD:  Yes, Your Honor.

11           THE COURT:  All right, Mr. Tracy, you may be excused.

12   Thank you very much.

13           THE WITNESS:  Thank you, sir.

14           THE COURT:  Okay.  You may call your next witness.

15           THE WITNESS:  Do I just get up and go?

16           THE COURT:  Yes.  Thank you, Mr. Tracy.

17           MS. MELL:  Counsel needs a moment with Your Honor to

18   address a technology issue and a mic issue, outside the

19   presence.  Thank you.

20           THE COURT:  Tyler, will you send the jury into the

21   break room?

22           THE CLERK:  Yes, Your Honor.  They are on their way

23   to the jury room at this moment.  It looks like they are all

24   out.

25    (The following occurred outside the presence of the jury.)

1    THE COURT:  Okay.  I got a message during the last

2   session from a Mr. Tracy Segal who works for Akerman, he's a

3   lawyer for Ackerman.  He said that during Mr. Tracy's

4   testimony somebody said, that might have been a spectator,

5   "Oh, my God, it's not that hard," and his note indicated we

6   saw Tom Ferraro's box, and I believe the comment was from

7   him.  Mr. Segal said, "I don't know who that is."

8    Obviously spectators should be muted and not -- well, here

9   is Mr. Ferraro.  I don't know who are you, Mr. Ferraro.

10    THE CLERK:  I muted him when I saw he was the one

11   that spoke.  Do you want to unmute him?  Do you want to talk

12   to him now?

13    THE COURT:  Yes.  You are muted, Mr. Ferraro.

14    MR. FERRARO:  I apologize profusely.  I thought I was

15   muted.  I was working on some other stuff, and I was mumbling

16   to myself.  I apologize.

17    THE COURT:  Okay.  Are you just a spectator in this

18   proceeding or did you have some part in it?

19    MR. FERRARO:  Well, primarily a spectator.  I am a

20   reporter.  I was looking into doing a story on immigrant

21   detainees.  And I apologize.  I thought I was muted.  This is

22   embarrassing, and I'm sorry.

23    THE COURT:  Okay.  It is all right.  Any questions of

24   Mr. Ferraro?

25    Okay, let me ask you to mute your mic and stay that way,

```
 1   Mr. Ferraro.  Okay?
 2       All right.  That's what I know about that.  I will advise
 3   the jury to disregard any comments like that that creep in.
 4       Ms. Mell, you had something?
 5            MS. MELL:  Your Honor, I did want to address the
 6   Ferraro issue.  I am getting from our end, our technology
 7   folks are indicating we may be getting an echo because of
 8   your phone being on and feeding the sound to you while the
 9   audio is also live.  We are getting a pretty bad echo.  We
10   are trying to address it from our end.  We think we might
11   need some support from your end.  Is there anything you need
12   to say to him?
13       Tom is not muted, still.
14            THE COURT:  Who is not muted?
15            MS. MELL:  Tom Ferraro is still not muted.
16            MR. FERRARO:  I am muted now, right?
17            MS. MELL:  No.
18            THE COURT:  I don't understand the technology that
19   goes into the spectators.  They should be not able to break
20   into the trial.  Is that something you can control, Tyler?
21            THE CLERK:  Unfortunately, with the Zoom platform,
22   you allow everyone to be able to speak if they unmute
23   themselves or not.  I can't, for example, choose to allow
24   just the attorneys to be able to speak without letting any
25   spectator.  There is no user-by-user option.
```

```
 1              MS. MELL:  That's crazy.

 2              THE COURT:  Yeah.

 3              MR. WHITEHEAD:  Is this where I say that I'm not a

 4     cat?

 5              MS. MELL:  We still have an echo issue we are trying

 6     to address.  If we could have a moment with my technology

 7     people and Tyler.

 8              THE CLERK:  It is not through Judge Bryan's phone.

 9     His phone only plays into his hearing aids themselves.  The

10     microphone is on the phone on the table.  Unless his phone

11     microphone can pick up his hearing aids audibly, then it

12     wouldn't be an echo from him.

13              MS. MELL:  All right.  So what else do we need to do

14     to work that out?  Is it because he has the audio on live?

15              MS. SCHEFFEY:  Is it possible that it is picking up a

16     computer and mic in that room or no?

17              MS. MELL:  We will do another run through.  It might

18     have been Mr. Ferraro's if he was live.

19              MS. SCHEFFEY:  If he was not muted, that may be where

20     it was.

21              MS. MELL:  That may have been the problem.

22              THE CLERK:  I muted Mr. Ferraro when he spoke up the

23     first time.  There was several minutes that was not the

24     issue.

25              MS. MELL:  I am not getting the echo right now so I
```

```
 1   think that's what the issue was.
 2           THE COURT:  Are we ready to go back to work?  Who is
 3   the next witness?
 4           MS. CHIEN:  State would like to call Maria Nayra
 5   Gomez Sotelo.
 6           THE CLERK:  Your Honor, should I bring the jury back
 7   in?
 8           THE COURT:  I was finding the witness on my list.
 9           MS. CHIEN:  She is also listed as Karla Gomez.
10           THE COURT:  Okay.  Bring the jury in.
11           THE CLERK:  The witness is also being admitted.
12       (The following occurred in the presence of the jury.)
13           THE COURT:  I think all the jurors are present.
14   Ladies and gentlemen, we had a little glitch here where
15   apparently a spectator made a comment that was live and
16   should not have been.  If you hear any -- if you heard any
17   such comment from an outside source that is not part of the
18   trial, you should disregard it and get all your information
19   from the people that are actually involved in the trial.
20       There are a number of spectators who have the ability to
21   sign in and listen.  They are not to make any comments or
22   have their mics open at all.  But apparently that mistake was
23   made and a comment about the evidence perhaps was made, and
24   you should disregard anything like that that did not come
25   from a lawyer or a witness or the judge.
```

1    Okay.  You may call your next witness.  She's here.

2  Ms. Gomez, if you will raise your right hand and be sworn.

3         (Interpreter present.  All answers through the

4         interpreter unless otherwise noted.)

5              MARIA NAYRA GOMEZ SOTELO,

6     having been sworn under oath, testified as follows:

7         THE COURT:  Thank you.  And you may inquire, counsel.

8              DIRECT EXAMINATION

9  BY MS. CHIEN:

10  Q   Can you please state your name for the record?

11  A   Maria Nayra Gomez Sotelo.

12  Q   Have you ever gone by a different name?

13  A   Karla Gomez Soto.

14  Q   Did you go by any other name?

15  A   No.

16  Q   Why did you go by a different name?

17  A   When I was trying to cross the border, the person guiding

18  us, our guide, said I could use a different name for the

19  records in case ICE would detain us.

20  Q   Are you known as Karla Gomez Soto for ICE's purposes?

21  A   Correct.

22  Q   Did you use that name when you came to the United States

23  or did you go by Maria Nayra Gomez Sotelo?

24  A   I used Maria Nayra Gomez Sotelo as my birth-given name.

25  Q   You mentioned you crossed the border.  How long have you

1    been in the United States?

2    A    Approximately 21 years.

3    Q    How old were you when you crossed the border?

4    A    19.  I actually was 25 years old when I got married.

5    Q    Why did you cross the border?

6    A    Because I met a man who was a U.S. citizen, and I wanted

7    to be with him.  We were married already.  The thing is I was

8    waiting for the process in Mexico before I could come here,

9    but I just loved him so much that I didn't want to wait.

10    Q    So do you have kids?

11    A    I have two beautiful boys.  They are also very good

12    students.  My younger one, Carlos Gomez Sotelo, he wrestles

13    for the district.  The younger one, Jose Maria Gomez Sotelo,

14    he wants to join the military, and I am really proud of both

15    of them.

16    Q    Are they both U.S. Citizens?

17    A    Correct.

18    Q    Since you have been in the United States, have you been

19    living in Washington?

20    A    Correct.

21    Q    You have lived in Washington for over 20 years?

22    A    Yes, that is right.

23    Q    Have you heard of the Northwest Detention Center?

24    A    Unfortunately, I was detained there in 2017.  I'm sorry,

25    it was 2018.  I get upset every time I remember those times.

Gomez-Sotelo - Direct Examination

1    Q    If I told you it was April 2018 when you were detained,

2    does that sound right?

3    A    Correct, yes.

4    Q    How long were you detained for?

5    A    One year.

6    Q    Were you detained because you were convicted of a crime?

7    A    No, I have never committed any crime.

8    Q    Where were you working when ICE picked you up?

9    A    I was working at this kind of like a young child school,

10   like a daycare, I would say, in the city of West Seattle.

11   Q    Were you a teacher at the daycare?

12   A    Yes, preschool, correct.

13   Q    Were you work authorized?

14   A    Not at that time.

15   Q    Were you paying taxes on the income you were earning?

16   A    Yes, all the taxes that the federal government withholds

17   from you.

18   Q    You were detained for over a year; is that right?

19   A    Correct.

20   Q    Did you get to hug your sons while you were detained?

21        THE INTERPRETER:  Should the interpreter --

22        MS. CHIEN:  I think opposing counsel made an

23   objection.

24        THE COURT:  I didn't hear the objection.

25        MR. SILVERMAN:  I objected, Your Honor.

1            THE COURT:  Who is speaking?

2            MR. SILVERMAN:  Larry Silverman.

3            THE COURT:  The objection is overruled.

4    BY MS. CHIEN:

5    Q    Did you get to hug your kids while you were detained?

6    A    I filed some kind of an order for ICE to allow my kids to

7    come visit me so I could hug them.  They never granted that.

8    Q    How did you stay in touch with your kids?

9    A    I would make calls.  I would call them over the phone,

10   which was pretty expensive.  Then they would come visit me,

11   but I would get to see them through a glass, and I had to

12   pick up the phone to talk to them.  It was really painful

13   both for them and for me.

14   Q    It cost money to call your kids; is that right?

15   A    Yes, both telephone calls or video calls are very

16   expensive in there.

17   Q    Let's talk about the detention center itself.  When you

18   entered at the Northwest Detention Center, where did you

19   enter?

20   A    First of all, they take you to the back of the building,

21   then you have to go through two security doors.  You get to a

22   sector they call intake.  That's what they call it.  You get

23   into this room.  This room has this unbearably cold air.  You

24   get to sit on these concrete benches.  Nobody pays attention

25   to you for hours until it is finally your turn to fill out

1  paperwork and to get your photos taken.

2  Q   Does the intake area get dirty?

3  A   It was really, really very dirty.  I mean, you could see

4  there was like pee around the bathrooms.  Also the bathrooms

5  were not separated for men and women, everybody would walk to

6  the same place.  From what I could see, there was no kind of

7  like sanitation or anything to prevent them from getting so

8  filthy.  There was no hygiene.  The bathrooms were always

9  very dirty.  You could smell the urine.  They were filthy.

10  Q   Did you see who cleaned the intake area?

11  A   At the time I could see that, I saw it was the detainees

12  or the residents, people who were housed at the detention

13  center.

14  Q   Did you ever see GEO staff clean the intake area?

15  A   I never saw them clean.

16  Q   From the intake area, were you taken to a living unit?

17  A   Correct.  You had to go through two security doors, then

18  you would end up at like what they call the hallway.  Then I

19  went to a unit that was D-1.  Then you have to go through two

20  more doors, and then they assigned a bed for me.

21  Q   Who cleaned the hallway that you walked through?

22  A   Also the interns, the residents.

23  Q   Do you mean the detainees?

24  A   Yes, detainees, correct.

25  Q   Did you ever see GEO staff cleaning the hallway?

1    A    I never saw them.

2    Q    I think you said you were assigned to D-1.  Did you see

3    who cleaned the showers in D-1?

4    A    Same thing, detainees.

5    Q    Who cleaned and maintained the toilets?

6    A    The ladies who were assigned to that job.

7    Q    Detainees?

8    A    Detainees, correct.

9    Q    Did you ever see GEO staff cleaning or maintaining the

10    showers or toilets?

11    A    I never saw them do that.

12    Q    How long would it take detainees to clean the showers and

13    the toilets?

14    A    Two to three hours.

15    Q    You also mentioned -- is there also a medical area at the

16    detention center?

17    A    Yes, there is a medical center.

18    Q    Did you have to go to the medical area?

19    A    Several times.

20    Q    Did you see who cleaned and maintained the medical area?

21    A    Female detainees.

22    Q    How long were the female detainee workers assigned to

23    clean the medical area working?

24    A    I think that is okay.  So we would all leave as a group at

25    seven a.m. and we would all go to the medical center, and

1    then we would all come back again as a group and that would

2    be before the meals.  That would be between noon and one p.m.

3    Q    So in your estimation, would it take several hours to

4    clean the medical areas for the female detainees?

5    A    Because also they would not let us like go back earlier.

6    We all had to go there as a group and we all had to return as

7    a group.

8    Q    Did you ever see GEO staff cleaning the medical area?

9    A    I never saw them.

10   Q    Is there also a visitation area at the Northwest Detention

11   Center?

12   A    Correct.

13   Q    Did you see who cleaned the visitation areas?

14   A    I always saw the males cleaning that area.

15   Q    Male detainees?

16   A    Correct.

17   Q    Did you ever see GEO staff cleaning the visitation area?

18   A    I never saw them clean.

19   Q    Did -- there was an exercise area or recreation area at

20   the Northwest Detention Center; is that right?

21   A    There were two recreation areas, as far as I remember.

22   One was outdoors and one was inside like where your dorm area

23   was.

24   Q    Who cleaned and maintained these areas?

25   A    I never saw who cleaned the outdoor recreation area, but

1    we would clean the recreation area inside our dorm ourselves.

2    Q    The detainees?

3    A    Correct.

4    Q    Did you ever see GEO staff clean the indoor recreation

5    area?

6    A    I never saw them.

7    Q    Did you also work at the Northwest Detention Center?

8    A    Yes, I worked at the laundry area.  What I would do is I

9    would fold the clothes that came to our unit from the laundry

10   area in the containers.

11   Q    Why did you want to work?

12   A    Well, I started working because the money that my family

13   was giving me, you know, to help me while I was in there was

14   not enough.  You always ended up having to buy something when

15   you were detained, anything that you needed, like, for

16   example, proteins, I would buy proteins like powder proteins

17   or fish or any other products.  There were other things they

18   would not give you, like, for example, shampoo or soap or

19   conditioner or bra or panties.  You know, at times your

20   underwear would get old and broken and they would not replace

21   it so you had to buy it.

22   Q    You folded laundry.  What kind of laundry were you

23   folding?

24   A    I would fold uniforms, T-shirts, underwear for both men

25   and women, socks, sheets, blankets.  All the clothing that

1  came out of the laundry during one day.

2  Q   How would the laundry -- what would the laundry arrive in

3  at your living unit?

4  A   They are like really large containers.  The kind you would

5  see used in different industries or at warehouses.  Really,

6  really large containers.

7          THE COURT:  Excuse me, counsel.  It is time we took a

8  break.  We will take about ten minutes.  Reconvene about ten

9  minutes to 11:00.  You may all be excused.

10                      (Recessed.)

11         CLERK KALEEL:  This is Courtroom Deputy Kaleel.

12  Tyler is with the jury discussing a technology issue.  We

13  will be ready in just a moment.

14         THE COURT:  All right.

15         THE CLERK:  Sorry about that, Your Honor.  I am back.

16  Are we ready for the jury?

17         THE COURT:  Yes.

18     (The following occurred in the presence of the jury.)

19         THE COURT:  I guess the jury is back.  Ladies and

20  gentlemen, I didn't repeat the instruction I gave you earlier

21  about the interpreter.  Obviously, this witness is testifying

22  with the help of our Spanish-English-Spanish interpreter.  I

23  just wanted to remind you that you must accept the

24  interpreter's translation of the witness's testimony and make

25  no assumptions about a witness or a party based solely on the

1  use of an interpreter to assist the witness.

2      I will not repeat that instruction every time we have a

3  witness who is to testify with the help of an interpreter.

4  You should keep it in mind as we go through other witnesses.

5      All right.  Ms. Chien, you may continue.

6          MS. CHIEN:  Thank you.

7  BY MS. CHIEN:

8  Q    I think you were testifying the laundry would come in big

9  industrial bins.  How many bins of laundry did you fold per

10  day?

11  A    Depending on the day, it would be between six to ten bins.

12  Q    Were you folding the laundry of the detainees currently in

13  the facility?

14  A    Many times, because of what I heard from my supervisor who

15  was a GEO officer who was in charge of laundry, those times

16  when we had a lot of clothes, it was because they did

17  deportation and so all those clothes needed to be, you know,

18  laundered and then folded.

19  Q    Can you give me a sense of how much clothes there were, if

20  there was a deportation?  How many detainees -- a sense of

21  the amount of clothes that you were folding?

22  A    Let's say for example there was 100 people deported.  Each

23  one of us get assigned two sports uniforms, five T-shirts,

24  five sets of underwear, two thin blankets, one thick blanket,

25  one bag, it is kind of like a mesh bag where we can keep our

Gomez-Sotelo - Direct Examination

1   dirty laundry.  If you have 100 people deported, you think

2   about five clothing items for each, so you could imagine it

3   was a lot, a lot of clothing.

4   Q   You mentioned your laundry supervisor, the GEO laundry

5   officer, how often did you meet with him?

6   A   So, well, I would see him frequently.  I would say that

7   once a week he would show up to tell me, for example, on such

8   a day we are going to have a lot of clothes, some extra

9   clothes to fold because usually we were 12 people, but he

10  could assign up to 15 people to help doing this.  So the

11  times he would come and check with me, are 12 enough or how

12  we were doing because I remember particularly there was a

13  time where you could hear there was something kind of like a

14  caravan with multiple people, and so in those days you had

15  really many, many people coming in or going out and so you

16  had to take care of all of that --

17            THE INTERPRETER:  The interpreter stopped her so I

18  could interpret.

19  Q   Actually, I will stop.  You mentioned there was 12

20  detainee workers that worked with you.  Could one person fold

21  all the laundry by themselves?

22  A   No, never, no.

23  Q   How many days a week did you work?

24  A   Almost every day.

25  Q   What were your hours?

A    It depended.  I would say it depended on each day.  Many

times, we would start working at five p.m. and we worked

until seven p.m. Other times, we would start at four p.m. and

we were still working at 11:00 p.m., which was not

appropriate because by then everything was usually shut down

or how they say it over there, everything has to be locked,

and sometimes everything was locked except the laundry area

because we were still folding and working.

Q    When you had to work longer hours, did you get paid extra

for those shifts?

A    No, we got the same pay.

Q    One dollar a day?

A    That is correct, one dollar a day.

Q    Were there times where you did not work?

A    Yes, I got sick.  There were times I didn't work because I

got sick.  I got sick physically and mentally.  Frequently, I

needed to go to these like therapy sessions, to these

psychological therapy sessions with two different people who

were there helping me with that.

Q    I understand -- sorry.  Did you work any other jobs at the

detention center?

A    So twice I also did some haircuts because I did study

cosmetology.  I have a certificate, actually, and so I was

involved in that twice.  They asked us if anybody wants to go

do haircuts, and they would pay you one dollar.  And since I

1  knew how to do it, I did it.

2  Q   When you say "they," it is the GEO officers?

3  A   Yes, the GEO officers.

4  Q   There was no waiting list you had to sign up on?

5  A   No, that was pretty automatic.  You would write down your

6  name on the list they had.  The haircuts only happened once a

7  month.

8  Q   How many barbers were there or how many people cutting

9  hair were there?

10  A   In my unit, it was just another detainee and myself.

11  Q   I am going to ask you to look in the documents for Exhibit

12  216, and ask if you recognize this?

13  A   Yeah, that's the place where we would go to cut hair.

14          MS. CHIEN:  I would like to move to admit Exhibit

15  216.

16          MR. SILVERMAN:  No objection.

17          THE COURT:  216 may be admitted.

18          (Exhibit 216 was admitted.)

19  BY MS. CHIEN:

20  Q   Can you tell me what this photo is of?

21  A   Barbershop.

22  Q   I see a trash bin.  As a barber, did you also clean the

23  barbershop?

24  A   Yes, we had to leave everything that we had used.  For

25  example, we had to sweep the hair, we had to also take care

1    of all the tools that we used to cut the hair, like, for

2    example, the scissors, the combs, all the razors and put

3    everything in the trash can.

4    Q    Did you ever see GEO staff cut hair in the barbershop?

5    A    I never saw them.

6    Q    Did you ever see GEO staff clean the barbershop?

7    A    I never saw them.

8    Q    Were you cutting other detainees' hair for free?

9    A    It was free for the detainees, I would say, not for GEO,

10   but they would still pay us one dollar.  I think that was a

11   lot cheaper probably than hiring somebody from the outside to

12   come do this job because those of us who are in that

13   profession, we charge between 25 or $30 per person to do that

14   job.

