UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

```
                              )
UGOCHUKWO GOODLUCK NWAUZOR,    )
et al.,                       )
                              )
              Plaintiffs,     )  3:17-cv-05769-RJB
                              )  3:17-cv-05806-RJB
v.                            )
                              )  Tacoma, Washington
THE GEO GROUP, INC.,          )
                              )  June 8, 2021
              Defendant.      )
_____ )  Jury Trial
                              )
STATE OF WASHINGTON,          )  9:00 a.m.
                              )
              Plaintiff,      )
                              )
v.                            )
                              )
THE GEO GROUP, INC.,          )
                              )
              Defendant.      )
                              )
```

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. BRYAN
UNITED STATES DISTRICT JUDGE
_____

Proceedings stenographically reported and transcribed
With computer-aided technology

```
 1                          APPEARANCES

 2

 3     For the Plaintiff        JAMAL N. WHITEHEAD
       Nwauzor, et al.:         ADAM J. BERGER
 4                              Schroeter Goldmark & Bender
                                810 Third Avenue
 5                              Suite 500
                                Seattle, Washington
 6

 7
       For the Plaintiff        ANDREA BRENNEKE
 8     State of Washington:     LANE POLOZOLA
                                MARSHA J. CHIEN
 9                              800 Fifth Avenue
                                Suite 2000
10                              Seattle, Washington

11

12     For the Defendant        LAWRENCE D. SILVERMAN
       The GEO Group:           ADRIENNE SCHEFFEY
13                              Akerman LLP
                                1900 Sixteenth Street
14                              Suite 1700
                                Denver, Colorado
15
                                JOAN K. MELL
16                              III Branches Law PLLC
                                1019 Regents Boulevard
17                              Suite 204
                                Fircrest, Washington
18

19

20

21

22

23

24

25
```

```
1                        EXAMINATION INDEX

2

3    EXAMINATION OF:                                     PAGE

4     BRUCE SCOTT        CROSS-EXAMINATION
                         BY MS. SCHEFFEY                   6
5                        REDIRECT EXAMINATION
                         BY MR. WHITEHEAD                  55
6                        RECROSS-EXAMINATION
                         BY MS. CHIEN                      70
7                        RECROSS-EXAMINATION
                         BY MS. SCHEFFEY                   71
8                        FURTHER RECROSS-EXAMINATION
                         BY MS. CHIEN                      75
9
      RYAN KIMBLE        DIRECT EXAMINATION
10                       BY MR. POLOZOLA                   77
                         DIRECT EXAMINATION
11                       BY MR. BERGER                    106
                         CROSS-EXAMINATION
12                       BY MS. MELL                      117
                         REDIRECT EXAMINATION
13                       BY MR. POLOZOLA                  135
                         REDIRECT EXAMINATION
14                       BY MR. BERGER                    140

15    CHRISTOPHER
      STRAWN             DIRECT EXAMINATION
16                       BY MR. BERGER                    141
                         CROSS-EXAMINATION
17                       BY MS. SCHEFFEY                  162
                         REDIRECT EXAMINATION
18                       BY MR. BERGER                    187
                         RECROSS-EXAMINATION
19                       BY MS. SCHEFFEY                  188

20    CHARLES HILL       DIRECT EXAMINATION
                         BY MS. BRENNEKE                  189
21

22

23

24

25
```

```
 1                              EXHIBIT INDEX

 2
        EXHIBITS ADMITTED                                     PAGE
 3
          36                                                    31
 4        175                                                   82
          180                                                   96
 5        194                                                  197
          253                                                  203
 6        347                                                   72
          534                                                   89
 7        598                                                   52
          260                                                  104
 8        A-219, A-281                                          29

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                        MORNING SESSION

 2                                        JUNE 8, 2021

 3      (The following occurred outside the presence of the jury.)

 4           THE COURT:  I think everybody is here now.  I just

 5      wanted to tell you a couple of scheduling issues.  At 12:30

 6      today, I have a conference call with Congressman Kilmer about

 7      our building and some issues.  It should be very brief and

 8      should not delay the start this afternoon, but it is possible

 9      we would be a few minutes delayed at 1:00.

10      Tomorrow morning at 9:00, I have a criminal matter that is

11      a priority that has to be heard.  It involves a prisoner at

12      the Federal Detention Center, and I am hopeful that it will

13      not take more than a very few minutes, so I don't want to

14      plan for a long delay.  I want to have everybody ready at

15      9:00 tomorrow, but hopefully that -- it is a telephonic

16      hearing, and hopefully that will be very brief and we can

17      start shortly after 9:00.  We will be a little delayed in the

18      morning.

19      There are other criminal matters set that have to be heard

20      later in our trial here.  I will keep you posted on those

21      things that come along.  We have a lot of things like

22      sentencings that are set and fluid and they get moved around,

23      so it is a little hard to tell you exactly what might delay

24      us a week or two down the road.

25      Okay.  Are we ready to proceed with Mr. Scott?
```

1    MS. SCHEFFEY:  Yes, Your Honor.  I had one issue I

2    wanted to raise with you before the jury comes in.

3        Plaintiffs intend to have Mr. Strawn, who is one of their

4    experts, testify today.  We would like to renew our *Daubert*

5    motion.  Would you like us to do it in the presence of the

6    jury, outside, or right now?

7        THE COURT:  I don't want to keep the jury waiting.  I

8    would say not now, but before he testifies, certainly.

9        MS. SCHEFFEY:  Wonderful.  Thank you.

10        THE COURT:  Anything else preliminarily?

11    Okay.  You can bring in the jury.

12    (The following occurred in the presence of the jury.)

13        THE CLERK:  They are on their way in.  Would you like

14    me to bring in Mr. Scott?

15        THE COURT:  Yes, please.

16        THE CLERK:  Your Honor, all the jurors are here.  The

17    witness is on his way in.

18        THE COURT:  Good morning, folks, we will continue

19    with Mr. Scott in just a minute when he appears on the screen

20    as if by magic.  There is Mr. Scott.

21        You may continue, counsel, Ms. Scheffey, I guess you had

22    the floor.

23                    CROSS-EXAMINATION (Resumed)

24    BY MS. SCHEFFEY:

25    Q   Mr. Scott, we didn't get to it yesterday.  I wanted to get

1   to your background.  What did you do before you got to GEO

2   for employment?

3   A   I retired from the United States Air Force after 20 years

4   of honorable service to this country.  I was a firefighter in

5   the Air Force, primary duty to protect the life and safety of

6   those from the effects of fire during peacetime and wartime.

7   Q   How long have you worked at GEO?

8   A   I worked for GEO for 11 years so far.

9   Q   How long have you been the facility administrator?

10  A   I became the facility administrator in February of this

11  year.

12  Q   Before that, what was your position?

13  A   I held multiple positions in that 11-year time frame.

14  Before that, I was the assistant facility administrator.

15  Before that, I was the chief of security or also known as the

16  major.  Prior to that, I was the contract compliance director

17  for the western region.  Before that, I was the compliance

18  director for the Northwest ICE Processing Center.  Then prior

19  to that, I was the fire safety manager at the Northwest ICE

20  Processing Center.

21  Q   Okay.  So about how much of your time with GEO has been at

22  the Northwest ICE Processing Center?

23  A   All but six months of that 11 years.

24  Q   I am hoping that our tech team can pull up Exhibit 129.

25  It will be PDF Page 82, Bates No. 036906.  If we could call

1   out Section 9 "manage detainee work program."

2        Mr. Scott, are you familiar with this section of the

3   contract?

4   A   Yes, ma'am, I am.

5   Q   What is the purpose of this section of the contract?

6   A   The purpose of this section is to identify the requirement

7   of a voluntary work program that the Department of Homeland

8   Security Immigration and Customs Enforcement wants us to

9   follow.  It lays out the basis and the foundation of that

10  program.

11  Q   Does this portion of the contract state that detainees

12  should be treated as employees?

13       MR. WHITEHEAD:  Objection, Your Honor, leading.

14       THE COURT:  Sustained.

15  BY MS. SCHEFFEY:

16  Q   Does this portion of the contract give you any direction

17  about how detainee volunteers will be used around the

18  facility?

19       MR. WHITEHEAD:  Same objection.

20       THE COURT:  I think you may answer this question.

21       THE WITNESS:  It does.  This section of the contract

22  identifies and lays out some foundations of how the detainees

23  will be used inside the facility in a voluntary status.

24  Talks about their purposes of assignment to industrial,

25  maintenance, custodial services or other jobs.  It could be

1  other jobs.  Says it may include those.  It talks about using

2  appropriate protective clothing and equipment.  Detainees

3  shall not be assigned work that is considered hazardous or

4  dangerous.  It also states that it is the sole responsibility

5  of ICE to determine whether a detainee will be allowed to

6  perform on the voluntary work program and at what

7  classification level.

8  BY MS. SCHEFFEY:

9  Q   So what does that mean to you, what you just said that ICE

10  has the sole responsibility to determine whether a detainee

11  is allowed to perform in the voluntary work program?

12  A   ICE reviews and has oversight of everything I do under the

13  contract.  They take it so seriously that they put a contract

14  monitor on site.  Actually, there is two government employees

15  on site that monitor this contract.  The contracting officer

16  representative, and we also have a detention services manager

17  which reports directly to the headquarters of Department of

18  Homeland Security in Washington.  That is how seriously they

19  take this contract.  You know, I just -- I got to tell you,

20  after 20 years --

21       THE COURT:  Wait a minute.  I think you have answered

22  the question.

23  BY MS. SCHEFFEY:

24  Q   Do you meet with the ICE personnel on site regularly?

25  A   Yes.

Scott - Cross-Examination

1    Q    How regularly?

2    A    I talk to them near daily.  We have at least two or three

3    weekly meetings every single week on subjects related to the

4    detention facility.

5    Q    Do they give you feedback if they think you are doing

6    something wrong?

7    A    Absolutely give us feedback.  There is a whole section of

8    the contract that covers that.

9    Q    Can you think of an example of a time when they gave you

10   feedback and told you to change something?

11              MR. WHITEHEAD:  Objection, Your Honor, hearsay.

12              THE COURT:  Sustained.

13   BY MS. SCHEFFEY:

14   Q    Have you ever changed something at ICE's direction?

15   A    Yes, all the time.

16   Q    What have you changed at ICE'S direction most recently?

17   A    Most recently about staffing and for the past over a year,

18   we have dealt with COVID.  There have been a number of

19   requirements daily that looked at that and how we handle

20   COVID-19, the contractor -- we're the contractor, but the COR

21   directed stuff with janitors and medical.  They run the

22   contract overall.  They are responsible for the facility.  I

23   manage the facility.

24   Q    Is there anything in this section of the contract that

25   gives you direction about whether detainees should receive

1    uniforms and equipment as part of their volunteer project?

2    A    Yes, it does.   The ICE standard, the PBNDS also requires

3    that we provide them uniforms.

4    Q    Does this part of the contract say anything about firing

5    detainee workers?

6    A    It does not.

7    Q    Let's turn to PDF Page 65 of the contract, which is Bates

8    No. 036889.   We are going to see on the page immediately

9    before it there is a section entitled "removal from duty,"

10   which continues on to this page.   Do you see that?

11   A    I do see that.

12   Q    Is this section -- what does this section describe?

13   A    This section describes removal from duty.   It lists a

14   number of reasons how a GEO contracted employee can be

15   removed from the contract.

16   Q    Does this section apply to detainee volunteers?

17   A    It does not.

18   Q    Is a detainee volunteer disqualified from volunteering if

19   he or she has previously been convicted of a felony?

20   A    No, but GEO staff would be.

21   Q    Is the detainee volunteer removed from their position if

22   they falsified information about their identity?

23   A    No.

24   Q    What about for misconduct at prior employment?

25   A    No.

1  Q   Does the contract say anything about the stipend the

2  detainees will receive for volunteering in the program?

3  A   The contract does specifically state that.

4  Q   Let's turn to Page 5 of the PDF, which is Bates

5  No. 036829.  Tell me when you are there, Mr. Scott.

6  A   829?  I'm there.

7  Q   Is this the section that discusses the detainee stipend?

8  A   It does.  This is one of those many different line items I

9  was referring to earlier, but this does clearly lay out what

10  the stipend is.

11  Q   What portion should our tech team pull out for the jury?

12  A   Line Item 0003, where it starts "detainee voluntary

13  wages."

14  Q   What does this section of the contract mean to you?

15  A   The contract, that very important document, means that I

16  cannot do anything other than what this contract says, which

17  specifically lays out here that the actual cost of one dollar

18  per day per detainee, I cannot exceed that amount without the

19  prior approval of the contracting officer.

20        MR. WHITEHEAD:  Your Honor, objection.  This

21  misrepresents the document.  I think it's also violative of

22  one of Your Honor's orders in limine.

23        THE COURT:  Well, the objection is sustained.

24  BY MS. SCHEFFEY:

25  Q   What does the phrase "actual cost" mean to you?

1    MR. WHITEHEAD:  Your Honor, I'm sorry.  I actually

2  would request an instruction.  The document talks about

3  reimbursement to GEO.  It does not talk about pay to

4  detainees.  I think this needs to be clarified on the record.

5    MS. SCHEFFEY:  Your Honor, I would say he can get

6  that in in redirect if he reads this differently.  I'm just

7  asking questions about the terms of the contract.

8    THE COURT:  Well, I think this is basically a matter

9  for cross-examination, counsel.  I don't know exactly what

10  the question is to the witness now, but it should -- I guess

11  a whole sentence is a whole sentence and needs to be looked

12  at as a whole sentence, not just one part.

13    MS. SCHEFFEY:  Okay.  Can my tech team highlight the

14  whole sentence so we are not just highlighting portions?

15  BY MS. SCHEFFEY:

16  Q   Mr. Scott, do you see the highlighted sentence?

17  A   I do.

18  Q   What does the phrase "actual cost" mean to you in that

19  sentence?

20  A   "Actual cost" means that the reimbursement for this line

21  item will be at the actual cost of one dollar per day per

22  detainee.  That's what I have to pay.  That's what will be

23  reimbursed under this line item for this contract.

24  Q   What is your understanding of the amount of the stipend

25  detainees will receive when they volunteer in the program?

1   A   As we tell detainees, the national detainee handbook, our

2   local supplement, the ICE standards, that the stipend is one

3   dollar a day.

4   Q   Okay.  You have the contract in front of you.  Are you

5   aware of anywhere in the contract that requires payment of

6   minimum wages to detainees?

7   A   I have never seen that written anywhere in this contract.

8   Q   Okay.  Are there requirements for employees?

9   A   Multiple requirements for employees under this contract.

10  Q   I want to go back to something we started yesterday.  The

11  contract requirements for employees.  If we could go to PDF

12  Page 62 which is -- could someone blow up the Bates number

13  for me so I can tell the Judge?

14          MS. SCHEFFEY:  It is GEO-State 036886.

15      Thank you, Kelly.  You can close that.

16  BY MS. SCHEFFEY:

17  Q   I would like to pull up subpart A, "minimum standards of

18  employee conduct."  Can you see that on your screen, Bruce?

19  A   I can.

20  Q   Can a detainee volunteer meet these standards?

21  A   No, a detainee volunteer cannot meet these standards.

22  Q   Why not?

23  A   Well, for many different reasons.  ICE and the Department

24  of Homeland Security require an extensive background check.

25  I mean, it even states in here that an employee can't discuss

1   any information related to detainee files, which is a primary

2   part of detention, with a detainee around the detainee.  They

3   can't accept gifts from family members of detainees.  They

4   can't enter into business relationships with family members

5   or anything.  There is so much stuff here that says these

6   employees have to be very, very careful what they do around

7   detainees to protect that national security information.

8   Q   Why couldn't a detainee volunteer simply agree not to

9   receive any gifts from their family?

10  A   It just doesn't work like that.  We actually teach in

11  training classes on con games and manipulation.  One way that

12  people in institutions attempt to manipulate and get things

13  done is kind of in that way, starting with gifts, starting

14  with talking with staff members, getting to know their

15  personal lives, then they put their hooks in them, and then

16  they have you bring in contraband because they threaten you

17  with getting you fired.

18  Q   If we could go to PDF Page 63, "minimum personnel

19  qualification standards."  That should be Bates No. 036887.

20       Before a detainee volunteers, do they have to

21  demonstrate the ability to deal tactfully with the general

22  public?

23  A   No.

24  Q   Does a GEO employee have to demonstrate that they can deal

25  tactfully with the general public?

Scott - Cross-Examination

1    A    Yes, they do.

2    Q    Before a detainee volunteers for the program, do they have

3    to demonstrate they have the ability to read and interpret

4    rules and regulations?

5    A    No.

6    Q    What about a GEO employee?

7    A    Yes, a primary function of their job is to be able to read

8    and understand post orders and follow directions very

9    carefully.

10   Q    You mentioned earlier that there are ICE contractors on

11   site; is that correct?

12   A    That is correct.  There are multitudes of ICE contractors

13   on site.

14   Q    Has it ever been your impression that those ICE officials

15   wanted you to make sure that detainee volunteers followed

16   these standards in front of you?

17           MR. WHITEHEAD:  Objection, Your Honor.

18           THE COURT:  Leading.  Sustained.

19   BY MS. SCHEFFEY:

20   Q    Have you ever required detainees to follow these

21   standards?

22   A    No, I have never required detainees to follow these

23   standards.

24   Q    Why not?

25   A    It would violate the contract and potentially put me at

1    risk of losing my job with ICE.

2    Q    Let's talk about GEO employees' core responsibilities.

3    First, how many GEO employees do you have?

4           We can take the contract down for now, Kelly.

5    A    Right now, I have about 230 GEO employees at this present

6    time.

7    Q    Can that number change?

8    A    It can change, based on the contract.  We have a staffing

9    plan that is required by the government to have, based on

10    1,181 detainees or up to 1,575 detainees, and that staffing

11    plan adjusts based on facility needs, and those are the

12    positions that I have to have ready and available.

13    Q    If you have 1,181 detainees, how many positions do you

14    have to have filled under the contract?

15    A    I believe, without looking at the staffing plan, there is

16    a lot of positions on it.  It is about 232 positions for the

17    1,181.

18    Q    How many do you have right now?

19    A    About 220, depending.  That's full-time employees.  We

20    have part-time employees in there as well.

21    Q    What are the detention officers' main responsibilities?

22    A    Their main responsibility is safety, security and direct

23    supervision of the detainees, to provide that safe, secure

24    environment.  That's their primary duties.

25    Q    Why is security important?

1  A    Security brings safety, and bringing everybody home at

2  night safely was something that I took great pride when I was

3  a military man and I take great pride in all my officers

4  going home safely every night and the safety and security of

5  the detainees inside the facility.

6  Q    Do detention officers' jobs differ from detainee

7  volunteers?

8  A    Yes, they do.

9  Q    How do they differ?

10 A    In a multitude of ways.  We have the entire contract, the

11 entire standard, the ACA accreditations that lists out all

12 the duties that the officers are supposed to do other than

13 just watching detainees.  I mean, I do not expect my officers

14 to sit and watch TV all day long or play board games.  That

15 would be entirely incorrect.

16 Q    What about the training requirements for your officers, do

17 those differ from detainee volunteers?

18 A    Immensely different.

19 Q    How are they different?

20 A    180 hours required in the first year of training to

21 include defensive tactics, weapons training, firearms

22 training, you have to be certified to carry a weapon in

23 public, duty of this contract, supervision, suicide awareness

24 and prevention, Prison Rape Elimination Act information and

25 awareness to make sure we follow a number of other sets of

1  standards that we are required to follow.  There is a host of

2  things that a detention officer has to know and follow on a

3  daily basis.

4  Q   How does that compare to the VWP training?

5  A   The VWP training that we provide that is required by the

6  standard on maybe how to sweep and mop a floor, how to spray

7  and clean a table.  You get a little bit more into the

8  required skills that they have in the kitchen and the

9  laundry.  Takes a little bit more training in those areas,

10 but they don't get all the training that a detention officer

11 receives.

12 Q   I want to talk about the process you go through in hiring

13 a new GEO employee under the contract.  Do you interview new

14 employees?

15 A   Yes, we do.

16 Q   Do you set minimum skill requirements?

17 A   It is a requirement of the standard that we set minimum

18 skill requirements and -- under the contract, I mean.

19 Q   When you say "requirement of the standard," what are you

20 referring to?

21 A   When I talk about "the standard," I'm talking about the

22 Performance-Based National Detention Standards.  But direct

23 supervision of detainees, and in some of those multiple

24 things that standard requires, we have to make sure they

25 would be able to perform those functions.  Primarily the

1  functions are labeled out in the contract as those minimum

2  requirements.

3  Q   Do you place them in positions based upon their prior

4  skills?

5  A   Prior skills is very important.  Especially a detention

6  manager, being a detention officer is not for everybody.  So

7  prior skills, experience is looked at very favorably, whether

8  they have already been in a correctional type of institution.

9  We have many that come over from state prisons, we have some

10  that have been in federal prisons as officers before; that

11  type of environment is very good to have somebody that knows

12  how to work inside that environment.

13  Q   Do GEO employees have to pass a background check?

14  A   A very strict background check, yes.

15  Q   Why is it very strict?

16  A   It is strict because this is a contract under Department

17  of Homeland Security.  I mean, it is very strict.  I don't

18  want to go into the history of Homeland Security and how it

19  was founded, why it was founded.  Homeland Security takes its

20  job very, very seriously.  I do as well.  There are a number

21  of requirements that we have to pass to be a contractor for

22  the Department of Homeland Security.

23  Q   Just so I can understand, how long does that background

24  check take?

25  A   It depends on the individual.  On average, that background

1  check takes 90 days to complete.

2  Q   Is it different than a background check for Target, for

3  example?

4  A   Yes.

5  Q   In what way?

6  A   From my knowledge, Target employees don't have to have

7  access to National Security information.  Sometimes under our

8  employment, we have to have access to that information

9  contained inside the Department of Homeland Security systems

10  to be able to do our job.

11  Q   Do you conduct background checks on detainees?

12  A   I do not.

13  Q   Do you require minimum skill levels for detainees that

14  choose to volunteer?

15  A   No.

16  Q   Do you interview detainees that choose to volunteer?

17  A   No.

18  Q   Okay.  You mentioned a little bit ago a staffing plan.

19  What is a staffing plan?

20  A   A staffing plan is, one, it is a requirement, but a

21  staffing plan is, it is a big document that looks at the

22  required number of posts, it looks at the potential need for

23  training.  People have to have off days.  They have to go

24  home.  We offer a vacation benefit.  We have sick leave

25  benefits.  You have to look at all those benefits together.

1    You have relief factors that are built in because I know if I

2    have to have 80 posts on first shift but I am going to have X

3    amount of staff off, I need to have X amount of staff in

4    relief to be able to rotate for all of those days offs,

5    vacations, training days.  A staffing plan is a very

6    important part of business.

7    Q    If you could condense it, what is the basic purpose of the

8    staffing plan?

9    A    To have enough people to do the job correctly.

10   Q    Does your staffing plan include detainee volunteers?

11   A    It does not.

12   Q    Has it ever included detainee volunteers?

13   A    It has not.

14   Q    Do you submit your staffing plan to ICE?

15   A    We do.

16   Q    Does ICE give you feedback on the staffing plan?

17   A    Yes, I have to give them monthly reports and sometimes

18   weekly conversations with the contracting officer

19   representative to make sure that we are doing what we are

20   supposed to do.

21   Q    Has the staffing plan ever not been approved by ICE?

22   A    No.

23   Q    I have also heard some questions about the trial that are

24   drawing a distinction between detention officers and other

25   staff.  I am going to try and understand that distinction.

1   Can anyone work in a secure side of the facility without

2   going through detention officer training?

3   A   Well, there is multiple sets of trainings required.  So I

4   can have somebody that works on the secure side that didn't

5   necessarily go through all the requirements of detention

6   officer training.  There is other requirements in the ACA

7   standards and the PBNDS that call that out.  There is a

8   number of core sets of training that everybody has to have on

9   the secure side.

10  Q   Are there currently janitors that work in the non-secure

11  side?

12  A   The only place janitors work on the non-secure side --

13  sorry, repeat the question.  I think I am confused.

14  Q   Are there currently janitors who work in the non-secure

15  side of the facility?

16  A   Yes, there are janitors that work on the non-secure side

17  of the facility.

18  Q   Do they have the same training as the detention officers

19  on the secure side of the facility?

20  A   They go through the original academy.  Those core sets

21  that require anybody to potentially be around a detainee

22  because if they maybe walk through a lieutenant's office, if

23  they are inside the secure part of the facility, they have to

24  have that core set of training.  They attend the annual

25  refresher training, the 40 hours which occurs every single

1    year.

2    Q    Let's talk about how people are deployed in the building.

3    When you come in in the day, how does each detention officer

4    know where to go?

5    A    There is a schedule posted at least 24 hours in advance.

6    They go, they look at the schedule, see what posts of the

7    many posts, depending on which shift they are at.  They

8    report to their lieutenant, they clock in and go to post.

9    Q    What happens if someone calls out and is sick?

10   A    That's what the relief factor is built in for.  We have

11   methods of making sure that we can staff -- staff can

12   volunteer for overtime.  If we don't have enough volunteers

13   for overtime, we can mandate overtime because we have

14   required posts that we have to fill.

15   Q    Okay.  So when you are planning for the unexpected, have

16   you ever had an officer pushing a tray of meals and it spills

17   in the hallway?

18   A    Yes, we have.

19   Q    What happened?

20   A    Well, the meals are very important, right?  So whatever

21   could be salvaged that didn't spill goes back to the kitchen,

22   more meals are put back on that cart, gets to the unit

23   because we have direct timelines that we have to get meals to

24   units by, and then the staff that -- that mess has to be

25   cleaned up.  Staff will clean up the mess.  I have actually

1  done that myself, taken a cart around a corner and a couple

2  trays fly off the top and then -- I take pride.  I cleaned up

3  my mess.

4  Q   Okay.  Let's talk about the phones.  Does GEO provide

5  phone services to detainees?

6  A   Phone service is provided here.  You are saying it kind of

7  wrong.  GEO doesn't provide the phone service.

8  Q   Who does?

9  A   ICE.  Through a contract directly with ICE, a company

10 called Telmate provides the phone service for detainees.

11 Q   Does GEO have any control over the price of phone calls in

12 the facility?

13 A   No, Telmate is a private company contracted directly by

14 ICE.  They control all that.

15 Q   If a detainee spends money on calls, does GEO receive any

16 profit or monetary benefits from those phone calls?

17 A   No.

18 Q   What about the commissary, does GEO provide the

19 commissary?

20 A   No, GEO does not provide the commissary.

21 Q   Who does?

22 A   A company called Keefe.  When I say "GEO does it," we

23 contract with -- GEO contracts with us to provide that

24 service.  That is something that GEO does have some control

25 over, but still Keefe is its own private company.

1    Q    So I think you are trying to draw a distinction between

2    the phone and commissary that I am not getting.  What is the

3    difference between the relationship with the commissary and

4    the relationship with the phone and GEO?

5    A    The phone is a completely separate function that is all

6    under ICE.  The phone system allows detainees to make phone

7    calls, but the Telmate phone system operated under ICE also

8    allows detainees to access tablets, video calls, movies,

9    radio stations.  There are some paid functions on that.

10   There are some free functions on that where they can get

11   access to free content on those tablets.  That's completely

12   separate from the commissary, which pretty much just deals

13   with -- Keefe runs the detainee accounting system that allows

14   money to be put on the detainees' accounts and then they can

15   purchase items from the commissary, which are a multitude --

16   we have over 100 items on the commissary that detainees can

17   purchase like the ramen that is so well-liked.  But they can

18   also purchase some extra sweats if they want other than the

19   ones we provide, yarn for knitting.  There is a lot of stuff

20   on the commissary that they can purchase.

21   Q    If a detainee makes a purchase from Keefe, does GEO get

22   any profit or benefit from that purchase?

23   A    No.  That is strictly controlled by the ICE standards and

24   our accreditation standards.  If there is any extra money

25   that comes back from commissary, that goes directly into a

1    detainees' account fund, all that money goes directly back to

2    the detainees.  Very similar to prisons and jails that run

3    those same commissary types of systems.

4    Q   When you say it goes back to the detainees, are you

5    handing out gift cards?

6    A   Well, we don't hand out gift cards, but it helps -- say,

7    for example, one thing that it is used for on Christmas

8    holiday, we give every detainee what is called a super sack.

9    It is a huge sack of commissary items that is free that comes

10   from Keefe.  GEO, on our side, we supplement that with hot

11   chocolate, cider, movies nights and popcorn and other stuff

12   from GEO.

13   Q   Are you aware of a detainee ever asking for a new type of

14   position to be made in the voluntary work program?

