<pre>
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                                )
     UGOCHUKWO GOODLUCK NWAUZOR,   )
 5   et al.,                       )
                                   )
 6              Plaintiffs,        ) 3:17-cv-05769-RJB
                                   ) 3:17-cv-05806-RJB
 7   v.                            )
                                   ) Tacoma, Washington
 8   THE GEO GROUP, INC.,          )
                                   ) June 9, 2021
 9              Defendant.         )
     _____  ) Jury Trial
10                                )
     STATE OF WASHINGTON,          ) 9:00 a.m.
11                                )
                Plaintiff,         )
12                                )
     v.                            )
13                                )
     THE GEO GROUP, INC.,          )
14                                )
                Defendant.         )
15                                )
     _____

16
                VERBATIM REPORT OF PROCEEDINGS
17          BEFORE THE HONORABLE ROBERT J. BRYAN
                UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24
          Proceedings stenographically reported and transcribed
25                With computer-aided technology
</pre>

```
1                          APPEARANCES

2

3     For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
4                              Schroeter Goldmark & Bender
                               810 Third Avenue
5                              Suite 500
                               Seattle, Washington
6

7
      For the Plaintiff        ANDREA BRENNEKE
8     State of Washington:     LANE POLOZOLA
                               MARSHA J. CHIEN
9                              800 Fifth Avenue
                               Suite 2000
10                             Seattle, Washington

11

12    For the Defendant        LAWRENCE D. SILVERMAN
      The GEO Group:           ADRIENNE SCHEFFEY
13                             Akerman LLP
                               1900 Sixteenth Street
14                             Suite 1700
                               Denver, Colorado
15
                               JOAN K. MELL
16                             III Branches Law PLLC
                               1019 Regents Boulevard
17                             Suite 204
                               Fircrest, Washington
18

19

20

21

22

23

24

25
```

```
 1                       EXAMINATION INDEX

 2
       EXAMINATION OF:                                    PAGE
 3
        CHARLES HILL        DIRECT EXAMINATION
 4                          BY MS. BRENNEKE                  6
                            CROSS-EXAMINATION
 5                          BY MS. SCHEFFEY                 32
                            REDIRECT EXAMINATION
 6                          BY MS. BRENNEKE                 47
                            REDIRECT EXAMINATION
 7                          BY MR. BERGER                   52
                            RECROSS-EXAMINATION
 8                          BY MS. SCHEFFEY                 55
                            FURTHER REDIRECT EXAMINATION
 9                          BY MS. BRENNEKE                 59
                            FURTHER REDIRECT EXAMINATION
10                          BY MR. BERGER                   60

11      BRIAN EVANS         DIRECT EXAMINATION
                            BY MS. BRENNEKE                 61
12                          VOIR DIRE EXAMINATION
                            BY MS. BRENNEKE                 99
13                          DIRECT EXAMINATION (Resumed)
                            BY MS. BRENNEKE                113
14                          CROSS-EXAMINATION
                            BY MS. SCHEFFEY                115
15                          REDIRECT EXAMINATION
                            BY MS. BRENNEKE                123
16                          RECROSS-EXAMINATION
                            BY MS. SCHEFFEY                124
17
        UGOCHUKWU
18      GOODLUCK NWAUZOR    DIRECT EXAMINATION
                            BY MR. WHITEHEAD               126
19                          CROSS-EXAMINATION
                            BY MS. SCHEFFEY                147
20
        ROBBIN GARD         DIRECT EXAMINATION             176
21                          BY MR. POLOZOLA

22

23

24

25
```

```
1                          EXHIBIT INDEX

2
     EXHIBITS ADMITTED                              PAGE
3
      184                                             12
4     262                                             28
      602-A - Removed                                112
5     602-A                                           90
      608                                            127
6     609 - Illustrative                             127
      A-303                                          157
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                      MORNING SESSION

 2                                      JUNE 9, 2021

 3      (The following occurred outside the presence of the jury.)

 4          THE COURT:  Okay.  Are we ready to proceed this

 5   morning?

 6          MS. BRENNEKE:  Yes, Your Honor.

 7          THE COURT:  Is Mr. Hill signed in?

 8          THE CLERK:  He's in the waiting room.  I can admit

 9   him now.

10          THE COURT:  You can admit him and bring the jury in.

11      (The following occurred in the presence of the jury.)

12          THE CLERK:  All nine jurors are here, and we are

13   waiting for the witness to turn the camera on.

14          THE COURT:  While Mr. Hill is coming on, I want to

15   explain to the jury why we are a few minutes late.  As you

16   probably understand, criminal defendants have some speedy

17   trial rights.  Many of the things that lead up to a trial

18   also have time limits on them.  We have to move them through

19   the court system.  I had a hearing this morning regarding a

20   release from custody pending a hearing.  It had to be

21   expedited, and so we stole a little time from the trial.  We

22   can't have those hearings when defendants are in custody

23   except on the time plans of the federal facility where they

24   are housed.  Anyway, we got that done.

25       Later in the trial, I am going to have to take more time
```

1    for interruptions.  I will tell you when we are doing that.

2    I have some sentencings and different criminal matters that

3    will interrupt the trial later as we go along.  That is what

4    happens.

5        We are now ready to go back to Mr. Hill.  I believe we

6    were still on direct examination.

7                    DIRECT EXAMINATION (Resumed)

8    BY MS. BRENNEKE:

9    Q    Good morning, Mr. Hill.  I can't hear you.  I think you

10   are still muted.  Can you say something?

11   A    Good morning.

12   Q    Great.  Just as a reminder, you are still under oath from

13   yesterday.  Do you recall that?

14   A    Yes.

15   Q    Now, I would like talk briefly about the ICE-GEO contract

16   that's come up before with other witnesses.  In your

17   position, you were actually involved in reviewing the pricing

18   that goes into the bid that GEO submits for detention service

19   contracts with the federal government; isn't that right?

20   A    Yes, in my position, I review pricing for contracts.

21   Q    You reviewed the pricing for the ICE-GEO contract, the

22   2015 contract; is that right?

23   A    Yes, I participated in that contract and pricing review.

24   Q    There were other executives at the regional and corporate

25   level who also reviewed that pricing, including the director

1    and CFO or the finance director, sorry, and CFO Brian Evans;

2    is that right?

3    A    Yes, that is correct.

4    Q    The 2015 contract is the currently operative contract

5    between GEO and ICE; is that true?

6    A    Yes, that is correct.

7    Q    Caiti, will you pull that up for me, please.  We have

8    already admitted Exhibit 129.

9         Just so the jury understands, the documents that

10   comprise the contract include both the federal government's

11   solicitation as well as GEO's offers and bids and the

12   contract award letter; is that right?

13   A    Yes, my understanding, there is language that incorporates

14   the proposal into the contract award.

15   Q    So part of the contract bid process is that you provide

16   pricing and spreadsheets and other things to back up what

17   your offer is; is that right?

18   A    Yes.  The pricing is built internally and submitted with

19   other statements of performance or work that will be

20   completed in accordance with the request for proposal bid

21   that ICE originally would have sent out.

22   Q    All right.  Exhibit 129, when it is all signed, that's the

23   contract or the deal that GEO agrees with ICE it will

24   perform; is that right?

25   A    Yes, the sheet in front of me is the contract award

1    signature sheet.

2    Q    Why don't we take a look, please, at Page 2.  Page 2 of

3    that document, it indicates that there is a period of

4    performance and that is from September 28th, 2015 through

5    September 27th, 2025; is that correct?

6    A    Yes.

7    Q    You are the money guy.  So the billing for GEO for the

8    detention services it provides and the revenues it receives

9    is done by CLIN or client line item numbers; is that right?

10   A    Yes, that is correct.

11   Q    The first category of work that GEO has agreed to perform

12   and bill for under this contract is marked "CLIN 0001;" is

13   that right?

14   A    Yes.

15   Q    Will you pull that up, Caiti, maybe highlight that.  That

16   is for detention services in accordance with the performance

17   work statements; is that right?

18   A    Yes, that's correct.

19   Q    GEO's pay is structured with two rates for detention

20   management services, isn't it?

21   A    Yes, two rates.

22   Q    Okay.  Under 001-A, GEO has a minimum guaranteed daily

23   payment for 1,181 beds; is that right?

24   A    Yes, we are guaranteed payment on 1,181 beds per day.

25   Q    Under the 2015 contract for that first year, that was at a

Hill - Direct

1    rate of $115.63; is that correct?

2    A    Yes.

3    Q    GEO is entitled to that payment regardless of how many

4    detainees are actually in the facility; is that true?

5    A    Yes, that's the guaranteed minimum payment.

6    Q    Caiti, if you would highlight the whole line that goes to

7    the end there.

8         So that's a guaranteed revenue stream to GEO of nearly

9    $50 million each year; is that correct?

10   A    Yes, this particular one would be for the first year of

11   the contract, which included the leap day, but the

12   calculation would be $49,980,604.

13   Q    When the jury gets this contract back in the deliberation

14   room, it's a lot longer than just this first page, but each

15   successive year GEO has a built-in increase in the rate its

16   earning; is that right?

17        MS. SCHEFFEY:  Objection.  I am going to object to

18   the relevance of this, in that it's not tied to the voluntary

19   work program at all.

20        THE COURT:  Overruled.

21   BY MS. BRENNEKE:

22   Q    Mr. Hill, you can answer then.

23   A    Yes, I believe there is an increase in each contract year

24   at the contract anniversary date.

25   Q    We can take away that highlight, and then just for

1  completion here, the 001-B, that is the additional payment

2  that GEO receives for daily bed days for detainees over the

3  minimum and up to 394 beds to the capacity of the facility;

4  is that right?

5  A    Yes, that's the rate for any beds occupied above the

6  minimum guarantee of 1,181.

7  Q    The bed-day rate in this contract is an all-inclusive,

8  fully-burdened rate, that's the language you use; is that

9  right?

10  A    The language in the contract speaks to a fully-burdened,

11  all-inclusive rate.

12  Q    That includes everything that GEO has to spend in order to

13  provide those detention management services and earn a

14  profit, doesn't it?

15  A    Yes, that would be inclusive of all the expenses

16  associated with this project to operate the facility.

17  Q    If we look, please, at Page 46.  It is Bates stamp 036870,

18  the bed-day rate is defined there.  That is what you just

19  said, I think, which is it is inclusive of all direct costs,

20  indirect costs, overhead and profit necessary to provide the

21  detention and food service requirements described in the

22  performance work statement; is that correct?  Did I read it

23  correctly?

24  A    Yes.

25  Q    Okay.  The built-in profit margin that is built in to that

1  rate that you have -- that GEO has agreed to is a ten percent

2  projected net profit; isn't that correct?

3  A    I believe that is what the pricing on this project was,

4  was a ten percent margin, net margin on the revenues.

5  Q    That was a net margin over all direct and indirect costs,

6  including even the administrative overhead and facility

7  expenses allocated to the Northwest Detention Center; is that

8  right?

9  A    For all the indirect costs that are allowable under FARS,

10 yes, that would be inclusive of those.

11 Q    Can you take a look, please, at Exhibit 184?

12 A    Yes.

13        THE COURT:  184?

14 BY MS. BRENNEKE:

15 Q    Is that an email from GEO's executive vice president that

16 includes the final pricing workbook for the 2015 GEO-ICE

17 contract?

18 A    Yes, that's from Matt Donato (phonetic), who is our

19 executive vice president of pricing, to Amber Martin saying

20 this is the final pricing workbook.

21 Q    You verified that this really is the final, that the

22 per diem rates in the pricing workbook match the 2015 GEO-ICE

23 contract that we have just looked at, Exhibit 129; is that

24 right?

25 A    Yes, this matches the contract rates.

1      MS. BRENNEKE:  I offer Exhibit 184.

2      MS. SCHEFFEY:  No objection.

3      THE COURT:  184 may be admitted.

4            (Exhibit 184 was admitted.)

5  BY MS. BRENNEKE:

6  Q   I am going to have you take a look at page 46 of this PDF.

7  This was produced as a native document and so it's not Bates

8  stamped, so it will be important to look on the screen.  This

9  is the final spreadsheet for the GEO Group Inc. Northwest

10 Detention Center 1,575 beds pricing for ICE.  That is the

11 title at the top.  Do you see that?

12 A   That's what it appears to be.

13 Q   Does this page show all the details of the direct and

14 indirect costs that make up the basis for the fully-burdened

15 per diem bed-day rate?

16 A   Can you move it up a little bit so I can see the bottom?

17 Q   It is hard to get on there, but we can.  Let's see.

18 A   Yes, that is correct, it has both the direct expense and

19 also the indirect expense.

20 Q   So the direct expenses include GEO's total labor expenses?

21 Can you highlight that one, Caiti?

22 A   Yes, that's correct.

23 Q   That constitutes the total expense for GEO staff only, not

24 detainee workers, correct?

25 A   That would be for GEO employees only.

1  Q    Below that are all of GEO's other operational expenses; is

2  that correct?

3  A    Yes, that is correct.

4  Q    Below that you have "depreciation," "general,"

5  "administrative" and "overhead;" is that right?

6  A    Yes, ma'am.

7  Q    Then once you have that total number, you have got the

8  line item that says "ten percent profit;" is that correct?

9  A    Yes.

10 Q    Now, yesterday you testified that the Northwest Detention

11 Center facility, at least since about 2010, has been

12 consistently earning between 16 to 19 percent net profit;

13 isn't that true?

14 A    Yes, that's been the actual experience.

15 Q    That means GEO has made more than 60 to 90 percent more

16 profit on this facility than it projected and told ICE it

17 would earn in the contracting process; isn't that right?

18 A    Our actual experience has been better than what the

19 pricing originally was.

20 Q    GEO gets to keep all of that extra profit, doesn't it?

21 A    The company earns that profit and uses it for company

22 purposes or reports it as net profit to Wall Street.

23 Q    It can either be reinvested in its own business as it sees

24 fit?

25 A    Yes, GEO reinvests profit into the facilities and other

1    aspects of the business.

2    Q    Or GEO pays it off to shareholders; is that right?

3    A    That's correct, GEO is structured currently as a real

4    estate investment trust and has requirements to pay out a

5    certain amount of profit to shareholders.

6    Q    Regardless of what it does with it, GEO gets to keep that

7    extra profit, doesn't it?

8    A    Yes, GEO retains that.

9    Q    Now, this pricing workbook also has detail about the

10   employee staffing from the community that GEO agrees to have

11   to operate the Northwest Detention Center; is that right?

12   A    Sorry, can you repeat that question?

13   Q    Yeah.  The pricing workbook also lays out the staffing

14   that GEO agrees to have of GEO staff from the community in

15   order to carry out the terms of the contract; is that true?

16   A    Yes, there is a staffing plan listing the positions GEO

17   anticipates will be needed to operate this contract.

18   Q    That represents the staffing that GEO has agreed to pay

19   and provide under its contract with ICE; is that right?

20   A    Yes, that's GEO's employees that will be paid through this

21   contract.

22   Q    Okay.  Let's take a look, please -- there are two pages of

23   the staffing detail, Pages 51 and 52.  It kind of extends.

24   Let's start with 51.  That is the guaranteed staffing plan,

25   is that correct, the beginning of it?

1   A    On top it says "guaranteed staffing plan, 1,575 beds for

2   ICE," so I'm not sure if this represents the entire staffing

3   plan of 1,575 or the minimum guarantee.

4   Q    Okay.  All right.  Let's look down below on Page 52

5   because there is a summary page.  I think it would be helpful

6   to start there.  This summary shows that the labor costs in

7   the contract reflect 276.52 full-time GEO staff that it hires

8   from the community to work at the Northwest Detention Center;

9   is that right?

10   A    Yes, that's correct.

11   Q    If we go back up to Page 251, we can look at the

12   operational areas of the Northwest Detention Center that are

13   at issue in this case.  Let's first look at the food services

14   staffing on Page 51.  All right.  Does this reflect that GEO

15   employs 13 full-time kitchen staff from the community to work

16   at the Northwest Detention Center?

17   A    Yes; on this staffing plan, it is requiring 13 employees.

18   Q    Okay.  And that is the one manager, one assistant manager

19   or supervisor, ten kitchen officers and one clerk; is that

20   correct?

21   A    Yes.

22   Q    This reflects that the kitchen officers in 2015 earned

23   $23.51 an hour; is that right?

24   A    Yes, that is correct.

25   Q    If we look under the category of "business" on Page 51, I

1  think that is higher up.  Does this reflect that GEO employs

2  three full-time janitors in the community to work at the

3  Northwest Detention Center?

4  A    Yes.

5  Q    The wage paid to those janitors in 2015 was $15.32 an

6  hour; is that right?

7  A    Yes, that's correct.

8  Q    Let's look again at one more category.  That is the

9  "detention officers."  That goes from Page 51 -- we want to

10  look at the portion, it starts "detention officers" there,

11  then we go down to 52.  There is a line item for "laundry."

12  You see that?  "Laundry officer, No. 213"?

13  A    Yes, I do.

14  Q    Does this reflect two full-time positions plus relief for

15  a total of 2.4 full-time officers from the community that GEO

16  employs to work in the laundry at the Northwest Detention

17  Center?

18  A    Yes, 2.4 employees.

19  Q    The wage paid to the laundry officers in 2015 was the same

20  as all other detention officer wages, 23.51 an hour; is that

21  right?

22  A    Yes, that is correct.

23  Q    This reflects the staffing that GEO -- I think we are done

24  with that.  This reflects the staffing that GEO has agreed to

25  provide under the 2015 contract and that ICE has agreed to

1  pay for; is that right?

2  A   Yes, that's correct.

3  Q   There is a concept of minimum staffing that GEO agrees to,

4  which is like a floor on the staffing?

5  A   Yes, so similar to the bed-day rate, there are staff

6  included in the minimum guaranteed rate, and then there would

7  be an incremental staffing plan for additional staff based on

8  the population of the facility.

9  Q   GEO could also make a business decision to hire staff

10  above that minimum staffing, provided it didn't bill ICE for

11  those additional staff costs; isn't that true?

12  A   GEO could make an internal decision to hire additional

13  staff based on company objectives or operational needs and

14  utilize those staff at the facility, but they would not be

15  included in the per diem rates or reimbursed by ICE if there

16  is not a contract modification.

17  Q   So GEO has, in fact, unilaterally increased its GEO

18  staffing and not sought reimbursement from ICE in the past,

19  hasn't it?

20  A   There have been a few instances where positions have been

21  added at GEO's discretion.

22  Q   For example, sergeants were hired prior to the 2015

23  contract to provide additional management over the detention

24  officers; isn't that true?

25  A   Yes, prior to 2015, GEO made the decision to add another

1  level of management at its own expense.  Then it was

2  incorporated into the 2015 contract.

3  Q    So after it was incorporated in the 2015 contract, GEO

4  billed ICE for the cost of those sergeants; is that right?

5  A    It would have been included in the minimum guaranteed

6  man-day rate.

7  Q    But for the period between when GEO hired the sergeants

8  and the rebidding of the 2015 contract, GEO just ate those

9  extra wage costs as a reduction in its profits, didn't it?

10  A    Yes, that expense would just come out of our normal --

11  increase our normal operating costs, reducing our operating

12  margin.

13  Q    Let's talk about the pay that GEO staff gets under the

14  terms of the ICE contract and that GEO agrees to pay under

15  the terms of the ICE contract.  GEO must pay its

16  non-management employees consistently with what is referred

17  to as federal wage determination rates; is that correct?

18  A    Yes, it's the Service Contract Act, so non-exempt

19  employees would be paid under the wage determination schedule

20  that is incorporated into the contract.

21  Q    The wage determination rates are incorporated into the

22  contract by way of an appendix; is that right?

23  A    Well, it is a contract modification each time with the

24  current wage determination schedule that the client is

25  incorporating at that time, I believe as an appendix or it's

1    a schedule.

2    Q   Let's look back at Exhibit 129 at Appendix 2, which is

3    also on Page 129 of the PDF and Bates stamp 036953.

4         Mr. Hill, is this wage determination under the Service

5    Contract Act revised on 7-24-2014?

6    A   This is a typical wage schedule that the Department of

7    Labor publishes.  This is for Pierce County, Washington,

8    among other counties.

9    Q   Pierce County is significant because that's the county

10   that the Northwest Detention Center is in, correct?

11   A   Yes, that is correct.

12   Q   At the beginning of this contract in 2015, GEO and ICE

13   incorporated this as the minimum wages that the GEO staff

14   would be paid, which are basically the prevailing wages; is

15   that correct?

16   A   I believe the Department of Labor does a wage survey of

17   the area to determine wages and then publishes their

18   schedule, and then this would be incorporated into the

19   contract to match up to those occupation codes with our job

20   titles, and that would be the wage that ICE would be

21   reimbursing us and that would be the wage we would be paying

22   our staff.

23   Q   If you take a look -- to illustrate your point, let's take

24   a look at the next page, 130.  Are these the established

25   federal contract rates for employees hired to do things like

1    food preparation, cooks and dishwashers, are those the

2    prevailing wages in the region for that period?

3    A    For those occupational codes, that is included in the wage

4    schedule.

5    Q    In the general services area, is the prevailing wage in

6    the community for a janitor "1150," is the prevailing wage in

7    the community 15.32?

8    A    That's what it is listed as on the schedule.

9    Q    Would you agree that this is basically the floor that GEO

10   has agreed to pay its GEO staff?  They agree to pay at least

11   the federal contracting prevailing wages for those jobs?

12   A    Yes, that's a requirement to pay at a minimum the rates

13   established by the Department of Labor.

14   Q    If GEO decided to, it could make a business decision to

15   pay the staff it hires from the community above the federal

16   wage determination rate; isn't that correct?

17   A    Yes, GEO could make a decision to pay a classification of

18   worker higher than this rate, although it wouldn't be

19   reimbursed by ICE.

20   Q    It is true that if that happens, you would just have to

21   eat those extra wage costs as a reduction in its profits; is

22   that right?

23   A    Yes, if we were to pay above the schedule and that's above

24   what we priced, then that difference would reduce our

25   operating margin on the contract.

1   Q    I think you maybe spoke to this before, but I want to make

2   sure the jury understands.  The Department of Labor updates

3   these schedules on an annual or on a very regular basis; is

4   that right?

5   A    I believe they typically update these schedules twice a

6   year.

7   Q    And when there is an update, the contract becomes modified

8   so that GEO would then pay the new rates for the GEO staff in

9   accordance with the current wage determination rates; is that

10  right?

11  A    Typically, annually on the contract anniversary date, ICE

12  will send a contract modification to incorporate the then

13  most current wage schedule.  So it is not with every update,

14  it is with the current wage schedule at the contract

15  anniversary date where ICE would incorporate a new wage

16  schedule into the contract.

17  Q    Because GEO has agreed to follow that, if the wages for

18  janitors, for example, goes up, GEO would basically give them

19  a raise, they would incorporate that into their personnel

20  human resources materials and pay them more, right?

21  A    So if the wage schedule increases rates, GEO passes that

22  increase on to its employees.  And because it has been

23  incorporated through a contract modification, GEO can request

24  an equitable adjustment from the government to be reimbursed

25  for the change in rates.

1    Q    Then ICE would reimburse you; is that right?

2    A    ICE would adjust the per diem rates to cover the cost, the

3    additional costs from the incorporation of the new wage

4    schedule.

5    Q    Now let's talk about detainee workers specifically.  In

6    addition to the employees hired from the community, GEO also

7    has detainees who work at the Northwest Detention Center as

8    part of the voluntary work program; is that right?

9    A    GEO, as part of the contract with ICE, has a voluntary

10   work program established at the facility.

11   Q    In that program, GEO pays the detainee workers a dollar a

12   day by putting the payment into the detainees' books for the

13   day that they work in the voluntary work program; is that

14   right?

15   A    Yes, for the detail that the detainee works, you know,

16   through the process, the business office would enter a dollar

17   onto a trust account for that detainee who participated.

18   Q    And then under the 2009 and 2015 contracts, GEO would seek

19   reimbursement from ICE through monthly invoices for the wages

20   it paid to the detainees; is that true?

21   A    Yes.  There is a separate CLIN in the contract for the

22   voluntary work program where ICE will reimburse GEO the

23   actual cost of a dollar a day for the detainees

24   participating.

25   Q    That is CLIN 3; is that true?

1    A    I believe so.

2    Q    I would like you to take a look at Exhibit 269.

3    A    Okay.

4    Q    Is that a spreadsheet of the monthly volunteer work

5    payment reimbursements from ICE to GEO from October 2009 to

6    through September of 2019?

7    A    That's what it appears to be.  There is not a header.

8    That is what it appears to be to me.

9    Q    Does this appear to be a true and accurate representation

10   of the reimbursements from ICE to GEO for that period?

11   A    Just based on the normal review, the numbers seem

12   consistent with what the program would have been billed back

13   to the client at.

14          MS. BRENNEKE:  I offer Exhibit 269 for admission.

15          MS. SCHEFFEY:  I object that he didn't recognize the

16   document.  He just described what it appeared to be.  He

17   didn't say he made it or he knew who made it.

18          MS. BRENNEKE:  Your Honor --

19          THE COURT:  Just a minute.  Whoever put these exhibit

20   books together must have got them at the Cheap Charlie's

21   Office Supply.  They don't stay together very well.

22          MS. BRENNEKE:  That's too bad, Your Honor.  Sorry

23   about that.

24          THE COURT:  I think the exhibit has been sufficiently

25   identified and may be admitted.

BY MS. BRENNEKE:

Q   Why don't we publish that to the jury.  On the left, we see the months and across the top we see the years; is that correct, Mr. Hill?

A   Yes.

Q   For each month throughout the period that this covers, the dollar amounts reflect the reimbursements from ICE to GEO for detainee wages; is that right?

     Can we blow that up?  It is hard to see.  That's better.  Thank you so much.

A   Yes, that appears to be the amount billed for the voluntary work program.

