1        UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT TACOMA

3    _____

4                                    )
     UGOCHUKWO GOODLUCK NWAUZOR,      )
5    et al.,                         )
                                     )
6             Plaintiffs,            ) 3:17-cv-05769-RJB
                                     ) 3:17-cv-05806-RJB
7    v.                              )
                                     ) Tacoma, Washington
8    THE GEO GROUP, INC.,            )
                                     ) June 10, 2021
9             Defendant.             )
     _____ ) Jury Trial
10                                   )
     STATE OF WASHINGTON,            ) 9:00 a.m.
11                                   )
              Plaintiff,             )
12                                   )
     v.                              )
13                                   )
     THE GEO GROUP, INC.,            )
14                                   )
              Defendant.             )
15                                   )
     _____

16            VERBATIM REPORT OF PROCEEDINGS
17        BEFORE THE HONORABLE ROBERT J. BRYAN
              UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24       Proceedings stenographically reported and transcribed
25              With computer-aided technology

```
 1                           APPEARANCES

 2

 3     For the Plaintiff        JAMAL N. WHITEHEAD
       Nwauzor, et al.:         ADAM J. BERGER
 4                              Schroeter Goldmark & Bender
                                810 Third Avenue
 5                              Suite 500
                                Seattle, Washington
 6

 7
       For the Plaintiff        ANDREA BRENNEKE
 8     State of Washington:     LANE POLOZOLA
                                MARSHA J. CHIEN
 9                              800 Fifth Avenue
                                Suite 2000
10                              Seattle, Washington

11

12     For the Defendant        LAWRENCE D. SILVERMAN
       The GEO Group:           ADRIENNE SCHEFFEY
13                              Akerman LLP
                                1900 Sixteenth Street
14                              Suite 1700
                                Denver, Colorado
15
                                JOAN K. MELL
16                              III Branches Law PLLC
                                1019 Regents Boulevard
17                              Suite 204
                                Fircrest, Washington
18

19

20

21

22

23

24

25
```

1                    EXAMINATION INDEX

2

3   EXAMINATION OF:                                        PAGE

4    ROBBIN GARD          CROSS-EXAMINATION
                         BY MS. SCHEFFEY                   9
5                        REDIRECT EXAMINATION
                         BY MR. POLOZOLA                  16
6                        RECROSS-EXAMINATION
                         BY MS. SCHEFFEY                  18
7
     TAMMY FELLIN         DIRECT EXAMINATION
8                        BY MS. MELL                      34

9    DEBRA JEAN EISEN     DIRECT EXAMINATION
                         BY MR. SILVERMAN                 93
10                       CROSS-EXAMINATION
                         BY MS. CHIEN                    103
11                       REDIRECT EXAMINATION
                         BY MR. SILVERMAN                108
12                       RECROSS-EXAMINATION
                         BY MR. BERGER                   110
13
     LYNNE BUCHANAN      DIRECT EXAMINATION
14                       BY MS. MELL                     113

15   SARAH SYTSMA        DIRECT EXAMINATION
                         BY MS. SCHEFFEY                 130
16

17

18

19

20

21

22

23

24

25

1                          EXHIBIT INDEX

2
   EXHIBITS ADMITTED                              PAGE
3
   Exhibit 609                                     19
4  Exhibit A-023                                   73
   Exhibit A-025                                  136
5  Exhibit A-31                                   142
   Exhibit A-44                                   170
6  Exhibit A-54                                   157
   Exhibit A-55                                   165
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | MORNING SESSION |
| 2 | JUNE 10, 2021 |
| 3 | (The following occurred outside the presence of the jury.) |
| 4 | THE CLERK:  I am going to let everybody in now, the |
| 5 | attorneys. |
| 6 | Good morning, counsel.  Looks like we have Mr. Gard on |
| 7 | standby in the waiting room, ready to go. |
| 8 | THE COURT:  Mr. Whitehead, you are blue like Ms. Mell |
| 9 | today, but not quite a match.  It is complementary colors |
| 10 | anyway. |
| 11 | Are we all ready to go this morning? |
| 12 | MS. CHIEN:  Your Honor, we have a couple preliminary |
| 13 | issues that we wanted to flag for the Court.  First, on a |
| 14 | scheduling issue, our building is having a fire alarm at |
| 15 | 10:15.  If at all possible, that might be a good time for a |
| 16 | break because we have to evacuate our building. |
| 17 | Second, we want to have hopefully a conference outside the |
| 18 | presence of the jury regarding the L&I witnesses that GEO |
| 19 | seeks to offer testimony on, which is all to testify in a |
| 20 | backdoor way of getting around the Court's order dismissing |
| 21 | their laches defense, their unclean hands defense, their |
| 22 | statute of limitations defense, and this Court's order |
| 23 | excluding exhibits regarding internal emails. |
| 24 | So I don't know when you would like to do that, have that |
| 25 | conference, but we want to flag that before the L&I witnesses |

1    are identified and testify.

2        THE COURT:  Let's go with what we've got, and when

3    it's time to make a motion or whatever, we'll deal with it.

4        MS. CHIEN:  Okay.  Thank you.

5        MR. POLOZOLA:  Your Honor, I have one more brief

6    issue the parties had discussed.  At the beginning of trial,

7    you asked the parties to consider how the admitted facts

8    should come in.  We have discussed this, and the plaintiffs

9    have uploaded as Exhibit 609 the admitted facts which the

10   parties have agreed to.  So we would request that the Court

11   place Exhibit 609 in the file, or in the record.

12       THE COURT:  Well, I take it you are offering an

13   exhibit?

14       MR. POLOZOLA:  Correct, Your Honor.

15       THE COURT:  I saw that this morning.  Aren't those

16   agreed facts rather than admitted facts?

17       MR. POLOZOLA:  They are agreed facts.  The parties

18   have added, to streamline issues, facts to which each side

19   has admitted, Your Honor.

20       THE COURT:  Should not the exhibit call them "agreed

21   facts" rather than "admitted facts"?

22       MR. POLOZOLA:  We can certainly update it to say

23   "agreed facts," Your Honor and re-upload it as Exhibit 609.

24   We just wanted to bring it to the Court's attention that we

25   had discussed the issue and that would be our proposed

1    approach.

2          THE COURT:  Okay.  Anything else on that?

3          MR. SILVERMAN:  Not on that, Your Honor, but I have

4    one procedural question.

5          THE COURT:  Wait a minute.  One thing at a time.

6          MS. SCHEFFEY:  Your Honor, I want to make sure we

7    have the right copy.  As long as it is everything we

8    discussed before, we can upload it.

9          THE COURT:  I think the exhibit should be called

10   agreed facts rather than admissions.  So I would entertain

11   the admissibility of that exhibit when that is changed on the

12   cover page and on the next page.  It appears twice.  Change

13   the word from "admitted" to "agreed" in two places.  And with

14   that change, that may be admitted, but I will need to tell

15   the jury that it is admitted.

16         MR. POLOZOLA:  Certainly.  We will get that corrected

17   and uploaded and we will, of course, copy you, Adrienne and

18   team, so that you are aware.

19      Thank you, Your Honor.

20         THE COURT:  What else?  Now, Mr. Silverman, you had

21   something?

22         MR. SILVERMAN:  Yes, Your Honor.  I just wanted to

23   note that the State has indicated this is their last witness

24   and then we are going to make our Rule 50 DV motion.

25      In terms of the Court's preference for the logistics of

1   that, if we were in Court I would walk up and I would hand up

2   a copy while making our argument.  What's the Court's

3   preference in terms of the logistics of how you would like us

4   to proceed with our Rule 50 motion?

5           THE COURT:  It makes some sense to me if you wait

6   until both plaintiffs rest.

7           MR. SILVERMAN:  Okay.  Is there an additional witness

8   that the private plaintiffs are putting on after Mr. Gard?

9           THE COURT:  I don't know.  Nobody has rested yet.

10          MR. SILVERMAN:  Once we move, I don't want to waste

11  jury time.  What is your preference in terms of me making the

12  Rule 50 motion into the record so we cannot -- so they can go

13  out and do what they are going to do?

14          THE COURT:  Just do it like you are in court.

15          MR. SILVERMAN:  Okay.

16          THE COURT:  If you have something you want me to

17  read, file it in whatever way we get it, just like every

18  other document.

19          MR. SILVERMAN:  Thank you, Your Honor.

20          THE COURT:  Anything else preliminary?

21      Bring in the jury and the witness, Mr. Gard.

22          THE CLERK:  They are on their way in, Your Honor.

23      (The following occurred in the presence of the jury.)

24          MS. SCHEFFEY:  May I proceed?

25          THE CLERK:  We are still waiting on one juror.  There

1  we go.  Okay.  Now all the jurors are all present.

2          THE COURT:  Where is Mr. Gard?  There you are.  Okay.

3  You are right in front of me.  I didn't see you, Mr. Gard.

4  All right.  I believe the State had finished its direct

5  testimony.

6          MR. POLOZOLA:  Correct, Your Honor.

7          THE COURT:  Go to cross-examination.

8                      CROSS-EXAMINATION

9  BY MS. SCHEFFEY:

10  Q   Mr. Gard, thank you for coming back today.  I wanted to

11  clarify a few things with you.  You have never worked for the

12  Northwest ICE Processing Center, correct?

13  A   Never worked for who?  Sorry.

14  Q   The Northwest ICE Processing Center.

15  A   No, I never have.

16  Q   You have no firsthand knowledge of the operations of the

17  voluntary work program at that facility, correct?

18  A   I do not.

19  Q   You are not a former detainee of that facility, right?

20  A   I am not.

21  Q   You work at the Employment Security Division, correct?

22  A   Employment Security Department, yes.

23  Q   Does your department help track how many unemployed

24  individuals there are in Tacoma?

25  A   Through the unemployment roles, Employment Security does

1    track how many people are unemployed and what -- through

2    sectors as well, I believe.  That piece is above me so...

3    Q    Do you know if the unemployment division counts

4    individuals at the Northwest ICE Processing Center as

5    unemployed?

6    A    I have no direct knowledge of that.

7    Q    Do you have any knowledge of who is included generally in

8    the unemployment bucket when they say someone is unemployed?

9    A    Individuals who have filed for unemployment.

10   Q    Do you have any knowledge about whether your agency as a

11   state government entity is required to buy its office

12   equipment from correctional industries?

13   A    I know we have office equipment that comes from

14   correctional industries, but I don't know what the contract

15   is.

16   Q    Some of your office equipment in your office where you

17   work comes from correctional industries, correct?

18   A    It does.

19        MR. POLOZOLA:  Your Honor, I would object.  This is

20   well beyond the scope of what Mr. Gard testified to.

21        THE COURT:  I think it is beyond the scope.

22   BY MS. SCHEFFEY:

23   Q    You testified yesterday you have helped people in the

24   restaurant and hospitality industries find jobs, correct?

25   A    That is correct.

1  Q    Does the hospitality industry typically include prisons

2  and detention centers?

3  A    I can't directly answer that.  To me, I guess the

4  hospitality is hotels, motels, anybody that would employ the

5  types of occupations that I was asked about yesterday.

6  Q    Okay.  When you think of the hospitality industry, you

7  don't think of prisons, right?

8  A    Prison does not immediately come to my mind when I think

9  of hospitality.

10 Q    What about the restaurant industry?  When you think of the

11 restaurant industry, do you immediately think of detention

12 centers?

13 A    No, I don't.

14 Q    You testified yesterday that you typically pair custodial

15 workers with hotels, hospitals and local schools as we just

16 discussed; is that right?

17 A    Yes, that is correct.

18 Q    In your experience, do local hotels typically require a

19 government security clearance for custodians?

20 A    No.

21 Q    What about hospitals?

22 A    Security clearance, no.  There is a limit to the

23 individuals that can work in that.  For instance, reentry,

24 those that have been formally incarcerated, things like that,

25 individuals of that nature.

1    Q    You are saying people who have been formally incarcerated

2    cannot work in hospitals?

3    A    May not due to background.  Not security clearance, but

4    background.

5    Q    In your personal experience with the people you have

6    worked with, how many of them have had trouble finding a

7    position because of their background?

8    A    We see reentry people on a regular basis, just as

9    involved.  I couldn't give you a number.

10   Q    Is it more than half or less than half of the dozens of

11   people you have worked with?

12   A    Less than half.

13   Q    Those people typically have criminal records, correct?

14   A    If they are justice involved, they would have criminal

15   records, yes.

16   Q    If they applied for a government security clearance that

17   required them not to have a criminal record, they couldn't

18   meet those requirements, correct?

19            MR. POLOZOLA:  Objection, foundation, Your Honor.

20            THE COURT:  Sustained.

21   BY MS. SCHEFFEY:

22   Q    You testified you see people by appointment or walk in who

23   are seeking jobs; is that correct?

24   A    That is correct.

25   Q    Have you ever gone to the Northwest ICE Processing Center

Gard - Cross-Examination

1   to try and help place detainees in jobs?

2   A   I have not.

3   Q   What about the Special Commitment Center on McNeil Island?

4   A   I have not.

5   Q   What about the local jails and prisons?

6   A   We have had a presence from Employment Security Department

7   at the local jail.

8   Q   Is that to help them with correctional industries?

9          MR. POLOZOLA:  Objection, Your Honor, scope again.

10         THE COURT:  He may answer.

11         THE WITNESS:  Could you repeat the question?

12  BY MS. SCHEFFEY:

13  Q   Is that to help them with correctional industries?

14  A   No, it is to help them find employment on release or

15  shortly after release.

16  Q   You testified that you tried to find people a living wage

17  job yesterday.  Do you remember that?

18  A   I do.

19  Q   A living wage job is one that would pay for an

20  individual's food, housing, clothing and other basic

21  necessities, right?

22  A   Yes.

23  Q   You also testified that if 85 new jobs became available in

24  Tacoma, you would not be surprised because that would be a

25  low number right now.  Do you remember that?

1   A   I do.

2   Q   Isn't it true that in Washington, there is currently a

3   shortage of workers willing to fill service industry jobs?

4   A   We are finding there is a low census of workers, yes.

5   Q   When you say "low census of workers," are you saying there

6   are more jobs than there are job seekers?

7   A   That is what I am saying.

8   Q   So the people that you help -- you talked about helping

9   dozens of people.  Do you remember that?

10  A   I do.

11  Q   The people you help, they are typically receiving

12  unemployment benefits, correct?

13  A   That is not accurate.  We serve everybody.

14  Q   Do you help people who are receiving unemployment

15  benefits?

16  A   We do.

17  Q   Some of the dozens of people that you have helped who are

18  receiving unemployment benefits have an obligation to look

19  for work, correct?

20  A   Not at this time.

21  Q   Not at this time?

22  A   The job search is waived for this period of time during

23  COVID.  In typical times, they would be required to look for

24  three jobs each week, or three job search activities.

25  Q   So prior to COVID, you helped people who had to look for

1    work as part of receiving their unemployment benefits?

2    A    That is correct.

3    Q    Before someone receives unemployment benefits, you verify

4    their immigration status through the Systematic Alien

5    Verification for Entitlement, or SAVE interface, correct?

6            MR. POLOZOLA:  Objection, scope and foundation, Your

7    Honor.

8            MS. SCHEFFEY:  Your Honor, these are the people he

9    testified that he helps.  That's the basis of his testimony.

10           THE COURT:  Wait a minute.  I think he may answer.

11           THE WITNESS:  Could you repeat the question?

12   BY MS. SCHEFFEY:

13   Q    Before someone receives unemployment benefits, you verify

14   their immigration status through the SAVE interface, correct?

15   A    That is done outside of my scope of work so I can't answer

16   directly to that.

17   Q    Do you know what the SAVE interface does?

18   A    I am not familiar with that.  Are you saying save,

19   S-A-V-E?

20   Q    Systematic Alien Verification for Entitlements.

21   A    I am not familiar with that.  It is outside my scope of

22   work.

23   Q    Are you aware of anyone at the Northwest ICE Processing

24   Center that has received unemployment benefits?

25           MR. POLOZOLA:  Same objection, scope, Your Honor.

1          THE COURT:  He may answer.

2          THE WITNESS:  I don't recall assisting directly

3     anybody from the immigration center.

4     BY MS. SCHEFFEY:

5     Q   If COVID was not waiving the job seeking requirement,

6     would someone who was detained at the Northwest ICE

7     Processing Center be able to meet the job search requirement

8     if there is no employment in the place where they are

9     detained?

10    A   Somebody who is detained, period, is not eligible for

11    unemployment benefits.  Is that what you are asking me?

12    Q   I was asking something along those lines.  I think that is

13    close.  Do you know, sitting here today, what the deficit

14    between job seekers and jobs is in the food service industry?

15    A   I do not.

16          MS. SCHEFFEY:  No further questions.  Thank you.

17          THE COURT:  Redirect, counsel?

18          MR. POLOZOLA:  Briefly, Your Honor.

19                    REDIRECT EXAMINATION

20    BY MR. POLOZOLA:

21    Q   Mr. Gard, thank you for coming back this morning.  We did

22    speak yesterday about how you have personally helped job

23    seekers in Tacoma and Pierce County who are looking for work;

24    is that correct?

25    A   That is correct.

1   Q   You said you have helped job seekers that have looked for

2   work as custodians, cooks and dishwashers, laundry workers

3   and barbers; is that correct?

4   A   That is correct.

5   Q   Now, counsel just asked you some questions about work

6   authorization and background checks, correct?

7   A   Uh-huh.

8   Q   You serve everyone who is looking for work in Tacoma,

9   right?

10         MS. SCHEFFEY:  Objection, leading.  Still his

11   witness.

12         THE COURT:  The question was leading in form.

13   BY MR. POLOZOLA:

14   Q   As a work force supervisor, who does your team serve?

15   A   Our team serves anybody in the State of Washington.  I

16   like to say that if you have a beating heart, we will help

17   you.

18   Q   Have you been successful in helping individuals in Tacoma

19   and Pierce County find work?

20   A   We have.

21   Q   What impact, if any, would it have on your work and the

22   job seekers you serve if there were more jobs available in

23   the areas such as custodians, cooks and dishwashers and

24   barbers?

25   A   It would have a great impact.  We welcome any employment

1    opportunity to connect our job seekers to those employment

2    opportunities.

3              MR. POLOZOLA:  Thank you.  No further questions.

4              MS. SCHEFFEY:  One follow up question, Your Honor.

5                        RECROSS-EXAMINATION

6    BY MS. SCHEFFEY:

7    Q   You just testified that --

8              MS. SCHEFFEY:  Following up.

9              THE COURT:  I'm sorry.  Don't get used to going

10   beyond one cross and one direct from each party.  What is

11   your question now, Ms. Scheffey?

12   BY MS. SCHEFFEY:

13   Q   Mr. Gard, you just testified that it would have a great

14   impact on your job seekers if there were more jobs, correct?

15   A   Yes.

16   Q   You don't know what the deficit is right now sitting here

17   today between job seekers and jobs?

18   A   I could not tell you how many job seekers there are out

19   there to employment opportunities, no.

20             MS. SCHEFFEY:  Thank you.  That's it.

21             THE COURT:  Well, I will withhold my comments and

22   excuse Mr. Gard.  Thank you.

23             THE WITNESS:  Thank you.

24             THE COURT:  Okay.  Next witness.

25             MR. POLOZOLA:  Your Honor, the State has no further

1    witnesses.

2         THE COURT:  All right.  Mr. Whitehead.

3         MR. WHITEHEAD:  Your Honor, private plaintiffs have

4    no further witnesses.  We would offer -- I hope it has been

5    uploaded at this time -- Exhibit 609.

6         MR. POLOZOLA:  I believe we are working on that right

7    now, counsel.  Your Honor, it will go in shortly.

8         MS. SCHEFFEY:  I need a minute.

9         THE COURT:  Let me explain that to the jury.  Exhibit

10   609 is a list of the agreed facts that the parties have

11   agreed to in this case.  That exhibit may be admitted.  It is

12   the same list that I read to the entire jury panel during my

13   introduction to the case.  609 may be admitted.

14      I take it now both plaintiffs rest; is that correct?

15              (Exhibit 609 was admitted.)

16        MR. WHITEHEAD:  That is correct, Your Honor.

17        MR. POLOZOLA:  That is correct, Your Honor.  Thank

18   you.

19        MS. SCHEFFEY:  Lane, can you send me a copy of what

20   we are admitting?

21        MR. POLOZOLA:  It is in the Box right now.  Adrienne,

22   if you can access our folder, it is there.

23        THE COURT:  Ladies and gentlemen, I am going to give

24   you a break here.  I have to hear some matters related to the

25   law in the case.  Take a break, and hopefully this won't take

1   long and we will be back with you soon.

2     (The following occurred outside the presence of the jury.)

3         THE COURT:  Mr. Silverman.

4         MR. SILVERMAN:   Thank you, Your Honor.

5     At this point, the defendant moves for a directed verdict

6   on the jury counts of involuntary dismissal, on the non-jury

7   counts under Federal Rule of Civil Procedure 50.

8     A brief is being -- I presume has been filed in the last

9   minute on that.  So Tyler, if you want to print that out as

10   it comes across the wire.

11     The brief is fairly exhaustive.  I will just hit each of

12   the elements, and we will go from there.

13     In addition, we have already moved, pursuant to Federal

14   Rule of Civil Procedure 23, to decertify the class.  We

15   believe, again, parallel to the Rule 50 requirements, that

16   the requirements of Rule 23 -- typicality, adequacy,

17   commonality and preponderance -- are established to be

18   inadequate as it pertains to the one remaining named

19   plaintiff, Mr. Nwauzor, as to the entire class.

20     Let me go through the Rule 50 arguments.  Like I said, we

21   filed it as well.  Your Honor, it should be appearing on your

22   screen momentarily.  No. 1 -- some of these are preservation

23   arguments.  Obviously, it is Rule 50.  We need to go through

24   this.

25     No. 1, we had pointed out most specifically in the Fourth

 1    Circuit case in *Ndambi* that under federal law the standards

 2    for the determination of whether a detainee can be considered

 3    an employee, that three-part test, which we believe the

 4    evidence clearly shows the evidence cannot be interpreted any

 5    way other than finding that the detainees are not employees.

 6        Under the modified economic dependence test applicable to

 7    detention, which again we have also briefed, the question of

 8    whether the detainee is working to turn a profit for GEO,

 9    whether the detainee and GEO have an opportunity for a

10    bargain for mutual economic gain, and whether GEO provides

11    the detainee with food, shelter and clothing that employees

12    would otherwise need to purchase in a true employment

13    situation, that the evidence cannot be reasonably interpreted

14    in any other way other than to find that the detainees are

15    not employees.

16        Under that, then that leads to the third version of "are

17    you an employee," which is the modified *Anfison* test that the

18    Court had considered and had put in some of the tentative

19    jury instructions, the nine-part test.  You know, we have

20    briefed that at some length.  Again, as noted in *Anfison* and

21    others, the nine-part jury test, which is the nature and

22    control of the detainees by GEO.  They are in custody.  They

23    are constantly under GEO's control.  That factor has little

24    or no weight.

25        The degree of supervision, indirect or direct, of work by

detainees.  They are always supervised, so that element has
little to no weight.

Whether GEO has the power to determine pay rates and the
method of payment.  As noted in great detail, the rate is
confirmed and set under contract between ICE and GEO.

D, whether GEO had the right directly or indirectly to
hire, fire or modify the employment conditions.  As you have
heard, GEO is required to offer the VWP position to every
detainee regardless of their prior experience or skill.  You
never heard of a single detainee who was actually terminated
from the program.  Spent a lot of time arguing about the
difference between termination from their post and firing
from their job.  You didn't hear a single detainee who was
actually removed from the program.

E, whether GEO prepared payroll and the payments to
detainees under VWP.  Again, GEO doesn't perform payroll
which involves calculating hours, withholding taxes and other
amounts.  The money goes into a trust account and then ICE
reimburses.

Whether GEO provided all necessary equipment and supplies
necessary for the VWP.  They are in detention.  That is the
only way it can work.  So that matter should have little or
no weight.

The degree of permanence in the working relationship in
the VWP.  You heard from their expert.  You heard the other

1    testimony, the average stay is about two months.  Some can

2    come and go within days.  Detainees can and do decide not to

3    show up, but nonetheless stay in the program.  You heard from

4    detainees who, in fact, provided decline to work forms and

5    stayed in the program.

6        H, whether the service rendered by detainees through VWP

7    is an integral part of GEO's business.  GEO is in the

8    business of providing secure detention.  Detainees do not do

9    that.

