1        UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT TACOMA

3   _____

4
    UGOCHUKWO GOODLUCK NWAUZOR,        )
5   et al.,                           )
                                      )
6             Plaintiffs,             ) 3:17-cv-05769-RJB
                                      ) 3:17-cv-05806-RJB
7   v.                                )
                                      ) Tacoma, Washington
8   THE GEO GROUP, INC.,              )
                                      ) June 11, 2021
9             Defendant.              )
    _____    ) Jury Trial
10                                    )
    STATE OF WASHINGTON,              ) 9:00 a.m.
11                                    )
              Plaintiff,              )
12                                    )
    v.                                )
13                                    )
    THE GEO GROUP, INC.,              )
14                                    )
              Defendant.              )
15                                    )
    _____

16          VERBATIM REPORT OF PROCEEDINGS
17       BEFORE THE HONORABLE ROBERT J. BRYAN
            UNITED STATES DISTRICT JUDGE
18  _____

19

20

21

22

23

24      Proceedings stenographically reported and transcribed
25              With computer-aided technology

```
 1                        APPEARANCES

 2

 3   For the Plaintiff        JAMAL N. WHITEHEAD
     Nwauzor, et al.:         ADAM J. BERGER
 4                            Schroeter Goldmark & Bender
                              810 Third Avenue
 5                            Suite 500
                              Seattle, Washington
 6

 7
     For the Plaintiff        ANDREA BRENNEKE
 8   State of Washington:     LANE POLOZOLA
                              MARSHA J. CHIEN
 9                            800 Fifth Avenue
                              Suite 2000
10                            Seattle, Washington

11

12   For the Defendant        LAWRENCE D. SILVERMAN
     The GEO Group:           ADRIENNE SCHEFFEY
13                            Akerman LLP
                              1900 Sixteenth Street
14                            Suite 1700
                              Denver, Colorado
15
                              JOAN K. MELL
16                            III Branches Law PLLC
                              1019 Regents Boulevard
17                            Suite 204
                              Fircrest, Washington
18

19

20

21

22

23

24

25
```

```
 1                          EXAMINATION INDEX

 2    EXAMINATION OF:                                      PAGE

 3    SARAH SYTSMA          DIRECT EXAMINATION (Resumed)
                            BY MS. SCHEFFEY                   6
 4                          CROSS-EXAMINATION
                            BY MS. CHIEN                     12
 5                          CROSS-EXAMINATION
                            BY MR. BERGER                    26
 6                          REDIRECT EXAMINATION
                            BY MS. SCHEFFEY                  28
 7                          RECROSS-EXAMINATION
                            BY MR. BERGER                    36
 8
      BYRON EAGLE           DIRECT EXAMINATION
 9                          BY MS. MELL                      37
                            CROSS-EXAMINATION
10                          BY MS. BRENNEKE                  94
                            REDIRECT EXAMINATION
11                          BY MS. MELL                     103

12    CHRISTINA WELLS       DIRECT EXAMINATION
                            BY MS. SCHEFFEY                 107
13                          CROSS-EXAMINATION
                            BY MS. BRENNEKE                 123
14                          REDIRECT EXAMINATION
                            BY MS. SCHEFFEY                 130
15
      JOSHUA GRICE          DIRECT EXAMINATION
16                          BY MS. MELL                     136
                            CROSS-EXAMINATION
17                          BY MR. POLOZOLA                 158

18    DANIEL RAGSDALE       DIRECT EXAMINATION
                            BY MS. SCHEFFEY                 160
19

20

21
                              EXHIBIT INDEX
22

23    EXHIBITS ADMITTED                                    PAGE

24     A-14                                                  63
       A-308                                                141
25
```

```
 1                              MORNING SESSION

 2                              JUNE 11, 2021

 3      (The following occurred outside the presence of the jury.)

 4           THE COURT:  All right.  Now we have lost Ms. Mell.

 5  There she is.  Okay.  Counsel, yesterday the defense made a

 6  motion for judgment as a matter of law and filed a lengthy

 7  brief.  I indicated I would make a definitive ruling on that

 8  after reading the submission.  This motion, you know, I have

 9  heard hundreds of motions to dismiss.  Hundreds and hundreds.

10  I have granted more than a few.  I have granted a number of

11  such motions over the years.

12      The defense here makes a basic error that defense lawyers

13  make often.  I don't understand exactly why they make that

14  mistake, but this motion is somewhat typical in that the

15  defense does not look at the law and the evidence from the

16  position of the plaintiffs to test the evidence.  It is not

17  my job to decide fact issues.  It is only my job to see if

18  fact issues are there and are sufficient to carry the case

19  forward.

20      Now, I read this brief.  I have heard virtually all of the

21  arguments in the brief before, and I have ruled on most of

22  them.  They are mostly the defendant's view of the case

23  without recognizing plaintiffs' evidence or having the -- not

24  recognizing the plaintiffs' evidence as having the credence

25  that the jury could fairly assign to it.
```

1          None of the defendants cited legal authorities dealing

2     with Washington's Minimum Wage Act, let alone the Minimum

3     Wage Act as applied to this particular contract.

4          All of those authorities are the reason that I said

5     yesterday that plaintiffs' position in this case is

6     counterintuitive.  Similar issues, not identical, but similar

7     have been raised throughout the country and generally have

8     resulted in rulings against the position of those somewhat

9     similar to plaintiffs'.

10         It would be a gross injustice and error to decide the case

11    based on intuition.  The facts and the law will dictate the

12    result, even if that result is counterintuitive or could lead

13    to a minority of one in a sea of similar but not identical

14    cases.

15         As I read the defendant's brief at 7:15 last night, I

16    started to note comments in the margin of the brief of

17    evidence contrary to the defendant's position.  There were

18    too many notes, and I stopped doing that.  It is not my job

19    at this point to articulate evidence supporting plaintiffs'

20    position, and so I stopped making notes because I didn't want

21    to do that.

22         Let me just say this:  In its simplest form, viewed from

23    plaintiffs' position, the evidence sufficiently shows that

24    GEO agreed to abide by state law.  State law includes the

25    Minimum Wage Act.  Employees are to be paid minimum wage

1  under the Minimum Wage Act.  Arguably, detainees

2  participating in the voluntary work program are employees

3  under the state Minimum Wage Act definition.

4      That's the case in a nutshell from the plaintiffs'

5  standpoint.  There is evidence, if the jury chooses to

6  believe it, to support those positions.  None of the

7  defendant's affirmative defenses have been proven as a matter

8  of fact and law at this point, and fact issues remain on all

9  of the plaintiffs' allegations in the case and all of the

10 defendant's affirmative defenses.

11     The motion for judgment as a matter of law is denied.

12 Issues relating to class representation are reserved until

13 briefing is completed on that issue.

14     All right.  You can bring the jury in, and we will

15 continue with Ms. Sytsma's testimony.

16         MS. SCHEFFEY:  Ms. Sytsma, while we get oriented, can

17 you confirm you have documents in front of you printed?

18         THE WITNESS:  I do.

19         THE CLERK:  Looks like all the jurors are present.

20     (The following occurred in the presence of the jury.)

21         MS. SCHEFFEY:  May I proceed?

22         THE COURT:  Please, do, Ms. Scheffey.

23                 DIRECT EXAMINATION (Resumed)

24 BY MS. SCHEFFEY:

25 Q   You testified detainees in the DOC system work in food

1   services for no more than $1.70 an hour; is that right?

2   A   We have incarcerated workers who work in food service and

3   that is correct, the $1.70 is the level 4.

4   Q   $1.70 an hour is not the amount a detained person

5   ultimately receives, correct, there is mandatory deductions?

6   A   We don't use "detainee," we use "incarcerated."  There are

7   mandatory deductions, correct.

8   Q   I understand you use incarcerated.  I think yesterday we

9   went over the fact that an incarcerated person just means

10  someone who is held under the authority of state law and is

11  not free to leave the place they are held; is that right?

12  A   They are held in the Department of Corrections.

13  Q   So there are mandatory deductions before the amount of pay

14  hits the inmate's account, correct?

15  A   Yes.

16  Q   Those food products that incarcerated persons are making,

17  they are sold to other detention centers and prisons and they

18  can serve those meals to their detainees or inmates, right?

19  A   The food products are within our DOC facilities, and we do

20  sell to county jails.

21  Q   Can Correctional Industries sell to private contractors?

22  A   If the finished good is used within agencies or non-profit

23  organizations.

24  Q   Do those agencies include the federal government?

25  A   Yeah -- so a public agency, so I would have to assume.

1   Q   Okay.  So a private contractor who is serving a public

2   agency could purchase food made at subminimum wages and use

3   that for its detained population, correct?

4   A   I could give an example.  The only example I have of us

5   selling to a private would be Shepherd's Grain.  We had a

6   wheat farm and sold to Shepherd's Grain.  In return, we

7   purchased the wheat back and used it in our food services

8   area and also I believe it was also utilized at the UW.

9   Q   The food made by incarcerated individuals was used at

10  University of Washington; is that correct?

11  A   No, the wheat that was sold to Shepherd's Grain.

12  Q   Okay.  The wheat that was picked by incarcerated

13  individuals, is that what they were doing?

14  A   No, CI had a field crops program.  We -- the wheat was

15  harvested.  We had to contract to have the wheat harvested,

16  and it was then purchased.  Our crew would help with watering

17  and maintaining the crop.

18  Q   So the incarcerated individuals helped work on a farm

19  essentially maintaining the crops?

20  A   Yes.

21  Q   While working on the farm, they were making subminimum

22  wages?

23  A   They were within our gratuity scale, correct.

24  Q   Those goods and services sold by that farm, which is

25  wheat, I assume, those were then sold to University of

Sytsma - Direct

1    Washington?

2    A    Shepherd's Grain.  We contracted with Shepherd's Grain

3    and, again, we had purchased the wheat to use within our own

4    food factory, and then I believe the UW had purchased wheat

5    as well.

6    Q    Did UW purchase directly from Correctional Industries or

7    did it purchase from Shepard's Grain?

8    A    From Shepherd's Grain.

9    Q    Is Shepherd's Grain a for-profit company?

10   A    Shepherd's Grain was a private organization, so I believe

11   so.

12   Q    So Shepherd's Grain was able to have its farm maintained

13   by incarcerated individuals, even though it was a for-profit

14   company?

15   A    That wasn't their farm.  We sold the wheat to them.

16   Q    The private company was able to buy wheat that was, I

17   guess, developed in part with subminimum wages and then sell

18   it to other customers, correct?

19   A    Yeah, Correctional Industries had the wheat crop.

20   Q    Shepherd's Grain sold it to other entities after it got it

21   from Correctional Industries, correct?

22   A    Yeah.  I know for a fact we had purchased wheat from

23   Shepherd's Grain.  I could assume that others had purchased

24   it as well.

25   Q    When you say "we purchased," are you saying the

1    incarcerated individuals helped maintain the crops for

2    Shepherd's Grain, then Shepherd's Grain resells you those

3    same crops after they help you -- after the incarcerated

4    individuals help grow them?

5            MR. BERGER:  Objection, misstates testimony.

6            THE COURT:  Rephrase the question, please.

7    BY MS. SCHEFFEY:

8    Q    Are you saying that CI both helped supply labor for the

9    grain and also ended up purchasing the end product of the

10   grain?

11   A    Right.  CI did not mill the wheat.  We purchased back the

12   final product to use the wheat in our food factory.

13   Q    Okay.  When you purchased the final product, did you pay

14   market rates for it?

15   A    I couldn't tell you exactly how much we paid.

16   Q    Was there a steep discount because the Shepherd's Grain

17   was using Correctional Industries labor?

18   A    I don't know how much we paid.  I would have to look.

19   Q    So that's a private company that was able to purchase from

20   Correctional Industries, right?

21   A    Correct.

22   Q    So a private company, as long as they are interfacing with

23   a public agency ultimately, can purchase from Correctional

24   Industries?

25           MR. BERGER:  Objection, misstates testimony.

1    THE COURT:  I think she may answer.

2    THE WITNESS:  Can you reask the question?

3  BY MS. SCHEFFEY:

4  Q    Yeah.  A private company, as long as they are interfacing

5  with a public agency, can purchase from Correctional

6  Industries, right?

7  A    Yeah, they could purchase -- they could purchase goods,

8  private organizations, from CI when the finished good is used

9  in an agency or a non-profit.

10  Q    So a private company that provides detention services

11  could buy from CI as long as it was ultimately working for a

12  government agency, right, detaining people for a government

13  agency?

14  A    You know, as the statute states, you know, private

15  organizations can purchase from CI with the ultimate good

16  being used within an agency.  I would have to look into that

17  more.

18  Q    It sounds like that is different than Shepherd's Grain.

19  Why is that different than Shepherd's Grain?

20  A    I would have to look into that.

21  Q    Does the statute draw distinctions between which types of

22  private contractors can buy grain or can buy products from

23  CI?

24  A    It just says "private contractor."  So if it's a private

25  contractor and the end good is ultimately being used in an

1    agency, it would appear that would be correct.

2    Q    Do you know of any reason that wouldn't be correct?

3    A    No.

4          MS. SCHEFFEY:  No further questions.

5                        CROSS-EXAMINATION

6    BY MS. CHIEN:

7    Q    Good morning.  You are the director of Correctional

8    Industries; is that right?

9    A    I am.

10   Q    I would like to show you Exhibit A-54, which I believe --

11   I would ask you to -- actually, you can look it up on the

12   screen.  It's already been admitted.  So you can look at your

13   screen.  I understand this to be Correctional Industries'

14   annual report; is that right?

15   A    That's correct.

16   Q    I understand the theme of this annual report is a future

17   filled with hope; is that right?

18   A    Correct.

19   Q    Considering that, can we take a step back and can you tell

20   me what Correctional Industries does?

21   A    Yeah, Correctional Industries is a training program.  We

22   train our incarcerated with job skills and we promote

23   positive work ethic.  Meaning, we provide training programs,

24   not only in technical skills but soft skills training as

25   well.

Sytsma - Cross

1  Q    Is Correctional Industries a private company?

2  A    No.

3  Q    Is it part of DOC?

4  A    Yeah, it is -- Correctional Industries is within the

5  reentry division in the Department of Corrections.

6  Q    Its focus, I think you said, was to do work training

7  programs for inmates released in the community; is that

8  right?

9  A    Yes.

10 Q    I would like to turn to -- I would like to turn to Exhibit

11 A-55.  I will pull it up on the screen because it was

12 previously admitted.  Reviewing this exhibit, can you tell me

13 how successful Correctional Industries is in easing

14 community's (sic) reentry into the community?

15 A    Sure.  So Correctional Industries, we can see by the

16 exhibit, we have four times the number who are employed three

17 years after release, so they are maintaining -- when we look

18 at it in three years, they are maintaining their employment

19 status compared to those who were incarcerated who didn't

20 come through the CI program.  About 57.14 percent of

21 individuals with CI are vocational education experience, that

22 is a post-release number.  This is back from 2017, I believe.

23 Today our number is higher of those who have gone through CI

24 who are currently employed post release.

25 Q    Sorry --

1        MS. SCHEFFEY:  I object.  The second half of that is

2  outside the scope.  She testified yesterday that she's not

3  sure of the current numbers that would be reflected in the

4  2021 report.

5        THE COURT:  Objection is overruled.

6  BY MS. CHIEN:

7  Q    Just so -- for people to be clear, the number of 57.14

8  percent in 2017 indicates the percentage of individuals who

9  get jobs after CI -- after they have been released into the

10 community because of their participation in CI; is that

11 right?

12 A    Correct.

13 Q    Turning to the second page of Exhibit A-55.  Can you tell

14 me about how CI's programs also reduce recidivism?

15 A    Right, so when the incarcerated go through our program, go

16 successfully through the programs, recidivism has shown to go

17 down.

18 Q    Does that result in cost savings to the public?

19 A    Absolutely.  You can see that $12.80 is the amount saved.

20 When the recidivism goes down, which it does with the

21 incarcerated going through the program, they are not coming

22 back to prison so it cuts down on arrests and convictions,

23 just as that number states.

24 Q    That number states, "For every dollar invested in CI, the

25 public saves $12.80."

1    A    Correct.

2    Q    We talked about what CI does in general, and the success

3    measures.  I would like to talk about you a little bit.  You

4    are the director of CI; is that right?

5    A    Correct.

6    Q    When did you start working for CI?

7    A    February of 2019.

8    Q    What did you do prior to working for CI?

9    A    Prior to that, I worked in corrections education.  I began

10    in corrections education in 2001.  Corrections education, my

11    whole time was in DOC facilities.  DOC contracts with

12    community colleges to provide the education in the

13    facilities.  I worked in DOC facilities for the community

14    colleges.

15    Q    What were your job responsibilities doing correctional

16    education as part of the community colleges?

17    A    I started out in 2001 as a secretary.  Then I worked my

18    way up.  I became an instructor and taught classes at both

19    the male and female facilities.  I then was promoted to the

20    director of education and then later to dean of prison

21    education for two different community colleges.

22    Q    Can you give me a sense of what you mean by "education"?

23    What classes were you teaching?

24    A    Sure.  The ones that I taught, a business technology

25    course, but within corrections we teach many vocational

```
 1    certified programs and also degree programs, AA degree
 2    programs.  The vocational programs, like I say, the one I
 3    taught was business.  The ones I oversaw, we had a
 4    horticulture program, we had welding, construction trades,
 5    technical design program.  We also taught basic AB GED
 6    courses as well.  The vocational, that was just to name a
 7    few.
 8    Q    Did you ever work as a warden?
 9    A    No.
10    Q    Were you ever a corrections officer?
11    A    No.
12    Q    Detention officer?
13    A    No.
14    Q    I would like to talk about who participates in the
15    Correctional Industries work programs.  Have all the
16    participants employed by Correctional Industries been
17    convicted of a crime?
18    A    Yes.
19    Q    Are any of the inmates civilly committed?
20    A    No.
21    Q    Are any of the inmates awaiting trial?
22    A    No.
23    Q    Is that why you refer to them as "incarcerated
24    individuals"?
25    A    They are incarcerated within DOC facilities.
```

Sytsma - Cross

1    Q    Does DOC manage jails?

2    A    No.

3    Q    The Correctional Industries doesn't operate in any jails;

4    is that right?

5    A    No.

6    Q    Not in Yakima County jail?

7    A    No.

8    Q    GEO's counsel yesterday asked you a couple questions about

9    those incarcerated who are serving life without parole; is

10   that right?

11   A    Yes.

12   Q    What percentage of inmates participating in Correctional

13   Industries programs will eventually be released into the

14   community?

15   A    Over 90 percent.

16   Q    Now, I would like to dig a little deeper into these work

17   programs we have been discussing.  What work programs does

18   Correctional Industries manage?

19   A    We manage the Class I and Class II.

20   Q    I understand Class I.  There is none operating; is that

21   right?

22   A    That's correct.

23   Q    So what are the work programs under Class II?

24   A    We have several programs.  We have textile operations,

25   which they do several things that could include mattresses,

1    clothes, embroidery, screen printing.  We also have our

2    optical.  We have food and laundry.  There is more.  I know I

3    am missing a lot.  We have the commissary.  We have our

4    transportation and CDC.  So that is warehousing, so they

5    learn warehousing skills.  We have our braille, our CAD

6    programming.

7    Q    What does CAD mean?

8    A    Computer-aided drafting.  Students learn the

9    computer-aided drafting skills software and do -- they will

10   build furniture settings, for example, and furniture that

11   would fit into that spacing.

12   Q    I would like to turn back to Exhibit A-54.  I am going to

13   ask you to turn to Page 24, which is Bates stamp 10171.  I

14   understand this is again from your annual report?

15   A    Yes, it is.

16   Q    Is this a photo of a Correctional Industries textiles

17   program?

18   A    Yes, that's at the Washington Corrections Center for

19   Women.

20   Q    The product that gets made out of these textiles, it gets

21   sold to government agencies or non-profits; is that right?

22   A    Correct.

23   Q    Are they sold at private market wages -- or private market

24   prices?

25   A    Yeah.  They are sold at competitive prices.

1  Q   You mentioned Correctional Industries as part of

2  the reentry division.  Can you tell me what the mission of

3  the program is?

4  A   Correctional Industries is committed to expanding and

5  maintaining work programs and promoting positive work ethics,

6  and so it is really about providing those successful reentry

7  skills so that when our incarcerated are released that they

8  can obtain living wage employment and not come back.

9  Q   Do the incarcerated have to meet any minimum requirements

10 to participate in the Correctional Industries program, work

11 programs?

12 A   Yeah, they have to have a high school diploma or a GED.

13 If they don't have that, they must be working on it.  There

14 are other -- there are some qualifications for some of the

15 programs.  I could give --

16 Q   Maybe give me an example?

17 A   So we do have an upholstery program.  We like to work with

18 our education partners.  I could use this for the CAD program

19 as well.  They need to have a foundation and some experience,

20 so we work with our college partners, those incarcerated

21 workers would be students in the education programs.  From

22 that experience, we move them into our programs.

23 Q   Can you describe your programs, the classes and training

24 components of the Correctional Industries work programs?

25 A   Sure.  So we have both technical skills, which are the

1  programs I just mentioned.  Then we have soft skills training

2  programs as well.  We have a Making It Work class.  So they

3  go over resume building, interview, interviewing skills,

4  financial literacy.  Then we also do mock interview fairs to

5  help them be, again, employment ready and be comfortable with

6  interviewing.  So we invite members from the community in to

7  sit on these interview panels, and our students will actually

8  dress for success on that day and go through these -- go

9  through interviews.  We also have our workforce development

10  team.  Navigators on the inside that work with individuals

11  helping them with release plans.  And then getting close to

12  release, we will transition them to our community employment

13  specialist who will work with them post release.  Again, to

14  help with their release plan and to help transition them into

15  employment.

16  Q  So community employment specialists help them even after

17  the incarcerated individual is released getting employment;

18  is that right?

19  A  Absolutely.  Our community employment specialists work

20  daily with employers, just educating them.  Several employers

21  have hesitations about hiring people with convictions.  It is

22  just an education process.  She's always seeking out new

23  employers and also working with other community organizations

24  on transitional resources.  We also annually hold an employer

25  forum which, again, we invite employers to join us on this

1    day.  We have panels set up of previously incarcerated to

2    tell their story, and also at the last forum we held we did

3    bring in currently incarcerated individuals to talk about

4    what they do in CI and the skills they have gained.

5    Q   I would like you to refer back to A-54, which is the

6    annual report, and turn to Page 14, which is Bates stamp

7    10161 -- sorry 001 -- yeah, right.  You were talking about

8    the community employment services and workforce development.

9    I would like to ask you a question after you have had a

10   chance to review this page.  I would like to ask, how

11   successful is CI's community employment specialist at helping

12   get inmates released a job?

13           MS. SCHEFFEY:  Objection, beyond the scope.

14           THE COURT:  Overruled.

15           THE WITNESS:  You can see from this chart, I mean,

16   community employment specialist employment rate is 86

17   percent.  So this -- of the individuals who release and go,

18   you know, work with our employment specialist, again, it is a

19   voluntary program, 86 percent of them are employed.  The

20   average amount of time it takes in this report is showing 18

21   days.  Again, we are proud of our success, so the average

22   wage was $16 per hour.  The highest wage was $48 per hour.

23   BY MS. CHIEN:

24   Q   Thank you.  So earlier you testified that CI, in addition

25   to upholstery and optical and other programs such as that,

1   also operates laundry facilities and food service programs;

2   is that right?

3   A    Correct.

4   Q    Do those working in CI laundry facilities receive the job

5   training supports we just discussed?

6   A    Absolutely.

7   Q    Do those working -- inmates working in Correctional

8   Industries food services receive the job training supports we

9   just discussed?

10  A    Yes.

11  Q    When the incarcerated individuals work in these laundry

12  and food services positions, who are they supervised by?

13  A    CI staff, which are Correctional Industries supervisor

14  assistants.

15  Q    Are those CI staff correctional officers?

16  A    No.

17  Q    What are they?

18  A    They are employees of CI.  They are Correctional

19  Industries supervisors.  So they are employees of

20  Correctional Industries.  They supervise the incarcerated, as

21  well as coach and mentor.

22  Q    Are they considered job mentors?

23  A    Yes.

24  Q    Do in -- does Correctional Industries -- or incarcerated

25  individuals who work in CI's food service program receive any

1  certification?

