```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                                  )
     UGOCHUKWO GOODLUCK NWAUZOR,     )
 5   et al.,                        )
                                     )
 6              Plaintiffs,          ) 3:17-cv-05769-RJB
                                     ) 3:17-cv-05806-RJB
 7   v.                             )
                                     ) Tacoma, Washington
 8   THE GEO GROUP, INC.,            )
                                     ) June 14, 2021
 9              Defendant.           )
     _____ ) Jury Trial
10                                   )
     STATE OF WASHINGTON,            ) 9:00 a.m.
11                                   )
                Plaintiff,           )
12                                   )
     v.                             )
13                                   )
     THE GEO GROUP, INC.,            )
14                                   )
                Defendant.           )
15                                   )
     _____

16              VERBATIM REPORT OF PROCEEDINGS
17          BEFORE THE HONORABLE ROBERT J. BRYAN
                UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24       Proceedings stenographically reported and transcribed
25               With computer-aided technology
```

```
 1                          APPEARANCES

 2

 3    For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
 4                             Schroeter Goldmark & Bender
                               810 Third Avenue
 5                             Suite 500
                               Seattle, Washington
 6

 7
      For the Plaintiff        ANDREA BRENNEKE
 8    State of Washington:     LANE POLOZOLA
                               MARSHA J. CHIEN
 9                             800 Fifth Avenue
                               Suite 2000
10                             Seattle, Washington

11

12    For the Defendant        LAWRENCE D. SILVERMAN
      The GEO Group:           ADRIENNE SCHEFFEY
13                             Akerman LLP
                               1900 Sixteenth Street
14                             Suite 1700
                               Denver, Colorado
15
                               JOAN K. MELL
16                             III Branches Law PLLC
                               1019 Regents Boulevard
17                             Suite 204
                               Fircrest, Washington
18

19

20

21

22

23

24

25
```

```
1                          EXAMINATION INDEX

2   EXAMINATION OF:                                       PAGE

3    DANIEL RAGSDALE       DIRECT EXAMINATION
                           BY MS. SCHEFFEY                  10
4                          CROSS-EXAMINATION
                           BY MR. POLOZOLA                  18
5                          CROSS-EXAMINATION
                           BY MR. WHITEHEAD                 37
6                          REDIRECT EXAMINATION
                           BY MS. SCHEFFEY                  39
7                          RECROSS-EXAMINATION
                           BY MR. WHITEHEAD                 41
8
     BRUCE SCOTT           DIRECT EXAMINATION
9                          BY MS. SCHEFFEY                  43
                           CROSS-EXAMINATION
10                         BY MR. WHITEHEAD                 49

11

12

13                          EXHIBIT INDEX

14
    EXHIBITS ADMITTED                                     PAGE
15
     A-321                                                 42
16

17

18

19

20

21

22

23

24

25
```

```
 1                                    MORNING SESSION

 2                                    JUNE 14, 2021

 3      (The following occurred outside the presence of the jury.)

 4           THE COURT:  I just wanted to ask you all about time

 5      here.  What are we looking at in terms of time to complete

 6      the defendant's case and any rebuttal?  I have to get

 7      cracking on jury instructions.

 8           MS. MELL:  Your Honor, we were actually going to

 9      touch base with you this morning on that.  I had an

10      opportunity to talk with Mr. Whitehead, and I think he spoke

11      with the other plaintiffs' counsel.  We are anticipating this

12      morning may go fairly quickly.  We have a few little issues

13      we need to bring up with regard to recalling Mr. Grice to get

14      in the current ESA policy.  Otherwise, this morning we are

15      looking at completing Mr. Ragsdale in not too much time,

16      recalling Mr. Grice just for a second to get in the ESA, then

17      we have two other agency people we may or may not call, and

18      then finally Mr. Scott will be on very briefly for probably

19      less than a half an hour.  We anticipate probably completing

20      our case, and we understand the opposite side has no rebuttal

21      witnesses unless something comes up this morning they want to

22      do, and then both sides have to do the 50 motions and then we

23      need instructions, and then we were going to recommend that

24      we be able to close in the morning.

25           THE COURT:  You anticipate no rebuttal?
```

1          MS. MELL:  That is what we heard from them yesterday.

2          MR. WHITEHEAD:  Your Honor, at this time I am not

3   anticipating a rebuttal case.  We need to see how this

4   morning plays out.  Based on what we have heard so far, I

5   don't anticipate one, Your Honor.  I will let Ms. Chien speak

6   for the State.

7          MS. CHIEN:  That's the same with the State,

8   Your Honor.

9          THE COURT:  Well, if I knew it was going to go that

10  fast, I would have worked yesterday on jury instructions.

11  Let's see where we get, and I will have to take some time to

12  work on instructions.  Okay.  I think the jury is all here.

13  Is Mr. Ragsdale here?

14         MS. CHIEN:  I think it might be prudent to discuss

15  Mr. Grice.  We don't believe he should be recalled.  He was

16  excused by the Court when he testified on Friday.  He is

17  honestly on parental leave, and we don't have an easy way of

18  contacting him.

19         MS. MELL:  It is highly prejudicial for the State to

20  take the position we can't recall Mr. Grice or,

21  alternatively, get a stipulation or agreement or available

22  witness to authenticate the current version of the ESA that

23  was admitted into evidence.

24     The State is deliberately prejudicing us on this question

25  because the ESA was modified, to which they did not disclose

1    to us which I learned when Mr. Grice was testifying to

2    include the cross references to detention centers so that it

3    broadly mirrors the actual exemption for private

4    corporations.

5        The ESA that is in front of the jury right now is limited

6    to correctional facilities.  The testimony from Mr. Grice is

7    they amended it to be more consistent with the statutory

8    exception to (k) for private corporations, and they have

9    incorporated even detention centers, that whole litany of

10   different kinds of detention or the exception to (k).  We

11   just need the current one into the record.

12       MS. CHIEN:  From the State's perspective, we don't

13   believe the ESA1 is admissible.  It does not have the force

14   of law.  In addition to the idea that this prejudice -- the

15   State is prejudicing GEO, that's not true.  GEO had an

16   opportunity to ask Mr. Grice about all of these, about any

17   current ESAs on Friday.  They didn't, and he was excused.  We

18   don't believe his parental leave should be disturbed again to

19   come back and testify because GEO wasn't prepared for his

20   testimony.

21       MS. MELL:  That's wholly inaccurate.  I did ask him

22   on the stand.  He did say it had changed, which is the first

23   notice we received from the State even though the State has

24   an obligation -- continuing obligation to update us on that

25   kind of discovery.  It did not.  I asked him about it.  He

1  said it didn't change.  I didn't have the ability in this

2  venue to get an updated exhibit out while he was on the

3  stand.

4          MS. CHIEN:  It is a public policy.

5          THE COURT:  Where is your proposed exhibit?

6          MS. MELL:  I will upload it to you right now.  It is

7  in the Box.  A-321.  The comparator exhibit is 308.  The

8  language is highly critical to GEO's arguments in this case.

9      It is an administrative policy that is published on the

10  L&I's website and to which Mr. Grice testified.  We could

11  just get it admitted as the policy that he testified to.

12          THE COURT:  I am trying to see it.

13          THE CLERK:  A-321.

14          MS. CHIEN:  Could you email it to us because I don't

15  think we have gotten a copy of it.

16          MS. MELL:  It is right on Labor & Industries' website

17  under "administrative policy for the Minimum Wage Act

18  applicability."  I can read into the record the language

19  change in the sentence at issue, if that is helpful.

20          THE COURT:  It would not be helpful.  I need to read

21  it.  I would like to get it here.  Rachel went to the printer

22  to see if it is on there.

23          MS. MELL:  Subsection (k), Page 6 of 9 in the updated

24  policy.  The sentence has been expanded to include residents,

25  inmates or patients of state, county, municipal correctional,

1   detention, treatment or rehabilitative institutions.  Whereas

2   the exhibit --

3           THE COURT:  Just a minute.  Just a minute.  What is

4   the exhibit that is admitted, the number?

5           MS. MELL:  A-308.  The language on A-308 is on Page 5

6   of 6, sub (k), last sentence.

7           THE COURT:  Why is that not just admissible by

8   stipulation?

9           MS. CHIEN:  We don't actually -- we don't -- we

10  didn't stipulate to the admission of A-308.  We don't believe

11  administrative policies should be provided to the jury in the

12  first place, so that's why we can't stipulate to the

13  admissibility of A-321 either.

14          THE COURT:  Is there any question about the -- about

15  this being the accurate policy that was revised in 2020?

16          MS. CHIEN:  I don't believe there is any question of

17  accuracy.  However, we have a concern about introducing an

18  exhibit for which there is no explanation that this exhibit

19  is actually the same as A-308.  It doesn't actually change

20  anything in terms of its applicability to private facilities

21  in the sense the Minimum Wage Act still applies to private

22  facilities regardless under A-308 and A-321.

23          MS. MELL:  Your Honor, Mr. Grice clarified the

24  enforcement's position of the agency did not change with any

25  of the changes.  He testified to that.

1          MS. CHIEN:  Which then would bring us to an

2    additional objection that this isn't necessary.

3          MS. MELL:  It is necessary because the language is

4    distinctly different, and they were going to argue it was

5    only applicable to correctional facilities which are

6    distinct.  The importance of the changes is it mirrors

7    exactly the subsection (k) exemption and includes detention

8    facilities.

9          THE COURT:  Detention facilities are mentioned in

10   A-308 as well.

11         MS. MELL:  It is not -- as it relates to private

12   facilities.

13         THE COURT:  The answer to this question is that you

14   can call Mr. Grice if there is no stipulation as to the

15   authenticity of the document.  It should be admitted to

16   clarify the record if the policy was testified to and it has

17   been changed.  You can either do it by interrupting the

18   witness's vacation or whatever he is doing or you can do it

19   by stipulation, which would simplify matters, but it is not

20   required.

21      All right.  Is Mr. Ragsdale here and ready to go?

22         THE WITNESS:  Good morning.  Yes, I am here.

23         THE COURT:  Good morning, Mr. Ragsdale.  All right,

24   bring the jury in.

25      (The following occurred in the presence of the jury.)

1    THE COURT:  That looks like the happy nine.  Good

2  morning, folks.  We are ready to continue with Mr. Ragsdale's

3  testimony this morning.  I guess you are all awake and ready

4  to go.

5    You may inquire, Counsel.

6    DIRECT EXAMINATION (Resumed)

7  BY MS. SCHEFFEY:

8  Q   Mr. Ragsdale, when we left off on Friday, we were talking

9  about hygiene items.  Do you remember that?

10 A   Good morning.  Yes, I do.

11 Q   Is there anything detainees need to pay for while at a GEO

12 facility?

13 A   There is a specific detention standard that relates to

14 hygiene, and ICE requires its contractors to provide all the

15 items that a person would need to take care of themselves.

16 It is expressly called out in the standard.  No, all of that

17 is free.

18 Q   Who sets up the phone services at GEO facilities?

19 A   ICE has its own contractor separate from GEO that provides

20 the telephone service.

21 Q   You also testified on Friday that you were a compliance

22 officer for the GEO Group.  Do you recall that testimony?

23 A   Yes.

24 Q   I believe you explained that your team ensures that GEO

25 meets its contractual requirements as well as any standards

1  appropriated; is that correct?

2  A   Yes, we audit.  We develop tool questions, as I mentioned

3  on Friday.  We pull samples at the facilities to see if we

4  are compliant with detention standards in the contract, yes.

5  Q   I would like to talk about how that works specifically at

6  the Northwest ICE Processing Center.  If my tech team could

7  pull up Exhibit 129, which we will be going to Page 5 of the

8  document.  If we could call out the CLIN 0003.

9       Mr. Ragsdale, how does your team assess compliance with

10  detainee pay under the contract?

11  A   We develop tool questions or audit questions based on each

12  standard.  To the extent, as we looked at in Standard 5.8,

13  there are expected outcomes.  We would develop questions and

14  then pull samples of the files at the Northwest ICE

15  Processing Center to determine that the detainee work program

16  was administered according to the standard.  We would

17  physically pull a number of people's individual files to

18  check and make sure they -- if they wanted to participate in

19  the voluntary work program and they did, in fact, participate

20  in the voluntary work program, they were paid at least a

21  dollar a day.

22  Q   When you are looking at a file, what amount are you

23  looking at for a detainee to -- that a detainee is paid to

24  ensure compliance?

25  A   A least a dollar a day.

1    Q    Does your audit consider whether detainees are paid

2    minimum wage?

3    A    No, that is outside the scope of what the standard

4    requires.

5    Q    Let's turn to pay GEO-State 036868, which is Page 44 of

6    the document.  I would like to call out letter q, small q.

7         When you are performing your compliance duties, do you

8    read this section to include application of the Washington

9    Minimum Wage Act to detainees?

10   A    I don't see a section.  I don't see anything.

11   Q    Do you see Section (q) on your screen, applicable --

12   A    I just see the folks.

13   Q    Do you have the contract in front of you?

14   A    Yes, I think I do.

15   Q    We are on Page 44 of that document, if it is easier.

16   A    44 of 203 pages?

17   Q    Yes, the Bates stamp at the bottom is GEO-State 036868.

18   A    I think I have a copy of the contract.  I don't think that

19   is what I am looking at here.

20   Q    Do you have on your screen -- is there someone that --

21   A    The tech gentleman just came in.

22   Q    For the tech person, we should have a split screen with

23   me, the jury.

24   A    Okay.  Now I see it.

25   Q    Do you see Section (q) of the contract?

1   A   Yes.

2   Q   When you are performing your compliance duties, do you

3   read this section to include applying the Washington Minimum

4   Wage Act to detainees?

5            MR. POLOZOLA:  Objection, leading, Your Honor.

6            THE COURT:  Sustained.

7   BY MS. SCHEFFEY:

8   Q   When you are assessing compliance and you look at this

9   section, what do you check for?

