```
 1                UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4                                )
     UGOCHUKWO GOODLUCK NWAUZOR,   )
 5   et al.,                       )
                                   )
 6              Plaintiffs,        ) 3:17-cv-05769-RJB
                                   ) 3:17-cv-05806-RJB
 7   v.                            )
                                   ) Tacoma, Washington
 8   THE GEO GROUP, INC.,          )
                                   ) June 15, 2021
 9              Defendant.         )
     _____ ) Jury Trial
10                                 )
     STATE OF WASHINGTON,          ) 9:00 a.m.
11                                 )
                Plaintiff,         )
12                                 )
     v.                            )
13                                 )
     THE GEO GROUP, INC.,          )
14                                 )
                Defendant.         )
15   _____

16              VERBATIM REPORT OF PROCEEDINGS
17         BEFORE THE HONORABLE ROBERT J. BRYAN
                UNITED STATES DISTRICT JUDGE
18   _____

19

20

21

22

23

24        Proceedings stenographically reported and transcribed
25                  With computer-aided technology
```

```
 1                         APPEARANCES

 2

 3    For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
 4                             Schroeter Goldmark & Bender
                               810 Third Avenue
 5                             Suite 500
                               Seattle, Washington
 6

 7
      For the Plaintiff        ANDREA BRENNEKE
 8    State of Washington:     LANE POLOZOLA
                               MARSHA J. CHIEN
 9                             800 Fifth Avenue
                               Suite 2000
10                             Seattle, Washington

11

12    For the Defendant        LAWRENCE D. SILVERMAN
      The GEO Group:           ADRIENNE SCHEFFEY
13                             Akerman LLP
                               1900 Sixteenth Street
14                             Suite 1700
                               Denver, Colorado
15
                               JOAN K. MELL
16                             III Branches Law PLLC
                               1019 Regents Boulevard
17                             Suite 204
                               Fircrest, Washington
18

19

20

21

22

23

24

25
```

```
 1                                    MORNING SESSION

 2                                    JUNE 15, 2021

 3        (The following occurred outside the presence of the jury.)

 4            THE COURT:  Are we ready to proceed here?  We don't

 5    have Ms. Brenneke.  There she is.  We are ready to proceed.

 6    Couple minutes it took us to get the instructions in the

 7    hands of the jury.  I will instruct the jury and then go

 8    directly to argument.

 9        In regard to argument, I am going to have to interrupt for

10    recesses at appropriate times.  Don't be surprised if that

11    happens.

12        You can let the jury in.

13        (The following occurred in the presence of the jury.)

14            THE COURT:  The next phase of the trial is for me to

15    instruct you on the law.  I am going to read the instructions

16    to you.  It is my understanding the written copy has been

17    made available to you.  If you want to, you can follow along

18    with the written instructions as I read them or just listen.

19    Some people like to read along, others are happy to just

20    listen.  Either way, please give the instructions your full

21    attention.

22        Members of the jury, now that you have heard all the

23    evidence, it is my duty to instruct you on the law that

24    applies to this case.

25        A copy of these instructions will be sent to you for you
```

1    to consult during deliberations.

2        It is your duty to find the facts from all the evidence in

3    the case.  To those facts, you will apply the law as I give

4    it to you.  You must follow the law as I give it to you

5    whether you agree with it or not, and you must not be

6    influenced by any personal likes or dislikes, opinions,

7    prejudices, sympathy or public opinion.  That means that you

8    must decide the case solely on the evidence before you.  You

9    will recall that you took an oath to do so.

10       Please do not read into these instructions or anything

11   that I may say or do or have said or done that I have an

12   opinion regarding the evidence or what your verdict should

13   be.

14       When a party has the burden of proving any claim or

15   affirmative defense by a preponderance of evidence, it means

16   you must be persuaded by the evidence that the claim or

17   affirmative defense is more probably true than not true.

18       You should base your decision on all of the evidence,

19   regardless of which party presented it.

20       The evidence you are to consider in deciding what the

21   facts are consists of the sworn testimony of the witnesses,

22   the exhibits that are admitted into evidence, any facts to

23   which the lawyers have agreed and any facts that I have

24   instructed you to accept as proved.

25       The parties have agreed to certain facts in Exhibit 609.

1   You must, therefore, treat these facts as having been proved.

2       In deciding the facts in this case, you may have to decide

3   which testimony to believe and which testimony not to

4   believe.  You may believe everything a witness says or part

5   of it or none of it.

6       In considering the testimony of any witness, you may take

7   into account the opportunity and ability of the witness to

8   see or hear or know the things testified to; the witness's

9   memory; the witness's manner while testifying; the witness's

10  interest in the outcome of the case, if any; the witness's

11  bias or prejudice, if any; whether other evidence

12  contradicted the witness's testimony, or supported it; the

13  reasonableness of the witness's testimony in light of all the

14  evidence; and any other factors that bear on believability.

15      Sometimes a witness may say something that is not

16  consistent with something else he or she said.  Sometimes

17  different witnesses will give different versions of what

18  happened.  People often forget things or make mistakes in

19  what they remember.  Also, two people may see the same event

20  but remember it differently.  You may consider these

21  differences.

22      If you think the witness testified untruthfully about some

23  things but told the truth about others, you may accept the

24  part you think is true and ignore the rest.

25      The weight of the evidence as to a fact does not

1    necessarily depend on the number of witnesses who testify.

2    What is important is how believable the witnesses were and

3    how much weight you think their testimony deserves.

4        Evidence may be direct or circumstantial.  Direct evidence

5    is direct proof of a fact, such as testimony by a witness

6    about what that witness personally saw or heard or did.

7    Circumstantial evidence is proof of one or more facts from

8    which you could find another fact.  You should consider both

9    kinds of evidence.  The law makes no distinction between the

10   weight to be given to either direct or circumstantial

11   evidence.  It is for you to decide how much weight to give to

12   any evidence.

13       You have heard testimony from witnesses about opinions and

14   the reasons for their opinions.  This opinion testimony is

15   allowed because of the education or experience of the

16   witnesses.

17       Such opinion testimony should be judged like any other

18   testimony.  You may accept it or reject it, and give it as

19   much weight as you think it deserves, considering the

20   witness's education and experience, the reasons given for the

21   opinion, and all the other evidence in the case.

22       The law treats all parties equally whether they are

23   corporations, government entities, a class or individuals.

24   This means that corporations, government entities, classes

25   and individuals are to be treated in the same fair and

1    unprejudiced manner.

2        Corporations and government entities can only act through

3    their employees, agents or officers.  Therefore, corporations

4    and government entities are responsible for the acts of their

5    employee, agents and officers, performed within the scope of

6    their authority.  It is important you discharge your duties

7    without discrimination, meaning that bias regarding the race,

8    color, religious beliefs, national origin, sexual

9    orientation, gender, political affiliation, political

10    beliefs, disability, or immigration status of any party, any

11    witnesses, and the lawyers, should play no part in the

12    exercise of your judgment throughout this trial, whether such

13    biases are conscious or unconscious.

14        You may consider only the testimony and exhibits received

15    into evidence and the Court's instructions.  Certain things

16    are not evidence, and you may not consider them in deciding

17    what the fact are.  I will list them for you:  Arguments and

18    statements by lawyers are not evidence.  The lawyers are not

19    witnesses.  What they have said in their opening statements,

20    closing arguments and at other times is intended to help you

21    interpret the evidence, but it is not evidence.  If the facts

22    as you remember them differ from the way the lawyers have

23    stated them, your memory of them controls.

24        Questions and objections by lawyers are not evidence.

25    Attorneys have a duty to their clients to object when they

1  believe a question is improper under the rules of evidence.

2  You should not be influenced by the objection or by the

3  Court's ruling on it.

4      Testimony that is excluded or stricken, or that you have

5  been instructed to disregard, is not evidence and must not be

6  considered.  In addition, some evidence may be received only

7  for a limited purpose.  If I have instructed you to consider

8  certain evidence only for a limited purpose, you must do so

9  and may not consider that evidence for any other purpose.

10     Anything you may see or hear when the court was not in

11 session is not evidence.  You are to decide the case solely

12 on the evidence received at the trial.

13     Because you must base your verdict only on the evidence

14 received in the case and on these instructions, I remind you

15 that you must not be exposed to any other information about

16 the case or to the issues it involves, except for discussing

17 the case with your fellow jurors during your deliberations.

18     Do not communicate with anyone in any way and do not let

19 anyone else communicate with you in any way about the merits

20 of the case or anything to do with it.  This includes

21 discussing the case in person, in writing, by phone or

22 electronic means, via email, via text messaging, or any

23 internet chat room, blog, website or application, including

24 but not limited to Facebook, YouTube, Twitter, Instagram,

25 LinkedIn, Snapchat, or any other forms of social media.  This

1  applies to communicating with your family members, your

2  employer, the media or press and the people involved in the

3  trial.  If you are asked or approached in any way about your

4  jury service or anything about this case, you must respond

5  that you have been ordered not to discuss the matter and to

6  report the contact to the court.

7      Do not read, watch or listen to any news or media accounts

8  or commentary about the case or anything to do with it.  Do

9  not do any research, such as consulting dictionaries,

10  searching the internet, or using other reference materials,

11  and do not make any investigation or in any other way try to

12  learn about the case on your own.  Do not visit or view any

13  place discussed in this case, and do not use the internet

14  programs or other devices to search for or view any place

15  discussed during the trial.  Also, do not do any research

16  about this case, the law, or the people involved -- including

17  the parties, the witnesses or the lawyers -- until you have

18  been excused as jurors.

19      If you happen to read or hear anything touching on this

20  case in the media, turn away and report it to me as soon as

21  possible.

22      These rules protect each party's right to have this case

23  decided only on the evidence that has been presented here in

24  court.  Witnesses here in court take an oath to tell the

25  truth, and the accuracy of their testimony is tested through

1    the trial process.  If you do any research or investigation

2    outside the courtroom, or gain any information through

3    improper communications, then your verdict may be influenced

4    by inaccurate, incomplete, or misleading information that has

5    not been tested in the trial process.  Each of the parties is

6    entitled to a fair trial by an impartial jury, and if you

7    decide the case based on information not presented in court,

8    you will have denied the parties a fair trial.  Remember, you

9    have taken an oath to follow the rules, and it is very

10    important that you follow these rules.

11        A juror who violates these restrictions jeopardizes the

12    fairness of these proceedings, and a mistrial could result

13    that would require the entire trial process to start over.

14    If any juror is exposed to any outside information during

15    deliberations, please notify the court immediately.

16        The law of the State of Washington in the Minimum Wage Act

17    provides:  "Employ" includes permit to work; "employee"

18    includes any individual employed by an employer.  "Employer"

19    includes any individual, partnership, association,

20    corporation, business trust, or any person or group of

21    persons acting directly or indirectly in the interest of any

22    employer in relation to an employee.

23        "Wage" means compensation due to an employee by reasons of

24    employment payable in legal tender of the United States or

25    checks on banks convertible into cash on demand at full face

1   value, subject to such deductions, charges or allowances as
2   may be permitted by rules of the Director of Labor &
3   Industries of the State of Washington.

4       Any employer who pays any employee less than wages to
5   which the employee is entitled under the Minimum Wage Act is
6   liable to such employee for the full amount of such wage rate
7   less any amount actually paid to such employee by such
8   employer.

9       The Minimum Wage Act requires employers to pay employees
10  the minimum wage for each hour of work performed, regardless
11  of the employee's immigration or citizenship status, or
12  eligibility to be employed.

13      An agreement between an employee and an employer allowing
14  the employee to receive less than the minimum wage is not
15  allowed under the Washington's Minimum Wage Act and
16  volunteers who perform work for a for-profit company are not
17  exempt from the Minimum Wage Act.  Neither such an agreement
18  nor volunteering is a defense to a Minimum Wage Act claim.

19      Plaintiffs allege that GEO's practice of paying detainee
20  workers $1 per day for work performed violates the Washington
21  Minimum Wage Act.  The Minimum Wage Act is the law of the
22  State of Washington and applies in this case.

23      To succeed on this claim, plaintiffs must prove by a
24  preponderance of the evidence the following two elements:
25  One, GEO employed detainee workers at the Northwest ICE

1   Processing Center; and two, GEO paid them less than the

2   minimum wage per hour of work.

3       The parties agree that GEO pays detainee workers less than

4   the minimum wage per hour of work, so the second element of

5   proof is established.

6       It is an affirmative defense to plaintiffs' claims if the

7   Minimum Wage Act discriminates against the federal government

8   or its contractors.  Discrimination here means to treat GEO

9   less favorably than similarly-situated State employers are

10  treated.

11      Exempt from the Minimum Wage Act are any resident, inmate,

12  or patient of a state, county or municipal correctional,

13  detention, treatment or rehabilitation institution.

14      As applied here, the question raised by this defense is

15  whether the provision in the Minimum Wage Act exempting

16  residents, inmates or patients of a state, county, or

17  municipal correctional, detention, treatment or

18  rehabilitation institutions allows the State to avoid paying

19  the minimum wage to it detainees, when the exemption does not

20  allow GEO to avoid paying the minimum wage to its detainees,

21  and the State, and its work programs and its detainees are

22  similarly situated to GEO, its voluntary work program, and

23  its detainees.

24      In determining similarity, you may consider whether there

25  are any significant differences between the State and GEO,

1   between the work programs operated by each, and between the

2   detainees of each, that justify the differential treatment.

3        GEO has the burden of proving this affirmative defense.

4        Before you begin your deliberations, elect one member of

5   the jury as your presiding juror.  The presiding juror will

6   preside over the deliberations and serve as the spokesperson

7   for the jury in court.

8        You shall diligently strive to reach agreement with all of

9   the other jurors, if you can do so.  Your verdict must be

10  unanimous on each question on the verdict form.

11       Each of you must decide the case for yourself, but you

12  should do so only after you have considered all of the

13  evidence, discussed it fully with the other jurors, and

14  listened to their views.

15       It is important that you may attempt to reach a unanimous

16  verdict, but, of course, only if each of you can do so after

17  having made your own conscientious decision.  Do not be

18  unwilling to change your opinion if the discussion persuades

19  you that you should, but do not come to a decision simply

20  because other jurors think it is right, or change an honest

21  belief about the weight and effect of the evidence simply to

22  reach a verdict.

23       If it becomes necessary during your deliberations to

24  communicate with me, you may send a note through the clerk,

25  from your presiding juror or from one or more members of the

1    jury.  No member of the jury should ever attempt to

2    communicate with me except through the clerk.  I will

3    communicate with any member of the jury on anything

4    concerning the case only in writing or here in open virtual

5    court.  If you send out a question, I will consult with the

6    parties before answering it, which may take some time.  You

7    may continue your deliberations while waiting for the answer

8    to any question.  Remember that you are not to tell anyone,

9    including me, how the jury stands, numerically or otherwise,

10   until after you have reached a unanimous verdict or have been

11   discharged.  Do not disclose any vote count in any note to

12   the court.

13       A verdict form has been prepared for you.  After you have

14   reached unanimous agreement on a verdict, your presiding

15   juror should complete the verdict form according to your

16   deliberations, sign and date it, and advise the Court that

17   you are ready to return to the virtual courtroom.

18       Ladies and gentlemen, I want you to look at the verdict

19   form that is prepared for you.  You will see on the second

20   page that reads:  We, the jury, find as follows by a

21   preponderance of the evidence:  1:  Under the Washington

22   Minimum Wage Act, did GEO employ detainee workers in the

23   voluntary work program at the Northwest ICE Processing

24   Center?

25       You are to write in "yes" or "no" according to your

1   decision.  If you answer "no" to Question 1, go no further

2   and advise the Court you are ready to return to the

3   courtroom.  If you answered "yes" to Question 1, go to

4   Question 2.

5       Question 2 reads:  Does the Washington Minimum Wage Act

6   discriminate against GEO?  Then you are again to write in

7   "yes" or "no" according to your decision and advise the Court

8   you are ready to return to the courtroom.

9       Those are the questions directed to you as jurors.

10      You will have available during your deliberations these

11  instructions on the law and the verdict form and also you

12  will have available to you any notes you may have taken and

13  also all of the exhibits that have been admitted in evidence.

14  If you have difficulty accessing exhibits, Tyler will assist

15  you with that issue.

16      Now please give your attention to the argument of counsel,

17  first Ms. Brenneke for the plaintiff, State of Washington.

18      Ms. Brenneke.

19       MS. BRENNEKE:  Good morning.  I am Andrea Brenneke

20  for the people of the State of Washington.

21      What GEO is doing to exploit captive detainee workers at

22  the Northwest Detention Center is for real and at a massive

23  scale.  GEO has been doing it behind the secure walls of its

24  facility for over 15 years.

25      The State of Washington brought this case against the GEO

Closing Argument - Ms. Brenneke

1    Group for violating the state law that says if a corporate

2    employer permits a person to work, that it has to pay the

3    minimum wage for that work.

4         GEO violates that law when it chooses to run the center on

5    the backs of detainees and pay only a dollar a day for that

6    work.

7         The Judge has now instructed you in how to enforce the

8    law, but only you, the jury, actually get to make the

9    decision as to whether or not GEO is required to follow the

10   State minimum wage law at the Northwest Detention Center.

11        GEO's executives have made it crystal clear that GEO's

12   dollar-a-day practice will continue until you, the jury,

13   finally hold them accountable.

14        The Court's instructions on the law make it clear that it

15   is not the contract or any ICE standard that dictates whether

16   a person is an employee.  It is Washington law that sets

17   forth the framework for you to determine whether an

18   employment relationship exists.

19        Under Washington law, to employ is defined simply as to

20   permit to work.  Period.

21        We have all been together for over two weeks of trial.  We

22   all know the evidence is actually overwhelming that GEO

23   permits detainee workers to work throughout the Northwest

24   Detention Center facility, in the kitchen, janitorial,

25   laundry and barbershop services.  Does GEO employ detainee

1  workers by permitting them to work at the center?  Of course,

2  it does.

3      That is why Ms. Chien warned you at the outset that GEO

4  would try to distract you with the simple question and

5  obvious answer with many arguments and excuses on why GEO

6  wouldn't have to comply with the law.

