**BRENNEKE DECLARATION**

**EXHIBIT A**

```
                    UNITED STATES DISTRICT COURT

               WESTERN DISTRICT OF WASHINGTON AT TACOMA
 _____

                                    )
 STATE OF WASHINGTON,                ) 3:17-cv-05806-RJB
                                     )
               Plaintiff,            ) Tacoma, Washington
                                     )
 v.                                  ) November 2, 2021
                                     )
 THE GEO GROUP, INC.,                ) Bench Trial
                                     )
               Defendant.            ) 2:30 p.m.
                                     )
 _____

                   VERBATIM REPORT OF PROCEEDINGS
              BEFORE THE HONORABLE ROBERT J. BRYAN
                   UNITED STATES DISTRICT JUDGE
 _____
```

Rough Draft

Proceedings stenographically reported and transcribed
With computer-aided technology

Angela Nicolavo - Court Reporter - 1717 Pacific Ave, Tacoma, WA - 253-882-3832

```
 1

 2
                          APPEARANCES
 3

 4   For the Plaintiff        MARSHA J. CHIEN
     State of Washington:     ANDREA BRENNEKE
 5                            LANE POLOZOLA
                              800 Fifth Avenue
 6                            Suite 2000
                              Seattle, Washington
 7

 8   For the Defendant        WAYNE H. CALABRESE
     The GEO Group:           JOSEPH NEGRON, JUNIOR
 9                            The GEO Group
                              4955 Technology Way
10                            Boca Raton, Florida

11                            AL ROUNDTREE
                              Fox Rothschild LLP
12                            1001 Fourth Avenue
                              Suite 4500
13                            Seattle, Washington

14

15

16

17

18

19

20

21

22

23

24

25
```

Rough Draft

```
                                        AFTERNOON SESSION
                                        NOVEMBER 2, 2021
        THE COURT:  Good afternoon.
    Before I embark on findings, there are a couple of
preliminary matters.  The first is exhibits marked as A-304,
A-309 and A-310 were offered in evidence.  They may be
admitted.  They are basically statements of law.  They may be
admitted.
    I also wanted to say one other thing preliminarily, and
that is that all exceptions to the Minimum Wage Act and
affirmative defenses have been resolved against the
defendants, over a long period of time in this case.
    The last one, the last affirmative defense that was still
alive at the time of the trial was the derivative sovereign
immunity defense.  That went by the wayside as well.  I
wanted to make it clear on the record that the reason for
that is that the defense did not put up evidence at trial to
support that defense.  In fact, it went by the wayside based
on the agreed facts in the case.  It was not proven.  That is
also out of the case.
    This is the time for Findings of Fact and Conclusions of
Law in the third phase of this case.  As I indicated the
other day, it is my habit to give oral opinions, including
Findings of Fact and Conclusions of Law.  They need not be
reduced to writing under Federal Rule of Civil Procedure
```

*Rough Draft*

```
 1    52(a)(1).  That rule requires that findings and conclusions be
 2    stated separately.  I try to do that, but there are some
 3    mixture of findings and conclusions when one gives an oral
 4    opinion.
 5         My first finding are the admitted facts that are found in
 6    the pretrial order and in the preliminary jury instructions
 7    submitted to the jury early in this proceeding.  I adopt
 8    those agreed facts as my Findings of Fact, which covers part
 9    of the issues in the case.
10         I have before me, in addition to those agreed facts, the
11    events of the joint trial and the events of the short
12    addition to trial that was held without a jury.  I have the
13    jury's verdicts before me.
14         The information presented is considerable.  A lot of it I
15    need not comment on, but there is a great deal I need to
16    comment on in making findings and conclusions.
17         One thing that I found in this case is that there was no
18    substantial change in the voluntary work program or in the
19    way it operated from 2005, the time of the contract between
20    GEO and ICE, until now.  It is appropriate that we consider
21    all of that time, not only the time from the start of this
22    lawsuit in 2017.
23         This case has been based not only on what has been
24    occurring on the site of the detention facility, but also it
25    is based on the ICE-GEO contract.  That contract is found at
```

