1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10
11

STATE OF WASHINGTON,

CASE NO. C17-5806RJB

Plaintiff,

MEMORANDUM OF DECISION
INCLUDING AMENDED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

v.

THE GEO GROUP, INC.,

Defendant.

12
13
14
15
16

At the conclusion of the trial in this matter, the Court made oral Findings of Fact and

17

Conclusions of Law consistent with Federal Rule of Civil Procedure 52(a)(1).  Following

18

motions and recommendations of counsel (Dkts. 637, 655 & 662), the Court issued an order

19

making amendments and additions to clarify the oral Findings of Fact and Conclusions of Law

20

(Dkt. 664 filed December 8, 2021).

21

Following is the Courts' Oral Findings of Fact and Conclusions of Law with the

22

amendments and additions incorporated therein in **bold**, which comprises the Findings of Fact,

23

Conclusions of Law, and opinion:

24

1

2

AFTERNOON SESSION

NOVEMBER 2, 2021

3          THE COURT:  Good afternoon.

4          Before I embark on findings, there are a couple of preliminary matters.  Exhibits marked as

5     A-304, A-309 and A-310 were offered in evidence.  They may be admitted.  They are basically

6     statements of law.  They may be admitted.

7          I also wanted to say one other thing preliminarily, and that is that all exceptions to the

8     Minimum Wage Act and affirmative defenses have been resolved against the defendants, over a

9     long period of time in this case.

          The last one, the last affirmative defense that was still alive at the time of the trial was the

10    derivative sovereign immunity defense.  That went by the wayside as well.  I wanted to make it

11    clear on the record that the reason for that is that the defense did not put up evidence at trial to

12    support that defense.  In fact, it went by the wayside based on the agreed facts in the case.  It was

13    not proven.  That is also out of the case.

14          **If the federal contractor had no discretion, then derivative sovereign immunity**

15    **applies.  Here, ICE gave GEO discretion over the Voluntary Work Program and,**

16    **specifically, the rate of pay for detainee workers, and GEO admitted that it had discretion**

17    **to pay more than $1 per day.  (*See* Court's Preliminary Instructions to the Jury (Dkt. 582)**

18    **at Instruction #15, the agreed facts:  "GEO has the option to pay more than $1/day to**

19    **detainee workers for work performed in the Voluntary Work Program at the Center.")**

20    **Derivative sovereign immunity does not apply.**

21          This is the time for Findings of Fact and Conclusions of Law in the third phase of this case.

22    As I indicated the other day, it is my habit to give oral opinions, including Findings of Fact and

23    Conclusions of Law.  They need not be reduced to writing under Federal Rule of Civil Procedure

24

52(a)(1). That rule requires that findings and conclusions be stated separately.  I try to do that, but there are some mixture of findings and conclusions when one gives an oral opinion.

My first finding are the admitted facts that are found in the pretrial order and in the preliminary jury instructions submitted to the jury early in this proceeding.  I adopt those agreed facts as my Findings of Fact, which covers part of the issues in the case.

I have before me, in addition to those agreed facts, the events of the joint trial and the events of the short addition to trial that was held without a jury.  I have the jury's verdicts before me.

The information presented is considerable.  A lot of it, I need not comment on, but there is a great deal I need to comment on in making findings and conclusions.

One thing that I found in this case is that there was no substantial change in the voluntary work program or in the way it operated from 2005, the time of the contract between GEO and ICE, until now.  **Similarly, GEO had the discretion to pay detainee workers more than $1/day throughout this entire period and did, in fact, pay more than $1/day on occasion during periods covered by former PBNDS Standards and the prior ICE-GEO contracts.**  It is appropriate that we consider all of that time, not only the time from the start of this lawsuit in 2017.

This case has been based not only on what has been occurring on the site of the detention facility, but also it is based on the ICE-GEO contract.  That contract is found at Exhibit 129.  It is a complex contract.  In order to fully understand it, one has to be aware of and consider Exhibit 127, which is the PBNDS standards that I will refer to as the "standards." It is in those standards that we find that the minimum wage to be paid to detainees engaged in the voluntary work program is "at least a dollar a day."

1    I think I should first address here the purpose of the contract.  That is found in a couple of

2    places in the record, and I have decided I should refer to the Bates stamped pages because the

3    paging in the contract and the standards can be quite confusing.