15   Q    Why were you ultimately released from the Northwest

16   Detention Center?

17   A    Because I won my case.

18   Q    Did it take almost a year for immigration officials to

19   review your status and release you?

20   A    Correct.

21   Q    When you applied for your immigration status, did you have

22   to disclose that you had previously crossed the border?

23   A    Correct.

24   Q    And they still released you; is that right?

25   A    Yes.

1  Q    So the federal government is not deporting you; is that

2  right?

3  A    No, not anymore.

4  Q    You are allowed to stay in the United States?

5  A    Yes, that is right.

6  Q    You were granted work authorization?

7  A    Of course.

8  Q    Where do you work now?

9  A    Right now, I am working at a care hospital in Seattle.  It

10  is called Transitional Care Center, and I am very happy

11  there.  I love my job and everybody who works there, the

12  administrators, they not only really value what I do, my

13  work, but they also really value me.  They are really nice to

14  me.

15  Q    What is your job there?

16  A    Well, I basically work for housekeeping, but I do other

17  things, too.  I work doing laundry.  I also provide care to

18  the residents.  I help out in the kitchen.  Everything that

19  they need me to do and that I can do, I am happy to do all

20  over the place.

21  Q    You do some laundry; is that right?  Is it similar to your

22  job at the Northwest Detention Center?

23  A    It is basically the same.  We launder their clothes, their

24  robes that we give them that we provide at the hospital,

25  sheets, socks, everything, it is kind of like the same.

1    Q    How much do you get paid?

2    A    $22 an hour.

3    Q    Do you think it was fairly-earned pay, a dollar per day at

4    the Northwest Detention Center?

5    A    No, because actually I got there -- well, first of all,

6    they took me there because I did not have a work

7    authorization.  As soon as I get there, they offer me to work

8    so that was kind of confusing to me, and they were paying,

9    you know, that kind of money.  It was not very clear to me.

10   At the beginning, I could not understand because I had been

11   arrested for not having a work authorization, and there they

12   were offering me to work which I thought I couldn't do and

13   with that minimal payments, that was not acceptable, that

14   amount.

15   Q    So I understand -- did you get -- did friends or family

16   give you money while you were detained in the Northwest

17   Detention Center?

18   A    Well, actually, my family, also my former boyfriend, they

19   would also put some money on the books for me while I was

20   there.  Also some organizations were out there, they would

21   also help.  They would send, I don't know, $5 or $10.  All

22   that money, I tried to save as much as I could.  I did use

23   some to get my personal stuff, like I said, but I also was

24   trying to save as much as I could because I did not know what

25   was going to happen to my case.  And the things that you hear

1   while you are out there is that all of a sudden when you are

2   done they will drop you off at night in the middle of the

3   street in Mexico, so I was trying to save some money so if I

4   needed to, I don't know, get a hotel or taxi or for my own

5   security because I just imagine if they leave me in the

6   middle of the night on the street in Mexico, I had not been

7   in Mexico for many years.

8   Q   You still needed to work even though your friends and

9   family were giving you money; is that right?

10       MR. SILVERMAN:  Objection, leading.

11       MS. CHIEN:  I will rephrase.

12  BY MS. CHIEN:

13  Q   Is that the reason why you needed to work?

14  A   Correct.

15  Q   Would you have worked in the laundry if you weren't

16  getting paid at all?

17  A   No, it is kind of like if I offer someone to come to my

18  house and then do the cleaning or landscaping.  Let's say I

19  bring someone to my house and I tell you, you have to do my

20  landscape, but then I am going to pay you.  We all work to

21  get some kind of compensation.  I believe every work you do

22  deserves a payment.

23       MS. CHIEN:  No further questions.

24       THE COURT:  All right.  Ms. Gomez, it would be a good

25  idea if you didn't -- if you broke up your answers so the

1    interpreter can catch up to the testimony.  It is hard for

2    the interpreter when they are long answers.  You can stop and

3    then finish your testimony.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  I just did it myself, Ms. Beatty.  Sorry.

6              THE INTERPRETER:  Thank you, Your Honor.  Appreciate

7    it.

8              THE COURT:  Mr. Silverman, I take it you are on deck

9    for cross?

10             MR. SILVERMAN:  Yes, sir.  Before we start, I would

11   like to check to see if the witness has someone who can

12   assist her with pulling up the Box documents because we are

13   going to be using a couple of those.

14             MS. CHIEN:  Mr. Silverman, we printed out the

15   documents you emailed me this morning.  If there is anything

16   other than that.

17             MR. SILVERMAN:  No.  Great.  Okay.  Good.  Thank you.

18                      CROSS-EXAMINATION

19   BY MR. SILVERMAN:

20   Q   Let's start with your name.  You indicated your correct

21   name is Maria Nayra Gomez Sotelo?

22   A   Correct.

23   Q   You indicated Karla Gomez Soto is a name you used but

24   isn't your correct name?

25   A   Correct.

1    Q    You stated you had no other names other than those two,

2    correct?

3    A    Correct.

4    Q    You have used Maria Gonzales Hernandez as a name, haven't

5    you?

6    A    Correct.

7    Q    You have used Maria Nayra Sotelo Loubiano (phonetic) as a

8    name as well, correct?

9    A    That is my birth given name in Mexico.

10   Q    What is Maria Gonzales Hernandez?

11   A    It is just a name I picked when I tried to cross the

12   border.

13   Q    So you have been deported twice, correct?

14   A    I actually was not deported twice.  I tried to cross, but

15   I never made it into the U.S.  They stopped me right there at

16   the border and they deported me back to Mexico, but I had not

17   crossed to the U.S.

18   Q    When you were deported back to Mexico, did you spend any

19   time in an ICE detention facility?

20   A    I was there in the sense they took pictures, I remember,

21   and I think the fingerprints as well, but then they

22   immediately sent you back to Mexico.

23   Q    Let's talk about your time in the Northwest facility.  You

24   arrived in April of 2018, correct?

25   A    Correct.

1  Q   As soon as you arrived, were you provided with information

2  about the volunteer work program?

3  A   Not exactly as soon as I got there.  So the info was given

4  to you once you were already placed in your dorm area.  There

5  were GEO staff that would be yelling the info, or they would

6  say, for example, does anybody want to work doing laundry,

7  and then you either raised your hand or you would go to the

8  desk where they were at and then you would write down your

9  name on a piece of paper.

10 Q   Can you look at the document that was provided to you this

11 morning that is labeled as 296?

12         MS. CHIEN:  (Ms. Chien speaking to the witness in

13 Spanish.)

14 A   Yes, I can see it now.

15 Q   Do you recognize that document?

16 A   Truly, I don't remember it.

17 Q   Is that your signature at the bottom?

18 A   Yes, that is my signature.

19         THE COURT:  Just a second, counsel.  What I have as

20 296 is not what she is talking about.

21         MR. SILVERMAN:  At the Court's direction over the

22 last few days, we separated Exhibit 268 in the binders, which

23 is a five-page document, into five individual exhibits.  If

24 you go to 268, A-268, those five pages will be the next few

25 exhibits, A-268.

1          THE COURT:  What you are giving me is plaintiff's

2     exhibits.  A-268 or A-296 would be defendant's exhibits.

3     They are over there in the black binder.

4          Okay.  Go ahead, Mr. Silverman.

5     BY MR. SILVERMAN:

6     Q    This specific document was page five of five of 268?

7          MS. CHIEN:  A-268?

8          MR. SILVERMAN:  Correct.  You are correct.

9          THE WITNESS:  Now, I am not sure.  I have separate --

10    I have A-268 in front of me.

11    BY MR. SILVERMAN:

12    Q    Page five of five of A-268?

13         THE COURT:  What it is marked?

14         MR. SILVERMAN:  Bates 299785 at the bottom right.

15         THE COURT:  You know, you got me confused here.  You

16    have added some exhibits, apparently, by cannibalizing some

17    other exhibits, which is fine, except I don't know what you

18    did and I don't have copies of whatever it is you are

19    offering now.

20         MR. SILVERMAN:  They are one-pagers.  They should be

21    fairly simple.

22         THE COURT:  Let's go back to Exhibit 296.  Was that

23    A-296?

24         MR. SILVERMAN:  Yes.

25         THE COURT:  She identified that document, I believe?

1      MR. SILVERMAN:  Yes, sir.

2      THE COURT:  You offered that exhibit?

3      MR. SILVERMAN:  Yes, I would offer that as admitted

4  into evidence, please.

5      THE COURT:  Ms. Chien?

6      MS. CHIEN:  No objection because she recognized her

7  signature.  She didn't actually recognize the document.

8      THE COURT:  A-296 may be admitted.

9   Let's go on from there, counsel.

10          (Exhibit A-296 was admitted.)

11      MR. SILVERMAN:  Thank you, Your Honor.

12  BY MR. SILVERMAN:

13  Q   So before you at A-296 is a volunteer work agreement with

14  your signature at the bottom, correct?

15  A   Correct, yes.

16  Q   You signed this as Gomez Soto, which is not your name,

17  correct?

18  A   Yes, that is the name that ICE had for me.  That's how

19  they recognized me under that name, using that name.

20  Q   You see the date there, which is April 23rd, 2018.  That's

21  fairly soon from when you were admitted into the facility,

22  correct?

23  A   Correct.

24  Q   If you could turn to the next document, which we had

25  marked as 297, A-297.  A-297, which was previously A-268,

1    four of five.  Will you look at this and tell me if you

2    recognize it?

3    A    Yes, I do recognize it.

4    Q    Is this your request to be assigned to the laundry in the

5    voluntary work program?

6    A    Yes, you would have to send this through a tablet.  That

7    was to let them know that I would be another worker for them.

8         MR. SILVERMAN:  At this point, we move to admit

9    Exhibit A-297.

10        MS. CHIEN:  No objection.

11        THE COURT:  It may be admitted.

12             (Exhibit A-297 was admitted.)

13   BY MR. SILVERMAN:

14   Q    Do you see there that you requested to work in the laundry

15   about a little over a week after you signed the voluntary

16   work program agreement?

17   A    Correct.

18   Q    Is it true that after a few days, you were advised that

19   you would be placed on the waiting list for the laundry?

20   A    Yes, that's what they tell you.

21   Q    Isn't it true that it took a few weeks before the laundry

22   position became available for you to volunteer?

23   A    I don't remember how much time went by until the time they

24   told me that yes, as of that moment, I was part of their

25   workers.

Gomez-Sotelo - Cross-Examination

1    Q    If you could turn to the next document, which is labeled

2    as Exhibit A-298.  Do you recognize that document?

3    A    No, I don't recognize it.

4    Q    Is that your signature at the bottom of the document?

5    A    Yes, that is my signature.

6         MR. SILVERMAN:  We would move Exhibit A-298 into

7    evidence, please.

8         MS. CHIEN:  No objection.

9         THE COURT:  A-298 may be admitted.

10         (Exhibit A-298 was admitted.)

11   BY MR. SILVERMAN:

12   Q    This is called a refusal to work form.  Isn't it true that

13   after being assigned or being given the opportunity to work

14   in the laundry, you refused to work in the laundry?

15   A    Yes, that is at the time when I needed some medical care.

16   Q    Turn to the next document, which is Exhibit 299.  Tell me

17   if that is your signature at the bottom of that document?

18   A    Correct, that is my signature.

19         MR. SILVERMAN:  We move to admit Exhibit 299 as

20   evidence, please.

21         MS. CHIEN:  No objection.

22         MR. SILVERMAN:  A-299.

23         THE COURT:  A-299 may be admitted.

24         (Exhibit A-299 was admitted.)

25

1    BY MR. SILVERMAN:

2    Q    This document is dated October 4th, 2018, correct?

3    A    Correct.

4    Q    At this point, you have been in the facility since April,

5    correct?

6    A    Yes.

7    Q    Just now you are beginning to actually work in the

8    voluntary work program, correct?

9              MS. CHIEN:  Objection, misstates the testimony.

10             THE COURT:  She may answer.

11             THE WITNESS:  I was working at the program.

12   BY MR. SILVERMAN:

13   Q    But not until October of 2018, correct?

14   A    I don't remember what the date was when I started working.

15   Q    If you can look at the next document in front of you,

16   which is marked as Exhibit A-300.  Tell me if you recognize

17   your signature at the bottom?

18   A    Yes, that is my signature.

19             MR. SILVERMAN:  I would move to admit Exhibit A-300

20   into evidence.

21             MS. CHIEN:  No objection.

22             THE COURT:  A-300 may be admitted.

23                  (Exhibit A-300 was admitted.)

24   BY MR. SILVERMAN:

25   Q    This is a job description for a position in the laundry,

1    correct?

2    A    This paper, we basically don't do that like the numbered

3    jobs.

4              THE COURT:    Excuse me.    Can we get the witness's

5    picture on the screen when she answers, Tyler?

6              THE CLERK:    Her video is on my screen.    I believe on

7    your side, you can pin her, if you want to keep her in the

8    frame.

9              THE COURT:    Okay.    Go ahead.

10   BY MR. SILVERMAN:

11   Q    All you did was fold laundry, correct, while you

12   participated in the volunteer work program as a laundry

13   worker?

14   A    Correct.

15   Q    It would be fair to say that a shift to fold laundry would

16   take about an hour and a half?

17   A    It was actually from five p.m. to seven or 7:30 p.m.

18             MR. SILVERMAN:    Can we upload the declaration into

19   the Box?    We will be sending another document.    We will move

20   on while we deal with that.

21   BY MR. SILVERMAN:

22   Q    You talked about some of the other areas of the detention

23   facility during your testimony this morning.    You never

24   volunteered or otherwise cleaned up in the medical area,

25   right?

1  A    Never.

2  Q    You never volunteered or cleaned up in the hallways,

3  correct?

4  A    Correct.  Never.

5  Q    You never volunteered or worked in the intake center,

6  correct?

7  A    Never.

8  Q    So you don't know how long it takes to clean the intake

9  area, the hallways with the medical area, do you?

10  A    Well, I could talk about the medical area because almost

11  everyday I was either at the intake area or the medical area.

12  Q    Why were you in the intake area every day?

13  A    Because I had the dentist one day, psychologist another

14  day.  They could not give me all my appointments on the same

15  day.

16  Q    You are talking about being there every day.  You were at

17  the facility for a year, correct?

18  A    Correct.

19  Q    Were you at the dentist or the medical provider every day?

20  A    If you can check my records, you will see that every day

21  they would send me out every single day.

22  Q    Did you ever pay for any of those medical or dental

23  services?

24  A    I never paid.

25  Q    There is no charge, right?

1  A    Correct.

2  Q    You volunteered for the program understanding that you

3  would receive one dollar per day, correct?

4  A    Correct.

5  Q    Did anybody ever tell you there was going to be a

6  different amount?

7  A    No, never.

8  Q    Did you ever have to do an interview to get your position?

9  A    Yes.

10 Q    Who did you interview with?

11 A    With the officers in charge on that day.

12 Q    The officers in charge on that day, does that mean the day

13 you started folding or every day?

14 A    The way it works is, first of all, they interview in the

15 morning so that when the clothing arrives, then you just go

16 out and start working with the clothes.

17 Q    So I think we may be having a difference in terms of the

18 definition of "interview."  To originally get a position so

19 that you could volunteer in the laundry, did you have to meet

20 with anyone to explain to them why you were qualified to do

21 that?

22 A    No.  They would tell you if you want to do the job, you

23 have it.  If you don't want it, somebody else is going to get

24 the job instead of you.

25 Q    You mentioned also you did haircuts.  Is that just twice?

1    A    Just those two times.

2    Q    Before you could do that, did you have to show anyone that

3    you were good at it or qualified?

4    A    No, they don't care much.  They just ask, does anybody

5    know how to cut hair, and then does anybody want to get their

6    hair cut.  And then those who go cut hair, you have to sign

7    something so that you get paid, and the ones who want to get

8    their hair cut also have to sign so that they can go there.

9    Q    When you volunteered to do haircuts or fold laundry, were

10   you ever asked to show a U.S. work authorization?

11   A    They never requested that.

12   Q    You talked a little bit about your commissary account.

13   You said some of the things you bought were soap and shampoo,

14   and they didn't give you soap and shampoo.  Do you remember

15   that?

16   A    Yes, I do.

17   Q    Did they not give you any shampoo or soap or did you not

18   like the free soap or shampoo they gave you?

19   A    Well, they do have in the container on some kind of like

20   tab, they do have soap.  It is like a multipurpose soap so

21   you have to use that for everything.  It is pretty strong,

22   actually.  That's what you use for everything.  It was

23   starting to give me some allergy because of how strong it is.

24   I was having, I don't know exactly how to call it.  It was

25   some kind of like a rash, so I even had to go get some

Gomez-Sotelo - Cross-Examination

1  ointment because of the rash that it was giving me because of

2  the allergy.

3          THE COURT:  Excuse me, Mr. Silverman.

4      Ms. Beatty, it is okay to stop the witnesses if you need

5  to in the middle of an answer.

6          THE INTERPRETER:  I will, Your Honor.  Thank you.

7          MR. SILVERMAN:  You're amazing, Ms. Beatty.

8          THE INTERPRETER:  Oh, thank you.

9  BY MR. SILVERMAN:

10  Q   You bought things like ramen noodles, right?

11  A   Correct.  So there is something about that that I would

12  like to say.  There were many women at the detention center

13  while I was there.  Many of those women did not have any

14  family whatsoever in the U.S.  The food that they would give

15  us was not enough for many of them, and there were some

16  elderly ladies whose stomachs could not recognize or were not

17  used to the type of food that they were given there.  It

18  could be like the culture, it could be the condiments that

19  were used.  So many of them would end up not eating at all

20  during a whole day.

21      Many times, I spent the money that my family would put to

22  me to share some of the food with them so that at least they

23  could eat something or try something.  At times, it wasn't

24  that they did not have food.  At times, the food would not

25  sit well in their stomachs or maybe they did not have enough,

1    they only ate a little bit or had a little bit.  It was not

2    food.  So it is hard at times to have to wait for the next

3    meal, and so because of that, I shared mine.  At least with

4    those soups you mentioned, they would be happy for a little

5    while, for as long as their stomachs were full.

6    Q   When you left the facility, you had about $800 that you

7    left with, correct?

8    A   Yes, I did.  The fact of the matter was, I was trying to

9    save as much as I possibly could just in case, you know, just

10   in case I got deported, just in case I lost my case so that I

11   could have enough at least to rent a hotel because they never

12   tell you where they are going to drop you off, what is going

13   to happen to you.  They don't care.  They just kick you out

14   of the country, and they don't care if you have money enough

15   to eat or not.  So, you know, I was there and I could hear

16   all these stories, so I was trying to save as much as I could

17   just in case they would leave me somewhere in Mexico, and I

18   did not know Mexico anymore because I hadn't been there in

19   the longest time.

20   Q   I would like you -- I believe in your Box should be a

21   document which is a Spanish version of a prior declaration

22   that you signed, which is at A-341.

23        MS. CHIEN:  Mr. Silverman, just so you know, we are

24   going to have somebody help her with the Box.  So somebody is

25   going to be in that room.  Are you sure it is --

1          MR. SILVERMAN:  A-341 is Spanish and A-342 is

2    English.

3          MS. CHIEN:  I think you are talking about 341, not A.

4          MR. SILVERMAN:  You're right.  It is just regular

5    341.  Do we know if we have it yet?

6          THE WITNESS:  Yes.

7    BY MR. SILVERMAN:

8    Q   If you could look at paragraph 7.

9    A   I am looking at one that is in English, if you could

10   translate it for me.

11   Q   Okay.  You signed a declaration that says, quote --

12         MS. CHIEN:  Can you wait, please, so we can make sure

13   she has the right document in front of her.

14         THE WITNESS:  I am on 7, but it is in English.

15   BY MR. SILVERMAN:

16   Q   We will translate what is before you.

17         THE COURT:  Excuse me, counsel.  You mentioned two

18   exhibits, 341 and 342.  341, I believe is in Spanish, and 342

19   is the same document translated into English.  If you are

20   asking her about a paragraph, you should ask her about the

21   one in Spanish.

22         MR. SILVERMAN:  That's what I am trying to do,

23   Your Honor.  It didn't sound like she had the Spanish one in

24   front of her, which is 341.

25         THE WITNESS:  We are looking for it.

1   MS. CHIEN:  Ms. Gomez, we will give you the hard

2   copy.  We are going to pull it right now.

3   THE WITNESS:  Thank you.  Okay.  I got it.

4   BY MR. SILVERMAN:

5   Q   Isn't it true you signed a declaration that said -- where

6   you said the normal shift was 90 minutes?

7   A   It was never 90 minutes.

8   Q   In your declaration, didn't you say that your regular work

9   schedule starts at eight p.m.?

10   MS. CHIEN:  Counsel, you have to read the entire

11   line, please.

12   THE WITNESS:  It says, "Our regular schedule starts

13   at eight p.m. but some days we start earlier than that."  At

14   times, we would start at eight a.m., but never at eight p.m.