15   A   Not a new type of position.  What we did do, because

16   volunteering is important to detainees.  They like to

17   volunteer.  I remember one time in rounds they have asked me

18   if we could take the bathroom cleaner, instead of having one

19   bathroom cleaner for the whole day, you can make it three

20   bathroom cleaners, breakfast, lunch and dinner bathroom

21   cleaners to do that and allow more people.

22        This is the Level 3s that can't work outside the housing

23   unit.  Level 3s typically have a little bit less opportunity

24   to participate in the voluntary work program.  They can only

25   do stuff inside the housing unit.  So we wanted to be able to

1  spread that benefit out to them as much as possible so that

2  as many people could volunteer as we could.  Because it just

3  benefits them, benefits the facility.

4  Q   Were you able to accommodate that request to have more

5  bathroom cleaners?

6  A   Yes.

7  Q   How about mural painting, have detainees ever asked for a

8  mural painting position?

9  A   They have.  After the first one that started it, it

10 started kind of a crazy trend.  There was one individual

11 that -- he was -- I remember him well because I used to watch

12 him and talk to him.

13         MR. WHITEHEAD:  Objection, hearsay.

14         MS. SCHEFFEY:  It is a party opponent.  It is a

15 detainee in the class period.

16         THE COURT:  I'm sorry, Ms. Scheffey, I didn't hear

17 what you said.

18         MS. SCHEFFEY:  Statement of a party opponent.  It's a

19 detainee in the class period.

20         MR. WHITEHEAD:  Absent class member, Your Honor, not

21 a named plaintiff.

22         THE COURT:  The objection is sustained.

23 BY MS. SCHEFFEY:

24 Q   Can you look at Exhibit A-219 in your packet, Mr. Scott?

25 A   I found it.

1  Q    What is that?

2  A    A series of murals that were painted by detainees upon

3  request at the Northwest ICE Processing Center.

4  Q    Can you also look at Exhibit A-281?

5  A    I'm there.

6  Q    What is that?

7  A    More of a close-up shot of one of those murals that were

8  painted by detainees.  Very, very talented detainees.

9  Q    Is that a color version of A-219?

10  A    It is.

11        MS. SCHEFFEY:  I offer into evidence A-219 and A-281.

12        MR. WHITEHEAD:  No objection.

13        THE COURT:  They may be admitted.

14           (Exhibits A-219, A-281 were admitted.)

15        MS. SCHEFFEY:  May we publish A-281 to the jury?

16        THE COURT:  Yes.

17  BY MS. SCHEFFEY:

18  Q    Is this the mural that detainees painted?

19  A    Yes, it is.

20  Q    Was that part of the voluntary work program?

21  A    We paid the detainee as part of the voluntary work

22  program.  This was kind of a special, off-the-side, one of

23  those special details.  Detainee requested -- wanted to put

24  some art work on the wall, which started a whole bunch of

25  other detainees that wanted to do the same thing.  We did

1    allow this under -- with approval of the contracting officer

2    representative to allow detainees.  We paid these detainees

3    under the voluntary work program.

4    Q    Is mural painting still a position available in the

5    voluntary work program?

6    A    It is not a listed position.  We have not had any requests

7    in a while for this.  We would just look at it on a

8    case-by-case basis as one of the special details.

9    Q    How many different murals can you remember having been

10   painted as part of this program?

11   A    Like I say, there is at least ten murals, potentially a

12   little bit more.  Detainees often stop and look at us.  A

13   great conversation with detainees and auditors and any

14   congressional people that walk through the facility always

15   stop and look at these murals.

16   Q    I am going to have you turn to Exhibit 36.  We can take

17   281 down from the screen.

18   A    Which exhibit, ma'am?

19   Q    36.

20   A    I am there.

21            THE COURT:  Wait a minute.

22            MS. SCHEFFEY:  Sorry, Your Honor.  We will wait until

23   you are there.

24            THE COURT:  You are referring to what exhibit now?

25            MS. SCHEFFEY:  Plaintiff's Exhibit 36.

1      Your Honor, do you have it in front of you now?  Is the

2  Court ready?

3           THE COURT:  Yes, I am waiting on you.

4  BY MS. SCHEFFEY:

5  Q   What is Exhibit 36, Mr. Scott?

6  A   Exhibit 36 is a yearly report that was created.  It covers

7  a multitude of information that comes directly from our

8  outcome measures that we are required to report to ICE and

9  under different formats for auditing purposes and end-of-year

10  stat purposes.

11           MS. SCHEFFEY:  I would offer into evidence Exhibit

12  36, which has been stipulated.

13           MR. WHITEHEAD:  No objection, Your Honor.

14           THE COURT:  36 may be admitted.

15                (Exhibit 36 was admitted.)

16           MS. SCHEFFEY:  May I publish?

17           THE COURT:  Yes.

18           MS. SCHEFFEY:  If we could turn to page PDF Page 6,

19  but page 5 of the document.

20  BY MS. SCHEFFEY:

21  Q   Tell me when you are there, Mr. Scott.

22  A   Can I have the Bates stamp just to make sure?

23  Q   Bates stamp 029839.

24  A   Okay.  I am there.

25  Q   I would like to call out the "average length of stay"

1    section of the chart.  Is this an accurate representation of

2    the average length of stay for any particular detainee?

3    A   For 2014, yes.

4    Q   So what is the average length of stay for a detainee in

5    your facility?

6    A   In looking at the admissions releases of detainees when

7    they go through their administrative processes with ICE and

8    the government, we look at how long they have stayed at the

9    facility.  The average length of stay, which is how long an

10   individual stays inside the facility, is what is listed here.

11   Q   So about how many days is the average length of stay for a

12   detainee?

13   A   For this year, we put the average length of stay at 71

14   days.

15   Q   When a detainee volunteers for the program, can you count

16   on them being at the facility much longer than the average

17   length of stay?

18   A   No.

19   Q   I would like you to take a look at -- we don't need to

20   call it out, they can take this down for now.  Take a look at

21   what is Bates stamped 029838.  If we could put that page on

22   the screen.  It is Page 5 of the PDF, Kelly.

23   A   I am there.

24   Q   How many audits did you have in the year 2014?

25   A   I see five audits for this year in 2014.

1    Q    Who is the first auditor that you see?

2    A    The very first one I see at the top of the list is Civil

3    Rights Civil Liberty audit in February.

4    Q    Who is Civil Rights Civil Liberty?

5    A    That is a division of ICE.  They have two different

6    divisions that will come down and audit sometimes.  One of

7    their many divisions that audit us.  This is the Department

8    of Civil Rights Civil Liberties of ICE.

9    Q    What do they audit you for?

10   A    A number of the standards and their requirements.  Similar

11   to the other audits that just look at us quite regularly.  I

12   have one going on this week, actually.

13   Q    Okay.  In 2014, did the Department of Civil Rights and

14   Civil Liberties have an adverse finding related to the

15   voluntary work program?

16   A    I do not recall one.

17   Q    Okay.  In 2014, what was the stipend paid to detainee

18   workers?

19   A    One dollar a day.

20   Q    What was the next audit you see listed?

21   A    Next audit I see is the ICE annual audit by the Nakamoto

22   Group.

23   Q    What is that audit?

24   A    The Nakamoto Group is a privately owned auditing group

25   that is contracted directly with ICE to review the ICE

1  detention standards, specifically now the Performance-Based

2  National Detention Standards at all ICE facilities.

3  Q   How often are you audited by Nakamoto?

4  A   In the past, it was one a year.  Now with COVID-19, they

5  have the audit scheduled two times a year.

6  Q   Has Nakamoto ever given you an adverse finding related to

7  paying detainees in the voluntary work program one dollar a

8  day?

9  A   No, they have not.

10  Q   What is the next audit you see?

11  A   The next audit is the annual corporate audit.

12  Q   What is that audit?

13  A   The GEO Group takes auditing very seriously.  They have

14  their own division for just audits.  So the annual corporate

15  audit looks at us again to make sure that we are following

16  all ICE standards and the ACA accreditation standards to

17  include GEO policies and our business section, make sure that

18  we are doing everything that we are supposed to do.  It is

19  another level of oversight throughout each year just to make

20  sure we are doing and providing the best service we can to

21  the United States government.

22  Q   What is the next audit on that list?

23  A   The next audit was the Office of Detention Oversight

24  audit.

25  Q   Who is the Office of Detention Oversight?

1    A    A specific division at ICE headquarters.  They are the

2    actual ones that are auditing this week.  They have oversight

3    of just all detention oversight.  So they will come down and

4    do audits specifically related to the contract and the PBNDS.

5    Q    So is that three audits from ICE that we have counted so

6    far?

7    A    Yes.

8    Q    What is the final audit?

9    A    This is a big -- this is the ACA audit, the American

10   Correctional Association.

11   Q    What is the American Correctional Association?  Why is

12   that an audit?

13   A    One, it is required by the standard.  I think it was

14   pointed out earlier in the contract.  It is required by the

15   contract that we be ACA accredited.  ACA is an accrediting

16   body that accredits international detention facilities,

17   correction facilities, youth facilities.  They have a number

18   of different auditing types of things.

19       We fall under the adult local detention facility, like

20   very similar to other state and local detention facilities.

21   A company has to seek accreditation from this entity, which

22   is a three-year audit.  So they come back every three years

23   and do an on-site and personal audit.  We have to give annual

24   reports each year throughout that audit and update on a

25   number of standards, from 374, I think it is, potential

1    standards that can be audited.  This is a huge one because

2    there is a number of mandatory standards in this audit.  If a

3    facility fails any mandatory standard, they do not get

4    accredited.

5    Q    Did any of those auditors bring up that detainees should

6    be employees?

7    A    No.

8    Q    Was 2014 a contract renewal year?

9    A    We did end one portion of the contract in that year and

10   renewed the current contract that we have been looking at in

11   2015.

12   Q    Was the voluntary work program in effect prior to the

13   current contract we have been looking at?

14   A    Yes.

15   Q    Were detainees paid less than minimum wages?

16   A    Yes, they were.

17   Q    Did ICE require in its new contract that detainees be paid

18   minimum wage?

19   A    No, it did not.

20   Q    Have you had audits since 2014?

21   A    Every year.

22   Q    Has anyone indicated in those audits that detainees should

23   be paid minimum wages?

24   A    Never.

25   Q    I also see on here there was a congressional visit.  Is

1    that unusual?

2    A    Not unusual.  We have had other congressional visits or

3    staffers come throughout the facility on a number of times

4    following the 2014.

5    Q    What do congress people get to see when they visit?

6    A    Anything they want to see.

7    Q    Can they see the voluntary work program?

8    A    They do.

9    Q    I think I see a number of media visits.  What does the

10   media get to see when they visit?

11   A    Entire detention standard on media towards visits.  Those

12   are controlled by ICE.  Typically media -- whatever ICE

13   allows them to see, they can see and take pictures of as long

14   as they follow the ICE rules.

15   Q    Do you remember yesterday counsel showed you a section of

16   the contract that talked about GEO's obligation to follow

17   applicable laws?

18   A    I do recall that.

19   Q    Did any of these auditors ever state that the Minimum Wage

20   Act was applicable to these detainees?

21   A    No, they did not.

22   Q    Prior to bringing this lawsuit, did the State ever visit

23   the facility?

24   A    Yes, the State has.

25   Q    What about the Department of Labor & Industries, have they

1   visited the facility?

2   A   They have visited the facility and know what type of

3   facility we are.

4   Q   Prior to bringing this lawsuit, did the State ever give

5   you a formal notice indicating the detainees should be paid

6   minimum wage?

7   A   No, they did not.

8   Q   Did the Department of Labor & Industries ever tell you

9   that minimum wage was applicable to detainee workers?

10  A   No, they have not.

11  Q   I want to switch gears a little bit here and talk a little

12  bit more about ICE's role in the facility.  When detainees

13  arrive, are they given a handbook that GEO has drafted?

14  A   When detainees arrive, they are given two handbooks, one

15  that I draft at my facility, and one that is drafted by ICE.

16          MR. WHITEHEAD:  Objection, Your Honor.  Relevance and

17  outside the scope of direct.

18          MS. SCHEFFEY:  Your Honor, my next question will tie

19  it back --

20          THE COURT:  The objection is overruled.

21  BY MS. SCHEFFEY:

22  Q   Does the ICE handbook detail the voluntary work program?

23  A   It does.

24  Q   What about the GEO handbook?

25  A   We echo what the ICE handbook says in the GEO supplement,

1  yes.

2  Q    So what is the gist of what detainees are told about the

3  ability to participate in the voluntary work program?

4  A    That a volunteer program is available.  They have the

5  opportunity to work inside the facility for reasons we have

6  talked about before and the stipend is a dollar a day.

7  Q    Does ICE review your detainee handbook before you give it

8  out to detainees to make sure it is accurate and correct?

9  A    Yes, our local supplement of the handbook is actually a

10 policy that ensures that we review it every year, and ICE

11 signs off on that review every single year.

12 Q    When you say they sign off on that, is that a formal sign

13 off or are you using that kind of casually?

14 A    No, it's a formal sign off.  There's their signature, my

15 signature, and the ICE officer in charge's signature will be

16 on the front of the handbook.

17 Q    If we could pull up Exhibit 123, first page.  Right there,

18 if we blow up the signatures.  Here, whose signatures are

19 those, if you know?

20 A    That is year 2016, so that was Ryan Kimble.  He was one of

21 the associate wardens at the time.  The warden must have been

22 off on leave on that day.  And then William Penaloza, he was

23 the ICE field officer director, what was formally called the

24 AFOD, assistant field officer director.  They are now called

25 the officer in charge.

1    Q   What is your understanding of what the signature by ICE

2    means on this handbook?

3    A   A signature reviewed and revised.  If there is any changes

4    to that, ICE would have looked at it and approved the changes

5    and signed off on the policy, the handbook, which would then

6    be published and put out for detainees.

7    Q   I want to pull the contract back up now.  If we could pull

8    up 129, Pages 86 and 87.

9         MS. SCHEFFEY:  Your Honor, it is Bates 036910.

10        Kelly, if you can blow it up, I am having trouble seeing

11   it, where it says "the list of one office," the end of that

12   first page.  Yep, right there.

13   BY MS. SCHEFFEY:

14   Q   Okay.  I know you talked before about how ICE is on site.

15   Are the two individuals you listed the only ICE personnel on

16   site?

17   A   The AFOD of those two names, one was the GEO, the AFOD was

18   the ICE officer on site, that was number one, the assistant

19   field office director.

20   Q   Are there ICE offices on site?

21   A   I am required to provide many offices to include ICE on

22   site for all of the folks listed in this part of the

23   contract.

24   Q   So this part of the contract, does this describe space

25   that is available to GEO personnel or ICE personnel?

1    A    No, this is strictly ICE personnel.

2    Q    Are there 24 offices for deportation officers on site?

3    A    Yes.

4    Q    What other types of facilities are available to ICE on

5    site?

6    A    The contract officer requires them to have a fitness

7    center.  ICE has a little fitness center on site.  It is on

8    the unsecured side so detainees cannot access that fitness

9    center.  There's just a number of offices here, work

10    stations, bond offices, secure visitor contact window so the

11    public can speak with ICE about information related to a

12    detainee's case, conference rooms, gun lockers, firearm

13    storage, counselor affair rooms, just a lot of offices.

14    Q    If we could take down this call out, Kelly.  I want to

15    talk about a different portion.  I believe below that there

16    is a section called "OPLA space."  Do you see that?

17    A    I do.

18    Q    What is OPLA space for?

19    A    It is the office of the principal legal advisor for ICE.

20    There is a number of ICE employees that I have to provide an

21    office space for.

22    Q    Are these different offices than the ones you just listed?

23    A    Yes, different section of the building.

24    Q    Explain to me, you have this detention center, where are

25    the ICE offices?

1    A    I pause because we had that event out there at the center

2    last year.  The ICE offices are upstairs on the second floor

3    of the administrative building that aligns J Street.

4    Q    Okay.  Below "OPLA space," I think we have a section

5    called E-I-O-R.  If we could blow up that space.  Is the

6    courthouse on site at the facility?

7    A    We have five courtrooms on site.

8    Q    Five?

9    A    Five federal courtrooms, three full, regular courtrooms

10   with -- looks like a regular courtroom and then two video

11   visitation courts.

12   Q    Are those also part of the facility contracted by the

13   federal government that GEO provides?

14   A    It is a requirement that I have those spaces for them.

15   Q    Are immigration judges regularly on site at the facility?

16   A    Yes, they are.

17   Q    What about ICE officers, are they regularly on site?

18   A    Regularly.

19   Q    So ICE officials can regularly observe the operations of

20   the facility; is that right?

21   A    Daily.

22   Q    Does ICE require GEO to provide it with this space?

23   A    Yes, it does.

24   Q    Have any of those ICE officers ever instructed you to

25   classify volunteer detainees as employees?

1    A    No.

2    Q    We can take that down.  I am going to talk to you a little

3    bit more about the basics of the voluntary work program.  So

4    how does a detainee express an interest?  How do they say

5    they want to volunteer for a position?

6    A    We have a staff detainee communication center.  They ask

7    in any form, really.  They can talk to their detention

8    officer.  They talk to me when I do rounds throughout the

9    facility.  Formally, we ask them to put it on a kite or what

10   is called a detainee request form, because that ultimately

11   goes back to their detainee record.  That is an electronic

12   form that has been referred to.

13   Q    Can they use kites for anything else?

14   A    Multitude of other reasons kites are used for.  Lots of

15   reasons.

16   Q    If a detainee has a problem with the food, for example,

17   can they use a kite to raise that issue?

18   A    They can take over a kite to the food service

19   administrator for food, they can request reading glasses from

20   the chaplain under the reading glass donation program, books,

21   videos, movies, computer, Xbox games, all those kind of

22   things can be requested on the detainee request form.  It is

23   a form of -- a required form of communication outside the

24   verbal communication in the standard.

25   Q    Can you remember a time when a detainee was ever turned

1   away from a volunteer work position because they didn't have

2   enough experience?

3   A    No.

4   Q    What about a GEO employee, have you ever turned away an

5   applicant because they didn't have enough experience?

6   A    Yes, I have.

7   Q    Once a detainee asks to participate, is there always a

8   space available?

9   A    Not always a space available immediately.  In the past,

10  what we looked at and talked about, the waiting list, that's

11  what the waiting list was because there was so many people

12  that wanted to volunteer.

13  Q    If you get a particularly skilled detainee who is

14  interested in a program, can you fire the detainee who is

15  currently volunteering and replace them with a better

16  detainee?

17  A    No, I can't.

18  Q    Why not?

19  A    That would be improper.  It is a voluntary work program.

20  We pride ourselves on operating a safe and secure, fair

21  detention center.  We tell the person he just has to wait

22  until that opening becomes available and his position is up

23  on the volunteer wait list.

24  Q    Are you trying to maximize efficiency when you come up

25  with the detainee volunteer positions?

1   A   We do try to maximize efficiency.  Running a detention

2   center has a number of things you have to take into account.

3   You can't say, "Hey, go do what you want today."  There is

4   movement, there's count, there's a bunch of things under the

5   facility movement schedule that has to be done efficiently,

6   and we want as many as potential (sic) to have that

7   opportunity to volunteer.

8   Q   How do you balance the two, efficiency and as many as

9   possible to volunteer?

10  A   We go to the contract officer representative.  Part of

11  those annual stats they see, they know what the program is

12  running.  We look at that and the number of opportunities

13  that we and the government will allow us to do.  We expand

14  those out as much as we can so we can get as much volunteer

15  activity.  Then when all -- talk about the schedules, has to

16  be worked with the facility schedule to make sure the safety

17  and security and all the other requirements are met.

18  Q   What happens if a detainee does not want to participate?

19  A   It is a voluntary work program.  He does not have to

20  participate.  He can remove himself from the voluntary

21  program.

22  Q   Do you have any programs in place to encourage detainees

23  who don't volunteer to keep their areas clean?

24  A   We have a number of programs.  The requirement of the

25  standard, detainees have the responsibility to keep their

1   immediate living area clean.  That is outside the voluntary

2   work program.  Most detainees take great pride in the

3   facility because it's their home.  They call their cellblock

4   their house.  They take -- they do take pride in what they

5   do.

6   Q   Okay.  Are there any messy detainees who just aren't

7   naturally clean people?

8   A   There are some.

9   Q   How do you encourage them to clean up after themselves?

10  A   That's where staff detainee communication comes in very

11  importantly.  We have also in the past included medical

12  because some detainees come from areas of the country that

13  may have never -- not the country, but the world, that may

14  have never seen a toilet.  So we engage medical staff also to

15  help educate detainees on proper hygiene.  That is a very

16  important aspect of living in a facility.

17  Q   What about the Xboxes, do you use those in any way to help

18  detainees stay clean?

19  A   The Xboxes you talk about are specifically related to a

20  two-fold part.  We are required to do a sanitation safety

21  inspection every week.  We couple this inspection with an

22  incentive program for detainees to clean their housing unit

23  and follow the facility rules, and the units that best meet

24  the facility rules and the sanitation for that given week

25  have a chance to earn not only an Xbox, but a chicken buffet

1    dinner.

2    Q    So if a volunteer chooses to help clean in the pods, are

3    they usually starting with a really messy pod?

4    A    No, they are not because the detainees really like --

5    especially the younger detainees like the Xbox.  Some like

6    the Xbox over chicken, if you can actually believe that.  But

7    a lot of people like the extra chicken buffet dinner.  So

8    most of them like keeping a clean house anyway.  They don't

9    start with a messy pod.

10   Q    What about your officers, have you ever seen an officer

11   clean?

12   A    Absolutely.  One officer is retired Army, he is always

13   cleaning, and typically he demonstrates leading by example so

14   he will start cleaning and the other detainees will just come

15   up and help him out.

16   Q    Have you ever reviewed security footage to check and see

17   if officers are keeping things clean?

18   A    We do review security footage for a lot of different

19   things.  We have seen officers conduct those cleaning cycles

20   that we have asked.

21   Q    Have you ever observed detainees performing their

22   voluntary work program tasks?

23   A    All the time.  When I walk through the facility,

24   especially after maybe a big detail, detainees like to show

25   me what they have done, show me what they have done in the

1    voluntary work program, or we had one that just loved

2    painting.  He showed me what he did inside the housing unit.

3    He was very proud of it.  All the time I see them doing --

4    every time I walk, I see somebody doing something.

5    Q    If you could go back to Exhibit 36 for me.  I am going to

6    have you turn to Bates page 029858, which is page 25 of the

7    PDF for my tech team.  If we could blow up the types of work

8    detail section with the numbers, Kelly.

9         Mr. Scott, what does this page tell me?

10   A    This is just an overview of the entire year that this

11   report was written.  Again, these data points are required in

12   some of our outcome measures with ICE and ACA that we report

13   on an annual basis -- monthly and annual basis required by

14   some of those audits.  Auditors like to look at this

15   information as well.  Just an overview of how many positions

16   in the voluntary work program were completed through that

17   year in those various sections.

18   Q    Okay.  You have a lot of information.  I am going to take

19   a step back and break it down so I understand.  What does

20   that 58 percent number mean?  What does it tell me?

21   A    The first 58 percent, that is if we look at just the

22   overall participation in the voluntary work program, 58

23   percent of that participation is in the housing units.  That

24   is by far the areas that have the most jobs available.

25   Q    Okay.  You have observed -- you just testified a few

1  minutes ago that you have observed people participate in

2  those voluntary work program positions in the pod?

3  A   Yes.

4  Q   About how long do those positions take?

5  A   On average, they can take 30 minutes.  Some are a lot

6  shorter.  Some, depending on how much work the detainee

7  volunteers do himself to make the housing unit look good for

8  him and his pod mates, it could be longer.  But an average is

9  about 30 minutes.

10  Q   I see here that there is something that says "painter."

11  What is that?

12  A   Painter, if we have a need, or if a detainee requests to

13  paint, sometimes they request to paint the rec yard, add

14  extra games, like boxes for handball and stuff like that,

15  they request to paint, or maybe they -- when detainees talk

16  on the phone, sometimes they put their feet up on the wall

17  and a detainee may want to do that, or an officer may say,

18  "Hey, look, that wall is looking a little dirty.  Does

19  anybody want to volunteer to paint?"  Those positions are

20  covered by that painting position.

21  Q   What percentage of positions were painters on this?

22  A   It says .3 percent of the overall voluntary work program.

23  Q   What is "facility"?

24  A   Facility is outside of just any other -- it is like -- it

25  is kind of like painter.  If we -- I remember one time we

1  wanted to move -- the courtroom updated their seats in the

2  courtroom.  We had some extra bench seats, so we wanted to

3  put those outside the medical waiting areas so detainees

4  could sit when they were waiting for their medical

5  appointments.  We had to move those benches from downstairs

6  to upstairs.  Something like that would fall under facility.

7  Q    "Floor," what is that?

8  A    That is the floor detail.  We have heard a lot about the

9  Grey Mile floor detail, pod laundry, kitchen floor.  That is

10 the floor detail.

11 Q    What percentage is that?

12 A    3 percent of the overall voluntary work program.

13 Q    We can take this document down.

14       What other opportunities do detainees have to keep

15 themselves busy, other than participation in the voluntary

16 work program?

17 A    A number of opportunities, recreation, TV.  We offer TVs

18 in each housing unit.  They are digital TVs with digital TV

19 receivers, about 22 digital channels.  They can ask the

20 officer to put on any news, legal channels that are on there,

21 MTV.  Some of the favorite channels they like to watch,

22 History channel as well.  Movies, board games.  These

23 tournaments we talked about.  There is a lot of activity.

24 Religious programs and services are required.  Law library.

25 They can go work on their cases.  There is a lot of things

1   that detainees can do.

2   Q   What if a detainee wants to read a book that has nothing

3   to do with the law, can they do that?

4   A   They can.  We have a book cart library program.  Book

5   carts go around to the dorms.  Every two weeks they are

6   rotated with books.  Detainees can request books via the kite

7   system to the recreation specialist.  If we can find that

8   book out there, we will purchase it and get it into the

9   library system.  We allow detainees also if they want to

10  purchase a specific book to come in from the outside, I'll

11  approve books to come in from the outside from time to time

12  individually.  I have one detainee that likes to study

13  physics, and he is getting his quantum physics books and

14  studying his quantum physics.

15  Q   What about arts and crafts, can they do arts and crafts?

16  A   We have a couple different arts and crafts programs.

17  Detainees like coloring books, so we purchase coloring books

18  and colored pencils under the recreation program.  There is

19  also kind of a two-fold yarn program.  They can buy yarn to

20  do their own stuff, knitting.  They like to knit hats and

21  other stuff in the facility to send home to people.  We have

22  a donation program with a non-profit on the outside that

23  works directly with ICE to donate yarn, writing materials.

24  They also donate coloring books.  They donate books as well

25  through that.  We get donations from the religious services

1   of Bibles and a lot of religious materials through those

2   religious donation programs as well.

3       COVID-19 stopped -- we did have a yarn program that was

4   set up with the community where certain detainees would knit

5   hats for the neonatal units, and they would donate those to

6   those charities.  We would provide all the yarn, GEO would

7   provide all the yarn and materials they needed for that

8   program.  But since COVID-19 started, we had to back off on

9   that but hope to get that back running soon as well.

10  Q   Do you have movie nights?

11  A   We have a movie night.

12  Q   Can you look at Exhibit 598?  Do you know what that is,

13  Mr. Scott?

14  A   I do see our list of movies for the week on the left side

15  and kind of the score sheet for our sanitation, letting the

16  detainees know who won the chicken dinner, who got the Xbox

17  for the week.  Specifically talking about the movies --

18  Q   Before you do that, I am going to ask you if this type of

19  posting is typical?

20  A   Very typical.  We put it up every week.

21          MS. SCHEFFEY:  I offer into evidence Exhibit 598.

22          MR. WHITEHEAD:  No objection, Your Honor.

23          THE COURT:  598 may be admitted.

24              (Exhibit 598 was admitted.)

25  BY MS. SCHEFFEY:

Scott - Cross-Examination

1    Q    This is what we are looking at.  Are detainees given movie

2    night every night?

3    A    We get them every night.  Saturday night is a bigger night

4    where we place multiple movies.  As part of the sanitation,

5    they can also win popcorn for those movies, which is

6    typically for the weekend, Saturday night movies.

7    Q    Can detainees give feedback about what movies they want to

8    see?

9    A    Absolutely.

10   Q    Then you were talking about the posting right next to it,

11   the sanitation winner.  What is that?

12   A    That is part of the incentive program tied with our weekly

13   sanitation inspection.  In this aspect, at this time in 2019

14   we had four divisions, so each week four different units won

15   a chicken buffet and four different units would win an Xbox.

16   Those were just kind of the score layout that showed

17   detainees how well their pod did in just keeping up facility

18   rules and sanitation.