Q   So for the months it reflects, every one of these dollars also represents payment by GEO of a dollar per day of work by a detainee worker; is that right?

A   Should reflect a dollar per detail worked.

Q   And would you agree this shows that detainee work and payments for that work was consistent over time as reported in this spreadsheet?

A   Yeah, they look fairly consistent.  You have a couple months slightly higher and slightly lower, but they seem to be relatively consistent over time.

Q   The reason you can identify that each of these dollars represents a shift of detainee work is because GEO has consistently paid a dollar a day for work in the Northwest

1  Detention Center to detainee workers from 2009 to present,
2  correct?
3  A   Yes, that's what the program requires and our contract
4  requires, a dollar per detail.
5  Q   Let's talk about that.  So you are aware of circumstances
6  in which GEO actually has paid detainee workers more than a
7  dollar a day for their work at the Northwest Detention
8  Center; isn't that true?
9  A   Yes, I was aware of three individual instances where there
10  might have been more than a dollar a day paid.
11  Q   Okay.  What were those instances, Mr. Hill?
12  A   In one instance, I believe the facility had been
13  quarantined for a chickenpox outbreak, and to get the one
14  dorm that was available to work in the kitchen who were
15  medically cleared, the facility offered to pay five dollars a
16  day.  The second time was a barbershop employee -- sorry,
17  barbershop detainee who worked sporadically was allowed to
18  pick up another job detail in a separate location, and at
19  times they overlapped and so they received two dollars a day,
20  one for each detail.
21      And then the final one, I believe, related to laundry
22  workers who were folding clothes in the female housing unit
23  who were allowed to participate in another work detail to
24  leave the housing unit after hours.  Each of those were
25  discussed with ICE ahead of time and lasted for various

1    periods, but relatively short periods.

2    Q   In addition to those times when detainees were asked to

3    work more than one shift a day, you are also aware that there

4    have been temporary situations where detainee workers were

5    not available to work, like in the chickenpox situation or

6    during a work stoppage; is that right?

7    A   Yes, it's a volunteer program so there's times when

8    detainees choose not to participate, do not show up for their

9    detail.

10   Q   During times when there is a substantial reduction of

11   detainee workers, GEO would adjust its staffing, deploy

12   additional staff and potentially increase overtime of

13   existing staff to complete the work that detainees would have

14   otherwise performed; is that right?

15   A   Yes, management at the facility would either redeploy

16   staff to areas that would need to function, whether it is the

17   kitchen or laundry, so you could do that by redeploying

18   staff, using part-time staff, using overtime, because at the

19   end of the day, regardless of whether there is the voluntary

20   work program and there is participants in it, the facility

21   has to continue to function.

22   Q   From the financial perspective, if GEO incurs additional

23   labor and overtime expenses to make up the work that is not

24   done through the voluntary work program, that reduces the

25   operating margin and makes a negative impact on GEO's bottom

1  line; isn't that true?

2  A   If the functions couldn't be done through a redeployment

3  of staff assigned to the facility, if additional hours or

4  overtime needed to be worked, it would have a small impact on

5  the overall operating margin.

6  Q   You are not aware of any time that GEO has paid detainee

7  workers who work at the Northwest Detention Center the

8  minimum wage; is that correct?

9  A   No.  From my recollection, GEO has never paid a voluntary

10 work program participant a minimum wage, the State of

11 Washington minimum wage.

12 Q   I have an accounting question then for you.  If GEO made

13 the business decision to pay detainee workers Washington

14 minimum wage, under GEO's contract with ICE, GEO would still

15 be reimbursed only a dollar a day; is that right?

16 A   If GEO were to pay above the dollar per detail and ICE

17 stated in the contract the amounts to be reimbursed is the

18 actual cost of a dollar per detail, GEO would not be

19 reimbursed by ICE under the current contract.

20 Q   So in those situations, GEO would have to eat those

21 additional wage costs as a reduction of its profit; is that

22 true?

23 A   I am not sure why GEO would make the business decision to

24 pay the wages for people who aren't employees, but if we

25 decided to increase an expense that the client wouldn't

1    reimburse, that would reduce our operating margin.

2    Q   In fact, GEO has done just that in the past, it's chosen

3    to use detainee workers regardless of whether or not it was

4    reimbursed by ICE; isn't that true?

5    A   For those three periods, I believe only the one situation

6    with the kitchen workers weren't reimbursed by ICE, but I

7    would have to review the actual billing.  I don't have a

8    solid foundation of knowledge to talk about those other two

9    situations where the double details on a day were performed.

10   Q   I would like you to take a look at Exhibit 262, please.

11   Are you familiar with the expanded financial summary for the

12   Northwest Detention Center?

13   A   I am.

14   Q   Did you prepare the summary?

15   A   No, I did not.

16   Q   Are you familiar with the contents?

17   A   Yes.

18   Q   From your knowledge, is this a true and accurate

19   representation of the finance of the Northwest Detention

20   Center from 2005 to 2019?

21   A   Yes, this looks fair and accurate.

22          MS. BRENNEKE:  I offer Exhibit 262 for admission.

23          MS. SCHEFFEY:  No objection.

24          THE COURT:  It may be admitted.

25                  (Exhibit 262 was admitted.)

BY MS. BRENNEKE:

Q   Now, Mr. Hill, this summary is similar to Exhibit 253 that you testified to before, but includes a lot more detail on the costs and revenues of the facility; is that correct?

A   Yes, this looks like a more detailed, expanded view of that.

Q   In fact, it also includes a line for detainee worker wages in two locations; isn't that true?

A   Yes.

Q   The first location that detainee wages is listed is under "revenue," do you see that?  Can we blow up the revenue, maybe blow up the whole revenue section so everyone can see it?  Thank you.

        Let's go back.  The first place detainee wages shows up is under revenue.  It says, "58013 billable inmate payroll;" is that correct?

A   Yes, below "earned revenue," underneath "pass-through revenue," it lists the account 58013 to represent the amount reimbursed by ICE.

Q   That's what I was wondering.  So that shows the reimbursement that GEO got from ICE for wages it paid detainee labor in each of those years; is that right?

A   Yes, that's what that would be.

Q   And that shows reimbursements from 2010 through 2019; is that true?

1    A    Yes, ma'am.

2    Q    Now, there is another section, the lower section that

3    relates to operating costs.  Let's try to blow that one up

4    now.  Here, there is another section for detainee payroll; is

5    that right?

6    A    Yes, ma'am.

7    Q    And in this section, detainee payroll is treated as an

8    expense of the Northwest Detention Center; is that right?

9    A    Yes, that's listed as operating expense.

10   Q    That's because for those periods of time, GEO didn't bill

11   or get reimbursed from ICE for detainee payroll that it paid;

12   is that correct?

13   A    That would be what I would expect.  The reason why there

14   is an expense there is that that represents an amount that

15   was not reimbursed.

16   Q    So from 2006 through 2009, those expenses were $50,983 for

17   2006, $61,525, $61,709, $59,227; is that right?

18   A    Yes.

19   Q    That reflects the number of detainee work shifts that GEO

20   asked detainees to work in the Northwest Detention Center; is

21   that true?

22   A    That would be a dollar per detail in accordance with the

23   program.

24   Q    And then in 2010, 2011 and 2018, looks like there was a

25   little of both.  There was earned income during those years

1  where GEO did get reimbursed, but there were some extra

2  expenses that GEO chose to incur over the contract minimum

3  that were treated as operational costs or expenses; is that

4  true?

5  A   There were the reimbursed costs, and then there were some

6  small amounts that reside in detainee payroll as an expense.

7  You know, from 2010, 6,242 hours; 2011,1,262.  In 2012, there

8  was a credit of $300, which might have been a timing issue

9  for December 2011.  Looks like in 2018, $928.

10 Q   So for each of those years, GEO was paying a dollar a day

11 and getting reimbursed a dollar a day for its wages, it chose

12 to incur additional expenses maybe for additional workers,

13 maybe because it was paying more than a dollar; is that

14 right?

15 A   I couldn't speak to the exact reason why it wasn't

16 reimbursed.  It could have been an accounting issue where

17 items were received after they completed the bill, and it was

18 a small amount that GEO did not go back to ICE to adjust the

19 bill for reimbursement.  It might be that there were

20 situations that we just discussed that are included in those

21 numbers.  I don't create the bill, so I couldn't speak to

22 what exactly those numbers represent in each instance.

23 Q   Okay.  But as an accounting matter, if GEO were to make

24 the decision to pay detainee workers minimum wage, it would

25 be shown on your accounting summaries like detainee payroll

1  as an operational expense; is that correct?

2  A   If GEO were to pay more than the reimbursed amount, we

3  would have to account for it as an expense.

4  Q   All right.  And regardless of the form of the accounting,

5  what is clear from this exhibit is that GEO has paid detainee

6  wages from 2006 through 2019 for their work at the Northwest

7  Detention Center and carefully accounted for those wages in

8  its financial accounting; isn't that true?

9  A   We record the pass-through expense and pass-through

10  revenue and, yes, we follow GAAP and record our expenses as

11  appropriate.

12       MS. BRENNEKE:  Thank you.  I have no further

13  questions.

14                    CROSS-EXAMINATION

15  BY MS. SCHEFFEY:

16  Q   Good morning, Mr. Hill, how are you today?

17  A   Good morning.  I am doing okay.

18  Q   That's good.  So there were a lot of numbers right there.

19  I want to back up.  Can you tell me how the voluntary work

20  program is treated for purposes of GEO's financial

21  statements?

22  A   We see it as a pass-through.  We record the expense as a

23  pass-through expense and the revenue is a pass-through

24  revenue, which is below the "earned revenue" line.  So those

25  items should offset, and there should be no impact to the

1  financial performance of the facility.

2  Q    Can you explain to me simply what a pass-through is?

3  A    A pass-through is a direct reimbursement.  So if GEO

4  spends a set amount on something that the client has agreed

5  to pay for, as opposed to having it included in our earned

6  revenue or in our expenses, it is a separate set of accounts

7  that should balance to zero that should show no impact to our

8  financial statements.  There is no markup on the revenue --

9  no markup on the expense to get higher revenue, so it is not

10 producing any margin for the company or the facility.

11 Q    Does GEO profit from the voluntary work program?

12        MS. BRENNEKE:  Objection to the form.

13        THE COURT:  I think he may answer.

14        THE WITNESS:  No.  In a pass-through situation, there

15 is no margin built in.  It is just a one-for-one

16 reimbursement.

17 BY MS. SCHEFFEY:

18 Q    Does GEO anticipate that its staff may work overtime when

19 pricing a contract?

20 A    I believe there is some overtime built into our pricings,

21 and then in our budgets, we always include overtime because

22 we know there will be situations that arise that require

23 either additional manpower or overtime to be used to

24 accomplish the missions of the facility.

25 Q    Does GEO reinvest any of its profits?

1    A    Yes, the company reinvests in its employees by additional

2    training above contract requirements.  We invest in our

3    facilities, whether it is a physical plant investment.  We

4    have added soccer fields to most of our federal facilities

5    that we own.  We invest locally in the community through

6    contributions and scholarships.  There is a lot of things

7    that GEO does with the margins we make at the facilities

8    before we report our actual profit to Wall Street.

9    Q    Has GEO added a soccer field to the Northwest ICE

10   Processing Center?

11   A    Yes, I believe they were included and have a turf area for

12   the recreation now that they didn't previously have.

13   Q    Was that required by the contract?

14   A    No, I believe that was not required by the contract.

15   Q    When a government owns and operates a facility, can it

16   reinvest its profits in the same way?

17           MS. BRENNEKE:  Objection to the form.  Foundation.

18           THE COURT:  Sustained.

19   BY MS. SCHEFFEY:

20   Q    Does GEO need to share its reinvestment budget with

21   schools and roads?

22           MS. BRENNEKE:  Objection to the form.

23           THE COURT:  The objection is sustained.

24   BY MS. SCHEFFEY:

25   Q    Do you know anything about government-owned facilities?

1    A    We operate a few facilities that the government owns.

2    Q    Do you know about how the government invests in those

3    facilities?

4        MS. BRENNEKE:  Object to the form.  Overly broad.  No

5    foundation for Washington.

6        THE COURT:  Sustained.

7    BY MS. SCHEFFEY:

8    Q    Is GEO a for-profit company?

9    A    Yes, we are a for-profit publicly traded company.

10   Q    Did ICE know that when it contracted with them?

11   A    Yes.  In our response for their request for proposal, the

12   company's financials and, you know, history of the company is

13   always included.

14   Q    What is your understanding of why ICE contracted with GEO

15   rather than just providing the services itself?

16       MS. BRENNEKE:  Object to the form.  Foundation.

17       MS. SCHEFFEY:  I asked for his understanding,

18   Your Honor.

19       THE COURT:  The objection is sustained.  You are

20   asking for an opinion about ICE's intent.  Ask ICE, if you

21   want.

22   BY MS. SCHEFFEY:

23   Q    What is your understanding of why government contractors

24   exist in the detention space?

25       MS. BRENNEKE:  Object to the form.

1     MS. SCHEFFEY:  It is the core of their business.

2  They exist.  They should know why they are in the market,

3  Your Honor.

4     THE COURT:  The objection is sustained.

5  BY MS. SCHEFFEY:

6  Q   Do you remember earlier we talked about how there is about

7  $50 million in revenue each year through the GEO-ICE

8  contract, right?

9  A   Yes, that's a rough average number.

10  Q   About how many people are held each year at the Northwest

11  ICE Processing Center?

12     MS. BRENNEKE:  I was going to object as to vague as

13  to time frame because that has shifted.

14     THE COURT:  I think he may answer.

15     THE WITNESS:  I don't have the exact numbers in front

16  of me.  But since the facility expanded and since I have been

17  in my position in 2010, we have generally been above the

18  minimum guarantee, probably many years averaging between

19  1,300 and 1,350 detainees, a few times being above 1,450,

20  sometimes being below the minimum guarantee, especially

21  during the pandemic last year and currently.

22  BY MS. SCHEFFEY:

23  Q   Do you know how many detainees that would be on an

24  annualized basis, how many detainees are in and out?

25     MS. BRENNEKE:  Same objection.

1    THE COURT:  I don't understand your question.

2  Sustained.

3  BY MS. SCHEFFEY:

4  Q    Let's pull up Exhibit 36.  We can go to the fifth page of

5  the document, which is GEO-State 029839.  If we can blow up

6  the part that says how many processed admissions and

7  releases.  Do you see this number on your screen, Mr. Hill?

8  A    Yes.

9  Q    So if the Northwest ICE Processing Center -- I'll

10  rephrase.  How many releases does it say there were from the

11  Northwest ICE Processing Center?

12  A    7,267 releases.

13  Q    Does that number correlate with the number of people who

14  would have been released from the facility?

15  A    Yes, this is a report for 2014, that states that during

16  that year there were 7,267 individuals released from the

17  facility.

18  Q    So I might be putting you on the spot here with math.  We

19  will see if it is a mistake, but if you take $50 million and

20  divide it by 7,000, what is the answer?

21  A    Wow.

22    MS. BRENNEKE:  Object, relevance.

23    THE COURT:  Sustained.

24    MS. SCHEFFEY:  I am trying to lay the foundation.

25    THE COURT:  Anybody can use the computer to figure

1    out those things.  It is not fair to ask the witness to do it

2    without that kind of assistance unless Mr. Hill is a

3    mathematical genius, and he may be.

4    BY MS. SCHEFFEY:

5    Q   Do you have any sense of how much you -- you can take the

6    exhibit down.  How much money per detainee that $50 million

7    works out to?

8         MS. BRENNEKE:  Object to the form.  Vague.

9         THE COURT:  No, I think he may answer.

10         THE WITNESS:  Just a rough calculation, I expect it

11   to be probably 70 to $75 per detainee per day.  That would

12   be, I believe, 20 -- sorry, my math is not that good right

13   now.

14   BY MS. SCHEFFEY:

15   Q   I'm sorry, Mr. Hill.  That's fine.  You said about $75 per

16   day per detainee; is that right?

17   A   I think that's roughly what it would come out to.

18   Q   Do you know if that number includes a guaranteed minimum

19   wage job?

20         MS. BRENNEKE:  Object to the form.

21         THE COURT:  I'm sorry.  I don't understand the

22   question.  Rephrase.

23   BY MS. SCHEFFEY:

24   Q   So you spoke earlier about a bed-day rate; is that

25   correct?

```
 1   A    Yes.

 2   Q    The combination of the bed-day rates, that's how you get

 3   to $50 million per year; is that correct?

 4   A    That is correct.

 5   Q    Does the bed-day rate contemplate a minimum wage job for

 6   each detainee?

 7            MS. BRENNEKE:  Object to the form.

 8            THE COURT:  I think he may answer.

 9            THE WITNESS:  No, that wouldn't have been

10   contemplated in the pricing and therefore would not be

11   included in the bed-day rates.

12   BY MS. SCHEFFEY:

13   Q    If you added a minimum wage job to the pricing, what would

14   happen?  Would it go up or down?

15   A    Just a job in general?  An additional employee?

16   Q    If you added as an option for detainees a guaranteed

17   minimum wage job, would the bed-day rate go up or down?

18            MS. BRENNEKE:  Objection, form.

19            THE COURT:  Well, the objection is sustained.

20   BY MS. SCHEFFEY:

21   Q    If detainees were paid minimum wage, would the price of

22   the contract go up or down?

23            MS. BRENNEKE:  Objection, speculation.

24            MS. SCHEFFEY:  Your Honor, he's laid the foundation

25   on direct that he prices these contracts and reviews them.
```

1    THE COURT:  The objection is overruled.  The witness

2    may answer.

3    THE WITNESS:  That would increase the cost to GEO and

4    the cost to the client.  We pass that on to ICE in a pricing,

5    so the cost for the bed-day rate would increase.

6    BY MS. SCHEFFEY:

7    Q    Do you know where ICE gets its funding from?

8    A    Federal government.

9    Q    Do you know where the federal government gets its funding

10   from?

11   A    Taxpayers.

12   Q    Do you have knowledge of whether there are any voluntary

13   work programs across the country that pay minimum wage to

14   detainees?

15   MS. BRENNEKE:  Object to the form.  Foundation.

16   THE COURT:  The objection is sustained.

17   BY MS. SCHEFFEY:

18   Q    As part of your job, do you review other ICE contracts?

19   A    Yes.

20   THE COURT:  The grounds for my ruling were it is not

21   relevant.

22   BY MS. SCHEFFEY:

23   Q    Have you ever been asked to price a contract for the

24   Northwest ICE Processing Center where detainees would be paid

25   minimum wages?

1  A    No, I have not.

2  Q    Have you ever reviewed a request for proposal from the

3  government that asks GEO to contemplate detainees would

4  receive minimum wages?

5            MS. BRENNEKE:  Object to the form.

6            THE COURT:  Well, the question technically is leading

7  in form.

8  BY MS. SCHEFFEY:

9  Q    Have you ever reviewed a request for proposal for the

10  Northwest ICE Processing Center?

11  A    Yes, I have.

12  Q    What was the rate that the request for proposal asked you

13  to contemplate for minimum wages -- or for detainees in the

14  voluntary work program?

15            MS. BRENNEKE:  Object to the form, vague as to rate,

16  difference between payment and reimbursement.

17            THE COURT:  The objection is sustained.

18  BY MS. SCHEFFEY:

19  Q    You talked a little bit about net margin in your direct

20  testimony; is that correct?

21  A    Yes.

22  Q    Does the net margin account for GEO's legal fees?

23  A    I don't believe that is allowable under FAR, so it would

24  not be included in the indirect allocation.

25  Q    Does the net margin account for taxes?

1    A    No, I believe taxes are taken after the company's

2    consolidated results are looked at, and then the tax is

3    calculated.  I don't believe it has ever been calculated at

4    the facility level.

5    Q    Is there a financial incentive to replace a GEO employee

6    with ten voluntary work program detainees?

7    A    I don't believe there is any incentive.  We have minimum

8    requirements for staffing to be in compliance with our

9    contract.  GEO employees were able to manage, and they are

10    much more productive.  I don't think we have ever, you know,

11    looked at an analysis, at least to my knowledge, that, you

12    know, what could we replace a GEO employee for in terms of

13    the work program.

14    Q    If GEO added another staff member in the kitchen, would it

15    lose money?

16    A    If GEO got that staff member incorporated into the

17    contract, no, it would not lose money because the margin

18    would be placed on top of their wages.  If it was outside of

19    a contract mod, it would just become part of the operational

20    cost.

21    Q    What is the margin GEO gets on the wages of an employee?

22    A    GEO priced the Northwest contract with the expected ten

23    percent margin.

24    Q    So break that down for me.  I don't think I am fully

25    understanding.  A ten percent margin goes on top of what?

1    A    So during a pricing, we billed out all the expenses GEO

2    expects to incur on the contract to include our labor costs,

3    the operational costs.  And so if during a pricing or

4    increase in staffing levels, that would increase our cost

5    base.  And so when you add the ten percent margin, you are at

6    a higher cost basis so your margin would increase with

7    additional staff.

8              MS. SCHEFFEY:  I would like to offer Exhibit 205,

9    which is stipulated, Your Honor.

10             MS. BRENNEKE:  Objection, Your Honor.  There is no

11   foundation.  Not relevant.

12             MS. SCHEFFEY:  Your Honor, it has been stipulated.

13   It is relevant because you told me if you wanted a certain

14   opinion in, that ICE would be the one to give it.

15             THE COURT:  Well, the objection is well taken as to

16   foundation.

17             MS. BRENNEKE:  It is also hearsay.

18             THE COURT:  Yes, it appears to be.

19             MS. SCHEFFEY:  Your Honor, it was stipulated.

20   BY MS. SCHEFFEY:

21   Q    Mr. Hill --

22             THE COURT:  Just a minute.  You mentioned a

23   stipulation.  I don't know, Ms. Brenneke, is this some sort

24   of an agreed exhibit?

25             MS. BRENNEKE:  Your Honor, in the pretrial process,

1  there was a stipulation to admissibility.  But this witness

2  has not laid a foundation and it is not relevant to the

3  matters at issue here, and it still constitutes hearsay.

4          THE COURT:  Well, at this point, even if it is

5  stipulated, it is not sufficiently identified to justify

6  admission now.

7          MS. SCHEFFEY:  Okay.

8  BY MS. SCHEFFEY:

9  Q   Mr. Hill, can you have someone get you access to Exhibit

10  205, whoever is at that office with you?

11  A   Yes.  Do I step away?

12  Q   I don't think there is anyone in the room with him.  And

13  he is in Los Angeles.  Is it okay if he just asks for help

14  outside the door?

15          THE COURT:  Yes.  It is time we took our morning

16  break.  We will take ten minutes or so.  You may be excused,

17  folks.

18                          (Recessed.)

19    (The following occurred outside the presence of the jury.)

20          THE COURT:  Tyler, we are ready for the jury.

21      (The following occurred in the presence of the jury.)

22          THE COURT:  I think we are ready.  You may continue,

23  Ms. Scheffey.

24  BY MS. SCHEFFEY:

25  Q   Mr. Hill, I think you testified on direct that you review

1    the pricing for contracts; isn't that right?

2    A    Yes, for the pricings for facilities in contracts in my

3    region.

4    Q    Why do you include a voluntary work program in the

5    contract?

6    A    It is required on ICE contracts due to the

7    Performance-Based National Standards, and it's just a

8    contract requirement at all ICE facilities.

9    Q    Why on the financial side do you contemplate a dollar a

10   day payment?

11   A    That's what has always been the accepted practice at our

12   ICE facilities.  That's what Performance-Based National

13   Detentions Standards require.  My understanding of the PBNDS

14   is that program is required and that detainees who

15   participate in that program are paid at a dollar per detail.

16   Q    Do you also review the staffing plan?

17   A    Yes, I do.

18   Q    What do you review them for?

19   A    When I review staffing plans, it is for operational

20   effectiveness, will there be enough employees to fulfill the

21   mission of the facility and in each department.  I am also

22   looking for classification of employee based on the wage

23   determination schedules to make sure that the positions are

24   priced correctly with the correct wages and also looking at

25   just the overall staffing plan that includes everything that

1  we will need to operate a facility.

2  Q   How do you know how many people you need to operate a

3  facility?

4  A   Company knowledge and experience.  I have worked on a lot

5  of contracts and overseen a lot of contracts and so it is,

6  you know, just looking at the size of the facility and the

7  expected operational needs of the facility to say, you know,

8  we have operated in a similar facility in a similar manner

9  with this number of employees.

10 Q   Do you ever suggest that the staffing plan include more

11 employees?

12 A   Yes, I have made recommendations to increase employees or

13 posts at different contracts at different times.

14 Q   If that cuts into your profits, why do you do that?

15 A   During a pricing exercise, you know, you are looking at

16 the opportunity to go to the client with what your expected

17 staffing plan is, so it is going to be incorporated into your

18 expenses and into your overall price.  So that's the

19 opportunity to take a review of facility operations, if it is

20 a facility that's that been in operation, or a review of

21 other locations that are similar in nature to develop that

22 staffing plan and develop it during the pricing period so

23 that it is included in our proposal.

24 Q   In creating a staffing plan, have you ever contemplated a

25 minimum number of detainees?

1    A    Minimum number of detainees in the facility?

2    Q    How about a minimum number of detainees in the voluntary

3    work program?

4    A    With the stipulation in the contract that there is a

5    voluntary work program, I think we, in general, expect there

6    to be some participation, but there is never a guarantee of

7    the number of participants, and so I think when we price we

8    have to price to a point that should there be no

9    participation, while we might need to redeploy staff or

10    utilize overtime, we'll be able to carry out the mission of

11    the facility.  So I don't believe, at least personally, I

12    have ever contemplated a minimum number of participants in

13    any work program.