10       I, detainees' dependence upon GEO for income.  This factor

11   doesn't make sense in the detention context, which is why the

12   Fourth Circuit ruled the way it did.

13       Under each of those elements, we believe that there is no

14   reasonable possibility that a jury can find in any way that

15   they are not employees.

16       I am going to raise a couple of the issues that the Court

17   has previously declined to include in the instructions

18   because we need to preserve them.

19       Detainees are not employees under the resident exception

20   to the Washington Minimum Wage Act, and that detainees are

21   not employees under the detainee exception to the Washington

22   Minimum Wage Act.  Again, you have seen briefing on that.  We

23   have reasserted those issues as well.

24       Finally, we get to the immunity defenses.  GEO must be

25   treated the same as the federal government for the purposes

1    of intergovernmental immunity.  We briefed that.  GEO is

2    therefor entitled to intergovernmental immunity because the

3    Washington Minimum Wage Act attempts to directly regulate the

4    federal government.  You have seen that briefing and we have

5    put that forth in great detail.

6        GEO is entitled to the intergovernmental immunity because

7    the Washington Minimum Wage Act discriminates against the

8    federal government as set forth in that statute.  The statute

9    specifically exempts the State from the same kinds of

10   services including corrections, detainee and whatever you

11   want to call someone who is incarcerated.  It doesn't apply

12   to the State.  It does apply to the federal government.  It

13   does apply to GEO.

14       Washington is entitled to -- GEO is entitled to derivative

15   sovereign immunity.  We briefed that.  We just need to

16   preserve that.  Your Honor has not included that within the

17   jury instructions.  We have argued in the past, and therefore

18   raise now that the Washington Minimum Wage Act is preempted

19   by federal law under both express preemption and field

20   preemption.  You have seen that briefing.  That is coming

21   back.  Again, that is contained in the brief that was

22   provided to Your Honor.

23       There is a third concept known as conflict/obstacle

24   preemption.  We have raised that as well, and therefore want

25   to preserve that as well.

1       So those are the arguments contained within the Rule 50

2   motion.  Again, it is not clear under Rule 23 whether the

3   motion as to decertify based on the evidence that is

4   presented is a halftime motion in a trial because the

5   prevailing cases seem to appear that the Court has the

6   discretion to decertify at any moment prior to the entry of a

7   final judgment.

8       But at this point, again, this is the point where you can

9   see that what we have is solely Mr. Nwauzor.  He is the only

10  named plaintiff on the private plaintiffs' claims.  He only

11  worked in the pod, and he talked about that.  So we spent the

12  rest of that evidence regarding the need for the plaintiffs

13  to put on additional witnesses to talk about what it's like

14  in the laundry, what it's like in the kitchen, talking about

15  the differences in the shift, how long they go, what the

16  basis is.  There is no named plaintiff for those.

17      Mr. Urbina, who was then removed as a named plaintiff, was

18  a food porter, a totally different experience as well.

19      For all of those reasons, as set forth more fully in our

20  Rule 50 motion, the defendants move the Court to, A, enter a

21  directed verdict on the jury claims.  B, to the extent that

22  there are equitable claims that the Court has deemed

23  non-jury, which we will decide later on, that an involuntary

24  dismissal be entered as to those counts, and that the Court

25  otherwise decertify the classes under Rule 23.

 1          THE COURT:  You have handed me a 27-page brief.  I

 2    take these motions seriously.  I obviously can't accurately

 3    rule on it or fairly rule on it without reading what you have

 4    presented.

 5       You know, this whole case is, I would call it

 6    counterintuitive.  That doesn't make it wrong.  I think at

 7    this point the plaintiffs have raised issues on -- fact

 8    issues on all the necessary issues in the case to carry it

 9    forward.  Before I rule finally on your motion, I will read

10    what you presented.

11       In regard to decertifying the class, the motion was made

12    and noted for the 18th.  I have not seen the plaintiffs'

13    response to it.  I think it would be premature to rule on

14    that issue at this point as well.  The motion is reserved.

15    We will proceed with the defense case.

16          MR. WHITEHEAD:  Your Honor, I would only point out

17    the motion for decertification has been re-noted for the

18    25th.

19          THE COURT:  I didn't know that.  Rachel did.  She is

20    signalling me that that's the case.  As soon as I feel

21    comfortable after reading everything, I will tell you

22    further, but I don't want to keep the jury waiting while that

23    gets done.

24          MS. CHIEN:  Your Honor, unfortunately we would like

25    to still have our conference regarding the L&I witnesses

because I believe GEO's first witness is an L&I witness.  I would like to renew our objections to this witness given that the Court has already rejected GEO's defenses of laches and statute of limitations and unclean hands, and has excluded all of the exhibits which Tammy Fellin appears on.  Calling her as a witness is really a back door to getting evidence that was excluded and defenses that were dismissed before the jury.  It is irrelevant, prejudicial and a waste of time.

MS. MELL:  Your Honor, may I address that when you have the opportunity?

THE COURT:  Go ahead.  I don't know where this is going.  Go ahead, Ms. Mell.

MS. MELL:  Your Honor, you mentioned that this case is somewhat counterintuitive.  That is exactly why we are calling the State's witnesses, especially as it relates to the manner in which the State has addressed detention.  There is a very specific instruction that you are authorizing GEO to defend on in this case.  That is --

THE COURT:  Wait a minute.  Wait a minute.  Those instructions were a discussion draft.  They don't mean a thing.

MS. MELL:  Okay.

THE COURT:  You all were anxious to know what the instructions might look like, so I prepared a discussion draft for you.  That's all it is.

1     Excuse me, counsel.

2        MS. MELL:  All right.  Not to attribute to you

3  something you haven't made a final decision on.  My

4  apologies, Your Honor.  It is what we have been working from,

5  but it's also consistent with GEO's position and defense that

6  we are here to show that GEO operates a governmental program

7  for detainees.  Detention is not employment.  It is a

8  distinct concept.  It's a mutually exclusive concept from

9  employment.

10     The evidence that we intend to put on through the State's

11  witnesses is that even the State knows and addresses

12  detention distinctly from employment.

13     Tammy Fellin, the next witness who will be called to

14  testify, will testify that she's a policy official who has

15  grappled with the issues of employment versus detention and

16  has expressed the policy reasons why there is a distinction

17  between detention and employment.

18     In opening and in examination of Mr. Scott, the plaintiffs

19  have expressly opened the door to the documents the Court

20  said were not per se admissible.  But when I asked, "Does

21  that mean I cannot get this whole history of the way the

22  State has handled detention and how they have addressed

23  whether or not the Minimum Wage Act is applicable to GEO or

24  the detainees at the detention center," the Court expressly

25  told me, "I am not saying that you can't get it in through

witness testimony."

    Ms. Fellin will be one of those witnesses who, in response
to the question put to Mr. Scott, "Is there a document that
says the Minimum Wage Act does not apply to the GEO
detainees," we'll be able to say, "Yes, there is," because I
authored it and I published it to the Governor's office when
there was an express inquiry by the very advocates who have
put -- the plaintiffs have put a witness on from the
Northwest Immigration Rights Project who has testified as
their expert, whose organization lobbied the Governor's
office in 2014 to enforce the Minimum Wage Act against GEO.

    There was a whole flurry of email discussion and briefing
and thought put into why would or wouldn't the State treat
detainees in federal custody under the Minimum Wage Act as
employees, and a policy determination was made expressly and
expressly published to those advocates that it didn't apply.

        MS. CHIEN:  Your Honor, that is a misstatement.
There is no publication.  There was an internal email within
L&I and the Governor's office.  There's nothing that went to
GEO indicating there was a Minimum Wage Act determination by
L&I.

    L&I's discussion from 2014 -- internal discussions
regarding 2014 were already excluded.  What L&I thought in
2014 does not matter.  That defense does not exist in this
case.  The Court dismissed laches, statute of limitations,

1   prosecutorial discretion, and excluded the emails that

2   Ms. Mell would like to come in through these witnesses.

3        MS. MELL:  Your Honor, I was interrupted.  I can read

4   expressly from the emails.  The email -- whether the email

5   comes in or not, Ms. Fellin can say whether or not the

6   Department treats detention, people in state custody or

7   federal custody, as employees.  She will say that.  She does

8   have an express provision that she says, "At least this way

9   we will all know the Department's authority moving forward as

10  to, do INS detainees fall under L&I's jurisdiction for wage

11  and hour issues?"  That wasn't an internal email.  The State

12  actually was asked and invited to come down and take a

13  position on it for the advocates who were out in front of the

14  detention center lobbying on whether or not the Governor

15  would back them on minimum wage issues, and the Governor

16  declined to do so in 2014.  That's a whole policy position of

17  the State on the difference between detention and employment.

18       It goes directly to our defenses of how does the State

19  treat its detainees, does it discriminate when asked here to

20  apply a different standard to GEO and its detainees.

21       The opening of the door cannot be underemphasized here.

22  On page 65 -- I am looking at the verbatim report of

23  proceedings from Mr. Whitehead to the facility

24  administrator -- "Is it your testimony that there is a

25  document somewhere that says GEO has complied or does not

1  need to comply with state minimum wage laws for the voluntary

2  work program?  Is that your testimony?

3      "Mr. Scott, I don't know anything about that, sir.

4      "Question:  Because if there was that sort of document, I

5  mean, that's a document we would have seen by now at trial,

6  would you agree?"

7      He put that right in front of the jury.  I have a right,

8  on behalf of GEO, to stand and up say, "Ms. Fellin, you know

9  of such a document.  You authored it.  It's right here."

10         MS. CHIEN:  The existence of a document that was not

11  shared with GEO or the advocates that Ms. Mell is talking

12  about is not relevant.

13         THE COURT:  Just a minute.

14      You know, Ms. Mell, what you are asking for is a jury

15  instruction that says the State has the right to change its

16  mind, and the question is now -- the question we are trying

17  in this case, it's not what the State's position might have

18  been at some other time.  I think you are --

19         MS. MELL:  Your Honor --

20         THE COURT:  -- barking up the wrong tree.  It is not

21  a defense.  Wait a minute.  Wait a minute.  I'm talking.

22         MS. MELL:  I'm sorry, Your Honor.  My apologies.

23         THE COURT:  The exhibits that I saw on this subject,

24  if I recall all of them, never amounted to a State policy

25  decision on this subject.  That is why I was very reluctant,

1    but didn't rule specifically pretrial on their admissibility.

2        I don't want to tell you how to try your case.  I think

3    you are barking up the wrong tree if you think the State

4    can't change its mind.  Particularly, if no policy was ever

5    reached.  I think we are on the verge of wasting a lot of

6    time.

7        On the other hand, this is basically a late motion in

8    limine.  I can rule better on things as they come up because

9    it may be that this witness has some admissible testimony

10   about some things relative to how the State treats its own

11   detainees --

12           MS. CHIEN:  Your Honor --

13           THE COURT:  -- which is probably the only thing that

14   she might have that is relevant to the issue in this case.

15           MS. MELL:  Thank you for that clarification,

16   Your Honor.  I can work with that.

17           MS. CHIEN:  We think it is prejudicial to have any of

18   the L&I witnesses discuss their thoughts on something --

19           THE COURT:  Okay.  Make an objection if they ask for

20   that and we will rule on it.

21           MS. CHIEN:  Okay.

22           THE COURT:  I can't anticipate every question or

23   possible answer.

24           MS. CHIEN:  Okay.  Thank you, Your Honor.

25       I am going to have to call Ms. Fellin, Ms. Mell, so you

 1    might have to give me a minute.

 2            MS. MELL:  We have an issue with regard to the

 3    State's instructions on how to give the documents to the

 4    witness.  It was my understanding we were supposed to be able

 5    to email.  I have just been handed a note that somehow they

 6    are thinking we need paper documents in Seattle.  What's the

 7    situation?

 8            MR. POLOZOLA:  I believe a member of your team asked

 9    if documents could be sent by mail to Seattle.  So perhaps

10    Mr. Silverman or Ms. Scheffey --

11            MS. SCHEFFEY:  Lane, we got a spreadsheet from Marsha

12    that said, you know, these witnesses want paper, these want

13    electronic.  I believe it was Eisen and Sytsma who want

14    paper, and everyone else was electronic.  I gave Fellin

15    electronic, so...

16            MR. POLOZOLA:  What is the issue?

17            MS. SCHEFFEY:  I don't know that there is one, if

18    she's okay with electronic documents.

19            MS. MELL:  Did the State give us her email then?

20    What is the email that she is supposed --

21            MR. POLOZOLA:  I believe she has the Box link.

22            MS. MELL:  Okay.  She has Box?  Okay.  We can work

23    with that, then.  Sorry.  We will call Ms. Fellin.

24            MS. CHIEN:  Was there a question to me while I was

25    gone?

1    THE COURT:  No, I don't think so.

2        Let's bring the jury in and go to work.  Is the witness

3    present?

4        THE CLERK:  The jurors are here, but we are waiting

5    on the witness.

6        (The following occurred in the presence of the jury.)

7        THE COURT:  Ms. Fellin, if you would unmute your

8    microphone.  If you will raise your right hand and be sworn.

9                    TAMMY FELLIN,

10    having been sworn under oath, testified as follows:

11        THE COURT:  You may inquire.

12                    DIRECT EXAMINATION

13    BY MS. MELL:

14    Q    Good morning, Ms. Fellin.

15    A    Good morning.

16    Q    Can you tell me your position?  You work for the State of

17    Washington, correct?

18    A    I do.  I am the legislative director for the Department of

19    Labor & Industries, so the Department's lobbyist.

20    Q    You are an employee, correct?

21    A    I am, yes.

22    Q    As a legislative director, it is your job to interface

23    with legislative officials, elected officials on L&I's

24    position on enforcing public policies, correct?

25    A    Yes, it is my role to represent the Department with

1    elected officials in general.

2    Q    Another population in the State of Washington who you work

3    with, with some regularity and it is your duty to work with,

4    are stakeholders, people that have an interest in what the

5    Department of Labor & Industries does and how it enforces

6    State policy, correct?

7    A    Yes.  I do also work with external stakeholders who

8    represent the Department with them.

9    Q    And you work with the Governor's office, correct?

10   A    Yes, I do.

11   Q    Your position is appointed?

12   A    Yes, I am appointed by the Director, yes.

13   Q    The Director is appointed by the Governor?

14   A    Yes.

15   Q    The Governor is the elected executive officer of the State

16   of Washington, correct?

17   A    Yes.

18   Q    You would agree that your position is pretty political,

19   right?

20            MS. CHIEN:  Objection, leading.

21            THE COURT:  Overruled.

22   BY MS. MELL:

23   Q    You may answer, Ms. Fellin.  Did you understand the

24   question?

25   A    I understood you to be asking if my position was

1    political, yes.

2    Q   When I say that, I mean if you step in it and take a wrong

3    political position, your job could be at risk, right?

4    A   I am an appointed position so, yes, there is all sorts of

5    reasons why my job could be at risk.  Sure.

6    Q   And what you find when you are in that position is that

7    there is a whole bunch of opinions on a whole bunch of issues

8    that you may not always see what the position is before there

9    is a public discussion about it, correct?

10             MS. CHIEN:  Objection, relevance.

11             THE COURT:  She may answer.

12             THE WITNESS:  I am not entirely sure I understand the

13   question, though.  If you could restate.

14   BY MS. MELL:

15   Q   Well, as a lobbyist for the Department of Labor &

16   Industries, has it been your experience that little things

17   that you didn't think were controversial, all of a sudden

18   become quite controversial?

19   A   Yes.  It is not always possible to predict how people will

20   react for sure.

21   Q   It is your job in that position to make your Director

22   looks good, correct?

23   A   Sure, and to represent the Department, yes.

24   Q   In a way that is consistent with the policy objectives set

25   by the legislature that the Governor and executive branch

1    then enforces, correct?

2    A    Sure.    Yes.

3    Q    Okay.    And so in your position, you have had the

4    experience of dealing with a variety of issues that are

5    unique to the Labor & Industries, correct?

6    A    Yes, that would be correct.

7    Q    So you know I worked on the Hill and am familiar with

8    policy issues, right?

9    A    I didn't know you had worked on the Hill, no.

10   Q    When we talk about "the Hill" and "lobbying," what does

11   that mean?

12   A    In this context, means most of my time is spent with the

13   legislature during session.    I am often on the capitol campus

14   where the legislature normally convenes.    That wasn't the

15   case this year.    That is what I mean by "the Hill," yes.

16   Q    And so one of the things you do for the Department of

17   Labor & Industries is you are the communication person on

18   request legislation, so if the Department wants to move a

19   particular piece of legislation or get the policy of the

20   State of Washington changed, you are the spokesperson for

21   that, correct?

22   A    Yes.

23   Q    The Governor's office communicates back with you, and you

24   use the resources of your agency to figure out what the right

25   position is on a particular issue affecting L&I, correct?

1          MS. CHIEN:  Objection, leading and relevance.

2          THE COURT:  The objection is overruled.

3          THE WITNESS:  In my role, yes, I am the spokesperson

4    for the Department on issues that the legislature is

5    considering.

6    BY MS. MELL:

7    Q    Part of that spokesperson role relates, in part, to

8    carrying out the policy objectives set by the Governor's

9    office and the agency via request legislation, correct?

10   A    That is one way, yes.  The Department is -- does usually

11   have an agency request legislation that we move forward.  We

12   do work closely with the Governor's office to make sure we

13   are consistent in the -- in the types of the requests we

14   bring forward, yes.

15   Q    Okay.  So with regard to the kinds of requests that you

16   bring forward, the kinds of requests that you bring forward

17   you want to make sure are consistent with the objectives of

18   the Department of Labor & Industries, correct?

19   A    When you say "requests," do you mean agency requests,

20   bills that we seek to bring forward?

21   Q    Actually, that brings up a good point.  There is a whole

22   bunch of ways that you in your position make sure that what

23   the legislature does or what the Governor's office does is

24   consistent with the objectives of Labor & Industry, correct?

25   A    I am struggling because we don't -- we don't control what

1    the legislature or the Governor's office brings forward.

2    That's my hesitation.  I am not -- I represent the

3    Department.  There is a lot of issues that come forward that

4    are not things the Department chooses to pursue or initiate.

5    Q   Right, but if they do have an issue they want to pursue,

6    request legislation is the way they do it?

7    A   Request legislation is the way the Department would do it,

8    yes.

9    Q   With regard to the Department of Labor & Industries, for

10   those on the jury who are not a policy wonk like you and me

11   or working the Hill by experience --

12          THE COURT:  Just a minute.  Ms. Mell, your background

13   is not relevant to your questioning of this witness or any

14   witness.  Leave your own experience out of it and just ask

15   the questions.

16          MS. MELL:  Okay.  All right.

17   BY MS. MELL:

18   Q   So the Department of Labor & Industries, just so we

19   understand what that means, is an agency that is basically a

20   labor agency.  Its focus is employment, correct?

21   A   No.  Our focus is workplace safety and rights, so we

22   administer the elevator programs, we do elevator inspections,

23   we do the workers' comp program, we do safety and health.  We

24   obviously do the wage and hour, so like minimum wage,

25   questions around overtime.  Plumbing.  If a person wants to

 1  hire a plumber, we license plumbers.  We do a whole variety

 2  of things.  It is workplace safety.  Our mission is to keep

 3  Washington safe and working.

 4  Q   Is it correct that L&I is a diverse agency dedicated to

 5  the safety, health and security of Washington's 3.3 million

 6  workers?

 7  A   Yeah.

 8  Q   Is it correct you understand that that 3.3 million workers

 9  does not include those individuals who are in the detention

10  of the State or custody of the State, correct?

11          MS. CHIEN:  Objection.  Objection.

12          THE COURT:  She may answer.

13          THE WITNESS:  I think it would depend on the program

14  that would be included.

15  BY MS. MELL:

16  Q   When you say "program," are you talking about the multiple

17  divisions the Department has?

18  A   I am thinking more in terms of the specific program.

19  Would it be a Paid Family Medical Leave issue, would it be a

20  workers' comp issue, would it be a plumber issue?  I mean,

21  there is a whole variety of different programs and different

22  applications.

23  Q   As a general rule, though, the Department of Labor &

24  Industries does not treat the individuals who are in the

25  custody of the State as employees?

1    MS. CHIEN:  Objection, foundation.

2   BY MS. MELL:

3   Q   Or covered worker, right?

4        THE COURT:  That's now two questions.  The second one

5   came after the objection.  The objection is sustained.  Ask a

6   single question.

7   BY MS. MELL:

8   Q   So as a general rule, the Department of Labor & Industries

9   doesn't count in its 3.3 million workers those individuals

10  who are in State custody, for instance, in the Department of

11  Corrections and held involuntarily?

12       MS. CHIEN:  Objection, foundation.

13       THE COURT:  She may answer, if she can.

14       THE WITNESS:  I think that is a question I would

15  confer with the policy experts of the Department.

16  BY MS. MELL:

17  Q   Do you -- with regard to the State's -- let's make it

18  specific to programs.  One of the divisions in the Department

19  of Labor & Industries is specific to employment standards,

20  correct, wage and hour issues?

21  A   One of our programs is, yes.

22  Q   Okay.  It is not a division, it is a program?

23  A   Right.  Not a division.  The division that it is part of

24  is the fraud and labor standards division, fraud protection

25  and labor standards.

1  Q    Labor standards is a broad umbrella part of Department of

2  Labor & Industries that deals with employment, correct?

3  A    Yes, generally, yes.

4  Q    One of those programs within that division is ensuring

5  that the 3.3 million workers in Washington get minimum wages?

6  A    Right.  Yes, one of those programs within the fraud

7  division has within its purview wage and hour issues,

8  including minimum wage.

9  Q    Specific to its enforcement of the Minimum Wage Act, the

10  3.3 million workers that it does not protect are those people

11  in the custody of the State of Washington, correct?

12         MS. CHIEN:  Objection, foundation.

13         THE COURT:  She may answer, if she knows.

14         THE WITNESS:  It is a question I would confer with

15  the program staff in order to answer.  I think there would be

16  all sorts of variations to respond to that kind of a

17  question.

18  BY MS. MELL:

19  Q    You did consult with agency staff back in 2014 on that

20  issue --

21         MS. CHIEN:  Objection.

22  BY MS. MELL:

23  Q    -- for detention, didn't you?

24         MS. CHIEN:  Objection, relevance.

25         THE COURT:  The objection is sustained.

BY MS. MELL:

Q   Have you had any experience working at the Department of
Labor & Industries where you have learned that the people who
are in the custody of the State of Washington are expressly
exempt from the Minimum Wage Act?

          MS. CHIEN:  Objection, foundation.

          THE COURT:  Restate the question.  You are asking for
her experience on an isolated thing.  The objection to that
is sustained.

BY MS. MELL:

Q   Has it been your experience with the Department of Labor &
Industries that there is an exemption for people in State
custody with regard to the Minimum Wage Act?

          MS. CHIEN:  Objection, foundation.

          THE COURT:  She may answer.

          THE WITNESS:  Can you repeat the question?

BY MS. MELL:

Q   The Minimum Wage Act does not apply to the State's
individuals in custody, correct?

          MS. CHIEN:  Objection, foundation.

          THE COURT:  She may answer, if she knows.

          THE WITNESS:  My experience is that question might
vary, and I would check with the program staff.

BY MS. MELL:

Q   Have you checked with the program staff on a question like

1    that presented to you in the past?

2    A    Yes.

3    Q    And was that question presented to you in a question posed

4    by the Governor's office?

5            MS. CHIEN:  Objection, relevance.

6            THE COURT:  Sustained.

7    BY MS. MELL:

8    Q    When that question was posed to you in the past, did you

9    come up with an answer to the question?

10            MS. CHIEN:  Objection, relevance.

11            THE COURT:  Sustained.

12   BY MS. MELL:

13   Q    In your experience, has the Department of Labor &

14   Industries taken on and handled complaints by individual

15   detainees for the State of Washington?

16            MS. CHIEN:  Objection, foundation.

17            THE COURT:  No, she may answer that.

18            THE WITNESS:  I would -- I am not sure.  I don't

19   always see all of the complaints that might come into the

20   Department.  I am unsure.  I don't know whether we would have

21   had something like that or not.

22   BY MS. MELL:

23   Q    Has the Department taken a position on whether or not

24   there are policy reasons, either fiscal or to achieve policy

25   objectives of the State, that the individuals who the State

1  detains, puts in State custody, should not get minimum wages?

2  A    I don't know.  I would have to again consult the program

3  staff whether we have taken a policy position like that.

4  Q    Have you ever looked at the Minimum Wage Act?

5  A    Yes.

6  Q    Have you had the experience of dealing with the definition

7  of "employee" and, in particular, the express exemption for

8  individuals within the custody of the State of Washington?