2  A    Yeah.    Incarcerated, if they work 1500 hours within the

3  occupational classification, they receive a certificate of

4  proficiency.   And then if they work laundry, they receive the

5  Linens Association certification that is nationally

6  recognized.   In food service, they also receive a serve safe

7  certification which is also recognized in the restaurant

8  industry.

9  Q    Serve safe certification, is that similar to a food

10  handler's card?

11  A    Similar.   We like to refer to it as food handlers on

12  steroids.   It is higher training.

13  Q    When they get -- when the incarcerated individuals get

14  these certifications, what can they use them for?

15  A    Are we specifically talking laundry and food?

16  Q    Yes.

17  A    Laundry -- well, both laundry and food would be the

18  hospitality arena, hotels, I can think for food and for

19  laundry.   Laundry, they could also work in dry cleaners.

20  Again, their certification is recognized.   Food would be

21  hospitality, and then any food service arena.   We also -- a

22  lot of folks within our food service area will go on to

23  higher training post release to one of our community

24  partners, which is Fair Start.   They just go into another

25  higher level training.

Sytsma - Cross

1  Q   Moving away from laundry and food services and getting

2  back to some of the products Correctional Industries makes

3  and sells, who does Correctional Industries typically sell

4  their products to?

5  A   Our biggest customer would be state agencies.

6  Q   Does CI ever sell products or services to a private

7  company?

8  A   I could use the example of Shepherd's Grain.  So, yes, we

9  did sell to Shepherd's Grain and the end product was used in

10 an agency.

11 Q   Is Shepherd's Grain the only example you can think of

12 selling to a private company?

13 A   That's the only one I know of.

14 Q   Are you aware of any time CI sold to a federal contractor?

15 A   No.

16 Q   Take one more step back.  Is the purpose of Correctional

17 Industries to turn a profit?

18         MS. SCHEFFEY:  Objection, leading.

19         THE WITNESS:  No.

20         THE COURT:  The objection is overruled.

21 BY MS. CHIEN:

22 Q   Your answer, sorry?

23 A   No.

24 Q   I would like to turn again to A-54, which is the annual

25 report.  I would like to turn to a page that GEO counsel has

1    directed you to.  Page 5, Bates stamp 10152.  I would like to

2    do a callout of the second paragraph, if we could.  Looks

3    like -- have you gotten there?

4    A    Yes.

5    Q    GEO counsel asked you about your total sales, Correctional

6    Industries total sales; is that right?

7    A    Yes.

8    Q    I would like you to take a look at the next sentence.  I

9    am going to ask you, where does the net income from CI sales

10   go to?

11   A    If we have a net income, it goes back into our program.

12   We are a self-sustaining program.  Goes back into our

13   program.  Our goal is to expand what we are doing to allow

14   for additional training opportunities to keep our equipment

15   up to standardized industry standards and to update the

16   infrastructure.

17   Q    Can you give me an example of some programs that you would

18   like to expand?

19           MS. SCHEFFEY:  Objection, outside the scope.

20           THE COURT:  Overruled.

21           THE WITNESS:  We are always looking -- well, for one

22   program to expand, really the foundation of what we do is our

23   workforce development.  So to have the income to expand that,

24   to have the opportunity to expand the soft skills training

25   programs.  It's also to expand our technical programs as

1  well.  We are always looking for new opportunities.  We are

2  looking for opportunities to work with our college partners

3  to expand programs to align with the vocational programs they

4  are teaching so that we can have that handoff, so they can

5  get the education, training, get the on-the-job training

6  within our program.  It just makes them -- gives them more

7  skills and helps them be more successful and prepare for

8  reentry.

9  BY MS. CHIEN:

10 Q   Does any net income that Correctional Industries generates

11 get distributed as profits to shareholders?

12 A   No.

13 Q   Does Correctional Industries have shareholders?

14 A   No.

15 Q   Does any net income that Correctional Industries generates

16 get distributed as dividends on Wall Street?

17 A   No.

18        MS. CHIEN:  No further questions.

19        MR. BERGER:  I have a few questions.

20        THE COURT:  Go ahead, counsel.

21                    CROSS-EXAMINATION

22 BY MR. BERGER:

23 Q   Good morning, Ms. Sytsma.  My name is Adam Berger.  I

24 represent the detainee plaintiffs in this case.  I just want

25 to clarify a few things with respect to Shepherd's Grain.

Sytsma - Cross

1   Correctional Industries' workers do not work for Shepherd's

2   Grain; is that correct?

3   A   That's correct.

4   Q   Correctional Industries contracted with Shepherd's Grain

5   for -- is it for harvesting and milling the grain?

6   A   Not for harvesting.  They mill the grain.

7   Q   Okay.  Correctional Industries contracted with Shepherd's

8   Grain to mill the grain?

9   A   Correct.

10  Q   Who milled the grain for Shepherd's Grain?  Who did that

11  work?

12  A   I don't know.  I would assume their employees.

13  Q   Do you know if Shepherd's Grain paid its employees minimum

14  wage when they were milling that grain?

15  A   I would imagine.

16  Q   As far as you know, Shepherd's Grain was not exempted from

17  paying its workers, its employees, the minimum wage simply

18  because it was contracting with Correctional Industries?

19          MS. SCHEFFEY:  Objection, calls for speculation and a

20  legal conclusion.

21          THE COURT:  She may answer if she knows.

22          THE WITNESS:  Can you restate the question?

23  BY MR. BERGER:

24  Q   Shepherd's Grain was not exempted from paying its

25  employees minimum wage simply because it was contracting with

1    Correctional Industries?

2    A    Correct.

3    Q    The same would be true of any private company that bought

4    goods from Correctional Industries for resale to a public

5    agency or non-profit?

6    A    Correct.

7            MR. BERGER:  Thank you.  That is all I have to ask.

8            MS. SCHEFFEY:  Few questions on redirect.

9                     REDIRECT EXAMINATION

10   BY MS. SCHEFFEY:

11   Q    You just testified earlier that it takes 1500 hours to get

12   a certificate of proficiency, correct?

13   A    Correct.

14   Q    Could an inmate do that if they were incarcerated for only

15   70 days?

16   A    I would have to go back and do the math.  Most of them

17   work five days a week, 40 hours a day -- excuse me, 40 hours

18   a week.

19   Q    Do you have to deal with a population and give them

20   certificates where the population changes every 70 days?

21   A    I don't know what you are asking.

22   Q    Yeah.  Is one of your constraints in operating

23   Correctional Industries that your population changes every 70

24   days?

25   A    No.

1   Q   Do you know if any of the certificates that you offer

2   could be completed in 70 days?

3   A   I would have to see if they could be in there for that.

4   When we are placing our incarcerated into our programs, you

5   know, we want to be fair to them and not set them up to where

6   they can't complete it.  There are times they can't.  Our

7   goal is to allow them the opportunity to receive that.

8   Q   You testified a little bit ago, you are not responsible to

9   shareholders, correct?

10  A   Correct.

11  Q   You are responsible to the taxpayers, right?

12  A   Yes.

13  Q   Your responsibility is to keep the cost low to the

14  taxpayers; is that correct?

15  A   We have to be -- we have to be competitive.

16  Q   When you say "we have to be competitive," what do you

17  mean?

18  A   I will use our furniture industry as an example.  We can't

19  undercut other people in that market, other businesses in

20  that market.  We have to stay competitive with them.

21  Q   Right.  I understand you have to be competitive with other

22  businesses.  What about the cost, do you have to be

23  responsible for the amount of cost you incur to the taxpayer?

24  A   Can you give me an example of what you are asking?

25  Q   Why doesn't Correctional Industries just give jobs to all

1  17,000 inmates in the Washington Department of Corrections?

2  A   We don't have 17,000 jobs.  You know, we have so many jobs

3  and there is the application process.  They can all apply.

4  Q   You testified that you would like to expand, right?

5  A   Of course.

6  Q   So why don't you have 17,000 jobs?

7  A   Well, first, we don't have the financial funds.  I would

8  love to expand.  We haven't been able to expand in the two

9  years I have been there.  I think I mentioned we had to lay

10 off folks.  We would really love to be able to have funds to

11 be able to expand programs and help the incarcerated

12 transition out successfully.

13 Q   Right.  Are you saying that you are limited in your

14 funding for the program?

15 A   We are self-funded.  We don't receive funds from the

16 general fund for our program.

17 Q   So if your labor costs went up, would that change how many

18 positions you could offer?

19 A   It could.

20 Q   Why could it?

21 A   If labor costs went up, our cost would go up.

22 Q   If you paid all of the Correctional Industries'

23 incarcerated individuals minimum wage, that would change how

24 many jobs would be available, right?

25 A   Correct.

1   Q   How would that change the number of jobs available?

2   A   Well, it would lower it.  We would have to work at -- we

3   are always trying to recover costs.  All the labor is

4   factored into that.  It could mean raising prices.  We would

5   have to be able to fund it.

6   Q   So if you lowered the number of jobs, you would also lower

7   the number of opportunities for people to get out of their

8   incarcerated environment and stay productive?

9   A   We would lower the opportunity to work with the number of

10  incarcerated.

11  Q   Mr. Berger asked you about Shepherd's Grain a few moments

12  ago.  Do you remember that?

13  A   I do.

14  Q   One of the services Correctional Industries offers is

15  custodial or janitorial, cleaning bathrooms, cleaning

16  grounds?

17          MS. CHIEN:  Objection, misstates the testimony.

18          THE COURT:  Overruled.

19          THE WITNESS:  Will you repeat the question?

20  BY MS. SCHEFFEY:

21  Q   One of the services that Correctional Industries offers to

22  its clients is that they can buy custodial or janitorial

23  services, right?

24  A   That they can buy?

25  Q   Let's take a step back.  Correctional Industries doesn't

1    just sell goods.  It also provides services, right?

2    A    To other agencies?

3    Q    Yes, to customers, right.

4    A    They could purchase goods.  Yes, they can purchase.

5    Q    We talked yesterday about at McNeil Island the

6    incarcerated individuals who work in Correctional Industries

7    don't provide goods and services, but they provide their

8    labors, right?

9    A    Our Class II incarcerated at McNeil Island work in the

10   diesel shop and the marine area and on the grounds.

11   Q    As a qualified customer of Correctional Industries,

12   Shepherd's Grain could ask for maintenance on the grounds

13   from Correctional Industries, right?

14   A    No.

15   Q    Why not?

16   A    Our incarcerated that we -- that work for us all work

17   within Correctional Industries' areas.  Shepherd's Grain

18   would not -- it is not part of Correctional Industries.

19   Q    Right.  I guess I am confused about what Shepherd's Grain

20   got.  My understanding from your testimony, please correct me

21   if I am wrong, the incarcerated individuals provided their

22   labor, as in they helped water plants, cut plants and tend to

23   gardens for Shepherd's Grain; is that right?

24            MR. BERGER:  Objection, misstates testimony.

25            THE COURT:  Sustained.

1    BY MS. SCHEFFEY:

2    Q    What services did Correctional Industries' inmates provide

3    to Shepherd's Grain?

4    A    They provided no services to Shepherd's Grain.

5    Q    What did they do?

6    A    We had a farming, agriculture program.  They worked on

7    agricultural skills, so moving sprinklers, such as that, as

8    the wheat was growing.  They did not harvest the wheat.  They

9    did not mill the wheat.

10   Q    You just said that they helped move sprinklers, correct?

11   A    Right.

12   Q    Moving sprinklers, is that a good or a service?

13   A    That was part of the program on farming.

14   Q    Right.  It is a program on farming, but what the inmates

15   are providing is a service, not a good, right?

16   A    They were learning skills within the agriculture industry.

17   Q    Right.  They worked on a farm, correct?

18   A    They learned skills.

19   Q    They didn't work on the farm?

20   A    Well, skills and work, could be interchangeable.

21   Q    Correctional Industries provides employment opportunities

22   for --

23   A    Right.

24   Q    -- incarcerated individuals?

25   A    Gaining skills.

1    Q    They were employed on a farm, correct, by Correctional

2    Industries?

3    A    Right, workers of CI, correct.

4    Q    That farm was the same farm where Shepherd's Grain got all

5    of its grain, right, or some of its grain?

6    A    They purchased -- yes, they purchased the wheat.

7    Q    Then that wheat was milled by Shepherd's Grain, right?

8    A    Correct.

9    Q    That wheat was resold to Correctional Industries?

10   A    The finished product, yes.

11   Q    Okay.  So I just want to understand, Correctional

12   Industries was on two sides of the Shepherd's Grain

13   transaction, both providing -- I know you don't like the word

14   "services" -- providing assistance in the farm and purchasing

15   the grain, ultimately, right?

16   A    Shepherd's Grain purchased the wheat.

17   Q    Didn't Correctional Industries purchase the grain or the

18   wheat --

19   A    Correctional Industries did, yes, to use in their food

20   factory.  They purchased grain, yes.

21   Q    Right.  There were two places where Correctional

22   Industries was involved, both in having detained

23   individuals -- incarcerated individuals on the farm and in

24   purchasing the end product?

25   A    Our incarcerated workers worked out in the fields working

1  on the land.  Correctional Industries, or purchasers,

2  purchased wheat from Shepherd's Grain.

3  Q    Okay.  Shepherd's Grain was a public or private company?

4  A    Correct.

5  Q    Shepherd's Grain did not pay minimum wages to the

6  incarcerated individuals while they were working on the farm?

7  A    Our individuals were not working for Shepherd's Grain.

8  They were working in the CI program.

9  Q    I understand that.  Who owned the land?

10  A    If we -- if we -- I mean, what you are explaining to me is

11  what we do have is Class I programs, that if Shepherd's

12  Grain --

13  Q    That's not what I am asking.  Was Shepherd's Grain a Class

14  I program?

15  A    No, they were not paying our incarcerated.  CI was paying

16  our incarcerated for the program.

17  Q    CI was paying the incarcerated people for the program.  I

18  understand that.  CI was not paying minimum wages, right?

19  A    Correct.

20  Q    They worked on a farm that benefitted a private company,

21  right?

22  A    Shepherd's Grain purchased the wheat.

23        MS. SCHEFFEY:  No further questions.

24        THE COURT:  Thank you, Ms. Sytsma.

25        MR. BERGER:  Your Honor, may I have one follow up?

1        THE COURT:  Yeah.  Go ahead.

2                    RECROSS-EXAMINATION

3   BY MR. BERGER:

4   Q   Did Shepherd's Grain own the farm?

5   A   No.

6        MR. BERGER:  Thank you.

7        THE COURT:  Thank you, Ms. Sytsma, you may be

8   excused.

9     You may call your next witness.

10       MS. MELL:  Mr. Eagle, Your Honor.

11       MS. BRENNEKE:  He is trying to connect.  Let us know,

12  Tyler, when he is in the waiting room.

13       THE CLERK:  He's not there yet.  I will let you know

14  when he is there.

15       THE COURT:  Good chance to take a stretch, ladies and

16  gentlemen, if you feel the urge.

17       Here is Mr. Eagle.  Mr. Eagle, you can unmute your

18  microphone.  Thank you.  If you would raise your right hand

19  and be sworn.

20                    BYRON EAGLE,

21    having been sworn under oath, testified as follows:

22       THE COURT:  Thank you.  Who is -- Ms. Mell.  All

23  right.  You may proceed.

24

25

1                    DIRECT EXAMINATION

2    BY MS. MELL:

3    Q    Can you give us your name, please?

4    A    Byron Eagle.

5    Q    Mr. Eagle, you are a State employee, correct?

6    A    Correct.

7    Q    The title of your position is chief of secure operations

8    for the Washington Special Commitment Center?

9    A    Yes.

10   Q    The Special Commitment Center houses people involuntarily,

11   correct?

12   A    Yes.

13   Q    They are civilly committed, not criminally, correct?

14   A    That is correct.

15   Q    The State houses them on an island in Puget Sound where

16   the job opportunities are limited to what work they can do

17   while confined there, correct?

18   A    Correct.

19   Q    The State pays money to these people they house on McNeil

20   Island to do work while detained, correct?

21   A    Correct.

22   Q    The amount of money the State pays to those workers is not

23   minimum wage, correct?

24   A    It is not.

25   Q    So one of those people the State maintains is

```
 1    Brandon Ollivier?
 2            MS. BRENNEKE:  Objection, relevance to the special
 3    case or person.
 4            THE COURT:  The objection is overruled.
 5    BY MS. MELL:
 6    Q   One of the individuals the State detains is Brandon
 7    Ollivier, O-L-L-I-V-I-E-R.  Do you know Mr. Ollivier?
 8    A   I don't know him.
 9    Q   One of the people the State has detained there is
10    John Anderson, do you know Mr. Anderson?
11    A   I remember seeing that name before.
12    Q   To the best of your knowledge, Mr. Anderson is a citizen
13    of the United States, right?  He didn't come to the
14    United States illegally, to the best of your knowledge?
15    A   To the best of my knowledge, I would say no.
16    Q   You have some familiarity with Mr. Anderson working as a
17    cashier in the store at the Special Commitment Center?
18    A   Not really, no.
19    Q   Do you know that he did laundry for the facility?
20    A   No.
21    Q   How about Jeremy Mathis, do you know Mr. Mathis?
22    A   I have seen his name before.
23    Q   Have you interacted with Mr. Mathis there?
24    A   I don't believe I have.
25    Q   Do you know that Mr. Mathis works as a cook in the kitchen
```

1    for subminimum wages?

2              MS. BRENNEKE:  Object.  The lawyer is testifying.

3              THE COURT:  The objection is sustained.

4    BY MS. MELL:

5    Q   Do you know that Mr. Mathis has been there for nine years?

6              MS. BRENNEKE:  Object to the form.

7              THE WITNESS:  I am not aware how long he has been

8    here.

9              MS. BRENNEKE:  Mr. Eagle --

10             THE COURT:  Wait a minute.  Wait a minute.  Wait a

11   minute.  Don't state facts that are not in evidence as part

12   of a question.

13        What is the next question?

14   BY MS. MELL:

15   Q   How long has Mr. Mathis been there, if you know?

16   A   I don't.

17   Q   Have you -- do you know whether or not he has been cooking

18   in the kitchen for nine years?

19             MS. BRENNEKE:  Object to the form.

20             THE COURT:  He may answer.

21             THE WITNESS:  I don't know.

22   BY MS. MELL:

23   Q   Do you know whether or not he has made any allegations or

24   complained about the conditions in the kitchen?

25   A   Not to my knowledge.

1  Q   Have you had complaints that the working conditions in the

2  kitchen are unsafe, the floors are slippery, there's not

3  proper food wear, dangerously dull knives?

4          MR. BERGER:  Objection to form.

5          MS. BRENNEKE:  Objection to form.  Compound.  She's

6  testifying again.

7          THE COURT:  Yes, the objection is sustained.

8  BY MS. MELL:

9  Q   Does the kitchen have slippery floors?

10 A   I don't know.

11 Q   Does the kitchen -- well, does the Special Commitment

12 Center issue proper footwear to its workers working at

13 subminimum wages in the kitchen?

14         MS. BRENNEKE:  Objection, form, foundation.

15         THE COURT:  Sustained.

16 BY MS. MELL:

17 Q   Do you know what kind of footwear the SCC issues to the

18 detainees that work in the kitchen?

19 A   No, I don't.

20 Q   Do you know whether or not there have been complaints

21 about insufficient hot water?

22 A   No, I don't.

23 Q   Does the State detain a person named Joseph Megna at the

24 Special Commitment Center?

25 A   Can you say the last name again?

1   Q   M-E-G-N-A, Megna?

2   A   I am not familiar with that name.

3   Q   Does the Special Commitment Center have a job called a

4   porter job?

5   A   Yes.

6   Q   Does that porter attend to the needs of the sick?

7   A   No.

8   Q   Does that porter change sheets soiled with urine and

9   feces?

10   A   No, not to my knowledge.

11   Q   Do they clean blood off the restroom stalls?

12   A   I don't know.

13   Q   Does a porter do laundry at the Special Commitment Center?

14   A   Yes.

15   Q   Do they have to clean soiled mattresses?

16   A   Not to my knowledge.

17   Q   Do they get paid $2.50 an hour?

18   A   Some do, I believe, yes.

19   Q   Does the State detain a person named Jeffrey Payne at the

20   Special Commitment Center?

21   A   Yes, I am familiar with that name.

22   Q   Does the Special Commitment Center have Mr. Payne cleaning

23   up biohazards?

24   A   I don't know what his actual job is.

25   Q   Does the Special Commitment Center train anyone to clean

1    up biohazards who is detained there?

2    A    I don't know.

3    Q    Does the Special Commitment Center have biohazards like

4    feces that the people detained there smear on the wall?

5            MS. BRENNEKE:  Object to the form of the question.

6            THE COURT:  Sustained.

7    BY MS. MELL:

8    Q    Does the Special Commitment Center have a unique

9    population where sometimes that population behaves in a

10   manner that is somewhat uncivil?

11   A    Clarify "uncivil."

12   Q    Well, not adult-like.  Things like cutting behaviors where

13   blood spills, taking feces and wiping it on the door handles,

14   urinating where they shouldn't, that kind of behavior?

15           MS. BRENNEKE:  Objection to the form of the question.

16           THE COURT:  He may answer.

17           THE WITNESS:  Yes.

18   BY MS. MELL:

19   Q    Does the Special Commitment Center have detained workers

20   clean up those kinds of messes?

21   A    Yes.

22   Q    Does the Special Commitment Center pay those cleanup

23   workers who are detained by the State $2.50 an hour to do

24   that kind of work?

25   A    I don't know what the pay is for that particular job.

1   Q    Is it somewhere around that?

2   A    Yes, it may be.

3   Q    Does the Special Commitment Center provide any

4   particularized protective equipment when it asks the people

5   it detains there to clean up those kinds of messes, blood,

6   feces, urine?

7           MR. BERGER:  Objection, relevance.

8           THE COURT:  You may answer.

9           THE WITNESS:  I don't know exactly what is provided.

10  BY MS. MELL:

11  Q    Let's go back and talk a little bit more about you.  You

12  have been there for 19 or 20 years, correct?

13  A    Correct.

14  Q    I would like to show you an illustrative exhibit, if we

15  can, please.

16          MS. BRENNEKE:  Your Honor, we have not seen this.

17  Please don't show it to the jury.

18          MS. MELL:  What did we mark that?  Should be just a

19  color photograph, aerial photograph, 312, A-312.

20          MS. BRENNEKE:  Your Honor, we are looking for this.

21  We haven't had notice of this.  Apparently, it is not a

22  photo.  I am about to try to pull that up myself.

23          MS. MELL:  Just for counsel's purposes, it is a color

24  blowup, the front of A-312.

25          MS. BRENNEKE:  I ask that counsel not describe an

1  exhibit in front of the jury that hasn't been admitted.

2          MS. MELL:  I am not describing it.

3          MS. BRENNEKE:  There is no picture on A-312.  I have

4  it in front of me.  I don't know what you are speaking of,

5  Ms. Mell.

6          THE COURT:  I don't know what you are talking about

7  because I don't have it either.

8          MS. MELL:  We can do it visually without a

9  photograph.

10 BY MS. MELL:

11 Q   Why don't you describe for us where the Special Commitment

12 Center is.

13 A   On McNeil Island.

14 Q   McNeil Island, for those who aren't from the Tacoma area,

15 is located where?

16 A   We catch a ferry from Steilacoom.  I guess in the south of

17 Steilacoom.

18 Q   Out in the middle of Puget Sound?

19 A   Yeah, that's accurate.

20 Q   With regard to what you do at the Special Commitment

21 Center, you have interaction with the residents who are

22 detained there in terms of the kind of work they do, correct?

23 A   I don't have interaction with them.

24 Q   Do you oversee the residential vocation program there?

25 A   I am about two levels removed from it.  Yes, it is one of

1    my departments.

2    Q    I think you submitted a declaration where you described

3    your job duties as overseeing the residential vocation

4    program.  Is that wrong?

5    A    Oversight, yes.  I have a manager that reports to me who

6    is the direct supervisor of the vocation coordinator for that

7    program.

8    Q    You are not day-to-day interacting with the workers?

9    A    No.

10    Q    You are clearly not a detainee, right?

11    A    No.

12    Q    Let's get to this point:  Once you get out to the island,

13    the place where these individuals are housed is secure,

14    correct?

15    A    Correct.

16    Q    There is barbed wire around the fences?

17    A    Yes.

18    Q    The individuals can't come and go freely?

19    A    No.

20    Q    One of the main concerns you have when working there is to

21    ensure that it is safe and secure, not only for you, but

22    those who are detained there, right?