10  A   This is a section that obviously is a layered approach.

11  There are certain laws and requirements that the federal

12  government requires, there are certain things obviously the

13  states require, and certain things like municipalities and

14  other entities can require.

15       We would look at this, and particularly as it relates to

16  the detainee work program, the detainee work program is not

17  employment, again, as we talked about on Friday.  It is a

18  volunteer program that is, again, to allow folks to have a

19  normal schedule, earn a nominal amount of money, and give

20  them something to do.  Anything like in terms of an employee

21  or employer relationship, particularly as relates to folks

22  that are not citizens, as we talked a little bit about on

23  Friday, is the section of the Immigration and Nationality Act

24  that relates to employing people that are not citizens is

25  ICE's responsibility along with another department, another

1    agency in DHS.  There is not a situation where we would look

2    on behalf of ICE to determine that somebody was paying

3    minimum wage as an employee.  It doesn't apply in this case.

4          MR. POLOZOLA:  Your Honor, I am going to object that

5    the witness's answer is non-responsive.  He is testifying to

6    what the law should be in this case.

7          THE COURT:  The answer may stand.

8    BY MS. SCHEFFEY:

9    Q   How do you comply with this section and also the dollar

10   per day payment?

11   A   We pull files that the facility maintains for the folks

12   that participate in the voluntary work program.  There is

13   around 15 or 20 questions.  We look at each element.  I think

14   as I mentioned on Friday, folks that have limited English

15   proficiency need to have an opportunity.  Folks -- it has to

16   be done and administered in a fair way.  Folks need to have a

17   certain amount of training to make sure if there is some

18   amount of technical use of equipment.

19       We would go through each of those elements to make sure

20   the program is being administered according to the standards

21   ICE requires and the outcomes.

22   Q   I would like to go to GEO-State 036906, Page 82 of the

23   document.  If we could call out the "manage a detainee work

24   program" section.  Can you see that on the screen?

25   A   Yes.

Ragsdale - Direct

1   Q   How does your compliance team measure whether GEO has

2   complied with the portion of this contract that prohibits it

3   from using detainees to perform the duties of an employee of

4   the contractor?

5   A   As we talked about Friday, the contract has a staffing

6   plan.  In other words, GEO proposes a number of employees

7   that ICE has to clear, give a background check and then bring

8   on.  It is five positions.  Everybody has a function.

9   Ultimately, everybody who works as a GEO employee is there to

10  make sure that we have a safe, secure, humane environment

11  that is appropriate under ICE's standards for the purpose of

12  the contract.

13      Detainees are not doing things that GEO employees are

14  doing.  In other words, the GEO employees are the people that

15  are responsible for the department, responsible for making

16  decisions.  Again, in other words, the voluntary work program

17  standard explicitly says what the voluntary work program can

18  do.  It can be in laundry.  It can be in janitorial.  It can

19  be in the kitchen.  GEO can't take detainees and have them do

20  things that are outside the scope of the voluntary work

21  program.

22  Q   Have you ever seen a staffing plan that includes

23  detainees?

24  A   No.

25  Q   If we could clear Exhibit 129 off the screen.  I would

1  like to look at Exhibit 127, which is the Performance-Based

2  National Standards.  I would like to go to GEO-Nwauzor

3  185199, which is Page 407 at the bottom of the PDF.  If we

4  can call out the "compensation" section.

5       Can you see that on your screen?

6  A   I can.

7  Q   Could GEO pay minimum wage and still comply with this

8  requirement?

9  A   No, we would not pay minimum wage because it would so

10  materially change what ICE's requiring us to do that we

11  couldn't do that on our own.  It is an ICE decision.  ICE

12  requires us to pay at least a dollar, and that's what we

13  audit to.

14  Q   How would it change what ICE is requiring you to do?

15  A   We talked a little bit about this on Friday, it would

16  materially change the amount of money that employees would

17  have in their -- sort of in their detainee banking system.

18  In terms of even just managing, in terms of having folks

19  wanting to participate, might be oversubscribed.  It just

20  would fundamentally change the purpose of the detainee work

21  program.

22       Again, it is something the agency gets to decide.  GEO is

23  not in a policy making decision.  We don't get to interpret

24  the standards.  We don't get to agree with some, disagree

25  with others, or materially change some.  We are supposed to

1    follow the black letter standards.  That would be a material

2    change.

3    Q   I think you said it would change the purpose.  What is

4    your understanding of what the purpose of the voluntary work

5    program is?

6    A   Again, the voluntary work program, under the "activities"

7    section of the standards is, I think, again, to give folks as

8    much a sense of sort of normalcy, normal schedule, give them

9    something meaningful to do.  Again, they can earn a nominal

10   amount of money.  It is not meant -- it is meant to, again,

11   sort of contribute to the good order of the facility, but it

12   is not meant to be anything other than an activity.

13   Q   If the voluntary work program were to be deemed employment

14   which requires minimum wages, would you recommend to GEO and

15   ICE the program continue?

16   A   I am not in a policy-making decision.  I think that is

17   such a material change it would have to be something that the

18   agency, the Department of Homeland Security, and probably

19   Congress would have to weigh in on.

20   Q   Do you think the voluntary work program in your opinion

21   benefits detainees?

22   A   I do.  Again, as I think I mentioned Friday, and I

23   believe, again, having a normal schedule, in other words, I

24   have been in detention facilities where you see folks who can

25   literally stay in their bed all day long.  They can play

1    video games.  They can play soccer.  They can do those

2    things.  There are some folks, particularly that are indigent

3    and obviously would welcome the dollar, certainly in terms of

4    you see folks even in places in the Western Hemisphere a

5    dollar of U.S. is a considerable amount of money.

6        It was part of our detention reform, we expanded the work

7    program during the Obama administration.  It is helpful, and

8    it is entirely voluntary.  If they want to do it, they

9    certainly can do it.  If folks don't want to do it, they

10   absolutely don't have to.

11            MS. SCHEFFEY:  Thank you.  I have no further

12   questions.

13            MR. POLOZOLA:  May I proceed, Your Honor?

14            THE COURT:  You may.

15                    CROSS-EXAMINATION

16   BY MR. POLOZOLA:

17   Q   Good morning, Mr. Ragsdale.

18   A   Good morning.

19   Q   Nice to see you again.

20        In your role at GEO, you are not in charge of

21   negotiating contracts for GEO, are you?

22   A   I am not.

23   Q   You are not in charge of interpreting contracts for GEO,

24   are you?

25   A   In part, you know, my -- I am consulted on what the

1    contract says.  In other words --

2    Q    Mr. Ragsdale, it was a yes-or-no question.

3    A    I will say no then.

4    Q    Thank you.  Now, before joining GEO in 2017, you worked

5    for ICE, I believe you said, correct?

6    A    I did.

7    Q    You were the number two person at ICE, I believe?

8    A    From 2012 to 2017, yes.

9    Q    Which made you a pretty important person at ICE?

10   A    I will say -- I am not sure what to say to that, but

11   probably.

12   Q    Now you work for GEO, correct?

13   A    I do.

14   Q    You report directly to GEO's CEO; isn't that right?

15   A    I do.

16   Q    In your current role, you make about $300,000 a year; is

17   that correct?

18            MS. SCHEFFEY:  Objection, relevance.

19            THE WITNESS:  I do.

20            MS. SCHEFFEY:  Foundation, facts not in evidence.

21            THE COURT:  He may answer.

22            THE WITNESS:  I do.

23   BY MR. POLOZOLA:

24   Q    Now, as part of your compensation working for GEO, you

25   also receive shares from GEO, GEO stock, correct?

1    A    I do.

2    Q    So you are a GEO shareholder as you sit here today,

3    correct?

4    A    Yes, I am.

5    Q    Does that mean you receive dividends from GEO each year?

6    A    Yes, I do.

7    Q    Now, last week counsel told you at one point to put your

8    GEO hat on.  Do you remember that statement?

9    A    I think so, yes.

10   Q    Okay.  Well, that's actually the only hat you have right

11   now, isn't it, because you don't work for ICE anymore,

12   correct?

13           MS. SCHEFFEY:  Objection, argumentative.

14           THE COURT:  Overruled.

15           THE WITNESS:  That is correct.

16   BY MR. POLOZOLA:

17   Q    You weren't here as an ICE employee or representative.  Do

18   I have that right?

19   A    Yes.

20   Q    You are not testifying for ICE in this case, are you?

21   A    No.

22   Q    And you are not here testifying under ICE's official

23   authorization, are you?

24   A    No.

25   Q    Because you work for GEO; is that right?

1    A    Correct.

2    Q    GEO is not the federal government; isn't that right?

3    A    GEO is not the federal government, no.

4    Q    Now, do you remember when I took your deposition in this

5    case, it was back in June 2020, by Zoom?

6    A    I do.

7    Q    And do you remember that I asked you questions about

8    certain things about what ICE does?

9    A    You know, I know we covered a lot in the deposition.  I

10   can't say I have it memorized.  If you point me to something,

11   I am sure you can refresh my recollection.

12   Q    Well, I actually have a more general question.  Do you

13   recall when I asked you about certain things ICE does, that

14   GEO's counsel actually objected and said you weren't prepared

15   to testify as to what ICE does and that you actually would be

16   prohibited from doing so?

17        MS. SCHEFFEY:  Objection, Your Honor, this is reading

18   in counsel's objections from a deposition, which is not

19   proper at trial.

20        THE COURT:  He may answer the question.

21        THE WITNESS:  Yeah, I don't remember precisely, no.

22   If you point me to something, I'll be happy to look at it,

23   but no, I don't remember.

24   BY MR. POLOZOLA:

25   Q    In any event, you understand because you don't work for

1    ICE anymore, you can't legally speak for ICE; isn't that

2    correct?

3    A    I do understand that, yes.

4    Q    Okay.  So a moment ago I believe you said "when we did

5    something at ICE," I understood you to be expressing a

6    position about what ICE may have done.  You can't speak for

7    ICE in this case, correct?

8            MS. SCHEFFEY:  Objection, asked and answered.

9            THE WITNESS:  After 21 years, it is hard to do that,

10    but yes, I am not speaking for ICE.

11    BY MR. POLOZOLA:

12    Q    Now you testified to a few things on Friday and then

13    briefly this morning that I think we need to address.  First,

14    I believe you told the jury the compensation rate for

15    detainee workers of a dollar a day is, quote, set by the

16    agency or ICE, do you remember testimony to that effect?

17    A    I do.

18    Q    That's not accurate, is it?

19    A    It is my understanding, yes.

20    Q    You understand the contract only limits what ICE will

21    reimburse GEO, correct?

22    A    No.  In other words, as I think I explained Friday, the

23    budget formulation process at ICE, right, when I was there,

24    and even in the President's FY '22 budget, contemplates the

25    agency funding detainee pay.

```
 1   Q   Mr. Ragsdale, you just said --
 2           MS. SCHEFFEY:  Object, interrupting the witness.
 3           THE COURT:  He is beyond the question.
 4       What is the next question?
 5   BY MR. POLOZOLA:
 6   Q   The question, Mr. Ragsdale, is:  You understand ICE agreed
 7   to reimburse GEO one dollar a day for each detainee work
 8   shift; is that correct?
 9   A   There is a contract line item number that says a dollar
10   for the detainee work program.  It is in the contract, yes.
11   Q   That says ICE will reimburse GEO one dollar per day,
12   correct?
13   A   Yes.
14   Q   There is nothing in that contract that says GEO can only
15   pay one dollar to detainee workers; isn't that correct?
16   A   It does not read only one dollar, no.
17   Q   There is nothing in the PBNDS, the standards, that limits
18   GEO to paying only one dollar per day to detainee workers; is
19   that correct?
20   A   As I said earlier, the standards we take as black letter.
21   We don't add our own sort of plusses and minuses.  We follow
22   the standards very precisely.  It is a dollar, which is why
23   it has been a dollar, and it is a dollar.
24   Q   Well, Mr. Ragsdale, it is not a dollar; isn't that right?
25   The standard says "at least one dollar," correct?
```

1          MS. SCHEFFEY:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3          THE WITNESS:  Again, I think as I told you, when we

4   developed our audit tools and the way we look at the

5   standard, we look to make sure people are paid at least a

6   dollar a day.

7   BY MR. POLOZOLA:

8   Q   You agree with me the ICE standard does not prevent GEO

9   from paying detainee workers more than a dollar a day,

10  correct?

11  A   No.

12  Q   The ICE standard does not prevent or limit GEO from paying

13  detainee workers the minimum wage for work performed?

14  A   As I already said, I think that is such a material change,

15  I don't think we would be allowed to do that, in my opinion.

16  Q   My question is:  Does the ICE standard, the PBNDS 5.8,

17  limit GEO from paying detainee workers the minimum wage for

18  work they perform?

19  A   Again, does it say that in express terms?  No, it does not

20  contemplate minimum wage anywhere in the standard, no.

21  Q   You will agree with me that, for example, 13.69 per hour

22  is more than one dollar per day, correct?

23  A   Yes.

24  Q   That would be at least one dollar per day; is that right?

25  A   13.69 per hour is, yes, more than a dollar a day.

1    Q    Assuming you work for just a few minutes?

2    A    Indeed.

3    Q    Now, we have been talking about the PBNDS.  Those are

4    ICE's standards, correct?

5    A    Yes.

6    Q    So those are standards that GEO agreed to follow when it

7    chose to do business with the federal government, correct?

8    A    Yes, they are in the contract, yes.

9    Q    That is part of the deal when GEO decides it wants to do

10   business with ICE, it agrees to follow the standards,

11   correct?

12   A    Yes.

13   Q    Are you aware, Mr. Ragsdale, that GEO has already agreed

14   in this case that it had the option to pay more than a day to

15   detainee workers for work they do at the Northwest Detention

16   Center?

17   A    I'm sorry.  I don't think I understood your question.  Can

18   you repeat that.  I think you said "a day," and you meant "a

19   dollar a day."

20   Q    Sure.  Are you aware that GEO has already agreed that it

21   has the option to pay workers more than a dollar a day for

22   work they do at the Northwest Detention Center?