7      In a little while, you will go into deliberations and you

8  will have three jobs.  One job is to answer the questions the

9  Judge gives you.  Your second job is to make sure everyone on

10  the jury carefully follows the law the Judge gives you.

11  Third, before you answer any questions, you will have to

12  explain to each other why you feel the way you do about each

13  question.

14      For these 45 minutes, I will review the two questions the

15  Judge has given you to answer and offer some ways to talk

16  about them, remain focused on the real issues in this case

17  and not the distraction.

18      The first question you will be asked whether GEO

19  employee -- employs detainee workers when it permits

20  detainees to work in its voluntary work program.  You have

21  heard the evidence that GEO permitted hundreds of detainees a

22  day to work in the center, in its kitchen, laundry,

23  janitorial and barbershop services.  "Work" was the middle

24  name of GEO's voluntary work program until this case was

25  close to trial and then GEO changed the name to "activities."

1      That change of phrase won't fool you because you have

2  heard the evidence.  The evidence is clear.

3      GEO's own employees testified to how GEO itself designed

4  and manages the detainee work program at the Northwest

5  Detention Center.  Detainee work is conducted throughout all

6  of the secure facility.

7      GEO's employees included the Assistant Warden

8  Bill McHatton, the classification managers Alisha Singleton

9  and Michael Heye, the kitchen managers and officers,

10  detention officers and the business manager.  They all

11  clearly said that GEO created the jobs and job descriptions

12  for detainee work.

13      Take a look at the evidence you will have available.

14  Exhibits 83 through 91 are the job descriptions that set

15  forth the job duties and expectations that the detainee

16  workers have in each position and that GEO requires detainees

17  to sign.  GEO wrote each one.

18      There is an official GEO job description for the cook,

19  prep and server in the kitchen.  Another official job

20  description for the dishwasher in the kitchen.

21      There is an official job description for the laundry

22  worker.  There is an official job description for the barber.

23  There is an official job description for the pod porter that

24  provides work in the common areas of the pod as well as

25  janitorial services throughout the facility.

1      The testimony is also that GEO handled detainee work

2   requests, GEO officers and their employment documents show

3   that GEO handled detainee work requests, did preemployment

4   medical screens for the kitchen, and maintained waiting lists

5   for workers who wanted particular jobs until there was an

6   opening.

7      GEO also sets the schedule or work roster and shows the

8   job and shifts detainee workers are assigned to work.  Review

9   Exhibit 309, the work roster that set the work schedules.

10  GEO set the schedules, decided how many workers were there

11  and necessary for each shift and expected they work their

12  shifts.

13     Remember that Ms. Henderson testified, she has only 13 GEO

14  kitchen staff on the payroll, and the kitchen detainee work

15  shift quota she set of 25 to 30 detainee workers for each of

16  the meal shifts and ten to 12 detainee workers for the night

17  cleaning crew, were based on the actual needs of the

18  facility.

19     GEO also trains and supervises the detainee workers before

20  and while they work.  Look back at the job descriptions as

21  well as Exhibit 5, the detailed kitchen worker orientation

22  and training that detainee workers receive.

23     GEO officers and their employment documents describe in

24  detail how they trained, controlled, supervised and engaged

25  in on-the-job training and retraining of detainee workers

1    while they worked.  They said these are entry level workers,

2    some of whom had no experience.  The GEO staff made sure they

3    got the work right, that it was done to standards.

4        GEO also can terminate and does fire detainees from their

5    jobs with some process allowed to appeal.  The written

6    evidence like the job descriptions show the grounds for

7    termination.  Exhibit 51 clearly shows that, although at

8    trial some GEO witnesses tried to put it on the detainees by

9    calling it a refusal to work, they do fire workers.

10        GEO also collects daily worker pay sheets for every day

11    for every job.  Look at Exhibits 57 and 408-A, the worker pay

12    sheets where GEO staff, who supervise the work of detainees,

13    sign off so the workers can get paid.  Remember the testimony

14    that they only sign off after verifying the work has been

15    done and done properly.

16        GEO also manages the detainee worker payroll and pays

17    detainees with direct deposits into their trust account for

18    their work.  Exhibits 115 and 175 are examples of GEO's

19    payroll lists for detainees.  GEO's detailed pay records

20    reveal the care and constancy by which GEO employs detainee

21    workers and tracks their work.

22        GEO provides all of the uniforms and equipment needed for

23    the detainee workers.  And finally, GEO and GEO alone

24    determines pay rates and makes detainees agree to those rates

25    or not work at all.

1          In short, GEO employs hundreds of underpaid detainee

2    workers a day in entry level jobs that support the essential

3    and core functions of the Northwest Detention Center.

4          Before this lawsuit was filed in 2015, Exhibit 260 shows

5    that GEO was unapologetic about employing 430 detainee

6    workers in its voluntary work program.  Mr. Kimble

7    specifically said we pay one dollar per day per employed

8    detainee.

9          When asked to provide a snapshot of their maximum detainee

10   worker staffing, Mr. Heye counted 470 approved detainee

11   worker positions, their locations in the facility, and an

12   estimate of how much time people worked on each shift.

13   That's in Exhibit 20.

14         The testimony from GEO's regional finance director,

15   Mr. Hill, is that GEO has paid a relatively consistent

16   detainee workforce for hundreds of thousands of work shifts a

17   year at the Northwest Detention Center for over 15 years.

18   That is in Exhibit 269.

19         GEO's violation of the minimum wage law at this scale is

20   shocking and causes significant harm to the people of

21   Washington.  GEO's dollar-a-day practice harms Tacoma area

22   workers who would otherwise be employed to do that work at a

23   living wage.  GEO's dollar-a-day practice exploits captive

24   and vulnerable people within the center who can earn money

25   only by working for GEO.

1    GEO's dollar-a-day practice hurts Washington's economy by

2  creating an underpaid, underclass of workers and unfair

3  business advantage for GEO as compared to employers who play

4  by the rules.

5    GEO knows it must and can comply with the minimum wage

6  law, but to date it has made the business decision not to.

7    GEO could pay detainee workers the minimum wage for the

8  work they are already doing or GEO could replace detainee

9  workers with employees from the community and pay them at

10 least minimum wage for their work.

11    GEO's CFO Mr. Evans testified adamantly that GEO would

12 never pay detainee workers the minimum wage.  GEO still

13 continues to permit those detainees to work for wages of only

14 a dollar a day.

15    Even if GEO doesn't think so, the minimum wage law is the

16 law.  GEO cannot be allowed to continue flouting it.

17    The minimum wage law is just that.  It is a minimum

18 standard to prevent a race to the bottom.  GEO's practice

19 undercuts the dignity and value of work.  It depresses wages.

20 It deprives Washington of taxes normally paid by employers.

21 It encourages other corporate employers to similarly take

22 wages from the vulnerable workers they employ.

23    If GEO gets away with it, that comes at the expense of all

24 workers and businesses who do play by the rules.

25    Now I am going to spend some time reviewing the

1  distractions GEO has thrown at you to obscure the

2  overwhelming facts and the straightforward law in this case

3  because it is possible some of those distractions may

4  resonate with someone on the jury.

5      GEO's first distraction is that this is ICE's program, not

6  GEO's program.  But that is not true.  If someone brings that

7  up in deliberations, remind them that GEO owns and operates

8  the Northwest Detention Center.  GEO voluntarily chooses to

9  do business with ICE and follow its standard to have a

10  detainee work program.  It was up to GEO alone to design,

11  manage and pay detainee workers at the Northwest Detention

12  Center.

13      All of the testimony from GEO's employees and detainee

14  workers about how GEO did that, and all of the program

15  documents we reviewed a moment ago, clearly show that despite

16  the context of being behind a secure perimeter, it is GEO's

17  work program and GEO is running the show in a way that is

18  typical of employment relationships we recognize.

19      GEO's documents and systems are managing a large

20  workforce.

21      If it weren't enough, remember when Mr. Marquez testified

22  that he was upset about the treatment he received from a

23  kitchen supervisor when he was sick and was forced to work

24  anyway?  He complained to ICE.  ICE told him to talk to GEO,

25  that it was GEO's work program.

1    Ms. Singleton also testified flat out in her 15 years of

2  managing the work program she never had a single conversation

3  with ICE about the work program whatsoever.  Again, that's

4  because it is GEO's detainee work program.

5    GEO's second distraction is GEO's contract with ICE

6  prevents them from paying minimum wage.  But that is not

7  true.  If someone repeats this, remind them the Court has

8  directed the jury that Washington law applies, not the

9  contract language.  GEO also has it wrong in another way as

10  well because the contract actually requires GEO to follow

11  state law, and the ICE standards allow for that.

12    The 2015 contract, Exhibit 129, requires compliance with

13  state laws in multiple places and GEO agreed to it.  At Pages

14  43 to 44, it requires GEO to comply with applicable federal,

15  state and local labor laws and codes.

16    At Page 82, the section on managing a voluntary work

17  program, it tells GEO in no uncertain terms that the detainee

18  work program must comply with all applicable laws and

19  regulations.  That includes Washington's Minimum Wage Act.

20    GEO will point to CLIN 0003, the reimbursement section of

21  the contract where GEO agreed with ICE that it would be

22  reimbursed for what it has actually been paying detainee

23  workers, a dollar a day.  Please remember that reimbursement

24  is different than GEO's duty to pay detainee workers, and

25  that GEO admits it has the power to set detainee pay.  Even

1   Mr. Ragsdale, who raised the distraction on Friday about

2   congressional appropriations made to ICE, admitted this week

3   that GEO has agreed to ICE standards to pay at least a dollar

4   a day and there is no limitation on GEO paying higher

5   detainee wages.

6        There has not been a single piece of evidence or testimony

7   that shows GEO is somehow limited to paying a dollar a day to

8   the people it permits to work.  As Exhibits 17 and 127

9   clearly show, ICE's National Detention Standards, the PBNDS,

10  say GEO must pay at least a dollar a day, which allows GEO to

11  pay the state minimum wage.  No ICE witness or GEO witness

12  ever testified this isn't true.

13       In fact, did you notice that not a single witness from ICE

14  even came to trial to agree with any of GEO's position?

15  That's because the ICE-GEO contract, ICE's PBNDS, and ICE

16  emails to GEO about the Northwest Detention Center work

17  program all undercut the claims GEO is making to you.

18       GEO has long known it can pay more than a dollar a day.

19  As you saw in Exhibit 14, Ms. Singleton flagged for GEO's

20  leadership back in April of 2012 GEO had the option to pay

21  more than a dollar per day.  As Exhibit 364 shows, in 2014

22  ICE told GEO it could pay more.  Despite Mr. Scott's

23  testimony to the contrary, you will see in Exhibit 609 the

24  agreed facts that GEO actually agreed in this case that it

25  has the option to pay detainees more than a dollar per day.

Closing Argument - Ms. Brenneke

1    Mr. Ragsdale admitted in cross-examination that another

2    GEO immigration detention center pays more.

3    You heard from Ms. Singleton, Ms. Henderson and Mr. Hill

4    that on occasion GEO has paid two dollars or five dollars to

5    detainee workers at the Northwest Detention Center as well.

6    GEO has never chosen to use this option to pay detainee

7    workers the minimum wage.  That is a violation of the law.

8    The third distraction is the claim the ICE contract

9    prevents them from employing detainees and that all employees

10   must be work authorized and undergo a criminal background

11   check.  Well, that is not true.  Again, remember that it is

12   not the ICE contract or an ICE standard that dictates whether

13   someone is employed under state law.  It is Washington law

14   itself.  And under Washington law, all workers are entitled

15   to the minimum wage for work performed, regardless of their

16   immigration or citizenship status or eligibility to be

17   employed.  The Court's instruction to you, No. 14, directs

18   you as such.  So whether particular detainee workers have

19   work authorization or not and some do, GEO has to pay the

20   minimum wage to everyone it has working.  Chris Strawn, the

21   immigration expert, testified that it is GEO's obligation to

22   do those checks.

23   Remember also Ms. Gomez Sotelo's testimony that she was

24   detained by ICE because she was working without authorization

25   in the community, and then she was put right back to work by

1    GEO on the inside of the detention center for just a tiny

2    fraction of the pay?  That awful irony highlights the fact

3    that GEO already and systematically employs a large pool of

4    detainee workers without even checking their work

5    authorization.  That is GEO's choice, and they are already

6    doing it.

7        GEO's fourth distraction is to imply that detainees are

8    not like GEO's detention officer or other employees, they did

9    not go through a six-week academy, they are not part of a

10   union, they don't get employment benefits, their taxes are

11   not taken out of their pay.  That is true, but no one is

12   arguing that the detainees are detention officers.  The State

13   of Washington's claim is the detainees are employees.

14   Period.

15       When you look at the Judge's instruction on how you are to

16   decide if someone is an employee under Washington law, there

17   is no factor of whether they are members of a union, go

18   through detention center training, get generous health or

19   other employee benefits or have tax withholding.  Otherwise,

20   nearly every entry-level job in the state would be excluded

21   from minimum wage protections.

22       The fifth distraction is somehow paying detainees more

23   would increase crime or gang activity at the center.  That is

24   a scare tactic that was not supported by any evidence.

25   Detainees have widely different amounts of funds in their

Closing Argument - Ms. Brenneke

1    accounts at the Northwest Detention Center, and there was no

2    evidence that that caused a spike in crime.  Same when some

3    detainees earned five dollars a day.  No spike in crime.

4         The sixth distraction is GEO provides everything a

5    detainee could ever need, eliminating any need for detainees

6    to make money.  But that is not true.  Remember what you

7    heard the detainees say?  Their lives in detention are not

8    free.  The food can be terrible or not digestible, and they

9    sometimes need alternatives.  They need money to buy extra

10   food, to buy a bra, to call and support their families and to

11   save money, like all of us do, to plan in the event the worst

12   happens.

13        The detainees didn't testify that they worked because they

14   were idle and needed something to do.  If they needed

15   something to do, they read a book, they worked out, they

16   called their family, they worked on their immigration cases

17   or they went to church.  The detainees worked because they

18   needed money.

19        It is also worth noting that GEO could have called to the

20   stand any of the thousands of detainees who have passed

21   through the Northwest Detention Center in the last 15 years

22   if they had anyone who could testify that they just worked

23   for fun.  They didn't call a single one.  Not one.  That

24   silence on GEO's part of the case should be deafening.

25        You also heard GEO claim the detainees are just

1   volunteers.  The work is voluntary, the work is made up for

2   the detainees' own benefit.  That is also a distraction and

3   is not true either.  Please remember all of the photos you

4   have seen and all of the testimony from the detainees and

5   GEO's own staff.  This is hard, daily, dirty and grinding

6   work.  Detainees prepare food and work food assembly lines to

7   distribute thousands of meals every single day.  They clean

8   the dirty trays and the walk-in ovens and kitchen for hours.

9   They wash, dry, sort and fold mountains of dirty laundry.

10  They mop, buff and wax almost every square foot of the

11  facility late into the night.

12      No GEO staff does any work in the barbershop.  No GEO

13  staff does janitorial work in the secure part of the

14  facility.  Detainee workers do the work that GEO needs to

15  have done to fulfill core contract obligations.

16      While Mr. Scott sat through the trial as the GEO company

17  representative and parroted its counsel's derogation of the

18  value of detainees and the work they do, Mr. Ragsdale

19  directly contradicted that by admitting that the work is

20  meaningful and not chores and would have to be done some

21  other way if detainee workers didn't do it.

22      In fact, as you heard from Mr. Evans, GEO conducted its

23  own financial analysis and estimated GEO would need 85

24  full-time workers from the Tacoma community to do the work

25  that detainee workers now perform.  Even GEO knows that isn't

1    speculation.  At times, when there were low numbers of

2    detainee workers in the past, GEO has paid detainee workers

3    two dollars and sometimes five dollars, provided sack

4    lunches, candy bars and extra food for incentive, pulled in

5    staff from other areas and had their own kitchen staff work

6    extra hours in overtime.

7        Ms. Singleton reported Ms. Henderson herself hit the

8    pavement and recruited detainee workers from the living

9    units.  When the kitchen underwent a remodel, they hired

10   temporary workers from the community to work eight hours a

11   day to replace detainee labor that was unavailable.

12       To be clear, no one has claimed that detainee work at the

13   Northwest Detention Center is forced labor or required, as

14   the Department of Corrections requires some classes of

15   incarcerated people to work.  That's just not the case.

16   Instead, detainee workers agreed to work, just like you or I

17   agreed to work.  The fact that participation is voluntary

18   does not make detainees any less entitled to a minimum wage

19   for the work they perform than any other person who chooses

20   each day to wake up and go to their job.

21       The Court's Instruction No. 15 draws the distinction

22   between voluntary work and volunteers.  It says that

23   volunteers who perform work for a for-profit company like GEO

24   are not exempt from the minimum wage.

25       Now I am up to the eighth distraction, that taxpayers will

1   ultimately bear the burden of GEO having to pay the minimum

2   wage.  That is not true.  GEO is a private, for-profit

3   company traded on the New York Stock Exchange, and the

4   Northwest Detention Center is one of its crown jewels, one of

5   the most profitable facilities it owns.  Mr. Hill showed the

6   numbers in Exhibit 283 and testified that the Northwest

7   Detention Center has made millions of dollars of profit every

8   year since 2010.

9       As Brian Evans testified, GEO itself did the math and

10  calculated it would cost only $3.4 million to pay detainee

11  workers at the Northwest Detention Center the minimum wage

12  for their work.  In other words, it is a simple math problem.

13  GEO could easily pay detainee workers the minimum wage and

14  still make millions of dollars in profit from the facility

15  each year without passing any cost on to ICE or to us

16  taxpayers.  In fact, Mr. Evans admitted in 2018, GEO made

17  18.6 million in profit and still would have paid -- sorry,

18  still would have made over 15 million in profits from the

19  center if it had paid the detainee workers it relies on to

20  run its business, the minimum wage.