1  Exhibit 129.  It is a complex contract.  In order to fully
2  understand it, one has to be aware of and consider Exhibit
3  127, which is the PBNDS standards that I will refer to as
4  "standards." It is in those standards that we find that the
5  minimum wage to be paid to detainees engaged in the voluntary
6  work program is "at least a dollar a day."
7      I think I should first address here the purpose of the
8  contract.  That is found in a couple of places in the record,
9  and I have decided I should refer to the Bates stamp pages
10 because the paging in the contract and the standards can be
11 quite confusing.
12     There are two places that the purpose of the contract
13 between ICE and GEO are set out.  One is at Exhibit 129.  I
14 will be referring mostly to that contract here at Bates
15 No. 036867.  The objective of GEO and US Immigration and
16 Customs Enforcement contract is to obtain a facility for the
17 detention, transportation and food services for the detainees
18 located in the Seattle, Washington area.
19     At another page or pages it goes on to say, and this is at
20 Bates 03869, the GEO contract with ICE to provide detention
21 management services, including the facility, detention
22 officers, management personnel, supervision, manpower,
23 training certificates, licenses and supplies.
24     GEO also agreed there to be responsible for other
25 ancillary services, including, but not limited to,

```
 1    transportation and food service.
 2         The ancillary services mentioned in the contract,
 3    obviously, from all the evidence in the case, include
 4    maintaining a clean environment, laundry services, food
 5    services, and barber services.
 6         The purpose of the contract is also found in great detail
 7    in the contract at Bates Nos. 036881 to 883.  I don't need to
 8    go through all of that.  What is clear from those provisions
 9    is that GEO was to provide certain core services, including
10    food service, laundry, cleaning, and barber services.  It is
11    those things that are mostly at issue in this case.
12         The purpose of the voluntary work program, the program, of
13    course, being at the heart of this case, is found a couple of
14    places in the standards and in the contract.  The standards
15    provides that the purpose of the voluntary work program,
16    according to the standards, is to provide detainees
17    opportunities to work and earn money while confined, subject
18    to the number of work opportunities available and within the
19    constraints of safety, security and good order of the
20    facility.
21         It is clear under the contract, GEO agreed to develop a
22    detainee work program that is voluntary and may include work
23    or program assignments for industrial, maintenance, custodial
24    service or other jobs.  In that provision, it also says the
25    detainee work program shall not conflict with any other
```

1    requirements of the contract and must comply with all
2    applicable laws and regulations.  That covers the purposes of
3    the voluntary work program.
4        The next issue is the question about whether there is a
5    necessity for GEO to follow state laws, including the Minimum
6    Wage Act.  Besides the provision that I just referred to,
7    there are many places in the contract that indicate that part
8    of GEO's requirements is to comply with all federal, state
9    and local labor laws and codes, and all applicable federal,
10   state and local laws and codes.  It is also clear that the
11   contract indicates that if there are the issues about those
12   standards, the most stringent standard shall apply.  That
13   language being at Bates 06876.
14       Those provisions speak of the applicability of State laws,
15   and the only evidence in the record that the State Minimum
16   Wage Act did not apply to the voluntary work program and to
17   detainees came from a couple of witnesses who opined that the
18   Minimum Wage Act was not applicable under the contract.  They
19   gave no reason for their opinions, except the argument was
20   made that GEO has never interpreted the contract to include
21   the Minimum Wage Act as applicable at all.  That is no
22   argument at all.  There is no information in the record that
23   indicates that that particular local labor law, the Minimum
24   Wage Act, should not apply.
25       In that regard, I wanted to refer further to the

1  constraints on the contract that GEO was obligated to know,
2  and I think to apply.  That appears at Bates 036868.  There
3  are not just one, but four constraints that are, I think,
4  important to consider in regard to the applicability of the
5  Minimum Wage Act.
6      Constraint (p) refers to "applicable federal, state
7  facility codes, rules, regulations and policies."
8      (q) provides the constraint that they "must follow
9  applicable federal, state and local labor laws and codes."
10     (r) provides they are "to follow applicable federal, state
11 and local firearm laws, regulations and codes."
12     Lastly in this group, subparagraph (s) provides that "GEO
13 should consider alignment with external sources," that is
14 state and local law enforcement organizations.
15     It is clear from those four provisions that there's a
16 build-in to the contract an expectation that GEO will
17 consider local laws and decide, based on facts and evidence,
18 as to what should apply, and should not just come to the
19 conclusion that something applies or doesn't apply based on
20 the whim of GEO.
21     I must say I found the testimony of those witnesses who
22 opined that the Minimum Wage Act was not applicable was not
23 believable.  I think they came to that conclusion for reasons
24 other than the merits that were to be considered under the
25 terms of the contract.