4    There are two places that the purpose of the contract between ICE and GEO are set out.

5    One is at Exhibit 129.  I will be referring mostly to that contract here at Bates No. 036867.  The

6    objective of the GEO and US Immigration and Customs Enforcement contract is to obtain a

7    facility for the detention, transportation and food services for the detainees located in the Seattle,

8    Washington area.

9    At another page or pages it goes on to say, and this is at Bates 03869, "The GEO contract

10   with ICE is to provide detention management services, including the facility, detention officers,

11   management personnel, supervision, manpower, training certificates, licenses and supplies."

12   GEO also agreed they are to be responsible for other ancillary services, including, but not

13   limited to, transportation and food service.

14   The ancillary services mentioned in the contract, obviously, from all the evidence in the

15   case, include maintaining a clean environment, laundry services, food services, and barber

16   services.

17   The purpose of the contract is also found in great detail in the contract at Bates

18   Nos. 036881 to 883.  I don't need to go through all of that.  What is clear from those provisions is

19   that GEO was to provide certain core services, including food service, laundry, cleaning, and

20   barber services.  It is those things that are mostly at issue in this case.

21   The purpose of the voluntary work program, the program, of course, being at the heart of

22   this case, is found a couple of places in the standards and in the contract.  The standards provide

23   that the purpose of the voluntary work program, according to the standards, is to provide

24

detainees opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security and good order of the facility.

It is clear under the contract, GEO agreed to develop a detainee work program that is voluntary and may include work or program assignments for industrial, maintenance, custodial service or other jobs.  In that provision, it also says the detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations.  That covers the purposes of the voluntary work program.

The next issue is the question about whether there is a necessity for GEO to follow state laws, including the Minimum Wage Act.  Besides the provision that I just referred to, there are many places in the contract that indicate that part of GEO's requirements is to comply with all federal, state and local labor laws and codes, and all applicable federal, state and local laws and codes.  It is also clear that the contract indicates that if there are issues about those standards, the most stringent standard shall apply.  That language being at Bates 06876.

Those provisions speak of the applicability of State laws, and the only evidence in the record that the State Minimum Wage Act did not apply to the voluntary work program and to detainees came from a couple of witnesses who opined that the Minimum Wage Act was not applicable under the contract.  They gave no reason for their opinions, except the argument was made that GEO has never interpreted the contract to include the Minimum Wage Act as applicable at all.  That is no argument at all.  **There is no credible information in the record that indicates that that particular local labor law, the Minimum Wage Act, should not apply.  The contract speaks for itself , and indicates, by plain inference and plain meaning, that among the state laws that are applicable, the Minimum Wage Act should apply.**

1    In that regard, I wanted to refer further to the constraints on the contract that GEO was

2 obligated to know and, I think, to apply.  That appears at Bates 036868.  There are not just one,

3 but four constraints that are, I think, important to consider in regard to the applicability of the

4 Minimum Wage Act.

5    Constraint (p) refers to "applicable federal, state facility codes, rules, regulations and

6 policies."

7    (q) provides the constraint that they "must follow applicable federal, state and local labor

8 laws and codes."

9    (r) provides they are to "follow applicable federal, state and local firearm laws, regulations

10 and codes."

11    Lastly in this group, subparagraph (s) provides that "GEO should consider alignment with

12 external sources," that is state and local law enforcement organizations.

13    It is clear from those four provisions that there is, built in to the contract, an expectation

14 that GEO will consider local laws and decide, based on facts and evidence, as to what should

15 apply, and should not just come to the conclusion that something applies or doesn't apply based

16 on the whim of GEO.

17    I must say I found the testimony of those witnesses who opined that the Minimum Wage

18 Act was not applicable was not believable.  I think they came to that conclusion for reasons other

19 than the merits that were to be considered under the terms of the contract.

20    I want to comment here also that the reimbursement rate in the contract is not relevant to

21 the issues in this case.  Whether the reimbursement rate goes up in the future to cover higher

22 wages to detainees is unknown.  It is clear from the agreed facts that GEO could pay more

23 regardless of that reimbursement rate.

24

MEMORANDUM OF DECISION INCLUDING AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

1    As I indicated, it is also clear that there are core obligations of GEO in the case and that the

2 detainee workers under the voluntary work program were not to be used to perform the

3 responsibilities or duties of an employee of the contract.  It appears to me that that is largely

4 what brings us here today is that the voluntary work program detainees were doing substantially

5 the core work required of GEO under the contract.