15   BY MR. SILVERMAN:

16   Q   Why did you sign a declaration that says that, quote, "Our

17   regular work schedule starts at eight p.m."?

18   A   So, yes, that is my signature.  I never was like that.  I

19   am thinking maybe they made a mistake because the laundry

20   time, the laundry schedule was always after dinner.  It was

21   always after dinner.  It was between six or sometimes we

22   started at four.  I mean, the time varied all the time.  It

23   depended on how much clothes there were and that.  We were

24   never told, okay, like this is the time and that's it.

25   MR. SILVERMAN:  Your Honor, I would like to publish

1  the English version of the declaration for the jury.

2         THE COURT:  These are not in evidence at this point.

3         MR. SILVERMAN:  I'm sorry, I would like Exhibit 341

4  and 342 moved into evidence.

5         MS. CHIEN:  Counsel, are you using this to impeach

6  because it doesn't get moved into evidence?

7         MR. SILVERMAN:  It would be -- well, I want to

8  publish it, so therefore I want to admit it.

9         MS. CHIEN:  That would be improper impeachment.  If

10 you are trying to impeach her, you can impeach her but the

11 document doesn't get admitted.

12        MR. SILVERMAN:  It is her declaration.  It is

13 admissible.  We are arguing.  Obviously, it is the Judge's

14 call.

15        THE COURT:  Well, I think A-3 -- I'm sorry.  No

16 prefix of "A"?

17        MR. SILVERMAN:  Correct.

18        THE COURT:  We are talking about Exhibit 341 and 342,

19 and they may be admitted.

20        MR. SILVERMAN:  I would like to publish paragraph 7.

21 BY MR. SILVERMAN:

22 Q   You signed this declaration, correct?

23 A   Yes, that is my signature.

24 Q   Now, you stated that you have now received authorization

25 to stay in the United States and work authorization; is that

1    correct?

2    A    Correct.

3    Q    You got that permission from ICE, not from GEO, correct?

4    A    Correct.

5    Q    You indicated that you are currently working at the

6    transitional care center, correct?

7    A    Correct.

8    Q    You are doing lots of different tasks there, correct?

9    A    Correct.

10   Q    You are not doing just one task.  Every day is something

11   different?

12   A    Well, my job is housekeeping.

13   Q    Are there volunteers at the transitional care center?

14   A    Not that I know of.

15   Q    You don't know one way or the other?

16   A    I don't know if there are any.

17        MR. SILVERMAN:  No further questions, Your Honor.

18        MS. CHIEN:  One quick question, Your Honor, on

19   redirect.

20                    REDIRECT EXAMINATION

21   BY MS. CHIEN:

22   Q    So Mr. Silverman has asked you questions about you knowing

23   it was that dollar per day at the voluntary work program; is

24   that right?

25   A    Correct.

1    Q    Why didn't you work somewhere else if you knew the pay was

2    only a dollar?

3    A    Because I couldn't.  They were holding me against my will

4    in there.

5    Q    If you could have worked somewhere for more than a dollar

6    per day, would you have?

7    A    Of course, I would.

8              MS. CHIEN:  No further questions.

9              THE COURT:  May this witness be excused?

10         Thank you, Ms. Gomez.  You may be excused.

11             THE WITNESS:  Thank you, Your Honor.

12             THE INTERPRETER:  Thank you.

13             MS. CHIEN:  Thank you.

14             MR. SILVERMAN:  Again, that was amazing, Ms. Beatty.

15             THE INTERPRETER:  Thank you very much.  Thank you.

16             THE COURT:  You may call your next witness, whoever

17    is on deck.

18             MR. WHITEHEAD:  Yes, Your Honor.  We would call

19    Marc Johnson.

20             MS. SCHEFFEY:  Give me a moment.  I will get him on.

21             MR. WHITEHEAD:  Given how close we are to the lunch

22    break, I'm certainly happy to begin my examination now.  Also

23    open to beginning after lunch.

24             THE COURT:  Well, five minutes is five minutes or

25    six.  If we can get the witness in.

```
 1        MS. MELL:  Yep, he's coming.  He should be sitting
 2   down in just a minute.
 3        THE CLERK:  The witness is being admitted at this
 4   moment.
 5        THE COURT:  All right.  Thank you, Tyler.
 6      Mr. Johnson, if you would raise your right hand and be
 7   sworn.
 8                       MARC JOHNSON,
 9      having been sworn under oath, testified as follows:
10        THE WITNESS:  Yeah.
11        THE COURT:  Thank you.  Mr. Whitehead, you may
12   examine.
13        MR. WHITEHEAD:  Thank you, Your Honor.
14                    DIRECT EXAMINATION
15   BY MR. WHITEHEAD:
16   Q   Good morning, Mr. Johnson.  I guess almost good afternoon.
17   A   Good morning.
18   Q   You currently work for GEO.  Do I have that right?
19   A   Yes.
20   Q   What is your current role with GEO?
21   A   I am a detention officer.
22   Q   We met over a year, year and a half ago at this point, and
23   I asked you a number of questions about the detainee worker
24   program, do you remember that?
25   A   I do.
```

1    Q    You testified under oath just like you are doing today,

2    correct?

3    A    Yes.

4    Q    You told me that as a detention officer, you were directly

5    involved in supervising detainee workers, correct?

6    A    Yes.

7    Q    Will you answer my questions today about the detainee

8    worker program?

9    A    Yes, I will.

10    Q    When did you begin working for GEO?

11    A    April of 2009.

12    Q    At GEO, it is a good paying job, isn't it?

13    A    It is good.

14    Q    In fact, you quit your last job to work at GEO, correct?

15    A    Yes.

16    Q    That's because the job at GEO paid more?

17    A    Uh-huh, yes.

18    Q    Just like the deposition questions, it is important you

19    answer my questions with words.  "Uh-huh" and "huh-uh" just

20    don't show up on the transcript.

21         When we spoke last, you were making close to $30 an

22    hour.  Do I have that right?

23    A    Yes.

24    Q    You also told me you work a fair amount of overtime,

25    correct?

1  A    Yes.

2  Q    Something along the lines of eight to 20 hours a week in

3  overtime.  Does that sound about right?

4  A    Yes.

5  Q    Is that -- does that carry through to today that you still

6  work about eight to 20 hours of overtime each week?

7  A    Yes.

8  Q    In your times at the Northwest Detention Center, can you

9  give me a list of the various roles that you have held?

10 A    I have been a detention officer, I was acting lieutenant

11 and lieutenant.  I promoted to lieutenant and then back to

12 detention officer.

13 Q    So the move from detention officer to acting lieutenant to

14 lieutenant, that was a promotion, correct?

15 A    Yeah.

16 Q    Why go from lieutenant back to being an officer?

17 A    The lieutenant position was salary, and at the time I just

18 wasn't making enough money to support my family so I stepped

19 down to, you know, get paid an hourly rate and be able to

20 work overtime.

21 Q    So as a detention officer, your main focus is on safety

22 and security.  Do I have that right?

23 A    Yes, that's my primary focus.

24 Q    You definitely have other duties, correct?

25 A    Yes.

1   Q    Supervising the detainee workers is one of those duties?

2   A    Yes.

3   Q    As a lieutenant, your supervision was more indirect, would

4   you agree with that?

5   A    Yes.

6   Q    As a detention officer, the supervision and direction is

7   more hands on?

8   A    Yes.

9   Q    That puts you closer to the actual supervision of the

10  detainee workers than say someone that might be in

11  administration, would you agree with that?

12  A    Yes.

13  Q    So you are closer to the work, so to speak, than someone

14  like the facility administrator?

15  A    Yes.

16  Q    Facility administrator, that's just a fancy name for

17  warden, correct?

18  A    I don't know that it is a fancy name.  It is the current

19  title they use.

20  Q    Fair enough.  The Northwest Detention Center, it is not a

21  criminal detention facility, is it?

22  A    No.

23  Q    The people held there, they are not being held as part of

24  punishment, correct?

25  A    Correct.

1    Q    I want to talk about your direct supervision of detainee

2    workers.  You have supervised detainee workers on the

3    graveyard shift, correct?

4    A    Yes.

5    Q    In fact, most of your time with GEO, at least when we

6    spoke last, you said you spent the bulk of it working the

7    graveyard shift?

8    A    Yes.

9    Q    Can you tell us about your work supervising detainee

10   workers on the graveyard shift?

11   A    On the graveyard shift, they clean up at the end of the

12   day, take the trash out, you just -- just make sure kind

13   of -- you wrap up the end-of-the-day kind of stuff, put

14   everything away.  That is about it.

15            THE COURT:  It is about lunch time now,

16   Mr. Whitehead.

17       Ladies and gentlemen, we will reconvene at 1:00.  Please

18   be back ready to go at 1:00.

19            MR. WHITEHEAD:  Thank you, Your Honor.

20            MS. SCHEFFEY:  Thank you, Your Honor.

21         (Recessed.)

22

23

24

25

1          AFTERNOON SESSION

2          JUNE 7, 2021

3     (The following occurred outside the presence of the jury.)

4          THE COURT:  I guess counsel are back.  You all are

5     driving me crazy with these motions to admit exhibits.  The

6     admission of exhibits does not require a motion.  Typically,

7     historically and customarily a lawyer will offer an exhibit

8     and it either will be admitted or not.  I don't know who came

9     up with the idea that you move to admit an exhibit.  In my

10    humble opinion, it is not the right way to do it, even though

11    it seems to have overwhelmed the bar.  I am not going to die

12    from it, but cuts against my respect for history every time

13    you move to admit an exhibit.

14         THE CLERK:  We got it all figured out, Your Honor.

15         THE COURT:  All right.  Bring the jury in.  The

16    witness is present.

17         THE CLERK:  They are on their way back in.

18     (The following occurred in the presence of the jury.)

19         THE CLERK:  Everybody is present.

20         THE COURT:  All right.  You may continue, counsel,

21    with Mr. Johnson.

22         MR. WHITEHEAD:  Thank you, Your Honor.

23    BY MR. WHITEHEAD:

24    Q   Mr. Johnson, before the lunch break, we were talking about

25    your work and supervising detainee workers on the graveyard.

```
 1   Do you remember?
 2          Sorry.  I can't hear you.  Can you hear me?  That might
 3   have done it.  Can you say something?
 4   A   Can you hear me now?
 5   Q   Yes.
 6   A   Sorry about that.
 7       I do remember talking about that.
 8   Q   Great.  So, as I understand it, you supervised the workers
 9   while they do trash pick up.  Is that one of the things you
10   do on graveyard?
11   A   Yes.
12   Q   Also while they clean the floors, correct?
13   A   Yes.
14   Q   Sweep, correct?
15   A   Yes.
16   Q   Waxing of the floors?
17   A   Yes.
18   Q   Stripping the wax?
19   A   Yes.
20   Q   And buffing the floors?
21   A   Yes.
22   Q   I think now is a good time to talk about the floors.  GEO
23   trains the detainee worker if they don't have prior
24   experience waxing and buffing floors, correct?
25   A   Correct.
```

1    Q    GEO provides the detainee workers all of the cleaning

2    supplies to do their job?

3    A    Yeah, due to the nature of the environment.

4    Q    You told the detainee workers where to buff, strip, wax,

5    et cetera, the floors, correct?

6    A    Yes.

7    Q    The buffing, waxing, stripping of the floors, it can take

8    two hours or up to four or five hours to complete, right?

9    A    It just depends.  The actual spreading or stripping of the

10   floors, putting on wax, there is a lot of wait time.

11   Q    Well, you gave me an estimate before.  You told me two

12   hours up to four or five hours; is that correct?

13   A    Yes.

14   Q    I think I would like to show you a couple pictures at this

15   point.  Let's take a look at Exhibit 491.

16         MR. WHITEHEAD:  The parties have stipulated to

17   authenticity and admissibility of Exhibit 491.

18         MS. SCHEFFEY:  No objection.

19         MR. WHITEHEAD:  I would offer Exhibit 491 into

20   evidence at this time.

21         THE COURT:  491 may be admitted.

22              (Exhibit 491 was admitted.)

23         MR. WHITEHEAD:  Thank you.  May I publish,

24   Your Honor?

25         THE COURT:  Yes.

Johnson - Direct

1    BY MR. WHITEHEAD:

2    Q   In a moment, Exhibit 491 is going to come up on your

3    screen.  My question to you is whether this is a fair and

4    accurate representation of the buffers that are used at the

5    Northwest Detention Center?

6    A   Yes.

7    Q   What is this that we are looking at here at Exhibit 491?

8    A   Looks like a janitor's closet, what we call it.  Yeah, it

9    has a buffer and then all the other tools that, you know, are

10   used, brooms, dust mops, mop handles.  They are all on a

11   shadow board so they can be accounted for.  There is a sink,

12   like a tub thing for water.

13   Q   The equipment we are looking at here in Exhibit 491, are

14   these the materials that the detainee workers use to care for

15   the floors?

16   A   I mean, the buffer, yes.  The actual wax and stripper is

17   in another location.

18   Q   Thank you.  I would like to take a look at another

19   picture.  Why don't we bring up Exhibit 474?

20           MR. WHITEHEAD:  Your Honor, Exhibit 474 has been

21   stipulated to as far as authenticity and admissibility.  We

22   would offer Exhibit 474 into evidence.

23           MS. SCHEFFEY:  No objection.

24           THE COURT:  It may be admitted.

25           MR. WHITEHEAD:  May I publish, Your Honor?

```
 1              (Exhibit 474 was admitted.)

 2          THE COURT:  Yes.

 3   BY MR. WHITEHEAD:

 4   Q   We have Exhibit 474 up on the screen.  What are we looking

 5   at here?

 6   A   Hallway inside the facility.

 7   Q   This hallway, is it part of the Grey Mile?

 8   A   Yes.

 9   Q   It is called the Grey Mile because it is long; is that

10   right?

11   A   And it used to be grey.  They put like a floor covering

12   over the floor.  Used to be cement colored so it was grey.

13   Q   The floors, this would be one of the hallways or corridors

14   that the detainee workers would buff, wax and strip that you

15   just described for us?

16   A   Yes.

17   Q   Why is it important for GEO to take care of the floors in

18   the way you just described?

19   A   Well, you want to upkeep the facility.  A clean facility

20   makes everyone feel better, you know.

21   Q   Keep the appearance of the facility up, would you agree?

22   A   That's part of it.

23   Q   Cleanliness and hygiene, I imagine those are parts as

24   well, would you agree?

25   A   Yes.
```

1    Q    Perhaps safety would be an issue as well in terms of

2    keeping the floors in good shape?

3    A    Yes.

4    Q    Probably some laws and regulations in there, too, that

5    require GEO to keep the floors in good shape, would you

6    agree?

7              MS. SCHEFFEY:  Objection.  Calls for speculation.

8              THE COURT:  I think he may answer.

9              THE WITNESS:  I am not sure if there are laws.

10   BY MR. WHITEHEAD:

11   Q    So if the detainee workers didn't perform this work,

12   someone else would have to care for the floors in the way you

13   have just described, would you agree with that?

14   A    Yes.

15   Q    The work you described in keeping the floors in tiptop

16   shape, that's not optional work, correct?

17   A    No.

18   Q    Needs to be done inside the facility, correct?

19   A    Yes.

20   Q    Let's talk about painting.  As I understand it, painting

21   is another area of detainee workers that you supervise,

22   correct?

23   A    Yes.

24   Q    The painting can range in scope, would you agree?

25   A    Yes.

1   Q    Can be touch-up paint on one hand and painting whole areas

2   of the facility on the other?

3   A    Yes.

4   Q    When we are talking about painting areas of the facility,

5   we are talking about the living pods?

6   A    That's part of it.

7   Q    Intake?

8   A    Another part.

9   Q    Booking?

10  A    That's the same as intake.

11  Q    What about the Grey Mile, is that another area?

12  A    Yes.

13  Q    What am I leaving out, anything else?

14  A    I think that is it.

15  Q    When it comes to painting, GEO trains the detainee workers

16  on proper painting techniques, correct?

17  A    Yeah.  I mean, it is pretty basic and simple stuff, but we

18  do.

19  Q    The painting, it can range in time.  You told me before

20  that it can range from two hours to four hours, correct?

21  A    Uh-huh.  Yes.

22  Q    Let's take a look at another picture.  Could we get

23  Exhibit 490, please.

24          MR. WHITEHEAD:  Your Honor, Exhibit 490 has been

25  stipulated as far as authenticity and admissibility.  We

1    would offer it into evidence at this time.

2              THE COURT:  490?

3              MR. WHITEHEAD:  Yes, Your Honor.

4              THE COURT:  What did I lose here?  I don't have --

5    okay.  It may be admitted.

6                    (Exhibit 490 was admitted.)

7              MR. WHITEHEAD:  May we publish?

8              THE COURT:  Yes.

9    BY MR. WHITEHEAD:

10   Q    Is this a fair representation of the painting materials

11   and rags that detainees use?

12   A    Yes.

13   Q    We have drop cloths in these pictures.  We have something

14   in a basket.

15   A    You are not talking about the rollers, you are talking

16   about the grey barred basket?

17   Q    Yeah, the thing hanging in the basket.  What is that?

18   A    Soap and extra chemicals are kept and secured, due to the

19   environment, the custody, custodial environment that we work.

20   Hypoallergenic hand wash.  We refill the showers and stuff so

21   they have soap to take showers.

22   Q    The drop cloths and paint rollers we are looking at, these

23   are materials GEO provides?

24   A    Yes, again, due to the nature of the environment, they

25   can't bring their own.  It can be used as weapons, stuff like

1    that.

2    Q    Have you heard of anyone using a paint roller as a weapon?

3    A    Not specifically a paint roller, but --

4    Q    Well, painting, why is it important for GEO to paint in

5    the way that you have just described for us, the touch-up

6    paint and painting whole areas of the facility?

7    A    It contributes to the overall cleanliness of the facility,

8    security, making sure everything is clean and orderly.

9    Similar to the floor upkeep.

10    Q    That's right.  You took the words right out of my mouth.

11    Similar to the floors, we are talking about the general

12    upkeep of the facility, right?

13    A    Yes.

14    Q    Just like my question about the floors, if the detainee

15    workers didn't do the touch-up paint and painting whole areas

16    of the facility, someone else would have to, correct?

17    A    Yes, the officers would.  They have.

18    Q    Right, the work would still need to be done?

19    A    Yes.

20    Q    That is because it is important work?

21    A    Yes.

22    Q    The detainee workers, they painted murals along the Grey

23    Mile, do I have that right?

24    A    Yes.

25    Q    Do you like the murals?

1   A   I do like the murals.

2   Q   What do you like about them?

3   A   They are very well done.  They are artistic and general --

4   and you know, different.  It definitely, you know, kind of

5   personalizes the place.

6   Q   Those murals, the GEO submitted a request to the detainee

7   workers to see if anyone wanted to paint the murals?

8   A   Yes.

9   Q   Like a bid for work?

10  A   I don't know that it is a bid for work.  It was more like,

11  see who was interested and they had to submit like examples.

12  Q   This is GEO vetting to make sure the people that were

13  offering to paint the murals could in fact paint good murals,

14  I guess for lack of a better way to put it?

15  A   Yeah, but if no one submitted interest or wanted to do it,

16  it wouldn't have happened, I don't think.

17  Q   The point I am driving at is perhaps a little bit

18  different.  GEO wouldn't have allowed just anyone to paint on

19  its walls, correct?

20  A   I don't know.

21  Q   GEO had to request samples and vet the samples to make

22  sure it was hiring the right people to paint the murals,

23  correct?

24  A   I don't know what the standards were for approving someone

25  to paint a mural, you know, or what the qualifications are.

1    I know that people expressed interest and volunteered and

2    they submitted like examples of their work.  That's all I

3    know.

4    Q    How about this, do you know how much the people that

5    painted the murals were paid?

6    A    I do not.

7    Q    More than a dollar?

8    A    I don't know.

9    Q    Do you know how much it would have cost to hire artists

10    from outside the Northwest Detention Center to paint those

11    same murals?

12    A    No.

13    Q    Let's keep moving through the work you supervised.  You

14    supervised work done in the recreational areas, correct?

15    A    Yes.

16    Q    The detainee work in the recreation yard, it is

17    essentially more cleaning?

18    A    Yes.

19    Q    As part of your job, you made sure the recreation workers,

20    the cleaners there had the tools they needed to clean, right?

21    A    Again, yes, due to the nature of the environment, stuff

22    has to get checked out, checked in, so it doesn't go missing,

23    you know.  Don't want it to be used as weapons, stuff like

24    that.

25    Q    Well, you are also making sure that the job is done

Johnson - Direct

1   safely?

2   A   Yes.

3   Q   And you are making sure they do the job satisfactorily?

4   A   Yes.

5   Q   When there are new workers, you provide them training

6   about how to do their jobs, correct?