19   Q    Okay.  We can take that down.  Before I turn you back over

20   to Mr. Whitehead, I have a few more questions.

21        Who makes the determination about whether a detainee

22   gets contact visitation and can hug their kids?

23   A    ICE makes that determination.

24   Q    Does that have anything to do with whether or not they are

25   participants in the voluntary work program?

1   A    No, it does not.

2   Q    If detainees receive minimum wage in the voluntary work

3   program, would that change whether they could get contact

4   visitation?

5   A    That would be something I couldn't answer.  ICE would have

6   to answer that.  I have no idea.

7   Q    On average, how many people leave the facility each day?

8   A    On average, each day it depends on a lot of different

9   things.  On average, looking at some past week numbers, seven

10  to ten potentially a day.

11  Q    So about how much unissued laundry might be cleaned each

12  day?

13  A    For each day, depending, 20 -- they may just be leaving.

14  There might be a couple guys, one guy that maybe left RHU

15  that week, so we're talking ten, 15 sets of laundry.

16  Typically, those big laundry days where you talk about maybe

17  100 detainees, that only would happen when we would book out

18  or ICE would release 100 or deport 100-plus detainees.  That

19  was once a week at most.  That doesn't happen all the time,

20  especially not in the past year with COVID.

21  Q    How do you feel about working with detainees?

22  A    I actually -- I didn't think I would when I left the Air

23  Force, but I like walking and talking with them.  Some good

24  guys out there that -- it is rewarding to help them out

25  through the time that they are there, and hopefully their

1    case gets won and whatever the government's rules are, the

2    government's rules are applied and done correctly, they get

3    to go home.

4         MS. SCHEFFEY:  Thank you.  No further questions.

5         MR. WHITEHEAD:  Your Honor, may I inquire?

6         THE COURT:  You may.

7                    REDIRECT EXAMINATION

8    BY MR. WHITEHEAD:

9    Q   Mr. Scott, I asked you questions yesterday on direct

10   examination.  Do you remember?

11   A   I do.

12   Q   You answered my questions under oath to tell the truth.

13   Do you remember that?

14   A   Yes.

15   Q   Ms. Scheffey began her examination yesterday, but she

16   wasn't able to finish before we concluded for the day; is

17   that right?

18   A   That's correct.

19   Q   Did you meet with your attorneys yesterday after

20   testifying?

21   A   I stayed around the office for a little bit of time after

22   we testified as the company agent.

23   Q   How long did you meet with your attorneys yesterday?

24   A   I would say we were here -- I was here about an hour after

25   court yesterday.

Scott - Redirect

1   Q    Did you meet with your attorneys this morning?

2   A    Briefly just prior to getting on camera.

3   Q    So after your meeting with your attorneys for sounds like

4   at least an hour, you are here to complete your testimony

5   this morning; is that right?

6   A    I don't want to say it was to complete my testimony this

7   morning.

8   Q    There are a few things I want to look at because I think

9   it is important we get this clarified on the record.  I want

10  to start with Exhibit 129.  This is the contract.  It has

11  been admitted, so we will bring it up on the screen.  In

12  particular, I would like to look at Page 5 of the contract.

13          MR. WHITEHEAD:  Your Honor, this bears Bates stamp

14  GEO-State 36829.

15      Let's blow up that item there, 003.  We will do a call out

16  so you can see it, but all the way across.  There we go.

17  BY MR. WHITEHEAD:

18  Q    Your attorney was inquiring with you about this section.

19  Do you remember that?

20  A    I do.

21  Q    You seem to suggest, sir, this language limited GEO in

22  terms of how much it could pay detainee workers.  Do you

23  recall that?

24  A    I do.  I think we talked about it a bit differently.

25  Q    Sir, I want to call your attention to the language there.

1  Perhaps we can get a highlight.  The contract reads,

2  "Reimbursement for this line item will be at the actual cost

3  of one dollar per day per detainee."  Do you see that?

4  A   Yes.

5  Q   Sir, this language refers to how much ICE is to compensate

6  GEO, correct?

7  A   This language speaks directly to this line item of what --

8  when we bill ICE back for services rendered under the

9  contract, what we can bill them back for.

10 Q   That's correct.  The language, "reimbursement," that talks

11 about what ICE pays to GEO, correct?

12 A   As part of that reimbursement to that line item, yes.

13 Q   When we are talking about how much GEO can pay detainee

14 workers, there is a different provision that applies.  Let's

15 take a look at Exhibit 17.  This is an excerpt from the

16 PBNDS.  It has been admitted.  In particular, I would like to

17 look at Page 3.  It's the third page of the document.

18         MR. WHITEHEAD:  Your Honor, it is Page 407 is what is

19 at the bottom.  If we could get a blowup of the entirety of

20 Section K on the right side of the document there.  There we

21 go.

22 BY MR. WHITEHEAD:

23 Q   This is the language that talks about what GEO may pay the

24 detainee workers; isn't that right?

25 A   Well, GEO and anybody else that is required to follow this

 1   standard.

 2   Q   That's right.  These are the standards that GEO must

 3   follow?

 4   A   GEO and anybody else.  ICE has to follow these standards,

 5   yes.

 6   Q   Show me here within this section where the word "stipend"

 7   is used.

 8   A   I don't see the word listed on this page.

 9   Q   That's right.  It uses the word "compensation," correct?

10   A   Correct.

11   Q   It says, "Compensation is at least one dollar per day."

12   Do I have that right?

13   A   Yes.

14   Q   Sir, you'll admit GEO may pay more than one dollar per

15   day, correct?

16   A   Yes.

17   Q   The contract does not limit GEO in how much it can pay to

18   detainee workers?

19   A   I have just a bit of trouble with that.  Contracting, I

20   can't exceed the amount without the express approval of the

21   contracting officer.

22   Q   Sir, back to what you just told me, though.  GEO may pay

23   more than one dollar per day?

24   A   Yes.

25   Q   GEO must also comply with state and local laws, that is

1   also required under the contract?

2   A   Yes.

3   Q   You'll agree with me the Washington Minimum Wage Act is a

4   state and local law?

5   A   Yes.

6   Q   If there is any conflict between any standards, GEO must

7   follow the most stringent of the standards?

8   A   Standards versus laws, but standards, yes.

9   Q   Sir, you told us about a number of audits.  I think we can

10   get this cleared off the screen.  You testified that the

11   Northwest Detention Center is routinely audited.  You

12   mentioned the ACA in particular.  Do I have that right?

13   A   Yes.

14   Q   I think you called the ACA audit "the big audit"?

15   A   I believe I did.

16   Q   You said that GEO passes the audits with flying colors; is

17   that right?

18   A   On our last ACA audit and for the other audits, I remember

19   we have 100 percent compliance in both mandatory and

20   non-mandatory standards.

21   Q   As relates to the voluntary work program, those audits,

22   they don't check whether GEO is complying with local labor

23   laws, do they?

24   A   I am not the auditors.  If we look at the audit standard,

25   I could tell you exactly what they look at, but I'm not the

 1  auditors.

 2  Q   There is no affirmative finding, let's say, in the ACA

 3  audit report that says GEO complies with state and local

 4  labor laws as it relates to the voluntary work program,

 5  correct?

 6  A   There is a number of standards.  I do recall seeing an ACA

 7  standard that requires us to follow all local applicable

 8  state and federal laws.  I don't know exactly what standard

 9  that is.  I do recall seeing that language in the ACA

10  document somewhere.

11  Q   We have seen the ACA book.  It has been marked and offered

12  into evidence.  Those are packets that GEO puts together for

13  the ACA visiting team, correct?

14  A   There is a visiting team that comes out.  The way ACA runs

15  their process, yes.

16  Q   That ACA team comes out and looks under the hood at GEO's

17  operations, correct?

18  A   Yes.

19  Q   The ACA visiting team then writes sort of a report it

20  sends back to the ACA board, correct?

21  A   Correct, called the visiting committee report, yes.

22  Q   Sir, I would like to drop an exhibit into the Box.  I

23  don't know if you have the computer in front of you.

24         MR. WHITEHEAD:  Counsel, perhaps you could help the

25  witness access.

1          MS. SCHEFFEY:  Do you mind if I get someone in there?

2          MR. WHITEHEAD:  I don't.

3          MS. SCHEFFEY:  Whoever is out there, let's send

4    someone in to help Bruce with Box.  Thank you.

5       What exhibit number are you going to want?

6          MR. WHITEHEAD:  608.

7          THE COURT:  Ladies and gentlemen, I am not sure you

8    have been advised about this, but exhibits that are admitted

9    in evidence are part of what you should consider and you will

10   have jury deliberation access electronically to all of these

11   exhibits and all pages of them if you want to look at any

12   part of an admitted exhibit, you are welcome to do it during

13   deliberation.  You will have the documents to study more

14   carefully that you can as we discuss them here in court.

15      Do you have the exhibit, Mr. Scott?

16         THE WITNESS:  Your Honor, not at this time, we are

17   having some trouble with Box.

18         THE COURT:  It is time for our recess.  Why don't we

19   take ten minutes and we will get things set up.  So you may

20   be excused for a break.

21                        (Recessed.)

22         THE CLERK:  All right, Your Honor, are we ready for

23   the jury?

24         THE COURT:  Yes.

25         MS. SCHEFFEY:  Mr. Scott, do you have 608 in front of

1    you?  Mr. Scott, do you have Exhibit 608 in front of you?

2           THE WITNESS:  I have Exhibit 347.

3           THE CLERK:  Your Honor, the jurors are back.

4       (The following occurred in the presence of the jury.)

5           THE COURT:  All right.  You may continue,

6    Mr. Whitehead.

7           MR. WHITEHEAD:  Thank you, Your Honor.

8    BY MR. WHITEHEAD:

9    Q   Mr. Scott, before the break I was asking about the

10   visiting committee members' report back to the ACA board.  Do

11   you recall that?

12   A   Yes, I do.

13   Q   I pointed your attention to the exhibit.  Do you have the

14   exhibit in front of you?

15   A   I have what has been marked as Exhibit 347.  Is that

16   correct?

17   Q   Yes, that's correct, sir.  What is Exhibit 347?

18   A   347 is the visiting committee report for September, audit

19   September 8 through 19, 2014.

20   Q   This report, it captures the findings of the visiting

21   committee members, correct?

22   A   But it is a narrative of the report where they made their

23   report to the ACA chair.

24   Q   Sir, isn't it the case that, at least for the 2014 year,

25   there was no finding by the ACA visiting members that GEO's

1    voluntary work program complies with state minimum wage laws,

2    correct?

3    A   I don't think I can answer the question the way it is

4    asked.  I don't understand the question.

5    Q   Sir, what I am driving at, you were saying earlier the ACA

6    accreditation outfit has come and said that GEO passes with

7    flying colors in all respects.  My question to you as relates

8    to the voluntary work program:  Has ACA ever made an

9    affirmative finding that GEO is complying with state minimum

10   wage laws as it relates to the voluntary work program?

11   A   I don't think that specific language is in the standard.

12   We have to look at the voluntary work program standards to

13   define what the ACA members are looking at.

14   Q   Isn't it the case that there has never been a finding

15   about whether the voluntary work program workers are

16   employees?  That's not something that ACA made a finding on

17   one way or the other, correct?

18   A   All I can -- I am trying to answer your question,

19   counselor.  I am.  There is a section on Page 11 that talks

20   about the offender work program.  That was the ACA finding.

21   I don't want to put words in auditors' mouths.  I can only go

22   with what they put down in their report.

23   Q   There is no mention in the report about a finding one way

24   or another that the voluntary work program participants are

25   employees, correct?

1   A    It has been awhile since I have seen this report.

2   Q    It is also why I marked it as an exhibit.  You are on the

3   relevant page, page 11?

4   A    Okay.

5   Q    Isn't it the case that the ACA visiting committee only

6   reports that the detainee workers are compensated at a rate

7   of one dollar, and it says nothing further about pay,

8   correct?

9   A    I do see that.

10  Q    It says nothing about pay, correct?

11  A    Correct.

12  Q    There is no finding about whether or not the Washington

13  Minimum Wage Act applies to detainee workers, correct?

14  A    I don't see that listed under the voluntary work program.

15  Q    Because that sort of determination is in the purview of

16  someone else, that's not part of ACA's mission or charge in

17  evaluating the Northwest Detention Center?

18          MS. SCHEFFEY:  Objection, calls for speculation.

19          THE COURT:  He may answer if he knows.

20          THE WITNESS:  Well, all I know is, and this is a

21  visiting committee report, but there is a number of files

22  that are submitted with process indicators, a lot of proof

23  that we show we do these type of things and the ACA auditors

24  interview detainees like on page 17.  There is a lot of

25  different things that go on with an ACA audit.

BY MR. WHITEHEAD:

Q   So your answer stands, though, that there is no finding about the minimum wage within the ACA report?  I see you flipping from page to page in the document.

A   I am looking.  You know, these aren't the areas where they marked the findings.  This is the narrative section of the report.  The actual findings are marked in a separate area. There are a whole lot of outcome measures as well.

Q   Is it your testimony that there is a document somewhere that says GEO has complied or does not need to comply with state minimum wage laws for the voluntary work program?  Is that your testimony?

A   I don't know anything about that, sir.

Q   Because if there was that sort of document, I mean that's a document we would have seen by now at trial, would you agree?

        MS. SCHEFFEY:  Objection, argumentative.

        THE COURT:  Sustained.

BY MR. WHITEHEAD:

Q   I would like to direct your attention to Exhibit 17.  This is the excerpt of the PBNDS.  You offered testimony yesterday about the purpose of the voluntary work program.  Do you remember giving testimony along those lines?

A   I do.

Q   We have a copy of the document up.  If we could blow up

1  Item 4 there towards the top right.  I believe this is the

2  section that you read from yesterday.  You talked about one

3  of the purposes being to combat the negative impact of

4  confinement and to reduce idleness.  Do you remember

5  testimony along those lines?

6  A   I do.  I am trying to find the page and exhibit.  What is

7  the Bates stamp number for that one?

8  Q   There is no Bates stamp.  This is Page 405.  I believe it

9  is the first page.

10  A   Okay.  I want to make sure I am there.

11  Q   We have it called up on your screen as well.  My question

12  to you is this:  Is this the section you testified from

13  yesterday about the purpose of the voluntary work program?

14  A   I do believe this is one of the expected outcomes that

15  comes to mind when we were talking about that.

16  Q   Let's clear out this callout.  I would like to look at the

17  first of the expected outcomes listed in the PBNDS.  Go ahead

18  and blow that up.  We are on the same page, bottom left.  You

19  skipped over this section.  This section reads, "Detainees

20  may have opportunities to work and earn money while confined,

21  subject to the number of work opportunities available and

22  within constraints of the safety, security and good order of

23  the facility."  Did I read that correctly?

24  A   You did read that correctly.

25  Q   That's the first of the expected outcomes.  Let's clear

1   off this callout and look at the third of the expected

2   outcomes.  Maybe we can blow that up also.  This one reads,

3   "To help with the essential operations and services shall be

4   enhanced through detainee productivity."  Do you see that?

5   A   That is correct.

6   Q   That's the third of the expected outcomes, to help with

7   essential operations?

8   A   Absolutely correct.

9   Q   Let's clear this off the screen.  I would like to look at

10  one more exhibit.  I am going to look at Exhibit 129.  This

11  is back to the contract.  This is from your testimony

12  yesterday.  I believe you said something along the lines that

13  GEO is prohibited from using non-U.S. citizens.  Do you

14  remember making a statement to that effect?

15  A   There's lots of parts of the contract.

16  Q   Sure.  Yeah, of course.  Let's go to Page 70.

17          MR. WHITEHEAD:  Your Honor, this bears Bates stamp

18  GEO-State 036894.

19  BY MR. WHITEHEAD:

20  Q   I am looking at the second paragraph there.  We can blow

21  that up.  I believe this is the section you testified from

22  yesterday.  Does this look familiar?

23  A   Yes.

24  Q   I want to make sure we put this in the proper context.  In

25  looking at this section it reads, "The use of non-U.S.

1    citizens, including lawful permanent residents, is not

2    permitted in the performance of this contract for any

3    position that involves access to DHS/ICE IT systems and the

4    information contained therein."  It continues on.  Sir, that

5    part about positions that involve access to government IT

6    systems, that's an important qualifier in this section.

7    Would you agree?

8    A    I see what you are reading.  The very last set of words,

9    the "slash, or derived from any DHS/ICE IT system."  ICE is

10   very peculiar about their information security as related to

11   Homeland Security and any information that is required to be

12   protected, or any information that has to be accessed from

13   that.  And they do share information with us that are

14   required for detention management services.

15   Q    Sir, for the detainees that prep, serve and clean up in

16   the kitchen, do they require any access to DHS or ICE IT

17   systems to do their job?

18   A    It would be very improper for them to have that

19   information.

20   Q    My question is different, to prep, serve and cook food in

21   the kitchen, do you need access to DHS or ICE IT systems, yes

22   or no?

23   A    To serve food, where this gets trickier is if there is a

24   special diet order that comes out of systems that would be

25   given by ICE medical, which is the immigration health

1    services corps.  They would potentially have or derive

2    information from those systems to use for those jobs.

3    Q   What about the clean showers in the living pods, do you

4    need access to DHS or ICE IT systems?

5    A   Just for cleaning showers?

6    Q   That's right.

7    A   I would say no.

8    Q   Officer Tracy, yesterday he talked about buffing the

9    floors to kill time at night.  Does he need to access IT

10   systems to buff the floors?

11   A   Well, not access to IT systems, but he may need access to

12   understand the classification levels if that person could

13   work outside the housing unit or not.  Those classification

14   levels, to include criminal histories, would be derived from

15   those IT systems.

16   Q   What about to do laundry?  Sir, do you need access to DHS

17   or ICE IT systems to do laundry?

18   A   Again, classification levels for that job outside the

19   housing units would require knowledge of whether that

20   detainee could work in that area.  That information would be

21   derived from DHS IT systems.

22   Q   Referring to the work, the work itself?

23   A   Just the plain work of taking something out of the washer

24   and put it into the dryer?

25   Q   Correct.

```
 1  A   If we are talking just the plain work of taking something
 2  out of a washer and putting it in the dryer, I would say no.
 3  Q   All right.
 4          MR. WHITEHEAD:  I don't think I have any further
 5  questions.  I will perhaps pass the witness.  I don't know if
 6  there is follow-up from the State.
 7          MS. CHIEN:  The State has a couple of questions,
 8  Your Honor.
 9                      RECROSS-EXAMINATION
10  BY MS. CHIEN:
11  Q   Mr. Scott, you testified that ICE has offices in the
12  Northwest Detention Center; is that right?
13  A   Yes.
14  Q   You suggested that ICE signs GEO's handbook; is that
15  right?
16  A   It was suggested ICE signs the handbook.
17  Q   You take direction from ICE; is that right?
18  A   Correct.
19  Q   I would like you to look at Exhibit 364, which was
20  previously admitted and which can be published for the jury.
21  I would like to do a callout of the second email.  Do you see
22  this?  This is the email that says, "According to the
23  standard, there is a minimum compensation of a dollar,
24  however there is no maximum."  Do you see that?
25  A   I read that line of --
```

1   Q    Okay.

2   A    I am not on this email originally.

3   Q    Yeah, I am not going to suggest that you were on the

4   email.  I am going to ask, James Gronewold is the ICE

5   contracting officer representative; is that right?

6   A    At that time, yes.

7   Q    Charles Howard, who sent the e-mail, is an ICE detention

8   services manager; is that right?

9   A    Correct.

10  Q    This email was sent in August of 2014; is that right?

11  A    I see that.

12           MS. CHIEN:  No further questions.

13           THE COURT:  Anything further of Mr. Scott?

14           MR. WHITEHEAD:  No, Your Honor.

15           MS. SCHEFFEY:  I would ask for recross.

16           THE COURT:  All right, Mr. Scott, you may be excused.

17           MS. SCHEFFEY:  Your Honor, may I have brief recross,

18  at least --

19           THE COURT:  What?

20           MS. SCHEFFEY:  I would ask for a few moments to

21  redirect, Mr. Scott.

22           THE COURT:  All right.  Go ahead.

23                        RECROSS-EXAMINATION

24  BY MS. SCHEFFEY:

25  Q    Do you have Exhibit 347 in front of you?

```
 1    A    I don't think I have 347.  Is that the e-mail we were just
 2    looking at?
 3    Q    No, that was the ACA standards Mr. Whitehead showed you in
 4    the beginning.
 5    A    Oh, oh, oh, oh.  So many things.  347, Exhibit 347, yes, I
 6    have it.
 7    Q    Do you recognize it?
 8    A    I do.
 9              MS. SCHEFFEY:  I offer Exhibit 347 into evidence.
10              MR. WHITEHEAD:  This is an exhibit that GEO objected
11    to.  I guess it is waiving the objection now.  That's fine by
12    us, no objection, Your Honor.
13              THE COURT:  347 may be admitted.
14                   (Exhibit 347 was admitted.)
15              MS. SCHEFFEY:  I would ask our IT team to help me
16    publish that.  We would like to go to Page 11 at the bottom
17    that Mr. Scott was referring to.
18    BY MS. SCHEFFEY:
19    Q    Mr. Scott, what portion of that were you referring to
20    earlier in your testimony when you said "the ACA audit
21    reviews the stipend paid to detainees in the work program"?
22    A    Speaking specifically to the auditors which are listed on
23    the front of the page that came in who indicated the
24    compensation rate of one dollar per day.
25    Q    What was their finding with respect to the dollar per day?
```

1    A    Their overall comments within this section was the very

2    last sentence, if we highlight that, "With such an extensive

3    job program, it helps explain the high level of sanitation

4    throughout this facility."

5    Q    You have this in front of you.  Is there anything there

6    that takes issue with paying detainees a dollar per day?

7    A    Look at the expected outcomes.  I do not see anything.

8    Q    I would like to pull up Exhibit 129, please.  If we could

9    go to PDF page 63 and call out the section called "minimum

10   personnel qualifications."

11           MR. WHITEHEAD:  Your Honor, outside the scope.

12   Counsel has already had an opportunity to examine about 129.

13           MS. SCHEFFEY:  I am addressing a segment addressed by

14   Mr. Whitehead, and I am completing it.  I called out only one

15   section.

16           THE COURT:  The objection is overruled.  I think she

17   may inquire, and you have the right to further redirect if

18   you wish.

19   BY MS. SCHEFFEY:

20   Q    Does the --

21           THE COURT:  What is the question to the witness?

22   BY MS. SCHEFFEY:

23   Q    Does this section require GEO employees to have a Social

24   Security card?

25   A    It does.

1  Q    Where?

2  A    Section B, it's highlighted there, "Contractor shall agree

3  to each person employed by the firm, any subcontractor shall

4  have a security card issued and approved by the Social

5  Security Administration."

6  Q    Does this section limit that requirement to only those

7  people who have access to IT systems?

8  A    No.

9  Q    Okay.  Then I just wanted to ask you two more questions.

10  You can take this document down.

11      You just looked at the email from an ICE official.

12  What was his name?

13  A    I believe that was the former contracting officer

14  representative, James Gronewold.

15  Q    What was the date of that email?

16  A    I can't remember the specific date.  I know I was

17  compliance administrator at the time.  It was after the

18  standard had changed and the standard language had changed

19  from the previous standard that said "compensation would be a

20  dollar a day."  Then the standard changed "to at least a

21  dollar a day," that was related to all the changes and the

22  other changes in the contract at that time to just draw out

23  those changes to make sure policies could be updated

24  correctly.

25  Q    What I am really asking is:  Do you know the year?  Was it

1    2014?

2    A    I believe I remember it as 2014.

3    Q    What is the year the current contract was entered into?

4    A    2015.

5    Q    Does the current contract have any requirement that you

6    pay more than one dollar a day to detainees in the work

7    program?

8    A    I don't see any requirement to pay more than one dollar a

9    day.

10          MS. SCHEFFEY:  Thank you.  No further questions.

11          THE COURT:  Mr. Whitehead, anything further?

12          MR. WHITEHEAD:  No, Your Honor.

13          MS. CHIEN:  Your Honor --

14          THE COURT:  Thank you --

15          MS. CHIEN:  Your Honor, I have a quick question.

16          THE COURT:  All right.  Go ahead.

17                    FURTHER RECROSS-EXAMINATION

18    BY MS. CHIEN:

19    Q    We were talking about Exhibit 347 which I believe is the

20    ACA standard; is that right, the ACA audit?

21    A    The visiting committee report from the ACA audit?

22    Q    Yes.

23    A    Okay.

24    Q    Does the ACA enforce the state minimum wage law in

25    Washington?

```
 1   A    As I talked earlier, there are a number of standards in
 2   the ACA manual.  Without reviewing the standard, ma'am -- I
 3   wouldn't want to speak for the ACA commission auditor.  I
 4   don't work for them.
 5   Q    I am not talking about whether or not they audited to
 6   check about whether the Northwest Detention Center complies
 7   with state minimum wage laws.  I am asking if they enforced
 8   the state minimum wage laws?
 9   A    Again, ma'am, I am not an ACA director or auditor.  I
10   don't know what they are told to do.
11             MS. CHIEN:  No further questions.
12             THE COURT:  All right.  Thank you, Mr. Scott.  You
13   may be excused.
14             THE WITNESS:  Thank you, Your Honor.  Good morning.
15             THE COURT:  You may call your next witness.
16             MR. POLOZOLA:  The State calls Ryan Kimble.
17             MS. SCHEFFEY:  I believe that is a different order.
18   That's fine.  We will get him on deck.
19             THE COURT:  Are you bringing the witness in?
20             MS. SCHEFFEY:  Yes, Your Honor.
21             THE COURT:  Mr. Kimble, if you will raise your right
22   hand and be sworn.
23                       RYAN KIMBLE,
24      having been sworn under oath, testified as follows:
25             THE COURT:  Thank you.  You may inquire.
```

1

2

3                    DIRECT EXAMINATION

4  BY MR. POLOZOLA:

5  Q   Good morning, Mr. Kimble.

6  A   Good morning.

7  Q   Mr. Kimble, you work for the GEO Group; is that correct?

8  A   That is correct.

9  Q   You work at the Northwest Detention Center?

10  A   That is correct.

11  Q   What is your position at the Northwest Detention Center?

12  A   I am the business manager for the Northwest Detention

13  Center.

14  Q   Is that the same thing as associate warden for finance and

15  administration?

16  A   Yes, it is just a name change.

17  Q   Okay.  How long have you held that position?

18  A   Since I have been at this facility, for -- from the

19  beginning until now.

20  Q   What was the beginning, so we understand?

21  A   Approximately 2012.

22  Q   What are your job duties as the associate warden of

23  finance and administration, or the business manager?

24  A   I am over purchasing.  I pay all the bills.  I prepare the

25  invoice to the client, to ICE.  That's my major functions at

1    the facility.

2    Q   With respect to the voluntary work program, your job is to

3    prepare the invoices with the line items seeking

4    reimbursement from ICE for work performed by detainees; is

5    that right?

6    A   That is part of the invoice.  That is one section of the

7    invoice.

8    Q   As a result of preparing the invoices, you are familiar,

9    generally speaking, with the number of detainees that work in

10   the facility each day?

11   A   Generally, yes.

12   Q   The number of detainees that work in the facility each

13   month?

14   A   I would have to look it up, but, yes, I have access to

15   that.

16   Q   Same question.  You are familiar with the number of

17   detainees who work in the facility each year, correct?

18   A   Yes.  I would be able to look on my invoices to find that

19   out.

20   Q   We have heard a lot about the actual work that gets done

21   in the facility.  I am not here to ask you details about

22   that.  I do want to understand the payment mechanics here.

23   Starting at the beginning, we have talked about invoices.

24   GEO sends ICE an invoice for the amount ICE owes GEO's

25   provision of services each month; is that right?

1    A    In the whole for every line item, yes.

2    Q    You personally prepare those invoices, correct?

3    A    I prepare the invoices, yes, sir, with my team.

4    Q    For each invoice, GEO identifies based on I think what you

5    said was the contract line item number, the amount owed and

6    provides backup documentation to ICE; is that right?

7    A    For every CLIN, that is correct.

8    Q    What is a CLIN?

9    A    A CLIN is ICE's delineation of mandate rate, voluntary

10   work program, there is different CLINs.  That is how they do

11   their accounting.

12   Q    It is how ICE tracks what it needs -- what it needs to

13   pay, right?

14   A    Yes.

15   Q    What does GEO include in its monthly invoices to ICE with

16   respect to wages that GEO pays to detainee workers?

17   A    It is a line item, and the information that I give the COR

18   for her approval is an Excel spreadsheet that has each one of

19   the detainees' names on it and shows that they were -- that

20   they were afforded the dollar, and we get those from the

21   sheets that the detainee signs every time that they work.