14         MS. SCHEFFEY:  Thank you.  No further questions.

15         THE COURT:  Ms. Brenneke.

16         MS. BRENNEKE:  Thank you, Your Honor.

17                   REDIRECT EXAMINATION

18    BY MS. BRENNEKE:

19    Q    Mr. Hill, when you indicated that -- earlier that the

20    contract could be revised with ICE, that would require

21    contract negotiations and agreement by ICE; is that correct?

22    A    The existing contract can be modified through contract

23    modifications.

24    Q    So, for example, if you added more GEO staff and you

25    wanted to get reimbursed for the cost of that staff, you

1   could go to ICE and ask for a contract modification; is that

2   right?

3   A    GEO could ask for a contract modification.  ICE would be

4   required to initiate the contract modification if they agreed

5   with our request.

6   Q    But unless they agreed, the additional cost of the staff

7   would go against GEO's bottom line, correct?

8   A    If GEO added staff and ICE had not agreed and incorporated

9   those staff into a contract modification to update the

10  staffing plan, then, yes, that expense would be incurred at

11  GEO's expense.

12  Q    So really the existing contract and what GEO has agreed to

13  do in that contract is your baseline, and anything you pay in

14  addition to that is your burden unless you get ICE to agree

15  to change their contract, correct?

16          MS. SCHEFFEY:  Objection, compound.

17          THE COURT:  Overruled.

18          THE WITNESS:  Can you repeat the question?  I'm

19  sorry.

20  BY MS. BRENNEKE:

21  Q    So you have an existing contract.  GEO's agreed to all the

22  terms of that contract; isn't that right?

23  A    Yes, so under the existing contract, the rate that ICE

24  pays GEO is an all-inclusive rate, and so anything that ICE

25  does not agree to modify, GEO, at its own discretion,

1    changes, would increase costs and would be an impact to GEO.

2    Q   You testified that GEO always has paid detainee workers a

3    dollar a day; is that right?

4    A   No, I think I mentioned the three times I am aware they

5    weren't paid a dollar a day.

6    Q   Right.  And so when GEO has paid more than a dollar a day,

7    ICE still reimbursed only a dollar a day, correct?

8    A   I believe so, but I don't have direct knowledge.

9    Q   We looked at the expanded spreadsheet which showed times

10   when all of the detainee wages were the cost of GEO because

11   they weren't reimbursed by ICE; is that right?

12   A   Yes, we did that earlier.

13   Q   Because GEO has agreed to a reimbursement rate of a dollar

14   a day; is that right?

15   A   We have -- the contract states that it is -- ICE's CLIN

16   says it is an actual reimbursement of the cost of a dollar a

17   day.

18   Q   That's because GEO generally pays a dollar a day, right?

19   A   GEO generally pays a dollar a day because that's the

20   expectation of ICE.

21   Q   Were GEO to follow the Washington minimum wage and pay

22   more than a dollar a day, GEO would still be reimbursed by

23   ICE at only a dollar a day, correct?

24   A   Unless ICE agreed to modify the contract, that's my

25   understanding.  ICE is going to only reimburse at a dollar a

1    day.

2    Q    I would like to pull up two exhibits that we just talked

3    to.  One is Exhibit 253.  The other is Exhibit 269.  I am

4    hoping you can pull those up side by side.  I want to remind

5    you, Exhibit 253 -- can we blow those up if they are side by

6    side?  I am asking for miracles by Zoom, so let's see.  We

7    can do it one at a time, if that would make it easier.  Let's

8    start with Exhibit 269.  I just want to have you look at this

9    again, Mr. Kimble -- Mr. Hill, sorry.  This is -- these are

10   the facts about GEO's employment of detainee workers

11   consistently every month for every year and what it was

12   reimbursed from ICE for that payment of wages; is that

13   correct?

14   A    This is the reimbursement of the voluntary work program by

15   year and by month.

16   Q    And we have established that GEO consistently employed

17   detainee workers as part of its operations during that

18   period; is that right?

19          MS. SCHEFFEY:  Objection, form.

20          THE COURT:  He may answer.

21          THE WITNESS:  GEO utilized the detainee worker

22   program from the onset of the contract.

23   BY MS. BRENNEKE:

24   Q    And utilized detainee work in its operation from the onset

25   of the contract to the present; is that right?

1  A    We utilized and maintained the voluntary work program in

2  accordance with the contract since the contract's existence.

3  It is a requirement by ICE to have the program while we

4  operate under the contract with ICE.

5  Q    Mr. Hill, it is true that you had detainees work each of

6  the days and each of the shifts listed on Exhibit 269; isn't

7  that true?

8  A    We would have had participants in the voluntary work

9  program being paid for a detail during that time, which is

10  what each of those amounts represent.

11  Q    Let's look at Exhibit 253 again, please.  Can you blow

12  that up, 253?

13        Mr. Hill, you have also testified that throughout the

14  contract, the Northwest Detention Center has had handsome

15  profits; isn't that correct?

16        MS. SCHEFFEY:  Objection, argumentative.  Misstates

17  his testimony.

18        THE COURT:  Reask that without using the word

19  "handsome."

20  BY MS. BRENNEKE:

21  Q    Mr. Hill, you also testified that the Northwest Detention

22  Center is one of the highest profit-earning facilities in

23  GEO's facilities that it owns and operates; isn't that true?

24  A    Yes, Northwest is one of the larger facilities and larger

25  contracts and has, you know, probably better than most in

1  terms of its margin.

2  Q   For each of the years it has been in operation and

3  detainees worked, the overall operations have resulted in

4  substantial profits to GEO, correct?

5  A   The facility has generated a positive net margin based on

6  the contract since its inception.

7       MS. BRENNEKE:  No further questions from me.

8       THE COURT:  Anything further of this witness?

9       MR. BERGER:  Your Honor, I have a few follow-up

10  questions.

11       THE COURT:  Mr. Berger, go ahead.

12            REDIRECT EXAMINATION

13  BY MR. BERGER:

14  Q   Good morning, Mr. Hill.  I am Adam Berger, one of the

15  attorneys representing the detainee workers in this case.

16  You were asked a few things by Ms. Scheffey on

17  cross-examination that I would like to follow up on.  One,

18  you were asked whether paying the detainees minimum wage

19  would result in an increase in the bed rate or the cost of

20  the contract.  Do you recall that?

21  A   Yes, sir.

22  Q   That is not necessarily the outcome, is it?

23  A   I am not sure I understand your question.

24  Q   Well, I think we just saw from 2015, the inception of the

25  contract through 2019, GEO made 18 to $20 million in

1    operating margin at the Northwest Detention Center each year,

2    right?

3    A    Gross margin, yes, sir.

4    Q    Yeah, it made 60 to 90 percent better than the net margin

5    contemplated by the contract, correct?

6    A    From the original pricing in general, I think we

7    established the net margin rate was 16 to 19 percent.

8    Q    Rather than the ten percent that was actually contemplated

9    in the pricing of the contract, correct?

10   A    Yes, the original pricing anticipated and expected a ten

11   percent return.

12   Q    It is possible that even if GEO had to pay minimum wage to

13   the detainee workers, there wouldn't be an increase in the

14   bed rate or the price of the contract, it would just get

15   GEO's profit down to that ten percent contemplated in the

16   original pricing, right?

17          MS. SCHEFFEY:  Objection, calls for speculation.

18          THE COURT:  He may answer.

19          THE WITNESS:  Well, if the client didn't incorporate

20   a change to the voluntary work program, and the voluntary

21   work program was still to be required and the detainees were

22   to be paid minimum wage, that would increase the expenses to

23   GEO, which at that point I don't know what the overall cost

24   of that change would be to speculate what that would do to

25   our current operating margin.

BY MR. BERGER:

Q    Fair enough.  I am not going to put you on the spot and make you do more math now.  There was one other thing I wanted to ask about.  You were asked about GEO's reinvestment in personnel and facilities and community.  Do you recall that?

A    Yes, sir.

Q    Now, GEO's primary business is owning and managing private prisons and detention facilities, correct?

A    Secure services, that's what we do.  We have our GEO care side that has halfway houses, in-prison programs, reentry services, electronic monitoring.  We have other lines of business.

Q    But GEO is structured as something called a real estate investment trust; is that correct?

A    Yes, currently structured as a real estate investment trust.

Q    That is because there are tax advantages to being structured as a real estate investment trust, correct?

A    Yes, my understanding is there is tax advantages, but there is also requirements to pay out dividends to shareholders.

Q    Okay.  REIT is a real estate investment trust, right?

A    Yes, that's the acronym I know.

Q    Well, REIT gets to deduct the dividends they pay to

1    shareholders from their pretax income, right?

2    A    I am not a tax expert or the company consolidated expert,

3    so I don't know how that structure works.  I just know in

4    lieu of -- because certain tax breaks, a certain percentage

5    has to be paid out to shareholders.

6    Q    Do you know whether that percentage of 90 percent of the

7    pretax earnings has to be paid out as dividends each year?

8    A    I don't personally deal with the payouts or tax

9    consequences, so just from my personal knowledge, I know it

10   is a rather large percentage.

11   Q    And that reduces GEO's taxable income, correct?

12   A    Again, that type of calculation would take part.  I am not

13   a regional and business and operation person.  That would be

14   handled at our corporate office by our tax people.

15   Q    Maybe one of the other witnesses we'll be hearing from can

16   speak to the tax advantages of being REIT.

17         I have nothing further.  Thank you.

18         MS. SCHEFFEY:  I have a few more on redirect.

19                    RECROSS-EXAMINATION

20   BY MS. SCHEFFEY:

21   Q    Mr. Hill, you were just asked about REIT.  Do you know

22   what that phrase means, REIT?

23   A    Real estate investment trust.

24   Q    So to operate a real estate investment trust, does GEO

25   have to own property?

1  A    I believe so, yes.

2  Q    Is one of those properties that GEO owns the Northwest ICE

3  Processing Center?

4  A    We have a controlling interest.  I think it was financed

5  by bonds that are still outstanding.  GEO controls the

6  property, from my understanding.

7  Q    Bonds that are outstanding, what do you mean by that?

8  A    To finance the project, GEO chose to sell bonds to

9  construct the facility and also again when the facility

10  expanded, and so it is a financing mechanism where we are

11  paying interest on the bond to bondholders and we have to pay

12  principal over time to pay off the bonds to the people who

13  bought them.

14  Q    Does GEO owe a debt on its property?

15  A    Yes.  Northwest, to my knowledge, there is still bonds

16  outstanding.  That is the facility use cost that was listed.

17  Q    Do you know the cost of building the facility?

18        MS. BRENNEKE:  Objection, this goes well beyond the

19  redirect.

20        THE COURT:  Yes.

21        MS. SCHEFFEY:  Your Honor, let me make my record.

22  There was discussion about the amount of profit --

23        THE COURT:  Wait a minute.  Wait a minute.  Talk a

24  little slower now.  What is it?

25        MS. SCHEFFEY:  There was significant discussion about

1   the amount of profit isolated from any outstanding debts that
2   were completely ignored.  I am just bringing up the second
3   half of the picture.
4          THE COURT:  The objection to the question you asked
5   is sustained.
6   BY MS. SCHEFFEY:
7   Q   What was the cost of building the facility?
8   A   I don't know the historical cost or cost of expansion.  I
9   am not the person to be able to speak to that.  I'm sorry.
10  Q   You talked a little bit about net margin and gross margin.
11  Do you remember that?
12  A   Yes.
13  Q   What is the difference between gross margin and net
14  margin?
15  A   So gross margin, in the way we calculate it, generally
16  reflects the costs associated with the facility that are
17  really in the ability of management to manage, with some
18  exceptions, depreciation cost and, you know, a few other
19  things which are relatively fixed.  Net margin is after
20  applying indirect costs and the facility use costs, in this
21  case the bond payments, which we would then say this is the
22  net margin for this particular facility.
23  Q   So does the gross margin have all expenses taken out of
24  it?
25  A   It has the facility level expenses, but not corporate and

1  overhead expenses taken out of it.

2  Q   When you are looking at profits, do you typically look at

3  gross or net margin?

4  A   I think as a company, we look at profit after all the

5  divisions and everything has been consolidated because it's

6  at that point where, you know, other expenses that aren't

7  included in FAR come out and you also have whatever taxes are

8  owed because we do have the REIT structure, but we have an

9  operating company, so there are still corporate taxes that

10 come out.  So profit is only really viewed at the corporate

11 level.  Whereas when we're looking at facility performance,

12 we generally look at the gross margin because we don't look

13 at net margin on a monthly basis and allocate costs out on a

14 monthly basis.

15         THE COURT:  Try and just answer the question,

16 Mr. Hill.  Don't explain your answer unless explanation is

17 asked for.

18     What is the next question, Ms. Scheffey?

19 BY MR. SCHEFFEY:

20 Q   A few minutes ago, you testified that the Northwest ICE

21 Processing Center has a higher profit margin than other

22 facilities across the country; is that correct?

23 A   Yes, it is one of the larger contracts and better

24 performing facilities.

25 Q   Are any of those other contracts you are comparing it to

1    ICE contracts?

2    A    Several of them are ICE contracts.

3    Q    Do those ICE contracts have a voluntary work program?

4            MS. BRENNEKE:  Objection to the form.  Foundation.

5            THE COURT:  You are beyond the relevant

6    recross-examination, counsel.

7            MS. SCHEFFEY:  Your Honor, I don't believe I am

8    because the implication is this one is more profitable

9    because they are not different and they are using detainee

10   labor, and that's what I am trying to get to.

11           THE COURT:  You can call the witness as your own

12   witness if you want to get into that.

13   BY MS. SCHEFFEY:

14   Q    Is the driving profit -- is the line item that drives

15   profit at this facility the voluntary work program?

16   A    No.

17           MS. SCHEFFEY:  Thank you.  No further questions.

18           MS. BRENNEKE:  Your Honor, I have just a couple.

19                   FURTHER REDIRECT EXAMINATION

20   BY MS. BRENNEKE:

21   Q    Mr. Hill, GEO and GEO's subsidiaries own the Northwest

22   Detention Center; is that correct?

23   A    We treat it as an owned facility, although I know there is

24   still bonds outstanding.  It is kind of like having a

25   mortgage.  An individual owns the house, but the bank

Hill - Recross

1    technically owns the house until the mortgage is paid off.

2    Q   Obviously, there is finances.  We can understand that.

3    GEO and GEO subsidiaries own the Northwest Detention Center,

4    correct?

5    A   I believe so.  I don't know the details or the

6    implications of the ownership structure.  In internal

7    documents, we view it as an owned facility.

8    Q   All financing costs that GEO pays are investments in GEO's

9    own property; isn't that true?

10   A   Specific to the Northwest.  If we are investing into that

11   property, it is being invested into a GEO-owned facility.

12          MS. BRENNEKE:  Thank you.  No further questions.

13          MR. BERGER:  One more question, Your Honor.  Not to

14   beat a dead horse.

15                   FURTHER REDIRECT EXAMINATION

16   BY MR. BERGER:

17   Q   The facility use cost, the finance costs are considered in

18   the net margin for the Northwest Detention Center, correct?

19   A   Yes.

20          MR. BERGER:  Thank you.

21          THE COURT:  Thank you, Mr. Hill.  You may be excused.

22      You may call your next witness.

23          MS. BRENNEKE:  The State calls Brian Evans.

24          THE COURT:  Has the witness signed in?

25          THE CLERK:  The witness has not signed in -- here he

1  is.

2          THE COURT:  Mr. Evans, if you will raise your right

3  hand and be sworn.

4                    BRIAN EVANS,

5      having been sworn under oath, testified as follows:

6          THE COURT:  Thank you.  You may inquire.

7                  DIRECT EXAMINATION

8  BY MS. BRENNEKE:

9  Q   Good morning, Mr. Evans.  I am Andrea Brenneke, and I

10 represent the State of Washington.  We met before when I took

11 your deposition, do you recall that?

12 A   Yes.

13 Q   That was in June 2020 and we did it by Zoom.  Do you

14 remember that?

15 A   I do.

16 Q   At that time, you agreed to answer my questions honestly

17 and under oath; is that right?

18 A   I did.

19 Q   Will you state your name for the record?

20 A   Brian Evans.

21 Q   Who is your employer?

22 A   The GEO Group.

23 Q   What is your title?

24 A   Senior vice president, chief financial officer.

25 Q   When did you start working for the GEO Group or any of its

1   predecessor corporations?

2   A    October 2000.

3   Q    You worked -- when did you become GEO's CFO?

4   A    August 2009.

5   Q    As chief financial officer for GEO, you have duties and

6   responsibilities to oversee all of GEO's corporate finance

7   and accounting tax functions and capital market activities;

8   is that correct?

9   A    Yes.

10  Q    As CFO, are you the highest ranking financial officer for

11  the company?

12  A    Yes.

13  Q    You are based in Florida; is that correct?

14  A    Yes.

15  Q    That's the headquarters for The GEO Group?

16  A    Yes.

17  Q    Now, GEO is a for-profit, publicly-traded corporation on

18  the New York Stock Exchange; is that correct?

19  A    Yes.

20  Q    It has a ticker "GEO"?

21  A    G-E-O.

22  Q    And in approximately 2005, GEO came to acquire and own the

23  Northwest Detention Center; is that true?

24  A    Yes.

25  Q    When GEO bought the Northwest Detention Center, GEO

1    maintained the corporate structure and financing of the

2    Northwest Detention Center; is that right?

3    A    Yes.

4    Q    The Northwest Detention Center is a wholly-owned

5    subsidiary of GEO; is that right?

6    A    It is owned through a wholly-owned subsidiary, yes.

7    Q    So GEO both owns the property and the facility and

8    operates that; is that correct?

9    A    Correct.

10   Q    After acquisition, GEO expanded the Northwest Detention

11   Center twice; is that true?

12   A    I believe so, yes.

13   Q    The first time simply increased the number of people that

14   could be housed within the same footprint from 500 to 1,000

15   people; is that right?

16   A    Yes.

17   Q    In the second expansion, GEO actually expanded the

18   footprint and the physical facility to increase the capacity

19   to 1,575 people; is that right?

20   A    Yes.

21   Q    GEO's capacity and the number of people it can house there

22   re -- has remained constant at 1,575; is that right?

23   A    Correct, since the expansion.

24   Q    That expansion was in what, 2011 or so?

25   A    I think that sounds about right.

1  Q    In your role as CFO, you were also involved in GEO's

2  business development work and bidding for federal government

3  contracts; is that true?

4  A    Yes.

5  Q    And so at a high level, there is a federal bid process to

6  provide detention management services at a facility like the

7  Northwest Detention Center; is that correct?

8  A    There is a process, yes.

9  Q    As part of the bid process, the federal agency, in this

10  case ICE, sets forth an RFP or request for proposal; is that

11  true?

12  A    They put -- typically, they put out an RFI, request for

13  information, first, followed by a request for proposal with

14  all the specifications that the parties are going to bid on.

15  Q    The specifications are the parameters of a particular

16  contract opportunity that they want bids and proposals for;

17  is that right?

18  A    That's correct.  They want the obligations that the

19  contractor has to meet.

20  Q    GEO, as a private corporation that wants to do business

21  with the federal government, puts together a bid proposal and

22  provides the proposed staffing and pricing to show how that

23  would be done as a business operation; is that right?

24  A    Yes.

25  Q    And then if GEO submits a proposal and bid that meets the

1   agency's qualifications, and if GEO chooses to contract with

2   GEO, the parties sign a binding contract; is that right?

3   A   If the government chooses to -- if the government selects

4   us, we sign a contract, that's correct.

5   Q   And there is an agreement that GEO agrees to meet the

6   obligations under the contract the way they said they would

7   in the contract; is that right?

8   A   That's correct.

9   Q   As CFO, your role in the federal contract bidding is the

10  financial piece; is that true?

11  A   For the most part, yes.

12  Q   So you help to develop and review the financing structure

13  on the contract and the price that you'll submit to the

14  client, ICE, as the cost of the services?

15  A   That is correct.

16  Q   And ICE's costs are GEO's revenues; is that true?

17  A   Generally speaking, yes.

18  Q   You were involved in developing the pricing model as part

19  of GEO's contract bidding for the Northwest Detention Center

20  2009 contract with ICE; is that true?

21  A   Yes.

22  Q   You were also involved in developing the pricing model and

23  reviewing the financing as part of GEO's contract bidding for

24  the 2015 contract with ICE; is that right?

25  A   Yes.

Evans - Direct

1    Q    The subsidiaries that control the operations of the

2    Northwest Detention Center and that own the property of the

3    Northwest Detention Center are within the secure services

4    division of GEO; is that right?

5    A    Yes.

6    Q    In terms of the overall business volume of GEO, the secure

7    services division accounts for about two-thirds, 65 to 70

8    percent, of all of GEO's revenue; is that true?

9    A    About 65 percent.

10   Q    In 2019, GEO owned and operated about 70 separate

11   facilities in the United States; is that right?

12            MS. SCHEFFEY:  Objection to relevance.

13            THE WITNESS:  Sounds approximately correct.

14            THE COURT:  The answer may stand.

15   BY MS. BRENNEKE:

16   Q    Of those, GEO had 14 to 17 immigration detention

17   facilities like the Northwest Detention Center; is that true?

18   A    Yes.

19   Q    For all of those immigration detention facilities, GEO had

20   contracts with the federal government, the federal

21   government, ICE, Immigration Control and Enforcement Agency?

22   A    For -- probably for most of them.  Not all of them.  Some

23   of them will be what are referred to as intergovernmental

24   services agreements.  So the federal government will contract

25   with a local government and the local government will

1    subcontract with us to provide the service.  Ultimately, the

2    service is being provided by us to the federal government.

3    Q    Now, as CFO at the corporate level, do you approve the

4    annual budget of the Northwest Detention Center facility?

5    A    Yes, I review the budget and ultimately approve it.

6    Q    You also monitor the Northwest Detention Center's facility

7    revenue and profit performance as compared to budget

8    projections; is that right?

9    A    We monitor the facility's revenue and pretax operating

10   margin.

11   Q    You do that through a PowerPoint presentation; is that

12   right?

13   A    On a monthly basis when we are looking at actual results,

14   we have standard reports that we issue.  I guess they could

15   be viewed as a PowerPoint.  They're not typically PowerPoint,

16   but they are standard reports that we have.

17   Q    So when you set up the budget, it's a PowerPoint, but

18   every month you are reviewing revenues, expenses, gross

19   profits on more standard reports; is that right?

20   A    That's correct.  The PowerPoint is really just used by

21   probably the regional management to present what the budget

22   is going to be.  The budget is still prepared in a system

23   similar to what the actual monthly results are recorded in.

24   The PowerPoint is just really a way for management to

25   communicate between two different hierarchies, if you will.

Evans - Direct

1  Q    But as a result of the work you do, you are familiar with

2  the revenues, the profits and the pricing at the Northwest

3  Detention Center; is that right?

4  A    Yes.

5  Q    You understand that this case is about people who are

6  detained and that work in the voluntary work program at the

7  Northwest Detention Center facility; is that right?

8  A    Yes.

9  Q    But there is absolutely no consideration of detainee

10  workers or their pay in the Northwest Detention Center

11  facility budget or the review of Northwest Detention Center's

12  budgets or actuals, is there?

13  A    No.

14  Q    GEO pays the people who are detained at the Northwest

15  Detention Center and work there as part of the voluntary work

16  program a dollar a day; is that correct?

17  A    Yes, I believe that is correct.

18  Q    GEO is then reimbursed by the government for those dollar

19  a day wage payments; is that right?

20  A    That is correct.  We don't technically pay anyone cash of

21  a dollar.  They have counts, if you will.  We will record to

22  their account that they earned that dollar and that get -- it

23  gets credited to them.  And then ultimately the government

24  reimburses us for that because the employee will spend that

25  money.

1  Q    The reimbursement happens sometimes later, like on a
2  monthly basis; is that right?
3  A    The government is usually a couple months behind on the
4  payments.
5  Q    GEO has never paid detainee workers at the Northwest
6  Detention Center for their labor at the Washington minimum
7  wage rate; is that true?
8  A    That's true.
9  Q    In 2017, Washington filed this lawsuit putting GEO on
10 notice that Washington's minimum wage should be paid for all
11 work GEO asks to be done inside the facility, including
12 detainee workers; isn't that right?
13 A    I don't know.  I don't know if there was a notice.  I am
14 aware of the lawsuit that was brought.  I am not aware of any
15 notice that was provided.
16 Q    You are aware that the lawsuit is about the detainee work
17 at the Northwest Detention Center, correct?
18 A    Yes.
19 Q    You are aware that Washington seeks to have the minimum
20 wage paid to detainee workers moving forward; is that right?
21 A    That's the purpose of the lawsuit, yes.
22 Q    You knew that in 2017, didn't you?
23 A    Approximately, I guess, whenever the lawsuit was brought.
24 Q    After this lawsuit was brought, GEO chose to maintain its
25 dollar a day payment scale; isn't that correct?

1    A    Yes.

2    Q    You and your team did calculate what it would cost to

3    comply with the minimum wage laws at the Northwest Detention

4    Center and other GEO ICE facilities, didn't you?

5    A    I don't know.

6    Q    Well, why don't you take a look at Exhibit 365-A, please.

7    A    365-A, you said?

8    Q    Yes.

9         THE COURT:  You don't mean A-365?

10        MS. BRENNEKE:  No.  It is labeled A because there are

11   redactions the parties agreed to and we want to make sure we

12   include the proper form.

13        THE WITNESS:  I think I have it.  I have 365-A pulled

14   up.

15   BY MS. BRENNEKE:

16   Q    Is that a letter that GEO's CEO and chair of the board,

17   George Zoley, sent to ICE on May 30th, 2018?

18   A    It is from George Zoley to ICE, yes.

19   Q    You were involved in helping to prepare financial

20   calculations that became part of that letter; is that

21   correct?

22   A    No, I don't think so.  I may have looked -- I remember

23   seeing this letter.  I am aware of the numbers in there.  I

24   don't think I prepared the numbers, if that's what you are

25   saying.