9          MS. CHIEN:  Objection, foundation.

10          THE COURT:  The question is whether she has looked at

11  it.  She may answer that.

12          THE WITNESS:  Yes, I personally have looked at it.  I

13  personally would not be the person to make those kinds of

14  determinations, though.

15  BY MS. MELL:

16  Q    You know, as we sit here today, that people who the State

17  of Washington have in its custody are not employees under the

18  Minimum Wage Act?

19  A    I know what the program staff would tell me.  My

20  experience would suggest that those kinds -- that there are

21  nuances, there are variations, so as the Department's

22  lobbyist, I wouldn't make that kind of determination.  I

23  would rely on program staff to make those -- provide that

24  kind of input.

25  Q    Have you ever had input from program staff that indicates

1   that people in the State's custody are employees under the

2   Minimum Wage Act?

3   A   I don't know.  Have I ever had input from program staff

4   that inmates are covered?  That was your question?

5   Q   No, it wasn't.  It is kind of along those lines.

6   Individuals who are in the custody of the State, inmate or a

7   special commitment center person, somebody who is civilly or

8   criminally committed, have you ever had a situation where

9   your staff has told you that the law that defines them not to

10  be employees doesn't apply?

11              MS. CHIEN:  Objection, calls for a legal conclusion.

12              MR. BERGER:  Also calls for hearsay.

13              THE COURT:  Sustained.  Yes.  Sustained.

14  BY MS. MELL:

15  Q   So let me get back to this and make sure I understand your

16  testimony.  You know for certain that there is, in the

17  definition of "employee" in the Minimum Wage Act, an

18  exclusion for individuals who are in State custody, correct?

19              MR. BERGER:  Objection, Your Honor, the attorney --

20  Ms. Mell is instructing the jury on the law or is asking a

21  question.  I am not sure it accurately states the law, in any

22  event.

23              THE COURT:  The objection is sustained on the last

24  ground.

25              MS. MELL:  I guess we can get the exception up so we

1  can look at it expressly.  Let me see if I can get that for

2  you.

3  BY MS. MELL:

4  Q   You have looked at the definition of "employee" under the

5  Minimum Wage Act, correct?

6  A   Yes.

7  Q   In looking at that definition, you know that there is an

8  exclusion or exception that applies to individuals in State

9  custody?

10         MS. CHIEN:  Objection, same issue.

11         MR. BERGER:  Join.

12         THE COURT:  Sustained.

13         MS. MELL:  We will see if we can get that pulled up

14  to get some clarity to what it actually says.

15  BY MS. MELL:

16  Q   Has the Director -- while we are waiting, I'm going to

17  move on here.  Is it the Director's position it must

18  investigate all wage complaints?

19         MS. CHIEN:  Objection, foundation.  She's not the

20  director.

21         THE COURT:  If she knows, she may answer.

22         THE WITNESS:  I don't know if the Director has taken

23  that position.

24  BY MS. MELL:

25  Q   Has L&I taken the position that if it receives a Minimum

1    Wage Act complaint, it will investigate it?

2    A   My understanding from program staff is that the statute

3    tells us to investigate wage complaints.

4    Q   Have you had -- do you know that in an investigation of a

5    wage complaint, the State considers different objectives for

6    why somebody would or would not pay minimum wage, correct?

7              MR. BERGER:  Objection, compound.

8              THE COURT:  The objection is sustained.  We are going

9    to take an early break today because of an issue in another

10   building that could affect us.  We are going to be at recess

11   for at least ten minutes.  You may be excused.

12                        (Recessed.)

13             THE COURT:  Is everybody back?  You can bring the

14   jury in and the witness.

15        (The following occurred in the presence of the jury.)

16             THE CLERK:  We have all the jurors back.

17             THE COURT:  Ladies and gentlemen, it is kind of slow

18   going this morning.  We run into these delays sometimes.

19   This time, it was a little unusual because it was a fire

20   alarm in another building where some of the lawyers are and

21   that required a longer recess than usual.  Anyway, we are

22   back ready to go after that long recess.

23        Ms. Mell, you may ask your next question.

24   BY MS. MELL:

25   Q   Ms. Fellin, can you hear me?  I need her up there.

1    A    Yes, I can.

2    Q    I needed to see you, too.  All right.

3        It is your understanding that the Department of Labor &

4    Industries has never historically investigated and processed

5    a complaint by a person in state custody that they have not

6    received and should have been entitled to minimum wages under

7    the Minimum Wage Act, correct?

8            MS. CHIEN:  Objection.

9            THE COURT:  She may answer if she knows.

10           THE WITNESS:  I don't know the answer to that

11   question.

12   BY MS. MELL:

13   Q    Do you -- why don't you know the answer to that question?

14   Is it because you don't see the complaints that come in?

15   A    I don't see all the complaints that come in.  I also --

16   you know, we are a large agency.  There is just no -- a

17   single person is not capable of doing all of that, keeping

18   track of all of that, so I don't know.

19   Q    When you went into this case -- strike that.

20           When you received my subpoena to testify, it is not an

21   issue that you looked into?

22   A    I didn't receive the subpoena.  I think it went to the

23   attorneys.  I think -- I would need to know what issue you

24   are wanting me to look into, I guess.

25   Q    Did you have no idea why you were being called to testify

1    to the jury today?

2            MR. BERGER:  Objection, Your Honor.

3            THE COURT:  Sustained.

4    BY MS. MELL:

5    Q    Did you have an understanding that you would be asked

6    questions about the Department of Labor & Industries'

7    application of the Minimum Wage Act to people in state

8    custody when you were called to testify today?

9            MS. CHIEN:  Objection, relevance.

10           THE COURT:  The objection is sustained.

11   BY MS. MELL:

12   Q    In your position, is it knowable to you whether or not the

13   State has enforced or been asked to enforce the Minimum Wage

14   Act by any individual who is in state custody?

15   A    Yes, it is knowable, if I consult with the program staff.

16   Q    Historically, you have never had to consult with the

17   program staff about that question, correct?

18   A    I have consulted with program staff, sure.

19   Q    Specific to whether or not an individual who is in state

20   custody can obtain minimum wages for work done while in state

21   custody?

22   A    Yes, specifically to that question.

23   Q    And the response you got to that question is consistent

24   with the Minimum Wage Act that expressly excludes from the

25   coverage of the Minimum Wage Act people in state custody,

1   correct?

2           MS. CHIEN:  Objection, hearsay.

3           MR. BERGER:  Objection.

4           THE COURT:  Sustained.

5   BY MS. MELL:

6   Q   The knowledge you have about whether or not the complaints

7   would be covered under the Minimum Wage Act is that it was

8   not, correct?

9           MS. CHIEN:  Objection.

10          THE COURT:  Sustained.

11  BY MS. MELL:

12  Q   What did you learn about the application of the Minimum

13  Wage Act to individuals in state custody?

14          MR. BERGER:  Objection.

15          THE COURT:  Sustained.  You are asking for hearsay,

16  counsel.

17          MS. MELL:  It is the Department of Labor &

18  Industries, which is a division of the State who is a party

19  opponent.  The position of the State agency is not hearsay.

20  BY MS. MELL:

21  Q   Before the break, you had indicated that you do know that

22  there's an exemption under the Minimum Wage Act for people in

23  state custody?

24  A   I have read the statute, yes.

25  Q   So I am going to show you what has been marked as A-307.

1          MS. CHIEN:  Is this in the Box, counsel?

2          MS. MELL:  Yes.

3          THE WITNESS:  Let me see if I can access it.  Exhibit

4  A-307 is the one you referenced?

5  BY MS. MELL:

6  Q   It should look like the statute.

7  A   Okay.

8  Q   Is this the statute that you have looked at before on the

9  issue of who is exempt and who is not considered an employee

10 under the Minimum Wage Act?

11 A   Yes.

12 Q   It is the definition section of the Minimum Wage Act,

13 correct?

14 A   It looks to be, yes.

15         MS. MELL:  Your Honor, if this is the statute she was

16 looking at, may we publish for illustrative purposes, the

17 definition?

18         MS. CHIEN:  We would object.  Any instruction as to

19 the law should be from the Court.

20         MR. BERGER:  Join, Your Honor.

21         THE COURT:  The objection is sustained.  This goes

22 far beyond the question you are seeking to answer.  You can

23 refer to a specific section if it is something she read, and

24 ask her about it.

25         MS. MELL:  All right.

1    BY MS. MELL:

2    Q    Subsection 3 is the definition of "employee," correct?

3    A    Yes.

4    Q    And an employee under Washington law includes any

5    individual employed by an employer but shall not include,

6    then it lists a series of people who aren't covered by the

7    Minimum Wage Act, correct?

8    A    Sure.

9    Q    All right.  If you go down to subsection (k), subsection

10   (k) says that any resident, inmate, or patient of a state,

11   county, or municipal correctional detention, treatment or

12   rehabilitative institution is not an employee, correct?

13   A    Yes, that is what is in the statute, yes.

14   Q    And the Minimum Wage Act is a statute that Labor &

15   Industries enforces?

16   A    Yes.

17   Q    Labor & Industries has never previously sought to change

18   the definition of "employee" to cover people in state

19   custody, correct?

20            MS. CHIEN:  Objection, foundation, and misstates the

21   law.

22            THE COURT:  The objection is sustained.

23   BY MS. MELL:

24   Q    It is the position of the Department of Labor & Industries

25   that you have to follow that law, correct?

1    A    Yes, we have to follow the law, as the state regulator.

2    Q    You would agree that the legislature controls setting the

3    policy, and this is one of the policies that the legislature

4    has set, correct?

5    A    Yes, the legislature puts their policy into the statute,

6    yes.

7    Q    Then it is your job, with the Department of Labor &

8    Industries, to enforce the policies specified by the

9    legislature, correct?

10         MS. CHIEN:  Objection.

11         THE COURT:  I don't know what you mean by "policies

12   specified by the legislature."  Are you talking about laws

13   passed by the legislature or some other administrative issue?

14         MS. MELL:  Well, I am talking about the laws and the

15   policy implications of the laws.  There is a difference

16   between policy and enforcing policy.  Policy making versus --

17         THE COURT:  Ask the question for the witness.

18   BY MS. MELL:

19   Q    It is the job of the Department of Labor & Industries to

20   enforce the laws of the State of Washington as the

21   legislature sets forth the laws of the State of Washington,

22   correct?

23   A    Yes.

24   Q    And their policy reasons, they may be fiscal, they may be

25   substantive policy concerns that are the reason for the law,

1    correct?

2          MR. BERGER:  Objection, foundation.

3          THE COURT:  I think she may answer this general

4    question.  Do you understand the question?

5          THE WITNESS:  I am not entirely sure, Your Honor,

6    what the question was.

7    BY MS. MELL:

8    Q   There are fiscal reasons and policy reasons why people in

9    the custody of the State are not employees under the Minimum

10   Wage Act, correct?

11         MR. BERGER:  Objection, foundation.

12         MS. CHIEN:  Objection.

13         THE COURT:  The objection is sustained.

14   BY MS. MELL:

15   Q   In --

16         MS. MELL:  Is that on foundation grounds, Your Honor,

17   or relevance?

18         THE COURT:  You are asking the witness a question

19   that it doesn't make sense for her to be able to answer that

20   question.

21         MS. MELL:  All right.

22   BY MS. MELL:

23   Q   In your position in the policy shop of the Department,

24   Ms. Fellin, is it your job to explain to stakeholders and

25   constituents why the Department of Labor & Industries would

1  choose to enforce the law as written, policy and fiscal

2  reasons that you discuss with them?

3  A   Yes, generally.  When a legislator has a question about

4  how an individual case has been adjudicated or something like

5  that, they can ask me.  I will consult with our program

6  staff.

7  Q   Do you know that there are reasons why the State of

8  Washington exempts people in its custody from the Minimum

9  Wage Act?

10           MS. CHIEN:  Objection, foundation.

11           THE COURT:  Sustained.

12  BY MS. MELL:

13  Q   Do you know the reasons why the State exempts people in

14  its custody from the Minimum Wage Act?

15  A   No, I don't know.

16  Q   In your position with the Department of Labor &

17  Industries, you have not had to explain that to anyone?

18  A   No, not that I recall.  It is a question I would likely

19  refer to the legislature.  I am mindful that we -- that they

20  create the law.  They can explain their intent better than I

21  can.

22  Q   It is the Department of Labor & Industries' job to enforce

23  the law, correct, that law in particular?

24  A   Yes, that is the role of the Department.

25  Q   And the Department of Labor & Industries, to the best of

Fellin - Direct

1    your knowledge, has never enforced the Minimum Wage Act

2    against an individual in state custody?

3            MS. CHIEN:  Objection, foundation.  Asked and

4    answered.

5            THE COURT:  Sustained.

6    BY MS. MELL:

7    Q   Do you have knowledge specific to complaints made by

8    detainees at the Northwest ICE Processing Center specific to

9    the Minimum Wage Act?

10   A   I can't say if it is specific to detainees at the Center.

11   Q   You have dealt with the issue of whether or not detainees

12   at the Northwest ICE Processing Center are covered by the

13   Minimum Wage Act, correct?

14           MS. CHIEN:  Objection, relevance.

15           MR. BERGER:  Objection, Your Honor.  I believe this

16   deals with something the Court has ruled on previously.

17           THE COURT:  The objection is sustained.

18   BY MS. MELL:

19   Q   Ms. Fellin, the facility administrator at the Northwest

20   ICE Processing Center was asked whether or not there is a

21   document of any kind indicating that the Minimum Wage Act

22   does not apply to detainees at the Northwest ICE Processing

23   Center.  You authored such a document, didn't you?

24           MR. BERGER:  Objection.

25           MS. CHIEN:  Objection, relevance.

1          MR. BERGER:  Ask the question be stricken.

2          THE COURT:  The objection is sustained.

3    BY MS. MELL:

4    Q    Has the Department of Labor & Industries taken a position

5    on the application of the Minimum Wage Act to detainees at

6    the Northwest ICE Processing Center and changed its position?

7          MS. CHIEN:  Objection.

8          THE COURT:  The objection is sustained.

9          MS. MELL:  Your Honor, I would like to examine the

10   witness on a document that is in the Box.  It is labeled 305,

11   A-305.

12         MS. CHIEN:  Your Honor, we object to any testimony

13   related to A-305.

14         THE COURT:  A-305?

15         MS. MELL:  Yes, Your Honor.

16         MS. CHIEN:  This is a document the Court has

17   previously excluded.  It was previously marked as A-231.  The

18   Court excluded this document.

19         THE COURT:  The copy I have of it here is mostly

20   blank pages.

21         MS. MELL:  That's the correct document, Your Honor.

22         MS. CHIEN:  It was excluded previously.

23         MS. MELL:  My question is whether or not it is an

24   official position of the Department with --

25         MR. BERGER:  Your Honor, there is a motion --

1    objection pending.

2          THE COURT:  Yes, just a minute.  What I have, you say

3    it is the accurate copy of A-305.  There is nothing relevant

4    in it.

5    BY MS. MELL:

6    Q    Ms. Fellin, did you receive any documents that reflected

7    an official position of anyone with the State of Washington

8    on the application of the Minimum Wage Act --

9          MS. CHIEN:  Objection.

10   BY MS. MELL:

11   Q    -- to the detainees at the Northwest ICE Processing

12   Center?

13         MS. CHIEN:  Objection.

14         MR. BERGER:  Objection.

15         THE COURT:  The objection is sustained.

16   BY MS. MELL:

17   Q    Ms. Fellin, did you ever craft an email for purposes of

18   taking an --

19         MS. CHIEN:  Objection.

20         MR. BERGER:  Objection, Your Honor.  I think --

21         THE COURT:  Yeah, the objection is sustained,

22   Ms. Mell.  Don't go there.

23   BY MS. MELL:

24   Q    Ms. Fellin, have you authored or expressed a position that

25   reflects the formal position --

 1              MR. BERGER:  Objection.

 2              MS. CHIEN:  Objection.

 3              MS. MELL:  I get to ask whether or not there is a

 4    formal official position.  That is expressly within the

 5    Court's ruling.

 6              THE COURT:  Well, your questions did not go to that

 7    question now, whether there is an official position or

 8    something.

 9              MS. MELL:  I may ask that, though, right?

10              THE COURT:  I don't know.  Ask and we will see.

11              MS. MELL:  Thank you, Your Honor.

12    BY MS. MELL:

13    Q   Ms. Fellin, is there or has there been an official

14    position of the Department of Labor & Industries with regard

15    to the application of the Minimum Wage Act to detainees at

16    the Northwest ICE Processing Center who volunteer in the work

17    program there?

18              MS. CHIEN:  Objection to the "has been."

19              THE COURT:  Sustained.

20    BY MS. MELL:

21    Q   Ms. Fellin, can you tell me whether or not the Department

22    of Labor & Industries has ever weighed in, in an official

23    way, with regard to the application --

24              MS. CHIEN:  Objection.

25              THE COURT:  The objection is sustained.

BY MS. MELL:

Q   Is there an official position of the Department on whether or not the exemption contained within 49.46.010 for state detainees is also applicable to the Northwest ICE Processing Center?

A   I would have to check with the policy staff to know if there is an official position.

Q   Do you know whether or not the Department has ever applied the State exemption --

        MS. CHIEN:  Objection --

BY MS. MELL:

Q   -- to detainees?

        THE COURT:  I think the objection would be sustained if you completed your question.

BY MS. MELL:

Q   Has the Department of Labor & Industries enforced the Minimum Wage Act against federal employees?

        MS. CHIEN:  Objection, foundation.

        THE COURT:  I think she may answer if she knows.

        THE WITNESS:  I don't know the answer to that.

BY MS. MELL:

Q   Are you unaware of any cases like that?

A   Yeah, I am not aware of cases like that.

Q   Are you aware of the Department of Labor & Industries seeking to enforce the Minimum Wage Act against any of the

1   federal prisons or detention centers?

2         MS. CHIEN:  Objection, foundation.

3         THE COURT:  No, I think she may answer that question,

4   if she knows.

5         THE WITNESS:  I am not aware of that type of

6   enforcement action.  I wouldn't know in my role, necessarily.

7   BY MS. MELL:

8   Q   In your role, if the Governor's office got involved, then

9   you might know, correct?

10  A   I may know if they asked me, and I could coordinate the

11  input of our staff.  Unless they involve me, I would likely

12  not know.

13  Q   Has the Department -- has the Department of Labor &

14  Industries made it pretty straightforward and simple to file

15  a Minimum Wage Act complaint?

16  A   Well, yes, over the last several years we have made it

17  possible to file online, which has increased the number of

18  complaints that we have received.

19  Q   That online format, doesn't it invite the individual who

20  is making the complaint to provide documentation of their

21  wage claim?

22  A   I am guessing that is true.  I haven't looked at the

23  online application myself.

24  Q   Do you know if one of the documents that the Department

25  seeks from an individual making a Minimum Wage Act complaint

1  is a written wage agreement?

2  A   I don't know that specifically, no.

3  Q   So if L&I receives a complaint through its online

4  platform, then L&I opens an investigation, correct?

5  A   That's my understanding, yes.

6  Q   So part of that investigation includes taking down

7  information from the employee, getting specific documentation

8  to the hours actually worked, correct?

9  A   Seems reasonable, but I have never done that.  I can't

10  speak knowledgeably about that process.

11  Q   Are you familiar enough with the process to know that L&I

12  usually contacts the employer for a response and gives them

13  an opportunity to either document their case or object --

14          MS. CHIEN:  Objection.

15  BY MS. MELL:

16  Q   -- on legal grounds?

17          THE COURT:  The form of that question is

18  objectionable, counsel.

19  BY MS. MELL:

20  Q   In an L&I investigation of the Minimum Wage Act, does L&I

21  talk to the employer?

22  A   I don't know that.  I have never done an investigation.

23  It would seem likely.

24  Q   Is it pretty typically the case that Labor & Industries

25  works with employers to come into compliance with the law?

1           MS. CHIEN:  Objection, foundation.

2           MR. BERGER:  Objection, foundation.

3           THE COURT:  Sustained.

4    BY MS. MELL:

5    Q    Is it correct that L&I takes whatever information it

6    obtains in the investigation and then issues findings?

7           MS. CHIEN:  Objection, foundation.

8           MR. BERGER:  Objection, foundation.

9           THE COURT:  Well, she can answer if she knows.  If

10   you don't know, just say so, Ms. Fellin.

11          THE WITNESS:  I would say that L&I does a whole

12   variety of investigations.  I am aware of the process for

13   several of our programs that we issue findings or letters of

14   compliance, those kinds of things.

15   BY MS. MELL:

16   Q    Those are findings that are communicated to the employer,

17   correct?

18   A    That's what I am told, yes.  I don't do that, but yes.

19   Q    Then those -- then the employer can resolve it or can

20   contest it, correct?

21   A    That is generally the case, yes, I think.

22   Q    If the employer is taking a position that L&I believes is

23   inconsistent with the law, L&I can formally file a legal case

24   against the employer, correct?

25   A    Again, my understanding is it would depend on the specific

1    program.  In general, there is a process for adjudicating

2    disagreements under the law, yes.

3    Q    In fact, L&I is, in fact, the agency expressly authorized

4    to enforce the Minimum Wage Act, correct?

5              MS. CHIEN:  Objection.

6              THE COURT:  She may answer.

7              THE WITNESS:  I believe so when it comes to the State

8    minimum wage and the jurisdiction under the statute, yes.

9    BY MS. MELL:

10   Q    Called the Wage Payment Act, right?

11   A    Now you are getting into specifics I am not entirely sure

12   of.  I would, again, speak with the program staff.

13   Q    Are you familiar with the Director's orders on the Wage

14   Payment Act?

15   A    No, I am not.

16   Q    Are you aware the Department of Labor & Industries files

17   formal complaints and lawsuits against employers to enforce

18   the Minimum Wage Act?

19             MS. CHIEN:  Objection, relevance.

20             THE COURT:  She may answer if she knows.

21             THE WITNESS:  I am trying to think -- I would guess

22   that is the case.  I am not sure that I have ever been

23   notified of that kind of action on the Department's behalf.

24   I have certainly never been part of any of that.

25

1    BY MS. MELL:

2    Q    Do you know that L&I isn't the named party or plaintiff in

3    this case?

4            MS. CHIEN:    Objection, relevance.

5            THE COURT:    She may answer.

6            THE WITNESS:    I don't know that, no.

7    BY MS. MELL:

8    Q    Do you know -- well, did you have -- strike that.

9            Do you have any knowledge about whether or not the

10   Department was asked to be a party plaintiff in this action?

11   A    I don't recall, no.

12   Q    Is Joel Sacks the director?

13   A    Yes, Joel Sacks is the director.

14   Q    Did you have a conversation with Joel Sacks a few days

15   before this lawsuit got filed?

16           MS. CHIEN:    Objection, relevance.

17           THE COURT:    She may answer.

18           THE WITNESS:    I am only vaguely aware of when the

19   lawsuit was filed.    In my role, I speak daily with the

20   Director.    I don't know how to answer more specifically than

21   that.

22   BY MS. MELL:

23   Q    Do you remember that it wasn't the Director's idea to file

24   a lawsuit against GEO?

25           MS. CHIEN:    Objection, this goes to motion in limine

1   No. 1 about prosecutorial discretion.

2          THE COURT:  Yes, the objection is sustained.

3   BY MS. MELL:

4   Q   Do you remember dealing with Jorge Barone of the Northwest

5   Immigration Rights Project?

6          MS. CHIEN:  Objection, relevance.

7          THE COURT:  I don't understand the question, I guess.

8   Restate it.

9   BY MS. MELL:

10  Q   Did you ever communicate to GEO the Department of Labor &

11  Industries' position on the application of the Minimum Wage

12  Act to it?

13         MS. CHIEN:  Objection, relevance.

14         THE COURT:  She may answer.

15         THE WITNESS:  Yeah, I don't recall.

16  BY MS. MELL:

17  Q   Do you know that if you knew the Department had a position

18  on the Minimum Wage Act case that you didn't communicate to

19  GEO?

20         MS. CHIEN:  Objection, confusing.

21         THE COURT:  She may answer.

22         THE WITNESS:  I am not entirely sure what the

23  question was.  If you can say it again.

24  BY MS. MELL:

25  Q   Did you have knowledge on the State's position on the

1    application of the Minimum Wage Act to GEO that you chose not

2    to share with GEO?

3              MR. BERGER:  Objection, relevance.

4              THE COURT:  Sustained.  Sustained.

5    BY MS. MELL:

6    Q   Typically, does the Department notify an employer if the

7    Minimum Wage Act is at issue with regard to the people in its

8    custody or whom it employs?