23    A    Correct.

24    Q    So in securing a facility that is secure where you have to

25    make sure those people you detain there don't simply come and

1   go at will, it is important to distinguish between who is a

2   detainee and who is an employee, correct?

3   A    Yes.

4   Q    So it would be difficult to maintain the security and

5   safety of that location, the Special Commitment Center, if

6   you were to treat the detainees as your employees, correct?

7            MS. BRENNEKE:  Object to the form.  Calls for legal

8   conclusion.

9            THE COURT:  The objection is sustained.

10  BY MS. MELL:

11  Q    Is it correct that the safety and security of the Special

12  Commitment Center would be compromised if you were to treat

13  the detainees as employees?

14           MS. BRENNEKE:  Same objection, Your Honor.

15           THE COURT:  Sustained.

16           MS. MELL:  The grounds, Your Honor?

17           THE COURT:  The grounds are that your question is

18  unanswerable because I don't know what you might mean by "how

19  you treat the employees" or "how you treat the detainees as

20  employees."  That is a broad question and nobody could expect

21  to know exactly what the answer to that might be.

22  BY MS. MELL:

23  Q    In terms of the differences between the way you are

24  treated as an employee versus a detainee, you have access to

25  areas the detainees do not have access to, correct?

1   A   Correct.

2   Q   You have working conditions that are unique to your

3   position, correct?

4   A   Yes.

5   Q   And those working conditions include an obligation to

6   maintain the safety and security of the facility, correct?

7           MS. BRENNEKE:  Object to form.

8           THE COURT:  He may answer.

9           THE WITNESS:  Can you restate the question?

10  BY MS. MELL:

11  Q   One of your obligations as an employee at the Special

12  Commitment Center is to maintain the safety and security of

13  the facility, correct?

14  A   Yes.

15  Q   Any employee of the Special Commitment Center who works

16  for the State of Washington, it is their duty and

17  responsibility to maintain the safety and security of the

18  facility, correct?

19          MR. BERGER:  Object to form.

20          THE COURT:  He may answer.

21          THE WITNESS:  It could be.  Depends on their role.

22  BY MS. MELL:

23  Q   One of the ways that you maintain the safety and security

24  of the facility is interacting with the detainees in a way

25  that ensures that they maintain a positive relationship with

1    you, correct?

2           MS. BRENNEKE:  Object to the form, foundation,

3    misstates his prior testimony.

4           THE COURT:  Objection is sustained.

5    BY MS. MELL:

6    Q   Mr. Eagle, have you found that one of the essential things

7    you can do as an employee at the Special Commitment Center

8    related to safety and security of the facility is treat the

9    detainees with respect?

10   A   Yes.

11   Q   Is one of the ways you treat the detainees with respect is

12   to interface with them in a way that they respect your

13   authority but not as their equal?

14          MS. BRENNEKE:  Object to the form.

15          THE COURT:  He may answer.

16          THE WITNESS:  I am frankly not sure what you mean by

17   "equal."

18   BY MS. MELL:

19   Q   Let me ask this:  Are you a union employee?

20   A   No.

21   Q   Are the detainees union represented?

22          MS. BRENNEKE:  Objection, relevance.  I am not really

23   sure where this is going.

24          THE COURT:  I think he may answer, if he knows.

25          THE WITNESS:  To my knowledge, they are not union.

 1   BY MS. MELL:

 2   Q   Do you -- in terms of how your wages are set as an

 3   employee, do you negotiate your wages or are they set by the

 4   State?

 5   A   Both.

 6   Q   Do you give the detainees an opportunity to negotiate

 7   their wages or are those set for them?

 8   A   I don't interact with the residents in that way so I can't

 9   speak to that.

10        MS. BRENNEKE:  Mr. Eagle, I kind of lost a little bit

11   of your answer.  It may be my computer.  Will you make sure

12   you speak up and into your headset, because I want to hear

13   every word.

14   BY MS. MELL:

15   Q   The individuals the State detains there are sex offenders,

16   correct?

17   A   Yes.

18   Q   But then they are not sex offenders in the sense that they

19   are serving time for their criminal behavior, correct?

20        MS. BRENNEKE:  Object to the form.

21        THE COURT:  He may answer.

22        THE WITNESS:  That is correct.

23   BY MS. MELL:

24   Q   While the Special Commitment Center is a lockdown,

25   locked-up facility, it is not a prison, correct?

1  A   No, it is not a prison.

2  Q   It is a housing facility, correct?

3  A   Yes, the residents live here.

4  Q   The residents don't come and go, meaning they sleep there,

5  eat there, work there.  They don't leave, correct?

6  A   Sorry.  I lost you.  No, they don't leave.

7  Q   Now, with regard to the position, your position in

8  overseeing what is called the residential vocation program,

9  is that the name of the program that pertains to work by the

10  detainees there?

11  A   What did you call it?  Could you say the name again?

12  Q   I was using the title in your position, residential

13  vocation program.

14      MS. BRENNEKE:  Object to the form.

15  BY MS. MELL:

16  Q   I don't mean to put words in your mouth.  If it is not

17  called that, I am mistaken.  Do I have the wrong term?

18  A   No.  Yeah.  Resident vocational program is the name.

19  That's close enough.

20  Q   Is it correct that it's not really vocational, it's just

21  work?

22      MS. BRENNEKE:  Object to the form.

23      THE COURT:  He may answer.

24      THE WITNESS:  No, that is not correct.  It is a

25  vocational program as a component of their treatment.

1    BY MS. MELL:

2    Q    In terms of -- strike that.  Just a minute.  Let me think

3    about this.

4        Tell me what you were thinking about when I used that

5    term?  Why were you struggling with that?  Why did you say it

6    was almost correct?

7                MS. BRENNEKE:  Object to the form.

8                THE COURT:  Well, you asked three questions in one.

9                MS. MELL:  I am trying to talk to the witness and

10   understand his testimony, Your Honor.

11   BY MS. MELL:

12   Q    You had a hard time with the word "vocational program."  I

13   am wondering why.

14   A    Actually, I didn't.  I just didn't hear how you stated it

15   the first time.  I just wanted you to repeat it so I could

16   see if that wording was accurate.

17   Q    Okay.  All right.  With regard to the individuals the

18   State is detaining there, how many people are there?

19   A    Right now about 150ish.

20   Q    Has the number been as high as 350 or somewhere

21   thereabouts?

22   A    No, we have never been north of 300.

23   Q    Was it built for that many?

24                MS. BRENNEKE:  Objection to the form.  Foundation.

25                THE COURT:  He may answer.

1        THE WITNESS:  I believe the maximum capacity is about

2   300.

3   BY MS. MELL:

4   Q   When is the last time it had 300 people there?

5   A   To my knowledge, we have never had 300.

6   Q   What is the maximum number of people you have had living

7   there?

8   A   About 280ish.

9   Q   Has the number changed recently because of COVID?

10  A   Do you mean from 280 to 150ish?

11  Q   Correct.

12  A   No, not due to COVID.

13  Q   Let me see, how do I want to say this.  Let me think here.

14  Of those people -- I am getting confused on the numbers I

15  want to deal with.  Right now, it is 180.  Is that what you

16  said?

17  A   No, I said 150.

18  Q   Okay.  Sorry.  Let me get this straight.  I have to write

19  it down.  150, but had as many as 280?

20  A   Yes.

21  Q   Of those people detained there, how many of them do you

22  want to keep busy doing work?

23        MS. BRENNEKE:  Object to the form.

24        THE COURT:  The objection is sustained.

25

1   BY MS. MELL:

2   Q   Of those 150 to 280 people, how many do you want to have

3   opportunities to work?

4            MS. BRENNEKE:  Objection, misstates his testimony.

5   He testified there are 150.

6            THE COURT:  The objection is sustained.  It is time

7   for a break.  We will take ten or so.  Jury may be excused.

8                        (Recessed.)

9     (The following occurred outside the presence of the jury.)

10           THE COURT:  Can we proceed with Mr. Eagle?  We got

11  about three minutes of information from him in the last

12  session.  Let's try to stay on task and get some information.

13     All right.  Bring the jury in.

14     (The following occurred in the presence of the jury.)

15           THE COURT:  Go ahead, counsel.

16  BY MS. MELL:

17  Q   Mr. Eagle, of the 150 to 280 residents who have been

18  detained by the Special Commitment Center, how many of those

19  residents do you make sure have work to do?

20           MS. BRENNEKE:  Object to the form.  Compound.

21           THE COURT:  Sustained.

22  BY MS. MELL:

23  Q   Does the Special Commitment Center try to have all 150 to

24  280 working?

25           MS. BRENNEKE:  Same objection, Your Honor.

```
 1            THE COURT:  I think he may answer.

 2            THE WITNESS:  So the vocational program is a

 3   voluntary program.

 4   BY MS. MELL:

 5   Q   All right.  So the vocational program is a voluntary

 6   program.  I am more interested in knowing whether or not the

 7   150 to 280 residents, the Special Commitment Center tries to

 8   have work for them to do?

 9            MS. BRENNEKE:  Object to the form.

10            THE COURT:  I think he may answer.

11            THE WITNESS:  I am confused by your question.  Can

12   you restate it?

13   BY MS. MELL:

14   Q   Sure.  Of the 150 to 280 residents the State has detained

15   at the Special Commitment Center, do you try to have work for

16   all of them to do or just some of them?

17   A   It is a -- vocation is a voluntary program.  It is their

18   decision to participate in that or not.  I don't know what

19   else to say.

20   Q   So is the only way that a person the State has detained

21   there able to get the 2.50 an hour is if they volunteer for

22   the work program?

23   A   Yes.

24   Q   So if a detainee wanted to work, the Special Commitment

25   Center could not allow him or her to do any work unless they
```

1  volunteered?

2  A   Say that one more time for me.  I'm sorry.  I am not

3  following.

4  Q   Do you have situations where a person will come up to you

5  who is detained there who says, "I want to take care of roses

6  in the garden"?  That's an example.  I am giving an example.

7  Is there ever a situation where a detainee asks you about

8  doing work?

9          MS. BRENNEKE:  Object to the form.

10         THE COURT:  He may answer.

11         THE WITNESS:  So not me specifically.  So I don't

12  know.

13  BY MS. MELL:

14  Q   What are the rules out there with regard to detainees who

15  ask to do work?  Are you allowed to say yes?

16  A   To my knowledge, a job proposal can be considered.

17  Q   Okay.  So is there a universe out there on the island

18  where a detainee can do work and not be in the program?

19  A   No.

20  Q   So the -- then the people who run the program decide what

21  the work is, correct?

22  A   Based on what the residents volunteer and apply for.

23  Q   Are the work activities that the employees pick for the

24  detainees to do designed around the operational needs of the

25  facility?

1   A   So the employees -- you are referring to State employees,

2   correct?  Maybe I should have you restate the question.

3   Q   So the employees pick what the activities are, correct?

4           MS. BRENNEKE:  Object to the form.

5           THE COURT:  Sustained.  I don't know what you are

6   talking about now.

7   BY MS. MELL:

8   Q   With the work that the detainees can do at the Special

9   Commitment Center, employees pick what kind of work they can

10  volunteer to do, correct?

11  A   Residents volunteer and they choose and apply for the work

12  they want to do.

13  Q   Okay.  So who creates the list of choices?  Did you hear

14  my question?

15  A   No.  I had some feedback.  Sorry.

16  Q   Who creates the choices in work?

17  A   The adult training specialist.

18  Q   And the kinds of work the adult training specialist picks

19  concerns the operational needs of the facility, right?

20  A   Some of them.

21  Q   Some of those operational needs of the facility include

22  doing the laundry, correct?

23  A   Yeah, laundry is a part of the vocational program, yes.

24  Q   And laundry is an operational need of the facility,

25  correct?

1    A    Yes.

2    Q    And the vocational program has detainees doing laundry

3    other than their own clothing, correct?

4    A    Correct.

5    Q    So how broad is the laundry that the detainees launder?

6    A    I don't know that.

7    Q    Do you know if they launder sheets for all the detainees?

8    A    No, I don't.

9    Q    Is the laundry facility an industrial laundry room?

10   A    I don't know.

11   Q    Have you ever been in the laundry room?

12   A    No.

13   Q    Do you know whether or not the laundry machines that are

14   used for the vocational program are the kind of laundry

15   machines that you have at home?

16          MS. BRENNEKE:  Objection, foundation.

17          THE COURT:  He may answer.

18          THE WITNESS:  Yeah, I don't know.  I haven't been in

19   that area.

20   BY MS. MELL:

21   Q    Is it correct you don't have any employees assigned to

22   launder the linens or bedding at the facility?

23   A    I don't know that to be true either.

24   Q    I didn't hear you.

25   A    I don't know.

Eagle - Direct Examination

1    Q    Is it correct that not all 150 to 280 detainees have

2    participated in the program?

3    A    They all have not.

4    Q    Is there a job cleaning toilets for detainees?

5    A    We have porter jobs.  That could be a duty of a porter.

6    Q    The toilets the porters clean are not just the toilets any

7    one porter uses, correct, they clean the toilets throughout

8    the facility?

9    A    No.

10   Q    Are there toilets that are commonly used by more than just

11   one detainee?

12   A    Yes.

13   Q    Do the porters clean those toilets that are commonly used?

14   A    I don't know.

15   Q    Do you know if employees use the toilets that the

16   detainees clean?

17   A    It is a big facility.  I don't know for certain.

18   Q    Well, as the manager of the program, do you limit the

19   activities of the detainees to cleaning their own bathroom?

20   A    Some of them do, yeah.

21   Q    So when you say "some of them do," what does that mean?

22   A    We have a custodial crew that works for the State.  So

23   they do that work also.  That's why I say I don't know

24   exactly what restrooms residents would clean because I am not

25   there and I don't offer the work.  That's what I am saying.

1   Q    There are paid employees for the State of Washington who

2   clean toilets at the Special Commitment Center alongside the

3   detainees who also clean the same toilets?

4            MS. BRENNEKE:  Object to the form.

5            THE COURT:  Well, I think he can answer.

6            THE WITNESS:  Yeah, we have custodial staff that

7   clean toilets.  Go ahead.

8   BY MS. MELL:

9   Q    I didn't mean to interrupt you.  Were you done?

10  A    Yeah.

11  Q    When the custodial staff are cleaning the toilets, are

12  they working with detainees?

13  A    I don't know.  They may be.

14  Q    As the manager of the vocational program, have you

15  restricted the toilets that the detainees can clean?

16  A    Well, yes, there are certain areas that residents cannot

17  access.

18  Q    Is that because it is a secure facility?

19  A    Yes.

20  Q    Are there toilets on the secure side that are commonly

21  used by employees and detainees?

22  A    I don't know.

23  Q    Have you ever been on the secure side?

24  A    Yes.

25  Q    When you are on the secure side, how do the residents

1  live?  Do they live collectively together in a large housing

2  unit?

3  A   Yes, they do.

4  Q   Are there bathrooms that have multiple shower stalls in

5  them?

6  A   Yes.

7  Q   Are there toilets -- are their bathrooms with multiple

8  toilets in them?

9  A   Yes.

10  Q   Do you know that the detainees clean those bathrooms?

11  A   Yes, they do.

12  Q   Do the staff use those bathrooms?

13  A   They do not.

14  Q   Are there special toilets on the secure side that staff

15  use?

16  A   Yes.

17  Q   Do the detainees clean those bathrooms?

18  A   I don't know.

19  Q   Do you send your janitors on to the secure side to clean

20  toilets?

21  A   Again, I don't send them anywhere.  That area is not under

22  me so I don't direct their work, so I don't know.

23  Q   When you have been on the secure side, have you ever seen

24  janitors who are employees for the State of Washington

25  cleaning the toilets?

```
 1   A   I honestly didn't pay attention, so no.

 2   Q   Do you -- as the manager for the program, do you prepare

 3   written materials for your program?

 4   A   For which program?  SCC?

 5   Q   Right.

 6   A   The Special Commitment Center?

 7   Q   Right, for the vocational program.

 8   A   No.

 9   Q   So there are no documents that you use to guide what the

10   detainees do or don't do when they are working?

11   A   Not that I recall outside of maybe a policy.

12   Q   Can you take a look at Exhibit A-14 for me, please?

13           MS. BRENNEKE:  Counsel, I need to provide the access

14   to these exhibits because they were just forwarded to us.  It

15   is going to take a minute for us to do that.

16           MS. MELL:  I believe they were received last night,

17   but that's fine.

18           MS. BRENNEKE:  Mr. Eagle, I am thinking I am going to

19   forward an email to you.  Please look for that.  Can you

20   access your email, Mr. Eagle?

21           THE WITNESS:  I can.

22           MS. BRENNEKE:  Has anything come up yet for you?

23           THE WITNESS:  No.

24           MS. BRENNEKE:  It has been sent.

25           MS. MELL:  Ms. Brenneke, can you make sure he has all
```

```
 1    of those exhibits?  I am dependent on you to get them to him.
 2             MS. BRENNEKE:  I got an email at 10:47 a.m. today
 3    from you.  I just forwarded that exact email to him.
 4             MS. MELL:  I don't want to debate with you whether or
 5    not you got them legitimately last night.  I do believe that
 6    you did.  I would appreciate if you would get it cumulatively
 7    to him so we don't have to waste the jury's time.
 8             MS. BRENNEKE:  What I was trying to say is that I
 9    forwarded what Kelly Connolly forwarded to me.  As long as
10    they are all in that email, I forwarded those to him so he
11    should have them.
12             THE WITNESS:  I got it.
13    BY MS. MELL:
14    Q   Are you good, Mr. Eagle?
15    A   I got it, yes.
16    Q   A-14, are we good with that?  That's what it says.
17    Exhibit A-14?
18    A   Yep.
19    Q   Do you recognize that?
20    A   Yes.
21    Q   What is it?
22    A   I see on my screen a residential vocational program
23    policy.
24    Q   Is this the --
25             THE COURT:  Just a minute.  Just a minute.  Just a
```

1    minute.  I don't have your exhibits.  I have something marked

2    A-14 that is not what he just described.

3              MS. MELL:  A-014?

4              THE COURT:  Well, I don't know about zero, A-14 is

5    right here.  This is another set.  All right.  I have it now.

6    BY MS. MELL:

7    Q   Is this -- is A-014 the residential vocational program

8    policy applicable to the program you manage?

9    A   It is.

10             MS. MELL:  I offer A-1 into evidence (sic).

11             MS. BRENNEKE:  No objection.

12             THE COURT:  A-14 may be admitted.

13                  (Exhibit A-14 was admitted.)

14   BY MS. MELL:

15   Q   With regard to A-14, did you write that?

16   A   No, I did not write it.

17   Q   You rely on this policy to administer your program?

18   A   Yes.

19   Q   With regard to the kinds of activities that detainees can

20   participate in, did you spell out any limitations on where a

21   detainee could work in your policy?

22             MS. MELL:  Your Honor, I would like to publish.  I

23   apologize.  I don't mean to keep the jury in the dark here.

24             THE COURT:  Go ahead.

25

1   BY MS. MELL:

2   Q   I call out page Bates No. WA 00011892.  You see Section 2,

3   Page 2 of 10?  Go to the next page.  Go to Page 2.  The next

4   page.  There you go.  How the resident vocational program is

5   managed?

6   A   Yes.

7   Q   Do you see down there at the bottom, the second bullet

8   from the bottom, "Ensure the vocational duties description

9   adequately describes the nature of the activities to be

10  performed."  You see that?

11  A   Yes.

12  Q   Is it your testimony that you do not have those kinds of

13  descriptions in the program there at the SCC?

14  A   Can you say the question again?

15  Q   Do you see the highlighted language there?

16  A   Yeah, I see that.

17  Q   So do you have those descriptions in writing?

18  A   Do I have them?  I am not the designated supervisor.

19  Q   Does the program keep them?

20  A   If -- yeah, it would be with the vocational coordinator,

21  the adult training specialist I referred to earlier.

22  Q   Have you reviewed them to be sure that they adequately

23  describe the nature of the activities to be performed?

24  A   No, I don't.

25  Q   So you don't know whether or not the detainees are asked

1   to do work that would be related to facilities that are used

2   by the staff?

3   A   Correct.

4   Q   It is your testimony, though, that with regard to space

5   detainees use, collectively, not individually, that if a

6   person is working as a porter in the program, they clean

7   those areas, the common areas?

8   A   Yes, they clean common areas.

9   Q   The other kinds of janitorial work that they do, does it

10  include polishing the floors?

11  A   I don't know.

12  Q   Sweeping the floors?

13  A   I don't know.

14  Q   Mopping the floors?

15  A   I don't know that either.

16  Q   As the manager of the program, do you spend any time on

17  the secure side watching what the detainees do?

18  A   I don't.

19  Q   Do you know whether or not any of the detainees do food

20  preparation?

21  A   Yes, they do.

22  Q   They are not just making individual meals for themselves,

23  correct?

24  A   Correct.

25  Q   The meals they prepare are in a kitchen that is larger

1    than your home kitchen, right?

2    A    Yes.

3    Q    Is there industrial equipment in the kitchen there?

4    A    Yes.

5    Q    Are the meals that are prepared there available for staff

6    to eat?

7    A    Yes.

8    Q    Do you know if the meals that the detainees prepare there

9    cost less than a dollar per meal?

10   A    I don't know the exact cost.

11   Q    Do you know what the target cost per meal is for the meals

12   prepared by the detainees there?

13   A    I don't know what they are.

14   Q    Do you have a budget for that?

15   A    No, I don't.

16   Q    You are not familiar with how the SCC budgets for food in

17   the kitchen?

18   A    No, that's not my area.

19   Q    So when the meals are prepared in the kitchen, the

20   detainees actually do the cooking, correct?

21   A    I don't know.

22   Q    Does the State employ cooks who work in the Special

23   Commitment Center?

24   A    Yes.

25   Q    Is one of the jobs for a detainee a cook?

Eagle - Direct Examination

1    A    I don't know.

2    Q    Have you ever been in the kitchen watching the meals

3    prepared?

4    A    No.

5    Q    Have you ever walked through the kitchen?

6    A    I have been through the kitchen, yes.

7    Q    Can you tell the difference between the detainees and the

8    employees?

9    A    Yes.

10   Q    How can you tell the difference between the detainees and

11   the employees in the kitchen?

12   A    I think it's been awhile, but the color of the shirts they

13   were wearing were different.

14   Q    So are the detainees obligated to wear uniforms?

15   A    They wear a shirt.  There is a certain shirt they wear.

16   Q    Why do you give them a certain shirt to wear?

17   A    I don't know why.

18   Q    What is the color of the shirt and what does it mean?

19   A    The color that I saw, it was kind of a tan colored shirt.

20   Q    Does the color of the shirt help identify and distinguish

21   an employee from a detainee?

22   A    Could be the reason.

23   Q    Does the Special Commitment Center give special clothing

24   to the detainees who work in the kitchen?

25   A    They get issued a shirt.  Outside of that, I don't know.

1  Q    When you have been in the kitchen, do the detainees have

2  boots that they are wearing?

3  A    I don't know.  I didn't pay attention to their feet.

4  Q    Do you know whether or not the detainees are given gloves

5  for meal preparation purposes?

6  A    I don't know.

7  Q    What kind of activities, when you have been in the

8  kitchen, have you seen the detainees actually doing?

9  A    I have seen them serve food to the residents, passing

10  food.

11  Q    Are meals prepared and served on trays?

12  A    Yes.

13  Q    When you have seen the serving, is it done in a serving

14  food line where there is multiple detainees lined up putting

15  food on trays -- putting food on trays?

16  A    Yeah.

17  Q    How many detainees line up to do that?

18  A    I don't recall.

19  Q    Do you know whether or not the activities in the kitchen

20  are broken down into tasks that will allow for the greatest

21  number of detainees to participate?

22  A    I don't know that.

23  Q    In your oversight of the program, have you encouraged your

24  supervisors to create tasks that enable the most people who

25  want to volunteer to participate?

1    A    That wouldn't be my role.  I don't know that.

2    Q    Do you know anything about it?

3    A    No, I don't.

4    Q    Do you know what the purpose is of the program that you

5    manage?

6    A    Say that again.  You broke up.

7    Q    Do you know what the purpose is of the program that you

8    manage?

9    A    The vocational program?

10   Q    The program in which the detainees are working, yes, why

11   are they working?