23   A    I don't know the nature of that agreement.  I am not

24   personally aware of it, no.

25   Q    Well, do you agree that GEO has the option to pay detainee

1    workers more than a dollar per day for work they do at the

2    Northwest Detention Center?

3    A    I do know it is possible for GEO to pay more than a

4    dollar.  I don't know that it has happened at the Northwest

5    ICE Processing Center.  I know it is possible, yes.

6    Q    You talked about the contract a moment ago with counsel.

7    So you understand that GEO's contract -- or in GEO's

8    contract, ICE told GEO to follow state and local labor laws,

9    correct?

10   A    I believe it is in the contract.  We just looked at that,

11   yes.

12   Q    Then I believe you also looked at the work program portion

13   of the contract.  Do you recall that a moment ago?

14   A    Yes.

15   Q    So you agree that in that portion of the contract, ICE

16   told GEO specifically with respect to the work program that

17   the work program must comply with all applicable laws and

18   regulations, correct?

19   A    That is what the contract says, yes.

20   Q    Another thing you said on Friday, I believe, I believe you

21   told the jury that everybody is paid a dollar a day in the

22   program because that's the set rate.  My question is:  That's

23   not the set rate, correct?

24   A    I think it is the set rate.  I think it is a dollar a day.

25   That's my opinion.

1  Q   Are you aware GEO has paid detainees at the Northwest

2  Detention Center more than a dollar per day in the past for

3  work they have done in the work program?

4  A   Again, as I said, I didn't know precisely at the Northwest

5  ICE Processing Center.  I do know there have been occasions,

6  I think, again, for lack of participation or for whatever

7  reason, to incentivize participation, they pay more than a

8  dollar per day, yes, I am aware.

9  Q   If the jury heard from other folks that worked at the

10  Northwest Detention Center that workers have been paid, for

11  example, five dollars for working in the kitchen, you would

12  have no basis to disagree with that?

13  A   I have no knowledge of it, no personal knowledge of it,

14  no.

15  Q   And are you aware that in other GEO facilities where

16  immigration detainees work, GEO sometimes pays more than a

17  dollar to those workers, correct?

18  A   I am aware, yes.

19  Q   Are those facilities -- they include the Montgomery

20  facility in Texas?

21       MS. SCHEFFEY:  Objection, assumes facts not in

22  evidence.

23       THE WITNESS:  Montgomery is the one I am aware of.

24       THE COURT:  The objection is overruled.  When there

25  is an objection, Mr. Ragsdale, wait for a ruling before you

1    respond.

2            THE WITNESS:  Yes, sir.

3    BY MR. POLOZOLA:

4    Q   At that facility, GEO pays more than a dollar a day

5    because of supply and demand?

6    A   I am not sure supply and demand.  The voluntary work

7    program and the activities that are part of the program are

8    supposed to contribute to the running of the facility.  There

9    is a staffing plan and there are some assumptions about, to

10   use your term, in terms of negotiation about the voluntary

11   work program is part of the way the facility runs and, again,

12   some level of participation.

13       To use your term in terms of the negotiations, to make the

14   facility work the way it is supposed to work, that is why

15   they have, on occasion, paid more than a dollar a day, as I

16   understand it.

17   Q   If I am understanding what you are saying, sometimes a

18   dollar a day isn't enough to make people want to work so you

19   have to pay a little more, correct?

20           MS. SCHEFFEY:  Objection, argumentative.

21           THE COURT:  Overruled.

22           THE WITNESS:  I can't speculate as to why people do

23   it.  In other words, I know that it has happened.

24   BY MR. POLOZOLA:

25   Q   It is up to GEO to pay more than a dollar in those

1    circumstances when it decides it needs to, correct?

2    A    GEO is responsible for the day-to-day function.  We have

3    to deliver meals to obviously everybody in the facility.

4    Again, the assumptions and the staffing plan assumes there is

5    detainee participation in the work program working in the

6    kitchen.  Yes, it would be GEO's responsibility under the

7    performance-based contract to make sure that happened, let's

8    just say, laundry, et cetera.  Yes, it is GEO's decision.  Is

9    it a long-term, sustainable part of the negotiations?  No.

10   Q    You didn't negotiate the contract for the Northwest

11   Detention Center for GEO, did you?

12   A    No, but I think we talked about on Friday all of these --

13   Q    Mr. Ragsdale, it was a yes-or-no question.

14   A    Did I do it?  No.

15   Q    You didn't negotiate it on ICE's behalf either, did you?

16   A    No.

17   Q    You said you have been to the Northwest Detention Center

18   in the past, correct?

19   A    Yes.

20   Q    How many times?

21   A    I think probably three times, but again, it has been a

22   long time.  21 years is a long time.  I think at least three

23   times.

24   Q    When did you visit the Northwest Detention Center?

25   A    I have been there once since joining GEO.  Once that we

1    talked about in 2014, and I believe one time before that.

2    Q    You have never been there with the goal of determining

3    whether GEO is complying with its contractual obligations,

4    have you, for auditing purposes?

5    A    My team has.  I have employees that do that.  Not myself.

6    Q    Not you, right?

7         Now, I want to circle back to what you were talking

8    about a moment ago, the nature of the work.  You agree that

9    detainees perform legitimate work at the Northwest Detention

10   Center?

11   A    "Work" in the comments, the way we say it, yes, they

12   perform work.

13   Q    It is not made-up work?

14   A    By standard, it is not supposed to be made-up work.

15   Q    Not mere personal chores, is it?

16   A    I believe the standard does -- for personal housekeeping,

17   folks' immediate living area, obviously, in other words, a

18   maid doesn't come in to change their sheets.  Their personal

19   area, they are supposed to clean up.  No, the work is

20   supposed to be meaningful.

21   Q    The work for which they are compensated through the work

22   program, those aren't chores, are they?

23             MS. SCHEFFEY:  Objection.

24             THE WITNESS:  No.  No.

25             THE COURT:  He may answer.

1      THE WITNESS:  No.

2  BY MR. POLOZOLA:

3  Q   I do want to understand, if the detainee workers didn't do

4  that work that they are compensated for now, GEO would still

5  have to do that work, correct?

6  A   The functions would have to get done, yes.  Precisely how

7  would be probably something that GEO would go back to ICE to

8  discuss and renegotiate.

9  Q   We don't know that because it hasn't happened, correct?

10  A   It has not happened to my knowledge, no.

11  Q   In any event, GEO still has to serve thousands of meals

12  that detainees have to eat, correct?

13  A   Absolutely.

14  Q   Even if there are no detainee workers to help prepare and

15  serve those meals?

16  A   Again, performance-based contract, the requirements don't

17  change.

18  Q   Right, so up to GEO how the meals get served, but they got

19  to get served; isn't that right?

20  A   Yes.

21  Q   GEO still has to do all the laundry for everyone in the

22  facility?

23  A   Yes.

24  Q   Even if the detainee workers don't show up to work,

25  correct?

1   A    Yes.

2   Q    Doesn't matter how GEO chooses to do that, the laundry

3   just has to get done, correct?

4   A    Correct.

5   Q    GEO still has to keep the entire facility clean even if

6   the detainee workers don't work, correct?

7   A    Correct.

8   Q    Doesn't matter how GEO does that, it has to get done?

9   A    Correct.

10  Q    Okay.  So on audits, you spoke a moment ago about your

11  team, the auditing team.  I believe you said last week that

12  your team makes sure GEO meets the contract requirements with

13  their clients and whatever standards are incorporated in the

14  contract; is that right?

15  A    Yes.

16  Q    As we just discussed, you know the Northwest Detention

17  Center requires GEO to follow all state -- federal, state and

18  local labor laws, correct?

19  A    I think you and I are probably going to disagree about

20  which laws apply as I understand them.  The answer is yes, to

21  the extent they apply, we are supposed to audit them, yes.

22  Q    So on that, I want to be clear that when you are going

23  around auditing facilities like the Northwest Detention

24  Center, you aren't checking to see whether workers make more

25  than a dollar per day, correct?

1   A    We are checking to make sure they get paid at least a

2   dollar a day.

3   Q    So you are not looking to see whether GEO is complying

4   with Washington's Minimum Wage Act, are you?

5   A    As relates to the detainee work program, no.

6   Q    Your team is not checking to see whether GEO pays into

7   Washington's unemployment compensation fund, correct?

8   A    I don't think so, no.

9   Q    You are not asking whether GEO follows the rules about

10   paying into Washington's paid family and medical leave

11   programs like other businesses, are you?

12   A    No.

13   Q    I think you mentioned that ICE conducts audits of the

14   Northwest Detention Center.  Did I hear you speak about that?

15   A    Yes, they do.

16   Q    You don't actually know what ICE audits with respect to

17   the work program, do you?

18   A    I don't know precisely what they audit.  They would audit

19   based on the outcomes and the standards in 5.8.  That's the

20   way the tools are built.

21   Q    Is it your understanding ICE is not auditing to see

22   whether GEO is paying workers the minimum wage at the

23   Northwest Detention Center?

24   A    You know, again, I don't want to speculate.  I don't think

25   so.

1  Q   ICE isn't auditing to see whether GEO is complying with

2  Washington law; is that right?

3  A   I don't know.  That, I don't know.

4  Q   Because ICE doesn't enforce Washington law, does it?

5  A   Not that I am aware of.

6  Q   Mr. Ragsdale, do you know who the Department of Homeland

7  Security Office of the Inspector General is?

8  A   Yes, I do.

9  Q   The inspector general provides independent oversight and

10 accountability for ICE?

11 A   Yeah, I mean, I wouldn't quite phrase it that way.  They

12 have -- they are a statutory IG Act office.  They are

13 supposed to help the secretary manage the department.

14 Q   They perform inspections at the Northwest Detention

15 Center?

16 A   The IG can visit any facility they wish.  I don't know

17 whether they have been to the Northwest ICE Processing

18 Center.

19 Q   So in your job, are you responsible for working with

20 ICE -- with the inspector general if they want to inspect the

21 Northwest Detention Center?

22 A   Certainly, we would collaborate.  We certainly collaborate

23 with both -- we haven't worked, since the time I have been

24 here, so closely with the inspector general at DHS.  We have

25 done more with DOJ.  We certainly are responsive to any of

1   their requests, yes.

2   Q   Did I understand your testimony a moment ago to be that

3   you are not sure if the inspector general has ever done an

4   inspection at the Northwest Detention Center?

5   A   Yeah, I don't know off the top of my head.

6   Q   If the inspector general had done an inspection at the

7   Northwest Detention Center and determined that ICE's

8   standards were violated, is that something you would know

9   about in your position?

10         MS. SCHEFFEY:  Objection.  Assumes facts not in

11   evidence.

12         THE WITNESS:  I'll be honest with you, I don't

13   memorize every report at every facility.  There are a lot of

14   them.  If I checked and there was a report, yes -- we would

15   have --

16         THE COURT:  The objection is overruled.  If you would

17   wait when there is an objection, Mr. Ragsdale, for a ruling.

18         THE WITNESS:  Yes.  Sorry.

19   BY MR. POLOZOLA:

20   Q   Are you aware of any instances in which the Office of the

21   Inspector General has determined that GEO's facilities where

22   ICE detainees are held has violated the PBNDS?

23   A   Yes, there are several reports, I believe, to facilities

24   in California, a facility in Louisiana, so, yes, there have

25   been audits where the IG has found that we have not -- found

1  areas of non-compliance, yes.

2  Q   Are you aware of any reports by the inspector general

3  critiquing the quality of ICE's auditing standards and

4  processes?

5  A   I have read reports over the years where the IG has made

6  those comments, yes.

7  Q   One moment, please.

8       Mr. Ragsdale, I think you testified at one point that

9  you had never visited a GEO detention facility where the

10  workers were paid the minimum wage; is that correct?

11  A   To the best of my knowledge, yes.

12  Q   Are you aware GEO is being sued over its detainee wage

13  payment practices in Colorado and California?

14  A   I am --

15       MS. SCHEFFEY:  Objection, outside the scope.

16       THE COURT:  The objection is sustained.

17  BY MR. POLOZOLA:

18  Q   Mr. Ragsdale, are you aware that GEO has asked ICE to step

19  in and defend this lawsuit?

20  A   I am aware that the agency and GEO have discussed the

21  litigation.  I know of no way that ICE can represent GEO.  I

22  don't think it really works that way.  I know the office --

23  litigation has been discussed between GEO and ICE.

24  Q   To your knowledge, ICE hasn't stepped in and taken over,

25  has it?

```
 1  A   Right, but the Department of Justice litigates on behalf
 2  of the United States, not ICE.  It would be directed to DOJ,
 3  not ICE.
 4  Q   Sure.  Fair point.  The Department of Justice has never
 5  stepped in to defend these lawsuits, has it?
 6  A   Not to my knowledge, no.
 7  Q   That's because it is GEO's decision to pay only a dollar
 8  per day to detainee workers, not the federal government's;
 9  isn't that correct?
10  A   I don't agree with that, no.
11          MR. POLOZOLA:  No further questions, Your Honor.
12          MS. SCHEFFEY:  Your Honor, I have two brief redirect
13  questions.
14          THE COURT:  Just a minute.  Mr. Whitehead.
15          MR. WHITEHEAD:  Yes, Your Honor.  Thank you.
16                      CROSS-EXAMINATION
17  BY MR. WHITEHEAD:
18  Q   Good morning, Mr. Ragsdale.
19          Earlier today, you answered there are laws that can
20  limit what you can say about your time with ICE.  Do I have
21  that correct?
22  A   Well, in other words, information that belongs to the
23  agency is the agency's.  They give an ethic letter.  I can
24  tell you about my experience, but I am not speaking on behalf
25  of ICE.
```

1    Q    You are not testifying today on behalf of ICE, correct?

2    A    Correct.

3    Q    You would have to seek prior approval, in fact, to share

4    information obtained from your time during your employment at

5    ICE, correct?

6    A    As relates to specific cases -- or, in other words, I

7    think I am perfectly able to talk about my experience.  I

8    can't talk about information the agency owns, like in a

9    system of record.