21      Even GEO submits a request to ICE that ICE cover

22  additional cost of detainee pay above the dollar-a-day

23  reimbursement rate, ICE would have to make that decision and

24  could refuse.  ICE already has refused GEO's request to pass

25  on GEO's cost of fighting this lawsuit.  As you saw in

1  Exhibit 365-A, when GEO asked ICE to pay its attorney fees,

2  ICE flatly denied it.  Remember that it isn't the taxpayers'

3  issue to fix here.  It is GEO's.

4      You have also heard GEO's representative say, with a

5  straight face, that it never knew it had to pay the minimum

6  wage.  Come on.  Not only is that not true, but anyone who

7  drives in Washington knows that ignorance of the law is no

8  excuse.

9      GEO also specifically agreed in its contract with ICE that

10  it would be familiar with and follow the constraints of state

11  law and specifically state labor laws.  Even if GEO didn't

12  know it before, at least when this lawsuit was filed in

13  September of 2015, GEO was on notice that Washington claimed

14  the minimum wage applies to all work in the Northwest

15  Detention Center.

16      What did GEO do?  Instead of paying the minimum wage to

17  the detainee workers or replace them with Tacoma residents,

18  GEO chose to fight it and fight it hard.  Mr. Evans testified

19  adamantly and defiantly GEO would never pay detainee workers

20  the minimum wage.

21      Once you are done discussing all of the evidence and these

22  arguments, generally the jury instructions will guide you on

23  the specifics of Washington law.  The minimum wage

24  instruction says simply that to employ means to permit to

25  work.  This is an elegant statement of the law that is

1  intended to be simple and broad so it includes all work and

2  doesn't create loopholes.

3      It is our burden to show that it is more likely true than

4  not that GEO permitted detainees to work at the Northwest

5  Detention Center.  We are confident that when you review the

6  evidence you have heard and that is in the exhibits about

7  detainee work and how GEO structured and managed it, the job

8  descriptions, shifts, assignments, training, control and

9  supervision, termination, pay and payroll, you will find it

10  overwhelming and will conclude that the answer is yes, GEO

11  permits detainees to work.

12      I want to mention one other aspect of Instruction No. 15,

13  that employers can't just opt out of the minimum wage law by

14  requiring vulnerable workers to sign away their rights and

15  agree to be paid a dollar a day.  Agreements such as GEO's

16  voluntary work program agreements are not allowed under

17  Washington's Minimum Wage Act and are not worth the paper

18  they are printed on.

19      Finally, I want to give voice to something that may be

20  bothering you.  The Judge has instructed you that you must

21  apply the law as it is.  You each agreed at the start of this

22  case that you would.  So even if some of you think Washington

23  should also pay its prisoners, mental health patients and

24  sexual offenders the minimum wage, it is fine to think that.

25  That is not the current law.  Others of you may think private

Closing Argument - Ms. Brenneke

1   companies should be exempt from the state minimum wage law

2   when they provide detention services.  That is not the

3   current law either.

4       As the law stands, the Washington Minimum Wage Act exempts

5   government institutions only and not private corporations,

6   certainly not corporations that earn tens of millions off the

7   backs of captive laborers.

8       After answering the question about employment, the second

9   question you will be required to consider is GEO's

10  affirmative defense in this case.  Their claim is that it is

11  unfair and discriminatory for government-owned and

12  government-run facilities like the ones the State runs to be

13  exempt from the minimum wage, when for-profit, money-making

14  facilities like the one GEO runs are not.

15      GEO argues that out of everyone in this case, GEO is the

16  victim, not the detainee workers, not people seeking

17  entry-level jobs in the community, and not the other

18  businesses that make less money because they play by the

19  rules.

20      This is perhaps the biggest distraction of them all, and

21  your common sense tells you that GEO's argument does not hold

22  water.  The government's job is to provide services and be

23  accountable to the public in ways that just don't compare to

24  the duty a company owes its shareholders.  The trial

25  testimony proved just that and then some.

1        After asking a parade of state agency representatives

2   about their work programs, it is clear just how different

3   government prisons and detention centers are from GEO's

4   private, for-profit detention center.  It only makes sense it

5   be treated differently under the law.

6        Remind those that bring up GEO's discrimination argument

7   that Washington's facilities are different in who they serve

8   and why they serve them.  Washington's prisons are there to

9   punish those who have committed crimes, ensure they pay their

10  debt to society and equip them to reenter the community.

11        As Ms. Sytsma testified, the Washington Department of

12  Corrections vocational work programs are focus on reentry and

13  provide the incarcerated with practice applying and

14  interviewing for jobs, job mentoring, training in specific

15  skills and certifications to put on their resumes so they can

16  obtain jobs upon release.

17        The work programs reduce the likelihood of future criminal

18  behavior.  If those programs even earn money, it gets

19  reinvested in more training and better services.  It does not

20  result in shareholder payments to investors and corporate

21  executives.

22        As Mr. Eagle testified, Washington's Department of Social

23  and Health Services Special Commitment Center houses

24  convicted sex offenders whom the courts have deemed will

25  require intensive and specialized treatment before they will

1    be released.  The Special Commitment Center provides

2    extensive treatment as well as vocational rehabilitation

3    programs, coordinated by a clinical caseworkers.  The work

4    done by SCC residents is part of the resident's

5    individualized treatment plans, through which residents have

6    support in identifying jobs they are interested in, help

7    applying for them and interviewing, and ongoing support by

8    their clinical team throughout the course of employment to

9    work on the particular challenges they face in keeping and

10   maintaining employment.

11        Finally, there was Ms. Wells.  If any one witness's

12   testimony just showed how off base GEO is in trying to walk

13   in the State's shoes, it was probably Ms. Wells' testimony.

14   She told you about Washington's habilitation programs which

15   provide developmentally disabled residents with

16   individualized treatment and training plans designed to help

17   the residents become more independent in basic activities of

18   daily living as well as other behavioral management and

19   social schools.  The habilitation programs provide work

20   opportunities as well to get residents ready for a more

21   independent life.

22        It was obvious from her testimony how much pride Ms. Wells

23   feels when residents progress in their levels of functioning

24   and graduate to independent living.  She doesn't merely mark

25   the people she serves off as a line item on a financial

1    balance sheet.

2         This is obvious after two weeks of testimony and evidence,

3    GEO's detention provides no clinical treatment services,

4    reentry planning, life skills coaching, or work for the

5    benefit of individual detainees.  The work that the detainees

6    perform at the Northwest Detention Center is not connected in

7    any way to getting them more equipped and better prepared for

8    life outside the walls.

9         Instead, in GEO's work program, the detainees work to

10   maintain GEO's facility.  That is it.  As Ms. Chien described

11   in the opening, comparing Washington State programs to GEO's

12   money-making business is like comparing apples to oranges.

13        Back to the discrimination and GEO's claim to be the

14   victim here.  GEO also has produced no evidence that the

15   State treated some contractors differently when it applies

16   the minimum wage than GEO.  All the evidence you have heard

17   is that Washington treats all private corporations the same.

18   The minimum wage applies.

19        GEO may try to make a big deal of the Labor & Industries

20   policy that says private contractors that work with state

21   inmates are exempt.  That's just another side show.  That

22   policy would apply to private companies who would come inside

23   the prison to help run those same reentry-focused programs on

24   facility premises.  The policy does not exempt private

25   contractors running standalone prisons for profit.  There are

1  no private companies that do that, as Ms. Sytsma testified.

2  Correctional Industries, a state government agency, runs its

3  own reentry programs in the state prisons.

4      Because GEO's unable to point to any other private company

5  that is getting a deal better than the one GEO is getting,

6  which is necessary to prove discrimination, GEO points back

7  to itself holding up its own contract with the Department of

8  Corrections to provide overflow prison services, never mind

9  GEO's contract with DOC has been expired for years and was

10  never once used.  Under its terms, the DOC contract treated

11  GEO the exact same way that the State is treating GEO now.

12  As Ms. Eisen testified, that contract required GEO to comply

13  with all state labor laws, including in any state where GEO

14  inmates would have been held.

15      In short, it is just not discrimination to treat state

16  programs different than private companies for purposes of the

17  minimum wage.  The jury instruction tells you why.  It is

18  Instruction 17.  For discrimination to exist, you must find

19  first, based on all the evidence, that the State programs and

20  the GEO facility are similarly situated.  The instruction

21  tells you three times, actually, that only similarly-situated

22  entities can be compared.

23      The instruction also tells you to consider significant

24  differences between GEO and the State and the work programs

25  operated by each.  There are almost too many significant

1    differences to count.  The mission, the services provided,

2    the people served, the accountability structure, profit

3    motive.  The law can tell the difference between apples and

4    oranges and so can you.

5        This is not to say that private companies are somehow bad.

6    Of course, they are not.  They provide needed goods and

7    services and jobs that allow many of us to support our

8    families.  Washington is proud of our economy and the many

9    upstanding companies that make our state a great place to

10   live.

11       If you buy GEO's argument, companies that do business with

12   the government become the government, and that would change

13   everything we know about the way things work.  Just think, if

14   all private companies who could have contracts with the

15   federal government were magically exempt from paying their

16   workers the minimum wage, some of Washington's largest

17   employers like Microsoft, Amazon or Boeing, who all sell

18   goods and services to the federal government, would have a

19   blank check to look for the most vulnerable workers they

20   could find and employ them at poverty wages.

21       Let's turn to the two questions on the verdict form that

22   you, the jury, need to consider at the end of deliberation.

23   The first question is whether GEO permitted detainees to work

24   or employed them.  The sole purpose of this question is to

25   decide if detainees are employees and GEO is their employer

1  under Washington law.  Here when you write on the verdict

2  form "yes," you will be enforcing the minimum wage law,

3  ensuring GEO is not above it, and requiring GEO to pay

4  minimum wages for all of the work and all of the people GEO

5  has working at the center.

6      The second question is GEO's burden to bear.  GEO must

7  convince you it shouldn't have to pay minimum wage to its

8  workers because the State of Washington law discriminates

9  against it.  GEO is a private corporation and has provided no

10 evidence that Washington treats any private corporations

11 differently than GEO.  The minimum wage simply applies to all

12 of them.  Nor has GEO proven that Washington's treatment or

13 correctional facilities are similarly situated to the

14 Northwest Detention Center.  In the end, the verdict in this

15 regard must be no.

16     If the law means anything, it has to be enforced.  And

17 now, after four years, the law is in your hands.

18     Thank you for your time and attention over the last two

19 weeks and for the thoughtfulness you are putting into this

20 decision.

21         THE COURT:  Thank you, Counsel.  Let's take a

22 ten-minute break, and then we will hear from the other

23 plaintiff, represented by Mr. Whitehead.  We will reconvene

24 at 20 minutes past ten.

25                 (Recessed.)

 1     (The following occurred outside the presence of the jury.)

 2          THE COURT:  Okay.  Are we ready?  Are we ready for

 3     the jury?

 4          MR. WHITEHEAD:  Yes, Your Honor.

 5          THE COURT:  Bring the jury in.

 6     (The following occurred in the presence of the jury.)

 7          THE COURT:  Okay, ladies and gentlemen, now please

 8     give your attention to Mr. Whitehead, who may offer argument

 9     for the private plaintiff class.

10     Mr. Whitehead.

11          MR. WHITEHEAD:  Thank you, Your Honor.  When my kids

12     were little, I used to read a book of Aesop's fables to them.

13     It was a little picture book with short tales about morality.

14     One of my favorites was the tale of the scorpion and frog.

15     It was a simple story and it went like this:  The scorpion

16     and fog were at a river crossing.  The frog could swim

17     across.  The scorpion couldn't.  The scorpion asked the frog

18     for a ride.  The frog hesitated.  He was afraid the scorpion

19     might sting him if he let the scorpion on his back.  The

20     scorpion said, "Why would I do that?  We would both drown."

21     Frog agreed to give the scorpion a ride, and midway across

22     the river, the scorpion stung the frog.  The dying frog said,

23     "What have you done?"  The scorpion replied, "I couldn't help

24     it, it is in my nature.  It is in my nature."

25          GEO is a money-making machine and the Northwest Detention

 1   Center is one of its most lucrative assets, bringing in 18 to
 2   $20 million a year in profit.  I don't begrudge GEO for that.
 3   It is in GEO's nature as a for-profit company to look for and
 4   take advantage of every opportunity to maintain its business
 5   model and profits, whether it is tax breaks that flow from
 6   its strange status as a real estate investment trust or
 7   negotiating a sweetheart deal with ICE that guarantees
 8   payment of $50 million a year, regardless of how many people
 9   are housed at the Northwest Detention Center.  GEO knows how
10   to work every angle.  It is in its nature.
11        I bring this up, not because I want you to hold it against
12   GEO, but because it explains GEO's conduct when it comes to
13   the voluntary work program.  GEO has been handed a captive
14   and endless supply of detainee workers.  So, of course, of
15   course, GEO has used the detainee workers at rock bottom
16   prices to maintain its facility and to buoy it profits.  It
17   is in GEO's nature, and no mystery about what happened here.
18        Now, Ms. Brenneke has done an excellent job providing you
19   a summary of the evidence in this case.  I will try to heed
20   the judge's advice and make what I have to say is new and
21   interesting.  Please forgive me if I cover some of the same
22   points.  This is an important case, and I don't want to leave
23   any of your questions unanswered.
24        At this point, everyone knows we are suing GEO.  You know
25   we are suing GEO because it broke the rule that says in

1   Washington, for-profit corporations must pay their employees

2   at least the minimum wage.  You have seen heaps of evidence

3   confirming what I promised you during opening statement.

4        The first evidence is the oral testimony you have heard

5   live from the witnesses who testified at trial.  When it

6   comes to the testimony, there is no serious dispute.  For

7   starters, you heard that GEO contracted with ICE to provide

8   detention management services at the Northwest Detention

9   Center.  GEO wasn't forced to enter into this relationship.

10  GEO volunteered and was and is paid a king's ransom for its

11  services.

12       There is no dispute about the rough outline of the

13  agreement.  You know from the testimony of everyone that

14  spoke on this point that GEO agreed to house and feed and

15  clean up after 1500 men and women at the facility.

16       Next, you know that the center is a large facility.  You

17  heard testimony from all concerned that someone needs to

18  prepare and serve meals, wash, fold and distribute laundry,

19  cut hair and generally keep the place clean and in good

20  repair.  There is no controversy or disagreement among the

21  witnesses on this point.

22       Finally, there is no serious dispute that the detainee

23  workers carry out most, if not all, of these functions.

24  Sure, there were a few GEO staffers that talked about how GEO

25  could get along without the detainee workers.  But the

1    evidence was undisputed at trial that, as presently

2    constituted, the detainee workers carry out most of the

3    non-security functions that make the place run.

4        In fact, it was the very talkative Dan Ragsdale, GEO's

5    chief compliance officer, that told you in a moment of candor

6    that GEO's staffing plans include detainee labor.  Here is

7    his testimony from yesterday, when he told you that the

8    detainee workers are a basic assumption in GEO's staffing

9    plan at the Northwest Detention Center.  He told you that

10   GEO's assumptions and the staffing plan assume there is

11   detainee participation in the kitchen, in other areas.

12   That's one type of evidence, the testimony you heard at

13   trial.

14       The other kind of evidence that you will see and have seen

15   are the documents.  You will get a set of exhibits when the

16   lawyers get done talking.  They are helpful because you can

17   see for yourself what really happened without anyone's spin.

18   There is a lot to wade through.

19       I want to call out a few that you may want to write down

20   and look at more closely.  I have listed them out for you on

21   a slide.  I will come back to it so you can take notes if you

22   like.

23       There is the contract, obviously.  That is Exhibit 129.

24   The contract is the document that spells out GEO's promises

25   to ICE and vice versa.

Closing Argument - Mr. Whitehead

1        I want to call out some of the pages in the contract that

2   may be interesting to you.  Take a look at Page 2, if you

3   want to know the date range of the contract.  Page two also

4   shows the guaranteed number of beds.  You will remember that

5   GEO's guaranteed a minimum 1,181 beds at a price of nearly

6   $50 million each year, regardless of how many people are

7   actually housed at the Northwest Detention Center.

8        Take a look at Page 42, if you want to see the total

9   contract price of 700 million.  It is a big number so it

10  probably stands out in your memory.  You can see it in print

11  on Page 42.  Page 42 is also where the contract talks about

12  GEO's reimbursement rate for ICE.

13       You heard a number of witnesses like Dan Ragsdale and

14  Bruce Scott, the facility administrator, dance around this

15  section of the contract to argue that it somehow limits what

16  GEO can pay detainee workers.  You can read for yourself

17  plain as day.  This language talks about the rate at which

18  ICE will reimburse GEO.  It isn't any sort of limitation

19  about what GEO can pay the detainee workers.

20       Pages 43 and 44 are important because they show the

21  constraints GEO operates under.  This is the part of the

22  contract that shows GEO agreed to be bound by a number of

23  constraints, and it was GEO's job to become familiar with and

24  comply with these restraints.  Everyone from GEO has

25  testified at length about section (j), this is in the PBNDS,

1   but be sure to look at constraint (q) which instructs GEO to

2   comply with all applicable state and local labor laws.

3       The contract doesn't differentiate between the constraints

4   or say the PBNDS controls above all else.  All the testifying

5   witnesses agree GEO was bound by this constraint.

6       Actually, you will see the part about complying with state

7   and local law repeated at Page 52.  This is also the spot

8   where you will find GEO's promise to apply the most stringent

9   standard, if there is any conflict between the various

10  standards.  The word "stringent" carries its ordinary

11  meaning.  There is nothing tricky there.

12      If there was any mistaking about what it meant, you

13  remember Mr. Scott, the facility administrator, testified it

14  means that GEO must apply the highest standard, if there is

15  ever any doubt about which standard or law to follow.

16      Definitely take a look at Page 82.  This is where you will

17  find what the contract says about the detainee worker

18  program.  Another thing to note here, look at where it says

19  "labor shall be used in accordance with the detainee work

20  plan developed by the contractor."