1    I want to comment here also that the reimbursement rate in
2    the contract is not relevant to the issues in this case,
3    whether the reimbursement rate goes up in the future to cover
4    higher wages to detainees is unknown.  It is clear from the
5    agreed facts that GEO could pay more regardless of that
6    reimbursement rate.
7        As I indicated, it is also clear that there are core
8    obligations of GEO in the case and that the detainee workers
9    under the voluntary work program were not to be used to
10   perform the responsibilities or duties of an employee of the
11   contract.  It appears to me that that is largely what brings
12   us here today is that the voluntary work program detainees
13   were doing substantially the core work required of GEO under
14   the contract.
15       I would comment in that regard on the testimony of
16   Bertha Henderson, the main head cook, who seemed like a nice
17   lady and a competent head cook.  She testified at great
18   length about her responsibilities of leadership and
19   management of the food service program.  As she testified, my
20   mind went to, well, who is doing the work?  The answer was
21   the very many members of the detainee work program, who are
22   doing various parts of food preparation and food service and
23   doing the work that the contract required be done by GEO.
24       It is my conclusion from all the evidence in the case that
25   GEO, by ignoring the Minimum Wage Act and misusing the

1  detainee labor to do core work that was required of GEO under
2  the contract and that they were not to be doing under the
3  contract, that GEO profited and continued to violate the
4  Minimum Wage Act by paying the minimum of only one dollar a
5  day.
6       Those are my Findings of Fact on the first portion of the
7  case.
8       It is my conclusion that the jury's two verdicts were well
9  supported by the evidence, and I agree with those findings of
10 the jury and with those verdicts and that is part of my
11 Findings and Conclusions.
12      Now, let me turn more directly to the basis for the
13 State's claim.  The State has brought this action under the
14 State's parens patriae authority, alleging unjust enrichment.
15 The defendant's have argued that the State has the burden of
16 proving that there is no legal remedy available to them as a
17 condition for any equitable relief.
18      I want to point out something that seems to me to be
19 important in this whole analysis.  The members of the class
20 are part of the State's representation of those harmed by
21 failure to pay the minimum wage.  They are, along with all
22 the other people protected by the Minimum Wage Act, part of
23 who the State has brought this case on behalf of.  You can't
24 separate them out as not being part of the body of people
25 that are protected by the Minimum Wage Act.

1  There is a legal remedy to that extent that the jury has
2  already ruled on, but there are the rest of the people
3  protected by the Minimum Wage Act for whom there is no legal
4  remedy.  It is appropriate to examine the evidence to
5  determine whether the unjust enrichment claim has been made
6  out.
7      In that regard, the Consumer Protection Act in the Revised
8  Code of Washington 19.86 does not apply.  It is not the basis
9  for the State's claim, and it is limited by its terms to
10 consumer protection.  So it is not relevant here.
11     What is relevant to the State's claim is the law as it
12 occurs in the State case of *Young vs Young* found at 164 Wn.2d
13 477.  The *Young* case differentiated between quantum meruit
14 and unjust enrichment, and this language is from that case:
15 "Unjust enrichment is the method of recovery for the value of
16 the benefit retained, absent any contractual relationship,
17 because notions of fairness and justice require it.
18     "Unjust enrichment occurs when one retains money or
19 benefits, which in justice and equity belong to another."
20 That page went on to say, "The three elements that must be
21 established in order to sustain a claim based on unjust
22 enrichment: a benefit conferred upon the defendant by the
23 plaintiff; an appreciation or knowledge by the defendant of
24 the benefit; and the acceptance or retention by the defendant
25 of the benefit under such circumstances as to make it