6    I would comment in that regard on the testimony of Bertha Henderson, the main head

7 cook, who seemed like a nice lady and a competent head cook.  She testified at great length

8 about her responsibilities of leadership and management of the food service program.  As she

9 testified, my mind went to, well, who is doing the work?  The answer was the very many

10 members of the detainee work program, who are doing various parts of food preparation and

11 food service and doing the work that the contract required be done by GEO.

12    It is my conclusion, from all the evidence in the case, that GEO, by ignoring the Minimum

13 Wage Act and misusing the detainee labor to do core work that was required of GEO under the

14 contract and that they were not to be doing under the contract, that GEO profited and continued

15 to violate the Minimum Wage Act by paying the minimum of only one dollar a day.

16    Those are my Findings of Fact on the first portion of the case.

17    It is my conclusion that the jury's two verdicts were well supported by the evidence, and I

18 agree with those findings of the jury and with those verdicts, and that is part of my Findings and

19 Conclusions.

20    Now, let me turn more directly to the basis for the State's claim.  The State has brought this

21 action under the State's parens patriae authority, alleging unjust enrichment.  The defendants

22 have argued that the State has the burden of proving that there is no legal remedy available to

23 them as a condition for any equitable relief.

24

MEMORANDUM OF DECISION INCLUDING AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

1    **The findings and conclusions of this Order related to the PBNDS, the purposes of the**

2    **VWP, and the provisions of GEO's contract are included as part of the Court's evaluation**

3    **of the equities of Washington's Unjust Enrichment claim.**

4    **The Court also finds, independent of the MWA, that Washington proved all three**

5    **prongs of Unjust Enrichment in this case: 1) GEO benefitted from detainee labor both**

6    **operationally and financially, as that work fulfilled core services that GEO agreed to**

7    **perform under its contract with ICE and GEO was paid for; 2) GEO was aware of the**

8    **benefit conferred on it by detainee workers, recognized it as 'meaningful and valuable,'**

9    **and GEO itself created the detainee job descriptions, assigned detainees to particular jobs**

10   **that needed to get done, and supervised their work to ensure they performed satisfactorily;**

11   **and 3) it is unjust for GEO to have paid them only $1/day from October 2005 to present**

12   **and retain the benefit of that labor while paying inadequate wages.**

13   I want to point out something that seems to me to be important in this whole analysis.  The

14   members of the class are part of the State's representation of those harmed by failure to pay the

15   minimum wage.  They are, along with all the other people protected by the Minimum Wage Act,

16   part of who the State has brought this case on behalf of.  You can't separate them out as not being

17   part of the body of people that are protected by the Minimum Wage Act.

18   There is a legal remedy to that extent that the jury has already ruled on, but there are the

19   rest of the people protected by the Minimum Wage Act for whom there is no legal remedy.  It is

20   appropriate to examine the evidence to determine whether the unjust enrichment claim has been

21   made out.

22

23

24

MEMORANDUM OF DECISION INCLUDING AMENDED FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 8

1       In that regard, the Consumer Protection Act in the Revised Code of Washington 19.86

2   does not apply.  It is not the basis for the State's claim, and it is limited by its terms to consumer

3   protection.  So it is not relevant here.

4       What is relevant to the State's claim is the law as it occurs in the State case of *Young vs*

5   *Young* found at 164 Wn.2d 477.  The *Young* case differentiated between quantum meruit and

6   unjust enrichment, and this language is from that case:  "Unjust enrichment is the method of

7   recovery for the value of the benefit retained, absent any contractual relationship, because

8   notions of fairness and justice require it.

9       "Unjust enrichment occurs when one retains money or benefits, which in justice and equity

10  belong to another." That page went on to say, "The three elements that must be established in

11  order to sustain a claim based on unjust enrichment are: a benefit conferred upon the defendant

12  by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance

13  or retention by the defendant of the benefit under such circumstances as to make it inequitable

14  for the defendant to retain the benefit without the payment of its value."

15      This case is different.  It doesn't have the same factual background, the same parties as

16  *Young*.  To interpret that case and to apply it here, it appears to me the first requirement is a

17  benefit conferred on GEO by the State of Washington.  That is, the benefit is the failure to pay

18  the minimum wage or the failure to collect the minimum wage for many years.