7   A   Yes.

8   Q   You go over the job description with them?

9   A   Yeah, the jobs are pretty basic and simple.

10  Q   Even though, you go over the job descriptions and basic

11  outline with them, correct?

12  A   Yes.

13  Q   You show them where to clean?

14  A   Yes.

15  Q   Show them the correct cleaning supplies to use?

16  A   Yes.

17  Q   You are making sure they understood what the job entails,

18  correct?

19  A   Yes.

20  Q   Those job descriptions, those aren't just suggestions

21  about the work to be done, are they?  Put another way, you

22  expect the detainee workers to follow the job descriptions?

23  A   Yeah, I believe they are guidelines.

24  Q   You expect them to perform in a satisfactory way, correct?

25  A   Yes.

1    Q    If they don't, there are consequences, right?

2    A    Yes.

3    Q    Like termination?

4    A    They could lose the job they volunteered for.

5    Q    "Termination" is the word I am using.  If people don't

6    perform satisfactorily, they can be terminated, right?

7    A    Yeah, I don't view it as terminated.  I view it as they

8    lose the job they volunteered for.

9    Q    Well, the detainee workers and their failure to follow GEO

10   staff instruction, could that lead to termination?

11   A    Well, the failure to follow instruction would be a

12   disciplinary thing, so... I believe, according to PBNDS, loss

13   of job is a penalty.

14   Q    Who initiates that process, the disciplinary process that

15   you are alluding to right now?  That's GEO, right?

16   A    It would be whoever observes the violation.  It could

17   be -- most often it is GEO.

18   Q    GEO can terminate detainee workers for excessive

19   absenteeism, correct?

20   A    Yeah, if you are absent, you will lose your job.

21   Q    GEO can terminate detainee workers for horseplay or

22   misconduct, correct?

23   A    Yes.

24   Q    Or theft?

25   A    Yes, you could.

1    Q    And unsatisfactory work performance?

2    A    Yes, you could.

3    Q    What is a worker pay sheet?

4    A    It is a pay sheet that has their name and their alien

5    number and job title, and then they sign it.  There is one a

6    day, one sheet a day.  You know, it holds several signatures.

7    Q    What is the point of the worker pay sheet?  What are they

8    for?

9    A    To make sure the detainees get paid and also to, you know,

10   know who the worker is, follow up and make sure the job gets

11   done.

12   Q    The last part, if the worker does a bad job, you as the

13   detention officer, you can refuse to let them sign the worker

14   pay sheet; is that right?

15   A    Uh-huh.

16   Q    That means the worker doesn't get paid, correct?

17   A    Yeah, if they don't sign the pay sheet, they wouldn't get

18   paid.

19   Q    It could lead to a loss of job if they do a bad job,

20   correct?

21   A    Yes.

22   Q    Now, the detainee workers, they cook inside the Northwest

23   Detention Center; is that right?

24   A    No, I don't believe they cook.  I think they assist in the

25   kitchen.

1    Q    Well, they help with the food preparation, you would agree

2    with that, right?

3    A    Yeah.

4    Q    They help with the food service?

5    A    Yeah, dishing out the food, uh-huh.

6    Q    They help with clean up in the kitchen?

7    A    Yeah.

8    Q    And the detainee workers, I mean they clean throughout the

9    facility; is that right?

10   A    Uh-huh, yes.

11   Q    They do the living areas, correct?

12   A    Yeah.

13   Q    I mean, I guess I could rattle off a big list, right?

14   They do the showers?

15   A    Yep.

16   Q    They do the toilets?

17   A    Yes.

18   Q    The sinks?

19   A    Yes.

20   Q    The floors?

21   A    Yes.

22   Q    The recreational area?

23   A    Yeah, we already talked about that.

24   Q    We did.  The barbershop?

25   A    They clean in the barbershop.

Johnson - Direct

1   Q    Okay.  They do the laundry; is that right?

2   A    Yes.

3   Q    I mean, they pick up the dirty laundry from the living

4   areas, right?

5   A    Uh-huh, yes.

6   Q    They wash it?

7   A    Yes.

8   Q    They fold it?

9   A    Yes.

10  Q    The detainee workers, they cut hair inside the facility,

11  right?

12  A    Yes.

13  Q    We talked about the painting.  We know they paint, right?

14  A    Yes.

15  Q    Everything that I have just described, I mean, these are

16  important contributions to keeping the Northwest Detention

17  Center running, correct?

18  A    Well, like we talked about before, it would happen

19  regardless of whether the detainees did it or not.  They are

20  all pretty standard for the industry, so whether it is this

21  place or prisons or jails, all of that stuff needs to get

22  done and so it does get done.

23  Q    That's right.  It is important work that needs to get

24  done, correct?

25  A    Yes.

```
1    Q    The detainee workers make an important contribution to

2    maintaining the Northwest Detention Center, correct?

3    A    Yes.

4         MR. WHITEHEAD:  Thank you, sir.

5         Your Honor, pass the witness.

6                    CROSS-EXAMINATION

7    BY MS. SCHEFFEY:

8    Q    Good afternoon.  Can you hear me, Mr. Johnson?

9    A    I can.

10   Q    Wonderful.  Okay.  So how long have you been at the

11   Northwest ICE Processing Center as an employee?

12   A    Just over 12 years.  April of 2009, like I said before.

13   Q    Did you overlap with Officer Tracy?

14   A    Yeah, I think he got hired a little after me, but almost

15   the same time.

16   Q    Were you ever Officer Tracy's direct supervisor?

17   A    I was.

18   Q    Did you supervise him differently than you supervise

19   detainees?

20   A    No.

21   Q    No?

22   A    I mean, you know, I would give him direction and I

23   wouldn't have to micromanage him, you know, or follow up as I

24   would with detainees, so in that case, yeah, I would

25   supervise him different.
```

1    Q    Did Officer Tracy have the same schedule as the detainee?

2    A    No.

3    Q    How was it different?

4    A    It would depend based on the needs of the shift, sometimes

5    he had to come in early, sometimes he had to stay late,

6    sometimes an event would happen and he would have to stay

7    late, sometimes it was planned or unscheduled.

8    Q    Did Officer Tracy have the same performance requirements

9    as a detainee?

10   A    No.

11   Q    How were they different?

12   A    Officer Tracy was in charge of life, safety and the

13   security and safety of the detainees and the facility, the

14   other staff.  The detainees are just worried about, you know,

15   their living areas, some of them were just worried about

16   themselves.

17   Q    You talked a little bit about your work in the pods on

18   graveyard.  Can you describe to me what the pod looks like?

19   A    So, yeah, it is -- you know, I guess they are kind of like

20   rectangular or square.  Depending on which unit, you know,

21   they have eight cells on the lower tier, eight cells on the

22   upper tier, or 20 cells on the lower tier and 20 cells on the

23   upper tier.  They are pretty compact.  They are always two

24   stories, two tiers.

25   Q    Are all of the units -- housing units cell style or is

Johnson - Cross

1  there another style as well?

2  A    No, so all the units -- some of them are cells, then some

3  are open bays, just like bunks, but two tiers.

4  Q    How is it determined which style housing unit a detainee

5  is placed in?

6  A    For the most part, usually just random, wherever we are

7  housing people at the time to keep the head counts similar,

8  or they do house people in the open bays due to like a mental

9  health request or medical need.

10  Q    You talked about safety and security a lot in your

11  testimony.  Does safety and security have anything to do with

12  where any people are housed?

13  A    Yes.

14            MR. WHITEHEAD:  Objection, leading.

15            THE WITNESS:  Yes.

16            THE COURT:  The answer may stand.

17  BY MS. SCHEFFEY:

18  Q    What does it have to do with safety and security?

19  A    We had to keep people who potentially could be abusers

20  away from victims.  There is gang members.  We have to keep

21  those away from the non-gang members.  It is based on

22  criminal history, too.  It is a custodial environment so you

23  are putting -- you know, you are mixing several different

24  people without completely honestly knowing them, so you go

25  based on the best information and you have to house them

1    accordingly.

2    Q    When it comes to the voluntary work program, is there

3    anything you have to take into account when deciding who can

4    participate in which --

5              MR. WHITEHEAD:  Objection, leading.

6              THE COURT:  He may answer.

7              THE WITNESS:  Yeah, that is also taken into account.

8    The higher custody detainees don't get to move around the

9    facility and mix -- potentially mix with, you know, the other

10   lower custody.  That is for their safety and everyone else's.

11   They are stuck, you know.  Their options are to work inside

12   the unit, volunteer for one of those jobs.

13   BY MS. SCHEFFEY:

14   Q    Is that something you have to take into account when you

15   were supervising GEO officers, keeping certain officers away

16   from others?

17   A    No, any GEO officer could go to any post.

18   Q    I think you talked about cleaning the floors.  Do you

19   remember that?

20   A    Yeah.

21   Q    How often or how frequently do detainees strip and wax the

22   floors?

23   A    It was pretty infrequent.  So I don't know, every other

24   month.  Four times a year maybe.

25   Q    Compared to the positions in the pod, which is more

1  frequent, the tasks in the pod or stripping and waxing the

2  floors?

3  A    No, the tasks in the pod are every day.  They are just

4  basic, you know, like life activities.  The trash would build

5  up, it needs to be taken out.  People make messes while they

6  are eating, it needs to be cleaned up, stuff like that.

7  Q    Is there a pod porter position for taking out the trash?

8  A    Yeah.

9  Q    Is that all that individual does as part of the voluntary

10  work program?

11  A    No, I believe they do other stuff as well, but that's one

12  of the jobs.

13  Q    What would that pod porter do?  What would be the scope of

14  their tasks?

15  A    The cleaning, wiping down the tables, counters, sweeping,

16  taking out the trash, mopping the floors.

17  Q    About how long does that usually take?

18  A    Not very long, 15 to 20 minutes.

19  Q    What happens if no detainee volunteers, how does that get

20  done?

21  A    Officers would do it, we would do it.  I have done it.

22  Q    Have you done it on more than one occasion?

23  A    Yeah, I have done it multiple occasions.

24  Q    Is it hard?

25  A    Nope.

1    Q    Do you mind doing it?

2    A    No, I don't mind doing it.  Even during COVID now, we have

3    been cleaning more, you know.

4    Q    When you say "we," who are you talking about?

5    A    Me and the other officers, some of the detainees have kind

6    of refused to clean.  I don't know.  I am not sure why.  So

7    we have a new checklist that we have to fill out and document

8    our times in the cleaning and stuff.  We are cleaning more

9    than we used to due to the pandemic.

10   Q    I think you also talked about painting.  Are there

11   maintenance staff at the facility?

12   A    Yes, there are.

13   Q    Do they do painting?

14   A    Yes, they do.

15   Q    Okay.  Are there detainees who express interest in

16   painting?

17   A    Yeah, they do.

18   Q    I think we also talked about the murals.  If we could pull

19   up Exhibit 474.  Who painted the mural in 474?

20   A    That was a detainee.  I don't know specifically the name.

21   I think they kind of sign or autograph the corner of it.  I

22   don't remember specifically which detainee did it.

23   Q    Have you heard detainees discuss painting the murals?

24   A    Yeah.  Some of the more artistic ones would like to paint

25   new murals.

Johnson - Cross

1    Q    Do you have an opinion about whether they enjoyed doing

2    it?

3    A    I think they enjoyed doing it, otherwise they wouldn't

4    sign up to volunteer or inquire whether they could do it.

5    Q    If they didn't participate in the voluntary work program,

6    what would they do all day?

7    A    They would just stay in their units or go to their

8    appointments.

9    Q    Are there any other activities other than participating in

10   the voluntary work program?

11   A    Yeah, they have recreation, law library.  They have

12   tournaments inside the units like dominos and spades.

13   Q    Tell me about the tournaments, how do those work?

14   A    I think it is over the weekend, like a Friday, Saturday,

15   Sunday thing.  Yeah, they form their own teams.  Some are

16   individual and some are like partners.  They just compete.

17   There is like basketball, spades, dominos, I think there is

18   chess.  Just depends on what the detainees in the unit want

19   to play.  They issue prizes for like first, second and third,

20   I believe.

21   Q    Who gives the prices?

22   A    GEO does.  Comes through the recreation specialist.

23   Q    How often are the tournaments?

24   A    Every weekend.  Every week.

25   Q    What about movies, do you play movies for detainees?

1  A   Yes, everyday.

2  Q   Do detainees participate in the tournaments and watching

3  movies?

4  A   Yeah, the detainees can actually request which movies are

5  played.

6  Q   We wanted to talk to you about the recreation cleaner

7  position.  Can you tell me what they do?

8  A   They, you know, just sweep up, pick up any trash out in

9  the rec yard, clean the bathroom and sink, the toilet and

10  sink and empty the trash.

11  Q   When you talk about the rec yard, what does it look like,

12  what is it?

13  A   There is an outside space and inside space.  The outside

14  space, it has a really tall fence but it is outdoors,

15  completely ourdoors, not covered.  It has a paved basketball

16  court, a paved area that has workout bikes and other kind of

17  equipment you can use.  There is like a soccer field with

18  turf, grass and goals and stuff.

19  Q   Other than the recreation position, what are the other

20  positions in the pod?

21  A   There is food porter, juice porter.  There is a laundry

22  porter.  They have a shower cleaner.  That happens multiple

23  times a day.  They have like the pod cleaner, a day shift

24  one, swing shift.

25  Q   About how long do each of those positions take?

1   A    Usually only -- just depends.  Ten to 20 minutes.  Not

2   very long.

3   Q    Have you ever gone to classification and asked for a new

4   voluntary work program position because you didn't want to

5   clean something?

6   A    Have I personally?  No.

7   Q    Do you know of anyone who has?

8   A    As an officer?  No, yeah.

9   Q    What would happen if there was no voluntary work program?

10  A    We would do more of the work.  GEO would hire more

11  officers or have an outside agency come in and do it.

12  Q    Do detainees, in your experience, are they particular

13  about who touches their things or who is in their bunk area?

14  A    They are.  Some don't like other detainees to be in their

15  bunk area.  They don't like living by other detainees.  Yes,

16  very personal about their space.

17  Q    So do detainees ever clean up after themselves separate

18  from the voluntary work program?

19  A    Yeah, a lot of the time, yeah, they keep their areas

20  clean, they wax their own areas.  They, you know, they take

21  care -- sometimes they take care of like the whole upper

22  tier, depends where they live, it is more than their area,

23  the larger area.

24  Q    Do you know if it was GEO or ICE who created the voluntary

25  work program?

1   A    I believe ICE, through the Performance-Based National

2   Standards, PBNDS.

3   Q    What is your opinion on why the voluntary work program

4   would be in the detention standards?

5         MR. WHITEHEAD:  Objection, well outside the scope of

6   the direct at this point.

7         THE COURT:  Sustained.

8   BY MS. SCHEFFEY:

9   Q    Do you have an opinion on why detainees volunteer for the

10  voluntary work program, even though it only pays a dollar a

11  day?

12  A    Gives them something to do.  Helps pass the time.  They

13  want to do it.

14  Q    Do -- when the voluntary work program positions are being

15  created, is there any focus on efficiency?

16  A    No.

17  Q    When you were a supervisor, did you try to be efficient

18  with your staff?

19  A    Yeah.

20  Q    How do you feel about working --

21  A    Something -- I didn't hear that completely.

22  Q    How do you feel about working with detainees?

23  A    I don't mind it.  I am a people person so I like being

24  around people, talking, hearing their story, working with

25  others.

Johnson - Redirect

1   Q    Do you hand out toiletries in your unit?

2   A    We do, yes.

3   Q    What are they?

4   A    Well, like I spoke earlier, we have the shampoo that is in

5   the showers, the hypoallergenic body wash shampoo.  We also

6   hand out toothpaste, toothbrush, bar soap.  We have razors

7   that you can check out, lotion.  All the basic toiletries.

8   Q    Do you charge detainees for those?

9   A    No, those are provided free of cost.

10          MS. SCHEFFEY:  I have no further questions.

11                      REDIRECT EXAMINATION

12  BY MR. WHITEHEAD:

13  Q    Mr. Johnson, you were asked a question along the lines of

14  what would happen if the detainee workers were removed from

15  the equation.  Do you remember that?

16  A    Yes.

17  Q    You mentioned there might be a need to hire additional

18  people to do the work, correct?

19  A    Yes.

20  Q    And as it stands, you are already working eight to 20

21  hours a week in overtime; is that right?

22  A    Yes.

23  Q    Because there is a need for work and that is with the

24  detainee workers, correct?

25  A    I don't necessarily think it is due to the need in work.

Johnson - Redirect

1   It is hard to get hired for this type of job.  It is not a

2   regular job.  You can't do certain things.  So it is more

3   selective.  Plus, you are subject to a background check and

4   passing.  So that excludes a lot of people.

5   Q   You mentioned that it is your belief the detainee workers

6   need something to do.  That is why they work; is that right?

7   A   I believe I said they wanted something to do.  I don't

8   know that they need something to do.

9   Q   They wanted something to do.  You mentioned a number of

10  recreational options.  I think you said something about

11  playing dominos; is that right?

12  A   Yes.

13  Q   Spades?

14  A   Yes.

15  Q   I think you said something about the option to watch

16  movies?

17  A   Yes.

18  Q   So these are recreational activities on the one hand that

19  someone can choose to do.  On the other hand, we have jobs in

20  the detainee worker program; is that right?

21  A   Yes.

22  Q   So we have movies over here on the left, and then we have

23  cleaning toilets on the right.  Are you with me?

24  A   Yeah, I wasn't sure if that was a question.

25  Q   My question is:  Are you with me?  What I am setting out

1    is the contrast, you have the fun of watching movies on the

2    one hand and you have cleaning toilets and feces-filled

3    underwear in the laundry on the other.  My question is:

4    Isn't it the case that the detainee workers take part in the

5    worker program because they need the money?

6          MS. SCHEFFEY:  Objection, argumentative.

7          THE COURT:  He may answer.

8          THE WITNESS:  I don't know if they need the money.

9    Some people do it to earn money.  Just because you work

10   doesn't mean you don't get to participate in the other items,

11   you know, like dominos or games or watch the movies.  They

12   replay the movies several times, the same movie, so just

13   because you are working doesn't mean you miss out on the fun

14   stuff, as you said.

15   BY MR. WHITEHEAD:

16   Q   GEO is more than happy to use the detainee workers for

17   their labor, correct?

18          MS. SCHEFFEY:  Objection, argumentative.

19          THE COURT:  Sustained.

20   BY MR. WHITEHEAD:

21   Q   GEO uses the detainee workers for their labor, correct?

22   A   For their labor?  I think GEO uses them because it is

23   allowed per the ICE contract and the PBNDS, that's why they

24   use them.

25   Q   So your answer to my question is yes?

1    A    My answer to the question is they use them because it is

2    allowed per the contract.

3    Q    So GEO uses the detainee workers inside the facility to

4    perform various janitorial functions and the other tasks that

5    you testified to earlier, correct?

6    A    Yes.

7             MR. WHITEHEAD:  Thank you, sir.

8             THE WITNESS:  Thank you.

9             THE COURT:  Anything further of this witness?  All

10   right.  Thank you, Mr. Johnson.  You may be excused.

11            THE WITNESS:  Thank you, sir.

12            THE COURT:  Next witness.

13            MR. WHITEHEAD:  At this time, we call Michael Heye.

14            THE COURT:  Tyler, are you finding the witness?

15            THE CLERK:  The witness has not signed in yet.

16            MS. SCHEFFEY:  I just pinged him so he should be on

17   Zoom.

18            THE CLERK:  Your Honor, he is on his way in right

19   now.

20            THE COURT:  Here we are.

21        Mr. Heye, will you raise your right hand and be sworn.

22                     MICHAEL HEYE,

23        having been sworn under oath, testified as follows:

24            THE COURT:  Thank you.  You may inquire.

25

1    DIRECT EXAMINATION

2    BY MR. WHITEHEAD:

3    Q    Good afternoon, Mr. Heye.

4    A    Hello.

5    Q    Who do you currently work for, sir?

6    A    The GEO Group.

7    Q    You are a classification officer at the Northwest

8    Detention Center.  Do I have that right?

9    A    Yes.

10   Q    One of your responsibilities as a classification officer

11   is the detainee worker program, correct?

12   A    Correct.

13   Q    Sir, will you answer my questions today about the

14   important role you play with respect to the detainee worker

15   program?

16   A    Yes.

17   Q    You started as a pod officer.  Do I have that right?

18   A    Yes.

19   Q    You worked in that role from 2004 to 2007?

20   A    No.

21   Q    No?  What were the dates you worked as pod officer?

22   A    All the way until 2 -- well, 2007, yes, and then I moved

23   around to intake, but still considered a pod officer as well.

24   Q    Well, as a pod officer, you had firsthand experience

25   directing and supervising detainee workers; is that right?

Heye - Direct

1    A    I observed detainees in my pod, yes.

2    Q    You trained detainee workers on how to do their job?

3    A    We showed them how to sweep and mop, if that was their

4    assignment that they had, yes.