22   There is a sheet, they sign that sheet, that sheet goes to

23   the business office, the business office keys it into the

24   system and we show that as backup for the reimbursement for

25   the ICE voluntary work program.

1    Q    You kind of got ahead of me there.  I want to be clear.

2    GEO tallies up the payments it has made to detainee workers

3    for their work on a monthly basis and provides that

4    information to ICE as backup, correct?

5    A    That's not quite correct.  It is a pass-through, so we

6    show that the detainees worked that day, we show the

7    detainees work by the signature that they worked that day.

8    We tally it up and we present that for ICE as part of the

9    bill, so at the end of the month it is a tally through the

10   month and we show that to ICE for them to approve it and that

11   is part of their approval process for the bill, COR's

12   approval process.

13   Q    I don't think you quite answered my question, which is:

14   You are not seeking reimbursement from ICE for something that

15   you haven't actually paid to the detainee workers, right?

16   A    The detainee -- let's see how to answer that correctly.

17   There is a dollar that is in the account.  We have a Keefe

18   banking system.

19   Q    Who puts the dollar in that account?

20   A    Business office keys in a dollar to that account.

21   Q    That's the GEO business office, right?

22   A    Business office, and then showing for reimbursement

23   because it is a pass-through, we show that to the ICE COR.

24   There is a reimbursement because it is a pass-through

25   account.  There is no cost to GEO to that.

```
 1   Q    That wasn't my question.  I just want to be clear.
 2   Reimbursement means it has already been paid to the detainee
 3   and GEO is asking ICE to pay it back.  Is that your
 4   understanding?
 5            MS. MELL:  Objection, Your Honor.  Testifying.
 6   Misstating the facts.
 7            THE COURT:  Overruled.
 8            THE WITNESS:  It is a reimbursement.  It is no cost
 9   to GEO for this program.  It is a reimbursement to what is
10   owed to the detainee account from ICE.
11   BY MR. POLOZOLA:
12   Q    Okay.  So GEO -- I think we touched on this, GEO tracks
13   every worker who worked and was paid for each day they
14   worked, correct?
15   A    That is correct, on the voluntary worker sheet that the
16   detainees sign.
17   Q    You mentioned the Keefe banking system.  That's the system
18   GEO uses to track that work and those payments, correct?
19   A    That is the system that GEO uses for all of the detainees,
20   all of the detainee funds.  It is a banking system that
21   delineates each detainee.  It tracks the funds because all
22   the funds go into a single account that is a trust fund for
23   the detainees because it is their money.  This program makes
24   sure that we know exactly how much is in each person's
25   account, each detainee's account.
```

1    Q    I am going to have you look at what has been premarked as

2    Exhibit 175.  It should be in your packet that has been

3    provided to you.

4    A    Give me a moment to open it up.

5    Q    Of course.

6    A    Exhibit 175, I have that.

7    Q    What is this document that we are looking at here?

8    A    This is a document that comes from the Keefe banking

9    system.  This shows the -- pardon me.  This shows the

10   detainee name, the A number and -- pardon me -- the date that

11   the transaction happened, and it shows a dollar applied to

12   their account.

13   Q    You are familiar with this document?

14   A    Yes.

15            MR. POLOZOLA:  Your Honor, we offer Exhibit 175 into

16   evidence.

17            MS. MELL:  No objection.

18            THE COURT:  175 may be admitted.

19                 (Exhibit 175 was admitted.)

20            MR. POLOZOLA:  Permission to publish, Your Honor?

21            THE COURT:  Yes.

22   BY MR. POLOZOLA:

23   Q    Mr. Kimble, you started to describe what we are looking at

24   here.  I want to take it a little bit slowly so we can all

25   follow along.  Does this document indicate that GEO tracks

1    each one dollar transaction it makes to detainee workers as

2    payroll?

3    A    Not as pay -- it is listed as payroll here, but it is not

4    as payroll, it is part of the voluntary work program.  This

5    is the backup that we have to have to be in compliance with

6    ICE's voluntary work program.

7    Q    Okay.  I think I heard you say earlier that GEO enters

8    these transactions and after, it confirms that the workers

9    worked, correct?

10   A    Yes, we put this -- we put this into the Keefe banking

11   system based on their signing of the voluntary work program

12   sheet that shows that they had worked, or that they had

13   participated in the program.

14   Q    So what we are looking at here, it's called a batch

15   summary.  This is the election of payments for one single

16   day, January -- it is listed as January 2nd, and then I am

17   going to have you look at the reason it has "transactions for

18   reason, January 1;" is that right?

19   A    That is correct.

20   Q    This is a list of payments that were made for work

21   performed by detainee workers on January 1, 2017; is that

22   right?

23   A    The reason, yes, January 1, 2017, yes.

24   Q    So under that "reason" column, we talked about the date.

25   There is also a notation indicating what appears to be the

1    location of the job performed; is that right?

2    A    The lo --

3    Q    See where it says "A-1"?

4    A    Yes.  Yes, sir.

5    Q    Is that a reference to work performed in the A-1 pod?

6    A    Yes, sir.

7    Q    If we skip on to Page 7.  At the very top, for example, if

8    we can blowout the Grey Mile folks there.  It will be easier

9    to read for those of us looking at the screen.  This is a

10   list of folks that worked cleaning the Grey Mile on January

11   1, 2017 at the Northwest Detention Center; is that correct?

12   A    That is a list, yes, of people that received their dollar

13   for participating.

14   Q    Okay.  So you got to my next question, which is the amount

15   is one dollar for each person, right?

16   A    That is correct, because we are following the rules of the

17   ICE voluntary work program.

18   Q    Okay.  Now, if we can get out of the Grey Mile blowup, and

19   let's take a look at the folks which have "kitchen D" in the

20   "reason" column.

21   A    Okay.

22   Q    Do you see where the column has listed "kitchen D"?

23   A    Kitchen D, yes.

24   Q    Is this a list of folks who worked on the kitchen dinner

25   shift at the Northwest Detention Center on January 1, 2017?

1   A    That would be, yes.

2   Q    Looks to me like there are a lot more than one or two

3   detainee workers who participated that day, correct?

4   A    That is correct.  There are more than one or two detainees

5   that participated that day because we are mandated to offer

6   as many opportunities as possible to the detainees in the

7   facility.

8   Q    Yeah.  And this isn't just the number of positions that

9   were offered.  This is the number of folks who actually

10  worked; isn't that right?

11  A    This would be -- this would be the number of people that

12  worked and signed the piece of paper that said that they

13  volunteered to participate in the kitchen, yes, on a dinner

14  shift on January 1.

15  Q    Yeah, by my count, this is more than 30 folks that worked

16  on that one kitchen dinner shift; is that correct?

17  A    I would have to count.  Give me one moment.  I will have

18  to count.  Looks to be 35.

19  Q    Who actually worked the kitchen dinner shift on January 1,

20  2017, right?

21  A    Sure.  Yes, sir.

22  Q    If we can go on to Page 9 now.

23  A    I am on Page 9.

24  Q    Do you see the notation towards the last bit of text there

25  were it says "DEP (453)," $453?

1  A   Yes.

2  Q   Does that reflect the total number of transactions that

3  were listed above as one dollar transactions?

4  A   That would be an aggregate of all the transactions for

5  that day that are listed for the 1st, yes.

6  Q   So in other words, this reflects that there were 453

7  detainee workers who worked on January 1, 2017 and each

8  received a dollar for their work; is that correct?

9  A   Throughout that day, that would be correct, showing an

10 aggregate of 453 entries.

11 Q   Right.  Okay.  Now, I think we touched on this.  Because

12 GEO tracks the payment it makes to detainee workers on a

13 daily basis, it has records of the payments that it made to

14 detainee workers on a monthly basis?

15 A   We have records that show that the detainees participated

16 in the voluntary work program on a daily basis, which would

17 aggregate to a monthly basis.

18 Q   I think you said you used an Excel spreadsheet with the

19 monthly tabulations to support your invoice to ICE?

20 A   It is a portion of it, yes.

21 Q   Can I have you take a look at what has been premarked as

22 Exhibit 534?

23 A   534?

24 Q   Correct.  I am going to ask you here to make sure that you

25 have access to the Box account, because this is going to be

1    an Excel spreadsheet, so you may need to access the actual

2    file as well.

3    A    I'll see if I do.  On my screen, I just have the Zoom

4    information.

5         MR. POLOZOLA:  Counsel, can you make sure Mr. Kimble

6    has access to Box and can access the electronic exhibits?

7         MS. MELL:  We have been printing those exhibits for

8    him so he has them in front of him.  Do you want him to

9    access the Excel spreadsheet digitally?

10        MR. POLOZOLA:  That is the native file, so, yes.

11        MS. MELL:  That will take time to get that loaded.

12        MR. POLOZOLA:  If he has access to Box, he should be

13   able to open it up.

14        MS. MELL:  That will take some time.

15        THE WITNESS:  Okay.  I am seeing it on my screen.

16   What number am I to look at?

17   BY MR. POLOZOLA:

18   Q    534.

19   A    534.  Give me one moment.  Give me just one more moment.

20   I think I am a little over halfway there.  505.  Nope.  534.

21   Q    You should see the Excel version, and there is also a PDF

22   print version.  That's how we made the hard copies to you all

23   as well.

24   A    I see the PDF version.  I see an Excel version, yes.

25   Q    Okay.  So I will ask that you take a look --

1  A    Hold on one second.  How do I switch between the two?  I'm

2  sorry, give me one more moment.

3  Q    Sure.

4  A    I have to click out of it?  Okay.  I want to make sure I

5  can get to each one of them.  Sorry.

6  Q    Are you ready?

7  A    I think I am.

8  Q    Okay.  Are you able to open up Exhibit 534?

9  A    The Excel or the PDF?

10  Q    Excel?

11  A    I have the Excel opened.

12  Q    Okay.  So what are we looking at here?  What is this

13  document?

14  A    This is a document that -- it is a newer version of what

15  we were just looking at.  This has the same information.  It

16  has the detainee A number, it has their name, it has the date

17  that they were -- that they worked.  It also has where they

18  worked.  It has the date that it was inputted in the system.

19  It has an amount at the final column.

20  Q    Do you recognize this as the monthly collection of

21  payments?

22  A    This would be, yes, this would be a listing of the monthly

23  payments, yes.

24  Q    This is transactions for August 1, 2017 through September

25  1, 2017; is that correct?

1    A    That would be correct.

2    Q    Is this the type of monthly Excel spreadsheet you told us

3    about earlier that would be used to calculate or support the

4    invoice to ICE?

5    A    This is out of the Keefe system.  It wouldn't be the exact

6    one that we would -- I don't think this is the exact one we

7    give ICE.  Give me just one second.

8    Q    Are you looking at the printout or Excel spreadsheet?

9    A    Sorry, I was looking at the printout.  I am going to the

10   Excel spreadsheet right now.  Sorry about that.  Yes, this

11   would be something that would be turned in for a portion of

12   the bill to be approved.

13   Q    This is the document that you would create in order to

14   support that invoice, or those invoices rather?

15   A    Yes.

16          MR. POLOZOLA:  We would offer Exhibit 534 into

17   evidence.

18          MS. MELL:  No objection, Your Honor.

19          THE COURT:  534 may be admitted.

20              (Exhibit 534 was admitted.)

21   BY M. POLOZOLA:

22   Q    Just so we are clear, while we are pulling up the Excel

23   spreadsheet for everyone to follow along, this document

24   reflects the payments that were made from August 1, 2017 to

25   September 1, 2017 to workers who worked at the Northwest

1   Detention Center; is that correct?

2   A    Just one second.  I am trying to see what is on the screen

3   because my other screen is covering it.

4   Q    Sure.

5   A    One moment.  Yes, that is what would come out of the Keefe

6   banking system for 8-1 through 9-1-2017.

7   Q    Now, just so we are clear here, I see in the description

8   it seems like some of the dates say "7-31-2017," and then

9   there is another column that says "date, time, 8-1-2017"?

10  A    Yes.

11  Q    Am I correct these are transactions that pay was made on

12  8-1-2017 for work performed on 7-31-2017; is that correct?

13  A    It is.  When it was keyed in the system for them being

14  present during signing sheet for the voluntary work program

15  and, yes, it would be for work -- program participation on

16  7-31.  It's different dates that are on there.  But the date,

17  the second date that's on there showing 8-1 is the date that

18  it was keyed into the system.

19  Q    Okay.  Is that because it normally takes you or your team

20  about a day to collect all the sheets and enter it into the

21  system?

22  A    Yes, they are usually a day behind.  If there is a

23  weekend, then it catches up from Friday, Saturday, Sunday on

24  that Monday when my team is back at the facility.

25  Q    Now, for the total of this month, can you tell us how many

1    transactions were recorded for that period between 8-1-2017

2    and 9-1-2017?  We can scroll to the bottom if you need help

3    getting there.

4    A    I was there.

5    Q    Are you able to see that, Mr. Kimble?

6    A    Yes.  There was 12,902 transactions during that month,

7    during that time frame shown on there.

8    Q    12,902 one-dollar payments to detainees?

9    A    Transactions, yes.

10   Q    So is another way of looking at this to say this document

11   would show that there were 12,902 work details worked by

12   detainees for this month?

13   A    Well, it actually shows that there was 12,902 detainees

14   that volunteered to work in the ICE voluntary work program.

15   Q    Throughout the course of the month, correct?

16   A    Throughout the course of the month, yes.

17   Q    Yeah, if you divided that by 30, would that give you the

18   average number of workers per day for the month?

19   A    That would, but you couldn't do an average per day because

20   it would change.  It changes constantly.  There really is no

21   average per day because ICE dictates when detainees are in,

22   when they leave.  There is a constant turn over so people --

23   detainees that would come in that would be cleared to work in

24   the program, detainees that would leave, so you really

25   couldn't do it by dividing it by how many days because it is

1    always forever changing.  Daily, it changes.

2    Q   I don't think that was my question.  Let me ask it this

3    way:  12,902 work details worked in this month, correct?

4    A   Yes, there were 12,902 detainees that volunteered to work,

5    yes, to be part of the program.

6    Q   There are 30 days in a month; is that correct?

7    A   There are 30 days in a month, that is correct.

8    Q   Would you disagree with me if I told you 12,902 divided by

9    30 days is about 462 workers per day?

10         MS. MELL:  Your Honor, I would object.  There is 31

11   days in August, as reflected in the invoices.

12         THE COURT:  The objection is sustained.  The numbers

13   are the numbers.

14   BY MR. POLOZOLA:

15   Q   Okay.  Well, Mr. Kimble, like any Excel spreadsheet, you

16   can filter the data in this, correct?

17   A   Yes, sir, you could.

18   Q   So we could look to see whether a certain individual

19   worked a certain number of shifts per month, according to

20   this data?

21   A   You could look to see if a person's name showed up,

22   however many times a person's name would have shown up.  It

23   should show on there if you filter it.

24   Q   For example, if we heard from, or if we wanted to see

25   whether someone named Orlando Marquez Zavalza worked in the

1    voluntary work program this month, we could filter it.  We

2    are going to do this on screen.  I want you to follow along

3    with me here.  We will search for Marquez Zavalza.  Are you

4    following along with what happened, Mr. Kimble?

5    A    I am.

6    Q    So filtered for Mr. Marquez Zavalza's name, you can now

7    see all of the entries for him for this month are shown,

8    correct?

9    A    They are shown -- it shows -- the one thing that was put

10   in there is 9-1; it shows 8-1 through 9-1.

11   Q    Right.

12   A    Let me try this again, showing 7-31 as one of the entries,

13   and then it's 8-1 through 7-31.

14   Q    That's because the transaction was actually entered on

15   8-1?

16   A    No, there is one -- he actually worked on 7-31.  The

17   transaction was put in on 8-1.  It goes from 7-31 on this

18   list through 8-31 for entry into the voluntary work program.

19   Q    So this document -- this is GEO's document -- would tell

20   us Mr. Marquez Zavalza worked 30 days for the period between

21   July 31st, 2017 and August 31, 2017; is that correct?

22   A    29 days in August because he wouldn't have the 7-31 in

23   there.  It would show 29 entries.

24   Q    Are you looking at the screen that is being shown on the

25   screen share?

1   A    I am looking at the screen being shown.

2   Q    My question was:  For work performed for July 31, 2017

3   through August 31, 2017, that's the description column,

4   right?

5   A    That is correct.

6   Q    You agree this record shows that Mr. Marquez Zavalza would

7   have worked 30 days during that time period, correct?

8   A    That seems to be what is shown on the screen.

9   Q    He received $30 for that work according to this document,

10  correct?

11  A    That shows that on the screen, yes.

12  Q    I understand you normally submit backup documentation like

13  this to ICE each time you submit an invoice; is that correct?

14  A    For each and every invoice we submit to ICE, there is

15  backup documentation.

16  Q    Do you submit them in hard copy or by email or both?

17  A    I submit them both.

18  Q    Okay.  So that spreadsheet, when you print it out, it is

19  pretty big, isn't it?

20  A    The spreadsheet -- there is a spreadsheet, yes.  Sometimes

21  it is lengthy, sometimes it is not as big, depending on the

22  month and number of participants in that month.

23  Q    Few inches thick?

24  A    It could be.  It could be, you know, half an inch to an

25  inch thick.  It all depends on how many detainees took

1    advantage of being part of the voluntary work program.

2    Q    I am going to show you what has been premarked as Exhibit

3    180.  It should be in your packet.  Let me know when you get

4    there.

5    A    I have an exhibit marked 180.

6    Q    Do you recognize this document?

7    A    Yes, I do.

8    Q    What is it?

9    A    This is the document that is sent when the COR approves

10   the invoice and all of the back up for the invoice.  This is

11   the email that I will send to Consolidated Invoices, which is

12   government's clearinghouse to receive and pay all of their

13   invoices.  This is, "Please find attached the November 2016

14   invoice" with the invoice date that was sent to Consolidated

15   Invoices.

16   Q    Okay.  This is a document that you sent, correct?

17   A    This would be the document that I am to send after the COR

18   approves the invoice.

19   Q    Okay.  The one you are looking at, just so I am clear,

20   this is an email with attachments that you in fact sent; is

21   that right?

22   A    Yes, I send this email, yes, after I get approval from the

23   COR.

24            MR. POLOZOLA:  Your Honor, we offer Exhibit 180 into

25   evidence.

1           MS. MELL:  No objection.

2           THE COURT:  180 may be admitted.

3                   (Exhibit 180 was admitted.)

4    BY MR. POLOZOLA:

5    Q   If you take a look at the second page, Mr. Kimble.

6    A   Okay.  Second page.

7    Q   What is this?

8    A   This is the ICE invoice on ICE's instructions on how to

9    pay their invoice.  This is the top half of it, and the

10   bottom half is the information that ICE requires to have for

11   an invoice to be paid.

12   Q   So can we call out that bottom portion, Judy?  Thank you,

13   so we can all see a little better.

14           So do you see the column that is listed "item number,"

15   Mr. Kimble?

16   A   Item number, yes.

17   Q   On the left-hand side there?

18   A   Yes.

19   Q   Then below that it lists a variety of CLIN numbers?

20   A   That is correct.

21   Q   Those are the contract line item numbers we were

22   discussing earlier?

23   A   That is correct.

24   Q   If you go over to the one, two, three, fifth column, you

25   see "unit price," what does the unit price refer to?

1   A    The unit price is the amalgamation of each one of the CLIN
2   line items.
3   Q    If we see the CLIN, OO1 A, kind of that first line item
4   there, you following with me?
5   A    Yes.
6   Q    To make sure I am understanding this correctly, is that
7   referring to the contract line item that requires ICE to pay
8   GEO $117.89 per detainee for providing detention management
9   services to 1,181 detainees?
10  A    That line, yes.  That line has 1,181, which is the minimum
11  guaranteed per our contract, times the amount of days in that
12  month, times the 117.89 is the man-day rate that was
13  negotiated into the contract.
14  Q    So that $117.89 per day, you called that a "man-day rate"?
15  A    It's just another name for it.  It's jargon.  It is the
16  man-day rate that ICE and GEO contracting has negotiated for
17  the facility.
18  Q    Another way of saying bed-day rate?
19  A    Bed-day rate, man-day rate.
20  Q    So at a minimum, GEO gets paid for 1,181 detainees per
21  month, regardless of how many detainees are in the facility?
22  A    That is a minimum guarantee.
23  Q    So for that line item, the unit price is $4,176,842.70; is
24  that correct?
25  A    That looks to be correct, yes.

1  Q   So GEO is receiving more than $4 million per month,

2  regardless of how many detainees are actually in the

3  facility?

4  A   Well, it is a minimum guarantee that was built into the

5  contract by contracting and ICE negotiations.

6  Q   Right, so if there were only 200 detainees there, this

7  amount stays the same; is that right?

8  A   It will change based on the days and the month.  But it

9  will always be 1,181 times whatever the man-day rate is times

10  the number of days in the month.

11  Q   That makes sense.  Thank you.  So in line Item B just

12  below that, this is the rate for the number of detainees

13  above 1,181; is that right?

14  A   That is correct.

15         MS. MELL:  Your Honor, I am objecting.  I am

16  objecting to this line of questioning and focus on these

17  figures.  The expense of how expensive it is to care for

18  detainees in the program is not relevant.

19         THE COURT:  The objection is overruled.

20  BY MR. POLOZOLA:

21  Q   Mr. Kimble, we were talking about line Item B.  I think

22  you confirmed for me that is the amount that GEO would be

23  paid for having more than 1,181 individuals in the facility,

24  correct?

25  A   That is correct, that is above the minimum guarantee.

1   Q   Okay.  What services is GEO providing to ICE in exchange

2   for the payments it is receiving under CLIN 1001 A and B?

3   A   They are receiving those for management of the facility.

4   GEO manages the facility for ICE.  ICE has ultimate say in

5   the facility.  This just is a payment for our management of

6   the day-to-day in the facility.

7   Q   It is GEO's facility, correct?

8   A   That is correct, it is GEO's facility that is contracted

9   with ICE to house ICE's detainees.

10  Q   So is this bed-day rate in these two line items that we

11  just discussed, is that the main way that GEO is compensated

12  for providing services to GEO -- or to ICE under the

13  contract?

14  A   Well, the entirety of the -- the entirety of the invoices,

15  how they are paid, there is multiple different line items,

16  there's multiple different things that is done through the

17  facility.  So each line item is a portion of how GEO gets

18  reimbursed by the government for housing the detainees that

19  we house for them.

20  Q   Right.  So I think you are referring to the items listed

21  under "transportation" there.  GEO is invoicing ICE for some

22  transportation-related fees; is that correct?

23  A   Yes.

24  Q   And -- sorry, go ahead.

25  A   No, I am done.

1    Q    There is one, CLIN 1003 worker pay; is that correct?

2    A    That is correct.

3    Q    So other than those, is there any other way reflected on

4    this invoice that GEO is being compensated for providing

5    services to ICE?

6    A    Just what's on the invoice.  The monthly flat fee, the

7    transportation fuel costs, which is, again, mostly a

8    pass-through just like the worker pay is a pass-through.  The

9    overtime is the overtime that GTI would have on the

10    transportation of detainees, and then "remote post" is a

11    negotiated remote post that is above and beyond the staffing

12    of the facility to do remote post for the detainees if they

13    have to go to a hospital or they have to -- there is a hotel

14    watch or anything like that.  That is where that is listed

15    with backup.

16        Then, of course, the CLIN, the final CLIN, the 1003 worker

17    pay CLIN that is, like I said, the pass-through where ICE is

18    paying for the worker, the voluntary worker program.

19    Q    Let me take it back to CLIN 1001 A and B, which I was

20    asking about.  Those are intended to cover GEO's costs of

21    providing detention and food services under the contract,

22    including direct and indirect costs, overhead and profit

23    margin; is that right?

24    A    That would be what was negotiated above my level by ICE

25    and contracting, however they negotiated and whatever they

1    negotiated in the RFP and the negotiations with them to come

2    up to an agreement of a contract.

3    Q    Okay.  So taking it down to the bottom here, we see the

4    grand total due for this month is $5,154,583.67, correct?

5    A    That's what this sheet is showing.

6    Q    Is that amount consistent month to month, generally

7    speaking?

8    A    No, it varies, because it varies on the amount of days in

9    the month.  It varies on what transportation occurred in that

10   month, it varies on what overtime would have happened.  It

11   varies on -- all the CLINs vary.  So all of those CLINs can

12   vary from month depending on how many detainees are in the

13   facility, how many detainees were part of the voluntary work

14   program, how many detainees had to be taken to the hospital

15   for hospital visits or for care, continuing of care for them,

16   you know, overtime for bringing detainees from the satellite

17   locations.  There is tons of variables in there, so it can

18   change from month to month.

19   Q    But it can't go too low because GEO has the minimum

20   guarantee for 1,181 detainees?

21   A    We do have a minimum guarantee of 1,181 detainees, that is

22   correct.

23   Q    We talked about the last CLIN 1003, worker pay, right?

24   A    Yep.

25   Q    This is similar to what we looked at in the Excel

1    spreadsheet.  This number reflects the number of, I would

2    say, detainee workers working in the work program for the

3    entire month?

4    A   That would be for the entire month of November 1 through

5    30, 2016.

6    Q   So in this one month, that was 13,885, correct?

7    A   That is correct.

8    Q   Is the invoice format you use each month the same,

9    Mr. Kimble?

10   A   Yes, it is.  This format has been used for as long as I

11   have been at the facility.

12   Q   Now, I want to turn away from specific invoices and just

13   talk big picture for a minute.  As the associate warden of

14   finance, or now the business manager, you are familiar with

15   the Northwest Detention Center's actual operating margins on

16   an annual basis, right?

17   A   On an annual basis?  I mean, I have access to that.

18   Q   So when I say "operating margin," what do you understand

19   that to mean?

20   A   It would -- operating margin would be your expenses --

21   your revenue minus your expenses, that is going to be your

22   profit for the month.

23   Q   In your experience, what has the annual profit margin been

24   for the Northwest Detention Center?

25   A   In my experience, it has ranged from -- it could be in the

1    18 million to 20.

2    Q    How much does GEO pay to each employed detainee per day?

3    A    GEO doesn't pay anything to the detainees per day.  It is

4    ICE's program and ICE is the one that actually pays them

5    through the pass-through.  There is no cost to GEO for the

6    detainee work program.

7    Q    Does GEO hire detainee workers?

8    A    GEO -- there is, there is -- say that again, please, one

9    more time.

10   Q    Does GEO hire detainee workers?

11   A    GEO puts out that there is availability for certain

12   opportunities and the detainees sign up for those

13   opportunities, and then GEO lets the detainee know that they

14   are available to work in that opportunity.  If they still

15   want to work, be a part of that opportunity, that they can.

16   Q    So you wouldn't refer to those who participate in the work

17   program as employed detainees who are hired?

18   A    No.  There is a difference.  I have employees that work

19   for GEO, and then we have detainees in the facility that are

20   part of the voluntary work program.  They are two distinct,

21   separate things.

22   Q    I am going to have you take a look at what has been marked

23   as Exhibit 260.

24   A    One moment.  I see the email.

25   Q    Is this an email you sent to Chuck Hill on September 2nd,

1    2015?

2    A    It looks to be an email I sent to Chuck Hill on 9-2-2015.

3              MR. POLOZOLA:  We offer Exhibit 260 into evidence.

4              MS. MELL:  No objection, Your Honor.

5              THE COURT:  260 may be admitted.

6                    (Exhibit 260 was admitted.)

7    BY MR. POLOZOLA:

8    Q    This is an email you sent to Mr. Hill from your GEO

9    account.  Let me ask it this way.  Mr. Hill, is he your boss?

10    A    He is the regional director of business management.

11    Q    Do you see in the bottom of this email that he was asking

12    some questions about your detainee work program?

13    A    He classified that as that because we administer the

14    program.  It is not our program.  We administer it for ICE.

15    He was asking questions to clarify the voluntary work

16    program.

17    Q    Do you see where he asked how many do we try to hire in

18    each job?  First bullet point highlighted on the screen.

19    A    I see that was one of his questions.

20    Q    You responded to Mr. Hill?

21    A    Yes, I did.

22    Q    You provided him some details on the number of workers in

23    the facility; is that right?

24    A    I did.

25    Q    Then you answered his question about how much they get

1  paid; isn't that right?

2  A   I did answer his question, yes.

3  Q   You told Mr. Hill, who I think you agreed is with the

4  western region, that we pay one dollar per day per employed

5  detainee, correct?

6  A   That is correct, but this is semantics.  He was asking

7  about the voluntary work program.  I wasn't specific in -- it

8  wasn't meant to be specific in the facility pays this.  It is

9  the voluntary work program is one dollar a day, that's how I

10 have always understood it.  That is how I have always

11 portrayed it.  We put in one dollar a day for the detainee

12 for the program.