1    Q    You reviewed the numbers that were included in the letter

2    that the CEO and chair of the board sent to ICE?

3    A    I reviewed the amounts.  Not in the way I would review a

4    pricing per se where I look at detail and how it is

5    calculated and so forth.  I am aware of these amounts, not

6    these amounts per se, but I am aware of the letter and the

7    amounts in there.

8            MS. BRENNEKE:  Your Honor, we offer this letter for

9    admission.

10           MS. SCHEFFEY:  I object to the relevance of this

11   letter.

12           MS. BRENNEKE:  For the record, it is 365-A.

13   Your Honor, would you like me to express the relevance?

14           THE COURT:  I would like you to be quiet for a second

15   so I can read it.  I think it may be admitted.  365-A is in

16   evidence.

17   BY MS. BRENNEKE:

18   Q    Why don't we pull that up.

19           MS. MELL:  We have an unredacted version in front of

20   the jury.

21           MS. BRENNEKE:  Ms. Mell, what you will notice, I was

22   going to point this out.  If you look, you will see, it is

23   whited out.  It doesn't show exactly where it is redacted.

24   You can see segments where it is whited out.  The white outs

25   are exactly what GEO and the parties had agreed to white out

1    and then submit to the Court.

2            MS. SCHEFFEY:  We would object to this not being

3    clearly marked where the redactions are, so it looks like

4    sentences.

5            THE COURT:  Wait a minute.  Wait a minute.  We have

6    too many lawyers for one party talking about this.  Whose

7    witness is this?

8            MS. SCHEFFEY:  It is mine, Your Honor.  We object to

9    the fact it is not clear where the redactions are.  The

10   parties did agree on the redactions.  Here, they used white

11   out as opposed to clear marking of redactions, and it is very

12   unclear.

13           THE COURT:  The exhibit may be admitted and that can

14   be explained.

15   BY MS. BRENNEKE:

16   Q   So let's go back to this letter.  First off, this was a

17   letter sent by George Zoley, chairman and CEO of the GEO

18   Group; is that correct?

19   A   Yes.

20   Q   The letterhead is GEO's letterhead from your former

21   offices in Boca Raton, Florida; is that right?

22   A   Yes.

23   Q   This letter was sent to Peter Edge, who is the acting

24   deputy director of ICE, Immigrations and Custom Enforcement

25   Agency; is that true?

Evans - Direct

```
 1    A    Yes.
 2    Q    In this letter, Mr. Zoley was discussing detainee minimum
 3    wage lawsuits brought by the State of Washington as well as
 4    detainees in Colorado, Washington and California; is that
 5    correct?
 6    A    Yes.
 7    Q    The line above the box in the middle, GEO states that it
 8    conducted an estimation of the costs necessary to achieve
 9    compliance with the plaintiffs' demands to comply with the
10    minimum wage laws; is that correct?
11          MS. SCHEFFEY:  Objection, misstates the document.
12          THE WITNESS:  I see it says "an estimation of costs
13    necessary with the plaintiffs" --
14          THE COURT:  Just a minute, Mr. Evans.  When there is
15    an objection, you need to wait for a ruling on it.
16       You should rephrase your question, counsel.  You added
17    words to the quote.
18    BY MS. BRENNEKE:
19    Q    In the first paragraph, the letter is about lawsuits
20    claiming a violation of state minimum wage filed by the
21    Plaintiff State of Washington and others; is that correct?
22    A    Could you restate the question one more time?
23    Q    I am drawing your attention -- we will go in steps here.
24    That first paragraph, the letter relates to lawsuits filed by
25    the State of Washington and detainees in Colorado, Washington
```

1   and California; is that right?

2   A   The way I read the first paragraph, it's referring to a

3   request for equitable adjustment that the company previously

4   filed related to legal costs that we incurred defending the

5   voluntary work program in those states.

6   Q   Right.  Okay.  Thank you for the clarification.

7       In addition, there is clarification that the lawsuits

8   were filed based upon the allegations or the claims, legal

9   claims that GEO was violating state minimum wages in those

10  states; is that right?

11  A   No, it says the ICE policy is alleged to be in violation.

12  Q   And it was GEO who was sued by the state of Washington; is

13  that right?

14  A   That is true.

15  Q   It was GEO that was sued in the state of Colorado; is that

16  right?

17  A   That is correct.

18  Q   And it was GEO that was sued in the state of California;

19  is that true?

20  A   That is correct.

21  Q   In all of those suits, the plaintiff sued GEO for

22  violating the wage laws; is that correct?

23  A   I believe that is correct.

24  Q   Okay.  And then the highlighted paragraph right above the

25  box says "we," which is GEO, is that correct, "we"?

Evans - Direct

1    A    Let me get to that line.  Okay.

2    Q    "We have conducted an estimation of the costs necessary to

3    achieve compliance with the plaintiffs."  Do you see that

4    line?

5    A    Yes.

6    Q    And that is GEO who conducted an estimation of the costs

7    that would be necessary to achieve compliance with the state

8    minimum wage laws in those different states; is that correct?

9    A    That's correct.

10   Q    You and your team were involved in the financial

11   calculations that were provided to ICE in that letter,

12   weren't you?

13   A    My team, no.  I don't think so.  Like I said, I reviewed

14   it.  I would imagine the numbers were gathered together from

15   the facilities.  I am not sure how they were accumulated.

16   They came up with some round numbers here, it looks like.

17   Then they just extrapolated it based on our number of beds to

18   the total number of beds, 11,000 to 33,000, so three times,

19   they took whatever number we came up with and extrapolated it

20   to the rest of the populations.  It is a little bit of a wild

21   ass guess.

22   Q    This was a wild ass guess that GEO sent to its client,

23   ICE; is that right?

24   A    That is correct.

25   Q    Let's break down what is in the box.  The first

1  calculation in the box is the calculation of the annual cost

2  of paying minimum wage to detainee workers at all of GEO's 12

3  ICE facilities; is that right?

4  A  That's what it says, yes.

5  Q  The total amount of that cost was $22 million; is that

6  right?

7  A  That's what it says, yes.

8  Q  $22 million a year?

9  A  Yes.

10 Q  And then the second calculation inside the box was GEO's

11 calculation of the annual cost of replacing detainee workers

12 with full-time employees hired from the community at GEO's 12

13 ICE facilities; is that right?

14 A  That is correct.  That's what it says, yes.

15 Q  The cost of replacing detainee workers with staff from the

16 community was $38 million; is that right?

17 A  That's correct.

18 Q  Your team -- or GEO approached the analysis of what it

19 would cost, I think you said, by gathering data from the

20 facilities of their staffing; is that correct?

21 A  Honestly, I don't know how it was done.  I don't think it

22 was done in an organized fashion, per se.  I think if I was

23 in charge of it, I would have done it probably differently.

24 My guess is facilities submitted some sort of estimate and

25 those were all compiled together.  I am not sure there was a

1    significant, diligent review performed like we would if we

2    were actually doing a pricing analysis and going to bid it to

3    the government.  The purpose was really just to give an

4    approximation to the government of what the annual cost

5    impact could be to them if ultimately there was to be some

6    new precedent established through these lawsuits.

7    Q    And the information that you reviewed and provided was

8    sufficiently correct that you felt comfortable passing it on

9    to ICE; isn't that right?

10           MS. SCHEFFEY:  Objection, misstates the testimony.

11           THE WITNESS:  Yeah, this is --

12           THE COURT:  Just a minute.

13           THE WITNESS:  I'm sorry.

14           THE COURT:  Just a minute.  The objection is

15    sustained.

16    BY MS. BRENNEKE:

17    Q    So let me take a step back, Mr. Evans.  You said the way

18    you would do it, if you were to undertake this analysis,

19    would be I think somewhat related to how you do pricing in a

20    normal facility; is that right?

21           MS. SCHEFFEY:  Objection, misstates testimony.

22           THE COURT:  Overruled.  You may answer.

23           THE WITNESS:  If I was trying to calculate the actual

24    cost, then we would do, you know -- if the government didn't

25    have the voluntary work program and was to require some of

1  these tasks to be completed by a regular labor force, then we

2  would evaluate that consistent with how we evaluate the rest

3  of our pricings and calculate accordingly.

4  BY MS. BRENNEKE:

5  Q   How would you do that?

6  A   Probably start at the facility level so they would have to

7  do an analysis of the amount of effort that would be required

8  and the number of people it would take to do it.  The

9  voluntary work program isn't really designed to operate as an

10  efficient workforce, if you will.  It would -- I think it

11  would take a lot of effort to figure out what that would be.

12  Q   So you would undertake the analysis at the facility level

13  of what it would take to replace detainee workers with

14  full-time employees; is that right?

15  A   Yeah, if it would be necessary.  I think some of the work

16  is, you know, I don't want to say busy work, but to give

17  people more to do.  I am not sure it would necessarily -- all

18  that work would necessarily be replaced or all the things

19  they are doing would necessarily be replaced.  That's why I

20  think the analysis would be a little bit more complicated and

21  take some time and effort to figure that out.

22  Q   So you would look at the different job functions that

23  needed to be completed at the facility that the detainee

24  workers were doing; is that right?

25  A   We would look at the tasks that needed to be completed.

1   There is no specific job functions or descriptions currently

2   that I am aware of, but maybe there is.

3   Q   You look at the tasks and functions that the detainee

4   workers are doing and then you would determine how many

5   full-time employees would be needed from the community to do

6   that work; is that right?

7   A   No, I would phrase it differently.  I would look at what

8   tasks actually need to be accomplished.  I don't think we

9   would use the -- we would not use the workforce, the

10  voluntary work program as a basis to determine what we would

11  need to do to functionally complete the work.  I think we

12  would just ignore them and figure out what we would need to

13  do if it wasn't a program that was required under the

14  contract.  If we had to deliver that service using our

15  workforce, then we would just look at it completely

16  standalone, what tasks need to be accomplished and how we

17  would do that.

18  Q   So you would do that by looking at what tasks needed to be

19  accomplished, how much your existing staff is, how many

20  additional staff you would need to add in order to accomplish

21  those tasks; is that right?

22  A   Something along those lines.

23  Q   The additional staff that you would need to have to

24  accomplish those tasks would be paid consistent with the job

25  descriptions in the Department of Labor wage determination

1    analysis.  You would figure out how much it would cost to do

2    that from staff from the community?

3    A    Yes, the Department of Labor establishes the wages for

4    hourly employees in our facilities.  There's different job

5    codes and descriptions.  We are required by law to pay in

6    accordance with that.

7    Q    So before we move from this exhibit, I want to be really

8    clear that the financial information GEO provided to ICE in

9    the letter of May 30th, 2018 about paying, or the cost of

10   paying minimum wage to detainee workers, or the cost of

11   paying prevailing wages for the work currently done by

12   detainees, if you had to hire staff from the outside to do it

13   instead, was for informational purposes only; isn't that

14   right?

15           MS. SCHEFFEY:  Objection, compound and vague.

16           THE COURT:  You may answer.

17           THE WITNESS:  Can you say it again?

18   BY MS. BRENNEKE:

19   Q    The financial information you provided was for

20   informational purposes for ICE; isn't that true?

21   A    I think it was for illustrative purposes to give them a

22   sense of what they could possibly incur if, as I said before,

23   if these programs, these voluntary programs were to go away.

24   The government is going to end up paying that cost if that

25   were to be the case.

Evans - Direct

1    Q    Well, the government would pay that cost only if it agreed

2    to pay that cost, correct?

3    A    Well, they would agree to pay it.

4    Q    You are pretty confident of that?

5    A    Certain of it.

6    Q    But under the existing contracts with ICE, GEO would have

7    to essentially eat those costs until such time as GEO paid

8    it, correct?  Until such time as ICE were to agree to pay

9    additional?

10   A    We have to go through an equitable adjustment process

11   which is similar to what this letter was about.

12   Q    The equitable adjustment process would be one to say, hey,

13   ICE, we have decided, or we now need to pay minimum wage to

14   our detainee workers in Washington State, and we would like

15   to pass that cost on to you.  That's what an equitable

16   adjustment would be; is that right?

17   A    Yeah.  I really don't know how it would work out.

18   Ultimately, the government has to adhere to the law, too.  If

19   the courts change the ruling, I think the government is

20   subject to that.  I am not sure there needs to be an

21   equitable adjustment process.  That's where the contractual

22   issues would be worked out and figured out, and I don't know

23   about that.

24   Q    What I am thinking is that what you are talking about

25   right now is an idea of what GEO would do and what GEO would

1  ask ICE to do if and when GEO started paying the minimum

2  wage; is that right?

3          MS. SCHEFFEY:  Objection, argumentative.

4          THE COURT:  Overruled.

5          THE WITNESS:  I am saying, I believe that the

6  government is subject to the rulings of the court, that

7  that's part of the law, right?  I am not a lawyer.  I think

8  courts can set precedent and change the law.  If it changes

9  the law, then the government has to comply with that.

10 BY MS. BRENNEKE:

11 Q   And if the jury were to decide that the Minimum Wage Act

12 applies in this case, GEO would have to comply with that,

13 correct?

14 A   At some point.  I mean, you know, again, there is a long

15 process.  I am sure that we would appeal that.  But

16 ultimately if the State were to prevail, of course we are

17 going to comply with the law.

18 Q   It is not clear right now how that would work in terms of

19 your contracting with ICE.  But you know GEO would comply

20 with the law, correct?

21         MS. SCHEFFEY:  Objection, misstates testimony.

22         THE COURT:  Overruled.

23         THE WITNESS:  Say that again.

24 BY MS. BRENNEKE:

25 Q   You are not sure how ICE would respond to a request to

Evans - Direct

1    change its contract, but you know that GEO would comply with

2    the law, correct?

3    A    Ultimately, if the courts side with the State, then, of

4    course we would.  That's what we have to do.  I don't think

5    we would ever pay detainees minimum wage.

6    Q    Unless you were required to do so, correct?

7    A    No, I don't think we would ever pay detainees minimum

8    wage.  We would hire outside workers.  I think it would be

9    destabilizing to the safety and security of the facility to

10   pay detainees minimum wage and would defeat the purpose of

11   the voluntary work program.

12   Q    So paying a detainee worker more would change anything in

13   the structure of the facility's operations?

14   A    I think it would, yeah.  You would introduce a level of

15   people who have a bunch of money who are working and those

16   who don't, and you are going to create opportunities for

17   abuse within that system, protection rackets, people are

18   going to control who necessarily gets to volunteer for those

19   jobs and how much they get from that.  It would be

20   disastrous.  I am not aware of any place in the world where

21   voluntary work programs pay minimum wage or high wages.  I

22   think it is for that reason.

23        The program exists to try to reduce idleness, boredom,

24   ensure people have an opportunity to be active if they want

25   to.  So to promote the safety and security of the facility, I

1    think if you start paying the detainees or the inmates a

2    significant amount of money, they are not all going to make

3    that and that is going to create a significant disparity

4    within the facility, and that is going to create issues.  We

5    operate facilities in the United Kingdom, Australia, South

6    Africa, we use these programs there, across the country, just

7    like our government counterparts do and are required to in

8    all of those locations.

9    Q    Thank you for sharing your perspective on that.

10          I am going to go back to Exhibit 365-A.  In this

11   letter, you urgently implored the Department of Justice to

12   take over the defense of these lawsuits and reimburse GEO for

13   its cost and attorney fees in defending its dollar-a-day

14   program, correct?

15   A    Yes.

16   Q    That request was denied; is that right?

17   A    Ultimately, yes.

18   Q    Now, you are aware there is no legal prohibition against

19   GEO paying more than a dollar a day to its detainee workers

20   that work in the voluntary work program, is there?

21   A    I know there is a legal requirement to pay what we are

22   required to pay.  I don't know if that could be interpreted

23   as, don't pay more, pay this.

24   Q    You are not aware of a legal prohibition against paying

25   the minimum wage?

Evans - Direct

```
 1              MS. SCHEFFEY:  Calls for a legal conclusion,
 2    Your Honor.
 3              THE COURT:  You may answer.
 4              THE WITNESS:  I am not aware of any.
 5    BY MS. BRENNEKE:
 6    Q   Some time after your deposition was taken, Mr. Evans, GEO
 7    provided counsel with the native format Excel spreadsheet
 8    that is the underlying calculations that went into the letter
 9    in 365-A.  We have printed out --
10              MS. SCHEFFEY:  Objection, Your Honor.  Counsel is
11    testifying about the contents of the document he hasn't seen.
12    She's trying to lay the foundation through her testimony.
13    She can show it to him and ask him.
14              THE COURT:  I think that is a fair objection.
15    BY MS. BRENNEKE:
16    Q   Mr. Evans, I would like you to take a look, please, at
17    Exhibit 602-A.
18    A   602-A?
19    Q   Is that one of the calculations entitled "annual impact of
20    paying detainees minimum wage" that is broken down by region
21    and facility?
22              MS. SCHEFFEY:  Again, object to foundation.  She
23    hasn't asked the witness if he has ever seen it before or
24    what it is.
25              THE WITNESS:  Most of it is blacked out.  It has
```

1    those captions on the left.  Is that what you are saying?

2    BY MS. BRENNEKE:

3    Q    We have blacked out -- the agreement of the parties, GEO

4    and the plaintiffs, was to black out all of the numbers

5    related to facilities other than the Northwest Detention

6    Center and the final number.  That's why it is blacked out.

7            MS. SCHEFFEY:  I would like to lodge my objection

8    that I think got spoken over.  It has not been asked if this

9    witness has seen it before and he is being asked to testify

10   about it without laying the foundation he has knowledge about

11   it, which is resulting --

12           THE COURT:  The exhibit has not yet been offered.  I

13   think the objection is premature.

14           MS. SCHEFFEY:  I understand.  I am just objecting to

15   the document being read in before it is offered -- captions

16   and titles.

17           THE COURT:  That is a fair objection.

18           MS. SCHEFFEY:  Thank you.

19   BY MS. BRENNEKE:

20   Q    So, Mr. Evans, is this the analysis underlying the figures

21   that are in Exhibit 365 that has been admitted as to the

22   total amount that it would cost to pay minimum wage to

23   detainees per year for their work?

24   A    I don't know.

25   Q    I would like you to compare the bottom line number total

Evans - Direct

1   for 12 ICE facilities with the number that is in the box on

2   365-A.

3   A    Okay.

4   Q    That number matches, doesn't it?

5            MS. SCHEFFEY:  Objection, we are reading what the

6   document is into the record.  She asked --

7            THE COURT:  He may answer this question.

8            THE WITNESS:  It is close, yes.

9   BY MS. BRENNEKE:

10  Q    So does that refresh your recollection that this was the

11  analysis done by GEO that was the basis for the summary in

12  the letter GEO sent to ICE?

13           MS. SCHEFFEY:  Again, refreshing recollection implies

14  that the witness has seen it before.

15           THE COURT:  Overruled.  You may answer.

16           THE WITNESS:  I really don't remember if I saw this.

17  I know I saw the letter, as I said before.

18  BY MS. BRENNEKE:

19  Q    Well, you know, Mr. Evans, that the finance people within

20  GEO conducted an analysis that went into the letter of 365;

21  is that correct?

22  A    I don't know who did it, honestly.  It could have been

23  legal.  It might have been people from the facilities up

24  through the regions.  When you say "finance," it wasn't my

25  finance or accounting department that prepared it.  I know

1    that for sure.

2    Q    Did your office review the document that is 602-A to

3    ensure that the information you were providing to ICE had a

4    grounds in fact?

5    A    I don't recall.  I mean, I may have seen this.  I just

6    don't remember.  I will add to that.  No one -- the only

7    person that would have seen it in my group would have been

8    me, if anyone saw it.

9    Q    Would you agree that before GEO submits information to its

10   client, that there is a due diligence process and that you

11   have some obligation to ensure the information is true and

12   correct?

13   A    Yes, generally.  Depends on the purpose, as I stated

14   earlier.  I think that is reasonable.

15   Q    So even though you don't have a specific memory right now,

16   you would have been the person who reviewed these underlying

17   calculations that were then submitted to ICE; is that right?

18   A    No.  If I did anything, I saw this, I didn't look at any

19   detail or anything on this.  I know that for sure that I

20   never looked at any underlying calculations or detail, as I

21   said.  I know I saw the letter.  I might have seen the

22   summary page.  I definitely did not ever look at any of the

23   detailed calculations that were used to prepare this.

24   Q    You mean you didn't look at them in detail?

25   A    I didn't look at them.

1    Q    You trusted that those who worked at the facility and the

2    regional level had undertaken the analysis in a way that was

3    reliable, that you could pass it on to ICE?

4    A    For the purposes of illustrating to the government the

5    potential cost ramifications, yeah.

6    Q    So I think what I am hearing you say, if I can read

7    between the lines, you don't necessarily ascribe to the truth

8    of what is here.  Like, you don't believe this may in fact be

9    the number; is that right?

10    A    Right.

11    Q    But it is the number that was generated and the

12    calculation that was generated that gave rise to the letter

13    of 365; is that true?

14    A    Yes.  Yes.

15    Q    These are business records that were normally kept in the

16    course of GEO's business; isn't that right?

17    A    Yes.  I would say this is like a worst case, probably,

18    analysis.

19    Q    Worst case analysis.  Okay.  All right.  So why don't we

20    move --

21            MS. BRENNEKE:  Offer 602-A.

22            MS. SCHEFFEY:  Object to the foundation.  The witness

23    has testified he doesn't remember it and hasn't seen it

24    before.

25            THE COURT:  This is identified as a business record

1    of GEO, I take it.  I think it may be admitted on that basis.

2                    (Exhibit 602-A was admitted.)

3    BY MS. BRENNEKE:

4    Q   Why don't we publish this for the jury.

5           Now, this GEO business record is entitled "annual

6    impact of paying detainees minimum wage."  You see that?

7    A   Yes.

8    Q   It is broken down by western region, central region and

9    eastern region; is that true?

10   A   Yes.

11   Q   Within the western region, the numbers that are visible

12   are under the column or the -- "Tacoma;" is that right?

13   A   Yes.

14   Q   And there it shows a summary of calculations of what it

15   would cost to pay Northwest Detention Center detainee workers

16   at Washington minimum wage rate; is that true?

17   A   I'm sorry.  Say that again.

18   Q   That is -- the numbers under "Tacoma" are the inputs or

19   the pieces of data that resulted in the calculation of the

20   bottom line of what it would cost to pay Northwest Detention

21   Center detainee workers at Washington minimum wage.

22   A   Yes, that's what it says.

23   Q   So for Tacoma, the number of detainee workers underlying

24   the calculation was 470; is that correct?

25   A   That's what it says, yes.

1    Q    The number of detainee hours was 294,873; is that right?

2    A    That's what it says, yes.

3    Q    This was 2018, so the minimum wage was listed as 11.50; is

4    that right?

5    A    That's what it is listed as.

6    Q    It is a math problem at this point, but the calculation of

7    the annual cost of paying detainees minimum wage for their

8    work at the Northwest Detention Center was $3,391,040; is

9    that correct?

10    A    Yes, correct.

11    Q    Did you ever ask to see the underlying documents from the

12    Northwest Detention Center that gave rise to the number of

13    detainee workers or the number of hours?

14    A    No.

15    Q    Will you pull up Exhibit 20, please, side by side with

16    this one?

17    A    I don't see an Exhibit 20.

18    Q    Mr. Evans, I may not have provided that to you.  We will

19    pull it up on the screen, and you will take a look at it

20    there, if you would.

21         Exhibit 20 was previously admitted, but I want you to

22    take a look down here at the "total workers" on the bottom,

23    the total number of detainee workers on the bottom.  It says

24    "470."  Do you see that?

25    A    Okay.

1    Q    And that matches the number of detainee workers on 602-A;

2    is that right?

3    A    It does match, yep.

4    Q    We can take Exhibit 20 away.  There is another part of

5    602-A that I wanted to point out, which is the second part of

6    the title.  It's where it says, "Assumes direct pass-through

7    to ICE, no G and A or fee applied."  Do you see that?

8    A    Yes.

9    Q    When this calculation was done, the assumption was that

10   there would be no financial impact to GEO's bottom line

11   because you assumed that ICE would just pay the increased

12   cost; is that right?

13   A    If they kept it part of the voluntary work program, that's

14   correct, it's a pass-through item.

15   Q    So let's go on to the next calculation, that is 602-B.  If

16   you could take a look at that, please.

17   A    Okay.

18   Q    That is another one of GEO's business records; is that

19   correct?

20   A    Yes, apparently.

21   Q    That is the summary of the annual impact of replacing

22   detainees with GEO employees broken down by region and

23   facility; is that right?

24   A    Hold on.  That's what it says, yes.

25          MS. BRENNEKE:  I offer Exhibit 602-B.

1    MS. SCHEFFEY:  Objection.  There is no foundation.

2 She's not asked him if he's seen it before, what it is.

3 Simply stating it is a business record doesn't lay the

4 foundation.  That may get around hearsay, but doesn't get

5 around foundation with this witness.

6    THE COURT:  I want to talk to counsel about this so

7 we will excuse the jury for lunch.  Come back ready to go

8 back at your computer work at 1:00.  You may be excused.

9  (The following occurred outside the presence of the jury.)

10    THE WITNESS:  Do I step out as well?

11    THE CLERK:  That was my question as well.  Do you

12 want the witness to remain in here?

13    THE COURT:  It doesn't matter to me.

14  It seems to me, I guess, that I am not sure that Mr. Evans

15 saying it was a business record completes the foundation for

16 admission.  I don't have the rule in front of me.  I think

17 there is more to it than that.