9              MS. CHIEN:  Objection, relevance.

10             THE COURT:  That is kind of a compound question.

11   Break it up.

12   BY MS. MELL:

13   Q   If the Department has taken a position on the application

14   of the Minimum Wage Act specific to an employer, does the

15   Department inform the employer?

16   A   I don't know that.  I would say that the Department

17   doesn't typically make affirmative statements in this area.

18   I am told that we are more likely to respond to a wage

19   complaint than make -- or initiate that kind of contact.

20   Q   What do you mean?  You typically respond to individualized

21   complaints?  You don't file lawsuits?

22   A   I thought the question was whether or not we notify the

23   employer.

24   Q   Right.  I think you gave an answer that I am following up

25   to that might not have been responsive.  I am trying to keep

1  pace with what you were saying.  Is it correct that L&I

2  responds to individualized wage complaints, it doesn't

3  typically file lawsuits against employers?

4          MS. CHIEN:  Objection, relevance.  Prosecutorial

5  discretion.

6          THE COURT:  Sustained.

7  BY MS. MELL:

8  Q   Is it correct that you, yourself, have never informed GEO

9  that the Minimum Wage Act applies to the ICE detainees at the

10 Northwest ICE Processing Center?

11         MS. CHIEN:  Objection, relevance.

12         THE COURT:  She may answer.

13         THE WITNESS:  I don't recall communicating with GEO.

14 BY MS. MELL:

15 Q   Did you have knowledge about GEO and the Minimum Wage Act

16 that you chose not to communicate with GEO?

17         MR. BERGER:  Objection.

18         MS. CHIEN:  Objection.

19         THE COURT:  The objection is sustained.

20 BY MS. MELL:

21 Q   To the best of your knowledge, the Department of Labor &

22 Industries never reached out to GEO or the federal government

23 to resolve any issues the Department had about the

24 application of the Minimum Wage Act to the detainees at the

25 Northwest ICE Processing Center, correct?

```
 1              MS. CHIEN:  Objection, relevance.

 2              THE COURT:  Sustained.

 3              MS. MELL:  I have nothing further, Your Honor.

 4              MS. CHIEN:  The State has no questions.

 5              THE COURT:  Mr. Berger, Mr. Whitehead?

 6              MR. BERGER:  Plaintiffs have no questions.

 7              THE COURT:  All right.  Thank you, Ms. Fellin.  You

 8     may be excused.

 9              THE WITNESS:  Thank you.

10              THE COURT:  You may call your next witness.

11              MS. CHIEN:  Ms. Mell, can you tell us who you would

12     like us to tee up?

13              MR. SILVERMAN:  Next up would be Debra Jean Eisen.

14              MS. CHIEN:  We are just trying to get her the

15     documents, counsel.

16              MR. SILVERMAN:  Thank you.

17              THE CLERK:  The witness is in the process of joining.

18              THE COURT:  If you will raise your right hand and be

19     sworn.

20                        DEBRA JEAN EISEN,

21        having been sworn under oath, testified as follows:

22              THE COURT:  You may inquire, counsel, Mr. Silverman.

23                        DIRECT EXAMINATION

24     BY MR. SILVERMAN:

25     Q    Good morning, Ms. Eisen.  How are you?
```

1    A    Good morning.  I am fine, thank you.

2    Q    Could you state and spell your name for the record?

3    A    Debra, D-E-B-R-A, J, Eisen, E-I-S-E-N.

4    Q    What is your current job title?

5    A    I am the contracts administrator for the Washington State

6    Department of Corrections.

7    Q    What are your job responsibilities at the Washington State

8    Department of Corrections?

9    A    I manage the office of contracts and legal affairs for the

10   agency.

11   Q    When you manage those contracts, do you manage both

12   contracts where the State of Washington is putting prisoners

13   somewhere as well as contracts where some other entity wants

14   to put its prisoners into a State facility?

15   A    Well, my office drafts contracts.  We work with the

16   program personnel in the drafting, and I sign them.  We do

17   not manage the contracts.  Those are managed by program

18   personnel.

19   Q    When you draft contracts, for instance, isn't it true that

20   you draft contracts where the State of Washington would be

21   potentially putting some of its incarcerated folks into a

22   facility that it doesn't own?

23   A    Yes.

24   Q    Do you also draft contracts where another governmental

25   entity may be putting incarcerated folks into a facility that

1    the State of Washington does own?

2    A    The office does, but those contracts are quite old so they

3    have not been drafted in quite some time.  Yes.

4    Q    Let me start.  Are you the contract under which ICE, the

5    federal entity, has put some of its detainees into the Yakima

6    County facility?

7    A    No.

8              MS. CHIEN:  Objection, foundation.

9              THE COURT:  She answered in the negative.  Her answer

10   may stand.

11   BY MR. SILVERMAN:

12   Q    Great.  Let me talk about a contract which I think you are

13   familiar with.  Provided to you was a contract which was

14   labeled A-023 between the State of Washington Department of

15   Corrections and GEO.  Do you have a copy of that contract

16   before you?

17   A    May I open the envelopes that were given to me?  I have

18   not opened anything.

19   Q    It is like who won the Academy Awards.  I think we are

20   doing better than they did.

21   A    May I open these things now?

22   Q    Please open the sealed envelope.

23   A    There are two envelopes.  I don't know where that would

24   be, but I will look for it.  This is not the contract.

25             MS. CHIEN:  Can you remind the witness what exhibit

1   she should be looking for?

2   BY MR. SILVERMAN:

3   Q    It is the contract you saw at your deposition, the

4   contract between the State of Washington Department of

5   Corrections and GEO?

6   A    Yes, contract No. 10825; is that correct?

7   Q    Yes.  Do you recognize this document?

8   A    I do.

9   Q    Can you tell me what it is?

10  A    It is a contract between the State of Washington

11  Department of Corrections and the GEO Group.

12          MR. SILVERMAN:  At this time, I would offer Exhibit

13  A-023 into evidence.

14          MS. CHIEN:  No objection.

15          MR. BERGER:  No objection.

16  BY MR. SILVERMAN:

17  Q    Can you tell me --

18          THE COURT:  Wait a minute, wait a minute, counsel.

19  A-023 may be admitted.

20                  (Exhibit A-023 was admitted.)

21  BY MR. SILVERMAN:

22  Q    You don't need to do this on the screen.  If you look at

23  page 32 of 31, ma'am, yes, that's how it is labeled, if you

24  take a look at the signature page.

25  A    32 of 31?

1    Q    Yep.

2    A    Okay.  I don't see a 32.  I am searching.

3    Q    On the lower right-hand corner there are two numbers, the

4    first of which is WA 00011388.  That's the signature page.

5    A    Okay.

6    Q    My question for you is:  When was the contract signed?

7    A    May of 2015.

8    Q    Who signed on behalf of the State of Washington Department

9    of Corrections?

10   A    Gary Banning.

11   Q    Who is that person?

12   A    Gary was a predecessor who was at that time the contracts

13   administrator.

14   Q    On the left it says, "Approved as to form only, Washington

15   Assistant Attorney General."  What does that mean?

16   A    That means the form of the contract, but not the content

17   was approved by the Office of the Attorney General.

18   Q    Let's turn back to the first page.  That is on the screen

19   right now.  At the bottom of the screen, the bottom of every

20   page says "State of Washington Department of Corrections."

21   Is that a standard format that the State uses on its

22   contracts?

23   A    Yes.

24   Q    Is this contract, the drafting of it, is it initially

25   drafted by the State or by the entity that it contracts with?

1    A    Typically, the State would draft contracts for which it

2    pays for the service, if there is payment involved.  This

3    particular contract, because of its format, I believe was

4    drafted by the State, by Corrections.

5    Q    Would you take the blowout off?

6         If you can look at the third -- the second "whereas" on

7    Page 1, "Whereas, GEO has available beds in its detention

8    system hereafter referred to as 'the facility'"?

9    A    Uh-huh.

10   Q    Why is that line there?

11   A    Well, the "whereas" are generally to explain the

12   development of the contract, the reasons for the contract.

13   Q    Then the next line states, "The facility is a correctional

14   facility operated by GEO in which inmates may be lawfully

15   confined."  Fair to say this contract contemplates the State

16   of Washington, if it had the need, would be putting folks

17   into a GEO-owned facility?

18   A    I can't say that because I didn't write this, but I can

19   say elsewhere it does discuss that.

20   Q    We will get to it.  On the bottom of Page 1 it defines

21   "offender."  States, "Any person incarcerated pursuant to

22   applicable Washington laws and assigned to the facility for

23   housing under this contract."  What was your understanding as

24   to what kind of folks would be potentially placed in a GEO

25   facility under that sentence?

1      MS. CHIEN:  Objection, foundation.

2      THE COURT:  She may answer.

3      THE WITNESS:  Well, anyone sentenced by a court to

4  more than a year of incarceration would be housed in a DOC --

5  Washington State DOC facility in Washington State.  I mean,

6  anyone in Washington State sentenced.

7  BY MR. SILVERMAN:

8  Q   Let's turn to Page 2.  If you look at the term, it

9  indicates the term is -- was to start May 1, 2015, correct?

10 A   Yes.

11 Q   So be fair to say that the contract wasn't signed until

12 two weeks after the term started, correct?

13 A   That's when the agency signed.  I didn't see when GEO

14 signed.  Both parties signed on --

15 Q   It wasn't signed until about two weeks after the term

16 began, correct?

17 A   Yes.

18 Q   Section 2.03 provides for termination for convenience.  Do

19 you know whether this contract was ever terminated for

20 convenience prior to the end of the term?

21 A   My understanding is it was not.

22 Q   If you can turn to Page 4, Section 305.  There it provides

23 that offenders will be paid two dollars or whatever the

24 standard wage is for calendar work day when the work is six

25 or more hours per day.

1      MS. CHIEN:  Objection, incomplete reading of the

2  document.

3      MR. SILVERMAN:  Great.

4  BY MR. SILVERMAN:

5  Q   Can you read this provision for us?

6  A   Do you mean me?

7  Q   Yes.

8  A   "3.05.  Offender work program assignment payment.  WDOC

9  offender shall be paid $2, or the standard wage for that

10  assignment, whichever is greater, per calendar work day when

11  the work assignment of six or more hours per day less

12  deduction for mandatory payments required by RCW 72.09.111."

13  Q   Was it your understanding that this contract requires an

14  offender to work at least six hours to make the two dollars?

15  A   Well, that is what the language seems to indicate.  I

16  didn't write the contract, but that's what the language seems

17  to indicate.

18  Q   Do you know again in your role whether the two dollars was

19  a requirement of the State or whether it was a requirement of

20  GEO?

21  A   No, I do not.

22  Q   Have you seen similar two dollar rates in other DOC

23  contracts?

24  A   I have not.

25  Q   There is a provision there that says "less deduction for

1  mandatory payments required by RCW 72.09" -- let me restate.

2  I put dashes where there weren't dashes.  You see the

3  statement regarding deduction for mandatory payments?

4  A    Yes.

5  Q    What is your understanding of what those mandatory

6  payments are?

7  A    They include things -- I cannot name them all.  They

8  include things like child support, crime victim's

9  compensation, those kinds of things that the incarcerant is

10  supposed to be paying for or paying towards.

11  Q    Does paying towards the cost of incarceration, is that one

12  of the payments that may be required?

13  A    I do not know.

14  Q    We will come back to that.

15  A    Okay.

16  Q    Let's move down to the next paragraph.  It begins, "After

17  each permanent move."  Talks about, to the extent that

18  someone moves they can receive a transitional stipend of one

19  dollar per day.  Do you know what that provision is intended

20  to do?

21  A    I have no idea.  I have not seen that any place else.

22  Q    Is the opportunity for an incarcerant to do work a

23  provision in every State contract where it contracts another

24  entity to provide housing or detention services for a State

25  of Washington incarcerant?

1  A    By RCW, incarcerated individuals are required to work in

2  certain work programs within the facility.  I have seen in

3  contracts when we house incarcerants in state facilities and

4  it would be with other government or tribal facilities, there

5  is a provision that says that they will have the same access

6  to work programs as the other people incarcerated in that

7  facility.

8  Q    It would be fair to say the reason for -- strike that.

9        Fair to say the reason to have offenders work is so

10 that the offenders are occupied during that incarceration,

11 correct?

12 A    I think there are probably many reasons for it.  That

13 would be one reason for idleness.  Not the only reason,

14 certainly.

15 Q    It would be fair to say it is a safety and security choice

16 for Department of Corrections, correct?

17        MS. CHIEN:  Objection, foundation.

18        THE COURT:  Sustained.

19 BY MR. SILVERMAN:

20 Q    Is safety and security one of the considerations for the

21 reason that the Department of Corrections provides a

22 mandatory work opportunity?

23 A    Well, a court determines that.  The RCW says they shall

24 participate in these work programs.  The court has made that

25 determination.

Eisen - Direct Examination

1    Q    Is it also a safety and security choice for the Department

2    of Corrections?

3    A    You know, I work in the contracts office.  I do not make

4    the decisions for the prisons division as to why they might

5    do one thing or another, or privy to that information.

6    Q    Do you remember when your deposition was taken in this

7    case?

8    A    I do.

9    Q    The deposition was transcribed by somebody who had to use

10   a miracle machine, correct?

11   A    Yes.

12   Q    You were sworn to tell the truth?

13   A    Yes.

14   Q    And under penalty of perjury.  All right, if you take a

15   look at Page 7 of your deposition.  The exact line, Lines 20

16   to 23.  You were asked, "Is it a policy choice of the

17   Department of Corrections?"  You answered, "It is a safety

18   and security choice for the Department of Corrections."

19   A    You are right, I did.

20   Q    Is that a correct statement?

21   A    I did say that, yes.

22   Q    Let's go back to the contract.

23   A    Okay.

24   Q    In your other contracting regarding potentially moving

25   offenders from one facility to another, is the, quote,

1   "transitional stipend of one dollar per day" common?

2   A   No, it is not.  As I said, I have not seen that in the

3   contracts we have in State for housing.

4   Q   Then let's turn to the second bullet point below that.

5   The section says, "To be eligible for the transitional

6   stipend the offender must," and then the second line is, "be

7   on a waiting list for work assignments."

8        Are you aware of any other contracts where an offender

9   may receive some sort of stipend for being on the waiting

10  list to work?

11  A   I am not.

12  Q   Do you have any knowledge or familiarity with this

13  provision?

14  A   I do not.  Again, I don't believe that it's standard in

15  our contracts for other housing with government entities.

16  Q   Okay.  Let's turn to the next page, which is Section

17  4.01.3.  Be fair to say that one of GEO's obligations is to,

18  quote, "make available work training and treatment programs,"

19  correct?  It is the fourth line down.

20  A   Yes, make available work, training and treatment programs,

21  yes.

22  Q   That's something that GEO is obligated to do under this

23  contract, correct?

24  A   I am reading.  Yes.

25  Q   Let's move down a couple of lines and move to the left

1  hand, which it states, "Otherwise comply with applicable

2  law."  You see that?

3  A   Yes.

4  Q   That's an obligation that GEO has under the contract,

5  correct?

6  A   Yes.

7  Q   Let's turn to the next page.  Take a look at 4.02.4.  This

8  requires GEO to permit the Washington Department of

9  Corrections to monitor all activities pursuant to the terms

10 of the contract, correct?

11 A   Yes.

12 Q   And how -- under your normal contracts, how does that

13 monitoring work?

14 A   Well, sometimes site visits are conducted.  There is a lot

15 of communication back and forth by phone or nowadays by teams

16 or however.  There is exchange of -- there is paperwork,

17 files.  There is a lot of information that is exchanged in

18 monitoring.

19 Q   Does the Department of Corrections actively monitor these

20 contracts as opposed to just having the right to do so?

21 A   I -- again, you know, I am not a program staff person so I

22 don't physically do the monitoring or have management over

23 the contracts.  I would assume so, that they would.

24 Q   Is the right to monitor a nonnegotiable provision in all

25 Washington Department of Corrections contracts?

1    A    I can't answer that because there are so many types of

2    contracts.

3    Q    In a contract to put one of the State's incarcerants in a

4    facility, are you aware of the State ever signing one of

5    those contracts where it didn't have the right to monitor the

6    facility the person was going into?

7    A    I cannot say unequivocally, but I would assume, based on

8    my work, that there would always be a monitoring provision.

9    Q    Let's turn to the next paragraph, 2.02.5.  This gives the

10   Washington --

11   A    Did you say 2.02?

12   Q    I'm sorry.  4.02.05.  I may have given you my ATM PIN

13   number by mistake.  Ignore that.

14   A    I'll check it out later.

15   Q    You'll be disappointed.  Look at 4.02.05.  This gives the

16   State of Washington the right to assign an onsite manager to

17   ensure compliance?

18   A    Yes.

19   Q    Is that something the State customarily requires in

20   contracts like that?

21   A    I don't know whether it is customary or not.  This

22   contract was never used, so these provisions were never

23   invoked.  I don't know.

24   Q    Let's talk about other contracts the State has had.  Is

25   this a common provision that the State inserts in contracts?

1   A   I don't know.  I don't know because, as I mentioned

2   earlier, the contracts for housing folks in out-of-state

3   prisons with other governments are very old and I did not

4   draft them.  Some of them are from the '90s.  I am not as

5   familiar with that language.  I just cannot say.

6   Q   Let's take it up to today.  As we sit here today, does the

7   State of Washington, through median and intergovernmental

8   agreement, put incarcerants in facilities it doesn't own,

9   could be a county or municipality?

10  A   Yes, we do.  We have contracts with all the counties in

11  Washington State and some tribal jails.

12  Q   In those contracts, does Washington reserve the right to

13  have an onsite manager?

14  A   I would have to look at the language of the contract.  I

15  don't know.  I don't know.

16  Q   Do you have any personal knowledge whether the Department

17  of Corrections actually has onsite managers in any of the

18  contracts you have done intergovernmental agreements for?

19  A   The only situation I can speak to is we had a contract

20  with Yakima County in Washington State for housing.  There

21  was language about onsite personnel.  My recollection is that

22  was more program personnel.  I can't say for sure whether

23  there was anyone there acting in a management capacity.  I

24  know we did have program personnel on site in Yakima.

25  Q   Yakima, is that a county facility?

1   A    Yes.

2   Q    Yakima County runs that?

3   A    Yes, it is their prison.  We no longer have incarcerants

4   there, but we did.

5   Q    Do you recall when you had incarcerants there whether they

6   were part of a work program?

7   A    I don't know.  That would be operational.  I don't know.

8   Q    Let's get back to stuff in the contract so it is easier to

9   determine whether you know it or not.  Let's go to the next

10  section, 4.03.  This section provides that GEO shall provide

11  health services, medical, dental and otherwise.  Is that a

12  customary provision in contracts?

13  A    Yes.  Yes.

14  Q    Do you know whether or not those health services are free

15  to the incarcerant?

16  A    I believe that they are for the most part, but I can't say

17  that all services -- the Department is responsible for

18  medically necessary care for incarcerated individuals.  There

19  may be some kind of co-payment from the incarcerant for

20  off-site care, meaning off site, taken from a facility to a

21  private practitioner or hospital, but I cannot say for

22  certain that this contract would have had that.  I don't

23  know.

24  Q    Not going to be a memory test.  There is a co-pay

25  provision we are going to go through later.  I was asking for

1    your general understanding.  If you can turn to Page 11.  It

2    is Section 4.05.1.

3    A    Yes.

4    Q    Called "offender work and programs."  Take a look at these

5    sections.  Are these standard terms of Washington agreements

6    or are they customized for this specific contract?

7    A    Just for -- I know that contracts to house incarcerants in

8    other public facilities do contain provisions about

9    participation in work programs.  I cannot say whether this is

10   the same language.

11   Q    Let's turn to 4.05.2.  This provision requires all

12   eligible offenders will be productively occupied for at least

13   30 hours per week in work, educational, vocational or major

14   habilitation programs.  Where does the 30 hours come from?

15   A    I do not know.

16   Q    Have you seen other contracts in the state of Florida --

17   sorry, State of Washington -- I've got GEO on the brain -- of

18   which -- which are a lower number or higher number than 30

19   hours a week?

20   A    Not that I can recollect.

21   Q    What is your understanding of the purpose of this

22   subsection?

23   A    I didn't write it.  Reading it, it is pretty clear on its

24   face, the first sentence about 30 hours per week.  The second

25   sentence is clear as well that, "Payment shall not be

1    rendered for a program that the State of Washington would not

2    pay for participation in."  It is clear on its face.

3    Q    Great.  Let's turn to 4.09.  GEO is responsible for

4    providing clothes and clean laundry to the offender, correct?

5    A    Yes.

6    Q    Do you know whether that is for a charge or without a

7    charge?

8    A    I don't know.

9    Q    Let's turn to Paragraph 5.03.  That is Page 21 of 31.

10   Blowout Section 5.03.  This talks about the mandatory

11   training of the GEO personnel.

12   A    Uh-huh.

13   Q    Is this a standard provision that the State of Washington

14   imposes in contracts with the facility where it is putting

15   State of Washington incarcerants?

16   A    I am not sure.  I don't know.

17   Q    Have you seen this in other contracts?

18   A    I can't say for certain.  I know training is required.  I

19   don't know if this is the same language.

20   Q    Do you know where the 160 minimum hours of curriculum

21   comes from?

22   A    No, I do not.

23   Q    Do you know whether this was requested by the State of

24   Washington or by GEO?

25   A    I have no idea.

Eisen - Direct Examination

1    Q    This training requirement requires all personnel who

2    supervise, confine or care for the State of Washington

3    offenders who are put in that facility, correct?

4    A    That's what the language says.  It is not anything I know

5    independent from that.

6    Q    It says, "Before they begin to work."  It would be your

7    understanding they are not allowed to have on-the-job

8    training to get to 160, they have to hit 160 before they

9    start?

10   A    Yes, that's how I would interpret it.

11   Q    Let's turn to the next page, Page 22.  6.02.01.  It

12   indicates that GEO will bill $60 per day per offender.  Do

13   you see that?

14   A    I do.

15   Q    That is the rate from a 2015 contract.  Do you know what

16   the current rate that the State of Washington is paying when

17   it puts its offenders into other folks' facilities?

18   A    Well, to my knowledge, we are not housing for long-term.

19   What we have are violator contracts where if somebody does

20   not abide by the terms of their supervision, then they may be

21   locally put into a local jail until DOC can determine where

22   to go from there.  So we call those violator contracts with

23   the counties.  The rates vary.  They are controlled by the

24   legislature.  So right now -- well, until last year, the cap

25   was about $80 a day.  They range anywhere from the 60s to

Eisen - Direct Examination

1    maybe into the 90s now.

2    Q   That's capped by the legislature, you just said?

3    A   The amount.  It was capped at $80 a day until last year,

4    the cap was lifted, but the amount that it can be increased

5    is limited by the legislature to five percent per year.

6    Q   Are you aware of whether the State of Washington was ever

7    able to negotiate a deal where it paid less than the cap?

8    A   Well, some of those facilities, some of those state jails

9    or county jails -- local or county jails do earn less than

10   the cap because that's where they started at a lower rate,

11   that is what was negotiated when they had started.  That's

12   the only -- those are the only circumstances I know of for

13   payments relating to housing.

14   Q   Let's turn to Paragraph 9.05, that's Page 27 of 31.

15   Jurisdiction and venue talks about the selection of

16   Washington law, rules and regulations shall be applied in the

17   interpretation, execution and enforcement of this contract.

18   Do you see that?  Is that common when the State of Washington

19   signs contracts under your purview?

20   A   Usually, it relates to venue.

21   Q   So the second sentence relates to venue, the first

22   sentence talks about the applicability of State of Washington

23   law to this contract.  Do you see that?

24   A   That is not what I commonly see.

25   Q   Where was the facility that it was contemplated that this

1    contract would cover?

2    A    There is mention of Michigan, but there is also mention of

3    other GEO facilities.  It could be another state.

4    Q    Let's turn to, if you look at the lower right-hand corner,

5    again, we are going to be past the contract.  It is going to

6    be the first of the two numbers on the right-hand corner,

7    it's going to be WA 00011408.  It is Page 6 of 22.  It will

8    take a minute for us to magically make that appear.  There is

9    a provision D.  This is a policy regarding trust accounts for

10   offenders, you see that?

11   A    Yes.

12   Q    What's your understanding of what a trust account for

13   offenders policy would be for?

14   A    The agency holds funds in trust for incarcerated

15   individuals.  My understanding would be that this policy sets

16   the rules for how funds come and go and how they must be

17   managed and what they are for.