12   A    They can gain vocational skills.

13   Q    So -- what is the average age of the detainees who are in

14   there?

15   A    I don't know the average age.

16   Q    Are the detainees working in the kitchen, adults?

17   A    Yes.

18   Q    Are they adults who have life experiences preparing meals

19   on their own outside of the Special Commitment Center?

20        MS. BRENNEKE:  Objection, foundation, overly broad.

21        THE COURT:  Sustained.

22   BY MS. MELL:

23   Q    Has it been your experience -- strike that.

24        The detainees who are housed at the Special Commitment

25   Center have meal preparation skills from their past, correct,

1    before they got there?

2            MS. BRENNEKE:  Objection.

3            MR. BERGER:  Foundation.

4            THE COURT:  The objection is sustained.

5    BY MS. MELL:

6    Q    Is it your opinion that the detainee workers need to have

7    help from the special commitment employees to learn how to

8    put food on a serving tray?

9    A    Repeat that one more time.

10   Q    Is it correct the detainees who are working in the kitchen

11   have the skill set to put food on a serving tray without

12   instruction from the employed Special Commitment Center

13   employees?

14           MS. BRENNEKE:  Objection, foundation, overly broad.

15           THE COURT:  The objection is sustained.

16   BY MS. MELL:

17   Q    Have you trained your Special Commitment Center employees

18   how to train the detainees?

19   A    I haven't, but I don't know that that training hasn't

20   occurred.

21   Q    With regard to the detainees who are working in the

22   kitchen, are they able-bodied workers or are they disabled

23   individuals?

24   A    Could be both.

25   Q    Do you know whether or not those individuals who volunteer

1    to work in the kitchen come to you with experience preparing

2    meals?

3    A    I don't know.

4    Q    Do you have to interview them to decide whether or not

5    they should be in the kitchen before you put them in the

6    kitchen?

7    A    Yes, they go through an interview process.

8    Q    In the interview process, do you ask them what kind of

9    experience they have had with meal preparation?

10   A    I don't sit in on the interview process, so I don't know

11   what questions are asked.

12   Q    Do you know what the purpose is of the interview?

13   A    Yes, to teach them how to interview, if they have never

14   participated in an interview.

15   Q    So when you are going through the interview process, do

16   you interview specific to the jobs that you have or are you

17   just demonstrating the interview process?

18   A    I don't know the specific questions that are asked, but

19   the interview process is to teach them the skill of how to

20   participate in the interview.

21   Q    Do you know how many people housed at the Special

22   Commitment Center have worked out in the community before

23   they came to the Special Commitment Center?

24   A    No.

25   Q    Do you know whether or not any of the individuals who are

1    housed at the Special Commitment Center have had no job in

2    the community before they come to McNeil?

3    A    No.

4    Q    Do the detainees have the opportunity to volunteer to do

5    yard work?

6    A    Yes.

7    Q    The kind of yard work that is made available to the

8    detainees includes mowing the lawn?

9    A    Yes.

10   Q    How strenuous is the -- strike that.

11           What is the most strenuous task you assign to detainees

12   to do?

13   A    I don't know how to qualify that.

14   Q    Can you tell me what you perceive to be some of the

15   hardest jobs out there for detainees?

16   A    No, I cannot.

17   Q    Do any jobs that you ask detainees to do strike you as

18   hard?

19   A    I can't speak for other individuals.

20   Q    Do you do any of the jobs that the detainees do?

21   A    No, I only do my job.

22   Q    Do any of the SCC employees do the jobs the detainees do?

23   A    Yes.

24   Q    Which ones are those?

25   A    Well, we were talking about food service.  Food service

1    workers work on the food line, resident workers work on the

2    food line, that would be one of them.

3    Q    How many detainees typically on any given day do you have

4    working?

5    A    I couldn't answer that.

6    Q    How many participants in the program do you have?

7    A    I don't know the number, exact number.

8    Q    You do know that it is less than all of the detainees,

9    though?

10   A    It would be less.

11   Q    Do you know what percentage of the total population

12   actually work?

13   A    No, I don't.

14   Q    Do you know if you could keep the Special Commitment

15   Center running without the detainees working?

16   A    Yes.

17   Q    How do you know that?  Did you hear me?

18   A    I don't know that we wouldn't.  I don't know.  I don't

19   understand the question.

20   Q    It is your testimony that the Special Commitment Center

21   could stay operational without detainees working; is that

22   what I understand you to have said?

23   A    Correct.

24   Q    So how do you know that the Special Commitment Center can

25   operate without the detainees working?

1    A    Because we have staff who work out here who run the

2    facility.

3    Q    Have you ever had a day where the Special Commitment

4    Center has operated without the detainees working?

5    A    Yes.

6    Q    How often does that happen?

7    A    Not that often.

8    Q    I'm sorry.  What did you say?

9    A    I said not that often, but we have had those days.

10   Q    What kind of days are those, COVID days?  Days when they

11   are sick?  What kind of days are the days where you have had

12   to do it without detainee workers?

13   A    Situations where, you know, there was no movement, the

14   facility -- we were going through a detail or something so

15   there was no resident movement.  Something of that nature.

16   Q    How long have you had limited resident movements in any

17   given day?

18   A    It varies also, but there has been some where it has been

19   all day.

20   Q    But not very frequently?

21   A    Not frequent, no.

22   Q    Do you think even more than a couple times a year?

23   A    Yeah, maybe two or three times a year.

24   Q    Do you value the work the detainees perform for the

25   Special Commitment Center?

1    A    Do I value it?  I don't know what you mean.

2    Q    Would you agree the work they perform is meaningful?

3    A    Yes.

4    Q    It is not your goal to make work for them to do like move

5    rocks that have no purpose?

6    A    No.

7    Q    Has there ever been a situation where a detainee has asked

8    to do work that you have not had a job for and you permitted

9    them to do that work?

10   A    I don't recall getting proposals.

11   Q    Do the detainees paint?

12   A    Not to my knowledge.

13   Q    Have you allowed the detainees to create art at the

14   Special Commitment Center?

15   A    Yes.

16   Q    What kind of art have you permitted detainees to make?

17   A    The art I am referring to is part of a therapeutic project

18   where they were working with some staff members on the unit.

19   The staff work with the residents to do some art work as part

20   of a therapeutic project.

21   Q    Was that therapeutic project done in a program outside of

22   the vocational program?

23   A    The one I am referring to, it did.

24   Q    You didn't pay them to do the art?

25   A    No, I don't believe they were paid, no.

1  Q    Is there any artwork out at the Special Commitment Center

2  the detainees have created that the Special Commitment Center

3  has paid for?

4  A    Not to my knowledge.

5  Q    There are no murals on the wall that you have allowed your

6  artistic detainees to paint?

7  A    Not that I am aware of.

8  Q    Do you pick any jobs for detainees to do that create --

9  that require creative skills as opposed to vocational skills?

10 A    Not to my knowledge.

11 Q    Do you look for work that taps into the varied skill set

12 of your detainees, or do you pick work that needs to be done

13 at the Special Commitment Center?

14 A    So, again, the residents volunteer for what they want to

15 do.  That is what they apply for and are considered for.

16 Q    Okay.  I understand they get to apply.  I am wondering,

17 how much time do you spend talking with your supervisors

18 about the kinds of work you can come up with for detainees to

19 do?

20 A    I don't spend much time in there.

21 Q    Can you tell me any work that you have come up with for

22 detainees to do that was designed for a particular skill set

23 of a detainee?

24 A    That's not my role.

25 Q    Whose role is it?

1    A    It would be the adult training specialist.

2    Q    I didn't hear you.  What did you call it?

3    A    The adult training specialist does that work.

4    Q    Is the adult training specialist somebody who reports to

5    you?

6    A    Not directly, no.

7    Q    Who do they report to?

8    A    Program -- one of my managers.

9    Q    So ultimately, they are answerable to you, correct?

10   A    They are answerable to me, yes.

11   Q    Have you ever gotten a communication from any of those

12   individuals saying, you know, a certain resident has a

13   particular talent, can we come up with a job for him to do?

14   A    I am not recalling.  Maybe, but I am not recalling at the

15   moment.

16   Q    Okay.  Of all of the work that you assign to detainees --

17   I am not asking that right.  Can you give me an itemized list

18   of all the work you know you assign to detainees?

19   A    Not all of them.  Not off the --

20   Q    Tell me the kind of work you assign to detainees that you

21   can think of?

22   A    So we have work such as, we talked about porters, food

23   service, landscaping.  That is it that is coming to mind.

24   Q    Do you have detainees who do electrical work for the

25   Special Commitment Center?

Eagle - Direct Examination

1   A   No, not to my knowledge.

2   Q   What is the scope of work done in the landscaping area?

3   A   Lawn mowing and weed eating.

4   Q   Are detainees ever asked to move dirt?

5   A   I don't know.  Not to my knowledge.

6   Q   Do you have employees overseeing the detainees when they

7   are mowing the lawn?

8   A   Yes.

9   Q   Does that work benefit the State?

10  A   Yeah.

11  Q   Does the work of the detainees mowing the lawn benefit the

12  State?

13  A   Yes.

14  Q   If the detainee didn't mow the lawn, the lawn supervisor

15  would have to mow the lawn, correct?

16  A   The lawn supervisor does mow the lawn.

17  Q   If a detainee worker isn't mowing the lawn, then the

18  supervisor will mow the lawn, correct?

19  A   No, the lawn supervisor, they do mow the lawn.

20  Q   Right.  So do they mow the lawn when the detainee is also

21  mowing the lawn?

22  A   Yes.

23  Q   So supervisors do the same work alongside the detainees?

24  A   I have seen that occur, yes.

25  Q   So it is the exact same work done by the supervisor as is

1    done by the detainee, correct?

2    A    When I observed it was, yes.

3    Q    The State employee gets paid State wages and the detainees

4    gets paid subminimum wages, correct?  Somewhere around 2.50

5    an hour, correct?

6    A    Somewhere around there, yes.

7    Q    Do you track your detainees' time working?

8    A    It is tracked, yes.

9    Q    Do you keep track of that time so that you could pay them?

10   A    Yes.

11   Q    Do you take any deductions from that pay?

12   A    I don't know that.

13   Q    Is the pay pretty typically somewhere between one dollar

14   and three dollars per hour?

15   A    Yes, that's accurate.

16   Q    Did the State at one point pay participants substantially

17   more but it cut the pay down to save money?

18   A    Yes, that's what I understand.

19   Q    Do you know that a number of the detainees there have sued

20   the State over the pay rates?

21        MS. BRENNEKE:  Your Honor, I object.  I think this is

22   an entirely different matter not relevant to this proceeding.

23        THE COURT:  The objection is sustained.

24   BY MS. MELL:

25   Q    In your position, do you set the pay rates?

1    A    No, I do not.

2    Q    The Special Commitment Center sets the pay rates, right?

3    A    Yes.

4    Q    I am going to ask you to take a look at Exhibit A-312.

5    Mr. Eagle, do you recognize that document?

6         MS. BRENNEKE:  Just so the record is clear, I believe

7    there are different A-312s.  The one we have here I think is

8    what you were trying to refer to before.  That may or may not

9    be what the Court has because we didn't have it before.

10        MS. MELL:  For verification, it is marked Exhibit 338

11   of the Eagle deposition.

12        THE WITNESS:  I have seen this document.

13   BY MS. MELL:

14   Q    What is it?

15        MS. BRENNEKE:  Object to the form in terms of the

16   foundation.

17        THE COURT:  He may answer that question.

18        THE WITNESS:  It says, "evaluation of cost effective

19   provision of services for the Special Commitment Center."

20   BY MS. MELL:

21   Q    Is that a document that has been kept in the ordinary

22   course of business for the Special Commitment Center?

23        MS. BRENNEKE:  Objection, foundation.

24        THE COURT:  Sustained.

25

1    BY MS. MELL:

2    Q   Mr. Eagle, are you familiar with the report because you

3    have used it in the course of your employment with the

4    Special Commitment Center?

5    A   No, that's not accurate.

6    Q   How are you familiar with this report?

7    A   I saw it.  I think it was the last time I was deposed.

8    Was that you?  By you?

9    Q   I think that was me.

10   A   Yeah.  That's my recollection of it, for the most part.

11   Q   And when you were deposed, we discussed this document,

12   correct?

13   A   You asked me if I had seen it.

14   Q   You were familiar with the document at the time we talked,

15   right?

16   A   Just seeing the document, yes.  That's my -- starts and

17   kind of stops there.

18   Q   I didn't hear what you said.

19   A   That's what I know of this document.

20   Q   It is a document you have read?

21       MS. BRENNEKE:  Counsel, I am going to object because

22   a foundation has not been laid for further testimony about

23   this exhibit.  He saw it for the first time in the

24   deposition.

25       THE COURT:  He may answer this question which is:

1    Have you read the document?

2          THE WITNESS:  I have not read it.

3    BY MS. MELL:

4    Q   Does the document contain information on the Special

5    Commitment Center that you are familiar with?

6          MS. BRENNEKE:  Objection to the form.  Foundation.

7          THE COURT:  Sustained.

8    BY MS. MELL:

9    Q   Do you know what the purpose of the report was?

10          MS. BRENNEKE:  Objection to the form.  Foundation.

11          THE COURT:  He may answer.

12          THE WITNESS:  Not entirely, other than some sort of

13    cost evaluation document.

14    BY MS. MELL:

15    Q   You are familiar with the cost evaluation portions of the

16    document?

17    A   No, I am saying that because I am reading the title.

18    Q   Okay.  At your deposition, did we go through that

19    document?

20    A   We may have.  I don't recall all of what we did.

21    Q   When we went through that document, did we talk about

22    whether or not the information contained in the document was

23    true and correct?

24          MS. BRENNEKE:  Object to the form of the question.

25          THE COURT:  Sustained.

1   BY MS. MELL:

2   Q    With regard to the content of the document that you are

3   familiar with from having seen it at your deposition, is the

4   report accurate?

5            MS. BRENNEKE:  Object to the form of the question.

6            THE COURT:  Sustained.

7   BY MS. MELL:

8   Q    Do you have enough knowledge about the document and its

9   contents to know whether or not it is trustworthy?

10           MS. BRENNEKE:  Object to the form of the question.

11  Foundation.

12           THE COURT:  Sustained.

13  BY MS. MELL:

14  Q    How much of the contents are you familiar with in the

15  document?

16           MS. BRENNEKE:  Object to the form of the question.

17  Foundation.

18           THE COURT:  There are 77 pages here, Counsel.  The

19  objection is sustained.

20  BY MS. MELL:

21  Q    Have you read the information on Page 6 of the document?

22  A    No.

23  Q    So you are not familiar with the numbers there relative to

24  operating costs?

25  A    Not particularly.  I wasn't in this role in 2011, so I

1    don't know much about this document.

2    Q    Do you know who the State's criminal justice planning

3    services department is?

4    A    No.

5    Q    Have you in your role done anything to manage the cost of

6    meal preparation in the facility?

7    A    No.

8    Q    Have you had the experience of contracting with

9    Correctional Industries?

10   A    No.

11   Q    Do you know whether or not the Special Commitment Center

12   relies on either services or products prepared or created

13   from inmate workers in the Correctional Industries program?

14   A    No, I can't speak to that.

15   Q    At the Special Commitment Center, do the detainees prepare

16   meals from scratch?

17   A    I have heard that they do.

18   Q    Okay.  You don't know that they do that?

19   A    I don't know that for certain, no.

20   Q    Do you eat the meals prepared there?

21   A    I do not.

22   Q    You can go ahead and put the document down now.  Thank

23   you.

24        With regard to detainees working out at the Special

25   Commitment Center, the detainees don't have to participate in

1  any treatment program, right?

2  A    Correct.

3  Q    So they can pick and choose how they participate in any

4  treatment regimen out there, correct?

5  A    Correct.

6  Q    The vocational work program is not per se a treatment

7  program, it is a work program, right?

8  A    It is a component of their treatment program.

9  Q    Small component of the treatment program, right?

10 A    Sure.

11 Q    In terms of the hours that detainees work relative to the

12 other activities they engage in during the day, their work is

13 a small part of their day?

14 A    Could be, yes.

15 Q    What is the shortest amount of time any one task that the

16 detainee is assigned to do, takes?

17 A    I don't know.

18 Q    Do you work detainees overtime?

19 A    I don't think we do.  No.

20 Q    Do you limit the number of hours they can work?

21 A    Yes, there are certain parameters.

22 Q    What are those parameters?

23 A    I don't have it in front of me, so I wouldn't be able to

24 give you the specifics of the parameters.

25 Q    Are the parameters set forth in the residential vocational

1    program policy?

2    A    They may be.

3    Q    You want to revisit that exhibit, A-14, and see if you can

4    locate those parameters.  The timekeeping provisions appear

5    to be on Page 5 of 10, or Bates No. 11897.  I see on the last

6    bullet on Page 6, "Resident timesheet for over 40 hours in

7    pay period must be accompanied by written explanation by

8    responsible supervisor."  Do you see that there, Page 6?

9    A    Yeah.

10   Q    Is that the --

11   A    Yeah.  I remember that.

12   Q    Last bullet there, "Resident timesheet for over 40 hours

13   in a pay period must be accompanied by a written

14   explanation."

15   A    I see that.

16   Q    Is that the only parameter on hours for detainees?

17        MS. BRENNEKE:  Object to the form.

18   BY MS. MELL:

19   Q    Mr. Eagle, do you know if there are any other parameters

20   that limit the hours worked?

21   A    No, I don't.

22   Q    There are limits on rest breaks or unpaid breaks for the

23   detainees, correct?  Subsection J?  If we could call out J,

24   it is on Page 8.  Highlight, "The unpaid breaks will be at

25   the discretion of the work site supervisor and will be for no

1    longer than ten minutes."  Is that correct?

2    A    That's what it says.

3    Q    Does that mean they don't get a meal break?  A meal break

4    longer than ten minutes, right?

5              MS. BRENNEKE:  Objection to the form.

6              THE COURT:  Sustained.

7    BY MS. MELL:

8    Q    Is it correct that the Special Commitment Center does not

9    allow detainees to take a break longer than ten minutes,

10   including meal breaks?

11   A    I don't know.  J says what it says.  I don't know.  I am

12   not there onsite.

13   Q    Can you take a look at Page 9, the definition where it

14   says "access porter."  It's the first one.

15   A    Yes.

16   Q    It says, "Resident worker that provides assistance to

17   persons who have disabilities"; is that correct?

18   A    Yes.

19   Q    Is it correct that the access porter acts somewhat like a

20   nursing assistant?  They would actually change bedding and

21   clothing of individuals residing there who have disabilities?

22   A    I don't know that.

23   Q    Do you know if an access porter assists disabled residents

24   with their toiletry needs, their personal hygiene?

25   A    No, I don't.

1  Q   We can take that down now.  Do you know if only 62 percent

2  of the detainees participate in treatment?

3  A   I don't know the exact percentage that participate.

4  Q   Does that percentage sound about correct?

5  A   I have heard 60, I heard 85 percent.  I don't know which

6  one is actually true or accurate, I should say.

7  Q   Is it correct the detainees who choose not to participate

8  in treatment can still participate in the work program?

9  A   That is true.

10  Q   It is correct that there are detainees at the Special

11  Commitment Center who are not in treatment who are paid

12  subminimum wages, correct?

13  A   Correct.

14  Q   When they are not participating in treatment, they are not

15  getting educational rehabilitation, correct?

16  A   Did you say "educational"?

17  Q   Part of training includes an educational rehabilitation

18  program, which is separate from the work program, right?

19  A   Yeah, we do offer educational opportunities, correct.

20  Q   So somebody who is not participating in treatment,

21  including the educational rehabilitation program, can still

22  receive subminimum wages working for the Special Commitment

23  Center?

24          MS. BRENNEKE:  Object to the form.

25          THE COURT:  He may answer.

1        THE WITNESS:  Correct, if they participate in the

2   vocation program, then that would be correct.

3   BY MS. MELL:

4   Q   Do you know the number of people who have left the Special

5   Commitment Center and are gainfully employed now?

6   A   No, I do not.

7   Q   Do you know how well you have provided vocational training

8   to the detainees so that they can actually get a job when

9   released?

10        MS. BRENNEKE:  Object to the form.

11        THE COURT:  Sustained.

12   BY MS. MELL:

13   Q   Do you have any statistics or measures to know whether or

14   not the jobs you've asked the detainees to do at the Special

15   Commitment Center actually prepare them for work on the

16   outside?

17   A   I don't have those statistics, no.

18   Q   Is it correct that there is a very small number of

19   detainees that actually leave the Special Commitment Center

20   once detained there?

21   A   I don't understand the question.

22   Q   How long do most detainees stay there?

23   A   I don't know how to qualify that.

24   Q   Do you have detainees who live there until their death?

25   A   We have had residents pass away here, yes.

Eagle - Direct Examination

1  Q   Do you have most residents staying there for more than a

2  year?

3  A   Yes, there is residents who have been here longer than a

4  year.

5  Q   Are there residents who will never leave there?

6  A   I don't know how to answer that.

7  Q   Is it a requirement for participation in your work program

8  to have a release date?

9  A   Say that again.

10 Q   Is it a requirement for participation in your work program

11 that a detainee have a release date?

12 A   No, that's not a requirement.

13 Q   So you have detainees doing work for the Special

14 Commitment Center who will never leave, right?

15        MS. BRENNEKE:  Object to the form.  Calls for

16 speculation.

17        THE COURT:  Sustained.

18 BY MS. MELL:

19 Q   So if a detainee is going to be there indefinitely, they

20 can still participate in the vocational program, correct?

21        MS. BRENNEKE:  Same objection.

22        THE COURT:  He may answer this.

23        THE WITNESS:  As long as they are here, they may

24 participate in the program.

25

1   BY MS. MELL:

2   Q    So even those detainees where there is no anticipated date

3   when they can leave, they can work for the Special Commitment

4   Center?

5   A    Yes.

6   Q    Okay.  There are no outcome studies that you have seen

7   that show the work that they do helps them on the outside?

8   A    Correct.

9   Q    Do you know, out of the total number of people who are

10  participating in the work program, how many have been

11  released?

12  A    No, I don't know that.

13  Q    Can you think of any detainee who has participated in a

14  work program who is working out in the community after

15  release?

16  A    Once they are conditionally released, we don't follow

17  them.

18  Q    Is it correct that your detainees there have to purchase

19  hygiene items, soap?

20  A    Some do, yes.

21  Q    Some have to purchase their own clothing?

22  A    Yes.

23  Q    And bedding?

24  A    If they choose to, yes.

25  Q    The money that they have to do that with is the money that

1    they get paid working there, right?

2              MS. BRENNEKE:  Object to the form.

3              THE WITNESS:  Not necessarily.

4              THE COURT:  The answer may stand.

5    BY MS. MELL:

6    Q    Do you keep track of the all the detainees' money?

7    A    I don't know that.

8    Q    Do any of the detainees purchase their own supplies to do

9    the work you have them do for the Special Commitment Center?

10   A    I don't know that either.

11   Q    Do you give the detainees the tools and implements they

12   need to do the work you have them do for the Special

13   Commitment Center?

14   A    Yes.

15   Q    Have you ever determined the value of the work performed

16   by the detainees relative to if you had to pay them minimum

17   wage?

18   A    No, I have not.

19   Q    Do you have any idea what it would cost to pay them

20   minimum wage?

21   A    No.

22   Q    Do you know where the money would come from if you had to

23   pay them minimum wage?

24   A    I never thought about it.

25              MS. MELL:  Nothing further.

1          THE COURT:  Okay.  It is almost noon.  We will go to

2    cross-examination at 1:00.  Mr. Eagle, I ask you to be back

3    at that time, please.  We will reconvene at 1:00.  You may be

4    excused.

5          (Recessed.)

```
1                                        AFTERNOON SESSION

2                                          JUNE 11, 2021

3       (The following occurred outside the presence of the jury.)

4              THE COURT:  Whose witness is this now?

5              MS. BRENNEKE:  I'll be taking the next turn.

6              THE COURT:  You can bring the jury in.

7         (The following occurred in the presence of the jury.)

8              THE COURT:  Ms. Brenneke, you may cross-examine.

9                             CROSS-EXAMINATION

10   BY MS. BRENNEKE:

11   Q   Mr. Eagle, thank you for coming back after lunch.  It was

12   awhile ago, but I want to go back at the beginning.  What is

13   your role at the SCC?

14   A   I am the chief of secure residential operations.  I have

15   oversight of the security operations, residential services,

16   meaning oversight of the direct care of staff, transport

17   services, visiting services and our mailing operations.

18   Q   I didn't hear what you said, the last portion?

19   A   The mailing operations.

20   Q   Your program services department, you are responsible for

21   the residential vocational program; is that right?

22   A   Yes, as part of the program services, vocational, mail

23   services, religious services, visiting services, all those

24   fall under the program services which I oversee.

25   Q   You're in more of an executive management position; is
```

Eagle - Cross

1  that right?