10   Q    That's so that former employees don't share sensitive

11   information, correct?

12   A    Of course.

13   Q    Also so that former employees don't misrepresent ICE's

14   position taken on any given subject?

15           MS. SCHEFFEY:  Objection, calls for speculation.

16           THE COURT:  He may answer.

17           THE WITNESS:  Former employees can't bind the agency,

18   yes, there is appropriate limits.

19   BY MR. WHITEHEAD:

20   Q    Earlier, you answered questions from Ms. Scheffey about

21   hygiene items provided by GEO to detainees at the Northwest

22   Detention Center.  Do you remember that?

23   A    I do.

24   Q    You made a statement that the hygiene items are provided

25   free of charge.  Do I have that right?

```
 1   A    Yes.

 2   Q    Those hygiene items, they are paid for by ICE, correct?

 3   A    Yes, by ICE, not by the detainees.

 4   Q    Just like the food provided at the Northwest Detention

 5   Center, correct?

 6   A    Yes.

 7   Q    Clothing?

 8   A    All of the items that GEO provides are ultimately paid for

 9   by the agency.

10   Q    And GEO doesn't seek reimbursement from the detainees for

11   these items.  Do I have that right?

12   A    No, they do not seek reimbursement.

13   Q    That's because they are already paid for by ICE?

14   A    Correct.  They are provided to the detainee for their

15   benefit.

16   Q    At ICE's expense, correct?

17   A    Correct, yes.

18          MR. WHITEHEAD:  Thank you, sir.

19          MS. SCHEFFEY:  I have a few brief redirect,

20   Your Honor.

21          THE COURT:  Yes.

22                     REDIRECT EXAMINATION

23   BY MS. SCHEFFEY:

24   Q    I think you just testified that food, clothing and hygiene

25   items are ultimately paid for by ICE; is that correct?
```

1   A    Yes.

2   Q    Are those items contemplated at the outset of the contract

3   between GEO and ICE?

4   A    Yes.

5   Q    Is minimum wage for detainees contemplated at the outset

6   of the contract between GEO and ICE?

7   A    Not to my knowledge, no.

8   Q    You also testified about Montgomery where they pay two

9   dollars per day.  Do you remember that?

10  A    I don't know that it was precisely two dollars.  I just

11  know anecdotally there have been occasions they paid more

12  than a dollar a day.

13  Q    Are you aware of detainees at Montgomery ever getting

14  minimum wage?

15  A    Not to my knowledge.

16  Q    Is there any facility across the country where GEO pays

17  minimum wages for the voluntary work program?

18  A    I have never heard of anybody making minimum wage, whether

19  GEO, ICE run, anybody.  I have never heard of it.

20  Q    Do the Performance-Based National Standards state that

21  detainees should be paid minimum wage anywhere in the

22  document?

23  A    No, it does not.

24  Q    Does the contract state that detainees should be paid

25  minimum wage anywhere in the document?

 1   A   No, it does not.

 2          MS. SCHEFFEY:  Thank you.  No further questions.

 3          MR. WHITEHEAD:  Your Honor, briefly.  See if I can do

 4   it in three questions.

 5                           RECROSS-EXAMINATION

 6   BY MR. WHITEHEAD:

 7   Q   Mr. Ragsdale, I understood you to say you are not aware of

 8   GEO paying the minimum wage at any of its facilities

 9   nationwide.  Do I have that right?

10   A   As relates to the detainee work program.

11   Q   You understand that the voluntary work program is the

12   subject of litigation at other GEO facilities, correct?

13   A   Yes, I am aware.

14          MR. WHITEHEAD:  No further questions, Your Honor.

15          THE COURT:  Mr. Ragsdale, in your earlier testimony

16   describing your work background, it sounded like some of your

17   jobs were legal jobs.  Are you a lawyer?

18          THE WITNESS:  I am, Your Honor.  From '96 to 2008, I

19   was in the legal program at ICE and INS.

20          THE COURT:  Yes.  I take it you have retired from

21   federal government service?

22          THE WITNESS:  Yes, in 2017.

23          THE COURT:  Okay.  All right.  Thank you.  You may be

24   excused.

25          THE WITNESS:  Thank you very much.

```
 1          MS. MELL:  GEO would recall Mr. Grice.

 2          MS. CHIEN:  We stipulate to authenticity so we would

 3   not have to call Mr. Grice back.

 4          MS. MELL:  Based on the stipulation of the State, we

 5   offer Exhibit A-321 into evidence.

 6          THE COURT:  Any objection?  A-321 may be admitted.

 7                  (Exhibit A-321 was admitted.)

 8          MS. MELL:  Your Honor, I ask to publish subsection

 9   (k) of the updated policy.

10          MS. CHIEN:  We don't believe that is appropriate.

11   There is no witness to testify to subsection (k).

12          THE COURT:  The objection is sustained.

13          MS. MELL:  The jury will have this in their evidence

14   to look at?

15          THE COURT:  Certainly.

16          MS. MELL:  Thank you, Your Honor.

17       With that being said, I believe we will be calling

18   Mr. Scott.

19          MS. CHIEN:  Ms. Mell, does that mean you are not

20   calling Ms. Perrin?

21          MS. MELL:  The next witness is Mr. Scott.

22          MS. SCHEFFEY:  Mr. Campbell, Mr. Scott should be in

23   the waiting room now or momentarily.

24          THE CLERK:  He just joined.  He is on his way in

25   right now.
```

1    THE COURT:  Here is Mr. Scott.  Mr. Scott, you were

2    previously sworn.  You are still under oath.  Do you

3    understand?  Okay.  You were muted there for a minute.  You

4    are clear now.  You may inquire of Mr. Scott.

5                        BRUCE SCOTT,

6         having been previously sworn under oath, testified as

7    follows:

8                     DIRECT EXAMINATION

9    BY MS. SCHEFFEY:

10   Q   Good morning, Mr. Scott.  What services does GEO provide

11   to ICE?

12   A   GEO provides services for the safe and secure detention of

13   detainees as they work through their immigration cases, and

14   those services that allow them to work through their

15   immigration cases until the courts ultimately decide their

16   outcome.

17   Q   Who decides who is detained at the facility?

18   A   ICE.

19   Q   How do you know who ICE is sending to your facility?

20   A   There is a number of ICE forms that we get.  Most

21   importantly, the one ICE form particularly, the I-203, which

22   is the order to detain or release an individual that has to

23   be filled out by ICE as a law enforcement entity.

24   Q   Do you have the ability to fill out an I-203 detainee

25   form?

1    A    I do not.

2    Q    Does anyone at GEO have that authority?

3    A    No one at GEO has that authority.

4    Q    Do you need detainees in the voluntary work program to

5    keep the facility safe and secure?

6    A    We don't need detainees, no, to keep the facility safe and

7    secure.  That is strictly the job of officers, and detainees

8    don't need to do that.

9    Q    Does having detainees in the voluntary work program make

10   it easier to keep the facility safe and secure?

11   A    I would say no.  The best way to have any -- if you look

12   at the maximum security prison -- safe and secure, nobody

13   leaves their cell.  We don't do that, but it does add a level

14   of oversight that we have to watch detainees with tools and

15   equipment.  It adds a level of safety and security that we

16   have to look at.

17   Q    If your officers didn't have to watch VWP participants

18   with tools, would that free up time for them to do other

19   tasks?

20        MR. WHITEHEAD:  Objection, Your Honor, leading.

21        THE COURT:  I think it is a self-answering question,

22   Ms. Scheffey.  Ask another question.

23   BY MS. SCHEFFEY:

24   Q    In your experience, do the detainees at the facility clean

25   up after themselves?

1    A    Yes.

2    Q    Other than detainee volunteers, who cleans the facility?

3    A    Everyone that cares about the facility and the sanitation,

4    myself, my staff, detainees that have the responsibility

5    themselves to take care of their areas, clean up the

6    facility.

7    Q    Where do the janitors come in?

8    A    The janitors are there primarily for the areas that

9    detainees are not allowed to go to in accordance with the ICE

10   standards.

11   Q    When you talk about the areas detainees aren't allowed to

12   go to, does that include the ICE areas?

13   A    Includes the ICE offices, GEO administrative offices which

14   are outside the secure area, the court areas, EOIR, executive

15   office of immigration review, all the other government

16   agencies that provide services at the center, detainees are

17   not allowed in those areas.

18   Q    Why have you never paid minimum wages to detainees?

19   A    It has never come up before, prior to this lawsuit.  We

20   have never heard of or been inspected or issued any type of

21   direction to pay minimum wage.

22   Q    Other than the type of detainees your facility holds, is

23   it any different than other confinement facilities around the

24   state?

25            MR. WHITEHEAD:  Objection, foundation.

1    THE COURT:  Sustained.

2  BY MS. SCHEFFEY:

3  Q   Have you been to other jails, prisons, other facilities

4  across the state?

5  A   I did visit Monroe.

6  Q   And what is Monroe?

7  A   Monroe is a state correctional facility.

8  Q   How is -- is your facility the same or different than

9  Monroe?

10    MR. WHITEHEAD:  Objection, foundation.  I think it is

11  also vague.

12    THE COURT:  That is a very broad question,

13  Ms. Scheffey.  I don't know exactly what you are driving at.

14  The objection is sustained.

15  BY MS. SCHEFFEY:

16  Q   Is your facility layout similar to the facility layout at

17  Monroe?

18  A   Our facility layout is very inclusive of any secure type

19  setting -- confinement setting with detention centers and

20  correctional facilities throughout the state.

21  Q   Are detainee workers integral to your operations at the

22  facility?

23  A   I say they are not integral.  They are very important.  We

24  care about giving detainees opportunities to perform

25  activities that decreases their idleness.  GEO -- we can do

1  all the essential functions of the job.

2  Q   Would it change your operations if voluntary work program

3  detainees became employees?

4  A   It would change a lot logistically.  I really don't know

5  how that would work.  We would have to keep different

6  classification of detainees separate.  They can't move at the

7  same time.  They can't go to the same phones at the same

8  time.  Some of them can't leave their housing unit to go to

9  other housing units.  I really don't know how that would

10 work.  It would drastically change the way the program was

11 intended to be laid out.

12 Q   Would those changes make your facility easier to operate

13 or more difficult to operate?

14 A   I think it would be extremely more difficult to operate.

15 If we had to pay minimum wages to some detainees, it would --

16 and not everybody got minimum wage, you would start getting

17 gangs that wanted to control where the money was coming from.

18 You would get more fights.  You would get more facility

19 violence.  That's exactly why corrections and confinement

20 centers don't run programs and work programs and pay minimum

21 wage.

22 Q   As it stands today, do you hold detainee volunteers to the

23 same standards as your employees?

24 A   No, I do not.

25 Q   Do you have the same type of control over detainee

1  volunteers as your employees?

2  A   I don't.  Detainees have a number of services they need to

3  attend to.  Courts.  I don't know when they are going to go

4  to court necessarily or have a doctor's appointment or want

5  to go to outdoor rec or want to stay in the unit and play

6  video games.  I have no control over those types of functions

7  with detainees.

8  Q   If one of your officers would want to play video games one

9  day and not come to work, how is it any different?

10  A   We have a leave program, progressive discipline program

11  for officers.  If he wanted to take vacation that day and he

12  has vacation allowable and we would permit that, he could

13  take the day off and play video games if he wanted to.

14  Q   Are you saying it is no different for detainees than

15  employees that want to take the day off?

16  A   There is a limit to how many times an employee can take a

17  day off.  If he was in a tournament and ran out of vacation

18  time and decided not to show up to work, we would start

19  looking at progressive discipline and potentially termination

20  of that employee for not showing up to work.  Detainees, they

21  don't have to participate in the voluntary work program.

22  They could say, "I don't want to do it today," and a week

23  later come back and say, "You know what, I want to volunteer

24  again."  They are allowed to do that.

25  Q   Are detainees subject to that progressive discipline you

1  just described?

2  A    No, that is strictly in the GEO policy for staff.

3  Detainees have a separate, in accordance with the ICE

4  standard, disciplinary procedure that is very formal.

5  Q    Is there a limit to the number of days a detainee can take

6  off from the voluntary work program?

7  A    No.

8  Q    Any restriction on how many times a detainee can leave the

9  program and ask to come back?

10  A    No.

11        MS. SCHEFFEY:   I have no further questions.

12              CROSS-EXAMINATION

13  BY MR. WHITEHEAD:

14  Q    Good morning, Mr. Scott.

15  A    Good morning, Mr. Whitehead.

16  Q    You have already testified at trial, correct?

17  A    Yes.

18  Q    In fact, your testimony straddled two days.  Do I have

19  that right?

20  A    Yes.

21  Q    I questioned you, what, last Monday?  Do I have that

22  right?

23  A    It has been a crazy week.  I believe it was Monday.

24  Q    You had a chance to think about your testimony overnight,

25  correct?

1  A   Yes.

2  Q   And you came back the following morning, and I think you

3  answered Ms. Scheffey's questions.  Do I have that right?

4  A   To the best of my recollection.

5  Q   I asked you some follow-up questions, I think, as well.

6  Do you remember that?

7  A   Yes.

8  Q   You already had a chance to say your piece at this trial,

9  correct?

10        MS. SCHEFFEY:  Objection, argumentative.

11        THE COURT:  Sustained.

12  BY MR. WHITEHEAD:

13  Q   Well, nothing has changed since the last time we spoke.

14  For example, you are still the facility administrator at the

15  Northwest Detention Center, correct?

16  A   Yes.

17  Q   It is still your job to protect GEO's interest at the

18  Northwest Detention Center, right?

19  A   It is my job to follow the contract and do the services

20  required by the federal government.

21  Q   You offered new testimony this morning about your belief

22  that there would be an uptick in gang violence if detainee

23  workers were paid more money.  Do I have that right?