21      This is the part that tells you the work plan was to be

22  developed by GEO, not ICE.  The plain language terms of the

23  contract leave it to GEO to come up with the shape and scope

24  of the work program.  Page 82 is where it says GEO must

25  comply with the Performance-Based National Standards and

1    GEO's work program must comply with all applicable laws and
2    regulations.  It gives some examples of work program
3    assignments, but doesn't specify any particular jobs.  That's
4    the contract.
5        You should, of course, look at the PBNDS.  The whole thing
6    is Exhibit 127.  It is 400 pages long and most don't apply to
7    the case.  I suggest you look at Exhibit 17, which is the
8    section about the voluntary work program.  Take a look at
9    Page 405, if you want to refresh your memory about the
10   purpose of the work program and expected outcomes.
11       You remember Mr. Scott and Mr. Ragsdale told you the
12   purpose of the program was to decrease idleness on the part
13   of detainees.  You will also remember that they both skipped
14   over the first expected outcome, which is for the detainee
15   workers to have an opportunity to earn money while detained.
16       Mr. Scott, Mr. Ragsdale, they also testified that the
17   PBNDS establishes a floor for GEO's performance, but leaves
18   it to GEO to figure out how to meet any given objective.
19   Please note that, here again, the PBNDS doesn't lay out any
20   specific job categories or tell GEO how many detainee workers
21   to use or where to use them.
22       Let's see.  Take a look also at Page 407 if you want to
23   see where it says compensation is at least one dollar per
24   day.  This language is important because it debunks any
25   claims by GEO that it was somehow limited and couldn't pay

1    more than a dollar a day.

2        So those are a few of the main documents.  There are

3    several more you should note.

4        If you want to know about whether GEO is limited in how

5    much it can pay detainee workers, I suggest you look at

6    Exhibit 14 and Exhibit 364.  Exhibit 364 is an email from ICE

7    to GEO about compensation in the worker program.  There has

8    been a lot of speculation about what ICE would do or what ICE

9    thought.  This is an email from ICE, including the ICE

10   representative, that former Assistant Warden Bill McHatton

11   called the guru of the contract.  In the email, ICE states

12   there is no maximum or cap for compensation in the voluntary

13   work program.

14       You know Exhibit 14.  This is the memo from

15   Alisha Singleton and Michael Heye, GEO's classifications

16   officers and the folks responsible for administering the

17   program at the Northwest Detention Center.  They sent this

18   memo to Associate Warden McHatton saying the same thing.

19       Just to put the issue to bed about whether GEO can pay

20   more in its contract with ICE, look at Exhibit 609.  This is

21   an agreed set of facts the parties drafted together.  Fact

22   No. 15, GEO admits it has the option to pay more than one

23   dollar a day to detainee workers.

24       The point about the scope of the program, I ask you to

25   look at Exhibit 309.  This is a facilities-wide roster.

1    Alisha Singleton told you the rosters are basically schedules
2    put together by GEO's classification unit and ICE has nothing
3    to do with setting the numbers.  309 shows the total worker
4    for October 22nd, 2015.  Just a moment in time.  It makes the
5    point about the scope of the program.  You will see about a
6    dozen workers in each pod, another 15 or so in the women's
7    laundry detail, dozens of people working janitorial details,
8    and 25 plus workers on each kitchen shift.

9         Finally, you may want to take a look and review the
10   detainee worker job descriptions.  Those are at Exhibits 84,
11   85, 88, 91.  Look at these if you have any questions about
12   the specific duties of the detainee workers.  You remember
13   that most, if not all of these, were created by former
14   Assistant Warden Bill McHatton.

15        Together, the testimony and the documents, fit like pieces
16   to a puzzle and lay bare that GEO has agreed to comply with
17   Washington laws, including the Washington Minimum Wage Act,
18   and nothing in GEO's contract or the law prevents GEO from
19   paying detainee workers minimum wage.  In fact, quite the
20   opposite.

21        The question before you is a simple one:  Did GEO employ
22   the detainee workers within the meaning of Washington law?
23   The Court has issued you a set of instructions that will
24   guide your deliberations and, really, they make it easy for
25   you to answer this question.  So, please, please rely on

1   them.

2       Instruction No. 13, to me, is the key.  It says, "To

3   employ under Washington law means to permit work," and read

4   with the definition of "employer" and "employee," also found

5   in Instruction 13, it means that any individual permitted to

6   work by an employer is an employee.

7       It is that simple.  So simple I will say it again:

8   Instruction No. 13 tells you any individual permitted to work

9   by an employer is an employee.

10       I know some of you may be craving a more complicated test.

11   No need to make this inquiry harder than it is.  Any

12   individual permitted to work by an employer is an employee.

13   The definition is deliberately broad, but it makes sense.

14       The Washington Minimum Wage Act reflects the will of the

15   people as enacted by the legislature to establish a minimum

16   standard of living, and to protect the health and well-being

17   of as many people as possible.  It's what we call a remedial

18   statute.  It is designed to prevent a downward spiral in

19   wages and living standards.  It is there to protect the

20   community against employers who take advantage of desperate

21   workers and push wages down for everyone.

22       The fact is, most people working for someone else are

23   employees.  Doesn't matter whether we are talking about the

24   baristas at Starbucks in my building lobby or mountain guides

25   working for an expedition company at the top of Mount Rainier

1    or deep sea welders in the Puget Sound, the basic definition

2    is the same.  That definition applies to detainee workers on

3    the Tacoma Tideflats.  GEO permitted them to work, and they

4    are therefore GEO's employees.

5        Now, the simplicity of this definition is beautiful.

6    Simplicity always wins out over complexity.  All I ask of you

7    here today is to follow the law as the Court has given it to

8    you and to apply it faithfully.  In doing so, the only

9    outcome that can be fairly reached is that an employment

10   relationship exists between GEO and the detainee workers.

11       If GEO or anyone else tells you the work setting is too

12   strange, the definitions given to you by the Court don't

13   apply, politely tell them you will follow the law and all the

14   rest is just noise.  If someone says, I think the contract or

15   the PBNDS control, tell them that both documents point back

16   to Washington law and the definitions the Judge has given to

17   you.

18       But, you know, let's say you want to dig deeper.  There is

19   no need because the definition again at Instruction 13 makes

20   it easy.  Let's say you did.  This goes back to what I said

21   during my opening statement about all of us having

22   experiences as employees or perhaps employers at one time or

23   another.  Some of the basic signs to look for in an

24   employment relationship, and they are all present here.  An

25   employer has the right to control and supervise its

1    employees.  You heard from just about every witness that GEO,

2    not ICE, supervises the detainee workers and carries out the

3    day-to-day functions at the detention center.

4        When it comes to the work program, GEO creates the job

5    descriptions, assigns detainee workers to particular jobs,

6    approves shift locations and length, trains detainee workers,

7    manages and directs the work and evaluates whether the work

8    has been done satisfactorily.  You heard from GEO's kitchen

9    staff like Ms. Henderson, Mr. De La Cruz and Mr. Griffin.

10   You heard it from Mr. Johnson, Mr. Tracy and Mr. Menza, the

11   ones that work closest to the workers and supervising the

12   detainee workers.  You heard it from detainee workers like

13   Mr. Medina-Lara and Ms. Sotelo, Goodluck and Mr. Marquez.

14       You heard from Mr. Tracy and Mr. De La Cruz that

15   supervising detainee workers was a separate function of the

16   detention officers.  You see this in the job descriptions for

17   the GEO staff, not the detainee workers but GEO staff at

18   Exhibits 300 and 141.  They both talk about supervising

19   detainee workers specifically.  The fact that GEO personnel

20   didn't also hover over the workers as they work doesn't mean

21   anything because the right to direct and supervise the work

22   is always present.

23       You heard from Officer Johnson when he testified that he

24   supervised Officer Tracy, a GEO staffer, in the same manner

25   he supervised the detainee workers.

1      Employers also carry the ability to set the rate of pay

2   for their employees.  We know from the internal GEO emails

3   and memos that I mentioned earlier, as well as the PBNDS

4   itself, the dollar was the floor payment to detainee workers,

5   but GEO had the discretion, in this case the obligation, to

6   pay more.

7      You heard testimony from GEO's corporate executives like

8   Chuck Hill, GEO's director of business management and

9   Brian Evans, GEO's chief financial officer, that GEO can in

10  fact pay more if it chooses.  Mr. Hill told you about a time

11  where GEO paid kitchen workers five dollars a day to attract

12  more workers during a chicken pox outbreak because GEO was

13  having trouble attracting kitchen workers and needed the

14  help.

15     You heard from Mr. Ragsdale that he admitted yesterday

16  that GEO can and does pay more than a dollar a day at other

17  facilities like the Montgomery, Texas facility.

18     There is no serious dispute about GEO's ability to set

19  rate of pay.  The ability to hire, fire, or modify the

20  relationship is another hallmark of the employer-employee

21  relationship.

22     We know detainee workers sign up to work, and GEO's

23  classification officers make work assignments as they become

24  available.  The work is assigned on a first-come-first-served

25  basis.  The voluntary work program section of the PBNDS at

1   Exhibit 17 talks about subjective considerations in hiring,

2   like the detainee's attitude and behavior.

3       Officer Tracy testified GEO has some discretion about who

4   to hire based on classification levels, behavior and

5   abilities.

6       Ms. Singleton told you that it is GEO who is responsible

7   for assigning duty, not ICE.  Ms. Singleton also told you

8   when there is a shortage of workers, GEO kitchen personnel

9   like Bertha Henderson and detention officers would reach out

10  to her about the need for more workers and GEO staff would

11  recruit more workers than necessary.  This is hiring

12  authority through and through.

13      The same goes for GEO's ability to fire workers.  All the

14  witnesses, some of them after I corrected them with their

15  deposition videos, acknowledged that GEO can fire workers.

16  This fact is also confirmed in the detainee worker job

17  descriptions, which all outline reasons for termination.

18  Yes, workers can sign up to work again, but they are subject

19  to the same hiring process described earlier.  Plus, is the

20  ability to reapply any different than any other job you find

21  outside the facility?

22      We also heard how GEO would use the refusal to work form

23  as a type of pink slip because it was less of an

24  administrative hassle than going through formal channels.

25  Even then, we heard about how when GEO makes a formal

1    determination to remove a worker, ICE always agrees with

2    GEO's determination.  All of this speaks to GEO's ability to

3    hire, fire or otherwise affect the conditions of employment

4    like an employer would.

5        What else do employers do?  Well, they provide all the

6    tools and equipment necessary to do the job, like GEO does

7    for every worker position.  Employers provide uniforms and

8    protective gear to their workers like GEO does for the

9    detainee workers in the kitchen and the barbershop.

10        Employers keep time records.  While GEO doesn't have a

11   punch clock for the detainee workers, it maintains worker pay

12   sheets which are a certification by the detainee worker that

13   the work has been performed.  It is also a certification by

14   the GEO supervising personnel that the work has been done

15   satisfactorily.  You can see an example of a blank form at

16   Exhibit 80.

17        Employers also prepare payroll like GEO does for the

18   detainee worker through its Keefe banking system.  You can

19   see the payroll ledgers that GEO maintains for the detainee

20   worker at Exhibits 115 and 175.

21        Last thing I will point out is the fact for most

22   employers, their employees play an important role in

23   accomplishing the work of the business.  On this point, there

24   is really no question that GEO doesn't just permit, it uses

25   the hard work and effort of the detainee workers to maintain

1  the Northwest Detention Center.

2      You heard from Mr. De la Cruz and Officers Johnson and

3  Tracy that the detainee workers make an important

4  contribution to the operations of the facility.  Each day,

5  hundreds of workers cook, clean and do laundry to keep the

6  facility running.

7      Take a look at Exhibit 20.  This was classification

8  officer Michael Heye's analysis of how many workers could

9  work on any given day and their average shift lengths.  The

10 scope of the work is astonishing.  I found that upwards of

11 470 people participated in the worker program each day and

12 their average shift length was 1.72 hours.

13     Easy to see why so many detainee workers were used by GEO

14 when you look at GEO's staffing levels.  For example, GEO

15 employs two or three janitors that clean the parts of the

16 facility that the detainee workers can't access like the

17 administrative offices and building lobby.  The vast majority

18 of the facility, living pods, the kitchen, the laundry room,

19 recreational areas, barbershop, hallways are all cleaned

20 exclusively by 300 plus detainee workers.

21     In the kitchen, GEO produces 30,000-plus meals each week.

22 There are only two kitchen officers working on each kitchen

23 shift that actually help to prepare and serve the food.  It

24 is the 25-plus kitchen workers doing the actual work.

25     In the laundry, GEO has one laundry officer per laundry

1    shift in a facility that can hold and produce laundry for

2    over 1,500 people.  It is the detainee workers, including a

3    whole pod of female laundry workers, that do the real work.

4    They wash and fold and distribute the clothes on a scale

5    large enough to support a four-digit detainee population.

6        GEO employs zero barbers and relies on the detainee

7    workers to carry out this part of GEO's obligation to provide

8    for the health and hygiene of the detainee population.

9        What this shows is the detainee workers are an integral

10   part of GEO's work plan at the Northwest Detention Center as

11   presently constituted.

12       Will GEO change the program next month or devise a new

13   plan?  I don't know.  Who knows.  What we do know from GEO's

14   testimony is that drastic changes would be in order if

15   detainee labor were removed from the equation.  Bruce Scott,

16   current warden, testified he would have to authorize

17   extensive overtime, bring in outside workers from other GEO

18   facilities, or obtain a third-party contractor to keep up

19   with the demands of the facility and work needed if there was

20   a prolonged work stoppage on the part of detainee workers.

21       Brian Evans told you GEO had done the analysis and GEO

22   calculated it would cost nearly $3.5 million a year to pay

23   the detainee workers minimum wage.  That is money saved on

24   the part of GEO. GEO also did the analysis and determined it

25   would need to hire 85 full-time employees from the community

```
 1   to replace the detainee workers.  This is GEO's own analysis.
 2       In the end, we know an employment relationship was formed
 3   because GEO permitted the detainee workers to work and acted
 4   as an employer would.
 5       There is one other instruction I would like to talk to you
 6   about, Jury Instruction No. 17.  This one relates to GEO's
 7   main argument about why it shouldn't have to pay the minimum
 8   wage.  It is a Hail Mary on GEO's part.  GEO is counting on
 9   you to get confused about whether the State is subjecting GEO
10   to a double standard.
11       People talk about frivolous lawsuits all the time.  GEO's
12   claim it is being treated unfairly shows, frankly, there are
13   frivolous defenses, too.
14       I want you to look at the word "similar."  As Ms. Brenneke
15   pointed out, that word appears, one, two, three times in the
16   instruction.  The fact the word "similar" appears three times
17   tells you how important it is to your inquiry.  This
18   instruction and GEO's defense are all about setting up the
19   proper comparison.
20       I suspect you'll hear from GEO's counsel about various
21   Washington State programs.  The ones we heard about at trial
22   couldn't be any more different than what GEO does.  The
23   distinctions are clearest when you look at who the program
24   serves and their purposes.
25       Let's start with GEO and the Northwest Detention Center.
```

1    There is no dispute, the people held there are not being held

2    as criminal punishment.  The nature of their detention is

3    administrative in nature.  They are there while they wait for

4    their immigration cases to get sorted out.  No dispute on

5    this point.  We have been referring to these folks throughout

6    trial as "detainees" or "detained persons."

7        The purpose of the voluntary work program is so detainee

8    workers can earn money to improve the operational efficiency

9    of the facility.  The benefits of their work flow to GEO and

10   its shareholders in the form of increased profits through

11   lower payroll cost.  Worker retraining, life skill planning,

12   therapy and preparation for reentry to society have

13   absolutely nothing to do with GEO's program.

14       In contrast, the people held in Washington State

15   Department of Correction facilities, they are there serving

16   active time as punishment for crimes that they have

17   committed.  You heard Sarah Sytsma refer to these people as

18   "incarcerants."  The purpose of DOC work programs is to equip

19   incarcerants for reentry into society by preparing and

20   helping them learn job skills.  Correctional Industries'

21   program isn't about making a profit.  If any money comes in,

22   it is reinvested in the program and used to offset the cost

23   of criminal incarceration the taxpayers.

24       Likewise, Christina Wells testified about habilitation

25   centers run by the Developmental Disabilities Administration

1   and how they provide care to individuals with intellectual or

2   developmental disabilities.  The programs help residents with

3   disabilities to become more independent.  They maintain a

4   work program as part of their positive behavioral support

5   plans and, wait for it, in some instances, workers receive

6   minimum wage.  There was a period in which they didn't.  The

7   habilitation centers sought and received minimum wage waivers

8   from state and local authorities under an exemption to the

9   Minimum Wage Act for disabled people.

10       To the extent GEO housed the same type of residents, it

11   could also apply for this exemption.  There is no

12   discrimination or differential treatment.

13       You heard about McNeil Island from Byron Eagle and how

14   they permit residents to work.  But they are residents.  They

15   are sexually violent predators deemed to have a mental defect

16   that makes them likely to offend again.  They are being held

17   because they are too dangerous to be released.  Their

18   confinement is about the need for intensive rehabilitation.

19   They work, but it is under the supervision of the case

20   manager and clinical team specific to the treatment plan for

21   each resident.

22       The resident population and goals of the program couldn't

23   be further from what GEO is doing with its voluntary work

24   program.

25       In the end, it is not even close.  The State of Washington

1    doesn't operate any programs similar to GEO's voluntary work

2    program.  If you think about it, it makes sense.  I talked

3    about GEO and how seeking profits above all else is in its

4    nature.

5        The State of Washington is carrying out a public service

6    in each of the programs that were mentioned at trial.  Its

7    programs are about achieving a greater public good.  It is in

8    the State's nature to try and benefit the public.  This is a

9    night and day difference from GEO and its profit motive.

10        The evidence is clear in this case, but I want to spend my

11    final minutes speaking to that little voice in your head.  We

12    all know the one, it is the naysayers, the voice telling us,

13    yeah, but what about, what about.  That voice may be telling

14    you, I think I know what happened here.  Yeah, but I am not

15    one hundred percent certain.