1  inequitable for the defendant to retain the benefit without
2  the payment of its value."
3     This case is different.  It doesn't have the same factual
4  background, the same parties as *Young*.  To interpret that
5  case and to apply it here, it appears to me the first
6  requirement is a benefit conferred on GEO by the State of
7  Washington.  That is, the benefit is the failure to pay the
8  minimum wage or the failure to collect the minimum wage for
9  many years.
10    As to knowledge of the benefit they were getting, GEO knew
11 or should have known that payment under the Minimum Wage Act
12 should have been made and considered.
13    Last, is it unfair for GEO to retain the benefit?  The
14 answer to that is "yes."
15    There was a lot of argument on the last day about the
16 equities because the last requirement of proof is unfairness.
17 That is sort of a moving target, because what is fairness to
18 one person may not be fairness to another.  The Court needs
19 to consider, in that regard, the totality of the
20 circumstances. I wanted to point out a few things, although I
21 am not sure how important this analysis is to the bottom
22 line.
23    First, GEO has argued that they should not have been aware
24 or should not be required to have been aware of the Minimum
25 Wage Act.  Ignorance of the law is no excuse.  Everybody in

1  the State is obligated, if they permit people to work, that
2  the Minimum Wage Act applies.
3      Deliberate ignorance should not be rewarded.  It appears
4  to me that the position of GEO was not necessarily ignorant,
5  but more deliberate ignorance.
6      There was argument on other matters.  There are statutes
7  of limitation.  Most in the State, I think, are three-year
8  statutes.  There are some two-year and some longer.  That is
9  true that most claims have limitations periods.
10     There is a reason for this claim and claims like it not
11 having a statute of limitation, and that is because there
12 have been some 16 years of failure to follow the law and the
13 contract and 16 years of unfairness to detainees involved in
14 the voluntary work program.
15     GEO also argues that the State doesn't pay its detainees,
16 and it maintains a voluntary work program in some of its
17 institutions.  The exception for state governmental programs
18 is clear on the law, and it is there for good reason.  This
19 program, under a control of the private corporation, is
20 different than the provision in the Minimum Wage Act
21 regarding State programs.
22     There was much argument and now evidence in the record
23 about the Department of Labor & Industry's early conclusions
24 about this issue, and doubts they had about whether the
25 Minimum Wage Act could be enforced against GEO.  Those

1  debates never were with GEO or ICE.  They were discussions

2  that people had, but there was no formal State judgment or

3  determination that the Minimum Wage Act did not apply.

4      Also argued as a matter of equity is the question of the

5  government's interest and their notice of interest in this

6  case.  That was litigated to some extent some time ago, and

7  I, frankly, thought it was misplaced interest.  The question

8  is:  What about now, what is the government's interest?

9      I think ICE's absence from this case speaks volumes.  As

10 near as I can tell, the government's interest and ICE's

11 interest is in having the contract enforced according to its

12 terms.  I guess that is all I have to say about that.

13     The equities in the case in considering the totality of

14 the case and the circumstances, the equities favor the State.

15 The amount of the remedy to the State is not based on

16 comparative equities.  It is based on the unfairness of the

17 amount that GEO should have paid and did not.

18     Now, I am coming to the question of what remedy should be

19 provided here.  The first issue in this regard was whether

20 the Court should consider the minimum wage or the prevailing

21 wage.

22     In looking at Dr. Nickerson's numbers and estimates, it is

23 my judgment that all of the voluntary work program detainees

24 that worked at the GEO facility were for jobs at the entry

25 level as unskilled labor.  Some of them, of course, had more

1   skills than others.  What they were used for in the kitchen,
2   in the food service, in the pods, in the laundry, was
3   entry-level, unskilled work.  I think it is not appropriate
4   to use prevailing wages for those things, based on some other
5   standard, other than the minimum wage program.  I think the
6   minimum wage program is what the standard should be.
7         Now, Dr. Nickerson's estimates and numbers have not been
8   challenged.  It appears that they are reasonable.  He
9   multiplied the estimates of hours worked by minimum wages
10  going back to 2005 up to the present and computed out those
11  figures, and then deducted from them the one dollar per day
12  wages actually paid to detainees.  He got the bottom line of
13  $23,237,403.  That seems to me to be an appropriate base.
14        I think it is inappropriate, as I indicated, to use some
15  standard of prevailing wages.  I think it is appropriate to
16  use the minimum wage as he did in the documents he presented
17  and in his testimony.
18        I think it is not appropriate to add to that number the
19  FICA addition.  The State and the citizens of the State
20  haven't lost that money.  It would not ever have been paid to
21  the State.  It seems to me not something that ought to be
22  added to the base number I mentioned.
23        It also seems to me that it is not appropriate to add the
24  interest figures that Dr. Nickerson ran for us.  These
25  numbers are only estimates, after all.  The citizenry, it