19      As to knowledge of the benefit they were getting, GEO knew or should have known that

20  payment under the Minimum Wage Act should have been made and considered.

21      Last, is it unfair for GEO to retain the benefit?  The answer to that is "yes."

22

23

24

MEMORANDUM OF DECISION INCLUDING AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

1        There was a lot of argument on the last day about the equities because the last requirement

2  of proof is unfairness.  That is sort of a moving target, because what is fairness to one person

3  may not be fairness to another.  The Court needs to consider, in that regard, the totality of the

4  circumstances. I wanted to point out a few things, although I am not sure how important this

5  analysis is to the bottom line.

6        First, GEO has argued that they should not have been aware or should not be required to

7  have been aware of the Minimum Wage Act.  Ignorance of the law is no excuse.  **Everybody in**

8  **the state, with some narrow exceptions not relevant here, is obligated, if they permit people**

9  **to work, that the Minimum Wage Act applies.**

10        Deliberate ignorance should not be rewarded.  It appears to me that the position of GEO

11  was not necessarily ignorant, but more deliberate ignorance.

12        There was argument on other matters.  There are statutes of limitation.  Most in the State, I

13  think, are three-year statutes.  There are some two-year and some longer.  That is true that most

14  claims have limitations periods.

15        There is a reason for this claim and claims like it not having a statute of limitation, and that

16  is because there have been some 16 years of failure to follow the law and the contract and 16

17  years of unfairness to detainees involved in the voluntary work program.

18        GEO also argues that the State doesn't pay its detainees, and it maintains a voluntary work

19  program in some of its institutions.  The exception for state governmental programs is clear on

20  the law, and it is there for good reason.  This program, under control of the private corporation, is

21  different than the provision in the Minimum Wage Act regarding State programs.

22        There was much argument and now evidence in the record about the Department of Labor

23  & Industries' early conclusions about this issue, and doubts they had about whether the Minimum

24

1    Wage Act could be enforced against GEO.  Those debates never were with GEO or ICE.  They

2    were discussions that people had, but there was no formal State judgment or determination that

3    the Minimum Wage Act did not apply.

4           Also argued as a matter of equity is the question of the government's interest and their

5    notice of interest in this case.  That was litigated to some extent some time ago, and I, frankly,

6    thought it was misplaced interest.  The question is:  What about now, what is the government's

7    interest?

8           I think ICE's absence from this case speaks volumes.  As near as I can tell, the

9    government's interest and ICE's interest is in having the contract enforced according to its terms.

10   I guess that is all I have to say about that.

11          The equities in the case in considering the totality of the case and the circumstances -- the

12   equities favor the State.  The amount of the remedy to the State is not based on comparative

13   equities.  It is based on the unfairness of the amount that GEO should have paid and did not.

14          Now, I am coming to the question of what remedy should be provided here.  The first issue

15   in this regard was whether the Court should consider the minimum wage or the prevailing wage.

16          In looking at Dr. Nickerson's numbers and estimates, it is my judgment that all of the

17   voluntary work program detainees that worked at the GEO facility were for jobs at the entry

18   level as unskilled labor.  Some of them, of course, had more skills than others.  What they were

19   used for in the kitchen, in the food service, in the pods, in the laundry, was entry-level, unskilled

20   work.  I think it is not appropriate to use prevailing wages for those things, based on some other

21   standard, other than the minimum wage program.  I think the minimum wage program is what

22   the standard should be.

23

24

Now, Dr. Nickerson's estimates and numbers have not been challenged.  It appears that they are reasonable.  He multiplied the estimates of hours worked by minimum wages going back to 2005 up to the present and computed out those figures, and then deducted from them the one dollar per day wages actually paid to detainees.  He got the bottom line of $23,237,403. That seems to me to be an appropriate base.

I think it is inappropriate, as I indicated, to use some standard of prevailing wages.  I think it is appropriate to use the minimum wage as he did in the documents he presented and in his testimony.

I think it is not appropriate to add to that number the FICA addition.  The State and the citizens of the State haven't lost that money.  It would not ever have been paid to the State.  It seems to me not something that ought to be added to the base number I mentioned.