5    Q    You gave them the necessary supplies they needed to do

6    their jobs?

7    A    Yes, we check out supplies and return them back to the

8    janitor closet because we had to keep track of all the

9    supplies that we would hand out.

10   Q    And it was your expectation that the detainee workers

11   follow their specific work duties, correct?

12   A    Work duties?  The detainees that had certain assignments,

13   they did them, yes.

14   Q    It is not a trick question, sir.  We know they have jobs

15   and they have job descriptions.  My question to you is

16   whether it was your expectation they follow their specific

17   work duties?

18   A    Correct.

19   Q    And if a detainee worker did an incomplete job, you would

20   direct him to finish their work, correct?

21   A    If an assignment was not completed, I would ask them to

22   finish the assignment, yes.

23   Q    This was as a pod officer, what we just talked about,

24   correct?

25   A    As a pod officer, yes.

1    Q    At some point, we know you became a classification

2    officer.  When was that?

3    A    Roughly December 2009, I think it was.

4    Q    You have been a classification officer ever since; is that

5    right?

6    A    Yes.

7    Q    Until recently, you were one of two classification

8    officers at the Northwest Detention Center, correct?

9    A    Yes.

10   Q    The other being Alisha Singleton?

11   A    Yes.

12   Q    Now, you and Ms. Singleton, you were co-equals within the

13   classification department; is that right?

14   A    Yes.

15   Q    You carried out the same functions?

16   A    Yes.

17   Q    Part of your responsibilities as a classification officer,

18   that was the worker program; is that right?

19   A    Yes, worker program.

20   Q    Now, at some point you conducted an analysis of how long

21   it takes, on average, to complete various detainee worker

22   program assignments; is that right?

23   A    Yes.

24   Q    That was in 2017?

25   A    Yes.

1    Q    Someone in administration asked you to complete this

2    analysis; is that right?

3    A    Correct.

4    Q    Perhaps Ryan Kimble, does that sound right?

5    A    I believe so.

6    Q    You looked at how many assignments were available in the

7    worker program facility-wide; is that right?

8    A    Yes.

9    Q    And how long it took to complete the various shifts,

10   correct?

11   A    It was an approximation, yes.

12   Q    You recorded your findings down on a spreadsheet; is that

13   right?

14   A    I did.

15   Q    The information you recorded was information you collected

16   from people with knowledge about the detainee worker shifts?

17   A    Yes.

18   Q    And your goal in creating the spreadsheet was to be

19   accurate?

20   A    As close as I could, yes.

21   Q    The spreadsheet was made in the normal course of business,

22   correct?

23   A    Yes.

24   Q    It was kept in the normal course of business?

25   A    Yes.

1    Q    Sir, I would like to show you Exhibit 20.  I am hoping it

2    is one my office mailed to you.  Do you have a packet of

3    documents in front of you right now?

4    A    I don't have a packet that has my name on it.

5              MR. WHITEHEAD:  Ms. Scheffey, Ms. Mell, are you able

6    to help Mr. Heye access the Box folder in Exhibit 20?  Thank

7    you.

8              THE COURT:  Is anyone getting the witness the

9    exhibits?

10             MS. SCHEFFEY:  I believe Ms. Mell is working on it.

11        It seems, Jamal, we have two for Mr. Tracy, and I am going

12   to open one of these and see if one is Mr. Heye's.

13             MR. WHITEHEAD:  Exhibit 20, just the one pager.

14             MS. SCHEFFEY:  I don't see it in here.  I am going to

15   have someone print it and give it to him right now.

16   BY MR. WHITEHEAD:

17   Q    You have been handed Exhibit 20.  Please take a look at

18   the document.  My question to you is this:  Is this the

19   spreadsheet you testified to moments ago about your analysis

20   of the detainee worker average hours?

21   A    Yes.

22             MR. WHITEHEAD:  Your Honor, we offer Exhibit 20 into

23   evidence.

24             MS. SCHEFFEY:  No objection.

25             THE COURT:  20 may be admitted.

1              (Exhibit 20 was admitted.)

2              MR. WHITEHEAD:  Permission to publish, Your Honor.

3              THE COURT:  Yes.

4    BY MR. WHITEHEAD:

5    Q   Feel free to look at the hard copy version in front of you

6    on Exhibit 20.  You can also follow along on your screen.  I

7    have some questions for you about Exhibit 20.  I would like

8    to look at the first column heading there at the top left

9    that says "pod," and then underneath that we have a bunch of

10   alphanumeric references.  The heading "pod," those refer to

11   the living pods within the Northwest Detention Center,

12   correct?

13   A   Yes.

14   Q   In the middle of the page, perhaps we could get a

15   highlight, it says "outside detail"?

16   A   Yes.

17   Q   To the left we have a number of notations there.  "Kit

18   BK," is that kitchen breakfast?

19   A   Yes.

20   Q   "Kit" L, that is kitchen lunch, correct?

21   A   Yes.

22   Q   "Kit D," that is kitchen dinner?

23   A   Yes.

24   Q   Looks like the rest of the names perhaps are

25   self-explanatory, medical, Grey Mile, barber.  "OSR," what is

1   that?

2   A   Outside rec.

3   Q   What we see in the first column with the pods and

4   continuing on with the left column on the outside detail,

5   these are all different work locations or jobs within the

6   Northwest Detention Center for the detainee workers, do I

7   have that right?

8   A   Yes, back then when I did it, these were the different

9   assignments in each unit or how many there were in each unit

10  or in each outside detail.

11  Q   I think maybe you are talking about the second column

12  there, the column that says "worker."  Do you see that?

13  A   Yes.

14  Q   That is the total workers that could be scheduled at a

15  time into any given job; is that right?

16  A   Yes.

17  Q   All right.  Then we see a third column there that says

18  "hours."  Do you see that?

19  A   I do.

20  Q   So looking at the pods, we see an estimate of .5, that is

21  30 minutes for the pod work; is that correct?

22  A   Yeah, that was an average of what it would take for each

23  individual assignment.  Some are a lot less than that.  It

24  would be for some of the assignments, some of them would take

25  maybe up to half hour.

1    Q    Right, that's because the pod jobs, they range.  We have

2    heard testimony about the various roles within the pods, but

3    your analysis, based on your investigation, was that these

4    job averaged about a half hour, correct?

5    A    Roughly.  I gave it a little more.  I just averaged it out

6    to about a half hour.

7    Q    Okay.  Maybe a little bit more.

8    A    A lot less.

9    Q    Okay.  We see the "outside detail."  So for kitchen

10   breakfast, for example, you have an estimate, based on your

11   analysis and investigation, that it was 4.5 hours for the

12   kitchen breakfast shift.  Did I read that correctly?

13   A    Yeah.

14   Q    Your investigation and analysis led you to believe it was

15   six hours for lunch, correct?

16   A    Yeah, only four.  It is not six.  Dinner is only four

17   also.  Each of the kitchens is max four hours.

18   Q    Okay.

19   A    I would have to revise what I have done.

20   Q    Well, just taking a sort of big picture with this document

21   here, Exhibit 20, you didn't just make these numbers up, did

22   you?

23   A    No, I talked to the kitchen.  Six hours was overdoing it.

24   It was more like four.  Rough estimate that they wanted.

25   They just wanted something to get a visual about how many

1    hours or how much time people would be doing an assignment in

2    a specific area.

3    Q    So my point, though, you didn't make these numbers up.

4    For the kitchen, for example, you called to the kitchen and

5    spoke with someone that would be knowledgeable about kitchen

6    work; is that right?

7    A    I believe I did.  Some of this stuff I did on my own

8    because I was pod officer.  I know kitchen lunch isn't six

9    hours.  I don't know why I had six.  I know it is only four.

10   Q    Your goal in creating Exhibit 20, it was to be as accurate

11   as possible; is that right?

12   A    To give them a rough estimate, yes.  Wasn't specifically

13   for accuracy.  It was a general assumption of what it would

14   be.  They said throw something together for me, so I threw

15   something together for them.

16   Q    "They" being Ryan Kimble?

17   A    Ryan asked me to throw something together for him.

18   Q    Let's take a look at the bottom of Exhibit 20.  You have

19   average hours.  Perhaps we can get a call out on that?

20   A    Okay.

21   Q    At the end of your investigation and analysis, you

22   concluded it was 1.72 hours was the average detainee worker

23   shift; I understand this is facility-wide, but that was your

24   conclusion, correct?

25   A    According to the numbers, how it came out, yes.

1    Q    We can clear the call out.  I hope everyone can see the

2    1.7.  Got a little blocked on my screen.

3         I asked you about this document during your deposition.

4    I asked you a question about whether your analysis was

5    accurate at the time you created the document.  Do you

6    remember that question?

7    A    The deposition two years ago?

8    Q    Yes, it was awhile ago.

9    A    Yeah.  No.  What was my answer?

10   Q    Your answer was that you had no reason to dispute the

11   accuracy of any of the data as of the time it was recorded

12   back in 2017.  Does it sound like your response?

13   A    Sounds like me, yeah.

14   Q    Thank you, sir.

15        MR. WHITEHEAD:  No further questions.

16                      CROSS-EXAMINATION

17   BY MS. SCHEFFEY:

18   Q    Mr. Heye, can you hear me?

19   A    Yes.

20   Q    Perfect.  Okay, I want to back up and talk about what is a

21   classification officer?

22   A    Classification, when detainees come into our facility, I

23   get their -- a packet from ICE that has their criminal

24   history on it and their immigration history and we go through

25   and read that and then put it on a classification form.  I

1  fill that out.  It gives me a number down at the bottom that

2  we can separate them according to levels, and there is four

3  different levels.  There is a blue, green, orange and red.

4  Also, we go by gang affiliation as well.  That way, depending

5  on what level they are is depending -- and if there is gang

6  affiliation, depends on what housing unit they will go into.

7  Also, any detainees, if they are a red detainee, high level

8  detainees are only allowed to have an assignment inside the

9  pod.  They are not allowed to have an assignment outside the

10 unit.

11 Q   That was a lot.  I am going to break it down if that's

12 okay because maybe the jury and I don't know as much as you

13 do.  There is four levels, what are the four levels?

14 A   Blue level is low level.  Green is low to like a moderate.

15 Orange is moderate to high.  Red level is a high level.  High

16 level detainees have a criminal history, like they have been

17 in prison for quite a while for various reasons.  The low

18 level detainee like a blue will have no criminal history or

19 maybe one DUI, then the orange are in between, the greens are

20 somewhat lower than that.

21 Q   Who gives you the direction of how to classify these

22 people?

23       MR. WHITEHEAD:  Your Honor, objection.  I limited

24 Mr. Heye's examination to his work in the voluntary work

25 program, not as relates to classifications.  All of this is

1    outside the scope of direct, and I would ask counsel to save

2    this part for GEO's case.

3          MS. SCHEFFEY:  Your Honor, I would say he testified

4    that he was a classification officer.  I am getting a sense

5    of his job, what portion is which.

6          THE COURT:  I think this is within the scope, and the

7    objection is overruled.

8    BY MS. SCHEFFEY:

9    Q    Do you remember the question, Mr. Heye?

10   A    Say that again.

11   Q    Do you remember the question that was pending?

12   A    No, go ahead.  Say the question again.

13   Q    I was asking you who gives you the direction about who to

14   place in low classification versus high classification?

15   A    The PBNDS lays out which is low, moderate and high,

16   depending on the criminal history.  We have a scale on high

17   level offenses to moderate offenses to low level offenses.

18   Q    So remind me again, who writes the PBNDS?

19   A    ICE is the PBNDS that we go by.

20   Q    So what percentage of your job is classification?

21   A    I would say roughly half of it is classification and the

22   other half is the worker program.

23   Q    Does the classification side have anything to do with your

24   worker program job?

25   A    Yes.  If the detainee cannot be classified because we

1    don't have enough information from ICE, then they can't join

2    the worker program until that has been completed.  If the

3    detainee is a red, they can only work in the unit, they

4    cannot work outside the unit.  We also, for security reasons,

5    they cannot mix males and females so certain assignments are

6    designated for males only and others for females for security

7    reasons.

8    Q    So when you say they can't mix males and females, are you

9    talking about just in the voluntary work program or is that

10   broader than that?

11   A    No, the whole facility.  If any males are out on the floor

12   going from one unit to another -- not one unit, from one

13   place to another, no females can be out on the floor and

14   vice versa.  We only have male units and strictly female

15   units.  There is no mixes.

16   Q    When you say "on the floor," are you talking about the

17   hallway we saw a picture of earlier?

18   A    The Grey Mile.  We call it the Grey Mile.  Anybody out on

19   the Grey Mile.  Also in medical or any visitation or intake,

20   they cannot mix at all ever.  When they book in, they are

21   booked in separately and they are placed in different cells

22   as well as different units.

23   Q    Would it be likely that a female detainee would observe

24   male detainees in the voluntary work program?

25   A    No.  Well, the only time anybody would see each other is

1    in intake, pretty much.  They are in different cells, but at

2    times you can see a female walking out of intake while males

3    are in cells or vice versa.

4    Q    Would they see each other in the hallways?

5    A    No, they would not see each other in the hallways.  They

6    are not supposed to see each other in the hallways because

7    they are all separated each time.  From when I have been a

8    pod officer and been on the floor, they have not been able to

9    see each other.

10   Q    So let's talk about the voluntary work program.  What is

11   your responsibility when it comes to that?

12   A    Mine is to take kites in from detainees that ask for an

13   assignment to do something so that they are not idle.  The

14   whole point of the worker program is to allow detainees to

15   have something to do while they are there and not be idle.

16   That's part of the worker program in the PBNDS so they don't

17   get stir crazy inside, they have something to do and they are

18   not bored.  I have detainees when I do my rounds delivering

19   paperwork and stuff, they come up to me and ask me for

20   multiple jobs.  They say that you don't even have to pay me,

21   I just want to do something.  I have -- I tell them you can

22   only have one assignment.  It is policy per the PBNDS.  If

23   they have more than one assignment, then other detainees,

24   because you only have so many allowed, somebody else would

25   then not be able to volunteer at the time.  They have to be

1    on a waiting list and wait for an assignment that comes up.

2    Q    You said another word in there, "kite."  What is a kite?

3    A    Electronic kite or paper kite.  Those are how they

4    communicate to us.  There is -- inside the units there is

5    tablets that they can ask or request for assignments.  They

6    can request for classification reassignment.  They can ask

7    anything.  They can kite ICE.  They can kite medical.  They

8    can request anything.  That's what the kite system is for is

9    for them to request different things.

10   Q    Can you respond to a kite?

11   A    Yes, we respond to a kite.  We can tell them we either

12   need more information or I can say if they are requesting to

13   work in the kitchen, they have to be cleared by medical

14   first.  I would respond back to them that I have received

15   your kite, processing it through medical.  Will give a

16   response within a week.  Sometimes it takes a week for

17   medical to clear them, sometimes it takes a couple weeks,

18   depending on how long they have been in the system.

19   Q    So when you receive a kite, what do you do with it?

20   A    I receive the kite, if they are like in Alpha 1 unit, they

21   are saying that I want to work in my unit that I am in, I can

22   look at a roster that I have in there and see if there is any

23   available positions and/or the pod officer, they will go up

24   to the pod officer and say, hey, how do I apply for the

25   worker program or how do I work in the unit or in the

1  kitchen?  The pod officer can let them know if there is an

2  assignment right away and they can get them started right

3  away, or if the unit is full and they can be put on a waiting

4  list that I have in my -- on my computer, and then on

5  Tuesdays and Fridays, I hand out new rosters to all the units

6  so that the officer in there knows which detainee is doing

7  which assignment.

8  Q   When you get a kite, do you ask for a resume to know what

9  the person's skills are?

10 A   No.  Anyone can have an assignment.

11 Q   Do you place detainees in positions based on their skills?

12 A   No.  They can request any assignment.

13 Q   Do you ask for references?

14 A   I do not.

15 Q   Is it your responsibility to figure out how to put all of

16 these detainees in positions they want while also considering

17 the classification issues that you talked about?

18 A   Yes, I run both things at the same time.  I'll answer

19 classification kites and worker program kites at the same

20 time.  The detainees do not have to have any kind of

21 experience whatsoever.  The officers in the pods can show

22 them, as well as the kitchen has their own training.  Any of

23 the jobs -- pretty much most of the jobs that are in there

24 are sweeping, mopping, and there is like a shower job in

25 there.  There is trash, or serving trays in the pod.  There

1    is nothing in there or any of the assignments that we have

2    that is, how do I put it, difficult or can't be trained right

3    there on the spot to do.

4    Q    Do you help come up with the scope of the tasks that are

5    in the voluntary work program?

6    A    No.  Those were already preset when I started the worker

7    program.

8    Q    Okay.  Do you have any control over how many detainees

9    volunteer any given day?

10   A    I do not.

11   Q    Okay.  Is the voluntary work program designed to be

12   efficient?

13   A    Yes, I have created it that way.

14   Q    Tell me about that?

15   A    All the pod paperwork and stuff was done by hand.  The

16   officers would write the detainee's name, the numbers down

17   and have them sign after they completed their task.  I have

18   put everything on a spreadsheet now and made it to where I

19   can hand out paperwork with the detainee's name and A number

20   prefilled out on the forms.  That way, when I get them back I

21   can see what is printed on there instead of handwriting from

22   each officer or detainee.  Makes it easier to read and helps

23   me keep track of who is where and who is doing what, and also

24   if they have switched units, because detainees will move to a

25   different unit if they request and that helps me know which

1  unit they have gone to.

2  Q   Have you ever been told to create more positions to save

3  GEO money?

4          MR. WHITEHEAD:  Objection, leading.

5          THE COURT:  Sustained.

6  BY MS. SCHEFFEY:

7  Q   Have you ever received any instructions about creating

8  more positions?

9          MR. WHITEHEAD:  Same objection.

10         THE WITNESS:  No.

11         THE COURT:  Well, the answer may stand.

12 BY MS. SCHEFFEY:

13 Q   How did you determine how many positions should be in the

14 voluntary work program?

15 A   That was already set up before I was in there.

16 Q   How long do most tasks take to complete?

17 A   In the units, it is anywhere from ten minutes, maybe 15

18 minutes.  Some of them take up to half an hour.

19 Q   Before you were in classification, how long were you a pod

20 officer?

21 A   I was pod officer for five -- it is rough.  I was a pod

22 officer, intake, back to pod officer again.  It switched back

23 and forth.  For the first -- from 2004 when I started until

24 2009 when I became a classification officer, I was designated

25 as pod officer, even though I would work at intake on

1  occasion or work in control or if they threw me in laundry to

2  help out there, if the officer was on vacation.  I moved

3  around a lot.

4  Q    Sounds like you have a lot to do.  When you were in

5  intake, did you give the orientation to detainees?

6  A    Yes, I did.

7  Q    Did you instruct detainees on anything about the voluntary

8  work program?

9  A    Yes.  Any time the detainee would arrive in the facility,

10 part of their orientation is to let them know there is a

11 voluntary work program.  We tell them it is strictly

12 voluntary.  You get paid one dollar a day and you don't have

13 to volunteer if you don't want to.

14 Q    How many times have you given that orientation?

15 A    A lot.  When I was in intake, we do it all the time.

16 Pretty much every single day.

17 Q    Do all detainees receive that orientation?

18 A    Yes.

19 Q    Do they also receive any of that information in writing?

20 A    Yes.

21 Q    When you were a pod officer, did you have to clean up the

22 unit where you worked?

23 A    Yes, I did.

24 Q    How often?

25 A    Depending.  Not every day.  But at least a couple times a

1    week when I was in there.

2    Q   Was there anyone else who was helping clean up the unit

3    who wasn't a voluntary worker who was assigned to one of

4    those pod positions?

5    A   I will have detainees that just wanted to do something.

6    You can tell them, yeah, you can sweep and mop if you like.

7    I am sweeping and mopping right now.  Detainees would come up

8    to me and ask for something to do, just to pass the time.  I

9    would have painting would be part of like a detail that is

10   not actually in the worker program per se in the pod.  It is

11   one of those extra details that is not a full-time job,

12   painting or waxing or buffing the floors.  A group of

13   detainees would get together and say, hey, we all want to wax

14   the floor or we all want to buff the floor tonight.  I can

15   tell them, yeah, I can get all the stuff for you and we can

16   set that up for the nighttime shift.

17   Q   So when you are supervising the detainees who are

18   participating in the program, what is that like?

19   A   Well, I don't directly supervise.  When you are in the

20   pod, you are supervising everybody.  You take rounds, meaning

21   you walk around, talk with detainees.  You will always have a

22   detainee either sweeping the floor, mopping, or working in

23   the shower, or they clean their own housing section where

24   they sleep on their own.  They will ask for spray bottles or

25   a mop bucket, and then you will go and check it out of the

1   janitor closet and go give it to them.  They will clean and

2   take care of their own area.  All you are doing is just

3   walking around and monitoring the unit.  You are not actually

4   supervising them in what they are doing like being next to

5   them and making sure that everything is done the way it

6   should be.  Just -- you just let them go and do what they

7   normally do.