13         MR. POLOZOLA:  No further questions, Your Honor.

14         THE COURT:  We will go to cross-examination at 1:00.

15 We will take an hour for lunch.  You may all be excused.

16         MR. BERGER:  Just to note, this is Mr. Berger.

17         THE COURT:  Yes.

18         MR. BERGER:  I want to note that I will have some

19 questions for the witness before cross-examination.

20         THE COURT:  Mr. Kimble, be back ready to go at 1:00.

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Okay.  Thank you.

23       (Recessed.)

24

25

```
1                                    AFTERNOON SESSION

2                                    JUNE 8, 2021

3     (The following occurred outside the presence of the jury.)

4          THE COURT:  I see we have a full complement of

5     counsel.  Mr. Kimble is present.  Get the jury and we'll go

6     to work.

7          THE CLERK:  I am just confirming the jury is present.

8       I am bringing the jury in now.

9       (The following occurred in the presence of the jury.)

10         THE CLERK:  All right, Your Honor, it appears that

11    everyone is here.

12         THE COURT:  Just be sure everybody is ready to go.

13    Okay, you may continue with Mr. Kimble.  Yes, he's here.

14         THE WITNESS:  Yes, sir.

15         MR. BERGER:  May I proceed, Your Honor?

16         THE COURT:  Yes, please do.

17                          DIRECT EXAMINATION

18    BY MR. BERGER:

19    Q   Mr. Kimble, my name is Adam Berger and I represent the

20    class of detainee workers in this case.  Can you hear me all

21    right?

22    A   Yes, sir.

23    Q   Great.  Before the break, you testified that GEO used

24    something called the Keefe banking system to keep track of

25    detainee accounts, correct?
```

1   A    That is correct, we use the Keefe banking system.

2   Q    Keefe is not an ICE system, correct?

3   A    No, it is not an ICE system.

4   Q    It is not a system ICE maintains, correct?

5   A    It is not a system that ICE maintains.  It is a system

6   that GEO maintains to stay in compliance with rules set forth

7   by the facility, or for the facility.

8   Q    Okay.  GEO puts money into detainee accounts after they

9   have worked in the worker program, correct?

10  A    Electronically, yes.

11  Q    And then if workers -- if detainees purchase something

12  from the commissary or make a phone call, that gets deducted

13  from the Keefe account, correct?

14  A    That is correct.

15  Q    GEO also has facility staff, correct?

16  A    GEO has facility staff that are GEO employees.

17  Q    Right, it pays that staff at least the Washington minimum

18  wage, correct?

19  A    It pays that staff the federal wage determination.

20  Q    Which is more than the Washington minimum wage, correct?

21  A    I think so, yes.

22  Q    So, for example, GEO has three janitors on staff whose job

23  it is to clean the unsecured side of the Northwest Detention

24  Center, correct?

25  A    We have three janitors that maintain the -- yes, the

1    outside of the secured area of the facility.

2    Q    It pays those janitors more than $15 an hour, right?

3    A    It pays the federal wage determination for those janitors,

4    yes.

5    Q    That's more than $15 an hour currently, right?

6    A    Yes.

7    Q    And detainee workers perform the similar janitorial work

8    on the secure side of the facility, correct?

9    A    They perform activities, but it is not the same work and

10    they are not workers for GEO.

11    Q    Are you saying the detainee workers don't perform similar

12    janitorial work on the secure side of the facility as the GEO

13    janitors perform on the unsecured side?

14    A    They perform opportunities that are approved by ICE, yes.

15    They perform multiple opportunities by ICE.  They perform

16    different things working in the kitchen, floors, all that

17    type of opportunity that ICE mandates that we provide for

18    them.

19    Q    Okay, but that's not quite my question, Mr. Kimble.  The

20    janitors who are employed by GEO for the unsecured side of

21    the facility, they sweep the floors, correct?

22    A    They do sweep the floors, yes.

23    Q    Clean the bathrooms?

24    A    Yes, they do.

25    Q    Take out the trash?

1    A    Yes, they do.

2    Q    Mop?

3    A    Yes, they do.

4    Q    Clean off table surfaces and things of that sort?

5    A    Dust, yes, in the unsecured side, yes.

6    Q    On the secured side, it is the detainees who mop and sweep

7    and dust and clean the bathrooms, correct?

8    A    Yes, as part of the VWP, as part of the ICE's voluntary

9    work program.

10   Q    For that, the detainee workers get paid a dollar a day,

11   correct?

12   A    They get paid a dollar a day through ICE, yes, through

13   ICE.

14   Q    GEO -- GEO is the entity that puts the money in the

15   detainees' Keefe banking accounts, correct?

16   A    We do the transaction that shows it there, but ICE is only

17   the person that is doing that because it is no cost to GEO.

18   It is ICE's reimbursement of that dollar for them being part

19   of ICE's voluntary work program, yes, sir.

20   Q    ICE reimburses GEO for the money put into the detainees'

21   accounts, correct?

22   A    It is a pass-through.  I show them how many times the

23   detainee has been part of the voluntary work program and ICE,

24   the COR approves that and it is part of the invoice that

25   goes.  It is part of the pass-through account, yes.

1    Q    I don't really want to get bogged down in semantics here

2    with you, Mr. Kimble.  We looked at the contract earlier.  I

3    think the contract talked about reimbursement under CLIN 3,

4    correct?

5    A    Yes.

6    Q    Okay.  ICE does not reimburse GEO for the pay, the money

7    it pays to its employee janitors on the unsecured side,

8    right?

9    A    There is nothing that I do like I do for the voluntary

10   work program, no.

11   Q    Yes.  ICE does not reimburse GEO for the pay of its

12   detention officers or kitchen staff, correct?

13   A    Kitchen staff and janitors are part of the staffing plan

14   for the facility that is approved by ICE.

15   Q    ICE doesn't reimburse GEO for payroll for those staff,

16   correct?

17   A    Not in the same way that it does for the voluntary work

18   program.

19   Q    If GEO incurs more overtime for its facility staff, GEO

20   does not get reimbursed by ICE for that, correct?

21   A    That is correct.

22   Q    So, for example, if GEO's kitchen staff has to incur more

23   overtime because there aren't enough detainee workers, GEO

24   does not get reimbursed by ICE for that additional overtime,

25   correct?

1  A   No, they do not get reimbursed for that overtime, that is

2  correct.

3  Q   In fact, back in late 2018, early 2019, at least GEO was

4  seeing increased overtime in the kitchen because of a lack of

5  detainee workers, right?

6  A   That could have been, yes, sir.

7  Q   When that happens, it impacts GEO's operating margin for

8  the center, correct?

9  A   It would impact it.  We try and manage as much as we can

10  for the use of overtime.  We manage it just like any other

11  company would try and manage our overtime.

12  Q   Similarly, if GEO had to add more staff or add more

13  detention officers or had to incur more overtime for existing

14  staff to do laundry or clean the facility because there were

15  not enough detainee workers, ICE would not reimburse GEO for

16  those additional staff costs, correct?

17  A   No, if we were to go for additional officers, it would be

18  an amendment to our contract and they would go through

19  contracting to add staffing because it would be beyond the

20  staffing plan if we had to add more detainees, and that would

21  go into a contracting realm that is above my position.

22  Q   So are you saying that GEO could not add additional staff

23  at the facility without getting ICE's permission?

24  A   We would get ICE's permission if it was above the approved

25  staffing plan, then it would go through contracting to do an

1    amendment to change the staffing plan, but we would be

2    staffed to our staffing plan, which is part of our contract.

3    Q    Okay.  The contracting is above your position, right?

4    A    Yes, yes, it is.

5    Q    We'll be talking to somebody later in the week about that.

6    Let me just ask this:  If GEO had to include more overtime

7    for existing staff to do laundry or clean the facility

8    because there were not enough detainee workers, it would not

9    be reimbursed by ICE for that additional overtime, correct?

10   A    That would be correct because it would be using the

11   existing staff that we have to the staffing plan.

12   Q    Okay.  Instead, those additional overtime costs would come

13   out of GEO's operating margin, correct?

14   A    Those additional overtime costs would come primarily out

15   of the overtime I budget overtime for the facility because I

16   budget overtime for the facility in the budget for the year.

17   Q    If you exceeded that budget because of lack of detainee

18   workers, that overage would come out of GEO's operating

19   margin, correct?

20   A    Yes, just like any company anywhere, absolutely.  Overtime

21   does do that.

22   Q    We are going to bring up Exhibit 303, which has already

23   been introduced and we have seen before in this case.  Do you

24   recognize Exhibit 303?

25   A    Yes, I recognize Exhibit 303.

1    Q    Okay.  Previously, there has been testimony about the

2    column labeled "raw tray" and what that represents.  I want

3    to ask about the columns to the right of "raw tray."

4    A    To the right of raw tray.

5    Q    "Raw tray," as I understand it, is just the cost of the

6    food, correct?

7    A    That is correct.

8    Q    The tray cost, which is the right most column.  Maybe we

9    can blow those up, Ms. Mendoza?

10         The tray cost includes the cost of the food, correct?

11   A    That is correct.

12   Q    The tray cost includes the cost of the food, which is the

13   raw tray, plus the cost of chemical usage, right?

14   A    That is correct.

15   Q    Plus non-food usage, whatever that is?

16   A    That is correct.

17   Q    Plus payroll, right?

18   A    That is correct, payroll.

19   Q    Payroll is the amount that GEO pays kitchen staff for the

20   week or whatever period is covered by this row, correct?

21   A    That would be yes for GEO employees that are in the

22   kitchen.

23   Q    Tray cost does not include the monies paid to detainee

24   workers, correct?

25   A    That is correct because it is -- sorry.  That is correct.

1    Q    Okay.  If GEO goes over budget on the tray costs, say

2    because of increased staff overtime, it doesn't get

3    reimbursed additionally by ICE for that, correct?

4    A    That is correct.

5    Q    That just impacts GEO's operating margin, correct?

6    A    That would impact their operating margin for that month,

7    that is correct.

8    Q    Thank you.  We can take the exhibit down.  One other thing

9    I wanted to ask about regarding the staff janitors who clean

10   the unsecured side of the facility and the detainee workers

11   who clean the secured side, nobody forces the janitors to

12   work for GEO, correct?

13   A    That is correct.

14   Q    That's their choice?

15   A    You are talking GEO employees, the three janitors?

16   Q    Yes.

17   A    Yes.

18   Q    That's a choice they make freely and voluntarily, correct?

19   A    Absolutely.

20   Q    You would agree they probably chose to work for GEO for

21   the money, right?

22   A    I couldn't say exactly why they do it, but I would do it

23   for my family, whatever is good for my family.

24   Q    Perhaps maybe some of them do it because they feel better

25   having a job than not working, correct?

```
 1    A    That very well could be.

 2    Q    But in any event, if those individuals wanted to, they

 3    could leave GEO and go work for another company, right?

 4          MS. MELL:   This is objectionable speculation based on

 5    the mindset that he's not a janitor.

 6          THE COURT:   He may answer.

 7          THE WITNESS:   The employees can work as long as they

 8    want to.   If they decide that they no longer want to work for

 9    GEO, they can put in their two-weeks notice, do the right

10    thing and do whatever is right for them and their family.

11    BY MR. BERGER:

12    Q    If they get a better offer from another company in the

13    community, they could take that, right?

14    A    They could take that, that is correct.

15    Q    The only option detainees have for earning money while in

16    the Northwest Detention Center is working in the dollar-a-day

17    worker program, correct?

18    A    Well, no, they can get money from friends and family put

19    in their Keefe account.   The voluntary work program is a

20    program that is put together by ICE to give opportunities for

21    detainees to volunteer in that program.   It is purely

22    voluntary.

23    Q    Okay.   That's not my question.   I will ask you to listen

24    to my question.

25    A    Yes, sir.
```

1    Q    The only option detainees have for earning money while in

2    the Northwest Detention Center is working in the dollar a day

3    work program, right?

4    A    The ICE's voluntary work program, that would be correct.

5    Q    In fact, detainees are prohibited from conducting any

6    other business while they are in the Northwest Detention

7    Center, correct?

8    A    I don't know how they would hold an outside job while they

9    are in the facility.

10   Q    Okay.  They couldn't set up their own hair salon in the

11   barbershop, right?

12   A    No, they could not.

13   Q    They couldn't bring in ramen and sell it to other

14   detainees for 25 cents a pack rather than the 50 cents a pack

15   that the commissary charges?

16   A    That would be against facility rules.

17   Q    Right.  So working in the worker program is their only

18   option for earning money while in the facility, correct?

19   A    Volunteering for that program would be.  Volunteer -- they

20   voluntarily say they will be a part of that program and they

21   say which portion that they want to do.  If they want to be a

22   pod porter, work in the kitchen, they put in that choice.

23   Q    That's not my question.  My question is:  Working in the

24   worker program is their only option for earning money while

25   in the facility, correct?

1   A   It is their only option for earning money in the facility,

2   but not their only option to get money while in the facility,

3   that is correct.

4         MR. BERGER:  Thank you.  I have nothing further.

5         THE COURT:  Any further examination of Mr. Kimble?  I

6   guess you may be excused.  Thank you very much.

7         MS. MELL:  I'm sorry.  There is cross-examination.

8         THE COURT:  Well, I am waiting.

9         MS. MELL:  We are ready to go.  I am just trying to

10  get Mr. Kimble up on the screen here.

11                        CROSS-EXAMINATION

12  BY MS. MELL:

13  Q   So, Mr. Kimble, you were just asked a number of questions

14  about the job opportunities inside detention; is that

15  correct?

16  A   Yes, ma'am.

17  Q   Is the reason the job opportunities are limited because

18  the detainees are locked up in a secure facility?

19  A   That is correct, it is a secured facility.

20  Q   The job options on the inside are distinctly different and

21  unique for detainees than they would be on the outside?

22        MR. BERGER:  Objection, leading.

23        THE COURT:  Sustained.

24  BY MS. MELL:

25  Q   How are the job opportunities different for detainees on

1    the inside versus the outside?

2    A    There is no comparison.  They are being detained by the

3    United States Government inside a secured facility so there

4    would not be a comparison between the two.

5    Q    Okay.  So showing you what has been marked as Exhibit 129.

6    Can we take a look at the contract again?

7    A    Yes.

8    Q    Bates No. 036858 would be CLIN 8003?

9    A    8003, yes.  I see it.

10   Q    Second sentence, "Reimbursement for this line item."  If I

11   could have that sentence highlighted.  Do you see the word

12   "actual" in front of the word "cost"?

13   A    Yes, ma'am.

14   Q    What does that word obligate ICE to pay GEO by way of a

15   reimbursement?

16   A    It would be the actual cost.  Actual is actual.

17   Q    So what was the actual cost of the VWP?

18   A    One dollar.

19   Q    If the VWP rate changed to the minimum wage rate, what

20   would the actual cost of the VWP be?

21   A    That would be at the Washington State minimum wage, $13

22   and whatever cents it would be.  It would be stated there.

23   Q    Okay.  Thank you.  That is all I need from the contract.

24   How about Exhibit 175.  Should be a batch summary.  We went

25   through a batch summary quite a bit.

1    A    I see that.

2    Q    Do you have a batch summary that you prepare for GEO

3    employees?

4    A    No, I do not.

5    Q    It is not a document that ICE requires you to submit for

6    GEO employees?

7    A    No, it is not.

8    Q    You don't prepare one either, do you?

9    A    I do not prepare one for GEO employees.

10   Q    Let's go to the Excel spreadsheet version at Exhibit 534.

11   Take a quick peek at that again just as a reminder.  You do

12   not prepare an Excel spreadsheet on employees' times for

13   submission to ICE every month, do you?

14   A    I do not.

15   Q    I think we have already discussed, ICE doesn't reimburse

16   per these kinds of Excel spreadsheets, right?

17           MR. BERGER:  Objection, leading, Your Honor.

18           THE COURT:  Sustained.

19   BY MS. MELL:

20   Q    You don't need these for employees, suffice to say?

21   A    For GEO --

22           MR. BERGER:  Same objection, Your Honor.

23           THE COURT:  Sustained.

24   BY MS. MELL:

25   Q    Is there any need to have an Excel spreadsheet for

1    employees like this?

2    A    There is no need that I know of.  No, I do not produce

3    something like this for GEO employees.

4    Q    That is all we need from that document.  How about Exhibit

5    260.  It is an email.  Do you recall being examined by the

6    State's attorney on this email?

7    A    Yes.

8    Q    I think you tried to highlight some employment terminology

9    like "employed."  You see the word "employed" there --

10   A    Yes.

11   Q    -- in your communication?

12   A    Yes.

13   Q    I think down further below, Mr. Hill, one of your

14   supervisors used an employment term like "hire"?

15   A    That is correct.

16   Q    When you read the e-mail from Mr. Hill and you responded,

17   was there any doubt in your mind that the detainees were not

18   employees?

19   A    There is no doubt.  This was talking about the voluntary

20   work program.  It was information on the voluntary work

21   program.

22   Q    So the fact you were using employment type words suggests

23   to you that you were trying to explain they were employees?

24   A    They weren't employees of GEO, no, it was never intended

25   as such.

1   Q  All right.  Let's go to Exhibit 180.  Page two.  This is

2   the ICE contract; is that right?

3   A  ICE invoice.

4   Q  The State was pretty interested in showing you the big

5   number off there to the right, almost five million bucks --

6          THE COURT:  Ms. Mell.

7          MS. MELL:  Yes.

8          THE COURT:  Ask the question.

9   BY MS. MELL:

10  Q  The State highlighted the 4663; is that right?  You see I

11  have done the same thing.

12  A  I see that, yes.

13  Q  Does that reflect that it cost a lot of money to house

14  detainees in a secure facility?

15  A  Absolutely.

16  Q  ICE is paying GEO a lot of money to secure the people it

17  detains at the Northwest ICE Processing Center?

18         MR. POLOZOLA:  Objection, leading, Your Honor.

19         THE COURT:  Sustained.

20  BY MS. MELL:

21  Q  What kind of money is ICE paying GEO to house its ICE

22  detainees at the Northwest ICE Processing Center?

23  A  We see it right there because we have to have a secure

24  facility because of the detainees that are in the facility.

25  Q  It is not -- it is not -- it is not a camp?

1  A    It is not a camp.  It is a secured facility with security

2  measures inside the facility.  It is a secure facility that

3  has low level, medium level, high level detainees in there as

4  delineated by ICE.

5  Q    How risky are the behaviors that the detainees ICE brings

6  to the Northwest ICE Processing Center that you are required

7  to have money to secure the facility for?

8         MR. BERGER:  Objection, Your Honor, foundation.

9         THE COURT:  I think he may answer.

10        THE WITNESS:  There are murderers, there are rapists,

11 there are child molesters, there are any gamut of people that

12 come in from state facilities that are housed in our facility

13 while the courts are deciding if they are United States

14 citizens.  We house all of the above.

15 BY MS. MELL:

16 Q    Does GEO spend money securing that facility to protect

17 citizens from individuals ICE places there who ICE has

18 identified to you as a threat to national security?

19        MR. BERGER:  Objection, argumentative, leading.

20        MR. POLOZOLA:  Objection, leading.

21        THE COURT:  Sustained.

22 BY MS. MELL:

23 Q    Is any of that number used by GEO to secure individuals

24 who present a threat to national security, to the best of

25 your knowledge?

1          MR. BERGER:  Objection.

2          THE WITNESS:  Yes.

3    BY MS. MELL:

4    Q   In fact, the State of Washington houses ex-convicts in the

5    Northwest ICE Processing Center; is that correct?

6          MR. POLOZOLA:  Objection, foundation, leading,

7    Your Honor.

8          THE WITNESS:  That is correct.

9          THE COURT:  Leading in form, counsel.

10   BY MS. MELL:

11   Q   Let me slow down.  What use does the State of Washington

12   make of the Northwest ICE Processing Center?

13   A   When inmates in the Washington State facilities are

14   released, if they have a detainer, if there is a question on

15   their United States citizenship, we are the facility that

16   they are brought to.  It doesn't matter what level they are,

17   what they have committed, we have to house them in our

18   facility so we protect the detainees that are in our

19   facility, we protect our officers that are in the facility,

20   and we also protect the city that our facility is located in

21   by housing them securely in our facility.

22   Q   Does the State of Washington have a person on site at the

23   Northwest ICE Processing Center?

24   A   They have a liaison that works with the State of

25   Washington that tracks the incarcerated -- the people that

 1  were incarcerated that got out that are in our facility.  His

 2  name is Vernon, I forget his last name.  He is the State

 3  liaison that coordinates with the State and tracks their

 4  detention while they are here at the facility.

 5  Q   Is it Virgil Wallace, is that the person you are talking

 6  about?

 7  A   That is correct.

 8  Q   The reason he is on site at the Northwest Detention Center

 9  is because there are conditions of release he's monitoring?

10           MR. BERGER:  Objection, leading.

11           THE COURT:  Sustained.

12  BY MS. MELL:

13  Q   What kind of monitoring is he doing at the facility?

14  A   He monitors the detainees and coordinates the detainees

15  that were released from state facilities at the Northwest ICE

16  Processing Center.

17  Q   Is he monitoring jail releases or prison ex-offenders?

18  A   Prison.

19  Q   All right.  How many documents are there for GEO at the

20  Northwest ICE Processing Center that pertain to the voluntary

21  work program?  Can you just give me the number generally?

22  A   Generally five.

23  Q   Contract, that's one?

24  A   Contract is one, yes.

25  Q   Multiple pages, lots of provisions we have looked at,

1    right?

2    A    Absolutely.

3    Q    How about this one?

4    A    PBNDS, that is one.  That is correct.

5    Q    All right.  We have a couple versions here.  What about

6    that one --

7              MR. POLOZOLA:  Objection, Your Honor.  This is all

8    leading.

9              THE COURT:  He may answer.

10             THE WITNESS:  That is ICE's detainee handbook and

11   GEO's detainee handbook.  What you are showing right now is

12   ICE's detainee handbook in Spanish and English.

13   BY MS. MELL:

14   Q    They come in multiple languages?

15   A    Multiple languages for multiple detainees that are in our

16   facility.

17   Q    How about -- what else do we have?  I did show you this

18   one?

19   A    That is the GEO detainee handbook.

20   Q    There is also the GEO 5.1.2?

21   A    That is the GEO policy 5.1.2 for the voluntary work

22   program.

23   Q    Out of this whole stack of documentation that you have for

24   the voluntary work program at the Northwest ICE Processing

25   Center, how many of those documents does GEO write?

```
 1  A    GEO would write the detainee handbook.  Everything else

 2  there is produced by ICE, and the detainee handbook is a

 3  mirror of what ICE's produced.

 4  Q    Does ICE approve GEO's detainee handbook?

 5  A    Absolutely.  They have to sign off on all policies,

 6  procedures in the detainee handbook.

 7  Q    What discretion do you, down at the Northwest ICE

 8  Processing Center, have as a GEO employee to go outside the

 9  bounds of these parameters in administering the VWP?

10  A    We do not.

11  Q    Are there any promises you could make to a detainee in the

12  voluntary work program that didn't get approved by ICE?

13          MR. BERGER:  Objection, leading, Your Honor.

14          THE WITNESS:  No.

15          THE COURT:  Sustained.

16  BY MS. MELL:

17  Q    What promises, if any, could you make to a VWP participant

18  that was not approved by ICE?

19  A    We couldn't and we don't.

20  Q    What do you know about the highest level of government

21  official and the VWP program?

22  A    I know it was -- the VWP was put in by the United States

23  Congress in a continuing resolution in -- I think in the

24  1970s, somewhere in that time frame.

25  Q    What do you know about where the dollar came from as an
```

```
 1   amount?
 2              MR. BERGER:  Objection, Your Honor.
 3              THE WITNESS:  To my understanding -- sorry.
 4              THE COURT:  Objection is sustained.
 5   BY MS. MELL:
 6   Q   What discussions did GEO ever have about creating a dollar
 7   a day?  Was the dollar GEO's dollar?
 8   A   No, there has been no discussions on that with GEO to ICE.
 9   This is ICE's program.  We just administer it.
10   Q   What do you believe -- who do you believe was the genesis
11   of the dollar?
12              MR. BERGER:  Objection, foundation.
13              THE COURT:  Sustained.
14              MS. MELL:  On foundation?  What is the sustained
15   objection, Your Honor?  Grounds?
16              THE COURT:  What he believes in this regard is not
17   relevant.  You are asking for his belief about a fact.
18   BY MS. MELL:
19   Q   What facts do you have about where the dollar a day came
20   from?
21              MR. BERGER:  Objection, foundation.  Mr. Kimble has
22   testified he has only worked for GEO since, I believe, 2012.
23              THE COURT:  The objection is sustained.
24   BY MS. MELL:
25   Q   During your tenure with GEO, have you come to learn what
```

1    facts are related to the dollar a day and where it came from?

2         MR. BERGER:  Objection, foundation, calls for

3    hearsay.

4         THE COURT:  That is a yes or no question.  He may

5    answer.

6         THE WITNESS:  Yes.

7    BY MS. MELL:

8    Q   What do you know?

9    A   What I know is that --

10        THE COURT:  Now, wait a minute.  You don't object.

11   All right.

12        MR. BERGER:  I object on hearsay grounds.  I still

13   think no foundation has been laid.

14        THE COURT:  Well, the objection is sustained.

15   BY MS. MELL:

16   Q   Have you any reason -- strike that.

17        Are you familiar with any records or documents that you

18   have had the opportunity to -- strike that.  How do I want to

19   do this?

20        What would be the basis of any facts you know about

21   where the dollar came from?

22   A   The basis that I have is the VWP program and the

23   information that we have to administer that program from ICE.

24   Q   What do you understand the genesis of the dollar a day was

25   from ICE?

1   A   What I --

2         MR. BERGER:  Same objection, Your Honor.

3         THE COURT:  Sustained.

4   BY MS. MELL:

5   Q   Do you have any firsthand knowledge of where the dollar a

6   day came from, what the original inception of that was?

7   A   I have seen the continuing resolution that it was put into

8   that continuing resolution to authorize --

9         THE COURT:  All right.  Just a minute.  You answered

10  the question.

11  BY MS. MELL:

12  Q   So to the best of your knowledge, GEO didn't come up with

13  the dollar amount?

14        MR. BERGER:  Objection, leading, Your Honor.

15        THE COURT:  Sustained.

16  BY MS. MELL:

17  Q   Based on your tenure and what you know about GEO and the

18  dollar, whose idea was the dollar?  Anyone at GEO?

19  A   No, United States Government.  ICE.

20  Q   Has the State ever notified the Northwest ICE processing

21  center or GEO that the VWP should be higher?

22  A   No, they have not.

23  Q   What, if anything, in the PBNDS standards that are

24  specific to the voluntary work program matches the conditions

25  applicable to your job with GEO?

1    A    There are none.  It is two separate -- completely separate

2    entities.

3    Q    Are you, in your employment, confined at the Northwest ICE

4    Processing Center?

5    A    I am not.

6    Q    You are free to come and go to and from your job?

7                MR. BERGER:  Objection, Your Honor, leading.

8                THE COURT:  Sustained.

9    BY MS. MELL:

10   Q    Do you stay at the Northwest ICE Processing Center against

11   your will?

12               MR. BERGER:  Objection, Your Honor, leading.

13               THE WITNESS:  I do not.

14               THE COURT:  It is also leading, counsel.

15               MS. MELL:  I have to practice my who, what, when,

16   where and hows.  My apologies, Your Honor.  I'll work on

17   that.

18   BY MS. MELL:

19   Q    All right.  So when you come and go from the facility, do

20   you pay for your own meals?

21   A    Yes, I do.

22   Q    How do you do that?

23   A    I pay for meals, I go to a restaurant and get something

24   and bring it in, or I bring it in from my house, go to the

25   store, buy it and bring it in to my desk.

1  Q    What money do you use to do that?

2  A    I use the money that GEO pays me to go to the restaurant

3  or go to the store.

4  Q    The money comes from your employment?

5  A    Money comes from my employment with GEO.  They pay me each

6  month to do the position that I have in the facility.

7  Q    With regard to the PBNDS standards, we talked about the

8  provision that says the detention standard requires providing

9  detainees an opportunity to work.  Does GEO provide you --

10  make work available for you to select from?

11  A    No, I have a standard job.  I have the job of business

12  manager of the facility.  It is multiple jobs.

13  Q    When, if ever, can you come to work and choose what you

14  get to do that day?

15  A    I don't choose.  I have a standard that I have to live by.

16  I have reports I have to do.  I have to keep track of paying

17  of bills.  I have to buy stuff for the facility.  I have to

18  report on what we did.  That is the majority of my job.

19  Q    Do you go home after four hours?

20  A    I do not go home after four hours.

21  Q    What kind of hours do you put in as an employee of GEO?

22  A    I am a salaried employee.  I put in the hours it takes.

23  Most of the time, it is not a typical eight-hour day.  I can

24  spend nine hours, just depends on what needs to be done.