18  The second, this second exhibit that was referred to, he

19 said it is a business record apparently, as though, you know,

20 I am not sure he knows whether it is a business record or

21 not.  He assumes it is.  And I am not sure.  This is the kind

22 of thing that you could put these numbers on a board without

23 any exhibit and you would get to the same conclusion that

24 they are -- how they got to those figures that appear in the

25 letter.  I think we are kind of barking up the wrong tree

```
 1    here with this evidence.
 2              MS. BRENNEKE:  Your Honor --
 3              THE COURT:  With these exhibits.
 4              MS. BRENNEKE:  Your Honor, if I may.  There has
 5    been -- I believe first we can certainly lay additional
 6    foundation after the break.  I was mindful of time and was
 7    trying to finish with this witness to go straight to the
 8    heart of it.
 9         Secondly, Your Honor, there has been testimony
10    specifically from Mr. Hill that there was no calculation of
11    what it would cost to replace the detainee workers or the
12    value of their work.  This goes directly to a number of
13    issues related to repeated testimony from GEO that all they
14    do is chores, that this work has no value.  It also goes to
15    the economic realities of this facility and what role that
16    detainee workers play in the overall operations of the
17    facility.
18         So there is this exhibit and then there is some breakdowns
19    of the Northwest Detention Center as well.  You can see the
20    bottom line here is exactly the number that was in 365-A.  It
21    is what was passed on to GEO, GEO's client, ICE.  It is
22    clearly a business record in that regard.  It is the
23    underlying documents for it.
24         The last exhibit is one that sort of breaks down the
25    Northwest Detention Center facility and what it would take to
```

1    replace detainee workers.  So it goes right to the heart of

2    plaintiff's claim and evidence, Your Honor.

3           MS. SCHEFFEY:  Here is the problem I am having:  This

4    has been raised before --

5           THE COURT:  Wait a minute.  Wait a minute.  Wait a

6    minute.

7           MS. SCHEFFEY:  If I may be heard.

8           THE COURT:  Go ahead, Ms. Scheffey.  I have to shift

9    gears to hear you.

10          MS. SCHEFFEY:  The problem I am having, Your Honor,

11   is that we have, you know, presented prior to trial the

12   evidence that the numbers were never disclosed outside of GEO

13   and that they were created by their legal department.  He

14   reviewed these.  I am not getting the opportunity to ask him

15   whether he reviewed them, whether those are his numbers, if

16   he came up with them.  That deprives me of the ability to

17   claim privilege over these if he is working with the legal

18   department.

19      While legal documents are business records, that doesn't

20   mean that they have to come in, doesn't mean they have a

21   sufficient foundation.

22      As you see in the letter, this is all about the cost of

23   these lawsuits.  The fact that lower level finance people

24   maybe didn't know about a damages model is not indicative of

25   what models they may have done for ICE contracts or for

 1    figuring out what to pay detainees.

 2            THE COURT:  All this is very interesting.  What we

 3    are talking about is the admissibility of exhibits.  That is

 4    based on the rules of evidence and the proper foundation.  I

 5    understand the relevance.  I don't think that is an issue.

 6    Under the present status of the testimony, it is a matter of

 7    admissibility of the exhibits.

 8            MS. BRENNEKE:  Thank you, Your Honor.  May I have the

 9    opportunity to lay a more detailed foundation after the

10    break?

11            THE COURT:  Oh, sure.  Yeah.  You are in charge of

12    what questions you want to ask.  And I'm in charge of either

13    letting you ask them or not letting you ask them.

14            MS. BRENNEKE:  Good thing someone is in charge.

15            THE COURT:  I wonder who it is.  All right.  It is

16    lunchtime.  Thank you.

17            (Recessed.)

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2          JUNE 9, 2021

3     (The following occurred outside the presence of the jury.)

4          THE COURT:  I am going to change my ruling on 602-A.

5     I am going to change my ruling.  I made a mistake in

6     admitting it under 803(6), the business records.  That's

7     without prejudice to reoffer with further identification.

8          MS. BRENNEKE:  This spreadsheet was produced by GEO

9     after the deposition of Mr. Evans.  We presented the relevant

10    pages with redactions, but there is also a native format of

11    that.  In order to clear up the admissibility of the

12    exhibits, we would like the opportunity to voir dire the

13    witness outside the presence of the jury and being able to

14    use that native exhibit.  We would like to do it in front of

15    the jury, we are mindful of GEO's confidentiality concerns

16    and that's why we didn't approach it that way to begin with.

17         MS. SCHEFFEY:  I don't know if you want to hear from

18    me.  I think voir diring him outside the presence of the jury

19    makes sense.

20         THE COURT:  Speak up.

21         MS. SCHEFFEY:  Voir diring him outside the presence

22    of the jury may make some sense.

23         THE COURT:  May be what?

24         MS. SCHEFFEY:  Makes sense so we are not reading the

25    document to the jury before it is admitted.

 1          THE COURT:  We will do that.  We will leave the jury

 2    cooking for a few minutes.  You may inquire, Ms. Brenneke.

 3       Go ahead, counsel.

 4                     VOIR DIRE EXAMINATION

 5    BY MS. BRENNEKE:

 6    Q    Mr. Evans, good afternoon.  You previously -- you are

 7    muted, Mr. Evans, can you unmute so we get a clear record.

 8    A    Sorry.

 9    Q    Prior to the break, you previously testified to the letter

10    of May 30th, 2018 that GEO sent to ICE requesting an

11    equitable adjustment; is that right?

12    A    Yes.

13    Q    In that letter, there were two calculations, one based

14    upon paying minimum wage to detainee workers and the other

15    based upon replacing detainee workers with employees from the

16    community; is that right?

17          MS. SCHEFFEY:  I object.  The document speaks for

18    itself.  I don't believe there were calculations.

19          THE COURT:  This is a preliminary question.  The

20    objection is overruled.

21          THE WITNESS:  Can you say the question again,

22    Ms. Brenneke?

23          MS. BRENNEKE:  Can you pull up 365-A.

24          THE WITNESS:  I am looking at it.

25

BY MS. BRENNEKE:

Q   365-A includes two bottom line numbers, effectively the calculations for paying detainees minimum wage and the second is replacing detainees with GEO staff from the community; is that right?

A   Yeah, I would say it is a summary of the estimated amount. It is not the calculations, but a statement of what the calculation was.

Q   It is true that that was done in May of 2018.  It was sent in May of 2018; is that right?

A   Yes.

Q   You were aware at that time that those calculations had been completed based upon an analysis of facility staffing and information obtained from the bottom up in the corporation; is that right?

A   Well, I am not really -- I just want to be careful.  I didn't look at any detail of how these numbers were calculated.  I saw the letter and I have a general understanding that it came from, you know, within the organization, either the facility through the regions or something along those lines.

Q   You acknowledge that on or around 2018, that process happened and that you reviewed those figures, correct?

A   Again, when you say "those figures," which figures are you referring to?  I remember the letter, as we talked about.

1   Then the other exhibit, I may have seen that one.  That

2   vaguely looks familiar.  That's the level of the detail that

3   I saw.  I didn't go any deeper than that.  I didn't look at

4   detailed calculations by facility or anything of that sort.

5   I know definitively that is not the case.

6   Q   Mr. Evans, what we are doing is establishing the

7   admissibility of the document.  I am not asking you to verify

8   the specific numbers on each document.  Okay?

9   A   Right.  When you say "detail," I have a different sense of

10  what "detail" is versus just some numbers summarized on a

11  page.  That's not the detail to me.

12  Q   You recall in your deposition I asked you if there had

13  been some analysis of the value of detainee labor in the GEO

14  facility.  Do you recall that?

15          MS. SCHEFFEY:  Can I have the Bates number?

16          THE WITNESS:  Go ahead.  Sorry.

17  BY MS. BRENNEKE:

18  Q   Mr. Evans, did you hear my question?

19  A   Was there an objection?  I don't know.  Repeat it.

20  Q   You indicated in your deposition that there had been some

21  analysis done by GEO at some point advising the government on

22  the cost of what the labor would look like if it was all done

23  by civil employees.  Do you recall testifying to that?

24  A   That's this letter.

25  Q   That's the underlying analysis that went into the letter,

1   right?

2   A   Say that again.

3   Q   That's the letter and the underlying analysis that went

4   into it?

5   A   There is an analysis that went into the letter.

6   Q   And I had asked you --

7        MS. SCHEFFEY:  I am going to object to you reading

8   the deposition into the record without giving me the page

9   number and without giving the witness the ability to observe

10  it and see the surrounding text and confirm it is accurate.

11       THE COURT:  Wait a minute.  The objection is

12  overruled.  That is not what is going on here.  Go ahead.

13  BY MS. BRENNEKE:

14  Q   Mr. Evans, you also, as part of the analysis that you

15  reviewed, there was an assessment of how many full-time

16  employees would be necessary to replace detainee workers at

17  the Northwest Detention Center, correct?

18  A   Well, that's what we looked at on Exhibit 602.  Like I

19  said, I didn't review that calculation or the process.  I may

20  have seen that summary sheet.  I didn't go beyond anything

21  that is on that summary sheet.

22  Q   On -- you agree that that was part of the analysis that

23  was conducted by GEO, correct?

24  A   Yes, that is what is on the summary sheet.

25  Q   You reviewed some of the work that was done in that vein;

1    isn't that right?

2    A    That's what I am saying.  I did not review -- the only

3    thing I saw is the letter for sure.  Then if I saw any other

4    document, it would have been that first exhibit that we

5    looked at.  Nothing below that.  I didn't look at how the

6    thing was calculated or anything.  I looked at the summary

7    total.  That's -- the summary is on 602-A.

8    Q    On 602-B, if you take a look at that.

9    A    B or D?

10   Q    Let's look at B.  Sorry.  602-B.  Did you look at the

11   summary total on 602-B as well?

12   A    This one, I honestly don't recall.

13   Q    Recall the time I took your deposition and I asked you the

14   question, how many -- this is on Page 112 at Line 6.  I asked

15   you, "How many FTEs or how many hours worked by full-time

16   employees would be necessary to replace the detainee workers

17   and the work they do at the Northwest Detention Center?"

18   There was an objection.  I asked the follow-up question at

19   Line 13, "Was that part of the analysis that you conducted?"

20   Do you recall that?

21   A    In my deposition?  No, if that is what you say the

22   question was.  I don't recall my answer.

23            MS. SCHEFFEY:  Do you have a copy of your deposition?

24            THE WITNESS:  Sorry.

25

1    BY MS. BRENNEKE:

2    Q    Take a look at Page 112.

3    A    I am on 112.  What line number?

4    Q    Review -- 6 was the original question, "About how many

5    FTEs at the Northwest Detention Center."  Line 13, I asked

6    you, "Was that part of the analysis you conducted?"  Do you

7    see that?

8    A    Yep.

9    Q    At that time you answered, "Yeah, I reviewed some work

10   that was done in that vein.  I think, you know, it would have

11   been done from the perspective, as I described it, as to how

12   much it would take to get it done."  You continued to

13   describe that; is that right?

14   A    Right.  So --

15   Q    Before you go on, Mr. Evans, I just want to have you

16   acknowledge that you acknowledged at the time of your

17   deposition that you reviewed some work that was done in that

18   vein; is that correct?

19   A    That's right.  I think that is 602-A.

20   Q    Mr. Evans, the question posed was how many FTEs or how

21   many hours worked by full-time employees would be necessary

22   to replace the detainee workers and the work they do at the

23   Northwest Detention Center.  That was the question, correct?

24   A    Okay.

25   Q    Line 6.

1   A    Yes, Line 6.  That was the question.  Doesn't look like I

2   answered the question.

3   Q    Exhibit 602-B --

4   A    Okay.

5   Q    -- is the annual impact of replacing detainees with GEO

6   employees, correct?

7        MS. SCHEFFEY:  I am going to object because we keep

8   skipping over his answer from the deposition, which is,

9   "That, I don't know," which is on 11.  We skipped it three

10  times.  You said what was the question.  His answer was,

11  "That, I don't know."

12       MS. BRENNEKE:  He said, "That, I don't know."  I

13  said, "Was that part of the analysis that you conducted?"

14  That was Line 13.  You said, "Yeah, I reviewed some work that

15  was done in that vein."  Correct?

16       THE WITNESS:  Right.  So I don't know how many FTEs

17  it was.

18  BY MS. BRENNEKE:

19  Q    I am not asking you that.  I appreciate there is a lot of

20  detail here.  Mr. Evans, I would like -- you will acknowledge

21  you reviewed the work that was done in-house at GEO to

22  determine the annual impact of replacing detainee workers

23  with GEO employees, correct?

24  A    No, I don't think that is true.  You know, I don't want to

25  parse words.  To review the detailed work -- if we look -- if

1  I could look at 602-B.  Somebody did something to calculate

2  these numbers on this page on 602-B.  I didn't look at any of

3  that.  I don't recall seeing this summary.  I recall the

4  letter and looking at that.  There may have been like a quick

5  discussion.  I think this was all kind of a rushed process to

6  get this letter out.  So, you know, the budget and finance

7  people didn't produce or review this.  I think maybe the

8  local staff in the facility did some work and submitted it up

9  either through legal.  I don't know who.  I saw the letter.

10  I vaguely recall seeing the first sheet.  I really don't

11  recall this level of detail.

12     I think I was more surmising this is what -- something

13  along this line might have been done to support the numbers

14  in the letter because I think you were asking me to speculate

15  how that may have been calculated.

16  Q    Okay.  So you did verify that there was a factual basis

17  for the numbers that were contained in the letter to ICE; is

18  that right?

19  A    Yeah, it was a reasonable, quick, back-of-the-envelope or

20  back-of-the-napkin type process to get something done

21  quickly.

22  Q    I would like you to take a look now at Exhibit 602.  We

23  are going to present it to you in its native format on the

24  screen so you can look at it, unless you have access to that

25  on your computer?

1   A    I have 602-A through D.

2   Q    Those are the PDFs of certain tabs.  Let's put up the

3   native 602, please.  Do you recognize this first page of 602

4   as the annual impact of replacing detainees with GEO

5   employees?

6   A    When you say "do I recognize," are you asking is that what

7   it says or do I recall seeing this schedule?  Because as I

8   said, this looks like the same schedule before but

9   unredacted.

10  Q    Yes.  Exactly.  That's the same as 602-B but unredacted?

11  A    Yes.

12  Q    And this -- does this appear to you to have all of the

13  western region, central region, eastern region GEO ICE

14  facilities?

15  A    It appears to.  At that point in time, I would have to go

16  back and look.  Seems right.

17  Q    Does this appear to be the type of spreadsheet and

18  staffing analysis that typically is done within the course of

19  business within GEO?

20  A    No.  I mean, again, this was for a unique purpose to send

21  that letter to calculate something for that letter.  This is

22  not something we would normally do.  In fact, we have never

23  done anything like it.

24  Q    Okay.  It was done in that particular instance for the

25  business reason of sending on a request for equitable

Evans - Voir Dire Examination

1  adjustment to ICE; is that right?

2  A    Yep, that seems to be the case.

3  Q    If you see -- if you see the salary expense, G and A

4  overhead.  G and A overhead is something you would calculate

5  in the normal course of business operations; isn't that true?

6  A    Yeah, again, like I said, I think this was done in a very

7  rapid fashion so that is -- somebody just used a standard

8  approximate rate.  Our overhead rate on a per facility basis

9  if we were going through a pricing process is going to vary

10 from facility to facility.  Could be anywhere from five and a

11 half to nine percent or ten percent.

12 Q    They used one of the standard approximate rates GEO would

13 normally use?

14 A    They used an approximation because all they were doing

15 here is doing a rough order of magnitude type analysis.

16 Q    They also did a per diem, like they did an analysis of

17 what that would result in as a per diem for the ICE

18 contracting, correct?

19         MS. SCHEFFEY:  Objection, foundation.

20         THE WITNESS:  It says there is a per diem down there.

21 I don't know how they calculate it without looking at the

22 cell and seeing what the calculation was.

23 BY MS. BRENNEKE:

24 Q    Per diem rates are the unit of measure of how GEO is paid

25 by ICE for detention management services, correct?

 1   A    No.

 2   Q    Pardon me?

 3   A    No.

 4   Q    You don't use per diem rates, bed-day rates?

 5   A    Most of our contracts -- all of the contracts in the

 6   western region were paid a fixed price for a portion of the

 7   contract.  Then there is an incremental per diem for

 8   occupancy or use above that fixed price.

 9   Q    The fixed price meaning there is a minimum guarantee for a

10   certain number of beds, correct?

11   A    Yeah.  It is a minimum monthly payment typically that the

12   government makes for a base amount of the contract activity.

13            MS. SCHEFFEY:  I object.  We are way beyond --

14   BY MS. BRENNEKE:

15   Q    I am going to go to the Tacoma tab, please.  Are you

16   familiar with the general way that this spreadsheet is laid

17   out for the Tacoma facility?

18   A    Yes.

19   Q    Can you tell us what you notice about the general way the

20   spreadsheet is laid out?

21   A    It is a listing of positions.  Calculates a cost per

22   position or a cost for a typical shift or category of

23   workers.

24   Q    This is consistent with the kind of pricing documents that

25   GEO uses for the Northwest Detention Center facility pricing

1    process; is that correct?

2    A   Similar, yep.

3    Q   If you go to the next tab, Tacoma summary, that becomes

4    then an analysis of how many additional staff would be needed

5    on top of existing staff to replace detainee workers; is that

6    correct?

7    A   What does it say on the top?  Oh, that's what it says.

8    Like I said, I wasn't part of the analysis, and I didn't

9    review this level of detail so this is the first time I am

10   seeing it.

11   Q   You know someone within GEO used the standard forms of

12   pricing analysis and came up with a conclusion that there

13   would be 85 staff -- additional staff members necessary; is

14   that right?  If you can go to the bottom of that.

15   A   The green box?

16   Q   Yes.  You are aware this document was made by people who

17   had knowledge either at the facility level or the regional

18   level; is that right?

19          MS. SCHEFFEY:  Objection, misstates prior testimony.

20          THE WITNESS:  I assume that would be the case.

21          THE COURT:  Overruled.

22          THE WITNESS:  I don't know who prepared it.  Like I

23   said, it may have been prepared by someone else at the

24   facility.  Could have been done by one person at corporate.

25   I really don't know.

1    BY MS. BRENNEKE:

2    Q   The existing staff and the information about salary, that

3    all requires knowledge that is GEO knowledge about how it is

4    currently staffed, correct?

5    A   Right.

6    Q   You are aware that during your deposition, I asked you

7    whether you had access to the underlying calculations because

8    we didn't have them in front of us at that time, did we?

9    A   Right.

10   Q   You believed that they would have been saved and retained

11   because at that point, due to their recency, they would not

12   have been destroyed, correct?

13        MS. SCHEFFEY:  Can you give us a page and line?

14   BY MS. BRENNEKE:

15   Q   Page 120 -- 119, I said, "Would you have a way of finding

16   that and finding the underlying price analysis of the labor

17   economics that backed up the summary costs?"  You said at

18   120, Page 4 (sic), "If it has been saved and still retained,

19   yes.  I mean -- given the recency of it, I think it would

20   still be available, but I don't know for sure."  Do you

21   recall saying that?

22   A   I don't recall saying that.  If that's my testimony, I

23   stand by it.  I am having a hard time getting to the --

24   getting out of this screen.

25   Q   I think we can take down the screen now.

1         Mr. Evans, is it --

2    A    There we go.

3    Q    Is it consistent with GEO's business practices that if it

4    produces spreadsheets and documents that it sends to the

5    federal government, that it maintains copies of those

6    documents in its normal course of business?

7    A    Yes.

8         MS. BRENNEKE:  Your Honor, these documents were

9    produced to plaintiffs as part of discovery late in the

10   process after a lot of motions to compel, a mandamus action,

11   and then again motions to compel.  There is no dispute as to

12   the authenticity of these documents.  We offer them for

13   admission before the Court.

14        MS. SCHEFFEY:  Your Honor, GEO objects.  First, it

15   would note that Your Honor specifically said in the motion to

16   compel that by ordering we turn over the documents, you were

17   not making a ruling on the admissibility of those.

18        I would point to -- I believe they are relying on business

19   records -- 803(6) first requires this is a

20   regularly-conducted activity.

21        The witness has testified he has never seen anything like

22   this.  It was a one off.  So it is not regularly conducted.

23        I would further state the witness has testified he has not

24   seen this before until today.

25        Finally, I would ask for the opportunity to ask a few

1   questions of the witness, at least complete his testimony

2   from some of this deposition because it has been read in

3   piecemeal.

4           THE COURT:  I don't think you made out the

5   foundation, counsel, for 602-A, B or C.

6           MS. BRENNEKE:  He testified specifically he heard

7   602-A.

8           THE COURT:  I heard what he testified to.  I don't

9   think you made out a foundation for any of those.  I'm sorry.

10  That's my ruling.

11      Let's get the jury in here and go to work.

12          THE CLERK:  All the jurors have joined.

13      (The following occurred in the presence of the jury.)

14          THE COURT:  Ladies and gentlemen, I'm sorry, we have

15  eaten into a half hour of your time here today on this issue.

16  There are matters that come up during a trial that require

17  that I discuss them with the lawyers and do that outside your

18  presence.  These are matters of law and admissibility of

19  evidence and procedure.  We are not trying to keep anything

20  from you that you should hear.  We try to keep such

21  conferences to a minimum.  Anyway, this took some time.

22      I indicated before the noon hour that 602-A would be

23  admitted.  I am changing my ruling.  602-A is not admitted in

24  evidence.  That does not mean you cannot consider the

25  witness's testimony on that subject.

1    Go ahead, Ms. Brenneke.

2                    DIRECT EXAMINATION (Resumed)

3    BY MS. BRENNEKE:

4    Q    Mr. Evans, I would like you to take a look at Exhibit

5    365-A.

6    A    I have it up.

7    Q    In the little box, you testified that there was a $22

8    million annual cost for paying state minimum wage to ICE

9    detainees at GEO's 12 facilities totalling 11,000 beds; is

10   that correct?

11   A    Yes.

12   Q    The portion of the minimum wage payments to pay the

13   Northwest Detention Center detainees minimum wage was

14   approximately $3,400,000; is that correct?

15   A    On this page?

16   Q    For the breakdown of the calculations.  When you

17   understand how the calculations were broken down, the portion

18   attributable to the Northwest Detention Center was

19   $3,400,000; is that correct?

20   A    Yes.

21   Q    And similarly for the second line, the 38 -- $38 million

22   annual cost replacing all GEO ICE detainees with full-time

23   employees.  The analysis from the Northwest Detention Center

24   would be that there were 85 full-time employees required at

25   the Northwest Detention Center to replace the detainee

1    workers, correct?

2    A    That's what the schedule said.

3    Q    85 full-time employees?

4    A    Okay.  Yes.

5    Q    So you testified you were sure that if GEO had to pay the

6    minimum wage, that GEO would pass on those increases of costs

7    to ICE through an equitable adjustment; isn't that true?

8    That is what you testified to?

9    A    Yes, I believe that is what would happen, yes.

10   Q    And a request for equitable adjustment is really just a

11   request to ICE to modify its contract and pay GEO more; is

12   that correct?

13   A    Typically, it is financial.  There could be other types of

14   adjustments or modifications to the contract, but yes.

15   Q    And this exhibit, 365-A, was related to a couple of

16   requests for equitable adjustment that GEO submitted to ICE,

17   in specific to request that ICE pay GEO's legal fees; is that

18   right?

19   A    Let me just read -- move up a little bit.

20         THE COURT:  You are not coming through real clear.

21         THE WITNESS:  I wanted to scroll up to the top to

22   read.  It was a request for equitable adjustment.

23   Reimbursement for cost already incurred.

24   BY MS. BRENNEKE:

25   Q    That was for costs incurred in these lawsuits to defend

1    against having to pay, correct?

2    A    That's correct.

3    Q    The last time GEO asked ICE to pay GEO's attorney's fees,

4    ICE denied that request, didn't it?

5    A    I don't know.  To which are you referring?

6    Q    Well, ICE denied the request of May 30th, 2018 that

7    Mr. Zoley made to take over the defense of these lawsuits and

8    reimburse GEO for its costs; isn't that true?

9    A    Yes.

10        MS. BRENNEKE:  Thank you.  I have no further

11   questions.

12                        CROSS-EXAMINATION

13   BY MS. SCHEFFEY:

14   Q    Good afternoon.  How are you, Mr. Evans?

15   A    Good.

16   Q    Do you remember earlier you were asked whether GEO began

17   paying minimum wage to detainees after this lawsuit was

18   filed?

19   A    Yes.

20   Q    Do you know why you didn't start paying minimum wage at

21   that point?

22   A    Well, I don't recall my testimony exactly.  As I said, I

23   think it is contractual.  There is -- the program requires it

24   be a voluntary work program, that it is approximately a

25   dollar a day.  The individuals that participate in the

1  program, the detainees are not eligible generally, to the

2  best of my knowledge, to be employees.  It would be a

3  violation of federal law.  I think it would -- personally, it

4  would look bizarre for a federal contractor who is working

5  for the department responsible for enforcing immigration law

6  to be violating federal employment law.

7        MR. BERGER:  Your Honor, I object to the extent the

8  witness is giving a personal opinion on that subject and ask

9  that part of the testimony be stricken.

10       THE COURT:  The answer was not totally responsive,

11  and that portion of the answer reflecting the witness's

12  personal opinion should be stricken and disregarded by the

13  jury.

14  BY MS. SCHEFFEY:

15  Q   Can we pull up Exhibit 365-A?

16  A   I have it.

17  Q   Hopefully the tech team will get it up for the jury,

18  although I am sure they have seen it a lot by now.  Why was

19  this letter written?

20  A   Well, as I said, at the time it was written to obtain --

21  try to obtain support from the government for defending the

22  voluntary work program against these lawsuits and to get

23  reimbursement for the legal costs it already had incurred.

24  Q   So if we can look in the box, see where it mentions 12

25  facilities?

1    A    Yes.

2    Q    Are those ICE facilities?

3    A    They are facilities that GEO owns and operates on behalf

4    of ICE.  They are all ICE detention centers.