18   Q    So it's your understanding that if an incarcerant receives

19   a stipend or money for participating in a work program, that

20   money goes into the trust account, correct?

21   A    Yes, that's my understanding.

22   Q    So this provision prohibits offenders from transferring

23   funds between each other.  My question for you is:  What is

24   your understanding, are offenders allowed to have any

25   businesses or any jobs while they are in these facilities,

1    other than the official program set forth by the facility?

2    A    Do you mean outside of prison?

3    Q    Yeah.  Can an -- let's break it down.  Which is, can an

4    offender buy stuff from the commissary and then resell it at

5    a profit to the other incarcerated folks?

6    A    I don't know.  I would think not, but I really don't know.

7    Q    This provision, which is part of the contract, prohibits

8    the offenders from transferring money to each other.  What

9    was your understanding of why this is included in the

10   contract?

11   A    I don't know.

12   Q    This trust account for offenders policy, have you seen

13   this attached to other contracts that your office has done in

14   terms of placing --

15   A    No, I have not seen this policy before, actually.

16        THE COURT:  Counsel, we are a couple of minutes

17   early.  I have a meeting at noon.  I think we will break here

18   for lunch.  The jury should come back at 1:00.  We will

19   continue.  I want to talk to counsel before counsel breaks,

20   but the jury may be excused.

21    (The following occurred outside the presence of the jury.)

22        THE COURT:  We just spent considerable time on this

23   contract and Ms. Eisen testified the contract was never used.

24   So why are we spending time on it?

25        MR. SILVERMAN:  Because, Judge, this is an overflow

1    contract by the State of Washington.  So if they need to put

2    their incarcerants somewhere, they can.  When they negotiated

3    with GEO to do that, every one of the elements that we heard

4    during direct that is a bad thing about GEO, they put in

5    their own contract.  The fact that they never actually put

6    any prisoners there under the contract isn't relevant.  This

7    is what the State demands in its own contracts when it

8    reserves the right to --

9             THE COURT:  All right.  Okay.  Is this contract still

10   in effect?

11            MR. SILVERMAN:  It expired in 2018.

12            THE COURT:  Expired of its own weight in 2018?

13            MR. SILVERMAN:  Yes.

14            THE COURT:  All right.  Thank you.  We will reconvene

15   at 1:30.  I have a court meeting at -- another Zoom deal.  I

16   hope we will be ready to go at 1:00.  It could be a few

17   minutes late.  Thank you.

18                  (Recessed.)

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2          JUNE 10, 2021

3     (The following occurred outside the presence of the jury.)

4          THE COURT:  We had a court meeting.  The good news is

5     the three nominees for vacant positions in this district had

6     their Senate committee hearing this last week.  There is no

7     apparent problems.  We are hoping for -- that they will get

8     to the floor of the Senate here within a matter of a few

9     weeks.  With luck, we might have a new judge in Tacoma by

10    August, who would take my position, which has gone through

11    another judge's full term.  I took senior status in 2000, and

12    Ron Leighton was appointed in 2002, I think.  He retired

13    fully in August.  It is that same position, which was the

14    second position in Tacoma that we think Judge David Estudillo

15    in Grant County will take that position.

16         Are we ready now to proceed with Ms. Eisen?  Yes.  I see

17    her here.  Bring the jury in and we can go to work.

18         (The following occurred in the presence of the jury.)

19              THE CLERK:  The jurors are back.

20              THE COURT:  Okay.  We have lost Ms. Mell.

21              MS. MELL:  No, I am here.  Okay.  Mr. Silverman.  Go

22    ahead.

23    BY MR. SILVERMAN:

24    Q   Good afternoon.  Seems like ages since we talked.  If you

25    can turn to, in the contract, only a few more tabs, Bates

1    stamp WA00011413.

2    A    I am there.

3    Q    416.  See, after lunch.  416, not 413.

4    A    Okay.

5    Q    There we go.  There is an indication of the debts that the

6    department collects and deductions out of incarcerant

7    accounts.  You see that?

8    A    Are you referring to E -- I see, referring to section II,

9    Roman Numeral II.

10   Q    Yes, ma'am.

11   A    I see that.

12   Q    Let's go through 1 through 4, describe for me what kind of

13   things these refer to?

14   A    I cannot because I am not familiar with the trust

15   accounting system or the requirements of it or the RCW.

16   Q    These couple of pages list the kinds of deductions that

17   are to be made from an offender's account, correct?

18   A    It does say that.  I don't know what RCW 72.09.450 says

19   specifically.  It refers to that and says the department will

20   collect debt in the following order.  That is all I can tell

21   you.

22   Q    Okay.  If you don't know --

23   A    I don't know.

24   Q    That is always an answer in court.

25         Let's turn to WA00011429.

1  A    Okay.

2  Q    Page entitled "disciplinary sanctions."

3  A    Yes.

4  Q    This page lists the kinds of things that can be taken away

5  from an incarcerant, see that, subsection E?

6  A    I do.

7  Q    What is your involvement, if any, in inserting these

8  policies into a contract?

9  A    Absolutely none because this contract with GEO obviously

10  is a custom contract.  It is not what we typically do.  They

11  are attaching the different policies which is not normally

12  what we do in our contracts.  This contract was drafted and

13  signed before I was contracts administrator and I had no

14  involvement with it.  I am not familiar with prison

15  operations.  The sanctions would be under prison operations.

16  Q    If you look at No. 10, which is removal from waiting list

17  for work or other program assignments as a potential loss of

18  privileges, are you familiar with that?

19  A    Not other than what I am just reading now.

20  Q    This is one of the policies attached to the contract,

21  correct?

22  A    It is in this exhibit that I have, yes.

23  Q    Last page, last page we are going to talk about in the

24  contract.  I know everybody would be happy about that,

25  WA00011469.

1    A    Okay.  Okay.

2    Q    You see the policy entitled "offenders in total

3    confinement facilities will be charged a co-payment to

4    participate in the cost associated with health care

5    services."  Is it your understanding that incarcerants are

6    charged a co-payment for certain health care services?

7    A    You know, I think this might be an out-of-date policy.

8    I -- I can tell you now that the position of the agency is

9    that people will be provided with medically necessary health

10   care.  I don't think there are conditions attached to that.

11   I couldn't say for certain.

12   Q    The co-payments are a requirement under this contract,

13   correct?

14   A    According to the policy, yes.  According to what you are

15   showing me now and what I am reading, that's the only thing I

16   can go by.

17   Q    So we can put the contract down.  You mentioned earlier

18   that no detainees or prisoners or incarcerants were sent to

19   GEO by the State of Washington under the terms of this

20   contract, right?

21   A    Yes.

22   Q    So fair to say this was an overflow contract that the

23   State had in place in case it needed it?

24   A    Essentially was a convenience contract for both the

25   Department and for GEO because GEO had a right to refuse and

1    the Department had a right not to send.

2    Q    In the past, the State of Washington has utilized other

3    private contractors under contract to house incarcerants,

4    correct?

5    A    I only know of one, but yes, that would be correct.

6    Q    The one other contract is Corrections Corporation of

7    America?

8    A    That's my understanding, yes.

9    Q    True that the State of Washington sent about 1,000

10   incarcerants to Correctional Corporations of America under

11   that contract?

12   A    That's my understanding.

13   Q    That contract also had a stipulated two dollar per day

14   payment to incarcerants for a minimum of six hours of work?

15            MS. CHIEN:  Object, misstates the testimony.

16            THE COURT:  Objection is overruled.

17            THE WITNESS:  Would you please repeat that.

18   BY MR. SILVERMAN:

19   Q    Under the Corrections Corporation of America contract,

20   isn't it true that the incarcerants that were sent to that

21   company by the State of Washington received a two dollars per

22   day payment for their work?

23   A    Would you please point me to the provision in the contract

24   where the language is?

25   Q    I don't have the contract, but do you remember that?

```
 1   A   Well, I remember there is something about two dollars a
 2   day.  I do not recall whether it was as in the GEO contract,
 3   the greater of that amount or whatever is typically paid for
 4   that type of work.  I don't want to attest to that without
 5   being sure of what this says.  Maybe I can find it.
 6           MS. CHIEN:  Ms. Eisen, you have to be directed to my
 7   documents by counsel.
 8           THE WITNESS:  Sorry.  I am used to finding things in
 9   the contract.
10   BY MR. SILVERMAN:
11   Q   Do you remember when you were asked about this issue in
12   your deposition?
13   A   I remember being asked about ACA.  I don't specifically
14   remember what my answer was without looking at the
15   deposition.
16   Q   Do you want to turn to Page 13 of your deposition?
17   A   What exhibit is my deposition?  Right here.
18   Q   Page 13.  Line 3, you were asked, "What were the
19   stipulations as to work?"  You answered, "It stipulated to
20   wage for the offenders to work."  You were asked, "What was
21   the wage for offenders to work?"  You stated, "I believe it
22   was two dollars per day."
23   A   I see that.  What I would add to that now with becoming
24   more familiar with the GEO contract is it might say the
25   greater of, either the two dollars or the customary wage for
```

Eisen - Direct

1    that type of work.  I am not sure about that.

2    Q    You were also asked in that regard, just -- again, it is

3    the bottom of Page 13 to the top of Page 14, the last line

4    25, "Just tell me what the two dollars was."  Your answer

5    was, "It was payment to incarcerants that worked more than

6    six hours a day per day that CCA would pay them."  You were

7    asked, "And tell me, two dollars a day is a" (inaudible) --

8    The answer was, "For working more than six hours per day, six

9    or more hours, I think it said six hours or six or more

10   hours."

11   A    I see that.  I did say that.

12   Q    Is that accurate?

13   A    It is what I said at the time, yes.

14   Q    Did you have an opportunity to talk to counsel during the

15   lunch break that we all took?

16   A    I had lunch with counsel.  I had lunch with other

17   attorneys, but not with Ms. Chien.

18   Q    Did you have any discussions about this case during lunch?

19          MS. CHIEN:  Objection.

20          THE COURT:  She may answer.  Wait a minute.

21          MR. SILVERMAN:  That is a yes or no.

22          THE COURT:  She may answer.

23          THE WITNESS:  We had some discussion.  Yes, we had

24   some discussion.

25

1  BY MR. SILVERMAN:

2  Q   So were any of the counsel that you had lunch with counsel

3  on the screen here in this case?

4  A   Yes.  Yes.

5  Q   All right.

6  A   I did not discuss the case with any of the counsel on the

7  screen.

8  Q   Are you aware of detainees or incarcerants under DOC

9  jurisdiction doing subminimum wage work?

10  A   Please ask that again.

11  Q   Are you aware of detainees or incarcerants under DOC

12  jurisdiction doing subminimum wage work?

13  A   We don't have detainees.  Our folks are incarcerated, yes,

14  their wages are below minimum wage for the programs that I am

15  familiar with.

16  Q   Earlier you used the term "violators" for folks who seem

17  to have probation potential violations?

18  A   Yes.

19  Q   Are you aware of any violators under DOC jurisdiction

20  doing subminimum wage work?

21  A   I would say not.  I am really not sure because violators

22  are usually in the jails for such a short period of time.  It

23  is sort of a weigh station until they are transported back.

24  I don't know.  I would suspect not because I don't think they

25  are in the jails long enough to be established in a work

1    program.

2    Q    For the incarcerant under DOC jurisdiction doing

3    subminimum wage work, what kinds of work is that?

4    A    Are you interested only in the prisons or other work

5    programs outside of the prisons?

6    Q    Anybody who is an incarcerant that doesn't get to leave

7    the facility.

8    A    That would be Class III work for supporting the prison

9    operations.  Working in that class is required by RCW.  The

10   types of work might be in the kitchen, in the laundry, office

11   work, janitorial work.  It is not full-time.  It is in

12   addition to programming and training and other things.

13   Q    You mention Class III.  What is Class III?

14   A    There are five classes of the types of work that offenders

15   can participate in.  My office deals -- writes contracts for

16   classes III, IV and V usually and is familiar with those.

17   Classes I and II, we are not familiar with.

18   Q    What are Classes I and II?

19   A    They are handled by Correctional Industries, another

20   division of the agency.  They are -- I am not sure if it is I

21   and II or I or II, but there is the ability to work for

22   private contractors, and folks are still housed at the prison

23   but the work they do can be for a private company and they

24   paid minimum wage or more.

25        The classes I am familiar with -- III, IV and V -- are

1  paid subminimum wage, by statute they can be, or they are not

2  paid at all because it is considered community restitution.

3  Q   Are all Class I and II work programs at minimum wage or

4  above?

5         MS. CHIEN:  Objection, foundation.

6         THE COURT:  I think you should rephrase the question.

7  I am not sure I understand it.

8  BY MR. SILVERMAN:

9  Q   Ma'am, you just talked about some kinds of work projected

10  under Class II.  To the best of your understanding and

11  knowledge, are all Class II work programs at minimum wage or

12  above?

13  A   I don't know.  I can't say for sure.

14  Q   Does your division within Department of Corrections

15  contract with a company called Keefe?

16  A   No.  Currently, I don't believe so, no.

17  Q   Does your division contract with a company called Telmate?

18  A   I am not sure.  I don't know.  I would have to check.

19  Q   For things like a commissary contract or the telephone

20  contract, does that go within your department?

21  A   Yes, that would -- well, yes, it would be under my

22  purview, yes, for commissary, and in fact we are currently in

23  the midst of a procurement for telephones and other media

24  services.

25  Q   Great.  Do you have any knowledge as to whether for the

1    different classes of prisoner like you talked about, whether

2    all of them have deductions taken from their accounts for the

3    cost of their detention?

4    A    I don't know.  I would imagine so except for Class V

5    because they don't earn anything.  I don't know.  As I said,

6    I am not familiar with the trust accounting system and that

7    detail.

8            MR. SILVERMAN:  No further questions, Your Honor.

9            THE COURT:  Ms. Chien.

10                        CROSS-EXAMINATION

11   BY MS. CHIEN:

12   Q    Hi, Ms. Eisen.  I would like to clarify some things.  I

13   heard you talk about a DOC contract with Yakima.  I want to

14   be clear, is that contract related to ICE?

15   A    No.

16   Q    DOC doesn't house immigration detainees; is that right?

17   A    Correct.

18   Q    Talk to me about the people who are incarcerated at DOC,

19   who does DOC incarcerate?

20   A    We incarcerate people who committed a crime who have been

21   sentenced to a term of one or more years -- one year or more

22   by court of law.

23   Q    How are they referred to as?

24   A    Incarcerated individuals.

25   Q    Does DOC incarcerate anyone based on civil or

Eisen - Cross

1    administrative proceedings?

2    A    No.

3    Q    Are all physically capable DOC inmates required to work?

4    A    The RCW requires work in Class III of incarcerants in the

5    prisons.  They require some work along with the programming

6    and training and counseling and whatever else.

7    Q    You have said "RCW."  I want to make sure the jurors

8    understand.  When you say "RCW," you mean a statute, a law

9    that requires them to work?

10   A    Yes.

11   Q    Let's talk about this contract that we have spent some

12   time on.  I want to make clear, did DOC ever actually send

13   any DOC inmates to a GEO facility?

14   A    No.

15   Q    The contract -- is DOC's contract with GEO still in

16   effect?

17   A    No.

18   Q    When did DOC's contract with GEO expire?

19   A    August of '18.

20   Q    There was not a single DOC inmate who has participated in

21   a work program run by GEO; is that right?

22   A    To my knowledge, yes, correct.

23   Q    If DOC had sent inmates to that GEO facility, I understand

24   they didn't, if they had, did the DOC-GEO contract

25   contemplate that inmates would participate in a work program

Eisen - Cross

1    and be paid?

2    A    Yes.

3    Q    Who would be responsible for managing that program?

4    A    GEO.

5    Q    Who would be responsible for identifying the work duties

6    and schedules?

7    A    It would be GEO.

8    Q    Who would be responsible for paying the inmates?

9    A    The same, it would be the contractor, GEO.

10   Q    We talked about what the contract set for the inmate pay

11   in the work program; is that right?

12   A    Yes.

13   Q    It said two dollars or the standard wage for that

14   assignment, whichever is greater; is that right?

15   A    Yes.

16   Q    What is the standard wage of the assignment mean?

17   A    What incarcerants are typically paid for that work, that

18   type of work within the facility.

19   Q    So the facility and GEO, if it has multiple different

20   types of incarcerants, not just DOC incarcerants, it would

21   have to pay what was typical of that facility?

22   A    What anyone else that did that same work would be paid for

23   that same work.

24   Q    So if GEO was paying the Michigan minimum wage to other

25   inmates in its facility, what would the GEO-DOC contract

1    require?

2    A   That the Washington State incarcerants were paid the

3    minimum wage, then, for the same work.

4    Q   Thank you.  Do you suspect that the contract regarding CCA

5    that counsel asked you about had that same provision?

6           MR. SILVERMAN:  Objection, Your Honor.  Calls for

7    speculation.

8           THE COURT:  Sustained.

9    BY MS. CHIEN:

10   Q   I am going to ask you to turn to Exhibit A-89.  I am going

11   to ask you to turn to page, I believe -- actually, let me

12   start.  Do you recognize this document?

13   A   Yes, I have looked at it once before or twice before.

14   Q   Is this the CCA contract?

15   A   Yes.

16   Q   I am going to ask you to turn to where the pay is

17   indicated.  Actually, you are actually the contract expert.

18   Can I ask you?

19   A   I think it is 3.05 on Page 3.  I located it.  The bottom

20   of Page 3.

21   Q   Does that provision look similar as the provision we are

22   talking about with the GEO contract?

23   A   Yes.  It is similar to.

24   Q   Refers to the standard wage assignment, whichever is

25   greater?

1   A    Yes.

2   Q    Are you aware of whether or not DOC participated in a work

3   program under the CCA contract?

4   A    I do not know.

5   Q    Are you aware how much CCA paid inmates?

6   A    I would not know.

7   Q    Let's turn back to the contract that was never used, which

8   I believe is A-23.

9          MR. SILVERMAN:   Objection, Your Honor.

10         THE COURT:   State your objection.

11         MR. SILVERMAN:   The preface to her question, which

12  she hasn't started, "let's turn back to the contract that was

13  never used."

14         THE COURT:   The objection is overruled.

15  BY MS. CHIEN:

16  Q    This contract that wasn't used, did it contain any other

17  requirements related to state law?

18  A    Well, yes.  I mean -- well, I think all of our contracts

19  contain a provision that says that state law -- state,

20  federal, constitutional law must be abided by, the contract

21  must be in conformance with law.  This one --

22  Q    Can we publish A-23.  I want to make sure the jury is

23  following along.  Turn to Page 5.  I want to highlight the

24  first paragraph.  I will do a call out so you can see it.

25  A    It requires operation in accordance with operating

Eisen - Redirect

1    requirements.  Those are defined in the definition on Page 2

2    as applicable federal, state, local law and court orders,

3    constitutional standards, et cetera.

4    Q    Can you turn to Page 2?  I want to make sure the jury is

5    going to follow the definition.  That provision requires that

6    GEO comply with all state laws?

7    A    Yes, it is at the top.  All of our contracts require

8    adherence to law.

9    Q    GEO's required to comply with federal, state and local law

10   under this contract?

11   A    Yes.

12   Q    One final question.  Does DOC have any contract with any

13   private facilities, corporations or prison services within

14   the State of Washington?

15   A    No.

16            MS. CHIEN:  No further questions.

17            MR. SILVERMAN:  I have some redirect.

18                      REDIRECT EXAMINATION

19   BY MR. SILVERMAN:

20   Q    Did the State of Washington cancel this contract at any

21   point prior to its natural termination date?

22   A    Not that I know of.

23   Q    If it did cancel it, would you know about it?

24   A    You know, at the time of the contract I was not the

25   contracts administrator.  So it ended August of '18.  I

1  started as administrator in February of '18, I probably would

2  have known.  I was the contracts administrator when it

3  naturally ended.

4  Q   This lawsuit was filed in 2017.  Between 2017 and the end

5  date of this contract, it was never cancelled by the State of

6  Washington, correct?

7  A   Not that I know of.

8  Q   It provides it can be cancelled upon convenience without a

9  reason, right?

10  A   Uh-huh.

11  Q   But it didn't.  You can't say "uh-huh."

12  A   Excuse me.  Yes.  Sorry.

13  Q   Let's turn to Page 4 of the contract.  At the very top,

14  Section 3.05.  This is A-023, which is the GEO-State of

15  Washington contract at Page 4.

16       MS. CHIEN:  This hasn't been moved into evidence.  I

17  don't think it should be published.

18       MR. SILVERMAN:  I offered A-023 in evidence at the

19  very beginning.

20       MS. CHIEN:  I thought it was A-25.

21       THE COURT:  Yes.

22       THE CLERK:  A-025 was on the screen.

23       MR. SILVERMAN:  We dropped it off.  It is A-023.

24  Page 4 of 31.  WA0011360.

25       THE WITNESS:  Yes.

1    THE COURT:  Wait a minute.  The Bates number doesn't

2    mean anything until I figure out what are you talking about.

3    What is the exhibit number you are now discussing?

4    MR. SILVERMAN:  A-023.

5    THE COURT:  Has this been in admitted in evidence?

6    MR. SILVERMAN:  Yes, Your Honor.

7    THE COURT:  Okay.  Go ahead.

8    BY MR. SILVERMAN:

9    Q   Very top.  Section 3.05.  States, "The offender shall be

10   paid two dollars or the standard wage for that assignment or

11   whatever is greater."

12   A   Yes.

13   Q   You testified the standard wage for that assignment is the

14   standard wage at the facility, correct?

15   A   Yes.  That would be my supposition, yes.

16   Q   This doesn't say "paid at least two dollars a day," does

17   it?

18   A   Well, it does say it would be whatever is greater because

19   it says "or pay two dollars."  It does set a floor of two

20   dollars.  That's how I read it.

21   Q   The only alternative to the two dollars is the standard

22   wage at the facility, correct?

23   A   Provided that it is greater, yes.

24   Q   Doesn't say "at least two dollars," correct?  The words

25   "at least" are not there, are they?

1    A    That is correct, but I don't really understand the

2    distinction that you are making.

3    Q    The setting of the offender's work rate at two dollars per

4    day as opposed to $14 a day, is the setting of the rate that

5    low based on the Washington law that exempts the State of

6    Washington Department of Corrections from paying the minimum

7    wage?

8    A    No, because that's available to the state government, to

9    the department.

10            MR. SILVERMAN:  No further questions.

11            THE COURT:  Anything further?

12            MS. CHIEN:  No, Your Honor.

13            THE COURT:  Thank you --

14            MR. BERGER:  Excuse me, Your Honor.  Mr. Berger might

15    have questions.

16            THE COURT:  How come when I ask if there are

17    questions, nobody speaks up and they speak up later?

18            MR. BERGER:  I apologize.

19            THE COURT:  No harm.

20                        RECROSS-EXAMINATION

21    BY MR. BERGER:

22    Q    What state did this contemplate overflow incarcerants

23    would be housed in?

24            MR. SILVERMAN:  Objection.

25            THE COURT:  Overruled.

1          THE WITNESS:  The contract mentions Michigan and also

2     mentions "or GEO facility," I believe.

3     BY MR. BERGER:

4     Q   Under the terms of the contract, would the laws of

5     Michigan or whatever other state the incarcerants were in

6     apply?

7     A   Yes.  Yes.

8          MR. BERGER:  Thank you.

9          THE COURT:  Thank you, Ms. Eisen.  You may be

10    excused.

11         THE WITNESS:  Thank you, Your Honor.

12         THE COURT:  You may call your next witness.

13         MS. MELL:  Lynne Buchanan.

14         MS. CHIEN:  Can we have a conference with this

15    witness outside the presence of the jury?  We believe we are

16    going to have a similar issue.

17         THE COURT:  The jury can be excused for a minute.

18    Take a stretch.  Won't take long.

19      (The following occurred outside the presence of the jury.)