2  A   Correct, I'm part of the executive leadership team out at

3  the Special Commitment Center.

4  Q   Do you actually supervise any of the work of the

5  residents?

6  A   No.

7  Q   And so you have some people that report to you, but that's

8  perhaps why some of your information is at a bit higher

9  level?

10  A   Correct.

11  Q   Mr. Eagle, I am noticing between my questions and your

12  answers, there is a bit of a delay.  Are you at McNeil Island

13  right now?  Are you at the Special Commitment Center?

14  A   Yes.

15  Q   Is there a little bit of a delay in the technology so when

16  I speak it takes a minute to get to you and vice versa?

17  A   Maybe.  I am responding as soon as I hear, you know, you

18  stop talking.

19  Q   Okay.  Great.  Let's take a step back.  What is the

20  Special Commitment Center?

21  A   It is a civil commitment program for sexually violent

22  predators who have been deemed too violent to be released

23  into the community.

24  Q   Who owns the Special Commitment Center?

25  A   State of Washington.

1    Q    Who operates and runs the Special Commitment Center?

2    A    We fall under DSHS, Department of Social and Health

3    Services.

4    Q    So who are the residents of the Special Commitment Center?

5    A    What do you mean, who are they?

6    Q    Who do -- who lives there?  Who are the residents that

7    you, at the Department of Social and Health Services, care

8    for at the Special Commitment Center?

9    A    Well, those are the individuals again that have been

10   deemed too violent to be released into the community.  They

11   have already served their criminal time and then they are

12   sent to us either on detainee status as part of the civil

13   commitment procedure.

14   Q    So is it correct that every resident there has committed

15   some crime that is like a sexual predator or sexual offense?

16   A    Correct.

17   Q    And they have all completed their criminal time; is that

18   right?

19   A    Correct.

20   Q    When you said they have been deemed unsafe to be back in

21   the community, who deemed them unsafe?

22   A    My understanding is that that is a review board that does

23   that.

24   Q    Have they all had a court process and a court

25   determination under the Washington Sexually Violent Predator

1    Statute that they are too dangerous to be released into the

2    community?

3    A    That's my understanding.

4    Q    The Special Commitment Center, do you offer residents

5    clinical mental health treatment as part of the services?

6    A    Sex offender treatment, yes.

7    Q    Do you also offer other kinds of programs that they need

8    to work toward the possibility and goal of reentry into the

9    community?

10   A    Yes, we do.

11   Q    Does the Special Commitment Center have any like subgroups

12   of residents?

13   A    Subgroups?  So we have residents who we consider to be

14   regular track or normal functioning.  Then we have residents

15   who are classified as special needs, so these residents have

16   developmental disabilities.  Then we also have a smaller

17   group of residents who are considered high acute.  These

18   residents have severe developmental disabilities.

19   Q    Does the Special Commitment Center offer all of these

20   residents that clinical sexual offender treatment you

21   mentioned?

22   A    Correct.

23   Q    Does it also offer its residents a range of vocational

24   rehabilitation and reentry programs?

25   A    Yes.

1    Q    How is case management done for residents of the Special

2    Commitment Center?

3    A    So all the residents who we have participate in treatment

4    are assigned a clinical therapist.  Their case management is

5    done that way.  The residents who do not participate in

6    treatment are assigned a case manager, and that person is

7    also from our clinical department.

8    Q    So you are saying that residents don't have an option of

9    accepting treatment or not accepting treatment, but either

10   way, there is a case manager who oversees their stay at the

11   Special Commitment Center; is that right?

12   A    Correct.

13   Q    And what are the kind of qualifications for case managers?

14   A    Well, I am not a clinician.  I know at a minimum they have

15   a master's degree, some form of clinical work, and I do

16   believe most of them are licensed.

17   Q    So all of the case managers are part of the clinical

18   mental health staff at the SCC?

19   A    Correct.

20   Q    What is the goal of the case management?

21   A    My understanding is the case managers for those residents

22   who don't participate in treatment, it is to meet with them,

23   continue to engage them to participate in treatment.  Also,

24   offer other forms of treatment and rehabilitation programs.

25   Q    For the residents who do engage in treatment, you said it

Eagle - Cross

1  was somewhere around 60 to 85 percent of your population, you
2  weren't sure exactly?
3  A    Those are the different percentages I have heard over the
4  last couple years.
5  Q    What is the goal of the treatment for those individuals
6  who are participating in their treatment?
7  A    The goal is to give them, you know, necessary skills and
8  coping mechanisms that will help them if they were to be
9  released into the community.
10 Q    You mentioned before there is something like a treatment
11 plan, that the work program was part of an individualized
12 treatment plan.  Do you recall that testimony?
13 A    Say that again.
14 Q    Yeah.  You testified earlier that work is part of a
15 treatment plan.  Do you recall that?
16 A    Yes.
17 Q    Can you describe what the treatment plans, like how they
18 work within the Special Commitment Center?
19        MS. MELL:  Objection, Your Honor.  Beyond his scope.
20 Treatment plans are being used broadly to apply to areas not
21 within his purview.
22        THE COURT:  Overruled.
23        THE WITNESS:  So the treatment -- each resident has a
24 treatment plan that is specific to their needs, their risk
25 and then there are components within the treatment plan

1  around their sex offender specific treatment, vocational,

2  religious and release planning.

3  BY MS. BRENNEKE:

4  Q  So if work is part of a resident's individualized

5  treatment plan, can you describe how the resident's clinical

6  treatment providers and case managers are involved with the

7  vocational rehabilitation program?

8      MS. MELL:  Your Honor, objection.  Testifying,

9  leading.

10     THE COURT:  Overruled.

11     THE WITNESS:  If the residents volunteer to be a part

12  of the vocational program, their treatment team, the

13  clinicians, it is a multidisciplinary team.  They look at

14  what the resident is looking to engage in, and they will

15  determine, based on what they know about the resident, if

16  that job or that, what they are electing to do, is a good fit

17  for them.  Every resident has different needs, risks

18  associated with their pattern around sexual deviancies.

19  That's how the clinicians play a part in that.

20  BY MS. BRENNEKE:

21  Q  Do the clinical treatment providers get involved in

22  helping verify that the job is a good job?

23  A  Yes, so they will work with the vocational coordinator,

24  the adult training specialist I referred to earlier, in that

25  part of the process.

1    Q    Would they also work with the vocational counselor on

2    issues like the appropriate number of work hours or what kind

3    of training or evaluation they would need?

4    A    They can work with that person or also work with the area

5    supervisor for hours worked and that kind of thing.

6    Q    Is the work done by residents also evaluated in relation

7    to the goals of the clinical treatment plan?

8    A    The area supervisors are the staff that work in the area

9    that the resident is working in.  They are supposed to submit

10   reports that are reviewed by a group of people.

11   Q    Can you describe also the kind of support the Special

12   Commitment Center provides residents on learning how to find

13   and keep work separate from the actual job duties?

14   A    Say that one more time.

15   Q    Can you give some examples of how the Special Commitment

16   Center helps residents with their goals of reentry separate

17   from the specific work duties, like how to find work, keep

18   work, that sort of thing?

19   A    Well, the vocational program, it teaches those residents

20   vocational skills, so things like everything from A to Z,

21   like how to apply for a job, teaches them how to interview,

22   go through that process.  It teaches them how -- if they were

23   to get to the job after they went through the interview

24   process, it teaches them how to keep a schedule, how to show

25   up on time, if the job is from eight to ten a.m., teaches

1   them how to take direction and instruction.  So that is

2   outside of doing the actual work, those skills is what it is

3   also designed to do.

4   Q   Do you want to add something?

5   A   Yeah.  I was going to say that because some of the

6   residents, you know, based on their history may not have held

7   an actual job or they have been incarcerated for so long that

8   some of those skills have been lost.

9   Q   You mentioned sort of in passing that residents can also

10  make proposals about work that they want to do.  Do you

11  recall any proposals that have been made that were approved

12  by the Special Commitment Center?

13  A   I haven't had any proposals that have made it to, like, to

14  my desk for approval.  There have been prior proposals that I

15  have heard about where, you know, there was a resident who

16  was a really good seamstress so that was like a job that was

17  created or something that he ended up doing.  That's the only

18  one I can think of, but I wasn't directly involved in it.

19  Q   You indicated earlier that residents are not paid the

20  state minimum wage, do you recall that?

21  A   (No audible response.)

22  Q   What is your understanding about why the Special

23  Commitment Center doesn't pay Washington minimum wage?

24  A   When I got in the role, the vocational coordinator at the

25  time, he provided me with some language.  It was from an RCW

1    or WAC that said something about it being because it was a

2    program within a state owned and operated facility, that it

3    didn't meet the criteria, you know, to be paid at a minimum

4    wage rate because it was part of a treatment or

5    rehabilitative type program.

6         MS. BRENNEKE:  Thank you, Mr. Eagle.  I have no

7    further questions.

8         MS. MELL:  I have some redirect unless plaintiffs

9    have questions.

10         MR. BERGER:  No questions.

11         THE COURT:  Go ahead, Ms. Mell.

12                   REDIRECT EXAMINATION

13    BY MS. MELL:

14    Q   Mr. Eagle, do you know if the detainee you were talking

15    about who has good seamstress skills, learned those skills in

16    prison?

17    A   I don't remember the name.

18    Q   Did he come from prison?

19    A   I don't remember the name.

20    Q   He came from prison out to the Special Commitment Center

21    after serving his sentence?

22    A   The residents that come here have done time within DOC,

23    but I don't remember his name.

24    Q   Yeah.  I don't think I asked you his name.  I was

25    wondering if you knew that he was in prison and came to the

1    Special Commitment Center?

2    A    Okay, so then, I don't know if he did.

3    Q    Do you know whether the detainees at the Special

4    Commitment Center who came from prison have already completed

5    vocational training as part of their programming, either in

6    Class III industries or in Class II industries with

7    Correctional Industries with DOC?

8    A    No, I wouldn't know that.

9    Q    Are most of the people detained at the Special Commitment

10   Center people who have spent years in prison?

11   A    Yes.

12   Q    Do you know whether or not programming is mandatory when

13   you are in prison?

14   A    No, I don't know that.

15   Q    Do you know if the sex offenders who are imprisoned in the

16   State of Washington who are illegally in the United States go

17   to the Special Commitment Center?

18          MS. BRENNEKE:   Object to the form.   Assumes facts not

19   in evidence.   Foundation.

20          THE COURT:   He may answer, if he knows.

21          THE WITNESS:   I have to ask you to repeat the

22   question.

23   BY MS. MELL:

24   Q    Do you know if any of the sex offenders who ultimately end

25   up at the Special Commitment Center are here illegally, here

1    meaning in the United States?

2    A    No, I don't know that.

3    Q    Do you know if the Department of Corrections puts

4    individuals who are here illegally who are sex offenders at

5    the Northwest ICE Processing Center rather than at the

6    Special Commitment Center?

7    A    I don't know that either.

8    Q    Do you -- well, does the Special Commitment Center have

9    any liaison working at the Northwest ICE Processing Center?

10   A    Not that I am aware of.

11   Q    Do you know that the Department of Corrections does have a

12   liaison, Virgil Wallace, who worked at the Northwest ICE

13   Processing Center?

14            MS. BRENNEKE:   Objection, counsel is testifying

15   again.

16            THE COURT:   Well, when the witness answers "I don't

17   know," there is no evidence in the record from the question

18   of the plaintiff.  I gave the jury a preliminary instruction

19   on that and so they should follow that instruction.

20       Next question.

21   BY MS. MELL:

22   Q    It is correct that the people who the State detains at the

23   Special Commitment Center are people that the State has

24   decided need to be locked up, correct?

25   A    Can you ask that again?

1   Q   It is correct that the people who are at the Special

2   Commitment Center are people that the State has decided need

3   to be locked up, not for criminal reasons, but civil reasons,

4   correct?

5   A   Correct.

6   Q   It is your job to keep them locked up safely and securely,

7   correct?

8   A   They come here for treatment.

9   Q   I understood that your position is security, correct?

10  A   That's one of my duties, yes.

11  Q   So you would agree that your job is to keep these people

12  locked up safely and securely?

13  A   Yeah, we keep them secure, yes.

14          MS. MELL:  I have nothing further.

15          MS. BRENNEKE:  No further questions.

16          THE COURT:  Okay.  All right.  Thank you, Mr. Eagle.

17  You may be excused.

18          MS. SCHEFFEY:  GEO calls Christina Wells to the

19  stand, or the Zoom, I guess.

20      Ms. Brenneke, did you call her?

21          MS. BRENNEKE:  We are in the process.  She's standing

22  by.  She was waiting this morning.

23          MS. SCHEFFEY:  I am having the Court's problem which

24  is everyone is in a different order every time I come back.

25          THE CLERK:  The witness is on their way in.

```
 1              THE COURT:  There is Ms. Wells.  If you will unmute
 2    your phone there.
 3              THE WITNESS:  Hi.
 4              THE COURT:  If you will raise your right hand and be
 5    sworn.
 6                        CHRISTINA WELLS,
 7        having been sworn under oath, testified as follows:
 8              MS. SCHEFFEY:  May I proceed?
 9              THE COURT:  You may inquire, Ms. Scheffey.
10                        DIRECT EXAMINATION
11    BY MS. SCHEFFEY:
12    Q    Good afternoon, Ms. Wells?
13    A    How are you?  Can you hear me?
14    Q    Are you in a place where you can testify from without
15    distraction?
16    A    Yes.
17    Q    Are you somewhere where there are other people or by
18    yourself?
19    A    There is other people somewhere around, but they are
20    nowhere near me.
21    Q    If you will do me a favor and let me know if someone comes
22    in and interrupts you so I know for the record?
23    A    Will do.
24    Q    What is your job?
25    A    I get to do a little bit of everything.  I work with the
```

Eagle - Redirect

1    Department of Social and Health Services, Developmental

2    Disabilities Administration, Residential Habilitation Program

3    manager.  I am trying really hard not to use acronyms because

4    we love those in state service.  I am kind of --

5    programatically, I oversee our residential habilitation

6    centers so I help develop policies and procedures.  I do a

7    lot of review and monitoring work, contract work.  I really,

8    they pretty much send anything that relates to the

9    residential rehabilitation centers to me.  I get to do quite

10   a lot of different things.

11   Q   I think I heard in there you are the residential

12   habilitation manager for the State of Washington?

13   A   Residential habilitation program manager.

14   Q   Program manager.  I missed some of those in there.  How

15   many programs are you responsible for?

16   A   We have four state run residential habilitation centers.

17   Q   What are those habilitation centers?  Which four are they?

18   A   Fircrest School up in Shoreline.  We have Rainier School

19   in Buckley.  We have Yakima Valley School over in Semar and

20   Lakeland Village in Medical Lake.

21   Q   Let's start with the Rainier Habilitation Program.  Who

22   lives there?

23   A   Individuals that are supported through the Developmental

24   Disabilities Administration.  We have about 175ish

25   individuals that live there right now.  They are individuals

1    that are diagnosed with an intellectual or developmental

2    disability, so they need help in their day-to-day care,

3    washing, bathing, dressing, toothbrushing, cooking, those

4    kinds of things.  A lot of those individuals are also

5    diagnosed with a mental disorder, some sort of psychiatric

6    illness of some sort.  We do a lot of behavioral support with

7    their positive behavior support plans, medication changes,

8    those kinds of things.

9    Q    You mentioned the Developmental Disability Administration,

10   did I get that right?

11   A    Yes.

12   Q    Is that a state agency?

13   A    It is.  It is an administration that is under the

14   Department of Social and Health Services.

15   Q    Is that the organization that is responsible for placing

16   individuals at the facility?

17   A    Depends on what you mean by that.  We don't place anybody.

18   Our individuals are able to ask for our service.  They do

19   have to be a Developmental Disabilities Administration

20   client.  They have to go through an eligibility process.  I

21   am not very familiar with that.  Once they become a

22   Developmental Disabilities Administration client, if they are

23   in need of different services, they get assessed for it and

24   that sort of thing.  If they choose, they can go to a

25   residential habilitation center.  So there is an assessment

1  process that occurs.  It is all completely voluntary.  We

2  don't force anybody to go.  We don't force anybody to stay.

3  We don't really place people.

4  Q   Is the facility state funded?

5  A   We have a 50/50 split.  We get 50 percent of our funding

6  from the Center for Medicare and Medicare Services, 50

7  percent federally funded and 50 percent state funded.

8  Q   50 percent state, 50 percent federal, but 100 percent

9  governmental funded; is that right?

10 A   Yes.  It can get confusing.

11 Q   No, I get it.  So then the people who need the support of

12 the state there, are they there 24/7 in the facility or is it

13 a day program?

14 A   No, our clients live there 24/7, yeah.

15 Q   Some of the services you provide are assisting them with

16 the needs of daily living; is that right?

17 A   Yes, that is one of the pieces we support.

18 Q   Are there people who are there who will need support for

19 their entire lives?

20 A   Potentially, yeah.

21 Q   Are there also people who might I guess rehabilitate and

22 advance to a place where they don't need state care?

23 A   Yes, so when they are in our -- one of the facilities,

24 basically what our job is, is to train.  We actually have two

25 different types of certifications.  I am not sure how

1    in-depth you want me to go, but we do have a nursing facility

2    side, and we have an intermediate care facility side,

3    depending on where you are at.  So Fircrest has both; we have

4    a nursing facility and an intermediate care facility on

5    campus.  Lakeland is set up the same way.  Yakima Valley

6    School is a nursing facility only.  Rainier is an

7    intermediate care facility only.

8         When they come to us, our job is to train and make them as

9    independent as possible so that they can be supported in a

10   less restrictive environment such as somewhere in the

11   community.  That is our main focus when we support those

12   individuals.

13   Q    The Rainier is intermediate; is that correct?

14   A    Yes, intermediate care.

15   Q    You said Fircrest has nursing and something else?

16   A    Intermediate care.

17   Q    Does everyone who is in intermediate care advance to the

18   point where they can take care of themselves?

19   A    Not necessarily.  They can rise to the level that they can

20   receive support in the community like living on their own in

21   supportive living or a group home or a group training home or

22   an adult family home.  Really, when someone comes to us

23   specifically in our intermediate care facility, it's

24   typically to kind of stabilize and learn about the

25   individual, complete our assessment to see what supports they

1   would need if they were to live in the community.  The intent

2   is not for them to stay with us forever.

3   Q   What about nursing, are those people expected to go into

4   the community at some point?

5   A   If they so choose.  It is not as hard pushed as it is in

6   the intermediate care facility.  It's always an option.

7   Again, nothing we do at our facility is involuntary.

8   Everything is there as they want to be.  They can choose to

9   stay, similar to a nursing home.  We have the same

10  regulations that we have to follow.  We do still try to train

11  and get them kind of independent, though most of those

12  individuals are probably going to need some higher level of

13  nursing support for the rest of their lives.

14  Q   At Rainier, let's start there, is there a work program for

15  the residents?

16  A   Yes, we do have a work program.

17  Q   What kinds of tasks can residents do in that work program?

18  A   Currently, we are kind of restricted with COVID so there

19  is not too much going on.  We do have a coffee shop on campus

20  at Rainier that the individuals will help.  We have a few

21  that are working in there helping to make the food, package

22  it, running the cashier, delivering food, that kind of thing.

23  We do still have the individuals helping with the Chihuly

24  wire.  We pick up the materials and then the individuals will

25  craft it so that the gentleman that does the Chihuly

1    glassblowing, the things he uses for that, they help make

2    those.  They also help with the Pike Place Market.  They will

3    get newspapers and then they will separate them out and then

4    bundle them up so that when it goes to the Pike Place Market,

5    they can use it to wrap the fish, basically.

6        We had a thrift store off campus that the individuals

7    would work in.  However, because of COVID, that is not an

8    option right now.  We always have the option for them to work

9    with the counties and get employment in the community.

10   Again, everything we do is really working toward getting them

11   independent and integrated into the community.  Employment is

12   one of those things that we work on.

13   Q    What about before COVID, did you have laundry positions?

14   A    We did have some, I think two individuals in the laundry.

15   They were helping to, well, to do laundry, basically.  I am

16   sure everybody knows what laundry looks like.  We did have an

17   individual that was learning lawn maintenance, he was working

18   with the lawn crew.  He was figuring out how to mow grass and

19   do the edge work and stuff like that.

20   Q    I am going to break these down from what you talked about.

21   The Chihuly wire, the individuals that help with that, do

22   they get paid Washington state minimum wage?

23   A    Yes.

24   Q    They do?

25   A    Yes.

1   Q   Have they always gotten Washington state minimum wages?

2   A   No.  Prior to July 1 of last year, we actually went

3   through a process to get some minimum wage certificates.  So

4   the individuals went through an assessment process to

5   determine their productivity level to see kind of how well

6   they could work independently, what level they could do and

7   then they completed that application for every individual

8   that needed that, submitted it, so they were receiving

9   subminimum wage.  However, the legislature passed a law that

10  went into effect July of last year that eliminated some

11  minimum wage at all of our state agencies.  So from July 1

12  nobody is working at any of the residential habilitation

13  centers under minimum wage.

14  Q   Before the July 1 law, was the laundry paid minimum wage?

15  A   Oh, my goodness, she told me and I don't remember what she

16  said.  I want to say they were just making under minimum

17  wage.

18  Q   Is that the same with the Pike Place Market people who

19  were separating the papers for the fish?

20  A   Yes.

21  Q   When you did the Pike Place Market, were you selling those

22  papers to a private company?

23  A   We were selling the bundles to the Pike Place Market.  I

24  don't know if they are considered a private company or not.

25  Q   What about Chihuly, do you know if that's a private

1    company or not?

2    A    I do not know.

3    Q    Is that the Chihuly -- I was in Seattle not too long ago

4    and there was big gardens.  Is that the same Chihuly?

5    A    Yeah.

6    Q    So what was it that the residents were doing at that time?

7    I know the rate has changed, but what were they doing for

8    Chihuly?  What part of that art work were they providing?

9    A    When the gentleman is doing the actual glassblowing to

10   create those things, he uses wires, and so it is kind of

11   like, it is a long wire with a hook on the end kind of thing.

12   The individuals would actually be molding the wire to make

13   that into a hook so that he could use it for the actual

14   glassblowing.  I don't know all the technical terms of that

15   obviously.

16   Q    Yes.  Of course.  Sounds like the residents there were

17   just shaping wire, or putting wire together, is that right?

18   A    Yes, shaping it and it would get bundled up.  We did have

19   some individuals that would actually go and deliver it.  In

20   our employment, everything is kind of broken down by task.

21   Some people may be doing the wiring, some people may do the

22   delivery, some people may do pick up.  Some people for the

23   Pike Place Market may do the bundling of the newspapers.  It

24   just depends on what somebody's need is.  For every

25   individual that we have, we complete assessments on.  Again,

1    our job is to meet those needs.  If they are assessed at

2    being able to do this particular thing or they want to do

3    something, they want to learn it, then we help them learn

4    that so that they can become more independent.

5    Q    Do you know if Chihuly was buying the wire from you or

6    donating it or how it was getting to them?

7    A    They would pay us for it.  I don't remember the exact

8    amount.  We got a certain amount per, I think every ten wires

9    or so.  So then that would -- so that money would go back

10   into the fund for the individuals to purchase more wire and

11   then it just kind of cycled.  Some of it would go towards

12   their pay.  However, we weren't making a ton of money off of

13   it.  The facility was helping to close that gap of whatever

14   is needed.

15   Q    You were selling at a per item or per piece rate?

16   A    Yes.

17   Q    You said you weren't making a ton of money off it.  Were

18   you making any?

19   A    They are making some.  Obviously, if you sell something

20   you are going to get something back.  It wasn't enough to

21   cover the cost of more wire and the pay for the individuals

22   and things.  They were making some, but it wasn't a profit, I

23   guess.