24  A   I don't think I said gang violence.  I think I said gangs

25  would likely want to control who got the money.

1   Q   You are aware that at the Northwest Detention Center, GEO

2   has, on occasion, paid more than a dollar a day for detainee

3   work.  Do I have that right?

4   A   Yes.

5   Q   On those occasions, there was no uptick in gang violence

6   experienced at the Northwest Detention Center.  Do I have

7   that right?

8   A   It is because the program was run in accordance with the

9   standard and voluntary, using a waiting list, and everybody

10  had the same opportunity.

11          MR. WHITEHEAD:  I don't think I have any further

12  questions.  Thank you, sir.

13          THE COURT:  Anything further for Mr. Scott?

14      Thank you, Mr. Scott.  You may be excused.

15          THE WITNESS:  Thank you, Your Honor.  Have a good

16  day, sir.

17          MS. MELL:  I just need a moment to confer with

18  counsel.  One quick moment.

19      GEO rests, Your Honor.

20          MR. WHITEHEAD:  Your Honor, we do have a motion that

21  should probably be discussed outside the presence of the

22  jury.

23          THE COURT:  Does either plaintiff have rebuttal

24  testimony to offer?

25          MS. CHIEN:  Not from the State.

1        MR. WHITEHEAD:  No, Your Honor.

2        THE COURT:  Do we need to hold the jury here for

3   whatever we have to do outside their presence?

4        MS. SCHEFFEY:  No, Your Honor.

5        MR. WHITEHEAD:  No, Your Honor.

6        THE COURT:  Ladies and gentlemen, I did not

7   anticipate that the evidence would be over so quickly today.

8   There is lots yet to do.  There are motions that the lawyers

9   will make and that I will have to rule on, and also there are

10  jury instructions to be prepared that are a little complex

11  and are going to take me some time and working with the

12  lawyers on jury instructions.

13       We are not going to have anything else for you until

14  tomorrow morning.  Let me excuse you for the rest of the day.

15  You can take the day off and do whatever you want.  I usually

16  tell jurors at this point that I won't report to your spouses

17  or employer that you got part of the day off.  You can do

18  what you want.

19       It is important that you keep your mind open.  You have

20  not heard everything yet.  There may be more testimony.  Even

21  though the parties have rested, sometimes there is a reason

22  to reopen.  You haven't heard the instructions on the law,

23  nor the arguments of counsel.  Of course, you have not

24  conferred with each other regarding deliberations and a

25  verdict.

1    The reason I recite those things is that it is important

2    for you to keep your minds open on all issues and not

3    conclude anything until you have heard everything.

4    Also, it is important that you don't discuss the case with

5    each other or anyone else.  Don't let anyone talk to you

6    about it.  Don't read, view or listen to any news accounts.

7    Don't do any independent research on any of the matters you

8    heard discussed in court.  We will work as fast as we can and

9    hopefully we will be ready for you first thing tomorrow

10   morning.

11   I do have an 8:30 hearing tomorrow morning on another

12   matter, and I am hopeful that we will be ready otherwise

13   first thing in the morning.  I will try not to make you wait.

14   It could be that we wouldn't start until some time after

15   9:00.  We will try and be ready for you.

16   Okay.  You all may be excused until 9:00 tomorrow morning.

17   Thank you.

18   (The following occurred outside the presence of the jury.)

19           THE COURT:  Okay.  Who is first?

20           MR. SILVERMAN:  Judge, I presume each side has a Rule

21   50 motion.  Why don't we start and say the first two

22   sentences so we preserve it, and we can talk about argument.

23   From the defendant, we renew their motion under Rule 50

24   for judgment as a matter of law.

25           MS. CHIEN:  State of Washington would also move,

 1   given the unrebutted facts and dismiss defense -- GEO's

 2   assertion of the residential exemption, the government

 3   facilities exemption, their assertion of intergovernmental

 4   immunity, and would join private plaintiffs' motion regarding

 5   the Minimum Wage Act on liability, and dismiss derivative

 6   sovereign immunity.

 7        MR. WHITEHEAD:  That is correct.  We anticipate

 8   filing a motion here momentarily.  We would move on the MWA

 9   claim, as well as GEO's defenses regarding intergovernmental

10   immunity, derivative sovereign immunity, and the application

11   of the MWA exemptions that GEO has identified.

12        MR. SILVERMAN:  Judge, on behalf of defendants, we

13   renew our motion, since we put on our defense case, we are

14   filing a short supplemental motion that deals with the

15   evidence presented on the intergovernmental immunity and

16   sovereign immunity issues.  On that basis, we renew as to our

17   previous motion, as well as we believe we have established

18   our affirmative defenses on those two defenses as a matter of

19   law.

20        THE COURT:  All right.  I have three motions pending.

21   The question on the certification of -- or decertification of

22   the class.  When is that going to be ripe?

23        MR. WHITEHEAD:  We were going to file that motion on

24   Monday.  We can file sooner if Your Honor would like us to.

25        THE COURT:  I thought you all had agreed on resetting

```
 1   that date from the 18th?

 2            MS. SCHEFFEY:  It is --

 3            MR. WHITEHEAD:  The motion is noted for next Friday,

 4   June 25th, making our opposition due on Monday, June 21.  As

 5   I have stated, if Your Honor would prefer us to complete the

 6   briefing schedule sooner, we can certainly make that happen.

 7            MS. SCHEFFEY:  GEO would work with private plaintiffs

 8   on any schedule they propose for replies.

 9            MR. WHITEHEAD:  By sooner, Your Honor, I mean

10   tomorrow.

11            THE COURT:  It appears to me that we don't have to

12   deal with that issue in this first phase of the case.  How a

13   verdict applies to the class would be subject to revision

14   after the fact, perhaps.  I don't think it has anything to do

15   at this point with this first phase.  I am not inclined to

16   adjust your schedule.

17       Now, you all want to be heard, and it is -- some of what

18   you mentioned you wanted to talk about has to do with jury

19   instructions.  I am willing to hear whatever you have to say

20   as long as it is entertaining argument.  So who goes first?

21            MR. SILVERMAN:  I will start for defendants.  I

22   believe the objections to the jury instructions have been

23   fully briefed.  Just working backwards from the tentative

24   instructions that the Court had prepared, I think we have --

25   we have set forth from the defendant's perspective our views
```

1   on which -- starting with the question of whether there is

2   employment -- employee/employer status under the MWA.  You

3   have seen the briefing from defendants on the question of

4   which test applies.  We fully briefed that.  So from a --

5   from that perspective, we have put our objections to the

6   tentative until, again, they become the finals.

7           To the extent the Court then does issue jury instructions,

8   I presume both sides will then object to the ones that they

9   don't agree with to preserve that record.  In terms of an

10  oral argument of what each side has already briefed in the

11  objections, I think we have done that.

12          Unless Your Honor wants to rehear some of those issues, I

13  just want to preserve our arguments, which is that we have

14  put in our objections to what we call the tentative

15  instructions.  Once you issue them, we will renew them to

16  preserve them.

17          THE COURT:  Okay.

18          MR. SILVERMAN:  The only other issue I would raise is

19  there is one peculiar aspect from the defendant's perspective

20  on the jury instructions in which, on the intergovernmental

21  immunity instruction, the verdict form says, "unfair

22  discrimination."  We just want to make sure, because the word

23  "unfair" is really a question under the jury instructions.

24  Either you find discrimination or you don't.  I don't want

25  there -- I don't want there to be a situation where the jury

1   finds there is discrimination and then goes to the verdict

2   form and then has a separate question of whether they were

3   unfair.  So I raise that on the verdict form.

4       I just want to make it abundantly clear we are not waiving

5   our objections.  Once you issue what you believe to be the

6   jury instructions as opposed to the tentative which nobody

7   was supposed to rely on, we need our opportunity to preserve

8   our objections to those, to the ones we object to.

9           THE COURT:  Yeah.  We are a long way from final

10  instructions.

11          MR. SILVERMAN:  If we can set some time so we can

12  argue about that when they come.

13          THE COURT:  Who is next?

14          MR. BERGER:  To the point of jury instructions,

15  although we did outline our primary concerns with the

16  discussion drafts in our submission, there are a few

17  additional items in the jury instructions that we would like

18  to be heard on both in terms of inclusion of some of the

19  proposed instructions, both agreed instructions and disputed

20  instructions that were not included in the discussion draft,

21  and that a couple of issues -- smaller issues with the

22  verbiage of some of the discussion drafts that we didn't

23  raise in the written responses, but, you know, have since

24  come to appreciate.  We would just want on opportunity to be

25  heard on those as well rather than the assumption that

1   everything was covered in our written submission.

2           THE COURT:  Okay.  State?

3           MR. POLOZOLA:  Yes, Your Honor.  We also have four

4   additional instructions that we would proposed adding to the

5   discussion draft -- or three for the State.

6       The first would be the parties agreed Instruction No. 17

7   that was about stipulations of fact.  We have since had

8   admitted into the record Exhibit 609 with the agreed facts.

9   We would request an instruction instructing the jury that

10  Exhibit 609 contains agreed facts that are to be deemed

11  proved in this case.  Additionally --

12          THE COURT:  Excuse me.  That's your instruction

13  number what?  17?

14          MR. POLOZOLA:  The parties agreed to Instruction

15  No. 17, but contained a placeholder for the actual agreed

16  facts.  That is now Exhibit 609.

17          THE COURT:  All right.  All right.

18          MR. POLOZOLA:  Additionally, we would request the

19  plaintiff's proposed Instruction No. 7, which set forth the

20  basic elements of a Minimum Wage Act claim.  We think this is

21  particularly important to include, given the amount of

22  testimony and suggestions by GEO that the ICE-GEO contract

23  defined who could be an employee.  It is Washington state law

24  that defines how "employee" is to be considered in this case.

25  We believe the proposed Instruction No. 7 clearly explains

 1   that to the jury and would ask the Court to include that

 2   instruction.

 3           THE COURT:  That's your requested No. 7?

 4           MR. POLOZOLA:  Yes, in the disputed instructions.

 5       The third for the State, Your Honor, is the plaintiff's

 6   proposed Instruction No. 10 that volunteers are not permitted

 7   under state law for for-profit companies.  We think this is

 8   extremely important given the name of the voluntary work

 9   program and the amount of emphasis that GEO has placed on the

10   workers as volunteers.

11       To avoid prejudice to the State, the jury should have a

12   clear understanding that under state law, volunteers are not

13   permitted for-profit companies, and we request an instruction

14   to that effect.  That is our proposed Instruction No. 10,

15   Your Honor.

16       We have objections that have been lodged in writing to the

17   Court that was a joint submission with the private class.  I

18   believe it was ECF 455 in the State's case.

19           THE COURT:  I have that in front of me.  I have not

20   analyzed all of that.  I have it.  I have read it once.

21           MR. POLOZOLA:  I won't walk you through that in

22   detail.  We do have objections that were contained in the

23   written submission as well as additional objections that we

24   would like to lodge for the record.

25       In particular, with the Court's proposed Instruction No. 4

on the burden of proof, we would lodge an objection to the
second sentence about intergovernmental immunity for the
reasons explained in our forthcoming JMOL motion.  We don't
believe that issue should be put to the jury.  It is a
question of law, and there hasn't been sufficient evidence
presented here to warrant putting it to the jury.

To the extent GEO continues to press and the Court allows
the jury to consider GEO's affirmative defenses on the
exemptions under the Minimum Wage Act, those exemptions are
issues on which GEO bears the burden because they are
affirmative defenses.  The instruction on its -- it is page
four of the Court's discussion draft -- would need to clearly
delineate that GEO bears the burden on any such exemptions if
they are put to the jury.

Your Honor, we also, for the proposed Minimum Wage Act
definitions instruction that the Court included in its
discussion draft, that was on Page 15, we briefed some of
these objections.  I do want to be clear that we object to
the exception -- or the definition of "employee" including
the exception for government facilities in the definition.
Part of that is for the reason I just explained, that it is
GEO's burden to prove entitlement to an exemption, and
putting them together muddles that for the jury.

Second, we don't believe GEO is entitled to assert that
exemption at all, so there is no need for it to be included

1   in the definition of "employee."  Including one exemption

2   rather than all of the exemptions in the Minimum Wage Act

3   suggests there is undue import for that one.  We don't

4   believe that is appropriate.

5          THE COURT:  Under this draft, it was drafted in mind

6   with one immunity offense available based on that one

7   exemption.  Where would the exemption go?

8          MR. POLOZOLA:  Your Honor, I believe if the

9   intergovernmental immunity issue is going to be put to the

10  jury, that exception or exemption (k) should be with the

11  immunity instruction so as not to suggest it is at issue

12  under the Minimum Wage Act because it should not be.  The

13  Court has already held repeatedly, and we are going to

14  explain this in our JMOL briefing in more detail, that GEO is

15  not entitled to exemption (k) because it is not a state,

16  local or municipal institution.

17      By including it in the definitions under the Minimum Wage

18  Act, it suggests to the jury that the Northwest Detention

19  Center might be.  That would be contrary to the Court's prior

20  rulings.

21      We would suggest the plain language of that exemption, if

22  it is to be included, be included only in the immunity

23  discussion so as to clearly frame that issue for the jury.

24          Additionally, Your Honor, for the instruction on Page 17

25  of the discussion draft, these were the proposed factors for

1    the Minimum Wage Act.  Again, we have briefed the issue that

2    we don't believe factors are necessary.  We believe the

3    definitions under the Minimum Wage Act are clear and should

4    apply.

5        Insofar as the Court will instruct the jury on a

6    multifactor test, I would point out a few things here.

7    First, the language in the first sentence, Your Honor, that

8    refers to the detainees enrolled in the VWP, we believe

9    mischaracterizes the workers and the evidence in this case.

10   They don't enroll in the voluntary work program.  They are

11   workers at the Northwest Detention Center.  They should be

12   called detainee workers, in the State's view.