16        If you hear that voice, remind yourself about Jury

17    Instruction No. 2.  It is the one that said you must be

18    persuaded by the evidence that plaintiffs' claim is more true

19    than not true.  This means are we more likely right than

20    wrong.  Now, we have shown you a lot more than more likely

21    right.  Instruction No. 2 means that even if someone thinks

22    we are only a little more right, even by just the smallest

23    amount, you must answer the question about employment our

24    way.  That means you don't have to deliberate for weeks

25    trying to be certain.  You can have all the doubts you want

1    on both sides, so long as when you come down to it you think

2    we are more likely right than wrong, the verdict must be for

3    plaintiffs.

4        What if that voice says, yeah, but most of the detainee

5    workers weren't authorized to work in the United States.

6    Well, remind yourself about Jury Instruction No. 14.  The

7    Judge has instructed you, GEO's attorneys should agree,

8    Washington law requires employers to pay the minimum wage for

9    work performed regardless of the employee's immigration or

10   citizenship status or eligibility to be employed.  This is a

11   good rule because otherwise there would be an incentive for

12   sketchy employers to hire workers without work authorization

13   knowing they could later stiff them, the workers, when it

14   came time to pay.

15       As a practical matter, you heard from UW Professor

16   Christopher Strawn.  He testified people in detention may

17   seek work authorization, some are work authorized.  You heard

18   from Mr. Medina-Lara, he was work authorized the entire time

19   that he was at the Northwest Detention Center.  What if that

20   voice says, yeah, but the detainee workers sign agreements to

21   work for a dollar a day.  Remind yourself about Jury

22   Instruction No. 15 that says an agreement between GEO and the

23   detainee workers to work for less than the minimum wage is

24   not a defense in this case.  Also remind yourself about the

25   testimony from Mr. Nwauzor and Mr. Medina-Lara and

1   Mr. Marquez that they needed to earn money to help their

2   immigration case or for more and better food from the

3   commissary.  Signing the form, whatever form GEO put in front

4   of them, was the only way to work.  These weren't

5   bargained-for contracts like you or I may enter into.

6       The same goes for GEO's repeated insistence that the

7   detainee workers are volunteers and that that somehow means

8   GEO doesn't have to pay the minimum wage.  Tell yourself that

9   Instruction No. 15 says volunteers who perform work for

10  for-profit companies like GEO are not exempted from the

11  minimum wage.  In other words, arguing the detainee workers

12  are volunteers is not a defense in this case.

13      What if the voice says, yeah, but ICE was calling the

14  shots.  Remind yourself the undisputed evidence in this case

15  is ICE set the floor not the ceiling for GEO's performance

16  and conduct and left it to GEO to design the specific details

17  of the work program.  It was GEO, not ICE, that decided to

18  use the detainee workers as the first and last word in its

19  kitchen, laundry and barbershop operations.

20      Remind yourself too about Exhibit 365-A.  This is the

21  letter from GEO to ICE.  GEO pleaded with ICE to take over

22  the defense of this lawsuit and others.  Neither ICE nor the

23  Department of Justice are anywhere to be found in this case.

24  That's because ICE left the work program and compliance with

25  state and local laws to GEO.  GEO failed to follow those

Closing Argument - Mr. Whitehead

1  laws, our laws.  My guess is ICE essentially told GEO some

2  version of, you made this mess, you are on your own.

3      Finally, that voice in your head may be saying, this isn't

4  fair to GEO.  But tell yourself that GEO isn't being picked

5  on.  Everything that has happened is as a result of choices

6  GEO made.  GEO isn't the little guy in this fight.  Its

7  contract with ICE called for GEO to make a profit.  There is

8  nothing wrong with that.  GEO has blown the estimated profit

9  out of the water pulling down 18 to $20 million every year

10  from taxpayers into GEO's pocket.

11      GEO promised to comply with Washington law.  It is

12  basically telling you, after no investigation on its part, it

13  didn't comply with their laws because it didn't think the law

14  applied.  Try that excuse the next time you are pulled over

15  for speeding.  Officer, I didn't think the law applied to me.

16      Or could you imagine a restaurant that got confused about

17  safe cooking temperatures?  They couldn't get out of a health

18  code violation by saying, oops, we got confused about the

19  standard that applied.  Of course not.

20      The same is true here.  Ignorance is not an excuse,

21  especially not for GEO, a company with near endless resources

22  to get it right.

23      I think I should stop here.  I want to give Ms. Mell an

24  opportunity to speak to you.

25      Please know that we have done exactly what I told you we

1    would do at the outset of this trial.  This case is about

2    corporate conduct that is premised on an unfair business

3    advantage, corporate conduct that deprives an entire

4    community of 85 good paying jobs and corporate conduct that

5    takes advantage of desperate people.

6        This case and the story will end with you, standing up for

7    our laws, standing up for our community, and holding GEO to

8    account.

9        Thank you.

10           THE COURT:  Thank you, Mr. Whitehead.

11       Ladies and gentlemen, please give your attention to

12   Ms. Mell, who will offer argument on behalf of the defendant.

13           MS. MELL:  Ladies and gentlemen of the jury, my name

14   is Joan Mell, and I represent the GEO Corporation.  This is a

15   classic case of pie-in-the-sky wishful thinking.

16       Plaintiffs pretend ICE detention programs at the Northwest

17   ICE Processing Center are employment.  If they do that, then

18   they can get GEO to pay for it without ever asking the

19   taxpayers or their representatives to change it.  That's bad

20   politics, and it is not right.

21       So there's a few things I wanted to address upfront that

22   came up in the closing arguments by counsel.  Why isn't ICE

23   here?  They don't know why ICE isn't here.  ICE isn't here --

24   one reason ICE is not here is because plaintiffs did not sue

25   ICE.  ICE didn't respond to paying GEO's attorney's fees

 1    because it doesn't have to yet.  This case hasn't concluded.

 2    That's why ICE isn't here.  To think ICE isn't here because

 3    it has told GEO it's GEO's mess, would be an erroneous

 4    conclusion.

 5         The other important thing that came up in the arguments of

 6    counsel is Instruction No. 13.  If you can pull up

 7    Instruction No. 13.  Take a careful look at the definitions

 8    there.  What the Court is doing is it is giving you some

 9    examples of the meaning of specific terms.  Unfortunately,

10    the State told you that the Judge's instruction says "employ"

11    means permit to work.  The State changed the words there.

12    That's not what the instruction says.  "Employ," per the

13    instruction, includes permit to work.  "Includes" is not the

14    same as "means."  Plaintiffs' attorney Mr. Whitehead did the

15    same thing.

16         They do that, and then they go on to explain all of the

17    different characteristics of why there is a distinction

18    between employment and a detention program down at the

19    Northwest ICE Processing Center.

20         This case isn't as simple as did GEO permit the detainees

21    to work.  Permit to work is but one example.  It is your job

22    today to put together all of the pieces and look at all of

23    the evidence and you make the decision:  Is there an

24    employment relationship between GEO and the voluntary work

25    program participants or not.  The evidence, we think, will

Closing Argument - Ms. Mell

1  show definitively that there is a complete distinction and

2  they are mutually exclusive concepts when you are a

3  government contractor running a program for detention

4  services and you are running a mandatory program that is an

5  activity within detention just like the State does.  That's

6  not employment.

7      The other important instruction I want you to take a look

8  at that was not fairly represented in the closing arguments

9  is Instruction No. 17.  Instruction No. 17 was presented to

10 you as if private corporations can't have the protections of

11 the government when it is doing the government's work.

12     Instruction No. 17 specifically calls out and informs you

13 with regard to GEO's affirmative defense.  If the Minimum

14 Wage Act discriminates against the federal government or its

15 contractors, that's an affirmative defense.  So please

16 recognize that just because GEO is a private corporation,

17 that doesn't preclude it from having the same protections of

18 government when it is doing the government's work.  That,

19 too, is wrong in what you heard from the opening arguments by

20 plaintiffs.

21     Another mischaracterization, I just wanted to point out

22 briefly, was that the plaintiffs put up an illustration and

23 it showed all these caricature visual images of detainees,

24 and then it showed and reflected that the detention officers

25 at the facility were miniscule, zero, one, two for each of

1    the activities that are happening down at the facility.  But

2    that's not true.  What they left out, what they left out of

3    that is the 232 actual detention officers who are onsite in

4    that facility when there is anywhere up to 1200 detainees in

5    that population.  Don't be misguided or misled by the

6    characterizations that have been put in front of you during

7    closing argument.

8         This is a case about common sense.  This case is actually

9    very intuitive.  The GEO Group has not now, nor has it ever

10   hired detainees to work for it.  Nor could it.  So how did we

11   get here?  I think one of the -- I did want to comment, too,

12   I think that in opening there was a comment that it is

13   shocking what has been going on at the detention center.

14        There is nothing shocking about it.  The State does the

15   exact same thing.  The key here is that it's detention.

16   Detention services are modelled the same whether it is the

17   state or the federal government.  They identify a purpose for

18   detention, they have an obligation in certain circumstances

19   for certain reasons to keep people detained, and when they do

20   that, it is very important to keep those people occupied.

21   Keeping people occupied has its advantages, and that's the

22   kind of program that was operating and is operating down at

23   the Northwest ICE Processing Center.  To change that or

24   mutate it into something it's not as if it was employment has

25   all sorts of adverse consequences that do not benefit the

Closing Argument - Ms. Mell

1   State, do not benefit the detainees, and do not benefit the

2   people who work there.

3        How did we get here again?  Let's look back at the

4   timeline.  More than a decade ago, October of 2005, during

5   the Bush administration, ICE issued its first detention

6   orders to house people that ICE took into custody at what is

7   now known as the Northwest ICE Processing Center in Tacoma's

8   Tideflats.  GEO had secured the necessary funding, and then

9   built an actual state-of-the-art facility designed

10  specifically for the federal government's purposes, designed

11  specifically for their occupancy and the five courtrooms down

12  there so that they can effectively process immigration cases.

13  That facility includes five courtrooms, administrative

14  offices, transportation facilities, full medical, dental,

15  mental health facilities and secure housing for over 500

16  people.  All 500 of which and for whom had an absolute right

17  to participate voluntarily in a work program to assist with

18  housing operations.  It had to be meaningful work.  It

19  couldn't be make work, and it wasn't.

20       Five years or so later in 2009, during the Obama

21  administration, the facility expanded with state assistance,

22  actually state bond funding to meet the contract needs of ICE

23  to house up to 1500 people, actually a little over, 1575.

24  Each, again, of whom had the absolute right to participate in

25  a voluntary work program to assist with housing operations.

1       Fast forward eight years to the next administration in

2    2017, this lawsuit is filed, not against ICE, the involved

3    government, that has its own issues for plaintiffs, but

4    against the private contractor, the GEO Group, claiming

5    workers participating in the voluntary work program, a

6    federally designed and mandated program, were GEO's employees

7    under the Minimum Wage Act.  GEO was suddenly, spontaneously

8    now their employer.

9       Who didn't start this lawsuit?  We know now by the

10    timeline that the program has been in operation for more than

11    ten years.  Historically, as you heard from Mr. Grice and

12    Ms. Buchanan, federal matters were left to the federal

13    government.  L&I stayed in its own lane.  Ms. Buchanan

14    specifically said with regard to the Minimum Wage Act, we

15    primarily dealt with state employees that were considered to

16    be employees through the Minimum Wage Act.

17       Mr. Grice told you and explained that not once did L&I

18    receive an individual complaint from a detainee participating

19    in the voluntary work program that they thought the voluntary

20    work program work they were doing required them to receive

21    minimum wage pay.  Not one detainee testified he or she filed

22    a wage complaint with Labor & Industries.  Consistent with

23    that testimony, L&I is not the one that filed this lawsuit.

24       Who filed this lawsuit?  In 2017, the State filed the

25    lawsuit.  Curiously, the State isn't here asking to recoup

Closing Argument - Ms. Mell

1   money for the people who actually did the work in the

2   program.  They are not representing the participants.  And

3   honestly, quite disrespectfully to GEO, a federal government

4   contractor, no one in the administration at any time ever

5   spoke to GEO, contacted GEO, reached out to GEO and suggested

6   GEO should be paying minimum wages to the participants, the

7   ICE detainees who were held by ICE down at the Northwest ICE

8   Processing Center.

9       After the State filed, a class action group of plaintiffs

10  got on board.  That class is represented by Mr. Nwauzor.  He

11  wasn't here at the beginning of the case, but he later came

12  on board to represent the class.  Actually, his story is kind

13  of interesting.

14      From what he tells us, in 2016 Mr. Nwauzor took a ship to

15  Brazil from Africa and then managed to work his way up

16  through three continents, South America, Central America,

17  then North America where he crossed over the border and

18  turned himself in to ICE officials so he could seek asylum.

19      Apparently during that trip, which sounded like a lengthy

20  one, he spent several weeks down at the border before he was

21  ever transported up to the facility, the state-of-the-art

22  facility, the Northwest ICE Processing Center here in Tacoma.

23      Presumably when he made it here, that was probably the

24  first time in a number of weeks he had an opportunity to take

25  a warm shower in a clean shower in a facility whereas, per

1    his words, he said the people there were clean and kept the

2    place nice.

3        Once up here, Mr. Nwauzor stayed for eight months, from

4    June '16 to January 2017.  During his stay, he opted to

5    continue that cleanliness by cleaning the shower.  He kept up

6    the showers by wiping them down if not once a week, every

7    day, depending on which part of his testimony you give weight

8    to.

9        Then, with the assistance of the local advocates who are

10   prevalent in interfacing with the Northwest ICE Processing

11   Center on a regular basis because of its location, because of

12   its jurisdiction, and because it has the best opportunity to

13   advocate for immigrants, he was able to connect with

14   volunteers who helped him win his freedom.  He prevailed.

15   Then he got a work authorization.  Ultimately, he landed a

16   real job on the outside working in maintenance for a hotel

17   chain in one of the downtown Seattle locations.

18       His path to the United States worked the way it was

19   supposed to for asylum seekers.  Yet, now well after he

20   gained his freedom, he still wants more.  Here we are.

21   Plaintiffs are asking you to look back in time and create an

22   employment relationship between GEO and the ICE detainees

23   when there never was one.

24       You kind of have got to scratch your head and say why is

25   that?  Well, the reason is probably because they have no

1  power over immigration detention at the Northwest ICE

2  Processing Center unless they can finesse a way to make state

3  law applicable.  Immigration issues are an exclusive federal

4  right and a federal issue.

5      Now, if the plaintiffs can prove that the Minimum Wage Act

6  is, quote, "applicable to the Northwest ICE Processing

7  detainees," then they can reform immigration detention

8  without ever having to go to Congress.  Here, they are taking

9  a shortcut via the courthouse to get what they want.

10      The problem with what they are trying to do, the vehicle

11  they are using to get here, is the Minimum Wage Act only

12  applies to employment.  You don't get to change wages and

13  talk about wages until you first find there is an employment

14  relationship.  Not all work is employment.  You know that.

15  You are here.  You are not getting paid minimum wages.  And

16  it is not employment.  There are other certain circumstances

17  and specific exemptions to employment under the Minimum Wage

18  Act.  One of those exemptions is very specific.  You will

19  hear about that more when we talk about the immunity.

20      The exemption that exists for government applies to

21  detention.  When government decides to take custody of

22  individuals, they have an opportunity and are exempt from the

23  Minimum Wage Act to use that detainee labor for whatever

24  their policy objectives may be.  The federal government was

25  not doing anything different than the state government.  GEO,

1    as a federal contractor, gets the advantage of those policy

2    objectives and the exemption under the Minimum Wage Act.

3        Why are you here if the law is that straightforward on an

4    exception?  Well, the reason you are here is that the

5    plaintiffs found a narrow, tiny little hole exception.  In

6    the exemption for state and local detention facilities, there

7    is not the word "federal" in front of that exemption.  The

8    absence of "federal" and the silence of "federal" leaves open

9    the question that you have to decide here.  Is it the same

10   kind of activity, and is it inherently unfair and the epitome

11   of hypocrisy for the State to be able to run its programs

12   which, in effect, the State said it was doing, said it got to

13   use its workforce that it detains at subminimum wages because

14   that's the law.  Well, then why is it reaching out to GEO and

15   applying different standard to it?  That's discriminatory.

16   In this case, you are permitted to consider that

17   discrimination as an affirmative defense.

18       In this case, based on what you will hear, GEO asks you to

19   respectfully and politely decline the plaintiffs' request

20   that you apply the Minimum Wage Act to the ICE detainees

21   participating in the voluntary work program while detained

22   under the custody of the federal government.

23       So one of the concerns that we want to get out right away

24   is that some of you may be struggling with a dollar a day.

25   That may give you some pause.  I am not suggesting that all

1    of you are actually thinking that.  If you are, GEO wants to

2    make sure you know GEO is not here to defend the dollar a

3    day.  It is not its dollar.  It didn't come up with a dollar.

4    It doesn't make money off the dollar.  It's a pass-through

5    dollar, and it takes no position on the dollar.

6        What GEO does hope you heard, and one of your takeaways,

7    is hopefully that Dan Ragsdale, Brian Evans at the corporate

8    executive level, and then here locally Bruce Scott and

9    Ryan Kimble, hopefully they impressed you that GEO's success

10   is entirely dependent on them being competent and capable and

11   highly sensitive to the rules and regulations and the safety

12   and security of the people not only in the facility working

13   there, but detained there and in the community.

14       A governmental contractor's continuing success depends

15   entirely upon its above-standard performance.  That's how the

16   community can support it.  That's how the politicians can get

17   behind it.  GEO has enjoyed years and years of bipartisan

18   support.

19       I think what you heard, I hope you heard, was that the

20   Northwest ICE Processing Center is not a Walmart.  You did

21   hear that GEO does pay far above, more than double, minimum

22   wages to its employees.  GEO is not expecting, and there was

23   no evidence that you ever heard, never saw any emails or

24   other communications, where GEO executives or facility

25   administrators were imagining or communicating or talking to

1    anyone about making sure they could maximize the use and

2    potential of the detainees because they had a detainee

3    workforce in the voluntary work program.

4         What you heard was that all of those individuals have done

5    the very same kind of work in order to maintain the ongoing

6    operations of the facility and keep it performing at above

7    standard.