1  seems to me, has not, or the State has not lost those things.
2  It appears to me that it would be punitive to add those
3  things in, and we are dealing with a number that is not
4  sufficiently certain in amount to justify adding interest to
5  it or to attempt to multiply the number somehow upward to the
6  conceived present value. I think that exercise is too
7  speculative to be justified here.
8     We start with the basic figure from Dr. Nickerson of
9  $23,237,403 as reflected in his Exhibit No. 620.
10    The next question is whether the award to the class should
11 be deducted from that or not. It appears to me that the
12 class action has succeeded in recovery the same numbers that
13 are covered in that $23 million figure.  To have GEO pay that
14 number twice is a double recovery that would not be
15 appropriate.
16    The class members that recovered the $17 million verdict
17 are people permitted to work and within the broad group of
18 those protected by the Minimum Wage Act, so that is the same
19 number as the first $17 million of the $23 million that I
20 mentioned.
21    My bottom line is that we should subtract from $23,237,403
22 the $17,287,063 that was the class's recovery for a net
23 unjust enrichment against the Defendant GEO in the sum of
24 $5,950,340.  It is my Conclusions of Law that that amount
25 should be reduced to judgment in favor of the State.

1     Now, one can argue, of course, about unjust enrichment,
2  whether we are really talking about disgorgement.  It was not
3  possible from what was presented to find a reasonable number
4  to justify a disgorgement of profit.  The profits based on
5  GEO's acts are unspecified in the evidence, in my opinion,
6  and the unjust enrichment and restitution are the same
7  number.
8     I want to point out this is not a penalty.  I think that
9  the Court should not set out to penalize GEO, but rather to
10 try and even the playing field by the award of unjust
11 enrichment for monies that should have been paid and were not
12 paid. Now, that is part of what I must decide.
13    The State has also asked for an injunction.  I have
14 thought about that considerably from the beginning of this
15 case, without coming to very good conclusions, perhaps.
16    It seems to me that an injunction against GEO should be
17 issued to this extent:  GEO should be enjoined from
18 continuing operation of the voluntary work program as it has
19 been operating without paying detainee workers the minimum
20 wage.
21    Let me repeat that:  They should be enjoined from
22 continuing operation of the voluntary work program as it has
23 been operated without paying detainee workers the minimum
24 wage.
25    The Court will not require specific changes to the

```
 1    voluntary work program, nor do I know the effect of any
 2    changes to the Minimum Wage Act requirements.  I would not
 3    speculate as to the employment status of detainee workers if
 4    they are receiving the minimum wage.  I won't require
 5    reports.
 6        On the other hand, GEO should cooperate with the State as
 7    the contract contemplates in the listed constraints
 8    requirements, including the restraint (s), which requires
 9    "alignment with external sources," which includes the
10    Attorney General, which is a state law enforcement
11    organization as GEO should clearly now know.
12        Injunction is only directed at how things have been
13    operating and not how things might operate in the future.
14        I am mindful that I have made scores of controversial
15    decisions in these cases, and that the results are contrary
16    to what the defendant says are 150 court decisions that have
17    gone the other way.
18        I am not aware of any of those 150 cases that have the
19    extensive record of abuse of the voluntary work program and
20    detainees that exists in this case.  I am aware that many of
21    those cases wrongly conflate immigration detainees with
22    criminals under sentence or awaiting trial.
23        Immigration detainees, as a group, have not been found to
24    have committed any crime, but are awaiting civil procedures
25    that may lead ultimately to U.S. residence and citizenship
```

1  or, of course, may lead to deportation.

2  I learned at the National Judicial College in 1967 that

3  "judges should not turn their backs on the locked prison

4  gates."  That thought is even more important as it relates to

5  civil detention facilities.

6  I hope that other judges who review these proceedings will

7  not be swayed by the idea, as quoted in the *Ndambi vs

8  Corecivic* case at 990 F.3d, 369, that "fair payment for

9  prisoners is too outlandish to consider."

10  Judgment will be entered probably tomorrow, not only the

11  money judgment, but the limited injunction that I referred

12  to.

13  If there are any Findings that I have overlooked or

14  Conclusions that I have overlooked, you should bring those to

15  my attention by motion and I can supplement, if I have

16  omitted anything that is important.

17  Thank you, all.

18                    (The proceedings adjourned.)