It also seems to me that it is not appropriate to add the interest figures that Dr. Nickerson ran for us.  These numbers are only estimates, after all.  The citizenry, it seems to me, has not, or the State has not lost those things.  It appears to me that it would be punitive to add those things in, and we are dealing with a number that is not sufficiently certain in amount to justify adding interest to it or to attempt to multiply the number somehow upward to the conceived present value. I think that exercise is too speculative to be justified here.

We start with the basic figure from Dr. Nickerson of $23,237,403 as reflected in his Exhibit No. 620.

The next question is whether the award to the class should be deducted from that or not.  It appears to me that the class action has succeeded in recovering the same numbers that are covered in that $23 million figure.  To have GEO pay that number twice is a double recovery that would not be appropriate.

1    The class members that recovered the $17 million verdict are people permitted to work and

2    within the broad group of those protected by the Minimum Wage Act, so that is the same number

3    as the first $17 million of the $23 million that I mentioned.

4    My bottom line is that we should subtract from $23,237,403 the $17,287,063 that was the

5    class's recovery, for a net unjust enrichment against the Defendant GEO in the sum of

6    $5,950,340.  It is my Conclusions of Law that that amount should be reduced to a judgment in

7    favor of the State.

8    Now, one can argue, of course, about unjust enrichment, whether we are really talking

9    about disgorgement.  It was not possible from what was presented to find a reasonable number to

10   justify a disgorgement of profit.  The profits based on GEO's acts are unspecified in the

11   evidence, in my opinion, and the unjust enrichment and restitution are the same number.

12   I want to point out this is not a penalty.  I think that the Court should not set out to penalize

13   GEO, but rather to try to even the playing field by the award of unjust enrichment for monies

14   that should have been paid and were not paid. Now, that is part of what I must decide.

15   The State has also asked for an injunction.  I have thought about that considerably from the

16   beginning of this case, without coming to very good conclusions, perhaps.

17   It seems to me that an injunction against GEO should be issued to this extent:  GEO should

18   be enjoined from continuing operation of the voluntary work program as it has been operating

19   without paying detainee workers the minimum wage.

20   Let me repeat that:  They should be enjoined from continuing operation of the voluntary

21   work program as it has been operated without paying detainee workers the minimum wage.

22   The Court will not require specific changes to the voluntary work program, nor do I know

23   the effect of any changes to the Minimum Wage Act requirements.  I would not speculate as to

24

MEMORANDUM OF DECISION INCLUDING AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13

the employment status of detainee workers if they are receiving the minimum wage.  I won't require reports.

On the other hand, GEO should cooperate with the State as the contract contemplates in the listed constraints requirements, including the restraint (s), which requires "alignment with external sources," which includes the Attorney General, which is a state law enforcement organization as GEO should clearly now know.

The injunction is only directed at how things have been operating and not how things might operate in the future.

I am mindful that I have made scores of controversial decisions in these cases, and that the results are contrary to what the defendant says are 150 court decisions that have gone the other way.

I am not aware of any of those 150 cases that have the extensive record of abuse of the voluntary work program and detainees that exists in this case.  I am aware that many of those cases wrongly conflate immigration detainees with criminals under sentence or awaiting trial.

Immigration detainees, as a group, have not been found to have committed any crime, but are awaiting civil procedures that may lead ultimately to U.S. residence and citizenship or, of course, may lead to deportation.

I learned at the National Judicial College in 1967 that "judges should not turn their backs on the locked prison gates."  That thought is even more important as it relates to civil detention facilities.

I hope that other judges who review these proceedings will not be swayed by the idea, as quoted in the *Ndambi vs Corecivic* case at 990 F.3d, 369, that "fair payment for prisoners is too outlandish to consider."

1    Judgment will be entered probably tomorrow, not only the money judgment, but the

2    limited injunction that I referred to.

3    If there are any Findings that I have overlooked or Conclusions that I have overlooked, you

4    should bring those to my attention by motion and I can supplement, if I have omitted anything

5    that is important.

6    Thank you, all.

7    * * *

8    IT IS SO ORDERED.

9    The Clerk is directed to send uncertified copies of this Order to all counsel of record and

10   to any party appearing pro se at said party's last known address.

11   Dated this 8th day of December, 2021.

12

13   _Robert J. Bryan_ (signature)

14   ROBERT J. BRYAN
     United States District Judge

15

16

17

18

19

20

21

22

23

24

MEMORANDUM OF DECISION INCLUDING AMENDED FINDINGS OF FACT AND CONCLUSIONS OF
LAW - 15