8   Q   What happens if they don't do a good job?

9   A   If we have a specific job like sweeping the floor after a

10  meal, then if the -- if they say -- they come up -- if they

11  come up and say they are done and they want to sign their

12  name on the paper, you can look around, see the floor, see if

13  it has been swept correctly -- not correctly.  If it has been

14  swept.  You can tell if the floor has been swept.  If it

15  hasn't I'll go, hey, you actually didn't sweep the floor.

16  Can you please sweep the floor?  Either they will say okay,

17  they will sweep the floor, or they say, nah, I am not

18  interested.  If they are not interested, you can say, here is

19  a refusal form you can sign saying you didn't want to do the

20  assignment you signed up for.  They can sign it or they can

21  do the assignment.  If they sign the refusal form, then that

22  gets sent in to the worker program and they can assign --

23  they can ask if there is any detainees that are on a waiting

24  list that want the assignment or the pod officer can go, does

25  anybody want to take this assignment on?  They can have

1    volunteers come up and say, yeah, I'll do it.  Or if nobody

2    does it, then later on the pod officer will sweep the floor.

3    Q    Okay.

4            THE COURT:  Excuse me, Ms. Scheffey.  It is time we

5    took our afternoon break.  We will reconvene in about ten

6    minutes.

7                        (Recessed.)

8            THE COURT:  Everybody here ready to go?

9            THE CLERK:  The jurors are ready.

10            THE COURT:  Okay, bring them in.

11        (The following occurred in the presence of the jury.)

12            THE COURT:  Okay.  We are all here and ready.  We

13    will continue.

14    BY MS. SCHEFFEY:

15    Q    All right, Mr. Heye, when we took our break, we were

16    talking about refusal to work forms.  Do you remember that?

17    A    Yes.

18    Q    If a detainee signs a refusal to work form, is there

19    anything that stops them from signing up again at the end of

20    the week?

21    A    No.

22    Q    Have you ever had a job where you could quit on Monday and

23    come back on Friday?

24    A    Me?  No.

25    Q    Have you ever had a job where someone else would do your

1    job for you if you just walked out?

2    A    Yeah, no.

3    Q    Okay.  You also talked about how if someone decides they

4    want to sign a refusal to work form, the officer may ask if

5    anyone else in the pod wants to perform that task; is that

6    right?

7    A    Correct.

8    Q    Have the detainees who that officer is asking if they want

9    to participate seen what the volunteering would entail?

10   A    Yes.  Working in the pod, everybody sees what you are

11   doing in there, all the detainees.  The officer can sit at

12   his desk and see the detainees working.  Any detainee that is

13   in the pod knows what the detainees are doing.  A lot of

14   times when the detainee is booking out or leaving, another

15   detainee will say, hey, I want his position when he leaves,

16   so they can -- what they will do is the pod officer can write

17   his name down so when he leaves, the officer can go to the

18   detainee and say, okay, you can volunteer for that position

19   now.

20   Q    Detainees, before they volunteer, have a good sense of

21   what the jobs are; is that right?

22   A    Yes.

23   Q    I wanted to pull up Exhibit 20 if we could, which I think

24   you looked at.  Can you see that?

25   A    Yes.

1    Q    Okay.  So in the "hours" column, what does that represent?

2    A    That is just an average of what it would take inside of a

3    unit or outside a unit, approximately how long it would be

4    for the job, or the assignment, the job.

5    Q    Okay.  When you are talking about how long it would take,

6    you are talking about how long a detainee would perform their

7    voluntary work program assignment?

8    A    Yes and no.  Some of the pod ones are, yes.  The outside,

9    like kitchen or medical, the hours are there because of

10   movement and detainees that are in the kitchen.  They have a

11   specific movement to go to the kitchen.  Once they are there,

12   they can do their assignment.  During count, they are not

13   doing their assignment for half hour or so.  They are just

14   sitting there waiting while we are doing count.  Other times,

15   they have to wait after the assignment has been done before

16   we can get another movement for them to get back to their

17   unit.  Like I said, the hours on there is approximate.  It is

18   not even -- it is approximate.  So if you say the breakfast

19   was 4.5 hours, I would roughly guesstimate to say two and a

20   half, maybe three they are actually working.  The rest is in

21   between movement and count times and other things that

22   happen.

23   Q    Okay.  Does the 4.5 hour number in kitchen breakfast

24   include a break time?

25   A    Yes.

1    Q    Does it include count time?

2    A    Yes.

3    Q    So is all of that productive time?

4    A    No.

5    Q    What about in laundry, is that four hours that you

6    estimated all productive time?

7    A    No.

8    Q    What else is included in there?

9    A    So when they go pick up laundry, bring it back, throw it

10   in the washing machines, they have to wait for it to finish

11   washing so you just are waiting for the washing machine to

12   finish, take it out, throw it in the laundry -- or the dryer,

13   wait for dryer to finish, pull the laundry out, fold,

14   stack, however that works.  It is not strictly working the

15   whole four hours.  There is a lot of down time in between

16   there as well.

17   Q    Do laundry workers have a break for lunch or dinner or

18   anything?

19   A    Yes, if they are working during the daytime, they go back

20   to their unit for lunchtime and come back into laundry after

21   lunch is over with and finish up.

22   Q    I see a notation of medical.  I don't think I heard yet

23   what you do in medical if you volunteer for that position.

24   A    Medical wanted some female detainees to sweep and mop the

25   floor in there.  During the time the females go to medical is

1    like in between count time.  They had females go to medical

2    that wanted to participate in the worker program to sweep and

3    mop medical or empty the trash cans that were in there.

4    Q    About how long does that take?

5    A    Yeah, that didn't take very long.  Had on there maybe half

6    hour, maybe less than that, just to sweep and mop the floor

7    and empty the trash bag.  The problem is you have to wait

8    through count and you have to wait -- get there before and

9    wait through count.  If they finish, they sat on a bench and

10   waited until count was over and go back to the unit after

11   that.

12   Q    Can you remind me, what is count?

13   A    Count.  Okay.  The facility does five counts during the

14   daytime, or during the 24-hour period.  So all movement

15   stops, all detainee workers stop and they count the whole

16   facility.  They do that five times a day, or five times

17   within a 24-hour period so we can keep track of all the

18   detainees, and we haven't -- nobody has left, escaped,

19   however you want to say it.  This is how we keep control of

20   where the detainees are and also to keep everything --

21   everybody safe and to know where everyone is at.

22   Q    In the "worker" column here, if you can still see it, is

23   that column intended to represent the fewest number of

24   detainees, the most number of detainees, or something else

25   that could participate in the program?

1    A    Okay.  So each unit has a maximum that has been set up.

2    Like in Alpha 1, it says 19.  You can have up to 19 in that

3    unit.  So Alpha 2, alpha 3 are up to 16.  The kitchen can

4    have up to 35.  When our facility was full, we had roughly up

5    to 35 at that time.

6    Q    So are you trying to maximize the number of opportunities

7    when you draft this?

8    A    So when we did this, they are given as many opportunities

9    for somebody to have something to do during their time here.

10   So they have created, I guess it was ICE, wanted to make sure

11   they would have a lot of positions so that they can give

12   everybody an opportunity to do something if they wanted to.

13   Q    For A-1, the 19 positions, could a pod officer complete

14   all of them during their shift?

15   A    Yes.

16   Q    Would that interfere with their other duties?

17   A    No, because they are walking around.  Like when I was a

18   pod officer, I could sweep and mop the floors, and you can

19   still watch what was going on in the facility in your unit

20   because you walk around and you talk with detainees when you

21   are in there.  When I was in my units, I would always walk

22   around and talk and see what was going on to get a feel for

23   my unit each day.  And if they were playing cards or dominos,

24   I would go say hi and see how things are going.  They have

25   also seen me sweep and mop the floor as well.  When I have

1    done that, sometimes a detainee would come up and say, hey,

2    let me give you a hand there as well.

3    Q    I also see on here something that says "intake."   What is

4    that position?

5    A    Intake is the same.   Sweep and mop and trash and clean the

6    windows?

7    Q    It says that takes one hour to complete; is that accurate?

8    A    If all the cells needed to be cleaned, maybe.   Typically,

9    we have detainees in certain cells so when they come down

10   they can only clean cells that are empty at the time.   They

11   can have up to seven.   Typically, we would have three or four

12   that came down and would work in intake and then go back.

13   The hour is because we have movements, certain times are

14   movement, and certain levels can move at certain times.   I

15   give an hour as an estimate just to do what it would take

16   inside intake and be able to get back and forth.

17   Q    As the person in charge of the voluntary work program, do

18   you ever get feedback from detainees about the program?

19   A    Yes, I do.

20   Q    What is the feedback you have received?

21   A    When they go to units, I deliver paperwork.   Detainees

22   will come up to me and ask me if they can work in the

23   kitchen, what requirements there are to work in the kitchen.

24   They will come up and say, hey, I work in the pod, but I also

25   want to work in the kitchen, I want to work the Grey Mile.   I

1   want to keep myself busy while I am here.  I have to tell

2   them, well, PBNDS says you can only have one assignment per

3   day.  If they have multiple assignments, then other detainees

4   will not be able to volunteer for that if they are taking

5   multiple assignments.  Per the PBNDS, they are only allowed

6   to have one.  I can understand that so the opportunity for

7   everybody to volunteer is available for them.

8   Q   Do you think detainees would miss the voluntary work

9   program if it was eliminated?

10  A   Yes, I do.

11  Q   When you created that Exhibit 20, were you thinking about

12  what you would do if you hired employees from the street?

13  A   No, I was not.  That was strictly based on detainees and

14  how they work.  When I was in the pod, detainees would -- you

15  know, you are working.  Some of them will try and go really

16  fast just to get it done.  Others will just sit there and,

17  you know, doot-doot-doot, sweep the floor, mop the floor,

18  they'll talk to their friends as they are going around, watch

19  TV for a minute and then go back.  It is not that you're on

20  them and hounding them and trying to get them to get the

21  stuff done right away.  I let them -- you know, the floor

22  needs to be swept, go ahead and take care of it whenever you

23  feel like it.  It wasn't like it is at this specific time at

24  this specific moment that you have to do it.  We have count

25  in between, we have IMSs where things have to stop and things

1   can get taken care of later on.

2   Q   I have one more question, IMSs, what is that?

3   A   If there is a fight in the unit or if somebody has a

4   medical problem and they have to stop all movement so they

5   can get medical to the unit or they can -- they stop movement

6   or if there is a fight where then the officers on the floor

7   can all get to that unit.  We can't have detainees on the

8   floor at that time so they all get -- they clear the floor,

9   how is that, so that the officers have control.

10  Q   Is medical a GEO function?

11  A   No, that is totally separate.  That is PHS.

12  Q   What is PHS, who runs that?

13  A   Public health service.  As far as I know, medical runs

14  themselves.

15  Q   Are they a branch of ICE?

16  A   I don't think so, no.

17  Q   All right.

18          MS. SCHEFFEY:  I have no further questions.

19          THE COURT:  Anything further?

20      All right, Mr. Heye, you may be excused.  Thank you very

21  much.

22          THE WITNESS:  Thank you.

23          THE COURT:  You may call your next witness.

24          MR. WHITEHEAD:  Your Honor, plaintiffs call

25  Bruce Scott.

```
 1          THE COURT:  Mr. Scott, if you will raise your right
 2   hand and be sworn.
 3                        BRUCE SCOTT,
 4      having been sworn under oath, testified as follows:
 5          THE COURT:  You may inquire, counsel.
 6          MR. WHITEHEAD:  Thank you, Your Honor.
 7                      DIRECT EXAMINATION
 8   BY MR. WHITEHEAD:
 9   Q   Hello, Mr. Scott.  You currently work for GEO, correct?
10   A   Correct.
11   Q   We met over a year and a half ago, I think it was at this
12   point.  I asked you a number of questions about the detainee
13   worker program.  Do you remember that?
14   A   It has been awhile.
15   Q   Well, that deposition was a special deposition because you
16   were testifying on behalf of GEO, not just yourself.  I
17   explained it to you like this and you agreed about your role.
18   Can we get clip 21, please.  This is from the Scott 30(b)(6)
19   deposition, Page 8, Line 15 through 21.
20          MS. SCHEFFEY:  Is this a designated portion?
21          MR. WHITEHEAD:  Yes.
22      (Video Clip 21 as follows:)
23      "Question:  The deposition today is different than the
24   deposition that you gave yesterday in that you have been
25   designated by the GEO Group to testify on the company's
```

1  behalf about information known or reasonably known to GEO on

2  certain subjects.  Is that your understanding of why you are

3  here today?

4      "Answer:  Yes."

5      (Video Clip 21 ended.)

6  BY MR. WHITEHEAD:

7  Q   At the time of your deposition, you were the assistant

8  facility administrator, do I have that right?

9  A   I do believe -- I can't remember.  It was a year and a

10  half ago.  Year and a half ago, I was the assistant facility

11  administrator.

12  Q   Since then, you have been promoted to the facility

13  administrator, correct?

14  A   That is correct; February of this past year, I was

15  promoted to the facility administrator.

16  Q   The facility administrator, that is the chief

17  administrator for the facility, correct?

18  A   Wouldn't quite say it that way.  The facility

19  administrator for GEO.  We do have an officer in charge who

20  is the ICE person that is fully on over the contract and

21  everything else, running the operation of the facility and

22  the detainees.

23  Q   That's a good distinction to observe.  Put another way,

24  you are the top boss for GEO's Northwest Detention Center,

25  correct?

1   A    Well, I have a number of supervisors above me.  I am the

2   facility administrator of the Northwest ICE Processing

3   Center.

4   Q    I think this is a straightforward question.  At the

5   Northwest Detention Center, are you the top GEO officer?

6   A    I am the top GEO employee at the Northwest ICE Processing

7   Center.

8   Q    All right.  Well, sir, that makes you an important witness

9   in this case.  Will you answer my questions about the

10  detainee worker program?

11  A    I will.

12  Q    Before we get underway, can I ask, have you heard any

13  parts of the trial so far?

14  A    I have.

15  Q    In fact, you have been designated as a corporate

16  representative for GEO; is that right?

17  A    That is correct.

18  Q    That means that you have listened to everyone testify so

19  far.  Do I have that right?

20  A    Yes.

21  Q    Well, let's start at the beginning.  GEO entered into a

22  large contract with ICE to house immigration detainees at the

23  Northwest Detention Center.  Do I have that right?

24  A    We did.  ICE put out a request for a proposal for a

25  contract, and they asked for a number of services to be

1    completed.  GEO was one of many companies that put in a bid

2    for that.  GEO won the bid to be able to perform the services

3    for the United States Government.

4    Q    That's right.  Nobody forced GEO to get into business with

5    the United States Government, correct?

6            MS. SCHEFFEY:  Objection, argumentative.

7            THE COURT:  Overruled.

8            THE WITNESS:  Well, I don't know about that.  I

9    joined GEO in 2010.  The contract was in operation well

10   before my time.

11   BY MR. WHITEHEAD:

12   Q    That bid that GEO submitted, that was a voluntary act on

13   GEO's part, correct?

14   A    Well, I am not part of the contracting portion of GEO so I

15   wouldn't be able to speak to that.

16   Q    You are familiar with the contract, though, correct?

17   A    I am very familiar with the contract.

18   Q    It is part of your job to be familiar with that contract?

19   A    Yes.

20   Q    It is a document that you review regularly, correct?

21   A    Almost daily.

22   Q    One of your go-to documents?

23   A    Absolutely.

24   Q    As with any contract, it includes the parties' promises to

25   each other, would you agree?

1    A    That's what a contract is.

2    Q    That's right.  That's what a contract is at the end of the

3    day, a promise from one party to the other and vice versa, do

4    you agree?

5    A    That is a good way of putting it.

6    Q    So in the ICE contract, GEO's basic promise was to provide

7    detention management services to ICE.  Would you agree with

8    that?

9    A    That is one of the many things in the contract.  Detention

10    management services is a big part.

11    Q    And in terms of the detention management services, how

12    long was the contract to run?  From when to when?

13    A    Oh, it was a large contract.  Do we have it in front of

14    us?  There are many pages and amendments to the contract.  If

15    we have it, we can definitely flip through the pages and take

16    a look at that.

17    Q    It is a large contract.  Let me ask you this:  This figure

18    you see on your screen, what is that number?

19          MS. SCHEFFEY:  Objection.  This isn't an exhibit.  I

20    don't know -- no foundation for this.

21          MR. WHITEHEAD:  This is a demonstrative.  If we were

22    in your courtroom, I could write this number on a white

23    board.

24          THE COURT:  He may answer.

25

1  BY MR. WHITEHEAD:

2  Q   My question is:  What is this number you see on your

3  screen?

4  A   Very large number.  That is what I see.

5  Q   Does this number mean anything at all to you?

6  A   I mean, if you are showing it to me, I am going to assume

7  that you have it somewhere in one of the contract pages which

8  I would really like to just get to the contract pages and

9  take a look at them.  We can clear it up a lot quicker than

10  showing a number on a screen.

11  Q   Well, sir, this is the maximum amount ICE has agreed to

12  pay GEO over the life of the contract at the Northwest

13  Detention Center; isn't that right?

14  A   Well, again, sir, as you said, the contract goes both

15  ways.  If we look at the many pages of the multiple parts and

16  amendments and task orders and modifications to a contract,

17  it changes over time.  I would not be able to sit here and

18  tell you definitively, without looking at all of the

19  documentation throughout the years and to determine a number.

20  Every time a modification happens, there is a modification,

21  so the overall end part of that contract changes.

22  Q   You are the facility administrator for the Northwest

23  Detention Center, correct?

24  A   We established that.

25  Q   Yep.  You are the top GEO boss at the facility.  We

1    established that, correct?

2    A    I think I have answered that question.

3    Q    All right.  You are familiar with the operational issues

4    at the facility?

5    A    Yes.

6    Q    Financial issues, correct?

7    A    Yes.

8    Q    It is your job to be familiar with these issues?

9    A    Yes.

10   Q    You also said you review the contract almost daily,

11   correct?

12   A    Correct.

13   Q    Sir, my question to you is this:  What is the maximum

14   amount, under the contract that GEO holds with ICE, that ICE

15   is to pay GEO?

16   A    Well, I am going to answer that a bit differently.  I have

17   to say, again, to try to tie down on a multiple -- we are

18   talking -- you said it -- it is a huge contract with multiple

19   modifications and changes that happen all the time.  If we

20   look at one number that might be on one page, that may not be

21   the same number today with all the modifications that have

22   changed that contract.  You are asking me to tell you

23   something without looking at everything and doing all the

24   arithmetic to it to determine an answer.

25   Q    All right.  Well, let's take a look at the contract.

1   Let's pull up Exhibit 129, please.

2           MR. WHITEHEAD:  Your Honor, this is an exhibit that

3   has already been marked and admitted in evidence.

4   BY MR. WHITEHEAD:

5   Q   Sir, you should have a copy of the contract with you as

6   Exhibit 129.  If you would like to flip through.  You can

7   also look at your screen here.  Let's start with the basics.

8   I would like to look at Page 43 of the document itself.

9           MR. WHITEHEAD:  Your Honor, this page bears Bates

10  stamp GEO-State 36867.

11  BY MR. WHITEHEAD:

12  Q   I am looking at the second paragraph.  ICE is anticipating

13  a one year base.  We are going to call it up on the screen so

14  you can see it more clearly.

15          Sir, what is the term of GEO's contract with ICE?

16  A   Well, again, as I have said, this is a contract.  If we

17  went back to the first page, we could look at when this

18  contract was initiated.  There has been multiple

19  modifications which have changed even this line of the

20  contract.  I can read the line.  I think the document speaks

21  for itself.

22  Q   I agree.  I will read it.  ICE is anticipating a one-year

23  base period with nine one-year and one six-month optional

24  periods and a 60-day transition period.

25          Did I read that correctly?

1    A    Pretty good reader.

2    Q    All right.  I would like to take a look at page 42, 42 of

3    the document.

4         MR. WHITEHEAD:  Your Honor, this bears Bates stamp

5    GEO-State 036865.

6    BY MR. WHITEHEAD:

7    Q    I would like to take a look, if we could get a call out on

8    the last sentence there.  It reads, "The total amount of the

9    award is $700,292,089.08."  Did I read that correctly?

10    A    Yes.

11    Q    That represents the maximum amount ICE will pay under the

12    contract to GEO, correct?

13    A    Well, that states on this page, and I would assume with

14    the multiple other pages that precede this with all the line

15    items that lead up to that amount, we can add all the line

16    items up.  Again, there has been multiple modifications to

17    the contract.  That number could be higher, it could be

18    lower.

19    Q    Well, sir, as the facility administrator, what I am asking

20    you is an open-ended question.  Tell us what the number is?