25  Very rarely do I leave at an eight-hour mark during the day.

1    Q    How often do you work more than eight hours a day?

2    A    A majority of my time.  Majority of the month.  I would

3    say if there is 22 work days in the month, I would say

4    probably 15 of those work days, I am there more than eight

5    hours a day.

6    Q    Are any of your work assignments voluntary?

7    A    None of my work assignments are voluntary.  I am expected

8    to do a job and get the job done.  If I don't do the job, I

9    would be fired.

10   Q    What about signing a voluntary work program agreement, is

11   there such a thing for you as an employee of GEO?

12            MR. BERGER:  Objection, leading.

13            THE COURT:  Sustained.

14   BY MS. MELL:

15   Q    What kind of voluntary work program agreement applies to

16   employment at GEO?

17   A    There are no voluntary work assignment papers that apply

18   to anybody that work for GEO.  They apply for a certain job

19   and that's the job they are going to do while they work for

20   GEO.

21   Q    What kind of attendance policy do you have?

22   A    I am expected to be there.  It is tracked through the

23   Kernow system that I have there.  If I am not there, I use my

24   leave that I get for my years of service.  The Kernow program

25   tracks when I come in and when I -- each day that I come in.

Kimble - Cross

1    Q    Do you have a limitation on the number of absences?

2    A    I can't have an absence.  If I have an absence, it would

3    be a job abandonment and I would be fired from the facility.

4    I can only not be there when I have approved leave through my

5    accumulated leave that I have.  That would be the only

6    absence I could have.

7    Q    What happens if you get sick at work?  Do you go to the

8    ICE medical facility onsite at the Northwest ICE Processing

9    Center?

10            MR. BERGER:  Objection, leading.

11            THE COURT:  He may answer.

12            THE WITNESS:  I do not go there because we cannot.

13   ICE -- the PHS is for detainees only.  I have to go out into

14   the community and go to my family doctor or an emergency

15   room, if need be.

16   BY MS. MELL:

17   Q    What about dental, do you get free dental onsite at the

18   Northwest ICE Processing Center?

19   A    No, I do not.  PHS has a dentist, but I don't have access

20   to it.  I have to make an appointment with my family dentist

21   on the outside of the facility.

22   Q    What about detainees, does a VWP participant who has a

23   toothache while in the kitchen have to pay for medical?

24   A    No, they do not.  They go to PHS, which is onsite in the

25   facility and they can see a doctor, they can see a dentist,

1   they can see mental health.  There is a whole array of

2   service providers there for them that they have access to

3   every single day.

4   Q   How about laundry, do you get your clothes laundered at

5   the GEO -- or the Northwest ICE Processing Center?

6   A   I do not.  I take them at a cost to myself to the local

7   cleaner or I do them in my basement of my house.

8   Q   What kind of sick leave do you get?  Do you get that

9   unpaid leave Washington offers?

10   A   No, I don't get the sick leave.  I have a leave program

11   that is set up based on the number of years that I've worked

12   for GEO.  I get a little over three weeks of leave a year for

13   my time served with GEO, being a GEO employee.

14   Q   When you hired on with GEO, how did your -- the rate of

15   your pay get decided?

16   A   I negotiated my rate of pay with the region.  They came to

17   my office and presented an opportunity for me, and I told

18   them what I need to be able to move my family and better my

19   position.  And they agreed and moved me up here and met my

20   demands for the pay for the position.

21   Q   Are you deemed an at will employee?

22   A   Absolutely.  If I don't do the job, they can terminate me

23   for not doing my job.  If I turn in -- if I turn in reports

24   that are wrong, if I don't show up to work, if I don't pay

25   bills for the facility, if I don't stock the facility

1   adequately, I could be terminated for all of those things

2   because they fall under my position.

3   Q   What happens when you walk away from your job, can you

4   come back?

5   A   If I were to walk away from my job, I would not be able to

6   come back to GEO.  I better have another job lined up

7   somewhere else or I -- or I would have to answer to my wife.

8         MS. MELL:  I have nothing further, Mr. Kimble.  Thank

9   you.

10        THE COURT:  Anything further?

11        MR. POLOZOLA:  I do for the State.  I'll be brief.

12                  REDIRECT EXAMINATION

13  BY MR. POLOZOLA:

14  Q   You looked at Exhibit 260.  We will show it to you again

15  so you can see it.  The first line, "We pay GEO one dollar

16  per day per employed detainee"?

17  A   We pay one dollar per day per employ -- employed detainee,

18  that is correct.

19  Q   You wrote those words in 2015, correct?

20  A   I did write those words.  I did write those words -- if

21  you go back to where you just were, right there, an "re" of

22  the detainee program.  This was all about the detainee work

23  program.

24  Q   Mr. Kimble, I asked if you wrote those words in 2015, yes

25  or no?

1    A    I wrote those words in 2015, yes.

2    Q    You are aware this lawsuit was filed in 2017; is that

3    right?

4    A    Sure.  Yes.

5    Q    Right.  So this is the language you used before you knew

6    GEO was being sued about this issue; is that correct?

7    A    That was the language that was used in talking about the

8    detainee work program.

9         MR. POLOZOLA:  No further questions, Your Honor.

10    Thank you.

11         MR. BERGER:  Your Honor, I do have a couple of

12    questions.

13         THE COURT:  All right, Mr. Berger.

14                   REDIRECT EXAMINATION

15    BY MR. BERGER:

16    Q    Mr. Kimble, you testified you had to pay for your own

17    meals, laundry, if you don't have insurance, pay for your own

18    doctors, dentist and stuff.  Sounds like you may have it a

19    bit rough on the financial front.  What is your salary?

20    A    Do I need to tell you the amount I make?  I don't tell

21    that to anybody.  That is personal to myself.  Do I have to

22    answer how much I make?

23         MS. MELL:  Your Honor, I think there is an objection

24    based on the confidentiality of the -- based on his position

25    in the facility.  It would be disclosing information in a

1  very public way that is pretty typically kept confidential.

2  MR. BERGER:  All right, Your Honor.  I will withdraw

3  the question.

4  I have nothing further for the witness, Your Honor.

5  THE COURT:  Okay.  Thank you, Mr. Kimble.  You may be

6  excused.

7  THE WITNESS:  Thank you, sir.  Have a good day.

8  THE COURT:  Next witness.

9  MR. BERGER:  We would call Christopher Strawn.

10  MS. SCHEFFEY:  Your Honor, this is where we would

11  make our *Daubert* objection.

12  THE COURT:  All right.  I am going to excuse the jury

13  for a few minutes while we hear this objection.  You may take

14  an extra break.  We'll be with you shortly.

15  (The following occurred outside the presence of the jury.)

16  THE COURT:  Okay.  What's the deal?

17  MS. SCHEFFEY:  GEO has previously filed a *Daubert*

18  motion on Mr. Strawn.  It is not relevant to this case as he

19  is an expert on the immigration system.  This is a case about

20  employment.  Your Honor ruled on Nwauzor Docket ECF 252.  You

21  said, "Without knowing what evidence would be presented at

22  trial, it was hard to determine what the motion would be."

23  It was denied without prejudice to us reraising it.

24  We would say this is not relevant.  The only thing in his

25  report is that some people could be work authorized while

1   detained at the Northwest ICE Processing Center.  The

2   detainee witnesses -- former witnesses have been able to

3   testify about that without expert knowledge.

4        THE COURT:  My law clerk is looking up that order.

5        MS. SCHEFFEY:  ECF 252 on the Nwauzor docket.  The

6   relevant paragraph, when you get it, starts with "what is

7   unclear to the Court."

8        MR. BERGER:  Would you like me to wait until you see

9   what you said or respond?

10       THE COURT:  I would like to see what I said.  Who

11  knows what I said.  I sure don't.  I am stuck with it.  The

12  foundation for this issue was -- excuse me.  She has it.

13     Okay.  I may want to look at.

14     Mr. Berger, it would probably be helpful if you would tell

15  me what you anticipate Mr. Strawn's testimony will be about

16  as an offer of proof.

17       MR. BERGER:  Certainly, Your Honor.  We expect

18  Mr. Strawn to testify basically about three things.  One is

19  the various circumstances that can cause individuals to be

20  detained at the Northwest Detention Center.  I think that is

21  directly -- been directly put at issue in this case by

22  testimony of various GEO witnesses regarding or suggesting

23  that people must have had an encounter with law enforcement,

24  that they are rapists, murderers and so forth.

25     Second, there is the issue of the work authorization of

1   individuals detained at the center and whether they either

2   have or are eligible to obtain work authorization.  Various

3   witnesses have been asked whether detainees are work

4   authorized, whether there is any checking on whether they are

5   work authorized.

6       Third, there has been testimony about immigration

7   proceedings in general, how long individuals may be in the

8   facility, the conditions under which they might be released.

9   I think Mr. Strawn will testify briefly and generally about

10  the sequence of immigration removal proceedings that will

11  allow the jury to make some sense of that other testimony.

12          THE COURT:  His testimony will be based on

13  statistics?

14          MR. BERGER:  Both his knowledge as an individual who

15  has practiced in the specialized field of immigration law for

16  many years and statistics from the primary source of

17  statistics for such information which is called TRAC.

18          MS. SCHEFFEY:  I would respond that, one, the

19  circumstances that can cause people to be detained is not the

20  proper subject of legal expert testimony.  Each witness who

21  has been asked has explained why they got there, how they got

22  there.

23      Work authorization, I think I have already mentioned each

24  of the individuals was able to testify as to whether they

25  were or were not work authorized.

1     The third one, immigration proceedings and how those work,

2  I don't think that is relevant to whether the detainees are

3  employees.

4          THE COURT:  I think all those things have been raised

5  by the testimony thus far.  The motion is denied without

6  prejudice to making specific objections to questions as they

7  come up.

8          MS. SCHEFFEY:  Thank you, Your Honor.

9          MR. BERGER:  Thank you, Your Honor.

10          THE COURT:  You don't need to thank me, particularly

11  when you disagree with my rulings.

12     Anyway, let's get the jury back and go until 2:30 or so.

13          THE CLERK:  Would Your Honor like me to go ahead and

14  admit the witness?

15          THE COURT:  Yes, and the jury.

16          THE CLERK:  The jury is on their way.

17     (The following occurred in the presence of the jury.)

18          THE CLERK:  All the jurors are back and the witness

19  is present as well.

20          THE COURT:  All right, Mr. Strawn, if you will raise

21  your right hand and be sworn.

22                    CHRISTOPHER STRAWN,

23     having been sworn under oath, testified as follows:

24          THE COURT:  Thank you.  You may inquire, counsel.

25

```
1                     DIRECT EXAMINATION
2   BY MR. BERGER:
3   Q   Good afternoon, Mr. Strawn.  I am going to be asking you
4   some questions about the status of folks in detention.  By
5   way of background, first --
6         THE COURT:  Excuse me.  Let me ask Mr. Strawn, if you
7   will give us your name and spell your last name for us,
8   please.
9         THE WITNESS:  Absolutely.  My name is Christopher
10  Strawn.  My last name is spelled S-T-R-A-W-N.
11        THE COURT:  Go ahead.
12        MR. BERGER:  The Court beat me to the punch there.  I
13  was going to say first I want to ask you something about your
14  background.
15  BY MR. BERGER:
16  Q   What is your profession?
17  A   I am an attorney.
18  Q   Do you have any particular area of specialization?
19  A   Yes, I have been practicing immigration law since 2003.
20  Q   Can you give me a sense of your educational background?
21  A   Certainly.  I went to Harvard Law School and graduated
22  from there in 2001.  I worked for a federal judge for two
23  years, then worked in private immigration practice for two
24  years.  Then I have worked at the Northwest Immigrant Rights
25  Project since January of 2006.  I have also been, for the
```

1  four academic years from 2017 to 2020, the director of the

2  immigration law clinic at the University of Washington Law

3  School.  At the Northwest Immigrants Rights Project, I am the

4  director of the asylum unit.

5  Q   What does directing the asylum unit entail?

6  A   I supervise several attorneys who take asylum cases as

7  well as people who have other forms of relief.  I am giving

8  presentations.  I am doing outreach and education.  I do

9  direct representation of individuals as well.  I also do

10 litigation in individual cases and in some class action cases

11 as well.

12 Q   What, in general, does the Northwest Immigrant Rights

13 Project do?

14 A   The Northwest Immigrant Rights Project is primarily

15 focused on representing individuals, and then there is also

16 an impact litigation arm of the organization so it engages in

17 litigation and some community outreach and education as well.

18 To a lesser extent, some policy work as well.

19 Q   What did your work at the University of Washington Law

20 School involve?

21 A   At the University of Washington, I had a small class of

22 students who we were training in immigration law and

23 immigration practice.  For the four academic years that I was

24 doing that, we took on a number of different cases.  I did

25 focus some on detention for a number of different reasons so

1  we always had some detained clients and we worked on

2  representing individuals who are detained.  We also had some

3  individuals who were not detained.  It was an opportunity for

4  students to learn about immigration law, learn about

5  immigration practice, and to have an experience working

6  directly one-on-one with a client under supervision, under my

7  supervision.

8  Q   Are you familiar, in general, with the range of

9  circumstances that might lead an individual to be held in an

10 immigration detention facility?

11 A   Yes, I am.

12 Q   What is the basis for that familiarity?

13 A   Having practiced immigration law since 2003, I have

14 represented people at the Northwest Detention Center since it

15 opened in 2004, and its prior incarnation before it opened in

16 2004.  As an organization, my co-workers and my colleagues

17 are taking on detained cases as well.  We are consulting.

18 People are consulting me.  I am consulting with others about

19 individual detention cases.  I also have done some class

20 action litigation around mandatory detention which brought me

21 into deeper contact with the detention center and the ways in

22 which somebody might end up there.

23 Q   Are you knowledgeable in general about the work

24 eligibility, work authorization, or potential for work

25 authorization of individuals being held in an immigration

1    detention center?

2    A    Yes.  So as part of immigration practice, we are often

3    preparing employment authorization or work authorization

4    documents for people.  It is something many people are

5    interested in and concerned about.  Generally, the law on

6    work authorization applies equally to detained people as to

7    non-detained people in terms of eligibility.  In particular,

8    I say my experience is a little deeper.  I have been class

9    counsel in two nationwide class actions regarding work

10   authorization delays and denial in the Western District of

11   Washington, both filed in the Western District of Washington.

12   Q    I think you have already said this, but are you familiar

13   with the Northwest ICE Processing Center formerly known as

14   the Northwest Detention Center?

15   A    Yes, I am.  I have been there frequently ever since it was

16   opened in 2004.

17   Q    I am going to ask you first about the circumstances that

18   might lead an individual to end up in detention.  Let me

19   start by asking, what is the purpose of an immigration

20   detention facility like the Northwest Detention Center?

21   A    Well, the idea is that a person in civil immigration

22   detention could be held while their immigration status is

23   decided.  While their immigration case is ongoing, they are

24   seeing an immigration judge in the detention center, they can

25   be held in detention.

1   Q   Are folks in immigration detention being punished?

2   A   So the legal status is that they are not being punished

3   but they are being held pursuant to the determination of

4   their status.  A Supreme Court case going back quite a few

5   years holds that this kind of civil pretrial detention is not

6   supposed to be punishment.  You can't be detained simply

7   because you have an immigration violation as a punishment.

8   You are being detained while it is determined what your

9   status is and while you are awaiting removal or release,

10  should you win your case.

11          MS. SCHEFFEY:  I object to the extent the witness is

12  providing the jury with an interpretation of the law or a

13  legal conclusion.

14          THE COURT:  The objection is overruled.

15  BY MR. BERGER:

16  Q   You mentioned "case."  Can you describe briefly what an

17  immigration case in this instance means and what the steps

18  are of that proceeding?

19  A   Certainly.  I would say although there are a number of

20  different ways in which an immigration case might go forward

21  depending on someone's past history, the kind of typical

22  immigration case is that you are served with a notice to

23  appear, which is a charging document informing you that you

24  are being put into removal proceedings.  You are being

25  charged as being removable from the U.S. or inadmissible to

1  the U.S.  Then you would appear -- this would be the case for

2  detained and non-detained cases -- you would appear before an

3  immigration judge at a master calendar hearing usually where

4  you would plead to the charges in the notice to appear.  Then

5  if you would identify any eligibility you have to stay in the

6  U.S., any grounds of relief you would be eligible for, say

7  applying for asylum, applying for permanent residency,

8  arguing you are actually a citizen, whatever the case may be.

9  Then if you are applying for some form of relief or

10  contesting that you are removable from the U.S., you would be

11  set for an individual hearing, a hearing on the merits of

12  your case where you would have a short kind of mini trial

13  generally on your application or on your argument that you

14  are not removable.  That would be the first step in a case.

15  Q   Who presides over those individual hearings?

16  A   Immigration judges.  Although we call them immigration

17  judges, they aren't technically administrative law judges or

18  federal Article III or Article I judges.  Rather, they are

19  Department of Justice employees and Department of Justice

20  hearing officers.

21  Q   Are there possible steps after the individual hearing in

22  these proceedings?

23  A   Yes.  In the type of hearing I described where you went to

24  an immigration judge and got a decision on your case, you

25  could appeal that to the Board of Immigration Appeals.  That

1  is the first level of appeal.  Generally if you disagreed

2  with the decision by the Board of Immigration Appeals, then

3  for somebody who is detained in Tacoma, for example, you

4  would appeal to the Ninth Circuit Court of Appeals, the

5  Federal Court of Appeals for this region.

6  Q   Did everyone who is detained in an immigration detention

7  center like the Northwest Detention Center enter the country

8  without permission?

9  A   Not necessarily.  You might have entered the country on a

10 visitor visa and overstayed.  You might have come to the U.S.

11 border seeking asylum and been detained at the border and

12 then brought to the detention center to hear your asylum

13 claim while you are in detention.  Also you might be a lawful

14 permanent resident who had a criminal conviction that could

15 make you removable or some other issue that comes up that

16 makes you arguably removable.

17     There are a number of different ways you might have

18 entered the U.S. lawfully, been in lawful status and could

19 end up detained for one reason or another while immigration

20 is putting you in proceedings and putting you through

21 proceedings.

22 Q   What are some of the other circumstances that might lead

23 someone to be detained at an institution like NWDC?

24 A   So I am not sure if I quite understand the question.

25 There is --

1    Q    Let me clarify.  You mention people can be put in

2    proceedings if they overstayed a visa, if they presented

3    themselves at the border and sought asylum, if they were

4    lawful permanent residents who committed a removable offense.

5    What other circumstances can lead somebody to be detained at

6    the Northwest Detention Center?

7    A    Certainly.  So just kind of cataloguing the different

8    types of cases, because there are quite a few different ways

9    in which somebody could end up there, you could have somebody

10   that entered without inspection who has been here for a long

11   period of time or a shorter period of time who is then

12   identified by ICE and placed into detention.  That is the

13   other category of case that comes to mind.  Somebody who

14   might have been previously deported who has come to ICE's

15   attention and is put into reinstatement proceedings as well.

16   Those are some of the more common circumstances that at least

17   come to mind.

18   Q    Is anyone at the Northwest Detention Center serving --

19   actively serving a criminal sentence?

20   A    They shouldn't be.  There would usual -- usually people

21   are held on their criminal sentences in state or federal or

22   local custody, and once those sentences are completed, then

23   the person is transferred for immigration proceedings and put

24   into immigration proceedings and held at the Northwest

25   Detention Center.

1    Q    Are you familiar with statistics about how many detainees

2    at the Northwest Detention Center are there because the

3    government is seeking their removal based on some sort of

4    criminal offense?

5    A    Yes, I am.

6    Q    What statistics are you familiar with?  What is the source

7    of those statistics?

8    A    The major source that I think everyone -- I am not sure I

9    can say everyone -- people would look to, to identify that

10   kind of information is from the Transactional Records Access

11   clearinghouse, called TRAC, which is a program and a research

12   center out of Syracuse University.  They compile data through

13   the Freedom of Information Act requests and request data from

14   Immigration, both through the Department of Justice and the

15   Department of Homeland Security, compile that data and then

16   publish it for public access.

17   Q    Why does TRAC compile this data?

18   A    It has been -- as an organization, as I understand it, it

19   has been around for decades and found that it was useful to

20   put the data out there because there isn't otherwise any

21   place where this data is released in a way that you could

22   look at it, search it and really have access to it.  Hence,

23   why they do Freedom of Information Act requests similar to

24   get the data in the first place.

25   Q    How many detainees -- based on the TRAC data, how many

1  detainees at the Northwest Detention Center are there because

2  the government is seeking their removal because of some sort

3  of criminal offense over the last few years?

4  A    Yeah.  That figure definitely has changed over time.

5  Before the pandemic, TRAC reported for fiscal year 2019, the

6  October to September year the U.S. government uses, that 11

7  percent of the people at the Northwest Detention Center were

8  charged in their notice to appear with criminal grounds; that

9  is, they are removable because of some criminal conviction.

10 In the year 2020, as we got into the pandemic, that number

11 had gone up, it was 27 percent.  Fiscal year 2021, up until

12 April, which is when TRAC has data to, it was -- had raised

13 to 61 percent as the numbers in the detention center had also

14 dropped pretty significantly throughout the pandemic.

15 Q    Is there any reason why the numbers changed that way

16 during the pandemic?

17 A    There has been more people who have been released, and so

18 due to the pandemic there have been opportunities to request

19 parole or release on your own recognizance due to

20 health-related grounds.  I think there is just a general

21 concern about having overcrowded or crowded conditions which

22 are problematic certainly during the pandemic.  The numbers

23 have dropped to -- from a detention facility which had 1,575

24 beds and could have up to 1,500 people, we are looking at

25 about 300 to 400 people now at the detention center.

1  Q   You were just talking about the statistics of people whose

2  removal proceedings were based on a criminal record versus

3  some other reason for being in detention proceedings and

4  removal proceedings.  Are there statistics on how many

5  detainees have a criminal record, period?

6  A   Nationally, TRAC also publishes that data.  Up until May

7  of this fiscal year, TRAC was reporting that 75 percent of

8  people who were put into immigration proceedings had no

9  criminal record.  Of people who were charged with a criminal

10 ground of removability, TRAC reported that only four percent

11 of people who were put into immigration proceedings were

12 charged with a criminal ground of removability.

13 Q   What about the other 21 percent, the people who had a

14 criminal record but that was not the reason they were placed

15 in removal?

16         MS. SCHEFFEY:  Objection for foundation for

17 nationwide data and also relevance of nationwide data.

18         THE COURT:  I think you should rephrase your

19 question.  I am not sure of the foundation for your question

20 here.

21         MR. BERGER:  Certainly.

22 BY MR. BERGER:

23 Q   I think you said 25 percent of individuals had a -- some

24 sort of criminal record, 75 percent had no criminal record,

25 only four percent of individuals were being placed into

1    removal proceedings because of their criminal record.  How

2    broadly is criminal record construed in these statistics?

3              MS. SCHEFFEY:  I am going to object again that this

4    is nationwide data and not tailored to this facility.

5              THE COURT:  He may answer.

6              THE WITNESS:  So criminal record as the TRAC database

7    actually explains as well, the statistic about 75 percent of

8    people not having any criminal record, that 25 percent would

9    include people who have very minor criminal records that

10   wouldn't have an immigration impact.  So if you had some kind

11   of particularly minor offense like petty shoplifting or

12   something like that, that might not have an immigration

13   consequence.  That would explain the difference in the

14   numbers.

15   BY MR. BERGER:

16   Q   Are there also statistics about how long individuals are

17   in immigration proceedings?

18   A   Yes.  So TRAC also gets data about immigration proceedings

19   specific to the Northwest Detention Center.

20   Q   What is -- what are the recent statistics about average

21   time in immigration proceedings for individuals at the

22   Northwest Detention Center?

23   A   So for fiscal year 2019, we were looking at 111 days.

24   That's gone up slightly for fiscal year 2021 up until April

25   at 123 days.

1   Q   I want to make sure to have the definition correct.  What

2   time period is that measuring?

3   A   That is measuring the time that somebody is getting a

4   decision -- being put in proceedings and getting a decision

5   by the immigration judge according to TRAC.  They are really

6   looking at the date where the immigration judge orders

7   removal or grants relief.

8   Q   That would be an order entered at either the master

9   calendar hearing or the individual calendar hearings that you

10  talked about?

11  A   Yes, that's the data that TRAC says it is looking at.

12  Q   Does that include time during which a person might be

13  appealing a ruling from their individual hearing?

14  A   So an appeal can take a significantly longer period of

15  time.  After that 120 day period, if you appeal to the Board

16  of Immigration Appeals, it could easily be six months to get

17  a decision from the Board of Immigration Appeals.  If you

18  appeal to the Ninth Circuit, I would be surprised to see a

19  decision faster than a year, particularly if you are set for

20  argument on a case.  I certainly had people who were detained

21  for significantly longer than that period.

22  Q   Now, you described the master calendar hearings as the

23  initial appearance by a detained individual where they

24  respond to the charge; is that accurate?  Did I get that

25  right?

1    A    That's correct.

2    Q    Do some people not contest the order of removal at the

3    master calendar hearing?

4    A    Certainly.  Certainly in the detention center, you will

5    find people who do not contest the charge and will basically

6    accept an order of removal and not appeal that order.

7    Q    Does the averages that you cited, does that include people

8    who don't contest the order of removal at the master calendar

9    hearing?

10   A    Yes, that is right.

11   Q    How would inclusion of those individuals affect that

12   average time into immigration proceedings?

13   A    So it definitely draws the number down.  If you are

14   measuring people who are having very little -- relatively

15   little time in immigration detention who do not ask for a

16   full hearing on this case and you are including those people

17   with those who are going forward on a full hearing on their

18   case.

19   Q    How do people end up getting released from detention?

20   A    There are a number of ways in which you might be released

21   from detention.  I say the most common way is that you would

22   request a bond hearing before an immigration judge and have a

23   bond hearing and the immigration would grant you a bond and

24   you would pay that bond and be released.  Additionally, ICE

25   officers have -- may set bonds initially, make the custody

1   determinations initially, and in some cases they may simply

2   release somebody on their own recognizance, release them

3   under what is called parole.  Given humanitarian

4   considerations, the status of the case, any number of factors

5   that could be relevant to whether a person should be detained

6   or not.

7   Q   I assume people can also be released if they have an order

8   of removal that is enforced against them, right?

9   A   Ultimately, the case will be decided, and you will, if you

10  win your case, have a final grant on your case or final

11  decision granting you relief, then you will be released.

12  Similarly, if you are ordered removed, you will eventually be

13  released as well.

14  Q   Let me go back to the bond issue for a moment.

15  Statistically, what is the likelihood of being released on a

16  bond from the Northwest Detention Center?

17  A   So for fiscal year 2019, TRAC reported that 44 percent of

18  people were granted bonds in their bond hearings.  Those

19  numbers decreased after COVID.  So in fiscal year 2020, it

20  was, I believe, 26 percent or 27 percent who were granted

21  bonds of those who had a bond hearing.  And then for fiscal

22  year 2021, it dropped to four percent.

23  Q   Do all detainees have bond hearings?

24  A   No.  There are certain classes of individuals who would be

25  ineligible for a bond, people who are categorized as arriving

1    aliens, generally people with certain criminal convictions

2    could also be barred from getting a bond hearing.  Not

3    everyone would be eligible.

4    Q    How much is the average bond for those who are successful

5    in getting a bond approved at a hearing?

6    A    TRAC reports that that number hasn't changed from fiscal

7    year 2019 to the present and remains at $15,000 as the

8    average bond.

9    Q    Does a detainee have to post the full amount of that bond

10   in order to be released?

11   A    Yes.  So in immigration detention, you do have to post the

12   full bond in order to be released, which is somewhat novel to

13   some of the people I have worked with who are maybe more

14   familiar or have heard of the ten percent rule that seems to

15   apply in some criminal proceedings.

16   Q    So I want to shift to the people who are -- who

17   successfully obtain relief from removal proceedings.  What is

18   the percentage of individuals detained at the Northwest

19   Detention Center who have been successful in obtaining relief

20   from removal proceedings?

21   A    For fiscal year 2019, 24 percent of those people who

22   applied were granted relief.  That had dropped some for

23   fiscal year 2021 where TRAC reports that 18 percent were

24   granted relief in their case.

25   Q    And what happens to those individuals who successfully

1   obtain relief?

2   A   If they have a final decision granting them the relief,

3   then they are released from detention and they are in status,

4   whether it is asylum or lawful permanent residence, whatever

5   other status might have been granted, those would have been

6   the most common ones.  If they choose, they can pursue

7   residency and citizenship eventually if they choose to.

8   Q   In the regular course of those proceedings, if an

9   individual entered the country without permission, would that

10  be disclosed during the proceedings?