5    Q    Do they all have a voluntary work program?

6    A    To the best of my knowledge.

7    Q    Do any of them pay minimum wage right now?

8         MS. BRENNEKE:  Objection, sounds like foundation is

9    at issue.

10        THE COURT:  I think he may answer this question, if

11   he knows.

12        THE WITNESS:  Repeat the question.

13   BY MS. SCHEFFEY:

14   Q    Do any of those facilities pay minimum wage right now?

15   A    To detainees?

16   Q    Yes.

17   A    No.

18   Q    Do all 12 facilities have the same profitability margin as

19   the Northwest ICE Processing Center?

20   A    No.

21   Q    Is the reason the Northwest ICE Processing Center has a

22   higher margin than the other facilities is its use of the

23   voluntary work program?

24        MS. BRENNEKE:  Object to the form.  Leading.

25        THE COURT:  Sustained.

BY MS. SCHEFFEY:

Q   Does the voluntary work program have any impact on profitability at the Northwest ICE Processing Center?

A   No.

Q   Does it give the Northwest ICE Processing Center a competitive edge over the other 12 facilities?

A   No.

Q   You talked about how you are a for-profit company; is that correct?

A   Yes.

Q   Does GEO reinvest any of the profits in its facility?

A   Yes.

        MS. BRENNEKE:  Objection, this is beyond the scope.

        THE COURT:  I think he may answer.  Pretty repetitive, counsel, but he may answer.

BY MS. SCHEFFEY:

Q   Does GEO reinvest any of its profit?

A   Yes.

Q   You discussed that you are involved in business development; is that correct?

A   Yes.

Q   Is GEO incentivized to reinvest its profits for competitive reasons?

A   Yes.

Q   Why is that?

1    A    Well, we believe we have the best facilities and that

2    helps with our client relations.  It promotes safety and

3    security of our staff and the people that are under our care,

4    so there is an incentive to ensure that the business is

5    maintained by reinvesting back into the business.  It is

6    pretty standard for most businesses to do that.

7    Q    Okay.  Do you know what the total amount of the award of

8    the Northwest ICE Processing Center is?

9    A    Not exactly, no.

10   Q    Are you generally familiar with what the total award of a

11   contract is?

12   A    Not typically.  I mean, at the time they are awarded, it

13   might be announced and I would see it.  Not typically.

14   Q    Okay.  So if we could pull up Exhibit 129.  I am going to

15   go to Bates No. 036866.  I think that there is a number in

16   there, total amount of award.  Can we blow that up?  Have you

17   seen this before, Mr. Evans?

18   A    What page are you on?

19   Q    036866 is the Bates number at the bottom.  Also on the

20   screen, if that is easier.

21   A    You said 866?

22   Q    Yeah.

23   A    Okay.  866.

24   Q    See the section that says the total amount of the award?

25   A    No.  Yes, there it is.  It is small.  Yep.

1   Q   What does this number represent?

2   A   That would represent the -- for all the years, for all the

3   different contract line items, the value of the contract if

4   the government were to utilize all of the services.

5   Q   What do you mean if the government were to utilize all of

6   the services?  Is there a circumstance where they wouldn't?

7   A   Well, they won't.  They never do.  ICE never utilizes all

8   of the -- especially in the bed -- the beds or occupancy,

9   they never use 100 percent of the capacity of the facility.

10  Typically, occupancy is 75 to 85 percent on average.

11      They are not going to use all the transportation, all the

12  line items amounts.  At the end of the contract, what do they

13  ultimately use?  I don't know.  Be a substantial portion of

14  that, but won't be all of it.

15  Q   Can GEO count on getting the entire amount as revenue?

16  A   No, we won't get that entire amount.  That's what I am

17  saying.  It would be something less than that.

18  Q   Are you familiar with the term "net margin"?

19  A   Yes.

20  Q   Does a net margin account for legal fees?

21  A   Not really.  Not in our facilities, no.

22  Q   Is -- do you tip --

23  A   Legal fees are typically incurred in the corporate office

24  and are part of our general and administrative expenses.

25  Q   Do you calculate profit typically on a facility by

1    facility basis?

2    A   We calculate, as I said before, pretax operating profit or

3    pretax margin.  Profit is really the net income of the

4    company, which is we take all the operations, all the

5    revenue, less all of our expenses, interest, costs, taxes, et

6    cetera, that results in our net income or profit, which year

7    in and year out is typically seven to eight percent of our

8    revenue.

9    Q   How do your profits compare to other for-profit companies

10   on the New York Stock Exchange?

11           MR. BERGER:  Objection, foundation.

12           THE COURT:  The objection is sustained.

13   BY MS. SCHEFFEY:

14   Q   Yeah.  Are you the CFO of the company, Mr. Evans?

15   A   Yes.

16   Q   Are you familiar with the general profits of other

17   companies that are traded on the New York Stock Exchange?

18   A   Generally.

19   Q   Are your profits comparable to others on the New York

20   Stock Exchange?

21   A   I think they are reasonable.  Probably in the lower half

22   of the range.

23   Q   Is there a financial incentive to replace a GEO employee

24   with voluntary work program detainees?

25   A   No.

1  Q    Why not?

2  A    Well, ultimately we are a service company.  The biggest

3  service we provide is labor and staffing to manage these

4  institutions.  Our markup, if you will, is on top of all of

5  our costs to operate the facility.  If we had more costs, we

6  are going to mark it up by approximately the same percentage.

7  Those rates are controlled by regulations in the government

8  referred to as the federal acquisition regulations, but they

9  set kind of a range and a formula for how you calculate what

10  is allowable.

11      The contracting officers, they are familiar with those

12  rules.  We are familiar with those rules.  We price our

13  contracts in accordance with those rules.  If the cost -- the

14  underlying costs to operate go up, necessarily the government

15  is going to pay more and there will be a little bit more

16  margin or fee for the company.

17  Q    Are any of your profits dependent on the voluntary work

18  program?

19           MS. BRENNEKE:  Object to the form.

20           THE COURT:  Sustained.

21  BY MS. SCHEFFEY:

22  Q    Are you aware of any occasion where participation in the

23  voluntary work program decreased and the company's overall

24  profits also decreased?

25  A    No.

1    MS. SCHEFFEY:  No further questions.

2    THE COURT:  Any further questions of Mr. Evans?

3    MS. BRENNEKE:  Yes, a couple.

4                    REDIRECT EXAMINATION

5    BY MS. BRENNEKE:

6    Q   Previously, Exhibit 253 was admitted.  I would like to

7    have Caiti please pull that up.

8    A   I don't have that one.

9    Q   I will show it to you on the screen.  Mr. Evans, this

10   is -- this has been previously admitted as a financial

11   summary of the Northwest Detention Center.  Does that look to

12   be consistent with what you understand the revenues, gross

13   margin and net margin to be for the Northwest Detention

14   Center?

15   A   Yep, that looks like that, yes.

16   Q   And because we were talking about this 2018 letter to ICE,

17   I want you to focus your attention on the column 2018.  The

18   gross margin for the Northwest Detention Center for 2018 was

19   $18,603,000?

20   A   That's what it says.

21   Q   If you were to subtract the cost of the minimum wage

22   payment to detainee workers of $3,400,000, there would still

23   be a profit -- a substantial profit at the Northwest

24   Detention Center, correct?

25   A   Which amount would I be subtracting?

1   Q   Recall you said the portion of detainee wages calculated

2   at the minimum wage for the Northwest Detention Center was

3   3.4 million; is that correct?

4   A   Yes.

5   Q   If you were to pay that in 2018, the gross margin for the

6   Northwest Detention Center would still be substantial,

7   wouldn't it?

8   A   It would be about 15 million.  The net margin would be cut

9   in half almost.

10  Q   The net margin would be over 5 million, correct?

11  A   About 5 million.

12          MS. BRENNEKE:  Thank you.  No further questions.

13          MS. SCHEFFEY:  One final question, Your Honor.

14                      RECROSS-EXAMINATION

15  BY MS. SCHEFFEY:

16  Q   Mr. Evans, is the reason you don't pay detainee volunteers

17  minimum wage because you can't afford it?

18          MS. BRENNEKE:  Objection.  Leading.

19          THE COURT:  Sustained.

20  BY MS. SCHEFFEY:

21  Q   Why don't you pay detainee workers minimum wage?

22  A   Well, as I said before, the primary reason is we believe

23  it would be in violation of the law.  It is in -- it is in

24  violation of our contract, and we believe it would be in

25  violation of federal law.

```
 1          MR. BERGER:  Objection, Your Honor, violates one of
 2   the Court's earlier orders on evidence.
 3          THE COURT:  The objection is sustained.  The jury
 4   should disregard the witness's last answer.
 5   BY MS. SCHEFFEY:
 6   Q   Mr. Evans, is there a financial reason you don't pay
 7   detainees minimum wage?
 8   A   No.
 9          MS. SCHEFFEY:  No further questions.
10          THE COURT:  Okay.  Thank you, Mr. Evans.  You may be
11   excused.
12          THE WITNESS:  Thank you, Your Honor.
13          THE COURT:  You may call your next witness.
14          MR. WHITEHEAD:  At this time, we call Ugochuwu
15   Goodluck Nwauzor.
16          MS. SCHEFFEY:  Does he have the exhibits in front of
17   him as well?
18          MR. WHITEHEAD:  Yes, we printed those off.
19          THE CLERK:  The witness has just joined.
20          THE COURT:  There he is.
21      Mr. Nwauzor, can you hear me?  Unmute your phone.  Raise
22   your right hand and be sworn.
23                    UGOCHUKWU GOODLUCK NWAUZOR,
24      having been sworn under oath, testified as follows:
25
```

```
 1              THE COURT:  You may inquire, Mr. Whitehead.
 2                      DIRECT EXAMINATION
 3   BY MR. WHITEHEAD:
 4   Q   Good afternoon.  Sir, could you please introduce yourself
 5   to the jury?
 6   A   My name is Ugochukwu Goodluck Nwauzor.
 7   Q   Sir, were you detained at the Northwest Detention Center?
 8   A   Yes, sir.
 9   Q   From when to when?
10   A   I came to America in 2016.  I can't remember exactly how
11   many months, yeah, but I came to America in 2016.
12   Q   Sir, while you were at the Northwest Detention Center, did
13   you work in the voluntary work program?
14   A   Yes, sir.
15   Q   Well, that's what this case is about.  Before we hear your
16   testimony about the voluntary work program, I would like for
17   the jurors to get a better sense of who you are.  How old are
18   you?
19   A   43 years old.
20   Q   Thank you.  What is your first language, sir?
21   A   My first language is Igbo language.
22   Q   Do you feel comfortable testifying in English today?
23   A   Yes, I will try my best.
24   Q   Where were you born?
25   A   Enziama, Imo State, Nigeria.
```

1    Q    What part of Nigeria is that?

2    A    It is east, east part of Nigeria.

3    Q    Sir, would it help to explain where you are from if we

4    were to show you a map?

5    A    Yes, sir.

6    Q    You have a map in front of you.  I would like for you to

7    look at the hard copy in front of you.

8         MR. WHITEHEAD:  Your Honor, counsel, this is Exhibit

9    608.

10   BY MR. WHITEHEAD:

11   Q    I have this Nigeria map.  Is this a fair and accurate

12   representation of Nigeria?

13   A    Exactly, sir.  Nigeria map, yeah.

14        MR. WHITEHEAD:  May we publish the map, 609?

15        THE COURT:  Are you offering it or offering it as an

16   illustrative exhibit?

17        MR. WHITEHEAD:  Illustrative.  It can certainly check

18   in as an exhibit.  It is just to illustrate his testimony.

19        MS. SCHEFFEY:  We object to it as an exhibit but not

20   as illustrative or demonstrative.

21        THE COURT:  It may be admitted as an illustrative

22   exhibit.

23        MR. WHITEHEAD:  May we publish?

24        THE COURT:  Yes.

25

1  BY MR. WHITEHEAD:

2  Q   We are going to bring a map of Nigeria up for you to see.

3  I am going to put a mark on the map near Imo state.  Is this

4  a map of Nigeria?

5  A   Yes, sir.

6  Q   I am going to put a circle around Imo state.  Did I get

7  it?

8  A   Yes.

9  Q   Tell us about Eziama in Imo state?

10 A   Eziama is a community in Imo state.  Imo state is a state.

11 Eziama is a community in Imo state where I was born.

12 Q   Before we move on, tell us, what is the community like?

13         MS. SCHEFFEY:  Objection, relevance.

14         THE COURT:  Overruled.

15 A   It is a community dominated by Christian.  Then my mother

16 and my father is Christian.  I am also born in Christian

17 family.  Eziama people, we normally engage in farm

18 production, vegetable, corn, tomato and yam.

19 Q   You mentioned your family.  Tell us about your family?

20 A   I born in a family of Mr. Augustin and Irene Nwauzor.

21 Then I am the younger one of the sons of Mr. Augustin and

22 Irene Nwauzor.

23 Q   You have siblings, brothers?

24 A   Yes, I have two.  I am the younger one.

25 Q   Sir, at some point did you move away from your community

1    in Imo state?

2    A    Yes, sir.  I later moved to Port Harcourt in River state.

3    Q    Why did you move away from Eziama?

4    A    In 2008, I moved to Port Harcourt where my brother is

5    still residing.

6    Q    Why did you move?

7    A    Then as a young guy, I moved to Port Harcourt to look for

8    green pasture.

9    Q    What did you do for work there?

10    A    When I got to Port Harcourt, I learned how to sew gloves

11    and make shoes.

12    Q    At some point, did you move away from Port Harcourt?

13    A    Yeah, after a period of a year in Port Harcourt, where I

14    opened my own shop.  Then due to the competition in Port

15    Harcourt in River state, there was a lot of competition.  I

16    have to relocate to the northern part of Nigeria, Borno

17    state, where the capital is Maiduguri.

18    Q    I am going to bring the map back up.  If we could get

19    Exhibit 609.  I am going to draw a circle around Borno state.

20    When I draw that circle, let me know if I have placed it in

21    the right spot.  Did I get that right?  Is that Borno state?

22    A    Yes.

23    Q    Is there someplace in particular that you moved to?

24    A    In Borno state, I move in a place called Chibok in Borno

25    state.

1    Q    In Chibok in Borno state, what did you do there for work?

2    A    I established my business there.

3    Q    Tell us about Chibok in Borno state?

4    A    Chibok is in a community or a county in Borno state that

5    is dominated by a mix of Christian and Muslim.  Then that is

6    where I put my business.

7    Q    Was it the same sort of business that you had in Borno

8    state?

9    A    Yeah, same business I had in Port Harcourt relocated to

10   Borno state.

11   Q    Selling men's clothing?

12   A    Yeah, and shoes.

13   Q    Have you heard of Boko Haram?

14   A    Yeah.  Boko Haram is predominantly in Nigeria.

15   Q    What is Boko Haram?

16   A    I would say Boko Haram is a group of people or

17   organization like terrorists or ISIS that destroy adults,

18   killing (inaudible) in the hospital.  There was a time

19   that --

20                    (Reporter interruption.)

21   Q    There is a court reporter.  She is giving us a reminder.

22   This is a good reminder for everybody.  It is very important

23   we speak slowly so she can type everything down and clearly

24   so she can understand what we are saying.  The record is very

25   important in this case.  Can you speak slowly and clearly for

Nwauzor - Direct

1   us?

2   A   Okay.

3   Q   Is that yes?

4   A   Yes, sir.

5   Q   I will do my best to do the same.

6   A   Okay.

7   Q   So we are talking about Boko Haram.  Did you have any

8   personal interaction with Boko Haram?

9   A   Yeah.  In Borno state Chibok precisely, I had an argument

10  with a Boko Haram supporter.

11  Q   What did you argue about?

12  A   I argued against the atrocities, the killing of

13  (inaudible), burning properties, attacking churches and, you

14  know, business places in Nigeria.

15  Q   What happened next?

16  A   Then he told me he was going to come for me because if you

17  come against them, they are going to get that person.

18  Q   Did they come for you?

19  A   Yeah.  Later they came to me, my shop and my house.  They

20  destroyed it.

21  Q   When you say they destroyed it, what did they do?

22  A   They bombed my shop and my house.

23  Q   Forgive me, I don't mean to dwell on difficult subjects.

24  You had a friend?

25  A   Yeah.  Yeah.

1    Q    That supported you?

2              MS. SCHEFFEY:  Objection, relevance.

3              THE WITNESS:  They also --

4              THE COURT:  Just a minute.  The objection is

5    overruled.

6    BY MR. WHITEHEAD:

7    Q    You may answer the question, sir.

8    A    A friend of mine, he also supported me against the

9    atrocity with Boko Haram performing in Nigeria.

10   Q    What happened to your friend?

11   A    They also attack, they killed him.

12   Q    So Boko Haram bombed your store and your house, what did

13   you do?

14   A    I ran.

15   Q    Where did you go?

16   A    I came back to the east part of Nigeria and Eziama, my

17   village.

18   Q    Did you stay in your village or did you leave?

19   A    I didn't leave.  I stayed in my village for a period of

20   time.  I was hiding because I know that if I go against them,

21   they most surely kill that person.

22   Q    As I understand it, at some point you left Nigeria.  Do I

23   have that right?

24   A    Yes, sir.

25   Q    Tell us, we know because you are here today, that you came

1    to America.  Tell us about your journey to America?

2    A    During this period of time, I was going through this

3    trauma because I know the consequences of anybody that has

4    gone against the way of the Boko Haram.  I contacted a

5    friend, you know, who promised to make a connection for me to

6    leave Nigeria because I am afraid.  I don't go out any more.

7    I was hiding in the village.  I didn't even tell my mother,

8    my father what I am going through because if I tell them they

9    are -- I am going to traumatize them.  I was in the village.

10   My mother and father are 80 something years of age.  I was

11   there helping them engaging in doing some work in the

12   village, helping them.  Both of them have high blood

13   pressure.  They are sick.  Helping them in the village, at

14   the same time living with fear of my life of the threat

15   because I have seen a lot of the killings these Boko Haram

16   are doing in Nigeria, killing a lot of people who step on

17   them.

18       My friend contacted me.  I moved to Lagos where I took a

19   ship down to Brazil.  From Brazil, I make my journey down to

20   America.

21   Q    Why come to America?  Why not go somewhere else?

22            THE COURT:  There she is.

23            THE WITNESS:  I believe America have the value of

24   human being because when I come to America, I believe that I

25   will have hundred percent protection.

1  BY MR. WHITEHEAD:

2  Q   You came to America, did you sneak in to America, sir?

3  A   No, sir.  When I came to America, I didn't jump the fence.

4  I didn't do anything stupid to come to find myself into

5  America.  I walked straight to the port of entry.

6  California -- Mexico, California border to the point of entry

7  when coming to America.  I find other people on the line.  I

8  get on the line.  I walk down to the checkpoints of the

9  security.  They asked me who I am.  I tell them.  Then they

10 took me, dropped me in a place, in a seat, sat me there

11 trying to know who I am and what my aim of coming to America,

12 if I am looking for asylum.  Then I told them what happened

13 to me, the reason why I was coming.  Then they told me they

14 are going to do investigation to see who I am and where I am

15 coming from.

16 Q   Is that when you were taken into ICE custody, immigration?

17 A   No.  At the point of entry, this is what they tell me.  At

18 the point of entry, in California border, that was the

19 security.  There was a group of people.  Not only me in the

20 port of entry.  I met other people from other different

21 countries in the port of entry.

22 Q   When you got to the point of entry, did you have any

23 personal belongings with you.  Did you have your things?

24 A   I had my bag, yeah, some of my little belongings.

25 Clothes, yeah.  My belongings.

1    Q    Did you have any money with you?

2    A    Yeah, $200 and something U.S. dollars with Mexico money.

3    When I came -- when I was in Mexico, when I bought something

4    I have change, I kind of change with pesos, Mexico pesos,

5    yeah.

6    Q    At some point, sir, were you taken to the Northwest

7    Detention Center?

8    A    Yeah, at the border after a couple weeks, we spent weeks

9    within California border, not only me, all that group.  I met

10   all that group.  Then they move us from California border,

11   from California down to Northwest Detention Center.

12   Q    The journey from the California border to the Northwest

13   Detention Center, what was that like?

14   A    You know, for me, the experience, not easy for me.  Yeah.

15   It wasn't easy.

16   Q    Why do you say that?

17   A    You know, I was thinking, crying, I don't know what is

18   going to be the end of my journey at that moment.  I was

19   remembering my mother back home and what I went through

20   before coming to America.

21   Q    I'm sorry.  I didn't mean to make you relive any of that.

22   Let's talk about the work program.  That is what this case is

23   about.  When did you learn about the voluntary work program

24   at the Northwest Detention Center?

25   A    Yeah, when I get to the Northwest Detention Center, I saw

1  some other detainee doing cleaning up, cleaning the shower
2  and also see other people working in a different area like
3  barber salon, kitchen and the laundry.
4  Q   What did you do?
5  A   Later I got a chance to work in my pod where I was -- my
6  job was cleaning the shower.
7  Q   So why did you sign up to work?
8  A   Because I have no money and also I want to do that to help
9  myself, to have some money to get some commissary like
10 biscuit or toothpaste.  Also, soup, we call it soup, and also
11 make a call to my brother to have some of my paperwork to --
12 journey for my immigration court, to make a call back home.
13 Q   You mentioned buying biscuits and noodles.  Why were you
14 buying food from the commissary?
15       MS. SCHEFFEY:  Objection, relevance.
16       THE COURT:  Overruled.
17 BY MR. WHITEHEAD:
18 Q   You can answer.
19 A   Sometimes in detention, they might present the food, maybe
20 if I don't want to eat that kind of food when they presenting
21 me, I can use the biscuit or the soup as alternative.  If I
22 don't want to eat the food, then I can use it to alternative
23 of food.
24 Q   What was the food like at the Northwest Detention Center?
25 A   Yeah, you know, you have no choice what they present to

1    you to eat.  I eat the food.  Sometimes I don't eat.  That's

2    the reason why I have the biscuit and the soup, yeah.

3    Q    You signed up to work.  Did they let you work right away?

4    A    No, I got to apply when they are vacant.

5    Q    Did a job open up for you?

6    A    Yeah, when the job opened up for me.

7    Q    What was the job that you did?

8    A    I cleaned the shower in my pod.

9    Q    Your pod, how many men lived in your pod?

10   A    I didn't count them.  I will say approximately 50 or 60.

11   I didn't count them.  There were enough in the pod.  I didn't

12   count them.

13   Q    You all used the same showers; is that right?

14   A    Yeah, I used the same shower I clean for everybody.

15   Q    How dirty would the showers get after that many men used

16   them?

17   A    They are dirty because a lot of people use them, a lot of

18   soap, a lot of hair, a lot of human spit in the shower.  Just

19   a number of people use it because it is mandated that

20   everyone has to take shower so that everybody going to look

21   good and they smell.  Yeah.

22   Q    Your job as a shower cleaner, did anyone train you how to

23   do your job?

24   A    When I got the job, the officer in the pod appoints one

25   detainee who also show me how to apply the materials, who

Nwauzor - Direct

1    show me how to do it.

2    Q   Well, I would like to bring up another picture for you.

3            MR. WHITEHEAD:   This is Exhibit 522.   This has been

4    previously admitted.

5    BY MR. WHITEHEAD:

6    Q   In a moment, a picture will show up.   My question is this:

7    What are we looking at?

8    A   Yeah, this is exactly what I clean, yeah.   Right.

9    Q   I would like for you to take us from start to finish in

10   the job that you did.

11   A   Could you repeat sir.

12   Q   Tell us about the work you did.   What was the first thing

13   you would do when it was time to clean the shower?

14   A   At first, I would dig the soap label, then I dig the

15   particles, the unfinished soap and the hair that try to block

16   the drain in the bathroom.   I make sure that I pick up all

17   those things first.   Make sure that the drain is open very

18   well so that the water after take -- after taking the shower,

19   the water going to go through the drain.   I make sure all

20   drain in this room, make sure all the drain is free to enable

21   the water when taking the shower to go through.   I wipe all

22   those thing, put them in the trash, you know, trash can.

23       Then first of all, the officer in the pod going to open a

24   room.   We are going to take the material because I have no

25   power of my own to take those things I am going to use, the

```
 1    material.  The officer going to open the room where I will
 2    get all the material, the tools I am going to use.  I get the
 3    water from a room close, yeah, close to this room.  This one
 4    here, the person that use this one, disabled people, there is
 5    a room close to that room where the materials we use.  They
 6    got them there.
 7    Q    I hear you saying materials, are you talking about the --
 8    what you would use to clean?
 9    A    Yeah, what I mean material, the tools we use, all the
10    tools we use.
11    Q    You told us about picking up labels, cleaning out the
12    drains, getting the supplies from the closet, what would you
13    do next?
14    A    After I remove all the hairs and I clean it, I took the
15    water mixed with chemical and soap, the water there, then
16    that water should be warm water, not cold water.  I use it
17    and apply it to the first room, then rub it on the wall, on
18    the drain, make sure I scrub it.  After scrubbing it, I am
19    going to use fresh water, apply the fresh water to rinse it.
20    I must do it from the beginning to the end of all this room.
21         MS. CHIEN:  Mr. Whitehead, I want to pause because I
22    think we might have lost a juror.
23         MR. WHITEHEAD:  Thank you, Ms. Chien.
24    Mr. Nwauzor, hold on one moment.
25    Your Honor, this is around the time we take our afternoon
```

 1    break.

 2            THE COURT:  Let me find out what is going on here

 3    first.

 4            THE CLERK:  We appeared to have lost Juror No. 6.

 5    She's not on the meeting anymore.  She's just rejoining now.

 6            THE COURT:  Where is she?

 7            THE CLERK:  Just a moment.  She's joining now.

 8            THE COURT:  Okay.  Did you miss very much, Juror

 9    No. 6?

10            JUROR NO. 6:  Yes.  I am so sorry.  I seemed to have

11    an issue there for several minutes.