20         MS. CHIEN:  Your Honor, the State would object to

21    this witness.  I think you can see how the testimony would

22    play out, almost exactly the same as Ms. Fellin, which I

23    don't think was useful to anybody.  Ms. Buchanan will only

24    testify to emails from 2014 related to the Northwest

25    Detention Center.

```
 1          THE COURT:  I don't know what she's going to testify
 2   to.  Certainly, we've got two witnesses that we spent a lot
 3   of time on that didn't know much about anything having to do
 4   with the case.  I am not going to grant a motion in limine to
 5   strike the witness because I don't know what they are going
 6   to testify to.  I hope we don't waste more time with people
 7   that don't know the answers to the questions that are
 8   appropriate to be asked.
 9       Bring the jury back.
10       (The following occurred in the presence of the jury.)
11          THE COURT:  We lost Juror No. 3, I see.  Said to take
12   a break, I guess she's taking a break.
13       Ms. Buchanan, this is Judge Bryan speaking.  Will you
14   raise your right hand and be sworn.
15                      LYNNE BUCHANAN,
16       having been sworn under oath, testified as follows:
17          THE COURT:  Thank you.  You may inquire, counsel.
18                    DIRECT EXAMINATION
19   BY MS. MELL:
20   Q   Your name is again Lynne Buchanan; is that correct?
21   A   Yes.
22   Q   You are an employee of the State of Washington?
23   A   Yes.
24   Q   Employed with the Department of Labor & Industries?
25   A   That is correct.
```

1   Q    Your current title, I am not sure I know what it is.  Can

2   you give me that?

3   A    Sure.  I am an internal investigator.

4   Q    Have you been the employment standards program manager at

5   Labor & Industries?

6   A    Yes, I have in the past.

7   Q    Was that position different than an internal investigator?

8   A    Oh, yes.

9   Q    Was it a management position?

10  A    It was -- yes, it was.

11  Q    What tier?  Who did you report to, Joel or did you -- the

12  Director Joel Sacks or someone below him?

13  A    I reported to someone below him.

14  Q    Who was that?

15  A    Elizabeth Smith.

16  Q    Is Elizabeth Smith the number two at the Department of

17  Labor & Industries in terms of hierarchy?

18  A    She currently is on a team of number twos.

19  Q    With regard to being an internal investigator, is that in

20  the wage and hour division or some other part of Labor &

21  Industries?

22  A    No, not in wage and hour.  Part of human resources.

23  Q    When you were the employment standards program manager,

24  was that in the wage and hour division?

25  A    Yes.

1    Q    You moved to the internal investigator position because

2    the opportunity arose?

3    A    Yes.  I preferred it.

4    Q    When you were in the employment standards program manager

5    position, were you familiar with the Department of Labor &

6    Industries' minimum wage and hour requirements for people in

7    state custody?

8    A    Minimally.

9    Q    Did you have a role with the enforcement of the Minimum

10   Wage Act?

11   A    Yes, I was part of a team.

12   Q    As part of that team, did you process Minimum Wage Act

13   complaints?

14   A    No, I didn't process complaints.  Are you talking about

15   when I was the manager?

16   Q    What was your involvement when you were a manager with

17   complaints that were specific to the Minimum Wage Act?

18   A    So as the manager, I primarily reviewed work that was done

19   by the field agents.

20   Q    All right.  Did you monitor what cases the field agents

21   got involved in?

22   A    Just some of them.  If they had determined that there was

23   what was called an NOA, a notice of assessment, those types

24   of things would come across my desk to review and look at

25   those cases and make sure that a notice of assessment would

1    be appropriate for an employer.  That kind of a determination

2    was made when an employer owed wages for work that had been

3    done by their employees.  That was my primary job.

4    Q    Are you familiar enough with the Minimum Wage Act because

5    of your experience with working in the division that you

6    worked in, employment standards, that there is an exception

7    to the definition of "employee" for individuals in state

8    custody?

9    A    Not anymore.  I haven't done that work for quite a long

10   time.

11   Q    As you sit here today, you have no recollection as to

12   whether or not people in state custody are exempt from the

13   Minimum Wage Act?

14   A    You know, I am not that familiar with the laws or the

15   rules anymore.  It has been several years since I have worked

16   in that program.  I would hate to try to quote something that

17   I am just really not very familiar with anymore.

18   Q    I wasn't asking you to quote it.  Do you need to take a

19   look at the statute to refresh your recollection?  Would that

20   help?

21   A    I don't have one handy.

22   Q    Well, I do.  I am going to try to pull one up here on the

23   screen for you.

24          MS. CHIEN:  We object to this being published again.

25   Same issue with the law being published.

1      THE COURT:  Yes, the objection is sustained.

2      MS. CHIEN:  I can check with support staff to see if

3   Ms. Buchanan has access to Box, if that is what your

4   preference would be, Ms. Mell?

5      MS. MELL:  Same statute.  It is still in there.

6      MS. CHIEN:  Ms. Buchanan, we are going to send you a

7   link to box.com where the exhibits are going to be pulled up.

8   I don't remember what exhibit number this is, Ms. Mell?

9      THE WITNESS:  Are you sending it by email?

10      MS. CHIEN:  We are going to send it via email.  Is

11   that okay?

12      THE WITNESS:  Yeah, let me switch over to that.  I am

13   looking at my emails, but I am not seeing it.

14      MS. CHIEN:  We are going to send it to you in one

15   second.

16      THE WITNESS:  RCW 49.46.010.  Which part of this?

17   BY MS. MELL:

18   Q   See where it defines "employee"?

19   A   Yes.

20   Q   "Includes any individual employed by an employer but shall

21   not include..."

22   A   Yes, I see that.

23   Q   Do you see there is an exception listed, subsection (k),

24   "Any resident, inmate or patient of a state, county or

25   municipal correctional, detention, treatment or

1   rehabilitative institution"?

2   A   Let me get down to that.  Any resident, inmate, yes, I see

3   that.

4   Q   Does that refresh your recollection as to individuals in

5   state custody being exempt from the Minimum Wage Act?

6   A   Well, I know what it means, but it is not --

7   Q   What does it mean?

8   A   Well, it sounds like it means that they would not be

9   included as an employee.

10  Q   In your -- let's get more specific about your time as

11  employment standards program manager.  How many years were

12  you doing that work?

13  A   Not very long.  Couple years.

14  Q   How much experience do you have with the Minimum Wage Act?

15  A   I started with Labor & Industries in 2008.  I worked with

16  the Minimum Wage Act as an industrial relations agent and

17  just promoted up from there.

18  Q   So when you were doing that work specific to the Minimum

19  Wage Act, did you have specific rules that interpreted that

20  statute that you applied in your position?

21  A   Yes.

22  Q   Did you have a definition for who L&I considered a

23  resident of a state, county or municipal correctional,

24  detention, treatment, or rehabilitative institution?

25  A   You know, those kinds of things didn't come up very often.

1    I mean, there is tons of rules for everything at Labor &

2    Industries.  Primarily, everyone that we received a wage

3    complaint from was considered an employee and they were a

4    resident of Washington.  We had very few cases that I recall

5    that came in outside of that parameter.

6    Q   Is it your position the Department did not need to define

7    who was a resident of a state, county or municipal

8    correctional, detention or treatment or rehabilitative

9    institution to know how to apply the exception?

10            MR. BERGER:  Objection to form.  Foundation.

11            MS. CHIEN:  Objection.

12            THE COURT:  The objection is sustained as to her

13   position.

14   BY MS. MELL:

15   Q   Did L&I not define who was a resident of a state, county

16   or municipal correctional detention, treatment or

17   rehabilitative institution because it didn't need one?

18            MS. CHIEN:  Objection, foundation.

19            THE COURT:  Sustained.

20   BY MS. MELL:

21   Q   Did L&I define who it considered an inmate of a state,

22   county or municipal correctional, detention, treatment or

23   rehabilitative institution?

24            MS. CHIEN:  Same objection.

25            THE COURT:  She may answer if she knows.

1          THE WITNESS:  You know, I think the 49.46.010, as it

2     defines who is an employee and who is not an employee, that's

3     what was followed.  That's not necessarily an L&I rule.  It

4     is a rule that is looked at by people in the wage and hour

5     program.  L&I didn't write this.  It is a rule that, of

6     course, people know about, and even though we didn't use any

7     kind of -- we didn't see people that were incarcerated filing

8     wage complaints on a frequent basis, and so that kind of

9     thing just never came up very often.

10    BY MS. MELL:

11    Q   Did it even come up at all?

12    A   I don't remember if it ever did.

13    Q   Is it your recollection that it did not?

14    A   I don't recall that it did.  I can't say that it never

15    did.  You know, honestly, it has been a really long time

16    since I worked in that program.  I just don't -- I don't

17    remember all of the cases that came up.

18    Q   Is it correct, then, that similarly L&I never previously

19    defined who it considered a patient of a state, county or

20    municipal correctional, detention, treatment or

21    rehabilitative institution?

22          MS. CHIEN:  Objection, foundation.

23          THE COURT:  The objection is sustained.

24    BY MS. MELL:

25    Q   As -- in your work in enforcing the Minimum Wage Act, did

Buchanan - Direct

1    you have a pretty good sense of who the people were that were

2    exempt under that provision without defining them more

3    specifically?

4    A    The people we typically would see that were exempt were

5    independent contractors.  They were not considered employees.

6    That's what we saw more than any other that I can remember.

7    Q    There was a rule that you developed specifically to try to

8    discern who was an independent contractor versus who was an

9    employee, correct?

10    A    I'm sorry.  I don't remember that.

11    Q    Do you remember the economic realities test?

12    A    I know those words, but I couldn't describe it to you.  It

13    is complicated.  I know that.

14    Q    Do you know it was so complicated you guys created a

15    formula to deal with that situation that was call --

16            MS. CHIEN:  Objection.

17    BY MS. MELL:

18    Q    -- that was the economic realities test?

19            MS. CHIEN:  Objection, calling for legal opinion.

20    Legal conclusion.

21            THE COURT:  The objection is sustained to the form of

22    the question.

23    BY MS. MELL:

24    Q    The economic realities test was a criteria you used to

25    discern the difference between an independent contractor and

1    an employee, correct?

2    A   Yes.

3    Q   And you developed an economic realities test so you could

4    investigate wage and hour complaints involving the difference

5    between an independent contractor and an employee, correct?

6         MS. CHIEN:  Objection, foundation.  Ms. Mell is

7    trying to -- misstating the law and trying to get it in

8    through a witness.

9         THE COURT:  The question assumes facts not in

10   evidence.

11   BY MS. MELL:

12   Q   Did you use the economic realities test when you were at

13   the Department?

14   A   I am assuming that I did.

15   Q   Did you ever use it in the context of somebody in state

16   confinement?

17   A   I don't remember if I did or not.

18   Q   Did you ever use that test and apply it to anyone at the

19   Northwest ICE Processing Center?

20   A   That name doesn't sound familiar to me.

21   Q   Does the name "GEO" sound familiar to you?

22   A   I don't know what that is.

23   Q   Does L&I know there are people in custody in local jails?

24   A   Yes.

25   Q   L&I does inspections in local jails, correct?

Buchanan - Direct

```
 1   A    I don't know.  I am not involved with inspections.

 2   Q    With regard to local jails, L&I knows the Minimum Wage Act

 3   doesn't apply to any of those individuals in the local jail

 4   preparing meals, correct?

 5   A    Preparing meals?  I don't know.

 6   Q    How about cleaning the toilets?  Trustees in the local

 7   jails who clean toilets in the local jails aren't covered by

 8   the Minimum Wage Act?

 9            MS. CHIEN:  Objection.

10            THE COURT:  Sustained.

11   BY MS. MELL:

12   Q    Have you ever processed a complaint by an inmate in the

13   local jail where they wanted minimum wages for cleaning the

14   toilet?

15   A    I don't think so.

16   Q    Have you ever processed a complaint from an individual at

17   SCORE?  Do you know what SCORE is?

18            MS. CHIEN:  Objection.

19            THE COURT:  That's two questions.

20            MS. MELL:  It is.

21   BY MS. MELL:

22   Q    Do you know what SCORE is?

23   A    No.

24   Q    Do you know there is a regional jail in South King County?

25            MS. CHIEN:  Objection.  She just said she didn't
```

1  know.

2       THE COURT:  This is a different question.  She may

3  answer.

4       THE WITNESS:  I am not aware of it.

5  BY MS. MELL:

6  Q   Has L&I put any resources into ensuring that people

7  detained in jail doing work like cleaning the toilets or

8  preparing food get paid minimum wage?

9       MR. BERGER:  Objection, foundation.

10       THE COURT:  I think she may answer if she knows.

11       THE WITNESS:  I'm sorry, I don't know.

12  BY MS. MELL:

13  Q   Were you ever involved -- did you ever allocate any of

14  your time to that issue?

15  A   I don't recall doing that.  No.

16  Q   Do you ever recall allocating any of your time to

17  ascertaining whether or not the detainees at the Northwest

18  ICE Processing Center are covered by the Minimum Wage Act?

19  A   Not that I can remember.  I haven't been in that program

20  for at least seven years.  A lot of it, I just don't know.  I

21  just don't remember.  I don't know how things have changed

22  since I have been there.  It is not even on the same floor

23  anymore.

24  Q   Are you glad to be gone off that floor?

25  A   Yes.

1    Q    All right.  Exhibit A-109, I would like to have you take a

2    look at, if you can.  It is probably something you have to

3    pull off your email.

4            THE WITNESS:  Is it in the same email?

5            MS. CHIEN:  We'll have to email it to you.  What was

6    the number, counsel?

7            MS. MELL:  A-109.

8            MS. CHIEN:  I note this is an excluded exhibit.

9            THE COURT:  Yes, I see that.

10   BY MS. MELL:

11   Q    Have you ever had an opportunity to review Exhibit A-109.

12           MS. CHIEN:  We have to email it, Ms. Mell.

13   Ms. Buchanan, I think we might have sent it.  You might want

14   to check your email.

15           THE WITNESS:  Here, we just got it.  Okay.

16           MS. CHIEN:  Sorry.  It is the wrong one.  One second.

17   It would be helpful if we can get them in a batch.

18           MS. MELL:  Add A-107 and A-116.  That would be

19   helpful.  Thank you.

20           MS. CHIEN:  All right.  We can start with A-109 for

21   now.  We will get the others.

22           MS. MELL:  Yep, we can do that.

23   BY MS. MELL:

24   Q    Exhibit A-109, what is that?

25   A    I can't see it yet because we have a block on our

1    computers.  Hopefully it brings up a preview and lets me look

2    at it.  Right now --

3              MS. CHIEN:  We would object to Ms. Mell asking

4    Ms. Buchanan to identify an exhibit that's been excluded.

5              THE COURT:  Did I already specifically rule on this

6    exhibit?

7              MS. CHIEN:  Yes.

8              MS. MELL:  Your Honor, your ruling was always subject

9    to what happens at trial, and refreshing the witness's

10   recollection is laying a foundation as to the question that

11   you did not exclude me from asking.

12             THE COURT:  Well, you can ask her to review the

13   exhibit, but don't show it to anybody.  We will see if it is

14   offered and admitted or whatever.  For now, she can look at

15   it, if that's the question.  What is your question?

16   BY MS. MELL:

17   Q   What is it?

18             MS. CHIEN:  Objection.  Objection, Your Honor.  This

19   is an excluded exhibit.  Her identifying an excluded exhibit,

20   we think goes against the Court's previous order.  We are

21   happy to have her review Exhibit 109.  We don't believe it

22   should be identified.

23             THE WITNESS:  Unfortunately, I am not able to review

24   it.

25             THE COURT:  Well, there you go.  What is the next

Buchanan - Direct

1    question?

2         MS. MELL:  I guess I want to make a record that I am

3    not going to be permitted to show the exhibit to the witness

4    and use it to refresh her recollection because she can't get

5    the exhibit in the manner in which I was asked to deliver it

6    to her.  Do we have a workaround here where somebody could

7    give it to her?

8         MS. CHIEN:  Ms. Buchanan is not in our office.

9         MS. MELL:  She's in Department of Labor & Industries.

10   Can somebody hand her the exhibit?

11        THE WITNESS:  I am not in the Department of Labor &

12   Industries.  I am working from home in Spokane.

13        MS. CHIEN:  Ms. Buchanan, just so I understand, are

14   you unable to open the attachment?  Is that's what is going

15   on?

16        THE WITNESS:  That is correct.  We have advanced

17   threat protection and it won't open.  It is an outside

18   attachment.  I was hoping to see a preview of it, but I can't

19   get it to even show me that.

20        THE COURT:  Okay.  We are wasting time dealing with

21   this, counsel.  The objection is fairly taken.  Go on to

22   something else.

23   BY MS. MELL:

24   Q   Did you, during your time with L&I when you were working

25   on the Minimum Wage Act, ever communicate to GEO that it

1  needed to comply with the Minimum Wage Act for its ICE work

2  program at the Northwest ICE Processing Center?

3          MS. CHIEN:  Objection, foundation, relevance.

4          THE COURT:  Sustained.

5  BY MS. MELL:

6  Q   During your tenure with L&I when you were dealing with the

7  Minimum Wage Act, did L&I take an official position with

8  regard to the application of the Minimum Wage Act to the

9  detainees ICE held at the Northwest ICE Processing Center?

10         MS. CHIEN:  Objection.

11         THE COURT:  Sustained.

12 BY MS. MELL:

13 Q   Did L&I make a determination in March of 2014 that L&I

14 had --

15         MS. CHIEN:  Objection.

16         MR. BERGER:  Objection.

17         THE COURT:  The objection is sustained.

18 BY MS. MELL:

19 Q   Did L&I enforce the Minimum Wage Act against the federal

20 government?

21 A   We primarily dealt with state employees that were

22 considered to be employees through the Minimum Wage Act.

23 Federal issues were not part of our -- were not part of what

24 we did.

25         MS. MELL:  I have nothing further, Your Honor.

```
 1              THE COURT:  Cross?

 2        No further questions of this witness?

 3        Thank you, Ms. Buchanan.  You may be excused.

 4              THE WITNESS:  Thank you, Your Honor.

 5              THE COURT:  You may call your next witness.

 6              MS. MELL:  I am.  It is Ms. Sytsma, please.

 7              MS. SCHEFFEY:  Your Honor, are you anticipating an

 8    afternoon break today?

 9              THE COURT:  Usually about 2:25.

10              MS. SCHEFFEY:  I was wondering if it would make sense

11    to do this while we work out the logistics of this witness.

12              MS. CHIEN:  Sorry.  I missed --

13              THE COURT:  Is it going to take some time to get the

14    witness up?

15              MS. CHIEN:  Might take like two minutes or so.  I am

16    not sure --

17              THE COURT:  Oh, well.

18              MS. SCHEFFEY:  Ms. Chien, we also had documents

19    couriered to your office.  Paper copies.

20              MS. CHIEN:  We might have to double check that.

21              THE CLERK:  The witness has just arrived.  She's

22    being admitted at the moment.

23              THE COURT:  Okay.

24              MS. CHIEN:  Let me check -- a courier came?

25              MS. SCHEFFEY:  They delivered hard copies.  If not,
```

1    they are in the Box.

2              MS. CHIEN:  Yes, it is confirmed.  She has whatever

3    you courried over.

4              THE COURT:  Ms. Sytsma, if you would raise your right

5    hand and be sworn.

6                          SARAH SYTSMA,

7         having been sworn under oath, testified as follows:

8                      DIRECT EXAMINATION

9    BY MS. SCHEFFEY:

10   Q    Good afternoon.  Can you see and hear me okay?

11   A    I can.

12   Q    Could you state your name for the record.  I want to make

13   sure I am saying it right.

14   A    Sarah Sytsma.

15   Q    You work for Washington Department of Corrections, right?

16   A    Correct.

17   Q    In 2019, you were named the Director of Correctional

18   Industries, correct?

19   A    Yes.

20   Q    You have over 25 years of experience in corrections?

21   A    20 years.

22   Q    The Department of Corrections is required to provide safe

23   and secure housing for those that are detained, correct?

24   A    Correct.

25   Q    It houses both individuals held on detainer after they

1  served their sentence and also those convicted of crimes,

2  correct?

3  A    I know those convicted of crimes.

4  Q    We will get to the next one afterward.  Correctional

5  Industries describes itself as a unique blend of business and

6  government?

7  A    Yes.

8  Q    In Correctional Industries, those who are detained across

9  the State of Washington work in various facilities, right?

10 A    Yes.

11 Q    You would agree those programs and other work programs

12 that allow detained individuals to stay busy are beneficial

13 to those people who are confined, correct?

14 A    Correct.

15 Q    In your over 20 years of experience, are you aware of any

16 detention facility in the State of Washington that does not

17 provide the opportunity for detained individuals to stay

18 busy?

19 A    Not within our DOC facilities.

20 Q    In the State of Washington, detained individuals can

21 participate in a class of worker called Class II work,

22 correct?

23 A    Yes, our incarcerated individuals, CI oversees Class II

24 programs.

25 Q    That work involves producing goods and services that are

1  sold to generate funds for Correctional Industries, right?

2  A   Many of the programs, yes.

3  Q   Those who perform that work while detained are not paid

4  minimum wages, correct?

5  A   Currently, that is correct.

6  Q   There are also Class III positions, right?

7  A   Yes.

8  Q   People who participate in Class III positions complete

9  tasks inside the facility where they are detained, right?

10 A   Yes.

11 Q   They help with food service?

12 A   There are some Class III positions, correct.

13 Q   They help with the laundry?

14 A   Class II.

15 Q   Class II.  What about maintenance, they help with

16 maintenance?

17 A   Maintenance is Class II -- excuse me, Class III.

18 Q   Class III.  They clean their cells and common areas; is

19 that right?

20 A   Yeah, Class III -- in our Class II programs we do have --

21 part of their day may be cleaning up before the end of the

22 day.

23 Q   They clean bathrooms that are used by many people who they

24 live with, right?

25 A   That's mainly a Class III, although there are some Class

1    II programs that may clean restrooms.  In Class II, it

2    wouldn't be restrooms of the incarcerated.

3    Q   In Class III, it would be restrooms of the detained

4    people, correct?

5    A   Yes.

6         MS. CHIEN:  For clarity, it is not "detained."  It is

7    not "detainees."

8         MS. SCHEFFEY:  Marsha, I don't think you are

9    testifying right now.  I don't think you should instruct the

10   witness.

11        MS. CHIEN:  I am trying to clarify your language.

12        MS. SCHEFFEY:  I don't think it is proper.

13    May I proceed, Your Honor?

14        THE COURT:  I am waiting for you.

15   BY MS. SCHEFFEY:

16   Q   Those people in Class III, they clean the showers that are

17   used by other people who they live with?

18   A   Correct.  I want to clarify, I do not oversee Class III

19   programs.  I would only be speculating.

20   Q   Okay.  What about Class II, do they clean showers?

21   A   No.

22   Q   Do prisoners serving life without parole participate in

23   work programs in the State of Washington?

24   A   Within a CI program, we do have some LWOP incarcerated in

25   the program.

1   Q   Those people participate in the work programs even though

2   they have no chance of release, correct?

3   A   Correct.  Some.

4   Q   None of those individuals receive minimum wages for their

5   participation, correct?

6   A   Correct.

7   Q   So you would agree that detainees who work in Class II and

8   Class III work at Washington State prisons for subminimum

9   wages, correct?

10  A   Our incarcerated work for a gratuity.

11  Q   I know you stated that you -- just now that you had no

12  knowledge of Class III positions.  Do you recall giving a

13  deposition in this case?

14  A   I do.

15  Q   Do you have a copy of that in front of you, by any chance?

16  A   There is a packet in front of me.

17  Q   You can open that, if you want.  I am going to have you --

18  I know I was asking you about your deposition.  Now that I am

19  seeing the packet, I will have you shift gears.  Can you find

20  Exhibit A-25?  Might be A-025.

21  A   A-025?

22  Q   Yes.

23  A   I see A-023.

24  Q   There should also be A-025.  I don't know --

25          MS. CHIEN:  Sorry.  Can I clarify with staff?

1    MS. SCHEFFEY:  If not, Marsha, could you get her a

2  copy of A-025 printed?

3          MS. CHIEN:  Can we have a staff go in there and help

4  her look for it.  Was it in the courier packet --

5          MS. SCHEFFEY:  It should have been.  I am going to

6  admit I did not put it together myself.  It was on the list.

7          THE COURT:  It is time for a break.  We will take ten

8  or 15 minutes, folks.  You may be excused.  You can get your

9  exhibit business together during the break, hopefully.

10          MS. SCHEFFEY:  Thank you.

11                      (Recessed.)

12    (The following occurred outside the presence of the jury.)

13          MS. CHIEN:  Counsel, we just gave Ms. Sytsma all of

14  the exhibits in binder form.  We still haven't gotten the

15  return courier thing, just FYI.

16          THE COURT:  Are we ready to proceed?

17          MS. CHIEN:  We seem to have a fire alarm.

18          THE COURT:  We are not having any more fires today.

19          MS. CHIEN:  Sorry.  One second.  I think we have

20  gotten a pass from this.

21          THE COURT:  Are we ready for the jury?  You can bring

22  the jury in.  The witness is present.

23      (The following occurred in the presence of the jury.)