24   Q    The amount which Chihuly was paying you wasn't covering

25   the cost of making it and the labor involved?

1  A   Yes.

2  Q   That is even though the rate is subminimum wages?

3  A   Correct.

4  Q   How would they get the wire if they didn't get it from

5  you?

6  A   The facility would buy it.  We have different budgets for

7  different things.  Our employment programs would buy those

8  kinds of thing out of their budget.

9  Q   How would Chihuly buy the wire if they didn't have your

10 residents making it?

11 A   That's a great question.  I don't know.  I don't know that

12 we were the only ones doing it.  I don't know how they work

13 either.

14 Q   In addition to the work programs, I think you mentioned

15 going back -- you gave me a lot of information.  You

16 mentioned that just having a routine and a schedule is part

17 of the therapy you provide at your facility.  Did I hear that

18 right?

19 A   Everybody chooses their own schedule.  We do a whole

20 assessment process.  There's a team of individuals that work

21 with every single individual that we support, and through

22 that team process they come up with the needs and the wants

23 for the individuals and then we develop training or goals

24 around that to help them be independent.

25 Q   Are the residents paid minimum wage to clean up after

1   themselves at the facility?

2   A    No, we have custodians that work and clean some of the

3   houses.  The individuals, if it is part of their training

4   program, they may learn to clean up after themselves and that

5   sort of thing.  Nothing more than you or I; if I was to go to

6   your house or something, I would clean up after myself.  I

7   would make my own bed and that kind of thing.  It is part of

8   their training program.  We don't force anybody to do

9   anything.  We encourage them and we try to teach them to the

10  best of their ability.

11  Q    Is there a benefit to keeping busy while they are in your

12  programs?

13  A    We don't really call it keeping them busy.  Our job is to

14  train.  We are constantly training and training and training.

15  That's the purpose of our facility.  Everything we do is

16  focused on their needs.  That is done per the assessment, per

17  team discussions.  It is not keeping them busy so much as

18  helping them be as independent as possible so they can move

19  out.

20  Q    Some of the -- you are calling it training.  Just to

21  clarify, when you say training, are you talking about things

22  the residents are doing without getting compensation?

23  A    Yes.

24  Q    Does some of their training involve making their own

25  meals?

1  A   If they choose.  Most of -- if we are talking about at

2  Rainier, they have a kitchen that actually supplies food to

3  the houses and then gets put in like those warming bins that

4  you see at like buffets and stuff, they will sit them in

5  things like that.  Then the individuals will come up, choose

6  what they want, fix their own plate, go and eat.  Staff help

7  them if they need it.

8  Q   Does any of that food come from Correctional Industries?

9  A   No.

10  Q   You don't purchase from Correctional Industries?

11  A   Not that I am aware of.  I can't remember the name of the

12  people we get our food from.

13  Q   The laundry, you mentioned there used to be a laundry

14  program?

15  A   So we have state staff that do the laundry.  The

16  individual that was working there actually has moved out of

17  the facility.  We do not currently have any clients working

18  in the laundry.

19  Q   If I heard that right, there was one person doing laundry

20  before?

21  A   Yes, one or two.

22  Q   How many people's laundry were they doing?

23  A   They would help with the facility mostly.  The way it

24  works is the individual's laundry is done on the houses,

25  similar to you or I in your house.  You will do your load of

1    laundry.  Some of the bigger stuff like your blankets, your

2    comforters, your sheets, those kinds of things, towels, those

3    would get sent over to laundry to be done.  If there is

4    something that got soiled or maybe there was something that

5    really you couldn't wash in a normal washer, it would need a

6    heavy duty kind of washer, those kinds of things would get

7    sent over.  They would wash it, then they would help fold it,

8    divide it, there is the word, divide it up into the different

9    houses and then prepare it to go back to the house.

10   Q    I think breaking that down, there's a laundry service but

11   there is also laundry in individual houses; is that right?

12   A    Yes.

13   Q    Who does the laundry in the individual houses?

14   A    Usually it is the individuals doing their own laundry.

15   Q    Are they paid to do their laundry?

16   A    No, again, part of their training program.  They work on

17   learning how to live independently.  Part of that is learning

18   how to do your own laundry.

19   Q    The State doesn't provide them like a motel service with

20   maid service?

21   A    No.  I bet they wish it did, but no.

22   Q    I think you said there was a Fircrest school.  Is there a

23   work program at that school as well?

24   A    We have a work program up at Fircrest.

25   Q    What do they do at Fircrest?

1  A    They have various tasks.  We do have a crew, what we call

2  a crew.  It is about five or six individuals who go around,

3  they pick up the different recycling bins throughout the

4  different homes, or the administration buildings and stuff.

5  They will help pick up the recycling, take it to the

6  recycling plant place, whatever that is called.  We have a

7  crew that does that.  We have a crew that will go around and

8  fill up the hand sanitizer bottles.  That's the new thing

9  since COVID.  A lot of washing your hands and a lot of the

10 anti-bacterial stuff.  They will go around and fill those up.

11 Now I am drawing a blank.  We have some that -- that program

12 stopped.  I want to say there's more.  We do have a coffee

13 stand up at Fircrest.  Those individuals help run that.  I

14 think that is about it from the work program.

15 Q    Who can purchase from the coffee stand?  Is it the general

16 public or only the residents?

17 A    Anybody and everybody.  All of our campuses are open.  We

18 do have visitors that will come by.  Less now that we have

19 COVID going on.  Open to anybody.

20 Q    Do you make any money from the coffee stand?

21 A    They do make some money.  I don't know how much.  I don't

22 know if they get a profit from it or not.

23 Q    The people that pick up the recycling bins, were they

24 doing that before this new July law was passed?

25 A    Yes.

Eagle - Redirect

1   Q   Were they doing it for less than minimum wage?

2   A   Most of them were not.  We did have a couple but they were

3   pretty close to minimum wage at the time, however, they were

4   working under the subminimum wage certificate.

5   Q   You also talked about recycling bins, trash, people that

6   fill up the soaps, now it is hand sanitizer, were they paid

7   minimum wage before the legislature changed the law?

8   A   We didn't have that job before the legislature changed the

9   law.  That is a new job they created after COVID hit, and

10   they were actually able to get out and about a little bit

11   more.  They have been making at least minimum wage ever

12   since.

13   Q   I think you said there were 100 some people in Rainier.

14   How many are there in Fircrest?

15   A   They are -- between the nursing facility and the

16   intermediate care facility, there is about 200.

17   Q   The people in the nursing facility, are they allowed to

18   participate in the work programs?

19   A   Yes.  I am not aware of anybody in the nursing facility

20   that currently works, but they do have that as an option.

21   Q   It isn't a prerequisite to work in the work program to be

22   able to show that you will be able to get out or be able to

23   be self sufficient?

24   A   No.  Again, everything we do is based on assessment, team

25   discussions with client and guardian.  All of it is part of

1  their plan.  None of it is contingent on them staying or

2  leaving.  That is always voluntary for them.

3  Q   Do these assessments -- you keep talking about

4  assessments -- do they consider at all the benefit to the

5  individual who is working to stay productive?

6  A   Yes, that is part of the assessment process.  Are they

7  benefitting from it, would they benefit from it, is it

8  something they want, is it something they need, those kinds

9  of bigger questions are things that we do answer through our

10  assessments.

11  Q   Participating in the program is completely voluntary; is

12  that right?

13  A   Yes.

14        MS. SCHEFFEY:  I have no further questions.  Thank

15  you so much.

16        THE COURT:  Ms. Brenneke.

17                    CROSS-EXAMINATION

18  BY MS. BRENNEKE:

19  Q   Just some very basic questions, Ms. Wells.  What is

20  habilitation, what does that mean?

21  A   For us, habilitation is really training and getting

22  someone to be as independent as they possibly can.

23  Q   You mentioned a number of different facilities, four

24  different habilitation centers?

25  A   Yes.

1    Q    Now, who owns those four habilitation centers?

2    A    That is an interesting question.  They are run by the

3    State.  However, because of the way they are paid, it is

4    technically the people that own them.  It is really the State

5    of Washington that owns the facility.

6    Q    Who operates the four habilitation centers?

7    A    The Developmental Disabilities Administration.

8    Q    Which is part of the State of Washington Department of

9    Social and Health Services, correct?

10   A    Yes, correct.

11   Q    I know these sound like basic questions.  I want to make

12   sure it is clear.  Are all of the people who live in the

13   habilitation centers there part of the Medicaid Treatment

14   Programs?

15   A    Yes, everybody that lives within one of the facilities has

16   their own plan, their own individual habilitation plan or

17   their care plan.  Every one of them has a plan, yes.

18   Q    Every one of them has a severe either developmental

19   disability or other type of disability that has led them to

20   need that level of care; is that right?

21   A    Yes.

22   Q    I believe you said all work done now in these centers is

23   paid at or above the minimum wage; is that right?

24   A    Correct.

25   Q    When you were using what you called subminimum wage

1    certificates, what was the authority that allowed you to get

2    those subminimum wage certificates?

3    A    So we actually had two layers of subminimum wage

4    certificates.  There is the federal subminimum wage, if

5    somebody is making lower than the federal minimum wage limit.

6    We did have that for some of our individuals.  Then the

7    state, through Labor & Industries, you know, L&I, that

8    actually gave us those through the application process.  We

9    had a Washington State Subminimum Wage Certificate as well.

10   Q    Is there a requirement that -- to get a Subminimum Wage

11   Certificate that the person employed has to be disabled in

12   some way?

13          MS. SCHEFFEY:  Objection, calls for a legal

14   conclusion.

15          THE COURT:  She may answer.

16          THE WITNESS:  Does that mean I need to answer?

17   BY MS. BRENNEKE:

18   Q    Yes.  You may answer.

19   A    I am not used to all the legal language.  I have honestly

20   never done this before, which is probably a good thing.

21          Yes, so part of the application process on there, there is

22   questions about why this person needs to make subminimum wage

23   and part of that is connected to a disability of some type.

24   Q    I know that you are a government entity.  Is it your

25   understanding that both government and private corporate

1    employers were eligible to obtain subminimum wage

2    certificates when that existed?

3    A    Yes.  From my understanding, anybody that needed that was

4    able to apply and get that.

5    Q    So when you were using that, that subminimum wage is

6    actually tied to the Washington state minimum wage; is that

7    right?

8    A    Yes, so again, there was the two certificates.  We had the

9    federal tied to the federal minimum wage and the state tied

10   to the state minimum wage.

11   Q    So when the habilitation programs were relying on the

12   subminimum wage certificates to pay less than the full

13   minimum wage, they were not relying on the government

14   facility exemption to the Washington minimum wage; is that

15   right?

16        MS. SCHEFFEY:  Objection, calls for a legal

17   conclusion.

18        THE COURT:  Objection is overruled.

19   BY MS. BRENNEKE:

20   Q    That means you can answer.

21   A    Thank you.  Sorry.  I forgot the question.

22   Q    The question is:  Your understanding of why you didn't pay

23   full minimum wage is because you had the subminimum wage --

24   A    Yeah, there was no exemptions that I was aware of.  My

25   understanding is it was state law that we had to follow this

1    process and then there is the federal law that we had to

2    follow as well.  I was not aware of any exemption.

3    Q   Are there some individuals in your care who don't work as

4    part of a work program but you determine are better suited

5    toward other kinds of programming?

6    A   Yes.  Not every individual that stays at the residential

7    habilitation center works.  It is all, again, tied to their

8    assessment, tied to their plan, is it something they need,

9    would benefit from.  If that's not a high priority for that

10   individual or the team feels it is not benefitting them,

11   then, yes, they have other training opportunities that they

12   would be able to do.

13   Q   Can you give some examples of some opportunities they

14   have?

15   A   So, again, we do a lot of behavior stability type

16   services, so if somebody is being aggressive towards a lot of

17   people or destroying a lot of different properties or hurting

18   themselves to the point they need medical care, then that is

19   usually a higher priority for us to kind of get them more

20   stable, kind of more back to baseline.  Those programs would

21   be, really be around trying to train the individual coping

22   skills and those kinds of things.  We have socialization

23   skills that we work on.  How do you talk to somebody?  How do

24   you stand by somebody so you are not right in their face?  We

25   are not grabbing on to people.  We do a lot around money

1    management, so learning how to count money, shop, budget.

2    Those kinds of things. We do a lot with our therapy so we

3    have physical therapy, occupational therapy, speech therapy,

4    who may be involved and maybe doing special things around

5    fine motor skills or just getting people up and moving,

6    getting them out of their bedroom. We do a lot of training

7    around like weight management, exercise, why it is important.

8    Q    Another question about the subminimum wages, when

9    assessments were done about how much a person should be paid,

10   was there ever a time when people were deemed to need to earn

11   at minimum wage?

12   A    Yes, we did have some individuals prior to July 1 that

13   were making higher than minimum wage. It was really tied to

14   productivity level and how well they could do the job on

15   their own or as independent as possible. We had some

16   individuals that were actually working out in the community.

17   Unfortunately, they lost those jobs when COVID hit. We are

18   kind of starting back over.

19   Q    The people who worked in the community, who did they work

20   for?

21   A    It depended on the person. We had an individual that was

22   working at Goodwill. We had somebody that was working at a

23   restaurant. We had somebody who was working at a radio --

24   not radio tower. I can't think of the name. My brain went

25   blank. Sorry. It just depended on the person and where they

1  worked.  Similar to you or I, they had an actual job they

2  went to.

3  Q    They worked for private corporations out in the community?

4  A    Yes.

5  Q    What were they paid?

6  A    At least minimum wage or higher.  It was pretty comparable

7  to what somebody else would make.

8  Q    Prior to the subminimum wage going away, did you have

9  people who were assessed to be having productivity at or

10  above a minimum wage level for jobs at your own facilities?

11  A    Yes.  We did have some that were on like the recycling

12  crew that were actually making minimum wage or higher.

13  Q    Did you have people who were running the essential

14  operations of the facility and you were depending on them to

15  run the essential operations of the facility?

16  A    Are you referring to the clients doing those kinds of

17  things or --

18  Q    Yeah.  Did your work program, like, do things that were

19  necessary in order to keep the doors open?

20  A    Not really.  Everything that we do is really around

21  training.  If somebody needs something, we will either create

22  the program or we will figure out a way to get them that.  We

23  do have state employees that would do all the stuff that is

24  needed to keep the facility running.

25           MS. BRENNEKE:  I have no further questions.  Thank

1   you, Ms. Wells.

2          MR. BERGER:  No questions.

3          MS. SCHEFFEY:  I have a few brief follow up

4   questions.

5                    REDIRECT EXAMINATION

6   BY MS. SCHEFFEY:

7   Q   You mentioned a few moments ago that some of the people

8   got minimum wages based on their productivity level, is that

9   correct?

10  A   Yes.

11  Q   In order to get minimum wage, did those individuals have

12  to show they were efficient at their task?

13  A   They had to show that they were able to do it similar to

14  what we would call a neuro typical individual, someone like

15  you or I, I would guess.

16  Q   Is the neuro typical individual judged by their slowest

17  day, fastest day, average time?

18  A   It is actually done over an average.  We do time studies,

19  or we did for everything -- well, no, we still do.  We do

20  time studies, then we kind of take -- those, whatever

21  sessions they do it over, and kind of average it out because,

22  you know, everybody has good days and bad days.

23  Q   Yeah.  So when you are doing a time study, are you

24  studying people who are actually doing those jobs for minimum

25  wage in the community?

1   A    Yes, so when -- so, hold on.  Maybe I answered that wrong.

2   We do the time studies based off of the individuals doing it

3   and then they would have staff kind of do the same study to

4   kind of compare.  Not necessarily someone in the community,

5   but somebody that would, again, neuro typical.  I really

6   don't like that word.  I don't want to say normal either.

7   Somebody that would be able to do it without the limitations

8   of the individual, if that makes sense.

9   Q    So the average, or the neuro typical person, when you are

10  comparing it, are you comparing it to them doing it

11  efficiently or to them taking as long as they possibly want

12  just to fill the time?

13  A    They would do it as like what is expected.  Let's say the

14  Chihuly wire, for example.  Staff would actually go through

15  the process of making it and kind of time it each step, and

16  then they would do the same thing with the individual and

17  then they would look at how efficient, how slow or how fast

18  the individual could do it and then compare the two.

19  Q    So if the individual could not do it efficiently, they

20  wouldn't get minimum wage; is that correct?

21  A    Prior to July 1 of last year, if they were under the

22  subminimum wage, yes.

23  Q    There was a time, right, where the Rainier School didn't

24  have a subminimum wage certificate; isn't that right?

25  A    I am not aware of that.  My understanding is we always had

1    one.  I could be wrong.

2    Q    Do you remember at any point Disability Rights of

3    Washington raising an issue about that facility not having a

4    subminimum wage certificate?

5    A    I am glad you clarified that.  I am not aware of the DRW

6    report around subminimum wage.

7    Q    Do you also have subminimum wage certificates from the

8    federal government?

9    A    We did.  We do not any more.

10   Q    Do you know for sure you had them from 2014 to now?

11   A    As far as I know, we did.

12   Q    Would you be the person to know or would someone else know

13   that?

14   A    I would have to go back and ask the facilities.

15   Q    That's not part of your responsibilities to get those

16   subminimum wage certificates?

17   A    No.

18   Q    That's not something you review regularly, right?

19   A    No, I wouldn't do it, no.

20   Q    Do you have anyone in your facilities who performs their

21   tasks slowly just to pass the time?

22   A    Not that I am aware of.  I mean, again, everybody has

23   their good days and bad days.  If they are not feeling quite

24   up to it that day, then they may take their time.

25   Q    Are they incentivized to be as quick as possible so they

1  could -- I guess this was before the minimum wage kicked

2  in -- so they could get a higher rate of pay?

3  A    Can you say that one more time?

4  Q    Do you kind of encourage your residents to work as fast as

5  they can so they can show their true abilities?

6  A    We are always encouraging our individuals to work to their

7  abilities.  We are not forcing them or anything to get them

8  to work faster.  They are being taught how to do each of the

9  tasks.  I mean, that's pretty much what we do is just

10  encourage and make sure they are on task.

11  Q    If they don't work efficiently before the change in law,

12  they would get a lower amount of pay; is that right?

13  A    Depending on the job.  So if they were working a job where

14  it was piece rate, for example, like the Chihuly wire, that's

15  usually tied to how many of those wires they can do.

16  Q    If they can't do the amount of those wires -- what was

17  that word?

18  A    Neuro typical.

19  Q    -- a neuro typical individual could do, they are not going

20  to get the highest rate available is, is that right?

21  A    Yes.  So, the way it worked is they would get paid per

22  piece.  If it took them two hours to do one piece, they would

23  get the same rate for that as they would each.  Then it would

24  be, you know, if they got hypothetically a quarter for every

25  wire that they did, then if they did ten of them, they got

1   $2.50 for that day.  That's kind of how it worked.

2   Q   Do you know what they got paid per piece?

3   A   I do not.

4   Q   Do you know the range of what they got paid per piece?

5   A   Not off the top of my head.  I am sure I have it

6   somewhere.

7   Q   You know it wasn't enough to get to minimum wage?

8   A   Correct.

9            MS. SCHEFFEY:  Thank you.  No further questions.

10           MS. BRENNEKE:  Thank you, Ms. Wells.  I have no

11  questions.

12           THE COURT:  Thank you, Ms. Wells.  You may be

13  excused.

14           THE WITNESS:  Thank you.

15           MR. SILVERMAN:  The defendant would call Sean Murphy,

16  Your Honor.

17           MS. BRENNEKE:  We are working to get him, Your Honor.

18  The witness is trying to get connected.  He says it is not

19  logging in.  He's trying.  Tyler, do you see anything?

20           THE CLERK:  No, he is not in the waiting room yet.

21           MS. CHIEN:  Seems like he's having some difficulties.

22  Might be prudent to take a break to see if we can figure out

23  the difficulty.

24           THE COURT:  We are having a problem with finding the

25  witness.

1      MS. BRENNEKE:  The witness is here.  He says he is

2  clicking the link that we sent and it is not logging in.  I

3  am not sure what that is about.  He is actively trying.

4      MS. BRENNEKE:  Might be ten minutes.

5      THE COURT:  We'll take our break, reconvene at 2:30

6  and get that worked out.  I hope.

7                    (Recessed.)

8    (The following occurred outside the presence of the jury.)

9      MS. MELL:  We can go ahead and call Mr. Grice.

10     MR. POLOZOLA:  We have Mr. Grice.  We are trying to

11  get him in now.

12     THE COURT:  Here is Mr. Grice.  Mr. Grice, if you

13  would unmute your phone.  Raise your right hand and be sworn.

14     THE CLERK:  Would you like me to bring the jury back

15  in?

16     THE COURT:  Excuse me, Mr. Grice.  I forgot where we

17  are.  We need to have the jury in.

18    (The following occurred in the presence of the jury.)

19     THE COURT:  All right.  Now, Mr. Grice, if you would

20  raise your right hand and be sworn.

21                  JOSHUA GRICE,

22    having been sworn under oath, testified as follows:

23     THE COURT:  Thank you.  You may inquire.

24

25

DIRECT EXAMINATION

BY MS. MELL:

Q    Your name is Joshua Grice; is that correct?

A    Correct.

Q    You work for the State of Washington?

A    Correct.

Q    You are a State employee?

A    Yes.

Q    The position you hold is employment standard program manager?

A    Correct.

Q    In that position, you are responsible for the enforcement of the Minimum Wage Act?

A    Yes, that is correct.

Q    The Minimum Wage Act is a labor standard, meaning a standard applicable to employment, not detention, correct?

A    Correct.

Q    So is Labor & Industries the agency that issues subminimum wage certificates to companies who wish to employ disabled people at subminimum wages?

A    Yes, the employment standards program at L&I does issue subminimum wage certificates on application from employers that pertain to workers with disabilities.

Q    All kinds of employers, private companies, for-profit companies, non-profit companies and even the State of

1  Washington, correct?

2  A   Yes, there are private employers as well as non-profit

3  employers that hold these certificates.  The law has changed

4  recently with regard to State agencies, as far as the

5  certificates.

6  Q   Historically, the State has not been exempt from the

7  subminimum wage certificate requirements when it wanted to

8  employ disabled workers, correct?

9          MR. POLOZOLA:  Objection, foundation.

10         THE COURT:  Speak up.

11         MR. POLOZOLA:  Foundation, Your Honor.

12         THE COURT:  I think he may answer.

13         THE WITNESS:  Could you repeat the question?

14  BY MS. MELL:

15  Q   Prior to the recent legislative changes applicable to the

16  State of Washington with regard to subminimum wage

17  certificates and the disabled, the State of Washington was

18  not historically exempt from obtaining subminimum wage

19  certificates when employing Washington's disabled citizens?

20  A   Correct, prior to the change in the law, state agencies

21  were required to obtain certificates for workers with a

22  disability to pay less than the minimum wage.

23  Q   Prior to the law change in 2019, L&I issued subminimum

24  wage certificates to Rainier School and Fircrest because they

25  were employing at subminimum wages, disabled workers?

1          MR. POLOZOLA:  Objection, assumes facts.

2          MR. BERGER:  Objection, relevance.

3          THE COURT:  He may answer.

4          THE WITNESS:  Correct.  The program -- employment

5    standards program had issued certificates to Fircrest and

6    Rainier School, which are state-operated facilities, to

7    employ workers with disabilities.

8    BY MS. MELL:

9    Q   2019 was the first year that L&I issued those subminimum

10   wages certificates to Fircrest or to Rainier School, correct?

11   A   I believe so, yes.

12   Q   Prior to 2019, Fircrest and Rainier School were -- were

13   employing disabled workers at subminimum wages and L&I knew

14   that, correct, without a subminimum wage certificate?

15   A   Prior to 2019, I am not aware that either of those

16   facilities had applied for the certificates.  I am not

17   certain what knowledge there was among program staff at that

18   time about the activities occurring at those two facilities.

19   Q   You are aware that in 2014, Disability Rights of

20   Washington notified the Department of --

21          MR. POLOZOLA:  Objection, assumes facts, Your Honor.

22          THE COURT:  Well, I think that is probably a fair

23   objection, Counsel.

24   BY MS. MELL:

25   Q   In 2014, did the Department of Labor & Industries receive

1  a letter from Disability Rights of Washington?

2  A    2014 is prior to my employment with the Department of

3  Labor & Industries.  I am not certain what specific

4  correspondence would have been received on this subject.