13       Additionally, on the first factor that the Court proposes

14   to use, the nature and degree of control of the detainees by

15   GEO, we believe the issue is not control of the detainees,

16   but of the detainees' work.  By framing this first factor as

17   merely the degree of control, we believe that essentially

18   allows for a detention-specific Minimum Wage Act analysis

19   which the Court has held is not appropriate, and we believe

20   is not appropriate.  We believe that factor would need to

21   focus on the nature and degree of control of the detainees'

22   work by GEO.

23       We have briefed in ECF 455 objections related to the

24   Factors No. 6 and 9.  I will rest on those.

25       With respect to the intergovernmental immunity instruction

1    on Page 18, that will be subject to our JMOL motion, and we

2    don't believe it should be put to the jury, but insofar as it

3    is, we have proposed additional language in our filing at ECF

4    455 that we believe would be appropriate if the issue is

5    going to be submitted.

6        The only final thing is on the verdict form, I will note

7    for the record that was briefed at ECF 455.  We have provided

8    additional proposed language consistent with those objections

9    in that filing as well.

10       Thank you, Your Honor.  I appreciate you letting me get it

11   all out there.

12           MR. SILVERMAN:  To put on the record, the defendants

13   object to the proposed instructions that counsel has just

14   made.  Obviously, I believe that we need the opportunity to

15   respond once they put it in writing.  I think the Court has

16   indicated you will provide us that opportunity.

17           MR. BERGER:  Your Honor, I apologize for not being

18   clear about the substance of my additional requests and

19   objections earlier.  I didn't know we were going to get into

20   the substance at this point.

21       In addition to what Mr. Polozola laid out, the only two

22   additional things I would note is we do have a concern or

23   objection to the discussion draft at Page 10 dealing with

24   corporations can only act through employees, agents or

25   officers.  Our concern is with the inclusion of classes in

```
 1   that instruction, because classes do not have employees,
 2   agents or officers in the same way.
 3            THE COURT:  I am aware of that.
 4            MR. BERGER:  Instead, we would propose giving the
 5   joint Instruction No. 1, which defines class actions.
 6            THE COURT:  Okay.
 7            MR. BERGER:  That's all I have to add.  Thank you.
 8            MR. SILVERMAN:  Again, Your Honor, we are
 9   anticipating that we are going to have a time to argue our
10   substantive objections once you come out with the proposed
11   instructions.
12            THE COURT:  Absolutely.  The problem is getting me
13   time to make the changes that are appropriate.  I have these
14   motions in front of me.  Any of you have anything else to say
15   on these, on the motions pending?
16            MR. SILVERMAN:  Yes, Ms. Mell has one note on the
17   issue that came up this morning, the L&I administrative
18   policy.
19            MS. MELL:  Your Honor, getting an instruction that
20   contains the ESA1 descriptor for sub (k) would be important,
21   particularly if the request or the Court is moved to put in a
22   provision or instruction that says "private corporations
23   can't have volunteers."  Private corporations can have
24   volunteers if they are operating and functioning within the
25   confines of state law mirrored to federal law where the
```

1    detention is exempt from the Minimum Wage Act.

2        It would be very prejudicial to GEO to have an instruction

3    saying private corporations can't have volunteers when they

4    are mandated to have volunteers by federal law, and under

5    state law any private contractor operating at the direction

6    of the state with regard to residents, inmates or patients of

7    state, county or municipal correctional, detention, treatment

8    or rehabilitative institutions can use volunteers.  The

9    testimony was clear that CI, Correctional Industries, is an

10   entirely volunteer program.

11            MS. CHIEN:  We object to any instruction as to ESA1.

12   As Mr. Grice testified, that's not the law.

13            MS. MELL:  It is the standard and guidelines given to

14   employers like GEO.

15            THE COURT:  Wait a minute.  Which of you speaks for

16   GEO on jury instructions?

17            MR. SILVERMAN:  I do.

18            THE COURT:  Okay.  I only want to hear from one

19   person on this subject from each party.  That includes you

20   too, Ms. Chien.  Mr. Polozola started this.

21            MS. CHIEN:  Got it.

22            THE COURT:  All right.  Anything else now?

23        On these motions, I am satisfied, as I was at the

24   conclusion of the plaintiffs' case, that there are issues of

25   fact on the subject matter of this case that require that it

```
 1   go to the jury.  In regard to requests for judgment on
 2   particular issues and defenses, those will be resolved in the
 3   jury instruction process.
 4       I am satisfied that the State's motion and the class's
 5   motion for judgment -- that is for final judgment -- should
 6   not be granted because there are issues of fact that remain
 7   for the jury.
 8       Now, is there anything else you want to talk to me about
 9   before I get to do my work?  I have a heavy remaining day to
10   get these instructions in shape.  I need you to stand by to
11   come back to Court when I need you.  It will be afternoon.
12   Anything else now?
13           MR. SILVERMAN:  Nothing else from the defendant.
14           THE COURT:  You all go get your final arguments
15   ready.  You've got time to prepare now.  That should make
16   them short.
17       Okay.  I will work as fast as I can to try and get these
18   prepared and that conform to the law and the evidence.
19           MS. MELL:  Thank you, Your Honor.
20       (Recessed.)
21
22
23
24
25
```

```
 1                                  AFTERNOON SESSION
 2                                   JUNE 14, 2021
 3      (The following occurred outside the presence of the jury.)
 4          THE COURT:  This is an additional instruction
 5    conference basically.  I have provided a draft set of
 6    instructions.  I have not numbered them because there may be
 7    more changes.  If you refer to them, you have to give us time
 8    to catch up to the instruction you are talking about.
 9          I read your submissions and made a lot of changes in what
10    I submitted before.
11          It is clear from the evidence, in my judgment, that the
12    defendant is not entitled to instructions on derivative
13    sovereign immunity or direct regulation intergovernmental
14    immunity or the resident exception to the Minimum Wage Act
15    because in the last matter, the duties do not require that
16    the detainees live at the detention center.  That's
17    substantially proven by all the evidence we have had that
18    those jobs, those duties, could be conducted by GEO staff.  I
19    don't think the evidence supports an instruction on that
20    defense.
21          I do think, as is reflected in the instructions, that the
22    defendants have made out a case for immunity based on
23    discrimination.  That is the basis for these instructions.
24          Now, this is not the time for formal exceptions.  That
25    will come later.  I want to know what is left out and that
```

1  you think is necessary and any objections you have to these

2  instructions.  In other words, I am interested in correcting

3  what we have here at this point.

4      Who goes for the State?  Mr. Polozola?

5          MR. POLOZOLA:  Yes.  Thank you, Your Honor.  Our

6  primary point of discussion would be the intergovernmental

7  immunity instruction, which perhaps is no surprise.  We have

8  a number of issues that we would like to point out and

9  address with the Court.

10      I will let you catch up, per your request.  Are you there?

11          THE COURT:  I am caught up.

12          MR. POLOZOLA:  Starting with paragraph 1, Your Honor,

13  we believe that --

14          THE COURT:  Just a minute.  You are talking about the

15  affirmative defense instruction?

16          MR. POLOZOLA:  The intergovernmental immunity

17  instruction, Your Honor.  Yes, in the first paragraph, it

18  starts with, "It is an affirmative defense to plaintiffs'

19  claims."

20      We believe the second sentence is somewhat unclear and

21  could be revised to more accurately state the law which would

22  be, "Discrimination here means to treat GEO less favorably

23  than similarly situated state facilities."

24      Then from there, Your Honor, we believe the second

25  paragraph that begins with "as applied" here --

1          THE COURT:  Just a minute.  Give me the language you

2    propose again.

3          MR. POLOZOLA:  For the second sentence we would

4    propose, "Discrimination here means to treat GEO less

5    favorably than similarly situated state facilities."

6          THE COURT:  Change to "treat GEO less"?

7          MR. POLOZOLA:  "Less favorably than similarly

8    situated state facilities."

9          THE COURT:  Okay.  Go ahead.

10         MR. POLOZOLA:  Thank you, Your Honor.  The reason for

11   that is GEO is the defendant asserting the defense and

12   asserting that it is the entity that is being discriminated

13   against.  So the question must necessarily be framed as

14   whether GEO is being treated differently from similarly

15   situated entities, in our view.

16     Going on to the second paragraph, Your Honor.  We would

17   propose striking that paragraph because it is unnecessary and

18   it assumes what is essentially the key issue about whether

19   the State and GEO are, in fact, similarly situated and

20   therefore proper comparators.

21     We believe the instruction would be clearer, more

22   accurate, and make more sense to the jury if it simply

23   proceeded to the third paragraph that defines how the jury

24   should determine similarity.  We do have some proposed

25   changes to that paragraph as well.

1          THE COURT:  What are those?

2          MR. POLOZOLA:  Those are similar to what we had

3   identified before, Your Honor.  In short, that the State has

4   no, quote, "voluntary work program," in all caps, the way

5   that GEO does.  So by drafting the instruction this way, it

6   suggests an equivalence that is not supported in the

7   evidence.

8       What I would propose on the third paragraph would be to

9   state that, "In determining similarity, you may consider

10  whether there are any significant differences between GEO and

11  other state facilities and work programs operated by each and

12  between detainees of each that justify the differential

13  treatment."  I'll repeat it for you.

14         THE COURT:  Go ahead, repeat it.

15         MR. POLOZOLA:  "In determining similarity, you may

16  consider whether there are any significant differences

17  between GEO and other state facilities, work programs

18  operated by each --

19         THE COURT:  GEO and other -- between GEO and other

20  state facilities?

21         MR. POLOZOLA:  "And state facilities," Your Honor.

22         THE COURT:  All right.

23         MR. POLOZOLA: "Work programs operated by each and

24  between detainees of each that justify the differential

25  treatment of each."

1          THE COURT:  "Work programs operated by each."

2          MR. POLOZOLA:  "And between detainees of each."

3          THE COURT:  Okay.

4          MR. POLOZOLA:  "That justify the differential

5  treatment."

6          THE COURT:  Okay.  I got your suggestion.

7          MR. POLOZOLA:  On the related point, if I may, I

8  would like to address the verdict form on this

9  intergovernmental immunity issue as well.  In particular, to

10  really be clear on what the jury must determine here, the

11  question is whether there is unfair discrimination, not

12  merely whether GEO is treated differently from any other

13  entity.

14    We would propose a two-question verdict form on this issue

15  with the first being:  "Do GEO and Washington operate

16  similarly-situated work programs?"

17          THE COURT:  "Operate"?

18          MR. POLOZOLA:  "Similarly-situated work programs."

19          THE COURT:  Okay.

20          MR. POLOZOLA:  The second question:  "If so, does the

21  Minimum Wage Act discriminate against GEO because it is a

22  federal contractor?"

23          THE COURT:  I got it.

24          MR. POLOZOLA:  Thank you, Your Honor.  We propose

25  that because it really is a two-part inquiry.  There have to

be programs or facilities that are similarly-situated before
you can determine whether the differential treatment, if any,
is due to GEO's status as a federal contractor.  We believe
that would appropriately get to the issue.

I will turn it over to class counsel, if they have
additional things to add, if I may.

THE COURT:  You woke them up.

MR. BERGER:  I am here.  I am paying attention.

We would join the State's concerns and statements
regarding the intergovernmental immunity instruction and
question on the verdict form.

You know, in particular, the second paragraph of the
instruction drafted by the Court seems to be redundant of the
first and third paragraphs, and the reference to the
capitalized voluntary work program, you know, presupposes
facts, you know, that are not in evidence regarding the
different state programs.  Not all the state programs that
were discussed were voluntary.  For example, the Class III
programs in the correctional facilities and use of that
phrase, which is specific to the GEO program, suggests a
congruity that is not necessarily borne out by the evidence,
and therefore shouldn't be included in the jury instruction.

Beyond that, we have a few comments on some of the other
instructions.  The instruction providing a definition under
the Minimum Wage Act that begins, "the law of the State of

1    Washington in the Minimum Wage Act."

2            THE COURT:  Just a minute.  Yes.

3            MR. BERGER:  We note the last sentence of that

4    instruction, "Any agreement between such employee and the

5    employer to work for less than such wage rate is no defense

6    to such action."  It is an accurate statement of the law, but

7    it is redundant of the instruction -- two instructions later

8    that deal with agreements and volunteers.

9        To avoid that redundancy, it might be easiest just to

10   strike that sentence from the last -- that last sentence in

11   the definitional instruction.  We just wanted to note that

12   redundancy.

13           THE COURT:  Right.

14           MR. BERGER:  Then turning to the instruction setting

15   forth the elements of the Minimum Wage Act claim.  So the

16   first parenthetical or the first element, I would just note

17   it seems that we should be talking -- even though the parties

18   are using Northwest Detention Center and Northwest ICE

19   Processing Center interchangeably throughout the case, I

20   believe at this point Northwest ICE Processing Center is the

21   proper --

22           THE COURT:  Wait a minute.  You are talking about

23   line 8 where I said "Northwest Detention Center"?

24           MR. BERGER:  Yes.

25           THE COURT:  And it is the Northwest?

1        MR. BERGER:  ICE Processing Center.

2        THE COURT:  Okay.

3        MR. BERGER:  Our bigger concern here, though, is that

4   we believe the verdict form should parallel the issues stated

5   in the instruction.  The first question on the verdict

6   form --

7        THE COURT:  Yes.

8        MR. BERGER:  First question on the verdict form, we

9   believe should parallel the first elements on the instruction

10  and read, "Under the Washington State Minimum Wage Act, did

11  GEO employ detainee workers in the voluntary work program at

12  the Northwest ICE Processing Center?"

13       THE COURT:  All right.  I see that.  I have it down.

14  I don't know if Mr. Polozola was through.

15       MR. POLOZOLA:  I am, Your Honor.  We join

16  Mr. Berger's request and explanation.  We are done.  Thank

17  you.

18       MS. SCHEFFEY:  Your Honor, I would begin by stating

19  that GEO objects to the changes that the State and class

20  plaintiffs have just requested, as well as renewing our

21  objections in ECF 378-1 and ECF 349.