8         It's also important to recognize that GEO does this

9    above-standard work at multiple dollars less than the

10   government can do it itself.  The plaintiffs were very

11   excited to put in front of you big, big numbers.  Those big,

12   big numbers are what it takes to run detention centers.

13   Those numbers are not that substantially different than the

14   numbers that are involved in government operations of their

15   detention facilities, except significantly, the benefits of a

16   private corporation and the flexibility they have in meeting

17   the market demands and not living budget cycle to budget

18   cycle is they can do it a whole lot cheaper.  Cheaper, but

19   not cheap.

20        Importantly, the VWP was not a profit center.  It didn't

21   make money for GEO.  The VWP itself does not make money for

22   GEO.  GEO doesn't mark it up.  GEO doesn't deduct anything

23   from the dollar.  It's purely a pass-through.

24        So some of you may be kind of scratching your head and

25   thinking about the voluntary work program as a voluntary work

1    program and thinking, well, it's not really voluntary if they

2    are paid a dollar.  That's true.  Don't get too tripped up on

3    the instructions about voluntary.  We will talk about that a

4    little bit later in the case.  What you need to know is that

5    the detainees are not GEO's volunteers who should not get

6    paid.  GEO's not saying that.  GEO understands that

7    volunteers on the outside are not someone you can have work

8    on terms that are applied to detention programs on the

9    inside.  Detention programs on the inside are exempt from the

10   Minimum Wage Act under state law for state facilities, and

11   GEO's saying that it is entitled to the same governmental

12   protections.

13       Remember that really what detainees are, are program

14   participants.  They are not GEO employees nor volunteers.

15   GEO's not their employer.  The detainees are free to

16   participate or not.  There is a difference between volunteer

17   and voluntary.  When you are operating work programs on the

18   inside, it's not whether or not the detainees are giving away

19   their work for free.  The question is, are they being forced

20   to work.  There is no indication under any of the facts that

21   any of the detainees were ever forced to work.

22       For those of you who really have no issue with the dollar

23   a day, I don't have to say more.  Those of you thinking about

24   the dollar, this case isn't the right path to make that

25   change.

1       What example do we have from the testimony in this case

2   that the right way to make a change is the Disability Rights

3   with Washington Advocacy for those state workers that the

4   State was using in their facilities who were disabled at

5   subminimum wages.  For years those workers, Washington's most

6   vulnerable population, those individuals who needed

7   institutionalized care because they couldn't care for

8   themselves on their own, those individuals worked at

9   subminimum wages for years without complying with the local

10  Labor & Industries requirements regarding subminimum wage

11  certificates.  The stakeholders got together, wanted a fix to

12  the problem and where did they go?  They went to the

13  legislature and fixed the problem.  Now the State no longer

14  can use its disabled detained workforce at subminimum wages.

15      GEO would suggest to you that that's a perfect example of

16  what needs to happen here.  If you feel the dollar a day is

17  not the right dollar, go talk to Derek Kilmer, Adam Smith,

18  Marilyn Strickland.  They know how to change the dollar, and

19  it's their job to do it.

20      As you have heard, GEO is not defending this case because

21  it cannot afford to pay minimum wages.  We know GEO has the

22  money.  We know GEO already pays its employees more than

23  minimum wages.

24      GEO is defending this case because it is the wrong vehicle

25  and wrong law to apply to detention services against a

1    government contractor who is performing the work it is

2    mandated to do.  It is also bad because making detainees

3    employees changes the whole nature of the relationship and

4    has unintended consequences and implicates a whole labor

5    scheme that is just not right and just does not fit for the

6    detainees and who they are and their transition through the

7    immigration process and stay down at the Northwest ICE

8    Processing Center.

9        What we really have here is a square peg, round hole

10   problem.  It has nothing to do with the dollar a day.  So we

11   are going to do a little slide presentation here to help you

12   sort through the evidence because it is a puzzle.  There is a

13   lot of pieces that you get to make the decision about, you

14   get to sort, you get to use to decide that GEO is not

15   employing the detainees.

16       Please remember that what you are not being asked to do

17   here, what you will not be doing here, is changing

18   immigration policy.  Your instructions will remind you of

19   that, and I think Judge Bryan reminded you of that at the

20   start of the case and again when he gave you the ending

21   instructions.  So remember, you are not here to decide a

22   dollar is not enough.  You are not here to punish GEO for

23   running a detention center.  You are not here to punish it

24   for being a private corporation.  You are not here to punish

25   it or otherwise decide government contractors should get a

1    profit or not as much profit or anything else.

2        It is also not your job to change the price or quality of

3    the phone services.  Those are actually provided by ICE

4    anyway, the commissary offerings or the meals or the

5    detention center themselves.

6        You will have two questions here before you.  In essence,

7    did GEO employ ICE detainees?  No.  And does Washington's

8    Minimum Wage Act discriminate against GEO?  It sure does.

9    It's a government contractor doing the same kind of work and

10   the same public service as the State's doing under state law.

11       Here we have our puzzle.  Let's see if we can sort through

12   this.  So what we have tried to diagram for you is

13   employment, that's the round hole.  Voluntary work program,

14   that's a square peg.  It just doesn't fit.

15       Here is my example of all the stuff you got over the last

16   two weeks.  There's a lot of puzzle pieces there and you have

17   been very patient in listening, waiting for all the evidence

18   to come in piece by piece, document after document.  For

19   that, GEO truly does appreciate you and your work in this

20   case.

21       So where do we start?  Employees.  What are the

22   characteristics of employees at GEO?  Well, think about the

23   relationship.  How do employees come to GEO?  GEO locates and

24   interviews the people it wants.  It selects the strongest

25   candidates from a competitive workforce.  The employee

1  applicants are required to have skills applicable to

2  detention services, they must be work authorized and have a

3  valid I-9.  They must also have a valid Social Security

4  number.  All employees must pass a rigorous federal

5  background check, have no issues with integrity to clear ICE

6  scrutiny.  If any of you have had background checks outside

7  of government or law enforcement or security services, you

8  may not be as familiar with the backgrounds that are done.

9  They are comprehensive.  They are not just a matter of doing

10  a Google search.

11      With regard to the question presented to you, detainee

12  workers in government confinement have never been paid

13  minimum wages.  Auditors know this.  The Department of Labor

14  and Industries knows this.  Washington Employment Security

15  knows this.  Immigration and Customs Enforcement certainly

16  knows this, they are there.  Congress knows it.  They set the

17  dollar and never changed it.  Former detainee Orlando Marquez

18  knows it, and he did nothing about it and worked for

19  subminimum wages in two other facilities where he did not sue

20  the facility operator.  Finally, all of the documents like

21  the Performance-Based National Standards don't hide it.  It

22  is a dollar.

23      Who are GEO's employees?  You had the opportunity to meet

24  Bruce Scott, the facility administrator.  What you know from

25  Mr. Scott and hopefully can tell from his testimony and

Closing Argument - Ms. Mell

1  having met him, he's the perfect balance for a secure

2  facility. He comes from an Air Force background where he has

3  had the experience as a fireman balancing the needs of people

4  at risk of harm with the need to follow regulations to

5  protect not only those people who need his assistance but the

6  greater community. He cares about the detainees working in

7  the program. He cares about his officers, and his paramount

8  concern is the safety and security of that location.

9      He explained that his 220-plus employees are required to

10  complete extensive training, including 180 hours in the first

11  year. The kind of training these detention officers and GEO

12  employees get to be at the Northwest ICE Processing Center is

13  extensive, and it's extensive and focused on the needs to

14  protect the public and the people down there.

15      You also met a number of other employees, David Tracy, a

16  detention officer, Ryan Kimble, another business officer,

17  Marc Johnson, another detention officer, Bert Henderson,

18  running the kitchen. Boy, she runs a tight ship. You heard

19  that. Iolani Menza, Erwin De La Cruz, food services

20  supervisor. These are folks that have made a career out of

21  their employment with GEO. They came to GEO because of their

22  particularized skills and demeanor and their ability to

23  interface with a number of individuals who are experiencing

24  the crisis of detention and need their support and care to

25  maintain a safe and secure transition through the immigration

1    processing process.

2        Just to highlight some differences with employment.

3    Northwest ICE Processing Center is a detention facility and

4    GEO may not employ anyone whose ethics may easily be

5    manipulated.  They are working with a population that are

6    capable and experienced at working the system.  They are

7    trained to address that and they are also trained to respect

8    those that they interface with in a way that is successful

9    with that particular population and the needs of the

10   community.

11       Good judgment is essential.  Courage, alertness and even

12   temperament are essential.  GEO employs people who are

13   deferential to those in crisis.  GEO employs people who

14   understand and will follow written and verbal rules and

15   regulations.  GEO employs people who pass extensive health

16   and mental fitness screening.  GEO employs people who can

17   commit to a code of conduct that prohibits contact with

18   detainees and their families outside the employment.  And in

19   the kitchen, Ms. Henderson, she does not hire any kitchen

20   employees who do not have a minimum of two to three years

21   working in the kitchen as well as the ability to read recipes

22   and help track inventories.

23       Every one of those employees were interviewed for their

24   positions.  Every one of them has become a long-tenured

25   employee for the GEO Group.

1     Let's look at some of the contract language itself.  The

2   contract with ICE, Exhibit 129, Page 63 has extensive

3   personnel qualification standards that are specifically

4   applicable to employees.  There's no mention of detainees,

5   and there is no confusion that this section applies to

6   employees, not detainees.

7     You can see that there are health requirements for all

8   officers.  At Page 71, this is an important provision,

9   "Subject to existing law, regulations and/or other provisions

10  of this contract, illegal or undocumented aliens will not be

11  employed by the contractor or with this contract.  The

12  contractor will ensure that this provision is expressly

13  incorporated into any and all subcontracts or subordinate

14  agreements issued in support of this contract."  The contract

15  spells it out.  The detainees are not GEO's employees.  By

16  contract, they can't be.

17    Let's talk about who are the detainees.  Detainees are the

18  people who are in the custody of ICE.  These people are

19  detained and transported to the Northwest ICE Processing

20  Center and are introduced to GEO via form I-203

21  administrative order.  GEO employees don't have I-203s.  They

22  are people whose immigration status is in question and being

23  determined by the immigration courts.  They are people whose

24  risk threat to the United States may or may not yet be known

25  and at least 60 percent of whom have known criminal

1   histories.  They are people who GEO could not hire even if it
2   wanted to while the person was detained, and who once
3   released most likely could not pass the background check.
4       How do we know this?  Christopher Strawn, the plaintiff's
5   expert, came before you and said that 75 percent of detainees
6   will not be able to prove that they are able to remain in the
7   United States lawfully.  60 percent of the current detainees
8   at the Northwest ICE Processing Center are being held because
9   of their criminal history.  Most detainees are simply not
10  work authorized.  These are barriers to employment.
11      We also know it from the testimony of the detainees that
12  you heard from.  Ms. Soto Gomez, "Were you work authorized?"
13  "Not while detained."  Medina-Lara, Mr. Medina-Lara, he got
14  his work permit in 2020, after release.  How about
15  Mr. Marquez?  "Prior to being detained, were you working?"
16  "Yes."  "Did you have a work authorization?"  "No."
17      Mr. Heye, from classification, tells us and told you,
18  "When you get a kite, do you ask for a resume to know what
19  the person's skills are?"  "No, anyone gets an assignment."
20  "Do you place detainees in positions based on their skills?"
21  "No, they can request any assignment."
22      That is a distinction from employment.  That is not the
23  way GEO interfaces with GEO's employees.  Detainees simply
24  are not employed by GEO.
25      There was testimony from Mr. Marquez.  "Did you have any

1    skills in that position?"  "No."  "Did anyone ask you about

2    that?  Did you get a background check?  Were you work

3    authorized?"  "No.  No.  No."

4        Back to employees.  Employees have essential job

5    functions.  We all know that, we have heard that term.  We

6    know what we are obligated to do as an employee.  The

7    essential function for any GEO employee is the safety and

8    security of the facility.  GEO employees ensure detainees are

9    safe and secure with all of their basic needs met to include

10   meals, clothing, shelter, entertainment and access to ICE

11   public health services.  GEO employees must be available to

12   work any shift and complete all operational requirements

13   around the clock, 24-hours-a-day, seven-days-a-week.

14       You can look at the contract.  What I just told you is

15   reflected right there in Paragraph 62.  "Contractors:

16   Uniformed staff members are responsible for the security,

17   care, transportation and supervision of detainees during all

18   phases of activities in a detention facility."  That's the

19   essential function of an employee of GEO.  That is not an

20   essential function of being a detainee or participation in

21   the voluntary work program.

22       Facility Administrator Bruce Scott told you he understands

23   this obligation and takes it very seriously.  Officer Tracy

24   said the same thing.  So did Officer Johnson.

25       In short, GEO does not employ the detainees.

1    How is the work different for detainees?  Detainees have

2    tasks, not essential job functions.  They have piecemeal

3    activities that are created so that a number of them can

4    participate in the program.  The activities are broken down

5    into tasks like handing out juice, wiping down tables,

6    cleaning the showers.  They are not responsible for other

7    people's tasks.  They are not responsible for the overall

8    maintenance and well-being of the facility.  They are

9    responsible for the individual activity that they selected to

10   undertake.

11   What did that work look like?  Well, Mr. Menza talked to

12   you specifically about the laundry porter position, talked

13   about it being at the most four hours of work with various

14   breaks and activities and down time as they would interact in

15   the laundry facility while not in their housing unit.

16   The kitchen volunteers helped with preparing and serving

17   the meals.  They weren't planning the meals.  They weren't

18   doing the shopping.  They weren't making sure that the meals

19   got out.  They showed up and helped get the meal delivered

20   and served so the detainees themselves could eat.

21   That gave them the opportunity to leave their pod for at

22   least four hours a day where they could help with something

23   meaningful and be with other people from the other units.

24   Juice porters, they spent 15 to 20 minutes handing out

25   juices after each shift.  You could be a unit porter and work

1  for 15 to 20 minutes wiping down tables, mopping the floors.

2  Shower cleaners.  Shower cleaning isn't the kind of shower

3  cleaning where every time somebody took a shower that person

4  would be responsible, the individual who was assigned as a

5  shower cleaner would have to clean up every time someone took

6  a shower.  It was work that was divvied up and made available

7  to a number of individuals in the housing unit who could take

8  20 minutes up to an hour to clean the showers, depending upon

9  their choice, how much time did they want to spend at it.

10      Mr. Menza talked about his approach to the work in the

11  laundry.  He participated.  He did those tasks.  Wasn't the

12  kind of work that any detention officer was unwilling to do.

13  It was an activity.  It was a way to engage with detainees in

14  a meaningful way during the day that otherwise could get very

15  long and very boring.

16      Officer Menza talked about the amount of time, five, ten

17  minutes, up to an hour.  Those aren't employment work days.

18  We are not talking about eight hour shifts day-to-day,

19  overtime and overall facility obligations.

20      Mr. Nwauzor spoke specifically about his work.  He said,

21  "We are all adults.  We are not playing around to be dirty.

22  When I eat there, I make sure the table looks neat."  Even he

23  recognized the work performed was work that was respectful

24  work that others made an effort to make easy, I guess.  Not

25  hard.  Not disrespectful.  Those others were the detainees

1    themselves living in the unit.

2        Mr. Medina-Lara.  "I always tried to clean up after myself

3    anywhere I'm at.  I tried to be respectful and clean up after

4    myself."  That's the essence of a housing work program with

5    detainees where they live.  They are the best at making sure

6    that people are respectful of their space and they are

7    respectful among each other.  They don't want outside people

8    coming in to take care of their personal belongings and

9    personal space.  It's almost demeaning to even suggest that's

10   the way it should be.

11       All right.  With regard to the types of tasks and

12   essential job functions, it is clear the detainees are not

13   employed by GEO.  Here is another piece of the puzzle.  There

14   are differences between reliability and permanence and the

15   transitory nature of detainees.  Employees have to be

16   reliable.  There is an expectation that they stay around.

17   There are many who make work at the Northwest ICE Processing

18   Center a career.  They must prove their value by exceptional

19   performance that is measured and reviewed in writing.  There

20   is an absence policy where they have to get to work on time

21   and if not, they get points deducted.

22       As I indicated, GEO values their longevity and promotes

23   those officers who work at the facility for years and make

24   exceptional service their career.

25       I think you heard from Officer De La Cruz who would talk

1    about the work he did to make sure that there was meals

2    served regardless of whether or not volunteers showed up,

3    regardless of whether detainees participated.  He didn't

4    depend on them.  He made sure the job got done.

5         Officer Menza, he participated in doing what it took to

6    get the job done.

7         Officer Tracy, he swept the floors and cleaned the floors.

8    They did what needed to be done, and that was in addition to

9    maintaining the safety and security of the facility.  Same

10   with Officer Heye.  He would do the work as well.  Not the

11   same for detainees.  Detainees are only in the facility for

12   two to three months.  During that time if they sign up,

13   there's no guarantee they will even be there the next day to

14   participate.  Their availability is totally controlled by

15   ICE.  Their participation is optional, not a requirement.

16   GEO must plan to have no detainee participants, and they do.

17   Yet again, the ICE detainees are not employed by GEO.

18        What do we mean by "transitory"?  There is an unlimited

19   no-show policy for VWP participants.  As Bert Henderson told

20   you from the kitchen, it happens all the time.  The detainees

21   don't have the ability to commit, nor are they required to

22   commit to continuing in the program.  Even they don't know

23   when ICE is going to release them.  You reviewed documents

24   showing the detainees are on average in the facility for

25   about three months.  That, Mr. Strawn affirmed with his

1    statistics.

2        Bertha Henderson.  "Can you count on any minimum numbers

3    of detainee in the kitchen a day?"  Nope, she can't.  It is

4    transitory.  Even the detainees acknowledged this.

5        Ms. Soto testified that shortly after signing up for a

6    laundry position, she withdrew her request and signed a

7    refusal to work form.  Mr. Marquez testified after weeks of

8    waiting for a position in the kitchen, he chose not to

9    participate less than 15 days after he started.