21    A    I think the document speaks for itself.  That is the total

22    amount.  But if you go back though all the pages that you are

23    not showing adding up to that, from Bates stamp --

24    Q    I see you looking down.  You have the complete contract in

25    front of you?

Scott - Direct

1   A    I do have the complete contract in front of me.

2   Q    All right.  Please take a moment to look at the contract

3   and tell me what the total amount on the contract is?

4   A    Well, like I am trying to explain, counselor, if I go back

5   to Bates stamp last 38226 all the way to Bates stamp 864,

6   there is a number of different line items in there.  I would

7   surmise if I added all those line items, I would equate to

8   this number here shown on that last page of all these

9   continuation sheets, and it would add up to the $700 million.

10  I have to tell you that this contract as laid out here is not

11  complete with all the modifications, all the task orders,

12  that have amended -- and amendments to this contract.  I

13  can't tell you that is the true number.  It could be less.

14  It could be more.

15  Q    One component of GEO's payment from ICE is based on a

16  bed-day rate.  Do I have that right?

17  A    I think we will find it in this large contract somewhere

18  that defines bed-day rate.

19  Q    You are jumping ahead on my question.  I want you to focus

20  on what I am asking you right now.  My question is:  One

21  component of GEO's payment from ICE is something called the

22  bed-day rate?

23  A    I do see the bed-day rate on Page 46.  It is Bates stamp

24  036870.

25  Q    The bed-day rate is the amount GEO pays for each detainee

1  housed at the detention center, correct?

2  A   As a contract, I refer to the contract.  The contract

3  speaks for itself.  I can read the bed-day rate on that page.

4  Q   GEO is guaranteed payment by ICE for a certain number of

5  beds, correct?

6  A   If you have the modification, that is one of the portions

7  of the modification or task order is to determine the types

8  of payment.

9  Q   Let's look at page two of the contract.  If we could get

10  the screen share back.

11  A   Page two of the physical document or page two of the

12  statement of work, what are we taking about?

13  Q   Page two of Exhibit 129.  You can follow along with the

14  hard copy or look at your screen.  There is a line item there

15  in the middle of the page.  Give us a moment here, we will

16  bring it up for you all to see.  We are looking at the middle

17  of the page.  We will blow it up so folks can see it more

18  clearly.  Detention bed days, guaranteed minimum beds 1,181.

19  A   Are you looking at a specific line item?

20  Q   I am.  It is the one marked "0001A."

21  A   Okay.  I do see the one line item.

22  Q   All right.  It says, "Guaranteed minimum beds, 1,181."

23  Did I read that correctly?

24  A   You did read that correctly.

25  Q   So this bed-day rate and the bed days, that's an amount of

1  beds that GEO is guaranteed to be paid regardless of how many

2  people are housed at the Northwest Detention Center.  If the

3  actual detainee population dips below 1,181, GEO is still

4  paid for at least 1,181 beds, correct?

5  A   That is what the government put down in the line item.

6  GEO did not write this contract.  This is the government's

7  language.

8  Q   Well, sir, feel free to testify from your knowledge.  You

9  are testifying as the facility administrator on behalf of

10  GEO.  If you believe something differently, please say.

11  A   Well, we take our job very seriously.  As you said, the

12  contract is very important.  I would go right straight to the

13  line item on the contract.  If asked a question, I would pull

14  up that page and I would read it.

15  Q   As we pull up the contract and look here, we see GEO is

16  guaranteed at least 1,181 beds.  That bed-day rate, it

17  includes several components; is that right?

18  A   There is a definite definition in this contract that

19  defines a bed-day rate.

20  Q   Let's turn to page 46 of the contract.

21       MR. WHITEHEAD:  This is bearing Bates stamp GEO-State

22  36870.

23  BY MR. WHITEHEAD:

24  Q   Let's see if we can do a call out on the sixth item.  What

25  we see there is the bed-day rate.  It is described as an

1  all-inclusive burdened rate.

2  A   I see the bed-day rate.  Right above that is five, the

3  definition of the bed day.  I think that is important to know

4  as well.

5  Q   I want you to focus on my question.  I am looking at the

6  bed-day rate.  My question is:  The bed-day rate, it is an

7  all-inclusive rate, correct?

8  A   I think you see language in there "all inclusive" in that

9  definition, right.  That's a portion of a multiple line item

10  contract.

11  Q   Yes.

12  A   We are talking about one portion of a contract.

13  Q   Yes, we have heard that part of your testimony.  I guess

14  we'll have an opportunity to expand with your counsel.  I

15  want to focus on the bed-day rate.  It includes direct costs

16  for housing detainees, correct?

17  A   I can read it for you, if you like.

18  Q   I would like for you to answer my question.  It includes

19  the direct cost for housing detainees, correct?

20  A   It reads, "Includes all costs inclusive of direct costs."

21  Q   It includes indirect costs, correct?

22  A   I see that on the page, sir.

23  Q   You agree with me, includes indirect costs?

24  A   I can read the definition as good as anybody.  Yes,

25  "indirect costs" right there.

1  Q   What that means, sir, is GEO is already paid by ICE for

2  clothing detainees, correct?

3  A   Well, again, direct cost, indirect cost, overhead, profit

4  necessary to provide the detention and food service

5  requirements described in the performance work statement

6  which is a large performance work statement with many

7  different contract line items.

8  Q   We will get to those.  We will definitely talk about the

9  profit baked into the bed-day rate.  My question is whether

10  ICE pays GEO for clothing detainee workers -- or detainees,

11  GEO is paid by ICE, correct?

12  A   We submit a bill to the contracting officer

13  representative.  Yes.  ICE pays us on multiple different line

14  items.

15  Q   ICE pays GEO to feed the detainees at the Northwest

16  Detention Center, correct?

17  A   If you want to look at it that way, ICE pays everything.

18  We do a service.  ICE pays.  We do detention managed services

19  which cover a lot of different components in this performance

20  work statement.

21  Q   ICE pays GEO to care for the medical treatment of the

22  detainees?

23  A   No, that would be a very incorrect statement.

24  Q   You would agree that ICE pays GEO to house the detainees?

25  A   As part of detention managed services, we house detainees.

1  Q   So there is no need to try and recoup, let's say, for

2  example, the cost of clothing from detainees because GEO is

3  already paid by ICE, would you agree?

4  A   There is a lot of language in this contract.  Repeat your

5  question one more time.

6  Q   You stay at a hotel and you go to check out.  You might

7  get a bill for the mini bar when you leave.  When the

8  detainees, who are far from staying at a resort, leave the

9  Northwest Detention Center, there is never a bill that is

10  handed to them for their stay, is there?

11  A   No, we wouldn't charge detainees for clothing, for

12  medical, for the toiletries.

13  Q   That's because you are already paid by ICE for those

14  items, correct?

15  A   Well, I'll agree we are paid in many different line items,

16  many different line items for those items.

17  Q   Let's stick with the bed-day rate.  If we could get a

18  highlight on indirect costs, overhead and profit.  The

19  bed-day rate includes a projected profit to GEO; is that

20  right?

21  A   Well, sir, if you are asking me if we are a profit

22  company.  We are.  ICE puts out a contract and asks for

23  somebody to perform the services.  Just like if I was to ask

24  somebody to come do windows at my house, I would put out a

25  contract and say who wants to do windows.  I would say

1    everything I want to happen with those windows, what I am

2    willing to pay.  If somebody comes in and they want to do it,

3    good, right?  There is a lot of legal back and forth with

4    that.  ICE asks for a contract.  We could go back to --

5              THE COURT:  Just a minute, Mr. Scott.  Your job here

6    is to answer the questions asked.  So please try and answer

7    the questions asked and don't go beyond that.  Just answer

8    the questions.

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  Mr. Whitehead.

11             MR. WHITEHEAD:  Thank you, Your Honor.

12   BY MR. WHITEHEAD:

13   Q    So my question is:  GEO turned a profit at the Northwest

14   Detention Center in 2018, correct?

15   A    Yes.

16   Q    2017?

17   A    Yes.

18   Q    2016?

19   A    Yes.

20   Q    2015?

21   A    Yes.

22   Q    The contract -- actually, we can clear that off the screen

23   now -- it includes several constraints on GEO; is that right?

24   A    That is correct.

25   Q    As a matter of fact, the contract has a list?

1   A   Is that a question?

2   Q   It is.  The contract has a list of constraints that GEO

3   operates under, correct?

4   A   Yes.

5   Q   Let's bring the contract back up.  This is Exhibit 129.

6   Let's look at the bottom of page 43.

7       MR. WHITEHEAD:  Your Honor, this bears Bates stamp

8   GEO-State 36867.

9   BY MR. WHITEHEAD:

10  Q   We are looking at the very bottom section.  I promise it

11  is going to come up on the screen here in a moment.  We will

12  do a blow up.  We will blow up the language I am talking

13  about.  At the bottom of the screen begins, "The following

14  constraints comprise the statutory, regulatory, policy and

15  operational considerations that will impact the contractor."

16  Do you see that?

17  A   I do.

18  Q   The contractor in this case is GEO, correct?

19  A   That is correct, we are the contractor.

20  Q   The sentence there, it is an incomplete sentences, carries

21  on to the next page, says, "The contractor is expected to

22  become familiar with the constraints."  Would you agree with

23  that statement?

24  A   I would.

25  Q   Let's go to the next page.  When we talk about these

1  constraints, again, we are talking about GEO's promises to

2  ICE that GEO will operate under certain constraints, correct?

3  A   You can put it that way.

4  Q   Well, I want to look at -- there is a sentence there that

5  says, "The constraints may change over time."  If we could

6  highlight that.  That statement is a recognition that just

7  like it says, the constraints can change over time, would you

8  agree?

9  A   Yes.

10  Q   Well, I want to look down.  There is a list that says,

11  "Constraints include, but are not limited to."  Then it has a

12  long list of constraints that GEO must operate under.  In

13  particular, I would like to look at Item J.  Give me a moment

14  here.  I will blow it up on the screen so everybody can

15  follow along.  Let's highlight that, too.

16        Item J says that GEO must operate under the

17  Performance-Based National Standards.  That's the PBNDS or

18  the PDBNS?

19  A   Shall I try?

20  Q   Please, I think I butchered it.

21  A   The Performance-Based National Standards or PBNDS.

22  Q   Thank you, sir.  That's one of the constraints.  GEO must

23  operate under the Performance-Based National Standards,

24  correct?

25  A   Yes.

1   Q   Let's look at Item Q on that same page.  Let's highlight

2   that as well.  Item Q says that applicable federal, state and

3   local labor laws and codes are another constraint that GEO

4   must operate under.  Do you see that?

5   A   Yes.

6   Q   Did I read that correctly?

7   A   You did.

8   Q   When it refers to "state" in this case, we are talking

9   about the State of Washington.  Do I have that right?

10  A   Yes.

11  Q   Now, GEO must perform in accordance with these

12  constraints.  Do you agree?

13  A   I do.  There is also portions of the contract which state

14  when there is multiple requirements, that the ICE standards

15  will prevail.

16  Q   I must have passed that along to you.  That's a tough one

17  to get out.  How about this, the part about complying with

18  applicable federal, state and local standards, that is

19  repeated elsewhere in the contract, do you agree?

20  A   And the PBNDS.

21  Q   Yes, of course, the PBNDS.  But specifically the part

22  about the federal, state and local standards, that's repeated

23  elsewhere in the contract, correct?

24  A   Yes.

25  Q   Let's look at Page 52.

Scott - Direct

```
 1              MR. WHITEHEAD:  This is GEO-State 36876.
 2   BY MR. WHITEHEAD:
 3   Q   I am looking in sort of the middle there under the section
 4   that says "ambiguities."  We will blow it up here.  It says
 5   that all services must comply with the performance work
 6   statement and all applicable federal, state and local laws
 7   and standards.
 8        Did I read that correctly?
 9   A   Yes.
10   Q   It continues on, "Should a conflict exist between any of
11   these standards, the most stringent shall apply."  Did I read
12   that correctly?
13   A   You read it correctly.
14   Q   The word "stringent," what does that mean?
15   A   It means it is important.
16   Q   Means to follow the highest standard, correct?
17   A   I am sure there is a legal definition for that.  I don't
18   have a legal dictionary in front of me.  I read it the most
19   stringent standard shall apply.  The highest standard shall
20   apply.
21   Q   Well, let's go ahead and clear that off the screen.
22        We heard a lot about it the last week or so, the
23   contract requires GEO maintain a voluntary work program,
24   correct?
25   A   Can we bring the last "ambiguities" back up?
```

1    Q    No, sir.  You'll have an opportunity when GEO's counsel

2    asks you questions.  We are getting late in the day so I want

3    to keep moving forward.  My question was:  The contract, it

4    all requires GEO to operate a voluntary work program?

5    A    Contract does.

6    Q    The contract offers examples of work that detainee workers

7    can perform.  Do I have that right?

8    A    Correct.

9    Q    The contract, however, doesn't dictate any basic job

10   categories that GEO has to offer workers, correct?

11   A    The -- if we go to that section of the voluntary work

12   program, it does list out a number of kind of categories in

13   that section.

14   Q    Sir, the contract, it doesn't dictate any basic job

15   categories.  Do you agree with that statement?

16   A    No, I don't.

17   Q    Well, you know, we talked about this before, the fact that

18   when we met before and I have asked you questions under oath.

19   Do you also remember that at the deposition, there was

20   someone taking down statements, the questions and the answers

21   and creating a transcript?  Do you remember that?

22   A    I do.

23   Q    Your deposition was videotaped.  Do you remember that?

24   A    I do.

25   Q    Sir, isn't it true that when I deposed you previously, you

Scott - Direct

1  told me that the contract doesn't dictate any basic job

2  categories?

3  A    If we could look at the entire deposition of the

4  transcript.  The deposition a lot of times is a lot of

5  leading questions up to that.  I would not want to be taken

6  out of context.  The contract does show those categories.

7  Q    Sir, I have a clip I would like to play for you from your

8  deposition.

9        MR. WHITEHEAD:  Counsel, this is from the 30(b)(6)

10 transcript.  There was an objection we edited out.  That's

11 because Your Honor has ruled on it previously.  This is Page

12 73, Lines 1 through 6.  Could we get clip 25, please?

13      (Video Clip 25 played as follows:)

14      "Question:  What are the basic job categories?

15      "Answer:  There are no basic job categories as listed by

16 the standard.  There are a number of program activities that

17 detainees can volunteer into in various parts of the

18 facility."

19      (Video Clip 25 concluded.)

20 Q    Sir, was that you in the video?

21 A    Absolutely was.

22 Q    I want to --

23 A    We were talking about the standard, not the contract.

24 Q    Well, the contract, it leaves it to GEO to develop a

25 detainee worker program, correct?

1   A    The contract requires a voluntary work program.

2   Q    The word "develop," that word is on GEO.  It is GEO to

3   develop the worker program?

4   A    I would disagree.  There is section --

5   Q    Let's go to the contract.  Let's look at Exhibit 129,

6   please.  We are going to bring up Page 82.

7         MR. WHITEHEAD:  This is Bate stamp GEO-State 36906.

8   BY MR. WHITEHEAD:

9   Q    Looking there, sort of in the middle bottom of the page,

10  "manage detainee work program."  Let's blow up that first

11  paragraph.  Sir, the first sentence reads, "Detainee labor

12  shall be used in accordance with the detainee work plan

13  developed by the contractor."

14  A    We develop that.

15  Q    Did I read that correctly?

16  A    I was saying about another line in the contract.

17  Q    Again, sir, don't try to anticipate my questions.  I just

18  want you to answer the questions that I am posing to you.

19  A    Well, so, I am trying to, sir.  Some of my answers may be

20  from a different part of the contract than you are thinking.

21  Q    It is also very important that we speak one at a time,

22  especially over Zoom.  Just gets horrible for everybody.

23        Sir, that line there says, "Detainee labor shall be

24  used in accordance with the detainee work plan developed by

25  the contractor."  Did I read that correctly?

1    A    Yes.

2    Q    All right.  The contractor in this sentence, it is GEO,

3    right?

4    A    Northwest ICE Processing Center, yes.

5    Q    Let's keep reading down.  There is a sentence there at the

6    bottom.  It says -- of the called out portion, it says, "The

7    detainee work plan must be voluntary and may include work or

8    program assignments for industrial, maintenance, custodial,

9    service, or other jobs."  Do you see that?

10   A    I do see that.

11   Q    What is the significance of the word "may"?

12   A    It can include those but doesn't have to.

13   Q    Exactly, it gives GEO the option, correct?

14   A    Right, in a broad sense of the contract.

15   Q    One thing GEO cannot do, however, and I am reading the

16   last sentence there, is use detainee workers -- "Detainees

17   shall not be used to perform the responsibilities or duties

18   of an employee of the contractor."  Did I read that right?

19   A    Yes.

20   Q    Again, the contractor is GEO?

21   A    Yes.

22   Q    Well, sir, even so, despite that prohibition that detainee

23   shall not be used to perform the responsibilities of duties

24   of an employee of the contractor, here is what you told me

25   during the deposition.

1    MR. WHITEHEAD:  This is going to be clip No. 26,

2    counsel.  This is Page 74, Lines 6 through 18.

3    (Video Clip 26 as follows:)

4    "Question:  Do detainee workers work in the kitchen?

5    "Answer:  Detainees volunteer to work in the kitchen.

6    "Question:  Do detainee workers work in the laundry unit?

7    "Answer:  Detainees volunteer to work in the laundry.

8    "Question:  Do detainee workers perform janitorial

9    services?

10   "Answer:  Detainee workers clean portions of the facility

11   in multiple different areas.  'Janitorial services' is a

12   broad term.

13   "Question:  Do detainee workers work in the barbershop?

14   "Answer:  I do have detainee workers volunteer in the

15   barbershop.

16   "Question:  Do detainee workers paint?

17   "Answer:  We do have detainees that volunteer to paint."

18   (Video clip concluded.)

19   Q   Again, sir, was that you in the video?

20   A   Yes.

21   Q   Sir, I asked you at the outset whether you were present

22   for most, if not all, of trial.  We know you were present

23   during opening statement because we saw you appear on screen.

24   You were there, correct?

25   A   Yes.

1  Q   And that means I know you heard GEO's counsel make a

2  statement to the effect that GEO has hundreds of utility

3  players that it can plug in anywhere if detainee labor were

4  removed from the equation.  Do you remember a statement to

5  that effect?

6  A   Something to that effect.

7  Q   That it was as simple as GEO sliding staffers from one

8  post to another was the implication, anyway.

9  A   I would say it a little bit differently.  Yeah.

10 Q   I asked you during your deposition what GEO would do in

11 the event of a prolonged detainee worker work stoppage.  You

12 mentioned that GEO would have to pay overtime to existing

13 workers.  Correct?

14        MS. SCHEFFEY:  Objection, improper impeachment.  We

15 are once again reading in a deposition without giving the

16 page number.

17        THE COURT:  Fair objection, counsel.

18 BY MR. WHITEHEAD:

19 Q   Sir, in the event of a prolonged detainee work stoppage,

20 GEO would have to pay overtime to existing employees,

21 correct?

22 A   Well, the word "overtime" has a definite definition to it,

23 right?  I mean, I may hold staff over.  Let's say, for

24 example, if I had a staff that just came back off vacation,

25 he was on vacation six out of seven days and I held him over

1    for four hours, it would not be overtime.  I have a staffing

2    plan.  I have emergency contingency plans for many different

3    things including a work stoppage, prolonged, as you say,

4    although we have never had a prolonged work stoppage, many

5    different ways we can handle the work that needs to be done

6    at the facility.

7    Q    I am not sure I heard an answer to my question.  My

8    question was:  In the event of a prolonged work stoppage, GEO

9    would have to pay overtime to existing workers, correct?

10   A    Not necessarily.

11   Q    You disagree with that statement?

12   A    Overtime -- you have to -- define "overtime" for me.

13   Q    Sir, you are the facility administrator.  You have your

14   finger on the budget.  You tell me, what is overtime?

15   A    All right.  More than likely if I hold somebody over to

16   overtime, it doesn't always mean the overtime.

17   Q    Okay.  GEO would have to call in extra workers from other

18   facilities in the event of a prolonged detainee work

19   stoppage, correct?

20   A    That is a portion of one of the contingency plans, TDY

21   type of people, yes.

22   Q    In the event of prolonged work stoppage, GEO would have to

23   look at third-party staffing companies?

24   A    As a potential, we could look at third-party staffing,

25   kind of like was done in the kitchen when the facility was

1  opened and expanded.

2  Q   Sir, you didn't mention anything about utility players

3  picking up the slack.  Here is what you said during your

4  deposition.  This is going to be Clip 27.  This is from the

5  30(b)(6) transcript.  This is Page 89, Line 5 through Page

6  90, Line 18.