11  A   Most forms -- the application for asylum, application for

12  cancellation of removal will ask about your entry history.

13  So you are required to disclose under penalty of perjury how

14  you entered the United States.  You would disclose that you

15  entered without inspection.

16  Q   Would those forms also typically ask whether individuals

17  had been working without authorization in the United States

18  before being detained?

19  A   Both the asylum application and the cancellation

20  applications require you to list your work history.

21  Basically from that, it is obvious if you have worked without

22  an authorization or not because you are disclosing all your

23  different places of employment, and based on your status you

24  know if you have had work authorization or not.

25  Q   For someone who obtains relief from removal, what impact

1    does prior entry without permission or work without

2    authorization have on that individual after they are

3    released?

4    A    So it generally wouldn't have an impact on them.  For the

5    case of an asylum seeker or person granted cancellation of

6    removal, that means they remain or get to be lawful,

7    permanent residents, and effectively they can then apply for

8    residency and citizenship, and the grant of asylum or

9    residency, in effect, waives any of the considerations of

10    prior unauthorized employment or prior unlawful entry, or at

11    least prior unlawful entry wouldn't be a bar to moving

12    forward in gaining the next step in status.

13    Q    Can individuals being held in the Northwest Detention

14    Center be authorized to work legally in the United States?

15    A    Yes, they can.

16    Q    Can you explain?

17    A    So you would have a number of different ways in which

18    someone might be in detention and be lawfully authorized to

19    work.  If you were a lawful, permanent resident who was put

20    into the detention center because you were charged with some

21    criminal grounds of removability or some other ground of

22    removability, you are allowed to work as a lawful permanent

23    resident, so you are authorized to work incident to status.

24    If you had some other status, you might have been a refugee

25    or an asylee or have temporary protected status, if you were

1  then put into removal proceedings, you would retain your

2  right to work while your proceedings were going forward.  In

3  addition --

4  Q    Are there other examples?

5  A    Yes.  So also people who don't have status but file

6  applications for relief may be able to obtain work

7  authorization based on those applications.  If you are filing

8  this application for cancellation of removal, which would

9  grant you lawful permanent resident status, you can apply at

10 the same time for a work authorization.  Asylum seekers do

11 have to wait before they are eligible to apply for work

12 authorization.  After a period of time passes, they are also

13 able to apply and obtain work authorization.

14 Q    You had anticipated my next question, which is that there

15 are individuals being held in detention who are eligible to

16 apply for work authorization even if they don't have it when

17 they enter detention, correct?

18 A    That is correct.

19 Q    What are the steps that such an individual needs to take

20 in order to obtain that work authorization?

21 A    It does depend on your underlying application.  You have

22 to have filed and received your application for relief,

23 asylum cancellation, could be temporary protected status as

24 well from people from certain countries that have undergone a

25 disaster, then you would file your application for employment

1   authorization.  It is a form I-765 in immigration parlance.

2   You need to have photos, a filing fee may be required.  You

3   can ask for a waiver for it.  Then you would need to fill out

4   the form, include any required documentation, proof of filing

5   your application, for example, and you would mail that off to

6   Immigration.

7        You are required to complete biometrics, which is

8   fingerprinting.  Usually there is a photo taken as well.

9   Then you wait for the immigration service to make a decision

10  on the employment authorization application.

11  Q    What is the filing fee?  How much is it?

12  A    Filing generally is $410.  Some categories also require a

13  biometrics fee of $85.

14  Q    What language does the form have to be filled out in?

15  A    It is filled out in English.

16  Q    Are there -- what are the obstacles for an individual

17  completing that form and applying for work authorization

18  while in detention?

19  A    The form itself can be kind of tricky.  It is now seven

20  pages long.  I remember when it started as a one-page form

21  when I first started out in practice.  The language can be

22  kind of convoluted, a little hard to understand, and it is in

23  English.  That is probably not the biggest obstacle.  I think

24  that just getting the photos, for example, can be very

25  difficult for somebody in a detention center.  You can't run

1   to your local CVS and get two passport photos, and detention

2   centers can be sensitive about you bringing in a camera if

3   you are an outside individual to take pictures.

4       Also, arranging for biometrics, when you are not in

5   detention you get a notice to show up to your USCIS office to

6   have biometrics taken.  However, when you get the notice for

7   biometrics, you have to pass that on to ICE an deportation

8   officer to arrange for biometrics to be taken.  That

9   historically has been an often difficult process to arrange

10  and one that changes over time within the detention center of

11  how you get that done.  Those are some of the initial

12  obstacles that make it a bit daunting for people, I think, to

13  do an employment authorization while detained.

14          THE COURT:  Excuse me, counsel.  It is time we took

15  our afternoon break.  We will reconvene at 20 minutes to

16  three.  You may be excused.

17                      (Recessed.)

18   (The following occurred outside the presence of the jury.)

19          THE COURT:  Okay.  Are we ready to proceed?  Bring

20  the jury back Tyler, please.

21          THE CLERK:  They are on their way.

22      (The following occurred in the presence of the jury.)

23          THE CLERK:  It looks like all of them have returned.

24          THE COURT:  Okay.  You may continue.  Who is

25  inquiring?  Mr. Berger, I believe.  Go ahead, Mr. Berger.

1    BY MR. BERGER:

2    Q    Mr. Strawn, before the break we were talking about

3    applications for work authorization.  How long does it take

4    to get a decision on an application for work authorization?

5    A    The safest answer to that question is months.  It is very

6    unpredictable.  The timing can change.  Depends on USCIS

7    processing.  There is no deadline for Immigration to decide

8    the work authorization application, except for in initial

9    asylum work authorization applications in some cases.

10   Q    In a United States workplace, whose responsibility is it

11   to ensure that a worker has work authorization?

12            MS. SCHEFFEY:  Objection, calls for a legal

13   conclusion.

14            THE COURT:  I think he may answer.

15            THE WITNESS:  An employer would ask an employee to

16   fill out on I-9 form where the employee would be choosing

17   from a list of approved documents to show that they were

18   authorized to work in the United States.

19            MR. BERGER:  I have no further questions at this

20   time.  Thank you.

21                      CROSS-EXAMINATION

22   BY MS. SCHEFFEY:

23   Q    Good afternoon, Mr. Strawn.

24   A    Good afternoon.

25   Q    We met before, just before the pandemic; is that correct?

1    A    I believe that is right.  The screen is quite small.

2    Q    Where are you testifying from today?

3    A    I am in San Juan del Sur, Nicaragua.

4    Q    It is my understanding that even though you are in

5    Nicaragua, you have agreed to be subject to penalty of

6    perjury here in Washington; is that correct?

7    A    That is correct.

8    Q    Thank you.  Let's talk about why you are here today.  You

9    are an immigration attorney, correct?

10   A    That's right.

11   Q    The reason you are here is because of your experience

12   representing individuals through the immigration system,

13   correct?

14   A    Yes, and I think my knowledge of immigration law and

15   processes.

16   Q    Thank you for that clarification.  You are here to provide

17   your expertise in immigration, correct?

18   A    That's right.

19   Q    You know this isn't an immigration case, right?

20   A    Yes, I understand that.  There is a wage and hour claim,

21   from what I understand from the Complaint.

22   Q    You understand from the Complaint the only thing the jury

23   has been asked to decide is whether detainees are employees,

24   correct?

25   A    Well, I haven't seen the form that was given to the jury

1    with the elements that they have to decide.  So besides

2    reading the Complaint, I haven't seen any other trial

3    documents.

4    Q    You are a lawyer, right?

5    A    Yes.

6    Q    You can understand a Complaint?

7    A    Certainly.

8    Q    You understand that the Complaint alleges that detainees

9    should be treated as employees under Washington law, correct?

10   A    Yes, that was the Complaint I saw, certainly.

11   Q    Some of your clients and former clients have a financial

12   stake in the lawsuit, correct?

13   A    I guess some former clients could benefit from the

14   lawsuit, that's right.

15   Q    In fact, the -- at the Attorney General's press conference

16   announcing this lawsuit, Jorge Barone, a representative of

17   the NWIRP where you work was present, correct?

18   A    So Jorge Barone is the executive director.  I didn't see

19   the conference, but yes, I understand that's right, he was

20   present.

21   Q    The executive director of your organization has weighed in

22   on how they think this lawsuit should turn out, correct?

23   A    I haven't seen any specific statements from him as to how

24   they think the law should weigh out.  I can't say exactly

25   what he said about the lawsuit.  I certainly haven't talked

1   with him about it.

2   Q   Do you know if anyone from your organization, Mr. Barone

3   or otherwise, ever emailed the Governor or the Department of

4   Labor & Industries about detainees receiving minimum wage?

5   A   That, I don't know.

6   Q   Okay.  Let's talk about work authorization.  So if I

7   understand your direct testimony correctly, it is your

8   position that some portion of the population at the Northwest

9   ICE Processing Center could receive work authorization,

10  correct?

11          MR. BERGER:  Object to form.

12          THE WITNESS:  That's right.  Sorry.

13  BY MS. SCHEFFEY:

14  Q   Typically, it is not your practice to encourage people to

15  apply for work authorization while detained, correct?

16  A   That's right.  We generally haven't had people applying

17  for work authorization because they didn't feel like they

18  could get out and work while they were detained and had never

19  been asked for that.  I can't remember ever having a client

20  asking me to prepare a work authorization application for

21  them.

22  Q   Okay.  I think you just said that's because there is --

23  they are not permitted to work outside the facility; is that

24  correct?

25  A   That's been my experience.  People aren't being released

1    from the Northwest Detention Center to work and then to come

2    back into the detention center.  If that was the case, then I

3    am sure some clients would have felt differently about

4    getting work authorization.

5    Q    The voluntary work program is the only way to earn money

6    while detained; is that correct?

7    A    Well, detainees get transferred money from family members.

8    In terms of earning money, as far as I know, that's the only

9    way that somebody would be able to earn money while in

10   detention, unless there is some other situation where they

11   could somehow work from the detention center.

12   Q    Even if there was some benefit for detained people getting

13   employment authorization while they are detained, not

14   everyone in the facility would be eligible for employment

15   authorization, correct?

16   A    That's right, not every single detainee would necessarily

17   be eligible to work.

18   Q    So let's talk about asylum seekers who I think you

19   mentioned before.  Isn't it true they can't seek work

20   authorization until after their case has been pending for 180

21   days?

22   A    No.  It has gotten more complicated and the law is in

23   flux.  The prior rule, which is still in effect for certain

24   people, is that they would have to wait 150 days, the asylum

25   application would have to be pending for 150 days before they

1  could apply for work authorization, and they were supposed to

2  get a decision and work authorization on the 180th day.

3  Q   So it was reasonable for you to predict under that rule --

4  I understand there are some changes in administration --

5  people who were seeking asylum could not get work

6  authorization until at least 180 days?

7  A   Your asylum case had to be pending for 180 days before you

8  could receive work authorization.

9  Q   For a detainee held at the facility seeking asylum, they

10 cannot seek relief until six months after arriving at the

11 facility?

12 A   Six months until their asylum application is filed.  That

13 would generally be true assuming they filed their asylum

14 application with one of the judges in the immigration

15 detention center.

16 Q   I guess you are saying generally it would be true.  Is

17 there a chance it could be longer because they wouldn't file

18 the work authorization on the first day they are detained; is

19 that right?

20 A   That could happen.  You also have people who file before

21 being taken into detention.  Those would be -- that would be

22 a marginal case.  I think it is correct the most common case

23 would be you would have to be in the detention center for 180

24 days after filing your application with the immigration judge

25 in Tacoma.

Strawn - Cross

1   Q   Detainees do not need an attorney to get work

2   authorization paperwork, correct?

3   A   That's right.  It is not a requirement.

4   Q   Do you know of anyone specifically who has work

5   authorization at the Northwest ICE Processing Center?

6   A   Past clients of mine certainly were authorized to work

7   while they were detained.  I can't speak if there is an

8   individual right now who has work authorization who is

9   detained.

10  Q   Do you personally know anyone at this moment who is work

11  authorized within the Northwest ICE --

12  A   I don't personally know anyone.  No, I don't.

13  Q   To be clear about the purpose of work authorization,

14  without a document from the government, the federal

15  government allowing an individual the work, they cannot

16  lawfully work in the United States under federal law,

17  correct?

18  A   So it is an issue of federal law whether or not you are

19  eligible to work in the United States, that is correct.

20  Q   I think my question is a little bit more specific than

21  that.  Without work authorization, it is not allowed under

22  federal law for an individual to work, correct?

23  A   Well, the actual document that you need will vary.  While

24  it is common for people to have an actual work authorization

25  card, an employment authorization document, a lawful,

Strawn - Cross

1    permanent resident, for example, would not have to have a

2    work authorization card.  They are authorized to work

3    incident to status.  What that means is a lot of my clients,

4    for example, all they would have is an unrestricted Social

5    Security card and a driver's license.  They would show those

6    two things, like any U.S. citizen, and they would be

7    authorized to work.  They wouldn't need to show an actual

8    employment authorization document.  They need to show an I-9

9    document that anybody needs to show their employer if they

10   are going to work.

11   Q    Would it be fair to say they need some sort of document

12   from the federal government that allows them to work?

13   A    I think that is fair to say.  You need to have some

14   documentation.  There is a list of all the different possible

15   documents you can have on the I-9 form.  You need to show

16   sufficient documents under that form in order to prove that

17   you are able to work.

18   Q    Can an individual, a detained individual's criminal

19   history impact their eligibility for work authorization?

20   A    Yes.  I would say principally in the asylum context, also

21   another area where the law is changing and very much in flux

22   right now.  Particularly in that context, it is relevant.

23   Q    Are there discretionary considerations the government can

24   consider when looking at whether someone can be work

25   authorized?

1    A    Not to equivocate too much, that is also another area

2    unfortunately which is in flux and being disputed.  The prior

3    administration admitted change to make asylum work

4    authorization discretionary, for example.  That has been

5    enjoined, that has been stopped right now.  Other parts of

6    the work authorization regulations are arguably unclear if it

7    is a discretionary determination or not.

8        I would say in my practice in general, if somebody was

9    eligible, that is they met the requirements, they were

10   granted a work authorization, and I wasn't seeing

11   discretionary denials.  That has been changing some,

12   particularly since the last administration.  As I mentioned,

13   it is really a little bit in flux in terms of what the status

14   is, in my opinion.

15   Q    Let's talk about how you get a work authorization.  First,

16   you need to pay the fee, right?

17   A    Not every category has to pay the fee.  There are fee

18   waivers.  Generally, there is fee requirements for a work

19   authorization.

20   Q    What is that fee?

21   A    Currently at $410, plus a biometrics fee of $85 for

22   certain categories.

23   Q    Barrier to entry is about $500 right off the bat; is that

24   correct?

25   A    It can be at the most, right.

1    Q    The detainee needs to figure out a way to provide

2    fingerprints in Seattle; is that correct?

3    A    There is a requirement to take biometrics.  That would --

4    that has been taken -- they have been doing biometrics in

5    Tacoma, as far as I understand in terms of deportation

6    officers doing it.  It is a little bit of a black box exactly

7    how ICE would take the biometrics at the detention center.

8    Yes, they would need to take the biometrics of the individual

9    and get that information to USCIS.

10   Q    When you say it is a black box, ICE's policies, nothing

11   that GEO is doing, correct?

12   A    That is correct, in terms of exactly whether they have a

13   USCIS employee come, if they authorize ICE to take the

14   biometrics, that is really an internal decision from their

15   end in terms of how that is happening on the ground.

16   Q    After the individual files the application, pays the fee,

17   gets the fingerprints, it could take between six and eight

18   months to get a resolution; is that correct?

19   A    Depends on who you are talking about exactly.  Definitely

20   months to get a work authorization is standard.  USCIS posts

21   processing times.  I checked at the end of May for the

22   Nebraska service center where a lot of work authorization

23   applications go.  Projected between 3.5 and six months.  For

24   initial asylum applicants, there is this class who still have

25   a right to get it within 30 days and are under order to

1   provide it within 30 days.  That is the group of asylum

2   seekers who we have been talking about who have the 180 days

3   before they can get the work authorization, so they apply at

4   150 days and ostensibly get the work authorization at 180

5   days.

6   Q    Let's break that down.  There is one group of asylum

7   seekers, they have to wait 180 days to apply, and after that

8   they get a decision within 30 days, correct?

9   A    They have to wait 150 days to apply and they are under

10  order to get a decision within 30 days.

11  Q    About six months total at a minimum they have to wait

12  before they can get work authorization?

13  A    The initial asylum applicant, if you are applying for

14  asylum for the first time.  Other people don't have to wait

15  like cancellation.  Those people could very well -- I was

16  giving the Nebraska service center, this one processing

17  center's time frame of three and a half to six months.  That

18  is certainly a time frame that somebody might have to wait to

19  get a work authorization.

20  Q    The asylum seekers aside, are you saying today that there

21  aren't significant delays and it couldn't be delayed six to

22  eight months before a person gets a work authorization?

23  A    No, I don't disagree with that.  It could be six to eight

24  months before a person gets work authorization.  USCIS

25  includes that time frame in their processing statistic.

Strawn - Cross

1  Q    Six to eight months is a good baseline of how long it

2  could take to get a work authorization?

3  A    I don't know if you can say that six to eight months is a

4  good baseline for work authorization because it depends on

5  where it is going, what their current delay is.  I was

6  referring to one service center that gave their own internal

7  statistics, but that will vary person to person.  Certainly

8  not unheard of for it to take eight months to get a work

9  authorization.  The six months is within the processing time

10 that USCIS publishes right now.

11 Q    Do you remember I took your deposition last, I guess,

12 December 2019, right before the pandemic?

13 A    That's right.

14 Q    Do you have a copy of that deposition with you?

15 A    I can pull it up.  It is on my computer.

16 Q    Can you go to page 42?

17 A    Yes.

18 Q    See the question about how long it takes for an EAD to

19 process someone to approve their final approval to work?

20 A    Yes.

21 Q    You told me first about the 30 day adjudication time for

22 people who are seeking asylum, correct?

23 A    That's right.

24 Q    After that, you told me in most other forms of work

25 authorizations you are seeing significant delays of six to

1  eight months; is that correct?

2  A    The answer is the application could be delayed six months,

3  eight months, varied by type of work authorization.

4  Q    Yeah.  Is that still accurate today?

5  A    Yes.

6  Q    Most detainee cases at the ICE processing center are

7  resolved in less than 11 days, correct?

8  A    Currently, the numbers have shifted up slightly to 123

9  days.  I understand that's the average number of days of a

10  case.

11  Q    In 2019, was it 111?

12  A    That is correct.

13  Q    How many days is six months?

14  A    180 days.

15  Q    Fair to say it's unlikely most detainees would be able to

16  get a work authorization in the time that they are detained?

17  A    If that's the average number, certainly that is going to

18  include people who simply accept removal at the hearing.  In

19  terms of the average number for people who are pushing

20  forward on an asylum case, that would be a different

21  statistic, and you would see people who had cases going for

22  longer, especially if their case was going on appeal.  That

23  said, it is certainly likely that a case could be resolved

24  for an asylum seeker before the 180 days had accrued, so an

25  asylum seeker would not be eligible to get work authorization

1    while in detention.  That is absolutely possible.

2    Q    111 days is shorter than 180 days?

3    A    Yes.

4    Q    The average time period detainees are detained is shorter

5    than the set 180 days for getting a work authorization,

6    correct?

7    A    Yes, keep in mind, the average time would include people

8    that don't apply for any relief.

9    Q    Correct.  I understand that.  Thank you for that

10   clarification.

11         Are you familiar with the idea that some detainees may

12   receive bond and leave the Northwest ICE Processing Center?

13   A    Certainly.

14   Q    I want to start with just the basics.  Who gives detainees

15   that bond?

16   A    So generally they would be asking an immigration judge to

17   set a bond.  ICE can also set initial bond amounts, too, when

18   they are initially detained.

19   Q    Those immigration judges are at the courthouse in Tacoma,

20   correct?

21   A    That's right.

22   Q    The length of time that it takes for a judge to make a

23   bond decision or final determination on someone's

24   removability is set by that judge or ICE, not GEO, right?

25   A    So that is correct.  The judge would be controlling their

1  calendar.

2  Q    Isn't it true that detainees are generally entitled to a

3  bond unless ICE can show or the U.S. government can show

4  clear and convincing evidence that a detainee posed a flight

5  or security risk?

6  A    If somebody is eligible for a bond, those are the factors

7  for determining whether or not somebody is eligible for a

8  bond.  That's the case law.  However, you would have quite a

9  few people who weren't statutorily eligible for a bond.  That

10  is the general case law in terms of flight risk and danger to

11  the community, are the two factors that the immigration

12  judges should consider.  The question of who the burden of

13  proof is on and this practice can sometimes be a little

14  trickier, I think.  Those are the two factors certainly.

15  Q    Taking out burden of proof and the complicated legal

16  stuff, some court is going to look at whether a detainee is a

17  flight risk or security risk in terms the bond, correct?

18  A    As long as they are eligible for a bond.  So there are

19  categories of mandatory detention where you aren't eligible

20  to get a bond, but yes, absolutely right.

21  Q    Another reason an immigration judge may deny bond is

22  because a person has used too many names, they can't verify

23  their identity?

24  A    Identity can be an issue, certainly, in bond cases.

25          MS. SCHEFFEY:  I am going to pause that.  I see black

 1   boxes for Juror 6 and Juror 9.  Are they still with us?

 2          THE COURT:  I don't know.  Tyler, are you there?

 3          THE CLERK:  Yes, sir, I am here.

 4          THE COURT:  We had a blackout.

 5          THE CLERK:  I saw.  Usually resolves itself in a

 6   second or two.  Looks like Juror 6 and Juror 9 are back now.

 7          MS. SCHEFFEY:  Thank you.

 8          THE CLERK:  Wait.  I think we lost another juror.

 9          MS. CHIEN:  We are missing Mr. Berger and

10   Mr. Whitehead.  If we could give them a minute.

11          THE CLERK:  There are only eight jurors.  Juror 6 is

12   missing at the moment.  Appears she got disconnected.  She's

13   back now.

14          MS. SCHEFFEY:  Juror 6, are you back with us?

15          JUROR NO. 6:  Sorry.

16          MS. SCHEFFEY:  No problem.

17      May I proceed, Your Honor?

18          THE COURT:  Yes, please.

19   BY MS. SCHEFFEY:

20   Q   Okay --

21          MS. CHIEN:  We have to wait for Mr. Berger.

22   Mr. Strawn is Mr. Berger's expert.

23          THE CLERK:  It appears Mr. Berger has disconnected

24   from the hearing.

25          MS. CHIEN:  I understand they are having internet

1     troubles.  They are hoping to join relatively soon.

2           THE CLERK:  It appears everyone from that office has

3     gone missing.

4           MS. CHIEN:  I will give them a quick call and I will

5     be back.

6           THE CLERK:  It appears that the participants from

7     that office has -- are rejoining at the moment.  They should

8     be back any second.

9           MR. BERGER:  Apologies.  Our entire office system

10    apparently just went down.

11          MS. SCHEFFEY:  Are we ready to proceed?  I don't know

12    if I see Jamal.  There is a lot of boxes.

13          MR. BERGER:  We can proceed.

14    BY MS. SCHEFFEY:

15    Q    I think before we had a bit of a technology glitch, I was

16    asking you one reason an immigration judge can deny a

17    detainee bond is because they have used too many names and

18    they can't verify their identity, correct?

19    A    Yes, identity issues come up in bond.

20    Q    Individuals held without bond may be those who ICE has

21    shown evidence pose the flight or security risk, correct?

22    A    That can be a reason why somebody is held without bond.

23    Q    You testified earlier as of April 2021, 61 percent of

24    people at the Northwest ICE Processing Center have criminal

25    convictions, correct?

1  A   They were charged as removable because of criminal

2  convictions, yes.

3  Q   Just so I understand that, it is a little complicated for

4  maybe a non-immigration lawyer.  When you say "charged as

5  removable because they have a criminal conviction" that means

6  they have served their sentence but now something about that

7  conviction has called into question their immigration status,

8  correct?

9  A   That's right.

10  Q   So I think you also mentioned something about mandatory

11  detention.  Are you familiar with that concept?

12  A   Yes, I am.

13  Q   So individuals who are held under mandatory detention are

14  those with aggravated felonies who are required to be

15  detained pending the resolution of their immigration

16  proceedings, correct?

17  A   Not just aggravated felonies.  It can be less serious

18  offenses as well.  Yes, it would be, that would be one

19  category of people subject to mandatory detention.  Others

20  could be people arriving at the border and seeking asylum.

21  Yes, criminal grounds are certainly one of the grounds that

22  make people subject to mandatory detention, that is detention

23  without a possibility of a bond hearing.

24  Q   Sitting here today, do you know how many detainees at the

25  Northwest ICE Processing Center are being held under

1    mandatory detention today?

2    A    I don't know that statistic.

3    Q    Do you know how many have aggravated felonies?

4    A    I don't know that statistic as well, although that is

5    available -- I believe that might be available on the TRAC

6    website.  Not a statistic I remember.

7    Q    You do know that there are people in the Northwest ICE

8    Processing Center that are there because of mandatory

9    detention, correct?

10   A    Yes.

11   Q    I think you also testified earlier that in 2019 about 24

12   percent of people who were detained were successful in

13   getting relief?

14   A    That's correct.

15   Q    So over 75 percent of people ultimately do not get legal

16   immigration status after being detained in the center,

17   correct?

18   A    So that's right.  At that snapshot in time, 75 percent

19   would have been denied relief or did not obtain relief, yes.

20   Q    What is the percentage now of individuals who are

21   successful getting relief?

22   A    For fiscal year 2021, it was decreased to 18 percent.

23   Q    Do you know if that percentage is higher or lower than

24   other detention centers across the country?

25   A    You know, I did not look at other detention facilities

1   across the country to compare.

2   Q   You work at the Northwest Immigration Rights Project,

3   correct?

4   A   That's right.

5   Q   The goal of your organization is to advance the rights of

6   immigrants, including by providing legal services, correct?

7   A   That is correct.

8   Q   Through that organization, you have helped increase the

9   number of people who are able to successfully challenge their

10  deportation orders when compared with other facilities across

11  the country, correct?

12  A   I am not sure I quite understand.  Compared to other

13  facilities across the country?

14  Q   Yeah, has your organization helped, you know, more

15  detainees be successful than maybe in let's say Texas or

16  Louisiana where your organization doesn't operate.

17  A   I don't know about comparison.  I would agree that

18  attorneys at the Northwest Immigrant Rights Project are

19  representing detainees, and we certainly are successful in

20  some of our cases.

21  Q   It is a valuable asset to detainees to have you close by;

22  is that correct?

23  A   Legal representation for people that can't afford it is

24  certainly valuable, yes.

25  Q   Detainees at the facility can call your office free of

1  charge, right?

2  A    That is correct.

3  Q    They can request representation, correct?

4  A    That's right.

5  Q    Are you aware of any other ICE detention facilities across

6  the country where detainees are paid minimum wage in the

7  voluntary work program?

8  A    I don't have personal knowledge of that.  I know that

9  there were other cases on wage and hour claims in other parts

10  of the country.  I haven't followed those cases closely.

11  Q    You are not aware of any other ICE detention facility

12  sitting here today where detainees in the voluntary work

13  program receive minimum wage, correct?

14  A    No, I am not.

15  Q    One unintended consequence of increasing the cost to the

16  federal government by housing detainees by requiring a

17  minimum wage job is that the federal government would choose

18  to hold them elsewhere, correct?

19  A    I can't speculate on what the federal government would do

20  in terms of holding them elsewhere.  They might also decide

21  not to detain as many people as well.  There are a couple

22  different policy outcomes that could happen.

23  Q    It would be fair to say that if detainees were moved away

24  from the Northwest ICE Processing Center, they would be --

25  they would suffer the adverse consequence of not having your

1  services or the services of your organization anymore; is

2  that correct?

3  A   Not necessarily.  If somebody is picked up in Seattle,

4  there might be a decision, for example, that they simply

5  aren't willing to fly that person to be detained in Texas.

6  It's hard for me to speculate on what the ultimate impact

7  would be in terms of whether it would mean people being

8  detained in other places more or that there would be less

9  detention.  I just don't know what the ultimate outcome would

10  be.

11        THE CLERK:  Just a moment.  I think we lost a juror.

12  I believe No. 6.  She appears to have completely disconnected

13  from the meeting.

14     Your Honor, Juror No. 6 is coming in right now.  Dara,

15  would you mind admitting her.

16     I believe also Juror No. 9 lost connection for a portion

17  of the last answer.  I am not sure how you would like to

18  address that.

19        JUROR NO.6:  I am so sorry, I am back.  I am going to

20  mute myself.