12            THE COURT:  Okay.  Let's take a break and we will

13    figure out what we ought to do about that.

14            JUROR NO 6:  Your Honor, if it would help, I -- the

15    last note I made was to pull up Exhibit 522, I believe.

16    That's when my -- I lost connection.  I am very, very sorry.

17            THE COURT:  That's all right.  Thank you.  We will

18    take our break and come back at 25 minutes to three.  You may

19    be excused.

20     (The following occurred outside the presence of the jury.)

21            THE COURT:  I assume we should read the testimony to

22    her from when Exhibit 522 was put on the board.

23        Angela, are you up to doing that?

24            COURT REPORTER:  Yes, Your Honor.

25            THE COURT:  That's what I was going to suggest, we do

1  a special reading for Juror No. 6.  You all agree that's the

2  appropriate way to deal with that?

3          MR. WHITEHEAD:  I do, Your Honor.

4          THE COURT:  We will do that after we take our break.

5                    (Recessed.)

6    (The following occurred outside the presence of the jury.)

7          THE COURT:  Tyler, can we get the one juror back in?

8          THE CLERK:  We can.

9          THE COURT:  Ms. McDonald-Poper, we are going to

10  read -- the court reporter will read what you missed to you.

11  We will read the evidence to you, the testimony of

12  Mr. Nwauzor.

13          MR. WHITEHEAD:  With permission, may we also show the

14  exhibit while the testimony is read?

15          THE COURT:  Yes.

16     (Reporter read back the requested portion.)

17          THE COURT:  Bring the rest of the jurors in, please.

18     (The following occurred in the presence of the jury.)

19          THE COURT:  We lost Juror No. 6, Ms. McDonald-Poper,

20  for a minute.  We had the court reporter read the part she

21  did not hear.  So now we are ready to continue with

22  Mr. Nwauzor's testimony.

23     Mr. Whitehead.

24  BY MR. WHITEHEAD:

25  Q  Mr. Nwauzor, you were describing for us your work in

1  cleaning the showers in your pod.  Can you continue where you

2  left off in terms of telling us what you would do to clean

3  the showers, is there anything else you would do?

4  A    Then after doing all the -- you know, I am going to use

5  fresh water, you know, flush it on the ground, make sure the

6  hallway through all this shower rooms, make sure I apply the

7  same chemical, the water, you know, with the soap, scrub it

8  on the ground so that the place going to be clean.  Also use

9  a mop to mop, you know, mop on the ground of this shower

10 room.  On the hallway, same time I apply the water, scrub it

11 with the mop.  They are going to use the fresh water, apply

12 it so that it will enable it to be very dry and clean,

13 because if I didn't apply the fresh water, then going to be

14 slippery, people going to fall.  First of all, I going to

15 make sure I apply the water mixed with the chemical or with

16 the soap.  Later, I am going to use the fresh water to clean

17 it off and dry it so that no one going to fall.  Later, I

18 going to pick up, I am going to take all the material, clean

19 them and put it back to where I got them.  Then I will go to

20 the pod officer in charge that moment of the time I am doing

21 the job and sign the paperwork that I am finished with the

22 job.

23 Q    The work that you just described for us, cleaning the

24 showers, how often would you do that job?

25 A    I do it every day.

1  Q   How long would it take you to clean the showers in the way

2  you just described for us?

3  A   One hour plus.

4  Q   When you were done cleaning the showers, you said you

5  would go to the GEO officer.  Do I have that right?

6  A   Yes, sir.

7  Q   Did anyone ever check your work to see if you did it

8  right?

9  A   Yeah, because the officer in charge of the pod always tell

10  us that if you don't perform good job, they are going to, you

11  know, take away the job from that individual doing that job.

12  Also, when I was there, I observed one guy from a Spanish

13  country, I don't know exactly the country, he lost the job

14  because he couldn't perform good job.  One guy took the job

15  from him because he was doing bad job.

16  Q   How much did GEO pay you to clean the showers?

17  A   One dollar.

18  Q   When you took the job, did you know the pay was one

19  dollar?

20  A   Yeah, I know it is one dollar.  I need --

21  Q   Why did you work?

22  A   Could you please --

23  Q   Knowing that it was only one dollar a day, why did you do

24  the job?

25  A   I do the job because I need the money desperately.  The

1  situation I find myself, I have no money to make a call to

2  call my brother back home, as I told you, concerning my case

3  to get some of my necessary documents to back up my case.

4  Also, use it to help myself to get some of the commissary

5  which I told you earlier like biscuits or toothpaste, the

6  soup.

7  Q    Were you granted asylum?

8  A    Yes, sir.

9  Q    Do you know when?

10  A    It was 24 January 2017, I was granted asylum.

11  Q    Is that date special to you?

12  A    I will never forget it in my life until I die.  It is a

13  wonderful day which I will never forget.

14  Q    Why is that, sir?

15  A    Happy finding myself in America where I feel 100 percent

16  protected.  Give me a very wonderful joy.

17  Q    When you were released from the Northwest Detention

18  Center, where did you go?

19  A    The day I was released from the detention, there is this

20  organization called Aid Northwest.  I met them at the

21  detention center gate, they took me.

22  Q    Did they help you find a job?

23  A    Yeah.  From that moment, you know, the day I was released,

24  like what I tell you, I will never forget that day.  I was

25  full of happiness, full of joy because I was traumatized and

depressed.  I am thinking all hope is gone in my life.  When
I came out that day, what Northwest Aid did to me really give
me more happiness and more life by consoling me, took me to a
particular place where I met other people who were -- they
are asylum like me in Tacoma.  Then the others started
processing our working permit, apply for a working permit for
me, all the necessary documents which I don't know, they help
me to apply all those things.  They get me with other people,
engage in us in one other organization in Kent.  They called
them World Relief.  They move us from Tacoma to World Relief.
When we get to World Relief, I met other people from
different country also who also win the asylum like me.  Then
they engage us, World Relief engage us in English education,
orientation, how to behave ourselves in America, how to
adopt -- know how to walk in traffic, how to use Orca cards,
how to speak English.  I write in English.  Back home in
Nigeria, I told you my language is Igbo.  They tell us how to
speak English.  A lot of things, how to know how America
work.  If you are a good person in America, don't violate the
law, don't violate the traffic.  I learned the laws from
World Relief.
Q   At some point, you got a job at a hotel.  Do I have that
right?
A   Yes, sir, through the help of World Relief, they engage us
in such in (inaudible) from immigrants.

1    Q    Where did you work?

2    A    I work at the Courtyard Marriott downtown.

3    Q    What did you do at the Courtyard Marriott?

4    A    Room maintenance.

5    Q    What sorts of things did you do as maintenance?

6    A    Making sure that the vents in the room, the air filter,

7    change the air filter, make sure the air filter is clean.

8    Then I clean the shower.  The tile.  Make sure the tile is

9    clean.  I do caulking, you know, caulking.  I learn how to do

10    this in Marriott.  Great opportunity for me to do some handy

11    work when I got there.

12    Q    How much were you paid for the work you just described?

13    A    They paid me $15 beginning.  They told me if I perform a

14    very nice job, I will -- they are going to be adding more pay

15    for me based on my performance.  For the period of time -- I

16    got the job in middle of 2017.  By 2018 -- 2015, I got an

17    award as employee of the month and issued a certificate by my

18    manager for work performance.  They add more money and one

19    day off paid for my good performance in 2015.

20    Q    Did you pay taxes?  Did they take taxes out of your

21    paycheck at the Marriott?

22    A    My manager told me when I enroll, they call it medical.

23    They said they are going to have medical insurance, that will

24    be taking some of my money from my paycheck and everything,

25    yeah.

1  Q   Sir, I guess I have one last question for you.  Why did

2  you want to be a part of this lawsuit?

3  A   After GEO, you know, took advantage of us the work in that

4  facility when I was there.

5       MR. WHITEHEAD:  Thank you for answering my questions.

6  Ms. Scheffey, opposing counsel, may have some questions for

7  you.

8                     CROSS-EXAMINATION

9  BY MS. SCHEFFEY:

10  Q   Good afternoon, Mr. Nwauzor.  Can you hear me?

11  A   I hear you very well.

12  Q   I will tell you ahead of time sometimes I talk too fast.

13  You testified earlier you are here today because you cleaned

14  the shower while detained by ICE; is that correct?

15  A   Yeah.

16  Q   You cleaned the showers in the afternoon; is that right?

17  A   Yes.

18  Q   Is it your testimony today people in your pod did not

19  clean up after themselves and that is why the showers were

20  dirty when you cleaned them?

21  A   Excuse me?

22  Q   Is it your testimony today that the other people who you

23  lived with in the pod didn't clean up after themselves which

24  made your job harder?

25  A   I am the one assigned to clean the shower.  Unless you are

1  assigned to do the job, you cannot go to the shower and clean

2  it.

3  Q   The other people in your pod, even if they weren't in the

4  work program, they cleaned up after themselves, correct?

5  A   I said I clean after.  Unless you are the one assigned to

6  clean the job and paid like me, I am paid.

7  Q   So no one in your housing unit took pride in keeping their

8  living unit clean?

9  A   Other people, as you said, clean.  I work afternoon.

10 Other people that clean in the night.  I work.  My own time

11 is afternoon.

12 Q   Yeah, if I am understanding correctly, you are saying

13 there was another voluntary worker who volunteered to clean

14 at a different time; is that right?

15 A   Yeah.

16 Q   What about the other people who weren't part of the

17 voluntary program, did they take pride in keeping the unit

18 clean?

19       MR. WHITEHEAD:  Objection.  I don't think he knows

20 what other people think.

21       THE COURT:  Sustained.

22 BY MS. SCHEFFEY:

23 Q   Mr. Nwauzor, is it your testimony today the other people

24 in your living unit that were not part of the voluntary work

25 program were dirty?

1    A    I said I am being paid.  It is not everybody in the pod is

2    cleaning.  It is only the people being paid are the ones

3    responsible for cleaning the shower in our pod.  I clean in

4    the afternoon.

5    Q    Did you have -- do you remember having your deposition

6    taken in this case?

7    A    Deposition?

8    Q    Yes, do you remember having your deposition taken in this

9    case?

10   A    No.

11   Q    You don't remember giving a statement and Mr. Whitehead

12   was there and there was another attorney, you were asked

13   questions?

14   A    You asked me how many minutes, how many hours it took.  I

15   know I had a deposition.  I thought you asked me how many

16   hours.  I don't know how many hours or minutes.

17   Q    You had a deposition?

18   A    I had a deposition.

19   Q    You remember you agreed to tell the truth during that

20   deposition?

21   A    Yeah.

22   Q    So what I would like to play for you is a clip from the

23   deposition starting at Page 68, Line 23, going to 69, 20.

24            MR. WHITEHEAD:  Wait a second.  If we could stop the

25   video for a second.  I am trying to figure out what the

1    impeachment is.  I haven't heard the witness commit to an

2    answer and haven't heard him confronted with an

3    inconsistency.

4        MS. SCHEFFEY:  He's committed to the fact the

5    voluntary workers are the only ones that clean the pod.  I am

6    showing him the answer now.  I have given two lines.

7        MR. WHITEHEAD:  This illustrates why this is improper

8    impeachment.  I don't know if that was the line of

9    questioning counsel asked.

10       THE COURT:  I think Mr. Whitehead is right.  I don't

11   know where you are going with this.

12       MS. SCHEFFEY:  I am following what Mr. Whitehead has

13   done previously.  I can lay more foundation, if you would

14   like.

15       THE COURT:  There is a difference between impeachment

16   and using testimony for other purposes.  Further foundation

17   would be appropriate.

18       MS. SCHEFFEY:  We can take the video clip down for

19   now.

20       MR. WHITEHEAD:  In the event Ms. Scheffey plans on

21   showing other clips, GEO did not file deposition designations

22   for Mr. Nwauzor.

23       MS. SCHEFFEY:  Your Honor, we don't have to file

24   designation for impeachment.

25       THE COURT:  Go ahead.  What is the next question?

BY MS. SCHEFFEY:

Q   So, Mr. Nwauzor, are you testifying today that everyone else who you lived with, if they weren't in the voluntary work program, they didn't clean up the showers?

A   I said I clean afternoon.  I clean afternoon in my pod.  I am the only one assigned to clean the pod in the afternoon.

Q   Did anyone else clean the showers other than you?

A   Other people get their own sheet.  The only people that clean the shower is the people paid.  Not everybody in the shower clean -- in my pod cleaned the shower.  The only people that cleaned the shower are the people paid by GEO.

Q   The only people who cleaned are the people paid by GEO, is that what you said?

A   The shower, yes.

Q   I would like you to turn to Page 68 of your deposition, Line 23.  Do you see where you were asked if the people in G-2 took pride in keeping their living space clean?

A   Yes, I said not the shower, the pod, sometimes we volunteer to clean.  Sometimes within the week, we do volunteer to clean the general pod.  A kind of free to clean. Not every time.  There are people assigned as their job to do it.  Sometimes, we do help ourselves.  During my deposition, I said volunteer is a kind of way you do work not paid.

Q   I would like to focus on what your deposition said.  "The people in G-2 took pride in keeping their living space

1    clean." Do you see that on the deposition?

2    A    That is what I am trying to explain to you.

3    Q    I would like to be more specific. Do you see your answer

4    was, "Yeah"?

5    A    Not shower, people --

6            MR. WHITEHEAD: Mr. Nwauzor, hold on one second.

7    Ms. Scheffey, objection. If you are going to read from the

8    transcript, you have to read his complete answer.

9            MS. SCHEFFEY: I am trying, Jamal, and I would like

10   to play the clip because every time I try, he won't go to the

11   transcript. I am asking him to look at the transcript. He's

12   not looking at it.

13       Your Honor, may I please play the clip?

14           THE COURT: If you would simplify your questions, it

15   would be much easier to communicate.

16       What is the next question to the witness?

17   BY MS. SCHEFFEY:

18   Q    Do you see after you were asked that question, your answer

19   starts with "yeah" in the transcript?

20           MR. WHITEHEAD: Hold on one second. The transcript

21   is in there. We are going to grab the transcript.

22           THE COURT: Are we ready?

23       Mr. Nwauzor, I understand that English is your second

24   language. Can you read English?

25           THE WITNESS: Yes, a little.

1    THE COURT:  Okay.  Thank you.  Go ahead,

2    Ms. Scheffey.

3    BY MS. SCHEFFEY:

4    Q    Do you have your deposition in front of you, Mr. Nwauzor?

5    A    Yeah, I have deposition.

6    Q    In response to, "So the people in G-2 took pride in

7    keeping their living space clean."  You started with, "Yeah."

8    Do you see that part of the deposition?

9    A    What paragraph?

10    Q    You are at Page 68, starting at Line 23.

11    A    Page 68.  Okay.

12    Q    Do you see where you said, "Yeah, also it is not everyday

13    that we done our job, maybe once in the week."

14    MR. WHITEHEAD:  Objection.

15    Mr. Nwauzor, hold on.

16    Objection.  Ms. Scheffey, if you are going to read from

17    the transcript, you need to read his complete answer.

18    MS. SCHEFFEY:  I am trying to break it down into

19    manageable parts.  I will get there.

20    MR. WHITEHEAD:  Improper impeachment.

21    THE COURT:  We have lost the question that was asked

22    in the deposition by now.  What is the question and the

23    complete answer, and then you can ask the witness?

24    BY MS. SCHEFFEY:

25    Q    You see where you were asked, "So the people in G-2 took

1   pride in keeping their living space clean?"  You responded,

2   "Yeah, also it is not every day that we done our job, maybe

3   once in a week, but there are also people employed assigning

4   to be cleaning, cleaning the area.  The voluntary is not

5   every day.  There are people assigned to be doing that job.

6   They are also paid in the way I have been paid for a dollar a

7   day shower I am cleaning."  Do you see that?

8   A    I said -- I don't know here.  What I said maybe due to my

9   English.  Maybe didn't understand how I explain it.  I told

10  you I am not perfect in English.  What I told him that I did,

11  I said in my pod sometimes people in there clean the pod, not

12  the shower.  The table where we eat, you know, everybody eat,

13  sometimes, but there are people assigned to do that job.

14  They do it every day.  The shower is different.  Shower,

15  nobody clean.  The shower is my job.

16       When I talk about people in the pod cleaning, I am talking

17  about the hall where people eat.  I am not talking about the

18  shower.  Nobody cleaned the shower apart from me and other

19  people assigned to that job.  Didn't include shower.  What I

20  meant I take pride, yeah, we take pride.  Other people do it

21  in different pods once in awhile.  There are people assigned

22  for cleaning the whole hall.

23  Q    Thank you.  So before you received a position in the

24  voluntary work program as a shower cleaner, did you clean up

25  the shower after yourself when you used it?

A    No.

Q    You left your mess for someone else?

A    When I -- until I got the job, I don't clean the shower.
There are people assigned to do it which GEO paying them one
dollar.  I never any day clean the shower.  When I start
cleaning the shower, when I sign for that job, that was the
time I start cleaning the shower.

Q    Thank you.  That helps me understand.

         You cleaned the showers in the afternoon; is that
right?

A    Yes.

Q    Other people cleaned the showers in the evening, right?

A    Yeah, I cleaned the shower.  I -- because of my job, I
clean afternoon.  Other people assigned for the same job.

Q    Cleaning the showers in the afternoon was the only task
you did as part of the voluntary work program, correct?

A    Yes.

Q    That's the reason you are suing GEO, correct?

A    Yes.

Q    You signed an agreement where you understood that the
compensation would be one dollar per day, correct?

A    I signed the agreement because I needed the money.  I
needed the money to get other things, to make a call and to
get commissary.  I needed assistance.

Q    You did not sign up to volunteer until five months after

1    you arrived, correct?

2    A   I can't remember when I signed into the work.  I can't

3    remember.  Maybe GEO have the record.  I can't remember.  All

4    I know is I work.

5    Q   I would like you to take a look at Exhibit 302, which

6    should be in front of you.

7    A   Where?

8         MR. WHITEHEAD:  Mr. Nwauzor, there is an envelope in

9    there.  If you open it up, there should be an exhibit in

10   there.

11   Q   Do you have Exhibit 302 in front of you?

12   A   Yes, I have it.

13   Q   Do you see at the top of the document there is an A

14   number, starting with 209?

15   A   Excuse me?

16   Q   Do you see at the top of the document an A number,

17   starting with 209?

18   A   No, I don't have anything 209 here.

19   Q   Do you see your name at the top of that document?

20   A   Is it a work program agreement?

21   Q   No, that might be a different one.  Let's start with that

22   if you have it in front of you.

23        Do you have something called A-303 at the top which is

24   a work program agreement?

25   A   I have A-302, yeah.

1   Q   Does that document -- at the bottom, is that your

2   handwriting where it says Nwauzor?

3   A   Yeah.

4   Q   Is that your A number, where the number starts with 209?

5   A   Yeah, 209, yeah, yes.

6           MS. SCHEFFEY:  I offer Exhibit A-303 into evidence.

7           MR. WHITEHEAD:  No objection.

8           THE COURT:  A-303 may it be admitted.

9                   (Exhibit A-303 was admitted.)

10  Q   So this document you signed says, "Compensation shall be

11  one dollar per day," in Item 7 at the top there, do you see

12  that?

13  A   Yeah, I see it.

14  Q   The date you signed this document was 11-10-2016.  Do you

15  see that?

16  A   Yeah, I see it.

17  Q   Do you have any reason to believe that you -- if I told

18  you the date GEO has that you began your detention was May

19  24th, 2016, would you have any reason to doubt that?

20  A   I have no reason.  That is the record.

21  Q   So if we could try again, I would like you to look at

22  Exhibit A-302.  Do you have that document in front of you?

23  It looks like a listing of typed numbers and descriptions?

24  A   Yes.

25  Q   Do you see your A number at the top of that document?

1  A    The A-302.

2  Q    A-302 is the exhibit number.  A little below it, it says

3  "resident account summary"?

4  A    Yeah, I see my number.

5  Q    Do you see your name on it?

6  A    I see my name.

7  Q    Do you have any reason to believe this is an inaccurate

8  accounting of your expenses while you were detained?

9  A    Please could you repeat.

10 Q    Yeah.  Do you have any reason to believe this is not an

11 accurate reflection of your payroll while you were detained?

12 A    I have no reason to say no.

13         MS. SCHEFFEY:  I offer A-302 into evidence.

14         MR. WHITEHEAD:  Your Honor, I would object just to --

15 purely from a foundational standpoint.  This is a printout.

16 I have never seen it before.  Mr. Nwauzor certainly didn't

17 prepare it.  I don't see how this is an admissible document

18 through this witness.

19         THE COURT:  Foundation is inadequate, counsel.

20 BY MS. SCHEFFEY:

21 Q    I will take that down.  Let's talk a little bit amongst

22 ourselves, instead of messing with these documents.  A minute

23 ago, we saw a document, if we could pull it back up.  I

24 believe it was A-303.  Do you have it in front of you?

25 A    Yes, I can see it.

1    Q    They should be putting it on the screen.  You signed that

2    document on November 10th, 2016, correct?

3    A    Yeah.  That's what it shows here, yes.

4    Q    You testified earlier you had to wait before you could get

5    a position in the voluntary work program; is that correct?

6    A    Can you repeat?

7    Q    Yeah.  You testified earlier that you had to wait before

8    you could get a position in the voluntary work program; is

9    that right?

10            MR. WHITEHEAD:   Objection, misstates prior testimony.

11            THE COURT:  Sustained.

12   BY MS. SCHEFFEY:

13   Q    You testified earlier that you were on a waiting list

14   before you were able to be a shower cleaner, correct?

15   A    Yeah, what I said, we get the job, the way you get the job

16   when it is open, when the person who is doing the job either

17   had been deported or he lost the job or one of two things.

18   That's the only way you get the job.  That's what I mean.

19   Q    So before that other people was deported, you were not the

20   shower cleaner, correct?

21   A    I am not saying somebody deported.  I am telling you the

22   vacancy been created.  I doubt somebody been deported or win

23   his case, that's when the job open or the person who is doing

24   the job is tired of doing the job.  It is going -- the job is

25   going to be open.  The officer in charge going to announce if

1    anyone is interested to catch up the job.

2    Q    Okay.  So there was a period of time, correct, where you

3    were not the shower cleaner while you were detained, right?

4    A    Yeah, another person was doing the job.

5    Q    That period was about five months, correct?

6    A    I can't -- something.

7    Q    During that time when you didn't have a voluntary work

8    program position, you still made phone calls, right?

9    A    What you say?

10   Q    You still made phone calls during that time, correct?

11   A    That's something I can't remember when I am making call.

12   When I get the job -- remember, when I get there I have some

13   money.  They tell us they are going to deposit money in our

14   account.  Something of that nature.  When I get to the

15   detention, we have the money.  They said they are going to

16   open an account for us if you have the money.  They are going

17   to put it in our account in our name.  Then I remember -- I

18   can't remember if I start the job, start making call.  I did

19   make a call.  When I start making the call or when I start

20   getting the job, I don't remember.

21   Q    Were you fighting your case the entire time you were in

22   the detention center?

23          MR. WHITEHEAD:  Objection, argumentative.

24          THE COURT:  I don't think so.  You might define what

25   case you are referring to.

BY MS. SCHEFFEY:

Q   Were you fighting your immigration case the entire time you were in the detention center?

A   Yeah.

Q   You testified earlier that you needed to make phone calls as part of fighting your case, correct?

A   Yeah, I called my brother.

Q   You were able to call your brother for the entire time you were in the detention center, correct?

A   When it is necessary.  I don't call my brother for nothing.  I call my brother for the documents I need.

Q   Okay.  You were able to call your brother before you started participating as a shower cleaner, correct?

A   That's what I am trying to tell you, that I can't remember if I start calling my brother when I start cleaning the shower.  I can't remember.  Yeah.

Q   Okay.  You had your choice of different positions in the voluntary work program, correct?

A   Can you repeat, please.

Q   Yeah.  You had a list of different options you could choose from for participating in the voluntary work program, correct?

A   Yes.

Q   You chose shower cleaner, correct?

A   Yes.

1    Q    You didn't have to interview to get that position, right?

2    A    No.

3    Q    You didn't have to show you were previously a really good

4    shower cleaner, right?

5    A    Somebody showed me how to use the stuff when I got the

6    job.

7    Q    Those were the showers you used, right?

8    A    Yeah, that's the shower I also used.

9    Q    Did you always clean the showers at the same time every

10   day?

11   A    Yeah, every afternoon, every day.

12   Q    After cleaning the showers, you were able to spend the

13   rest of your day working on your immigration case if you

14   wanted, correct?

15   A    Immigration case?

16   Q    Yes.

17   A    I only work on my immigration case when my attorney came

18   for me.  They are going to call me out to see my attorney.

19   Q    If you weren't working on your immigration case, you could

20   watch TV, right?

21   A    Please, I didn't understand what you mean.

22   Q    If you were not working on your immigration case, you

23   could watch TV, correct?

24   A    I normally stay in the room or read my Bible because I am

25   afraid.  A lot of things going on within me.  I don't know

1    what going to be my status.  Yeah.

2    Q    You were able to go to church while you were detained?

3    A    Yes.

4    Q    Were you able to exercise while you were detained?

5    A    Not every time.  I do go outside with them on the

6    playground to see if I can get some sunshine, yeah.

7    Q    While you were detained, someone else did your laundry,

8    right?

9    A    Could you repeat, please?

10   Q    While you were detained, someone else did your laundry,

11   correct?

12   A    Yeah, there are other detainees that work in laundry.

13   They had the ability to wash our clothes.  They bring some

14   stuff there, we dump our clothes, they took it to laundry.

15   That's the area they are working in detention, too.

16   Q    Did you send your clothes to the laundry before they were

17   really, really gross?