24          THE COURT:  One of the bad things about the system is

25  your positions on my screen keep changing.  As part of the

1  Zoom platform, I had hoped as time goes on everybody would

2  stay in the same block on the screen so we can keep track of

3  each other better.

4      All right.  You may continue, Ms. Scheffey.

5          MS. SCHEFFEY:  Thank you, Your Honor.

6  BY MS. SCHEFFEY:

7  Q   Do you have Exhibit A-025 in front of you?

8  A   Yes.

9  Q   State of Washington Department of Corrections?

10 A   Yes.

11 Q   Do you recognize this type of document?

12 A   I do.

13 Q   Is this maintained by Department of Corrections?

14 A   Yes.

15 Q   Is it regularly updated?

16 A   They are.  This last one -- this is actually an old

17 version.  There was an update in 2019.  A next update in

18 2022.

19         MS. SCHEFFEY:  I would offer this exhibit into

20 evidence.

21         MS. CHIEN:  No objection.

22         MR. BERGER:  No objection.

23         THE COURT:  All right.  It may be admitted.

24              (Exhibit A-025 was admitted.)

25

BY MS. SCHEFFEY:

Q   What is this document?

A   This is policy 710-400.  It is Correctional Industries and it is over Class II employment.

Q   I would like to go to the second page marked WA00011236. Do you see where it says "policy" at the top?

A   I do.

Q   Section 3, it states that Class II employment is voluntary for offenders; is that correct?

A   Correct.

Q   Is that still the policy for Class II employment?

A   Yes.

Q   Class II employment is available to anyone who is detained within Department of Corrections system; is that accurate?

A   Yes, if they meet certain qualifications.

Q   If we keep going to the page marked -- it is the third page, I believe, of the document, Bates No. WA00011237.  Do you see that?

A   Yes.

Q   In the middle it says "industry responsibility."  Do you see that section?

A   I do.

Q   It states that each Class II business will maintain written job descriptions; is that accurate?

A   Yes.

1  Q    Is that still the policy for Class II employment?

2  A    Yes.

3  Q    For detainees who participate in Class II programs, they

4  receive a written job description before they participate?

5  A    So, again, you are referring to them as "detainees."  Our

6  language is "incarcerated individuals."  I don't believe they

7  are each provided a position description.  It is not handed

8  to them.  They can obtain that information with their

9  correctional counselors.

10  Q    I think you just made a distinction between the language I

11  am using and what you use.  You used "incarcerated

12  individuals"?

13  A    Yes.

14  Q    Are those individuals who are held under the authority of

15  the State of Washington?

16  A    Yes.

17  Q    Are they free to come and go from the facilities where

18  they are held?

19  A    No, they are not.

20  Q    They are confined to the location where the State of

21  Washington sends them; is that correct?

22  A    Correct.

23  Q    I would like you to turn to, I guess it is Page

24  WA00011239.  It should be the fifth page of that document.

25  There is a Section C, which starts with "each CI class

1    business will establish a fair recruitment and hiring

2    process."  Do you see that?

3    A    I do.

4    Q    Is it accurate that individuals that want to participate

5    in Class II opportunities have to interview before they do

6    so?

7    A    Yes, they do.

8    Q    If they want to work, they have to do a skills assessment;

9    is that correct?

10    A    Yeah, they fill out an application.

11    Q    They have to establish that they have prior experience; is

12    that accurate?

13    A    Yeah.  Yes, for some of our positions.  We really -- we do

14    have a requirement that they have to have a high school

15    diploma or GED.  If they don't, at least be working on it

16    simultaneously.

17    Q    I would like to go to the next page, which is WA000011243,

18    Section C that says "offender pay rates."  You see that

19    section?

20    A    I do.

21    Q    As I read that, offenders are paid between 55 cents and a

22    1.60 per hour for participating in the program?

23    A    That has been updated in the new policy.

24    Q    When was the new policy enacted?

25    A    In 2019.

1  Q   What is the amount now?

2  A   It went up ten cents, 65 cents to 1.70.

3  Q   This document was updated in 2014, correct?

4  A   This was updated -- the one I am looking at was 2014.  We

5  have a more current of 2019.

6  Q   From 2014 to 2019, were the numbers you see on the screen

7  accurate?

8  A   I know when I came into my position we were paying the

9  probation rate at 65 cents per hour in 2019.

10  Q   The current rate is still less than minimum wage, correct?

11  A   Correct.  The current rate for Class II starts out at 65

12  cents an hour up to 1.70.

13  Q   I believe you testified earlier that some Class II

14  employment is in laundry rooms; is that correct?

15  A   That's correct.  All of laundry is Class II.

16  Q   Sorry.  What was the end of that answer?

17  A   All laundry is managed by CI and Class II.

18  Q   Class II work that is paid at 65 cents an hour; is that

19  correct?

20  A   65 up to 1.70.

21  Q   You also testified earlier that Class II work involves

22  food services; is that accurate?

23  A   It does involve food service.

24  Q   The food service work involves helping prepare meals in an

25  industrial kitchen; is that accurate?

1   A    Yes.

2   Q    That work is also compensated between 65 cents and 1.75 an

3   hour?

4   A    Correct.

5   Q    I would like you to take a look at Exhibit A-031.  My tech

6   team can take the other one down.  Do you have it in front of

7   you now?

8   A    I do.

9   Q    Do you recognize this document?

10  A    No. I recognize that it is a policy.

11  Q    Is this a policy maintained by Department of Corrections?

12  A    Yes.

13  Q    Does it look like the last policy you looked at?

14  A    This is the -- looking at the title, this is Class III

15  offender employment.

16  Q    Is this the type of policy that is typically maintained by

17  Department of Corrections?

18  A    Yes.  It is the template of our policies, yes.

19  Q    It is signed that it is approved here on the front page;

20  is that correct?

21  A    Correct.

22          MS. SCHEFFEY:  Offer to admit Exhibit A-031.

23          MS. CHIEN:  We object.  Ms. Sytsma only knows Class I

24  and II, that's what she testified to.  She doesn't recognize

25  this policy.

1    MS. SCHEFFEY:  She testified it is the type of policy

2    maintained by the DOC, regularly updated and it is signed.

3    MS. CHIEN:  Recognizes the format.

4    THE COURT:  Do you have some serious objection that

5    that is not what it purports to be?

6    MS. CHIEN:  No, this isn't the witness --

7    THE COURT:  A-31 may be admitted.

8    (Exhibit A-31 was admitted.)

9    BY MS. SCHEFFEY:

10   Q   So as part of your job in the Department of Corrections

11   overseeing Class II workers, you have knowledge about Class

12   III workers and Class I workers; is that correct?

13   A   I have knowledge about Class I and Class II workers.  CI

14   does not have oversight of Class III workers.

15   Q   Although you don't have oversight over them, you

16   understand the differences between the different classes; is

17   that correct?

18   A   I have some knowledge of the differences.

19   Q   One of those differences is the rate of pay; is that

20   correct?

21   A   That's correct.

22   Q   Class III workers -- if we can turn to Page WA00011101.

23   It is true Class III workers do not qualify for an amount in

24   excess of $55 a month as a stipend; is that correct?

25   A   Yeah, that's what I am reading, yes.

1    Q   And they -- Class II workers cannot earn more than $55 per

2    month even if they work over 40 hours each week; is that

3    correct?

4         MR. BERGER:  Objection, I believe you meant to refer

5    to Class III.

6         MS. SCHEFFEY:  Yes.  Sorry.  Class III workers.

7         THE WITNESS:  Can you repeat the question?

8    BY MS. SCHEFFEY:

9    Q   Class III workers can't make more than $55 a month even if

10   they work over 40 hours a week; is that correct?

11        MS. CHIEN:  Objection, foundation.

12        THE COURT:  The exhibit is in evidence.  If she's

13   just reading the exhibit, the objection is sustained.  If she

14   has some personal knowledge, she can answer the question.

15        THE WITNESS:  I have no personal knowledge.

16   BY MS. SCHEFFEY:

17   Q   We can take that down.  The Class II workers get overtime?

18   A   Yes.

19   Q   How much is their overtime?

20   A   Time and a half.

21   Q   So --

22   A   Over 40 hours.

23   Q   For someone who is working over 40 hours a week, for every

24   hour over 40 hours, they get about $3; is that accurate?

25   A   Depending on which level they are at, they could.

Sytsma - Direct

1   Q   They are not going to get more than $3 an hour?

2   A   Time and a half.

3   Q   I understand math.  I am not trying to do it exactly

4   either.

5         Can detainees be terminated from the correctional

6   industry program?

7   A   Incarcerated workers can be terminated.

8   Q   For what reasons?

9   A   They could be terminated for infractions.

10  Q   When you say "infractions," what does that mean?

11  A   Infractions ranging from anything -- they could be

12  infracted from theft from our own program to drug

13  infractions.  Any type of infraction they receive from the

14  facility.

15  Q   What about for not following an officer's orders?

16  A   I mean, so when they receive infractions, it really is

17  dependent on what the infraction is for.  We look at all of

18  them, each of them.  I can't specifically answer yes or no.

19  We would have to look at the infraction.

20  Q   Is there a safety and security reason offenders would need

21  to be terminated for inappropriate behavior such as stealing?

22  A   There could be.

23  Q   What kind of reason?

24  A   If it is theft, I mean in our program, we are teaching

25  skills -- soft skills are just as equally important as

1   technical skills.  If it is theft, well, theft would be a

2   security issue.  Definitely depending on what they may be

3   stealing, it could be used for strong arm or anything back in

4   their unit.

5   Q    Thank you.  Could you turn to Exhibit 22.

6           MS. CHIEN:  A-22?

7           MS. SCHEFFEY:  A-22.  My fault.

8   BY MS. SCHEFFEY:

9   Q    Do you have it in front of you?

10  A    I do.

11  Q    Do you recognize this document?

12  A    I have not personally seen this document.

13  Q    Have you seen any -- is there a document you give to

14  incarcerated individuals which gives them orientation on the

15  system?

16  A    Not that CI does.

17  Q    Does the Department of Corrections give it?

18  A    I believe they do.

19  Q    You have 20 years of experience in Department of

20  Corrections, right?

21  A    Yes, I do.

22  Q    Are you aware the Department of Corrections gives a

23  state-wide inmate orientation handbook?

24  A    Yeah, I know they give one out.  I have not looked at

25  this.

1  Q   You have not looked at this.  Does -- do you have any

2  reason to believe this is not the Department of Corrections

3  state-wide orientation handbook?

4  A   No, I have no reason not to believe that.

5  Q   Does this appear to be a regularly maintained Department

6  of Corrections orientation handbook?

7  A   Not seeing one, I would believe so.

8       MS. SCHEFFEY:  I offer to admit this in evidence.

9       MS. CHIEN:  We object.  The witness doesn't recognize

10 this document.

11      THE COURT:  It is not sufficiently identified at this

12 point.

13 BY MS. SCHEFFEY:

14 Q   One of the goals of corrections is to allow inmates to

15 live in a safe and secure facility, correct?

16 A   Correct.

17 Q   Do you agree audits help achieve this goal?

18 A   I would imagine.

19 Q   If the orientation handbook said audits help achieve that

20 goal, would you have any reason to doubt that?

21      MR. BERGER:  Objection to form.

22      THE COURT:  The objection is sustained.

23 BY MS. SCHEFFEY:

24 Q   Is it important in your position for facility operations

25 to be consistent throughout Department of Corrections?

1    A    Facility operations?

2    Q    Yes.  Why don't I rephrase my question.  Is it important

3    for you that everyone who participates in the Correctional

4    Industries program has the same opportunities regardless of

5    which state facility where they are held?

6    A    Yeah.

7    Q    Uniformity in applying those rules for Correctional

8    Industries is important; is that correct?

9    A    It is correct.

10    Q    That would also go to the pay rates of those individuals

11    who participate in Correctional Industries, you would want

12    those to be uniform regardless of where someone is held,

13    correct?

14    A    I want uniformity within CI.

15    Q    CI serves something like 20 or more different institutions

16    across the state, correct?

17    A    12.

18    Q    12.  Okay.  Among those 12 institutions that you serve,

19    you would want every inmate in any of those facilities to

20    have the same opportunity to earn that rate of pay, correct?

21    A    I would want Class II industries that I oversee to be

22    consistent within their levels of pay, that is correct.

23    Q    When you say you want Class II, there are Class II inmates

24    at more than one institution across the state, correct?

25    A    We have Correctional Industries operations in 11 of our

1    facilities.  I would want them to all be consistent.

2    Q    What 11 facilities are those?

3    A    We have the Washington State Penitentiary, the Coyote

4    Ridge, Airway Heights Corrections Center, Clallam Bay

5    Corrections Center, Stafford Creek Corrections Center,

6    Washington Corrections Center, Washington Corrections Center

7    for Women, Monroe Correctional Complex, Larch Corrections

8    Center, Olympic Corrections Center and Mission Creek

9    Corrections Center for Women.

10   Q    You mentioned Airway Heights Correction Center; is that

11   right?

12   A    I did.

13   Q    Can you look at Exhibit A-128?

14   A    128?

15   Q    Yes.  Is this an Airway Heights Correction Center offender

16   job description?

17   A    That's what it says at the top, "offender job

18   responsibilities."

19   Q    Does this look like a job description maintained by Airway

20   Heights for Class II industries?

21   A    This does not look like a Class II.  I am looking at the

22   position, the position on it.  Hobby craft.

23   Q    Why does it not look like a Class II job description?

24   A    Hobby craft is not something that Class II oversees.

25   Q    Who would oversee that?

Sytsma - Direct

1    A    I believe Class III.  I believe that would be a prisons

2    job.

3    Q    So you do have an idea of the distinction between

4    Correctional Industry jobs and Class III?

5    A    I do.  I know what jobs fall in Class II.

6    Q    Tell me what jobs fall in Class III or that you would know

7    would not be a Class II job description so I can know what

8    types of jobs.

9    A    I can't -- for Class III, I wouldn't be able to answer

10   that.

11   Q    How do you know the thing you are looking at is not a

12   Class III job?

13   A    I know hobby craft equipment room worker is not a position

14   within Class II that I oversee.

15   Q    If this was an older document, would you have any

16   knowledge, before your time in 2019, Class II positions?

17   A    If this was before my time in '19, that is correct, I

18   wouldn't know.

19   Q    Let's see if we can figure out what the jobs are in Class

20   II.  Can you try looking at Exhibit 152.

21            MR. BERGER:  A-152?

22            MS. SCHEFFEY:  Sorry.  A-152.

23   A    I see it.

24   Q    Does this look like a job description for a Class II

25   worker?

Sytsma - Direct

1    A    No.

2    Q    Why not?

3    A    We don't supervise janitors, yeah.  We don't have floor

4    and dayroom janitors.

5    Q    Do you know if there are inmates incarcerated within the

6    DOC that perform dayroom janitor positions?

7    A    I don't believe -- no.  For Class II?  Sorry.

8    Q    No, just within the Department of Corrections.  Have you

9    visited any of the facilities in Department of Corrections?

10   A    I have.

11   Q    Have you observed people working in those facilities?

12   A    I have.

13   Q    Do you know if any of the people who work in those

14   facilities perform janitor duties, sweeping, mopping the

15   floor, wiping the tables?

16   A    They do.

17   Q    You know that is a job.  Next question, is that job Class

18   II or Class III?

19   A    Class III.

20   Q    I think you testified earlier Class III does not pay

21   minimum wage, correct?

22   A    Correct.

23   Q    Let's see if I can find a Class II exhibit in here.  Can

24   you look at A-129?

25   A    I am looking at 129.

1    Q    Have you seen a document like this before?

2    A    Is it the document that says "mandatory waiting list"?

3    Q    Yes.

4    A    I have not seen that document.

5    Q    Is this a mandatory waiting list for the Class II

6    positions?

7    A    There is a volunteer waiting list.

8    Q    Tell me about the volunteer waiting list for Class II

9    positions?

10   A    When our incarcerated go through the screening process

11   applying for jobs, there are waiting lists created by their

12   counselor.  They are able to go in and pull names from the

13   waiting lists.

14   Q    Do you pull names in order or do you pull based on who you

15   prefer?

16   A    I can't answer that.  I have general managers at each site

17   that work with those waiting lists.  I am not specific on the

18   process.

19   Q    Is it typical that there is a waiting list for Class II

20   positions?

21   A    For some positions, not all.  Our goal would be a waiting

22   list.

23   Q    Why would your goal be a waiting list?

24   A    So we know people are wanting to sign up for programs and

25   so we can plan accordingly.

1    Q    Why do you want to have people interested in signing up

2    for the programs?

3    A    Because we believe our program makes a difference within

4    reentry.  We are excited to get our incarcerated in there and

5    start working on programming, technical and soft skills to

6    prepare them for release.

7    Q    You also allow people who have life without parole to

8    participate in the programs?

9    A    Yes, there are some.

10   Q    Do you believe it has a benefit for those people?

11   A    I do.

12   Q    What is that benefit?

13   A    If we can get some individuals who are at the facilities

14   for a long time that, A, it helps mentor.  They can help

15   mentor the others who are getting out.  We look at -- it

16   gives them a benefit of being able to learn skills.  Helps

17   with idleness.  We are looking at them to help mentor others

18   that come into our program.

19   Q    I understand the benefit to the State of having workers

20   who are experienced and aren't going to leave.  What is the

21   benefit to the incarcerated person who is not going to be

22   able to reenter society?

23   A    It gives them a sense of accomplishment.  It gives them a

24   sense of doing good things.  They are able to keep busy.

25   They are able to earn a gratuity.  There is things that they

1   need gratuity for.  If they want to purchase from commissary

2   and things of that nature.

3   Q   When you say "gratuity," do you mean a payment?

4   A   Yeah, that's the pay scale, gratuity scale.  Their hourly,

5   what we pay them hourly.

6   Q   You think those detainees get a sense of accomplishment

7   even if they are doing something like cleaning the toilets in

8   the bathroom?

9           MS. CHIEN:  Objection.

10          THE COURT:  You are asking for what many, many

11   hundreds of people think about something.  I don't know how

12   this witness can answer that.

13   BY MS. SCHEFFEY:

14   Q   Do you know about the mandatory deductions from Class II

15   worker pay?

16   A   Yes, we have mandatory deductions.

17   Q   Is it accurate to say those are the type of deductions

18   that may be taken from the amount they receive for

19   participating in work programs before they actually get that

20   payment; is that right?

21   A   Yes.

22   Q   Taken out kind of like taxes might be before I get my

23   paycheck, they are already taken out?

24   A   Correct.

25   Q   One of those is a cost of incarceration fee, correct?

Sytsma - Direct

1    A    Yes.

2    Q    What is that fee for?

3    A    Covers cost of incarceration.  I don't know the specifics.

4    It is the cost of incarcerating.  I couldn't tell you the

5    specific breakdown of that.

6    Q    Does that fee go back to the state?

7    A    I don't know where the fee goes.

8    Q    Does it go back to Correctional Industries?

9    A    I don't know.  I'm sorry.  I don't know where the fee

10   actually goes.

11   Q    Another deduction is the department debt, correct?

12   A    I am not -- the fees, I don't know.  I am not -- the

13   breakdown of the deductions, there is several deductions.

14   Child support, crime victim, mandatory savings account.  I

15   can't name all the deductions.

16   Q    Why don't you just take a look at Exhibit 22, Page

17   WA00011499 and see if that refreshes your recollection?

18            MS. CHIEN:  A-22?

19            MS. SCHEFFEY:  A-22.  Sorry.

20            THE WITNESS:  A-22.  What is the number?

21   BY MS. SCHEFFEY:

22   Q    00011499.

23            MS. CHIEN:  Your Honor, the witness didn't recognize

24   this document.

25            MS. SCHEFFEY:  She has stated she knows --

1      THE COURT:  What is the question to the witness?

2      MS. SCHEFFEY:  Asking if it refreshes her

3   recollection.  She stated she is aware of the mandatory

4   deductions taken out.  I am asking her if this document helps

5   her remember.

6      THE COURT:  She may answer that question.

7      THE WITNESS:  WA000149, did you say 6?

8      MS. SCHEFFEY:  499.  I just lost it.  My PDF is

9   freezing up.

10  BY MS. SCHEFFEY:

11  Q   WA00011528.  It is the top number.  Does this document

12  refresh your recollection about the types of mandatory

13  deductions?

14  A   I do see the deductions on here.

15  Q   Does it help you remember the different types?

16  A   Well, I have read this several times in the statute, so

17  yes.

18  Q   Is one of those deductions a department debt?

19  A   Yes.

20  Q   The department debt deduction allows the Department of

21  Corrections to take out funds for detainees' medical and

22  dental services, correct?

23  A   That's what shows on here, yes.

24  Q   Also what it says in the statute you said you read?

25  A   I don't recollect.

1    Q    Do you have any reason to believe that is not accurate?

2    A    No, I don't have any reason not to believe.

3    Q    Also allows the Department of Corrections to take out

4    money for hygiene supplies such as soap and shampoo, correct?

5    A    Yes, that's what it says on here.

6    Q    Those deductions are intended to offset the cost of

7    housing individuals to the taxpayers, right?

8            MS. CHIEN:  Objection.

9            THE COURT:  Objection is sustained.  Intended by

10   whom?

11   BY MS. SCHEFFEY:

12   Q    Does Correctional Industries have a purpose of offsetting

13   some of the cost of incarceration to taxpayers?

14   A    To reduce the burden to taxpayers.

15   Q    If Correctional Industries does not recoup those debts,

16   ultimately the cost falls on the taxpayer, right?

17   A    Can you --

18            MS. CHIEN:  Objection, foundation.

19            MS. SCHEFFEY:  I will rephrase.

20   BY MS. SCHEFFEY:

21   Q    If Correctional Industries doesn't meet its goal to reduce

22   the burden on the taxpayer, the cost of incarceration is

23   borne by taxpayers in Washington, correct?

24            MS. CHIEN:  Objection, foundation.

25            THE COURT:  Sustained.

 1              MS. SCHEFFEY:  She's the Director of Correctional

 2   Industries.  She said this is their stated goal.

 3              THE COURT:  I know what she is.

 4   BY MS. SCHEFFEY:

 5   Q   Will you turn to Exhibit 54 in your packet?

 6              MS. CHIEN:  A-54.

 7              MS. SCHEFFEY:  Exhibit A-54.

 8              THE WITNESS:  Okay.

 9   BY MS. SCHEFFEY:

10   Q   Do you know what this is?

11   A   Yes, annual report.

12   Q   What is it an annual report for?

13   A   Correctional industries.

14   Q   Are you the Director of Correctional Industries?

15   A   I am.

16   Q   Is this a report that Correctional Industries makes every

17   year?

18   A   It is, yes.

19              MS. SCHEFFEY:  Offer to admit Exhibit A-54.

20              MS. CHIEN:  No objection.

21              MR. BERGER:  No objection.

22              THE COURT:  It may be admitted.

23                      (Exhibit A-54 was admitted.)

24   BY MS. SCHEFFEY:

25   Q   If you could turn to Page WA00010152.  The second

1  paragraph right there, if we could blow it up, looks like

2  Correctional Industries ended with total sales -- I can

3  barely read it, $114 million, a little over $114 million at

4  the end of the year?

5  A  That's what it says, yes.

6  Q  Do you know what the annual sales were this year?

7  A  We are just finishing up the year so I don't know yet.

8  No.

9  Q  Were they significantly less than $115 million?

10  A  I am not sure yet.

11  Q  What about last year in 2020?

12  A  I believe they were less, but I did not refresh my memory

13  on that.

14  Q  Is it typically in the hundred million dollar range?

15  A  For sales?  Yes.

16  Q  Let's go to WA00010157.  Are you there?

17  A  I am, yes.

18  Q  At the bottom that indicates the total assets at the end

19  of the year, total assets of Correctional Industries is $55

20  million?

21  A  Yes.

22  Q  Is that somewhat similar to your total assets right now?

23  A  It should be close to that.  That's assets.  So that would

24  be -- includes inventories and furniture, equipment, what you

25  see on the page.

1    Q    Let's break that down.  Inventories, when you talk about

2    inventories and furniture, furniture built by the Class II

3    workers?

4    A    That could be part of the inventory.  Raw material on hand

5    would be part of inventories.  Items in process could be some

6    finished goods.

7    Q    Raw materials at hand, are you buying furniture for

8    inmates to put together?

9    A    We -- for raw materials we purchase steel, wood products.

10   There are some goods that are purchased.  I couldn't tell you

11   off the top of my head for incarcerated to assemble.

12   Q    All of that inventory would be put together by subminimum

13   wage work, correct?

14   A    It would be.  They would be paid the Class II gratuity

15   rate.