5  Q    You weren't there in 2014.  You have since been designated

6  the speaking agent for the Department of Labor & Industries

7  in this matter, correct?

8  A    Yes.

9  Q    You were deposed in this matter, correct?

10  A    Yes.

11  Q    And the Disability Rights of Washington communication to

12  the Department of Labor & Industries in 2014 was the subject

13  matter of your deposition, correct?

14  A    I recall testifying that I was aware of various

15  stakeholder processes that helped to establish the rules and

16  application processes related to subminimum wage certificates

17  for workers with disabilities.  I don't recall the specific

18  correspondence you are referring to.

19  Q    Okay.  You knew from those stakeholder meetings that there

20  were a number of entities, including the state, who had not

21  been obtaining subminimum wage certificates even though they

22  were using disabled workers at subminimum wages, correct?

23  A    Yes, I understand that stakeholder process.  The purpose

24  of it was to develop the process under state law that had not

25  been observed prior to that time for employers to seek

1    certificates for workers employed at subminimum wages, yes.

2    Q    L&I -- I say that in a way that is not very professional,

3    Labor & Industries writes administrative policies, correct?

4    A    The employment standards program at L&I does produce

5    administrative policies to establish interpretations that

6    guide its enforcement actions under various laws.

7    Q    One of those -- well, what you generally refer to as your

8    administrative policies are employment standards, right, ES

9    for short?

10   A    Yes, for the employment standards program, our

11   administrative policies are designated with an "ES" and

12   further nomenclature, depending on what law they relate to.

13   Q    Labor & Industries created an employment standard specific

14   to the applicability of the Minimum Wage Act, correct?

15   A    Correct, there is an administrative policy entitled ESA1

16   that relates to the applicability of the Minimum Wage Act.

17   Q    I am going to show you what has been marked as Exhibit

18   A-308.  Should have been received by your counsel and

19   forwarded on to you.  Do you have ESA1 accessible to you

20   there?

21   A    One moment.  You said A-308?

22        Yes, I have it.

23   Q    Is Exhibit A-308 the employment standard as to the Minimum

24   Wage Act applicability?

25   A    Yes, it appears A-308 is the ESA1 Minimum Wage Act

1    applicability policy last issued by the Department in 2014.

2            MS. MELL:  Your Honor, GEO offers Exhibit A-308, the

3    Minimum Wage Act applicability employment standard.

4            MR. POLOZOLA:  State would object on relevance and

5    403 grounds, Your Honor.

6            THE COURT:  Are these the policies that are in effect

7    now, or is this policy in effect now, Mr. Grice?

8            THE WITNESS:  There has been a revision to this

9    policy within the last year.  It is not the current version

10   in effect.

11           THE COURT:  Exhibit A-308 may be admitted.

12                (Exhibit A-308 was admitted.)

13   Q    So this particular employment standard as to the

14   applicability of the Minimum Wage Act describes more

15   specifically, from the Department of Labor & Industries'

16   perspective, when the Minimum Wage Act applies, correct?

17   A    Correct, this administrative policy is intended to provide

18   further detail as to whom the Minimum Wage Act applies and

19   particularly to whom it does not apply as specified in

20   various statutory exemptions.

21           MS. MELL:  May we publish the employment standard for

22   the jury so they may follow along, please?

23   BY MS. MELL:

24   Q    I am going to ask you to turn to Page 2, subsection 6

25   entitled "Which employees are excluded from the protection of

1    the Minimum Wage Act."  You see that section?

2    A   Yes.

3    Q   Mr. Grice, is there a subsection (k) set forth -- well,

4    this section talks about the exemptions to the Minimum Wage

5    Act set forth in the statute; is that correct?

6    A   Correct, this section describes statutory exemptions from

7    the Minimum Wage Act.

8    Q   Subsection (k) is specific to detention, correct, that's

9    set forth on Page 5?

10   A   Subsection (k) pertains to residents, inmates and others

11   in state custody, in the custody of state, county or

12   municipal institutions.

13   Q   From L&I's perspective by way of policy, state inmates who

14   are assigned by prison officials to work on prison premises

15   for a private corporation, they do not have an obligation to

16   pay minimum wage either, correct?

17            MR. POLOZOLA:  Object to the extent counsel is

18   seeking a legal interpretation from the witness, Your Honor.

19            THE COURT:  Mr. Polozola, I have a hard time hearing

20   you.

21            MR. POLOZOLA:  Sorry, Your Honor.  Is this better?

22            THE COURT:  Yes.

23            MR. POLOZOLA:  I would object to the extent counsel

24   seeks a legal interpretation from the witness.

25            MS. MELL:  GEO is simply asking how the Department

1    applied the standards.

2            THE COURT:  Just a minute.

3        Your question paraphrased not quite fully subsection (k).

4    The objection is sustained.

5    BY MS. MELL:

6    Q    Is it correct, Mr. Grice, that state inmates assigned by

7    prison officials to work on prison premises for a private

8    corporation at rates established and paid for by the state

9    are not employees of the private corporation and would not be

10   subject to the Minimum Wage Act according to practices at the

11   Department?

12   A    Yes, that would be the Department's enforcement policy as

13   codified in ESA1, our administrative policy on that subject.

14   Q    So any state inmate assigned under, for instance, a

15   contract with GEO to detain state inmates, GEO could have

16   those inmates working at two dollars a day and not be subject

17   to the Minimum Wage Act?

18           MR. POLOZOLA:  Objection, counsel is asking the

19   witness to speculate about a position they would take.

20           THE COURT:  The objection is sustained.

21   BY MS. MELL:

22   Q    Is it consistent with your standard that GEO could pay two

23   dollars a day to inmates assigned by the State of Washington

24   to be in their custody?

25           MR. POLOZOLA:  Same objection, Your Honor.

1        MR. BERGER:  Incomplete hypothetical.

2        THE COURT:  The objection is sustained.  You are

3   talking about this as though it were the current policy.  I

4   don't know that it is.  The objection is sustained.

5   BY MS. MELL:

6   Q   Mr. Grice, has this portion of your policy changed in any

7   more recent iteration?

8   A   I believe the revision that occurred earlier this year to

9   this policy did make some modifications to this section, but

10  they were not substantive.  They were more rephrasing and

11  clarifying.

12  Q   Were the changes because of this lawsuit?

13  A   I don't recall specifically what the changes were.  Again,

14  I don't think they were substantive or related to any

15  litigation.

16  Q   The enforcement position of the agency did not change with

17  any of the changes?

18  A   I don't believe so, no.

19  Q   So let's just pick the year that this was last modified,

20  2014.  Well, no, let's do it when the GEO contract was in

21  effect.  Let's do it 2018.  In 2018, if GEO had state inmates

22  assigned by prison officials to work on prison premises for

23  it, it could have paid them two dollars a day?

24        MR. POLOZOLA:  Same objection.

25        MR. BERGER:  Objection, incomplete hypothetical.

1    THE COURT:  The objection is sustained.

2  BY MS. MELL:

3  Q   Is it correct the Department of Labor & Industries would

4  not have enforced the Minimum Wage Act against GEO if the

5  state had assigned inmates by prison officials to work on

6  prison premises for GEO?

7    MR. POLOZOLA:  Same objection.

8    MR. BERGER:  Same objection.

9    THE COURT:  I think your question assumes facts not

10  in evidence.  Not supported by the record.

11  BY MS. MELL:

12  Q   Have you ever used this subsection in considering

13  enforcement action against GEO as to the applicability of the

14  Minimum Wage Act to detainees at the Northwest ICE Processing

15  Center?

16  A   This section has not entered into the -- has not been

17  material to any determination that I have issued while

18  holding the role of employment standards program manager.

19  Q   Have you made any determinations as to the applicability

20  to detainees at the Northwest ICE Processing Center?

21    MR. POLOZOLA:  Objection, Your Honor, I believe we

22  have been through this yesterday as well.

23    THE COURT:  The objection is sustained.  I think it

24  needs to be limited in time.

25

 1    BY MS. MELL:

 2    Q    From 2004 to date, has L&I made a determination as to the

 3    applicability of the Minimum Wage Act to detainees at the

 4    Northwest ICE Processing Center?

 5            MR. POLOZOLA:  Objection, covered by motion in

 6    limine.

 7            THE COURT:  The objection is sustained.

 8    BY MS. MELL:

 9    Q    Was the Minimum Wage Act applicable to the Northwest ICE

10    Processing Center from 2004 to date?

11            MR. POLOZOLA:  Same objection, Your Honor.

12            MR. BERGER:  Objection.

13            THE COURT:  Objection is sustained.

14    BY MS. MELL:

15    Q    Has the Department of Labor & Industries always maintained

16    that the Minimum Wage Act was applicable to the Northwest ICE

17    Processing Center and specifically the detainees there

18    working in the voluntary work program?

19            MR. POLOZOLA:  Same objection, Your Honor.

20            MR. BERGER:  Objection.

21            THE COURT:  The objection is sustained.

22    BY MS. MELL:

23    Q    Has the Department of Labor & Industries ever chosen not

24    to apply the Minimum Wage Act at the Northwest ICE Processing

25    Center --

1      MR. POLOZOLA:  Same objection.

2      MS. MELL:  Let me ask my question for the record,

3  please.  Can I complete my question?

4      THE COURT:  What is your question?

5      MS. MELL:  Thank you, Your Honor.

6  BY MS. MELL:

7  Q   Has the Department of Labor & Industries ever made a

8  determination that the Minimum Wage Act applies to the

9  Northwest ICE Processing Center for the detainees

10  participating in the voluntary work program based on legal

11  advice from the AG's office?

12      MR. POLOZOLA:  Objection, Your Honor, this is well

13  covered by a motion in limine.  Counsel is attempting to

14  testify.

15      THE COURT:  The objection is sustained.

16  BY MS. MELL:

17  Q   Mr. Grice, are you aware of the legitimate policy reasons

18  for exempting residents, inmates or patients of state, county

19  or municipal correctional, detention, treatment or

20  rehabilitative institutions, from application of the Minimum

21  Wage Act?

22  A   I am not aware of the specific policy reasons why the

23  legislature elected to exempt inmates and others in custody

24  from the Minimum Wage Act, no.

25  Q   Has the Department ever contemplated request legislation

1  to revise this exemption?

2  A   I am not aware of any such request legislation, no.

3  Q   Does the Department of Labor & Industries have a position

4  as to whether or not this is an appropriate exemption?

5          MR. POLOZOLA:  Objection, form, Your Honor.

6          THE COURT:  I don't know -- when you are asking the

7  position of the Department of Labor & Industries, I am not

8  sure what you are asking about, an agency of government

9  having or a department of government having a position.  I

10  think there needs to be some foundation for that question.

11  BY MS. MELL:

12  Q   Does the Department of Labor & Industries ever communicate

13  with the Governor's office about exemptions within its

14  statutes that are applied to, for instance, the Minimum Wage

15  Act?

16  A   The Department does communicate with the Governor's office

17  regarding various aspects of employment law, depending on how

18  that may arise, yes.

19  Q   Does it also give its opinion on the applicability of

20  Minimum Wage Act exemptions to the legislature?

21  A   No, generally the agency's role would be to execute and

22  enforce the law.  Aside from proposing agency requests

23  legislation, the Department would generally not offer its

24  opinion as to the legitimacy of any given exemption.

25  Q   Has the Department of Labor & Industries ever given its

1   opinion to the Governor's office as to the applicability of

2   the Minimum Wage Act to detainees participating in the

3   voluntary work program at the Northwest ICE Processing

4   Center?

5           MR. POLOZOLA:  Objection, Your Honor.

6           MR. BERGER:  Objection.

7           THE COURT:  The question is overbroad.  Sustained.

8   BY MS. MELL:

9   Q   Has -- in 2014, did the Department of Labor & Industries

10  give its opinion as to the applicability of the Minimum Wage

11  Act to participants at the Northwest ICE Processing Center's

12  ICE voluntary work program?

13          MR. POLOZOLA:  Objection, Your Honor.

14          MR. BERGER:  Objection, counsel is trying to

15  circumvent the Court's motion in limine rulings.

16          THE COURT:  The objection is sustained.

17          MS. MELL:  With regard to the objection being

18  sustained, is that based on the motion in limine, even though

19  the applicability --

20          THE COURT:  I am not going to explain it to you.  It

21  is obvious to me, and the objection is sustained.

22  BY MS. MELL:

23  Q   With regard to the Northwest ICE Processing Center, Labor

24  & Industries to date has never received a complaint from a

25  detainee at the Northwest ICE Processing Center about

1    subminimum wages, has it?

2    A    I am not aware of any complaint like the one you

3    described, no.

4    Q    Not one detainee held at the Northwest ICE Processing

5    Center has ever logged onto L&I's website and filed a Minimum

6    Wage Act claim, have they?

7    A    I am not aware of any complaints filed by detainees at

8    that facility.

9    Q    Not one detainee has ever called in to L&I's hotline or

10   made a phone call to their local L&I official to complain

11   about the one dollar a day rate for participating in ICE's

12   voluntary work program, correct?

13   A    I can't say for certain who may call -- who may call the

14   Department's phone line, as I don't receive reports of any

15   kind as to the subjects of those calls.  I am not aware of

16   any calls of that type.

17   Q    If somebody had called and complained about the dollar a

18   day rate, that would come through your department, correct?

19   A    Employment standards does have a 1-800 line where it

20   offers guidance on workplace rights laws.  That is staffed by

21   customer service specialists.  I am not entirely certain of

22   all of the -- they handle a variety of subjects.

23   Q    L&I has never opened an investigation to look into or

24   investigate any Northwest ICE Processing Center detainee

25   complaints about the dollar a day rate, has it?

1    A    No, I am not aware of any investigation that has dealt

2    with detainees at that facility.

3    Q    The Department of Labor & Industries has never enforced

4    the Minimum Wage Act with regard to federal employees,

5    correct?

6    A    No, a federal employee who inquired about workplace rights

7    with L&I would likely be referred to the U.S. Department of

8    Labor.

9    Q    Similarly, a federal detainee who made a Minimum Wage Act

10   complaint would be referred to the federal government?

11   A    No, I don't believe that necessarily would be the same

12   circumstance.  Likely someone who received that inquiry would

13   seek further guidance about how a state law may apply.

14   Q    So why do you say there would be a distinction between a

15   federal detainee and a federal employee?

16   A    Federal employees are subject very clearly to federal

17   labor laws, and state law is generally considered not to

18   apply to them as far as department procedure.  Inquiry from a

19   federal employee would be referred to the U.S. Department of

20   Labor.  There are more -- there are circumstances in which

21   state law might apply to individuals doing work with the

22   federal government who are not federal employees.

23   Q    Does that include the individuals who are in the Federal

24   Detention Center in SeaTac?

25   A    I am not certain whether the -- the Department has not

1    considered that question or issued any formal determination

2    on that question.

3    Q    Do you know what factors it would have to consider?

4         MR. POLOZOLA:    Objection, Your Honor, to the extent

5    she's asking the witness to testify about the law.

6         THE COURT:    The last question is incomplete.

7    Sustained.

8    BY MS. MELL:

9    Q    Are there factors that you know you would apply if -- to

10   ascertain whether or not you refer a federal detainee to the

11   federal government or open an investigation yourself?

12   A    The Department would likely seek legal guidance in

13   determining how state law may apply to that circumstance.

14   Q    Where does the Department of Labor & Industries get its

15   legal advice?

16   A    L&I consults with the Labor & Industries Division of the

17   Attorney General's Office for legal advice.

18   Q    In 2017, did the Department of Labor & Industries receive

19   notice from the Attorney General's Office about a press

20   conference concerning this case?

21   A    I was not employed at the Department for the entirety of

22   2017, and I am not specifically aware of that notice.

23   Q    As a speaking agent of the Department for purposes of this

24   case, did you know there was a press conference to announce

25   this case by the Attorney General?

1    A    I don't have any recollection of that at the moment.

2    Q    Do you have any recollection of there being communications

3    intra-agency about whether or not the Attorney General was

4    going to pursue this lawsuit?

5    A    I don't recall any communications.  I don't believe I was

6    involved in any of those communications, if they did occur.

7    Q    Would they have occurred at your level or were you too low

8    or you just weren't there at that time; is that right?

9    A    I started with the Department as a regulations analyst in

10   July of 2017.  So it is unlikely I would have been involved

11   in that conversation at any point in 2017.

12   Q    As the speaking agent for the Department of Labor &

13   Industries in this case, did you identify any notification

14   that Labor & Industries gave to GEO in advance of the

15   Attorney General filing this lawsuit?

16   A    I am not aware of any notification that the Department

17   gave to GEO, no.

18   Q    You are familiar with the Department of Labor &

19   Industries' procedures for enforcement of the Minimum Wage

20   Act, correct?

21   A    Yes.

22   Q    You know this lawsuit was not filed in the name of the

23   Department of Labor & Industries, correct?

24   A    I don't know the full background as to how this lawsuit

25   was offered, within the scope of my duties.

1    Q    Do you know, when the Department of Labor & Industries

2    wishes to enforce the Minimum Wage Act, it does that in the

3    agency's name?

4    A    Yes, the Department does use its own authorities in the

5    enforcement of the Minimum Wage Act.

6    Q    Before the Department takes a formal enforcement action

7    when enforcing the Minimum Wage Act, the Department is in

8    communication with the employer during the investigative

9    stage; isn't that correct?

10   A    Yes, any investigation conducted by L&I regarding labor

11   standards would involve communication with the employer.

12   Q    L&I never did an investigation of the practices at the

13   Northwest ICE Processing Center specific to VWP participants

14   in the voluntary work program?

15   A    No, no, I am not aware of any investigation that touched

16   on detainees in the voluntary work program.

17   Q    You know Department of Labor & Industries has been inside

18   the Northwest ICE Processing Center, don't you?

19   A    I understand that certain other areas of L&I, in my

20   recollection, the safety and health officials have conducted

21   inspections at that facility.

22   Q    Do you know that when they are on site, that they are

23   given full access to the facility?

24   A    I don't know the nature of their access or the procedures

25   they follow for their investigations.

1    Q    Do you know that they ascertain, during their inspection,

2    the number of employees and they write that number down in

3    their reports?

4            MR. BERGER:  Objection.

5            MR. POLOZOLA:  Objection, assumes facts.

6            THE COURT:  Sorry.  I heard something.

7            MR. POLOZOLA:  Objection, assumes facts.

8            THE COURT:  I think he may answer, if he knows.

9            THE WITNESS:  Can you repeat the question?

10   BY MS. MELL:

11   Q    Do you know that the Department of Labor & Industries,

12   when it conducts a site inspection and walk through, it

13   counts the number of employees and records the number in

14   their inspection report?

15   A    I don't know the details of the procedures that safety and

16   health inspectors follow for their inspections.

17   Q    You do know that the Department of Labor & Industries has

18   never communicated with GEO about the applicability of the

19   Minimum Wage Act to the voluntary work program at the

20   Northwest ICE Processing Center, don't you?

21   A    I am not aware of any communication from the employment

22   standards program regarding applicability of the Minimum Wage

23   Act with GEO, no.

24   Q    The whole department, not just your division, right?

25   A    I can't say with certainty what would have been

1    communicated by other administrative units at L&I.

2    Q   You are speaking today as a speaking agent for the entire

3    agency, aren't you?

4           MR. POLOZOLA:  Objection, Your Honor.

5           THE COURT:  That's a fair question.

6           THE WITNESS:  I don't believe I am speaking for the

7    entirety of L&I.  I am offering what I am aware of in the

8    scope of my duties and past involvement in this case as a

9    speaking agent.

10   Q   Is it your understanding that your subpoena for trial was

11   limited to your division and not you as a speaking agent?

12   A   I don't recall how my designation was framed in that

13   subpoena.

14   Q   Assuming that you were designated -- well, you know you

15   have been designated as the speaking agent for the Department

16   of Labor & Industries in this case, correct?

17   A   Yes, in the past, in the past aspects of this case, I

18   acted as a speaking agent for the Department.

19   Q   The -- I took a deposition of you in your capacity as

20   speaking agent, correct?

21   A   Correct.

22   Q   And in your review of the subpoena for purposes of trial,

23   you did not ascertain whether or not you would be speaking in

24   your capacity for the agency as opposed to an individual

25   capacity?

1    A    It was my understanding that I was here in my individual

2    capacity as employment standards program manager for today's

3    purposes.

4    Q    Did you ascertain that from the attorneys as opposed to

5    you looking at the subpoena and reading it yourself?

6            MR. POLOZOLA:  Your Honor, I am going to object to

7    the extent counsel is seeking privileged information or

8    asking him to make a legal conclusion.

9            MS. MELL:  I am asking what he based it on.  Did he

10   rely on his attorney's advice or did he make the

11   determination?

12           MR. POLOZOLA:  Also relevance.

13           THE COURT:  Objection is sustained.

14   BY MS. MELL:

15   Q    Did you review the subpoena?  Did you look at it yourself?

16   A    Yes, I looked at it.

17   Q    Did you ask the question?

18   A    I did not specifically ask that question, no.

19   Q    Could you be mistaken as to whether or not you are here in

20   a speaking agent capacity versus an individual capacity?

21   A    I could be mistaken, but I believe I am here as an -- in

22   an individual capacity.

23           MS. MELL:  I have nothing further.

24           THE COURT:  Cross?  Any questions?

25           MR. POLOZOLA:  Yes, just briefly.

```
 1                      CROSS-EXAMINATION
 2   BY MR. POLOZOLA:
 3   Q   Mr. Grice, you were asked a few questions a moment ago
 4   about the administrative policy, ESA1, correct?
 5   A   Correct.
 6   Q   What's your understanding about whether that policy has
 7   the force of law?
 8   A   An administrative policy issued by the Department would
 9   not necessarily have the force of law in the same way a
10   statute or a rule adopted by the Department would.
11   Q   You were asked about exemption (k).  I believe you said or
12   you read it as the exemption that referred to state and
13   municipal institutions, right, do you recall that?
14   A   Yes, I do.
15   Q   Counsel asked you some questions, there is the sentence
16   that referred to a private contractor, do you remember that?
17   A   I do.
18   Q   That was the sentence that referred to state inmates
19   assigned by prison officials to work on prison premises; is
20   that correct?  Do you recall that language?
21   A   Yes.
22   Q   So what is your understanding about that portion that
23   refers to private contractors about where the private
24   contractors may have been?
25   A   My understanding of that language is that it is offered to
```

1  further interpret and provide guidance on exemption (k) which

2  applies to state, county and municipal facilities in which

3  someone may be a resident or inmate.  The language there is

4  intended to provide further context as to how that aspect may

5  apply in those situations.

6  Q   Your understanding, does exemption (k) apply to private

7  facilities?

8  A   No, exemption (k) relates to inmates or residents held in

9  state, municipal or county facilities and does not relate to

10 private facilities.

11         MR. POLOZOLA:  Thank you.  Nothing further.

12         THE COURT:  Any further questions?

13         MS. MELL:  No, Your Honor.

14         THE COURT:  Thank you, Mr. Grice.  You may be

15 excused.

16     You may call your next witness.

17         THE CLERK:  It appears Juror 8 might have dropped off

18 a second ago after we finished this witness.

19         THE COURT:  We better reconnect Juror No. 8.

20         MS. CHIEN:  Can you tell us who you might be calling

21 next while we are waiting on Juror 8?

22         THE COURT:  Fair question.  Who is the next witness?

23         MR. SILVERMAN:  Given the misunderstanding, we are

24 going to call Mr. Ragsdale is next, who is under our control.

25         THE CLERK:  She's just logging in.  Let me get her

1   back.  She has returned.  Nope.  I was going to say the

2   witness is here, but I don't believe so.

3           MS. SCHEFFEY:  When I spoke with him, he was trying

4   to join.

5           THE COURT:  Ms. Farney, someone there asked a

6   question that appeared you were talking to someone.  Okay.

7   You are not distracted by anything, I hope, that is going on.

8   Okay.

9           JUROR 5:  Are you referring to me?

10          THE COURT:  No, I was referring to Ms. Farney.

11      Where is her witness?

12          THE CLERK:  The witness has not logged in yet.

13          MS. MELL:  I believe he is trying to come in.  Do you

14   see him there?

15          THE CLERK:  There he is.

16          THE COURT:  Mr. Ragsdale, raise your right hand and

17   be sworn.