22     I wanted to discuss objections to this current draft.  I

23  want to start with the instruction that defines "employ,

24  employee and employer."  Says, "The law of the State of

25  Washington and the Minimum Wage Act provides."

1          THE COURT:  What is wrong with that?

2          MS. SCHEFFEY:  First, we would object to the fact

3     this does not include the exception to the Minimum Wage Act,

4     exception (k)  we believe it is unnecessarily confusing to

5     the jury to not explain to them there are exceptions to the

6     phrase "employee," including for the State residents, inmates

7     of a correctional facility, detention center, and suddenly

8     spring it on them in the discrimination instruction.  Doesn't

9     make clear how the law works, and I don't think they will be

10    able to see how different exceptions play out.

11         We also object to the extent the only definition given to

12    the jury to consider about what an employee is, is just any

13    individual employed by an employer.  This instruction is

14    directly contrary to the controlling law in the State of

15    Washington and *Anfinson vs FedEx*, which has unambiguously

16    found that the statutory definition of employee is ambiguous

17    and it incorporates the economic dependence test evolved by

18    the federal courts.  The citation for that is *Anfison vs*

19    *FedEx*, 174 Wn.2d 851.  The pincite is Page 868.

20         THE COURT:  Now, just let me ask you about that.  Are

21    there any cases that have defined employ and employer and

22    employee differently than they are defined in the statute?

23         MS. SCHEFFEY:  Yes.  I would state that *Anfison* and

24    also the other federal case law states that you look to the

25    multipart test, the economic dependence test which defines

 1  what an employee is.  Especially in this case and --

 2          THE COURT:  Does the -- are there any cases that

 3  are -- other than differentiating between independent

 4  contractors and employees in the State of Washington that

 5  require just a simple definition of or just require these

 6  considerations in a straight question of whether one is

 7  employed?  I am not sure I am putting that very well.

 8          MS. SCHEFFEY:  Your Honor, I think you are right, the

 9  case law is not perfectly clear, that's what you are alluding

10  to.  We point to *Calhoun vs State*, 146 Wn.App. 877 where the

11  court talked about the fundamental purpose and looked at an

12  individual who was participating in the SCC's program and

13  just said this doesn't align with the definition of

14  employment, but they did it as a matter of law.

15      I understand it is more complicated here where Your Honor

16  has decided there are fact issues.  I think those fact issues

17  related to each of the factors in the economic dependence

18  test.

19          THE COURT:  Wait a minute.  You are talking too fast.

20  Give me the citation to your case again.

21          MS. SCHEFFEY:  *Calhoun vs State*, 146 Wn.App. 877.

22          THE COURT:  146?

23          MS. SCHEFFEY:  146, yes, Wn.App. 877.

24          THE COURT:  What does it say?  Defines employment

25  relationship?

 1          MS. SCHEFFEY:  It both applies the exception (k), but

 2    also states further when looking at detained individuals in

 3    other non-traditional employment situations you have to look

 4    at the fundamental nature of the relationship as a whole, see

 5    if it fits within the definition of employment context.

 6          That is the first objection.  I know this isn't the place

 7    for formal exceptions, so I will keep moving on the current

 8    draft.

 9          We would renew our objection to the citizenship

10    instruction as we last briefed in ECF 349.

11          THE COURT:  Wait a minute.  Wait a minute.  I don't

12    know which instruction you are talking about.  Tell me

13    what --

14          MS. SCHEFFEY:  The page right after the definition,

15    if that helps, starts, "The Minimum Wage Act requires

16    employers to pay employees the minimum wage."

17          THE COURT:  Okay.  What is wrong with that?

18          MS. SCHEFFEY:  We object to this as not relevant to

19    this phase of trial because it is applicable only to the

20    payment of back wages and has nothing to do with whether

21    detainees should be employees or classified as employees

22    going forward.  The State's claim is purely forward-looking.

23          This implies and will confuse the jury that if they find

24    they are employees, that somehow they could supersede federal

25    law and entitle the individuals to minimum wage on a

1   forward-looking basis.

2        THE COURT:  Okay.  What else?

3        MS. SCHEFFEY:  Next one we would go to is the

4   following instruction, which I will call the volunteer

5   instruction which starts with, "An agreement between employee

6   and employer."  Mr. Berger already noted our first objection,

7   which is that the first sentence is in here twice, both in

8   the definition section and in this separate instruction.  We

9   think that redundancy is prejudicial --

10       THE COURT:  Wait a minute.  I don't know what you are

11  talking about.  Where is it a duplication?

12       MS. SCHEFFEY:  The sentence that starts with, "An

13  agreement between an employee and employer".  You see that?

14  That also is on -- if you go two pages back to the definition

15  instruction, the very last paragraph says, "An employer who

16  pays an employee less than minimum wages," the second

17  sentence in that paragraph, "Any agreement between such

18  employee and employer to work for less than such wage is no

19  defense to such an action."

20       THE COURT:  Okay.  I see what you mean.

21       MS. SCHEFFEY:  Just twice says "an agreement is no

22  defense."

23       THE COURT:  Yep.  What next?

24       MS. SCHEFFEY:  We argue there is no basis in law for

25  this volunteer instruction.  The Minimum Wage Act explicitly

1    includes a volunteer exemption in its definition.  The

2    definition sections proposed do not indicate they are going

3    to include any of those exemptions.  To the extent we are not

4    explaining exemption, there is no legal support for giving a

5    counter exemption essentially saying the opposite applies.

6        As we would state again under the economic realities test,

7    volunteering is relevant and has been relevant up to this

8    point in all of our briefing as a defense to the Minimum Wage

9    Act because it goes directly to the issue about an employer's

10   control over the individual, because all of the former

11   detainees testified about their understanding of the program

12   being voluntary.  That goes to whether they could have a set

13   schedule, whether they were supposed to show up every time,

14   if GEO could tell them which position to perform.  All of

15   that is relevant to the employment relationship and how we

16   would typically assess whether someone is an employee.

17       Without that, essentially, there is no distinction, and we

18   also think this essentially just instructs the jury what to

19   find, which is that it is a voluntary work program, means it

20   is employment.

21       So we would argue that if this instruction is to be given,

22   it must be made clear to the jury that it is a question of

23   fact for them to determine whether the voluntary work program

24   is employment or whether the detainees are employees of GEO,

25   and that they may consider the voluntary nature of the

1   program in reaching that conclusion because that is a fact

2   issue, Your Honor.

3          THE COURT:  Just a minute.  Let me think about that.

4   I want to hear from plaintiffs on that.

5          MS. SCHEFFEY:  I further state that the statement,

6   "Volunteering is not a defense to the Minimum Wage Act claim"

7   is legally inaccurate because in some circumstances it is.

8      The next one we would --

9          THE COURT:  Under what circumstances here is it?

10         MS. SCHEFFEY:  Exemption (d), any individual who

11  volunteers for a governmental body or agency for a nominal

12  stipend is not an employee under the Minimum Wage Act.  If

13  someone volunteers for ICE -- that's exemption (d) to RCW

14  49.46.010.  That's why we -- and we briefed this in ECF 349.

15  We believe this instruction is not appropriate because there

16  is an explicit exemption.

17         THE COURT:  Just a minute.  Let me get the statute.

18         MS. SCHEFFEY:  Go to RCW 49.46.010, which is the

19  definition section of the Minimum Wage Act, under Section

20  (3)(d), which states the exceptions to the definition of

21  "employee" under the Act.  It explains --

22         THE COURT:  Wait a minute.  Subsection what?

23         MS. SCHEFFEY:  (3)(d), as in dog.

24         THE COURT:  There is no (3)(d).  (5)(d).

25         MS. SCHEFFEY:  Someone printed this for me.  It

1    starts with, "Any individual engaged in the activities of

2    educational, charitable" --

3           THE COURT:  That's (5)(d).

4           MS. SCHEFFEY:  Okay.

5           THE COURT:  Unless -- you are right.  It is (3)(d) in

6    the pocket part.  What is your point with that now?

7           MS. SCHEFFEY:  We think this instruction goes too far

8    because it is one thing for this Court to determine that the

9    exception doesn't apply and therefore not instruct the jury

10    on it.  It is an entirely different thing to give them a

11    further instruction that the Court has found this doesn't

12    apply and volunteering has no weight.

13      We believe the appropriate way to deal with the

14    volunteering not applying is how you are dealing with every

15    other exception, which is you don't include it in the

16    definition.  We think all exceptions should be treated the

17    same.

18           THE COURT:  Ms. Scheffey, you talk very fast and in a

19    monotone.  It is very hard to follow you.  Slow it down and

20    take one thing at a time, and I will want to hear from the

21    defense on that issue.  What is next?

22           MS. SCHEFFEY:  The next thing would be the

23    instruction that begins, "Plaintiffs allege that GEO's

24    practice of paying detainee workers one dollar per day for

25    work."

1    GEO objects to this instruction, again, as contrary to the

2    controlling law in *Anfison* as we just discussed.  There is no

3    definition of "employee" which the jurors are permitted to

4    apply as a matter of fact.  Gives them no instructions about

5    the facts.

6    THE COURT:  I will look at your case.

7    MS. SCHEFFEY:  We would further object that this

8    doesn't explain to the jury that they need to find whether

9    detainees are employees, which is what is in the verdict

10   form.  It should instruct them that that is their duty.

11   Their duty is not to find whether they -- what the amount is

12   that they should be paid or that they were employed.  They

13   have to find that detainees fall within the definition of

14   "employee," and that GEO falls within the definition of their

15   employer.

16   Again, we would ask for some sort of instruction that that

17   is a question of fact for the jury to determine, because

18   right now the phrasing already talks about paying detainee

19   workers one dollar per day for work performed, which tracks

20   the definition and does not seem to give the jury any

21   discretion and presupposes that there was work performed.

22   And "employ" is to permit to work.

23   THE COURT:  Go ahead.

24   MS. SCHEFFEY:  I think, Mr. Berger, we would join his

25   request that the "Northwest Detention Center" be changed to

1    the "Northwest ICE Processing Center" for consistency.

2          THE COURT:  Yes.  I got that.

3          MS. SCHEFFEY:  Then the last one is that we would

4    object to the defenses not given.  GEO believes it has proven

5    through the evidence -- or presented evidence which a

6    reasonable jury could find it is entitled to derivative

7    sovereign immunity.  There has been extensive testimony that

8    each of the things it did with respect to the voluntary work

9    program was directed by ICE coming from job descriptions to

10   placement and where they place people in the program, amount

11   of pay.  Every element that we have gone through GEO has

12   presented some evidence that ICE directed it to do so.

13       We believe that remains a fact issue, and we do not

14   believe the facts are decidably on one side or the other.

15       The last would be we maintain that the jury should be

16   instructed as to the resident exception to the Minimum Wage

17   Act because it has presented evidence that one of the key

18   duties of the voluntary work program detainees was to be

19   available and detained at the facility when the task arose,

20   so they had to reside or sleep there.

21         THE COURT:  Okay.  All right.  Thank you.

22       Let me go back to plaintiffs regarding the definition of

23   "employment" and that case, if you have it.  I am going to

24   ask Rachel to bring it for me, 146 Wn.App.  Okay.  Who wants

25   to respond regarding the definition of "employment" and the

1   volunteer instruction?

2          MR. BERGER:  Your Honor --

3          THE COURT:  Nobody.

4          MR. BERGER:  To start, with respect to *Anfison*, that

5   was a test that was specifically developed first by the

6   federal courts and then adopted by the Washington courts to

7   distinguish between independent contractors and employees.

8   It simply does not apply here where there is no -- there is

9   no question of independent contractor status.  Instead, the

10  definition in the RCW applies, and I think we have covered

11  that in our prior briefing.

12      With respect to -- there is no cases applying that test

13  outside of the independent contractor classification issue.

14      *Calhoun* is not even a Minimum Wage Act case.  It was a

15  case brought under the Washington Law Against Discrimination

16  and, in fact, the court states in that case -- specifically

17  states, "The state responds that neither the FLSA nor the MWA

18  applies to the present case.  We agree."

19      So that court -- that case doesn't tell us anything about

20  the test for employee status under the Minimum Wage Act.  The

21  court does go on to note the Section (k) exemption, but the

22  basic holding is that the MWA doesn't even apply in that

23  situation because it was not a Minimum Wage Act case.

24          MS. SCHEFFEY:  If I may point you to the paragraph I

25  was referring to.  Paragraph 16 of that case, where the court

 1   says, "The record provides insufficient indicia of employment

 2   in this case."  It goes on to state that, "Calhoun's

 3   employment is optional, paid and supervised, however, does

 4   not necessarily demonstrate that he is an employee for

 5   purposes of this statute.  Rather, he is a pretrial detainee

 6   attempting to adapt to life at the SCC.  It is healthy for

 7   SCC residents to remain active and feel productive on a daily

 8   basis.  For many of these residents, contributing to the

 9   community in which they live undoubtedly facilitates the

10   treatment process.  The SCC, which recognizes this, has

11   developed a treatment program into which these principles are

12   integrated.  Earning a living is the goal of most workers,

13   but the primary goal of work at SCC is to maintain a healthy

14   life-style and promote good habits for residents.  We are not

15   persuaded that Calhoun is an employee for purposes of Chapter

16   49.60 RCW."  That is not applying the exemption (k); it is a

17   separate analysis.  We believe that tracks *Ndambi* and the

18   other cases we have looked at, that at least consider the

19   alternate purposes of a program when individuals are confined

20   that may countervail the indicia of employment.

21        MR. BERGER:  Again, Your Honor, I think the critical

22   sentence there is, "We are not persuaded that Calhoun is an

23   employee for purposes of Chapter 49.60 RCW."  That's the

24   Washington Law Against Discrimination.  The Minimum Wage Act

25   is RCW 49.46.  The case is simply inapposite to the question

1    presented here.