10       Yet again, based on the tasks and the activities and the

11   transitory nature and the permanence, detainees are distinct

12   from employees.

13       Here is the next characteristic, another puzzle piece.

14   Fireable, employees are fireable.  GEO employees do something

15   wrong, they are not going to get rehired.  They are gone.  We

16   did -- let me go through this one, I guess.  There are

17   specific reasons in the ICE contract that pertain to

18   employees in terms of the standards.  There is a whole lot of

19   things they can do that will get them fired.  Falsification

20   of information, conviction of a felony, possessing a record

21   of arrest.  The standards are pretty high and pretty

22   definitive.  You can -- this is Exhibit 29, some of the terms

23   in the contract.  I just highlighted them so you could take a

24   look at them if you wanted to see what those were.

25       What you did hear was a lot of different discussion and

1    verbiage and words tripped up around what is a firing, what

2    is a termination.  The reality is, that in the detention

3    programs detainees are subject to disciplinary infractions.

4    They do not lose their right to participate in the voluntary

5    work program for performing poorly.  If a detainee commits to

6    an infraction and is disciplined and ICE affirms the

7    discipline, the detainee completes the discipline, and after

8    that, they get to start all over.  They are not fired.  They

9    can sign up and select new activities and begin participating

10   again.  Once again, the detainees are not employed by GEO.

11       The PBNDS standards are specific about the standards, you

12   can look at Exhibit 17 and go through it in detail about the

13   process.  The bottom line and important piece of the puzzle

14   is that ICE has the final say so.  ICE cannot fire detainees.

15   You can't.  They have to continue to participate because they

16   have the absolute right to participate in the voluntary work

17   program while detained.

18       We heard that from Ms. Singleton.  She explained it.

19   Mr. De La Cruz, he explained it.  The reality was that there

20   was no termination of a volunteer for bad performance.  There

21   simply weren't those expectations of participation in the

22   voluntary work program at the Northwest ICE Processing

23   Center.

24       Officer Tracy, they are not firing them.  They are

25   removing them from the program for disciplinary infraction

 1    reasons.

 2        Next puzzle piece.  GEO gets to control all aspects of its

 3    employment.  They can set the requirements for when GEO

 4    officers work, where they work, their performance

 5    expectations and their minimum skills.

 6        GEO has limited control over the voluntary work program

 7    and the detainees participating.  They have no control over

 8    what skills the detainees come to the program with, what

 9    activities they select, when they choose to participate or

10    not, or if they even perform well.

11        The only thing GEO can control is the safety and security

12    and their safety and security as part of the detention

13    environment.  Once again, they are just not employed by GEO.

14        Detainees are program participants.  Officer Tracy

15    described this.  Officer Johnson described this.  It's a

16    custodial environment, so you are putting people in a

17    situation where you have to make sure they are safe.

18        GEO has flexibility with regard to its employees.  Like in

19    other businesses, it can control its staffing.  It can

20    allocate its resources.  It can create its own workforce.  It

21    can put together a specific request for proposal for a

22    staffing plan and choose how it wants to staff the facility,

23    what positions it wants to keep, what positions it wants to

24    remove, and how it wants to negotiate those staff positions

25    with ICE.

Closing Argument - Ms. Mell

1       Mr. Scott explained that.  Explained that when the

2   unexpected happens, he needs to be able to move the staff

3   around and be ready to be redeployed to do what is necessary,

4   follow the schedules and respond to the shifting needs of the

5   facility, and no one can be limited to any single task.

6       ICE mandates no flexibility.  It's a requirement.  The

7   voluntary work program has to exist.  GEO has no discretion

8   about whether to use it and must implement the program

9   consistent with the requirements of the contract.  The

10  contract is pretty darn specific.  Here is the language,

11  Exhibit 129, Page 82.  While the plaintiff says that there is

12  no specificity there, you figure out how you deal with a

13  contract term that specific.  "It may include work or program

14  assignments for industrial maintenance, custodial service or

15  other jobs.  Detainees shall not be used to perform the

16  responsibilities or duties of an employee of the contractor,

17  and ultimately it will be the sole responsibility of ICE to

18  determine whether a detainee will be allowed to perform on

19  voluntary work details and at what classification levels."

20      It is controlled by ICE.  The voluntary work program has

21  further specifications in the PBNDS standards.  Take a look

22  at those.

23      The kinds of activities that the voluntary work program

24  should have are essential operations and services that

25  enhance detainee productivity.

1    GEO did as the contract required.  It designed a program

2    to fit the specifications.  The details were in the

3    testimony.  Ms. Henderson, Mr. Heye explained, detainees have

4    full choice over the positions they want to select.  GEO

5    can't tell the detainees what to pick.  If they wanted to

6    participate in the evening, in the morning, that's their

7    choice.  They get to do what they want.

8        Bill McHatton summed it up when referencing ICE.  ICE has

9    to sign off on all policies GEO implements.  All of the job

10   descriptions, all of the voluntary work program work

11   agreements, GEO's specific policy on the voluntary work

12   program, Mr. McHatton shared with you and showed you that

13   those contracts have to be signed off on by ICE.  They review

14   it.  They actually put their signature on it and approve it.

15       Next puzzle piece, necessary staffing.  GEO gets to decide

16   the staff and only hire those who are integral to the

17   operations.  Again, related to safety and security, their

18   ultimate concern.

19       In the voluntary work program, everyone needs an

20   opportunity.  The tasks have to be divvied up and broken down

21   so that they can get the widest and broadest participation

22   possible to meet that mandate that every detainee there has

23   the opportunity to participate.  Michael Heye said it.  They

24   are given as many opportunities as possible.

25       Next puzzle piece.  We are getting close.  GEO staff

1    depend on GEO for income.  It's obvious.  You know what you

2    do with your paycheck.  GEO employees do the same thing.

3    They have to take care of their family, they have to provide

4    for themselves, and GEO doesn't provide for them, nor does

5    ICE while they are operating and working down at the

6    Northwest ICE Processing Center.

7         The other component that is important about what is

8    happening there about the money made is an issue, as

9    Mr. Scott said, that if you change the standard to standards

10   where it is an employment relationship rather than a

11   voluntary work program, what you have done is given a limited

12   few a lot more money in an environment rife and able to be

13   corrupted far more easily than if you share equally among all

14   employees the opportunity to participate at the same level.

15        One of the important things you heard from Mr. Scott is

16   GEO never did lay off any staff during the pandemic despite

17   decreased revenue.  In fact, even the State Correctional

18   Industries, that does not have shareholders for profits,

19   didn't meet those standards.  It was unable to keep all of

20   its employees working.

21        I don't think it's in dispute.  I don't know how much you

22   need to see or be reminded of these things, the voluntary

23   work program, it's important to remember is really a

24   component of the activities that are made available to

25   detainees at the facility.  It's not just the opportunity to

1   work, but it is an opportunity combined with all sorts of

2   other activities that go on down there.

3       One of the things I want to highlight here, you see the

4   2800 calories, the State took a potshot at GEO talking about

5   their mediocre meals in opening.  2800 is not mediocre.

6   Certainly in my old age, I shouldn't be eating that many

7   calories a day.  They are very attentive to making sure there

8   are nutritional meals.  I think it's a disservice to

9   Ms. Henderson to suggest that she would be slighting

10  detainees while she's preparing the meals for the detainees

11  in the kitchen.

12      The activities that they have down at the facility include

13  chess tournaments, basketball, soccer, Xboxes, TV and

14  reading.  Those are things they can choose to do just like

15  participating in the voluntary work program.  You heard from

16  Mr. Medina-Lara that GEO's facilities were actually better

17  than other government-run facilities where he had previously

18  stayed, because they had more recreational opportunities,

19  more games and more television.

20      Finally, detainees' basic needs are met at the facilities.

21  They don't need to participate in the voluntary work program

22  to buy clothing, food, health care; GEO covers those costs

23  regardless of participation in the program.  The detainees

24  participate to get their dollar and to reduce idleness and

25  feel a sense of purpose.

Closing Argument - Ms. Mell

1      We see that, not because I say so, but because that's what

2  they testified to.  When asked if he would have liked more

3  time out of his cell at state-run detention centers,

4  Mr. Medina-Lara said no doubt, anyone would.  Other detainees

5  testified similarly making it clear that they liked to have

6  something to do to pass the time.  Ms. Soto was able to leave

7  the facility with $800, something that would not have been

8  possible had she been required to pay for her medical care,

9  which she testified she received every single day for an

10  entire year.  There was no deduction for those services.

11      Officer Menza explained that a lot of these individuals,

12  they don't have too many things going on, so this helps them

13  fill the day.  They would come down and keep busy.  You heard

14  Mr. Marquez say this was true.  He liked to stay busy while

15  he was detained.  You heard from Mr. Medina-Lara that he

16  preferred to stay busy and lacked the same opportunity to do

17  so at other ICE facilities.

18      Ms. Singleton said they get to learn new things and keep

19  their mind off their issues.  Former Officer Mr. Griffin

20  agreed that the GEO detainees enjoyed being in the kitchen.

21  They were happy to get out of their pods and do something.

22      Final puzzle piece.  GEO pays it employees market

23  competitive pay.  Their payments are based upon the pay scale

24  set to ensure competitive pay in the local industry.

25      Officers Johnson and Tracy explained that they left their

1   prior jobs in the Tacoma area to get better pay at GEO.  GEO

2   pays them competitive wages.  You reviewed documents and

3   testimony that showed the Service Contract Act.  The wages

4   are more than double the minimum wages for detention

5   officers, and those wages apply to employees, not detainees.

6       Detainees, instead, are paid based upon a rate set by

7   Congress to control costs of immigration detention to

8   taxpayers, immigration detention to taxpayers, that's where

9   the dollar a day came from.

10      To complete the puzzle, finally, we all know the terms for

11  employment, at will.  GEO employees are free to come and go

12  at will.  They are not detained.  Detainees are confined.  At

13  the end of the day, the ICE detainees are going nowhere until

14  ICE releases them, and without the voluntary work program,

15  their time stands still.

16      I want to take a moment to talk about one of the jury

17  instructions that is very specific.  I think I can maybe

18  toggle over to it.  Instruction No. 15.  Verbiage in here, I

19  want to remind you of.  I talked about it a little bit in the

20  opening.  GEO is not saying that the detainees are its

21  volunteers, and because they are volunteers in the charitable

22  purpose it doesn't have to pay them a minimum wage or the

23  Minimum Wage Act doesn't apply.  They are not suggesting

24  either that the voluntary work agreement is an absolute

25  defense to the Minimum Wage Act claims.

1     What they are saying is they are a government contractor,

2  operating a government program, by government mandates,

3  following the same kind of mandates that the State operates.

4  In that context, whether or not somebody is volitionally

5  participating is the issue.

6     GEO doesn't expect or think that the detainees themselves

7  are volunteers.  You know they are not volunteers.  They are

8  not volunteers.  They are paid.  None of the detainees

9  themselves spoke about giving away their time for free to

10  GEO.  They didn't.

11     Going through these bullets, I think I have already said

12  there is a difference between voluntary, being a volitional

13  act, which is important in the sense of confinement programs

14  versus volunteer in the outside sense of the word where

15  people do work for charitable purposes.  GEO understands the

16  distinction.  That's the distinction that applied down there.

17  It is not a barrier to not paying the Minimum Wage Act if you

18  are voluntarily participating in a program.  That's an

19  important factor in detention.

20     It is important because under the Minimum Wage Act, the

21  State's detained workers operating in government programs may

22  participate in voluntary work programs without receiving

23  minimum wages.  It's simply not employment.

24     We are finally through the pieces of the puzzle and back

25  to square peg/round hole that I told you about from the

1    beginning.  Detainees are not employees.  You cannot fit a

2    square peg into a round hole.  It's not going to work.

3        Where does that leave us with the verdict form?  First

4    question, what is the answer?  They are not employed by GEO.

5    The answer is "no."  If you write that into the verdict form,

6    we are done, you go home.  We don't think we will need to go

7    further.  There is a second part to the verdict form.  If you

8    get to the second part of the verdict form, it is GEO's

9    affirmative defense that the State is unfairly targeting it.

10   It's discriminating against GEO because the State does the

11   exact same thing that GEO does.

12       That should be "yes."  That's how you answer the second

13   question on the verdict form.

14       Instruction 17 is what we call the affirmative defense

15   instruction.  I brought that up in the first part of my

16   closing.  It is important.  The defense --

17           THE COURT:  Excuse me, Ms. Mell.  I have got my eyes

18   on the clock.  It is noon.  We need to take a break.  We have

19   been in session for quite awhile.  Let's reconvene at 12:45.

20   Take 45 minutes for lunch.

21       Please, ladies and gentlemen, you haven't heard everything

22   yet.  Don't discuss the case among yourselves yet, and keep

23   your minds open until you have heard all of the arguments.

24   And come back in 45 minutes and Ms. Mell may complete her

25   argument and there may be rebuttal arguments also at that

1   time.  You have not heard everything yet.  We will see you in

2   45 minutes.

3                        (Recessed.)

1        AFTERNOON SESSION

2        JUNE 15, 2021

3    (The following occurred outside the presence of the jury.)

4        THE COURT:  Are we ready to proceed?  Bring the jury

5    back, please, Tyler.

6    (The following occurred in the presence of the jury.)

7        THE COURT:  I think the jury is here.  Please give

8    your attention to Ms. Mell, who may continue.

9        MS. MELL:  Thank you, Your Honor.

10    We will go back a slide just so I can remind you what part

11    of the argument we are in here.  We are talking about GEO's

12    affirmative defense.  Its affirmative defense has to do with

13    discrimination, inherent hypocrisy in asking GEO to pay

14    minimum wages to ICE detainees volunteering in the work

15    program at the Northwest ICE Processing Center.  How does

16    that affirmative defense work?  We will start with how it

17    shows up on the verdict form.  The verdict form asks the

18    question:  Does the Washington state Minimum Wage Act

19    discriminate against GEO?  We went through this, the right

20    answer to that question is "yes."

21    What does the instruction tell us about the application of

22    that affirmative defense and what you'll need to consider?

23    Let's look at Instruction No. 17.  This was the affirmative

24    defense instruction that I talked to you about at the

25    beginning of the case.  It is important to pay attention to

1    the application of this instruction to not just government,

2    but government contractors.  It is there in the first line.

3    It is an affirmative defense to plaintiffs' claims if the

4    Minimum Wage Act discriminates against the federal government

5    or its contractors.  In short, government contractors get the

6    benefits of state government when they are doing the

7    government's work.

8        What does that mean on the facts that you have heard?

9    Hypocritical.  You heard Mr. Whitehead say in opening it

10   wouldn't be right for the State to be hypocritical on this

11   minimum wage issue.  He told you if the State was operating

12   similar programs for inmates and detainees and paying them

13   less than the minimum wages, it wouldn't be right.  GEO

14   absolutely agrees.  It's not right, and this case is totally

15   hypocritical.  The State has people in its custody who work

16   in its institutions who are not paid minimum wages.

17       When you consider the discrimination, it is an unusual use

18   of the term "discrimination."  It's not the way you usually

19   think of it in the employment context, but it's nonetheless

20   applicable here.  What is important to remember is that

21   governments have all sorts of different purposes.  There is

22   not going to be a precise and exact comparator for the

23   Northwest ICE Processing Center because it's a federal

24   governmental facility.  There is no comparator state function

25   that addresses immigration in the state.  That's not the

1  question.  The question is:  Are they substantially similar?

2  The number one thing you have to look at in substantial

3  similarity, what is substantially similar is that they are

4  governmental programs, and the individuals are in detention.

5  We are dealing with a population, like it or not, whom the

6  government, for some reason or another, has decided needs to

7  be in state custody, or in this instance at the Northwest ICE

8  Processing federal custody.  Governments are allowed to

9  decide what the purposes are and what the policies are for

10  having them there.  Governments are allowed to decide how

11  they treat them there.

12      There is commonality among how governments treat people

13  they detain because there is commonality on the policy

14  implications of having people detained.  Specifically having

15  people detained results in isolation and just sitting still

16  in a way that can drive you crazy if you don't have something

17  to do.  There is a need to participate in the process.  It is

18  a process that is there to serve the individual needs of

19  those people who are there and broader policy concerns that

20  implicate government programs.  It is because of that,

21  sitting idle and needing something to do and avoiding the old

22  adage of the devil's idle hands are the devil's work shop.

23  It is known, we recognize it.  It is common and there were

24  several witnesses who testified to the need to do that, both

25  in state programs and in the Northwest ICE Processing Center.

1        So what information can I give you that helps you apply

2   this standard?  I can tell you where it came from.  It came

3   from the exemption in the Minimum Wage Act that is specific

4   for any resident, inmate or patient of the state, county or

5   municipal correctional, detention treatment or rehabilitative

6   institution is not an employee under the Minimum Wage Act.

7        It doesn't really matter if you look at the definition

8   whether the purpose is correctional, detention, treatment or

9   otherwise.  It is when you are in state custody that matters.

10       The distinguishing characteristic that plaintiffs told you

11  in opening was it is all about GEO being a private

12  corporation.  Wait a minute.  A private corporation in and of

13  itself isn't a bad thing.  Private corporations, as

14  Dan Ragsdale told you, serves a legitimate public function at

15  much more cost effective terms than government can sometimes

16  do these services themselves.

17       What do we look towards and look at to address the private

18  contractor issue?  Well, Labor & Industries has issued an

19  employment standard on the applicability of the Minimum Wage

20  Act that you have at Exhibit 321.  Take a look at the current

21  version.  It mirrors the statute and it says, "Residents,

22  inmates or patients of state, county or municipal

23  correctional, detention, treatment or rehabilitative

24  institution assigned by facility officials to work on

25  facility premises for a private corporation at rates

1  established and paid for by public funds are not employees of

2  the private corporation and would not be subject to the

3  Minimum Wage Act."

4      Plaintiffs try to say yeah, yeah, yeah, but GEO, GEO owns

5  the property and that must be a substantial difference.  That

6  is a red herring.  It is not a substantial difference because

7  ICE leases the premises for exclusive federal use.  ICE is on

8  site.  It is operationally controlled by ICE, that's what

9  facility administrator Bruce Scott told you.  He has

10  individuals, officers in charge from ICE whom he reports to

11  and who scrutinize his program at that facility.  There are

12  federal judges at that facility.  It is an ICE operational

13  immigration processing center and it was designed to serve a

14  federal governmental function.  That's what GEO does.  It

15  provides that service.