7          (Video Clip 27 as follows:)

8          "Question:  Mr. Scott, before the break I had asked you

9  some questions about different work stoppage scenarios, work

10 stoppage on the part of detainee workers.  You told me about

11 some of the considerations or contingencies that GEO had in

12 place.  Do you recall having that discussion?

13         "Answer:  I remember talking about detainee work

14 stoppages.

15         "Question:  If I understood you correctly -- this is

16 not to put words in your mouth -- but that you listed off

17 several options, one being overtime for existing workers.  Is

18 that correct?

19         "Answer:  That could be a potential option.

20         "Question:  You had mentioned pulling in workers from

21 other parts of the facility.  Did I get that right?

22         "Answer:  As far as overtime periods, yes.

23         "Question:  As well as pulling in GEO workers from

24 other GEO facilities to work at the Northwest Detention

25 Center.  Did I get that right?

1      "Answer:  I did say that TDY options would be

2  available.

3      "Question:  What does "TDY" stand for?

4      "Answer" temporary duty.

5      "Question:  You mentioned that a third-party

6  contracting agency would be an option.  Did I get that right?

7      "Answer:  That could be an option.

8      "Question:  Beyond what we just discussed, are there

9  any other options or considerations that GEO would have to

10  address a detainee worker stoppage of a prolonged nature?

11      "Answer:  Again, it would be difficult to outline every

12  potential option based on the relevant information that would

13  be with any event.  The options that I listed now are the

14  options that I can think of that would be considered in any

15  prolonged detainee work stoppage."

16      (Video clip concluded.)

17  Q   One thing that you would not consider is robbing from one

18  post to fill another in the event of a detainee work

19  stoppage, correct?

20  A   Well, there is different types of posts.  We would have to

21  really drill down to look at individual posts, post by post.

22  I would not take out of an open housing unit or detainee -- I

23  had detainees in a housing unit and had an officer staffing

24  that direct supervision in the housing unit, I would not take

25  that housing out.  If it were a visitation day and I had

1   nobody in visitation at that very moment, I could use those

2   visitation officers that I have on my staffing plan.  I could

3   redeploy them up until the time other visitation comes in.  I

4   would need to put them back.  It is a very fluid management

5   just controlling resources.

6   Q   Sir, let's see what you said before.  Let's look at clip

7   28.  This is Page 78, Line 16 through Page 79, Line 2.

8       (Video Clip 28 as follows:)

9       "Question:  You would agree with me, though, that

10  pulling personnel from other parts of the facility into the

11  kitchen could impact the operations of other parts of the

12  facility?

13      "Answer:  No, sir, we would not rob posts to fill

14  another one.  We would offer overtime, we would seek possibly

15  TDY staff from other facilities.  I'm sorry, seek TDY,

16  temporary staff.  There are a number of options available.

17  Speculating on the potentials of anything would just be that,

18  speculating and planning for potential occurrences."

19      (Video clip concluded.)

20  Q   Sir, authorizing overtime, bringing in temporary duty

21  employees, retaining contractors, these are all options that

22  would eat into GEO's profit under its $700 million contract

23  with ICE, correct?

24  A   Depends on how the TDYs were done.  If I had to pay for an

25  outside contractor, I would pay for the outside contractor.

1  If I had to bring TDY staff in from other duty locations, how

2  that interoffice billing would be worked, that can get tricky

3  sometimes.  Like I was trying to say in there, and we talked

4  about some of those options, we didn't talk about all of the

5  options.

6  Q    Sir, paying the detainee workers one dollar a day presents

7  a far cheaper option for accomplishing the same work,

8  correct?

9  A    I don't look at it this way.  The detainee voluntary work

10  program is required by the contract and the standard and also

11  required by the ACA standards as an option to give detainees

12  something to do to not be idle.  The words are strictly out

13  of the ICE standard and contract for them to participate in a

14  voluntary work program.

15  Q    The work program, to quote you, gives the detainee worker

16  something to do.  Is that your testimony?

17  A    Well, it improves morale, decreases idleness, fewer

18  disciplinary actions, that would be my testimony.

19  Q    Provides to GEO a ready-made cheap labor source?

20  A    I don't look at it this way.  We take very good pride in

21  following the standards in meeting our accreditations.  We

22  are audited on these things quite regularly by multiple

23  sources that look at that voluntary work program in depth and

24  look at how we are doing it.

25  Q    Thank you, sir.  Your attorney may have some additional

1    questions for you.  I don't have anything further at this

2    time.

3                        CROSS-EXAMINATION

4    BY MS. SCHEFFEY:

5    Q    Good afternoon.  Mr. Scott, take a deep breath for me.  I

6    haven't seen your smile yet today.

7    A    Let me take another drink of water.  Good afternoon.

8    Q    I am going to start by putting up the contract.  Exhibit

9    129.  I am conscious we are short on time for the day.  While

10   our staff gets the contract up, do you have a copy of it in

11   front of you?

12   A    I do.

13   Q    What is this document?

14   A    This is the contract that was put forward by the

15   United States Government, especially the -- specifically the

16   Department of Homeland Security seeking detention-managed

17   services and somebody to perform a very critical, needed step

18   for the United States of America for somebody to do.  That is

19   what this contract is.

20   Q    Okay.  I want to go to the page that is Bates stamped

21   036867.  What is the objective of this contract, when you get

22   there?

23   A    I will start reading while it gets there.  The objective

24   of this contract -- the objective of this contract is to

25   obtain a facility for the detention, transportation and food

1   services for ICE detainees located in Seattle, Washington,

2   that are in support of the ICE ERO, which is enforcement

3   removal operations, Seattle field office.  The contractor

4   shall furnish the facility and services inclusive of a

5   trained and qualified management staff, supervision,

6   manpower, relief officers, uniforms, equipment, vehicles and

7   supplies, which includes firearms, ammunition, body

8   restraints, non-lethal devices, body armor, radios, cellular

9   telephones to provide support seven days a week, 24 hours a

10  day.  That's the objective that the government wanted in a

11  contractor.

12  Q   I appreciate you reading that for me.  Can you put that in

13  your own words, what is the point of the contract?

14  A   The point of the contract is to provide safe and secure

15  detention, to provide world class safe and secure detention

16  management services to the United States Government, that

17  protecting its laws and its interests and to provide in a

18  safe and secure manner that respects the dignity of the

19  detainees that we watch day-to-day.

20  Q   So does this contract require GEO to provide secure

21  housing?

22  A   Absolutely must provide secure housing.

23  Q   Are you required to follow the directives in this

24  contract?

25  A   I am.

1    Q    Okay.  We have talked about the Performance-Based National

2    Detention Standards or PBNDS, which we use the acronym in

3    this case, it sounds like, because we can't all say it well.

4    How do those relate to this contract?

5    A    The contract, as we pointed out earlier, requires the

6    PBNDS.  The PBNDS is another large tome, 450 some pages of

7    standards that we are required to follow.  Those standards

8    are written by the government and non-government

9    organizations.  GEO did not write those standards.  We have

10   to follow every one of those standards because we get audited

11   quite immensely, a lot of oversight on those standards to

12   make sure we do exactly what we are supposed to do to provide

13   the safe and secure detention management services that

14   respects the rights of the detainees.

15   Q    Let's turn to Page 45 of this contract, which is GEO-State

16   36869.  If we could call out the "performance" section.  Is

17   that the section you are referring to when you say GEO has to

18   follow the Performance-Based National Standards?

19   A    Yes.  It requires multiple things, not just

20   Performance-Based National Standards, but to be ACA

21   accredited.  We have to be ACA accredited, which is the

22   American Correctional Association.  That is a very

23   challenging, very challenging accreditation.  I tell you, I

24   know for a fact that only, besides us, three other facilities

25   in the entire state of Washington have that certification.

1   Q   Who wrote the Performance-Based National Standards?

2   A   ICE, government folks at the highest levels.  I know they

3   have some NGOs, non-governmental organizations that work with

4   that, people out of the -- attorneys and, you know, the

5   United States Bar helps.  That document was drafted by some

6   really smart people.  It was not drafted or created by GEO.

7   Q   Do you know if the standards are made to ensure uniformity

8   across the country for detainee care?

9   A   That's how I relate the word "standard."  That is a good

10  point, whether it is a private company that performs

11  detention-managed services or if it is a government-run

12  facility, they have to follow the same exact standards.  Like

13  I know our folks on site upstairs with ICE, they have to

14  follow these same standards as well.

15  Q   I believe those standards have been admitted as Exhibit

16  127.  If we could pull those up.  While we go there, my

17  question for you is:  Do those -- do the PBNDS contemplate

18  the voluntary work program?

19  A   Absolutely, they do.

20  Q   Okay.  If our great tech people, I know it is late in the

21  day, could turn to the page that has Section 5.8 on it, that

22  would be great.  Do you know, Mr. Scott, what the PBNDS says

23  is the purpose of the voluntary work program?

24  A   The purpose of the voluntary work program, there is a

25  couple things listed in here.  The main purpose of the

1  voluntary work program is to provide the detainees an

2  opportunity to work which has the -- and to participate in a

3  voluntary work program, which meets the needs of the facility

4  and decreases their idleness, gives them something to do

5  which improves morale.  When they are happy and they are

6  engaged, which for the most part they are, then things go

7  very well and disciplinary events at that facility go down.

8  We have seen this work so well in not only our facility, but

9  throughout other facilities to include prisons and jails

10  which operate under very similar standards, especially all

11  those that are out there that are accredited by ACA.  You

12  know, if they are accredited by ACA, they have a very similar

13  voluntary work program.

14  Q   When you say we have seen this go very well, what happens

15  when there is a bunch of bored people in a facility?

16  A   Well, they are going to occupy their time.  As the old

17  adage says, idle hands get into many things.  If they are not

18  otherwise engaged, they can start maybe doing those things

19  they shouldn't be doing like making the pruno or homemade

20  alcohol, trying to circumvent security, escapes, fights

21  increase.  Refusing of staff orders increase.  There is a

22  whole disciplinary section to the standard as well that

23  covers all the different types of things that happen inside a

24  facility.  When they are idle and not doing anything, not

25  actively engaged, that's the kind of stuff that can happen.

1    The voluntary work program, in my experience in the 11 years

2    I have been at the Northwest ICE Processing Center and the

3    multitude of positions that I have been in, detainees like

4    being engaged.  They are actually very proud of what they do.

5    As I walk through my rounds weekly, they talk to me all the

6    time about how proud they are of what they are doing.  They

7    like to show me what they have done.

8    Q   I am going to have our team call out Item 4 on the right

9    side of the page that is up on the screen.  I am going to ask

10   if you see that.  Is this right here one of the purposes of

11   the voluntary work program?

12   A   Yes, that is what I was working on earlier.  That just --

13   just to know that portion of the ICE standard is under the

14   expected outcomes.  Those are what the auditors look at us to

15   make sure -- they expect us to follow these.  These are one

16   of the things they look at heavily when they come to audit

17   us.

18   Q   Is this definition right here on the screen, is this

19   Bruce Scott's idea of why the voluntary work program should

20   exist?

21   A   Not my idea.

22   Q   Whose idea is it?

23   A   The idea of all the smart people and NGOs and the bar that

24   created this document.

25   Q   How long has the voluntary work program been a detention

1  standard requirement for the Northwest ICE Processing Center?

2  A  I can definitely speak to my 11 years here.  We have had

3  one the whole time.  I know it was when I was the compliance

4  administrator for the company.  I had to look at the 2000

5  standards, 2008 standards, 2011 standards, two revisions

6  under the 2011 standards.  The voluntary work program has

7  been in play since as long as I can remember of finding in

8  any detention standard even before the Performance-Based, go

9  back to the National Detention Standards, the voluntary work

10  program was there.

11  Q  Do you know if the Northwest ICE Processing Center is the

12  only facility where there is a voluntary work program?

13  A  No, every other facility has -- we are late in the day.

14  Nobody asked me all the things I have done.  I feel a little

15  bad about that.  I was the contract compliance director for

16  the western region and had an opportunity to see many

17  different facilities in the western region to include

18  state-run contracts in Arizona, New Mexico, California; every

19  single facility I visit has a voluntary work program.

20  Q  Are the detainees in any voluntary work program that you

21  visited paid minimum wage?

22  A  No.

23  Q  I am going to go back to the contract, Exhibit 129, page

24  47.  It is going to be Bates number 036871.  When we get

25  there, I am going to have the definition of "detainee" called

1    out.  Let me know when you have gotten there in your paper

2    copy, Mr. Scott.

3    A    I am there in my paper copy.

4    Q    Does the definition of "detainee" indicate that detainees

5    will be employees?

6    A    No, it does not.

7    Q    A little bit up on that page, definition 14, if we can

8    pull it out.  What is that definition?

9    A    That is a definition of a contract employee, which is what

10   my staff do.  They are hired to perform a variety of detailed

11   services under this contract.

12   Q    You talk about your staff, are you talking about GEO

13   staff?

14   A    Contractor employee would be GEO staff.  Completely

15   separate and different from a detainee.

16   Q    Does the definition of contractor employee say that it

17   could be a detainee?

18   A    No, it does not.

19   Q    Are you aware of anywhere in this contract that

20   contemplates detainees will be employees?

21   A    No.  Quite separately.  There is an area where it says

22   they can't be employees.

23   Q    Where is that section?

24   A    If we went to page 70 of the contract.  This will be Bates

25   stamp 036894.  It would be, if we call out the second

Scott - Cross

1    paragraph on that page from the top of the page.  Since we

2    work for the Department of Homeland Security, we have access

3    to information that comes from their information system,

4    especially when it deals with the criminality and criminal

5    history of detainees.  The staff have access to that.  The

6    use of non-U.S. citizens including lawful permanent residents

7    is not permitted in the performance of this contract.  There

8    is a number of other sections in the employment.  Whole area

9    on personnel requirements, some of which was brought up by

10   Mr. Whitehead on the employment section.  There is a lot of

11   different requirements that a GEO staff member has to go

12   through to be cleared by the United States Government to have

13   a security clearance very similar to a secret clearance that

14   I had in my time in the armed services -- I am retired Air

15   Force -- to protect national security that they would not be

16   able to work under this contract.

17   Q   Let's go to Page 63 of this contract, which is also

18   GEO-State 036887.  If we could call out Section D, the

19   minimum personnel qualifications standard.  Does this section

20   require employees of GEO to have a Social Security number?

21   A   Yes, it does.

22   Q   Are you aware of any detainees who have Social Security

23   cards?

24   A   That information, I don't get from ICE.  They maintain

25   that information so I would not be able to know that

1    particular aspect.

2    Q    Has ICE ever asked you for work authorization documents

3    related to detainee volunteers?

4    A    No, ICE has never asked for that.

5    Q    Do you know if ICE is the one who enforces immigration

6    laws with respect to whether people are work authorized?

7    A    That is a requirement of ICE.  It is actually called out

8    in the contract as well.  It explains that.

9    Q    Has ICE ever asked you to have detainee participants meet

10   the standards for employment under the contract?

11          MR. WHITEHEAD:  Objection, leading.

12          THE COURT:  Sustained.

13   BY MS. SCHEFFEY:

14   Q    Yeah.  What requirements does ICE give you for detainee

15   volunteers in the voluntary work program?

16   A    ICE requires us to have a program.  We have to work with

17   the contracting officer's representative.  One thing we

18   didn't get into about contracts, and I remember from my early

19   day as a young airman, This is from 30, 25, 27 years ago that

20   I learned really quick.  I cannot obligate funds under a

21   federal contract, only the contracting officer has the

22   availability to authorize any funding or changes to the

23   contract.  We work very closely with ICE, the OIC, the

24   contracting officer's representative when it comes to the

25   voluntary work program because we are limited to a line item

1    amount, and I have to work closely with them to make sure

2    that we have -- you know, obligating that money and getting

3    as many detainees as possible to volunteer that we can.  We

4    work closely with that contractor representative to make sure

5    if we go over the line item, they know and authorize that in

6    the position.  The annual reports show them what is going on

7    with the voluntary work program when they review that or

8    review our policies.  They take a very hand-in-hand approach

9    with us on a multitude of this, the standard in the contract.

10   That is why it is on my desk almost every single day.

11          THE COURT:  Okay.  It is quitting time for the day.

12   We will reconvene, folks, tomorrow at nine.  We will continue

13   at that time.

14     Are you all getting along okay?  You seem so remote.  It

15   is hard to make friends out of a jury panel when you are not

16   in the next room or in the same room, same courtroom.

17     Okay.  Follow my instructions about recesses.  Be back at

18   nine in the morning ready to go.  You may be excused.

19    (The following occurred outside the presence of the jury.)

20          THE COURT:  Let's leave counsel on the screen for a

21   minute, Tyler.

22     I don't like to break in when there is no objection.

23   Simple questions do not justify a lengthy discussion that

24   goes way beyond the question.

25     Mr. Scott, you are still here to hear this.  This is

1    directed toward you.  You need to answer the question asked

2    and then stop and not make a speech about what you want to

3    talk about, but to answer the questions that the lawyers ask

4    you.  It is hard to be a witness because the communications

5    that we use in court, the communication system is different

6    than what you might use at work or at a cocktail party or

7    anywhere else.  So the point is, we will go a lot faster if

8    you just answer the questions and stop your answer when you

9    have answered.

10       Okay.  See you all tomorrow morning.  Nine a.m.

11            MS. MELL:  Your Honor, I do have one comment.

12            THE COURT:  Yes.

13            MS. MELL:  Along those same lines, I am seeing it is

14   really improper use of deposition testimony to be putting up

15   the screen and reading the Q and A before the witness has had

16   an opportunity to read it and the Court has had an

17   opportunity to read it.  Seems to me we are missing a step in

18   the usual publication process.  I am not sure I know how to

19   address that in the Zoom trial.  It is frustrating to sit

20   here and see that go on.  Typically, you can object and the

21   witness gets to look.

22            THE COURT:  I think you are probably right in that

23   regard.  I would suggest to counsel that you review the

24   requirements for use of depositions or other documents or

25   videos to impeach the witness.  There is a little formula you

1  go through to identify the impeaching material.  I think we
2  kind of skipped the step a number of times with the video
3  clips.
4       MR. WHITEHEAD:  Your Honor, I will say that first I
5  do know how to impeach a witness.  I subscribe to the notion
6  of three Cs, commit, credit and confront.  Mr. Scott's
7  deposition was different.  This was a deposition that was
8  taken as a 30(b)(6) designee so Federal Rule 32(a), I believe
9  it is, allows us to use the deposition of a party opponent
10 for any purpose.  That's what you saw today, Your Honor.
11      THE COURT:  Well, you should make that clear to the
12 old judge so I know what you are doing.
13      MR. WHITEHEAD:  For the record, I would say also that
14 all of the testimony that you saw today, Your Honor, had been
15 designated over what, a year ago, whenever we did the first
16 run up to trial.  Counsel has had an opportunity to weigh in
17 on everything that was shown today.  Your Honor has in fact
18 ruled on many of the objections.
19      THE COURT:  Okay.  I know more right now about what
20 you are doing than I knew before.  Raise whatever objections
21 may be appropriate tomorrow, if there are any, and we will
22 rule on them right or wrong to keep things moving.
23      MS. SCHEFFEY:  One last thing.  If we could just
24 maybe schedule getting an offer of proof, who is going to be
25 in line, then we are not tracking people down who have walked

1    away from the computer, at least at the beginning of the
2    morning so we know who is up and who is on deck.
3         THE COURT:  Ms. Scheffey, you drop your voice at the
4    end of sentences a lot.  I have -- fortunately, I have real
5    time.  You should know that sometimes you drop your voice at
6    the end of a sentence and it makes it hard to hear you.
7    Now, your question is addressed to whom?  You are asking
8    for what is going to happen tomorrow?
9         MS. SCHEFFEY:  I am -- sorry, go ahead, Joan.
10        MS. MELL:  I was going to say, we are trying to
11    juggle a number of witnesses who plaintiffs are calling who
12    are trying to also be at work running the facility as well.
13    We are queueing them up.  When we get the notification of who
14    is, the list of witnesses, we don't know the order.  It would
15    be helpful.  If they don't want to give it to us when they
16    give us the list, the order they are going to call them in,
17    if they could give it to us in the morning, we could have the
18    right person on standby.
19        THE COURT:  That's a reasonable request, I think, for
20    all concerned.  If you know the order you are going to call
21    your witnesses, tell them so they can get ready.
22        MS. MELL:  Thank you.
23        MR. WHITEHEAD:  The only thing I would add to that, I
24    would hope GEO would reciprocate when it gets into their
25    case, the DHS --

1          THE COURT:  Absolutely.  Absolutely.  Okay.  See you

2   tomorrow.

3                    (The proceedings adjourned.)

4

5

6                    C E R T I F I C A T E

7

8

9       I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.

11

12

13

14   /s/ Angela Nicolavo

15   ANGELA NICOLAVO
     COURT REPORTER

16

17

18

19

20

21

22

23

24

25