21        MS. SCHEFFEY:  Could we have the court reporter read

22  back the last question and answer?  It will be easier than me

23  trying to recreate it.

24        THE COURT:  Yes.  Yes.  I have it here.  The last

25  answer of the witness before we had trouble was as follows:

Strawn - Cross

1     "Necessarily, if somebody is picked up in Seattle, there

2     might be a decision, for example, that they simply aren't

3     willing to fly that person to be detained in Texas.  It is

4     hard for me to speculate on what the ultimate impact would be

5     in terms of whether it would mean people being detained in

6     other places, more or less detention.  I just don't know what

7     the ultimate outcome would be.

8          MS. SCHEFFEY:  Thank you.

9          THE COURT:  Next question.

10    BY MS. SCHEFFEY:

11    Q    Mr. Strawn, your organization doesn't operate in Texas,

12    correct?

13    A    That's right.

14    Q    You can't help detainees in Texas, right?

15    A    We wouldn't do individual representation.  We do some

16    class action work where obviously people around the U.S. are

17    covered.  We don't generally do individual representation in

18    Texas, that's right.

19    Q    You don't do individual representation anywhere other than

20    Washington, correct?

21    A    Generally, no.  There might be some exceptions, but they

22    would be relatively rare.

23    Q    You would agree that detainees benefit from being housed

24    near their families, correct?

25    A    Well, I mean I would think that detainees, people

1   generally mostly benefit by not being detained, but certainly

2   if somebody is detained, if they are close to counsel and

3   close to potential witnesses and family members, that is

4   something that I as an attorney like to see.  Although I will

5   say, you know, regardless of these broader policy questions,

6   you know, in my opinion on those, you know, that really

7   doesn't impact kind of my statement about the facts on the

8   ground and what is going on.

9   Q    Right.  You just gave me a lot there.  I understand that

10  it is your opinion that people would benefit from not being

11  detained.  Right now, federal law requires certain people to

12  be mandatorily detained, correct?

13  A    Although there is a mandate for detention, in the end --

14  and we might be getting into the weeds here on policy -- in

15  the end, often bed space and prosecutorial discretion, that

16  is the decision of the individual ICE officers, is what drive

17  who ends up getting detained.  Even though there is a

18  mandatory detention mandate, many of the people subject to it

19  aren't actually brought into mandatory detention.

20  Q    Right now there is no bed space problem, right?

21  A    At the Northwest Detention Center, no, there are beds.  I

22  don't know, you know, what their policies are specific to

23  COVID and capacity, to what extent that is obviously driving

24  bed space.

25  Q    So there are some people who are mandatorily detained

1    under the federal laws, correct?

2    A    Certainly, yes.

3    Q    For those detainees, you would agree it is better for them

4    to be detained close to their families than far from their

5    families?

6    A    I think that is probably generally true for an individual

7    that they would be better -- they would prefer normally to be

8    detained close to their families.

9    Q    That's because --

10   A    I am having trouble imagining why they wouldn't be, but I

11   would be speculating.

12   Q    One reason is their families can visit them?

13   A    Absolutely.

14   Q    If there was a policy that suddenly made it too expensive

15   to house detainees in one state and they all moved away from

16   their families in another state, you agree that would be a

17   bad policy?

18            MS. CHIEN:  I object.

19            MR. BERGER:  Calls for speculation.

20            MS. SCHEFFEY:  Asking for his opinion.

21            MR. BERGER:  And beyond the scope.

22            THE COURT:  Sustained.

23            MS. SCHEFFEY:  I have no further questions.

24            THE COURT:  Any further questions of Mr. Strawn?

25            MR. BERGER:  Just a few questions in follow up.

1          THE COURT:  Mr. Berger, go ahead.

2                REDIRECT EXAMINATION

3     BY MR. BERGER:

4     Q   Did anyone at the Northwest Immigrants Rights Project tell

5     you to act as an expert for plaintiffs in this case?

6     A   No, they did not.  I was contacted independently.

7     Q   Do NIRP policy positions or your personal beliefs about

8     the rights of immigrants have any impact on the substance of

9     the testimony that you gave me here today?

10    A   No.  My testimony would be the same whether I was working

11    at the University of Washington, as I was before, or the

12    Northwest Immigrant Rights Project or in private practice.

13    Q   Nothing about NWIRP policy positions changed the TRAC data

14    you cited, right?

15    A   That is correct.

16    Q   You were asked again about the 61 percent fiscal year '21

17    figure for detainees at Northwest Detention Center who --

18    whose removal charge was based on a criminal offense.  I

19    wanted to reiterate, what was the pre-pandemic --

20    corresponding pre-pandemic statistic?

21    A   For fiscal year 2019, before the pandemic, it was 11

22    percent.

23          MR. BERGER:  I have no further questions, Your Honor.

24          MS. SCHEFFEY:  I have a brief follow up, if the State

25    doesn't have anything.

```
 1            THE COURT:  Okay.
 2                      RECROSS-EXAMINATION
 3   BY MS. SCHEFFEY:
 4   Q   Is it your testimony today your opinions are not
 5   consistent with NWIRP's opinions?
 6   A   No, I don't believe it is.
 7            MS. SCHEFFEY:  No further questions.
 8            THE COURT:  Thank you, Mr. Strawn.  You may be
 9   excused.
10            THE WITNESS:  Thank you.
11            MS. BRENNEKE:  Your Honor, the State would call
12   Charles Hill as our next witness.
13            MS. SCHEFFEY:  Just a second.  He is in California.
14       Mr. Campbell, wherever you are, my understanding is the
15   witness is joining.
16            THE CLERK:  I will admit him as soon as he joins the
17   meeting.  Here he is.  He is on his way in at this moment.
18       Juror No. 4, are you still there?  It is frozen.
19            THE COURT:  Here is Mr. Hill.  Mr. Hill, this is
20   Judge Bryan.  Will you raise your right hand and be sworn,
21   please.
22                      CHARLES HILL,
23       having been sworn under oath, testified as follows:
24            THE COURT:  Thank you.
25            MS. MELL:  I think Juror 4 is frozen up again.
```

1          THE COURT:  Looks like he's frozen there.  There is

2    No. 4.  Mr. Monta, you were frozen there for a minute.  Okay.

3    All the jurors are present, I think, now, and Mr. Hill is

4    present.  You may proceed, Ms. Brenneke.

5                         DIRECT EXAMINATION

6    BY MS. BRENNEKE:

7    Q    Will you please state your name for the record?

8    A    James Charles Hill.

9    Q    What do you prefer that people call you?

10   A    I go by the nickname Chuck.

11   Q    Mr. Hill, my name is Andrea Brenneke.  Do you recall I

12   took your deposition pre-pandemic in Los Angeles in July of

13   2019?

14   A    Yes, I recall that.

15   Q    At that time you were designated as GEO's 30(b)(6)

16   deposition deponent or their corporate spokesperson.  Do you

17   recall that?

18   A    Yes.

19   Q    You agreed at that time to tell the truth to all of my

20   questions; is that right?

21   A    Yes.

22   Q    So we will continue today.  I wanted to make that record

23   for the Court that you were a 30(b)(6) deponent.

24          Now, will you please state who your employer is and

25   what your title is?

1    A    Sure.  I work for the GEO Group.  I am the director of

2    business management for GEO's secure services western region.

3    Q    The secure services division, that oversees GEO's 70 large

4    adult corrections and detention facilities, including the

5    Northwest Detention Center; is that correct?

6    A    That's correct.

7    Q    As GEO's director of management -- of business management

8    for the western region, is it your responsibility to oversee

9    all of the business functions and support services for the

10   Northwest Detention Center?

11   A    I don't necessarily get into the details of every process

12   or function.  I did oversee our policies and procedures to

13   ensure that our main controls are in place in all our

14   locations in my region.

15        MS. BRENNEKE:  Looks like Juror 4 is frozen again.

16   Sorry, Mr. Hill, we will take a moment.

17        THE COURT:  I wonder what causes that.  Tyler, do you

18   have a fix for that?

19        THE CLERK:  I wish I did.  He has left the meeting so

20   hopefully when he reconnects he will have a better

21   connection.  Unfortunately, there is not much we can do about

22   his internet connection.  He is back now.

23        THE COURT:  Okay.  Did you miss anything?  I don't

24   know when you went blank there.  Did you hear the

25   introduction of Mr. Hill, the next witness?

1    JUROR NO. 4:  Yes.

2    THE COURT:  Proceed, Ms. Brenneke.

3    BY MS. BRENNEKE:

4    Q   Mr. Hill, as GEO's director of business management for the

5    western region, I think you said you are responsible for

6    overseeing all the policies and procedures of GEO's for all

7    of the 16 adult facilities in your region?

8    A   As relates to business and related support services.

9    Q   So you are the regional person in charge of the Northwest

10   Detention Center, correct?

11   A   On the business aspects of it, yes, ma'am.

12   Q   You are their point of contact for billing, accounting,

13   financial reporting, budgeting and forecasting; is that

14   right?

15   A   Yes, those are some of the key areas of responsibilities.

16   Q   With regard to the budget and finances, who is it you work

17   with at the Northwest Detention Center level?

18   A   Primarily the business manager, Ryan Kimble.

19   Q   Who does the initial budgeting and forecasting for the

20   Northwest Detention Center?

21   A   Our budget process generally begins at the facility level

22   with the business manager leading the collaboration with

23   different department heads on facility level budget

24   submission.  That would then come to the regional office for

25   a technical review and then regional review of assumptions

1    with myself, our director of operations, and our regional

2    vice president.  Then from our review, any adjustments would

3    go to our corporate office for a review both in the business

4    side of the house and then eventually with the executive

5    management of the company.

6    Q    Are the budgets and forecasts presented to the -- at the

7    corporate level done by a PowerPoint presentation?

8    A    The budget process generally is -- culminates with a

9    PowerPoint presentation to be presented to senior management.

10   Q    Once the facility budget is set, GEO tracks the Northwest

11   Detention Center revenues and costs by month; is that right?

12   A    Yes, our accounting process accounts for revenue and

13   expenses at the facility level monthly.

14   Q    You note variances and the facility's gross operating

15   margin on a monthly basis as well; is that right?

16   A    Yes, our reports after our month end close processes would

17   have a variance report generated and that is done monthly.

18   Q    GEO tracks performance of the facilities like the

19   Northwest Detention Center and their profits based upon their

20   gross margin; isn't that true?

21   A    Yes, on a monthly basis, revenue generated by the

22   facilities and expenses are subtracted from that to get a

23   gross margin at the facility level.

24   Q    You do that because the gross margin is directly

25   attributable to that facility itself; is that right?

1  A    Yes, we do that because it contains the costs that are

2  directly attributable and controllable by that facility's

3  management team for the most part.

4  Q    As a result of your budgeting and oversight of the actual

5  performance of the Northwest Detention Center, are you

6  familiar with its revenues, its contract pricing, its cost

7  and expenses and its profits over time?

8  A    I am generally familiar with that information, although I

9  probably need a document.  I can't recall it off the top of

10  my head.

11  Q    Okay.  Why don't we try Exhibit 194, please.  I would like

12  you to take a look in the package of materials we have sent

13  you.

14  A    Can I open the package?

15  Q    Please do.  Yes.

16  A    Sorry, what was the exhibit number?

17  Q    194, please.

18  A    I am there.

19  Q    Now, is this a version of the western region budget

20  PowerPoint presentation that you would have personally worked

21  on and prepared for review by GEO's corporate leadership?

22  A    Yes, this looks like the overview from my region for our

23  proposed 2014 budget.

24  Q    That proposed 2014 budget would include the proposed

25  Northwest Detention Center facility budget projections; isn't

1  that correct?

2  A   Yes, ma'am.

3  Q   Also includes financial information about the Northwest

4  Detention Center revenue and costs and actual results from

5  the first part of 2013; is that right?

6  A   Yes.  Yes, ma'am.

7  Q   All the information contained in this PowerPoint is

8  accurate and correct to the best of your knowledge as of the

9  time this PowerPoint was created; is that right?

10  A   Yes, this would have been as accurate as possible at the

11  time it was created.

12          MS. BRENNEKE:  Move for admission, Your Honor.

13          MS. SCHEFFEY:  I just object to the relevance.  It

14  hasn't been tied at all to the employment directors.

15          THE COURT:  My copy is marked.  There is no material

16  in my copy.  Do you have one with numbers and stuff in it?

17          MS. BRENNEKE:  Yes.

18  BY MS. BRENNEKE:

19  Q   Mr. Hill, if you take a look at the document, can you see

20  the information about other facilities other than the

21  Northwest Detention Center has been redacted and/or marked as

22  confidential so it is not visible on this document?

23  A   I had no information until I got to Northwest Detention

24  Center.

25  Q   If you look at page two of the document, do you see that

1    everything is whited out except for information about the

2    Northwest Detention Center?

3    A    Yes, ma'am.

4    Q    From this entire slide show presentation of your 16

5    facilities, only the Northwest Detention Center information

6    is visible; is that true?

7    A    That's true for slide 2.

8    Q    Page 35 is where the Northwest Detention Center specific

9    slides are starting.

10         THE COURT:  I don't have page numbers on mine either.

11         MS. BRENNEKE:  Your Honor, if you take a look at

12    227842, that's where the Northwest Detention Center

13    information is visible.

14         THE COURT:  Okay.  Just a second.  All right.  This

15    is offered?

16         MS. BRENNEKE:  It is offered, Your Honor.  Thank you.

17         THE COURT:  All right.  There is an objection.

18         MS. SCHEFFEY:  The objection is to the relevance of

19    this.  It doesn't seem to have anything to do with the case.

20         MS. BRENNEKE:  Your Honor, if I may, this goes to

21    many aspects of what has already been addressed in -- by

22    other witnesses and in other testimony.  Most significantly,

23    to the essential operations of the Northwest Detention Center

24    and the role that detainee work plays.  We also have other

25    exhibits that will relate to this in terms of their actuals.

1   This is what the corporation reviews for purposes of its

2   evaluation.

3           MS. SCHEFFEY:  I believe --

4           THE COURT:  Let me ask another question.  That is:

5   This is 2014, I think.  Yes.  What is the relevance of a

6   document from 2014?

7           MS. BRENNEKE:  Your Honor, the practices of the

8   Northwest Detention Center and the way they budget from the

9   2009 and 2015 contracts have remained relatively constant.

10  This is the only PowerPoint presentation that GEO has

11  produced in discovery with regard to what its corporate

12  officers actually review and what they care about in terms of

13  the Northwest Detention Center's results, and it creates a

14  foundation for them getting into the 2015 and other

15  contracts.

16          MS. SCHEFFEY:  Your Honor, I would say because

17  something is produced in discovery doesn't necessarily make

18  it relevant.  I haven't heard the witness provide any

19  foundation as to why this is relevant to the VWP or detainee

20  worker program.

21          MS. BRENNEKE:  It is also the basis for how the

22  detention management services are paid under the 2009 and

23  2015 contracts.  Then as a result of that, that is a

24  component of the overall business operations and whether or

25  not the detainee workers are providing an essential part of

1    that.

2            THE COURT:  194 may be admitted.

3                    (Exhibit 194 was admitted.)

4    Q   Let's publish that for the jury so they can see what we

5    are talking about as well.  Why don't we take a look at Page

6    2.  This is Bates stamp 2278089.  The most general level,

7    Mr. Hill, you presented here an overview of the year to year

8    comparison of earned revenue and profits of all of GEO's

9    western regional facilities; is that right?

10   A   Comparison of revenue and gross margin for each facility.

11   Q   That includes the result for the Northwest Detention

12   Center; is that true?

13   A   Yes, that's correct.

14   Q   The profit margin listed there is 36.79 percent?

15   A   Gross margin is listed as 36.79 percent.

16   Q   The dollar amount was what?

17   A   For the gross operating margin, $19,621,970.

18   Q   Now, let's take a look at Page 35, which is Bates stamp

19   227842.  Will you verify this is the beginning of the section

20   of the PowerPoint focused on the budget proposal for the

21   Northwest Detention Center in more detail?

22   A   Yes, that is correct.

23   Q   On this page, you list some of the facts that were used to

24   generate the 2014 budget for the Northwest Detention Center;

25   is that right?

1   A   Yes, those are just some of the key components of the

2   facility's contract and, you know, authorized staffing,

3   whether it is a union facility that falls under the Service

4   Contract Act.  Yes, there's some basic information and

5   assumptions going into the building of this budget.

6   Q   The capacity of the Northwest Detention Center that you

7   listed was 1,575 people who can be detained; is that right?

8   A   Yes, that was the number of beds, total capacity

9   available.

10  Q   And under that you list the pricing of how ICE pays GEO

11  under the ICE contract; is that right?

12  A   It lists the per diem for the man-day rates.  It is

13  bifurcated so there is a guaranteed rate and anything above

14  the guaranteed rate.

15  Q   Those are significant because, in general, GEO earns money

16  for their detention services on the basis of the number of

17  people housed times the rate per person; is that right?

18  A   A revenue is generated based on those rates and the total

19  number of people who are housed on any given day at the

20  facility.

21  Q   Let's break that down for a minute.  The operative rates

22  at the time, this was for 2014, said there was a guaranteed

23  payment of 103.58 for up to 1,181 detainees; is that right?

24  A   Yes, so ICE had guaranteed GEO a payment of 103.58 for the

25  use of 1,181 beds on a daily basis.

1    Q    ICE has guaranteed that regardless of how many detainees

2    are actually present in the facility; is that right?

3    A    Yes, that's what we referred to as minimum guarantee.

4    Q    On top of that, you -- the contract provided that ICE

5    would pay GEO $63.90 for the number of detainees over 1,181

6    and up to the full capacity of the facility; is that right?

7    A    Yes, that is correct on a daily basis any beds occupied

8    over the 1,181 would be paid at that rate of 63.90.

9    Q    This reflects the terms of the 2009 ICE-GEO contract that

10   was operative at the time; is that right?

11   A    That would be the final rates of that contract.  Just

12   looking at the notes, that contract would have expired

13   October 24, 2014.

14   Q    At that time, GEO had 265 authorized staff; is that right?

15   A    Yes, that's what the page reflects.  That would have been

16   accurate.

17   Q    The wage rate at that time was $23.51 an hour; is that

18   correct?

19   A    Yes, that would be the Service Contract Act wage

20   determination rate for officers at the time the budget was

21   built.

22   Q    So GEO would have paid officers that amount for their

23   straight time; is that right?

24   A    Yes, that's correct.

25   Q    They would have paid that amount and a half for any

1    overtime; is that right?

2    A    Yes.    That would be 1.5 times that rate for any hours that

3    were overtime hours worked by an officer.

4    Q    Take a look at the next page, please.    Page 36 of the

5    PowerPoint, which is 227843.    Here, you reported the 2013

6    average daily population year to date in the forecast for the

7    rest of the year; is that right?

8    A    That is correct.

9    Q    The average year to date population was 1,328?

10   A    Yes, ma'am.

11   Q    Then your projections culminate with the 2013 budget

12   forecast of a revenue of $53,700, you see that?

13   A    Yes.

14   Q    There was also a forecast of 36.4 percent profit; is that

15   right?

16   A    The gross operating margin was forecasted to end the year

17   at 36.4 percent of revenue.

18   Q    I want to point out, the 53,700, that's actually revenue

19   of 53,700,000 because you need to add three zeros; is that

20   correct?

21   A    Where it says revenue and the dollar sign with the three

22   zeros indicating that is thousands, so yes, 53,700,000.

23   Q    Similarly, the forecast gross profit -- strike that.

24        The forecasted profit or gross operating margin for

25   2013 was 19,531,000; is that right?

1    A    Yes, that was what the forecasted gross margin was.

2    Q    Based on the 2013 figures, you said a similar 2014

3    Northwest Detention Center facility budget with a gross

4    profit margin was anticipated at 36.8 percent; is that right?

5    A    The budget reflected very closely to what we experienced

6    in 2013 and the gross margin percentage was calculated at

7    36.8 percent based on the revenue we had budgeted and the

8    margin we arrived at.

9    Q    Let's take a look at the next page, Page 37, which is

10   Bates stamped 227844.  Here, you have tracked the forecasted

11   earned revenue and gross operating margin as well as costs,

12   this time including overtime and regular labor costs; is that

13   right?

14   A    Yes, it is a little more detail about the breakdown of the

15   year over year comparison by expense categories.

16   Q    The total labor and related taxes are the most significant

17   costs of the operation of the Northwest Detention Center at

18   19,611,000; is that right?

19   A    Yes, labor and related costs are nearly always our most --

20   our largest cost category.

21   Q    All other expenses really pale in comparison?

22   A    In this case, it looks like they are about 40 percent of

23   overall expenses with labor being about 60 percent, if I had

24   to eyeball it.

25   Q    Yeah.  Okay.  Thank you.  All right.  We are done with

1    that exhibit.  Thank you, Caiti.

2         I will have you take a look at Exhibit 253 in your

3    packet.  Tell me when you are there.  Is that the

4    consolidated financial statement of the Northwest Detention

5    Center showing financial data from 2005 through 2018?

6    A   Yes, ma'am, that's what I am looking at.

7    Q   That consolidated financial statement includes actual

8    revenue and cost figures and reports both the gross margin

9    and net margin for the facility; is that right?

10   A   Yes, there is the actual revenue, labor related and then a

11   line for other operating expenses, gross margin, and then

12   indirect and facility use cost to get a net margin.

13   Q   The figures reported here are accurate based upon your own

14   personal knowledge; is that right?

15   A   Yes, I believe them to be accurate.

16   Q   And the handwriting on that exhibit is also your

17   handwriting; isn't that true?

18   A   Yes, that is correct.

19         MS. BRENNEKE:  So I offer this exhibit for admission,

20   Your Honor.

21         MS. SCHEFFEY:  Which number is it?  I thought you

22   said 263.

23         MS. BRENNEKE:  253.  My apologies if I wasn't

24   accurate.

25         MS. SCHEFFEY:  No objection, Your Honor.

1           THE COURT:  253 may be admitted.

2                       (Exhibit 253 was admitted.)

3    Q    So this consolidated financial statement includes the

4    total revenue from operation of the Northwest Detention

5    Center year by year; is that correct?

6    A    Yes, ma'am.

7    Q    And below that you have listed the expenses for operation

8    of the Northwest Detention Center year by year; is that true?

9    A    Yes, they were listed by two categories, labor and

10   related, and all other operating expenses.

11   Q    Then the handwriting reflects your calculations of what

12   the gross profit and net profit margins were for 2013 and

13   2014; is that right?

14   A    Yes, that is correct.

15   Q    So the gross operating margin or profit of the Northwest

16   Detention Center for 2013 was what?

17   A    The gross margin -- would you like the dollar amount or

18   percentage?

19   Q    Start with the dollar amount.

20   A    20,013,628.

21   Q    The percentage you calculated was 36.97 percent?

22   A    Gross operating margin, yes.

23   Q    Which is the same as the profit, correct?

24   A    I typically use the term "margin" because "profit"

25   indicates the company's overall performance after all

1  expenses are taken out on a consolidated basis.  It may be a

2  small, minute distinction.  I typically use the term

3  "margin."

4  Q   Okay.  Generally GEO tracks, like we saw in the PowerPoint

5  presentation, that gross margin for the Northwest Detention

6  Center on an annual basis, correct, that's the number they

7  review?

8  A   Yes, from the budget standpoint they are looking at the

9  gross operating margin on a yearly basis.

10  Q   To get the net margin or the actual profit to GEO, you

11  would subtract out all of the indirect costs and facility use

12  costs of the facility; is that right?

13  A   Yes, if we are using FARS standards to the left, which are

14  federal acquisition regulation standards, it allows us to

15  calculate indirect costs and then also subtract out the

16  facility use costs, which is tracked separately here based on

17  the financing arrangement.  Subtracting those from the gross

18  margin results in the net margin on the slide.

19  Q   The indirect costs are things like general administrative

20  overhead of GEO's, higher than the facility level like

21  regional and corporate level; is that right?

22  A   Yes.  So indirect costs generally are general and

23  administrative overhead type expenses to include my office, a

24  portion of our corporate overhead for those allowable costs

25  under FARS, you know, the total expenses are then allocated

1    out to the facilities.  For a report like this, we don't do

2    this typically on a monthly basis or even an annual basis

3    because our results are consolidated when we report to Wall

4    Street and announce our earnings.  For this, we calculated

5    the indirect costs, the facility use costs to get a net

6    margin for this particular facility.

7    Q    When you mention facility use costs, you are talking about

8    like financing of the property that GEO owns and holds for

9    the Northwest Detention Center; is that right?

10   A    Yes, the facility use costs listed there are, I think, the

11   bond payments that were sold to finance the project.

12   Q    Okay.  So in the end of 2013, the net margin or the profit

13   to GEO from the Northwest Detention Center was 19.9 percent;

14   is that right?

15   A    Yes, that's what my handwriting says.

16   Q    And GEO earned a profit off of the Northwest Detention

17   Center in 2013 of 10,788,018?

18   A    That was our net margin on this exhibit.

19   Q    Similarly, let's go to 2014.  The 2014 gross margin is

20   37.43 percent; is that right?

21   A    Yes.

22   Q    The gross operating margin was 20,388,962; is that right?

23   A    Yes, that is correct.

24   Q    In that year, the net margin was only 10.84 percent; is

25   that correct?

1  A    Yes, net margin was 10.84 percent.

2  Q    That year was aberrational wasn't it, because the finance

3  costs, the facility use costs were high; is that right, the

4  11,795?

5  A    Yes, my recollection is that bonds were refinanced which

6  required an additional bond payment, so those costs were

7  higher in 2014, the finance costs were higher in 2014.

8  Q    That's because there were two principal payments due in

9  one year and every other year there is just one; is that

10  correct?

11  A    I know there was an additional payment.  I don't know if

12  there were two typically annually, and this was three or if

13  it was one and then two.  I do recall there was an additional

14  principal payment made.

15  Q    Still, even with that additional investment in the

16  facility cost, the profits were over -- were nearly 11

17  percent that year, correct?

18  A    10.84 percent.

19  Q    I want to keep the exhibit up.  Let's take away the

20  highlight.  There you go.  Now, over the years GEO has

21  consistently earned a gross profit or gross margin from the

22  Northwest Detention Center facility of between 22 and 37

23  percent; isn't that right?

24  A    I haven't calculated each of those out.  I believe that

25  looks to be relatively accurate.

Hill - Direct

1   Q   That is what you testified to in your deposition, isn't

2   it?

3   A   I believe so.

4   Q   Over the years, GEO has also consistently earned a net

5   profit from the Northwest Detention Center between 16 to 19

6   percent; isn't that right?

7   A   I don't believe those percentages would have been met

8   until prior to 2010.  It looks like those percentages might

9   be a little bit high.

10  Q   Are you saying prior to 2010, the net profits were higher

11  than 16 to 19 percent?

12  A   No, looks like if you look at in 2006, for example, 2.

13  24 -- 2,049,210 net margin based on revenues of 26, that is

14  less than 10 percent.  I think those percentages are a little

15  bit high unless you are referencing maybe specific years

16  towards the 2015 contract.  I can't do all the calculations

17  in my head.  A couple of them look like they would be below

18  16 percent.

19  Q   So from let's say 2010 forward, isn't it true that the net

20  margin, the net profits were between 16 to 19 percent from

21  the Northwest Detention Center?

22  A   With the exception of 2014, just a quick look at the

23  numbers, there could be a give or take of a couple percentage

24  points.  That looks relatively reasonable.

25  Q   It is true the Northwest Detention Center is among the

1  higher profit earning facilities that GEO owns and operates;

2  isn't that right?

3  A   Again, depending on the year, in recent years it is one of

4  the larger, better performing facilities that I am aware of.

5  Q   In fact, it is one of the higher profit earning facilities

6  that GEO owns and operates; isn't that true?

7          MS. SCHEFFEY:  Objection, foundation.

8          THE COURT:  He may answer.

9          THE WITNESS:  It is one of the larger operating

10  margins -- facility producing -- facilities producing one of

11  the larger operating margins.

12  BY MS. BRENNEKE:

13  Q   We can put this exhibit down, please.  Let's --

14          THE COURT:  Let's go home.  It is quitting time.

15          MS. BRENNEKE:  Your Honor, I lost track of time

16  there.

17          THE COURT:  We will pick this up tomorrow morning,

18  folks.  Follow my instructions about recesses.  Keep your

19  minds clear and open on all issues.  Come back tomorrow at

20  9:00 ready to go to work with your computers all compatible.

21      See you in the morning.

22                  (Recessed.)

23

24

25

1

2

3                       C E R T I F I C A T E

4

5

6      I certify that the foregoing is a correct transcript from

7   the record of proceedings in the above-entitled matter.

8

9

10

11   */s/ Angela Nicolavo*

12   ANGELA NICOLAVO
     COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25