18   A    Excuse me, please?

19   Q    Did you try to send your clothes to the laundry regularly

20   before they got really dirty?

21   A    We have different clothes to change.  Whenever the -- they

22   bring the bins, we dump our clothes, we have to change.  You

23   know, you need to be neat, clean yourself.  We are adults.

24   We are not playing around to be dirty.  That's one of -- I

25   dump my clothes in a kind of cart.  They took it to the

1    laundry.  We have that one to change different clothes, yeah.

2    Q   While you were detained, someone else helped clean up the

3    living area?

4    A   Living area?

5    Q   Pod or your housing unit?

6    A   Yeah.  I live in a room where I have my bed.  I make my

7    bed when I wake up.

8    Q   Okay.  Someone else cleaned the tables where you ate,

9    correct?

10   A   There is no table there.  We eat outside the general

11   living room.

12   Q   You call it a general living room.  Does that have tables?

13   A   Yeah, that is the hall.  The hall where there is a TV.  In

14   the room, no TV.

15   Q   In the hall with the TV, someone else cleaned up those

16   tables, right?

17   A   The whole hall when we eat, where you eat as an adult,

18   when you eat you need to clean up your mess where you eat.

19   We are adult, most of the people in the detainee are adult.

20   When I eat there, I make sure the table look neat.  Which

21   that was the instruction given by us and by GEO, make sure

22   you clean your table.  Don't mess around the table where you

23   eat.

24   Q   You received dental care without paying for it while you

25   were detained, correct?

1    A    Right.

2    Q    You received medical care while you were detained without

3    paying for it, correct?

4    A    Right.

5    Q    You received mental health counseling while you were

6    detained without paying for it?

7    A    Right.

8    Q    You got those things whether or not you participated in

9    the voluntary work program, correct?

10   A    I don't really understand what you mean by "voluntary

11   work."

12   Q    You didn't have to participate in the voluntary work

13   program in order to get medical care, correct?

14   A    Yeah.

15   Q    After you left the Northwest ICE Processing Center, you

16   went to work at the Marriott, correct?

17   A    Yes.

18   Q    And did you work as a housekeeper at the Marriott?

19   A    Yes, maintenance.

20   Q    When you were there, did you have to clean other people's

21   showers?

22   A    Other people's shower?

23   Q    Yes, showers used by someone else, did you have to clean

24   those?

25   A    Yeah, I was employed to do that and they pay me for that.

1    They employ me for that.

2    Q    That job was a 40-hour-per-week position, correct?

3    A    I believe.

4    Q    You were expected to be there every day, right?

5    A    Yeah, all day, every day.  Also I have two days off.  I

6    work five days.

7    Q    You had to show up when you were scheduled, correct?

8    A    Right.

9    Q    You had to interview for that position, correct?

10   A    Yes.

11   Q    When you interviewed, did you tell them you had experience

12   cleaning showers at the detention center?

13   A    In detention?  Could you repeat?

14   Q    Did you tell the person you interviewed with that you had

15   experience cleaning showers from your time at the detention

16   center?

17   A    When I got the job, they also train me there.  Yeah.

18   Detention, I don't clean vent.  Marriott, I clean vent.  Then

19   they have different, other additional job in Marriott which

20   is similar like cleaning is cleaning.  I also clean.  In GEO

21   detention, I don't clean vent.  I don't do caulking.  They

22   taught me there when I get to Marriott.  When I was in GEO

23   detention, the detainee also taught me how to do it in GEO.

24   Q    Fair to say your job at the Marriott had a lot more tasks

25   involved with it, right?

Nwauzor - Cross

1   A   Excuse me?

2   Q   What you said is your job with Marriott had a lot more

3   tasks you had to do each day, correct?

4   A   You asked me if I told them if I learn how to do it from

5   GEO.  I said somebody taught me how to do it too when I got

6   to Marriott, what I do there.  That's what I mean.  Like

7   somebody taught me what I do in GEO, too.  I don't get there

8   by myself.  Somebody taught me how to do the job in GEO, too.

9   Q   At the Marriott, if you didn't want to be a housekeeper

10  anymore, could you just stop showing up and ask to get on the

11  wait list to be a front desk clerk?

12  A   Excuse me?

13  Q   When you were working at Marriott, could you come in and

14  ask, I don't want to be a housekeeper any more, I want to

15  work at the front desk, put me on the wait list?

16  A   No.  There are jobs here in America that has education.

17  Front desk, as you said, they have to speak English for you

18  to be customer service, for me to apply such a job.

19  Q   They have a requirement at Marriott that you have to be

20  fluent in English to be in customer service; is that right?

21  A   I am just talking with my experience because I know I am

22  not fully in English.  I know some boundary which I cannot

23  go.  I cannot apply for front desk because I know the

24  consequences of much English and how to use -- you have to

25  know how to use the computer which I am not able doing those

Nwauzor - Cross

1    things.

2    Q    Did you have to be fluent in English to participate in the

3    voluntary work program?

4    A    No.  What I did is physical.  They show me how to do it

5    whether I speak English or not.  Someone have to give you

6    instruction, this is what you do, don't require much grammar

7    or English speaking.  Physical, just do it, just learn how to

8    do it.  What you said, front desk, you have to speak, you

9    have to write certain things.

10   Q    You had to provide proof of work authorization through an

11   I-9 form to Marriott, correct?

12   A    Hello.

13   Q    You had to provide proof of work authorization to

14   Marriott, right?

15   A    Yeah, I got to have that to work in Marriott, yeah.

16   Q    While you were at the Northwest ICE Processing Center, you

17   didn't yet have work authorization, right?

18   A    Yeah, because I didn't get the job by myself.

19   Organization of America which know background.  I didn't get

20   it by myself.  This organization tell them I am in the

21   process.  After a couple more, everything came.  I also

22   showed them my asylum granted for me to work.  My asylum

23   document.

24   Q    When you say after a couple of months everything came,

25   couple months after you were released from detention?

1    A    Yeah, what I mean, what you asked me at the Marriott.    I

2    said I didn't get the job by myself.    I got it by the

3    organization in America, they engaged, enroll us in getting a

4    job and they know our documents and the process.    They also

5    help us getting our documents done and that is how I see.

6    They are the one, the company where I got a job.    Marriott.

7    I didn't get job by myself.    World Relief Organization, they

8    know the process.    I have already apply for it and it is

9    going to come.    Also I have my immigration asylum granted and

10    work permit to work on the back of the document for me to

11    work.

12    Q    I understand you worked with World Relief to get the

13    Marriott position.    While you were working at the Marriott,

14    you still had to pay for your meals, right?

15    A    Say?

16    Q    You still had to pay for your own meals while you were

17    working at Marriott, correct?

18    A    I still do what?

19    Q    You paid for your own meals, your own dinner and lunch and

20    breakfast?

21    A    Yes, Marriott, sometimes they give us food.    They give us

22    in the hotel, we take breakfast with low price, someone who

23    is working there, yeah.

24    Q    When you worked at Marriott, you had to do your own

25    laundry, right?

1    A    My laundry?

2    Q    You did your own laundry at home?

3    A    I do my laundry and also, yeah, I do my own laundry.

4    Q    No one pays you to do your laundry while you were working

5    at Marriott?

6    A    No.

7    Q    Do you like living in a clean house?

8    A    Perfect.  I love living in clean house.

9    Q    If no one paid you, would you still keep where you live

10   clean?

11   A    No one pay me in my house where I live.

12   Q    You still keep it clean?

13   A    Right.

14   Q    Do you clean your shower in your apartment multiple times

15   a day?

16   A    I clean my shower.

17   Q    How many times a day?

18   A    How many times I clean my shower?

19   Q    Yeah, each day.

20   A    Each day.

21   Q    Each day once?

22   A    I repeat what you said, how many times I clean my shower.

23   I say I clean my shower.  My shower is always clean.  I clean

24   my shower.

25   Q    Since leaving the Northwest ICE Processing Center, you

1    have had roommates, right?

2    A    Yeah, I had a roommate.

3    Q    Did you ask your roommates to pay you minimum wage when

4    you cleaned the common areas in your apartment?

5    A    Please, I don't get it.

6    Q    When you vacuum your living room, did you ask your

7    roommate to pay you minimum wage?

8    A    My room?

9    Q    Your roommates, your housemates?

10        MR. WHITEHEAD:  Objection, Your Honor.

11        THE COURT:  Sustained.

12    BY MS. SCHEFFEY:

13    Q    Let's get back to how you got here.  You wanted to seek

14    legal citizenship in the United States, right?

15    A    Yes.

16    Q    That's why you presented yourself at a security checkpoint

17    seeking asylum, right?

18    A    Yes.

19    Q    You traveled really far to get to the United States to

20    seek citizenship, right?

21    A    Yes.

22    Q    Did you cross a lot of borders before arriving in the

23    United States?

24    A    Yes.

25    Q    You didn't stop at any of those countries and seek

1   citizenship, right?

2   A   Yes.

3   Q   You wanted to be a citizen in America?

4   A   Yes.

5   Q   It worked, right?

6   A   Yes.

7   Q   You knew that by seeking citizenship in the United States,

8   part of the process would possibly be detention, correct?

9   A   Detention?  I don't have idea what I am going to, where I

10  going to end when coming to America.  I don't even get a job

11  in detention.  This my first time I find myself --

12  Q   You submitted yourself to the authorities in another

13  country, right?

14  A   Another country?

15  Q   In the United States, you submitted yourself to an ICE

16  official, correct?

17  A   Yeah, when I came, yeah.

18  Q   You wanted to follow the process legally, right?

19  A   Yes.

20  Q   When you arrived in Washington, you didn't have family you

21  could stay with, right?

22  A   Yes.

23  Q   You didn't have a reservation at a hotel where you could

24  stay, right?

25  A   Yes.

1    Q    I think you testified earlier you only had $200, right?

2    A    When coming, when I arrive at the detention, that's what I

3    had with me which GEO took out of me and keep it for me all

4    deposited in my account, yeah, when I came to America.

5    Q    200 is the right number, right?  200 is the right number?

6    A    About 200 and something, yes, dollar, not 200, it is above

7    200.  It is upper, maybe 300.  It is not 200, 200, if I can

8    recall.  Yeah.

9    Q    It was ICE not GEO who detained you, correct?

10   A    Okay.

11   Q    It was ICE who detained you, correct?

12   A    Yeah.  I know the hand of America.  America, yeah.

13   Q    It was not GEO, right?

14   A    What?

15   Q    It was not GEO, right, it was the hand of America, as you

16   said?

17   A    Yeah.

18   Q    There was an immigration judge who you got to tell your

19   story to in the detention center, right?

20   A    Yes.

21   Q    And that's the judge who determined the outcome of your

22   asylum application, right?

23   A    Yes.

24   Q    The same day your immigration case resolved and you got

25   asylum, you were released, right?

1    A    It took a process.  I got the first one, hearing, then

2    postpone.  Kind of a process before I got the final judgment.

3    Q    You did get released after you received asylum, right?

4    A    Yes.

5    Q    It wasn't until your asylum case was resolved that you

6    were able to work legally in the United States, right?

7    A    Yes.

8    Q    Without those documents you received, you couldn't have

9    legally worked in the United States and supported yourself,

10   right?

11   A    I believe so.

12   Q    Now that you are in the United States, you no longer have

13   to worry about Boko Haram, correct?

14   A    Yeah.

15   Q    You are not here today to seek relief from Boko Haram,

16   right?

17   A    Excuse me, could you repeat?

18   Q    You are not here to sue Boko Haram today, right?

19   A    No.

20   Q    You are not here to challenge the commissary prices,

21   right?

22   A    Yes.

23   Q    You are not here to challenge the phone prices in

24   detention, right?

25   A    Yes.

1  Q   You are not here to challenge the type of food that they

2  serve in the detention center, right?

3  A   Yes.

4  Q   Your only claim today is you believe you were an employee

5  of GEO when you cleaned the showers, right?

6  A   Yes.

7            MS. SCHEFFEY:  No further questions.

8            THE COURT:  Mr. Whitehead?

9            MR. WHITEHEAD:  Nothing, Your Honor.  I don't have

10  any further questions.

11            THE COURT:  Thank you, Mr. Nwauzor.  You may be

12  excused.

13       Next witness.

14            MR. POLOZOLA:  The State will call its last witness,

15  Mr. Robbin Gard.  I understand he should be calling in now.

16  We may need just a moment for Tyler to get him in.

17            MS. SCHEFFEY:  We object to this witness.  If we

18  could have a brief sidebar outside the presence of the jury.

19            THE COURT:  I don't do sidebars.  What is it you want

20  to raise?

21            MS. SCHEFFEY:  Your Honor, Mr. Gard has no relevance

22  to this case.  He has no firsthand knowledge about the

23  Northwest ICE Processing Center, about the detainees.

24            THE COURT:  We will see.  Is this something that --

25  it is not something you can't handle as the testimony goes

 1   on?  He is on his way.  The name of the witness, please,

 2   again?

 3           MR. POLOZOLA:  Robbin Gard, yes, Your Honor.

 4           THE CLERK:  They have just been admitted.

 5           THE COURT:  Here is Mr. Gard.  If you will raise your

 6   right hand and be sworn.

 7                       ROBBIN GARD,

 8      having been sworn under oath, testified as follows:

 9           THE COURT:  You may inquire, Mr. Polozola.

10                       DIRECT EXAMINATION

11   BY MR. POLOZOLA:

12   Q   Good afternoon, Mr. Gard.  Thank you for being with us

13   today.  Can you take a brief moment and introduce yourself to

14   the Court and jury?

15   A   Robbin Gard.  I am a resident of Pierce County, here in

16   Washington.

17   Q   Mr. Gard, where do you work?

18   A   I work for the Employment Security Department at Work

19   Source Pierce in Tacoma.

20   Q   Is the Employment Security Department a Washington State

21   agency?

22   A   It is.

23   Q   How long have you held your current job?

24   A   I have worked for Employment Security Department since

25   June 16th of 2016.

1    Q    What did you say your current position was with the

2    Employment Security Department?

3    A    Right now, I am a supervisor, front end supervisor,

4    resource room supervisor at Work Source.

5    Q    So what are your duties as a Work Source supervisor?

6    A    I oversee a team of about ten other Work Source

7    specialists and supervise day-to-day activities for them.

8    Q    Prior to becoming a supervisor, did you hold any other

9    positions with the ESD?

10   A    I did.  I started out as the Work Source specialist for

11   the Employment Security Department at the Work Source Pierce

12   office.

13   Q    So what does a Work Source specialist do at ESD?

14   A    So we greet individuals, job seekers as they come into the

15   office looking for assistance with their job search.  We meet

16   with them regarding their resumes and cover letters, provide

17   reviews for them, help them with their job search strategies,

18   help them with identifying what their job skills are and how

19   to parlay those, in order to get a better job, into a career.

20   We make referrals for our Work Source partners for training

21   and community referrals as well.

22   Q    You said this early on -- maybe I missed it -- where do

23   you work?  Geographically speaking, where is your office?

24   A    Geographically, we are at 2121 South 8th Street in Tacoma.

25   Q    You serve job seekers in the Tacoma and the Pierce County

1  area looking for work?

2  A    That is correct.

3  Q    Before going to ESD, the Employment Security Department,

4  what did you do?

5  A    Prior to joining ESD, I worked for the State of Montana

6  for the Department of Labor & Industry over there essentially

7  providing the same services to job seekers at the job office

8  in Kalispell, Montana.

9  Q    How long have you been doing this type of work?

10  A    Since February of 2010.

11  Q    Let's take it back to ESD for a moment, for those of us

12  who aren't quite as familiar.  At a high level, what does ESD

13  do for folks in Washington?

14  A    ESD really has a couple of main functions.  We act as

15  employment connections, helping people find jobs, connect

16  them to employers, and most people would see us as the

17  unemployment insurance department.

18  Q    So there is kind of two parts of ESD.  You are on the side

19  that helps folks look for work, find work, find employers in

20  the Tacoma area; is that right?

21  A    That's correct.

22  Q    You mentioned the term "work source."  I just want to be

23  clear for everyone, what is Work Source?

24  A    Work Source is a partnership of several community

25  agencies, non-profits, for-profits that work with job seekers

1  and work with employers to connect them to each other to get

2  employment.

3  Q    ESD is one of the members of that group?

4  A    That is correct.  ESD, Employment Security Department, is

5  one of the partners within that.  We all work under the

6  guidance of our Workforce Development Board, which is

7  Workforce Central in Tacoma.

8  Q    So as a result of your work, supervising a team of folks

9  in Tacoma, helping folks look for jobs in Tacoma in the

10  Pierce County area, are you familiar with the Tacoma/Pierce

11  County labor market?

12  A    Fairly familiar, yes.

13  Q    How so?  How are you familiar with it as a result of your

14  work?

15  A    In working with individual job seekers, we have occasion

16  to look up what the local labor market economic and analysis

17  results are, which would indicate to us if somebody came in

18  looking for a specific job or employment opportunity, we can

19  look at the labor market information that is provided by the

20  Employment Security Department and inform and explain to

21  somebody how this occupation may be in demand, this

22  occupation may not be in demand for Pierce County and other

23  counties across Washington State.

24         MS. SCHEFFEY:  Your Honor, I object to testimony

25  about the labor market analysis, which hasn't been disclosed.

1  Mr. Gard was neither disclosed as an expert nor qualified as

2  one.

3          MR. POLOZOLA:  Your Honor, I am asking him about his

4  personal experience serving job seekers in this geographic

5  area.

6          THE COURT:  Nobody has asked for his opinion yet on

7  anything.  The objection is overruled without prejudice.  Go

8  ahead, Mr. Polozola.

9  BY MR. POLOZOLA:

10 Q   Thank you, Your Honor.  Mr. Gard, where I was headed was

11 you have personal experience helping folks find work in the

12 Tacoma/Pierce County area, correct?

13 A   Yes, I do.

14 Q   In your prior experience, what types of jobs have you

15 helped individuals find in Tacoma and in the Pierce County

16 area?

17 A   I have helped individuals find all types of jobs.  I have

18 met with former politicians, I have met with actors, I have

19 met with individuals looking for server positions.  I have

20 met with individuals looking for real estate positions.

21 Really, just a myriad of occupations throughout Pierce

22 County, throughout the state.

23 Q   Are any jobs or occupations, lines of work more common

24 than others, in your experience?

25 A   We see a lot of hospitality work in the area.  That seems

1  to be prevalent.

2  Q   Any others, if you are thinking of the most common job

3  seekers or types of work that folks are seeking?

4  A   We see a real myriad.  We have helped people in the

5  restaurant industry.  I have worked specifically with

6  individuals looking for server positions, cook positions,

7  hospitality.  A myriad of things to offer including linen

8  services, maids or clean up.  Really running the gamut.

9  Q   You kind of beat me to my next question which is, have you

10 ever assisted anyone looking for work as a cook or kitchen

11 worker in the Tacoma/Pierce County area?

12      MS. SCHEFFEY:  Objection, leading.

13      THE COURT:  He may answer.

14 BY MS. SCHEFFEY:

15 Q   You may answer, Mr. Gard.

16 A   I have.

17 Q   What about as dishwasher?

18 A   I have.

19 Q   What about folks who work as -- as a janitor or custodian,

20 have you ever helped folks look for that type of work?

21 A   I have.

22 Q   Have you ever assisted anyone who works as a barber or

23 stylist, hairstylist?

24 A   Yes, I have.

25 Q   What about folks who do construction, paint, that type of

1  work, ever help folks find that type of work?

2  A   I have helped individuals in construction and paint, both

3  commercial and residential.

4  Q   Now that we have that baseline kind of established, I want

5  to kind of take it one by one again.  Starting with folks who

6  are looking for work in kitchen, for example.  What types of

7  employers, in your experience, have you helped folks try and

8  connect with in the Tacoma/Pierce County area?

9          MS. SCHEFFEY:  Objection, relevance.

10          THE COURT:  Overruled.

11          THE WITNESS:  Can you repeat the question?

12  BY MR. POLOZOLA:

13  Q   Starting with folks who are looking for work, for example

14  in kitchens as cooks or dishwashers, what types of employers

15  have you tried to connect those job seekers with?

16  A   Depending on the level of experience, it could be fast

17  food restaurants, higher end restaurants, convention center,

18  caterers, it could be hotels that potentially have

19  restaurants within them.  That type of thing.

20  Q   Just to be clear, you have personally helped folks look

21  for those types of jobs in Tacoma?

22  A   I have.

23  Q   Would your answer be the same for -- well, let me back up.

24  You mentioned janitors or custodians, folks looking for that

25  type of work.  What types of employers, in your experience,

1    have you tried to connect folks with in that line of work?

2    A    Custodian or janitorial, very similar businesses because

3    everybody needs somebody there to clean up, to act in that

4    capacity.  I have referred individuals to hotel/motels, state

5    hospitals, for instance, local schools, education system.

6    Places like that.

7    Q    Places that have a lot of space that needs to be cleaned;

8    is that what you mean when you say "places like that"?

9    A    Yes.

10   Q    What about barbers, same question?  Who is hiring barbers

11   in your experience in the Tacoma/Pierce County area?

12   A    Yeah, most of my experience has been more with salons

13   rather than traditional barbershops.  Anyplace that would

14   offer spa or salon work from the mall to again perhaps hotels

15   that might offer that to private ownership.

16   Q    Kind of taking it back to the individuals you serve, you

17   have actually helped folks in the Tacoma/Pierce County area

18   look for that type of work, correct?

19   A    I have.

20   Q    I think we also mentioned painters or folks who do that

21   type of work.  Same question.  What types of employers in the

22   area are you trying to get folks connected with in your

23   experience in that field?

24   A    In addition to businesses that specifically offer painting

25   services, perhaps apartment buildings, businesses that would

1    need maintenance either on site or on call, construction

2    companies, home builders, places like that.

3    Q    You have personally helped folks look for that type of

4    work in the Tacoma/Pierce County area?

5              MS. SCHEFFEY:  Objection, leading.

6              THE COURT:  Leading.

7    BY MS. SCHEFFEY:

8    Q    Mr. Gard, you just described certain types of employers

9    who may hire folks for painting jobs, for example.  Let me

10   ask it a different way.  How many folks, in your experience,

11   if any, have you helped try and find that type of work in the

12   Tacoma/Pierce County area?

13   A    It is hard to put a number on that.  I would like to say

14   in the dozens, but I honestly couldn't tell you a precise

15   number.  We see people on appointment, we see people just

16   walking in to the resource room and walking out again.  It is

17   hard to get any type of a specific number for that.

18   Q    Let me ask a similar question, for example, for kitchen

19   workers whom you have assisted over the years.  How many

20   would you estimate, how many folks would you estimate you

21   have helped try to find work working in a kitchen in the

22   Tacoma/Pierce County area?

23   A    Same answer.  In the dozens.

24   Q    Personally?

25   A    Yes.

1    Q    You said you supervise a team of ten employment

2    specialists; is that correct?

3    A    Currently, a team of ten employment specialists, yes.

4    Q    Do those folks do the same type of assistance or offer the

5    same type of assistance that you are speaking to that you

6    have offered?

7    A    They do.

8              MS. SCHEFFEY:  Objection, vague.

9              THE COURT:  He may answer.

10             THE WITNESS:  The team I supervise does provide the

11   same type of service, yes.

12   BY MR. POLOZOLA:

13   Q    Okay.  I think I understand what you have done and the

14   experience that you have.  Let me ask a different question.

15   In your experience, have you ever helped individuals in the

16   Tacoma or Pierce County area try to get a job that pays a

17   dollar a day?

18   A    Never.

19   Q    No.  What kind of jobs are you trying to help folks get?

20   A    We try to help folks obtain a living wage job.  Minimum

21   wage right now is $13.69 an hour.  So those are the wages

22   that somebody should expect here in Pierce County.  I have

23   never assisted anybody in trying to find a job for wages that

24   pay less than that.

25   Q    Now, if I were to tell you that 85 new jobs became

1  available in the Tacoma/Pierce County area in areas like

2  kitchen work, laundry, painting, that kind of stuff,

3  custodial work, how would you respond to me telling you those

4  jobs were available?

5      MS. SCHEFFEY:  Objection, leading.  Calls for

6  speculation.

7      THE COURT:  He may answer.

8      THE WITNESS:  I would not be surprised.  I would

9  think that is a low number right now.

10 BY MR. POLOZOLA:

11 Q  Maybe I didn't ask it precisely enough.  Let me ask it a

12 different way.  If there were 85 additional jobs available in

13 Tacoma in those areas, would you help folks looking for those

14 types of work try and find those jobs?

15 A  Yes, absolutely we would help folks with that, yes.

16 Q  Okay, Mr. Gard.  Thank you for your time.  I think I have

17 done what I need.  We are just about where I think the Judge

18 is going to call it quitting time.  I will let the Judge say

19 that.

20     THE COURT:  Well, you've got that right, except I

21 don't always call it quitting time.  Sometimes it is just

22 time to go home.

23    You have cross-examination of Mr. Gard?

24     MS. SCHEFFEY:  I do, Your Honor.

25     THE COURT:  All right.  I will have to ask you to

1  come back tomorrow, Mr. Gard, at 9:00.  We will reconvene

2  then.

3      Again, let me remind the jury to follow my instructions

4  about recesses.  Keep your minds open.  Don't discuss the

5  case with each other or anyone else.  Come back tomorrow

6  morning bright-eyed and bushy-tailed and ready to get back

7  into our case.

8      Okay.  Thank you, folks.  You may be excused.

9          MR. POLOZOLA:  Thank you, Your Honor.

10             (The proceedings adjourned.)

11

12          C E R T I F I C A T E

13

14

15      I certify that the foregoing is a correct transcript from

16  the record of proceedings in the above-entitled matter.

17

18

19

20  /s/ Angela Nicolavo

21  ANGELA NICOLAVO
    COURT REPORTER

22

23

24

25