16   Q    That's less than the minimum wage, correct?

17   A    Correct.

18   Q    What is the highest rate that is right now?

19   A    In the facilities, it is $1.10.

20   Q    Can we go to WA00010163?

21   A    Will you say that number again?

22   Q    Yeah, I have to say it for myself, too.  00010163.

23   A    I want to go back.  I believe I misstated the amount.

24   They are paid up to $1.70.

25   Q    Thank you.  This document says there are 25 Class II

1   programs.   Earlier, you testified there is only 12?

2   A   No, I said there were only 12 facilities.

3   Q   Okay.   12 facilities, but some facilities have multiple

4   programs?

5   A   Yes.

6   Q   Across those 12 facilities, there is about 2,500 workers

7   that are incarcerated?

8   A   That are working in Correctional Industries, we average

9   about 2,000 workers.

10  Q   Those are incarcerated individuals, correct?

11  A   Correct.

12  Q   Overseeing them is about 430 staff?

13  A   There were, but we had a significant layoff this year.  We

14  have about 400 staff.

15  Q   Why did you have a layoff?

16  A   Our financials were -- our financials -- we are losing

17  money.

18  Q   Did you lay off the Washington workers or did you lay off

19  the incarcerated workers?

20  A   We did not lay off any incarcerated workers.  We laid off

21  staff.

22  Q   You kept all the incarcerated workers?

23  A   Yes.   The numbers have been different this last year due

24  to COVID.  Not by -- well, by choice of COVID.

25  Q   I think you testified that your assets remain about the

1    same as they were in 2017, correct?

2    A    I believe.  We are at the end of the year.  I haven't seen

3    the numbers yet come out.

4    Q    You still have about $55 million in assets?

5    A    Again, I would be making the assumption, as I have not

6    seen the financials for the end of the year yet this year.

7    Q    I'm sorry.  I see you looking a few different directions.

8    I want to make sure you are not receiving any communication.

9    A    No, sorry.  I am looking at this document.

10   Q    That's fine.  It is always unique during Zoom.  I

11   appreciate it.  While we are on this page, at the bottom, do

12   you see the average annualized cost of incarceration per

13   inmate?

14   A    I do.

15   Q    What is that amount?

16   A    $36,880.

17   Q    Is that still the same amount today?

18   A    I don't know.

19   Q    If you could turn to the very next page.  It is

20   WA00011528.

21   A    1528?

22   Q    Yeah.  In the middle, you'll see it says "McNeil Island

23   stewardship."  Do you see that?

24   A    Tell me again which page.

25   Q    WA00010164.  At the bottom, 1014.

1    A    Okay.

2    Q    64 at the top.  There is two Bates numbers.  I apologize.

3    A    McNeil Island stewardship.  I see that.

4    Q    McNeil Island is where the Special Commitment Center is;

5    is that correct?

6    A    That's correct.

7    Q    Those people are not criminally held, correct?

8    A    I don't -- I don't know anything about the Special

9    Commitment Center.

10   Q    Tell me about the people who work at McNeil Island, are

11   those offenders?

12   A    The McNeil Island stewardship are incarcerated

13   individuals.

14   Q    Where are they incarcerated?

15   A    Cedar Creek Corrections Officer.

16   Q    There is a Special Commitment Center on McNeil Island?

17   A    There is, yes.

18   Q    Why don't the people on McNeil Island get to do the job

19   that the people mentioned here are doing?

20        MR. BERGER:  Objection, foundation.

21        THE COURT:  The objection is sustained.

22   BY MS. SCHEFFEY:

23   Q    Why isn't the SCC or Special Commitment Center included in

24   Correctional Industries?

25   A    They are not part of DOC.

1    Q    Why are they not part of DOC?

2            MS. CHIEN:  Objection, foundation.

3    BY MS. SCHEFFEY:

4    Q    Sorry.  You can say you don't know.

5            THE COURT:  I think she can answer if she knows.

6            THE WITNESS:  I don't know.

7    BY MS. SCHEFFEY:

8    Q    Is every correctional facility in the state that holds

9    criminally held individuals eligible for participation in

10   Correctional Industries?

11   A    We do go through a screening process.  They all can apply

12   for Correctional Industries.

13   Q    Is there a facility or a prison or jail, whatever you want

14   to call it, that cannot -- all of the people in their

15   categorically cannot participate in Correctional Industries?

16   A    No.  Like I said, they can all apply.

17   Q    I think you testified earlier that SCC is not part of DOC,

18   that's why you don't know about it?

19   A    Special Commitment Center is not ran by DOC, no.

20   Q    The people there are not criminally held, correct?

21           MS. CHIEN:  Objection, foundation.

22           THE COURT:  The objection is sustained.

23   BY MS. SCHEFFEY:

24   Q    The people who come to McNeil Island where we have

25   established there is a Special Commitment Center, what do

1    they do?

2    A    So Class II workers, they work in our marine maintenance

3    department, they work on the operations team.  They work in

4    the diesel shop.

5    Q    What is at McNeil Island, other than the Special

6    Commitment Center?

7    A    CI's operations, which is where we are overseeing the

8    maintenance of the island, our diesel shop.  I think DOC does

9    have a training site out there.  Not real familiar with that.

10   There is not a lot out there.

11   Q    You said it is your operations.  Have you been out there?

12   A    I have.

13   Q    Do you work out there?

14   A    Daily?

15   Q    Do you work out there regularly?

16   A    No.

17   Q    Do you work out there periodically?

18   A    I go out -- I have probably been there three times -- I

19   have probably been there two times in the last year.

20   Q    Are there residents of Washington who are not incarcerated

21   or detained out there that live there?

22   A    Say that one more time.

23   Q    Are there residents of Washington who are not held in

24   state custody who live there?

25   A    I don't believe so.

Sytsma - Direct

1    Q    Can you look at Exhibit 55 for me.

2            MR. BERGER:  A-55.

3            MS. SCHEFFEY:  Yes, sorry, Adam.  At some point, I'll

4    get better.

5            THE WITNESS:  I see it.

6    BY MS. SCHEFFEY:

7    Q    Do you know what this is?

8    A    Correctional Industries fact sheet.

9    Q    That's created by Correctional Industries?

10   A    Yes.

11   Q    You are the Director of Correctional Industries?

12   A    I am.

13           MS. SCHEFFEY:  I offer to admit A-55.

14           MS. CHIEN:  No objection.

15           MR. BERGER:  No objection.

16           THE COURT:  A-55 may be admitted.

17                (Exhibit A-55 was admitted.)

18   BY MS. SCHEFFEY:

19   Q    On the second page of this document, you see a number

20   3,780,075?

21   A    Yes.

22   Q    What is that number?

23   A    Total number of hours that are incarcerated individuals

24   programmed within CI.

25   Q    Number of hours worked by Class II participants in the CI?

1    A    Correct.

2    Q    Is that number, barring COVID, usually about the same?

3    A    I would only have to speculate.

4    Q    You have worked at CI since 2019, correct?

5    A    Correct.

6    Q    In 2019, was the number about the same as this number?

7    A    Off the top of my head -- I would have to look.

8    Q    Does that number include Class III work?

9    A    No.

10   Q    About what percentage of people who are incarcerated are

11   in Class II work?

12   A    We will -- we have about -- well, we average 2,000 workers

13   a year, given the average daily population.  Last year,

14   probably the average daily population or two years ago was

15   around 17,000.  So 2,000 of those.

16   Q    2,000 out of 17,000 participate in Correctional Industries

17   Class II work, correct?

18   A    Correct.

19   Q    Are the remainder eligible for Class III work?

20   A    Again, I would speculate that they go through a process.

21   Class II is voluntary.  I don't believe Class III is

22   voluntary.  I would assume, yes.

23   Q    Do you know if your Class II workers also work in Class

24   III work?

25   A    No.  They may have at some point, but they wouldn't do it

1    at the same time.

2    Q    They don't do it simultaneously?

3    A    Correct.

4    Q    Class III work is done by some group other than those

5    2,000 people?

6    A    Correct.

7    Q    Fair to say this three million hours number doesn't

8    represent all the work done by inmates in DOC, correct?

9    A    Correct.

10   Q    We can take the exhibit down.  We talked about the

11   products that CI makes.  I want to talk about who CI sells

12   to.  Organizations in the State of Washington, certain ones

13   are required to purchase from CI if it is cheaper than other

14   places, correct?

15   A    State agencies are required to purchase from CI.

16   Q    Is one of those agencies the University of Washington?

17   A    The University of Washington is not -- I would have to

18   refresh my memory.  I don't believe they are mandated.

19   Higher education, I don't believe is mandated to purchase.

20   Q    What about the Attorney General's Office?

21   A    State agencies are mandated to purchase from CI, unless

22   they seek exemptions.

23   Q    Explain to me how that works.

24   A    How what works?

25   Q    How the mandated purchase works.  You have a list of built

1    in customers; is that right?

2    A    State agencies purchasing furniture.  Furniture is the

3    biggest industry.  They purchase from CI.  Submit purchase

4    orders and go through the process order process.

5    Q    You sell most of the furniture to state agencies around

6    the state; is that correct?

7    A    I would say a good amount.

8    Q    That furniture used by all the state agencies is made by

9    subminimum wage workers, correct?

10   A    Made by our incarcerate individuals.

11   Q    Because that's the law, you don't have to worry about

12   those customers going away?

13   A    They can seek out exemptions.

14   Q    They have to get a specific exemption before they cannot

15   purchase from you, correct?

16   A    Correct.

17   Q    How many organizations are you aware of that you know of

18   that got that exemption?

19   A    I don't know the number off the top of my head.  I have to

20   look.

21   Q    Do you know any off the top of your head?

22   A    I know there have been exemptions, but I couldn't tell you

23   which agency.

24   Q    Correctional Industries also partners with private

25   industries, correct?

1    A    They have -- did you say with private industries?

2    Q    Yes, private industries.  You provide workers to private

3    companies, correct?

4    A    Well, I believe you are referring to Class I industries.

5    Q    I am just asking generally if Correctional Industries --

6    if you agree that Correctional Industries provides workers to

7    private industry?

8    A    We currently do not.

9    Q    Why don't you look at Exhibit 44.

10         MR. BERGER:  A-44.

11   BY MS. SCHEFFEY:

12   Q    At the top it says "food services program."  Does this

13   describe a Class II program or Class III?

14   A    Food service falls under both.

15   Q    Can you take a look at this document and see if it

16   describes a Class II program?

17   A    Little of both, Class II and III.

18   Q    Are you familiar with documents like this?

19   A    I am.

20   Q    Do you have any reason to believe this document isn't a

21   Department of Corrections food services program for Class II

22   and III workers?

23   A    No.

24         THE COURT:  I offer Exhibit A-44 for admission.

25         MS. CHIEN:  No objection.

1          MR. BERGER:  No objection.

2          THE COURT:  A-44 may be admitted.

3          (Exhibit A-44 was admitted.)

4    BY MS. SCHEFFEY:

5    Q   If you can go to the second page of the document which is

6    WA0009925.

7    A   All right.

8    Q   Talks about food service operations that will be

9    supervised by full-time employees who are experienced in food

10   service management.  Does that describe Class II work in CI?

11   A   It would describe both Class II and Class III.

12   Q   I am trying to be cognizant of your distinction and not

13   ask you about Class III.  My questions are about Class II,

14   for the rest of this document.  About how many food service

15   staff do you have compared to incarcerated individuals who

16   are working in food service?

17   A   I would be guessing to tell you an exact number.

18   Q   What is the approximate ratio, 50/50, higher, lower?

19   A   I don't know.  I couldn't tell you.

20   Q   In here, it talks about offenders being given 20 minutes

21   of dining time for each meal.  Do you see that?

22   A   Yep.

23   Q   People who volunteer to work in the kitchen in CI, they

24   get a meal break in the middle of their shift; is that right?

25   A   They do.

1   Q   Do they eat the food they are preparing?

2   A   They do.

3   Q   Is that the same food that is provided to incarcerated

4   individuals across the state?

5   A   Same menu, yes.

6   Q   Can anyone else buy that food?

7   A   Some facilities I know do have staff -- staff kitchens.

8   There may be some variations.  I am not certain.

9   Q   Can government agencies buy that food?

10  A   Yes.  We have jails that we contract with for food.

11  Q   Explain to me how that works.  Is there a big kitchen and

12  you are shipping it out in an inmates' facility?

13  A   We have food service, food service programs, and

14  distribution, which is really different.  Food distribution

15  makes and packages meals.  Could be frozen meals which those

16  are what we sell to jails.

17  Q   Do you sell those to federal contractors?

18  A   I am not sure of all of our contracts.

19  Q   Are you allowed to sell those to government contractors?

20  A   To government agencies.

21  Q   What about entities that contract with the government?

22  A   Could you give me an example?

23  Q   Air Mark, if they are going to provide services to one of

24  your jail facilities, you could sell the meals to them,

25  correct?

Sytsma - Direct

1   A   I would have to check on that.

2   Q   Sitting here today, do you know of any reason why you

3   couldn't sell to a government contractor?

4   A   I can't answer that.  I would have to seek clarification

5   on that.

6   Q   I understand you would have to seek clarification.

7   Sitting here today, do you know any reason you could not sell

8   to a government contractor?

9   A   Well, I really -- if I had to answer that, I would say no

10  today until I could check on it.

11  Q   CI sells these meals to jails across the state to provide

12  meals to their detained individuals, correct?

13  A   Yeah, I know there are contracts, yes.

14  Q   CI earns revenue from those sales?

15  A   We earn income.

16  Q   Those meals are made with subminimum wage work, correct?

17  A   They are made, yes, with our incarcerated workers.

18  Q   If you will look at WA0009926 are the last four.  Do you

19  see the section that says "purchasing"?

20  A   Yes.

21  Q   Purchases will be made in compliance with RCW 43.19.  What

22  does that mean to you?

23  A   Well, it means the purchases need to be in compliance with

24  that RCW.

25  Q   Do you know what that RCW says?

1   A   I don't know that off the top of my head.  I would have to

2   pull the RCW.

3   Q   When CI makes purchases, do you have any restrictions on

4   who you can buy things from?

5   A   Well, we do a lot of things through -- I mean, we have to

6   go through the rules of Department of Enterprise Services.  I

7   know we have contracts, and then I don't know the specific

8   restrictions.  I would need to meet with our -- my AD in the

9   area.

10  Q   Do you know if that directs you to buy from other

11  government agencies or anything like that?

12  A   No, I am not aware.

13  Q   Could you pull up Exhibit A-047, A-47?  Do you recognize

14  this?

15  A   No, I don't recognize this.  I have seen this before, but

16  it is not something we use today.

17  Q   Do you know if it was used in the past?

18  A   Well, the only thing I can say is I see this document.  I

19  don't really.  I must assume.

20  Q   At the top it says "correctional industry quarterly detail

21  statement."

22  A   I see that.

23  Q   What is a quarterly detail statement created by CI?

24  A   We don't.  This isn't a document of CI.

25  Q   CI doesn't create quarterly detail statements?

1   A    Not similar to this.

2   Q    Do you know why the State would have produced it in this

3   format?

4           MS. CHIEN:  Objection.

5           THE WITNESS:  No, I don't.

6           MS. CHIEN:  Go ahead.  Sorry.

7           THE WITNESS:  This statement, as I look at it, is all

8   about inmates, inmate counts.  I don't know what that

9   document is.

10  BY MS. SCHEFFEY:

11  Q    Do you track how many people work as barbers as part of

12  Correctional Industries?

13  A    No.

14  Q    Do you track how many people work as clerks as part of

15  Correctional Industries?

16  A    For Class II clerks, each general manager within their

17  facility tracks their incarcerated workers.

18  Q    Do you track how many people work as custodians for

19  Correctional Industries?

20  A    We don't have custodians.

21          MS. SCHEFFEY:  Can I make a record this was provided

22  by the State as something that is from Correctional

23  Industries?  I am not sure what it is for.  I would like to

24  make that record.  The State produced this as a document from

25  Correctional Industries.

1    BY MS. SCHEFFEY:

2    Q    Do you have barbers in Correctional Industries?

3    A    No.

4    Q    Do you know if Class III has barbers?

5    A    I believe that is where the barbers fall is Class III.

6    Q    That would be -- if they are in Class III, that would be

7    subminimum wage work, correct?

8    A    That would be under the Class III gratuity scale, yes.

9    Q    Class III gratuity scale, to be clear, is less than

10   minimum wage, correct?

11   A    Correct.

12   Q    Significantly less than minimum wage, right?

13   A    Yes.

14   Q    I am assuming it is the same thing.  Why don't you look at

15   Exhibit 48.  Let me know if that is something you would do.

16           MR. BERGER:  A-48.

17           MS. SCHEFFEY:  A-48.  Yeah.  Sorry.

18           THE WITNESS:  I am not familiar with this Class III

19   report.

20   BY MS. SCHEFFEY:

21   Q    Are there pretrial detainees who are allowed to work in

22   Correctional Industries?

23   A    We don't have detainees.  Those working in CI are

24   incarcerated.

25   Q    In CI, do you know about individuals who are held on a

1    detainer?

2    A    No.

3    Q    Can you look at Exhibit 22 again.

4            THE COURT:  A-22?

5            MS. SCHEFFEY:  A-22, yes.  Sorry, Your Honor.

6    BY MS. SCHEFFEY:

7    Q    I will direct you to a page.  At the bottom, it says 48.

8    It is 11547.  Are you on that page?

9    A    I am.

10   Q    Does that refresh your recollection as to whether people

11   are held under a detainer?

12   A    In my role, I am not familiar with detainers.

13   Q    Are you familiar with the Department of Corrections

14   holding people for immigrations after their sentence is done?

15   A    No, I am not familiar with that.

16   Q    You testified earlier you have had 20 years plus

17   experience in Department of Corrections; is that right?

18   A    That is correct.

19   Q    Do you know anything about Yakima County Jail?

20   A    I am familiar with Yakima County Jail.

21   Q    Are you aware the State has an agreement with the federal

22   government to hold ICE detainees at Yakima County?

23           MS. CHIEN:  Objection, assuming facts not in

24   evidence.

25           THE COURT:  She may answer.

1          THE WITNESS:  No.

2     BY MS. SCHEFFEY:

3     Q   Does Yakima County have any of the work programs we have

4     discussed today?

5     A   No.  No CI work.  No Class II program.

6     Q   Does Yakima County Jail have Class III work programs?

7     A   I don't know.

8     Q   Didn't you testify earlier today that every jail or county

9     or local in the state of Washington offers a work program?

10          MR. BERGER:  Objection, misstates testimony.

11          THE COURT:  Sustained.

12    BY MS. SCHEFFEY:

13    Q   Are you aware of any jail in the state of Washington that

14    does not offer a work program?

15    A   I don't know about jails.

16    Q   What about prison?

17    A   Our 12 facility -- DOC facilities offer programs.

18    Q   You are not aware of any reason sitting here today why a

19    federal contractor couldn't buy meals from Correctional

20    Industries and use them in their own detention facility,

21    correct?

22          MR. BERGER:  Objection, asked and answered.

23          THE COURT:  Double negative in there somewhere.

24    Rephrase the question.

25

1    BY MS. SCHEFFEY:

2    Q    Are you familiar with the Correctional Industries statute?

3    A    With the Correctional Industries statute?

4    Q    Yeah.

5    A    I have read through it.

6    Q    Are you familiar with the WAC for the Correctional

7    Industries?

8    A    I have read through them.

9    Q    Do those regulations tell you who you can and cannot sell

10   to from Correctional Industries?

11   A    They do.

12   Q    If you were to look at that law, would it refresh your

13   recollection about who can buy from Correctional Industries?

14   A    Yeah.  As I mentioned, we sell to other state agencies,

15   non-profits, tribe.

16           MS. SCHEFFEY:  Can we get a copy of that in front of

17   her to refresh her recollection?

18           MS. CHIEN:  Tell me the statute.

19           MS. SCHEFFEY:  Chapter 137-80 of the WAC.

20           MS. CHIEN:  Are you talking about the regulation?

21           THE COURT:  That's not a statute.  That's a

22   regulation.

23           MS. SCHEFFEY:  She said she was familiar with the

24   WAC.  Is someone over there emailing it?

25           MS. CHIEN:  Can you tell us what section of the

1   regulation you are referring to?

2         MS. SCHEFFEY:  She said it would refresh her

3   recollection.  I was going to give her the whole section so

4   she can look at it.

5         MS. CHIEN:  137-80?

6         MS. SCHEFFEY:  There is the purpose.  You want me

7   direct her to --

8         MS. CHIEN:  It will take us a very long time to print

9   out the entire thing.  We are trying to get you to tell us

10  which chapter you are referring to.

11        MS. SCHEFFEY:  Section called sale of goods, that is

12  relevant.  137-80-40, sale of goods.

13        MS. CHIEN:  I will print it now.

14        MS. SCHEFFEY:  I will tell you the RCW, 72.01.090.

15        THE COURT:  Are we going to have a question for the

16  witness?

17        MS. SCHEFFEY:  Yes, Your Honor.

18  BY MS. SCHEFFEY:

19  Q   If the statute said you can sell to a private contractor

20  as long as they are serving a government, would that be

21  accurate?

22        MR. BERGER:  Object to form.  Assumes facts not in

23  evidence.

24        MS. SCHEFFEY:  That's why I am trying to refresh her

25  recollection, Your Honor.

1    THE COURT:  You are asking her if the law as you

2  paraphrased it is accurate.  The objection is sustained.

3    MS. SCHEFFEY:  Yes, Your Honor, that's why the

4  question pending before -- this is easy in open court when

5  you can hand someone the document.  The question before is

6  whether the law would refresh her recollection.  She said

7  yes.  That's what I am trying to get to her.

8    Marsha, I am emailing you something to print for the

9  witness.  I will use it for impeachment or to refresh her

10  recollection or pull up on her screen.

11    MS. CHIEN:  We just found it.  We are giving her

12  WAC -- the WAC 137-80-040.

13    THE COURT:  Someone should explain to the jury that

14  the Revised Code of Washington is commonly referred to as

15  RCW.  That is the law as passed by the state legislature with

16  the approval of the governor.  That is the law of the State

17  of Washington.  The Washington Administrative Code is made up

18  of administrative regulations adopted by various agencies in

19  order to implement the laws passed by the legislature.  If I

20  am in error, counsel, you can correct me now.

21    MS. SCHEFFEY:  Does the witness have in front of you

22  72-09  --

23    MS. CHIEN:  No, we are having a hard time keeping up.

24    MS. SCHEFFEY:  Please print that.

25    MR. BERGER:  Can you repeat the code section?

1    MS. SCHEFFEY:  72.09.100.  If the witness would let

2    me know when she has 72.09.100 or if she can find it in the

3    WAC.

4    BY MS. SCHEFFEY:

5    Q   If you have 72.09.100 in front of you, I can direct you to

6    the section --

7    A   I don't have it in front of me.

8         MS. CHIEN:  We are printing it now.

9         THE COURT:  We have run out of time.  It is almost

10   quitting time.  We don't have time to have her look at it and

11   then go to further questions.  We will break for the evening

12   and hopefully counsel can get your kit together on this for

13   the witness before tomorrow morning at 9:00 where -- when I

14   will ask the jurors to return.  Come back tomorrow morning at

15   9:00.  We have one more day in this week.  We are progressing

16   along.  I don't want to try and estimate how much longer

17   before the first phase of the case will be put to you.  It

18   still will be awhile.

19        Follow my instructions about recesses, please.  Don't

20   think about the case when you are not in court.  Keep your

21   minds open on all issues.  Come back tomorrow at 9:00 and we

22   will continue with Ms. Sytsma at that time.

23        Thank you very much, folks.  You may be excused.

24    (The following occurred outside the presence of the jury.)

25        THE COURT:  Counsel, I was perhaps naive in my

1    expectations.  I thought that you had -- part of your
2    obligation was to have the exhibits you were going to use on
3    cross-examination ready and available for the witnesses.  I
4    don't know.  Maybe, I guess I am wrong because that has not
5    been the case so far.  You are burning a lot of your time up
6    looking for exhibits.  I would hope you would think ahead and
7    plan ahead for examination a little more carefully.  I know
8    this is asking you to do stuff that I don't know how to do so
9    it may be -- it is beyond my knowledge.  It may be beyond
10   yours, too.  I don't know.  We moved awful slow today.
11        Okay.  See you in the morning.
12                    (The proceedings adjourned.)

1            C E R T I F I C A T E

2

3

4        I certify that the foregoing is a correct transcript from

5   the record of proceedings in the above-entitled matter.

6

7

8

9   /s/ Angela Nicolavo

10  ANGELA NICOLAVO
    COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25