18                    DANIEL RAGSDALE,

19      having been sworn under oath, testified as follows:

20          MS. SCHEFFEY:  May I proceed?  Can you hear me,

21   Your Honor?

22                    DIRECT EXAMINATION

23   BY MS. SCHEFFEY:

24   Q   Good afternoon.  Thank you for joining us.  Could you

25   state your name for the record?

1   A   Daniel Ragsdale.

2   Q   Where do you work, Mr. Ragsdale?

3   A   I work for the GEO Group.

4   Q   What is your title?

5   A   Executive vice president for contract compliance.

6   Q   What does that mean?  What do you do?

7   A   I am a compliance officer for the company.  My team and I

8   perform audits of the company's operations to make sure we

9   meet the contract requirements with our clients and whatever

10  standards are incorporated in the contracts.

11  Q   Where did you work before you worked at GEO?

12  A   I worked for U.S. Immigration and Custom Enforcement.

13  Q   What job did you hold there?

14  A   I worked there for 21 years.  I had several jobs, recent

15  job was deputy director of the agency.

16  Q   21 years, that's awhile.  Let's go through all of them.

17  What was your first job?

18  A   In 1996, I joined what was the Immigration and

19  Naturalization Service in New York City.  I joined the legal

20  program.  I was the assistant district counsel.  I was there

21  for three years.  I transferred to Tucson, Arizona as

22  assistant chief counsel.  I got promoted and became deputy

23  chief counsel and went to Phoenix, Arizona and was there for

24  three years.  I went to Washington, D.C. where I was the

25  chief of the enforcement law division.  I was in that job for

1    about two years.  Then I was promoted and went to the ICE

2    sort of director's office as the senior management counsel,

3    and I was in that job for about roughly two years.  Then I

4    became the executive associate director for management and

5    administration, and I was in that job for about two years.

6    And then I became the deputy director, and I was in that job

7    for about five years.

8    Q   As a deputy director, did you oversee detention services

9    for ICE?

10   A   As the deputy director of the agency, I worked for the

11   presidentially-appointed, Senate-confirmed political

12   appointee.  Everything else in the agency, other than a

13   couple political appointees, worked for me.  I oversaw and

14   was responsible for everything.

15   Q   What is your understanding of why ICE contracts with

16   private contractors for detention services?

17   A    In the time that -- my 21 years, the INS and then ICE as

18   the successor agency and part of what was the INS, inherited

19   both contract facilities and government-owned.  Essentially,

20   there were never enough government-owned facilities to sort

21   of manage the operational requirements of the agency, not

22   under what was the Immigration and Naturalization Service nor

23   under ICE.  The contracting was both sort of a matter of

24   policy from the executive branch but also a decision by

25   Congress to not have the government owning every detention

1    center that the agency required.

2    Q    You just said there were never enough government-owned

3    facilities.  Why didn't ICE build more facilities?

4              MR. POLOZOLA:  I object on relevance and speculation.

5              MR. WHITEHEAD:  Also the witness is not here to

6    testify on behalf of ICE.

7              MS. SCHEFFEY:  I am asking about his personal

8    experience.  No different than Mr. Gard the other day.

9              THE COURT:  The objection is sustained.

10   BY MS. SCHEFFEY:

11   Q    Do you have any knowledge, Mr. Ragsdale, personal

12   knowledge of ICE building a facility from the time of its

13   existence which was 2003 to now?

14   A    At the time I was there, ICE never built a facility.

15   There is a very specific type of appropriation Congress must

16   provide.  It is construction funds.  It is not like the

17   agency can take money appropriated for another purpose and

18   then build a building or build a detention center.  It is a

19   Congressional decision as to what the agency can and cannot

20   do in terms of construction.

21   Q    If ICE didn't build any facilities, how did it find more

22   space to detain people?

23             MR. POLOZOLA:  Your Honor, same objection as a moment

24   ago.

25             THE COURT:  I think he may answer.

1        THE WITNESS:  So there were two avenues.  They either

2   went to private industries, essentially the contracting

3   community, and put out requests for proposals, they went to

4   private companies or they would go to other government

5   agencies, local sheriffs, other municipalities and sort of

6   what they would call enter into an intergovernmental service

7   agreement and buy detention space from another government

8   agency.

9   BY MS. SCHEFFEY:

10  Q   When it -- when ICE would contract with private

11  industries, what was the purpose -- let me back up.  When ICE

12  would contract with private industries, did it have standards

13  the private companies must follow?

14  A   Yes, so the INS in 2000 published the first set of

15  detention standards related to immigration detention.  There

16  had been follow-on revisions of that, the most recent one are

17  the Performance-Based National Standards that were revised in

18  2016.  There is a very -- it is several hundred pages of

19  standards that contractors are required to follow in order to

20  house immigration detainees.

21  Q   That most recent revision, was that while you were still

22  deputy director?

23  A   Yes.

24  Q   Who was the president at that time?

25  A   It was President Barack Obama.

1   Q    Have they been revised since, to your knowledge?

2   A    The Performance-Based National Standards have not.  I

3   believe in 2019, ICE updated its National Detention

4   Standards, which are not standards that GEO follows.  It is

5   standards that apply at the type of facilities that are run

6   by a local sheriff.  It is essentially a lower set of

7   standards as opposed to the Performance-Based National

8   Standards, the most rigorous standards.

9   Q    How familiar are you with the Performance-Based National

10  Standards?

11  A    I am familiar with them.  As I said, they are several

12  hundred pages.  It is certainly not something anybody would

13  memorize.  They are broken down by activities.  It is a

14  document that is meant to be consulted.

15  Q    Do you have a copy of the Performance-Based National

16  Standards in front of you?

17  A    I have -- there is a book right here.

18  Q    It should be Exhibit 127.  If we need to refer to them, we

19  can pull that up.  For now, I think my questions shouldn't be

20  that deep.  Do the Performance-Based National Standards say

21  anything about a voluntary work program?

22  A    There is a specific standard that relates to the voluntary

23  work program, yes.

24  Q    Do you know what standard that is?

25  A    I believe the 5.8.

1    Q    Would it help you to look at that standard?

2    A    If we are going to discuss it in detail, yes.

3    Q    Why don't you pull it up, and I will have our tech team

4    pull 5.8 of Exhibit 127 up.  While we are discussing that,

5    what is your understanding of the purpose of a voluntary work

6    program?

7    A    The voluntary work program has been in existence again

8    since the standards in 2000.  It is under the chapter of

9    activities.  These are -- this portion of the standards

10   relates to sort of the things that are available to folks

11   that are in ICE's custody.  It is recreation, voluntary work

12   program, that sort of type of activities.

13   Q    Are you saying the voluntary work program is like

14   recreation?  It is just an activity?

15   A    So the purpose of the voluntary work program is to combat

16   what is sort of in the industry called idleness.  In other

17   words, for folks that are in the immigration process, you

18   know, it was an idea to make the day seem to go faster, make

19   the day more normal, human beings are sort of interested in

20   having a routine.  It is sort of a principle that exists.  It

21   was sort of imported from the criminal justice sort of

22   environment over to the immigration detention environment to

23   give folks something to do.

24   Q    Is that just your position or is that reflected in the

25   Performance-Based National Standards?

1    A    In other words, the standard sets out a purpose, outcomes.

2    This is defined by ICE.  Again, all of these standards are

3    required by the contract for GEO to follow.  This is not

4    something that is a GEO idea.  This is required by the

5    contract.  It is a necessary required function that we must

6    provide.

7    Q    So I think you can see in front of you on the screen, if

8    not, hopefully you can see on your page, expected outcomes in

9    Section 5.8.  What is your understanding of what the phrase

10    "expected outcomes" means in the Performance-Based National

11    Standards?

12    A    The concept of a performance-based standard, there are

13    these sort of principled goals that the agency sets out that

14    are expected of the contractor, in this case, that we are

15    supposed to perform.  These are statements that we are to

16    meet in implementing the voluntary work program.  It doesn't

17    prescribe a precise method in every case.  It sets out a

18    floor that we are required to do.

19    Q    When we are talking about the floor, if we could call out

20    item 3 under "expected outcomes," which starts with

21    "essential operations."

22    A    Yes, I see it.

23    Q    What is your understanding of what GEO must do to comply

24    with that expected outcome?

25    A    As I understand it, the purpose of the voluntary work

1    program is to essentially enhance the overall operation of

2    the facility.  In other words, it is not supposed to be a

3    function that is busy work.  It is not something where let's

4    just say you had a detainee that was working in a cleaning

5    type role, you wouldn't take dirt on the floor and keep

6    throwing dirt on the floor just to have the work program go.

7    It has to be something meaningful and useful that just sort

8    of would make logical sense.  That's what I understand that

9    to mean.

10   Q   We can take that part down for now.  What is your

11   understanding of what detainees at the Northwest ICE

12   Processing Center are paid in the voluntary work program?

13   A   As I understand it, they are paid a dollar a day.

14   Q   Why?

15   A   The dollar a day is -- first of all, it is set by the

16   agency.  In other words, there is a portion of the

17   Immigration and Nationality Act that authorized ICE to pay

18   detainees in the detainee work program.  There is no

19   appropriation.  Just means you have the authority to do it.

20   Congress, through the ICE budget process or every agency's

21   budget process, prescribes how much money the agency can

22   spend on a particular item.  In this case, the voluntary work

23   program is in ICE's budget.  It is in our contract.  It is in

24   the standard, and the rate that the agency has set is a

25   dollar a day.

1    Q    When you say "the agency," what are you referring to?

2    A    ICE, about ICE.

3    Q    So have you visited other facilities as part of your time

4    at ICE?

5    A    Yes, in Arizona there were facilities that I worked at on

6    a regular --

7            MR. WHITEHEAD:  Objection, relevance.  Is the witness

8    testifying for GEO or ICE?

9            MS. SCHEFFEY:  I am asking about his personal

10   experience if he visited other facilities.

11           THE COURT:  Well, the answer to the question is yes.

12   The rest of the witness's answer is not responsive to the

13   question and should be stricken.

14           MS. SCHEFFEY:  Thank you.  Your Honor.

15   BY MS. SCHEFFEY:

16   Q    Did you ever visit any facilities where the voluntary work

17   program paid minimum wage?

18   A    No.

19   Q    Did you visit the Northwest ICE Processing Center when you

20   worked for ICE?

21   A    I did.

22   Q    What was your impression of the Northwest ICE Processing

23   Center?

24   A    I have a favorable impression of it.  The facility was

25   built for immigration detention.  It was -- it was a

1    relatively modern facility.  Of course, that was several

2    years ago when I was there.  It was built for the purpose for

3    which it is being used.  It was -- I had a favorable

4    impression of it.

5        In addition, because there is office space that ICE also

6    occupies, there is a large component of ICE personnel that

7    are at the facility.  In terms of the ICE officers being able

8    to speak with detainees, the immigration court function, it

9    was designed for that purpose.  There was certainly some

10   efficiencies related to the way the facility could be run

11   based on the physical layout.

12   Q   At the time you visited the Northwest ICE Processing

13   Center while you were still with ICE, did you have any

14   concern about the rate that detainees were being paid?

15           MR. WHITEHEAD:  Objection, Your Honor.

16           THE COURT:  He may answer.

17           THE WITNESS:  No, I did not.

18   BY MS. SCHEFFEY:

19   Q   Why not?

20   A   Again, the appropriation and the amount of money that the

21   agency had been spending on custody operations is in the

22   billions.  As part of the agency's budget process, every

23   dollar, every component part of the essential cost of

24   detaining someone is calculated by the agency.  What I will

25   say is it is not money that was available to fund activities

1    as a decision that I could make.  In other words, even as the

2    No. 2 person at the agency, it is Congress that appropriates

3    money and essentially tells the agency how we can spend it.

4    There is not funding for that type of activity that we could

5    just make that decision.  Doesn't work that way.

6    Q    Have you made ICE aware of this lawsuit?

7    A    I have not personally made ICE aware.  I have had

8    conversations with ICE employees about it.  They are

9    obviously aware.

10   Q    Has ICE changed any of it practices in response to this

11   lawsuit?

12   A    Not that I am aware of.  Certainly as related to the

13   voluntary work program, that is the standard the agency has

14   since its published and again it is required in our contract.

15   Q    What is the current status with ICE on the voluntary work

16   program?

17          MR. WHITEHEAD:  Objection.

18          MR. POLOZOLA:  Objection, form.

19          THE COURT:  I don't know what the import of your

20   question is, Ms. Scheffey.  The objection is sustained.

21   BY MS. SCHEFFEY:

22   Q    Are you aware if ICE changed any of its policies or

23   practices you just discussed since the filing of this

24   lawsuit?

25   A    ICE is still requiring us to follow this standard, and it

1    is still a requirement for GEO to follow.

2    Q    I want you to put your GEO hat on for a minute.

3    A    Okay.

4    Q    What is your understanding of why GEO pays a dollar a day

5    to detainees at the Northwest ICE Processing Center?

6    A    GEO follows the standard.  It is really ICE's dollar and

7    GEO is the intermediary.  In other words, the agency -- in

8    our contract, there is a contract line item number or CLIN

9    that tells GEO what it can spend on the voluntary work

10   program.  It is a matter of federal contracting.  We are

11   performing or implementing the voluntary work program at

12   ICE's direction in the way they essentially want us to

13   implement it, and that's what we do.  GEO has no discretion

14   here.  This is something done at the agency's direction.

15   Q    You mentioned earlier that I believe ICE has not built a

16   new facility since 2003; is that correct?

17   A    That's correct.

18   Q    Has GEO built a new facility since 2003?

19   A    Yes, we just built a facility in the suburbs of

20   Houston, Texas for ICE.

21   Q    Do you know if the Northwest ICE Processing Center was

22   built after 2003?

23   A    I don't know precisely.  No, I believe it was built

24   earlier than 2003.

25   Q    Do you know the approximate cost of building one of those

1    facilities?

2    A    I can tell you the facility in Texas cost more than $100

3    million.

4    Q    Is GEO taking on a risk in building these facilities?

5    A    Yes, because the agency signs contracts that are generally

6    one year and have option years.  ICE is generally

7    appropriated year to year.  It is what they call one-year

8    money.  There is no guarantee for GEO that the agency will

9    continue to use the facility in perpetuity, certainly as long

10   as the building would last.  The risk is borne by the

11   contractor.

12   Q    Does GEO have to continue to maintain those buildings?

13   A    Yes, obviously not only do the detention standards require

14   it.  It has to be an appropriate, habitable, well-maintained

15   facility, air conditioning, heat.  There are medical

16   facilities.  For example, in Houston the facility has two

17   backup generators.  In the case of hurricanes, the facility

18   will have electricity.  All of those things require

19   maintenance, yes.

20   Q    So for example at the Northwest ICE Processing Center,

21   when GEO enters into a contract with ICE, does that contract

22   have to account for all the maintenance and all the other

23   expenses, all building expenses?

24   A    Essentially, the contract price covers those things.  Yes.

25   Q    At the Northwest ICE Processing Center, is there any

1    guarantee the government will use that facility again next

2    year?

3    A    There are termination clauses in the contract.  There

4    certainly would have to be notice requirements.  What is

5    important to note is, again, the agency can't spend money it

6    doesn't have.  If Congress appropriates money, the agency may

7    use it and continue.  If Congress doesn't appropriate money,

8    the agency may be authorized to use it, but may not be able

9    to do it because there isn't funding.

10   Q    With respect to next year, has Congress appropriated money

11   yet?

12   A    The President just proposed the fiscal year '22 budget.

13   Federal budgets start on October 1.

14   Q    Would that budget include funding for the Northwest ICE

15   Processing Center?

16            MR. WHITEHEAD:  Objection, Your Honor, foundation.

17            MS. SCHEFFEY:  I can rephrase.

18   BY MS. SCHEFFEY:

19   Q    Do you know anything about that appropriation or the --

20            THE COURT:  The budget is not yet fixed, I believe,

21   for the next fiscal year; isn't that right, Mr. Ragsdale?

22            THE WITNESS:  President Biden has proposed his budget

23   to Congress.

24            THE COURT:  Wait a minute.  Wait a minute.  Wait a

25   minute.  Will you answer my question, please?

 1              THE WITNESS:  Is it final yet?  No.

 2              THE COURT:  Okay.  The objection is sustained.

 3    BY MS. SCHEFFEY:

 4    Q    Do you know if the proposed budget suggests an increase in

 5    the voluntary work program payment?

 6    A    The budget includes detainee pay as part of ICE's

 7    formulation.  It does not break that down, but it does not

 8    call out for an increase in the dollar a day for the detainee

 9    work program, no.

10    Q    In your role at ICE, when you send out an RFP, did you

11    have any knowledge that the private contractor would be

12    making a profit?

13              MR. POLOZOLA:  Objection, foundation and leading.

14              THE COURT:  It is leading.  The objection is

15    sustained.

16    BY MS. SCHEFFEY:

17    Q    Let's try it a different way.  GEO, has GEO hidden from

18    the federal government there might be a profit baked into its

19    proposals?

20    A    No.  So when the agency solicits work from contractors,

21    there is something called a federal acquisition regulation or

22    FAR that governs the process.  That's not just for ICE,

23    that's not just for the Department of Homeland Security, it

24    is federal government-wide.  There is a particular regulation

25    in the FAR that permits contractors to make a profit.  In

1    fact, the regulation says that a profit is appropriate for

2    government contractors because it enhances efficiency,

3    enhances performance.  Just as that principle exists in the

4    regular commercial environment, when the government is the

5    recipient of the services, the government specifically

6    contemplates contractors making a profit.

7    Q    Why do contractors get to make a profit?

8    A    They wouldn't exist.  There wouldn't be anybody to

9    contract with if folks couldn't make a profit.

10   Q    Is the profit related to the risk of building those

11   facilities?

12   A    Certainly in part, absolutely.  In other words, I will

13   tell you again as we talked about sort of the differences

14   between the government-owned facilities and the private-run

15   facilities, the government-run facilities were demonstrably

16   more expensive per person per day, in some cases double or

17   triple the amount.  There are certain things that are

18   inherently governmental that the government employees have to

19   do in the law enforcement, in the judiciary obviously.  In

20   cases where there are things that government doesn't need to

21   have expensive or more expensive government employees doing

22   that work, it obviously makes sense to contract it.  Even

23   those principles are generally set by the executive office,

24   the office of management and budget.  It is government-wide.

25   Q    I think you just mentioned that the government sets the

1  amount of profit.  Is that what you said at some point in

2  there?

3  A   The government doesn't set the profit.  It specifically

4  contemplates its contractors making a profit.

5  Q   Does the government allow GEO to make an unlimited profit?

6  A   The regulation doesn't put a ceiling or a floor.  The idea

7  of profit is to again encourage efficiency, get high

8  performance.  It doesn't put a ceiling or floor.

9  Q   How does ICE control for profit?  How does it not have

10  everyone making one hundred percent profit?

11       MR. WHITEHEAD:  Objection, Your Honor, foundation,

12  relevance.

13       THE COURT:  Sustained.

14  BY MS. SCHEFFEY:

15  Q   Does ICE have -- when you were at ICE, did you have access

16  to the privately-run facility?

17  A   In terms of physical access, yes.

18  Q   Did you ever use the access to make sure they were doing a

19  good job?

20  A   ICE has its own auditing it performs.

21       MR. WHITEHEAD:  Objection.  That was a yes or no

22  question.  Also relevance.

23       THE COURT:  Sustained.

24  BY MS. SCHEFFEY:

25  Q   For GEO, how does your experience at ICE help you in your

1    current position?

2    A    Well, again, I am familiar with the agency's operation,

3    familiar with what the agency requires.  I obviously still

4    have contact with other employees at the agency.  I am

5    obviously very familiar with what the agency does, the way --

6    what it is responsible for, what its standards are, what its

7    goals are.  It obviously informs my work at GEO every day.

8    Q    How does your familiarity with the ICE standards play into

9    your current role at GEO?

10   A    In a compliance environment, the standards prescribe the

11   outcomes and requirements that the agency requires of the

12   contractor.  Obviously, being familiar with the standard,

13   understanding how to reach those outcomes, how to test for

14   them, the development of audit tools, it allows me to be

15   familiar with what the goals are.

16   Q    Do you develop internal audit tools for the voluntary work

17   program?

18   A    We do have an audit tool essentially based on ICE's tool

19   on the voluntary work program, yes.

20   Q    What is that audit tool review?

21   A    What I mean by "tool," a series of questions.  That is a

22   term of art.  Not to be jargony.  It essentially would make

23   sure there is a voluntary work program in place.  It would

24   see where detainees are working in the facility.  Are they

25   trained to do the jobs that they are doing.  Are they being

1    compensated for it.  Are they managing people that either

2    have limited English proficiency.  It has to be done in a

3    fair way.  You know, it is those types of things.

4    Q    Why does it have to be done in a fair way?

5    A    Well, it has to be done in a way that again is voluntary

6    so folks have to have an opportunity to volunteer.  It has to

7    be administered in a way that gives people equal opportunity.

8    Q    Does it have to give people equal pay as well?

9    A    Well, everybody is paid a dollar a day.  In terms of that

10   sense, it is equal.

11   Q    Is there any reason why you couldn't have some people

12   making minimum wage and some people making less than minimum

13   wage in the facility?

14   A    Well, again, you can't pull the voluntary work program

15   standard out in isolation.  In other words, the standard --

16   the standards that involve care, for example, in other words

17   there is standards involving food, standards involving

18   medicine.  The voluntary work program is designed again to

19   combat idleness and give folks something to do.  All their

20   needs are met.  The food and medical care, all those things

21   are all free.  It is really a question of giving something --

22   folks something to do and it has to be done in a way that, as

23   we already talked about, that positively impacts the

24   operation of the facility.  And again, ICE has said a dollar

25   a day is the compensation.  Obviously, folks find themselves

1    in the immigration process from a variety of backgrounds.

2    There are obviously some folks that are indigent.  For them,

3    it obviously is something helpful.  It is an activity.  It is

4    not something necessary to be well maintained in the

5    facility.

6    Q   For those indigent individuals, do they have to

7    participate in the voluntary work program to get hygiene

8    supplies?

9    A   Absolutely not.  Voluntary.

10   Q   How do they get hygiene supplies if they don't participate

11   in the program?

12   A   They are given to every detainee every day.

13   Q   When you say they are given to every detainee every day,

14   what are you talking about?

15   A   Appropriate items for hygiene for human beings, soap,

16   toothpaste, toothbrushes, combs, and things that we would all

17   use to take care of ourselves.

18           THE COURT:  Thank you.  It is quitting time.  It is

19   the end of the day on the second week, end of the week.  We

20   originally estimated three weeks for this first phase of this

21   trial.  It looks to me like we will take all of next week, at

22   least.  That would be my best guess for your planning.

23       Please continue to follow my instructions about recesses.

24   Let me remind you, don't talk to each other about the case,

25   don't let anyone talk to you about it.  Don't talk about it.

1    Don't read, view or listen to any news account.  Don't do any

2    independent investigation.  Don't look anything up on your

3    own, and rely on us to get all the information you need here

4    in the courtroom.

5        I am aware of one news account that I saw that had

6    information in it that was not part of the evidence in the

7    case and was excluded for a good legal reason.  It is

8    important for you to not follow natural curiosity and try and

9    find out information about the case because it can cause a

10   less than a fair trial and a result that would not be fair if

11   you were to do that.

12       Have a good weekend.  As I have indicated, don't worry

13   about the case.  Keep your minds open on all issues.  When

14   you come back on Monday and we start again with Mr. Ragsdale,

15   I am sure your minds will click back in to gear for this

16   trial.

17       Okay.  You can be excused.  Monday morning at 9:00.

18    (The following occurred outside the presence of the jury.)

19           THE COURT:  Mr. Ragsdale, I need you to come back

20   Monday morning at 9:00.

21           MS. CHIEN:  Tyler, can we get a time check?

22           THE CLERK:  The State has used 13 hours and 56

23   minutes, the class has used five hours and 49 minutes, and

24   the defense has used 20 hours and ten minutes.

25           THE COURT:  Okay.  Thank you for that.  Don't spend

1    your weekend writing briefs.  I have read enough briefs.

2    Okay.  I will see you on Monday morning.  We will go back to

3    work.

4              MR. POLOZOLA:  Thank you, Your Honor.

5                   (The proceedings adjourned.)

6

7

8                    C E R T I F I C A T E

9

10

11       I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14

15

16   /s/ Angela Nicolavo

17   ANGELA NICOLAVO
     COURT REPORTER
18

19

20

21

22

23

24

25