2              MS. SCHEFFEY:  We would state the definition of

3    "employee" would be the same for either.  There is no

4    distinction between employees who can be discriminated

5    against and employees who can get the minimum wage.  People

6    who are employees both are entitled to minimum wage and to

7    not be discriminated against by their employer.  It is not a

8    dichotomy.

9              MR. BERGER:  The case law recognizes that the

10   definition of "employee" can vary from statute to statute

11   which is precisely why two paragraphs earlier the court says

12   neither the FLSA nor the Minimum Wage Act applies to the

13   present case.

14             THE COURT:  Thank you.

15             MR. BERGER:  Turning to the other issue you asked

16   about, the instruction regarding volunteers.  I think it is

17   precisely because there has been so much stress on

18   "volunteer" and "voluntary" by the defense in this case that

19   that is why this instruction is needed, because without this

20   instruction, the jury could easily misapprehend the law and

21   determine that individuals can volunteer for for-profit

22   corporations, and therefore be excluded or exempt from the

23   Minimum Wage Act when, in fact, the subsection (d) exemption

24   in the Minimum Wage Act is very clearly and expressly limited

25   to government agencies and non-profit entities.

1        So to avoid confusion, possible jury confusion or

2   misapprehension or misapplication of the law, that is why the

3   instruction is needed, and it is relevant.  It is important

4   that it be given in this case.

5        MS. SCHEFFEY:  Your Honor, we state it may be one

6   thing if you were giving the jury factors to consider, ways

7   they can weigh various elements that they have heard

8   throughout the trial.  Here, in not giving them any elements,

9   any instruction of what they are considering, but then

10  telling them that volunteering is not a defense, you are

11  singling out a specific fact that we have presented evidence

12  of that we were not given notice of before trial, would not

13  be something we could indicate as part of control, and

14  excluding it from the jury's purview.  We believe that would

15  be inaccurate as this is a voluntary program, and that is a

16  critical element of why it may or may not be employment.

17  Obviously, GEO says it is not employment because the

18  voluntary nature shows it doesn't have the traditional

19  indicia of employment, doesn't have the same control, which

20  is what every other court has considered.

21        MR. BERGER:  Your Honor, all employment in the

22  United States is voluntary.  Otherwise, we have a Thirteenth

23  Amendment problem.  The point of calling it a voluntary work

24  program in the PBNDS is to distinguish it from compulsory

25  labor such as you might see in a prison setting like the

1   Class III, Category III work programs that were talked about

2   with Department of Corrections in this case where

3   incarcerated individuals can be required to work.  That's the

4   issue with voluntary here, not whether somebody choosing to

5   work or not choosing to work affects the definitional

6   question under the Minimum Wage Act as to whether GEO or the

7   employer suffered or permitted them to work.

8        MS. SCHEFFEY:  Your Honor, to the point that all

9   employment is voluntary in the United States, to the extent

10  that is true, then there is no need to instruct the jury.

11  They will be able to determine the voluntary nature and that

12  that is separate from employment.  Here, the thing that

13  Mr. Berger is disregarding, and the jury is not being told it

14  can consider, is that in typical employment, you are working

15  as *Calhoun* said, to earn a living.  That is the goal of why

16  you are working.  It is different when you have all of your

17  needs met.  We don't have any instructions about that,

18  despite our request.  This just elevates plaintiffs' theory

19  of the case above all of the other exceptions, which are

20  simply being left out of the definition.

21       MR. BERGER:  Nothing in the volunteer instruction

22  prevents GEO's counsel from talking about control, from

23  talking about the ability of detainees to choose not to work

24  in the program, from talking about their ability to change

25  their mind from day-to-day on whether they want to

1    participate.

2        What the problem here is, again, the possibility that the

3    jury will misapprehend the law to think that volunteers for

4    for-profit corporations can be exempt from the Minimum Wage

5    Act, and that clearly is not consonant with Washington law.

6        MS. SCHEFFEY:  To the extent Washington law is any

7    individual employed by an employer, as we are instructing the

8    jury, that wouldn't be misapprehending it if they decided

9    that due to the voluntary nature, it is not like employment.

10   I would just end with, you know, this specifically says that

11   volunteering is not a defense to the Minimum Wage Act, and we

12   take issue with that because volunteering in terms of

13   control, which they are no longer being instructed on, is a

14   defense.

15       THE COURT:  Okay.  Let me point out to you that in

16   not listing considerations that the jury should consider in

17   determining whether this is an employment relationship, I

18   have left it open for you to argue all of those elements that

19   have been covered by the evidence in the case.  This is not a

20   case where there is a decent definition of employment and

21   employer and employee.  It is what we are stuck with in the

22   statute.

23       I think on balance, after looking at these cases and

24   everything, I think it would be a mistake for me to try to

25   list those things that the jury should consider, because they

1   can consider everything in the evidence.  You can argue all

2   of those points that were in the original draft instruction

3   that I submitted.  I have not removed anything.  That

4   includes you can argue about the voluntary nature of this

5   relationship as indicating whether it was an employment

6   relationship or not.  That alone and by itself is not a

7   defense to the Minimum Wage Act.  I am satisfied with that

8   instruction as it stands.

9       Also, a quick look at this case tells me that it does not

10  establish a different -- that is the *Calhoun* case -- it does

11  not establish some different definition of "employment" and

12  "employee" that is directly definitive of those terms in this

13  setting.  I don't think it adds much.  It is not a Minimum

14  Wage Act case, in any event.  I don't think it changes the

15  definition at all.

16      Now, you have got to give me time to prepare these the way

17  I think they should be, which we will do right now, and I

18  will consider your arguments and determine what, if anything,

19  should be changed.  Give us at least a half an hour to do

20  that.  I will ship the final proposed instructions and, after

21  that, we will hear exceptions so we can argue in the morning.

22  Thank you.

23                    (Recessed.)

24      THE COURT:  Counsel, we just sent a draft of the

25  instructions I propose to give.  Let me know when you are

1    ready to take exceptions, through Tyler.

2                    (Recessed.)

3        THE COURT:  Okay.  First, Ms. Scheffey suggested an

4    additional instruction that I have received and read.  She

5    asks for an instruction that says, "It is a question of fact

6    for you, the jury, to determine if the ICE voluntary work

7    program is employment and if GEO is the employer, considering

8    all the evidence that has been presented."

9        I would decline to give that additional instruction,

10   Ms. Scheffey.  I think, certainly hope, that the jury would

11   understand that they are to consider all the evidence in the

12   case and answer the question of fact that is set out perhaps

13   a little differently than you set it out there, but it says

14   basically the same thing.  I don't think an additional

15   instruction is necessary.

16       I have provided to counsel proposed instructions numbering

17   1 through 20 and a proposed verdict form.  Now is the time to

18   present exceptions to those instructions.

19       Mr. Polozola.

20       MR. POLOZOLA:  Thank you, Your Honor.  The State

21   takes exception to Instruction No. 17 with respect to

22   intergovernmental immunity.  We don't believe it is an

23   accurate statement of the law, that it is unduly confusing to

24   the jury, and is unnecessary because the appropriate legal

25   test is whether the Minimum Wage Act discriminates against

1    the federal government, or with those with whom it deals.

2    And the relevant question is whether the law treats a

3    similarly-situated entity better than GEO because GEO is a

4    federal contractor.

5        The appropriate comparator in that analysis would be a

6    private contractor that owns and operates a detention

7    facility or another similarly-situated entity in the jury's

8    view.

9        We believe this instruction essentially makes that fact

10   determination for the jury by instructing them that the State

11   and GEO are to be compared directly against each other in

12   Paragraph 2 as we discussed earlier.

13       We also note that we don't believe there are facts in

14   evidence that warrant instructing the jury on

15   intergovernmental immunity with discrimination.  We would

16   specifically point out that the Court has held previously

17   that the Minimum Wage Act treats private businesses like GEO

18   the same, whether or not they are doing business with the

19   federal government.  That is ECF 162.  We don't believe this

20   issue or this instruction, rather, is necessary.

21       Along the same lines, we, the State, would take exception

22   to the second question presented in the verdict form for the

23   reasons we discussed earlier.  We don't believe that this

24   question presented to the jury on immunity accurately sets

25   forth the question that needs to be resolved in this case in

1  order to resolve the intergovernmental immunity defense.

2       THE COURT:  Okay.  Thank you.

3    Mr. Berger.

4       MR. BERGER:  The private plaintiffs join the State's

5  exception to Instruction No. 17.  In addition to the

6  considerations stated by Mr. Polozola, we believe the second

7  paragraph implies or states a finding of fact that the State

8  and its work programs are comparable to GEO, and therefore is

9  an improper instruction.

10    In that respect, we also join the exception to the second

11  question of the verdict form for the same reasons, that it

12  does not, we believe, accurately set forth the question that

13  the jury needs to consider under the intergovernmental

14  immunity defense, which is whether GEO is being treated -- is

15  being discriminated against based on its status as a federal

16  contractor.

17       THE COURT:  Thank you.  Defense, Ms. Scheffey.

18       MS. SCHEFFEY:  Yes, as an initial matter, GEO takes

19  exception to the jury instructions that have been excluded

20  that were previously briefed at ECF 349 and 378-1.  It is

21  GEO's position those instructions should have been included.

22    GEO takes exception to lack of a derivative sovereign

23  immunity and an instruction on the resident exception to the

24  Minimum Wage Act.

25    GEO takes further exception to Instruction No. 13, in that

1   it does not include a full description of the law.  GEO

2   reiterates that the correct definition of employee must

3   follow some additional factors as set forth in *Anfison vs*

4   *FedEx,* which is binding case law.  GEO states the best

5   guidance is *Ndambi*, disclosed in ECF 349, which is a case out

6   of the Fourth Circuit, pincite is 990 F.3d at 372.

7       GEO takes exception to 14 as inappropriate at this time.

8   Damages are not an issue.

9       GEO takes exception to Instruction 15, particularly in

10  that it calls out the volunteer exception and twists it on

11  its head without legal authority.  There is no other

12  exception to the Minimum Wage Act that this Court has found

13  is inapplicable that it is getting its own exception to the

14  jury, instructing the jury specifically not to consider those

15  elements.

16      GEO takes exception to Instruction No. 16, specifically

17  when issued in connection with the instructions which state

18  that, "'Employ' includes to permit to work and 'employee' is

19  any individual employed by an employer."  This instruction

20  presupposes the result, talking about paying workers for one

21  dollar per day for work performed, and asks if GEO employed

22  detainee workers without instructing them that they may

23  consider all evidence that has been presented or that this is

24  an issue of fact.

25      GEO further takes issue with Instruction 16 because it is

1    not an accurate statement of what the State must prove and

2    does not provide what the jury should consider, whether it be

3    all evidence that has been presented or a specific set of

4    factors.

5        Other than that, GEO still believes there should be

6    further instruction on what evidence the jury should consider

7    specifically with respect to its ability to consider the fact

8    that detainees volunteered because, as it stands, that has

9    been taken out of the consideration of the jury.  GEO would

10   object that the law has changed after summary judgment and

11   after the evidence has been presented, and GEO believes that

12   raises a due process issue.

13       That is all, I believe, other than renewing ECF 349 and

14   378-1.

15           THE COURT:  Thank you.  Who is going to be arguing

16   for plaintiff?

17           MR. WHITEHEAD:  I'll be arguing for private

18   plaintiffs.

19           MS. BRENNEKE:  Andrea Brenneke for the State of

20   Washington.

21           THE COURT:  For the defense.  Ms. Mell?  Okay.  I

22   think I told the jury to come back at 9:00.  I can't remember

23   that far back.  Okay.  Be here at 9:00 ready to go.  I do

24   have a hearing at 8:30 or something.  I will try and be

25   through with that so we can start promptly.  We will hear

1  argument and see what the jury does.

2      I might tell you a couple of things.  One is that, you

3  know, I come from a state court background, a long time ago

4  now.  But in the state court, the judge can't comment on the

5  evidence.  I have never felt that was a bad thing, and I have

6  always tried to avoid commenting on the evidence.  The

7  instruction that was proposed that said you should consider

8  this, this, this, this and this in determining whether it was

9  an employment relationship, in my view is typical of the kind

10  of instructions that are simply comments on the evidence.  I

11  don't think the Court needs to pick out special things for

12  the jury to consider under ordinary circumstances, and

13  counsel can certainly point out all those things in argument

14  that you think are important in regard to an employment

15  relationship, provided, of course, that your argument is

16  supported by testimony or evidence.

17      I also wanted to make this comment.  We are faced here

18  with a bad state law that defines "employment."  It is not a

19  complete definition in the statute, at least not as complete

20  as I would like, but it is what we have.  The jury will get

21  the law the way it is, not in the way that it probably should

22  be.  I think in the 18, nearly 18 years I was a state judge,

23  I was reversed 11 times, and one of those reversals was when

24  I instructed the jury on the -- and used the language of a

25  statute.  The appellate court, in its wisdom, reversed me on

1    that and said the statute was not complete and it shouldn't

2    have been the subject of an instruction without some

3    embellishment.  I never figured out what else I was supposed

4    to say because all I had was the law.  I think it was

5    something as simple as the criminal definition of intent or

6    something like that that was very poorly drafted, in my view,

7    in the jury instruction.  That was the only time I was

8    reversed on a jury instruction, I think, in the state court

9    in the years I served there.

10        That is not important to anybody.  It is just a little bit

11    of history that is there in the back of my mind that is

12    somewhat relevant to this statute that we are dealing with

13    here.

14        Okay.  I will see you in the morning.  Get a good rest.

15    Don't eat too much.  My dad always says a hungry dog hunts

16    best.  Have a light breakfast.  See you at 9:00.

17                    (The proceedings adjourned.)

18

19

20

21

22

23

24

25

1

2

3              C E R T I F I C A T E

4

5

6       I certify that the foregoing is a correct transcript from

7   the record of proceedings in the above-entitled matter.

8

9

10

11   /s/ Angela Nicolavo

12   ANGELA NICOLAVO
     COURT REPORTER
13

14

15

16

17

18

19

20

21

22

23

24

25