16      Other indications that the private status of a corporation

17  is not a distinction or is a distinction without a

18  difference.  It may be a distinction if the private

19  contractor serves no government purpose or doesn't provide

20  the services or goods for the government function and the

21  policies that the government is trying to achieve by

22  detaining people.  But Ms. Sytsma told us that private

23  companies who are buying services or products for

24  governmental purposes may have the benefit of reduced labor

25  costs associated with the products and services they can

1   purchase from Correctional Industries where those individuals

2   providing the products or services have been paid wages

3   comparable to those at the ICE processing center.  It is the

4   same thing.  They are substantial similarly.  It is all

5   subminimum wage work by individuals who are detained.

6   Legally detained, criminal, civil, whatever.  That's the

7   comparator.

8        How much of a mirror image are the programs?  Here is a

9   table to help you walk through that.  What are the important

10  characteristics and similarities?  Both are administrative

11  confinement when you are dealing with a Special Commitment

12  Center.  Seems like the plaintiffs are trying to suggest that

13  somehow sex offenders don't deserve the same treatment or

14  should be distinguished, it is a distinguishing

15  characteristic that they are sex offenders there.  They have

16  served their time.  They are functioning in an environment

17  where the state has kept them in a facility that the state

18  operates for lots of money and, as part of their service to

19  that detention, they work.  They are given some of the

20  dirtiest jobs out there.  You heard from Mr. Eagle.  Some of

21  the jobs they are given is that of like a nursing assistant,

22  cleaning up after their fellow detainees who aren't very

23  respectful about their own bodily functions and make quite a

24  disastrous mess out there.  You didn't hear that that's what

25  GEO was doing.  You heard at GEO the detention officers

1   worked right alongside the detainees.  They got done what

2   needed to get done, and the detainees were given specific

3   tasks that were not that gruesome, not that dirty and not

4   that disgusting and the detainees aren't that disgusting in

5   terms of their care and maintenance and taking care of

6   themselves.  They weren't sending dirty laundry to the

7   facility every day.  They were respectful adult people.

8       We are talking about subminimum wage stipends.  They are

9   both called stipends in those programs.  What are the tasks?

10  They are tasks that are necessarily associated with the

11  housing needs of a facility.  Institutionalized care requires

12  laundry, cleaning, meal preparation.  It is part and parcel

13  of the function of an institutionalized care that's always

14  done under governmental authority.  That's what happens in

15  these two programs.  Paid employee officers supervise the

16  safety and security and work right alongside the confined

17  individuals.  Same thing down at the Northwest ICE Processing

18  Center.  Both are given meaningful opportunities and not

19  nonsense work.  It is serious work.  It is real work, but it

20  is not minimum wage work.

21      Correctional Industries, you have a whole population of

22  labor force that generates over one hundred million dollars

23  for Correctional Industries every year.  It is not correct to

24  say that government isn't a for-profit corporation.  While

25  government is a government entity, Correctional Industries

1  operates at a profit and it pursues a profit using subminimum

2  wage labor by the detainees who it has under its custody.

3      What kinds of things do they ask them to do?  Well, they

4  call their subminimum wage a gratuity.  GEO calls it and ICE

5  calls it a stipend.  Whatever.  It is not minimum wages.

6  What kind of tasks?  Cleaning, laundry and meal preparation.

7  Same kind of basic functions that go on when you have a

8  locked facility, meeting the housing needs of its detained

9  population that the government puts there.

10      Paid employee officers supervise the safety and security

11  and work alongside confined individuals.  You heard that's

12  the way it works in both programs.  What you certainly heard,

13  certainly recognize that those kinds of activities, cleaning,

14  laundry, meal preparation, that provides a certain skill set

15  but not a particularly unique skill set that individuals

16  don't learn as they become adults, meal preparation, laundry,

17  cleaning.  It is not so particularized that it is widget

18  making or welding.  Nobody down at the Northwest ICE

19  Processing Center is developing widgets for sale or anything

20  else.  That's not what we are talking about.  We are talking

21  about the basic necessities, activities of daily living that

22  just need to get done when you are living in common with

23  others in government custody.

24      When you talk about numbers, this is an interesting slide

25  we put together because we understood that plaintiffs would

1    be talking a lot about big numbers involving GEO.  But look,

2    if Correctional Industries didn't have the advantages of

3    subminimum wage workers, the kind of number we are talking

4    about, the cost savings is $45 million.  Certainly the state

5    advantages itself off subminimum wage workers.  They do that

6    and it is unbelievable that they are complaining that the

7    federal government, through its contractor GEO, is doing a

8    similar thing.  It is the way it operates.  It is what is

9    done in detention to maintain the facilities and offset some

10   of the costs.

11         Then we have Rainier School.  Certain individuals who

12   can't care for themselves, they are disabled workers, they

13   must care for their facility too.  You heard residents held

14   in state custody for their disabilities were not paid minimum

15   wages for years.  They were doing widget making.  They were

16   making things for Dale Chihuly, the artist, at subminimum

17   wages.  How then can it be that here we are dealing with an

18   allegation that a federal governmental contractor is

19   utilizing, as required in a voluntary work program, the

20   individuals it is housing on behalf of ICE down at the

21   Northwest ICE Processing Center.  It is really something that

22   needs to be changed congressionally.  If there a problem

23   with the way it is working, it is Congress's to fix it.

24         The proposal that they be paid minimum wages suggests, or

25   if not minimum wages, hiring outside workers, suggests it is

 1    not detention.  The idea that you would bring somebody in

 2    from the outside to make beds or clean somebody else's

 3    laundry, it kind of avoids the obligation of personal duties

 4    and responsibilities we all have for ourselves as

 5    individuals.  Why shouldn't taking care of yourself be part

 6    of your duty and responsibility even if it is commonly when

 7    there is a number of you living together in the same place?

 8    Why shouldn't that be an activity that you can undertake in a

 9    voluntary work program setting and not have it be subject to

10    the minimum wage?  It just doesn't make sense that it would

11    be any other way.

12        In fact, Ms. Wells actually found it laughable to imagine

13    that in state institutionalized care, there would be such a

14    thing as a hotel model.  Residents, even those with severe

15    disabilities, are encouraged and supported to take care of

16    the activities of daily living that help the operational

17    needs of the facility in which they are residing.

18        Where does that leave us?  I don't know.  The State

19    programs compare exactly to the voluntary work program.

20    Their detention facilities, like it or not, whatever the

21    reasons are, whatever the programs are, they do compare

22    because they are government programs meeting the needs, a

23    need the government has decided must be met for purposes of

24    the safety, security of the individuals and the country and

25    the community.

1          Here are some of my closing thoughts.  This case is the

2    wrong place to make sweeping policy changes that have the

3    potential to do real harm.  Nobody has disputed the value of

4    the voluntary work program.  This lawsuit should not be the

5    end of it.  The voluntary work program should remain a

6    detention work program and not be reimagined as employment.

7          I want to take a minute to revisit some of the

8    instructions.  In opening -- in closing by the State and the

9    party plaintiffs, they kept going back and forth to

10   Instruction 15, Instruction 13.  Why did they do that?  They

11   wanted to present this instruction almost as if it is telling

12   what you the right answer is.  They changed the word from

13   "includes" to "means."  Well, "means" is the wrong word.

14   Jury Instruction No. 13, "'Employ' includes permit to work.

15   'Employee' includes any individual employed by an employer.

16   'Employer' includes any individual, partnership or

17   association."  The word is "includes" because this is your

18   case to decide.  You've got the facts.  You get to make the

19   final determination.  It is not in reference to this

20   instruction.  This instruction is not intended to tell you

21   what the answer is.  You get to make the decision because

22   "includes" means it is part of the puzzle.  You get to put

23   together all the puzzle pieces and reach the final right and

24   fair and just answer.

25          Instruction No. 15.  This is the one they really like on

1    voluntary.  Volunteers and whether or not they receive less

2    than minimum wage for volunteers is no defense.  Well, let's

3    talk about this again.  Is Instruction 15 even important if

4    you don't come to the conclusion that they are an employee?

5    It doesn't.  Look at these words.  Are those all highlighted?

6    I can't tell on my screen.  I don't know if I need to push a

7    button for you to see those, but it is my intent that I

8    highlight the word "employ," "employer" and "employee."

9    Instruction No. 15 is an instruction that pertains to a

10   determination that someone is in fact an employer, someone is

11   an employee and they are allowing the employee to receive

12   less than minimum wage under some sort of agreement between

13   the two of them.  That's not this case.  We don't get to that

14   place because they are not employees.  GEO does not employ

15   the detainees.  GEO is not their employer.  The detainees are

16   not the employee.  This instruction has no application to

17   this case with regard to whether or not they are employees.

18   It may be an issue that you can consider in the context of, I

19   don't know, is GEO saying that volunteers, that their time is

20   charitable?  No.  You can't.  That's not what we are talking

21   about.  It doesn't -- it is not an instruction that you get

22   to absent reaching the conclusion that they are employees.

23        Remember, you have the evidence in this case.  You have

24   the discretion to decide.  It is your decision to make.  This

25   case goes to you so you can apply the law and the facts and

1    come to the right conclusion.

2         Where does this leave us on the verdict form itself?

3    Well, we will just revisit that.  The first instruction, or

4    the first question asked on the verdict form, the answer is

5    no.  Don't think you need to go any further.  If you get to

6    2, the answer is yes.

7         That really concludes my presentation today.  I know I

8    have put a lot of material in front of you, put the pieces

9    together in a way that tries to make sense of all of it.  You

10   are the jurors that get to decide this case.  GEO appreciates

11   your time and effort and hopes that you do the right thing to

12   come to the right conclusion when you finally enter your

13   answers on the verdict form.

14        Thank you very much.

15        THE COURT:  Thank you, Ms. Mell.  Ms. Brenneke, are

16   you next?  Please give your attention to Ms. Brenneke, who

17   may offer rebuttal argument.

18        MS. BRENNEKE:  Thank you, Your Honor.  I'll be

19   extremely brief.  GEO wants to have everything both ways.

20   Detainees do important work because that is required by the

21   contract, but at the same time the jobs are just make work.

22        You know what the evidence shows.  This is real work.

23        GEO can only hire authorized workers, but at the same time

24   can use thousands of immigrant workers a year to run its

25   facility.  You know the minimum wage law applies to workers

1    regardless of immigration status.

2        GEO can use only employees to run its facility, but at the

3    same time extensively uses detainee volunteers to perform its

4    work operations.  You know that the law doesn't allow GEO to

5    use volunteers to run its center.  Most obviously, that GEO

6    is a private company that gets to keep its profits, but at

7    the same time deserves to be treated the same as the

8    government.  You know GEO is not the government.  You can

9    tell the difference because the government is here enforcing

10   the law and GEO is here resisting it.

11       This is the bottom line:  We ask you to reject GEO's

12   defense that the 60-year-old minimum wage law somehow singles

13   GEO out for worse treatment.  The minimum wage does not apply

14   to facilities run by federal, state or local governments.

15   GEO says it's the same, that it's the same as a government.

16       Talk about a square peg in a round hole.  The mission,

17   financials, programs, clinical treatment and accountable

18   measures are just too different.  GEO is a for-profit company

19   and you should treat it like every other for-profit company

20   in our state.  We ask you to find that GEO is not above the

21   law.

22       THE COURT:  Thank you, Ms. Brenneke.

23   Mr. Whitehead.

24       MR. WHITEHEAD:  Thank you, Your Honor.  I am glad

25   Ms. Brenneke went first because I am left scratching my head

1    about many of the things we just heard.  GEO has taken a

2    number of positions throughout this trial and frankly made a

3    number of promises it hasn't kept or followed up on.  On the

4    very first day of trial, counsel told you the volunteer task

5    that they do, the detainee workers are more like chores.  We

6    just heard during closing, counsel told you that the work is

7    designed to increase the operational efficiency of the

8    facility.  Acknowledging that it is real work.  That's

9    frankly consistent with the evidence that we have heard at

10   trial.  There is no choice but to concede that point.  We

11   have seen an industrial kitchen operation, industrial

12   laundry.  This is work on a massive scale.  You have seen

13   detainees operating heavy buffers and floor equipment.

14   Chores are making your bed and throwing away your personal

15   garbage.  That's what Goodluck testified to, just being a

16   good person.  I am not sure why counsel is twisting his

17   testimony.  He was talking about being conscientious and

18   cleaning up after himself.  You heard him.  He was very clear

19   when he testified at trial that the work he did on a daily

20   basis, cleaning the shower behind 50 and 60 other men was

21   work, and hard work at that.  This was more work than GEO is

22   leading onto, and apparently GEO is now finally acknowledging

23   what we've known all along and what I said would happen at

24   the outset.  This is real work.

25        The point of the voluntariness of the work.  At the

1    beginning of trial, counsel told you that this case was about

2    the plaintiffs' attempt to convert what is a volunteer

3    program into employment.  You will recall that throughout

4    trial, GEO's employees went out of their way to describe the

5    work as voluntary in nature.  GEO just retreated from this

6    position and acknowledged that whether people sign up of

7    their own accord is no defense in this case.  You heard from

8    GEO about the wonderful recreational opportunities available

9    at the detention center and how there are tournaments and

10   Xbox and what not.  GEO has argued all the while that people

11   worked in the detainee worker program just to kill time.  It

12   doesn't make sense.  Why would someone volunteer to clean

13   showers or handle soiled laundry just for fun and kill time?

14   Use your common sense.  You will see the only answer is

15   people did these jobs for money.

16       GEO has talked about thugs and dangerous people inside the

17   facility throughout trial.  We have heard this testimony.

18   But at the same time, GEO personnel has consistently

19   testified about their positive personal interactions with the

20   detainee population.  Which is it?  GEO tells you now during

21   closing argument not to decide this case on policy grounds or

22   because you wish the law was different, while at the same

23   time telling you to ignore the Minimum Wage Act and the

24   Judge's jury instructions that show GEO is an employer.

25   Disregarding the law and the jury instructions would be an

1    act of policy making.  You would be allowing rich

2    corporations to flout our laws as a state.  It is confusing.

3    I mean, really, GEO doesn't need to tell a coherent-hair

4    story.  They hope to get you distracted, confused or worried

5    enough maybe, just maybe, someone will decide this case on

6    something other than the evidence and the law.

7         I know you have been diligent.  I know that you have been

8    paying attention.  I know you will base your decision on the

9    jury instructions which you have heard in this virtual

10   courtroom.  There has been talk of Jury Instruction No. 13

11   and a discussion about the fact that the definition of employ

12   includes to permit work.  I didn't hear from counsel the

13   importance of the distinction that was being drawn.  I tell

14   you it is a distinction without a difference.  It's like

15   saying the Mariners are a major league baseball team and

16   objecting when someone says well, a major league baseball

17   team would include the Mariners.  What we have shown is GEO

18   has permitted work.  It fits within the definition that

19   Your Honor has given to all of us.  That's the end of the

20   story.

21        In a few moments, you'll receive a verdict form from the

22   Court.  The first question, I am not going to put it up on

23   the screen; you have seen it enough.  It reads, "Under the

24   Washington state Minimum Wage Act, did GEO employ detainee

25   workers in the voluntary work program at the Northwest ICE

1    Processing Center?  "Because we have satisfied the definition

2    and shown the definition of employment is met, as defined in

3    Jury Instruction No. 13, you should write yes in response to

4    the first question on the verdict form.

5         The second question asks, "Does the Washington state

6    Minimum Wage Act discriminate against GEO?"  Because the

7    State doesn't operate any similar programs as explained by

8    Ms. Brenneke and, as shown by the evidence, it doesn't,

9    therefore, discriminate against GEO.  You should answer the

10   second question as no.

11        So I told you before this is an important case.  Again, it

12   is not because you are being asked to weigh in on some

13   cultural war or the country's immigration policies, but

14   because you get to decide as a community of jurors whether

15   companies like GEO are answerable only to their shareholders

16   or to our laws that promote public welfare.

17        With all due respect to Mr. Brian Evans, GEO's chief

18   financial officer that testified that GEO would never pay

19   detainee workers the minimum wage, GEO doesn't get to decide

20   our community standards or the law.  If an employee pays its

21   employees less than the minimum wage, the law requires the

22   employer to make it right.  We are asking you to hold GEO

23   accountable for its choices.  We are asking you to make this

24   right.

25        Thank you for your time and your service.  I look forward

1    to seeing you when you return a verdict in this case.

2          THE COURT:  Thank you, Mr. Whitehead.

3      Ladies and gentlemen, you may commence your deliberations.

4    You'll be private at that time and not involved with the rest

5    of us.  We will await your judgment.  You will have the

6    exhibits admitted in evidence, the verdict form, and also

7    your notes available to you.  You may now commence your

8    deliberations.

9      Timing on this is, I won't set any deadlines at this

10   point.  I like to leave that up to juries, to some extent.

11   If you have some issue with time or you want to stop, or

12   whatever, communicate that to Tyler and he will bring it to

13   me and we will decide on that.

14     Anyway, the case is in your hands.  Thank you.  We will

15   be -- the rest of us will be adjourned.

16    (The following occurred outside the presence of the jury.)

17          THE COURT:  We'll see what happens now.  Thank you,

18   all.  I thought the arguments were very good all the way

19   around.  We will see what the jury does.

20          MS. BRENNEKE:  Thank you, Your Honor.

21                      (Recessed.)

22

23

24

25

1

2

3                       C E R T I F I C A T E

4

5

6       I certify that the foregoing is a correct transcript from

7   the record of proceedings in the above-entitled matter.

8

9

10

11  /s/ Angela Nicolavo

12  ANGELA NICOLAVO
    COURT REPORTER
13

14

15

16

17

18

19

20

21

22

23

24

25